# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## COLUMBUS DIVISION



FILED
JAMES BONINI
CLERK

08 JUN 30 PM 2:12

U.S. DIST. COURT
S. DIST. OHIO
EAST. DIV. COLUMBUS

|  |  |
|---|---|
| **SUHAIL NAJIM ABDULLAH AL SHIMARI** <br> Baghdad, Iraq <br><br> Plaintiff <br><br> v. <br><br> **TIMOTHY DUGAN** <br> 75 S. Township Road <br> Pataskala, Ohio 43062 <br><br> **CACI INTERNATIONAL, INC.** <br> 1100 North Glebe Road, <br> Arlington, Virginia 22201 <br><br> **CACI PREMIER TECHNOLOGY, INC.** <br> 1100 North Glebe Road, <br> Arlington, Virginia 22201 <br><br> **L-3 SERVICES, INC.** <br> 1320 Braddock Place <br> Alexandria, VA 22314 <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**CIVIL COMPLAINT
AND JURY DEMAND**

**2:08 cv 637**

**JUDGE FROST**

**MAGISTRATE JUDGE KEMP**

## COMPLAINT

1.      Suhail Najim Abdullah Al Shimari, an Iraqi civilian, was imprisoned and tortured at Abu Ghraib, a prison in Iraq. He brings this tort action against those who tortured, and conspired with others to torture, him: Timothy Dugan, a resident of the Columbus Division of the Southern District of Ohio, CACI, and L-3 Services (formerly Titan Corporation), both publicly-traded corporations that made millions of dollars selling the services of Dugan and other employees to the United States military.

## JURISDICTION AND VENUE

2.      This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1332 (diversity jurisdiction); 28 U.S.C. § 1350 (Alien Tort Statute); and 28 U.S.C. § 1367 (supplemental jurisdiction).

3.      Venue is proper pursuant to U.S.C. § 1391(a)(3) and § 1391(b)(2).

4.      Plaintiff Suhail Najim Abdullah Al Shimari resides in Baghdad, Iraq. He is an innocent Iraqi who was badly tortured by defendants and their co-conspirators.

5.      Defendant Timothy Dugan is an individual residing at 75 S. Township Road, Pataskala, Ohio 43062. He currently works for S.C. Solutions Inc., 4119 Ashgrove Drive, Grove City, Ohio 43123.

6. Defendant Dugan was employed by Defendant CACI as a screener and interrogator at Abu Ghraib prison and other prisons in Iraq from October 2003 to May 2004.

7. Defendant CACI International Inc. is a publicly-traded Delaware corporation with headquarters located at 1100 North Glebe Road, Arlington, Virginia 22201. Defendant CACI Premier Technology, Inc. is a wholly-owned subsidiary and alter ego of CACI International Inc., and is also located at 1100 North Glebe Road, Arlington, Virginia 22201.

8. CACI received millions of dollars from the United States in exchange for providing the United States Army with services, including interrogation services.

9. Defendant L-3 Services, Inc. is a publicly-traded Delaware corporation with headquarters located at 1320 Braddock Place, Alexandria, Virginia 22314. L-3 employed all the civilian translators used by the military in Iraq, including a man named Adel Nakhla.

10. L-3 received millions of dollars from the United States in exchange for providing the United States Army with services, including translation and interrogation services.

## THE TORTURE OF SUHAIL NAJIM ABDULLAH AL SHIMARI

11.    Mr. Al Shimari was repeatedly and gravely tortured by Defendants and their co-conspirators after being arrested at his home on or about November 7, 2003.

12.    After his arrest, Mr. Al Shimari was placed in a cage, and threatened with death and with being taken to a "far away" place. He was threatened with dogs.

13.    Thereafter, Mr. Al Shimari was moved to the "hard site" at the Abu Ghraib prison. He remained there for approximately two months, after which he was transferred first to the Abu Ghraib tent prison and then to Camp Bucca, another prison in Iraq. Mr. Al Shimari was kept imprisoned for no reason for more than four years. On or about March 27, 2008, Mr. Al Shimari was finally released – without ever having been charged with any crime or having received any judicial process.

