# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

|  |  |  |
|---|---|---|
| SUHAIL NAJIM ABDULLAH AL SHIMARI, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 1:08-CV-827-GBL-JFA |
| v. | ) ) | |
| CACI INTERNATIONAL INC, et ano., | ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS CACI INTERNATIONAL INC AND CACI PREMIER TECHNOLOGY, INC.'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

J. William Koegel, Jr. (Va. Bar No. 38243)
John F. O'Connor (admitted *pro hac vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902

*Counsel for Defendants CACI International Inc and CACI Premier Technology, Inc.*

October 2, 2008

# **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ..................................................................................................1

II.  BACKGROUND AND ALLEGATIONS IN THE AMENDED COMPLAINT................2

III.  ANALYSIS..........................................................................................................5

    A.  Motion to Dismiss Standard..................................................................................5

    B.  Plaintiffs' Claims Present Nonjusticiable Political Questions................................6

        1.  Plaintiffs' Complaint Alleges Conspiratorial Conduct That Necessarily Involves Official Complicity, Implicating Foreign Power Responsibilities Constitutionally Committed to the Political Branches........................................................................................................7

        2.  Whether Recovery for Wartime Injuries Should Be Available is a Political Question Constitutionally Committed to the Political Branches......................................................................................................10

        3.  There Are No Judicially Discoverable and Manageable Standards for Evaluating Plaintiffs' Claims .................................................................12

    C.  CACI Is Immune from Suit for the Operations For Which Plaintiffs Seek Recovery ..........................................................................................................13

        1.  CACI Has Absolute Official Immunity From Plaintiffs' Suit ..................13

        2.  Because Plaintiffs' Tort Claims Would Be Governed By Iraqi Law, the CACI Defendants Are Immune From Suit Even If They Were Not Entitled to Absolute Official Immunity ..............................................18

    D.  Plaintiffs Fail to State Factual Allegations Sufficient to Show a Plausible Entitlement to Relief..........................................................................................23

    E.  Plaintiffs' Claims are Preempted Under the Combatant Activities Exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(j)...........................26

    F.  Plaintiffs' Alien Tort Claims Must Be Dismissed .................................................32

        1.  ATS Permits Assertion of New Tort Claims Only in Narrowly Prescribed Circumstances ........................................................................32

            a.  Congress Has Expressed an Intent Not To Have Wartime Claims Litigated in Federal Tort Actions ......................................33

            b.  Recognizing Private Causes For Wartime Injuries Would Reverse Two Centuries of Law to the Contrary ...........................34

            c.  Jurisdiction Under ATS Extends Only To Suits Concerning Official Actions of the United States ..............................................35

        2.  Plaintiffs Have Not Properly Exhausted Their Remedies.........................35

G.    Plaintiffs' Complaint Fails to Allege Facts Sufficient to Establish *Respondeat Superior* Liability ................................................................36

IV.    CONCLUSION ......................................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Ins. Ass'n v. Garamendi*,
    539 U.S. 396 (2003)..................................................................................29

*Anderman v. Fed. Republic of Austria*,
    256 F. Supp. 2d 1098 (C.D. Cal. 2003) ........................................................11, 12

*Baker v. Carr*,
    369 U.S. 186 (1962)..................................................................................6, 12

*Barr v. Matteo*,
    360 U.S. 564 (1959)..................................................................................14

*Beebe v. Washington Metropolitan Area Transit Authority*,
    129 F.3d 1283 (D.C. Cir. 1997)..................................................................15, 16

*Bell Atl. Corp. v. Twombly*,
    127 S. Ct. 1955 (2007)............................................................................. passim

*Bentzlin v. Hughes Aircraft Co.*,
    833 F. Supp. 1486 (C.D. Cal. 1993) ........................................................12, 28, 29

*Boyle v. United Technologies Corp.*,
    487 U.S. 500 (1988)..................................................................................26, 27

*Bradley v. United States*,
    161 F.3d 777 (4th Cir. 1998) ......................................................................19

*Burlington Indus. v. Ellerth*,
    524 U.S. 742 (1998)..................................................................................36

*Burns v. Wilson*,
    346 U.S. 844 (1953)..................................................................................21

*Chappell v. Wallace*,
    462 U.S. 296 (1983)..................................................................................10

*Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
    333 U.S. 103 (1948)..................................................................................12

*Coleman v. Tennessee*,
    97 U.S. 509 (1878)..................................................................................20, 21

*Colgan Air, Inc. v. Raytheon Aircraft Co.,*
    507 F.3d 270 (4th Cir. 2007) ................................................................18

*Conley v. Gibson,*
    355 U.S. 41 (1957)................................................................................6

*Crosby v. Nat'l Foreign Trade Council,*
    530 U.S. 363 (2000)...........................................................................29

*Davis v. County of Amherst,*
    2008 WL 591253 (W.D. Va. 2008) ....................................................25

*Dep't. of Army v. Blue Fox,*
    525 U.S. 255 (1999)...........................................................................26

*Dostal v. Haig,*
    652 F.2d 173 (1981)...........................................................................21

*Dow v. Johnson,*
    100 U.S. 158 (1879)...........................................................................21

*Edwards v. City of Goldsboro,*
    178 F.3d 231 (4th Cir. 1999) ...............................................................5

*El-Shifa Pharm. Indus. Co. v. United States,*
    55 Fed. Cl. 751 (2003) .......................................................................12

*Ex parte Quirin,*
    317 U.S. 1 (1942)...............................................................................32

*Forlastro v. Collins,*
    2007 WL 2325865 (S.D.N.Y. Aug. 14, 2007) ...................................19

*Gilligan v. Morgan,*
    413 U.S. 1 (1973)....................................................................9, 17, 30

*Goldman v. Weinberger,*
    475 U.S. 503 (1986)....................................................................17, 30

*Goldstar (Panama) S.A. v. United States,*
    967 F.2d 965 (4th Cir. 1992) .............................................................35

*Hamdan v. Rumsfeld,*
    126 S. Ct. 2749 (2006).......................................................................21

*Hamdi v. Rumsfeld,*
    542 U.S. 507 (2004)...........................................................................32

*Hamilton v. McClaughry*,
   136 F. 445 (C.C. D. Kan. 1905) ........................................................21

*Hines v. Davidowitz*,
   312 U.S. 52 (1941) ........................................................................29

*Ibrahim v. Titan Corp.*,
   391 F. Supp. 2d 10 (D.D.C. 2005) ............................................. passim

*Ibrahim v. Titan Corp.*,
   556 F. Supp. 2d 1 (D.D.C. 2007) ...............................................3, 31

*In re Lo Dolce*,
   106 F. Supp. 455 (W.D.N.Y. 1952) ..................................................21

*Japan Line, Ltd. v. County of Los Angeles*,
   441 U.S. 434 (1979) ........................................................................29

*Johnson v. Eisentrager*,
   339 U.S. 763 (1950) ...................................................................10, 29

*Johnson v. United States*,
   170 F.2d 767 (9th Cir. 1948) ........................................................3, 32

*Klaxon v. Stentor Elec. Mfg. Co.*,
   313 U.S. 487 (1941) ........................................................................18

*Koohi v. United States*,
   976 F.2d 1328 (9th Cir. 1992) .................................................. passim

*Labram v. Havel*,
   43 F.3d 918 (4th Cir. 1995) ..............................................................5

*Laios v. Wasylik*,
   ___ F. Supp. 2d ___, 2008 WL 2741158 (E.D. Va. 2008) ...............5, 36

*Leitensdorfer v. Webb*,
   61 U.S. 176 (1857) ........................................................................20

*Madsen v. Kinsella*,
   343 U.S. 341 (1952) ...................................................................21, 22

*Mangold v. Analytic Services, Inc.*,
   77 F.3d 1442 (4th Cir. 1996) ....................................13, 14, 15, 17

*McMellon v. United States*,
   387 F.3d 329 (4th Cir. 2004) ..........................................................30

iii

*Midland Psychiatric Assocs., Inc. v. United States*,
  145 F.3d 1000 (8th Cir. 1998) ........................................................................15

*Milton v. ITT Research Inst.*,
  138 F.3d 519 (4th Cir. 1998) .........................................................................23

*Mistretta v. United States*,
  488 U.S. 361 (1989).......................................................................................30

*Morgan v. Biro Mfg. Co.*,
  474 N.E.2d 286 (Ohio 1984)..........................................................................19

*Murray v. Northrop Grumman Information Tech., Inc.*,
  444 F.3d 169 (2d Cir. 2006)..............................................................15, 16, 17

*Mylan Labs, Inc. v. Matkari*,
  7 F.3d 1130 (4th Cir. 1993) .............................................................................5

*New Orleans v. The Steamship Co.*,
  87 U.S. 387 (1874).........................................................................................20

*Orloff v. Willoughby*,
  345 U.S. 83 (1953).........................................................................................10

*Pani v. Empire Blue Cross Blue Shield*,
  152 F.3d 67 (2d Cir. 1998).............................................................................15

*Perrin v. United States*,
  4 Ct. Cl. 543 (1868) ..................................................................................10, 34

*Peugeot Motors of Am., Inc. v. E. Auto. Dist., Inc.*,
  892 F.2d 355 (4th Cir. 1989) .........................................................................18

*Phillips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985).......................................................................................20

*Piney Run Preservation Ass'n v. County Com'rs of Carroll County, MD*,
  523 F.3d 453 (4th Cir. 2008) ...........................................................................5

*Reid v. Covert*,
  354 U.S. 1 (1957)...........................................................................................21

*Republican Party of N.C. v. Martin*,
  980 F.2d 943 (4th Cir. 1992) ...........................................................................5

*Ruttenberg v. Jones*,
  No. 07-1037, 2008 WL 2436157 (4th Cir. June 17, 2008)...........................24

*Saleh v. Titan Corp.*,
436 F. Supp. 2d 55 (D.D.C. 2006) ............................................................... passim

*Sanchez-Espinoza v. Reagan*,
770 F.2d 202 (D.C. Cir. 1985) ....................................................................... 35

*Self v. Norfolk Southern, Corp.*,
No. 07-1242, 2008 W L 410284 (4th Cir. Feb. 13, 2008) ........................... 23

*Smith v. Reagan*,
844 F.2d 195 (4th Cir. 1988) ......................................................................... 9

*Smith v. United States*,
507 U.S. 197 (1993) ..................................................................................... 23

*Smithfield Foods, Inc. v. United Food and Commercial Workers Intern. Union*,
No. 3:07cv641, 2008 WL 2233979 (E.D. Va. 2008) ................................... 23

