## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

|  |  |  |
|---|---|---|
| SUHAIL NAJIM ABDULLAH AL SHIMARI, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:08-CV-00827-GBL-JFA |
| v. | ) ) ) | |
| CACI INTERNATIONAL INC, et ano, | ) ) | |
| Defendants. | ) ) | |

### DECLARATION OF JOHN F. O'CONNOR

I, John F. O'Connor, hereby declare as follows:

1.     I am an attorney with the law firm of Steptoe & Johnson LLP.  I am one of the counsel of record for Defendants CACI International Inc and CACI Premier Technology, Inc. (collectively, the "CACI Defendants") in this action.  I have personal knowledge of the matters addressed in this Declaration.

2.     To the best of my knowledge, the CACI Defendants first encountered Plaintiff's counsel Susan L. Burke, Esq., in 2004, when she filed a putative class action against Defendant CACI International Inc and two other CACI entities in the U.S. District Court for the Southern District of California.  *See Saleh v. Titan Corp.*, 361 F. Supp. 2d 1152 (S.D. Cal. 2005).  I am one of the CACI Defendants' counsel of record in the *Saleh* case and have been since the initiation of that case.  Plaintiff Al Shimari would have been a member of the *Saleh* putative class.  The putative class action filed by Ms. Burke in California alleged claims under RICO, the Alien Tort Statute ("ATS"), the U.S. Constitution, the Geneva Conventions, and the common-

law tort jurisprudence of some unidentified state or foreign nation against the CACI Defendants, Titan Corporation (an entity now known as L-3 Services, Inc., that provided civilian linguists to support the military in Iraq), and certain of their employees. The gravamen of the *Saleh* plaintiffs' claims were that these defendants entered into a "torture conspiracy" with Secretary of Defense Rumsfeld, two undersecretaries of defense, a handful of general officers, and dozens of soldiers to torture detainees in Iraq for the express purpose of increasing the business market for civilian intelligence services. *See* Exhibit 1 at 3-5

3.     The CACI Defendants successfully transferred the *Saleh* action to this Court over plaintiffs' objections. Once the *Saleh* case reached this Court, the plaintiffs successfully moved to transfer the case a second time, this time to the District of Columbia, where the case could be consolidated with a related case pending in that Court. The CACI Defendants opposed the transfer of *Saleh* to the District of Columbia on the grounds that this Court was the more convenient forum and because transfer was unavailable to the District of Columbia in the grounds that the District of Columbia lacked personal jurisdiction over the individual defendants. After transfer to the District of Columbia, that court in fact dismissed the individual defendants on personal jurisdiction grounds.

4.     In the District of Columbia, the court dismissed most of the *Saleh* plaintiffs' claims, including all claims asserted under RICO and ATS, allowing only a handful of common-law tort claims to proceed. *Saleh v. Titan Corp.*, 436 F. Supp. 2d 55, 59 (D.D.C. 2006). The court also dismissed all of the individual defendants, including Timothy Dugan, a named Defendant in this action (since dismissed), on personal jurisdiction grounds. With respect to the surviving common-law tort claims, the court invited summary judgment motions from the

defendants on the issue of preemption, and limited discovery to that necessary to address the defendants' summary judgment motions.

5.     After summary judgment discovery, briefing, and argument, the *Saleh* court granted summary judgment to Titan Corporation and denied it to the CACI Defendants. Subsequently, the *Saleh* court granted the CACI Defendants' motion to certify the court's summary judgment order for interlocutory appeal, finding that the order involved "a controlling question of law as to which there is a substantial ground for difference of opinion." The *Saleh* court has stayed all trial court proceedings, over plaintiffs' objections, pending resolution of the CACI Defendants' interlocutory appeals. After issuing its summary judgment ruling, the *Saleh* court denied, without briefing, plaintiffs' motion to certify a class, and granted plaintiffs' counsel leave to file a Fourth Amended Complaint to add any additional plaintiffs to the case. On December 17, 2008, plaintiffs' counsel filed an amended complaint that added more than 230 new plaintiffs to the *Saleh* case, but not Plaintiff Al Shimari.

6.     On May 5, 2008, Ms. Burke filed a single-plaintiff suit against the CACI Defendants, L-3 Services, Inc., and Steven Stefanowicz in the U.S. District Court for the Central District of California. *Al-Janabi v. Stefanowicz*, No. 08-CV-2913 (C.D. Cal.) (the "California action"). That suit asserted that the defendants were liable to the plaintiffs for injuries the plaintiff allegedly suffered while detained by the United States in Iraq. Because Mr. Stefanowicz was one of the defendants in *Saleh* who had prevailed in the District of Columbia based on lack of personal jurisdiction, his inclusion as a defendant in the California action effectively prevented the defendants from transferring the case to the District of Columbia.

7.     On June 30, 2008, Ms. Burke followed up on the California action by filing three more single-plaintiff lawsuits against the CACI Defendants, each in a different federal court: (1)

this action, filed in the Southern District of Ohio; (2) *Al-Ogaidi v. Johnson*, No. 08-CV-1006 (W.D. Wash.) (the "Washington action"); and (3) *Al-Qurashi v. Nakhla*, No. 08-CV-1696 (D. Md.) (the "Maryland action"). Also on June 30, 2008, Ms. Burke filed a similar single-plaintiff action in the U.S. District Court for the Eastern District of Michigan, but that case named only L-3 Services as a defendant.

8.      Each of the single-plaintiff lawsuits Ms. Burke filed against the CACI Defendants on June 30, 2008 made essentially the same allegations as in the California action. These suits named as defendants the CACI Defendants, L-3 Services, and a different individual defendant in each case who had successfully asserted in *Saleh* that there was no personal jurisdiction over him in the District of Columbia. As with the California action, Plaintiffs' counsel's inclusion of a single individual defendant in each case who had successfully established a lack of personal jurisdiction in the District of Columbia meant that these cases could not be transferred by the defendants to the District of Columbia.

9.      On June 27, 2008, the CACI Defendants filed a motion to transfer the California action to this Court. The plaintiff, through counsel, opposed transfer and filed an opposition to the CACI Defendants' motion. With respect to the other actions, my colleague, J. William Koegel, Jr., and I conferred with Ms. Burke on several occasions in an attempt to obtain the plaintiffs' consent to transfer, but the plaintiff, through Ms. Burke, declined to consent. As a result, the CACI Defendants began preparing transfer motions, and filed a transfer motion in the Washington action on July 24, 2008.

10.      After causing the CACI Defendants to prepare a contested motion to transfer venue in the Washington action, Ms. Burke advised me on July 30, 2008 that the plaintiffs in this action and the Washington action would not oppose transfer to this Court. As a result, the

plaintiff in the Washington case filed no opposition to the CACI Defendants' motion to transfer, and Plaintiff Al Shimari consented to the filing of an unopposed motion to transfer venue in this action. With respect to the Maryland action, the plaintiff voluntarily dismissed the CACI Defendants and is proceeding solely against L-3 Services and the individual defendant named in that case.

11. In their transfer motions, the CACI Defendants had argued that the center of gravity for these cases was the Eastern District of Virginia and that transfer also could allow for consolidation of these single-plaintiff cases that Plaintiffs' counsel had filed around the country. Though it was the third case in which the CACI Defendants filed a motion to transfer venue, this action was the first to be transferred to this Court and was assigned to Judge Lee. *See Al Shimari v. Dugan*, No. 08-CV-0827 (E.D. Va.). Mr. Koegel and I had a telephone conference with Ms. Burke on the day the Ohio action was docketed in this Court and advised Ms. Burke that the case had been docketed and assigned to Judge Lee. During this telephone conference, Ms. Burke asked if the CACI Defendants still intended to seek consolidation of the cases that eventually were transferred to this Court. Mr. Koegel advised that the CACI Defendants anticipated that the Clerk's office might consolidate these related cases on its own, but that the CACI Defendants would move for consolidation if the Clerk's office did not do so.

12. On August 14, 2008, this Washington action was transferred to this Court and assigned to Judge Ellis. On August 15, 2008, Ms. Burke left a phone message for Mr. Koegel and then immediately sent Mr. Koegel and me an email to state the purpose of her call. Ms. Burke's email, received by the CACI Defendants' counsel at 9:49 a.m., indicated Ms. Burke's intent to advise the Clerk's office that it needed to "relate the Washington case to the Ohio case." *See* Exhibit 2. Three minutes later, Mr. Koegel responded to the email and advised that the

CACI Defendants' counsel desired to be on any call with the Court regarding the subject of consolidation. *See* Exhibit 3. Ms. Burke responded by email that she was already on the phone with the Clerk's office and would report on what she learned. *See* Exhibit 4. Ms. Burke ultimately reported that the Clerk's office advised that the parties would have to file a motion on the subject of consolidation, and stated that she would circulate a proposed consent motion. *See* Exhibit 5.

13.     Ms. Burke sent Mr. Koegel and me a proposed consent motion late in the day on August 15, 2008. Although there were now two cases in this Court (the Washington action and the present action), Ms. Burke proposed to file a motion only in the Washington action, in effect moving that Judge Ellis reassign his case to Judge Lee. The CACI Defendants' position was (and always had been) that it supported consolidation of these cases before a single judge. But the CACI Defendants thought (and think) it inappropriate for the parties to purport to select a judge to preside over their cases. Therefore, on the next business day, the CACI Defendants sent Ms. Burke proposed consent motions to consolidate to be filed in both this case and the Washington action. These motions would have sought consolidation of the two cases and left it to whatever internal procedures the Court uses to identify what judge should be assigned the consolidated cases. At Ms. Burke's request, I pasted the proposed motions into the body of an email rather than sending Ms. Burke an attached file containing the draft motions. *See* Exhibit 6.

