**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| SUHAIL NAJIM ABDULLAH AL SHIMARI, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:08-CV-00827-GBL-JFA |
| v. | ) ) ) | |
| CACI INTERNATIONAL INC, et ano, | ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF J. WILLIAM KOEGEL, JR.

I, J. William Koegel, Jr., hereby declare as follows:

1.      I am an attorney with the law firm of Steptoe & Johnson LLP.  I am one of the counsel of record for Defendants CACI International Inc and CACI Premier Technology, Inc. (collectively, the "CACI Defendants") in this action.  I have personal knowledge of the matters addressed in this Declaration.

2.      Attached hereto are true copies of the following documents:

Exhibit A:      Executive Summary of the Senate Armed Services Committee's *Inquiry into the Treatment of Detainees in U.S. Custody*, which was released to the public on December 11, 2008

Exhibit B:      Congressional Press Release, December 11, 2008

Exhibit C:      Statement of Senator Carl Levin, December 11, 2008

3. Pursuant to 28 U.S.C. § 1746, I swear that the foregoing is true to the best of my knowledge and belief. Executed this 19th day of December 2008, at Washington, D.C.

J. William Koegel, Jr.

# CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of October, 2008, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

> Susan L. Burke
> William Gould
> Attorneys for Plaintiff
> Burke O'Neil LLC
> 4112 Station Street
> Philadelphia, PA 19127
> (215) 487-6596 – telephone
> sburke@burkeoneil.com
> wgould@burkeoneil.com

J. William Koegel, Jr.
Virginia Bar No. 38243
Attorney for Defendant CACI-Athena, Inc.
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000 - telephone
(202) 429-3902 – facsimile
wkoegel@steptoe.com

# Exhibit A



**SENATE ARMED SERVICES COMMITTEE INQUIRY INTO THE TREATMENT OF DETAINEES IN U.S. CUSTODY**

**Executive Summary**

*"What sets us apart from our enemies in this fight… is how we behave. In everything we do, we must observe the standards and values that dictate that we treat noncombatants and detainees with dignity and respect. While we are warriors, we are also all human beings"*

*-- General David Petraeus*

*May 10, 2007*

(U) The collection of timely and accurate intelligence is critical to the safety of U.S. personnel deployed abroad and to the security of the American people here at home. The methods by which we elicit intelligence information from detainees in our custody affect not only the reliability of that information, but our broader efforts to win hearts and minds and attract allies to our side.

(U) Al Qaeda and Taliban terrorists are taught to expect Americans to abuse them. They are recruited based on false propaganda that says the United States is out to destroy Islam. Treating detainees harshly only reinforces that distorted view, increases resistance to cooperation, and creates new enemies. In fact, the April 2006 National Intelligence Estimate "Trends in Global Terrorism: Implications for the United States" cited "pervasive anti U.S. sentiment among most Muslims" as an underlying factor fueling the spread of the global jihadist movement. Former Navy General Counsel Alberto Mora testified to the Senate Armed Services Committee in June 2008 that "there are serving U.S. flag-rank officers who maintain that the first and second identifiable causes of U.S. combat deaths in Iraq – as judged by their effectiveness in recruiting insurgent fighters into combat – are, respectively the symbols of Abu Ghraib and Guantanamo."

(U) The abuse of detainees in U.S. custody cannot simply be attributed to the actions of "a few bad apples" acting on their own. The fact is that senior officials in the United States government solicited information on how to use aggressive techniques, redefined the law to create the appearance of their legality, and authorized their use against detainees. Those efforts damaged our ability to collect accurate intelligence that could save lives, strengthened the hand of our enemies, and compromised our moral authority. This report is a product of the Committee's inquiry into how those unfortunate results came about.

**Presidential Order Opens the Door to Considering Aggressive Techniques** (U)

(U) On February 7, 2002, President Bush signed a memorandum stating that the Third Geneva Convention did not apply to the conflict with al Qaeda and concluding that Taliban detainees were not entitled to prisoner of war status or the legal protections afforded by the Third Geneva Convention. The President's order closed off application of Common Article 3 of the Geneva Conventions, which would have afforded minimum standards for humane treatment, to al Qaeda or Taliban detainees. While the President's order stated that, as "a matter of policy, the United States Armed Forces shall continue to treat detainees humanely and, to the extent appropriate and consistent with military necessity, in a manner consistent with the principles of the Geneva Conventions," the decision to replace well established military doctrine, i.e., legal compliance with the Geneva Conventions, with a policy subject to interpretation, impacted the treatment of detainees in U.S. custody.

(U) In December 2001, more than a month before the President signed his memorandum, the Department of Defense (DoD) General Counsel's Office had already solicited information on detainee "exploitation" from the Joint Personnel Recovery Agency (JPRA), an agency whose expertise was in training American personnel to withstand interrogation techniques considered illegal under the Geneva Conventions.

(U) JPRA is the DoD agency that oversees military Survival Evasion Resistance and Escape (SERE) training. During the resistance phase of SERE training, U.S. military personnel are exposed to physical and psychological pressures (SERE techniques) designed to simulate conditions to which they might be subject if taken prisoner by enemies that did not abide by the Geneva Conventions. As one JPRA instructor explained, SERE training is "based on illegal exploitation (under the rules listed in the 1949 Geneva Convention Relative to the Treatment of Prisoners of War) of prisoners over the last 50 years." The techniques used in SERE school, based, in part, on Chinese Communist techniques used during the Korean war to elicit false confessions, include stripping students of their clothing, placing them in stress positions, putting hoods over their heads, disrupting their sleep, treating them like animals, subjecting them to loud music and flashing lights, and exposing them to extreme temperatures. It can also include face and body slaps and until recently, for some who attended the Navy's SERE school, it included waterboarding.

(U) Typically, those who play the part of interrogators in SERE school neither are trained interrogators nor are they qualified to be. These role players are not trained to obtain reliable intelligence information from detainees. Their job is to train our personnel to resist providing reliable information to our enemies. As the Deputy Commander for the Joint Forces Command (JFCOM), JPRA's higher headquarters, put it: "the expertise of JPRA lies in training personnel how to respond and resist interrogations – not in how to conduct interrogations." Given JPRA's role and expertise, the request from the DoD General Counsel's office was unusual. In fact, the Committee is not aware of any similar request prior to December 2001. But while it may have been the first, that was not the last time that a senior government official contacted JPRA for advice on using SERE methods offensively. In fact, the call from the DoD General Counsel's office marked just the beginning of JPRA's support of U.S. government interrogation efforts.

**Senior Officials Seek SERE Techniques and Discuss Detainee Interrogations** (U)

(U) Beginning in the spring of 2002 and extending for the next two years, JPRA supported U.S. government efforts to interrogate detainees. During that same period, senior government officials solicited JPRA's knowledge and its direct support for interrogations. While much of the information relating to JPRA's offensive activities and the influence of SERE techniques on interrogation policies remains classified, unclassified information provides a window into the extent of those activities.

(U) JPRA's Chief of Staff, Lieutenant Colonel Daniel Baumgartner testified that in late 2001 or early 2002, JPRA conducted briefings of Defense Intelligence Agency (DIA) personnel on detainee resistance, techniques, and information on detainee exploitation.

(U) On April 16, 2002, Dr. Bruce Jessen, the senior SERE psychologist at JPRA, circulated a draft exploitation plan to JPRA Commander Colonel Randy Moulton and other senior officials at the agency. The contents of that plan remain classified but Dr. Jessen's initiative is indicative of the interest of JPRA's senior leadership in expanding the agency's role.

(U) One opportunity came in July 2002. That month, DoD Deputy General Counsel for intelligence Richard Shiffrin contacted JPRA seeking information on SERE physical pressures and interrogation techniques that had been used against Americans. Mr. Shiffrin called JPRA after discussions with William "Jim" Haynes II, the DoD General Counsel.

