IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

Suhail Najim Abdullah           )
Al Shimari, et al.,             )
                                )
        Plaintiffs,             )
                                )
        v.                      )        Case No. 1:08cv827 (GBL)
                                )
CACI Premier Technology, Inc.   )
and CACI International, Inc.,    )
                                )
        Defendants.             )

## Memorandum Order

THIS MATTER is before the Court on Defendants CACI Premier Technology, Inc. and CACI International, Inc.'s ("CACI") Motion to Dismiss Plaintiffs' Amended Complaint. This case concerns the civil tort claims of four Iraqi citizens alleging that United States government contractor interrogators tortured them during their detention at Abu Ghraib prison in Iraq. There are seven issues before the Court. The first issue is whether alien civil tort claims against government contractor interrogators present a nonjusticiable political question. The second issue is whether government contractor interrogators are entitled to derivative absolute immunity where the lack of discovery prevents the Court from reviewing the government contract. The third issue is whether wartime interrogation claims involve "combatant activities" within the meaning of the combatant activities exception to the Federal Tort Claims Act ("FTCA") and are

1

Dockets.Justia.com

therefore preempted. The fourth issue is whether the Alien Tort Statute ("ATS") provides a basis for this Court to exercise original jurisdiction over tort claims against government contractor civilian interrogators. The fifth issue is whether Plaintiffs' allege sufficient facts to support their claims against Defendants under the theory of respondeat superior. The sixth issue is whether Plaintiffs' sufficiently allege conspiratorial liability where they fail to specifically identify the individuals involved in the conspiracy. The seventh issue is whether Plaintiffs' have alleged sufficient facts to show that Defendants' employees caused Plaintiffs' injuries.

The Court denies Defendant's Motion to Dismiss on all grounds except the Court grants the Motion to the extent that Plaintiffs' claims rely upon ATS jurisdiction. The Court holds that Plaintiffs' claims are justiciable because Defendants are private corporations and civil tort claims against private actors for damages do not interfere with the separation of powers between the executive branch and the judiciary. Second, the Court finds that Defendants are not entitled to immunity at the dismissal stage because discovery is necessary to determine both the extent of Defendants' discretion in interaction with detainees and to weigh the costs and benefits of granting Defendants immunity in this case. Third, the Court holds that Plaintiffs' claims are not preempted by the combatant activities

exception at this stage because the parties must conduct discovery to determine whether the interrogations here constitute "combatant activities" within the meaning of the exception. Fourth, the Court finds that Plaintiffs' claims are dismissed to the extent that they rely upon ATS jurisdiction because tort claims against government contractor interrogators are too recent and too novel to satisfy the *Sosa* requirements for ATS jurisdiction. Fifth, the Court holds that Plaintiffs sufficiently allege facts supporting vicarious liability because the Amended Complaint states that Defendants' employees engaged in foreseeable tortious conduct when conducting the interrogations. Sixth, the Court holds that Plaintiffs sufficiently allege conspiratorial liability because facts alleging the use of code words and efforts to conceal abusive treatment plausibly suggest conspiratorial activity. Seventh, the Court holds that the Amended Complaint sufficiently alleges the direct involvement of Defendants' employees in causing Plaintiffs' injuries because Plaintiffs point to specific employees who played a direct role in supervising and participating in the alleged conduct. These issues are addressed in turn below.

## I.  BACKGROUND[1]

September 11, 2001, was one of the worst days in American history.  At nine o'clock in the morning, as many Americans were either on their way to or arriving at their jobs, the al Qaeda terrorist network hijacked commercial airliners to attack prominent targets in the United States.  Approximately 3000 people were killed in the attacks.  One week later, the United States Congress passed the Authorization for Use of Military Force Joint Resolution, which authorized the president to use "all necessary and appropriate force" against those associated with the attacks.

On March 20, 2003, a multinational coalition force led and composed almost entirely of troops from the United States and Great Britain invaded Iraq.  The invasion, initially premised on the threat of and in search of weapons of mass destruction ("WMDs"), led to the rapid defeat of the Iraqi military and the capture and execution of Saddam Hussein.[2]  Throughout the occupation, coalition forces met with fierce hostility. Conventional and asymmetric warfare tactics employed by insurgents, including the much-publicized Improvised Explosive

---

[1] Much of the following information is pulled from Supreme Court and Fourth Circuit cases in order to provide a historical context for the present case. *See Hamdan v. Rumsfeld*, 548 U.S. 557 (2006); *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004); *CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280 (2008).

[2] It was later determined that Saddam Hussein was not responsible for the September 11 attacks.

4

Device ("IED"), led to the death of over 4000 coalition troops and counting.

In addition to the hunt for WMDs, the invasion also sought the liberation of the Iraqi people from Saddam Hussein's oppressive regime, infamous for imprisoning political dissidents. One singularly imposing locus of this legendary oppression was the Abu Ghraib prison, located near Baghdad. During Saddam Hussein's regime Abu Ghraib was one of the world's most notorious prisons. Some detainees were held without charge for decades and subjected to testing in experimental chemical and biological weapons programs. As many as 40 detainees were squeezed into cells measuring approximately 170 square feet each. In this 280-acre city within a city, torture was the rule and not the exception. Executions occurred weekly, and vile living conditions made life miserable for the tens of thousands who lived and died there.

Just before the 2003 coalition invasion, the then-existing Iraqi regime, aiming to create havoc for coalition forces, released the detainees held at Abu Ghraib prison and other facilities. After the invasion the United States military took over Abu Ghraib. The military used it to detain three types of prisoners: (1) common criminals, (2) security detainees accused or suspected of committing offenses against the Coalition Provisional Authority, and (3) "high value" detainees who might

possess useful intelligence (insurgency leaders, for example).
As it had in the past, the post-invasion Abu Ghraib prison
population included women and juveniles. A U.S. Army military
police brigade and a military intelligence brigade were assigned
to the prison. The intelligence operation at the prison suffered
from a severe shortage of military personnel, prompting the U.S.
government to contract with private corporations to provide
civilian interrogators and interpreters. These contractors
included L-3 Services (formerly Titan Corporation) and CACI
International.

Abu Ghraib prison again received negative publicity, this
time in late April 2004, when CBS aired an extended report on the
modern Abu Ghraib on *60 Minutes II*. The broadcast showed
sickening photographic evidence of U.S. soldiers abusing and
humiliating Iraqi detainees at Abu Ghraib. It showed photographs
of naked detainees stacked in a pyramid; a photograph of two
naked and hooded detainees, positioned as though one was
performing oral sex on the other; and a photograph of a naked
male detainee with a female U.S. soldier pointing to his
genitalia and giving a thumbs-up sign. Another photograph showed
a hooded detainee standing on a narrow box with electrical wires
attached to his hands. A final photograph showed a dead detainee
who had been badly beaten. U.S. soldiers were in several of the
photographs, laughing, posing, and gesturing. The abuses stunned

the U.S. military, public officials in general, and the public at large.

This case arises out of the detention, interrogation and alleged abuse of four Iraqi citizens detained as suspected enemy combatants at Abu Ghraib between September 22, 2003, and November 1, 2003, a period corresponding to the Abu Ghraib prison abuse scandal. Plaintiffs are Suhail Najim Abdullah Al Shimari, Taha Yaseen Arraq Rashid, Sa'ad Hamza Hantoosh Al-Zuba'e and Salah Hasan Usaif Jasim Al-Ejaili. Between 2004 and 2008, all four Plaintiffs were released from Abu Ghraib without ever being charged with any crime. (Am. Compl. ¶¶ 25, 44, 53, and 63.)

On June 30, 2008, Plaintiffs filed this action against Defendants CACI International, Inc., a Delaware corporation with its headquarters in Arlington, Virginia, and CACI Premier Technology, Inc., its wholly-owned subsidiary located in Arlington, Virginia. Defendants are corporations that provided interrogation services at Abu Ghraib during the period in question. Beginning in September 2003, Defendants provided civilian interrogators for the U.S. Army's military intelligence brigade assigned to the Abu Ghraib prison. Plaintiffs allege that Defendants committed various acts of abuse, including food deprivation, beatings, electric shocks, sensory deprivation, extreme temperatures, death threats, oxygen deprivation, shooting prisoners in the head with taser guns, breaking bones, and mock

executions. Plaintiffs assert that jurisdiction is proper under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1332 (diversity), 28 U.S.C. § 1350 (Alien Tort Statute) and 28 U.S.C. § 1367 (supplemental jurisdiction). Plaintiffs allege the following twenty (20) counts:

1) Torture;

2) Civil conspiracy to commit torture;

3) Aiding and abetting torture;

4) Cruel, inhuman or degrading treatment;

5) Conspiracy to treat Plaintiffs in a cruel, inhuman or degrading manner;

6) Aiding and abetting cruel, inhuman and degrading Treatment;

7) War crimes;

8) Civil conspiracy to commit war crimes;

9) Aiding and abetting the commission of war crimes;

10) Assault and battery;

11) Civil conspiracy to assault and batter;

12) Aiding and abetting assaults and batteries;

13) Sexual assault and battery;

14) Civil conspiracy to sexually assault and batter;

15) Aiding and abetting sexual assaults and batteries;

16) Intentional infliction of emotional distress;

17) Civil conspiracy to inflict emotional distress;

18) Aiding and abetting intentional infliction of

emotional distress;

19)   Negligent hiring and supervision; and

20)   Negligent infliction of emotional distress.
Defendants now move for dismissal of all claims.

## II.   DISCUSSION

### A.   Standard of Review

#### 1.   Nonjusticiable Questions Under Rule 12(b)(1)

A party challenging the justiciability of an issue before a court questions that court's subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *See Republican Party of N.C. v. Martin*, 980 F.2d 943, 949 n.13 (4th Cir. 1992). Where a court determines that a nonjusticiable question is presented it must dismiss the action. FED. R. CIV. P. 12(h)(3). A court need not accept factual allegations as true for purposes of a motion to dismiss for lack of subject matter jurisdiction under 12(b)(1). *Thigpen v. United States*, 800 F.2d 393, 396 (4th Cir. 1986) ("In contrast to its treatment of disputed issues of fact when considering a Rule 12(b)(6) motion, a court asked to dismiss for lack of jurisdiction may resolve factual disputes to determine the proper disposition of the motion."). The plaintiff bears the burden of persuasion when a motion to dismiss challenges a court's subject matter jurisdiction. *See Piney Run Pres. Ass'n v. County Comm'rs of Carroll County, MD*, 523 F.3d 453, 459 (4th Cir. 2008).

