# IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| SUHAIL NAJIM ABDULLAH AL SHIMARI ) | CIVIL ACTION |
| ) | |
| TAHA YASEEN ARRAQ RASHID ) | NO. 08-cv-0827 GBL-JFA |
| ) | |
| ASA'AD HAMZA HANFOOSH AL-ZUBA'E ) | |
| ) | CIVIL COMPLAINT |
| SALAH HASAN NSAIF JASIM AL-EJAILI ) | JURY DEMAND |
| ) | |
| Plaintiffs, ) | REDACTED PUBLIC VERSION |
| ) | |
| v. ) | |
| ) | |
| CACI PREMIER TECHNOLOGY, INC. ) | |
| 1100 North Glebe Road ) | |
| Arlington, Virginia 22201 ) | |
| ) | |
| Defendant. | |

## THIRD AMENDED COMPLAINT

1.     Plaintiffs are four Iraqi civilians who were victims of the Abu Ghraib prison abuse scandal.  As was well-publicized in the spring of 2004, detainees at the "Hard Site" within Abu Ghraib prison were brutally tortured and otherwise seriously abused by persons conspiring and otherwise acting together.  Included among the conspirators inflicting severe pain on Plaintiffs were employees of a defense contractor commonly known as "CACI."  Indeed, according to testimony and statements by military co-conspirators, CACI employees Steven Stefanowicz (commonly known as "Big Steve"), Daniel Johnson (commonly known as "DJ") and Timothy Dugan directed and caused much of the egregious torture and abuse at Abu Ghraib.

## JURISDICTION AND VENUE

2.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1332 (diversity jurisdiction); 28 U.S.C. § 1350 (Alien Tort Statute); and 28 U.S.C. § 1367 (supplemental jurisdiction).

1

3.     Venue is proper pursuant to U.S.C. § 1391(a)(3) and § 1391(b)(2).

**PARTIES**

4.     Plaintiff Suhail Najim Abdullah Al Shimari (aka "Suhail Najm Abdullah Shammari") resides in Baghdad, Iraq.  He is an innocent Iraqi civilian who was badly tortured by employees of Defendant CACI Premier Technology ("CACI PT") and their co-conspirators while detained, without charge, at Abu Ghraib.  He suffered and continues to suffer from physical and mental injuries caused by the torture.

5.     Plaintiff Taha Yaseen Arraq Rashid (aka "Taha Yaseen Arrak" and "Taha Yassin Arrak Al-Gherari") resides in Baghdad, Iraq.  He is an innocent Iraqi civilian who was badly tortured by CACI PT employees and their co-conspirators while detained, without charge, at Abu Ghraib.  He suffered and continues to suffer from physical and mental injuries caused by the torture.

6.     Plaintiff Asa'ad Hamza Hanfoosh Al-Zuba'e (aka "Asaad Hamzah Hanfoosh," "Asad Hamza Hanfosh" and "Asaad Hamzah Hanfoosh Alnamri") resides in Baghdad, Iraq.  He is an innocent Iraqi civilian who was badly tortured by CACI PT employees and their co-conspirators while detained, without charge, at Abu Ghraib.  He suffered and continues to suffer from physical and mental injuries caused by the torture.

7.     Plaintiff Salah Hasan Nsaif Jasim Al-Ejaili (aka "Salah Hassan Nsaif") resides in Qatar. He is an innocent Iraqi civilian who was badly tortured by CACI PT employees and their co-conspirators while detained, without charge, at Abu Ghraib.  He suffered and continues to suffer from physical and mental injuries caused by the torture.

8.     Defendant CACI Premier Technology, Inc. is a wholly-owned subsidiary, but referred to in CACI International, Inc.'s ("CACI International's") book, *Our Good Name* (2008),

2

as a "business unit" or "division" of CACI International, a publicly traded Delaware corporation, and is located at 1100 North Glebe Road, Arlington, Virginia 22201.

9.      CACI International incorporated CACI PT in March 2003 in order to acquire Premier Technology Group ("PTG") which, according to *Our Good Name*, was for the purpose of expanding CACI International's intelligence services into the field of tactical intelligence, including interrogation support.

10.      CACI PT received millions of dollars from the United States in exchange for providing interrogation services in Iraq, including at Abu Ghraib. Further, United States Army contracts with CACI PT provided a valuable endorsement of the CACI corporate family's work, contributing to the growth of its $1.5 billion business as a government contractor.

### OVERVIEW OF THE CONSPIRACY BETWEEN CACI PT EMPLOYEES AND MILITARY PERSONNEL TO TORTURE AND OTHERWISE SERIOUSLY MISTREAT DETAINEES

11.      In March 2003, the United States and certain allies invaded Iraq and quickly dispatched the regime of Saddam Hussein. Although that military mission was quickly accomplished, an insurgency soon developed in response to the United States occupation. In an attempt to respond to and control this insurgency, large numbers of Iraqis were apprehended in wide sweeps and detained, often with little or no reason to suspect their involvement in hostile activity. Plaintiffs are among those Iraqis who were caught up in this effort to gain intelligence and to show results, by any means necessary.

12.      For want of other available facilities, many detainees were imprisoned at the Abu Ghraib site (also known as the "Baghdad Central Confinement Facility"), a notorious prison previously utilized by Saddam Hussein's regime to deploy torture and other cruel, inhuman, and degrading tactics. Abu Ghraib is a sprawling site, but the events that gave rise to this action

3

occurred in a relatively small and confined section of the "Hard Site." The Hard Site is a building consisting of four tiers, three of which were controlled by Iraqi police and only one of which – Tier 1 – was under the control of United States forces. It was in Tier 1A of the Hard Site, which consisted of cells and nearby interrogation rooms, that detainees allegedly suspected (often without reason) to be of military intelligence value were sent.

13.     Among the challenges to the United States in dealing with the insurgency were insufficient numbers of military personnel who were trained and skilled as interrogators and interpreters. Accordingly, the United States resorted to contracting with private companies, including CACI PT, to provide such personnel.

14.     CACI PT was the only private contractor whose employees served as interrogators at the Abu Ghraib Hard Site during the time period relevant to this action, specifically from fall 2003 to spring 2004. CACI PT provided these services through a prior Blanket Purchase Agreement ("BPA") between PTG and the Interior Department, which managed the contract on behalf of the recipient of the services, the United States Army. The BPA was among PTG's assets when CACI International acquired the company. The BPA was modified in July 2003 to reflect CACI International's acquisition of PTG's assets.

15.     According to the "Statement of Work" ("SOW") accompanying the contract between the United States and CACI PT, it was CACI PT's responsibility to provide "the best value Interrogation Support Cell management and support; functioning as resident experts for the implementation of an Interrogation Support Cell, [in accordance with Department of Defense, US Civil Code, and International] regulations and standard operating procedures." The SOW provided that CACI PT would "provide Interrogation Support Cells, as directed by military authority. . . to assist, supervise, coordinate, and monitor all aspects of interrogation activities, in

4

order to provide timely and actionable intelligence to the commander." The SOW also provided that CACI PT would be "responsible for providing supervision for all contractor personnel."

16.     The initial SOW required CACI PT to provide at least six screeners and ten interrogators for the Theater Interrogation Support Cell, and at least six screeners and four interrogators for the Division Interrogation Support Cell, in addition to other personnel. CACI PT's screeners and interrogators worked within the Joint Interrogation and Debriefing Center ("JIDC"). The January 23, 2004 JIDC organizational chart recorded 97 soldiers and 32 CACI PT employees. That JIDC organizational chart shows CACI PT employees assigned to 15 of the 20 staffed cells conducting interrogations within the Interrogation Control Element ("ICE").

17.     At the Hard Site at Abu Ghraib, the detainees were guarded by military police ("MPs") from the 372nd Military Police Company. The MPs, however, did not conduct interrogations. Interrogations were conducted by the CACI PT employees and Military Intelligence personnel (collectively known as the "MIs") who were deployed to this site. Interrogators were responsible for particular detainees.

18.     Then-Staff Sergeant Ivan "Chip" Frederick, who was sentenced by court martial to eight years imprisonment for his participation in torture in Abu Ghraib and had his rank reduced to Private, was the Non-Commissioned Officer in Charge ("NCOIC") of the MPs that guarded the detainees at the Hard Site. He in turn should have been instructed and commanded by officers in the 372nd Military Police Company, but, as investigations commissioned by the United States later found, a command vacuum existed at Abu Ghraib. There was virtually no supervision of the MPs at the Hard Site by superiors in the military chain of command. Instead, the interrogators took over. As Frederick has testified under oath, civilian interrogators employed by CACI PT filled the vacuum by assuming *de facto* positions of authority. These

5

civilian interrogators from CACI PT expressly instructed Frederick to "soften up" detainees at the Hard Site for interrogation by using various specific techniques that were then practiced on Plaintiffs. Sometimes, the CACI PT interrogators bypassed Frederick's command authority and directly instructed Frederick's subordinate soldiers to take specific actions to rough up and humiliate detainees, allegedly in preparation for their interrogations. CACI PT employees not only served as interrogators, but also served as the *de facto* authority to the MPs at the Hard Site. As authority figures, they created and set in place the extreme and abusive conditions in which detainees were to be confined at the Hard Site location where Plaintiffs were detained. It was those torturous conditions ordered by CACI PT employees to which Plaintiffs were subjected at the Hard Site. It was in this way as well that the horrific acts of torture and inhumane treatment of Abu Ghraib detainees that were revealed to the world in April 2004 occurred. Whatever place the CACI PT employees may have held on the CACI PT organizational chart, in reality they assumed and wielded significant authority and control "on the ground" at the Hard Site that allowed them to set the conditions for abuse.

