**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| SUHAIL NAJIM ABDULLAH AL SHIMARI *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 08-cv-0827 GBL-JFA |
| vs. | ) ) | |
| CACI INTERNATIONAL, INC., *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

**GOVERNMENT'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL
THE PRODUCTION OF DOCUMENTS FROM THE DEPARTMENT OF
<u>HOMELAND SECURITY</u>**

## I.   INTRODUCTION

Plaintiffs' Motion to Compel the United States to Produce Documents and

Information ("MTC"), Dkt. No. 374, challenges a *Touhy* denial issued by the Department

of Homeland Security ("DHS") in response to certain subpoena requests made by

Plaintiffs. Those requests sought documentary confirmation as to whether Plaintiffs were

on a No Fly List or any other watchlist that prevented or would prevent them from flying

into the United States, and, if they were or are on such a list, for the underlying

information supporting that status. The subpoena also requested that DHS search through

thirteen months of communications between any employee, agent, or attorney for CACI

Premier Technology, Inc. ("CACI"), and any of its affiliates or subsidiaries, and any

DHS employee to find and produce any communications that relate to Plaintiffs. DHS

denied Plaintiffs' these requests because the information sought is privileged and cannot

be disclosed to Plaintiffs; in addition, the subpoena would impose an undue burden on

DHS as a result of the breadth of information it seeks related to potential communications between DHS and CACI.

The denial of Plaintiffs' requests was in accordance with DHS's *Touhy* regulations.[1]  This Court reviews DHS's *Touhy* denial pursuant to the Administrative Procedure Act ("APA") and may overturn it only if the Court finds that these decisions were arbitrary and capricious.  They were not.  First, with regard to watchlist status (subpoena requests two and three), DHS responded that it could neither confirm nor deny Plaintiffs' presence on such a list because that information is sensitive security information ("SSI") and also law enforcement sensitive.  Accordingly, DHS's denial of Plaintiffs' requests appropriately protects privileged information and is not arbitrary or capricious.

Second, DHS properly denied subpoena requests one and four, which seek the reasons Plaintiffs were unable to board an aircraft, and any information that would support their inclusion on a watchlist.  Just as watchlist status is privileged, so is information that supports watchlist status.  DHS thus appropriately denied these requests because it cannot disclose such privileged information to Plaintiffs, and DHS's denial is thus neither arbitrary nor capricious.

Finally, DHS also properly denied Plaintiffs' request to search through thirteen months of communications to identify and then produce any communications between CACI and DHS that related to Plaintiffs.  Plaintiffs did not argue in their motion why DHS's denial of this request was arbitrary and capricious, let alone why such information

---

[1] Relying on precedent established in *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), DHS has promulgated regulations that set forth the requirements for the production of official documents in response to a subpoena request.  *See* 6 C.F.R. §§ 5.41 *et seq.*

would be relevant. As such, Plaintiffs have waived any challenge to this decision. Even if they have not, DHS properly determined that it needed to conserve the time of its employees for the conduct of official business rather than take on the unduly burdensome task of complying with Plaintiffs' fishing expedition for information. This decision is neither arbitrary nor capricious, particularly in light of the fact that CACI, unlike DHS, is litigating against Plaintiffs and would be in a better position to know whether, when, and with whom its employees, agents, and attorneys communicated with regard to Plaintiffs.

II.    BACKGROUND

A. Statutory and Regulatory Framework

Various components of the United States Government protect this nation and its airways from terrorist threats. The Federal Bureau of Investigation ("FBI") has responsibility for investigating and analyzing intelligence relating to both international and domestic terrorist activities, and the National Counterterrorism Center ("NCTC") serves as the primary organization for analyzing and integrating intelligence relating to international terrorism and counterterrorism. *See* 28 U.S.C. § 533; 28 C.F.R. § 0.85(l); *see also* 50 U.S.C. §§ 4040(a) & (d)(1). DHS is primarily charged with "prevent[ing] terrorist attacks within the United States," and "reduc[ing] the vulnerability of the United States to terrorism." 6 U.S.C. § 111. Within DHS, the Transportation Security Administration ("TSA") is responsible for transportation— including aviation—security. *See* 6 U.S.C. §§ 111(b)(1), 202(1); 49 U.S.C. § 114.

1. Creation of the Terrorist Screening Center

In 2003, the President ordered the establishment of a governmental organization that would "consolidate the Government's approach to terrorism screening and provide

for the appropriate and lawful use of Terrorist Information in screening processes." Homeland Security Presidential Directive 6. The Terrorist Screening Center ("TSC") maintains the federal government's Terrorist Screening Database ("TSDB"), which contains identifying information about individuals known or suspected to be engaged or aiding in terrorist related conduct. *See* Ex. 1, Declaration of Debra Lubman ¶¶ 6, 12.

Government agencies nominate individuals to be included in the TSDB if there is sufficient identifying information and if certain minimum substantive criteria are met, including a conclusion that the supporting information shows that the government has a "reasonable suspicion" based on the "totality of the circumstances" that the individual is a known or suspected terrorist. *Id.* ¶¶ 9, 10, 12. The substantive information supporting a TSDB nomination is known as "derogatory information" and it "consists of "operational facts derived from underlying international counterterrorism investigations or intelligence collections methods, which are generally classified to protect sources and methods." *Id.* ¶¶ 9, 15, 21.

