IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

|  |  |  |
|---|---|---|
| SUHAIL NAJIM ABDULLAH<br>AL SHIMARI, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 1:08-cv-827 (GBL/JFA) |
| v. | ) | |
| | ) | |
| CACI INTERNATIONAL, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Defendant CACI Premier Technology, Inc.'s ("CACI PT") Motion for Reconsideration, or in the alternative Motion to Dismiss Plaintiffs' Alien Tort Statute Claims (Doc. 354), and Motion to Dismiss Plaintiffs' Third Amended Complaint for Failure to State a Claim (Doc. 363). This case concerns the civil tort claims of four Iraqi citizens alleging that CACI PT, a United States military government contractor, abused and tortured them during their detention in Abu Ghraib, Iraq. Plaintiffs bring their claims under common law and international law, the latter by virtue of the Alien Tort Statute ("ATS"). There are three issues before the Court.

The first issue is whether the Court has subject matter jurisdiction, by operation of the ATS, over Plaintiffs' claims of violations of international law against CACI PT for torture, war crimes, and inhuman treatment resulting from injuries occurring in Abu Ghraib. In light of the United States Supreme Court's decision in *Kiobel v. Royal Dutch Petroleum*, 133 S. Ct. 1659 (2013), the Court holds that it lacks ATS jurisdiction over Plaintiffs' claims because the acts giving rise to their tort claims occurred exclusively in Iraq, a foreign sovereign. As the Court held in *Kiobel*, the presumption against extraterritorial application applies to the ATS. Here,

because Plaintiffs complain of injuries sustained on foreign soil, the Court cannot apply the ATS extraterritorially to extend jurisdiction over Plaintiffs' claims. *Kiobel* precludes such a result. Therefore, Plaintiffs' claims under the ATS are dismissed for want of jurisdiction.

The second issue is whether the Court will apply Ohio, Virginia, or Iraqi law to Plaintiff Al Shimari's common law claims where Al Shimari filed suit in Ohio against a Virginia corporation for acts and injuries occurring in Iraq during a multinational occupation of Iraq. The Court holds that Iraqi law governs Al Shimari's common law claims. The Court invokes Ohio's choice-of-law analysis, as Al Shimari's claims were originally filed in Ohio and are thus governed by Ohio law. Ohio applies the law of the place of injury unless certain factors demonstrate that another state holds a more significant relationship to the claims. Here, Iraq is the place of injury, and neither Virginia nor Ohio holds a more significant relationship to Al Shimari's injuries. Therefore, the Court applies Iraqi law when evaluating Al Shimari's common law claims.

The third issue is whether the Court should grant CACI PT's Motion to Dismiss for failure to state a claim under Iraqi law where Al Shimari presents various common law claims for actions occurring in Iraq, which was governed by laws promulgated by the Coalition Provisional Authority ("CPA"), during occupation by a multinational force. The Court holds that Al Shimari fails to state a claim under Iraqi law because the law governing Iraq at the time of injury precludes both liability under Iraqi law and the application of law from a jurisdiction within the United States to CACI PT's actions. The relevant regulations provided immunity from suit to contractors for activities related to the terms and conditions of their contracts. Furthermore, the regulations also provided that personal injury suits would be governed by the law of the state from which the contractor was sent only if the alleged injury was not connected

2

to military combat operations. Here, CACI PT's actions—detention and interrogation—were all related to its contractual duties as a United States military contractor and connected to military combat operations in Iraq. Accordingly, Al Shimari's common law claims against CACI PT are dismissed.

## I.    BACKGROUND and PROCEDURAL HISTORY

The long and intricate history of this case bears little mention. The pendency of this litigation approaches its fifth anniversary, and its procedural posture results from multiple transfers from various district courts, case consolidation, and numerous pretrial motions, including dispositive motions to dismiss various parties and claims, which have resulted in multiple decisions of this Court. *See Al Shimari v. CACI Int'l, Inc.*, 1:08-CV-00827, 2013 WL 1234177 (E.D. Va. Mar. 19, 2013); *Al Shimari v. CACI Premier Tech., Inc.*, 657 F. Supp. 2d 700 (E.D. Va. 2009); *Al Shimari v. CACI Int'l*, 1:08-CV-00827, 2008 WL 7348184 (E.D. Va. Nov. 25, 2008). The case has also twice been before the United States Court of Appeals for the Fourth Circuit and remanded to this Court. *See Al Shimari v. CACI Int'l, Inc.*, 658 F.3d 413 (4th Cir. 2011), *vacated*, 679 F.3d 205 (4th Cir. 2012) (en banc). For the sake of brevity and clarity, the Court will only recite the relevant factual background and procedural history necessary to resolve the present Motions.

Plaintiffs Suhail Najim Abdullah Al Shimari, Taha Yaseen Arraq Rashid, Asa'ad Hamza Hanfoosh Al-Zuba'e, and Salah Hasan Nsaif Jasim Al-Ejaili are Iraqi citizens. (3d Am. Compl. ¶¶ 4-7, Doc. 254.) Plaintiffs bring this action against CACI PT, alleging physical and mental injuries resulting from abuse and torture, including food deprivation, forced nudity, beatings, electric shocks, sensory deprivation, extreme temperatures, death threats, oxygen deprivation, sexual assaults, and mock executions. (*Id.* ¶¶ 23-77.) Plaintiffs claim that all of the alleged acts

3

occurred while being interrogated as suspected enemy combatants by CACI PT and the United States military at military detention centers within a complex located in Abu Ghraib, Iraq between September 22, 2003, and May 6, 2005, a period corresponding to the Abu Ghraib prison abuse scandal.  (*Id.* ¶¶ 24-77.)  At various times between 2004 and 2008, all four Plaintiffs were released from custody without being charged with any crime.  (*Id.* ¶¶ 38, 58, 66, 77.)

On June 30, 2008, Plaintiff Al Shimari filed this action against CACI International, Inc. ("CACI, Inc."), a Delaware corporation with its headquarters in Arlington, Virginia, and CACI PT, its wholly-owned subsidiary also located in Arlington, Virginia.  (*See* Doc. 2.)   The remaining Plaintiffs joined the action on September 18, 2008.  (*See* Doc. 28.)  Both CACI PT and CACI, Inc. are corporations that contractually provided interrogation services for the United States military at Abu Ghraib during the period in question.  (3d Am. Compl. ¶¶ 10, 14.)  Specifically, beginning in September 2003, CACI PT provided civilian interrogators for the U.S. Army's military intelligence brigade assigned to the Abu Ghraib prison.  (*Id.* ¶¶ 14-16.)  Plaintiffs seek to impose liability in common law tort and under international customary law, asserting jurisdiction under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1332 (diversity), 28 U.S.C. § 1350 (ATS), and 28 U.S.C. § 1367 (supplemental jurisdiction).  (*Id.* ¶ 2.)  Plaintiffs' Third Amended Complaint alleges twenty (20) causes of action including torture; civil conspiracy to commit torture; aiding and abetting torture; cruel, inhuman, or degrading treatment; and war crimes.  (*Id.* ¶¶ 210-313.)

