IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

SUHAIL NAJIM ABDULLAH )
AL SHIMARI, et al., )
 )
    Plaintiffs, )
 ) 1:08-cv-827 (LMB/JFA)
v. )
 )
CACI PREMIER TECH., INC., )
 )
    Defendant. )

## MEMORANDUM OPINION

The issue before the Court is the legal standard under which plaintiffs' claims under the Alien Tort Statue ("ATS"), 28 U.S.C. § 1350, will be analyzed for purposes of determining whether the Court has subject matter jurisdiction over those claims. At the instruction of the Court [Dkt. No. 571], both parties have submitted briefs explaining their views regarding the appropriate legal framework. [Dkt. Nos. 576 and 577]. This Memorandum Opinion addresses 1) whether claims of torture; cruel, inhuman, and degrading treatment ("CIDT"); and war crimes are actionable under the ATS; 2) if so, the applicable sources of law for defining the prohibitions; and 3) whether such claims are actionable against private parties.

## I. BACKGROUND

Plaintiffs Suhail Al Shimari, Salah Al-Ejaili, and Asa'ad Al-Zuba'e (collectively "plaintiffs"),[1] all Iraqi nationals, were detained in the custody of the U.S. Army at Abu Ghraib prison in Iraq in 2003 and 2004. In 2008, they brought a civil action under the ATS[2] against CACI

---

[1] Taha Rashid, who was added to this civil action as a plaintiff on September 15, 2008 [Dkt. No. 28], was dismissed without prejudice on June 9, 2017 [Dkt. No. 607].

[2] The operative Third Amended Complaint also alleged common law claims, but these were voluntarily dismissed with prejudice on January 17, 2017 [Dkt. Nos. 574 and 575].

Premier Technology, Inc. ("CACI" or "defendant"), which provided interrogation services for the U.S. military at Abu Ghraib at the time of the relevant events. Plaintiffs allege that defendant violated the law of nations by committing acts involving torture, CIDT, and war crimes. Third Am. Compl. [Dkt. No. 251].

This civil action has been before the Fourth Circuit four times, most recently after plaintiffs' Third Amended Complaint was dismissed on the grounds that it presented a non-justiciable political question. The district court had reasoned that according to the chain of command "the military exercised 'plenary' and 'direct' control over how Defendants interrogated detainees at Abu Ghraib" and that "[t]o consider Plaintiffs' claims would require the Court to impose state tort duties onto an active war zone, raising a broad array of interferences by the judiciary into the military functions textually committed by our Constitution to Congress, the President, and the Executive Branch." Al Shimari v. CACI Premier Tech., Inc., 119 F. Supp. 3d 434, 444-47 (E.D. Va. 2015) (internal quotation marks omitted) (emphasis in original). On appeal, the Fourth Circuit found that the district court erred by focusing on formal control and "failing to determine whether the military exercised actual control over any of CACI's alleged conduct" and explained that "irrespective [of] whether that conduct occurred under the actual control of the military," "conduct by CACI employees that was unlawful when committed is justiciable." Al Shimari v. CACI Premier Tech., Inc. (Al Shimari IV), 840 F.3d 147, 151 (4th Cir. 2016). In keeping with this principle, the acts committed by CACI "are shielded from judicial review under the political question doctrine" only if they "were not unlawful when committed and occurred under the actual control of the military or involved sensitive military judgments." Id.

Accordingly, the Fourth Circuit vacated the district court's judgment and remanded the case with the explanation that

2

> on remand, the district court will be required to determine which of the alleged acts, or constellations of alleged acts, violated settled international law and criminal law governing CACI's conduct and, therefore, are subject to judicial review. The district court will also be required to identify any 'grey area' conduct that was committed under the actual control of the military or involved sensitive military judgments and, thus, is protected under the political question doctrine.

Id. at 160. To the extent that the alleged conduct was lawful, CACI will be shielded from judicial review under the political question doctrine if the lawful action occurred under the "actual control of the military." Id. at 157 (emphasis in original).

