IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| SUHAIL NAJIM ABDULLAH AL SHIMARI, <u>et</u> <u>al.</u>,<br><br>       Plaintiffs,<br><br>       v.<br><br>CACI PREMIER TECHNOLOGY, INC.,<br><br>       Defendant/Third Party Plaintiff,<br><br>       v.<br><br>UNITED STATES OF AMERICA,<br><br>       Third Party Defendant. | No. 1:08-cv-827 (LMB/JFA) |

## MEMORANDUM OPINION

Before the Court is defendant CACI Premier Technology, Inc.'s ("CACI" or

"defendant") Motion to Dismiss [Dkt. No. 626]. For the reasons that follow, the Motion will be

granted in part and denied in part, and Counts 1, 4, and 7 of the Third Amended Complaint will

be dismissed. Because portions of the Third Amended Complaint and the parties' briefs were

filed under seal, this opinion has redacted references to those sealed materials; however, the

Court questions the rationale for such seals and has ordered the parties immediately to show

cause why anything in this record should be sealed.

## I.    BACKGROUND

In this civil action, plaintiffs Suhail Najim Abdullah Al Shimari ("Al Shimari"), Asa'ad

Hamza Hanfoosh Al-Zuba'e ("Al-Zuba'e"), and Salah Hasan Nsaif Jasim Al-Ejaili ("Al-Ejaili")

(collectively, "plaintiffs")[1] bring nine counts[2] against CACI. The essence of plaintiffs' claims, which are all brought pursuant to the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, is that defendants' employees, who were military contractors at Abu Ghraib prison in Iraq, worked with military personnel to abuse plaintiffs, who were detained at the prison. This abuse is alleged to involve torture; cruel, inhuman, or degrading treatment ("CIDT"); and war crimes.

## A. **Factual Background**

As explained in plaintiffs' Third Amended Complaint, the genesis of this civil action goes back to 2003, when the United States of America and various allied forces invaded Iraq and toppled Saddam Hussein's regime. Third Am. Compl. ("TAC") [Dkt. No. 254] ¶ 11.[3] Although the coalition forces quickly achieved military victory, a variety of insurgent forces developed to resist the coalition. Id. In response to this insurgency, the allied forces arrested and detained many Iraqi citizens. Id. In need of facilities to hold their detainees, the coalition forces took over the Abu Ghraib site, a prison complex outside Baghdad. Id. ¶ 12. Although the Abu Ghraib complex had many different sections controlled by different groups, the events giving rise to this civil action all took place in Tier 1A of the "Hard Site," a relatively small section of the complex controlled by American military forces that housed detainees who were suspected to be of "military intelligence value." Id.

At least between fall 2003 and spring 2004, the military contracted with CACI to provide interrogators to supplement the military personnel who worked at the Hard Site. Id. ¶¶ 13-14.

---

[1] Former plaintiff Taha Yaseen Arraq Rashid's ("Rashid") claims were dismissed without prejudice on June 9, 2017 because he was unavailable to submit to deposition. [Dkt. No. 607].
[2] The Third Amended Complaint originally contained twenty counts, including eleven common law counts. The common law counts—Counts Ten through Twenty—were voluntarily dismissed with prejudice on January 17, 2017. [Dkt. No. 575].
[3] When reciting the facts in this section, the Court has assumed that the factual allegations in the Complaint are true and has drawn all reasonable inferences in plaintiffs' favor. See Robertson v. Sea Pines Real Estate Cos., 679 F.3d 278, 284 (4th Cir. 2012).

According to documents accompanying this contract, CACI was responsible for providing personnel to "assist, supervise, coordinate, and monitor all aspects of interrogation activities, in order to provide timely and actionable intelligence to the commander." Id. ¶ 15. CACI was also required to provide supervision for its own personnel. Id. As of January 23, 2004, the Joint Interrogation and Debriefing Center ("JIDC") organizational chart showed that 32 CACI employees, along with 97 soldiers, were assigned to the JIDC and CACI employees were "assigned to 15 of the 20 staffed cells conducting interrogations within the Interrogation Control Element." Id. ¶ 16.

The detainees at the Hard Site were guarded by Military Police ("MPs") from the 372nd Military Police Company. Id. ¶ 17. Interrogations were conducted by CACI employees and Military Intelligence ("MI") personnel, who were assigned to particular detainees. Id. At the time, Staff Sergeant Ivan Frederick ("Frederick") was the Non-Commissioned Officer in Charge of the MPs at the Hard Site.[4] Id. ¶ 18. Although Frederick was subordinate to officers in the 372nd Military Police Company, his military superiors engaged in "virtually no supervision of the MPs at the Hard Site." Id. In addition, CACI employees had full access to the areas where detainees were imprisoned, and MPs were often confused about whether particular interrogators were CACI employees or MI personnel. Id. ¶¶ 89-90. As a result, CACI employees were the de facto supervisors, and they expressly ordered both Frederick and his subordinates to take specific actions to "soften up," "rough up," or "humiliate" detainees, "allegedly in preparation for their

_____

[4] Frederick was court-martialed for his role in detainee abuse at Abu Ghraib. TAC ¶ 18. He was sentenced to eight years imprisonment and had his rank reduced to Private. Id.

interrogations." Id. ¶ 18; see also id. ¶¶ 110-11.[5] The MPs at the site ████████████████ ███████████████████████. Id. ¶ 115.

In February 2004, Sergeant Joseph Darby disclosed evidence of the abuse at Abu Ghraib to military authorities, and the military opened multiple investigations into the conduct at the prison. Id. ¶ 79. One investigation, which was conducted by Major General George R. Fay, found that CACI employees, as well as MI personnel, MPs, and other soldiers, had "responsibility or complicity in the abuses that occurred at Abu Ghraib" and that what began as "nakedness and humiliation, stress and physical training (exercise)" devolved into "sexual and physical assaults by a small group of morally corrupt and unsupervised soldiers and civilians." Id. ¶¶ 81-82. This investigation identified at least five such civilians as CACI employees. Id. ¶ 82. In addition, the investigation identified (by pseudonyms) CACI employees Steven Stefanowicz ("Stefanowicz"), Daniel Johnson ("Johnson"), and Timothy Dugan ("Dugan") as individuals who abused detainees and concluded that Johnson had encouraged Frederick to abuse detainees. Id. ¶ 88.[6]

Another investigation, conducted by Major General Antonio Taguba, identified CACI employee Stefanowicz[7] as one of a variety of personnel who were "directly or indirectly responsible for the abuses at Abu Ghraib." Id. ¶¶ 78, 83. The investigation further concluded

---

[5] According to plaintiffs, in the absence of proper training and supervision, it was "likely" that "abusive and inhuman treatment of detainees would occur," because experimental research has confirmed that individuals who are "placed in a position of unrestrained authority over prisoners" will "often resort to violence and abuse." TAC ¶ 19.

[6] The investigation also concluded that Stefanowicz lied in the course of the investigation. TAC ¶ 88.

[7] A former CACI employee present in Abu Ghraib at the time has testified that Stefanowicz tried to "present" or "establish" himself as the "senior intelligence person" among the CACI employees, so that personnel with operational questions would go to him first. TAC ¶ 105. He was apparently successful, because Frederick testified that ████████████████████████████ ████████████████████████ Id. ¶ 106.

4

that Stefanowicz gave "instructions to military personnel that [he] knew were both physically abusive and prohibited." Id. ¶ 87. Based on these findings, the investigation recommended "official reprimand and termination of Stefanowicz." Id.[8] The investigation was accompanied by a report prepared by Colonel Henry Nelson, a psychologist, which observed that MP personnel, including Frederick, "collaborated with . . . civilian contract interrogators" and that witnesses reported "pairs of civilian interrogators and interpreters carrying out detainee abuse." Id. ¶ 84.

In testimony, MPs who were present at the site have corroborated this connection between MP personnel and CACI employees and have explained that CACI employees assumed supervisory roles at the site. Specifically, Frederick has testified that CACI employees ordered him to "conduct or permit the following abusive acts upon the detainees under his supervision": restriction of detainees' diets; exposure of detainees to extreme hot or cold, including cold water; nudity; stress positions; sleep deprivation; forced physical exertion to the point of exhaustion; humiliation, such as forcing detainees to wear female underwear; and the use of unmuzzled dogs. Id. ¶ 23. In addition, Frederick has testified that ███████ personnel "had actually ordered him to set the conditions for abusing the detainees" and that ████████████ who "actually ordered the more severe forms of abuse" were Stefanowicz and Johnson. Id. ¶ 85. Frederick has further testified that ████████████████████████████████████████ ██████████████████████████████████████. Id. ¶ 86. Other military personnel, including Sergeant Theresa Adams and Captain Carolyn Wood, have testified that CACI interrogators "actually supervised" military personnel at the site, and then-Corporal Charles Graner ("Graner")

---

[8] The investigation also concluded that Stefanowicz made a false statement in the course of the investigation to cover up his role in the detainee abuse. TAC ¶ 87.

testified that Stefanowicz and Johnson directed him to torture detainees.[9] Id. ¶¶ 97, 100. █████

████████████████████████████████████████████████████████████████████████████

███████████████████ according to Frederick. Id. ¶ 108.

Frederick has also testified that he "never really knew who was in charge at Abu Ghraib." Id. ¶ 89. Not only were CACI personnel given full access to the site and often confused with MI personnel, but it was "common practice" for personnel to cover their name tags, causing confusion among both detainees and MPs about the identities and affiliations of interrogators. Id. ¶¶ 91-93 (quoting testimony of Frederick, then-Sergeant Javal Davis ("Davis"), and Sergeant Hydrue Joyner ("Joyner")). Joyner also specifically testified ████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████ Id. ¶ 94. Similarly—but even more specifically—Davis testified that "Steve" was one of the individuals who contributed to the abuse of detainees but that Davis "did not know who [Steve] work[ed] for," just that "he [wa]s an investigator/interrogator." Id. ¶ 103 (second alteration in original).[10]

In addition to military personnel, detainees themselves have corroborated the structure of this de facto hierarchy, where MPs took orders from CACI personnel. For example, in his deposition, Al-Ejaili testified that "civilian interrogators were seen as authority figures who gave instructions to military personnel" and he recalls guards asking interrogators for instructions about how to punish prisoners. Id. ¶ 138. Al-Ejaili has also specifically identified CACI employee Johnson as one of the interrogators who gave instructions to the guards and has

---

[9] Graner was court-martialed for his role in the prisoner abuse. TAC ¶ 100. He was sentenced to ten years imprisonment and had his rank reduced to Private. Id.

[10] Plaintiffs hypothesize that "Steve" was Steven Stefanowicz. TAC ¶ 103.

6

testified that Johnson would visit the detainees' cellblock multiple times each week to talk to the guards or observe each cell. Id. ¶¶ 139-40.

From these de facto supervisory positions, CACI employees helped establish a system of communication and oversight that enabled them to direct and monitor prisoner abuse. For example, CACI employees used "code words or terms," such as giving detainees "special treatment," "soften[ing] up" detainees, and the "doggie dance," to communicate to military personnel that they wanted the personnel to abuse prisoners in preparation for interrogations. Id. ¶ 117. Stefanowicz, in particular, ███████████████ and would direct MPs to use unmuzzled dogs to threaten and, in at least one case, bite detainees. Id. ¶¶ 122-23. ████████ ████████████████████████████████████████████ Id. ¶ 123. He also told Graner that ████████████████████████████████ Id. ¶ 126.[11] In addition, CACI employees—specifically Stefanowicz and Johnson—were present for a variety of abuses, including when prisoners were kept naked in cells, were forced to wear women's underwear, were tied to the cell bars, and were put in stress positions. Id. ¶ 119.

