## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

SUHAIL NAJIM ABDULLAH AL SHIMARI, *et al.*,

        Plaintiffs,

v.

CACI PREMIER TECHNOLOGY, INC.,

        Defendant.

CACI PREMIER TECHNOLOGY, INC.,

        Third-Party Plaintiff,

v.

UNITED STATES OF AMERICA,
and JOHN DOES 1–60,

        Third-Party Defendants.

No. 1:08–cv–827 (LMB/JFA)

**OPPOSITION BY THE UNITED STATES TO DEFENDANT CACI PT'S MOTION TO COMPEL THE UNITED STATES TO DISCLOSE INTERROGATOR IDENTITIES**

## INTRODUCTION

Defendant CACI Premier Technology (hereinafter "CACI PT") moves to compel the Government to disclose the identities of the individuals who interrogated the named plaintiffs, information which is properly classified pursuant to Department of Defense ("DoD") Directive 3115.09 (DoDD" or "Directive") and subject to the state secrets privilege. Defendant's Mot. to Compel, ECF No. 736 ("MTC"); Mem. in Support of CACI PT's Mot., ECF No. 737 ("MTC Memo."). CACI PT contends that this information is "the most important factual matter in this case," MTC Memo. at 16. This assertion is not credible, and in any event, cannot outweigh the harms to national security and the risks to the physical safety of the interrogators that would accompany such a disclosure. These harms are set forth in the accompanying Declaration and Assertion of State Secrets Privilege by James N. Mattis, Secretary of Defense ("Mattis Declaration"), attached as Exhibit 1, which asserts the state secrets privilege over this information. *See United States v. Reynolds*, 345 U.S. 1 (1953); *Abilt v. CIA*, 848 F.3d 305, 312 (4th Cir. 2017) (state secrets privilege forecloses disclosure of information in litigation where reasonable danger exists of harm to national security). The Court, however, need not reach the state secrets assertion at this time because the United States has proposed a sensible procedure by which depositions of these interrogators could proceed in a manner that would protect their identities—an approach that would allow the parties and the Court to determine whether those identities are relevant at all. Specifically, the parties could inquire into the interrogators' knowledge of interactions with, or treatment of, the named plaintiffs, whether they have knowledge of mistreatment or abuse, if any, the named plaintiffs might have suffered, and their knowledge of the relationships among CACI PT personnel and military personnel at Abu Ghraib.

To the extent that this Court deems the alternative of pseudonymous depositions insufficient, however, it should uphold Secretary Mattis' determination that disclosure of the information sought reasonably can be expected to cause significant harm to national security, and is therefore privileged as a state secret.

For these reasons, CACI PT's motion to compel should be denied.

## BACKGROUND

### A. Procedural Background

#### a. Past Discovery in This Case.

Since the outset of this litigation, the United States has made good faith efforts to provide the parties with information necessary to litigate this case, insofar as such information can be provided without disclosing information the release of which would harm national security (or compromise other governmental privileges) and without excessively burdening the Department of Defense, its warfighting components, and other government agencies.  The United States' past productions and the limits thereto reflect the Fourth Circuit's instruction that discovery be "properly conducted" to avoid the "risk that military personnel will be improperly haled into court or their depositions taken." *Al Shimari v. CACI, Int'l Inc.*, 679 F.3d 205, 219 (4th Cir. 2012) (en banc).  As a third party to this action until 2018, the United States properly responded to discovery requests by applying the housekeeping regulations of agencies from which the parties sought information, pursuant to the doctrine established in *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951).

Many of the parties' discovery requests sought classified information, frequently from classified documents.  In response, the United States made good-faith efforts to declassify and produce versions of these documents where the parties themselves had made corresponding

2

efforts to narrow the focus of their discovery requests.  Review of classified documents imposes an immense burden on DoD and its intelligence and military operations components because it is the components responsible for the classified material at issue that possess the expertise to determine whether the release of the classified information is likely to cause harm to national security.  Often, these components are warfighting combatant commands, and review of even a limited number of pages requires the combatant command or other component to divert manpower and other resources—including resources physically located overseas and in combat theaters—from their primary warfighting mission.

Nevertheless, this process has resulted in the classification review and production of hundreds of pages of information relevant to the parties.  These include selected annexes from the investigative reports of abuses at Abu Ghraib as well as information from the plaintiffs' detention and interrogation files.  Significantly, none of the information produced in discovery describes any methods of interrogation of plaintiffs apart from the lawful methods authorized by the U.S. Army Field Manual.[1]

### b.  CACI's Previous Motion to Compel Interrogator Identities

During discovery in 2013, CACI PT requested that DoD and Army authorize depositions of the intelligence interrogators who interrogated the plaintiffs while plaintiffs were detained at Abu Ghraib and provide identifying information about the interrogators so that they could be subpoenaed for deposition.  However, because DoDD 3115.09 classifies the names and visual

---

[1] The United States also authorized depositions of military personnel held accountable through courts-martials for their responsibility for abuses at Abu Ghraib.  These included Charles Graner (convicted in a court-martial in January, 2005 and deposed April 22, 2013), Ivan Frederick (pleaded guilty in October, 2004, and deposed March 3, 2013), Sabrina Harman (convicted in a court-martial in May, 2005, and deposed April 25, 2013), and Megan Ambuhl Graner (convicted in a court-martial in October, 2004, and deposed April 22, 2013).

representations of who interrogated which detainees, the Government could not authorize the

disclosure of their identities to the parties.[2]  Nonetheless, understanding that the identities of

interrogators are of limited value, and notwithstanding the risks of disclosure of classified

information that depositions would entail, the United States sought to identify a way to provide

CACI PT and the plaintiffs with any relevant information possessed by the interrogators.

Specifically, after discussing various alternatives with the parties, the United States made

a formal proposal to authorize the depositions of interrogators pursuant to pseudonyms and

---

[2] The Directive applies to "DoD military personnel, DoD civilian employees, and DoD contractor personnel to the extent incorporated in their contracts, who conduct or support intelligence interrogations, detainee debriefings, or tactical questioning."  DoDD 3115.09 ¶2(b) (Exhibit 2).  Paragraph 13(a) of Enclosure 4 to the Directive provides:

> The names and visual representation of DoD interrogators, debriefers, contract interrogators, support personnel, and foreign government interrogators shall be classified, at a minimum, "SECRET//RELEASABLE TO" or "SECRET//NOFORN," as appropriate, when their identities are associated with the interrogation, debriefing, or other intelligence questioning of a specific detainee, pursuant to section 1.4.(c) of [Executive Order 13526, "Classified National Security Information," December 29, 2009].

*Id*.

Executive Order (EO) 13526 sets forth a comprehensive, "uniform system for classifying, safeguarding, and declassifying national security information, including information relating to defense against transnational terrorism."  *See* 75 Fed. Reg. 707 (Dec. 29, 2009).  Under that order's substantive criteria, the classified level "'Secret' shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause serious damage to the national security," where such potential harm can be identified or described.  EO 13526 § 1.2(a)(2).  Once information is classified, EO 13526 requires numerous protections for that information.  No person "may have access to classified information" unless they have both a "favorable determination of eligibility for access . . . made by an agency head," and a "need-to-know the information," EO 13526 § 4.1(a), and only after "sign[ing] an approved nondisclosure agreement."  *Id*.  EO 13526 further provides for agencies responsible for classified information to "promulgat[e] implementing regulations," as DoD has done here.  *Id*. § 5.4(d)(2).

arrangements that would be reasonably effective at protecting the classified identities of the interrogators from disclosure.  In discussions with both parties on March 20, 2013, the United States presented its plan to conduct the depositions in a manner that would conceal the interrogators' identities, but still provide wide latitude for the parties to inquire about the interrogators' interactions with and treatment of the named plaintiffs.  The Government memorialized its written proposal in a letter sent to the parties on March 22, 2013.  *See* Ex. 4 (letter to CACI PT's counsel); Ex. 5 (letter to Plaintiffs' counsel).

CACI PT never attempted to conduct such depositions, but instead moved to compel disclosure of the interrogators' identities.  The parties fully briefed the motion before the Court denied it as moot upon dismissing plaintiffs' underlying action against CACI PT.  *See* ECF No. 460 at 30.  At the time, the United States did not invoke the state secrets privilege but rather argued that it was premature to address state secrets until the Court resolved the question of the sufficiency of the Government's pseudonymous depositions proposal.  *See* Opp. to Motion to Compel (ECF No. 325) at 3 ("The assertion of the state secrets privilege is a significant undertaking, one which involves the personal attention of the Attorney General and Secretary of Defense.  It should only be used as an option of last resort, and only after CACI [PT] has established that all other options of reasonably tailoring discovery have been exhausted and failed.  Because CACI [PT] has not done so here, the Court should not compel an assertion of the privilege.").

### c.  CACI's Latest Discovery Requests

After CACI filed its third-party lawsuit on January 17, 2018, CACI PT and the United States discussed the propriety of discovery against the United States during the pendency of an

5

anticipated motion to dismiss the third-party claims, and, to avoid bringing a dispute immediately before the Court, agreed to move forward on CACI PT's request for interrogator identities while staying all other discovery against the United States.  As part of this agreement, the United States agreed to object and/or respond to the following two interrogatories:

1.    Identify any interrogator who interrogated any Plaintiff at Abu Ghraib Prison.
2.    For each interrogator identified in response to Interrogatory #1, describe the facts relating to such interrogator's interactions with Plaintiff(s), including the specific conduct to which such interrogators subjected any Plaintiff and the source of any direction under which the acts took place.

Following the Court's adoption of this plan, CACI PT served the interrogatories on the United States, which provided objections and responses on March 26, 2018.  *See* Ex. 6.

### d.  The Government's Response to CACI PT's Latest Discovery Requests

In its efforts to provide a fulsome response to CACI PT's two interrogatories, the Government undertook another classification review of the information sought, including whether the identities of the interrogators as they relate to the particular plaintiffs remain classified.  After conducting the classification review, DoD confirmed that this information remains classified but nevertheless provided as much information as possible without undermining any classification designation.

Although the United States objected to the first interrogatory on several grounds, it still provided information in response to the request (while still withholding from disclosure any still properly classified identifying information).  In particular, the United States provided a pseudonym for each interrogator, the date of each interrogation it had identified for each plaintiff, and whether the interrogator was employed by CACI PT or by the United States Army.  *See* Ex. 6.  In addition, the United States referred the parties to other information that DoD had

6

previously produced that could arguably be responsive to the request even in situations in which DoD had not located formal documentation referring to a specific interrogation.  *See id.*

In responding to the second interrogatory, upon completing the classification review, DoD was able to declassify additional information from the plaintiffs' files that had previously been considered classified when DoD produced redacted versions of those files earlier in the litigation.  DoD included information from these files in its responses and re-produced those files based on current classification designations.  This material includes information that could be explored further in pseudonymous depositions, such as DoD summaries of the reports and notes from these interrogations.  These summaries included the matters on which the interrogators questioned the detainees, interrogators' assessments of the detainees, specific interrogation techniques used on the detainees, detainees' reactions to those techniques, the chain of command involved in the interrogations, and the involvement of any CACI PT personnel in the interrogations.  In all, DoD's response for the second interrogatory totaled ten pages, excluding the objections.

With both interrogatory responses, the United States emphasized that it is continuing to exercise due diligence to determine if there is additional information it can provide and that it will supplement its responses consistent with Rule 26(e) of the Federal Rules of Civil Procedure should it come across additional information.  *See* Ex. 6.

> ### e.  The Government's Proposal to Conduct Interrogator Depositions in a Manner that Conceals their Identities

In objecting to CACI PT's request for the disclosure of the identities of interrogators specific to each plaintiff, the Government renewed its proposal from 2013 to allow for pseudonymous depositions.  *See id.*  The linchpin of the Government's proposal is that the

individuals would be assigned a case-specific pseudonym, *e.g.*, "Interrogator A," "Interrogator B," and so on. *See id.* To protect the individuals' visual identities, the depositions would be held telephonically. *See id.* The Government would at no time confirm the identity of an individual deposed pseudonymously, and the parties would likewise have to agree to make no attempt in their filings or appearances before the Court to link any of the pseudonyms to the real name or identity of any interrogator.

As with other depositions approved in this case, the Government would authorize the individuals testifying pseudonymously to provide only factual information within their own personal knowledge; they would not be authorized to testify as experts, offer opinions, or answer hypothetical questions, or to provide official information that is classified, privileged, or otherwise protected by law from public disclosure, other than information that may be disclosed pursuant to the protective order issued in this case. The individuals testifying pseudonymously would be authorized to disclose whether they were employed by Army or CACI PT while conducting interrogations at Abu Ghraib. And they would be authorized to discuss their recollections of, interactions with, and treatment of the named plaintiffs.[3]

In its motion to compel, CACI PT contends that pseudonymous depositions will be inadequate based on the possible nature of a hypothetical future trial and speculation about the content of the interrogators' testimony, and CACI PT chose to proceed with this motion without first even attempting to ascertain what information could be gleaned from pseudonymous depositions.

---

[3] As discussed further below, contrary to CACI PT's assertion in its motion, the parties would not have to agree in advance not to call deponents testifying pseudonymously as witnesses at trial. *See infra* n.6.

**ARGUMENT**

## I. CACI PT'S REQUEST FOR IDENTITY INFORMATION IS NOT PROPORTIONAL TO THE NEEDS OF THE CASE.

Under Rule 26(b)(1) of the Federal Rules of Civil Procedure, discovery must be "proportional to the needs of the case," considering, *inter alia*, the importance of the issues at stake and the importance of the discovery in resolving the issues. *See* Fed. R. Civ. P. 26(b)(1). In its brief, CACI PT erroneously conflates this requirement with the related, but separate obligation that Rule 26(g) imposes on parties to ensure that discovery is "neither unreasonable nor unduly burdensome . . . considering the needs of the case . . . and the importance of the issues at stake. . . ." Fed. R. Civ. P. 26(g). These are not the same: CACI PT's misconstruction leads to a circular definition in which CACI PT states that "burden . . . is evaluated based on . . . whether the burden or expense . . . outweighs [the] likely benefit." *See* MTC Memo. at 13-14 (misstating the elements to be "consider[ed]" in assessing whether discovery is "proportional to the needs of the case"). Nor is CACI PT correct when it construes the terms "burden" and "burdensome" to be limited only to the ease of writing responses on paper. To the contrary, the obligation to avoid "unduly burdensome" discovery takes into account the full set of consequences stemming from discovery requests, and Rule 26(g) thereby imposes on CACI PT "a correlative obligation to tailor interrogatories to suit the particular exigencies of the litigation," and thereby avoid "us[ing] broadswords where scalpels will suffice." *Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 187 (1st Cir. 1989); *see Rodger v. Elec. Data Sys. Corp.*, 155 F.R.D. 537, 542 (E.D. N.C. 1994) (quoting *Mack*).

> **a. Before Considering the Government's Assertion of the State Secrets Privilege, the Court Should Assess Whether Alternatives Are More Proportional to the Needs of the Case.**

9

In objecting to CACI PT's request for the identities of particular interrogators for particular detainees, the United States objected that, in light of the authorization of pseudonymous depositions, this request for further information is not "proportional to the needs of the case." *See* Ex. 6.   As explained below, the United States also objected that the information sought is properly classified and subject to the state secrets privilege. *See Id.*

The principle of proportionality is necessarily implicated when a court is confronted by the need to resolve a state secrets privilege assertion.  The Supreme Court has explained that the state secrets privilege "is not to be lightly invoked," and parties and courts should consider whether the "necessity" for involving state secrets in litigation can be "greatly minimized by an available alternative" that provides parties with "the evidence to make out their case without forcing a showdown on the claim of [the state secrets] privilege."  *United States v. Reynolds*, 345 U.S. at 7, 11.  In addition, "the state secrets privilege . . . performs a function of constitutional significance, because it allows the executive branch to protect information whose secrecy is necessary to its military and foreign-affairs responsibilities." *El-Masri v. U.S.*, 479 F.3d 296, 303, 304 (4th Cir. 2007).  In part for this reason, the court's inquiry into the matter "is a difficult one," for it pits the judiciary's search for truth against the Executive's duty to maintain the nation's security.  *Id.* at 305.  As a result, the Supreme Court has "'mandat[ed] restraint in the exercise of [judicial] authority'" in reviewing state secrets privilege assertions.  *Abilt v. CIA*, 848 F.3d at 312 (quoting *El-Masri,* 479 F.3d at 304–05).

Here, consistent with these principles, the United States proffered its pseudonymous depositions proposal.  The Court should adopt this approach as the proportional one for this litigation, thereby avoiding the need to consider the state secrets privilege and acting consonant with the "collective responsibility" of "[t]he parties and the court . . . to consider the

proportionality of all discovery . . . in resolving discovery disputes." Committee Note, 2015 Amendment, Fed. R. Civ. P. 26. In sum, because CACI PT's request for information beyond what is authorized under the pseudonymous deposition proposal is not proportional to the needs of the case, this Court should deny CACI PT's motion.

### b. The Government's Pseudonymous Deposition Proposal is More Proportional to the Needs of the Case.

#### i. Pseudonymous Depositions Would Provide the Most Relevant Information Sought By CACI PT.

Although CACI PT's motion to compel seeks only identity information for interrogators, it also makes clear that this is only the first step in a multi-stage inquiry: CACI PT seeks to "develop evidence . . . [by] identifying these interrogators and *taking discovery from them.*" MTC Memo. at 1; *id.* at 5-6 (describing that CACI PT intends to obtain the interrogators' testimony to "(1) rebut Plaintiffs' allegations, which diverge considerably from the facts stated in the United States' interrogatory responses; and (2) rebut Plaintiffs' allegations that CACI PT personnel aided and abetted and/or conspired with the persons with whom Plaintiffs interacted at Abu Ghraib prison"). These statements underscore the actual, relevant information being sought by CACI PT: "to learn what actually happened to Plaintiffs while detained at Abu Ghraib prison." ECF No. 276 at 5; *see also* MTC Memo. at 13, n.5 (hypothesizing that discovery from interrogators is needed as a "source of information regarding non-interrogators with whom the Plaintiffs interacted").

This information would be available under the Government's proposal for pseudonymous depositions. If such depositions proceed, the parties would be able to obtain the following information from these individuals:

- whether they were U.S. Army personnel or CACI PT contractors;

11

- whether, more than fifteen years later, they have any recollection of the named plaintiffs;

- any special conditions they set for their interrogations with the named plaintiffs;

- any instructions or orders they gave to military police or other personnel regarding the named plaintiffs' treatment;

- any unclassified interrogation techniques they utilized during their interrogations of the named plaintiffs;

- whether they were aware of applicable standard operating procedures (to the extent such procedures are not classified);

- whether they abided by standard operating procedures during their interrogations of the named plaintiffs;

- whether they ever mistreated, abused, or tortured the named plaintiffs and, if so, details of that treatment;

- details of any interactions they had with the named plaintiffs outside of their interrogations; and

- their knowledge of the interactions of any other military personnel or CACI PT contractors and plaintiffs.

Contrary to CACI PT's rhetoric, facts such as these, and not the names, visual images, or other identifying information of the interrogators are "*the most relevant fact[s] in this case*."  MTC Memo. at 1 (emphasis in original).  And these facts would be available through pseudonymous depositions of the interrogators pursuant to the United States' proposal.

The Fourth Circuit has also highlighted that the information available through pseudonymous depositions, not the actual names of interrogators, is the key, relevant information needed in litigation between CACI PT and the plaintiffs.  In its two most recent opinions in this litigation, the Court of Appeals described essential information that it sought in vain from the record presented on appeal.  Specifically, the Fourth Circuit noted that the record "was

12

inconclusive 'regarding the extent to which military personnel actually exercised control over CACI [PT] employees in their performance of their interrogation functions,'" and that this "concept of direct control encompasses not only the requirements that were set in place in advance of the interrogations, but also what actually occurred in practice during those interrogations and related activities." *Al Shimari v. CACI PT*, 840 F.3d 147, 157 (4th Cir. 2016) (quoting *Al Shimari v. CACI PT*, 758 F.3d 516, 535 (4th Cir. 2014)), *remanded*, 263 F. Supp. 3d 595 (E.D. Va. 2017). This—and other such information known to the interrogators—can be obtained through pseudonymous depositions.

### ii. Pseudonymous Depositions Avoid Serious Burdens From Which This Court Should Protect the Interrogators.

Even before considering the national security interests in protecting interrogators' identities (discussed in Part II, *infra*), the individual interrogators have a personal interest in being shielded from physical harm. Here, the identities being sought are those of interrogators who questioned for intelligence purposes the named plaintiffs and other detainees, including enemy combatants likely associated with the insurgency in Iraq or global terrorist organizations such as Al Qaeda. Separate and apart from the Government's national security interests, "[c]oncerns about witness safety" constitute "a significant countervailing interest" justifying nondisclosure. *United States v. Cousins*, 858 F. Supp. 2d 614, 618 (E.D. Va. 2012); *accord Erby v. Phillips*, 2009 WL 1883279, at *3 (S.D.N.Y. June 30, 2009 ("the safety of a witness constitutes an overriding interest"); *United States v. Suppressed*, 2010 WL 4962885, at *2 (E.D. Mo. Oct. 22, 2010) ("the need to protect the identity and safety of potential witnesses, and the need to protect the privacy interests of individuals identified" constitute compelling interests justifying nondisclosure). This risk of physical harm is sufficient to outweigh the tangential

13

relevance of the interrogators' identities, thereby rendering the discovery request for their names not "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1).

Indeed, except to the extent they may be named as "John Doe" defendants—an issue addressed below, *see* Part I.C.2—the intelligence interrogators whose identities are being sought are "nonparties" who "deserve extra protection from the courts." *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 2012 WL 4846522, at *2 (N.D. Cal. Aug. 7, 2012). As non-parties, they are "powerless to control the scope of litigation and discovery." *United States v. Columbia Broad. Sys., Inc.*, 666 F.2d 364, 371–72 (9th Cir. 1982). As they are absent and unable to represent their interests, Rule 26 and Rule 45 allocate to the Court the responsibility for protecting these individuals. *See* Fed. R. Civ. P. 26(b)(2)(C) ("[O]n its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that . . . the discovery sought . . . can be obtained from some other source that is . . . less burdensome."); Fed R. Civ. P. 45(d)(3)(A) (requiring courts to grant motions to quash where a non-party is "subject[] . . . to undue burden"); *In re NCAA Student-Athlete Litig.*, 2012 WL 4846522, at *2 ("Rule 45 imposes a mandatory responsibility on this court to protect nonparties from unduly burdensome discovery.").

Information in the record indicates that the safety of U.S. military personnel, present or former, would be at risk if disclosed. As set forth in the files produced by the United States in discovery, the Government assessed during the time of detention that ███████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

14

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████   In addition, as the parties have acknowledged, interrogators at Abu Ghraib had an expectation that their identities would be kept secret.  Interrogators routinely covered their names, did not wear uniforms, or otherwise did not disclose their true identities during the interrogation process.  *See, e.g.*, Third Am. Compl., ECF No. 254, at ¶¶ 92-93.  Accordingly, the record before the Court makes clear that the interrogation personnel would have a reasonable concern that any exposure of their identities in connection with whom they interrogated would place them or members of their family at substantial risk of harm or unlawful injury.[4]

One direct way to protect their identities is straightforward: to assign pseudonyms or alternative names to conceal their true identities.  In *James v. Jacobson*, 6 F.3d 233 (4th Cir. 1993), the Fourth Circuit overruled and remanded the district court's denial of the appellants' request to proceed anonymously in the trial of their medical malpractice/fraud action.  Recognizing "[t]he decision whether to permit parties to proceed anonymously . . . [is]

---

[4] At a March 30, 2018 hearing, *see* ECF Nos. 726, 745, Plaintiffs objected to reliance by the United States on the facts of their detention in a previous response to a motion to compel by CACI PT, noting a footnote in the Fourth Circuit's 2014 opinion that states: "The record [in the 2013 appeal] does not contain any evidence that the plaintiffs were designated 'enemy combatants' by the United States government." *Al Shimari*, 758 F.3d at 521 n.2.  However, neither the designation of plaintiffs as "enemy combatants" nor the ultimate release of plaintiffs from detention during the course of hostilities is evidence that plaintiffs were not properly detained.

committed in the first instance to trial court['s] discretion," the Fourth Circuit concluded that

"under appropriate circumstances anonymity may, as a matter of discretion, be permitted." *Id.* at

238. The *Jacobson* Court laid out non-exhaustive guidelines to consider when deciding whether

to permit parties to proceed pseudonymously, including "whether identification poses a risk of

retaliatory physical or mental harm to the requesting party or even more critically, to innocent

non-parties." *Id.* The Fourth Circuit also has recognized that in civil and criminal contexts the

assignment of pseudonyms to witnesses is proper. *See, e.g.*, *Smyth ex rel. Smyth v. Rivero*, 282

F.3d 268, 271 n.1 (4th Cir. 2002) ("[P]laintiffs . . . sought and received permission to file their

complaint and proceed in the action under pseudonyms."); *U.S. v. Ramos-Cruz*, 667 F.3d 487,

500 (4th Cir. 2012) (allowing experts to testify using pseudonyms where "the government makes

a showing of an actual threat" of harm).

In analogous situations, where the identity of the witness in question is classified, the

Fourth Circuit also has deemed steps to conceal witnesses' identities appropriate.[5] *See, e.g.*,

*United States v. Moussaoui*, 382 F.3d 453, 480 n.37 (4th Cir. 2004) (noting that the names of

enemy combatants that defendant sought to subpoena were classified and that, to protect national

security interests, the district court could use non-substantive changes, including "alternate

---

[5] Although criminal cases may provide a useful analog for purposes of identifying measures that can be taken to protect witness identities, the treatment of classified information in criminal and civil cases differs in a critical respect. In contrast to criminal cases, where the use of classified information is governed by the Classified Information Procedures Act, Pub. L. No. 96–456, 94 Stat. 2025 (1980), codified at 18 U.S.C. app. 3, that statutory authority does not govern judicial review of classified information in civil actions like this one. Rather, to the extent that the disclosure of information that may be relevant to a civil action reasonably could be expected to harm national security, such information is subject to exclusion from the case under the state secrets doctrine. *See Reynolds*, 345 U.S. at 10; *Abilt*, 848 F.3d at 310–11; *El-Masri*, 479 F.3d at 306. This Court need not reach the state secrets privilege issue here, however, to the extent the Court finds that pseudonymous depositions may be used to protect the classified information at issue.

16

names for people or places" in creating substitutions for those witnesses' proposed testimony); *United States v. Marzook*, 435 F. Supp. 2d 708, 715 n.7 (N.D. Ill. 2006) (court allowed use of pseudonyms at a suppression hearing to protect the classified identities of secret agents of the Israel Security Agency). Consistent with this obligation to protect the safety of these individuals, and the requirement that discovery be limited to what is proportionate to the needs of the case, the Court should not require release of the individuals' identities when pseudonymous discovery remains available.

### c. CACI PT's criticisms of the Government's pseudonymous deposition proposal are meritless.

CACI PT makes two fundamentally flawed criticisms of the Government's pseudonymous deposition proposal. First, CACI PT claims that it needs to know the identities for purposes of trial. But such a concern is premature at this stage of the proceedings, where there is no indication the interrogators have useful testimony that would be beneficial to present at trial. In addition, CACI PT suggests they need to know the identities for purposes of its third-party complaint. But, again, that concern is premature because the third-party action is derivative of the underlying action and would be pertinent only if plaintiffs are able to prevail on their claims against CACI PT. As such, the appropriate course would be to sever and stay the third-party complaint at this time, not to jeopardize the interrogators' safety. Neither of these concerns should override the need to protect the safety of these third-party witnesses.

### 1. It is premature to decide what will be needed at trial of the underlying action.

First, although this case is still in the discovery phase, CACI PT claims obtaining the interrogators' identities is essential because, absent such identities, it cannot "subpoena a . . . witness to testify live at a trial." MTC Memo. at 17. As an initial matter, CACI PT should

recognize that the geographic limitations to the Court's subpoena power in Federal Rule 45(c)(1) could render most current or past U.S. military personnel beyond the reach of a trial subpoena. *See* Fed. R. Civ. P. 45(c)(1)(A) (setting scope at "100 miles of where the person resides, is employed, or regularly transacts business in person"); *id.* 45(c)(1)(B) (setting scope at state boundaries for "a party or party's officer"). Second, until the interrogators are deposed, it is merely speculative that any individual interrogator has relevant information that should be presented at trial. And in fact, given the passage of time, the limited recollections exhibited by plaintiffs in their depositions, and the large number of interrogations likely to have been carried out by any particular military or contract interrogator, there is substantial reason to believe the testimony of interrogators may shed little or no light on the facts in this litigation at all. In the event interrogator testimony proves necessary at a trial, the mechanism for such testimony can be addressed then.[6]

CACI PT also asserts that the Government's proposal would deny the company "the opportunity to learn whether the witness is impeachable because of bias or other reasons." MTC Memo. at 17-18. But CACI PT's argument is contingent on there actually being a need for CACI PT to probe into the credibility of these interrogators, which again is speculative at this juncture. If, for example, CACI PT deposes these interrogators pseudonymously and the interrogators claim they never mistreated or abused the named plaintiffs, it is likely that CACI

---

[6] Contrary to CACI PT's statement, nothing about pseudonymous depositions "would preclude CACI PT from calling Plaintiffs' assigned interrogators as trial witnesses." The Government's proposal is silent on that matter and limited to discovery because that is the immediate issue to be addressed. As appropriate, the Government's approach defers trial issues to the stage at which the parties and the Court can engage in more informed discussion about the issue of how trial may proceed in a manner that protects national security. However, the Government reserves the right to oppose the testimony of interrogators at trial at the appropriate time.

PT would not seek to impeach their testimony.[7]  In addition, once pseudonymous depositions occur, the parties could look to a more thorough record regarding the claimed need for impeachment testimony, including whether the individuals at issue were Army personnel or CACI PT contractors, or whether there is already information in the record that would call into doubt their credibility without disclosing their identity.  In either case, the Court would at least have a record to weigh against the important equities of protecting these interrogators' identities.

### 2.    This Court Should Sever the Claims Against the United States and the John Does to Not Unduly Delay the Underlying Action.

CACI PT also claims it needs the identifying information for purposes of pursuing their claims against the John Does in the third-party action.  The third-party action, however, is derivative of the underlying action and would be pertinent only if plaintiffs are able to prevail on their claims against CACI PT.  Rather than unnecessarily implicating classified information at this time, this Court should instead sever the third-party claims from the underlying action under Federal Rule of Civil Procedure 14(a)(4).

---

[7] An example from a deposition taken in 2013 highlights the speculative nature of CACI PT's argument.  PVT Ivan Frederick's deposition testimony was undoubtedly helpful to CACI PT on at least two points:  he testified that 1) he did not recognize the named plaintiffs in photographs shown to him, Ex. 7, Frederick Dep. at 161:20-163:21, 185:14-186:6, and 2) CACI PT personnel were not involved in certain episodes of mistreatment or abuse of detainees at Abu Ghraib.  *See, e.g.*, *id.*, Frederick Dep. at 217:19-221:19 (Frederick testified on cross that CACI PT personnel were not involved in an incident of abuse with a detainee nicknamed "Gilligan").  PVT Frederick provided this testimony without implicating information covered by the Directive.  Not surprisingly, while CACI PT cites in its motion to moments in the deposition where PVT Frederick was instructed by the Government not to answer certain questions that called for information covered by DoDD 3115.09, it never points to any testimony about which it intended to impeach PVT Frederick but was unable to because of the need to rely on classified information.  *Compare* MTC Memo. at 4-5 (discussing Frederick deposition) *with* MTC Memo. at 17-18 (discussing theoretical need for impeachment).

As the Committee Notes to Rule 14 recognize, a court should consider whether severance would promote judicial economy. Fed. R. Civ. P. 14, Committee Notes, 1963 Amendment ("After the third-party defendant is brought in, the court has discretion to strike the third-party claim if it is obviously unmeritorious and can only delay or prejudice the disposition of the plaintiff's claim, or to sever the third-party claim or accord it separate trial if confusion or prejudice would otherwise result."). The severance of a third-party claim under Rule 14(a)(4) lies within the discretion of the court in this consideration of judicial economy. *Estate of Cuffee by & through Cuffee v. Newhart*, 2010 WL 11527337, at \*1 (E.D. Va. Feb. 16, 2010) ("In light of this case's extensive procedural history and the court's familiarity with it, the court believes the interests of judicial economy are better served by retaining, but severing"). And, under Rule 21 of the Federal Rules of Civil Procedure, a court may sever any claim against a party on its own or by motion. *Thornapple Assocs., Inc. v. Izadpanah*, 2014 WL 7239018, at \*2 (E.D. Va. Dec. 17, 2014).

Here, judicial economy would be promoted by the Court severing the third-party claims. It is not practical for the third-party case to be litigated on the same schedule as the underlying action. Discovery closes in the underlying action on July 13 and yet the John Does would not even be required until July at the earliest to serve an opening responsive pleading to the complaint against them. *See* Order, ECF No. 771 (granting CACI PT an extension until June 13, 2018, to serve John Does defendants). Allowing the third-party complaint to remain joined with the original action would only further delay the resolution of a case that has already been pending in this district for a decade. Likewise, judicial economy would counsel in favor of severing and staying the claims because the entire action against the John Does—and thus, the

question of whether they must be identified—may be unnecessary if CACI PT ultimately

prevails in the underlying action.

## II. THE STATE SECRETS PRIVILEGE BARS THE DISCOVERY SOUGHT BY DEFENDANTS.

To the extent that this Court considers it necessary now to review the Government's

assertion of the state secrets privilege, that privilege properly protects the identities of particular

interrogators for particular detainees.  As explained in Secretary Mattis' supporting declaration,

after his personal consideration of the matter, disclosure of this information reasonably would be

expected to cause a significant harm to national security.

The existence of a privilege for military and state secrets to protect information vital to

the national security or diplomatic relations "is well established in the law of evidence."

*Reynolds*, 345 U.S. at 6-7.  As the Fourth Circuit recognized in this case, "rules . . . such as . . .

the state secrets doctrine" exist to "adequately safeguard military interests" in cases such as the

one at bar.  *Al Shimari*, 679 F.3d at 219 (en banc). Although the privilege was developed in

common law, the state secrets privilege has a constitutional foundation grounded in the

President's Article II powers to conduct foreign affairs and provide for the national defense.  *See*

*United States v. Nixon*, 418 U.S. 683, 710 (1974); *El-Masri*, 479 F.3d at 303-04.[8]  The state

secrets privilege "must be formally asserted by the head of the Executive Branch agency with

control over the state secrets at issue, and then only after that person has personally considered

---

[8] *See also Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988) (The Executive's authority to protect national security information derives from the President's Article II role as head of the Executive Branch and as Commander in Chief.).  The privilege encompasses a wide range of information. *Ellsberg v. Mitchell*, 709 F.2d 51, 57 (D.C. Cir. 1983) (State secrets privilege prevents the "impairment of the nation's defense capabilities, disclosure of intelligence-gathering methods or capabilities, and disruption of diplomatic relations with foreign governments.").

the matter." *El-Masri v. Tenet*, 437 F. Supp. 2d 530, 535-36 (E.D. Va. 2006) (referencing *Reynolds*, 345 U.S. at 7-8). The state secrets privilege is an absolute privilege and "even the most compelling necessity cannot overcome the claim of privilege." *Reynolds*, 345 U.S. at 11; *Sterling v. Tenet*, 416 F.3d 338, 343 (4th Cir. 2005).

### a. The Government Has Properly Asserted the State Secrets Privilege.

The Government has satisfied the procedural requirements for invoking the state secrets privilege. "First, the state secrets privilege must be asserted by the United States." *El-Masri*, 479 F.3d at 304. The privilege exclusively "belongs to the Government and ... can neither be claimed nor waived by a private party." *Id.* (quoting *Reynolds*, 345 U.S. at 7). "Second, '[t]here must be a formal claim of privilege, lodged by the head of the department which has control over the matter,'" here, the Department of Defense. *Id.* (quoting *Reynolds*, 345 U.S. at 7-8). Third, the "formal privilege claim may be made only 'after actual personal consideration by that officer.'" *Id.* (quoting *Reynolds*, 345 U.S. at 8).

The Government has satisfied these requirements in this case. First, the state secrets privilege has been formally asserted by Secretary Mattis, a Cabinet-level official in the United States Government. *See* Mattis Decl. ¶¶ 1, 3. Second, as Secretary of Defense, Secretary Mattis is the head of DoD, which has control over the identities of interrogators sought in this case. *Id*. Third, the Secretary has personally considered the matter and has determined that disclosure of the information at issue reasonably could be expected to cause serious damage to the national security of the United States. *Id*. ¶¶ 2-3; 5-7; 9-10.

In addition to the foregoing procedural requirements established by the case law, the Attorney General issued formal Executive Branch guidance in 2009 regarding the assertion and defense of the state secrets privilege in litigation. *See* Ex. 3. Memorandum Governing

22

Invocation of the State Secrets Privilege ("States Secrets Policy").  Under those procedures, "the U.S. Government will invoke the [state secrets] privilege in court only when genuine and significant harm to national defense or foreign relations is at stake and only to the extent necessary to safeguard those interests."  *Id.*

The States Secrets Policy also sets forth the procedural and substantive path for agencies to follow in invoking the state secrets privilege.  *Id.*  This procedure ensures that DoD and other agencies treat invocation of the state secrets privilege with the seriousness it deserves and provides for careful review by the most senior officials in the Department of Justice.  The end result is that the invocation of the state secrets privilege here involved personal consideration by some of the most senior officials in the Department of Justice and the Department of Defense.  *See id.*

Accordingly, the Government has satisfied the procedural requirements for the assertion of the state secrets privilege in the case law, and has taken seriously the instruction in *Reynolds* that the state secrets privilege "is not to be lightly invoked."  *Reynolds*, 345 U.S. at 7.

> **b.  The Secretary of Defense Has Demonstrated That Disclosure of the Information Covered by the Privilege Assertion Risks Damage to National Security.**

 "After a court has confirmed that the *Reynolds* procedural prerequisites are satisfied, it must determine whether the information that the United States seeks to shield is a state secret, and thus privileged from disclosure." *El–Masri*, 479 F.3d at 304.  "A court is obliged to honor the Executive's assertion of the privilege if . . . there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged." *Id.* at 305 (citing *Reynolds*, 345 U.S. at 10).  Because this question is of "constitutional significance . . . the executive's determination that disclosure of information

23

might pose a threat to national security is entitled to 'utmost deference.'" *Abilt*, 848 F.3d at 312 (quoting *Nixon*, 418 U.S. at 710).  Further, deference is appropriate because "the Executive and the intelligence agencies under his control occupy a position superior to that of the courts in evaluating the consequences of a release of sensitive information." *El-Masri*, 479 F.3d at 305; *see also United States v. Marchetti*,  466 F.2d 1309, 1318 (4th Cir.1972)  ("The courts, of course, are ill-equipped to become sufficiently steeped in foreign intelligence matters to serve effectively in the review of secrecy classifications in that area.").

Here, in his formal assertion of the state secrets privilege, the Secretary of Defense has described the "serious damage to the national security of the United States" that reasonably could be expected upon disclosure of the identifying information for particular interrogators of particular detainees.  *See* Mattis Decl. ¶ 2.  Specifically, Secretary Mattis explained that disclosure would impose "an unacceptable risk of . . . possible retribution by the detainees, groups to which the detainees belong, or other sympathizers," directed at "the interrogators and their families."  *Id.* ¶ 4.  Secretary Mattis described specific activities by "[t]errorist groups and their affiliates" to target both "U.S. military personnel and contractors."  *Id.* ¶ 5.  These actions include "actual attacks against DoD interrogators by detainees" as well as the publication of "kill lists online, which include personally identifiable information, such as the names and home addresses of DoD personnel." [9]  *Id.*  Secretary Mattis also made clear that the harms from such

---

[9] The Government has previously explained publicly that this threat involves the interplay of threats posed by terrorist organizations abroad with threats posed by potential attackers in the United States.  *See, e.g.*, Testimony of DHS Deputy Sec'y Alejandro Mayorkas, Sen. Comm. on Homeland Security and Gov. Affairs, *Protecting America from the Threat of ISIS* (May 26, 2016) ("DHS Testimony"), available at https://www.dhs.gov/news/2016/05/26/written-testimony-dhs-deputy-secretary-mayorkas-senate-committee-homeland-security (last visited April 26, 2018) (explaining that ISIS "is actively trying to inspire" individuals through "messages and propaganda [it] disseminates through its use of social media," and that these

attacks would not be limited to the interrogators and their families alone, but would lead to "a significant propaganda event . . . [that] would strengthen our adversaries in their recruiting and ability to propagandize effectively . . . to the significant detriment of our national security." *Id.* ¶ 6. And Secretary Mattis explained that a "[f]ailure to protect the interrogators' identities in connection with the interrogations of specific detainees would also have a chilling effect on DoD's ability to recruit and retain interrogators," a necessary prerequisite to gathering intelligence from detainees. *Id.* ¶ 4.

Secretary Mattis also verified that "there is no official confirmation in the public record" of any of the information over which the state secrets privilege is being invoked, and described the additional risks that would occur through "official acknowledgment or confirmation" of the identity of an intelligence interrogator in association with the interrogation of a particular detainee. *Id.* ¶ 8. Secretary Mattis has thereby plainly set forth how disclosure of the information sought by CACI PT's motion to compel "will expose military matters which, in the interest of national security, should not be divulged." *El-Masri*, 479 F.3d at 305.

"[T]he [G]overnment may use the state secrets privilege to withhold a broad range of information," *Kasza v. Browner*, 133 F.3d 1159, 1166 (9th Cir. 1998), and the privilege is "expansive" as to the "various harms[] against which protection is sought by invocation of the privilege." *Ellsberg*, 709 F.2d at 57 (enumerating harms that "include impairment of the nation's defense capabilities, disclosure of intelligence-gathering methods or capabilities, and disruption of diplomatic relations with foreign governments"). The privilege thereby properly encompasses

---

activities include "gathering personal information through open source research and sometimes through hacking—and then publically disseminating the information and calling for attacks against these individuals"). As Deputy Sec'y Mayorkas noted, Al Qaeda employs like approaches. *See id.*

both the type of information—the names, visual representations, and other identifying

information—as to which the state secrets privilege is asserted here, and the threats to U.S.

personnel, disruption of military missions, and potential strengthening of adversaries that this

assertion of the privilege seeks to avoid.

As Secretary Mattis also explains, identifying information for intelligence interrogators is

particularly critical information for the Government to protect "because of the close, face-to-face

relationships that interrogators have with those they interrogate," and "[i]ntelligence operations

are particularly sensitive," in light of "the kind of relationships needed to gain valuable

intelligence." Mattis Decl. ¶ 7. And visual images and other identifying information are, like

names, important to protect here because "others [aside from plaintiffs] who may wish to target

the interrogators or their families" could rely on such information in their targeting efforts. *Id.* ¶

9. Importantly, Secretary Mattis highlighted in his declaration the threat that interrogator

identities could be "linked … through information disclosed in this litigation, available in the

public domain," to create the threats of harm he describes, even if individual pieces of

information may not create such risks independently. *Id.* ¶ 9; c*f. CIA v. Sims*, 471 U.S. 159, 178

(1985) (In intelligence matters, "[w]hat may seem trivial to the uninformed, may appear of great

moment . . . in its proper context."). As Secretary Mattis notes, among the publishers of online

"kill lists" identifying DoD personnel for targeting by terrorists are "ISIS . . . hackers," who pose

just one of the many threats—whether deliberate or accidental—from which counsel for the

parties cannot reasonably be expected to ensure safety. Mattis Decl. ¶ 5; *see also* DHS

Testimony*, supra* n. 9.

"Information that is properly privileged under the state secrets doctrine is absolutely

protected from disclosure . . . [and] remove[d] . . . from the proceedings entirely." *Abilt*, 848

26

F.3d at 313 (citation omitted). For this reason, CACI PT's proposal that the Court order release of interrogator identities in conjunction with "a protective order," MTC Memo. at 18, is flatly contrary to well-settled law stemming from *Reynolds*, wherein the Supreme Court expressly ruled out even *in camera* examination: "the court should not jeopardize . . . security . . . by insisting upon an examination of the evidence, even by the judge alone." *Reynolds*, 345 U.S. at 10; *see El-Masri,* 479 F.3d at 311 (holding that *Reynolds* "expressly foreclosed" adoption of a "procedure under which state secrets would have been revealed to [the plaintiff], his counsel, and the court, but withheld from the public"); *Sterling*, 416 F.3d at 344 (describing *in camera* review as "play[ing] with fire and chanc[ing] further disclosure . . . that would defeat the very purpose for which the privilege exists").[10] In *Sterling*, the Fourth Circuit rejected the "argument that the court could devise special procedures that would allow" access to the privileged information by the Court and by counsel:

> Such procedures, whatever they might be, still entail considerable risk.
> Inadvertent disclosure during the course of a trial—or even in camera—is
> precisely the sort of risk that *Reynolds* attempts to avoid. At best, special

---

[10] As the D.C. Circuit has explained, "[p]rotective orders cannot prevent inadvertent disclosure nor reduce the damage to the security of the nation which may result." *Halkin v. Helms*, 598 F.2d 1, 7 (D.C. Cir. 1978). Indeed, the record in this case already reflects the challenges that exist in ensuring compliance with judicial protective orders. For example, notwithstanding a protective order in *Ibrahim, et al. v. Titan Corp. et al.* ("*Saleh*"), Civ. No. 04-1248-JR (D.D.C.), requiring "all material treated as confidential . . . be returned to the producing party . . . [or] destroyed," *see Saleh*, ECF No. 66 ¶ 11, the material produced by the United States in that case was neither returned nor destroyed, thus necessitating treatment in a special paragraph in the Protective Order in this case. *See* ECF No. 211 at ¶ 14. These and other actions, whether inadvertent or deliberate, underscore that in the context of the national security dangers presented here, the responsibility for the security of classified information cannot be transferred from the United States to a protective order. *See also General Dynamics Corp. v. U.S.*, 563 U.S. 478, 486-87 (2011) (discussing the failure of protective order procedures in case where "[d]isclosure of state secrets occurred twice before the [trial court] terminated discovery," and warning that "both sides have an incentive to probe up to the boundaries of state secrets," and that "[e]ach assertion of the privilege can provide another clue about" the nature of the classified information).

27

accommodations give rise to added opportunity for leaked information. At worst, that information would become public, placing covert agents and intelligence sources alike at grave personal risk.

*Id.* at 348.

Upon review of the assertion of the state secrets privilege, the Court should therefore conclude that the United States has properly invoked that privilege, established that a "reasonable danger" to national security would exist upon release of the information, and order that names and identifying information of the intelligence interrogators associated with interrogations of the plaintiffs be excluded entirely from this litigation.

## CONCLUSION

For the foregoing reasons, CACI PT's Motion to Compel should be denied.

Dated: April 27, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

TRACY DOHERTY-MCCORMICK
Acting United States Attorney

   */s/*
LAUREN A. WETZLER
Chief, Civil Division
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Ave.
Alexandria, VA  22314
Tel:    (703) 299-3752
Fax:    (703) 299-3983
Email: Lauren.Wetzler@usdoj.gov

ANTHONY J. COPPOLINO
Deputy Branch Director
ADAM G. KIRSCHNER
ERIC J. SOSKIN

28

Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
Tel: (202) 353-9265
Fax: (202) 616-8470
Email: Eric.Soskin@usdoj.gov

Attorneys for the United States

29

## **CERTIFICATE OF SERVICE**

I certify that on April 27, 2018, I electronically filed the foregoing with the Clerk of Court

using the CM/ECF system, which sent a notification of such filing (NEF) to the following counsel

of record:

John Kenneth Zwerling
The Law Offices of John Kenneth Zwerling, P.C.
114 North Alfred Street
Alexandria, VA  22314
jz@zwerling.com

Conor P. Brady
Steptoe & Johnson LLP
1330 Connecticut Ave., N.W.
Washington, DC  20036
cbrady@steptoe.com

William D. Dolan, III
Law Offices of William D. Dolan, III, PC
8270 Greensboro Drive, Suite 700
Tysons Corner, VA  22102
wdolan@dolanlaw.net

                                        /s/
                              LAUREN A. WETZLER
                              Chief, Civil Division
                              Assistant United States Attorney
                              United States Attorney's Office
                              2100 Jamieson Ave.
                              Alexandria, VA  22314
                              Tel:     (703) 299-3752
                              Fax:     (703) 299-3983
                              Email:   Lauren.Wetzler@usdoj.gov