IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| SUHAIL NAJIM ABDULLAH AL SHIMARI, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CACI PREMIER TECHNOLOGY, INC., <br><br> Defendant/Third-Party Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Third-Party Defendant. | 1:08-cv-827 (LMB/JFA) |

## MEMORANDUM OPINION

Defendant/third-party plaintiff CACI Premier Technology, Inc. ("CACI") has filed a suggestion of a lack of subject matter jurisdiction [Dkt. No. 811], in which it argues that under what CACI characterizes as the test established in the Supreme Court's recent decision in Jesner v. Arab Bank, PLC, 138 S. Ct. 1386 (2018), the Court should dismiss plaintiffs' claims for lack of subject matter jurisdiction. For the reasons stated after oral argument in open court and further developed in this Memorandum Opinion, the Court finds that it has jurisdiction over the claims and parties in this civil action, which involves allegations by plaintiffs that CACI engaged in tortious conduct in violation of specific, universal, and obligatory international norms.

This civil action arises out of the alleged mistreatment of plaintiffs Suhail Najim Abdullah Al Shimari, Asa'ad Hamza Hanfoosh Al-Zuba'e, and Salah Hasan Nusaif Jasim Al-Ejaili (collectively, "plaintiffs") by members of the United States military and CACI while plaintiffs were detained at Abu Ghraib prison. Plaintiffs bring claims under the Alien Tort

Statute ("ATS"), 28 U.S.C. § 1350,[1] that CACI employees conspired with and aided and abetted military personnel in subjecting plaintiffs to torture; cruel, inhuman, and degrading treatment; and war crimes.[2] In addition, CACI has filed a Third-Party Complaint asserting claims against third-party defendants the United States of America and John Does 1-60[3] for contribution, exoneration, and indemnification if plaintiffs win a judgment against CACI because the conduct in question was overseen and directed by the military, as well as for breach of contract based on the government's alleged failure to provide CACI with documents in this litigation that could have helped CACI defend itself against plaintiffs' claims.

I. DISCUSSION

A. **Standard of Review**

Under Fed. R. Civ. P. 12(b)(1), a civil action must be dismissed whenever the court lacks subject matter jurisdiction. The plaintiff has the burden of establishing subject matter jurisdiction, Demetres v. E.W. Constr., Inc., 776 F.3d 271, 272 (4th Cir. 2015), and the Court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment," In re KBR, Inc., Burn Pit Litig., 744 F.3d 326, 333 (4th Cir. 2014) (internal quotation marks omitted).

---

[1] The ATS provides: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C § 1350.
[2] The factual background and procedural history of this litigation are described in detail in Al Shimari v. CACI Premier Tech., Inc., 300 F. Supp. 3d 758 (E.D. Va. 2018).
[3] The John Doe third-party defendants comprise three groups of natural persons: soldiers stationed at Abu Ghraib; "civilian employees of the United States Department of Defense, or any components thereof, or civilian contractor employees supporting the U.S. military mission at Abu Ghraib"; and "employees of the United States or civilian contractor personnel working for Other Government Agencies at Abu Ghraib." Third-Party Compl. [Dkt. No. 665] ¶ 9.

## B. Analysis

In Jesner, the Supreme Court addressed the question of whether lawsuits by foreign citizens against foreign corporate entities are permissible under the ATS. The petitioners in that case were foreign nationals who had filed five different lawsuits against the Arab Bank, PLC, in the Eastern District of New York. Jesner, 138 S. Ct. at 1394. The foreign nationals alleged that they or their family members had been injured in various terrorist attacks in the Middle East and that the Arab Bank, a "major Jordanian financial institution with branches throughout the world," had helped finance these attacks by, among other actions, maintaining bank accounts for terrorists and allowing these accounts to be used to pay the families of suicide bombers. Id. Although most of their claims involved conduct which had occurred in the Middle East, their complaints alleged that the Arab Bank had used its New York branch to clear terrorist-related dollar-denominated transactions and to launder money for a charity affiliated with Hamas. Id. at 1395. Based on this connection to the United States, they filed ATS claims in federal court alleging that the Arab Bank's conduct had facilitated the terrorists' actions in violation of clearly established international law. See id.

In the lower courts, the petitioners' claims had been dismissed on the ground that the ATS does not impose liability on corporations, see id. at 1396, and the Supreme Court granted certiorari to address the question of "[w]hether the [ATS] categorically forecloses corporate liability," Pet. for a Writ of Certiorari at i, Jesner, 138 S. Ct. 1386. Rather than resolving this categorical question, the Court held only that ATS suits may not proceed against foreign corporations. In reaching that conclusion, the Court explained that there is a general reluctance to create a private right of action where, as in the ATS, there is no explicit statutory right of action and that this principle should "apply with particular force in the context of the ATS" because of

3

the foreign policy concerns implicated by ATS suits. Jesner, 138 S. Ct. at 1402-03. Applying this principle to petitioners' specific claims, the Court observed that the litigation had "caused significant diplomatic tensions with Jordan, a critical ally in one of the world's most sensitive regions," and that previous ATS litigation had similarly caused tension with foreign sovereigns. Id. at 1406-07 (internal quotation marks omitted). Citing these concerns, the Court held that foreign corporate entities are not appropriate defendants under the ATS because courts, as opposed to the political branches, "are not well suited to make the required policy judgments that are implicated by corporate liability in cases like this one." Id. at 1407.

CACI cites Jesner as supporting its claim that this Court does not have jurisdiction to consider plaintiffs' ATS claims "for two independent reasons: (1) the separation-of-powers concerns inherent in [the] ATS precluded judicial creation of a private right of action in the new context at issue in Jesner; and (2) allowing an ATS claim did not further [the] ATS's objective of preventing friction between the United States and foreign nations." CACI Mem. [Dkt. No. 812] 12. Under CACI's reading of Jesner, the Supreme Court "change[d] the way a court must analyze claims asserted under [the] ATS for purposes of subject-matter jurisdiction." Id. at 3. Specifically, CACI argues that Jesner "makes clear" that courts must undertake "an independent inquiry akin to a Bivens 'special-factor analysis'" before allowing an ATS claim to proceed and that, under this framework, plaintiffs have the burden of showing that allowing their claims to proceed would not infringe on appropriate separation of powers and would "further the principal objective of the ATS," which is to "prevent foreign entanglements and international friction." Id. at 3-4. Although this Court has serious doubts about whether Jesner established this kind of

analysis,[4] assuming for the sake of argument that CACI has correctly framed the appropriate ATS inquiry after Jesner, plaintiffs have nevertheless made the required showing and their claims will not be dismissed.

---

[4] As an initial matter, both Supreme Court precedent and the text of the ATS make clear that the ATS provides for subject matter jurisdiction over claims like plaintiffs' claim. See Sosa v. Alvarez-Machain, 542 U.S. 692, 713-14 (2004); see also 28 U.S.C. § 1350 ("The district court shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." (emphasis added)). Accordingly, the framework established by Sosa and Jesner is concerned with the question of whether federal courts should recognize a private right of action with respect to a given plaintiff's claim, not with the preliminary and analytically distinct question of whether federal courts have jurisdiction.

Moreover, when this analysis is appropriately understood as a question of determining whether there is a private right of action, the Supreme Court has explained that the "judicial task" is "to interpret the statute Congress has passed to determine whether it displays an intent to create . . . a private remedy." Alexander v. Sandoval, 532 U.S. 275, 286 (2001). The intent of Congress in passing the statute is "determinative." Id. In Sosa, the Supreme Court undertook this analysis with respect to the ATS, examining the statute and the state of the common law in 1789, when the ATS was enacted, to determine what the First Congress would have intended with respect to private rights of action under the ATS, and concluded that the First Congress would have understood that the common law provided a right of action with respect to certain well-defined torts in violation of international law. Sosa, 542 U.S. at 731-34. Accordingly, as Sosa recognizes, there is a cause of action under the ATS for aliens who bring claims for violations of such specific, universal, and obligatory norms.

The usual rule once jurisdiction is established and plaintiffs have shown that they possess a right of action requires a federal court to exercise its jurisdiction; indeed, this obligation is "virtually unflagging." Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976). Nevertheless, the Supreme Court has held that in some narrow circumstances, where "the clearest of justifications" is present, a federal court may in its discretion decline to exercise jurisdiction that it possesses. Id. at 819; see also, e.g., Younger v. Harris, 401 U.S. 37 (1971). Accordingly, the Sosa Court recognized that in some specific ATS cases, there may be clear justifications requiring dismissal even when the plaintiff has appropriately alleged the violation of a clear and obligatory international norm. See Sosa, 542 U.S. at 733 n.21 (giving as an example several then-pending class actions seeking damages from corporations alleged to have participated in South Africa's apartheid regime where both the South African and American governments had indicated that allowing the suits to proceed would interfere with South Africa's policy choice to avoid a "victors' justice" approach to apartheid and move beyond apartheid with an approach "based on confession and absolution, informed by the principles of reconciliation, reconstruction, reparation and goodwill" (internal quotation marks omitted)). In Jesner, the Supreme Court appears to have applied this approach to ATS claims against foreign

Beginning with CACI's argument that plaintiffs' claims infringe on separation of powers, the Fourth Circuit has already recognized that allowing these claims to proceed does not impermissibly interfere with the political branches. First, in its 2014 decision addressing extraterritoriality under Kiobel v. Royal Dutch Petrol. Co., 569 U.S. 108 (2013), the Fourth Circuit concluded:

> Indeed, we observe that mechanically applying the presumption [against extraterritoriality] to bar these ATS claims would not advance the purposes of the presumption. A basic premise of the presumption against extraterritorial application is that United States courts must be wary of international discord resulting from unintended clashes between our laws and those of other nations. In the present case, however, the plaintiffs seek to enforce the customary law of nations through a jurisdictional vehicle provided under United States law, the ATS, rather than a federal statute that itself details conduct to be regulated or enforced. Thus, any substantive norm enforced through an ATS claim necessarily is recognized by other nations as being actionable. Moreover, this case does not present any potential problems associated with bringing foreign nationals into United States courts to answer for conduct committed abroad, given that the defendants are United States citizens.
>
> We likewise note that further litigation of these ATS claims will not require unwarranted judicial interference in the conduct of foreign policy. The political branches already have indicated that the United States will not tolerate acts of torture, whether committed by United States citizens or by foreign nationals.
>
> The plaintiffs do not appear to have access to federal courts under the Torture Victim Protection Act of 1991 (TVPA), presumably because they did not suffer injury under actual or apparent authority, or color of law, of any foreign nation. Nevertheless, the TVPA's broad prohibition against torture reflects Congress's recognition of a

---

corporations, determining that the substantial international relations problems caused by such suits provided a clear reason to avoid exercising jurisdiction. See 138 S. Ct. at 1406-07.

CACI's reading of Jesner as requiring an independent inquiry where the burden is on a plaintiff to show that its claims do not infringe on separation of powers and affirmatively promote the purposes of the ATS seems to run headlong into this substantial body of precedent explaining that the general rule is that once jurisdiction is established, it must be exercised. Instead, the better reading of Jesner's interpretation of Sosa appears to be that the federal courts should abstain from exercising jurisdiction under the ATS in the exceptional case when the defendant presents a clear justification to do so, as the Arab Bank did in Jesner. Nevertheless, because plaintiffs' claims survive even under CACI's proposed framework, the Court need not decide whether CACI has appropriately interpreted Jesner.

6

distinct interest in preventing the United States from becoming a safe harbor (free of civil as well as criminal liability) for a torturer or other common enemy of mankind. This conclusion is reinforced by the fact that Congress has authorized the imposition of severe criminal penalties for acts of torture committed by United States nationals abroad. The Supreme Court certainly was aware of these civil and criminal statutes when it articulated its "touch and concern" language in Kiobel.

Al Shimari v. CACI Premier Tech., Inc., 758 F.3d 516, 529-30 (4th Cir. 2014) (footnote, internal quotation marks, citations, and alteration omitted).

Similarly, in its 2016 decision addressing the political question doctrine, the Fourth Circuit explained:

> The political question doctrine derives from the principle of separation of powers, and deprives courts of jurisdiction over controversies which revolve around policy choices and value determinations constitutionally committed to Congress or, as alleged in this case, to the executive branch. This doctrine is a narrow exception to the judiciary's general obligation to decide cases properly brought before the courts. Although most military decisions are committed exclusively to the executive branch, a claim is not shielded from judicial review merely because it arose from action taken under orders of the military.
>
> . . .
>
> We turn now to consider the district court's treatment of the second Taylor factor, which asks whether a decision on the merits of the claim would require the court to question actual, sensitive judgments made by the military. The district court concluded that the plaintiffs' claims were non-justiciable under this second Taylor factor. The court explained that it was unequipped to evaluate whether the use of certain extreme interrogation measures in the theatre of war was appropriate or justified. In the court's view, adjudicating the plaintiffs' claims would impinge on the military's authority to select interrogation strategies and rules of engagement. Debates existing within the executive branch at that time regarding the propriety of certain aggressive interrogation tactics reinforced the court's conclusion.
>
> We conclude that the above analysis that the district court conducted was incomplete. In addressing the second Taylor factor, the district court erred in failing to draw a distinction between unlawful conduct and discretionary acts that were not unlawful when committed.
>
> The commission of unlawful acts is not based on military expertise and judgment, and is not a function committed to a coordinate branch of government. To the contrary, Congress has established criminal penalties for commission of acts constituting torture and war crimes. Therefore, to the extent that the plaintiffs' claims

> rest on allegations of unlawful conduct in violation of settled international law or criminal law then applicable to the CACI employees, those claims fall outside the protection of the political question doctrine. On remand, the district court must first segregate such justiciable claims in its analysis before proceeding to determine whether any claims alleging conduct that was not unlawful implicated sensitive military judgments under the second prong of Taylor.
>
> . . .
>
> In reaching this conclusion, we emphasize the long-standing principle that courts are competent to engage in the traditional judicial exercise of determining whether particular conduct complied with applicable law. Accordingly, when a military contractor acts contrary to settled international law or applicable criminal law, the separation of powers rationale underlying the political question doctrine does not shield the contractor's actions from judicial review.

Al Shimari v. CACI Premier Tech., Inc., 840 F.3d 147, 154, 157-58 (4th Cir. 2016) (internal quotation marks and citations omitted).

In February, this Court applied the Fourth Circuit's political question framework to plaintiffs' claims and concluded that plaintiffs' claims should not be dismissed under the political question doctrine because plaintiffs have adequately alleged that CACI personnel engaged in conduct that was unlawful when it was committed. See Al Shimari, 300 F. Supp. 3d 758. Accordingly, the Court has already determined, and it is the law of the case, that adjudication of plaintiffs' claims does not impermissibly infringe on the political branches and plaintiffs have met the first prong of CACI's proposed two-part test.

Turning to the purpose of the ATS, which CACI describes as "prevent[ing] foreign entanglements and international friction," CACI Mem. 4, the Court concludes that plaintiffs have shown that adjudication of their claims is consistent with this purpose. As the Supreme Court has explained, Congress enacted the ATS in 1789 in the wake of two "notorious episodes involving violations of the law of nations," each of which involved American nationals engaging in tortious conduct against foreign ambassadors. Kiobel, 569 U.S. at 120. At the time, neither the

8

federal courts nor the state courts had jurisdiction over tort suits for violations of the law of nations, which left both ambassadors without an adequate civil remedy resulting in significant international tension.[5] See id. As a result, Congress enacted the ATS to "ensur[e] the availability of a federal forum where the failure to provide one might cause another nation to hold the United States responsible for an injury to a foreign citizen." Jesner, 138 S. Ct. at 1397.

Based on this history, the ATS was originally intended to apply to situations where a foreign citizen was the victim of an international law violation committed by an American national. The reasoning behind the ATS was that the failure to provide an adequate remedy to an aggrieved alien could cause significant international tension with that alien's country or even lead that country to attempt to hold the United States or the American citizen responsible. In Jesner, this purpose militated against allowing the claims to proceed because that case involved foreign plaintiffs suing a Jordanian corporation for injuries sustained in the Middle East, and Jordan considered the "litigation to be a 'grave affront' to its sovereignty." Jesner, 138 S. Ct. at 1407. By contrast, the lawsuit before this Court involves foreign plaintiffs suing an American corporate defendant, which fully aligns with the original goals of the ATS: to provide a federal forum for tort suits by aliens against Americans for international law violations. Moreover, because CACI is an American, rather than a foreign, corporation, there is no risk that holding CACI liable would offend any foreign government.[6] Lastly, unlike in Jesner and in the other

---

[5] Indeed, after one of the incidents, which involved the Secretary of the French Legion, the French Minister Plenipotentiary "lodge[d] a formal protest with the Continental Congress and threaten[ed] to leave the country unless an adequate remedy were provided." Kiobel, 569 U.S. at 120.

[6] The Court believes that it is necessary to underscore this distinction between Jesner and the present lawsuit. In Jesner, the question presented by the petition for a writ of certiorari, on which the circuits were and are split, involved whether the ATS categorically forecloses corporate liability, regardless of whether the corporation in question is foreign or domestic. In spite of this broad question presented, the Supreme Court's holding is explicitly confined to foreign

ATS cases discussed by the Jesner Court, neither the United States government nor any foreign government has expressed any objection to this litigation or appeared as an amicus to express any concern with the Court's exercise of jurisdiction over plaintiffs' claims. Indeed, the United States is currently a party in this lawsuit and abstained from filing any brief in support of CACI's suggestion of a lack of subject matter jurisdiction, which indicates that the United States does not believe that there are significant foreign-relations problems implicated by allowing plaintiffs' claims to proceed. Accordingly, the Court's exercise of jurisdiction over the claims in this litigation is consistent with the purposes of the ATS, and does not conflict with either the holding or reasoning in Jesner.

## II. CONCLUSION

For the reasons stated above, without conceding that CACI has correctly interpreted Jesner, plaintiffs have met both prongs of CACI's proposed test and CACI's suggestion of a lack of subject matter jurisdiction will be denied by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 25 day of June, 2018.

Alexandria, Virginia

/s/ Leonie M. Brinkema
United States District Judge

---

corporations, and the focus of the Court's analysis involved the role of the political branches in conducting foreign relations. The vast majority of the circuits to have considered the question have adopted a rule allowing ATS claims to proceed against corporate defendants, see Pet. for a Writ of Certiorari at 3, 14-16, Jesner, 138 S. Ct. 1386, and Jesner's careful limiting of the analysis and holding suggests to this Court that the Jesner Court did not intend to disturb this status quo with respect to domestic corporations.

10