## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

|  |  |  |
|---|---|---|
| SUHAIL NAJIM ABDULLAH AL SHIMARI, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No.      1:08-cv-0827 LMB-JFA |
| CACI PREMIER TECHNOLOGY, INC., | ) ) ) | **PUBLIC VERSION** |
| Defendant, | ) ) | |
| CACI PREMIER TECHNOLOGY, INC., | ) ) | |
| Third-Party Plaintiff, | ) ) | |
| v. | ) ) | |
| UNITED STATES OF AMERICA, and JOHN DOES 1-60, | ) ) ) | |
| Third-Party Defendants. | ) ) | |

## DEFENDANT/THIRD-PARTY PLAINTIFF CACI PREMIER TECHNOLOGY, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO COMPEL PRODUCTION OF UNREDACTED DETAINEE FILES AND UNREDACTED ANNEXES TO GOVERNMENT REPORTS

John F. O'Connor
Virginia Bar No. 93004
Linda C. Bailey (admitted pro hac vice)
Molly Bruder Fox (admitted pro hac vice)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000 – telephone
(202) 429-3902 – facsimile
joconnor@steptoe.com
lbailey@steptoe.com
mbfox@steptoe.com

William D. Dolan, III
Virginia Bar No. 12455
LAW OFFICES OF WILLIAM D. DOLAN, III, PC
8270 Greensboro Drive, Suite 700
Tysons Corner, Virginia 22102
(703) 584-8377 – telephone
wdolan@dolanlaw.net

*Counsel for Defendant CACI Premier Technology, Inc.*

## I.   INTRODUCTION

The Court should direct the United States to produce unredacted detainee files for each of the four Plaintiffs in this case and to produce unredacted versions of two government reports – the Taguba Report[1] and the Jones/Fay Report[2] addressing detainee abuse at Abu Ghraib prison. The United States has thus far withheld portions[3] of Plaintiffs' detainee files and the government reports on the grounds that the withheld materials are privileged state secrets, but has not yet formally asserted the state secrets privilege as required under the law of this Circuit. *El-Masri v. United States*, 479 F.3d 296, 309 (4th Cir. 2007). The United States completed its document production in mid-September 2018, and the parties have worked diligently since then to narrow the scope of their disputes. This motion is now ripe for resolution.

CACI PT's[4] need for discovery of Plaintiffs' unredacted detainee files is substantial and obvious. As the Fourth Circuit has explained, the "main avenues of defense available" in a detainee abuse case are to show that the plaintiff "was not subject to the treatment that he alleges; that, if he was subject to such treatment, the defendants were not involved in it; or that, if they were involved, the nature of their involvement does not give rise to liability." *El-Masri v. United States*, 479 F.3d 296, 309 (4th Cir. 2007). Moreover, the Fourth Circuit's remand instructions in this case specifically directed the Court to develop the record regarding "the specific conduct to which the plaintiffs were subjected and the source of any direction under

---

[1] The "Taguba Report" refers to the Article 15-6 Investigation of the 800th Military Police Brigade. *See* O'Connor Decl., Ex. 1.

[2] The "Jones/Fay Report" refers to the Article 15-6 Investigation of the Abu Ghraib Detention Facility and 205th Military Intelligence Brigade by Lieutenant General Anthony Jones and the Article 15-6 Investigation of the Abu Ghraib Detention Facility and 205th Military Intelligence Brigade by Major General George Fay. *See* O'Connor Decl., Ex. 2.

[3] A detailed list of all challenged redactions is filed herewith. *See* O'Connor Decl., Ex. 3.

[4] "CACI PT" refers to Defendant/Third-Party Plaintiff CACI Premier Technology, Inc.

which the acts took place." *Al Shimari v. CACI Premier Tech., Inc.*, 840 F.3d 147, 160-61 (4th Cir. 2016) ("*Al Shimari IV*"). As the only contemporaneous documentation of Plaintiffs' experiences in U.S. military custody, unredacted versions of Plaintiffs' detainee files are essential to developing and presenting the facts concerning Plaintiffs' treatment while in U.S. military custody and the extent of involvement, or non-involvement, of CACI PT personnel in such treatment. Accordingly, production of unredacted detainee files not only meets the liberal standard for discovery under Federal Rule of Civil Procedure 26(b), it is crucial to the fair litigation of this case.

Production of portions of the Taguba and Jones/Fay Reports is similarly essential to this case. After ten years of litigation, Plaintiffs admit that "CACI interrogators [never] laid a hand on them,"[5] and that the "gravamen of [their] complaint is conspiracy and aiding and abetting." Dkt. #639 at 31 n.30. Accordingly, the Court has dismissed Plaintiffs' claims of direct abuse by CACI PT personnel and all that remains in the case are claims that CACI PT is liable for abuse inflicted by U.S. military personnel under theories of co-conspirator and aiding and abetting liability. Neither Plaintiffs nor any other witness has connected CACI PT personnel with any mistreatment of Plaintiffs. Plaintiffs have indicated an intention to try to fill this evidentiary gap by relying on the Taguba and Jones/Fay Reports on summary judgment and at trial. Indeed, Plaintiffs rely heavily on these Reports in their Third Amended Complaint. *See* Third Am. Compl. ("TAC") ¶¶ 78, 81-84, 87-88, 97, 154, 158, 178. Thus, production of unredacted

---

[5] *See* 9/22/17 Tr. at 15 ("We are not contending that the CACI interrogators laid a hand on the plaintiffs."); *see also* Dkt. #639 at 31 n.30 (the "gravamen of Plaintiffs' complaint is conspiracy and aiding and abetting"); *id.* at 1 ("Plaintiffs sued CACI under well-established theories of accessory liability.").

2

versions of the relevant portions[6] of the Taguba and Jones/Fay Reports bears heavily both on the admissibility of these reports and the weight that should be accorded these reports with respect to Plaintiffs' claims of "accessory liability."

Plaintiffs' unredacted detainee files and unredacted versions of the government reports on which Plaintiffs intend to rely easily meet Rule 26(b)'s standard for discovery, which merely requires that the materials be "relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b). The United States literally has the redacted materials at its fingertips and can produce the requested materials without any further search. To date, the United States has not formally asserted the state secrets privilege to resist production, though it might for some or all of the materials requested. If so, the Court can, and must, at that time evaluate such an assertion of privilege under the standards set forth in *El-Masri*, 479 F.3d at 307. Absent such an assertion, though, the discoverability question is straightforward given the centrality of the evidence to CACI PT's defense and the slight burden (if that) involved with production.

## II.    BACKGROUND

This is a case in which Plaintiffs seek recovery under the Alien Tort Statute from CACI PT for injuries they allegedly suffered while in U.S. military custody at Abu Ghraib prison in Iraq. CACI PT provided some of the civilian contractor interrogators who worked alongside military interrogators at Abu Ghraib prison. Many of the interrogators at Abu Ghraib prison were soldiers, and others were employed by Other Government Agencies. Third Party Complaint ("TPC"), Dkt #665 ¶¶ 1, 14, 22.

---

[6] Through the meet-and-confer process, CACI PT has been able to narrow the universe of annexes for which it seeks production in unredacted form.

3

## A.    Detainee Files

The United States military maintained detainee files for persons detained at Abu Ghraib prison. ██████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████  *See* O'Connor Decl., Exs. 7-10.  For detainees interrogated at Abu Ghraib prison by military personnel or contractors supporting the military intelligence effort, the U.S. military required that the assigned interrogator prepare an interrogation plan that had to be approved by the U.S. military chain of command before the interrogation could go forward.  The U.S. military further required that an interrogation report be prepared by the assigned interrogator after each interrogation.  O'Connor Decl., Ex. 4 (Pappas Decl. ¶ 10).

In 2013, the Department of Defense produced heavily-redacted detainee files for the Plaintiffs.  O'Connor Decl. ¶ 2.  In February 2018, CACI PT served discovery requests upon the government, requesting "[u]nredacted detainee files for each Plaintiff."  O'Connor Decl., Ex. 5 at 5.  On March 26, 2018, the government produced new copies of several pages of the detainee files produced in 2013 with fewer, but still very significant, redactions.  O'Connor Decl., Ex. 6.  On April 30, 2018, the government objected to CACI PT's request for production of Plaintiffs' detainee files on the grounds that, among other things, the requested information "is subject to the state secrets privilege."  O'Connor Decl., Ex. 5 at 5.  The United States, however, did not at that time formally assert the state secrets privilege, which requires personal consideration of an agency head.  *El-Masri*, 479 F.3d at 306.

In May 2018, CACI PT and the United States engaged in multiple meet and confer sessions to address the United States' objections to producing unredacted detainee files, with CACI PT prepared to bring a motion to compel discovery at that time with respect to Plaintiffs'

detainee files.  The United States requested that CACI PT hold off on moving to compel and instead file a consolidated motion to compel after the United States completed its document production, as this would allow the United States to approach Secretary Mattis just once for potential assertion of the state secrets privilege with respect to production of documents.  CACI PT agreed and noted the United States' request in connection with an extension of the United States' deadline to complete its document production.  Dkt. #828 at 5-9.

On May 15, June 6, and July 2, 2018, the government produced detainee files that integrate the 2013 and 2018 productions.  ███████████████████████████████████ ██████████████████████████████████████████[7]  O'Connor Decl., Exs. 7-10. For example, counsel for the United States has explained that the full page redaction in Plaintiff Al Shimari's detainee file at AS-USA-053958 is an interrogation plan.  O'Connor Decl. ¶ 3 & Ex. 9.  The United States has stated that its records show that Al Shimari was subjected to only one intelligence interrogation at Abu Ghraib and that the interrogator was a CACI PT employee. O'Connor Decl., Ex. 11 at 4.  Thus, it is reasonable to conclude that the approved interrogation plan withheld by the United States pertains to the single known interaction between any CACI PT employee and Plaintiff Al Shimari.

**B.      Select Annexes to the Taguba Report**

The Taguba Report investigated the military police brigade at Abu Ghraib prison, and was not focused on the military intelligence assets at the facility.  The Taguba Report detailed several instances of detainee abuse at Abu Ghraib prison.  As counsel for the United States has noted, Major General Taguba interviewed relatively few witnesses in conducting his

---

[7] ██████████████████████████████████████████ ██████████████████████████████████████████ ██████ *See, e.g.*, O'Connor Decl., Ex. 7-10.  CACI PT seeks production of fully unredacted detainee files, as these are the only contemporaneous records specifically about these Plaintiffs. A detailed list of all challenged redactions is filed herewith.  *See* O'Connor Decl., Ex. 3.

5

investigation.   Rather, his report relies heavily on prior statements made to Army Criminal Investigation Division investigators, with no ability for Major General Taguba to observe the witnesses or judge their credibility or demeanor.   As the United States succinctly put it, the Taguba Report "rel[ies] on information obtained second-and, third-hand, or more remotely, *e.g.*, from reports of investigations previously conducted."  Dkt. #285 at 10 n.7.

The Taguba Report recommended further investigation to determine whether adverse action should be taken against two U.S. Army officers and two civilians involved in military intelligence operations at Abu Ghraib prison, Colonel Thomas Pappas, Lieutenant Colonel Steve Jordan, Titan Corporation linguist John Israel, and CACI PT interrogator Stephen Stefanowicz. With respect to Mr. Stefanowicz, he is referenced in the "Recommendations" section of the Taguba Report, where he was alleged to have misled investigators and also:

> Allowed and/or instructed MPs, who were not trained in interrogation techniques, to facilitate interrogations by "setting conditions" which were neither authorized and in accordance with applicable regulations/policy. He clearly knew his instructions equated to physical abuse.

O'Connor Decl Ex. 1 at 48.  The same passage of the report states, however, that this conclusion relates to acts by Mr. Stefanowicz "which have been previously referred to in the aforementioned findings."  *Id.*  But Mr. Stefanowicz is not mentioned, not even once, in the "aforementioned findings."   Indeed, neither this "recommendation" nor the Taguba Report findings identifies anyone who was provided instructions by Mr. Stefanowicz, or any detainees with whom Mr. Stefanowicz interacted, or any detainees mistreated as a result by instructions from Mr. Stefanowicz.

6

██████████████████████████████████████████████████

██████████████████████████████████    O'Connor Decl., Ex. 12 at 50-54.

Indeed, with respect to the four non-MPs identified in the Taguba Report, Colonel Pappas was never charged with wrongdoing involving detainee treatment. Lieutenant Colonel Jordan was acquitted by a court-martial of all charges involving alleged detainee abuse. He was convicted of violating an order not to speak with potential witnesses, but the Army officer convening the court-martial disapproved that finding, acquitting him of that charge as well. Mr. Israel was never charged with any wrongdoing, and the subsequent Jones/Fay Report explicitly exonerated him of any wrongdoing. Mr. Stefanowicz was never charged with any wrongdoing. These facts are telling. As the D.C. Circuit noted in the related *Saleh* case:

> To be sure, the executive branch has broadly condemned the shameful behavior at Abu Ghraib documented in the now infamous photographs of detainee abuse. This disavowal does not, however, bear upon the issue presented in this tort suit against these defendants. Indeed, the government acted swiftly to institute court-martial proceedings against offending military personnel, but no analogous disciplinary, criminal, or contract proceedings have been so instituted against the defendants. This fact alone indicates the government's perception of the contract employees' role in the Abu Ghraib scandal.

*Saleh v. Titan Corp.*, 580 F.3d 1, 10 (D.C. Cir. 2009).

In February 2018, CACI PT served discovery requests upon the government, requesting "[u]nredacted copies of government reports concerning detainee abuse at Abu Ghraib Prison, including but not limited to: . . . the Taguba Report." O'Connor Decl., Ex. 5 at 7-8. On April 30, 2018, the United States objected to CACI PT's request for production of the government reports on the grounds of over-breadth and undue burden, and also on the grounds that the requested information "is subject to the state secrets privilege." *Id.* Throughout May 2018, counsel for CACI PT and the United States worked collaboratively to narrow the list of

7

Taguba annexes for which production was necessary, an appropriate exercise given that much of the focus of the Taguba Report involved MP operations and a considerable portion of the report Annexes involved MP operations at locations other than Abu Ghraib prison.

At present, the United States is withholding unredacted portions of five Annexes to the Taguba Report that are highly relevant to this case, both in terms of factual development and in terms of assessing the admissibility and weight properly accorded to the report.  These withheld materials include:

- ███████████████████████████████████

    O'Connor Decl., Ex. 13.

- ███████████████████████████████████

    O'Connor Decl., Ex. 14 at AS-USA-052033.

- ███████████████████████████████████

    O'Connor Decl., Ex. 15 at 173-74.

- ███████████████████████████████████ O'Connor Decl., Ex. 16.

- ██████████████████ O'Connor Decl., Ex. 17.  The Camp Ganci riot is important to this case because many of the detainee abuses by MPs that were captured on film occurred to these rioters when they were brought to the Abu Ghraib hard site to remove them from the general population at Camp Ganci.

## C.    Select Annexes to the Jones/Fay Report

While the Taguba Report focused on MP operations in Iraq, the Jones/Fay Report investigated the military intelligence operation at Abu Ghraib and catalogued all of the instances of misconduct (some involving detainees, some not) that the authors could identify.  The Jones/Fay Report concluded that a preponderance of the evidence supported a conclusion that

more than forty-five military and civilian personnel committed some form of misconduct at Abu Ghraib prison.  Four of the persons identified were CACI PT employees:

- CIVILIAN-5 allegedly pulled an Iraqi general (not one of the Plaintiffs) from the back of a jeep and dragged him on the ground; drank alcohol while at Abu Ghraib prison; and refused to take instructions by mouthing off to a sergeant and not paying attention in a training session.  Jones/Fay Report at 131 (O'Connor Decl., Ex. 2).

    These allegations have nothing to do with Plaintiffs' claims.

- CIVILIAN-11 is alleged to have engaged in misconduct during IP Roundup.  "IP Roundup" is short for "Iraqi Police Roundup," and arose when a detainee used a pistol smuggled into the Abu Ghraib hard site by an Iraqi police officer to shoot a soldier.  After the shooting, military and civilian interrogators questioned Iraqi police officers and detainees to learn the source of the pistol and determine whether other deadly weapons had been smuggled into the hard site.  The alleged misconduct for CIVILIAN-11 involved allegedly encouraging abuse of an Iraqi police officer (not one of the Plaintiffs) by allowing an MP to twist the handcuffs on the Iraqi police officer, causing pain; allowing an MP to cover the Iraqi police officer's nose and mouth for a few seconds; threatening to bring the MP back into the cell if the Iraqi police officer did not answer questions; placing the Iraqi police officer in an unauthorized "stress position" by interrogating the police officer while he squatted in a plastic chair; telling a detainee that he would get a working dog on him if the detainee did not provide information; and failing to prevent a detainee from being photographed. *Id.* at 132.

    These allegations also have nothing to do with Plaintiffs' claims.

- CIVILIAN-21 is alleged to have used working dogs during certain interrogations without authorization; "push[ed] (kick[ed]) a detainee into a cell with his foot"; lied to investigators about using working dogs during interrogations; failed to report a detainee's allegation that he had been struck by a civilian translator; and humiliated a detainee by shaving his beard and requiring him to wear women's underwear. *Id.* at 134.

    CACI PT has no reason to believe these allegations relate to Plaintiffs' claims.

- CIVILIAN-20 is alleged to have used one or more interrogation techniques that he or she believed in good faith were approved but which were not.  The recommendation was that no adverse action be taken against this employee. *Id.* at 135.

> CACI PT has no reason to believe this allegation relates to Plaintiffs' claims, and CACI PT has no idea as to the identity of CIVILIAN-20.

To CACI's knowledge, none of the alleged acts of misconduct detailed in the Jones/Fay Report involve the mistreatment of these Plaintiffs, and Plaintiffs have not alleged to the contrary. No CACI PT employee identified in the Jones/Fay Report—indeed, no CACI PT employee, period—has ever been charged with a crime arising out of detainee treatment in Iraq.

The Jones/Fay Report rejects one of the central premises of Plaintiffs' theory of co-conspirator liability, and a theory credited by the Court at the motion to dismiss stage (Dkt. #679 at 40 n.31)—that everyone involved in the intelligence gathering mission at the Abu Ghraib hard site was part of a conspiracy to mistreat detainees:

> I found that no single, or simple, explanation exists for why some of the Abu Ghraib abuses occurred. For clarity of analysis, my assessment divides abuses at Abu Ghraib into two different types of improper conduct: First, intentional violent or sexual abuses and, second, actions taken based on misinterpretations of or confusion about law or policy.
>
> Intentional violent or sexual abuses include acts causing bodily harm using unlawful force as well as sexual offenses including, but not limited to rape, sodomy and indecent assault. No Soldier or contractor believed that these abuses were permitted by any policy or guidance. If proven, these actions would be criminal acts. The primary causes of the violent and sexual abuses were relatively straight-forward — ***individual criminal misconduct***, clearly in violation of law, policy, and doctrine and contrary to Army values.
>
> Incidents in the second category resulted from misinterpretations of law or policy or resulted from confusion about what interrogation techniques were permitted. These latter abuses include some cases of clothing removal (without any touching) and some uses of dogs in interrogations (uses without physical contact or extreme fear). Some of these incidents may have violated international law. At the time the Soldiers or contractors committed the acts, however, some of them may have honestly believed the techniques were condoned.

10

O'Connor Decl., Ex. 2 at 4 (emphasis added) (paragraph numbers and unclassified designations omitted). Indeed, the Jones/Fay Report rejected the premise that all, or even most, incidents of detainee mistreatment had any connection to the interrogation mission:

> Most, though not all, of the violent or sexual abuses occurred separately from scheduled interrogations and did not focus on persons held for intelligence purposes. No policy, directive or doctrine directly or indirectly caused violent or sexual abuse.

O'Connor Decl., Ex. 2 at 5.

In February 2018, CACI PT served discovery requests upon the government, requesting "[u]nredacted copies of government reports concerning detainee abuse at Abu Ghraib Prison, including but not limited to: . . . the Jones/Fay Report." O'Connor Decl., Ex. 5 at 7-8. On April 30, 2018, the United States objected to CACI PT's request for production of the government reports on the grounds of over-breadth and undue burden, and also on the grounds that the requested information "is subject to the state secrets privilege." *Id.* at 9.

In total, the Jones/Fay Report appends 16 Annexes that support and inform the report's conclusions. Most of those Annexes are made up of many documents. Annex B to the Jones/Fay Report includes 173 interview statements, primarily from May and June 2004. Prior to 2018, the publicly-releasable versions of the interview statements and other Annexes were significantly redacted. During discovery, CACI PT and the United States engaged in a significant effort to prioritize the witness statements to be sent through a declassification review. From May through September 2018, the United States produced unredacted or lesser redacted versions of these statements and documents as they were processed through a declassification review. *See* O'Connor Decl. ¶ 4.

Still, significant redactions remain in both the 20 witness statements and two other Annex documents that CACI PT challenges. *See* O'Connor Decl., Ex. 3. ▮▮▮▮▮▮▮▮▮▮

11

███████████████████████████ *See* O'Connor Decl., Ex. 18. ███████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

O'Connor Decl., Ex. 18, AS-USA-052105. ██████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ O'Connor

Decl., Ex. 18, AS-USA-052147.

Similarly, the United States has identified only one potential interaction between a CACI PT employee and Plaintiff Al-Ejaili. No abuse is alleged to have occurred during the one recorded direct interaction. ████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████ *See* O'Connor Decl., Ex. 18, AS-USA-052110. ██████

███████████████████████████████████████████████████ *Id.*

Likewise, the two additional Jones/Fay Report Annexes for which CACI PT seeks unredacted versions contain significant multi-page redactions. ███████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████ *See* O'Connor Decl., Ex. 19, AS-USA-JF-Annex_H10-0003 (withholding pages 3-15); _H10-0012 (withholding pages 24-25); _H10-0014 (withholding page 27). September 2003 is a significant date because it is immediately before CACI PT personnel began arriving at Abu Ghraib prison. The state of play that existed at Abu Ghraib immediately before CACI PT personnel arrived is crucial in assessing Plaintiffs' argument that all failings at Abu Ghraib prison should be laid at CACI PT's doorstep.

12

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████     *See* O'Connor Decl.,

Ex. 20, AS-USA-JF-Annex_H6A-0023, _H6A-0027, _H6A-0031.   January 2014 is a crucial time period as well, as this is a period in which CACI PT personnel are working at Abu Ghraib prison and the manner in which interrogation operations proceeded bears directly on the merits and well as defenses relating to military control such as immunity, preemption, and the political question doctrine.

Over the course of several months, counsel for CACI PT and the United States conferred multiple times in an effort to narrow the issues presented by this motion.   The government has clarified that most of the materials sought by this motion all are being withheld on the grounds that the materials are classified and will be subject of a request to the Secretary of Defense to formally assert the state secrets privilege.

III.     **ANALYSIS**

Federal Rule of Civil Procedure 26(b)(1) establishes a permissive standard for discoverability.   Matters are discoverable if they are "relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1).   Unredacted detainee files and unredacted government reports on which Plaintiffs have relied in their Complaint and on which they intend to rely on at summary judgment and at trial, easily meet this standard.   But CACI PT's entitlement to these materials is not merely grounded in the Federal Rules; the Federal Rules are grounded in parties' due process right to a fair opportunity to pursue its claims and defenses in litigation.

It is this fundamental principle of due process that a party is entitled to develop evidence to challenge its adversary's rendition of the facts.   Even in civil litigation, "[i]t is axiomatic that

13

'[a] fair trial in a fair tribunal is a basic requirement of due process.'" *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 876 (2009) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). Indeed, due process requires that legal procedures be fundamentally fair. *See McNeill v. Butz*, 480 F.2d 314, 321 (4th Cir. 1973). Due process also requires that parties "have an adequate opportunity to present their claims fairly within the adversary system." *Ross v. Moffitt*, 417 U.S. 600, 612 (1974). "In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Id.* (quoting *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970)).

Through a detailed meet-and-confer process, CACI PT has narrowed its request for withheld documents to those essential to the fair litigation of this case. As explained below, the Court should order production based not only on Rule 26(b)(1)'s permissive standard for discovery, but on CACI PT's due process right to develop evidence that will allow it to mount a defense on summary judgment and at trial. If the United States ultimately asserts the state secrets privilege for some or all of the requested documents, the Court can, and must, evaluate that assertion and its implications under the appropriate standard. *See El-Masri*, 479 F.3d at 307.

A. **Discovery of the Unredacted Detainee Files and Select Jones/Fay Annexes Is Highly Relevant and Essential to the Litigation of this Case**

1. **Unredacted Detainee Files Are Critical to CACI PT's Defense**

Understanding what happened at Abu Ghraib—what interrogations were authorized, who authorized the conduct, and who was responsible for the conduct—is central to litigating this case. Plaintiffs do not have this information. Neither does CACI PT. Accordingly, the United States is the *only* source of documents relating to the Plaintiffs' detention and interrogation at Abu Ghraib.

14

This case cannot be litigated through generalities, with Plaintiffs offering general information regarding conditions at Abu Ghraib prison and asking a finder of fact to infer that CACI PT personnel must have had some involvement in whatever Plaintiffs say happened to them.  The Fourth Circuit made this very clear in *El-Masri*, 479 F.3d at 308, where the Court addressed the type of evidence, and discovery, necessary for litigation of a detainee abuse claim.  As the Court explained:

> El-Masri is therefore incorrect in contending that the central facts of this proceeding are his allegations that he was detained and interrogated under abusive conditions, or that the CIA conducted the rendition program that has been acknowledged by United States officials.  Facts such as those furnish the general terms in which El-Masri has related his story to the press, but advancing a case in the court of public opinion, against the United States at large, *is an undertaking quite different from prevailing against specific defendants in a court of law.  If El-Masri's civil action were to proceed, the facts central to its resolution would be the roles, if any, that the defendants played in the events he alleges.* To establish a prima facie case, he would be obliged to produce admissible evidence *not only that he was detained and interrogated, but that the defendants were involved in his detention and interrogation in a manner that renders them personally liable to him*.

*Id.* at 308-09 (emphasis added).  Indeed, the Fourth Circuit issued remand instructions in the present case that directed this Court to conduct a "discriminating analysis" as to exactly what happened to these Plaintiffs while in United States custody:

> This "discriminating analysis," will require the district court to examine the evidence regarding the specific conduct to which the plaintiffs were subjected and the source of any direction under which the acts took place.

*Al Shimari IV*, 840 F.3d at 160-61 ("*Al Shimari IV*").

As the Fourth Circuit held in *El-Masri* and *Al Shimari IV*, central facts in a detainee abuse case, on which there *must* be evidence, is what actually happened to the plaintiffs and how the corporate defendant's conduct ties in to the specific injuries that the plaintiffs allege they

15

suffered.  The unredacted detainee files—including contemporaneous interrogation plans and interrogation reports—is key evidence of what actually happened to Plaintiffs (if anything) during their detentions, and who was involved directly or in providing material support to those directly interacting with Plaintiffs.

The relevance of unredacted detainee files is heightened by the dismissal of the direct counts in this case, which leaves Plaintiffs with claims seeking to hold CACI PT liable solely for abuse committed by soldiers under aiding and abetting or co-conspirator theories of liability. With respect to aiding and abetting claims brought under the ATS, the Fourth Circuit's decision in *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 398 (4th Cir. 2011), adopted as the law of this Circuit the Second Circuit's decision in *Presbyterian Church of Sudan v. Talisman*, 582 F.3d 244, 258 (2d Cir. 2009).  As explained in *Aziz*, the Second Circuit held in *Talisman* that:

> [A] defendant may be held liable under international law for aiding and abetting the violation of that law by another when the defendant (1) provides practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) does so with the purpose of facilitating the commission of that crime.

*Aziz*, 658 F.3d at 398 (quoting *Talisman*, 582 F.3d at 258).  Thus, an essential element of Plaintiffs' aiding and abetting claims is that CACI PT "provide[d] practical assistance" to whomever abused Plaintiffs "which had a substantial effect on the perpetration of the crime." *Id.* To develop that evidence, CACI PT must understand what conduct was authorized, what conduct was planned and by whom, and what conduct actually occurred.  The unredacted detainee files are central to that inquiry because they are the *only* documentary evidence concerning Plaintiffs' experiences at Abu Ghraib prison.

CACI PT is entitled to discovery of the unredacted detainee files as they are relevant to CACI PT's defense.  The files are necessary to rebut Plaintiffs' characterization of events that

16

occurred during the interrogations.  The interrogation plans, interrogation logs and interrogation reports are contemporaneous records of what occurred at Abu Ghraib.  The United States' interrogatory responses reveal substantial discrepancies between Plaintiffs' current version of the facts and contemporaneous documentation by the United States.  *See* Dkt. #737, at 10-11 (summarizing significant inconsistencies between United States' interrogatory responses and plaintiffs' deposition testimony).

Moreover, the detainee files—including the interrogation plans and reports—are central to CACI PT's defense of derivative sovereign immunity.  Sovereign immunity derivatively extends to a government contractor acting within the scope of its engagement.  *See, e.g.*, *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 21-22 (1940) (holding that contractor that constructed dikes that caused erosion of plaintiff's land was immune from suit); *Butters v. Vance Int'l, Inc.*, 225 F.3d 462, 466 (4th Cir. 2000) (affirming contractor's immunity where it provided security services to Kingdom of Saudi Arabia to protect the royal family).  As the Fourth Circuit recently explained:

> Under the concept of derivative sovereign immunity, stemming from the Supreme Court's decision in *Yearsley*, agents of the sovereign are also sometimes protected from liability for carrying out the sovereign's will.  This immunity derives from the government's unquestioned need to delegate governmental functions, and the acknowledgement that [i]mposing liability on private agents of the government would directly impede the significant governmental interest in the completion of its work. [U]nder *Yearsley*, a government contractor is not subject to suit if (1) the government authorized the contractor's actions and (2) the government validly conferred that authorization, meaning it acted within its constitutional power.

*Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 643 (4th Cir. 2018) (quoting *In re KBR, Inc. Burn Pit Litig.*, 744 F.3d 326, 342 (4th Cir. 2014), *Butters*, 225 F.3d at 466, and *Yearsley*, 309 U.S. at 20-21) (internal quotations and citations omitted) (alterations in original).

17

For CACI PT to have any fair opportunity to develop its derivative sovereign immunity defense, it must have access to the interrogation plans and reports in Plaintiffs' detainee file in order to show that "the government authorized the contractor's actions." *Id.* The unredacted detainee files thus are central to proving that CACI PT, whose employees acted as authorized by the United States, is entitled to derivative sovereign immunity.

### 2.     Unredacted Versions of Select Taguba and Jones/Fay Report Annexes Are Relevant and Discoverable

The starting point for assessing the relevance of the unredacted versions of select Taguba and Jones/Fay Report Annexes is that Plaintiffs have cited them extensively in their Complaint, TAC ¶¶ 78, 81-84, 87-88, 97, 154, 158, 178, and have made clear that they intend to try to make their case for "accessory liability" through the use of these reports as evidence. CACI PT seeks the unredacted versions of the selected Annexes to the reports in order to develop evidence regarding the admissibility of the reports as well as their proper weight if they are permitted into evidence.

Plaintiffs' will likely contend that the reports are admissible into evidence pursuant to Federal Rule of Evidence 803(8)(iii), which states that the rule against hearsay does not preclude the introduction of factual findings from a legally authorized investigation *where neither "the source of information or other circumstances indicate a lack of trustworthiness."* Fed. R. Evid. 803(8)(A)(iii)-(B) (emphasis added). CACI PT must test the trustworthiness of the reports, and can do so only if it receives complete and unredacted copies of the underlying documents.

The admissibility of government reports under Fed. R. Evid. 803(8) is not mandatory, but permissive. *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 264 (4th Cir. 2005). Courts are obligated to exclude reports, or any portion thereof, determined to be untrustworthy. *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 167 (1988). The Supreme Court has held that a

key to Rule 803(8) is that the trustworthiness requirement "provides 'ample provision for escape if sufficient negative factors are present.'" *Id.* (quoting Advisory Committee Report). Indeed, insufficient trustworthiness may be demonstrated by unreliability, inadequate investigation, inadequate foundation for conclusions, and an invasion of the jury's function. *Id.* Relatedly, "safeguards built into other portions of the Federal Rules, such as those dealing with relevance and prejudice, provide the court with additional means of scrutinizing and, where appropriate, excluding evaluative reports or portions of them." *Id.* at 167-68.[8]

CACI PT will be unable to marshal its evidence on the trustworthiness of the reports without having unredacted versions of the Annexes addressing key issues in this case. CACI PT must be afforded the opportunity to investigate whether the reports' findings reasonably follow from the evidence on which they rely. Any deficiencies could preclude the admissibility of the reports. *See Abusamhadaneh v. Taylor*, 873 F. Supp. 2d 682, 714 (E.D. Va. 2012) (reports not admissible under Fed. R. Evid. 803(8) where testimony revealed the investigation to be inadequate). CACI PT does not have a sufficient basis to evaluate whether all of the findings and conclusions in the Taguba and Jones/Fay Reports are sufficiently supported.

---

[8] Even if the Taguba and Jones/Fay Reports were found to be admissible hearsay under Fed. R. Evid. 803(8), they still may be inadmissible based on other grounds, such as if their probative value is substantially outweighed by unfair prejudice, confusion of the issues, or misleading the jury. *See Distaff v. Springfield Contracting Corp.*, 984 F.2d 108, 112 (4th Cir. 1993) (noting that Fed. R. Evid. 403 may bar admissibility). The reports are rife with these concerns. There is a substantial risk that the reports unfairly prejudice CACI PT. The description or inclusion of events in the reports that do not involve a plaintiff or defendant can outweigh any probative value. *Anderson*, 406 F.3d at 263-64 (finding the district court did not abuse its discretion in excluding a report for unfair prejudice because it included allegations of events not involving either party to the litigation). Similarly, the conclusions in the reports could invade the province of the jury or confuse the issues to be decided. *See Jones v. Ford Motor Co.*, No. 05-1342, 2006 WL 3055492, at *5-6 (4th Cir. Oct. 27, 2006) (affirming district court's decision excluding study of other complaints against manufacturer under Fed. R. Evid. 403 for potential confusion of the jury).

Beyond concerns of admissibility, the select Taguba and Jones/Fay Report Annexes play a key role in understanding CACI PT's employees' conduct at the Abu Ghraib.  Without discovery of unredacted versions of the challenged witness statements, CACI would be unfairly deprived of information about their employee's conduct at Abu Ghraib.  ████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████  While CACI PT has no insight into the content of those 16 pages, that document likely offers relevant information on the status of the interrogation operation where CACI PT employees were placed. Without this underlying information, it is impossible for CACI PT to place report findings in context and defend this suit.

**B.      CACI PT's Request for Unredacted Detainee Files and Select Taguba and Jones/Fay Report Annexes Is Not Unduly Burdensome**

Ordinarily, the burden associated with a discovery request is evaluated based on whether the request is

> proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1).  Here, as explained in Section III.A, the unredacted detainee files and select Taguba and Jones/Fay Report Annexes—detailing what interrogation conduct was authorized, what actually occurred and the government's investigation thereof—are central to this case. *See also El-Masri*, 479 F.3d at 308-09; *Al Shimari IV*, 840 F.3d at 160-61.  Despite the import of this discovery, however, the burden of producing these documents is minimal, as the United States has collected and reviewed these documents to produce the redacted versions of the documents.  That is, the United States has recently *completed* a declassification review of

20

most of these files in order to determine which pages could be produced to CACI PT in this case. Indeed, this process resulted in the removal of redactions from some of the pages of Plaintiffs' detainee files and the report Annexes.

> C.   **The Classified Nature of the Unredacted Detainee Files and Select Jones/Fay Annexes Is Not Relevant Unless and Until the United States Formally Asserts the State Secrets Privilege**

The United States' objections to CACI PT's request for production of documents state that the identity of interrogators interacting with Plaintiffs "is considered classified under DoD Directive 3115.09, and therefore this request for production seeks information subject to the state secrets privilege." O'Connor Decl., Ex. 5 at 6, 9. At this point, however, the United States has not formally asserted the state secrets privilege, nor has it complied with the mandatory prerequisites for such an assertion as dictated by the Fourth Circuit.

For the United States to withhold otherwise discoverable information from discovery on the grounds that the information is classified, the United States must invoke the state secrets privilege. *United States v. Reynolds*, 345 U.S. 1, 10-11 (1953); *El-Masri*, 479 F.3d at 307 ("First, evidence is privileged pursuant to the state secrets doctrine if, under all the circumstances of the case, there is a reasonable danger that its disclosure will expose military (or diplomatic or intelligence) matters which, in the interest of national security, should not be divulged."); *Sterling v. Tenet*, 416 F.3d 338, 341 (4th Cir. 2005) ("[The state secrets] doctrine embodies an evidentiary 'privilege which protects military and state secrets' from disclosure in judicial proceedings." (quoting *Reynolds*, 345 U.S. at 7)).

The Fourth Circuit requires formality in the invocation of the state secrets privilege by the United States:

> [I]n order to invoke the privilege protecting evidence of state
> secrets, "[t]here must be a formal claim of privilege, lodged by the

21

head of the department which has control over the matter, after actual personal consideration by that officer. The court itself must determine whether the circumstances are appropriate for the claim of privilege, and yet do so without forcing a disclosure of the very thing the privilege is designed to protect."

*In re Under Seal*, 945 F.2d 1285, 1288 (4th Cir. 1991) (quoting *Reynolds*, 345 U.S. at 7-8); *see also El-Masri*, 479 F.3d at 304 (identifying same requirements for formal assertion of state secrets privilege by the United States).

If there has been no formal assertion of the state secrets privilege by the United States, the Court considers a motion to compel under the ordinary rules for production of non-secret material in discovery. *Reynolds*, 345 U.S. at 10-11 ("[Because there had been no formal claim of state secrets privilege], it was entirely proper to rule initially that petitioner had shown probable cause for discovery of the documents.").

At this point, the United States has not formally asserted that the unredacted detainee files and select Taguba and Jones/Fay Report Annexes are privileged state secrets. Accordingly, as in *Reynolds*, unless and until the United States formally asserts the state secrets privilege, this Court's task is to determine whether the unredacted detainee files and select report Annexes are materials that would be discoverable under the Federal Rules' ordinary treatment of discovery, without regard to whether the material is classified or a proper state secret. *Reynolds*, 345 U.S. at 10-11. As addressed in Section III.A, *supra*, these documents are not just sufficiently relevant to be discoverable, they are fundamental to this case.

## IV.    CONCLUSION

For the foregoing reasons, the Court should grant CACI PT's motion and direct the United States to produce unredacted detainee files and select Taguba and Jones/Fay Report Annexes. If the United States elects to invoke the state secrets privilege rather than produce this material, the Court at that time can consider the ramifications of that invocation.

Respectfully submitted,

*/s/   John F. O'Connor*
John F. O'Connor
Virginia Bar No. 93004
Linda C. Bailey (admitted *pro hac vice*)
Molly Bruder Fox (admitted *pro hac vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000 – telephone
(202) 429-3902 – facsimile
joconnor@steptoe.com
lbailey@steptoe.com
mbfox@steptoe.com

William D. Dolan, III
Virginia Bar No. 12455
LAW OFFICES OF WILLIAM D.
DOLAN, III, PC
8270 Greensboro Drive, Suite 700
Tysons Corner, Virginia 22102
(703) 584-8377 – telephone
wdolan@dolanlaw.net

*Counsel for Defendant CACI Premier*
*Technology, Inc.*

23

**CERTIFICATE OF SERVICE**

I hereby certify that on the 11th day of October, 2018, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following counsel. A copy of the version of this memorandum that is filed under seal also will be sent by email on the same date to the below-listed counsel.

John Kenneth Zwerling
The Law Offices of John Kenneth Zwerling, P.C.
114 North Alfred Street
Alexandria, Virginia 22314
jz@zwerling.com

Lauren Wetzler
United States Attorney Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
lauren.wetzler@usdoj.gov

/s/   John F. O'Connor
John F. O'Connor
Virginia Bar No. 93004
Attorney for Defendant CACI Premier Technology, Inc.
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000 – telephone
(202) 429-3902 – facsimile
joconnor@steptoe.com