**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

|  |  |
|---|---|
| SUHAIL NAJIM ABDULLAH AL SHIMARI, *et al.*, | |
| Plaintiffs, | No. 1:08–cv–827 (LMB/JFA) |
| v. | |
| CACI PREMIER TECHNOLOGY, INC., | |
| Defendant. | |
| CACI PREMIER TECHNOLOGY, INC., | |
| Third-Party Plaintiff, | |
| v. | |
| UNITED STATES OF AMERICA, and JOHN DOES 1–60, | |
| Third-Party Defendants. | |

**OPPOSITION BY THE UNITED STATES TO DEFENDANT CACI PT'S MOTION TO COMPEL THE UNITED STATES TO PRODUCE UNREDACTED DOCUMENTS**

## INTRODUCTION

Defendant CACI Premier Technology (hereinafter "CACI PT") moves to compel the

Government to disclose complete versions of documents previously-produced in redacted form,

which contain information that is properly classified and subject to the state secrets privilege.

This Court previously rejected two earlier motions from CACI PT seeking to compel the

disclosure of classified information, specifically, the identities of interrogation personnel in

connection with the intelligence interrogations of specific detainees.[1] *See* ECF No. 849

(identities of interrogators in connection with specific detainees); ECF No. 921 (identities of

interpreters in connection with specific detainees). This motion to compel once again places at

issue the identities of interrogation personnel in connection with specific detainees (albeit

different interrogation personnel and detainees), along with information about international

military partners; the selection of lawful interrogation techniques and military judgments about

those techniques;[2] specific, actionable intelligence provided by individuals other than the

plaintiffs in this action; and non-DoD intelligence sources. As with the classified information at

issue in the prior motions to compel, disclosure of the information sought in this motion

reasonably could be expected to cause significant harm to national security (including harms

---

[1] Interrogation personnel is a category that encompasses DoD interrogators (including interrogation analysts, sometimes described as "assistant interrogators"), debriefers, contract interrogators, support personnel, and foreign interrogators. *See* Declaration and Third Assertion of State Secrets Privilege by James N. Mattis, Secretary of Defense, at ¶ 4 (attached as Ex. 1).

[2] As Secretary Mattis's declaration explains, none of the information being withheld conceals unlawful activity or interrogation techniques other than those authorized by the Army Field Manual. *See* Mattis Decl. at ¶ 3.

identical to those prevented by the Court's previous orders denying CACI PT's motions to compel) and therefore should be excluded from this case.

The harms that reasonably can be expected from disclosure of the information at issue in the pending motion are set forth in the accompanying Declaration and Assertion of State Secrets Privilege by Secretary of Defense James N. Mattis ("Mattis Declaration"), attached as Exhibit 1. This declaration demonstrates that the information requested should not be disclosed. *See United States v. Reynolds*, 345 U.S. 1, 6-7 (1953); *Abilt v. CIA*, 848 F.3d 305, 312 (4th Cir. 2017). As explained therein, the assertion of the state secrets privilege in response to this motion to compel is necessary to prevent a reasonable likelihood of, *inter alia*, physical danger to United States military and other interrogation personnel; substantial propaganda victories for Al Qaeda, ISIS, and other violent extremist organizations; disclosure of intelligence sources and methods; and disruptions of United States military and national security missions.

Because the Secretary of Defense has again properly asserted the state secrets privilege and demonstrated that disclosure of the information sought in CACI PT's motion reasonably could be expected to cause significant harm to national security, the motion to compel should be denied.

## BACKGROUND

### A.  Procedural Background

A more thorough background of the involvement of the United States in this litigation is set forth in the Opposition by the United States to the Motion to Compel Interrogator Identities, ECF No. 775. Since then, this Court has denied two motions to compel classified discovery from the United States, following which the United States has facilitated the taking of ten

pseudonymous depositions in which the classified identity of the deponent has been kept secret (along with depositions of Major General (MG) Antonio Taguba and William Cathcart, a soldier who was shot and wounded by a detainee who had obtained a firearm while in his cell at Abu Ghraib).  In addition, since becoming a party to this litigation, the United States has responded to 25 interrogatories propounded by CACI PT and produced over 60,000 pages in response to CACI PT's requests for production of documents.

**B.  CACI PT's Previous Motions to Compel Classified Information**

On March 30, 2018, CACI PT filed a Motion to Compel Disclosure of Interrogator Identities with this Court.  *See* ECF No. 740 (sealed version); ECF No. 737 (public version).  In that motion, CACI PT requested that the Court order the United States to disclose in discovery the identities of any interrogators with whom Plaintiffs interacted while in the custody of the United States military.  *See id.*  The United States opposed the motion, contending that the identities of interrogators would not be proportional to the needs of the case, given the potential availability of the interrogators for pseudonymous depositions, and presenting an assertion of the state secrets privilege to safeguard national security against a significant harm that reasonably would have been expected from disclosure.  *See* ECF No. 775.  In an unclassified declaration accompanying that prior assertion, Secretary Mattis explained that disclosure could lead to retribution by those subject to interrogations, along with groups to which those individuals belonged or other sympathizers, and that such revenge could be directed at both interrogators and their families.  *See id.*  Secretary Mattis also described the broader harms from successful attempts at retribution, including those related to propaganda and recruitment by United States

3

adversaries, as well as to DoD's efforts to recruit and retain the interrogation personnel necessary to gather intelligence from detainees. *See id.*

On May 4, 2018, following a hearing on CACI PT's motion to compel, this Court denied the motion. *See* ECF No. 791. The Court ordered that the United States facilitate pseudonymous depositions, agreeing with the United States that the availability of this discovery tool rendered CACI PT's request for specific identity information disproportionate to the needs of the case. *See id.* The Court also affirmed the Secretary's assertion of the state secrets privilege, thereby excluding from the case the identities of Plaintiffs' interrogators in connection with the intelligence interrogations of Plaintiffs. *See id.* CACI PT took objections to the Court's Order, *see* ECF No. 805, and after argument on June 15, 2018, Judge Brinkema affirmed the Order. *See* ECF No. 850.

Meanwhile, on June 8, 2018, CACI PT brought a second motion to compel regarding the identities of interrogation personnel involved in intelligence interrogations of the Plaintiffs, this time seeking the names of linguists, interpreters, and any other personnel not covered by CACI PT's first motion to compel. *See* ECF No. 836. On July 20, 2018, the United States opposed, with both sides presenting similar arguments to those raised in briefing on CACI PT's first motion to compel. *See id.*; ECF No. 875. The Secretary again asserted the state secrets privilege, supported by a second unclassified declaration explaining the reasonable likelihood of physical harm to interrogation personnel, along with concomitant harms to U.S. national security interests. *See* ECF No. 875. On July 27, 2018, the Court denied CACI PT's second motion to compel, *see* ECF No. 887, and, following Objections by CACI PT, Judge Brinkema affirmed the ruling on September 14, 2018. *See* ECF No. 921.

C.  **Document Production by the United States**.

This motion to compel by CACI PT seeks redacted portions of documents from the robust document production made by the United States, specifically, the United States Department of Defense ("DoD") and the United States Army ("Army"), over the five-month discovery period in this case.  These narrowly redacted documents include:

- Files maintained by the United States for all four Plaintiffs in this case.  Various Plaintiff-specific files were originally reviewed for declassification purposes and produced in unclassified, redacted form in 2013.  As part of discovery in 2018, the United States re-reviewed requested portions of these files and produced new versions of many pages in the files reflecting additional information that is no longer classified.  Also in 2018, the United States identified additional Plaintiff-specific materials that had not been located in 2013, and, following declassification review, produced unclassified, redacted versions of these documents.

- Copies of official United States Government reports relating to investigations of detention activities and abuses at Abu Ghraib, including the reports by MG Miller, MG Ryder, MG Taguba, Lieutenant General (LTG) Mikolashek, LTG Jones and MG Fay, Vice Admiral (VADM) Church, and Brigadier General (BG) Formica.

- Thousands of pages of annexes to the aforementioned Government reports, including dozens of witness statements taken by investigators as part of Government investigations into conduct at Abu Ghraib.

Ultimately, the United States' document production has encompassed a total of 60,843 pages and 220 native files.  Conducting declassification reviews entailed careful, line-by-line review of thousands of pages, ultimately requiring hundreds of hours of effort on the part of DoD and Army classification review officials.  The Government consulted closely with counsel for requestor CACI PT to ensure that these substantial efforts were focused on documents of specific interest to CACI PT to minimize the wasted effort and to ensure that disputes over production were not brought before the Court unnecessarily.

**D.  CACI PT's Instant Motion to Compel**.

On September 21, 2018, ten days after the United States completed its rolling production, counsel for CACI PT emailed counsel for the United States stating that CACI PT intended to move to compel unredacted versions of certain redacted pages in:  (i) files specific to each of the four Plaintiffs; (ii) various witness statements made as part of the investigation of MG George Fay; and (iii) eight documents from annexes to the Jones-Fay report.  Between September 21 and October 5, CACI PT and the United States met and conferred regarding CACI's proposed challenges.  Ultimately CACI PT agreed not to move to compel on five of the Fay witness statements and six of the Jones-Fay report annex documents.

On Friday, October 5, 2018, counsel for CACI PT emailed a revised chart of redactions on which CACI PT intended to move.  In that email, CACI PT added to the stated scope of its planned motion to compel certain redactions found in five annexes to the Taguba report, all of which had been produced by the United States in May 2018.  The United States promptly responded with an explanation that because several of CACI PT's new challenged redactions had not been through a recent declassification process (because CACI PT had never highlighted them as documents of particular interest in the more-than-four months since they had been produced), it would be exceedingly impractical to include them in a response to CACI PT's motion to compel on a timetable likely to be acceptable to this Court.

CACI PT proceeded to file its motion to compel on October 11, 2018.  CACI PT's motion included challenges to certain redactions on the five Taguba report annexes, as well as to three other pages that CACI PT had never brought to the United States' attention during the meet-and-confer process.  Some of this material has been eliminated, however: since CACI PT

6

filed its motion to dismiss, the United States and CACI PT have continued to narrow CACI PT's

challenges. *See* Ex. 2 (Correspondence between counsel for the United States and counsel for

CACI PT). Between October 15, 2018 and November 7, 2018, the United States made five

separate productions of new versions of certain pages and documents challenged by CACI PT's

motion to compel. *See id.* A revised list of CACI PT's contested redactions, as thereby

narrowed, with resolved challenges stricken through, is attached as Exhibit 3.[3] Although the

United States initially requested additional time, the Court ultimately gave the United States until

November 16, 2018 at 5:00 p.m. to file its response, including any decision and briefing

regarding an assertion of the state secrets privilege. *See* ECF Nos. 959, 984, 986. The United

States files this response pursuant to that schedule.[4]

## ARGUMENT

### A. The State Secrets Privilege Bars CACI PT's Requested Discovery.

The existence of a privilege for military and state secrets to protect information vital to

---

[3] CACI PT provided a list of the "contested redactions" in each of these categories as Exhibit 3 to its motion. *See* ECF No. 949-1. The United States has updated this Exhibit to reflect that CACI PT and the United States have subsequently resolved their dispute over some of those materials. In most cases, the information in dispute comprises discrete redactions of limited information in the context of a page or a document largely provided in unclassified form. The documents attached to CACI PT's motion to compel thus do not reflect the minimal redaction on a number of the documents.

[4] In the course of DoD's review and preparation for the assertion of the state secrets privilege, DoD identified certain additional information in some of the challenged documents for which no harm to national security would reasonably be expected from disclosure. Although revised versions of these documents could not be prepared by the filing deadline, the Government anticipates producing new versions (in which this information is unredacted) prior to the November 30, 2018 hearing date for this motion, at which time the withholding of such information will no longer be at issue.

the national security or diplomatic relations "is well established in the law of evidence." *Reynolds*, 345 U.S. at 6-7.  As the Fourth Circuit recognized in this case, "rules . . . such as . . . the state secrets doctrine" exist to "adequately safeguard military interests" in cases such as the one at bar.  *Al Shimari v. CACI*, 679 F.3d 205, 219 (4th Cir. 2012) (en banc).  Although the privilege was developed in common law, the state secrets privilege has a constitutional foundation grounded in the President's Article II powers to conduct foreign affairs and provide for the national defense.  *See United States v. Nixon*, 418 U.S. 683, 710 (1974); *El-Masri v. United States*, 479 F.3d 296, 303-04 (4th Cir. 2007).[5]  The state secrets privilege "must be formally asserted by the head of the Executive Branch agency with control over the state secrets at issue, and then only after that person has personally considered the matter."  *El-Masri v. Tenet*, 437 F. Supp. 2d 530, 535-36 (E.D. Va. 2006) (referencing *Reynolds*, 345 U.S. at 7-8).  The state secrets privilege is an absolute privilege and "even the most compelling necessity cannot overcome the claim of privilege."  *Reynolds*, 345 U.S. at 11; *Sterling v. Tenet*, 416 F.3d 338, 343 (4th Cir. 2005).

### B.  The Government Has Properly Asserted the State Secrets Privilege.

The Government has satisfied the procedural requirements for invoking the state secrets privilege.  "First, the state secrets privilege must be asserted by the United States."  *El-Masri*, 479 F.3d at 304.  The privilege exclusively "belongs to the Government and . . . can neither be

---

[5] *See also Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988) (The Executive's authority to protect national security information derives from the President's Article II role as head of the Executive Branch and as Commander in Chief.).  The privilege encompasses a wide range of information.  *Ellsberg v. Mitchell*, 709 F.2d 51, 57 (D.C. Cir. 1983) (state secrets privilege prevents the "impairment of the nation's defense capabilities, disclosure of intelligence-gathering methods or capabilities, and disruption of diplomatic relations with foreign governments.").

claimed nor waived by a private party." *Id.* (quoting *Reynolds*, 345 U.S. at 7). "Second, '[t]here must be a formal claim of privilege, lodged by the head of the department which has control over the matter,'" here, the Department of Defense. *Id.* (quoting *Reynolds*, 345 U.S. at 7-8). Third, the "formal privilege claim may be made only 'after actual personal consideration by that officer.'" *Id.* (quoting *Reynolds*, 345 U.S. at 8).

The Government has satisfied these requirements in this case. The state secrets privilege has been formally asserted by the head of the department involved: Secretary Mattis, the Secretary of Defense and head of DoD. *See* Mattis Decl. ¶¶ 1-3. The Secretary has personally considered the matter and determined that disclosure of the information at issue reasonably could be expected to cause serious damage to the national security of the United States. *See id.* ¶¶ 2-3. Accordingly, the Government has met the procedural requirements and ensured that the state secrets privilege "is not . . . lightly invoked." *Reynolds*, 345 U.S. at 7.[6]

### C. Secretary Mattis Has Demonstrated That Disclosure of the Information Covered by the Privilege Risks Damage to National Security.

"After a court has confirmed that the *Reynolds* procedural prerequisites are satisfied, it must determine whether the information that the United States seeks to shield is a state secret, and thus privileged from disclosure." *El–Masri*, 479 F.3d at 304. "A court is obliged to honor

---

[6] In addition, the Department of Justice set forth guidance in 2009 regarding the assertion and defense of the state secrets privilege in litigation, which has also been followed in this case. *See* Memorandum Governing Invocation of the State Secrets Privilege, available at: https://www.justice.gov/sites/default/files/opa/legacy/2009/09/23/state-secret-privileges.pdf. Consistent with that guidance, the assertion of the state secrets privilege here is being made to avoid "genuine and significant harm to national defense [and] foreign relations," has been made only as "necessary to safeguard those interests," and is not being made to conceal unlawful activity or to prevent embarrassment. *See id.* And invocation of the state secrets privilege has been reviewed at the highest levels of the Department of Justice.

the Executive's assertion of the privilege if . . . there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged." *Id.* at 305 (citing *Reynolds*, 345 U.S. at 10). Because this question is of "constitutional significance . . . the executive's determination that disclosure of information might pose a threat to national security is entitled to 'utmost deference.'" *Abilt*, 848 F.3d at 312 (quoting *Nixon*, 418 U.S. at 710). Further, deference is appropriate because "the Executive and the intelligence agencies under his control occupy a position superior to that of the courts in evaluating the consequences of a release of sensitive information." *El-Masri*, 479 F.3d at 305; *see also United States v. Marchetti*, 466 F.2d 1309, 1318 (4th Cir. 1972) ("The courts, of course, are ill-equipped to become sufficiently steeped in foreign intelligence matters to serve effectively in the review of secrecy classifications in that area.").

1. **Disclosure of the Identities of Intelligence Personnel Engaged in the Interrogation of Specific Detainees Risks Damage to National Security**.

As with CACI PT's two previous motions to compel, one major category of information over which the state secrets privilege is being asserted comprises the identity of interrogation personnel engaged in intelligence interrogations of specific detainees, where the identity of those personnel can be connected to identified detainees. This information is classified under DoD Directive 3115.09, which protects from disclosure the "association of specific DoD interrogators [and other interrogation personnel] with the interrogation, debriefing, or other intelligence questioning of a specific detainee." For the reasons described in Secretary Mattis's declaration, disclosure of these relationships reasonably could be expected to risk the security of the

intelligence personnel by placing them at risk of retribution, and further, to risk propaganda and recruiting successes by United States adversaries.  *See* Mattis Decl. ¶¶ 9-12.[7]

As he did in connection with his two previous assertions of the state secrets privilege, Secretary Mattis has described the "serious damage to the national security of the United States" that reasonably could be expected upon disclosure of the relationships between specific interrogation personnel and the particular detainees in whose interrogations the interrogation personnel participated.  *See* Mattis Decl. ¶ 9.  Specifically, Secretary Mattis explained that disclosure "could expose [the interrogation personnel] and their families to an unacceptable risk of harm through possible retribution by the detainees, groups to which the detainees belong, or other sympathizers."  *Id.*  Secretary Mattis emphasized that "[t]errorist groups and their affiliates have targeted U.S. military personnel and contractors supporting U.S. military operations for attacks for many years, sometimes with devastating consequences."  *Id.* ¶ 10.  Secretary Mattis also made clear that the harms from such attacks would not be limited to the interrogators and their families alone, but would lead to "a significant propaganda event . . . [that] would strengthen our adversaries in their recruiting and ability to propagandize effectively . . . to the significant detriment of our national security."  *Id.* ¶ 11.  And Secretary Mattis explained that a "[f]ailure to protect the identities of [intelligence] personnel in connection with the interrogations of specific detainees would also have a chilling effect on DoD's ability to recruit and retain"

---

[7] Secretary Mattis previously asserted the state secrets privilege over the identities of interrogation personnel involved in the intelligence interrogations of the four Plaintiffs in this case, in connection with requests that these individuals be questioned about their interactions with the Plaintiffs.  The current assertion of the state secrets privilege covers the relationship between other interrogation personnel and other detainees, as reflected in documents created during Government investigations of Abu Ghraib, such as witness statements to investigators.

intelligence personnel, a necessary prerequisite to gathering intelligence from detainees. *Id.* ¶ 9. Secretary Mattis has thereby plainly set forth how disclosure of this identifying information "will expose military matters which, in the interest of national security, should not be divulged." *El-Masri*, 479 F.3d at 305. This Court has previously and correctly recognized that these harms serve as a proper basis for assertion of the state secrets privilege and should do the same here. *See* ECF Nos. 791, 850, 887, 921.

### 2. Disclosure of the Alpha-Numeric Portion of Internment Serial Numbers, Including Information About Foreign Partners, Risks Damage to National Security.

Secretary Mattis has also properly asserted the state secrets privilege over the alphanumeric prefix portion of Plaintiffs' internment serial numbers ("ISNs") because disclosure would provide information about, *inter alia*, foreign partners that participated in Coalition military operations that led to the detention of Plaintiffs. *See* Mattis Decl. at ¶¶ 13-15. As Secretary Mattis's declaration explains, although general information about the participation of these partners is often available—such as the fact of their participation in a United States-led coalition, or the geographic area of operations in which a partner is active—many foreign partners join the United States based on an understanding that specific details of their cooperation in military activities, including the specific operations in which their forces participate, will be kept confidential. *See id.* at ¶¶ 14-15. Thus, disclosure of the fact that a foreign partner "participated in a specific mission" or "captured an individual and turned the individual over to the United States" would be "likely to be viewed as a breach of the trust on which our military partnerships are based." *Id.* at ¶ 14. Such disclosures "reasonably could be expected to undermine the willingness of foreign partners," many of whom "continue to

12

participate alongside the United States in ongoing military activities in Iraq and Afghanistan," to participate alongside the United States in the future. *Id.* at ¶ 15. Because "[t]he participation of coalition partners is essential to accomplishing the United States' military and national security objectives, as well as to safeguarding the lives of American military service members," *id.* at ¶ 14,[8] a diminished willingness by partners to participate reasonably could be expected to harm national security and this information is therefore properly withheld pursuant to the state secrets privilege.[9]

The importance of protecting similar information has been widely recognized by courts. "It is self-evident that . . . disclosures . . . pose a 'reasonable danger' to the diplomatic and military interests of the United States" if they would lead to "[r]evelation of particular instances in which foreign governments assisted" the United States in a circumstance where they expected confidentiality. *Halkin v. Helms*, 690 F.2d 977, 993 (D.C. Cir. 1982) (upholding invocation of state secrets privilege where the CIA "relied upon the cooperation of foreign" governments and disclosure would have effect of "generally embarrassing [those] governments"). Similarly, in *American Civil Liberties Union* ("*ACLU*") *v. Department of Defense* ("*DoD*"), 628 F.3d 612,

---

[8] The Secretary's declaration spells out some of the specific ways in which these partners are essential, including that they offer specialized capabilities and expertise, facilitate diplomacy, and serve as a force multiplier for United States military forces. *See* Mattis Decl. ¶ 14.

[9] Secretary Mattis also made clear these harms remain extant even with "[t]he passage of time," because foreign partners "expect us to [classify and safeguard this information] long after a military operation has occurred." Mattis Decl. ¶ 15. Significantly, many of the foreign partners that participated in military operations with the United States in Iraq in 2003 continue to participate in military operations alongside the United States at the current time, and "the unauthorized disclosure of their participation in specific events 15 years ago reasonably could be expected to undermine [their] willingness" to continue to assist the United States today. *Id.*

625 (D.C. Cir. 2011), the Court affirmed the propriety of withholding information about foreign partners under the Freedom of Information Act ("FOIA").  There, relying on Government declarations explaining that disclosure would "hinder the CIA's ability to obtain assistance from foreign nations," the D.C. Circuit concluded that "it is both plausible and logical that the disclosure of information regarding the capture . . . of detainees would degrade the [agency's] ability to carry out its mission."  *Id.*[10]  Secretary Mattis's declaration documents how similar harms reasonably could be expected to be caused by disclosure of the portions of the ISNs at issue here.

3.  **Disclosure of Information About the Selection of Interrogation Methods, Evaluations of the Effectiveness of Those Methods, and Other Related Judgments, Risks Damage to National Security**.

Equally well supported is Secretary Mattis's assertion of the state secrets privilege over the selection of methods used to interrogate particular military detainees, evaluations of the effectiveness of those methods, and other judgments related to those methods.  Secretary Mattis explains in his declaration that disclosure of this information reasonably could be expected to harm national security by "enlighten[ing] our adversaries about the orchestration of interrogation

---

[10] Secretary Mattis's declaration also explains why similar harms would result from disclosure of the alpha-numeric portion of the ISN for detainees captured by the United States.  *See* Mattis Decl. at ¶ 16 ("disclosure of the alpha-numeric string in cases where the United States was the capturing power" would make it "apparent by implication that a coalition partner was the capturing power in all cases where the alpha-numeric string was redacted," thereby rendering it "likely that the specific country involved with a particular capture could be identified").  It is well-established that such prophylactic withholdings are appropriate and necessary to protect national security.  *See, e.g.*, *ACLU v. DoD*, 752 F.Supp. 2d 361, 363, 367-68 (S.D.N.Y. 2010) (affirming a "*Glomar*" FOIA response over "information regarding the nature of [the] CIA's cooperation with foreign governments, or the absence thereof" based on Government declarations explaining that "disclosure of such information . . . reasonably could be expected to prompt a foreign government to restrict" cooperation with the United States in the future).

methods, thereby increasing the likelihood of effective resistance to interrogation." Mattis Decl. ¶ 18. Importantly, the information withheld in this category concerns interrogation techniques "still in use today," so insights gleaned from disclosure could be used in the present day by adversaries to help their personnel "channel DoD interrogators towards the use of a particular interrogation method" that they "could be specifically trained in how to resist."[11] *Id.* The declaration also establishes one of the bases on which DoD has determined this to be a genuine threat: "At least one terrorist organization has studied and learned many counter-interrogation measures, and this organization's training has already apparently changed over time in response to the conduct of U.S. interrogations." *Id.* at ¶ 22. Secretary Mattis's declaration explains this harm in further detail, including by reference to the specific material withheld from Plaintiff Al Shimari's Interrogation Plan, Interrogation Reports, and Interrogator Notes, *see* Mattis Decl. ¶¶ 19-20, and the material withheld from Counterintelligence Information Reports and Interrogator Notes related to Plaintiff Al Zubae, *see* Mattis Decl. ¶ 21. Secretary Mattis's careful and persuasive analysis of how release of these classified interrogation details would limit the future effectiveness of DoD interrogations, and therefore reasonably could be expected to cause serious damage to national security, is entitled to the "utmost deference" and should be sustained. *Abilt*, 848 F.3d at 312.

---

[11] For example, if an adversary learned that the technique of "We Know All" is typically employed when a detainee makes particular types of statements or exhibits a particular mood, the adversary could train its personnel to make the appropriate statements or exhibit the appropriate mood to channel interrogations in a direction that would lead the technique to be employed, simplifying the ability of those personnel to resist the interrogation technique. ("We Know All" is a technique in which the intelligence collector convinces the source that his questioning of the source is perfunctory because any information that the source has is already known. *See* Army Field Manual 34-52 (2-22.3), Human Intelligence Collector Operations, at ¶ 8-53 (Sept. 6, 2006)).

15

Indeed, in connection with the habeas litigation brought by detainees at Guantanamo Bay, the United States District Court for the District of Columbia recognized that this type of information is properly protected from disclosure even where, unlike here, such information is unclassified. *See In re Guantanamo Bay Detainee Litigation*, 787 F. Supp. 2d 5, 23 (D.D.C. 2011). There, members of the news media invoked the First Amendment in seeking access to protected, but unclassified, information "about the effectiveness of certain [lawful] interrogation techniques and approaches . . . described in Army Field Manual No. 2–22.3, as well as details about the implementation of those techniques and approaches." *Id.* There, as here, the information at issue was not the "types of approaches used . . . but rather the manner and strategy in which they are employed." *Id.* (internal quotations omitted). After consideration of Government declarations, that court recognized that the Government's withholdings were appropriately "tailored to explain why protection is warranted" even where the material at issue was "the subject of vigorous public debate, interest, and concern." *Id.* at 24. The D.C. Circuit in *ACLU v. DoD* similarly recognized that it was proper for the Government to classify and withhold information that would "provid[e] terrorists with insight into . . . interrogation techniques, strategies, and methods" because the Government's declarations had "establish[ed] that public disclosure of the withheld information reasonably could be expected to result in damage to the national security." 628 F.3d at 624-25. Secretary Mattis's declaration likewise has established that harm here.

**4.   Disclosure of Intelligence-Gathering Sources, Efforts, and Results, Unrelated to Plaintiffs, Risks Damage to National Security**.

The Mattis Declaration also explains that the withholding of specific, actionable intelligence obtained from two identified detainees (who are not the plaintiffs in this litigation),

16

and other information about those detainees, is necessary to protect against reprisals directed at the individuals who provided the information. *See* Mattis Decl. at ¶ 23. Such retaliation attempts may occur either for the "purpose of retribution" or to "make an example" of those who provide intelligence to the United States. *Id.* These reprisal attempts would likely discourage future detainees from providing intelligence information to the United States. *See id.* Because DoD's ability to obtain timely and actionable intelligence from detainees, including those responsible for attacks against military forces, is critical to DoD's ability to prevent future attacks, the consequences of disclosure of this information would be to make such attacks more likely or more successful. *See id.*

"The Government has a compelling interest in protecting . . . the appearance of confidentiality so essential to the effective operation of our foreign intelligence. . . ." *Snepp v. United States*, 444 U.S. 507, 509 n.3 (1980). As the Secretary's declaration makes clear, the need for confidentiality encompasses information not only about the identities of sources, but the information they provided. This is because, based on DoD's "experience in military and intelligence operations," Mattis Decl. ¶ 23, both of these define the risk of whether their cooperation as a detainee will "endanger [their] personal safety." *Snepp*, 444 U.S. at 512. Even "[w]ithout considering the risk to the individuals involved," it is unassailable that the Government may assert the state secrets privilege over this type of information to protect DoD's "ability to deter and prevent future . . . attacks" on our forces. Mattis Decl. ¶ 23; *see Halkin*, 690 F.2d 993; *El-Masri*, 479 F.3d at 303-04.[12]

---

[12] The Government also has a qualified privilege to protect the anonymity of individuals providing information for law-enforcement purposes—the "informer's privilege." *See Roviaro v. United States*, 353 U.S. 53, 59 (1957). In that context, courts have recognized the

Secretary Mattis also establishes in his declaration the "paramount importance" of avoiding the harm to national security that reasonably could result from disclosing a non-DoD intelligence source and information about integrating that source into DoD operations.  Mattis Decl. ¶ 24.  It is unassailable that information that would compromise sensitive "sources and methods" or "result in disclosure of intelligence-gathering methods or capabilities" must be protected and "fall[s] squarely within the definition of state secrets."  *Sterling*, 416 F.3d at 338.  As documented in Secretary Mattis's Declaration, disclosure of this information would "thwart the independent activities of non-DoD actors and reduce their willingness to participate in coordinated endeavors with DoD."  Mattis Decl. at ¶ 24.  This information is thus properly protected by the Secretary's assertion of the state secrets privilege.  For this information, as with the categories described above, Secretary Mattis has established that disclosure reasonably could be expected to cause serious damage to national security.

## 5.   The Information Over Which the State Secrets Privilege is Asserted is Properly Excluded From this Action.

Once it is established, as Secretary Mattis has done here, that "[i]nformation . . . is properly privileged under the state secrets doctrine," that information "is absolutely protected from disclosure . . . [and] remove[d] . . . from the proceedings entirely."  *Abilt*, 848 F.3d at 313 (citation omitted).  In light of Secretary Mattis's detailed declaration, the Court should heed the

---

unquestionable reality of the threat posed to "the informer and his family [of] possible physical harm or . . . other potential undesirable consequences." *United States v. Green*, 670 F.2d 1148, 1155 (D.C. Cir. 1981).  Although the state secrets privilege is "absolute," *Reynolds*, 345 U.S. at 11, not qualified like the informer's privilege, the applicability of this privilege reinforces the Secretary Mattis's conclusion that exposure of the identities and information provided by detainees would likely "discourage individuals from providing information to the government in the future." *United States v. Hugo Key & Son*, 672 F. Supp. 656, 658 (D. R.I. 1987).

command of *Reynolds* and "not jeopardize . . . security . . . by insisting upon an examination of the evidence, even by the judge alone." *Reynolds*, 345 U.S. at 10; *Sterling*, 416 F.3d at 344 (describing *in camera* review as "play[ing] with fire and chanc[ing] further disclosure . . . that would defeat the very purpose for which the privilege exists"). In *Sterling*, the Fourth Circuit rejected the "argument that the court could devise special procedures that would allow" access to the privileged information by the Court and by counsel:

> Such procedures, whatever they might be, still entail considerable risk. Inadvertent disclosure during the course of a trial—or even in camera—is precisely the sort of risk that *Reynolds* attempts to avoid. At best, special accommodations give rise to added opportunity for leaked information. At worst, that information would become public, placing covert agents and intelligence sources alike at grave personal risk.

*Id.* at 348; *see also El-Masri,* 479 F.3d at 311 (holding that *Reynolds* "expressly foreclosed" adoption of a "procedure under which state secrets would have been revealed to [the plaintiff], his counsel, and the court, but withheld from the public").

Upon review of the assertion of the state secrets privilege, the Court should therefore conclude that the United States has properly invoked that privilege, established that a "reasonable danger" to national security could result upon release of the information, and order that the unredacted versions of the documents sought by CACI PT's motion be excluded entirely from this litigation.

## CONCLUSION

For the foregoing reasons, CACI PT's Motion to Compel should be denied.

Dated: November 16, 2018                    Respectfully submitted,

                                            G. ZACHARY TERWILLIGER
                                            United States Attorney

19

JOSEPH H. HUNT
Assistant Attorney General, Civil Division

JAMES G. TOUHEY, JR.
Director, Torts Branch

RUPERT M. MITSCH
Assistant Director, Torts Branch

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

ADAM G. KIRSCHNER
ERIC J. SOSKIN
Senior Trial Counsel, Federal Programs Branch

ELLIOTT M. DAVIS
PAUL STERN
JOCELYN KRIEGER
DANIEL D. MAULER
Trial Attorneys, Civil Division
U.S. Department of Justice

 */s/* Lauren A. Wetzler
LAUREN A. WETZLER
Chief, Civil Division
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Ave.
Alexandria, VA  22314
Tel:    (703) 299-3752
Fax:    (703) 299-3983
Email: Lauren.Wetzler@usdoj.gov

*Counsel for the United States*

20

## CERTIFICATE OF SERVICE

I certify that on November 16, 2018, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system, which sent a notification of such filing (NEF) to the following

counsel of record:

John Kenneth Zwerling
The Law Offices of John Kenneth Zwerling, P.C.
114 North Alfred Street
Alexandria, VA  22314
jz@zwerling.com

John O'Connor
Steptoe & Johnson LLP
1330 Connecticut Ave., N.W.
Washington, DC  20036
joconnor@steptoe.com

William D. Dolan, III
Law Offices of William D. Dolan, III, PC
8270 Greensboro Drive, Suite 700
Tysons Corner, VA  22102
wdolan@dolanlaw.net

      /s/
LAUREN A. WETZLER
Chief, Civil Division
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Ave.
Alexandria, VA  22314
Tel:      (703) 299-3752
Fax:      (703) 299-3983
Email:    Lauren.Wetzler@usdoj.gov

21