**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

SUHAIL NAJIM ABDULLAH AL SHIMARI, *et al.*,

        Plaintiffs,

v.

CACI PREMIER TECHNOLOGY, INC.,

        Defendant.

No. 1:08–cv–827 (LMB/JFA)

CACI PREMIER TECHNOLOGY, INC.,

        Third-Party Plaintiff,

v.

UNITED STATES OF AMERICA, and JOHN DOES 1–60,

        Third-Party Defendants.

**OPPOSITION BY THE UNITED STATES TO DEFENDANT CACI PT'S MOTION TO COMPEL THE UNITED STATES TO PRODUCE UNREDACTED DOCUMENTS**

# Exhibit 1

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| SUHAIL NAJIM ABDULLLAH AL SHIMARI, *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>CACI PREMIER TECHNOLOGY, INC.,<br><br>    Defendant.<br><br>CACI PREMIER TECHNOLOGY, INC.,<br><br>    Third-Party Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>and JOHN DOES 1-60,<br><br>    Third-Party Defendants. | No. 1:08-cv-827 (LMB-JFA) |

## DECLARATION AND THIRD ASSERTION OF STATE SECRETS PRIVILEGE BY
## JAMES N. MATTIS, SECRETARY OF DEFENSE

I, James N. Mattis, do hereby state and declare as follows:

1. I am the Secretary of Defense and have served in this capacity since January 20, 2017. I am the head of the Department of Defense ("DoD") and the principal assistant to the President in all matters relating to DoD. The Secretary of Defense has authority, direction, and control

over DoD and its components, activities, and information. *See* 10 U.S.C. § 113(b). As more fully detailed in the declaration I submitted in connection with this litigation on April 27, 2018, prior to serving as the Secretary of Defense, I served more than four decades in uniform, commanding Marines at all levels, including during combat operations. *See* Declaration and Assertion of State Secrets Privilege by James N. Mattis, Secretary of Defense, Dkt. No. 775-1 (Apr. 27, 2018).

2. Since the filing of my April 27, 2018 declaration in which I asserted the state secrets privilege with respect to the names and visual representations of all individuals who served as interrogators and interrogation analysts in intelligence interrogations of the plaintiffs, and the filing of my July 18, 2018 declaration in which I asserted the state secrets privilege with respect to the names and visual representations of all individuals who supported the interrogations of the plaintiffs, including linguists and interpreters, and through the exercise of my official duties, I have been kept informed of significant developments in this litigation. The purpose of this declaration is to formally assert the state secrets privilege in order to protect a focused and discrete set of classified information of DoD contained in the unredacted versions of various redacted documents produced in this case. As summarized in this declaration, public disclosure of the information covered by my privilege assertion reasonably could be expected to cause serious damage to the national security of the United States. As the Secretary of Defense and pursuant to Executive Order 13256, "Classified National Security Information," I hold original classification authority up to the TOP SECRET level. This means that I have been authorized by the President to make original classification decisions. I make the following statements pursuant to that authority and based upon my personal knowledge and on information made available to me in my official capacity.

2

## I. ASSERTION OF THE STATE SECRETS PRIVILEGE

3. As described further in the following paragraphs, and after personal consideration of the matter, I am asserting the state secrets privilege over classified information implicated by this litigation described below, which consists generally of: (a) the names and/or visual representations of individuals who either conducted or supported the intelligence interrogation or questioning of specific detainees, other than plaintiffs, at Abu Ghraib or other detention facilities in Iraq and the names or identities of specific detainees, other than plaintiffs, in connection with the names and/or visual representations of personnel who either conducted or supported the interrogation or questioning of these detainees; (b) the alpha-numeric portion of the plaintiffs' internment serial numbers ("ISNs"); (c) certain records of intelligence interrogations, detainee debriefings, or intelligence questioning related to transcribed interrogator notes, summary interrogation reports, an interrogation plan, and other related records pertaining to the plaintiffs; and (d) information relating to specific intelligence-gathering efforts and results, unrelated to plaintiffs, as well as information relating to non-DoD intelligence sources. Parts I.A. through I.D. of this Declaration describe these categories of information in more detail and set forth my conclusion regarding the consequences of unauthorized disclosure for each category of information: that such disclosure reasonably could be expected to cause serious damage to the national security of the United States. Parts II.A. through II.D. set forth in detail the explanation, corresponding to each category, of why I have reached that conclusion. In preparation for my assertion of the state secrets privilege over the information covered by this declaration, all of the disputed documents (27 documents consisting of approximately 300 pages) containing privileged information were made available to me for review in unredacted form. In the majority of these documents, DoD has disclosed to the parties in this litigation extensive portions of the

3

documents at issue, with redactions used narrowly and sparingly to protect only the information for which disclosure reasonably could be expected to cause serious damage to the national security of the United States. Significantly, given the subject matter of this litigation and the allegations of the plaintiffs, none of the withheld material discusses or describes the use of enhanced interrogation techniques or techniques not authorized by Army Field Manual ("FM") 34-52. I have personally reviewed all of these documents that contain information in each of the above categories. I have also discussed the details of the documents and information sought in this case with knowledgeable members of my staff to ensure that the bases for the privilege assertions set forth in this Declaration are appropriate.

A.      **Statements Containing Protected Identities.**

4. DoD classifies as "SECRET" the names and visual representations of DoD interrogators, debriefers, contract interrogators, support personnel, and foreign government interrogators when their identities are associated with the interrogation, debriefing, or other intelligence questioning of a specific detainee, pursuant to section 1.4(c) of Executive Order 13526. This is reflected in DoD Directive 3115.09, "DoD Intelligence Interrogations, Detainee Debriefings, and Tactical Questioning." I previously asserted the state secrets privilege over information in this category pertaining to the interrogation personnel involved with intelligence interrogations of the plaintiffs in this litigation; however, other information properly classified and protected from disclosure by these authorities is contained in a statement at Annex 53 to the *Army Regulation 15-6 Investigation of the 800th Military Police Brigade*, conducted by Major General Antonio M. Taguba ("Taguba Report"), and in 13 statements in Annex B to the *Army Regulation 15-6 Investigation of the Abu Ghraib Detention Facility and 205th Military Intelligence Brigade*, conducted by Lieutenant General Anthony Jones and Major General

4

George Fay ("Jones-Fay Report"). In contrast to my two previous assertions of the state secrets privilege in this category, much of the information redacted from the documents now at issue comprises detainee identities (other than the plaintiffs') rather than the identities of interrogation personnel. This permitted production of documents such as witness statements with the information most relevant to this litigation (such as the names of the witnesses providing the statements), while at the same time protecting the relationship between interrogation personnel and the intelligence interrogations of specific detainees. In my judgment, unauthorized disclosure of this information reasonably could be expected to cause serious damage to the national security of the United States.

**B.    Alpha-Numeric Portion of the Internment Serial Number (ISN).**

5. Executive Order 13526, section 1.4(a), permits the classification of military plans, weapons systems, or operations. DoD classifies as "SECRET" the alpha-numeric portion of the ISN. This alpha-numeric portion of the ISN describes the capturing power (*i.e.*, the country that captured the individual), the theater code (*i.e.*, the theater where the individual was captured), and the serving power of the captured individual (*i.e.*, the individual's country of military allegiance). The capturing country and military allegiance of the captured individual are denoted by letters, while the conflict zone is denoted by a number.[1] While that information remains redacted and classified[2], the unique six digit number portion of the ISN is unredacted for the

---

[1] For example, if the United States (referred to as "US" in this system) were to capture a Syrian fighter (referred to as "SY") in Iraq (referred to as "9"), that individual's complete ISN would be: US9SY-123456EPW. The "EPW" (Enemy Prisoner of War) portion references the detainee classification. Depending on the circumstances, this could be "CI" (Civilian Internee), among others. The six digit number portion of the ISN for this individual (123456) is releasable, but the alpha-numeric portion of the ISN would remain classified.

[2] Although the capture of the four plaintiffs in this case in Iraq is not a classified fact, it is impractical for DoD to declassify and unredact individual characters in an alphanumeric string

5

plaintiffs.[3] Information properly classified and protected from disclosure by this authority is contained throughout the detainee files of Plaintiffs Al Shimari, Rashid, and Al Zubae. In my judgment and for the reasons outlined below, unauthorized disclosure of this information reasonably could be expected to cause serious damage to the national security of the United States.

**C.    Portions of Documents Created Before or After Intelligence Interrogations.**

6. Pursuant to section 1.4(c) of Executive Order 13526 and DoD Manual 5200.01, "DoD Information Security Program," DoD classifies as "SECRET" all transcribed interrogator notes, memoranda for the record, summary interrogation reports, and all other related records of intelligence interrogations, detainee debriefings, or intelligence questioning in accordance with the relevant security classification guides. *See* DoD Directive 3115.09, "DoD Intelligence Interrogations, Detainee Debriefings, and Tactical Questioning," Enclosure 4, paragraph 13b. Within these documents, I am asserting the state secrets privilege over (i) counterintelligence (CI) information reports [AS-USA-054188 thru -054190, -054213 thru -054215, -054241 thru -054243], (ii) summary interrogation reports containing analyst and interrogator intelligence focus comments [AS-USA-054169, -054195, -054224; AS-USA-053950, -053954, -054113], (iii) interrogation collector comments [AS-USA-053945, -053948, -053949, -054122], (iv) detainee interrogation plans [AS-USA-053958], (v) approaches used during interrogation [AS-USA-053943, -053970; -054175, -054201, -054230]; (vi) observations related to the

---

while leaving the remainder classified and redacted. Attempting to do so would carry a high risk that portions of the adjacent characters would be inadvertently exposed through errors or imperfections in the redaction process, thereby causing the harms described in this declaration that would occur if the other portions of the alphanumeric string were to be released.

[3] Al Shimari's six digit ISN is 153913, Rashid's is 150803, Al Zubae's is 152529, and Al Ejaili's is 152735. Their six digit ISN is unique, as is every other one issued. They are never re-issued to another detainee.

6

mood/attitude of the detainee [AS-USA-053943, -053970; -054176, -054202, -054231]; (vii) assessments by the interrogator regarding the truthfulness of the detainee [AS-USA-053943, -053970; -054176, -054202, -054231]; (viii) interrogator recommendations and/or suggested future approaches that may work with the detainee [AS-USA-053943, -053970; -054176, -054202, -054231]; and (ix) suggestions for when future interrogations should occur [AS-USA-054176, -054202, -054203], except where such information has been produced in discovery pursuant to a determination by DoD personnel that disclosure would not reasonably be expected to cause serious damage to the national security of the United States. The remainders of those documents have been produced in this litigation, and the information redacted is narrowly tailored to the information over which I am asserting the state secrets privilege. Such discrete information, properly classified and protected from disclosure as explained below, is contained within the written interrogation plan and interrogation reports for Plaintiff Al Shimari, and the interrogator notes for Plaintiffs Al Shimari and Al Zubae. In my judgment and for the reasons explained below, unauthorized disclosure of this information reasonably could be expected to cause serious damage to the national security of the United States.

**D.      Intelligence-Gathering Sources, Efforts, and Results, Unrelated to Plaintiffs.**

7. Executive Order 13526, Section 1.4(c), authorizes the classification of intelligence activities and intelligence sources or methods. Annex H, Appendix 6-A of the Jones-Fay Report consists of a command briefing prepared by the 205th Military Intelligence Brigade regarding the Brigade's operations at Abu Ghraib in early 2004. Thirty-four of the 36 pages in that briefing have been declassified, including all pages in the mission, overview, internee operations, community outreach, and magistrate operations sections. In the interrogation operations section of the briefing, nine of the eleven pages have been declassified in full and the remaining two

7

pages have been declassified in part. I have reviewed and determined that the information in the remaining two pages that was not declassified is currently and properly classified as it contains detailed, sensitive information regarding two specific interrogation-based operations and includes specific actionable intelligence obtained from two identified detainees, other than plaintiffs in this litigation. For the reasons detailed below, it is my judgment that the unauthorized release of this information reasonably could be expected to cause serious damage to the national security.

8. Similarly, Annex H, Appendix 10 of the Jones-Fay Report contains a classified September 2003 briefing prepared for the Commander, Combined Joint Task Force 7, the senior military commander in Iraq at that time. Of the 27 pages of the briefing, styled as a "concept brief" for interrogation operations in Iraq, 23 pages have been declassified and released in full and the remaining four pages have been declassified in large part. I have reviewed and determined that the information withheld on the four partially-declassified pages is currently and properly classified pursuant to EO 13526, Section 1.4(c). The protected information relates to a non-DoD intelligence source and a proposal for integrating this source into the overall interrogation processes in Iraq. Although this particular briefing was presented 15 years ago, the information I am protecting by asserting the state secrets privilege remains applicable to some interrogation operations today. As more fully described below, failure to prevent unauthorized disclosure of this information reasonably could be expected to cause serious damage to our national security.

## II. HARM TO NATIONAL SECURITY THAT REASONABLY COULD RESULT FROM DISCLOSURE OF PRIVILEGED INFORMATION

A.    <u>Statements Containing Protected Identities.</u>

9. Disclosure of the identities of intelligence interrogators and support personnel, in connection with the interrogation of specific detainees, reasonably could be expected to cause serious damage to the national security of the United States. DoD human intelligence (HUMINT) collection activities, including intelligence interrogations, provide the President, the National Security Council, Congress, the Secretary of Defense, commanders at every echelon, and other U.S. Government departments and agencies the intelligence they need to protect the national security. The identities of intelligence interrogators and support personnel, when associated with the interrogation of specific detainees, and the identities of specific detainees, in connection with the names and/or visual representations of individuals who either conducted or supported the intelligence interrogation or questioning of these detainees, could expose intelligence interrogators and support personnel, and their families, to an unacceptable risk of harm through possible retribution by the detainees, groups to which the detainees belong, or other sympathizers. Failure to protect the identities of intelligence interrogators and support personnel in connection with the interrogations of specific detainees would also have a chilling effect on DoD's ability to recruit and retain intelligence interrogators and support personnel and to collect intelligence on these dangerous groups and individuals. DoD asks its intelligence interrogators and support personnel to assist in the collection of information from persons who belong to or are associated with some of the most dangerous enemies of the United States, including individuals who belong to or are associated with al Qaeda or its affiliates or with the Islamic State of Iraq and ash-Sham ("ISIS"), organizations whose stated purpose is to kill Americans, military or civilian, wherever they are found. Intelligence interrogators and support personnel who assist in the conduct of interrogation operations do so with the expectation that their identities and involvement with interrogations of particular detainees will be protected from

9

public disclosure. For these reasons, I previously asserted the state secrets privilege over other information in this category and explained the reasons for doing so in my April 27, 2018 and July 18, 2018 declarations. I hereby provide a renewed explanation of the importance of protecting this information for the Court's convenience.

10. The risk of harm to U.S. national security interests from the disclosure of the intelligence interrogator and support personnel information at issue is not merely theoretical. Terrorist groups and their affiliates have targeted U.S. military personnel and contractors supporting U.S. military operations for attacks for many years, sometimes with devastating consequences. For the past few years, ISIS sympathizers and hackers have periodically published "kill lists" online, which include personally identifiable information, such as the names and home addresses of DoD personnel. As recently as December 2017, a "kill list" that included the names and contact information of DoD military and civilian personnel was posted to the Internet by ISIS supporters who encouraged "lone wolves" to use the information for targeting purposes. In addition, there have been actual attacks against DoD interrogators by detainees. If the names of these intelligence interrogators and support personnel were disclosed in court in connection with their interrogations of specific detainees, then they could be added to the "kill lists." In my judgment, the likelihood that such kill lists will inspire action by ISIS, Al Qaeda, their sympathizers, or lone wolves is substantially greater where such action can be linked to the actual interrogation of a detainee and characterized as retribution on behalf of that individual detainee.

11. Despite the passage of time since the events at Abu Ghraib that are the subject of this lawsuit, violent extremist organizations continue to look to capitalize on existing, lingering resentment towards the United States from these events. Indeed, pursuant to the Protected

10

National Security Documents Act of 2009, Section 565 of the Department of Homeland Security Appropriations Act of 2010 (Public law 111-83), three of my predecessors, former Secretaries of Defense Gates, Panetta, and Carter, have all certified that the public release of photos of detainee mistreatment, including at Abu Ghraib, would continue to endanger U.S. citizens, including members of the Armed Forces and employees of the U.S. government abroad. On November 2, 2018, based on recommendations from the commanders of U.S. Central Command, U.S. Africa Command, and U.S. Forces—Afghanistan, I determined that public disclosure of certain detainee abuse photos continues to pose a danger to U.S. personnel abroad and renewed the statutory certification. My certification will remain in effect until November 2021. *See* Section 565(d)(2) (certifications expire three years after issued). It is my assessment that these violent extremist groups would similarly exploit the disclosure of the identities of the Abu Ghraib personnel who were confirmed to have participated in the interrogation of specific Abu Ghraib detainees in order to inspire and recruit individuals in support of their causes and encourage attacks on identified individuals. I am confident they will try to kill them. In my view, if any of these groups or their allies or sympathizers were successful in targeting intelligence interrogators or support personnel, or their families, and could claim successful retribution for Abu Ghraib, it would be a significant propaganda event. Indeed, it would strengthen our adversaries in their recruiting and ability to propagandize effectively, which in turn would be to the significant detriment of our national security. Thus, I am asserting the state secrets privilege to protect the safety of intelligence interrogators and support personnel, and their families, both now and in the future. In addition, I make this assertion to prevent the damage to national security that actions by violent extremist groups based on a disclosure could cause to the important missions of DoD.

11

12.  Since the issuance of DoD Directive 3115.09, DoD has, to my knowledge, never declassified the identity of an intelligence interrogator or anyone who has supported an intelligence interrogator when their identity has been associated with the interrogation of a particular detainee or otherwise officially acknowledged such an identity.  In addition, public speculation about the identity of an individual who either interrogated or supported the interrogation of a particular detainee—whether through allegations in a lawsuit, media reporting, or conjecture based on a partial picture of the facts—does not constitute an official declassification or acknowledgment.  The disclosure of national security information only through official acknowledgment or confirmation is vital to the protection of intelligence information and personnel.  The absence of official confirmation leaves an important element of doubt about the veracity of speculation and reports, and thus provides an essential additional layer of protection and confidentiality.  That protection would be lost, however, if the Government were forced to confirm or deny the accuracy of speculation or unofficial disclosures.

**B.     Alpha-Numeric Portion of the Internment Serial Number (ISN).**

13.  Disclosure of the alpha-numeric portions of ISNs reasonably could be expected to cause serious damage to the national security of the United States.  As explained in paragraph 5 and note 1, *supra*, throughout the detainee files for Plaintiffs Al Shimari, Rashid, Al Zubae, and Al Ejaili, there is a unique ISN for each individual.  Each individual was assigned a six digit number that remains unredacted.  This information was previously provided to the parties.  In many instances, this six-digit number appears on its own in the documents produced in this case; however, there are numerous other instances where more than a six digit number is present.  Where more than six digits appear, the portion immediately preceding that unique six digit

12

number has been redacted. The specific information redacted is referred to as the alpha-numeric portion of the ISN. This alpha-numeric portion of the ISN describes the capturing power (i.e, the country that captured the individual), the theater code (i.e., the theater where the individual was captured), and the serving power of the captured individual (i.e., the individual's country of military allegiance). The capturing country and military allegiance of the captured individual are denoted by letters, while the conflict zone is denoted by a number. As explained previously, the alpha-numeric portion of the ISN remains redacted in whole, as it is not practical to segregate individual characters within an alphanumeric string without a substantial risk that other information in the alphanumeric string would be disclosed; thus, specific information, such as the numeric identifier for the theater, is not segregable.

14. This information remains classified because its protection is critical to fostering and maintaining sensitive coalition relationships in combined military operations.[4] From the beginning of Operation Iraqi Freedom, as well as in other military operations around the world, such as Operation Enduring Freedom in Afghanistan, the United States has relied on international military partners to assist in its operations. These partners contribute specialized capabilities and facilitate diplomacy, and their participation serves as a force multiplier by permitting the United States and its partners to direct their resources collectively at common, shared goals. The participation of coalition partners is essential to accomplishing the United States' military and national security objectives, as well as to safeguarding the lives of American military service members participating in military operations. Foreign partners are also vital to our world-wide efforts to collect intelligence and thwart terrorist attacks. Although DoD has

---

[4] As commonly used by the United States and DoD in connection with military activities, a coalition is a group of countries engaged in military operations together under a unified command structure.

13

publicly acknowledged the participation of many coalition partners and the approximate troop numbers associated with those partners, acknowledgment of general participation in American-led military operations is not the same as describing the specific operational functions performed. Frequently, our coalition partners do not want it to be publicly acknowledged that they participated in a specific mission, or that they captured an individual and turned the individual over to the United States for interrogation and/or detention, and disclosure of such information is likely to be viewed as a breach of the trust on which our military partnerships are based and lead to a less robust relationship in the future. The latter, in particular, could negatively impact their military at home.

15. In these detainee files, the alpha-numeric portion of the ISN for one of the individuals establishes that a coalition partner was the capturing power. This was a combined mission led by that capturing power, although the actual detaining soldier was an American as reflected in the apprehension form. Our coalition partners are aware that we classify and safeguard this information, and expect us to continue to do so long after a military operation has occurred. The passage of time since the events at issue in this litigation has not eliminated the risk of serious damage to the national security; indeed, many coalition partners continue to participate alongside the United States in ongoing military activities in Iraq and Afghanistan and continue to perform in similar roles. Thus, the unauthorized disclosure of their participation in specific events 15 years ago reasonably could be expected to undermine the willingness of foreign partners to assist the United States in the future and cause the foreign governments to distance themselves publicly from the U.S. Government or U.S. military. This could result in the withdrawal of coalition forces from current, ongoing military activities or a future unwillingness of coalition forces to participate in military operations or to turn captured individuals over to

14

United States military units for interrogations and/or detention in the future. The loss or diminution of coalition military partners and the support they provide reasonably could be expected to cause serious damage to the national security of the United States.

16. The concerns described above also require nondisclosure of the "US" where the United States was the capturing power. If DoD disclosed that the United States was the capturing power in such cases, it would be apparent by implication that a coalition partner was the capturing power in all cases where the alpha-numeric string was redacted. And because there may be other information that is publicly-available about capture locations, including information about which other nations were operating in a specific sector at a specific time, it would then be likely that the specific country involved with a particular capture could be identified. This is particularly true because there were a limited number of coalition partners operating in conjunction with the United States in the Iraq theater at any given time. For this reason, disclosure of the alpha-numeric string in cases where the United States was the capturing power also reasonably could be expected to cause the serious damage to national security described above.

## C.    Portions of Documents Created Before or After Intelligence Interrogations.

17. Disclosure of information about the selection of methods used to interrogate particular military detainees, evaluations of the effectiveness of those methods, and other judgments related to those methods, reasonably could be expected to cause serious damage to the national security of the United States. As previously noted, the intelligence interrogation of detainees is critical to the mission of collecting information from human sources. This, in turn, greatly aids in the DoD's ability to fight and win the nation's wars. In conducting these intelligence interrogations, DoD personnel seek information regarding, among other things, the

15

identities of individual terror suspects, terrorist methods of operation, and terrorist plans and

intentions with regard to U.S. military and civilian targets in the United States and abroad.

Timely collection of intelligence information from detainees is critical to the DoD's ability to

analyze, produce, and disseminate foreign and military intelligence to support national security

decision making by senior civilian and military leaders within the DoD and the United States

Government. In general, and as described more fully below, the unauthorized disclosure of

details about the selection of methods used to interrogate particular military detainees and

evaluation of the effectiveness of those methods would significantly limit the DoD's future

ability to collect actionable intelligence from detainees and, thus, reasonably could be expected

to cause serious damage to national security.[5] In some cases, information of this nature may be

sufficiently innocuous such that under the specific facts and circumstances its unauthorized

disclosure may pose no risk of damage to the national security. This is because adversaries

would be unable to derive any useful information to thwart our intelligence gathering

capabilities. The mere fact that some information has been determined to not require SECRET

classification does not necessarily mean that the unauthorized disclosure of other similar

information would not cause serious damage to the national security.[6]

---

[5] Congress has separately recognized the importance of protecting intelligence sources and methods from unauthorized disclosure. Public Law 108-458, the Intelligence Report and Terrorism Prevention Act of 2004, imposes an obligation on the Director of National Intelligence to ensure that he U.S. Intelligence Community adequately protects intelligence sources and methods from unauthorized disclosure. That requirement is now codified in 50 U.S.C. § 403-1(i), and my conclusion here that disclosure of information about intelligence methods could reasonably be expected to cause serious damage to national security is consistent with Congress's enactment of this statute.

[6] It is the role of individuals with original classification authority and other classification experts to make determinations regarding whether particular information should be classified because disclosure of that information reasonably could be expected to cause serious damage to national security. An untrained eye may look at a document released in full and see no apparent

16

18. The interrogation techniques described in the documents that are subject to this state secrets privilege assertion are still in use today. Although the United States Government has publicly disclosed the interrogation methods and approaches that it may use with detainees in general,[7] the DoD necessarily exercises a high degree of judgment in choosing which methods to use with a particular detainee, when to use a given method, how to modify an interrogation plan as the interrogation proceeds, and otherwise how best to interrogate a particular detainee. These judgments, which are extremely subjective, reflect an assessment of the detainee's background and conduct, as well as observation of the detainee while in custody. The judgments are incorporated into a written interrogation plan – that is, a plan to use certain specific methods and approaches with the detainee in specific ways and at specific times – which may be modified from time to time depending on the progress of interrogation and continued observations of the detainee. In general, disclosing the details of the decisions DoD made regarding how to interrogate a given detainee would enlighten our adversaries about the orchestration of interrogation methods, thereby increasing the likelihood of effective resistance to interrogation. For example, our adversaries could use this information to develop, and train their personnel to use, techniques that would channel DoD interrogators towards the use of a particular interrogation method. Then, knowing the likely interrogation method that would be employed, such personnel could be specifically trained in how to resist that interrogation method. Thus, although the interrogation methods themselves are unclassified, disclosure of the manner in

---

difference between it and one with portions withheld as SECRET, but an individual making such judgment may lack important context or understanding of how disclosure of the particular information could damage national security.

[7] Army Field Manual (FM) 2-22.3, Human Intelligence Collector Operations, establishes Army doctrine on approach techniques and detainee questioning and is an unclassified document for official use only.

17

which they may be applied as part of a specific detainee's interrogation plan and recommendations for future approaches based on the results of interrogations as documented in interrogation reports and interrogator notes reasonably could be expected to cause serious damage to the national security.

19. Plaintiff Al Shimari's Interrogation Plan, Interrogation Reports, and Interrogator Notes. Unlike the United States Government's general, unclassified descriptions of authorized interrogation methods, the tailored interrogation plan [Bates AS-USA-053958] actually used for a lengthy interrogation of Plaintiff Al Shimari provides a focused assessment of the approach best suited to assist the interrogators in obtaining his cooperation in responding to questions and disclosing information about subjects into which interrogators wished to inquire.[8] Disclosing this interrogation plan would reveal the subjective judgments made by the interrogation team involved in developing, using, and modifying an interrogation plan in an attempt to obtain this information from Plaintiff Al Shimari. Likewise, portions of the documents titled Summary Interrogation Reports and Interrogator Notes [AS-USA-053943, -053945, -053948, -053949, -053970, -054113, and -054122] related to interrogations of Plaintiff Al Shimari were redacted for the same reasons as his interrogation plan. These documents summarize the results of interrogations and were completed close in time to their conclusion. While these documents were not redacted in full, the portions containing interrogator notes regarding the effectiveness of the approach used, the mood of the detainee, the overall assessment of the detainee during the interrogation and recommended future approaches were redacted.

---

[8] The plan for interrogating Plaintiff Al Shimari never contemplated the use of enhanced interrogation techniques or techniques not authorized by FM 34-52.

18

20.   If our adversaries were aware of the information redacted from Plaintiff Al Shimari's interrogation plan, summary interrogation reports, and interrogator notes, they could develop strong counter-interrogation tactics and hinder our ability to gather intelligence through interrogations.  This is because disclosure of the specific circumstances in which these approaches were employed would shed light on how those approaches are chosen for a specific detainee, permitting adversaries to train their personnel how to thwart our interrogation approaches.  Such training could seriously undermine our ability to collect intelligence from detainees.  Thus, disclosure of information of this type reasonably could be expected to cause serious damage to the national security.

21.   Counterintelligence (CI) Information Reports and Interrogator Notes Related to Plaintiff Al Zubae.  Portions of three versions of the same document titled CI Information Report related to Plaintiff Al Zubae were redacted [AS-USA-054188 thru -054190, -054213 thru -054215, -054241 thru -054243].  The redactions included a specific intelligence requirement [AS-USA-054188, -054213, -054241], intelligence comments on the source [AS-USA-054189, -054214, -054242], and intelligence field comments regarding the specific information provided [AS-USA-054190, -054215, -054243].  This report is included in Plaintiff Al Zubae's detainee file because he was subsequently captured in a vehicle that coalition forces were looking for as a result of the underlying CI information report.  The unauthorized disclosure of information of this type would provide our adversaries with insight regarding how we identify and evaluate intelligence sources and information, which reasonably could be expected to cause serious damage to the national security.  Further, portions of some of the documents titled "Interrogator Notes" related to interrogations of Plaintiff Al Zubae were redacted for the same reasons previously discussed for Plaintiff Al Shimari.  These documents summarize the results of

19

interrogations and were completed close in time to their conclusion. While these documents were not redacted in full, some of the portions containing interrogator notes regarding the effectiveness of the approach used, the mood of the detainee, the overall assessment of the detainee during the interrogation, and recommendations/suggested future approaches were redacted.[9] Plaintiff Al Zubae's interrogator notes illustrate how interrogations build off previous ones with the interrogator noting what approach was utilized, how that impacted the mood/attitude of the detainee, and recommended future approaches that would work well. Each of the three interrogator notes is more detailed than the previous notes, offering additional insight into interrogation methods. As previously discussed in connection with Plaintiff Al Shimari, disclosure of this information would enlighten our adversaries about why and when a specific approach is used, thereby increasing the likelihood of them developing effective resistance techniques. Thus, the unauthorized disclosure of information of this type reasonably could be expected to cause serious damage to the national security.

22. Counter-Interrogation Techniques and Resistance Training. For the reasons already referred to above and for other reasons, disclosure of information regarding the effectiveness of interrogation techniques and methods, as well as the decisions regarding which techniques to employ while in military custody, would assist terrorist organizations, and thus could reasonably be expected to cause serious damage to the national security of the United States. At least one terrorist organization has studied and learned many counter-interrogation measures, and this organization's training has already apparently changed over time in response to the conduct of

---

[9] DoD personnel concluded that some other portions of Plaintiff Al Zubae's interrogator notes, although superficially pertaining to detainee mood and assessment, or the effectiveness and selection of approaches, were innocuous, did not need to be redacted and withheld, and would not substantially enlighten or assist our adversaries.

20

U.S. interrogations. As that terrorist organization has gained insights into the interrogation process, more recent detainees have shown that organization's ability to adopt new counter-interrogation methods. Disclosing information about specific interrogations, such as the interrogations of these detainees, could allow terrorist organizations to further modify their counter-interrogation techniques, particularly when many of the same interrogation methodologies are in use today. Disclosure of this information would provide terrorist organizations' trainers and operators extremely valuable insights into how DoD intelligence interrogators approach the subject of an interrogation on a practical level. Information of this type is contained within the interrogation plan for Al Shimari [Bates AS-USA-053958], as well as summary interrogation reports and interrogator notes for Al Shimari [AS-USA-053943, -053945, -053950, -053954, -053970, -054113, and -054122] and interrogator notes for Al Zubae [AS-USA-054169, -054175 thru -054176, -054195, -054201 thru -054202; -054224, -054230 thru -054231].

D.    **Intelligence-Gathering Sources, Efforts, and Results, Unrelated to Plaintiffs.**

23. Disclosure of specific, actionable intelligence obtained from identified detainees (other than plaintiffs) reasonably could be expected to cause serious damage to the national security of the United States. As described in paragraph 7, *supra*, two pages in Annex H, Appendix 6-A of the Jones-Fay Report contain detailed information regarding specific interrogation-based operations, including specific actionable intelligence obtained from two identified detainees (other than plaintiffs in this litigation), and other sensitive details about these detainees, their capture, and relationships with certain organizations. DoD's ability to obtain timely, actionable intelligence from those responsible for attacks against our forces is critical to our ability to deter and prevent future similar attacks. For the reasons described in paragraphs

21

17-22, *supra*, divulging the details of successful interrogations of specific detainees would provide our adversaries valuable insights into our interrogation operations and permit them to develop effective counter-interrogation techniques and train potential future detainees on those procedures. Because of the nature of these two pages, however, there are further harms that would likely occur in the event of disclosure. Our experience in military and intelligence operations indicates that it is likely that our adversaries would attempt to retaliate against a former detainee who is identified as having provided valuable, actionable information to our intelligence collectors. Such retaliation may occur not only for the purpose of retribution, but also in order to make an example of any detainee who provides information to our intelligence collectors.[10] Such acts of reprisal would undoubtedly further deter future detainees from providing information, hampering our human intelligence collection operations. Accordingly, I have concluded that the release of the portions of the two pages from Annex H, Appendix 6, Tab A of the Jones-Fay Report that contain this information – which, again, is unrelated to any of the plaintiffs – reasonably could be expected to cause serious damage to national security.

24. Disclosure of the limited withheld portions of the "concept brief" for interrogation operations in Iraq also reasonably could be expected to cause serious damage to the national security of the United States. As set forth in paragraph 8, *supra*, information has been withheld from four of the 27 pages of the briefing. This information relates to a non-DoD intelligence

---

[10] In light of the affirmative steps to bring this litigation taken by the plaintiffs (thereby exposing their identities as detainees), the allegations set forth in their complaint, and the relatively unremarkable nature of plaintiffs' information, it is DoD's experience and predictive judgment that it is unlikely that they will face retaliation for any intelligence they provided to our intelligence collectors, and thus, that there is no serious risk of harm to national security from disclosing the detainees' statements during their detention, including, for example, plaintiff Al Zubae's forewarning of a rumored attack on American forces and identification of individuals who may be involved. *See, e.g.*, AS-USA-054189 thru AS-USA-054190.

22

source and a proposal for integrating this source into overall interrogation processes in Iraq. Safeguarding DoD's intelligence activities and methodologies, including if, when, and how non-DoD actors may be integrated into DoD operations, is of paramount importance in preserving the integrity and effectiveness of the overall human intelligence collection efforts. In order to avoid undermining the activities of non-DoD actors, DoD employs all available measures to ensure that the identity of non-DoD intelligence sources is not disclosed without specific authorization. Unauthorized disclosure of such information is reasonably likely to thwart the independent activities of non-DoD actors and reduce their willingness to participate in coordinated endeavors with DoD.

25. I do not make this assertion of the state secrets privilege lightly. I have attempted to limit the scope of the privilege asserted, consistent with my responsibilities to protect classified information and comply with the Attorney General's guidance. See Attorney General's September 23, 2009 Memorandum on Policies and Procedures Governing Invocation of the State Secrets Privilege.

26. I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this ___9TH day of November 2018.

James N. Mattis
Secretary of Defense

23