# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | |
|---|---|
| SUHAIL NAJIM ABDULLAH AL SHIMARI *et al*., | ) ) ) |
| Plaintiffs, | ) ) ) |
| *v.* | ) ) ) |
| CACI PREMIER TECHNOLOGY, INC. | ) ) ) |
| Defendant. | ) ) ) ) |
| CACI PREMIER TECHNOLOGY, INC., | ) ) |
| Third-Party Plaintiff, | ) ) ) |
| v. | ) ) |
| UNITED STATES OF AMERICA, and JOHN DOES 1-60, | ) ) ) ) |
| Third-Party Defendants. | ) ) ) |

Case No. 1:08-cv-827 (LMB/JFA)

**PUBLIC VERSION**

## PLAINTIFFS' OPPOSITION TO DEFENDANT CACI PREMIER TECHNOLOGY, INC.'S MOTION FOR SUMMARY JUDGMENT

10768062

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT .........................................................................................1

STATEMENT OF MATERIAL FACTS .............................................................................2

    A.    Parties ..................................................................................................................2

    B.    Detentions At Abu Ghraib .................................................................................3

    C.    Abuse Suffered By Plaintiffs ............................................................................3

    D.    Direct Connections Between CACI Interrogators And Plaintiffs .......................4

    E.    Government Investigations Found CACI Employees Complicit In Abuse ............6

    F.    CACI Employees Conspired In And Aided And Abetted The Harms
        Suffered By Plaintiffs .....................................................................................10

    G.    CACI Controlled Its Employees And Maintained Discretion To Conduct
        Formal Interrogations .....................................................................................12

    H.    CACI's Knowledge And Cover Up Of Abuse ................................................15

    I.    CACI Rewarded Abusive Interrogators ..........................................................17

PLAINTIFFS' RESPONSE TO DEFENDANT'S STATEMENT OF ALLEGED
MATERIAL UNDISPUTED FACTS ...............................................................................17

LEGAL STANDARD .......................................................................................................21

ARGUMENT ....................................................................................................................22

I.    THE RECORD EVIDENCE FORECLOSES SUMMARY JUDGMENT ON
    PLAINTIFFS' CONSPIRACY CLAIMS ...............................................................22

    A.    The Record Evidence Shows The Conspiracy ................................................23

    B.    The Law Of The Case Forecloses CACI's Other Arguments .........................26

II.    THE RECORD EVIDENCE FORECLOSES SUMMARY JUDGMENT ON
    PLAINTIFFS' AIDING AND ABETTING CLAIMS ............................................29

III.    *RESPONDEAT SUPERIOR* LIABILITY IS AVAILABLE .....................................30

    A.    CACI Is Liable For The Acts Of Its Employees And Their Co-
        Conspirators ...................................................................................................31

    B.    The Borrowed Servant Doctrine Is Not Applicable Here ...............................31

IV.    PLAINTIFFS' CLAIMS ARE NOT PREEMPTED .............................................33

CONCLUSION ..................................................................................................................34

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adickes v. S.H. Kress & Co.*,
  398 U.S. 144 (1970) ................................................................................................................25

*Al Shimari v. CACI Premier Tech., Inc.*,
  300 F. Supp. 3d 758 (E.D. Va. 2018) ............................................................................ *passim*

*Al Shimari v. CACI Premier Tech., Inc.*,
  320 F. Supp. 3d 781 (E.D. Va. 2018) ......................................................................................33

*Al Shimari v. CACI Premier Tech., Inc.*,
  758 F.3d 516 (4th Cir. 2014) .....................................................................................................1

*Al Shimari v. CACI Premier Tech., Inc.*,
  840 F.3d 147 (4th Cir. 2016) .....................................................................................1, 26, 34

*Am. Canoe Ass'n v. Murphy Farms, Inc.*,
  326 F.3d 505 (4th Cir. 2003) ...................................................................................................27

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................................................................22

*In re Apex Express Corp.*,
  190 F.3d 624 (4th Cir. 1999) ...................................................................................................22

*Aziz v. Alcolac, Inc.*,
  658 F.3d 388 (4th Cir. 2011) ............................................................................................28, 29

*Bailey v. Allegheny Energy Serv. Corp.*,
  2009 U.S. Dist. LEXIS 140038 (S.D.W. Va. Mar. 11, 2009) ................................................32

*Cabello v. Fernandez-Larios*,
  402 F.3d 1148 (11th Cir. 2005) .........................................................................................22, 33

*Carlson v. Boston Sci. Corp.*,
  856 F.3d 320 (4th Cir. 2017) ............................................................................................26, 33

*Doe v. Nestlé, S.A.*,
  766 F.3d 1013 (9th Cir. 2014) .................................................................................................28

*Flomo v. Firestone Natural Rubber Co, LLC*,
  643 F.3d 1013 (7th Cir. 2011) .................................................................................................28

10768062

## TABLE OF AUTHORITIES
## (CONTINUED)

**Page(s)**

*In re French*,
499 F.3d 345 (4th Cir. 2007) ...........................................................................................21, 22

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983) ................................................................................................28

*Hamdan v. Rumsfeld*,
548 U.S. 557 (2006)................................................................................................................28

*Jesner v. Arab Bank*,
138 S. Ct. 1386 (2018)............................................................................................................33

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
582 F.3d 244 (2d Cir. 2009)...............................................................................................27, 28

*Prosecutor v. Tadić*,
Case No. IT-94-1-A (ICTY App. Chamber, July 15, 1999) ....................................................28

*Prosecutor v. Sainovic*,
Case No. IT-05-87-A (ICTY App. Chamber, Jan. 23, 2014) ..................................................29

*In re S. African Apartheid Litig.*,
617 F. Supp. 2d 228 (S.D.N.Y. 2009).....................................................................................28

*Saleh v. Titan Corp.*,
580 F.3d 1 (D.C. Cir. 2009) ....................................................................................................34

*Tysons Toyota v. Globe Life Ins. Co.*,
1994 U.S. App. LEXIS 36692 (4th Cir. Dec. 29, 1994).........................................................23

*U.S. Vinyl Mfg. Corp. v. Colour & Design, Inc.*,
32 F. Supp. 3d 1253, 1262–65 (N.D. Ga. 2013) ....................................................................32

*United States v. Harris*,
433 F.2d 333 (4th Cir. 1970) ..................................................................................................23

*White v. Bethlehem Steel Corp.*,
222 F.3d 146 (4th Cir. 2000) ..................................................................................................32

**Statutes**

Rome Statute, Art. 25(3)(d) .....................................................................................................29

**Other Authorities**

RESTATEMENT (THIRD) OF AGENCY § 7.03, comment d(2) .........................................................32

iii

Suhail Al Shimari, Taha Arraq Rashid, Asa'ad Al-Zuba'e, and Salah Hasan Al-Ejaili

("Plaintiffs") respectfully submit this opposition to the motion for summary judgment filed by

Defendant CACI Premier Technology, Inc. ("CACI").  (Dkt. 1033.)

## PRELIMINARY STATEMENT

This Court and the Fourth Circuit are well aware of the long procedural history of this

case and the factual basis that forms Plaintiffs' claims against CACI.  *See Al Shimari v. CACI*

*Premier Tech., Inc.*, 758 F.3d 516, 521–24 (4th Cir. 2014) (detailing factual allegations

supporting conspiracy and aiding and abetting claims); *Al Shimari v. CACI Premier Tech., Inc.*,

840 F.3d 147, 152–54 (4th Cir. 2016) (same); *Al Shimari v. CACI Premier Tech., Inc.*, 300 F.

Supp. 3d 758, 763–71 (E.D. Va. 2018) (same).  Indeed, this Court has already held that

Plaintiffs' "substantial factual allegations" support an inference of a conspiratorial agreement

between CACI employees and military personnel to abuse detainees, *Al Shimari*, 300 F. Supp. 3d

at 782–84; *see also id.* at 786 (same for aiding and abetting theory), and that the abuse Plaintiffs

Al Shimari, Al Zuba'e, and Al Ejaili suffered as a result rose to the legal definition of torture,

war crimes, and cruel, inhuman, and degrading treatment.  *See id.* at 779–81.

CACI ignores that the evidence Plaintiffs have marshalled in this case is essentially

identical to those allegations this Court has found sufficient to state a claim.  Because Plaintiffs'

allegations were sufficient to show Plaintiffs have stated a claim for relief, it therefore follows

that the *evidence* supporting those allegations is sufficient to show CACI is not entitled to

judgment as a matter of law, *i.e.*, that a reasonable jury can find in Plaintiffs' favor.  To the

extent CACI points to evidence stemming from discovery following this Court's ruling, it only

raises issues of fact that are disputed and must go to a jury.

1

Thus, CACI is left seeking to re-litigate legal questions regarding accessory liability and preemption that this Court has already resolved in Plaintiffs' favor under still-governing law and which are accordingly final as "law of the case"—a standard CACI does not even bother to address, let alone overcome.  And, given the parallelism between the allegations the Court found sufficient to state a claim and the corresponding, supporting evidence Plaintiffs have marshalled, CACI simply ignores a mountain of obviously relevant evidence, including the government investigations that document CACI's involvement in the abuse at Abu Ghraib and the testimony of CACI co-conspirators that CACI interrogators directed them to abuse detainees.

**STATEMENT OF MATERIAL FACTS**

Mindful of the Court's instruction not "to rehash the whole history of the case," Plaintiffs have been judicious in their citations to the record.  For a fuller recitation, Plaintiffs refer the Court to their prior briefing.  (*See* Dkts. 639, at 3–16; 639-1; and 639-2 (on Plaintiffs' abuse and interactions with CACI and co-conspirators); Dkts. 527, 528 (on "command and control"); Ex. 1 (Dkt. 50, 4th Cir., Case No. 15-1831) at 9–25 (same).)

**A.  Parties**

1.      Plaintiffs are four Iraqi civilians who were tortured and otherwise seriously abused while detained at Abu Ghraib prison in Tier 1A, before their eventual release without charge.  (*See, e.g.*, Ex. 2 at 15:13–18:16;  Ex. 3 at 106:3–6; Ex. 5 at 49:7–8; Ex. 9 at No. 3.)

2.      CACI, a wholly-owned subsidiary of the publicly-traded corporation CACI International Inc., is a Delaware corporation with its principal place of business at 1100 North Glebe Road, Arlington, Virginia 22201.  (Dkt. 968 ¶ 22.)

2

**B.  Detentions At Abu Ghraib**

3.      In 2003, in an attempt to control the insurgency in Iraq, the United States apprehended large numbers of Iraqi civilians, often with little or no reason to suspect their involvement in hostile activity.  (*See, e.g.*, Ex. 28 at AS-USA-5255 to 57.)  Plaintiffs are among those Iraqis who were detained as a result of this effort.  (*See, e.g.*, Exs. 7–10 at Nos. 3; Ex. 2 at 22:20–23:5; Ex. 3 at 106:3–13; Ex. 4 at 20:3–28:14; Ex. 5 at 49:2–52:16.)

4.      Plaintiffs were imprisoned in Tier 1A of the "Hard Site" at Abu Ghraib.  (Dkt. 968 ¶¶ 6, 10, 14, 19.)  Detainees believed to have intelligence value were held in Tier 1A at the Hard Site.  (*Id.* ¶ 4.)  ███████████████████████████████████ ████████████████████████████████████  (Ex. 11.)  The January 23, 2004 JIDC Organizational Chart shows that CACI supplied 32 employees, with CACI employees assigned to 15 interrogation cells.  (Dkt. 665, CACI Answer ¶ 16.)

**C.  Abuse Suffered By Plaintiffs**

5.      While imprisoned in Tier 1A of the Hard Site, Plaintiffs suffered the following forms of abuse, among others:

- stress positions (*see, e.g.*, Ex. 2 at 54:19–21, 55:6–22, 56:13–19, 57:6–8, 57:15–18; Ex. 3 at 61:13–18, 64:21–65:2, 217:16–218:9; Ex. 4 at 78:5–79:9, 81:12–83:21, 102:8–103:14);

- isolation (*see, e.g.*, Ex. 2 at 122:1–21);

- sleep deprivation (*see, e.g.*, Ex. 3 at 71:1–20);

- sensory deprivation (*see, e.g.*, Ex. 3 at 101:11–102:1, 218:3–9);

- beatings and other physical abuse (*see, e.g.*, Ex. 2 at 43:10–44:2, 48:6–19, 58:3–7, 119:1–22; Ex. 3 at 74:1–10, 79:4–16; Ex. 4 at 52:14–53:3, 58:13–59:10, 106:9–108:8, 133:8–135:1, 139:15–19; Ex. 5 at 85:16–19, 100:3–6, 101:1–4);

- forcible removal of clothing (*see, e.g.*, Ex. 2 at 38:13–40:19; Ex. 3 at 51:22–52:10, 54:13–17, 56:11–21; Ex. 4 at 57:19–58:3);

- kept naked for extended periods of time (*see, e.g.*, Ex. 3 at 58:3–18, 69:7–16; Ex.4 at 63:20–65:13; Ex. 5 at 71:10–12, 85:12–14);

- subjected to hot or cold temperatures, including cold water poured on them while naked (*see, e.g.*, Ex. 2 at 68:20–22, 69:8–18, 72:1–2; Ex. 3 at 100:20–21, 200:16–20; Ex. 4 at 54:13–55:17, 55:20–56:20, 94:1–96:16);

- sexual assault, including forced masturbation (*see, e.g.*, Ex. 2 at 105:4–108:2, 125:5–126:10; Ex. 3 at 65:6–12; Ex. 4 at 33:18–21, 35:10–37:5, 46:4–5; Ex. 5 at 86:4–10, 87:5–11, 89:6–13, 93:17–19);

- humiliation, including forced shaving of facial hair and forced wearing of female underwear (*see, e.g.*, Ex. 2 at 67:19–68:7, 67:12–20, 70:2–9; Ex. 3 at 69:7–16);

- forced into a naked "pyramid" of detainees (*see* Ex. 5 at 118:1–18);

- threatened with a gun (*see* Ex. 5 at 80:7–19);

- threatened with dogs (*see, e.g.*, Ex. 2 at 63:2–64:15, 66:1–14, 77:16–78:6; Ex. 3 at 201:16–202:13; Ex. 4 at 61:13–22);

- at one point during his detention, Plaintiff Rashid was hidden from the Red Cross because he was severely injured (Ex. 5 at 120:1–14);

- all Plaintiffs suffered and continue to suffer physically and mentally (*see, e.g.*, Ex. 2 at 91:20–93:19; 95:19–22; Ex. 3 at 208:2–22, 212:18–214:8; 220:12–20; Ex. 5 at 140:7–13, 142:8–13; Ex. 12 at 8–9, 11; Ex. 13 at 4–7; Ex. 14 at 4–7; Ex. 15 at 8–10).

While CACI elicited testimony from various interpreters and interrogators that ██████████ ████████████████████████████, CACI has elicited no evidence to controvert Plaintiffs' allegations of how they were abused outside their formal interrogations.

### D.  Direct Connections Between CACI Interrogators And Plaintiffs



6.  ███████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████(  *E.g.*, Ex. 16 at 53:10–11.) █████████████████████

████████████[1]  (Ex. 22.)

----

[1] ██████████████████████(Ex. 17.) █████████████████████████
████████████████████████████(Ex. 18 ("████████████

10768062

7.       ██████████████████████████████████████

████████████████████████████  (Ex. 23 at 18:8–20:5.)

8.       CACI interrogator ██████ saw Mr. Al Ejaili naked in his cell and at that moment appeared to direct the military police in their abusive treatment towards him.  (Ex. 3 at 199:5–200:6.)

9.       Mr. Al Ejaili was abused by CACI's co-conspirators, at least twice by then-Cpl. Charles Graner and at least once by then-Sgt. Ivan Frederick II.  (Ex. 3 at 61:13–18, 63:2–65:16, 68:2–18, 69:2–16, 80:1–82:21, 89:9–15, 207:2–22, 217:16–219:13.)

10.      Plaintiffs Al-Zuba'e and Al Shimari testified that they were interrogated by civilians.  (Ex. 4 at 67:19–71:5, 104:20–105:17; Ex. 2 at  45:17–46:13, 50:3–17, 120:20–121:1.)

██████████████████████████████████████

██████████  (Ex. 24 at AS-USA-000286.)  ████████████████████

██████████████████████  (Ex. 25 at No. 3.)

11.      On December 23, 2003, "CACI Interrogator G" interrogated Plaintiff Al-Zuba'e.[2] (Dkt. 968 ¶ 18.)

12.      ██████████████████████████████████████

████████  (Ex. 26 at 121:15–122:1.)

---

████████████████████████████████████████

████████████████████████████████"); Ex. 19 (████████████

████████████).

██████████  (Ex. 20.)

████████████  (Ex. 21.)

[2] The deposition of "CACI Interrogator G" has yet to be taken and Plaintiffs reserve the right to supplement their brief after that deposition has occurred.

**E.   Government Investigations Found CACI Employees Complicit In Abuse**

13.    In January 2004, the Army appointed Major General (MG) Taguba to inquire "into all facts and circumstances surrounding . . . allegations of detainee abuse at Abu Ghraib." (Ex. 27 at AS-USA-07230.)   The Taguba Report concluded that between October and December 2003, "numerous incidents of sadistic, blatant, and wanton criminal abuses were inflicted on several detainees" at Abu Ghraib prison.  (*Id.* at AS-USA-007255.)

14.    In March 2004, Lieutenant General ("LTG") Ricardo S. Sanchez appointed MG George R. Fay "to investigate allegations that members of the 205th Military Intelligence Brigade (205 MI BDE) [in which CACI interrogators were employed] were involved in detainee abuse at the Abu Ghraib Detention Facility."  (Ex. 28 at AS-USA-005242.)  In June 2004, LTG Anthony R. Jones was appointed as an additional Procedure 15 investigating officer (MG Fay still remained as an investigating officer).  (*Id.*)

15.    Both of the investigation teams "conducted a comprehensive and exhaustive review of available background documents and statements" (*id.* at AS-USA-005280) and interviewed numerous witnesses under oath.  (*Id.*; Ex. 27 at AS-USA-007273 to 75.)  Both the Taguba and Fay teams interviewed MPs and Military Intelligence personnel ("MI").

16.    The Taguba Report included the following findings:

> Lack of clear understanding of the command structure led to insufficient control and oversight of detainee operations at Abu Ghraib (BCCF).  The command and supervisory presence within the facility was non-existent due to the weak and ineffective leadership . . . . These leadership failures resulted in an environment that allowed those criminally culpable of the abuse to feel that they had free rein in their treatment of detainees.

(*Id.* at AS-USA-0007230.)

17.    The Taguba Report found that, although MPs were not supposed "to set conditions for detainees for subsequent MI interrogations," "it is obvious from a review of

6

comprehensive CID interviews of suspects and witnesses that this was done at lower levels."

(*Id.* at AS-USA-007251.)

18.     This was at least partly due to "no clear delineation of responsibility between [MI and MP] commands, little coordination at the command level, and no integration of the two functions."  (*Id.* at AS-USA-007277.)  This allowed "[c]oordination [to] occur[] at the lowest possible levels with little oversight by commanders."  (*Id.*)

19.     CACI interrogators and soldiers alike understood that "softening up" and "special treatment" for interrogations equated to serious physical abuse and mental harm in an attempt to make detainees more responsive to questioning.  (*See, e.g.*, *id.* at AS-USA-007287; *see also* Ex. 39 at 170:12–15, 175:15–21; Ex. 6 at 156:14–19.)

20.     Regarding abuse, MG Taguba found that the following acts occurred, among others:

- Punching, slapping, and kicking detainees;
- Jumping on their naked feet;
- Videotaping and photographing naked male and female detainees;
- Forcibly arranging detainees in various sexually explicit positions for photographing;
- Forcing detainees to remove their clothing and keeping them naked for several days at a time;
- Forcing naked male detainees to wear women's underwear;
- Forcing groups of male detainees to masturbate themselves while being photographed and videotaped;
- Arranging naked male detainees in a pile and then jumping on them;
- Using military working dogs (without muzzles) to intimidate and frighten detainees, and in at least one case biting and severely injuring a detainee;
- Threatening detainees with a charged 9mm pistol;
- Pouring cold water on naked detainees; and
- Beating detainees with a broom handle and a chair.

(Ex. 27 at AS-USA-007255 to 57.)  These acts of abuse were often documented in photos, including a photo of Plaintiff Al Ejaili standing or kneeling in front of a pool of his own vomit.

(Ex. 29.)

21.      ████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

██████████████████████ (Ex. 30 at AS-USA-036168.)

22.      Exactly as Plaintiff Rashid described, the Taguba Report found that some detainees were "moved around within the facility to hide them from a visiting International Committee of the Red Cross . . . survey team.  This maneuver was deceptive, contrary to Army Doctrine, and in violation of international law."  (Ex. 27 at AS-USA-007266.)

23.      The Taguba Report concluded that CACI interrogator Steven Stefanowicz "[a]llowed and/or instructed MPs, who were not trained in interrogation techniques, to facilitate interrogations by 'setting conditions' which were neither authorized [nor] in accordance with applicable regulations/policy.  He clearly knew his instructions equated to physical abuse."  (*Id.* at AS-USA-0007287.)

24.      The Taguba Report also found that ████████████ and ██████████████ were "ringleaders" of abuse who "collaborated with other MP Soldiers and several unknown MI personnel, to include Soldiers *as well as their U.S. civilian contract interrogators* and interpreters. . . .  In fact, the MI unit seemed to be operating in a conspiracy of silence."  (Ex. 31 at 2 (emphasis added).)[3]

25.      The Fay/Jones Report found that "abuses occurred at the prison at Abu Ghraib," with abuses "defined as treatment of detainees that violated U.S. criminal law or international

---

[3] These findings were included in an Annex prepared by Colonel Henry Nelson, a psychiatrist who served on MG Taguba's investigative team. █████████████████████████████████ █████████████████ (Ex. 32 at 123:12–124:22.)

law or treatment that was inhumane or coercive without lawful justification." (Ex. 28 at AS-USA-005243 to 44.)

26.     The Fay/Jones Report found that "[m]ost, though not all, of the violent or sexual abuse occurred separately from scheduled interrogations." (*Id.*) "MI solicitation of MP abuse included the use of isolation with sensory deprivation, removal of clothing and humiliation, the use of dogs as an interrogation tool to induce fear, and physical abuse." (*Id.* at AS-USA-005281.)

27.     The Fay/Jones Report found an "apparent lack of understanding of the appropriate relationship between contractor personnel, government civilian employees, and military personnel." (*Id.* at AS-USA-005325.)

28.     The Fay/Jones Report found that 27 MI "requested, encouraged, condoned or solicited [MPs] to abuse detainees and/or participated in detainee abuse and/or violated established interrogation procedures and applicable laws and regulations during interrogation operations at Abu Ghraib." (*Id.* at AS-USA-005244.) Ultimately, the Report found that "[f]ifty-four (54) MI, MP, [] Medical Soldiers, and civilian contractors . . . have some degree of responsibility or complicity in the abuses that occurred at Abu Ghraib." (*Id.* at AS-USA-005281 to 82.)

29.     Among those 54 were at least three CACI employees—Steven Stefanowicz, Daniel Johnson, and Tim Dugan—whom the Fay/Jones Report explicitly cites for abusive behavior.[4] (*Id.* at AS-USA-005404 to 08.) For example, Johnson placed a prisoner in an "unauthorized" stress position, used military dogs in a manner that was "clearly abusive and unauthorized," and "encouraged SSG Frederick to abuse Iraqi Police." (*Id.* at AS-USA-005406.)

---

[4] *See* Ex. 70 at Nos. 23–25 (admitting that "CIVILIAN-05" in the Fay/Jones Report is Tim Dugan, "CIVILIAN-11" is Daniel Johnson, and "CIVILIAN-21" is Steve Stefanowicz).

Stefanowicz "[i]nappropriately use[d] dogs," "abuse[d]" at least one detainee, "[f]ailed to report detainee abuse," and engaged in "[d]etainee [h]umiliation." (*Id.* at AS-USA-005408.) And Dugan grabbed a handcuffed detainee "off a vehicle and dropped him to the ground" then "dragged him into an interrogation booth" and, "as the detainee tried to get up," Dugan "would yank the detainee very hard [to] make him fall again." (*Id.* at AS-USA-005404 to 05.)

**F.   CACI Employees Conspired In And Aided And Abetted The Harms Suffered By Plaintiffs**

30.    CACI provided interrogation services under two delivery orders, Delivery Order 35 ("DO 35") and Delivery Order 71 ("DO 71"), ███████████████████████. (*See* Ex. 33 at CACI 0005; Ex. 34 at CACI 0051.)  These delivery orders were issued and administered by the Department of the Interior.  (Dkt. 968 ¶ 26.)  Pursuant to these delivery orders, CACI interrogators and screeners began arriving in Iraq on or about September 28, 2003. (*Id.* ¶ 27.)

31.    At the Hard Site, MPs guarded the detainees and CACI and other MI conducted interrogations.  (Ex. 28 at AS-USA-005259.)  The military police guarding detainees in Tier 1 were under the command of then-Sgt. Ivan Frederick.  (*See, e.g.*, Ex. 36 at 165:22–25.)

32.    ████████████████████████████████████████ ███████, (Ex. 35 at 141:18–143:6), ███████████████████ (*Id.* at 325:12–22, 161:16–162:4.)  Many of the abuses at Abu Ghraib occurred outside these formal interrogation sessions, at night and frequently in the detention blocks.  (*E.g.*, Ex. 28 at AS-USA-005263.)

33.    Two of CACI's co-conspirators, then-Cpl. Graner and then-Sgt. Frederick II testified that ████████████████████████. Frederick testified that ██████████████ ████████████████████████████████████████. (Ex. 36 at 71:11–

82:9, 84:6–85:8, 90:19–92:24.)  Graner testified that ██████████████████████

██████████████████████████████ (Ex. 37 at 24:5–25:11, 35:17–38:12, 49:22–

50:11.)  Other MPs testified that ████████████████████████████████████

████████████████████████████████████████ (Ex. 38 at

20:10–16, 21:4–10, 23:20–24.)  Both Frederick and Graner were court martialed for their

participation in detainee abuse and sentenced to eight and ten years of imprisonment,

respectively.

     34.    Both Frederick and Graner testified ██████████████████

████████████████████████████████████████

██████ ( *Compare, e.g.*, Ex. 36 at 158:20–159:15 (████████████████████

████████████████ ), 164:19–165:4 (██████████), and Ex. 37 at 53:7–9 (██████████),

43:12–44:19 (████████████████████████████████████ ), *with, e.g.*, Ex. 3 at 62:2–

65:16, 68:2–18, 81:18–83:11, 89:9–92:19, 101:5–103:3.)

     35.    CACI interrogators understood that ██████████████████████

████████████████████████████. (Ex. 16 at 154:16–17 (" ██████████████████

██████████████████████████ "); Ex. 39 at 137:2–6 (" ████████████████

████████████████████████████████████████

████████████████████████████████ ").) ██████████████████

████████████████████████████████████████

██████████████████ (Ex. 39 at 170:12–15, 175:15–21; Ex. 6 at 156:14–19.)

     36.    Plaintiff Al Shimari testified that most of his beatings occurred before or after

interrogations.  (Ex. 2 at 97:11–20, 103:19–104:19, 105:4–11; *see also* Ex. 5 at 86:4–10, 97:5–

11, 100:3–6, 102:1–7; Dkt. 639, at 8–10 (Al-Zuba'e); *id.* at 4–5 (Al Ejaili)).

### G. CACI Controlled Its Employees And Maintained Discretion To Conduct Formal Interrogations

37.     The Statement of Work between CACI and the Government required ███



███████████████████████████████████████████████████████████

█████████████████████████████████████████████████ (Ex. 33

at 7 ¶¶ 3, 5.) ██████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████ ( *Id.*; Ex. 34 at 5 ¶ 4.a.)

38.     Governing military operations also dictated that CACI control its interrogators. The Army Field Manual stated, "Commanders do not have direct control over contractors of their employees . . . ; only contractors manage, supervise, and give directions to their employees."  (Ex. 40 ¶¶ 1–22; *id.* ¶¶ 4–19 ("[T]he contractor is solely responsible to manage its employees and operations[.]").)

39.     CACI interrogators were not subject to military discipline or the chain of command:

> Contract employees are disciplined by the contractor through the terms of the employee and employer relationship. . . . Commanders have no penal authority to compel contractor personnel to perform their duties or to punish any acts of misconduct.



(Ex. 41 ¶ 15.) █████████████████████████████ (Ex. 35 at 185:1–14.) ███

███████████████████████████████████████████████████

███████████████████████████████████ ( *Id.* at 142:23–144:6; Ex. 42 at 182:4–12; Ex. 43 at 172:12–174:6, 185:6–17, 223:3–224:22; Ex. 44 at 50:4–11, 88:13–17.)

40.     ███████████████████████████████████████████████

███████████████████████████████████████████ (Ex. 43 at

106:2–107:6, 180:22–181:12, 183:9–185:4; Ex. 35 at 142:23–144:6, 151:23–152:13, 164:7–22.)



(Ex. 35 at 157:2–158:19.)

( *Id.* at 161:4–14, 164:7–22, 325:12–327:4.)

41.

(Ex. 45 at 64:20–65:24, 90:6–93:23.)

(Ex. 35 at 192:15–193:3; Ex. 46 at 7–8.)

42.

(Ex. 43 at 178:13–14; Ex. 35 at 234:12–235:21 ("

); Ex. 44 at 48:23–49:7.)

(Ex. 45 at 67:3–9, 117:9–19; Ex. 35 at 90:18–93:23, 101:15–102:14, 109:19–110:6.)

(Ex. 43 at 67:2–24, 78:5–79:1, 178:11–18; Ex. 44 at 117:9–118:7.)

(Ex.

43 at 188.) 

(Ex. 42 at 188:15–22.)

43. 

(Ex. 43 at 90:14–19.)

( *Id.* at 200:16–204:14.)

(Ex. 47 at 54:7–62:3.)

(Ex. 43 at 200:16–204:14.)

44. 

(Ex. 48 ¶¶ 5–8.)

(Ex. 49 at 70:11–14.)

( *Id.* at 100:22–101:15.)

45. 

(Ex. 51; Ex. 20 at AS-USA-005314.)

14



(Ex. 49 at 62:1–63:24, 100:22–101:13.)

46. ████████████████████████████████████

████████████████████████████████████ (Ex. 52 at

50:20–51:15.)  That testimony contradicts the Pappas declaration relied on by CACI in support

of its present motion.

47. ████████████████████████████████████

████████████████████████████████████

████████████ (Ex. 49 at 25:7–10, 62:1–16.)  That testimony contradicts the Brady

declaration relied on by CACI in support of its present motion.[5]

48.     The Fay/Jones Report concluded that "the delineation of responsibilities [was]

blurred when military police Soldiers, untrained in interrogation operations, were used to enable

interrogations."  (Ex. 28 at AS-USA-005259.)

49.     A military analyst at Abu Ghraib testified that "████████████████████

████████████████████████████████████"  (Ex. 50 at

36:16–37:10.)

**H.  CACI's Knowledge And Cover Up Of Abuse**

50. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████.  (Ex. 54.)  ████████████████████

---

[5] The government, acting pursuant to its *Touhy* regulations, prohibited Cols. Pappas and Brady from being deposed, but granted CACI *ex parte* access to them in order to obtain their declarations.  (Ex. 53.)



██████████████████████████████████████████████████

████████████████████ (Ex. 45 at 144:17–185:21.)

51.   ██████████████████████████████████████

██████████████████████████████████████████

███████████████████ (Ex. 47 at 54:7-62:3.) ████████████

████████████████████████████████████████

█████ (Ex. 55.) ████████████████████████████

████████████ (Ex. 47 at 54:7-62:3.) ██████████████████

███████████████████████████████████████

███████████████ (Ex. 56; Ex. 42 at 185:20–189:11.)

52.   ██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

(Ex. 57.) ███████████████████████████████

████████████████████████ ( *Id.*) ██████████████

██████████████████████████ (Ex. 71) ███████

█████████████████████████████████████████████

█████ (Ex. 58.) ████████████████████████████

███████████████ (Ex. 59.) █████████████████████

██████████████████████ (Ex. 43 at 222:5–20.)

**I.   CACI Rewarded Abusive Interrogators**

53.   ███████████████████████████████████

████████████████████████████████████████

████████████████ (Ex. 60.)

54.   ███████████████████████████ █████████

████████████████████████████████████

██████████████████ (Ex. 42 at 79:19–81:15; Ex. 45 at 68:21–69:8.)

████████████████████████████████████

(Ex. 35 at 155:4–15.) ████████████████████████████

████████████████████████████████████

████████ (Ex. 21; Ex. 63.) ████████████████████████████

███████████████████████████████

██████████████ (Ex. 64; Ex. 60; Ex. 65; Ex. 66; Ex. 16 at 153:10–154:9.)

55.   ██████████████████ (Ex. 67.) ███████████████

██████████████████ (Ex. 68 at CACI 6311), █████████████

████████████████████████████████ (Ex. 69 at CACI

12688.)

## PLAINTIFFS' RESPONSE TO DEFENDANT'S STATEMENT OF ALLEGED MATERIAL UNDISPUTED FACTS

As the previous recitation of material facts indicates, Plaintiffs contest many of the

alleged facts asserted by Defendant.

---

6 ███████████████████████████████████████

██████████████████████████████████████

███████████████████████ (Ex. 61; *see also* Ex. 62.)

1.      Admit.

2.      Admit, but contest whether this is material to a decision on summary judgment. *See infra* pp. 25–26.

3.      Deny on the grounds that the Tiger Team leader assigned to Plaintiff Rashid was a CACI employee.  (*See* Statement of Material Facts ("SMF") ¶ 12.)[7]

4.      Admit, but contest whether this is material to a decision on summary judgment. *See infra* pp. 25–26.

5.      Deny on the grounds that ███████████████████████████████████ ███████████████.  (*See* SMF ¶ 12.)

6.      Army Interrogator H testified that ████████████████████████████ ██████████████████████████████  (*See* SMF ¶ 12.)  Deny that Army Interrogator H testified that ███████████████████████████████████████████████████ ████████████████████████████████████  (CACI Ex. 6 at 145:8–16.)  Admit that Army Interrogator H testified to the remaining facts in paragraph 6, but contest whether they are material to a decision on summary judgment.  *See infra* p. 26; SMF ¶ 5, 13–36.

7.      Admit that Army Interrogator I so testified, but contest whether it is material to a decision on summary judgment.  *See infra* p. 26; SMF ¶ 5–36.

8.      Admit.

9.      Admit that the quote is accurate, but deny that Al Ejaili has no knowledge of his contact with CACI interrogators.  (*See* SMF ¶¶ 7–8.)

10.     Admit that the quotes are accurate, but deny that Al Ejaili has no knowledge of his contact with CACI interrogators.  (*See* SMF ¶¶ 7–8.)

---

[7] Citations to the Statement of Material Facts include the exhibits cited therein.

11.     The United States' records do not have a "formally document[ed]" interrogation

of Al Ejaili, but Beachner testified that ████████████████████████████████████████

(SMF ¶ 7), and so Plaintiffs deny CACI's characterization of facts on that basis.

12.     Admit that Beachner testified that ████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████ ( *See* SMF

¶ 7.)  Deny CACI's remaining characterizations of Beachner's testimony, including that

Beachner testified that ████████████████████████████████████████████████████████

██████████████████████████████████████████ ( *See* CACI Ex. 14 at 16; Ex. 8 at

30–31; Ex. 15 at 2.)  Furthermore, CACI interrogators ██████████████████████████████

████████████████, and that likewise applies to Al Ejaili's treatment while imprisoned in Tier

1A. (*See, e.g.*, SMF ¶¶ 5, 17, 19, 23, 26–29, 35.)  The United States' invocation of state secrets

is not a material fact, so Plaintiffs do not deny or admit it.

13.     Admit.

14.     Admit that Al Shimari cannot identify all his abusers by name, but deny that he

has no knowledge of his contact with CACI interrogators.  (*See* SMF ¶ 10.)

15.     Admit that Al Shimari's testimony regarding his interrogations and the United

States' records of formal, scheduled interrogations creates, at most, a disputed fact.  (*Compare*

CACI Ex. 17 at 85–86, *with* CACI Ex. 14 at 4–5.)  CACI Interrogator A testified ██████████████

██████████████████████████████████████████████████ and Army Interrogator B

testified that ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████ (CACI Ex. 1 at 96:19–21; Ex. 2 at 56:2–5, 57:2–5.)  Deny that CACI

19

Interrogator A testified ███████████████████████████████████████

███████████ ( *See* CACI Ex. 1 at 92–93.)   Deny that CACI had no role in interrogations of

our Plaintiffs.  (*See* SMF ¶¶ 5–36.)  Except as stated above, admit that CACI Interrogator A and

Army Interrogator B testified to the remaining facts, but contest whether they are material to a

decision on summary judgment.  *See infra* p. 26.

     16.    Admit.

     17.    Admit that Al-Zuba'e cannot identify all his abusers by name, but deny that he

has no knowledge of his contact with CACI interrogators.  (*See* SMF ¶ 10.)

     18.    Admit that Al-Zuba'e cannot identify all his abusers—or their employers—by

name, but deny that he has no knowledge of his contact with CACI interrogators.  (*See* SMF ¶

10.)

     19.    Admit that government records show three formal, scheduled interrogations of

Al-Zuba'e, but there is evidence that CACI employees did not adhere to assigned and scheduled

interrogations and therefore deny that this representation is a complete or accurate statement of

how, when, where, and by whom Al-Zuba'e was interrogated.  (*See, e.g.*, SMF ¶ 7.)

     20.    Deny that Army Interrogator F definitively testified that ███████████████

███████████████████████ ( *See* CACI Ex. 5 at 44–45, 54, 63–65.)  Admit that Army

Interrogators C and F testified to the remaining facts, but contest whether they are material to a

decision on summary judgment.  *See infra* p. 26.

     21.    Admit that Army Interrogator E testified to these facts, but contest whether they

are material to a decision on summary judgment.  *See infra* p. 6.

     22.    Army Interrogator B testified that ███████████████████████

████████████████████████████████████████████████

████████████ (CACI Ex. 2 at 57:3:7.)  To the extent not contradicted by the above, admit that Army Interrogator B testified to the remaining facts, but contest whether they are material to a decision on summary judgment.  *See infra* p. 6.

23.     Plaintiffs' contest all of CACI's allegations that they were controlled by or integrated into the military (*see* SMF ¶¶ 37–49), but admit that CACI provided interrogators under DO 35 and DO 71.

24.     Plaintiffs' contest all of CACI's allegations that they were controlled by or integrated into the military.  (*See* SMF ¶¶ 37–49.)

25.     Plaintiffs' contest all of CACI's allegations that they were controlled by or integrated into the military.  (*See* SMF ¶¶ 37–49.)  Plaintiffs contest the accuracy of the Brady and Pappas Declarations.  (*See* SMF ¶¶ 46–47.)

26.     Plaintiffs' contest all of CACI's allegations that they were controlled by or integrated into the military.  (*See* SMF ¶¶ 37–49.)  Plaintiffs contest the accuracy of the Pappas Declaration.  (*See* SMF ¶ 46.)

27.     Plaintiffs' contest all of CACI's allegations that they were controlled by or integrated into the military.  (*See* SMF ¶¶ 37–49.)  Plaintiffs contest the accuracy of the Pappas Declaration.  (*See* SMF ¶ 46.)

28.     Plaintiffs' contest all of CACI's allegations that they were controlled by or integrated into the military.  (*See* SMF ¶¶ 37–49; *see also infra* pp. 33–34.)

## LEGAL STANDARD

"A court may award summary judgment only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *In re French*, 499 F.3d 345, 351 (4th Cir. 2007).  In evaluating a summary judgment motion, a court "must

21

consider whether a reasonable jury could find in favor of the nonmoving party, taking all inferences to be drawn from the underlying facts in the light most favorable to the nonmovant." *In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999).  At summary judgment, a court "is not entitled to either weigh the evidence or make credibility determinations." *In re French*, 499 F.3d at 352 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

## ARGUMENT

The Court's February 21, 2018 decision resolved nearly every question CACI re-raises on what were then well-pled allegations.  Those allegations are fully supported by evidence and thus are sufficient to deny CACI any judgment as a matter of law.  CACI does not and cannot attack the sufficiency of this evidence (much of which it simply ignores).  Instead, it asks the Court to effectively rewrite its opinion from a year ago without even recognizing—let alone disputing—that the legal judgments in that opinion are the law of the case that forecloses CACI's restated arguments.  For this reason, and those discussed below, CACI's motion for summary judgment should be denied.

## I.   THE RECORD EVIDENCE FORECLOSES SUMMARY JUDGMENT ON PLAINTIFFS' CONSPIRACY CLAIMS

"To state a claim for conspiracy under the ATS, plaintiffs must allege that two or more persons agreed to commit a wrongful act, that defendant joined the conspiracy knowing of the goal of committing a wrongful act and intending to help accomplish it, and that one or more violations of the ATS 'was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy.'"  *Al Shimari*, 300 F. Supp. 3d at 783 (quoting *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1159 (11th Cir. 2005)).

10768062

**A.  The Record Evidence Shows The Conspiracy**

"A conspiracy claim does not require an express agreement; proof of a tacit understanding suffices."  *Tysons Toyota v. Globe Life Ins. Co.*, 1994 U.S. App. LEXIS 36692, at *15 (4th Cir. Dec. 29, 1994).  Where the evidence "points to complementary and interlocking actions by the defendants which together suggest a conspiratorial scheme," the evidence "support[s] an inference that the conspiracy existed."  *Id.* at *14–15.

Inferences are especially warranted in a conspiracy case because:

> If [direct evidence of conspiracy] were necessary, it rarely, if ever, could be proved.  Conspirators do not work in the light.  They prefer darkness literally and figuratively.  They frequently obscure their purpose . . . . The effects and results of a conspiracy can be observed and proved, but rarely can one get a glimpse or make proof of the secret conferences which inaugurate it.  For these manifest reasons, proof of a [conspiracy] can rarely be made except by light reflected from its consequences or results.

*United States v. Harris*, 433 F.2d 333, 335 n.1 (4th Cir. 1970) (internal quotation marks omitted) (first alteration in original); *see also id.* at 335 ("It [i]s not necessary [to] show the existence of a formal agreement . . . .  The existence of an unlawful and inherently covert agreement can be inferred from the overt conduct of the parties.").

This Court has already held that the allegations then before it—now supported by the subsequently described evidence—"support[s] an inference that CACI employees entered into an agreement with other personnel at the Hard Site to subject the detainees at the site, including plaintiffs, to torture, CIDT, and war crimes."  *Al Shimari*, 300 F. Supp. 3d at 783.  The Hard Site is a "small and confined universe" where "CACI interrogators explicitly instructed MPs to 'soften up' detainees to prepare them for interrogation," and "CACI interrogators, including some who are identified by name, ordered various military personnel to 'set the conditions' for detainees and 'actually ordered' the most severe forms of abuse."  *Id.*; *see* SMF ¶¶ 6, 8–9, 17–19,

23–24, 26, 28–29, 33–36.   "These instructions evince an agreement among both CACI interrogators and military personnel at the Hard Site to abuse detainees in an attempt to make them more amenable to interrogation." *Al Shimari*, 300 F. Supp. 3d at 783; *see* SMF ¶¶ 17, 19, 23, 26–29, 35, 48.   "Moreover [the evidence shows] that CACI interrogat[ors] and military personnel used and understood various code words, such as '[set the conditions],' which is further evidence of a widespread agreement at the Hard Site to engage in this misconduct." *Al Shimari*, 300 F. Supp. 3d at 783; *see* SMF ¶¶ 19, 23–24, 33.

"This goal of the conspiracies [to make detainees more amenable to interrogation] also provides a clear motive for both CACI employees and CACI management to enter into the conspiracies." *Al Shimari*, 300 F. Supp. 3d at 783 n.30; *see* SMF ¶¶ 17, 19, 23, 26–29, 35, 48. First, "CACI had a contract with the United States government to provide interrogation services." *Al Shimari*, 300 F. Supp. 3d at 783 n.30; *see* SMF ¶ 30.   Second, "CACI's contract— as well as its individual employees' employment contracts—were dependent on those interrogations yielding high-quality intelligence that CACI could provide to the military." *Al Shimari*, 300 F. Supp. 3d at 783 n.30; *see* SMF ¶ 35.   Finally, "[t]o the extent that CACI or its employees believed that the ATS violations . . . could 'soften up' detainees and encourage them to provide additional information in the interrogations, it is clear that they would have a plausible motive for entering into the conspiracies." *Al Shimari*, 300 F. Supp. 3d at 783 n.30; *see* SMF ¶¶ 17, 19, 23, 26–29, 35, 48.

The evidence also now shows that "CACI employees and military personnel worked together at the Hard Site to hide evidence of this abuse, such as by concealing detainees from Red Cross inspectors." *Al Shimari*, 300 F. Supp. 3d at 783; *see* SMF ¶¶ 5, 22.   In addition, "the very willingness of CACI interrogators and military personnel to engage in this conduct indicates

24

an agreement among the personnel at the site because it is natural to expect that, in the absence of such an agreement, the personnel would have found it necessary to conceal such misconduct from each other." *Al Shimari*, 300 F. Supp. 3d at 784; *see* SMF ¶ 24.

The evidence also shows that CACI's management participated in the conspiracies. CACI refused to act on specific reports of misconduct perpetrated by its employees, instead covering up the misconduct. (*See* SMF ¶¶ 50–52.) Multiple CACI employees or military personnel reported to "upper management" that CACI interrogators and military personnel were engaging in detainee abuse and CACI managers failed to report this abuse to the military—or even ensure that CACI's own employees stopped the abuse. (*See* SMF ¶¶ 50–55.)

In its summary judgment motion, CACI ignores most of this evidence. Instead, it first repeats the argument it has made throughout the litigation: that Plaintiffs have no personal knowledge of CACI's participation in their abuses. Second, it surfaces what is at most a disputed issue of fact by noting that some interrogators officially assigned to Plaintiffs testified (pseudonymously) that they saw no abuse during interrogations.

As to the first, the fact that Plaintiffs cannot name CACI as their abusers' employer is of no moment. The Supreme Court has made clear that Plaintiffs bringing conspiracy claims need not have personal knowledge of all relevant conduct of the defendant. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970) (summary judgment inappropriate even where plaintiff had no knowledge of an agreement between conspirators because "the sequence of events created a substantial enough possibility of conspiracy to allow her to proceed to trial, especially given the fact that the noncircumstantial evidence of the conspiracy could only come from adverse witnesses"). CACI completely ignores the evidence that *does* link CACI interrogators directly to each Plaintiff. (*See* SMF ¶¶ 6–12.) In any event, CACI's liability does not turn on evidence of

those direct links because, as CACI has correctly conceded, clear law demonstrates that conspiratorial liability attaches "even if the defendant had no involvement with the actions that injured the plaintiff." (Dkt. 222, at 11.) And, as this Court recognized already in rejecting this CACI argument, *see* Dkt. 627, at 32, Plaintiffs' allegations meet the standard for conspiracy even absent such a direct link. *Al Shimari*, 300 F. Supp. 3d at 782–84. By directing mistreatment of detainees, CACI interrogators created at least a tacit understanding in the confined space of the Tier 1 interrogation unit that such abuse was invited, encouraged, condoned, and would not be reported. *Id.* The abusive behavior could not have occurred without such an understanding— that is the essence of conspiracy—regardless of whether CACI personnel carried out each specific abuse on each Plaintiff.

As to CACI's second argument, it is of little consequence at the summary judgment stage that some interrogators gave self-serving testimony about not seeing abuse during Plaintiffs' interrogation sessions. This does not prove a negative. At most, this is a disputed fact that the jury will need to weigh. Moreover, the fact that an interrogator witnessed no abuse *during* formal, documented interrogation sessions does not address the evidence of abuse occurring *outside* of interrogations, which is central to Plaintiffs' theory of the case. *See Al Shimari*, 840 F.3d at 152 (plaintiffs allege that "most of these acts of abuse occurred during the nighttime shift at the prison, in order to reduce the likelihood that nonparticipants would learn of this conduct"). Thus, this argument does not support summary judgment.

**B. The Law Of The Case Forecloses CACI's Other Arguments**

"The law-of-the-case doctrine provides that in the interest of finality, when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017) (internal quotation marks omitted). That means the Court may only depart from the law of the

26

case if "(1) 'a subsequent trial produc[es] substantially different evidence'; (2) [there is] a change in applicable law; or (3) [it was] clear error causing 'manifest injustice.'" *Id.* (quoting *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 515–16 (4th Cir. 2003)).

Although CACI argues (CACI Br. at 15–16) that this Court "erred" in its denial of CACI's motion to dismiss, *see Al Shimari*, 300 F. Supp. 3d at 783, it does not address the standard for overturning this Court's prior decisions.  Even if it had, CACI would still fail to meet that standard.  First, there has been no subsequent trial, and the discovery conducted between February 2018—when the Court issued its prior decision—and today has not generated "substantially different" evidence.  Second, CACI has cited to no change in applicable law.  And third, CACI demonstrates no clear error or manifest injustice.  CACI must register its disagreement with the Court's ruling from an appeal of final judgment, not again in the heat of this litigation.

Relying on a decade-old case from the Second Circuit, *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244 (2d Cir. 2009), CACI appears to argue that this Court erred in (1) recognizing conspiracy as a valid theory of liability under domestic law and (2) failing to look to international law, such that it must reevaluate its decision.  But CACI does not even attempt to present *Talisman* as a "*change* in existing law"; it simply takes an opportunity to advance arguments it failed to include in its motion to dismiss.  (Dkt. 627.)  In any event, both arguments fail.  On the first, CACI misstates the import of *Talisman*'s reference to the *Pinkerton* doctrine to assert, without citation, that "*Pinkerton* liability does not extend to civil actions."[8] (CACI Br. at 16 n.8.)  CACI's inability to cite a case for that proposition is not surprising, as

---

[8] Contrary to CACI's suggestion, *Talisman* only addressed *Pinkerton* in dicta, noting that plaintiffs raised *Pinkerton* liability and then dismissing the conspiracy claim on other grounds, holding that plaintiffs would have to prove a purpose to violate internationally recognized norms—a triable issue of fact in this case involving intentional torts directed by CACI employees.

courts have enforced *Pinkerton*-like liability in civil actions for a very long time. *See*

*Halberstam v. Welch*, 705 F.2d 472, 476–78 (D.C. Cir. 1983) (recounting the history of civil

conspiracy and aiding and abetting). Although not all courts use the term "*Pinkerton* liability,"

*see id.* at 479–81, it is well-established that civil liability attaches where conspirators enter into

an agreement and one undertakes "an unlawful overt act [that] produced an injury and damages,"

*id.* at 477, which was taken in furtherance of the conspiracy.

On the second, CACI gets no further by claiming this Court was incorrect to rely on

*Cabello*, which relied on domestic law to define conspiracy, when the Fourth Circuit suggested

in *Aziz v. Alcolac, Inc.*, 658 F.3d 388 (4th Cir. 2011), that courts should look to international law

to define the law of conspiracy. It is a distinction without a difference. Contrary to what CACI

suggests, international law does recognize conspiracy liability.[9] As a growing number of courts

have concluded, the analog to conspiracy in international law is joint criminal enterprise

("JCE"). *See, e.g., Prosecutor v. Tadić*, Case No. IT-94-1-A, Judgment ¶¶ 185–226 (ICTY App.

Chamber, July 15, 1999), cited in *Hamdan v. Rumsfeld*, 548 U.S. 557, 631 n.63 (2006).[10] Under

the JCE or "common purpose," liability is established for anyone who contributes in any way "to

the commission or attempted commission of . . . a crime by a group of persons acting with a

---

[9] For this reason, CACI's passing argument that the scope of vicarious liability must be assessed under international law, (CACI Br. at 24), is immaterial. It is also incorrect. *E.g., Doe v. Nestlé, S.A.*, 766 F.3d 1013, 1022 (9th Cir. 2014) ([C]orporate liability [in ATS cases] must be governed by domestic law."); *Flomo v. Firestone Natural Rubber Co., LLC*, 643 F.3d 1013, 1020 (7th Cir. 2011) (Posner, J.) ("[I]nternational law imposes substantive obligations and the individual nations decide how to enforce them."); *In re S. African Apartheid Litig.*, 617 F. Supp. 2d 228, 301–02 (S.D.N.Y. 2009) ("*Sosa* expressly applies its limitations to 'accepting a cause of action.' Vicarious liability is not a cause of action; it is a principle for the distribution of civil liability in an independent tort. . . . Thus, . . . federal common law . . . establish[es] principles of vicarious liability, which are the means of domestic enforcement against those who violate internationally recognized torts." (footnotes omitted)).

[10] Indeed, the very case that CACI relies on, *Talisman*, recognizes that JCE is the international-equivalent to conspiracy. 582 F.3d at 260.

common purpose."  Rome Statute, Art. 25(3)(d);[11] *see also Tadić* ¶ 190 (holding that a

conspiracy occurs "where several persons having a common purpose embark on criminal activity

that is then carried out either jointly or by some members of this plurality of persons").  Thus,

international law not only recognizes liability for conspiracies, but, like American common law,

also does not require the defendant to have personally committed the crime.

## II.    THE RECORD EVIDENCE FORECLOSES SUMMARY JUDGMENT ON PLAINTIFFS' AIDING AND ABETTING CLAIMS

"To maintain a claim for aiding and abetting under the ATS, plaintiffs must allege facts

that support a plausible inference that CACI 'provide[d] substantial assistance with the purpose

of facilitating the alleged violation' of international law."  *Al Shimari*, 300 F. Supp. 3d at 786

(quoting *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 401 (4th Cir. 2011)).[12]

For the same reason that CACI's arguments in support of summary judgment on the

conspiracy claims fail, its argument in support of summary judgment on aiding and abetting

claims also fails.  As with the conspiracy claim, there is more than sufficient evidence to allow

the jury to find what this Court held states a claim for relief: "that CACI personnel substantially

aided the military personnel responsible for directly carrying out the abuses, including directing

them on how to set the conditions of confinement, ordering them to employ various abusive

tactics, and helping them conceal the abuses."  *Al Shimari*, 300 F. Supp. 3d at 786; *see* SMF ¶¶

---

[11] *See Aziz v. Alcolac, Inc.*, 658 F.3d 388, 401 n.13 (4th Cir. 2011) (explaining that Article 25(3)(d) of the Rome Statute "defin[es] the elements of conspiratorial liability").

[12] Contrary to CACI's assertion, it is not required that aiders and abettors identify the *specific victims* of the unlawful conduct for which they are providing practical assistance.  (CACI Br. 12.)  Indeed, such a requirement would be absurd in the context of mass atrocity where the elements of aiding and abetting liability are regularly applied.

As CACI again advises that international law is the proper source for determining the elements of aiding and abetting, Plaintiffs note that since the Fourth Circuit issued its decision in *Aziz*, the ICTY Appeals Chamber clarified that the *mens rea* standard for aiding and abetting is "knowledge."  *See Prosecutor v. Sainovic*, No. IT-05-87-A, Judgment para. 1649 (ICTY App. Chamber, Jan. 23, 2014).

17–19, 23–24, 27–36, 48.  "Moreover, upper-level management at CACI substantially aided these continued abuses by refusing to inform the military of reports that CACI and military personnel were abusing detainees and by continuing to employ—and even promote— interrogators engaging in the abuses."  *Al Shimari*, 300 F. Supp. 3d at 786; *see* SMF ¶¶ 50–55.  Given testimony from CACI employees that ███████████████████████████████ ███████████████████████████████████ (SMF ¶ 35), evidence that ██████ ████████████████████████████████████████, (SMF ¶ 17–19, 26– 29, 33, 48), and evidence that ███████████████████████████████ ███████████████████████ (SMF ¶ 33–35; *see also id.* ¶ 23), the jury will be able to conclude that CACI employees encouraged, solicited and aided such misconduct "with the necessary purpose of facilitating the abusive conduct because the goal of the abusive regime was to 'soften up' the detainees to convince them to cooperate with CACI's interrogators."  *Al Shimari*, 300 F. Supp. 3d at 786; *see* SMF ¶¶ 17, 19, 23, 26–29, 35, 48.  The evidence also shows "who committed or directed particular forms of abuse, what the abuse involved, who was aware of the abuse and concealed it, and the motivation for committing the abuses."  *Al Shimari*, 300 F. Supp. 3d at 787; *see* SMF ¶¶ 6–36, 50–55.

## III.   *RESPONDEAT SUPERIOR* LIABILITY IS AVAILABLE

The Court has already addressed what CACI dubs "double vicarious liability" (CACI Br. at 24), which is the unremarkable proposition that an individual who enters a conspiracy is liable for the acts of his co-conspirators within the scope of the conspiracy, and the employer of that individual is liable to the same extent as its employed individual.  *See Al Shimari*, 300 F. Supp. 3d at 785.  CACI does not even mention the Court's prior decision concerning the availability of *respondeat superior* liability in this case, let alone explain why the Court should depart from it.  CACI also argues for the first time that the "borrowed servant" doctrine bars recovery, but fails

to acknowledge the highly factual inquiry involved in such a determination and fails to address

any of the evidence Plaintiffs have repeatedly identified on the issue of "command and control."

### A.  CACI Is Liable For The Acts Of Its Employees And Their Co-Conspirators

This Court has already held that "CACI may be held liable for its employees'

participation in the conspiracies—*including* for tortious acts committed by its employees' co-

conspirators in furtherance of the conspiracies." *Al Shimari*, 300 F. Supp. 3d at 785 (emphasis

added).  Therefore, because the jury could properly find that "interrogators entered into the

conspiracies within the scope of their employment" CACI may be held liable under *respondeat*

*superior.*  First, "[b]ecause the . . . conspiracies were directly related to the interrogators'

employment, CACI had an ability to monitor the interrogators to ensure that they did not enter

into the conspiracies—and . . . to appropriately screen and train interrogators before sending

them to Abu Ghraib and to discipline interrogators who committed transgressions." *Id.*; *see* SMF

¶¶ 35, 37–49.  Second, "CACI stood to benefit directly from its interrogators' actions because

the facilitation of successful interrogations would please its most important client, the United

States military, and perhaps position it to gain future contracts with the military." *Al Shimari*,

300 F. Supp. 3d at 785; *see* SMF ¶¶ 30, 35, 54.  Finally, "[w]hen balancing benefits and

liabilities, it is clear that CACI had an ability to head off the entry into these conspiracies and

that CACI itself benefitted from its employees' participation in the conspiracies." *Al Shimari*,

300 F. Supp. 3d at 785; *see* SMF ¶¶ 50–55.  "Therefore, *respondeat superior* liability is

appropriate." *Al Shimari*, 300 F. Supp. 3d at 785.  Nothing in CACI's current motion advances

any alleged facts that would undermine those propositions.

### B.  The Borrowed Servant Doctrine Is Not Applicable Here

The borrowed servant doctrine only applies when the borrowing employer "possesses . . .

authoritative direction and control over" the "servant's performance of the particular work in

which he is engaged at the time of the accident." *White v. Bethlehem Steel Corp.*, 222 F.3d 146, 149 (4th Cir. 2000).  This is a fact-intensive inquiry in which the court looks "at factors such as the supervision of the employee, the ability to unilaterally reject the services of an employee, the payment of wages and benefits either directly or by pass-through, or the duration of the employment." *Id.*  Since this a factual determination, it does not usually lend itself to determination on summary judgment.  *See, e.g.*, *U.S. Vinyl Mfg. Corp. v. Colour & Design, Inc.*, 32 F. Supp. 3d 1253, 1262–65 (N.D. Ga. 2013) (denying summary judgment on the "borrowed servant" issue, noting "the question is heavily fact based" (internal quotation marks omitted)).

To succeed at summary judgment, CACI must show not just that the U.S. military shared control, but that CACI *relinquished all* control of the borrowed employee.  *See, e.g.*, *Bailey v. Allegheny Energy Serv. Corp.*, 2009 U.S. Dist. LEXIS 140038, at *6 (S.D.W. Va. Mar. 11, 2009) ("The burden is upon the employer to prove (*i.e.* affirmatively show) that this right to control the employee has been completely relinquished." (alterations and internal quotation marks omitted)).  Moreover, there is a presumption that the general employer retains control over the employee, even when he is lent out to a different "special" employer.  *See* RESTATEMENT (THIRD) OF AGENCY § 7.03, comment d(2) ("Many cases . . . presuppose[] that ties between a general employer and an assigned employee will remain strong despite the employee's emplacement in the special employer's workplace where the employee's performance will often be subject to some degree of direction and monitoring of the special employer's management.").

CACI's assertion that "the undisputed facts demonstrate that the U.S. Army chain of command assumed the right and power to supervise and control . . . CACI PT personnel" is therefore insufficient to entitle it to summary judgment, because it is consistent with shared

10768062

control.  CACI's burden is to demonstrate that CACI relinquished *all* control of its own

employees.  This it cannot do.  *See* SMF ¶¶ 37–49.

## IV.    PLAINTIFFS' CLAIMS ARE NOT PREEMPTED

As with most of its summary judgment motion, in asserting "preemption," CACI does not

attack the sufficiency of Plaintiffs' evidence—as is customary at the summary judgment stage—

but instead tries to re-litigate issues already decided in this case.

Without addressing the law-of-the-case standard, CACI argues that the Court should

overturn its prior decision that Plaintiffs' claims are not preempted, *see Al Shimari*, 300 F. Supp.

3d at 788, because (i) *Jesner v. Arab Bank*, 138 S. Ct. 1386 (2018), supposedly confirmed ATS

cases "must be 'subject to vigilant doorkeeping'"; (ii) Plaintiffs' claims of direct abuse have been

dismissed; and (iii) discovery conducted after February 2018 shows that "CACI PT personnel

were fully integrated."  (CACI Br. at 25.)

None of these arguments justify overturning this Court's thorough and carefully-reasoned

decision of less than a year ago.  First, as this Court already determined in rejecting CACI's

*Jesner*-based motion to dismiss, 320 F. Supp. 3d 781 (E.D. Va. 2018), *Jesner* did not signal "a

change in *applicable* law" regarding claims against a domestic defendant.  *Carlson*, 856 F.3d at

325 (emphasis added).  Indeed, CACI relies on the portion of *Jesner* that merely reiterates the

requirements of *Sosa*, decided fourteen years ago and fully incorporated in this Court's prior

ruling.  Second, that Plaintiffs' claims for direct abuse have been dismissed has nothing to do

with the standard for overturning the law of the case.  Third, CACI cites to supposedly "new"

discovery conducted between February 2018 and the present, but in fact its citations are all to

discovery from many years ago with the exception of one pseudonymous deposition of a former

CACI interrogator who—█████████████████████████████████████████

█████████████████████████████████████ that is refuted by a wealth of contrary evidence.

*See* SMF ¶¶ 37–49.  In any event, the Fourth Circuit has established that, to the extent CACI employees committed acts in violation of established law, it is no defense that those acts might have been commanded by the military.  *Al Shimari v. CACI Premier Tech., Inc.*, 840 F.3d 147, 159 (4th Cir. 2016) ("[A]ny acts of the CACI employees that were unlawful when committed, irrespective of whether they occurred under actual control of the military, are subject to judicial review.").  The "just following orders" defense is no more effective as a ground for preemption than it is as a ground to dismiss Plaintiffs' claims under the political question doctrine.  If Congress has declared conduct illegal, there can be no conflict between federal policy and an effort to enforce civil liability for perpetration of such illegal conduct.  And, without a conflict with federal policy, CACI's inventive "preemption" argument never gets off the ground.

The rest of CACI's preemption argument is just a slightly revised version of its prior brief (*see* Dkt. 627, at 35–41), which primarily relies on the D.C. Circuit's 2-1 decision in *Saleh v. Titan Corp.*, 580 F.3d 1 (D.C. Cir. 2009).  This Court has already considered *Saleh* and correctly decided the issue.  *Al Shimari*, 300 F. Supp. 3d at 789 ("nothing in the Constitution can be read to 'preempt' the application of ATS to plaintiffs' claims").  Preemption is a doctrine involving federal displacement of *state* law claims under the Supremacy Clause; thus, because the FTCA and ATS are congressional statutes, the Court's job is to "harmonize [them] rather than find that one preempts the other."  *Id.* at 789.

## CONCLUSION

For the foregoing reasons, CACI's motion for summary judgment should be denied.

Respectfully submitted,

   */s/ John Kenneth Zwerling*
John Kenneth Zwerling (VA Bar #08201)
ZWERLING/CITRONBERG, PLLC
114 North Alfred Street
Alexandria, VA 22314

Tel. 703-684-8000 | jz@zwerling.com

Baher Azmy, *Admitted pro hac vice*
Katherine Gallagher, *Admitted pro hac vice*
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012

Robert P. LoBue, *Admitted pro hac vice*
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036

Shereef Hadi Akeel, *Admitted pro hac vice*
AKEEL & VALENTINE, P.C.
888 West Big Beaver Road
Troy, MI 48084-4736

*Attorneys for Plaintiffs*

10768062

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 22, 2019, I electronically filed the Plaintiffs' Opposition to Defendant's Motion for Summary Judgment as well as the LoBue Declaration and accompanying exhibits through the CM/ECF system, which sends notification to counsel for Defendants and the United States.  A copy of the version of this memorandum and the exhibits filed under seal will also be sent by email on the same date to the below-listed counsel.

> John O'Connor
> Steptoe & Johnson LLP
> 1330 Connecticut Avenue, N.W.
> Washington, D.C. 20036
> joconnor@steptoe.com
>
> Lauren Wetzler
> United States Attorney Office
> 2100 Jamieson Avenue
> Alexandra, VA 22314
> Lauren.wetzler@usdoj.gov

> _____*/s/ John Kenneth Zwerling*_____
> John Kenneth Zwerling (VA Bar #08201)

36

10768062