IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| SUHAIL NAJIM ABDULLAH AL SHIMARI,<br>     et al., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CACI PREMIER TECHNOLOGY, INC., | ) | 1:08-cv-827 (LMB/JFA) |
| | ) | |
| Defendant/Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

MEMORANDUM OPINION

Before the Court are third-party defendant the United States of America's ("United

States") Motion to Dismiss [Dkt. No. 696] and Motion for Summary Judgment [Dkt. No. 1129],

as well as defendant/third-party plaintiff CACI Premier Technology, Inc.'s ("CACI") Motion to

Dismiss for Lack of Jurisdiction [Dkt. No. 1149]. For the reasons that follow, the United States'

Motion to Dismiss will be granted as to Count 4 and denied in all other respects, CACI's Motion

to Dismiss will be denied, the United States' Motion for Summary Judgment will be granted, and

the Third-Party Complaint will be dismissed as to the United States.

I. BACKGROUND

This civil action arises out of the alleged torture; cruel, inhuman, or degrading treatment

("CIDT"); and war crimes inflicted on plaintiffs Suhail Najim Abdullah Al Shimari ("Al

Shimari"), Asa'ad Hamza Hanfoosh Al-Zuba'e ("Al-Zuba'e"), Salah Hasan Nusaif Jasim Al-

Ejaili ("Al-Ejaili"), and Taha Yaseen Arraq Rashid ("Rashid")[1] (collectively, "plaintiffs") by members of the United States military and CACI employees while plaintiffs were detained at the Abu Ghraib prison. The procedural and factual background of this civil action is described extensively in the Memorandum Opinion of February 21, 2018 [Dkt. No. 678] and will not be repeated in detail here. For the purposes of the present motions, it is sufficient to understand that plaintiffs, all of whom are Iraqi citizens who were detained at Abu Ghraib for a significant period of time, allege that they suffered severe mistreatment at the hands of military personnel and CACI employees. As summarized in the Memorandum Opinion:

> Over the course of six weeks, Al-Ejaili was subjected to repeated stress positions, including at least one that made him vomit black liquid; sexually-related humiliation; disruptive sleeping patterns and long periods of being kept naked or without food or water; and multiple instances of being threatened with dogs. The approximately ten to twelve times he was interrogated involved systematic beatings, including to the head, and being doused with hot and cold liquids. Al-Zuba'e was subjected to sexual assault and threats of rape; being left in a cold shower until he was unable to stand; dog bites and repeated beatings, including with sticks and to the genitals; repeated stress positions, including at least one that lasted an entire day and resulted in his urinating and defecating on himself; and threats that his family would be brought to Abu Ghraib. Al Shimari was subjected to systematic beatings, including on his head and genitals, with a baton and rifle, and some where he was hit against the wall; multiple stress positions, including one where he was forced to kneel on sharp stones, causing lasting damage to his legs; being threatened with dogs; a cold shower similar to Al-Zuba'e's, being doused with water, and being kept in a dark cell and with loud music nearby; threats of being shot and having his wife brought to Abu Ghraib; electric shocks; being dragged around the prison by a rope tied around his neck; and having fingers inserted into his rectum.

Mem. Op. [Dkt. No. 678] 31-32. Plaintiffs allege that as a result of this treatment, they have suffered "severe and lasting physical and mental damage." Id. at 33. For example, Al Shimari, Al-Zuba'e, and Al-Ejaili each allege that they have "been diagnosed with post-traumatic stress

---

[1] On February 27, 2019, Rashid was dismissed from this civil action because the primary mistreatment he described occurred before CACI personnel had arrived at Abu Ghraib. Dkt. No. 1144.

disorder and major depressive disorder," and each "has submitted an expert report detailing how these mental illnesses have caused significant problems in [their] personal and professional lives" through the present day. Id. Each plaintiff also alleges that he continues to suffer from physical symptoms, including pain and scarring, attributable to this mistreatment. Id.

The claims against CACI are brought under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, and were initially for engaging in, conspiring to engage in, and aiding and abetting torture; CIDT; and war crimes, all in violation of international law. On February 21, 2018, the Court granted in part and denied in part CACI's Motion to Dismiss and dismissed the direct liability counts against CACI. In so doing, the Court determined that plaintiffs' factual allegations describe conduct that represents "violations of international law norms that are specific, universal, and obligatory." Mem. Op. 28 (internal quotation marks and citation omitted); see also Sosa v. Alvarez-Machain, 542 U.S. 692, 732 (2004).

CACI has brought a Third-Party Complaint [Dkt. No. 665] against the United States of America and John Does 1-60.[2] According to the allegations in the Third-Party Complaint, the United States military oversaw interrogation operations at Abu Ghraib, including making decisions about which detainees would be interrogated and which "Tiger Teams," consisting of an interrogator (either a CACI employee or a military person) and a linguist, would be assigned

---

[2] The John Doe defendants comprise three groups of natural persons: soldiers deployed to Abu Ghraib; "civilian employees of the United States Department of Defense, or any components thereof, or civilian contractor employees supporting the U.S. military mission at Abu Ghraib"; and "employees of the United States or civilian contractor personnel working for Other Government Agencies at Abu Ghraib." Third-Party Compl. ¶ 9. None of these defendants has been served. On June 8, 2018, the United States moved to sever and stay the claims against the John Doe defendants. Dkt. No. 832. CACI opposed the United States' motion. Dkt. No. 853. On July 6, 2018, the Court granted the United States' motion, and CACI's third-party claims against the John Doe defendants were severed and stayed "pending resolution of the underlying action." Dkt. No. 869.

to which detainees. Third-Party Compl. ¶ 18. In addition, all Tiger Teams reported to the military

chain of command, which included various military noncommissioned officers in charge, the

Officer in Charge of the Interrogation Control Element, and the Commanding Officer of the

intelligence battalion deployed to Abu Ghraib. Id. ¶ 19. CACI alleges that the United States

military "exercised direct and plenary control over all aspects of a detainee's experience at Abu

Ghraib," control which included not only assigning teams to detainees but also establishing the

Interrogation Rules of Engagement, approving interrogation plans for each detainee, reviewing

interrogation reports prepared after each interrogation, and approving certain techniques that

required authorization. Id. ¶ 20. The gravamen of CACI's allegations is that the United States

military personnel, and not CACI personnel, were ultimately responsible for directing the

interrogations of the plaintiffs and subjecting plaintiffs to mistreatment. Accordingly, CACI

seeks to hold the government liable on a variety of theories.

      In Count 1, CACI seeks common law indemnification against the United States and the

John Doe defendants and, in Count 2, exoneration for any judgment that might be entered against

CACI for acts of mistreatment toward plaintiffs that the third-party defendants "inflicted,

directed, authorized, or permitted." Id. ¶¶ 38, 45. In Count 3, CACI seeks contribution against

the third-party defendants to the extent that plaintiffs seek to hold CACI liable on a respondeat

superior theory based on CACI employees' entry into a conspiracy with or aiding and abetting

the United States or the John Doe defendants. Lastly, in Count 4, CACI brings a breach of

contract claim against the United States, in which it alleges that CACI's contract with the

government to supply interrogators contained an implied duty of good faith and fair dealing that

the government violated when it refused to produce discovery that could have allowed CACI to

defend itself against plaintiffs' claims.

4

The United States has filed a Motion to Dismiss [Dkt. No. 696], in which it argues that the Court lacks subject matter jurisdiction to consider the Third-Party Complaint because all of CACI's claims against it are barred by sovereign immunity. CACI has also filed a derivative Motion to Dismiss [Dkt. No. 1149], in which it argues that any sovereign immunity granted to the United States must apply equally to it due to its status as a government contractor. Because the Court had not ruled on the United States' Motion to Dismiss, the United States has also filed a Motion for Summary Judgment [Dkt. No. 1129], in which it argues that it is entitled to judgment as a matter of law because in 2007, CACI and the United States settled all claims arising out of the task orders pursuant to which CACI sent civilian interrogators to Abu Ghraib.

## II. UNITED STATES' MOTION TO DISMISS

### A. **Standard of Review**

Under Fed. R. Civ. P. 12(b)(1), a civil action must be dismissed whenever the court lacks subject matter jurisdiction. The plaintiff has the burden of establishing subject matter jurisdiction. Demetres v. E.W. Constr., Inc., 776 F.3d 271, 272 (4th Cir. 2015). "Because jurisdictional limits define the very foundation of judicial authority, subject matter jurisdiction must, when questioned, be decided before any other matter." United States v. Wilson, 699 F.3d 789, 793 (4th Cir. 2012).

### B. **Federal Tort Claims Act Waiver of Immunity**

CACI first contends that the Federal Tort Claims Act ("FTCA") has waived the government's immunity for the claims at issue in this case. In response, the government argues that the foreign country exception, 28 U.S.C. § 2680(k), operates to bar CACI's tort claims. The FTCA generally waives sovereign immunity and subjects the United States to liability for tort damages "caused by the negligent or wrongful act or omission of any employee of the

5

Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." Id. § 1346(b)(1). Congress has provided a variety of exceptions to this waiver, including for "[a]ny claim arising in a foreign country." Id. § 2680(k).

CACI argues that the foreign country exception does not apply to its claims because the area where plaintiffs' claims arose—Abu Ghraib—was a location "in which the sovereign government had been forcibly displaced by the United States military and its allies, occupied by United States military forces, and governed by a military occupation government." Third-Party Pl. CACI Premier Tech., Inc.'s Opp'n to the U.S.' Mot. to Dismiss [Dkt. No. 713] ("CACI MTD Opp'n") 17. This position relies primarily on United States v. Spelar, 338 U.S. 217 (1949), in which the Supreme Court held that an air base in Newfoundland that was held by the United States under a long-term lease was a "foreign country" for purposes of the FTCA. Id. at 218-19. Although the Court did not clearly define the phrase "foreign country" as used in that section, it relied primarily on considerations of sovereignty, stating: "We know of no more accurate phrase in common English usage than 'foreign country' to denote territory subject to the sovereignty of another nation. By the exclusion of 'claims arising in a foreign country,' the coverage of the [FTCA] was geared to the sovereignty of the United States." Id. at 219 (footnote omitted). Although this decision indicates that territory subject to another country's sovereignty is categorically within the limits of the foreign country exception, it does not explain how the FTCA treats territory that is subject to no—or overlapping or ambiguous—sovereign claims.

That being said, more recent Fourth Circuit and Supreme Court decisions have made clear that land may be subject to the foreign country exception even if another country does not

6

exercise sovereignty over it. For example, in <u>Burna v. United States</u>, 240 F.2d 720 (4th Cir. 1957), the Fourth Circuit applied <u>Spelar</u> to post-World War II Okinawa, which was subject to substantial governance by the United States pursuant to a treaty provision. <u>Id.</u> at 720-21. The plaintiff in that case argued that <u>Spelar</u> indicated that the FTCA exception only applied to territory under another country's control and that Okinawa was actually under the United States' control. <u>See id.</u> at 721. The Fourth Circuit disagreed, concluding that <u>Spelar</u> had held that foreign sovereignty over a particular territory was sufficient, but not necessary, to trigger application of the foreign country exception. <u>Id.</u> at 721-22. In reaching that conclusion, the Fourth Circuit cited Congress's use of the words "foreign country" to connote a "sense of 'otherness,'" or to mean "a country which is not the United States or its possession or colony,—an alien country,—other than our own." <u>Id.</u> at 722-23 (internal quotation marks and citation omitted); <u>see also id.</u> at 722 (framing the inquiry in terms of whether "Okinawa has been incorporated into the United States"). Accordingly, it determined that Congress "did not have in mind the fine distinctions as to sovereignty of occupied and unoccupied countries which authorities on international law may have formulated" and that Okinawa—even when occupied by the United States—remained a "foreign country" for purposes of the FTCA. <u>Id.</u> at 722-23.

This understanding of the FTCA is in accord with more recent Supreme Court precedent. In <u>Smith v. United States</u>, 507 U.S. 197 (1993), the Court held that Antarctica, which is a "sovereignless region," falls within the foreign country exception. <u>Id.</u> at 198. Although the Court relied on a variety of pieces of evidence in evaluating the status of Antarctica (and did not produce a decision clearly adopting a definition of "foreign country"), it did observe that "the commonsense meaning of the term ['country'] undermines petitioner's attempt to equate it with 'sovereign state'" because the first definition of "country" in the dictionary is "simply '[a] region

7

or tract of land.'" Id. at 201 (second alteration in original) (quoting Webster's New International Dictionary 609 (2d ed. 1945)).

When these decisions are read together, it becomes clear that Abu Ghraib is in a "foreign country" and remained as such during the time it was occupied by coalition forces. In many ways, its status mirrored post-World War II Okinawa's, as the United States and other coalition governments displaced the previous Iraqi sovereign. Abu Ghraib, like Okinawa, was never "incorporated into the United States" and, given the concept of "foreign country" embraced in Smith, the lack of an independent Iraqi sovereign does not bar the application of the foreign country exception. Accordingly, the FTCA does not waive sovereign immunity for the tort claims asserted in this civil action.

### C. Sovereign Immunity and Jus Cogens Violations

CACI further argues that the government has waived sovereign immunity for violations of jus cogens norms—that is, those peremptory international law norms from which states may not derogate.[3] This question appears to be one of first impression, not just in this district or circuit but nationally.[4] Accordingly, before the question presented may be addressed, it is

---

[3] Although plaintiffs, and not CACI, were the victims of the alleged jus cogens violations at issue in this suit, CACI argues that its claims for indemnification, exoneration, and contribution are derivative of plaintiffs' claims against CACI. Accordingly, CACI appears to assume, and the government does not argue otherwise, that if the government does not have immunity for jus cogens violations, and thus plaintiffs would be able to bring their claims against the government, CACI may recover from the government on its derivative claims.

[4] As discussed below, various federal courts have confronted the question whether foreign states may invoke sovereign immunity in federal court with respect to alleged jus cogens violations. These cases are not helpful for two reasons. First, they are primarily concerned with interpreting the Foreign Sovereign Immunities Act ("FSIA"), which codifies a doctrine of foreign sovereign immunity in American courts. By contrast, the immunity of the American government from suit is a common law doctrine, and the question whether the United States has waived sovereign immunity for jus cogens violations does not turn on the interpretation of any one statute. Second, domestic and international law treat the questions whether a sovereign is immune from suit in its own courts and whether a sovereign is immune from suit in the courts of a different country as

necessary to examine the history and development of sovereign immunity doctrine and jus cogens norms to contextualize the current dispute.

    1.  Development of Sovereign Immunity Doctrine

        a.  Historical Background and Incorporation into American Law

The doctrine of sovereign immunity, which was recognized in English common law as early as the thirteenth century, appears to have its roots in England's feudal system, in which "each petty lord in England held or could hold his own court to settle the disputes of his vassals." David E. Engdahl, Immunity and Accountability for Positive Governmental Wrongs, 44 U. Colo. L. Rev. 1, 2 (1972). Although a lord's vassals were subject to the jurisdiction of his court, "as the court was the lord's own, it could hardly coerce him." Id. Indeed, the "trusted counsellors who constituted [a lord's] court" could "claim no power over him their lord without his consent." Id. That being said, each "petty lord . . . was vassal in his turn, and subject to coercive suit in the court of his own lord." Id. In the organization of the feudal hierarchy, "[t]he king, who stood at the apex of the feudal pyramid" and was "not subject to suit in his own court," was wholly immune from suit because "there happened to be no higher lord's court in which he could be sued." Id. at 2-3; see also United States v. Lee, 106 U.S. 196, 206 (1882) (identifying "the absurdity of the King's sending a writ to himself to command the King to appear in the King's court" as a basis of sovereign immunity in England).

With the rise of the nation-state, this "personal immunity of the king" transformed into "the immunity of the Crown." George W. Pugh, Historical Approach to the Doctrine of

---

distinct questions. In particular, the serious concerns that would arise from any rule allowing a country to be sued in foreign courts the world over, as well as considerations of comity and respect, may incline in favor of a rule of restrictive jurisdiction over suits in courts of a foreign state but that do not apply similarly to suits in domestic courts.

Sovereign Immunity, 13 La. L. Rev. 476, 478 (1953). Given the potential harshness of such a doctrine as attached to the Crown rather than the king, legal authorities developed procedures whereby victims could obtain redress for wrongs committed by the government without directly suing the Crown. For example, when a government agent committed a tort, "English courts permitted suit against the government official or employee who had actually committed the wrong complained of." Id. at 479-80. Indeed, in such situations, the doctrine of sovereign immunity, as embodied in the famous phrase "the king could do no wrong," ensured that the tort victim could obtain a judgment against the agent: theoretically, if "the king could do no wrong, it would be impossible for him to authorize a wrongful act, and therefore any wrongful command issued by him was to be considered as non-existent, and provided no defense for the dutiful" agent. Id. at 480.

Similarly, English law developed the "petition of right," which allowed subjects to petition the king for the ability to sue the Crown in the king's courts—in effect, asking the king to waive sovereign immunity with respect to a specific legal dispute. See James E. Pfander, Sovereign Immunity and the Right to Petition: Toward a First Amendment Right to Pursue Judicial Claims Against the Government, 91 Nw. U. L. Rev. 899, 900-08 (1997). As with tort suits against government agents, the notion that "the king could do no wrong" worked to ensure the availability of a remedy for victims of wrongdoing because the "king, as the fountain of justice and equity, could not refuse to redress wrongs when petitioned to do so by his subjects." Louis L. Jaffe, Suits Against Governments and Officers: Sovereign Immunity, 77 Harv. L. Rev. 1, 3 (1963) (citation omitted); see also Engdahl, supra, at 3 (describing the "principle that the king could not rightfully refuse to grant a petition of right"). Moreover, because petitions of right and other "prerogative remedies" that allowed subjects to pursue a suit against the Crown "were

invariably controlled by the King's justices rather than the King himself," the "rule of law, as opposed to royal whim, largely determined the availability of relief against the Crown." Pfander, supra, at 908. By the eighteenth century, such procedures were so ingrained in the common law that "[i]n the same paragraph in which William Blackstone proclaimed the immunity of the Crown, he also sketched the procedure on the 'petition of right.'" Id. at 901; see also Marbury v. Madison, 5 U.S. (1 Cranch) 137, 163 (1803) ("The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection. In Great Britain the king himself is sued in the respectful form of a petition, and he never fails to comply with the judgment of his court."). As a result of these procedures for obtaining redress, although the formal immunity of the Crown was deeply rooted in the common law, by the eighteenth century, it operated primarily as merely a matter of formalism, with a variety of procedural work-arounds to ensure that victims could obtain redress for wrongs committed by the Crown's agents.[5]

Given that sovereign immunity in England was rooted in the common law and linked to the personal immunity of the king, it is not surprising that "[a]t the time of the Constitution's adoption, the federal government's immunity from suit was a question—not a settled constitutional fact." Vicki C. Jackson, Suing the Federal Government: Sovereignty, Immunity,

---

[5] There is some historical evidence that by the time of the Founding, the English legal system had moved responsibility for adjudicating claims against the Crown from these mechanisms formally relying on the king's consent to Parliament, as Parliament won authority over appropriations. See generally Paul F. Figley & Jay Tidmarsh, The Appropriations Power and Sovereign Immunity, 107 Mich. L. Rev. 1207 (2009). That being said, the English commentators on whom the Founders relied to understand the common law, such as Blackstone, continued to describe this petitioning process. Moreover, as discussed below, American sources at the Founding relied on these earlier English doctrines in articulating an understanding of the basis of sovereign immunity, and early American practice mimicked, in many ways, these formalist work-arounds to ensure that wrongs did not go unredressed.

and Judicial Independence, 35 Geo. Wash. Int'l L. Rev. 521, 523 (2003). "The nature of the sovereignty created under the 1789 Constitution was something new and uncertain—it took the people and the institutions time to work out their relationships." Id. at 528. Mapping the old English doctrine of sovereign immunity onto this new system implicated many "[q]uestions of the form of government and of the nature of the sovereignties created" by the Constitution, including whether there was a sovereign in the new republic and, "[i]f so, where did that sovereignty reside under a system of separated powers" and "[w]hat were the roles of the national legislature, the executive, and the federal courts" in that sovereign system. Id. at 528-29. The answers to these questions were not immediately obvious and, indeed, the courts did not quickly adopt a theory of federal sovereign immunity. In fact, "[t]he first clear reference to the sovereign immunity of the United States in an opinion for the entire [Supreme] Court" did not appear until 1821, when the concept of federal sovereign immunity was discussed in dicta, and the first time sovereign immunity was invoked by the Supreme Court "as a basis to deny relief" occurred in 1846. Id. at 523 n.5.

Indeed, early discussions of federal sovereign immunity by the Supreme Court exhibit a sense that the doctrine may be incompatible with a republican form of government. For example, in Chisholm v. Georgia, 2 U.S. (2 Dall.) 419 (1793), superseded by constitutional amendment, U.S. Const. amend XI, Chief Justice Jay wrote:

> It will be sufficient to observe briefly, that the sovereignties in Europe, and particularly in England, exist on feudal principles. That system considers the Prince as the sovereign, and the people as his subjects; it regards his person as the object of allegiance, and excludes the idea of his being on an equal footing with a subject, either in a Court of Justice or elsewhere. That system contemplates him as being the fountain of honor and authority; and from his grace and grant derives all franchises, immunities and privileges; it is easy to perceive that such a sovereign could not be amenable to a Court of Justice, or subjected to judicial controul and actual constraint. It was of necessity, therefore, that suability became incompatible with such sovereignty. Besides, the Prince having all the Executive powers, the judgment of the Courts would,

in fact, be only monitory, not mandatory to him, and a capacity to be advised, is a distinct thing from a capacity to be sued. The same feudal ideas run through all their jurisprudence, and constantly remind us of the distinction between the Prince and the subject. No such ideas obtain here; at the Revolution, the sovereignty devolved on the people; and they are truly the sovereigns of the country, but they are sovereigns without subjects . . . and have none to govern but themselves; the citizens of America are equal as fellow citizens, and as joint tenants in the sovereignty.

Id. at 471-72 (opinion of Jay, C.J.) (emphasis omitted). Although the question was not directly presented in Chisholm, Chief Justice Jay argued that "fair reasoning" suggests that the Constitution permits "that the United States may be sued by any citizen, between whom and them there may be a controversy" by extending judicial power to "controversies to which the United States are a party." Id. at 478; see also Jackson, supra, at 532-33 (reading Justice Wilson's opinion in Chisholm to argue "that the absence of monarch, the role of a written constitution and the process of judicial review suggested that English approaches to sovereign immunity were inapposite to the suability of governments under the United States Constitution" (citing Chisholm, 2 U.S. (2 Dall.) at 453-66 (opinion of Wilson, J.))).

Early American courts were not generally forced to confront the question whether the federal government enjoyed sovereign immunity because, as in England, "many judicial remedies for governmental wrongdoing were available" that did not involve direct suit against the government. Jackson, supra, at 523-24. For example, in the early days of the Republic, the usual remedy for torts committed by government officials was a damages suit directly against the official who committed the tort. Ann Woolhandler, Patterns of Official Immunity and Accountability, 37 Case W. Res. L. Rev. 396, 414-16 (1987); see also Ann Woolhandler, Old Property, New Property, and Sovereign Immunity, 75 Notre Dame L. Rev. 919, 922 (2000) ("Individual officers remained liable for their torts under general agency law, even if they were working for a disclosed principal—the state."). In addition, under the Judiciary Act of 1789, "all

federal courts could issue writs of habeas corpus," which are inherently directed to government custodians but "have never been regarded as barred by sovereign immunity." Jackson, supra, at 524. Similarly, "the writ of mandamus and the injunction have been available in actions against individual government officials" to address ongoing legal violations. Id. at 525.

Specifically with respect to torts committed by government agents, the Supreme Court confirmed as early as 1804 that, as in England, direct suits against government officers were not barred by sovereign immunity. In Little v. Barreme, 6 U.S. (2 Cranch) 170 (1804), the Court held that a damages suit could proceed against a naval officer who directed the seizure of a ship sailing from France to St. Thomas. Id. at 176-77, 179. Although the seizure conformed to orders given by the Secretary of the Navy, it was unlawful under the relevant statute, which authorized seizures of ships sailing to, but not from, French ports. Id. at 177-78. The Court recognized the apparent unfairness of holding a military officer personally liable for following orders but nevertheless concluded that instructions from the executive "cannot change the nature of the transaction, or legalize an act which without those instructions would have been a plain trespass" and, accordingly, the naval captain "must be answerable in damages to the owner of this neutral vessel." Id. at 179.

Although such suits were nominally brought against government officials rather than the government itself, in the early Republic there was a "practice of relatively routine, but not automatic, indemnification" by Congress where an official had been held liable in tort. James E. Pfander & Jonathan L. Hunt, Public Wrongs and Private Bills: Indemnification and Government Accountability in the Early Republic, 85 N.Y.U. L. Rev. 1862, 1868 (2010). "Following the imposition of liability on a government officer, Congress would decide whether to make good the officer's loss in the exercise of its legislative control of the appropriation process," thereby

"preserv[ing] the formal doctrine of sovereign immunity while assigning the ultimate loss associated with wrongful conduct to the government." Id. For example, after the Supreme Court's decision in Little, Captain Little, the naval officer found liable for the unlawful seizure of the ship, submitted a petition for indemnity to Congress, and Congress passed a bill indemnifying him. Id. at 1902. Indeed, between 1789 and 1860, there were at least "57 cases of officers petitioning for indemnification and 11 cases of suitors petitioning for the payment of a judgment against an officer" and, of these cases, over 60% of the petitioners received some form of relief, such as a private bill appropriating money directly to the officer or the victim. Id. at 1904-05.

This two-part officer suit and indemnification system rendered sovereign immunity a formalism that barred suits directly against the government but did not bar recovery from the government, at least with respect to torts committed by government agents. Instead, the function of sovereign immunity was to divide responsibilities between the judiciary and the legislature: the judiciary determined, in a direct suit against the officer, whether the conduct was unlawful and, if so, the amount of damages; and in the case of unlawful conduct, Congress determined whether the circumstances were such that the government rather than the officer should ultimately bear the loss. See id. at 1868.

Even after the concept of federal sovereign immunity had worked its way into our legal system to become "a familiar doctrine of the common law," The Siren, 74 U.S. (7 Wall.) 152, 153-54 (1869), the idea that the concept should be construed, to the extent possible, as a procedural doctrine rather than a substantive bar to recovery led the Supreme Court to create work-arounds to allow recovery, as demonstrated by a pair of Reconstruction Era cases. In The Siren, the Court held that even though direct suits may not be instituted against the United States,

15

"when the United States institute a suit, they waive their exemption so far as to allow a presentation by the defendant of set-offs, legal and equitable, to the extent of the demand made or property claimed, and when they proceed in rem, they open to consideration all claims and equities in regard to the property libelled." 74 U.S. (7 Wall.) at 154. In a similar vein, in The Davis, 77 U.S. (10 Wall.) 15 (1870), the Court held that sovereign immunity does not bar the enforcement of a lien against goods that are seized after the United States has contracted for their delivery but before they are in the possession of the government. Id. at 21-22. Although the seizure in question forced the United States "to the necessity of becoming claimant and actor in the court to assert [a] claim" to the goods, the Court determined that it technically did not infringe on the immunity of the federal government because the "marshal served his writ and obtained possession without interfering with that of any officer or agent of the government." Id. at 22.

In both of these cases, the Supreme Court relied on formal understandings of the nature of immunity from suit to allow injured parties to maintain claims—either as offset or in rem claims—even though doing so subjected the government's conduct or property rights to judicial review. Moreover, in both cases, the Court invoked the historical remedies available against the Crown in England as a reason for narrowly construing any claim of immunity. In The Siren, the Court observed that "[i]n England, when the damage is inflicted by a vessel belonging to the crown," the "present practice" is to file a suit in rem and have the court direct "the registrar to write to the lords of the admiralty requesting an appearance on behalf of the crown—which is generally given." 74 U.S. (7 Wall.) at 155. Similarly, in The Davis, the Court observed that in situations where "it is made to appear that property of the government ought, in justice, to contribute to a general average, or to salvage" in maritime cases, the "usual course of proceeding" in England is "for the proper office of the government to consent in court that it may

take jurisdiction of the matter." 77 U.S. (10 Wall.) at 20. Although these procedures, which were developed to "prevent [the] apprehension of gross injustice in such cases in England," id., could not be identically implemented in the United States given the government's structure, the Court attempted to prevent gross injustice by providing a procedural mechanism that allowed injured parties to obtain relief without directly suing the government.

This formalistic approach to sovereign immunity was reinforced a decade later in United States v. Lee, 106 U.S. 196 (1882), which involved the question whether an ejectment action between private plaintiffs and federal officer defendants should be dismissed as barred by sovereign immunity when the United States asserted ownership of the land. Id. at 196-98. To help explain the limits of sovereign immunity, the Lee Court went through the justifications given in English common law for the immunity of the Crown, explaining how each justification did not serve to support the adoption of the doctrine into the quite different context of the American republican government. According to the Lee Court, "one reason given by the old judges was the absurdity of the King's sending a writ to himself to command the King to appear in the King's court," but "[n]o such reason exists in our government." Id. at 206. Another reason advanced by English authorities was that "the government is degraded by appearing as a defendant in the courts of its own creation," but the Lee Court rejected this reason "because [the government] is constantly appearing as a party in such courts, and submitting its rights as against the citizen to their judgment." Id. The Lee Court also observed that another reason given for sovereign immunity—"that it would be inconsistent with the very idea of supreme executive power, and would endanger the performance of the public duties of the sovereign, to subject him to repeated suits as a matter of right"—did not apply to the United States because "no person in this government exercises supreme executive power, or performs the public duties of a

17

sovereign," and it is therefore "difficult to see on what solid foundation of principle the exemption from liability to suit rests." Id. (citation omitted).

Indeed, the Lee Court explained that the differences between the English and American systems of government are such that English court decisions extending immunity in similar circumstances should be discounted in light of the uniquely American principle that no man is above the law:

> [L]ittle weight can be given to the decisions of the English courts on this branch of the subject, for two reasons: —
> 1. In all cases where the title to property came into controversy between the crown and a subject, whether held in right of the person who was king or as representative of the nation, the petition of right presented a judicial remedy,— a remedy which this court, on full examination in a case which required it, held to be practical and efficient. There has been, therefore, no necessity for suing the officers or servants of the King who held possession of such property, when the issue could be made with the King himself as defendant.
> 2. Another reason of much greater weight is found in the vast difference in the essential character of the two governments as regards the source and the depositaries of power. Notwithstanding the progress which has been made since the days of the Stuarts in stripping the crown of its powers and prerogatives, it remains true to-day that the monarch is looked upon with too much reverence to be subjected to the demands of the law as ordinary persons are, and the king-loving nation would be shocked at the spectacle of their Queen being turned out of her pleasure-garden by a writ of ejectment against the gardener. The crown remains the fountain of honor, and the surroundings which give dignity and majesty to its possessor are cherished and enforced all the more strictly because of the loss of real power in the government.
> It is not to be expected, therefore, that the courts will permit their process to disturb the possession of the crown by acting on its officers or agents.
> Under our system the people, who are there called subjects, are the sovereign. Their rights, whether collective or individual, are not bound to give way to a sentiment of loyalty to the person of monarch. The citizen here knows no person, however near to those in power, or however powerful himself, to whom he need yield the rights which the law secures to him when it is well administered. When he, in one of the courts of competent jurisdiction, has established his right to property, there is no reason why deference to any person, natural or artificial, not even the United States, should prevent him from using the means which the law gives him for the protection and enforcement of that right.

Id. at 208-09 (alterations in original); see also Langford v. United States, 101 U.S. 341, 342-43 (1879) (unanimously rejecting the "maxim of English constitutional law that the king can do no

wrong" because it does not "have any place in our system of government," where "[w]e have no king" and where it is obvious that "wrong may be done by the governing power"). Accordingly, the Lee Court interpreted the doctrine of sovereign immunity formalistically, barring suit directly against the government but allowing the plaintiffs to proceed with their ejectment action against the government officers despite the federal government's claim of ownership to the land.

As these cases, together with the earlier cases allowing for direct suit against government officials, demonstrate, sovereign immunity was incorporated into American common law in the nineteenth century primarily as a procedural mechanism regulating the ways in which injured parties could obtain relief rather than as a substantive bar to recovery in the ordinary case. Indeed, well into the twentieth century, "[f]or tortious or otherwise wrongful action by a government official, in violation of or not authorized by law, . . . officer suits—for mandamus, for ejectment, or other common law remedies—could serve as moderately effective vehicles for contesting claims of right as between governments and private individuals." Jackson, supra, at 554.

Although these procedural work-arounds reduced the need for federal courts to explore the contours of sovereign immunity doctrine by providing some avenues for recovery, by the late nineteenth century, the Supreme Court recognized that the "general doctrine" of federal sovereign immunity, which had first appeared in Cohens v. Virginia, 19 U.S. (6 Wheat.) 264 (1821), had "been repeatedly asserted" until it came to be "treated as an established doctrine" by the Court. Lee, 106 U.S. at 207. As the Lee Court observed, this entrenchment in the common law had happened sub silentio: to that point, the Supreme Court had never engaged in a detailed discussion of the doctrine or explained the reasons for it, but rather had implicitly incorporated it into American law. Id. Nevertheless, by the end of the Civil War, the Supreme Court, while

19

narrowly construing the doctrine, invariably adhered to the principle that the federal government could not formally be sued without its consent.

b. Contemporary Sovereign Immunity Practice

Despite these murky beginnings, it is today well established that the United States enjoys the benefit of sovereign immunity and cannot be sued absent a waiver of this immunity. Pornomo v. United States, 814 F.3d 681, 687 (4th Cir. 2016).[6] With respect to torts committed

---

[6] The government argues that any government waiver of immunity must be "express." U.S.' Mem. of Law in Supp. of its Mot. to Dismiss [Dkt. No. 697] ("Gov't MTD Mem.") 3; see also Notice of Suppl. Authority Regarding the U.S.' Pending Mot. to Dismiss [Dkt. No. 1166]. Although the Fourth Circuit and the Supreme Court have used language suggesting that any sovereign immunity waiver must be explicit and statutory, see, e.g., Lane v. Pena, 518 U.S. 187, 192 (1996) ("A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text . . . ."); Robinson v. U.S. Dep't of Educ., No. 18-1822, 2019 WL 1051585, at *2 (4th Cir. Mar. 6, 2019) ("Sovereign immunity, in short, can only be waived by statutory text that is unambiguous and unequivocal."); Pornomo, 814 F.3d at 687 ("As a sovereign, the United States is immune from all suits against it absent an express waiver of its immunity." (citation omitted)), both contemporary and historical practice, including many Supreme Court decisions, confirm that no such categorical rule exists. For example, the Supreme Court has held that time-bar limitations on waivers of sovereign immunity may be subject to equitable tolling even in the absence of affirmative congressional authority indicating an intent to allow such tolling. See United States v. Kwai Fun Wong, 135 S. Ct. 1625, 1630-33 (2015). In addition, the Court has suggested that in some circumstances, the doctrine of estoppel may support suits against the government even in the absence of an explicit waiver of sovereign immunity. Office of Personnel Mgmt. v. Richmond, 496 U.S. 414, 422-23 (1990). Similarly, the Court has indicated that sovereign immunity would not always bar an independent action brought under Fed. R. Civ. P. 60(b) in the same court in which the government had previously subjected itself to suit, which is an interpretation of immunity relying on the government's ability to waive its immunity through litigation conduct. United States v. Beggerly, 524 U.S. 38, 42-48 (1998). This decision accords with the settled rule in a variety of other contexts that governments may impliedly waive sovereign immunity. See, e.g., 28 U.S.C. § 1605(a)(1) (stating that a foreign state may waive its immunity "by implication"); Lapides v. Bd. of Regents of the Univ. Sys. of Ga., 535 U.S. 613, 616 (2002) (holding that the act of removing a lawsuit against a state to federal court operates as a waiver of state sovereign immunity); United States v. Eckford, 73 U.S. (6 Wall.) 484, 491 (1868) (holding that when the government brings suit against a defendant, the defendant may permissibly plead a counterclaim that acts as an offset against the government's claim even absent a statutory waiver of sovereign immunity as to the counterclaim); Int'l Indus. Park, Inc. v. United States, 102 Fed. Cl. 111, 113-14 (2011) (holding that the Army Corps of Engineers waived sovereign immunity with respect to a fee award by entering into a contract that included a fee-shifting provision). There is also a long history in

by federal government actors, Congress has "provid[ed] a limited waiver of sovereign immunity for injury or loss caused by the negligent or wrongful act of a Government employee acting within the scope of his or her employment" through the FTCA, which "renders the United States liable for such tort claims in the same manner and to the same extent as a private individual under like circumstances." Id. (internal quotation marks and citations omitted). At the same time, Congress has placed two relevant limitations on the ability of injured parties to recover under the FTCA. First, Congress has carved out multiple exceptions to its waiver of immunity, see 28 U.S.C. § 2680, including, as previously discussed, any claim "arising in a foreign country," id. § 2680(k).[7] Second, the Westfall Act provides that the FTCA's remedies against the government itself are "exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against the employee whose act or omission gave rise to the claim." Id. § 2679(b)(1). Under this provision, if an injured party attempts to bring a tort suit directly against the government officer who caused the harm and the officer was acting within the scope of his employment at the time, the United States is substituted as a defendant, id. § 2679(d), and enjoys all of the privileges of sovereign immunity. Accordingly, for torts committed by government

---

American jurisprudence of "U.S. courts rel[ying] on the doctrine of implied waiver to find jurisdiction over trading corporations owned or controlled by a foreign government." Adam C. Belsky et al., Comment, Implied Waiver Under the FSIA: A Proposed Exception to Immunity for Violations of Peremptory Norms of International Law, 77 Calif. L. Rev. 365, 395-96 (1989); see also Bank of the U.S. v. Planters' Bank of Ga., 22 U.S. (9 Wheat.) 904, 907-08 (1824) (recognizing that a state can waive immunity by conduct, such as becoming a corporator in a corporation, because "when a government becomes a partner in any trading company, it devests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen"). Accordingly, although sovereign immunity waivers are often effected through statute, history and caselaw confirm that the government may also waive its immunity impliedly through its conduct.

[7] Because federal sovereign immunity is a creature of federal common law rather than any statute or the Constitution, the FTCA does not affirmatively assert sovereign immunity with respect to any of the exceptions in § 2680. Instead, the FTCA provides that the "provisions of this chapter" that waive sovereign immunity "shall not apply" to such claims. 28 U.S.C. § 2680.

employees, a direct suit against the wrongdoer is no longer available and, when the tort claim falls within an exception delineated in the FTCA, a suit directly against the government is ordinarily blocked by sovereign immunity. As a result, in the realm of torts committed by government agents, sovereign immunity has in many situations evolved into a substantive bar to relief, rather than merely a procedural device regulating how the injured party may recover.

It was not inevitable that sovereign immunity would develop in this way. Indeed, in many other countries whose legal systems evolved from English common law, sovereign immunity is no longer a bar to suing the government in tort. For example, in the United Kingdom, the Crown Proceedings Act establishes that "the Crown shall be subject to all those liabilities in tort to which, if it were a private person of full age and capacity, it would be subject" in respect of, among other things, "torts committed by its servants or agents." Crown Proceedings Act 1947, 10 & 11 Geo. 6 c. 44, § 2(I); see also Crown Proceedings Act 1950, s 6 (N.Z.) (establishing the same rule for New Zealand). Similarly, in Canada, the "Crown is liable for the damages for which, if it were a person, it would be liable" for "a tort committed by a servant of the Crown" or "a breach of duty attaching to the ownership, occupation, possession or control of property." Crown Liability and Proceedings Act, R.S.C. 1985 c. c-50, s. 3. In Australia, government liability is even broader, as the Australian Constitution gives Parliament the power to "make laws conferring rights to proceed against the Commonwealth," Australian Constitution s 78, and the Judiciary Act of 1903 provides that any "person making a claim against the Commonwealth, whether in contract or in tort, may in respect of the claim bring a suit against the Commonwealth" in the High Court or various state or territorial courts, Judiciary Act 1903 (Cth) s 56. Perhaps most relevant to the United States given the debates described above about the application of common law sovereign immunity to a republican government, the Irish Supreme

Court has held that sovereign immunity did not survive the creation of the Irish Free State because "it is the People who are paramount and not the State" and this system is "inconsistent with any suggestion that the State is sovereign internally." Byrne v. Ireland [1972] IR 241, 295 (opinion of Budd, J.); see also id. at 266 (opinion of Walsh, J.) ("The fact that this English theory of sovereign immunity, originally personal to the King and with its roots deep in feudalism, came to be applied in the United States where feudalism had never been known has been described as one of the mysteries of legal evolution. It appears to have been taken for granted by the American courts in the early years of the United States—though not without some question . . . .").[8]

Given the experiences of other countries, as well as the way in which the doctrine of sovereign immunity was adopted into federal common law, it is not surprising that there is a long history of criticism of the notion that the federal government should be immune from suit. As early as 1953, academics were attacking "the very bases of this unwanted and unjust concept," Pugh, supra, at 476, and a decade later, professor Louis Jaffe succinctly described the basis of academic and judicial unease with the way in which sovereign immunity had developed into a bar to recovery:

> The King cannot be sued without his consent. But at least in England this has not meant that the subject was without remedy. . . .
> By a magnificent irony, this body of doctrine and practice, at least in form so favorable to the subject, lost one-half of its efficacy when translated into our state and federal systems. Because the King had been abolished, the courts concluded that where in the past the procedure had been by petition of right there was now no one authorized to consent to suit!

---

[8] As Justice Walsh observed in Byrne, this move away from sovereign immunity with respect to tort claims is not limited to countries whose legal systems are rooted in English common law. For example, the law in both France and Germany had developed by 1972 to the point where the state was liable for the tortious acts of its employees. [1972] IR at 267-68 (opinion of Walsh, J.).

Jaffe, supra, at 1-2; see generally Edwin M. Borchard, Government Liability in Tort, 34 Yale L.J. 1, 4-5 (1924) (arguing that the basis of sovereign immunity is the location of absolute sovereignty in the king's person but that the doctrine makes little sense in a country where "sovereignty resides in the American electorate or the people" and that this problem is "heightened by the fact that whereas in England, to prevent the jurisdictional immunity resulting in too gross an injustice, the petition of right, whose origin has been traced back to the thirteenth century, was devised as a substitute for a formal action against the Crown, in America no substitute except an appeal to the generosity of the legislature has in most jurisdictions been afforded" (footnote omitted)); Erwin Chemerinsky, Against Sovereign Immunity, 53 Stan. L. Rev. 1201, 1201 (2001) ("Sovereign immunity is an anachronistic relic and the entire doctrine should be eliminated from American law."). This criticism of the doctrine has also made its way into the judiciary. Not only do the Supreme Court and other courts have a long history of expressing discomfort with the prospect of wielding sovereign immunity as a substantive shield to recovery, as discussed above, but at least one circuit judge has recently argued in favor of reconsidering the principle of sovereign immunity altogether:

> [T]he underpinning for this outcome is an anachronistic judicially invented legal theory that has no validity or place in American law—in this case, sovereign immunity. Two hundred and thirty-five years after we rid ourselves of King George III and his despotic ascendancy over colonial America, we cling to a doctrine that was originally based on the Medieval notion that "the King can do no wrong." This maxim was blindly accepted into American law under the assumption that it was incorporated as part of the common law in existence when our Nation separated from England. However, this assumption does not withstand historical scrutiny. Furthermore, the present case is the quintessential example of the fact that at times the government can, and does, do wrong.
> More importantly, the doctrine of sovereign immunity cannot be sustained in the face of our constitutional structure. Although its language is far from specific in many parts, the Constitution nevertheless contains nothing, specific or implied, adopting the absolutist princip[le] upon which sovereign immunity rests. Furthermore, the record of the debates preceding the adoption of the Constitution are bare of any language or asseveration that might serve as a basis for support of this monarchist anachronism. In

24

fact, the establishment in this country of a republican form of government, in which sovereignty does not repose on any single individual or institution, made it clear that neither the government nor any part thereof could be considered as being in the same infallible position as the English king had been, and thus immune from responsibility for harm that it caused its citizens.

Donahue v. United States, 660 F.3d 523, 526 (1st Cir. 2011) (en banc) (Torruella, J., concerning

the denial of en banc review) (emphasis in original) (citations omitted).[9]

Although this Court remains mindful of the binding nature of the determinations by the

Supreme Court and the Fourth Circuit that the federal government may not be sued in tort

without its consent, the deeper understanding of the history and development of sovereign

immunity doctrine, as well as the contemporary practice in other countries and the academic and

judicial criticism of the path the United States has taken, contextualizes the question presented

by the government's motion to dismiss CACI's Third-Party Complaint.

2.  Jus Cogens Norms

a.  Development of Jus Cogens Norms

Jus cogens norms are defined as those "peremptory norms" that "are nonderogable and

enjoy the highest status within international law." Comm. of U.S. Citizens Living in Nicar. v.

Reagan, 859 F.2d 929, 940 (D.C. Cir. 1988); see also Vienna Convention on the Law of Treaties

art. 53, May 23, 1969, 1155 U.N.T.S. 331 ("Vienna Convention")[10] (defining a jus cogens norm

---

[9] The First Circuit denied en banc review and upheld the decision that it did not have jurisdiction to hear a lawsuit for damages under the FTCA because the plaintiffs did not timely file an administrative notice of their claims. Id. at 524 (majority opinion). The plaintiffs, the estates and heirs of two men killed on the order of notorious Boston mobster Whitey Bulger, had sued the United States under the FTCA "for leaking confidential information to Bulger and enabling his reign of terror." Donahue v. United States, 634 F.3d 615, 616 (1st Cir. 2011).

[10] Although the Vienna Convention has not been ratified by the United States, the "United States considers many of the provisions of the Vienna Convention on the Law of Treaties to constitute customary international law on the law of treaties." Vienna Convention on the Law of Treaties, U.S. Dep't of State, https://www.state.gov/s/l/treaty/faqs/70139.htm (last visited Mar. 11, 2019).

as "a norm accepted and recognized by the international community of States as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character"). Such norms come first from "customary international law," which is a body of law that "results from a general and consistent practice of states followed by them from a sense of legal obligation." Comm. of U.S. Citizens, 859 F.2d at 940 (quoting Restatement (Third) of Foreign Relations Law § 102(2) (Am. Law Inst. 1987)). Once a necessary number of states determine that a particular rule should have the force of international law, that rule is incorporated into customary international law, which is therefore "continually evolving." Id. After a norm has been incorporated into customary international law, it may become a jus cogens, or peremptory, norm if there is "a further recognition by the international community as a whole that this is a norm from which no derogation is permitted." Id. (alterations, internal quotation marks, and citation omitted). Once a norm has achieved the status of jus cogens, it assumes a place at the top of the hierarchy of international norms, such that no state is permitted to derogate from the norm and any treaty or other agreement is void if it conflicts with the norm. See Vienna Convention art. 53; Comm. of U.S. Citizens, 859 F.2d at 940.

The development of the concept of jus cogens norms has proceeded as the "status of individuals under international law has undergone a fundamental change" since World War II, such that "individuals are now said to possess substantive international rights vis-à-vis states." Belsky et al., supra, at 393. This change has corresponded with a shift in the emphasis of international law from "the formal structure of the relationships between States and the delimitation of their jurisdiction to the development of substantive rules on matters of common concern vital to the growth of an international community and to the individual well-being of the

citizens of its member States." Id. at 392-93 (quoting Wilfred Jenks, The Common Law of Mankind 17 (1958)). As a result, the "irreducible element" of international law has become "the sovereignty of the individual, not the sovereignty of states." Id. at 393.

Against this backdrop, jus cogens norms have developed as an expression of the international community's recognition that all states are obligated, in their capacity as states, to respect certain fundamental rights of individuals. Although the exact content of the set of jus cogens norms is debatable, it is clear that certain "fundamental human rights law[s]," such as those that "prohibit[] genocide, slavery, murder, torture," and similarly universally condemned practices, have achieved the status of jus cogens. Comm. of U.S. Citizens, 859 F.2d at 941. In particular, "[t]orture is widely recognized as contravening jus cogens," and "[a]ll major human rights agreements and instruments contain a prohibition against torture" that "is non-derogable." Karen Parker & Lyn Beth Neylon, Jus Cogens: Compelling the Law of Human Rights, 12 Hastings Int'l & Comp. L. Rev. 411, 437-38 (1989).

### b. Jus Cogens Norms and Foreign Sovereign Immunity Law

Although there is no American case law exploring the interplay between violations of jus cogens norms and federal sovereign immunity, the problem of reconciling the peremptory status of jus cogens norms with assertions of immunity from suit has repeatedly vexed foreign, international, and domestic courts in the context of foreign sovereign immunity—that is, the ability of one state to claim immunity from being sued in the courts of another state.

The current position of customary international law on this issue was described in a case in 2012, in which a divided International Court of Justice held that it was a violation of international law for Italian courts to refuse to extend state immunity to Germany with respect to claims brought by Italian citizens for alleged jus cogens violations during World War II.

27

Jurisdictional Immunities of the State (Ger. v. It.; Greece Intervening), Judgment, 2012 I.C.J. 99, ¶ 95 (Feb. 3). Although the court recognized that jus cogens norms preempt any contradictory substantive rules, it held that "the rules which determine the scope and extent of jurisdiction and when that jurisdiction may be exercised do not derogate from those substantive rules which possess jus cogens status," which meant that the customary international rule that states generally enjoy immunity from being sued in the courts of another state prohibited Italy from exercising jurisdiction over a nonconsenting Germany, notwithstanding the jus cogens nature of the norms at issue. Id.

This International Court of Justice decision is generally in accord with other international law decisions on the subject. For example, in 2001, the European Court of Human Rights confronted a case in which a dual British and Kuwaiti national alleged that he was tortured by Kuwaiti officials in Kuwait and attempted to sue Kuwait and various Kuwaiti officials in the British courts. Al-Adsani v. U.K., 2001-XI Eur. Ct. H.R. 79, ¶¶ 9-16. The British courts found that the State Immunity Act of 1978, which governs the exercise of jurisdiction over foreign sovereigns in British courts, did not permit such a suit, id. ¶ 18, and the European Court of Human Rights upheld that decision, ruling that the United Kingdom did not violate international law by declining to exercise jurisdiction over Kuwait to allow for the redress of the jus cogens violations, id. ¶ 66. In particular, the court did not "find it established that there is yet acceptance in international law of the proposition" that one state is not entitled to claim sovereign immunity in the courts of another state "for damages for alleged torture committed outside the forum" state. Id. ¶ 66. Similarly, a Canadian court has held that the plain language of the State Immunity Act, which governs grants of sovereign immunity to foreign states sued in Canadian courts, does not allow for a foreign state to be sued for torture that allegedly occurred in that foreign state and

that international law did not compel the court to exercise jurisdiction despite the plain language of the act. Bouzari v. Iran, [2002] O.J. No. 1624, para. 69 (Can. Ont. Sup. Ct. J.). In so holding, the court interpreted the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. 100-20, 1465 U.N.T.S. 85 ("Convention Against Torture"), to require states to "provide a remedy for torture committed within their jurisdiction" but not to "require a state to provide a civil remedy for acts of torture by a foreign state outside the forum." Id. paras. 51, 54. In addition, the court conducted a survey of international and foreign court decisions and determined that the majority of those decisions held that "to promote comity and good relations between states," a state should be granted immunity from civil suit in the courts of another state, even where torture or other jus cogens violations are considered. Id. para. 69. Accordingly, the court held that the plaintiff could not bring suit in Canadian courts against a foreign state for torture that occurred outside of Canada.

Similarly, American courts have generally refused to interpret the FSIA to waive sovereign immunity in American courts for all jus cogens violations committed by a foreign state. In 1992, the Ninth Circuit held that former Argentine residents could not pursue a lawsuit against Argentina to seek redress for torture and expropriation of property because the FSIA explicitly grants immunity to foreign sovereigns in all cases that do not come within one of the specifically enumerated exceptions, 28 U.S.C. § 1604, and violations of jus cogens norms are not one of the exceptions. Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 704, 718-19 (9th Cir. 1992).

Following this logic, a divided panel of the D.C. Circuit held two years later that a Holocaust survivor could not sue Germany in an American court "to recover money damages for the injuries he suffered and the slave labor he performed while a prisoner in Nazi concentration

29

camps." Princz v. Federal Republic of Germany, 26 F.3d 1166, 1168 (D.C. Cir. 1994). The court specifically examined whether the case fell into the "waiver exception" in the FSIA, which provides that there is no sovereign immunity where "the foreign state has waived its immunity either explicitly or by implication." Id. at 1173 (quoting 28 U.S.C. § 1605(a)(1)). The court rejected the argument "that the Third Reich impliedly waived Germany's sovereign immunity under the FSIA by violating jus cogens norms of the law of nations" because a "foreign state that violates these fundamental requirements of a civilized world thereby waives its right to be treated as a sovereign," finding that the legislative history of the implied waiver provision indicated that any such waiver must be intentional, such as by filing a responsive pleading without raising an immunity defense or agreeing to a choice of law provision. Id. at 1174; see also Sampson v. Federal Republic of Germany, 250 F.3d 1145, 1155-56 (7th Cir. 2001) (holding that Congress did not intend for the FSIA to create an immunity exception for all jus cogens violations); Smith v. Socialist People's Libyan Arab Jamahiriya, 101 F.3d 239, 243-44 (2d Cir. 1996) (holding that the violation of a jus cogens norm did not trigger the implied waiver provision because the examples of implied waivers in the legislative history of the FSIA all involve litigation-adjacent conduct, which the court deemed to be "persuasive evidence that Congress primarily expected courts to hold a foreign state to an implied waiver of sovereign immunity by the state's actions in relation to the conduct of litigation").

Accordingly, in both the international and domestic contexts, there is general, though not unanimous, agreement that a state may not be sued in the courts of a foreign state for conduct, including jus cogens violations, that occurred outside the forum state. Such a rule not only promotes comity and international respect among sovereigns, but it also avoids the problem of global forum-shopping that would accompany any regime of truly universal jurisdiction. That

30

being said, at least some of the foreign cases include an implicit understanding that although sovereign immunity might defeat the exercise of jurisdiction by a state with no connection to the underlying conduct, it may not appropriately bar relief in the courts of a state with a jurisdictional nexus to the jus cogens violation.

### 3. Jus Cogens and Domestic Sovereign Immunity

With this background in mind, it is now appropriate to address the essential question presented by the United States' Motion to Dismiss, which is whether the federal government retains sovereign immunity that protects it from being sued in an American court for alleged jus cogens violations committed by Americans. For the reasons that follow, this Court concludes that the United States does not retain such immunity.

### a. Rights and Remedies

Jus cogens norms not only carry with them an obligation on the part of states to respect the norms but also confer an unquestionable right on each individual to be free from states violating those norms. This right, which is created by international law, is binding on the federal government and enforceable in the federal courts, and the basic axiom that where there is a right, there must be a remedy leads to the conclusion that the government has waived its sovereign immunity with respect to alleged jus cogens violations.

The basic principle that international law is incorporated into American law and is binding on the federal government and enforceable by American courts is as old as the Republic itself. In 1796, the Supreme Court "held that the United States had been bound to receive the law of nations upon declaring its independence," which meant that "the United States was required" to recognize international norms when those norms were recognized by all other nations. David F. Klein, Comment, A Theory for the Application of the Customary International Law of Human

31

Rights by Domestic Courts, 13 Yale J. Int'l L. 332, 338 (1988) (citing Ware v. Hylton, 3 U.S. (3 Dall.) 199 (1796)); see also Jules Lobel, The Limits of Constitutional Power: Conflicts Between Foreign Policy and International Law, 71 Va. L. Rev. 1071, 1084 (1985) ("The early American leadership believed that the attainment of independence obligated the United States to receive and to follow the law of nations."). Indeed, at the time of the Founding, American law was expected to conform to the dictates of international law. "Early federal court cases also suggested that laws or executive actions in violation of international law were void," Lobel, supra, at 1087, and at least one state court permitted the indictment of a defendant for a violation of the law of nations, finding that law to be, "in its full extent, . . . part of the law of th[e] State," Respublica v. De Longchamps, 1 U.S. (1 Dall.) 111, 116 (Pa. Ct. Oyer & Terminer 1784). In a similar vein, the Supreme Court held in 1804 that an "act of Congress ought never to be construed to violate the law of nations if any other possible construction remains, and consequently can never be construed to violate neutral rights, or to affect neutral commerce, further than is warranted by the law of nations as understood in this country." Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 118 (1804).

In the last two centuries, the principle that "federal common law incorporates international law" has become a "settled proposition." Kadic v. Karadzic, 70 F.3d 232, 246 (2d Cir. 1995). Over that time, "Supreme Court decisions, executive statements, and scholarly commentary have . . . considered customary international law to be the law of the land." Lobel, supra, at 1072; see also The Paquete Habana, 175 U.S. 677, 700 (1900) ("International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination."). Moreover, because the "Constitution does not freeze international law to its

state of development [as of] 1789," as international law has evolved to incorporate <u>jus cogens</u> norms, so too has federal common law. Belsky <u>et al.</u>, <u>supra</u>, at 398; <u>see also</u> <u>Sosa</u>, 542 U.S. at 724 (holding that the ATS is a jurisdictional statute "creating no new causes of action" but that the common law "provide[s] a cause of action for . . . certain torts in violation of the law of nations"). Accordingly, there is today a federal common law right derived from international law that entitles individuals not to be the victims of <u>jus cogens</u> violations.

Once it is determined that <u>jus cogens</u> violations infringe on federal rights, it becomes clear that there must be a remedy available to the victims. Indeed, the "ancient legal maxim" <u>ubi jus, ibi remedium</u>—"[w]here there is a right, there should be a remedy"—is as "basic and universally embraced" today as it was two hundred years ago. Akhil Reed Amar, <u>Of Sovereignty and Federalism</u>, 96 Yale L.J. 1425, 1485-86 (1987). As Chief Justice Marshall famously stated in <u>Marbury v. Madison</u>, "The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right." 5 U.S. (1 Cranch) at 163. In fact, not only did the early Supreme Court embrace this principle, but it was also endorsed by many state constitutions and in <u>The Federalist Papers</u>. <u>See</u> Amar, <u>supra</u>, at 1485-86. Since that time, the principle has been incorporated into the basic fabric of American law. Accordingly, by joining the community of nations and accepting the law of nations, the federal government has impliedly waived any right to claim sovereign immunity with respect to <u>jus cogens</u> violations when sued for such violations in an American court.[11]

---

[11] This does not compel the conclusion that federal sovereign immunity does not bar claims of violations of domestic law. The rights created by such laws, which are enacted by Congress against the backdrop of sovereign immunity, may be limited so as not to create a substantive right enforceable against the federal government. <u>Cf.</u> <u>Kawananakoa v. Polyblank</u>, 205 U.S. 349, 353 (1907) (explaining that sovereign immunity derives from the "ground that there can be no

33

## b. The International Enforcement Structure

In addition to this common law remedial imperative, the international enforcement structure mandated by various multilateral agreements to which the United States is a party and envisioned by foreign and international courts requires the United States to submit to suit in its own courts for certain jus cogens violations, especially those related to torture. By joining these agreements and participating in the international community, the United States has therefore impliedly waived its sovereign immunity with respect to such claims.

The Convention Against Torture, which the United States ratified in 1994, requires each state to "ensure in its legal system that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation." Convention Against Torture art. 14(1). Indeed, "[a]lmost all international human rights declarations and treaties, including those that are binding on the United States, impose an obligation on the State to provide compensation for violations of rights that occur." Denise Gilman, Calling the United States' Bluff: How Sovereign Immunity Undermines the United States' Claim to an Effective Domestic Human Rights System, 95 Geo. L.J. 591, 624 (2007); see also Velasquez Rodriguez Case, 1988 Inter-Am. Ct. H.R. (ser. C) No. 4, ¶ 174 (July 29, 1988) ("The State has a legal duty to take reasonable steps to prevent human rights violations and to use the means at its disposal to carry out a serious investigation of violations committed within its jurisdiction, to identify those responsible, to impose the appropriate punishment and to ensure the victim adequate compensation.").

---

legal right as against the authority that makes the law on which the right depends"). With respect to violations of jus cogens norms, the substantive right has been created by international law and incorporated into federal common law. Accordingly, the right is not so limited and is enforceable against the federal government.

In response to inquiries from the United Nations Committee Against Torture about whether the United States has taken appropriate steps to comply with its obligation "to ensure that mechanisms to obtain full redress, compensation and rehabilitation are accessible to all victims of acts of torture," the United States has explained that "U.S. law provides various avenues for seeking redress in cases of torture" and that, "as to torture specifically, the Torture Victim Protection Act . . . created a cause of action in federal courts against" foreign officials who commit torture. United Nations Committee Against Torture, Convention Against Torture, Periodic Report of the United States of America (Third, Fourth, and Fifth Reports) (Aug. 12, 2013) ¶ 147, at 53. Although with respect to American officials and the federal government, neither of whom may be sued under the Torture Victim Protection Act, the government has explained to the Committee Against Torture that claims may be resolved through the military, id., it has not provided any information about how this resolution structure complies with its obligations under the Convention Against Torture. Moreover, in response to a request asking "whether the United States would consider authorizing jurisdiction by the Committee to receive and adjudicate complaints by individuals claiming to have suffered human rights violations committed by the United States," the government refused to consent to such jurisdiction on the basis that the domestic legal system provides an adequate remedy for such individuals. See Gilman, supra, at 602. Because the Westfall Act provides that a suit against the government is the exclusive remedy for torts committed by government officers in the course of their government employment, victims who were tortured by American government or military personnel are unable to sue the torturers directly. See Ameur v. Gates, 950 F. Supp. 2d 905, 914-18 (E.D. Va. 2013) (holding that the United States had properly substituted itself as a defendant under the Westfall Act where the plaintiff, who alleged various jus cogens violations including

torture, had named individual government officers as defendants), aff'd, 759 F.3d 317 (4th Cir. 2014). As such, allowing the United States to assert sovereign immunity as a defense to such claims would ensure that the domestic legal system does not provide an adequate remedy to victims of torture. Cf. Gilman, supra, at 634 (explaining that the European Court of Human Rights has held that blanket immunities amount "to an unjustifiable restriction on an applicant's right to have a determination on the merits of his or her claim" and that courts must examine claims "on the merits in an adversarial proceeding that would require the [government actors] to 'account for their actions and omissions' rather than to dismiss those claims on immunity grounds" (quoting Osman v. United Kingdom (No. 95), 1998-VIII Eur. Ct. H.R. 3124, 3170-71)). Accordingly, by ratifying the Convention Against Torture and assuring the Committee Against Torture that an adequate civil remedy exists for such victims, the United States has impliedly waived its sovereign immunity with respect to such claims.

This conclusion is further reinforced by the international prosecution structure envisioned by these agreements and effected by international and foreign courts. Article 5 of the Convention Against Torture provides that each state party "shall take such measures as may be necessary to establish its [criminal] jurisdiction over" torture-related offenses where the offenses occur within the territory of the state, where the offender is a state national, or "where the alleged offender is present in any territory under its jurisdiction and it does not extradite him." Convention Against Torture art. 5(1)-(2). This provision establishes a structure whereby each state party to the Convention is required to assume criminal jurisdiction over all cases with a strong jurisdictional nexus to the state—where the offender is a national or the offense occurred within the state—and is also required either to extradite or prosecute offenders who are not nationals and who did not engage in the criminal conduct within the state but who are found in the state's territory. Read

together, these rules establish a logical structure for criminal prosecution of those engaged in torture: when possible, prosecution should take place in a state with a strong jurisdictional interest in the case, but when that is not possible, prosecution may take place in any state where the offender is found or to which the offender can be extradited.

Although not specifically required by the Convention Against Torture, courts have effected a similar remedial structure for civil torture claims against states. By refusing to exercise jurisdiction over foreign states where the conduct in question occurred outside the forum, courts have determined that civil suits should, like criminal prosecutions, proceed in the courts that have the strongest jurisdictional nexus to the conduct. Typically, those courts would be in the state that allegedly carried out the torture or where the torture allegedly occurred. Unlike in the case of criminal prosecutions, there is no universal jurisdiction safety valve where such a court is unable or unwilling to exercise jurisdiction. Accordingly, to effectuate the global remedial structure apparently envisioned by the Convention Against Torture, it is necessary for those courts with a nexus to alleged torture to exercise jurisdiction over victims' civil claims. In this case, the United States has decreed that it and its personnel are not subject to the jurisdiction of Iraqi courts for conduct arising out of the occupation of Iraq, see Memorandum Opinion [Dkt. No. 678] 51 (explaining that Coalition Provisional Authority Order 17 directs that injured parties, such as plaintiffs, may not bring claims arising from coalition activities in Iraqi courts because "occupying powers . . . are not subject to the laws or jurisdiction of the occupied territory" (citation omitted)), which leaves American courts as the only courts with a jurisdictional nexus to such claims. Therefore, to effectuate the international enforcement structure envisioned by the Convention Against Torture and affirmed by international and foreign courts, it is necessary for American courts to exercise jurisdiction over civil claims

arising out of alleged torture by American personnel in Iraq.[12] Accordingly, by becoming a party to the Convention Against Torture, the government has impliedly waived any sovereign immunity defense that would prevent such enforcement.

### c. Hierarchy of Norms

The place of jus cogens norms at the top of the hierarchy of international law norms and their status as obligatory and overriding principles that invalidate any contradictory state acts, as well as their development from the ashes of World War II, provide an additional reason that the United States does not have sovereign immunity here.

Jus cogens norms "enjoy the highest status within international law," and their supremacy "extends over all rules of international law." Siderman de Blake, 965 F.2d at 715-16 (internal quotation marks and citation omitted). Accordingly, these norms "prevail over and invalidate international agreements and other rules of international law in conflict with them." Id. (internal quotation marks and citation omitted). As one specific example, it is unquestionable that jus

---

[12] This structure for civil enforcement, including waiver of sovereign immunity in a state's own courts, also dovetails with Congress's original intent in passing the ATS. This statute was passed after "substantial foreign-relations problems" were caused by the "inability of the central government to ensure adequate remedies for foreign citizens" under the Articles of Confederation. Jesner v. Arab Bank, PLC, 138 S. Ct. 1386, 1396 (2018). For example, "[i]n 1784, the French Minister lodged a protest with the Continental Congress after a French adventurer, the Chevalier de Longchamps, assaulted the Secretary of the French Legation in Philadelphia." Id. Similarly, "[a] few years later, a New York constable caused an international incident when he entered the house of the Dutch Ambassador and arrested one of his servants." Id. The Articles of Confederation did not provide a national forum to resolve these disputes, which caused tension with foreign governments and led to a fear that the failure to provide such a forum "might cause another nation to hold the United States responsible for an injury to a foreign citizen." Id. at 1397. In the case before this Court, the government has already disclaimed Iraqi jurisdiction over the American personnel who allegedly committed the jus cogens violations, despite their occurrence in Iraq against Iraqi citizens. Barring any civil suit in American federal court against the government officials involved or the government itself may result in Iraq or another government asserting jurisdiction with respect to the claims, thereby frustrating the original purpose of the ATS.

cogens norms "limit the scope of treaties, such that a treaty concluded in violation of a jus cogens norm [i]s null and void." Belsky et al., supra, at 390. Because the concept that a sovereign may claim immunity from suit "itself is a principle of international law," Siderman de Blake, 965 F.2d at 718, the peremptory status of jus cogens norms means that when sovereign immunity and jus cogens norms conflict, the sovereign immunity principle must give way. See id. (concluding that as "a matter of international law, [this] argument carries much force"). In this case, the two norms conflict because the jus cogens norms in question inherently include not only a rule prohibiting states from torturing individuals but also necessarily a rule requiring an effective means to redress that violation. Without such a remedial principle, the prohibitory norm itself would be toothless and, given the recognized importance of ensuring adherence to jus cogens norms, any interpretation defanging the norm would impermissibly "undo what [the international community] has done" in implementing the norm. King v. Burwell, 135 S. Ct. 2480, 2496 (2015). So interpreted, any jus cogens norm must prevail over and invalidate any principle allowing the assertion of sovereign immunity in response to claims of jus cogens violations.[13]

Moreover, the circumstances surrounding the development of the concept of peremptory norms—ones that can bind all states even without their explicit consent and even with regard to domestic conduct—provide additional force to the conclusion that sovereign immunity must give way in the face of violations of such norms. The concept of such binding norms arose in the

---

[13] Indeed, the "very existence of jus cogens limits state sovereignty in the sense that the general will of the international community of states takes precedence over the individual wills of states to order their relation." Belsky et al., supra, at 390 (internal quotation marks and footnote omitted). Accordingly, "the concept that a sovereign is subject to no restraints except those imposed by its own will is inconsistent with the definition of jus cogens as peremptory law," id. at 390-91, and because the United States accepts the existence of jus cogens norms, it must also accept the conclusion that its immunity from suit is not categorical.

wake of World War II and the Nuremberg trials. Before the atrocities committed by Nazi Germany, "a state's treatment of its own citizens was considered immune from the dictates of international law." Princz, 26 F.3d at 1182 (Wald, J., dissenting). The Nuremberg trials, in which German officials were prosecuted for crimes against humanity, including crimes against German citizens, "permanently eroded any notion that the mantle of sovereign immunity could serve to cloak an act that constitutes a 'crime against humanity,' even if that act is confined within the borders of a single sovereign state." Id. These prosecutions "forced the world to acknowledge that, even absent formal expressions of certain international principles in the past, the rule of reason required the conviction of Nazi war criminals" and, more generally, represented an acceptance by the global community of the idea that rules "appealing to normative values, such as human rights principles, do not depend on the will of the governing executive or legislative authority for their legality; they are part of the common law." Klein, supra, at 348, 352. As the International Military Tribunal at Nuremberg explained:

> The principle of international law, which under certain circumstances, protects the representatives of a State, cannot be applied to acts which are condemned as criminal by International Law. The authors of these acts cannot shelter themselves behind their official position in order to be freed from punishment in appropriate proceedings. . . . [T]he very essence of the Charter [of the International Military Tribunal] is that individuals have international duties which transcend the national obligations of obedience imposed by the individual State. He who violates the laws of war cannot obtain immunity while acting in pursuance of the authority of the State if the State in authorizing action moves outside its competence under International Law. . . . The provisions of [the Charter of the International Military Tribunal providing that acting pursuant to a superior's order is not a defense to criminal liability] are in conformity with the law of all nations. That a soldier was ordered to kill or torture in violation of the International Law of war has never been recognized as a defense to such acts of brutality . . . .

International Military Tribunal (Nuremberg), Judgment and Sentences (1946), reprinted in 41 Am. J. Int'l L. 172, 221 (1947). The principle at the heart of the Nuremberg trials, and the concomitant acceptance of the existence of certain peremptory norms, is simple and persuasive:

40

there are some acts that are, as a matter of morality and reason, fundamentally wrong such that

no state may authorize their commission nor immunize those involved in such acts from liability.

This principle compels the conclusion that just as a government official is unable to cloak

himself in the mantle of sovereign immunity to avoid prosecution when he commits a jus cogens

violation, so too is a government unable to immunize itself from civil liability for such

violations. And indeed, not only has the United States accepted the principles advanced at

Nuremberg, it actually

> led the way in these developments and must therefore accept domestically these legal
> limitations on national sovereignty. As Justice Jackson, the United States prosecutor
> at Nuremberg, stated, "[i]f certain acts in violation of treaties are crimes, they are
> crimes whether the United States does them or whether Germany does them, and we
> are not prepared to lay down a rule of criminal conduct against others which we would
> not be willing to have invoked against us." A complete deference by United States
> courts to executive orders or congressional acts irrespective of international law
> implications would be simply inconsistent with the spirit and rationale of Nuremberg.

Lobel, supra, at 1074 (alteration in original) (footnotes omitted). Accordingly, both by

participating in the Nuremberg trials and the parallel development of peremptory norms of

international law and by continuing to recognize the existence of such peremptory norms, the

United States has waived its sovereign immunity for any claims arising from the violations of

such norms.

d.  Consent Through Membership in the Community of Nations

The United States has also consented to suit with respect to jus cogens violations by

holding itself out as a member of the international community because the respect and

enforcement of jus cogens norms are fundamental to the existence of a functioning community of

nations. Jus cogens norms have been developed not only to safeguard the rights of individuals

but also to provide an obligatory framework for ordering the relations of states because, as in any

community, the "absolute protection" of "certain norms and values" is necessary for the "public

order of the international community." Belsky et al., supra, at 387. Indeed, at least one "influential modern definition of jus cogens," which was given by a delegate to the United Nations Conference on the Law of Treaties, frames jus cogens norms in precisely these terms: "The rules of jus cogens [are] those rules which derive from principles that the legal conscience of mankind deem[s] absolutely essential to coexistence in the international community." Parker & Neylon, supra, at 415 (alterations in original) (citation omitted). A similar "emphasis on the importance of jus cogens in maintaining the existence of international law" has been echoed by a variety of other authorities, including foreign court decisions. Id. at 415-16; see also Princz, 26 F.3d at 1181 (Wald, J., dissenting) (explaining that the "principle of nonderogable peremptory norms evolved due to the perception that conformance to certain fundamental principles by all states is absolutely essential to the survival of the international community" and that if "the conscience of the international community [were] to permit derogation from these norms, ordered society as we know it would cease"); Stefan A. Riesenfeld, Editorial Comment, Jus Dispositivum and Jus Cogens in International Law: In the Light of a Recent Decision of the German Supreme Constitutional Court, 60 Am. J. Int'l L. 511, 513 (1966) ("Only a few elementary legal mandates may be considered to be rules of customary international law which cannot be stipulated away by treaty. The quality of such peremptory norms may be attributed only to such legal rules as are firmly rooted in the legal conviction of the community of nations and are indispensable to the existence of the law of nations as an international legal order, and the observance of which can be required by all members of the international community." (quoting the German Supreme Court)).

This function of jus cogens norms as the building blocks of an international legal order comes into considerable tension with the notion of sovereign immunity. In recognition of this

inherent discord between the rule of law and unrestrained sovereignty, at least some commentators have described the introduction of jus cogens norms as "part of an ongoing struggle to move beyond unrestricted state sovereignty (that is, to establish an international rule of law)." Mary Ellen Turpel & Philippe Sands, Peremptory International Law and Sovereignty: Some Questions, 3 Conn. J. Int'l L. 364, 365 (1988). By continuing to engage with the international community, the United States has expressed a wish "to preserve the international order," which inherently involves "abdicat[ing] any 'right' to ignore or violate [jus cogens] norms." Princz, 26 F.3d at 1181 (Wald, J., dissenting); see also id. at 1184 ("Adhering to such principles, now termed jus cogens norms, is an obligation erga omnes—an obligation of the state toward the international community as a whole—and by abdicating its responsibility to act in accordance with such norms, Germany consciously waived its right to any and all sovereign immunity." (footnote and citation omitted)). Accordingly, by holding itself out as a member of the international community, the United States has impliedly waived its sovereign immunity for jus cogens violations because the continued deployment of such immunity would be fundamentally inconsistent with any desire to maintain an international legal order. Cf. Libyan Arab Jamahiriya, 101 F.3d at 242 & n.1 (concluding that the argument that "a state impliedly waives its immunity for jus cogens violations by holding itself out as a state within the community of nations," which is "premised on the idea that because observance of jus cogens is so universally recognized as vital to the functioning of a community of nations, every nation impliedly waives its traditional sovereign immunity for violations of such fundamental standards by the very act of holding itself out as a state," is "appealing" and has been "persuasively developed").

e. The Character of Sovereign Acts

The United States also may not claim immunity for jus cogens violations because when government agents commit such violations, their actions are not sovereign in nature. Under international law, jus cogens norms are "by definition nonderogable," which means that the "rise of jus cogens norms limits state sovereignty in the sense that the general will of the international community of states, and other actors, will take precedence over the individual wills of states to order their relations." Princz, 26 F.3d at 1182 (Wald, J., dissenting) (internal quotation marks and citation omitted). As such, when "a state thumbs its nose at such a norm, in effect overriding the collective will of the entire international community, the state cannot be performing a sovereign act entitled to immunity" because such an act is fundamentally inconsistent with the obligations of every state. Id. In effect, "[i]nternational human rights law as a whole abrogates traditional notions of state sovereignty: states do not have the sovereign right to violate human rights." Parker & Neylon, supra, at 446; see also Belsky et al., supra, at 401 ("Nonrecognition is based on the principle that acts contrary to international law are invalid and cannot become a source of legal rights for the wrongdoer. . . . Because a state act in violation of a rule of jus cogens is not recognized as a sovereign act, the violating state has no legal right to claim immunity." (internal quotation marks and footnotes omitted)). Any other conclusion would be "senseless," as it would be illogical to argue that "on account of the jus cogens value of the prohibition against torture, treaties or customary rules providing for torture would be null and void ab initio," but a state may take "national measures authorising or condoning torture or absolving its perpetrators." Prosecutor v. Furundžija, No. IT-95-17/1-T (Dec. 10, 1998), ¶ 155, reprinted in 38 I.L.M. 317, 349; see also id. (concluding that the jus cogens prohibition on torture "serves to internationally de-legitimise any legislative, administrative or judicial act authorising torture"). Therefore, when

the United States violates jus cogens norms, it is not acting as a state must, and the violative acts do not have the sovereign character necessary to confer immunity.

This principle has been persuasively applied by at least two district courts in the FSIA context. In Liu v. Republic of China, 642 F. Supp. 297 (N.D. Cal. 1986), the court denied a motion to dismiss under the FSIA's discretionary function exception in a lawsuit where the plaintiff's representative alleged that the plaintiff was killed in California at the direction of Chinese officials. Id. at 305. The court held that "planning and conducting the murder of Henry Liu could not have been a discretionary function as defined by the FSIA" because the "killing of Americans residing in the United States is not a policy option available to foreign countries." Id. In short, China "and its agents simply did not have the discretion to commit the acts alleged." Id. Similarly, in Letelier v. Republic of Chile, 488 F. Supp. 665 (D.D.C. 1980), the court found that the discretionary function exception did not bar a suit against Chile stemming from its alleged participation in the assassination of a Chilean official in Washington, D.C. because "there is no discretion to commit, or to have one's officers or agents commit, an illegal act." Id. at 673. In the words of the court: "Whatever policy options may exist for a foreign country, it has no 'discretion' to perpetrate conduct designed to result in the assassination of an individual or individuals, action that is clearly contrary to the precepts of humanity as recognized in both national and international law." Id. Although both Liu and Letelier involved the question whether certain violations of international law could constitute discretionary acts that allowed the foreign government to retain sovereign immunity under the statutory scheme of the FSIA, which is a slightly different concern from the question presented in this civil action, the "fundamental premise" underlying both decisions "is that, although political assassination can be viewed as a public act by a state, there is a strong international consensus that such acts are not sovereign

acts." Belsky et al., supra, at 400. Accordingly, "the acts, although performed by the government, were not recognized as state acts under national and international law." Id. Similarly, when the United States government commits acts that violate jus cogens norms, it is not acting in a sovereign capacity, which means that it is not entitled to immunity for such acts.

This conclusion is reinforced by the nature of sovereignty in the American system. Since the Founding, Americans have recognized that "indivisible, final, and unlimited authority," i.e., sovereignty, rests in the People, not the government. See Amar, supra, at 1435-37. Accordingly, when speaking of the "government as sovereign," the Founders "mean[t] sovereign in a necessarily limited sense" because "[b]y definition, government's sovereignty was bounded" to "its sphere of delegated power." See id. at 1437.[14] Therefore, the federal government may only exercise power that has been legitimately delegated to it by the People.

Moreover, at the Founding, even those with expansive views of sovereign immunity recognized that the ability to claim sovereign immunity was bounded by substantive lawmaking power. As Justice Iredell argued in dissent in Chisholm, Georgia's sovereign immunity was "exactly coextensive with her derivative 'sovereign' lawmaking capacity: A state could use its lawmaking power to adopt rules immunizing itself from liability, as long as such immunity

---

[14] Cf. U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 838-39 (1995) (Kennedy, J., concurring) ("The Framers split the atom of sovereignty. It was the genius of their idea that our citizens would have two political capacities, one state and one federal, each protected from incursion by the other. The resulting Constitution created a legal system unprecedented in form and design, establishing two orders of government, each with its own direct relationship, its own privity, its own set of mutual rights and obligations to the people who sustain it and are governed by it. . . . A distinctive character of the National Government, the mark of its legitimacy, is that it owes its existence to the act of the whole people who created it. . . . As James Madison explained, the House of Representatives derives its powers from the people of America, and the operation of the government on the people in their individual capacities makes it 'a national government,' not merely a federal one." (quoting The Federalist No. 39 (James Madison), at 244, 245 (C. Rossiter ed. 1961))).

frustrated no higher-law restrictions on the state's limited sovereignty." See id. at 1472.

Accordingly, by the very nature of limited sovereignty, governments may "choose to exercise their sovereign power by immunizing themselves from rules that apply to private citizens" only when acting "within the scope of their delegated authority." Id. at 1490. On the other hand, when republican "governments act ultra vires and transgress the boundaries of their charter," they have no sovereign power to immunize themselves. Id.

Putting these two conclusions together: the federal government may immunize itself from liability for jus cogens violations only if the acts of authorizing or engaging in such violations fall within the sphere of authority that has been legitimately delegated by the People. Under the principles of international law discussed in this section, the People as sovereign are bound by the nonderogability of jus cogens norms, which means that the People may not legitimately delegate to the government the power to engage in jus cogens violations. Accordingly, the federal government, bounded by its status as a limited government of delegated powers, has no sovereign power to immunize itself from liability for such violations.

For these reasons, the United States does not retain sovereign immunity for violations of jus cogens norms of international law. Because Counts 1-3 in the Third-Party Complaint are derivative of plaintiffs' claims that CACI employees conspired with and aided and abetted the federal government in violation of jus cogens norms, CACI's assertion of these counts against the United States is not barred by sovereign immunity, and the government's Motion to Dismiss will be denied as to Counts 1-3.

**D.  Sovereign Immunity and CACI's Contract Claim**

Unlike the claims in Counts 1-3, CACI's contract claim in Count 4 is not derivative of plaintiffs' claims for violations of jus cogens norms. Instead, in Count 4, CACI alleges that the

47

government has breached an implied duty of good faith and fair dealing by refusing to provide

discovery in this litigation that CACI believes would have been helpful in defending itself

against plaintiffs' claims. Accordingly, sovereign immunity with respect to this claim is not

waived by the nature of plaintiffs' allegations because no jus cogens issues are involved in this

claim. Instead, CACI argues that the Little Tucker Act functions as a waiver of sovereign

immunity for its contract claim. CACI MTD Opp'n 29 (citing 28 U.S.C. § 1346(a)(2)). That Act

provides district courts with jurisdiction (concurrent with the United States Court of Federal

Claims) over any "civil action or claim against the United States, not exceeding $10,000 in

amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an

executive department, or upon any express or implied contract with the United States, or for

liquidated or unliquidated damages in cases not sounding in tort," 28 U.S.C. § 1346(a)(2), but it

exempts "any civil action or claim against the United States founded upon any express or

implied contract with the United States or for liquidated or unliquidated damages in cases not

sounding in tort which are subject to" the Contracts Dispute Act ("CDA"), id. The CDA covers,

among other contracts, "any express or implied contract . . . made by an executive agency for . . .

the procurement of services." 41 U.S.C. § 7102(a). The CDA includes certain statutory review

procedures, id. §§ 7103-7107, that are "exclusive of jurisdiction in any other forum." United

States v. J & E Salvage Co., 55 F.3d 985, 986 (4th Cir. 1995). "Thus, federal district courts lack

jurisdiction over government claims against contractors which are subject to the CDA." Id.

CACI argues that its claim is "not necessarily rendered contractual in nature for CDA

purposes simply because" its relationship with the United States is "contractual in nature" and

that the "essence" of its claim is not a contractual claim that would be subject to the provisions of

the CDA, but rather a claim for "recovery of any tort judgment against it." CACI MTD Opp'n

48

27-29. CACI's argument fails. The Little Tucker Act and the CDA read together put CACI in a double bind. On one hand, if CACI's claim is "founded upon" its contract for services with the federal government, then it is subject to the exclusion in the Little Tucker Act because the underlying contract is "subject to" the CDA. On the other hand, if CACI's claim is not "founded upon" its contract with the federal government, then it never falls within the Little Tucker Act in the first place because § 1346(a)(2) only reaches claims "founded . . . upon any express or implied contract with the United States." Either way, the Little Tucker Act does not provide for jurisdiction.[15]

Although the CDA does not define the type of "claims" it governs, the Federal Acquisition Regulations ("FARs") define a "claim" as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract," 48 C.F.R. § 2.101(b), and courts have generally adopted this definition for purposes of the CDA, see Todd Constr., L.P. v. United States, 656 F.3d 1306, 1311 (Fed. Cir. 2011). This definition, which reaches assertions for any "relief arising under or relating to the contract," is extremely broad, and CACI's claim, which seeks damages for a breach of the implied duty of good faith and fair dealing contained in its contract with the government, easily qualifies as such a claim.

---

[15] The government also argues that three FTCA exceptions would apply to the breach of contract claim if it were reconceptualized as a tort, rather than a contract, claim, as CACI argues it should be: the exceptions for "[a]ny claim arising out of . . . interference with contract rights," for "[a]ny claim arising out of . . . misrepresentation," and for "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the government." Gov't MTD Mem. 23-25 (citing 28 U.S.C. § 2680(a), (h)). CACI does not attempt to explain how its breach of contract claim, even if it were classified as a tort claim, would avoid any of these three exclusions.

CACI cites a variety of cases in which courts looked at factors such as the type of relief sought by the plaintiff, the basis for the plaintiff's claims, and whether the Court of Federal Claims had any special expertise in the matter to determine whether the plaintiff's claims were "in essence" contract claims subject to the CDA; however, none of the cases cited by CACI involved a breach of contract cause of action. Instead, these cases involved situations where a plaintiff that had a contractual relationship with the federal government attempted to plead around the CDA by recasting its claims as sounding in tort or other areas of law. Accordingly, the courts undertook an examination of the claims to ensure compliance with the principle that "a plaintiff may not avoid the jurisdictional bar of the CDA merely by alleging violations of regulatory or statutory provisions rather than breach of contract." Ingersoll-Rand Co. v. United States, 780 F.2d 74, 77 (D.C. Cir. 1985). In this case, CACI has explicitly pleaded Count 4 as a breach of contract claim, which means that there is no need for the Court to engage in this analysis of the essence of the claims: the claim arises from and is related to CACI's contract for services with the federal government because the foundation of the claim is a breach of that contract.

Moreover, even if the Court were to consider these other factors, the result would be the same. CACI seeks up to $10,000 in reimbursement for any future tort judgment against it as breach of contract damages and cites no law establishing any duty it contends the government has breached or otherwise establishing the government's liability to CACI. In addition, although CACI's breach of contract claim does not call for a price adjustment or other FAR-dependent analysis that might involve the core competency of the Court of Federal Claims, there is a governmental interest in having a uniform national rule about whether government contracts include an implied duty regulating the government's handling of discovery requests in litigation

related to the contractor's activity. This governmental interest is best advanced by the procedures of the CDA and subsequent review by the Court of Federal Claims, not district courts.

Accordingly, CACI's breach of contract claim is undeniably subject to the provisions of the CDA, which means that this Court does not have jurisdiction over it. Accordingly, the United States' Motion to Dismiss will be granted as to Count 4.

### III. CACI'S MOTION TO DISMISS

Piggybacking on the United States' motion to dismiss based on sovereign immunity, CACI has moved to dismiss plaintiffs' Third Amended Complaint based on a claim of "derivative sovereign immunity." Dkt. No. 1149. CACI argues that if sovereign immunity protects the United States from its third-party claims, then it should be protected from plaintiffs' claims because the conduct at issue occurred when it was a government contractor.

Derivative sovereign immunity shields a government contractor from suit when (1) the United States would be immune from suit if the claims had been brought against it, (2) the contractor performed services for the sovereign under a validly awarded contract, and (3) the contractor adhered to the terms of the contract. See Cunningham v. Gen. Dynamics Info. Tech., Inc., 888 F.3d 640, 646-47 (4th Cir.) (citing Yearsley v. W. A. Ross Constr. Co., 309 U.S. 18, 20-21 (1940)), cert. denied, 139 S. Ct. 417 (2018). Because this Court has ruled that sovereign immunity does not protect the United States from claims for violations of jus cogens norms, the first prong of the derivative sovereign immunity test is not met, and CACI's Motion to Dismiss based on a theory of derivative immunity will be denied.[16]

---

[16] Although CACI noticed its Motion for argument on April 5, 2019 [Dkt. No. 1173], no further discussion would change the outcome for the reasons stated above.

Even if the Court had concluded that sovereign immunity protected the United States from suit, it is not at all clear that CACI would be extended the same immunity. As plaintiffs argue in their Opposition [Dkt. No. 1172], the Supreme Court has held that derivative immunity is not guaranteed to government contractors and is not awarded to government contractors who violate the law or the contract. Campbell-Ewald Co. v. Gomez, 136 S. Ct. 663, 672-74 (2016). The task orders under which CACI provided interrogators to the United States Army required that CACI employees conduct themselves "[in accordance with] Department of Defense, U.S. Code, and International Regulations." CACI Decl. [Dkt. No. 1154] Ex. 3. To the extent that plaintiffs have alleged that CACI conspired with and aided and abetted military personnel in committing acts of torture, CIDT, and war crimes, CACI would not have acted in accordance with the U.S. Code and international regulations. When a contractor breaches the terms of its contract with the government or violates the law, sovereign immunity will not protect it.

Yearsley, the Supreme Court case from which this doctrine of limited derivative immunity originates, "suggests that the contractor must adhere to the government's instructions to enjoy derivative sovereign immunity; staying within the thematic umbrella of the work that the government authorized is not enough to render the contractor's activities 'the act[s] of the government.'" See In re KBR, Inc., Burn Pit Litig., 744 F.3d 326, 345 (4th Cir. 2014) (alteration in original) (quoting Yearsley, 309 U.S. at 22); see also Myers v. United States, 323 F.2d 580, 583 (9th Cir. 1963) (stating that a government contractor is not liable under Yearsley if the work was done under the contract and in conformity with the contract terms but may be liable for damages from acts "over and beyond acts required to be performed by it under the contract" or "acts not in conformity with the terms of the contract"). Regardless, CACI's Motion to Dismiss fails because the United States does not enjoy sovereign immunity for these kinds of claims.

52

## IV. UNITED STATES' MOTION FOR SUMMARY JUDGMENT

In its Motion for Summary Judgment, the United States primarily argues that all claims between CACI and the federal government "arising out of or related to" the two task orders under which CACI placed civilian interrogators at Abu Ghraib were settled in 2007.

The following facts are not disputed. CACI provided interrogators to the United States Army pursuant to Task Orders 35 and 71. U.S.' Mem. of Law in Supp. of its Mot. for Summ. J. [Dkt. No. 1130] ("Gov't SJ Mem.") ¶ 1. These task orders were issued and administered by the United States Department of the Interior ("DOI"). Id. ¶ 2. Some of the interrogators provided by CACI pursuant to these task orders were sent to Abu Ghraib. Id. ¶ 5. In June 2004, several individuals who alleged they were subjected to torture while detained at Abu Ghraib filed a putative class action complaint against CACI's parent company. Id. ¶ 8.[17] In December 2006, while that class action was proceeding in the United States District Court for the District of Columbia, CACI noticed an appeal in a dispute over several task orders, including Task Orders 35 and 71. Id. ¶ 10. This appeal was docketed as CBCA No. 546 in the Civilian Board of Contract Appeals ("CBCA"). Id. (citing Exs. 2, 7). In February 2007, CACI agreed to a "full and final settlement of all claims and disputes arising out of" the terminated task orders in exchange for the government's payment of $200,000, which CACI agreed "shall constitute full and final payment, settlement, and accord and satisfaction of all claims and disputes by DOI and CACI arising out of or related to the terminated Task Orders, including those in CBCA No. 546, including but not limited to all claims for interest, general administrative costs, direct and

---

[17] See Al Rawi v. Titan Corp., No. 3:04-cv-1143-R-NLS (S.D. Cal. June 9, 2003). This action was transferred to the United States District Court for the District of Columbia and amended in 2006 to name CACI as a defendant. Gov't SJ Mem. ¶ 8 (citing Saleh v. Titan Corp., No. 1:05-cv-01165-JR (D.D.C. Mar. 22, 2006)).

indirect costs of all kinds whatsoever relating to the terminated Task Orders." Id. ¶¶ 11-12 (emphasis added) (citing Ex. 2).

## A. **Standard of Review**

Summary judgment is appropriate where the record demonstrates that "there is no genuine dispute as to any material fact and movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although the Court must view the record "in the light most favorable to the non-moving party," Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 324 (4th Cir. 2012), "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" to overcome summary judgment, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); see also Am. Arms Int'l v. Herbert, 563 F.3d 78, 82 (4th Cir. 2009). Rather, a genuine issue of material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. Moreover, "[t]he mere existence of some alleged factual dispute" cannot defeat a motion for summary judgment. Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001). Instead, the dispute must be both "material" and "genuine," meaning that it must have the potential to "affect the outcome of the suit under the governing law." Id.

## B. **Settlement Agreement**

The United States argues that all of CACI's third-party claims "aris[e] out of" and are "related to" Task Orders 35 and 71, Gov't SJ Mem. Ex. 2 ¶ 3, and because CACI and the United States settled all claims and disputes arising out of or related to these task orders, the United States is entitled to judgment as a matter of law. Settlement agreements with the federal government, such as the one at issue here, are governed by federal common law, see Moore v. U.S. Dep't of State, 351 F. Supp. 3d 76, 88 (D.D.C. 2019), of which the Court of Federal Claims

and the Federal Circuit are "a rich source," Trout v. Comm'r, 131 T.C. 239, 251 (2008). Where the provisions of a settlement agreement are "clear and unambiguous, they must be given their plain meaning." Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004). Broadly worded releases evince "an intent to make an ending of every matter arising under or by virtue of the contract." United States v. William Cramp & Sons Ship & Engine Bldg. Co., 206 U.S. 118, 128 (1907). The language employed in the 2007 settlement agreement is indeed broad and speaks for itself: the agreement constitutes "full and final" settlement of "all claims and disputes" "arising out of or related to" the task orders. Gov't SJ Mem. Ex. 2 ¶ 3. In addition to stressing the plain meaning of the words in the settlement agreement, the United States further supports its argument by pointing to CACI's description of plaintiffs' claims as "arising out of CACI PT's performance of its contract," Compl. ¶ 57.

CACI responds to this argument by citing Fourth Circuit case law holding that the phrase "arising out of or related to" reaches only "dispute[s] between the parties having a significant relationship to the contract." See Wachovia Bank, Nat'l Ass'n v. Schmidt, 445 F.3d 762, 769 (4th Cir. 2006) (citation omitted). This line of Fourth Circuit case law does not help CACI because it is limited to interpreting the scope of arbitration agreements. See U.S.' Reply Mem. of Law in Further Supp. of its Mot. for Summ. J. [Dkt. No. 1168] 4-5 ("It is no coincidence that CACI refers the Court only to arbitration agreement cases that apply Fourth Circuit precedent. The Fourth Circuit has an unusual line of arbitration cases in which the court injected a significant-relationship test into arbitration agreements that use the 'arising out of or relating to' formulation." (emphasis omitted)). Furthermore, in Wachovia Bank, the Fourth Circuit's most recent case on this issue, the panel acknowledged that it was "constrained to adhere to [its] precedent" but observed that the significant relationship test "appears to be at odds" with the

language of the arbitration clause itself and may "be in tension with the Supreme Court's mandate that [courts] apply the ordinary tools of contract interpretation in construing an arbitration agreement." 445 F.3d at 767 n.5.

Even if a significant relationship were required, one clearly exists in this case. The phrase "significant relationship" itself is to be interpreted broadly. See Am. Recovery Corp. v. Computerized Thermal Imaging, Inc., 96 F.3d 88, 93-94 (4th Cir. 1996) (citing Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 398 (1967) (labeling as "broad" a clause that required arbitration of "[a]ny controversy or claim arising out of or relating to this Agreement.")). For example, an agreement to arbitrate "any dispute that arose out of or related to" a consulting agreement "did not limit arbitration to the literal interpretation or performance of the contract, but embraced every dispute between the parties having a significant relationship to the contract regardless of the label attached to the dispute." Id. (alterations, emphasis, internal quotation marks, and citation omitted). As the United States argues, but for the task orders, CACI would not have provided interrogation services at Abu Ghraib. The task orders did not simply place CACI on the scene; they placed CACI personnel alongside United States military personnel with the job of interrogating detainees, and it was from that relationship that plaintiffs' allegations of abuse arose.

To avoid having its claims for indemnification, exoneration, and contribution barred by the settlement agreement, CACI argues that allegations of jus cogens violations exceed the bounds of that settlement agreement, citing the familiar adage that one cannot contract for unlawful acts. It argues that its claims are equitable in nature and "assertable without an allegation of contractual relationship," see Williams v. United States, 469 F. Supp. 2d 339, 342 (E.D. Va. 2007) (citation omitted); however, "a claim may arise outside of an agreement and yet

still be related to that agreement," <u>Am. Recovery Corp.</u>, 96 F.3d at 95. As the United States appropriately argues, CACI's equitable claims still relate to the task orders and are therefore encompassed by the settlement agreement.

CACI had been on clear notice for several years that it was exposed to lawsuits directed at its conduct at Abu Ghraib when it entered into the settlement agreement in 2007. As discussed above, as early as 2004, several Abu Ghraib detainees had filed a putative class action complaint against CACI's parent company and two of its subsidiaries, alleging torture. If CACI wished to preserve its right to assert an equitable claim based on <u>jus cogens</u> violations, it should have, and could have, done so in the settlement agreement. See <u>Dairyland Power Coop. v. United States</u>, 27 Fed. Cl. 805, 811 (1993) ("If a contractor wishes to preserve a right to assert a claim under that contract later, it bears the burden to modify the release, before signing it."). CACI did not do so, and the Court will not read such a reservation into the settlement agreement.

CACI points to the language in the settlement agreement that refers to the CBCA proceeding in an effort to limit the scope of the settlement to "those [claims and disputes] in CBCA No. 546, including but not limited to claims for interest, general administrative costs, direct and indirect costs of all kinds whatsoever relating to the terminated Task Orders." Gov't SJ Mem. Ex. 2 ¶ 3. This argument fails because it is the words "including but not limited to" that support the conclusion that the settlement agreement as a whole was "not limited" to just those claims.

In short, the unambiguous wording of the settlement agreement as concerning "all claims and disputes . . . arising out of or related to the terminated Task Orders" bars CACI's claims against the United States, and for this reason the government is entitled to judgment as a matter of law. Therefore, its Motion for Summary Judgment will be granted.

## V. CONCLUSION

For the reasons stated above, the United States' Motion to Dismiss will be granted as to Count 4 and denied in all other respects, CACI's Motion to Dismiss will be denied, the United States' Motion for Summary Judgment will be granted, and the Third-Party Complaint will be dismissed as to the United States by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 22 day of March, 2019.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge