**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| SUHAIL NAJIM | ) |
| ABDULLAH AL SHIMARI *et al.*, | ) |
| Plaintiffs, | ) |
| | ) |
| *v.* | ) Case No. 1:08-cv-827 (LMB/JFA) |
| | ) |
| CACI PREMIER TECHNOLOGY, INC. | ) |
| Defendant. | ) |
| | ) |
| | ) |
| | ) |
| | ) |

**PLAINTIFFS' OPPOSITION TO DEFENDANT CACI PREMIER TECHNOLOGY,
INC.'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

12936049

## Table of Contents

Page

PRELIMINARY STATEMENT ............................................................................................1

STATEMENT OF FACTS ..................................................................................................4

I.    THE FACTUAL RECORD REFLECTS A SIGNIFICANT DOMESTIC
NEXUS ....................................................................................................................4

    A.    Iraq and Abu Ghraib Were Under U.S. Control in 2003 and 2004 When
the Torts Occurred ......................................................................................4

    B.    CACI Engaged in Substantial Relevant U.S.-Based Conduct. ...............5

II.    RELEVANT PROCEDURAL HISTORY .................................................................7

ARGUMENT .....................................................................................................................9

I.    THIS CASE DOES NOT INVOLVE AN EXTRATERRITORIAL
APPLICATION OF THE ATS BECAUSE THE UNITED STATES
EXERCISED COMPLETE MILITARY AND LEGAL CONTROL OVER
IRAQ DURING THE COMMISSION OF THE TORTS .................................9

II.    *AL SHIMARI III* REMAINS LAW OF THE CASE ......................................13

III.    PLAINTIFFS' ATS CLAIMS INVOLVE SUFFICIENT RELEVANT U.S.-
BASED CONDUCT TO SATISFY ANY VERSION OF THE "FOCUS" TEST........18

    A.    CACI Misconstrues *Nestlé* to Argue that Corporate Activity Is Irrelevant
to the Extraterritoriality Analysis..........................................................19

    B.    *Al Shimari III*'s Analysis of the Relevant Conduct Is Consistent with the
Proper Understanding of the Focus of the ATS Claims Plaintiffs Raise..............21

    C.    Even Under CACI's Constricted View of the Focus of the ATS, Plaintiffs'
Claims Survive.........................................................................................25

IV.    *SOSA* INDISPUTABLY PERMITS COURTS TO RECOGNIZE CAUSES OF
ACTION UNDER THE ATS FOR TORTURE, CRUEL, INHUMAN AND
DEGRADING TREATMENT, AND WAR CRIMES....................................28

CONCLUSION....................................................................................................................28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adhikari v. Kellogg Brown & Root, Inc.*,
  845 F.3d 184 (5th Cir.) ....................................................................................14

*Al Shimari v. CACI Premier Tech., Inc.*,
  No. 19-1328, 775 Fed. Appx. 758 (4th Cir. Aug. 23, 2019).....................................8

*Al Shimari v. CACI Premier Technology, Inc.*,
  758 F.3d 516 (4th Cir. 2014) ................................................................... *passim*

*Boumediene v. Bush*,
  553 U.S. 723 (2008)........................................................................................12

*Bristol-Myers Squibb Co. v. Superior Court of California*,
  137 S. Ct. 1773 (2017)....................................................................................19

*Brown v. Nucor Corp.*,
  785 F. 3d 895 (4th Cir. 2015) .......................................................................9, 14

*Fabrigas v. Mostyn*,
  20 Howell's State Trials 81 (K.B. 1775) .............................................................13

*Fidrych v. Marriott Int'l, Inc.*,
  952 F. 3d 124 (4th Cir. 2020) ..........................................................................19

*Foley Bros., Inc. v. Filardo*,
  336 U.S. 281 (1949)...................................................................................11, 12

*Jesner v. Arab Bank, plc*,
  138 S. Ct. 1386 (2018)........................................................................... *passim*

*Kiobel v. Royal Dutch Petroleum Co.*,
  569 U.S. 108 (2013)............................................................................... *passim*

*Morrison v. National Australia Bank Ltd.*,
  561 U.S. 247 (2010)........................................................................2, 14, 15, 22

*Munaf v. Geren*,
  128 S. Ct. 2207 (2008)....................................................................................13

*Nestlé USA, Inc. v. Doe*,
  141 S. Ct. 1931 (2021)........................................................................... *passim*

12936049

*PTA-FLA Inc. v. ZTE Corp.*,
  715 Fed. Appx. 237 (4th Cir. 2017) .................................................................19

*Rasul v. Bush*,
  542 U.S. 466 (2004) ........................................................................... *passim*

*RJR Nabisco, Inc. v. European Community*,
  136 S. Ct. 2090 (2016) ....................................................................... *passim*

*Roe v. Howard*,
  917 F.3d 229 (4th Cir. 2019) ......................................................................14, 17

*Sosa v. Alvarez-Machain*,
  542 U.S. 692 (2004) ..............................................................................23, 28

*Souryal v. Torres Advanced Enter. Solutions, LLC*,
  847 F. Supp. 2d 835 (E.D. Va. 2012) ...........................................................11, 12

*Vermilya-Brown Co. v. Connell*,
  335 U.S. 377 (1948) ...............................................................................11, 13

*WesternGeco LLC v. ION Geophysical Corp.*,
  138 S. Ct. 2129 (2018) ............................................................................16, 22

## Other Authorities

White House Office of Management and Budget (OMB) (U.S. Office of
  Management and Budget, "Report to Congress Pursuant to Section 1506 of
  the Emergency Wartime Supplemental Appropriations Act, 2003 (Public Law
  108-11)" (June 2, 2003) .............................................................................4

Plaintiffs respectfully submit this opposition to the motion by Defendant CACI Premier Technology, Inc. ("CACI") to dismiss this case based on its argument that the Court lacks subject matter jurisdiction in light of *Nestlé USA, Inc. v. Doe*, 141 S. Ct. 1931 (2021).

## PRELIMINARY STATEMENT

CACI attempts to transform the Supreme Court's recent holding in *Nestlé* into a watershed event, and to use it as a justification to resuscitate the arguments this Court previously rejected concerning the implications of *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090 (2016). For several reasons, nothing in *Nestlé* warrants dismissal of Plaintiffs' Alien Tort Statute ("ATS") claims.

First, as Plaintiffs have previously argued, because the torts here occurred while the United States exercised plenary military and legal authority over Iraq and Abu Ghraib via the Coalition Provisional Authority—thereby displacing Iraqi law and stipulating that U.S. law would apply to U.S. forces and contractors—under the holding and principles of *Rasul v. Bush*, 542 U.S. 466, 480 (2004), this case does not involve an extraterritorial application of the ATS, thus rendering *Nestlé*'s extraterritoriality analysis inapposite.

Second, under *Nestlé*, the "touch and concern" analysis of *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013), for determining a permissible domestic application of the ATS has not materially changed. Accordingly, the Fourth Circuit's analysis of subject matter jurisdiction in *Al Shimari v. CACI Premier Technology, Inc.*, 758 F.3d 516 (4th Cir. 2014) ("*Al Shimari III*") and this Court's denial of CACI's 2019 motion to dismiss for lack of subject matter jurisdiction remain good law and are still law of the case.

CACI asserts that *Nestlé* confirms its view that *RJR Nabisco* overturned the "touch and concern" analysis of *Kiobel*, *sub silentio*, and that now, *Al Shimari III*'s faithful application of

1

the *Kiobel* analysis to displace the presumption against extraterritoriality for ATS claims is not good law. As before, CACI's arguments reveal themselves to be little more than restated disagreement with *Al Shimari III*'s holding and reasoning, and *Nestlé* provides no support for crediting those arguments now.

Neither *Nestlé* nor *RJR Nabisco*—and their use of a "focus" analysis from *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), for evaluating whether the presumption against extraterritoriality can be displaced in any particular case—revised the "touch and concern" test in *Kiobel*, which itself relied on the focus analysis from *Morrison* in presenting a harmonized test for the distinct context of a jurisdictional statute like the ATS. If anything, *Nestlé* confirms that there is no conflict between the "focus" test of *RJR Nabisco* and the "touch and concern" test articulated in *Kiobel*, as it cites both cases approvingly. Indeed, there can be none, as the "touch and concern the territory of the United States … with sufficient force" requirement in *Kiobel*, 569 U.S. at 124–25, serves to ensure that "the case involves a permissible domestic application" of the ATS. *Nestlé*, 141 S. Ct. at 1936 (quoting *RJR Nabisco*). The Fourth Circuit has held that this case satisfies the *Kiobel* test—leaving nothing for this Court to do but continue to carry out the *Al Shimari III* mandate, as it remains valid and is still law of the case.

Third, as this Court already recognized, the "focus" of the ATS—i.e., "the object of its solicitude," *Morrison*, 567 U.S. at 267—is to prevent the "international discord" that would occur if the U.S. *failed* to remedy violations of fundamental human rights law. *Jesner v. Arab Bank, plc*, 138 S. Ct. 1386 (2018); *see also* Dkt. No. 859 at 9 (explaining similar purpose of ATS). And as this Court has already concluded, "the lawsuit before this Court involves foreign nationals suing an American corporation, which fully aligns with the original goals of the ATS:

2

to provide a federal forum for torts suits by aliens against Americans for violations of international law." Dkt. No. 869 at 9.

Finally, unlike in *Nestlé*, here there is sufficient evidence of relevant conduct by CACI specifically related to Plaintiffs' causes of action to support a domestic application of the ATS, regardless of how the Court defines the "focus" of the ATS. Under any definition of the "focus" of the ATS—a question left open by the Supreme Court in *Nestlé* and effectively made irrelevant by the Court's decision to analyze the nexus between the domestic conduct at issue and the cause of action in the case—evidence of CACI's relevant U.S.-based conduct in the record here is sufficient to displace the presumption against extraterritoriality and support a permissible domestic application of the ATS. Even under CACI's unsupported interpretation of the "focus" test—i.e., looking exclusively at torts that have occurred within the United States—Plaintiffs' ATS claims survive.

CACI also misreads the Supreme Court's holding in *Nestlé* that "*general* corporate activity … alone" or "generic allegations" of common-place corporate activity cannot establish jurisdiction as a far-reaching conclusion that *any* corporate activity "carr[ies] no weight in the extraterritoriality analysis." Dkt. No. 1332 ("CACI Br.") at 17. The Supreme Court's decision— and the facts of *Nestlé*—do not support CACI's reading. CACI's U.S.-based conduct (even if characterized as "corporate") is all *specific* to the claims in this case, and it is both more substantial and more relevant to Plaintiffs' claims than the generic corporate activities considered in *Nestlé*. Undoubtedly, the record evidence of CACI's activities "draw[s] a sufficient connection between the cause[s] of action"—conspiracy and aiding and abetting torture, war crimes and cruel, inhuman or degrading treatment—"and domestic conduct." *Nestlé*, 141 S. Ct. at 1937.

For all of these reasons, CACI's motion should be denied.

3

## STATEMENT OF FACTS[1]

I.   **THE FACTUAL RECORD REFLECTS A SIGNIFICANT DOMESTIC NEXUS**

    A.   **Iraq and Abu Ghraib Were Under U.S. Control in 2003 and 2004 When the Torts Occurred**

In March 2003, the United States launched a military invasion of Iraq, overthrew the previously sovereign government, and initiated an extended military occupation of the country with plenary legal authority over all Iraqi institutions. In May 2003, President George W. Bush appointed Ambassador L. Paul Bremer as civil Administrator of Iraq and executive of a new government agency, the Coalition Provisional Authority ("CPA"). The authority of the CPA, which was directly answerable to the President of the United States, was total. It assumed control over all lawmaking functions in the U.S. occupied country:

> The Administrator of the Coalition Provisional Authority (CPA) reports to the President through the Secretary of Defense.... The CPA exercises powers of government temporarily in order to provide for the effective administration of Iraq... *The CPA is vested by the President with all executive, legislative and judicial authority necessary to achieve its objectives...* The CPA Administrator has primary responsibility for exercising this authority.[2]

As detailed further below, *see infra* Argument I, the CPA replaced the sovereign authority of Iraq and functioned as the new government of Iraq with plenary legal powers. *See* Declaration of Baher Azmy, Esq., dated August 20, 2021, ("Azmy Decl.") Ex. 1 (CPA Order 1) § 1.2 ("The CPA is vested with all executive, legislative and judicial authority necessary to

---

[1] Mindful of the Court's familiarity with the record and procedural history of the case, Plaintiffs set forth key facts relevant to the instant motion. For a more complete recitation of facts, Plaintiffs refer the Court to prior briefing. *See* Dkt. Nos. 1090, at 2–17; 639, at 3–16; 639-1; 639-2; 527, at 2–15; and 528.

[2] White House Office of Management and Budget (OMB) (U.S. Office of Management and Budget, "Report to Congress Pursuant to Section 1506 of the Emergency Wartime Supplemental Appropriations Act, 2003 (Public Law 108-11)" (June 2, 2003) (emphasis added).

12936049

achieve its objectives….”). Pursuant to its plenary authority, the CPA displaced Iraqi

governmental institutions and laws. *See, e.g.*, Azmy Decl. Ex. 2 (CPA Order 2) § 1 & Annex.

(dissolving Iraqi government ministries, legislative bodies and army and police forces)[3]; Azmy

Decl. Ex. 3 (CPA Order 7) § 1 (placing all Iraqi judges, police and prosecutors under CPA

control). The U.S. government placed Abu Ghraib and all Iraqi prisons under the Ministry of

Justice, which was subject to the “authority, direction and control” of the CPA. Azmy Decl. Ex.

4 (CPA Order 10) §§ 1, 2.

In exchange for a grant of certain immunities with respect to Iraqi jurisdiction, the CPA

issued an order providing that U.S. contractors such as CACI were subject to liability pursuant to

*U.S. law*. *See* Azmy Decl. Ex. 5 (CPA Order 17) §18. The CPA stipulates that the CPA and

Coalition Forces (U.S. and allied forces) “shall be immune from Iraqi Legal Process,” and that

all personnel “shall be subject to the exclusive jurisdiction of their Parent States, and shall be

immune from local criminal, civil and administrative jurisdiction,” Azmy Decl. Ex. 5 (CPA

Order 17), §2.1, 2.4, and affords contractors the same immunity from Iraqi laws and legal

process, *id*. § 3. CPA Order 7 also made clear that “torture and cruel, degrading or inhumane

treatment” was prohibited. Azmy Decl. Ex. 3 (CPA Order 7) § 3.2.

**B.      CACI Engaged in Substantial Relevant U.S.-Based Conduct.**

CACI contends that there is a “wholesale absence of evidence of domestic conduct by

CACI with respect to the violations of international law alleged by Plaintiffs,” CACI Br. at 22.

---

[3] Including Ministry of Defence, Ministry of Information, Ministry of State for Military Affairs, National Security Bureau; the “Army, Air Force, Navy, the Air Defence Force, and other regular military services,” the Republican Guard; the Presidential Diwan, the Presidential Secretariat, the Revolutionary Command Council, the National Assembly, the National Olympic Committee, the Revolutionary, Special and National Security Courts.

That is a gross mischaracterization of the record in this case. As this Court noted in its decision

denying CACI's previous motion to dismiss for lack of subject matter jurisdiction,

> while some of the conduct occurred at Abu Ghraib, *there's clearly significant conduct that occurs in the United States*. The contract, for example, that gets CACI involved in this in the first place was issued in the United States. We have a United States corporation. We have United States staff over there at Abu Ghraib. We have people from CACI traveling from the United States to Abu Ghraib. You've got [Charles Mudd] doing that, you have others....

Dkt. No. 1333-2 (O'Connor Decl. Ex. 2) (emphasis added). Indeed, there is substantial evidence

in the record of U.S.-based conduct by CACI that is relevant to proving elements of both

Plaintiffs' conspiracy and aiding and abetting claims. Among other facts:

- CACI's decisions on hiring, promotion, and termination of the CACI employees assigned to Abu Ghraib—who participated in the conspiracy to torture and abuse Plaintiffs and other detainees at Abu Ghraib and aided and abetted that torture and abuse—involved Virginia-based human resources and management staff, who regularly sought input from Iraq-based CACI staff. This includes decisions to hire and send to Abu Ghraib numerous persons who lacked the qualifications and training for the positions for which CACI hired or placed them. These were decisions specifically related to the incidents at Abu Ghraib, not general hiring and promotion decisions. *See* Azmy Decl. Ex. 6 (Email chain on hiring/candidate vetting with and cc: Amy Jensen, Mark Billings. Charles Mudd, Dan Porvaznik); Ex. 7 (4/12/04 Email from Amy Jensen to Stefanowicz re promotion & raise).

- CACI's contract with the United States made it "responsible for providing supervision for all contractor personnel," Azmy Decl. Ex. 8 (CACI PT Delivery Order 35), and its supervisory structure went back to its personnel in the United States, who received daily reports on CACI personnel from CACI personnel in Iraq and sent a CACI executive based in Virginia (Charles Mudd) to Abu Ghraib at least 17 times to monitor CACI interrogators' performance. *See* Azmy Decl. Ex. 9 (CACI Code of Conduct); Ex. 10 (Daniel Porvaznik Depo. Tr.); Ex. 11 (Charles Mudd Depo. Tr.); Ex. 12 (Mark Billings Depo. Tr.). That executive who traveled to and from Iraq reported directly to the Chief Executive Officer of CACI, Jack London. *See* Azmy Decl. Ex. 11 (Charles Mudd Depo. Tr.).

- CACI management also sent *daily* reports up the CACI hierarchy, which included personnel in the U.S., "so they could keep a grip on what was happening." *See* Azmy Decl. Ex. 13 (Scott Northrop Depo. Tr.).

6

12936049

- CACI interrogators were required to bring all issues to CACI management, not military supervisors. *See* Azmy Decl. Ex. 11 (Charles Mudd Depo. Tr.).

- At least two CACI interrogators reported troubling interrogation methods used by military and CACI interrogators to CACI management in the United States, *see* Azmy Decl. Ex. 14 (10/14/03 Email from Rich Arant to Amy Jensen); Ex. 15 (Amy Monahan Depo. Tr.); Ex. 16 (Torin Nelson Depo. Tr.), but CACI took no action and CACI management in Virginia even discussed how to get rid of one of the whistleblowers who reported abuse committed by two other CACI interrogators, *see* Azmy Decl. Ex. 17 (CACI Daily Report 2/18/04); Ex. 13 (Scott Northrop Depo. Tr.).

- Even after receiving reports that CACI interrogators were engaged in abuse at Abu Ghraib, CACI management in the United States promoted Steven Stefanowicz. *See* Azmy Decl. Ex. 18 (10/18/04 Letter from Jack London to Secretary of the Army); Ex. 19 (Chart of CACI Interrogators in Iraq); Ex. 7 (4/12/04 Email from Amy Jensen to Stefanowicz); Ex. 20 (3/24/04 CACI Personnel Action Request Form for Stefanowicz); Ex. 21 (Arnold Morse Depo. Tr.).

- CACI's CEO, Jack London, wrote and published a book in the United States entitled *Our Good Name* denying that CACI engaged in any abuse at Abu Ghraib despite receiving reports from his own employees of abuse and despite the military having asked CACI to remove at least one employee implicated in the abuse. *See* Azmy Decl. Ex. 22 (5/13/04 Memo from Major Eugene Daniels to Raymond Northrop).

After considering all of this evidence when resolving CACI's last motion to dismiss for lack of subject matter jurisdiction, this Court properly concluded that this evidence established "enough connection" to the United States to permit jurisdiction under the ATS. Dkt. No. 1333-2.

## II.    RELEVANT PROCEDURAL HISTORY

After the Supreme Court issued its decision in *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013), CACI filed a motion to dismiss Plaintiffs' ATS claims in the Third Amended Complaint ("TAC") on the ground that those claims were an impermissible extraterritorial application of the ATS. Dkt. No. 354. The district court granted CACI's motion, but the Fourth Circuit reversed. *Al Shimari v. CACI Premier Technology, Inc*., 758 F.3d 516 (4th Cir. 2014) ("*Al Shimari III*").

7

After the Supreme Court issued its decision in *Jesner v. Arab Bank, plc*, 138 S. Ct. 1386 (2018), CACI filed another motion to dismiss, arguing that *Jesner*'s prohibition on ATS claims against foreign corporations should be extended to domestic corporations. Dkt. No. 812. Although the Supreme Court had previously decided *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090 (2016), CACI made no mention of that decision in its *Jesner* motion. The Court denied CACI's motion on Jun 25, 2018. Dkt. No. 860.

In early 2019, CACI filed yet another motion to dismiss for lack of subject matter jurisdiction, this time arguing that the Supreme Court had abrogated *Kiobel*'s "touch and concern" test in *RJR Nabisco*, that *Al Shimari III* was therefore no longer good law, and that the record did not contain evidence of domestic conduct by CACI relevant to the "focus" of the ATS. Dkt. No. 1057. On February 27, 2019, the Court denied that motion. Dkt. No. 1143.

Separately, CACI filed a motion for summary judgment on December 20, 2018. Dkt. No. 1033. In their opposition, Plaintiffs reminded the Court that "the evidence Plaintiffs have marshalled in this case is essentially identical to those allegations [in the TAC] this Court has found sufficient to state a claim." Dkt. No. 1086 at 1. On February 27, 2019, in the same decision denying CACI's subject matter jurisdiction motion, the Court denied CACI's motion for summary judgment. Dkt. No. 1143.

The case, which has been pending for more than a decade, is back before this Court after CACI's second meritless interlocutory appeal was dismissed summarily by the Fourth Circuit. *Al Shimari v. CACI Premier Tech., Inc.*, No. 19-1328, 775 Fed. Appx. 758 (4th Cir. Aug. 23, 2019), *cert. denied*, No. 19-648 (U.S.) --- S.Ct. ----, 2021 WL 2637838 (June 28, 2021).

12936049

## ARGUMENT

CACI's latest motion to dismiss for lack of subject matter jurisdiction should be denied for several reasons. First, because Plaintiffs were injured at Abu Ghraib at a time when the United States exercised plenary legal authority over the relevant territory, this case does not involve an extraterritorial application of the ATS, and *Nestlé* is inapplicable here. Second, in any event, *Nestlé* expressly affirms both *Kiobel* and *RJR Nabisco*. Because the law is substantively unchanged, *Al Shimari III*—and this Court's denial of CACI's previous motion to dismiss for lack of subject matter jurisdiction—remain law of the case. At a minimum, *Nestlé* does not represent the kind of "dramatic[]" change in controlling legal authority that would require a district court to disregard Fourth Circuit precedent. *Brown v. Nucor Corp.*, 785 F. 3d 895, 901 (4th Cir. 2015). Third, though *Nestlé* remained silent on where one should look to identify the "focus" of the ATS, *Kiobel* and *Jesner* make clear it is to avoid international harms from the failure to remediate international law violations and that focus is satisfied by recognizing the ATS violations by U.S. entities against Iraqi citizens at the notorious Abu Ghraib prison. Finally, CACI's U.S.-based conduct related to the claims in this case is much more relevant and substantial than the defendants' U.S.-based conduct in *Nestlé* and is sufficient to establish jurisdiction under the ATS, regardless of how the Court defines the "focus" of the ATS (should the Court decide to answer that question).

## I.    THIS CASE DOES NOT INVOLVE AN EXTRATERRITORIAL APPLICATION OF THE ATS BECAUSE THE UNITED STATES EXERCISED COMPLETE MILITARY AND LEGAL CONTROL OVER IRAQ DURING THE COMMISSION OF THE TORTS

Following the Supreme Court's decision in *Kiobel*, Plaintiffs argued before this Court, Dkt. No. 399 at 11–17, and the Fourth Circuit that this case involved a domestic application of

9

the ATS because Iraq and Abu Ghraib were *de facto* U.S. territory during the times relevant to Plaintiffs' claims. Abu Ghraib was not extraterritorial because during the relevant time period Iraq was under the total military occupation and legal control of the United States.[4] *See supra* Statement of Facts I.A.

The conclusion that this case does not involve an extraterritorial application of the ATS follows directly from the Supreme Court's holding in *Rasul v. Bush*, and the corresponding logic of the presumption against extraterritorial application of a statute. In *Rasul*, a number of individuals detained at the U.S. Naval Base in Guantánamo Bay, which the United States occupied and controlled, to the exclusion of any Cuban or other law, raised statutory objections to their detention under 28 U.S.C. § 2241 and the ATS. In an attempt to defeat those claims, the United States expressly sought "application of the longstanding principle of American law that congressional legislation is presumed not to have extraterritorial application unless such intent is clearly manifested." *See Rasul*, 542 U.S. 466, 480 (2004) (citations omitted). The United States argued this should foreclose the detainee's statutory claims because, despite U.S. military occupation and legal control, Cuba—and not the United States—retained "ultimate sovereignty" over the territory, by virtue of the governing Lease Agreement. *Id*.

The Supreme Court rejected the argument, explaining that "whatever traction the presumption against extra-territoriality might have in other contexts, it certainly has no

---

[4] The Fourth Circuit declined to address this argument at the time, *Al Shimari III*, 758 F.3d 516, 531 n. 8 (4th Cir. 2014), though it did note the Supreme Court's admonition that "nothing ... categorically excludes aliens detained in military custody outside the United States from [asserting an ATS claim] in U.S. courts," *id.* n.7 (quoting *Rasul v. Bush*, 542 U.S. 466, 484 (2004)).

10

application" to territory over which the United States "exercises complete jurisdiction and control." *Id*. at 480. By virtue of the lease agreement between the two countries, the fact that Cuban law did not apply at Guantánamo, and other practical factors rendering the naval base at Guantánamo *de facto* U.S. territory, the Court held that the presumption against extraterritoriality did not apply to operations at the U.S. Naval Base in Guantánamo and petitioners could therefore assert both statutory habeas claims and ATS claims. *Id*. at 484–85. *Rasul*'s analysis followed prior Supreme Court decisions, which assessed the extraterritoriality question based on the level of actual, practical control the United States exerted over a particular space sitting outside of U.S. territorial boundaries. For example, in *Vermilya-Brown v. Connell*, 335 U.S. 377, 382 & n.4 (1948), the Court held that the Fair Labor Standards Act (FLSA) applied to operations on a U.S. Naval Base in Bermuda because the U.S. exercised "rights, power and authority" as well as "control" over the territory, while in *Foley Bros. v. Filardo*, 336 U.S. 281, 285 (1949), the Court held the FLSA would not apply to a corporation acting in Iraq/Iran without "some measure of legislative control" or "transfer of property rights to the U.S."

During the events at issue in this case, the United States asserted total military control and legal authority over Iraq, displacing Iraqi law, and decreeing applicability of law of the sending state to nations stationed there, including prohibitions on torture and CIDT. *See supra* Statement of Facts I.A. Under the holdings of *Rasul* and *Vermilya-Brown*, this "exclusive jurisdiction and control," or exercise of "rights, power and authority," by the U.S. mandates that the presumption against extraterritoriality—in whatever manifestation or application—does not apply as a threshold matter. *See Souryal v. Torres Advanced Enter. Solutions*, LLC, 847 F. Supp. 2d 835, 840 (E.D. Va. 2012) (explaining "a region constitutes a U.S. territory if the U.S. has jurisdiction to regulate conduct by virtue of the conduct occurring within that region" and

11

holding that the Iraqi embassy in 2009, after governance was *returned* to Iraq, is not a place over which the United States exercises "some measure of legislative control" (quoting *Foley Bros.*, 336 U.S. at 285)).

The orders issued by the CPA make clear that—as in Guantánamo—the United States would provide the exclusive forum for adjudicating claims concerning the conduct of U.S. personnel (whether military or contractors). The CPA orders stipulate that the CPA and Coalition Forces (U.S. and allied forces) "shall be immune from Iraqi Legal Process," and that all personnel "shall be subject to the exclusive jurisdiction of their Parent States, and shall be immune from local criminal, civil and administrative jurisdiction," Azmy Decl. Ex. 5 (CPA Order 17), § 2.1, 2.4, and affords contractors the same immunity from Iraqi laws and legal process, *id.* § 3. It expressly prohibited torture and cruel, inhuman and degrading treatment. As in Guantánamo, because the CPA displaced Iraqi law with U.S.-created law, applying U.S. law would produce no risk of conflict between sovereign legal principles and at the same time, not applying U.S. law would leave no law. Application of the ATS would thus avoid the concern reflected in *Kiobel*, *Jesner*, and other extraterritoriality cases, which is an implied preference to seek remediation in the domestic courts where the claim arose: that is not possible here.[5]

---

[5] CACI has previously argued that, despite the undisputed plenary legal authority and control the U.S. exercised over Iraq, Abu Ghraib should nevertheless be considered extraterritorial because Iraq retained a final residuum of sovereignty. But that same argument has been rejected by the Supreme Court with respect to Guantánamo in both *Rasul* and *Boumediene v. Bush*. *Rasul*, 542 U.S. at 475 (habeas statute applies where U.S. exercises "plenary and exclusive jurisdiction, but not "ultimate sovereignty'"); *Boumediene v. Bush*, 553 U.S. 723, 755 (2008) (rejecting the "Government's premise that de jure sovereignty" is the "touchstone for extraterritorial habeas jurisdiction"); *id.* at 762 (rejecting government's political question defense and proposed "formalistic, sovereignty-based test for determining the reach of the Suspension Clause" and adopting functional test that turns on level of U.S. control); *see also Vermilya-Brown*, 335 U.S. at 390. In addition, when Iraq was occupied by a multinational force, it was still under the unified command of the United States; accordingly, the involvement of other nations in Iraq's

12

Under *Rasul* and related cases it is clear that the presumption against extraterritoriality should not insulate CACI's conduct from adjudication via the ATS. It is also a principle of elementary justice. Having participated in and benefited from a total military take over and occupation of Iraq, and having profited by millions of dollars in this takeover of the country, CACI cannot reasonably complain about a U.S. court asserting jurisdiction via the ATS with respect to claims arising from its conduct.[6]

## II.   *AL SHIMARI III* REMAINS LAW OF THE CASE

Setting aside the argument that Abu Ghraib was not extraterritorial at the time relevant to Plaintiffs' claims, CACI wrongly asserts that this case involves an impermissible extraterritorial application of the ATS under *Nestlé* and *RJR Nabisco*. As explained further below, *Al Shimari III* reflects a faithful and evidence-based application of *Kiobel*, which the Supreme Court has never overruled. Accordingly, it remains law of the case notwithstanding intervening decisions in *Nestlé* and *RJR Nabisco*. Contrary to CACI's assertions, those decisions do not reflect a change in the law, let alone the sort of dramatic change that might require a district court to disregard Fourth Circuit precedent under *Brown*, 785 F. 3d at 901.

---

occupation does not render Iraq extraterritorial under the principle of the presumption. *See Munaf v. Geren*, 128 S. Ct. 2207, 2216–17 (2008) (holding that habeas statute binds U.S. government despite operation within broader coalition forces).

[6] As Lord Mansfield explained in rejecting a proposition that English law would not apply in a territory occupied by the empire, "to lay down in an English court of justice such monstrous propositions as that a governor ... can do what he pleases ... that he may spoil, plunder, affect [the people's] bodies and their liberty, and is accountable to nobody—is a doctrine not to be maintained; for if he is not accountable in this court, he is accountable nowhere." *Fabrigas v. Mostyn*, 20 Howell's State Trials 81 (K.B. 1775).

13

**A.    The Court Has Already Rejected CACI's Argument that *RJR Nabisco* Overruled *Kiobel*, Which Remains Good Law After *Nestlé***

CACI urges this Court for the second time to disregard *Al Shimari III* based on the claim that *RJR Nabisco*—and now *Nestlé*—overruled, *sub silentio*, the "touch and concern" test established in *Kiobel* and applied in *Al Shimari III*. This Court already rejected CACI's argument with respect to *RJR Nabisco*. Dkt. No. 1143. And there is no merit to CACI's argument that *Nestlé*—which cites and discusses both *RJR Nabisco* and *Kiobel approvingly*—represents a "dramatic[]" change in "controlling legal authority," *Brown*, 785 F.3d at 901, such that this Court should "disregard Fourth Circuit precedent," CACI Br. at 13.[7] As demonstrated below, there has been no radical shift in the law and *Al Shimari III* still controls.

In *Kiobel*, the Supreme Court held that the presumption against extraterritoriality extends to claims arising under the ATS, except in circumstances where "*the claims* touch and concern the territory of the United States ... with sufficient force to displace the presumption against extraterritorial application." *Kiobel*, 569 U.S. at 125 (emphasis added); *see also Jesner*, 138 S. Ct. at 1398 (affirming, several years after *RJR Nabisco*, the continued validity of *Kiobel*'s "touch and concern" test). In support of this standard, *Kiobel* cited the Supreme Court's opinion in *Morrison*,[8] which considered the "focus" of the statute and the relevant conduct which "the statute seeks to 'regulate'" in considering a statute's extraterritorial reach. *See Morrison*, 561 U.S. at 267; *see also Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 193 (5th Cir. 2017)

---

[7] Indeed, the Fourth Circuit itself confirmed the continuing validity of the *Kiobel* framework after *Al Shimari III*. *See Roe v. Howard*, 917 F.3d 229, 240 n.6 (4th Cir. 2019) ("In delineating the two-step framework in *RJR Nabisco*, the Supreme Court drew on two of its key precedents addressing extraterritoriality: *Morrison* and *Kiobel*); *see also id.* ("*RJR Nabisco did not overturn Kiobel* and—in step two—retains a similar emphasis on the relevant claim's connection to U.S. territory." (emphasis added)).

[8] *Kiobel*, 569 U.S. at 125 (citing *Morrison*, 561 U.S. at 266–73).

14

12936049

("Notably, in discussing claims that 'touch and concern' the United States, the Court cited to *Morrison* and its 'focus' inquiry.").

In applying the presumption against extraterritoriality to civil RICO claims, *RJR Nabisco* discussed the reasoning of *Kiobel* but did not modify its "touch and concern" test or cast any doubt on the continued vitality of *Kiobel*. In *RJR Nabisco* the Court reiterated that the territoriality inquiry examines whether there is domestic conduct that is "relevant" to the statute's focus. 136 S. Ct. at 2101. Although consideration of the ATS's focus was not expressly addressed in *Kiobel*, the *RJR Nabisco* decision explained that this was because the Court "did not need to determine, as we did in *Morrison*, the statute's 'focus,'" because on the facts presented— a foreign corporation aiding and abetting a foreign government to commit violations against foreign citizens in a foreign country—"*all* the relevant conduct" regarding the international law violations occurred abroad and none occurred in the U.S. *Id.* (emphasis added).

The Fourth Circuit faithfully applied *Kiobel* in *Al Shimari III*. In its decision, the Fourth Circuit held that, in contrast to *Kiobel*, Plaintiffs' claims reflect "extensive 'relevant conduct' in United States territory," and otherwise recognized that the claims had "substantial ties to United States territory." *Id.* at 528; *see also id.* ("[I]t is not sufficient merely to say that because the actual injuries were inflicted abroad, the *claims* do not touch and concern United States territory."). In particular, the Fourth Circuit held that Plaintiffs' claims "'touch and concern' the territory of the United States with sufficient force" to displace the presumption based on the following "relevant conduct":

> (1) CACI's status as a United States corporation; (2) the United States citizenship of CACI's employees, upon whose conduct the ATS claims are based; (3) the facts in the record showing that CACI's contract to perform interrogation services in Iraq was issued in the United States by the United States Department of the Interior, and that the contract required CACI's employees to obtain security

> clearances from the United States Department of Defense; (4) the allegations that CACI's managers in the United States gave tacit approval to the acts of torture committed by CACI employees at the Abu Ghraib prison, attempted to "cover up" the misconduct, and "implicitly, if not expressly, encouraged" it; and (5) the expressed intent of Congress, through enactment of the TVPA and 18 U.S.C. § 2340A, to provide aliens access to United States courts and to hold citizens of the United States accountable for acts of torture committed abroad.

*Id.* at 530–31. Although CACI derisively characterizes this analysis as an "amorphous 'touch and concern test' fashioned by the Fourth Circuit," CACI Br. at 15, 26, the analysis in *Al Shimari III* is consistent with both *Kiobel* and *RJR Nabisco*. *See WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2137 (2018) ("The focus of a statute is the object of its solicitude, which can include the conduct it seeks to regulate, *as well as the parties and interests it seeks to protect or vindicate*." (quotation marks and brackets omitted; emphasis added)).

The Supreme Court's most recent pronouncement on the ATS in *Nestlé* confirms the harmony between *RJR Nabisco* and *Kiobel*, and does not, as CACI now argues (as it did previously with respect to *RJR Nabisco*), change the law that provides the foundation for *Al Shimari III*. Indeed, the "touch and concern the territory of the United States … with sufficient force" requirement in *Kiobel*, 569 U.S. at 124–25, serves to confirm that "the case involves a permissible domestic application" of the ATS. *Nestlé,* 141 S. Ct. at 1936 (quoting *RJR Nabisco*).

In *Nestlé*, the Supreme Court reversed the Ninth Circuit and held that the plaintiffs had failed to plead facts sufficient to displace the presumption against extraterritorial application of the ATS. 141 S. Ct. at 1937. The Court noted that the Ninth Circuit had permitted the case to proceed "because respondents pleaded *as a general matter* that 'every major operational decision by both [defendants] is made in or approved in the U.S.'" *Id.* at 1937 (emphasis added). In reversing, the Supreme Court held only that "allegations of *general* corporate activity—like

16

decisionmaking—cannot *alone* establish domestic application of the ATS." *Id.* (emphasis added). The Court then expressly connected this ruling to *Kiobel*:

> As we made clear in *Kiobel*, a plaintiff does not plead facts sufficient to support domestic application of the ATS simply by alleging 'mere corporate presence' of a defendant. … Pleading general corporate activity is no better. Because making 'operational decisions' is an activity common to most corporations, *generic* allegations of this sort do not draw a sufficient connection between the cause of action respondents seek … and domestic conduct.

*Id.* (emphasis added). The Court concluded, "[t]o plead facts sufficient to support a domestic application of the ATS, plaintiffs must allege more domestic conduct than general corporate activity." *Id.* Because the domestic conduct on which the Ninth Circuit relied in permitting the case to proceed in *Nestlé* was all generic corporate activity unconnected to the cause of action, the Supreme Court reversed.

The Supreme Court in *Nestlé* never stated or even suggested that *Kiobel* was no longer good law, and the Fourth Circuit has held explicitly that "*RJR Nabisco* did not overturn *Kiobel*." *Howard*, 917 F.3d at 240 n.6. Furthermore, the Supreme Court in *Nestlé* declined to define the "focus" of the ATS and instead analyzed only whether there were relevant domestic facts alleged that would be sufficient to support a domestic application of the ATS. This approach affirms that to realize the object of the ATS's solicitude—its focus—against the backdrop of the presumption against extraterritoriality, the relevant inquiry is whether the cause of action "touches and concerns" the United States with sufficient force to support a permissible domestic application of the statute. Far from a change in the law, *Nestlé* simply applies *Kiobel* and *RJR Nabisco* to the unique facts of that case and finds them insufficient to support jurisdiction under the ATS. And this is not the first time that the Supreme Court found *Kiobel* and *RJR Nabisco* to be consistent. *After RJR Nabisco* was decided, *Jesner* expressly *reaffirmed Kiobel*'s touch and concern test. *See*

17

*Jesner*, 138 S. Ct. at 1398–99 (restating touch and concern test); *id.* at 1406 (declining to apply touch and concern test given that foreign-corporate status of defendant resolved the case); *see also id.* at 1429, 1435 (Sotomayor, J., dissenting) (discussing *Kiobel*'s touch and concern test).

For all of these reasons, *Kiobel* and its "touch and concern" test to gate-keep permissible domestic applications of the ATS remains valid, and the Fourth Circuit's application of the "touch and concern" test also continues to be valid.

### B.   *Al Shimari III* Was Based on the Evidentiary Record, Not Mere Allegations

CACI suggests that because it is making a "factual" rather than "facial" motion, *Al Shimari III* should not control here in any event because it turned on Plaintiffs' allegations, rather than evidence in the record. CACI Br. at 14, 21–22. That argument fails for two reasons. First, the allegations in the TAC, upon which the Fourth Circuit based its decision in *Al Shimari III*, were based on the evidentiary record that had already been developed when Plaintiffs filed the pleading. Second, CACI's motion to dismiss for lack of subject matter jurisdiction in early 2019 was also a "factual" motion, based on the evidentiary record, which was before the Court in full at the same time, in connection with CACI's largely unsuccessful motion for summary judgment. The Court denied CACI's prior motion on the full evidentiary record, in accord with *Al Shimari III*. There is accordingly no reason for the Court to depart from its prior ruling.

### III.   PLAINTIFFS' ATS CLAIMS INVOLVE SUFFICIENT RELEVANT U.S.-BASED CONDUCT TO SATISFY ANY VERSION OF THE "FOCUS" TEST

The "focus" analysis referenced in *Nestlé* and *RJR Nabisco* does not reflect a new standard that has supplanted *Kiobel*'s "touch and concern" test and abrogated *Al Shimari III*. Notwithstanding CACI's argument to the contrary, however, the issue is academic because

18

Plaintiffs' claims readily satisfy any version of the "focus" inquiry for the reasons set forth below.

### A.   CACI Misconstrues *Nestlé* to Argue that Corporate Activity Is Irrelevant to the Extraterritoriality Analysis

As an initial matter, CACI misreads *Nestlé*'s analysis of the domestic conduct alleged there, which the Court characterized as "general corporate activity." Specifically, CACI's contention that this phrase "encompass[es] all of a company's authorized business conduct," entirely misconstrues the Court's decision. That language does not exclude all corporate conduct—including the long list of corporate activities recited in CACI's footnote 13, CACI Br. at 18 n.13—from consideration when assessing relevant conduct for ATS purposes. Instead, the word "general" is used to distinguish corporate activities that are *unconnected to* the claims.[9]

In *Nestlé*, the corporate conduct and decision-making identified as the relevant domestic nexus was not specifically related to the plaintiffs' child slave labor and trafficking claims. In the Court's own words, "respondents pleaded *as a general matter* that *'every major operational decision* by both companies is made in or approved in the U.S.'" 141 S. Ct. at 1937. The use of

---

[9] The Supreme Court's use of the phrase "general" in *Nestlé* is analogous to the same word in the personal jurisdiction context, which draws a distinction between specific and general jurisdiction. For a federal court to exercise jurisdiction in a particular state, "the suit must arise out of or relate to the defendant's contacts with the forum." *Bristol-Myers Squibb Co. v. Superior Court of California*, 137 S. Ct. 1773, 1781 (2017). "When there is no such connection, specific jurisdiction is lacking *regardless of the extent of a defendant's unconnected activities in the State.*" *Id.* at 1781 (emphasis added). Consistent with this distinction, the Fourth Circuit has held that courts may not exercise specific jurisdiction based on allegations of general business activity in the state—even if substantial—that is unconnected to the claims. *See, e.g.*, *Fidrych v. Marriott Int'l, Inc.*, 952 F. 3d 124, 138–39 (4th Cir. 2020) (the fact that defendant "franchises, licenses, or manages ninety hotels in the state ... ha[s] nothing to do with the claims asserted" and the claims therefore "do not in any sense 'arise out of or relate to' [defendant's] connections to the hotels located in" the state); *PTA-FLA Inc. v. ZTE Corp.*, 715 Fed. Appx. 237, 242 (4th Cir. 2017) (holding that defendant's general business contacts with the forum state "have nothing to do with [plaintiff's] breach of contract claim").

19

the word "alone" is also tellingly omitted from CACI's discussion of *Nestlé*, which holds that "allegations of general corporate activity—like decisionmaking—cannot *alone* establish domestic application of the ATS." *Id.* In other words, evidence of general corporate activity can be considered *along with* other evidence of U.S.-based conduct, but it is not *by itself* enough to establish jurisdiction, just as "mere corporate presence"—that is, corporate presence and nothing else—is insufficient under *Kiobel*. If anything, *Nestlé* simply elaborates upon the "touch and concern" test from *Kiobel* by offering that in addition to "*mere* corporate presence," general corporate activities *alone* are insufficient to establish ATS jurisdiction.

While some of the relevant U.S.-based conduct at issue in this case has a corporate character—including entering into contracts with the United States to provide its own employees for interrogations at Abu Ghraib, hiring underqualified employees to send to Abu Ghraib, maintaining daily communications and reporting between corporate HQ and employees at Abu Ghraib, reporting up the corporate chain about activities and reports of abuse at Abu Ghraib involving CACI employees, making employment decisions about its own employees involved in misconduct at Abu Ghraib, and sending an executive to Abu Ghraib to collect information and report to CACI's CEO, *see supra* Statement of Facts I.B (reciting domestic conduct relevant to Plaintiffs' claims)—it is all specific to Plaintiff's claims, unlike the conduct in *Nestlé*.

Accordingly, CACI can find no support in *Nestlé* for casting this evidence of U.S.-based conduct aside when analyzing the extraterritoriality issue under any definition of the "focus" of the ATS.

12936049

**B.**     ***Al Shimari III*'s Analysis of the Relevant Conduct Is Consistent with the Proper Understanding of the Focus of the ATS Claims Plaintiffs Raise**

In *Nestlé*, the Supreme Court declined to define the "focus" of the ATS for purposes of the second step of the extraterritoriality analysis.[10] 141 S. Ct. at 1936. Instead, the Supreme Court concluded that the allegations were devoid of specific domestic conduct relevant to the plaintiffs' claims, so the evidence was insufficient to displace the presumption against extraterritoriality regardless of the statute's focus.

Nevertheless, CACI urges the Court to view the "focus" of the ATS through the same lens put forward by the defendants in *Nestlé*—namely that the ATS's focus is limited to conduct that directly resulted in the Plaintiffs' injuries, to the exclusion of any other conduct relevant to establishing CACI's aiding and abetting liability or participation in a conspiracy. CACI Br. at 18. In doing so, CACI focuses solely on the location where Plaintiffs allege they were injured. *Id.* This definition is far too narrow and would, by its terms, always preclude ATS jurisdiction when the plaintiff was injured anywhere but on U.S. soil. If the statute intended to impose such a bright line rule (which the Supreme Court has rejected), there would be no reason to engage in the kind of careful inquiry into the sufficiency of a domestic nexus that the Court has permitted.

CACI's proposed incorrect framework mirrors a similar argument CACI made in its 2019 motion based on *RJR Nabisco* and in its appeal to the Fourth Circuit eight years ago: "The district court's conclusion that *the alleged violation of the law of nations* is what must occur

---

[10] Pursuant to that second step, where a statute does not apply extraterritorially, the court must determine that "the conduct relevant to the statute's focus occurred in the United States." *Nestlé*, 141 S. Ct. at 1936. The parties in *Nestlé* offered competing definitions of the "focus" of the ATS. The defendants argued, as CACI has done in this case, that the focus of the ATS is the tortious conduct that caused the injury, while the plaintiffs argued "that the 'focus' of the ATS is conduct that violates international law. *Id.* With respect to their aiding and abetting forced labor claims, the *Nestlé* plaintiffs argued that aiding and abetting forced labor is a violation of international law and domestic conduct can aid and abet forced labor that occurs overseas. *Id.*

21

12936049

domestically for ATS to apply flows directly from *Kiobel*." Dkt. No. 69, Appellees' Br. at 15, *Al Shimari III*, No. 13-1937 (4th Cir. Dec. 2, 2013). The Fourth Circuit rejected this narrow framing of the relevant conduct in *Al Shimari III* as foreclosed by the majority opinion in *Kiobel*. 758 F.3d at 527. The Fourth Circuit observed that CACI's argument represented the view of Justice Alito's concurring opinion in *Kiobel*, which was joined by only Justice Thomas, and that the analysis advanced in this concurrence was "far more circumscribed than the majority opinion's requirement that the claims touch and concern the territory of the United States." *Id.* (quotation marks omitted).[11]

Properly understood, a statute's "focus" is the object of its solicitude, including the conduct it seeks to regulate and the parties and interests it seeks to protect. *See WesternGeco LLC*, 138 S. Ct. at 2137. For example, in *Morrison*, to determine whether the "focus" of Section 10(b) of the Securities Exchange Act was to prevent deceptive conduct (as plaintiffs had argued) or to regulate the purchase or sale of securities on U.S. exchanges, the Court looked to the overall objective of the Exchange Act and found that "purchase-and-sale transactions" are "the objects of the statute's solicitude" and what "the statute seeks to regulate." 561 U.S. at 267 (quotation marks omitted). And in *WesternGeco*, the Court identified the focus of Section 271(f) of the Patent Act by considering that this provision "was a direct response to a gap in our patent law" which sought to "reach[] components that are manufactured in the United States but assembled overseas" and to "protect[] against domestic entities who export components from the United States." 138 S. Ct. at 2138 (quotation marks and ellipsis omitted).

---

[11] Justice Kennedy's concurrence—which represented the fifth vote for what would otherwise have been a plurality decision—likewise rejected CACI's (and Justice Alito's) view that the international law violation must occur domestically, as he emphasized that *Kiobel* left open the application of the ATS for "human rights abuses committed abroad" in cases not covered by the "reasoning and holding" of *Kiobel*. *Kiobel*, 569 U.S. at 125 (Kennedy, J., concurring).

Because the ATS is a jurisdictional statute, the presumption against extraterritoriality does not apply to the statute itself, but to "claims" arising under the statute. *Kiobel*, 569 U.S. at 124. The Supreme Court has made clear that only those "violations of international law norms that are 'specific, universal and obligatory'" are actionable under the ATS. *Id.* at 117 (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004)). That limitation stems from what the Court has identified as the "objective" of the ATS: "[T]o avoid foreign entanglements by ensuring the availability of a federal forum where the failure to provide one might cause another nation to hold the United States responsible for an injury to a foreign citizen." *Jesner*, 138 S. Ct. at 1397.[12]

Thus, under step two of the *RJR Nabisco* framework, a court must consider whether the conduct relevant to the focus of the ATS—providing redress for international law violations without which the U.S. would be deemed "responsible" and risk international discord— "touch[es] and concern[s] the territory of the United States … with sufficient force" to displace the presumption against extraterritoriality. *Kiobel*, 569 U.S. at 124–25. That is what Plaintiffs argued to the Fourth Circuit in 2013,[13] and what the Fourth Circuit held in *Al Shimari III*. *See Al*

---

[12] *See also Sosa*, 542 U.S. at 715 ("It was this narrow set of violations of the law of nations, admitting of a judicial remedy and at the same time threatening serious consequences in international affairs, that was probably on minds of the men who drafted the ATS with its reference to tort."); *Kiobel*, 569 U.S. at 123–24 ("[O]ffenses against ambassadors violated the law of nations, and if not adequately redressed could rise to an issue of war. ... The ATS ensured that the United States could provide a forum for adjudicating such incidents." (quotation marks omitted)); *Al Shimari III*, 758 F.3d at 529-30 ("A basic premise of the presumption against extraterritorial application is that United States courts must be wary of 'international discord' resulting from 'unintended clashes between our laws and those of other nations.'" (quoting *Kiobel*, 569 U.S. at 115)).

[13] *See* Dkt. No. 28, Pls.' Br. at 27, *Al Shimari III*, No. 13-1937(4th Cir. Oct. 29, 2013) ("In *Kiobel*, the Supreme Court recognized that the focus of the ATS—or the object of its solicitude—is to provide jurisdiction over civil claims by aliens for core international law violations, including those committed against ambassadors in the U.S. and those committed by U.S. citizens, so as to avoid diplomatic strife or even breaches of international law giving rise to war." (citations omitted)).

23

*Shimari III*, 758 F.3d at 530 (noting that "litigation of these ATS claims will not require unwarranted judicial interference in the conduct of foreign policy" in part because the "political branches already have indicated that the United States will not tolerate acts of torture, whether committed by United States citizens or by foreign nationals" (quotation marks omitted)). It is also consistent with what this Court held in denying CACI's motion to dismiss based upon *Jesner*. Dkt. No. 859 at 9 (holding that "the original goal[] of the ATS" was "to provide a federal forum for tort suits by aliens against Americans for international law violations"). As explained, *Nestlé* declined to analyze this question—because all of the domestic conduct in that case was general corporate activity unrelated to the claims—so it cannot be read to overrule the Fourth Circuit's holding. 141 S. Ct. at 1936–37.

Under this—the correct—interpretation of the "focus" of the ATS, the constellation of facts in this case provide ample support for displacing the presumption against extraterritoriality: (i) the claims arise out of universally condemned acts (torture and war crimes), perpetrated against foreign nationals who were actually under the authority and implicit international law responsibility of the U.S. given the U.S. occupation and then-plenary authority over Iraq and Abu Ghraib; (ii) there was no conflicting Iraqi law or sovereign government in place and, indeed, during the U.S. occupation of Iraq, it was United States law that expressly applied via President Bush's creation of the CPA; (iii) the international law violations were committed by U.S. actors, in a conspiracy with U.S. soldiers (who were themselves court-martialed by the U.S. military for their role in the conspiracy), via a contract with the United States government entered into in the United States, thereby implicating a U.S. obligation under international law to punish American tortfeasors and provide a remedy to their victims; and (iv) CACI managers acting inside the United States took actions to reward abusive employees and cover up its role in the scandal. *See*

24

*supra* Statement of Facts I.B (reciting domestic conduct relevant to Plaintiffs' claims); *Al Shimari III*, 758 F.3d at 530–31; *cf. Jesner*, 138 S. Ct. at 1406–07 (detailing the ways in which international "discord" may follow by extending the reach of the ATS to *foreign* corporations); *Nestlé*, 141 S. Ct. at 1948 (Sotomayor, J. concurring) (observing that "foreign nations may take (and, indeed, historically have taken) umbrage at the United States' refusal to provide redress to their citizens for international law torts committed by U.S. nationals within the United States").

## C.  Even Under CACI's Constricted View of the Focus of the ATS, Plaintiffs' Claims Survive

Even if the Court were to adopt CACI's proposed focus analysis to conclude that only the conduct that directly caused the injury is relevant—in contravention of *Al Shimari III* and the binding Supreme Court precedent in *Kiobel* and *Jesner*—Plaintiffs' claims still survive, for two reasons.

*First*, the conduct constituting aiding and abetting and conspiracy is an integral part of the causes of action advanced in this case: Plaintiffs could not succeed in establishing liability for their claims without establishing the elements for either theory of liability for at least one of the substantive violations advanced—torture, war crimes and cruel, inhuman or degrading treatment. Moreover, the tortious conduct for these claims encompasses more than the acts that directly caused Plaintiffs' injuries. As this Court recognized in its decision denying CACI's motion to dismiss the TAC, Plaintiffs' conspiracy allegations—which are all supported by record evidence*, see supra* Statement of Facts I.B—"reach beyond CACI's on-site employees and plausibly demonstrate CACI management's participation in the conspiracies," Dkt. No. 679 at 40, including that "CACI refused to act on specific reports of misconduct perpetrated by its employees, instead covering up the misconduct and furthering the conspiracies," *id.* This Court

25

cited specific examples—all of which are supported by record evidence, *see supra*, Statement of Facts  I.B—including "multiple instances where CACI employees or military personnel reported to 'upper management' that CACI interrogators and military personnel were engaging in detainee abuse and that CACI managers failed to report this abuse to the military—or even ensure that CACI's own employees stopped the abuse," "CACI's refusal to remove employees from [Abu Ghraib] despite credible reports of misconduct," and the fact that "various CACI managers were either stationed at the Hard Site or regularly visited Abu Ghraib and that CACI's executive team regularly reviewed reports from these individuals." Dkt. No. 679 at 40.

Similarly, this Court recognized some of the allegations of domestic conduct relevant to Plaintiffs' aiding and abetting claims—which, again, are drawn from and supported by evidence in the record, *see supra* Statement of Facts I.B—including that "upper-level management at CACI substantially aided the[] continued abuses [at Abu Ghraib] by refusing to inform the military of reports that CACI and military personnel were abusing detainees and by continuing to employ—and even promote—interrogators engaging in the abuses." Dkt. No. 679 at 44.[14] This conduct—much of which occurred in the United States—is itself tortious conduct connected directly to Plaintiffs' claims.

*Second*, as explained above, the facts of this case paint a substantially clearer picture of U.S. conduct *specifically* related to the torture and abuse that gives rise to Plaintiffs' tort claims when compared to the general corporate conduct that the Court in *Nestlé* found to be insufficient. In *Nestlé*, the defendants' conduct considered by the Supreme Court consisted of:

---

[14] Among the allegations supporting the Fourth Circuit's findings were "that CACI's managers in the United States gave tacit approval to the acts of torture committed by CACI employees at the Abu Ghraib prison, attempted to 'cover up' the misconduct, and 'implicitly, if not expressly, encouraged' it." *Al Shimari III*, 758 F.3d at 531.

(i)    "provid[ing] … farms with technical and financial resources—such as training, fertilizer, tools, and cash—in exchange for the exclusive right to purchase cocoa," which the Court found to have "occurred in Ivory Coast";

(ii)    "financing decisions … originated" in the United States; and

(iii)    the fact that "every major operational decision by both companies is made in or approved in the U.S."

141 S. Ct. at 1935–37.

Here, by contrast, among other facts:

(i)    CACI made hiring, promotion, and termination decisions in Virginia *for the CACI employees assigned to Abu Ghraib who were involved in the abuse of Plaintiffs*;

(ii)    CACI's contract with the United States, which it entered into in the United States, made it "responsible for providing supervision for all contractor personnel," and its supervisory structure went back to its personnel in the United States, who received *daily reports* on CACI personnel at Abu Ghraib;

(iii)    CACI sent an executive based in Virginia to Abu Ghraib at least 17 times to monitor CACI interrogators' performance and report directly to the company's CEO;

(iv)    CACI interrogators at Abu Ghraib were required to bring all issues to CACI management, not military supervisors;

(v)    at least two CACI interrogators reported troubling interrogation methods used by military and CACI interrogators to CACI management in the United States, but CACI management in Virginia took no action and discussed how to get rid of one whistleblower who reported abuse committed by two other CACI interrogators;

(vi)    after receiving reports that CACI interrogators were engaged in abuse at Abu Ghraib, CACI management in the United States promoted one of those interrogators; and

(vii)    CACI publicly denied having engaged in any abuse at Abu Ghraib despite receiving reports from its own employees of abuse and despite the military having asked CACI to remove at least one employee implicated in the abuse.

12936049

*See supra* Statement of Facts I.B.[15] The U.S.-based conduct here far exceeds anything the Supreme Court discussed in *Nestlé*.

Neither the Supreme Court's recent *Nestlé* ruling nor any of the decisions discussed by CACI justify revisiting the reasoned judgment of the Fourth Circuit in *Al Shimari III* or concluding that this Court lacks subject matter jurisdiction over Plaintiffs' ATS claims.

## IV.    *SOSA* INDISPUTABLY PERMITS COURTS TO RECOGNIZE CAUSES OF ACTION UNDER THE ATS FOR TORTURE, CRUEL, INHUMAN AND DEGRADING TREATMENT, AND WAR CRIMES.

In the final pages of its brief, CACI longs wistfully for a future when *Sosa* is not the law of the land and the door to causes of action under the ATS is closed. CACI Br. at 26–29. It does not request any relief, however, because—as CACI acknowledges, *id.* at 28—*Sosa* is still the law. And this Court's prior ruling that torture, cruel, inhuman and degrading treatment, and war crimes are cognizable under ATS—as are Plaintiffs' claims for conspiracy and aiding and abetting these acts—remains both correct as a matter of law and controlling here as law of the case. Dkt. No. 615.

## CONCLUSION

For all of the foregoing reasons, CACI's motion to dismiss should be denied.

Respectfully submitted,

*/s/ John Kenneth Zwerling*
John Kenneth Zwerling (VA Bar #08201)
ZWERLING/CITRONBERG, PLLC
114 North Alfred Street
Alexandria, VA 22314

---

[15] Some CACI employee conduct—communications, supervision, and decision-making about its operations in Iraq—is both domestic *and* extraterritorial. In an age where email, videolink, and telecommunications allow for global operations, to apply a bright line between purely domestic conduct and purely extraterritorial conduct would be both impractical and retrograde.

28

12936049

Tel. 703-684-8000
jz@zwerling.com

Baher Azmy, *Admitted pro hac vice*
Katherine Gallagher, *Admitted pro hac vice*
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012

Peter A. Nelson, *Admitted pro hac vice*
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036

Shereef Hadi Akeel, *Admitted pro hac vice*
AKEEL & VALENTINE, P.C.
888 West Big Beaver Road
Troy, MI 48084-4736

*Attorneys for Plaintiffs*

29

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 20, 2021, I electronically filed Plaintiffs' Opposition to Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction through the CM/ECF system, which sends notification to counsel for Defendants.


                               */s/ John Kenneth Zwerling*          
                            John Kenneth Zwerling (VA Bar #08201)

12936049