**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| SUHAIL NAJIM ABDULLAH AL SHIMARI, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) No.   1:08-cv-0827 LMB-JFA |
| CACI PREMIER TECHNOLOGY, INC., | ) ) ) |
| Defendant, | ) ) ) |

**DEFENDANT CACI PREMIER TECHNOLOGY, INC.'S REPLY IN SUPPORT
OF ITS MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

John F. O'Connor (Va. Bar #93004)
Linda C. Bailey (admitted *pro hac vice*)
Molly B. Fox (admitted *pro hac vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000 – telephone
(202) 429-3902 – facsimile
joconnor@steptoe.com
lbailey@steptoe.com
mbfox@steptoe.com

William D. Dolan, III (Va. Bar #12455)
LAW OFFICES OF WILLIAM D.
DOLAN, III, PC
8270 Greensboro Drive, Suite 700
Tysons Corner, Virginia 22102
(703) 584-8377 – telephone
wdolan@dolanlaw.net

*Counsel for Defendant CACI Premier
Technology, Inc.*

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    ANALYSIS......................................................................................................... 2

       A.    Conduct Occurring in Iraq Is Not "Relevant *Domestic* Conduct" .......................... 2

       B.    This Court's Obligation Is To Follow *Nestle*, Not *Al Shimari III* ......................... 9

       C.    *Nestle* Requires Dismissal Because the Record Establishes Only "General Corporate Activity" By CACI in the United States ................................ 12

       D.    The Evidentiary Record Is Devoid of Evidence of CACI Involvement in International Law Violations in the United States ................................ 15

III.   CONCLUSION................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adhikari v. Kellogg Brown & Root, Inc.*,
  845 F.3d 184 (5th Cir. 2017) ............................................................................8

*Al Maqaleh v. Gates*,
  605 F.3d 84 (D.C. Cir. 2010) ............................................................................7

*Al Shimari v. CACI Premier Tech., Inc.*,
  758 F.3d 516 (4th Cir. 2014) ...........................................................1, 10, 11, 12

*Aziz v. Alcolac, Inc.*,
  658 F.3d 388 (4th Cir. 2011) ...........................................................................17

*Beck v. McDonald*,
  848 F.3d 262 (4th Cir. 2017) ...........................................................................12

*Boumediene v. Bush*,
  553 U.S. 723 (2008).............................................................................................7

*Braden v. 30th Jud. Cir. Ct. of Ky.*,
  410 U.S. 484 (1973).............................................................................................6

*Doe v. Nestle, S.A.*,
  906 F.3d 1120 (9th Cir. 2018) ....................................................................13, 14

*United States ex rel. DRC, Inc. v. Custer Battles, LLC*,
  562 F.3d 295 (4th Cir. 2009) ..........................................................................3, 4

*EEOC v. Arabian Am. Oil Co.*,
  499 U.S. 244 (1991).............................................................................................4

*Foley Bros. v. Filardo*,
  336 U.S. 281 (1949).........................................................................................5, 9

*In re French*,
  440 F.3d 145 (4th Cir. 2006) .............................................................................5

*Jesner v. Arab Bank, PLC*,
  138 S. Ct. 1386 (2018).......................................................................................20

*Kiobel v. Royal Dutch Petroleum Co.*,
  569 U.S. 108 (2013)................................................................................. *passim*

*Missouri v. Jenkins*,
  495 U.S. 33 (1990)...............................................................................................2

*Morrison v. Nat'l Australia Bank, Ltd.*,
    561 U.S. 247 (2010) ......................................................................................4, 5, 9

*Nestle USA, Inc. v. Doe*,
    141 S. Ct. 1931 (2021) ................................................................................ *passim*

*Rasul v. Bush*,
    542 U.S. 466 (2004) .................................................................................... *passim*

*RJR Nabisco, Inc. v. European Cmty.*,
    136 S. Ct. 2090 (2016) ................................................................................ *passim*

*Roe v. Howard*,
    917 F.3d 229 (4th Cir. 2019) .......................................................................11, 12

*Roman Catholic Archdiocese of San Juan v. Acevedo Feliciano*,
    140 S. Ct. 696 (2020) ............................................................................................2

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*,
    713 F.3d 175 (4th Cir. 2013) .............................................................................16

*Sale v. Haitian Ctrs. Council, Inc.*,
    509 U.S. 155 (1993) ..............................................................................................4

*Smith v. United States*,
    507 U.S. 197 (1993) ..........................................................................................4, 9

*United States v. Lighty*,
    616 F.3d 321 (4th Cir. 2010) .............................................................................16

*United States v. Verdugo-Urquidez*,
    494 U.S. 259 (1990) ..............................................................................................7

*Vermilya-Brown v. Connell*,
    335 U.S. 377 (1948) ..............................................................................................7

**Other Authorities**

*Black's Law Dictionary* (11th ed. 2019) .....................................................................3

J. Phillip London, *Our Good Name* (2008) ...............................................................20

## I.  INTRODUCTION

The Supreme Court's recent decision in *Nestle USA, Inc. v. Doe*, 141 S. Ct. 1931 (2021), unequivocally holds that the Alien Tort Statute ("ATS") applies only when "the conduct relevant to the statute's focus occurred in the United States." *Id.* at 1936.  The focus of ATS is violations of universally-accepted international norms.  Accordingly, ATS does not apply absent evidence showing violations of universally-accepted international norms in the United States.  The evidentiary record in this case shows no involvement by CACI personnel in the United States in the treatment of detainees generally, or of these Plaintiffs specifically.  That irrefutable fact requires dismissal of this case as an impermissible extraterritorial application of ATS.  Plaintiffs' arguments to the contrary lack legal and factual merit.

Plaintiffs begin with a true swing-for-the-fences argument, telling the Court that it can ignore *Nestle* and all of the other inconvenient extraterritoriality case law by simply redefining the "United States" to include Iraq.  Under Plaintiffs' redefinition of the United States, Abu Ghraib prison is as "domestic" as Old Town Alexandria, rendering ATS and an unending list of "domestic only" federal laws fully applicable in Iraq.  From there, Plaintiffs ask the Court to avert its eyes from the last seven years of extraterritoriality precedent and continue applying *Al Shimari III*,[1] notwithstanding Supreme Court case law rejecting *Al Shimari III*'s approach and holding every fact relied on in *Al Shimari III* irrelevant to the required extraterritoriality analysis.

After these barely-disguised requests that the Court simply refuse to apply *Nestle*, Plaintiffs pivot and argue that they have evidence of U.S. conduct sufficient to meet *Nestle*'s jurisdictional requirements.  That Plaintiffs would leave this argument for last tells the Court all it needs to know about the quality of Plaintiffs' evidence.  Plaintiffs' alleged facts fall into two

---

[1] "*Al Shimari III*" refers to *Al Shimari v. CACI Premier Tech., Inc.*, 758 F.3d 516 (4th Cir. 2014).

buckets – general corporate activity that cannot support ATS jurisdiction, and a less-than-candid description of the factual record to create the illusion of domestic involvement by CACI personnel in detainee treatment and abuse. Plaintiffs are entitled to their own arguments, but they are not entitled to create their own facts in derogation of the actual record.

Perhaps the most difficult challenge facing the Court is whether the Plaintiffs' opposition is more similar to the fiction of Lewis Carroll or of George Orwell. Lewis Carroll gave us Humpty Dumpty's "When I use a word . . . it means just what I choose it to mean – neither more nor less." That describes the Plaintiffs' definition of "United States" and their standard for assessing extraterritorial jurisdiction. On the other hand, their approach is distinctly Orwellian, where language is used to mean the opposite of reality. ("War is peace. Freedom is slavery. Ignorance is strength.") In Plaintiffs' view, the United States means Iraq. Worse yet, Plaintiffs use their opposition as a vehicle for revisionist history – creating 'facts' that never actually took place. Yet neither Plaintiffs nor a Court may make the record what it is not. *See, e.g.*, *Roman Catholic Archdiocese of San Juan v. Acevedo Feliciano*, 140 S. Ct. 696, 701 (2020); *Missouri v. Jenkins*, 495 U.S. 33, 49 (1990). The actual record shows that Plaintiffs' claims are an extraterritorial application of ATS, and *Nestle* requires that they be dismissed.

## II.    ANALYSIS

### A.    Conduct Occurring in Iraq Is Not "Relevant *Domestic* Conduct"

Bereft of relevant conduct occurring in the United States, Plaintiffs' lead argument is to redefine "domestic" as including Iraq, on the theory that U.S. military control in Iraq rendered conduct occurring in Iraq, and Abu Ghraib specifically, *de facto* domestic conduct. Plaintiffs' argument is an invitation to lawlessness. They ask the Court to disregard the Supreme Court's holdings in *Kiobel* and *Nestle* that ATS does not apply when the relevant conduct occurred outside the United States. *Kiobel* and *Nestle* closed the door on whether relevant conduct

occurring outside the United States can form the basis of an ATS claim, squarely holding that it cannot.  The Court should give effect to these binding precedents.

In *Nestle*, the Court specifically addressed where relevant conduct must occur for it to be a domestic application of ATS, holding that the conduct must occur "in the United States":

> [W]here the statute, as here, does not apply extraterritorially, plaintiffs must establish that "the conduct relevant to the statute's focus ***occurred in the United States.***"

141 S. Ct. at 1936 (2021) (emphasis added) (quoting *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 117-18 (2013), and *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016)).  *Kiobel* held the same:

> "[T]here is no clear indication of extraterritoriality here," and petitioners' case seeking relief for violations of the law of nations ***occurring outside the United States*** is barred.

*Kiobel*, 569 U.S. at 124 (emphasis added) (quoting *Morrison v. Nat'l Australia Bank, Ltd.*, 561 U.S. 247, 265 (2010)); *see also id.* (rejecting ATS claims because "all the relevant conduct took place outside the United States.").  The term "extraterritorial" means "occurring outside a particular state or country; beyond the geographic limits of a particular jurisdiction."  *Black's Law Dictionary* (11th ed. 2019).  Thus, as both *Nestle* and *Kiobel* held, extraterritoriality under ATS is not based on some vague assessment of control, but on whether the conduct relevant to ATS's focus (*i.e.*, violations of universally-accepted international norms) occurred ***in the United States***.  And as any third-grader can confirm, Iraq is not "in the United States."

Indeed, as the Fourth Circuit has recognized, the Coalition Provisional Authority ("CPA"), not the United States, "governed Iraq from May 2003 to June 28, 2004, when it turned over governing authority to the Interim Government of Iraq."  *United States ex rel. DRC, Inc. v. Custer Battles, LLC*, 562 F.3d 295, 298 (4th Cir. 2009).  While most CPA personnel were Americans, the CPA's personnel also were drawn "from other countries in the coalition

occupying Iraq, including Australia, the Czech Republic, Denmark, Italy, Japan, Poland, Romania, Spain, the United Kingdom, Ukraine, and others." *Id.*  Iraq was no more part of the United States than it was part of Denmark or Poland.

In arguing that Iraq was *de facto* United States territory, Plaintiffs principally rely on *Rasul v. Bush*, 542 U.S. 466 (2004), in which the Court held, as a matter of statutory construction, that the federal habeas statute applied to persons held at Guantanamo Bay when their custodian could be served with process in the United States.  Plaintiffs' reliance on *Rasul* reflects a misunderstanding of extraterritoriality jurisprudence and of *Rasul*'s place in that body of law.  Unpacking the required test for extraterritoriality makes this clear.

The presumption against extraterritoriality "represents a canon of construction, or a presumption about a statute's meaning, rather than a limit upon Congress's power to legislate." *Morrison*, 561 U.S. at 255.  The Supreme Court found it inappropriate for courts to guess "what Congress would have wanted if it had thought of the situation before the court."  *Id.* at 261. "Rather than guess anew in each case, [courts] apply the presumption in all cases, preserving a stable background against which Congress can legislate with predictable effects."  *Id.*  Thus, "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application."  *RJR Nabisco*, 136 S. Ct. at 2100.  Congress can give extraterritorial effect to a statute by clearly stating so when enacting it, or by amending a statute to give it extraterritorial effect.  *Morrison*, 561 U.S. at 265 n.8; *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 173 (1993); *Smith v. United States*, 507 U.S. 197, 204 (1993); *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 258 (1991).

As a canon of statutory construction, the first step of the *Morrison/RJR Nabisco* extraterritoriality test is to determine whether "the statute gives a clear, affirmative indication

that it applies extraterritorially." *RJR Nabisco*, 136 S. Ct. at 2101; *see also Nestle*, 141 S. Ct. at 1936. A court determines this by applying the usual rules of statutory construction, making use of "whatever sources of meaning one consults to give the most faithful reading of the text." *Morrison*, 561 U.S. at 265 (quotations omitted). This includes considering the statute's text, and as appropriate, the statute's context, purpose, and legislative history. *Id.*; *Foley Bros. v. Filardo*, 336 U.S. 281, 285 (1949); *In re French*, 440 F.3d 145, 151 (4th Cir. 2006).

If a court concludes that the statute does not apply extraterritorially, the second step of the extraterritoriality test requires that the court determine the statute's "focus."

> "If the conduct relevant to the statute's focus occurred ***in the United States***, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory."

*RJR Nabisco*, 136 S. Ct. at 2101 (emphasis added); *see also Nestle*, 141 S. Ct. at 1936.[2]

Plaintiffs' reliance on *Rasul* is misplaced because that case was decided at ***step one*** of the extraterritoriality test, on a question of statutory construction. As the Court explained:

> The question now before us is whether ***the habeas statute*** confers a right to judicial review of the legality of executive detention of aliens in a territory over which the United States exercises plenary and exclusive jurisdiction, but not 'ultimate sovereignty.'"

*Rasul*, 542 U.S. at 475 (emphasis added).

In conducting this exercise in statutory construction, the Court traced the history of the writ of habeas corpus, and noted that "[c]onsistent with the historic purpose of the writ, this Court has recognized the federal courts' power to review applications for habeas relief in a wide

---

[2] If a court concludes in the first step of the extraterritoriality analysis that the statute applies extraterritorially, the court applies the statute according to "the limits Congress has (or has not) imposed on the statute's foreign application." *RJR Nabisco*, 136 S. Ct. at 2101.

variety of cases involving executive detention, in wartime as well as in times of peace." *Id.* at 474-75.  The Court explained that it had held "that the prisoner's presence within the territorial jurisdiction of the district court is not 'an invariable prerequisite' to the exercise of district court jurisdiction under the federal habeas statute," so long as the prisoner's custodian may be served in the district.  *Id.* at 478-79 (citing *Braden v. 30th Jud. Cir. Ct. of Ky.*, 410 U.S. 484, 495 (1973)); *id.* at 481 ("Application of the habeas statute to persons detained at [Guantanamo Bay] is consistent with the historical reach of the writ of habeas corpus.").  The Court also noted that *Braden* relied on "decisions of this Court in cases involving habeas prisoners 'confined overseas (and thus outside the territory of any district court)," in which the Court "held, if only implicitly, that the petitioners' absence from the district does not present a jurisdictional obstacle to the consideration of the claim.'"  *Id.* at 479 (quoting *Braden*, 410 U.S. at 497-98).

From there, the *Rasul* majority held that there was nothing about Guantanamo Bay that would take it outside of its prior construction of the federal habeas statute as conferring jurisdiction in courts where the *custodian* is amenable to process.  Given the habeas statute's historical application to prisoners held overseas, and the United States' concession that a court would have jurisdiction over a habeas petition by an American citizen held at Guantanamo Bay, the Court explained that "[w]hatever traction the presumption against extraterritoriality might have in other contexts, it certainly has no application to the operation of ***the habeas statute*** within 'the ***territorial*** jurisdiction' of the United States."  *Id.* at 480 (emphasis added).  Finally, the Court characterized its holding as a simple exercise in statutory construction:

> In the end, the answer to the question presented is clear.  Petitioners contend that they are being held in federal custody in violation of the laws of the United States.  No party questions the District Court's jurisdiction over petitioners' custodians.  Section 2241 [of the federal habeas statute], ***by its terms***, requires nothing more.  We therefore hold that § 2241 confers on the District Court

6

jurisdiction to hear petitioners' habeas corpus challenges to the legality of their detention at Guantanamo Bay Naval Base.

*Id.* at 483-84 (emphasis added) (footnote and internal citation omitted).

Thus, the Supreme Court resolved *Rasul* at ***step one*** of the extraterritoriality test, holding that the federal habeas statute, "by its terms," conferred jurisdiction where the custodian could be served, and that nothing in the statute justified an exception for aliens held at Guantanamo Bay. *Id.*  The other case on which Plaintiffs rely, *Vermilya-Brown v. Connell*, 335 U.S. 377 (1948), also is a "step one" case, with the Court holding that the FLSA's provision extending its reach to U.S. "possessions," as a matter of statutory construction, applied to a permanent U.S. military base in Bermuda.  *Id.* at 386 ("The point of statutory construction for our determination is whether the word 'possession,' used by Congress to bound the geographical coverage of the Fair Labor Standards Act, fixes the limits of the Act's scope so as to include the Bermuda base.").[3]

Step one of the required extraterritoriality test – whether the statute gives a clear indication of extraterritorial application – is not a matter for debate in this action.  That ship has sailed, as the Supreme Court has twice held unequivocally that "[c]ourts thus cannot give 'extraterritorial reach' to any cause of action judicially created under the ATS."  *Nestle*, 141 S. Ct. at 1936 (internal quotations omitted); *see also Kiobel*, 569 U.S. at 124 ("[T]here is no clear indication of extraterritoriality here, and petitioners' case seeking relief for violations of the law of nations occurring outside the United States is barred.").  Thus, the Supreme Court's

---

[3] Plaintiffs cite *Boumediene v. Bush*, 553 U.S. 723, 755 (2008), in a footnote, but *Boumediene* involves a *constitutional* question – application of the Suspension Clause – and not statutory construction to which the presumption against extraterritoriality applies.  Regardless, the Suspension Clause does not apply to aliens in military custody in in places where the U.S. had not signaled an intent to maintain sovereignty jurisdictions "with permanence." *Al Maqaleh v. Gates*, 605 F.3d 84, 97 (D.C. Cir. 2010).  And the Supreme Court has "rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990).  Thus, *Boumediene* in no way supports a conclusion that Iraq or Abu Ghraib prison were U.S. territory.

construction of the federal habeas statute in *Rasul* has no bearing on the proper construction of the ATS, as the Court has ruled twice since *Rasul* that the ATS has no extraterritorial application.

No court has held that Iraq, or any other place under non-permanent military occupation, is part of the U.S. for purposes of the application of federal laws. The Fifth Circuit considered the argument Plaintiffs make here, and held that conduct at the U.S. military base at Al Asad, Iraq, was not "domestic" for purposes of ATS. *Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 196 (5th Cir. 2017). The court noted that *Rasul* involved construction of the federal habeas statute, and was distinguishable because, unlike battlefield facilities in Iraq, the U.S. has a perpetual lease granting it "complete jurisdiction and control" over Guantanamo Bay. *Id.* The court held that a U.S. military base cannot constitute *de facto* U.S. territory where "the United States has not demonstrated intent to exercise sovereignty" over the base permanently. *Id.* at 197 (quoting *Marshall v. Exelis Sys. Corp.*, No. 13-cv-545, 2014 WL 1213473, at *6 (D. Colo. Mar. 24, 2014) (rejecting § 1981 claim arising out of conduct at Bagram Airfield in Afghanistan).

The Fifth Circuit also pointed out the staggering implications of the plaintiffs' position:

> It is worth noting the scope of Plaintiffs' reasoning: it is not limited to ATS. Plaintiffs' contention would compel the conclusion that federal laws generally applied to Al Asad in 2004.

*Id.* at 196 n.4. The same is true here.

If the U.S. military presence in Iraq, or at Abu Ghraib prison, rendered conduct in those places "domestic" for purposes of the presumption against extraterritoriality, it would make domestic law generally applicable in those locations. Consider Iraqi police officers working at Abu Ghraib prison while it was under U.S. military control. Under Plaintiffs' argument, legislation by the U.S. Congress would supply the law in Iraq. The Iraqi police officers would be entitled to the benefits of federal wage and hour laws; to federal rights of collective bargaining; to the protections of the FTCA, Title VII, the Family and Medical Leave Act, and the Americans

8

with Disabilities Act.[4]  They would be subject to federal RICO and securities laws for schemes occurring entirely in Iraq.[5]  Moreover, extending "United States" to include property under U.S. military control in an ongoing war would cause the footprint of U.S. territory, and the reach of federal laws, to expand and contract on a daily basis depending on operations in a theater of war. And all of this would be a complete misapplication of *Rasul*, which is limited to construction of a federal habeas statute that generally applies to prisoners held abroad, and the Court's conclusion that nothing in *that particular statute* would exclude from its reach a prisoner in U.S. military custody at a base under permanent U.S. control.

### B.  This Court's Obligation Is To Follow *Nestle*, Not *Al Shimari III*

Plaintiffs do not dispute, nor could they, that this Court must give effect to Supreme Court decisions issued after the Fourth Circuit's decision in *Al Shimari III*.  Instead, Plaintiffs argue that the "touch and concern" extraterritoriality test applied in *Al Shimari III* remains good law notwithstanding *RJR Nabisco* and *Nestle*.  Pl. Opp. at 14-18.  Plaintiffs reach this conclusion by arguing that (1) *Al Shimari III* purported to apply the Supreme Court's decision in *Kiobel*; (2) *RJR Nabisco* and *Nestle* did not overrule *Kiobel*; and (3) therefore, *Kiobel* and *Nestle* are consistent with each other and "touch and concern" must be an appropriate extraterritoriality test under *Nestle*.  Pl. Opp. at 14-18.  Plaintiffs' argument does not withstand basic logic or a cursory examination of *Kiobel*, *Al Shimari III*, *RJR Nabisco*, and *Nestle*.

Contrary to Plaintiffs' intimation, CACI does not argue that "*RJR Nabisco* – and now *Nestle* – overruled, *sub silentio*, the 'touch and concern' test established in *Kiobel* and applied in

---

[4] *See Smith*, 507 U.S. at 204 (FTCA's immunity waiver applies to torts occurring in U.S. territory); *Foley Bros.*, 336 U.S. at 285 (federal Eight Hour Law applied only in U.S. territory).

[5] *See RJR Nabisco*, 136 S. Ct. at 2108 (RICO private right of action does not apply to "injuries suffered outside of the United States."); *Morrison*, 561 U.S. at 273 (Section 10(b) of the Securities Exchange Act applies to purchase or sale of securities "in the United States").

*Al Shimari III*." Pl. Opp. at 14. Rather, *RJR Nabisco* and *Nestle* vindicate what CACI said

all along – that *Kiobel*'s "touch and concern" language did not create a different test than the

two-step *Morrison/RJR Nabisco* extraterritoriality test that applies to every other federal statute.

In *RJR Nabisco*, the Supreme Court confirmed that "*Kiobel* reflect[s] the two-step

framework for analyzing extraterritoriality issues" – one that determines at step one whether the

presumption against extraterritoriality has been rebutted, and if not, determines at step two

whether the conduct that is the "focus" of the statute is domestic or extraterritorial. 136 S. Ct. at

2101. The Court further explained *Kiobel* did not assess ATS's focus for a simple reason – there

was no need because "all of the relevant conduct regarding those violations took place outside

the United States." *Id.* (internal quotations omitted). In *Nestle*, the Supreme Court reaffirmed

that *RJR Nabisco*'s two-step "focus" test applies to ATS and held that the presumption against

extraterritoriality barred the plaintiffs' ATS claim because the only conduct alleged in the United

States was "general corporate activity." *Nestle*, 141 S. Ct. at 1936.

Plaintiffs' argument that *Al Shimari III*'s application of a holistic "touch and concern"

test somehow survives *RJR Nabisco* and *Nestle* is an exercise in willful blindness. In *Al Shimari*

*III*, the court held that the "touch and concern" test allowed it to consider any domestic conduct

relevant to the plaintiff's *claims*. 758 F.3d at 527. Indeed, the *Al Shimari III* panel found

jurisdiction under ATS based on the following domestic contacts by CACI:

> (1) CACI's status as a United States corporation;
>
> (2) the United States citizenship of CACI's employees in Iraq;
>
> (3) that CACI's contract to perform interrogation services in Iraq
> was issued in the United States government and required CACI's
> employees to obtain U.S. government-issued security clearances;
>
> (4) the ***allegations*** that CACI's managers in the United States gave
> tacit approval to the acts of torture committed by CACI employees

at the Abu Ghraib prison, attempted to "cover up" the misconduct, and "implicitly, if not expressly, encouraged" it; and

(5) the expressed intent of Congress, through enactment of the TVPA and 18 U.S.C. § 2340A, to provide aliens access to United States courts and to hold citizens of the United States accountable for acts of torture committed abroad.

*Id.* at 530-31. By contrast, however, *RJR Nabisco* holds that "if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application ***regardless of any other conduct that occurred in U.S. territory***." 136 S. Ct. at 2101 (emphasis added). And *Nestle* holds that general corporate activity in the United States is not relevant conduct that can support an exercise of jurisdiction under ATS. 141 S. Ct. at 1936.

Indeed, even before *Nestle*, the Fourth Circuit recognized that the "touch and concern" test *Al Shimari III* ascribed to *Kiobel* is incompatible with *RJR Nabisco*'s "focus" test:

> In delineating the two-step framework in *RJR Nabisco*, the Supreme Court drew on two of its key precedents addressing extraterritoriality: *Morrison* and *Kiobel*. The second step described in *RJR Nabisco*, however, appears to privilege consideration of a statute's "focus" — the approach set out in *Morrison* – over the inquiry articulated in *Kiobel*, which asked whether the claims at issue "touch and concern the territory of the United States." On the other hand, *RJR Nabisco* did not overturn *Kiobel* and – in step two – retains a similar emphasis on the relevant claim's connection to U.S. territory. We need not resolve the effect of *RJR Nabisco* on *Kiobel* because, as explained herein, we do not reach the second step of the *RJR Nabisco* framework.

*Roe v. Howard*, 917 F.3d 229, 240 n.6 (4th Cir. 2019).

This Court similarly recognized the conflict between the "touch and concern" test applied in *Al Shimari III* and the "focus" test mandated by *RJR Nabisco*, calling CACI's post-discovery extraterritoriality motion "interesting," and observing that based on *RJR Nabisco* the Fourth Circuit "may want to reverse themselves." Ex. 2 at 4-6. The Fourth Circuit panel hearing CACI's 2019 appeal understood that this Court's obligation was to apply *RJR Nabisco*. Ex. 4 at

11

12:12-15 (Floyd, J.) ("Somewhere in the record, Judge Brinkema said that it's – used the phrase "law of the case."   Does – does she understand that *RJR Nabisco* controls?"); *id.* at 33:8-19 ("Well, you – you're going to have to answer this question one way or another if we assume pendent – pendent appellate jurisdiction or if we were to send it back.   Assume the *RJR Nabisco* *test* is – is applicable, and the focus of the statute is to – a domestic nexus to the merits . . . of the ATS claim, not your allegation, but what is your evidence that – that – that there is activity here in the United States.").

To the extent the import of *RJR Nabisco* was at all in doubt, *Nestle* "resolve[s]the effect of *RJR Nabisco* on *Kiobel*,"[6] making clear that the "focus" test applies to ATS and that any other reading of *Kiobel* is simply incorrect.   *Nestle*, 141 S. Ct. at 1936 ("Second, where the statute, as here, does not apply extraterritorially, plaintiffs must establish that 'the conduct relevant to the statute's focus occurred in the United States.'" (quoting *RJR Nabisco*, 136 S. Ct. at 2101)). Therefore, this Court's obligation is to apply the extraterritoriality test mandated by *RJR Nabisco* and *Nestle* and not to perpetuate the "touch and concern" test applied in *Al Shimari III*.[7]

C.   ***Nestle* Requires Dismissal Because the Record Establishes Only "General Corporate Activity" By CACI in the United States**

Plaintiffs accuse CACI of misreading *Nestle*.   Pl. Opp. at 19.   According to Plaintiffs, when the Supreme Court said that "general corporate activity" could not support domestic application of the ATS, it meant "corporate activities that are *unconnected* to the claims."   *Id.* Indeed, Plaintiffs even represent that "[i]n *Nestle*, the corporate conduct and decision-making

---

[6] *Roe*, 917 F.3d at 240 n.6.

[7] Plaintiffs state that *Al Shimari III* was decided on an evidentiary record, and not on allegations.   Pl. Opp. at 18.   With discovery incomplete, the Fourth Circuit credited Plaintiffs' *allegation* that CACI's managers in the United States gave tacit approval, attempted to cover up, and encouraged the alleged acts of torture.   *Al Shimari III*, 758 F.3d at 530-31.   That allegation is irrelevant now that discovery has closed.   *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017).

identified as the relevant domestic nexus was not specifically related to the plaintiffs' child slave labor and trafficking claims." *Id.* That is a complete mischaracterization of *Nestle*.

What the Supreme Court meant by "general corporate activity" is easily determined by examining the conduct it reviewed in *Nestle* and characterized as general corporate activity. In *Nestle*, the Ninth Circuit relied on the following conduct in the United States to conclude that the plaintiffs' claims were a "domestic" application of ATS:

- the defendants' decisions in the United States about buying and selling commodities from a child slave-based supply chain;

- defendants' orchestration from the United States of a child slave-based supply chain;

- defendants' perpetuation from the United States of child slavery to depress labor costs;

- payments of kickbacks approved in the United States by defendants to perpetuate prices that required child slave labor; and

- regularly sending U.S. employees to inspect operations in the Ivory Coast and report back to U.S. headquarters for decision-making purposes.

*Doe v. Nestle, S.A.*, 906 F.3d 1120, 1123-26 (9th Cir. 2018). Additional allegations included providing tools, equipment, and technical support to farmers who utilized child slave labor. *Id.* at 1123-26. The Supreme Court determined that "providing training, fertilizer, tools, and cash to overseas farms" "occurred in Ivory Coast." *Nestle*, 141 S. Ct. at 1937. **It characterized the remainder of the allegations as falling under the umbrella of "operational decision[s]" made in the United States** and held that this was the sort of "general corporate activity" that alone[8] could not support domestic application of the ATS. *Id.* (quoting *Morrison*, 561 U.S. at 266).

---

[8] Plaintiffs accuse CACI of omitting the word "alone" from its discussion of *Nestle*. This is inaccurate. *See* CACI Mem. at 13 (block quoting *Nestle* and including the word "alone"). Regardless, Plaintiffs point to evidence of only general corporate activity and, under *Nestle*, general corporate activity alone does not establish domestic application.

Thus, the domestic activity at issue in *Nestle* cannot sincerely be described as "corporate activities that are *unconnected* to the [*Nestle* plaintiffs'] claims." Pl. Opp. at 19. Every one of these allegations was directly connected to "[t]he gravamen of the complaint . . . that defendants depended on – and orchestrated – a slave-based supply chain." *Nestle*, 906 F.3d at 1123. And the Supreme Court described them as "general corporate activity." *Nestle*, 141 S. Ct. at 1937.

Plaintiffs admit that their allegations – many of which have no support in the record – have "a corporate character," but urge that because the alleged activities are "all specific to Plaintiffs' claims" they fall outside *Nestle*'s prohibition. Pls. Opp. at 20. But this ignores that, as shown above, *all* of the *Nestle* plaintiffs' allegations were likewise "specific to [their] claims" and nonetheless deemed inadequate. The *Nestle* plaintiffs alleged general corporate activity that had the effect of supporting child slave labor practices in the Ivory Coast and that was not enough. Plaintiffs here assert even less U.S.-based corporate activity and have absolutely no evidence showing it contributed to their alleged abuse at Abu Ghraib. Plaintiffs have failed to show that anything actionable under the ATS occurred in the United States.

For that reason, Plaintiffs' argument that *Al Shimari III* applies "the proper understanding of the focus of the ATS claims Plaintiffs raise" is irrelevant. Pl. Opp. at 21. As in *Nestle*, if the only domestic conduct is general corporate activity, the claim is barred no matter how a court describes ATS's focus. Thus, it does not matter whether this Court agrees with the *Nestle* defendants that the proper focus of the ATS is "the conduct that directly caused the injury" or with the *Nestle* plaintiffs that the focus should be the "conduct that violates international law." *Nestle*, 141 S. Ct. at 1936-37. Plaintiffs' claims fail under either standard.

Indeed, Plaintiffs characterize ATS's focus as "providing redress for international law violations without which the U.S. would be deemed 'responsible' and risk international discord."

Pls. Opp. at 23. This focus is not dissimilar from CACI's formulation: "the tort committed in violation of international norms." CACI Mem. at 18. Under either construct, the focus is the alleged violation of international law. Where Plaintiffs and CACI disagree is not the focus of the ATS, but what conduct is "relevant" to that focus under *RJR Nabisco*'s step-two analysis:

Plaintiffs contend it is relevant that "the claims arise out of universally condemned acts (torture and war crimes), perpetrated against foreign nationals" whom they argue were essentially within the United States (*see* Section II.A, *supra*, for why this argument has no merit). Pl. Opp. at 24. But that does not identify any U.S. conduct, or any specific conduct at all. It is simply a regurgitation of Plaintiffs' theory of the case. And "arising out of" is no part of the required test – the test is whether the conduct on which ATS is focused occurred in the U.S. or abroad. *Nestle*, 141 S. Ct. at 1936-37. Plaintiffs next urge "that international law violations were committed by U.S. actors, in a conspiracy with U.S. soldiers," and the alleged violations were committed "via a contract with the United States government entered into in the United States, thereby implicating a U.S. obligation under international law to punish American tortfeasors and provide a remedy to their victims." *Id.* But, again, this argument points to no conduct ***in the United States*** other than CACI's entry into a contract with the U.S. government, and *Nestle* makes clear that such conduct is not relevant to the extraterritoriality inquiry.

### D.   The Evidentiary Record Is Devoid of Evidence of CACI Involvement in International Law Violations in the United States

When the parties argued in the Fourth Circuit in 2019, the panel pressed Plaintiffs' counsel for "JA cites about the conduct that happened in the United States, not just theories, evidence with JA cites." Ex. 4 at 36:6-8 (Quattlebaum, J.). Judge Floyd joined in, advising that "this case rises and falls on that." *Id.* at 37:12-14. To his credit, Plaintiffs' counsel did not try to identify specific record evidence of relevant domestic conduct, as there is none.

Plaintiffs' opposition before this Court takes an entirely different tack. After making its arguments that the Court should apply *Al Shimari III* instead of *Nestle*, Plaintiffs make a last-ditch argument that the record contains facts regarding CACI personnel *in the United States* being involved in violations of universally-accepted international norms. Pl. Opp. at 5-7, 25-28. The problem with this argument is that these so-called "facts" are completely unsupported by the record, or occurred ***in Iraq*** if they occurred at all. It is as if Plaintiffs are banking on the Court not "digging in" to the actual record, and instead accepting Plaintiffs' representations about the record at face value.[9] But factual challenges to subject-matter jurisdiction are decided by resort to the *actual* evidentiary record, and are not based on how a party is willing to describe the record. *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013); *see also United States v. Lighty*, 616 F.3d 321, 361 (4th Cir. 2010) (noting the "fundamental rule, known to every lawyer, that argument is limited to the facts in evidence"). The actual record is far different from Plaintiffs' characterization of it.

Plaintiffs allege that the record in this case supports the following facts:

- "CACI refused to act on specific reports of misconduct perpetrated by its employees, instead covering up the misconduct and furthering the conspiracies,"

- "[M]ultiple instances where CACI employees or military personnel reported to 'upper management' that CACI interrogators and military personnel were engaging in detainee abuse and that CACI managers failed to report this abuse to the military – or even ensure that CACI's own employees stopped the abuse,"

- "CACI's refusal to remove employees from [Abu Ghraib] despite credible reports of misconduct," and

- "CACI managers were either stationed at the Hard Site or regularly visited Abu Ghraib and that CACI's executive team regularly reviewed reports from these individuals."

---

[9] Plaintiffs attach deposition excerpts, but do not cite to pages of the depositions, frustrating the Court's ability to evaluate Plaintiffs' description of the record. Pl. Opp. at 6-7.

Pl. Opp. at 25-26.  The common thread running through Plaintiffs' representation of the facts is a contention that CACI personnel in the United States supposedly knew about ATS violations in Iraq and did nothing about it.  Of course, mere knowledge of a violation of an international norm is insufficient for aiding and abetting liability under ATS; rather, aiding and abetting liability requires the provision of *practical assistance* with the *purpose* of assisting in an international law violation.  *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 398 (4th Cir. 2011).  But even if that were not so, there is no evidence that CACI personnel in the United States were even aware of international law violations, or of detainee abuse, before the Abu Ghraib scandal was reported in the media.

A grand total of one U.S.-based CACI employee (Charles Mudd) visited CACI personnel in Iraq.  Putting aside that *Nestle* treats site visits by U.S.-based personnel as "general corporate activity," Mr. Mudd has stated under oath that "[a]ll decisions relating to interrogations in Iraq were made exclusively by U.S. military personnel and communicated to [CACI] personnel in Iraq only," and that CACI personnel in Iraq "did not communicate any reports regarding interrogations to [CACI] personnel in the United States."  Mudd Decl. ¶ 8.  Mr. Mudd also testified by declaration and in his deposition[10] that he visited Iraq for purposes of contract administration and to check on issues such as employee housing, that he "didn't go around the cells where the prisoners were," and that he "didn't go around watching operations because [he] wasn't there for operational issues.  The government ran that."  Ex. 17 at 182:6-16 (Mudd Dep.).  Plaintiffs' representation that Mr. Mudd went to Iraq "to monitor CACI interrogators' performance" (Pl. Opp. at 6), is false and unsupported by record evidence.  Mudd Decl. ¶¶ 6-8.

Mr. Mudd also was unaware of detainee abuse at Abu Ghraib prison before reports surfaced in the media.  He testified that he is unaware of any CACI employee getting into trouble

---

[10] Mr. Mudd was deposed in the related *Saleh* case, which is treated as having been taken in the present action.  Dkt. #211, ¶ 14.

for detainee treatment prior to the Abu Ghraib scandal becoming public.  Ex. 17 at 176:8-22.  The only time Mr. Mudd received an allegation from a CACI employee that another employee had mistreated a detainee was *after* the Abu Ghraib scandal became public.  The allegation was that a CACI employee had grabbed a detainee by the shirt, CACI reported the allegation to the U.S. military, and the military investigated it and cleared the CACI employee.  *Id.* at 209:2-210:5.  All of Mr. Mudd's declaration and deposition testimony is uncontroverted.  Not a single document or witness suggests that Mr. Mudd, the sole U.S.-based CACI employee to visit Iraq, saw or knew of detainee abuse in Iraq prior to it being reported in the media.

Plaintiffs also play fast and loose by arguing that CACI personnel in the U.S. received "*daily* reports" (emphasis by Plaintiffs) from Iraq "so they could keep a grip on what was happening," as if this suggests reporting to U.S.-based CACI personnel on interrogation operations or detainee abuse.  Pl. Opp. at 6.  Curiously, Plaintiffs, who have the burden of proving jurisdiction, attached only one daily report to their opposition, even though dozens were produced in discovery.  Plaintiffs would rather the Court guess their significance than submit them and allow the Court to see their benign nature.  CACI has attached the reports as Exhibit 18, and they are administrative in nature.  They advise where in Iraq various employees had been deployed by the U.S. military, identify personnel on leave, and describe various other personnel and administrative matters.  They contain not a hint of allegations of detainee abuse.

Plaintiffs also represent that the record shows that "[a]t least two CACI interrogators reported troubling interrogation methods used by military and CACI interrogators to CACI management ***in the United States***."  Pl Opp. at 7 (emphasis added); *see also id.* at 27.  Given that CACI's motion rises and falls on *where* conduct occurred, one would expect Plaintiffs to take care to accurately state where events occurred.  But one of the two instances on which Plaintiffs

rely is a conversation between former CACI employee Torin Nelson and CACI country manager Scott Northrop.  Pl. Opp. at 7 (citing Nelson deposition without page citations).  Messrs. Nelson and Northrop both testified that their conversation occurred at ***Abu Ghraib prison in Iraq*** on one of Northrop's visits from his office at Camp Victory to Abu Ghraib.  Pl. Ex. 16 at 60:11-62:3; Ex. 19 at 163:13-165:17 (Northrop Dep.); Ex. 5 at 32:13-33:19 (Northrop worked in Iraq).  And Nelson testified unequivocally that CACI personnel in the U.S. had *no involvement whatsoever* in operational matters at Abu Ghraib prison.  Ex. 15 at 27:7-13.  Moreover, Mr. Nelson, by his own admission, "did not have anything damning" to say about CACI interrogators.  Pl. Ex. 16 at 54:7-56:11.  Thus, Plaintiffs' opposition falsely represents that Nelson reported misconduct by military and CACI personnel to a CACI manager in the U.S., when his discussion was actually in Iraq and Nelson had no evidence of misconduct.

The other communication on which Plaintiffs rely is a post-resignation email sent by a CACI interrogator to a CACI employee in the United States.  Again, Plaintiffs' description is less than candid.  Far from describing "troubling interrogation methods used by military and CACI interrogators," the former employee stated that "the CACI personnel with whom [he] had contact . . . have [his] highest admiration and respect."  Pl. Ex. 14 at 1.  The email references "concerns regarding the handling of prisoners and interrogation methods" by junior enlisted interrogators, but the only specific recitation is that male military interrogators interrogated a female prisoner at Abu Ghraib.  *Id.*  The former employee's email is very clear, however, that "[t]his does not involve anything which I or any other CACI employee witnessed or reported," and further states that the matter was already under investigation.  *Id.*  Thus, this email (1) makes no allegations of misconduct by CACI personnel, (2) does not detail any troubling interrogation conduct by soldiers other than male interrogators interrogating a female prisoner, and (3) does

not detail any conduct by anyone that would appear to fit within the "certain narrow circumstances courts [in which] may recognize a common-law cause of action for claims based on the present-day law of nations." *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1398 (2018).

Finally, Plaintiffs make the remarkable argument that the publication of a book by CACI's then-CEO in 2008 – four years after Plaintiffs' alleged abuse – somehow retroactively renders Plaintiffs' claims a "domestic" application of the ATS.  Pl. Opp. at 7, 27; *see also* J. Phillip London, *Our Good Name* (2008).  Left unexplained by Plaintiffs is how one is able to aid and abet conduct that allegedly had occurred four years earlier.

## III.   CONCLUSION

For the foregoing reasons, binding authority requires dismissal of Plaintiffs' claims.

Respectfully submitted,


*/s/   John F. O'Connor*
John F. O'Connor
Virginia Bar No. 93004
Linda C. Bailey (admitted *pro hac vice*)
Molly Bruder Fox (admitted *pro hac vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000 – telephone
(202) 429-3902 – facsimile
joconnor@steptoe.com
lbailey@steptoe.com
mbfox@steptoe.com

William D. Dolan, III
Virginia Bar No. 12455
LAW OFFICES OF WILLIAM D.
DOLAN, III, PC
8270 Greensboro Drive, Suite 700
Tysons Corner, VA 22102
(703) 584-8377 – telephone
wdolan@dolanlaw.net


*Counsel for Defendant CACI Premier*
*Technology, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of September, 2021, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following counsel:

John Kenneth Zwerling
The Law Offices of John Kenneth Zwerling, P.C.
114 North Alfred Street
Alexandria, VA 22314
jz@zwerling.com


/s/  John F. O'Connor
John F. O'Connor
Virginia Bar No. 93004
Attorney for Defendant CACI Premier Technology,
    Inc.
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000 – telephone
(202) 429-3902 – facsimile
joconnor@steptoe.com