**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| SUHAIL NAJIM ABDULLAH AL SHIMARI, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| CACI PREMIER TECHNOLOGY, INC., | ) ) ) |
| Defendant, | ) ) ) |

No.      1:08-cv-0827 LMB-JFA

**DEFENDANT CACI PREMIER TECHNOLOGY, INC.'S**
**MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS**
**FOR LACK OF SUBJECT MATTER JURISDICTION**

John F. O'Connor (Va. Bar #93004)
Linda C. Bailey (admitted *pro hac vice*)
Molly B. Fox (admitted *pro hac vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000 – telephone
(202) 429-3902 – facsimile
joconnor@steptoe.com
lbailey@steptoe.com
mbfox@steptoe.com

William D. Dolan, III (Va. Bar #12455)
LAW OFFICES OF WILLIAM D.
DOLAN, III, PC
8270 Greensboro Drive, Suite 700
Tysons Corner, Virginia 22102
(703) 584-8377 – telephone
wdolan@dolanlaw.net

*Counsel for Defendant CACI Premier*
*Technology, Inc.*

## TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................. 1

II.     LEGAL STANDARD ............................................................................................ 2

III.    ANALYSIS ............................................................................................................ 4

        A.    The Required Framework for Evaluating Proposed Claims Under ATS .............. 4

        B.    *Egbert*, *Torres*, and *Biden* ................................................................................... 7

              1.    *Egbert* .................................................................................................... 7

              2.    *Torres* .................................................................................................... 9

              3.    *Biden* .................................................................................................... 12

        C.    The Supreme Court's Recent Decisions in *Egbert*, *Torres*, and *Biden*
              Reinforce That ATS Does Not Permit the Exercise of Jurisdiction Over
              Claims Arising from U.S. Military Operations in a War .................................... 13

              1.    *Egbert* Reinforces the *Ziglar*/*Jesner* Test Applies and Prohibits
                    Judicial Recognition of Causes of Action If There "Is Even a
                    Single Sound Reason to Defer to Congress" ............................................ 15

              2.    *Egbert*, *Torres*, and *Biden* Present a Host of Reasons to Think That
                    Congress Would Not Authorize a Private Damages Action Under ATS
                    for Injuries Incurred at the Hands of U.S. Soldiers Prosecuting a War .... 16

IV.     CONCLUSION ................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Elec. Power Co. v. Massachusetts*,
  564 U.S. 410 (2011)...........................................................................................................19

*Arbaugh v. Y & H Corp.*,
  546 U.S. 500 (2006)..............................................................................................................3

*Beck v. McDonald*,
  848 F.3d 262 (4th Cir. 2017) ..............................................................................................3

*Biden v. Texas*,
  142 S. Ct. 2528 (2022)................................................................................................ *passim*

*Demetres v. E.W. Constr., Inc.*,
  776 F.3d 271 (4th Cir. 2015) ..............................................................................................4

*Egbert v. Boule*,
  142 S. Ct. 1793 (2022)................................................................................................ *passim*

*Green v. Sessions*,
  No. 1:17-cv-1365-LMB-TCB, 2018 WL 2025299 (E.D. Va. May 1, 2018)...........................3

*Guillen v. Esper*,
  No. 1:19-cv-1206-LMB/IDD, 2020 WL 3965007 (E.D. Va. July 13, 2020) ...........................4

*Hernandez v. Mesa*,
  140 S. Ct. 735 (2020).............................................................................................................6

*Jesner v. Arab Bank PLC*,
  138 S. Ct. 1386 (2018)................................................................................................ *passim*

*In re KBR, Inc., Burn Pit Litig.*,
  744 F.3d 326 (4th Cir. 2014) ..............................................................................................3

*Kiobel v. Royal Dutch Petroleum Co.*,
  569 U.S. 108 (2013)...............................................................................................2, 6, 12, 24

*Koohi v. United States*,
  976 F.2d 1328 (9th Cir. 1992) ...........................................................................................23

*Lebron v. Rumsfeld*,
  670 F.3d 540 (4th Cir. 2011) .............................................................................................10

*Milwaukee v. Illinois,*
    451 U.S. 304 (1981)..................................................................................................20

*Nestle USA, Inc. v. Doe,*
    141 S. Ct. 1931 (2021).................................................................................. *passim*

*Payne v. Taslimi,*
    998 F.3d 648 (4th Cir. 2021) .....................................................................................2

*Saleh v. Titan,*
    580 F.3d 1 (D.C. Cir. 2009).............................................................................19, 20

*Sosa v. Alvarez-Machain,*
    542 U.S. 692 (2004)....................................................................................... *passim*

*In re Thomas,*
    988 F.3d 783 (4th Cir. 2021) .....................................................................................2

*Thomasson v. Perry,*
    80 F.3d 915 (4th Cir. 1996) (*en banc*) ....................................................................10

*Tiffany v. United States,*
    931 F.2d 271 (4th Cir. 1991) ...................................................................................10

*Torres v. Texas Dep't of Pub. Safety,*
    142 S. Ct. 2455 (2022).................................................................................. *passim*

*United States v. Beasley,*
    495 F.3d 142 (4th Cir. 2007) .....................................................................................3

*United States v. Chamblin,*
    No. 201500388, 2017 WL 5166627 (N-M. Ct. Crim. App. Nov. 8, 2017) ............21

*United States v. Drotleff,*
    497 F. App'x 357 (4th Cir. 2012) ...........................................................................21

*United States v. England,*
    No. ARMY20051170, 2009 WL 6842645 (A. Ct. Crim. App. Sept. 10, 2009).....................21

*United States v. Green,*
    654 F.3d 637 (6th Cir. 2011) ...................................................................................21

*United States v. Harman,*
    68 M.J. 325 (C.A.A.F. 2010) ...................................................................................21

*United States v. Moussaoui,*
    382 F.3d 453 (4th Cir. 2004) ...................................................................................10

*United States v. Passaro*,
   577 F.3d 207 (4th Cir. 2009) .............................................................................21

*United States v. Pennington*,
   No. NMCCA200800106, 2008 WL 5233379 (N-M. Ct. Crim. App. Dec. 16,
   2008) ...................................................................................................................21

*United States v. Slatten*,
   865 F.3d 767 (D.C. Cir. 2017) ...........................................................................21

*Williams v. United States*,
   50 F.3d 299 (4th Cir. 1995) ..................................................................................3

*Ziglar v. Abbasi*,
   137 S. Ct. 1843 (2017) ............................................................................ *passim*

**Statutes**

10 U.S.C. § 802 ............................................................................................................21

10 U.S.C. § 2734 ..........................................................................................................20

18 U.S.C. § 2340 ..........................................................................................................20

18 U.S.C. § 2441 ..........................................................................................................20

18 U.S.C. § 3261 ..........................................................................................................21

28 U.S.C. § 1350 note ..................................................................................................19

Judiciary Act of 1789. Act of Sept. 24, 1789, ch. 20, § 9, 1 Stat. 77 ...........................18

## I.     INTRODUCTION

CACI's[1] pending motion to dismiss (Dkt. #1331) explains that the presumption against extraterritoriality as applied in *Nestle USA, Inc. v. Doe*, 141 S. Ct. 1931 (2021), bars Plaintiffs' ATS claims.  Three recent decisions by the United States Supreme Court – all decided in June 2022 – demonstrate another reason why this Court lacks subject matter jurisdiction:  the ATS does not permit courts to recognize and authorize claims under the ATS that arise out of the United States' prosecution of war.  *See Egbert v. Boule*, 142 S. Ct. 1793 (2022); *Torres v. Texas Dep't of Pub. Safety*, 142 S. Ct. 2455 (2022); *Biden v. Texas*, 142 S. Ct. 2528 (2022).  These decisions reinforce the exceedingly narrow circumstances under which federal courts can recognize constitutional or statutory damages actions not set forth in the text, such as a claim brought under ATS, and that federal courts must be particularly vigilant to avoid uninvited intrusion into matters relating to national security and foreign affairs.

This Court has heretofore concluded that it has jurisdiction to create and permit tort claims based on alleged violations of international norms even when they occur in the context of the U.S. military's prosecution of war.  *See, e.g.*, Dkt. #678, 860, 1183.  But as the Supreme Court recently held, the courts are "long past 'the heady days in which [the Supreme Court] assumed common-law powers to create causes of action.'"  *Egbert*, 142 S. Ct. at 1802 (quoting *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 75 (2001)).  While CACI respectfully submits that the Court's prior decisions concluding that it possessed the power to create and allow wartime ATS claims were erroneous when issued, the Supreme Court's recent decisions regarding the propriety of judge-made damages claims and the exclusive commitment of war powers to the federal political branches remove any doubt.

---

[1] "CACI" refers to Defendant CACI Premier Technology, Inc.

The *Egbert*, *Torres*, and *Biden* opinions, as well as the precedents on which they build, make clear that whatever theoretical jurisdiction federal courts may have to recognize private causes of action under ATS, that jurisdiction does not extend to creating private causes of action for injuries allegedly incurred at a war-zone facility under U.S. military control during the United States' prosecution of a war. Thus, Plaintiffs' claims, all of which require judicial recognition of a cause of action under ATS, must be dismissed as outside this Court's jurisdiction *even if* Plaintiffs could overcome the presumption against extraterritoriality, which they have not come remotely close to doing.

## II.      LEGAL STANDARD

The issue presented by this motion is whether the Supreme Court's holdings in *Egbert*, *Torres,* and *Biden* apply beyond their specific contexts and adopt principles that bar recognition of the claims in this action under the ATS. It is, of course, beyond the power of an inferior court to disregard Supreme Court decisions. *Payne v. Taslimi,* 998 F.3d 648, 654 (4th Cir. 2021) (citations omitted). As the Fourth Circuit recognized in *Taslimi,* "[i]n looking up to the Supreme Court, we may not weigh the same factors used by the Supreme Court . . . in deciding whether to follow their guidance. We must simply apply their commands." *Id.* The Court's task is to follow the Supreme Court's reasoning and the governing legal principles from the Supreme Court's decisions. *See, e.g., In re Thomas,* 988 F.3d 783, 790 (4th Cir. 2021). The consistent admonition of the Supreme Court in prior decisions, and now punctuated by *Egbert, Torres,* and *Biden,* necessarily dictates that there is no subject matter jurisdiction under the ATS for claims arising from the United States' prosecution of war.

All of the claims remaining in this case are brought under the ATS. The ATS is a "strictly jurisdictional" statute that creates no substantive causes of action. *Kiobel v. Royal*

*Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013); *see also Nestle USA, Inc. v. Doe*, 141 S. Ct. 1931, 1935 (2021).   Accordingly, whether a claim is cognizable under ATS is a question of subject matter jurisdiction.   *Jesner v. Arab Bank PLC*, 138 S. Ct. 1386, 1397 (2018).   A challenge to the Court's subject matter jurisdiction may be brought at any time, and "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."   Fed. R. Civ. P. 12(h)(3); *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006); *United States v. Beasley*, 495 F.3d 142, 147 (4th Cir. 2007); *Green v. Sessions*, No. 1:17-cv-1365-LMB-TCB, 2018 WL 2025299, at *7 (E.D. Va. May 1, 2018).

"A defendant may challenge subject-matter jurisdiction in one of two ways: facially or factually."   *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017).   A facial challenge to subject-matter jurisdiction accepts the well-pleaded allegations in the complaint as true, "and the defendant's challenge must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Id.*

By contrast, in a factual challenge, the defendant does not accept the plaintiffs' allegations as true and challenges subject-matter jurisdiction based on the evidentiary record.   *Id.* "In this posture, the presumption of truthfulness normally accorded a complaint's allegations does not apply."   *Id.* (internal quotations and citations omitted).   Rather, the Court applies the standard applicable to a motion for summary judgment, under which the plaintiffs must set forth evidence that genuine issues of material facts exist, except that the Court resolves factual disputes bearing on jurisdiction.   *Id.*; *see also In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 333 (4th Cir. 2014) (a court considering a factual challenge to subject-matter jurisdiction "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment."); *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995).   Plaintiffs have the

burden of proving jurisdiction.  *Demetres v. E.W. Constr., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); *Guillen v. Esper*, No. 1:19-cv-1206-LMB/IDD, 2020 WL 3965007, at *8 (E.D. Va. July 13, 2020).

This motion raises a <u>factual</u> challenge to jurisdiction based on the fully-developed evidentiary record.  Therefore, the allegations in Plaintiffs' complaint are irrelevant, the Court must resolve any evidentiary disputes, and to prevail Plaintiffs must present facts sufficient to establish a claim that would fall within the limited jurisdiction conferred by ATS.

## III.   ANALYSIS

### A.   The Required Framework for Evaluating Proposed Claims Under ATS

In order to place the Supreme Court's recent decisions in *Egbert*, *Torres*, and *Biden* into their proper context, it is useful to begin with the framework for evaluating ATS claims as mandated by the Supreme Court.

In *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), the Court held the door for judicial recognition of ATS causes of action is "still ajar subject to vigilant doorkeeping, and thus open to a narrow class of international norms today."  *Id.* at 729.  More recently, in *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386 (2018), the Supreme Court reiterated that "in certain narrow circumstances courts may recognize a common-law cause of action for claims based on the present-day law of nations, in addition to the 'historical paradigms familiar when § 1350 was enacted.'"  *Id.* at 1398 (quoting *Sosa*, 542 U.S. at 732).  But *Jesner* reiterated that *Sosa* explicitly held "that ATS litigation implicates serious separation-of-powers and foreign-relation concerns" and, therefore, "ATS claims must be 'subject to vigilant doorkeeping.'"  *Id.* (quoting *Sosa*, 542 U.S. at 729).  As the Court explained in *Jesner*:

> *Sosa* is consistent with the Court's general reluctance to extend judicially created private rights of action.  The Court's recent

> precedents cast doubt on the authority of courts to extend or create private causes of action even in the realm of domestic law, where this Court has "recently and repeatedly said that a decision to create a private right of action is one better left to legislative judgment in the great majority of cases."  That is because "the Legislature is in the better position to consider if the public interest would be served by imposing a new substantive legal liability."  **Thus, "if there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy, . . . courts must refrain from creating the remedy in order to respect the role of Congress."**
>
>         . . . .
>
> Neither the language of the ATS nor the precedents interpreting it support an exception to these general principles in this context.  In fact, the separation-of-powers concerns that counsel against courts creating private rights of action apply with particular force in the context of ATS.

*Id.* at 1402-03 (emphasis added) (citations omitted) (quoting *Sosa*, 542 U.S. at 727, and *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857-58 (2017)).

In *Jesner*, the Supreme Court adopted **the same gatekeeping test for ATS cases that it had adopted and applied in *Ziglar* for *Bivens* actions**:  Courts may not recognize a cause of action under ATS "if there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy."  *Id.*; *see Ziglar*, 137 S. Ct. at 1857.  And *Ziglar* explained the reasons why courts should be reluctant to recognize causes of action under both the Constitution and federal statutes such as ATS:

> When a party seeks to assert an implied cause of action under the Constitution itself, just as when a party seeks to assert an implied cause of action under a federal statute, separation-of-powers principles are or should be central to the analysis.  The question is "who should decide" whether to provide for a damage remedy, Congress or the courts?
>
> The answer most often will be Congress.  When an issue involves a host of considerations that must be weighed and appraised, it should be committed to those who write the laws rather than those who interpret them.

*Ziglar*, 137 S. Ct. at 1857 (internal quotations and citations omitted); *see also Hernandez v. Mesa*, 140 S. Ct. 735, 742 (2020) ("In both statutory and constitutional cases, our watchword is caution.  For example, in [*Jesner*], we expressed doubt about our authority to recognize any causes of action not expressly created by Congress.").

      *Ziglar* involved a *Bivens* claim challenging on Constitutional grounds "the confinement conditions imposed on illegal aliens pursuant to a high-level executive policy created in the wake of a major terrorist attack on American soil."  *Ziglar*, 137 S. Ct. at 1860.  As the Court explained, the plaintiffs' claims "would necessarily require inquiry and discovery into the whole course of the discussions and deliberations that led to the policies and governmental acts being challenged."  *Id.*  The Court rejected the plaintiffs' claims, holding that it was inappropriate for the judiciary to make the policy determination of whether a private damages action should be allowed in this context.  As the Court explained, "[n]ational-security policy is the prerogative of the Congress and President," and "[j]udicial inquiry into the national-security realm raises concerns for the separation of powers in trenching on matters committed to the other branches."  *Id.* at 1861 (internal quotations and citations omitted).  Indeed, *Ziglar* recognized that "'courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs' unless 'Congress specifically has provided otherwise.'"  *Id.* (quoting *Dep't of the Navy v. Egan*, 484 U.S. 518, 530 (1988)).

      "Tellingly, [the Supreme Court has] never created a cause of action under the ATS" nor upheld a lower court's conclusion that a proposed ATS claim overcame the significant restrictions for judge-made causes of action.  *Nestle*, 141 S. Ct. at 1937 (plurality opinion).  In *Sosa*, the Court held that the plaintiffs' proposed ATS claim of arbitrary detention "exceeds any binding customary rule having the specificity we require."  *Sosa*, 542 U.S. at 738.  In *Kiobel v.*

6

*Royal Dutch Petroleum Co.*, 569 U.S. 108, 124 (2013), the Court rejected any extraterritorial application of the ATS.  In *Jesner*, 138 S. Ct. at 1403, the Court held that separation-of-powers concerns dictated that "absent further action from Congress it would be inappropriate for courts to extend ATS liability to foreign corporations."  And most recently, the Court reaffirmed in *Nestle* that ATS has no extraterritorial effect and that general corporate activity in the United States, such as decisionmaking, is an insufficient basis for establishing jurisdiction under ATS. 141 S. Ct. at 1937.  Relying on ATS and *Bivens* precedents, a three-Justice plurality (Justices Thomas, Gorsuch, and Kavanaugh) would have rejected the plaintiffs' claims for the additional reason that "our precedents since *Sosa* have clarified that courts must refrain from creating a cause of action whenever there is even a single sound reason to defer to Congress."  *Id.* (citing *Sosa*, 542 U.S. at 724, and *Hernandez*, 140 S. Ct. at 742-43).   The three-Justice plurality concluded that separation-of-powers and foreign-affairs considerations counseled against judicial recognition of claims under ATS other than the three types of claims recognized at the time of ATS's passage – violation of safe conducts, infringement of the rights of ambassadors, and piracy. *Id.* at 1938.

> **B.**     ***Egbert*, *Torres*, and *Biden***
>
> **1.**     ***Egbert***

*Egbert v. Boule*, 142 S. Ct. 1793 (2022), involved a *Bivens* claim in which a plaintiff property owner along the Washington-Canada border sought damages for a border patrol agent's alleged violation of his Fourth Amendment rights.   After concluding that Boule's claim presented a new context for purposes of *Bivens*, the Court turned to the gatekeeping test it has applied to *Bivens* claims in *Ziglar* and ATS claims in *Jesner*.  The Court began by reinforcing that judicial creation of private damages claim implicates serious separation-of-powers and judicial competence concerns:

> At bottom, creating a cause of action is a legislative endeavor. Courts engaged in that unenviable task must evaluate a range of policy considerations . . . at least as broad as the range . . . a legislature would consider. Those factors include economic and governmental concerns, administrative costs, and the impact on governmental operations systemwide. Unsurprisingly, Congress is far more competent than the Judiciary to weigh such policy considerations. And the Judiciary's authority to do so at all is, at best, uncertain.

*Egbert*, 142 S. Ct. at 1802. Based on these considerations, the Court applied the *Ziglar/Jesner* test for judicial creation of private damages remedies: ***"[I]f there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy[,] the courts must refrain from creating [it]."*** *Egbert*, 142 S. Ct. at 1803 (emphasis added) (alterations in original). From there, the majority opinion in *Egbert* relied on *Nestle*, an ATS case, and adopted the plurality statement in *Nestle* that "'even a single sound reason to defer to Congress' is enough to require a court to refrain from creating such a remedy." *Id.* (quoting *Nestle*, 141 S. Ct. at 1937).

Applying the *Ziglar/Jesner* test, the Court identified two sound reasons why "the Judiciary is not undoubtedly better positioned than Congress to authorize a damages action." *Id.* at 1805. The first is that the claim arose in the context of border security measures and Congress was better positioned to balance national security interests in deciding whether to allow damages claims against border patrol agents for alleged Constitutional violations. *Id.* The second reason is that the availability of alternative remedies created by Congress or the Executive – in that case, an administrative grievance procedure in which the complainant had no right of participation or judicial review – should be respected by the courts and forecloses a judicially-created private right of action "even if a court independently concludes that the Government's procedures are 'not as effective as an individual damages remedy.'" *Id.* at 1807 (quoting *Bush v. Lucas*, 462 U.S. 367, 372 (1983)).

Thus, the Court's recent decision in *Egbert*:

- Reinforces that the *Ziglar/Jesner* test bars creation of constitutional or ATS causes of action when there "are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy" (142 S. Ct. at 1802-03);

- Elevates to a holding of the Court the three-Justice observation in *Nestle* that courts must refrain from creating a private damages remedy if there is "even a single sound reason to defer to Congress" (*id.* at 1803); and

- Holds that national security concerns and the availability of alternative remedies are two sound reasons that require courts to refrain from creating a private damages remedy (*id.* at 1805-07).

##     2.    *Torres*

In *Torres v. Texas Department of Public Safety*, 142 S. Ct. 2455 (2022), the Supreme Court considered whether state sovereign immunity barred a private lawsuit brought under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"). Ruling for the plaintiff, the Court, in an opinion by Justice Breyer, held that the states had waived their sovereign immunity with respect to legislation enacted by Congress under its powers to raise and support the Armed Forces. In so holding, the Court relied on the "plan of the Convention" that required national war powers that were freed from outside interference by the states. *Torres* bears on the mandatory "gatekeeping" analysis this Court must conduct before allowing an ATS claim to proceed. The Supreme Court's statements in *Torres* regarding Congress and the Executive's exclusive control over national defense matters demonstrate that Plaintiffs' claims, involving injuries allegedly suffered at the hands of U.S. soldiers in a war, do not present the rare instance where judicial creation of private rights of action is appropriate.

In considering whether the Constitutional plan waived states' sovereign immunity for matters relating to the federal government's war powers, the Court began with the Constitution's text. As the Court explained, "the Constitution's text, across several Articles, strongly suggests a complete delegation of authority to the Federal Government to provide for the common defense."

*Torres*, 142 S. Ct. at 2463.  In particular, Article I of the Constitution entrust Congress with the power to "provide for the common defense"; to "declare War"; to "raise and support armies"; to provide and maintain a Navy"; to "'make Rules' for the Armed Forces"; to "provide for calling forth the Militia"; and to "provide for [their] organizing, arming, and disciplining."  *Id.* (quoting U.S. Const. art. I, § 8, cls. 1, 11-16).  The Court further observed that Article II of the Constitution "makes the President the 'Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States.'"  *Id.* (quoting U.S. Const. art. II, cl. 1).  Finally, the Court noted that "the Federal Government is charged with 'protect[ing] each' State 'against Invasion.'"  *Id.* (quoting U.S. Const. art. IV, § 4).  By contrast, the Court explained, the Constitution expressly divested the states of several war powers, and the war powers they retained – appointing officers to and training the state militia – were "strictly cabined."  *Id.* at 2363-64.[2]

Turning from the Constitution's text, the Court analyzed the historical context in which the states ratified the Constitution and the consistent historical understanding that the federal government's exercise of the war powers was not subject to interference by other sovereigns. The Court recounted that the Constitution grew out of the failings of the Articles of Confederation, and that one of those chief failings was "Congress lacked the power to marshal and maintain a fighting force 'fit for defence.'"  *Id.* at 2464 (quoting 1 Records of the Federal Convention of 1787 at 19 (M. Farrand ed. 1966).  The Framers faulted the Articles of

---

[2] The Fourth Circuit has made similar observations regarding the Constitution's commitment of war powers to Congress and the Executive.  *Lebron v. Rumsfeld*, 670 F.3d 540, 548-49 (4th Cir. 2011); *United States v. Moussaoui*, 382 F.3d 453, 469-70 (4th Cir. 2004). "There is nothing timid or half-hearted about this constitutional allocation of authority." *Thomasson v. Perry*, 80 F.3d 915, 924 (4th Cir. 1996) (*en banc*).  "The strategy and tactics employed on the battlefield are clearly not subject to judicial review."  *Tiffany v. United States*, 931 F.2d 271, 277 (4th Cir. 1991).

Confederation because they allowed states to exercise their sovereign power to deny the federal government troops, supplies, and funds for fighting a war.  *Id.*  "The need to fix that failing by establishing a strong national power to raise and maintain a military was one of the 'recognized necessities' for calling the Constitutional Convention."  *Id.* (quoting *Selective Draft Law Cases*, 245 U.S. 366, 381 (1918)).

As explained in *Torres*, the Constitution solved this problem by giving Congress "direct power over the *formation, direction* or *support* of the NATIONAL FORCES."  *Id.* at 2464. Thus, "Congress's authority to raise armies could not be qualified or restricted by the States because the Constitution 'manifestly intended to give . . . all' such power to the Federal Government and 'leave none to the States.'"  *Id.* at 2465 (quoting *Selective Draft Law Cases*, 245 U.S. at 381).  From this history, the Court concluded in *Torres* that the war powers are exclusively committed to the federal government, and that exclusive commitment is inconsistent with an exercise of state sovereign immunity in matters relating to the war powers.  As the Court explained:

> The lesson we draw from these cases is that [t]he power to wage war is the power to wage war successfully.  The Framers had emerged from a long struggle which had taught them the weakness of a mere confederation, so they established a Union which could fight with the strength of one people under one government entrusted with the common defence.  Under our constitutional order, States may not place any limitations inconsistent with Congress' power because every resource of the people must be at command.  In short, the States agreed to dives[t] themselves of the traditional diplomatic and military tools that . . . sovereigns possess – to sacrifice their sovereignty for the common defense.
>
> It follows that Congress' power to build and maintain a national military is "complete in itself."  Text, history, and precedent show the States agreed that their sovereignty would yield . . . so far as is necessary to national policy to raise and maintain the military.  And because States committed themselves not to thwart the exercise of this federal power, [t]he consent of a State, including to suit, can never be a condition precedent to [Congress'] enjoyment

11

of it.  We consequently hold that, as part of the plan of the Convention, the States waived their immunity under Congress' Article I power [t]o raise and support Armies" and "provide and maintain a Navy.

*Id.* at 2465-66 (internal citations and quotations omitted) (alterations in original).

Indeed, the *Torres* majority distinguished the federal government's war powers, where state sovereignty is waived by implication, from other Article I powers such as the Commerce Clause.  As the Court explained, regulation of commerce is shared between the federal government and the states – with the states regulating goods "before they travel between States or outside a tribe."  *Id.* at 2467.  By contrast, the Court explained, the war powers conferred on the federal government are "complete in themselves" and "any assertion of state sovereignty to frustrate federal prerogatives to raise and maintain military forces would be strongly '*contradictory* and *repugnant*' to the constitutional order."  *Id.* (quoting The Federalist No. 32 (A. Hamilton).  "For that reason, the war powers – more than any other power, and surely more than eminent domain – were 'complete in themselves.'  They were given by the States, ***entirely and exclusively***, to the Federal Government."  *Id.* at 2469 (emphasis added).  Thus, the upshot of *Torres* is that the very design of the Constitution called for the federal government to have sole and exclusive control over the exercise of military power, so much so that even the states that formed the United States necessarily waived any sovereign immunity that would allow them to control or frustrate the federal government's exercise of the war powers.

### 3. *Biden*

In *Biden v. Texas*, 142 S. Ct. 2528 (2022), the Supreme Court rejected administrative law challenges by the States of Texas and Missouri to the federal government's rescission of the prior administration's "return to Mexico" policy.  In so holding, the Court relied on its decision in *Kiobel* – where the Court held that the presumption against extraterritoriality applies to ATS –

for the proposition that the Court looks for a clear invitation from Congress before interfering in matters bearing on foreign affairs.  As the Court explained:

> And the foreign affairs consequences of mandating the exercise of contiguous-territory return likewise confirm that the Court of Appeals erred.   Article II of the Constitution authorizes the Executive to engag[e] in direct diplomacy with foreign heads of state and their ministers.  ***Accordingly, the Court has taken care to avoid the danger of unwarranted judicial interference in the conduct of foreign policy, and declined to run interference in [the] delicate field of international relations without the affirmative intention of Congress clearly expressed.***

*Biden*, 142 S. Ct. at 2533 (emphasis added) (internal quotations and citations omitted) (alterations in original) (quoting *Kiobel*, 569 U.S. at 115-16).  *Biden* thus reinforces that courts must not wade into matters bearing on foreign affairs unless the statute expressly permits that.  Significantly, the Supreme Court  relied on an ATS case for that principle.

### C.  The Supreme Court's Recent Decisions in *Egbert*, *Torres*, and *Biden* Reinforce That ATS Does Not Permit the Exercise of Jurisdiction Over Claims Arising from U.S. Military Operations in a War

Plaintiffs' claims arise out of the United States' prosecution of the war in Iraq.  Plaintiffs, by their own admission, were captured by U.S. military forces and detained in the U.S. military held wartime detention facility at Abu Ghraib.  Even more to the point, Plaintiffs are seeking recovery for injuries allegedly inflicted on them ***by U.S. soldiers*** in a combat-zone detention facility.  Indeed, Plaintiffs admit that "CACI interrogators [never] laid a hand on them,"[3] and all of Plaintiffs' claims of direct abuse by CACI personnel have been dismissed.  Dkt. #680.  All that remains are claims by which Plaintiffs seek to hold CACI liable for CACI employees supposedly conspiring with or assisting U.S. soldiers who allegedly abused Plaintiffs.

---

[3] *See* 9/22/17 Tr. at 15 ("We are not contending that the CACI interrogators laid a hand on the plaintiffs."); *see also* Dkt. #639 at 31 n.30 (the "gravamen of Plaintiffs' complaint is conspiracy and aiding and abetting"); *id.* at 1 ("Plaintiffs sued CACI under well-established theories of accessory liability.").

There is no serious dispute that the U.S. soldiers at Abu Ghraib prison, and the interrogation operations themselves, were at all times under the operational control of the U.S. military. As the United States has explained:

> In connection with the December 15, 2003 interrogation [of Al Shimari], CACI Interrogator A and Army Interrogator B were subject to the direction of the military chain of command, beginning with their military section leader, an Army non-commissioned officer, who was to be briefed both prior to and following the interrogation to ensure that the interrogators were focused on answering CJTF-7's priority intelligence requirements, human intelligence (HUMINT) requirements, and source directed requirements. Their military section leader was also responsible for strictly enforcing the interrogation rules of engagement (IROE). From their military section leader, the interrogators' chain of command flowed through the military non-commissioned officer in charge (NCOIC) and officer in charge (OIC) of the Interrogation and Control Element (ICE), to the military chain of command at the Joint Interrogation and Detention Center (JIDC).
>
> ***No CACI personnel were in this chain of command***. While the CACI site manager at Abu Ghraib, Daniel Porvaznik, managed CACI personnel issues and the ICE OIC relied on him as one source of information regarding the abilities and qualifications of CACI interrogators, ***the military chain of command controlled the interrogation facility, set the structure for interrogation operations, and was responsible for how interrogations were to occur during both the planning and execution phases***.

Ex. 1 at 8 (emphasis added); *see also id.* at 14. Thus, the relevant jurisdictional question is whether the Court properly may create a claim for private damages under ATS for injuries allegedly inflicted by U.S. soldiers (with the alleged complicity of civilian contractors) during the prosecution of a war at a war-zone detention facility under U.S. military control. The Supreme Court's recent case law makes clear that the Court may not create such a claim.

**1.**     ***Egbert* Reinforces the *Ziglar*/*Jesner* Test Applies and Prohibits Judicial Recognition of Causes of Action If There "Is Even a Single Sound Reason to Defer to Congress"**

As explained in Section III.A, the Supreme Court's decision in *Jesner* recognized the Court's "general reluctance to extend judicially created causes of action."  138 S. Ct. at 1402.  The Court also noted that recent precedents "cast doubt on the authority of courts to extend or create private causes of action even in the realm of domestic law, where this Court has 'recently and repeatedly said that a decision to create a private right of action is one better left to legislative judgment in the great majority of cases.'"  *Id.* (quoting *Sosa*, 542 U.S. at 727).

For these reasons, and because "the Legislature is in the better position to consider if the public interest would be served by imposing a new substantive legal liability," *id.* (quoting *Ziglar*, 137 S. Ct. at 1857), the *Jesner* Court held that the gatekeeping test for proposed ATS claims is the same as the test applicable to *Bivens* claims:

> [I]f there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy, . . . courts must refrain from creating the remedy in order to respect the role of Congress.

*Id.* at 1402-03 (emphasis added) (citations omitted) (quoting *Ziglar*, 137 S. Ct. at 1857-58).

*Egbert* reinforces the validity of the gatekeeping test applied in *Ziglar* and *Jesner*.  The Court reiterates that "creating a cause of action is a legislative endeavor" and "the Judiciary's authority to do so at all is, at best, uncertain."  *Id.* at 1802-03 (quoting *Hernandez*, 140 S. Ct. at 742).  Moreover, the *Egbert* majority observed that Congress is "far more competent than the Judiciary" to weight the multitude of policy decisions bearing on whether to recognize a particular cause of action in a particular context.  *Id.* (quoting *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988)).  Importantly, and consistent with *Ziglar* and *Jesner*, the Court's decision in *Egbert* relies on *Bivens* and ATS precedents interchangeably in describing and applying the required gatekeeping test for judicial recognition of a private damages claim.  *Egbert*, 142 S. Ct.

at 1802-03.  Moreover, *Egbert* elevates to a holding of the Court the three-Justice observation in *Nestle* that "'even a single sound reason to defer to Congress' is enough to require a court to refrain from creating such a remedy."  *Id.* at 1803 (quoting *Nestle*, 141 S. Ct. at 1937).

**2.      *Egbert*, *Torres*, and *Biden* Present a Host of Reasons to Think That Congress Would Not Authorize a Private Damages Action Under ATS for Injuries Incurred at the Hands of U.S. Soldiers Prosecuting a War**

*Egbert* makes clear that the Court must decline to create a private damages remedy if "there is *any* rational reason (even one) to think that *Congress* is better suited to 'weigh the costs and benefits of allowing a damages action to proceed.'"  *Egbert*, 142 S. Ct. at 1805 (quoting *Ziglar*, 137 S. Ct. at 1858).  *Egbert*, *Torres* and *Biden* make clear that the decision whether to create a private damages remedy for injuries arising out of U.S. military operations in a war rests with Congress, ***not***  with the federal courts.

In *Egbert*, the Court acknowledged that it previously had allowed federal courts to create an implied damages action for Fourth Amendment excessive force claims, the same claim asserted by Boule.  142 S. Ct. at 1802.  But as the Court explained, the border-security context in which Boule's claim arose required a different analysis:  "the Judiciary is not undoubtedly better positioned than Congress to authorize a damages action in this national-security context."  *Id.* at 1805.   The Court made a related point in *Biden*, quoting *Kiobel* (an ATS case), for the proposition that "the Court has taken care to avoid 'the danger of unwarranted judicial interference in the conduct of foreign policy,' and declined to 'run interference in [the] delicate field of international relations' without 'the affirmative intention of the Congress clearly expressed.'"  *Biden*, 142 S. Ct. at 2543 (alteration in original) (quoting *Kiobel*, 569 U.S. at 115-16).  Indeed, as the Supreme Court explained in declining to create a judge-made damages claim in *Ziglar*:

16

> National-security policy is the prerogative of the Congress and
> President. Judicial inquiry into the national-security realm raises
> concerns for the separation of powers in trenching on matters
> committed to the other branches. These concerns are even more
> pronounced when the judicial inquiry comes in the context of a
> claim seeking money damages rather than injunctive or other
> relief. This risk of personal damages liability is more likely to
> cause an official to second-guess difficult but necessary decisions
> concerning national-security policy.
>
> For these and other reasons, courts have shown deference to what
> the Executive Branch has determined . . . is essential to national
> security. Indeed, courts traditionally have been reluctant to intrude
> upon the authority of the Executive in military and national
> security affairs unless Congress specifically has provided
> otherwise.

*Ziglar*, 137 S. Ct. at 1861.

The takeaway from these cases is that judicial creation of private damages actions is different in the context of national defense and prosecution of war. While judicial creation of private damages actions is *always* disfavored based on separation-of-powers principles, a connection between the plaintiff's proposed claim and the United States' exercise of its war powers will render otherwise-permissible judge-made claims wholly inappropriate.

Here, Congress has not invited judicial involvement in wartime matters through judge-made damages actions under ATS; rather, Congress's actions have evinced its intent to jealously guard the exclusive roles of Congress and the Executive in matters relating to the prosecution of war. As the Court explained in *Torres*, the Constitutional Convention was an outgrowth of the failed Articles of Confederation, and the chief flaw in the Articles was that they allowed outside interference (in that case, from the states) in the national government's conduct of war. 142 S. Ct. at 2464. For that reason, "the Constitution's text, across several Articles, strongly suggests a complete delegation of authority to the Federal Government to provide for the common defense." *Id.* at 2463; *see also id.* at 2465 ("the Constitution 'manifestly intended to give . . . all' such

power to the Federal Government"); *id.* at 2466 (the Constitution "established a Union which could fight with the strength of one people under one government entrusted with the common defence" (internal quotations and citations omitted)).   Thus, interference with the federal government's power over the conduct of war, even by the states that comprised the nation, "would be strongly '*contradictory* and *repugnant*' to the constitutional order."   *Id.* at 2467 (quoting The Federalist No. 32 (A. Hamilton)).   The Constitution reserves war powers for the federal government and, within the federal government, for the Executive and Legislative branches.   Judicial intrusion on their exercise of those powers is equally inimical to the constitutional order.

The very first Congress enacted the ATS as part of the Judiciary Act of 1789.   Act of Sept. 24, 1789, ch. 20, § 9, 1 Stat. 77; *see also Sosa*, 542 U.S. at 712.   The statute contains no affirmative invitation for unelected judges to create private damages actions in the wartime context.   Indeed, the "relatively modest set" of international law violations that were "probably on the minds of the men who drafted the ATS" – "violation of safe conducts, infringement of the rights of ambassadors, and piracy" – all involve conduct unrelated to U.S. military operations in a war.   *Jesner*, 138 S. Ct. at 1397 (quoting *Sosa*, 542 U.S. at 715).   Moreover, at the time Congress enacted the ATS, the Framers, in enacting the Constitution, had just finished preventing, as part of the Constitutional design, state interference in the national government's prosecution of war.   *Torres*, 142 S. Ct. at 2464.   The notion that the Framers would have created an entirely new constitutional order to avoid states meddling in the conduct of war, only to immediately allow interference through private damages actions by those injured in war, based on unelected judges' conceptions of international norms, is, frankly, absurd, and inconsistent with the federal political branches' exclusive purview over war.   Put another way, our

18

Constitutional scheme – which categorically prohibits any role for the fifty states in the United States' prosecution of war – cannot reasonably be construed to invite and allow foreign countries, via international law applied in private damages actions, to have a role in the prosecution of war by the federal government.

More recent congressional actions only underscore the point.  In the 233 years since it enacted ATS, Congress has enacted only one substantive cause of action under ATS's grant of jurisdiction – the Torture Victims Protection Act ("TVPA"), which Congress enacted in 1992. 28 U.S.C. § 1350 note.[4]  Congress enacted the TVPA "[i]n the midst of debates in the courts of appeals over whether . . . plaintiffs could bring ATS actions based on modern human-rights laws absent an express cause of action created by an additional statute."  *Jesner*, 138 S. Ct. at 1398.

Against that backdrop, Congress limited the reach of the TVPA to torture and extrajudicial killing committed ***under color of foreign law***, thus excluding causes of action arising out of U.S. military actions.  28 U.S.C. § 1350 note; *Saleh v. Titan*, 580 F.3d 1, 16 (D.C. Cir. 2009) ("Perhaps most relevant is the TVPA, in which Congress provided a cause of action whereby U.S. residents could sue foreign states for torture, but did not – and we must assume that was a deliberate decision – include as possible defendants either American government officers or private U.S. persons, whether or not acting in concert with government employees."). That, in itself, precludes this Court from using its common-law powers to strike a different balance than Congress struck in deciding which claims of torture should be cognizable through a private damages action.  *See, e.g.*, *Am. Elec. Power Co. v. Massachusetts*, 564 U.S. 410, 423

---

[4] *See Jesner*, 138 S. Ct. at 1403 (plurality opinion) (describing the TVPA as "the only cause of action under the ATS created by Congress rather than the courts").

(2011) (federal statutes can displace the power of federal court to recognize causes of action under federal common law); *Milwaukee v. Illinois*, 451 U.S. 304, 314 (1981) (same).[5]

Relatedly, *Egbert* holds that creation of a judge-made damages remedy is by definition inappropriate when Congress has provided, or authorized the Executive to provide, an alternative remedial structure. 142 S. Ct. at 1804. Thus, the availability of a grievance procedure for claims of misconduct by border patrol agents, ***by itself*** was sufficient to preclude judicial recognition of a damages claim ***even if the district court viewed the grievance process as inadequate***. *Egbert*, 142 S. Ct. at 1806-07. There are myriad avenues created by Congress and the Executive that are available to address claims of detainee abuse in Iraq.

"The U.S. Army Claims Service has confirmed that it will compensate detainees who establish legitimate claims for relief under the Foreign Claims Act, 10 U.S.C. § 2734." *Saleh*, 580 F.3d at 2. Congress also enacted the Anti-Torture Statute in 1994, 18 U.S.C. § 2340A, but limited the reach of that statute to ***criminal prosecution only***. That was no accident, as the statute specifically provides that it shall not be construed "as creating any substantive or procedural right enforceable by law by any party in any civil proceeding." 18 U.S.C. § 2340B. Congress enacted the War Crimes Act in 1996, which covers both war crimes and cruel or inhuman treatment, but again did not include a private right of action in that statute. 18 U.S.C. § 2441. Congress created jurisdiction in federal district court for civilians accompanying the

---

[5] Indeed, President Bush signed the TVPA based on his explicit understanding that "the Act does not permit suits for alleged human rights violations in the context of United States military operations abroad." Statement by President of the United States, Statement by President George [H.W.] Bush upon Signing H.R.2092, 1992 U.S.C.C.A.N. 91 (Mar. 12, 1992). That qualification would have made no sense at all if ATS already permitted such lawsuits.

armed forces overseas,[6] enacted legislation creating court-martial jurisdiction over contractors serving in the field with the armed forces during a contingency operation,[7] and allows courts-martial of soldiers for misconduct in the conduct of war.[8]  The common thread running through these legislative enactments is that they provide remedies and create deterrence through either criminal prosecution or an administrative claim rather than through a private right of action in court.

Egbert holds that it is not the role of the judiciary to decide whether the remedial structures put into place by Congress and the Executive are adequate, or whether the boundaries they chose are wise.  "Rather, the court must ask only whether it, rather than the political branches, is better equipped to decide whether existing remedies 'should be augmented by the creation of a new judicial remedy.'"  Egbert, 142 S. Ct. at 1804.  And the Supreme Court

---

[6] See, e.g., Military Extraterritorial Jurisdiction Act of 2000, 18 U.S.C. § 3261 et seq. (creating federal court forum for crimes committed by civilians serving with the armed forces overseas).

[7] Uniform Code of Military Justice art. 2(a)(10), 10 U.S.C. § 802(a)(10) (designating civilians serving with the armed forces "in the field" during time of war as subject to trial by court-martial).

[8] The United States regularly prosecutes soldiers and civilian contractors, in courts-martial or in federal criminal cases, for alleged unlawful conduct toward perceived enemies in a war zone.  See, e.g., United States v. Drotleff, 497 F. App'x 357, 358-59 (4th Cir. 2012) (involuntary manslaughter charges against contractors for shooting in Afghanistan); United States v. Passaro, 577 F.3d 207, 211 (4th Cir. 2009) (assault charges against CIA contractor arising out of "a military operation in Afghanistan in an effort to topple the Taliban regime"); United States v. Slatten, 865 F.3d 767, 776-77 (D.C. Cir. 2017) (voluntary manslaughter and first-degree murder charges against contractors for shooting in Iraq); United States v. Green, 654 F.3d 637, 640 (6th Cir. 2011) (federal court prosecution of former soldier for murder and sexual assault of Iraqis); United States v. Harman, 68 M.J. 325, 326 (C.A.A.F. 2010) (court-martial for maltreatment of detainees at Abu Ghraib prison); United States v. Chamblin, No. 201500388, 2017 WL 5166627, at *1 (N-M. Ct. Crim. App. Nov. 8, 2017) (court-martial conviction for desecration of enemy corpses); United States v. England, No. ARMY20051170, 2009 WL 6842645, at *1 (A. Ct. Crim. App. Sept. 10, 2009) (court-martial for maltreatment of detainees at Abu Ghraib prison); United States v. Pennington, No. NMCCA200800106, 2008 WL 5233379, at *1 (N-M. Ct. Crim. App. Dec. 16, 2008) (court-martial for murder of suspected insurgent leader).

answered that question: creation of a judge-made damages action is inappropriate where "Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence." *Id.* at 1807; *see also id.* ("And, again, the question whether a given remedy is adequate is a legislative determination that must be left to Congress, not the federal courts.").

Congress and the Executive invariably are the proper entities to assess when, if ever, tort claims arising out of war should be permitted in federal courts, as those branches are better positioned than courts to evaluate the effect of such litigation on national defense. *Jesner*, 138 S. Ct. at 1403 ("[T]he separation-of-powers concerns that counsel against courts creating private rights of action apply with particular force in the context of ATS" because "[t]he political branches, not the Judiciary, have the responsibility and institutional capacity to weigh foreign-policy concerns.") (citing *Kiobel*, 569 U.S. at 116-17).

This case is a classic example. Plaintiffs seek damages from CACI on the premise that they were abused by soldiers who committed the abuse as part of a conspiracy with CACI employees. The U.S. government will not even allow these Plaintiffs to set foot on U.S. soil, so any testimony they provide will have to be remote. In an effort to discover the facts regarding Plaintiffs' treatment in U.S. custody, CACI sought discovery from the United States, and this Court three times upheld invocations of the state secrets privilege by Secretary of Defense Mattis. This included withholding from CACI (and Plaintiffs) the identities of the interrogation personnel (both military and civilian) who actually interacted with these Plaintiffs and requiring that their depositions occur pseudonymously. Meaning, Plaintiffs are seeking to hold CACI liable for conspiratorial or aiding-and-abetting conduct by its employees who interacted with Plaintiffs, but CACI is denied discovery into who those employees are.

Plaintiffs also are proceeding on the broken syllogism that (1) government reports implicated three CACI employees in discrete acts of mistreatment of detainees other than Plaintiffs, (2) Plaintiffs also allege that they were mistreated in similar ways, so (3) a jury can conclude that CACI personnel were involved in Plaintiffs' alleged mistreatment. But the Court's state secrets rulings preclude CACI from calling the three employees named in the government reports and asking them whether or not they were ever assigned to interrogate Plaintiffs, or asking the pseudonymously-deposed former CACI employees who interrogated Plaintiffs whether they are any of the individuals named in the government reports. As a result, CACI is denied the basic tools for mounting a factual refutation of Plaintiffs' reliance on government reports. Thus, any trial of this action will lack the basic protections normally associated with due process, restrictions that would not impair the U.S. government's investigation of an administrative claim brought under the claims processes the U.S. Army provided but Plaintiffs eschewed.

Finally, *Egbert* recognizes that the decision to allow a private damages claim involves "a range of policy decisions," including "economic and governmental concerns," administrative costs," and the "impact on governmental operations systemwide." 142 S. Ct. at 1802-03. As the Ninth Circuit observed in *Koohi v. United States*, 976 F.2d 1328 (9th Cir. 1992), "[w]ar produces innumerable innocent victims of harmful conduct – on all sides," and it makes little sense for judges to make the policy decision to single out for economic compensation detainees injured from treatment in custody "rather than from the overwhelming and pervasive violence which each side intentionally inflicts on the other." *Id.* at 1335. These are the delicate policy decisions in the context of foreign affairs that the judiciary is ill-equipped to make. *Egbert*, 142 S. Ct. at 1802-03.

As the Supreme Court observed in *Egbert*, since 1983 it has declined twelve times out of twelve to imply a cause of action for alleged constitutional violations.  *Egbert*, 142 S. Ct. at 1799-1800 (collecting cases).  With respect to claims brought under ATS, which are subject to the same gatekeeping test as proposed *Bivens* claims, the Court has rejected federal court jurisdiction in every one of the four cases it has considered.  *Sosa*, 542 U.S. at 724; *Kiobel*, 569 U.S. at 108; *Jesner*, 138 S. Ct. at 1386; *Nestle*, 141 S. Ct. at 1931.  Whatever crack may remain in the door for judicial recognition of damages claims, and *Egbert* suggests that the crack might be non-existent,[9] it certainly does not extend to recognizing private damages actions relating to the U.S. military's prosecution of war, a subject matter Constitutionally committed to Congress and the Executive and where courts must be exceedingly reluctant to tread.

## IV.    CONCLUSION

For the foregoing reasons, the Court should dismiss this action for lack of subject matter jurisdiction.

---

[9] *Egbert*, 142 S. Ct. at 1803 ("[T]he Judiciary's authority to [create causes of action] at all is, at best, uncertain.").

Respectfully submitted,

*/s/   John F. O'Connor*

| | |
|---|---|
| John F. O'Connor | William D. Dolan, III |
| Virginia Bar No. 93004 | Virginia Bar No. 12455 |
| Linda C. Bailey (admitted *pro hac vice*) | LAW OFFICES OF WILLIAM D. |
| Molly Bruder Fox (admitted *pro hac vice*) | DOLAN, III, PC |
| STEPTOE & JOHNSON LLP | 8270 Greensboro Drive, Suite 700 |
| 1330 Connecticut Avenue, N.W. | Tysons Corner, VA 22102 |
| Washington, D.C. 20036 | (703) 584-8377 – telephone |
| (202) 429-3000 – telephone | wdolan@dolanlaw.net |
| (202) 429-3902 – facsimile | |
| joconnor@steptoe.com | |
| lbailey@steptoe.com | |
| mbfox@steptoe.com | |

*Counsel for Defendant CACI Premier
Technology, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 18th day of July, 2022, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following counsel:

Cary Citronberg, Esq.
Zwerling/Citronberg, PLLC
114 North Alfred Street
Alexandria, VA 22314
cary@zwerling.com

*/s/   John F. O'Connor*
John F. O'Connor
Virginia Bar No. 93004
Attorney for Defendant CACI Premier Technology,
   Inc.
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000 – telephone
(202) 429-3902 – facsimile
joconnor@steptoe.com