```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
                         ALEXANDRIA DIVISION
---------------------------x
SUHAIL NAJIM ABDULLAH AL     :   Civil Action No.:
SHIMARI,                     :   1:08-cv-827
          Plaintiff,         :
     versus                  :   Friday, September 16, 2022
                             :
CACI PREMIER TECHNOLOGY,     :
INC.,                        :
          Defendant.         :
---------------------------x
```

The above-entitled motion to dismiss was heard before the Honorable Leonie M. Brinkema, United States District Judge.  This proceeding commenced at 10:46 a.m.

A P P E A R A N C E S:

FOR THE PLAINTIFF:    BAHER AZMY, ESQUIRE
                      KATHERINE GALLAGHER, ESQUIRE
                      THE CENTER FOR CONSTITUTIONAL RIGHTS
                      666 Broadway
                      7th Floor
                      New York, New York  10012
                      (212) 614-6464

FOR THE DEFENDANT:    JOHN O'CONNOR, JR., ESQUIRE
                      STEPTOE & JOHNSON LLP
                      1330 Connecticut Avenue, NW
                      7th Floor
                      Washington, D.C.  20036
                      (202) 429-3000

                      WILLIAM DOLAN, III, ESQUIRE
                      WILLIAM D. DOLAN, III, P.C.
                      8270 Greensboro Drive
                      Suite 700
                      Tysons Corner, Virginia  22102
                      (703) 584-8377

COURT REPORTER:       STEPHANIE M. AUSTIN, RPR, CRR
                      Official Court Reporter
                      United States District Court
                      401 Courthouse Square
                      Alexandria, Virginia  22314
                      (571) 298-1649
                      S.AustinReporting@gmail.com

       COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

```
 1                    P R O C E E D I N G S
 2           THE DEPUTY CLERK:  Civil Action 8-827, Suhail
 3   Najim Abdullah Al Shimari, et al. versus CACI Premier
 4   Technology, Inc.
 5           Would counsel please note their appearances for
 6   the record.
 7           MR. O'CONNOR:  Good morning, Your Honor.
 8   John O'Connor and William Dolan for CACI.
 9           THE COURT:  Good morning.  Nice to see you all in
10   court again.
11           MR. DOLAN:  Good morning, Your Honor.
12           MR. AZMY:  Good morning, Your Honor.  Baher Azmy
13   and Katherine Gallagher for the plaintiffs.
14           THE COURT: Good morning.  All right.  Well, we
15   have the defendant's latest motion, I think it might be the
16   sixth, to dismiss for lack of subject matter jurisdiction
17   citing to three additional Supreme Court cases for the Court
18   to consider.
19           I have not yet given you a ruling on the other
20   pending motion to dismiss, and I'm planning probably to
21   combine the two.  We have an opinion in draft.  I haven't
22   finished it yet.  I thought I would hear your discussion
23   today and then incorporate it into the final decision that
24   should be coming out probably sometime in October.  All
25   right.
```

```
 1                But, Mr. O'Connor, I'll let you start.
 2                MR. O'CONNOR:  Thank you, Your Honor.
 3                Your Honor, Egbert makes clear that judicial
 4   implied causes of action are highly, highly disfavored.  And
 5   I think the rules adopted in Egbert are clear in their
 6   application.
 7                One, creating a cause of action is a legislative
 8   endeavor that involves evaluating a broad range of policy
 9   considerations.
10                And, two, Congress is far more competent than the
11   Judiciary to weigh those policy consideration.
12                Three, the Court expressed doubt about the
13   Judiciary's power to do so at all.  The Court said:  The
14   Judiciary's authority to do so at all is, at best,
15   uncertain.
16                And then, four, if there are sound reasons to
17   think Congress might doubt the efficacy or necessity of a
18   damages remedy, the courts must refrain from creating one.
19                And then last, even a single sound reason to defer
20   to Congress is enough to require a court to refrain from
21   creating such a remedy.
22                I think of this as what, in my house, we call the
23   Christmas card test, which is if my wife says, should I send
24   a Christmas card to so-and-so, I say, the fact that you
25   asked answers the question.  Of course you should because
```

3

1  you don't want to antagonize somebody who maybe you should
2  have sent a Christmas card.  Well, that's the rule the
3  Supreme Court has adopted here.  If there's any reason to
4  doubt whether the courts, as opposed to Congress and the
5  president, should be delineating the contours of a private
6  cause of action, then the courts should not do it.
7         THE COURT:  Well, what specifically do you think
8  *Egbert* does to change the second step of *Sosa*?
9         MR. O'CONNOR:  Well, what *Egbert* does is -- *Sosa*
10 talked about that a -- the two pieces of the analysis, is
11 the cause of action clear, universal, et cetera, and, two,
12 you know, vigilant door-keeping.  *Sosa* was basically opaque
13 on what that second requirement required.
14        And Your Honor, when you denied our motion to
15 dismiss, seemed to indicate that what that meant was that
16 the Court had to make very sure that the proposed tort is
17 universal, obligatory, you know, among civilized nations.
18 And, to be candid, that did not strike me as obviously wrong
19 given what *Sosa* had said.  It didn't provide any guidance at
20 all.
21        And what we've learned since the Court's prior
22 motion to dismiss ruling from cases like *Jesner*, from cases
23 like -- well, certainly *Egbert*, is that it's a distinct
24 separation of powers inquiry, one that asks is there any
25 reason.  Because courts generally should not be in the

4

1    business of implying causes of action.  And it paired what
2    certainly happens in *Sosa* is the second part of the test for
3    an ATS claim has merged into the second part of the test for
4    a *Bivens* claim.  As we laid out in the chart in our reply
5    brief, the test is exactly the same, that if there's any
6    reason, then the Court doesn't do it.
7             And if we turn to *Egbert*, *Egbert* relied on -- one
8    of the main reasons it held that there should be no cause of
9    action was national security.  And what were the national
10   security implications in that case?  Well, a border patrol
11   agent was questioning someone about potential illegal border
12   crossings, American citizen completely in the United States,
13   and allegedly roughed him up in the process of doing that.
14   And the Court said, oh, we can't have that.  There's a
15   reason to pause because there's national security
16   implications.
17            Well, if that's enough, what are the national
18   security implications here?  We have soldiers guarding and
19   interrogators interrogating detainees detained by the United
20   States military in a war zone where they are trying to
21   collect intelligence with respect to an insurgency which is
22   killing American soldiers every day.
23            And if you compare the national security
24   implications of *Egbert* versus the national security
25   implications of this case, which not only has those facts

5

1    but involves three separate invocations of the state secrets
2    privilege, involves a case of proceeding with no ability to
3    have any discovery into who actually interrogated these
4    plaintiffs, who interacted with these plaintiffs.  There's
5    not really any comparison of the national security
6    implications here.
7           But then *Egbert* has another reason why the Court
8    said a cause of action should not be implied, and that was
9    while there's an alternative remedy established.  And what
10   was the alternative remedy in *Egbert*?  You could file a
11   grievance.  That's it.  That was the alternative remedy.
12   But it existed.  And the Court said, it's not really for the
13   courts to decide whether that alternative remedy is good
14   enough.  It exists.  That's it.
15          Well, what do we have here?  We've had Congress
16   legislate all over questions of things like torture, cruel,
17   inhumane and degrading treatment.  And those statutes apply
18   criminally; do not create a private right of action, but
19   they do apply criminally.
20          We also have a claim -- you know, an
21   administrative claim process that is available -- well, it
22   was available, where persons alleging that they were injured
23   while in the United States custody in Iraq and filed an
24   administrative claim where the United States, which has
25   access to all the information that neither Your Honor nor we

6

1   have access to about the circumstances of these plaintiffs,
2   could decide whether there's actual facts supporting claims
3   of mistreatment, and, if so, determine what ought to be done
4   in terms of allowing a claim or not.
5           And so the -- both of the reasons in *Egbert* that
6   were found independently sufficient to not permit implying a
7   cause of action were present in this case, and they're
8   present in more.
9           The national security implications are greater.
10  The legislation and the availability of remedies is greater
11  then they were in *Egbert*.  But, again, the Court's not --
12  you know, per *Egbert*, the adequacy of those remedies is not
13  a matter that the courts ought to consider; the existence is
14  enough.
15          THE COURT:  All right.  Thank you.  Let me hear
16  the response to that.
17          MR. O'CONNOR:  Thank you.
18          MR. AZMY:  Good morning, Your Honor.
19          Three basic responses.  First, *Egbert* merely
20  applies the separation of powers analysis from *Ziglar v.*
21  *Abbasi* decided in 2017, and Your Honor's two decisions in
22  2018 rejecting that separation of powers framework.  And
23  also, *Abbasi* was a national security case, it was a
24  post-9/11 case.  Your decisions in February and June of 2018
25  rejected those separation of powers arguments.  The June

7

1    2018 arguments rejected those -- decision rejected those
2    separation of powers arguments as law of the case.  So I
3    suppose now we have double, or law of the case squared.
4         Second, the ATS -- as Your Honor also found, the
5    ATS is fundamentally different than a *Bivens* cause of action
6    because the ATS does not imply a cause of action; it imposes
7    an express cause of action.
8         Let's just sort of think for a minute about the
9    two different kinds of paradigms.  In *Bivens* and in implying
10   causes of action from a statute, Congress has -- or the
11   Constitution has set forth a norm that Federal officials or
12   other people have to follow, but Congress has chosen not to
13   give individuals the right to come to Federal court and
14   enforce the norm against the Government, let alone for
15   damages.
16        The ATS is exactly the opposite.  Congress has
17   authorized a specific person, an alien, to assert a cause of
18   action for tort.  And what is tort?  That's 18th century
19   speak for damages.  And what's interesting is the ATS is
20   different from implied causes of action, because while
21   presupposing a damage remedy, it leaves the norm open.  And,
22   per *Sosa*, Your Honor has found that the norm of torture of
23   war crimes in CIDT is sufficient to confer jurisdiction,
24   which I think really ultimately gets us to the heart of
25   CACI's argument, which is an attempt to disregard or

8

```
 1  overrule Sosa.  That's Step 1.
 2           Your Honor has found jurisdiction, and Footnote 4
 3  of your June 2018 opinion says:  Once jurisdiction has been
 4  established, there may be prudential considerations that
 5  suggest the case should not go forward.  But every
 6  prudential consideration that CACI has put forward Your
 7  Honor has considered, or the Fourth Circuit has considered
 8  and rejected.  Political question doctrine, FTCA preemption
 9  law, war immunity.  We've done this all before.
10           THE COURT:  Of course the Fourth Circuit did not
11  actually rule or has not actually reviewed the substance of
12  the 2018 decision.  Because that was a pass.  They said it
13  was not appealable.  And, as we all know, for some strange
14  reason, that opinion sat for over two years at the Supreme
15  Court, which ultimately decided not to grant cert.
16           MR. AZMY:  Right.
17           THE COURT:  I thought they would, frankly, but
18  they didn't.  So it's a strange -- that decision is actually
19  untested at this point.
20           And since then, as you also know, because that's
21  what's pending before the Court, there have been several
22  other Supreme Court decisions addressing the -- and we're
23  not discussing that specifically today, but the
24  extraterritoriality reach.  I mean, that has certainly
25  changed, to some degree.
```

9

1                So I think that the legal landscape in which this
2    case is now pending has shifted.  I don't know if you want
3    to address that, but I would be interested, since you're all
4    here, to hear your opinion about that.
5                MR. AZMY:  Well, with respect to *Egbert* and
6    *Abbasi*, not only are your decisions the law of this case
7    pending some change in the Fourth Circuit with respect to
8    how to analyze the ATS, *Sosa* is still good law.  And there
9    is this fundamental analytical difference between the ATS, a
10   congressional authorization for damages and implying a cause
11   of action.  It's fundamental.
12               And with respect to extraterritoriality, Your
13   Honor, we continue -- there has not been a fundamental
14   change in the law regarding extraterritoriality.  As the
15   Fourth Circuit has found, *Kiobel* has not been reversed.  I
16   found it surprising they cited the *Elbaz* case, which
17   affirmatively relies on and applies the *Kiobel* "touch and
18   concern" test, and thereafter applies the *Nabisco* "focus"
19   test.
20               Because as I think we've explained to the Court
21   before, all of these tests are in conversation with each
22   other, they are two ways of describing Step 2, the
23   extraterritoriality analysis, because they're a domestic
24   application.  And one way is to ask is this a "touch and
25   concern"; another way is to ask directly does this satisfy

                                                              10

1   the "focus" of the statute.  And as Your Honor has already
2   found, the "focus" of the statute, the "object of its
3   solicitude," is to ensure that there's no international
4   tension from the U.S.'s failure to provide a remedy for
5   harms done to foreign nationals.
6         And also with respect to *Nestlé*, as we put forward
7   in our briefing, our facts are fundamentally different than
8   those in *Nestlé*.  In *Nestlé*, there was just an allegation
9   that there was general corporate activity and visits to Côte
10  d'Ivoire to buy cocoa.  The Court said, first, there is no
11  presence -- corporate presence in Côte d'Ivoire; and,
12  second, there's absolutely no nexus between the general
13  corporate activity and the torts alleged in -- the child
14  slavery alleged, sort of just driving down prices that might
15  incentivize child slavery.
16        Here, as Your Honor well knows, there was a direct
17  corporate presence in Abu Ghraib.  And, here, as Your Honor
18  has found -- and this is also law of the case -- there was
19  direct participation between U.S. headquarters here and the
20  alleged torture there, suggesting a very serious nexus that
21  was absent in *Nestlé*.  So there have been developments, but
22  we think our case still survives.
23        THE COURT:  All right.  Mr. O'Connor.
24        MR. O'CONNOR:  Yes, Your Honor, briefly.
25        We don't think that a cursory review of these

11

1   cases supports a proposition that the context between *Bivens*
2   is different from the context of ATS.
3          *Sosa* is clear that ATS is jurisdictional only,
4   creates no exceptional causes of action; only provides
5   jurisdiction.  Well, what's Section 1331 do?  Creates
6   jurisdiction only for claims brought under the Constitution.
7          The next question for both *Bivens* and ATS is,
8   should a court imply a cause of action.  And, as we've
9   explained, the first part of the test for each is different,
10  but the second -- the separation of powers inquiry is
11  exactly the same.  The words are identical, word for word.
12  The tests are applicable to both.  So we don't see that you
13  can just wave away the *Bivens* case as irrelevant.
14         And, as we've pointed out, there's a string of
15  five cases in a row from the Supreme Court where they're
16  citing back and forth to each other, ATS to *Bivens* cases,
17  *Bivens* cases to ATS.
18         Mr. Azmy talked a bit about extraterritoriality
19  and about, well, we think that "touch and concern" and
20  "focus," those are -- you know, there's two ways you can
21  look at it.  This is what the Court said in *Elbaz*:  To
22  identify a permissible domestic application, we must -- not
23  may, must -- determine the statute's focus and whether the
24  conduct relevant to the statute's focus occurred inside the
25  United States.  It is not enough for conduct to merely

12

```
 1   "touch and concern" the territory of the United States; the
 2   conduct must be domestic.  That could have been pulled from
 3   any number of briefs that we've written in the last five
 4   years here and in the Fourth Circuit.  The Fourth Circuit's
 5   view of the law as stated in *Elbaz* is identical to what
 6   we've been saying for at least five years.
 7            And then, finally, Mr. Azmy talked about, well,
 8   the facts here are different than *Nestlé* because there was
 9   no corporate presence by *Nestlé* in Côte d'Ivoire.  That's --
10   well, the Court accepted the allegations that folks from
11   *Nestlé* were visiting and were aware of child slavery going
12   on and continued to fund the farmers who were engaged in the
13   child slavery, and so that's not enough.
14            But more to the point, whether there's a presence
15   outside the United States is very much irrelevant to all of
16   this, because, as we know, what did the Court hold in
17   *Kiobel*?  ATS has no extraterritorial application.  They use
18   the word "none" to describe it.  So things like, well,
19   you're a U.S. corporation, you're -- you know, you have
20   people -- you know, U.S. citizens engaged, you know, in
21   contracts with the United States to do work overseas.  None
22   of that matters.  All that matters is what's the focus of
23   the statute, and *Elbaz* answers that.  *Elbaz* says:  For
24   secondary liability claims -- and that's all we've got left
25   here -- the focus of the statute is the underlying wrongful
```

13

```
 1  conduct.  The object of the conspiracy, which, you know,
 2  that case didn't have anything about abetting, but by
 3  analogy, it's the purpose of the aiding and abetting, which
 4  is the conduct in Iraq.  Thank you.
 5              THE COURT:  All right.  Thank you.
 6              Did you have anything you wanted to add from the
 7  plaintiff's standpoint?  I was watching body language, and
 8  it looked as though you had something you wanted to say.
 9              MR. AZMY:  Oh, just with respect to the 1331
10  argument, I think that's somewhat confused.  I mean, that's
11  what someone would invoke to -- say invoke FERPA, the
12  statute issue in *Gonzaga*.  And then the secondary question
13  is, is there a private cause of action there, to which the
14  Court would say no.  But the ATS, as we've said, explicitly
15  authorizes an individual to go to Federal court and to sue
16  for tort.  Thank you.
17              THE COURT:  Thank you.  All right.  Thank you,
18  counsel.  Again, as always, very interesting arguments.
19              We'll recess court for the day.
20              MR. AZMY:  Thank you, Your Honor.
21              MR. O'CONNOR:  Thank you, Your Honor.
22                 (Proceedings adjourned at 11:05 a.m.)
23
24
25
```

14

```
 1                  ----------------------------------
 2    I certify that the foregoing is a true and accurate
 3    transcription of my stenographic notes.
 4                           _____
                                   Stephanie Austin
 5                             Stephanie M. Austin, RPR, CRR
 6
 7
 ...
25
```

15