IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

SUHAIL NAJIM ABDULLAH AL SHIMARI,
   et al.,

        Plaintiffs,

   v.

CACI PREMIER TECHNOLOGY, INC.,

        Defendant.

1:08-cv-827 (LMB/JFA)

## MEMORANDUM OPINION

On remand following the Supreme Court's denial of defendant CACI Premier

Technology, Inc.'s ("CACI") petition for a writ of certiorari, CACI has filed two Motions to

Dismiss for Lack of Subject Matter Jurisdiction [Dkt. Nos. 1331, 1367] arguing that intervening

Supreme Court decisions require the Court to revisit its prior decisions finding subject matter

jurisdiction over this civil action, which was brought by plaintiffs Suhail Najim Abdullah Al

Shimari ("Al Shimari"), Asa'ad Hamza Hanfoosh Al-Zuba'e ("Al-Zuba'e"), and Salah Hasan

Nusaif Jasim Al-Ejaili ("Al-Ejaili") (collectively, "plaintiffs") under the Alien Tort Statute

("ATS"), 28 U.S.C. § 1350, based on physical and psychological abuse that they allegedly

suffered while they were detained by the United States military at Abu Ghraib prison in Iraq.

CACI's first motion contends that pursuant to Nestlé USA, Inc. v. Doe, 141 S. Ct. 1931

(2021), this civil action involves an impermissible extraterritorial application of the ATS. [Dkt.

No. 1331]. In its second motion, CACI asserts that Egbert v. Boule, 142 S. Ct. 1793 (2022),

Torres v. Texas Department of Public Safety, 142 S. Ct. 2455 (2022), and Biden v. Texas, 142 S.

Ct. 2528 (2022), preclude recognizing a cause of action arising out of the United States'

prosecution of war.  [Dkt. No. 1367].  For the reasons that follow, both Motions to Dismiss for

Lack of Subject Matter Jurisdiction will be denied.

## I. BACKGROUND

Since this litigation began in 2008, there have been multiple rounds of motions to

dismiss, appeals, and ensuing remands.  Because the procedural history and background of this

civil action has been described extensively in prior opinions of this Court and the United States

Court of Appeals for the Fourth Circuit,[1] it will not be repeated here unless relevant to resolving

the pending jurisdictional motions.

In this civil action, plaintiffs bring claims under the ATS, which provides that the

"district courts shall have original jurisdiction of any civil action by an alien for a tort only,

committed in violation of the law of nations[.]"  28 U.S.C. § 1350.  Specifically, plaintiffs allege

that employees of CACI, an American corporation with its headquarters in the Eastern District of

Virginia, conspired with and aided and abetted United States military personnel in subjecting

plaintiffs to torture; cruel, inhuman, or degrading treatment ("CIDT"); and war crimes, all in

violation of international law, while plaintiffs were detained by the United States military at Abu

Ghraib prison in Iraq from late 2003 to 2004.  At that time, Iraq was under the control of the

Coalition Provisional Authority, a temporary governing body that was created in the early days

of the United States-led occupation of Iraq by the Commander of Coalition Forces, who was a

United States Army General.[2]  See Al Shimari v. CACI Premier Tech., Inc., 758 F.3d 516, 524

n.4 (4th Cir. 2014).  The Coalition Provisional Authority was governed by an administrator

---

[1] See, e.g., Al Shimari v. CACI Premier Tech., Inc., 324 F. Supp. 3d 668, 673-87 (E.D. Va. 2018); Al Shimari v. CACI Premier Tech., Inc., 758 F.3d 516, 522-24 (4th Cir. 2014).

[2] A multinational coalition led by the United States participated in the invasion of Iraq in 2003. See Al Shimari, 758 F.3d at 521.

appointed by the United States President and the United States Secretary of Defense.  See United States ex rel. DRC, Inc. v. Custer Battles, LLC, 562 F.3d 295, 298 (4th Cir. 2009).

CACI contracted to provide interrogation services to the United States Army under two delivery orders issued and administered by the Department of the Interior pursuant to a General Services Administration schedule contract, and in September 2003, CACI interrogators began arriving in Iraq.  [Dkt. No. 968] ¶¶ 25-27.  Plaintiffs have testified that they were subjected to abuse at Abu Ghraib, including violent beatings, stress positions, sleep and sensory deprivation, exposure to extreme temperatures, forcible removal of clothing and forced nudity, sexual assault, humiliation, electric shocks, and threats from dogs and firearms.  See Al Shimari v. CACI Premier Tech., Inc., 324 F. Supp. 3d 668, 677-82 (E.D. Va. 2018).  Department of Defense investigators later concluded that CACI interrogators and United States military personnel had abused detainees at Abu Ghraib,[3] and evidence in the record links CACI interrogators—namely Steven Stefanowicz ("Stefanowicz"), Doug Johnson ("Johnson"), and Timothy Duggan ("Duggan")—to abuse of detainees, ███████████████.[4]

---

[3] See Maj. Gen. Antonio M. Taguba, Article 15–6 Investigation of the 800th Military Police Brigade 48 (2004); Maj. Gen. George R. Fay, Article 15–6 Investigation of the Abu Ghraib Detention Facility and 205th Military Intelligence Brigade 51-52, 63, 79, 82, 84, 86-87, 89, 116-17, 130-35 (2004).

[4] For instance, then-Sergeant Ivan Frederick II, who was court martialed for his participation in detainee abuse and sentenced to eight years of imprisonment, testified that Stefanowicz "told [him] personally to treat certain detainees like shit, use the dogs on certain detainees, and he would sometimes be there directing as we carried it out."  [Dkt. No. 1090-1] Ex. 36, at 71:3-6. Frederick also testified that Johnson once asked Frederick to show him "pressure points" and Johnson brought Frederick in to "hit [detainees] with a pressure point" if they did not answer questions right away.  Id. at 86:11-89:15.  Then-Corporal Charles Graner, who was court martialed for his participation in detainee abuse and sentenced to ten years of imprisonment, testified that putting detainees "up on the box" (i.e., forcing detainees to stand on a box which "kept [them] awake") had been "cleared" with "Big Steve" (Stefanowicz) and was "normal" and "something that we did with pretty much everybody."  [Dkt. No. 1090-1] Ex. 37, at 24:9-25:3, 43:12-44:11.  See also, e.g., [Dkt. No. 1086-4] Ex. 3, at 86:9-22, 89:9-15, [Dkt. No. 1045-1] Ex. 4, at 76:18-78:16; [Dkt. No. 1090-1] Ex. 39, at 170:8-10; [Dkt. No. 1083-2] at DoD-1168, 1170.

The operative Third Amended Complaint ("Complaint") was filed in March 2013 and initially contained direct liability, conspiracy, and aiding and abetting claims for torture, CIDT, and war crimes against CACI.[5]  [Dkt. Nos. 251, 254].  CACI moved to dismiss the Third Amended Complaint on several grounds.  On August 25, 2013, relying on the extraterritorial jurisprudence set out in Kiobel v. Royal Dutch Petroleum Company, 569 U.S. 108 (2013), the district judge then-assigned to this civil action dismissed plaintiffs' ATS claims for lack of jurisdiction "because the acts giving rise to their tort claims occurred exclusively in Iraq, a foreign sovereign."  Al Shimari v. CACI Int'l Inc., 951 F. Supp. 2d 857, 858 (E.D. Va. 2013).

The Fourth Circuit vacated that decision, holding that under the standard set forth in Kiobel, plaintiffs' claims "touch[ed] and concern[ed] the territory of the United States with sufficient force to displace the presumption against extraterritorial application" of the ATS because of:

> (1) CACI's status as a United States corporation; (2) the United States citizenship of CACI's employees, upon whose conduct the ATS claims are based; (3) the facts in the record showing that CACI's contract to perform interrogation services in Iraq was issued in the United States by the United States Department of the Interior, and that the contract required CACI's employees to obtain security clearances from the United States Department of Defense; (4) the allegations that CACI's managers in the United States gave tacit approval to the acts of torture committed by CACI employees at the Abu Ghraib prison, attempted to "cover up" the misconduct, and "implicitly, if not expressly, encouraged" it; and (5) the expressed intent of Congress, through enactment of the TVPA [Torture Victim Protection Act] and 18 U.S.C. § 2340A, to provide aliens access to United States courts and to hold citizens of the United States accountable for acts of torture committed abroad.

Al Shimari v. CACI Premier Tech., Inc. (Al Shimari III), 758 F.3d 516, 530-31 (4th Cir. 2014). The Fourth Circuit remanded the civil action for further proceedings, after which the parties litigated jurisdictional issues relating to the political question doctrine.  See Al Shimari v. CACI

---

[5] The Complaint also alleged several common law claims, which plaintiffs later voluntarily dismissed.  [Dkt. No. 574].

Premier Tech., Inc. (Al Shimari IV), 840 F.3d 147 (4th Cir. 2016).  This civil action was subsequently reassigned to the undersigned judge.

On remand, this Court held that torture, CIDT, and war crimes constitute violations of international-law norms that are actionable under the ATS, relying on the Supreme Court's decision in Sosa v. Alvarez-Machain, 542 U.S. 692 (2004).  See Al Shimari v. CACI Premier Tech., Inc., 263 F. Supp. 3d 595 (E.D. Va. 2017).  In Sosa, a Mexican national sued a group of Mexican nationals, who allegedly had been hired by the United States Drug Enforcement Agency, for abducting him from his house in Mexico, detaining him overnight, and bringing him by private plane to Texas where he was arrested by federal officers. 542 U.S. at 698.  After considering the history and scope of the ATS, the Supreme Court held that the statute was enacted "to furnish jurisdiction for a relatively modest set of actions alleging violations of the law of nations." Id. at 720.  Although Sosa cautioned that federal courts must consider "the practical consequences" of making a private cause of action available to litigants under the ATS, it affirmed the power of federal courts to recognize a cause of action for violations of the "present-day law of nations" that "rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms" recognized by the Supreme Court, i.e., "violation of safe conducts, infringement of the rights of ambassadors, and piracy," or, in other words, a violation of a norm that is "specific, universal, and obligatory." Id. at 724-25, 732-33.  Based on Sosa, this Court found that torture, CIDT, and war crimes constitute violations of "specific, universal, and obligatory" norms and defined the sources of law underlying those norms.  See Al Shimari, 263 F. Supp. 3d 595.

The Court subsequently directed CACI to file its Rule 12 motions in response to the Complaint, and after reviewing the parties briefing on CACI's motions to dismiss for lack of

subject matter jurisdiction and for failure to state a claim, the Court found that the Complaint sufficiently described "serious misconduct to constitute torture, CIDT, and war crimes, all of which violated settled international law at the time—and still do." See Al Shimari v. CACI Premier Tech., Inc., 324 F. Supp. 3d 668, 693 (E.D. Va. 2018). Although the direct liability counts against CACI were dismissed under Fed. R. Civ. P. 12(b)(6), id. at 693, the Court held that the Complaint plausibly alleged secondary liability claims of conspiracy and aiding and abetting, id. at 694-97, rejected CACI's argument that the political question doctrine precluded judicial review of plaintiffs' claims, id. at 687-93, and found that the claims were not preempted by the United States Constitution, the Federal Tort Claims Act, the Anti-Torture Act, 18 U.S.C. § 2340A, the Torture Victim Protection Act, 18 U.S.C. § 1350 (note), and a Coalition Provisional Authority Order, id. at 698-702.

On April 24, 2018, the Supreme Court issued its decision in Jesner v. Arab Bank, PLC, 138 S. Ct. 1386 (2018), holding that ATS suits cannot proceed against foreign corporate defendants because of the "serious foreign policy consequences" posed by such suits. Id. at 1407 (quoting Kiobel, 569 U.S. at 124). In response, CACI filed another motion to dismiss arguing that Jesner requires that a court permit ATS claims to proceed only if doing so would not infringe on separation-of-powers principles and would further the ATS's objective of "prevent[ing] foreign entanglements and international friction." [Dkt. No. 812] at 3-4. Without deciding, but expressing doubt as to, whether CACI correctly interpreted Jesner, the Court denied the motion to dismiss, finding that plaintiffs had made the requisite showing demanded by CACI. Al Shimari v. CACI Premier Tech., Inc., 320 F. Supp. 3d 781 (E.D. Va. 2018).

CACI did not appeal that decision, and the parties engaged in discovery. After discovery was completed, CACI filed a Motion for Summary Judgment, [Dkt. No. 1033], and a Suggestion

6

of Lack of Subject Matter Jurisdiction, [Dkt. No. 1057].[6] CACI's jurisdictional motion argued,

inter alia, that the Supreme Court's decision in RJR Nabisco, Inc. v. European Community, 579

U.S. 325 (2016), "rejected" the Fourth Circuit's extraterritoriality test in Al Shimari III, such that

it was "no longer good law," and that under RJR Nabisco, this Court was required to examine

whether conduct relevant to the ATS's "focus"—specifically, "conduct comprising international

law violations"—occurred in the United States. [Dkt. No. 1058] at 4, 12.

In an oral ruling on February 27, 2019, the Court denied CACI's Suggestion of Lack of

Subject Matter Jurisdiction.  [Dkt. Nos. 1143, 1145].  After pointing out that RJR Nabisco had

been decided in 2016, two years before Jesner, and that CACI waited until 2019 to raise the case

as a basis for dismissal, the Court found that Kiobel was "still good law" because Jesner did not

overrule Kiobel, and therefore Al Shimari III, which was "based primarily on the Kiobel

analysis," was "the law of this case."  [Dkt. No. 1145] at 5.  The Court further explained that,

"[e]ven under the relatively possibly new standard that [RJR Nabisco] applied," which involves

"look[ing] at the statute's focus," there was "significant conduct that occur[ed] in the United

States," such as CACI's government contract that was issued in the United States, CACI's status

as a United States corporation, the presence of CACI's American employees at Abu Ghraib, and

a CACI employee's travel from the United States to Abu Ghraib.  Id. at 5-6.  The Court also

denied CACI's Motion for Summary Judgment as to Al Shimari, Al-Zuba'e, and Al-Ejaili,

finding that there were sufficient material facts in dispute to permit plaintiffs' conspiracy and

aiding and abetting claims to proceed to trial.[7]  Id. at 15-17.  In so ruling, the Court discussed

---

[6] CACI also filed a Motion to Dismiss Based on the State Secrets Privilege, [Dkt. No. 1040], which was denied, [Dkt. No. 1143].

[7] The Court granted CACI's Motion for Summary Judgment as to the fourth plaintiff, Taha Yaseen Arraq Rashid, who has been dismissed from this civil action.  [Dkt. No. 1144].

plaintiffs' evidence of conduct occurring in the United States that supported conspiracy and aiding and abetting liability. Id. at 16.

The next day, CACI filed a Suggestion of Lack of Subject Matter Jurisdiction based on derivative immunity. [Dkt. No. 1149]. The motion was denied by an opinion in which the Court held that the United States does not retain sovereign immunity for violations of jus cogens norms of international law—which include torture, CIDT, and war crimes—and therefore CACI was not entitled to derivative sovereign immunity for such violations. See Al Shimari v. CACI Premier Tech., Inc., 368 F. Supp. 3d 935 (E.D. Va. 2019). CACI sought to take an interlocutory appeal of the denial of its motion to dismiss based on derivative sovereign immunity, but the Fourth Circuit dismissed the appeal for lack of jurisdiction on August 23, 2019. See Al Shimari v. CACI Premier Tech., Inc., 775 F. App'x 758 (4th Cir. 2019). On November 15, 2019, CACI filed a petition for a writ of certiorari before the Supreme Court, see [Dkt. No. 1321], which denied the petition a year and a half later on June 28, 2021. While CACI's appeal was pending, this civil action was stayed. Several days before the Supreme Court denied certiorari, it decided Nestlé v. Doe, 141 S. Ct. 1931 (2021), which further interpreted the presumption against extraterritoriality as applied to the ATS.

After this civil action was unstayed, CACI filed the pending Motion to Dismiss for Lack of Subject Matter Jurisdiction based on Nestlé's extraterritoriality decision. [Dkt. No. 1331]. On July 18, 2022, CACI filed the second pending Motion to Dismiss for Lack of Subject Matter Jurisdiction, arguing that Egbert v. Boule, 142 S. Ct. 1793 (2022), Torres v. Texas Department of Public Safety, 142 S. Ct. 2455 (2022), and Biden v. Texas, 142 S. Ct. 2528 (2022), preclude the Court from recognizing a private damages action under the ATS for injuries sustained during the

United States' prosecution of war. [Dkt. No. 1367]. Both motions have been fully briefed and oral argument has been held.

## II. DISCUSSION

CACI's motions repeat many of the same arguments it has previously made and which have been rejected by the Court. Although the Nestlé decision warrants refining the assessment of the presumption against extraterritoriality, plaintiffs have shown that there is sufficient evidence in the record to support a domestic application of the ATS, and therefore CACI's first motion will be denied. CACI's second motion also will be denied because neither Egbert, Torres, nor Biden v. Texas provide any basis for overruling the law of the case that plaintiffs' claims for conspiring to commit, and aiding and abetting, torture, CIDT, and war crimes may proceed under the ATS, even if the torts occurred in the context of the United States' prosecution of war.

### A. **Standard of Review**

Under Fed. R. Civ. P. 12(b)(1), a court must dismiss a civil action over which it lacks subject matter jurisdiction. A "defendant may challenge subject-matter jurisdiction in one of two ways: facially or factually." Beck v. McDonald, 848 F.3d 262, 270 (4th Cir. 2017). A facial challenge contends that "a complaint simply fails to allege facts upon which subject matter jurisdiction can be based," and in evaluating such a challenge, "the facts alleged in the complaint are taken as true." Id. (quoting Kerns v. United States, 585 F.3d 187, 192 (4th Cir. 2009)). By contrast, a factual challenge—as CACI asserts here—contends that "the jurisdictional allegations of the complaint [are] not true," and a court is permitted to "go beyond the allegations of the complaint and in an evidentiary hearing determine if there are facts to support the jurisdictional allegations." Id. (quoting Kerns, 585 F.3d at 192). In either case, the plaintiff bears the burden

9

of proving that subject matter jurisdiction exists.  Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982).

The present motions implicate the "law of the case doctrine" which "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."  TFWS, Inc. v. Franchot, 572 F.3d 186, 191 (4th Cir. 2009) (quoting United States v. Aramony, 166 F.3d 655, 661 (4th Cir. 1999)).  "This rule of practice promotes the finality and efficiency of the judicial process by protecting against the agitation of settled issues."  Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816 (1988) (internal quotations omitted).  Accordingly, the law of the case, once established, "must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal [ ] unless: (1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice."  TFWS, 572 F.3d at 191 (quoting Aramony, 166 F.3d at 661).  The law of the case "is not absolute nor inflexible," Cap. Invs. Co. v. Executors of Morrison's Est., 584 F.2d 652, 654 (4th Cir. 1978), and "a court has the power to revisit prior decisions of its own . . . in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances," Christianson, 486 U.S. at 817.[8]

---

[8] CACI argues that the "law-of-the-case doctrine does not even apply" to its first motion based on the presumption against extraterritoriality because Al Shimari III was decided "before the close of discovery on a limited record and credited mere allegations that are irrelevant to CACI's present post-discovery, fact-based jurisdictional challenge."  [Dkt. No. 1332] at 14.  That argument ignores the Court's February 27, 2019 oral ruling on CACI's motion to dismiss under RJR Nabisco, which was based on the post-discovery record and accordingly was in the same procedural posture as the present motion.  That decision is also part of the law of the case.

### B. Extraterritoriality

CACI argues that Nestlé confirms that the Fourth Circuit's extraterritoriality analysis in

Al Shimari III is "no longer viable," [Dkt. No. 1332] at 14, Kiobel's "touch and concern" test is

"[d]ead," [Dkt. No. 1366] at 10, and the Court must instead look to the "focus" of the ATS and

the location of relevant tortious conduct when examining extraterritoriality.  CACI contends that

under that approach, plaintiffs' claims must be dismissed as an impermissible extraterritorial

application of the ATS.

Nestlé involved a lawsuit brought under the ATS by six individuals from Mali who

claimed that they had been trafficked into Ivory Coast as child slaves to work on cocoa farms.

Although the defendants, Nestlé USA and Cargill, Inc., did not own or operate cocoa farms in

Ivory Coast, they bought cocoa from farms on which the plaintiffs had allegedly been enslaved

and provided the farms with "technical and financial resources—such as training, fertilizer, tools,

and cash—in exchange for the exclusive right to purchase cocoa." Nestlé, 141 S. Ct. at 1935.

The plaintiffs sued Nestlé and Cargill for aiding and abetting child slavery, on the theory that

Nestlé and Cargill "'knew or should have known' that the farms were exploiting enslaved

children yet continued to provide those farms with resources" and they "had economic leverage

over the farms but failed to exercise it to eliminate child slavery." Id.

In Nestlé, the Supreme Court held that plaintiffs' allegations that "financing decisions . . .

originated" in the United States and "every major operational decision by both companies is

made in or approved in the U.S." were insufficient to establish a domestic application of the

ATS.  Id. at 1936-37.  Citing Kiobel for the proposition that alleging "mere corporate presence"

of a defendant in the United States is insufficient to overcome the presumption against

extraterritoriality, the Court observed that "[n]early all the conduct that . . . aided and abetted

forced labor—providing training, fertilizer, tools, and cash to overseas farms—occurred in Ivory

11

Coast," and concluded that "plaintiffs must allege more domestic conduct than general corporate activity" to support a permissible application of the ATS.  Id. at 1937.

As CACI correctly points out, Nestlé made clear that the general "two-step framework for analyzing extraterritoriality issues" established by the Supreme Court applies to the ATS. Nestlé, 141 S. Ct. at 1936 (quoting RJR Nabisco, 579 U.S. at 337).  Under step one of that framework, a court "presume[s] that a statute applies only domestically" and "ask[s] 'whether the statute gives a clear, affirmative indication' that rebuts this presumption."  Id. (quoting RJR Nabisco, 579 U.S. at 337).  Kiobel "answered that question in the negative," therefore a court "cannot give 'extraterritorial reach' to any cause of action judicially created under the ATS."  Id. (citing Kiobel, 569 U.S. at 117-18, 124).  Where a statute like the ATS does not apply extraterritorially, at step two, "plaintiffs must establish that 'the conduct relevant to the statute's focus occurred in the United States . . . even if other conduct occurred abroad.'"  Id. (quoting RJR Nabisco, 579 U.S. at 337); see United States v. Elbaz, 52 F.4th 593, 602 (4th Cir. 2022).

Although Nestlé provides that extraterritoriality must be analyzed by reference to the ATS's "focus," CACI overstates Nestlé's impact on Kiobel's "touch and concern" standard.  In Kiobel, the Supreme Court found that "all the relevant conduct" regarding the alleged international law violations in that case "took place outside the United States," and explained that "even where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application."  569 U.S. at 125.  Nestlé and RJR Nabisco did not overrule or reject Kiobel.  To the contrary, Nestlé cited Kiobel with approval, see Nestlé, 141 S. Ct. at 1937, and although the Supreme Court did not reference Kiobel's "touch and concern" language in Nestlé, it did so in Jesner, which came two years after RJR Nabisco.  See Jesner, 138 S. Ct. at 1406 (observing that "the Court need not now

12

decide[] whether [the plaintiffs'] allegations are sufficient to 'touch and concern' the United States under Kiobel"). RJR Nabisco, as applied in Nestlé, does not represent a radical departure from Kiobel; rather, as the Supreme Court explained in RJR Nabisco, Kiobel "reflect[ed] . . . [the] "two-step framework for analyzing extraterritoriality issues" and did not determine the "focus" of the ATS because "all the relevant conduct . . . took place outside the United States." RJR Nabisco, 579 U.S. at 337. Indeed, the Fourth Circuit has described step two of RJR Nabisco, which looks to the "focus" of the statute, as "retain[ing] a similar emphasis on the relevant claim's connection to U.S. territory" as Kiobel's inquiry, which "ask[s] whether the claims at issue 'touch and concern' the territory of the United States." Roe v. Howard, 917 F.3d 229, 240 n.6 (4th Cir. 2019).

Nevertheless, the Supreme Court and the Fourth Circuit's recent extraterritoriality decisions "appear[] to privilege consideration of a statute's 'focus' . . . over the inquiry articulated in Kiobel," id.; see Nestlé, 141 S. Ct. at 1936; Arbitron Austria GmbH v. Hetronic Int'l Inc., 600 U.S. ---, --- S . Ct. ---, 2023 WL 4239255 (June 29, 2023). Although this Court considered conduct relevant to the focus of the ATS under RJR Nabisco in its February 27, 2019 oral ruling on CACI's motion to dismiss, Nestlé warrants a reassessment of extraterritoriality.

    1. Focus of the ATS

Nestlé did not determine the focus of the ATS, and accordingly the Court's first task is to identify the statute's focus, meaning "'the object of its solicitude,' which can include the conduct [the statute] 'seeks to regulate,' as well as the parties and interests it 'seeks to protect' or vindicate." Abitron, 600 U.S. at *4 (quoting WesternGeco LLC v. ION Geophysical Corp., 138 S. Ct. 2129, 2136 (2018)); Elbaz, 52 F.4th at 602-03. Enacted by the First Congress in 1789 in response to "concern over the inadequate vindication of the law of nations," Sosa, 542 U.S. at 717, the ATS confers "original jurisdiction" in the federal courts over "any civil action by an

alien for a tort only, committed in violation of the law of nations or a treaty of the United States,"

28 U.S.C. § 1350.  As the Supreme Court and this Court have held, "[t]he ATS was intended to

promote harmony in international relations by ensuring foreign plaintiffs a remedy for

international-law violations in circumstances where the absence of such a remedy might provoke

foreign nations to hold the United States accountable." Jesner, 138 S. Ct. at 1406; see Kiobel,

569 U.S. at 123-24; Sosa, 542 U.S. at 715-19; Al Shimari, 320 F. Supp. 3d at 787.[9]  Based on

the clear and undisputed purpose of the ATS and the text of the statute, the "'focus' of

congressional concern underlying" the statute, Abitron, 600 U.S. at *4, is to provide foreign

citizens with redress for torts committed in violation of the law of nations.

    2.  Relevant Conduct

Next, the Court considers whether plaintiffs have established that "the conduct relevant to

the statute's focus occurred in the United States." Nestlé, 141 S. Ct. at 1936.  The parties dispute

the types of domestic conduct or activity that are relevant to the focus of the ATS and, therefore,

can support a domestic application of the statute.  Plaintiffs essentially rest on the approach of Al

Shimari III, which considered both the location of the tortious conduct and other fact-specific

connections between the claims and the United States.  CACI seeks to limit the conduct that may

be considered by the Court in three ways, arguing: only conduct and not other "holistic" factors

considered by the Fourth Circuit in Al Shimari III are relevant; only the location where the direct

violation and injury occurred may be considered, not where any secondary liability conduct

---

[9] "[T]wo 'notorious episodes involving violations of the law of nations,' each of which involved American nationals engaging in tortious conduct against foreign ambassadors," provided the impetus for Congress to enact the ATS in 1789, because at the time, "neither the federal courts nor the state courts had jurisdiction over tort suits for violations of the law of nations, which left both ambassadors without an adequate civil remedy resulting in significant international tension." Al Shimari, 320 F. Supp. 3d at 787 (quoting Kiobel, 569 U.S. at 120).

occurred; and under Nestlé, domestic conduct cannot include "general corporate activity," which "[e]ncompass[es] all of a company's authorized business conduct[.]"  [Dkt. No. 1332] at 7, 18; [Dkt. No. 1366] at 12.  Each of these arguments will be addressed in turn.

### a.   Identity of the Parties and Status of Abu Ghraib

As to CACI's first argument, in Al Shimari III, the Fourth Circuit rejected CACI's position that "relevant conduct" includes only the "domestic tortious conduct of the defendants," instead adopting a "fact-based analysis" that "consider[s] all the facts that give rise to ATS claims, including the parties' identities and their relationship to the causes of action."  758 F.3d at 527.  The Fourth Circuit's conclusion rested in part on Kiobel's "broad" statement that the "'claims,' rather than the alleged tortious conduct, must touch and concern United States territory with sufficient force" to displace the presumption against extraterritorial application.  Id. Accordingly, the Fourth Circuit considered both "CACI's relevant conduct in the United States" and the "ATS claims' connection to the territory of the United States," and found that plaintiffs' claims involved a domestic application of the ATS because the Complaint alleged, inter alia, tortious acts committed by personnel employed by a United States corporation, "the performance of a contract executed by a United States corporation with the United States government," and "torture [that] occurred at a military facility operated by United States government personnel." Id. at 528-29.

CACI argues that Al Shimari III's approach is no longer viable after Nestlé.  In Nestlé, the parties advanced competing positions about what conduct is relevant to the focus of the ATS, with the defendants arguing that relevant conduct includes only "conduct that directly caused the injury" and the plaintiffs asserting that any "conduct that violates international law" is relevant, including conduct that aids and abets an injury that occurs overseas.  141 S. Ct. at 1936. Although Nestlé did not resolve that dispute, Nestlé and the Supreme Court's most recent

15

extraterritoriality decision in Abitron have prioritized the "location of the conduct" on which "Congress has premised liability" in analyzing the focus of a given statute. Abitron, 600 U.S. at *6-7. These decisions suggest that the center of the Court's inquiry into conduct that is relevant to the focus of the ATS must be conduct constituting the alleged violation of the law of nations.

Nevertheless, the ATS "does not expressly 'regulate conduct,'" Nestlé, 141 S. Ct at 1936, and its "focus" clearly is broader than regulating conduct as evidenced by the creation in the ATS of a remedy in the federal courts. Because the ATS's historical purpose was to provide a remedy for torts committed by U.S. nationals in violation of the law of nations, the identity of an ATS defendant and the claims' overall connections to the United States are relevant to "separating the activity that matters from the activity that does not." Abitron, 600 U.S. at *4; see Adhikari v. Kellogg Brown & Root, Inc., 845 F.3d 184, 209-11 (5th Cir. 2017) (Graves, J., concurring in part, dissenting in part).[10] As Justice Gorsuch explained in his concurrence in Jesner, "[t]he law of nations required countries to ensure foreign citizens could obtain redress for wrongs committed by domestic defendants, whether 'through criminal punishment, extradition, or a civil remedy.'" 138 S. Ct. at 1417 (Gorsuch, J., concurring in part and concurring in the judgment) (quoting Anthony J. Bellia & Bradford R. Clark, The Alien Tort Statute and the Law of Nations, 78 U. Chi. L. Rev. 445, 509 (2011)); see id. at 1416 n.3 ("As a leading treatise

---

[10] To be sure, a defendant's status as a U.S. citizen, "mere corporate presence" in the United States, Kiobel, 569 U.S. at 125, or undertaking "general corporate activity" in the United States, Nestlé, 141 S. Ct. at 1937, do not by themselves overcome the presumption against extraterritoriality; however, Kiobel and Nestlé did not foreclose consideration of these facts. Instead, these cases only held that these factors "alone" could not support finding a domestic application of the ATS, id., which does not mean they are irrelevant. See Doe v. Drummond, 782 F.3d 576, 594 (11th Cir. 2015) ("Kiobel implicitly supports that citizenship or corporate status may be relevant to whether a claim touches and concerns the territory of the United States, given that, after it set forth the test, it determined that 'mere corporate presence' was insufficient.").

explained, a sovereign 'ought not to suffer his subjects to molest the subjects of others, or to do them an injury, much less should he permit them audaciously to offend foreign powers.'" (quoting Emmerich de Vattel, 1 The Law of Nations, bk. II, § 76 (1760))); Kiobel, 569 U.S. at 136 (Breyer, J., concurring in the judgment) ("Nations have long been obliged not to provide safe harbors for their own nationals who commit such serious crimes abroad."). A sovereign's failure to provide redress for harms committed by its nationals implicated it as an "accomplice in the injury," Vattel, supra, § 77, at 145, and risked reprisal from the nation whose citizen suffered the wrong. See William Blackstone, Commentaries on the Laws of England, bk. 4, 67-68 (1791); Sosa, 542 U.S. at 715-17. "U.S. citizens committing international law violations abroad had the potential to implicate the United States in diplomatic conflicts," which the First Congress sought to "avoid" by providing a civil remedy for such violations in the ATS.[11] Adhikari, 845 F.3d at 210 (Graves, J., concurring in part, dissenting in part).

In this case, the foreign policy concerns from the failure to provide redress for the alleged international law violations is "particularly heightened," id. at 211, because the alleged torture, CIDT, and war crimes in which CACI allegedly conspired and aided and abetted involved

---

[11] Historical evidence supports this conclusion. In 1792, a few years after the ATS was enacted, Secretary of State Thomas Jefferson and Attorney General Edmund Randolph "affirmed that the ATS provided an immediately actionable civil remedy for incidents of robbery, a law of nations violation, committed by U.S. citizens extraterritorially during George Washington's first administration." Brief of Professors of Legal History as Amici Curiae in Support of Respondents, at 15-18, Nestlé v. Doe, 141 S. Ct. 1931 (2019) (Nos. 19-416, 19-453). These incidents of "robbery" were committed by U.S. citizens who unlawfully captured enslaved persons in Spanish or French territory and brought them back to the United States. In response to complaints from France and Spain, Jefferson and Randolph confirmed that federal courts have civil jurisdiction under the ATS to remedy these complaints. See id. (discussing Thomas Jefferson, Opinion on Offenses Against the Law of Nations, Dec. 3, 1972, reprinted in 24 The Papers of Thomas Jefferson (John Catanzariti ed., 2018); Thomas Jefferson, Edmund Randolph's Opinion on Offenses Against the Law of Nations, Dec. 5, 1792, reprinted in The Papers of Thomas Jefferson (John Catanzariti ed., 2018)).

United States military personnel and CACI's employees who were U.S. citizens, and arose from

a contract executed between CACI, a United States corporation, and the United States

government.  Moreover, the alleged torture occurred in territory that was effectively under the

control of the United States military at the time.  When plaintiffs were detained at Abu Ghraib,

Iraq was occupied by United States-led coalition forces and governed by the Coalition

Provisional Authority, whose leadership was appointed by and answered to the United States

President and Secretary of Defense.[12]  The Coalition Provisional Authority displaced Iraqi law

and governmental institutions, see [Dkt. Nos. 1341-1, 1341-2], and, pursuant to Coalition

Provisional Authority Order 17, immunized coalition personnel and contractors from Iraqi laws

and "Iraqi Legal Process," instead subjecting all coalition personnel to the "exclusive jurisdiction

of their Parent States."  [Dkt. No. 1341-5] §§ 2.1, 2.4, 3.1-3.2.  Coalition Provisional Authority

Order 17 further provided that third-party claims for personal injury could not be brought in Iraqi

courts but would be "submitted and dealt with by the Parent State whose Coalition personnel,

property, activities or other assets are alleged to have caused the claimed damage, in a manner

consistent with the national laws of the Parent State."  Id. § 6.  The Parent State for CACI

personnel was the United States, and the ATS is one of its national laws.  See Al Shimari, 324 F.

Supp. 3d at 701.  Moreover, reflecting universally-accepted norms under international law,

"[t]orture and cruel, degrading or inhuman treatment or punishment" was prohibited under

---

[12] See Office of Management and Budget, Executive Office of the President, Report to Congress Pursuant to Section 1506 of the Emergency Wartime Supplemental Appropriations Act, 2003 (Public Law 108-11), at 2 (June 2, 2003) (explaining that the Coalition Provisional Authority was vested by the "President [of the United States] with all executive, legislative and judicial authority necessary to achieve its objectives"); Cong. Rsch. Serv., RL 32370, The Coalition Provisional Authority (CPA): Origin, Characteristics, and Institutional Authorities, at CRS-14 (June 6, 2005) ("While it is clear that, ultimately, the [Coalition Provisional Authority] Administrator answered to the President, it is also clear that the Administrator reported to the Secretary of Defense as well.").

18

Coalition Provisional Order 7. [Dkt. No. 1341-3] § 3.2. Abu Ghraib's unique status during the relevant time period therefore established considerable connections between plaintiffs' claims and the United States because the situs of the alleged torts was effectively under United States governance and control, the alleged perpetrators of plaintiffs' abuse were subject to United States jurisdiction while in Iraq, and the Coalition Provisional Authority envisioned that third-party claims like plaintiffs' would be dealt with in accordance with the laws of the Parent State involved—here, the United States.

These facts cannot be ignored and they significantly differentiate this case from the facts at issue in Kiobel,[13] Jesner,[14] and Nestlé, none of which involved the alleged torts being committed by U.S. nationals, acting under a U.S. government contract, and in foreign territory controlled by the U.S. government. Indeed, plaintiffs' ATS claims implicate substantial domestic and foreign interests of the United States and further the purpose of providing redress for violations of the law of nations committed by U.S. nationals. Notwithstanding the Supreme

---

[13] The claims in Kiobel involved allegations by Nigerian nationals that certain British, Dutch, and Nigerian corporations violated the law of nations by aiding and abetting atrocities committed by Nigerian military and police forces by providing those forces with food, transportation, compensation, and access to property; however, it was undisputed that all of the atrocities were committed in Nigeria, none of the defendants had engaged in any activities in the United States that were relevant to the tortious acts occurring in Nigeria, and the only connections to the United States consisted of the foreign corporate defendants' listing of shares on the New York Stock Exchange and their affiliation with an office in New York. See 569 U.S. at 113; id. at 139-40 (Breyer, J., concurring in the judgment).

[14] In Jesner, plaintiffs who were injured, or whose family members were injured, in terrorist attacks in the Middle East sued Arab Bank, a Jordanian financial institution, for allegedly helping finance attacks by Hamas and other terrorist groups by maintaining bank accounts for terrorists and their front groups and allowing the accounts to be used to fund payments to the families of suicide bombers. 138 S. Ct. at 1394. Most of the plaintiffs' allegations involved conduct occurring in the Middle East, and the only connections to the United States were allegations that Arab Bank used its New York branch to clear dollar-denominated transactions through the Clearing House Interbank Payments System, some of which may have "benefited terrorists," and that Arab Bank's New York branch was used to launder money for a Texas-based charity that was purportedly "affiliated with Hamas." Id. at 1394-95.

19

Court's conduct-centered approach reflected in its "focus" analysis, these types of connections between plaintiffs' claims and the United States are of "critical importance to analyzing the focus of the ATS," and it would "contravene[] the focus of the ATS to disregard these facts entirely." Adhikari, 845 F.3d at 211 (Graves, J., concurring in part, dissenting in part) (emphasis in original). As the Fourth Circuit observed in Al Shimari III, "further litigation of these ATS claims will not require 'unwarranted judicial interference in the conduct of foreign policy,'" because "[t]he political branches already have indicated that the United States will not tolerate acts of torture, whether committed by United States citizens or by foreign nationals," as reflected by the enactment of the Torture Victim Protection Act, which was intended to supplement the ATS, see H.R. Rep. No. 102-367, at 3-4 (1991), as well as the enactment of the Antiterrorism Act, 18 U.S.C. § 2340A. Al Shimari III, 758 F.3d at 530. Moreover, "mechanically applying" the presumption against extraterritoriality "to bar these ATS claims would not advance the purposes of the presumption," because a basic premise of the presumption is avoiding "'international discord' resulting from 'unintended clashes between our laws and those of other nations,'" which is not present here. Id. at 529-30 (quoting Kiobel, 569 U.S. at 115); see RJR Nabisco, 579 U.S. at 335-36.

In sum, even after Nestlé, "CACI's status as a United States corporation," the "United States citizenship of CACI's employees," "facts in the record showing that CACI's contract to perform interrogation services in Iraq was issued in the United States" by the United States government, Al Shimari III, 758 F.3d at 530-31, as well as Iraq's status as territory under United States control, all show that plaintiffs' claims involve a domestic application of the ATS.

### b. Conduct Relevant to the Law of Nations Violations

The record also shows substantial domestic conduct that is relevant to the alleged law of nations violations. CACI argues that this evidence cannot be considered because only direct

tortious acts, i.e., the "actual abuse of [p]laintiffs," are relevant to the focus of the ATS, and not "alleged conspiratorial or aiding and abetting conduct by CACI," even if that conduct occurred in the United States. [Dkt. No. 1366] at 13. CACI maintains that because the alleged abuse of plaintiffs occurred in Iraq, plaintiffs' claims involve an impermissible extraterritorial application of the ATS.

This argument is unpersuasive. In Al Shimari III, the Fourth Circuit concluded that "it is not sufficient merely to say that . . . the actual injuries were inflicted abroad" to find a claim barred by the presumption against extraterritoriality. Warfaa v. Ali, 811 F.3d 653, 659 (4th Cir. 2016) (quoting Al Shimari III, 758 F.3d at 528). Nestlé does not disturb Al-Shimari III's conclusion because Nestlé did not resolve the scope of relevant conduct "or narrow it to only the direct tortious conduct causing injury." Est. of Alvarez v. Johns Hopkins Univ., 598 F. Supp. 3d 301, 317 (D. Md. 2022). Instead, the Supreme Court in Nestlé assumed without deciding that it could consider "domestic conduct" that "aid[s] and abet[s] an injury that occurs overseas," and held that even under that approach, "[n]early all the conduct that . . . aided and abetted forced labor" occurred abroad. 141 S. Ct. at 1936-37.

Like the Fourth Circuit in Al Shimari III, other circuits have looked to the location of all conduct that constitutes secondary liability for the international law violation, not just the location of conduct that directly inflicts injury, to determine whether an aiding and abetting or conspiracy claim involves an extraterritorial application of the ATS, even after the RJR Nabisco and Nestlé decisions. See Doe I v. Cisco Systems, Inc., --- F.4th ---, 2023 WL 4386005, at *26 (9th Cir. 2023) (holding that "conduct that occurs within the United States and violates customary international law is most relevant to the ATS's aim of providing a forum to address violations of international norms that take place in U.S. territory," and therefore "conduct within

21

the United States that constitutes aiding and abetting a violation of international law, 'even if

other conduct [i.e., the principal's acts] occurred abroad,' is a violation of the law of nations that

falls within the 'focus' of the ATS"); Jara v. Nunez, 878 F.3d 1268, 1273 (11th Cir. 2018)

("[O]ur jurisdictional inquiry requires us to consider the domestic or extraterritorial location

where the defendant is alleged to engage in conduct that directly or secondarily results in

violations of international law. . . . '[R]elevant domestic conduct' may include both primary

tortious conduct and affirmative involvement in the torts of others." (quoting Doe v. Drummond,

782 F.3d 576, 592, 597-98 (11th Cir. 2015))); see also Mastafa v. Chevron Corp., 770 F.3d 170,

185 (2d Cir. 2014) (explaining that "relevant conduct" is "the conduct of the defendant which is

alleged by [the] plaintiff to be either a direct violation of the law of nations or . . . conduct that

constitutes aiding and abetting another's violation of the law of nations").  Accordingly, this

Court agrees with these circuits that "'actions from within the United States,' such as 'aiding and

abetting and conspir[ing]'" with a tortfeasor who is a U.S. national in a foreign country, may

"displace the presumption against extraterritoriality if enough of the relevant conduct occurs

domestically and if the allegations of domestic conduct are supported by a minimum factual

predicate." Jara, 878 F.3d at 1273 (quoting Drummond, 782 F.3d at 597-98).  This interpretation

accords with federal courts' recognition of secondary liability claims as cognizable under the

ATS, see Aziz v. Alcolac, Inc., 658 F.3d 388, 395-96 (4th Cir. 2011), as well as the "focus" of

the ATS on providing foreign nationals with redress for violations of the law of nations.  That

purpose would be frustrated if a U.S. defendant like CACI could avoid liability for injuries in

violation of international law that its employees caused within the scope of their employment merely because the injuries occurred abroad.[15]

CACI next argues that all of the domestic conduct identified by plaintiffs is "general corporate activity that cannot support an exercise of jurisdiction under [the] ATS," asserting that "general corporate activity" includes "all of a company's authorized business conduct," such that evidence of "contracting" and supplying employees "as interrogators [who] would be U.S. citizens" with "security clearances" cannot be considered. [Dkt. No. 1332] at 18-20.

This argument also lacks merit because CACI relies on an incorrect and overly broad interpretation of Nestlé's reference to "general corporate activity." 141 S. Ct. at 1937. Although Nestlé held that "general corporate activity . . . cannot alone establish domestic application of the ATS," it is clear that "general corporate activity" meant activities that are "common to most

---

[15] In support of its argument, CACI primarily relies on the Fourth Circuit's decision in Elbaz, 52 F.4th 593, for the proposition that "for secondary liability claims . . . extraterritoriality is assessed by reference to the place where the object of the alleged conspiracy or aiding and abetting—i.e., the alleged primary unlawful conduct—occurred[.]" [Dkt. No. 1366] at 2. Elbaz did not establish such a bright-line rule. In Elbaz, the Fourth Circuit considered Elbaz's conviction for wire fraud and conspiracy to commit wire fraud where most of the criminal conduct had occurred abroad, and held that her wire fraud conviction involved a domestic application of the wire fraud statute, 18 U.S.C. § 1343, because she had caused three domestic wire transmissions to occur in Maryland. 52 F.4th at 604. Turning to Elbaz's conspiracy conviction under 18 U.S.C. § 1349, the Fourth Circuit concluded that her "conspiracy conviction was a domestic application of the statute in so far as the object of the conspiracy was domestic wire fraud." Id. at 604-05 & n.6 ("[T]he actual criminal conspiracy here is just the agreement to commit domestic wire fraud").

Contrary to CACI's assertion, Elbaz did not establish a general rule that a conspiracy is domestic only if the underlying substantive offense is domestic. In fact, Elbaz cited to the Fourth Circuit's observation in United States v. Ojedokun, 16 F.4th 1091 (4th Cir. 2021), that "[c]onspiracies operate wherever the agreement was made or wherever any overt act in furtherance of the conspiracy transpires, which may include a place where the defendant has never set foot," id. at 1107 (internal quotations omitted). Accordingly, where the agreement was made or acts in furtherance of the conspiracy occurred in the United States, the presumption against extraterritoriality does not bar a claim based on conspiracy liability simply because the object of the conspiracy was located abroad.

corporations" and otherwise unconnected to the asserted ATS claims, because the Supreme

Court pointed out that the Nestlé plaintiffs had "pleaded as a general matter that 'every major

operational decision by both companies is made in or approved in the U.S.,'" and concluded that

"generic allegations of this sort do not draw a sufficient connection between the cause of action

[plaintiffs] seek—aiding and abetting forced labor overseas—and domestic conduct." 141 S. Ct.

at 1937 (emphasis added). Notably, the Supreme Court did not categorically exclude all

"authorized business conduct," [Dkt. No. 1332] at 18, and instead distinguished between specific

conduct like "providing training, fertilizer, tools, and cash to overseas farms" that had occurred

in Ivory Coast from "allegations of general corporate activity . . . like decisionmaking" where

"every major operational decision . . . is made in or approved in the U.S.," Nestlé, 141 S. Ct. at

1937, even though providing goods, services, and funding is no doubt typical business activity.

See Cisco, 2023 WL 4386005, at *27 (distinguishing between the "simple corporate oversight

and direction" in Nestlé from domestic corporate activities including designing and optimizing

databases, manufacturing hardware, and providing technological support which "constituted

essential, direct, and substantial assistance for which aiding and abetting liability can attach" and

"support application of the ATS"); Estate of Alvarez, 598 F. Supp. 3d at 317-18 (differentiating

between "general corporate activity" and alleged conduct that was directly related to the alleged

violations of the law of nations); A.O.A. v. Rennert, No. 4:11-CV-44-CDP, 2023 WL 346001, at

*21 (E.D. Mo. Jan. 20, 2023). Contrary to CACI's overly broad interpretation, Nestlé provides

that corporate activity that is "generic" and attenuated from the international law violations is

insufficient "alone [to] establish domestic application of the ATS," but does not preclude

consideration of corporate conduct specifically related to the underlying claims. 141 S. Ct. at

1937.

Plaintiffs have produced sufficient evidence showing that this civil action involves significant domestic conduct that is directly related to plaintiffs' claims. First, the torture, CIDT, and war crimes in which CACI's employees allegedly conspired and aided and abetted arose from an agreement to provide interrogation services to the United States Army as part of a contract with the United States Department of Interior, which was executed in the United States and provided for payment within the United States. See [Dkt. No. 1342-8]. Pursuant to that contract, CACI hired employees who were trained in the United States, received government security clearances, and were sent to Abu Ghraib, where the alleged abuse occurred. Plaintiffs point to evidence showing that CACI personnel in Virginia made hiring decisions regarding the CACI interrogators who were allegedly involved in plaintiffs' abuse at Abu Ghraib, including one interrogator who appeared to be unqualified. Email correspondence dated August 16, 2003 shows that CACI employee Tom Howard ("Howard") had reviewed resumes for potential candidates for the interrogator position, including Stefanowicz, and flagged to Program Manager Amy Monahan ("Monahan"), who was based in Virginia, that "NONE of these candidates have the basic qualifications that the customer requires for the [i]nterrogator position." [Dkt. No. 1342-6] at 2 (emphasis in original). Howard described Stefanowicz as "neither trained nor qualified for the interrogator position," id. at 3, but Stefanowicz was nevertheless hired and ultimately served as an interrogator. After CACI interrogators were hired but before travelling to Iraq, they received training at a CONUS Replacement Center in Fort Bliss, Texas, including training "regarding [the] Geneva Convention." [Dkt. No. 1342-10] at 111:14-112:4. CACI was aware of the training its employees were receiving at Fort Bliss. [Dkt. No. 1342-11] at 91:1-7.

Moreover, CACI was responsible for supervising its employees in Iraq, see [Dkt. No. 1342-8] at 8, and those employees functioned within a reporting structure monitored by

personnel located in the United States.  CACI Vice President Charles Mudd, who was based in

the United States, testified that he made 17 trips from the United States to Iraq to meet with

CACI employees as well as military personnel to check on the CACI employees' wellbeing and

performance and whether they were performing "properly" pursuant to the contract.  [Dkt. No.

1342-11] at 67:2-24, 80:1-19.  Mudd testified that CACI employees did not take direction from

military personnel but took direction from "the[] person that they're working for," and they

could escalate concerns to the CACI site lead at Abu Ghraib.  Id. at 90:11-19.  In turn, the CACI

site lead reported to the CACI in-country manager, who worked with and reported back to CACI

program managers based in the United States.  See [Dkt. No. 1342-12] at 120:10-21; [Dkt. No.

1342-15] at 117:9-118:7, 120:21-24; [Dkt. No. 1342-13] at 77:9-80:12.  In-country CACI

personnel sent frequent status reports to management in the United States, such as Mudd and

CACI Manager Mark Billings ("Billings"), "so they could keep a grip on what was happening,"

[Dkt. No. 1342-13] at 188:6-22; [Dkt. No. 1342-11] at 204:15-18.  Program managers based in

the United States who reported to Billings were responsible for working with in-country program

managers and the site lead to conduct performance evaluations of CACI employees based in

Iraq.  See [Dkt. No. 1342-12] at 47:4-48:12.

Dan Porvaznik ("Porvaznik"), the CACI site lead at Abu Ghraib from fall 2003 to March

2004, testified that "as the site manager" and "as part of quality control," he would have

"absolutely" stopped physical abuse by interrogators.  [Dkt. No. 1342-10] at 143:13-144:6.

Although Porvaznik observed "quite a few" interrogations, id. at 160:20-24, and saw "quite a

few" CACI interrogation plans, id. at 164:10, he denies witnessing any abuse or seeing any plans

26

that raised concerns; however, he explained that he would have "reported" violations involving a CACI employee "within the CACI-PT chain of command."[16] Id. at 149:2-150:4.

Plaintiffs have also presented evidence that CACI managers in the United States were made aware of detainee abuse and were on notice that their Abu Ghraib employees might be asked to engage in or abet unlawful conduct, but took no action in response or otherwise disregarded the concerns.  For example, on October 14, 2003, a few weeks after CACI interrogators arrived at Abu Ghraib, Rich Arant ("Arant"), a CACI interrogator, emailed Monahan, who was based in Virginia, informing her of his resignation from employment with CACI. [Dkt. No. 1342-14].  In his email, Arant expressed that he had shared with CACI site lead Porvaznik "concerns regarding the handling of prisoners and interrogation methods used," which "should be kept in house for now," including "allegations that male interrogators conducted an unauthorized interrogation of a female inmate held in an isolation facility at Abu [Ghraib] prison" which "confirm[ed] [his] assessment that the situation [he] observed may not be an isolated instance." [Dkt. No. 1342-14] at 2.  Arant explained that he believed that without officer supervision, "violations of the well-written 'rules of engagement' will likely continue to occur."  Id.  He indicated that the "troubling acts [he] witnessed" were "conducted by [] junior active duty military personnel," and wrote that CACI personnel have his "highest admiration and respect," but he felt compelled to resign because he "remain[s] very inflexible as to what [he] will tolerate in [his] presence."  Id. at 2-3.

Monahan testified in her deposition that she received Arant's email, which she considered something serious, [Dkt. No. 1342-15] at 168:20-22, and recognized "how clearly

---

[16] Porvaznik testified that Stefanowicz reported an abuse-related incident to him in "December 2003 or January 2004," which Porvaznik reported to a military captain, but he did not recall whether a report was filed with CACI leadership about the incident. Id. at 150:6-152:9.

upset Rich Arant was," id. at 155:20-21; however, she did not consider reporting the alleged violations to military personnel "[b]ecause at the time [she] read this e-mail, [she] did not interpret the e-mail to be telling [her] unequivocally that there were abuses ongoing at the prison that he witnessed." Id. at 152:19-153:4. Monahan could not remember taking any action on Arant's email other than speaking with Billings about it at CACI's office in Virginia, id. at 150:12-14, 155:1-17, and showing the email to another colleague who also considered it serious, id. at 169:3-20. Monahan did not take any action to find out whether Arant's concerns were well-founded, and she continued to hire personnel and send them to Iraq without informing herself as to whether there were any ongoing violations of the law occurring in the interrogation process. Id. 162:14-163:12. There is no evidence in the record that Billings investigated or took any action after his conversation with Monahan, and Monahan did not follow up with Billings to ask whether anything had been done because she "had moved on with trying to continue working this project." Id. at 170:11-20. In his email, Arant also alerted Monahan that she would probably hear more from Porvaznik, [Dkt. No. 1342-14] at 2; however, Monahan did not "recall a specific conversation with [Porvaznik] regarding this, but [she] may have" spoken with him. [Dkt. No. 1342-15] at 154:20-24, 170:8-10. There is no evidence in the record of any further response by CACI managers or employees to Arant's email.

Another CACI interrogator, Torin Nelson ("Nelson"), testified in his deposition that during the "third week of January" in 2004, the Joint Interrogation and Debriefing Center was "notified that [they] would need to go over to CID [the Army Criminal Investigation Division] . . . to go testify as to . . . if [they've] seen anything . . . untoward." [Dkt. No. 1342-16] at 54:11-17. Nelson reported to CID "questionable things" he had "seen about" CACI interrogators Duggan and Johnson and suggested that CID "take a look" at them. Id. at 55:2-56:11. Nelson testified

that the next day, he saw Duggan who "did not look too happy," "stared at [his] face and said, 'You better watch your back. You're dead to me. I'm through with you,'" and "turned around and walked away." Id. at 56:12-21. Nelson "suspected" that "some word had gotten to [Duggan] that [he] said something against him," and Nelson went to find Porvaznik to "see what was going on." Id. at 56:22-57:1. Nelson described Porvaznik as responding, "Well I think he thinks that you're ratting on him to CID." Id. at 57:2-7. Nelson learned that CACI personnel were "pretty pissed off at [him] for even saying anything about any CACI guys," id. at 57:20-23, and described how Porvaznik was being "very skeptical towards [his] role and everything" and "how [he] should be treated," and it "seemed like" Porvaznik "kind of wanted to be a little bit standoff-ish." Id. at 58:9-18. Nelson decided to quit and wrote an email to Monahan explaining that he "feared for [his] life," id. at 58:20-25, and "didn't really trust" the CACI or military chain of command, because it "seemed like . . . there was really something serious going on," describing that the "CID individual" with whom he had spoken "was telling me some really bad things that they were finding out . . . that I had no idea could have possibly been going on under the watch of responsible people," id. at 59:6-18.

A short time after sending that email, Nelson told Scott Northrup, then the in-country program manager who was visiting Abu Ghraib, that he was quitting and "unloaded on him, telling him the whole story about what was going on, and how [he] was . . . afraid for [his] life, and the fact that [he] didn't trust the local command." Id. at 60:12-17, 61:12-22. Nelson left Abu Ghraib that day and eventually left Iraq in February. Id. at 61:23-62:3, 62:18-21. When Nelson returned to the United States, "no CACI personnel contacted [him]" and he did not hear anything for months, until photos of detainee abuse at Abu Ghraib were publicly leaked and he

was asked by the government to testify in Major General George Fay's investigation into abuse at Abu Ghraib. Id. at 62:6-64:5.

Plaintiffs produced a CACI status report discussing Nelson that was dated February 18, 2004 and sent to United States-based management, including Billings and Mudd, stating: "[t]here is a portion of this 'challenge' that I need to address with Chuck [Mudd] 'face to face', this is due to the sensitivity of a certain 'on-going' investigation that was instigated/fueled by an employee, who in mine and Scott's [Northrup] opinion, needs to be quietly let-go . . . . Scott will address this with Mark [Billings] as well." [Dkt. No. 1342-17] at 2. Northrup testified that this report was written by Howard and had to do with the "Torin Nelson, DJ and Tim Dugan [sic] thing," and the "employee who . . . needs to be quietly let-go" was Nelson. [Dkt. No. 1342-13] at 186:2-24. Northrup testified that he believed "the situation just needed to be addressed," and "the quietly let go part" was Howard's "concept." Id. at 186:24-187:2. An update was later added to the report that stated, "Based on the current information by Tom Howard today, C2X would like to see this person gone ASAP!" [Dkt. No. 1342-17] at 2. Northrup testified that "C2X" referred to the "colonel for whom Tom Howard worked." [Dkt. No. 1342-13] at 189:7-11. Another update to the report indicated that "[t]he individual was delivered to the airport this evening and has manifested out." [Dkt. No. 1342-17] at 2.

Plaintiffs also point to testimony that CACI personnel who were based in the United States were communicating with personnel in Iraq early on in the government's investigation into detainee abuse in Iraq and were aware of the potential for litigation. See [Dkt. No. 1350-2] at 10; [Dkt. No. 1342-21] at 55:12-18. Plaintiffs' evidence includes communication between the United States military, CACI's in-country manager in Iraq, and CACI's United States-based leadership about how to respond to a photograph depicting CACI interrogator Johnson with a

30

detainee in a stress position.  On May 13, 2004, Major Eugene Daniels emailed Northrup requesting Johnson's "immediate termination" from the contract because Johnson was "pictured in a possible abusive situation" involving a "detainee in a dangerous stress position."  [Dkt. No. 1342-22] at 2.  On May 21, 2004, CACI's Executive Vice President and General Counsel Jeff Elefante replied to the email, which had been "passed on" to him, requesting more information. Id.  On June 3, 2004, Northrop and CACI Senior Vice President Harry Thornsvard responded to Major Daniels opposing taking any action against Johnson.  [Dkt. No. 1090-2] at 261-66. Plaintiffs' evidence also shows that even after the government's investigation into detainee abuse had begun, Billings and Mudd approved Stefanowicz's promotion to site lead at Abu Ghraib, [Dkt. No. 1342-13] at 78:9-21, and on April 12, 2004, Monahan sent an email to Stefanowicz confirming his promotion.  [Dkt. No. 1342-7].

All of the aforementioned conduct is directly relevant to plaintiffs' claims that CACI conspired with United States military personnel, and aided and abetted, the abuse of detainees during interrogations at Abu Ghraib.  Evidence that "CACI's senior management were aware of the ongoing abuse . . . and CACI's decisions not to report this abuse and, in fact, to continue employing and even promoting the individuals involved" supports their conspiracy and aiding and abetting claims.  Al Shimari, 324 F. Supp. 3d at 694-95; see id. at 697 ("[U]pper-level management at CACI substantially aided these continued abuses by refusing to inform the military of reports that CACI and military personnel were abusing detainees and by continuing to employ—and even promote—interrogators engaging in the abuses.").  Plaintiffs' evidence far exceeds the domestic conduct at issue in Kiobel, which involved only "corporate presence" in the United States, 569 U.S. at 124-25, Jesner, which involved a domestic branch of a foreign bank clearing dollar-denominated transactions occurring in the United States and allegedly being

31

used to launder money for "a Texas-based charity" allegedly affiliated with Hamas, 138 S. Ct. at

1395, and Nestlé, which involved generic corporate decision-making and attenuated connections

to slave-based supply chains, 141 S. Ct. at 1937.  Although CACI disputes the extent to which

the evidence in the record is sufficient to establish its liability, that is not the issue raised in its

motions, which are limited to whether there is enough evidence in this record to establish subject

matter jurisdiction.  Whether plaintiffs will ultimately prevail on the merits of their claims is a

question for the jury.  Accordingly, for all the foregoing reasons, CACI's first Motion to Dismiss

for Lack of Subject Matter Jurisdiction will be denied.

### C. Implied Causes of Action Under the ATS

CACI's second motion argues that this Court lacks jurisdiction over plaintiffs' ATS

claims because the Supreme Court's decisions in Egbert, Torres, and Biden v. Texas demonstrate

that "whatever theoretical jurisdiction federal courts may have to recognize private causes of

action under [the] ATS, that jurisdiction does not extend to creating private causes of actions for

injuries allegedly incurred at a war-zone facility under U.S. military control during the United

States' prosecution of a war."  [Dkt. No. 1368] at 7.  CACI's argument rests on separation-of-

powers concerns with "judicial creation of private damages actions," and CACI asserts that the

"connection" between plaintiffs' claims and "the United States' exercise of its war powers will

render otherwise-permissible judge-made claims wholly inappropriate."  Id. at 22.  CACI has

previously raised similar arguments, which have been rejected, and its renewed separation-of-

powers arguments provide no basis for this Court to change its earlier rejection of these

arguments.

### 1. The Existing Law of the Case

Although the ATS is "a jurisdictional statute" that "creat[es] no new causes of action,"

"the First Congress understood that the district courts would recognize private causes of action

for certain torts in violation of the law of nations." Sosa, 542 U.S. at 725. Accordingly, in Sosa, the Supreme Court refused to "close the door to further independent judicial recognition of actionable international norms" and left the door "ajar subject to vigilant doorkeeping," id. at 729, permitting federal courts to recognize a private cause of action for violations "of a norm that is specific, universal, and obligatory," subject to considering "the practical consequences of making that cause available to litigants in the federal courts." Id. at 732-33. Sosa remains binding precedent in determining whether a cause of action is cognizable under the ATS and has not been overruled by the Supreme Court.[17] See Nestlé, 141 S. Ct. at 1935; Jesner, 138 S. Ct. at 1399. Based on Sosa, this Court has held that torture, CIDT, and war crimes constitute violations of the law of nations for which a private right of action exists under the ATS. See Al Shimari, 263 F. Supp. 3d 595.

---

[17] CACI points out that in Nestlé, three Justices (Thomas, Gorsuch, and Kavanaugh, JJ.) took the position that federal courts do not have discretion to recognize new causes of action beyond the "three historical torts" (i.e., violation of safe conducts, infringement of the rights of ambassadors, and piracy) because doing so "invariably gives rise to foreign-policy concerns" that provide a "sound reason to defer to Congress" in lieu of judicial recognition of a cause of action. Nestlé, 141 S. Ct. at 1939-40 (plurality op.); see id. at 1942-43 (Gorsuch, J., concurring). Nevertheless, three other Justices (Sotomayor, Breyer, and Kagan, JJ.) opposed the plurality's view and affirmed "the Court's obligation to follow" the "legislative directive" of the First Congress in recognizing causes of action for "violations of specific, universal, and obligatory norms of international law" to "provide noncitizens [with] a federal forum to seek redress for law-of-nations violations." Id. at 1950 (Sotomayor, J., concurring in part and concurring in the judgment). Justice Alito, who dissented in Nestlé on the grounds that the Court should have resolved the question of corporate immunity on which certiorari was granted, did not explicitly adopt a position, but he observed that the plurality "ma[de] strong arguments that federal courts should never recognize new claims under the ATS." Id. at 1950-51 (Alito, J., dissenting). The Chief Justice and Justice Barrett did not express a view on this issue. Because Nestlé did not cabin Sosa to the three historical paradigms and the Supreme Court appears divided on this issue, Sosa may be applied by this Court. See TFWS, 572 F.3d at 192 (observing that the Supreme Court "does not normally overturn, or [] dramatically limit, earlier authority sub silentio" (quoting Shalala v. Ill. Council on Long Term Care, Inc., 529 U.S. 1, 18 (2000))).

After the Supreme Court decided Jesner, CACI advanced the argument that Jesner "makes clear" that courts must undertake "an independent inquiry akin to a Bivens 'special-factor analysis'" before allowing an ATS claim to proceed, that is, make a finding that allowing plaintiffs' claims to proceed would not infringe on the separation of powers and would "further the principal objective of the ATS" in "prevent[ing] foreign entanglements and international friction." [Dkt. No. 812] at 3-4. Although this Court has expressed doubt as to whether CACI correctly framed the appropriate ATS inquiry after Jesner, it determined that "it is the law of the case[] that adjudication of plaintiffs' claims does not impermissibly infringe on the political branches," Al Shimari, 320 F. Supp. 3d at 786 (discussing Al Shimari III, Al Shimari IV, and Al Shimari, 324 F. Supp. 3d 668), and concluded that adjudication of plaintiffs' claims was consistent with the ATS's purpose of providing a "federal forum for tort suits by aliens against Americans for international law violations," Al Shimari, 320 F. Supp. 3d at 787. The Court further observed that because CACI is not a foreign corporation, there was "no risk that holding CACI liable would offend any foreign government," and there was also no indication of "significant foreign-relations problems implicated by allowing plaintiffs' claims to proceed" because "neither the United States government nor any foreign government has expressed any objection to this litigation or appeared as an amicus." Id. at 787-88.

Moreover, both this Court and the Fourth Circuit have concluded that neither the military context nor the connection to the prosecution of war present a unique separation-of-powers bar to plaintiffs' claims. CACI previously argued that the "Constitution's allocation of war powers precludes ATS claims arising out of the United States' conduct of war" because the "Constitution expressly commits this Nation's foreign policy and war powers to the federal government" and does not "allow international law . . . to govern the prosecution of war by the

34

United States" or "contemplate a judicial role in this area." [Dkt. No. 627] at 36.  CACI based

this argument on Ziglar v. Abbasi, 582 U.S. 120 (2017), which declined to recognize a Bivens

action brought by non-U.S. citizens who were detained in the aftermath of the September 11

attacks and sought to challenge the federal government's detention policies and their conditions

of confinement.  This Court found that CACI's argument:

> fundamentally misunderstands the nature of an ATS claim. Although norms of
> international law are incorporated by the ATS—and, of course, the judiciary must
> often interpret and apply the ATS—the ATS is itself a federal statute. As such, the
> ATS embodies Congress's considered determination that there should be a cause of
> action in federal district court for violations of the law of nations. Accordingly,
> CACI's argument that the Constitution allocates war powers to Congress and the
> President only serves to illustrate why plaintiffs' claims are not preempted: because
> applying the ATS in this context represents the constitutional exercise of Congress's
> inherent powers to regulate the conduct of war. The incorporation of international law
> into the ATS and the judicial role in interpreting and applying the statute do not change
> the fundamental nature of the statute as an exercise of congressional power.
>
> . . . In this case, the Court has already determined that the international norms
> prohibiting torture, CIDT, and war crimes were sufficiently specific, universal, and
> obligatory at the time of the alleged abuse to allow plaintiffs to maintain their ATS
> claims.
>
> Therefore, although the Constitution provides the legislative and executive branches
> with primary authority in the conduct of war, nothing in the Constitution can be read
> to "preempt" the application of the ATS to plaintiffs' claims. Indeed, the ATS
> represents Congress's determination, in accordance with its war powers, that victims
> of violations of international law should have a remedy in federal district courts.

Al Shimari, 324 F. Supp. 3d at 698-99.

In Al Shimari IV, the Fourth Circuit also rejected CACI's argument that the political

question doctrine, which is rooted in separation-of-powers principles, barred plaintiffs' claims,

finding that "[a]lthough most military decisions are committed exclusively to the executive

branch, a claim is not shielded from judicial review merely because it arose from action taken

under orders of the military." 840 F.3d at 154.  The Fourth Circuit held that "when a military

contractor acts contrary to settled international law or applicable criminal law, the separation of

powers rationale underlying the political question doctrine does not shield the contractor's actions from judicial review," regardless of "whether they occurred under actual control of the military." Id. at 158-59. On remand, this Court applied Al Shimari IV's political question framework to plaintiffs' claims and concluded that the political question doctrine was inapplicable because the Complaint adequately alleged that CACI personnel engaged in conduct that was unlawful when it was committed. See Al Shimari, 324 F. Supp. 3d at 693.

## 2.   Egbert, Torres, and Biden v. Texas

Egbert, Torres, and Biden v. Texas, which CACI concedes must be "appl[ied] beyond their specific contexts," [Dkt. No. 1368] at 2, do not constitute a "material change in controlling authority" that requires the Court to revisit these aforementioned decisions. TFWS, 572 F.3d at 191. First, CACI argues that Egbert "reinforces the validity of the gatekeeping test applied in Ziglar and Jesner" and requires a court to decline to recognize a cause of action if there are reasons to defer to Congress. [Dkt. No. 1368] at 15. Egbert involved a Bivens action in which the plaintiff sought damages for a border patrol agent's alleged violation of his First and Fourth Amendment rights. The Supreme Court declined to extend Bivens to this "new context" because "Congress is better positioned to create remedies in the border-security context" and "the Government already has provided alternative remedies" that protect the plaintiff. 142 S. Ct. at 1804.

This Court previously considered CACI's "gatekeeping" argument that Jesner requires an inquiry "akin to a Bivens 'special-factor analysis'" before allowing an ATS claim to proceed, [Dkt. No. 812] at 3-4, finding that "it is the law of the case[] that adjudication of plaintiffs' claims does not impermissibly infringe on the political branches" and that allowing plaintiffs' claims to proceed is consistent with the purpose of the ATS. See Al Shimari, 320 F. Supp. 3d at 786. That is still the law of the case, and nothing in Egbert changes that result. Moreover,

36

CACI's argument ignores a critical difference between <u>Bivens</u> actions and actions under the ATS—although both involve judicially-implied causes of action, <u>Bivens</u> actions arise in the absence of a statutory mandate, whereas the ATS is a federal statute and "embodies Congress's considered determination that there should be a cause of action in federal district court for violations of the law of nations." <u>Al Shimari</u>, 324 F. Supp. 3d at 698; <u>see</u> <u>Nestlé</u>, 141 S. Ct. at 1947 (Sotomayor, J., concurring in part and concurring in the judgment) (explaining that "the ATS . . . is not a statute that 'makes no reference to [a] remedy'"; rather, "'a federal court's authority to recognize a damages remedy' under the ATS very much 'rest[s] at bottom on a statute enacted by Congress,' and "[r]espect for the separation of powers is hardly served by refusing a legislatively assigned task" (quoting <u>Hernandez v. Mesa</u>, 140 S. Ct. 735, 742 (2020))). As the Supreme Court observed in <u>Sosa</u>, "[t]he First Congress did not pass the ATS as a jurisdictional convenience to be placed on the shelf for use by a future Congress or state legislature that might, someday, authorize the creation of causes of action. . . . [T]he First Congress understood that the district courts would recognize private causes of action for certain torts in violation of the law of nations," 542 U.S. at 719, 724, subject to "vigilant doorkeeping," id. at 729.

Indeed, CACI also discounts <u>Jesner</u>'s recognition that "<u>Sosa</u> is consistent with this Court's general reluctance to extend judicially created private rights of action," 138 S. Ct. at 1402, and accordingly, "the test announced in <u>Sosa</u>" governs the exercise of federal courts' discretion in "recognizing a common-law action under the ATS," id. at 1399. [18]  Where, as here,

_____

[18] CACI points out that <u>Egbert</u> quotes the <u>Nestlé</u> plurality in stating that "'even a single sound reason to defer to Congress' is enough to require a court to refrain from creating" a damages remedy, <u>Egbert</u>, 142 S. Ct. at 1803 (quoting <u>Nestlé</u>, 141 S. Ct. at 1937 (plurality op.)), arguing that <u>Egbert</u> "elevates" the <u>Nestlé</u> plurality's observation "to a holding of the Court." [Dkt. No. 1368] at 16.  CACI makes too much of this single quote.  As discussed, there are significant

ATS claims satisfy the requirements set forth in Sosa—that the norm at issue is specific, universal, and obligatory, and practical consequences do not militate against allowing the claims to proceed—there is no basis for declining to recognize plaintiffs' causes of action. [19]

CACI next argues that Egbert, Torres, and Biden v. Texas "make clear that the decision whether to create a private damages remedy for injuries arising out of U.S. military operations in a war rests with Congress, not with the federal courts," and therefore "a connection between the plaintiff's proposed claim and the United States' exercise of its war powers will render otherwise-permissible judge-made claims wholly inappropriate. [Dkt. No. 1368] at 16 (emphasis in original). CACI's argument is essentially a revival of its earlier argument that the Constitution's allocation of war powers and the national defense to the legislative and executive branches "precludes ATS claims arising out of the United States' conduct of war." [Dkt. No. 627] at 36. For the reasons explained in its prior Memorandum Opinion, the Court has rejected this argument because the ATS is itself "an exercise of congressional power" and reflects "Congress's determination, in accordance with its war powers, that victims of violations of international law should have a remedy in federal district courts." Al Shimari, 324 F. Supp. 3d at 698. Contrary to CACI's argument that "Congress has not invited judicial involvement in

---

differences between the ATS and Bivens actions, and the view that "courts must refrain from creating a cause of action whenever there is even a single sound reason to defer to Congress," Nestlé, 141 S. Ct. at 1937 (plurality op.) was not adopted by a majority of the Court in Nestlé and is therefore not controlling law with respect to the ATS. It cannot become so just by virtue of being adopted by the Supreme Court in a subsequent case that was not about the ATS.

[19] CACI also argues that "creation of a judge-made damages remedy" is "inappropriate when Congress has provided, or authorized the Executive to provide, an alternative remedial structure. [Dkt. No. 1368] at 20. CACI asserts that a "myriad" of alternative remedies exist to "address claims of detainee abuse in Iraq" that preclude recognition of plaintiffs' claims, such as the Foreign Claims Act, the Anti-Torture Act, and the Torture Victim Protection Act. Id. CACI essentially repeats preemption arguments that have been rejected by the Court and will not be addressed again. See Al Shimari, 324 F. Supp. 3d at 699-702.

wartime matters through judge-made damages actions under [the] ATS," [Dkt. No. 1368] at 17,

the statute embodies Congress's exercise of its foreign relations powers "to promote harmony in

international relations," Jesner, 138 S. Ct. at 1406, "avoid foreign entanglements" id. at 1397,

and provide a remedy for incidents that "if not adequately redressed could rise to an issue of

war," Kiobel, 569 U.S. at 123 (quoting Sosa, 542 U.S. at 715), which is intimately related to, and

indeed part of, Congress's exercise of its war powers.

 Moreover, this civil action involves the adjudication of plaintiffs' claims that CACI

conspired with and aided and abetted United States military personnel in committing torture,

CIDT, and war crimes against plaintiffs, which does not interfere with the United States'

"prosecution of war." CACI focuses on plaintiffs' claims being based on injuries that they

sustained while in the custody of the United States military following the invasion of Iraq;

however, the Fourth Circuit observed in Al Shimari III that "ATS jurisdiction is not precluded by

the fact that the alleged conduct occurred while the plaintiffs in this case were detained in the

custody of the United States military," 758 F.3d at 530 n.7, pointing out that in Rasul v. Bush,

the Supreme Court briefly considered the jurisdiction of federal courts to consider ATS claims

filed by detainees held at the United States Naval Base at Guantanamo Bay, Cuba, and stated that

"nothing . . . categorically excludes aliens detained in military custody outside the United States

from [asserting an ATS claim] in U.S. courts," 542 U.S. 466, 484 (2004). In addition, the Fourth

Circuit has found that "the political branches already have indicated that the United States will

not tolerate acts of torture, whether committed by United States citizens or by foreign nationals."

Al Shimari III, 758 F.3d at 530. As the Fourth Circuit explained in Al Shimari IV, adjudicating

whether a "military contractor act[ed] contrary to settled international law," such as by

committing torture, "requires a court only to engage in the traditional judicial function of

'say[ing] what the law is,' and of determining how that law applies to the facts of a particular case, rather than passing judgment on a discretionary policy choice." Al Shimari IV, 840 F.3d at 158-59.

Egbert, Torres and Biden v. Texas do not call for a different conclusion. For the reasons previously explained, Egbert's analysis of Bivens actions is not material to this ATS action. Torres and Biden v. Texas have even less bearing on plaintiffs' claims and in no way reflect a change in controlling authority. In Torres, the Supreme Court held that state sovereign immunity did not bar a private lawsuit brought against state defendants under the Uniformed Services Employment and Reemployment Rights Act because "as part of the plan of the [Constitutional] Convention, the States waived their immunity under Congress' Article I power '[t]o raise and support Armies' and 'provide and maintain a Navy.'" 142 S. Ct. at 2466. CACI argues that Torres's "statements" about "Congress and the Executive's exclusive control over national defense matters" bears on this Court's decision to allow plaintiffs' ATS claims to proceed, [Dkt. No. 1368] at 9; however, what CACI misses it that Torres concerned the relationship between the federal government and the states, but federalism concerns are not at issue here. As plaintiffs correctly point out, "[u]nlike concerns regarding federal supremacy over the states, here Congress has specifically authorized the federal judiciary to enforce the ATS[.]" [Dkt. No. 1374] at 11.

As for Biden v. Texas, which challenged the federal government's rescission of the "Remain in Mexico" immigration protocols under the Administrative Procedure Act, CACI argues the case is relevant to plaintiffs' ATS action because it quotes Kiobel in stating that "the Court has taken care to avoid 'the danger of unwarranted judicial interference in the conduct of foreign policy,' and declined to 'run interference in [the] delicate field of international relations'

40

without 'the affirmative intention of the Congress clearly expressed.'" 142 S. Ct. at 2543

(quoting Kiobel, 569 U.S. at 115-16). CACI ignores that the quoted language from Kiobel was

about the rationale for the presumption against extraterritoriality, which the Court has evaluated

and found does not bar plaintiffs' claims. CACI asserts that Biden v. Texas "reinforces that

courts must not wade into matters bearing on foreign affairs unless the statute expressly permits

that," [Dkt. No. 1368] at 18, but as explained, that argument is not a basis to deny jurisdiction

over plaintiffs' claims in this case.

In sum, neither Egbert, Torres, nor Biden v. Texas provide a basis for revisiting this

Court's and the Fourth Circuit's prior decisions finding that plaintiffs' ATS claims can go

forward without violating separation-of-powers principles. Accordingly, CACI's second Motion

to Dismiss for Lack of Subject Matter Jurisdiction will be denied.

III. CONCLUSION

For the reasons stated above, CACI's first Motion to Dismiss for Lack of Subject Matter

Jurisdiction [Dkt. No. 1331] and second Motion to Dismiss for Lack of Subject Matter

Jurisdiction [Dkt. No. 1367] will be denied by an Order to be issued with this Memorandum

Opinion.

Entered this _31_ day of July, 2023.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge