```
 1                 UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF VIRGINIA
 2                     ALEXANDRIA DIVISION

 3   --------------------------x
     SUHAIL NAJIM ABDULLAH AL   :    Civil Action No.:
 4   SHIMARI, et al.,           :    1:08-cv-827
                 Plaintiffs,    :
 5        versus                :    Monday, April 15, 2024
                                :    Alexandria, Virginia
 6   CACI PREMIER TECHNOLOGY,   :    Volume I - A.M. session
     INC,                       :    Pages 1-146
 7               Defendant.     :
     --------------------------x
 8

 9        The above-entitled jury trial was heard before the
     Honorable Leonie M. Brinkema, United States District Judge.
10   This proceeding commenced at 10:09 a.m.

11              A P P E A R A N C E S:

12   FOR THE PLAINTIFFS:   BAHER AZMY, ESQUIRE
                           THE CENTER FOR CONSTITUTIONAL RIGHTS
13                         666 Broadway
                           7th Floor
14                         New York, New York  10012
                           (212) 614-6464
15
                           MUHAMMAD FARIDI, ESQUIRE
16                         MICHAEL BUCHANAN, ESQUIRE
                           BONITA ROBINSON, ESQUIRE
17                         ANDREW HADDAD, ESQUIRE
                           MICHAEL FISHER, ESQUIRE
18                         THOMAS KICAK, ESQUIRE
                           SCOTT KIM, ESQUIRE
19                         ALEXANDRA MAHLER-HAUG, ESQUIRE
                           PATTERSON BELKNAP WEBB & TYLER LLP
20                         1133 Avenue of the Americas
                           New York, New York  10036
21                         (212) 336-2000

22                         CARY CITRONBERG, ESQUIRE
                           JOHNSON/CITRONBERG, PLLC
23                         421 King Street
                           Suite 505
24                         Alexandria, Virginia  22314
                           (703) 684-8000
25
                                                            1
```

```
1                      A P P E A R A N C E S:

2    FOR THE DEFENDANT:    JOHN O'CONNOR, JR., ESQUIRE
                           LINDA BAILEY, ESQUIRE
3                          JOSEPH MCCLURE, ESQUIRE
                           STEPTOE & JOHNSON LLP
4                          1330 Connecticut Avenue, NW
                           7th Floor
5                          Washington, D.C.  20036
                           (202) 429-3000
6
                           NINA GINSBERG, ESQUIRE
7                          DIMUROGINSBERG PC
                           1101 King Street
8                          Suite 610
                           Alexandria, Virginia  22314
9                          (703) 684-4333

10   FOR THE UNITED        REBECCA LEVENSON, ESQUIRE
     STATES:               OFFICE OF THE UNITED STATES ATTORNEY
11                         2100 Jamieson Avenue
                           Alexandria, Virginia  22314
12                         (703) 299-3700

13                         STEPHEN ELLIOTT, ESQUIRE
                           JASON LYNCH, ESQUIRE
14                         UNITED STATES DEPARTMENT OF JUSTICE
                           CIVIL DIVISION FEDERAL PROGRAMS BRANCH
15                         1100 L Street, NW
                           Washington, D.C.  20044
16                         (202) 598-0905

17   COURT REPORTER:       STEPHANIE M. AUSTIN, RPR, CRR
                           Official Court Reporter
18                         United States District Court
                           401 Courthouse Square
19                         Alexandria, Virginia  22314
                           (571) 298-1649
20                         S.AustinReporting@gmail.com

21       COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

22

23

24

25
                                                              2
```

```
 1                     P R O C E E D I N G S
 2              THE DEPUTY CLERK:  Civil Action Number
 3    1:08-cv-827, Suhail Najim Abdullah Al Shimari, Salah Hasan
 4    Nusaif Jasim Al-Ejaili, Asa'ad Hamza Hanfoosh Al-Zuba'e
 5    versus CACI Premier Technology, Inc.  This case comes on for
 6    trial by jury.
 7              Will counsel please note their appearance for the
 8    record, beginning with the plaintiff.
 9              MR. FARIDI:  Good morning, Your Honor.
10    Muhammad Faridi from Patterson Belknap on behalf of the
11    plaintiffs.  I'm joined by my colleagues here,
12    Bonita Robinson Michael Buchanan.
13              MR. BUCHANAN:  Good morning, Your Honor.
14              MR. FARIDI:  I'm also joined by Mr. Al-Ejaili,
15    Mr. Azmy from The Center for Constitutional Rights, and we
16    have our paralegals here as well, Mr. Sean O'Shea and Kaihan
17    Rahimi.
18              THE COURT:  Good morning.
19              MR. O'CONNOR:  Good morning, Your Honor.
20    John O'Connor for CACI.  I'm joined by my co-counsel,
21    Linda Bailey, Nina Ginsberg, Joseph McClure, CACI corporate
22    rep, Jody Brown, and our technical assistant.
23              THE COURT:  Good morning.
24              MR. O'CONNOR:  Good morning.
25              THE COURT:  And good morning, ladies and
```

3

```
 1    gentlemen.  I know the courtroom is packed.  We have some
 2    members of the media and the public here.  This is as much
 3    as we can get into the courtroom.  As soon as we make some
 4    space, we'll be able to have more folks come in.  But I'm
 5    sorry that we are as crowded as we are.  We'll move things
 6    as quickly as we can.
 7           Now, ladies and gentlemen, those of you who are
 8    here as potential jurors, I want to explain to you that
 9    you're going to be asked, in a very few minutes, first of
10    all to identify yourselves, and then to answer a series of
11    questions.  We call that voir dire.  That's a fancy Latin
12    term, but it basically means the time when the Court is
13    going to be asking you all some questions.
14           And the reason we do that is we're trying to
15    determine which of the eight of you -- because we're going
16    to sit a jury of eight people since this is a civil case,
17    and we're going to try to determine which of the eight of
18    you would be best suited to serve as judges in this case.
19    Because a juror is actually a judge.  The job of a juror is
20    to judge the facts of the case and then to render a decision
21    based upon the facts that the jury has found.
22           Now, you know -- I wish I actually had eight black
23    robes I could give you all to wear so that you would be
24    reminded, as you sit over here over in the jury box, of the
25    very special role that you will be playing in this trial,
```
                                                                4

1   and also the incredibly important role that a juror plays in

2   our civil justice system.

3           Now, you know yourself, what do you expect of a

4   good judge?  You, first of all, want a person who has

5   absolutely no pre ideas, no predispositions, who knows

6   nothing about the case, has no stake in the outcome of the

7   case, who's coming in with a completely open mind.  You want

8   a judge to be somebody who can listen to the evidence

9   carefully.  That means he or she will have a decent

10  understanding of the English language, be able to read any

11  of the documents that might come in as evidence.  You want

12  the judge to have enough time and patience to be able to

13  really listen carefully to the evidence and to think about

14  it carefully and not to rush to judgment, you sometimes hear

15  that term.

16          So we're going to ask you all a series of

17  questions with that goal in mind, and I ask that you listen

18  very, very carefully to each question and think not only as

19  it applies to you individually, but also to any of your

20  immediate family members or very close personal friends.

21          If you think you have an answer to any of my

22  questions, the procedure is to raise your hand, and I'm

23  going to have to just point to you.  I normally start on my

24  left side and then move over into the center and then over

25  to the right.  When I do acknowledge you, please stand,

                                                        5

```
 1    restate your name, and then we will have a little back and
 2    forth about the question and your answer.
 3            Now, at any point if I need to have -- if you need
 4    to raise an issue that is very personal and private and you
 5    don't want everybody in the courtroom to hear it, ask to
 6    approach the bench, in which case you will come around this
 7    way, and only one attorney for each side, plus my court
 8    staff, will be able to hear what you have to say.
 9            Now, any time that we're having a bench
10    conference, I will put on that funny white noise machine.
11    And during the course of the trial, we may also have that
12    machine on if I have to address an issue that only I and the
13    attorneys should be discussing and the jury should not be
14    hearing.
15            I don't mind if you stand up and stretch, because
16    I know you're packed into the courtroom, when we have a
17    bench conference, but please do not start talking, because
18    we will get that noise plus the noise up here, and then it
19    becomes very difficult for us to hear.
20            So the first order of business we're going to do
21    right now is we're going to call attendance.  If you
22    would -- when you hear your name called, please stand and
23    either say "here" or "present," and then you may sit down.
24            THE DEPUTY CLERK:  Juror Number 1, John Amenyah.
25            THE PROSPECTIVE JUROR:  Present.
```

6

```
 1                THE DEPUTY CLERK:  Juror Number 2, Venugopal
 2   Annapaneni.
 3                THE PROSPECTIVE JUROR:  Present.
 4                THE DEPUTY CLERK:  Juror Number 3, Alyssa
 5   Ashworth.
 6                THE PROSPECTIVE JUROR:  Present.
 7                THE DEPUTY CLERK:  Juror Number 4, Yohannes
 8   Assefa.
 9                THE PROSPECTIVE JUROR:  Present.
10                THE DEPUTY CLERK:  Juror Number 5, Susan Barbini.
11                THE PROSPECTIVE JUROR:  Present.
12                THE DEPUTY CLERK:  Juror Number 6, Frederick
13   Beltran.
14                THE PROSPECTIVE JUROR:  Present.
15                THE DEPUTY CLERK:  Juror Number 7, Anthony
16   Berardo.
17                THE PROSPECTIVE JUROR:  Present.
18                THE DEPUTY CLERK:  Juror Number 8, David
19   Blanchard.
20                THE PROSPECTIVE JUROR:  Present.
21                THE DEPUTY CLERK:  Juror Number 10, Patrick
22   Branigan.
23                THE PROSPECTIVE JUROR:  Here.
24                THE DEPUTY CLERK:  Juror Number 11, Linh Bui.
25                THE PROSPECTIVE JUROR:  Present.
```

7

```
 1                THE DEPUTY CLERK:  Juror Number 12, Howard Byrd,
 2   Jr.
 3                THE PROSPECTIVE JUROR:  Present.
 4                THE DEPUTY CLERK:  Juror Number 13, Lynn Casey.
 5                THE PROSPECTIVE JUROR:  Present.
 6                THE DEPUTY CLERK:  Juror Number 14, Stephen Clark.
 7                THE PROSPECTIVE JUROR:  Present.
 8                THE DEPUTY CLERK:  Juror Number 15, Amy Collins.
 9                Juror Number 16, Robert Conrad.
10                THE PROSPECTIVE JUROR:  Present.
11                THE DEPUTY CLERK:  Juror Number 17, Harold Cooper.
12                THE PROSPECTIVE JUROR:  Present.
13                THE DEPUTY CLERK:  Juror Number 18, Sheri
14   DeCasper.
15                THE PROSPECTIVE JUROR:  Here.
16                THE DEPUTY CLERK:  Juror Number 19, Thomas
17   Dementi.
18                THE PROSPECTIVE JUROR:  Here.
19                THE DEPUTY CLERK:  Juror Number 20, Miles
20   DeSamour.
21                THE PROSPECTIVE JUROR:  Here.
22                THE DEPUTY CLERK:  Juror Number 21, Michael
23   Di Vincenzo.
24                Juror Number 22, Timothy Dionisopoulos.
25                THE PROSPECTIVE JUROR:  Here.
```

```
 1              THE DEPUTY CLERK:  Juror Number 23, James Dize.

 2              THE PROSPECTIVE JUROR:  Here.

 3              THE DEPUTY CLERK:  Juror Number 24, Devin Draine.

 4              THE PROSPECTIVE JUROR:  Present.

 5              THE DEPUTY CLERK:  Juror Number 25, Alison

 6   Edelstein.

 7              THE PROSPECTIVE JUROR:  Present.

 8              THE DEPUTY CLERK:  Juror Number 26, Paula Edmunds.

 9              THE PROSPECTIVE JUROR:  Present.

10              THE DEPUTY CLERK:  Juror Number 27, Daniel Garcia.

11              Juror Number 28, Joanne Giles.

12              THE PROSPECTIVE JUROR:  Here.

13              THE DEPUTY CLERK:  Juror Number 29, Timothy

14   Goeglein.

15              THE PROSPECTIVE JUROR:  Here.

16              THE DEPUTY CLERK:  Juror Number 30, Jorge

17   Guardado.

18              THE PROSPECTIVE JUROR:  Present.

19              THE DEPUTY CLERK:  Juror Number 31, Nei-Lei Hai.

20              THE PROSPECTIVE JUROR:  Present.

21              THE DEPUTY CLERK:  Juror Number 32, Kristy Hakes.

22              THE PROSPECTIVE JUROR:  Present.

23              THE DEPUTY CLERK:  Juror Number 33, Brian Hanning.

24              THE PROSPECTIVE JUROR:  Present.

25              THE DEPUTY CLERK:  Juror Number 34, Craig
```

```
 1   Harmison.

 2             Juror Number 35, Quillan Heim.

 3             THE PROSPECTIVE JUROR:  Present.

 4             THE DEPUTY CLERK:  Juror Number 36, John Heishman.

 5             THE PROSPECTIVE JUROR:  Present.

 6             THE DEPUTY CLERK:  Juror Number 37, Heather Henry.

 7             THE PROSPECTIVE JUROR:  Present.

 8             THE DEPUTY CLERK:  Juror Number 38, Zoe Hunter.

 9             THE PROSPECTIVE JUROR:  Present.

10             THE DEPUTY CLERK:  Juror Number 39, Ramatu Kamara.

11             THE PROSPECTIVE JUROR:  Present.

12             THE DEPUTY CLERK:  Juror Number 41, Keagan Lanham.

13             THE PROSPECTIVE JUROR:  Present.

14             THE DEPUTY CLERK:  Juror Number 42, Tammy Lieu.

15             THE PROSPECTIVE JUROR:  Present.

16             THE DEPUTY CLERK:  Juror Number 43, Kendra

17   Lubarsky.

18             THE PROSPECTIVE JUROR:  Present.

19             THE DEPUTY CLERK:  Juror Number 44, Susan Manke.

20             THE PROSPECTIVE JUROR:  Present.

21             THE DEPUTY CLERK:  Juror Number 45, Jason

22   Martinez.

23             THE PROSPECTIVE JUROR:  Here.

24             THE DEPUTY CLERK:  Juror Number 46, Jody McDonald.

25             THE PROSPECTIVE JUROR:  Here.
```

                                                                10

```
1                  THE DEPUTY CLERK:  Juror Number 47, Haritha
2     Meduri.
3                  THE PROSPECTIVE JUROR:  Here.
4                  THE DEPUTY CLERK:  Juror Number 48, Alberto
5     Menendez Hassel.
6                  THE PROSPECTIVE JUROR:  Present.
7                  THE DEPUTY CLERK:  Juror Number 49, Max Milien,
8     Jr.
9                  Juror Number 50, Kathleen Moran.
10                 THE PROSPECTIVE JUROR:  Present.
11                 THE DEPUTY CLERK:  Juror Number 51, Salina
12    Natnael.
13                 THE PROSPECTIVE JUROR:  Present.
14                 THE DEPUTY CLERK:  Juror Number 52, Toan Nguyen.
15                 THE PROSPECTIVE JUROR:  Present.
16                 THE DEPUTY CLERK:  Juror Number 53, Vanthu Nguyen.
17                 THE PROSPECTIVE JUROR:  Present.
18                 THE DEPUTY CLERK:  Juror Number 54, Robert O'Hara.
19                 THE PROSPECTIVE JUROR:  Present.
20                 THE DEPUTY CLERK:  Juror Number 55, Miguel Perez,
21    Jr.
22                 THE PROSPECTIVE JUROR:  Present.
23                 THE DEPUTY CLERK:  Juror Number 56, Maria Pesino.
24                 THE PROSPECTIVE JUROR:  Here.
25                 THE DEPUTY CLERK:  Juror Number 57, Penelope
```

11

```
 1   Pietrowski.

 2             THE PROSPECTIVE JUROR:  Present.

 3             THE DEPUTY CLERK:  Juror Number 58, Michelle

 4   Popaden.

 5             THE PROSPECTIVE JUROR:  Here.

 6             THE DEPUTY CLERK:  Juror Number 59, Alex Purdy.

 7             THE PROSPECTIVE JUROR:  Here.

 8             THE DEPUTY CLERK:  Juror Number 60, Michael Romar.

 9             THE PROSPECTIVE JUROR:  Present.

10             THE DEPUTY CLERK:  Juror Number 61, Lynne Rose.

11             THE PROSPECTIVE JUROR:  Present.

12             THE DEPUTY CLERK:  Juror Number 62, Dean Ross.

13             Juror Number 63, Jodie Safer.

14             THE PROSPECTIVE JUROR:  Here.

15             THE DEPUTY CLERK:  Juror Number 64, Ramesh

16   Sankaranarayan.

17             THE PROSPECTIVE JUROR:  Present.

18             THE DEPUTY CLERK:  Juror Number 65, Edward Scerbo.

19             THE PROSPECTIVE JUROR:  Present.

20             THE DEPUTY CLERK:  Juror Number 66, Cynthia Sliwa.

21             Juror Number 67, Sydney Stallard.

22             THE PROSPECTIVE JUROR:  Here.

23             THE DEPUTY CLERK:  Juror Number 68, Melane Starr.

24             THE PROSPECTIVE JUROR:  Here.

25             THE DEPUTY CLERK:  Juror Number 69, Charles
```

```
 1   Steigerwald, Jr.

 2             THE PROSPECTIVE JUROR:  Here.

 3             THE DEPUTY CLERK:  Juror Number 70, Regina

 4   Thompson.

 5             THE PROSPECTIVE JUROR:  Present.

 6             THE DEPUTY CLERK:  Juror Number 71, Juan Venegas.

 7             THE PROSPECTIVE JUROR:  Present.

 8             THE DEPUTY CLERK:  Juror Number 72, Gordon Woods.

 9             THE PROSPECTIVE JUROR:  Present.

10             THE DEPUTY CLERK:  Juror Number 73, Ellen Young.

11             THE PROSPECTIVE JUROR:  Here.

12             THE DEPUTY CLERK:  Juror Number 74, Melika Zand.

13             THE PROSPECTIVE JUROR:  Present.

14             THE DEPUTY CLERK:  Juror Number 75, Michael Zurita

15   Albarracin.

16             THE PROSPECTIVE JUROR:  Present.

17             THE DEPUTY CLERK:  Are there any jurors present

18   whose name I have not called?  Thank you.

19             Members of the jury, will you please stand and

20   raise your right hands.

21                  (Prospective jurors sworn.)

22             THE DEPUTY CLERK:  Thank you.  You may be seated.

23             THE COURT:  All right.  Ladies and gentlemen, I'm

24   going to give you a very brief overview of what is involved

25   in this case, and then I'm going to be asking whether any of
```

                                                            13

you may have seen, heard, read or believe that you might

know anything about this case.  I will tell you in advance

that there has been a fair amount of media coverage.  There

was something in the Washington Post over the last two or

three days.  Those of you who read The Guardian, there was

an article in The Guardian.  When I was driving to the court

this morning, the local NPR station, WAMU, had an article

about the case.  It's very important that we know whether

any of you might know in advance something about this case.

This is a civil action that's brought by three

plaintiffs.  And in a civil case, the plaintiff is the party

who files the lawsuit, and the defendant is the party

against whom the lawsuit has been filed.  And we have three

Iraqi nationals, Mr. Suhail Al Shimari and Mr. Asa'ad

Al-Zuba'e.  And these two plaintiffs, I understand, will be

testifying from Iraq.  They are not able to come to the

courthouse.  The third plaintiff, Mr. Salah Al-Ejaili, who

is a former Al Jazeera reporter, is in the courtroom today,

and he will be able to testify in person.

They are the three plaintiffs, and they have filed

this lawsuit against the defendant, CACI Premier Technology,

Inc., which you will probably hear referred to more often as

CACI or C-A-C-I, which is a Northern Virginia government

contractor.  And at issue in this case are events that

occurred at the Abu Ghraib detention center which was

14

1   located in Iraq near Baghdad in the fall of 2003 into

2   January of 2004.

3        In 2003, a multinational coalition led by the

4   United States invaded Iraq, and those forces were attacked,

5   and to gather intelligence to assist the coalition, many

6   Iraqis who were believed to have information that could help

7   the coalition forces were detained at the Abu Ghraib

8   facility for questioning.  Because the United States

9   military did not have enough interrogators, it hired defense

10  contractor CACI to supply interrogators.

11       The plaintiffs allege that while they were held at

12  Abu Ghraib, they were subjected to conduct that constitutes

13  torture, cruel, inhuman and degrading treatment -- which you

14  may hear referred to as CID or CIDT -- and war crimes.  I

15  will give you more specific instructions as to what is

16  involved in these types of conduct later in the trial.

17       The plaintiffs do not claim that any CACI

18  interrogator directly abused them; instead, they allege that

19  CACI interrogators conspired with military police to subject

20  these plaintiffs to torture, CID and war crimes, and aided

21  and abetted the military police to either torture, commit

22  CID or war crimes against these plaintiffs.  Each plaintiff

23  seeks monetary damages from CACI for the abuse they claim

24  they experienced.

25       Now, CACI maintains that none of its interrogators

15

```
 1   either conspired with or aided and abetted the military
 2   police or anyone else to mistreat the plaintiffs, and that
 3   it was the United States Army that had operational control
 4   over interrogations at Abu Ghraib, and it will be the job of
 5   the jury to decide this case and the issues in this case.
 6            Now, having told you a little bit about what's
 7   involved in this case, do any of you believe you may know
 8   anything about the case either from some personal experience
 9   or from something that you have consumed in the media?  I'm
10   going to start on the left side.  So if you believe you know
11   anything about this case -- just on the left side first --
12   please raise your hand so I can see who you are.
13            Way in the back, your name, please.  If you would
14   stand up and tell us your name.
15            THE PROSPECTIVE JUROR:  Miguel Perez.
16            THE COURT:  I'm sorry?
17            THE PROSPECTIVE JUROR:  Miguel Perez.
18            THE COURT:  Can you spell the last name?
19            THE PROSPECTIVE JUROR:  P-E-R-E-Z.
20            THE COURT:  Mr. Perez, what do you know -- what
21   have you heard about this case?
22            THE PROSPECTIVE JUROR:  I'm former military, I was
23   in the United States Marines, and I still have many friends
24   throughout the past 25 years in the military, and I served
25   22 years as a federal agent with the Department of Homeland
```

16

```
1    Security, ICE.  So I would like to be excused because we

2    have seen many --

3              THE COURT:  All right.

4              THE PROSPECTIVE JUROR:  Not exactly this case, but

5    something similar on the side of cases that we had in

6    immigration.

7              THE COURT:  All right.  Thank you, Mr. Perez.

8              Is there anybody else on the left side?  So no one

9    else on the left side believes they have seen, heard or read

10   anything about this case; is that correct?

11             All right.  In the center.  I saw some hands in

12   the center.

13             Yes, sir.  Your name on the aisle.

14             THE PROSPECTIVE JUROR:  My name is Alberto

15   Menendez Hassel.

16             THE COURT:  Can you spell the last name, please.

17             THE PROSPECTIVE JUROR:  M-E-N-E-N-D-E-Z

18   H-A-S-S-E-L.

19             THE COURT:  I have you.  Yes, sir.  Number 48.

20             THE PROSPECTIVE JUROR:  I listened to the whole

21   story on NPR this morning on the way here.

22             THE COURT:  All right.  Is there anything about

23   what you heard that you feel has predisposed you to thinking

24   about this case, or have you formed any opinion about the

25   case?  If you're not sure, you need to tell me.  It's a very
```

17

```
 1   hard question to answer, actually.
 2              THE PROSPECTIVE JUROR:  I mean, they shared more
 3   details than what you shared just now, so I guess some of
 4   what went on --
 5              THE COURT:  All right.  Thank you, sir.
 6              Is there anybody else in the center section?  Yes.
 7   Your name, please.  If you would stand up.
 8              THE PROSPECTIVE JUROR:  My name is Robert Conrad.
 9              THE COURT:  Yes, Mr. Conrad.
10              THE PROSPECTIVE JUROR:  My wife actually is an
11   independent contractor and has done work for CACI, and I've
12   also heard about this case.
13              THE COURT:  All right.  And you've heard about the
14   case?
15              THE PROSPECTIVE JUROR:  (Gesturing affirmatively.)
16              THE COURT:  Is there anything about what you've
17   heard or about what your wife does that you feel could make
18   it difficult for you to be impartial in this case?
19              THE PROSPECTIVE JUROR:  I honestly am not sure.
20              THE COURT:  All right.  Thank you, sir.
21              Is there anybody else in the center section?  So
22   nobody else in the center section has heard or read or seen
23   anything about this case?
24              All right.  How about on the right side.  Whoever
25   is against the wall.  I'm sorry, sir.  Yeah.  Your name,
```

                                                              18

```
 1    please.
 2              THE PROSPECTIVE JUROR:  Yohannes Assefa.  I've
 3    heard the story on NPR this morning and I read The Guardian
 4    article as well.
 5              THE COURT:  Is there anything about what you've
 6    read or heard that you think could affect your ability to be
 7    impartial?
 8              THE PROSPECTIVE JUROR:  I'm an attorney, and I was
 9    more interested in the qualified immunity discussion that
10    was presented as the --
11              THE COURT:  All right.  Thank you, sir.
12              There's another hand up.  Yes, ma'am.
13              THE PROSPECTIVE JUROR:  Joanne Giles.
14              THE COURT:  Yes, Ms. Giles.
15              THE PROSPECTIVE JUROR:  I was a 38-year civil
16    servant with the Department of Homeland Security, and I was
17    also in charge of 32 Army Reserve officers, and I did
18    research on the case before I was -- reported today.
19              THE COURT:  All right.  Thank you, Ms. Giles.
20              Is there anybody else?  All right.  I'll have
21    counsel for the plaintiffs first stand and introduce
22    themselves.  Please state your names slowly and the firm --
23    or the group with which you are associated.  And, ladies and
24    gentlemen, what I want to know is whether any of you might
25    know in any personal or business capacity any of the
```

                                                              19

1    plaintiffs' counsel or the counsels' assistants in this case

2    or whether you've had any dealings with the plaintiffs' law

3    firm or the group that's also helping to represent the

4    plaintiffs.  All right.

5            MR. FARIDI:  Good morning.  My name is

6    Muhammad Faridi.  I'm joined by my colleagues,

7    Bonita Robinson, Michael Buchanan, and our co-counsel from

8    The Center for Constitutional Rights, Baher Azmy.  And we're

9    also joined by four other lawyers from Patterson Belknap who

10   are sitting in the front row, Scott Kim, Andrew Haddad,

11   Michael Fisher, and our local Virginia counsel, Cary

12   Citronberg.

13           THE COURT:  Now, the law firm here is -- name the

14   law firm and where you're located.

15           MR. FARIDI:  The law firm is Patterson Belknap

16   Webb & Tyler located in New York City.

17           THE COURT:  Mr. Citronberg, identify your firm,

18   please.

19           MR. CITRONBERG:  Johnson/Citronberg, and we are

20   located in Alexandria.

21           THE COURT:  All right.  Do any members of the

22   panel believe you might know in any business or personal

23   capacity any of the plaintiffs' counsel?

24           To your knowledge, have any of you ever had any

25   dealings with their law firms?  Ever been sued by or had

                                                        20

```
 1    suits against the Belknap law firm?

 2              How about The Center for Constitutional -- is it

 3    Constitutional Rights?

 4              MR. AZMY:  Yes, Your Honor.

 5              THE COURT:  Anybody ever had any dealings with

 6    that center?  All right.

 7              Counsel, we also need to have any of your tech

 8    people or anybody else who's working on the plaintiffs'

 9    behalf during the trial to identify themselves, please.

10              MR. FARIDI:  Yes, Your Honor.  Sean O'Shea, our

11    tech assistant; and Kaihan Rahimi, our tech assistant.

12              THE COURT:  And they're both with your firm or

13    private parties?

14              MR. FARIDI:  From the firm, Your Honor.

15              THE COURT:  All right.  And then please introduce

16    your client and also any interpreters who may be assisting

17    your client.

18              MR. FARIDI:  Our client is Salah Al-Ejaili.  If

19    you can stand up.  And the interpreters I believe were sent

20    to the witness room.  We're gathering them, Your Honor.

21              THE COURT:  All right.  We should just have them.

22    Well, what are the interpreters' names?

23              MR. HADDAD:  Rodina Mikhail and Ali Kadhim.

24              THE COURT:  All right.  Do those names sound

25    familiar at all to any of the jurors?  No.
```

21

1          All right.  Do any of the jurors believe you might

2    know the plaintiff who's here standing in court or any of

3    the tech people who are assisting counsel?  No?  All right.

4    Thank you, all.  You may have a seat.

5          All right.  Mr. O'Connor, we'll now have the

6    defense team introduce themselves.

7          MR. O'CONNOR:  Good morning, Your Honor.  My name

8    is John O'Connor.  I'm with the law firm of Steptoe LLP,

9    it's in Washington, D.C.  With me is my co-counsel,

10   Linda Bailey, who is also with Steptoe, Joseph McClure,

11   who's also with Steptoe.  Our co-counsel is Nina Ginsberg,

12   she is with the Alexandria, Virginia law firm of

13   DiMuroGinsberg.  And then Jody, could you stand up.  This is

14   Jody Brown.  She is a corporate communications

15   representative for CACI.  We're joined here by our technical

16   consultant, Alexander Rennick, who is with a company called

17   Digital Evidence Group, and our paralegal, whose name is

18   Riley John.  She is also with my firm, Steptoe LLP's,

19   Washington office.

20         THE COURT:  Ladies and gentlemen, do any of you

21   think you might know in any personal or business capacity

22   any of the defense counsel, whether you might know the

23   corporate representative from CACI, or any of the tech folks

24   who are assisting?  Is there anybody?  All right.  You all

25   may have a seat.

```
 1              Other than the one juror who has already indicated
 2    that he has a spouse who works for CACI, are there any other
 3    members of the panel who have ever -- who are currently
 4    working for CACI or with CACI that is a consultant or that
 5    sort of relationship, or have, in the past, ever worked for
 6    or with CACI?  Are there any people?  I would expect, given
 7    the number of government contractors in this area, there are
 8    going to be some.
 9              Over here on the left.  Your name, please.
10              THE PROSPECTIVE JUROR:  David Blanchard.
11              THE COURT:  Mr. Blanchard, are you currently or in
12    the past?
13              THE PROSPECTIVE JUROR:  I'm a managing director at
14    a competitor of theirs.  We've had corporate discussions in
15    the past.
16              THE COURT:  All right.  Is there anything about
17    the work that you have done with that competitor, vis-a-vis
18    CACI, that you feel could make it difficult for you to be
19    impartial in judging this case?
20              THE PROSPECTIVE JUROR:  No.
21              THE COURT:  The government contractor for whom you
22    work is who?
23              THE PROSPECTIVE JUROR:  Accenture.
24              THE COURT:  Has that government contractor, to
25    your knowledge, ever been involved in any type of government
```

                                                              23

```
 1    contract involving interrogation services?
 2              THE PROSPECTIVE JUROR:  Not that I'm aware of.
 3              THE COURT:  Or serving in the -- during the Iraq
 4    war?
 5              THE PROSPECTIVE JUROR:  No.
 6              THE COURT:  All right.  Thank you, Mr. Blanchard.
 7              And is there anyone else on the left side?  All
 8    right.
 9              In the center section I saw some hands.  Let me
10    start with the woman over here.  Yes, your name, please.
11              THE PROSPECTIVE JUROR:  Alyssa Ashworth.
12              THE COURT:  Yes, Ms. Ashworth.  Number 3.
13              THE PROSPECTIVE JUROR:  I sell software to the
14    federal government and often partner with CACI to do our
15    implementation work.
16              THE COURT:  Are you currently in that kind of a
17    business right now?
18              THE PROSPECTIVE JUROR:  Yes.
19              THE COURT:  Is there anything about your business
20    relationship with CACI that you feel might make it difficult
21    for you to be impartial in judging this case, since this
22    case is seeking to get damages from CACI?
23              THE PROSPECTIVE JUROR:  No.
24              THE COURT:  Thank you.  Was there another hand?
25    Yes.  In the back.  Your name, please.
```

                                                                24

```
 1                    THE PROSPECTIVE JUROR:  Lynn Ann Casey.

 2                    THE COURT:  Yes, Ms. Casey.

 3                    THE PROSPECTIVE JUROR:  Our company that I own,

 4       Arc Aspicio, has worked with CACI as both a subcontractor

 5       and a prime contractor on past contracts, but we have

 6       nothing currently going on with CACI.

 7                    THE COURT:  Do you feel that that business

 8       relationship could make it difficult for you to be impartial

 9       in judging this case?

10                    THE PROSPECTIVE JUROR:  No.

11                    THE COURT:  All right.  Thank you, ma'am.

12                    Yes.  Any other hand?  Anybody else in the center?

13                    Now, on the far right, is there anybody?  Yes.  In

14       the first row.  Your name, sir.

15                    THE PROSPECTIVE JUROR:  Howard Byrd.

16                    THE COURT:  What's the last name?

17                    THE PROSPECTIVE JUROR:  Byrd, B-Y-R-D.

18                    THE COURT:  Yes, Mr. Byrd.

19                    THE PROSPECTIVE JUROR:  And so I'm prior Air

20       Force, and I was a contracting officer in the Air Force and

21       had dealings with CACI as a contracting officer.  And I

22       currently work for Deloitte leading their contract staff for

23       the government and public services practice.  So we do have

24       teaming relationships with the company.

25                    THE COURT:  Do you feel that that business
```

25

```
 1    relationship might make it difficult for you to be impartial

 2    in judging this case?

 3              THE PROSPECTIVE JUROR:  I don't.

 4              THE COURT:  All right.  Thank you, sir.

 5              There was another.  Yes.  Your name, please.

 6              THE PROSPECTIVE JUROR:  Hi.  My name is Steve

 7    Clark.

 8              THE COURT:  Yes, Mr. Clark.

 9              THE PROSPECTIVE JUROR:  In the past, I once worked

10    on a contract that was -- CACI was a prime contractor.

11              THE COURT:  Is there anything about that business

12    relationship that you feel might make it difficult for you

13    to be impartial?

14              THE PROSPECTIVE JUROR:  No.

15              THE COURT:  All right.  Thank you.

16              Yes, your name please.

17              THE PROSPECTIVE JUROR:  Zoe Hunter.

18              THE COURT:  Yes, Ms. Hunter.

19              THE PROSPECTIVE JUROR:  I previously worked in

20    offices where there have been CACI's -- CACI employees also

21    working in the same office.  We weren't both employed by the

22    same employer.

23              THE COURT:  Was there anything about those

24    business activities that you feel might make it difficult

25    for you to be impartial?
```

26

```
 1                THE PROSPECTIVE JUROR:  No.

 2                THE COURT:  Thank you.

 3                Yes, your name, please.

 4                THE PROSPECTIVE JUROR:  Heather Henry.

 5                THE COURT:  What's the last name?

 6                THE PROSPECTIVE JUROR:  Henry.

 7                THE COURT:  Yes, Ms. Henry.

 8                THE PROSPECTIVE JUROR:  About 20 years ago, I was

 9    in an office adjacent to the CACI employees as a consultant.

10                THE COURT:  Was there anything about that

11    experience that you feel could make it difficult for you to

12    be impartial?

13                THE PROSPECTIVE JUROR:  No, Your Honor.

14                THE COURT:  All right.  Thank you.  Anybody else?

15                Has anybody -- to your knowledge, do any of you

16    have any stock or financial investments in CACI?  I see a

17    hand up.  Yes, ma'am.

18                THE PROSPECTIVE JUROR:  Yeah.  Sydney Stallard.

19                THE COURT:  How do you spell the last name?

20                THE PROSPECTIVE JUROR:  Stallard, S-T-A-L-L-A-R-D.

21                THE COURT:  Yes, Ms. Stallard.

22                THE PROSPECTIVE JUROR:  I own stock in CACI.

23                THE COURT:  Ms. Stallard, do you feel in any

24    respect that could affect your impartiality?

25                THE PROSPECTIVE JUROR:  No.
```

27

```
 1              THE COURT:  All right.  Thank you.  Anybody else?
 2              I want now for counsel for the plaintiffs to
 3    slowly list the names of any witnesses who you anticipate
 4    calling during your case.  And we'll see whether you
 5    recognize, ladies and gentlemen, any of the names.
 6              MR. FARIDI:  Plaintiffs intend to call Salah
 7    Al-Ejaili, Suhail Al Shimari, Asa'ad Al-Zuba'e, George Fay,
 8    Ivan Frederick, Charles Grainer, Ambuhl Grainer, Sabrina
 9    Harmon, Jens Simon Modvig, Amy Monahan, Arnold Morse,
10    Torin Nelson, Antonio Taguba, Steven Xenakis.
11              THE COURT:  Is that it?
12              MR. FARIDI:  That's it, Your Honor.
13              THE COURT:  Now for the defense.
14              MR. O'CONNOR:  CACI intends to call, either live
15    or by video or by tape recording, the following witnesses:
16    Charles Mudd, Mark Billings, Raymond Scott Northrop, Thomas
17    Pappas, Carolyn Holmes, also known as Carolyn Wood, Steven
18    Stefanowicz, Colonel William Brady, James Beachner, Amy
19    Monahan, and there will be a number of tape-recorded
20    depositions of people whose names are concealed for state
21    secrets reasons.
22              THE COURT:  Ladies and gentlemen, do any of you
23    believe that you recognize the names of any of the witnesses
24    who we anticipate will be called in some capacity in this
25    trial?  I see a hand up.  I've got to be able to see you.
```

28

```
 1    Your name please.
 2              THE PROSPECTIVE JUROR:  Melika Zand.  I noticed --
 3              THE COURT:  Hold on one second.  How do you spell
 4    your last name?
 5              THE PROSPECTIVE JUROR:  Z-A-N-D.
 6              THE COURT:  I'm sorry?
 7              THE PROSPECTIVE JUROR:  Z-A-N-D.
 8              THE COURT:  Yes, Ms. Zand.
 9              THE PROSPECTIVE JUROR:  I know a Charles Mudd, a
10    lawyer in Chicago.  I'm not sure if it's the same one.
11              THE COURT:  He's not a lawyer, so we're okay on
12    that.  Thank you, Ms. Zand.
13              Anybody else?  All right.
14              Since this case obviously will involve information
15    about the United States military, I want to know whether any
16    of the panel -- and, again, this would include your
17    immediate family members or very close personal friends --
18    have ever served in the U.S. Armed Services or are currently
19    working in the Armed Services.
20              So we'll start on the left side first.  All right.
21    Let's see.  At the very first row.  Yes.  Again, your name,
22    sir.
23              THE PROSPECTIVE JUROR:  Brian Hanning,
24    H-A-N-N-I-N-G.
25              THE COURT:  Yes, Mr. Hanning.
```

                                                                29

```
 1              THE PROSPECTIVE JUROR:  My cousin, he served in

 2    the U.S. Air Force, the military police at the Abu Ghraib.

 3              THE COURT:  He did.  I assume --

 4              THE PROSPECTIVE JUROR:  He has -- he's honorably

 5    discharged and had been in for several years.

 6              THE COURT:  Did he talk to you about his

 7    experiences in Abu Ghraib?

 8              THE PROSPECTIVE JUROR:  He has.

 9              THE COURT:  All right.  Based upon those

10    conversations, have you formed any views or opinions about

11    the facility?  The fact that you're pausing tells the Court

12    you have.

13              THE PROSPECTIVE JUROR:  Yeah.

14              THE COURT:  All right.  Thank you, Mr. Hanning.

15              THE PROSPECTIVE JUROR:  Thank you.

16              THE COURT:  There are other people on that side.

17    Raise your hands up high so I can see you.  Yes, ma'am, the

18    second row.

19              THE PROSPECTIVE JUROR:  Michelle Popaden.  I --

20              THE COURT:  Wait.  I'm sorry spell the last name.

21              THE PROSPECTIVE JUROR:  P-O-P-A-D-E-N.

22              THE COURT:  Yes, Ms. Popaden.

23              THE PROSPECTIVE JUROR:  Both my parents --

24    grandfathers served in the U.S. Air Force, and I have a

25    cousin that's in the U.S. Air Force.
```

30

```
1              THE COURT:  Is there anything about their military

2    service that you feel could affect your impartiality in

3    judging this case?

4              THE PROSPECTIVE JUROR:  No.

5              THE COURT:  To your knowledge, did they ever serve

6    as military police officers?

7              THE PROSPECTIVE JUROR:  No.

8              THE COURT:  Or military intelligence?

9              THE PROSPECTIVE JUROR:  No.

10             THE COURT:  All right.  Thank you, Ms. Popaden.

11             Yes.  The next person in that row.  Your name,

12   please.

13             THE PROSPECTIVE JUROR:  Jodie Safer.

14             THE COURT:  The last name?

15             THE PROSPECTIVE JUROR:  Safer.

16             THE COURT:  Ms. Safer, yes.

17             THE PROSPECTIVE JUROR:  My cousin is currently

18   serving in the Coast Guard.

19             THE COURT:  In the Coast Guard.  How long has he

20   been in the Coast Guard or she?

21             THE PROSPECTIVE JUROR:  He's been serving at least

22   ten years.

23             THE COURT:  I'm sorry?

24             THE PROSPECTIVE JUROR:  At least ten years.

25             THE COURT:  All right.  Well, this case occurred
```

                                                              31

1    before that.

2            Is there anything about your cousin's service that

3    you feel could affect your impartiality in judging this

4    case?

5            THE PROSPECTIVE JUROR:  No.

6            THE COURT:  All right.  And do you know whether or

7    not the position your cousin has is a military police

8    officer?

9            THE PROSPECTIVE JUROR:  Not to my knowledge.

10           THE COURT:  All right.  Thank you.  Anybody else

11   in that row?  Behind you.  I'm just going to have to point

12   to you all.  Yes, ma'am -- sir.

13           THE PROSPECTIVE JUROR:  Edward Scerbo.  S-C.

14           THE COURT:  E-R-B-O; right?

15           THE PROSPECTIVE JUROR:  That's right.

16           THE COURT:  Got you.

17           THE PROSPECTIVE JUROR:  My father, who is 87, was

18   a Marine.

19           THE COURT:  All right.

20           THE PROSPECTIVE JUROR:  That's all I'm telling.

21           THE COURT:  All right.  That's fine.  That

22   certainly is enough.

23           Mr. Scerbo, to your knowledge, did he ever serve

24   as a military police officer in that capacity?

25           THE PROSPECTIVE JUROR:  No, Your Honor.

                                                          32

```
 1                THE COURT:  Is there anything about his service or

 2    things he told you about his service that you feel could

 3    affect your impartiality?

 4                THE PROSPECTIVE JUROR:  No, Your Honor.

 5                THE COURT:  All right.  Thank you, sir.

 6                And, yes, your name, please.

 7                THE PROSPECTIVE JUROR:  Robert O'Hara.

 8                THE COURT:  Yes.  Mr. O'Hara.

 9                THE PROSPECTIVE JUROR:  My father and all his

10    brothers served in the Navy, and my cousin is a recent

11    retired Navy captain.

12                THE COURT:  To your knowledge, did any of them

13    serve as military police officers?

14                THE PROSPECTIVE JUROR:  No.

15                THE COURT:  Is there anything about their service

16    that you feel might affect your impartiality in judging the

17    case?

18                THE PROSPECTIVE JUROR:  No, ma'am.

19                THE COURT:  All right.  Thank you, sir.  I see --

20    against the wall.  Yeah.  Your name, please.

21                THE PROSPECTIVE JUROR:  David Blanchard.

22                THE COURT:  Yes, Mr. Blanchard.

23                THE PROSPECTIVE JUROR:  My father was in the Army

24    out of -- go ahead.

25                THE COURT:  Did he ever serve as a military police
```

```
 1   officer to your --
 2            THE PROSPECTIVE JUROR:  He did not.
 3            THE COURT:  Is there anything about his work with
 4   the military that you feel could affect your impartiality?
 5            THE PROSPECTIVE JUROR:  No.
 6            THE COURT:  Thank you, Mr. Blanchard.
 7            THE PROSPECTIVE JUROR:  And I'm not sure if you're
 8   going to get to this, but I also directly support defense
 9   clients today as part of my job.
10            THE COURT:  We're going to get to government
11   contracting.  Thank you.
12            Yes.  Yes, ma'am.
13            THE PROSPECTIVE JUROR:  Melane Starr.  My father
14   was in the Army, and my son-in-law just retired from the
15   Coast Guard.
16            THE COURT:  Was there -- do you know whether
17   either of those two individuals were ever military police
18   officers?
19            THE PROSPECTIVE JUROR:  No.
20            THE COURT:  Is there anything about their service
21   that you feel could affect your impartiality?
22            THE PROSPECTIVE JUROR:  No.
23            THE COURT:  No.  Thank you, Ms. Starr.  All right.
24   Anyone else?  Way in the back.  I'll start in the corner.
25   Your name, please.
```
                                                            34

```
 1                THE PROSPECTIVE JUROR:  Toan Nguyen.

 2                THE COURT:  What's the last name?

 3                THE PROSPECTIVE JUROR:  Nguyen, N-G-U-Y-E-N.

 4                THE COURT:  We have two Mr. Nguyens.  What is --

 5                THE PROSPECTIVE JUROR:  Toan is the first name.

 6                THE COURT:  Toan.  Number 52.  Yes, sir.

 7                THE PROSPECTIVE JUROR:  One of my uncles is

 8   currently U.S. Army Reserves.

 9                THE COURT:  Do you know what capacity?  In other

10   words, military police or just ordinary service?

11                THE PROSPECTIVE JUROR:  Ordinary service.  Fort

12   Meade.

13                (Reporter interrupted for clarification.)

14                THE PROSPECTIVE JUROR:  Fort Meade.

15                THE COURT:  Fort Meade.

16                Is there anything about that service that you feel

17   could affect your impartiality in this case?

18                THE PROSPECTIVE JUROR:  No, Your Honor.

19                THE COURT:  Thank you, Mr. Nguyen.

20                Yes, your name please.

21                THE PROSPECTIVE JUROR:  Miguel Perez, P-E-R-E-Z.

22                THE COURT:  Mr. Perez, thank you.  You've already

23   answered our questions.  Thank you.

24                Anybody else on the left side?  Yes, ma'am.

25                THE PROSPECTIVE JUROR:  Lynne Rose.
```

35

```
1                 THE COURT:  Yes, ma'am.

2                 THE PROSPECTIVE JUROR:  My husband is retired

3      military of 24 years.  He was in the Iraq war and actually

4      was in the green zone in Iraq.  And my brother-in-law is

5      also retired but was also in the Iraq war and was in the

6      green zone.

7                 THE COURT:  I am assuming they talked to you about

8      their experiences?

9                 THE PROSPECTIVE JUROR:  Yes.  Some.

10                THE COURT:  Is anything that they've talked to you

11     about that you feel might make it difficult for you to be

12     impartial?

13                THE PROSPECTIVE JUROR:  I don't believe so.

14                THE COURT:  All right.

15                THE PROSPECTIVE JUROR:  I will say, my

16     brother-in-law was in the military intelligence.

17                THE COURT:  All right.  Thank you, ma'am.

18                That takes care of the left side.  How about in

19     the center section now?  All right.  Starting in the first

20     row.  Yes, ma'am.

21                THE PROSPECTIVE JUROR:  Keagan Lanham.

22                THE COURT:  Wait.  Slow down.

23                THE PROSPECTIVE JUROR:  Sorry.

24                THE COURT:  We have to find you.  We have several

25     pages.  How do you spell your last name?
```

                                                                36

```
 1                 THE PROSPECTIVE JUROR:  L-A-N-H-A-M.

 2                 THE COURT:  All right.  Ms. Lanham, yeah.

 3                 THE PROSPECTIVE JUROR:  I have an uncle who is a

 4  U.S. Army medic, and I believe he served during the time of

 5  this trial -- during the time that is being discussed.

 6                 THE COURT:  Had he ever talked to you or you heard

 7  the family talking about any of his experiences?

 8                 THE PROSPECTIVE JUROR:  No.

 9                 THE COURT:  Is there anything about his work in

10  the military that you feel could affect your impartiality?

11                 THE PROSPECTIVE JUROR:  No.

12                 THE COURT:  All right.  Thank you, Ms. Lanham.

13                 And there was somebody else in that row.  Yes,

14  your name, please.  Yeah.

15                 THE PROSPECTIVE JUROR:  My name is Charles

16  Steigerwald.

17                 THE COURT:  Yes, sir.

18                 THE PROSPECTIVE JUROR:  My grandmother and my

19  grandfather, they were in the State Department; and my

20  father, he was in the Navy; and my uncle, he's in the

21  British Army.

22                 THE COURT:  Have any of them, to your knowledge,

23  done military intelligence work or served as military police

24  officers?

25                 THE PROSPECTIVE JUROR:  No.
```

```
 1                    THE COURT:  Is there anything about their service
 2      that you feel could affect your impartiality?
 3                    THE PROSPECTIVE JUROR:  No.
 4                    THE COURT:  All right.  Thank you, sir.
 5                    Let me finish the first row.  Yeah.  Your name,
 6      sir.
 7                    THE PROSPECTIVE JUROR:  Gordon Woods.
 8                    THE COURT:  Yes, Mr. Woods.
 9                    THE PROSPECTIVE JUROR:  I served in the Marine
10      Corps from 1988 to 1993 in signals intelligence.
11                    THE COURT:  All right.  Is there anything about
12      your work in intelligence and in the military that you feel
13      could affect your impartiality in judging this case?
14                    THE PROSPECTIVE JUROR:  No.
15                    THE COURT:  All right.  Thank you, Mr. Woods.
16                    Yes, ma'am.  Your name.
17                    THE PROSPECTIVE JUROR:  Kendra Lubarsky.
18                    THE COURT:  I'm sorry.  Spell the last name.
19                    THE PROSPECTIVE JUROR:  Lubarsky, L-U-B.  I think
20      I'm 43.
21                    THE COURT:  Yes.  Ms. Lubarsky.  Yeah.
22                    THE PROSPECTIVE JUROR:  I have a close friend and
23      colleague who serves in the Army and did a service in
24      Afghanistan.
25                    THE COURT:  Not Iraq?
```

                                                                    38

```
1              THE PROSPECTIVE JUROR:  Not in Iraq.

2              THE COURT:  Do you know whether that person's

3    position involved military intelligence or military

4    interrogation, if you know?

5              THE PROSPECTIVE JUROR:  No.  We had conversations

6    around interrogation, but not to my knowledge.

7              THE COURT:  Is there anything about those

8    conversations that you feel could affect your impartiality?

9              THE PROSPECTIVE JUROR:  I don't believe so.

10             THE COURT:  All right.  Thank you, ma'am.

11             Anybody else in the first row or two?  All right.

12   Let's see on the aisle.  Your name, sir.

13             THE PROSPECTIVE JUROR:  Your Honor, Timothy

14   Goeglein.

15             THE COURT:  How do you spell that?

16             THE PROSPECTIVE JUROR:  Yeah.  Last name

17   G-O-E-G-L-E-I-N.

18             THE COURT:  I've got it.  Thank you.

19             THE PROSPECTIVE JUROR:  One of my best friends

20   served in the mid 2000s in the Army in the 82nd Airborne,

21   served multiple deployments, including in Iraq.  To my

22   knowledge, he was not involved with interrogation or with

23   the police there, but he did sort of paint a very visceral

24   image of people he did know who were involved in that.

25             THE COURT:  Is there anything about those
```

```
 1    experiences or conversations you've had with him that you

 2    feel could affect your impartiality in judging this case?

 3              THE PROSPECTIVE JUROR:  No, ma'am.

 4              THE COURT:  All right.  Thank you.

 5              Were there more folks in that row?  Yes.  Your

 6    name, please, ma'am.

 7              THE PROSPECTIVE JUROR:  Penny Piettrowski,

 8    P-I-E-T.

 9              THE COURT:  Yes, ma'am.

10              THE PROSPECTIVE JUROR:  My father and brother were

11    both Air Force.  And then I have -- uncle was a Marine, my

12    brother -- like I said, my brother was Air Force, but nobody

13    was military police, nobody was intelligence.

14              THE COURT:  And in any respect, would their

15    military service -- could that in any way affect your

16    impartiality in judging this case?

17              THE PROSPECTIVE JUROR:  No.

18              THE COURT:  Thank you, ma'am.

19              Yes.  Your name, please.

20              THE PROSPECTIVE JUROR:  Maria Catalina Pesino.

21              THE COURT:  Spell the last name.

22              THE PROSPECTIVE JUROR:  P-E-S-I-N-O.

23              THE COURT:  Try it again.  I couldn't hear it.

24              THE PROSPECTIVE JUROR:  P, as in Paul.

25              THE COURT:  Oh P, I'm sorry.  I thought it was V.
```

```
 1    I'm sorry.

 2              THE PROSPECTIVE JUROR:  P-E-S-I-N-O.

 3              THE COURT:  Yes, Ms. Pesino.

 4              THE PROSPECTIVE JUROR:  My husband is a retired

 5    U.S. Air Force.  He was deployed in the Middle East.  He was

 6    deployed there.

 7              THE COURT:  He was deployed in Iraq?

 8              THE PROSPECTIVE JUROR:  I don't know.

 9              THE COURT:  You don't know?

10              THE PROSPECTIVE JUROR:  Yeah.  Middle East.

11              THE COURT:  But in the Middle East?

12              THE PROSPECTIVE JUROR:  Yes.

13              THE COURT:  Is there anything about his military

14    service that you think could make it difficult for you to be

15    impartial in judging this case?

16              THE PROSPECTIVE JUROR:  I don't think so.

17              THE COURT:  Thank you, Ms. Pesino.

18              THE PROSPECTIVE JUROR:  And my daughter, too,

19    served in the U.S. Navy.

20              THE COURT:  I'm sorry.  Your daughter served?

21              THE PROSPECTIVE JUROR:  U.S. Navy.

22              THE COURT:  In the Navy.  Do you know whether she

23    was involved in any military police or military intelligence

24    work?

25              THE PROSPECTIVE JUROR:  No.
```

41

```
 1                    THE COURT:  No, she was not.  All right.  Thank
 2     you, ma'am.
 3                    All right.  Other folks.  Yes.  Your name, please.
 4                    THE PROSPECTIVE JUROR:  Susan Manke.
 5                    THE COURT:  Yes, Ms. Manke.  Yes, ma'am.
 6                    THE PROSPECTIVE JUROR:  I've had -- my father was
 7     in the Air Force.  I've had two brothers that were in the
 8     Marines, two brothers in the Navy, my son was in the Army,
 9     and I have several nephews and nieces in the Army.
10                    THE COURT:  Did any of them, to your knowledge,
11     serve in Iraq?
12                    THE PROSPECTIVE JUROR:  Yes.
13                    THE COURT:  To your knowledge, were any of them
14     involved at all at the Abu Ghraib site?
15                    THE PROSPECTIVE JUROR:  No.
16                    THE COURT:  To your knowledge, were any of them
17     ever military police officers or involved in military
18     intelligence?
19                    THE PROSPECTIVE JUROR:  My nephew was a military
20     intelligence with the Department of the Army.
21                    THE COURT:  Is there anything about their service
22     that you feel could affect your impartiality in judging this
23     case?
24                    THE PROSPECTIVE JUROR:  No, Your Honor.
25                    THE COURT:  All right.  Thank you, Ms. Manke.
```

```
 1                    Anyone else in that row?  How about further in the
 2      back, anyone else?  Yes.  Your name, please.
 3                    THE PROSPECTIVE JUROR:  Alyssa Ashworth.
 4                    THE COURT:  Yes, Ms. Ashworth.
 5                    THE PROSPECTIVE JUROR:  Both my father and my
 6      brother are both in the U.S. Air Force.
 7                    THE COURT:  To your knowledge, did they ever have
 8      military police or military intelligence duties?
 9                    THE PROSPECTIVE JUROR:  My father would have both.
10                    THE COURT:  He would have both.  All right.
11                    Is there anything about their service that you
12      feel could affect your impartiality?
13                    THE PROSPECTIVE JUROR:  No.
14                    THE COURT:  All right.  Thank you.
15                    Anyone else in the center section?  All right.
16      Now on the right side.  We'll start in the first row again.
17      Yes.
18                    THE PROSPECTIVE JUROR:  Steven Clark.
19                    THE COURT:  Yes, Mr. Clark.
20                    THE PROSPECTIVE JUROR:  My father-in-law and
21      father both served and retired from the U.S. military.
22                    THE COURT:  And were they, to your knowledge,
23      either in the military police or military intelligence?
24                    THE PROSPECTIVE JUROR:  No.
25                    THE COURT:  Is there anything about that service
```

43

```
 1   that you feel could affect your impartiality?
 2              THE PROSPECTIVE JUROR:  No.
 3              THE COURT:  All right.  And next to you again,
 4   your name, sir, again.
 5              THE PROSPECTIVE JUROR:  Howard Byrd, B-Y-R-D.  My
 6   father was in the Army, and as I mentioned, I was prior Air
 7   Force.
 8              THE COURT:  During either your service or your
 9   father's service, were either of you ever in Iraq?
10              THE PROSPECTIVE JUROR:  No.
11              THE COURT:  Ever involved in military intelligence
12   or in any kind of interrogation facility or military police
13   work?
14              THE PROSPECTIVE JUROR:  No interrogation, no MP
15   work.  I, as a contracting officer, did support the
16   intelligence community.
17              THE COURT:  All right.  Thank you, Mr. Byrd.
18              Yes, ma'am.  Your name, please.
19              THE PROSPECTIVE JUROR:  Kristy Hakes.
20              THE COURT:  Yes, ma'am.
21              THE PROSPECTIVE JUROR:  My whole family are
22   veterans.  My father was a military intelligence.  I have
23   nieces and nephews who are currently in military
24   intelligence.  My sisters were military police, their
25   husbands were military police.
```

44

```
 1              THE COURT:  Is anything that -- to your knowledge,
 2   did any of them serve in Iraq?
 3              THE PROSPECTIVE JUROR:  Yes.
 4              THE COURT:  Is there anything about their service
 5   or things they may have told you -- of course if they're in
 6   intelligence, they probably didn't tell you too much,
 7   frankly -- that you feel could affect your impartiality in
 8   this case?
 9              THE PROSPECTIVE JUROR:  Yes.
10              THE COURT:  All right.  Thank you, ma'am.  Anybody
11   behind -- yes, your name, sir.
12              THE PROSPECTIVE JUROR:  Patrick Branigan.  I had a
13   nephew who served in Desert Storm.
14              THE COURT:  Do you know in what capacity?  Was he
15   ever military police?
16              THE PROSPECTIVE JUROR:  No.  Nothing that would
17   affect my ability to make a judgment.
18              THE COURT:  All right.  So you don't feel that his
19   service or his service in that part of the world could
20   affect your judgment?
21              THE PROSPECTIVE JUROR:  No.
22              THE COURT:  All right.  Thank you, Mr. Branigan.
23   Next to you on the aisle.  Your name, sir.
24              THE PROSPECTIVE JUROR:  Devin Draine.  My father
25   was --
```

45

```
1                 THE COURT:  I'm sorry.  Spell your last name for
2     me.
3                 THE PROSPECTIVE JUROR:  D-R-A-I-N-E.
4                 THE COURT:  Yes, Mr. Draine.  I've got you.
5                 THE PROSPECTIVE JUROR:  Father served 38 years in
6     the Air Force, air traffic controller.  I think at one point
7     he told me he was in the area, but I'm not sure.
8                 THE COURT:  All right.  Do you know whether he was
9     ever in the military police or military intelligence?
10                THE PROSPECTIVE JUROR:  He was an air traffic
11    controller, so I'm not sure.  I know he was in Germany for a
12    little bit right before he retired.  I think he would let us
13    know where -- I'm not sure.
14                THE COURT:  Is there anything about his service
15    that you feel could affect your impartiality in this case?
16                THE PROSPECTIVE JUROR:  I don't think so.
17                THE COURT:  Do you have some concern that you
18    might have some difficulty?
19                THE PROSPECTIVE JUROR:  No.
20                THE COURT:  All right.  Thank you, Mr. Draine.
21                And next to you, way against the wall.  Yes, sir.
22    Your name please.
23                THE PROSPECTIVE JUROR:  Yohannes Assefa,
24    A-S-S-E-F-A.
25                THE COURT:  Yes, Mr. Assefa.
```

46

```
 1                THE PROSPECTIVE JUROR:  My younger sister served

 2      in the Army, and then afterwards she served in the

 3      intelligence community at the end of last year.  She retired

 4      last year.

 5                THE COURT:  Thank you, sir.

 6                Yes.  Your name, please.

 7                THE PROSPECTIVE JUROR:  Quillan Heim, last name

 8      H-E-I-M.

 9                THE COURT:  Yes, Mr. Heim.

10                THE PROSPECTIVE JUROR:  My grandfather and uncles

11      were both in the military.  Grandfather was during Vietnam,

12      uncles were deployed in Iraq.  My father was not military

13      directly but was a contractor during Iraq and spent some

14      time over there, too.

15                THE COURT:  I'm sorry, and he was what?

16                THE PROSPECTIVE JUROR:  A defense contractor there

17      during Iraq and spent some time over there, too.

18                THE COURT:  Is there anything about their work

19      that you feel could affect your impartiality in judging this

20      case?

21                THE PROSPECTIVE JUROR:  Not that I'm aware of.

22                THE COURT:  I'm sorry?

23                THE PROSPECTIVE JUROR:  Not that I'm aware of.

24                THE COURT:  All right.  Thank you, sir.

25                Against the wall, your name, please.
```

```
 1                    THE PROSPECTIVE JUROR:  Heather Henry.

 2                    THE COURT:  I'm sorry?

 3                    THE PROSPECTIVE JUROR:  Heather Henry.

 4                    THE COURT:  Yes, Ms. Henry.

 5                    THE PROSPECTIVE JUROR:  I have two grandparents

 6       now deceased that served in the Army.  They did not serve in

 7       that region.  And they are not military intelligence or

 8       former -- or military police.

 9                    THE COURT:  Anything at all about their work that

10       you feel could make it difficult for you to be impartial?

11                    THE PROSPECTIVE JUROR:  No, Your Honor.

12                    THE COURT:  Thank you, Ms. Henry.

13                    Let's see.  Way in the back.  Yes, your name,

14       please.

15                    THE PROSPECTIVE JUROR:  Jason Martinez.

16                    THE COURT:  Yes, Mr. Martinez.

17                    THE PROSPECTIVE JUROR:  My cousin served in the

18       Marines.

19                    THE COURT:  I'm sorry?

20                    THE PROSPECTIVE JUROR:  My cousin served in the

21       Marines.

22                    THE COURT:  Do you know when?

23                    THE PROSPECTIVE JUROR:  I think he started in

24       2015.

25                    THE COURT:  All right.  Is there anything about
```

48

```
 1    your cousin's service that you feel could affect your

 2    impartiality?

 3               THE PROSPECTIVE JUROR:  No.

 4               THE COURT:  Thank you.

 5               So have I got everybody?  I don't.  On the far

 6    side here.  Yes, your name, please.

 7               THE PROSPECTIVE JUROR:  Sorry, Your Honor.  Brian

 8    Hanning.  I'll add that my dad was in the Marines, uncle in

 9    the Army.  I previously served at the U.S. Embassy in Iraq

10    at Baghdad and Erbil.  I'm a federal agent with the U.S.

11    Department of State.

12               THE COURT:  Thank you.  And there was another hand

13    up.  Yes, ma'am.  Your name, please.

14               THE PROSPECTIVE JUROR:  Popaden, P-O-P-A-D-E-N.

15               THE COURT:  Yes, Ms. Popaden.

16               THE PROSPECTIVE JUROR:  I just want to point out

17    one of my grandfathers was a prisoner of war.  I don't know

18    if that makes a difference.

19               THE COURT:  Well, do you feel that could affect

20    your impartiality in judging this case?

21               THE PROSPECTIVE JUROR:  I don't think so because

22    it was so long ago.

23               THE COURT:  I'm sorry?

24               THE PROSPECTIVE JUROR:  I don't think so.

25               THE COURT:  Is there any concern that you have
```

                                                              49

```
 1      about that?  I mean, did he talk to you much about the
 2      experience?
 3                   THE PROSPECTIVE JUROR:  Growing up he did, yes.
 4                   THE COURT:  Thank you.
 5                   Yes.  Against the wall.  Your name, please.
 6                   THE PROSPECTIVE JUROR:  Alex Purdy.
 7                   THE COURT:  The last name?
 8                   THE PROSPECTIVE JUROR:  Purdy, P-U-R-D-Y.
 9                   THE COURT:  Yes, Mr. Purdy.
10                   THE PROSPECTIVE JUROR:  My grandfather, my father
11      and my two brothers.  My grandfather and my father served in
12      the Air Force.  My grandfather was intelligence, and my
13      oldest brother was intelligence.  They were in Iraq.  I'd
14      like to point that out.
15                   THE COURT:  And is there anything about their
16      service that you feel could affect your impartiality?
17                   THE PROSPECTIVE JUROR:  Yes.
18                   THE COURT:  Thank you.  You're -- thank you, sir.
19                   Anybody else?  Yes, in the back there.
20                   THE PROSPECTIVE JUROR:  Vanthu Nguyen.  I was --
21                   THE COURT:  I'm sorry.  I need your name.
22                   THE PROSPECTIVE JUROR:  My name is Vanthu Nguyen.
23      Last name is N-G-U-Y-E-N.
24                   THE COURT:  Yes, Ms. Nguyen.
25                   THE PROSPECTIVE JUROR:  And my father is a
```

50

```
1    prisoner of war, so I -- just in Vietnam.

2              THE COURT:  And do you feel that that experience

3    and things he may have told you could affect your

4    impartiality in this case?

5              THE PROSPECTIVE JUROR:  Somewhat.

6              THE COURT:  Thank you, ma'am.

7              Anybody else?  Yes.  Your name, please.

8              THE PROSPECTIVE JUROR:  I think I'm Number 64,

9    Ramesh.

10             THE COURT:  Yes.  We're having a little trouble,

11   I'm sorry, pronouncing your name.

12             THE PROSPECTIVE JUROR:  No, it was good.

13             THE COURT:  I got you.

14             THE PROSPECTIVE JUROR:  My brother is -- was ex

15   Indian Air Force.  I'm not sure -- I know you mentioned U.S.

16   military, but I just wanted to make it clear that he was in

17   the Indian Air Force when --

18             THE COURT:  Is there anything about his experience

19   that you feel could affect your impartiality in this case?

20             THE PROSPECTIVE JUROR:  No.  No, Your Honor.

21             THE COURT:  Thank you, sir.

22             And, folks, I'd rather you think of something and

23   raise your hand and bring it to our attention.  That's the

24   way we do it.  So even though I may have asked a question

25   and, you know, you didn't raise your hand initially and you
```

51

```
 1    thought more about it, it's perfectly appropriate to raise
 2    your hand so we can be sure about the answers.
 3              Yes, ma'am.  Your name, please.
 4              THE PROSPECTIVE JUROR:  Kendra Lubarsky, 43.
 5              THE COURT:  Yes, ma'am.
 6              THE PROSPECTIVE JUROR:  I forgot to mention that
 7    my grandfather was intelligence in World War II.
 8              THE COURT:  All right.  Thank you.  And did I see
 9    another hand up?  Yes.  In the middle there.  I can barely
10    see you.
11              THE PROSPECTIVE JUROR:  Paula Edmunds.  My mother
12    was in the Army in the nurse in World War II.
13              THE COURT:  Was there anything about her service
14    that you feel could affect your impartiality?
15              THE PROSPECTIVE JUROR:  No.
16              THE COURT:  Thank you, Ms. Edmunds.
17              Anybody else?
18              Other than what some of you have already told us,
19    are there any other members of the panel who have any
20    experience in law enforcement or corrections work, that is
21    you've ever worked in a prison or any kind of a detention
22    facility?  Is there anybody on the left?  Yes.  Your name
23    again, sir.
24              THE PROSPECTIVE JUROR:  Brian Hanning.
25              THE COURT:  Yes, Mr. Hanning.
```

52

```
 1              THE PROSPECTIVE JUROR:  I'm currently a special

 2    agent with the U.S. Department of State to provide security

 3    service.

 4              THE COURT:  Thank you.

 5              Anyone else on the left side?  Now the center.

 6    How about on the right side?  All right.  Against the wall.

 7    Ma'am, your name, please.

 8              THE PROSPECTIVE JUROR:  Jody McDonald.

 9              THE COURT:  Yes, Ms. McDonald.

10              THE PROSPECTIVE JUROR:  My husband is a recently

11    retired special agent with the FBI.

12              THE COURT:  All right.  Is there anything about

13    his work in law enforcement to your knowledge that you think

14    would make it difficult for you to be impartial in judging

15    this case?

16              THE PROSPECTIVE JUROR:  No.

17              THE COURT:  No.  All right.  Thank you,

18    Ms. McDonald.

19              Yes, ma'am.  Your name, please.

20              THE PROSPECTIVE JUROR:  Joanne Giles.

21              THE COURT:  That's all right.  You've got the

22    floor, Ms. Giles.  Go ahead.

23              THE PROSPECTIVE JUROR:  My fiancé is a retired

24    deputy sheriff with the Alexandria Sheriff's Department.

25              THE COURT:  Is there anything about his work that
```

                                                            53

```
 1   you think could make it difficult for you to be impartial?

 2             THE PROSPECTIVE JUROR:  No.

 3             THE COURT:  All right.  Thank you, ma'am.

 4             Yes.

 5             THE PROSPECTIVE JUROR:  Zoe Hunter.  I previously

 6   worked for the State Department during the police training

 7   world project.  I personally was not doing the training, but

 8   I worked closely with diplomatic security.

 9             THE COURT:  All right.  So you've had some

10   experience and training in interrogation?

11             THE PROSPECTIVE JUROR:  Not in interrogation, no.

12             THE COURT:  But in --

13             THE PROSPECTIVE JUROR:  Just generic normal police

14   training, like community policing, that sort of thing.

15             THE COURT:  And nothing about how to question

16   people?

17             THE PROSPECTIVE JUROR:  No.

18             THE COURT:  All right.  Thank you.

19             Anybody else?  Yes.  Way in the back.  Your name,

20   please.

21             THE PROSPECTIVE JUROR:  Lynn Ann Casey.  My

22   brother worked for the NYPD and the FBI on the Joint

23   Terrorism Task Force.

24             THE COURT:  And do you feel that any of that work

25   could make it difficult for you to be impartial?
```

                                                              54

```
 1                    THE PROSPECTIVE JUROR:  No.

 2                    THE COURT:  All right.  Thank you, ma'am.

 3                    Yes.  Back there in the corner.

 4                    THE PROSPECTIVE JUROR:  Regina Thompson.

 5                    THE COURT:  Thompson?

 6                    THE PROSPECTIVE JUROR:  Yes.

 7                    THE COURT:  Yes, ma'am.

 8                    THE PROSPECTIVE JUROR:  I've been an analyst with

 9      the FBI for the last 13 years.

10                    THE COURT:  Here in Alexandria?

11                    THE PROSPECTIVE JUROR:  No.  In Manassas, and now

12      Fredericksburg, and also for the WFO.

13                    (Reporter interrupted for clarification.)

14                    THE PROSPECTIVE JUROR:  So it was the WFO, the

15      Washington Field Office, Manassas RA and now Fredericksburg.

16                    THE COURT:  And as an analyst, you work on what

17      types of cases?

18                    THE PROSPECTIVE JUROR:  It varies.  It was

19      criminal for seven years, and now I'm in the operational

20      technology division.  So it's pretty broad.  It covers all

21      things that need surveillance.

22                    THE COURT:  All right.  Is there anything about

23      your work for the FBI that you feel could make it difficult

24      for you to be impartial in judging this case?

25                    THE PROSPECTIVE JUROR:  No, Your Honor.
```

```
 1                THE COURT:  All right.  Thank you, ma'am.

 2                Is there anybody else?

 3                Do any members of the panel have any training or

 4     experience in interrogation, that is that you are somebody

 5     who, by profession, questions people?  You could be maybe an

 6     investigative reporter or an actual, you know, interrogator

 7     for a police or intelligence agency.  If it's an

 8     intelligence agency, you may have to approach the bench.  Is

 9     there anybody?

10                Way in the back.  Mr. Perez; is that correct?

11                THE PROSPECTIVE JUROR:  Yes, Your Honor.

12                THE COURT:  Yeah.  I already know your situation.

13     Thank you.

14                Anyone else on the left?  How about in the center?

15     And there's somebody over here.  Yes.  Your name, please.

16                THE PROSPECTIVE JUROR:  Last name Berardo, B-E-R.

17                THE COURT:  Yes, Mr. Berardo.

18                THE PROSPECTIVE JUROR:  University conduct

19     officer.

20                THE COURT:  University conduct officer?

21                THE PROSPECTIVE JUROR:  Yes, ma'am.

22                THE COURT:  So is that if there's a discipline

23     problem, you would be conducting an investigation?

24                THE PROSPECTIVE JUROR:  Yes, ma'am.

25                THE COURT:  And were you trained in how to conduct
```

56

```
 1    those investigations?
 2              THE PROSPECTIVE JUROR:  Yes, ma'am.
 3              THE COURT:  Is there anything about that
 4    experience that you feel could make it difficult for you to
 5    be impartial in judging this case?
 6              THE PROSPECTIVE JUROR:  No, ma'am.
 7              THE COURT:  Thank you.  Yes.  On the aisle.
 8              THE PROSPECTIVE JUROR:  Yes.  My name is
 9    James Dize.  I'm in-house counsel --
10              THE COURT:  I'm sorry.  Stop.  Spell the last --
11              THE PROSPECTIVE JUROR:  D-I-Z-E.
12              THE COURT:  I couldn't hear you.
13              THE PROSPECTIVE JUROR:  D, as in David, I, Z, as
14    in zebra --
15              THE COURT:  D-I-Z-E.  Thank you.  I've got you.
16              THE PROSPECTIVE JUROR:  Correct.
17              THE COURT:  Thank you.
18              THE PROSPECTIVE JUROR:  I'm in-house counsel with
19    a Belgium company, and I perform investigative, you know,
20    activities and we handle disputes.
21              THE COURT:  Did you receive any specialized
22    training in how to question folks?
23              THE PROSPECTIVE JUROR:  No.
24              THE COURT:  Is there anything about your
25    experience as somebody who does, you know, as part of your
```

57

```
 1   job, question folks, that you feel could make it difficult
 2   to be impartial in judging this case?
 3               THE PROSPECTIVE JUROR:  Not at all.
 4               THE COURT:  And the count -- do you work for a
 5   firm, or you're in-house counsel?
 6               THE PROSPECTIVE JUROR:  I'm in-house counsel with
 7   SWIFT.
 8               THE COURT:  What kinds of investigations do you
 9   conduct?
10               THE PROSPECTIVE JUROR:  There are various claims
11   with respect to customers and vendors, employee claims.
12   There's some data-related issues that SWIFT is involved in.
13               THE COURT:  All right.  But you don't think that
14   any -- given the fact that this case is going to focus a
15   great deal on interrogation techniques, in any respect do
16   you feel that your work would make it difficult for you to
17   be impartial in judging this case?
18               THE PROSPECTIVE JUROR:  No.
19               THE COURT:  All right.  Thank you, Mr. Dize.
20               Is there anybody else?
21               I know we have a couple of lawyers who've already
22   identified themselves, but I'll ask them to do that again
23   anyway for the record.  But are there any members of the
24   panel who are either currently or in the past been lawyers
25   or have had legal training or experience?  This would
```

58

1   include paralegals, somebody who's been to law school but is

2   not a practicing lawyer, or somebody who works in a fairly

3   significantly legal capacity.

4           So let me start on the left side.  Are there any

5   folks with that kind of legal training or experience?

6   Nobody.  How about in the center?  Way in the back.  Yes,

7   your name, please.

8           THE PROSPECTIVE JUROR:  Regina Thompson.

9           THE COURT:  Yes, Ms. Thompson.

10          THE PROSPECTIVE JUROR:  When I was in the criminal

11  division, I was in the forfeiture unit, so we worked with

12  EDVA often.

13          THE COURT:  All right.  Now, one of the reasons

14  why I want to make sure if we have any lawyers in the

15  courtroom you understand that some of the terms, like

16  conspiracy and aiding and abetting, are terms that are used

17  in criminal law, but they also apply to civil law, and

18  they're totally different standards in the civil field.

19          If you were chosen to be a juror, can you put

20  aside your own view of the law and follow the legal

21  instructions that I'll be giving you at the end of the

22  trial?

23          THE PROSPECTIVE JUROR:  Yes, Your Honor.

24          THE COURT:  All right.  Thank you.

25          Anybody else in the center section?  On the right

```
 1   side, anybody?  All right.  We'll start on the first row.
 2   Let me start with the lady.  Yes.  Your name, please.
 3                THE PROSPECTIVE JUROR:  Susan Barbini.  B-A-R.
 4                THE COURT:  Yes, Ms. Barbini.
 5                THE PROSPECTIVE JUROR:  I have my paralegal.  I
 6   was a legal services specialist for a circuit court judge
 7   for about four years.  I'm currently a docket manager for
 8   the circuit court where I manage all the cases that come on
 9   the docket.  So I do extensive research of the different
10   cases.
11                THE COURT:  All right.  So you have some
12   understanding of the law?
13                THE PROSPECTIVE JUROR:  Yes.
14                THE COURT:  Again, so this is for everybody.  So
15   at the end of the trial, I give -- well, during the trial
16   and at the end of the trial I give you legal instructions.
17   This includes definitions of legal terms, it will talk about
18   the burden of proof and other legal concepts.
19                For those of you with legal training or
20   experience, if you have a different view of a particular
21   piece of law, can you put aside your own view and follow
22   those instructions of the Court?  Because we can't have
23   basically a shadow legal advisor on a jury.
24                Would you have any difficulty, Ms. Barbini, in
25   following those instructions?
```

```
 1                   THE PROSPECTIVE JUROR:  I would not.

 2                   THE COURT:  All right.  Thank you, ma'am.

 3                   Was there another person?  Yes.  Your name again.

 4                   THE PROSPECTIVE JUROR:  Steve Clark.

 5                   THE COURT:  Yes, Mr. Clark.

 6                   THE PROSPECTIVE JUROR:  Once during college

 7       clerked in the legal aid office.

 8                   THE COURT:  How long did you do that?

 9                   THE PROSPECTIVE JUROR:  For a summer.

10                   THE COURT:  Again, that would be mostly some civil

11       housing or rent issues?

12                   THE PROSPECTIVE JUROR:  Yes.  Rental issues,

13       driving, parking tickets.  Basic things college students

14       needed help with.

15                   THE COURT:  Was there anything about that work

16       that you feel would make it difficult to be impartial?

17                   THE PROSPECTIVE JUROR:  No.

18                   THE COURT:  Thank you.

19                   THE PROSPECTIVE JUROR:  I also was a witness

20       coordinator one summer as well as a volunteer.

21                   THE COURT:  Again, would there be anything about

22       that work that you feel could make it difficult for you?

23                   THE PROSPECTIVE JUROR:  No.

24                   THE COURT:  Thank you, sir.

25                   All right.  In the second row.  Your name, please.
```

61

```
 1              THE PROSPECTIVE JUROR:  Zoe Hunter.

 2              THE COURT:  Yes, Ms. Hunter.

 3              THE PROSPECTIVE JUROR:  I volunteered in a legal

 4     aid office in Northern Minnesota for a summer, and I also

 5     started law school and went for three weeks and decided that

 6     was not my gym.

 7              THE COURT:  All right.  That's fine.  Thank you,

 8     Ms. Hunter.

 9              The gentleman against the wall.  Your name, sir.

10              THE PROSPECTIVE JUROR:  Assefa.  Last name

11     A-S-S-E-F-A.

12              THE COURT:  Yes, sir.

13              THE PROSPECTIVE JUROR:  I trained as a

14     criminologist, worked to conduct research and then went to

15     law school.  I clerked for the New York Appellate Division

16     Fourth Department, practiced law, both civil and

17     transactional law work, and currently I am a sole

18     practitioner doing national transactional work.

19              THE COURT:  Thank you, sir.  And behind you.  Yes.

20              THE PROSPECTIVE JUROR:  Heather Henry.

21              THE COURT:  Yes, Ms. Henry.

22              THE PROSPECTIVE JUROR:  In undergrad I took a

23     course in legal writing and legal argumentation, and I

24     decided not to be a lawyer.

25              THE COURT:  All right.  I guess I should ask the
```

62

    1    two of you who didn't decide to become lawyers, do you have
    2    anything you hold against lawyers?
    3               THE PROSPECTIVE JUROR:  No.
    4               THE COURT:  Ladies and gentlemen, let me just say,
    5    we just laughed, we've laughed a couple of times, and I
    6    always warn jurors that the fact that we will, at moments
    7    during a trial, and I don't care how serious the case is,
    8    there will be moments when we laugh.  And we do that in part
    9    because it's still a human enterprise, that is trying a
   10    case, whether it's civil or criminal.  And, in fact, humor
   11    is a very good way of relieving tension.
   12               I always tell my jurors, you know, those of you
   13    who are into English literature, Hamlet is probably the
   14    greatest tragically ever written in the English language,
   15    and in the midst of the deepest, darkest tragedy out there,
   16    there's slapstick humor.  Shakespeare put that in to break
   17    the tension.
   18               So the fact that we may, at moments, laugh, does
   19    not mean that this is not an incredibly serious case, both
   20    for the three plaintiffs who brought this action, as well as
   21    for the defendant, CACI.  So as long as you understand it,
   22    the fact that we occasionally have humor, doesn't mean that
   23    this is not a really serious case.  Just keep that, please,
   24    in perspective.
   25               All right.  I think we still had a few folks with

                                                                    63

```
 1    their hands up.  Yes, your name, please, sir.
 2                THE PROSPECTIVE JUROR:  James Dize, D-I-Z-E.
 3                THE COURT:  Yes, Mr. Dize.
 4                THE PROSPECTIVE JUROR:  In-house counsel for
 5    SWIFT.
 6                THE COURT:  Right.  And I think we've already been
 7    through that.  And, again, there's nothing about that work
 8    that you feel could interfere with your ability to be an
 9    impartial juror?
10                THE PROSPECTIVE JUROR:  No.
11                THE COURT:  And could you again not -- if you
12    disagreed with how I gave a particular legal principle, can
13    you follow what the Court gives you at the end of the case?
14                THE PROSPECTIVE JUROR:  Yes.
15                THE COURT:  All right.  Thank you, Mr. Dize.
16                Anybody else with legal training or experience?
17    Yes, your name, please.
18                THE PROSPECTIVE JUROR:  My name is Charles
19    Steigerwald.  I had a few classes in college, a few law
20    classes, but I could put that aside.
21                THE COURT:  Again, was there anything about --
22    just tell me, what courses did you take?
23                THE PROSPECTIVE JUROR:  I had real estate law and
24    white collar crime.
25                THE COURT:  All right.  But the law didn't catch
```

                                                              64

1    your fancy?

2           THE PROSPECTIVE JUROR:  I like law.  I could have

3    been a lawyer, I think.

4           THE COURT:  Now, you can't play lawyer if you

5    become a juror in this case; all right?

6           THE PROSPECTIVE JUROR:  No.  Like I said, I'll put

7    it to the side.

8           THE COURT:  All right.  Well, you have to be a

9    judge, not a lawyer.  In other words, you have to judge the

10   case, all right, if you're a juror.  Thank you, Mr. Goeglein

11   [sic].

12          Anybody else?  Okay.

13          Do any members of the panel have any medical

14   training or experience, either being trained in medical

15   school, paramedic school, working as a nurse, nurse's aide?

16   There will be some medical evidence in this case, and we

17   just want to see whether anyone has had any training or

18   experience.  And that would also include mental health as

19   well as physical health issues.

20          Anybody on the left side?  Yes, your name, please.

21          THE PROSPECTIVE JUROR:  Amenyah, John Kwame.

22          THE COURT:  Can you spell the last name, please.

23          THE PROSPECTIVE JUROR:  A-M-E-N-Y-A-H.

24          THE COURT:  Yes, sir.

25          THE PROSPECTIVE JUROR:  Yes, I'm a pharmacist,

                                                                65

```
 1    trained pharmacist.  And I went to -- (inaudible) -- I am in

 2    the health system.

 3            THE COURT:  All right.  So you're a pharmacist.

 4    There will be some medical evidence in this case.  I don't

 5    think we're going to be talking about medications at all;

 6    are we, counsel?  Anything about medications?  No?

 7            MR. FARIDI:  No, Your Honor.

 8            MR. O'CONNOR:  I don't believe so, Your Honor.

 9            THE COURT:  All right.  Is there anything about

10    your work in that field that you feel could make it

11    difficult for you to be impartial in judging this case?

12            THE PROSPECTIVE JUROR:  No, ma'am.

13            THE COURT:  Thank you, sir.  Anyone else on the

14    left side?  How about in the center?  Yes, ma'am.  Your

15    name, please.

16            THE PROSPECTIVE JUROR:  Keagan Lanham.

17            THE COURT:  Spell your last name again.

18            THE PROSPECTIVE JUROR:  L-A-N-H-A-M.

19            THE COURT:  Yes, Ms. Lanham.

20            THE PROSPECTIVE JUROR:  I work as a baby

21    (inaudible) technician, and I also am looking into PA

22    schools currently.

23            THE COURT:  Into?

24            THE PROSPECTIVE JUROR:  PA schools.

25            THE COURT:  Physician assistant schools?
```

                                                                    66

```
 1                  THE PROSPECTIVE JUROR:  Yes.

 2                  THE COURT:  All right.  Is there anything about

 3     that work that you feel could make it difficult for you to

 4     be impartial in this case?

 5                  THE PROSPECTIVE JUROR:  No.

 6                  THE COURT:  And do you understand that if a

 7     medical expert testifies about certain medical issues and

 8     you perhaps disagree because of your personal knowledge,

 9     you're going to pay attention to the evidence that comes

10     into the courtroom?

11                  THE PROSPECTIVE JUROR:  Yes, ma'am.

12                  THE COURT:  All right.  That's fine.  Thank you,

13     Ms. Lanham.

14            Anybody else?  Yes, ma'am.  Your name, please.

15                  THE PROSPECTIVE JUROR:  Kendra Lubarsky.

16                  THE COURT:  Yes, ma'am.

17                  THE PROSPECTIVE JUROR:  I'm a clinical

18     psychologist, and I work for a medical practice, and I take

19     care of pediatric patients.

20                  THE COURT:  Thank you.

21            Anybody else in the center section?  No?  How

22     about on the far right?  Anybody?  All right.

23                  THE CSO:  Judge, there's a hand over here.  Hand

24     up, ma'am.

25                  THE COURT:  You've got to get your hands up so I
```

```
 1    can see you.  Yes, ma'am.

 2              THE PROSPECTIVE JUROR:  Jody McDonald.

 3              THE COURT:  Yes, ma'am.

 4              THE PROSPECTIVE JUROR:  I've worked my whole

 5    career in a medical office.

 6              THE COURT:  I'm sorry, what?

 7              THE PROSPECTIVE JUROR:  I've worked my whole

 8    career in a medical office.

 9              THE COURT:  In what capacity?

10              THE PROSPECTIVE JUROR:  Management and patient

11    care.

12              THE COURT:  Do you actually get involved in

13    treating the patient, or are you just in the administrative

14    area?

15              THE PROSPECTIVE JUROR:  Both.

16              THE COURT:  All right.  Are you a licensed

17    practitioner of some kind?

18              THE PROSPECTIVE JUROR:  I am not.  Just patient

19    care in a dermatologist setting.

20              THE COURT:  All right.  Is there anything about

21    that work that you feel could affect your impartiality?

22              THE PROSPECTIVE JUROR:  No.

23              THE COURT:  All right.  Thank you.  Anybody else?

24              Other than those of you who have already answered

25    this question, are there any other jurors that have ever
```

68

```
 1    been to Iraq other than the folks who have already told us

 2    about that?  Anybody?  Nobody on the left?  Nobody in the

 3    center?  Wait, in the center.  Yes, I see a hand up.  Your

 4    name, please.

 5              THE PROSPECTIVE JUROR:  Susan Manke.

 6              THE COURT:  Yes, Ms. Manke.

 7              THE PROSPECTIVE JUROR:  I was deployed to Iraq as

 8    a Department of Army civilian employee.

 9              THE COURT:  And when was that?

10              THE PROSPECTIVE JUROR:  At the beginning of the

11    war.  I can't remember exactly.

12              THE COURT:  How long were you there?

13              THE PROSPECTIVE JUROR:  I was just there for

14    120 days.

15              THE COURT:  Do you remember the time frame when

16    you were there?

17              THE PROSPECTIVE JUROR:  Actually, I don't.  I do

18    know when I was getting prepared to go is when they actually

19    declared the war, and I still went as a civilian personnel.

20              THE COURT:  And what specific -- are you able to

21    tell us exactly what your assignment was?

22              THE PROSPECTIVE JUROR:  I was civilian personnel.

23    So I did the coordination with all the Department of Army

24    civilians that were deployed there.

25              THE COURT:  In other words, Army civilians?
```

```
 1                    THE PROSPECTIVE JUROR:  Yes, ma'am.

 2                    THE COURT:  Do you mean contractors?

 3                    THE PROSPECTIVE JUROR:  No.  We were actually

 4      Department of Army civilian civil service that volunteered

 5      to go over in different capacities.

 6                    THE COURT:  Is there anything about your

 7      experience in Iraq during that time frame that you feel

 8      could make it difficult for you to be impartial in judging

 9      this case?

10                    THE PROSPECTIVE JUROR:  No, Your Honor.

11                    THE COURT:  Is there anything you saw or observed

12      about the military who were there that you think could

13      affect your impartiality?

14                    THE PROSPECTIVE JUROR:  No, Your Honor.

15                    THE COURT:  All right.  Thank you, Ms. Manke.

16                    Is there anybody else in the center section?  How

17      about on the far right?  Yes.  Your name, please.

18                    THE PROSPECTIVE JUROR:  Zoe Hunter.

19                    THE COURT:  Yes, Ms. Hunter.

20                    THE PROSPECTIVE JUROR:  So I went to work for the

21      State Department.  I went to Iraq on TDY for two weeks.  We

22      were looking at standing up for bilateral programming.

23                    THE COURT:  All right.  Thank you.

24                    Anybody else?

25                    Have any members of the -- do any members of the
```

70

 1    panel feel that because one of the plaintiffs,

 2    Mr. Al-Ejaili, who will be here in court, had worked for the

 3    newspaper Al Jazeera, that you would have difficulty in

 4    thinking about his case?  In other words, that his

 5    connection to that journal, in any respect do you feel that

 6    could affect how you would judge this case?  Nobody.  Okay.

 7            Have any members of the panel had any interactions

 8    with members of the Muslim faith such that you feel that

 9    could affect your impartiality, either pro or anti that

10    person because of his or her faith?

11            Do any of you hold any opinion about the civil

12    justice system in the United States?  That is that people

13    can come into a court and can file lawsuits seeking damages

14    because of allegations that they've been injured or harmed

15    by a party, do any of you feel that is a system that is

16    problematic?  Yes.  Your name, please.

17            THE PROSPECTIVE JUROR:  Timothy Goeglein, Your

18    Honor.

19            I just want to disclose the following.  It's not

20    my personal opinion.  I work for a lobbying firm in

21    Washington, D.C.  One of our firm's clients, not a client I

22    handle, but a client that the firm handles is the Kingdom of

23    Saudi Arabia, and our firm is currently interested in

24    legislation that has been introduced in Congress, a

25    legislation that would allow families of 9/11,

                                                              71

```
 1    September 11th, 2001, to sue in a civil court in the United

 2    States.

 3              THE COURT:  So you have some concerns about that

 4    type of litigation?

 5              THE PROSPECTIVE JUROR:  Potentially.

 6              THE COURT:  Thank you, sir.

 7              THE PROSPECTIVE JUROR:  Thank you.

 8              THE COURT:  Is there anybody else?  Yes, ma'am.

 9    Your name, please, again.

10              THE PROSPECTIVE JUROR:  Susan Barbini.

11              THE COURT:  I'm sorry?

12              THE PROSPECTIVE JUROR:  Susan Barbini.

13              THE COURT:  Can you spell the last name?

14              THE PROSPECTIVE JUROR:  Sure.  B-A-R-B-I-N-I.

15              THE COURT:  Yes.

16              THE PROSPECTIVE JUROR:  It's kind of a personal

17    matter.  If I could approach.

18              THE COURT:  Of course.

19              THE CSO:  Ma'am, come forward.

20                      (Bench conference.)

21              THE COURT:  Ms. Barbini.

22              THE PROSPECTIVE JUROR:  Good morning.  I was

23    personally sued in my capacity at work civilly concerning my

24    job duties.  One of the -- one of it was conspiracy and

25    collusion, and that experience has quite tainted my view of
```

72

```
 1   this process.
 2            THE COURT:  Now that's over; right?
 3            THE PROSPECTIVE JUROR:  It is over.
 4            THE COURT:  But it's affected you?
 5            THE PROSPECTIVE JUROR:  Yes.  Unfortunately it has
 6   quite a bit.
 7            THE COURT:  All right.  And that was -- and you
 8   never filed, Ms. Barbini?
 9            THE PROSPECTIVE JUROR:  Yes.
10            THE COURT:  All right.  Thank you, ma'am.
11                       (Open court.)
12            THE COURT:  Is there anybody else who has a view
13   about the civil justice system that they feel could affect
14   their impartiality in judging this case?  Okay.
15            Have any members of the panel ever brought a civil
16   lawsuit?  No one's ever sued anybody?
17            THE CSO:  One in the middle.
18            THE COURT:  Wait.  We've got some.  Yes, in the
19   back.  Your name, please, ma'am.
20            THE PROSPECTIVE JUROR:  Maria Catalina Pesino.
21            THE COURT:  Spell the last name for me again.
22            THE PROSPECTIVE JUROR:  P, as in Paul, E-S-I-N-O.
23            THE COURT:  I'm sorry.  Spell it again.
24            THE PROSPECTIVE JUROR:  P, as in Paul --
25            THE COURT:  Ms. Pesino.  I've got it.  Thank you.
```

73

```
 1              THE PROSPECTIVE JUROR:  Yes.  In the Philippines,
 2   a civil lawsuit.
 3              THE COURT:  I'm sorry?
 4              THE PROSPECTIVE JUROR:  Not here in the U.S.
 5              THE COURT:  You sued in your home country?
 6              THE PROSPECTIVE JUROR:  Yes.
 7              THE COURT:  All right.  What happened as a result
 8   of that?  Did you succeed in getting something in that case?
 9              THE PROSPECTIVE JUROR:  Nothing happened.
10              THE COURT:  Nothing happened?
11              THE PROSPECTIVE JUROR:  I won.  I won the case,
12   but I didn't get what I deserved.
13              THE COURT:  Is there anything about your
14   experience as a plaintiff in a lawsuit that you feel could
15   affect your impartiality in judging this case?
16              THE PROSPECTIVE JUROR:  Somewhat.
17              THE COURT:  Thank you, ma'am.
18              There's another hand up.  Yes.
19              THE PROSPECTIVE JUROR:  Lynn Ann Casey.  I'm a
20   plaintiff in a civil lawsuit in South Carolina state court.
21              THE COURT:  And, Ms. Casey, where is that case
22   right now?  Is it in discovery or close to trial?
23              THE PROSPECTIVE JUROR:  It's not in discovery yet.
24   It's in the process.  So -- in the very long process.
25              THE COURT:  All right.  And can you just tell us
```

74

```
 1   briefly what's the issue?

 2           THE PROSPECTIVE JUROR:  It's a case against a

 3   private equity developer.

 4           THE COURT:  As a result of being a plaintiff in an

 5   ongoing civil suit, do you feel that could affect your

 6   ability to be impartial in judging this case?

 7           THE PROSPECTIVE JUROR:  No.

 8           THE COURT:  All right.  Thank you, ma'am.

 9           THE PROSPECTIVE JUROR:  Thank you.

10           THE COURT:  Anybody else?  How about over here on

11   the side.  Yes, your name, please.

12           THE PROSPECTIVE JUROR:  Zoe Hunter.  Can I

13   approach the bench?

14           THE COURT:  Yes.

15                   (Bench conference.)

16           THE PROSPECTIVE JUROR:  Okay.  So I file for

17   divorce.  The other woman that you're talking -- when you're

18   talking military intelligence issues before, I didn't want

19   to announce it to the court, I worked for DIA for two years.

20   I don't think that's going to influence my opinion on this.

21           THE COURT:  All right.  But you are currently in a

22   civil proceeding with the divorce?

23           THE PROSPECTIVE JUROR:  With the divorce?  No.

24   That was completed years ago.

25           THE COURT:  Was there anything about that
```

                                                              75

```
 1    experience, the whole process --

 2              THE PROSPECTIVE JUROR:  No.

 3              THE COURT:  Did it go to court?

 4              THE PROSPECTIVE JUROR:  Yeah.

 5              THE COURT:  It did.  Was there anything about the

 6    court process that gave you concerns?

 7              THE PROSPECTIVE JUROR:  No.  It was very

 8    straightforward.

 9              THE COURT:  Thank you.

10              THE PROSPECTIVE JUROR:  Thank you.

11                         (Open court.)

12              THE COURT:  Is there anybody else who has brought

13    a lawsuit or is currently involved in any litigation?  Yes.

14    Mr. Dize; am I correct?  Yeah.

15              THE PROSPECTIVE JUROR:  It is -- I'm just -- I

16    just want to get clarification on have you brought, is it

17    personal, or is it in the capacity of representing clients?

18              THE COURT:  Well, I think -- we know that you've

19    been representing clients, so I think the only question is

20    personal.

21              THE PROSPECTIVE JUROR:  No.

22              THE COURT:  No.  Okay.  Yes, against the wall.

23    Your name, please.

24              THE PROSPECTIVE JUROR:  Assefa.  I have lawsuits

25    in the District of Columbia and primarily get involved in --
```

```
 1                THE COURT:  In suing?

 2                THE PROSPECTIVE JUROR:  Yeah.

 3                THE COURT:  Or in being sued, I assume?

 4                THE PROSPECTIVE JUROR:  Luckily, so far, I haven't

 5     been sued.

 6                THE COURT:  Okay.  All right.  Anybody else?  Yes.

 7     Your name, please.

 8                THE PROSPECTIVE JUROR:  Steve Clark.

 9                THE COURT:  Yes.

10                THE PROSPECTIVE JUROR:  My wife was once sued.  It

11     was a traffic-related accident.

12                THE COURT:  Do you know what happened in the case?

13                THE PROSPECTIVE JUROR:  It was -- the plaintiff

14     did not get the -- my wife won.

15                THE COURT:  Your wife won the lawsuit.

16                Anything about that experience that you feel could

17     affect your impartiality?

18                THE PROSPECTIVE JUROR:  No.

19                THE COURT:  No.  All right.

20                Anybody else?

21                Now, the flip side of that question, have any of

22     you ever been sued in a civil case?  And, again, a couple of

23     you have answered that question already.  I don't need to

24     hear it again.  But anybody who's been sued in a civil case?

25     Anyone on the left?  How about in the center?  Yes, sir.
```

77

```
 1    Your name, please.
 2              THE PROSPECTIVE JUROR:  Gordon Woods.
 3              THE COURT:  And what's the last name?
 4              THE PROSPECTIVE JUROR:  Woods, W-O-O-D-S.
 5              THE COURT:  Yes, sir.
 6              THE PROSPECTIVE JUROR:  I was sued in a
 7    traffic-related incident.
 8              THE COURT:  And what happened in that case?
 9              THE PROSPECTIVE JUROR:  They settled with the
10    insurance company.
11              THE COURT:  Was there anything about your
12    experience as a defendant that you feel could affect your
13    impartiality?
14              THE PROSPECTIVE JUROR:  No.
15              THE COURT:  Did it turn you off in any respect
16    about the civil system?
17              THE PROSPECTIVE JUROR:  Not at all.
18              THE COURT:  Thank you, Mr. Woods.
19              Anybody else in the center section?  How about on
20    the far right here?  Nobody else.
21              Have any of you ever had to testify as a witness
22    in an actual trial proceeding?  Anybody on the left side
23    ever had to be a witness?  Mr. Perez, that's you way in the
24    back?
25              THE PROSPECTIVE JUROR:  Yes, ma'am.
```

                                                                78

```
 1              THE COURT:  That's fine.  I would know how that
 2   would work for you.
 3              How about in the center?  Anybody?  Yes, ma'am.
 4   Your name again, please.
 5              THE PROSPECTIVE JUROR:  Kendra Lubarsky.
 6              THE COURT:  Yes.
 7              THE PROSPECTIVE JUROR:  I was a fact witness in a
 8   clinical case of mine.
 9              THE COURT:  And you were a fact witness?
10              THE PROSPECTIVE JUROR:  I was a fact witness.
11              THE COURT:  And where was that case held?
12              THE PROSPECTIVE JUROR:  It was in Loudoun County.
13              THE COURT:  All right.  So you actually were on
14   the stand and you were cross-examined?
15              THE PROSPECTIVE JUROR:  Yes.
16              THE COURT:  Was there anything about your
17   experience as a witness in that case that you feel could
18   affect your impartiality?
19              THE PROSPECTIVE JUROR:  No.
20              THE COURT:  Thank you, ma'am.
21              Anyone else in the center section who's testified
22   as a witness?  How about on the right side?  Yes, your name
23   again, sir.
24              THE PROSPECTIVE JUROR:  Steve Clark.
25              THE COURT:  Yes, Mr. Clark.
```

                                                                79

```
 1                    THE PROSPECTIVE JUROR:  I was testifying as a

 2        witness in a traffic violation case.

 3                    THE COURT:  The one that your wife was involved

 4        in?

 5                    THE PROSPECTIVE JUROR:  No.

 6                    THE COURT:  A different one?  What kind of a case

 7        was it?

 8                    THE PROSPECTIVE JUROR:  It involved my mom.  And

 9        so she was hit by another car, and so it was just -- I was a

10        witness to the accident.

11                    THE COURT:  Was there anything about your

12        experience on the witness stand or in that case that you

13        feel could affect your impartiality in judging this case?

14                    THE PROSPECTIVE JUROR:  No.

15                    THE COURT:  All right.  Thank you, Mr. Clark.

16                    Yes.  Your name, sir.

17                    THE PROSPECTIVE JUROR:  Patrick Branigan.

18                    THE COURT:  Yes.

19                    THE PROSPECTIVE JUROR:  I testified once.  I was a

20        TV news camera person.  This is back in the 1970s.  It was a

21        tax fraud case where we had shot an interview with somebody

22        with a tax protestor, and they wanted to enter my video as

23        evidence, and that was the ...

24                    THE COURT:  Was there anything about that

25        experience that you feel could affect your impartiality?
```

                                                            80

 1              THE PROSPECTIVE JUROR:  No, Your Honor.

 2              THE COURT:  Thank you, Mr. Branigan.

 3              Anyone else?  Anybody else?

 4              Do any members of the panel -- are any members of

 5    the panel fairly fluent in the Arabic language?  Can any of

 6    you understand Arabic?  Okay.

 7              I don't think I detected any significant problems

 8    with English, but is there anybody -- yes, ma'am.  Your

 9    name, please.

10              THE PROSPECTIVE JUROR:  Melika Zand.

11              THE COURT:  How do you spell your last name?

12              THE PROSPECTIVE JUROR:  Z-A-N-D.

13              THE COURT:  I'm sorry, Ms. Zand.  Yes.

14              THE PROSPECTIVE JUROR:  I speak Farsi, and I took

15    an Arabic course in college as well.  So I'm fairly

16    knowledgeable about Arabic.

17              THE COURT:  Now, we are going to have translation

18    in this case for two of our -- maybe all three of our

19    plaintiffs.  You're going to have to rely on the Arabic

20    translation that you're getting from the official

21    interpreters.  Is that going to be a problem for you in any

22    respect if you were going to hear, well, they're not quite

23    translating it the way you might translate it?

24              THE PROSPECTIVE JUROR:  No, Your Honor.

25              THE COURT:  You don't think that will be a

                                                                  81

```
 1    problem?
 2              THE PROSPECTIVE JUROR:  No.
 3              THE COURT:  All right.  Thank you.  Anybody else
 4    with Arabic?
 5              Does anybody have a problem reading or
 6    understanding or speaking English?  Anyone who has had any
 7    difficulty understanding my questions?  Yes.  Way in the
 8    back.  Your name, please.
 9              THE PROSPECTIVE JUROR:  My name is Nguyen.
10              THE COURT:  Yes, Ms. Nguyen.
11              THE PROSPECTIVE JUROR:  I only understand
12    70 percent of English.
13              THE COURT:  Have you had difficulty understanding
14    all of my questions?
15              THE PROSPECTIVE JUROR:  Yes.
16              THE COURT:  You have.  And you are Number 53; is
17    that correct?  Yes.  Your first name is Vanthu?
18              THE PROSPECTIVE JUROR:  That's right.
19              THE COURT:  Thank you, ma'am.
20              THE PROSPECTIVE JUROR:  Thank you.
21              THE COURT:  Is there anybody else?
22              Way in the back.  Yes, your name, please.
23              THE PROSPECTIVE JUROR:  Ramatu Kamara.
24              THE COURT:  Can you spell the last name?
25              THE PROSPECTIVE JUROR:  R-A-M-A-T-U.
```

82

```
 1              THE COURT:  Spell it again.

 2              THE PROSPECTIVE JUROR:  K-A-M-A-R-A.  Sorry.

 3              THE COURT:  Is your first name Ramatu?

 4              THE PROSPECTIVE JUROR:  Yes.

 5              THE COURT:  All right.  Have you had difficulty

 6    understanding my questions?

 7              THE PROSPECTIVE JUROR:  Not that much.  Some of

 8    them.

 9              THE COURT:  Some of them?

10              THE PROSPECTIVE JUROR:  Yes.

11              THE COURT:  All right.  Thank you, ma'am.

12         Anybody else?  Way in the back.  Your name, sir.

13              THE PROSPECTIVE JUROR:  Juan Venegas,

14    V-E-N-E-G-A-S.

15              THE COURT:  Wait one second, sir.

16              V-E-N-E-G-A-S.  Have you had trouble understanding

17    my questions?

18              THE PROSPECTIVE JUROR:  Some of them.

19              THE COURT:  Some of them.  All right.  Thank you,

20    sir.

21         Anybody else?

22              THE PROSPECTIVE JUROR:  I just have a question.

23              THE COURT:  Yeah.  Your name, please.

24              THE PROSPECTIVE JUROR:  Lieu, L-I-E-U.

25              THE COURT:  I'm sorry?
```

```
 1                THE PROSPECTIVE JUROR:  L-I-E-U.

 2                THE COURT:  Yes, Ms. Lieu.

 3                THE PROSPECTIVE JUROR:  I don't have a problem

 4     understanding your questions.  In case there are

 5     terminologies that I don't understand, is there -- like, we

 6     could ask or something like that?

 7                THE COURT:  Well, jurors are not allowed to ask

 8     questions during a trial.  If it's a question that you

 9     didn't understand English, that would be all right to ask.

10     But if you don't understand a concept, we can't have that

11     being explained.  I don't know if that helps you or not.

12                THE PROSPECTIVE JUROR:  Okay.  Because listening

13     in, there may be some terminologies I may not be familiar

14     with and stuff.

15                THE COURT:  All right.  But, Ms. Lieu, how are you

16     employed?

17                THE PROSPECTIVE JUROR:  I'm sorry?  How am I

18     employed?

19                THE COURT:  Employed.  Do you have a job?

20                THE PROSPECTIVE JUROR:  Yes, I do.

21                THE COURT:  What kind of work do you do?

22                THE PROSPECTIVE JUROR:  I'm an IT specialist.

23                THE COURT:  I'm sorry?

24                THE PROSPECTIVE JUROR:  IT specialist.

25                THE COURT:  IT specialist.  All right.  So it
```

```
 1    sounds as though you're not having any difficulty

 2    understanding right now.

 3              THE PROSPECTIVE JUROR:  Right.  No.  No.  Yeah.

 4    Because if there was like other terminologies, medical

 5    terminologies or like military terminology, I'm just

 6    concerned about that.

 7              THE COURT:  I try to listen pretty carefully if

 8    the lawyers are using jargon that I think the ordinary

 9    person might not understand.  And good lawyers know not to

10    do that.  And I try, again, to think about whether a jury

11    would really understand a particular term.  And you're

12    right, in this case, there is some military jargon, and

13    we'll make sure that that is adequately explained.

14              THE PROSPECTIVE JUROR:  Okay.

15              THE COURT:  All right.  Thank you, Ms. Lieu.

16              Anybody else?

17              Do any members of the jury have any prior jury

18    experience?  That is, have you ever served as a juror in any

19    civil or criminal case on either a trial jury or a grand

20    jury?  So we're now looking for any of you who may have had

21    previous jury experience.

22              Yes.  Your name, please.

23              THE PROSPECTIVE JUROR:  P-O-P-A-D-E-N.

24              THE COURT:  I'm sorry.  Let's start it again.

25              THE PROSPECTIVE JUROR:  P-O-P-A-D-E-N, Michele.
```

```
 1                 THE COURT:  Yes, ma'am.

 2                 THE PROSPECTIVE JUROR:  I was on a jury in Loudoun

 3      County.

 4                 THE COURT:  Was it civil or criminal, do you know?

 5                 THE PROSPECTIVE JUROR:  I think it was civil.  It

 6      was so long ago.

 7                 THE COURT:  Was there any -- do you know what the

 8      jury did in the case?

 9                 THE PROSPECTIVE JUROR:  We just had to do

10      guilty/not guilty.

11                 THE COURT:  Well, if it's guilty, it was a

12      criminal case.

13                 THE PROSPECTIVE JUROR:  Okay.  A criminal case

14      then.

15                 THE COURT:  Okay.  Was there anything about your

16      experience as a juror that you feel could make it difficult

17      for you to be impartial about judging this case?

18                 THE PROSPECTIVE JUROR:  No.

19                 THE COURT:  Thank you, ma'am.

20                 Yes.  Your name, please.

21                 THE PROSPECTIVE JUROR:  Sheri DeCasper.

22                 THE COURT:  Yes, ma'am, Ms. DeCasper.

23                 THE PROSPECTIVE JUROR:  Prince William County,

24      criminal case, DUI.

25                 THE COURT:  And what did the jury do in that case?
```

                                                                  86

```
 1                    THE PROSPECTIVE JUROR:  Guilty.

 2                    THE COURT:  Guilty.  How long ago was that?

 3                    THE PROSPECTIVE JUROR:  Oh, goodness.  Maybe

 4     ten years.

 5                    THE COURT:  Was there anything about your

 6     experience as a juror in that case that you feel could

 7     affect your ability to be impartial in judging this case?

 8                    THE PROSPECTIVE JUROR:  No.

 9                    THE COURT:  No.  Thank you, ma'am.

10                    Yes, ma'am.  Oh, you've got to get your hands up,

11     folks.  There you go.  Yes, ma'am.

12                    THE PROSPECTIVE JUROR:  Jodie Safer.  I was a

13     juror in a civil case in 2022.

14                    THE COURT:  And in what jurisdiction?

15                    THE PROSPECTIVE JUROR:  Alexandria.

16                    THE COURT:  And what was involved in that case?

17                    THE PROSPECTIVE JUROR:  We were deciding damages.

18                    THE COURT:  So just for damages?

19                    THE PROSPECTIVE JUROR:  Yeah.

20                    THE COURT:  All right.  What did the jury do?

21                    THE PROSPECTIVE JUROR:  We awarded I think 10,000.

22                    THE COURT:  Do you know what kind of a case it

23     was?

24                    THE PROSPECTIVE JUROR:  The plaintiff was

25     rear-ended by the defendant, and they had already -- he said
```

87

```
 1    he was responsible, so we were just deciding the monetary
 2    value.
 3              THE COURT:  Was there anything about your
 4    experience in that case that you feel could make it
 5    difficult to be impartial in judging this case?
 6              THE PROSPECTIVE JUROR:  I don't think so.
 7              THE COURT:  All right.  Thank you, Ms. Safer.
 8              Yes.  Your name, sir.  Yeah.
 9              THE PROSPECTIVE JUROR:  Rob O'Hara.
10              THE COURT:  Yes, sir.
11              THE PROSPECTIVE JUROR:  It was a criminal case in
12    Charles County, Maryland.
13              THE COURT:  And now recently?
14              THE PROSPECTIVE JUROR:  This was a long time ago.
15              THE COURT:  A long time ago.
16              Do you remember what the jury did?
17              THE PROSPECTIVE JUROR:  We were dismissed right in
18    the beginning of the case because the defendant argued a
19    plea bargain; so ...
20              THE COURT:  So no actual experience sitting as a
21    juror?
22              THE PROSPECTIVE JUROR:  Well, we actually got in
23    the box, but that was it.  And there was a translator that
24    was late, so the judge called a brief recess, and by the
25    time we got back ...
```

                                                          88

```
 1                    THE COURT:  Was there anything about that
 2      experience that you feel could affect your impartiality?
 3                    THE PROSPECTIVE JUROR:  No.
 4                    THE COURT:  All right.  Thank you, Mr. O'Hara.
 5                    Anyone else?  Yes, in the back there.
 6                    THE PROSPECTIVE JUROR:  Melane Starr.
 7                    THE COURT:  Yes, Ms. Starr.
 8                    THE PROSPECTIVE JUROR:  I've been on two civil
 9      juries.  The first one was argument over the price of a
10      boat.  And after three days on the jury, they settled.  So
11      that was my first one.
12                    The second one was an easement for Fairfax County
13      Parkway, and he lost, but it was a civil case.
14                    THE COURT:  All right.  Was there anything about
15      either of those two jury experiences that you feel could
16      affect your impartiality as a juror in this case?
17                    THE PROSPECTIVE JUROR:  No.
18                    THE COURT:  All right.  Thank you.  Anyone else on
19      the left side?  Now in the center.  We'll start on the first
20      row.
21                    Yes, your name, please.
22                    THE PROSPECTIVE JUROR:  Ramesh, Number 64.
23                    THE COURT:  Yes.
24                    THE PROSPECTIVE JUROR:  About ten years ago, a
25      criminal case in Arapahoe County, Colorado, and it was a
```

                                                                    89

```
 1    drug-related distribution case.
 2              THE COURT:  And what did the jury do, if you
 3    remember?
 4              THE PROSPECTIVE JUROR:  We -- I think we found the
 5    defendant guilty.
 6              THE COURT:  Very good.  Was there anything about
 7    your experience in that trial that you feel could make it
 8    difficult for you to be impartial in judging this case?
 9              THE PROSPECTIVE JUROR:  No.
10              THE COURT:  Thank you, sir.
11              I'm sure there's some others.  Yes, on the aisle
12    in the back, your name.
13              THE PROSPECTIVE JUROR:  Lieu, L-I-E-U.
14              THE COURT:  Yes, Ms. Lieu.
15              THE PROSPECTIVE JUROR:  I was a juror before, but
16    I don't remember anything about it.
17              THE COURT:  How long ago was it?
18              THE PROSPECTIVE JUROR:  I can't remember.  It was
19    a really long time ago.
20              THE COURT:  Was there anything about the
21    experience that was particularly positive or negative such
22    that you think it could affect your ability in this case?
23              THE PROSPECTIVE JUROR:  No.
24              THE COURT:  Thank you, Ms. Lieu.
25              Anyone else in the center section?  Yes.  Your
```

90

```
 1    name, please.

 2                THE PROSPECTIVE JUROR:  Kathleen Moran.

 3                THE COURT:  Yes, Ms. Moran.

 4                THE PROSPECTIVE JUROR:  Fairfax County, and it was

 5    a drug case.  It was probably 25 years ago.

 6                THE COURT:  Do you remember what the jury did?

 7                THE PROSPECTIVE JUROR:  We found the person

 8    guilty.

 9                THE COURT:  Was there anything about that

10    experience that you feel could make it difficult for you to

11    be impartial in judging this case?

12                THE PROSPECTIVE JUROR:  I don't think so.

13                THE COURT:  All right.  Thank you, Ms. Moran.

14                And I think there was another.  Yes, in the back.

15                THE PROSPECTIVE JUROR:  Regina Thompson.

16                THE COURT:  Yes, Ms. Thompson.

17                THE PROSPECTIVE JUROR:  From 2012 to 2017, we

18    were -- I was involved in that forfeiture unit, so we worked

19    a ton of cases for EDVA specifically.  Mostly criminal,

20    civil forfeiture and some abandonment cases, and I was a

21    recipient of the -- a public service award from EDVA in 2017

22    for one of the cases that I worked on.

23                THE COURT:  All right.  But you, yourself, were

24    not a juror?

25                THE PROSPECTIVE JUROR:  Correct.
```

```
 1              THE COURT:  But you were just participating in
 2    those?
 3              THE PROSPECTIVE JUROR:  I had to sign grand jury
 4    subpoenas and things like of that nature.
 5              THE COURT:  But is there anything about those
 6    experiences that you feel could make it difficult for you to
 7    be impartial?
 8              THE PROSPECTIVE JUROR:  No, Your Honor.
 9              THE COURT:  The fact that you've worked so much
10    for the government, and particularly FBI, do you feel in any
11    respect you might tend to side more with sort of the
12    military or governmental side of this case than the civilian
13    side?
14              THE PROSPECTIVE JUROR:  No, Your Honor.
15              THE COURT:  All right.  Thank you.
16              Anybody else in the center section?  How about on
17    the far side?  Yes, your name again.  I should get to know
18    some of your names.
19              THE PROSPECTIVE JUROR:  Steve Clark.
20              THE COURT:  Yes, Mr. Clark.
21              THE PROSPECTIVE JUROR:  Over 20 years ago.  So it
22    was a case --
23              THE COURT:  But you were a juror?
24              THE PROSPECTIVE JUROR:  Yes.  It was a civil case
25    related to homeowner and builder.  The builder was the
```

1   defendant; the homeowner was the plaintiff, and there was a

2   partial award.

3           THE COURT:  Was there anything about that

4   experience that you feel might make it difficult for you to

5   be impartial in judging this case?

6           THE PROSPECTIVE JUROR:  No.

7           THE COURT:  Thank you, Mr. Clark.

8           Anybody else?  So everybody with prior jury

9   experience has told me about it; is that correct?  All

10  right.

11          Now, let me give you all a sense of how we

12  structure trials here.  We're going to be in trial all of

13  this week and most of next week.  And I do think, given the

14  number of witnesses and the issues, this case could run

15  through a week from this Friday.  I will tell you that I do

16  push cases vigorously.  This court has a nickname called the

17  rocket docket because we're one of the fastest federal

18  courts in the country.  But obviously it's going to take

19  time to try the case.

20          We will start -- from tomorrow on, we'll be

21  starting at 9:30 in the morning, and we'll run close to

22  6:00.  I take a one-hour lunch break for everybody at 1:00,

23  and there's always a mid-morning and a mid-afternoon break

24  of about 15 or so minutes so people can stretch their legs,

25  get coffee, whatever.  And obviously if someone needs a

                                                          93

1   break beforehand, you know, during one of the other time

2   frames, we can certainly make small breaks.  We will be

3   stopping a little early next Monday, and we will not be in

4   session next Tuesday, that is a week from tomorrow.  So for

5   planning purposes, I wanted any potential jurors to know

6   that.

7          We obviously need jurors who can give us their

8   full time and attention during that time frame.  And so the

9   question I'm asking you now is, are there any reasons,

10  either because of a medical situation -- and we can

11  accommodate certain medical problems.  People with back

12  trouble are certainly free to stand up and stretch.  We've

13  had diabetic jurors who need to have sugar, and we've been

14  able to accommodate that.  But obviously if you have, again,

15  medical appointments that cannot be rearranged, if you have

16  a medical problem that would make it difficult to be a fully

17  attentive juror, if you have other things going on, that is

18  child care arrangements that cannot be rearranged or

19  business arrangements that cannot be rearranged, we need to

20  know that now.

21         So the question now is whether any of you, for any

22  medical, business or personal reasons, feel that you could

23  not sit as a fully attentive juror for the time period that

24  is required for this case.  This is when you need to let us

25  know.  So let me start on the left side, and I'll start

94

```
 1    against the wall, and we'll just go across like that.
 2              THE PROSPECTIVE JUROR:  Brian Hanning.
 3              THE COURT:  All right.  Hold on.  I need to,
 4    again, hear your names clearly.
 5              THE PROSPECTIVE JUROR:  Hanning, H-A-N-N-I-N-G.
 6              THE COURT:  Yes, Mr. Hanning.
 7              THE PROSPECTIVE JUROR:  My wife won't be available
 8    to watch our kid on the 23rd, so I'm going to be -- have to
 9    stay home.
10              THE COURT:  All right.  That's fine.  Thank you,
11    Mr. Hanning.
12              And the next person.
13              THE PROSPECTIVE JUROR:  P-O-P-A-D-E-N.
14              THE COURT:  Yes, ma'am.
15              THE PROSPECTIVE JUROR:  I have a medical --
16    doctor's appointment next Friday that I can't get out of.
17    I've been two months waiting to get this appointment.
18              THE COURT:  All right.  So you have a medical
19    problem?
20              THE PROSPECTIVE JUROR:  Uh-huh.
21              THE COURT:  All right.  Thank you.
22              And next to you, is there somebody else?
23              THE PROSPECTIVE JUROR:  Shari DeCasper.  I live in
24    Haymarket.  I know this sounds stupid --
25              THE COURT:  Hold on one second.  What's the last
```

95

```
 1  name?

 2            THE PROSPECTIVE JUROR:  DeCasper.

 3            THE COURT:  Yes, ma'am.

 4            THE PROSPECTIVE JUROR:  I live in Haymarket.  I

 5  have panic and anxiety attacks.  It took a lot for me to

 6  drive here today.  My husband used to drive me, but he died

 7  in 2019.  So I would really appreciate it if I didn't have

 8  to drive in again.

 9            THE COURT:  All right.  Thank you, ma'am.

10            THE PROSPECTIVE JUROR:  Thank you.

11            THE COURT:  And on the aisle, your name, please.

12            THE PROSPECTIVE JUROR:  Jodie Safer.

13            THE COURT:  Yes, ma'am.

14            THE PROSPECTIVE JUROR:  I have a doctor's

15  appointment this Wednesday in the afternoon and next

16  Thursday morning.

17            THE COURT:  And those can't be changed?

18            THE PROSPECTIVE JUROR:  No.

19            THE COURT:  All right.  Thank you.  All right.

20            And then in the second row against the wall.  Your

21  name, sir.

22            THE PROSPECTIVE JUROR:  Alex Purdy, P-U-R-D-Y.

23            THE COURT:  Yes, Mr. Purdy.

24            THE PROSPECTIVE JUROR:  I have a brother with a

25  mental disability that I'm the main caretaker for.  And also
```

96

```
 1    we're going on vacation coming up on Thursday, and that's

 2    not going to be able to be rearranged.

 3                THE COURT:  Thank you, sir.

 4                Yes.  Your name, please.

 5                THE PROSPECTIVE JUROR:  Robert O'Hara.

 6                THE COURT:  Yes, Mr. O'Hara.

 7                THE PROSPECTIVE JUROR:  I totally understand why I

 8    can't be dismissed for this.  I'm a wagering person.  A week

 9    and a half, that's not a problem, but after that, that could

10    be a real problem for me.

11                THE COURT:  Well, in other words, if we get this

12    case finished by Friday -- when I say "finished," I mean all

13    the evidence is in and the jury has been able to reach its

14    decision -- is that a --

15                THE PROSPECTIVE JUROR:  By this Friday?

16    Absolutely not.

17                THE COURT:  No, not by this Friday, the following

18    Friday.  We're talking a two-week maximum time here.

19                THE PROSPECTIVE JUROR:  That could be the real

20    problem.

21                THE COURT:  Even with Tuesday being off?  In other

22    words, next Tuesday, not tomorrow, but the next Tuesday is a

23    free day.

24                THE PROSPECTIVE JUROR:  I may not -- because I

25    work on a per-day basis, I may not be scheduled to work on
```

97

```
 1   Tuesday.
 2              THE COURT:  All right.  Thank you, Mr. O'Hara.
 3              Anyone else?  Yes, sir.  Your name, please.
 4              THE PROSPECTIVE JUROR:  Amenyah, A-M-E-N-Y-A-H,
 5   Number 1.
 6              THE COURT:  I'm sorry.  Yes.  Mr. -- you're the
 7   pharmacist?
 8              THE PROSPECTIVE JUROR:  Yes.  Yes.  Unfortunately
 9   I have a doctor's appointment on Wednesday the 17th that
10   I've been waiting two months to get that I don't think can
11   be rescheduled.  It's Wednesday the 17th.
12              THE COURT:  All right.  So that's a medical
13   appointment?
14              THE PROSPECTIVE JUROR:  Yes.
15              THE COURT:  All right.  Thank you.  Against the
16   wall.  Yes, sir.
17              THE PROSPECTIVE JUROR:  David Blanchard.
18              THE COURT:  Yes, sir.
19              THE PROSPECTIVE JUROR:  I have two elementary
20   school kids who need to get off the bus at 3:30.  My
21   mother-in-law, who was supposed to be watching them broke
22   her arm two weeks ago, so my wife had to take off work.
23              THE COURT:  Are there any neighbors or parents of
24   the children's classmates who could help you out for a few
25   days?
```

98

```
 1                 THE PROSPECTIVE JUROR:  We're calling in favors as
 2   we can, but for that extended period, we ...
 3                 THE COURT:  All right.  Thank you, sir.  Yes.
 4                 THE PROSPECTIVE JUROR:  Melane Starr.
 5                 THE COURT:  Yes, Ms. Starr.
 6                 THE PROSPECTIVE JUROR:  I have ongoing medical
 7   treatment that I can't miss, which would be this coming
 8   Wednesday.  And also we already rented a vacation home next
 9   week.  I didn't realize I was going to be called.
10                 THE COURT:  All right.  Thank you, Ms. Starr.
11                 Anyone else?  Yes.  Your name, please.
12                 THE PROSPECTIVE JUROR:  Annapaneni.
13                 THE COURT:  Spell the last name.
14                 THE PROSPECTIVE JUROR:  A-N-N-A -- Number 2.
15                 THE COURT:  Yes.  I've got you.
16                 THE PROSPECTIVE JUROR:  I need to take care of my
17   kids after school.
18                 THE COURT:  Is there no other family member who
19   can help out?
20                 THE PROSPECTIVE JUROR:  My wife is working, so I
21   need to be home.
22                 THE COURT:  And are your children in elementary or
23   high school?
24                 THE PROSPECTIVE JUROR:  One is elementary, one is
25   in middle school.
```

```
 1                THE COURT:  All right.  But there's no family

 2     member or neighbor who can help out?

 3                THE PROSPECTIVE JUROR:  No.

 4                THE COURT:  All right.  Thank you, sir.  Yeah.

 5                THE PROSPECTIVE JUROR:  Sydney Stallard.

 6                THE COURT:  Yes, Ms. Stallard.

 7                THE PROSPECTIVE JUROR:  I'm a full-time college

 8     student, so I have class.  I actually missed today.  I live

 9     two and a half hours away.

10                THE COURT:  All right.  Thank you, Ms. Stallard.

11                Yes.  Your name, please.

12                THE PROSPECTIVE JUROR:  Ellen Young.

13                THE COURT:  Yes, Ms. Young.

14                THE PROSPECTIVE JUROR:  I'm 32 weeks pregnant with

15     gestational diabetes, so I have to monitor with my phone,

16     but I didn't bring my phone in.

17                THE COURT:  Are you comfortable sitting for two

18     weeks?

19                THE PROSPECTIVE JUROR:  No.

20                THE COURT:  Well, I recognize you're probably not

21     comfortable anyway.  I mean -- so you're 32 weeks?

22                THE PROSPECTIVE JUROR:  Yes.

23                THE COURT:  So you're getting pretty close.

24                THE PROSPECTIVE JUROR:  Yes.

25                THE COURT:  All right.  Thank you, Ms. Young.
```

                                                                      100

```
 1              Yes, sir.

 2              THE PROSPECTIVE JUROR:  My name is Juan Venegas.

 3              THE COURT:  Hold on.

 4              THE PROSPECTIVE JUROR:  V-E-N-E-G-A-S.

 5              THE COURT:  Mr. Venegas, yes.

 6              THE PROSPECTIVE JUROR:  My wife is getting a

 7   surgery right now.  She's overseas.  I was planning to go

 8   with her, but she's coming back on Wednesday.

 9              THE COURT:  All right.  That's fine.  I've got

10   you.  Thank you.

11              Anybody else on the left side?  Now in the center.

12   Yes, ma'am?

13              THE PROSPECTIVE JUROR:  Keagan Lanham.

14              THE COURT:  Yes, Ms. Lanham.

15              THE PROSPECTIVE JUROR:  I have a doctor's

16   appointment tomorrow, and it's like my fifth follow-up, so

17   it's pretty important.

18              THE COURT:  And you can't put it off a week or

19   two?

20              THE PROSPECTIVE JUROR:  No.

21              THE COURT:  All right, Ms. Lanham, thank you.

22              Yes.  Your name, please.

23              THE PROSPECTIVE JUROR:  Miles DeSamour,

24   D-E-S-A-M-O-U-R.

25              THE COURT:  Yes, sir.
```

                                                              101

```
 1              THE PROSPECTIVE JUROR:  No medical or schedule

 2    conflicts, but I really have to use the bathroom.

 3              THE COURT:  Otherwise can you be a juror?

 4              THE PROSPECTIVE JUROR:  Yes, I can.

 5              THE COURT:  Go ahead.

 6              THE PROSPECTIVE JUROR:  Thank you very much.

 7              THE COURT:  Make sure you come right back.

 8              Yes.  Your name, please.

 9              THE PROSPECTIVE JUROR:  My name is Thomas Dementi.

10              THE COURT:  Yes, sir.

11              THE PROSPECTIVE JUROR:  I have two elementary

12    school children that I pick up from school, and I also have

13    a trip planned leaving this Friday.

14              THE COURT:  Is there anyone else who could pick

15    the children up?

16              THE PROSPECTIVE JUROR:  It would be difficult to

17    find somebody.  My wife works full time.

18              THE COURT:  I'm sorry?

19              THE PROSPECTIVE JUROR:  My wife works full time,

20    so it would be hard for me to find somebody.

21              I also am self-employed, and it would kind of put

22    me in some financial hardship to miss two weeks of working.

23              THE COURT:  All right.  Thank you, Mr. Dementi.

24              Yes.  Your name.

25              THE PROSPECTIVE JUROR:  Kendra Lubarsky.  I have a
```

102

```
 1    presentation at a national conference Wednesday.

 2              THE COURT:  Thank you, Ms. Lubarsky.  Did I get

 3    everybody in the first row here?

 4              All right.  The next row on the aisle.  Your name,

 5    please.

 6              THE PROSPECTIVE JUROR:  Melika Zand, Z-A-N-D.

 7              THE COURT:  Yes, ma'am.

 8              THE PROSPECTIVE JUROR:  I have been on the

 9    full-time job hunt for the past six months, and I have two

10    final interviews for different companies on Wednesday and

11    Thursday, and if I delay or reschedule, I would lose the

12    opportunity to seek full-time employment.

13              THE COURT:  All right.  Thank you, ma'am.

14              The next person.  Yes.  Your name, sir.

15              THE PROSPECTIVE JUROR:  Michael Zurita.  I have a

16    medical appointment next Thursday, and I've had to

17    reschedule a couple of times already.  I can't miss that

18    one.

19              THE COURT:  All right.  And you're Number 75?

20              THE PROSPECTIVE JUROR:  Yeah.

21              THE COURT:  Thank you, sir.  Anybody else?

22              Yes.  Your name, please.

23              THE PROSPECTIVE JUROR:  Kamara Ramatu.

24              THE COURT:  Stand up so I can see you.

25              THE PROSPECTIVE JUROR:  Kamara Ramatu.
```

                                                                103

```
 1                  THE COURT:  Yes, ma'am.

 2                  THE PROSPECTIVE JUROR:  I have to pick my daughter

 3     at the bus stop.  I don't have somebody to help me.

 4                  THE COURT:  Thank you.  All right.

 5                  In the front.  Yeah.  I can't see who you are.

 6     Your name, please.

 7                  THE PROSPECTIVE JUROR:  Maria Catalina Pesino.

 8                  THE COURT:  Yes, Ms. Pesino.

 9                  THE PROSPECTIVE JUROR:  Child care.  I have a one

10     elementary son, and I need to -- he has several after-school

11     activities, and I need to pick him up.

12                  THE COURT:  There's nobody else who can help with

13     that?

14                  THE PROSPECTIVE JUROR:  No.

15                  THE COURT:  All right.  Thank you, ma'am.

16                  Yes.  The lady next to you.  Yeah.

17                  THE PROSPECTIVE JUROR:  Alison Edelstein.

18                  THE COURT:  Yes, ma'am.

19                  THE PROSPECTIVE JUROR:  I have a medical

20     appointment next Thursday morning.

21                  THE COURT:  Is there any way that can be changed?

22                  THE PROSPECTIVE JUROR:  No.

23                  THE COURT:  No.  All right, Ms. Edelstein.  Thank

24     you.

25                  All right.  Next to you.  Yes.
```

                                                                    104

```
 1              THE PROSPECTIVE JUROR:  Timothy Goeglein.  Two

 2   things, Your Honor.  The first of which, no medical

 3   conflicts.  I work for a very small firm in Washington,

 4   which I'm only one of three employees.  This is one of the

 5   most consequential weeks probably of this Congress, and

 6   without me, the only employee who is here in the Washington,

 7   D.C./Virginia area full time, it would just be very

 8   difficult for our firm to do what we need to do this week

 9   and next.

10              If -- could I have your permission perhaps to

11   discuss something that is relevant but may belong in the

12   previous?

13              THE COURT:  It's okay.  I've heard enough.  Thank

14   you.

15              THE PROSPECTIVE JUROR:  Okay.  Thank you.

16              THE COURT:  All right.  Let's see.  Behind you.

17   Yes, ma'am -- or sir, sorry.  You name, please.

18              THE PROSPECTIVE JUROR:  Sorry about that.

19   Robert Conrad.  I have business travel next week that is for

20   a session with a client of mine.

21              THE COURT:  You have business travel that can't be

22   changed?

23              THE PROSPECTIVE JUROR:  Yes.  Unfortunately.

24              THE COURT:  All right.  Thank you, sir.

25              All right.  Let's see.  In the back there.  Yes.
```

105

```
 1   Your name, please.

 2              THE PROSPECTIVE JUROR:  Vanthu Nguyen.  I have

 3   family that will be leaving Friday of next week.

 4              THE COURT:  All right.  Thank you, Ms. Nguyen.

 5              Yes.

 6              THE PROSPECTIVE JUROR:  Haritha Meduri.

 7              THE COURT:  Hold on one second.

 8              THE PROSPECTIVE JUROR:  Last name M-E-D-U-R-I.

 9              THE COURT:  Yes, Ms. Meduri.

10              THE PROSPECTIVE JUROR:  My youngest is in

11   elementary school, and I need to pick him up from the bus

12   stop at 4:15 every day.  And I also have an older child who

13   comes home a little early, but I have to pick him up from

14   after-school activities.

15              THE COURT:  Is there no other person in your

16   family or a neighbor that can help out with that?

17              THE PROSPECTIVE JUROR:  No neighbors.  I have to

18   call in a lot of favors for this week, and my husband works

19   full time, and he would have to make significant changes or

20   take time off.

21              THE COURT:  All right.  Thank you.

22              Yes, in the corner.

23              THE PROSPECTIVE JUROR:  Thompson.

24              THE COURT:  Yes, ma'am.

25              THE PROSPECTIVE JUROR:  My daughter's daycare
```

```
 1    closes at 6, and I live roughly an hour away.

 2             THE COURT:  All right.  Thank you, Ms. Thompson.

 3             Anybody else in the center section?  Yes.

 4             THE PROSPECTIVE JUROR:  I forgot to mention, I

 5    have a medical appointment as well on the 30th of April.

 6             THE COURT:  And your name again is?

 7             THE PROSPECTIVE JUROR:  Haritha Meduri,

 8    M-E-D-U-R-I.

 9             THE COURT:  Thank you.  All right.  On the

10    right -- anybody else in the center section?  Now on the

11    right side starting in the first row.  Yes, ma'am.

12             THE PROSPECTIVE JUROR:  Susan Barbini.

13             THE COURT:  I'm sorry?

14             THE PROSPECTIVE JUROR:  Barbini.

15             THE COURT:  Yes, ma'am.

16             THE PROSPECTIVE JUROR:  I have a medical

17    appointment Thursday that can't be moved.

18             THE COURT:  All right, Ms. Barbini.  Thank you.

19             Anyone else in the first row?  No.  In the second

20    row?  Yes, your name.

21             THE PROSPECTIVE JUROR:  Devin Draine.

22             THE COURT:  I'm sorry?

23             THE PROSPECTIVE JUROR:  Devin Draine.

24             THE COURT:  Yes, Mr. Draine.

25             THE PROSPECTIVE JUROR:  I have a dentist
```

107

```
 1    appointment right in the middle of two root canals Tuesday

 2    and Thursday.

 3              THE COURT:  Okay.

 4              THE PROSPECTIVE JUROR:  I'm finishing one and

 5    starting another one and finishing another one.

 6              THE COURT:  All right.  Good luck.  All right.

 7    Yes.  Against the wall, your name, please.

 8              THE PROSPECTIVE JUROR:  Yohannes Assefa.  I'm

 9    caring for my sister in New York.  She had a stroke.  She

10    has Stage 4 pancreatic cancer.  She's in ICU.  My siblings

11    are all going to New York.  I came back last night for this.

12              THE COURT:  All right, Mr. Assefa.  Thank you.

13              All right.  Yes, your name, please.

14              THE PROSPECTIVE JUROR:  Berardo, B-E-R.  I have a

15    two-year-old that I have to pick up at 5, and my wife, who's

16    the primary caregiver, had knee surgery a couple weeks ago.

17              THE COURT:  Spell your last name again.

18              THE PROSPECTIVE JUROR:  B-E-R -- Berardo.

19              THE COURT:  Yes, I've got you.  All right.  So you

20    have to be home?

21              THE PROSPECTIVE JUROR:  Yeah.  At five-ish.

22              THE COURT:  All right.  Thank you, sir.

23              THE PROSPECTIVE JUROR:  Thank you.

24              THE COURT:  In the back, yes.

25              THE PROSPECTIVE JUROR:  Harold Cooper.
```

```
 1              THE COURT:  Yes, Mr. Cooper.

 2              THE PROSPECTIVE JUROR:  So on Wednesday I have a

 3    home study for a placement adoption for my four-year-old

 4    son, and so I can't reschedule that.  And also Thursday and

 5    Friday I'll be in Norfolk for a conference.

 6              THE COURT:  And the home study has been scheduled

 7    for some time?

 8              THE PROSPECTIVE JUROR:  Yeah.  Wednesday at 12.

 9              THE COURT:  No.  About the -- I mean it's been

10    scheduled for a while?

11              THE PROSPECTIVE JUROR:  Yes.  Yes.

12              THE COURT:  All right.  And that really can't be

13    changed?

14              THE PROSPECTIVE JUROR:  No, we can't change it.

15    We're within a 30-day window, and we're at the end now, so

16    we can't change it.

17              THE COURT:  Thank you, Mr. Cooper.

18              Anybody else?  Yes, ma'am.

19              THE PROSPECTIVE JUROR:  Giles.

20              THE COURT:  Yes, Ms. Giles.

21              THE PROSPECTIVE JUROR:  I work for a small

22    assisted living community in Fredericksburg assisting the

23    two nurses that are on staff, and it's a hardship on them

24    for me not to be there to assist the families and the other

25    residents.
```

109

```
 1              THE COURT:  All right.  Thank you.  Anybody else?

 2              Now, ladies and gentlemen, I've asked you a far

 3     range of questions, so I want to just have a general

 4     catch-all question.  Is there any reason that any of you

 5     know of that you have not already told me about why you feel

 6     you could not sit as a fair, objective juror for the

 7     duration of this trial?  Is there anybody?

 8              Yes.  Your name, please.

 9              THE PROSPECTIVE JUROR:  My name is Charles

10     Steigerwald.

11              THE COURT:  Do you want to approach the bench?

12              THE PROSPECTIVE JUROR:  Yes.

13              THE COURT:  All right.  Come up.

14                      (Bench conference.)

15              THE COURT:  Can we have your name again, please.

16              THE PROSPECTIVE JUROR:  Charles Steigerwald.

17              THE COURT:  Yes, sir.

18              THE PROSPECTIVE JUROR:  So I've been in court and

19     jail a handful of times.  One time was a bad experience.  I

20     was in the same room for five days straight with lights and

21     every one out type of deal.

22              THE COURT:  Got it.

23              THE PROSPECTIVE JUROR:  So, yeah, I think that

24     would probably affect me.

25              THE COURT:  I think it would, too.  Thank you.
```

```
 1                    (Open court.)

 2            THE COURT:  Is there anybody else who hasn't

 3   answered that general question?

 4            Yes.  Your name, please.

 5            THE PROSPECTIVE JUROR:  Timothy Goeglein.

 6            THE COURT:  I don't need to hear anything further.

 7   Thank you.

 8            Anything -- anybody else?  All right.

 9            Counsel, approach the bench.

10                    (Bench conference.)

11            THE COURT:  Does the plaintiff have any objection

12   to the voir dire?

13            MR. FARIDI:  None, Your Honor.

14            THE COURT:  Any additional questions you want the

15   Court to ask?

16            MR. FARIDI:  None, Your Honor.

17            THE COURT:  Does the defense have any objection to

18   the voir dire?

19            MR. O'CONNOR:  No objections.

20            THE COURT:  Any additional questions you want the

21   Court to ask?

22            MR. O'CONNOR:  Your Honor, as strange as this

23   seems, I believe I grew up with one of the members of the

24   venire in a small town in Upstate New York.

25            THE COURT:  Really?  Which one?
```

111

```
 1              MR. O'CONNOR:  Scerbo.  The age is right, the name

 2    with the junior is right, he looks like him.

 3              THE COURT:  Should I ask him?

 4              MR. O'CONNOR:  I think he's from Upstate -- we

 5    think he's from Upstate New York.

 6              THE COURT:  What town?

 7              MR. O'CONNOR:  Fulton.

 8              THE COURT:  Let me ask you all just step aside.

 9              Mr. Scerbo, are you here?

10              THE PROSPECTIVE JUROR:  Yes.

11              THE COURT:  Are you from Fulton, New York?

12              THE PROSPECTIVE JUROR:  Yes, I am.

13              THE COURT:  Thank you.

14              THE PROSPECTIVE JUROR:  You're welcome.

15              THE COURT:  Apparently you and Mr. O'Connor grew

16    up in the same town.

17              MR. O'CONNOR:  Hey, Ed.

18              THE COURT:  You didn't recognize each other?

19              THE PROSPECTIVE JUROR:  Mr. O'Connor meaning?

20    First name.

21              MR. O'CONNOR:  John.  Wrestling.

22              THE PROSPECTIVE JUROR:  I know Mr. O'Connor,

23    Judge.  From 1975.

24                      (Bench conference.)

25              THE COURT:  Other than that, is there anything
```

112

```
 1   further?

 2             MR. O'CONNOR:  Not from us.

 3             THE COURT:  No objection.  Let me tell you who I

 4   think we need to strike for cause, and you tell me if you

 5   disagree.  All right.  And I'm not actually going to give

 6   you the reasons.  I think they're on the record, but if you

 7   have any questions why I'm striking them, tell me.

 8             Number 1, Mr. Amenyah, pharmacist with a

 9   medical -- just tell me, any objection from the plaintiff?

10             MR. FARIDI:  No.

11             MR. O'CONNOR:  No.

12             THE COURT:  Okay.  Number 2, Annapaneni, child

13   care issue.

14             MR. O'CONNOR:  No.

15             THE COURT:  Any objection?

16             MR. FARIDI:  None.

17             THE COURT:  Number 3, Ashworth, which is somebody

18   who I think has worked with CACI as military intelligence.

19   Right now I think that person should be out.  Any objection?

20             MR. FARIDI:  No.

21             MR. O'CONNOR:  No, Your Honor.

22             THE COURT:  Number 4, Assefa.  That's the attorney

23   that's heard about this on NPR this morning.  Right.  Any

24   objection?

25             MR. FARIDI:  None.
```

```
 1                MR. O'CONNOR:  No.

 2                THE COURT:  Five, Ms. Barbini.  She's got -- she's

 3     the paralegal.  She's got issues about civil cases.

 4                MR. O'CONNOR:  None.

 5                THE COURT:  Okay.  And Number 7, Berardo, any

 6     objection there?  I can't read my own handwriting, but I

 7     know I wrote out -- I think she's got child care issues.

 8                MR. O'CONNOR:  She had child care issues, Your

 9     Honor.  I don't have an objection.

10                THE COURT:  Number 8, Blanchard, again, child care

11     issues.  Any objection?

12                MR. FARIDI:  None.

13                MR. O'CONNOR:  No.

14                THE COURT:  Number 12, Mr. Byrd.  He has teaming

15     experience with CACI.  He's been a CAT.  I think he's too

16     close to the issues in this case.  He's been a contracting

17     officer.

18                MR. FARIDI:  None.

19                MR. O'CONNOR:  He's been a contracting officer.

20                THE COURT:  I'm going to strike him for cause.

21     All right.  Any objection?

22                MR. FARIDI:  None.

23                MR. O'CONNOR:  I mean, we object, but --

24                THE COURT:  All right.  Well, if you have an

25     objection, let me know.
```

                                                              114

1          Ms. Casey, another CACI person, but she's got a

2    civil case of some -- I think she was just pending -- in

3    fact, she should be stricken for cause, Number 13.

4          MR. FARIDI:  No objection.

5          MR. O'CONNOR:  I'm not sure why -- what she said.

6    She has a civil lawsuit.

7          THE COURT:  Yeah.  Somebody who's pending a case

8    right now.  That's too close.  She's going to have -- she's

9    a plaintiff.

10          MR. O'CONNOR:  Maybe.

11          MR. FARIDI:  And she's also got some CACI

12    foundation, Your Honor.

13          THE COURT:  Yeah.  I'm going to strike her for

14    cause.

15          Fourteen, Clark.  I have a question mark there.

16    Clark's somebody who said CACI --

17          MR. O'CONNOR:  He stood a lot, but I don't recall

18    him saying anything that would be --

19          THE COURT:  He's with a CACI contract, but I don't

20    think -- yeah, I just put a question mark.  I'm going to let

21    him stay in.  The plaintiff can use a peremptory if he has

22    to.  He's not employed by CACI.

23          MR. FARIDI:  We're fine with it, Your Honor.

24          THE COURT:  Number 16, this is the man, Conrad,

25    whose wife works for CACI, and I felt that he was --

                                                          115

 1  definitely should be out.  She's currently employed by CACI.

 2  That's different than --

 3          MR. O'CONNOR:  I think she said she works with

 4  CACI.

 5          MR. FARIDI:  What was that number?

 6          THE COURT:  Sixteen.

 7          MR. O'CONNOR:  Yes.

 8          THE COURT:  Number 17, Harold Cooper.  He's the

 9  man with the home study for the adoption of his child.

10          Any objection?

11          MR. O'CONNOR:  No objection.

12          MR. FARIDI:  No.

13          THE COURT:  Okay.  Number 18, Ms. DeCasper has the

14  panic attack.  She's from Haymarket.  No objection?

15          MR. FARIDI:  No objection.

16          THE COURT:  All right.  Number 19, Dementi has a

17  child care issue and financial issue.

18          MR. FARIDI:  No objection.

19          MR. O'CONNOR:  None.

20          THE COURT:  Number 24, Draine.

21          MR. FARIDI:  Wisdom teeth or root canal.

22          MR. O'CONNOR:  Root canal.  That's right.

23          THE COURT:  He's out.

24          Number 25 is Edelstein with a medical appointment

25  she can't miss.  Any objection?

                                                        116

```
 1                 MR. FARIDI:  No objection.

 2                 MR. O'CONNOR:  No objection.

 3                 THE COURT:  Twenty-eight, Giles, did research on

 4     the case.

 5                 MR. O'CONNOR:  Right.

 6                 THE COURT:  So no objection?

 7                 MR. O'CONNOR:  And she said she couldn't be

 8     impartial, too.

 9                 THE COURT:  Twenty-nine, Mr. Goeglein.  Again, all

10     sorts of impartiality problems there.

11                 MR. FARIDI:  Yes.

12                 THE COURT:  Number 21.

13                 MR. FARIDI:  No objection.

14                 MR. O'CONNOR:  No objection.

15                 THE COURT:  Thirty-three -- I'm sorry 32, Hakes.

16     Too many military intelligence connections, in my view.

17                 MR. O'CONNOR:  I think she indicated she probably

18     would be impartial.

19                 THE COURT:  Yeah.

20                 MR. FARIDI:  Yes.  No objection.

21                 THE COURT:  And 33 --

22                 MR. O'CONNOR:  She also indicated --

23                 THE COURT:  -- also would have a problem being

24     objective.

25                 MR. FARIDI:  No objection.
```

117

```
 1                THE DEPUTY CLERK:  Who was before 33, Judge?  I'm

 2     sorry.

 3                THE COURT:  Thirty-two and 33 are --

 4                THE DEPUTY CLERK:  Thirty-two.

 5                THE COURT:  Although 37, Henry, has some

 6     connection with CACI.  I didn't think there was enough there

 7     to be a problem.

 8                MR. FARIDI:  May I just have one quick moment,

 9     Your Honor?

10                THE COURT:  Yeah.

11                MR. O'CONNOR:  It was a long time ago.

12                MR. FARIDI:  No objection, Your Honor.

13                THE COURT:  All right.  Thirty-seven stays in.

14                Thirty-eight has worked with CACI, has been in

15     Iraq, has police training.  That's too close to the issues

16     in this case.  Thirty-eight is out.

17                MR. FARIDI:  No objection.

18                THE COURT:  Thirty-nine has an English language

19     problem, might not understand the evidence.

20                MR. O'CONNOR:  I agree.

21                MR. FARIDI:  I thought she understood, Your Honor.

22                THE COURT:  I take people at their word if they

23     tell me they're uncomfortable, so I'm going to strike 39.

24                Forty-one has medical experience, Lanham.

25                MR. FARIDI:  No objection.
```

                                                              118

```
 1              MR. O'CONNOR:  No objection.

 2              THE COURT:  Okay.  Forty-three, Lubarsky, this

 3   is -- she -- she's had -- she has discussed interrogation

 4   issues in the past.  She's got a work problem as well.

 5              MR. FARIDI:  She's been looking to get off.  No

 6   objection.

 7              MR. O'CONNOR:  No objection.

 8              THE COURT:  Forty-seven, Meduri has child care

 9   issues.

10              MR. FARIDI:  No objection.

11              MR. O'CONNOR:  No objection.

12              THE COURT:  Forty-eight has heard about the case,

13   that's Menendez Hassel.

14              MR. FARIDI:  No objection.

15              MR. O'CONNOR:  No objection.

16              THE COURT:  Fifty-three, Nguyen.

17              MR. FARIDI:  No objection.

18              MR. O'CONNOR:  No objection.

19              THE COURT:  Fifty-four, O'Hara, has a work

20   conflict.  He's, I think, a waiter.  He's going to be the

21   natural --

22              MR. FARIDI:  No objection.

23              MR. O'CONNOR:  No objection.

24              THE COURT:  Fifty-five, Perez.

25              MR. O'CONNOR:  He said he couldn't be impartial.
```

                                                          119

```
 1                THE COURT:  He couldn't be impartial.

 2                Fifty-six, Pesino, that's the child care issue.

 3                MR. FARIDI:  No objection.

 4                THE COURT:  You're okay on that?

 5                MR. O'CONNOR:  I'm fine.

 6                THE COURT:  Fifty-eight, Popaden, has a medical

 7   issue and also grandfather is a prisoner of war.

 8                MR. FARIDI:  No objection.

 9                MR. O'CONNOR:  No objection.

10                THE COURT:  Fifty-nine, intelligence work in Iraq

11   and --

12                MR. FARIDI:  No objection.

13                MR. O'CONNOR:  No objection.

14                THE COURT:  Sixty-one, Rose, her husband was in

15   Iraq.  I have, again, concerns about her.

16                MR. FARIDI:  Just one moment, Your Honor.  No

17   objection.

18                THE COURT:  Okay.  Sixty-three, Jodie Safer has a

19   medical --

20                MR. FARIDI:  No objection.

21                MR. O'CONNOR:  No objection.

22                THE COURT:  And of course Mr. Scerbo would be out.

23   And that's Number 65.

24                MR. O'CONNOR:  Yes.

25                THE COURT:  Sixty-seven, Stallard, college --
```

```
 1    full-time college student.

 2               MR. O'CONNOR:  Oh, right.

 3               MR. FARIDI:  No objection.

 4               MR. O'CONNOR:  No objection.

 5               THE COURT:  And 68 is medical and vacation

 6    conflicts.

 7               MR. FARIDI:  Yes.  No objection.

 8               THE COURT:  That's Starr.

 9               MR. O'CONNOR:  No objection.

10               THE COURT:  Sixty-nine who spent five days in jail

11    with no lights on.

12               MR. O'CONNOR:  No objection.

13               THE COURT:  Seventy is Thompson.  She's got child

14    care issues, and she's an FBI analyst.

15               MR. FARIDI:  No objection.

16               MR. O'CONNOR:  No objection.

17               THE COURT:  Seventy-one, Venegas, English was a

18    problem for him.

19               MR. FARIDI:  No objection.

20               MR. O'CONNOR:  No objection.

21               THE COURT:  And the last four, Young, Zand and

22    Albarracin.

23               MR. O'CONNOR:  What was the last one, Your Honor?

24               THE COURT:  Seventy-three, 74 and 75.

25               Any objection?  Zand's got the job interview and
```

```
 1   also speaks Arabic, which would make me concerned in any

 2   case -- in this case.  And the last one, 75, has a medical

 3   excuse.

 4               MR. O'CONNOR:  Oh, and I already crossed out 74,

 5   actually.

 6               THE COURT:  So 73, 74, 75 are out.

 7               MR. FARIDI:  Your Honor, do you recall the reason

 8   for 73?

 9               MR. O'CONNOR:  Yes.  39 weeks pregnant.

10               THE COURT:  She's pregnant.  Yes.  Yep.

11               Now, are there any other folks you all want

12   stricken for cause?  We're going to excuse the jurors who

13   will be stricken for cause --

14               THE DEPUTY CLERK:  Okay.

15               THE COURT:  -- now because there are people

16   outside who want to sit in the courtroom.

17               THE DEPUTY CLERK:  Okay.

18               MR. FARIDI:  Just give me 30 seconds, Your Honor.

19               THE COURT:  Sure.  The jurors, their number and

20   name, excuse them so we can double-check and make sure that

21   we didn't add anybody or miss anybody.

22               THE DEPUTY CLERK:  Okay.

23               MR. FARIDI:  I'm on the last page, Judge.

24               THE COURT:  Okay.

25               MR. FARIDI:  Number 44, Ms. Manke.  My
```

```
 1    recollection is that she visited Iraq 120 days, she worked

 2    with the Department of the Army managing the civilian

 3    personnel there during the Iraq war, and so that does raise

 4    a concern in our minds.

 5              THE COURT:  Well, I watched her demeanor.  I mean,

 6    do you have an objection?

 7              MR. O'CONNOR:  No, Your Honor.

 8              THE COURT:  I listened very carefully to that.  I

 9    think she didn't have anything to do with, you know,

10    military intelligence.  She wasn't at Abu Ghraib, so I'm not

11    going to strike her.

12              MR. FARIDI:  Nothing further from us, Your Honor.

13    That was the only one.

14              THE COURT:  Okay.  Anything else?

15              MR. FARIDI:  No, Your Honor.

16              THE COURT:  All right.  Then you know about no

17    backstriking.  All right.  And you each get three

18    peremptories, and we'll get the jury in place.

19              Now, I'm going to giving them the preliminary

20    instructions, and because I'd like the two opening

21    statements back to back, we're going to give them an earlier

22    lunch break than I normally do, so you'll be opening up

23    right after lunch.

24              MR. O'CONNOR:  What time do you normally take

25    lunch, Your Honor?
```

123

```
1                THE COURT:  1:00.  So today -- by the time we
2    instruct the jury, it will be 12:30, 12:35.
3                MR. O'CONNOR:  Oh, I completely agree.  That was
4    just for future reference.  I did have a question --
5                THE COURT:  Let's get the jury in place and then
6    we can talk.
7                MR. FARIDI:  Your Honor, I'm just curious, how
8    many do you have left?
9                THE COURT:  How many do we have left?
10   Twenty-four.
11               MR. O'CONNOR:  Oh, I know the question.  It does
12   go to the peremptories.
13               THE COURT:  The critical mass is 14.
14               MR. O'CONNOR:  When we -- when we exercise a
15   peremptory, we're going to slide someone in so we see who
16   goes in for our next peremptory?
17               THE COURT:  I'm sorry?
18               MR. O'CONNOR:  When we exercise a peremptory and
19   Mr. Faridi does, we're going to immediately put a new person
20   in the box?
21               THE COURT:  Yeah.  There's no backstriking.  In
22   other words, the plaintiff will strike one, two -- zero,
23   one, two or three on that first round.
24               MR. O'CONNOR:  Right.
25               THE COURT:  We'll see who they've struck.  You
```

```
 1    will then strike from who's left.  All right.  Ms. Ginsberg

 2    should be able to tell you exactly how this is done.  All

 3    right.  And then whoever has been stricken, their names are

 4    removed from the board, and the only ones that you can

 5    restrike from are the new ones that go in.

 6              MR. O'CONNOR:  Okay.  That's what I -- I wanted to

 7    make sure I understood.

 8              THE COURT:  Counsel next to you, she knows how

 9    it's done.

10              MR. O'CONNOR:  Her view wasn't quite so sure.

11              THE COURT:  Okay.

12              MR. O'CONNOR:  Thank you, Your Honor.

13                         (Open court.)

14              THE COURT:  Now, ladies and gentlemen, what we're

15    going to do in a minute is we're going to call the names of

16    those jurors who are going to be excused at this time, and

17    when you hear your name called, you may leave the courtroom,

18    you should go down to the clerk's office, check out with the

19    clerk's office, and we want to thank you for your service.

20    And then as soon as we clear up some space, we'll be able to

21    let the folks who have been standing get a seat in the

22    courtroom.

23              THE DEPUTY CLERK:  Juror Number 1, John Amenyah.

24    Juror Number 2, Venugopal Annapaneni.  Juror Number 3,

25    Alyssa Ashworth.  Juror Number 4, Yohannes Assefa.  Juror
```

                                                              125

```
 1    Number 5, Susan Barbini.  Juror Number 7, Anthony Berardo.
 2    Juror Number 8, David Blanchard.  Juror Number 12, Howard
 3    Byrd, Jr.  Juror Number 13, Lynn Casey.  Juror Number 16,
 4    Robert Conrad.  Juror Number 17, Harold Cooper.  Juror
 5    Number 18, Shari DeCasper.  Juror Number 19, Thomas Dementi.
 6    Juror Number 24, Devin Draine.  Juror Number 25, Alison
 7    Edelstein.  Juror Number 28, Joanne Giles.  Juror Number 29,
 8    Timothy Goeglein.  Juror Number 32, Kristy Hakes.  Juror
 9    Number 33, Brian Hanning.  Juror Number 38, Zoe Hunter.
10    Juror Number 39, Ramatu Kamara.  Juror Number 41, Keagan
11    Lanham.  Juror Number 43, Kendra Lubarsky.  Juror Number 47,
12    Haritha Meduri.  Juror Number 48, Alberto Menendez Hassel.
13    Juror Number 53, Vanthu Nguyen.  Juror Number 54, Robert
14    O'Hara.  Juror Number 55, Miguel Perez, Jr.  Juror
15    Number 56, Maria Pesino.  Juror Number 58, Michele Popaden.
16    Juror Number 59, Alex Purdy.  Juror Number 61, Lynne Rose.
17    Juror Number 63, Jodie Safer.  Juror Number 65, Edward
18    Scerbo, Jr.  Juror Number 67, Sydney Stallard.  Juror
19    Number 68, Melane Starr.  Juror Number 69, Charles
20    Steigerwald, Jr.  Juror Number 70, Regina Thompson.  Juror
21    Number 71, Juan Venegas.  Juror Number 73, Ellen Young.
22    Juror Number 74, Melika Zand.  Juror Number 75, Michael
23    Zurita Albarracin.
24             THE COURT:  I'll ask the jurors sitting in the
25    back to sort of move up closer to the front, please.  All
```

126

```
1    right.  So anybody who's out in the public who needs to get

2    a seat can now come into the courtroom.

3              And now what's going to happen, folks, is my

4    courtroom deputy is going to call eight names, and my court

5    security officer will show you where to sit in the jury box,

6    and we'll start the process of choosing the jury.

7              Juror Number 50, Kathleen Moran.  Juror Number 64,

8    Ramesh Sankaranarayan.  Juror Number 51, Salina Natneal.

9    Juror Number 26, Paula Edmunds.  Juror Number 22, Timothy

10   Dionisopoulos.  Juror Number 23, James Dize.  Juror

11   Number 20, Miles DeSamour.  And Juror Number 37, Heather

12   Henry.

13                        (Pause.)

14             THE DEPUTY CLERK:  If I call your name, you may

15   leave the courtroom.

16             Juror Number 23, James Dize.  Juror Number 22,

17   Timothy Dionisopoulos.  And Juror Number 51, Salina Natneal.

18             If I call your name, please come forward and have

19   a seat in the jury box.  Juror Number 44, Susan Manke.

20   Juror Number 45, Jason Martinez.  And Juror Number 46, Jody

21   McDonald.

22                        (Pause.)

23             THE DEPUTY CLERK:  If I call your name, please

24   feel free to leave the courtroom.  Juror Number 44, Susan

25   Manke.  And Juror Number 46, Jody McDonald.
```

127

```
 1              If I call your name, please come forward and have

 2     a seat in the jury box.  Juror Number 42, Tammy Lieu.  And

 3     Juror Number 11, Linh Bui.

 4                        (Pause.)

 5              THE DEPUTY CLERK:  Members of the jury, could you

 6     please stand and raise your right hand and respond after the

 7     affirmation.

 8                        (Jury panel sworn.)

 9              THE DEPUTY CLERK:  Thank you.  You may be seated.

10              THE COURT:  All right.  The rest of the panel is

11     now free to leave.  Again, I want to thank you for your

12     attendance this morning, but we have selected the eight

13     people who will serve as the jurors in this case.

14              Can you all put up with about ten more minutes

15     before I let you go for your lunch break?  We're going to

16     stop for lunch a little earlier than normal today because I

17     know you've been sitting in court a long time.  At least

18     those chairs are more comfortable than the wooden benches

19     you've been on for the last two hours.

20              Again, folks, I really want to thank you, and the

21     parties certainly appreciate the fact that you're willing to

22     spend the next several days sitting as the jury in this

23     case.

24              Now, I first of all want to go over with you sort

25     of the structure of the trial and what you can be expecting.
```

```
 1    And the first thing I do want to tell you is that I allow
 2    jurors to take notes.  Some courts don't permit that, but I
 3    think it can be helpful, especially if the case is going to
 4    take several days.  So after the break, we'll give you
 5    notebooks and pens, and you'll be free to take whatsoever
 6    notes you feel are comfortable -- you're comfortable taking.
 7              Now, you're not able to get transcripts of the
 8    proceedings at the end of the day, so you're going to have
 9    to rely on your memories of what's gone on during the trial,
10    and to the extent that taking notes will help you keep your
11    memory, you know, nice and sharp, then feel comfortable
12    taking notes.  Some people take lots of notes, I happen to
13    do that; some people don't need to take notes, they are able
14    to remember things very, very well.  It's totally up to you
15    individually.
16              You should understand, though, that your notes are
17    only an individual memory aid; they're not meant to be
18    shared or shown to anybody else other than you.  We keep
19    them here in the courthouse when we're not in session; you
20    don't take them home with you.
21              And the fact that some of you may take a lot of
22    notes and some of you may take very few or none doesn't
23    change the fact that you are eight co-equal judges.  At the
24    end of the trial, it will be each of your own individual
25    memories of the evidence, evaluation of the evidence that
```

129

```
 1    will be important.  And so you must give careful
 2    consideration to the opinions of each juror.
 3            The fact that one juror may have taken a lot of
 4    notes doesn't mean that his or her memory of the evidence or
 5    opinion is worthy of any more consideration than that of a
 6    juror who takes very few notes or none at all.  So as long
 7    as you keep the concept of note-taking in perspective, there
 8    won't be any problems with your taking notes.  Again, you
 9    don't have to; if you want to, we're making them available
10    to you.
11            Now, after the lunch break, we're going to have
12    what are called opening statements.  This is the time when a
13    lawyer for each side will be able to give you a brief
14    overview as to what the lawyer thinks the case is going to
15    show.
16            For those of you who do jigsaw puzzles, you may
17    know that the cover of the box of the jigsaw puzzle has the
18    final picture.  You put all the pieces together, and here's
19    what you get.  Well, opening statements are basically two
20    different box cutters, that's what you're going to get from
21    the lawyers.  At the end of the day, you'll have to see how
22    the pieces fit together or not.
23            Whenever the lawyers are talking to you during the
24    trial -- and you'll hear a lot of lawyer talk, either in an
25    opening statement or in the form of a question that they
```

130

1    might ask of a witness, or in an objection to something

2    that's happening, or at the end of the trial when they do

3    closing arguments.  What lawyers say is not evidence.

4    Unless the lawyer is quoting a stipulation or a witness in

5    answering a question says yes, that's what happened, what

6    the lawyer has said is not evidence.  But it is a lawyer's

7    job to pull out the evidence by asking the correct question

8    or by producing the correct piece of evidence.  So in the

9    opening statements, you should certainly listen carefully

10   because that will help you have an idea of what the case is

11   going to be all about.

12           Now, in a civil case, the burden of proof is on

13   the plaintiff, that is the party, or, in this case, the

14   three plaintiffs who are bringing the lawsuit.  And because

15   they have the burden of proof, they get to go first at each

16   stage of the proceedings.  That's why the plaintiffs will

17   make their opening statement first, and then CACI will make

18   the opening statement on behalf of CACI.  Then we start the

19   evidence portion of the trial.

20           Now, evidence consists of several different

21   categories of information.  First, there can be something

22   called judicial notice, and that's when the Court takes

23   judicial notice of a particular fact.  That just means that

24   the parties are not going to put any evidence on and the

25   court is satisfied that a particular fact is the case and

131

```
 1     you have to accept that fact.

 2            Stipulations occur when the -- both sides agree to

 3     a certain fact.  And we do have stipulations in this case.

 4     But you are the ultimate triers of fact, and a jury has the

 5     right to reject a stipulation if you don't find that there's

 6     a basis for it.  But usually the lawyers agree and there's

 7     no evidence presented as to that fact.

 8            The next type of evidence would be testimony of

 9     witnesses.  Now, we're going to have several different types

10     of witnesses in this case.  First we'll have witnesses who

11     are physically in the courtroom, they will be sitting in the

12     witness box over here, and they will testify, what we call

13     that live testimony.  So you will actually be able to see

14     and hear the witness live.

15            Then we're going to have the two plaintiffs who

16     are in Iraq will be testifying via video.  Again, you'll be

17     able to see and hear them.  They will be assisted with an

18     interpreter.

19            You will also have testimony coming in by

20     deposition.  Now, in civil cases before a case ever comes to

21     trial, the lawyers have a chance to do discovery, that is

22     they try to find out what the facts are.  And for various

23     reasons, it's sometimes the case that a witness is unable to

24     come to court physically and testify and is also not

25     available to be videotaped so that we could have a live
```

132

1    video presentation of the evidence.  Instead, that witness,

2    at some earlier time, was questioned by the lawyers for both

3    sides, was placed under oath, and there was a video

4    recording made of the testimony.  So you are going to get

5    video depositions.

6            In some cases, there will not be video

7    depositions, but we will have a written transcript of a

8    particular witness's testimony, again made under oath.  In

9    that case, one of my law clerks will sit in the witness box

10   and will read the answers to the various questions that were

11   presented.  The lawyers will read the question, and my law

12   clerk will read the answer.  And I'll go over that with you

13   again.

14           And the last thing that's a little bit unusual in

15   this case, but because the United States government did

16   impose a state secrets cloak on some of the evidence in this

17   case, some of the witnesses were not permitted to testify

18   during discovery using their names, and, in fact, even their

19   faces could not be seen.  You are going to therefore have

20   some witnesses whose depositions will be identified as

21   Witness A, Witness B.  In other words, either -- I think

22   it's a letter or a number that was used to identify the

23   witness, and that is just a particular aspect of this case.

24           You may also see some physical exhibits in this

25   case that would have originally had some classification

133

1    markings on them, like the word "secret," which normally you

2    all couldn't see, but they have been declassified so that

3    they are now available to the public.  So that's something

4    else you will see in this case.

5              In terms of witness testimony, again, because the

6    plaintiff has the burden of proof -- the plaintiffs have the

7    burden of proof in this case, they go first at each stage.

8    So after the opening statements, the plaintiff will call --

9    plaintiffs will call their first witness, and they will ask

10   all the questions they have of that witness.  We call that

11   the direct exam.  When they're finished, then on behalf of

12   CACI -- CACI's attorneys will be able to ask any questions

13   they have of that witness.  We call that cross-examination.

14             If, during the cross-examination, issues come up

15   which the plaintiffs want to correct or make clearer, they

16   are allowed what is called redirect.  So another round of

17   questioning by the plaintiffs' counsel.  And if, during the

18   redirect, certain issues are raised, the defense can do

19   another round of questioning, which we call recross.  And

20   then that witness is finished, and he or she is excused, or

21   if they're held on, they can be called back later in the

22   trial.  And we'll go that way until all of the plaintiffs'

23   witnesses have been called.

24             During the course of the plaintiffs' case, they

25   may also move to admit certain exhibits.  I think there will

134

```
 1    be a fair number of photographs in this case, and there will
 2    be other items of evidence.
 3              When the plaintiff has put on all of -- plaintiffs
 4    have put on all of their evidence, you will hear counsel say
 5    that the plaintiffs are resting.  And then we turn to the
 6    defense.  At this point, we now sort of reverse the order.
 7    The defense will call their first witness, so the defense
 8    counsel will have the direct examination, and then
 9    plaintiffs' counsel will have the cross.  And if the defense
10    counsel need to redirect, they'll do the redirect, and then
11    plaintiffs' counsel will do the recross if that's necessary.
12    And we'll go that way until all of the defense witnesses
13    have testified and their evidence has been presented.
14              There may or may not be a rebuttal case.  We do
15    permit that in some cases, in which case, again, the
16    plaintiffs would go first if there's some additional
17    evidence that they want to put on to rebut evidence that
18    came in during the defendant's case.  And in some rare
19    cases, we allow a surrebuttal case by the defense.
20              But once all the evidence is in, then the next
21    phase of the trial is what's called closing arguments.
22    Because the plaintiffs have the burden of proof, they make
23    the first closing argument.  And this is a time when the
24    lawyers will again -- the lawyer will again address you
25    directly and try to argue and explain to you from the
```

135

1   evidence presented during the trial to what they want your

2   conclusion to be.

3          After the plaintiff has made their first opening

4   closing, the defense counsel makes closing argument on

5   behalf of the defendant.  And then, again, because the

6   plaintiff has the burden of proof, the plaintiff is allowed

7   a very brief rebuttal argument, and then it's my job to give

8   you the instructions of the law.

9          And instructions will be given to you orally the

10  way I am right now, but you will also get to take back with

11  you into the jury room the written instructions.  So you

12  will actually have copies of the instructions if you need to

13  refresh yourselves about any of those issues.

14         Now, during the course of a trial, occasionally a

15  lawyer objects to a particular question that might be asked

16  or a piece of evidence that's coming in, and it is a

17  lawyer's job to object when the lawyer believes that

18  something is happening that violates the rules of evidence

19  or some earlier ruling of the Court, and it's my job to rule

20  on an objection.

21         If I agree with the lawyer that there is a good

22  basis for the objection, I will either say objection granted

23  or sustained.  Those words mean the same thing.  On the

24  other hand, if I don't think there's a problem, I will

25  either say objection overruled or denied, and those words

136

 1    mean the same thing.

 2           Now, it's very important that jurors not hold it

 3    against a lawyer or the lawyer's client or clients the fact

 4    that he or she has made an objection, nor should you try to

 5    read any inference into how I rule on an objection.  The

 6    fact that I might grant an objection doesn't mean I think

 7    that side should win the case, or if I overrule or deny an

 8    objection, it doesn't mean I think that side should lose the

 9    case.  Think about how a judge rules on objections the way a

10    referee or an umpire in a sporting event, you know, baseball

11    calls balls or strikes or fouls.  That's not meant to help

12    one side or hurt the other; it's meant to keep the operation

13    going by the rules.

14           Now, the last thing I want to talk to you about is

15    juror conduct during a trial, especially a trial that's

16    going to take quite a few days.  There is definitely media

17    interest in this case.  You have to be extremely careful to

18    avoid any contamination of your thought process.  So the

19    first and most important thing a juror must remember is

20    you've taken an oath, a promise, that you will decide this

21    case solely on what you see and hear in this courtroom,

22    which means no outside influence.

23           So, first of all, nobody should be talking to you

24    or asking you any questions about the case or your job as a

25    juror.  We're a small courthouse.  If you're downstairs

```
 1    grabbing a sandwich or you're out on the street, you know,

 2    walking to one of the food places and somebody asks you

 3    about the case, you should immediately tell them I can't

 4    talk about the case, and you should immediately let my court

 5    security officer know that somebody tried to talk to you

 6    about the case.

 7             You have to avoid any media coverage.  I'm not

 8    barring you from watching TV, or, you know, going on the

 9    Internet or reading the paper.  But if you should see

10    anything whatsoever about this case, about Abu Ghraib, about

11    Iraq, anything like that, you must immediately get away from

12    it.  All right.

13             When you go home tonight, family, friends,

14    business colleagues -- you know, it's all right to say I'm a

15    juror in federal court in Alexandria.  If they ask you what

16    the case is about, you say I can't -- judge told me I can't

17    talk about it, and you must not talk with anybody about the

18    case.

19             It's extremely important that jurors not make up

20    their mind on any issue until you've heard all the evidence,

21    all the arguments of counsel, and you've received the

22    instructions from the Court.  So you must keep an open mind

23    throughout the trial, because sometimes things that happen

24    at the beginning of a case and seem really important by the

25    end of the case, ah, they're not that important.  Or things
```

138

```
 1    that didn't seem very important become much more significant

 2    as the case evolves.  So you have to be very careful.

 3              When you're together during the breaks, get to

 4    know each other, chat about the weather, baseball, whatever

 5    you want.  Don't talk about the case.  Don't talk about

 6    what's going on in the courtroom, because the problem is,

 7    you might start making up your minds about something, and

 8    then it becomes harder to change your mind if new

 9    information comes in.  So we want you to keep an open mind

10    throughout the trial.

11              We want to make sure that you also avoid any

12    social media issues.  That's been a real problem, not in

13    this courthouse, but there have been some jury cases where

14    mistrials had to be declared because a juror had been

15    chatting or doing something with social media that resulted

16    in the jury being contaminated.  So as long as you all, you

17    know, follow these instructions, there should be no problems

18    with this case.  All right.

19              Now, normally we would be breaking for lunch at

20    1:00, but because I want you to hear the opening statements

21    back to back, and they will take longer than 15 minutes, I'm

22    going to give you your lunch break now.  So you're going to

23    be on break from quarter of 1 to quarter of 2.  We'll want

24    you back in here promptly by quarter of 2.  We cannot start

25    until all the jurors are together.  All right.
```

139

```
1              So if you go with my court security officer, he'll
2    give you a little bit of orientation as to where you can
3    find lunch around here, and we'll see you back here in an
4    hour.  We're going to stay in session.  I know there are a
5    couple of matters to take up with counsel.
6              THE CSO:  Rise for the jury.
7                   (Jury not present at 12:47 p.m.)
8              THE COURT:  All right.  Counsel, first of all, any
9    objection to the Court's preliminary instructions?
10             MR. FARIDI:  None, Your Honor.
11             MR. O'CONNOR:  No, Your Honor.
12             THE COURT:  All right.  You all can have a seat.
13             I understood, Mr. O'Connor, there were one or two
14   matters you wanted me to take up?  One that has to do with
15   your witness, Mr. Mudd.
16             MR. O'CONNOR:  One has to do with the witness,
17   Mr. Mudd.
18             THE COURT:  All right.  Yeah.
19             MR. O'CONNOR:  Your Honor, I met with Mr. Mudd
20   yesterday, and I would say his condition is significantly
21   worse than the last time I met with him.  I've talked with
22   Mr. Faridi, and I believe we're on the same page that the
23   solution here is to read in during our case both sides'
24   deposition designations.  We met and conferred on those
25   yesterday, and there's I think two or three passages that we
```

140

```
 1    can -- if we can't sort those out, we'll get a ruling on

 2    those two or three passages.

 3                THE COURT:  All right.

 4                MR. O'CONNOR:  We would like the Court to advise

 5    the jury that he's medically unavailable.  I can bring him

 6    in if the Court feels --

 7                THE COURT:  No.  I'll take your word on that.  And

 8    if and when you call him, if I forget to do it, remind me.

 9                MR. O'CONNOR:  I will do that, Your Honor.

10                THE COURT:  All right.  Was there anything else of

11    a preliminary matter?  Ms. Ginsberg?

12                MS. GINSBERG:  Yes, Your Honor.

13                Based on the Court's ruling on the conspiracy

14    issue last Friday, I reviewed the exhibits that I thought

15    were covered by it.  I found some additional exhibits which

16    I added to the list, which I provided to counsel for the

17    plaintiffs on Friday.  When we got a copy of their final

18    exhibit list, only one of those exhibits was removed.

19                So, in my view, all of the exhibits -- there are

20    some 29 exhibits, which I think are covered by Your Honor's

21    ruling.  It may be that some of those exhibits are at least

22    arguably admissible on -- for other reasons, and I think the

23    Court probably will have to hear how they're presented for

24    those.  But the majority of these exhibits are, I think

25    squarely within the Court's ruling that things that occurred
```

141

 1    after the end of the conspiracy are not admissible.  I have

 2    a list of those exhibits.  I'll give the revised --

 3    actually, I think I've given the revised new list to counsel

 4    for the plaintiffs.

 5              I don't know if Your Honor wants to deal with that

 6    issue now, but I just cannot imagine how most of these

 7    exhibits could be relevant for any other purpose other than

 8    to suggest that the conspiracy lasted longer and that the

 9    things that CACI did after the conspiracy ended suggests

10    that -- some kind of liability on their part.

11              THE COURT:  All right.  Let me hear briefly from

12    counsel.

13              MR. FARIDI:  Good afternoon, Your Honor.

14              I think the key phrase that Ms. Ginsberg used was

15    some of those exhibits may be admissible for other purposes.

16    We think a good number of them are admissible for other

17    purposes, and Your Honor can deal with that issue when those

18    exhibits do come up.

19              And I'll just preview for Your Honor that some of

20    those exhibits are admissible not -- and I've told

21    Ms. Ginsberg, we're not going to argue that there was a

22    cover-up conspiracy following the release of the reports by

23    the generals.  What we are going to argue is that some of

24    those exhibits are relevant to establish that CACI did have

25    control over its employees who were serving in Abu Ghraib,

                                                                142

```
1    which is relevant to the defense that they are putting up

2    before the jury, or we expect them to put up before the

3    jury.  They're also relevant to establish that some of the

4    techniques that their folks were directing the military

5    police to implement, the military actually took issue with

6    those techniques, and they told CACI that in the May or

7    June 2004 time period.  So that's relevant to establish

8    conspiracy.  We heard Your Honor's ruling.  We're going to

9    abide by it.  But those exhibits are relevant for many other

10   purposes, two of which I just previewed for Your Honor now.

11          I don't think Your Honor needs to deal with that

12   issue now.  We'll take a look at the list that Ms. Ginsberg

13   gave us on Friday, we took a look at it when it came in.  I

14   think many of those exhibits we will not seek to offer, but

15   there are some, there's a handful, and I previewed that

16   issue with Ms. Ginsberg.

17          THE COURT:  All right.  Well, to focus the Court's

18   attention, when you leave the courthouse tonight, make sure

19   that you've sent us a list of those exhibits that remain

20   potentially in contest; all right --

21          MS. GINSBERG:  Yes, Your Honor.

22          THE COURT:  -- so that we're not looking at this

23   cold.

24          MS. GINSBERG:  And one thing that I think Your

25   Honor agreed that the conspiracy ended not when the generals
```

143

1    issued their report, but when the photographs were disclosed

2    and the general -- General Taguba actually was authorized or

3    directed to conduct an investigation.  That was

4    significantly -- that was mid January, at the very latest.

5    The reports were not disclosed and wasn't made public until

6    April.  So we're talking -- we're bringing the time frame

7    significantly back.

8              THE COURT:  I don't think there's a dispute over

9    that, I mean, based upon what I said in court Friday;

10   correct?

11             MR. FARIDI:  That is correct, Your Honor.

12             THE COURT:  All right.

13             MR. FARIDI:  General Taguba, I believe he was

14   charged with the investigation on January 31st.  There was a

15   CID investigation that began to take place in the middle of

16   January, and they made the argument that the initiation of

17   the CID investigation put an end to the conspiracy.  I think

18   that's a contested issue, and that's something that we can

19   tee up for Your Honor when you have the exhibits in front of

20   you.

21             MS. GINSBERG:  I believe -- we will do that, but,

22   Your Honor, I believe that the beginning of the Taguba

23   report states that he was directed or authorized on January

24   the 19th, that that's when the authorization occurred.  But

25   it is what it is.

                                                              144

```
 1            THE COURT:  The real question is, is there going

 2    to be any evidence in this case of the abuse occurring after

 3    things basically went public?  I think that is the fact that

 4    it stopped.

 5            MR. FARIDI:  Yeah.  That is correct, Your Honor.

 6    But there will be evidence as to whether or not the abuse

 7    that took place is abuse that the military took an issue

 8    with in its communications with CACI after the abuse came to

 9    light.

10            THE COURT:  But remember, it's also required that

11    there has to be evidence that CACI knew that the misconduct

12    was occurring at the time it was occurring, otherwise, I

13    mean, there's no way they could have stopped it; all right?

14            MR. FARIDI:  And there will be ample evidence of

15    that, Your Honor.

16            THE COURT:  That's fine.  All right.  Then we'll

17    take our break now.

18            MR. FARIDI:  There is just two minor issues.

19            THE COURT:  All right.

20            MS. GINSBERG:  Thank you, Your Honor.

21            MR. FARIDI:  We have Mr. Citronberg here who is

22    our local counsel.  He has requested to us, and we request

23    to you, that he be relieved for the remainder of the

24    proceeding.

25            THE COURT:  I don't have any problem given the
```

145

```
 1    length of time.  But, Mr. Citronberg, I think you probably
 2    should come back towards the end when we do the jury
 3    instructions.
 4            MR. CITRONBERG:  I'll make my best effort, Your
 5    Honor.
 6            THE COURT:  All right.  That's fine.  But you're
 7    excused then at this point.
 8            MR. FARIDI:  And we expect General Taguba to
 9    testify tomorrow.  There's one outstanding issue with
10    respect to his cross-designations to his report that CACI
11    has served.  Your Honor said on Friday that was under
12    advisement.
13            Whenever Your Honor rules, we will swap into your
14    binders the report that reflects Your Honor's rulings.
15            THE COURT:  All right.  Anything further?
16            MR. FARIDI:  None from us, Your Honor.
17            MR. O'CONNOR:  No, Your Honor.
18            THE COURT:  We'll be in recess then until quarter
19    of.
20                (Proceedings adjourned at 12:55 p.m.)
                  ---------------------------------
21    I certify that the foregoing is a true and accurate
22    transcription of my stenographic notes.
23
24                              Stephanie Austin
25                              Stephanie M. Austin, RPR, CRR
                                                          146
```