```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
 2                      ALEXANDRIA DIVISION

 3   --------------------------x
     SUHAIL NAJIM ABDULLAH AL    :      Civil Action No.:
 4   SHIMARI, et al.,            :      1:08-cv-827
                   Plaintiffs,   :
 5        versus                 :      Thursday, April 18, 2024
                                 :      Alexandria, Virginia
 6   CACI PREMIER TECHNOLOGY,    :      Volume IV
     INC,                        :      Pages 1-152
 7                 Defendant.    :
     --------------------------x
 8

 9        The above-entitled jury trial was heard before the
     Honorable Leonie M. Brinkema, United States District Judge.
10   This proceeding commenced at 9:32 a.m.

11                    A P P E A R A N C E S:

12   FOR THE PLAINTIFFS:    BAHER AZMY, ESQUIRE
                            THE CENTER FOR CONSTITUTIONAL RIGHTS
13                          666 Broadway
                            7th Floor
14                          New York, New York  10012
                            (212) 614-6464
15
                            MUHAMMAD FARIDI, ESQUIRE
16                          MICHAEL BUCHANAN, ESQUIRE
                            BONITA ROBINSON, ESQUIRE
17                          ANDREW HADDAD, ESQUIRE
                            MICHAEL FISHER, ESQUIRE
18                          THOMAS KICAK, ESQUIRE
                            SCOTT KIM, ESQUIRE
19                          ALEXANDRA MAHLER-HAUG, ESQUIRE
                            PATTERSON BELKNAP WEBB & TYLER LLP
20                          1133 Avenue of the Americas
                            New York, New York  10036
21                          (212) 336-2000

22

23

24

25
                                                            1
```

```
 1                    A P P E A R A N C E S:

 2    FOR THE DEFENDANT:    JOHN O'CONNOR, JR., ESQUIRE
                            LINDA BAILEY, ESQUIRE
 3                          JOSEPH MCCLURE, ESQUIRE
                            STEPTOE & JOHNSON LLP
 4                          1330 Connecticut Avenue, NW
                            7th Floor
 5                          Washington, D.C.  20036
                            (202) 429-3000
 6
                            NINA GINSBERG, ESQUIRE
 7                          DIMUROGINSBERG PC
                            1101 King Street
 8                          Suite 610
                            Alexandria, Virginia  22314
 9                          (703) 684-4333

10    FOR THE UNITED        REBECCA LEVENSON, ESQUIRE
      STATES:               OFFICE OF THE UNITED STATES ATTORNEY
11                          2100 Jamieson Avenue
                            Alexandria, Virginia  22314
12                          (703) 299-3700

13                          STEPHEN ELLIOTT, ESQUIRE
                            JASON LYNCH, ESQUIRE
14                          UNITED STATES DEPARTMENT OF JUSTICE
                            CIVIL DIVISION FEDERAL PROGRAMS BRANCH
15                          1100 L Street, NW
                            Washington, D.C.  20044
16                          (202) 598-0905

17    COURT REPORTER:       STEPHANIE M. AUSTIN, RPR, CRR
                            Official Court Reporter
18                          United States District Court
                            401 Courthouse Square
19                          Alexandria, Virginia  22314
                            (571) 298-1649
20                          S.AustinReporting@gmail.com

21         COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

22

23

24

25
                                                                    2
```

```
 1                    TABLE OF CONTENTS

 2                        WITNESSES

 3   On behalf of the Defendant:

 4   MARK BILLINGS

 5   Direct examination by Mr. O'Connor .......18
     Cross-examination by Ms. Robinson ........31
 6   Redirect examination by Mr. O'Connor ......66
     Recross-examination by Ms. Robinson .......70
 7
     CHARLES MUDD (Read-in deposition)
 8
     Direct examination by Mr. O'Connor .......83
 9
     WILLIAM BRADY, III (Read-in deposition)
10
     Direct examination by Mr. O'Connor .......121
11
                         EXHIBITS
12
     On behalf of the Plaintiffs:
13   Admitted

14   Number 100 ...............................27
     Number 103 ...............................46
15   Number 225 ...............................53
     Number 133 ...............................55
16   Number 207 ...............................59
     Number 85 ................................62
17   Numbers 104, 72, 98A, 98B, 107A thru 107E .82

18                       MISCELLANY

19   Certificate of Court Reporter ............152

20

21

22

23

24

25
                                                    3
```

```
 1                    P R O C E E D I N G S
 2              THE DEPUTY CLERK:  Civil Action
 3    Number 1:08-cv-827, Suhail Najim Abdullah Al Shimari, et al.
 4    versus CACI Premier Technology, Inc.
 5              Will counsel please note their appearance for the
 6    record, beginning with the plaintiff.
 7              MR. FARIDI:  Good morning, Your Honor.
 8    Muhammad Faridi from Patterson Belknap on behalf of the
 9    plaintiffs.  I'm joined by my colleagues, Alex Mahler-Haug
10    and Bonita Robinson.
11              THE COURT:  Good morning.
12              MS. BAILEY:  Good morning, Your Honor.
13    Linda Bailey on behalf of CACI.  I'm joined by my
14    colleagues, John O'Connor, Nina Ginsberg and Joe McClure.
15              THE COURT:  Good morning.  And I understand
16    there's a state secret issue?
17              MS. BAILEY:  Yes, Your Honor.
18              THE COURT:  Approach the bench.
19                   (Bench conference.)
20              MR. ELLIOTT:  Good morning, Your Honor.
21              THE COURT:  Good morning.  All right.  This has to
22    do with which -- who's your first witness?
23              MS. BAILEY:  Well, we're going to continue Steve.
24              THE COURT:  All right.  Is this coming up during
25    this testimony?
```

                                                          4

```
1              MS. BAILEY:  No.

2              MR. ELLIOTT:  I apologize.  I'll be quick.  Go

3    ahead.

4              MS. BAILEY:  So, Your Honor, if you remember,

5    during the Pappas deposition we entered this organization

6    chart, and the group names were considered by plaintiffs and

7    the Court to be inflammatory.  It was like foreign fighters

8    and breaker and all of that, and the Court instructed us

9    that we had to use bland names.  So we substituted Group 1,

10   2, 3, 4 and 5.  You know, we met and conferred with

11   plaintiffs' counsel, and everybody agreed to do that.

12             On the JIDC forms, they had the same group names

13   here.  And so what we did was we substituted the exact same

14   language.

15             THE COURT:  Okay.

16             MS. BAILEY:  Counsel for the government's concern

17   is that that takes it, and because these are both Group 1,

18   you can put these two pieces of evidence together and see

19   that there's a limited universe of about eight interrogators

20   that could have been -- that, you know, were assigned to

21   these two plaintiffs, which is in violation of state

22   secrets.  And so the concern is putting them together is

23   problematic.

24             Our concern is that this shows that neither of

25   these two plaintiffs were in the group for either Steve
```

5

1  Stefanowicz or DJ, both of whom were greatly at issue in

2  this case.  So not being able to show they weren't in those

3  groups is a problem for us.

4          THE COURT:  Well, wait one second.

5          I thought that it was stipulated to and it's not

6  an issue in terms of the three plaintiffs who were in this

7  case having ever been interrogated by any other CACI

8  interrogators.

9          MR. FARIDI:  Yes, Your Honor, there is a

10  stipulation that talks about which individuals, based on the

11  limited records that the government has, were interrogated

12  by CACI interrogators.  But our claim doesn't really turn on

13  linking the particular interrogator to any of the

14  plaintiffs.  Our claim is for conspiracy and aiding and

15  abetting.  And this linking thing, you know, we haven't

16  objected to this, I understand this is their defense, but it

17  is legally irrelevant.

18          MS. BAILEY:  So to the extent they're willing to

19  stipulate that neither DJ nor Steve or Tim Dugan, the people

20  they've raised up as sort of the boogeyman in this case

21  are -- did not interrogate these plaintiffs, we're fine with

22  that.

23          THE COURT:  That was always an issue in this

24  case -- or a non-issue in this case.  This is a case based

25  on conspiracy and aiding and abetting.  They're inchoate.

                                                          6

```
 1    And my understanding has been there's no claim that's been

 2    made by the plaintiffs that any of the three plaintiffs

 3    themselves were interrogated by Dugan, Johnson and

 4    Stefanowicz, which are the three and the only three CACI

 5    people who've been identified as having been possibly

 6    complicit in the conspiracy.

 7              MS. BAILEY:  If that's accurate, then we're fine

 8    with that as long as the jury understands that there is no

 9    claim that these three men ever interrogated.

10              THE COURT:  That's going to be -- yeah.

11              MR. FARIDI:  I think there's one qualification I

12    would add, Your Honor.

13              I would urge the Court, if you're going to admit

14    that statement, to also note that the -- there's no evidence

15    whatsoever that the government's record on this issue are

16    conclusive.

17              We already heard evidence of interrogations taking

18    place outside of the interrogation chambers, taking place in

19    the shower halls and Tier 1A.

20              MS. BAILEY:  We would be willing to say formal

21    interrogation.

22              MR. FARIDI:  I think as long as you add another

23    sentence that says that -- something to the effect that the

24    government's records on this issue are not conclusive, you

25    know, I think we're fine.
```

7

1           THE COURT:  You've got Fay's testimony that even

2    though -- I think it's Fay or somebody's testimony, I think

3    it's in this case, that even though there was no --

4    actually, it's a stipulation, isn't it, that there was no

5    formal report of interrogating of the one plaintiff.  There

6    was recognition that he had, in fact, most likely been

7    interrogated because there was other documentation in the

8    report, Mr. Al-Ejaili.

9           MS. BAILEY:  Yes, Al-Ejaili.

10           THE COURT:  Okay.  So that's already in the case,

11    and I'll just clarify that with an instruction to the jury.

12           MS. BAILEY:  That none of the three --

13           THE COURT:  One of the two of you work together

14    and make a proposed simple instruction to the jury and

15    explain it.

16           MS. BAILEY:  Yes, Your Honor.

17           THE COURT:  That takes care of the issue.

18           MS. BAILEY:  Not quite, Your Honor, because these

19    are already in evidence.

20           MR. ELLIOTT:  We disagree with that.  We disagree

21    that the organizational chart is in evidence.

22           THE COURT:  Was this --

23           MS. BAILEY:  It was put in in the Pappas

24    deposition without the redactions.

25           THE COURT:  First of all, Pappas hasn't been

                                                                  8

```
 1   raised in this case yet.
 2           MS. BAILEY:  Right.  Yes, Your Honor.
 3           THE COURT:  All right.  So when you call the --
 4   when you put the Pappas deposition in --
 5           MS. BAILEY:  Yes.
 6           THE COURT:  -- we will correct it at that point.
 7           MS. BAILEY:  Yes, Your Honor.
 8           THE COURT:  All right.  So it's not part of this
 9   trial.  The trial --
10           MS. BAILEY:  Understood.
11           THE COURT:  -- hasn't happened until the witness
12   comes in and then we move for it.  So just make sure you
13   raise that issue with the Pappas deposition.
14           MS. BAILEY:  And we can talk about that.
15           MR. ELLIOTT:  Absolutely.
16           THE COURT:  Pappas isn't scheduled for today.
17           MS. BAILEY:  No, Your Honor.  If things go much
18   quicker than we anticipate, which shouldn't happen because
19   they're recordings, but it would only be the direct
20   examination that would come in.  We obviously didn't put him
21   on our disclosure because we don't intend to get that.
22           THE COURT:  Okay.
23           MR. ELLIOTT:  Your Honor, can I raise one point?
24           THE COURT:  Sure.
25           MR. ELLIOTT:  We noticed this last night, these
```

9

```
 1    leakings of these two documents.
 2              THE COURT:  Right.
 3              MR. ELLIOTT:  But the plaintiffs or defendants
 4    can't raise different pieces of information and put them
 5    together in an attempt to circumvent our privilege.  This is
 6    one example.  I don't know if they intend to do it in other
 7    instances.  We don't know what their case will be.
 8              THE COURT:  Wait a minute.  You've got to stop
 9    them.
10              THE CSO:  Yes.
11              THE COURT:  Is that your team?  You've got to tell
12    your people when we're having these conversations, that's
13    way too much noise; all right?
14              MR. FARIDI:  Yes.  I will make sure, Your Honor.
15              THE COURT:  Or they will be invited to not sit in
16    the courtroom anymore.
17              MR. FARIDI:  All right.
18              THE COURT:  I understand the problem.
19    Hopefully -- I'm going to -- again, this case has been gone
20    long enough.  I don't expect a whole lot of these problems.
21    But if they do come up, we'll have to deal with them.
22              MS. BAILEY:  All right.
23              MR. FARIDI:  Your Honor, while we're here, just a
24    housekeeping issue.
25              I conferred with CACI's counsel this morning.  It
```

                                                              10

```
1   looks like they're going to be resting their case probably
2   tomorrow.  We will have --
3               THE COURT:  Excellent.
4               MR. FARIDI:  We will have a very short rebuttal
5   case, if we have one at all.  I don't think it will exceed
6   more than 45 minutes to an hour.
7               THE COURT:  Okay.
8               MR. FARIDI:  I assume that Your Honor will not ask
9   the parties to close tomorrow?
10              THE COURT:  Well, it depends.  Oh, no.  No.  No.
11  It depends.  If I can get this case to the jury on Friday,
12  that would be fantastic.
13              MR. FARIDI:  Okay.  It looks like it will be
14  happening -- they will probably be resting sometime around 4
15  or 5:00 tomorrow.
16              THE COURT:  Depends on what time they close.
17              MR. FARIDI:  Okay.
18              THE COURT:  Now, I'm going to give each side a
19  total of 45 minutes for closing.  The plaintiff needs to
20  tell me how you want to the divide that.  In other words,
21  half an hour for your opening, 15 for rebuttal or whatever
22  and keep time.
23              MS. BAILEY:  Yes, Your Honor.
24              THE COURT:  Forty-five minutes per side.
25              You've got the proposed verdict form.  I want to
```

                                                                    11

```
 1    discuss that with you today, and I'm working on the jury
 2    instructions, and we'll hopefully give you a draft sometime
 3    tonight that I want you to look over.
 4            MS. BAILEY:  Yes.
 5            MR. FARIDI:  Your Honor, is it possible to discuss
 6    the verdict form after we receive the instructions?  We
 7    looked at the verdict form, we have one issue with it.  I
 8    think the resolution of that issue is going to be contingent
 9    upon --
10            THE COURT:  We need to resolve that today.  I want
11    the verdict form locked in today.
12            MR. FARIDI:  Okay.
13            MS. BAILEY:  Yes, Your Honor.
14            THE COURT:  It does help figuring out the
15    instructions.
16            MR. FARIDI:  Okay.
17            MS. BAILEY:  Yes, Your Honor.
18            MR. ELLIOTT:  Thank you, Your Honor.
19                      (Open court.)
20            THE COURT:  I believe, despite the problems on
21    I-95 this morning, we have all our jurors here, so I want to
22    get things started.
23            Are you set to go, Mr. O'Connor?
24            MR. O'CONNOR:  We are, Your Honor.  Could I give
25    the Court a one-minute update?
```

                                                               12

1          THE COURT:  All right.

2          MR. O'CONNOR:  Following up on some -- on the

3     colloquy that we had at the end of the day on Tuesday, we

4     have made arrangements to get Mr. Porvaznik to a law firm in

5     Ohio where he will do a video link.  We have him set for

6     2 p.m. tomorrow.  I will work with the court staff to get

7     the correct ZoomGov link, but my client is actually doing a

8     ZoomGov test with them today to make sure that the law firm

9     doesn't have any problems.

10          THE COURT:  Excellent.

11          MR. O'CONNOR:  And, by way of further update, my

12    belief is we are going to rest tomorrow.  I don't believe,

13    as I -- unless plaintiffs' crosses are much longer than I

14    expect, I don't believe that we will go past tomorrow.

15          THE COURT:  All right.  Well, as I indicated at

16    the bench conference, I'm giving each side 45 minutes total

17    for closing arguments.  Whether they occur Friday afternoon

18    or Monday morning, we'll see.  You've got the proposed

19    verdict form.  I want to make sure that we've resolved any

20    concerns about the verdict form today.  And you'll be

21    getting a draft charge tonight at some point, and then we'll

22    obviously have a charging conference at some point on

23    Friday.

24          I doubt the jury will get instructed on Friday,

25    but it could happen.  So, you know, we move fast.  All

                                                              13

```
 1    right.  Very good.

 2              Let's call the jury in.  And I think it's mostly

 3    depositions today; is that correct?

 4              MR. O'CONNOR:  It is, Your Honor.  If we get into

 5    the afternoon and the jurors appear to be getting a little

 6    groggy from watching tape recordings, we may do some

 7    read-ins, but we'll -- right now, the plan is to play

 8    depositions.

 9              THE COURT:  Are there any live witnesses planned

10    for today?

11              MR. O'CONNOR:  Yes, Your Honor.  Right after

12    Mr. Stefanowicz's testimony is finished, we're going to call

13    Mark Billings, and that's our only live witness for today.

14    We will have two live witnesses tomorrow, one of which is

15    Mr. Porvaznik.

16              THE COURT:  Excellent.  All right.  Very good.

17    Let's bring the jury in.

18              THE CSO:  Yes, Judge.

19                   (Jury present at 9:43 a.m.)

20              THE COURT:  Good morning, ladies and gentlemen.

21              Again, we certainly appreciate your being here on

22    time.  We had a few preliminary matters we were talking

23    about.  The case is moving, again, very, very quickly.  I'm

24    cautiously optimistic that you'll have this case for

25    deliberation on Monday, so we're way ahead of schedule in
```

                                                              14

```
 1    that respect.
 2            Did any of you have any problems last night in
 3    complying with my instructions?  No?  Very good.
 4            Today is going to be mostly testimony via video as
 5    we've been seeing.  There will be some also depositions that
 6    you're going to just hear the audio for, and we'll talk
 7    about those when we get to it.  And we have one or two -- I
 8    guess one live witness you will also hear today.  All right.
 9            So we're going to get started continuing the video
10    deposition of Mr. Stefanowicz.
11            MR. O'CONNOR:  Shall we proceed, Your Honor?
12            THE COURT:  Yes, sir.
13        (Video deposition of Stephen Stefanowicz played.)
14            MR. O'CONNOR:  Your Honor, now we're going to play
15    the cross-examination for plaintiffs, and we have a short
16    redirect after that.
17            THE COURT:  All right.
18        (Video deposition of Stephen Stefanowicz played.)
19            THE COURT:  All right.
20            MR. O'CONNOR:  Your Honor, the Court had indicated
21    that if a line of questioning came up about meeting with
22    counsel before testimony, that the Court was going to
23    instruct the jury about the propriety of that.
24            THE COURT:  Well, I will explain to the jury that
25    it frankly is expected that lawyers who are calling
```

                                                            15

```
 1    witnesses will have talked to them ahead of time because you
 2    want to make sure the witness understands why they're being
 3    called, what the subject matter is going to be.  It's
 4    perfectly appropriate for that to be done.
 5              Okay.  Go ahead.
 6              MR. O'CONNOR:  Thank you, Your Honor.
 7              CACI calls Mark Billings.
 8              THE COURT:  All right.
 9              MR. O'CONNOR:  I will retrieve him.
10              MR. FARIDI:  Your Honor, while the witness is
11    being retrieved, can we just offer into evidence the
12    exhibits that we used during the cross-examination of
13    Mr. Stefanowicz?
14              THE COURT:  All right.  Now, while we're talking
15    about exhibits -- because, again, what's happened here,
16    again, because this case has been around so long and
17    discovery occurred over many, many years, one of the things
18    I want to make sure does not confuse the jury is that in
19    some of these recorded depositions, exhibit numbers were
20    used that are not actually the same as the number that's
21    being used for that exhibit during the trial.
22              So, Counsel, what you need to be preparing right
23    now, each of you, is an index of the exhibits that have been
24    entered into this trial, and where they were referred to in
25    a deposition as a different number, I want there to be a
```

16

```
 1    clear cross-reference.  So I know you all have been taking
 2    very careful notes.
 3            So, for example, in this last deposition, I don't
 4    know whether Plaintiffs' Exhibit 13, a photo of the hard
 5    site that's referenced by this witness, is the same as
 6    Exhibit 13 that's in this case.  If it is, that's easy.  But
 7    if it were not, then you'd need to say Exhibit 13,
 8    cross-reference -- I mean, somehow figure out -- and do it
 9    the same way.  So you need to talk about that before you do
10    your own individual exhibit lists.
11            Is that clear?
12            MR. O'CONNOR:  Understood, Your Honor.
13            THE COURT:  Okay.  And that should help the jury
14    in figuring that out.  All right.
15            THE CSO:  Raise your right hand.  Face the deputy
16    clerk.
17    Thereupon,
18                    MARK BILLINGS,
19    having been called as a witness on behalf of the defendant
20    and having been first duly sworn by the Deputy Clerk, was
21    examined and testified as follows:
22                (Time noted:  10:53 a.m.)
23            THE DEPUTY CLERK:  Thank you.
24            THE CSO:  You may be seated.
25            MR. O'CONNOR:  Your Honor, I have some direct
```

Direct examination - M. Billings

```
 1    examination binders, one for the witness.

 2              THE COURT:  We'll take those later.  All right.

 3              MR. O'CONNOR:  May I proceed, Your Honor?

 4              THE COURT:  Yes, sir.  Yes, sir.

 5                        DIRECT EXAMINATION

 6    BY MR. O'CONNOR:

 7    Q    Please state your name for the record.

 8    A    Mark Wilson Billings.

 9    Q    Mr. Billings, are you currently employed?

10    A    No.  I'm retired.

11    Q    Who was your last employer?

12    A    CACI.

13    Q    What years did you work for CACI?

14    A    2003 through 2020.

15    Q    I'm going to quickly go through your career prior to

16    CACI.

17              Did you go to college?

18    A    I did.  University of New Hampshire.

19    Q    Were you in the U.S. Army immediately after college?

20    A    I was.

21    Q    Were you an officer?

22    A    Yes, I was.

23    Q    Did you have a military occupational specialty?

24    A    I was a transportation code officer, and also I had an

25    alternate as an automated data processing officer.
```

Direct examination - M. Billings

```
1    Q     Did you retire from the Army?

2    A     I did.

3    Q     What rank did you hold upon retiring?

4    A     Lieutenant Colonel.

5    Q     What year did you retire?

6    A     It was 1995.

7    Q     Did you take employment after retiring?

8    A     I did.

9    Q     With what company?

10   A     FC Business Systems.

11   Q     What sort of a company was FC Business Systems?

12   A     It was a defense contractor type of work.

13   Q     And what sort of a role did you have with FC Business

14   Systems?

15   A     I was initially an analyst, and then I became a project

16   manager.

17   Q     What does a project manager do?

18   A     Well, it's responsible for a specific contract with, in

19   this case, the U.S. government, and you basically meet the

20   requirements of the statement of work, and you ensure that

21   the employees associated with that are properly cared for

22   and maintained and they have their needs met, such as time

23   sheets, vacation, benefits, those types of things.

24   Q     Okay.  How long were you at FC Business Systems?

25   A     About two and a half years.
```

19

Direct examination - M. Billings

```
 1   Q     And where did you go after that?

 2   A     I went to Premier Technology Group.

 3   Q     What was Premier Technology Group?

 4   A     They were a small business referred to as an 8(a).  It

 5   also did defense contracting work.

 6   Q     When you joined -- was Premier Technology Group

 7   sometimes referred to as PTG?

 8   A     Correct.

 9   Q     When you joined PTG, what were your job

10   responsibilities?

11   A     Initially I was, again, a project manager.  I had

12   various government contracts, most of them were at Fort

13   Belvoir, Virginia when we started.

14   Q     Did you work on a particular contract when you joined

15   PTG?

16   A     When I started there, I can't honestly recall which

17   project it was.  But, yes, I assume I did.

18   Q     Okay.  Do you remember working on an intelligence

19   contract for PTG?

20   A     Yes.  Yes.  It was probably -- we got that contract in

21   June of 1999.

22   Q     And what sort of services did PTG provide in connection

23   with this intelligence contract?

24   A     We were contracted by the GT -- G2 of the United States

25   Army Europe, and we were providing intelligence analysts.
```

20

Direct examination - M. Billings

1    They were in the areas of human intelligence, signal

2    intelligence, what we call all source intelligence.  So

3    there was a variety of different types of analysts.  They

4    were associated with how the intelligence was being gathered

5    primarily.

6    Q    And you said the contract was with the G2.

7         What's the G2?

8    A    It's a staff element within the Army associated with

9    intelligence.

10   Q    Do you remember about how many intelligence analysts

11   were provided to U.S. Army Europe under this contract?

12   A    We started with 20 to 30 intel analysts.  It probably

13   grew to over 100 by the time we were finished with that

14   particular contract.

15   Q    Did the intelligence contract for PTG call for PTG to

16   provide operational supervision for the intelligence

17   analysts it was providing the Army?

18   A    No.  These were basically staff augmentation.  We were

19   providing bodies, if you imagine that, to augment the staff

20   element.  In those days, intelligence mission was growing,

21   and they just did not have enough active duty military to

22   fulfill all the requirements that they had.  And that's

23   where PTG stepped in.  We hired former military analysts in

24   the area of intelligence to return to that role that they

25   performed earlier.

Direct examination - M. Billings

```
 1    Q    Well, if PTG was not providing an operational

 2    supervision structure, where did the supervision come from?

 3    A    It came from the United States Army.

 4    Q    So did the PTG analysts report to the Army chain of

 5    command like Army analysts?

 6    A    Yes.  Yes, they did.  I mean, they took all of their

 7    operational guidance and missions.  They worked side by side

 8    between -- by military analysts, you know, in the military

 9    facility.

10    Q    And did PTG provide administrative support for those

11    employees?

12    A    Yes, we did.  As I mentioned earlier about project

13    management, we, again, were responsible for the care and

14    feeding to make sure that the time sheets were done, that

15    the person received the proper benefits and those types of

16    administrative functions.

17    Q    Okay.  Did there come a time when PTG was acquired by

18    CACI?

19    A    Yes.  It was in May of 2003.

20    Q    And when you shifted from being a PTG employee to a

21    CACI employee, did your job responsibilities change any?

22    A    By that time, I was a director with PTG, and I became a

23    director with CACI.  So, no, there was no change in my

24    functions.

25    Q    Okay.  What were your job responsibilities as a
```

22

Direct examination - M. Billings

```
 1   director?
 2   A     I was responsible for multiple projects, managers,
 3   basically.  I oversaw their daily operations and ensured
 4   that they were doing their jobs of care and feeding of the
 5   employees.
 6   Q     When CACI acquired PTG, did PTG's government contracts
 7   come with the transaction?
 8   A     Yes.  They actually -- they just transferred over.
 9   Q     Okay.  When the United States invaded Iraq, did CACI
10   have some of its employees deploy with the Army into Iraq?
11   A     Yes.  At that time, we were providing support to
12   multiple staffs within the USAEUR headquarters.
13                  (Reporter interrupted for clarification.)
14                  THE WITNESS:  USAEUR, United States Army Europe.
15                  So we actually had people deploy as part of the
16   G3, the G2 and the G4.  So that was logistics, operations
17   and intelligence.
18   BY MR. O'CONNOR:
19   Q     Okay.  So G2 is intelligence; correct?
20   A     Yes.
21   Q     And G3 is operations?
22   A     Correct.
23   Q     And G4 is logistics?
24   A     Exactly.
25   Q     Okay.  And once the United States had invaded Iraq, did
```
                                                              23

Direct examination - M. Billings

1    CACI obtain a contract to provide interrogators and analysts

2    in support of the Army in Iraq?

3    A    Yes.

4    Q    Was this a staff augmentation contract?

5    A    Yes, it was.

6    Q    What types of positions did CACI fill under the

7    contract?

8    A    We had analysts, screeners, interrogators.  Those were,

9    I guess, the primary ones that we provided support for.

10   Q    Did CACI provide a -- an operational supervision

11   hierarchy to manage the interrogations that were being done

12   by its interrogators?

13   A    No, not at all.

14   Q    Who provided that type of supervision for the

15   interrogators?

16   A    The United States Army did.

17   Q    And were the interrogators integrated into the Army

18   chain of command?

19   A    Absolutely.  They took all instructions from the Army.

20   Q    Who decided where in Iraq the CACI personnel would be

21   deployed once they got there?

22   A    The Army decided where they would be assigned.  We were

23   at multiple locations.

24   Q    So it's -- it's not correct that the contract only

25   involved providing personnel at Abu Ghraib?

                                                              24

Direct examination - M. Billings

```
 1    A    No.  That's -- we were up at Mosul, we were at -- oh,

 2    several different locations and such.  We were supporting

 3    individual brigade with teams of analysts and things like

 4    that in the area of screeners and general analysts and such.

 5    So we were all over the country.

 6    Q    What role did CACI have in setting the intelligence

 7    priorities in Iraq?

 8    A    We set no intelligence priorities.  Again, our mission

 9    was to take care of the employees.  We ensured that they

10    were trained, deployed out of Fort Bliss, Texas, arrived in

11    country, and then we made sure that they were transported up

12    to the assigned location that the Army picked for them.

13              THE COURT:  You mentioned Fort Bliss.

14              Were any CACI staff involved in the training at

15    Fort Bliss?

16              THE WITNESS:  No, ma'am.

17              THE COURT:  So who provided the training at Fort

18    Bliss?

19              THE WITNESS:  The United States Army did.

20    BY MR. O'CONNOR:

21    Q    Who established the interrogation rules of engagement

22    for CACI interrogators in Iraq?

23    A    The United States Army.

24    Q    Did CACI have any role in setting those rules of

25    engagement?
```

25

Direct examination - M. Billings

```
 1   A     No.
 2   Q     Who assigned interrogators to specific detainees?
 3   A     The United States Army.
 4   Q     Where were you working while this contract was in
 5   effect?
 6   A     I remained in Chantilly, Virginia.  I was kind of like
 7   the rear support.
 8   Q     Did CACI management in Virginia have any role in
 9   directing or supervising the interrogation and intelligence
10   collection efforts?
11   A     No.
12   Q     Who did that?
13   A     The United States Army.
14   Q     Did CACI management in Virginia receive operational
15   reports on the intelligence collection efforts in Iraq?
16   A     No.  We received no operational intelligence.  You've
17   got to remember, most of that information would be
18   classified, and it would not be something to be shared.
19   Q     Did CACI management even know who its interrogators
20   were assigned to interrogate in Iraq?
21   A     No.  We had no idea.  We knew where they were, that was
22   it.
23   Q     Did CACI management ever know what substantive
24   intelligence was being gathered in these interrogations?
25   A     No.
```

26

Direct examination - M. Billings

```
 1   Q    What sort of support did CACI management in Virginia

 2   provide to the interrogators, analysts and screeners in

 3   Iraq?

 4   A    Again, it's just administrative types of things.  We

 5   made sure that their time sheets got annotated and

 6   forwarded, that they got to take their R&R and vacation when

 7   it came time to do that.  We supported -- or assisted in

 8   transportation to come from Iraq.  Those types of things.

 9   Q    Did the government have the power to direct CACI to

10   remove an employee from a contract?

11   A    Yes, they did.

12   Q    And did the government ever exercise that power?

13   A    Yes, they did.

14   Q    I'm going to ask you to take a look in your binder.

15   It's not going to be hard to find; there's only two tabs.

16           Turn to the first to be, which is PTX100.

17           MR. O'CONNOR:  Your Honor, we move in Plaintiffs'

18   Exhibit 100.  The first page was moved in by plaintiffs

19   yesterday, and we're moving in the remainder of their

20   exhibit.

21           THE COURT:  Any objection?

22           MS. ROBINSON:  No objection, Your Honor.

23           THE COURT:  All right.  It's in.

24    (Plaintiffs' Exhibit Number 100 admitted into evidence.)

25   BY MR. O'CONNOR:
```

27

Direct examination - M. Billings

```
 1   Q    Do you remember a circumstance where the Army indicated
 2   its intention to direct Mr. Dan Johnson's removal from the
 3   contract?
 4   A    Yes.
 5   Q    Did that relate to the photograph of him with a
 6   detainee squatting in a chair?
 7   A    Yes.
 8   Q    If you look at the first page of PTX100, is that the
 9   notification that CACI received from Major Daniels?
10   A    Yes, it is.
11   Q    And who was Major Daniels?
12   A    He was the COR -- the contracting officer
13   representative -- at that time for us what we call the C2
14   contract.
15   Q    And what is a contracting officer representative?
16   A    Well, he's between -- he's the go-between the United
17   States Army, the customer, and the contractor, which would
18   be CACI in this case.  So he was our central point of
19   contact concerning anything about this contract.
20   Q    And do you recall who Major Daniels' predecessor was as
21   contract officer's representative?
22   A    Colonel Brady.
23   Q    Thank you.
24        And the first page of this exhibit indicates that
25   if CACI or Mr. Johnson unopposed having Mr. Johnson removed
```

                                                              28

Direct examination - M. Billings

```
 1    from the contract, they should make a submission; do you

 2    recall that occurring?

 3    A    Yes.

 4    Q    And did CACI make a submission?

 5    A    They did.

 6    Q    Do you remember why CACI made a submission?

 7    A    The government actually wanted to keep Johnson on

 8    board, and so we prepared a rebuttal to this letter that you

 9    quoted.

10    Q    And ultimately did the government receive CACI's

11    rebuttal and say take him off the contract anyways?

12    A    Yes.

13    Q    And what did CACI do?

14    A    We took him off the contract.

15    Q    Were there other employees who were on the contract

16    that the government directed CACI to take off the contract?

17    A    Yes.

18    Q    Do you remember an employee named Joe Ryan?

19    A    I do.

20    Q    Did the government ask that he be removed from the

21    contract?

22    A    They did.

23    Q    And do you recall what he did?

24    A    Well, he said things that were not very flattering

25    about the United States military and in a home-log-type
```

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

Direct examination - M. Billings

```
 1    thing.  So he was sending nice little emails or whatever

 2    back to the hometown to publish stuff.

 3    Q    Like a local newspaper?

 4    A    Yes.

 5    Q    And when the government said take Ryan off the

 6    contract, what did CACI do?

 7    A    Took him off the contract.

 8    Q    Were CACI employees sometimes promoted from, say,

 9    screener or analysts to interrogator?

10    A    Yes, they were.

11    Q    And whose decision was that?

12    A    That was the government, the Army's decision.

13    Q    Now, do you recall Major General Fay conducting an

14    investigation of detainee abuse in the spring --

15    A    Yes, I do.

16    Q    -- of 2004?

17    A    Right.  Yes, I do.

18    Q    Did CACI have a policy in terms of how it responded to

19    requests for information from General Fay?

20    A    We fully supported any requests that he made.

21    Q    I'm going to ask you to turn to the second tab in your

22    binder, which is Plaintiffs' Exhibit 115, which was admitted

23    into evidence yesterday.

24          This is the -- an email from Richard Arrant to Amy

25    Jenson dated October 14, 2003.
```

30

Cross-examination - M. Billings

```
 1              Do you recall receiving this email back in or
 2  around October of 2003?
 3  A    No, I do not.
 4  Q    You've seen it since then?
 5  A    I have seen it since then, yes.
 6  Q    And Richard Arrant was a CACI employee?
 7  A    He was.
 8  Q    And does the letter make any allegations of misconduct
 9  by CACI employees?
10  A    No, it does not.
11  Q    Mr. Billings, did you enter into an agreement with
12  anyone to abuse detainees?
13  A    No.
14  Q    Did you do anything to provide practical assistance to
15  anyone for the purpose of helping them abuse detainees?
16  A    No, I did not.
17  Q    Does CACI condone -- well, did CACI condone torture or
18  cruel, inhuman, degrading treatment of detainees?
19  A    Absolutely not.
20              MR. O'CONNOR:  No further questions, Your Honor.
21              THE COURT:  All right.  Cross-examination.
22                     CROSS-EXAMINATION
23  BY MS. ROBINSON:
24  Q    Good morning, Mr. Billings.  My name is
25  Bonita Robinson, and I'm an attorney for the plaintiffs in
```

31

Cross-examination - M. Billings

```
 1   this case.
 2          All right.  So if I have my math right, you were
 3   employed by CACI or by its predecessor company for about
 4   22 years?
 5   A    That's correct.
 6   Q    Okay.  Do you own stock in CACI?
 7   A    I do.
 8   Q    How much stock do you own?
 9   A    Oh, about 100 shares.  It was part of the employee
10   purchase plan when I was an employee there.
11   Q    And do you hold stock options?
12   A    No.
13   Q    Okay.  Now, I want to focus on your role at CACI in the
14   2003 to 2004 time period.
15          And so I believe you testified that at that time
16   you were a director at CACI?
17   A    Correct.
18   Q    Is it correct that your responsibilities included, in
19   addition to what you testified about earlier, managing
20   day-to-day recruiting and quality assurance operations?
21   A    It did.
22          MS. ROBINSON:  Okay.  Your Honor, we have binders
23   for the Court that I should have passed up a moment ago.
24          THE COURT:  All right.
25   BY MS. ROBINSON:
```

32

Cross-examination - M. Billings

```
 1   Q    And those day-to-day -- I'm not going to refer you to
 2   anything in it just yet.
 3   A    Oh, okay.
 4   Q    And those day-to-day management operations included
 5   management responsibility for the contract by which CACI
 6   supplied interrogation support in Iraq; is that right?
 7   A    I supervised managers that were responsible for the
 8   contracts, yes.
 9   Q    Would you describe that as management responsibility?
10   A    Yes.
11   Q    All right.  And that intelligence support included
12   providing interrogators and screeners and analysts at Abu
13   Ghraib; is that correct?
14   A    Yes.
15   Q    All right.  Now, there were two particular delivery
16   orders issued pursuant to that contract that related to the
17   provision of those interrogators, analysts, screeners at Abu
18   Ghraib; is that right?
19   A    I couldn't say that there were two.  That was 20 years
20   ago.
21   Q    All right.  Maybe I can help refresh your recollection.
22   A    Okay.
23   Q    Can you please turn in your binder to the tab labeled
24   Billings declaration.  And just let me know when you're
25   there.
```

Cross-examination - M. Billings

```
 1   A     Exhibit 22?

 2   Q     No.  It's got a label on it.

 3               THE COURT:  It's way to the back of the book.

 4               MS. ROBINSON:  It has a label that has just

 5   Billings declaration on it.

 6               THE COURT:  The third or fourth tab from the back.

 7               THE WITNESS:  Billings declaration.  Okay.

 8   Dated --

 9   BY MS. ROBINSON:

10   Q     This is dated -- if you turn to the last page.

11   A     8/4/06?

12   Q     It's dated December 15th, 2005.  Are you there?  Oh, I

13   see.  You're looking at the number at the top; right?

14   A     Okay.

15   Q     Do you see a signature line at the bottom with your

16   signature on it at the last page?

17   A     Yes.

18   Q     Okay.

19   A     Okay.  15th of December 2005.

20   Q     Correct.

21   A     Okay.

22   Q     And this was a declaration that you submitted under

23   penalty of perjury; is that correct?

24   A     I did.

25   Q     Okay.  Now, I just want to look at -- or can you please
```

                                                              34

Cross-examination - M. Billings

```
 1    just take a look and read to yourself paragraphs 11 and 13
 2    of that declaration.
 3    A    Okay.
 4    Q    Okay.  Does that refresh your recollection that two of
 5    the delivery --
 6    A    It does.
 7    Q    And I'll just -- so the jury can hear it.
 8            Two of the delivery orders issued pursuant to that
 9    contract concerned the provision of intelligence support,
10    including interrogators to Abu Ghraib?
11    A    Right.
12    Q    Right.  And there were particular numbers for those
13    delivery orders, those were delivery order 35 and deliver
14    order 71?
15    A    Correct.
16    Q    Okay.  I would like to take a look at each of those
17    delivery orders.  And so if you could take a look in your
18    binder at PTX83, which is in evidence, and let me know when
19    you're there.
20    A    (Complies.)
21    Q    So PTX83, that is delivery order number 35; correct?
22    A    Okay.  Yes.  Yes.  You almost punched a hole through
23    it.  Yep.
24    Q    And it's dated August 14th, 2003?
25    A    Yes.
```

35

Cross-examination - M. Billings

```
 1  Q    All right.  I want to just briefly go over the value of
 2  this delivery order.
 3           If you look at the bottom of the first page on the
 4  right-hand side, do you see the dollar amount $13,765,733?
 5  A    Correct.
 6  Q    And so that was the amount, at least according to this
 7  delivery order, that CACI was to receive under this
 8  contract; correct?
 9  A    Correct.
10  Q    And if you could just flip ahead to page 23 of the
11  document, the page numbers are right at the bottom center.
12  A    Just to clarify, that's the maximum amount of money.
13  It doesn't mean that CACI received all of it.
14  Q    I'm just asking you what the value that CACI could
15  receive under the contract was.
16  A    I understand.
17  Q    And on page 23, do you see this represents a
18  modification of that order?
19  A    Yeah, it's mod 3.
20  Q    And if you look again at the bottom right-hand side of
21  the document, the total value that could be received under
22  this order was increased by a little more than $6 million to
23  about $19,915,000?
24  A    That's correct.
25  Q    Okay.  Let's -- we're going to come back to this
```

36

Cross-examination - M. Billings

```
 1   document in a moment, but I'd like to look quickly at the
 2   second delivery order, delivery order 71.  That's the next
 3   exhibit in your binder, PTX84, which has also been admitted.
 4   A    Okay.
 5   Q    So looking at the first page of the document, you can
 6   see on the top left this says order number 71 again with a
 7   hole punch nearby?
 8   A    Correct.
 9   Q    And this was dated December 3rd, 2003; correct?
10   A    Correct.
11   Q    And again in the bottom right-hand corner, there is a
12   dollar amount that's $21,799,921; correct?
13   A    Correct.
14   Q    And that was the total value that CACI could receive
15   under this delivery order; correct?
16   A    That's correct.
17   Q    All right.  Okay.  Let's return to PTX83.
18            THE COURT:  Actually, at this point we're going to
19   take the morning break.  I want to stay on schedule.  We'll
20   reconvene at 25 of.
21            (Jury not present at 11:21 a.m.)
22              (A brief recess was taken.)
23            THE COURT:  Let's bring the jury in.
24            THE CSO:  Yes, Judge.
25            THE COURT:  Mr. Billings should be back on the
```

                                                                37

Cross-examination - M. Billings

```
 1    stand.

 2              THE CSO:  Rise for the jury.

 3                   (Jury present at 11:39 a.m.)

 4              MS. ROBINSON:  May I proceed, Your Honor?

 5              THE COURT:  Yes.

 6    BY MS. ROBINSON:

 7    Q    Mr. Billings, when we left off, we were about to return

 8    to PTX83 in your binder, and that was delivery order

 9    number 35, which is the first of two delivery orders

10    governing CACI's provision of intelligence support at Abu

11    Ghraib; all right?

12    A    Okay.

13    Q    Now, can you please turn to the statement of work in

14    this exhibit, which begins on page 6 of the exhibit.

15              A statement of work sets out the purpose of the

16    delivery order; is that fair to say?

17    A    Yes, that's correct.

18    Q    Now let's look at paragraph 3 of this statement of

19    work.  This paragraph says that the personnel CACI was

20    providing would function as resident experts for the

21    implementation of an interrogation support cell; do you see

22    that?

23    A    Yes.

24    Q    What does the phrase "resident experts" mean to you?

25    A    It means that it's someone that's trained in the proper
```

                                                              38

Cross-examination - M. Billings

```
 1    skills to be an interrogator, that they have either

 2    performed as an interrogator in the past or has attended

 3    military training that had been taught by the United States

 4    government.

 5    Q     So as the person with management responsibility for

 6    this contract, was it important to you to ensure that CACI

 7    provided resident experts to the military at Abu Ghraib?

 8    A     Absolutely.

 9    Q     All right.  Now let's look a few lines down in

10    paragraph 3.  Do you see the language:  The contractor will

11    provide interrogation support cells as directed by military

12    authority throughout the CJTFC AOR to assist, supervise,

13    coordinate and monitor all aspects of interrogation

14    activities; do you see that?

15    A     Which paragraph are you referring to?

16    Q     The same paragraph, paragraph 3.

17    A     Okay.

18    Q     And you can look on the monitor next to you, too.  The

19    text is highlighted.

20    A     Correct.

21    Q     Now, I'd like you to look down at paragraph 5 of this

22    document.  Same page.

23          Now, the heading of this is:  Technical

24    Considerations C2X Screening and Interrogation Operations --

25    A     Yes.
```

39

Cross-examination - M. Billings

```
 1   Q     -- Coordinator/Special Advisor.

 2   A     Okay.

 3   Q     Is it correct that the C2X is a high-level intelligence

 4   director who reports to a senior intelligence officer?

 5   A     Yes.

 6   Q     And the C2X during the time that CACI began providing

 7   personnel at Abu Ghraib was a man named Tom Howard; is that

 8   correct?

 9   A     Correct.

10   Q     And Tom Howard was a CACI employee; is that right?

11   A     He was at that time.

12   Q     Okay.  Now I want to look at the last line of this

13   paragraph, the last sentence.  And that sentence says:  The

14   contractor is responsible for providing supervision for all

15   contractor personnel; do you see that?

16   A     Okay.

17   Q     And you testified earlier that CACI personnel only had

18   responsibility for administrative functions; is that right?

19   A     Right.

20   Q     Can you point me to anything in paragraph 5 that

21   qualifies the language responsible for providing supervision

22   for all contractor personnel to only administrative

23   functions?

24   A     There's nothing that I see there that is directly

25   related to administrative.
```

                                                                    40

Cross-examination - M. Billings

```
 1   Q    Okay.  Thank you.

 2             Now, Mr. Howard, he actually helped to write this

 3   statement of work; is that right?

 4   A    I cannot recall.

 5   Q    Okay.  Mr. Billings, do you recall giving deposition

 6   testimony under oath in a related litigation back in, I

 7   think it was 2007?

 8   A    I did.

 9   Q    Can you please turn to the tab in your binder labeled

10   deposition transcript, and specifically to page 38, lines 13

11   through 23.

12   A    Okay.  This was deposition -- which one?

13   Q    It's got a label, deposition transcript, on it, and the

14   cover page should say videotaped deposition Mark W.

15   Billings.

16   A    Right.  Yes.

17   Q    So if you could just turn to page 38, and once you're

18   there, let me know.

19   A    Okay.

20   Q    And could you just read to yourself lines 13 through 23

21   of that page.

22   A    Okay.

23   Q    Does that refresh your recollection that Mr. Howard

24   helped to write this statement of work?

25   A    Yeah.  But even in that statement, I made no reference
```

Cross-examination - M. Billings

```
 1   that he did.
 2   Q    You understood that he did; is that fair?
 3   A    I was led --
 4   Q    He told you that he did?
 5   A    -- to believe that he did, yes.
 6   Q    Because he told you that; didn't he?
 7   A    (Gesturing affirmatively.)
 8   Q    At least according to Mr. Howard, CACI had input into
 9   this language or the statement of work?
10   A    Because it says here did Mr. Mudd tell you or
11   Mr. Howard told you.  And I said yes.
12   Q    So it was your understanding that he had input into the
13   same report?
14   A    Correct.
15        MS. ROBINSON:  Okay.  You can put that document
16   down, Sean.
17   BY MS. ROBINSON:
18   Q    I'd like to talk in a little more detail about the
19   resident experts that CACI sent to Abu Ghraib.
20        It was CACI's responsibility to recruit personnel
21   to send to Abu Ghraib; is that right?
22   A    Yes.
23   Q    Okay.  And CACI had not previously been in the business
24   of providing interrogators to the military; is that right?
25   A    That's correct.
```

42

Cross-examination - M. Billings

```
 1   Q    And CACI had difficulty finding qualified people to
 2   serve as interrogators in Abu Ghraib?
 3   A    That is correct.
 4   Q    All right.  And there were, in fact, a number of people
 5   who ended up working as interrogators at Abu Ghraib but who
 6   initially had been hired as screeners because they weren't
 7   considered qualified under the statement of work; is that
 8   right?
 9   A    The quantity I have no recollection of, but --
10   Q    More than one, let's say.
11   A    More than one, yes.  And those were at the discretion
12   of the United States Army that they basically would -- you
13   know, in most cases they would tell us that they would like
14   so and so considered.
15   Q    So was it your understanding that the Army approved
16   everyone who was hired to work as a --
17   A    Absolutely.
18   Q    And did the Army approve everyone who CACI hired at all
19   to send to Abu Ghraib?
20   A    Yes.  They reviewed all resumes.
21   Q    All right.  They read all resumes?
22   A    They reviewed all resumes that were submitted for
23   hiring.
24   Q    All right.  Let's --
25   A    Let me clarify.  That was one of the responsibilities
```

43

Cross-examination - M. Billings

```
 1    of the COR that you brought up before.

 2    Q     And what is the COR?

 3    A     Contracting officer representative.

 4    Q     And that's a military position that interacts with --

 5    A     Correct.

 6    Q     Okay.  Let's take a look at what's already in evidence

 7    as PTX104, and that's in your binder.  All right.

 8          So this is an email chain that Amy Jenson

 9    forwarded to you in May 2004; is that right?

10    A     Yes, it is.

11    Q     And looking at the email chain on the bottom of the

12    first page, you were actually also copied on this email from

13    Tom Howard on August 16th, 2003; is that right?

14    A     Correct.

15    Q     And Mr. Howard wrote -- and I'm looking about three

16    lines down -- I have carefully reviewed each resume, and

17    though some have potential to be either a database/intel

18    research clerk, LEP screener or a screener for interrogation

19    OPs, none of these candidates have the basic qualifications

20    that the customer requires for the interrogator position; do

21    you see that?

22    A     I do.

23    Q     And if you turn to the next page and you look down

24    to -- it's fair to say this page lists several people who

25    Mr. Howard believed were unqualified for the interrogation
```

44

Cross-examination - M. Billings

```
 1    position -- interrogator position?

 2    A     Yeah.

 3    Q     Okay.  So looking at the third number down, the name

 4    there is Steven Stefanowicz; do you see?

 5    A     Yes.

 6    Q     And Mr. Howard wrote:  Though he has a crafty resume,

 7    he is neither trained nor qualified for the interrogator

 8    position; do you see that?

 9    A     Uh-huh.

10    Q     And a few lines down he also wrote:  If you sift

11    through his resume, he has no supporting credentials;

12    correct?

13    A     Uh-huh.

14          THE COURT:  Say yes or no for the record.

15          THE WITNESS:  Yes.

16    BY MS. ROBINSON:

17    Q     You're aware that Mr. Stefanowicz began interrogating

18    detainees almost from the beginning of his time at Abu

19    Ghraib?

20    A     Yes.

21    Q     I want to look at just one other example, you know, on

22    this subject.  And can you please look at what's been marked

23    for identification -- this has not been admitted yet -- at

24    PTX103.

25          THE COURT:  Any objection to 103?
```

45

Cross-examination - M. Billings

```
 1              MR. O'CONNOR:  Looking at it now, Your Honor.

 2              No, Your Honor.

 3              THE COURT:  All right.  It's in.

 4     (Plaintiffs' Exhibit Number 103 admitted into evidence.)

 5   BY MS. ROBINSON:

 6   Q    This is another email that Amy Jenson sent to you and

 7   another individual in May of 2004; right?

 8   A    Yes.

 9   Q    And she basically forwarded a longer email chain; is

10   that fair to say?

11   A    Yes.

12   Q    Okay.  Now, can we look on the second page of the

13   document, at the bottom of the second page, you see there's

14   an email from Timothy L. Dugan on August 24th, 2023?

15   A    Yes.

16   Q    The email says:  I've pasted my cover letter and resume

17   below; do you see that?

18   A    Yes.

19   Q    Now, if you flip back to the first page of the

20   document --

21              MR. O'CONNOR:  Your Honor, this has PII in it.

22              THE COURT:  Well, you all were supposed to go

23   through these exhibits.

24              MR. O'CONNOR:  It's their exhibit.  I didn't know

25   what they were going to use.
```

                                                                  46

Cross-examination - M. Billings

```
 1              MS. ROBINSON:  We'll redact it.  I don't think
 2   anything is going to come up for the jury that shows any --
 3              THE COURT:  Just ask questions of it; do not show
 4   it.
 5              MR. O'CONNOR:  He can answer questions.  That's
 6   not a problem.
 7   BY MS. ROBINSON:
 8   Q    Do you have the document in front of you?
 9              At the bottom of the first page, there's an email
10   from Tom Howard to Amy Jenson and Daniel Porvaznik; do you
11   see that?
12   A    Yes, I do.
13   Q    And that email is dated August 29th, 2003?
14   A    Correct.
15   Q    And about Mr. Dugan, Mr. Howard wrote:  I am sorry to
16   give my no-go for this guy.  And he wrote further down in
17   the email:  It seems that this resume demonstrates taking
18   down shoplifters; do you see that?
19   A    Yes.
20   Q    And CACI hired him as a screener; correct?
21   A    I know Timothy Dugan was hired; I can't say as a
22   screener.
23   Q    So you don't know if he was hired as a screener,
24   interrogator or some other position?
25   A    Correct.
```

Cross-examination - M. Billings

```
 1   Q    Now, are you aware that he, too, began performing
 2   interrogation shortly after arriving at Abu Ghraib?
 3   A    I'm not aware of that.
 4   Q    Okay.  Now, we just looked at two emails from the
 5   summer and fall of 2003 that were forwarded to you in
 6   May 2004.
 7          Do you recall why they were forwarded to you?
 8   A    Which particular documents are you referring to?
 9   Q    The document we're looking at now and PTX104, which we
10   just looked at.
11   A    Okay.  Do I recall them?  No.
12   Q    Not do you recall them.
13          Do you recall why they were forwarded to you?
14   A    No, I don't.
15   Q    All right.  Now, I think your testimony a few minutes
16   ago was that CACI had to -- or, excuse me, the military
17   signed off on everyone that CACI hired; is that right?
18   A    Correct.
19   Q    But isn't it true that many of the resumes that
20   received a sign-off were signed off by Tom Howard, who was a
21   CACI employee, not by the military?
22   A    I know nothing about that.
23   Q    All right.  Let's return to --
24   A    You must understand that Tom was a senior person at
25   that time with the company.  He reviewed things, but it was
```

48

Cross-examination - M. Billings

```
 1   still the COR's responsibility to accept that individual.
 2   It was not Tom's decision whether or not we hired someone.
 3   Q    Okay.  So Tom did not have approval authority, did not
 4   sign off on resumes for hires, he didn't give approval?
 5   A    He does not have -- he did not have that authority; it
 6   was a government approval that was required.
 7   Q    Let's look at your deposition again.  You have that
 8   tab?  And can you please turn to page 91 of your deposition.
 9   And I'm going to read aloud these lines, so just follow
10   along with me.
11            THE COURT:  Well, wait.  Let him look at them
12   first to see whether they refresh his memory.
13            MS. ROBINSON:  I'm not refreshing his
14   recollection, Your Honor, I'm impeaching his testimony.  He
15   said that --
16            THE COURT:  What line?
17            MS. ROBINSON:  91-22 to 92-8.
18            THE WITNESS:  What --
19            THE COURT:  Wait a minute.
20            I don't think that's impeachment.  I'll sustain
21   the objection.
22   BY MS. ROBINSON:
23   Q    Do you recall -- well, withdrawn.
24            The COR at Abu Ghraib for this contract was
25   someone named Colonel Brady, is that correct?
```
49

Cross-examination - M. Billings

1    A    That's correct.

2    Q    And was Colonel Brady the person who, in your view, was

3    supposed to be approving the individuals that CACI hired?

4    A    That's correct, yes.

5    Q    Colonel Brady was, as you understood it, a very busy

6    person; is that right?

7    A    He was.

8    Q    So you had to work through Mr. Howard in order to get

9    candidates approved; is that right?

10   A    The resumes may have been funneled to Tom to give to

11   Colonel Brady, yes.

12   Q    Now, do you have any knowledge of whether Mr. Brady --

13   Colonel Brady, excuse me, ever actually laid eyes on and

14   approved these candidates?

15   A    No.

16   Q    Now, we had looked at two emails regarding Mr. Dugan

17   and Mr. Stefanowicz earlier; is that right?

18   A    Correct.

19   Q    And it's your understanding that Mr. Stefanowicz was

20   promoted from a screener to an interrogator?

21   A    That, I cannot recall.

22   Q    Okay.  You don't know.  All right.

23        Now, you testified earlier that the military also

24   signed off on promotions for personnel; is that right?  For

25   CACI personnel.

                                                              50

Cross-examination - M. Billings

```
 1    A    Correct.

 2    Q    CACI doesn't have any documentation reflecting military

 3    approval of the promotions of several CACI personnel; is

 4    that right?

 5    A    No.  Obviously if we change someone from a screener to

 6    an interrogator, that was a different labor category within

 7    the statement of work.  So we would have had knowledge of

 8    that, and we would have seen it on their time sheet.

 9    Q    CACI has documents reflecting that it promoted these

10    personnel; right?

11    A    Correct.

12    Q    CACI does not have documentation for several people who

13    were promoted from screener to interrogator of the

14    military's approval of those promotions; is that right?

15    A    I can't say whether we do or we don't.  I don't have

16    the documentation in front of me.

17    Q    Do you recall Amy Jenson telling you that there was no

18    documentation of military approval of several CACI personnel

19    promotions, including promotions for Mr. Dugan and

20    Mr. Stefanowicz?

21    A    I do not.

22    Q    All right.  Can you please look at your binder, it's

23    the tab labeled Billings Deposition Exhibit 22, and I will

24    now mark this for identification as PTX225.

25              And let me know when you've had a chance to look
```

51

Cross-examination - M. Billings

```
 1    at that.  Can you please read to yourself, actually,

 2    specifically, the second paragraph of the document.

 3    A    (Complies.)

 4    Q    Mr. Billings, does that refresh your recollection that

 5    Ms. Jenson told you that there was no documentation for

 6    military approvals of several CACI personnel promotions,

 7    including Mr. Dugan's and Mr. Stefanowicz's?

 8    A    I would assume based on the email addressees that I did

 9    receive this, yes.

10    Q    And it refreshes your recollection that that's what you

11    were told by Ms. Jenson?

12    A    I cannot recall that I was told this specific email.

13    Again, this was 22 years ago.

14    Q    At the time that Ms. Jenson sent you this document, you

15    were both CACI employees; is that right?

16    A    Yes.

17    Q    And these emails were sent in the course of your normal

18    job responsibilities?

19    A    Right.

20         MS. ROBINSON:  Your Honor, plaintiffs move for

21    admission of PTX225.

22         MR. O'CONNOR:  No objection, Your Honor.

23         THE COURT:  All right.  I'm sorry.  What number

24    did you put on it?

25         MS. ROBINSON:  225.  It's a new addition to the
```

Cross-examination - M. Billings

```
 1    exhibit list.
 2            THE COURT:  All right.  It's in.
 3      (Plaintiffs' Exhibit Number 225 admitted into evidence.)
 4            MR. O'CONNOR:  Other than that there's PII in the
 5    second-to-last paragraph.
 6            MS. ROBINSON:  We're just going to shoot this
 7    portion up there.  And we'll redact this document when it
 8    goes to the jury.
 9            MR. O'CONNOR:  That's fine.
10            THE COURT:  And PII, folks, is personal
11    identification information.  It would be such things as home
12    phoner numbers, Social Security numbers, personal
13    information which is not appropriate to be in public
14    documents.
15    BY MS. ROBINSON:
16    Q    So in this email, Mr. Billings, Ms. Jenson wrote to
17    you:  Additionally, you won't find interrogator approvals
18    for the following due to the fact that they were only hired
19    as screeners and then were promoted in country; do you see
20    that?
21    A    I do.
22    Q    And you see that there are seven names listed there?
23    A    Correct.
24    Q    Two of which are Timothy Dugan and Steven Stefanowicz?
25    A    Correct.
```

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

Cross-examination - M. Billings

```
 1              MS. ROBINSON:  You can take that document down.
 2   BY MS. ROBINSON:
 3   Q    In addition to hiring and -- withdrawn.
 4              CACI conducted performance reviews for the
 5   personnel that they sent to Abu Ghraib; is that right?
 6   A    Performance reviews?
 7   Q    Yes.
 8   A    We conducted performance reviews on people that worked
 9   there, yes.
10   Q    Yes.  That was my question.
11   A    Yes.
12   Q    And so in those performance reviews, CACI was actually
13   evaluating the work that its personnel performed at Abu
14   Ghraib; is that right?
15   A    Yes.
16   Q    Okay.  Now I want to talk about the guidance that was
17   provided to CACI personnel when they were sent to Abu
18   Ghraib.
19              Can you please turn in your binder to what's been
20   marked as PTX133.  This is a document that has not been
21   admitted yet.
22              THE COURT:  Any objection to 133?
23              MS. ROBINSON:  And, Your Honor, we'll only seek to
24   admit a portion of it once we just establish that he
25   received the document.
```
                                                          54

Cross-examination - M. Billings

```
 1              MR. O'CONNOR:  Which pages do you want -- are you

 2    interested in?

 3              MS. ROBINSON:  I'm going to ask him about the

 4    cover email, and then pages 4 through 11.

 5              MR. O'CONNOR:  No objection, Your Honor.

 6              THE COURT:  All right.

 7     (Plaintiffs' Exhibit Number 133 admitted into evidence.)

 8    BY MS. ROBINSON:

 9    Q    Okay.  So, Mr. Billings, this is an email that you and

10    your colleague at CACI, Chuck Mudd, received from another

11    colleague, Scott Northrop, in May 2004; is that right?

12    A    Correct.

13    Q    And it contains several attachments which Mr. Northrop

14    describes as the briefings and in-processing material used

15    by both the military and CACI internal at Abu Ghraib; is

16    that right?

17    A    Correct.

18    Q    All right.  Let's turn to page 4.

19              Do you see this is a document with the heading:

20    Some Thoughts for Debriefers on Dealing With Iraqi

21    Detainees; do you see that?

22    A    I do.

23    Q    I just want to look at a couple of the thoughts listed

24    here.

25              Can you please look at Point 1A on that same page.
```
                                                              55

Cross-examination - M. Billings

```
 1   And do you see the language at the bottom of the page:  Do
 2   nothing, above all, humiliation and mistreatment that will
 3   cause the door to slam in your face?
 4   A    Okay.
 5   Q    All right.  Just a couple of others.
 6           Can you look at Point 2A on page 5.  Do you see
 7   the language:  Keep in mind that every detainee is, first of
 8   all, a human being, who has a wife, husband, family or
 9   children and who is subject to the same emotions and
10   sentiments as all of us.  Treatment of this sort is legal,
11   moral and makes sense; do you see that?
12   A    I do.
13   Q    All right.  And I just want to look at one more point
14   in this document.  2E on page 7.
15           Do you see highlighted in 2E on the screen:  Five
16   reasons why you should follow the recipe for decent
17   treatment outlined in this document are, one, it's illegal,
18   against the law, to mistreat prisoners; two, it's morally
19   wrong to do so; three, it's not the most effective way to
20   obtain good information; four, doing so invites reciprocal
21   brutality against coalition prisoners; and five, amateurish
22   and brutal treatment by American forces can and does result
23   in damaging press stories, causing the U.S. and coalition to
24   lose the information war being waged by the enemy and
25   undermining support for your efforts on the home front; do
```

56

Cross-examination - M. Billings

```
 1   you see that?

 2   A    I do.

 3   Q    All right.  And I just want to turn to the last page of

 4   the document, page 11.  Sorry, not of the whole document,

 5   but just in this particular attachment.

 6              And you see this was prepared by Stuart A.

 7   Harrington, Colonel Retired, U.S. Army?

 8   A    Yes.

 9   Q    And you see the letters MI underneath that?

10   A    Military intelligence.

11   Q    Do you understand that -- thank you.

12   A    His branch of service.

13   Q    Right.

14              Now, you testified earlier, Mr. Billings, that you

15   served in the United States Army; is that correct?

16   A    Correct.

17   Q    And was that for about two decades?

18   A    Twenty-two years.

19   Q    Twenty-two years.

20              And after your service in the Army, you've spent

21   several years working on contracting with the Army as a

22   customer; right?

23   A    Correct.

24   Q    So are you familiar with Army field manuals?

25   A    Yes.
```

Cross-examination - M. Billings

1    Q    Can you tell the jury what they are?

2    A    A field manual is a military publication that the

3    United States would put together on a particular topic,

4    whether it's map reading, how to build a fighting position,

5    how to repair a truck.

6    Q    So is it fair to describe it as an official publication

7    issued by the U.S. Army that instructs personnel about the

8    appropriate way to do things?

9    A    Yes.

10   Q    Okay.  Now, given your experience with both the Army

11   and with contracting and providing services to the Army, you

12   do have some familiarity with the rules and policies that

13   govern the Army's relationship with contractors; is that

14   right?

15   A    Correct.

16   Q    All right.  I'd like you to look at what's been marked

17   as PTX207 in your binder.  This is not admitted yet.

18            Now, this is an Army field manual issued by the

19   Department of the Army concerning contractors on the

20   battlefield; is that right?

21   A    Yes.

22   Q    And this document is dated January 2003?

23   A    Uh-huh.  Yes.

24   Q    So this was in the same year that CACI was providing

25   intelligence support to the Army; is that right?

58

Cross-examination - M. Billings

```
 1   A    Yes.
 2           MS. ROBINSON:  Plaintiffs move for admission of
 3   PTX207.
 4           MR. O'CONNOR:  Relevance, Your Honor.  The witness
 5   hasn't even indicated familiarity with it.
 6           THE COURT:  Oh, I think it's adequately relevant.
 7   I'm allowing it in.  Overruled.
 8     (Plaintiffs' Exhibit Number 207 admitted into evidence.)
 9   BY MS. ROBINSON:
10   Q    All right.  Now, I just -- you know, this is a long
11   document, but I just want to look through a couple of short
12   passages.
13           Can you please turn to page 15 of this document.
14   And specifically there is a paragraph on page 15, 1-22; do
15   you see that?  It's at the top of the page.  It's also
16   highlighted on your screen.
17   A    Fifteen of 124.
18   Q    Fifteen of 124, correct?
19   A    Okay.
20   Q    And at the top of the page, you see that paragraph
21   reads:  Management of contractor activities is accomplished
22   through the responsible contracting organization, not the
23   chain of command.  Commanders do not have direct control
24   over contractors or their employees.  Contractor employees
25   are not the same as government employees.  Only contractors
```

Cross-examination - M. Billings

```
 1   manage, supervise and give directions to their employees; do
 2   you see that?
 3   A    I do.
 4   Q    Now let's look at page 68 of 124.  And you're there?
 5   A    Page 68.
 6   Q    Okay.  Do you see paragraph 4-45?
 7   A    Yes.
 8   Q    And the language that is highlighted on the screen
 9   right now says:  That maintaining discipline of contractor
10   employees is the responsibility of the contractor's
11   management structure, not the military chain of command.
12   The contractor, through company policies, has the most
13   immediate influence in dealing with infractions involving
14   its employees.  It is the contractor who must take direct
15   responsibility and action for his employees' conduct; do you
16   see that?
17   A    I do.
18   Q    All right.  I want to look at just one more paragraph
19   from this document.  Please turn to page 90.
20             All right.  And this is Appendix A to the
21   document, and it's the contracting officer representative
22   guidelines.
23             You testified earlier that the contracting officer
24   representative for the particular contract pursuant to which
25   CACI was providing intelligence support at Abu Ghraib was
```

60

Cross-examination - M. Billings

```
 1    Mr. Brady, Colonel Brady; right?

 2    A    Yes.

 3    Q    Okay.  Now, if you just look at paragraph A3 towards

 4    the bottom of the page.

 5    A    Yes.

 6    Q    And it runs onto the next page that -- but do you see

 7    the language in that heading at A3:  Although the COR

 8    provides a vital link between the military and the

 9    contractor, there are certain limits to his authority.  A

10    COR is prohibited from -- and then the last bullet point

11    reads:  Interfering with the contractor's management

12    prerogative by "supervising" contractor employees or

13    otherwise directing their work efforts; do you see that?

14    A    Yes.

15    Q    You can put that document away.

16    A    But what you fail to mention is that this is just

17    guidance; it's not policy.

18    Q    I believe we -- well, withdrawn.

19         I think we have your testimony on what an Army

20    field manual constitutes.

21         During your time at CACI, CACI had a code of

22    conduct; is that right?

23    A    Yes.

24    Q    Can you please look at PTX85.

25         THE COURT:  Any objection to 85?
```

61

Cross-examination - M. Billings

```
 1              MR. O'CONNOR:  No, Your Honor.
 2              THE COURT:  All right.  It's in.
 3      (Plaintiffs' Exhibit Number 85 admitted into evidence.)
 4   BY MS. ROBINSON:
 5   Q    Now, this was CACI's code of conduct, and on the first
 6   page, this was revised in February 2004; is that right?
 7   A    Yes.
 8   Q    And that was during the period in which CACI was
 9   providing intelligence support, including interrogators to
10   Abu Ghraib; right?
11   A    Yes.
12   Q    I would like to look at page 7 of this document.
13              And do you see in the bottom right-hand corner the
14   heading Management Rights Policy?  Do you see that,
15   Mr. Billings?
16   A    Yes.
17   Q    All right.  Now, the first sentence begins under that
18   heading:  CACI management retains all rights to operate the
19   business according to its judgment; do you see that?
20   A    Yes.
21   Q    And then there's an including clause, and one of the
22   things this includes, looking at the last line on this page,
23   is to direct, supervise, control, and when it deems
24   appropriate, discipline the workforce; do you see that?
25   A    Yes.
```

                                                              62

Cross-examination - M. Billings

```
 1   Q    All right.  Now, can you go to page 5 of this document.
 2   This sets out CACI's ten business values; is that right?
 3   A    Yes.
 4   Q    All right.  Now, Value Number 8 is being accountable
 5   and taking responsibility for what we do.
 6             Is that a value that's important to you as a
 7   long-time former CACI employee?
 8   A    Yes.
 9   Q    And as far as you know, is that a value that CACI lives
10   by?
11   A    Yes.
12   Q    Is CACI accountable for the actions of the personnel
13   that it hired to serve its interrogators at Abu Ghraib?
14   A    Yes.
15   Q    And does CACI take responsibility for the actions of
16   those people?
17   A    To a certain extent.  You cannot use a generic saying
18   that a company is responsible for all actions that an
19   individual performs.
20   Q    But they're responsible for the actions they perform as
21   CACI employees; is that right?
22   A    As it goes to do they meet the statement of work, are
23   they performing the job that they were hired to perform.
24   Q    And if they're not performing that job or if they're
25   violating the rules that govern that job, is CACI
```

63

Cross-examination - M. Billings

```
 1   responsible for that?
 2   A    They cannot be held responsible for all actions of an
 3   individual; they can only be responsible for the actions
 4   that they're being asked to perform.
 5   Q    So CACI's responsible for the good actions but not the
 6   bad ones; is that your testimony?
 7              MR. O'CONNOR:  Objection.  Argumentative.
 8              THE COURT:  Sustained.
 9   BY MS. ROBINSON:
10   Q    All right.  You testified earlier about CACI
11   interrogator named Daniel Johnson; do you recall that?
12   A    No, I don't.
13   Q    You don't recall that?
14   A    I don't recall that.
15              THE COURT:  Well, why don't you make the question
16   more specific.
17              MS. ROBINSON:  Sure.
18              THE COURT:  You can lead.
19   BY MS. ROBINSON:
20   Q    You testified about a request from the military to
21   terminate a CACI interrogator named Daniel Johnson.
22   A    Yes.
23   Q    All right.  Now, I just want to make sure I understand
24   what you said the story was with that request.
25              Now, can you please -- do you still have PTX100,
```

64

Cross-examination - M. Billings

```
 1   which was the document in the binder that Mr. O'Connor gave
 2   you?
 3   A    I think she's referring to that book.  Okay.
 4   Q    Okay.  So what I understood from your testimony -- and
 5   correct me if I'm wrong -- was your testimony that the
 6   government wanted Mr. Johnson to stay on as a CACI employee?
 7   A    Correct.
 8   Q    And asked CACI to prepare a rebuttal to this request
 9   for termination of Mr. Johnson that is on --
10   A    They said that they would -- they would be receptive if
11   we decided to do one.
12   Q    And CACI did prepare a rebuttal?
13   A    We did.
14   Q    And the Army still requested Mr. Johnson's termination;
15   correct?
16   A    They did.
17   Q    And just looking at the language on that first page on
18   PTX100, Number 2 says:  Mr. Johnson was photographed with a
19   security detainee in a dangerous stress position; is that
20   right?
21   A    Yes.
22   Q    Do you agree that Mr. Johnson was photographed with a
23   security detainee in a dangerous stress position?
24   A    I had no knowledge of that photograph at the time.
25   Q    All right.  One moment.
```

65

Redirect examination - M. Billings

```
 1              You mentioned briefly an email that CACI receive
 2    from a CACI interrogator named Mr. Arrant; do you recall
 3    that?
 4    A     Yes.
 5    Q     You said you didn't recall receiving the email; right?
 6    A     Correct.
 7    Q     Do you know one way or the other whether you did?
 8    A     I can't say that I definitely did or did not.  I have
 9    seen the document, so ...
10    Q     And having seen the document, is that the kind of thing
11    that you would have remembered if you had received it?
12    A     Not necessarily.  It didn't really rise to my attention
13    at the time because there was no allegation of any
14    wrongdoing by CACI employees.
15    Q     So it just wasn't something that seemed that
16    significant to you if you had received it?
17    A     If I did receive it, that would have been my reaction.
18              MS. ROBINSON:  Okay.  Thank you.  No further
19    questions.
20              THE COURT:  Okay.  Redirect.
21              MR. O'CONNOR:  Redirect, Your Honor?
22              THE COURT:  Uh-huh.
23                   REDIRECT EXAMINATION
24    BY MR. O'CONNOR:
25    Q     Mr. Billings, let's start with, you were asked
```

66

Redirect examination - M. Billings

```
 1    questions about an Army field manual, contractors on the
 2    battlefield.
 3              You said a field manual is guidance?
 4    A    No.
 5    Q    Explain.
 6    A    Yes.  The Army publishes information on all different
 7    types of topics.  These are things that could be considered
 8    when I was a soldier as, okay, these are good ideas, but it
 9    doesn't mean that it is a dictated policy that you must do
10    these things.
11    Q    Could you turn to that field manual?  It's probably
12    marked as PTX207.
13              MR. O'CONNOR:  Is that what it says in your
14    binder?
15              MS. ROBINSON:  Yes.
16    BY MR. O'CONNOR:
17    Q    Are you there?
18    A    Yes.
19    Q    Okay.  I'm going to ask you to turn to page 4 of 124.
20    A    Okay.
21    Q    And do you see the second paragraph?
22    A    Yes.
23    Q    What's the first sentence say?
24    A    Field manual 3-100.21 (100-21) addresses the use of
25    contractors as an added resource for the commander to
```

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

Redirect examination - M. Billings

```
 1   consider when planning support for an operation.
 2   Q     So it's matters for the commander to consider?
 3   A     Absolutely.
 4   Q     And in the context of this contract, the United States
 5   Army was in the middle of a war in Iraq?
 6   A     Yes.
 7   Q     And the statements of work in which CACI provided
 8   interrogation personnel, the idea was that you were
 9   providing bodies but not a supervisory structure for the
10   mission?
11   A     That's correct.
12   Q     And who was going to provide that structure under
13   the --
14   A     The United States Army.
15             MS. ROBINSON:  Objection.  Leading.
16             THE COURT:  Sustained.
17   BY MR. O'CONNOR:
18   Q     Can you -- in plaintiffs' book -- well, let me back up.
19             Let's go to Plaintiffs' Exhibit 104, which is one
20   of the emails about resumes and the like.
21             You see what's the date of Mr. Howard's email?
22   A     The 5th -- the 8th of May 2004.
23   Q     No.  If you go down to Mr. Howard's email.
24   A     Okay.  The 16th of August 2003.
25   Q     And so at that point, how long after that did CACI
```

68

Redirect examination - M. Billings

```
 1    start providing interrogators in Iraq?

 2    A    Oh, that was fairly soon.  I mean, that was fairly

 3    early in the contract.

 4    Q    And do you recall when the first interrogators arrived

 5    in Iraq?

 6    A    I do not.

 7    Q    And let's go to 103.  And if you could look at the

 8    second email down on the first page.

 9    A    To Dan Porvaznik?

10    Q    Yes.  The one from Amy Jenson to Dan Porvaznik.

11    A    Yes.  Dated 7 November 2003.

12    Q    You testified on cross that you couldn't remember what

13    position Tim Dugan was hired as.

14         Does this refresh your recollection?

15    A    Yes.

16    Q    And what was he hired as?

17    A    It says there interrogation position.  Let's see.  As

18    you can see, Tom and you gave him a no-go -- okay -- for

19    interrogation.

20         Okay.  So he was hired as a screener.

21    Q    So Mr. Howard, did he express concern that Tim Dugan's

22    resume would not be appropriate for an interrogator

23    position?

24    A    I can't recall.

25    Q    Okay.  But, in any event, he was hired as a screener?
```

69

Recross-examination - M. Billings

```
 1   A     Correct.

 2   Q     And who made the decision to promote him to an

 3   interrogator?

 4   A     The United States Army.

 5               MR. O'CONNOR:  No further questions.

 6               THE COURT:  Recross.

 7               MS. ROBINSON:  One question for redirect -- or

 8   recross.

 9                      RECROSS-EXAMINATION

10   BY MS. ROBINSON:

11   Q     Can you please go back to PTX207.  And can you please

12   take a look at page 5 of the document.  It's the page after

13   the one Mr. O'Connor just showed you.  Let me know when

14   you're there.

15               Could you just read aloud for the jury the second

16   paragraph on page 5 beginning with "this manual."

17   A     We're talking about the preface on page 5 of 124?

18   Q     Page 5 of 124, second paragraph beginning "this

19   manual."

20   A     This manual reflects relevant doctrine, incorporates

21   lessons learned from recent operations and conforms to the

22   Army doctrine and policy.

23               MS. ROBINSON:  Thank you.  No further questions.

24               THE COURT:  All right.  Thank you.

25               Does anybody plan to calling Mr. Billings again
```

70

Recross-examination - M. Billings

```
 1    during the course of the trial?

 2              MR. O'CONNOR:  No, Your Honor.

 3              MS. ROBINSON:  Not plaintiffs.

 4              THE COURT:  All right.  Thank you.

 5         Mr. Billings, you may stay in the courtroom and

 6    watch the proceedings or you may leave, but you're not to

 7    discuss anything you see or hear in court or your testimony

 8    with any witness who has not yet testified.  Thank you.

 9              THE WITNESS:  Thank you.

10              (Witness excused at 12:24 p.m.)

11              THE COURT:  All right.  So we go back to

12    depositions; is that correct?

13              MR. O'CONNOR:  Yes, Your Honor.  First, Ms. Bailey

14    is going to read some interrogatory responses that are

15    relevant to the depositions.

16              THE COURT:  Oh, all right.

17              MS. BAILEY:  Linda Bailey for CACI.  This is the

18    United States Army response to CACI's second interrogatory.

19         At the time that these interrogatories were

20    drafted, some of the interrogators were unidentified, but

21    with the agreement of plaintiffs' counsel, we're subbing in

22    the designations for the interrogators that were previously

23    unidentified who are now identified.  And this is Defense

24    Exhibit 2, and I'm at page 10.

25              Plaintiff Al-Zuba'e.  On November 7th, 2003, Army
```

71

Recross-examination - M. Billings

1    Interrogator C served as the lead interrogator in the

2    initial intelligence interrogation of Plaintiff Al-Zuba'e.

3    Army Interrogator F, an individual who the Department of

4    Defense has been unable to identify by name or affiliation,

5    assisted in this interrogation.  According to the

6    interrogator's report and notes, the interrogation lasted

7    one hour and 30 minutes.

8            Two days prior to this interrogation,

9    November 5th, 2003, the military police log for the Abu

10   Ghraib hard site contains an entry at 1850 hours (6:50 p.m.)

11   referencing military intelligence instructions to the

12   military police:  New MI (military intelligence) hold,

13   Number 152529 placed in isolation per MI, (military

14   intelligence), instructions.  Following the shift change at

15   6:00 a.m. on November 6th, 2003, the military police log

16   contains an entry:  Note - MI instructed night shift to keep

17   new prisoner, Number 152529, in the hole overnight.  Removed

18   prisoner from the hole at 0645 (6:45 a.m.) and placed in

19   Cell Number 20.

20           Going to the next page in the middle.

21           The reported and recommended interrogation

22   approaches are authorized techniques.  And then there's a

23   citation to the IROE.

24           Oversight in the use of these approaches was

25   provided by the section and the ICE (Interrogation Control

72

Recross-examination - M. Billings

1    Element) media military leaders.

2          Going to the next page in the middle.

3          The military police log for November 12th and

4    13th, 2003 contains entries relating to instructions from

5    unidentified military intelligence personnel.  "2145, or

6    9:45 p.m., stripped civilian property from Number 152529

7    Cell Number 1A20.  Placed in property room.  Done at 0230."

8          The log continues with an entry at "0230

9    (2:30 a.m.) November 13th, 2003.  Civilian

10   property/government property removed from Number 152529 in

11   cell 1A20.  Military intelligence handlers will be turning

12   on heat to this one.  Sleep management program was

13   requested, but paperwork has not been approved yet.

14   Property placed in storage and CI (civilian internee) only

15   has his jumpsuit."

16         On November 18th, 2003, Army Interrogator D and

17   Army Interrogator E served as lead and assistant

18   interrogators respectively in the second intelligence

19   interrogation of Plaintiff Al-Zuba'e.  According to the

20   interrogators' notes, the interrogation lasted one hour and

21   28 minutes.

22         Going to the next page.

23         The approach used in this interrogation

24   includes -- and it's redacted.  These interrogation

25   approaches are all authorized by then applicable authorities

73

Recross-examination - M. Billings

```
 1   and have been described previously.

 2              Skipping down.

 3              Suggested interrogation -- or suggested approaches

 4   for future interrogations were -- it's redacted.  These

 5   recommended approaches have been previously described and

 6   are authorized.

 7              Page 14.

 8              On December 23rd, 2003, CACI Interrogator G served

 9   as the lead interrogator, and Army Interrogator B served as

10   the assistant interrogator/analyst in the third

11   interrogation of Plaintiff Al-Zuba'e.  According to the

12   interrogators' report and notes, the interrogation lasted

13   two hours and 40 minutes.

14              Going down to the bottom paragraph.

15              In connection with the three intelligence

16   interrogations of Plaintiff Al-Zuba'e, all interrogators

17   were subject to the direction of their military chain of

18   command, beginning with their military section leader, an

19   Army non-commissioned officer, who was to be briefed both

20   prior to and following the interrogation to ensure that the

21   interrogators were focused on answering CJTF-7's priority

22   intelligence requirements, HUMINT requirements and

23   source-directed requirements.  The section leader was also

24   responsible for strictly enforcing the IROE (the rules of

25   engagement) during each interrogation.
```
                                                              74

Recross-examination - M. Billings

```
 1              From their military section leader, the
 2    interrogators' chain of command flowed through the ICE
 3    military NCOIC (non-commissioned officer in charge) and OIC
 4    (the officer in charge) to the military leadership at the
 5    JIDC.  Thank you.
 6              MR. O'CONNOR:  Your Honor, CACI presents Army
 7    Interrogator C by deposition.  I will note that at the
 8    United States' insistence, the pitch on the voices has been
 9    altered slightly to further mask the participants.  Well,
10    the participant, the witness.
11              THE COURT:  All right.
12               (Audio clip of Interrogator C played.)
13              THE COURT:  All right.  Is that the conclusion of
14    the entire interrogation of the -- entire deposition of this
15    witness?
16              MR. O'CONNOR:  It is, Your Honor.
17              THE COURT:  And there's no cross, or was cross
18    included?
19              MR. O'CONNOR:  This is all that's being presented.
20              THE COURT:  All right.  Perfect timing.  We'll
21    take the one-hour lunch break and see everybody back here at
22    2:00.
23               (Court recessed for lunch at 1:01 p.m.)
24              THE COURT:  Counsel, approach the bench.
25                  (Bench conference.)
```

75

Recross-examination - M. Billings

```
 1              THE COURT:  Over the lunch break, two different
 2   jurors have reported possible interference attempts, one by
 3   a reporter who was trying to ask a juror questions and
 4   asking if -- when she said no she would not talk to him, he
 5   said, well, how about tomorrow.  The other one is somebody
 6   who's out there taking photographs of jurors.
 7              MR. O'CONNOR:  They were photographing all of us
 8   coming in this morning.
 9              THE COURT:  Do you know who or what media person
10   he is?
11              MR. O'CONNOR:  I do not.
12              MR. FARIDI:  When we were walking in, Your Honor,
13   there's a gentleman out there who's photographing everyone
14   who's walking in and out of the courthouse, and I even
15   approached the courtroom security officers downstairs about
16   it.
17              THE COURT:  He's taking pictures of the counsel as
18   well?
19              MR. FARIDI:  Yeah.  So he came up to me as well as
20   I was walking in and he said, are you guys here for the Abu
21   Ghraib trial, and I said no comment.  And then he asked --
22   and then he showed me his business card and it said
23   something -- his first name is Alexander.  I couldn't -- I
24   didn't take note of his last name, and then I just walked by
25   him.
```

Recross-examination - M. Billings

```
 1              The same thing happened yesterday, and when our
 2    client, Mr. Al-Ejaili, was here, he was basically being
 3    intimidated by the same individual.  And we're being
 4    followed around as well.
 5              THE COURT:  All right.  Well, just so you know,
 6    two things.  We've asked the two jurors who were approached
 7    if they should see these -- either of these two people -- I
 8    think we're talking actually about two different people
 9    possibly, they're going to raise their hand, at which point
10    I'm going to have them identify them in court and then I'm
11    going to take care of that problem.
12              MR. O'CONNOR:  Okay.  That sounds like a good
13    plan.
14              MR. FARIDI:  There are two different people.
15    There was one person yesterday, he's not here today.  Today
16    is some other individual.  The guy who was here yesterday
17    was carrying around a child and --
18              THE COURT:  He was here today, too.
19              MR. FARIDI:  He was here this morning and now we
20    have a different person.
21              MR. O'CONNOR:  It was someone in a yellow coat who
22    was, as I was coming in, followed me with his camera.
23              THE COURT:  All right.  Well, if he's here, he may
24    stay here a while.  We'll take care of it.  Okay.  That's
25    potential intimidation of jurors and of counsel.
```

Recross-examination - M. Billings

```
 1              THE CSO:  Okay.

 2              THE COURT:  It's interference, at the very least.

 3              I'm going to have the jurors escorted through the

 4   private elevator up through our garage to their parking

 5   spots.  There's no danger, I just don't want interference.

 6   I don't want --

 7              MR. O'CONNOR:  I agree with that.

 8              MR. FARIDI:  I think what happens is when the

 9   jurors go out for the lunch break --

10              THE COURT:  Right.

11              MR. FARIDI:  -- that's when they notice that

12   individual.  So if there's a way they can avoid going out

13   for lunch through that --

14              THE COURT:  I think what I'm going to do, too, I'm

15   going to send them in the back and we're going to get the

16   jurors lunch tomorrow and keep them in the building, and I'm

17   going to tell them not to go out for lunch.  I don't want

18   this jury contaminated.  Just so you know, they'll be

19   escorted out after each day.  Because I think coming in here

20   individually, they won't attract as much attention.  As a

21   group when they go out at lunchtime, because this one guy

22   was asking our court security officer when we break for

23   lunch, so he was trying to, I think, to capture them.

24              MR. FARIDI:  There is press here.  I don't think

25   any of these people in the room are involved.  It may be
```

78

Recross-examination - M. Billings

```
 1   useful, Your Honor, if you instruct the jury that you've
 2   spoken to both counsel and neither side has anything to do
 3   with this.
 4            THE COURT:  Okay.
 5            MR. FARIDI:  I just don't want us to be tagged
 6   and --
 7            THE COURT:  And I think if we have media people
 8   here, I'll let them know it's a problem.  I know it's not
 9   them.
10            MR. O'CONNOR:  Thank you, Your Honor.
11            MR. FARIDI:  Thank you.
12                      (Open court.)
13            THE COURT:  I think we have some members of the
14   media in the courtroom right now.  Do we?  Okay.
15            You're not the problem, but apparently there are
16   some people potentially associated with the media, or
17   purporting to be, who may be intimidating, or, in my view,
18   trying to interfere with the jury process.  They've been
19   trying to interview jurors while the case is in progress.
20   Should you bump into them or see them, you better warn them
21   to stop.  All right.  I know you two are not doing that, but
22   I just wanted to get that out there.
23            All right.  Let's bring the jury in.
24            THE CSO:  Yes, Judge.
25                      (Jury present at 2:10 p.m.)
```

Recross-examination - M. Billings

```
 1              THE COURT:  Ladies and gentlemen, I want to thank
 2    two of your members for bringing to our attention the fact
 3    that there may have been attempts by, I don't know if it's
 4    members of the media or members of the public, to talk with
 5    you about your job as jurors or possibly to take
 6    photographs.  I take that very seriously.
 7              Number one, I want to assure you that none of the
 8    attorneys or the parties in this case have anything to do
 9    with that.  In fact, they've also been subjected to the same
10    problem.  All right.
11              To make your jobs a little bit more comfortable,
12    I'm going to require that lunch be brought in for you
13    tomorrow.  I hope that you'll be satisfied.  I think it will
14    probably be Potbelly's or one of the local places, and
15    hopefully there will be enough variety that you'll be happy
16    with it.  But I'm going to ask you tomorrow -- it's going to
17    be rainy tomorrow anyway, I think -- to stay in the
18    courthouse for lunch.  All right.  And at the end of the
19    day, we're going to have you escorted to your cars.  So
20    we'll avoid any of that kind of problem.
21              But, again, you've been excellent by letting us
22    know that, and, please -- there's no risk or danger, it's
23    just a nuisance.  But we don't want the process being
24    contaminated, that's the real danger.  All right.  So let
25    us -- keep us posted if you have any more of these issues.
```

80

Recross-examination - M. Billings

```
 1                   If you should see either of these two people in

 2       the courtroom, raise your hands because we will then take

 3       further measures.  All right.  Thank you.

 4                   All right.  Let's start with the next witness.

 5                   MR. FARIDI:  Before the next video is -- witness

 6       is called, just two issues.  We have redacted copies of the

 7       two exhibits that were introduced earlier that had some PII

 8       on them.  So that's PTX104 and PTX103.  I've shared this

 9       with CACI's counsel -- I've shared these with CACI's counsel

10       already.  There's one other exhibit that we're looking into

11       that we'll clean up tomorrow morning, Your Honor.

12                   THE COURT:  We need to make sure then, the only

13       set I'm concerned about is the set that's over here that

14       goes into the final record of the court.  So tonight we must

15       change these out so there's no mistake on that.  All right.

16                   MR. FARIDI:  And then the last thing is, Your

17       Honor, I want to offer into evidence the exhibits that were

18       marked at the de bene esse deposition of Steve Stefanowicz

19       during his cross-examination.

20                   THE COURT:  All right.

21                   MR. FARIDI:  So those are -- and I'll read the

22       numbers out loud in a moment.

23                   THE COURT:  Well, I don't think we need all three

24       sets at this point; we just need the one set for the formal

25       record, because that's already been done.
```

                                                                    81

Recross-examination - M. Billings

```
 1              MR. FARIDI:  Yes.  So those are PTX104, PTX72,

 2   PTX98A, PTX98B, PTX107A, PTX107B, PTX107C, PTX107D and

 3   PTX107E.

 4              Thank you, Your Honor.

 5              THE COURT:  All right.

 6   (Plaintiffs' Exhibit Numbers 104, 72, 98A, 98B, 107A through

 7                    107E admitted into evidence.)

 8              THE COURT:  Did you get all that, Katie?

 9              THE DEPUTY CLERK:  Yes.

10              THE COURT:  All right.

11              MR. O'CONNOR:  Your Honor, CACI calls by tape

12   recorded deposition, CACI Interrogator G.

13              THE COURT:  All right.

14              MR. O'CONNOR:  And I have a clipped report to hand

15   up to the Court.  Thank you.

16              The run time on this, Your Honor, is 55 minutes.

17              THE COURT:  All right.

18               (Audio clip of Interrogator G played.)

19              MR. O'CONNOR:  Your Honor, CACI would like to

20   present Charles Mudd by deposition read-in.

21              THE COURT:  All right.

22              MR. O'CONNOR:  And Your Honor indicated that the

23   Court would give an instruction about Mr. Mudd's

24   unavailability.

25              THE COURT:  Mr. Mudd has serious medical problems
```

Direct examination - C. Mudd (read-in deposition)

```
 1   and is, therefore, unable to appear.  There had been an
 2   original plan that he would be here in person, but it's been
 3   determined that he's not capable of doing that; therefore,
 4   we're going to be reading in a previously sworn deposition
 5   at which there was an opportunity for counsel for the
 6   plaintiffs to cross-examine; correct?
 7              MR. O'CONNOR:  That's right.  And the designations
 8   here are both ones that we wanted and ones that they wanted.
 9   So this is both sides.
10              THE COURT:  Right.  And so when we have the other
11   side cross-examination, you'll read the questions?
12              MR. O'CONNOR:  Well, they're all interspersed,
13   Your Honor.
14              THE COURT:  They're all interspersed.
15              MR. O'CONNOR:  So I think I'm just going to read
16   them.
17              THE COURT:  All right.
18              MR. O'CONNOR:  I'd be happy to split it with
19   somebody.
20              We'll begin on page 6.
21                      DIRECT EXAMINATION
22   BY MR. O'CONNOR:
23   Q    Would you please state your name for the record.
24   A    Charles Leslie Mudd.
25   Q    When did you retire from CACI?
```
                                                              83

Direct examination - C. Mudd (read-in deposition)

```
 1              THE COURT:  You need to address the page so we get

 2    right to it.

 3              MR. O'CONNOR:  Page 7.  It's only the highlighted

 4    ones.  Page 7.

 5    BY MR. O'CONNOR:

 6    Q    When did you retire from CACI?

 7    A    I did not retire from CACI.  I quit CACI January 13th,

 8    2005 -- 2006.  One year ago.

 9              MR. O'CONNOR:  Page 8.

10    BY MR. O'CONNOR:

11    Q    Why did you quit?

12    A    I was ready to retire.  I sat in retire -- CACI didn't

13    have a retirement plan like the government, so I just gave

14    my resignation, decided I worked long enough, and I wanted

15    to enjoy life while I can still enjoy it.

16    Q    Did you take any employment after you resigned from

17    CACI?

18    A    I formed up an LLC to trade stock.  I'm on a couple

19    companies as a consultant if needed.  I think I've worked

20    six hours for one company in the last -- over a year

21    basically looking over proposals.  So basically I'm not

22    working for any company.

23    Q    Let's start with your educational background.

24    A    Undergrad degree in mathematics from Western Kentucky

25    University in 1970, a master's of public administration from
```
                                                              84

Direct examination - C. Mudd (read-in deposition)

1   Western Kentucky University, I don't know, 1970 something,

2   '74, '75, I'm not too sure when.

3            MR. O'CONNOR:   Page 9.

4   BY MR. O'CONNOR:

5   Q    That's okay.

6   A    Master of science in computers, engineering department

7   out of George Washington University, probably about '82,

8   '83.  I've done graduate work at Marymount University in

9   education.

10  Q    And what about your employment history, sir?  Where did

11  you first begin after college?

12  A    I went right into the Army.  Twenty-six years in the

13  military.  Retired from the military in 1996.

14  Q    What branch of the -- Army?

15  A    Army.  I was in the computer field acquisition field

16  for the Army.

17  Q    Were you infantry?  Artillery?

18  A    The branch itself was adjutant general's corps.  After

19  I retired in '96, I went to work for a company called FC

20  Business Systems here in the local area.  I'm not too sure

21  of their address now; they moved.  I worked for them for

22  about one year.  Then I went to work for a company called

23  PTG, Premier Technology Group, from '97 to 2004 when PTG got

24  bought out by CACI.  Left CACI, stayed with PTG CACI.  Left

25  CACI on 13 January 2006.

85

Direct examination - C. Mudd (read-in deposition)

1   Q    What rank did you retire with?

2   A    Colonel, '06.

3   Q    Full colonel?

4   A    Uh-huh.

5   Q    When you first started PTG group, what were your job

6   responsibilities?

7   A    Management VP, management of business development,

8   building business.  Once I built it, to manage what I was

9   building.

10  Q    And what kind of business was PTG in?

11  A    Basically it was all work for the government.

12  Q    Was it all working for the military?

13  A    Everything I dealt with was mostly working for the

14  military.  A couple small little projects non-military, but

15  basically working for the military.

16  Q    During your time at PTG, did PTG contract with the

17  military to provide interrogators?

18  A    No.

19  Q    When did you -- when did you first contract with the

20  military to provide interrogators?

21  A    Exact time frame, sometime in the fall of 2003.

22  Q    Was that business that you had developed?

23  A    Yes.

24  Q    And tell me how you went about getting that business.

25  A    We had a contract.  "We," being PTG.  PTG was bought

86

Direct examination - C. Mudd (read-in deposition)

```
 1   out by CACI, I want to say in May of 2003.  I could be wrong
 2   about the exact date.  When PTG was bought out, we had
 3   already had a contract in Germany supporting V Corps G2 and
 4   V Corps G3 and V Corps G4.  When the Iraq kicked off -- the
 5   war kicked off in Iraq, we had three or four of our
 6   employees from V Corps G2 and two or three employees from V
 7   Corps G4 deployed to Iraq with the soldiers supporting the V
 8   Corps.
 9   Q    When you say that you had a contract supporting the V
10   Corps, what does that mean?  What does "support" mean?
11   A    We had a contract with where we provided intel analysts
12   for the G2, logistics analysts for the G4.
13   Q    And when you say -- just because they may be read by a
14   jury or may be read by the people, when you say an intel
15   analyst, that's an intelligence analyst?
16   A    Uh-huh.  I'm sorry.  Intelligence analyst, right.
17   Q    And logistics analyst?
18   A    Logistics analyst.
19   Q    And in that setting where you, PTG, has this contract
20   to support V Corps, do the PTG employees report to the
21   military?
22   A    Yes.
23   Q    Now, the deployment of the employees to Iraq, how did
24   that come about?  The three or four employees that were on
25   the intel analyst side and the two to three -- I'm sorry.  I
```

87

Direct examination - C. Mudd (read-in deposition)

```
 1   got that wrong.
 2           The three to four employees that were V Corps 3
 3   and the two to three employees that were V Corps 4 support.
 4   A    When they deployed to Iraq -- "they," being the V Corps
 5   military side -- the contracting office modified our
 6   contract so that we could deploy with them.  There was
 7   already a clause, it's a boilerplate clause in the contract
 8   that we had to go wherever the government told us to go, but
 9   they had to modify the contract, put some different cost
10   estimates in there.  So when the military deployed they told
11   us that they were going to take our employees.  We went to
12   our employees, told them they were going to be deployed to
13   Iraq, and they said fine, and so they went to Iraq.
14   Q    I'm sorry.  The COR, who was the contracting officer?
15   A    I want to say at that time frame most likely is
16   Lieutenant Colonel Brady, but I could be wrong.
17           MR. O'CONNOR:  Page 15.
18   BY MR. O'CONNOR:
19   Q    The employees that deployed to Iraq at that time frame,
20   what were they supposed to be doing in Iraq?
21   A    Same thing they were doing for the V Corps in Germany
22   in Heidelberg, Germany.  The intelligence analysts would do
23   intel work, intelligence work, study issues, write papers,
24   take direction from the military.  You know, it kind of
25   depends on what the government needed at that time.  Same
```

88

Direct examination - C. Mudd (read-in deposition)

1    with the logistics people.  They did whatever I call

2    staff-type work.

3              MR. O'CONNOR:  Page 18.

4    BY MR. O'CONNOR:

5    Q    In Iraq.  So at this time now, CACI owns PTG, and you

6    have several employees supporting V Corps?

7    A    Uh-huh.

8    Q    What happened to make you get the Iraq contract?

9    A    Okay.  Part of my job was multifold.  One was to build

10   business; two, manage the business that we've got; and

11   three, take care of employees.

12   Q    Take care of employees.  Okay.

13   A    Make sure they're housed properly and they don't have

14   any problems.  Or if they've got an issue, they can talk to

15   us, talk to CACI or PTG management.

16             About in July of 2003, because I had four or five

17   or six, seven employees in Iraq, I decided to go to Iraq and

18   see how our employees were doing because it was a war zone,

19   so I got permission from the government to go to Iraq.  I

20   had to have a letter of -- LOI.  LOI stands for letter of

21   maybe invitation, but I don't know what the "I" stands for.

22   So I got a letter from them to go to Iraq, permission.  Got

23   a badge before I go into Iraq, a CAC card, and then flew

24   into Kuwait commercial.  I was not billable to the

25   government.

                                                            89

Direct examination - C. Mudd (read-in deposition)

```
 1              Once I got to Kuwait, there was a V Corps liaison
 2    there in Kuwait.  I was asked to stop by and see her from
 3    the managers in Germany, to stop by and see the V Corps
 4    liaison to make sure we weren't having any problem that she
 5    knew about.
 6    Q    And what was her name?
 7    A    Female major.  I don't remember.  Okay.  It's just been
 8    too long ago.
 9              I stopped by and saw her, she didn't have a
10    problem with us and what we were doing down range.  She
11    recommended I might want to go see the contracting office
12    and make sure we weren't having any problems there in
13    Kuwait.  So I went by and saw some contracting officer, a
14    civilian.  Again, I don't remember his name.  Introduced
15    myself.  He was friendly.  Told him what kind of stuff we
16    did and asked him if I found business in Iraq because,
17    again, I have multiple purposes in life, and I do bring it
18    back to him as the contracting office.  He said no.  Grant
19    you, it just started up.  Again, this is in July.
20    Q    I'm sorry.  What just started up?
21    A    Iraq just really is into a turmoil, wild west.  He said
22    I'm more concerned right now.  His exact words, I'm more
23    concerned about getting water trucks and port-a-potties in
24    Iraq than I am about doing other type of contract work.
25              He said deal with the contracting officer in Iraq,
```

90

Direct examination - C. Mudd (read-in deposition)

```
 1    there's one down there.  If you find something you think you

 2    might help them out with or they need help, I said fine.

 3    Q    And what type of services were you describing to him?

 4    A    I didn't know what he was looking for.

 5    Q    So you were open-ended, what do you need?

 6    A    We do intel-type.  We do logistics-type.  We do

 7    IT-type.  We do all kinds of things.  He said fine.

 8              He wanted to know if we had any type of BPAs or

 9    IDIQ-type contracts.  Any type of contract where you could

10    add more work to it.  I said, yeah, we had those, all

11    companies do.  Not all companies; most companies do.  He

12    wanted to know which one we had.  I told him we had one out

13    of Fort --

14              MR. O'CONNOR:  Huachuca.

15              THE WITNESS:  -- Huachuca.  He said fine.  Who was

16    my contracting officer?  And I told him.  And he said, yeah,

17    I know her.

18    BY MR. O'CONNOR:

19    Q    Who was the contracting officer?

20    A    I want to say -- I could be wrong -- Betty Sebastian,

21    but I could be wrong about that.

22    Q    Could it be Blankenship?

23    A    Blankenship name rings a bell to me, but she's not the

24    one I dealt with.

25    Q    Okay.
```

91

Direct examination - C. Mudd (read-in deposition)

```
 1    A    Anyway, he said he knew whatever contracting officer's
 2    name I gave him from the government, said she was a good
 3    lady, and she would keep us out of trouble -- keep him out
 4    of trouble.  So then I went on, hitched a ride by a C130
 5    into Iraq, met up with my employees and started.  See how
 6    they're doing.  Started worrying about where they're going
 7    to sleep and what they're going to eat every day and about
 8    the water.  The normal care and feeding of our employees.
 9    Q    And there were seven there at the time?
10    A    Had some over the logistics side and some over the
11    intel side.  Anywhere from five to seven.  We had people
12    coming back and forth, too.  Temporary duty from Germany
13    into Iraq, so it kind of changed back and forth.
14           One of the things I would always do is go in and
15    talk to our customers.  If I've got two employees supporting
16    this major or this captain or this whoever, I go see how our
17    employees are doing to make sure, one, that the customer
18    understood from a corporate standpoint we were concerned to
19    make sure we were doing a good job; and two, if there was a
20    problem, I could snip it in the bud and fix the problem if
21    there was a personality conflict or if an employee was not
22    doing -- living up to what the contract -- what he's
23    supposed to be doing.  So I would go around and visit.
24           At that time frame, all our people were located in
25    a place called Camp Victory close to Baghdad, one location,
```

                                                                92

Direct examination - C. Mudd (read-in deposition)

1   not living together, but separated out.  Not working

2   together, but in that general area, so it's easy to get

3   around to them.

4          Talked to the different customers about different

5   things our company could do.  Logistics said they need a

6   whole bunch of help, the G4 types, doing property

7   accountability, different areas.  They wanted to know if we

8   could do that type of work.  We said, yeah, we do that type

9   of work in other contracts, we could do that.  We could get

10  the people for you and so on and so forth.

11         They wanted to know about what it would cost, not

12  the exact cost, what we call an estimate.  We always go a

13  little bit higher so we can always drop it down to make sure

14  everybody is happy, but they need to know what they have to

15  worry about from a cost standpoint.

16         MR. O'CONNOR:  Page 25.

17  BY MR. O'CONNOR:

18  Q    Do you remember who you dealt with on the intel side?

19  A    Colonel Brady was one of them.  He was there at that

20  time frame if I remember correctly.  He was not the COR at

21  the time.  There was a female major, if I'm not mistaken,

22  there for a very, very short time frame.  She still stayed

23  there, but I think she gave it up to Colonel Brady or passed

24  it off to someone else.

25         Colonel Brady, at his level, he was a lieutenant

93

Direct examination - C. Mudd (read-in deposition)

 1   colonel.  He was more involved in the big picture trying to

 2   see what things we needed, so I did a rough order of

 3   magnitude.  I was told they would have to go through some

 4   type of requirements board.  They didn't know if it was

 5   approved or not, obviously.  They wanted to know what kind

 6   of contract vehicle we had.  Again, I passed the information

 7   about Fort Huachuca, gave them the names and phone numbers

 8   and email addresses so they started dialoguing government to

 9   government.

10   Q    So you told Colonel Brady about the Fort Huachuca

11   contracting vehicle?

12   A    Not only Colonel Brady I also talked -- gave the same

13   information to the logistics side, also the same information

14   to the IT side people, who did the IT work.

15   Q    On the intel side at this point, are you talking only

16   about intel analysts, or had you started talking about

17   interrogators?

18   A    To tell you the truth, I don't remember.  He was

19   talking about a whole lot of things.  Some things I said I

20   would not do.

21   Q    What did you say you would not do?

22   A    Any time it was a job where it required one spending a

23   lot of time outside the compound like security of a convoy,

24   we wouldn't touch that.  They talked about they were having

25   problems at the different sites about needing more guards,

                                                              94

Direct examination - C. Mudd (read-in deposition)

```
 1   and I said we don't touch that because it requires us to

 2   carry a gun and shoot somebody, and we don't -- our company

 3   does not do that type of work.  Those type of things we said

 4   no to.  We also turned down things I didn't think I could

 5   do.  For example, they wanted to know if I could -- I

 6   remember I said no.  They wanted me to get two or three

 7   buses into Iraq for about 90 days at a time.  I said no, I

 8   don't.

 9   Q    When you were first asked by Colonel Brady about

10   interrogators, did that strike you as something the company

11   could do?

12   A    Yes.  Again, it's interrogators, intel-type,

13   logistics-type.  You hire persons qualified to do the job.

14   As a company, we did not manage interrogators.  I'm not an

15   intel-type.

16   Q    You have no intelligence-gathering background?

17   A    Prior to this, prior to getting this contract, no.  So

18   if they asked me to manage intel types, I couldn't do it.  I

19   had military experience, but not intel-type.  It was not my

20   background.

21   Q    But that wasn't a reason to tell Colonel Brady that the

22   company as a whole couldn't do it?

23   A    Oh, yeah.  Issues come up.  We were giving them

24   qualified individuals, and they were managing those

25   qualified individuals.  I was not managing or my team
```

95

Direct examination - C. Mudd (read-in deposition)

1    leaders were not managing their day-to-day operations.

2              MR. O'CONNOR:   Page 54.

3    BY MR. O'CONNOR:

4    Q    Now, you had talked before about the corporate decision

5    to make sure that CACI employees stayed, I believe the

6    phrase you used was inside the wire?

7    A    It wasn't so much a corporate decision, it was my

8    decision, and it was also the COR's position, the different

9    CORs we used.  Our contracts were not for us to go out to

10   tactical units on patrols and all that.  We didn't go out

11   and gather intel firsthand from a building under fire.

12             MR. O'CONNOR:   Page 56.

13   BY MR. O'CONNOR:

14   Q    When CACI was being asked Colonel Brady's wish list,

15   did you talk at all about where the screeners were going to

16   be located in deciding how many screeners you were

17   interested in contracting for?

18   A    No.  The fact that they were going to be physically

19   located at, he had his mind up.  It drove his numbers of how

20   many he needed -- he thought he needed, but didn't really

21   impact me one way or another of me putting a person in Balad

22   or Fallujah or Camp Victory or at the prison, whatever.  It

23   made no difference to the cost standpoint or what kind of

24   person, you know, the body I needed.

25             So as long as it was not on a tactical deployment

96

Direct examination - C. Mudd (read-in deposition)

```
 1    going out with combat control, it was back in.  They call it

 2    rear.  Semi safe zone.  I wasn't concerned, so it had no

 3    play one way or the other as far as I was concerned.

 4              MR. O'CONNOR:  Fifty-eight.

 5    BY MR. O'CONNOR:

 6    Q    Now, when you got word -- well, who actually told you

 7    that CACI had gotten the contract -- excuse me, the intel

 8    piece of the contract?

 9    A    A contracting officer out at Fort Huachuca sent us the

10    contract.

11              MR. O'CONNOR:  Sixty-seven.

12    BY MR. O'CONNOR:

13    Q    Now, when you -- you said that when you went on your 17

14    trips to Iraq, one of the things that you did was go and

15    talk to the customer to make sure that CACI employees were

16    performing properly; right?

17    A    True.  Yes.

18    Q    And did you do that first focusing on the triage

19    screeners, did you do that as to the triage screeners?  Did

20    you talk to their customer?

21    A    Yes.

22    Q    And who was the military customer for the triage

23    screeners?

24    A    It changed.  I remember the guy person, one person I

25    used to talk to, some warrant officer.  I do not remember
```

                                                              97

Direct examination - C. Mudd (read-in deposition)

```
 1    his name.  On the operations side, there used to be a
 2    captain, I cannot remember her name.
 3    Q    Was it Captain Wood?
 4    A    Yeah, she was there.  Yes.
 5    Q    And when you -- did you -- when you conducted these
 6    checks on CACI employees, did you learn the military's view
 7    of their performance?
 8    A    Yes.
 9    Q    Now, I've seen reference in the documents that some of
10    the triage screeners were promoted to interrogators; do you
11    recall that?
12    A    Yes.
13    Q    Do you recall who was promoted to interrogator?
14    A    I know of one.  We had a few.  I can't remember their
15    names.  Steve -- I can't pronounce the last name.  Big
16    Steve, he started out as a screener.  I call it triage
17    screener.  Triage is my name.
18    Q    Yes, I understand.
19    A    It's not the government's.
20    Q    No, but it's helpful.  Thank you.
21    A    For the non-intel-type, I understand what it means.  We
22    had a few who, based upon how good a job they did as a
23    screener and the government's recommendation, we would
24    promote them up to being an interrogator, and we had other
25    ones who were not promoted based upon the government's
```

98

Direct examination - C. Mudd (read-in deposition)

```
 1   recommendation.

 2   Q    And when you say "government's recommendation," how did

 3   that come about?  Did they simply come to you -- did Captain

 4   Wood or someone else come to you and say they want Big Steve

 5   to be promoted to interrogator?

 6   A    Uh-huh.

 7   Q    You need to say --

 8   A    Objection to the form of the question.

 9             MR. O'CONNOR:  No.  Line 9.

10   BY MR. O'CONNOR:

11   Q    You need to say --

12   A    Yes.

13   Q    And then on the CACI end, what did -- what did you do

14   when you got that government recommendation?

15   A    We would go to the employee and ask them if they wanted

16   to be promoted to another position.

17             MR. O'CONNOR:  Page 72.

18   BY MR. O'CONNOR:

19   Q    Do you recognize the name DJ Johnson?

20   A    Yes, I do.

21   Q    And do you recall that there was a picture of DJ

22   Johnson in which he was interrogating an Iraqi?

23   A    Yes, I am aware of that picture.

24   Q    And my understanding from the documents is that the

25   military initially asked CACI to fire Mr. Johnson; is that
```

99

Direct examination - Mudd (read-in deposition)

```
 1   correct?

 2   A     I do not remember that.

 3   Q     What do you remember about what the military asked CACI

 4   to do vis-a-vis Mr. Johnson?

 5   A     Look at the picture.  As a matter of fact, just the

 6   opposite.  I remember the military asking us not to fire

 7   him, if my recollection is correct, because certain

 8   interrogations he was doing were too critical to the mission

 9   for us to fire him.

10   Q     Had CACI been going to fire him?

11   A     If -- at that time frame, no, because when the

12   government gave us the picture, they also told us not to

13   fire him at the same time.  So it wasn't a decision-making

14   on our process one way or another.

15   Q     And did you review the picture?

16   A     I've seen the picture, yes.

17   Q     You said in your declaration that you became familiar

18   with the Interrogation Rules of Engagement?

19   A     Uh-huh.  Yes.

20   Q     And why is it that you were reviewing the Interrogation

21   Rules of Engagement?

22   A     When all the problems with the pictures of Iraq came up

23   into the press, I started getting a whole lot more involved

24   in the interrogation, paying a whole lot more attention to

25   it.  Up to that time frame, interrogation was only one very
```

100

Direct examination - Mudd (read-in deposition)

```
 1   small part of our contract.
 2   Q     Prior to the photographs of the abuse being published,
 3   had you read the Interrogation Rules of Engagement?
 4   A     I do not remember reading them before then, no.
 5             MR. O'CONNOR:  Page 77.
 6   BY MR. O'CONNOR:
 7   Q     Now, you talked about making 17 trips to Iraq?
 8   A     Uh-huh.  Yes.
 9   Q     What prompted that number of trips?  For example, did
10   you have a schedule where you went to Iraq every quarter?
11   A     No.  There was no particular schedule.  I'd go all over
12   as often as I thought was necessary to take care of
13   employees.
14   Q     Was it -- were the trips prompted by concern for the
15   employees, or were they prompted by a desire to expand the
16   business, or both?
17   A     More concern about the employees, especially once we
18   got our task orders -- started getting task orders.
19             MR. O'CONNOR:  Page 79.
20   BY MR. O'CONNOR:
21   Q     When you -- when you went over on the trips, did you
22   have staff meetings?  Did you have group meetings with the
23   CACI employees at a given location?
24   A     Uh-huh.  I would pull them all together, sometimes as
25   much as I could pull together.  If a person is working on a
```

101

Direct examination - Mudd (read-in deposition)

```
 1   site, I couldn't pull him away from his job, so if I
 2   couldn't get him into the meeting, a lot of times I walk
 3   around and see them one-on-one to see how things are going.
 4   Q    So you did a lot of direct conversation with the
 5   employees?
 6   A    Direct conversation.
 7   Q    And what was the purpose of that?
 8   A    To make sure they're taken good care of, did they have
 9   any complaints that maybe we could help them with, living
10   conditions, food, danger.  A lot of it was just showing them
11   that CACI corporate was concerned about their welfare.
12   Q    Did you meet with the customers when you were on the
13   site visits as well?
14   A    Any time I went in country, I'd meet with the COR, make
15   sure the COR was happy, or if there's problems I could work
16   with.  Then when I go down to an individual site, I would
17   meet with the customers.
18   Q    And what did you tell the customers was the reason that
19   you wanted to meet with them?
20   A    I'm truthfully here to find out how our employees are
21   doing, if there's anything we should be doing that we're not
22   doing.
23   Q    And what were the types of things that you learned from
24   the customer?
25   A    I would find out about personality conflicts, certain
```

102

Direct examination - Mudd (read-in deposition)

```
 1   employees weren't working out properly, coming late to work,
 2   taking lunch breaks too long, were not writing good reports.
 3   Normal things like that, you know, we would hear about.
 4   Q    And then when you got that information from the
 5   customer, what did you do with it?
 6   A    Counsel employee if there was need to be counseled.
 7            MR. O'CONNOR:  Page 82.
 8   BY MR. O'CONNOR:
 9   Q    Did all -- on all 17 of your trips, did you include a
10   visit to Abu Ghraib prison?
11   A    No, did not.
12   Q    Do you remember on how many of the trips you went to
13   Abu Ghraib?
14   A    A bunch.  You know, out of 17, I don't know, 10, 11,
15   12, but not every time.
16            MR. O'CONNOR:  Page 84.
17   BY MR. O'CONNOR:
18   Q    What were the -- what were the range of actions that
19   you had available to you with a problem employee?
20   A    Counseling, transferring to another location within
21   Iraq called rehab transfer.
22   Q    Rehab transfer?
23   A    And firing.
24   Q    Did you have to fire some of the CACI employees in
25   Iraq?
```

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

Direct examination - Mudd (read-in deposition)

```
 1  A    Yes.

 2  Q    Do you have a sense of the magnitude of how many people

 3  you had to fire?

 4  A    Not very many.  Very few compared to the number of

 5  employees we had over there.

 6  Q    Now, when you -- when CACI wanted to make a rehab

 7  transfer, what did it have to do?

 8  A    We would go to our COR and say we've got A, B, C, we've

 9  got Mr. So and So and -- or Ms. So and So at this location,

10  he or she is not doing this properly, we think by moving

11  them over to this other location, we think there's a

12  personality conflict, or we think if we move this individual

13  they'll still do a good job, then the COR would have to

14  bless it, approve it.

15           MR. O'CONNOR:  Page 88.

16  BY MR. O'CONNOR:

17  Q    Did the training that CACI gave its deploying

18  employees, did that come before or after the Fort Bliss

19  training?

20  A    No, before.  Because when you went to Fort Bliss, in

21  most cases, you deployed right from Fort Bliss to Kuwait.

22  Kuwait right into Iraq.  And then once they got into Iraq,

23  we brought them down to our CACI where we stayed on Camp

24  Victory, and we gave them briefings what to expect, what

25  they should and should not do before the government decides
```

                                                              104

Direct examination - Mudd (read-in deposition)

```
 1    where they're going to go to.
 2    Q    I've heard that called CACIville, is that what it's
 3    called?
 4    A    That's what we -- we called it CACIville, right.
 5              MR. O'CONNOR:  Page 90.
 6    BY MR. O'CONNOR:
 7    Q    Did the CACI employees have to take directions from any
 8    soldier from any military personnel?
 9    A    No.  They took directions from their person that
10    they're working for.  If they did get direction from someone
11    else and they thought it was bad direction, they would take
12    it to the site lead, and the site lead would work with the
13    customer to get it worked out.
14    Q    Did that happen on occasion?
15    A    Occasionally, yes.
16              MR. O'CONNOR:  Page 91.
17    BY MR. O'CONNOR:
18    Q    Now, when the CACI employees got to Iraq and you had
19    the training at CACIville, what was the -- what were the
20    topics that were covered in the CACIville training?
21    A    What we did, the country manager at CACIville would
22    pull the new people together, one person, eight people,
23    depends on how many arrived that day, give them a briefing
24    what to expect, where they might be going, what's going to
25    be, what's going to happen in the next week, week and a
```

105

Direct examination - Mudd (read-in deposition)

```
 1   half, because it might take a week before we get them

 2   shipped out to the site.  So the government would remind

 3   them where they're going to go, on what they could and could

 4   not do.  I.e., couldn't drink alcohol, you know, couldn't

 5   carry weapons.

 6            Just kind of went over the whole checklist of

 7   sayings and tried to answer their questions, make sure they

 8   were comfortable, make sure they knew where -- you know, how

 9   to get to chow, whether they're at CACIville and get them

10   rested up.

11   Q    And when the -- and then when they were sent to their

12   different sites, did their -- was there then additional

13   on-site training?

14   A    It depends on what their job was going to be.  But,

15   yes.  If they went to the prison, they got briefed by the

16   people at the prison; if they went to a LEP screening sale,

17   they got briefed on what their job was going to be.  So they

18   would get briefings once they went to a location what their

19   function is going to be.

20   Q    And were those briefings done by the military or done

21   by CACI personnel or both?

22   A    In most cases, done by military.

23   Q    Did the CACI site leads do any briefings?

24   A    Yes.  They did the briefings on the admin stuff.  Okay.

25   Here's how we do time sheets.  This says you have to keep a
```

106

Direct examination - Mudd (read-in deposition)

```
 1    daily time sheet.  So they did the CACI admin-type stuff,
 2    made sure they understood their chain of command.  If they
 3    had a problem with the site lead, they could jump up to the
 4    country manager, make sure they had the project manager's
 5    name and phone number, email address so they could always go
 6    back to CACI corporate if they had an issue.
 7                 MR. O'CONNOR:  Page 96.
 8    BY MR. O'CONNOR:
 9    Q    When you were -- when you were making your visits to
10    Abu Ghraib and talking to the customer about the performance
11    of the interrogators, what were the topics of the
12    discussion?
13    A    How their interrogation or screening analysts work, are
14    they performing what they're supposed to be doing, do they
15    have the right attitude.  Okay.  Are they showing up to work
16    on time, are they goofing off too much, are they treating
17    the -- you know, are they dealing with the prisoners like
18    they're supposed to be dealing with them.  Just the normal
19    day-by-day type operations.
20    Q    On that latter topic, are they dealing with the
21    prisoners the way they're supposed to be dealing with them,
22    did you ever have any conversation with the customer in
23    which the customer expressed some concern about, you know,
24    one of your guys is too rough with the prisoners?
25    A    No.
```

107

Direct examination - Mudd (read-in deposition)

```
 1   Q    What were the conversations about dealing with the

 2   prisoners the way they were supposed to be dealing with

 3   them?  I mean, how did that topic come up?

 4   A    At that time frame, more not being physically abusive,

 5   it was more of their attitude towards your prisoners.  Were

 6   they doing interrogation with the right attitude.

 7   Q    And what was the right attitude?  What does that mean?

 8   How were they supposed to be treating the prisoners?

 9   A    That's classified.  That's Rules of Engagement of

10   interrogation.

11           MR. O'CONNOR:  Page 99.

12   BY MR. O'CONNOR:

13   Q    And at the time pre-scandal when you're having these

14   conversations, what -- and the customer is telling you

15   whether or not they're happy with their attitude or not

16   happy with the attitude, what are your reference points?

17   A    My reference point is what the government thinks is

18   right or wrong since I'm not an interrogator, so I can't

19   tell you what the proper attitude is.  I can only tell you

20   if the government thought he or she had a bad -- wrong

21   attitude or correct attitude.

22   Q    So really a question of is the customer happy with the

23   CACI employees' attitude?

24   A    Yes.

25           MR. O'CONNOR:  Page 102.
```

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

Direct examination - Mudd (read-in deposition)

```
 1    BY MR. O'CONNOR:

 2    Q    Do you recall an interrogator named Richard Arrant

 3    quitting?

 4    A    I recall the name, but I don't recall him quitting, no.

 5    Q    Do you recall a CACI interrogator observing abuse by

 6    the military and getting so concerned about it that he left

 7    country?

 8    A    No.

 9    Q    Were you ever aware of that?

10    A    I heard about it after the fact.

11    Q    And when you say "after the fact," meaning you heard

12    about it after the scandal?

13    A    Yes.

14              MR. O'CONNOR:  Page 107.

15    BY MR. O'CONNOR:

16    Q    Prior to the lunch break I had asked you about the

17    Rules of Engagement, and you said that you had seen them

18    after the Abu Ghraib scandal broke; right?

19    A    Uh-huh.

20    Q    You can't say uh-huh.

21    A    Yes, I did.  Okay.  Yes.  I saw them after the scandal

22    broke.

23    Q    And I take it CACI continued to provide employees to

24    the military to conduct interrogations in accord with those

25    Rules of Engagement?
```

109

Direct examination - Mudd (read-in deposition)

```
1    A    We continued to provide employees to the government

2    under a task order, and, in turn, the government would

3    drive -- dictated what Rules of Engagement should be

4    followed.

5    Q    Did you learn that there was a change in the Rules of

6    Engagement after the scandal?

7    A    I saw -- I know I've seen two versions of the Rules of

8    Engagement, at least two versions after the scandal broke.

9    I don't know if they were changed due to the scandal

10   breaking or not, I just know I saw a couple different

11   versions.

12   Q    Did you or anyone else at CACI undertake an analysis as

13   to whether CACI was comfortable letting its employees

14   operate according to the Rules of Engagement that you saw?

15   A    No, I did not.  We did not.

16   Q    Why not?

17   A    It was a -- we were working under a government task

18   order under management of the government.  They set the

19   Rules of Engagement; we did not.

20              MR. O'CONNOR:  Page 120.

21   BY MR. O'CONNOR:

22   Q    Did you interview the CACI employees that were

23   interrogators at Abu Ghraib?

24   A    No.  The main why we did not, there was investigations

25   going on.  We did not want to do anything that would cause a
```

110

Case 1:08-cv-00827-LMB-JFA   Document 1625   Filed 05/06/24   Page 111 of 152 PageID#
43895
Direct examination - Mudd (read-in deposition)

1    problem to the investigations.

2    Q    And when you say "cause a problem to investigations,"

3    you're referring to the military investigating the abuse?

4    A    Yes.

5    Q    And did the military ask you not to conduct any type of

6    internal investigation?

7    A    No, they did not.  Did not ask us to do -- yeah.  The

8    military gave us no direction there, except we were told

9    when the military talked to our employees in some of the

10   cases, our employees were told not to share this

11   information, what kind of questions we asked you, with

12   anybody else.

13   Q    And some of your employees shared with you that they

14   had been told not to share the information --

15   A    Yeah.

16   Q    -- with you?

17   A    Yes.

18   Q    Did you ever ask the military whether it was

19   permissible for you to conduct an internal investigation of

20   your own employees' conduct?

21   A    No and yes.  We would go to the COR and say are any of

22   our employees in trouble?  Is there anything we should be

23   doing?  Up until the actual reports come out naming certain

24   employees, we were told by the COR that, no, your CACI

25   employees are not in any type of trouble.

                                                              111

Direct examination - Mudd (read-in deposition)

```
 1  Q    Oh.  So prior to the Taguba report coming out, you had

 2  been assured by Colonel Brady that none of the CACI

 3  employees were in any trouble?

 4  A    Uh-huh.  Yes.

 5           MR. O'CONNOR:  Page 140.

 6  BY MR. O'CONNOR:

 7  Q    More so than for your employees that are assigned to

 8  contracts performed for the military outside of Iraq?

 9  A    Truthfully, for people outside of Iraq it was one of

10  the forms they fill out, and I never pay any attention to it

11  because it's just a normal piece of paper like insurance

12  documents.  But the next of kin for Iraq was a critical

13  process for us because a lot of companies were having

14  problems over there when someone got killed, so we had that.

15           We had, for example, when we gave them an

16  interview -- not interview.  When they first got in country

17  at CACIville, our repo depot, whatever you want to call it.

18  Before we sent them out to whatever site, we gave them a

19  briefing.  We had them sign that briefing.  We made sure we

20  had those to make sure that one got the briefing.  I wasn't

21  too concerned.  We just wanted to make sure everyone got a

22  detailed briefing when we got in country, so we had certain

23  little forms that we ensured for our people in Iraq, but not

24  very much.

25  Q    Of the paper that you had them sign about in-country
```

112

Direct examination - Mudd (read-in deposition)

1    briefing, is that one of the parts of what you have as

2    Exhibit 5?

3    A    Yeah.  Probably the --

4    Q    If you could just identify it by the numbers, the Bates

5    numbers.

6    A    No, this is not it.

7    Q    Okay.

8    A    The briefings back -- in the back are the briefings

9    taking place out at the prison by the government.

10   Q    But not the CACIville briefing?

11   A    Not the CACI briefing.

12        Now, our site at the prison -- our site manager

13   would be there when new employees got briefed, but this is

14   not the CACI briefing I was talking about.

15   Q    Did the in-country CACI briefing cover the law of war

16   at all?

17   A    No, it did not.  It covered -- if you see something you

18   don't agree with, tell somebody, but it didn't go over what

19   you could do and what you could not do.

20   Q    It went more over your reporting obligations?

21   A    Right.  And it was not just for -- it was everybody's

22   guide.  So your LEP screener got the same in-country

23   briefing as an interrogator got.  Or the logi supply clerk

24   got the same briefing as the interrogator got.

25   Q    And was the briefing given that they were to report

                                                          113

Direct examination - Mudd (read-in deposition)

```
 1   both to the military and to CACI?

 2   A    Yes.

 3   Q    And you say you remember talking on the phone on a

 4   recurring basis.  Did you have any regular calls with

 5   Dr. London before the Abu Ghraib scandal?

 6   A    Yes.

 7   Q    And what was the substance of those calls?

 8   A    How were our people doing?  Anybody get killed?  Any

 9   problems I should be aware of?  He was concerned about the

10   safety of our employees and also concerned about how is our

11   fill rate coming along.  I mean, are we getting enough

12   people to keep the customer happy?

13   Q    And by "fill rate," you mean the number of human beings

14   you can place over in Iraq --

15   A    Yes.

16   Q    -- to do the job?

17   A    Yes.

18   Q    And it was a constant struggle to keep that fill rate

19   up?

20   A    Yes.  It was hard to find enough qualified people and

21   to get them through the pipeline.  Security clearances.  A

22   security clearance could take anywhere from a month to seven

23   months, and so that -- all the contractors have that

24   problem; it's not just CACI on security clearances, so yes.

25            MR. O'CONNOR:  And that concludes the testimony of
```
                                                              114

Direct examination - Mudd (read-in deposition)

```
 1   Charles Mudd.
 2            THE COURT:  Just to give the jury context.  You
 3   reference a Dr. London.  We've not heard that name before.
 4   Who's Dr. London?
 5            MR. O'CONNOR:  Dr. J.P. London, I think he did
 6   come up.  He was the CEO and chairman of the board of CACI.
 7            THE COURT:  Okay.
 8            MR. O'CONNOR:  He's now deceased.
 9            THE COURT:  All right.  Your next witness.
10            MR. O'CONNOR:  Your Honor, CACI calls, by
11   tape-recorded deposition, Army Interrogator F.  I have
12   clips.  Everyone will probably be happy to hear that over
13   the lunch hour, we cut these back substantially.  But for
14   the clips, because we don't have a printer in the building,
15   we did it the old-fashioned way.  So the clips will have a
16   big X of what we took out.
17            THE COURT:  That's fine.
18            (Audio clip of Interrogator F played.)
19            THE COURT:  We're going to break.  It's 4:10.
20   We'll give the jury to 4:30.
21                (Jury not present at 4:15 p.m.)
22            THE COURT:  Okay.  So what is the issue that you
23   all want to discuss?
24            MS. MAHLER-HAUG:  Your Honor, Alex Mahler-Haug for
25   plaintiffs.
```

115

Direct examination - Mudd (read-in deposition)

```
 1              THE COURT:  Yeah.

 2              MS. MAHLER-HAUG:  Plaintiffs had objected to a

 3   certain clip in Interrogator F, lines 24-08 through 21 --

 4   25, excuse me, 01, and it was played as part of the audio

 5   just now.

 6              We've discussed this with counsel for the

 7   defendant, and we've reached an agreement where we think

 8   we've resolved the issue, and so they're not going to argue

 9   it in their closing or further draw attention to the fact

10   that this was played.  And so, at this time, we're not going

11   to request a curative instruction, but we just wanted to put

12   this all on the record and make a note of it.

13              THE COURT:  I have to tell you, the way these are

14   going in -- I'm watching the jury.  Up until now, they're

15   taking notes.  They're not taking notes anymore.  This is

16   becoming highly repetitive.  I'm assuming we're going to

17   shorten this even more.

18              I mean, I think you've made the point, number one,

19   that a lot of people who were on the scene didn't see

20   anything.

21              MR. O'CONNOR:  That's right.

22              THE COURT:  Number two, you've made the point, I

23   think, quite graphically, that there were all kinds of what

24   I think now as you look at the context of this case were

25   completely unreasonable invocations of any kind of state
```

116

Case 1:08-cv-00827-LMB-JFA   Document 1625   Filed 05/06/24   Page 117 of 152 PageID#
43901
Direct examination - Mudd (read-in deposition)

1    secret or privilege.  I mean, I actually was starting to

2    take a look through the two, but between two of the

3    interrogators, in one it was okay to talk about the Geneva

4    Convention, and the other it wasn't.  Absolutely ridiculous.

5    It makes, unfortunately, the United States government look

6    very foolish in this case, if not overly defensive.

7            But, anyway, that's as it is.  But I think you've

8    made whatever points you're going to make out of these.

9            MR. O'CONNOR:  I think that's right, Your Honor.

10           And just to give the Court a little background.

11   Originally Your Honor had said rather than instructing on

12   this, leave the objections in.  But we took them out mostly

13   from the Army interrogators.  There was one, which was F,

14   that we left in as a flavor of what it was for Army, but we

15   really -- for the other ones, we mostly took it out unless

16   the state secrets was preventing the soldier from

17   identifying a CACI employee.  And then for the CACI people,

18   we tended to leave them in more so the jury would understand

19   the hardship that we have in trying to defend under those

20   circumstances.

21           Now, we've been cutting.  One of the reasons that

22   we read Mudd today -- and we're going to read Brady as soon

23   as this finishes -- is to get us to do fewer of the

24   pseudonymous interrogators today because, with the changes

25   in pitch, we can't -- those cannot be instantaneously

                                                          117

Direct examination - Mudd (read-in deposition)

```
1    cropped.  It takes like a 45-minute process.
2            So the idea is we were doing these read-ins, so
3    we're pushing more of the pseudonymous stuff tomorrow so we
4    can cut more.  But we won't have any many pseudonymous
5    interrogators.  What we have today -- what's going to be
6    left today is Brady, which is probably a 15-minute read-in,
7    and then we're going to have to do Interrogator E, and then
8    probably at least one of the interpreters.  There's two
9    interpreters that are each about either .3 or .4 hours.
10   They're 15 to 20 minutes.  But --
11           THE COURT:  Okay.
12           MR. O'CONNOR:  -- I'm -- we're going to have to do
13   those, even though I would rather put another read-in, but I
14   don't have another read-in ready to go.
15           THE COURT:  Okay.  Give me an estimate of how much
16   time you think you're going to need to complete your case
17   tomorrow.
18           MR. O'CONNOR:  Well, Your Honor, I believe we
19   will -- we have Mr. Porvaznik available at 2.
20           THE COURT:  Right.  I'm not trying to rush you, I
21   just want to get a reasonable estimate, because I'm trying
22   to make a decision about how long we go today.
23           MR. O'CONNOR:  I think it's reasonable to
24   assume -- if we went to 6 today, I think it's reasonable to
25   assume that Mr. Porvaznik would either be our last witness
```

118

Direct examination -- Mudd (read-in deposition)

```
 1    or there will be some cats and dog after Mr. Porvaznik but
 2    not very much.  You know, we have a live witness, Scott
 3    Northrop, which we think our direct is about an hour.
 4              THE COURT:  All right.
 5              MR. O'CONNOR:  We have Colonel Pappas is 1.1
 6    between both sides, and then a couple of read-ins.
 7              THE COURT:  What we're going to do is, I'm going
 8    to stop around quarter of 6 today for a couple of reasons.
 9    One is, I definitely want to start talking -- I want to talk
10    about the verdict form, and I want to get a few -- run a
11    couple of things by you all for the jury instructions.  I've
12    got some questions that you're going to need to answer from
13    me.  We're going to try to get you a preliminary drafty
14    draft from the Court sometime tonight so that you can be
15    looking at them.
16              It's possible the jury may get charged tomorrow.
17    I just want you to be prepared for that.  It depends on when
18    we finish the evidence.  We know we need an hour and a half
19    for closing arguments.  I don't think the instructions are
20    going to take more than about an hour to give to the jury.
21    So I'm just saying, we may be able to move things quite
22    quickly.  I would like to get the case to the jury tomorrow
23    if I can.
24              All right.  So let's start then with your witness
25    next.  All right.
```

Direct examination - Mudd (read-in deposition)

```
 1              MR. O'CONNOR:  And, Your Honor, just one

 2    additional time management issue.

 3              There's one, I think, lingering issue that I think

 4    dealt with the state secrets thing that the Court took up

 5    this morning -- well, I think there's two issues there.  But

 6    one of them has to be resolved before we can put Colonel

 7    Pappas on because it deals with the exhibit and what form of

 8    the exhibit, if any, goes up on the screen.

 9              THE COURT:  Let's take care of that this evening.

10              MR. O'CONNOR:  So put that on the list.

11              THE COURT:  That's fine.  All right.  So I assume

12    the jury is ready now?

13              THE CSO:  Yes, Judge.

14              THE COURT:  Let's bring them in.

15                   (Jury present at 4:38 p.m.)

16              THE COURT:  You all got your lunch orders in for

17    tomorrow?

18              THE JUROR:  Yes.

19              THE COURT:  All right.  All right.  Your next

20    witness.

21              MR. O'CONNOR:  We have five more minutes of the

22    current witness, and then we'll be doing a read-in.

23              THE COURT:  All right.

24              MR. O'CONNOR:  Please continue with Army

25    Interrogator F.
```

                                                            120

Direct examination - Brady (read-in deposition)

```
 1                (Audio clip of Interrogator F played.)
 2                MR. O'CONNOR:  Your Honor, CACI calls Colonel
 3    William Brady, III by read-in deposition.
 4                THE COURT:  All right.  My clerk will go back in.
 5                MR. O'CONNOR:  Sorry for this.
 6                May I proceed, Your Honor?
 7                THE COURT:  Yes, sir.
 8                MR. O'CONNOR:  Page 4.
 9                      DIRECT EXAMINATION
10    BY MR. O'CONNOR:
11    Q    Please state your full name for the record.
12    A    William Harding Brady, III.
13    Q    When did you become -- are you a full colonel?
14    A    Yes.
15    Q    When did you become a full colonel?
16    A    December of 2005.
17    Q    When you work with the contractual services that you
18    are -- let me start over.
19                When you work with the contractual services that
20    are supporting military operations, do you consider the
21    contract employees to be the equivalent of soldiers?
22    A    Can you be a little more specific on what you're
23    asking?
24    Q    Well, really I'm trying to get at how you think of
25    contractors.  Like, when you're working day to day --
```

121

Direct examination - Brady (read-in deposition)

```
 1   A    Okay.
 2   Q    -- within a military environment with soldiers and with
 3   contractors, in your mind, what are the -- what are the
 4   similarities, and what are the differences?
 5   A    They are a member of our team.
 6   Q    And what do you mean by saying a member of the team?
 7   They have the same responsibilities as a military person?
 8   A    What I'm saying is that they are part of our mission.
 9   They're part of how we execute our mission.
10   Q    Are there any differences between a soldier and a
11   contract employee?
12   A    In my opinion, there are some differences, primarily
13   administrative and logistical.  But from a mission's
14   standpoint, no.
15   Q    When you say logistical, administrative, who is
16   actually employing the contractor?
17   A    What contractor are you referring to?
18   Q    I'm really talking any time you've been working with
19   contract employees.
20        The military itself is not the employer; correct?
21   A    I would consider the military as the overseer of the
22   civilian contractor.
23        MR. O'CONNOR:  Page 17.
24   BY MR. O'CONNOR:
25   Q    Okay.  Thinking back over time and on the instances
```

122

Direct examination - Brady (read-in deposition)

```
 1   when you've worked with the outside -- with contractors
 2   rather than soldiers, could anybody give a contractor an
 3   order the same way that anybody could give a soldier an
 4   order?
 5   A    I've never been in a situation where you're saying give
 6   them an order.  In my experience, the contract workers that
 7   I have been associated with have performed the duties
 8   they've been asked to do by the supervisor.
 9   Q    And that's kind of what I'm getting at, sir.
10        Because they're contract employees, is it more
11   clearly delineated who their supervisor is so they -- so
12   that they essentially take contract direction from one
13   designated person in the military?
14   A    In my experience when there is a contractor embedded in
15   a unit, whether it is a staff or whatever the function is --
16   and I'm being generic here in my experience -- that that
17   contractor has clearly worked for the supervisor of that
18   particular section or unit.
19            MR. O'CONNOR:  Page 24.
20   BY MR. O'CONNOR:
21   Q    Okay.  What were your responsibilities vis-a-vis the
22   CACI contract?
23   A    I oversaw the requirements, and I worked directly with
24   the CACI site manager within the country.
25   Q    And who was that?
```

123

Direct examination - Brady (read-in deposition)

```
 1   A    There were a couple during my time frame there.  The

 2   last time that I recall, the first name is Scott.  I forget

 3   his last name.

 4   Q    Scott Northrop?

 5   A    Scott Northrop, correct.

 6   Q    When you say you oversaw the requirements, what do you

 7   mean by that?

 8   A    When the Army established a requirement for contractual

 9   services from the military standpoint, I provided oversight

10   to what was being -- what was being filled by the

11   contractor, made sure they understood what the requirement

12   was.

13            MR. O'CONNOR:  Page 26.

14   BY MR. O'CONNOR:

15   Q    How did it come about that the 5th Corps in Iraq

16   decided to use CACI to augment its ranks?

17   A    I think the simplest way to explain that was that we

18   had an existing relationship with CACI, and they were

19   established on the ground, and we had, thus far, been very

20   satisfied with their performance.

21   Q    But was it a shortage of the ability to get more

22   personnel from the military?

23   A    Largely, yes.  Actually, let me restate that.  As

24   opposed to unable to get people from the military, it was

25   simply, at the time, a shortage on the ground that we did
```

124

Direct examination - Brady (read-in deposition)

1    not see addressed in a reasonable time frame.
2            MR. O'CONNOR:   Page 33.
3    BY MR. O'CONNOR:
4    Q    Did you express any view as to whether or not the
5    contract should be bid out generally?
6    A    No.
7    Q    Do you know -- do you have any knowledge as to why it
8    was given to CACI?
9    A    Only what I said earlier.  We had an existing
10   relationship with CACI, they were on the ground.  We had,
11   thus far, been satisfied with their services.  We were in
12   the middle of a war.
13           MR. O'CONNOR:   Page 37.
14   BY MR. O'CONNOR:
15   Q    Did you play any role in deciding who it was that CACI
16   was going to hire?
17   A    CACI, as a rule, would have the resumes on site in
18   Baghdad when the Internet decided to work on a good day.
19   When we had a 25th hour and an eighth day of the week to
20   look at paper.
21           But, yes, they brought their resumes, and to the
22   extent possible, I would screen resumes as a quality control
23   function.
24   Q    And when you say "quality control function," am I
25   correct in understanding that you viewed yourself basically

                                                            125

Direct examination - O'Brady (read-in deposition)

1    as just kind of checking up to make sure that CACI was doing

2    what it was supposed to do?

3    A    I reviewed resumes just to have a reasonable belief

4    that we were getting quality employees.  I can't say I

5    reviewed all of them by any stretch of the imagination.  I

6    reviewed a significant percentage.

7            MR. O'CONNOR:  Page 41.

8    BY MR. O'CONNOR:

9    Q    Now, my understanding is that, for the most part, you

10   viewed the CACI employees as performing well; correct?

11           MR. RUCCI:  I don't have page 41.

12           THE WITNESS:  Yes.

13           MR. O'CONNOR:  Page 68.

14   BY MR. O'CONNOR:

15   Q    And so did you have some pattern or practice where you

16   talked to your leadership point of contact how were the CACI

17   employees doing?

18           THE COURT:  I'm sorry.  Did you miss 59?  I have

19   41 and 59 highlighted.  Am I missing something?

20           MR. O'CONNOR:  I don't have 59, Your Honor.

21           MR. RUCCI:  I have three 59s.

22           THE COURT:  All right.  So 41 that was yes.  We

23   just did that one; correct?

24           MR. O'CONNOR:  We did.  So I'll read 59.

25           THE COURT:  All right.  Fifty-nine.

                                                              126

Direct examination - Brady (read-in deposition)

```
 1    BY MR. O'CONNOR:
 2    Q    But just speaking to your own actions, did you ever
 3    brief anybody out at Abu Ghraib or did -- or any group of
 4    people out at Abu Ghraib about the fact that they could
 5    reject CACI employees as unsatisfactory?
 6    A    A group of people?
 7    Q    Or a person.
 8    A    Is it an audience?  The leadership of the MI brigade
 9    that they knew they had the ability to reject unsatisfactory
10    soldiers, unsatisfactory contractors, any unsatisfactory
11    condition on the ground because that's the scope of a
12    commander on the ground.
13              MR. O'CONNOR:  Page 68.
14    BY MR. O'CONNOR:
15    Q    And so did you have some pattern or practice where you
16    talked to your leadership point of contact how are the CACI
17    employees doing?
18    A    I can't say that I had a set rhythm or such to do that.
19    I guess what I will express is that I was very confident in
20    the military chain of command.  It does real well for the
21    Army.  The contract employees were embedded with the
22    military chain of command.  Any problem, regardless of the
23    nature of the problem, the Army's pretty good at reporting
24    the problem.
25    Q    So it's your confidence in the military's chain of
```

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

Direct examination - Brady (read-in deposition)

```
 1   command ferreting out and reporting of problems that leads
 2   you to be confident that any problems with CACI employees
 3   would have similarly been ferreted out and reported?
 4   A    I was confident that there were leaders on the ground
 5   present in and around the interrogation operations or the
 6   analytical operations or the staff operations that they were
 7   performing.  But I had a point of contact that is well known
 8   that if there was a problem, you report the problem.
 9              MR. O'CONNOR:  Page 100.
10   BY MR. O'CONNOR:
11   Q    Did you ever go and observe CACI interrogators
12   interrogating prisoners?
13   A    I did observe interrogation operations several times,
14   yes.
15   Q    Did you observe CACI employees, though, not --
16   A    There were times that CACI employees were part of the
17   interrogation team, yes.
18   Q    Did you ever observe interrogations out at Abu Ghraib
19   where there weren't CACI interrogators in the team?
20   A    I can't say for sure if I did or not.
21   Q    Do you remember people complaining to you about Steve
22   Stefanowicz?
23   A    No, I don't at the time.  I think after the fact I've
24   seen his name come up in things.  But at the time, no, I
25   don't.
```

Direct examination - Brady (read-in deposition)

```
 1                MR. O'CONNOR:  Thank you.

 2                    (Witness excused at 4:52 a.m.)

 3                MR. O'CONNOR:  Your Honor, at this time we present

 4   Army Interrogator E by tape-recorded deposition.  It's about

 5   30 minutes in length, I'm told.

 6                THE COURT:  All right.

 7                (Audio clip of Interrogator E played.)

 8                THE COURT:  Haven't we heard this one before?

 9   Wait.  Stop.  Let's stop this.  You have two radar fellas or

10   gals or whatever they are?

11                MR. O'CONNOR:  Your Honor, CACI calls

12   Interpreter N -- or M.

13                THE COURT:  Interpreter N.

14                MR. O'CONNOR:  M, as in Mary.

15                THE COURT:  Oh, M as in Mary.  All right.

16                Wait.  Wait.  Wait.  Wait.  Let's make sure we've

17   got the right one.

18                (Audio clip of Interrogator M played.)

19                MR. O'CONNOR:  Your Honor, hopefully the last one

20   for the day.  This would be Interpreter N.

21                (Audio clip of Interrogator N played.)

22                THE COURT:  I think since we have other matters I

23   have to take up with counsel, I know the jury has been a

24   long day and this has been a bit tedious, this last round of

25   evidence, I'm going to let the jury get home early tonight.
```

```
 1    We have an escort to get you to your cars.

 2            Folks, again, please remember my cautions.  You've

 3    all been excellent about not talking to anybody, and that's

 4    exactly what we want you to do, not conduct any

 5    investigation.  We are moving the case.  As I said, we're

 6    well ahead of schedule.  Leave your notebooks here, and

 7    we'll see you tomorrow morning at 9:30.  Thank you.

 8            We'll stay in session.

 9            THE CSO:  Rise for the jury.

10            (Jury not present at 5:38 p.m.)

11            THE COURT:  All right.  First of all, let's talk

12    about the verdict form, which we got to you a while ago.  I

13    haven't gotten any feedback from you all.  So I want to know

14    now if there are any issues -- we found one or two small

15    typos.

16            And, as I said, it's my intention -- I think the

17    way you did it -- I didn't like the way you did it.  I

18    always like to do it, when I have multiple parties, to have

19    a separate verdict form for each party.  So we're going to

20    do three separate forms for each plaintiff.  All right.  And

21    that emphasizes the fact that the jury's evaluation has to

22    be individualized.

23            So, anyway.  Let me start with the plaintiff.

24            MS. MAHLER-HAUG:  Alex Mahler-Haug again for

25    plaintiffs, Your Honor.
```

                                                              130

1           Just a few items, I think, on our end.  As you

2    noted, just a few corrections.  Question 3 appears to have

3    an extra aiding and abetting, which is covered in

4    Question 4.

5           With respect to Question 5, plaintiffs would

6    submit that we don't think it needs to be included as a

7    special interrogatory, whereas here, plaintiffs have

8    established an employer/employee relationship between CACI

9    and its employees.

10          And, finally, just briefly with respect to

11   Question 7.  Our understanding of the standard there is that

12   it's a preponderance of the evidence, and that's primarily

13   based on what we saw in your instructions to the jury in

14   *Warfaa* and other ATS cases, so we just wanted to raise that

15   as a question.

16          THE COURT:  Well, that may have been wrong,

17   because in Virginia it certainly would be clear and

18   convincing.  So you'll need to give me authority other than

19   what I might have incorrectly have done, since, as I recall,

20   that was quite a while ago.  But I think it is clear and

21   convincing.  All right.  So if you find case law that

22   establishes that that's the wrong standard, you've got to

23   let me know.

24          MS. MAHLER-HAUG:  Sure.  We'll take that and get

25   back to you if necessary.

                                                              131

```
 1                  Thank you, Your Honor.

 2                  THE COURT:  All right.

 3                  MR. O'CONNOR:  I think the only comment we had,

 4     Your Honor, is the -- it is a little difficult without the

 5     instructions to, you know, make a final, you know,

 6     assessment of the verdict form.

 7                  The scope of employment question, one of the -- we

 8     assumed that there would be some question on, you know,

 9     borrowed servant.  And I'm not sure if that's subsumed in

10     the way the Court's going to instruct or something else.

11                  THE COURT:  On the borrowed servant, that would

12     appear to be an affirmative defense that you were making in

13     your case; is that right?

14                  MR. O'CONNOR:  I'm not sure it's an affirmative

15     defense.  It's certainly a defense.

16                  THE COURT:  Well, who's got the burden?  Do you

17     have the burden of showing by a preponderance of the

18     evidence, or does the plaintiff have the burden of proving

19     that you're not a borrowed servant?

20                  MR. O'CONNOR:  I think of it as their burden, Your

21     Honor, because they have to prove respondeat superior

22     liability, which includes showing, you know, all of the

23     legal indicia of employment, which, as we know under the

24     doctrine, is not just who signs your paycheck.

25                  But, either way, there was no reference of it on
```

132

```
 1    the verdict form, and we were debating internally whether
 2    that was because --
 3                THE COURT:  I mean, there are two different
 4    concepts, and the only reason we really have -- well, no.
 5    Borrowed servant does go beyond the ATS.  You can use the
 6    borrowed servant doctrine in other context.  Frankly, I've
 7    not seen it used that often, and I don't think there's a ton
 8    of case law out there on it.  We did a cursory check and so
 9    far haven't found any court talking about who's got the
10    burden.
11                But it is different from the respondeat superior
12    concept in the sense that the first doctrine requires proof
13    that an employee was acting within the course of his
14    employment.  Just because somebody is an employee of a
15    corporation doesn't necessarily bind the corporation for the
16    torts of that individual.
17                MR. O'CONNOR:  Agreed.
18                THE COURT:  I mean, that's boiler -- you know, the
19    standard law.
20                So I think the jury has to make a finding --
21    because if they -- if they were to find that CACI employees
22    were not acting within the scope of their employment, that
23    ends it.
24                MR. O'CONNOR:  That's right.
25                THE COURT:  All right.  So then the second line
```

133

1    is, well, if they were acting within the scope of their

2    employment, the question is whose employment?

3              MR. O'CONNOR:  Right.  That's exactly how we see

4    it, Your Honor.

5              THE COURT:  Yeah.  Yeah.  Yeah.

6              MR. O'CONNOR:  So that was our only comment on the

7    verdict form, I think.

8              MS. GINSBERG:  Your Honor, could we just have a

9    minute?

10             THE COURT:  Uh-huh.

11             MS. MAHLER-HAUG:  And, Your Honor --

12             THE COURT:  Wait one second.

13             MR. O'CONNOR:  Those are our comments, Your Honor.

14             THE COURT:  All right.

15             MS. MAHLER-HAUG:  May I respond?

16             THE COURT:  Yes.  At the lectern.

17             MS. MAHLER-HAUG:  With respect to Your Honor's

18   question about who has the burden should borrowed servant

19   come into this case, our understanding is that, again, where

20   an employer/employee relationship has been established

21   between the employee and its general employer, it is on the

22   burden of that general employer to show that that

23   presumption is rebutted and that their employee is in the

24   service of another master of a special employer.  And we've

25   identified some case law in Virginia and in federal courts

134

```
 1    applying that that we're happy to put together in a

 2    supplemental instruction for Your Honor's consideration if

 3    that would be helpful.

 4              THE COURT:  Well, get it to us as quickly as

 5    possible with the authorities, because I want to try to have

 6    a draft to you.  And I'm not working until midnight tonight,

 7    so I want it right away; all right?

 8              MS. MAHLER-HAUG:  We have that prepared.  We can

 9    file that or email it, whatever Your Honor's preference is.

10              THE COURT:  Email it.  Don't bother filing it at

11    this point.

12              MS. MAHLER-HAUG:  Sure.

13              THE COURT:  And then on the issue of the standard

14    for punitive damages, you think -- putting aside what might

15    have happened in *Warfaa*, you think you have authority that

16    it's by a preponderance not clear and convincing?

17              MS. MAHLER-HAUG:  Another example is another ATS

18    case that almost went to trial, *Salim v. Mitchell* out in

19    Washington.  The parties proposed instruction on punitive

20    damages, again requested an instruction based on

21    preponderance of the evidence.  That instruction was based

22    on the Ninth Circuit Model Jury Instructions, which is

23    another example that we've identified that's consistent with

24    Your Honor's instruction and verdict form in *Warfaa*.

25              THE COURT:  All right.  Well, we'll double-check
```

135

```
 1    to see what the Fourth Circuit said.  Certainly the standard

 2    approach on punitives is clear and convincing.

 3              MS. MAHLER-HAUG:  Certainly in at least some

 4    states, for example, North Carolina.

 5              THE COURT:  In Virginia --

 6              MS. ROBINSON:  -- for sure.

 7              THE COURT:  But it is in Virginia, and we're in

 8    Virginia.  That's something that we have to look at.  Okay.

 9              Now, in terms of the jury instructions that you

10    all submitted, I had some questions as to why we would

11    consider.

12              I've not heard anything about spoliation of

13    evidence.  One of you is asking for a spoliation

14    instruction.

15              MR. O'CONNOR:  I think that's been overcome by

16    events, Your Honor.

17              THE COURT:  Well, let me do this.  Let me go

18    through the index, because I don't want to waste our time on

19    instructions that we don't need.  So hold on a second.

20              All right.  So the plaintiffs' proposed

21    instructions.  I can tell you right now, I'm giving my

22    standard introduction to the final charge which explains the

23    problems to the jury.  I'm not giving the implicit bias

24    instruction.  I've never given it, and there's a general

25    instruction that talks about the fact that the jury can't
```

136

1    base their decision on bias, prejudice or sympathy.  So that

2    I'm satisfied covers that.

3            In terms of the evidence received in the case, I

4    am going to give three -- the three specific judicial

5    notices.  The two I said I would give yesterday, and I think

6    the defense is correct that I should be also giving the one

7    they proposed this morning.  So there will be three.

8            And I assume you gave a copy of that,

9    Mr. O'Connor, to the plaintiff, the proposed --

10           MR. O'CONNOR:  We filed it, Your Honor.

11           THE COURT:  Yeah.  All right.  That's fine.

12   Because that's appropriate.  All right.  And the issue did

13   come up during the questioning of the witnesses, so I think

14   it should be there.

15           I will be giving an instruction explaining

16   admissions.  I'm giving my standard quantity of evidence

17   instruction, my standard one on credibility of witnesses.  I

18   already gave the pseudonymous instruction at the beginning.

19   I'll give it again.  Inferences defined, I have a

20   one-sentence definition.  I don't use the one you all

21   submitted.

22           Preponderance of the evidence, the plaintiffs'

23   instruction was way too long.  I have a good standard one

24   that's never been a problem.  I'm going to use that one.  I

25   will do a multiple plaintiffs' instruction.

                                                          137

```
 1              I certainly will define the alien and tort
 2    statute.  I can't recall if there's any significant
 3    difference between the way the two of you have submitted it,
 4    but obviously we'll explain that to the jury.
 5              And we're going to -- obviously the two torture
 6    instructions, N and O, which the plaintiff wanted, are now
 7    irrelevant.  We will give a definition of cruel, inhuman or
 8    degrading treatment that which is -- whether I give P or a
 9    different version, I'm going to look at what the defense put
10    on that.  Again, Q comes out because there are no war crimes
11    left in this.
12              I don't think there's an affirmative defense for
13    international law violations.  I don't think that issue has
14    come up.  I didn't permit it.  All right.  So I don't think
15    there's any need for that to be in here, so I don't think R
16    is necessary.
17              So the real crux of the case I think comes down to
18    T, which is corporate responsibility on the theories of
19    liability for a corporation under the facts of this case.
20    The definition of conspiracy, the definition of aiding and
21    abetting.  The Fourth Circuit just came out with the latest
22    version of aiding and abetting, and we're going to take our
23    language from that Fourth Circuit case that you all cited in
24    that supplemental motion for reconsideration.
25              MR. O'CONNOR:  Is this the *Aziz* case?
```

138

```
 1              THE COURT:  The one you cited to in the motion to
 2   reconsider, yeah.
 3              MR. O'CONNOR:  Okay.
 4              THE COURT:  And then compensatory damages, I
 5   certainly will, first of all, instruct the jury the standard
 6   instruction about the fact that I'm instructing on damages
 7   doesn't mean I think the plaintiff should win.  I mean,
 8   again, that's just a standard boilerplate instruction.
 9              Compensatory, I don't think there's any real issue
10   there.  And with punitive damages, again, I'll take a look
11   at where you're fighting over that, but I think the burden
12   is important because if I'm satisfied, as I think I am that
13   it should be clear and convincing, then I'll need to add the
14   standard clear and convincing instruction there.
15              And I think that covers sort of briefly the
16   plaintiffs' instructions.
17              In terms of the defendant's, I will be giving my
18   standard use of notes instruction, organization is treated
19   equally.  Spoliation is out.  That's not an issue.
20              I don't think we had any issue about evidence
21   admitted for a limited purpose.  I think that always
22   confuses the jury, and I don't think that's been an issue in
23   the case.  So nine and ten of the defendant's will
24   automatically come out.
25              Discrepancy in testimony, that would stay in.  Use
```

139

1    of depositions as evidence, we have to leave that in given

2    the nature of this case.

3            The standard impeachment instruction, prior

4    inconsistent statements.  Again, no problems there.

5            And so I think -- you know, I'm definitely going

6    to tell the jury that mere presence or mere presence at --

7    when a tort is committed, mere knowledge that a tort is

8    committed is not enough to make either conspiracy or aiding

9    and abetting.  There has to be more.  And we're going to

10   look then at the borrowed servant.  So I think there's

11   really not much here that's genuinely in dispute; it's just

12   wording.

13           I did think over all that the plaintiffs'

14   instructions in many cases were overly wordy.  I noticed the

15   Ninth Circuit case that -- or the Ninth -- the California

16   case -- it's not a Ninth Circuit case -- that was cited much

17   simpler and cleaner instructions.  I might use a few of

18   those.  But, anyway, you won't be overly surprised, I don't

19   think.

20           But I think the real question that I have is you

21   should submit to the Court as soon as you can your -- how

22   you would revise the verdict form if we're going to include

23   a finding on the borrowed servant doctrine.  All right.

24   That's what I'm looking for.  And I definitely want to know

25   what the authority is as to the burden on that doctrine.

                                                          140

```
 1    Okay.  Other than that, that's what we'll be working on this
 2    evening.  All right.
 3            And then I'm going to want you, as soon as you can
 4    when you get the instructions, take a careful look at them,
 5    and hopefully you'll have feedback to us tomorrow morning.
 6    You can email it to us.  You don't have to be filing stuff
 7    yet because we'll -- you know, the final version of the
 8    instructions will be on the record.  But this is right now
 9    just drafting back and forth.  All right.
10            Yes.
11            MR. AZMY:  Briefly, Your Honor.
12            I understood this morning there was a brief
13    discussion about the possibility of a stipulation regarding
14    the lack of government records substantiating a connection
15    between CACI interrogators and our specific plaintiffs.  And
16    I just want to suggest that it's not something we can
17    probably stipulate to because I think our position has
18    always been that level of connection is legally irrelevant.
19    We've long abandoned a direct liability theory.  This is a
20    conspiracy case, and so all we have to show is an agreement
21    and that the abuses our plaintiffs suffered were reasonably
22    foreseeable.  As a result of that agreement, you've found
23    that plausible, we've denied summary judgment.  I think
24    there's enough evidence for the jury to so conclude.
25            So we don't think we have to prove in any way that
```

141

```
 1    there's a direct connection between CACI interrogators and

 2    our plaintiffs.

 3              THE COURT:  So what do you -- so what's the point?

 4              MR. AZMY:  The point is there was a conversation

 5    about potentially stipulating to the fact that the

 6    government doesn't have those records, and we wouldn't want

 7    to because we think that point is irrelevant.

 8              THE COURT:  Let me hear the response to that.

 9              MS. BAILEY:  Your Honor, it came up this morning

10    in the context of trying to handle the state secret concerns

11    that the government had about two exhibits.  And the

12    resolution that the Court agreed to, and that, at that time,

13    the parties agreed to, was that because we are not able to

14    use those exhibits to show that the three CACI

15    interrogators, that they've sort of turned into boogeymen in

16    this trial, Mr. Dugan, Mr. Stefanowicz and Mr. Johnson, are

17    not linked to plaintiffs with that evidence.  And because

18    Your Honor made clear that, you know, that's not something

19    that they've tried to -- that they should be trying to argue

20    anyway, that we would just have a stipulation that says that

21    there is no evidence that Mr. Stefanowicz, Mr. Dugan and

22    Mr. Johnson ever interrogated these plaintiffs.

23              And counsel raised that -- his concern that that

24    be limited just to formal interrogations, because, you know,

25    he was concerned that there was some evidence in the record
```

142

```
 1    that things happened outside the structured process.  And so

 2    we supplied a draft for their consideration that said, you

 3    know -- within government records.  But it was -- it was a

 4    resolution that the Court found with respect to the

 5    government's concerns about state secrets.

 6              MR. ELLIOTT:  Your Honor --

 7              THE COURT:  Well, just a second.

 8              I think this is not necessary to get into the

 9    weeds on this because the -- when I explained this case to

10    the jury -- and there was no objection to any of the Court's

11    comments.  So the way the case was presented to the jury --

12    all right.  This is what the jury was told, and you've been

13    getting the transcripts so you should know this.  Plaintiffs

14    do not claim that any CACI interrogator directly abused

15    them.  All right.

16              So, I mean, the jury's been told that by the

17    Court, and I'm planning to repeat this in my very brief

18    description of the case when I give them the instructions to

19    remind them of that.  That's not been the case -- that's not

20    been the case as it's been presented, in my view.  All

21    right.

22              So, you know, if you don't want to stipulate,

23    that's fine, but that's how I told the case -- gave the case

24    to the jury.  And, at this point, I would not expect that

25    either side's going to be arguing or trying to suggest
```

143

```
 1    something to the contrary.

 2            MS. BAILEY:  Yes, Your Honor.  And we completely

 3    agree with that view of the case, and that's why when the

 4    state secret issue came up this morning and we discussed it,

 5    it was important to CACI to say, look, you know, there have

 6    been three men who have been discussed repeatedly throughout

 7    this case, and there is no connection between them and these

 8    plaintiffs because of how the case has unraveled, and that's

 9    why the Court agreed with us this morning on that point.

10            THE COURT:  The connection is an indirect

11    connection, and I -- again, the language says directly

12    abused.

13            The theory that I've allowed to go -- and I think

14    it's a shaky theory, but, you know, I'm allowing it to go

15    forward -- is that by -- if the plaintiffs are correct that

16    CACI staff encouraged or directed military police to rough

17    up, soften up the detainees, they created the environment in

18    which some other people, other actors, did, in fact, rough

19    up the plaintiffs.  And if there's enough evidence that

20    supports the conclusion that CACI knowingly and

21    intentionally, you know, got involved in this and that

22    headquarters was sufficiently complicit, then the plaintiffs

23    may prevail.

24            MS. BAILEY:  The only caveat I would put with

25    that, Your Honor, is that part of the evidence in this case
```

144

```
1     is that -- whether or not interrogators gave instructions to

2     the MPs.  And what's been clear throughout the case is that

3     interrogators only gave instructions with respect to

4     detainees for which they were assigned.

5           So being able to say that none of those three

6     gentlemen were assigned these plaintiffs is an important

7     point because it's not just did they punch them; it's did

8     they tell an MP to punch them.  And the answer on that is

9     also unequivocally no, but because of the state secrets

10    limitations, we can't say that.  And so that's the concern.

11          THE COURT:  Well, you've got the Fay -- the

12    testimony from General Fay that with the plaintiff who

13    worked for Al Jazeera, although there's no formal report of

14    a formal interrogation, there were other indicia that he

15    had, in fact, been questioned.

16          MS. BAILEY:  Yes.  And that's the Beachner

17    situation.  So that's a very limited situation.  It's where

18    Mr. Stefanowicz was there at the time of the IP roundup.  He

19    asked random detainees around him questions, as everybody

20    down there was doing.  Beachner saw him talking to

21    Mr. Al-Ejaili, Your Honor.

22          MR. ELLIOTT:  I'm sorry.  We're getting very close

23    to the territory that gets close to the privilege.  If we

24    could just come up to the sidebar, it would be very much

25    appreciated.
```

145

```
 1            THE COURT:  All right.  Come up.

 2                 (Bench conference.)

 3            MR. ELLIOTT:  I apologize, Your Honor.  I don't

 4     want -- we're still in open court.

 5            MS. BAILEY:  Just to be clear, everything I just

 6     said has been said in the trial already.

 7            But Mr. -- so that is a very targeted specific

 8     incident that happened under, you know, unusual

 9     circumstances.  And so there's no other indication that

10     there were these informal interrogations going on.  It was a

11     cite to that specific instance, and in that specific

12     instance, Mr. Beachner said that Mr. Stefanowicz did nothing

13     wrong.  And so to leave an impression that there was some

14     contact there or there was some potential for contact there

15     that could have been abusive is inaccurate, and it's not

16     fair to leave with the jury.

17            THE COURT:  All right.

18            MR. ELLIOTT:  I have nothing to say, Your Honor.

19     The conversation between the parties is getting very close

20     to the line, and it just gave me concern since we're still

21     in open court with journalists present.

22            THE COURT:  Nothing has been said so far that goes

23     across the line.

24            MR. ELLIOTT:  No.

25            THE COURT:  No.  No.  I'm not going to include a
```

1    special instruction on this issue.  You can argue it to the

2    jury into the case.  I think if you get too far into the

3    weeds, the jury is not going to get it.  There's so much

4    information in this case.  All right.

5          MS. BAILEY:  So our concern is the potential for

6    confusion with the jury because so much focus has been put

7    on three men who have nothing to do with these plaintiffs,

8    and we can't say CACI Interrogator A and CACI Interrogator G

9    are not any of these three men.

10          And the question would be if plaintiffs don't

11    care, why are they not willing to say CACI Interrogator A

12    and CACI Interrogator G are not Dugan, Stefanowicz and

13    Johnson?  If they're not going to make that argument, then

14    what difference does it make to make it clearer to the jury

15    that that's the truth of the matter?

16          MR. AZMY:  Of course it is disputed that the three

17    had nothing to do with our plaintiffs.

18          MS. BAILEY:  Just that they're not CACI

19    Interrogator A or G.  That's it.  That's all we're asking

20    for.

21          THE COURT:  Well, let's see if you can figure it

22    out tonight.

23          MS. BAILEY:  Yes, Your Honor.

24          THE COURT:  Are there any other issues?

25          MR. ELLIOTT:  I would just reserve the -- I mean,

147

```
 1    the government argued previously that -- a negative answer

 2    as to whether an individual interrogator did not interrogate

 3    a detainee.  We thought that was within the scope of the

 4    privilege; Your Honor ruled otherwise.  I would just like to

 5    reserve that argument.

 6             THE COURT:  Yeah.  I mean, I've got to tell you,

 7    the state secret invocation in this case was appalling.

 8    It's just rough really for the jury on that issue.  So I

 9    don't think it should be a problem tomorrow when you all

10    come in.  I'll go ahead and --

11             MS. BAILEY:  Understood.  And then the government

12    has another issue to raise.

13             MR. ELLIOTT:  Sorry.  Just to be clear, Your

14    Honor.  The defendants are not going to be linking those two

15    documents we talked about this morning?

16             MS. BAILEY:  No.

17             MR. ELLIOTT:  Okay.  The defendants have taken the

18    position that we waived our ability to make PII redactions

19    to the organizational chart that was admitted during the

20    Pappas deposition.  We were only provided that document on

21    the day of the deposition.  It was admitted, but all we ask

22    for is the opportunity to make the PII redactions consistent

23    with Your Honor's previous rulings before the organizational

24    chart is --

25             MS. BAILEY:  To be clear, PII --
```

```
 1                  THE COURT:  Do you have a copy of it?

 2                  MR. ELLIOTT:  I've got it.  This is the version we

 3      all agree with, but this is theirs.  There are no

 4      redactions.

 5                  MS. BAILEY:  So they want to take out --

 6                  THE COURT:  First of all, it's almost impossible

 7      to read it.  All right.

 8                  MS. BAILEY:  I would think it would have been

 9      produced in better condition.

10                  THE COURT:  Is this how the exhibit is going to go

11      to the jury?

12                  MR. ELLIOTT:  This is what they're proposing.

13                  MS. BAILEY:  Well, we're going to take the

14      language of the groups out because that was the concern the

15      government had.

16                  MR. ELLIOTT:  Yes.  Thank you.

17                  MS. BAILEY:  So based on our resolution this

18      morning, we agreed to take that out.  But that was when

19      plaintiffs had agreed to stipulate that there were no

20      records of Dugan, Stefanowicz and Johnson interrogating

21      plaintiffs.

22                  THE COURT:  If this is how it's going to the jury,

23      I don't know how they're going to even read it.  You all

24      have lived with this for some time.

25                  Can you read this?
```

                                                                    149

```
 1              MR. ELLIOTT:  This is the government's version
 2    that obviously has redactions of military personnel.
 3              THE COURT:  The jury will not be able to read
 4    this.  Right?  So you're going to change the names so that
 5    we don't have --
 6              MS. BAILEY:  Yes.  It will be black blocks.  But
 7    what they would like to do is take out all the other names
 8    of every person in the --
 9              MR. ELLIOTT:  No.  The names of non-public
10    military personnel consistent with Your Honor's prior
11    decision.
12              THE COURT:  Are any of them material to the case?
13    I mean, you've already had -- I can't even read the names.
14              MR. ELLIOTT:  If you'll see, the ranks are still
15    included, which indicates they are military personnel.
16              THE COURT:  What difference does it make who they
17    are other than there's a general, there's a colonel, there's
18    a lieutenant colonel, there's a major?  What difference does
19    it make who they are?  You've already got the testimony of
20    whatever his name is, the CIT.  That fell badly.  You've got
21    certain names in here.
22              So tell me, what names do you really need to have
23    in here?
24              MS. BAILEY:  Well, we need to be able to keep all
25    of the CACI and anybody who is in the chain of command.
```

150

```
 1              MR. ELLIOTT:  Well, again, we did our best efforts
 2   to identify those individuals who are not public and redact
 3   those.  We did not redact CACI names and any upper echelon
 4   individuals that we know are made public.
 5              MS. BAILEY:  I'm happy to agree to go through and
 6   anyone who hasn't been mentioned at all during the trial we
 7   can take out.
 8              MR. ELLIOTT:  Yes.
 9              THE COURT:  All right.  The jury will never be
10   able to read that.
11              MS. BAILEY:  I understand.  I wish it was in
12   better shape.
13              THE COURT:  They need a magnifying glass.
14              Anything else?
15              MS. BAILEY:  That's it.
16              MR. ELLIOTT:  Thank you very much, Your Honor.
17                      (Open court.)
18              THE COURT:  All right.  We'll recess court.
19              Oh, we have court tomorrow morning at 8:30 in
20   other cases, so you're going to have to clean up your tables
21   for tomorrow.  All right.
22              We'll recess court until 8:30 tomorrow.
23                  (Proceedings adjourned at 6:05 p.m.)
24
25
```

151

1  ----------------------------------

2  I certify that the foregoing is a true and accurate

3  transcription of my stenographic notes.

4

5  *Stephanie Austin*

6  Stephanie M. Austin, RPR, CRR

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

152