```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
 2                      ALEXANDRIA DIVISION

 3   --------------------------x
     SUHAIL NAJIM ABDULLAH AL    :   Civil Action No.:
 4   SHIMARI, et al.,            :   1:08-cv-827
                 Plaintiffs,     :
 5        versus                 :   Monday, April 22, 2024
                                 :   Alexandria, Virginia
 6   CACI PREMIER TECHNOLOGY,    :   Volume VI
     INC,                        :   Pages 1-122
 7               Defendant.      :
     --------------------------x
 8

 9        The above-entitled jury trial was heard before the
     Honorable Leonie M. Brinkema, United States District Judge.
10   This proceeding commenced at 9:28 a.m.

11                    A P P E A R A N C E S:

12   FOR THE PLAINTIFFS:    BAHER AZMY, ESQUIRE
                            THE CENTER FOR CONSTITUTIONAL RIGHTS
13                          666 Broadway
                            7th Floor
14                          New York, New York  10012
                            (212) 614-6464
15
                            MUHAMMAD FARIDI, ESQUIRE
16                          MICHAEL BUCHANAN, ESQUIRE
                            BONITA ROBINSON, ESQUIRE
17                          ANDREW HADDAD, ESQUIRE
                            MICHAEL FISHER, ESQUIRE
18                          THOMAS KICAK, ESQUIRE
                            SCOTT KIM, ESQUIRE
19                          ALEXANDRA MAHLER-HAUG, ESQUIRE
                            PATTERSON BELKNAP WEBB & TYLER LLP
20                          1133 Avenue of the Americas
                            New York, New York  10036
21                          (212) 336-2000

22

23

24

25
                                                           1
```

```
 1                   A P P E A R A N C E S:

 2   FOR THE DEFENDANT:    JOHN O'CONNOR, JR., ESQUIRE
                           LINDA BAILEY, ESQUIRE
 3                         JOSEPH MCCLURE, ESQUIRE
                           STEPTOE & JOHNSON LLP
 4                         1330 Connecticut Avenue, NW
                           7th Floor
 5                         Washington, D.C.  20036
                           (202) 429-3000
 6
                           NINA GINSBERG, ESQUIRE
 7                         DIMUROGINSBERG PC
                           1101 King Street
 8                         Suite 610
                           Alexandria, Virginia  22314
 9                         (703) 684-4333

10   FOR THE UNITED        REBECCA LEVENSON, ESQUIRE
     STATES:               OFFICE OF THE UNITED STATES ATTORNEY
11                         2100 Jamieson Avenue
                           Alexandria, Virginia  22314
12                         (703) 299-3700

13                         STEPHEN ELLIOTT, ESQUIRE
                           JASON LYNCH, ESQUIRE
14                         UNITED STATES DEPARTMENT OF JUSTICE
                           CIVIL DIVISION FEDERAL PROGRAMS BRANCH
15                         1100 L Street, NW
                           Washington, D.C.  20044
16                         (202) 598-0905

17   COURT REPORTER:       STEPHANIE M. AUSTIN, RPR, CRR
                           Official Court Reporter
18                         United States District Court
                           401 Courthouse Square
19                         Alexandria, Virginia  22314
                           (571) 298-1649
20                         S.AustinReporting@gmail.com

21        COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

22

23

24

25
                                                               2
```

TABLE OF CONTENTS

MISCELLANY

Closing argument by Mr. Faridi ...........17
Closing argument by Mr. O'Connor .........38
Rebuttal closing argument by Mr. Faridi ...66
Jury instructions .......................73
Note .....................................117
Certificate of Court Reporter ............122

3

```
1                    P R O C E E D I N G S

2            THE DEPUTY CLERK:  Civil Action Number

3    1:08-cv-827, Suhail Najim Abdullah Al Shimari, et al. versus

4    CACI Premier Technology, Inc.

5            Will counsel please note their appearance for the

6    record beginning with the plaintiff.

7            MR. FARIDI:  Good morning, Your Honor.

8    Muhammad Faridi from Patterson Belknap on behalf of the

9    plaintiffs.  I'm joined by my colleagues Mr. Baher Azmy,

10   Alex Mahler-Haug and Michael Buchanan.

11           THE COURT:  Good morning.

12           MR. O'CONNOR:  Good morning, Your Honor.

13   John O'Connor for defendant CACI.  I'm joined by my

14   co-counsel Linda Bailey, Nina Ginsberg and Joseph McClure.

15           THE COURT:  Good morning.

16           As you know, we're down to the wire in this case,

17   and I want to go over with you your concerns about the jury

18   instructions and the verdict form.

19           Again, with the verdict form, although I know the

20   defense wants a special finding on whether or not the

21   borrowed servant doctrine applies, we're not going to do

22   that.  In my view, the instructions are clear enough that if

23   the jury does find liability, that means they've rejected

24   the affirmative defense, and I think that gives the Court of

25   Appeals sufficient information in which to evaluate the
```

4

1   case.  So with that change not being included, the verdict

2   form will be as we've submitted it.  All right.

3           Was there anything else that was of concern to

4   either side?

5           MS. MAHLER-HAUG:  No objection from the plaintiffs

6   as to the verdict form.

7           THE COURT:  Mr. O'Connor.

8           MR. O'CONNOR:  We would just note our objection

9   for the record.

10          THE COURT:  Now, make sure as well, so we have a

11  complete record of the case, that the objections that you

12  all sent by email this morning, you get them filed so

13  they're part of the record of the case.

14          Did you already do that?

15          MR. O'CONNOR:  I think both sides filed them, Your

16  Honor.

17          THE COURT:  Great.  Okay.  I just wanted to make

18  sure that was done.  All right.

19          Now, in terms of the jury instructions themselves,

20  we've given you a red line -- yes, ma'am.

21          MS. MAHLER-HAUG:  I'm sorry to interrupt, Your

22  Honor.  Just to note plaintiffs' objection -- I would like

23  to preserve our objection to the clear and convincing

24  standard in the punitive damages on the verdict form.

25          THE COURT:  I understand that.  I rechecked the

```
 1    Northern District of California case, which was a case

 2    involving the ATS.  Clearly, again, that Court found clear

 3    and convincing evidence is the standard for punitive

 4    damages.  Whether I gave it in the previous case or not,

 5    that would have been error in my view.

 6            Anyway, I'm staying with clear and convincing.

 7    All right.  So, yes, I understand each side has an

 8    objection.

 9            All right.  In terms of the jury instructions

10    themselves, I've looked very carefully at what you all have

11    submitted, and where there is no red line indicated, that

12    means I rejected the request for a change.

13            So, for example, for Instruction Number 10, the

14    defendant wanted the Court to limit that instruction to

15    simply the defendants.  But, frankly, my view is that both

16    sides were hampered in their ability to present all of the

17    evidence that they would like to have presented because of

18    the government's invoking the state secrets, and so I think

19    it may have affected the defendant more than the plaintiff,

20    I can't make that judgment, but both sides were affected, so

21    I think it was only fair to put that in.  So that objection

22    was overruled.

23            The one -- one sort of global change that we

24    made -- and these were very difficult instructions because

25    of just the amount of evidence in the case, but also just
```

6

```
 1    the different theories of the case.

 2              We went back and forth, frankly, in chambers

 3    between whether this was limited to military police or

 4    military personnel, but because after we thought more about

 5    it, there was significant evidence that there were military

 6    interrogators, and there was some evidence of military

 7    interrogators shoving detainees around, and there was the

 8    one who was -- apparently had a detainee stand against the

 9    wall with his nose against the wall.  That, in my view, was

10    enough to include, so I expanded it.

11              So wherever we had military police, we expanded it

12    to military personnel.  That should have been changed in all

13    of the instructions.  And I don't know whether the defense

14    is objecting to that or not.  It is a change, but I think

15    that's more appropriate given the evidence.

16              MR. O'CONNOR:  We're not objecting to that, Your

17    Honor.

18              THE COURT:  Okay.  That's fine.

19              All right.  Then in terms of the overview of the

20    case, I think it is not inappropriate to add the names of

21    the three specific interrogators.  It says "including," but

22    it wasn't limited to those three.  And then to refine that

23    instruction by adding "plaintiffs' claim," and I think

24    that's appropriate.  So I would not expect the plaintiff to

25    be objecting to that.
```

7

```
 1              I do think that it is appropriate to put the

 2    borrowed servant instruction in that instruction.  It makes

 3    more sense.  Now, there's not going to be a standalone

 4    borrowed servant instruction then with a heading; it's right

 5    there in explaining to the jury the basic structure of the

 6    case.  And so all of the red line on page 23 has an

 7    explanation of that doctrine.

 8              I've looked again at the Alvarez case.  I think

 9    that our instruction absolutely models the Fourth Circuit's

10    discussion of the borrowed servant doctrine, and unless --

11              First of all, it's the defendant's instruction.

12    Do you have any objection as to how it's written here?

13              MR. O'CONNOR:  No, Your Honor.

14              THE COURT:  All right.  Other than the plaintiffs

15    wanting to add additional gloss, which I don't think is

16    necessary, and it's certainly not within the Alvarez

17    decision, I think this is a correct statement of Fourth

18    Circuit law on this issue.

19              MS. MAHLER-HAUG:  So, Your Honor, plaintiffs do

20    object to the instruction as it stands.  Plaintiffs would

21    submit that it is incomplete to the extent that it does not

22    reflect important limitations on the doctrine, specifically

23    that a general employer must be shown to completely

24    relinquish control where -- and -- in order to avoid a

25    liability, and a general employer is also not absolved from
```

                                                                  8

1    liability where a borrowed employee also acts in the course

2    and scope of his employer -- employment for his general

3    employer at the same time.  That's actually expressly

4    referenced in *Estate of Alvarez*, that's Section 226 of the

5    restatement of agency.

6              So we would submit that including this additional

7    explanation for the jury would give them a complete

8    understanding of the law to apply and would be absolutely

9    consistent with the Fourth Circuit's most recent

10   articulation of when a general employer needs to be held

11   liable for the actions of its employees.

12             THE COURT:  All right.  Well, I understand the

13   objection.  If a question were to arise from the jury that

14   they don't understand this, then we can revisit it, but I

15   think this is an adequately clear instruction, so we're

16   going to go with what's there.  All right.

17             There was no objection to the preponderance of the

18   evidence in terms of torture, at least on page 27.  Again,

19   we've made the switch from "police" to "personnel," and I

20   don't believe there will be any objection there.

21             I think the defendant is correct that giving

22   specific examples of torture is too close to quoting the

23   expert's evidence.  It's up for counsel to argue that to the

24   jury, and so we have taken out those specific examples.

25             I mean, quite frankly, it's a little bit like

                                                              9

```
1    Potter Stewart's comment about how do you define obscenity;
2    you know it when you see it, frankly.  And I think we have a
3    good cross-section of jurors of different ages and
4    backgrounds, they shouldn't have any difficulty
5    understanding what both CID and torture involve.  So we've
6    done the same thing by taking out those specific examples.
7    It doesn't prevent obviously plaintiffs' counsel from
8    arguing all of that evidence to the jury.
9           On the conspiracy count, I have taken the
10   language -- I think this was the plaintiffs' preferred
11   language, getting away from proximate cause.  It struck me
12   that neither of your original instructions, as I remember
13   them, really had that necessary element.  It had to be
14   there.  I hated to use proximate cause because I think it's
15   a strange wording.  I think this is actually clearer, but it
16   definitely is necessary, in my view, to have that there.  So
17   I'm going to use the language.
18          Is there any objection?  Because I believe that's
19   plaintiffs' proposed language.
20          MR. O'CONNOR:  None from CACI, Your Honor.
21          THE COURT:  All right.  And the plaintiffs are
22   happy with that?
23          MS. MAHLER-HAUG:  No objection.
24          THE COURT:  All right.  And then the next -- the
25   next paragraph we have added:  Once a conspiracy is formed,
```

                                                                10

```
 1   each member of the conspiracy is liable for the actions of
 2   the other co-conspirators performed during the course and in
 3   furtherance of the conspiracy.  That's boilerplate language.
 4   I don't think either side is objecting to that.
 5            MR. O'CONNOR:  No objection, Your Honor.
 6            MS. MAHLER-HAUG:  No objection.
 7            THE COURT:  Okay.  All right.  Mere presence is
 8   insufficient.  That's a pretty standard instruction.  We've
 9   added that.  I assume there's no objection to that?
10            MS. MAHLER-HAUG:  No objection.  Just a very small
11   typo fix.  There's an extra "not."
12            THE COURT:  Thank you for catching that.  Yes.  We
13   will take the extra "not" out.  Very good.
14            Mr. O'Connor.
15            MR. O'CONNOR:  We agree with that, Your Honor.
16            THE COURT:  Okay.  That's fine.
17            Now, for aiding and abetting, again, we've changed
18   "police" to "personnel."  And other than that, there's been
19   no change, and there did not appear to be any substantive
20   objection to the aiding and abetting instruction; correct?
21            MS. MAHLER-HAUG:  Thank you, Your Honor.
22            Plaintiffs would just like to preserve their
23   objection to the aiding and abetting instruction as it
24   stands presently.  We appreciate the change in accordance
25   with our request to military personnel throughout, and so
```

11

1    we're fine on that end.  But we would just like to preserve

2    our objection otherwise to the record to give an instruction

3    that more closely conforms with the *Estate of Alvarez* and

4    other related authorities.

5            THE COURT:  Well, with aiding and abetting -- I

6    mean, it's very interesting how -- the conspiracy theory and

7    aiding and abetting are somewhat different in this case,

8    and, in my view, the aiding and abetting must be more razor

9    focused on the specific injury to the specific plaintiff,

10   whereas the conspiracy is, in some sense, broader and more

11   general.  So I think this is the correct instruction.

12           Anyway, there was no objection to it, as I recall,

13   from the defense.  All right.  So that's going to go as is.

14           All right.  A corporate responsibility for

15   employee conduct I think is a correct statement of the law.

16   I don't think more is necessary.  You can argue more details

17   about that, but there was no objection from the defense

18   and -- all right.  So Instruction 26 comes out because it's

19   now incorporated earlier on.

20           And other than that, with compensatory damages, I

21   agree with the defense that there was more detail there than

22   is necessary or appropriate.  Again, the rest of the -- so

23   the red shows what we've taken out, but there's clearly

24   enough there.

25           There was no dispute about the punitive damage

                                                              12

```
 1    instruction, clear and convincing.  I know the plaintiff

 2    objects, but we're going to go with that.

 3              MS. MAHLER-HAUG:  Yes.  We would just like to

 4    preserve our objection on that.

 5              THE COURT:  That's fine.  So what we're going to

 6    do then is we're going to give you yet another version of

 7    the instructions without the ugly red stuff.  And it may

 8    change the pagination, but the instruction numbers will not

 9    change.  All right.

10              MR. O'CONNOR:  Your Honor, I also want to put on

11    the record that we object to the Court's decision not to

12    make the changes we proposed for Instruction 18, the Alien

13    Tort Statute.

14              THE COURT:  All right.  And, again, the whole

15    issue about the degree to which the United States is

16    involved in this activity, you know, whether the conduct

17    touches sufficiently the United States, the issue of

18    extraterritoriality, I have already ruled on that in the

19    motion to dismiss, and I find that to be a pure question of

20    law, and so I'm not -- I did not ask the jury.  I know that

21    was in several of your instructions, and it's not here

22    because I feel that that is a pure legal issue.  I may be

23    wrong about that, but that's my ruling.

24              All right.  Is there anything further from the

25    plaintiffs?
```

```
 1              MS. MAHLER-HAUG:  Just very briefly, Your Honor.

 2              Plaintiffs understand Your Honor's decision and

 3   instructions as shared with the parties.  We would just like

 4   to state that we understand that Your Honor's declined to

 5   give the additional instruction on the Court's comments not

 6   being evidence, which was jointly proposed by the party in

 7   which we noted again in our response sent this morning.  So

 8   we would just like to preserve our objection to that.

 9              THE COURT:  Fine.

10              Anything further from the defense?

11              MR. O'CONNOR:  No, Your Honor.  Thank you.

12              THE COURT:  All right.  Now, housekeeping matters.

13   My courtroom deputy sent you all an email Friday night just

14   to make sure that all the exhibits are in proper order.

15              Have you been able -- for instance, the defense,

16   have you provided Exhibit 70, which I believe was missing?

17   Did you get everything's there?

18              THE DEPUTY CLERK:  Yes.

19              THE COURT:  All right.  And you've both been

20   satisfied with each other's index to the --

21              MR. FARIDI:  We are.

22              THE COURT:  All right.  Do we have our indexes

23   filed at this time?

24              MR. FARIDI:  I have a copy here.  We can file them

25   as well on the docket, Your Honor.
                                                            14
```

```
 1              MR. O'CONNOR:  Same, same, Your Honor.

 2              THE COURT:  Make sure that they get docketed, and

 3    make sure, obviously, that we have them to give to the jury.

 4    All right.

 5              Is there anything else we need to address before

 6    opening statements?

 7              MR. FARIDI:  None from our side, Your Honor.

 8              MR. O'CONNOR:  Closing statements.  That's right,

 9    Your Honor.

10              THE COURT:  Well, opening closing.

11              Yes, how do you want to divide your time?

12              MR. FARIDI:  I want to reserve 10 minutes for

13    rebuttal.  So I'll do 35 minutes in opening closing and then

14    10 minutes afterwards, Your Honor.

15              THE COURT:  Again, have your colleagues checking

16    so that you're not -- I don't want to have to interrupt you

17    or -- well, you better not have a clock that's smart.  The

18    CSO will take that from you.  But it's a three-minute

19    warning and a one-minute warning.  And so we'll hold up

20    something, but your colleagues should be looking for that as

21    well.  All right.

22              MR. FARIDI:  And it's not a smart clock, Your

23    Honor.

24              THE COURT:  Good.  Only dumb ones are allowed in

25    the courthouse.
```

                                                              15

```
 1              Is there anything further that either side needs
 2    to address before we bring the jury in?  I don't think
 3    they're here yet.  If they get here a few minutes before 10,
 4    we could start early.  All right.
 5              As I said, we're on schedule now.  So the jury
 6    will be getting this case by lunchtime.  And I am going to
 7    suggest to them that if they want to stay past 4, they can
 8    today, but obviously I had told them we would stop at 4, and
 9    so if some jurors have made plans, then that's when we
10    finish today.  They'll come back in on Wednesday to finish
11    their deliberations.
12              I only need one attorney per side.  If you all
13    want to come, that's fine, but I'm just saying that's all
14    that's necessary.  But whoever stays has to be able to
15    respond to any issues or questions that may come up from the
16    jury.  All right.
17              If there's nothing further, we'll recess court
18    until 10:00.
19                    (A brief recess was taken.)
20         THE COURT:  All right.  Counsel, my understanding
21    is all the jurors are here on time, so we're going to start.
22    We'll bring the jury in, unless there are any issues we need
23    to address before the jury comes.  No?
24         MR. O'CONNOR:  No, Your Honor.
25         THE COURT:  All right.  That's fine.
```

                                                                    16

1           THE CSO:  Rise for the jury.

2                (Jury present at 10:04 a.m.)

3           THE COURT:  Good morning, ladies and gentlemen.

4    Thank you again for being so prompt.

5           As I indicated Friday afternoon, we've now reached

6    the portion of the trial when we're going to have the

7    closing arguments of counsel.  So counsel for the plaintiffs

8    will go first because the plaintiff has the burden of proof

9    in the case, in most issues, and their argument will run a

10   total of 45 minutes.  We've divided that into 35 minutes for

11   what is called the opening closing, and then CACI will have

12   an opportunity, that is our defendant, to make a closing

13   argument, and then because the plaintiff has the burden of

14   proof on the liability issues, the plaintiff gets a brief

15   rebuttal of 10 minutes.

16          So, as I indicated before, about an hour and a

17   half of closing arguments, and then we'll take the morning

18   break.  When you come in after the morning break, I will be

19   giving you the legal instructions, and you will have this

20   case for deliberation by lunchtime.  Thank you.

21          All right.  You may begin.

22       CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFFS

23          MR. FARIDI:  May it please the Court.  Good

24   morning, members of the jury.

25          THE COURT:  Counsel, do you need water?

                                                          17

1          MR. FARIDI:  I have it, Your Honor.

2          THE COURT:  Okay.

3          MR. FARIDI:  Let me take you back to Iraq in the

4     fall of 2003.  The journalist, a taxi driver and a farmer

5     are swept up and taken to a prison outside of Baghdad, the

6     prison that is notorious for torture and abuse.  And they're

7     stripped of their clothes, they are immediately hooded,

8     they're physically and sexually assaulted, and they're

9     humiliated.  They're shocked, terrified and confused.  And

10    then they're brought into an interrogation.

11         At the same time, interrogators from a Virginia

12    company are planning with the prison guards to inflict the

13    very abuse that would be perpetrated on the detainees.  Why?

14    Because the interrogators want the detainees to be softened

15    up for the interrogations that the interrogators want to

16    conduct.  That was part of their plan with the military

17    police.  And the military police carried out that plan by --

18    to use General Taguba's carefully chosen words --

19    perpetuation of systemic and illegal brutality.

20         And that's the brutality that shocked the world

21    when the photos became public in April of 2004, almost

22    20 years to the time when you will begin your deliberations.

23    What a coincidence.  And our clients, Salah, Asa'ad and

24    Suhail, are the victims of that inescapable brutality that

25    was visited upon them at Abu Ghraib.  They have come to this

18

1    court in Virginia to hold CACI accountable for its horrific

2    conduct.

3              I'm very pleased to be able to speak to you

4    directly for the first time today, and I want to echo

5    Judge Brinkema's comments from last week in thanking you and

6    for your careful attention and diligence throughout this

7    entire proceeding.  Your job is not an easy one, and we know

8    that you have taken it seriously, and, for that, we are

9    indebted.

10             Judge Brinkema is soon going to instruct you on

11   the law -- on the two claims that the plaintiffs have

12   brought against CACI:  Conspiracy to commit torture, and

13   cruel, inhuman or degrading treatment, CIDT, and aiding and

14   abetting of torture and CIDT.  And as the Judge said at the

15   very beginning of this trial, trials are like putting

16   together a puzzle, and the pieces to the puzzle, those are

17   the facts.  And here, the facts are simple, and they show

18   that there was, in fact, a conspiracy, and CACI aided and

19   abetted the military personnel who were perpetuating abuse

20   on the detainees, including our clients, at Abu Ghraib.

21             So who was -- who are the members of the

22   conspiracy?  It's the military intelligence, including CACI,

23   and the members of the military police.  And you remember

24   Sergeant Frederick's testimony that the relationship between

25   the military intelligence and the members of the police, it

19

1    constituted a brotherhood.

2            What was the purpose of the conspiracy?  To soften

3    up the detainees for interrogations that the interrogators

4    wanted to conduct.  And what were the acts that were in

5    furtherance of the conspiracy?  The MPs carried out the

6    instructions and did, in fact, inflict brutality on our

7    clients.

8            And then, lastly, what were the results of that

9    conspiracy?  The torture and the CIDT inflicted upon our

10   clients.  And when these pieces are put together, there is

11   one thing that is clear, CACI is liable for the abuse that

12   our clients suffered.

13           Luckily, your job in this case is made a bit

14   easier by the work that our country's military did to

15   investigate the abuses.  And you heard about those

16   investigations.

17           First, there was an Army criminal investigation,

18   division investigation that began in approximately mid

19   January 2004 after the abuses began to come to light in late

20   2003, and the CID of the Army interviewed more than 100

21   witnesses, including CACI personnel.  They analyzed video

22   and photographic evidence.  And then the military appointed

23   Major General Antonio Taguba, from whom you heard last week,

24   and he investigated detainee abuse.  He interviewed 50

25   witnesses -- more than 50 witnesses, including Big Steve,

                                                            20

1    CACI's main witness, who you heard from, and he reviewed

2    over 100 statements that were made to the CID and reviewed

3    many photos and videos.

4           And then the military appointed Major General

5    George Fay.  For what?  To investigate the role of military

6    intelligence, including CACI, in detainee abuse.  And he

7    interviewed 173 witnesses, including the CACI employees, and

8    he took a look at all of the record that the CID and General

9    Taguba had reviewed before.

10          One note here.  When our country's military found

11   out about the abuses at Abu Ghraib, they don't cover them

12   up.  They appointed highly-respected, highly-credentialed

13   generals to investigate the abuses.  And our country's

14   military held the military police members, who were actually

15   physically perpetuating the abuse, accountable.  Those

16   individuals were court martialed, and they served time in

17   jail.  CACI escaped liability.

18          All three of the investigations focused on Tier 1

19   of the hard site, which you've heard about a lot last week.

20   And that's the same place where CACI interrogators were

21   roaming around, and that's the place where Salah, Asa'ad,

22   and Suhail were detained in November and December of 2003.

23          Now, you've seen many pictures of Tier 1A, but the

24   picture that is on the screen in front of you now shows how

25   small it was.  Look how crowded the hallway gets when you

21

1   have a small number of people in it.  And that's important,

2   because if you work in Tier 1A, like the CACI

3   interrogators -- that's where Dan Porvaznik roamed around --

4   it is impossible to claim that you did not observe the

5   pervasive abuse.

6          And you heard testimony from the small team of

7   people who actually helped perpetuate the abuse.  You heard

8   from the military police, and you see on the slide what they

9   looked like back in 2003 and what they looked like many

10  years later at their depositions.  And that's Ivan

11  Frederick, Charles Grainer, Sabrina Harman and Megan Ambuhl

12  Grainer.  All of these individuals were convicted for their

13  crimes at Abu Ghraib.

14         And General Taguba and Fay told you about the

15  abuses that these individuals carried out, among others, and

16  here's what General Taguba said what took place at Tier 1A:

17  Punching, slapping, kicking, forcing detainees to remove

18  their clothing and keeping them naked for several days at a

19  time, forcing naked male detainees to wear women's

20  underwear, using military working dogs without muzzles to

21  intimidate and frighten detainees.

22         And here's what General Fay found:  Clear abuses

23  occurred at the prison at Abu Ghraib.  And who carried out

24  those abuses?  Morally-corrupt soldiers and civilians.

25  That's CACI.  And he also found that the abuses violated

                                                              22

```
 1    U.S. criminal or international law.

 2            And who was behind these abuses?  Take a look at

 3    what General Taguba found.  Military intelligence -- that

 4    includes CACI -- interrogators actively requested that the

 5    military police guards set physical and mental conditions

 6    for favorable interrogation of witnesses.  And he

 7    specifically called out CACI when he took the witness stand

 8    in front of you last week.

 9            And here's what General Fay found.  Also CACI.

10    CACI's responsible.  And he was asked:  Did you conclude

11    whether or not the contractor interrogators from CACI were

12    involved in the abuse you uncovered?  Yes, they were.  And

13    he found that they set conditions for interrogations.

14            But don't just -- take a look here at all of the

15    abuses that CACI, according to General Fay, is ultimately

16    responsible for.  Physical abuse, use of dogs, humiliating

17    and degrading treatment, nakedness, simulated sexual

18    positions and improper use of isolation.

19            And why is CACI liable for all of these abuses?

20    Take a look at what General Fay said during his testimony:

21    Their instructions, the CACI interrogators, the military

22    intelligence personnel's instructions, created an

23    environment that resulted in the routine abuse of detainees,

24    including our clients.  That, by itself, makes CACI liable.

25            And if the General's words aren't enough, you also
```

```
 1    heard from the MPs about who was directing the abuse.  And
 2    it wasn't their superiors in the military police, but from
 3    the MI interrogators, including CACI.  And that direction
 4    didn't come in the form of formal memos or written
 5    interrogation plans, but through verbal instructions.
 6              Take a look at what Ivan Frederick said.  Do you
 7    understand that you were to follow the instructions provided
 8    to you by the interrogators?  I'll say we was encouraged.
 9              Do you recall that MPs were instructed to set
10    conditions by interrogators?  Yes, sir.
11              And what do you understand the purpose of these
12    kinds of treatment to be?
13              To get them to talk.
14              And Mr. Stefanowicz obviously told him that he was
15    doing a great job.
16              Charles Grainer.  Another convict.  Did civilian
17    interrogators ever give you instructions about how to treat
18    detainees?  Yes.
19              Did you hear those instructions being passed on to
20    other members of the military?  Yes.
21              And did you receive encouragement from civilian
22    interrogators?  Yes.
23              And take a look at what Megan Grainer said.  That
24    the civilian interrogators give her instructions, and those
25    instructions included removing the detainees' clothing and
```

24

1  putting them in stress positions.

2          And Sabrina Harman described that the nakedness --

3  the forced nakedness, the chaining to the bars, the forcing

4  the male detainees to wear female underwear and the use of

5  unmuzzled dogs, all of that was designed to soften up the

6  detainees for interrogations.

7          And you also saw evidence on who from the military

8  intelligence directed this abuse.  There are a few names

9  that kept on coming up, and that's Steve Stefanowicz, Big

10 Steve; Dan Johnson, DJ; and Tim Dugan, the unqualified

11 interrogators that CACI sent to Iraq in order to get paid.

12         Let's take a look at the treatment that they

13 encouraged the MPs, the military police, to inflict on

14 detainees.  And here's what Ivan Frederick said about Steve

15 Stefanowicz.  That Steve just wanted us to use the dogs on a

16 detainee to treat him like shit.  Sabrina Harman spoke about

17 how Steve was present at the beginning of an interrogation

18 when a detainee had his hands chained up or handcuffed and

19 was wearing women's underwear, and they did that to him

20 throughout the night.

21         And here's what General Taguba said about Big

22 Steve.  That Big Steve allowed and/or instructed the MPs to

23 facilitate interrogations by setting conditions.  He clearly

24 knew his instructions equated to physical abuse.

25         And here's what General Fay said about Big Steve.

25

1    He used dogs, he pushed, kicked a detainee, and he shaved

2    the hair and beard of a detainee and put him in red women's

3    underwear, and he was bragging about it.

4           Let's focus on DJ.  Here's what Ivan Frederick

5    said about DJ.  That DJ directed him or pressured him --

6    told him to use pressure points on a detainee, and at DJ's

7    direction, Frederick covered up a detainee's nose and mouth,

8    making it difficult for the detainee to breathe.

9           Here's what -- Torin Nelson, the CACI interrogator

10   who flew here from Fort Huachuca, Arizona, sat in the

11   witness box right in front of you, here's what he told you

12   about DJ.  That he was in a room next to DJ where he heard

13   that the walls were beaten, banging was going on on the

14   furniture, and furniture was being thrown around.  And then

15   he took a look at one of the interrogation reports that DJ

16   had put together, and you know what he found?  That DJ --

17   here's what DJ wrote down, that the detainee was crying like

18   a baby -- like a little baby in the corner, and the detainee

19   is broken into a thousand pieces like Humpty Dumpty.

20          And here's what General Fay said about DJ.  He

21   engaged in detainee abuse, used dogs and used -- and put

22   detainees in unauthorized stress positions.

23          Last but not least, Torin Nelson.  I'm sorry.

24   Last but not least, Tim Dugan.  And here's what Torin Nelson

25   said about him.  That he interrogated a detainee who was

26

 1   previously assigned to Dugan.  And this is what he found.

 2   That the detainee was abused, had bumps on his forehead over

 3   his left arm and bruises on his forearm.

 4           And here's what General Fay said about Dugan.

 5   That he pulled a detainee out of a car, dropped him to the

 6   ground, dragged him, and when the detainee tried to get up,

 7   make him fall again.

 8           Let's talk about the victims of the brutality that

 9   the Big Steves, the DJs and the Dugans of the world

10   perpetuated.

11           You met these three men here last week, and all

12   three of them were subjected to the same pattern of abuse

13   from their very first night at the hard site.  Abuse,

14   followed by interrogation; abuse, followed by interrogation;

15   abuse, followed by interrogation.  And all three men were at

16   the hard site in November and/or December of 2003 at the

17   same time, and they were at the same place where CACI's

18   interrogators were roaming.

19           And here you see some of the abuse perpetuated

20   upon Salah.  And he sat right in front of you in that jury

21   box, and he described how painful it was for him to be naked

22   in front of other detainees and how these grown men were

23   avoiding making eye contact with each other so as to not

24   exacerbate each other's shame.

25           And here's what they did to Asa'ad.  You remember,

                                                              27

1    he's illiterate, he doesn't know how to read and write, but

2    you heard him try to convey how he cried out for that night

3    when he was put in the hole, and he cried out for help.  No

4    one came, and that was by design.  And the humiliation he

5    suffered forced him to urinate on himself.

6              And you heard from Suhail.  You saw Suhail talk

7    about how the MPs had their fingers up his rectum, his

8    genitals were grabbed, you remember the words he said when

9    he talked about the indignity of being forced to be naked.

10   He said:  I am a principal.  I am a man.

11             And when these three men testified in this court,

12   you saw the vulnerability, and you saw their pain, and you

13   saw their bravery, and then you saw the truth come out in

14   its raw form.  And you saw all three men struggle to keep

15   their composure to regain their dignity as they told you

16   about their physical and psychological trauma without

17   breaking down in front of you, as difficult as it was.  And

18   you know that this type of trauma will continue to haunt

19   them for the rest of their lives.

20             And you also saw pictures depicting the abuse, the

21   type of brutality that these men suffered.  We're not going

22   to show you those pictures, and we know that seeing them

23   once was enough.  But I want to make a couple of

24   observations about them.

25             You know from General Taguba's testimony that the

28

1    pictures that we showed you are a small fraction of the vast

2    collection of photographs and videos depicting the

3    brutality.  There was no need to show you the videos; the

4    pictures were sufficient.

5            And, second, the mere fact that these pictures

6    were taken demonstrates how open and notorious and

7    normalized the abuse was.  You heard General Taguba talk

8    about how these pictures were being used as screen savers

9    within the hard site.

10           And you also heard the three men identify some of

11   their abusers.  They pointed the fingers at Frederick and

12   Grainer, the duo that roamed the hard site.  And you heard

13   them describe their -- the MPs interactions with the

14   interrogators.  The interrogators would talk to the MPs, the

15   MPs would perpetuate the abuse, back to interrogation, back

16   to abuse, and the cycle would continue.

17           And then we called a witness -- an expert witness

18   to the witness stand, Dr. Jen Modvig, and he told you about

19   how the types of treatments and abuse that our clients

20   suffered and endured can individually, and more so in

21   combination with each other, can violate international

22   standards.

23           And then came CACI's cross-examination of him

24   where they asked him whether corporal punishment amounts to

25   CIDT.  You know and CACI knows that this case is not about

                                                                29

```
 1    corporal punishment.

 2              As you deliberate, one thing to keep in mind is

 3    the total disregard of CACI's management when it hired the

 4    interrogators, when it failed to train the interrogators,

 5    when it failed to supervise the interrogators as required by

 6    CACI's contracts with the government, and when it failed to

 7    discipline the interrogators when it learned of the abuse.

 8              On the screen in front of you, you see CACI's ten

 9    business values.  The first value is placing integrity and

10    honesty above all else.  And you see another one, being

11    accountable and taking responsibility for what we do.  Did

12    they live up to those values at Abu Ghraib?  I think you

13    know the answer.

14              And you also saw their contracts with the

15    government.  The contracts required them to provide resident

16    experts, resident experts for interrogation services at Abu

17    Ghraib, and to supervise those interrogators that they sent

18    to Abu Ghraib.  And you saw how much CACI stood to gain from

19    those two contracts.  Excluding transportation and other

20    costs, in total they stood to gain about $32 million.

21              So with all this money to gain, did CACI hire

22    resident experts?  Take a look at what Tom Howard said about

23    the people that CACI was sending to Iraq.  None of them --

24    none of these candidates have the basic qualifications that

25    the customer requires for the interrogator position.
```

30

 1              And here's what he said about Big Steve.  He's got
 2     a crafty resume.  He's not trained or qualified for the
 3     interrogation position.  He used to work at the U.S.
 4     Consulate in Oman as an administrative assistant, but he's
 5     using crafty language in his resume.  And if you sift
 6     through his resume, he has no supporting credentials; he's a
 7     no-go.  Well, we know what they did.  They sent him to Abu
 8     Ghraib, and then they promoted him a few months later.
 9              Here's what Tom Howard said about Tim Dugan's
10     qualifications.  He's also a no-go, even though he seems to
11     have some skills in taking down shoplifters.
12              And obviously DJ.  And you heard Don Porvaznik
13     talk about how he was just 22 years old.
14              And you also heard Dan Porvaznik talk about how
15     many years of experience and how many years of training he
16     had to go through to become an interrogator.  Did any of
17     these people that CACI sent to Abu Ghraib have that
18     training?  Absolutely not.
19              And take a look at what General Fay found.  He
20     found that CACI's failure to send qualified and trained
21     people to Abu Ghraib was detrimental to the intelligence
22     operation at Abu Ghraib.  Sending these unqualified people
23     contributed to the abuse and the results are detrimental to
24     our country's military -- our country's military's
25     intelligence operation.

                                                              31

1          And then CACI sent these unqualified people there

2     even when it was made aware, as early as October of 2003, a

3     month before our clients showed up to Abu Ghraib, that the

4     detainee abuse there was rampant.

5          Here's an email from Richard Arant on

6     October 14th, 2003, a month before our clients showed up to

7     Abu Ghraib.  And he sent this to CACI's leadership.  And he

8     says in this email very clearly that he wanted to separate

9     from the company because of the abuse of detainees in

10    connection with the interrogations.  And he says that he

11    made Dan Porvaznik aware of that issue.  And he goes on to

12    say that he's so upset about the abuse, he doesn't even want

13    CACI to pay him the money that they owe him for the work

14    that he's done.  He tells CACI that they can actually bill

15    him for his -- for the costs associated with leaving Iraq.

16    He wanted nothing to do with them.

17         And then when Dan Porvaznik was confronted with

18    this email during his deposition in 2006, you know what he

19    claimed?  You heard that.  He claimed that Arant was leaving

20    Abu Ghraib because he needed cataract surgery.  And when we

21    asked CACI's Amy Jenson -- the one who was sending all of

22    these people to Iraq -- what she did after she saw Arant's

23    email?  Nothing.  Continued to hire personnel.  Continued to

24    send them to Iraq, to Abu Ghraib, after she's put on notice

25    about what's happening there.

1              And then you heard about how CACI reacted to the

2    military's request for DJ's termination when the military

3    caught him red-handed engaged in abuse.  CACI sent that

4    letter that's on the screen in front of you to the

5    government.  Internally CACI believed that DJ was probably

6    lying, but they told the government in their letter that

7    they're challenging the finding, and they argue that the

8    photo that caught him red-handed reflects a relaxing

9    position, going as far as to point out that the squatting

10   that you see there on the screen is -- could be a common

11   Iraqi custom.  I'll leave it to you to judge whether you

12   find that offensive.

13             And then don't forget Torin Nelson's testimony.

14   After he told the CID what he observed there, he was

15   approached by DJ and by Dugan who threatened him.  What did

16   CACI do?  They didn't terminate DJ or Dugan; Torin had to

17   leave.

18             So did CACI place integrity and honesty above all

19   else?  Did they accept accountability and responsibility for

20   their actions?  I think you know the answers to those

21   questions.

22             So how is CACI trying to avoid accountability?

23   First, you know, to our surprise, during the

24   cross-examinations of our clients, they suggested that our

25   clients may not be suffering from the results of the abuses

                                                              33

1    that they suffered at the hard site.  No apology from any

2    company representative, let alone any recognition of the

3    fact that these men were abused.

4           And then they nitpick minor details.  Asa'ad was

5    asked whether he was on his stomach or on his feet when he

6    was being bitten by dogs.  And he was asked whether the

7    blows that he suffered came from kicks or punches 20 years

8    ago when he had a bag over his head.

9           And who did CACI call to the witness stand to

10   avoid accountability?  The first witness was Big Steve.  You

11   heard about him via video deposition.  Did you find him to

12   be credible?  Certainly the General didn't.  General Taguba

13   told you why he was interested in interviewing Big Steve,

14   because the MPs who he was talking to were implicating Big

15   Steve as providing instructions to them, and he told you

16   that one of the MPs told him that Stefanowicz had provided

17   instructions to set the conditions for interrogation.

18          And then you heard from General Taguba what Big

19   Steve did during the interview.  He was very coy.  He leaned

20   against the table, staring the General down in an

21   intimidating manner.  And here's what General Taguba

22   ultimately found.  He found that Big Steve made a false

23   statement to the investigation team regarding the location

24   of his interrogations, the activities during his

25   interrogations and his knowledge of the abuses.

34

1           General Taguba wasn't the only one who found Big

2    Steve to be deceitful.  General Fay also found that Big

3    Steve made false statements -- plural -- to General Fay

4    about his use of dogs in interrogations.  So who do you

5    believe?  General Taguba and General Fay, or Big Steve?

6           And then Big Steve's lies, they started in 2004,

7    and they continued in this court courtesy of CACI.  And

8    here's what he claimed on the witness stand.  The only abuse

9    he ever saw was one naked detainee which he reported

10   immediately.

11          How do you square that against General Taguba and

12   General Fay's findings that the abuse was pervasive?

13   Frederick's and Harman's testimony was that Big Steve was

14   directing the abuse.  Big Steve claimed that dogs were

15   fortuitously present for one of the interrogations; they

16   just happened to be there.  And General Fay found that Big

17   Steve was deliberately using dogs to soften up detainees on

18   many other occasions.  And Big Steve claimed that the

19   detainees wore women's underwear only because Abu Ghraib ran

20   out of men's underwears.  And General Fay found that Big

21   Steve was bragging and laughed out loud about making

22   detainees wear women's underwears on their heads.

23          CACI also put up other witnesses, Dan Porvaznik

24   and the anonymous interrogators and the anonymous

25   interpreters who claimed that they didn't see anything at

35

```
 1    Abu Ghraib.  Did you find any of that testimony to be
 2    rehearsed?
 3             And then you heard CACI claim that even if its
 4    interrogators had involvement in the abuse, the corporation
 5    has nothing -- no liability for the actions of its own
 6    employees.
 7             Think about that.  They get paid millions of
 8    dollars for the work that they do at Abu Ghraib, and they
 9    bear no responsibility for sending unqualified interrogators
10    who they hired, they promoted, they were supposed to
11    supervise per the terms of the contract with the government?
12    And they, alone, had the ability to fire or discipline but
13    they chose not to?
14             So what should you do now that -- when you see the
15    puzzle come together?  Okay.  You should hold CACI
16    accountable, just as their co-conspirators were held
17    accountable and the court-martials that our military
18    instituted against them.
19             But how do you measure the harm that CACI's
20    actions have caused our clients?  Difficult question.  Poets
21    have written about how language doesn't fully and accurately
22    capture pain, and it didn't for our clients.  So how can
23    money capture pain?  How can a dollar amount capture pain?
24    But, in our legal system, that is the mechanism that this
25    jury has in providing some measure of justice to Salah, to
```

                                                                    36

```
 1    Asa'ad and to Suhail.

 2            The verdict form is going to ask you to ascribe a

 3    damages figure for each of our clients should you find CACI

 4    liable.  The damages award is for you to determine, but we

 5    suggest that in these circumstances, a figure of $3 million

 6    for each of the clients is reasonable.

 7            And you will also have to evaluate whether to

 8    punish CACI for its behavior, and that's the issue of

 9    punitive damages.  And the Court is going to provide you

10    instructions on punitive damages.  The appropriate measure

11    of punitive damages, in our view, is the amount that CACI

12    stood to gain from its contracts with the government, which,

13    by our calculations, was just about $32 million for the

14    services, not including travel and other costs.

15            Remember, at the very beginning of this case my

16    colleague, Baher Azmy, told you that this case is about one

17    of the most disturbing and shameful episodes in American

18    history -- recent American history.  And you probably had

19    some idea of the horrors at Abu Ghraib, but you knew nothing

20    about the involvement of a Virginia-based company, CACI, in

21    those abuses.  The law authorizes you, the members of this

22    jury, to send a message that this cruelty, this

23    dehumanization and CACI's recklessness in pursuit of profits

24    would not be tolerated.

25            Thank you.
```

```
 1              THE COURT:  All right.  Mr. O'Connor.

 2          CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

 3              MR. O'CONNOR:  Good morning.

 4              Why would a company like CACI take a case like

 5      this to trial?  Why would CACI reassociate itself with a

 6      horrible scandal, one of the worst scandals in recent

 7      American history that's 20 years in the rear-view mirror?

 8      And the answer is simple.

 9              Think about it from the perspective of CACI's

10      management.  You have a few employees who deploy to Iraq

11      with U.S. Army Europe.  You go to check on them.  The Army

12      says we're dreadfully short on interrogators, screeners and

13      analysts.  And you say, we don't really have those, but we

14      will get some of them, and we will send them to Iraq.  And

15      the whole idea is that they're going to go there, the Army's

16      going to decide where they go, the interrogators are going

17      to be put in Tiger Teams that the Army establishes, the Army

18      is going to decide what the interrogation priorities are,

19      they're going to decide who these -- who the interrogators

20      are going to interrogate and with whom.  They're going to

21      decide what the Interrogation Rules of Engagement are.

22      They're going to decide everything.  CACI management,

23      they're not going to -- they're not going to know the

24      interrogation priorities, they're not going to see

25      interrogation plans, they're not going to see interrogation
```

                                                              38

1    reports, they're not going to know what the intelligence

2    priorities are.

3           Basically, they know where their people are in

4    Iraq, and that's basically it, because this is all

5    classified.  And then you're sued, and the allegation is

6    that your company is a renegade company.  They're

7    mercenaries.  They're -- the executives are in a torture

8    conspiracy.  When you provided people, and the Army directed

9    them every step of the way in everything that they're

10   supposed to be doing at Abu Ghraib and Mosul, in Fallujah

11   and everywhere else that they were in Iraq.

12          Now, Mr. Faridi mentioned the pseudonymous

13   interrogations that we all had to sit through last Thursday.

14   And I want to apologize for subjecting everyone to that.  We

15   didn't have a choice.  We would have much preferred to have

16   those pseudonymous witnesses get in that stand so we all

17   could see them, including me, and know who they are and ask

18   them to tell you exactly what happened.  It would have taken

19   half as long, and it would have been twice as valuable, but

20   their identities are classified, even from me.  So we had no

21   choice but to do this tape-recorded process that was long

22   and annoying and was boring, but I hope you understand why

23   we had to do it.

24          We had to do that so that you could learn a few

25   things from all of the interrogators that the Army assigned

                                                              39

1    to interrogate these plaintiffs.  And the things we needed

2    to have you hear, as boring as it might have been, are they

3    deny what was -- what the plaintiffs say happened to them in

4    interrogations.

5         The other important thing is that they all told

6    you, Army and CACI, that CACI management had nothing to do

7    with how they do their interrogations.  Didn't matter if it

8    was an Army interrogator or a CACI interrogator, all of

9    their direction came from the U.S. Army.  And that came from

10   the section leaders for the Tiger Team to the

11   non-commissioned officer in charge, to the officer in

12   charge, Captain Wood who you heard from, all the way up to

13   Colonel Pappas and the ICE.  We needed you to hear all of

14   that.

15        And we also needed you to hear -- we gave you a

16   flavor of the objections for state secrets so you could

17   learn the things that we could not present to you but wanted

18   to present to you.

19        It's very easy to say CACI sent over unqualified

20   personnel.  I want to push back on that for a second.

21   Stefanowicz, Dugan, they say they sent over -- and they were

22   interrogators and they were unqualified.  Did CACI send them

23   over as interrogators?  It did not.  It sent them over as

24   screeners, for which they're eminently qualified.  And what

25   happened?  They got over there, and the U.S. Army, which

                                                          40

was, you know, in a severe shortage of interrogators.  You
could see Defendant's Exhibit 20, the organizational chart.
You had Tiger Teams that were completely unfilled.  The U.S.
Army said, we're going to put you, and you're going to be
interrogating because that's what we need right now.

And was it just CACI personnel?  You heard two of
the Army pseudonymous interrogators, they're radar techs;
they're not investigators.  But the Army had a shortage.
They said we have way too many people than we can handle.
So they took CACI screeners and said you seem to be doing
pretty well, we're going to make you an interrogator.  They
took radar techs and other people who had no interrogation
experience and said we're going to make you interrogators,
too.

One of the first things that Judge Brinkema said
to you last Monday is you're the judge of the facts, and
that requires evaluating the facts in an analytical,
even-handed way, not to be overcome by emotion, not to be
overcome by your feelings.  It's a -- you're supposed to
hear the facts and apply the facts as you've heard them at
the trial.

You can believe that Abu Ghraib is a terrible
stain on this country.  We believe that Abu Ghraib was a
terrible stain on this country.  There's no excuse for
assault, depriving someone of needed medical treatment or a

41

```
 1   bathroom, denying them food or water, stacking them naked in
 2   a pyramid, sexual humiliation.  There's no excuse for any of
 3   that.  Those were terrible things that happened in Iraq.  It
 4   was un-American, and about a dozen MPs got court-martialed
 5   for doing those things, and rightfully so.  They went to
 6   jail, and some of them for a long time, and rightfully so.
 7           You can believe all that was terrible and wrong
 8   because we agree it was terrible and wrong.  You can also
 9   sympathize with the plaintiffs.  You can sympathize with
10   anyone who was held in the hard site.  The hard site, by all
11   accounts, was a terrible place to be.  And you can have all
12   those feelings and also come to the conclusion you sued the
13   wrong defendant.  CACI is not the entity that was
14   responsible for the plight of those people in the hard site;
15   it's the Army, and it's the individual criminals who
16   actually abused these plaintiffs, if they were abused, and
17   they probably were.  That's -- you can have all these
18   feelings and still look at the evidence and say where is the
19   connection between the abuse these plaintiffs allege and
20   CACI personnel?
21           Pictures.  I told you last Monday you were going
22   to see disturbing pictures, and you did.  I did.  Everyone
23   did.  And the question is:  What do the pictures have to do
24   with the facts of this case?
25           One of the things that was interesting from
```

42

```
 1    Mr. Faridi's remarks is, he showed you one picture, not of
 2    abuse -- there may have been some abuse, I couldn't really
 3    see it that well.  He was showing you the close confines in
 4    the hard site.  Well -- and he said, these close confines,
 5    how could you not know that abuse was going on?  And he cast
 6    doubt on all the pseudonymous interrogators because a lot of
 7    them said I never saw abuse.
 8            Well, you know who else also said that?  Their
 9    boy, Torin Nelson, who got on the stand who hates CACI with
10    the intensity of 1,000 suns.  And what did I ask him?
11    Mr. Nelson, you were there for two months going into the
12    hard site every day, did you see any abuse?  And the only
13    abuse he saw was he saw a soldier shove somebody up an
14    intake.  Period.
15            So, yes, it is possible, in those close confines,
16    to have been there for a long time and not see abuse that
17    happened to detainees.  You heard it from a lot of different
18    witnesses.
19            The other thing about the small confines, it's
20    great to say, oh, there's these -- everything is in close
21    quarters, you must have seen it.  There's hundreds and
22    hundreds and hundreds of pictures of abuse.  And I agree
23    with Mr. Faridi, that's because the people who took those
24    pictures are sick.  I mean, it's bad enough to being abusing
25    these people, but then you're taking pictures for souvenirs
```

43

```
 1    and war trophies.  It's sick.

 2            But in these close quarters, how did it turn out

 3    that there's hundreds and hundreds and hundreds of these

 4    pictures, and there's one picture of a CACI employee with a

 5    detainee?  That's some pretty clever work if you're out

 6    there in the middle of abuse and somehow you don't make it

 7    into any of the hundreds and hundreds and hundreds of

 8    pictures.

 9            The Court advised you last Monday and will advise

10    you again today, plaintiffs are not alleging that CACI

11    personnel ever laid a hand on them.  Last week when Mr. Azmy

12    gave his opening statement, he said to you that's

13    irrelevant.  It's not irrelevant.  The reason it's relevant

14    is because if they had gone and sued Frederick, Grainer, the

15    U.S. Army, this would be a much simpler case.  The case

16    would be, did they abuse them?  If they did, is the United

17    States liable?  Likely so.  What are the damages?  And you

18    would decide the damages.

19            But when you sue somebody for injuries that are

20    inflicted by somebody else, the law imposes a much higher

21    burden.  There's only a couple of avenues where you can sue

22    somebody for injuries that somebody else inflicted on you.

23    Those are conspiracy, aiding and abetting, and they have

24    stringent standards that have to be met, and the judge is

25    going to instruct you on those when we're done with our
```

                                                                    44

```
 1   closing remarks.

 2          Why didn't they sue the people who actually abused

 3   them?  Why is Ivan Frederick not a defendant?  Why is

 4   Charles Grainer?  Why is the United States not a defendant

 5   here?  Or why didn't they file an administrative claim?  You

 6   saw Secretary Rumsfeld's memo.  If there's claims of

 7   detainee abuse, we will consider them and pay them if

 8   appropriate.  We know that Al-Zuba'e knew how to file a

 9   claim.  He filed a claim for $20,000 that he said he was

10   carrying in cash in his cab when he was detained.  So they

11   could have done that, but there's no publicity kick in suing

12   the United States.  And that's why, you know, they're going

13   after a contractor to try to make a political and public

14   point, but there's no evidence tying CACI to these

15   plaintiffs.

16          So we talked last week about the three hurdles.

17   Were the plaintiffs subjected to torture or CIDT?  Now, are

18   we going to stand here and say to you that we know for sure

19   that these plaintiffs were never subjected to abuse at Abu

20   Ghraib prison?  No.  If we said that, knowing what we know

21   about the hard site, and knowing what we know about the

22   criminals who work every day in the hard site, if we were to

23   say that to use a, you know, obscure precise legal term, it

24   would be stupid.  We don't know.

25          We heard from the plaintiffs, and they certainly
```

45

```
 1    all testified about being abused.  They don't have any

 2    corroboration.  There's no witness -- there's no witnesses

 3    other than the plaintiffs, no friends, no family talking

 4    about their condition.  Some of their -- some of their

 5    testimony is provably incorrect.  We'll get to that when I

 6    talk about the next hurdle.  Some of their explanations and

 7    testimony has shifted and expanded over time.  A lot more

 8    civilianized when they're suing a civilian contractor.  And

 9    we do know that the pseudonymous interrogators largely

10    dispute what the plaintiffs say happened to them during

11    interrogations.  And they don't really have an incentive to

12    lie because they've got the greatest protection known to

13    man, their identities are classified, but they do deny what

14    the plaintiffs say.

15           But the strangest thing about this case -- other

16    than the look on Dr. Modvig's face when Ms. Bailey

17    cross-examined him with his own book, which was quite a

18    sight, the strangest thing is this is a personal injury

19    case.  You have no medical evidence.

20           If somebody has a fender-bender and they say their

21    neck hurts, you have a doctor get on that stand and give a

22    diagnosis, you have a doctor say, well, I see this and

23    that's consistent with what they're saying about everything

24    that happened in the car crash.  These plaintiffs were

25    released.  For the most part, they didn't go to doctors.
```

                                                                  46

1                You had probably a dozen members of the jury panel

2     get excused because they had doctor's appointments, because

3     doctor's appointments are important.  And these plaintiffs

4     who were claiming physical injuries really, for the most

5     part, didn't go to the doctor.  But we do know one thing.

6     They testified that in 2013, they went and met with the

7     expert doctor that plaintiffs' counsel had retained to

8     testify for them in this case who they decided not to call

9     as a witness.  He's actually right there with the mask in

10    the third row.

11               They decided in a personal injury case they would

12    rather not present you with a diagnosis rather than subject

13    that diagnosis to cross-examination and the rebuttal expert

14    that we retained that we had no reason to call.  But this is

15    a case with, you know, a personal injury, physical, we want

16    compensatory damages, and you don't even have a diagnosis.

17    You have nothing.  No medical evidence at all.

18               The second hurdle, even if you conclude that

19    plaintiffs were abused in the hard site -- and, as we said,

20    we're not going to say that they weren't.  I mean, it's --

21    you know, that was a terrible place to be -- they have to

22    prove conspiracy or aiding and abetting that somehow ties it

23    to CACI.  Because, again, they don't allege the CACI

24    employee ever laid a hand on them.

25               But what do they need for conspiracy?  The Judge

47

 1   is going to give you instructions.  But they have to have an

 2   agreement, they have to show you an agreement.  It doesn't

 3   have to be a verbal, doesn't have to be a written contract,

 4   but they have to show an agreement by two people that we're

 5   going to do some unlawful means together.  And the agreement

 6   has to include an intent to the abuse that resulted in

 7   injury to these plaintiffs, and parallel conduct isn't

 8   enough.

 9            What's parallel conduct?  If I leave here today

10   and I go to get my car in the parking garage and someone

11   stole it, if I know who it is, I can sue that guy, and I can

12   get my car back or I can get damages.  But what I can't do

13   is I can't sue the other guy who went in the garage and

14   stole somebody else's car if they weren't working together.

15   That's parallel conduct.  Even if they both knew that the

16   other one was in there stealing cars, that's not a

17   conspiracy.  They're doing their own thing, and I can't say

18   you stole a car, too, so you should give me damages.

19            And you're going to hear that presence alone and

20   knowledge alone is not enough.  It's not enough to know that

21   criminal conduct is going on, it's not enough to be present.

22   You have to reach an agreement to commit this criminal

23   conduct.  And there's no evidence at all of CACI personnel

24   entering into any agreement relating to these plaintiffs.

25            Aiding and abetting.  Aiding and abetting has to

                                                              48

```
 1    be very much directed at these plaintiffs.  They have to
 2    prove that CACI personnel did something that provided
 3    practical assistance to the abuse of these plaintiffs.  And
 4    it's not enough that you provided assistance, they have to
 5    show that a CACI employee gave that assistance with the --
 6    for the purpose of causing the abuse.  It's not even enough
 7    that you know that some MP or someone else is going to abuse
 8    somebody, you have to give them help because you want them
 9    to abuse.  There's no evidence of that connecting any of
10    CACI personnel with these plaintiffs.
11            So let's talk about the three plaintiffs.
12    Al-Zuba'e.  His testimony was very emotional.  He talked
13    about some horrific treatment that he alleges occurred in
14    the intake, and then he alleges he was subjected to other
15    treatment when he was brought down to the hard site.  And he
16    said he was interrogated multiple times, always by
17    civilians.
18            Well, Plaintiffs' Exhibit 20 is the statement that
19    Al-Zuba'e said out loud.  He didn't write it, he spoke it,
20    and it was transcribed, and plaintiffs marked it as an
21    exhibit in this case of his statement of what happened to
22    him.  And when he was asked, he doesn't say anything about
23    intake, at all.
24            Now, you know, that seemed to be the most horrific
25    of the abuse that he testified about on the stand, and it
```

49

1  didn't come to his mind to say, oh, you are not going to

2  believe what they did to me up in intake.  And, in fact,

3  intake, by all accounts, appears not to have any real

4  involvement in abuse.  No findings in Taguba or Fay reports.

5  What did Al-Ejaili tell you about intake?  I was yucking it

6  up with the MPs and a CACI guy came over and they said

7  you're really a reporter?  And then they took me into

8  another room, and they were nice to me there.  Intake seemed

9  to be a pretty functional place.

10         But what he said in his statement, back when he

11 wasn't suing a government contractor, is that he was -- he

12 was -- that he was abused when he got brought down to the

13 hard site, he was made to crawl on the ground.  Again, we

14 don't have any reason to dispute any of that.  This is all

15 before he was ever interrogated.  And then he said he was

16 interrogated two days later, and then after the

17 interrogation, a soldier hit him.  After the interrogation

18 when he was being brought back from the interrogation.

19         So he says he was brought there the 5th, he says

20 that a couple days later he was interrogated.  That actually

21 checks out, because if you look, he was actually

22 interrogated on November 7.  So that checks out that two

23 days later he was interrogated.

24         But he wasn't interrogated by CACI.  And that's

25 the thing is Al-Zuba'e got on the stand and said I was only

1    interrogated by civilians.  Well, according to the Army, he

2    was interrogated three times, and five of the six

3    interrogators were soldiers.  And you heard from four of

4    those.  They couldn't find Army Interrogator D, but you

5    heard from the rest.  You heard from Army Interrogator C,

6    Army Interrogator F, Army Interrogator E and Army

7    Investigator B, and they all said, yeah, I was involved in

8    interrogating that guy.

9           So the idea -- I mean, so the government says he's

10   interrogated a bunch by soldiers, and you have a bunch of

11   soldiers saying, yeah, I interrogated that guy, which

12   completely refutes the testimony now that he was only

13   interrogated by civilians.  And if you look at paragraph 18,

14   there's his first documented interaction with a civilian or

15   certainly a CACI employee.  It's almost two months after he

16   arrived at the hard site, December 23rd, 2003.

17          And when we're thinking about how to view

18   Al-Zuba'e's testimony, he is the cab driver who was carrying

19   $20,000 in cash, in his telling, at the time that he was

20   detained by U.S. forces.

21          Al-Ejaili.  He said he was interrogated 10 to 12

22   times.  He was abused during interrogations with civilians.

23   You heard the Department of Defense has -- they have no

24   record of him ever being interrogated.

25          There's a logbook entry that the U.S. talks about

                                                              51

1   in its interrogatory response that he's not supposed to be

2   talked to by anyone because he's a reporter; they didn't

3   know what to do with that guy.  So the records suggest he

4   was not interrogated.

5           And then you have the final -- according to the

6   United States, there was one interaction between Steve

7   Stefanowicz and Al-Ejaili.  You heard from Mr. Stefanowicz,

8   it occurred during IP roundup.  The records show there was

9   nothing violating the Interrogation Rules of Evidence -- or

10  Interrogation Rules of Engagement with respect to that brief

11  encounter.

12          And, as Mr. Stefanowicz testified, it was during

13  IP roundup when he was -- he stumbled into a scene where

14  there had been a shooting, he was -- his -- the guy he was

15  coming to interrogate was being carried out past him, he had

16  a brief conversation with someone, who we now assume is

17  Al-Ejaili.  Sergeant Beachner came up and said, hey, no

18  one's supposed to talk to him except me.  And he said

19  righto, and he went, I'm not needed here; I'm leaving, and

20  that was it.

21          Al-Ejaili was present here.  He could have gotten

22  on the stand and refuted that if he wanted to, if he could

23  have to say what Mr. Stefanowicz said about that encounter

24  is not true.  But they did not call him in their rebuttal

25  case.

                                                          52

 1              And Mr. Al Ejaili, like Mr. Al-Zuba'e, wrote a

 2     statement back in 2003/2004, and his -- and Mr. Al Ejaili's

 3     statement -- which is Plaintiffs' Exhibit 224, and when

 4     you're deliberating, I urge you to take a look at it.  The

 5     English translation is seven pages.  In those seven pages

 6     where he's detailing from soup to nuts his experience at Abu

 7     Ghraib prison, he makes two references to civilians.  They

 8     were both up at intake.  The first one was when he was

 9     joking around when the MPs, a civilian came up and said, is

10     this guy really a reporter?  He didn't believe him.  And

11     then they showed him the dossier and he's like look at that.

12     And then they took him to the next room where he was

13     questioned some more by a soldier.  And there was a civilian

14     sitting there doing what?  Nothing.  Just sat there and said

15     nothing.  Those are the only two references to civilians in

16     the report that Mr. Al Ejaili wrote for his employer back in

17     2004 after he was released.

18              And then how did my cross-examination of

19     Mr. Al Ejaili end?  And so the answer is:  No, you can't

20     point to a CACI employee giving anyone instructions about

21     your treatment; correct?  No.

22              And finally, Mr. Al Shimari.  He testified about

23     multiple interrogations.  He says that a person in a black

24     shirt mistreated him, and he testified about a civilian

25     with -- a male civilian with a ponytail who abused him.

                                                              53

1            The interesting thing about Mr. Al Shimari's

2    testimony was when he was on the stand in direct, plaintiffs

3    had him go through what happened to him, and he kept saying

4    they did this, and they did that, and then they did this,

5    and they did that.  And you know what they never did?  They

6    never stopped and said, wait, wait, wait.  When you say

7    "they," who?  And the reason is simple; it's soldiers.

8    There's virtually no connection between civilian personnel

9    and Mr. Al Shimari.  The only one is the United States says

10   he was interrogated, not many times like he says, but once.

11   And they say his interrogators were CACI Interrogator A, who

12   you heard from, and Army Interrogator B.

13           What we know is that CACI Interrogator A was the

14   lead, and B was the assistant interrogator.  The

15   interrogation lasted almost three hours.  The reported

16   approaches used in the interrogation were authorized by the

17   Interrogation Rules of Engagement.

18           We also know that A and B testified that the

19   things Mr. Al Shimari said happened to him in interrogations

20   never happened in an interrogation that they participated

21   in.  We also know there are no -- there were no CACI

22   interrogators who had a ponytail.  So either that's a

23   mistake or there's some other civilian with a ponytail but

24   not related to CACI who had some interaction with Mr. Al

25   Shimari.

                                                          54

1              And CACI Interrogator A testified -- you might not

2    have caught this, but he testified that he knew he did not

3    have any other interrogations of Mr. Al Shimari after

4    December 15, 2003, and he said he knew it because of the

5    date.

6              We were not allowed, because of the state secrets

7    privilege, to have him explain why that date was significant

8    to him, but he knew by looking at the date that he did not

9    interrogate that guy ever again.

10             So what's plaintiffs' case built on?  And you saw

11   quite a bit of this in Mr. Faridi's presentation; it's the

12   boogeymen.

13             You know, they talk about General Taguba and

14   General Fay making all these findings.  All together, you

15   know, Major General Fay documented 44 incidents of abuse,

16   implicated 54 different people.  Three of them were CACI

17   employees.  Just three.  Their connections with plaintiffs

18   are either tenuous or non-existent, depending on the case.

19             So let's start with Mr. Stefanowicz.  What's the

20   connection between him and these plaintiffs?  Well, one

21   thing we know is he testified unequivocally he was not

22   assigned to interrogate any of these three plaintiffs.  And

23   the reason he knows that is he was put on one detainee from

24   December 15 on.  And before that, he said he had been

25   involved with only four or five detainee -- different

detainees being interrogated, and these plaintiffs were not
one of those four or five.

          Even if you discount everything Mr. Stefanowicz
said -- and he took the stand.  He took the stand and swore
to tell you the truth, and he did.  But even if you discount
all of that, the reports themselves make clear that the
allegations against Mr. Stefanowicz were only related to
detainees that he was assigned to interrogate.  He didn't
walk into the hard site -- if you believe the reports and
discount Mr. Stefanowicz, he did not walk into the hard site
and say, okay, boys, here's what I want you to do to
everybody on this wing.  According to the report authors,
you heard both of them say this.  General Taguba said the
only information I had dealt with Mr. Stefanowicz giving
instructions about detainees he was assigned to.

          And, you know, giving instructions is not
inherently wrong, because there are things that the MPs
would implement that are perfectly legal.  But we do know
that things were done to detainees that weren't legal, too.
But with respect to Mr. Stefanowicz, it was all limited to
people that he was assigned to interrogate.

          And I asked General Fay the same thing, and you
might remember that from his testimony.  And he said if
there's one -- if there's any allegation of -- you know,
relating to somebody that Stefanowicz wasn't assigned to,

56

1   it's in my report, but I don't remember any, and there

2   aren't any.  You have his report.  There aren't any

3   allegations.  The allegations against Mr. Stefanowicz are

4   solely related to people he was assigned to interrogate.

5   And limited to use of dogs.

6         General Taguba found enforced nudity that General

7   Fay did not find.  General Fay found an incident where --

8   never really could track down that there was a hearsay

9   incident that Stefanowicz was bragging about putting

10  underwear on someone's head and shaving them, and then there

11  was an allegation that he had pushed or kicked a detainee

12  into a cell with his foot.  That's it.  There's no, you

13  know, the beatings, the -- you know, all the other abuses

14  that you saw, no one, even on their worst day, assigns those

15  to Mr. Stefanowicz.  The only connection that

16  Mr. Stefanowicz has to these plaintiffs is the one IP

17  roundup interaction with Plaintiff Al Ejaili that nobody

18  says anything inappropriate happened.

19        Johnson.  IP roundup dealings with an Iraqi cop.

20  That's what you have related to Mr. Johnson.  These

21  plaintiffs aren't those Iraqi cops.

22        Dugan.  There's not even a picture of Dugan in the

23  rogues' gallery that plaintiffs presented you with.  My name

24  came up in the testimony in this trial more often than his

25  did.  He's alleged by General Fay to have done one thing

                                                          57

1   wrong with respect to a detainee, and he didn't even -- it's

2   not even something that he's alleged to have agreed with

3   somebody on.  He's alleged to have dragged somebody off the

4   back of a Jeep and dragged them to an interrogation booth.

5   I'm not condoning, but it's not these plaintiffs, and

6   there's no connection at all, and there's no indication at

7   all that he ever reached any agreements or asked MPs to do

8   anything to anybody.

9           None of these three were charged with a crime.

10   The United States had 20 years.  Didn't see fit to charge

11   any of these three individuals with crimes.  Mr. Stefanowicz

12   was reenlisted in the Navy, had his security clearance

13   upgraded and served from 2011 to 2016, I think it was.

14           All right.  Conspiracy.  Circling back, there is

15   no -- there's no evidence that CACI personnel entered into

16   an agreement to mistreat these plaintiffs.  There's

17   virtually no connection between the CACI employees and these

18   plaintiffs.  The evidence is unrefuted.  Taguba, Fay,

19   Frederick, Grainer, the interrogator instructions involved

20   instructions for someone assigned to that interrogator and

21   not broader, I want you to do this to multiple people.

22           No indication that the plaintiffs were ever

23   assigned to a CACI -- to one of the three people identified

24   in the Fay report.  No indication that the people -- you

25   know, CACI Interrogator A and G, the ones who did one

1    interrogation of Al Shimari, and one of Al-Zuba'e are

2    implicated in any sort of wrongdoing.

3            Notably, they called in their case all of these

4    criminals, Frederick, Grainer, Megan Grainer, Sabrina

5    Harman, and never really asked them did you enter into an

6    agreement with any CACI employees to abuse these plaintiffs?

7    Did you ever enter into an agreement to abuse generally?

8    They didn't ask them any of that, and there's no reason for

9    that.

10           And everything you heard from General Taguba and

11   General Fay talked about a chaotic scene at Abu Ghraib

12   prison.  It was completely dysfunctional.  Nobody's running

13   from that.  Conspiracies are organized.  These were chains

14   of command that weren't talking to each other.  Insufficient

15   controls in and out of the hard site.  All sorts of chaotic

16   conduct that is inconsistent with the idea of an ordered

17   conspiracy.

18           And aiding and abetting.  I mean, that's got to be

19   laser-focused on these plaintiffs.  Did somebody from

20   CACI -- did a CACI interrogator provide practical assistance

21   in the abuse of one of these detainees?  Where is the

22   connection between the abuse they allege and a CACI

23   employee?  It's just not there.

24           And they talked about the Rich Arant email.  They

25   talked about all the wrong parts.  Mr. Arant -- and this is

                                                              59

```
 1    Plaintiffs' Exhibit 115.  I urge you to read it, you know,

 2    when you're deliberating, pull it out.  He saw one incident

 3    that he doesn't describe further involving junior military

 4    personnel.  And that unnerved him.  He said it -- you know,

 5    he's concerned it may not be an isolated incident.

 6              But what's he say about the CACI personnel?  Dan

 7    was alert to such possible circumstances, and he told

 8    everybody, make sure you stay clear.  Stay squeaky clean, we

 9    don't want to get ourselves caught up in that kind of thing.

10              And Mr. Arant says CACI personnel with whom I had

11    contact, especially Porvaznik and Stefanowicz, had my

12    highest admiration and respect.  And he's certain that Dan

13    Porvaznik is totally honest and straightforward and

14    competent and will ensure that CACI is able to honorably

15    support the client.  That was Mr. Arant's view of CACI, as

16    compared to his view of the junior soldiers who were -- that

17    he had seen at least one incident that he didn't describe

18    but he was certainly uncomfortable with.

19              And hurdle three.  In some ways, this is the

20    simplest one.  And there are two mini hurdles here.  The

21    first one is -- and hurdle three is, even if you find these

22    plaintiffs were abused, and even if you find that a CACI

23    interrogator is somehow wrapped up in it, is it appropriate

24    to hold CACI, the company, my client, responsible for

25    whatever abuse may have occurred?  And there's two pieces to
```

60

1    it.  The first one is scope of employment, and the

2    plaintiffs have the burden on that.  And the question there

3    is, the act has to be the same general nature as that

4    authorized or incidental to the conduct authorized by the

5    corporation.

6              I'll give you an example.  Your FedEx has a truck

7    driver who loses control of his truck and hits somebody.

8    Generally speaking, you can sue FedEx.  The guy is out there

9    to drive a truck, he hits somebody driving the truck.

10             Here, how does committing torture or CIDT or

11   entering into a conspiracy with soldiers to do that, how

12   would that be incidental to the work that CACI wanted these

13   people to do?  How does that help the employer?  It doesn't.

14   I mean, what it does is it puts the employer at great risk

15   because the United States is obviously against everything

16   that occurred here.  There is no upside to lying down with a

17   bunch of criminal MPs and entering into some sort of torture

18   conspiracy.  That does not benefit the company in any way,

19   and, in fact, greatly imperils the company.

20             And the other piece of hurdle three is the

21   borrowed servant doctrine.  And you're going to hear about

22   this from the Judge.  Basically, what the borrowed

23   servant -- it's all about control.  And the questions are,

24   even if you find that CACI -- a CACI employee at Abu Ghraib

25   somehow conspired with or aided and abetted the abuse of

                                                              61

1  these plaintiffs, and you somehow find it was within the

2  scope of their employment, the question is, whose

3  employment?  And it's all about control.  And the question

4  is, whose work is being performed, and who has the power to

5  control and direct the person in the performance of their

6  work?  In these circumstances, was it CACI?  Or was it the

7  U.S. Army?  And the answer here -- you heard witness after

8  witness testify about command and control.

9         Who developed the intelligence priorities?  The

10  Army or CACI?  Who decided which detainees would be

11  interrogated?  The Army or CACI?  Who decided which

12  interrogator would be assigned to a particular

13  interrogation?  The Army or CACI?  Who approved

14  interrogation plans?  Who even saw interrogation plans?  The

15  Army or CACI?  Who required interrogation reports?  Who set

16  the Interrogation Rules of Engagement?  Was that CACI, or

17  was that the Army?

18         CACI, which basically knew where its employees

19  were and because of the classified nature of the work,

20  didn't really know anything more about what exactly was

21  going on because the Army controlled all of that.  That was

22  their deal.  And it's not surprising; they're in a war zone.

23         The Army's funny about that, when they're in a war

24  zone, they don't like to share control; they want to be in

25  charge.  And you understand why, because they need to make

                                                          62

```
 1    sure that they're laser-focused on their mission.  And so
 2    that was the arrangement.
 3              And they -- you know, plaintiffs pointed to you --
 4    pointed you to stray language in the delivery orders.  If
 5    you actually read those delivery orders, like every
 6    paragraph says, as directed by military authority, says that
 7    the interrogators will be integrated into military civilian
 8    teams as directed by military authority in accordance with
 9    higher command directives.  The deal was always you find
10    them, hire them, pay them, get them to Iraq, we're going to
11    take it from there.
12              And you don't have to believe me.  What did the
13    U.S. say about this?  This is about the interrogation of
14    Mr. Al Shimari.  CACI Interrogator A and Army Interrogator B
15    were subject to the direction of the military chain of
16    command.  And it goes on, beginning with their section
17    leader, an Army non-commissioned officer, going up to the
18    NCOIC, going up to the OIC, going up to the JIDC, which is
19    Colonel Pappas.  This is Defense Exhibit 2 again if you want
20    to look at that while you're deliberating.
21              What else did the U.S. say in that response?  No
22    CACI personnel were in this chain of command.  And then you
23    go down a little bit.  The military chain of command
24    controlled the interrogation facility, set the structure for
25    interrogation operations, and was responsible for how
```

63

1    interrogations were to occur during both the planning and

2    execution phases.  I mean, they're standing right there and

3    saying it's me.  That was our deal.

4           They say basically the same thing with respect to

5    Al-Zuba'e's.  One interrogation in which a CACI employee

6    participated.  All interrogators were subject to the

7    direction of their military chain of command.  And you don't

8    just have to read it off the page.  You heard it at trial.

9           Do I click it again?  All right.  This is Captain

10   Wood.

11                        (Video played.)

12          MR. O'CONNOR:  And what else does Captain Wood

13   say?

14                        (Video played.)

15          MR. O'CONNOR:  You don't have to believe Captain

16   Wood.  This is Colonel Brady, the contracting officer's

17   representative:  I would consider the military as the

18   overseer of the civilian contractor.

19          And look at the last one.  The others are all

20   there, but the contract employees were embedded with the

21   military chain of command.  Any problem, regardless of the

22   nature of the problem, the Army's pretty good at reporting

23   the problem.

24          And you heard witness after witness testify as to

25   who set the priorities, who approved the plans, who assigned

                                                              64

1    the Tiger Teams, who required interrogation reports, and it

2    wasn't CACI.

3            So when you ask whose work was being done, the

4    answer to that was pretty clear, the Army's work was being

5    done, and it was done under the Army's direction and

6    control.  It doesn't matter if they exercised it poorly;

7    what matters is that that was the setup, that they were to

8    exercise the direction and control and the day-to-day

9    operations of the CACI interrogators.

10           And then CACI had no visibility.  To this day,

11   CACI doesn't know who its interrogators were interrogating

12   because it's classified.  And that was by design because

13   they're in a war and the Army calls the shots in a war.

14           So we're left with the government has agreed that

15   it will pay bona fide claims of detainee abuse.  That

16   doesn't bar the plaintiffs from going and bringing a suit

17   against a civilian contractor, but they've got to prove a

18   lot of extra things by bringing a claim to a company that

19   didn't directly have anything to do with their abuse.

20           The right answer here is if you believe they were

21   abused -- and, you know, they're in the hard site, that's

22   reasonable to conclude -- just tell them to make their claim

23   against the United States against the soldiers who abused

24   them, against the U.S. Army that was in charge of everything

25   that happened at Abu Ghraib prison.  Because there's no

                                                              65

1    basis for a claim against my client, which provided people

2    and paid them, subject to the Army calling all the shots.

3           Thank you.

4           THE COURT:  All right.  Rebuttal.

5     REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFFS

6           MR. FARIDI:  So could you follow all of what

7    Mr. O'Connor had to say?  He tried to add a lot of pieces to

8    a puzzle, to a very simple puzzle, to obscure and to confuse

9    the picture.  But the puzzle has four simple pieces.  Okay.

10   Was there a conspiracy?  Yes.  The conspiracy was to soften

11   up the detainees for interrogation by the MI personnel,

12   including CACI.  Who were the members of the conspiracy?  MI

13   personnel, including CACI, and the military police that --

14   the police members that perpetuated the abuse.

15          What were the overt acts of the conspiracy?  You

16   have to follow the Judge's instruction on this.  Read that

17   instruction carefully on conspiracy.  What were the overt

18   acts in furtherance of the conspiracy?  The perpetuation of

19   the abuse, the carrying out of the instructions that the

20   military intelligence, the Stefanowiczs of the world, the

21   Dugans of the world, and the DJs of the world gave to the

22   military police.

23          And then what were the results of those actions?

24   The actual torture and cruel, degrading and inhuman

25   treatment that our clients suffered.

                                                        66

```
 1              And then Mr. O'Connor, during his presentation,
 2   took what lawyers like to refer to as a kitchen sink
 3   approach.  He threw everything against the wall to see --
 4   figure out -- you know, hoping that something sticks.  He
 5   said at some point that Abu Ghraib was, in fact, a stain on
 6   our American -- on our country's history.  But then he put
 7   up witnesses -- witness after witness on the witness stand
 8   who claimed they didn't see anything, they didn't hear
 9   anything.
10              So what is it?  Did it happen, or did it not
11   happen?  What's the answer?  He said, oh, these pseudonymous
12   witnesses had no incentive to lie.  Really?  Do you not
13   think that if they acknowledge that they engaged in abuse,
14   that they perpetuated abuse, that they directed abuse, that
15   they have no liability?  Did he really expect those
16   pseudonymous witnesses to take the witness stand and confess
17   that they engaged and perpetuated and directed the abuse?
18              And another thing out of the kitchen sink
19   approach.  Oh, the plaintiffs didn't call a doctor to the
20   witness stand.  Do we really need to call a doctor, a
21   physician, a psychiatrist to tell this jury what the impact
22   of the trauma has been for these men?
23              And then he focused on, towards the tail end of
24   his presentation, about this borrowed servant doctrine.
25   Okay.  I want to spend just a couple of minutes on that.
```

```
 1    And the Judge is going to tell you it's actually CACI's
 2    burden to prove that its servants were borrowed by the
 3    military.  And the evidence that you have seen shows that
 4    they're not going to be able to meet that burden.  They
 5    don't meet that burden.
 6              And the key question that you have to ask -- and
 7    this is going to be the Judge's instruction to you -- whose
 8    work was being performed?  It was CACI's work.  CACI had a
 9    contract with the government, and under the terms of that
10    contract, CACI was supposed to provide interrogation
11    services at Abu Ghraib.  CACI was getting paid; not some
12    other third-party.  CACI was getting paid for the
13    interrogation services that it was providing, up to
14    $32 million.  It was CACI that had the ability to fire and
15    hire and promote and discipline those people; not the Army,
16    not the military.
17              And the second inquiry with respect to this
18    particular borrowed servant doctrine is who had the power to
19    control the interrogators in the performance of their work
20    at Abu Ghraib?  That's coming right out of the Judge's
21    instructions.
22              Did CACI relinquish the control that it had over
23    its employees?  You saw the evidence on that.  They had the
24    ability to sit in during the interrogations.  Porvaznik
25    testified about that.  They had the ability to stop the
```

```
 1    interrogations if the interrogations violated the code of

 2    conduct.  Porvaznik admitted to that during his

 3    cross-examination.  They had the ability to stop the

 4    interrogations if the interrogations violated the Geneva

 5    Convention of international law.  Porvaznik testified about

 6    that.  It's all about deflection.

 7            The military has all the -- has already held its

 8    people accountable for the abuse that they perpetrated.

 9    CACI now wants to avoid accountability, and they'll say and

10    do anything to get there.

11            Let me just show you just on the borrowed servant

12    thing that he spoke about the last minute.  CACI's contract.

13    Take a look at this contract, this PTX83, and take a look at

14    Section 5.  The contractor is responsible for providing

15    supervision for all of the contractors's personnel, all of

16    CACI's personnel.  It's their burden; not CACI's burden.

17    Section 5 of PTX83.

18            Take a look at CACI's code of conduct that they

19    required all of their employees to sign when they showed up

20    to Iraq.  This is PTX85.  And take a look at pages 7 and 8.

21    And this code of conduct says that CACI's management retains

22    all rights to operate the business according to its

23    judgment, including to direct, supervise, control, and when

24    it deems appropriate, discipline the workforce, not the

25    military.
```

1              And take a look at the Army policy, the Army

2    doctrine, the Army Field Manual, what it says about CACI's

3    responsibility to manage its people there.  Why do you think

4    Dan Porvaznik was there every day?  Why do you think Scott

5    Northrop was visiting Abu Ghraib?  Why do you think Chuck

6    Mudd, every time he visited Iraq from the U.S., visited Abu

7    Ghraib?  Did they relinquish control over their people

8    there?  No.  It was their responsibility to manage their

9    people there, and now they're trying to avoid any

10   responsibility, any accountability for the bad acts that

11   their people did there.

12             And this is what the Army Field Manual says, that

13   the management of contractor activities is accomplished

14   through the responsible contracting organization.  That's

15   CACI.  Not the chain of command for the military.

16   Commanders, military commanders, do not have direct control

17   over contractors or their employees.  That's PTX207.  Only

18   the contractors, that's CACI, managed, supervised and give

19   direction to their employees.

20             Section 4-45, maintaining discipline of contract

21   employees is a responsibility of CACI.  CACI's management

22   structure; not the military chain of command.  It's a

23   contractor who must take direct responsibility and actions

24   for his employees' conduct.  Are they taking responsibility?

25   No.

                                                              70

1           Again, page 90, the COR -- who was Colonel Brady,

2    Mr. O'Connor spoke about him -- is prohibited from

3    interfering with a contractor's management by supervising

4    their employees or otherwise directing their work.  And you

5    heard what Arnold Morse -- who was CACI's corporate

6    representative -- said about this.  That Dan Porvaznik was

7    the one.  Dan Porvaznik was the one who was providing the

8    operational support at Abu Ghraib.

9           And here's General -- General Fay's finding.  It

10   appears that under the CACI contract, no one was monitoring

11   CACI's decisions because those were CACI's decisions to

12   make.

13          And then Amy Monahan said the same thing,

14   corroborated the fact that Colonel Brady, who was the Army's

15   COR, wasn't reviewing the resumes; it was Tom Howard, a CACI

16   manager who was taking a look at the resumes and making

17   decisions on promotions.

18          And then Mr. O'Connor said, hey, look, the Army

19   directed CACI at every step of the way.  Army controlled the

20   interrogations.  Well, you know what, the Army also directed

21   CACI people not to engage in abuse.  And you know what they

22   did?  They engaged in the abuse at Abu Ghraib.

23          And Mr. O'Connor also spoke about the notion that,

24   look, the Fay report only catalogs about 44 or so episodes

25   of detainee abuse.  But General Fay explained to you during

                                                              71

1   his testimony that he saw abuses that were common, that were

2   routine, and that were repetitive.  And General Taguba also

3   told you the same thing, that the abuse at Abu Ghraib was

4   systemic and illegal.  You know, use your common sense.  The

5   abuse is not limited to the few instances, the exemplars

6   that General Fay calls out in his report.

7          And then I want to end on this notion that there's

8   no link between CACI interrogators and our clients.  And on

9   this, please take a close look at the Judge's instruction on

10  conspiracy.  The instruction is going to say:  Once a

11  conspiracy is formed, each member of the conspiracy is

12  liable for the actions of other co-conspirators performed

13  during the course and in furtherance of the conspiracy.

14         So CACI is liable for the actions of the other

15  co-conspirator's military police people who were carrying

16  out the instructions at CACI personnel's behest.  We do not

17  need to prove that a particular CACI employee directly

18  mistreated any of our clients; the only thing that we have

19  to prove is that CACI interrogators, along with military

20  intelligence, created an environment by giving instructions

21  to the military police to abuse the detainees, to soften

22  them up for the interrogations.

23         THE COURT:  Counsel, time is up.

24         MR. FARIDI:  Thank you, Your Honor.

25         THE COURT:  All right.  We've now completed the

                                                          72

```
 1   closing arguments.  I'm going to give the jury a 20-minute
 2   break.  So get your coffee, because I want you to be able to
 3   pay careful attention to the instructions.
 4        We don't allow people to come and go from the
 5   courtroom while I'm instructing a jury, so anyone who wants
 6   to stay for the instructions needs to understand you're here
 7   until I'm finished.  So if you don't want to stay for the
 8   instructions, please leave at this time.
 9        We'll be on recess until ten of.  Thank you.
10            (Jury not present at 11:34 a.m.)
11        THE COURT:  All right.  Do we need to address
12   anything before I start charging the jury?
13        MR. FARIDI:  Nothing from us, Your Honor.
14        MR. O'CONNOR:  No, Your Honor.
15        THE COURT:  All right.  Then let's bring the jury
16   in.
17        THE CSO:  Yes, Judge.
18        Rise for the jury.
19            (Jury present at 11:55 a.m.)
20                    JURY INSTRUCTIONS
21        THE COURT:  All right.  Ladies and gentlemen, now
22   that you have heard all of the evidence that is to be
23   received in this trial and each of the arguments of counsel,
24   it becomes my duty to give you the final instructions of the
25   Court as to the law that is applicable to this case.  You
```

73

 1    should use these instructions to guide you in your

 2    decisions.

 3              Now, I'm reading the instructions to you right

 4    now, but we will give you four copies of the written

 5    instructions that you can take back into the jury room to

 6    refresh yourselves about anything that we may have said.

 7              All of the instructions of law given to you by the

 8    Court, those given to you at the beginning of the trial,

 9    those given to you during the trial, and these final

10    instructions must guide and govern your deliberations.  It

11    is your duty as jurors to follow the law as stated in all of

12    the instructions of the Court and to apply these rules of

13    law to the facts as you find them to be from the evidence

14    received during the trial.

15              Now, counsel have quite properly referred to some

16    of the applicable rules of law in their closing arguments to

17    you.  If, however, any difference appears to you between the

18    law as stated by counsel and that as stated by the Court in

19    these instructions, you, of course, are to be governed by

20    the instructions given to you by the Court.  You are not to

21    single out any one instruction alone as stating the law but

22    must consider the instructions as a whole in reaching your

23    decisions.

24              Neither are you to be concerned with the wisdom of

25    any rule of law stated by the Court.  Regardless of any

                                                              74

1   opinion you may have as to what the law ought to be, it

2   would be a violation of your sworn duty to base any part of

3   your verdict upon any other view or opinion of the law than

4   that given in these instructions of the Court, just as it

5   would be a violation of your sworn duty as judges of the

6   facts to base your verdict upon anything but the evidence

7   received in the case.

8           You were chosen as jurors for this trial in order

9   to evaluate all of the evidence received and to decide each

10  of the factual questions presented by the allegations in

11  plaintiffs' complaint and the defendant's denials of those

12  allegations in its answer.

13          In resolving the issues presented to you for

14  decision in this trial, you must not be persuaded by bias,

15  prejudice or sympathy for or against any of the parties to

16  this case or by any public opinion.

17          Justice through trial by jury depends upon the

18  willingness of each individual juror to seek the truth from

19  the same evidence presented to all the jurors here in the

20  courtroom and then to arrive at a verdict by applying the

21  same rules of law as are now being given to each of you in

22  these instructions.

23          Now, during the trial, I permitted you to take

24  notes, many courts do not permit note-taking by jurors, so a

25  word of caution is again in order.  There's always a

75

1    tendency to place undue importance on matters which one has

2    written down.  Some testimony, which is considered

3    unimportant at the time presented and thus not written down,

4    may take on greater importance later in the trial in light

5    of all the evidence presented.  Therefore, you are

6    instructed that your notes are only a tool to aid in your

7    own individual memory, and you should not compare your notes

8    with other jurors in determining the content of any

9    testimony or in evaluating the importance of any evidence.

10         Your notes are not evidence and are by no means a

11   complete outline of the proceedings or even a list of the

12   highlights of the trial.  Above all, your memory should be

13   your greatest asset when it comes time to deliberate and

14   render a decision in this case.

15         Moreover, you are co-equal judges of the facts,

16   and each juror's memory of and opinion about the evidence is

17   worthy of consideration by all the other jurors.  That a

18   juror may have taken extensive notes does not mean that his

19   or her memory or opinion is worthy of more consideration

20   than the memory or opinion of a juror that took few or no

21   notes.

22         All parties are equal before the law and are

23   entitled to be treated as equals.  In this case, the

24   plaintiffs are citizens of another country.  Citizens of

25   another country are entitled to the same fair and

                                                            76

1    conscientious consideration by you as any party.

2            In this case, the defendant is a corporation.

3    Corporations are entitled to the same fair and conscientious

4    consideration by you as any party.

5            A juror should consider the evidence in a trial as

6    a reasonable and careful person would deal with any very

7    important question that must be resolved by examining facts,

8    opinions and evidence.  You are expected to use your good

9    sense in considering and evaluating the evidence in the

10   case.  Use the evidence only for those purposes for which it

11   has been received, and give the evidence a reasonable and

12   fair construction in the light of your common knowledge of

13   the natural tendencies and inclinations of human beings.

14   Keep constantly in mind that it would be a violation of your

15   sworn duty to base a verdict upon anything other than the

16   evidence received in the case and the instructions of the

17   Court.

18           Now, the evidence in this case consists of the

19   sworn testimony of the witnesses, regardless of who may have

20   called them; all exhibits received in evidence, regardless

21   of who may have produced them; all facts which have been

22   agreed to or stipulated; and all facts and events which may

23   have been judicially noticed.

24           When the attorneys on both sides stipulate or

25   agree as to the existence of a fact, you may accept the

77

1    stipulation as evidence and regard that fact as proved;

2    however, you are not required to do so because you are the

3    sole judges of the facts.  The stipulations are reflected in

4    Plaintiffs' Exhibit 226.

5           The Court has taken judicial notice of certain

6    facts or events.  When the Court declares that it has taken

7    judicial notice of some fact or event, you may accept the

8    Court's declaration as evidence and regard as proved the

9    fact or event which has been judicially noticed; however,

10   you're not required to do so, since you are the sole judges

11   of the facts.  Now, the facts for which I have taken

12   judicial notice are the following:

13          Number 1:  The coalition provisional authority

14   displaced Iraqi law and governmental institutions, and

15   pursuant to Coalition Provisional Authority Order 17,

16   immunized coalition personnel and contractors from Iraqi

17   laws and Iraqi legal process, instead, subjecting all

18   coalition personnel to the exclusive jurisdiction of their

19   parent states.

20          Two:  Coalition Provisional Authority Order 17

21   further provided that third-party claims for personal injury

22   could not be brought in Iraqi courts, but would be submitted

23   and dealt with by the parent state whose coalition,

24   personnel, property, activities or other assets are alleged

25   to have caused the claimed damage in a manner consistent

                                                              78

1    with the national laws of the parent state.

2            Three:  The United States Army has claims

3    responsibility in Iraq with respect to the personal

4    injury/abuse and mistreatment of Iraqi detainees,

5    particularly at Abu Ghraib.

6            Accordingly, the Department of Defense established

7    a formal claims process on September 15 of 2004, pursuant to

8    the Foreign Claims Act Title 10 of the United States Code

9    Section 2734, through which the United States committed to

10   investigate claims and provide a recommendation regarding an

11   appropriate amount of compensation, if any.

12           If a cognizable claim is not payable under the

13   Foreign Claims Act or other claim statutes, the Secretary of

14   the Army will identify alternative authorities under which

15   compensation could be provided, and, in appropriate cases,

16   take such action.

17           The Court took judicial notice of these three

18   facts because the issue of claim recovery through the

19   Foreign Claims Act was raised during the trial.  Nothing in

20   the Foreign Claims Act, however, prevents a plaintiff from

21   bringing a civil action in a domestic court under the Alien

22   Tort Statute, which is the statute at issue in this case.

23           Now, any proposed testimony or proposed exhibit to

24   which an objection was sustained by the Court and any

25   testimony or exhibit ordered stricken by the Court must be

79

1    entirely disregarded by you.  Anything you may have seen or

2    heard outside the courtroom is not evidence and must be

3    entirely disregarded.

4          Questions asked by a lawyer for either side is not

5    evidence.  If a lawyer asks a question by a witness which

6    contains a statement of fact, you may not consider the

7    lawyer's statement of any evidence of that fact.  Only a

8    witness's answer to a question may be considered as

9    evidence.

10         Objections, statements and arguments of counsel

11   also are not evidence in the case unless made as an

12   admission or a stipulation of fact.

13         You are to base your verdict only on the evidence

14   received in the case; however, in your consideration of the

15   evidence received, you are not limited to the bald

16   statements of the witnesses or to the bald assertions in the

17   exhibits.  In other words, you're not limited solely to what

18   you see and hear as the witnesses testify or as the exhibits

19   are admitted.  Instead, you are permitted to draw from the

20   facts which you find have been proved such reasonable

21   inferences as you feel are justified in the light of your

22   experience and common sense.

23         Inferences are simply deductions or conclusions,

24   which reason and common sense lead the jury to draw from the

25   evidence received in the case.

                                                            80

1          Testimony and/or exhibits can be admitted into

2    evidence during a trial only if it meets certain criteria or

3    standards.  It is the sworn duty of the attorney on each

4    side of the case to object when the other side offers

5    testimony or an exhibit which that attorney believes is not

6    properly admissible under the rules of law.  Only by raising

7    an objection can a lawyer request and then obtain a ruling

8    from the Court on the admissibility of the evidence being

9    offered by the other side.

10         You should not be influenced against an attorney

11   or his or her client because the attorney has made an

12   objection.  Moreover, do not attempt to interpret my rulings

13   on objections as somehow indicating how I think you should

14   decide the case.  I'm simply making a ruling on a legal

15   question regarding that particular piece of testimony or

16   exhibit.

17         It is the duty of the Court to admonish an

18   attorney who, out of zeal for his or her cause, does

19   something which I feel is not in keeping with the rules of

20   evidence or procedure.  You are to draw absolutely no

21   inference against the side to whom an admonition of the

22   Court may have been addressed during the trial of this case.

23         And during the course of the trial, I occasionally

24   asked questions of the witness.  Do not assume that I hold

25   any opinion on the matters to which my question may relate.

81

1    The Court may ask a question simply to clarify a matter, not

2    to help one side of the case or hurt the other side.

3            Now, there are two types of evidence which are

4    generally presented during a trial, they're called direct

5    evidence and circumstantial evidence.  Direct evidence is

6    the testimony of a person, such as an eyewitness, who

7    asserts or claims to have actual knowledge of a fact.

8            Circumstantial evidence is proof of a chain of

9    facts and circumstances indicating the existence of a fact.

10   An example of circumstantial evidence is the following:  You

11   leave your house at noon on a cold February day.  Now, your

12   front yard is bare at the time that you leave, but it starts

13   to snow, and you return at 5 p.m., and when you return, you

14   see a footprint in the snow that now covers your yard.  From

15   the facts that you left your home at noon and returned at

16   5 p.m., you see the footprint, and you know from common

17   experience that human beings are associated with footprints,

18   you can infer that there was a person in your yard sometime

19   between noon and 5 p.m. that day.  And that's an example of

20   circumstantial evidence.

21           Now, if you had actually seen a person, that would

22   be direct evidence of that fact.  The law makes no

23   distinction between the weight or value to be given to

24   either direct or circumstantial evidence, nor is a greater

25   degree of certainty required of circumstantial evidence than

82

 1    of direct evidence.

 2            You should weigh all the evidence in the case in

 3    making your decisions.  And your decisions on the facts of

 4    this case should not be determined by the number of

 5    witnesses testifying for or against a party or by the number

 6    of exhibits introduced by one side or the other.  You should

 7    consider all the facts and circumstances in evidence to

 8    determine which of the witnesses you choose to believe or

 9    not believe, and which of the exhibits have more or less

10    value.

11            You may find that the testimony of a smaller

12    number of witnesses on one side is more credible than the

13    testimony of a greater number of witnesses on the other

14    side, or that one or two exhibits may have more significance

15    in your evaluation of the case as against numerous exhibits

16    that you find have less significance.  To sum up this

17    instruction, always consider the quality of the evidence

18    rather than the quantity of the evidence.

19            You, as jurors, are the sole and exclusive judges

20    of the credibility of each of the witnesses called to

21    testify in this case, and only you determine the importance

22    or weight, if any, that their testimony deserves.  After

23    making your assessment concerning the credibility of a

24    witness, you may decide to believe all of that witness's

25    testimony, only a portion of it, or none of it at all.

1          In making your assessment of that witness, you

2     should carefully scrutinize all of the testimony given by

3     that witness, the circumstances under which each witness has

4     testified, and all of the other evidence which tends to show

5     whether a witness, in your opinion, is worthy of belief.

6          Consider each witness's intelligence, motive to

7     testify, motive to falsify, state of mind and appearance and

8     manner while on the witness stand.  Consider the witness's

9     ability to observe the matters as to which he or she has

10    testified, and consider whether he or she impresses you as

11    having an accurate memory or recollection of these matters.

12    Also consider any relation that a witness may bear to either

13    side of the case, the manner in which each witness might be

14    affected by your verdict, and the extent to which, if at

15    all, each witness is either supported or contradicted by

16    other evidence in the case.

17         Now, inconsistencies or discrepancies in the

18    testimony of a witness or between the testimony of different

19    witnesses may or may not cause you to disbelieve or

20    discredit such testimony.  Two or more persons witnessing an

21    incident or transaction may simply see or hear it

22    differently.  Innocent misrecollection, like failure of

23    recollection, is not an uncommon human experience.

24         In weighing the effect of a discrepancy, however,

25    always consider whether it relates to a matter of importance

84

1    or to an insignificant detail, and consider whether the

2    discrepancy results from innocent error or from intentional

3    falsehood.

4              The ability of both the plaintiffs and the

5    defendant to produce all the exhibits and witness testimony

6    they would have wanted to produce has been limited by the

7    United States invoking the state secrets privilege to ensure

8    that military or other secrets are not revealed.  As a

9    result, certain exhibits have been redacted, and certain

10   witnesses were unable to testify in this case as to matters

11   to which the government invoked the state secrets privilege.

12             As I instructed you at the outset of this trial,

13   for interrogation personnel whose identities were withheld

14   by the government, do not base any of your credibility

15   determinations on the format in which their testimony was

16   admitted into evidence.  The parties in this case bear no

17   responsibility for that decision, and the lack of identity

18   and background information should not adversely influence

19   your judgment as to these witnesses' credibility.

20             In this case, we've heard the testimony of some

21   witnesses by deposition.  When a person is unavailable to

22   testify at trial, the deposition of that person may be used

23   at trial.  A deposition is simply a pretrial procedure in

24   which the attorneys for both sides may question a witness or

25   an adverse party under oath before a court stenographer.

1   Each side is entitled to take depositions, and each side is

2   entitled to ask questions at each deposition.

3          You may consider the testimony of a witness given

4   at a deposition according to the same standards you would

5   use to evaluate the testimony of a witness given at trial.

6   These instructions apply to witnesses who testify

7   pseudonymously, by audio and whose testimony was read into

8   the record.

9          In those cases where depositions were read to you,

10  do not place any significance on the behavior or tone of

11  voice of any person reading the questions and answers.

12  Otherwise, you should treat the deposition testimony the

13  same as any other testimony presented in court.

14         Evidence was presented to you in the form of

15  admissions to the truth of certain facts.  These admissions

16  were given in writing before the trial in response to

17  questions that were submitted under established court

18  procedures.  You must treat those facts as having been

19  proved.

20         A witness may be discredited or impeached by

21  contradictory evidence or by evidence that at some other

22  time the witness has said or done something or has failed to

23  say or do something that is inconsistent with the witness's

24  present testimony.

25         If you believe any witness has been impeached and

86

1  thus discredited, you may give the testimony of that witness

2  such credibility, if any, you think it deserves.  If a

3  witness is shown knowingly to have testified falsely about

4  any material matter, you have a right to distrust such

5  witness's other testimony, and you may reject all the

6  testimony of that witness or give it such credibility as you

7  may think it deserves.

8          An act or omission is knowingly done if the act is

9  done voluntarily and intentionally and not because of a

10  mistake or accident or other innocent reason.  And that is

11  the same definition of knowingly that applies to all the

12  instructions in this case.

13          If you believe from the evidence that a party --

14  now, a party would be either the plaintiffs or the

15  defendant.  So if you believe from the evidence that a party

16  previously made a statement inconsistent with his testimony

17  at this trial, you may consider that previous statement as

18  evidence that what the party previously said was true.

19          The rules of evidence ordinarily do not permit

20  witnesses to testify as to their own opinions or their own

21  conclusions about important questions in a trial.  An

22  exception to this rule exists as to those witnesses who are

23  described as expert witnesses.  An expert witness is someone

24  who, by education or by experience, may have become

25  knowledgeable in some technical, scientific or very

87

1    specialized area.

2           If such knowledge or experience may be of

3    assistance to you in understanding some of the evidence or

4    in determining a fact, an expert witness in that area may

5    state an opinion as to a matter in which he or she claims to

6    be an expert.

7           You should consider each expert opinion -- now, we

8    only had, as I recall, one expert opinion in this case, and

9    that was the professor -- or the doctor who talked about

10   torture and CIDT.  So you should consider the expert opinion

11   received in evidence in this case and give it such weight,

12   if any, that you think it deserves.

13          You should consider the testimony of an expert

14   witness just as you consider other evidence in this case.

15   If you should decide that the opinion of an expert witness

16   is not based upon sufficient education or experience, or if

17   you should conclude that the reasons given in support of the

18   opinion are not sound, or if you conclude that the opinion

19   is outweighed by other evidence, you may disregard the

20   opinion in part or in its entirety.  As I've told you

21   several times, you, the jury, are the sole judges of the

22   facts of the case.

23          And if any reference by the Court or by counsel to

24   matters of testimony or exhibits does not coincide with your

25   own recollection of that evidence, it is your recollection

88

1    which should control during your deliberations and not the

2    statements of the Court or of counsel, because, again, you

3    are the sole judges of the evidence received in the case.

4           Now, there are three plaintiffs in this trial.

5    Each plaintiff has separate individual rights.  You should

6    decide the case as to each plaintiff and the defendant

7    separately.  Unless otherwise stated, the instructions being

8    given to you apply to all of the parties.

9           So we're now going to go into instructions that

10   address the law that's involved in this case, which is the

11   Alien Tort Statute, and the various what we call elements or

12   the various facts that parties have to be able to prove in

13   order to prevail on their particular issue.

14          In this lawsuit, plaintiffs claim that they were

15   the victims of torture or cruel, inhuman or degrading

16   treatment -- that sometimes is called CIDT, and you may see

17   that in some of the exhibits -- while based in the hard site

18   at Abu Ghraib.

19          They sue under the Alien Tort Statute, which is a

20   United States law which gives people the right to sue and

21   their cases to be decided in an American court for certain

22   violations of international law.

23          International law prohibits torture and cruel,

24   inhuman or degrading treatment.  There are no exceptions to

25   these prohibitions.  Neither war, nor national security, nor

89

1    any other exceptional circumstance can justify torture and

2    cruel, inhuman or degrading treatment.  All persons have the

3    right to be free from these violations.

4            A person who is injured by any of these

5    international law violations may sue in a United States

6    court under the Alien Tort Statute.  This is true even if

7    the international law violations occur in another country,

8    such as Iraq.

9            Each plaintiff in this case alleges that in

10   violation of the Alien Tort Statute, he was the victim of

11   torture and cruel, inhuman and degrading treatment while he

12   was detained at the Abu Ghraib hard site.

13           The plaintiffs do not allege that any CACI

14   personnel, including Steve Stefanowicz, Daniel Johnson and

15   Timothy Dugan, directly mistreated them.  Instead, they rise

16   two theories of indirect liability.

17           First:  Plaintiffs claim that CACI interrogators

18   conspired with Army military personnel to torture or inflict

19   cruel, inhuman or degrading treatment on detainees at the

20   hard site, which resulted in the plaintiffs being tortured

21   or subjected to cruel, inhuman or degrading treatment.

22           Second:  Plaintiffs claim that CACI interrogators

23   aided and abetted Army military personnel in torturing or

24   inflicting cruel, inhuman or degrading treatment on the

25   plaintiffs.

90

1          For any plaintiff to prevail on his claim that his

2     right to be free from torture or cruel, inhuman or degrading

3     treatment under the Alien Tort Statute has been violated by

4     the defendant, that plaintiff must prove all of the

5     following by a preponderance of evidence:

6          First:  The plaintiff must prove that he was

7     either tortured or subjected to cruel, inhuman or degrading

8     treatment.  The plaintiff does not have to prove that he was

9     both tortured and subjected to cruel, inhuman or degrading

10    treatment.  Proof by a preponderance of the evidence as to

11    either type of wrongful treatment satisfies this element.

12         Two:  The defendant must -- the plaintiff must

13    prove that the defendant was indirectly responsible for the

14    plaintiff being tortured or subjected to cruel, inhuman or

15    degrading treatment either through its interrogators

16    conspiring with Army military personnel to have hard site

17    detainees tortured, or to inflict cruel, inhuman or

18    degrading treatment on them or through its interrogators

19    aiding and abetting Army military personnel in torturing or

20    inflicting cruel, inhuman or degrading treatment on the

21    plaintiff.

22         And three:  That defendant's interrogators were

23    acting within the scope of their employment when they

24    conspired with or aided and abetted the Army military

25    personnel in torturing or inflicting cruel, inhuman or

91

1   degrading treatment on the plaintiff.

2          If a plaintiff fails to prove any of these facts

3   by a preponderance of the evidence, the defendant is not

4   liable to that plaintiff.

5          So as another way of thinking about this, every

6   cause of action has what we call essential elements, and

7   I've just given you the three essential elements for -- of

8   the Alien Tort Statute case.  They're like ingredients in a

9   recipe, those of you who cook.  So if your recipe for a cake

10  requires, you know, eggs, milk and butter, and you've got

11  eggs and milk but you don't have butter, you can't make that

12  cake.  And very simply thinking about it, that's really how

13  a cause of action works in the law.

14         So if there are three causes -- three elements to

15  a cause of action and the party who has the burden can only

16  prove one or two of the elements but not all three, the

17  party does not win.

18         So, in this case, for the plaintiffs to succeed on

19  their claim, they have to prove each one of those three

20  facts, and the burden for a plaintiff is by a preponderance

21  of the evidence.  So if a plaintiff fails to prove any of

22  these facts by a preponderance of the evidence, then the

23  defendant is not liable to the plaintiff.

24         Because each plaintiff's case must be evaluated

25  individually, that one plaintiff may prevail against the

                                                            92

1    defendant does not mean that any other plaintiff

2    automatically prevails.  Likewise, should defendant be found

3    not liable as to one plaintiff, does not mean that the

4    defendant is automatically not liable to any other

5    plaintiff.

6         If a plaintiff proves all three facts by a

7    preponderance of the evidence, the defendant may nonetheless

8    prevail if the defendant proves an affirmative defense by a

9    preponderance of the evidence.

10        The defendant has asserted the borrowed servant

11   affirmative defense claiming that it is not liable for any

12   misconduct of its interrogators under the borrowed servant's

13   doctrine.

14        Defendant has the burden of proving this defense

15   by a preponderance of the evidence.  When a plaintiff seeks

16   to hold an employer liable for its employees' tortious acts,

17   it is necessary to determine who had control of the employee

18   when those acts occurred.

19        If you determine that CACI interrogators were

20   temporarily under the control of the United States Army when

21   plaintiffs were tortured or subjected to cruel, inhuman or

22   degrading treatment, then defendant cannot be held liable

23   for any injuries resulting from any conduct of CACI

24   interrogators in conspiring with or aiding and abetting the

25   military personnel and mistreating plaintiffs.

93

1           A person can be in the general employ of one

2    company while, at the same time, being in the particular

3    employ of a borrowing employer with all the legal

4    consequences of the new relation, and that is called being a

5    borrowed servant.

6           To determine if plaintiff -- I'm sorry.

7           If defendant has proven by a preponderance of the

8    evidence that its interrogators were borrowed servants, you

9    must determine, number one, whose work was being performed

10   by the interrogators; and, two, who had the power to control

11   and direct the interrogators in the performance of their

12   work at Abu Ghraib.  In determining whether the defendant

13   has proven that its interrogators were borrowed servants,

14   you should consider all the facts and circumstances in

15   evidence.

16          I'm going to now give you the definition of

17   preponderance of the evidence, which is the burden of proof

18   for most of the issues in this case.

19          Each plaintiff has asserted what are called claims

20   against the defendant, each of which alleges that the

21   defendant violated U.S. law.  To prevail on a claim, a

22   plaintiff has the responsibility in a civil action, such as

23   this, to prove every essential element of his claim by what

24   is called a preponderance of the evidence.

25          To prove a claim by a preponderance of the

                                                              94

1    evidence means to prove that something is more likely true

2    than not true.  In other words, a preponderance of the

3    evidence means such evidence as, when considered and

4    compared with the evidence opposed to it, has more

5    convincing force and produces, in your minds, belief that

6    what is sought to be proved is more likely true than not

7    true.

8              A preponderance of the evidence means the greater

9    weight of the evidence.  It refers to the quality and

10   persuasiveness of the evidence, not to the number of

11   witnesses or documents.  This standard does not require

12   proof to an absolute certainty.

13             I always tell jurors -- I don't know if you can

14   see it behind the screen, but you know what a balance scale

15   looks like when you have two platforms -- yeah.  It's behind

16   you there.

17             So think about the greater weight of the evidence

18   the way you would -- and have that balance scale in mind.

19   And what you do -- and, again, the defendant also has a

20   burden of preponderance of the evidence as to the

21   affirmative defense of the borrowed servant document that --

22   doctrine that I just explained to you.  But if you put all

23   the evidence on one side of the scale on the side -- I'm

24   sorry.  If a party has the burden of proof, you put all the

25   evidence that favors that party on one side, and then you

                                                        95

1    look at all the evidence that the opposing party has put on.

2    All right.  And then you look and see how does the scale

3    balance.  If it's 50/50, it's equal, then the party with the

4    burden of proof has not met the burden because they have not

5    produced the greater weight of the evidence.  All right.

6    However, if the scales tip in that party's favor -- and it

7    only needs to be a feather's weight difference, but the

8    weight of the evidence must be in favor of the party who has

9    the burden in order for the party to prevail on that issue.

10             So if you find that the credible evidence on a

11   given issue is evenly divided between the parties, that it

12   is equally probable that one side is right as it is that the

13   other side is right, then you must decide that issue against

14   the party who has the burden of proof.  And this is because

15   the party bearing this burden must prove more than simple

16   equality of evidence; he must prove the element at issue by

17   a preponderance of the evidence, by the greater weight of

18   the evidence.

19             On the other hand, the party with this burden of

20   proof need prove no more than preponderance, so long as you

21   find that the scales tip, however slightly, in favor of the

22   party with this burden of proof then that element will have

23   been proved by the preponderance of the evidence.

24             You may have heard the term proof beyond a

25   reasonable doubt.  That standard applies to criminal cases

96

1      and is a stricter standard requiring more proof than a

2      preponderance of the evidence.  The reasonable doubt

3      standard does not apply in a civil case such as this one,

4      and you should therefore put that standard out of your mind.

5              Now, plaintiffs each contend that they were

6      subjected to torture in violation of customary international

7      law.  This claim must be proved separately as to each

8      individual plaintiff.  To establish this claim, each

9      plaintiff must prove by a preponderance of the evidence:

10             One:  That military personnel subjected him to

11     severe pain or suffering, whether physical or mental.

12             Two:  That military personnel inflicted this pain

13     or suffering on him intentionally for the purpose of

14     obtaining information or a confession or for punishment,

15     intimidation or coercion.

16             And three:  That military personnel inflicted this

17     pain or suffering on him by or with the consent of a public

18     official or other person acting in an official capacity and

19     while the plaintiff was in the official's custody or under

20     the official's control.  In other words, that military

21     personnel were acting under color of law.

22             Acting under color of law means that a person is

23     acting or purporting to act in the performance of his

24     official duties.  It means that the action is clothed with

25     the authority of government.  A person can act under color

1    of law even when his actions overstep or constitute an abuse

2    of his legal authority.

3            Torture may include mental pain and suffering.  To

4    constitute torture, the mental pain or suffering must be

5    prolonged mental harm and caused by or resulting from the

6    intentional infliction or threatened infliction of severe

7    physical pain or suffering or the threat of imminent death.

8            In evaluating the severity of the pain and

9    suffering a plaintiff endured, you should consider the

10   duration, frequency and intensity of the methods he endured,

11   the permanence or lasting effects of the methods used, and

12   individual factors such as age, gender and religion.

13           The severity of physical or mental pain or

14   suffering by an individual is not evaluated by the effects

15   of any acts or methods taken in isolation; rather, torture

16   should be measured by considering the cumulative effects of

17   the acts and methods on an individual.

18           Each plaintiff also contends that he suffered

19   cruel, inhuman or degrading treatment in violation of

20   international law.  For a plaintiff to prevail on this

21   claim, he must prove by a preponderance of the evidence:

22           One:  That Army military personnel intentionally

23   inflicted acts of cruel, inhuman or degrading treatment on

24   him.

25           And two:  The person who intentionally inflicted

98

```
 1    severe or serious pain or suffering, whether physical or
 2    mental on that plaintiff, did so while he was within the
 3    custody or control of that person.
 4              Cruel, inhuman or degrading treatment causes
 5    feelings of fear, anguish or inferiority capable of
 6    humiliating or debasing the victim and possibly breaking his
 7    physical or moral resistance.
 8              Treatment is cruel if it causes serious mental or
 9    physical suffering or injury or constitutes a serious attack
10    on human dignity.
11              Treatment is inhuman if it deliberately causes
12    severe suffering, mental or physical, which, in the
13    particular situation, is unjustified.  Treatment is
14    considered degrading if its effect is such as to arouse
15    feelings of fear, anguish or inferiority, capable of
16    humiliating or debasing any one of the plaintiffs.
17              You must consider the totality of the
18    circumstances in determining whether any individual
19    plaintiff was subjected to cruel, inhuman or degrading
20    treatment which caused severe psychological or physical
21    harm.
22              Whether treatment is cruel, inhuman or degrading
23    depends upon an assessment of all the particularities of the
24    evidence before you, including the specific conditions at
25    issue, the duration of the measures imposed, the objectives
```

99

1    pursued by the perpetrators, and the physical or mental

2    effects on the persons involved.

3          Acts of torture constitute cruel, inhuman or

4    degrading treatment.  The difference between torture and

5    cruel, inhuman or degrading treatment is the intensity or

6    degree of the physical or mental suffering inflicted.  The

7    two violations are actually understood to be a continuum of

8    misconduct.  Even if you find that a plaintiff did not

9    suffer from harm severe enough to constitute torture, you

10   may still find that the plaintiff endured cruel, inhuman or

11   degrading treatment.

12         Now, a conspiracy is an agreement between two or

13   more persons to commit a wrongful act.  To hold defendant

14   liable under a theory of conspiracy to commit torture or

15   cruel, inhuman or degrading treatment as to any plaintiff,

16   that plaintiff must prove by a preponderance of the evidence

17   the following four facts:

18         Number 1:  That there was an agreement between two

19   or more persons to inflict torture or cruel, inhuman or

20   degrading treatment on detainees at the Abu Ghraib hard

21   site.

22         Two:  That the defendant knowingly and

23   intentionally joined the conspiracy.

24         Three:  That either the defendant or a

25   co-conspirator committed an act in furtherance of the

100

1    conspiracy.

2         And four:  The torture and/or cruel, inhuman or

3    degrading treatment to which plaintiffs were subjected

4    resulted from acts in furtherance of the conspiracy.

5         Knowledge and participation in a conspiracy may be

6    shown by circumstantial evidence.  Once a conspiracy is

7    formed, each member of the conspiracy is liable for the

8    actions of the other co-conspirators performed during the

9    course and in furtherance of the conspiracy.

10        To prevail on this conspiracy theory, a plaintiff

11   does not have to show that the conspirators met with all the

12   alleged co-conspirators or that there was a formal or

13   written agreement or that all comparators agreed on every

14   detail of the conspiracy.

15        An agreement to commit torture or cruel, inhuman

16   or degrading treatment may be inferred from circumstances

17   including the nature of the acts done, the relationship

18   between the parties and the interests of the alleged

19   co-conspirators.

20        The mere presence at the scene of wrongful conduct

21   itself does not make one a conspirator or an aider or

22   abettor.  Even knowing that wrongful conduct is occurring

23   does not make one a conspirator or an aider or abettor.

24   Rather, there must be evidence that a defendant knowingly

25   and intentionally did something that enabled the wrongful

101

```
 1    conduct to occur.

 2            Now, plaintiffs contend that defendants --

 3    defendant is responsible for the Army military personnel

 4    torturing or inflicting cruel, inhuman or degrading

 5    treatment on them on the basis of CACI's interrogators

 6    aiding and abetting that conduct.  This is the other theory

 7    of liability in the case.  Because you have conspiracy, and

 8    now I'm talking about aiding and abetting.  Defendant denies

 9    that its interrogators aided and abetted the military

10    personnel's conduct.

11            To prevail on their aiding and abetting theory,

12    each plaintiff must prove by a preponderance of the evidence

13    the following three facts:

14            One:  That Army military personnel subjected that

15    plaintiff to torture or cruel, inhuman or degrading

16    treatment.

17            Two:  That CACI interrogators provided practical

18    assistance to the military personnel that had a substantial

19    effect on the military personnel torturing or inflicting

20    cruel, inhuman or degrading treatment on that plaintiff.

21            And three:  That when CACI interrogators provided

22    the assistance, they acted with the purpose of facilitating

23    torture and/or cruel, inhuman or degrading treatment on that

24    plaintiff.

25            In other words, to constitute aiding and abetting,
```

102

1    there must be a causal link between actions by CACI

2    interrogators and the commission of the wrongful act against

3    that plaintiff.  If CACI interrogators' assistance was

4    insignificant or insubstantial, then their acts and conduct

5    cannot have had a substantial effect.

6         The purpose standard cannot be satisfied by a

7    finding that CACI interrogators merely knew that military

8    personnel were committing wrongful acts and assisted them

9    anyway.  The purpose standard also cannot be satisfied by a

10   mere failure to report or stop misconduct that a person

11   observes.  Instead, to be liable for aiding and abetting,

12   there must be evidence that CACI interrogators intended that

13   any assistance they provided military personnel would result

14   in military personnel committing wrongful acts against these

15   plaintiffs.

16        The purpose standard cannot be satisfied by a

17   finding that CACI interrogators assisted military personnel

18   with the purpose of its facilitating wrongful acts against

19   other detainees.  You must separately consider whether CACI

20   aided and abetted the United States conduct with regard to

21   each plaintiff.

22        Now, defendant is a corporation, and under the

23   law, a corporation is considered to be a person.  When a

24   corporation is involved, it can only act through its

25   employees, agents, directors or officers.  A corporation is

103

1    liable under the law for the acts of its employees, agents,

2    directors and officers performed within the scope of their

3    employment.  Conduct is within the scope of employment if it

4    is of the same general nature as that authorized or

5    incidental to the conduct authorized by the corporation.

6         I'm now going to instruct you on some law that

7    applies to damages.  The fact I have instructed you as to

8    the proper measure of damages should not be considered as

9    indicating any view of mine as to which party is entitled to

10   your verdict in this case.

11        Instructions as to the measure of damages are

12   given for your guidance only in the event you should find in

13   favor of the plaintiff from a preponderance of the evidence

14   in the case in accordance with the other instructions.

15        If you find in favor of a plaintiff and against

16   the defendant, then you must determine an amount that is

17   fair compensation for the damages suffered by that

18   plaintiff.  Compensatory damages seek to make the party

19   whole, that is to compensate a plaintiff for the damage

20   suffered because of the defendant's wrongful conduct.  The

21   damages, if any, that you award should be full and fair

22   compensation, no more and no less.

23        If you decide to award compensatory damages, you

24   should be guided by dispassionate common sense.  Computing

25   damages may be difficult, but you must not let that

                                                            104

1    difficulty lead you to engage in arbitrary guesswork.

2              On the other hand, the law does not require a

3    plaintiff to prove his losses with mathematical precision,

4    but only with as much definiteness and accuracy as the

5    circumstances permit.

6              Compensatory damages are the measure of the loss

7    or injury sustained by the injured plaintiff and may embrace

8    shame, mortification, humiliation, indignity to the feelings

9    and the like.  You should consider the following elements in

10   determining the amount of compensatory damages to the extent

11   you find them proved by a preponderance of the evidence

12   because the plaintiffs do have to prove their damages --

13   compensatory damages by a preponderance of the evidence.

14   You should consider emotional pain and suffering, mental

15   anguish, physical disfigurement and/or physical pain.

16             In making an award for such damages, you must use

17   your best judgment and establish an amount of damages that

18   is fair and reasonable in light of the evidence before you.

19             No evidence of the monetary value of such

20   intangible things as pain and suffering has been or need be

21   introduced into evidence.  There is no exact standard for

22   fixing the compensation to be awarded for these elements of

23   damages.  Any award you make must be fair in light of the

24   evidence presented at trial.

25             If you should find that the defendant is liable

105

```
 1   for a plaintiff's injuries, then you have the discretion to

 2   award, in addition to compensatory damages, punitive

 3   damages.  You may award punitive damages if a plaintiff

 4   proves, by clear and convincing evidence -- that's a

 5   different standard of proof that I'll explain to you in a

 6   minute -- that the defendant's conduct was malicious and

 7   reckless, not merely unreasonable.

 8           An act that's malicious and reckless if it is done

 9   in such a manner and under such circumstances as to reflect

10   utter disregard for the potential consequences of the act on

11   the safety and rights of others.

12           The purpose of punitive damages is to punish a

13   defendant for shocking conduct and to set an example in

14   order to deter the defendant or others from committing

15   similar acts in the future.

16           Whether to award punitive damages is within your

17   discretion.  You are not required to award them.  Punitive

18   damages are appropriate only for especially shocking and

19   offensive misconduct.  If you decide to award punitive

20   damages, you must use sound reason in setting the amount.

21   It must not reflect bias, prejudice or sympathy towards any

22   party, but the amount may be as large as you believe

23   necessary to fulfill the purpose of punitive damages.  In

24   this regard, you may consider the financial resources of the

25   defendant in fixing the amount of punitive damages.
```

106

1          Now, plaintiffs' punitive damages must be proven

2    by clear and convincing evidence.  This is a higher standard

3    of proof than preponderance of the evidence.  Clear and

4    convincing evidence means that the thing to be proved is

5    highly probable or reasonably certain.  You have heard again

6    the phrase proof beyond a reasonable doubt.  And, again,

7    that's stricter -- that's a stricter standard than clear and

8    convincing evidence.  The proof beyond a reasonable doubt

9    standard applies in criminal cases and not in this civil

10   case.  So if you think about it, you've got preponderance of

11   the evidence, clear and convincing evidence, a slightly

12   higher standard than the first one.

13          This is the last instruction.  I know it's been a

14   while.

15          Upon retiring to the jury room to begin your

16   deliberations, you must first elect one of your members to

17   act as your foreperson.  The foreperson will preside over

18   your deliberations and will be your spokesperson here in

19   court, but I want to remind you that you are eight co-equal

20   judges, so the fact that one of you is going to be the

21   foreperson doesn't mean that his or her opinion is worthy of

22   more consideration than that of any other juror.  So please

23   remember that.

24          Your verdict must represent the collective

25   judgment of the jury.  In order to return a verdict, it is

                                                              107

1    necessary that each juror agree to it.  Your verdict, in

2    other words, must be unanimous, all eight of you must agree.

3              It is your duty as jurors to consult with one

4    another and to deliberate with one another with a view

5    towards reaching an agreement if you can do so without

6    violence to your individual judgment.

7              Each of you must decide the case for yourself, but

8    do so only after an impartial consideration of all the

9    evidence in the case with your fellow and sister jurors.

10             In the course of your deliberations, do not

11   hesitate to re-examine your own views and to change your

12   opinion if convinced it is erroneous; however, do not

13   surrender your honest conviction solely because of the

14   opinion of other jurors or for the mere purpose of thereby

15   being able to return a unanimous verdict.

16             Remember at all times you're not partisans, you

17   don't represent the plaintiffs, and you don't represent the

18   defendant.  Instead, you are judges, and, specifically, you

19   are the judges of the facts of this case.  Your sole

20   interest is to seek the truth from the evidence received

21   during the trial.

22             Your verdict must be based solely upon the

23   evidence received in the case.  Nothing you have seen or

24   read or heard outside of court may be considered.  Nothing

25   that I have said or done during the course of this trial is

108

1    intended in any way to somehow suggest to you what I think

2    your verdict should be.

3           Nothing said in these instructions and nothing in

4    the form of the verdict is to suggest or convey to you in

5    any way or manner any intimation as to what verdict I think

6    you should return.

7           What the verdict shall be is the exclusive duty

8    and responsibility of the jury.  As I've told you many

9    times, you're the sole judges of the facts.

10          Now I want to give you the verdict form.  We've

11   prepared this for you.  And actually what we've done, you've

12   got three verdict forms because I wanted to emphasize once

13   again, each plaintiff has his own case.  So we're going to

14   ask you as to each individual plaintiff to evaluate the

15   evidence and to decide your decision.  So you'll have three

16   separate sheets of paper.  All right.  Each verdict form is

17   two pages.  And each one has the same caption of the case,

18   and the case is captioned Suhail Najim Abdullah Al Shimari,

19   et al. -- when we have multiple parties, we just take the

20   very first name on the papers, and then et al. means and

21   everything else or and others.  All right.  That's why it's

22   captioned that way -- who are the plaintiffs versus CACI

23   Premier Technology, Inc., which is the only defendant in

24   this case.

25          And the verdict form goes as follows:  To answer

109

```
1    any question in this verdict form, the jury must be

2    unanimous.  That's a reminder to you.  So all eight of you

3    have to agree.  And then the first form, as to plaintiff

4    Salah Hasan Nusaif Jasim Al-Ejaili, the first question:  Has

5    plaintiff proven, by a preponderance of the evidence, that

6    defendant, CACI Premier Technology, Inc., is liable to

7    plaintiff for conspiring with military personnel to inflict

8    torture or cruel, inhuman or degrading treatment on

9    detainees at the Abu Ghraib hard site which resulted in the

10   plaintiff being tortured or subjected to cruel, inhuman or

11   degrading treatment?  And your answer is either yes or no.

12        The second question:  Has plaintiff proven, by a

13   preponderance of the evidence, that defendant, CACI Premier

14   Technology, Inc., aided and abetted military personnel in

15   inflicting torture or cruel, inhuman or degrading treatment

16   on plaintiff?  And again, the answer would be yes or no.

17        And then we give you some instructions.  If you

18   answer yes to either one or both of Questions 1 and 2,

19   please answer Questions 3 and 4.  If you answered no to both

20   questions, you do not need to answer any further questions,

21   and the foreperson should sign the last page.

22        Now, Questions 3 and 4 go to damages, because if

23   you had found no as to the first two questions, then you

24   have essentially found that the defendant is not liable, and

25   obviously you would not then address damages.
```

110

```
 1              Question Number 3:  What amount, if any, of
 2   compensatory damages has plaintiff proven by a preponderance
 3   of the evidence?  And there you would indicate what damages
 4   you find.
 5              And the last question:  What amount, if any, of
 6   punitive damages has plaintiff proven by clear and
 7   convincing evidence?  And that is where you would put your
 8   answer.
 9              Then we ask whoever the foreperson is to put the
10   date the decision is made, and we ask the foreperson to both
11   sign with his or her signature and then print your name,
12   because sometimes we can't read your signature.
13              And we have the exact same format for each of the
14   other two plaintiffs.  So the exact same verdict form for
15   Plaintiff Asa'ad Hamza Hanfoosh Al-Zuba'e, and the last one
16   is for the Plaintiff Suhail Najim Abdullah Al Shimari.  All
17   right.  So you will have a total of six pages, but there are
18   three two-page verdict forms that need to be filled out.
19              You will take these verdict forms with you when
20   you go back to the jury room to deliberate.  You will have
21   all of the exhibits that have been entered into evidence.
22   And I had the attorneys for both sides prepare for you an
23   index, so you will see -- be able to find, you know, like
24   Plaintiffs' Exhibit 42 and just a little description of what
25   it is, Defendant's Exhibit 13 and what it is so then you can
```

111

```
 1    go more easily to those documents.

 2            My understanding is that there are two volumes of

 3    plaintiff exhibits and one volume of defense exhibits.  And

 4    so you'll have plaintiffs' exhibits in two volumes;

 5    defendant's in one, and you'll have the indexes, so it

 6    should help you to be able to find them.

 7            So you will have the verdict forms, you will have

 8    the notebooks, which you can keep with you.  You will have

 9    the exhibits and the exhibit lists.  And I'm going to

10    prepare -- I think you only need four, so you can share

11    them, four sets of instructions so you can refresh yourself

12    about any issue that we've raised in the instructions.

13            Now, if it becomes necessary during your

14    deliberations to communicate with the Court, that is if it's

15    too cold in the jury room, you need more heat, if you need

16    more pencils, I know some of you had to have replacements,

17    or if you have a question, if you're not sure about

18    something or there's whatever, whatever you do, you should

19    communicate with the Court in writing.  Just have the

20    foreperson or another juror write a note.  You should always

21    put the date of the note and whoever is sending it to us so

22    we know.  And that would be sent then through my court

23    security officer, Kim.

24            All right.  No member of the jury should ever

25    attempt to communicate with the Court by any means other
```

112

 1    than a signed writing, and I will never communicate with any

 2    member of the jury concerning any issue unless I do it in

 3    writing back to you or we do it here in court.

 4             Remember that my court security officer, as well

 5    as all other staff, are forbidden to communicate in any way

 6    or manner with the jury concerning the evidence, your

 7    opinions or your deliberations.

 8             And it's very important that you never reveal to

 9    anyone, including me, should you send us a note, how you are

10    voting or how the jury stands on any issue, because that's

11    purely a jury matter you keep among yourselves.

12             When you have finally reached verdicts, you fold

13    over the verdict form so it's hidden, knock on the door.  My

14    court security officer will bring you in, and we'll read the

15    verdict here in court.

16             Now, because jury deliberation is a collective

17    thinking process, it's really important for the eight of you

18    to always be together when you're talking about the case or

19    discussing it.  So if anybody is in the restroom, the

20    foreperson should stop deliberations, because the seven of

21    you could continue to be talking and the eighth person

22    wouldn't be hearing that.  That's very important.

23             Any time you do have a question, I cannot answer

24    that question without running it by counsel, and so my

25    practice is to require the lawyers to stay in the courtroom.

                                                              113

```
 1    At least one lawyer per side has to be in the courtroom
 2    while you're deliberating so that if you have a question, I
 3    don't have to take a half an hour to find where the lawyers
 4    are before I can answer it.  We answer your questions as
 5    quickly as we can.  But that also means, however, that if
 6    you're not working, I can let the lawyers stretch their
 7    legs, go out and get fresh air, whatever.
 8            So I do ask that before you break for lunch --
 9    because we're right on schedule -- you do the following:
10    I'm going to ask when you go back into the jury room that
11    you decide who wants to be the foreperson.  And number two,
12    that you decide how you want to run your schedule today.
13            Now, I had told you at the beginning of the trial
14    that we would be closing down early today at 4:00, and I
15    think some of you may be relying upon that.  So if that's
16    definite, then I'm assuming we'll stop at 4.  If all eight
17    of you wanted to stay longer, you could, however.  In other
18    words, we're here if you want to stay until the 5:30 or 6:00
19    time that we've been stopping.  That's fine.
20            We would like to know what your schedule is
21    because I can then let the lawyers know what they can and
22    can't do.  So when you plan to take your afternoon break, if
23    you could tell us what time -- how long you want to go, like
24    we want to go from 3:10 to 3:20, then I can tell everybody
25    you've got a ten-minute break.
```

114

```
 1              I also would like you to be thinking about your
 2    schedule for Wednesday.  Remember, tomorrow we're not in
 3    session, and it's very important that over tomorrow's
 4    recess, you don't do any thinking about the case, don't
 5    email each other, do not do anything.  Just enjoy the fresh
 6    air.  If you want to go to work, it's fine, just do not talk
 7    about the case, and don't let anybody talk to you about the
 8    case.  But we'd like to know what time you want to start up
 9    on Wednesday, and if you could give us an idea of what your
10    schedule would look like on Wednesday for planning purposes.
11    All right.
12              All right.  Counsel, do you want to approach the
13    bench, please.
14                        (Bench conference.)
15              THE COURT:  All right.  So just for the record,
16    any objections other than what we've already expressed as to
17    the Court's charge?
18              MR. FARIDI:  None.
19              MR. O'CONNOR:  No, Your Honor.
20              THE COURT:  Okay.  We're all set to go.  All
21    right.
22              MR. O'CONNOR:  I think so.
23              THE COURT:  All right.
24                        (Open court.)
25              THE COURT:  All right.  So, ladies and gentlemen,
```

115

```
 1   if you'll -- we're going to let you go into the jury room.
 2   If you could decide who's going to be the foreperson, what
 3   your schedule is going to be for today, and if you could let
 4   us know how you plan your schedule for Wednesday.  And once
 5   you've sent that note in to us, then I believe your lunches
 6   are already in the jury room, so you can begin eating your
 7   lunch.  And while you're doing that, we will be bringing
 8   things in to you just so you can get started on
 9   deliberations.  All right.
10             We'll recess court to await the decision of the
11   jury.
12                 (Jury not present at 1:01 p.m.)
13                   (A recess was taken.)
14             THE COURT:  All right.  Counsel, the jury does
15   want to work until 4 today, so they do want to stay to that
16   schedule.  They want to come back Wednesday morning at 9:30.
17   So our standard schedule.  And I'll let counsel know who the
18   foreperson is.  We're going to keep that among counsel and
19   the Court until a verdict comes in.  All right.
20             You'll need to clean your tables because I do
21   have -- I don't have court until Wednesday, but I do have
22   quite a few matters Wednesday morning, so it's probably a
23   good idea to get them cleaned today.  And I think -- you all
24   go to lunch, they're not going to come back until 2:00, so
25   we're on lunch break.  Okay.
```

116

```
 1              (Court recessed for lunch at 1:08 p.m.)

 2                    AFTERNOON SESSION 2:13 p.m.

 3                              NOTE

 4         THE COURT:  All right.  So we have our first note

 5    from the jury.  Number 1 -- or let me do Number 2.  Can we

 6    have a white board to record our thoughts?  Yes.  We're

 7    giving them a white board.  No problem with that.

 8         The other question:  Can we have videotapes of the

 9    depositions to review?  If both sides agree, I don't have a

10    problem with it.  I suspect at least one side will not be in

11    agreement with that.

12         What's the plaintiffs' position?

13         MR. FARIDI:  We would be fine with that, Your

14    Honor.

15         THE COURT:  I mean, I will tell you that the

16    normal -- my normal philosophy -- and I think most judges'

17    normal philosophy -- is that we don't -- and you get this

18    question all the time from jurors, you know, they want the

19    testimony of somebody or the transcript of a particular

20    witness's testimony.  And the problem that creates is, you

21    know, they're supposed to look at the totality of the

22    evidence, and so it is worrisome when they're picking and

23    choosing particular parts of it.  But if both sides have no

24    problem with it, then I don't really see an issue.

25         I did warn the jury at the beginning, you may
```

```
 1    recall, I said transcripts would not be available.  But I
 2    just want to know what both sides' position is.  So the
 3    plaintiff has no objection.  If we did this, we would send
 4    all the depositions for which we have videotapes.
 5              MR. O'CONNOR:  Your Honor, if they wanted to see
 6    the transcript of a live witness, I assume that's a hard no?
 7    Or maybe it's not a hard no.  I'm thinking about parity.
 8              THE COURT:  I mean, this -- there are so many --
 9    most of the testimony in this case -- or a significant
10    portion of it is on videotapes.  They haven't told us which
11    ones they want.  My concern is we have to give them all, and
12    I have to tell them you have to look at it all.  So they'll
13    be here a week.
14              MR. O'CONNOR:  Right.  I think that's right.
15              I mean, we don't have a strong view.  Our -- we
16    released our tech guy, but we can get him back if that's
17    something the Court wants to do, but we don't --
18              THE COURT:  Your videos are on what format?  Are
19    they on a disk, or are they on a thumb drive?  How are they?
20    What format are they in?
21              MR. MCCLURE:  Your Honor, I believe they're on the
22    hard drive of the computer of our tech person.  Now, they
23    were copied onto a flash drive at one point.  We don't have
24    that flash drive with us; he has it.
25              THE COURT:  All right.
```

1          MR. O'CONNOR:  But we could get him if --

2          THE COURT:  I'm going to follow the normal

3     practice.  I'm going to bring the jury in and tell them

4     they're going to have to rely on their collective memories

5     of the evidence.  I had warned them at the beginning they

6     could not get transcripts.  I think it's going to create

7     more problems than it's worth.

8          Any objection to proceeding that way?

9          MR. O'CONNOR:  None from us, Your Honor.

10         MR. FARIDI:  None from us, Your Honor.

11         THE COURT:  All right.  That's fine.  Let's bring

12    them back in.

13         THE CSO:  Yes, Judge.

14              (Jury present at 2:17 p.m.)

15         THE COURT:  All right.  Ladies and gentlemen,

16    we've gotten your notes.  You'll certainly have a white

17    board and whatever markers you need to work on it.

18         In terms of the first question, can you have the

19    videotapes of the depositions to review, I have to tell you

20    that you can't have them.  As I told you at the beginning of

21    the trial, we're not able to give you transcripts of the

22    testimony, so you have to rely on your memories.  And I know

23    all of you have been taking very diligent notes.

24         There are multiple reasons.  Number one, we have

25    technological issues as to how these are -- what format

```
 1    they're in and the tech people have left, so they're not

 2    even available.  Number two, judges are very hesitant to

 3    give jurors snippets of the testimony because you have to

 4    consider the case as a whole with all the evidence that has

 5    come in.  So the answer is we're not able to give you the

 6    videotapes of the depositions.  All right.  But we

 7    appreciate the question.

 8            And, again, this is the way we'll proceed.  That

 9    is, if you have a question -- every now and then I can send

10    you back a quickie answer like yes or no; otherwise, I'll

11    bring you in, as I've done today, and, you know, talk to you

12    about it.

13            I should tell you that I never let jurors go home

14    without sort of giving you a last-minute pep talk.  So at

15    4:00 I'll have you brought in and just remind you about the

16    cautions.  I need to do that for the record just to make

17    sure you know that.  All right.

18            We'll recess court then and await the decision of

19    the jury.

20                    (A brief recess was taken.)

21            THE COURT:  Let's bring the jury in.

22            THE CSO:  Yes, Judge.

23            THE COURT:  Maybe they've changed their mind.

24    Maybe they want to stay later.

25                    (Jury present at 4:05 p.m.)
```

                                                                    120

```
 1              THE COURT:  All right.  The jury has given us
 2   their schedule for Wednesday.  They're going to start at
 3   9:30, their break will be 11:15 to 11:30.  Lunch is 1 to
 4   2:00 time frame.  The second break is around 4 p.m., and
 5   they will end at 6.
 6              That's fine, folks.  And if for any reason on
 7   Wednesday that schedule changes, you know, let us know.
 8              I'm going to send you home.  As I said, you've
 9   heard this a million times, but it's even more important
10   now, since we've invested all this time, you know, six full
11   days of working on this case, to please make sure you
12   continue to follow my instructions to absolutely conduct no
13   investigation about this case.  Stay away from any media
14   coverage about the case, and do not discuss it with anybody,
15   don't have any private conversations among yourselves.
16   Enjoy the day off tomorrow, and you can come back fresh on
17   Wednesday.
18              The one thing I wanted to alert you to is there's
19   another civil trial going on in the building that has some
20   local public interest.  And my understanding -- you may
21   already have seen there have been some folks out in the
22   courtyard in front of the courthouse protesting or making
23   their voices heard about that case.
24              There may be more of them out there on Wednesday
25   morning; it has nothing to do with this case.  It's not a
```

121

```
 1   criminal case; it's just a civil case, so there's no danger
 2   or anything like that.  But I didn't want you to be
 3   surprised if you were to see something like that.  Just come
 4   through as you normally do, and there should be no problem.
 5   We will still have lunch.  I assume you gave your lunch
 6   order for Wednesday, so that's taken care of?  Very good.
 7             Then there's nothing further.  We'll let you all
 8   go home, and we'll see you at 9:30.  But I would ask our
 9   foreperson, remember, if everyone's not here at 9:30, you
10   all can, you know, chat, have some coffee, but do not talk
11   about the case until everybody is there.  All right.
12             Thank you, folks, for giving us your time.  You've
13   been an excellent jury, and I know you'll continue to be an
14   excellent jury.  We'll recess court for the day.
15             (Jury not present at 4:08 p.m.)
16             ----------------------------------
17   I certify that the foregoing is a true and accurate
18   transcription of my stenographic notes.
19
20                              _Stephanie Austin_
21                              Stephanie M. Austin, RPR, CRR
22
23
24
25
```

122