14.    Mr. Al Shimari was subjected to electric shock during interrogations conducted at the Abu Ghraib prison.

15.    Mr. Al Shimari was struck with a baton-like instrument and beaten.

16.    Mr. Al Shimari was deprived of food.

17.    Mr. Al Shimari was deprived of sleep for extended periods of time.

18. Mr. Al Shimari was threatened with dogs.

19. Mr. Al Shimari was subjected to sensory deprivation and to extreme temperatures.

20. Mr. Al Shimari was stripped naked and kept naked in his cell.

21. Mr. Al Shimari was threatened with death.

22. Mr. Al Shimari was kept naked and forced to engage in physical activity to the point of exhaustion.

23. Mr. Al Shimari was forcibly shaved.

24. Mr. Al Shimari was forced to watch as Defendants and their co-conspirators choked another prisoner.

25. Mr. Al Shimari returned to Baghdad after his release. He reunited his family, and now makes a living by farming his land.

## THE TORTURE CONSPIRACY

26. Although Mr. Al Shimari was often hooded when he was being interrogated and tortured, and he was never told the names of his torturers, certain facts about the "hard site" torture are known.

27. The facts known to date show that Dugan, other CACI employees (*e.g.* Steven Stefanowicz (hereinafter "Big Steve") and Daniel Johnson), and L-3 employees (*e.g.* Adel Nakhla), conspired with certain military personnel to torture

prisoners kept at the Abu Ghraib hard site. Dugan and other corporate employees instigated, directed, participated in, aided, and abetted conduct towards prisoners that clearly violated the Geneva Conventions, the Army Field Manual, and the laws of the United States.

28.     Defendant Dugan personally engaged in the torture of prisoners. Dugan threw a handcuffed and hooded prisoner from a vehicle onto the ground, and dragged him across the rocks to an interrogation booth, bruising the prisoner. Whenever the prisoner tried to get up to his knees, Dugan knocked him down again.

29.     Defendant Dugan bragged to other interrogators that he had broken an Iraqi general during interrogation by threatening the general's son. Dugan and other interrogators had roughed up the son, ripped his clothes, and smeared mud on him, to make it look as though he had been severely beaten, and brought him into his father's interrogation booth.

30.     Defendant Dugan struck prisoners, deprived them of sleep, stripped them naked, shackled them in painful positions, and threatened prisoners and their family members.

31.     Military intelligence soldiers were not able to prevent Dugan and other CACI interrogators from abusing prisoners. Dugan bragged to a non-conspiring soldier on his interrogation team that he had frightened a prisoner

during interrogation so badly that the prisoner had vomited. The soldier John Neal, told military investigators in a sworn statement that he when he instructed Dugan to cease torturing prisoners and comply with Army Field Manual 34-52, Dugan responded, "I have been doing this for 20 years and I do not need a 20-year-old telling me how to my job."

32.     Torin Nelson, another CACI employee, reported his suspicions that Dugan had tortured prisoners to the U.S. Army's Criminal Investigation Division. When Dugan learned of this from co-conspirators, he threatened Nelson that "You better watch your back," and that "You're dead to me." Nelson, fearing for his physical safety, left his job with CACI and left Iraq.

33.     The acts of Dugan and other CACI employees constitute acts of CACI. CACI conveyed its intent to join the conspiracy by making a series of verbal statements and by engaging in a series of criminal acts of torture alongside and in conjunction with several co-conspirators.

34.     CACI's motivation was wholly financial -- it made millions of dollars as a result of keeping quiet about and participating in the conspiracy to torture and mistreat Mr. Al-Shimari and other prisoners.

35.     Dugan and his fellow CACI interrogators were not the only corporate employees involved in the hard site torture. L-3 translators, including Adel

Nakhla, participated at every step along the way, translating threats and in some instances assisting with the physical torture of hard site victims.

36. The acts of Adel Nakhla and other L-3 translators constitute acts of L-3. L-3 conveyed its intent to join the conspiracy by making a series of verbal statements and by engaging in a series of criminal acts of torture alongside and in conjunction with several co-conspirators.

37. L-3's motivation was wholly financial -- it made millions of dollars as a result of keeping quiet about and participating in the conspiracy to torture and mistreat Mr. Al Shimari and other prisoners.

## CACI AND L-3 COULD HAVE PREVENTED AND STOPPED THEIR EMPLOYEES FROM TORTURING MR. AL SHIMARI

38. Dugan worked for CACI Premier Technology. CACI Premier Technology is an alter ego of CACI International Inc., not a separate fully-capitalized business governed and controlled by independent executives with full autonomy. CACI International Inc. wholly owns and controls CACI Premier Technology, and operates CACI Premier Technology as one of its corporate divisions. CACI International Inc. executives controlled how and whether CACI Premier Technology did business in Iraq.

39. CACI has admitted that it had the ability to control, direct and influence the actions performed by Dugan and their other employees. CACI had

the ability to prevent Dugan and the other employees from torturing Mr. Al Shimari.

40. Adel Nakhla worked for L-3, as did the other translators who kicked, beat, and threatened Mr. Al Shimari. L-3's Adel Nakhla has confessed to government officials that he participated in torturing hard site prisoners.

41. L-3 had the ability to control, direct, and influence the actions taken by their employees who directly participated in the torture of prisoners. L-3 had the ability to prevent Nakhla and the other translators from torturing prisoners.

42. CACI and L-3 at all times were obliged by the terms of its contract to supervise their employees such as Dugan and Nakhla.

43. CACI and L-3 at all times retained the ability to stop Dugan, Nakhla, and their other employees from torturing Mr. Al Shimari.

44. CACI and L-3 are responsible for the actions taken by their employees towards Mr. Al Shimari.

## DEFENDANTS AND THEIR CO-CONSPIRATORS TOOK STEPS TO COVER UP THE SCOPE AND EXTENT OF TORTURE

45. To date, the "investigations" of the events at Abu Ghraib have failed to include the fundamental step of interviewing the hard site victims.

46. Reasonable discovery will establish that, in addition to participating in the actual physical and mental abuse of the plaintiff, Dugan, other CACI

employees (including but not limited to Steve Stefanowicz and Daniel Johnson), Adel Nakhla, and other L-3 employees participated in other conspiratorial misconduct, including, but not limited to:

    (a)    destroying documents, videos, and photographs,

    (b)    preventing the reporting of the torture and abuse to non-conspiring authorities, the International Committee of the Red Cross ("ICRC"), and the media,

    (c)    hiding plaintiff and other prisoners from the ICRC, and

    (d)    misleading non-conspiring military and government officials about the state of affairs at the prisons.

## CACI IS ENGAGED IN ONGOING EFFORTS
## TO COVER UP THE TORTURE

47.    CACI has been an ongoing part of this conspiratorial campaign to prevent the truth about the torture, and CACI's participation, from ever being known to the public.

48.    CACI embarked upon a campaign of intimidation to suppress any coverage or investigation of their role in the conspiracy. CACI repeatedly had its lawyers send letters threatening legal action to reporters who were considering reporting on CACI's role in the torture and mistreatment of prisoners.

49.     As part of this campaign of intimidation, CACI brought a frivolous lawsuit against a radio station. CACI lost the lawsuit.

50.     Reasonable discovery will establish that CACI did not anticipate being able to prevail in the lawsuit, but rather brought it in order to intimidate media members who otherwise would have reported more fully on CACI's role in the torture.

51.     CACI has repeatedly made, and continues to make, knowingly false statements to the effect that none of its employees was involved in torturing prisoners. In fact, co-conspirators have admitted that CACI corporate employees were involved in the torture.

52.     CACI's former Chief Executive Officer has written a book called *Our Good Name*, claiming that CACI has conducted a thorough investigation, and found none of its employees at fault. Based on the description of the investigation found in this book, it appears that CACI's view of a "thorough investigation" is an investigation that fails to include any interviews of the Iraqi torture victims.

53.     Nor does the "thorough investigation" include interviews with the CACI employee Torin Nelson, who blew the whistle on the misconduct of his colleagues.

54.     The book falsely claims that the publicly-released photographs of torture at Abu Ghraib do not show any CACI employees. In fact, there is a

photograph of Daniel Johnson interrogating a prisoner in a dangerous and harmful stress position not authorized by the relevant military regulations governing interrogation.

55. Reasonable discovery will establish that CACI consulted with one or more of its co-conspirators during the preparation of this book.

## DEFENDANTS KNEW THAT THEIR TORTURE OF PRISONERS VIOLATED THE LAWS OF THE UNITED STATES

56. Dugan, CACI, and L-3 intentionally and knowingly agreed to and did work in concert with the co-conspirators. To the extent that any particular act was perpetrated by a co-conspirator, Dugan, CACI, and L-3 confirmed and ratified the same.

57. Defendants knew that the conspiracy to torture would harm Mr. Al Shimari.

58. CACI and L-3 earned millions of dollars in revenues as a result of participating in the ongoing conspiracy.

59. CACI and L-3 invested the financial fruits of the conspiracy in their ongoing operations.

60. Dugan, CACI, and L-3 knew that military officials were prohibited from torturing prisoners by the Army Field Manual and other controlling law, and that any military officials who were doing so were violating the law.

61.     Dugan, CACI, and L-3 knew that the United States government has denounced the use of torture and other cruel, inhuman, or degrading treatment at all times.  Dugan, CACI and L-3 knew that it was illegal for them to participate in, instigate, direct, or aid and abet the torture of plaintiff and other prisoners.

62.     For example, in its Initial Report to the United Nations Committee Against Torture, the United States Department of State noted that, "[t]orture is prohibited by law throughout the United States.  It is categorically denounced as a matter of policy and as a tool of state authority . . . .  No official of the government, federal, state or local, civilian or military is authorized to commit or to instruct anyone else to commit torture.  Nor may any official condone or tolerate torture in any form."  *U.S. Department of State: Initial Report of the United States of America to the U.N. Committee Against Torture, Introduction (1999).*  The State Department's Report on Human Rights Practices characterized the following as prohibited forms of torture:  mock executions, sensory deprivation, repeated slapping, exposure to cold, stripping and blindfolding, food and sleep deprivation, threats to detainees or family members, dripping water on the head, squeezing of the testicles, rape, and sexual humiliation.

63.     Dugan, CACI, and L-3 knew that the ban on torture is absolute and no exigent circumstances permit the use of torture.

64.     Dugan, CACI, and L-3 knew that the United States intended and required that any person acting under the contract to the United States would conduct themselves in accordance with the relevant domestic and international laws.

65.     Dugan, CACI, and L-3 knew and understood that the United States does not condone torture of prisoners.

66.     Defendants cannot credibly claim that the wrongful and criminal conduct of certain military and government personnel misled them into thinking that the torture of prisoners was lawful and permissible.

## THE CORPORATE DEFENDANTS ACTED NEGLIGENTLY

67.     CACI acted negligently and wrongfully by failing to prevent Dugan and other employees from engaging in foreseeable and predictable wrongful acts.

68.     L-3 acted negligently and wrongfully by failing to prevent Adel Nakhla and other employees assigned to Iraqi detention centers from engaging in foreseeable and predictable wrongful acts.

69.     CACI and L-3 acted negligently and wrongfully by failing to discipline those who engaged in wrongful acts in Iraq.

70.     CACI and L-3 acted negligently and wrongfully by failing to take due care in hiring employees being deployed to Iraq.

71.     CACI and L-3 acted negligently and wrongfully by failing to train their employees.

72.     CACI and L-3 acted negligently and wrongfully by failing to supervise adequately their employees. CACI admitted on its web site that CACI employees in Iraq work under "minimal supervision." L-3 has likewise admitted that it failed to supervise its employees.

73.     CACI and L-3 acted negligently and wrongfully by failing to investigate and report accusations of wrongdoing committed and witnessed by their employees and agents.

74.     CACI and L-3 profited financially from their negligent misconduct. The United States paid CACI and L-3 millions of dollars in exchange for their contractual promises to provide services in a lawful manner.

75.     Instead of providing those services in a lawful manner, CACI and L-3 failed to ensure that their employees and agents abided by the contract terms and a with the Geneva Conventions.

76.     Dugan, CACI, and L-3 injured Mr. Al Shimari and harmed the reputation of the United States throughout the world.

77.     Mr. Al Shimari seeks compensatory and punitive damages in an amount far in excess of the jurisdictional amount set forth in 28 U.S.C. § 1332 ($75,000).

78.    Mr. Al Shimari seeks any and all additional remedies (such as attorneys' fees) available under law.

## COUNT ONE
## TORTURE

79.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

80.    Defendants' acts and omissions were deliberate and intentional. Defendants acted purposefully to punish, intimidate, discriminate, and to obtain information from Plaintiff, who was in their physical custody and control.

81.    The acts committed by Defendants and their agents constitute torture in violation of the law of nations. The acts of torture committed against Plaintiff include, among other things, beatings, forced nudity, death threats, withholding of food, water and necessary medical care, and intentional exposure to extremes of heat and cold.  The acts, done by Defendants working under contract with the United States, directly contradicted domestic law and the United States' express policy against torture.

82.    Defendants' misconduct caused grave and foreseeable injuries to Plaintiff.

## COUNT TWO
## CIVIL CONSPIRACY TO TORTURE

83. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

84. Defendants agreed with each other and others to participate in a series of unlawful acts.

85. Each Defendant performed one or more overt acts pursuant to and in furtherance of the common scheme.

86. Defendants are liable for torture because they set the conditions, directly and indirectly facilitated, ordered, acquiesced, confirmed, ratified, and conspired with others to torture Plaintiff.

87. Defendants' knowing participation in the conspiracy caused grave and foreseeable damages to Plaintiff.

## COUNT THREE
## AIDING AND ABETTING TORTURE

88. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

89. Defendants knowingly and substantially assisted others in torturing Plaintiff.

90. Defendants are liable for the torture because they aided and abetted others who were torturing Plaintiff.

91.    Defendants' substantial assistance caused grave and foreseeable damages to Plaintiff.

## COUNT FOUR
## CRUEL, INHUMAN OR DEGRADING TREATMENT

92.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

93.    The acts described herein had the intent and the effect of causing serious mental and physical pain and suffering to Plaintiff, grossly humiliating and debasing the Plaintiff, and forcing him to act against is will and conscience, inciting fear and anguish and breaking his physical or moral resistance.

94.    Defendants set the conditions, directly and indirectly facilitated, ordered, acquiesced, confirmed, ratified, and conspired with others to subject Plaintiff to cruel, inhuman or degrading treatment.

95.    Defendants are liable for their conduct that led to the cruel, inhuman and degrading treatment of Plaintiff.

96.    Defendants' misconduct caused grave and foreseeable injuries to Plaintiff.

- 18 -

## COUNT FIVE
## CIVIL CONSPIRACY TO TREAT PLAINTIFF IN
## A CRUEL, INHUMAN OR DEGRADING MANNER

97.     All preceding paragraphs are hereby incorporated by reference as if
fully set forth herein.

98.     Defendants agreed with each other and others to participate in a series
of unlawful acts.

99.     Each Defendant performed one or more overt acts pursuant to and in
furtherance of the common scheme.

100.    Defendants are liable for the cruel, inhuman, and degrading treatment
of Plaintiff because they set the conditions, directly and indirectly facilitated,
ordered, acquiesced, confirmed, ratified, and conspired with others to so treat
Plaintiff.

101.    Defendants' knowing participation in the conspiracy caused grave and
foreseeable damages to Plaintiff.

## COUNT SIX
## AIDING AND ABETTING
## CRUEL, INHUMAN AND DEGRADING TREATMENT

102.    All preceding paragraphs are hereby incorporated by reference as if
fully set forth herein.

103.    Defendants knowingly and substantially assisted others in treating
Plaintiff in a cruel, inhuman, and degrading manner.

104. Defendants are liable for the injuries caused by the cruel, inhuman, and degrading treatment because they substantially aided and abetted others in so treating Plaintiff.

105. Defendants' knowing and substantial assistance to others caused grave and foreseeable damages to Plaintiff.

## COUNT SEVEN
## WAR CRIMES

106. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

107. Defendants' acts were deliberate, willful, intentional, wanton, malicious, and oppressive and constitute grave breaches of the Geneva Conventions and war crimes. These acts included torture, cruel, inhuman and degrading treatment, and willfully causing great suffering and serious bodily injury to Plaintiff.

108. Defendants' acts took place during a period of armed conflict, in connection with hostilities.

109. Defendants set the conditions, directly and indirectly facilitated, ordered, acquiesced, confirmed, ratified, and conspired with others to commit war crimes against Plaintiff.

110. Defendants are liable for their conduct that constitutes war crimes.

111. Defendants' misconduct caused grave and foreseeable injuries to Plaintiff.

## COUNT EIGHT
## CIVIL CONSPIRACY TO COMMIT WAR CRIMES

112. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

113. Defendants agreed with each other and others to participate in a series of unlawful acts.

114. Each Defendant performed one or more overt acts pursuant to and in furtherance of the common scheme.

115. Defendants are liable for war crimes against Plaintiff because they set the conditions, directly and indirectly facilitated, ordered, acquiesced, confirmed, ratified, and conspired with others to commit war crimes against Plaintiff.

116. Defendants' knowing participation in the conspiracy caused grave and foreseeable damages to Plaintiff.

## COUNT NINE
## AIDING AND ABETTING COMMISSION OF WAR CRIMES

117. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

118. Defendants knowingly and substantially assisted others in committing war crimes against Plaintiff.

119. Defendants are liable for the injuries caused by the war crimes because they substantially aided and abetted others in committing war crimes against Plaintiff.

120. Defendants' knowing and substantial assistance to others in the commission of war crimes caused grave and foreseeable damages to Plaintiff.

## COUNT TEN
## ASSAULT AND BATTERY

121. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

122. Defendants unlawfully intended to and did inflict immediate injury upon Plaintiff.

123. Defendants intentionally assaulted, battered, and made other offensive contacts' and aided and abetted the assaulting and battering and offensively contacting, of the Plaintiff.

124. Plaintiff did not consent to the offensive contacts. Plaintiff feared his personal safety and felt threatened by Defendants' actions.

125. Defendants set the conditions, directly and indirectly facilitated, ordered, acquiesced, confirmed, ratified, and conspired with others to commit the assaults and batteries.

126. Defendants' acts caused grave and foreseeable damages to Plaintiff.

## COUNT ELEVEN
## CIVIL CONSPIRACY TO ASSAULT AND BATTER

127. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

128. Defendants agreed with each other and others to participate in a series of unlawful acts.

129. Each Defendant performed one or more overt acts pursuant to and in furtherance of the common scheme.

130. Defendants are liable for the assaults and batteries against Plaintiff because they because they set the conditions, directly and indirectly facilitated, ordered, acquiesced, confirmed, ratified, and conspired with others to commit the assaults and batteries.

131. Defendants' knowing participation in the conspiracy to assault and batter caused grave and foreseeable damages to Plaintiff.

## COUNT TWELVE
## AIDING AND ABETTING
## ASSAULTS AND BATTERIES

132. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

133. Defendants knowingly and substantially assisted others in assaulting and battering Plaintiff.

134.   Defendants are liable for the injuries caused because they substantially aided and abetted others in assaulting and battering Plaintiff.

135.   Defendants' knowing and substantial assistance to others caused grave and foreseeable damages to Plaintiff.

## COUNT THIRTEEN
## SEXUAL ASSAULT AND BATTERY

136.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

137.   Plaintiff was sexually assaulted and battered by Defendants and their co-conspirators.

138.   Defendants intended to, and did, cause offensive sexual contacts with intimate parts of Plaintiff. Defendants acted to cause Plaintiff imminent apprehension of harmful and offensive contact with his intimate parts.

139.   Plaintiff did not consent to the contacts. Plaintiff feared for his personal safety and felt threatened by Defendants' actions.

140.   Defendants set the conditions, directly and indirectly facilitated, ordered, acquiesced, confirmed, ratified, and conspired with others to sexually assault and batter Plaintiff.

141.   Defendants' act caused grave and foreseeable damages to Plaintiff.

## COUNT FOURTEEN
## CIVIL CONSPIRACY TO SEXUALLY ASSAULT AND BATTER

142. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

143. Defendants agreed with each other and others to participate in a series of unlawful acts.

144. Each Defendant performed one or more overt acts pursuant to and in furtherance of the common scheme.

145. Defendants are liable for the sexual assaults and batteries against Plaintiff because they set the conditions, directly and indirectly facilitated, ordered, acquiesced, confirmed, ratified, and conspired with others to sexually assault and batter Plaintiff.

146. Defendants' knowing participation in the conspiracy caused grave and foreseeable damages to Plaintiff.

## COUNT FIFTEEN
## AIDING AND ABETTING
## SEXUAL ASSAULTS AND BATTERIES

147. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

148. Defendants knowingly and substantially assisted others in sexually assaulting Plaintiff.

149. Defendants are liable for the injuries caused by the crimes because they substantially aided and abetted others in sexually assaulting and battering Plaintiff.

150. Defendants' knowing and substantial assistance to others caused grave and foreseeable damages to Plaintiff.

## COUNT SIXTEEN
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

151. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

152. Defendants intentionally inflicted severe emotional distress by way of extreme and outrageous conduct on Plaintiff. Defendants intended or recklessly disregarded the probability of Plaintiff suffering emotional distress when directing offensive conduct toward Plaintiff or carrying out offensive conduct while aware of Plaintiff's presence.

153. Defendants set the conditions, directly and indirectly facilitated, ordered, acquiesced, confirmed, ratified, and conspired with others to inflict emotional distress on Plaintiff.

154. Defendants' acts caused grave and foreseeable injuries to Plaintiff.

## COUNT SEVENTEEN
## CIVIL CONSPIRACY TO INFLICT EMOTIONAL DISTRESS

155. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

156. Defendants agreed with each other and others to participate in a series of unlawful acts.

157. Each Defendant performed one or more overt acts pursuant to and in furtherance of the common scheme.

158. Defendants are liable for intentional infliction of emotional distress on Plaintiff because they because they set the conditions, directly and indirectly facilitated, ordered, acquiesced, confirmed, ratified, and conspired with others to inflict emotional distress on Plaintiff.

159. Defendants' knowing participation in the conspiracy to inflict intentionally emotional distress caused grave and foreseeable damages to Plaintiff.

## COUNT EIGHTEEN
## AIDING AND ABETTING
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

160. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

161. Defendants knowingly and substantially assisted others in intentionally inflicting emotional distress upon Plaintiff.

162. Defendants are liable for the injuries caused by the intentional infliction of emotional distress because they substantially aided and abetted others in causing the emotional distress to Plaintiff.

163. Defendants' knowing and substantial assistance to others caused grave and foreseeable damages to Plaintiff.

## COUNT NINETEEN – AGAINST THE CORPORATE DEFENDANTS NEGLIGENT HIRING AND SUPERVISION

164. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

165. Defendants acted negligently and directly harmed Plaintiff by taking or failing to take one or more of the following steps:

(a) failing to take the appropriate steps in hiring proper personnel to perform services;

(b) failing to screen properly personnel before their hiring;

(c) failing to train personnel or subsidiary personnel properly to perform services in a legal fashion;

(d) failing to investigate allegations of torture and abuse carried out by their subsidiaries or their employees;

(e) failing to report to the government allegations of torture and abuse carried out and witnessed by their agents;

(f) failing to adequately supervise and discipline their employees; and

(g) negligently setting the conditions that facilitated the abuse.

166. The negligence of CACI and L-3 directly and foreseeably harmed Plaintiff.

## COUNT TWENTY –
## AGAINST THE CORPORATE DEFENDANTS
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

167. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

168. Defendants negligently inflicted severe emotional distress on Mr. Al Shimari.

169. Defendants had a duty to Plaintiff, which they breached.

170. The negligence of CACI and L-3 directly and foreseeably harmed Mr. Al-Shimari.

## JURY DEMAND AND PRAYER FOR DAMAGES

171. Mr. Al Shimari seeks a jury trial. Mr. Al Shimari is entitled to any and all remedies available as a result of the conduct alleged herein, including, but not limited to:

(a) compensatory damages for physical, mental, and economic injuries;

(b)    punitive damages in an amount sufficient to punish Defendants for engaging in human rights abuses and deter similar behavior; and

(c)    any attorneys' fees and costs permitted by law.

Date: June 30, 2008

*Susan Burke* by MK

SUSAN L. BURKE
Trial Counsel
*Admission Pro Hace Vice Pending*
WILLIAM F. GOULD
*Admission Pro Hace Vice Pending*
BURKE O'NEIL LLC
4112 Station Street
Philadelphia, PA 19127
Telephone: (215) 971-5058
Facsimile: (215) 482-0874
E-Mail: sburke@burkeoneil.com

JENNIFER M. KINSLEY
(Ohio Bar No. 0071629)
SIRKIN, PINALES & SCHWARTZ LLP
105 West Fourth Street, Suite 920
Cincinnati, Ohio 45202
Telephone: (513) 721-4876
Facsimile: (513) 721-0876

KATHERINE GALLAGHER
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, 7th Floor,
New York, NY 10012
Telephone:  (212) 614-6455
Facsimile:  (212) 614-6499

SHEREEF HADI AKEEL
AKEEL & VALENTINE, P.C.
401 South Old Woodward Avenue
Suite 430
Birmingham, MI 48009
Telephone: (248) 594-9595
Facsimile: (248) 594-4477

*Attorneys for Plaintiff*