*Sosa v. Alvarez-Machain*,
124 S. Ct. 2739 (2004) .............................................................................. passim

*Steel Co. v. Citizens for Better Env't*,
523 U.S. 83 (1998) ......................................................................................... 6

*Tellabs v. Makor Issues & Rights*,
127 S. Ct. 2499 (2007) .................................................................................. 5

*Tennessee v. Hibdom*,
23 F. 795 (C.C. M.D. Tenn. 1885) ............................................................... 21

*Thigpen v. McDonnell*,
273 Fed. Appx. 271 (4th Cir. 2008) ............................................................. 25

*Thigpen v. United States*,
400 F.2d 393 (4th Cir. 1986) ........................................................................ 5

*Thomasson v. Perry*,
80 F.3d 915 (4th Cir. 1996) ................................................................ 9, 17, 30

*Tiffany v. United States*,
931 F.2d 271 (4th Cir. 1991) ................................................................... 9, 10

*TWI d/b/a Servco Solutions v. CACI Int'l Inc*,
2007 WL 3376661 (E.D. Va. 2007) ............................................................. 15

*United States ex rel. Godfrey v. Kellogg, Brown & Root, Inc.*,
No. 1:05-CV-1418(GBL), 2008 U.S. Dist. Lexis 21957 (E.D. Va. Mar. 13, 2008) .......... 24, 25

*United States v. Belmont,*
  301 U.S. 324 (1937) .................................................................29

*United States v. Pink,*
  315 U.S. 203 (1942) ............................................................27, 29

*Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co.,*
  386 F.3d 581 (4th Cir. 2004) ................................................18

*Ware v. Hylton,*
  3 U.S. (3 Dall.) 199 (1796) .........................................10, 11, 34

*Westfall v. Erwin,*
  484 U.S. 292 (1988) ................................................14, 15, 16, 17

*Williams v. United States,*
  50 F.3d 299 (4th Cir. 1995) ...................................................5

*Zivkovich v. Vatican Bank,*
  242 F. Supp. 2d 659 (N.D. Cal. 2002) ..............................11, 12

*Zschernig v. Miller,*
  389 U.S. 429 (1968) .................................................................29

CONSTITUTIONS

U.S. Const. art. I, § 8, cls. 1, 11-15 ..............................................29

U.S. Const. art. I, § 10, cls. 1, 3 ...................................................29

U.S. Const. art. II, § 2 ...................................................................10

STATUTES

28 U.S.C. ¶ 1292(b) ........................................................................4

28 U.S.C. § 1346(b)(1) ...................................................................26

28 U.S.C. § 1404(a) .......................................................................18

28 U.S.C. § 2680(j) ...................................................................26, 28

**RULES**

Fed. R. Civ. P. 12(b)(1)................................................................................................5

Fed. R. Civ. P. 12(b)(6)....................................................................................5, 23, 36

**BOOKS AND ARTICLES**

Gerhard von Glahn, *The Occupation of Enemy Territory: A Commentary on the Law and Practice of Belligerent Occupation* 112 (1957)....................................................21

Restatement (Second) of Agency § 229.........................................................................37

*Restatement (Second), Conflict of Laws* ....................................................................19

2 William Winthrop, *Military Law and Precedents* 800 (2d rev. ed. 1896) ................19

## I.    INTRODUCTION

Plaintiffs – Iraqi citizens detained by U.S. forces in Iraq – seek to hold government contractors who conducted interrogations in support of the military liable for injuries Plaintiffs allegedly suffered while in U.S. custody in wartime Iraq.  The Amended Complaint, however, ***does not allege a single interaction between Plaintiffs and anyone affiliated with CACI***. Instead, Plaintiffs argue that CACI is liable for any injury suffered by any Iraqi detained by the U.S. military through the false construct of a conspiracy.  Plaintiffs allege that the CACI Defendants conspired to abuse detainees, and that any detainee allegedly injured while in United States custody was therefore a target of this supposed conspiracy.  But Plaintiffs allege no ***facts*** to support the "conspiracy" label on which all of their claims depend.  Indeed, all Plaintiffs allege is that someone employed by CACI said something to someone, at some time and at some place, to signal an intent to join an ongoing conspiracy to abuse detainees in military custody. Plaintiffs' lack of factual allegations falls far short of the pleading standard adopted in *Twombly*, requiring dismissal of Plaintiffs' claims.

Even if Plaintiffs had alleged ***facts*** to connect the CACI Defendants' employees to Plaintiffs' claimed injuries, several doctrines bar battlefield tort claims.  First, Plaintiffs' claims present nonjusticiable political questions, depriving the Court of subject matter jurisdiction. Second, Defendants are immune from suit for Plaintiffs' claims under both Supreme Court precedent and executive proclamation of the Coalition Provisional Authority.  Third, Plaintiffs' ATS claims fail as a matter of law because Plaintiffs do not allege the required state action and, in any event, the ATS does not apply to claims arising out of the United States' prosecution of an external war.  Fourth, Plaintiffs' claims are preempted by the combatant activities exception to

the Federal Tort Claims Act. Finally, the Amended Complaint alleges no facts that would render Defendants liable on a *respondeat superior* theory.

## II.      BACKGROUND AND ALLEGATIONS IN THE AMENDED COMPLAINT

In 2004, the same Plaintiffs' counsel here filed a putative class action asserting a panoply of claims arising out of alleged detainee abuse of putative class members in Iraq. This 2004 suit alleged that detainee abuse occurred in connection with interrogations conducted by military interrogators and CACI PT employees in support of the military mission.[1]  Prior to a decision on class certification, the district court dismissed all of the RICO and ATS claims asserted by the plaintiffs, leaving only a handful of common-law torts. *See Saleh v. Titan Corp.*, 436 F. Supp. 2d 55, 59 (D.D.C. 2006). The *Saleh* court declined to dismiss certain tort claims on political question grounds, adopting its prior decision in the related case of *Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10, 15-16 (D.D.C. 2005), even though, unlike the *Saleh* plaintiffs, the *Ibrahim* plaintiffs disclaimed any allegation of conspiracy between the CACI Defendants and military and government officials. *Saleh*, 436 F. Supp. 2d at 57.[2]  The *Saleh* court, however, cautioned that plaintiffs' allegations *might* trigger application of the political question doctrine, noting that "the more plaintiffs assert official complicity in the acts of which they complain, the closer they sail to the jurisdictional limitation of the political question doctrine." *Id.* at 58.

The *Saleh* court recognized that the plaintiffs' tort claims might be preempted by federal law, but concluded that this issue could not be determined on a motion to dismiss. Notably, the

---

[1]  CACI Premier Technology ("CACI PT") was the CACI entity that provided civilian interrogators in support of the United States military's mission in Iraq.

[2]  The district court's analysis also was based on the premise – later shown to be incorrect – that there was no administrative claims process available to detainees presenting bona fide claims that they were mistreated while detained. *See Ibrahim*, 391 F. Supp. 2d at 16 n.4; O'Connor Decl., Exs. A-C. The court did note that manageability problems later could require dismissal on political question grounds. *Id.* at 16.

*Saleh* court declined to apply the combatant activities preemption test announced by the Ninth Circuit in *Koohi v. United States*, 976 F.2d 1328, 1336-37 (9th Cir. 1992), in which the court dismissed claims against a defense contractor on the sole basis that it was performing combatant activities during time of war. Distinguishing *Koohi* as a case involving a procurement contract, the *Saleh* court held that the defendants would be entitled to preemption if their employees were acting as "soldiers in all but name." *Saleh*, 436 F. Supp. 2d at 57 (incorporating motion to dismiss decision in *Ibrahim*); *Ibrahim*, 391 F. Supp. 2d at 19. Nevertheless, the district court determined that "[f]ull discovery [was] not appropriate at this stage," and invited summary judgment motions from defendants solely on the issue of preemption, with plaintiffs permitted to take discovery prior to responding. *Saleh*, 436 F. Supp. 2d at 60; *Ibrahim*, 391 F. Supp. 2d at 19.

After the parties completed summary judgment discovery and briefing, the district court abandoned the "soldiers in all but name" approach in favor of a new test. Under the district court's new test, a defendant seeking preemption first had to establish that its employees were engaged in a "combatant activity," which required a showing that the defendant was "engaged in 'activities both necessary to and in direct connection with actual hostilities.'" *Ibrahim v. Titan Corp.*, 556 F. Supp. 2d 1, 4 (D.D.C. 2007) (quoting *Johnson v. United States*, 170 F.2d 767, 770 (9th Cir. 1948)).[3] On this issue, the court determined that "[t]here can be no question that the nature and circumstances of the activities that CACI employees were engaged in – interrogation of detainees in a war zone – meet the threshold requirement for preemption pursuant to the combatant activities exception." *Id.* at 10. Under *Koohi*, this would have been enough to compel judgment in the CACI Defendants' favor. 976 F.2d at 1336-37.

---

[3] The district court issued a single opinion for both *Ibrahim* and *Saleh*.

The district court, however, added as a preemption requirement that "defendants' employees were acting under the direct command and *exclusive* operational control of the military chain of command." *Id.* at 4 (emphasis added). Applying this new test, the court noted that the military indisputably exercised operational control over CACI PT's interrogators, but concluded that "a reasonable jury could conclude that [a CACI PT employee] effectively co-managed contract interrogators, giving them advice and feedback on the performance of their duties," and that this possibility sufficed to preclude summary judgment. *Id.*

On December 6, 2007, the *Saleh* court denied the plaintiffs' motion for class certification. Eleven days later, the court granted the CACI Defendants' motion to certify the summary judgment order for interlocutory appeal, pursuant to 28 U.S.C. ¶ 1292(b), finding that the order involved "a controlling question of law as to which there is a substantial ground for difference of opinion." Or. of 12/17/07, Dkt. # [149], *Saleh v. Titan Corp.*, No. 05-1165 (D.D.C.).[4] The same day, Plaintiffs' counsel filed a fourth amended complaint that added more than 230 named plaintiffs, which inexplicably did not include the Plaintiffs here. The CACI Defendants filed a motion to dismiss. On January 8, 2008, the district court stayed proceedings pending the resolution of the CACI Defendants' appeal. Or. of 1/8/08, Dkt. # [157], *Saleh v. Titan Corp.*, No. 05-1165 (D.D.C.).

Plaintiffs' claims here are hardly distinguishable from those asserted in *Saleh*, 436 F. Supp. 2d at 57. The Amended Complaint does not allege any contact between Plaintiffs and CACI PT employees. Rather, Plaintiffs allege the CACI Defendants joined with the U.S. military and L-3 Services, Inc. ("L-3") in a conspiracy to abuse detainees by "making a series of verbal statements and by engaging in a series of criminal acts of torture alongside and in

---

[4] The U.S. Court of Appeals for the D.C. Circuit subsequently granted the CACI Defendants' petition for permission to appeal.

conjunction with several co-conspirators." Am. Compl. ¶ 72. The Complaint does not describe the statements or acts supposedly signifying Defendants' entry into this wide-ranging conspiracy.

## III. ANALYSIS

### A. Motion to Dismiss Standard

The CACI Defendants' political question defense challenges the subject-matter jurisdiction of the Court, and is properly treated as a Rule 12(b)(1) motion. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 949 n.13 (4th Cir. 1992). A court considering a Rule 12(b)(1) motion need not treat the allegations in the complaint as true, *Thigpen v. United States*, 400 F.2d 393, 396 (4th Cir. 1986), and may consider matters outside the complaint. *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995). The plaintiff bears the burden of persuasion when a motion to dismiss challenges the Court's subject-matter jurisdiction. *Piney Run Preservation Ass'n v. County Com'rs of Carroll County, MD*, 523 F.3d 453, 459 (4th Cir. 2008).

The CACI Defendants' other grounds for dismissal are properly considered under Rule 12(b)(6). *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). For a complaint to survive a Rule 12(b)(6) motion, its factual allegations "must be enough to raise a right of recovery above the speculative level" or present "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1969 (2007). In considering a Rule 12(b)(6) motion, a court construes the complaint in the light most favorable to the plaintiff, and takes the facts asserted as true. *Mylan Labs, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). Courts must consider the complaint in its entirety, as well as other sources, such as documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. *Tellabs v. Makor Issues & Rights*, 127 S. Ct. 2499, 2509 (2007); *Laios v. Wasylik*, ___ F. Supp. 2d ___, 2008 WL 2741158, at *1 (E.D. Va. 2008). Conclusory allegations regarding the legal effect of the facts alleged need not be accepted. *Labram v. Havel*, 43 F.3d

918, 921 (4th Cir. 1995). Because the purpose of the complaint is to provide the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests," the plaintiff's legal allegations "must be supported by some factual basis sufficient to allow the defendants to prepare a fair response." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

### B.    Plaintiffs' Claims Present Nonjusticiable Political Questions

The political question doctrine implicates the Court's subject-matter jurisdiction, so the Court should consider this issue first. *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 94 (1998). Cases raising political questions generally have one or more of the following characteristics: (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; (2) a lack of judicially discoverable and manageable standards for resolving it; (3) the impossibility of deciding without an initial policy determination of a kind clearly for non judicial discretion; (4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question. *Baker v. Carr*, 369 U.S. 186, 217 (1962). If any "one of these formulations is inextricable from the case," the Court must dismiss the case. *Id.* While not every case having a foreign affairs connection presents a political question, the political question doctrine has widespread application to "questions touching foreign relations." *Baker*, 369 U.S. at 211.

Even if Plaintiffs had alleged that they suffered abuse at the hands of a CACI PT employee, or facts sufficient to support co-conspirator liability, the Amended Complaint is still barred by the political question doctrine.

### 1. Plaintiffs' Complaint Alleges Conspiratorial Conduct That Necessarily Involves Official Complicity, Implicating Foreign Power Responsibilities Constitutionally Committed to the Political Branches

Plaintiffs, after asserting their innocence, claim that they suffered wartime injuries as a result of the United States' interrogation policies and practices. Plaintiffs' action targets conduct involving official complicity, implicating the separation of powers concerns underlying the political question doctrine. Litigation of this action would necessarily entail judicial review of the interrogation policies and rules promulgated by the U.S. Department of Defense and implemented by the U.S. military. Plaintiffs try to soft-peddle the official complicity alleged by avoiding reference to interrogation policies and practices or direct identification of the supposed co-conspirators, variously describing the other members of the alleged "torture conspiracy" as "groups of persons conspiring together" (Am. Compl. ¶ 64), unnamed "military personnel" (*id.* ¶ 71), and "certain military and government personnel" (*id.* ¶ 100). Plaintiffs' strategic pleading aside, the official complicity alleged by Plaintiffs is evident from the Amended Complaint's allegations.

Plaintiffs allege that CACI conveyed its intent to join an ongoing conspiracy comprised of military and government personnel "by making a series of verbal statements and by engaging in a series of criminal acts of torture alongside and in conjunction with several co-conspirators." *Id.* ¶ 72. Plaintiffs allege no facts as to who supposedly conveyed the CACI Defendants' decision to enter into this ill-defined conspiracy, who they told, where these communications would have occurred, or details to suggest these allegations are any more than the invention of a creative litigant. As for the conduct engaged in by the conspiracy, Plaintiffs allege:

- That employees of the CACI Defendants participated in the abuse of detainees in Iraq, without alleging any facts which, if true, would establish the participation of a CACI PT interrogator in any actions or decisions regarding the detention or treatment of Plaintiffs. Am. Compl. ¶¶ 64-67, 70.

- That "[r]easonable discovery will establish that [the CACI Defendants, certain of their employees] and their co-conspirators attempted to avoid detection by treating certain detainees as 'ghost detainees.' That term was the conspiracy's code word for prisoners who were never recorded as having been detained." Am. Compl. ¶ 68.

- That members of the supposed conspiracy allegedly hid detainees from the Red Cross during its visits to Abu Ghraib prison. Am. Compl. ¶¶ 69, 79(c).

Much of this alleged conspiratorial conduct is not within the purview of a civilian contractor or a handful of low-ranking soldiers. For example, Plaintiffs seek to hold the CACI Defendants liable for injuries allegedly arising out of the United States' "ghost detainee" practices, where United States officials determined that certain high-value detainees would not be recorded as having been captured by the United States. But this activity was an official program of the Central Intelligence Agency, and not the military forces the CACI Defendants supported. As a government investigation of military intelligence practices noted:

> CIA detainees in Abu Ghraib, known locally as "Ghost Detainees," were not accounted for in the detention system. When the detainees were unidentified or unaccounted for, detention operations at large were impacted because personnel at the operations level were uncertain how to report them or how to classify them, or how to database them, if at all. Therefore, Abu Ghraib personnel were unable to respond to requests for information about CIA detainees from higher headquarters. This confusion arose because the CIA did not follow the established procedures for detainee in-processing, such as fully identifying detainees by name, biometric data, and Internee Serial Number (ISN) number.[5]

By definition, seeking to hold the CACI Defendants liable for a United States "ghost detainee" program necessarily implicates government actions, official complicity, and high-level

---

[5] MG George Fay, AR 15-6 Investigation of the Abu Ghraib Detention Facility and 205th Military Intelligence Brigade, at 53, *available at* http://fl1.findlaw.com/news.findlaw.com/hdocs/docs/dod/fay82504rpt.pdf. Again, because the political question doctrine implicates the Court's subject-matter jurisdiction, the Court may consider this evidence concerning the CIA's "ghost detainee" program.

determinations made as part of the United States' war effort. This is the type of official involvement in foreign affairs decisions "traditionally reserved to the political branches and removed from judicial review." *Smith v. Reagan*, 844 F.2d 195, 198 (4th Cir. 1988).

"Of the legion of governmental endeavors, perhaps the most clearly marked for judicial deference are provisions for national security and defense." *Tiffany v. United States*, 931 F.2d 271, 277 (4th Cir. 1991). "National defense decisions not only implicate each citizen in the most profound way. Such decisions also require policy choices, which the legislature is equipped to make and the judiciary is not." *Thomasson v. Perry*, 80 F.3d 915, 925 (4th Cir. 1996).[6]

> While Congress and the President have access to intelligence and testimony on military readiness, the federal judiciary does not. While Congress and the members of the Executive Branch have developed a practiced expertise by virtue of their day-to-day supervision of the military, the federal judiciary has not. . . . In fact, it is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches.

*Id.* at 925-26 (citing *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973)).

In *Tiffany*, the Fourth Circuit held that the political question doctrine barred a lawsuit alleging negligence against the United States after a civilian pilot died in a collision with a United States fighter jet sent to intercept the civilian plane. 931 F.2d at 274-75. The district court conducted a bench trial and found that the government was negligent because, *inter alia*, "it failed to terminate the intercept when it had sufficient information to do so." *Id.* On appeal, the Fourth Circuit held that the district court should have dismissed the lawsuit in its entirety:

---

[6] While Judge Robertson declined to find a political question at the motion to dismiss stage in *Saleh*, he was not bound by the Fourth Circuit's political question jurisprudence, nor was he aware that the United States had made an administrative remedy available for persons with legitimate claims of detainee abuse in Iraq. *See Ibrahim*, 391 F. Supp. 2d at 16 n.4.

The negligence alleged in this case necessarily calls into question the government's most important procedures and plans for the defense of the country. Because providing for the national security is both a duty and a power explicitly reserved by the Constitution to the executive and legislative branches of government, the judiciary must proceed in this case with circumspection. If we were to hold that the United States acted negligently in conducting the defense of its eastern border, we would be interjecting tort law into the realm of national security and second-guessing judgments with respect to potentially hostile aircraft that are properly left to the other constituent branches of government. . . . **The decisions whether and under what circumstances to employ military force are constitutionally reserved for the executive and legislative branches.** *See, e.g.*, U.S. Const. art. II, § 2; art. I, § 8. With regard to decisions to employ military troops, "it is not the function of the Judiciary to entertain private litigation . . . which challenges the legality, the wisdom, or the propriety of the Commander-in-Chief in sending our armed forces abroad or to any particular region." *Johnson v. Eisentrager*, 339 U.S. 763, 789 (1950). "Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters." *Chappell v. Wallace*, 462 U.S. 296, 301 (1983) (quoting *Orloff v. Willoughby*, 345 U.S. 83, 94 (1953)). **The strategy and tactics employed on the battlefield are clearly not subject to judicial review.**

931 F.2d at 275-78 (emphasis added). Plaintiffs are clearly challenging battlefield policies and tactics concerning interrogation of war-zone detainees, and alleging complicity by unnamed members of U.S. military and other Executive branch officials. No amount of strategically vague pleading can obscure the nonjusticiable nature of Plaintiffs' claims in these circumstances.

> 2. **Whether Recovery for Wartime Injuries Should Be Available is a Political Question Constitutionally Committed to the Political Branches**

Courts have long recognized that they have no role in compensating individuals, whether the defendant is the United States or a private party, for injuries suffered as a result of the manner in which the United States wages war. *See Ware v. Hylton*, 3 U.S. (3 Dall.) 199, 230 (1796) (no compensation available even though loss occurred through violation of war of nations); *Perrin v. United States*, 4 Ct. Cl. 543 (1868), *aff'd*, 79 U.S. (12 Wall.) 315 (1871). The

propriety of such compensation is determined solely through the diplomatic efforts of the political branches of government. *See Zivkovich v. Vatican Bank*, 242 F. Supp. 2d 659, 666-67 (N.D. Cal. 2002) ("As an issue affecting United States relations with the international community, war reparations fall within the domain of the political branches and are not subject to judicial review." (citation omitted)); *Anderman v. Fed. Republic of Austria*, 256 F. Supp. 2d 1098, 1117 (C.D. Cal. 2003).

Dismissing Plaintiffs' lawsuit on political question grounds will not leave Plaintiffs without a remedy for their alleged injuries. The United States' position is that it will provide an administrative remedy for persons presenting credible claims that they were abused while detained by the United States in Iraq. *See* O'Connor Decl., Exs. A, C. Indeed, the United States took this position despite the best efforts of Plaintiffs' counsel to convince the United States to take the contrary position and deny an administrative remedy for counsel's own client. *Id.*, Ex. B. Thus, if the Court viewed the existence of an available administrative remedy necessary to bring claims within the general rule that reparations claims are nonjusticiable, the United States' willingness to provide such a remedy requires dismissal of Plaintiffs' claims.

That said, a reparations agreement is not required for dismissal based on the political question doctrine. As the D.C. Circuit has observed, an agreement *that makes no provision for reparations* just as conclusively bars war claims as an agreement providing for reparations:

> [T]he restitution of, or compensation for, British property confiscated, or extinguished, during the war, by any of the United States, could only be provided for by the treaty of peace; and *if there had been no provision, respecting these subjects, in the treaty,* they could not be agitated after the treaty, by the British government, much less by her subjects in courts of justice.

*Hwang Geum Joo*, 413 F.3d 45, 51 (D.C. Cir. 2005) (emphasis added) (quoting *Ware v. Hylton*, 3 U.S. (3 Dal.) 199, 230 (1796)), *cert. denied,* 126 S. Ct. 1418 (2006). Courts have relied upon

the political question doctrine to reject reparations claims even though the claimants had no administrative means of recovery available to them. *See, e.g.*, *El-Shifa Pharm. Indus. Co. v. United States*, 55 Fed. Cl. 751, 769 (2003), *aff'd*, 378 F.3d 134 (Fed. Cir. 2004); *Alperin*, 242 F. Supp. 2d at 689-90; *Anderman*, 256 F. Supp. 2d at 1117; *Zivkovich*, 242 F. Supp. 2d at 666-67.

As the cases cited above show, reparations claims present political questions even when they involve intentional infliction of injury and other malicious conduct. These cases nevertheless stand for the proposition that claims for compensation for injuries suffered as a consequence of war present nonjusticiable political questions. This is so even in the absence of any alternative procedure for recourse, though an administrative remedy *does* exist for credible claims of detainee abuse in Iraq.[7]

### 3. There Are No Judicially Discoverable and Manageable Standards for Evaluating Plaintiffs' Claims

Courts regularly hold that they lack judicially manageable standards for evaluating wartime injury claims that would require extensive review of classified materials, or materials unlikely to be discoverable because of the "fog of war." *See Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948); *Anderman*, 256 F. Supp. 2d at 1112-13; *Alperin*, 242 F. Supp. 2d at 695; *Zivkovich*, 242 F. Supp. 2d at 668. "In wartime, it would be inappropriate to have soldiers assembling evidence, collected from the 'battlefield.'" *Bentzlin v. Hughes Aircraft Co.*, 833 F. Supp. 1486, 1495 (C.D. Cal. 1993). These concerns apply here.

Plaintiffs' claims arise out of activities taking place in a combat-zone detention facility. Records regarding who was detained by the military and why, what detainees were interrogated

---

[7] Moreover, because the Constitution vests the power to wage war and conduct foreign affairs in the political branches, adjudicating Plaintiffs' reparations claims would demonstrate a lack of respect for the proper constitutional role of coordinate branches of government, which, under *Baker*, supports a finding of nonjusticiability. *Zivkovich*, 242 F. Supp. 2d at 668.

(and by whom), what interrogation techniques were approved by the military, the reports of interrogations, and whether a detainee reported abuse, are within the exclusive control of the United States. The same is true of information regarding "ghost detainees," something that government reports have indicated was a practice engaged in not by the Defense Department, but by the Central Intelligence Agency. These records are largely, if not entirely, classified. But the CACI Defendants would need access to these records in order to refute Plaintiffs' claims.

In addition to classified materials in United States custody, much of the evidence relating to Plaintiffs' claims will be located in Iraq. For example, other detainees who were detained in the vicinity of the Plaintiffs may have relevant information. That evidence is beyond CACI's reach. Iraq was, is, and will be for the foreseeable future, a war zone. And it is a war zone with no functioning judicial system. There is no reasonable prospect that the CACI Defendants could obtain the assistance of an Iraqi judiciary or diplomatic agency in obtaining compelled testimony or production of documents. This factor, too, warrants dismissal.

## C.     CACI Is Immune from Suit for the Operations For Which Plaintiffs Seek Recovery[8]

### 1.      CACI Has Absolute Official Immunity From Plaintiffs' Suit

The Fourth Circuit's decision in *Mangold v. Analytic Services, Inc.*, 77 F.3d 1442, 1447-48 (4th Cir. 1996), compels the dismissal of Plaintiffs' claims on absolute immunity grounds. In *Mangold*, an Air Force colonel and his wife sued a government contractor and certain of its principals, alleging that these defendants had defamed the plaintiffs with respect to information that they provided to the government in the course of a government investigation of alleged contracting irregularities. *Id.* at 1445. The district court denied the defendants' claim of

---

[8] The district court in *Saleh* has not ruled on the CACI Defendants' immunity defense because the action is stayed pending resolution of the interlocutory appeal.

immunity, but the Fourth Circuit reversed and held that the contractors had absolute official immunity for the statements they made to government investigators.  *Id.* at 1450.

The *Mangold* court began by recognizing an absolute immunity from tort law for federal officials who exercised discretion in acting within the scope of their employment.  *Id.* at 1446 (citing *Barr v. Matteo*, 360 U.S. 564, 569-73 (1959) (plurality opinion), and *Westfall v. Erwin*, 484 U.S. 292, 295 (1988)).  *Barr* and *Westfall* required absolute immunity for government officials whenever "the public benefits obtained by granting immunity outweighs its costs."  *Id.* at 1447.  While Congress later established a statutory framework for official immunity for government employees, the *Mangold* court held that the test for absolute immunity announced in *Barr* and *Westfall* continued to apply to private contractors, *i.e.*, private contractors would enjoy absolute immunity for discretionary functions performed for the United States government to the extent the public benefits of granting immunity outweigh its costs.  *Id.*  As the court explained:

> The privilege [of absolute immunity] is not a badge or emolument of exalted office, but an expression of a policy designed to aid in the effective functioning of government.  The complexities and magnitude of governmental activity have become so great that there must of necessity be a delegation and redelegation of authority as to many functions, and we cannot say that these functions become less important simply because they are exercised by officers of lower rank in the executive hierarchy.
>
> If absolute immunity protects a particular governmental function, no matter how many times or to what level that function is delegated, it is a small step to protect that function when delegated to private contractors, particularly in light of the government's unquestioned need to delegate governmental functions.  The government cannot perform all necessary and proper services itself and must therefore contract out some services for performance by the private sector.  When the government delegates discretionary governmental functions through contracting with private contractors, therefore, the same public interest identified in *Barr* and *Westfall* – the interest in efficient government – demands that the government possess the ability meaningfully to investigate these contracts to ensure that they are performed without fraud, waste, or mismanagement.

*Id.* at 1447-48 (citation omitted). The *Mangold* court noted that if the contractor defendants had been tasked with *performing* the investigation – a classic discretionary function of government – their immunity would have been clear. *Id.* at 1448. The defendants, however, had not performed the investigation, but merely provided information to government investigators. Nevertheless, while responding to a government investigation was not, strictly speaking, performance of a discretionary function, the court held that the government's interest in investigating allegations of contracting abuse supported the imposition of absolute immunity. *Id.* at 1449-50.

Other courts have applied absolute official immunity to non-government officials performing delegated government functions. *See, e.g., Murray v. Northrop Grumman Information Tech., Inc.*, 444 F.3d 169, 175 (2d Cir. 2006) (government contractor absolutely immune from tort liability for performing contracted-for government function) (citing *Mangold*, 77 F.3d at 1447); *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 71-73 (2d Cir. 1998) (same); *Midland Psychiatric Assocs., Inc. v. United States*, 145 F.3d 1000, 1005 (8th Cir. 1998) (common-law official immunity barred tort suit against Medicare insurer); *Beebe v. Washington Metropolitan Area Transit Authority*, 129 F.3d 1283, 1289 (D.C. Cir. 1997) (absolute official immunity barred claims against individual defendants for alleged intentional torts, such as fraud and intentional infliction of emotional harm, as well as torts motivated by personal animus because they were alleged to have occurred during performance of a contracted-for government function); *TWI d/b/a Servco Solutions v. CACI Int'l Inc*, 2007 WL 3376661, at *1 (E.D. Va. 2007). Thus, "[e]xtending immunity to private contractors to protect an important government interest is not novel." *Mangold*, 77 F.3d at 1448.

In determining whether official immunity applies, the first question is whether in providing interrogation services to the United States the CACI Defendants were "carrying out a

governmental function." *Murray*, 444 F.3d at 174.[9] Plaintiffs allege that they were injured by *somebody* during their detention and interrogation in combat detention facilities in Iraq. Interactions with and interrogation of detainees were clearly within the responsibilities delegated to CACI PT interrogators in Iraq. It does not matter that Plaintiffs allege (without detail) that CACI PT employees were somehow motivated by animus, acted negligently or intentionally to injure others, or were acting contrary to the government's actual interests; so long as the CACI PT interrogators' actions occurred in the course of performing the duties they were assigned, the first prong of the *Westfall* immunity test is satisfied. *See Beebe*, 129 F.3d at 1289.[10]

Plaintiffs' Complaint is inconsistent as to whether they allege that CACI PT interrogators were acting under the United States' direction in "torturing" prisoners or were performing discretionary functions. *Compare* Compl. ¶¶ 69, 79 (alleging that the CACI Defendants and their alleged co-conspirators hid Plaintiffs from the Red Cross, conduct that could not have occurred absent official government direction and complicity) *with* ¶¶ 76, 105 (alleging that CACI had the ability to "control, direct and influence" the actions of their employees, and that CACI was negligent in failing to "supervise adequately their employees"). Either way, Plaintiffs' Complaint must be dismissed.

---

[9] In *Saleh*, Plaintiffs alleged that the conduct of interrogations is an "inherently governmental function." Third Am. Compl. ¶ 71; Fourth Am. Compl. ¶ 116.

[10] To the extent Plaintiffs even came into contact with CACI PT interrogators (which they fail to allege), the official responsibilities of the CACI PT employees involved interrogation of detainees, consistent with the interrogation rules of engagement established by the United States, to obtain intelligence to save lives. Such war-zone interrogations are inherently stressful. Moreover, if the allegations against the CACI PT interrogators (vague as they may be) are so extreme, and so divorced from their actual duties as to defeat a defense of absolute official immunity, the CACI Defendants could not be liable on a *respondeat superior* theory for such conduct. *See* Section III.G, *infra*.

If Plaintiffs' allegation is that the CACI PT interrogators were permitted to exercise discretion in performing interrogation services, *Westfall* absolute immunity requires dismissal of Plaintiffs' complaint. *Mangold*, 77 F.3d at 1447; *Murray*, 444 F.3d at 175. And, as explained in Section III.E *infra*, if Plaintiffs' allegation is that CACI PT interrogators exercised no discretion, then any analysis of combatant activities preemption would require dismissal of Plaintiffs' Complaint. There is no middle ground.

Assuming Plaintiffs allege that CACI PT employees performed a discretionary function, the public interest served by absolute immunity is clear. The United States and its citizens have an urgent and compelling interest in enabling government contractors to perform combatant activities in a war zone free from the interference of tort law. Whether the United States is a defendant in this action or not, allowing tort suits such as Plaintiffs' will require military and government officials to justify and explain their wartime decisions in court.

In addition, the government has a strong interest in retaining the flexibility to delegate functions to contractors, and to augment its personnel with contractors when it deems such support necessary. *Mangold*, 77 F.3d at 1447-48. Refusing to extend the immunity held by government employees to contractors working with them side-by-side, and performing the same duties, impairs the government's flexibility because commanders would forfeit the tort-free environment deemed essential to effective combat operations whenever they decide to augment military personnel with civilian contractors. This judicial intrusion into the process of selecting among the wartime staffing options available to commanders is particularly inappropriate given the Constitution's grant of decision-making authority to the political branches, and the judiciary's comparative lack of expertise in this area. *See, e.g.*, *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986); *Gilligan*, 413 U.S. at 10; *Thomasson*, 80 F.3d at 925.

### 2. Because Plaintiffs' Tort Claims Would Be Governed By Iraqi Law, the CACI Defendants Are Immune From Suit Even If They Were Not Entitled to Absolute Official Immunity

Plaintiffs' common-law tort claims must derive from the application of some jurisdiction's laws. The relevant choice of law rules appear to require that the CACI Defendants' liability, if any, for torts committed in Iraq be governed by Iraqi law. Yet the CACI Defendants are immune from Iraqi law, both as a matter of customary (and binding) international law as well as through the executive proclamation of the Coalition Provisional Authority. This requires dismissal.

A court sitting in diversity ordinarily must apply the choice of law rules of the forum state. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Where a plaintiff's claims have been transferred pursuant to 28 U.S.C. § 1404(a), and venue for such claims was appropriate in the transferor forum, the court ordinarily applies the choice of law rules of the state where the transferor court sits. *Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 600 (4th Cir. 2004).

Plaintiffs Rashid, Al-Zuba'e, and Al-Ejaili first asserted their claims against the CACI Defendants in this Court, meaning that this Court must apply Virginia's choice of law rules to these Plaintiffs' common-law tort claims. *Klaxon*, 313 U.S. at 496; *Peugeot Motors of Am., Inc. v. E. Auto. Dist., Inc.*, 892 F.2d 355, 357-58 (4th Cir. 1989). "Under Virginia law, the rule of lex loci delicti, or the law of the place of the wrong, applies to choice-of-law decisions in tort actions." *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007). As Plaintiffs' claims arise out of alleged conduct in Iraq, the claims of Plaintiffs Rashid, Al-Zuba'e, and Al-Ejaili, if they exist at all, must be a product of Iraq law.

As for Plaintiff Al Shimari, he originally asserted his claims in Ohio, and then consented to a transfer to this Court. Thus, if venue was proper in Ohio, the Court ordinarily will apply

Ohio's choice of law rules to Al Shimari's common-law tort claims. *Forlastro v. Collins*, 2007 WL 2325865, at *2 (S.D.N.Y. Aug. 14, 2007) (transferor court's choice of law rules apply only "to cases that could have been maintained in their original forum") (citing additional cases).[11] The Court need not make this venue determination, however, because the choice of law rules of Ohio, like those of Virginia, require application of Iraq law to Al Shimari's common-law claims.

Under Ohio's choice of law rules, "a presumption is created that the law of the place of the injury controls unless another jurisdiction has a more significant relationship to the lawsuit." *Morgan v. Biro Mfg. Co.*, 474 N.E.2d 286, 289 (Ohio 1984). To assess whether a jurisdiction other than the place of injury has a greater relationship to the lawsuit, Ohio courts consider: (1) the place of injury; (2) the place of the conduct causing the injury; (3) the domicile, residence, and nationality of the parties; (4) the place where the parties' relationship is located; and (5) any factors under Section 6 of the *Restatement (Second), Conflict of Laws* which the court may deem relevant to the litigation. *Id.*[12]

Here, the place of alleged injury is Iraq, and none of the relevant factors causes another jurisdiction to have a greater interest in governing the parties' respective rights. The place of alleged injury, place of the alleged tortious conduct, and the place where the parties' relationship was located are all Iraq. The only factor even mildly weighing against application of Iraqi law would be the parties' domiciles. And even there, Al Shimari is an Iraqi, though Defendants are

---

[11] Even if Ohio's choice of law rules apply to Al Shimari's common-law claims, the Court remains bound by Fourth Circuit precedent as it relates to matters of federal law. *Bradley v. United States*, 161 F.3d 777, 782 n.4 (4th Cir. 1998).

[12] The Section 6 factors under the *Restatement* are the needs of the interstate and international systems; the relevant policies of the forum; the relevant policies of other interested jurisdictions; the protection of justified expectations; the basic policies underlying the field of law; certainty, predictability, and uniformity of result; and ease in the determination and application of the law to be applied. *Restatement (Second), Conflict of Laws* § 6 (1971).

incorporated in Delaware with their principal places of business in Virginia.[13]  Thus, any

common-law tort claim asserted by Al Shimari against the CACI Defendants must be a product

of Iraq law regardless of whether Virginia's or Ohio's choice of law rules apply.

But the CACI Defendants are immune from application of Iraq law, both as a matter of

international law and through CPA Order 17.  As the Supreme Court has held, the local law of an

occupied territory applies only to the extent permitted by the occupation government.  *Coleman*

*v. Tennessee*, 97 U.S. 509, 517 (1878); *New Orleans v. The Steamship Co.*, 87 U.S. 387, 394

(1874) ("[T]he conquering power has a right to displace the pre-existing authority, and to assume

to such extent as it may deem proper the exercise by itself of all the powers and functions of

government.").  If the occupying power permits local laws to remain in effect, those laws govern

only relations between inhabitants of the occupied territory.  *Coleman*, 97 U.S. at 517; *see also*

*Leitensdorfer v. Webb*, 61 U.S. 176, 177 (1857) (holding that local laws of occupied New

Mexico governed solely internal relations between inhabitants of that territory).  The local law of

the occupied territory does not apply to occupying personnel.  *Coleman*, 97 U.S. at 517-19; *see*

*also* 2 William Winthrop, *Military Law and Precedents* 800 (2d rev. ed. 1896) ("Whether

administered by officers of the army of the belligerent, or by civilians left in office or appointed

by him for the purpose, [the occupation government] is the government of and for all the

---

[13] State choice of law rules also must yield to the constitutional requirements of due process.  *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821-22 (1985).  A jurisdiction must have a "significant contact or significant aggregation of contacts" to each and every plaintiff and his claims in order for the application of that state's law to comport with due process.  *Id.* Therefore, no state without a significant connection with Al Shimari and his claims can have its law apply without violating due process requirements.

inhabitants, native or foreign, wholly superseding the local law and civil authority except in so far as the same may be permitted by him to subsist.").[14]

Because local laws have no application to occupying personnel, "indigenous courts have no right whatsoever (during belligerent occupation) to try enemy persons (that is, individuals of the occupant's nationality or of that of any of his allies in the war) for any and all acts committed by them in the course of hostilities in the broadest sense of the term." Gerhard von Glahn, *The Occupation of Enemy Territory: A Commentary on the Law and Practice of Belligerent Occupation* 112 (1957); *see also Madsen v. Kinsella*, 343 U.S. 341, 345 n.6 (1952) (recognizing immunity of dependent of American servicemember to jurisdiction of local courts in occupied post-war Germany); *Dow v. Johnson*, 100 U.S. 158, 166 (1879) (civil laws of occupied state continue to apply only as permitted by occupying power).[15]

The D.C. Circuit more recently rejected a suit challenging the refusal by U.S. government officials to provide a court in which the plaintiffs could challenge zoning decisions in occupied Berlin. *Dostal v. Haig*, 652 F.2d 173, 176-77 (1981). Noting that *Coleman v. Tennessee*, 97 U.S. at 517, rendered the defendants – both military officers and civilian government officials – immune from the jurisdiction of local German courts, the D.C. Circuit held that the United States was "practically 'sole sovereign' in its sector, and exercises 'supreme authority,' local government institutions and courts being but its creatures." *Dostal*, 652 F.2d at 176.

_____

[14] Colonel Winthrop's "classic treatise" has been recognized by the Supreme Court as authoritative, with the Supreme Court acknowledging Colonel Winthrop as the "Blackstone of Military Law." *See Hamdan v. Rumsfeld*, 126 S. Ct. 2749, 2777 (2006) (plurality opinion); *Reid v. Covert*, 354 U.S. 1, 19 n.38 (1957) (plurality opinion); *Burns v. Wilson*, 346 U.S. 844, 849 n.1 (1953) (opinion of Frankfurter, J.).

[15] *See also Coleman*, 97 U.S. at 517 (members of occupying force immune from application of occupied territory's criminal laws); *Hamilton v. McClaughry*, 136 F. 445, 448-49 (C.C. D. Kan. 1905); *Tennessee v. Hibdom*, 23 F. 795, 796 (C.C. M.D. Tenn. 1885); *In re Lo Dolce*, 106 F. Supp. 455, 459-60 (W.D.N.Y. 1952).

Thus, upon the United States' occupation of Iraq, Iraq law continued to govern affairs solely between inhabitants of Iraq, "subject however to their being in whole or in part suspended and others substituted in their stead – in the discretion of the governing authority." *Madsen*, 343 U.S. at 349 (quoting Winthrop, *supra*, at 800). In that regard, the "governing authority" for occupied Iraq reaffirmed the customary principle that persons serving with or accompanying the occupying force would remain immune from Iraqi law.

In CPA Order 17, issued on June 27, 2003, Ambassador Paul Bremer, the Coalition Provisional Authority administrator, stated as follows concerning the extent to which non-Iraqi personnel serving with or accompanying the occupying force could be subject to Iraqi law:

> [U]nder international law occupying powers, including their forces, ***personnel***, property and equipment, funds and assets, are not subject to the laws or jurisdiction of the occupied territory.

CPA Order 17 at 1 (6/27/03) (emphasis added) (copy attached as Exhibit D to O'Connor Decl.). The term "personnel" includes CACI PT's employees, as the term "Coalition Personnel" is defined in CPA Order 17 as "all non-Iraqi military and ***civilian personnel*** assigned to or under the command of the Commander, Coalition Forces, or all forces employed by a Coalition State ***including attached civilians***, as well as all non-Iraqi military and civilian personnel assigned to, or under the direction or control of the Administrator of the CPA." *Id.* (emphasis added).[16] Moreover, under CPA Order 17, Coalition Personnel are immune from local jurisdiction absent a waiver of this immunity from the person's parent state. As CPA Order 17 provides:

> Coalition contractors and their sub-contractors as well as their employees not normally resident in Iraq, shall not be subject to

---

[16] CPA Administrator Bremer subsequently issued a revised CPA Order 17 on June 27, 2004. The original CPA Order 17 governs the CACI Defendants because it was the order in effect at the time of the events alleged in Plaintiffs' complaint. Regardless, however, the revised CPA order 17 in no way suggests a change in the customary immunity from local law provided to personnel – such as the CACI PT interrogators – accompanying an occupying force.

> Iraqi laws or regulations in matters relating to the terms and
> conditions of their contracts in relation to the Coalition Forces or
> the CPA.

*Id.* at 2.

Where, as here, the governing law does not permit a cause of action, courts must respect

the governing law and dismiss the suit. *See Smith v. United States*, 507 U.S. 197, 202 n.3 (1993)

(plaintiff could not avoid sovereign immunity by asking court to apply the law of another

jurisdiction); *Milton v. ITT Research Inst.*, 138 F.3d 519, 523 (4th Cir. 1998) (dismissing tort

claim where governing law did not recognize cause of action). Because CACI is immune under

the governing law, Plaintiffs' claims must be dismissed.

### D. Plaintiffs Fail to State Factual Allegations Sufficient to Show a Plausible Entitlement to Relief

Plaintiffs allege, in the vaguest terms possible, that a few individual CACI PT

interrogators engaged in abuse of detainees. Am. Compl. ¶¶ 64-71. But what the Court ***will not

find*** in the Amended Complaint is a single allegation of fact that Plaintiffs had any interaction

with a CACI PT employee, much less an interaction that allegedly resulted in abuse. *Twombly*

requires that "in order to withstand a motion to dismiss, the plaintiffs' [f]actual allegations must

be enough to raise a right to relief above the speculative level." *Smithfield Foods, Inc. v. United

Food and Commercial Workers Intern. Union*, No. 3:07cv641, 2008 WL 2233979, at *3 (E.D.

Va. 2008) (citing *Self v. Norfolk Southern, Corp.*, No. 07-1242, 2008 W L 410284, at *1 (4th Cir.

Feb. 13, 2008)). Plaintiffs' rote and conclusory allegations do not allege ***facts*** that would

implicate any CACI PT employee in participating in abuse of Plaintiffs, and therefore cannot

withstand a Rule 12(b)(6) motion to dismiss. *See Twombly*, 127 S. Ct. at 1276.

Because Plaintiffs allege no contacts with a CACI PT employee, the Amended Complaint

is entirely dependent on the sufficiency of Plaintiffs' allegations of co-conspirator liability. But

this is the single allegation by Plaintiffs that supposedly provides the factual basis for their claim

that the CACI Defendants joined a conspiracy with military and governmental personnel:

> CACI conveyed its intent to join the conspiracy by making a series
> of verbal statements and by engaging in a series of criminal acts of
> torture alongside and in conjunction with several co-conspirators.

Compl. ¶ 72. Plaintiffs do not allege who supposedly caused the CACI Defendants to enter into

this conspiracy, what such person's authority was, what such person said, to whom such words

were spoken, when or where the CACI Defendants signaled an intent to join a "torture

conspiracy," or why it would be a plausible purpose of this alleged conspiracy to injure

Plaintiffs. ***Plaintiffs do not even identify the list of alleged co-conspirators whose actions***

***supposedly may be attributed to the CACI Defendants on the basis of co-conspirator liability***.

A litigant cannot identify parallel conduct and then defeat a motion to dismiss by merely

alleging that the parties were engaged in a conspiracy. *Twombly*, 127 S. Ct. at 1971-72. As the

Fourth Circuit recently noted, such bare allegations are insufficient under *Twombly*.

> Under *Twombly*, Appellants were required to allege enough facts
> to state a claim that is plausible on its face. This requires a
> plausible suggestion of conspiracy, and Appellants needed to plead
> facts that would reasonably lead to the inference that Appellees
> positively or tacitly came to a mutual understanding to try to
> accomplish a common and unlawful plan. The complaint makes
> the bare, conclusory allegation that the defendants conspired to
> violate his constitutional rights and that the conspiracy culminated
> in the fabricated testimony. No common purpose is alleged and
> nothing beyond conclusory allegations of conspiracy are made.
> We therefore affirm the dismissal of the § 1983 conspiracy claim.

*Ruttenberg v. Jones*, No. 07-1037, 2008 WL 2436157, at *8 (4th Cir. June 17, 2008).

Indeed, this Court recently rejected similarly vague conspiracy allegations in *United*

*States ex rel. Godfrey v. Kellogg, Brown & Root, Inc.*, No. 1:05-CV-1418(GBL), 2008 U.S. Dist.

Lexis 21957, at *16-17 (E.D. Va. Mar. 13, 2008). The Court noted that "[a]s with any

conspiracy claim, Plaintiff must be able to show that 'two or more entities that previously

24

pursued their own interests separately are combining to act as one for their common benefit.'"

*Id.* "Allegations that the defendants' actions combined to injure the plaintiff are not a sufficient basis from which to imply a conspiracy." *Id.* at *17. As the Court explained, vague allegations of conspiracy do not meet the pleading requirements of *Twombly*:

> KBR argues that "Godfrey invites too great an 'inferential leap' between his bare allegations and the conclusion that there was an actionable 'meeting of the minds' on a scheme to defraud the Government, as opposed to independent decisions." The Court finds this argument compelling because Godfrey has failed to provide evidence to negate the inference that Defendants were merely parallel actors, or two players with no intention of defrauding the Government at all. The parties here include a government contractor and subcontractors who by definition have agreed to work together on a single contract. That relationship in and of itself does not show a combination or a conspiracy to defraud the Government. KBR concludes with an argument on this point that the Court finds persuasive: "[t]o state a claim for conspiracy, Godfrey had to plead particularized facts sufficient to support a reasonable inference that [the misdeeds alleged] were not separate and independent decisions, but rather in furtherance of a meeting of the minds whose object was to defraud the Government." Godfrey's claims must fail because he has failed to provide sufficient facts giving rise to an inference of a meeting of the minds and agreement sufficient to support a claim for conspiracy.

*Id.* at *17-18 (citations omitted).[17]

Under *Twombly*, the lack of specific factual allegations of concerted conduct requires that the plaintiff make factual allegations that plausibly compel an inference of conspiratorial conduct, as opposed to independent parallel conduct. Plaintiffs cannot rely on unproven reports that a small number of Defendants' employees may have engaged in discrete acts of improper

---

[17] *See also Thigpen v. McDonnell*, 273 Fed. Appx. 271, 273 (4th Cir. 2008) (affirming dismissal where "complaint contains no facts to either support such a [conspiracy] claim or, alternatively, to indicate that he did not actually intend to allege conspiracy"); *Davis v. County of Amherst*, 2008 WL 591253, at *4 (W.D. Va. 2008) (dismissing conspiracy claim because "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do").

conduct in Iraq – none involving Plaintiffs – as a basis for alleging that any injuries **some other**

**person** allegedly inflicted on Plaintiffs were the product of a conspiracy that Defendants joined.

Because Plaintiffs allege no facts indicating direct involvement of CACI PT personnel in causing

them injury, or to support co-conspirator liability, Plaintiffs' claims must be dismissed.

### E.     Plaintiffs' Claims are Preempted Under the Combatant Activities Exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(j)

Sovereign immunity bars suits against the United States absent an explicit waiver.  *Dep't.*

*of Army v. Blue Fox,* 525 U.S. 255, 261 (1999).  While the Federal Tort Claims Act ("FTCA"),

28 U.S.C. § 1346(b)(1), waives the United States' sovereign immunity for certain tort claims, the

FTCA contains a number of exceptions to this waiver of sovereign immunity.  One of those

exceptions is the combatant activities exception, which retains the United States' sovereign

immunity for any claim arising out of the combatant activities of the military during time of war.

28 U.S.C. § 2680(j).  The immunity of the United States and its employees  is the reason why

Plaintiffs assert their claims solely against contractors with which they had little or no contact.

However, the government interests embodied in the combatant activities exception preempt the

application of tort law to a contractor when the claims arise out of the contractor's performance

of combatant activities.

In *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), the Court announced the

framework by which exceptions to the FTCA's waiver of sovereign immunity require

preemption of tort claims against government contractors.  The first requirement for such

preemption is that the dispute involve "'uniquely federal interests' [that] are . . . committed by

the Constitution and laws of the United States to federal control."  *Id*. at 504 (citations omitted).

Once a unique federal interest is shown, preemption is appropriate where "a 'significant conflict'

exists between an identifiable 'federal policy or interest and the [operation] of state law,' or the

application of state law would 'frustrate specific objectives' of federal legislation." *Id*. at 507 (internal citations omitted). Thus, in *Boyle*, which involved preemption based on the FTCA's discretionary function exception, the Court examined whether a significant conflict existed between the discretionary function exception and the application of tort law by examining the federal interest embodied in that exception, which the Court characterized as the prevention of second-guessing of the United States' discretionary decisions. *Id.* at 511. Based on that federal interest, the Court held that the discretionary function exception conflicted with, and thereby preempted, product defect claims against a contractor where the federal government approved reasonably precise product specifications, the contractor complied with the specifications, and the contractor warned the government of any known defects in such specifications. *Id.* at 512.

In the present action, however, the FTCA exception at issue is the combatant activities exception, which requires consideration of the federal interests embodied in that provision. There is no question that Plaintiffs' claims implicate "uniquely federal interests." *Id.* at 504. In *Boyle*, the Court determined that there is a uniquely federal interest in "the civil liabilities arising out of the performance of federal procurement contracts," and the federal government's interest in "getting the Government's work done." *Id.* at 505-06. Here, that federal interest is even more pronounced. This case has all of the general contracting interests found in *Boyle* to be a uniquely federal interest for contracting purposes, and also implicates the unique federal role in the prosecution of war. The conduct of war is a power constitutionally vested exclusively in the federal government. *See, e.g.*, *United States v. Pink*, 315 U.S. 203, 233 (1942) ("Power over external affairs is not shared by the States; it is vested in the national government exclusively.").

Because Plaintiffs' claims implicate unique federal interests, their claims are preempted if the application of tort law would create a significant conflict with the federal interests underlying

the combatant activities exception. The combatant activities exception retains sovereign immunity for "[a]ny claim arising out of the combatant activities of the military . . . during time of war." 28 U.S.C. §2680(j). While the legislative history of the exceptions to the FTCA is "singularly barren of Congressional observation apposite to the specific purpose of each exception," courts have held that the exception reflects a congressional judgment that no tort duty should extend to those against whom combatant force is directed in time of war. *Koohi*, 976 F.2d at 1333, 1337 ("The reason [why claims against the contractor were subject to combatant activities preemption], we believe, is that one purpose of the combatant activities exception is to recognize that during wartime encounters no duty of reasonable care is owed to those against whom force is directed as a result of authorized military action."); *Ibrahim*, 391 F. Supp. 2d at 18 ("The [combatant activities] exception seems to represent Congressional acknowledgement that war is an inherently ugly business for which tort claims are simply inappropriate."); *Bentzlin v. Hughes Aircraft Co.*, 833 F. Supp. 1486, 1493 (C.D. Cal. 1993) ("The *Koohi* court noted that in enacting the combatant activities exception, Congress recognized that it does not want the military to 'exercise great caution at a time when bold and imaginative measures might be necessary to overcome enemy forces.'" (citation omitted)).

Eliminating a battlefield duty of care also spares military leaders from having to answer for combat judgments in a civil court or being distracted by a suit brought by the persons against whom military force has been directed. *Koohi*, 976 F.2d at 1337. This allows military leaders to conduct the war without having to exercise the "great caution" that might be required if second-guessing by tort regulation applied. *Id.* at 1334-35; *Ibrahim*, 391 F. Supp. 2d at 18 ("It would be difficult to devise more effective fettering of a field commander than to allow the very enemies he is ordered to reduce to submission to call him to account in his own civil courts and divert his

efforts and attention from the military offensive abroad to the legal defensive at home." (quoting *Johnson v. Eisentrager*, 339 U.S. 763, 778 (1950))); *Bentzlin*, 833 F. Supp. at 1493.

Finally, removing battlefield tort duties ensures equal treatment of those injured in war. As the Ninth Circuit observed: "War produces innumerable innocent victims of harmful conduct- on all sides. It would make little sense to single out for special compensation a few of these persons . . . on the basis that they have suffered from the negligence of our military forces rather than from the overwhelming and pervasive violence which each side intentionally inflicts on the other." *Koohi*, 976 F.2d at 1334-35; *see also Bentzlin*, 833 F. Supp. at 1494.

Aside from the stand-alone interest in eliminating battlefield duties of care, another purpose underlying the combatant activities exception is ensuring that the United States' conduct of war is not regulated by another sovereign – whether a state or a foreign power – in the guise of applying that sovereign's tort law. The Constitution expressly commits foreign policy and war powers to the federal government. U.S. Const. art. I, § 8, cls. 1, 11-15; art. II, § 2, cls. 1, 2. Conversely, it expressly forbids the states from exercising those powers. U.S. Const. art. I, § 10, cls. 1, 3. Because "[p]ower over external affairs is not shared by the States; it is vested in the national government exclusively," *Pink*, 315 U.S. at 233, the Supreme Court regularly invalidates state regulations that intrude into the Nation's foreign affairs or frustrate the federal government's Constitutionally-committed role as the sole voice on war and foreign affairs.[18]

Indeed, the Fourth Circuit recently observed that courts have "not hesitated to strike down provisions of law that either accrete to a single Branch powers more appropriately diffused among separate Branches or that undermine the authority and independence of one or

---

[18] *See, e.g.*, *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413-14 (2003); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 380-81 (2000); *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 447-49 (1979); *Zschernig v. Miller*, 389 U.S. 429, 434-35 (1968); *Hines v. Davidowitz*, 312 U.S. 52, 65-68 (1941); *United States v. Belmont*, 301 U.S. 324, 331 (1937).

another coordinate Branch." *McMellon v. United States*, 387 F.3d 329, 341 (4th Cir. 2004) (en banc) (quoting *Mistretta v. United States*, 488 U.S. 361, 382 (1989)). The combatant activities exception ensures that states cannot impose their own tort norms on the United States' prosecution of war. Allowing battlefield tort claims to proceed would place state and federal courts in the role of evaluating battlefield tactics, and making their own judgments about the reasonableness of such tactics on the context of war, a role the combatant activities exception is designed to prohibit and a role for which the judiciary is not well suited. *See, e.g.*, *Goldman*, 475 U.S. 503, 507 (1986); *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973); *Thomasson*, 80 F.3d at 925.

The federal interest in not having a foreign sovereign's tort law apply to the United States' conduct of war is even more acute. The local law of an occupied territory applies only as permitted by the occupying government, and even then only to relations solely between inhabitants of the occupied country. *See* Section III.C.2, *supra*. The combatant activities exception reflects the federal interest in ensuring that the United States' waiver of sovereign immunity will not subject its prosecution of war to the tort regulation of a foreign power.

Applying these principles, the Ninth Circuit held in *Koohi*, 976 F.2d at 1336-37, that claims against a defense contractor relating to the U.S. Navy's shooting down of an Iranian commercial aircraft during the Iran-Iraq "tanker war" were preempted by the federal interests embodied in the combatant activities exception. Consistent with the combatant activities exception's purpose, the Ninth Circuit's analysis began – and essentially ended – by considering whether the injuries arose out of combatant activities. Having found that the injuries occurred in "time of war," the Ninth Circuit affirmed dismissal of the United States on sovereign immunity grounds, finding that the combatant activities exception barred plaintiffs' claims. *Id.* at 1337.

Turning to the claims against the contractor, the *Koohi* court recognized that the *only* relevant consideration, once it determined the conduct took place in "time of war," was whether the contractor's actions in supplying a vessel's weapons constituted a combatant activity. *Id.* at 1336-37. Holding that they did constitute a combatant activity, the court affirmed dismissal of claims against the contractor, as allowing such claims to proceed would accomplish exactly what the statute was intended to preclude – injecting tort duties of care onto the battlefield. *Id.* It mattered not to the Ninth Circuit the extent of the contractor's role in designing the weapons system or whether the victims were innocent civilians because, as the court recognized, the purposes of the combatant activities exception are defeated *whenever* a contractor is subject to a tort suit for the combatant activities of its employees in a military operation. Thus, the *Koohi* court affirmed dismissal of the contractor based on the combatant nature of the conduct, without applying any of the product specification requirements of the government contractor defense.

In *Ibrahim*, 556 F. Supp. 2d at 4, the court held that CACI PT's employees engaged in "combatant activities," which suffices for preemption under *Koohi*, but then added a requirement that the military exercise "exclusive operational control" over the contractor's employees. The D.C. court's test contradicts the essential purpose of the federal interest in combatant activities. The exception is designed to avoid fettering a commander's flexibility in combat, or forcing him to answer for combat judgments in a civil court. The test also contradicts the congressional judgment, reflected in the combatant activities exception, that no duty of care should exist in combat. Allowing battlefield tort suits against contractors where a contractor exercises *some* degree of supervision over its own employees otherwise under military control frustrates this federal interest by creating tort duties that Congress determined should not exist in the wartime environment. It permits tort regulation of commanders' battlefield decisions by the very enemies

he has been called on to suppress. As a result, the proper test for preemption here is solely whether the contractor was engaged in combatant activities of the military.

Here, CACI PT's employees indisputably were performing "combatant activities" in interrogating Iraqis who were detained by the U.S. military and held at a combat zone detention facility. Combatant activities "include not only physical violence, but activities both necessary to and in direct connection with actual hostilities." *Johnson*, 170 F.2d at 770. "Aiding others to swing the sword of battle is certainly a 'combatant activity.'" *Id.* Battlefield intelligence efforts directly support combat operations and constitute "combatant activities." *Hamdi v. Rumsfeld*, 542 U.S. 507, 518 (2004) (arrest and detention activities "by 'universal agreement and practice,' are 'important incident[s] of war'" (citing *Ex parte Quirin*, 317 U.S. 1 (1942))). Allowing Plaintiffs' claims would create a duty of care on the battlefield that Congress sought to prevent, would subject military leaders to distracting tort litigation as third-party witnesses, and would infringe on the United States' constitutionally committed role in exercising the Nation's war powers. Therefore, the Court should hold that federal law preempts Plaintiffs' claims.

## F.     Plaintiffs' Alien Tort Claims Must Be Dismissed

In *Saleh*, the court dismissed the ATS claims asserted by the representative plaintiffs on behalf of a putative class that included Plaintiffs. *Saleh*, 436 F. Supp. 2d at 57-58. Plaintiffs' attempt to pursue ATS claims fares no better in this forum.[19]

### 1.     ATS Permits Assertion of New Tort Claims Only in Narrowly Prescribed Circumstances

In *Sosa v. Alvarez-Machain*, 124 S. Ct. 2739, 2762 (2004), the Court held that ATS "is a jurisdictional statute creating no new causes of action." Rather, ATS "enabled federal courts to

---

[19] Although Plaintiffs do not identify which claims they assert under ATS, the CACI Defendants assume that Plaintiffs are seeking to bring Counts I-IX under that statute.

32

hear claims in a very limited category defined by the law of nations and recognized at common law." *Id.* at 2754. When Congress enacted ATS, the common law recognized three violations of the law of nations as actionable by private parties under ATS: (1) offenses against ambassadors; (2) violations of safe conduct; and (3) actions involving piracy or prize captures. *Id.* at 2759 ("["O]ffences against this law [of nations] are principally incident to whole states or nations' and not individuals seeking relief in court." (quoting 4 *Blackstone's Commentaries* 68)).

Thus, *Sosa* requires "judicial caution when considering the kinds of individual claims that might implement the jurisdiction conferred by [ATS]," *id.* at 2762, and identified five factors that "argue for great caution in adapting the law of nations to private rights":

(1) At the time of ATS's enactment, the common law was perceived as the process of discovering preexisting law rather than making new law.

(2) The federal courts' practice "to look for legislative guidance before exercising innovative authority over substantive law."

(3) The Court "has recently and repeatedly said that a decision to create a private right of action is one better left to legislative judgment in the great majority of cases."

(4) "[T]he potential implications for the foreign relations of the United States of recognizing such causes should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs."

(5) The absence of a "congressional mandate to seek out and define new and debatable violations of the law of nations."

*Id.* at 2762-63. Claims arising out of the United States' conduct of war are poor candidates for private causes of action under ATS. Therefore, the Court should dismiss Plaintiffs' ATS claims.

### a. Congress Has Expressed an Intent Not To Have Wartime Claims Litigated in Federal Tort Actions

Courts should exercise caution before recognizing ATS claims because federal courts "look for legislative guidance before exercising innovative authority over substantive law," and

there has been no congressional mandate to recognize new ATS claims. *Sosa*, 124 S. Ct. at 2762-63. Congressional intent is clear that wartime injury claims should not be resolved through tort litigation. As explained in Section III.E, *supra*, the combatant activities exception to the FTCA reflects congressional judgment that no tort duty of care should exist in a combat context. *Koohi*, 976 F.2d at 1336; *Ibrahim*, 391 F. Supp. 2d at 18. The Court should respect Congress's determination. *See Sosa*, 124 S. Ct. at 2765 (noting that Congress can remove causes of action from ATS jurisdiction "explicitly, or implicitly by treaties or statutes that occupy the field").

> **b.      Recognizing Private Causes For Wartime Injuries Would Reverse Two Centuries of Law to the Contrary**

Wartime injury claims belong to the injured party's nation and cannot be asserted in a private suit. *See Ware*, 3 U.S. (3 Dall.) at 230 ("[T]he restitution of, or compensation for, British property confiscated, or extinguished, during the war, by any of the United States, could only be provided for by the treaty of peace; . . . they could not be agitated after the treaty, by the British government, much less by her subjects in courts of justice."); *Perrin*, 4 Ct. Cl. at 544; *Frumkin*, 129 F. Supp. 2d at 376 ("Claims for war reparations arising out of World War II have always been managed on a governmental level."); *Iwanowa*, 67 F. Supp. 2d at 485 ("The executive branch has always addressed claims for reparations as claims between governments."); *Burger-Fischer*, 65 F. Supp. 2d at 273 ("Under international law claims for compensation by individuals harmed by war-related activity belong exclusively to the state of which the individual is a citizen."); Restatement (Third) Foreign Relations Law of the United States § 713 cmt. a (1987).

The discretion to resolve wartime reparations claims belongs to the political branches, and is accomplished on a government-to-government level. It would infringe on the political branches' exclusive role in resolving wars and establishing foreign policy for the judiciary to

disrupt two centuries of foreign policy norms by allowing private litigants to circumvent this procedure by asserting claims under ATS. *See Sosa*, 124 S. Ct. at 2762-63.[20]

### c. Jurisdiction Under ATS Extends Only To Suits Concerning Official Actions of the United States

Plaintiffs allege that their injuries violated the "law of nations," Compl. ¶ 94, but have named only private contractors as defendants. Plaintiffs have failed to invoke this Court's limited jurisdiction under ATS because that jurisdiction only extends to suits involving state actors. *See Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 (D.C. Cir. 1985) (law of nations does not reach claims against private, non-state actors for "execution, murder, abduction, torture, rape [and] wounding"). To the extent Plaintiffs are claiming that CACI PT interrogators were acting as agents of the United States, the CACI Defendants would be entitled to the same sovereign immunity that government officials would enjoy. *See Sanchez-Espinoza,* 770 F.2d at 207 n.4; *Goldstar (Panama) S.A. v. United States*, 967 F.2d 965, 968 (4th Cir. 1992). The political question doctrine also clearly would bar such a claim. *Saleh*, 436 F. Supp. 2d at 58. Therefore, under either scenario, Plaintiffs' ATS claims must be dismissed.

### 2. Plaintiffs Have Not Properly Exhausted Their Remedies

The *Sosa* Court commented favorably on the premise that "basic principles of international law require that before asserting a claim in a foreign forum, the claimant must have exhausted any remedies available in the domestic legal system, and perhaps in other fora such as international claims tribunals." *Sosa*, 124 S. Ct. at 2766 n.21. It does not appear that Plaintiffs have made *any* effort to assert an administrative claim against the United States, even though it is United States policy that it *will* provide an administrative remedy to claimants with bona fide

---

[20] Indeed, the political branches have performed their exclusive role in determining wartime reparations by making administrative remedies available to claimants with verified claims of detainee abuse. *See* O'Connor Decl., Exs. A-C.

claims of injuries suffered while detained in United States detention facilities.  O'Connor Decl., Exs. A-C.[21]  Lack of exhaustion requires dismissal of Plaintiffs' ATS claims.

### 3. Plaintiffs Have Not Alleged His ATS Causes of Action With Sufficient Definiteness

In *Sosa*, the Supreme Court made clear that the *only* violations of the law of nations that could qualify as a cognizable tort under ATS are those that "rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to" the few torts understood as authorized under ATS at the time of the statute's enactment.  124 S. Ct. at 2761-62.  Plaintiffs have not defined the contours of the new "law of nations" torts they ask this Court to recognize.  This lack of definiteness is fatal to Plaintiffs' proposed ATS causes of action.  *See, e.g.*, Compl. ¶¶ 126-30 (asserting various causes of action for "Cruel, Inhuman or Degrading Treatment").  Therefore, even if Plaintiffs could demonstrate that ATS would permit litigation of claims for injuries incurred in war, regardless of Plaintiffs' failure to exhaust available administrative remedies, Plaintiffs' ATS claims *still* would fail for lack of definiteness.

### G. Plaintiffs' Complaint Fails to Allege Facts Sufficient to Establish *Respondeat Superior* Liability

Plaintiffs' complaint does not allege facts sufficient to create vicarious liability on the CACI Defendants' part.  Employers are liable for the intentional torts of their employees only when the tortious acts fall within the scope of their employment.  *Burlington Indus. v. Ellerth*, 524 U.S. 742, 756 (1998).[22]  Conduct is within the scope of employment if it is "of the same

---

[21] The Court may consider the United States' stated position in deciding the Rule 12(b)(6) aspects of the CACI Defendants' motion to dismiss as a matter on which the Court may take judicial notice.  *Laios*, ___ F. Supp. 2d at ___, 2008 WL 2741158, at *1.

[22] As the CACI Defendants have explained in Section III.C.2, *supra*, it does not appear that the tort law of any jurisdiction can be applied in this case.  Nevertheless, in explaining why Plaintiffs' assertion of *respondeat superior* liability fails as a matter of law, the CACI Defendants will cite to general principles of *respondeat superior* law for illustrative purposes.

general nature as that authorized" or "incidental to the conduct authorized."  Restatement (Second) of Agency § 229.  Acts within the scope of employment must be "actuated, at least in part, by a purpose to serve the master."  *Id*. § 228.  Plaintiffs allege no **facts** (as opposed to legal labels and conclusions) that would establish either that the CACI Defendants authorized CACI PT personnel to treat detainees in a manner prohibited by competent military authority or that the abuse of detainees by CACI PT employees would serve the interests of CACI PT.

The most specific allegation regarding the *respondeat superior* issue is that the CACI Defendants supposedly entered into a conspiracy to abuse detainees.  Am. Compl. ¶ 72.  But as explained in Section III.D, *supra*, the Plaintiffs allege no facts supporting this conclusory allegations.  Thus, the Amended Complaint falls far short of the "fair notice" to which the CACI Defendants are entitled in order to defend against a claim of *respondeat superior* liability.

## IV.    CONCLUSION

For the foregoing reasons, the Court should dismiss the Amended Complaint.

Respectfully submitted,

/s/   *J. William Koegel, Jr.*

J. William Koegel, Jr.
Virginia Bar No. 38243
John F. O'Connor (admitted *pro hac vice*)
Attorneys for Defendants CACI Premier
    Technology, Inc. and CACI International Inc
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000 - telephone
(202) 429-3902 – facsimile
wkoegel@steptoe.com
joconnor@steptoe.com

October 2, 2008

**CERTIFICATE OF SERVICE**

I hereby certify that on the 2nd day of October, 2008, I have served the foregoing by hand on the counsel identified below. I also will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

> Susan L. Burke
> William Gould
> Attorneys for Plaintiff
> Burke O'Neil LLC
> 4112 Station Street
> Philadelphia, PA 19127
> (215) 487-6596 – telephone
> sburke@burkeoneil.com
> wgould@burkeoneil.com

> */s/  J. William Koegel, Jr.*
> _____
> J. William Koegel, Jr.
> Virginia Bar No. 38243
> Attorney for Defendant CACI-Athena, Inc.
> STEPTOE & JOHNSON LLP
> 1330 Connecticut Avenue, N.W.
> Washington, D.C. 20036
> (202) 429-3000 - telephone
> (202) 429-3902 – facsimile
> wkoegel@steptoe.com