14.     On August 21, 2008, Ms. Burke contacted me and took the position that the CACI Defendants had "agreed" to consolidation before Judge Lee. I responded that this was not true, that the CACI Defendants' position had always been that they believed consolidation was appropriate, and that the CACI Defendants neither favored nor opposed assignment of the consolidated cases to any particular judge. Ms. Burke asked me to verify this position with Mr.

Koegel, as Ms. Burke claimed confidence that Mr. Koegel would recall that he had agreed to consolidate the cases before Judge Lee during the telephone conference in which Ms. Burke, Mr. Koegel, and I participated. I responded that I found it highly unlikely that Mr. Koegel would recall the conversation in this manner, as it differed from my clear recollection of the telephone conference, but that I would raise the issue with him. In response, Mr. Koegel sent Ms. Burke an email to confirm that the CACI Defendants favored consolidation but had never represented that they would purport to advise the Court which judge should be assigned the consolidated cases. *See* Exhibit 7.

15. On August 22, 2008, Ms. Burke asked me to send her a Word version of the draft motions to consolidate the CACI Defendants previously had sent Ms. Burke by email, which I did. *See* Exhibits 8, 9. This request was consistent with Ms. Burke's statement on August 21 that she would send a proposed filing to the CACI Defendants for their review.

16. While the CACI Defendants were awaiting a revised draft motion to consolidate from Ms. Burke, Ms. Burke, without advising the CACI Defendants of any change in plans, instead filed a notice of dismissal for the Washington action on August 25, 2008. Because Ms. Burke had previously intimated that she would be sending a revised draft motion to consolidate to Defendants for their review, I telephoned Ms. Burke to get an understanding of what she was doing with these cases. Ms. Burke advised that she had decided to dismiss the Washington action because it was too much work to litigate on behalf of two plaintiffs in a court that moves as fast as this Court. Ms. Burke added that she intended to "shift" the plaintiff in the Washington action to the case she had filed in Maryland, and which was now proceeding solely against L-3 Services and a single individual defendant.

17.     I asked Ms. Burke whether her actions and explanation meant that she would be dismissing the California action, which had been transferred to this Court. Ms. Burke stated that while she had seen the transfer order, she did not believe the California action had been docketed in this Court yet. I advised Ms. Burke that the case had been docketed and that it had been assigned to Judge O'Grady. Ms. Burke stated that she did not know anything about Judge O'Grady, and I responded that he had been recently appointed to the Court. Ms. Burke responded by claiming a need to confer with her client in the California case as to whether to dismiss that action and "shift" him to the Maryland action. At 7:00 a.m. the next morning, Ms. Burke filed a notice of dismissal of the California action.

18.     On September 15, 2008, Ms. Burke filed an Amended Complaint adding Plaintiffs Rashid, Al-Zuba'e, and Al-Ejaili to this action. These Plaintiffs were not parties to this action while the case was pending in Ohio.

19.     Attached hereto are true copies of the foregoing documents:

Exhibit 1:     Plaintiffs' RICO Case Statement in *Saleh v. Titan*, No. 04-CV-1143 (S.D. Cal.)

Exhibit 2:     Email from Susan Burke to J. William Koegel, Jr. and John O'Connor of August 15, 2008

Exhibit 3:     Email from J. William Koegel, Jr. to Susan Burke of August 15, 2008

Exhibit 4:     Email from Susan Burke to J. William Koegel, Jr. and John O'Connor of August 15, 2008

Exhibit 5:     Email from Susan Burke to J. William Koegel, Jr. and John O'Connor of August 15, 2008

Exhibit 6:     Email from John O'Connor to Susan Burke of August 18, 2008

Exhibit 7:     Email from J. William Koegel, Jr. to Susan Burke of August 21, 2008

Exhibit 8:     Email from Susan Burke to John O'Connor of August 22, 2008

Exhibit 9:    Email from John O'Connor to Susan Burke of August 22, 2008

Exhibit 10:   Excerpts from the hearing transcript of December 6, 2007 in *Saleh v. Titan Corp.*, No. 05-1165 (D.D.C.).

20.    Pursuant to 28 U.S.C. § 1746, I swear that the foregoing is true to the best of my knowledge and belief. Executed this 10th day of October 2008, at Washington, D.C.

_____
John F. O'Connor

**CERTIFICATE OF SERVICE**

I hereby certify that on the 10th day of October, 2008, I served the foregoing, by hand delivery, on the counsel indicated below. In addition, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Susan L. Burke
William Gould
Attorneys for Plaintiff
Burke O'Neil LLC
4112 Station Street
Philadelphia, PA 19127
(215) 487-6596 – telephone
sburke@burkeoneil.com
wgould@burkeoneil.com


/s/  *J. William Koegel, Jr.*

J. William Koegel, Jr.
Virginia Bar No. 38243
Attorney for Defendant CACI-Athena, Inc.
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000 - telephone
(202) 429-3902 – facsimile
wkoegel@steptoe.com

# **Exhibit 1**

1 | William J. Aceves (CA Bar # 151031)
225 Cedar Street
2 | San Diego, CA 92101
(619) 515-1589
3 | Counsel for Plaintiffs

FILED
04 JUL 30 PH 4: 09
CLERK U S DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY FACSIMILE
DEPUTY

4

5 | **IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

6

7 | SALEH, an individual; SAMI ABBAS AL RAWI, an individual; MWAFAQ SAMI ABBAS AL
8 | RAWI, an individual; AHMED, an individual; ISMAEL, an individual; NEISEF, an individual;
9 | ESTATE OF IBRAHIEM, the heirs and estate of an individual; RASHEED, an individual; JOHN DOE
10 | NO. 1; JANE DOE NO. 2; CLASSES OF PERSONS SIMILARLY SITUATED, KNOWN
11 | HEREINAFTER AS JOHN and JANE DOES NOS. 3 – 1050,
12 | 
      Plaintiffs,
13 | 
14 | v.
15 | TITAN CORPORATION, a Delaware Corporation; ADEL NAKHLA, a Titan employee located in Abu
      Ghraib, Iraq; CACI INTERNATIONAL INC., a
16 | Delaware Corporation; CACI INCORPORATED – FEDERAL, a Delaware Corporation; CACI N.V., a
17 | Netherlands corporation; STEVEN A. STEFANOWICZ, a CACI employee located in Abu
18 | Ghraib, Iraq; and JOHN B. ISRAEL, a Titan subcontractor located in Abu Ghraib, Iraq,
19 | 
20 | 
      Defendants.

| Case No. '04 CV 1143 R (NLS)
| **CLASS ACTION**
| **PLAINTIFFS' RICO CASE STATEMENT FILED PURSUANT TO LOCAL RULE 11.1**
| **FILED BY FACSIMILE**

21 | 
      Plaintiffs hereby file their initial RICO Case Statement pursuant to Local Rule 11.1.
22
23
24
25
26
27
28

RICO CASE STATEMENT                    Case No. 04cv1143 R (NLS)

051                                                                **EXHIBIT 1**

ORIGINAL

1.  **State whether the alleged unlawful conduct is in violation of 18 U.S.C. 1962(a), (b), (c), and/or (d).**

Defendants' unlawful conduct violates subsections (a), (c) and (d) of 18 U.S.C. § 1962. Plaintiffs believe additional discovery and investigation may reveal that Defendants' unlawful conduct also violates subsection (b) and respectfully reserves the right to supplement this RICO Case Statement upon the completion of discovery relating to subsection (b).

2.  **List the defendants and state the alleged misconduct and basis of liability of each defendant.**

Titan Corporation ("Defendant Titan") - Defendant Titan, acting through its employees, engaged in racketeering activity by participating in a conspiracy that kidnapped persons and repeatedly threatened to murder and harm persons being detained in prisons in Iraq. Plaintiffs also believe that discovery and further investigation will establish that Defendant Titan, acting through its employees, conspired to murder persons being detained in prison in Iraq and transported stolen property across state lines. Defendant Titan acted in Iraq through Defendants Adel L. Nakhla and John B. Israel, as well as Simon Rouhana, Wagdy Ashamalla, Hussein Gurashi, Bakeer Naseef, Khalid Omran, Al Sleem, Leonardo Acho, Hoger Sairany, Sonia Mohammed, Hana Korkis, Keirkan Hovsepian, Nesrin Dikow, Amal Hanna, Mervat Mousa, Nada Fradi, Issam Hamama, and Rauf Zeerak. Further discovery and investigation is needed to establish which of these persons and other as yet to be identified persons participated along with Adel Nakhla and John B. Israel in racketeering activity.

Adel Nakhla. Defendant Nakhla engaged in racketeering activity by personally participating in a conspiracy that kidnapped persons, and repeatedly threatened to murder and harm persons being detained in prisons in Iraq.

John B. Israel. Defendant Israel engaged in racketeering activity by participating in a conspiracy that repeatedly threatened to murder and otherwise harm persons being detained in prisons in Iraq.

1    <u>CACI International, Inc., CACI Incorporated – Federal, CACI N.V.</u> ("CACI Corporate

2    Defendants") The CACI Corporate Defendants, acting through its employees, engaged in

3    racketeering activity by participating in a conspiracy that kidnapped persons and repeatedly

4    threatened to murder and harm persons being detained in prisons in Iraq.  In addition, Plaintiffs

5    believe that discovery and further investigation will establish that the CACI Corporate Defendants,

6    acting through its employees, conspired to murder and otherwise harm persons being detained in

7    prison in Iraq and transported stolen property across state lines.  The CACI Corporate Defendants

8    acted in Iraq through, among others, Peter Bilon, Jeff McCall, Ferdinand Ibabao, Harold Mong,

9    Michael Tutor, Allen West, Tyrone Gardner, Ken Powell, Mohammed Ali, Joseph Solin, Dan

10    Porvoznik, Mike Cahoon, Donald Hyde, John Blee, Mike Hensch, Luke Olander, Kevin

11    Bloodworth, Martin Meadows, James Mayo, Tim Dugan, Torin Nelson, Skylar Greco, Don

12    Simpson, Eric Fair, William Armstrong, Sean Duysen, Scott Norman, Mike Bagdasarov, Defendant

13    Steven Stefanowicz, C. James Albury,  Dan Johnson, Steve Hattabaugh, and Joseph Ryan.  Further

14    discovery and investigation will establish which of these persons in addition to Defendant Steven

15    Stefanowicz engaged in racketeering activity.

16    <u>Steven A. Stefanowicz.</u>  Defendant Stefanowicz engaged in racketeering activity by

17    participating in a conspiracy that kidnapped persons and repeatedly threatened to murder and

18    otherwise harm persons being detained in prisons in Iraq.

19    <u>Basis for liability under RICO for Defendants</u>:  Defendant Titan, CACI Corporate

20    Defendants, Defendant Stefanowicz, Defendant Israel, and Defendant Nakhla conspired with

21    certain United States officials to engage in a series of wrongful and illegal acts, including but not

22    limited to, kidnapping and repeatedly threatening murder and harm.

23    Defendants intentionally participated in this conspiracy and knowingly engaged in a pattern

24    and practice of wrongful acts in order to inflate artificially by these acts the demand for

25    interrogation and other related services such as interpretation and translation (collectively referred

26    to as "Interrogation Services").

27

28

1    Defendants profited from this artificially-inflated "supply" of "intelligence" because it
2  caused the United States to increase the demand for such services and direct additional government
3  contracts to Defendant Titan and CACI Corporate Defendants.

4        Each of the Defendants was the agent, employee and/or joint venturer, and/or working in
5  concert with, other Defendants and was acting within the course and scope of such agency,
6  employment and/or joint venture or concerted activity.  To the extent that any particular act was
7  perpetrated by a certain Defendant or Defendants, the remaining Defendant or Defendants
8  confirmed and/or ratified the same.

9        3.  **List alleged wrongdoers, other than the defendants listed above, and state the**
10  **alleged misconduct of each wrongdoer.**

11        Certain government officials (hereinafter included in the term "Torture Conspirators")
12  conspired with Defendants to engage in racketeering acts, including but not limited to threatening
13  murder and murder.  Among other acts, these government officials adopted and/or implemented
14  "Rules of Engagement" for Interrogations purporting to permit Interrogators to threaten detainees
15  with death.  These government officials adopted and/or implemented policies and practices that led
16  to detainees being kidnapped, tortured, threatened with death and bodily harm, physically and
17  mentally permanently disabled, and, in some cases, murdered.

18        Further discovery and investigation is needed to identify all of the conspiring government
19  officials, but they include Donald H. Rumsfeld, Douglas J. Feith, Major General Geoffrey D.
20  Miller, Stephen A. Cambone, Mark Jacobson, General Ricardo Sanchez, Lieutenant Colonel Jerry
21  Phillabaum, Brigadier General Janis L. Karpinski, Colonel Thomas M. Pappas, Lieutenant Colonel
22  Steven L. Jordan, Major David W. DiNenna, Sr., CPT Donald J. Reese, Major General Barbara
23  Fast, Maj. General Walter Wojdakowski, First Lieutenant Lewis C. Raeder, Sergeant Major Marc
24  Emerson, First Sergeant Brian G. Lipinski, Sergeant First Class Shannon K. Snider, Specialist
25  Sabrina Harman, Sergeant Javal S. Davis, Specialist Charles A. Graner, Jr., Staff Sgt. Ivan L.
26  Frederick II, 800th MP Brigade S-4 Major Green, Lieutenant Colonel James O'Hare, Lieutenant
27  Gary Maddocks, Specialist Jeremy Sivits, PFC Lynndie R. England, Captain Carolyn A. Wood,
28

1  Spec. Megan M. Ambuhl, Master Sgt. Lisa Girman, Scott McKenzie, SFC Tracey E. Perkins, Lt.

2  Jack M. Saville, Sgt. Reggie Martinez, and SPC Terry Bowman.

3         Further discovery and investigation is needed to ascertain whether the following persons

4  also participated in the conspiracy and illegal rackeetering activity: CPL Brottomesso, CPT

5  Chamorro, CPT McNealkidd, CPT Thompson, CW2 Graham, CW2 Rivas, CW2 Rumminger, MAJ

6  Price, PFC Banks, PFC Stumpf, PFC Williams, SFC Brokaw, SFC Cecil, SFC Johnson, SFC

7  Roberts, SFC Seija, SFC Yeske, SGT Brown, SGT Chan, SGT DeLaRosa, SGT Dennis, SGT

8  Eckroth, SGT Garcia, SGT Gouldner, SGT Hernandez, SGT Hill, SGT Kasse, SGT Knuth, SGT

9  Komarek, SGT Laursen, SGT Lee, SGT Monserate, SGT Moore, SGT Provance, SGT

10  Siegenthaler, SGT Stoltzman, SGT Yager, SGT Yi, SPC Blalock, SPC Blalock, SPC Borden, SPC

11  Breitman, SPC Caudill, SPC Chavarna, SPC Chavarrla, SPC Clardy, SPC Cruz, SPC DeLaRosa,

12  SPC Delgado, SPC Drown, SPC Ellis, SPC Forcash, SPC Garhart, SPC Gilchrist, SPC Griffin,SPC

13  Harris, SPC Heidenreich, SPC Janes, SPC Johnson, SPC Kersey, SPC Ketzer, SPC Langlanese,

14  SPC Mitchell, SPC Monath, SPC Nelson, SPC Pazdersky, SPC Porter, SPC Rivera, SPC Rush,

15  SPC Schlegal, SPC Shepherd, SPC Son, SPC Spencer, SPC Travise, SPC Walker, SPC Webster,

16  SPC Wong, SPC Zawacki,SSG Aston, SSG Blumenburg, SSG Burgess, SSG Henderson, SSG

17  Klesowitch, SSG Labonte, SSG Neal, SSG Schuster, SSG Strothenke, SSG Swiderski, SSG

18  Williams, SSG Yusufoff, and SSG Zambito.

19         4.  **List the alleged victims and state how each victim was allegedly injured.**

20         Victims who have suffered RICO injuries include Plaintiff Sami Abbas Majdel Al Rawi

21  ("Plaintiff Sami"), a 56-year old Iraqi citizen, residing at Bhagdad – Amirya – PL636, St 74, House

22  No. 19, Bhagdad, Iraq. He owns and manages a company in Baghdad that had entered into a

23  number of reconstruction contracts with the United States government. On March 1, 2004, Plaintiff

24  Sami was arrested and detained at the Baghdad International Airport Prison, together with his four

25  sons. Plaintiff Sami was tortured and otherwise mistreated by the Defendants and their co-

26  conspirators. Plaintiff Sami was released without charge on March 6, 2004. At the time of his

27  arrest, Plaintiff Sami had in his possession $65,750 and 15,350,000 Iraqi dinars, as well as other

28

055

1 valuables. The Torture Conspirators wrongfully confiscated and kept this money and property
2 following Plaintiff Sami's arrest.

3 Victims who have suffered RICO-injuries include Plaintiff Ahmed ("Plaintiff Ahmed"), an
4 Iraqi released without charge after five months of detention in Abu Ghraib Prison, Tent No. 7,
5 Camp No. 3. His prison number was No. 154120. Plaintiff Ahmed was tortured and otherwise
6 mistreated by the Defendants and their co-conspirators. Plaintiff Ahmed also suffered property
7 losses as a result of actions by the Torture Conspirators. They destroyed his house, and took
8 $3,200 in cash, $1,500 worth of gold, and jewelry and other property.

9 Victims who have suffered RICO injuries include Plaintiff Neisef ("Plaintiff Neisef"), an
10 Iraqi who was detained for seven months in Abu Ghraib Prison, Tent No. 7, Camp No. 3, and for
11 five months in Buka Prison. Plaintiff Neisef was tortured and otherwise mistreated by the
12 Defendants and their co-conspirators. Plaintiff Neisef suffered property losses as a result of actions
13 by the Torture Conspirators. They damaged his house, took $6,000 in cash, $1,000 worth of gold
14 and jewelry.

15 Victims who suffered RICO injuries also include the class known as Plaintiffs John and
16 Jane Does Nos. 3 – 500, which are persons who (a) have been forcibly detained in prisons or
17 facilities in or around Iraq subsequent to the fall of the Hussein regime; (b) have been subjected to
18 conditions and abuses that violate United States domestic law, international treaties, and norms of
19 customary international humanitarian and human rights law; and (c) have suffered injuries to their
20 properties and businesses as a result of those conditions and abuses. (This Class shall hereinafter
21 be known as the "RICO Class.")

22 The Torture Conspirators have caused extensive damage to certain Plaintiffs' businesses
23 and properties, including, upon information and belief, putative RICO Class Members' businesses
24 and properties located in the United States.

25 In addition to the victims who suffered RICO injuries, there are many victims of the Torture
26 Conspiracy who lost their lives or who survived but who were permanently physically and mentally
27 harmed by the torture. These include, but are not limited to, the persons identified as murdered in
28 response to Question No. 5, Amjed Isail Waleed, Hiadar Saber Abed Miktub-Aboodi, Huessin

1  Mohssein Al-Zayiadi, Kasim Medhaddi Hilas, Mohanded Juma, Mustafa Jassim, Shalan Said
2  Alsharoni, Abd Alwhab Youss, Asad Hamza Hanfosh, Nori Samier Gunbar Al-Yasseri, Thaar
3  Salman Dawod, Ameen Sa'eed Al-Sheikh, and Abdou Hussain Saad Faleh, plaintiffs, and the
4  putative class of plaintiffs. Plaintiffs reserve the right to conduct discovery to ascertain whether
5  these additional victims also suffered RICO injuries in addition to being deprived of life and/or
6  physical and mental health.

7      5. **Describe in detail the pattern of racketeering activities or collection of unlawful**
8  **debts alleged for each RICO claim. The description of the pattern of racketeering shall**
9  **include the following information:**

10          (a) **List the alleged predicate acts and the specific statutes that were allegedly**
11  **violated.**

12          Plaintiffs allege that Defendant Titan, CACI Corporate Defendants and the Individual
13  Defendants, together with the co-conspiring government officials, engaged in a systematic and
14  extensive series of illegal acts that formed a pattern and practice of racketeering activity. The
15  pattern and practice of racketeering activities included, but was not limited to, kidnapping, assault
16  including rape, acts and threats of murder, and murder.

17          Statutes violated include, among others, California Code Cal. Penal Code §§ 187-199
18  (homicide); 207-210 (kidnapping); 211-215 (robbery); 217.1-219.3 (attempts to kill); 261-269
19  (rape, abduction, carnal abuse of children, and seduction); 311-312.7 (obscene matter); 422-422.1
20  (criminal threats); United States Code, Title 18, U.S.C. § 1510 (relating to the obstruction of
21  criminal investigations), § 1951 (relating to interference with commerce, robbery, or extortion), §
22  1952 (relating to racketeering), § 1958 (relating to use of interstate commerce facilities in the
23  commission of murder-for-hire), §§ 2251-2252 and 2260 (relating to sexual exploitation of
24  children) and § 2315 (relating to interstate transportation of stolen property); Article 23 of the
25  Transitional Administrative Law, and Iraqi laws in force under Coalition Provisional Authority
26  Regulation No. 1, including Iraqi Penal Code of 1968 and the Criminal Procedure Code of 1972,
27  which include laws prohibiting murder, attempted murder, and robbery.

28

1        (b) **Provide the date of each predicate act, the participants in each predicate act,**

2   **and a description of the facts constituting each predicate act.**

3        On or about May 11, 2003, persons yet to be identified murdered Hussein Awad Al-Juwadi,

4   a male detaineee being held in Bhadgdad, Iraq.

5        On or about June 6, 2003, persons yet to be identified murdered Naem Sadoon Htab, a male

6   Iraqi being detained in Nasyrah, Iraq, by strangling him until he died.

7        On or about June 13, 2003, persons yet to be identified murdered Dilar Dababa, a male

8   detainee being held at a classified interrogation facility in Bagdad known as Camp Cropper. The

9   murder was accomplished by blows to the head, which were described in the death certificate as

10  "closed head injury with a cortical brain contusion and subdural hematoma."

11       On or about August 22, 2003, persons yet to be identified murdered Tariq Zaid Mohamded,

12  a detainee in Iraq.

13       On or about November 4, 2003, persons yet to be identified, including but not limited to

14  persons who worked with the Special Forces and Navy SEALS, murdered Manadel Al-Jamadi, an

15  Iraqi male detained in Abu Ghraib prison. The murder was described in the death certificate as

16  accomplished by "blunt force injuries complicated by compromised respiration."

17       On or about November 20, 2003, persons yet to be identified murdered an Iraqi named

18  Jamadi. The murder occurred in Abu Ghraib prison. Subsequent to the murder, persons yet to be

19  identified tried to obscure the murder and portray it as death by natural causes by placing an IV into

20  his arm.

21       On or about November 26, 2003, persons yet to be identified murdered Maj. Gen. Abid

22  Hamed Mowhoush by shoving him head-first into a sleeping bag and smothering him. The murder

23  occurred in Al Qaim, Iraq. The death certificate describes the murder as accomplished by

24  "asphyxia due to smothering and chest compression."

25       On or about January 9, 2004, persons yet to be identified murdered Abdul Jaleel, a 47-year

26  old Iraqi male. He was murdered at the Forward Operating Bases Rifles Bases, Al Asad, Iraq. His

27  body was discovered shackled to the door of his cell with his hands over his head and gagged. The

28  death certificate describes the murder as accomplished by "blunt force injuries and asphyxia."

1    On or about April 5, 2004, persons yet to be identified murdered Fashad Mohamad, a male
2    detainee being held at an unknown location in Iraq.

3    On or about April 14, 2004, persons yet to be identified murdered Mousa Farhan. The
4    murder occurred in Abu Ghraib prison.

5    On or about April 28, 2004, persons yet to be identified murdered Fahin Ali Gumas, a 44-
6    year old Iraqi being detained in Baghdad, Iraq. The death certificate describes the murder as
7    accomplished by "multiple gunshot wounds."

8    On or about June 28, 2003, five persons yet to be identified took a male detainee Saleh into
9    an interrogation booth at the Abu Ghraib prison. One of the persons pulled out a gun and fired at
10   Saleh from several yards away. The attempted murder occurred in Abu Ghraib prison.

11   On or around mid-December, 2003, Sgt. Cardona and other persons yet be identified
12   threatened Ballendia Sadawi Mohammed with death by loosing dogs on him. The threat occurred
13   at the Abu Ghraib prison.

14   On or about December 12, 2003, persons yet to be identified threatened a naked Iraqi
15   detainee with death by loosing a dog on him. The threat of murder occurred in Abu Ghraib prison.

16   On or around early January, 2004, Sgt. Cardona and other persons yet to be identified
17   threatened a yet-to-be identified person with death by bringing a dog to an interrogation booth.

18   On or before May 21, 2004, an unknown employee of Defendant Titan and other persons
19   yet to be identified threatened persons with death and/or severe bodily harm, and forcibly stripped
20   them, handcuffed them, and forced them to assume sexual positions.

21   On a date that has not yet been determined, SPC Sabrina D. Harman and other persons yet
22   to be identified threatened a detained Iraqi with death by loosing dogs on him. The attempted
23   murder occurred at the Abu Ghraib prison.

24   On a date that has yet to be determined, persons who have yet to be identified videotaped
25   the sexual molestation and rape of a 15-year old boy.

26   On dates that have not yet been determined, SPC Sabrina D. Harman and other persons yet
27   to be determined caused to be transported obscene materials.

28

On or around winter 2003-2004, persons yet to be identified kidnapped the sixteen-year-old son of an Abu Ghraib detainee, stripped the boy naked, threw him in the back of an open truck, drove the truck around in the cold night air, splattered him with mud, and then brought him before his father. The detainee thereafter promised to tell interrogators everything he knew.

At a date not yet determined, a translator identified by the media as "Abu Hamid" raped a teenage Iraqi boy while a female who has not yet been identified photographed the rape.

At a date not yet determined, persons not yet identified videotaped Iraqi boys being sodomized at the Abu Ghraib prison.

On or around November 2003, persons not yet identified imported obscene materials into the United States, including but not limited to pictures of detainees in sexual positions at Abu Ghraib prison.

**(c) If the RICO claim is based on the predicate offenses of wire fraud, mail fraud, or fraud in the sale of securities, the "circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). Identify the time, place and substance of the alleged misrepresentations and the identity of persons to whom and by whom the alleged misrepresentations were made.**

The RICO claims are not based upon the predicate offenses of wire fraud, mail fraud, or fraud in the sale of securities.

**(d) State whether there has been a criminal conviction for violation of any predicate act.**

To date, one participant in the Torture Conspiracy has been convicted. He pleaded guilty and was sentenced to one year in prison.

**(e) State whether civil litigation has resulted in a judgment with regard to any predicate act.**

No.

**(f) Describe how the predicate act forms a "pattern of racketeering activity."**

The predicate acts of murder, attempted murder and threats of murder are part of a series of acts beginning as early as January 2002 and continuing to date. These predicate RICO acts, as well

1 as numerous other acts of torture were and are designed to intimidate and coerce hundreds of

2 detainees into providing a continuing stream of "intelligence."

3      Defendants and the co-conspiring government officials jointly operate six "intelligence"

4 facilities in Iraq. These facilities are known as Talil Airbase, Bushmaster, Bucca, Dogwood,

5 Cropper and Abu Ghraib (which is also spelled as Abu Ghurayb).

6      At each of these facilities, and perhaps at other locations yet to be identified, Defendants

7 and the co-conspiring government officials operated an intensive interrogation, debriefing and

8 intelligence gathering program designed to screen and identify detainees who had valuable

9 "intelligence."

10      Defendants and the co-conspiring government officials formed "tiger teams" and "break

11 teams." These teams typically consisted of an Interrogator employed by either the CACI Corporate

12 Defendants or the United States, a Translator employed by Defendant Titan or the United States,

13 and an Analyst employed by either the CACI Corporate Defendants, Defendant Titan or the United

14 States.

15      These "tiger teams" and "break teams" interrogated detainees in interrogation booths. After

16 the completion of an interrogation session, the "intelligence" obtained from the detainee was

17 inputted into a database known as the Interrogation and Reporting Database. This Database was

18 used to generate a "daily interrogation rollup" as well as other statistical reports that reflected the

19 number of interrogations and the amount of information obtained from the interrogations.

20      Defendants and the co-conspiring government officials ("Torture Conspirators") did not

21 conduct the interrogations in a manner that complied with the law. Instead, the Torture

22 Conspirators repeatedly and routinely engaged in a series of unlawful acts, including predicate

23 RICO acts such of kidnapping, murdering, and threatening to murder detainees and otherwise

24 torturing and mistreating the detainees.

25      **(g) State whether the alleged predicate acts relate to each other as part of a**

26 **common plan. If so, describe the relationship and common plan in detail.**

27      As described in the Complaint, acting together, Defendants Titan, CACI Corporate

28 Defendants, Stefanowicz, Israel, and Nakhla conspired with certain United States officials to

1 engage in a series of wrongful and illegal acts, including but not limited to, threatening to murder,

2 murder, torture or other cruel, inhuman or degrading treatment, arbitrary arrest and detention,

3 assault and battery, false imprisonment and intentional interference with religious practices.

4      These predicate acts were all part and parcel of a common plan. The plan's purpose was to

5 inflate artificially by these acts the demand for interrogation and other related services such as

6 interpretation and translation. By designing and implementing this plan, Defendants expected to,

7 and did, profit and gain a competitive advantage from this artificially-inflated demand for such

8 services and from additional government contracts awarded to them.

9      The alleged predicate acts all relate to each other as part of this common plan. These acts

10 are part of a series of wrongful and illegal acts that are all part of the common plan to intimidate

11 and coerce detainees into providing interrogators with "intelligence" as a means to cease the

12 physical and mental harm being done to them. The "intelligence" obtained by these illegal and

13 unlawful means was disseminated both by means of the Interrogation and Reporting Database and

14 otherwise. The Torture Conspirators, relying on the existence of "intelligence" obtained by

15 unlawful means, successfully created additional demand for the Interrogation Services being

16 marketed and sold by the Corporate Defendants.

17      The murders, kidnappings, robberies, threats of murder, and obscene acts identified above

18 are part of the series of wrongful acts all designed to intimidate and coerce detainees into providing

19 "intelligence." To date, based on the United States' preliminary investigations, there are already

20 more than 94 instances of theft, physical assault, sexual assault and murder by the Torture

21 Conspirators.

22     **6. Describe in detail the alleged "enterprise" for each RICO claim. A description of**

23 **the enterprise shall include the following:**

24      **(a) State the name of the individuals, partnerships, corporations, associations, or**

25 **other legal entities, which allegedly constitute the enterprise.**

26      The RICO Enterprise consists of an association-in-fact between Defendant Titan, the CACI

27 Corporate Defendants, Defendants Nakhla, Stefanowicz and Israel, and the co-conspiring

28 government officials.

1    (b) **A description of the structure, purpose, function and course of conduct of the**
2    **enterprise.**

3        The Enterprise is an association-in-fact formed by the CACI Corporate Defendants,
4    Defendant Titan, the individual Defendants and certain government officials. The central purpose
5    of the Enterprise is to increase the United States' demand for the non-governmental professionals to
6    assist the United States' intelligence-gathering efforts.

7        To achieve that end, the Enterprise seeks to prove the capacity to obtain "intelligence" from
8    detained persons. To accomplish that purpose in Iraq, the Enterprise organized itself into a series
9    of interrogation teams that function as units. The personnel assigned to each interrogation team
10   shifts over time, but typically includes a person designated as an Interrogator, a person designated
11   as a Translator, and a person designated as an Analyst. On occasion, an interrogation team may
12   include more than three persons.

13       The Enterprise obtained "intelligence" from detainees by both lawful and unlawful means.
14   The Enterprise is an ongoing organization that continues to function as a unit and engage in activity
15   separate and apart from the criminal and illegal activity. The Enterprise operates in locations in
16   Iraq, other foreign locations, and in the United States. The Enterprise is managed and operated by
17   executives from the CACI Corporate Defendants, Defendant Titan, and by certain government
18   officials, including military officials.

19       The Enterprise conducts legitimate business in Iraq, other foreign countries, and in the
20   United States. For example, discovery likely will reveal that in some instances the Enterprise
21   conducted certain interrogations in Iraq in a lawful manner. Note, however, that the overarching
22   goal of the Enterprise (to obtain more government contracts for Interrogation Services) may be
23   illegal to the extent that the law of government contracts prohibits and prevents the United States
24   from hiring outside contractors to perform uniquely-governmental functions such as intelligence
25   gathering.

26       (c) **A statement of whether any defendants are employees, officers or directors of**
27   **the alleged enterprise.**

28

1    Defendant Nakhla was an employee of Defendant Titan, one of the entities comprising the

2    Enterprise. Defendant Israel was an agent, constructive employee and/or subcontractor of

3    Defendant Titan, one of the entities comprising the Enterprise. Defendant Stefanowicz is an

4    employee of the CACI Corporate Defendants, one of the entities comprising the Enterprise.

5        Defendant Titan and the CACI Corporate Defendants are corporate entities that, together

6    with certain government officials, comprise the Enterprise.

7           (d) **A statement of whether any defendants are associated with the alleged**

8    **enterprise.**

9        As described above, all of the Defendants were associated with the Enterprise during the

10   events alleged in the Second Amended Complaint. At present, Defendants Nakhla and Israel do not

11   appear to be employed or subcontracted by any of the Enterprise entities.

12         (e) **A statement of whether plaintiff is alleging that the defendants are individuals**

13   **or entities separate from the alleged enterprise or that the defendants are the enterprise itself,**

14   **or members of the enterprise.**

15        Plaintiffs allege that Defendant Titan and CACI Corporate Defendants, together with the

16   individual Defendants and certain government officials are members of, and have an association-in-

17   fact that is, the Enterprise.

18         (f) **If any defendants are alleged to be the enterprise itself, or members of the**

19   **enterprise, an explanation of whether such defendants are perpetrators, passive instruments,**

20   **or victims of the alleged racketeering activity.**

21        Plaintiffs allege that Defendant Titan, CACI Corporate Defendants, and the individual

22   Defendants are all members of the association-in-fact that is the Enterprise.

23        Defendant Titan, CACI Corporate Defendants, and the individual Defendants are all

24   members of the Torture Conspiracy and are perpetrators of the alleged racketeering activity.

25        7. **State and describe in detail whether plaintiff is alleging that the pattern of**

26   **racketeering activity and the enterprise are separate or have merged into one entity.**

27        Plaintiffs allege that the pattern of racketeering activity ("the Torture Conspiracy") and the

28   Enterprise are separate and apart. Plaintiffs allege that the racketeering activity was committed in

furtherance of the business of the Enterprise but did not constitute entirety the business of the Enterprise. The Enterprise is an ongoing association-in-fact that continues to function as a unit and appears to be engaging in lawful activity separate and apart from the criminal and illegal activity of the Torture Conspiracy.

8. **Describe the alleged relationship between the activities of the enterprise and the pattern of racketeering activity. Discuss how the racketeering activity differs from the usual daily activities of the enterprise, if at all.**

The Enterprise operated both legally and illegally to obtain intelligence from detainees and to disseminate that intelligence to others via the Interrogation and Reporting Database and other means. To the extent discovery reveals that an Enterprise "team" conducted an interrogation in a lawful manner, and recorded intelligence obtained from that interrogation in the Database, the Enterprise's daily activities may have been lawful. However, to the extent an Enterprise "team" conducted an interrogation in an unlawful manner, the Enterprise is part of the Torture Conspiracy. Thus, the Torture Conspirators' illegal racketeering activities are a subset, albeit a large subset, of the Enterprise's overall activities.

9. **Describe what benefits, if any, the alleged enterprise receives from the alleged pattern of racketeering.**

The Enterprise received significant financial benefits from the pattern of racketeering. The Corporate Defendant members of the Enterprise received millions of dollars over and above what they otherwise would have received in the absence of the racketeering activity. In addition, the Corporate Defendant members received government contracts providing future revenue streams that they would not have otherwise received in the absence of the racketeering activity.

The Individual Defendant members of the Enterprise received thousands of dollars over and above what they otherwise would have received in the absence of the racketeering activity.

The government official members of the Enterprise received financial incentives, institutional praise and recognition (including but not limited to promotions and pay raises), and power over and above what they would have received in the absence of the racketeering activity.

1  10. **Describe the effect of the activities of the enterprise on interstate or foreign**
2  **commerce.**

3      Plaintiffs allege that the activities of the Enterprise had a substantial effect on interstate and
4  foreign commerce.

5      The Enterprise impacted interstate and foreign commerce by permitting Defendant Titan
6  and CACI Corporate Defendants to receive more United States government contracts than they
7  would otherwise have received. This impacted competitors and others in commerce.

8      The Enterprise's ongoing pattern and practice of illegal acts was designed to, and did,
9  inflate artificially the demand for "intelligence" and the resulting demand for independent
10 contractors' Interrogation Services. The Enterprise distorted the United States' overall investment
11 in intelligence-gathering exercises and caused the expenditure of United States funds that should
12 not have been spent. This spending impacts interstate commerce.

13     The Enterprise interfered with the United States' hiring patterns by causing the United
14 States to forego adding personnel to government payroll. These failures to hire impact interstate
15 commerce.

16     11. **If the complaint alleges a violation of 18 U.S.C. 1962(a), provide the following:**

17         (a) **State who received the income derived from the pattern of racketeering activity**
18 **or through the collection of unlawful debt.**

19     Plaintiffs allege that the Defendant Titan, CACI Corporate Defendants, and the individual
20 Defendants received the income derived from the pattern of racketeering activity.

21         (b) **Describe the use or investment of such income.**

22     Plaintiffs allege that the income received from the pattern of racketeering was used by
23 Defendant Titan and CACI Corporate Defendants to invest in and operate the ongoing operations of
24 the corporations, including but not limited to those portions of the corporate operations that were
25 members of the Enterprise and the Torture Conspiracy.

26     12. **If the complaint alleges a violation of 18 U.S.C. 1962(b), describe in detail the**
27 **acquisition of maintenance of any interest in or control of the alleged enterprise.**

28

1    Plaintiffs do not allege a violation of this subsection. Plaintiffs reserve the right to amend

2    this statement if discovery reveals violation of this subsection.

3        13. **If the complaint alleges a violation of 18 U.S.C. 1962(c), provide the following:**

4            (a) **State who is employed by or associated with the alleged enterprise.**

5        The Enterprise consists of an association-in-fact comprised of Defendant Titan, CACI

6    Corporate Defendants, Defendant Nakhla, Defendant Israel and Defendant Stefanowicz, as well as

7    certain government officials. All defendants either are or were employed by an entity that

8    comprises the Enterprise.

9            (b) **State whether the same entity is both the liable "person" and the "enterprise"**

10   **under 18 U.S.C. 1962(c).**

11       Plaintiffs do not allege that the same entity is both the liable "person" and the "enterprise"

12   under § 1962(c).

13       14. **If the complaint alleges a violation of 18 U.S.C. 1962(d), describe in detail the facts**

14   **showing the existence of the alleged conspiracy.**

15       The facts that show the existence of the alleged conspiracy include, but are not limited to,

16   the following:

17       First, the corporate Defendants openly recruited in California, Virginia and other locations

18   throughout the United States to hire Interrogators, Translators, and Analysts to work in Iraq. The

19   corporate Defendants publicized that they would only hire persons acceptable to government

20   officials.

21       For example, a Team Titan postings sought "male U.S. citizens" and revealed that

22   applicants "must undergo a favorable U.S. Army Counterintelligence screening interview."

23   Defendant Titan advertised for employees "to work 12 hour shifts and in excess of 60-hour weeks

24   in order to provide continuous contract linguist support that this 24x7 operation requires." *See*

25   FAC Exhibit B, job description OAT730. Defendant Titan employees "work as part of a civil-

26   military team in an unstructured environment; [they] live and work in a harsh environment." *See*

27   First Amended Complaint ("FAC") Exhibit B, job description TOSG26. They are expected to

28

"[i]dentify and extract information components meeting military information requirement list criteria, and to "[p]rovide input to reports" *See* FAC Exhibit B, job description OAT730.

The CACI Corporate Defendants recruited for, among other persons, "Interrogators" and "Jr CI Agent[s]," who "[c]onduct[] interrogations of detainees." *See* FAC Exhibit C, job descriptions BZSG224 and BZSG191. CACI Corporate Defendants also sought, among other persons, "Intelligence Analysts" who:

> Provides intelligence analytical support to the interrogation team during development and execution of the interrogation plan/cycle. Interfaces with higher, lower and adjacent intelligence organizations to *fully prepare interrogation team for exploitation of detainees*, as well as preparing post interrogation analytical products/assessments that support further targeting efforts, source development and analysis of the threat.

(Emphasis added.) *See* FAC Exhibit C, job description BZSG192.

Second, the individual Defendants and other Titan and CACI employees worked hand-in-hand with government officials on "tiger teams" and "break teams" in Iraq. Attached as Exhibit A is an organization chart that demonstrates the composition of the teams working in the Abu Ghraib prison in Iraq.

Third, it is beyond dispute that these teams engaged in illegal conduct. At present, the United States' initial investigative efforts have revealed that there are at least 94 cases in which detainees were tortured, killed, sexually assaulted or robbed.

Fourth, plaintiffs hereby incorporate by reference the additional facts alleged in the Third Amended Complaint that establish the existence of the Torture Conspiracy.

15. **Describe the alleged injury to business or property.**

These injuries are described in detail above in response to Question No. 3. Plaintiff Sami, Plaintiff Ahmed, Plaintiff Neisef and Putative RICO Class members have been injured in their business and/or property in amounts to be determined at trial by the ongoing pattern and practice of illegal acts by the Torture Conspirators.

16. **Describe the direct causal relationship between the alleged injury and the violation of the RICO statute.**

1    But for the existence of and wrongful acts by the Torture Conspirators, Plaintiffs Saleh,

2  Sami, Ahmed, Neisef and Putative RICO Class members would not have been injured, either

3  physically or financially.  There is a direct causal relationship between the injury and the pattern of

4  racketeering activity.

5    **17. List the damages sustained by reason of the violation of 18 U.S.C. 1962, indicating**

6  **the amount for which each defendant is allegedly liable.**

7    Plaintiffs and members of the class have sustained damages to their businesses and/or

8  property in amounts to be determined at trial.

9    **18. List all other federal causes of action, if any, and provide the relevant statute**

10 **numbers.**

11    Plaintiffs allege that the acts described in the Complaint constitute summary execution,

12 torture, cruel, inhuman or degrading treatment, enforced disappearance, arbitrary arrest and

13 detention, war crimes, and crimes against humanity in violation of the law of nations under the

14 Alien Tort Claims Act, 28 U.S.C. § 1350, in that the acts violated definite and specific customary

15 international law norms accepted by civilized nations and reflected, expressed, and defined in

16 multilateral treaties and other international instruments, international and domestic judicial

17 decisions, and other authorities.  Defendants are liable for said conduct directly and in so far as they

18 directed, ordered, confirmed, ratified, and/or conspired with certain government officials to commit

19 these violations.

20    Plaintiffs and putative Class Members were treated in a manner that violates the Religious

21 Land Use and Institutionalized Persons Act, 24 U.S.C. §2000cc-1 (hereinafter "RLUIPA").

22 Defendants acting under the color of the law of the United Stated intentionally imposed a

23 substantial burden on the Plaintiffs' and putative Class Members' exercise of their religious beliefs.

24    Plaintiffs and putative Class Members were tortured and otherwise mistreated in violation

25 of specific protections of the Third and Fourth Geneva Conventions.  Violations under the Geneva

26 Conventions are direct treaty violations, and are also violations of customary international law.

27 Defendants are liable for said conduct directly and in so far as they directed, ordered, confirmed,

28 ratified, and/or conspired to violate the Geneva Conventions.

1  Plaintiffs and putative Class Members were treated in a manner that violates the
2  Constitution of the United States and its Amendments. Defendants intentionally, and with
3  deliberate disregard for any injury Plaintiffs and putative Class Members would suffer, deprived
4  Plaintiffs of life and liberty without due process of law. Defendants were acting under the color of
5  the law of the United States when they deprived Plaintiffs of life and liberty without due process of
6  law. Defendants' actions were accorded the color of the United States law because they were
7  conspiring with certain public officials, including certain military officials, and other persons acting
8  in an official capacity on behalf of the United States.

9  19. **List all pendent state claims, if any.**

10  Plaintiffs assert state claims of assault and battery, sexual assault and battery, wrongful
11  death, false imprisonment, intentional infliction of emotional distress, negligent hiring and
12  supervision, negligent infliction of emotional distress, conversion, and unjust enrichment.

13  20. **Provide any additional information that you feel would be helpful to the court in**
14  **processing your RICO claims.**

15  Plaintiffs will continue to supplement this RICO Statement with the fruits of additional
16  investigation.

17

18  DATED: July 30, 2004

19

20

21

22

23

24

25

26

27

28

_[signature]_
William J. Aceves (CA Bar # 151031)
225 Cedar Street
San Diego, CA 92101
Telephone: (619) 515-1589
Facsimile: (619) 696-9999
_Serving as Local Counsel Only_

_[signature]_
Susan L. Burke (admitted _pro hac vice_)
Joyce S. Meyers
MONTGOMERY, MCCRACKEN,
    WALKER & RHOADS, LLP
123 South Broad Street
Philadelphia, PA 19109
Telephone: (215) 772-7514
Facsimile: (215) 772-7620

_[signature]_
Barbara Olshansky
Michael Ratner
Jeffrey Fogel
Jennifer Green
Judith Brown Chomsky
Jules Lobel
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Telephone: (212) 614-6439
Facsimile: (212) 614-6499

_[signature]_
Shereef Hadi Akeel
MELAMED, DAILEY & AKEEL, P.C.
26611 Woodward Avenue
Huntington Woods, MI 48072-2026
Telephone: (248) 591-5000
Facsimile: (248) 541-9456

_[signature]_
Joseph Margulies
Locke Bowman
MACARTHUR JUSTICE CENTER
UNIVERSITY OF CHICAGO LAW SCHOOL
1111 East 60th Street
Chicago, IL 60637
Telephone: (773) 702-9560
Facsimile: (773) 702-0771

_[signature]_
Susan Feathers
UNIVERSITY OF PENNSYLVANIA
    LAW SCHOOL
3400 Chestnut Street
Philadelphia, PA 19104-6204
Telephone: (215) 898-0459

_Attorneys for Plaintiffs and Class Plaintiffs_

# Exhibit 2

## O'Connor, John

| | |
|---|---|
| **From:** | Susan Burke [sburke@burkeoneil.com] |
| **Sent:** | Friday, August 15, 2008 9:49 AM |
| **To:** | Koegel, William; O'Connor, John |
| **Subject:** | EDVA |
| **Importance:** | High |

Contrary to Bill's prediction, the Court did not realize that it needed to relate the Washington case to the Ohio case. I am calling over there now to let them know that the parties agreed they are to be related.   I will let you know if anything needs to be filed.

Susan L. Burke
Burke O'Neil LLC
4112 Station Street
Philadelphia, PA 19127
215.487.6596 (office)
215.971.5058 (cell)
www.burkeoneil.com

**EXHIBIT 2**

# **Exhibit 3**

## O'Connor, John

| | |
|---|---|
| **From:** | Koegel, William |
| **Sent:** | Friday, August 15, 2008 9:52 AM |
| **To:** | 'sburke@burkeoneil.com'; O'Connor, John |
| **Subject:** | RE: EDVA |

*Susan: We want to be on any call to the court. I am tied up this morning but can participate in a call this afternoon.*

> **From:** Susan Burke [mailto:sburke@burkeoneil.com]
> **Sent:** Friday, August 15, 2008 9:49 AM
> **To:** Koegel, William; O'Connor, John
> **Subject:** EDVA
> **Importance:** High
>
> Contrary to Bill's prediction, the Court did not realize that it needed to relate the Washington case to the Ohio case. I am calling over there now to let them know that the parties agreed they are to be related. I will let you know if anything needs to be filed.
>
> Susan L. Burke
> Burke O'Neil LLC
> 4112 Station Street
> Philadelphia, PA 19127
> 215.487.6596 (office)
> 215.971.5058 (cell)
> www.burkeoneil.com

**EXHIBIT 3**

8/29/2008

# Exhibit 4

## O'Connor, John

**From:** Susan Burke [sburke@burkeoneil.com]
**Sent:** Friday, August 15, 2008 9:57 AM
**To:** Koegel, William; O'Connor, John
**Subject:** RE: EDVA

I am on the line to the clerk's office right now trying to figure out what we need to do. If we need to call the court itself, I'll let you know and we can work it around your schedule. But I think the answer is going to be that we need to file something in writing, not do this by phone.

**From:** Koegel, William [mailto:WKoegel@steptoe.com]
**Sent:** Friday, August 15, 2008 9:52 AM
**To:** sburke@burkeoneil.com; O'Connor, John
**Subject:** RE: EDVA

*Susan: We want to be on any call to the court. I am tied up this morning but can participate in a call this afternoon.*

**From:** Susan Burke [mailto:sburke@burkeoneil.com]
**Sent:** Friday, August 15, 2008 9:49 AM
**To:** Koegel, William; O'Connor, John
**Subject:** EDVA
**Importance:** High

Contrary to Bill's prediction, the Court did not realize that it needed to relate the Washington case to the Ohio case. I am calling over there now to let them know that the parties agreed they are to be related. I will let you know if anything needs to be filed.

Susan L. Burke
Burke O'Neil LLC
4112 Station Street
Philadelphia, PA 19127
215.487.6596 (office)
215.971.5058 (cell)
www.burkeoneil.com

**EXHIBIT 4**

# Exhibit 5

## O'Connor, John

**From:** Susan Burke [sburke@burkeoneil.com]
**Sent:** Friday, August 15, 2008 10:02 AM
**To:** Koegel, William; O'Connor, John
**Subject:** RE: EDVA

I just got off the line with the clerk. She advises that we file a consent motion to consolidate as the best way to proceed. As I anticipated, they opened them as separate cases for the obvious reason that they came from different jurisdictions. I'll put together a short consent motion to consolidate, and send it over.

**From:** Koegel, William [mailto:WKoegel@steptoe.com]
**Sent:** Friday, August 15, 2008 9:59 AM
**To:** sburke@burkeoneil.com; O'Connor, John
**Subject:** RE: EDVA

*Susan: By "court" I included the clerk's office. If you want to speak with the clerk, please schedule it for this afternoon so I can participate.*

**From:** Susan Burke [mailto:sburke@burkeoneil.com]
**Sent:** Friday, August 15, 2008 9:57 AM
**To:** Koegel, William; O'Connor, John
**Subject:** RE: EDVA

I am on the line to the clerk's office right now trying to figure out what we need to do. If we need to call the court itself, I'll let you know and we can work it around your schedule. But I think the answer is going to be that we need to file something in writing, not do this by phone.

**From:** Koegel, William [mailto:WKoegel@steptoe.com]
**Sent:** Friday, August 15, 2008 9:52 AM
**To:** sburke@burkeoneil.com; O'Connor, John
**Subject:** RE: EDVA

*Susan: We want to be on any call to the court. I am tied up this morning but can participate in a call this afternoon.*

**From:** Susan Burke [mailto:sburke@burkeoneil.com]
**Sent:** Friday, August 15, 2008 9:49 AM
**To:** Koegel, William; O'Connor, John
**Subject:** EDVA
**Importance:** High

Contrary to Bill's prediction, the Court did not realize that it needed to relate the Washington case to the Ohio case. I am calling over there now to let them know that the parties agreed they are to

**EXHIBIT 5**

be related.   I will let you know if anything needs to be filed.

Susan L. Burke
Burke O'Neil LLC
4112 Station Street
Philadelphia, PA 19127
215.487.6596 (office)
215.971.5058 (cell)
www.burkeoneil.com

# **Exhibit 6**

| | |
|---|---|
| **From:** | O'Connor, John |
| **Sent:** | Monday, August 18, 2008 5:00 PM |
| **To:** | sburke@burkeoneil.com |
| **Cc:** | 'William O'Neil'; Koegel, William |

Susan:

I've put our rewrite of the consolidation motion in text here. You'll see we made it into two motions. We don't think that one judge (other than, I suppose, the Chief Judge) could take one case and assign it to another judge's docket. So we made the consolidation motion into two essentially identical motions.

These drafts include comments from counsel for Johnson and Dugan.

--John O'Connor

---------------------------------------------------------------------------------------------------------------------------

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | |
|---|---|
| SA'ADOON ALI HAMEED AL-OGAIDI, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>DANIEL E. JOHNSON, et al., )<br>)<br>Defendants. )<br>) | Case No. 1:08-CV-00844-TSE-TCB |

## JOINT MOTION TO CONSOLIDATE RELATED ACTIONS

All parties to the above-captioned action respectfully request that this action be consolidated for pretrial proceedings and discovery with the related action of *Al Shimari v. Dugan*, Case No. 1:08-CV-00827-GBL-JFA. A substantively identical motion seeking the same relief is being filed contemporaneously in the *Al Shimari* action. In support of this motion, the parties state as follows:

**EXHIBIT 6**

1.     This action (the "Washington action") was filed on June 30, 2008 in the United States District Court for the Western District of Washington. On that same day, the *Al Shimari* action (the "Ohio action") was filed in the United States District Court for the Southern District of Ohio.

2.     On July 24, 2008, the CACI Defendants moved to transfer the Washington action to the U.S. District Court for the Eastern District of Virginia. The Washington court granted that motion without opposition on August 12, 2008.

3.     On August 6, 2008, the CACI Defendants moved to transfer the Ohio action to the U.S. District Court for the Eastern District of Virginia. The Ohio court granted that motion without opposition on August 7, 2008.

4.     The Ohio and Washington actions have the same lead Plaintiff's counsel. Both cases are brought against the CACI Defendants. The CACI Defendants are represented by the same counsel in both actions. In addition to the CACI Defendants, each case names as a Defendant one former employee of CACI Premier Technology, Inc. – Defendant Daniel Johnson in the Washington action and Defendant Timothy Dugan in the Ohio action.

5.     Both actions assert personal injury claims arising out of the same alleged conspiracy. If these cases had been originally filed in the same District, they would have qualified for designation as related cases.

6.     The same Plaintiff's counsel in the Ohio and Washington actions also filed a similar single-Plaintiff suit against the CACI Defendants, a former employee of CACI Premier Technology, Inc., and L-3 Services, Inc., on May 5, 2008 in the United States District Court for the Central District of California. *Al-Janabi v. Stefanowicz*, No. 2:08-CV-2913 (C.D. Cal.) (the "California action"). The Defendants in the California action have moved to transfer venue to this Court, which Plaintiff opposed. Briefing on the motion to transfer the California action was completed on July 14, 2008, and the parties are awaiting a ruling by the California court on that motion. In the event that the California action is transferred to this Court, the parties to

the California action anticipate seeking to consolidate that action with the Ohio and Washington actions.

7.    Consolidation of the Ohio and Washington actions will serve the interests of efficiency and judicial economy by centralizing the cases before a single judge, which will allow for coordinated briefing on motions to dismiss and pretrial matters.

Respectfully submitted,

_____
Susan L. Burke
Virginia Bar No. 27769
William Gould
Attorneys for Plaintiff
Burke O'Neil LLC
4112 Station Street
Philadelphia, PA 19127
(215) 487-6596 – telephone
**[need fax number per local rules]**
sburke@burkeoneil.com
wgould@burkeoneil.com

_____
J. William Koegel, Jr.
Virginia Bar No. 38243
John F. O'Connor (*pro hac vice* application pending)
Attorneys for Defendants CACI Premier Technology, Inc. and
      CACI International Inc
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000 - telephone
(202) 429-3902 – facsimile
wkoegel@steptoe.com
joconnor@steptoe.com

_____
Patrick O'Donnell
Virginia Bar No. 41761
Attorneys for Defendant Daniel E. Johnson
HARRIS, WILTSHIRE & GRANNIS LLP
1200 18th Street, N.W., Suite 1200
Washington, DC 20036
(202) 730-1300 - telephone

3

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

_____
                                                   )
SUHAIL NAJIM ABDULLAH              )
AL SHIMARI,                             )
                                                   )
                    Plaintiff,                 )        Case No. 1:08-CV-00827-GBL-JFA
                                                   )
          v.                                      )
                                                   )
TIMOTHY DUGAN, et al.,               )
                                                   )
                    Defendants.            )
_____)

## CONSENT MOTION TO CONSOLIDATE RELATED ACTIONS

Defendants CACI Premier Technology, Inc., and CACI Premier Technology Inc (collectively, the "CACI Defendants") and Plaintiff Suhail Najim Abdullah Al Shimari respectfully request that this action be consolidated for pretrial proceedings and discovery with the related action of *Al-Ogaidi v. Johnson*, Case No. 1:08-CV-00844-TSE-TCB. A substantively identical motion seeking the same relief is being filed contemporaneously in the *Al-Ogaidi* action. While Defendant Timothy Dugan has not yet been served in this action, counsel for the CACI Defendants and counsel for Plaintiff represent that Defendant Dugan has, through counsel, agreed that this Consent Motion should be granted. In support of this motion, the parties state as follows:

1.      This action (the "Ohio action") was filed on June 30, 2008 in the United States District Court for the Southern District of Ohio. On that same day, the *Al-Ogaidi* action (the "Washington action") was filed in the United States District Court for the Western District of Washington.

2.      On July 24, 2008, the CACI Defendants moved to transfer the Washington action to the U.S. District Court for the Eastern District of Virginia.  The Washington court granted that motion without opposition on August 12, 2008.

3.       On August 6, 2008, the CACI Defendants moved to transfer the Ohio action to the U.S. District Court for the Eastern District of Virginia.  The Ohio court granted that motion without opposition on August 7, 2008.

4.      The Ohio and Washington actions have the same lead Plaintiff's counsel.  Both cases are brought against the CACI Defendants.  The CACI Defendants are represented by the same counsel in both actions.  In addition to the CACI Defendants, each case names as a Defendant one former employee of CACI Premier Technology, Inc. – Defendant Timothy Dugan in the Ohio action and Defendant Daniel E. Johnson in the Washington action.  As already noted, Defendant Dugan agrees that the Court should grant this Consent Motion to Consolidate.  Defendant Johnson has joined in the Consent Motion to Consolidate filed in the Washington action.

5.      Both actions assert personal injury claims arising out of the same alleged conspiracy.  If these cases had been originally filed in the same District, they would have qualified for designation as related cases.

6.      The same Plaintiff's counsel in the Ohio and Washington actions also filed a similar single-Plaintiff suit against the CACI Defendants, a former employee of CACI Premier Technology, Inc., and L-3 Services, Inc., on May 5, 2008 in the United States District Court for the Central District of California.  *Al-Janabi v. Stefanowicz*, No. 2:08-CV-2913 (C.D. Cal.) (the "California action").  The Defendants in the California action have moved to transfer venue to this Court, which Plaintiff opposed.  Briefing on the motion to transfer the California action was completed on July 14, 2008, and the parties are awaiting a ruling by the California court on that motion.  In the event that the California action is transferred to this Court, the parties to the California action anticipate seeking to consolidate that action with the Ohio and Washington actions.

7.    Consolidation of the Ohio and Washington actions will serve the interests of efficiency and judicial economy by centralizing the cases before a single judge, which will allow for coordinated briefing on motions to dismiss and pretrial matters.

Respectfully submitted,

_____
Susan L. Burke
Virginia Bar No. 27769
William Gould
Attorneys for Plaintiff
Burke O'Neil LLC
4112 Station Street
Philadelphia, PA 19127
(215) 487-6596 – telephone
**[need fax number per local rules]**
sburke@burkeoneil.com
wgould@burkeoneil.com

_____
J. William Koegel, Jr.
Virginia Bar No. 38243
John F. O'Connor (*pro hac vice* application pending)
Attorneys for Defendants CACI Premier Technology, Inc. and
        CACI International Inc
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000 - telephone
(202) 429-3902 – facsimile
wkoegel@steptoe.com
joconnor@steptoe.com

# **Exhibit 7**

| | |
|---|---|
| **From:** | Koegel, William |
| **Sent:** | Thursday, August 21, 2008 2:14 PM |
| **To:** | 'sburke@burkeoneil.com' |
| **Cc:** | O'Connor, John |
| **Subject:** | EDVA consolidation |

*Susan:*

*John informs me that you believe that we agreed to have the Ohio and Washington actions consolidated in Virginia before Judge Lee, and you are now claiming that we are backing off that 'agreement.'*

*There was no such agreement or understanding. In our telephone call we informed you that the Ohio action, that had arrived in EDVA, had been assigned to Judge Lee. We also told you, consistent with our multiple transfer motions, that when the Washington case arrived in EDVA, that in our view it should be consolidated with the Ohio action. We had no discussion whatsoever of whether that consolidation should be before a particular judge. Nor would I have had such a discussion, since it is not our prerogative to tell the court to whom to assign a case or cases. That is the exclusive province of the court. To assert that we agreed that the two actions should be consolidated before a specific judge is just plain false.*

*We continue to believe that the Ohio and Washington actions, and also the California action now that our transfer motion has been granted, should be consolidated before a single judge. Once the California action has been docketed in Virginia, we can seek that relief.*

*FYI - neither John nor I are available for any hearing on August 29, but we are available on Sept. 5.*

**EXHIBIT 7**

# Exhibit 8

## O'Connor, John

| | |
|---|---|
| **From:** | Susan Burke [sburke@burkeoneil.com] |
| **Sent:** | Friday, August 22, 2008 4:41 PM |
| **To:** | O'Connor, John |
| **Cc:** | Koegel, William |
| **Subject:** | draft on consolidation |

John – could you please send me your draft as word document?  I was trying to do a cut and paste from  the email, but it got quite jumbled up.  Thanks.

Susan L. Burke
Burke O'Neil LLC
4112 Station Street
Philadelphia, PA 19127
215.487.6596 (office)
215.971.5058 (cell)
www.burkeoneil.com

**EXHIBIT 8**

# Exhibit 9

**O'Connor, John**

| | |
|---|---|
| **From:** | O'Connor, John |
| **Sent:** | Friday, August 22, 2008 7:21 PM |
| **To:** | 'sburke@burkeoneilllc.com' |
| **Cc:** | Koegel, William |
| **Subject:** | Draft Motions to Consolidate |

**Attachments:** 2083009_1.DOC

Susan:

As you requested, attached is a Word attachment of the motions to consolidate that I copied and pasted into an email to you this past Monday.

--John O'Connor


2083009_1.DOC
(74 KB)

**EXHIBIT 9**

# Exhibit 10

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ILHAM NASSIR IBRAHIM, ET AL.,
SALEH, ET AL.,                              CA Nos. 04-1248
         Plaintiffs,                                05-1165

                                            Washington, DC
    vs.                                     December 6, 2007
                                            10:40 a.m.
CACI PREMIER TECHNOLOGY, INC.,
         Defendant.
_____


TRANSCRIPT OF STATUS HEARING
BEFORE THE HONORABLE JAMES ROBERTSON
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs:          SUSAN L. BURKE, ESQUIRE
                             Burke O'Neil LLC
                             4112 Station Street
                             Philadelphia, PA  19127
                             (215) 482-0874

                             L. PALMER FORET, ESQUIRE
                             Law Firm of L. Palmer Foret, PC
                             1735 20th Street, N.W.
                             Washington, DC  20009
                             (202) 332-2404


APPEARANCES continued on next page

**EXHIBIT 10**

1

AFTER RECESS

2    MS. BURKE: Your Honor, when we first filed this

3  action back in 2004 we brought it as a class action because we

4  were concerned about whether or not the victims of the torture

5  would actually be willing to come forward and to come to us.

6  In the three years that the case has been going on, we are

7  pleased to report that in fact just through word of mouth many

8  of the victims have indeed come forward, and so our initial

9  need for class certification has dissipated to a great extent.

10    That being said, we were just trying to put

11  together -- looking in terms of manageability, and also

12  cognizant of our fiduciary duty to the class since we

13  initially served it as a class action, we did not think it

14  would behoove us to simply, you know, recast it as no longer a

15  class action. We tried to think through how, if at all, class

16  certification would benefit the management of the complex

17  litigation, and for that reason kind of parsed out a very

18  narrow issue, the issue of the conspiracy, and ask for class

19  treatment of that issue.

20    We were well-aware, based on Your Honor's past

21  comments, that you did not view the case as suitable for

22  overall class certification, and certainly if at this time

23  you're inclined to deny that motion, we're more than willing

24  to proceed as individual actions. We're ready to go on that

25  and we anticipated that happening, but we did not think it was

1  within our own power to simply transform it into a non-class

2  action.

3         THE COURT: Well, you'd save all of us a lot of

4  time if you'd just withdraw that motion because otherwise CACI

5  has to write a long opposition to it and then they're going to

6  ask for interim discovery, and you know --

7         MS. BURKE: Your Honor, we are willing to withdraw

8  the motion or have it --

9         THE COURT: But you have a statute of limitations

10  problems, don't you, or do you?

11         MS. BURKE: No, Your Honor, everything has been

12  tolled because of the pendency of the class action and we

13  would turn these into individual cases immediately, so we

14  would not have a statute of limitations problem. We were

15  really acting more to make sure that since we brought it as a

16  class, from our research we did not think that we were free

17  to -- that we had to bring on the motion for class

18  certification. And if Your Honor wants to deny it without an

19  opposition, that's fine with us, and then it would immediately

20  become no longer a class action.

21         THE COURT: Motion denied.

22         MS. BURKE: Thank you, Your Honor.

23         THE COURT: But stay up, Ms. Burke, because then

24  the next question is: How on earth are we going to try this

25  case?