(U) In late July, JPRA provided the General Counsel's office with several documents, including excerpts from SERE instructor lesson plans, a list of physical and psychological pressures used in SERE resistance training, and a memo from a SERE psychologist assessing the long-term psychological effects of SERE resistance training on students and the effects of waterboarding. The list of SERE techniques included such methods as sensory deprivation, sleep disruption, stress positions, waterboarding, and slapping. It also made reference to a section of the JPRA instructor manual that discusses "coercive pressures," such as keeping the lights on at all times, and treating a person like an animal. JPRA's Chief of Staff, Lieutenant Colonel Daniel Baumgartner, who spoke with Mr. Shiffrin at the time, thought the General Counsel's office was asking for the information on exploitation and physical pressures to use them in interrogations and he said that JFCOM gave approval to provide the agency the information. Mr. Shiffrin, the DoD Deputy General Counsel for Intelligence, confirmed that a purpose of the request was to "reverse engineer" the techniques. Mr. Haynes could not recall what he did with the information provided by JPRA.

(U) Memos from Lieutenant Colonel Baumgartner to the Office of Secretary of Defense General Counsel stated that JPRA would "continue to offer exploitation assistance to those government organizations charged with the mission of gleaning intelligence from enemy detainees." Lieutenant Colonel Baumgartner testified that he provided another government agency the same information he sent to the DoD General Counsel's office.

(U) Mr. Haynes was not the only senior official considering new interrogation techniques for use against detainees. Members of the President's Cabinet and other senior officials attended meetings in the White House where specific interrogation techniques were discussed. Secretary of State Condoleezza Rice, who was then the National Security Advisor, said that, "in the spring of 2002, CIA sought policy approval from the National Security Council (NSC) to begin an interrogation program for high-level al-Qaida terrorists." Secretary Rice said that she asked Director of Central Intelligence George Tenet to brief NSC Principals on the program and asked the Attorney General John Ashcroft "personally to review and confirm the legal advice prepared by the Office of Legal Counsel." She also said that Secretary of Defense Donald Rumsfeld participated in the NSC review of CIA's program.

(U) Asked whether she attended meetings where SERE training was discussed, Secretary Rice stated that she recalled being told that U.S. military personnel were subjected in training to "certain physical and psychological interrogation techniques." National Security Council (NSC) Legal Advisor, John Bellinger, said that he was present in meetings "at which SERE training was discussed."

## Department of Justice Redefines Torture (U)

(U) On August 1, 2002, just a week after JPRA provided the DoD General Counsel's office the list of SERE techniques and the memo on the psychological effects of SERE training, the Department of Justice's Office of Legal Counsel (OLC) issued two legal opinions. The opinions were issued after consultation with senior Administration attorneys, including then-White House Counsel Alberto Gonzales and then-Counsel to the Vice President David Addington. Both memos were signed by then-Assistant Attorney General for the Office of Legal Counsel Jay Bybee. One opinion, commonly known as the first Bybee memo, was addressed to Judge Gonzales and provided OLC's opinion on standards of conduct in interrogation required under the federal torture statute. That memo concluded:

> [F]or an act to constitute torture as defined in [the federal torture statute], it must inflict pain that is difficult to endure. Physical pain amounting to torture must be equivalent in intensity to the pain accompanying serious physical injury, such as organ failure, impairment of bodily function, or even death. For purely mental pain or suffering to amount to torture under [the federal torture statute], it must result in significant psychological harm of significant duration, e.g., lasting for months or even years.

(U) In his book The Terror Presidency, Jack Goldsmith, the former Assistant Attorney General of the OLC who succeeded Mr. Bybee in that job, described the memo's conclusions:

> Violent acts aren't necessarily torture; if you do torture, you probably have a defense; and even if you don't have a defense, the torture law doesn't apply if you act under the color of presidential authority.

(U) The other OLC opinion issued on August 1, 2002 is known commonly as the Second Bybee memo. That opinion, which responded to a request from the CIA, addressed the legality of specific interrogation tactics. While the full list of techniques remains classified, a publicly released CIA document indicates that waterboarding was among those analyzed and approved. CIA Director General Michael Hayden stated in public testimony before the Senate Intelligence Committee on February 5, 2008 that waterboarding was used by the CIA. And Steven Bradbury, the current Assistant Attorney General of the OLC, testified before the House Judiciary Committee on February 14, 2008 that the CIA's use of waterboarding was "adapted from the SERE training program."

(U) Before drafting the opinions, Mr. Yoo, the Deputy Assistant Attorney General for the OLC, had met with Alberto Gonzales, Counsel to the President, and David Addington, Counsel to the Vice President, to discuss the subjects he intended to address in the opinions. In testimony before the House Judiciary Committee, Mr. Yoo refused to say whether or not he ever discussed or received information about SERE techniques as the memos were being drafted. When asked whether he had discussed SERE techniques with Judge Gonzales, Mr. Addington, Mr. Yoo, Mr. Rizzo or other senior administration lawyers, DoD General Counsel Jim Haynes testified that he "did discuss SERE techniques with other people in the administration." NSC Legal Advisor John Bellinger said that "some of the legal analyses of proposed interrogation techniques that were prepared by the Department of Justice... did refer to the psychological effects of resistance training."

(U) In fact, Jay Bybee the Assistant Attorney General who signed the two OLC legal opinions said that he saw an assessment of the psychological effects of military resistance training in July 2002 in meetings in his office with John Yoo and two other OLC attorneys. Judge Bybee said that he used that assessment to inform the August 1, 2002 OLC legal opinion that has yet to be publicly released. Judge Bybee also recalled discussing detainee interrogations in a meeting with Attorney General John Ashcroft and John Yoo in late July 2002, prior to signing the OLC opinions. Mr. Bellinger, the NSC Legal Advisor, said that "the NSC's Principals reviewed CIA's proposed program on several occasions in 2002 and 2003" and that he "expressed concern that the proposed CIA interrogation techniques comply with applicable U.S. law, including our international obligations."

## JPRA and CIA Influence Department of Defense Interrogation Policies (U)

(U) As senior government lawyers were preparing to redefine torture, JPRA – responding to a request from U.S. Southern Command's Joint Task Force 170 (JTF-170) at Guantanamo Bay (GTMO) – was finalizing plans to train JTF-170 personnel. During the week of September 16, 2002, a group of interrogators and behavioral scientists from GTMO travelled to Fort Bragg, North Carolina and attended training conducted by instructors from JPRA's SERE school. On September 25, 2002, just days after GTMO staff returned from that training, a delegation of senior Administration lawyers, including Mr. Haynes, Mr. Rizzo, and Mr. Addington, visited GTMO.

███████████

(U) A week after the visit from those senior lawyers, two GTMO behavioral scientists who had attended the JPRA-led training at Fort Bragg drafted a memo proposing new interrogation techniques for use at GTMO. According to one of those two behavioral scientists, by early October 2002, there was "increasing pressure to get 'tougher' with detainee interrogations." He added that if the interrogation policy memo did not contain coercive techniques, then it "wasn't going to go very far."

(U) JPRA was not the only outside organization that provided advice to GTMO on aggressive techniques. On October 2, 2002, Jonathan Fredman, who was chief counsel to the CIA's CounterTerrorist Center, attended a meeting of GTMO staff. Minutes of that meeting indicate that it was dominated by a discussion of aggressive interrogation techniques including sleep deprivation, death threats, and waterboarding, which was discussed in relation to its use in SERE training. Mr. Fredman's advice to GTMO on applicable legal obligations was similar to the analysis of those obligations in OLC's first Bybee memo. According to the meeting minutes, Mr. Fredman said that "the language of the statutes is written vaguely… Severe physical pain described as anything causing permanent damage to major organs or body parts. Mental torture [is] described as anything leading to permanent, profound damage to the senses or personality." Mr. Fredman said simply "It is basically subject to perception. If the detainee dies you're doing it wrong."

(U) On October 11, 2002, Major General Michael Dunlavey, the Commander of JTF-170 at Guantanamo Bay, sent a memo to General James Hill, the Commander of U.S. Southern Command (SOUTHCOM) requesting authority to use aggressive interrogation techniques. Several of the techniques requested were similar to techniques used by JPRA and the military services in SERE training, including stress positions, exploitation of detainee fears (such as fear of dogs), removal of clothing, hooding, deprivation of light and sound, and the so-called wet towel treatment or the waterboard. Some of the techniques were even referred to as "those used in U.S. military interrogation resistance training." Lieutenant Colonel Diane Beaver, GTMO's Staff Judge Advocate wrote an analysis justifying the legality of the techniques, though she expected that a broader legal review conducted at more senior levels would follow her own. On October 25, 2002, General Hill forwarded the GTMO request from Major General Dunlavey to General Richard Myers, the Chairman of the Joint Chiefs of Staff. Days later, the Joint Staff solicited the views of the military services on the request.

(U) Plans to use aggressive interrogation techniques generated concerns by some at GTMO. The Deputy Commander of the Department of Defense's Criminal Investigative Task Force (CITF) at GTMO told the Committee that SERE techniques were "developed to better prepare U.S. military personnel to resist interrogations and not as a means of obtaining reliable information" and that "CITF was troubled with the rationale that techniques used to harden resistance to interrogations would be the basis for the utilization of techniques to obtain information." Concerns were not limited to the effectiveness of the techniques in obtaining reliable information; GTMO's request gave rise to significant legal concerns as well.

███████████

**Military Lawyers Raise Red Flags and Joint Staff Review Quashed** (U)

(U) In early November 2002, in a series of memos responding to the Joint Staff's call for comments on GTMO's request, the military services identified serious legal concerns about the techniques and called for additional analysis.

(U) The Air Force cited "serious concerns regarding the legality of many of the proposed techniques" and stated that "techniques described may be subject to challenge as failing to meet the requirements outlined in the military order to treat detainees humanely..." The Air Force also called for an in depth legal review of the request.

(U) CITF's Chief Legal Advisor wrote that certain techniques in GTMO's October 11, 2002 request "may subject service members to punitive articles of the [Uniform Code of Military Justice]," called "the utility and legality of applying certain techniques" in the request "questionable," and stated that he could not "advocate any action, interrogation or otherwise, that is predicated upon the principle that all is well if the ends justify the means and others are not aware of how we conduct our business."

(U) The Chief of the Army's International and Operational Law Division wrote that techniques like stress positions, deprivation of light and auditory stimuli, and use of phobias to induce stress "crosses the line of 'humane' treatment," would "likely be considered maltreatment" under the UCMJ, and "may violate the torture statute." The Army labeled GTMO's request "legally insufficient" and called for additional review.

(U) The Navy recommended a "more detailed interagency legal and policy review" of the request. And the Marine Corps expressed strong reservations, stating that several techniques in the request "arguably violate federal law, and would expose our service members to possible prosecution." The Marine Corps also said the request was not "legally sufficient," and like the other services, called for "a more thorough legal and policy review."

(U) Then-Captain (now Rear Admiral) Jane Dalton, Legal Counsel to the Chairman of the Joint Chiefs of Staff, said that her staff discussed the military services' concerns with the DoD General Counsel's Office at the time and that the DoD General Counsel Jim Haynes was aware of the services' concerns. Mr. Haynes, on the other hand, testified that he did not know that the memos from the military services existed (a statement he later qualified by stating that he was not *sure* he knew they existed). Eliana Davidson, the DoD Associate Deputy General Counsel for International Affairs, said that she told the General Counsel that the GTMO request needed further assessment. Mr. Haynes did not recall Ms. Davidson telling him that.

(U) Captain Dalton, who was the Chairman's Legal Counsel, said that she had her own concerns with the GTMO request and directed her staff to initiate a thorough legal and policy review of the techniques. That review, however, was cut short. Captain Dalton said that General Myers returned from a meeting and advised her that Mr. Haynes wanted her to stop her review, in part because of concerns that people were going to see the GTMO request and the military services' analysis of it. Neither General Myers nor Mr. Haynes recalled cutting short the Dalton

review, though neither has challenged Captain Dalton's recollection. Captain Dalton testified that this occasion marked the only time she had ever been told to stop analyzing a request that came to her for review.

## Secretary of Defense Rumsfeld Approves Aggressive Techniques (U)

(U) With respect to GTMO's October 11, 2002 request to use aggressive interrogation techniques, Mr. Haynes said that "there was a sense by the DoD Leadership that this decision was taking too long" and that Secretary Rumsfeld told his senior advisors "I need a recommendation." On November 27, 2002, the Secretary got one. Notwithstanding the serious legal concerns raised by the military services, Mr. Haynes sent a one page memo to the Secretary, recommending that he approve all but three of the eighteen techniques in the GTMO request. Techniques such as stress positions, removal of clothing, use of phobias (such as fear of dogs), and deprivation of light and auditory stimuli were all recommended for approval.

(U) Mr. Haynes's memo indicated that he had discussed the issue with Deputy Secretary of Defense Paul Wolfowitz, Under Secretary of Defense for Policy Doug Feith, and General Myers and that he believed they concurred in his recommendation. When asked what he relied on to make his recommendation that the aggressive techniques be approved, the only written legal opinion Mr. Haynes cited was Lieutenant Colonel Beaver's legal analysis, which senior military lawyers had considered "legally insufficient" and "woefully inadequate," and which LTC Beaver herself had expected would be supplemented with a review by persons with greater experience than her own.

(U) On December 2, 2002, Secretary Rumsfeld signed Mr. Haynes's recommendation, adding a handwritten note that referred to limits proposed in the memo on the use of stress positions: "I stand for 8-10 hours a day. Why is standing limited to 4 hours?"

(U) SERE school techniques are designed to simulate abusive tactics used by our enemies. There are fundamental differences between a SERE school exercise and a real world interrogation. At SERE school, students are subject to an extensive medical and psychological pre-screening prior to being subjected to physical and psychological pressures. The schools impose strict limits on the frequency, duration, and/or intensity of certain techniques. Psychologists are present throughout SERE training to intervene should the need arise and to help students cope with associated stress. And SERE school is voluntary; students are even given a special phrase they can use to immediately stop the techniques from being used against them.

(U) Neither those differences, nor the serious legal concerns that had been registered, stopped the Secretary of Defense from approving the use of the aggressive techniques against detainees. Moreover, Secretary Rumsfeld authorized the techniques without apparently providing any written guidance as to how they should be administered.

## SERE Techniques at GTMO (U)

(U) Following the Secretary's December 2, 2002 authorization, senior staff at GTMO began drafting a Standard Operating Procedure (SOP) specifically for the use of SERE techniques in interrogations. The draft SOP itself stated that "The premise behind this is that the interrogation tactics used at U.S. military SERE schools are appropriate for use in real-world interrogations. These tactics and techniques are used at SERE school to 'break' SERE detainees. The same tactics and techniques can be used to break real detainees during interrogation." The draft "GTMO SERE SOP" described how to slap, strip, and place detainees in stress positions. It also described other SERE techniques, such as "hooding," "manhandling," and "walling" detainees.

(U) On December 30, 2002, two instructors from the Navy SERE school arrived at GTMO. The next day, in a session with approximately 24 interrogation personnel, the two SERE instructors demonstrated how to administer stress positions, and various slapping techniques. According to two interrogators, those who attended the training even broke off into pairs to practice the techniques.

(U) Exemplifying the disturbing nature and substance of the training, the SERE instructors explained "Biderman's Principles" – which were based on coercive methods used by the Chinese Communist dictatorship to elicit false confessions from U.S. POWs during the Korean War – and left with GTMO personnel a chart of those coercive techniques. Three days after they conducted the training, the SERE instructors met with GTMO's Commander, Major General Geoffrey Miller. According to some who attended that meeting, Major General Miller stated that he did not want his interrogators using the techniques that the Navy SERE instructors had demonstrated. That conversation, however, took place after the training had already occurred and not all of the interrogators who attended the training got the message.

(U) At about the same time, a dispute over the use of aggressive techniques was raging at GTMO over the interrogation of Mohammed al-Khatani, a high value detainee. Personnel from CITF and the Federal Bureau of Investigations (FBI) had registered strong opposition, to interrogation techniques proposed for use on Khatani and made those concerns known to the DoD General Counsel's office. Despite those objections, an interrogation plan that included aggressive techniques was approved. The interrogation itself, which actually began on November 23, 2002, a week before the Secretary's December 2, 2002 grant of blanket authority for the use of aggressive techniques, continued through December and into mid-January 2003.

(U) NSC Legal Advisor John Bellinger said that, on several occasions, Deputy Assistant Attorney General Bruce Swartz raised concerns with him about allegations of detainee abuse at GTMO. Mr. Bellinger said that, in turn, he raised these concerns "on several occasions with DoD officials and was told that the allegations were being investigated by the Naval Criminal Investigative Service." Then National Security Advisor Condoleezza Rice said that Mr. Bellinger also advised her "on a regular basis regarding concerns and issues relating to DoD detention policies and practices at Guantanamo." She said that as a result she convened a "series

of meetings of NSC Principals in 2002 and 2003 to discuss various issues and concerns relating to detainees in the custody of the Department of Defense."

(U) Between mid-December 2002 and mid-January 2003, Navy General Counsel Alberto Mora spoke with the DoD General Counsel three times to express his concerns about interrogation techniques at GTMO, at one point telling Mr. Haynes that he thought techniques that had been authorized by the Secretary of Defense "could rise to the level of torture." On January 15, 2003, having received no word that the Secretary's authority would be withdrawn, Mr. Mora went so far as to deliver a draft memo to Mr. Haynes's office memorializing his legal concerns about the techniques. In a subsequent phone call, Mr. Mora told Mr. Haynes he would sign his memo later that day unless he heard definitively that the use of the techniques was suspended. In a meeting that same day, Mr. Haynes told Mr. Mora that the Secretary would rescind the techniques. Secretary Rumsfeld signed a memo rescinding authority for the techniques on January 15, 2003.

(U) That same day, GTMO suspended its use of aggressive techniques on Khatani. While key documents relating to the interrogation remain classified, published accounts indicate that military working dogs had been used against Khatani. He had also been deprived of adequate sleep for weeks on end, stripped naked, subjected to loud music, and made to wear a leash and perform dog tricks. In a June 3, 2004 press briefing, SOUTHCOM Commander General James Hill traced the source of techniques used on Khatani back to SERE, stating: "The staff at Guantanamo working with behavioral scientists, having gone up to our SERE school and developed a list of techniques which our lawyers decided and looked at, said were OK." General Hill said "we began to use a few of those techniques … on this individual…"

(U) On May 13, 2008, the Pentagon announced in a written statement that the Convening Authority for military commissions "dismissed without prejudice the sworn charges against Mohamed al Khatani." The statement does not indicate the role his treatment may have played in that decision.

## DoD Working Group Ignores Military Lawyers and Relies on OLC (U)

(U) On January 15, 2003, the same day he rescinded authority for GTMO to use aggressive techniques, Secretary Rumsfeld directed the establishment of a "Working Group" to review interrogation techniques. For the next few months senior military and civilian lawyers tried, without success, to have their concerns about the legality of aggressive techniques reflected in the Working Group's report. Their arguments were rejected in favor of a legal opinion from the Department of Justice's Office of Legal Counsel (OLC) John Yoo. Mr. Yoo's opinion, the final version of which was dated March 14, 2003, had been requested by Mr. Haynes at the initiation of the Working Group process, and repeated much of what the first Bybee memo had said six months earlier.

(U) The first Bybee memo, dated August 1, 2002, had concluded that, to violate the federal torture statute, physical pain that resulted from an act would have to be "equivalent in intensity to the pain accompanying serious physical injury, such as organ failure, impairment of

bodily function, or even death." Mr. Yoo's March 14, 2003 memo stated that criminal laws, such as the federal torture statute, would not apply to certain military interrogations, and that interrogators could not be prosecuted by the Justice Department for using interrogation methods that would otherwise violate the law.

(U) Though the final Working Group report does not specifically mention SERE, the list of interrogation techniques it evaluated and recommended for approval suggest the influence of SERE. Removal of clothing, prolonged standing, sleep deprivation, dietary manipulation, hooding, increasing anxiety through the use of a detainee's aversions like dogs, and face and stomach slaps were all recommended for approval.

(U) On April 16, 2003, less than two weeks after the Working Group completed its report, the Secretary authorized the use of 24 specific interrogation techniques for use at GTMO. While the authorization included such techniques as dietary manipulation, environmental manipulation, and sleep adjustment, it was silent on many of the techniques in the Working Group report. Secretary Rumsfeld's memo said, however, that "If, in your view, you require additional interrogation techniques for a particular detainee, you should provide me, via the Chairman of the Joint Chiefs of Staff, a written request describing the proposed technique, recommended safeguards, and the rationale for applying it with an identified detainee."

(U) Just a few months later, one such request for "additional interrogation techniques" arrived on Secretary Rumsfeld's desk. The detainee was Mohamedou Ould Slahi. While documents relating to the interrogation plan for Slahi remain classified, a May 2008 report from the Department of Justice Inspector General includes declassified information suggesting the plan included hooding Slahi and subjecting him to sensory deprivation and "sleep adjustment." The Inspector General's report says that an FBI agent who saw a draft of the interrogation plan said it was similar to Khatani's interrogation plan. Secretary Rumsfeld approved the Slahi plan on August 13, 2003.

**Aggressive Techniques Authorized in Afghanistan and Iraq** (U)

(U) Shortly after Secretary Rumsfeld's December 2, 2002 approval of his General Counsel's recommendation to authorize aggressive interrogation techniques, the techniques – and the fact the Secretary had authorized them – became known to interrogators in Afghanistan. A copy of the Secretary's memo was sent from GTMO to Afghanistan. Captain Carolyn Wood, the Officer in Charge of the Intelligence Section at Bagram Airfield in Afghanistan, said that in January 2003 she saw a power point presentation listing the aggressive techniques that had been authorized by the Secretary.

(U) Despite the Secretary's January 15, 2003 rescission of authority for GTMO to use aggressive techniques, his initial approval six weeks earlier continued to influence interrogation policies.

(U) On January 24, 2003, nine days after Secretary Rumsfeld rescinded authority for the techniques at GTMO, the Staff Judge Advocate for Combined Joint Task Force 180 (CJTF-180),

U.S. Central Command's (CENTCOM) conventional forces in Afghanistan, produced an "Interrogation techniques" memo. While that memo remains classified, unclassified portions of a report by Major General George Fay stated that the memo "recommended removal of clothing – a technique that had been in the Secretary's December 2 authorization" and discussed "exploiting the Arab fear of dogs" another technique approved by the Secretary on December 2, 2002.

(U) From Afghanistan, the techniques made their way to Iraq. According to the Department of Defense (DoD) Inspector General (IG), at the beginning of the Iraq war, special mission unit forces in Iraq "used a January 2003 Standard Operating Procedure (SOP) which had been developed for operations in Afghanistan." According to the DoD IG, the Afghanistan SOP had been:

> [I]nfluenced by the counterresistance memorandum that the Secretary of Defense approved on December 2, 2002 and incorporated techniques designed for detainees who were identified as unlawful combatants. Subsequent battlefield interrogation SOPs included techniques such as yelling, loud music, and light control, environmental manipulation, sleep deprivation/adjustment, stress positions, 20-hour interrogations, and controlled fear (muzzled dogs)...

(U) Techniques approved by the Secretary of Defense in December 2002 reflect the influence of SERE. And not only did those techniques make their way into official interrogation policies in Iraq, but instructors from the JPRA SERE school followed. The DoD IG reported that in September 2003, at the request of the Commander of the Special Mission Unit Task Force, JPRA deployed a team to Iraq to assist interrogation operations. During that trip, which was explicitly approved by U.S. Joint Forces Command, JPRA's higher headquarters, SERE instructors were authorized to participate in the interrogation of detainees in U.S. military custody using SERE techniques.

(U) In September 2008 testimony before the Senate Armed Services Committee, Colonel Steven Kleinman, an Air Force Reservist who was a member of the interrogation support team sent by JPRA to the Special Mission Unit Task Force in Iraq, described abusive interrogations he witnessed, and intervened to stop, during that trip. Colonel Kleinman said that one of those interrogations, which took place in a room painted all in black with a spotlight on the detainee, the interrogator repeatedly slapped a detainee who was kneeling on the floor in front of the interrogator. In another interrogation Colonel Kleinman said the two other members of the JPRA team took a hooded detainee to a bunker at the Task Force facility, forcibly stripped him naked and left him, shackled by the wrist and ankles, to stand for 12 hours.

(U) Interrogation techniques used by the Special Mission Unit Task Force eventually made their way into Standard Operating Procedures (SOPs) issued for all U.S. forces in Iraq. In the summer of 2003, Captain Wood, who by that time was the Interrogation Officer in Charge at Abu Ghraib, obtained a copy of the Special Mission Unit interrogation policy and submitted it, virtually unchanged, to her chain of command as proposed policy.

███████████

(U) Captain Wood submitted her proposed policy around the same time that a message was being conveyed that interrogators should be more aggressive with detainees. In mid-August 2003, an email from staff at Combined Joint Task Force 7 (CJTF-7) headquarters in Iraq requested that subordinate units provide input for a "wish list" of interrogation techniques, stated that "the gloves are coming off," and said "we want these detainees broken." At the end of August 2003, Major General Geoffrey Miller, the GTMO Commander, led a team to Iraq to assess interrogation and detention operations. Colonel Thomas Pappas, the Commander of the 205th Military Intelligence Brigade, who met with Major General Miller during that visit, said that the tenor of the discussion was that "we had to get tougher with the detainees." A Chief Warrant Officer with the Iraq Survey Group (ISG) said that during Major General Miller's tour of the ISG's facility, Major General Miller said the ISG was "running a country club" for detainees.

(U) On September 14, 2003 the Commander of CJTF-7, Lieutenant General Ricardo Sanchez, issued the first CJTF-7 interrogation SOP. That SOP authorized interrogators in Iraq to use stress positions, environmental manipulation, sleep management, and military working dogs in interrogations. Lieutenant General Sanchez issued the September 14, 2003 policy with the knowledge that there were ongoing discussions about the legality of some of the approved techniques. Responding to legal concerns from CENTCOM lawyers about those techniques, Lieutenant General Sanchez issued a new policy on October 12, 2003, eliminating many of the previously authorized aggressive techniques. The new policy, however, contained ambiguities with respect to certain techniques, such as the use of dogs in interrogations, and led to confusion about which techniques were permitted.

(U) In his report of his investigation into Abu Ghraib, Major General George Fay said that interrogation techniques developed for GTMO became "confused" and were implemented at Abu Ghraib. For example, Major General Fay said that removal of clothing, while not included in CJTF-7's SOP, was "imported" to Abu Ghraib, could be "traced through Afghanistan and GTMO," and contributed to an environment at Abu Ghraib that appeared "to condone depravity and degradation rather than humane treatment of detainees." Major General Fay said that the policy approved by the Secretary of Defense on December 2, 2002 contributed to the use of aggressive interrogation techniques at Abu Ghraib in late 2003.

## OLC Withdraws Legal Opinion - JFCOM Issues Guidance on JPRA "Offensive" Support (U)

(U) As the events at Abu Ghraib were unfolding, Jack Goldsmith, the new Assistant Attorney General for the Office of Legal Counsel was presented with a "short stack" of OLC opinions that were described to him as problematic. Included in that short stack were the Bybee memos of August 1, 2002 and Mr. Yoo's memo of March 2003. After reviewing the memos, Mr. Goldsmith decided to rescind both the so-called first Bybee memo and Mr. Yoo's memo. In late December 2003, Mr. Goldsmith notified Mr. Haynes that DoD could no longer rely on Mr. Yoo's memo in determining the lawfulness of interrogation techniques. The change in OLC

███████████

guidance, however, did not keep JPRA from making plans to continue their support to interrogation operations. In fact, it is not clear that the agency was even aware of the change.

(U) In 2004, JPRA and CENTCOM took steps to send a JPRA training team to Afghanistan to assist in detainee interrogations there. In the wake of the public disclosure of detainee abuse at Abu Ghraib, however, that trip was cancelled and JFCOM subsequently issued policy guidance limiting JPRA's support to interrogations.

(U) On September 29, 2004 Major General James Soligan, JFCOM's Chief of Staff, issued a memorandum referencing JPRA's support to interrogation operations. Major General Soligan wrote:

> Recent requests from [the Office of the Secretary of Defense] and the Combatant Commands have solicited JPRA support based on knowledge and information gained through the debriefing of former U.S. POWs and detainees and their application to U.S. Strategic debriefing and interrogation techniques. These requests, which can be characterized as 'offensive' support, go beyond the chartered responsibilities of JPRA... The use of resistance to interrogation knowledge for 'offensive' purposes lies outside the roles and responsibilities of JPRA.

(U) Lieutenant General Robert Wagner, the Deputy Commander of JFCOM, later called requests for JPRA interrogation support "inconsistent with the unit's charter" and said that such requests "might create conditions which tasked JPRA to engage in offensive operational activities outside of JPRA's defensive mission."

(U) Interrogation policies endorsed by senior military and civilian officials authorizing the use of harsh interrogation techniques were a major cause of the abuse of detainees in U.S. custody. The impact of those abuses has been significant. In a 2007 international BBC poll, only 29 percent of people around the world said the United States is a generally positive influence in the world. Abu Ghraib and Guantanamo have a lot to do with that perception. The fact that America is seen in a negative light by so many complicates our ability to attract allies to our side, strengthens the hand of our enemies, and reduces our ability to collect intelligence that can save lives.

(U) It is particularly troubling that senior officials approved the use of interrogation techniques that were originally designed to simulate abusive tactics used by our enemies against our own soldiers and that were modeled, in part, on tactics used by the Communist Chinese to elicit false confessions from U.S. military personnel. While some argue that the brutality and disregard for human life shown by al Qaeda and Taliban terrorists justifies us treating them harshly, General David Petraeus explained why that view is misguided. In a May 2007 letter to his troops, General Petraeus said "Our values and the laws governing warfare teach us to respect human dignity, maintain our integrity, and do what is right. Adherence to our values distinguishes us from our enemy. This fight depends on securing the population, which must understand that we - not our enemies - occupy the moral high ground."

## Senate Armed Services Committee Conclusions

**Conclusion 1:** On February 7, 2002, President George W. Bush made a written determination that Common Article 3 of the Geneva Conventions, which would have afforded minimum standards for humane treatment, did not apply to al Qaeda or Taliban detainees. Following the President's determination, techniques such as waterboarding, nudity, and stress positions, used in SERE training to simulate tactics used by enemies that refuse to follow the Geneva Conventions, were authorized for use in interrogations of detainees in U.S. custody.

**Conclusion 2:** Members of the President's Cabinet and other senior officials participated in meetings inside the White House in 2002 and 2003 where specific interrogation techniques were discussed. National Security Council Principals reviewed the CIA's interrogation program during that period.

## Conclusions on SERE Training Techniques and Interrogations

**Conclusion 3:** The use of techniques similar to those used in SERE resistance training – such as stripping students of their clothing, placing them in stress positions, putting hoods over their heads, and treating them like animals – was at odds with the commitment to humane treatment of detainees in U.S. custody. Using those techniques for interrogating detainees was also inconsistent with the goal of collecting accurate intelligence information, as the purpose of SERE resistance training is to increase the ability of U.S. personnel to resist abusive interrogations and the techniques used were based, in part, on Chinese Communist techniques used during the Korean War to elicit false confessions.

**Conclusion 4:** The use of techniques in interrogations derived from SERE resistance training created a serious risk of physical and psychological harm to detainees. The SERE schools employ strict controls to reduce the risk of physical and psychological harm to students during training. Those controls include medical and psychological screening for students, interventions by trained psychologists during training, and code words to ensure that students can stop the application of a technique at any time should the need arise. Those same controls are not present in real world interrogations.

## Conclusions on Senior Official Consideration of SERE Techniques for Interrogations

**Conclusion 5:** In July 2002, the Office of the Secretary of Defense General Counsel solicited information from the Joint Personnel Recovery Agency (JPRA) on SERE techniques for use during interrogations. That solicitation, prompted by requests from Department of Defense General Counsel William J. Haynes II, reflected the view that abusive tactics similar to those used by our enemies should be considered for use against detainees in U.S. custody.

**Conclusion 6:** The Central Intelligence Agency's (CIA) interrogation program included at least one SERE training technique, waterboarding. Senior Administration lawyers, including Alberto Gonzales, Counsel to the President, and David Addington, Counsel to the Vice President, were consulted on the development of legal analysis of CIA interrogation techniques. Legal opinions

subsequently issued by the Department of Justice's Office of Legal Counsel (OLC) interpreted legal obligations under U.S. anti-torture laws and determined the legality of CIA interrogation techniques. Those OLC opinions distorted the meaning and intent of anti-torture laws, rationalized the abuse of detainees in U.S. custody and influenced Department of Defense determinations as to what interrogation techniques were legal for use during interrogations conducted by U.S. military personnel.

## Conclusions on JPRA Offensive Activities

**Conclusion 7:** Joint Personnel Recovery Agency (JPRA) efforts in support of "offensive" interrogation operations went beyond the agency's knowledge and expertise. JPRA's support to U.S. government interrogation efforts contributed to detainee abuse. JPRA's offensive support also influenced the development of policies that authorized abusive interrogation techniques for use against detainees in U.S. custody.

**Conclusion 8:** Detainee abuse occurred during JPRA's support to Special Mission Unit (SMU) Task Force (TF) interrogation operations in Iraq in September 2003. JPRA Commander Colonel Randy Moulton's authorization of SERE instructors, who had no experience in detainee interrogations, to actively participate in Task Force interrogations using SERE resistance training techniques was a serious failure in judgment. The Special Mission Unit Task Force Commander's failure to order that SERE resistance training techniques not be used in detainee interrogations was a serious failure in leadership that led to the abuse of detainees in Task Force custody. Iraq is a Geneva Convention theater and techniques used in SERE school are inconsistent with the obligations of U.S. personnel under the Geneva Conventions.

**Conclusion 9:** Combatant Command requests for JPRA "offensive" interrogation support and U.S. Joint Forces Command (JFCOM) authorization of that support led to JPRA operating outside the agency's charter and beyond its expertise. Only when JFCOM's Staff Judge Advocate became aware of and raised concerns about JPRA's support to offensive interrogation operations in late September 2003 did JFCOM leadership begin to take steps to curtail JPRA's "offensive" activities. It was not until September 2004, however, that JFCOM issued a formal policy stating that support to offensive interrogation operations was outside JPRA's charter.

## Conclusions on GTMO's Request for Aggressive Techniques

**Conclusion 10:** Interrogation techniques in Guantanamo Bay's (GTMO) October 11, 2002 request for authority submitted by Major General Michael Dunlavey, were influenced by JPRA training for GTMO interrogation personnel and included techniques similar to those used in SERE training to teach U.S. personnel to resist abusive enemy interrogations. GTMO Staff Judge Advocate Lieutenant Colonel Diane Beaver's legal review justifying the October 11, 2002 GTMO request was profoundly in error and legally insufficient. Leaders at GTMO, including Major General Dunlavey's successor, Major General Geoffrey Miller, ignored warnings from DoD's Criminal Investigative Task Force and the Federal Bureau of Investigation that the techniques were potentially unlawful and that their use would strengthen detainee resistance.

**Conclusion 11:** Chairman of the Joint Chiefs of Staff General Richard Myers's decision to cut short the legal and policy review of the October 11, 2002 GTMO request initiated by his Legal Counsel, then-Captain Jane Dalton, undermined the military's review process. Subsequent conclusions reached by Chairman Myers and Captain Dalton regarding the legality of interrogation techniques in the request followed a grossly deficient review and were at odds with conclusions previously reached by the Army, Air Force, Marine Corps, and Criminal Investigative Task Force.

**Conclusion 12:** Department of Defense General Counsel William J. Haynes II's effort to cut short the legal and policy review of the October 11, 2002 GTMO request initiated by then-Captain Jane Dalton, Legal Counsel to the Chairman of the Joint Chiefs of Staff, was inappropriate and undermined the military's review process. The General Counsel's subsequent review was grossly deficient. Mr. Haynes's one page recommendation to Secretary of Defense Donald Rumsfeld failed to address the serious legal concerns that had been previously raised by the military services about techniques in the GTMO request. Further, Mr. Haynes's reliance on a legal memo produced by GTMO's Staff Judge Advocate that senior military lawyers called "legally insufficient" and "woefully inadequate" is deeply troubling.

**Conclusion 13:** Secretary of Defense Donald Rumsfeld's authorization of aggressive interrogation techniques for use at Guantanamo Bay was a direct cause of detainee abuse there. Secretary Rumsfeld's December 2, 2002 approval of Mr. Haynes's recommendation that most of the techniques contained in GTMO's October 11, 2002 request be authorized, influenced and contributed to the use of abusive techniques, including military working dogs, forced nudity, and stress positions, in Afghanistan and Iraq.

**Conclusion 14:** Department of Defense General Counsel William J. Haynes II's direction to the Department of Defense's Detainee Working Group in early 2003 to consider a legal memo from John Yoo of the Department of Justice's OLC as authoritative, blocked the Working Group from conducting a fair and complete legal analysis and resulted in a report that, in the words of then-Department of the Navy General Counsel Alberto Mora contained "profound mistakes in its legal analysis." Reliance on the OLC memo resulted in a final Working Group report that recommended approval of several aggressive techniques, including removal of clothing, sleep deprivation, and slapping, similar to those used in SERE training to teach U.S. personnel to resist abusive interrogations.

## Conclusions on Interrogations in Iraq and Afghanistan

**Conclusion 15:** Special Mission Unit (SMU) Task Force (TF) interrogation policies were influenced by the Secretary of Defense's December 2, 2002 approval of aggressive interrogation techniques for use at GTMO. SMU TF interrogation policies in Iraq included the use of aggressive interrogation techniques such as military working dogs and stress positions. SMU TF policies were a direct cause of detainee abuse and influenced interrogation policies at Abu Ghraib and elsewhere in Iraq.

**Conclusion 16:** During his assessment visit to Iraq in August and September 2003, GTMO Commander Major General Geoffrey Miller encouraged a view that interrogators should be more aggressive during detainee interrogations.

**Conclusion 17:** Interrogation policies approved by Lieutenant General Ricardo Sanchez, which included the use of military working dogs and stress positions, were a direct cause of detainee abuse in Iraq. Lieutenant General Sanchez's decision to issue his September 14, 2003 policy with the knowledge that there were ongoing discussions as to the legality of some techniques in it was a serious error in judgment. The September policy was superseded on October 12, 2003 as a result of legal concerns raised by U.S. Central Command. That superseding policy, however, contained ambiguities and contributed to confusion about whether aggressive techniques, such as military working dogs, were authorized for use during interrogations.

**Conclusion 18:** U.S. Central Command (CENTCOM) failed to conduct proper oversight of Special Mission Unit Task Force interrogation policies. Though aggressive interrogation techniques were removed from Combined Joint Task Force 7 interrogation policies after CENTCOM raised legal concerns about their inclusion in the September 14, 2003 policy issued by Lieutenant General Sanchez, SMU TF interrogation policies authorized some of those same techniques, including stress positions and military working dogs.

**Conclusion 19:** The abuse of detainees at Abu Ghraib in late 2003 was not simply the result of a few soldiers acting on their own. Interrogation techniques such as stripping detainees of their clothes, placing them in stress positions, and using military working dogs to intimidate them appeared in Iraq only after they had been approved for use in Afghanistan and at GTMO. Secretary of Defense Donald Rumsfeld's December 2, 2002 authorization of aggressive interrogation techniques and subsequent interrogation policies and plans approved by senior military and civilian officials conveyed the message that physical pressures and degradation were appropriate treatment for detainees in U.S. military custody. What followed was an erosion in standards dictating that detainees be treated humanely.

# Exhibit B



MICHIGAN

# Carl Levin
### UNITED STATES SENATOR

FOR IMMEDIATE RELEASE
December 11, 2008

Contact: Senator Levin's Office
Phone: 202.224.6221

## Levin, McCain Release Executive Summary and Conclusions of Report on Treatment of Detainees in U.S. Custody

WASHINGTON – Senate Armed Services Committee Chairman Carl Levin (D-Mich.) and Ranking Member John McCain (R-Ariz.) today released the executive summary and conclusions of the Committee's report of its inquiry into the treatment of detainees in U.S. custody.

A major focus of the Committee's investigation was the influence of Survival Evasion Resistance and Escape (SERE) training techniques on the interrogation of detainees in U.S. custody. SERE training is designed to teach our soldiers how to resist interrogation by enemies that refuse to follow the Geneva Conventions and international law. During SERE training, U.S. troops --- in a controlled environment with great protections and caution --- are exposed to harsh techniques such as stress positions, forced nudity, use of fear, sleep deprivation, and until recently, the waterboard. The SERE techniques were never intended to be used against detainees in U.S. custody. The Committee's investigation found, however, that senior officials in the U.S. government decided to use some of these harsh techniques against detainees based on deeply flawed interpretations of U.S. and international law.

The Committee concluded that the authorization of aggressive interrogation techniques by senior officials was both a direct cause of detainee abuse and conveyed the message that it was okay to mistreat and degrade detainees in U.S. custody.

Chairman Levin said, "SERE training techniques were designed to give our troops a taste of what they might be subjected to if captured by a ruthless, lawless enemy so that they would be better prepared to resist. The techniques were never intended to be used against detainees in U.S. custody."

Senator McCain said, "The Committee's report details the inexcusable link between abusive interrogation techniques used by our enemies who ignored the Geneva Conventions and interrogation policy for detainees in U.S. custody. These policies are wrong and must never be repeated."

Chairman Levin also said: "The abuses at Abu Ghraib, GTMO and elsewhere cannot be chalked up to the actions of a few bad apples. Attempts by senior officials to pass the buck to low ranking soldiers while avoiding any responsibility for abuses are unconscionable. The

message from top officials was clear; it was acceptable to use degrading and abusive techniques against detainees. Our investigation is an effort to set the record straight on this chapter in our history that has so damaged both America's standing and our security. America needs to own up to its mistakes so that we can rebuild some of the good will that we have lost."

In the course of its more than 18-month long investigation, the Committee reviewed hundreds of thousands of documents and conducted extensive interviews with more than 70 individuals.

**Executive Summary and Conclusions** [PDF]
**Statement of Senator Levin**
**Part I of the Committee's Inquiry into the Treatment of Detainees in U.S. Custody - June 17, 2008**
**Part II of the Committee's Inquiry into the Treatment of Detainees in U.S. Custody - September 25, 2008**

# Exhibit C

**Documentary on Guantanamo**
First Hand Detainee Accounts Real stories,
watch preview video
www.ACLU.tv

**Special Forces**
Huge Selection of Special Forces Products
and Collectibles
www.norbay.com

**"USAF Guy Makes $5K/mth"**
Read how a USAF Staff Sergent mak
$5000 a month while on active duty
DarrensMoney.com

**v v**                                                                                          Ads t





**M I C H I G A N**

# Carl Levin
### UNITED STATES SENATOR

FOR IMMEDIATE RELEASE                     Contact: Senator Levin's Office
December 11, 2008                          Phone: 202.224.6221

## Statement of Senator Carl Levin on Senate Armed Services Committee Report of its Inquiry into the Treatment of Detainees in U.S. Custody

*Senate Armed Services Committee Inquiry into the Treatment of Detainees in U.S. Custody, Executive Summary and Conclusions [PDF]*

On November 21st, the Senate Armed Services Committee approved its report on aspects of the treatment of detainees in U.S. custody since 2001. Today we're releasing the executive summary and conclusions of that report. The Department of Defense is reviewing the body of the report for classification. Senator McCain and I have urged the Department to expedite that review.

The abuse of detainees in U.S. custody compromised our moral authority and damaged both our ability to attract allies to our side in the fight against terrorism and to win the support of people around the world for that effort. In May 2004, just after the pictures from Abu Ghraib became public, Deputy Secretary of Defense Paul Wolfowitz said that the abuses depicted were simply the result of a few "bad apples" and that those responsible for abuse would be held accountable. More than seven months later, then-White House Counsel Alberto Gonzales testified before the Senate Judiciary Committee. Asked about accountability for detainee abuses, Gonzales said "we care very much about finding out what happened and holding people accountable." Neither of those two statements was true.

Department of Defense investigations into detainee abuse failed to adequately assign accountability to those senior military and civilian officials who authorized abusive interrogation techniques.

Shortly after I became Chairman of the Armed Services Committee in January 2007, I set up an investigations unit of my Committee staff whose first order of business was to look into the origins of detainee abuses. Committee staff has spent more than a year-and-a-half conducting that investigation. They've reviewed hundreds of thousands of documents and conducted extensive interviews of more than 70 individuals, including a number of senior

civilian and military officials. The Committee also held public hearings on June 17th and September 25th.

As we began to dig into what happened, the influence of SERE (Survival Evasion Resistance and Escape) resistance training techniques on our interrogation policies and practices became more and more obvious and became the focus of our investigation. SERE training is intended to be used to teach our soldiers how to resist interrogation by enemies that refuse to follow the Geneva Conventions and international law. In SERE school, our troops who are at risk of capture are exposed – in a controlled environment with great protections and caution - to techniques adapted from abusive tactics used against American soldiers by enemies such as the Communist Chinese during the Korean War. SERE training techniques include stress positions, forced nudity, use of fear, sleep deprivation and, until recently, the Navy SERE school used the waterboard. These techniques were designed to give our students a taste of what they might be subjected to if captured by a ruthless, lawless enemy so that they would be better prepared to resist. The techniques were never intended to be used against detainees in U.S. custody. As one JPRA instructor explained, SERE training is "based on illegal exploitation (under the rules listed in the 1949 Geneva Convention Relative to the Treatment of Prisoners of War) of prisoners over the last 50 years."

So, how did it come about that American military personnel stripped detainees naked, put them in stress positions, used dogs to scare them, put leashes around their necks to humiliate them, hooded them, deprived them of sleep, and blasted music at them.

The Committee has previously released a large number of documents and information revealing the influence of SERE on the interrogations of detainees in U.S. custody beginning in 2002. For example, the investigation revealed that, beginning in the spring of 2002, Cabinet officials met in the White House to discuss the CIA's interrogation program. Resistance training (the "R" in SERE) was a subject of discussion. We discovered that in July 2002, at the request of DoD General Counsel Jim Haynes's office, the Joint Personnel Recovery Agency (JPRA) - the DoD agency that oversees SERE training - provided Haynes's office a list of techniques used in SERE school and an assessment of the psychological effect of using those techniques on students. In December 2002, Secretary of Defense Rumsfeld authorized some of those same techniques for use against detainees at GTMO. We discovered that, in January 2003, SERE instructors travelled to GTMO and trained interrogators to hit detainees and put them in stress positions. And the investigation revealed that instructors from JPRA's SERE school participated in at least one abusive interrogation and were present for others during a visit to Iraq in September 2003. The executive summary we are releasing today contains additional evidence of the influence of SERE on interrogations. I want to mention just one piece of that new evidence.

Following our first hearing in June, I sent a number of questions to Jay Bybee, who currently sits on the 9th Circuit Court of Appeals and was formerly the Assistant Attorney General for the Department of Justice's Office of Legal Counsel (OLC). When he was at OLC, Judge Bybee signed two legal opinions, both issued on August 1, 2002. The first Bybee OLC memo, which was sent to White House Counsel Alberto Gonzales, addressed the legal standards applicable to interrogations. The second Bybee OLC memo – which was for the CIA and remains classified – evaluated the legality of particular interrogation techniques, including waterboarding. Senior Administration lawyers, including Alberto Gonzales, Counsel to the President, David Addington, Counsel to the Vice President, and Attorney General John Ashcroft were consulted on the development of OLC's legal analyses.

In his response to my questions, Jay Bybee said that, in July 2002 – just before those two OLC opinions were issued and about the same time Jim Haynes's office requested a list of SERE training techniques and information on the psychological effects of SERE (including waterboarding), the CIA provided OLC with an assessment of the psychological effects of SERE resistance training. Jay Bybee wrote me that the assessment provided by the CIA was used to "inform" the August 1, 2002 OLC legal opinion that has yet to be made public. (CIA officials, including George Tenet and acting General Counsel John Rizzo declined to answer questions relating to both that assessment and the CIA's interrogation program.)

Judge Bybee's answers provide insight into how senior officials in the United States government sought information on aggressive techniques used in SERE training, twisted the law to create the appearance of their legality, and authorized their use against detainees.

The message from the top was clear; it was appropriate to consider degrading and abusive techniques for use against detainees. Given that message, Secretary Wolfowitz's characterization of detainee abuse as the result of "a few bad apples" is simply false. The Committee, in fact, reached the opposite conclusion.

Conclusion 1 of the Committee's report states:

"On February 7, 2002, President George W. Bush made a written determination that Common Article 3 of the Geneva Conventions, which would have afforded minimum standards for humane treatment, did not apply to al Qaeda or Taliban detainees. Following the President's determination, techniques such as waterboarding, nudity, and stress positions, used in SERE training to simulate tactics used by enemies that refuse to follow the Geneva Conventions, were authorized for use in interrogations of detainees in U.S. custody."

Conclusion 13 states:

"Secretary of Defense Donald Rumsfeld's authorization of aggressive interrogation techniques for use at Guantanamo Bay was a direct cause of detainee abuse there. Secretary Rumsfeld's December 2, 2002 approval of Mr. Haynes's recommendation that most of the techniques contained in GTMO's October 11, 2002 request be authorized, influenced and contributed to the use of abusive techniques, including military working dogs, forced nudity, and stress positions, in Afghanistan and Iraq."

And the Committee's 19th and final conclusion states:

"The abuse of detainees at Abu Ghraib in late 2003 was not simply the result of a few soldiers acting on their own. Interrogation techniques such as stripping detainees of their clothes, placing them in stress positions, and using military working dogs to intimidate them appeared in Iraq only after they had been approved for use in Afghanistan and at GTMO. Secretary of Defense Donald Rumsfeld's December 2, 2002 authorization of aggressive interrogation techniques and subsequent interrogation policies and plans approved by senior military and civilian officials conveyed the message that physical pressures and degradation were appropriate treatment for detainees in U.S. military custody. What followed was an erosion in standards dictating that detainees be treated

humanely."

The impact of Secretary Rumsfeld's December 2, 2002 authorization of aggressive techniques was profound. Shortly after his approval, the techniques – and the fact the Secretary had authorized them – became known to interrogators in Afghanistan. In fact, a copy of the Secretary's memo was sent from GTMO to Afghanistan. And in January 2003 the Officer in Charge of the Intelligence Section at Bagram Airfield in Afghanistan said that she saw a power point presentation listing the aggressive techniques that had been authorized by the Secretary.

On January 24, 2003, the Staff Judge Advocate for Combined Joint Task Force 180 (CJTF-180), U.S. Central Command's (CENTCOM) conventional forces in Afghanistan, produced an "Interrogation techniques" memo. Unclassified portions of a report by Major General George Fay stated that the memo "recommended removal of clothing – a technique that had been in the Secretary's December 2 authorization" and discussed "exploiting the Arab fear of dogs" another technique approved by the Secretary on December 2, 2002.

From Afghanistan, the techniques made their way to Iraq. According to the Department of Defense Inspector General, at the beginning of the Iraq war, special mission unit forces in Iraq "used a January 2003 Standard Operating Procedure (SOP) which had been developed for operations in Afghanistan." According to the DoD IG, the Afghanistan SOP had been:

> [I]nfluenced by the counterresistance memorandum that the Secretary of Defense approved on December 2, 2002 and incorporated techniques designed for detainees who were identified as unlawful combatants. Subsequent battlefield interrogation SOPs included techniques such as yelling, loud music, and light control, environmental manipulation, sleep deprivation/adjustment, stress positions, 20-hour interrogations, and controlled fear (muzzled dogs)…

Special mission unit techniques eventually made their way into Standard Operating Procedures issued for all U.S. forces in Iraq. On September 14, 2003, Lieutenant General Sanchez issued the first Combined Joint Task Force 7 interrogation SOP. That SOP authorized interrogators in Iraq to use stress positions, environmental manipulation, sleep management, and military working dogs to exploit detainees' fears in interrogations.

In the report of his investigation into Abu Ghraib, Major General George Fay said that interrogation techniques developed for GTMO were implemented at Abu Ghraib. Following a September 9, 2004 Committee hearing on his report, I asked Major General Fay whether the policy approved by the Secretary of Defense on December 2, 2002 contributed to the use of aggressive interrogation techniques at Abu Ghraib, and he responded "Yes."

The Committee reached a number of other conclusions that expose efforts by administration officials to place responsibility for detainee abuses mostly on lower ranking military personnel as both inaccurate and misleading. Here are a few more of the Committee's conclusions.

- Conclusion 2: Members of the President's Cabinet and other senior officials participated in meetings inside the White House in 2002 and 2003 where specific interrogation techniques were discussed. National Security Council Principals reviewed the CIA's interrogation program during that period.

- Conclusion 6: The Central Intelligence Agency's (CIA) interrogation program included at least one SERE training technique, waterboarding. Senior Administration lawyers, including Alberto Gonzales, Counsel to the President, and David Addington, Counsel to the Vice President, were consulted on the development of legal analysis of CIA interrogation techniques. Legal opinions subsequently issued by the Department of Justice's Office of Legal Counsel (OLC) interpreted legal obligations under U.S. anti-torture laws and determined the legality of CIA interrogation techniques. Those OLC opinions distorted the meaning and intent of anti-torture laws, rationalized the abuse of detainees in U.S. custody and influenced Department of Defense determinations as to what interrogation techniques were legal for use during interrogations conducted by U.S. military personnel.

- Conclusion 7: Joint Personnel Recovery Agency (JPRA) efforts in support of "offensive" interrogation operations went beyond the agency's knowledge and expertise. JPRA's support to U.S. government interrogation efforts contributed to detainee abuse. JPRA's offensive support also influenced the development of policies that authorized abusive interrogation techniques for use against detainees in U.S. custody.

- Conclusion 16: During his assessment visit to Iraq in August and September 2003, GTMO Commander Major General Geoffrey Miller encouraged a view that interrogators should be more aggressive during detainee interrogations.

- Conclusion 17: Interrogation policies approved by Lieutenant General Ricardo Sanchez, which included the use of military working dogs and stress positions, were a direct cause of detainee abuse in Iraq. Lieutenant General Sanchez's decision to issue his September 14, 2003 policy with the knowledge that there were ongoing discussions as to the legality of some techniques in it was a serious error in judgment. The September policy was superseded on October 12, 2003 as a result of legal concerns raised by U.S. Central Command. That superseding policy, however, contained ambiguities and contributed to confusion about whether aggressive techniques, such as military working dogs, were authorized for use during interrogations.

The abuses at Abu Ghraib, GTMO and elsewhere cannot be chalked up to the actions of a few bad apples. Attempts by senior officials to portray that to be the case while shrugging off any responsibility for abuses are both unconscionable and false. Our investigation is an effort to set the record straight on this chapter in our history that has so damaged both America's standing and our security. America needs to own up to its mistakes so that we can rebuild some of the good will that we have lost.

Executive Summary and Conclusions [PDF]
Levin-McCain Joint Statement
Part I of the Committee's Inquiry into the Treatment of Detainees in U.S. Custody - June 17, 2008
Part II of the Committee's Inquiry into the Treatment of Detainees in U.S. Custody - September 25, 2008

Source: Office of Sen. Levin