## 2. Failure to State a Claim Under Rule 12(b)(6)

A Federal Rule of Civil Procedure 12(b)(6) motion should be granted unless an adequately stated claim is "supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1969 (2007); *see* FED. R. CIV. P. 12(b)(6). In considering a Rule 12(b)(6) motion, the Court must construe the complaint in the light most favorable to the plaintiff, read the complaint as a whole, and take the facts asserted therein as true. *Mylan Lab., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). In addition to the complaint, the court may also examine "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007). "Conclusory allegations regarding the legal effect of the facts alleged" need not be accepted. *Labram v. Havel*, 43 F.3d 918, 921 (4th Cir. 1995). Because the central purpose of the complaint is to provide the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests," the plaintiff's legal allegations must be supported by some factual basis sufficient to allow the defendant to prepare a fair response. *Conley v. Gibson*, 355 U.S. 41, 47 (1957).

## B. Analysis

### 1. Nonjusticiable political question

The Court denies Defendants' Motion to Dismiss Plaintiffs' Amended Complaint as presenting a nonjusticiable political question because courts are wholly competent to resolve private actions between private parties, even where the defendant is a government contractor. Courts can identify nonjusticiable political questions by the presence of any one or more of six factors outlined by the United States Supreme Court in *Baker v. Carr*, 369 U.S. 186 (1962). In *Baker*, the Court held that nonjusticiable political questions involve at least one of the following:

> 1) a textually demonstrable constitutional commitment of the issue to a coordinate political department;
>
> 2) a lack of judicially discoverable and manageable standards for resolving it;
>
> 3) the impossibility of deciding without an initial policy determination of a kind clearly for non-judicial discretion;
>
> 4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government;
>
> 5) an unusual need for unquestioning adherence to a political decision already made; or
>
> 6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217. In evaluating a case, a court must engage in a

11

"discriminating inquiry into the precise facts and posture of the particular case," while understanding "the impossibility of resolution by any semantic cataloguing." *Id.* "[It] is 'error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance.'" *Japan Whaling Ass'n v. American Cetasean Soc'y*, 478 U.S. 221, 229-30 (1986) (citing *Baker*, 369 U.S. at 211). The concern is not with "political cases" carrying the potential to stir up controversy, but instead with "political questions" which, by their nature, create separation of powers concerns. *See Baker*, 369 U.S. at 217. The Court addresses each of these factors slightly out of turn below, focusing first on the three factors expressly raised by Defendants, then on the remaining three as outlined in *Baker*.

a. *Constitutional commitment to a coordinate political branch*

Defendants argue that Plaintiffs' claims are nonjusticiable because the Amended Complaint alleges conspiratorial conduct and, since the type of conspiracy alleged could not be carried out by low-level contractors and military personnel, Plaintiffs' claims must therefore challenge official policies and directives that were established by the executive branch and are consequently nonreviewable by the judiciary. CACI's argument is flawed for two reasons.

First, as an initial matter, the Court finds no basis to hastily conclude that a conspiracy of the type Plaintiffs allege

12

could not be carried out by on-site military and contracted personnel because it is quite unlikely that these personnel were subjected to the persistent and pervasive supervision that CACI necessarily suggests. CACI would have the Court blindly accept its premise that the activities at Abu Ghraib were so heavily monitored that, but for the involvement and approval of high-level government officials, the atrocities could not have occurred. The problem with CACI's premise is that Abu Ghraib prison sits over six thousand miles from the Pentagon. As a result, it is very unlikely that the President of the United States or his top military and government officials had the type of regular insight into the daily activities at Abu Ghraib that Defendants suggest. Likewise, the military commanders in theater were, and still are, focused on conducting military operations in both Iraq and Afghanistan. It would be unrealistic for this Court to presume that theater commanders had the time or resources to stay a vigilant eye on the day to day activities at Abu Ghraib while fighting a war on two fronts. Consequently, the Court finds it plausible that the on site personnel engaged in conduct that higher-ups were wholly unaware of. If that be the case, it is completely within the realm of possibility that a conspiracy of the type Plaintiffs complain of was carried out

absent the authorization or oversight of higher officials.[3]

Second, it is clear to this Court that Plaintiffs' Amended Complaint challenges not the government itself or the adequacy of official government policies, but the conduct of government contractors carrying on a business for profit. Defendants rely on the United States Court of Appeals for the Fourth Circuit's opinion in *Tiffany v. United States*, 931 F.2d 271 (4th Cir. 1991), for the proposition that civil claims such as Plaintiffs' challenge the Executive's battlefield policies and are therefore nonjusticiable. CACI's reliance is misplaced because the *Tiffany* facts are wholly distinguishable from the present case.

In *Tiffany*, Mr. Tiffany and six passengers where killed when he flew unidentified into an air defense zone and collided with a United States F-4C fighter jet. *Id.* at 271. One of the fighter jets sent out to visually identify Mr. Tiffany's plane came too close to his aircraft, colliding with it as the jet banked sharply to break off the intercept. *Id.* Mr. Tiffany's widow sued the government, alleging negligence on the part of the military pilot and ground control in their execution of the intercept. *Id.* The Fourth Circuit, however, took issue with the

---

[3] Because this premise forms the foundation of CACI's constitutional commitment argument, its failure thereby destroys CACI's argument that follows because, as noted by this Court, it is entirely possible that a conspiracy of this type could be carried out by low level officials. As such, this Court could analyze this low-level conspiracy without once calling the executive's interrogation policies into question. However, for the sake of completeness, the Court will proceed to evaluate CACI's position in its entirety.

idea of holding the United States liable in tort, finding that "[t]he negligence alleged in this case necessarily calls into question the government's most important procedures and plans for the defense of the country." *Id.* at 275. Revealing separation of powers concerns as the reason for its decision, the Fourth Circuit held that the claim was nonjusticiable because resolution of the claim would result in the court "interjecting tort law into the realm of national security and second-guessing judgments with respect to potentially hostile aircraft that are properly left to the other constituent branches of government." *Id.*

The present case is clearly distinguishable from *Tiffany* for two reasons. First, the defendant here is a private party, not the government itself, which is a key distinction when identifying separation of powers problems. As the courts in both *Baker* and *Tiffany* noted, the political question doctrine is rooted in separation of powers principles. *See Baker*, 369 U.S. at 217 ("several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of separation of powers."); *Tiffany*, 931 F.2d at 276 ("Separation of powers is a doctrine to which the courts must adhere even in the absence of an explicit statutory command. That doctrine requires that we examine the relationship between the judiciary and the coordinate branches of

the federal government cognizant of the limits upon judicial power.") (internal citations omitted). At no time is the potential for a separation of powers problem more apparent than when the federal government is the named defendant. Here, however, Plaintiffs' action is against CACI, a private corporation engaged in interrogating prisoners merely for self profit. Certainly, separation of powers is a concern in a case like *Tiffany*, where a private party's action is against the government and its allegation is that the government improperly conducted its affairs. But the government is not a party to the present case. The Amended Complaint does not attack government policies. Instead, Plaintiffs' allege that a private corporation conducted its business in derogation of United States and international law, an allegation that is entirely justiciable.

Second, the conduct complained of in *Tiffany* triggered separation of powers problems because the conduct was inextricable from the executive branch, as fighter intercepts are non-existent outside of the governmental context. There, the plaintiff argued that the United States was negligent in the way in which it intercepted Mr. Tiffany's aircraft. *Id.* at 275. The conduct the plaintiff complained of was created, trained and regulated only in order to serve the government's national defense function. As a result, there was no way to independently evaluate the conduct because the conduct did not exist

independent of the government. As noted by the Fourth Circuit, such a claim "calls into question the government's most important procedures and plans for the defense of the country." *Id.* at 275. Here, however, torture has an existence all its own. Plaintiffs' allege that they were, among other things, beaten, stripped naked, deprived of food, water and sleep, subjected to extreme temperatures, threatened and shocked. (Am. Compl. ¶¶ 11-63.) Unlike the fighter intercept in *Tiffany*, this conduct does not depend on the government for its existence; private actors can and do commit similar acts on a regular basis. Separation of powers is not implicated where the conduct is already separate and distinct from the government.

The fact that CACI's business involves conducting interrogations on the government's behalf is incidental; courts can and do entertain civil suits against government contractors for the manner in which they carry out government business. *See Boyle v. United Tech. Corp*, 487 U.S. 500 (1988) (estate's wrongful death claim against government helicopter manufacturer justiciable); *see also Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10 (D.D.C. 2005) *and Saleh v. Titan Corp.*, 436 F. Supp. 2d 55 (D.D.C. 2006) (Iraqis' civil suits against government contractor interrogators and interpreters posed no political question where the court found "no merit in the defendants' political question defense . . .". The judiciary is regularly entrusted with the

responsibility of resolving this type of dispute. Hence, the Court finds that separation of powers concerns are not triggered by the Court's evaluation of CACI's conduct in this case.

Alternatively, Defendants argue that Plaintiffs' claims are nonjusticiable because the issue of recovery for wartime injuries is constitutionally committed to the political branches. CACI insists that this Court lacks the authority to resolve the present action because reparations claims are generally barred absent an express reparations agreement or a diplomatic agreement with a provision expressly allowing such claims. CACI cites no cases that square with the facts of this case. Four of the cited cases involve plaintiffs seeking recovery directly from the offending government and the fifth involves equitable claims against the State of the Vatican City. The only case CACI cites that involves recovery from a private party is over two hundred years old, is actually a preemption case, and only tangentially addresses recovery of *pre*-war debt. *See Ware v. Hylton*, 3 U.S. 199, 230 (1796) (allowing a British subject to collect a pre-war debt from an American citizen despite a state law discharging debts to the British because of the supremacy of a peace treaty providing for debt recovery). CACI conveniently ignores the long line of cases where private plaintiffs were allowed to bring tort actions for wartime injuries. *See The Paquete Habana*, 175 U.S. 677 (1900) (damages imposed for seizure of fishing vessels during

military operation); *Ford v. Surget*, 97 U.S. 594 (1878) (soldier not exempt from civil liability for trespass and destruction of cattle if act not done in accordance with the usages of civilized warfare); *Mitchell v. Harmony*, 54 U.S. 115 (1851) (soldier sued for trespass for wrongful seizure of citizen's goods while in Mexico during Mexican War); *Little v. Barreme*, 6 U.S. 170 (1804) (naval officer liable to ship owner for damages for illegal seizure of his vessel during wartime). Thus, this Court finds ample support for its ability to entertain Plaintiffs' present tort claims.[4]

### b. *Judicially discoverable and manageable standards for resolution*

CACI argues that there are no judicially discoverable and manageable standards for evaluating Plaintiffs' claims because the Court would have to conduct an extensive review of classified materials, or materials unlikely to be discoverable because of the "fog of war." (Defs.' Mem. 12.) The Court finds CACI's position very unlikely given the extensive amount of litigation that has already occurred involving the events at Abu Ghraib prison and the fact that CACI's government contract likely lays out the applicable standard of care in this case. First, and

---

[4] CACI seems to suggest that the Court should feel comfortable dismissing Plaintiffs' claims on political question grounds because, after all, Plaintiffs may still have administrative remedies available to them. However, as the Supreme Court stressed in *Baker*, "courts cannot reject as 'no law suit' a bona fide controversy . . . ." 369 U.S. at 217. Hence, this Court will refrain from doing so here.

most notably, CACI itself brought a civil suit involving most of the same facts present in this case. In *CACI Premier Technology, Inc. v. Rhodes & Piquant, LLC*, CACI alleged defamation against a radio personality for statements she made blaming CACI for the atrocities at Abu Ghraib. 2006 U.S. Dist. LEXIS 96057 (E.D. Va. 2006), *aff'd*, 536 F.3d 280 (4th Cir. 2008). In that case, this Court granted summary judgment in favor of the defendant, but only after carefully examining the briefs, exhibits, and affidavits submitted by both parties. *Id.* The Court finds it ironic that CACI argues that this case is clouded by the "fog of war," yet CACI saw only clear skies when it conducted discovery to develop its defamation case.

Second, this Court also finds instructive the number of other courts that have entertained similar cases and conducted some level of discovery on these or similar facts. In *Ibrahim v. Titan Corporation*, 391 F. Supp. 2d 10 (D.D.C. 2005), the court, in considering a motion to dismiss, noted the potential for manageability problems in the future but concluded that "[t]he government is not a party . . . and [the court is] not prepared to dismiss otherwise valid claims at this early stage in anticipation of obstacles that may or may not arise." *Id.* at 14. The court went on to allow discovery as to the issue of whether the defendants were "essentially soldiers in all but name" and the plaintiffs' claims consequently preempted. *See id.* at 18-19.

Likewise, in *Saleh v. Titan Corporation*, a case "virtually indistinguishable" from *Ibrahim* but for added conspiracy claims, the court permitted discovery as to the evidentiary support for the plaintiffs' claims, and the exact nature of the information the plaintiffs relied upon where they asserted claims "upon information and belief." 436 F. Supp. 2d 55, 59 (D.D.C. 2006). The completion of at least some level of discovery in these cases leads the Court to reject the position that the present case implicates manageability issues severe enough to trigger the political question doctrine.

Third, the Court finds that many of the potential witnesses have already testified about their actions and the actions of others during the courts martial of several military personnel involved in the events at Abu Ghraib. Several of the soldiers who participated in the atrocities were tried and convicted of their crimes. Plaintiffs expressly refer to "post conviction testimony and statements by military co-conspirators" suggesting that "CACI employees Steven Stefanowicz . . . and Daniel Johnson . . . directed and caused some of the most egregious torture and abuse at Abu Ghraib." (Am. Compl. ¶ 1.) This availability of eyewitness testimony further hurts CACI's position.

Fourth, Plaintiffs made clear to this Court that they do not intend to delve into the Central Intelligence Agency's "Ghost Detainee" program. Given that assurance, there is no reason for

the Court to suspect that classified documents regarding that program will be sought or necessary to Plaintiffs' case. Due to the number of cases, both criminal and civil, that have already been brought challenging the events at Abu Ghraib and Plaintiffs' assurance that they do not plan to challenge the "Ghost Detainee" program, the Court rejects CACI's argument that this case necessarily involves the evaluation of numerous documents that are either classified or unavailable to the Court. The government has not sought to intervene in this case. The government has not asserted any state secret on behalf of CACI. If and when the time comes to consider whether classified information is necessary in this case, the government and the Court will address that issue.

The Court finds that the judicial standards governing this case are both manageable and discoverable. As mentioned above, many of the documents likely to form the basis of the present action have already been obtained and evaluated by this and other courts. In addition, the Court finds that CACI's government contract is likely to be highly instructive in evaluating whether CACI exercised the appropriate level of care in its dealings with Abu Ghraib detainees. The Court suspects that the contract details CACI's responsibilities in conducting the interrogations, outlines the applicable laws and rules that CACI personnel are bound by, and sets further restrictions on the type of conduct

permitted.  The Court finds that manageable judicial standards are readily accessible through the discovery process.

c.  *Lack of respect due coordinate branches of government*

CACI argues that the Court will demonstrate a lack of respect due to the political branches should it adjudicate Plaintiffs' claims because the Constitution vests the power to wage war and conduct foreign affairs in the political branches. It is likely that CACI recognized the futility of this argument, as CACI buried it in a footnote on the twelfth page of its supporting memorandum.  As CACI is undoubtedly aware, matters are not beyond the reach of the judiciary simply because they touch upon war or foreign affairs.  *See Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) (hearing the habeas appeal of suspected alien terrorist detained by the Department of Defense at Guantanamo Bay); *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) (examining the process owed to citizens being detained in the United States as enemy combatants); *Dames & Moore v. Regan*, 453 U.S. 654 (1981) (evaluating whether the president exceeded his constitutional and statutory authority when he suspended American citizens' claims against Iran following Iranian hostage crisis); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) (reversing a presidential directive ordering the seizure of steel mills to protect the production of armaments for the Korean War); *see also United States v. Lindh*, 212 F. Supp. 2d 541 (E.D. Va. 2002)

23

(addressing the issue of whether an American citizen fighting with the Taliban in Afghanistan was entitled to lawful combatant immunity). Surely, if courts can review the actions of the President of the United States without expressing a lack of respect for the political branches, this Court can review the actions of a contracted, for-profit corporation without doing so as well.

### d. Impossibility of deciding without non-judicial policy determination

Now turning to the remaining *Baker* factors, this Court finds that the present issue can be decided by this Court because the political branches already made a policy determination through the enactment of the Anti-Torture Statute, 18 U.S.C. § 2340, *et seq.* (2006). The Anti-Torture Statute provides for criminal sanctions for the commission or attempted commission of torture. *Id.* The statute extends jurisdiction to United States nationals located outside of the United States and to offenders within the United States, regardless of the offenders' and the victims' nationalities. § 2340A. As this legislation makes clear, the policy determination central to this case has already been made; this country does not condone torture, especially when committed by its citizens.

In addition, the legislative branch has already made a policy determination specifically concerning the events that took place at Abu Ghraib. In the Senate Armed Service Committee's

investigation of the events at Abu Ghraib, the committee clearly condemns the mistreatment that occurred at the prison. *See S. ARMED. SERV. COMM., 110TH CONG., EXECUTIVE SUMMARY OF THE S. ARMED SERV. COMM.'S INQUIRY INTO THE TREATMENT OF DETAINEES IN U.S. CUSTODY* (Comm. Print 2008). The summary starts out with a quote:

> What sets us apart from our enemies in this fight . . . is how we behave. In everything we do, we must observe the standards and values that dictate that we treat noncombatants and detainees with the dignity and respect. While we are warriors, we are also all human beings.

*Id.* at xii (internal citations omitted). From there, the report outlines all of the underlying problems that ultimately paved the way for the events at Abu Ghraib. Hence, the policy is clear: what happened at Abu Ghraib was wrong.

  e.  *Need for adherence to a political decision already made*

The Court finds that adjudication of the present case in no way countermands a need for adherence to a political decision already made because, as mentioned above, the decision made is one against torture.

  f.  *Potential for embarrassment from multifarious pronouncements*

As to the final *Baker* factor, the Court finds no potential for embarrassment from multifarious pronouncements because, as mentioned above, the political branches of government have already spoken out against torture. The Anti-Torture Statute is a codified consensus reached among the executive and legislative

branches of government.

While it is true that the events at Abu Ghraib pose an
embarrassment to this country, it is the misconduct alleged and
not the litigation surrounding that misconduct that creates the
embarrassment. This Court finds that the only potential for
embarrassment would be if the Court declined to hear these claims
on political question grounds. Consequently, the Court holds
that Plaintiffs' claims pose no political question and are
therefore justiciable.

## 2. Derivative absolute official immunity

Having established that the political question doctrine does
not deprive this Court of jurisdiction, the Court must now
address the question of whether the doctrine of derivative
absolute official immunity bars Plaintiffs' claims. Defendants
argue that they are immune for two reasons. First, Defendants
argue they are immune because they performed a discretionary
function within the scope of their government contract. Second,
Defendants argue they are immune because the public benefit of
immunity for contractor interrogators outweighs the cost of
ignoring a potential injustice should Plaintiffs' claims go
unremedied and unaddressed. The Court rejects both arguments
because the Court cannot determine the scope of Defendants'
government contract, the amount of discretion it afforded
Defendants in dealing with detainees, or the costs and benefits

of recognizing immunity in this case without examining a complete record after discovery has taken place. The Court will first address the issue of whether Defendants performed a discretionary function within the scope of their government contract, followed by an analysis of the costs and benefits of granting immunity in this case.

The law of governmental absolute immunity has largely developed as a part of the federal common law to protect discretionary government functions from the potentially debilitating distraction of defending private lawsuits. *See, e.g., Westfall v. Erwin*, 484 U.S. 292, 295 (1988), *superseded by* 28 U.S.C. § 2679 (2006); *Barr v. Matteo*, 360 U.S. 564, 569–73 (1959) (plurality opinion). There are various principles underlying the doctrine of immunity. One principle is "to serve the public good or to ensure that talented candidates [are] not deterred by the threat of damages suits for entering public service." *Wyatt v. Cole*, 504 U.S. 158, 167 (1992). Another is to protect the public from the timidity of public officials by "encouraging the vigorous exercise of official authority." *Butz v. Economou*, 438 U.S. 478, 506 (1978); *see also Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (listing prevention of inhibition of discretionary action).

In *Barr* and *Westfall*, the Supreme Court recognized absolute immunity from state tort liability for federal officials

exercising discretion while acting within the scope of their employment. The Supreme Court made clear that the purpose of such immunity was not to bestow a benefit upon government actors for their private gain, but instead to protect the government's interest in conducting its operations without the threatened disruption of civil litigation. *See Barr*, 360 U.S. at 572-73 ("The privilege is not a badge or emolument of exalted office, but an expression of a policy designed to aid in the effective functioning of government."). Thus, the question of whether to grant immunity is closely connected to the policies that would be served by doing so.

The Fourth Circuit extended the doctrine of absolute immunity to government contractors in *Mangold v. Analytic Services*, 77 F.3d 1442 (4th Cir. 1996). In that case, the court granted derivative immunity to a government contractor for statements it made in response to the inquiries of Air Force investigators regarding improper practices by Air Force officers. *Id.* at 1450. The Court found that the *Westfall* principles discussed above, combined with the same interest that justifies protecting witnesses in government-sponsored investigations, supported the extension of immunity. *Id.* at 1448. Read broadly, *Mangold* means that in some circumstances, government contractors are immune from liability while performing their government contracts. *Id.*

28

But courts recognize that protecting government actors with absolute immunity is not without costs. Immunity undermines a core belief of American jurisdprudence, that individuals must be held accountable for their wrongful acts. *See Westfall*, 484 U.S. at 295. This interest in holding individuals accountable while protecting governmental functions from distracting private lawsuits led to a balancing test, affording immunity "only to the extent that the public benefits obtained by granting immunity outweigh [the] costs." *Mangold*, 77 F.3d at 1447 (citing *Westfall*, 484 U.S. at 296 n.3); *see id.* at 1446-47 ("Protecting government actors with absolute immunity, however, has its costs, since illegal and even offensive conduct may go unredressed.").

a. *Discretionary function and scope of contract*

Defendants first argue that they are immune because their interrogations constituted a discretionary function within the scope of their government contract. Under the first prong of the *Westfall* test, "immunity from state law tort liability [attaches] for federal officials *exercising discretion* while acting within the scope of their employment." *Mangold*, 77 F.3d at 1446 (emphasis supplied). The Court has insufficient information at this stage in the litigation to conclude that Defendants had either the authority to exercise discretion in how they conducted interrogations or that they did so within the scope of their government contract. The Court addresses each element in turn

29

below.

i.   discretionary function

Defendants argue that the Court need not even address the
question of discretion because *Mangold* held a contractor immune
from suit even though the function that the contractor
performed—responding to a government investigation—was not
discretionary.  Defendants' assertion, however, misses the
broader rule to which *Mangold* represents an exception.  When
*Mangold* extended government employee immunity to government
contractors, it did so with explicit reference to the test
established in *Barr* and *Westfall*.  *Mangold*, 77 F.3d at 1448
(couching the issue as whether *Barr* and *Westfall* immunity should
be extended).  *Barr* and *Westfall* clearly looked to the presence
of a discretionary function to determine the propriety of
extending immunity.  *Id.* at 1446.  *Mangold* then addressed a
narrow issue:  "[w]hether *Barr* and *Westfall* immunity also extends
to persons in the private sector who are government contractors
participating in official investigations of government
contracts."  *Id.* at 1447.  By answering in the affirmative,
*Mangold* did not generally repudiate the discretionary function
requirement of *Barr* and *Westfall* in the contractor context but
instead recognized a limited expansion of the rule, extending
immunity "only insofar as necessary to shield statements and
information . . . given by a government contractor . . . *in*

*response to queries* by government investigators engaged in an official investigation." *Id.* at 1449.

This case does not fall within the narrow response-to-government-inquiries expansion to the discretionary function requirement as carved out in *Mangold* because here Defendants were not giving information, they were extracting it through the use of allegedly abusive means. The distinction is important because the *Mangold* court extended immunity in that case to preserve the government's interest in protecting the integrity of its investigations. This, again, goes back to the central purpose of absolute immunity that the Supreme Court addressed in *Barr*: preservation of an efficiently operating government. *Mangold*, then, did not ignore the discretionary function requirement outlined in *Barr* and *Westfall*, but instead found that similar policy interests were served by the extension of immunity to the precise and limited *Mangold* facts. The Court therefore rejects Defendants' argument that discretion is irrelevant and finds the limited *Mangold* extension inapplicable to the present case.[5] Therefore, the fundamental inquiry remains whether Defendants acted pursuant to discretionary authority within the scope of

---

[5] Defendants argue in the alternative that the FTCA's combatant activities exception, 28 U.S.C. § 2860(j), creates an alternate basis for granting derivative absolute official immunity. The Court is unpersuaded because Defendants offer no precedent supporting this assertion. Moreover, the question of whether the combatant activities exception to the FTCA supports a finding of immunity is distinct from the question of whether it supports a finding of preemption. The Court addresses this second question in Section 3, below.

their contract. Although the Court agrees with Defendants that the mere allegation of serious abuse does not automatically strip Defendants of any immunity to which they might otherwise be entitled, the Court is unpersuaded at this early stage of the proceedings and in light of a very limited factual record that Defendants performed a discretionary function entitling them to absolute immunity.

The Court doubts, however, that Defendants will fall within the discretionary function category even after a chance for discovery because the facts of this case are wholly distinguishable from the *Mangold* facts. The wartime interrogations in this case are different from the investigations referenced in *Mangold* because in that case, there was no question of whether the investigative techniques used by the Air Force were lawful; the only question was whether the contractor's responses were protected. *Id.* at 1448. Moreover, responses to Air Force inquiries surrounding whether an officer inappropriately pressured a private engineering and analysis firm to hire a family friend are not immediately analogous to Defendants' allegedly abusive interrogations of detainees at Abu Ghraib prison. Indeed, this case presents a question of whether the government actually delegated to Defendants the task of performing allegedly abusive conduct. For these reasons, based on the limited record currently before the Court, *Mangold* is

entirely distinguishable from this case.

Furthermore, the Court finds that Defendants may have problems after discovery showing that their actions were discretionary in light of Plaintiffs' allegations that Defendants violated laws, regulations and Defendants' government contract. A government contractor does not automatically perform a discretionary function simply by virtue of being a government contractor. *See United States v. Gaubert*, 499 U.S. 315, 322 (1991) (observing that a federal employee's actions are not discretionary "if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'")(citations omitted); *see also Perkins v. United States*, 55 F.3d 910, 914 (4th Cir. 1995) ("Obviously, failure to perform a *mandatory* function is not a *discretionary* function"); *Baum v. United States*, 986 F.2d 716, 720 (4th Cir. 1993) ("[I]f the plaintiff can show that the actor in fact failed to so adhere to a mandatory standard then the claim does not fall within the discretionary function exception."). Here Plaintiffs allege that Defendants violated laws and their government contract, which is the same as claiming that Defendants failed to adhere to a mandatory standard. The Court finds it doubtful that discovery will show that Defendants' actions were discretionary in light of Plaintiffs' allegations of legal and contractual

violations.

    ii.  scope of government contract

Defendants argue that Plaintiffs' claims arise out of
conduct that allegedly occurred in the course of Defendants'
interrogation duties at Abu Ghraib prison.  The Court is
completely bewildered as to how Defendants expect the Court to
accept this scope of contract argument when the contract is not
before the Court on this motion.

There are many ways in which discovery will answer
unresolved questions that must be answered before the Court can
reasonably determine whether Defendants are entitled to immunity.
For example, Defendants' contract with the government will shed
much light on the responsibilities, limitations and expectations
that Defendants were bound to honor as government contractors.
In addition, consideration of Defendants' course of dealing with
the government may reveal whether deviations from the contract
occurred and, if so, whether they were tolerated or ratified.
The scope of Defendants' contract is thus an open issue that
requires discovery.

Furthermore, if Plaintiffs' allegations are true, then
Defendants are not entitled to absolute immunity if their actions
were wrongful.  Plaintiffs allege that Defendants violated United
States and international law, military policies and procedures,
and finally, the terms of their contract.  (Am. Compl. at ¶¶ 67,

94, 108.) If these allegations are true, then Defendants are not entitled to dismissal on derivative absolute immunity grounds because Defendants' alleged abuse of Plaintiffs was not within the scope of their contract. *See Mangold*, 77 F.3d at 1446 (noting that *Barr* and *Westfall* grant immunity to federal officials "acting within the scope of their employment.").

For these reasons, and on this limited record, the Court lacks a basis for finding that the conduct in the Complaint arises out of a discretionary function within the scope of Defendants' government contract. Discovery as to Defendants' contract and course of dealings with the government is necessary to determine whether Defendants meet these requirements.

b. *Cost v. public benefit of immunity*

Assuming, *arguendo*, that Defendants' alleged abuse of Plaintiffs constituted a discretionary government function within the scope of Defendants' contract, the Court must now determine whether the public benefits of granting immunity outweigh the costs. Defendants argue that the public has an urgent and compelling interest in enabling government contractors to perform combatant activities in a war zone free from the interference of tort law. The Court finds that the limited record currently available does not support the conclusion that the public interest outweighs the costs of granting immunity in this case.

As discussed above, the Court must balance the interest in holding individual wrongdoers accountable against the interest in protecting the government from distracting litigation. *Mangold*, 77 F.3d at 1447. From this Court's perspective, it is clear that the Supreme Court expected courts to adopt a case-by-case approach to this analysis. As the Supreme Court explained in *Westfall*, "the inquiry into whether absolute immunity is warranted *in a particular context* depends on the degree to which the official function would suffer under the threat of prospective litigation." *Westfall*, 484 U.S. at 296 n.3 (emphasis supplied). Here Defendants ask this Court to do for government contractors what the Supreme Court was unwilling to do for government officials: adopt a *per se* rule that the benefits of immunity necessarily outweigh the costs. Defendants cite no authority for this proposition. Indeed, if the public benefits always outweighed the costs, the balancing test requirement would be meaningless. The Court finds it appropriate to weigh the public interest in granting immunity to Defendants against the costs of doing so.

Defendants urge that the public interest in recognizing absolute immunity here is the "compelling interest in enabling government contractors to perform combatant activities in a war zone free from the interference of tort law." (Defs.' Mem. 17.) As discussed in Section 3, below, the Court is unconvinced that

36

contractor interrogations are in fact combatant activities.
Further, even if Defendants' activities are combatant activities,
the Court questions whether the public's interest is stronger in
recognizing immunity for these types of activities or in allowing
suits like this to go forward.  The public outcry against the
abuse of detainees at Abu Ghraib was strong and compelling.
Photographs of detainee abuse scarred the national conscience,
leading to the publication of numerous books, newspaper and
magazine articles and at least one congressional investigation.
On the limited record currently before the Court, the Court
cannot say that the public has a stronger interest in recognizing
immunity than it does in allowing Plaintiffs' suit to proceed.
Discovery is needed to address the scope of Defendants' contract,
their actual conduct, and the applicable statutes and
regulations.  Absent this information, the Court cannot say that
the public interest in granting immunity outweighs the costs.

Defendants also argue that immunity is available even for
illegal and offensive conduct.  For example, Defendants cite
*Medina v. United States*, 259 F.3d 220 (4th Cir. 2001), in which a
former diplomat sued Immigration and Naturalization Service
agents for assault, battery and other torts arising out of his
arrest.  259 F.3d at 222.  The Fourth Circuit held that the
agency was immune from suit under the discretionary function
exception to the FTCA because the case implicated public policy.

*Id.* at 229. Defendants also cite *Perkins v. United States*, 55 F.3d 910 (4th Cir. 1995), a wrongful death action in which a worker suffocated in a mine attempting to remove equipment to satisfy an Internal Revenue Service ("IRS") seizure order. 55 F.3d at 912. There, the court held that immunity protected the IRS agents because the acts they committed, even if illegal or tortious, were related to the assessment of a tax debt. *Id.* at 915. The Court does not disagree that where immunity applies, it is a powerful shield. But *Medina* and *Perkins* do not support a finding of immunity for Defendants because those cases involved FTCA suits against United States government officials, not contractors. *Medina*, 259 F.3d at 220; *Perkins*, 55 F.3d at 910. A public benefits analysis under the FTCA is inapposite here because the FTCA authorizes suit against the government; by contrast, in cases where only private parties are involved, the presumption is that public policy favors granting access to the courts and resolution of conflicts through the adversarial system.

Even if the policies in *Medina* and *Perkins* are evaluated in the context of this case, they do not help Defendants. The policy behind allowing FTCA suits against government actors is essentially accountability. *See Dalehite v. United States*, 246 U.S. 15, 27 (1953), *rev'd in part on other grounds by Indian Towing Co. v. United States*, 350 U.S. 61 (1955). On the other

hand, Defendants' strongest policy arguments for granting immunity in this case are efficiency and flexibility. Here, the immense pubic outcry in the wake of the Abu Ghraib scandal illustrates the public's strong interest in accountability even though efficiency and flexibility are otherwise valued.

Defendants argue that allowing suits such as Plaintiffs' will require military and government officials to justify and explain their wartime decisions in court. As addressed throughout this Order, however, the question whether a private actor exceeded the scope of its contractual obligations or otherwise violated the law is a question soundly committed to the judiciary. "Damage actions are particularly judicially manageable . . . . The granting of monetary relief will not draw the federal courts into conflict with the executive branch." *Gordon v. Texas*, 153 F.3d 190, 195 (5th Cir. 1998) (internal citations and formatting omitted).

Finally, Defendants caution that without a finding of derivative absolute official immunity in this case, military commanders would forfeit the tort-free environment deemed essential to effective combat operations whenever they decide to augment military personnel with civilian contractors. But even if the Court were to find that the interrogation of detainees by civilians necessarily constitutes "combat operations," the decision to employ civilian contractors instead of military

personnel is one that commanders must make in consideration of all the attendant costs and benefits. In any case, Defendants' concern for preventing judicial interference with military decisions is inconsistent with their request that the Court shield the military from the consequences of one of those decisions, namely, to employ civilian contractors, who normally are not immune from suit, instead of soldiers, who normally are.

In sum, taking as true Plaintiffs' allegations that Defendants exceeded the scope of their government contract and violated laws and regulations, the Court cannot say that the public benefits of granting derivative absolute official immunity here outweigh the costs of holding immune contractors who allegedly "crossed the line from official duty into illicit brutality." *Griggs v. WMATA,* 232 F.3d 917, 921 (D.C. Cir. 2000). For all these reasons, and based on the information available to the Court at this time, the Court denies Defendants' Motion to Dismiss Plaintiffs' Amended Complaint on the grounds of derivative absolute official immunity.

### 3. Preemption under the Combatant Activities Exception to the FTCA

Having established that Plaintiffs' claims are not barred by the doctrine of derivative absolute official immunity, the Court now addresses the question of whether Plaintiffs' tort claims are preempted by federal law. Defendants urge that the combatant activities exception of the Federal Tort Claims Act ("FTCA")

preempts Plaintiffs' claims because wartime interrogations are combatant activities that present a uniquely federal interest that significantly conflicts with state law. The Court expresses doubt as to whether Defendants' actions constituted combatant activities and holds that, even if they did, Plaintiffs' claims are not preempted because they do not present uniquely federal interests, nor do they pose a significant conflict with state law.

Under the FTCA, the United States waives its sovereign immunity for torts and authorizes suit against the federal government subject to certain exceptions. *See* 28 U.S.C. § 1346(b) (2005). One of these is the discretionary function exception, which reserves immunity for claims against the government based on the performance of a discretionary governmental function. *Id.* § 2680(a). Another exception, which is the one raised in this case, is the combatant activities exception. The combatant activities exception reserves sovereign immunity for "[a]ny claim arising out of combatant activities of the military or naval forces, or of the Coast Guard, during time of war." *Id.* § 2680(j).

a. *Combatant activities*

As an initial matter, because Defendants argue that Plaintiffs' claims are preempted under the combatant activities exception to the FTCA, the Court addresses the issue of whether

Defendants' conduct constituted a combatant activity. Defendants argue that they indisputably performed combatant activities because they interrogated Iraqis detained at a combat zone detention facility in support of the U.S. Army. The Court finds that discovery is needed to determine whether Defendants' services qualify as combatant activities because, unlike soldiers engaging in actual combat, the amount of physical contact available to civilian interrogators against captive detainees in a secure prison facility is largely limited by law and, allegedly, by contract.

Defendants urge the Court to adopt a "battlefield" theory and conclude that "[a]iding others to swing the sword of battle is certainly a combatant activity." (Defs.' Mem. at 32) (internal formatting and citations omitted). While the Court agrees that "arrest and detention activities are important incidents of war," (Id.), this broad generalization does not resolve the question of whether Defendants engaged in combatant activities within the meaning of § 2680(j) because merely being an "important incident of war" does not make something a combatant activity. For instance, the mass production of military uniforms at a private mill is an important incident of war, but it is certainly not a combatant activity.

Defendants argue that their employees indisputably performed combatant activities, but the Court cannot draw this conclusion

without examining the government contract itself. This is because the Court's inquiry is a precise one and different courts reach different results. Defendants argue that the Court should adopt the Ninth Circuit's broad interpretation of combatant activities to "include not only physical violence, but activities both necessary to and in direct connection with actual hostility." *Johnson v. United States*, 170 F.2d 767, 770 (9th Cir. 1948). However, other courts find ample justification to limit the application of the exception, concluding that:

> If it had been intended that *all* activities . . . in . . . . preparation for war were to be included[,] . . . the words 'war activities,' it seems, would have been more appropriate, but instead, the exception or exemption from liability for torts was restricted to 'combat activities,' which as indicated means *the actual engaging in the exercise of physical force*.

*Skeels v. United States*, 72 F. Supp. 372, 374 (W.D. La. 1947) (emphasis supplied). This Court is inclined to adopt the more limited definition because it comports with the common sense notion that a government contractor does not necessarily conduct combatant activities merely because it provides services in support of a war effort. *See, e.g., McMahon v. Presidential Airways*, Inc., 502 F.3d 1331, 1366 (11th Cir. 2007) (declining to review or reverse district court's holding that declined to extend *Boyle* preemption for private contractors); *Lessin v. Kellogg Brown & Root Servs.*, Inc. 2006 WL 3940556 at *5 (S.D. Tex. Jun. 12, 2006) (declining to preempt claims against military

43

logistics contractor in Iraq); *Fisher v. Halliburton*, 390 F. Supp. 2d 610, 615-16 (S.D. Tex. 2005) (declining to preempt service contractors because *Boyle* protects against state product liability claims only). In this Court's view, interrogation should not properly be understood to constitute actual physical force under *Skeels* because the amount of physical contact available to an interrogator is largely limited by law and by contract, to the point where the amount of contact is unlikely equivalent to "combat." The Court declines Defendants' invitation to summarily conclude, without learning the relevant facts, that the combatant activities exception of § 2680(j) applies in this case. Therefore, before even reaching a *Boyle* analysis, the Court finds it too early to conclude that the combatant activities exception to the FTCA is applicable to this case.

b.    *Two-part* Boyle *analysis*

Assuming, *arguendo*, that Defendants' services qualify as combatant activities, and thus potentially fall under the combatant activities exception, the Court now addresses the issue of whether, when applying the *Boyle* test, the combatant activities exception preempts the claims in this case.[6]  For the

---

[6] From the briefs, both parties appear to accept that the *Boyle* analysis, initially developed in the context of the discretionary function exception to the FTCA, applies equally in the context of the combatant activities exception. That being the case, the Court will assume without deciding that *Boyle* applies when evaluating whether Plaintiffs' conduct falls within the combatant activities exception.

reasons to follow, the Court finds that Plaintiffs' claims are not preempted here under the *Boyle* analysis.

In *Boyle v. United Technologies Corporation*, 487 U.S. 500 (1988), the Supreme Court explained the framework under which exceptions to the FTCA's waiver of sovereign immunity require the preemption of tort claims against government contractors. The issue before the Court was whether the discretionary function exception of the FTCA preempted the plaintiff's tort claims. *Id.* at 511. *Boyle* involved a wrongful death claim by the father of a Navy lieutenant who drowned when he was unable to escape from his crashed helicopter. *Id.* at 500. The father alleged that the escape hatch design was defective because it opened out instead of in, allowing the water pressure against a submerged helicopter to prevent its operation. *Id.* at 503. The Supreme Court found that the FTCA preempted state tort claims. *Id.* at 512.

In doing so, the Court announced a two-part test, holding that state law is displaced by federal law only when (1) "uniquely federal interests" are at stake; *id.* at 504-07, and (2) the application of state tort law would produce a "significant conflict" with federal policies or interests. *Id.* at 507-13. Applying this test, the *Boyle* Court found that the discretionary function exception conflicted with, and thereby preempted, product defect claims against a government contractor supplying goods where the federal government approved and the contractor

complied with reasonably precise product specifications, and where the contractor warned the government of any known defects. *Id.* at 512. Finding that the procurement of equipment by the United States was a uniquely federal interest, *id.* at 507, the Court held that the plaintiff's claims were preempted because the state-imposed duty of care (to manufacture escape-hatch mechanisms of the sort that plaintiff claimed was necessary) was exactly contrary to the government contract-imposed duty (to manufacture escape-hatch mechanisms shown by the specifications). *Id.* at 509.

Defendants argue that Plaintiffs' claims are preempted because the prosecution of war is a uniquely federal interest that would be significantly frustrated by interposing state tort causes of action against CACI. The Court finds, based on the limited record available at this stage in the litigation, that Plaintiffs' claims are not preempted because the interests in this case are shared between federal and state governments and Plaintiffs' claims do not significantly conflict with uniquely federal interests. The Court addresses each part of the *Boyle* analysis in turn below.

    i.    uniquely federal interests

Defendants argue that Plaintiffs' claims implicate a uniquely federal interest because the prosecution of war is a power constitutionally vested solely in the federal government.

46

Although it recognizes the federal government's sole authority to prosecute war, the Court disagrees that Plaintiffs' claims implicate a uniquely federal interest for three (3) reasons.

First, the Court is unpersuaded by Defendants' argument that subjecting a private, for-profit civilian corporation to a damages suit will interrupt or interfere with the prosecution of a war. Plaintiffs are not suing soldiers or any government entity; they are suing civilian corporations. Additionally, as far as the Court can discern, the military has already collected much of the evidence it may be asked to provide in this case in pursuing courts martial proceedings against CACI's alleged co-conspirators. Accordingly, the source-collecting burden on the government in this case will be minimal and will not distract it from the prosecution of a war. The Court therefore rejects Defendants' argument that allowing this suit to go forward to discovery will interfere with the government's prosecution of a war.

Second, this Court finds that permitting this litigation against CACI to go forward actually advances federal interests (and state interests, as well) because the threat of tort liability creates incentives for government contractors engaged in service contracts at all levels of government to comply with their contractual obligations to screen, train and manage employees. *See Richardson v. McKnight*, 521 U.S 399, 409 (1997)

47

("Competitive pressures mean . . . that a firm whose guards are too aggressive will face damages that raise costs, thereby threatening its replacement.")

In *Richardson*, the Supreme Court declined to extend qualified immunity to prison guards employed by a private prison management firm in a constitutional tort action. 521 U.S. at 412. The Court reasoned that the history and purpose of qualified immunity did not support an extension in that case because declining to extend immunity would motivate the contractor to provide service in a manner compliant with government requirements and constitutional norms. *Id.* at 409.

Like in *Richardson*, permitting Plaintiffs' claims against CACI to go forward will advance the federal interest in low cost, high quality contractors by forcing CACI to "face threats of replacement by other firms with records that demonstrate their ability to do both a safer and a more effective job." *Id.* at 409. The claims in this suit therefore advance any federal interests that may be involved here.

Third, Defendants' federalism concerns are misplaced because both federal and state governments have a strong interest in the enforcement of laws against torture, evincing a shared policy that opposes preemption in this case. *Compare, e.g.*, Anti-Torture Act, 18 U.S.C. § 2340A (2006) (criminalizing torture); War Crimes Act, 18 U.S.C. § 2441 (2006) (criminalizing war

crimes); *and* Military Commission Act, 10 U.S.C. § 948a(1)(A)
(2006) (defining "unlawful enemy combatant"), *with* Constitution
of Maryland, Decl. of Rights, Art. 16 (prohibiting laws
permitting cruel and unusual pains); VA. CODE ANN. § 19.2-264.2
(LexisNexis 2008) (providing that the use of torture is a
consideration in death penalty sentencing); *and* MD. CODE ANN.,
Health - General § 24-302 (LexisNexis 2008) (forbidding the sale
of toys depicting or resembling an instrument designed for
torture). Concerns regarding torture are both state and federal
and are therefore not a uniquely federal concern. For all these
reasons, the Court concludes that "uniquely federal interests"
are not at stake in this case.

     ii. significant conflict with federal policies

Assuming, *arguendo*, that Plaintiffs' claims invoke uniquely
federal interests, the Court must now address whether Plaintiffs'
state tort claims pose a significant conflict with federal
interests. Anything less than a total conflict between state and
federal interests is insufficient to cause preemption under *Boyle*
because preemption only applies if the contractor cannot possibly
comply with its contractual duties and the state-law imposed
duties at the same time. *See Boyle*, 487 U.S. at 508-09.
Preemption does not apply even in "an intermediate situation, in
which the duty sought to be imposed on the contractor is not
identical to one assumed under the contract, but is also not

contrary to any assumed." *Id.* at 509. As long as "[t]he contractor could comply with both its contractual obligations and the state prescribed duty of care," state law will not generally be preempted. *Id.; see also In re Joint E. & S. Dist. New York Asbestos Litig.*, 897 F.2d 626, 632 (2d Cir. 1990) ("Stripped to its essentials, the military contractor's defense under *Boyle* is to claim, 'The Government made me do it.'"); *Barron v. Martin-Marietta Corp.*, 868 F. Supp. 1203, 1207 (N.D. Cal. 1994) ("[R]equisite conflict exits [sic] only where a contractor cannot at the same time comply with duties under state law and duties under a federal contract.").

Defendants raise several arguments as to why the application of state tort law would create a significant conflict with the federal interests underlying the combatant activities exception. Upon careful consideration, the Court finds that Defendants' arguments do not justify finding that Plaintiffs' claims pose a significant conflict with federal interests, as discussed below.

Defendants cite *Koohi v. United States*, 976 F.2d 1328, 1333, 1337 (9th Cir. 1992), for the proposition that no tort duty should extend to those against whom combatant force is directed in times of war because it would subject commanders to judicial second-guessing. In *Koohi*, heirs of the deceased passengers and crew of an Iraqi civilian aircraft sued after a United States warship shot down the aircraft during the "tanker war" between

Iraq and Iran. 976 F.2d at 1329-30. The plaintiffs sued both the United States and the civilian manufacturers of the weapons systems used by the warship. *Id*. at 1330. Citing the Supreme Court's formulation of the preemption framework in *Boyle*, the Ninth Circuit found that the combatant activities exception to the FTCA "shield[ed] from liability those who supply ammunition to fighting vessels in a combat area." *Id*. at 1336. The court based its holding partially on the rationale that "during wartime encounters no duty of reasonable care is owed to those against whom force is directed as a result of authorized military action." *Id*. at 1337.

As an initial matter, this Court is not bound by Ninth Circuit precedent. Addressing the substance of Defendants' argument, however, Defendants fail to consider that Plaintiffs at the time of their interrogation posed no combatant threat and therefore were not properly the recipients of combatant force. Accordingly, on the limited record currently before the Court, the Court cannot say that no duty was owed. Moreover, the distinction between the *Koohi* contractor as a supplier of complex goods and Defendants as government contractor service providers suggests *Koohi* is distinguishable on a fundamental level. Supplying complex military technologies inevitably implicates nuanced discretion and sophisticated judgments by military experts. *See Boyle*, 487 U.S. at 511. It was therefore

51

appropriate to absolve *Koohi*'s government contractor of responsibility for the government's misidentification of the civilian Airbus as an enemy target. In contrast, Plaintiffs here do not allege that Defendants supplied any equipment, defective or otherwise, to the United States military, and as discussed elsewhere, the Court must withhold judgment on the scope of Defendants' discretion until it can examine Defendants' contract. For these reasons, the Court concludes that *Koohi* does not entitle Defendants to dismissal in this case.

Again citing *Koohi*, Defendants counter that removing "battlefield tort duties" is beneficial because it ensures equal treatment of those injured in war. "It would make little sense," Defendants tell the Court, "to single out for special compensation a few [innocent victims of harmful conduct] . . . on the basis that they have suffered from the negligence of our military forces" rather than from the intentional infliction of violence in war. *Koohi*, 976 F.2d at 1334-35. To the extent that Defendants' argument is that it is worse to compensate a few deserving innocent victims than none at all, the Court rejects it as inconsistent with the strong public policy favoring access to the courts.

More important, however, is that Plaintiffs do not allege that they suffered from the negligence of U.S. military forces. While indeed they may have, the case at bar is captioned solely

against private government contractors. Defendants fail to appreciate that, generally speaking, private contractors are not entitled to sovereign immunity unless classified as government employees. *See McMahon v. Presidential Airways, Inc.*, 460 F. Supp. 2d 1315, 1330 (M.D. Fla. 2006) ("The doctrine of sovereign immunity may not be extended to cover the fault of a private corporation, no matter how intimate its connection with the government.") (citing *Foster v. Day & Zimmerman, Inc.*, 502 F.2d 867, 874 (8th Cir. 1974)). Defendants acknowledge that they do not qualify as government employees within the meaning of the FTCA. (*See* Defs.' Mem. at 26 ("The immunity of the United States and its employees is the reason why Plaintiffs assert their claims solely against contractors with which they had little or no contact.").) Immunity is a shield, not a blanket. The Court therefore concludes that the limited record does not indicate that allowing Plaintiffs' claims to go forward would create a duty of care on the battlefield.

The Court also rejects Defendants' argument that haling private citizens into federal court to defend against alleged violations of a government contract and other law infringes on the Executive's constitutionally committed war powers. These separation of powers concerns are not implicated here because "[d]amage actions are particularly judicially manageable . . . . The granting of monetary relief will not draw the federal courts

into conflict with the executive branch." *Gordon v. Texas*, 153
F.3d 190, 195 (5th Cir. 1998) (internal citations and formatting
omitted). *Compare Gilligan v. Morgan,* 413 U.S. 1, 11 (1973)
(refusing to hear suit seeking judicial supervision of operation
training of Ohio National Guard in wake of Kent State shootings),
*with id.* at 5 & 11 (suggesting the Court might allow suit against
National Guard for damages). Private actors are accountable for
their actions even when employed by the executive. *Cf.*
*Richardson v. McKnight*, 521 U.S. 399 (1997) (holding privately
employed prison guards amenable to suit for prison abuse).

Defendants further argue that one purpose underlying the
combatant activities exception is ensuring that the United
States' conduct of war is not regulated by another sovereign in
the guise of applying that sovereign's tort law. Defendants
argue that this purpose would fail if this case were to proceed.
The Court need not address that issue at this stage in the
litigation, however, because even if the law of a foreign
jurisdiction were to govern any of Plaintiffs' claims, it would
not regulate the conduct of the United States, a non-party to
this suit between private parties.[7] For the reasons stated
above, the Court concludes that Plaintiffs' claims do not present
a significant conflict with a uniquely federal interest.

---

[7] If and when it should become relevant, the Court will present the parties
with the opportunity to address the choice of law issue at a later date.

In sum, the Court doubts that Defendants' activities constituted combatant activities and therefore doubts that the FTCA is relevant because the limited record does not support that conclusion where Defendants are civilian contractors assigned to interrogate incapacitated detainees. Even if it did, however, the Court holds that Plaintiffs' claims are not preempted under *Boyle* because Plaintiffs' claims do not present a significant conflict with a uniquely federal interest. The Court therefore denies Defendants' motion to dismiss on the grounds of preemption.

### 4. Alien Tort Statute

Having established that Plaintiffs' claims are not preempted by federal law, the Court must now address the question of whether the Alien Tort Statute ("ATS") confers original jurisdiction upon this Court over alien tort claims against government contractor civilian interrogators for injuries sustained by detainees during military prison interrogations. Plaintiffs argue that their ATS claims survive under *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), because the Court need not recognize any new claims here and because war crimes are universally condemned on the grounds that they are so reprehensible that anyone who commits them must be held individually responsible. The Court holds that the ATS does not confer original jurisdiction over civil causes of action against

government contractors under international law because such claims are fairly modern and therefore not sufficiently definite among the community of nations, as required under *Sosa*.

The ATS, passed as part of the Judiciary Act of 1798, confers original jurisdiction upon district courts to hear "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350 (2006). Courts need not rely on express legislation to entertain civil claims based on ATS jurisdiction. *See Sosa*, 542 U.S. at 718. It is clear, however, that under ATS jurisdiction, courts have only the ability "to hear claims in a very limited category defined by the law of nations and recognized at common law." *Id*. at 712.

In *Sosa*, the Supreme Court further defined the "law of nations" violations that trigger jurisdiction under the ATS by first generally identifying the two different types of violations. *Id*. at 714-15. The term "law of nations" is historically comprised of two distinct spheres. *Id*. at 715. The first concerns how states conduct themselves among each other, and the second involves the conduct of individuals "outside domestic boundaries and consequently carrying an international savor." *Id*.

At the intersection of these two spheres lies a class of "hybrid international norms" and the ATS confers jurisdiction

only where that overlap occurs. *See id.* at 715-16, 720. This limited category expressly includes three tort causes of action: (1) violation of safe conduct; (2) infringement of the rights of ambassadors; and (3) piracy on the high seas. *Id.* at 715, 720, and 724. The underlying concern with respect to the hybrid norms is not so much vindication of the individual right as it is compensation to the sovereign affected by the tort. *See id.* at 724 (pointing to an interest that the state, as to offenses against ambassadors, "at the expense of the delinquent, give full satisfaction to the sovereign who has been offended in the person of his minister.").

Although the Supreme Court recognizes that ATS jurisdiction may extend beyond the three torts mentioned in *Sosa*, district courts must exercise caution when recognizing additional torts under the common law that enable ATS jurisdiction. *See id.* at 729 ("[T]he judicial power should be exercised on the understanding that the door is still ajar subject to vigilant doorkeeping, and thus open to a narrow class of international norms today."). The Supreme Court highlighted five concerns in recognizing additional torts under the ATS, namely that:

1) the current view of common law as made or created law creates the potential that district courts will exercise too much discretion in recognizing torts;

2) it is customary to look for legislative guidance "before exercising innovative authority over substantive law";

3) the creation of private rights of action is better left

57

to the legislative branch;

4) potential adverse foreign policy consequences from the recognition of additional causes of action; and

5) Congress has not asked the judiciary to expand the law in this area.

*Id.* at 725–28.

Although the Supreme Court warns caution, it does not foreclose the possibility of additional causes of action. *Id.* at 729. *Sosa* provides at least two guidelines as to what qualifies as a cause of action enabling ATS jurisdiction should a district court find it proper to recognize one after fully considering the concerns listed above. First, "federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted." *Id.* at 732 (referring to the three torts expressly mentioned above). Second, district courts must temper "the determination [of] whether a norm is sufficiently definite to support a cause of action" with "an element of judgment about the practical consequences of making that cause available to litigants." *Id.* at 732–33.

Plaintiffs argue that their allegations fall within the scope of *Sosa* and do not require the Court to recognize any new claims because "war crimes, torture and cruel, inhuman and degrading treatment are precisely the specific, universal, and

obligatory violations that are actionable under the ATS." (*See* Pls.' Opp'n at 23 (internal formatting and citations omitted).) The Court grants Defendants' Motion to Dismiss as to Plaintiffs' ATS claims because the Court is not convinced that civil causes of action against government contractors in this context qualify under *Sosa* for ATS jurisdiction for two (2) reasons.

First, the Court doubts that the content and acceptance of the present claims are sufficiently definite under *Sosa* because the use of contractor interrogators is a modern, novel practice. Plaintiffs contend that *Sosa* brings Plaintiffs' allegations within the scope of this Court's ATS jurisdiction on the grounds that war crimes and other degrading treatment constitute specific, universal, and obligatory violations of the law of nations. Plaintiffs draw this conclusion, they explain, because *Sosa* cited with approval *Filártiga v. Peña-Irala*, 630 F.2d 876, 887 (2d Cir. 1980), and *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 781 (D.C. Cir. 1984). Plaintiffs do not explain why they discern the *Sosa* Court's citation of these cases as helpful to their position.

In fact, a nuanced reading of *Sosa* reveals that the Supreme Court cited *Filártiga* and *Tel-Oren* only for the proposition that federal courts may recognize enforceable international norms when they are specific, universal and obligatory. *See Sosa*, 542 U.S. at 732. The *Sosa* Court's citation of these cases therefore does

not support Plaintiffs' argument that Plaintiffs' *particular* allegations constitute specific, universal, and obligatory violations of the law of nations. As this Court mentioned above, Plaintiffs' claims lack this universality because the use of contractor interrogators is a recent practice. *See id.* at 725 (allowing only claims resting on norms "with a specificity comparable to the features of the 18th-century paradigms."). As the use of contractor interrogators is modern, so too is the concept of suing contractor interrogators in tort for a violation of the law of nations. As such, these claims fail under *Sosa*.

Second, even if Plaintiffs' claims were sufficiently accepted and universal, the Court is unconvinced that ATS jurisdiction reaches private defendants such as CACI. In *Sosa*, the Court questioned whether international law extends liability to private defendants. *See id.* at 733 n.20 (comparing cases ten years apart, one finding no true consensus that torture by private actors violated international law, the other finding a sufficient consensus that genocide by private actors violated international law). Plaintiffs contend that international law does extend liability to private defendants but point the Court to no mandatory case law definitively establishing their position. Plaintiffs' reliance on nonbinding authority does not persuade the Court that ATS jurisdiction reaches Defendants. Plaintiffs rely heavily on *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995),

which held that "certain forms of conduct violate the law of nations whether undertaken by those acting under the auspices of a state or only as private individuals." 70 F.3d at 239. Plaintiffs emphasize that *Kadic* was cited favorably by the Supreme Court. It is questionable, however, whether the references to *Kadic* in the *Sosa* opinion can fairly be classified as favorable. *Kadic* is mentioned once in footnote twenty of the majority opinion for the proposition that the existence of ATS jurisdiction against private defendants is an open question; it is mentioned again in Justice Scalia's concurring opinion as an example of a case that leads the judiciary "directly into confrontation with the political branches." *Sosa*, 542 U.S. at 748 (Scalia, J., concurring in part and concurring in judgment). Because the Supreme Court's treatment of *Kadic* was neutral at best, the Court is reluctant to rely on *Kadic*.

In any event, this Court need not follow a case from the Second Circuit and declines to do so in light of the five initial *Sosa* concerns mentioned above. *See Sosa*, 542 U.S. at 725–28 (ranging from caution against excessive district court discretion to giving due deference to the legislature). Here, the Court is particularly wary of exercising too much discretion in recognizing new torts. *See id*. Although some international tribunals have held private actors criminally liable under international law, the Court questions whether this liability is

similarly established in the civil context under the ATS. The Court is unpersuaded that Plaintiffs' claims fall into the "very limited category defined by the law of nations and recognized at common law," *id.* at 712, because the Court is unconvinced that a suit against private civilian interrogators falls within the class of hybrid international norms in existence when the ATS was enacted. The Court therefore grants Defendants' Motion to Dismiss Plaintiffs' Amended Complaint to the extent that its claims invoke ATS jurisdiction. However, because Plaintiffs assert diversity and federal question as alternate bases of jurisdiction, the Amended Complaint survives as to those claims that do not rely upon the ATS.[8]

## 5. Sufficiency of claims

The Court holds that Plaintiffs sufficiently plead facts to support the claims in their Amended Complaint. Defendants challenge the sufficiency of the pleadings in three respects. First, Defendants argue that Plaintiffs fail to sufficiently allege Defendants' vicarious liability because Plaintiffs alleged no facts indicating that CACI authorized its employees to treat detainees in an unauthorized manner, or that CACI employees did so to serve CACI's interests. Second, Defendants argue

---

[8] The Court is operating under the assumption that diversity and/or federal question jurisdiction are sufficient bases for jurisdiction as to all of Plaintiffs' claims. If Defendants believe differently, the Court invites Defendants to brief the question of which of the counts of the Amended Complaint, if any, must be dismissed because they rely solely upon ATS for subject matter jurisdiction.

Plaintiffs insufficiently plead facts as to conspiratorial liability because Plaintiffs point to no facts showing that their injuries where the result of an agreement between parties and not the product of independent actors acting in parallel. Third, CACI argues that Plaintiffs' claims fail because the Amended Complaint sets forth no facts indicating that CACI personnel were directly involved in causing injury to these particular Plaintiffs. The Court rejects these arguments for the reasons set forth in order below.

a. *Vicarious liability*

As an initial matter, the Court rejects Defendants' argument that Plaintiffs fail to allege facts sufficient to hold Defendants vicariously liable under a respondeat superior theory. Under the theory of respondeat superior, an employer may be held liable in tort for an employee's tortious acts committed while doing his employer's business and acting within the scope of the employment when the tortious acts were committed. *See Plummer v. Ctr. Psychiatrists, Ltd.*, 476 S.E.2d 172, 174 (Va. 1996) (internal citations omitted). An employer may be liable in tort even for an employee's unauthorized use of force if "such use was foreseeable in view of the employee's duties." *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1351 (4th Cir. 1995) (internal citations omitted); *Heckenlaible v. Va. Peninsula Reg'l Jail Auth.*, 491 F. Supp. 2d 544, 549 (E.D. Va. 1950) (finding a

jury question as to whether correctional officer's sexual assault on an inmate was within the scope of his employment).

Here, Plaintiffs sufficiently allege that Defendants are vicariously liable for the conduct of CACI employees. Plaintiffs argue that CACI employees Steven Stefanowicz, Daniel Johnson, and Timothy Dugan tortured Plaintiffs and instructed others to do so. (Am. Compl. ¶¶ 1, 64-68.) They also allege that Defendants employed all three and knowingly ratified their illegal actions. (*Id.* at ¶¶ 72, 76-80, 90-91.) The Amended Complaint further alleges that CACI took steps to cover up the activities of its employees involved in the Abu Ghraib scandal. (*Id.* at ¶¶ 79, 81-88.) The Amended Complaint also alleges that CACI failed to properly train and supervise its employees and failed to properly report the torture committed. (*Id.* at ¶¶ 101-108.) Finally, the Amended Complaint alleges that Defendants made millions of dollars as a result of their wrongful behavior. (*Id.* at ¶¶ 73, 92-93.) Consequently, the Court finds that Plaintiffs make a sufficient showing of vicarious liability to withstand the motion to dismiss.

Defendants argue that any alleged misconduct by its employees at Abu Ghraib was not within the scope of employment because Defendants never authorized CACI employees to torture detainees. Here, however, it was foreseeable that Defendants' employees might engage in wrongful tortious behavior while

conducting the interrogations because interrogations are naturally adversarial activities. As such, Plaintiffs sufficiently plead vicarious liability.

   b.  *Conspiratorial liability*

The Court finds that Plaintiffs sufficiently plead facts to support a conspiratorial liability claim under *Bell Atlantic v. Twombly*. In *Twombly*, the Supreme Court held that a plaintiff must go beyond "a short and plain statement of the claim" showing entitlement to relief in order to survive a motion to dismiss. 127 S. Ct. at 1964 (internal citations omitted). The Court stressed that a successful allegation of conspiracy requires the plaintiff to cross the line between "the conclusory and the factual" as well as between "the factually neutral and the factually suggestive." *Id.* at 1966 ("Each must be crossed to enter the realm of plausible liability."). In that case, the plaintiffs attempted to allege an antitrust conspiracy based on the facts that the defendant exchange carriers engaged in parallel conduct to prevent the growth of upstart carriers and agreed not to compete with each other. *See id.* at 1962. The Court found that the plaintiffs failed to state a conspiracy claim because the complaint lacked enough "factual matter ([when] taken as true) to suggest that an agreement was made." *Id.* at 1966. The Court found the allegations of parallel conduct insufficient without more because the defendant carriers had

independent incentives to act in the manner that they did that in no way obviated conspiratorial conduct. *See id.* at 1971. The Court further found the agreement not to compete did not suggest a conspiracy because of a history of monopoly in the field and the defendant carriers' likely desire to maintain the status quo. *See id.* at 1972-73. As such, the Court held that the plaintiffs' complaint should be dismissed. *Id.* at 1961.

Here, Defendants argue that the present claims also fail because Plaintiffs point only to parallel conduct which fails under *Twombly*. This Court rejects Defendants' argument for two reasons. First, the Court finds that Plaintiffs adequately allege specific facts to create the plausible suggestion of a conspiracy. Unlike the *Twombly* plaintiffs, who relied solely on parallel conduct and an agreement not to compete to state their conspiracy claim, here Plaintiffs point to at least two suggestive facts that push their claims into the realm of plausibility. First, Plaintiffs allege that CACI employees adopted the code phrase "'special treatment,' which was code for the torture of the type endured by Plaintiffs in the hard site." (Am. Compl. ¶ 70.) Taking the allegation as true, the use of code words makes a conspiracy plausible because the personnel would have to reach a common understanding of the code in order to effectively respond to it. Second, Plaintiffs also allege that Plaintiff Mr. Rashid was "removed from his cell by stretcher

and hidden from the International Committee of the Red Cross . . . who visited Abu Ghraib shortly after Mr. Rashid had been brutally and repeatedly beaten." (*Id.* at ¶ 43.) The act of hiding abuse from a humanitarian organization's inspection also plausibly suggests a conspiracy, as a cover-up would require the participation and cooperation of multiple personnel. As such, the Court finds that these specific allegations together with the other conduct alleged are enough to state a conspiratorial liability claim.

Second, unlike *Twombly*, the Defendants here have no independent motive to act in the alleged manner. In *Twombly*, the Supreme Court found persuasive arguments against the conspiracy claim in that there was a history of monopoly in the rather specialized field and because the defendant carriers had an independent motive to resist upstart carriers in order to avoid subsidization burdens. *See id.* at 1971-72. These alternate, independent motives made the plaintiffs' conspiracy allegations less plausible. *See id.* Here, however, the Court cannot think of any history or independent motive Defendants might have that would move Plaintiffs' conspiracy claims outside of the realm of plausibility. As an initial matter, torture during interrogations is historically banned. As far back as 1949, the Third Geneva Convention demanded that "[p]risoners of war must at all times be treated humanely." Geneva Convention Relative to

the Treatment of Prisoners of War art. 13, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135. In addition, the Uniformed Code of Military Justice imposes criminal punishment for many of the offenses alleged in the Amended Complaint, including murder, rape, and cruelty and maltreatment. *See* 10 U.S.C. §§ 893, 918, & 920 (2007). Consequently, the historical explanation present in *Twombly* is absent here. Likewise, the Court can think of no plausible motive Defendants might have to act independently in the egregious manner alleged by Plaintiffs. In *Twombly*, the defendant carriers faced the potential for financial gain as a result of their actions. *See Twombly*, 127 S. Ct. at 1971-72. Here, its possible that the personnel at Abu Ghraib acted individually in pursuit of some perverse pleasure, but this possibility is insufficient to make Plaintiffs' conspiracy allegations less than plausible.

   c.  *Direct involvement*

   Defendants argue that Plaintiffs' claims must fail because Plaintiffs allege no facts implicating Defendants in the conduct that caused injury to these Plaintiffs. The Court denies Defendants' motion to dismiss on these grounds because, again, the Amended Complaint identifies Mr. Dugan, Mr. Stefanowicz and Mr. Johnson, as directing and causing "some of the most egregious torture and abuse at Abu Ghraib." (Am. Compl. ¶ 1.) Plaintiffs also allege that military co-conspirators have testified that Mr.

Stefanowicz and Mr. Johnson were "among the interrogators who most often directed that detainees be tortured." (*Id.* at ¶ 66.) The Amended Complaint alleges that Mr. Stefanowicz and Mr. Johnson directed and engaged in conduct in violation of the Geneva Conventions, U.S. Army guidance, as well as United States law. (*Id.* at ¶ 68.) The Court finds these factual allegations sufficient to suggest that CACI employees were directly involved in the injuries caused Plaintiffs.

## III. CONCLUSION

The Court denies Defendant's Motion to Dismiss on all grounds except the Court grants the Motion to the extent that Plaintiffs' claims rely upon ATS jurisdiction. The Court holds that Plaintiffs' claims are justiciable because civil tort claims against private actors for damages do not interfere with the separation of powers. Second, derivative absolute immunity is inappropriate at this stage because discovery is necessary to determine both the extent of Defendants' allowed discretion in dealing with detainees and to determine the costs and benefits of granting immunity in this case. Third, the Plaintiffs' claims are not preempted by the combatant activities exception at this stage because discovery is required to determine whether the interrogations here constitute "combatant activities" within the meaning of the exception. Fourth, the Court dismisses Plaintiffs' claims to the extent that they rely upon ATS

jurisdiction because tort claims against government contractor interrogators do not satisfy the *Sosa* requirements for ATS jurisdiction. Fifth, Plaintiffs sufficiently allege facts supporting vicarious liability because the Amended Complaint states that Defendants' employees engaged in foreseeable tortious conduct when conducting the interrogations. Sixth, conspiratorial liability is sufficiently alleged because facts stating the use of code words and efforts to conceal abusive treatment plausibly suggest conspiratorial activity. Seventh, the Court finds that the Amended Complaint sufficiently alleges the direct involvement of Defendants' employees in causing Plaintiffs' injuries because Plaintiffs point to specific employees who played a direct role in supervising and participating in the alleged conduct. Therefore, it is hereby

ORDERED that Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is GRANTED in part and DENIED in part. Defendants' Motion to Dismiss is GRANTED only to the extent that Plaintiffs' claims rely on ATS jurisdiction.

The Clerk is directed to forward a copy of this Order to Counsel.

Entered this _18th_ day of March, 2009.

/s/

**Gerald Bruce Lee**
**United States District Judge**

Alexandria, Virginia
3/ _18_ /09