19.    In the absence of proper training and supervision by command authorities— whether military or civilian—it was foreseeable, and indeed likely, that abusive and inhuman treatment of detainees would occur. Psychological research conducted over decades, such as the famous Stanford Prison Experiment, has confirmed that even "good people," when placed in a position of unrestrained authority over prisoners, will often resort to violence and abuse of their charges. According to the expert opinion offered in this case by Dr. Philip Zimbardo, the designer of the Stanford Prison experiment and one of the nation's foremost social psychologists, any individual with supervisory authority should have foreseen that interrogators in a prison

6

environment such as Abu Ghraib, absent strict training, supervision and discipline, would engage in such egregious conduct.

20.    Similarly, according to the expert opinion offered in this case by Geoffrey S. Corn, an expert on the laws of war and 21 year veteran of the Judge Advocate General's office, the only way to ensure compliance with the obligation to ensure humane treatment of individuals in military detention is through a strict regime of training, supervision, and discipline. And yet, CACI PT neither hired experienced interrogators nor exercised oversight of its employees' compliance with the requirements of the Geneva Conventions and other applicable law concerning the proper treatment of detainees.

21.    In the closed world of the Hard Site, acts of cruelty against detainees could only plausibly occur if there was at least a tacit understanding among the MPs and interrogators at the site that the abusive behavior was encouraged and condoned. Otherwise, the risk to any individual perpetrator that his or her conduct would be reported to higher authority and punished would be far too great for any reasonable person to accept.

22.    Because the abuse of Plaintiffs by guards at the Hard Site was unquestionably perpetrated by members of the 372nd Military Police Company under the charge and control of Frederick, and because Frederick testified that he took direct orders to engage in such behavior (and to order or tolerate his subordinates in doing so) towards those detainees at the Hard Site from the CACI PT interrogators, those CACI PT employees filled a necessary role in the accomplishment of the cruel and inhuman conduct that occurred at Abu Ghraib and specifically the serious harms visited on Plaintiffs. The involvement of CACI PT employees in this chain of events constitutes both conspiracy—because of the necessity of, at minimum, a tacit agreement among the interrogators and MPs to engage in improper conduct—and aiding and abetting

7

tortious conduct, because the CACI PT employees ordered, dictated, encouraged and assisted the MPs in carrying out acts of cruelty upon Plaintiffs.

23.     In a deposition taken in this case on March 3, 2013, Fredrick testified that CACI PT employees ordered him to "set the conditions" at the Hard Site, during the time when Plaintiffs were detained there, and conduct or permit the following abusive acts upon the detainees under his supervision:

     a.    Diet manipulation, such as restricting the food detainees were permitted to eat;

     b.    Environmental changes, including subjecting detainees to extreme hot or cold climates and exposing them to cold water;

     c.    Nudity;

     d.    Stress positions such as being cuffed to the bars of cells;

     e.    Sleep deprivation using loud music;

     f.    "Physical training," such as forcing detainees to do push-ups until they were exhausted;

     g.    Humiliating detainees, for example by putting them in female underwear; and

     h.    Use of unmuzzled dogs.

## THE TORTURE AND OTHER SERIOUS MISTREATMENT OF SUHAIL NAJIM ABDULLAH AL SHIMARI

24.     Plaintiff Al Shimari was imprisoned at the Abu Ghraib Hard Site for approximately two months after being arrested on or about November 7, 2003 and was detained and abused under conditions referenced above and ordered and encouraged by CACI PT personnel.

25.   Plaintiff Al Shimari was subjected to electric shocks.

26.   Plaintiff Al Shimari was struck with a baton-like instrument.

27.   Plaintiff Al Shimari was beaten.

28.   Plaintiff Al Shimari was deprived of food.

29.   Plaintiff Al Shimari was deprived of sleep for extended periods of time.

30.   Plaintiff Al Shimari was threatened with dogs.

31.   Plaintiff Al Shimari was subjected to sensory deprivation and to extreme temperatures.

32.   Plaintiff Al Shimari was stripped naked and kept naked in his cell.

33.   Plaintiff Al Shimari was threatened with death.

34.   Plaintiff Al Shimari was kept naked and forced to engage in physical activities to the point of exhaustion.

35.   Plaintiff Al Shimari was forcibly shaved.

36.   Plaintiff Al Shimari was kept in a cage.

37.   Plaintiff Al Shimari was choked.

38.   Plaintiff Al Shimari was released on or about March 27, 2008, without ever being charged with any crime.

### THE TORTURE AND OTHER SERIOUS MISTREATMENT
### OF TAHA YASEEN ARRAQ RASHID

39.   Plaintiff Rashid was imprisoned at the Abu Ghraib Hard Site for approximately three months after being arrested on or about September 22, 2003 and was detained and abused under conditions referenced above and ordered and encouraged by CACI PT personnel.

40.   Plaintiff Rashid was stripped and kept naked.

41.   Plaintiff Rashid was deprived of oxygen.

9

42.    Plaintiff Rashid was subjected to sensory deprivation.

43.    Plaintiff Rashid was placed in stress positions for extended periods of time.

44.    Plaintiff Rashid was deprived of food and water.

45.    Plaintiff Rashid was forcibly subjected to sexual acts by a female as he was cuffed and shackled to cell bars.

46.    Plaintiff Rashid was beaten with wooden sticks.

47.    Plaintiff Rashid was repeatedly shot in the head with a taser gun.

48.    Plaintiff Rashid was subjected to electric shocks.

49.    Plaintiff Rashid suffered from a broken arm, broken leg, inability to walk and loss of vision as a result of the beatings.

50.    Plaintiff Rashid suffered abuses to his genitals.

51.    Plaintiff Rashid was hung from the ceiling by a rope tied around his chest.

52.    Plaintiff Rashid was subjected to mock execution.

53.    Plaintiff Rashid was shot in the leg.

54.    Plaintiff Rashid was subjected to having woman's underwear placed over his head while handcuffed.

55.    Plaintiff Rashid was subjected to being detained naked in the same cell as a female detainee.

56.    Plaintiff Rashid was forced to watch as the conspirators raped a female detainee.

57.    Plaintiff Rashid was removed from his cell by stretcher and hidden from the International Committee of the Red Cross ("ICRC"), who visited Abu Ghraib shortly after Plaintiff Rashid had been brutally and repeatedly beaten.

58.     Plaintiff Rashid was released on or about May 6, 2005 without ever being charged with any crime.

## THE TORTURE AND OTHER SERIOUS MISTREATMENT
## OF ASA'AD HAMZA HANFOOSH AL ZUBA'E

59.     Plaintiff Al-Zuba'e was imprisoned at the Abu Ghraib Hard Site for approximately one year after being arrested on or about November 1, 2003 and was detained and abused under conditions referenced above and ordered and encouraged by CACI PT personnel.

60.     Plaintiff Al-Zuba'e was repeatedly beaten.

61.     Plaintiff Al-Zuba'e was stripped and kept naked.

62.     Plaintiff Al-Zuba'e was subjected to extremes of temperature and to having cold water poured over his naked body.

63.     Plaintiff Al-Zuba'e was hooded and chained to the bars of his cell.

64.     Plaintiff Al-Zuba'e was threatened with unleashed dogs.

65.     Plaintiff Al-Zuba'e was beaten on his genitals with a stick.

66.     Plaintiff Al-Zuba'e was imprisoned in a solitary cell in conditions of sensory deprivation for almost a full day.

67.     Plaintiff Al-Zuba'e was released from Abu Ghraib on or about October 24, 2004, without ever being charged with a crime.

## THE TORTURE AND OTHER SERIOUS MISTREATMENT
## OF SALAH HASAN NSAIF JASIM AL-EJAILI

68.     Plaintiff Al-Ejaili was imprisoned in the Abu Ghraib Hard Site after being arrested on or about November 3, 2003 and was detained and abused under conditions referenced above and ordered and encouraged by CACI PT personnel.

69.     Plaintiff Al-Ejaili was subjected to repeated beatings.

11

70.    Plaintiff Al-Ejaili was stripped and kept naked.

71.    Plaintiff Al-Ejaili was imprisoned in a solitary cell in conditions of sensory deprivation.

72.    Plaintiff Al-Ejaili was subjected to extremes of temperature, with both hot and cold water thrown on his naked body.

73.    Plaintiff Al-Ejaili was placed in stress positions for extended periods of time.

74.    Plaintiff Al-Ejaili was threatened with unleashed dogs.

75.    Plaintiff Al-Ejaili was deprived of food.

76.    Plaintiff Al-Ejaili was deprived of sleep.

77.    Plaintiff Al-Ejaili was released from Abu Ghraib on or about February 1, 2004, without ever being charged with a crime.

### THE IMPLEMENTATION OF THE CONSPIRACY BETWEEN CACI PT EMPLOYEES AND MILITARY PERSONNEL TO TORTURE AND OTHERWISE SERIOUSLY MISTREAT DETAINEES

78.    All of these harms were inflicted on Plaintiffs by groups of persons conspiring together to torture and otherwise abuse detainees kept at the Abu Ghraib Hard Site. Among the known conspirators in setting the conditions for abuse at the Hard Site were CACI PT employees Steven Stefanowicz, Daniel Johnson, and Timothy Dugan, who conspired with soldiers including Ivan Frederick, Charles Graner, Megan Ambuhl, Javal Davis, Lynndie England, Roman Krol, Michael Smith, and Sabrina Harman. Other CACI PT employees, other civilian contractors at the site, including Adel Nakhla and Etaf Mheisen, and other soldiers deployed to the Hard Site at Abu Ghraib, whose identities are presently unknown to Plaintiffs, also participated in the conspiracy to torture and aided and abetted the torture of Plaintiffs and other detainees. The conspiracy was formed no later than October 2003, when the named conspirators were stationed

12

at the Hard Site and when acts of "sadistic, blatant, and wanton criminal" abuse, as described in Major General Antonio Taguba's Article 15-6 Investigation of the 800th Military Police Brigade ("Taguba Investigation"), were found to have occurred.  These acts could not plausibly have occurred in the absence of at least tacit agreement to permit such conduct.  **The conspiracy was** largely carried out in Tiers 1A and 1B of the Hard Site at the Abu Ghraib prison.  Most of the abuse pursuant to the conspiracy was carried out during the night shift at the Hard Site, to minimize the risk of detection by nonparticipants.

79.    The conspiracy ended in approximately February 2004, following Sergeant Joseph Darby's disclosure to military authorities of photographs and information that documented the abusive conduct, and the commencement of investigations by the Criminal Investigation Division of the Department of Defense, although several conspirators attempted during and after those investigations to conceal the conspiracy and their role in it.

80.    During the period of the conspiracy at the Hard Site, at the same location and in the same time period when Plaintiffs were detained and seriously mistreated, CACI PT employees instigated, directed, participated in, encouraged, and aided and abetted conduct towards detainees that clearly violated the Geneva Conventions, the Army Field Manual, and the laws of the United States.

81.    Major General George R. Fay's AR 15-6 Investigation of the Abu Ghraib Detention Facility and 205th Military Intelligence Brigade ("Fay Investigation") found that CACI PT employees, along with military intelligence personnel, military police, and medical soldiers, had "responsibility or complicity in the abuses that occurred at Abu Ghraib."

82.    The Fay Investigation concluded, "[w]hat started as nakedness and humiliation, stress and physical training (exercise), carried over into sexual and physical assaults by a small

13

group of morally corrupt and unsupervised soldiers and civilians." The civilians identified by the Fay Investigation included at least five CACI PT employees, identified by pseudonym, among them individuals known to be Stefanowicz, Johnson, and Dugan.

83.    The Taguba Investigation concerning the abuse at Abu Ghraib identified CACI PT employee Stefanowicz alongside military personnel and the employee of another contractor working at Abu Ghraib, as directly or indirectly responsible for the abuses at Abu Ghraib.

84.    Colonel Henry Nelson, a trained psychologist who accompanied General Taguba in conducting his investigation of the Abu Ghraib events, submitted a report that concluded that a conspiracy existed between the MPs and interrogators, including CACI PT civilian employees, to abuse detainees: "note carefully that [Frederick and Graner] collaborated with other MP Soldiers and several unknown MI personnel, to include Soldiers as well as their United States civilian contract interrogators and interpreters. Witnesses report pairs of civilian interrogators and interpreters carrying out detainee abuse, as well as an interpreter raping a male juvenile detainee. In fact, the MI unit seemed to be operating in a conspiracy of silence." Colonel Nelson concluded that "the behavior at [Abu Ghraib] crossed the line. The sadistic and psychopathic behavior was appalling and shocking."

85.    In addition, Frederick testified that as the NCOIC of the Hard Site, where Plaintiffs were detained, ▆▆▆▆▆▆ personnel had actually ordered him to set the conditions for abusing the detainees. ▆▆▆▆▆▆▆▆▆ CACI PT personnel – Stefanowicz and Johnson – who actually ordered the more severe forms of abuse.

86.    Frederick also testified that ▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆.

14

87.     The Taguba Investigation recommended official reprimand and termination of Stefanowicz for his role in the conspiracy, including for giving instructions to military personnel that Stefanowicz knew were both physically abusive and prohibited.  The Taguba Investigation also revealed that Stefanowicz made a false statement to the investigation team regarding the location and conduct of interrogations, as well as abuses that occurred, which was done to cover up his role in the conspiracy to abuse detainees at Abu Ghraib.

88.     The Fay Investigation likewise concluded that a civilian known to be Stefanowicz lied to government investigators, and that CACI PT employees, identified by pseudonym in the report but known to be Stefanowicz, Dugan, and Johnson, abused detainees, and that a civilian interrogator known to be Johnson had encouraged Frederick to abuse detainees.

89.     CACI PT employees had unsupervised access to the areas of Abu Ghraib where detainees were imprisoned, causing confusion among military police personnel as to whether CACI PT employees were military intelligence personnel or civilian contractors.  Frederick testified that he never really knew who was in charge at Abu Ghraib.

90.     Military personnel at the Abu Ghraib Hard Site were frequently confused as to whether interrogators were associated with civilian contractors or military intelligence personnel, and frequently used the term "military intelligence" or "MI" to refer to both civilian and military interrogators.

91.     Causing further confusion, as Frederick testified, it was common practice for personnel working at Abu Ghraib to cover their name tags and not disclose their identities to detainees.

15

92.     Similarly, then-Sergeant Javal Davis, later demoted to the rank of Private, gave sworn testimony to the United States Criminal Investigation Division that military intelligence personnel routinely "cover[ed] their name with tape."

93.     Sergeant Hydrue Joyner gave sworn testimony to the United States Criminal Investigation Division that he did not know the names of military intelligence personnel because "they did not use their names."

94.     Joyner also ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████

95.     In order to further assure anonymity and deniability, the conspiring interrogators and military police regularly placed hoods on the detainees when they were being taken for questioning or during questioning to avoid being identified.

### CACI PT Employees' Positions of Authority at the Hard Site

96.     CACI PT employees positioned themselves at the top of the power structure at the Abu Ghraib Hard Site. From that position of *de facto* authority, CACI PT employees gave direction to military personnel in direct violation of CACI PT's SOW as well as the controlling military regulations. In fact, CACI PT went beyond the SOW of providing interrogation support services, and actually dictated and set the conditions of how detainees were to be confined at the Hard Site, where Plaintiffs were detained. Because military personnel perceived CACI PT employees as authority figures, military personnel followed the instructions of CACI PT employees.

16

97.     Sergeant Theresa Adams, a military intelligence section leader at Abu Ghraib, and Captain Carolyn Wood, the Officer in Charge with the JIDC, both provided testimony in the Fay Investigation that CACI PT interrogators had actually supervised military personnel.

98.     Frederick testified that he tortured and otherwise severely mistreated detainees as a result of instructions given to him by CACI PT employees Stefanowicz and Johnson.

99.     Frederick confirmed that military personnel did not devise their abuse of detainees out of whole cloth. Instead, they received instructions from "████████ employees."

100.    Then-Corporal Charles Graner, who was sentenced by court martial to ten years imprisonment for his participation in torture in Abu Ghraib and had his rank reduced to Private, gave sworn testimony to the Criminal Investigation Division that he tortured detainees on the instructions of CACI PT interrogators Stefanowicz and Johnson.

101.    CACI PT employees Stefanowicz and Johnson were among those interrogators who most frequently directed that detainees be tortured. Sworn and unsworn testimony from military co-conspirators describe a system in which CACI PT employees ordered torture and mistreatment of detainees and military personnel carried out those orders. In this manner CACI PT employees assisted in and contributed to the commission of these crimes at the Hard Site, where Plaintiffs were detained, even without personally participating in the physical abuse of detainees. This system necessarily required the military personnel taking orders from their perceived superiors (i.e., CACI PT employees), to carry out the torture and cruel, inhuman, and degrading treatment of the detainees, rather than CACI PT employees committing such abuses themselves.

102.    CACI PT employees intended for military co-conspirators to torture and otherwise inflict cruel, inhuman, and degrading treatment on detainees at the Hard Site, where

17

Plaintiffs were detained, in order to extract information from detainees, including Plaintiffs, using extreme, harsh, and unlawful interrogation techniques.

103.   Davis, in his sworn statement to the Criminal Investigation Division, identified "Steve" as a person he believed contributed to the abuse and maltreatment of detainees, likely referring to "Big Steve" Stefanowicz.  He said that he "did not know who he work[ed] for," he "just knew that he is an investigator/interrogator."

104.   Frederick testified at his court martial proceeding that in setting conditions for detainees, interrogators gave orders by specific detainee.

105.   Torin Nelson, a former CACI PT employee present in Abu Ghraib during the period that Plaintiffs were detained and abused, gave testimony in this case that Stefanowicz "was trying to present himself or establish himself as the senior intelligence person. . . on the CACI side, so that any CACI personnel who had operational questions would go to Steve first. . . Steve was just trying to put himself into that position of authority."  That position of authority was on the "operational line," meaning the actual conducting of intelligence operations, and not on the administrative side.

106.   Frederick testified that Stefanowicz



107.   Frederick testified that Johnson

108.   Frederick stated, in his sworn statement to the Criminal Investigation Division, ████████████████████ – a time period when Plaintiffs were detained at Abu

Ghraib— 

### The Plan, Agreement or Understanding to Torture and Abuse Detainees

109.   Frederick, who as the NCOIC was the senior enlisted officer working at the Abu
Ghraib Hard Site during the period when Plaintiffs were detained and subjected to cruel
treatment, testified that he received direct orders from Stefanowicz and Johnson.

110.   Frederick testified that of all of the intelligence personnel present at Abu Ghraib,
Plaintiff Al-Ejaili, Plaintiff Al Shimari,
and Plaintiff Al-Zuba'e were subjected to intimidation by dogs during their time at the hard site.

111.   Frederick testified that
Frederick testified that
Frederick also testified that CACI PT employees, in particular
Stefanowicz and Johnson, circumvented him and gave orders directly to his subordinates, in
particular to Graner.

19

112.   CACI PT employees encouraged abuse of detainees by praising military personnel who carried out orders to abuse detainees. ████████████████ ███████████████████████████████████████

113.   Then-Specialist Megan Ambuhl, later demoted to the rank of Private due to her role in the abuse of detainees at Abu Ghraib, testified at the court martial of Graner that ██ ███████████████████████████████████████ ███████████████████████████████████████ ████"

114.   CACI PT employees, who military personnel viewed as their superiors in the intelligence hierarchy at the Abu Ghraib Hard Site, instructed military personnel to "set the conditions" for interrogations.  The CACI PT employees knew, and military personnel understood, that "setting conditions" for interrogations equated to serious physical and mental abuse in an attempt to make detainees more responsive to questioning.

115.   Frederick testified that it was routine for intelligence personnel to tell him to set certain conditions for certain detainees, ██████████████████████ ████████████  He testified that when interrogators ordered him to "set conditions" at the Hard Site, where Plaintiffs were detained, they specified which conditions should be set.

116.   The "conditions" ordered by CACI PT employees included abusive techniques of the kind Plaintiffs suffered at the Hard Site.  Frederick testified at a deposition that the type of conditions requested by CACI PT interrogators included:

    a.   Diet manipulation;

    b.   Environmental changes;

    c.   Nudity;

20

    d.  Stress positions such as being cuffed to the bars of prison cells; and

    e.  Humiliating them.

117.  CACI PT employees used code words or terms such as "special treatment," "soften up," "doggie dance," and related code-words to signal to their military co-conspirators to employ torture and other abusive techniques of the kind Plaintiffs suffered at the Hard Site. Many military personnel, including Graner, Frederick, and Ambuhl, have testified that civilian interrogators told them to "soften up" detainees.

118.  The CACI PT employees knew, and the military personnel understood, that "softening up" and "special treatment" for interrogations equated to serious physical abuse and mental harm in an attempt to make detainees more responsive to questioning.

119.  Frederick testified that Johnson and Stefanowicz were present when detainees were naked in the cells, were forced to wear female underwear, were tied to the bars of prison cells, and were put in stress positions. Plaintiffs were each subjected to this kind of painful and humiliating abuse and torture during the same time period when Johnson and Stefanowicz were present at the Hard Site.

120.  The process of "softening up" ordered by CACI PT employees included abusive techniques of the kind Plaintiffs suffered at the Hard Site during the same time period CACI PT personnel were present. Frederick testified that based upon orders from CACI PT employees Stefanowicz and Johnson, he gave detainees "physical training, pushups, put them into cold climates, [took] away their clothing, put them in female clothing, [took] their cigarettes away from them, [gave] them certain diets, music, sleep deprivation. Maybe expose them to cold water." Frederick also testified that "softening up" included humiliation, such as having detainees naked in their cells and having them wear female underwear.

21

121.   During the time period when Frederick was ordered by CACI PT personnel to soften up detainees at the Hard Site, all of the Plaintiffs were left naked in their cells for prolonged periods of time.  Plaintiff Rashid and Plaintiff Al-Ejaili were forced to wear female underwear; Plaintiff Rashid was forced to wear it on his head.  Plaintiffs were also subjected to sleep deprivation and painful exposure to cold water and cold temperatures.  Plaintiff Al Shimari was forced to do push-ups in the manner described by Frederick.

122.   Frederick also testified that "softening up" included the use of unmuzzled dogs. In particular, Stefanowicz used the term "doggie dance" when he instructed military personnel to "use the dog" to intimidate detainees.  Frederick testified that detainees were bitten by dogs, similar to what happened with Plaintiff Al-Zuba'e, and that from his understanding this was part of the softening-up process.

123.   Frederick testified that



124.   Sergeant James Lee Joseph Beachner, an MI interrogator who was deployed to the Hard Site during the period when Plaintiffs were detained and subjected to cruel treatment,

Plaintiff Al-Ejaili was a reporter for Al Jazeera, and recalled in his deposition in this case that military and civilian personnel at Abu Ghraib called him "Al Jazeera."



125.   The use of dogs, a type of softening up ordered by Stefanowicz, was used on Plaintiff Al-Ejaili, Plaintiff Al Shimari, and Plaintiff Al-Zuba'e.

126.   Graner stated, in a sworn statement to the Criminal Investigation Division, ▓▓

127.   Frederick testified that Stefanowicz ordered abuse, ▓▓▓▓▓▓▓▓▓▓▓, and complimented military personnel on their treatment – meaning serious mistreatment -- of detainees.

128.   According to the expert report submitted in this litigation by Darius Rejali, Ph.D – an internationally recognized expert on government interrogation and torture, and author of *Torture and Democracy* (Princeton University Press, 2008) covering the history, causes, and consequences of modern torture – restraint techniques, positional techniques, exhaustion exercises, electrical shocks, sleep deprivation, and closed confinement in extreme temperatures are known techniques used historically in coercive interrogations and have been characterized by courts and governments, including the United States government, as torture.  According to Dr. Rejali, public nakedness is universally condemned as a form of prisoner mistreatment.

129.   The conspirators intentionally hid detainees, including Plaintiff Rashid, from the Red Cross, in order to prevent the Red Cross from visiting with them and learning of their mistreatment of detainees (not as a "Ghost Detainee," as he had an identification number).

23

## Torture and Other Cruel Treatment Suffered by Plaintiffs
## Attributable to the Conspiracy and Aiding and Abetting

130.   Plaintiffs were subjected to acts of cruelty and serious mistreatment by military personnel at the Hard Site who received direct instructions from CACI PT employees and used techniques mandated by CACI PT employees.

131.   Plaintiff Al-Ejaili identified Graner and Frederick as individuals who beat and/or abused him at the Hard Site.  Al-Ejaili also recalled that Graner had a separate role from interrogators –Graner punished and otherwise harmed detainees, but did not interrogate them. Al-Ejaili was stripped naked, subjected to extremes of temperature and hot and cold water, placed in stress positions, threatened with dogs, deprived of food, and deprived of sleep: all "conditions" or methods of "softening up" ordered and endorsed by CACI PT employees for Hard Site detainees.

132.   Plaintiff Al Shimari recognized Frederick and Graner as men who hurt the detainees often.   Plaintiff Al Shimari was beaten, deprived of food, deprived of sleep, threatened with dogs, subjected to sensory deprivation and extreme temperatures, stripped naked, forcibly shaved, and forced to exercise: all "conditions" or methods of "softening up" ordered and endorsed by CACI PT employees.

133.   ███████████████████████████████████████
█████████████████████████████████████████████
██████████"

134.   Plaintiff Al-Zuba'e recognized Graner as a person who hurt detainees and who specifically mistreated him.   At the Hard Site, Plaintiff Al-Zuba'e recalled that an interrogator would call Graner and tell Graner to hurt Plaintiff Al-Zuba'e and take him to his cell.  Plaintiff Al-Zuba'e was beaten, stripped naked, subjected to extremes of temperature and cold water, and

24

chained to the bars of his cell with his arms above his head and his feet barely touching the floor, overnight: all "conditions" or methods of "softening up" ordered and endorsed by CACI PT employees for Hard Site detainees.

135.   Plaintiff Rashid was beaten by Graner.  At the Hard Site, Plaintiff Rashid was stripped naked, subjected to sensory deprivation, chained to the door of his cell with his wrists above his head so that his feet could barely touch the floor, deprived of food and water, and placed in women's underwear: all "conditions" or methods of "softening up" ordered and endorsed by CACI PT employees for Hard Site detainees.

136.   Plaintiff Rashid was also sexually assaulted by a female whom he has identified as Etaf Mheisen.  Frederick testified that ███████████████.  Frederick also testified that ████████████ ████████████.

137.   A photograph taken at the Hard Site at Abu Ghraib ███████████ ████████████████████████  Plaintiff Al-Ejaili has identified Frederick and CACI PT employee Dan Johnson in this picture.

138.   Al-Ejaili testified that civilian interrogators were seen as authority figures who gave instructions to military personnel.  He recalled people "passing by the cells" at the Hard Site, who detainees thought had "some kind of authorities."  He recalled "the guards asking these people about the prisoners. . . these guards were talking to these people, ask if they got instructions from them about what to do to this person because he's shouting or making noise, how to punish."

139.   Plaintiff Al-Ejaili specifically identified CACI PT employee Johnson as a person who stood outside of detainee cells and gave instructions to military personnel.

25

6053919v.1

140.   Plaintiff Al-Ejaili testified under oath, at a deposition on March 6, 2013, that Johnson was someone who "was always in the hall . . . talking to the guards there or stopping by each and every cell there. He used to visit us every two or three days. We thought that he might be one of the interrogators or on high authority. We have this imagination; we thought that, if someone has no ranks or someone not in military uniform or military fatigue he or she might be working for intelligence services."

141.   Plaintiff Al-Ejaili also recalled that he once asked Johnson "can you just give me some information about my case, tell me why am I here." Johnson "looked at [Al-Ejaili] and just smiled and went away." On that occasion, Plaintiff Al-Ejaili was naked, a humiliating condition ordered by CACI PT employees for detainees at the Hard Site where Plaintiff Al-Ejaili was detained.

142.   Plaintiff Al-Ejaili testified that interrogators and military personnel would confer outside of his cell. He testified that "there were discussions between the guards and also the interrogators and these people there about what to do with prisoners, how to deal with the prisoners. So sometimes a group comes to the door of the cell. So they were forcing me and tell me to go to back of cell and face wall. When I could hear that they are discussing about how to deal with me, what to do with me." CACI PT employee Johnson and Frederick were among the people who ordered Plaintiff Al-Ejaili to face the wall and then proceed to talk about "what to do with" him.

## The Direct and Vicarious Liability of the Corporation

143.   The wrongful acts of CACI PT employees complained of herein were carried out within the scope of their employment by CACI PT and were foreseeable to CACI PT in the absence of proper hiring, training, and oversight, particularly because interrogation presents a

26

frequently adversarial, domineering dynamic between interrogator and detainee, heightening the likelihood of abuse.

144.   According to law of war expert Professor Corn, who provided an expert report in this case, "[t]he efficacy of even the most comprehensive humanitarian regulatory regime is absolutely contingent on the proper training and leadership of those tasked with the capture, detention, and interrogation of detainees.  This is especially important with interrogators, who will be under intense pressure to produce actionable intelligence to facilitate tactical and operational success of friendly forces."  In his expert opinion he explained, "[c]ommanders and those responsible for leadership of subordinates engaged in detention operations must embrace their obligation to provide constant oversight of such operations in order to identify and correct deficiencies rapidly and efficiently," given the high risk "that the pressure to deliver actionable information will inevitably push even the very best trained interrogators to fall into the trap of acting on the belief that the means justifies the ends."

145.   Similarly, according to Dr. Zimbardo's expert report in this case, "[i]ndividuals involved in detention and interrogation operations in high-stress environments without actual mission-specific training or fully operational oversight are likely to escalate abuse of prisoners and even torture them without regard for human rights regulations governing such situations."  Given the foreseeability of such abuses, Dr. Zimbardo concluded that "individuals in positions of authority, i.e., employers or supervisors, should: (a) adequately train guards or interrogators; (b) set up rigorous protocols for supervision and accountability; (c) actively monitor conduct of its on-the-scene employees, and (d) discipline transgressors fully and publicly."

146.   Despite the high risk that its employees would participate in the torture or abuse of detainees, CACI PT failed to take due care to hire and deploy to Abu Ghraib employees who

27

had sufficient experience, training, or certification to conduct interrogations of detainees.   CACI

PT also ████████████████████████████████████████████

███████████████████████████████████████████████

███████████. CACI PT insufficiently supervised the conduct of its employees; ignored reports

of abuse; and promoted and/or praised employees implicated in detainee abuse, providing

incentives for behavior that lead to the torture and abuse of detainees.

147.   Torin Nelson gave testimony in this case explaining that a program manager from

CACI PT only questioned him for about five minutes over the phone about his background and

skills as an interrogator before offering him a position as an interrogator in Iraq.

148.   CACI PT acquiesced in its employees' misconduct, turning a blind eye to reports

of employee abuse and failing to adequately train and supervise employees to prevent reasonably

foreseeable abuses of detainees at Abu Ghraib.

149.   In addition, CACI PT attempted to cover up misconduct of its employees, and

thereby perpetuate and prolong the conspiracy, by misleading United States government and

international officials regarding CACI PT's role in detainee abuse and failing to report instances

of detainee abuse.

150.   When a military officer, Staff Sergeant Neal, attempted to report to "upper

management" that CACI PT employee Timothy Dugan was bragging that he had frightened a

detainee badly enough to make him vomit, the response he received was "[w]hat do you want me

to do about it?"  CACI PT did not conduct an inquiry into this misconduct or otherwise

discipline this employee.

151.   CACI PT employees alerted the CACI PT managers about the prevalence of

abuse of detainees at Abu Ghraib.  CACI PT ████████████████████████████████

28

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Similarly, Torin Nelson testified in this case that he informed CACI PT management of Tim Dugan and Daniel Johnson's mistreatment of detainees, as well as the threats he received for reporting their conduct to military investigators.

152.   Despite knowledge of the seriousness of the situation at Abu Ghraib, CACI PT management failed to report this abuse to the military or to take additional steps to ensure its own employees discontinued detainee abuse.

153.   In fact, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

154.   CACI PT failed to follow Major General Taguba's recommendation to reprimand Stefanowicz for his role in detainee abuse.  Instead, it launched an "internal investigation" into CACI PT employees' involvement in detainee abuse which absolved Stefanowicz from all wrongdoing.  While their "internal investigation" was on-going, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓.

155.   CACI PT failed to promptly discipline or terminate Johnson despite being informed that Johnson appeared in photographs depicting torture and abuse of detainees.  ▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

156.   CACI PT interrogators' encouragement, facilitation, direction, and conspiracy to engage in torture and abuse of the detainees at the Abu Ghraib Hard Site was undertaken with

the hope of creating "conditions" in which they could extract more information from detainees to please their client, the United States government, who CACI PT's parent company described in *Our Good Name* as their "single most important customer," and secure more profitable contracts.

157.   Despite having knowledge of abuses, and despite having both the authority and duty to prevent these abuses, CACI PT willfully ignored reports of CACI PT employees' participation in the conspiracy, failed to discipline conspirators who engaged in detainee abuses, and otherwise kept quiet about CACI PT's role in the conspiracy in order to continue to earn millions of dollars from its contract with the United States government.  CACI PT implicitly, if not expressly, encouraged such misconduct.

## SUMMARY OF REASONS FOR BELIEVING THE CONSPIRACY WAS PLAUSIBLE

158.   In summary, the allegations of conspiracy between at least three CACI PT civilian interrogators and a group of MPs who together were responsible for Plaintiffs at the Hard Site are plausible for a number of reasons, including the following:

    a.    The wrongful conduct occurred in the closed universe of the Hard Site at Abu Ghraib for a finite time period, where in the absence of at least a tacit agreement to condone the abuse, it would have been too risky for any individual interrogator or military guard to engage in such illegal conduct without fear of detection.

    b.    Many of the abusive acts, such as hiding Plaintiff Rashid from the ICRC when they visited the site, could not have been accomplished without the participation of multiple individuals.

    c.    The CACI PT interrogators used code words, such as "set the conditions," "special treatment," "soften up," and "doggie dance" to order abusive

conduct at the Hard Site of specific detainees allegedly to prepare them for interrogation.

d.    Plaintiffs and others observed interrogators who were CACI PT employees interacting with MPs and soliciting them to abuse detainees.

e.    General George Fay made a finding of fact in an investigation authorized by the United States Army that no less than five CACI PT employees played a role in abusive conduct toward detainees.

f.    Colonel Henry Nelson, after reviewing the same circumstances that Plaintiffs intend to prove at trial, concluded that the mistreatment of detainees at Abu Ghraib was the result of "collaboration" and "conspiracy" between the MPs and the interrogators, including the civilian interrogators employed by CACI PT.

g.    Frederick commanded all of the MP guards at the Hard Site, including those who were responsible for Plaintiffs, and identified CACI PT interrogators as the persons who ordered and directed him and his soldiers to mistreat the detainees.  No other superiors have ever been identified as procuring or encouraging the abuse of the detainees at the Hard Site during the relevant time frame.

h.    CACI PT was under intense pressure to deliver information they deemed actionable intelligence from the detainees at Abu Ghraib by whatever means were necessary.

## CACI PT COULD HAVE PREVENTED AND STOPPED ITS EMPLOYEES FROM TORTURING PLAINTIFFS

31

159.   CACI PT admitted in litigation in the District of Columbia that it had the ability to control, direct and influence the actions performed by employees.

160.   CACI PT had the ability to prevent employees from torturing Plaintiffs.

161.   It was foreseeable to CACI PT that, in the absence of proper hiring, training and oversight, its employees would engage in abusive conduct at the Abu Ghraib Hard Site.

162.   CACI PT at all times was obligated by the terms of its contract and by applicable military regulations to directly supervise and discipline its employees.  CACI PT directed its employees to report all problems they confronted to CACI PT Management, rather than to the United States military.

163.   CACI PT placed a Site Lead Manager, Daniel Porvaznik, at Abu Ghraib prison, who himself reported to higher-level CACI PT management, and was in daily contact with CACI PT in the United States.  CACI PT also placed a manager, Thomas Howard, at the military's C2X (intelligence) office in Iraq.  Both Porvaznik and Howard had access to and reviewed interrogation reports, some of which, according to Torin Nelson's testimony, raised concerns of potential abuse by other CACI PT personnel.

164.   As Porvaznik was based at Abu Ghraib and communicated daily with senior military personnel regarding the work of CACI PT employees at the facility, he had access to full information about the conduct and performance of CACI PT employees, including CACI PT interrogators, and sent daily reports to CACI PT management.

165.   CACI PT's country manager in Iraq at the time, Scott Northrop, met regularly with military officials for status reports on the conduct of CACI PT employees, including interrogators at Abu Ghraib.

166.   Chuck Mudd, a vice president at CACI PT, traveled to Iraq regularly and visited Abu Ghraib to meet with prison leadership officials in order to determine whether CACI PT employees were providing satisfactory service and treating detainees in a manner consistent with applicable laws and regulations.

167.   According to *Our Good Name*, reports from Porvaznik, Northrop, and Mudd were "regularly reviewed by CACI's executive team, including [CACI International Inc.'s then-Chief Executive Officer, J. Phillip] London, during a weekly Monday meeting to assess the company's overall worldwide business situation."

168.   CACI PT was put on notice of detainee abuse occurring at Abu Ghraib by CACI PT whistleblowers and United States military personnel alike.

169.   CACI PT at all times retained the ability to stop its employees from torturing and abusing Plaintiffs, but did not do so.

170.   CACI PT is responsible for the actions taken by its employees towards Plaintiffs.

## CACI PT AND ITS CO-CONSPIRATORS TOOK STEPS TO COVER UP THE SCOPE AND EXTENT OF TORTURE

171.   In addition to participating in the actual physical and mental mistreatment of Plaintiffs through its employees, CACI PT contributed to the conspiracy to torture and aided and abetted those who carried out the abuses through its efforts to cover up the abuse and its employees' role in the abuse by, among other acts:

    a.   Destroying or failing to preserve documents, videos, and photographs;

    b.   preventing the reporting of and failing to report the torture and abuse to non-conspiring authorities, the ICRC, and the media;

    c.   misleading non-conspiring military and government officials about the state of affairs at the prisons;

33

    d.    misleading non-conspiring military personnel ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████ and

    e.    knowingly providing false testimony of Site Lead Daniel Porvaznik and

Project Manager Scott Northrop that CACI PT was "at all times" under the

control and direction of US military personnel, when in fact, it was the

opposite at the Hard Site, as CACI PT was directing US military personnel

to abuse detainees, including Plaintiffs.

172.    Furthermore, through its parent company, CACI International, CACI PT

embarked upon a campaign of intimidation to suppress any coverage or investigation of its role

in the conspiracy.  CACI PT repeatedly had its lawyers send letters threatening legal action to

reporters who were considering reporting on CACI PT's role in the torture and mistreatment of

detainees.

173.    As part of this campaign of intimidation, CACI PT and CACI International

brought a frivolous lawsuit against a radio station. CACI PT and CACI International lost the

lawsuit.

174.    Also through its parent company, CACI International, CACI PT repeatedly made

knowingly false statements to the effect that none of its employees was involved in torturing

detainees.  In fact, co-conspirators have admitted, some of whom admitted under oath, that CACI

PT employees were involved in the torture.

175.   CACI PT through its parent company CACI International, in an effort to cover up the conspiracy, falsely claimed in a press release dated August 12, 2004 that none of its employees' departures from the company within the past year "involve[d] the abuse of detainees or any other inappropriate behavior that has been identified with the Abu Ghraib prison."

176.   In fact, CACI PT interrogator Torin Nelson, based at Abu Ghraib, had informed CACI PT management that he decided to leave the company at least partly due to the fear he felt working alongside his fellow CACI PT interrogators Tim Dugan and Daniel Johnson after implicating them in detainee abuse in a statement to the military's Criminal Investigation Division.

177.   Moreover, 

178.

. General Fay's investigation concluded that Tim Dugan played a role in detainee abuse.

179.   In a further effort to cover up the conspiracy, CACI PT falsely claimed in a book written by CACI PT's parent company, CACI International, *Our Good Name*, that "[t]he performance of CACI PT employees was monitored by both U.S. military and CACI PT chains of command" and that "[a]t all times the U.S. government had oversight of CACI's employees reporting to work," when in fact there was a command vacuum at Abu Ghraib with CACI PT employees working under little to no supervision.

35

180.   In the same book, *Our Good Name*, CACI PT also falsely claimed that "[a]t no time did CACI employees have 'chain of command' or supervisory authority over military personnel," and that "[i]nterrogators did not direct the actions of military police," when in fact at least several CACI PT personnel assumed *de facto* supervisory authority over military police officers.

181.   *Our Good Name* further falsely claims that the publicly-available photographs of torture at Abu Ghraib do not show any CACI PT employees.  In fact, there is a photograph of Daniel Johnson interrogating a detainee in a dangerous and harmful stress position not authorized by the relevant military regulations governing interrogation or by any military personnel.  This photograph had been brought to the attention of CACI PT management ███████
████████.

182.   CACI PT also used a limited internal investigation conducted by CACI International to mislead the public, the government, and investors into believing that there was no "credible or tangible evidence that substantiates the involvement of CACI personnel in the abuse of detainees at Abu Ghraib prison or elsewhere in Iraq," when in fact numerous statements by military and civilian personnel staffed at Abu Ghraib during the relevant time period as well as at least one photograph depicting detainee abuse implicate CACI PT employees in the abuse.

183.   CACI PT, primarily through its parent company CACI International, made false or misleading statements regarding the role of its employees at Abu Ghraib, and specifically regarding their role in the abuse of detainees at Abu Ghraib, in order to continue earning millions of dollars from United States government contracts and keep the CACI corporate family's stock price high.

## CACI PT KNEW THAT ITS EMPLOYEES' TORTURE OF DETAINEES VIOLATED THE LAWS OF THE UNITED STATES

184.    CACI PT intentionally and knowingly agreed to and did work in concert with the co-conspirators. To the extent that any particular act was perpetrated by a co-conspirator, CACI PT confirmed, sanctioned, ratified or otherwise acquiesced in the same.

185.    CACI PT knew or should have known that the conspiracy to torture would harm Plaintiffs.

186.    CACI PT earned millions of dollars in revenues as a result of participating in the ongoing conspiracy and in covering up its knowledge of the conspiracy.

187.    CACI PT invested the financial fruits of the conspiracy in its ongoing operations.

188.    CACI PT knew that military officials were prohibited from torturing detainees by the Army Field Manual, the Geneva Conventions, the United States Code of Military Justice and other controlling law, and that any military officials who were doing so were violating the law.

189.    CACI PT knew that the United States government has denounced the use of torture and other cruel, inhuman, or degrading treatment at all times. CACI PT knew that it was illegal for them to participate in, instigate, direct, or aid and abet the torture of Plaintiffs and other detainees.

190.    For example, in its Initial Report to the United Nations Committee Against Torture, the United States Department of State noted that, "[t]orture is prohibited by law throughout the United States. It is categorically denounced as a matter of policy and as a tool of state authority.... No official of the government, federal, state or local, civilian or military is authorized to commit or to instruct anyone else to commit torture. Nor may any official condone or tolerate torture in any form." *U.S. Department of State: Initial Report of the United States of America to the U.N. Committee Against Torture, Introduction* (1999). The State Department's

37

Report on Human Rights Practices characterized the following as prohibited forms of torture: mock executions, sensory deprivation, repeated slapping, exposure to cold temperatures, stripping and blindfolding, food and sleep deprivation, threats to detainees or family members, dripping water on the head, squeezing of the testicles, rape, and sexual humiliation.

191.   CACI PT knew that the ban on torture is absolute and no exigent circumstances permit the use of torture.

192.   CACI PT knew that the United States intended and required that any person acting under the contract to the United States would conduct themselves in accordance with the relevant domestic and international laws, including laws prohibiting the use of torture and cruel, inhuman and degrading treatment.

193.   CACI PT knew and understood that the United States does not condone torture of detainees.

194.   Nonetheless, CACI PT purposefully furthered the commission of torture and other cruel, inhuman, or degrading treatment of detainees in order to get "results" from harsh interrogations.

195.   CACI PT cannot credibly claim that the wrongful and criminal conduct of certain military and government personnel misled them into thinking that the torture of detainees was lawful and permissible.

### CACI PT CONDONED, ACQUIESCED IN AND ACTED NEGLIGENTLY IN FAILING TO PREVENT AND STOP TORTURE AND ABUSE OF DETAINEES

196.   CACI PT's contract with the United States required it to provide "the best value Interrogation Support Cell management and support; functioning as resident experts for the implementation of an Interrogation Support Cell [in accordance with Department of Defense, US

6053919v.1

Civil Code, and International] regulations and standard operating procedures. . . The contractor will provide Interrogation Support Cells, as directed by military authority. . . to assist, supervise, coordinate, and monitor all aspects of interrogation activities, in order to provide timely and actionable intelligence to the commander."

197.   CACI PT acted negligently and wrongfully by failing to prevent employees from engaging in foreseeable and predictable wrongful acts.

198.   CACI PT acted negligently and wrongfully by failing to discipline those who they knew, or with reasonable investigation could have determined, had engaged in wrongful acts at Abu Ghraib.

199.   CACI PT acted negligently and wrongfully by failing to take due care in hiring employees who had sufficient experience or training or certification in conducting interrogations of detainees, and deploying those employees to undertake interrogations in prisons in Iraq.

200.   CACI PT acted negligently and wrongfully by failing to train employees for the specialized task of interrogating detainees and by failing to sufficiently train employees about the United States military law and policy prohibitions on war crimes, torture and cruel, inhuman and degrading treatment.

201.   Lieutenant General Anthony R. Jones' AR15-6 Investigation of the Abu Ghraib Detention Facility and 205th Military Intelligence Brigade attributed abuses at Abu Ghraib to insufficient hiring or training by civilian contractors.

202.   Despite obligations under its contract with the United States government and obligations under United States government regulations, CACI PT acted negligently and wrongfully by failing to adequately supervise its employees. CACI PT admitted on its web site that CACI PT employees in Iraq worked under "minimal supervision."

39

203.   CACI PT acted negligently and wrongfully by failing to investigate and report accusations of wrongdoing referred to it by CACI PT employees and military personnel, and committed or witnessed by its employees and agents, despite an obligation under United States law to discipline employees for improper conduct and to timely report misconduct to appropriate United States government officials.

204.   CACI PT profited financially from its negligent misconduct.  The United States paid CACI PT millions of dollars in exchange for its contractual obligation to provide intelligence services.  CACI PT's wrongfulness and negligence in failing to properly hire, train, supervise and discipline employees allowed CACI PT to increase its profits without adequately fulfilling its duties under the contract with the United States.

205.   CACI PT failed to ensure that its employees and agents abided by the contract terms and with the Geneva Conventions.

206.   CACI PT injured Plaintiffs and harmed the reputation of the United States throughout the world.

207.   Plaintiffs suffered, and continue to suffer, extensive physical and mental harm as a result of being tortured and abused by CACI PT employees and their co-conspirators.

208.   Plaintiffs seek compensatory and punitive damages in an amount far in excess of the jurisdictional amount set forth in 28 U.S.C. § 1332 ($75,000).

209.   Plaintiffs seek any and all additional remedies (such as attorneys' fees) available under law.

## COUNT ONE
## TORTURE

210.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

211.    Defendant's acts and omissions were deliberate and intentional.  Defendant acted purposefully to punish, intimidate, discriminate, and to obtain information from Plaintiffs, who were in their physical custody and control.

212.    The acts committed by Defendant and its agents constitute torture in violation of the law of nations. The acts of torture committed against Plaintiffs include, among other things, beatings, placing plaintiffs in stress positions, forced nudity, sexual assault, death threats, withholding of food, water and necessary medical care, sensory deprivation, and intentional exposure to extremes of heat and cold. These acts, perpetrated by Defendant while working under a contract with the United States, directly contradicted the contract's express terms, domestic law, and the United States' express policy against torture.

213.    Defendant's misconduct caused grave and foreseeable injuries to Plaintiffs.

## COUNT TWO
## CIVIL CONSPIRACY TO TORTURE

214.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

215.    Defendant is liable for torture because it knowingly and/or purposefully participated in a conspiracy, consisting of a plurality of persons, to torture Plaintiffs.

216.    Defendant was aware that torture was a natural and foreseeable consequence of the execution of that enterprise, and with that awareness, participated in the enterprise.

217.    Defendant knowingly and/or purposefully agreed, or took concerted action, with each other and others to participate in a series of unlawful acts.

218.    Defendant performed one or more overt acts pursuant to and in furtherance of the common scheme.

219.    Defendant is liable for torture because it set the conditions, directly and indirectly facilitated, ordered, acquiesced, confirmed, ratified, and conspired with others to torture Plaintiffs.

220.    Defendant's knowing and/or purposeful participation in the conspiracy caused grave and foreseeable damages to Plaintiffs.

## COUNT THREE
## AIDING AND ABETTING TORTURE

221.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

222.    Defendant's employees, acting within the scope of their employment, knowingly and substantially ordered, procured, encouraged and assisted others in torturing Plaintiffs.

223.    Defendant, with the purpose of facilitating the commission of torture, provided assistance to others who were torturing Plaintiffs.

224.    Defendant's practical assistance had a substantial effect on the actions of others who were torturing Plaintiffs.

225.    Defendant is liable for the torture because it aided and abetted others who were torturing Plaintiffs.

226.    Defendant's knowing and/or purposeful substantial assistance caused grave and foreseeable damages to Plaintiffs.

## COUNT FOUR
## CRUEL, INHUMAN OR DEGRADING TREATMENT

227.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

6053919v.1

228.    The acts described herein had the intent and effect of causing serious mental and physical pain and suffering to Plaintiffs, grossly humiliating and debasing Plaintiffs, and forcing them to act against their will and conscience, inciting fear and anguish and breaking their physical or moral resistance.

229.    Defendant set the conditions, directly and indirectly facilitated, ordered, acquiesced, confirmed, ratified, and conspired with others to subject Plaintiffs to cruel, inhuman or degrading treatment.

230.    Defendant is liable for its conduct that led to the cruel, inhuman and degrading treatment of Plaintiffs.

231.    Defendant's misconduct caused grave and foreseeable injuries to Plaintiffs.

## COUNT FIVE
## CIVIL CONSPIRACY TO TREAT PLAINTIFFS IN A CRUEL, INHUMAN OR DEGRADING MANNER

232.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

233.    Defendant is liable for the cruel, inhuman, or degrading treatment of Plaintiffs because it knowingly and/or purposefully participated in a conspiracy, consisting of a plurality of persons, to so treat Plaintiffs.

234.    Defendant was aware that cruel, inhuman, or degrading treatment of Plaintiffs was a natural and foreseeable consequence of the execution of that enterprise, and with that awareness, participated in the enterprise.

235.    Defendant knowingly and/or purposefully agreed or took concerted action, along with others, to participate in a series of unlawful acts.

43

236.   Defendant performed one or more overt acts pursuant to and in furtherance of the common scheme.

237.   Defendant are liable for the cruel, inhuman, and degrading treatment of Plaintiffs because they set the conditions, directly and indirectly facilitated, ordered, acquiesced, confirmed, ratified, and conspired with others to so treat Plaintiffs.

238.   Defendant's knowing and/or purposeful participation in the conspiracy caused grave and foreseeable damages to Plaintiffs.

## COUNT SIX
## AIDING AND ABETTING
## CRUEL, INHUMAN AND DEGRADING TREATMENT

239.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

240.   Defendant's employees, acting within the scope of their employment, knowingly and substantially ordered, procured, encouraged and assisted others in treating Plaintiffs in a cruel, inhuman, and degrading manner.

241.   Defendant, with the purpose of facilitating the commission of torture, provided assistance to others who were treating Plaintiffs in a cruel, inhuman, and degrading manner.

242.   Defendant's practical assistance had a substantial effect on the actions of others who were treating Plaintiffs in a cruel, inhuman, and degrading manner.

243.   Defendant is liable for the injuries caused by the cruel, inhuman, and degrading treatment because it substantially aided and abetted others in so treating Plaintiffs.

244.   Defendant's knowing and/or purposeful substantial assistance to others caused grave and foreseeable damages to Plaintiffs.

## COUNT SEVEN
## WAR CRIMES

44

245.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

246.   Defendant's acts were deliberate, willful, intentional, wanton, malicious, and oppressive and constitute grave breaches of the Geneva Conventions and war crimes. These acts included torture, cruel, inhuman and degrading treatment, and willfully causing great suffering and serious bodily injury to Plaintiffs.

247.   Defendant's acts took place during a period of armed conflict, in connection with hostilities.

248.   Defendant set the conditions, directly and indirectly facilitated, ordered, acquiesced, confirmed, ratified, and conspired with others to commit war crimes against Plaintiffs.

249.   Defendant is liable for its conduct that constitutes war crimes.

250.   Defendant's misconduct caused grave and foreseeable injuries to Plaintiffs.

## COUNT EIGHT
## CIVIL CONSPIRACY TO COMMIT WAR CRIMES

251.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

252.   Defendant is liable for torture because it knowingly and/or purposefully participated in a conspiracy, consisting of a plurality of persons, to commit war crimes against Plaintiffs.

253.   Defendant was aware that the commission of war crime against Plaintiffs was a natural and foreseeable consequence of the execution of that enterprise, and with that awareness, participated in the enterprise.

6053919v.1

254.   Defendant knowingly and/or purposefully agreed, or took concerted action, with each other and others to participate in a series of unlawful acts.

255.   Defendant performed one or more overt acts pursuant to and in furtherance of the common scheme.

256.   Defendant is liable for war crimes against Plaintiffs because they set the conditions, directly and indirectly facilitated, ordered, acquiesced, confirmed, ratified, and conspired with others to commit war crimes against Plaintiffs.

257.   Defendant's knowing and/or purposeful participation in the conspiracy caused grave and foreseeable damages to Plaintiffs.

## COUNT NINE
## AIDING AND ABETTING COMMISSION OF WAR CRIMES

258.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

259.   Defendant's employees, acting within the scope of their employment, knowingly and substantially ordered, procured, encouraged and assisted others in committing war crimes against Plaintiffs.

260.   Defendant, with the purpose of facilitating the commission of torture, provided assistance to others who were committing war crimes against Plaintiffs.

261.   Defendant's practical assistance had a substantial effect on the actions of others who were committing war crimes against Plaintiffs.

262.   Defendant is liable for the injuries caused by the war crimes because it substantially aided and abetted others in committing war crimes against Plaintiffs.

263.   Defendant's knowing and/or purposeful substantial assistance to others in the commission of war crimes caused grave and foreseeable damages to Plaintiffs.

46

6053919v.1

## COUNT TEN
### ASSAULT AND BATTERY

264.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

265.   Defendant unlawfully intended to and did inflict immediate injury upon Plaintiff Al Shimari.

266.   Defendant intentionally assaulted, battered, and made other offensive contacts, and aided and abetted the assaulting and battering and offensively contacting, of Plaintiff Al Shimari.

267.   Plaintiff Al Shimari did not consent to the offensive contacts. Plaintiff Al Shimari feared for his personal safety and felt threatened by Defendant's actions.

268.   Defendant set the conditions, directly and indirectly facilitated, ordered, acquiesced, confirmed, ratified, and conspired with others to commit the assaults and batteries.

269.   Defendant's acts caused grave and foreseeable damages to Plaintiff Al Shimari.

## COUNT ELEVEN
### CIVIL CONSPIRACY TO ASSAULT AND BATTER

270.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

271.   Defendant agreed or took concerted action, with others, to participate in a series of unlawful acts.

272.   Defendant performed one or more overt acts pursuant to and in furtherance of the common scheme.

47

273.    Defendant is liable for the assaults and batteries against Plaintiff Al Shimari because it set the conditions, directly and indirectly facilitated, ordered, acquiesced, confirmed, ratified, and conspired with others to commit the assaults and batteries.

274.    Defendant's knowing participation in the conspiracy to assault and batter caused grave and foreseeable damages to Plaintiff Al Shimari.

## COUNT TWELVE
## AIDING AND ABETTING
## ASSAULTS AND BATTERIES

275.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

276.    Defendant's employees, acting within the scope of their employment, knowingly and substantially ordered, procured, encouraged and assisted others in assaulting and battering Plaintiff Al Shimari.

277.    Defendant is liable for the injuries caused because they aided and abetted others in assaulting and battering Plaintiff Al Shimari.

278.    Defendant's knowing and substantial assistance to others caused grave and foreseeable damages to Plaintiff Al Shimari.

## COUNT THIRTEEN
## SEXUAL ASSAULT AND BATTERY

279.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

280.    Plaintiff Al Shimari was sexually assaulted and battered by Defendant and its co-conspirators.

6053919v.1

281.    Defendant intended to, and did, cause offensive sexual contacts with intimate parts of Plaintiff Al Shimari. Defendant acted to cause Plaintiff Al Shimari imminent apprehension of harmful and offensive contact with their intimate parts.

282.    Plaintiff Al Shimari did not consent to the contacts. Plaintiff Al Shimari feared for his personal safety and felt threatened by Defendant's actions.

283.    Defendant set the conditions, directly and indirectly facilitated, ordered, acquiesced, confirmed, ratified, and conspired with others to sexually assault and batter Plaintiff Al Shimari.

284.    Defendant's acts caused grave and foreseeable damages to Plaintiff Al Shimari.

## COUNT FOURTEEN
## CIVIL CONSPIRACY TO SEXUALLY ASSAULT AND BATTER

285.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

286.    Defendant agreed or took concerted action, with others, to participate in a series of unlawful acts.

287.    Each Defendant performed one or more overt acts pursuant to and in furtherance of the common scheme.

288.    Defendant is liable for the sexual assaults and batteries against Plaintiff Al Shimari because it set the conditions, directly and indirectly facilitated, ordered, acquiesced, confirmed, ratified, and conspired with others to sexually assault and batter Plaintiff Al Shimari.

289.    Defendant's knowing participation in the conspiracy caused grave and foreseeable damages to Plaintiff Al Shimari.

## COUNT FIFTEEN
## AIDING AND ABETTING
## SEXUAL ASSAULTS AND BATTERIES

49

290.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

291.    Defendant's employees, acting within the scope of their employment, knowingly and substantially ordered, procured, encouraged and assisted others in sexually assaulting Plaintiff Al Shimari.

292.    Defendant is liable for the injuries caused by the crimes because they substantially aided and abetted others in sexually assaulting and battering Plaintiff Al Shimari.

293.    Defendant's knowing and substantial assistance to others caused grave and foreseeable damages to Plaintiff Al Shimari.

## COUNT SIXTEEN
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

294.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

295.    Defendant intentionally inflicted severe emotional distress by way of extreme and outrageous conduct on Plaintiff Al Shimari.  Defendant intended or recklessly disregarded the probability of Plaintiff Al Shimari suffering emotional distress when directing offensive conduct toward Plaintiff Al Shimari or carrying out offensive conduct while aware of Plaintiff Al Shimari's presence.

296.    Defendant set the conditions, directly and indirectly facilitated, ordered, acquiesced, confirmed, ratified, and conspired with others to inflict emotional distress on Plaintiff Al Shimari.

297.    Defendant's acts caused grave and foreseeable injuries to Plaintiff Al Shimari.

## COUNT SEVENTEEN
## CIVIL CONSPIRACY TO INFLICT EMOTIONAL DISTRESS

298.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

299.    Defendant agreed or took concerted action, with others, to participate in a series of unlawful acts.

300.    Each Defendant performed one or more overt acts pursuant to and in furtherance of the common scheme.

301.    Defendant is liable for intentional infliction of emotional distress on Plaintiff Al Shimari because they set the conditions, directly and indirectly facilitated, ordered, acquiesced, confirmed, ratified, and conspired with others to inflict emotional distress on Plaintiff Al Shimari.

302.    Defendant's knowing participation in the conspiracy to intentionally inflict emotional distress caused grave and foreseeable damages to Plaintiff Al Shimari.

**COUNT EIGHTEEN**
**AIDING AND ABETTING**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

303.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

304.    Defendant's employees, acting within the scope of their employment, knowingly and substantially ordered, procured, encouraged and assisted others in intentionally inflicting emotional distress upon Plaintiff Al Shimari.

305.    Defendant is liable for the injuries caused by the intentional infliction of emotional distress because they substantially aided and abetted others in causing the emotional distress to Plaintiff Al Shimari.

51

306.    Defendant's knowing and substantial assistance to others caused grave and foreseeable damages to Plaintiff Al Shimari.

## COUNT NINETEEN
### NEGLIGENT HIRING, TRAINING AND SUPERVISION

307.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

308.    Defendant acted negligently and directly harmed Plaintiff Al Shimari by taking or failing to take one or more of the following steps:

    a.    failing to take the appropriate steps in hiring proper personnel to perform services;

    b.    failing to screen properly personnel before their hiring;

    c.    failing to train personnel or subsidiary personnel properly to perform services in a legal fashion;

    d.    failing to investigate allegations of torture and abuse carried out by its subsidiaries or its employees;

    e.    failing to report to the government allegations of torture and abuse carried out and witnessed by its agents;

    f.    failing to adequately supervise and discipline its employees; and

    g.    negligently setting the conditions that facilitated the abuse.

309.    The negligence of CACI PT directly and foreseeably harmed Plaintiff Al Shimari.

## COUNT TWENTY
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

310.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

6053919v.1

311.   Defendant negligently inflicted severe emotional distress on Plaintiff Al Shimari.

312.   Defendant had a duty to Plaintiff Al Shimari, which they breached.

313.   The negligence of CACI PT directly and foreseeably harmed Plaintiff Al Shimari.

## JURY DEMAND AND PRAYER FOR DAMAGES

314.   Plaintiffs seek a jury trial. Plaintiffs were all seriously physically and mentally injured, and are entitled to any and all remedies available as a result of the conduct alleged herein, including, but not limited to:

    a.    compensatory damages for physical, mental, and economic injuries;

    b.    punitive damages in an amount sufficient to punish Defendant for engaging in human rights abuses and deter similar behavior; and

    c.    any attorneys' fees and costs permitted by law.

March 28, 2013

    /s/ George Brent Mickum IV
George Brent Mickum IV (VA Bar # 24385)
LAW FIRM OF GEORGE B. MICKUM IV
5800 Wiltshire Drive
Bethesda, MD 20816
Telephone: (202) 281-8662
gbmickum@gmail.com

Baher Azmy
Katherine Gallagher
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012

Robert P. LoBue
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036

53

6053919v.1

Shereef Hadi Akeel
AKEEL & VALENTINE, P.C.
888 West Big Beaver Road
Troy, Michigan 48084-4736

*Attorneys for Plaintiffs*

6053919v.1

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of March, 2013, I caused the foregoing Third Amended Complaint to be filed via ECF upon:

J. William Koegel, Jr.
Virginia Bar No. 38243
John F. O'Connor
Attorneys for Defendant CACI Premier Technology, Inc.
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000 – telephone
(202) 429-3902 – facsimile
wkoegel@steptoe.com
joconnor@steptoe.com


    /s/ George Brent Mickum IV
George Brent Mickum IV (VA Bar # 24385)
LAW FIRM OF GEORGE B. MICKUM IV
5800 Wiltshire Drive
Bethesda, MD 20816
Telephone: (202) 281-8662
gbmickum@gmail.com

6053919v.1