The TSDB includes only identifying information; it does not include the underlying derogatory information. *Id.* ¶ 14. Separating the names from the underlying derogatory information allows TSC to share identifying information with government and law enforcement officials who may lack appropriate security clearances, but who need to know the information to positively identify known or suspected terrorists who try to enter the country, board aircraft, or engage in other activity that may pose a risk to national security. *See id.* ¶¶ 14, 16. Because intelligence is continually evolving, the composition of the TSDB, including the identifying information about known or suspected terrorists, is regularly updated. *Id.* ¶¶ 19-20.

### 2. No Fly List

The No Fly List is a subset of the TSDB. *Id* ¶ 16. The No Fly List is defined as "a list of individuals who are prohibited from boarding an aircraft." *Id.* ¶ 17. To be included on the No Fly List, an individual must be in the TSDB and meet additional criteria, beyond the "reasonable suspicion" standard generally required for inclusion in the TSDB. *Id.* ¶ 7. The government treats the No Fly criteria (as well as the watchlist status of an individual) as law enforcement sensitive and SSI; as a result, neither the No Fly criteria, nor the implementation guidance, may be publicly released. *See* 49 C.F.R. § 1520.5(b)(9)(i); Lubman Decl. ¶¶ 18, 29.

### B. Procedural History

On April 15, 2013, three of the four Plaintiffs (Suhail Najim Abdullah Al Shimari, Taha Yaseen Arraq Rashid, Asa'ad Hamza Hanfoosh Al Zuba'e) served a subpoena on DHS. In the accompanying cover letter, Plaintiffs explained that they had obtained visas in February 2013 in order travel to the United States for their depositions in this case. *See* MTC, Ex. B. According to Plaintiffs, they purchased tickets and received boarding passes to travel from Baghdad, Iraq, to Istanbul, Turkey, and then on to Chicago. *Id.* Plaintiffs assert that on March 15, 2013, they "were prevented from boarding their flight to Istanbul for unknown reasons." *Id.*

Plaintiffs' subpoena sought documents in five categories: (1) "[d]ocuments sufficient to show why" Plaintiffs "were prevented from boarding" their flight; (2) "[d]ocuments sufficient to show whether, as of March 15, 2013, [they] were on a 'No Fly List'" or other watchlist that would prevent them from boarding a flight; (3) documents sufficient to show they are currently on any of these lists; (4) documents "showing any of

the reasons for [their] inclusion" on any of these lists; and (5) "[a]ll communications between April 1, 2012 and present between Department of Homeland Security employees and any employees or agents or attorneys of CACI International, Inc., CACI Premier Technology, Inc. or any affiliates or subsidiaries thereof relating to Plaintiffs . . . ." *Id.*

Correctly treating the subpoena as a request for official information under its *Touhy* regulations, DHS denied all of Plaintiffs' requests on April 23, 2013. *See* 6 C.F.R. §§ 5.41 *et seq.*; MTC, Ex. C. With regard to the requests for watchlist status (subpoena requests two and three), the denial letter stated that "DHS can neither confirm nor deny whether any individual was or is on the 'No Fly List' or any other government security list" and explained that the information sought was protected from disclosure by statute as SSI and also by the law enforcement privilege. MTC, Ex. C, at 2-3. DHS also noted that the No Fly List is maintained by the Terrorist Screening Center, *see* MTC Ex. C, at 3, which is in turn administered by the FBI. *See* Lubman Decl. ¶ 2.

Similarly, with regard to the requests for any information underlying Plaintiffs' alleged watchlist status (subpoena requests one and four), DHS likewise could neither confirm nor deny the existence of that information because to do so would necessarily confirm or deny that Plaintiffs were on a watchlist. MTC, Ex. C, at 2-3. Additionally, if Plaintiffs are on a watchlist (which the government can neither confirm nor deny), any information underlying that status could be law enforcement sensitive and is also likely classified. *See* MTC, Ex. C, at 2-3. Finally, with regard to Plaintiffs' fifth request regarding CACI communications, DHS noted that it "lack[ed] sufficient information to respond to this request . . . [and that] without further description of the particular records

6

you are seeking, responding to this request would be unduly burdensome to DHS."

MTC, Ex. C, at 3-4.

Nine days later, on May 2, 2013, Plaintiffs filed their motion to compel.

## III.   STANDARD OF REVIEW

### A.   Judicial review of DHS's denial of Plaintiffs' third-party subpoena must be undertaken pursuant to the APA and on consideration of DHS's *Touhy* regulations.

In their motion, Plaintiffs acknowledge (but do not apply) the controlling legal standard, that "[w]hen the government is not a party, the APA provides the sole avenue of review" for an agency's decision to reject a *Touhy* request for compliance with a subpoena. *COMSAT Corp. v. Nat'l Science Found.*, 190 F.3d 269, 274 (4th Cir. 1999); *see also* 5 U.S.C. §§ 702, 704, 706; *Puerto Rico v. United States*, 490 F.3d 50, 61 (1st Cir. 2007) ("[S]ubpoenas are in effect a request for information from an executive department, and, consequently . . . are treated as an administrative demand[.]") (internal quotations omitted).

### B.   The standard of review under the APA is whether DHS's decision is arbitrary and capricious.

Under the APA, DHS's determinations with regard to Plaintiffs' subpoena must be upheld as reasonable unless "the government has refused production in an arbitrary, capricious, or otherwise unlawful manner." *COMSAT*, 190 F.3d at 277.  In other words, DHS's decision should be affirmed as long as "the record reveals that a rational basis existed for [the] decision." *Fishermen's Dock Coop., Inc. v. Brown*, 75 F.3d 164, 168 (4th Cir. 1996).  In evaluating the agency's decision, the Court may consider any reason stated by the agency at the time, and may in addition consider declarations and affidavits that

"expand significantly upon [the agency's] initial explanation of [its] decision." *Spence v. NCI Information Sys., Inc.*, 530 F. Supp. 2d 739, 742, 744 (D. Md. 2008).

## IV.    ARGUMENT

DHS acted reasonably in denying all five of Plaintiffs' document requests.  The first four requests seek information that is privileged and cannot be disclosed to Plaintiffs; the fifth request demands DHS search for an unreasonably broad category of documents, which would be unduly burdensome.

### A.  Subpoena requests two and three regarding watchlist status seek information that is both SSI and Law Enforcement Sensitive.

DHS's decision to neither confirm nor deny the watchlist status[2] of Plaintiffs is not arbitrary or capricious because that information is properly protected from disclosure.[3]  The type of watchlist status Plaintiffs seek constitutes SSI, and it is also protected by the law enforcement privilege.  DHS thus appropriately informed Plaintiffs that it could "neither confirm nor deny whether any individual was or is on the 'No Fly List' or any other 'government security list'" that would prevent them from boarding a flight. *Id.*, Ex. C, at 2-3.  This response follows DHS's own *Touhy* regulations, which require officials to consider "[w]hether compliance is appropriate under the relevant substantive law concerning privilege or disclosure of information."  6 C.F.R. § 5.48(a)(2).

---

[2] In this brief, "watchlist status" is used to refer to the specific status information sought by Plaintiffs, which involves information which "may prevent Plaintiffs from flying into the United States."  MTC, Ex. B.

[3] This type of response is known as a *Glomar* response and derives its name from the facts of *Phillipi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976) in which the CIA refused to confirm or deny that it had documents relating to Howard Hughes' ship, the Glomar Explorer.

8

     **i.**    *The requested watchlist status is Sensitive Security Information and cannot be disclosed*.

DHS cannot disclose the requested watchlist status because such disclosure would contravene the statutes which govern protection of SSI.  The governing *Touhy* regulations provide that "compliance [with a request] will not ordinarily be authorized" if "compliance would violate a statute" or "a specific regulation."  6 C.F.R. § 5.48(b)(1), (2).  Here, providing the requested information would violate a specific regulation intended to protect aviation security.  Congress has specifically directed TSA[4] to "prescribe regulations prohibiting the disclosure of information obtained or developed in carrying out security . . . if the Under Secretary decides that disclosing the information would . . . be detrimental to the security of transportation."  49 U.S.C. § 114(r)(1)(c) (formerly § 114(s)).  This statutory and regulatory scheme authorizes TSA to determine whether particular material is SSI, and, if so, whether and to what extent it may be disclosed.  *See id.*; 49 C.F.R. Part 1520.  In accordance with the applicable statute, *see* 49 U.S.C. § 114(r)(1), TSA has promulgated a regulation that expressly prohibits the disclosure of "[i]nformation and sources of information used by a passenger or property screening program or system, including an automated screening system."  49 C.F.R. § 1520.5(b)(9)(ii).  As David Hoffman, the Chief of the Sensitive Security Information Branch of the TSA declares:

---

[4] In response to the attacks on the United States on September 11, 2001, Congress enacted the Aviation and Transportation Security Act (Pub. L. No. 107-71, 115 Stat. 597 (2001)), which created in the Department of Transportation ("DOT") a new Transportation Security Administration, centralizing in one agency DOT's authority for security in all modes of transportation.  *See* 49 U.S.C. § 114.  When Congress created DHS through the Homeland Security Act of 2002 (Pub. L. No. 107-295, 116 Stat. 2064 (2002)), it transferred TSA from DOT to DHS, continued its authority to prohibit the disclosure of sensitive information regarding transportation security, and provided similar authority to DOT, again as to all modes of transportation.  *See* 49 U.S.C. § 40119(b).

> The DHS Watchlist Service ("WLS") receives and maintains data from the Terrorist Screening Database (TSDB) that is continuously updated with exports of information and other changes by the Terrorist Screening Center (TSC).  The No Fly and Selectee lists are sub-sets of the larger TSDB.  TSA uses No Fly and Selectee list status when vetting passengers attempting to board commercial aircraft.

Ex. 2, Declaration of David Hoffman ¶ 7.  The status of any individual on the No Fly List constitutes information TSA uses to screen passengers; and, as such, TSA has determined that the requested watchlist status constitutes SSI, "the disclosure of which TSA has determined would . . . [b]e detrimental to the security of transportation."  49 C.F.R. § 1520.5(a)(3); *see Blitz v. Napolitano*, 700 F.3d 733, 737 n.5 (4th Cir. 2012) (noting that these regulations deem "the identities of individuals on no-fly and selectee lists" as SSI); Hoffman Decl. ¶¶ 6-9; Lubman Decl. ¶ 8.  As the Hoffman Declaration explains, the "prohibition on public release of SSI is not discretionary but is mandatory in accordance with 49 C.F.R. § 1520.15(a)."  Hoffman Decl. ¶ 4.  Disclosure is appropriate only to those who qualify as "covered persons" with a need to know as set forth in the governing regulation.  *See* 49 U.S.C. § 114(r); 46 C.F.R. § 1520.9(a)(2); *see also* MTC, Ex. C, at 2-3; Hoffman Decl. ¶ 4.[5]  Because neither Plaintiffs nor their counsel qualify as "covered persons" under the regulation, Hoffman Decl. ¶ 4, which they admit, *see* MTC at 8 n.2, it was not arbitrary or capricious for DHS to deny their request for protected SSI.

---

[5] For example, SSI may be released to individuals or entities (such as air carriers) to "carry out security activities approved, accepted, funded, recommended, or directed by DHS or DOT."  49 C.F.R. § 1520.11(a)(1).  The regulations impose on covered persons an express duty to protect the information.  *See id.* § 1520.9.  Specifically, the regulations require that such persons must "[t]ake reasonable steps to safeguard SSI . . . from unauthorized disclosure," and "[r]efer requests by other persons for SSI to TSA or the applicable component or agency within DOT or DHS."  *Id.* Violation of these and additional non-disclosure requirements "is grounds for a civil penalty and other enforcement or corrective action."  *Id*. § 1520.17.

To the extent that Plaintiffs' motion to compel can be read as a challenge to TSA's designation of the requested watchlist status as SSI, this Court is without jurisdiction to hear such an argument.  A challenge to an SSI designation is a challenge to a final order of TSA, and, as such, jurisdiction to hear such a challenge would rest exclusively in the United States Court of Appeals.  *See* 49 U.S.C. § 46110(a) (" . . . [A] person disclosing a substantial interest in an order issued by [TSA] . . . may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has [his] principal place of business."); *see also Blitz*, 700 F.3d at 739  (finding that a challenge to a TSA standard operating procedure for checkpoint screening was a challenge to a "final order" under section 46110(a) that had to be brought in the court of appeals); *Robinson v. Napolitano*, 689 F.3d 888, 892-93 (8th Cir. 2012) (jurisdiction for challenge to TSA decision with regard to disclosure of certain SSI was to be had in court of appeals under 49 U.S.C. § 46110(a)).

Plaintiffs largely disregard the applicable APA standard of review and the fact that their challenge is to DHS's *Touhy* denial of their request for documents.  This leads them to request that the Court "[a]t minimum . . . order that Plaintiffs' counsel be deemed 'covered persons' with a 'need to know' the information requested . . . under the safeguards of the protective order," MTC at 8.  But this approach is meritless and ignores the APA nature of Plaintiffs' challenge.  Plaintiffs asked DHS to produce documents concerning their purported No Fly List status, *see* MTC, Ex. B; they did not petition TSA to seek access to SSI and designation of their counsel as "covered persons" as required by

the applicable statute.  *See* Department of Homeland Security Appropriations Act of

2007, Pub. L. No. 109-295 § 525(d), 120 Stat. 1355, 1382 (Oct. 4, 2006), as reenacted.[6]

Moreover, pursuant to Section 525(d), a party to a civil case in federal district

court can seek access to SSI but, to do so successfully, must demonstrate "a substantial

need of relevant SSI in the preparation of the party's case and that the party is unable

without undue hardship to obtain the substantial equivalent of the information by other

means."  *Id.*  There are, however, significant limitations on when this information may be

provided.  If a party can make the substantial need showing—to TSA first, as the

government entity with the Congressional mandate to make such determinations, 49

U.S.C. § 114(r)(1)(c)—the party must still undergo a criminal history records check and

terrorist assessment like that done by aviation workers.  If a party or their counsel pass

vetting, TSA would designate the party or their counsel as "covered persons" who may

access SSI unless TSA determines that, due to the sensitivity of the information,

disclosure would present a risk of harm to the nation.  *See* § 525(d).

Plaintiffs' counsel has not attempted to demonstrate to TSA a substantial need for

or the relevance of the SSI sought and has not undergone the statutorily required vetting.

Even if Plaintiffs' counsel were to make the requisite showings and pass vetting, this

Court would have to enter a protective order to protect SSI from unauthorized and

---

[6] For subsequent reenactments, see Consolidated Appropriations Act, 2008, Pub. L. No.
110-161, Division E, § 522, 121 Stat. 2074 (Dec. 26, 2007); Consolidated Security,
Disaster Assistance, and Continuing Appropriations Act, 2009, Pub. L. No. 110-329,
Division D, § 510, 122 Stat. 3682 (Sept. 30, 2008); Legislative Branch Appropriations
and Continuing Appropriations Resolution of 2010, Pub. L. 111-68, Division B, § 101,
123 Stat. 2044 (Oct. 1, 2009); Department of Homeland Security Appropriations Act,
2010, Pub. L. No. 111-83, Division B, § 510, 123 Stat. 2170 (Oct. 28, 2009); Department
of Defense and Full-Year Continuing Appropriations Act, 2011, Pub. No. 112-10, §§
1101(a)(3), 1104, 125 Stat. 102 (Apr. 15, 2011); Consolidated Appropriations Act, 2012,
Division D, § 510, Pub. L. No. 112-74 (Dec. 23, 2011).

unnecessary disclosure prior to the provision of any SSI.  Consequently, any decision by the Court with regard to whether the current Protective Order in this matter is sufficient to protect this SSI would be premature.  *See* § 525(d).[7]

For all these reasons, DHS acted reasonably when it denied Plaintiffs' requests because they sought SSI.

> ### ii.     *Watchlist status is also protected by the Law Enforcement Privilege.*

Watchlist status information is also protected by the law enforcement privilege. The law enforcement privilege is designed "to prevent disclosure of law enforcement techniques and procedures . . . and otherwise to prevent interference with an investigation." *In re The City of New York*, 607 F.3d 923, 941 (2d Cir. 2010).  The privilege bars disclosure of facts and is "based primarily on the harm to law enforcement efforts which might arise from public disclosure of . . . investigatory files." *Black v. Sheraton Corp. of Am.*, 564 F.2d 531, 541 (D.C. Cir. 1977).  The privilege "may [also] be asserted to protect testimony about or other disclosure of the contents of law enforcement investigatory files." *In re Sealed Case*, 856 F.2d 268, 271 (D.C. Cir. 1988).  As demonstrated herein, DHS acted reasonably by denying Plaintiffs request because it sought information that is law enforcement sensitive.

Invocation of a claim of law enforcement privilege should satisfy three requirements: "(1) there must be a formal claim of privilege by the head[s] of the department[s] having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by [those] official[s]; and (3) the

---

[7] Any order regarding the disclosure of SSI would be immediately appealable to the U.S. Court of Appeals.  *See* § 525(d).

13

information for which the privilege is claimed must be specified, with an explanation

why it properly falls within the scope of the privilege." *Id.* (citing *Friedman v. Bache

Halsey Stuart Shields, Inc.*, 738 F.2d 1336, 1341-42 (D.C. Cir.1984)); *Black*, 564 F.2d at

542-43.  Once this privilege is properly invoked, the court must balance the public's

interest in nondisclosure of the information against the plaintiff's need for access to the

investigatory files.  *In re Sealed Case*, 856 F.2d at 272; *see also In re The City of New

York*, 607 F.3d at 945.

Here, the government has properly invoked the law enforcement privilege through

the declaration of Debra Lubman, the Acting Deputy Director for Operations at TSC.  *See*

Lubman Decl. ¶¶ 29-30.[8]  In this declaration, TSC demonstrates the harms to law

enforcement operations and counterterrorism efforts that could flow from disclosure of an

individual's watchlist status.  *See id.* ¶¶ 31-44.  If an individual is on the No Fly List,

such a disclosure would confirm the United States' interest in that individual and could

also alert associated terror groups to that fact.  *See id.* ¶ 31.  Confirmation that an

individual was on the No Fly List "would allow him to take new precautions against

surveillance (such as altering his appearance or obtaining new identification) and change

the level of any terrorism related activity in which he is engaged" or to try to manipulate

---

[8] In contrast to an assertion of the state secrets privilege, the Court of Appeals for the
D.C. Circuit and other courts have found that "it would be counterproductive to read
'head of the department' in the narrowest possible way." *Landry v. FDIC*, 204 F.3d 1125,
1136 (D.C. Cir. 2000)  (permitting "the head of the appropriate regional division of the
FDIC's supervisory personnel" to make the assertion and contrasting this with the state
secrets privilege). *Accord U.S. v. $463497.72 in U.S. Currency*, 779 F. Supp. 2d 696, 713
(E.D. Mich. 2011); *El Badrawi v. DHS*, 258 F.R.D. 198, 203 (D. Conn. 2009).  As Acting
Deputy Director for Operations at TSC, Ms. Lubman is the head of the appropriate
component and is "of sufficient rank to achieve the necessary deliberateness" in asserting
the privilege. *Landry*, 204 F.3d at 1136.

14

or circumvent enhanced airline screening or border inspection procedures, thus increasing the individual's ability to commit an act of terrorism. *See id.* ¶¶ 32-35.[9]

Revelation that an individual was on a watchlist could also provide the individual, and/or the associated terrorist group, "with the ability to identify the specific means by which the U.S. Government gathered information about them, thereby endangering classified or law enforcement sensitive sources and methods." *See id*. ¶ 33.  The No Fly List and the larger TSDB are effective tools in the government's counterterrorism efforts in part because their contents are not disclosed. *See id.* ¶ 40.  This means that neither confirming nor denying an individual's status on the watchlist is in the best interests of national security.  *Id*. ¶¶ 34-36.

For the same reasons, confirmation that an individual was not on the No Fly List, or similar government watchlist, would also result in harms to national security and law enforcement interests.  As Ms. Lubman explains, confirming that an individual is not in the TSDB "would substantially harm law enforcement investigative and intelligence gathering interests because such knowledge would serve to encourage the commission of an act of terrorism and lead someone intent on committing an act of terrorism to move without detection." *Id*. ¶ 35.  In other words, if members of a terrorist group knew which of its members had evaded "the attention of law enforcement and intelligence investigations," then this would permit them "to manipulate the system and provide an

---

[9] TSC has provided examples of when this type of disclosure has caused national security and law enforcement harm.  "[O]ngoing FBI national security investigations have been harmed when a known or suspected terrorist has learned that he or she is included in the TSDB and/or is the subject of a national security investigation.  Release of this information has compromised ongoing surveillance efforts to gather information about the individual and has also resulted in FBI agents, whose identities had become known to the subject, being placed in personal danger." Lubman Decl. ¶ 32.

15

incentive for them to prepare for and commit an act of terrorism prior to being detected."
*Id*. ¶ 35.

For all these reasons, the government has a significant interest in protecting against the disclosure of watchlist status.  As the Fifth Circuit has noted, the justification for the law enforcement privilege is particularly compelling where "the compelled production of government documents could impact highly sensitive matters relating to national security."  *In re U.S. Dep't of Homeland Security*, 459 F.3d 565, 569 (5th Cir. 2006); *cf. Tooley v. Bush*, Case No. 06-cv-00306 (CKK), 2006 WL 3783142, at *20 (D.D.C. Dec. 21, 2006), *aff'd*, *Tooley v. Napolitano*, 586 F.3d 1006 (D.C. Cir. 2009) ("[I]f TSA were to confirm in one case that a particular individual was not on a watch list, but was constrained in another case merely to refuse to confirm or deny whether a second individual was on a watch list, the accumulation of these answers over time would tend to reveal [sensitive security information].") (internal citations omitted); *cf. also Barnard v. DHS*, 531 F. Supp. 2d 131, 134 (D.D.C. 2008) (upholding withholding of records in response to plaintiff's request to "obtain records related to him that could explain why he has been detained, questioned, and/or searched in airports during and after his international trips beginning in January 2003").

In contrast to the importance of protecting watchlist status and the harms that could result to law enforcement operations and counterterrorism efforts from its disclosure, Plaintiffs have not demonstrated a compelling need for this information that it would offset the need to protect it from disclosure.[10]  Certainly, in the context of

---

[10] Plaintiffs' only purported need for their watchlist status is for use in motions practice concerning their attendance at depositions.  Disclosure of their status will have no practical effect on their ability to attend depositions.  Plaintiffs are non-resident aliens

determining whether DHS's *Touhy* denial was arbitrary and capricious, the record is sufficient for the Court to conclude that DHS acted reasonably in asserting the law enforcement privilege in response to these requests.

Nor is a protective order a solution to protect the Government's interests, as Plaintiffs suggest. MTC at 9.[11] The disclosure of sensitive law enforcement information, even pursuant to a protective order, is nonetheless a disclosure of sensitive information to parties outside the government that still can result in significant harms to the government interests identified herein. *See id.* ¶ 43. At the least, such a disclosure would alert the very parties in interest to their watchlist status, and result in the precise harms identified by the Government, even if that information is not disclosed publicly. *See id.*

Also, the use of protective order procedures can result in broader inadvertent disclosures of properly privileged information. As noted in the Lubman Declaration, "the risks of inadvertent or wrongful disclosure of Law Enforcement Sensitive information are too great to justify providing the requested information." *Id*. Once this kind of information is disclosed, even inadvertently, investigative interests can suffer because "[t]argets and associates may change activity to the detriment of investigative interests,

---

who filed civil suits in the United States; because there is no entitlement to a visa or a right to fly, when Plaintiffs filed suit in this district they took the risk that they might be unable to travel to the United States for discovery or trial.

[11] The Supreme Court recently addressed a somewhat similar issue in *Clapper v. Amnesty International USA*, 133 S. Ct. 1138 (2013). There, it was suggested that the government could confirm to the court whether it was intercepting certain persons' communications, in order to help resolve whether standing existed in the case. *Id.* at 1149. The Supreme Court rejected that argument, for reasons not relevant here, but went on to say that the use of a protective order would fail to safeguard national security interests because the government's disclosure in such circumstances would still have the effect of revealing to an individual "whether his name was on the list of surveillance targets." *Id.* at 1149 n.4. That is true here, as well. No matter what the terms of any protective order, the purpose of Plaintiffs' request is to ensure that the information is disclosed.

sources may become isolated from collaborators, or a rise in disinformation from sources or suspects may occur." *Id.*   Indeed, "the U.S. Government may never know if its operations have even been compromised by an inadvertent or unauthorized disclosure of that information." *Id.*[12]  As a result, the Court should find that DHS's decision to deny Plaintiffs' subpoena requests regarding watchlist status was neither arbitrary nor capricious.[13]

---

[12] And, as is evident in this very litigation, inadvertent disclosures do occur despite the best of intentions. *See*, *e.g.*, Def's Emergency Mot., Dkt. No. 220 (moving to replace information designated as subject to the protective order that was inadvertently included in a prior filing); Government's Emergency Mot., Dkt. No. 294 (same).

[13] In the event the Court determines that DHS' denial of this request was arbitrary and capricious and the watchlisting status is disclosed, and in the event that any of the Plaintiffs are on the No Fly List, any challenge by Plaintiffs to that status would be heard in the court of appeals and not the district court. *See Mohamed v. Holder*, 1:11-cv-0050 (AJT/TRJ), 2011 WL 3820711 (E.D. Va. Aug. 26, 2011) (unpublished opinion) (finding that any challenge to placement on the No Fly List must be heard in the court of appeals). *But see Ibrahim v. DHS*, 669 F.3d 983, 991 (9th Cir. 2012).

In the meantime, the Government understands that Plaintiffs have recently filed a complaint with DHS Traveler Redress Inquiry Program (DHS TRIP) about being denied boarding.  In responding to this complaint, if the applicable DHS component determines that the complainant is an exact or near match to an identity in the TSDB, the matter is referred to the TSC Redress Unit.  Lubman Decl. ¶ 25.  The TSC Redress Unit will also review the available information to determine whether the DHS TRIP complainant is an exact match to a TSDB identity, and if so, whether the individual's status should be modified.  *See id*.  As part of this process, TSC contacts the agency that originally nominated the individuals for placement in the TSDB and determines whether their current status in the TSDB is suitable based on the most "current, accurate, and thorough information available."  *See id.*  ¶ 26.  The TSC Redress Unit then makes a determination as to whether any adjustment in the individual's status, including modification or removal, is required and informs DHS TRIP accordingly.  *See id*. ¶¶ 27-28.  DHS TRIP subsequently sends a determination letter to the complainant.  *See id*. ¶ 28.  Pursuant to the government's current *Glomar* policy, however, the letter does not confirm or deny whether the individual is in the TSDB, or on the No Fly subset list.  *See id*.  Judicial review of the decisions reflected in the letters is available in the Courts of Appeal pursuant to 49 U.S.C. § 46110.

**B.      Subpoena requests one and four for information underlying watchlist status seek information that is classified.**

Plaintiffs also request all information that served as the basis for Plaintiffs' watchlist status, if any.  DHS responded by stating that "[s]ince DHS can neither confirm nor deny whether any individual was or is on the 'No Fly List' or any other government security list, it is likewise unable to produce any records or communications that might relate to any individual's inclusion on such lists."  MTC, Ex. C, at 3.  Because such information, if it exists, is SSI and law enforcement sensitive, DHS's response was not arbitrary or capricious for the reasons explained above.

Furthermore, if information responsive to this part of Plaintiffs' subpoena did exist, that information is "typically based on classified and/or law enforcement sensitive information, including information obtained from confidential sources, various types of surveillance, and/or other extremely sensitive sources and methods."  Lubman Decl. ¶ 37.  Plaintiffs have not challenged DHS's separate judgment that any underlying information responsive to the request that might exist would be properly protected from disclosure because it would be classified information.  *See* MTC; *see also* MTC, Ex. C, at 3 (noting that any underlying information, if it exists, would be "national security information").  As such, Plaintiffs have waived any challenge to DHS's denial on those grounds.  To be sure, even if Plaintiffs had made such an argument, the judgment by DHS under its *Touhy* regulations that such sensitive information could not be produced would also be entirely reasonable.  *See* 6 C.F.R. § 5.48(b)(3) (stating that "compliance will not ordinarily be authorized" when it would "reveal information properly classified in the interests of national security").

19

Plaintiffs are not entitled to have access to classified information, and it would not be appropriate for the Court to order such a disclosure.  As a general matter, the authority to determine who may have access to classified information "is committed by law to the appropriate agency of the Executive Branch." *Department of the Navy v. Egan*, 484 U.S. 518, 527 (1988).  The grant of a security clearance requires a favorable determination by the Executive branch that an individual is trustworthy for access to classified information and, in addition, a separate determination by an official within the Executive branch that an individual has a demonstrated "need to know" classified information—that is, "requires access to specific classified information in order to perform or assist in a lawful and authorized governmental function."  *See* Exec. Order No. 13,526, 2009 WL 6066991, 75 FR 707 (Dec. 29, 2009), §§ 4.1(a)(3), 6.1(dd).  Moreover, information is identified as classified precisely because its disclosure reasonably could be expected to harm the national security of the United States.   *See* Exec. Order No. 13,526, § 1.2.

The decision by DHS to protect classified information is plainly well-founded.  As explained by the TSC declaration, disclosure of any underlying classified information (if it exists) "would compromise ongoing or future intelligence or law enforcement operations."  Lubman Decl. ¶ 37.  For example, disclosing underlying information to individuals on a No Fly List, whose appearance on the list means that the United States reasonably suspects them to be associated with terrorism, could "inform[] targets of the U.S. Government's range of intelligence capabilities, . . . encourag[e] the development of countermeasures," and ultimately "eliminate any . . . operational advantages that the government has in its investigations."  *Id.* ¶ 37, 39.  In the context of challenging a decision under an agency's *Touhy* regulations denying access to classified information,

the Government need only show that it was reasonable to decline to produce information where disclosure would harm national security. *See* Opposition by the United States to Defendant's Motion to Compel Unredacted Copies of Government Reports Concerning Detainee Abuse at Abu Ghraib, at 8-11, Dkt. No. 324 (arguing that, in the *Touhy* denial context, as in the Freedom of Information Act context, it is entirely proper for the government to withhold classified information.

For these reasons, this Court should find that DHS's decision to neither confirm nor deny whether underlying information existed was not arbitrary and capricious. Alternatively, this Court should find that DHS reasonably asserted that the requested information, if it exists, would be law enforcement sensitive and/or classified and thus protected from disclosure.

**C.  Subpoena request five for communications between CACI and DHS was properly denied because, among other things, a search for responsive material would be unduly burdensome.**

This Court should find that it was not arbitrary and capricious for DHS to refuse to search through all communications for the last thirteen months between any DHS employee and any CACI employee, agent, or attorney to find and then produce any communications that relate to Plaintiffs. Plaintiffs have waived their challenge to this *Touhy* denial. Although they quote this fifth request in full in the "Relevant History" section of the MTC, *see* MTC at 2, 4, nowhere in their brief do Plaintiffs even begin to argue why DHS's denial of that request was arbitrary and capricious. By failing to address the merits of that decision in this motion, Plaintiffs have waived any opportunity to challenge this *Touhy* determination.

21

Moreover, even if they have not waived any challenge to the decision, it was not arbitrary and capricious for DHS to determine that Plaintiffs' request would unduly burden[]" the Department.[14]  MTC, Ex. C, at 4.  DHS's decision relied on an explicit factor set forth in its own *Touhy* regulations, *see* 6 C.F.R. § 5.48(a)(1), and merely states the obvious: the request purports to require a search of all written communications for a thirteen month period between any CACI entity (their employees, agents, and attorneys) and any DHS employee across twenty-six operational and support components.  *See* Ex. 3, Declaration of Vince N. Micone III,  ¶ 3.

Given that DHS employs almost a quarter of a million people across fifty states and around the world and also contracts with CACI (so that communications between CACI and DHS employees would yield many documents to review for references to Plaintiffs), DHS concluded it would be unduly burdensome.  *See id.* ¶¶ 4-6.  But even, as the Micone Declaration notes, if the search and review was limited to the components most likely to possess the type of information that Plaintiffs request, the time consumed would still be unduly burdensome.  *Id.* ¶ 6.

Weighed against the undue burden involved in responding to Plaintiffs' request is the reality of the "current fiscal environment" and the need for DHS to discharge its primary missions of protecting "our country from threats to the homeland," securing our borders, and responding to natural disasters.  *See id.* ¶ 7; *see also* 6 U.S.C. § 111(b) (enumerating DHS's primary mission).  DHS determined that the burden of responding to this request would exacerbate the current fiscal constraints on the government by diverting many personnel away from their official business for a significant period of

---

[14] If the request was not unduly burdensome, DHS reserves the right to assert applicable privileges over any documents that might be responsive to this subpoena request.

time for private purposes and cause an adverse effect on the Department's ability to fulfill its primary missions. *See id.* ¶ 7. The Fourth Circuit has recognized that, in cases in which the United States is not a party, a federal agency or department has a compelling interest in conserving agency resources by declining to participate in discovery. *See, e.g.,* *Boron Oil Co. v. Downie*, 873 F.2d 67, 70 (4th Cir. 1989) (recognizing the compelling interests agencies have in being able to conduct their official business without the distractions of significant involvement in private litigation).

In denying this request, DHS also took into account the cumulative burden on the Department if it were to respond to similarly broad requests made by various other litigants in cases around the country. *Id.* This is also an entirely appropriate consideration. *See COMSAT*, 190 F.3d at 277-78 (noting that the "limitless number of private litigants . . . and the potential cumulative burden" are a public interest "entirely reasonable" for the agency to consider); *Spence*, 530 F. Supp. 2d at 745 ("To effectively further [the government's] interest [in conserving resources], federal agencies must be permitted to consider the precedential effects of granting individual discovery requests.").

As a corollary to the decision with regard to burden, [15] denying the request was also not arbitrary and capricious in light of the fact that Plaintiffs failed to explain the

---

[15] It was also not arbitrary and capricious for DHS to determine that it would not conduct the search without more information. MTC, Ex. C at 3. Section 5.45 instructs the requester to "provide a description [of the requested documents] using the types of identifying information suggested in § 5.3(b)." 6 C.F.R. § 5.45(a). Section 5.3(b) indicates that the requester "must describe the records . . . in enough detail to enable Department personnel to locate them with a reasonable amount of effort. Whenever possible, your request should include specific information about each record sought, such as the date, title or name, author, recipient, and subject matter of the record." *Id.* § 5.3(b). DHS concluded that it "lack[ed] sufficient information to respond to this request." MTC, Ex. C, at 3. This determination is not arbitrary or capricious because, by not identifying any specific communications sought, Plaintiffs failed to limit the search to any particular

23

relevance of the requested information. DHS's *Touhy* regulations specifically state that the requester "must set forth in writing, and with as much specificity as possible, the nature and relevance of the official information sought." 6 C.F.R. § 6.45(a). Plaintiffs did not. DHS's denial letter objected generally that "[y]our request does not describe the relevance of the information sought," MTC Ex. C, at 2, and this failure was most evident with regard to this request. It was entirely proper for DHS to take this lack of any articulated relevance of the requested information into consideration when deciding whether to commit its scarce resources to conduct a search. Similarly, it was neither arbitrary nor capricious to decline to undertake the burden of searching for responsive information when the request was for communications involving CACI, the adverse party in this case which would be—without a comparable burden— in a better position to know whether, when, and with whom its employees, agents, and attorneys communicated with regard to Plaintiffs.

As a result, this Court should find that DHS's conclusion that complying with this subpoena request would be unduly burdensome was neither arbitrary nor capricious.

## V.   CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Compel should be denied.

Dated: May 8, 2013

---

components within DHS so that, in order to comply, DHS may have had to search all twenty-six of its operational and support components. *See* Micone Decl. ¶ 3. Whatever the ultimate burden of doing so, it is not arbitrary and capricious for DHS to determine that it could not, without further information, locate any responsive documents with only a "reasonable amount of effort." 6 C.F.R. § 5.3(b) (emphasis added).

Respectfully submitted,

STUART F. DELERY
Acting Assistant Attorney General

NEIL H. MacBRIDE
United States Attorney

/s/_____
R. JOSEPH SHER
Assistant United States Attorney
Deputy Chief, Civil Division
Office of the United States Attorney
Justin W. Williams U.S. Attorney's Building
2100 Jamieson AVE
Alexandria VA 22314
Telephone: (703) 299-3747
Facsimile: (703) 299-3983

JOSEPH H. HUNT
Branch Director
ARTHUR R. GOLDBERG
Assistant Branch Director
ERIC J. SOSKIN (PA Bar 200663)
SCOTT LEVIN
RODNEY PATTON
SEAN O'DONNELL
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
Tel: (202) 353-7919
Fax: (202) 305-2685
Email: Rodney.Patton@usdoj.gov
Attorneys for the United States

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of May, 2013, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

George Brent Mickum IV
Law Firm of George Brent Mickum IV
5800 Wiltshire Drive
Bethesda, Maryland 20816
gbmickum@gmail.com

Susan L. Burke
Burke PLLC
1000 Potomac Street, N.W.
Washington, D.C. 20007
(215) 487-6596 – telephone
sburke@burkeoneil.com

J. William Koegel, Jr.
Virginia Bar No. 38243
John F. O'Connor
Attorneys for Defendant
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000 – telephone
wkoegel@steptoe.com
joconnor@steptoe.com

Dated:  May 8, 2013


_____/s/_____
R. JOSEPH SHER
Assistant United States Attorney
Deputy Chief, Civil Division
Office of the United States Attorney
Justin W. Williams U.S. Attorney's Building
2100 Jamieson AVE
Alexandria VA 22314
Telephone: (703) 299-3747
Facsimile: (703) 299-3983

26