On March 18, 2009, the Court denied a motion to dismiss Plaintiffs' state law claims, rejecting the argument that such claims were preempted or that CACI PT and CACI, Inc. were entitled to some novel form of derivative sovereign immunity for their conduct. *See Al Shimari*, 657 F. Supp. 2d at 731-32.  The Court, however, declined to exercise jurisdiction over Plaintiffs'

ATS claims, reasoning that, "tort claims against government contractor interrogators are too modern and too novel to satisfy the *Sosa* [*v. Alvarez-Machain*] requirements for ATS jurisdiction." *Id.* The Court noted that *Sosa v. Alvarez Machain*, 542 U.S. 692 (2004), instructs federal courts to dismiss claims "for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted," and to be cautious "when recognizing additional torts under the common law that enable ATS jurisdiction." *Al Shimari*, 657 F. Supp. 2d at 726-27 (quoting *Sosa*, 542 U.S. at 729) (internal quotation marks omitted). The Court, however, did not address the question of whether war crimes; torture; and cruel, inhuman, and degrading treatment are sufficiently universal and obligatory international law norms to meet the *Sosa* standard. Instead, the Court reasoned that the status of CACI PT and CACI, Inc.—private contractors—impacted the analysis and ruled that claims against "government contractors under international law . . . are fairly modern and therefore not sufficiently definite among the community of nations, as required under *Sosa*." *Id.* at 726. The Court noted that, "the use of contractor interrogators is a recent practice," and concluded that to extend ATS jurisdiction over claims brought against CACI PT and CACI, Inc. would be an imprudent exercise of "recognizing new torts." *Id.* at 727-28.

On September 21, 2011, a divided Fourth Circuit panel reversed the ruling denying the motion to dismiss, reasoning that CACI PT and CACI, Inc. should be immune from liability by virtue of their integration into military combatant activities. *Al Shimari*, 658 F.3d at 420. On May 11, 2012, the Fourth Circuit sitting en banc vacated the panel decision, finding that the court lacked jurisdiction over CACI PT and CACI, Inc.'s appeal from this Court. *Al Shimari*, 679 F.3d at 224. On May 31, 2012, CACI PT and CACI, Inc. moved to stay the Fourth Circuit's

mandate, claiming they intended to file a petition for certiorari to the United States Supreme Court. The Fourth Circuit stayed its mandate on June 1, 2012 but issued the final mandate on June 29, 2012.

On remand, the Court decided three significant motions affecting the procedural posture of this case. First, the Court considered and granted Plaintiffs' motion seeking the reinstatement of their Alien Tort Statute claims. (*See* Doc. 159.) Second, the Court considered and granted CACI PT and CACI Inc.'s motion to dismiss Plaintiffs' conspiracy claims for a failure to sufficiently allege a conspiracy between (a) CACI PT and its parent company, CACI, Inc.; (b) CACI PT and its employees; and (c) CACI PT and the United States military. (Order, March 8, 2013, Doc. 215.) Accordingly, all claims involving CACI, Inc. and conspiracy claims related to a conspiracy between CACI PT and its employees were dismissed with prejudice, thereby removing CACI, Inc. from the case entirely. (*See id.*) On March 19, 2013, the Court granted Plaintiffs leave to file a Third Amended Complaint on the condition that Plaintiffs could only add allegations related to the alleged conspiracy between CACI PT and the United States military ("March 19 Order"). (Order, March 19, 2013, Doc. 227.) Third, the Court considered and granted CACI PT and CACI, Inc.'s motion for reconsideration of the Court's November 25, 2008 Order, in which the Court denied CACI PT and CACI, Inc. partial summary judgment by way of their argument that three of the plaintiffs' common law claims were barred by Virginia's statute of limitations. In reconsidering the November 25, 2008 Order, the Court dismissed the three plaintiffs' common law claims, leaving only the common law claims of Plaintiff Al Shimari and the ATS claims of all four Plaintiffs. *See Al Shimari*, 2013 WL 1234177, at *6-9.

Plaintiffs filed their Third Amended Complaint on April 4, 2013. (Doc. 254.) CACI PT soon thereafter filed motions to strike and dismiss. (*See* Docs. 300, 312.) CACI PT's motion to

strike sought to remove allegations that did not comply with the Court's March 19, 2013 Order, including allegations of injuries not previously alleged as well as allegations about the relationship between CACI PT and its parent company, CACI, Inc., who was dismissed from the case with prejudice. (*See* Doc. 300.) CACI PT's motion to dismiss focused on the plausibility of Plaintiffs' conspiracy claims. (Doc. 312.)

Prior to hearing those motions filed in the wake of Plaintiffs' Third Amended Complaint, the Supreme Court issued its decision in *Kiobel v. Royal Dutch Petroleum*, addressing the application of the Alien Tort Statute to acts occurring on foreign soil. *See* 133 S. Ct. 1659. In light of this decision and its potential to affect the Court's subject matter jurisdiction over the case, the Court stayed all pending motions as of April 18, 2013 and ordered briefing on the following issues: (1) the effect, if any, of *Kiobel* on Plaintiffs' claims asserted under ATS jurisdiction; and (2) whether the Court retains jurisdiction over Plaintiff Al Shimari's common law claims and the choice-of-law determination on those claims. (Doc. 349.) These issues, including the stayed motions, were to be argued orally on May 10, 2013.[1]

In accordance with the Court's Order, CACI PT filed (1) a Motion for Reconsideration, or in the Alternative Motion to Dismiss for Lack of Subject Matter Jurisdiction and (2) a Motion to Dismiss Plaintiff Al Shimari's common law claims. (Docs. 354, 363.) Oral argument was heard on these motions on May 10, 2013. Due to the potentially dispositive effect of each of these motions, the Court stayed all other pending motions, including those filed after April 18,

---

[1]    The Court also directed a briefing schedule for CACI PT's renewed motion for sanctions related to Plaintiffs' failure to appear for depositions. CACI PT filed its motion for sanctions on April 29, 2013 and oral argument was heard on that motion on May 10, 2013. (*See* Docs. 367-68, 433-34.) However, because the resolution of CACI PT's motions to dismiss disposes of the case, the Court does not reach the merits of CACI PT's motion for sanctions.

2013. (*See* Order, May 9, 2013, Doc. 433.)  Having considered oral argument and the extensive

briefing on these motions, the Court now issues its ruling.

## II.   STANDARD OF REVIEW

### A.   12(b)(1) Standard of Review[2]

Federal Rule of Civil Procedure 12(b)(1) allows a defendant to move for dismissal where

the court lacks jurisdiction over the subject matter of the action.  Fed. R. Civ. P. 12(b)(1).  Where

a federal court finds subject matter jurisdiction lacking, it must dismiss the case.  *Arbaugh v.*

*Y&H Corp.*, 546 U.S. 500, 514 (2006); *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 301 (4th Cir.

2009) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)).  In considering a

12(b)(1) motion to dismiss, the plaintiff bears the burden to prove that federal subject matter

jurisdiction is proper.  *Warren v. Sessoms & Rogers, P.A.*, 676 F.3d 365, 371 (4th Cir. 2012)

(citing *U.S. ex. rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009)).  A defendant may use

a 12(b)(1) motion to present a facial attack upon the complaint where the complaint "fails to

allege facts upon which subject matter jurisdiction can be based."  *Kerns v. United States*, 585

F.3d 187, 192 (4th Cir. 2009) (quoting *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982))

(internal quotation marks omitted).  In such a case, the Court assumes the truth of all facts

alleged by the plaintiff.  *Id.* (quoting *Bain*, 697 F.2d at 1219).

The ATS is jurisdictional in nature.  *Yousuf v. Samantar*, 552 F.3d 371, 374-75 (4th Cir.

2009) (citing *Sosa v. Alvarez-Machain*, 542 U.S. 692, 724 (2004)), *aff'd*, 560 U.S. 305 (2010).  It

is therefore subject to challenge by a 12(b)(1) motion.  *See, e.g.*, *Ali v. Rumsfeld*, 649 F.3d 762,

775 (D.C. Cir. 2011) (finding a 12(b)(1) motion the appropriate vehicle for ATS dismissal).  The

---

[2]      CACI PT filed its Motion as one for reconsideration, or in the alternative to dismiss for
lack of subject matter jurisdiction.  Because the merits of CACI PT's motion concern the Court's
jurisdiction under the ATS, a jurisdictional statute, the Court reviews the Motion under the
12(b)(1) standard.

ATS confers jurisdiction upon federal courts to hear a "very limited category" of claims presented by aliens for violating the law of nations. *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 395 (4th Cir. 2011) (quoting *Sosa*, 542 U.S. at 712). Where a party challenges jurisdiction under the ATS, courts must determine whether the plaintiff is an alien who has properly stated a claim for a tort in violation of international customary law. *In re XE Servs. Alien Tort Litig.*, 665 F. Supp. 2d 569, 589 (E.D. Va. 2009) (citing *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1270 (11th Cir. 2009)); *cf. Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 619 (S.D.N.Y. 2012) (explaining that the court has subject matter jurisdiction under the ATS only where the plaintiff sufficiently alleges the elements of an ATS claim).

### B.     12(b)(6) Standard of Review

A Federal Rule of Civil Procedure 12(b)(6) motion should be granted unless the complaint "state[s] a plausible claim for relief" under Rule 8(a). *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (internal quotation marks omitted) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). A claim is facially plausible where the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 554 (4th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678) (internal quotation marks omitted). Thus, surviving a Rule 12(b)(6) motion requires that the complaint contain sufficient factual allegations, taken as true, "to raise a right to relief above the speculative level" and "nudg[e] [the] claims across the line from conceivable to plausible." *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 543 (4th Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)) (internal quotation marks omitted). The plausibility requirement imposes not a probability requirement, but rather a mandate that a plaintiff "demonstrate more than 'a sheer possibility that a defendant

has acted unlawfully.'" *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). Accordingly, a complaint is insufficient if it relies upon "naked assertions" and "unadorned conclusory allegations" devoid of "factual enhancement." *Id.* (citing *Iqbal*, 556 U.S. at 678 and *Twombly*, 550 U.S. at 557).

In considering a Rule 12(b)(6) motion, the Court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). In addition to the complaint, the Court may also examine "documents incorporated into the complaint by reference." *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 176 (4th Cir. 2009) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). However, the Court "need not assume the veracity of 'bare legal conclusions'" offered in the complaint or incorporated sources. *Burnette v. Fahey*, 687 F.3d 171, 180 (4th Cir. 2012) (quoting *Aziz*, 658 F.3d at 391). Nor is the Court obligated to assume the veracity of the legal conclusions drawn from the facts alleged. *Adcock v. Freightliner LLC*, 550 F.3d 369, 374 (4th Cir. 2008) (citing *Dist. 28, United Mine Workers of Am., Inc. v. Wellmore Coal Corp.*, 609 F.2d 1083, 1085-86 (4th Cir. 1979)). Thus, the Court's review involves the separation of factual allegations from legal conclusions. *Burnette*, 698 F.3d at 180. After such separation, the Court will grant a 12(b)(6) motion to dismiss unless the complaint presents sufficient non-conclusory factual allegations to support reasonable inferences of the plaintiff's entitlement to relief and the defendant's liability for the unlawful act or omission alleged. *See Giacomelli*, 588 F.3d at 196-97 (citing *Iqbal*, 556 U.S. at 678-79 and *Gooden v. Howard Cnty., Md.*, 954 F.2d 960, 969-70 (4th Cir. 1992) (en banc)).

### III.   DISCUSSION

The Court grants CACI PT's motions to dismiss.   First, the Court concludes that it lacks subject matter jurisdiction over all claims brought pursuant to the ATS because the ATS cannot be extraterritorially applied to Plaintiffs' claims.   Second, the Court holds that the law of Iraq, the place of injury, applies to Plaintiff Al Shimari's common law claims.   Third, the Court concludes that the governing law during the relevant time period precludes both liability under Iraqi law and the application of domestic law to CACI PT's actions.   Therefore, Plaintiffs' Third Amended Complaint is dismissed.

### A.   CACI PT's Motion to Dismiss Plaintiffs' ATS Claims

The Court grants Defendant's Motion to Dismiss and holds that it lacks subject matter jurisdiction over Plaintiffs' ATS claims because, as held in *Kiobel*, the acts and injuries giving rise to their claims cannot support ATS jurisdiction.

The ATS is a jurisdictional statute, enacted by the First Congress as part of the Judiciary Act of 1789, providing that "district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."   28 U.S.C. § 1350.   The ATS provides no independent cause of action but provides district courts with jurisdiction over tort claims arising from violations of international law. *Sosa*, 542 U.S. at 714.   As explained in *Kiobel*, Congress's motivation for enacting the ATS arose from violations of international law committed within the United States against foreign ambassadors.   *Kiobel*, 133 S. Ct. at 1666.   At the time, the "three principal offenses against the law of nations" were "violation of safe conducts, infringement of the rights of ambassadors, and piracy."   *Id.* (citing *Sosa*, 542 U.S. at 723-24).   To date, courts interpret the statute as a vehicle for bringing private claims for those violations of international law that contain the requisite

11

"definite content and acceptance among civilized nations." *Id.* at 1670.  Since *Sosa*, ATS jurisprudence turns on whether, and under what circumstances, certain acts constitute violations under its litmus.  *Compare Vietnam Ass'n for Victims of Agent Orange v. Dow Chemical Co.*, 517 F.3d 104 (2d Cir. 2008) (manufacture and supply of herbicidal agent used for defoliation of crops did not constitute a violation of an international norm), *with Abdullah v. Pfizer*, 562 F.3d 163 (2d Cir. 2009) (nonconsensual human medical experimentation is a recognized prohibition in customary international law).  Not until recently has the extraterritorial reach of the ATS been challenged.

On April 17, 2013, the Supreme Court issued its landmark decision in *Kiobel*.  The issue in *Kiobel* was whether and under what circumstances courts retain jurisdiction under the ATS over causes of action alleging violations of international law occurring in sovereign territories outside the United States.  133 S. Ct. at 1663.  *Kiobel* involved former Nigerian nationals, now residing in the United States, who filed suit under the ATS against Dutch, British, and Nigerian corporations for aiding and abetting the Nigerian government in committing various violations of the law of nations within Nigerian borders.  *Id.* at 1662-63.  The district court in *Kiobel* dismissed some of the plaintiffs' claims but otherwise denied the corporations' motions to dismiss the plaintiffs' complaint, recognizing that only those actions that are internationally recognized as violations of international customary law are actionable under the ATS.  *Id.* at 1663.  The Second Circuit affirmed the district court on other grounds, concluding that ATS claims against corporations were not actionable because the law of nations did not recognize corporate liability.  *Id.* (citing *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111 (2d Cir. 2010)).  The Supreme Court granted certiorari to answer the question of corporate liability, but,

12

following oral argument, directed the parties to submit additional briefing on the issue of whether the ATS confers jurisdiction over claims arising from tortious acts occurring abroad.  *Id.*

*Kiobel* rejected the extraterritorial application of the ATS.  In its decision, the Court relied upon a canon of statutory construction, which states that absent Congress's indication otherwise, there exists a presumption against extraterritorial application of federal statutes.  *Id.* at 1664.  The canon "provides that '[w]hen a statute gives no clear indication of an extraterritorial application, it has none . . . .'"  *Id.* (quoting *Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869, 2878 (2010)).  Recounting the purposes behind applying the presumption—the most important being international comity concerns—the Court explained that the principles underlying the presumption "similarly constrain[ed] courts considering causes of action that may be brought under the ATS."  *Id.* at 1664.

Having held that the presumption against extraterritoriality applies to ATS claims, the Court further held that the text of the ATS failed to rebut the presumption that the statute would not be extraterritorially applied.  *Id.*  "[T]o rebut the presumption, the ATS would need to evince a 'clear indication of extraterritoriality.'  It does not."  *Id.* at 1665 (internal citation omitted). *Kiobel* recognized that "nothing in the text of the [ATS] suggests that Congress intended causes of action recognized under it to have extraterritorial reach."  *Id.*  Therefore, because the alleged violations occurred exclusively outside the United States, the Court concluded that federal courts were not a proper forum for the plaintiffs' claims absent an indication of congressional intent for the ATS to apply to injuries occurring within the territory of another sovereign.  *Id.* at 1669. Thus, the Court affirmed dismissal of the plaintiffs' suit under the ATS.

The application of *Kiobel* to this case compels the dismissal of Plaintiffs' claims invoking international law for lack of subject matter jurisdiction.  As *Kiobel* explained, absent

congressional action, the ATS cannot provide jurisdiction for alleged violations of the law of nations where the alleged conduct occurred in territories outside the United States. *Id.* Here, as in *Kiobel*, Plaintiffs are barred from asserting ATS jurisdiction because the alleged conduct giving rise to their claims occurred exclusively on foreign soil. Plaintiffs allege that torture and war crimes occurred during their detention in Abu Ghraib, a location external to United States territory. Additionally, Plaintiffs' ATS claims do not allege that any violations occurred in the United States or any of its territories. Therefore, on these facts, the Court holds that *Kiobel*'s bar against extraterritorial application of the ATS governs here and dismisses Plaintiffs' claims.[3]

The Court declines to adopt Plaintiffs' argument that Iraq was not a territory external to the United States. *De facto* sovereignty, unlike *de jure* sovereignty, is subject to judicial determination. *See Boumediene v. Bush*, 553 U.S. 723, 753-54 (2008). However, the Court finds inconclusive, at best, Plaintiffs' support for their contention that the United States held *de facto* sovereignty over Iraq during the relevant time period in this case. Plaintiffs rely on *Boumediene* and *Rasul v. Bush*, 542 U.S. 466 (2004), where the Supreme Court held that an express lease agreement demonstrated that the United States maintained complete jurisdiction and control over Guantanamo Bay, Cuba. *See Boumediene*, 553 U.S. at 754; *Rasul*, 542 U.S. at 480. In this case, no such express agreement exists. The only legal documents Plaintiffs offer in support of their position are the CPA-promulgated regulations. The Court notes that while wartime occupation may demonstrate *de jure* sovereignty, *see Boumediene*, 553 U.S. at 754, the

---

[3]   The Court's decision on ATS jurisdiction is dispositive of all ATS claims, including those asserted by Plaintiff Al Shimari. The Court notes, however, that Plaintiffs Rashid, Al-Zuba'e, and Al-Ejaili rely exclusively on ATS jurisdiction. Therefore, only these Plaintiffs are entirely dismissed as a result of the Court's ruling on ATS jurisdiction. Because Plaintiff Al Shimari asserts common law claims, the Court proceeds to evaluate those claims pursuant to CACI PT's Motion to Dismiss discussed below.

occupying force in Iraq involved more than just the United States military. Thus, it would be difficult to conclude that the United States, to the exclusion of all other involved nations, exercised complete jurisdiction over Iraq. *Cf. Fleming v. Page*, 50 U.S. 603, 614 (1850) (finding that the United States exercised dominion and control over the Port of Tampico, Mexico where "the country was in the exclusive and firm possession of the United States, and governed by its military authorities, acting under the orders of the President"). Furthermore, the CPA was the product of a multinational coalition, and the Court similarly refrains from construing its operation to equate to circumstances where one country's personnel exclusively exercised control over another. The District Court for the District of Columbia previously found insufficient an offering of the CPA regulations and the United States' military presence in Iraq as demonstrative of the United States' sovereignty over Iraq during the same military occupation related to the claims currently before the Court. *In re Iraq & Afghanistan Detainees Litig.*, 479 F. Supp. 2d 85, 102-03 (D.D.C. 2007). In much the same manner, the Court will not accept Plaintiffs' reliance upon *Boumediene*, *Rasul*, the CPA provisions, and the presence of the United States military as conclusive of *de facto* sovereignty. Thus, because Iraq is beyond United States territory, the presumption against extraterritoriality applies.

Plaintiffs also invite the Court to interpret *Kiobel* to hold that the presumption against extraterritoriality can be sufficiently displaced by their claims' sufficient connection with the United States. Indeed, Plaintiffs make much of the "touch and concern" language contained in the final paragraph of the *Kiobel* opinion, which states that "even where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application." *Id.* at 1669. Thus, Plaintiffs argue, *Kiobel* does not impose a "bright line test" or an automatic bar when the underlying tort occurs abroad, but

rather allows for the facts of the case to rebut the presumption through a significant tie to the United States. (Pls.' Mem. Opp'n Mot. Reconsideration at 6, Doc. 399.) By implication, Plaintiffs read *Kiobel* to permit displacement of the presumption against extraterritoriality by judicial decision rather than by legislative act. Since the facts of *Kiobel* involved the "foreign cubed" circumstance of claims involving foreign conduct brought by foreign plaintiffs against foreign defendants, Plaintiffs essentially contend that *Kiobel*'s outcome is limited to similar facts and the Supreme Court intended to leave open for judicial determination the question of what cases or claims could displace the presumption. Plaintiffs argue that their circumstances presented in this case meet *Kiobel*'s "touch and concern" requirement.

The Court disagrees with Plaintiffs' reading of *Kiobel*. The Supreme Court makes clear that the presumption against extraterritoriality is only rebuttable by legislative act, not judicial decision. This reading is supported by at least four specific references in the opinion. First, *Kiobel* framed its discussion by stating that "[w]hen a *statute* gives no clear indication of an extraterritorial application, it has none," suggesting that the text of the statute itself, rather than any judicial factual determination, must rebut the presumption. *Id.* at 1664 (emphasis added). Second, *Kiobel* stated that "to rebut the presumption, the ATS would need to evince a clear indication of extraterritoriality," again using language directed at the statute itself. *Id.* at 1665 (internal citations omitted). In concluding this portion of the analysis, the *Kiobel* Court again stated that "nothing in the statute rebuts [the] presumption." *Id.* at 1669. Third, the Court commented that a statute more specific than the ATS would be required if Congress intended courts to exercise jurisdiction over claims predicated on extraterritorial acts. *Id.* Fourth, *Kiobel* explains that the presumption serves to maintain the respect of those matters committed to other branches, such that "the Judiciary does not erroneously adopt an interpretation of U.S. law that

16

carries foreign policy consequences not clearly intended by the political branches." *Id.* at 1664 (citing *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) ["*Aramco*"]).   This again indicates the Court's admonition that it is for Congress, not the Judiciary, to displace the presumption.   In each instance, the Court repeatedly used language that suggests the presumption is rebuttable only by congressional action indicating the presumption does not, or would not, apply to ATS claims.   Nowhere in the *Kiobel* decision does the Court explicitly state or even suggest that the facts of a case should or could, under certain circumstances, inform a court's judgment about whether the presumption is sufficiently rebutted and thus displaced.   Contrary to Plaintiffs' interpretation, *Kiobel* repeatedly points to legislative action as the necessary means to extraterritorial application of ATS jurisdiction.

 The Court's reading of *Kiobel* is also consistent with *Morrison*, the case upon which *Kiobel* heavily relies.   In *Morrison*, the issue was whether the Securities Exchange Act ("the Act") provided a cause of action to foreign plaintiffs for fraudulent securities exchanges originating outside the United States.   130 S. Ct. at 2875.   Both the district and appellate courts in *Morrison* dismissed the plaintiffs' claims for lack of subject matter jurisdiction, finding that the bulk of the allegedly fraudulent transfers occurred abroad.   *Id.* at 2876.   In its review, the *Morrison* Court invoked the presumption against extraterritorial application of the Act, concluding that "'unless there is the affirmative intention of the Congress clearly expressed' to give a statute extraterritorial effect, 'we must presume it is primarily concerned with domestic conditions.'"   *Id.* at 2877 (quoting *Aramco*, 499 U.S. at 248).   The Court then took note of the Second Circuit's "north star" approach of judicially weighing the "conduct" and "effects" of securities cases to determine whether the presumption against extraterritoriality was sufficiently rebutted.   *Id.* at 2879.   Rejecting that approach, *Morrison* admonished that "[t]he results of

17

judicial-speculation-made-law—divining what Congress would have wanted if it had thought of the situation before the court—demonstrate the wisdom of the presumption against extraterritoriality." *Id.* at 2881. In lieu of such an approach, *Morrison* directed courts to "apply the presumption in all cases, preserving a stable background against which Congress can legislate with predictable effects." *Id.* Thus, Plaintiffs' argument that this Court should engage in a judicial factual determination here is demonstrably flawed in that it suggests an approach similar to the Second Circuit's "north star" approach. *Morrison* expressly rejected the Second Circuit's view of the presumption's operation, which Plaintiffs urge the Court to adopt here— namely that rebutting the presumption against extraterritoriality is for a court to "discern" rather than for Congress to legislate. *Id.* at 2878. *Kiobel* did not qualify, modify, or limit *Morrison* or its disapproval of judicial guessing as to the presumption's applicability, but rather heavily relied upon it in extending the presumption to the ATS.

Admittedly, Plaintiffs' reading of *Kiobel* is a fair one. Its "touch and concern" language is textually curious and may be interpreted by some as leaving the proverbial door ajar for courts to eventually measure its width. Nonetheless, this Court holds steadfast that its reading of *Kiobel* remains consistent with its articulated reasoning and the underlying jurisprudence of the presumption at the heart of the decision. Moreover, the Court's decision adheres to the admonition against "judicial-speculation-made-law," and comports with the presumption's best practice, which is the universal application of the presumption, providing the stable backdrop against which Congress is free to indicate otherwise. *Id.* at 2881.

Even assuming that the Court was to adopt Plaintiffs' reading, it is unclear to the Court how to apply a "touch and concern" inquiry to a purely jurisdictional statute such as the ATS. As noted above, *Kiobel*'s brief mention of the touch and concern analysis cites *Morrison*. In

*Morrison*, the Court explained that a statute giving rise to a cause of action for domestic conduct would not apply to extraterritorial acts, even where some related conduct occurred domestically, if the activity forming the focal point of congressional concern occurred overseas. *Id.* It is no small distinction that the Court's explanation involved statutes that regulated conduct, while the ATS is purely jurisdictional.[4]  *See Kiobel*, 133 S. Ct. at 1664. Thus, it is unclear whether and to what extent the "touch and concern" analysis as explained by *Morrison* should be applied to the ATS, a jurisdictional statute with a potentially unlimited scope in a manner that would not eviscerate the presumption.[5]

Therefore, the Court concludes that Plaintiffs' ATS claims are barred because the ATS does not provide jurisdiction over their claims, which involve tortious conduct occurring exclusively outside the territory of the United States. As *Kiobel* suggested, if Congress were to determine that the ATS should apply extraterritorially, a statute more specific than the ATS would be required. *Id.*

---

[4]     The Supreme Court concluded that the focal point of the Exchange Act, which provided a substantive cause of action for securities violations, was on domestic securities fraud, and thus conduct that may occur overseas in relation to such fraud remained insufficient to invoke extraterritorial application. *Morrison*, 130 S. Ct. at 2884.  In reaching its conclusion on the conduct necessary to rebut the presumption, the Court noted that *Aramco* similarly properly avoided extraterritorial application of Title VII where the employment at issue in *Aramco* occurred abroad. *Id.* (citing *Aramco*, 499 U.S. at 247). Title VII, at the time of *Aramco*, focused on domestic employment; therefore, the fact that the plaintiff in *Aramco* was a United States citizen hired in Houston, Texas could not rebut the presumption against extraterritoriality because the employment at issue was not domestic. *Id.* at 2884 & n.8.

[5]     Were courts to look at the focal point of the conduct contemplated by the ATS, its application would be limitless, as violations of international and customary law could conceivably arise anywhere.  Such a conclusion would render *Kiobel*'s application of the presumption paradoxical and thus certainly could not have been the Supreme Court's intention.

B.     **CACI PT's Motion to Dismiss Al Shimari's Common Law Claims**

The Court grants CACI PT's Motion to Dismiss Plaintiff Al Shimari's common law claims because the law governing Iraq during the relevant time period precludes liability for the actions in this case.   Regulations governing Iraq at the time of the alleged incidents immunized contractors from liability for actions related to their contracts, as well as personal injuries suffered in connection with military operations.   To reach this conclusion, the Court first finds that Ohio choice-of-law principles require the application of Iraqi law, rather than that of Ohio or Virginia, to Al Shimari's common law claims.   These conclusions are discussed in turn.

**1. Choice of Law**

The Court applies the substantive law of Ohio to Plaintiff Al Shimari's claims.   The well-settled doctrine set forth in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938), requires that district courts sitting in diversity apply the substantive law of the state in which the court sits, including that state's choice-of-law rules.   *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007) (citing *Erie*, 304 U.S. at 78 and *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941)).

Transfer under 28 U.S.C. § 1404(a) implicates an exception to the general rule of the *Erie* doctrine.   Section 1404(a) permits a district court to transfer a civil action to another district court for the convenience of parties, if the case could have been originally brought in the transferee court.   28 U.S.C. § 1404(a).   Where a defendant has transferred a case under § 1404(a), "only a change of courtrooms [is] effected," not a change of law.   *Goad v. Celotex Corp.*, 831 F.2d 508, 510 & n.5 (4th Cir. 1987) (citing *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964)).   Accordingly, the "transferee court must apply [the] law of [the] original court."   *Motor Club of Am. Ins. Co. v. Hanifi*, 145 F.3d 170, 178-79 (4th Cir. 1998) (citing *Van Dusen*, 376 U.S.

at 639).  Here, Al Shimari's claims were transferred to this Court from the Southern District of

Ohio.  Accordingly, the doctrines of *Erie* and *Van Dusen* compel the Court to apply the

substantive law of Ohio, including Ohio's choice-of-law analysis.

Ohio traditionally applied the rule of *lex loci delicti*, which requires that tort actions be

governed by the substantive law of the place of the injury.  *See Morgan v. Biro Mfg. Co.*, 474

N.E.2d 286, 288 (Ohio 1984).  This approach remains viable, despite the trend of other

jurisdictions in departing from this rule, yet is no longer the only possible conclusion in an Ohio

choice-of-law analysis; it is a rebuttable presumption in Ohio, subject to being set aside where

the court determines that "another jurisdiction has a more significant relationship to the lawsuit."

*Id.* at 288-89.  The following factors, derived from the Restatement (Second) of Conflict of

Laws, are to be considered in determining the state with the most significant relationship to the

claims:

> (1) the place of the injury; (2) the place where the conduct causing the injury
> occurred; (3) the domicile, residence, nationality, place of incorporation, and
> place of business of the parties; (4) the place where the relationship between
> the parties, if any, is located; and (5) any factors under Section 6 which the
> court may deem relevant to the litigation.

*Id.* at 289 (citing Restatement (Second) of Conflict of Laws § 145 (1971)).  *Morgan* further

identified additional considerations, comprising the fifth factor, as:

> (a) the needs of the interstate and international systems, (b) the relevant
> policies of the forum, (c) the relevant policies of other interested states and the
> relative interests of those states in the determination of the particular issue, (d)
> the protection of justified expectations, (e) the basic policies underlying the
> particular field of law, (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of [the] law to be applied.

*Id.* at 289 n.6 (quoting Restatement (Second) of Conflict of Laws § 6).  With *lex loci delicti* no

longer applied as a matter of course regardless of the facts of a case, these other factors "must be

thoroughly analyzed" prior to making a conclusive choice-of-law determination.  *Id.* at 288.

Even in engaging in the "significant relationship" inquiry, the Court remains mindful that these factors must be of such significance to require displacement of the *lex loci delecti* presumption. *Cf. Bramberger v. Toledo Hosp.*, 897 F. Supp. 2d 587, 596-97 (N.D. Ohio 2012) (holding that the facts before the court "do not overcome this presumption because they do not demonstrate that Ohio has a more significant relationship to the claim" where the act or omission at issue occurred in Michigan, the injured party resided in Michigan, the defendant was incorporated in Michigan, and the injured party died in Michigan).

Turning to the facts at issue here, the Court begins by presuming that the law of Iraq, the place of Al Shimari's injury, applies. In considering the "more significant relationship" factors, the Court finds that those factors fail to compel a departure from the presumptive application of Iraqi law. The first factor is essentially the traditional consideration of the place of injury, which favors no other state because that place is Iraq. The second factor, the place where the conduct causing the injury occurred, is also Iraq. The third factor does not demonstrate a more significant relationship by a place other than Iraq. Al Shimari is an Iraqi citizen and CACI PT is a Delaware corporation with its principal place of business in Virginia. The fourth factor also implicates Iraq, as that is the place the parties' relationship was located. Thus, none of the first four Section 145 factors identify a place other than Iraq as having a more significant relationship to Plaintiff Al-Shimari's claims.

Nor does the fifth Section 145 factor, which implicates the multiple factors defined by Section Six of the Restatement (Second) of Conflict of Laws, sufficiently displace the presumption that the Court apply the law of the place of the injury. These factors fail to point to any single state that holds a more significant relationship to the claims than Iraq. The needs of state and international systems would not suggest that state law apply to torts occurring on

22

foreign soil, as that would create a patchwork of liability for acts occurring in the same place if the actors originate from different states. The same can be said of the certainty, predictability, and uniformity of a result—no such predictability would occur if CACI PT were subject to Virginia law while another contractor working at Abu Ghraib but domiciled in another state would be subject to a different law. As CACI PT notes, the only Section Six factor that definitively points to the application of state law would be the ease in determination and application. However, this one consideration, in the face of all of the other concerns, is not sufficient to rebut the presumption of applying the law of the place of the injury, especially considering that three other Section 145 factors directly implicate Iraq in Ohio's "more significant relationship" examination.

The Court finds unpersuasive Al Shimari's argument that the analysis set forth in *Morgan* demonstrates that Virginia law is proper under Ohio's choice-of-law analysis.[6] Al Shimari relies heavily upon four of the seven factors set forth in Section Six. However, the Section Six factors are just part of the Section 145 analysis, which sets forth four considerations before reaching those presented in Section Six. Al Shimari does not and, as demonstrated above, cannot offer any of the other Section 145 factors as supportive of its position that Virginia law should apply to his claims. The Court does not read *Morgan* to permit it to go fishing in the bowels of Section Six for a few factors to justify setting aside those factors in Section 145, under which Section Six is subsumed, that further support the presumption of applying the place of the wrong and weigh against Al Shimari's position. Indeed, the choice-of-law determination requires a thorough

---

[6]     The Court notes that even were Virginia law to apply, Virginia's choice-of-law rules—a substantive rather than procedural issue—also adhere to the traditional rule that tort claims are governed by the law of the place of the injury. *See, e.g., Colgan Air*, 507 F.3d at 275 (citations omitted). Thus, even if Plaintiff successfully demonstrated that the proper substantive law is Virginia's, the Court must still apply Iraqi law because that is "the place of the wrong." *Id.*

analysis, and thus a consideration of the totality of the factors, before making a final conclusion about the law to be applied. In making this consideration, the Court finds that application of the factors set forth in *Morgan* do not, on these facts, compel a departure from the presumption that the law of the place of the injury applies.

Therefore, because the present facts fail to sufficiently rebut the presumption that the law of the place of the wrong applies, Ohio's choice-of-law rules require the Court to apply Iraqi law to Al Shimari's common law claims.

### 2. Failure to State a Claim

The Court grants CACI PT's Motion to Dismiss for failure to state a claim because the applicable provisions governing Iraq at the time of the alleged acts preclude liability for CACI PT's actions. The relevant provisions under Iraqi law provide immunity for a contractor's actions related to the terms of the contract, and the governing provisions also carve out an exception for personal injury liability where injury results from those activities related to military combat operations. Thus, the Court dismisses Al Shimari's common law claims.

As both parties recognize, the operative Iraqi law at the time of the events in question arose from the promulgations by the CPA. The CPA governed Iraq between May 2003 and June 28, 2004, at which time the CPA ceded governance to the Interim Government of Iraq. *See U.S. ex rel. DRC, Inc. v. Custer Battles, LLC*, 562 F.3d 295, 298 (4th Cir. 2009). During its operation, the CPA issued a number of "orders" setting forth the operative legal framework at the time, including Order Number 17, the relevant regulation here. *See Galustian v. Peter*, 591 F.3d 724, 728 (4th Cir. 2010). Order No. 17 § 3(1), in the version in effect during the relevant time

period before the Court,[7] provides, in pertinent part, that "[c]oalition contractors and their sub-contractors as well as their employees . . . shall not be subject to Iraqi laws or regulations in matters relating to the terms and conditions of their contracts in relation to the Coalition Forces or the CPA." (O'Connor Decl. Ex. 1, at 2, Doc. 365-1.)  Order No. 17 § 6, addressing personal injury tort claims, explained, in pertinent part, that:

> [t]hird party claims including those for . . . personal injury, illness or death or in respect of any other matter arising from or attributed to Coalition personnel or any persons employed by them . . . that do not arise in connection with military combat operations, shall be submitted and dealt with by the Parent State whose Coalition personnel, property, activities or other assets are alleged to have caused the claimed damage, in a manner consistent with the national laws of the Parent State.

(*Id.* at 3.)  Considering the Third Amended Complaint's multiple allegations of CACI PT's employment and activity in Iraq, Section Three implicates CACI PT's activities and thus precludes liability under Iraqi law.  CACI PT was a United States contractor and a member of the multinational coalition.  Therefore, any activity that "relat[es] to the terms and conditions of their contract[]" with the United States military would not be subject to Iraqi law.

CACI PT argues that the phrase "relating to" has been interpreted broadly by the Supreme Court where Congress used this language in preempting state legislation.  *See Altria Group, Inc. v. Good*, 555 U.S. 70, 85 (2008) (finding congressional intent that the Airline Deregulation Act preempted certain state laws because "relating to" is synonymous with "having a connection with").  As a result, CACI PT argues, Al Shimari's allegations connecting the alleged acts with CACI PT's obligations most clearly demonstrate that the alleged harms are connected with, and thus relate to, CACI PT's contract.  As such, these acts would fall within the

---

[7]  Order No. 17 was amended shortly before the dissolution of the CPA in June 2004. While adding a number of provisions not at issue here, the revisions do not substantively alter the language relevant to the Court's analysis.

immunity granted by Order No. 17 § 3.  Al Shimari fails to rebut or in any way respond to this position.

Considering the broad language contained in the provision, the Court holds that Order No. 17 § 3 prevents Al Shimari from pursuing his claims under Iraqi law.  The alleged acts were performed as a result of CACI PT being in Iraq to perform its contractual duties.  The fact that Al Shimari alleges the activities violated the contract further supports this position, as it would be relevant to determine how the acts do or do not relate to the contractual duties imposed upon CACI PT.  Whether or not their actions were authorized does not diminish the fact that these activities were related to their contractual duties.  *But see McGee v. Arkel Int'l, LLC*, 671 F.3d 539, 544 (5th Cir. 2012) (holding that the equivalent section in the revised Order No. 17 only addresses contract claims and "does not create an immunity from Iraqi laws relating to tort claims brought in federal court in the United States").

Alternatively, the Court holds that Section Six of Order No. 17 also supports dismissal here, as Al Shimari cannot proceed with his claims as defined by state or federal law.  Section Six specifically addresses personal injury claims yet, in doing so, carves an exception to liability for those claims arising from actions in connection with military combat activities.  The Court finds unpersuasive any argument that this does not preclude Al Shimari's common law claims under Iraqi law.  Al Shimari misconstrues the provision when he argues the immunity afforded by Section Six requires that CACI PT's actions "involve 'military combat operations'" and the contract with the United States military expressly prohibited CACI PT's participation in combat operations.  (Pl.'s Mem. Opp'n Mot. Dismiss at 3.)  Rather, the language in Section Six precludes liability where the activity is *connected with* military combat operations; Plaintiff's argument otherwise is too narrowly construed.

26

The detention and interrogation of potential enemy combatants or hostile individuals is most certainly connected with contemporaneous military combat operations. Courts have differed on whether a contractor's activities in support of the military qualify as actual combat activity. *Compare Harris v. Kellogg, Brown & Root Servs., Inc.*, 618 F. Supp. 2d 400, 434 (W.D. Pa. 2009) (holding that a military contractor was not immune under the Federal Tort Claims Act's combatant activities exception because "the alleged negligent performance or non-performance of KBR in providing maintenance services to the United States Army" did not "aris[e] from active military combat operations"), *with Aiello v. Kellogg, Brown & Root Servs., Inc.*, 751 F. Supp. 2d 698, 712-13 (S.D.N.Y. 2011) (holding that the combatant activities exception to the Federal Tort Claims Act applied to a contractor because "[t]he creation and maintenance of toilets at [a military installation in Iraq] was active logistical support of combat operations, both necessary to and in direct connection with actual combat"). However, the exception to liability under Section Six requires less than such a determination by the Court. There is no need to determine whether CACI PT's activities were *per se* combat activities in and of themselves—merely a connection with combat activity is sufficient. Because Section Six purports to govern personal injury claims while carving out an exception for those activities connected with military combat activities, the Court finds that Al Shimari cannot rely on Section Six as a vehicle for proceeding under domestic law or otherwise invoking liability under Iraqi law. Accordingly, with Section Three being the only remaining provision of Order No. 17 that in any way addresses contractor liability in a manner pertinent to the facts before the Court, the Court holds that CACI PT is not subject to liability for actions either related to the terms and conditions of their contract or arising in connection with military combat activities.

The Court emphasizes that its conclusion arises from the application of Iraqi law in light of Ohio's choice-of-law rules, not the military immunity considerations set forth in *Coleman v. Tennessee*, 97 U.S. 509 (1879), and *Dow v. Johnson*, 100 U.S. 158 (1879).  CACI PT relies on *Coleman* and *Dow* for the position that the law of an occupied territory applies only to internal relations between its citizens, and occupying personnel involved in the prosecution of a public war are not subject to the laws of the occupied territory.  (Def.'s Mot. Dismiss at 11, Doc. 364.)  However, these cases, and their progeny cited by CACI PT, addressed acts by officers and soldiers of foreign armies as well as civilians who were committing military acts under duress or coercion, particularly, in *Coleman* and *Dow*, Union soldiers in Confederate territory during the Civil War.  The Fourth Circuit noted the difference between this "law-of-war" defense afforded to military personnel and a situation involving non-soldiers such as CACI PT's employees.  *Al Shimari*, 679 F.3d at 216-17.  The Court recognizes that the Fourth Circuit left open the question of the relevance and applicability of Civil War-era cases to the facts in issue, *see id.* at 217, and thus finds it unsettled that those cases would conclusively determine any choice-of-law issues and foreclose suit here.  However, such a determination is unnecessary to the resolution of either the choice of law question or the viability of Al Shimari's common law claims pursuant to the governing Iraqi law as set forth by the CPA.[8]

---

[8]      Even if the Court accepted Al Shimari's argument that his negligent hiring, training, and supervision claim falls under Virginia law, he would fail to survive a 12(b)(6) motion.  Negligent hiring under Virginia law imposes liability for the "failure to exercise reasonable care in placing an individual with known propensities, or propensities that should have been discovered by reasonable investigation, in an employment position in which, due to the circumstances of the employment, it should have been foreseeable that the hired individual posed a threat of injury to others."  *Interim Personnel of Cent. Va., Inc. v. Messer*, 559 S.E.2d 704, 707 (Va. 2002).  Al Shimari's allegations on this claim amount to little more than expert testimony about the atmosphere of detention centers and conclusory allegations regarding the foreseeability that "in the absence of proper hiring, training, and oversight, [CACI PT] employees would engage in abusive conduct."  (3d Am. Compl. ¶¶ 144-47, 161, 191.)  The crux of his allegations, that the

Therefore, the Court grants CACI PT's Motion to Dismiss Plaintiff Al Shimari's common law claims for failure to state a claim under Iraqi law.

## IV.   CONCLUSION

For the foregoing reasons, the Court holds that (1) the Supreme Court's recent decision in *Kiobel* compels the conclusion that Plaintiffs' ATS claims are barred by the presumption against the extraterritorial application of the statute; and (2) Plaintiff Al Shimari's common law claims fail to state a claim under Iraqi law because, pursuant to the governing CPA regulations, CACI PT is immune from suit for claims arising from acts related to its contract or performed in connection with military combat operations.  Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Reconsideration of the Court's Order Reinstating Plaintiffs' Alien Tort Statute Claims, or in the alternative Motion to Dismiss Plaintiffs' Alien Tort Statute Claims for Lack of Subject Matter Jurisdiction (Doc. 354) is **GRANTED**;

**IT IS FURTHER ORDERED** that Defendant's Motion to Dismiss Plaintiff Al Shimari's Common Law Claims for Failure to State a Claim (Doc. 363) is **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiffs' Third Amended Complaint is **DISMISSED without prejudice**; and

---

Abu Ghraib situation is one where "good people can go bad," is a non-sequitur.  If even good people, who lack any propensity for posing a threat to injure another, would eventually cause harm to detainees at Abu Ghraib, then no entity could hire an employee in a manner compliant with Virginia law and avoid liability for negligent hiring.  Thus, the application of Virginia law would not salvage the negligent hiring claim.

Additionally, negligent supervision and negligent training are not recognized as torts in Virginia. *See Muse v. Schleiden*, 349 F. Supp. 2d 990, 1001 (E.D. Va. 2004) (citations omitted) (noting that "Virginia does not recognize a claim for negligent supervision"); *Morgan v. Wal-Mart Stores East, LP*, No. 3:10-CV-669, 2010 WL 4394096, at *4 (E.D. Va. Nov. 1, 2010) (citations omitted) ("[T]his Court is not aware of any case from the Supreme Court of Virginia or lower courts that recognizes the distinct tort of negligent training.").

**IT IS FURTHER ORDERED** that Defendant's Motion to Compel Interrogator Information from the United States (Doc. 275), Defendant's Motion to Compel Complete and Unredacted Government Reports from the United States (Doc. 279), Defendant's Motion to Strike Non-Conspiracy Allegations from the Third Amended Complaint (Doc. 300), Defendant's Motion to Dismiss Plaintiffs' Third Amended Complaint (Doc. 312), Defendant's Motion for Sanctions Against Plaintiffs Al Shimari, Rashid, and Al Zuba'e (Doc. 367), Plaintiffs' Motion to Compel the United States to Produce Documents and Information (Doc. 380), Plaintiffs' Motion to Compel 30(b)(6) Deposition Testimony from Defendant CACI Premier Technology, Inc. and CACI International, Inc. (Doc. 392), and Defendant's Motion for Leave to File Supplemental Memorandum in Support of Motion for Sanctions (Doc. 451) are **DENIED** as moot.

**IT IS SO ORDERED**.

ENTERED this 25th day of June, 2013.

Alexandria, Virginia
6 / 24 / 2013

/s/
Gerald Bruce Lee
United States District Judge

30