Following remand, the district court judge previously assigned to the case recused himself and the case was reassigned to this Court. After briefing by both parties as to how the case should proceed, the Court held a status conference where it observed that the threshold issue was whether the Court had subject matter jurisdiction and, per the Fourth Circuit's opinion in Al Shimari IV, to resolve that question it would need to determine whether the alleged CACI conduct was unlawful when committed. Dec. 16, 2016 Tr., [Dkt. No. 573]. To begin addressing this question, the Court ordered the parties to "submit briefs addressing the applicable legal standard under the Alien Tort Statute." [Dkt. No. 571] at 1.[3] Both parties have done so and this Memorandum Opinion sets forth the legal standard under which this litigation will proceed.

---

[3] Although the Court's order specifically directed the parties to address the "applicable legal standard under the Alien Tort Statute," defendant has raised several preemption claims, arguing that "preemption controls what substantive law, if any, the Court can apply." Def. Mem. at 1. Defendant contends that plaintiffs' ATS claims are preempted by both the Federal Tort Claims Act ("FTCA"), which includes an exemption from liability for combat activities, and Coalition Provisional Order 17, which suspended proceedings in Iraqi courts during the time of the relevant events and established an alternative claims regime. Def. Mem. at 4. Defendant raised a similar FTCA preemption argument in a Motion to Dismiss filed in 2008 [Dkt. No. 34] but it was rejected by the district court [Dkt. No. 94]. Defendant appealed that decision and the Fourth Circuit, sitting en banc, dismissed the appeal as interlocutory because "preemption falls squarely on the side of being a defense to liability and not an immunity from suit." Al Shimari v. CACI Int'l, Inc. (Al Shimari II), 679 F.3d 205, 217 (4th Cir. 2012) (en banc); see also Harless v. CSX Hotels, Inc., 389 F.3d 444, 450 (4th Cir. 2004) (holding that "the only potential for federal preemption comes in the form of an affirmative defense"). Because CACI's preemption arguments are a defense to liability

## II. DISCUSSION

Passed by the First Congress as part of the Judiciary Act of 1789, the ATS grants federal courts original jurisdiction over "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350; Sosa v. Alvarez-Machain, 542 U.S. 692, 712 (2004). The Supreme Court has construed the ATS as "a jurisdictional statute" that "creat[es] no new causes of action." Sosa, 542 U.S. at 724. Rather, the statute was "enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time," which included "violation of safe conducts, infringement of the rights of ambassadors, and piracy." Id. Because the ATS was rooted in common law, "the First Congress understood that the district courts would recognize private causes of action for certain torts in violation of the law of nations." Id.

Although federal courts have the power to recognize causes of action beyond the three enumerated above, the Supreme Court has cautioned that there are "good reasons for a restrained conception of the discretion a federal court should exercise in considering a new cause of action of this kind." Id. at 692. These reasons include the shift in the prevailing conception of the common law, which is no longer understood as something that is "found or discovered" but instead "made or created;" the watershed decision in Erie R. Co. v. Tompkins, 304 U.S. 64 (1938), denying the existence of any federal "general" common law; and the recent reluctance of courts to infer an intent to create a private right of action where Congress has not expressly created one. See Sosa, 542 U.S. at 725-27. Beyond these broader trends, the Supreme Court has recognized that "the potential implications for the foreign relations of the United States of recognizing such causes

---

and the Court is currently assessing whether it has jurisdiction over plaintiffs' claims, this is not the appropriate juncture for CACI to raise these arguments.

4

should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs," especially when courts have "no congressional mandate to seek out and define new and debatable violations of the law of nations." Id. at 727-28. But, subject to these cautionary principles, "the door is still ajar subject to vigilant doorkeeping, and thus open to a narrow class of international norms today." Id. at 729.

Pursuant to the Supreme Court's guidance in Sosa, courts are to "require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms [the Supreme Court has] recognized." Id. at 732. Such "[a]ctionable violations of international law must be of a norm that is specific, universal, and obligatory." Id. (quoting In re Estate of Marcos Human Rights Litigation, 25 F.3d 1467, 1475 (9th Cir. 1994)). To determine the content of an international norm, courts should look first to whether Congress has defined the relevant international legal norm, in which case federal courts must apply the statutory standard. In re XE Servs. Alien Tort Litig., 665 F. Supp. 2d 569, 582 (E.D. Va. 2009). Where Congress has been silent, "U.S. courts must define the applicable legal norms independently of the determinations of international tribunals and foreign bodies, but they may accord those determinations an appropriate level of 'respectful consideration.'" Id. (quoting Sanchez–Llamas v. Oregon, 548 U.S. 331, 333 (2006)). In addition to scrutinizing the nature of the violation, courts also exercise "an element of judgment about the practical consequences of making that cause available to litigants in the federal courts." Sosa, 542 U.S. at 732-33.

Against this backdrop, the question before the Court is whether torture, CIDT, and war crimes constitute violations of the law of nations.[4]

## A. Torture

Counts I, II, and III of the Third Amended Complaint allege torture, civil conspiracy to torture, and aiding and abetting torture, respectively. [Dkt. No. 251] ¶¶ 210-226. Both parties agree that according to "a critical mass of international law" torture was unlawful at the time of the relevant events and that torture claims are "actionable under ATS." Def. Mem. at 13; see also Pl. Mem. at 8. There is ample case law supporting this proposition. The Second Circuit's decision in Filartiga v. Pena-Irala, the case that gave birth to the modern line of ATS litigation, held that "the torturer has become—like the pirate and slave trader before him—hostis humani generis, an enemy of all mankind." 630 F.2d 876, 890 (2d Cir. 1980). This conclusion has been affirmed by the numerous other courts, including the Fourth Circuit. See Yousuf v. Samantar, 699 F.3d 763,

---

[4] In addition to discussing which types of violations are cognizable under the ATS, the Supreme Court has observed that "[a] related consideration is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual. Compare Tel–Oren v. Libyan Arab Republic, 726 F.2d 774, 791–795 (C.A.D.C.1984) (Edwards, J., concurring) (insufficient consensus in 1984 that torture by private actors violates international law), with Kadic v. Karădzíc, 70 F.3d 232, 239–241 (C.A.2 1995) (sufficient consensus in 1995 that genocide by private actors violates international law)." Sosa, 542 U.S. at 733. The Court need not address the issue of corporate liability here because a previous ruling in this litigation held that corporate defendants such as CACI "may be liable for violation[s] of the law of nations under the ATS." [Dkt. No. 471] at 26:11-14. This conclusion, which two courts in this Circuit have adopted, Al-Quraishi v. Nakhla, 728 F. Supp. 2d 702, 723 (D. Md. 2010); XE Servs. Alien Tort Litig., 665 F. Supp. 2d at 582, also reflects the prevailing view among Courts of Appeals that have considered the issue, see Doe I v. Nestle USA, Inc., 766 F.3d 1013, 1022 (9th Cir. 2014); Doe VIII v. Exxon Mobil Corp., 654 F.3d 11, 57 (D.C. Cir. 2011), vacated on other grounds, 527 F. App'x. 7 (D.C. Cir. 2013); Flomo v. Firestone Nat'l Rubber Co., 643 F.3d 1013, 1021 (7th Cir. 2011); Romero v. Drummond Co., 552 F.3d 1303, 1315 (11th Cir. 2008); but see In re Arab Bank, PLC Alien Tort Statute Litig., 808 F.3d 144, 151 (2d Cir. 2015), as amended (Dec. 17, 2015). Nevertheless, the Court is aware that the Supreme Court recently granted certiorari on the question of whether the ATS "categorically forecloses corporate liability," Jesner v. Arab Bank, PLC, 137 S. Ct. 1432 (2017) (No. 16-499), and will revisit this issue, if necessary, once the Supreme Court issues its decision.

6

775–76 (4th Cir. 2012) ("Prohibitions against the acts involved in this case—torture, summary execution and prolonged arbitrary imprisonment—are among the[] universally agreed-upon [international] norms."); Doe I v. Nestle USA, Inc., 766 F.3d 1013, 1019 (9th Cir. 2014) ("Under contemporary international law, federal courts have permitted plaintiffs to pursue ATS claims based on a broad range of misconduct, including genocide, war crimes, torture, and supporting terrorism."); Romero v. Drummond Co., 552 F.3d 1303, 1315 (11th Cir. 2008) ("[T]he law of this Circuit is that [the ATS] grants jurisdiction from complaints of torture against corporate defendants."); Al-Quraishi, 728 F. Supp. 2d at 723 (declaring the prohibition on torture a "universally recognized rule").[5]

Despite having conceded that torture is actionable under the ATS, in what can only be described as a confusing line of reasoning, defendant proceeds to argue that there is no private cause of action for torture. Def. Mem. at 14. Citing to a separate statutory scheme, the Torture Victims Protection Act ("TVPA"), defendant emphasizes that "that statute provides a private right of action only for torture committed under color of foreign law and, as the Fourth Circuit has held, applies only to individuals and not to corporations." Id. Defendant also emphasizes that the Anti-Torture Act, which criminalizes torture, "does not create a private right of action." Id. But whether these statutes create a cause of action is beside the point because courts have recognized that torture is a common law cause of action under the ATS. As the Seventh Circuit has aptly explained, because the ATS makes violations of the law of nations actionable in U.S. courts "the fact that Congress may not have enacted legislation implementing a particular treaty or convention

---

[5] This decision was appealed to the Fourth Circuit where it was reversed by a panel decision, Al-Quraishi v. L-3 Servs., Inc., 657 F.3d 201 (4th Cir. 2011), which was in turn consolidated with the first appeal in Al Shimari and vacated by an en banc decision of the Fourth Circuit that dismissed the consolidated appeals for lack of jurisdiction. Al Shimari II, 679 F.3d at 213. Following the en banc ruling, the case settled. [Dkt. No. 145] at 9 n.7.

(maybe because the treaty or convention hadn't been ratified) does not make a principle of customary international law evidenced by the treaty or convention unenforceable in U.S. courts." Flomo, 643 F.3d at 1022.

In defining the content of the prohibition against torture, the Court looks first to congressionally authorized statutes, and any case law interpreting or applying those statutes. See Breard v. Greene, 523 U.S. 371, 376 (1998); XE Servs. Alien Tort Litig., 665 F. Supp. 2d at 582. In the context of torture, relevant statutes defining "torture" include the Anti-Torture Act, 18 U.S.C. § 2340,[6] and the TVPA, 28 U.S.C. § 1350 (note). According to the Anti-Torture Act, "'torture' means an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control." 18 U.S.C. § 2340. Similarly, the TVPA, which applies to individuals who act "under actual or apparent authority, or color of law, of any foreign nation," defines torture as "any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind." 28 U.S.C. § 1350 (note)(2)(b)(1).

---

[6] Although the Anti-Torture Act is a criminal statute that creates no private right of action, because Congress enacted the law in order to effectuate its obligations under the Geneva Conventions, the definition of torture contained therein can be viewed as an accurate reflection of the law of nations. Cf. Al-Quraishi, 728 F. Supp. 2d at 745.

8

Because these statutes, as well as many international agreements dealing with torture, see, e.g., The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 34 I.L.M. 590 (1995), speak in terms of actions committed by state actors or persons acting under color of law, torture claims are not actionable against private parties "when not perpetrated in the course of genocide or war crimes," Kadic, 70 F.3d at 243. Notwithstanding the limitation to state actors, an ostensibly private organization may be found to have acted under color of law when, for example, "there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001) (quoting Jackson v. Metro. Edison Co., 419 U.S. 345, 351 (1974)). The Fourth Circuit has elaborated that state action may be found when a private actor engaged in a "public function," that is "if the private entity has exercised powers that are 'traditionally the exclusive prerogative of the State.'" Mentavlos v. Anderson, 249 F.3d 301, 311 (4th Cir. 2001) (citing Blum v. Yaretsky, 457 U.S. 991, 1005 (1982)). Likewise, "state action has also been found in circumstances where the private actor operates as a 'willful participant in joint activity with the State or its agents.'" Id. (citing Brentwood, 531 U.S. at 296).

Applying these cases, a court in this circuit found that contractors operating alongside the military as interpreters for non-English speaking detainees at Abu Ghraib performed a public function. Al-Quraishi, 728 F. Supp. 2d at 751. That finding was premised on the observation that "[o]peration of a military force is one of the most basic governmental functions, and one for which there is no privatized equivalent." Id. at 749. "While certain discreet military tasks, such as translation services in this case, may be delegated to contractors, the military still has need to understand, digest, and act upon information taken from enemy (or suspected enemy) prisoners who speak a language other than English." Id. at 750. Because defendants were "alleged to have

operated alongside the military, carrying out a military task which likely would have been performed by the military itself under other circumstances," the court concluded that their work could be viewed as a public function. Id. at 751. Turning to the alternative, "willful participant" standard, the court found that based on plaintiffs' allegations that "certain members of the military, indisputably state actors, conspired and acted together with Defendants to commit the alleged acts of torture" plaintiffs had "properly alleged joint action between Defendants and state actors such that Defendants may be deemed to have acted under color of law." Id.[7] Although this Court does not currently decide the color-of-law question, it finds Al-Qurashi's analysis persuasive and the parties should treat it as controlling precedent.

Defendant proceeds to argue that plaintiffs have not alleged facts sufficient to state a cause of action for torture because "claims brought under the ATS must allege conduct that violated international norms that were specific, universal, and obligatory at the time of the conduct in question" and "there was great uncertainty at the time of Plaintiffs' imprisonment whether certain approved interrogation techniques and conditions of confinement constituted torture." Def. Mem. at 15 (emphasis omitted).[8] But, in the face of a clearly stated statutory definition of torture, debates within the Executive Branch regarding interrogation techniques do not undermine the clarity or force of the prohibition. Moreover, irrespective of these debates, the widespread judicial agreement that torture is actionable under the ATS constitutes a recognition that the prohibition against torture is specific, universal, and obligatory.

---

[7] As the Al-Qurashi court thoroughly discussed, "A person may have acted under color of law, yet still not have acted in an official capacity so as to gain the benefit of sovereign immunity." Id. at 752.

[8] To the extent that defendant's argument challenges plaintiffs' pleadings it is, again, premature. At this juncture the parties were asked to address only "the applicable legal standard under the Alien Tort Statute" and the Court has reserved the question of whether plaintiffs' claims satisfy this standard for subsequent briefing.

## B. CIDT

Counts IV through VI of the Third Amended Complaint allege CIDT, conspiracy to commit CIDT, and aiding and abetting CIDT. [Dkt. No. 251] ¶¶ 227-44. And, again, defendant argues that without a statutory cause of action, CIDT is not a basis for a claim under the ATS. This argument is unavailing for the reasons stated above. Under the ATS, a cause of action for CIDT need not emanate from a statute but can be provided by the common law. See Sosa, 692 U.S. at 724.

With respect to whether CIDT constitutes a violation of the law of nations, defendant argues that "the only court of appeals decision assessing whether claims of CIDT are cognizable under the ATS," decided by the Eleventh Circuit in 2005, "categorically held that such claims are unavailable." Def. Mem. at 13 (citing Aldana v. Del Monte Fresh Produce, N.A., Inc., 416 F.3d 1242 (11th Cir. 2005)). This is an accurate description of Aldana, but this thinly reasoned case cannot be squared with either prior or subsequent decisions of the Eleventh Circuit, see Baloco ex rel. Tapia v. Drummond Co., 640 F.3d 1338, 1345 (11th Cir. 2011); Cabello v. Fernandez-Larios, 402 F.3d 1148, 1154 (11th Cir. 2005), nor does it reflect the prevailing view among district courts outside the Eleventh Circuit, see Al-Quraishi, 728 F. Supp. 2d at 757 (collecting cases). Aldana's explanation for rejecting CIDT as a cause of action was simply that the two district court cases in that circuit recognizing an ATS claim for CIDT relied on the International Covenant on Civil and Political Rights, which Sosa explains " did not 'create obligations enforceable in the federal courts.'" 416 F.3d at 1247 (citing 124 S. Ct. at 2767). But this is an unduly narrow reading of Sosa, which confirmed that courts have authority to recognize new common law causes of action. Consistent with this view, the Eleventh Circuit's more recent precedent calls Aldana's ongoing applicability into question. In a 2011 case, that circuit found that a "complaint alleg[ing] an intricate and vindictive plot, orchestrated by the defendants, that ultimately led to the

11

assassinations" of multiple victims "adequately pled a cause of action cognizable under the ATS," and in doing so it cited another Eleventh Circuit case "collecting authorities showing that 'torture, crimes against humanity, and cruel, inhumane, or degrading punishment [are] a part of the United States and international law.'" Baloco ex rel. Tapia, 640 F.3d at 1345 (quoting Cabello, 402 F.3d at 1154). Moreover, a multitude of district courts outside the Eleventh Circuit have recognized CIDT as an actionable claim under the ATS. See, e.g., Al-Quraishi, 728 F. Supp. 2d at 757; Roe I v. Bridgestone Corp., 492 F. Supp. 2d 988, 1023 (S.D. Ind. 2007) (recognizing a "general international norm against cruel, inhuman and degrading treatment"); Tachiona v. Mugabe, 234 F. Supp. 2d 401, 437 (S.D.N.Y.2002) ("[T]he infliction of cruel, inhuman or degrading treatment . . . is universally condemned and renounced as offending internationally recognized norms of civilized conduct."); Jama v. United States Immigration and Naturalization Serv., 22 F. Supp. 2d 353, 363 (D.N.J. 1998) (holding that "[t]he mental and physical abuses which are alleged to have been inflicted upon plaintiffs violate the international human rights norm of the right to be free from cruel, unhuman and degrading treatment"); Xuncax v. Gramajo, 886 F. Supp. 162, 186 (D. Mass. 1995) (observing that "the major international agreements on human rights generally treat the norm proscribing cruel, inhuman, or degrading treatment in parity with the prohibition against official torture").

Turning to the substance of the prohibition, defendant suggests that CIDT did not have a defined standard at the time of the events in question because it had not been specifically codified like the definition of torture. Def. Mem. at 11. This argument has been rejected by numerous courts across the country. "Despite the absence of a distinct definition for what constitutes cruel, inhuman or degrading treatment, various authorities and international instruments make clear that this prohibition is conceptually linked to torture by shades of misconduct discernible as a continuum." Tachiona v. Mugabe, 234 F. Supp. 2d 401, 437 (S.D.N.Y. 2002). "The gradations of the latter are

marked only by the degrees of mistreatment the victim suffers, by the level of malice the offender exhibits and by evidence of any aggravating or mitigating considerations that may inform a reasonable application of a distinction." Id. "Generally, cruel, inhuman or degrading treatment includes acts which inflict mental or physical suffering, humiliation, fear and debasement, which do not rise to the level of 'torture' or do not have the same purposes as 'torture.'" Mehinovic v. Vuckovic, 198 F. Supp. 2d 1322, 1348 (N.D. Ga. 2002). Instead, the focus is on whether the specific conduct alleged is condemned by the international community as a violation of international law. See Doe v. Qi, 349 F. Supp. 2d 1258, 1322 (N.D. Cal. 2004). For example, in Al-Quraishi, the court found that a complaint alleging "beatings, electric shocks, threats of death and rape, mock executions, and hanging from the hands and feet," successfully pled a claim for CIDT, although the court qualified that the alleged acts might also "justify a finding of torture." 728 F. Supp. 2d at 760. Moreover, the difficulty of determining where particular conduct falls on the spectrum of CIDT and torture does not make the definition of CIDT any less specific because difficult line drawing between prohibitions (i.e. first- and second-degree assault) is endemic to complex legal systems, even when the concepts are specifically defined. And, "distinctly classified or not, the infliction of cruel, inhuman or degrading treatment by agents of the state, as closely akin to or adjunct of torture, is universally condemned and renounced as offending internationally recognized norms of civilized conduct." Tachiona, 234 F. Supp. 2d at 437.[9]

---

[9] Defendant also argues that the provision in the Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment addressing CIDT does not apply to alien detainees held abroad, citing a letter from Assistant Attorney General William Moschella to Senator Patrick Leahy dated April 4, 2005. Def. Mem. Ex. 2 [Dkt. No. 576-1] at 2. Beyond the cited letter being written well after the conduct at issue, the Court is unpersuaded that it supports the position advanced by defendant. The letter represents the Department of Justice's "interpretation of [the United States'] obligations under the Convention," id. at 1, not a formal position stated in implementing legislation or as part of the ratification of the Convention. In

In addition, although as of 2004 Congress had not passed a statue analogous to the Anti-Torture Act that expressly criminalized CIDT,[10] courts are not without legislative guidance as to the meaning of CIDT. To the contrary, the War Crimes Act, which was in force at the time of the events in question prohibited "grave breach[es] of common Article 3" of the Geneva Conventions, including "cruel or inhuman treatment," which is defined as "[t]he act of a person who commits, or conspires or attempts to commit, an act intended to inflict severe or serious physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions), including serious physical abuse, upon another within his custody or control." 18 U.S.C. § 2441(d)(1)(B).[11] [12]

---

addition, the Department's position was based on an untested interpretation of Supreme Court precedent regarding the scope of Fifth Amendment protections. Id. at 2.

[10] In 2005, Congress passed the Detainee Treatment Act, which provides "No individual in the custody or under the physical control of the United States Government, regardless of nationality or physical location, shall be subject to cruel, inhuman, or degrading treatment or punishment." 42 U.S.C. § 2000dd.

[11] This definition closely tracks the War Crimes Act's definition of torture; however, the torture provision says "specifically intended" rather than simply "intended," references "severe physical or mental pain or suffering" rather than "severe or serious," and qualifies that torture must be "for the purpose of obtaining information or a confession, punishment, intimidation, coercion, or any reason based on discrimination of any kind." 18 U.S.C. § 2441(d)(1)(A).

[12] The United States ratified the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 34 I.L.M. 590 (1995), in 1990 with a reservation, stating that it considers itself bound by Article 16 of the Convention regarding CIDT to the extent that this term has the same meaning as the kind of cruel and unusual treatment or punishment prohibited by the Fifth, Eighth, or Fourteenth Amendments to the United States Constitution. See S. Exec. Report (Sen.) 101-30 101st Cong., 2d Sess., Convention Against Torture and Other Cruel, Inhuman and Degrading Treatment or Punishment (1990). This reservation raises some question about whether to apply the definition in the reservation or that of the War Crimes Act. Given that the War Crimes Act, which was passed in 2002, is last in time, to the extent that the definitions conflict, the War Crimes Act controls. See Whitney v. Robertson, 124 U.S. 190, 194 (1888). Moreover, the Court is aware of no court that has used the reservation's standard as the basis for assessing a CIDT violation under the ATS. (Indeed only one court appears to have even mentioned the reservation in the context of the ATS. See Doe, 349 F. Supp. 2d at 1324 n.44.) In addition, it bears emphasizing that the touchstone of the ATS is the "law of nations," and the Geneva

## C. War Crimes

Counts VII, VIII, and IX of the Third Amended Complaint allege war crimes offenses, including "torture, cruel, inhuman and degrading treatment, and willfully causing great suffering and serious bodily injury to Plaintiffs," as well as civil conspiracy to commit war crimes and aiding and abetting the commission of war crimes. [Dkt. No. 251] ¶¶ 245-63.

Defendant acknowledges that "[a]s with torture, a general proscription on war crimes existed in 2003-04" and that "courts have recognized war crimes as actionable ATS claims." Def. Mem. at 16. The content of this norm is provided by the War Crimes Act of 1996, which states that a war crime includes any conduct "defined as a grave breach" of any of the Geneva Conventions of August 12, 1949 or prohibited by select articles of the Hague Convention IV. 18 U.S.C. § 2441(c). The grave breaches of the Geneva Conventions defined by the statute include "torture" and "cruel or inhuman treatment," as well as "intentionally causing serious bodily injury." Id. at § 2441(d)(1).

Importantly, the Fourth Geneva Convention, which covers treatment of civilians in war zones and occupied territories, "does not limit its application based on the identity of the perpetrator of the war crimes," suggesting that there is no distinction between state and private actors when it comes to liability for war crimes. Al-Quraishi, 728 F. Supp. 2d at 744-45. The most influential decision recognizing this principle is the Second Circuit's decision in Kadic, which explained that "[t]he liability of private individuals for committing war crimes has been recognized since World War I and was confirmed at Nuremberg after World War II, and remains

---

Conventions, which serve as the source of the definitions enumerated in the War Crimes Act and have been ratified by over 180 countries, are compelling evidence of international consensus. See, e.g., Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, S. Exec. Rep. 101–30, at 15 (1990) ("[T]he Geneva Conventions, to which the United States and virtually all other countries are Parties, . . . generally reflect customary international law.").

15

today an important aspect of international law." 70 F.3d at 243 (internal citations omitted). Consistent with this history, the War Crimes Act "does not provide that non-state actors are exempt from prosecution," id. at 745, and current government regulations specifically instruct contractors to notify their employees that they can be held liable under that statute, see 48 C.F.R. § 252.225-7040(e)(2)(ii). In addition, "[t]he weight of authority . . . shows that a claim of war crimes may be asserted against private actors." Al-Quraishi, 728 F. Supp. 2d at 747; XE Servs. Alien Tort Litig., 665 F. Supp. 2d at 585-86.

Notwithstanding the consensus that war crimes are clearly defined and actionable against private actors under the ATS, defendant argues that the norm prohibiting war crimes does not provide a cause of action in this case because "the claim involves U.S. military operations and conditions of detention approved by the military chain of command." Def. Mem. at 16. This argument is contradicted by Al Shimari IV's holding that "the military cannot lawfully exercise its authority by directing a contractor to engage in unlawful activity." 840 F.3d at 157. In keeping with the Fourth Circuit's opinion, whether the U.S. military approved the conditions of detention has no bearing on whether war crimes claims are actionable under the ATS.

Next, defendant argues that because the War Crimes Act does not create a private right of action, it cannot support a claim brought under the ATS. Def. Mem. at 17. This argument, which mirrors defendant's contentions regarding torture and CIDT, is similarly unavailing and demonstrates a fundamental failure to understand that common law provides the cause of action for all actionable ATS claims. Moreover, Goldstar (Panama) S.A. v. United States, 967 F.2d 965, 968 (4th Cir. 1992), the case defendant cites as holding that "the Hague Convention, like the Geneva Conventions, was not self-executing, and therefore could not support a claim brought under the Convention or a private right of action brought derivatively under the ATS," Def. Mem. at 17, says no such thing. In that case, plaintiff's suit against United States for alleged violations of

the Hague Conventions was dismissed for lack of subject matter jurisdiction after the district court concluded that the action was barred by the FTCA. Goldstar (Panama) S.A., 967 F.2d at 967. On appeal, plaintiff contended that the ATS established jurisdiction, arguing that the Hague Convention constituted a self-executing waiver of sovereign immunity. Id. at 967-68. The Fourth Circuit disagreed explaining that "[c]ourts will only find a treaty to be self-executing if the document, as a whole, evidences an intent to provide a private right of action," which the Hague Convention does not. Id. at 968.[13] By contrast, in the instant action plaintiffs are not arguing that the Geneva Conventions are self-executing or constitute a waiver of sovereign immunity but rather that the law of nations provides a common law cause of action for war crimes, and defendant has conceded the correctness of plaintiffs' argument by acknowledging that "courts have recognized war crimes as an actionable ATS claim." Def. Mem. at 16.

### III. CONCLUSION

Having set forth the legal standard for the ATS under which this litigation will proceed, the Court will issue an appropriate order directing defendant to file a motion challenging subject matter jurisdiction under Rule 12(b)(1) and any other Rule 12 arguments defendant may wish to raise.

Entered this 28 day of June, 2017.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge

---

[13] The War Crimes Act was passed in 2002, a decade after the Fourth Circuit decided Goldstar (Panama) S.A.