According to plaintiffs, responsibility for this abuse extended not just to individual CACI employees but also to the corporation. Plaintiffs rely on references to experts who have made clear that interrogators in war theatres will generally "be under intense pressure to produce actionable intelligence" and ensuring that interrogators do not "fall into the trap of acting on the belief that the means justifies the ends" requires proper training, leadership, and supervision. Id. ¶¶ 144-45. Plaintiffs allege that CACI failed to provide such training, leadership, and

---

[11] One famous published photograph of the prisoner abuse at Abu Ghraib involves a prisoner who Graner forced to stand naked on a box, covered only by a blanket and hood and with electrical wires connected to his fingers, toes, and genitalia. See Scott Higham & Joe Stephens, "New Details of Prison Abuse Emerge," Wash. Post, May 21, 2004, at A01, http://www.washingtonpost.com/wp-dyn/articles/A43783-2004May20.html.

supervision, instead ██████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████ and, for at least one employee, conducting only a five-minute telephone interview before offering him a position as an interrogator in Iraq. Id. ¶¶ 146-47. CACI also failed to appropriately investigate after multiple CACI employees and military officers informed CACI management about its employees' participation in prisoner abuse—and, in one case, ████████████████████████████████████████████████████

█████████████████████. Id. ¶¶ 150-53.[12] Even after the prisoner abuse became public and the military conducted multiple investigations, CACI failed to discipline its employees whom the military determined were involved in the abuse. Id. ¶¶ 154-55. Instead, CACI launched its own "internal investigation," which cleared its employees of wrongdoing; ███████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████. Id.

Plaintiffs further allege that CACI and its employees worked to cover up the prisoner mistreatment and CACI employees' roles in the abuse. In addition to the lies that Stefanowicz told government investigators, individuals at the prison intentionally hid detainees from the Red Cross when the Red Cross inspected the Hard Site. Id. ¶ 129. After the mistreatment became public, CACI and its parent company engaged in a "campaign of intimidation to suppress any coverage or investigation of its role in the conspiracy," including by sending letters threatening legal action to reporters and bringing a frivolous lawsuit against a radio station. Id. ¶¶ 172-73. They also issued a series of misleading statements, including falsely stating in a press release in

---

[12] In addition to the concerns raised directly by other interrogators and military officials, CACI supervisors and managers had regular access to reports from Abu Ghraib interrogators that raised concerns about prisoner abuse by CACI employees and met regularly with military officials to discuss CACI employees' conduct. TAC ¶¶ 163-67.

2004 that no employee departures in the previous year had been related to Abu Ghraib abuse, claiming in testimony and a book that CACI employees were always monitored by the military and CACI supervisors, and falsely claiming in a book that none of the publicly available photographs of abuse at Abu Ghraib show CACI employees. Id. ¶¶ 171, 175-76, 179, 181.

### B. Abuse Suffered by Plaintiffs

All three plaintiffs were detained at Abu Ghraib in late 2003 or early 2004, during the time that the abuse described above was ongoing. Each plaintiff was subjected to a variety of mistreatment while at Abu Ghraib, and each has submitted to a deposition in which he has detailed the abuse he suffered.[13]

### 1. Treatment of Al-Ejaili

Al-Ejaili, a former credentialed reporter for Al-Jazeera, was first arrested by United States Army personnel on November 3, 2003, while he was reporting on an explosion in Iraq's Diyala province. Pl. Opp. [Dkt. No. 639] Ex. A ("Al-Ejaili Dep.") 9:3-:22, 25:5-:12. After about a week of detention in various Army facilities, he was transferred to Abu Ghraib, where he was held for approximately six weeks. Id. at 17:19-36:3, 106:3-:6. He was processed at Abu Ghraib and taken to Tier 1, where a man in a military uniform and an interpreter took him to a hallway, commanded him to strip naked, put a bag over his head, and shouted at him to confess. Id. at 51:22-52:17. After shouting at Al-Ejaili for some amount of time, they left him naked in the

---

[13] For the purposes of defendant's motion under Fed. R. Civ. P. 12(b)(1), which argues that the Court does not have subject matter jurisdiction over plaintiffs' claims because of the political question doctrine, the Court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." In re KBR, Inc., Burn Pit Litig., 744 F.3d 326, 333 (4th Cir. 2014) (internal quotation marks omitted). Conversely, when ruling on defendant's motion under Fed. R. Civ. P. 12(b)(6), the Court is largely confined to allegations in the TAC. See Tellabs, Inc. v. Makor Issues & Rights Ltd., 551 U.S. 308, 322 (2007). Accordingly, the facts that have been developed through limited jurisdictional discovery, such as plaintiffs' depositions, but that are not included in the TAC will be considered only for the purpose of determining whether the Court has subject matter jurisdiction.

hallway. Id. at 58:3-:18. Graner then transported Al-Ejaili to another corridor, where he put him in an orange jumpsuit and handcuffed him to a pole. Id. at 61:7-63:17. Al-Ejaili was left handcuffed to the pole with a bag on his head through the night. He alleges that he vomited up a black substance while in that position. Id at 63:21-64:16.[14] At some point during the night, a woman approached the still-naked Al-Ejaili and touched him all over his body, pulling at his hair and pinching him. Id. at 65:6-:9. The next morning, Al-Ejaili was forced to clean the vomit off the floor with his jumpsuit and taken to a cell. Id. at 68:6-:13. He tried to clean the jumpsuit but, while it was drying, had nothing to wear. Id. at 69:5-:9. When he told a guard in a military uniform that he was cold, the guard gave him female underwear. Id. at 69:10-:19.

Over the ensuing weeks, Al-Ejaili was interrogated ten to twelve times—approximately once every two or three days. Id. at 80:7-:9. Each time, he was stripped naked, had a bag placed over his head, and was taken to an interrogation room. Id. at 74:6-:9. During the interrogations, he was often handcuffed to a pipe in the room and was beaten, punched, kicked, and slapped on the head. Id. at 79:5-:11, 82:19-:21, 100:1-:6. The interrogators also sometimes doused him with hot water, hot tea, or cold water. Id. at 100:20-01:3.

The mistreatment continued outside of interrogations. The prison personnel forced Al-Ejaili to follow a disruptive sleeping regimen and punished him when he was unable to follow it. Id. at 101:15-:18. They withheld food and water from him. Id. at 101:19-:20; 217:22-18:4. They left him alone and naked in a dark room in the basement of the tier. Id. at 101:20-02:1. They sometimes took all of the belongings in his cell, including the bed and his clothing, and left him naked there for multiple days. Id. at 102:7-:10. They chained his naked body to the wall or the

---

[14] Plaintiffs have corroborated this account with a photograph of Al-Ejaili, who appears to be naked, standing over a pool of dark-colored liquid with a bag over his head and an orange jumpsuit tied around his shoulders. Pl. Opp. Ex. F.

bars of his cell or the bed, and they repeatedly chained him in stress positions. Id. at 217:20-:22;

Orig. Def. Mem. [Dkt. No. 28] Ex. 2 ("Al-Ejaili Int."), at No. 4. They put a bag over his head

and beat him. Al-Ejaili Dep. 102:17-03:14. At least three times, they brought dogs so close to his

face while it was covered with a bag that he could feel them, an experience he has described as

"[t]errifying." Id. at 201:16-:13; see also Pl. Opp. Ex. P (photos of Abu Ghraib detainees being

threatened with dogs); Al-Ejaili Int., at No. 4 ("Al-Ejaili was threatened with unleased dogs

during an interrogation."); Pl. Opp. Ex. D ("Al-Ejaili Xenakis Rep.")[15] 4 ("[Al-Ejaili] was

threatened with dogs when hooded and could feel the dogs salivating as they put their paws on

his legs.").

   After 48 days at Abu Ghraib, Al-Ejaili was released. Al-Ejaili Xenakis Rep. 4. As a result

of his treatment at Abu Ghraib, Al-Ejaili has suffered "severe and debilitating" physical and

psychological symptoms. Id. at 5. He suffers from depression and anxiety, which "spoil his

personal and work life," because he is unable to do any broadcasting, freezes when on air, and

cannot complete live reporting due to anxiety attacks. Id. at 5. He has problems with his memory,

attention span, and concentration. Id. He suffers from frequent nightmares, "interfering

significantly with [his] quality of sleep." Id. He is prone to angry outbursts that frighten his wife

and children and his relationships with family and friends have deteriorated. Id. He has been

diagnosed with "moderately severe posttraumatic stress disorder" and "major depressive

disorder." Id. at 7. He also suffers from physical pain and scarring from the beatings, severe

headaches that he traces back to the beatings to the head, and gastric distress. Id. at 6.

---

[15] Stephen Xenakis, a board-certified psychiatrist and former Army brigadier general, examined
each of the plaintiffs and produced reports detailing the physical and mental effects of plaintiffs'
mistreatment.

2. Treatment of Al-Zuba'e

Al-Zuba'e was arrested by American military personnel in November 2003 after he was stopped while driving home with a neighbor. Pl. Opp. Ex. G. ("Al-Zuba'e Dep.") 19:5-24:15. He was taken to Abu Ghraib and put in a large room with a number of other detainees for two days. Id. at 31:17-33:21. On the third day, civilian guards transferred Al-Zuba'e to another room, took off his clothes, and instructed him to masturbate. Id. at 35:10-37:17. Al-Zuba'e refused, informing them that masturbation was forbidden by his religion, and one of the civilians touched his penis until it became erect. Id. at 36:15-:16, 40:4-41:4. At that point, another civilian took a picture of his penis. Id. at 41:1-:9. Once the civilians had taken the picture, they told Al-Zuba'e to put his clothes back on and had him transported to another room, where he was left alone for three or four hours. Id. at 42:3-:10, 47:21-48:5.

A few hours later, the same civilians came back to the room, put bands on Al-Zuba'e's wrists and a black bag on his head, and took him in a Hummer to the Hard Site. Id. at 48:8-49:20. When they arrived at the Hard Site, one of the guards put a rope around Al-Zuba'e's neck and pulled him out of the Hummer with the rope. Id. at 50:1-:9. When he cried in pain, the guards repeatedly punched and kicked him. Id. at 50:10-51:13. After beating Al-Zuba'e, the guards took him to a room with a group of soldiers, where they stripped him again. Id. at 52:2-53:13. One of the soldiers hugged Al-Zuba'e's naked body and told him, "I'm going to 'fiki-fiki' you."[16] Id. at 53:16-:21; Pl. Opp. Ex. H. A group of guards, including both males and females, took Al-Zuba'e to a bathroom, where they forced him into a cold shower with a bar of soap. Al-Zuba'e Dep. 54:4-55:4. They rubbed soap into his eyes and told him that he had to stay in the cold shower until he had used the entire bar. Id. at 54:15-55:7; Orig. Def. Mem. Ex. 1 ("Al-Zuba'e Int."), at

---

[16] The personnel at Abu Ghraib apparently used the word "fiki-fiki" to mean "f---." See Pl. Opp. Ex. J ("Al Shimari Dep.") 105:13-07:4.

No. 4. At some point, Al-Zuba'e became so cold that he was no longer able to stand and he fell on the floor. Al-Zuba'e Dep. 55:22-56:2.

After Al-Zuba'e fell, the soldiers dragged him from the bathroom down to the first floor. Id. at 57:22-58:3. He lost consciousness and awakened to the guards hitting him.[17] Id. at 58:15-:18. They forced him to crawl or slide around the hallway on his stomach while they beat him until his chest bled. Id. at 58:15-61:7; Al-Zuba'e Int., at No. 4. When they stopped beating him, the guards brought a dog into the hallway and allowed the dog to bite Al-Zuba'e's hand and legs. Al-Zuba'e Dep. 61:8-:22. Rather than provide medical treatment for these injuries, the guards put bands on Al-Zuba'e's wrists and a hood on his head and left him, still naked, in a cell overnight. Id. at 63:21-65:13.

The next day, Al-Zuba'e was transported to an interrogation room, where he was interrogated by two apparently civilian interrogators with a civilian interpreter for two to three hours. Id. at 70:10-72:16. At the end of the questioning, one of the interrogators had a conversation with a guard which Al-Zuba'e could not hear. Id. at 74:22-76:6, 77:12-:14. The guard took Al-Zuba'e to a cell and smashed his head against a wall, causing him to fall to the ground. Id. at 76:7-:19. The guard told Al-Zuba'e to stand up and handcuffed his arms to the upper bunk such that his arms were above his head and his feet were barely touching the floor. Id. at 78:13-79:14. Al-Zuba'e was left in this stress position for an entire day, during which time Al-Zuba'e urinated and defecated on himself. Id. at 81:14-:16, 135:21-37:5. Although he was screaming and crying in pain, the guard told him that he could not release him because the guard had orders to leave him in the stress position. Id. at 82:1-83:4.

---

[17] Plaintiffs' brief states that Al-Zuba'e "was awakened by being beaten with a stick all over his body, including on his genitals." Pl. Opp. 9. In his deposition, Al-Zuba'e testified separately that he woke up to the guards hitting him on this occasion and that he was beaten on the genitals with a stick, see Al-Zuba'e Dep. 58:15-:18, 134:8-35:20, 139:17-:19.

After Al-Zuba'e was unchained from the bed, he was left alone in the cell for four or five

days. Id. at 83:15-84:12. At that point, the same three civilians who had conducted the first

interrogation came to Al-Zuba'e's cell and transported him back to the interrogation room. Id. at

85:1-:14. After interrogating Al-Zuba'e, they again had a conversation with the guard who was

guarding his cell. Id. at 90:19-91:4. The guard took Al-Zuba'e back to his cell, instructed him to

take off his clothes, and removed all the furniture, with the possible exception of his bedframe,[18]

from the cell. Id. at 91:11-93:13. Al-Zuba'e was left alone, naked in the empty cell, for three

days until he became sick. Id. at 93:15-:19. At that point, the guards brought Al-Zuba'e a

jumpsuit, put a bag on his head, spun him around to disorient him, and brought him to "a room

somewhere that was very cold, very cold, very cold," where he was questioned for a couple of

hours. Id. at 94:1-96:16.

After this third interrogation, Al-Zuba'e was left in his cell for ten days, until he was

taken back to the interrogation room. Id. at 100:12-:15. During this fourth interrogation, the

interrogators threatened to bring Al-Zuba'e's family to Abu Ghraib if he did not cooperate. Id. at

101:10-:20. When the interrogation concluded, Al-Zuba'e was brought back to his cell, was told

to bend over, and was handcuffed to the cell door. Id. at 102:3-03:14 ; see also Pl. Opp. Ex. R

(photos of Abu Ghraib detainees in a similar stress position). At some point, Al-Zuba'e was

released from this stress position and was left in the cell for approximately twenty days before he

was taken to a new interrogation room with a new set of civilian interrogators. Al-Zuba'e Dep.

103:11-05:17. When Al-Zuba'e told the new interrogators that he could not answer their

---

[18] There appears to be a slight inconsistency between Al-Zuba'e's deposition, in which he
testified that the guard "took everything, all my belongings" out of the cell, see Al-Zuba'e Dep.
92:17-:18; see also id. at 93:3-:4 ("He took everything out, including my mattress."), and Al-
Zuba'e's interrogatory responses, in which he stated that the guard "removed everything but the
bedframe from his cell," Al-Zuba'e Int., at No. 4.

questions, the interrogation ended with the interrogators hitting Al-Zuba'e repeatedly and throwing him against the wall. Id. at 106:1-08:8. After this last interrogation, Al-Zuba'e was released from the Hard Site. Id. at 109:20-10:3.

As a result of the mistreatment he suffered at the Hard Site, Al-Zuba'e claims he has suffered "severe and debilitating symptoms that have persisted since his release." Pl. Opp. Ex. K ("Al-Zuba'e Xenakis Rep.") 4. He has been diagnosed with "severe posttraumatic stress disorder and major depressive disorder." Id. at 6. He also continues to suffer from frequent headaches and nightmares that interfere with his work, social relationships, and ability to sleep. Id. at 4. He has become "physically and emotionally abusive to his wives and children," suffers from "problems in attention and concentration," and "often dissociates or daydreams." Id. He also suffers from constant fatigue and "persistent gastric distress." Id. He has also suffered scarring from the beatings and dog bites and continues to suffer musculoskeletal aches and pains. Id. at 6; Al-Zuba'e Int., at No. 4.

    3.  <u>Treatment of Al Shimari</u>

Al Shimari, who was working as a farmer, was arrested by American forces at his home in early November 2003. Al Shimari Dep. 13:7-15:4. He was originally taken to a United States military camp, where he was held for two days while military personnel conducted an investigation into weapons that were found in his house. Id. at 22:22-26:15. Al Shimari was then transported among a variety of military camps, as the investigation into the weapons continued. Id. at 28:13-37:5. After he had been in custody for approximately a month, Al Shimari was transported to Abu Ghraib, where he was initially stripped naked and had his body examined by nonmedical personnel. Id. at 37:3-39:8.

The next day, Al Shimari was handcuffed, had a bag placed over his head, and was taken for his first interrogation. Id. at 41:4-:14. When he got to the interrogation room, he was forced to kneel on sharp stones and was punched all over his face. Id. at 41:15-43:15. The sharp rocks caused lasting damage to his legs, as he is now unable to stand for extended periods of time and still has scars, numbness, and pain. Id. at 117:8-18:22; Pl. Opp. Ex. M. ("Al Shimari Xenakis Rep.") 4. During the interrogation, either the interrogator or one of the guards pulled on Al Shimari so hard while he was handcuffed that he feared his hands would break, and they stepped on his stomach, back, legs, and head. Al Shimari Dep. 47:9-49:3, 119:1-:15. After he was interrogated, Al Shimari was taken to a cold brick room, where he was left—barefoot and without any food—for a day. Id. at 52:1-54:4.

Al Shimari was interrogated again the next day for about three hours. Id. at 54:13-:21. The interrogator forced him to stand on his toes with his nose against the wall during the interrogation and, at various times, ordered the guard to hit Al Shimari against the wall. Id. at 55:2-57:14. Although the interrogator threatened to keep Al Shimari in this stress position overnight, he only forced him to stand against the wall for approximately three hours. Id. at 56:13-:19. At the end of the interrogation, the guard tied Al Shimari's hands behind his back and beat him all over his body, including on his head and face. Id. at 58:1-:15.

About a week later, Al Shimari was taken for a third interrogation, which lasted approximately four hours. Id. at 59:4-62:15. During this interrogation, the civilian interrogator forced Al Shimari to sit with his handcuffed hands behind his back facing a window. Id. at 63:2-:12, 66:1-:11. The civilian brought a dog to the other side of the window and threatened to have the dog bite Al Shimari's hands if he was uncooperative. Id. at 66:1-:11. After this interrogation, the civilian interrogator directed the guards to shave Al Shimari's hair and mustache, force him

16

into a cold shower with a bar of soap until the entire bar was dissolved, and give him a soaked jumpsuit to wear. Id. at 67:19-70:6.

Even after these three initial interrogations, Al Shimari was continuously mistreated during his forty days at the Hard Site. On at least one occasion, guards brought a dog to his cell and threatened him with it, allowing the dog to lunge at him and putting a blanket over his head and allowing the dog to bite it. Id. at 77:16-78:6. In addition, his cell was often kept extremely dark, loud music was played nearby, and guards would often douse him with water. Id. at 86:20-89:9. At one point, an interrogator threatened to bring Al Shimari's wife to Abu Ghraib if he did not confess, and on a separate occasion, an interrogator threatened to shoot him. Id. at 90:12-:19, 100:4-01:8. The guards routinely beat Al Shimari, including with a baton stick and rifle and sometimes in the face and on the genitals, which resulted in his teeth falling out and his being unable to have children. Id. at 97:4-98:8, 102:2-:5, 105:4-:11; see also Al Shimari Xenakis Rep. 4. The guards sometimes wired Al Shimari to electric equipment that they called a lie detector and would shock him while interrogating him, resulting in lasting scars. Al Shimari Dep. 102:8-03:13; Al Shimari Xenakis Rep. 11-12. They also dragged Al Shimari to and from interrogations using a rope tied around his neck. Al Shimari Dep. 103:19-04:19. In addition, on multiple occasions, guards inserted their fingers into Al Shimari's rectum. Id. at 125:5-:20.

The mistreatment Al Shimari suffered resulted in "severe and debilitating symptoms that manifested in the early days of his detention and have persisted since his release." Al Shimari Xenakis Rep. 6. He continues to suffer from multiple "musculoskeletal aches and pains" and has "scarring that he attributes to beatings." Id. at 8. He has been diagnosed with "moderately severe postconcussive syndrome attributable to multiple beatings on the head with loss of consciousness," post-traumatic stress disorder, and major depressive disorder. Id. at 8-9. He has

trouble sleeping, often dissociates for extended periods of time, and suffers severe headaches

multiple times each week. Id. at 6. At this point, he appears unable to have any more children,

and his relationship with his wife has suffered. Id. He often feels angry without provocation and

has emotional outbursts, which have resulted in abusive behavior toward his family and hurt his

children's performance in school. Id.

## C. Procedural History

On June 30, 2008, Al Shimari filed this civil action in the United States District Court for

the Southern District of Ohio against then-defendants Dugan; CACI International, Inc. ("CACI

International"); CACI; and L-3 Services, Inc., alleging three substantive violations of the law of

nations under the ATS: torture, CIDT, and war crimes. [Dkt. No. 2]. For each substantive

violation, Al Shimari also alleged separate counts of civil conspiracy and aiding and abetting. Id.

In addition, he alleged eleven common law causes of action. Id. In August 2008, the civil action

was transferred to this court at the request of the parties and was assigned to Judge Gerald Bruce

Lee. [Dkt. No. 16]. Shortly thereafter, Dugan and L-3 Services, Inc. were voluntarily dismissed

without prejudice. [Dkt. Nos. 21 & 27].

On September 15, 2008, the Amended Complaint, which added Rashid, Al-Ejaili, and Al-

Zuba'e as plaintiffs, was filed. [Dkt. No. 28]. CACI and CACI International moved to dismiss

the Amended Complaint, arguing that plaintiffs' claims presented nonjusticiable political

questions, that defendants were immune from suit, that plaintiffs failed to state factual

allegations sufficient to demonstrate a plausible entitlement to relief, that plaintiffs' claims were

preempted by the Combatant Activities Exception to the Federal Tort Claims Act ("FTCA"), that

plaintiffs' ATS claims were not cognizable, and that plaintiffs had failed to allege facts sufficient

to establish respondeat superior liability. [Dkt. Nos. 34 & 35]. CACI and CACI International also

filed a Motion for Partial Summary Judgment, arguing that the newly-added plaintiffs' common law tort claims were barred by the statute of limitations. [Dkt. Nos. 44 & 45].

On November 25, 2008, the Motion for Partial Summary Judgment was denied after the court found that Rashid, Al-Ejaili, and Al-Zuba'e fell into the definition of a class proposed in Saleh v. Titan Corp., No. 04-cv-1143 (S.D. Cal.), which tolled the statute of limitations on their tort claims from the time the Saleh civil action was filed until the time class certification was denied. [Dkt. No. 76]. On March 18, 2009, Judge Lee granted the Motion to Dismiss "to the extent that [the Amended Complaint's] claims invoke ATS jurisdiction," because he was "unconvinced that a suit against private civilian interrogators falls within the class of hybrid international norms in existence when the ATS was enacted." Al Shimari v. CACI Premier Tech., Inc., 657 F. Supp. 2d 700, 728 (E.D. Va. 2009);[19] [Dkt. No. 94]. At the same time, Judge Lee held that plaintiffs' claims were justiciable, that defendants were not entitled to immunity, that plaintiffs' claims were not preempted, that plaintiffs alleged sufficient facts to support vicarious liability, that plaintiff sufficiently alleged conspiratorial liability, and that plaintiffs sufficiently alleged direct involvement by defendants' employees in the tortious conduct. Id. at 731-32.

CACI and CACI International filed an interlocutory appeal, challenging the rulings on immunity, preemption, and the political question doctrine. The Fourth Circuit reversed the district court, concluding "based on the uniquely federal interests involved in this case, that the plaintiffs' tort claims are preempted and displaced under the reasoning articulated in [Boyle v. United Technologies Corp., 487 U.S. 500 (1988),] as applied to circumstances virtually identical to those before us in Saleh v. Titan Corp., 580 F.3d 1 (D.C. Cir. 2009)." Al Shimari v. CACI

---

[19] Given the long history of this civil action, the Court has omitted all subsequent history from citations to previous decisions in this civil action.

Int'l, Inc. (Al Shimari I), 658 F.3d 413, 417 (4th Cir. 2011). Plaintiffs filed a petition for rehearing en banc, which was granted, vacating the panel decision. The en banc Fourth Circuit dismissed the appeal, concluding that it lacked jurisdiction over the interlocutory appeal. Al Shimari v. CACI Int'l Inc. (Al Shimari II), 679 F.3d 205, 212 (4th Cir. 2012) (en banc).

On remand, plaintiffs filed a Motion for Reconsideration, in which they asked Judge Lee to revisit his previous ruling dismissing their ATS claims in light of subsequent case law. [Dkt. Nos. 144 & 145]. Plaintiffs' motion was granted, and their ATS claims were reinstated. [Dkt. No. 159]. After the claims were reinstated, plaintiffs filed a Second Amended Complaint, which included the same parties and claims as the Amended Complaint. [Dkt. No. 177]. Three weeks later, on January 14, 2013, CACI and CACI International each filed a Motion to Dismiss. [Dkt. Nos. 180 & 183]. CACI argued that the Second Amended Complaint did not appropriately plead conspiracy claims, and CACI International argued that the Second Amended Complaint did not allege facts sufficient to support holding CACI International liable for the actions of the interrogators, who were CACI, not CACI International, employees. [Dkt. Nos. 181 & 184]. Judge Lee granted both motions, dismissing without prejudice plaintiffs' claims alleging a conspiracy between CACI and the United States military and dismissing with prejudice plaintiffs' claims alleging a conspiracy between CACI International and CACI or between CACI and its employees, as well as all claims against CACI International. [Dkt. No. 215].

Concurrently with these motions, defendants also filed a Motion for Reconsideration, in which they asked Judge Lee to reconsider his earlier decision denying their summary judgment motion as to Rashid's, Al-Ejaili's, and Al-Zuba'e's common law claims in light of intervening precedent from the Virginia Supreme Court. [Dkt. Nos. 161 & 162]. On March 19, 2013, Judge Lee granted defendants' motion, vacated his previous Order, and dismissed with prejudice

Rashid's, Al-Ejaili's, and Al-Zuba'e's common law claims. [Dkt. No. 226]. On the same day, he granted plaintiffs leave to file a Third Amended Complaint but instructed them to limit any amendments to those related to conspiracy allegations between CACI and the United States military. [Dkt. No. 227].

On March 28, 2013, plaintiffs filed their Third Amended Complaint [Dkt. No. 251]. As before, the Complaint contained nine counts under the ATS brought by all plaintiffs. Id. In addition, the Complaint contained eleven common law counts brought by Al Shimari. Id. CACI promptly filed a Motion to Strike, in which it argued that the amendments to the Complaint went beyond those permitted by the court's order granting plaintiffs leave to amend. [Dkt. Nos. 300 & 301]. In addition, CACI filed a Motion to Reconsider, arguing that plaintiffs' ATS claims should be dismissed in light of the Supreme Court's decision in Kiobel v. Royal Dutch Petroleum Co., 133 S. Ct. 1659 (2013). [Dkt. Nos. 354 & 355]. It also filed a Motion to Dismiss, arguing that Al Shimari's common law claims should be dismissed because they were governed by Iraqi law, to which CACI was not subject. [Dkt. Nos. 363 & 364]. On June 25, 2013, both motions were granted. Al Shimari v. CACI Int'l Inc., 951 F. Supp. 2d 857 (E.D. Va. 2013); [Dkt. No. 460]. Judge Lee found that, in light of Kiobel, which established a presumption against extraterritorial application of the ATS, the court lacked jurisdiction over plaintiffs' ATS claims "because the acts giving rise to their tort claims occurred exclusively in Iraq, a foreign sovereign." Id. at 858. In addition, he found that Iraqi law, which governed Al Shimari's tort claims under Ohio's choice-of-law provisions, "precludes both liability under Iraqi law and the application of law from a jurisdiction within the United States to [CACI's] actions." Id. Accordingly, plaintiffs'

Third Amended Complaint was dismissed without prejudice. Id.[20] Plaintiffs timely filed a notice of appeal. [Dkt. No. 461].

On appeal, the Fourth Circuit considered two jurisdictional questions: the extraterritorial application of the ATS, as discussed by Judge Lee in his opinion, and also the political question doctrine, which CACI raised as a separate argument for lack of jurisdiction. See Al Shimari v. CACI Premier Tech., Inc. (Al Shimari III), 758 F.3d 516, 527 (4th Cir. 2014). The court concluded that plaintiffs' claims "touch and concern" the "territory of the United States with sufficient force to displace the presumption against extraterritorial application" of the ATS; however, the court was "unable to determine" from the record developed at that time whether plaintiffs' claims "present nonjusticiable political questions." Id. at 520 (internal quotation marks omitted). Accordingly, the Fourth Circuit held that the district court erred in determining that it lacked jurisdiction under the ATS, vacated the district court's judgment, and remanded the case for "factual development of the record" and to analyze whether the political question doctrine precluded subject matter jurisdiction. Id. at 520-21.

On remand, Judge Lee reopened discovery to allow for limited jurisdictional discovery, ordered briefing on the political question doctrine and the elements of plaintiffs' ATS claims, and instructed the parties not to file any motions that were unrelated to those two issues. [Dkt. No. 507]. After the close of discovery, CACI filed a Motion to Dismiss, in which it argued that the political question doctrine deprived the court of subject matter jurisdiction. [Dkt. Nos. 516 & 517]. On June 18, 2015, Judge Lee granted CACI's motion and dismissed plaintiffs' Third Amended Complaint. Al Shimari v. CACI Premier Tech., Inc., 119 F. Supp. 3d 434 (E.D. Va. 2015); [Dkt. No. 547].

---

[20] A variety of pending discovery motions as well as defendants' pending motion to strike certain allegations from the Third Amendment Complaint were denied as moot. [Dkt. No. 460].

Judge Lee began by explaining that the Fourth Circuit has "formulated a test for considering whether" lawsuits "brought against government contractors who perform services for the military" are "justiciable under the political question doctrine." Id. at 442 (citing Taylor v. Kellogg Brown & Root Servs., Inc., 658 F.3d 402, 404 (4th Cir. 2011)). Under this test, such lawsuits are nonjusticiable if "the government contractor was under the 'plenary' or 'direct' control of the military" or if "national defense interests were 'closely intertwined' with military decisions governing the contractor's conduct, such that a decision on the merits of the claim 'would require the judiciary to question actual, sensitive judgments made by the military.'" Id. (quoting Taylor, 658 F.3d at 411). After reviewing the evidence in the record, Judge Lee found that plaintiffs' claims failed under both prongs of the Taylor test. First, he concluded that "the military exercised 'plenary' and 'direct' control over how Defendants interrogated detainees at Abu Ghraib" and that the "military clearly chose how to carry out tasks related to the interrogation mission, while CACI had no discretion in any operational matters." Id. at 446. Second, he found that the judiciary "is simply not equipped to make judgments as to whether the techniques approved by the military were appropriate—a judgment that would no doubt come into question during adjudication of the merits of this case." Id. at 449. As such, he concluded that "the national defense interests are so closely intertwined with military decisions governing Defendant's conduct" that "a decision on the merits of the claim would require the judiciary to question actual, sensitive judgments made by the military." Id. Additionally, Judge Lee concluded that the court lacked judicially manageable standards for evaluating plaintiffs' claims, both because the court lacked expertise in matters of foreign law, which might govern some of plaintiffs' claims, and because there was "ambiguity surrounding the elements" of each ATS

claim. Id. at 449-50. Accordingly, CACI's Motion to Dismiss was granted, and plaintiffs timely appealed. [Dkt. No. 554].

On appeal, the Fourth Circuit clarified the appropriate standard for application of the political question doctrine and vacated the district court's judgment. Al Shimari v. CACI Premier Tech., Inc. (Al Shimari IV), 840 F.3d 147 (4th Cir. 2016). With respect to the first Taylor factor, the Fourth Circuit concluded that the district court erroneously focused on whether "the military maintained formal control over interrogations," rather than whether "the military actually controlled the CACI interrogators' job performance, including any activities that occurred outside the formal interrogation process." Id. at 156-57. In addition, the Fourth Circuit held that although the decisions of a contractor under actual control of the military are considered to be de facto military decisions, "the military cannot lawfully exercise its authority by directing a contractor to engage in unlawful activity." Id. at 157. Accordingly, the court held "that a contractor's acts may be shielded from judicial review under the first prong of Taylor only to the extent that those acts (1) were committed under actual control of the military; and (2) were not unlawful." Id.

With respect to the second Taylor factor, the Fourth Circuit found that the district court conducted an "incomplete" analysis because it "fail[ed] to draw a distinction between unlawful conduct and discretionary acts that were not unlawful when committed." Id. at 158. The Fourth Circuit observed that the "commission of unlawful acts is not based on military expertise and judgment, and is not a function committed to a coordinate branch of government." Id. (internal quotation marks omitted). Accordingly, the Fourth Circuit held that "to the extent that the plaintiffs' claims rest on allegations of unlawful conduct in violation of settled international law

24

or criminal law then applicable to the CACI employees, those claims fall outside the protection of the political question doctrine." Id.

In sum, with respect to the application of the political question doctrine, the Fourth Circuit held

> that any conduct of the CACI employees that occurred under the actual control of the military or involved sensitive military judgments, and was not unlawful when committed, constituted a protected exercise of discretion under the political question doctrine. Conversely, any acts of the CACI employees that were unlawful when committed, irrespective whether they occurred under actual control of the military, are subject to judicial review. Thus, the plaintiffs' claims are justiciable to the extent that the challenged conduct violated settled international law or the criminal law to which the CACI employees were subject at the time the conduct occurred.

Id. at 159. Lastly, the Fourth Circuit held that the judiciary has "manageable standards" for adjudicating plaintiffs' claims. Id. at 161. Although the court recognized that "the substantive law applicable to the present claims may be unfamiliar and complicated in many respects," it concluded that the "district court in the present case is called upon to interpret statutory terms and established international norms," as well as "long-standing common law principles," all of which are tasks within the ability of the judiciary. Id.

In addition to joining the unanimous majority opinion, Judge Floyd concurred to "articulate [his] understanding of one aspect of [the] holding." Id. at 162 (Floyd, J., concurring). In particular, Judge Floyd emphasized that he did not read the majority opinion "to suggest that courts cannot adjudicate close questions of lawfulness regarding military affairs" and that, even in close cases, "the judiciary is well equipped to adjudicate such issues without impermissibly answering political questions." Id. at 162-63.

On remand, Judge Lee recused himself from this civil action, and it was reassigned to the undersigned judge. [Dkt. No. 562]. After holding a status conference to determine the appropriate path forward, the Court ordered plaintiffs' counsel to arrange for the deposition of Al

25

Shimari, Al-Zuba'e, and Rashid[21] and ordered both parties to submit briefs addressing the applicable legal standards under the ATS and the common law. [Dkt. No. 571]. On January 17, 2017, the plaintiffs voluntarily dismissed all of the remaining common law claims with prejudice [Dkt. No. 575] and both parties submitted briefs addressing the applicable legal standards under the ATS [Dkt. Nos. 576 & 577]. When plaintiffs were unable to arrange for the deposition of Rashid, he was dismissed without prejudice from this civil action [Dkt. No. 607], leaving Al Shimari, Al-Zuba'e, and Al-Ejaili as the only plaintiffs.

On June 28, 2017, the Court issued a Memorandum Opinion clarifying the appropriate legal framework for analyzing plaintiffs' ATS claims. Al Shimari v. CACI Premier Tech., Inc., 263 F. Supp. 3d 595 (E.D. Va. 2017); [Dkt. No. 615]. The Court held that torture, CIDT, and war crimes all constitute violations of the law of nations and that claims of torture, CIDT, and war crimes are actionable against private parties under the ATS. In addition, the Court identified the "applicable sources of law for defining the prohibitions." Id. at 596. Specifically, the Court identified the Anti-Torture Act ("ATA"), 18 U.S.C. § 2340, and the Torture Victims Protection Act ("TVPA"), 28 U.S.C § 1350(note), as well as case law interpreting and applying those statutes and international agreements dealing with torture, as persuasive sources of authority on the definition of the prohibition against torture, Al Shimari, 263 F. Supp. 3d at 600-02. In addition, the Court identified sources of law defining CIDT, such as the International Covenant on Civil and Political Rights as well as Article 3 of the Geneva Conventions, which has been incorporated into American statutory law through the War Crimes Act. Id. at 602-04; see 18 U.S.C. § 2441(d)(1)(B). Lastly, the Court identified the War Crimes Act of 1996 as providing a clear definition of war crimes. Al Shimari, 263 F. Supp. 3d at 605; see 18 U.S.C. § 2441(c).

---

[21] Al-Ejaili had already been deposed. [Dkt. No. 571].

With this legal framework in place, the Court provided defendant an opportunity to file a motion addressing any arguments that it wished to raise under Fed. R. Civ. P. 12. CACI has filed a Motion to Dismiss [Dkt. No. 626], in which it argues that the political question doctrine precludes judicial review of plaintiffs' claims; that plaintiffs' allegations are not cognizable under the ATS because they do not constitute torture, CIDT, or war crimes; that plaintiffs' direct liability claims should be dismissed because they have failed to allege direct involvement in their abuse by CACI employees; that plaintiffs' conspiracy claims must be dismissed for failure to state a claim; that plaintiffs' aiding and abetting claims fail; and that plaintiffs' ATS claims are preempted by the Constitution, the FTCA, Coalition Provisional Authority ("CPA") Order 17, and the ATA and TVPA. CACI's Motion to Dismiss has been fully briefed [Dkt. Nos. 627, 639, & 645] and oral argument has been heard. For the reasons that follow, CACI's Motion to Dismiss will be granted in part and denied in part, and plaintiffs' direct liability claims will be dismissed.

## II.    STANDARD OF REVIEW

Under Rule 12(b)(1), a civil action must be dismissed whenever the court lacks subject matter jurisdiction. The plaintiff has the burden of establishing subject matter jurisdiction, Demetres v. E.W. Constr., Inc., 776 F.3d 271, 272 (4th Cir. 2015), and the Court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment," In re KBR, 744 F.3d at 333 (internal quotation marks omitted).

Under Rule 12(b)(6), a civil action must be dismissed if the complaint does not "contain sufficient facts to state a claim that is 'plausible on its face.'" E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 440 (4th Cir. 2011) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Although the Court must assume for the purposes of deciding the motion

27

that all "well-pleaded allegations" are true and must "view the complaint in the light most favorable to the plaintiff," Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009), allegations that are merely conclusory need not be credited, see Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

### III.    SUBJECT MATTER JURISDICTION

Before addressing the merits of plaintiffs' claims and CACI's various defenses, the Court must first determine whether it has subject matter jurisdiction. CACI argues that the Court lacks subject matter jurisdiction because "the political question doctrine precludes judicial review," Def. Mem. [Dkt. No. 627] 3-12 (formatting and capitalization altered), and because "plaintiffs' allegations are not cognizable under the" ATS, id. at 12-26 (formatting and capitalization altered). With respect to the application of the political question doctrine, the Fourth Circuit has held that "any acts of the CACI employees that were unlawful when committed . . . are subject to judicial review" and, accordingly, that "plaintiffs' claims are justiciable to the extent that the challenged conduct violated settled international law or the criminal law to which the CACI employees were subject at the time." Al Shimari IV, 840 F.3d at 159. As this Court has previously recognized, plaintiffs' claims are only cognizable under the ATS to the extent that they represent "violations of international law" norms that are "specific, universal, and obligatory." Al Shimari, 263 F. Supp. 3d at 599 (quoting Sosa v. Alvarez-Machain, 542 U.S. 692, 732 (2004)). As such, at the subject matter jurisdiction stage, the inquiries under the political question doctrine and the ATS merge, such that if plaintiffs' claims are cognizable under the ATS, they necessarily state a violation of settled international law and the political

question doctrine is inapplicable.[22] Therefore, the Court must determine whether plaintiffs have sufficiently alleged—and the evidence in the record supports—claims of torture, CIDT, or war crimes.

As the Court previously held, any definition of the prohibition against torture must begin with congressionally authorized statutes and any case law applying those statutes, but international agreements and sources may also be persuasive authority in determining the contours of settled international law. See Al Shimari, 263 F. Supp. 3d at 600-02. The ATA defines torture as "an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control." 18 U.S.C § 2340(1). This definition is substantially similar to those found in other domestic and international law sources. See, e.g., TVPA, 28 U.S.C § 1350(note)(2)(b)(1) (defining "torture" as "any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual" for a variety of specified purposes); Convention Against Torture and Other Cruel,

---

[22] Defendant argues that "the unlawfulness inquiry" should not be "focused on the conduct of whoever mistreated Plaintiffs, but on evidence of whether CACI PT personnel engaged in unlawful conduct associated with Plaintiffs' alleged injuries." Def. Mem. 5 (emphasis in original). As discussed more fully below, the TAC contains sufficiently detailed factual allegations to support plaintiffs' claims that CACI interrogators entered into conspiracies with military personnel to abuse plaintiffs and that CACI interrogators aided and abetted the abuse of plaintiffs. In addition, these allegations in the TAC are supported by substantial evidence, including depositions taken of military personnel before the TAC was filed, and the jurisdictional evidence developed since the filing of the TAC has aligned with these allegations. Furthermore, CACI does not dispute that it is unlawful to conspire to commit unlawful activity or to aid and abet the commission of unlawful activity. Accordingly, the Court's focus at this juncture is on whether the allegations of abuse rise to the level of unlawful torture, CIDT, or war crimes, because if so, the allegations support a finding that CACI's activity was illegal.

Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46, art. 1, U.N. Doc.

A/RES/39/46 (Dec. 10, 1984) (defining "torture" as "any act by which severe pain or suffering,

whether physical or mental, is intentionally inflicted on a person for" a variety of specified

purposes). In addition, both plaintiffs and defendant rely on similar definitions of torture to

structure their arguments, see Def. Mem. 13, Pl. Opp. 19, further reinforcing the Court's

conclusion that the prohibition against torture encompasses any act, or combination of acts,[23] by

a person acting under color of law that is intended to inflict severe physical or mental[24] pain or

suffering on an individual in that person's custody.

The Court has already adopted the analysis in Al-Quraishi v. Nakhla, 728 F. Supp. 2d

702 (D. Md. 2010), rev'd on other grounds, 657 F.3d 201 (4th Cir. 2011), which held that

"contractors operating alongside the military as interpreters for non-English speaking detainees

at Abu Ghraib performed a public function" and operated as a "willful participants" in joint

activity with state actors and, as such, were acting under color of law. Al Shimari, 263 F. Supp.

3d at 601-02. Although the Court has not previously decided that the CACI interrogators here

---

[23] Although CACI has focused on each alleged type of abuse individually because it "found it analytically useful to evaluate allegations of mistreatment by type," Def. Reply [Dkt. No. 645] 7, both parties agree that the Court "should 'view the facts holistically, with an eye to the full factual context," id. at 6 (quoting Velasquez v. Sessions, 866 F.3d 188, 195 (4th Cir. 2017)). Because plaintiffs have offered substantial evidence to show that their abuse took place in the context of a program of mistreatment designed to "soften up" the detainees for interrogation, see, e.g., TAC ¶¶ 18, 110-11, 117, 123, the Court must evaluate that program as a whole rather than focusing on each act individually.

[24] CACI argues that "severe mental pain or suffering" requires "prolonged mental harm" resulting from the infliction of severe physical pain or suffering, the use of mind-altering substances or "other procedures calculated to disrupt profoundly the senses or the personality," the "threat of imminent death," or similarly severe threats to other individuals. Def. Reply 7 (quoting 18 U.S.C. § 2340(2)). Although the Court doubts that the recognized international prohibition is so restrictive, see, e.g., Convention Against Torture ¶ 1 (defining "torture" to include any "severe" mental "pain or suffering," without reference to these limitations), it is clear that the allegations supported by plaintiffs' evidence meet the "severe physical pain" standard and that the prolonged mental harm that each plaintiff has suffered is connected both to the severe physical pain he endured as well as the other torture techniques enumerated in § 2340(2).

were also performing a public function or had operated as willful participants in joint activity with state actors, see id. at 602 ("[T]his Court does not currently decide the color-of-law question . . . ."), CACI appears to concede that under the Al-Quraishi standard, its interrogators were acting under color of law, Def. Mem. 13.[25] In addition, CACI explicitly concedes that plaintiffs "were within the custody and physical control of the U.S. military." Id. Accordingly, the sole remaining question is whether the program of abuse suffered by plaintiffs was intended to inflict severe physical or mental pain or suffering.

Based simply on the plain meaning of these words, it is clear that the abuse suffered by plaintiffs was intended to inflict severe pain or suffering and rises to the level of torture. Over the course of six weeks, Al-Ejaili was subjected to repeated stress positions, including at least one that made him vomit black liquid; sexually-related humiliation; disruptive sleeping patterns and long periods of being kept naked or without food or water; and multiple instances of being threatened with dogs. The approximately ten to twelve times he was interrogated involved systematic beatings, including to the head, and being doused with hot and cold liquids. Al-Zuba'e was subjected to sexual assault and threats of rape; being left in a cold shower until he was unable to stand; dog bites and repeated beatings, including with sticks and to the genitals; repeated stress positions, including at least one that lasted an entire day and resulted in his urinating and defecating on himself; and threats that his family would be brought to Abu Ghraib.

---

[25] This apparent concession is well-supported by the evidence. Like the interpreters in Al-Quraishi, the CACI interrogators were "alleged to have operated alongside the military, carrying out a military task which likely would have been performed by the military itself under other circumstances." Al-Quraishi, 728 F. Supp. 2d at 751; see also TAC ¶ 13 (explaining that one of the "challenges to the United States in dealing with the insurgency" was an insufficient number of trained military interrogators and interpreters, which forced the military to contract with private companies to provide these personnel). In addition, as discussed more fully below, there is substantial evidence that CACI interrogators willfully participated in joint activity with military personnel by entering together into conspiracies with them to mistreat detainees.

Al Shimari was subjected to systematic beatings, including on his head and genitals, with a baton and rifle, and some where he was hit against the wall; multiple stress positions, including one where he was forced to kneel on sharp stones, causing lasting damage to his legs; being threatened with dogs; a cold shower similar to Al-Zuba'e's, being doused with water, and being kept in a dark cell and with loud music nearby; threats of being shot and having his wife brought to Abu Ghraib; electric shocks; being dragged around the prison by a rope tied around his neck; and having fingers inserted into his rectum.

Beyond the obvious physical pain caused by this abuse, plaintiffs have also submitted evidence explaining how many of the tactics employed by interrogators were specifically designed to mentally and emotionally harm plaintiffs by breaking cultural and religious norms. According to a report authored by Dr. Mohammad Fadel, a law professor and expert on Islamic theology and law, the forced nudity, particularly in front of females, and sexual humiliation described by plaintiffs "represent gross violations of Muslim norms of sexual propriety." Pl. Opp. Ex. I ¶ 24. Islamic teaching, which is "further reflected in . . . [c]ultural taboos surrounding nudity and sex roles in many Muslim societies," instills "a sense of modesty and bashfulness with respect to the human body (particularly when naked) and human sexuality." Id. ¶¶ 24-25. Because of Islamic teachings on the subject, a "Muslim would ordinarily feel deep shame, if not outright humiliation, at being forced to be naked in front of other members of the same sex, to say nothing of being naked in front of members of the different sex." Id. ¶ 38. Moreover, the interrogators' exploitation of phobias and use of solitary confinement and sleep deprivation are commonly used torture tactics that "are equally destructive as physical torture methods"— indeed, the suffering caused by these tactics "is very often aggravated by the lack of acknowledgment, due to the lack of scars, which leads to [survivors'] accounts very often being

32

brushed away as mere allegations." Report of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, UN Doc. A/HRC/13/39/Add.5 ¶ 55 (Feb. 5, 2010).

There is evidence in the record that this mistreatment has caused severe and lasting physical and mental damage to all three plaintiffs. Each has been diagnosed with post-traumatic stress disorder and major depressive disorder, and each has submitted an expert report detailing how these mental illnesses have caused significant problems in plaintiffs' personal and professional lives up through today. In addition, each plaintiff still suffers from physical symptoms, including pain and scarring, from the mistreatment. Accordingly, based simply on the plain meaning of the words "severe physical or mental pain or suffering," it is clear that plaintiffs' mistreatment rises to the level of torture.

The Court's conclusion that plaintiffs were tortured is also well-supported by case law interpreting and applying the prohibition against torture. For example, in Al-Saher v. INS, 268 F.3d 1143, 1147 (9th Cir. 2001), the court overturned the Board of Immigration Appeals, finding that plaintiff's description of interrogators using their hands and feet as well as electrical wires to deliver "sustained beatings" during plaintiff's month in Iraqi custody and, separately, his description of "severe beatings" and being "burned with cigarettes over an 8 to 10 day period" amounted to torture as defined in the Convention Against Torture. See also, e.g., Abebe-Jira v. Negewo, 72 F.3d 844 (11th Cir. 1996) (describing interrogations of one plaintiff who was undressed, bound, whipped, and threatened with death; of another plaintiff who was undressed, bound, hung from a pole, beaten severely, and had water poured into her wounds, all resulting in permanent physical scarring; and of a third plaintiff who was undressed, bound, placed on a wooden pole, and beaten severely as "torture" for purposes of an ATS claim); Daliberti v.

Republic of Iraq, 97 F. Supp. 2d 38, 45 (D.D.C. 2000) (finding torture under the TVPA definition where one plaintiff was detained for eleven days "with no water, no toilet and no bed" and another plaintiff was detained for at least four days "with no lights, no window, no water, no toilet and no proper bed" (internal quotation marks omitted)); Xuncax v. Gramajo, 886 F. Supp. 162, 170, 197-98 (D. Mass. 1995) (finding "torture" for purposes of an ATS claim and awarding $3,000,000 in damages where plaintiff was interrogated for fourteen hours and, during that time period, beaten with interrogators' hands and guns, put inside thick plastic bags, and had a knife held to his head).[26] In each of these cases, the tortured plaintiffs' experiences were shorter and involved a narrower array of mistreatment than those of plaintiffs here, and, unlike plaintiffs here, there is no indication in these cases that the plaintiffs were diagnosed with severe and lasting mental illness such as post-traumatic stress disorder and major depressive disorder. Moreover, plaintiffs here were, like plaintiffs in each of these cases, severely beaten, including with objects and in sensitive areas such as the head and genitals. Accordingly, there is ample case law applying the prohibition against torture that supports the Court's conclusion that the mistreatment plaintiffs suffered constitutes torture.

Lastly, the Court's conclusion is further reinforced by international law and domestic executive and military sources, which clearly identify the abuse experienced by plaintiffs as

---

[26] CACI cites to a variety of cases either where a torture victim experienced arguably worse treatment than did the plaintiffs here or where the court held that a subset of the treatment alleged here did not constitute torture. See Def. Mem. 16-19. These cases are of limited value in determining whether plaintiffs' allegations rise to the level of torture. Of course, that some individuals have been tortured more severely than plaintiffs does not mean that plaintiffs have not been tortured. Furthermore, that individual prisoner abuses—such as a single electric shock, see id. at 17, or a single dog bite, see id. at 17-18—have been held not to constitute torture says little about how these techniques operate in combination to produce the severe physical and mental pain that is the hallmark of torture. Accordingly, the cases cited by CACI cannot overcome the Court's interpretation of the plain meaning of the definition of torture or the various other domestic and international law sources indicating that the mistreatment alleged by the plaintiffs constitutes torture.

torture. See, e.g., Headquarters, Department of the Army, FM 34-52: Intelligence Interrogation § 1-8 (including "[e]lectric shocks"; "[i]nfliction of pain" through "bondage"; "[f]orcing an individual to stand, sit, or kneel in abnormal positions for prolonged periods of time; "[f]ood deprivation"; "[a]ny form of beating"; and "[a]bnormal sleep deprivation" as examples of torture and cautioning that these "illegal acts are not authorized" and "are criminal acts punishable under the" Uniform Code of Military Justice)[27]; Senate Committee on Foreign Relations Report on Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, S. Exec. Rep. No. 101-30, at 14 (giving as examples of torture "sustained systematic beating" and "tying up or hanging in positions that cause extreme pain"); Report of the Committee Against Torture, UN Doc. A/52/44 (1997) (concluding that methods including "restraining in very painful conditions"; "hooding under special conditions"; "sounding of loud music" and "sleep deprivation" for "prolonged periods"; "threats, including death threats"; "violent shaking"; and "using cold air to chill" constitute torture and stating that this "conclusion is particularly evident where such methods of interrogation are used in combination"). Again, plaintiffs were subjected to nearly all of the methods of torture identified in these documents, often repeatedly and in combination with each other, and a variety of other techniques that were designed to cause severe physical and mental pain. Accordingly, it is clear that the mistreatment of plaintiffs constitutes torture.

---

[27] Although CACI argues that much of this "alleged conduct involves practices that were expressly permitted by the executive branch," Def. Mem. 14 (citing Def. Mem. Ex. 7, at xxii-xxiv), the memoranda authorizing these techniques were rescinded by the executive branch in December 2003, see Def. Mem. Ex. 7, at xxiv, and have been roundly criticized, see Pl. Opp. 22 & n. 21 (collecting sources). In any event, memoranda written by the executive branch specifically to justify the conduct at issue in this civil action cannot overcome the strong weight of domestic judicial, executive, and military authority discussed here, to say nothing of the corroborating international law sources.

Having determined that plaintiffs' allegations sufficiently describe severe physical and mental pain and suffering to constitute torture, it is clear that they have also sufficiently alleged CIDT and war crimes. In the War Crimes Act, CIDT is defined as the "act of a person who commits, or conspires or attempts to commit, an act intended to inflict severe or serious physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions), including serious physical abuse, upon another within his custody or control." 18 U.S.C. § 2441(d)(1)(B). Accordingly, any mistreatment that rises to the level of torture—or severe physical or mental pain or suffering—must definitionally also constitute CIDT—which only requires severe or serious physical or mental pain or suffering. Moreover, the War Crimes Act includes both torture and CIDT as war crimes.[28] See Al Shimari, 263 F. Supp. 3d at 605; 18 U.S.C. § 2441(d)(1).[29] Accordingly, because plaintiffs' allegations have sufficiently alleged facts supporting their claims of being subjected to torture and CIDT, they have also sufficiently alleged the commission of war crimes.

Therefore, plaintiffs' allegations—and the evidence they have produced in support of those allegations—describe sufficiently serious misconduct to constitute torture, CIDT, and war crimes, all of which violated settled international law at the time—and still do. Accordingly,

---

[28] Defendant argues that these provisions do not apply to Abu Ghraib detainees because they only apply to actions undertaken in armed conflicts "not of an international character," 18 U.S.C. § 2441(c)(3); however, defendant agrees that the definition of a war crime includes allegations of "serious bodily harm" (in the appropriate context) and that the definition of "serious bodily harm" is "nearly and in all practical ways identical to the definition embraced by the Court for CIDT." Def. Mem. 25-26. Accordingly, both parties agree that if the substantive allegations of misconduct rise to the level of CIDT, they also rise to the level of war crimes.

[29] The parties argue about whether an element of a war crimes claim under the ATS is that plaintiffs were innocent civilians. See Def. Mem. 25-26; Pl. Opp. 23-24; Def. Reply 12-13. The Court need not resolve this disagreement at this juncture, because plaintiffs have provided substantial evidence that they were mistakenly arrested and were not involved in fighting coalition forces.

plaintiffs have appropriately stated a claim under the ATS and the political question doctrine is inapplicable.

IV.    DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

   **A. Plaintiffs' Direct Liability Claims (Counts 1, 4, and 7)**

CACI argues that plaintiffs' direct liability claims—Counts 1, 4, and 7—should be dismissed because the "TAC does not allege that a CACI PT employee directly injured" plaintiffs. Def. Mem. 26. Plaintiffs respond to this argument in a footnote, conceding that "the gravamen of Plaintiffs' complaint is conspiracy and aiding and abetting" but arguing that "the TAC does include allegations of direct contact between CACI and Plaintiffs." Pl. Opp. 31 n.30 (citing TAC ¶¶ 124, 133, 141-42).

Although plaintiffs' claim that the TAC alleges some direct contact between CACI personnel and plaintiffs is correct, the few connections described in the TAC are insufficient to state a plausible claim for relief. One of the contacts alleged by the TAC is ███████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

███████████. The second contact alleged by the TAC is █████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

37

██████████████████ The final direct contact alleged by the TAC is that a naked Al-Ejaili once asked Johnson for some information about his case but Johnson "just smiled and went away" and that Johnson was among the people who ordered "Al-Ejaili to face the wall and then proceed[ed] to talk about 'what to do with' him." Id. ¶¶ 141-42. This allegation is also insufficient to establish CACI's direct liability because there is no explanation of conduct engaged in by Johnson personally that could rise to the level of torture, CIDT, or war crimes— instead, this allegation seems to place Johnson in a supervisory role, conspiring with and directing subordinates who themselves actually engaged in the torture of Al-Ejaili. Therefore, plaintiffs' allegations are insufficient plausibly to establish CACI's direct liability. For these reasons, Counts 1, 4, and 7 will be dismissed.

### B. Plaintiffs' Conspiracy Claims (Counts 2, 5, and 8)

To state a claim for conspiracy under the ATS, plaintiffs must allege that two or more persons agreed to commit a wrongful act, that defendant joined the conspiracy knowing of the goal of committing a wrongful act and intending to help accomplish it, and that one or more violations of the ATS "was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy." Cabello v. Fernandez-Larios, 402 F.3d 1148, 1159 (11th Cir. 2005). CACI argues that plaintiffs' conspiracy claims must be dismissed for failure to state a claim because the facts alleged do not support a conspiratorial agreement rather than mere parallel conduct. CACI also argues that plaintiffs have not alleged a plausible motive for CACI to enter into the conspiracies, that only a person with authority or with influence on a decisionmaker with authority can enter into a conspiracy on behalf of the corporation, and that a corporation may not be held liable for the acts of its employee's co-conspirators under a respondeat superior theory. CACI's arguments are unpersuasive.

Plaintiffs' TAC contains substantial factual allegations to support an inference that CACI employees entered into an agreement with other personnel at the Hard Site to subject the detainees at the site, including plaintiffs, to torture, CIDT, and war crimes. The TAC alleges that, in the small and confined universe of the Hard Site, CACI interrogators explicitly instructed MPs to "soften up" detainees to prepare them for interrogation and that CACI interrogators, including some who are identified by name, ordered various military personnel to "set the conditions" for detainees and "actually ordered" the most severe forms of abuse. These instructions evince an agreement among both CACI interrogators and military personnel at the Hard Site to abuse detainees in an attempt to make them more amenable to interrogation.[30] Moreover, the TAC alleges that CACI interrogations and military personnel used and understood various code words, such as "doggie dance," which is further evidence of a widespread agreement at the Hard Site to engage in this misconduct. In addition, the TAC's allegation that CACI employees and military personnel worked together at the Hard Site to hide evidence of this abuse, such as by concealing detainees from Red Cross inspectors, further supports plaintiffs' claim that CACI employees had entered into the alleged conspiracies. Lastly, based on the TAC's allegations of plaintiffs' public and sustained mistreatment, as well as the admissions that the conduct that occurred at Abu Ghraib represented serious criminal activity, the very willingness of CACI interrogators and military personnel to engage in this conduct indicates an agreement among the personnel at the site because it is natural to expect that, in the absence of such an agreement, the personnel would

---

[30] This goal of the conspiracies also provides a clear motive for both CACI employees and CACI management to enter into the conspiracies. CACI had a contract with the United States government to provide interrogation services and CACI's contract—as well as its individual employees' employment contracts—were dependent on those interrogations yielding high-quality intelligence that CACI could provide to the military. To the extent that CACI or its employees believed that the ATS violations described in the TAC could "soften up" detainees and encourage them to provide additional information in interrogations, it is clear that they would have a plausible motive for entering into the conspiracies.

have found it necessary to conceal such misconduct from each other. These factual allegations establish that it is more than plausible that CACI employees and military personnel entered into an agreement to torture detainees.[31]

Moreover, the TAC contains substantial factual allegations that reach beyond CACI's on-site employees and plausibly demonstrate CACI management's participation in the conspiracies. The TAC alleges that CACI refused to act on specific reports of misconduct perpetrated by its employees, instead covering up the misconduct and furthering the conspiracies. Specifically, the TAC alleges multiple instances where CACI employees or military personnel reported to "upper management" that CACI interrogators and military personnel were engaging in detainee abuse and that CACI managers failed to report this abuse to the military—or even ensure that CACI's own employees stopped the abuse. Indeed, the TAC alleges that ███████████████████████████ ████████████████████████████████████████████ Moreover, CACI's intent to promote these conspiracies is evidenced by CACI's ██████████████████ ██████████████████████████ even after the military recommended disciplining him for his role in the abuse, as well as CACI's refusal to remove employees from the site despite credible reports of misconduct and, in at least one case, ████████████████████████ ████████████████████████████ Moreover, the TAC alleges that various CACI managers were either stationed at the Hard Site or regularly visited Abu Ghraib and that CACI's executive team regularly reviewed reports from these individuals. As such, the TAC plausibly alleges that CACI's senior management were aware of the ongoing abuse at the Hard Site, and

---

[31] Given the confined and relatively small nature of the Hard Site, as well as the commonalities among different detainees' description of the abuse that they suffered and the concerted efforts to conceal the mistreatment, the allegations referenced in this paragraph support an inference not merely of individual conspiracies between specific interrogators and specific MPs to torture specific detainees but instead of a broad-ranging conspiracy involving a number of interrogators and military personnel to torture detainees.

CACI's decisions not to report this abuse and, in fact, to continue employing and even promoting the individuals involved constitute plausible evidence of an intent from the highest levels of the company to enter into the conspiracies that had developed among CACI's employees and military personnel.

The TAC also alleges sufficient facts to overcome CACI's argument that only individuals who are in authority, or who influence those with authority, may validly enter into a conspiracy on behalf of a corporation. In support of this argument, CACI cites to two Fourth Circuit decisions examining employer liability, but neither case is helpful because each is limited to employment discrimination lawsuits. See Def. Mem. 28 (citing Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 289 (4th Cir. 2004) (en banc); and Young v. United Parcel Serv., Inc., 707 F.3d 437 (4th Cir. 2013)). As these decisions make clear, their analysis is limited to the employment discrimination context, where Congress has "evince[d] an intent to place some limits on the acts of employees for which employers . . . are to be held responsible." Hill, 354 F.3d at 287 (alterations in original) (internal quotation marks omitted). CACI has pointed to no evidence or case law to support the idea that Congress has expressed a similar intent in the ATS context. Moreover, a closer examination of Hill actually undercuts CACI's position. According to Hill, limiting an employer's employment discrimination liability to actions taken by supervisors is reasonable because the "supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control." Id. (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 762 (1998)). In other words, Hill explains that Congress made a decision to limit employer liability in the discrimination context to those actions taken by individuals whose job involves employment-related decisions such as hiring, firing, and promotion. In this case, the alleged conspiracies

41

involved mistreatment of detainees in an attempt to soften them up for interrogation. The CACI interrogators' jobs unquestionably included making the decisions—about how to treat detainees in preparation for interrogation—that were involved in entering into and advancing these conspiracies. Accordingly, the interrogators in this case are situated similarly to supervisors in an employment discrimination case, as the employees whose jobs involve making the decisions relevant to the misconduct alleged, and, even under the logic of Hill, CACI should be held responsible for the interrogators' decision to enter into the conspiracies.

Moreover, even if an employee without authority to bind CACI may not appropriately enter into a conspiracy on CACI's behalf, CACI may be held liable for its employees' participation in the conspiracies—including for tortious acts committed by its employees' co-conspirators in furtherance of the conspiracies. In arguing otherwise, CACI primarily relies on Oki Semiconductor Co. v. Wells Fargo Bank, National Ass'n, 298 F.3d 768, 776-77 (9th Cir. 2002), which held that the employer was "not vicariously liable for [its employee's] conduct" because the employee "did not conspire to violate [the statute] within the course and scope of her employment." This holding is distinguishable because unlike the employee in Oki Semiconductor, the CACI interrogators' actions were undeniably related to and within the scope of their employment. The entire purpose of their employment was to direct the interrogation of detainees at the Hard Site—and the goal of the conspiracies was to design and implement a program of abuse to facilitate successful interrogations. Additionally, there are sufficient allegations in the TAC that interrogators entered into the conspiracies within the scope of their employment to deny dismissing the conspiracy counts under CACI's respondeat superior argument. Respondeat superior liability "balances the benefits an employer receives from an employee against the liabilities an employer incurs as a result of its employee's actions." Id. at

777. Because the alleged conspiracies were directly related to the interrogators' employment, CACI had an ability to monitor the interrogators to ensure that they did not enter into the conspiracies—and, as the TAC alleges, to appropriately screen and train interrogators before sending them to Abu Ghraib and to discipline interrogators who committed transgressions. Moreover, CACI stood to benefit directly from its interrogators' actions because the facilitation of successful interrogations would please its most important client, the United States military, and perhaps position it to gain future contracts with the military. When balancing benefits and liabilities, it is clear that CACI had an ability to head off the entry into these conspiracies and that CACI itself benefitted from its employees' participation in the conspiracies. Therefore, respondeat superior liability is appropriate. In addition to being compelled by the logic of the respondeat superior doctrine, this conclusion is supported by case law. See, e.g., United States v. Stevens, 909 F.2d 431 (11th Cir. 1990); Commercial Bus. Sys., Inc. v. Bellsouth Servs., Inc., 453 S.E.2d 261 (Va. 1995).

Lastly, even if CACI's legal arguments were correct, there are sufficient factual allegations in the TAC to plausibly infer that high-level management at CACI entered into the conspiracies on the corporation's behalf.

Accordingly, plaintiffs have stated plausible conspiracy claims against CACI, and Counts 2, 5, and 8 will not be dismissed.

## C. Plaintiffs' Aiding and Abetting Claims (Counts 3, 6, and 9)

To maintain a claim for aiding and abetting under the ATS, plaintiffs must allege facts that support a plausible inference that CACI "provide[d] substantial assistance with the purpose of facilitating the alleged violation" of international law. Aziz v. Alcolac, Inc., 658 F.3d 388, 401 (4th Cir. 2011). In arguing that plaintiffs have failed to allege such facts, CACI relies on the

same argument that it made with respect to the conspiracy claims: that plaintiffs "rely on parallel conduct allegations" that "do not support an inference that [CACI] somehow provided substantial assistance to whomever might have injured" them or that CACI had the purpose of facilitating those injuries. Def. Mem. 35; see also Def. Reply 18 ("Plaintiffs' aiding and abetting claims are essentially duplicative of their conspiracy claims.")

For the same reason that CACI's arguments in support of dismissing the conspiracy claims fail, their argument in support of dismissing the aiding and abetting claims fails. Plaintiffs have appropriately alleged, as described above, that CACI personnel substantially aided the military personnel responsible for directly carrying out the abuses, including directing them on how to set the conditions of confinement, ordering them to employ various abusive tactics, and helping them conceal the abuses. Moreover, upper-level management at CACI substantially aided these continued abuses by refusing to inform the military of reports that CACI and military personnel were abusing detainees and by continuing to employ—and even promote— interrogators engaging in the abuses. In addition, plaintiffs have plausibly alleged that CACI's and its employees' actions to aid the abuses were undertaken with the necessary purpose of facilitating the abusive conduct because the goal of the abusive regime was to "soften up" the detainees to convince them to cooperate with CACI's interrogators.

This conclusion is further supported by a closer examination of Aziz, the primary case on which CACI relies. In Aziz, the plaintiffs alleged that the defendant chemical manufacturing company had sold thiodiglycol ("TDG"), a chemical with "many lawful commercial applications," including "dyeing textiles and producing inks," to a shell corporation in Brooklyn, New York and that the TDG shipments it sent to the company in Brooklyn eventually made their way—apparently through a different Swiss company—to Iraq, where Saddam Hussein used the

TDG to manufacture mustard gas that he employed in chemical attacks against Kurdish enclaves in northern Iraq. Aziz, 658 F.3d at 389-91. The plaintiffs attempted to sue the defendant under the ATS for aiding and abetting the Iraqi regime's use of the chemical weapons. Id. at 394. The Fourth Circuit affirmed the dismissal of the plaintiffs' ATS claims because the "sole reference to [the defendant's] intentional conduct in the Amended Complaint [wa]s an allegation that [the defendant] placed [the TDG] 'into the stream of international commerce with the purpose of facilitating the use of said chemicals in the manufacture of chemical weapons to be used, among other things, against the Kurdish population in northern Iraq.'" Id. at 401 (quoting Am. Compl. ¶ 53). The Fourth Circuit found that this "cursory allegation" in the plaintiffs' Amended Complaint was "untethered to any supporting facts." Id. By contrast, as described above, plaintiffs' TAC in this civil action contains a wealth of factual allegations explaining who committed or directed particular forms of abuse, what the abuse involved, who was aware of the abuse and concealed it, and the motivation for committing the abuses. Accordingly, plaintiffs' TAC alleges exactly the supporting facts for which the Aziz court was searching, and these facts render plausible the ultimate inference that CACI and its employees purposefully aided the violations of international law in order to facilitate the interrogations of plaintiffs. For these reasons, Counts 3, 6, and 9 will not be dismissed.

## V.    PREEMPTION

Lastly, CACI argues that various doctrines of preemption bar plaintiffs' claims. Specifically, CACI argues that the Constitutional allocation of war powers and the combatant activities exception to the FTCA preempt incorporation of the law of nations through the ATS. CACI also argues that CPA Order 17 limits plaintiffs to an administrative claim and that

Congress's enactment of the TVPA displaces the power of federal courts to recognize a cause of action for torture under the ATS.[32]

## A. Constitutional Preemption

CACI first argues that the "Constitution's allocation of war powers precludes ATS claims arising out of the United States' conduct of war" because the "Constitution expressly commits this Nation's foreign policy and war powers to the federal government." Def. Mem. 36 (formatting and capitalization altered). Therefore, CACI argues that the "Constitution does not allow international law, or the law of any foreign sovereign, to govern the prosecution of war by the United States . . . [n]or does the Constitution contemplate a judicial role in this area." Id. This argument fundamentally misunderstands the nature of an ATS claim. Although norms of international law are incorporated by the ATS—and, of course, the judiciary must often interpret and apply the ATS—the ATS is itself a federal statute. As such, the ATS embodies Congress's considered determination that there should be a cause of action in federal district court for violations of the law of nations. Accordingly, CACI's argument that the Constitution allocates war powers to Congress and the President only serves to illustrate why plaintiffs' claims are not preempted: because applying the ATS in this context represents the constitutional exercise of Congress's inherent powers to regulate the conduct of war. The incorporation of international law into the ATS and the judicial role in interpreting and applying the statute do not change the fundamental nature of the statute as an exercise of congressional power.

---

[32] CACI also claims it is entitled to derivative immunity from suit as a government contractor that complied with instructions from the government; however, CACI admits that it "has not submitted the record materials showing [its] entitlement to immunity" because it believes that such a question is only appropriate for resolution at the summary judgment, rather than the motion to dismiss, stage. Def. Mem. 45. Accordingly, the Court will not address this argument.

In support of its argument, CACI primarily relies on the D.C. Circuit's decision in Saleh, 580 F.3d 1, in which the court held that the plaintiffs' state law tort claims were preempted by federal law and that the plaintiffs' claims of abuse were not actionable under the ATS. Although the scope of the Saleh decision is admittedly not entirely clear, it appears to hold only that "torture committed by a state is recognized as a violation of a settled international norm" but that the same "cannot be said of private actors" and, accordingly, that the plaintiffs could not maintain a claim for torture against a private contractor under the ATS. Id. at 15-16. The court's discussion of the "foreign policy prerogatives of our legislative and executive branches," which CACI apparently reads as support for an independent argument that the Constitution preempts the ATS, actually appears to be merely a reminder of one of the reasons that Sosa requires that any norm supporting an ATS claim be "specific, universal, and obligatory." See id. In this case, the Court has already determined that the international norms prohibiting torture, CIDT, and war crimes were sufficiently specific, universal, and obligatory at the time of the alleged abuse to allow plaintiffs to maintain their ATS claims. See Al Shimari, 263 F. Supp. 3d 595. Accordingly, Saleh's discussion of the allocation of foreign policy authority in the Constitution is irrelevant to the question currently before the Court.

Therefore, although the Constitution provides the legislative and executive branches with primary authority in the conduct of war, nothing in the Constitution can be read to "preempt" the application of the ATS to plaintiffs' claims. Indeed, the ATS represents Congress's determination, in accordance with its war powers, that victims of violations of international law

should have a remedy in federal district courts. Thus, the Constitution does not preempt plaintiffs' claims.[33]

## B. FTCA Preemption

CACI also argues that the combatant activities exception to the FTCA preempts plaintiffs' ATS claims.[34] See 28 U.S.C. § 2680(j) (excepting any "claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war" from the provisions of the FTCA). In support of this argument, CACI again relies primarily on the D.C. Circuit's decision in Saleh. In that case, the court recognized that a "significant conflict between federal interests and state law" must exist for the federal law to preempt the state law and observed that "the reason[] for the combat activities exception" is that "such activities by

---

[33] In its reply brief, CACI appears to shift its position slightly to argue that "the Constitution limits Congress's power to legislate," Def. Reply 19, which appears to be an argument not that the Constitution "preempts" application of the ATS to plaintiffs' claims but that, as applied, the ATS represents an unconstitutional exercise of congressional power. Although it is true that such an argument is conceptually coherent, Congress is only prevented from infringing on executive power when "the President's asserted power [is] both 'exclusive' and 'conclusive' on the issue." Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S. Ct. 2076, 2084 (2015) (quoting Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 597, 637-38 (1952) (Jackson, J., concurring)). The parties have not briefed this issue, but the Court observes that CACI itself repeatedly argues that the Constitution confers war-related powers on both the President and on Congress. This interpretation is clearly supported by the Constitution, which grants Congress the power to "declare war . . . and make rules concerning captures on land war," "raise and support armies," "provide and maintain a navy," and "make rules for the government and regulation of the land and naval forces." U.S. Const. Art. I, § 8. Therefore, there is no plausible argument that the President's power is both "exclusive" and "conclusive" on the issue of wartime conduct, and the application of the ATS to plaintiffs' claims does not represent an unconstitutional exercise of congressional power.

[34] CACI briefly argues that the "federal interests embodied in the foreign country exception to the FTCA, 28 U.S.C. § 2680(k), preempt Plaintiffs' claims" because this exception is evidence that "Congress did not want the United States' conduct being judged through 'the application of foreign substantive law.'" Def. Mem. 40-41 (quoting Sosa, 542 U.S. at 707). As explained above, the ATS is a federal statute that represents Congress's determination that violations of universally recognized international norms should be actionable in federal district court. Accordingly, the ATS does not subject CACI to the wide body of foreign substantive law but instead subjects it to international norms that have been incorporated into domestic law. Thus, CACI's argument is unavailing.

48

their very nature should be free from the hindrance of a possible damage suit." <u>Saleh</u>, 580 F.3d at 5-7 (internal quotation marks omitted). Moreover, the court identified various potential conflicts between state tort law and the federal interest embodied by the combatant activities exception, all centered on the idea of "battle-field preemption," or the concept that "the federal government occupies the field when it comes to warfare, and its interest in combat is always precisely contrary to the imposition of a non-federal tort duty." <u>Id.</u> at 7 (internal quotation marks omitted). According to the court, this conflict is magnified by the possibility of military conduct "being subjected to fifty-one separate sovereigns." <u>Id.</u> at 11. Accordingly, the court held that "[d]uring wartime, where a private service contractor is integrated into combatant activities over which the military retains command authority," any state tort claim "arising out of the contractor's engagement in such activities shall be preempted." <u>Id.</u> at 9.

Even assuming that the reasoning behind the <u>Saleh</u> decision is correct, <u>but see id.</u> at 17-36 (Garland, J., dissenting), it does not support preempting plaintiffs' ATS claims. In <u>Saleh</u>, the court was concerned with the conflict between federal policy—as embodied in the FTCA—and state tort law; however, in the present civil action, plaintiffs' claims are exclusively brought pursuant to federal law.[35] As such, respecting federal interests requires enforcing the federal law upon which plaintiffs rely, and Congress's decisions to pass both the FTCA and the ATS require the Court to harmonize the two statutes rather than find that one preempts the other. In this case, the harmonization is clear: although Congress has decided that the federal government is not itself amenable to suit for activities arising out of combatant activities, it has not extended that immunity to private contractors operating alongside military forces. Instead, it has determined that such contractors, like any other defendant, should be liable in federal district court when

---

[35] As discussed above, all of plaintiffs' state tort and common law claims have been dismissed with prejudice.

they commit violations of the law of nations. See also Al Shimari IV, 840 F.3d at 158

(explaining that Congress has "established criminal penalties for commission of acts constituting

torture and war crimes," which is indicative of the federal interest in eliminating such behavior).

Moreover, the dictates of the ATS are far less intrusive than the state tort law preempted in

Saleh, both because the ATS represents a single regime of liability, rather than fifty-one separate

regimes, and because the ATS, unlike traditional tort law, only recognizes a small number of

particularly egregious intentional torts—those committed in violation of the law of nations.[36]

Therefore, the FTCA does not preempt plaintiffs' ATS claims.

### C. CPA Order 17 Preemption

CACI further argues that the ATS claims are preempted by Section 6 of CPA Order 17,

which provides:

> Third party claims including those for property loss or damage and for personal
> injury, illness or death or in respect of any other matter arising from or attributed to
> Coalition personnel or any persons employed by them, whether normally resident in
> Iraq or not and that do not arise in connection with military combat operations, shall
> be submitted and dealt with by the Parent State whose Coalition personnel, property,
> activities or other assets are alleged to have caused the claimed damage, in a manner
> consistent with the national laws of the Parent State.

CPA Order 17, § 6(1). CACI argues that CPA Order 17 "establishes that if a claimant's injury

arises out of noncombat operations,[37] under Section 6, the claimant shall submit a[n

---

[36] The Court recognizes that the Saleh court, after finding that the plaintiffs' allegations did not
support an ATS claim, also remarked that the ATS claim "runs athwart of our preemption
analysis" because "the application of international law to support a tort action on the battlefield
must be equally" as barred as the application of state law. Saleh, 503 F.3d at 16. This statement,
which came after the court had already determined that the ATS did not provide a cause of action
for plaintiffs because the norm that they claimed was violated was not sufficiently specific,
universal, and obligatory, is merely conclusory and fails to consider the nature of the ATS as a
federal statute—and, as such, as a congressional choice to incorporate principles of international
law into domestic law. Accordingly, the Court is not persuaded to follow this reasoning.
[37] CACI does not explain why it believes both that the FTCA's combatant activities exception—
which, by its terms, only applies to a "claim arising out of . . .combatant activities," 28 U.S.C. §

administrative] claim to the Parent State (here, the United States) where it will be dealt with under national law (here, the Foreign Claims Act)." Def. Mem. 41-42. According to CACI, "CPA Order 17 thus prohibits tort claims by Iraqis alleging injury at the hands of Coalition personnel, and instead requires submission of an administrative claim to the Parent State." Id. at 42.

CACI's argument is not supported by the text of CPA Order 17. According to the Order, assuming plaintiffs' claims are covered, they must be dealt with by the United States "in a manner consistent with the national laws." CPA Order 17, § 6. The ATS is, of course, just as much a "national law" of the United States as is the Foreign Claims Act, and allowing plaintiffs to pursue their claims under the ATS is, based on the plain language of the Order, treating the claims in a manner consistent with American law. Moreover, and even more fundamentally, CPA Order 17 was promulgated to ensure that Coalition forces were not subject to Iraqi law. See id. Preamble ("Recalling that under international law occupying powers, including their forces, personnel, property and equipment, funds and assets, are not subject to the laws or jurisdiction of the occupied territory"). Accordingly, based on the intent behind CPA Order 17, all it directs is that injured parties may not bring their claims in Iraqi courts; however, it does not make any pronouncements about how various Coalition states' domestic laws should treat these claims. See also McGee v. Arkel Int'l, LLC, 671 F.3d 539, 544 (5th Cir. 2012) (interpreting a later, but substantially similar, version of CPA Order 17 to "provide[] contractors immunity from Iraqi laws . . . and from Iraqi legal process" but not to create an immunity "relating to tort claims brought in federal court in the United States"). Lastly, CACI provides no authority for the

2680(j) —should preempt plaintiffs' claims based on its interrogation activities and also that CPA Order 17—which applies only to claims that "do not arise in connection with military combat operations," CPA Order 17—should preempt plaintiffs' claims, despite the apparently contradictory nature of these two positions.

fundamental premise of this argument: that an Order promulgated by the head of the CPA—and

not approved by Congress—can somehow preempt federal domestic law. Accordingly, CPA

Order 17 does not bar plaintiffs' ATS claims.

### D. Legislative Preemption

Lastly, CACI argues that Congress's enactment of the ATA and the TVPA preempt the

creation of a cause of action for torture under the ATS. The ATA, a federal criminal statute with

extraterritorial application, criminalizes acts of torture, 18 U.S.C. § 2340A, but provides that the

statute should not "be construed as creating any substantive or procedural right enforceable by

law by any party in any civil proceeding," id. § 2340B. The TVPA creates a private cause of

action against individuals who commit acts of torture under authority or color of law of a foreign

nation, but it does not reach corporate entities or American officials. 28 U.S.C. § 1350(note).

Based on these two statutes, CACI posits that Congress has "through legislation, established the

contours of a civil cause of action for torture" and thereby displaced federal common law. Def.

Mem. 44. To support this position, CACI relies primarily on American Electric Power Co. v.

Connecticut (AEP), 564 U.S. 410, 424 (2011), in which the Supreme Court held that the Clean

Air Act "displace[s] any federal common law right to seek abatement of carbon-dioxide

emissions from fossil-fuel fired power plants." In that case, the plaintiffs sought to bring an

action under the federal common law governing environmental protection, a body of law that

emerged in the wake of Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938), in recognition of the

national character of environmental regulation. See AEP, 564 U.S. at 420-21. The cause of

action in that case was not authorized by Congress or otherwise established by statute. Instead,

the plaintiffs sought to vindicate a purely common law right. The Supreme Court held that in

such circumstances, "congressional legislation excludes the declaration of federal common law"

when the legislation "speak[s] directly to [the] question at issue." Id. at 424 (alterations in original) (internal quotation marks omitted). The Clean Air Act directs the EPA Administrator to establish standards of performance and emissions guidelines for various pollutants, including carbon dioxide, and allows both states and private parties to bring a civil enforcement action to enforce these limits. Id. at 424-25. Moreover, if the EPA does not set emissions limits for carbon dioxide, states and private parties may petition for a rulemaking on the matter and challenge the resulting process in federal court. Id. at 425. Therefore, the Supreme Court found that the Clean Air Act "itself thus provides a means to seek limits on emissions of carbon dioxide from domestic power plants—the same relief the plaintiffs seek by invoking federal common law" and that there is "no room for a parallel track." Id.

CACI's reliance on AEP is unavailing for two reasons. First, as discussed above, although recognition of causes of action under the ATS requires judicial interpretation of the statute and analysis of international law norms, the ATS is itself a congressional enactment that reflects Congress's decision to provide a cause of action for victims of violations of the law of nations. Accordingly, plaintiffs' ATS claims are grounded in federal statute, not merely in federal common law like the claims in AEP. As such, the claims cannot be so easily displaced by other federal statutes, which are entitled to no more respect than the ATS. Second, the AEP Court relied on the Clean Air Act's containing a means for plaintiffs to seek the same relief that they sought in their federal civil action. In this case, CACI agrees that the ATA and the TVPA do not provide an avenue for plaintiffs to pursue their claims against CACI. As such, allowing plaintiffs' claims to proceed is not an example of the judiciary using federal common law to invent a "parallel track" to a process designed by Congress. Therefore, other legislation does not displace the ATS and plaintiffs' claims will not be dismissed.

## VI.    CONCLUSION

For the reasons stated above, CACI's Motion to Dismiss [Dkt. No. 626] will be granted

in part and denied in part and Counts 1, 4, and 7 of the Third Amended Complaint will be

dismissed by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 21 day of February, 2018.


Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge