1

```
 1                   UNITED STATES DISTRICT COURT
                   FOR THE EASTERN DISTRICT OF VIRGINIA
 2                        Alexandria Division

 3

    SUHAIL NAJIM ABDULLAH          :    Civil Case
 4  AL SHIMARI,  et al.,           :    No. 1:08-CV-827
                                   :
 5                  Plaintiffs     :
                                   :
 6           v.                    :
                                   :
 7  CACI PREMIER TECHNOLOGY,       :
    INC.,                          :    April 16, 2024
 8                                 :    P.M. SESSION
                 Defendant         :    2:00 p.m.
 9  .........................      :    .....................

10            TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                     DAY 2 - P.M. SESSION
11          BEFORE THE HONORABLE LEONIE M. BRINKEMA
                 UNITED STATES DISTRICT JUDGE

12

13   APPEARANCES:

14    FOR THE PLAINTIFFS:        MUHAMMAD USMAN FARIDI
                                 ALEXANDRA MAHLER-HAUG
15                               ANDREW HADDAD
                                 BONITA ROBINSON
16                               MICHAEL BUCHANAN
                                 MICHAEL FISHER
17                               THOMAS KICAK
                                 W. SCOTT KIM
18                               PATTERSON BELKNAP WEBB &
                                 TYLER, LLP
19                               1133 Avenue of the Americas
                                 New York, New York  10036
20                               212-336-2000

21                               BAHER AZMY
                                 CENTER FOR CONSTITUTIONAL RIGHTS
22                               666 Broadway
                                 7th Floor
23                               New York, New York  10012
                                 212-614-6464

24
                                 (APPEARANCES CONTINUED ON
25                               FOLLOWING PAGE:
```

```
 1    FOR THE DEFENDANT:          JOHN O'CONNOR, JR.
                                  LINDA BAILEY
 2                                JOSEPH McCLURE
                                  STEPTOE & JOHNSON LLP
 3                                1330 Connecticut Avenue, NW
                                  7th Floor
 4                                Washington, D.C. 20036
                                  202-429-3000
 5
                                  NINA GINSBERG
 6                                DIMUROGINSBERG PC
                                  1101 King Street
 7                                Suite 610
                                  Alexandria, Virginia 22314
 8                                703-684-4333

 9
      OFFICIAL COURT REPORTER:    REBECCA STONESTREET, RPR, CRR
10                                U.S. District Court, 9th Floor
                                  401 Courthouse Square
11                                Alexandria, Virginia  22314
                                  (240) 426-7767
12

13                          ( Pages 1 - 100)

14

15           COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

16

17

18

19

20

21

22

23

24

25
```

1                        C O N T E N T S

2

3  **WITNESS:**              **DIRECT**     **CROSS**      **REDIRECT**     **RECROSS**

   ANTONIO TAGUBA
4  By Mr. Faridi              4           --            --              --
   By Mr. O'Connor           --           18            --              --
5
   JENS MODVIG
6  By Mr. Fisher             35           --            71              --
   By Ms. Bailey             --           49            --              --

7

8  (EXCERPTED VIDEOTAPED DEPOSITIONS PLAYED IN COURT:)

9  IVAN FREDERICK          33
   MEGAN AMBUHL GRANER     34
10  SABRINA HARMAN          35

11

12                        E X H I B I T S

13  **PLAINTIFF EXHIBITS**                                **PAGE**

    Exhibit 5                                          33
14  Exhibit 11                                         33
    Exhibit 16                                         33
15  Exhibit 17                                         33
    Exhibit 19                                         33
16  Exhibit 76                                         33

17  Exhibit 161, pictures Z1-Z6, D1, D2, and D38       33

18  Exhibit 206, pages 2, 10, 13, 14                   33

19

20

21

22

23

24

25

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

4

1              **P R O C E E D I N G S**

2              (Jury in at 2:04 p.m.)

3              THE COURT:  Continue the direct examination of

4    General Taguba, and, General, please speak up.  Keep your voice

5    up, especially at the end of the sentence.

6              THE WITNESS:  Yes, Your Honor.

7              THE COURT:  Much better.

8         **(ANTONIO TAGUBA, having been previously duly sworn,**

9              **testified as follows:)**

10         **CONTINUED EXAMINATION BY COUNSEL FOR PLAINTIFFS**

11   BY MR. FARIDI:

12   Q.  General Taguba, I'm going to ask you to turn, sir, to

13   page 44 of your report.  And there's a section here titled

14   "Recommendations As to Part 3 of the Investigation."

15             MR. FARIDI:  If you would pull that up on the screen as

16   well.

17   Q.  And here, sir, you make a finding and a recommendation as to

18   Janis Karpinski, Brigadier General Janis Karpinski.  Correct?

19   A.  That's correct.

20   Q.  Can you describe who she is and her role at Abu Ghraib, or

21   in Iraq at that time period?

22   A.  She was the commanding general for the 400 MP Brigade.  And

23   at the time of her interview, she was removed as the commander

24   of the Forward Operating Base Abu Ghraib.

25   Q.  And did you say that she was the person in command of the

1    Military Police Brigade?

2    A.  Of the MP Brigade, yes.  The Military Police Brigade.

3    Q.  And is that the Military Police Brigade into which the

4    company that we spoke about earlier, the specific company being

5    the 372nd Company of the 200 -- withdrawn.

6         The brigade that she managed, did that brigade subsume

7    the 372nd Company that was operating at Abu Ghraib?

8    A.  That is correct.

9    Q.  And what findings, just generally speaking, did you make

10   with respect to Brigadier General Karpinski?

11   A.  In terms of?

12   Q.  Her supervision of Abu Ghraib.

13   A.  She wasn't exactly what I would consider as an effective

14   commander.  She made excuses, she also made derogatory remarks

15   about some of her soldiers.

16   Q.  And did you issue -- did you recommend a reprimand for her?

17   A.  Yes, I did, following my interview of her.

18   Q.  And why did you recommend a reprimand for her?

19   A.  She's very evasive in answering the questions, which are

20   pretty simple.  She tried to explain herself as a female soldier

21   that's being picked on, and she was making excuses on her

22   ability to provide senior supervision when she was in command of

23   Abu Ghraib.

24   Q.  So that's with respect to the military police.  Let's turn

25   now to the next page, page 45, and let's bring up the second

1    paragraph of this particular section.  And can you tell the

2    jury, who is Colonel Thomas Pappas?

3    A.  Colonel Thomas Pappas was the commander of the

4    205th Military Intelligence Brigade that was also present there

5    at Abu Ghraib.

6    Q.  And the military intelligence is different than the military

7    police.  Correct?

8    A.  Correct.

9    Q.  Okay.  And what finding did you make as to him?

10   A.  When we were provided information through in-person

11   interview and also from the statement that was provided by the

12   MPs that we had -- we wanted to make clear that there were two

13   units that were assigned at the detention center.  And I was

14   seeking advice from my legal team whether I had the authority to

15   at least find credible information by interviewing

16   Colonel Pappas.

17   Q.  And what information did you learn from the interviews with

18   Colonel Pappas and other individuals related to this issue?

19   A.  I wanted to find out from his perspective why there were not

20   a harmonious relationship between the two commanders, inasmuch

21   with General Karpinski.

22   Q.  And the harmonious relationship between the two commanders,

23   the two commanders being Brigadier General Janis Karpinski and

24   Colonel Pappas.  Correct?

25   A.  That's correct.

1    Q.  And did you make a recommendation as to a reprimand for

2    Colonel Pappas?

3    A.  He was also very evasive when I asked him a few questions,

4    generic questions, on the performance of his military

5    intelligence unit, the relationship between his soldiers, his

6    interrogators, and also with the military police.

7    Q.  I take it, sir, that you were at a higher rank relative to

8    Brigadier General Karpinski and Colonel Pappas?

9    A.  That's correct.

10    Q.  And what does military policy require as to officers that

11    are layers below a major general, as to those inferior officers

12    in their interactions with someone at a more superior level?

13    A.  According to AR, Army Regulation 15-6, an investigation must

14    be officiated by a senior officer senior to the rank or the

15    person that we are to investigate.  In other words, I outrank

16    General Karpinski.

17    Q.  Did you draw any conclusions, sir, about how well their

18    supervisory -- withdrawn.

19         Did you draw any conclusions about the level of

20    supervision that they were providing to their units?

21    A.  Yes.

22    Q.  What conclusions did you draw?

23    A.  Well, General Karpinski was very uncooperative.  They did

24    not see eye to eye.  She was in command at that time, until

25    November 2003, and then Colonel Pappas was then appointed to

1    take over the Forward Operating Base at Abu Ghraib.

2         In other words, a subordinate was picked to command the

3    detention center.

4    Q.  And you spoke earlier about the lack of command and control

5    at Abu Ghraib.  Do you recall that?

6    A.  That's correct.

7    Q.  How did your findings with respect to these two individuals,

8    Brigadier General Karpinski and Colonel Pappas, how did these

9    findings relate to the lack of command and control at

10   Abu Ghraib?

11   A.  Both commanders were reporting to two different authorities,

12   while they were supposed to be cooperating with each other.

13   Colonel Karpinski at that time, when she was picked to command,

14   was in charge of the detention center but not in charge of the

15   interrogation mission.  That belonged to Colonel Pappas.

16   Q.  And did this friction between these two individuals, this

17   lack of coordination between these two individuals, how did that

18   create an environment where abuse was more likely to occur at

19   Abu Ghraib?

20   A.  Well, friction in and of itself makes that happen, because

21   then the soldiers were improperly led on their ability to

22   conduct their mission with a clear delineation of their

23   responsibility.

24   Q.  And that leads me, sir, to Paragraph 11 of this particular

25   section on page 46.

```
 1            MR. FARIDI:  Let's bring that up, please.
 2    Q.  Who is Steve Stefanowicz?
 3    A.  Mr. Stefanowicz was mentioned by his first name through the
 4    course of our interview of a few of the military police
 5    soldiers.  They referred to him as Mr. Stefanowicz.
 6    Q.  Who did he work for?
 7    A.  I'm sorry?
 8    Q.  Who did he work for?
 9    A.  At that time we didn't know who he was working for.
10    Q.  Did you ultimately come to find out who was his employer?
11    A.  Yes, because when a few of the soldiers that we interviewed
12    in person named him as a member of CACI.  Of course we didn't
13    know what CACI meant, so I sought legal counsel, or my legal
14    team, to approach Mr. Stefanowicz - or find him, anyway - if he
15    was willing to be interviewed.
16    Q.  In your report, sir, in Paragraph 11, you say,
17    "Mr. Stefanowicz, contract U.S. civilian interrogator, CACI,"
18    and then you go on to state, "205th Military Intelligence
19    Brigade."
20            What's his relationship, as a civilian interrogator, to
21    the 205th Military Intelligence Brigade?
22    A.  At that time I didn't know that he had a relationship with
23    the 205th Military Intelligence Brigade, until I found him at
24    the joint detention center, which is a separate facility from
25    the prison site.
```

1    Q.  Did you interview him in connection with your investigation?

2    A.  Yes, I did.

3    Q.  Why?  Why was he important for -- withdrawn.

4        Why did you interview him?

5    A.  Well, on advice of my legal team, it's to establish some

6    kind of credible information that he might have been involved

7    with the MPs, at least initially, and to establish a requirement

8    or a format -- a formality to have the MI Brigade be

9    investigated as well.

10   Q.  And were you personally present for the interview, or is

11   this an interview that your staff conducted?

12   A.  I personally interviewed him.

13   Q.  How long was the interview?

14   A.  I would say about an hour, hour and a half.

15   Q.  Can you describe his demeanor to the jury?

16   A.  He was very a coy type of personality.  He would lean on the

17   table staring me down, and I did the same thing to him.  He did

18   not answer the question accurately, meaning when I asked him,

19   "Are you working for CACI," I believe he did not say that he was

20   working as a contractor for CACI, that he was basically present

21   at the Joint Interrogation Detention Center.

22   Q.  Sir, did you say that he was staring you down in the

23   interview?

24   A.  Yes, he was.  In an intimidating manner.

25   Q.  Did that concern you?

1    A.  Absolutely.

2    Q.  Why?

3    A.  Because he was trying to intimidate me by asking him all

4    those questions, and I was just establishing some information

5    from him regarding his role and relationship with the military

6    police soldiers.

7    Q.  Were you, in fact, intimidated, General?

8    A.  Not in your life.

9    Q.  General, let's take a look at what you wrote here in your

10   report with respect to Mr. Stefanowicz.  I want to focus on the

11   second bullet point first.  You wrote, "Mr. Stefanowicz allowed

12   and/or instructed MPs who were not trained in interrogation

13   techniques to facilitate interrogations by setting conditions

14   which were neither authorized and not in accordance with

15   applicable regulations/policy.  He clearly knew his instructions

16   equated to physical abuse."

17        Let's break that up.  Earlier you had said that the

18   MIs, military intelligence, after they requested the MPs, the

19   military police, to set physical and mental conditions of

20   favorable interrogations, do you recall that?

21   A.  Yes.

22   Q.  Is this what you're talking about in this second bullet

23   point of Paragraph 11?

24   A.  Based on the responses that we received from the MP soldiers

25   that we interviewed, they literally implicated him as providing

1    instructions to them.

2    Q.  And you said, sir, that the instructions were neither

3    authorized nor were they in accordance with applicable

4    regulations/policy.  Why did you write that?

5    A.  The term that they used was "setting conditions for a

6    successful interrogation," which means instructing the MPs to

7    set conditions for a successful interrogation, is not legal.

8    Q.  What is that a euphemism for, "setting conditions for a

9    successful interrogation"?

10            MR. O'CONNOR:  Objection.  Relevance, competence.

11            THE COURT:  Lay a foundation.  I'll sustain the

12   objection.

13            MR. FARIDI:  Sure.

14   Q.  What do you mean by "setting conditions for a favorable

15   interrogation"?

16   A.  Well, we made the soldiers who made those comments to give

17   us an example.  Some of the examples that I remember was, giving

18   them a hard time so we can conduct our interrogation when

19   they're harassed or intimidated or assaulted, things of that

20   nature.

21   Q.  Did you make observations or findings as to whether the MPs

22   followed the instructions by Steve Stefanowicz?

23   A.  One soldier basically said that they were not getting any

24   credible set of instructions from their own superior, so they

25   regarded Mr. Stefanowicz as providing that set of instructions

1    on behalf of the MP command and control.

2    Q.  And then you wrote here, "He clearly knew his instructions

3    equated to physical abuse."

4          How did you know that, that he clearly knew his

5    instructions equated to physical abuse?

6    A.  We only based that on the statements from the MP soldiers.

7    Q.  And at the very beginning of the paragraph, General, you

8    wrote that an official reprimand be placed in his employment

9    file, his employment should be terminated, and that there should

10   be a generation of a derogatory report to revoke his security

11   clearance.  Do you see that?

12   A.  Yes.

13   Q.  Did CACI, to your knowledge, in fact terminate

14   Mr. Stefanowicz?

15   A.  That I don't know.

16   Q.  And how would you describe Mr. Stefanowicz's involvement

17   with detainee abuse relative to the other interrogators?

18   A.  We didn't have physical evidence about him conducting that

19   in person.  All we knew was that he was always present at the

20   interrogation site, and we also witnessed him going in and out

21   of the headquarters at Camp Liberty.  I think that's what it

22   was, the headquarters for CJTF-7.

23   Q.  I understand, sir, this is 20 years ago, but I'm going to

24   ask you to describe the specific type of physical abuse that

25   Mr. Stefanowicz directed.  Do you recall that?

14

1    A.  I don't recall that at all.

2    Q.  Let me see if I can help refresh your recollection.

3    A.  Okay.

4    Q.  I'm going to ask you, sir, to take a look at your deposition

5    testimony.

6    A.  Okay.

7    Q.  That is in the binder in front of you.  And take a look

8    at -- let me know when you get there.

9    A.  Okay.  Which PTX?

10   Q.  Actually, the tab is titled "Deposition Transcript."  It

11   should be at the very end of the binder.

12   A.  Okay.

13   Q.  And if you can turn, General, to page 71.

14   A.  Okay.

15   Q.  And just read to yourself, sir, lines 5 to 10.

16   A.  Which page again?

17   Q.  Page 71, lines 5 to 10.

18   A.  Maybe I'm looking at the wrong page.

19        THE COURT:  There are four pages per sheet of paper,

20   General.  In the upper right-hand corner you'll see the page

21   numbers.

22        MR. FARIDI:  Your Honor, we can streamline this.  I'll

23   move on.

24   Q.  Sir, you can set that aside.

25   A.  Okay.

```
 1    Q.  You're there now.  Just read to yourself, General, lines 8
 2    to 10.  Just three lines.
 3    A.  Eight to 10.  Line 8, "There was" --
 4    Q.  No, no, General, just read it to yourself, sir.
 5    A.  I'm sorry.
 6    Q.  I hate to be in a position to give orders to a general.
 7    A.  Yeah, I'll give you a set of orders.
 8          THE COURT:  So the question is, reading that response,
 9    does that refresh your memory today?
10          THE WITNESS:  Yes, Your Honor.
11          THE COURT:  I'm sorry, it does?
12          THE WITNESS:  Yes, it does.
13          THE COURT:  So what is your memory today now of that
14    issue?
15          THE WITNESS:  I do remember that one of the soldiers
16    had described about the use of dogs, and we related that to the
17    photograph that we saw on the dogs that were either inside the
18    detention center, the prison side, and also outside the
19    interrogation center.
20    Q.  And what was Mr. Stefanowicz's role with respect to the use
21    of dogs?
22    A.  Of course he denied it.
23    Q.  What did you find?
24    A.  We found it credible that perhaps from the testimony of the
25    soldiers, which we found credible, as they're the
```

1   junior soldiers there to follow orders, that's what they were

2   saying.  They were following instructions from the MI, as they

3   called him; that there might have been a use of dogs at that

4   point in time.

5          When I asked the dog handlers, they also collaborated

6   that they did not want to use the dogs inside the prison site

7   because that was not their job.  But they were basically given

8   orders to use the dogs.

9   Q.  Let's go to page -- just to refresh your recollection on the

10  same issue again, to page 75.  And just read, General, to

11  yourself lines 14 through 19.  Let me know when you're ready.

12  A.  14 to 19?

13  Q.  Yes.

14  A.  Yes.

15  Q.  Can you give the jury another example of an instruction that

16  Mr. Stefanowicz provided to the military police?

17  A.  Well, I recall nudity was basically a common use, because it

18  was also a comment that was made to me that they were paraded

19  back to their cell without their clothes on.  Essentially it's

20  associated with what we saw in the photograph as well.

21  Q.  Now, Mr. Stefanowicz was a civilian.  Did you have the

22  authority as a general in our country's military to discipline

23  him?

24  A.  No, we did not have that authority.

25  Q.  Why not?

1    A.  Civilian contractors were everywhere, and they were not --

2    you might say not under the control of the military authorities

3    unless they do something that's questionable, of a criminal

4    nature, that matter.

5    Q.  Why is it that civilian contractors are not within the

6    control of the United States military?

7    A.  I have no idea.

8    Q.  And can you tell the jury, what was the policy of the

9    United States government with respect to the infliction of abuse

10   of detainees at that time?

11   A.  Against civilians, we did not question that at all.  We left

12   that to the commanding general of CJTF to provide the policy and

13   command and control and military policy for general contractors.

14   Q.  General, can you describe -- withdrawn.

15          How would you describe what happened at Abu Ghraib in

16   2003 relative to other events of wartime abuse in the U.S.

17   military?

18          THE COURT:  I'm going to sustain that.

19          MR. O'CONNOR:  Thank you, Your Honor.

20          MR. FARIDI:  Your Honor, can I have just one moment to

21   confer with my colleague?

22          No further questions, Your Honor.

23          THE COURT:  Mr. O'Connor, cross-examination?  Do you

24   have a book?

25          MR. O'CONNOR:  Oh, we do.

**CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

1

2  BY MR O'CONNOR:

3  Q.  Good afternoon, General Taguba.

4  A.  How are you?

5  Q.  I'm good, how are you?

6  A.  Long time, no see.

7  Q.  It's been a little while, hasn't it?  I again want to thank

8  you for your service, including your service in putting together

9  the investigation here.

10        So you were appointed to investigate the 800th Military

11  Police Brigade.  Correct?

12  A.  That is correct.

13  Q.  And the decision was made by Lieutenant General Sanchez to

14  have a major general appointed on January 19th of 2004?

15  A.  General Sanchez requested it, but I was ordered by my own

16  commanding general, Lieutenant General David McKiernan.

17  Q.  Right.  So General Sanchez asked that an investigation be

18  commissioned on the 19th, and then you were appointed on

19  January 31 of 2004?

20  A.  That is correct.

21  Q.  Thank you.  And you were not appointed to investigate the

22  Military Intelligence Brigade that was serving at Abu Ghraib?

23  A.  On my orders, that is also correct.

24  Q.  And you were not appointed to investigate the civilian

25  contractors that were working with the Military Intelligence

1    Brigade?

2    A.  At that time, that is correct.

3    Q.  The report that you prepared, that was originally drafted by

4    your staff and then you edited it.  Is that correct?

5    A.  No, that was drafted by the staff judge advocate for the

6    command.

7    Q.  That was part of your investigation team?

8    A.  Right.

9    Q.  That's what I'm getting at, that your staff, including the

10   staff judge advocates, they drafted the report, and then you

11   reviewed it and edited it as requested?

12   A.  No, that's not right.

13   Q.  What am I getting wrong?

14   A.  My staff did not draft anything that related to my order.

15   That was drafted by the staff judge advocate.

16   Q.  Oh, I'm not talking about your appointment order, I'm

17   talking about your report.

18   A.  Yes.  Okay, I'm sorry.

19   Q.  Your report was drafted by your investigation staff?

20   A.  Correct.

21   Q.  And then you reviewed it and you edited it as appropriate?

22   A.  Yes.

23   Q.  And with respect to allegations of detainee abuse, your

24   report focused on the period from October to December of 2003?

25   A.  That's the period of time that -- yes.

1    Q.  And that's because in late December or early January,

2    Army CID received a boatload of pictures of horrific detainee

3    abuse.  Right?

4    A.  Correct.

5    Q.  And then CID began an investigation?

6    A.  Correct.

7    Q.  And they took statements from dozens and dozens of soldiers

8    and civilians?

9    A.  Correct.

10   Q.  And those were all handed over to you for you to use in your

11   investigation?

12   A.  Correct.

13   Q.  And how far were you in to your investigation of the

14   MP Brigade before you realized that the Military Intelligence

15   Brigade had civilian contractors working with it at the prison?

16   A.  It was about two weeks after my initial.

17   Q.  So you were halfway or more done with your investigation at

18   that point?

19   A.  I don't think so.  But I don't recall.

20   Q.  Fair enough.  It's been 20 years.  That's fair.

21        Other than seeing pictures and videos, and I don't want

22   to understate their horrific nature, but other than that, you

23   didn't personally observe detainee abuse occur when you were at

24   Abu Ghraib, did you?

25   A.  No, not personally.  Yes.

1    Q.  During your direct examination you testified that your staff

2    relied on a number of CID statements that had been made by

3    soldiers and contractors.  Correct?

4    A.  Yes.

5    Q.  And you mentioned one of those being Torin Nelson, who was a

6    CACI interrogator?

7    A.  Can you repeat that, please?

8    Q.  And one of those statements you were asked about on direct

9    was a statement by Torin Nelson, who was a CACI interrogator?

10   A.  Yes, from the CID.

11   Q.  Right.  A statement he gave to CID?

12   A.  Yes.

13   Q.  Do you know if Torin Nelson made any allegations about

14   Steve Stefanowicz?

15   A.  No.

16   Q.  Do you know what his opinion was of Steve Stefanowicz?

17   A.  No.

18   Q.  Would it surprise you to hear he thinks Steve Stefanowicz is

19   a good guy, affable?

20   A.  That's his opinion.

21   Q.  Everyone has their opinions on people.  Right?

22   A.  (No verbal response.)

23   Q.  You also mentioned that your investigation relied on some

24   statements that CID had taken from detainees.  Correct?

25   A.  Yes.

1    Q.  And one of those that you were asked about on direct was a

2    statement by Mr. Hanfoosh.  Correct?

3    A.  I don't recall that name.

4         MR. O'CONNOR:  Can we go to Exhibit 28, Paragraph 9.

5    Defendant's Exhibit 28, page 18, Paragraph 9.

6         THE COURT:  Is it in your book?  It's listed as

7    plaintiffs'.

8         MR. O'CONNOR:  Oh, I'm sorry.  It's Plaintiff's

9    Exhibit 28, you're right.

10        THE COURT:  Page 9, did you say?

11        MR. O'CONNOR:  Paragraph 9 on page 18, Your Honor.

12        THE COURT:  And this is the correct version?

13        MR. O'CONNOR:  Oh, I need to go over to 137.  The

14   version they gave us is...

15        THE COURT:  This is still not the right version.

16        MR. O'CONNOR:  Can you pull up 137?

17        MR. FARIDI:  Your Honor, if I can help him out just

18   to...

19        THE COURT:  Yeah.  But for purposes of the record, this

20   Plaintiffs' 28 is not in.

21        MR. O'CONNOR:  As the Court knows, there was a

22   redaction issue, so we have to rely on plaintiffs' exhibit.

23        THE COURT:  As long as you're doing that, take a look

24   at H.  There's a mistake in H.

25        MR. FARIDI:  That's not a mistake, that's the one that

1    the government has agreed to unredact.

2            THE COURT:  No, no, no, there's a mistake.

3            MR. O'CONNOR:  I understand what you're looking at,

4    Your Honor.

5    BY MR. O'CONNOR:

6    Q.  Could you look in the binder that you were given by

7    plaintiffs and go to Exhibit 137.

8    A.  Page 137?

9    Q.  No, Plaintiff's Exhibit 137.  You can actually look on the

10   screen to your left.  It's just as easy to do it there.  Do you

11   see the reference to Torin Nelson, and it says "Contractor,

12   Titan Corp.," in H?

13   A.  In H?

14   Q.  In Paragraph 7.

15   A.  Yeah.

16   Q.  He was actually a CACI employee, wasn't he?

17   A.  I don't know.

18           THE COURT:  Well, for the sake of the record, it's a

19   mistake.  He's a CACI employee, not Titan.  That's a mistake.

20   But it should be accurate.  I don't want the jury to get

21   confused.

22           MR. O'CONNOR:  Me either.

23   Q.  Let's go to the next page, Paragraph 9.  And you were asked

24   about 9(i), Asa'ad Hamza Hanfoosh.

25   A.  Yes.

1   Q.  And so that was one of the detainee statements given to CID

2   that your investigation relied on and found credible?

3   A.  Yes.

4          MR. O'CONNOR:  Can we put that up on the screen?

5          THE COURT:  Can you clarify this as well?  I don't want

6   the jury to get misled because they have not seen this name

7   before.

8          MR. O'CONNOR:  This is Al-Zuba'e, Your Honor.

9          THE COURT:  I know.  I wanted the jury to understand.

10  There is also a prisoner number 152529, and he did testify that

11  that is his number.  I don't know why the name that we know him

12  by, which is Mr. Al-Zuba'e, is not written here, but there are

13  many names, I think, for people from that part of the world.

14         But I just don't want the jury to misunderstand that

15  that little letter (i) references the plaintiff who we heard

16  from this morning on the deposition.

17         MR. O'CONNOR:  Thank you, Your Honor.  That's exactly

18  right.

19  Q.  And so this is a statement from Mr. Hanfoosh to CID that

20  your investigation considered and found credible for purposes of

21  its investigation.  Is that right, General?  Are you still

22  reading?

23  A.  Yes.  I don't recall, as I said, 20 years ago.

24  Q.  You don't recall if that's the statement or if it was a

25  different statement by Mr. Hanfoosh?

1    A.   I don't recall that.

2    Q.   But you relied on and found credible Mr. Hanfoosh's

3    statement that he gave to CID?

4    A.   Yes.

5    Q.   And your team didn't participate in any of the interviews

6    that CID had done in its investigation?

7    A.   Say that again, please.

8    Q.   Your team didn't participate in the interviews that CID

9    conducted?

10   A.   No, we did not.

11   Q.   Those were handed over to you for consideration?

12   A.   Correct.

13   Q.   You did use the photos that Army CID had collected of

14   detainee abuses?

15   A.   Correct.

16   Q.   Was most of the detainee abuse that you reported on

17   documented by photographs and videos taken by MPs?

18   A.   On the photographs, we did not ask for identification, we

19   just relied -- we just saw the pictures and also read their

20   statements.

21   Q.   And you saw hundreds of photographs of detainee abuse at

22   Abu Ghraib prison.  Correct?

23   A.   Yes.

24   Q.   And some of those photos actually show people inflicting

25   abuse on detainees?

1    A.   Absolutely.

2    Q.   Did any of the photos that you reviewed in conducting your

3    investigation show a CACI employee inflicting abuse on a

4    detainee?

5    A.   We did not see any.

6    Q.   And your investigation didn't see any photos of a -- that

7    included both a detainee and a CACI employee in it.  Right?

8    A.   Yes.  Not -- correct.

9    Q.   Isn't it true that you were only allowed to interview four

10   people working on the military intelligence side of the house at

11   Abu Ghraib prison?

12   A.   Correct.

13   Q.   And those were Colonel Pappas, the commander of the

14   MI Brigade?

15   A.   Yes.

16   Q.   And Lieutenant Colonel Steve Jordan, who was the executive

17   officer of the MI Brigade?

18   A.   Right.

19   Q.   And Mr. Stefanowicz, a civilian contractor from CACI?

20   A.   Right.  Right.

21   Q.   And John Israel, who was a translator working for

22   Titan Corporation?

23   A.   Right.

24   Q.   So you did not interview Captain Carolyn Wood, who was in

25   charge of the interrogation control element?

1    A.  No.

2    Q.  Did you want to?

3    A.  No.

4    Q.  Did you review any interrogation plans from the MI Brigade

5    in conducting your investigation?

6    A.  We did not.  We limited ourselves to the four that you

7    mentioned, and made a recommendation that a separate

8    investigation should be conducted because it was outside of the

9    parameters of my order.

10   Q.  You did ask to see interrogation plans, didn't you?

11   A.  I don't recall.

12   Q.  Okay.  And so as you just said, your purpose with respect to

13   the military intelligence side was to identify some things that

14   might be credible, and then hand that off so that somebody

15   appointed to investigate the MI Brigade could do that?

16   A.  At the recommendation of my legal team, that was the

17   authority that we should do -- should we pursue, because that's

18   outside the parameters of my instructions on investigating the

19   MPs.

20   Q.  In your investigation, did you receive any documents from

21   the military intelligence operation?

22   A.  No.  They conducted their own investigation.

23   Q.  And that was General Fay, General Jones, and General Kern's

24   investigation?

25   A.  Correct.

1    Q.  With respect to Mr. Stefanowicz, your investigation didn't

2    turn up any evidence that he had given MPs instructions relating

3    to detainees other than those who were assigned to him.

4    Correct?

5    A.  We took credible information from the soldiers who

6    implicated him.

7    Q.  And that was only with respect to detainees he was assigned

8    to interrogate.  Correct?

9    A.  From what I understand, yes.

10   Q.  And when you reported first to alleged misconduct by

11   Mr. Stefanowicz, it was -- what you had found credible evidence

12   of was unauthorized use of dogs and forced nudity.  Correct?

13   A.  If I recall, yes.

14   Q.  There were no others, were there?

15   A.  We suspected, but we did not have any evidence about him

16   personally conducting.

17   Q.  And, again, the unauthorized use of dogs and forced nudity

18   were for detainees that were assigned to Mr. Stefanowicz only?

19   A.  I didn't understand your question.

20   Q.  The information you developed about use of dogs and forced

21   nudity with respect to Mr. Stefanowicz were for detainees he was

22   assigned to interrogate?

23   A.  I wouldn't say that.  We just took credible evidence from

24   the soldier, the MP soldiers that we interviewed.

25   Q.  Right.  That he had engaged in that conduct or encouraged

```
 1    that conduct for people who he was appointed -- or he was

 2    assigned to interrogate.  Right?

 3    A.  Based on the comment that he was instructing the MPs by

 4    name, so we took that as credible evidence.

 5    Q.  For detainees that he was assigned to interrogate?

 6    A.  Correct.

 7    Q.  Thank you.

 8           Do you know who was assigned to interrogate the three

 9    plaintiffs in this case, if anyone?

10    A.  No.  As I mentioned --

11           MR. ELLIOTT:  Your Honor --

12           THE COURT:  He says he doesn't know.

13    Q.  If you could just answer this yes or no for now.  Do you

14    know if any of the plaintiffs in this case were interrogated?

15    A.  No.

16    Q.  Let's talk about the four MI personnel that you interviewed.

17    You made findings with respect to all four of them in your

18    report?

19    A.  Right.

20    Q.  And Colonel Pappas, he was never charged with a crime

21    relating to detainee abuse, was he?

22    A.  As far as I know, not at the time.  But he was given an

23    Article 15.

24    Q.  Nonjudicial punishment, but not charged with a crime?

25    A.  Right.
```

1    Q.  And Mr. Stefanowicz was never charged with a crime?

2    A.  I don't know.

3    Q.  You're not aware of any?

4    A.  I'm not aware.

5    Q.  You recommended that Mr. Stefanowicz have his security

6    clearance revoked, right?

7    A.  I did not ask him that.

8    Q.  Didn't you recommend that it be revoked?

9    A.  Yes.

10   Q.  Do you know if the Army took any action to revoke

11   Mr. Stefanowicz's security clearance?

12   A.  That I do not know.

13   Q.  John Israel, the Titan translator that you made findings

14   about, was he ever charged with a crime?

15   A.  No.

16   Q.  And he was exonerated in the Fay report, wasn't he?

17   A.  That I do not know.

18   Q.  And in the report, didn't you list Mr. Israel as a CACI

19   employee?

20   A.  He said that he was hired by Titan as an interpreter.

21   Q.  But your report erroneously said that he was a CACI

22   employee?

23   A.  I could have, but I don't know.

24   Q.  And other than Mr. Stefanowicz, did you make findings in

25   your report about any other CACI employee?

1    A.  Again, we stopped interviewing MI or contractors on

2    interrogation based on advice of my legal team that they be

3    investigated by a separate team.

4    Q.  So you passed on what you had developed so that General Fay

5    could make the definitive investigation of that?

6    A.  Correct.

7    Q.  When you finished your report, an Article 15-6 report,

8    that's what you conducted.  Right?

9    A.  Right.

10    Q.  And that then gets forwarded up the chain of command for

11    review and approval?

12    A.  Correct.

13    Q.  And at some point during that process, the report was

14    illegally leaked to the media.  Right?

15    A.  Unfortunately, yes.

16    Q.  And did you take any steps to investigate how that came to

17    happen?

18    A.  No.

19            MR. FARIDI:  Objection.

20            MR. O'CONNOR:  I'm all done, Your Honor.

21            THE COURT:  Well, I'm going to sustain the objection.

22            MR. O'CONNOR:  No further questions.

23            THE COURT:  Is there any redirect?

24            MR. FARIDI:  None, Your Honor.

25            THE COURT:  Then, General, thank you.

1          Is anyone going to call the general again?

2          MR. FARIDI:  No, Your Honor.

3          MR. O'CONNOR:  No, Your Honor.

4          THE COURT:  General, thank you for your testimony.

5     You're now released as a witness.  You can stay in court and

6     watch the proceedings or you may leave, but do not discuss your

7     testimony or anything you see or hear in court with any witness

8     who has not testified.  Thank you.

9          THE WITNESS:  Thank you, Your Honor.

10         THE COURT:  All right.  Your next witness?

11         MR. FARIDI:  Your Honor, plaintiffs call Ivan Frederick

12    via deposition.  The run time of this video is an hour and 15

13    minutes for plaintiffs' examination and 24 minutes for

14    defendant's cross-examination.

15         And, Your Honor, we will also be moving into evidence

16    PTX 5, 11, 16, 17, 19, 76; and pictures Z1 to Z6, D1, D2, and

17    D38 to PTX 161; and pages 2, 10, 13, and 14 of PTX 206.  These

18    were all admitted at the deposition, Your Honor.

19         MR. O'CONNOR:  We agree that these have all been

20    admitted during the previous deposition, Your Honor.

21         THE COURT:  That's fine.

22         MR. FARIDI:  And, Your Honor, as I mentioned, the run

23    time is approximately 1 hour and 15 minutes for plaintiffs'

24    direct.

25         THE COURT:  Let's get it started.  We're not going to

 1      break for a long time.  All right.

 2                (PLAINTIFF Exhibits 5, 11, 16, 17, 19, 76; pictures Z1

 3      to Z6, D1, D2, and D38 to PTX 161; pages 2, 10, 13, and 14 of

 4      PTX 206 were admitted into evidence.)

 5                (Excerpt of video deposition of IVAN FREDERICK played

 6      in open court.)

 7                (End of excerpt.)

 8                THE COURT:  I think this would be a logical time to

 9      take the afternoon break so the jury stays alert, and then we

10      will have, as I understand, the equivalent of a

11      cross-examination.  Correct?

12                MR. O'CONNOR:  That's right, Your Honor.

13                THE COURT:  All right.  We'll be on recess until 20

14      after.

15                (Recess taken at 4:05 p.m.)

16                THE COURT:  Bring the jury in.

17                MR. O'CONNOR:  Your Honor, we request an instruction on

18      questions of lawyers are not evidence.  This would be a good

19      time to remind the jury.

20                THE COURT:  No, they've heard it before.  They'll get

21      it at the end.

22                (Jury in at 4:23 p.m.)

23                THE COURT:  So, ladies and gentlemen, we're now going

24      to have the cross-examination of the witness, Frederick, and

25      that will be done by counsel for CACI.

1           (Excerpt cross-examination in videotaped deposition of

2    IVAN FREDERICK played in open court.)

3           (End of excerpt.)

4           THE COURT:  Call your next witness.

5           MR. FARIDI:  At this time plaintiffs call by video

6    designation Megan Ambuhl Graner.  The run time of this video is

7    4 minutes and 11 seconds, and I have a copy of the transcripts,

8    Your Honor.

9           Your Honor, this witness was shown PTX 159, which was

10   already admitted into evidence.

11          THE COURT:  That's fine.  So it's in this record as

12   well.

13          (Excerpt of the videotaped deposition of MEGAN AMBUHL

14   GRANER played in open court.)

15          (End of excerpt.)

16          THE COURT:  Was there any cross on this one?

17          MR. O'CONNOR:  Our cross was included in

18   counter-designations that were played within the playing,

19   Your Honor.

20          THE COURT:  All right.  That's fine.

21          Your next witness?

22          MR. FARIDI:  Your Honor, at this time plaintiffs call

23   by video deposition Sabrina Harman, and the run time of this

24   video is 6 minutes and 15 seconds.  And I have the transcripts,

25   Your Honor.

```
 1                (Excerpt of videotaped deposition of SABRINA HARMAN
 2     played in open court.)
 3                (End of excerpt.)
 4                MR. FARIDI:  At this time, Your Honor, plaintiffs call
 5     Jens Modvig.
 6                (Oath administered by courtroom deputy clerk.)
 7                MR. FISHER:  Your Honor, for the record, my name is
 8     Michael Fisher, Patterson, Belknap, Webb & Tyler, for the
 9     plaintiffs.
10                THE COURT:  Do you have exhibit books?
11                MR. FISHER:  No exhibits, Your Honor.
12                THE COURT:  No exhibits?  All right.
13                MR. FISHER:  May I proceed?
14                THE COURT:  Yes.
15        (JENS MODVIG, having been duly sworn, testified as follows:)
16                   EXAMINATION BY COUNSEL FOR PLAINTIFFS
17     BY MR. FISHER:
18     Q.  Can you please introduce yourself to the jury?
19     A.  My name is Jens Modvig.  I'm a medical doctor.
20     Q.  Where do you currently work?
21     A.  I work in DIGNITY, Danish Institute Against Torture.
22     Q.  And how long have you held this position?
23     A.  I've been there since 2008.
24     Q.  And can you please describe to the jury what your
25     responsibilities are as chief physician at DIGNITY?
```

1    A.  My responsibilities are to develop and implement expert

2    knowledge on torture, its documentation and prevention.

3    Q.  Now, did you prepare a PowerPoint presentation for your

4    testimony today?

5    A.  Yes, I did.

6    Q.  Can you briefly describe your educational background for the

7    jury?

8    A.  I was originally trained as a social worker.  And after that

9    I graduated as medical doctor in 1988, and three years later, as

10   Ph.D. from University of Copenhagen.

11   Q.  And where did you receive your medical doctor degree?

12   A.  At the University of Copenhagen.

13   Q.  In the interest of time, we're only going to focus on your

14   professional background for the past couple of decades.  Can you

15   please describe what you've done professionally?

16   A.  Well, from 2000 to 2004, I was secretary general of an

17   international organization called International Rehabilitation

18   Council For Victims of Torture.

19          THE COURT:  I'm sorry, you need to keep your voice up.

20   If you could get a little closer to the microphone.

21          THE WITNESS:  Okay.  Good.

22   A.  IRTC, I was secretary general.  Then I was deputy head of

23   the OSCE mission in Kosovo for three years, and director of the

24   United Nations office in Belgrade, Serbia for one year, and then

25   I continued in DIGNITY.

1    Q.  Do you have any other relevant experience?

2    A.  I have.  Because I have been elected to the United Nations

3    Committee Against Torture in 2014, and I was serving as its

4    chairperson from 2016 until '21.

5    Q.  Can you please describe for the jury what your

6    responsibilities were as the chairperson of the United Nations

7    Committee Against Torture?

8    A.  As chairperson, you lead the committee which comprises

9    10 individual experts elected by the state parties.  And the

10   mandate of the committee is to examine states' compliance with

11   the obligations in the convention.

12   Q.  Now, you mentioned that on the committee there are elected

13   experts.  What field of expertise are these people in?

14   A.  They are mostly lawyers, but they are also political

15   scientists.

16   Q.  And can you please describe, when you say that you enforce

17   the mandate of the United Nations Committee Against Torture, can

18   you go into a little bit of detail on that?

19   A.  Any state party to the convention - that's 174 states - have

20   an obligation every four years to report to the committee what

21   they have done in order to implement the obligations of the

22   convention.  And then the committee examines this report, and

23   there's a two-day question-and-answer session with a delegation

24   from the country in Geneva.  And then the committee concludes

25   after this dialogue and presents recommendations on how to

1    improve the implementation.

2    Q.  Have you published any books, articles, or other

3    publications related to the field of torture and/or other cruel,

4    inhuman, and degrading treatment?

5    A.  I have published quite a number of research papers and a

6    book, research handbook, on torture.  And I'm also on the

7    advisory board on *Torture Journal*, a scientific journal on

8    torture issues.

9            Further, I may mention that I have been part of the

10   editorial committee for the Istanbul Protocol, which were

11   originally published in 1999, but where we revised it and it was

12   published by the United Nations in 2022.

13   Q.  Can you brief describe to the jury what the

14   Istanbul Protocol is?

15   A.  Yes, it's an international standard, United-Nations-endorsed

16   protocol that guides the evaluation of psychological and

17   physical evidence on torture in the investigation of alleged

18   cases of torture.

19   Q.  Now, you mentioned that you're on the editorial committee.

20   What were your roles on the editorial committee?

21   A.  It was to guide the review and revision of the protocol,

22   which actually entailed more than 150 different drafters and

23   editors of each chapter.  And we were a group of editorial

24   committee that oversaw the overall revision of the protocol.

25   Q.  Were you retained by counsel for plaintiffs in this case?

1    A.  I was.

2    Q.  And what were you retained to do?

3    A.  I was retained to analyze the conduct that constitutes

4    torture and other cruel, inhuman, or degrading treatment

5    according to international standards.

6    Q.  Were you compensated in connection with your assignment?

7    A.  Yes, I was.

8    Q.  And was your compensation tied in any way to the conclusions

9    you reached or the outcome of this trial?

10   A.  No, it wasn't.

11        MR. FISHER:  Your Honor, at this time plaintiffs move

12   to qualify Dr. Modvig as an expert in the field of international

13   norms and rules governing torture and other cruel, inhuman, or

14   degrading treatment.

15        MS. BAILEY:  No objection.

16        THE COURT:  All right.  He's so qualified.

17        Ladies and gentlemen, what that means is, normally we

18   don't let witnesses testify as to their opinion about facts in

19   the case.  However, if somebody either through experience or

20   education and training has developed expertise in an area that

21   the average juror might not completely know, we allow that

22   person to testify as to his or her opinions about certain

23   issues.

24        You ultimately, though, are the fact finders, and you

25   have the right to reject the testimony of an expert witness, or

1    to accept only a portion of it, or all of it at all.  It will be

2    your option to do that.  But we will be allowing this witness to

3    give you his opinion.  Thank you.

4          MR. FISHER:  Thank you, Your Honor.

5    Q.  I want to focus now on your opinions in this case.  What

6    does international law say about torture and other cruel,

7    inhuman, or degrading treatment?

8    A.  It says that torture and other cruel, inhuman, or degrading

9    treatment are prohibited and violates international law, and

10   that there is no justification for their use.

11   Q.  When you say that they are never justified, can you

12   elaborate on that a little bit more for the jury?

13   A.  Well, it means that no circumstances such as state of

14   emergency or suspicion of terrorism or whatever might justify

15   the use of torture.

16   Q.  Based on your knowledge of international norms, can you

17   please provide for the jury the definition of torture as

18   understood in the international community?

19   A.  Certainly.  It's rather lengthy, but it's stated in the

20   United Nations Convention Against Torture and Other Cruel,

21   Inhuman, Or Degrading Treatment, in Article 1.  And it

22   essentially entails any act by which severe pain or suffering,

23   physical or mental, is intentionally inflicted for a specific

24   purpose such as obtaining a confession, information, punishment,

25   coercion, or discrimination of any kind, inflicted by or at the

```
 1    instigation of or with the consent or acquiescence of a public
 2    official or a person acting in an official capacity.
 3            So essentially for issues, severe pain or suffering
 4    intentionally inflicted for a specific purpose by a public
 5    official.
 6    Q.  I want to focus first on that first element, severe pain or
 7    suffering.  Is that limited to physical pain?
 8    A.  No, it's not.  It's clearly stated that also mental
 9    suffering and psychological pain is included.
10    Q.  Is the pain limited to the pain suffered at the moment of
11    torture?
12    A.  No, it may extend after and actually develop into chronic
13    pain.
14    Q.  Is there a certain threshold for when pain may become
15    severe?
16    A.  No, because pain is essentially a subjective concept that
17    depends on the individual in terms of gender, age, health,
18    et cetera.  So the perception of pain is subjective.
19    Q.  Have there been any proposals to set defined thresholds for
20    what may constitute severe pain or suffering?
21    A.  There have been attempts to define a level of extreme pain
22    equal to what might be imagined as organ failure, pain, or even
23    death.  But this has been rejected by the international
24    community, being not consistent with the perception of severe
25    pain or suffering.
```

1   Q.  I want to now focus on severe mental pain and suffering,

2   which you had just briefly discussed.  Does severe mental harm

3   have to result from physical acts of torture or the threatened

4   use of physical acts of torture?

5   A.  It doesn't.  Because you can inflict severe pain or

6   suffering even without touching the victim, by use of

7   psychological methods such as threats or humiliations or

8   isolation that deprives you of any impressions.

9   Q.  So are there any common elements between physical and

10   psychological methods of torture?

11   A.  There is.  The creation of powerlessness, where the

12   individual is completely under the control of the perpetrator,

13   and where the individual does not retain any integrity, perhaps

14   not even dignity or identity.  And that feeling is created

15   independently of whether the methods are physical or

16   psychological.

17   Q.  I want to shift gears for a moment to other cruel, inhuman,

18   or degrading treatment.  What is the definition of other cruel,

19   inhuman, or degrading treatment?

20   A.  Cruel or inhuman treatment are considered as severe pain or

21   suffering, but the requirement of a purpose and intent is not

22   necessarily present.

23        Degrading treatment is slightly different because this

24   attacks the dignity, the human dignity of the person, and it's

25   humiliating, diminishing treatment that is incompatible with

1    respect for human beings.

2    Q.  Is other cruel, inhuman, or degrading treatment different

3    from torture in the level of severity of the pain or suffering

4    inflicted?

5    A.  Not necessarily.  The main difference seems to be the

6    purpose that is absent.

7    Q.  And how is severe pain and suffering analyzed in this

8    context, in the context of other cruel, inhuman, or degrading

9    treatment?

10   A.  It's analyzed the same way as torture; that is, the method

11   applied is not in and by itself torture or treatment, it depends

12   on the circumstances.  And they can be summarized to the

13   purpose, if any; the duration and the intensity of the

14   treatment; the condition of the victim; and any combinations of

15   methods that might apply.

16   Q.  Must an action be all of cruel, inhuman, and degrading in

17   order to violate international law?

18   A.  No, they can be separate, one by one.

19   Q.  So if an action is either cruel, inhuman, or degrading, it

20   violates international law?

21   A.  Exactly.

22   Q.  I want to focus a little bit on degrading treatment.  Is

23   there a certain standard for what may be considered degrading

24   treatment?

25   A.  No.  Basically this depends on the individual and this

1    person's ethnic origin, religious beliefs, and other

2    preconditions for the treatment.  For instance, violation of

3    taboos, including sexual taboos, may be intensely degrading to

4    some people.

5    Q.  Now, are there examples of what have been considered torture

6    and other cruel, inhuman, or degrading treatment?

7    A.  That could be threats, threats of killing, threats of

8    injury, isolation, humiliation, deprivation of food, drink,

9    light, darkness, rest, sleep.  There are many, many examples.

10   Q.  And are these examples listed on this slide?

11   A.  Many of these are here on this slide.  And the foregoing

12   feature is that they are physical, they are psychological, they

13   are even sexual methods, but all may constitute torture or ill

14   treatment that is other cruel, inhuman, or degrading treatment,

15   depending on the circumstances I just mentioned.

16   Q.  Can you elaborate a little bit more on the circumstances

17   that you just mentioned?

18   A.  Well, as I mentioned, the difference between torture and ill

19   treatment - that is, other cruel, inhuman, or degrading

20   treatment - is typically the absence of a purpose, when we talk

21   about ill treatment.  But the circumstances might also entail

22   differences in duration and intensity.

23           An obvious example is beatings, where slight beatings

24   may be not even ill treatment, but systematic, brute,

25   unrestrained beatings systematically in one place of the body

1    may constitute torture.

2    Q.  I want to focus on a few examples on this page.  I want to

3    first talk about isolation or solitary confinement, which you

4    had briefly mentioned.  How may solitary confinement violate the

5    prohibition against torture and/or other cruel, inhuman, or

6    degrading treatment?

7    A.  Well, looking at the criteria I just mentioned, one would

8    look at whether there's a purpose for isolating the person.  Is

9    this to put a pressure on the person in order to obtain

10   information or a confession?

11        Then you would look at the duration, how long time is

12   it.  Some have argued that isolation for more than 15 days may

13   constitute torture.  The intensity of the isolation would

14   involve, for instance, whether there's access to any meaningful

15   activities during the isolation, whether there's access to any

16   meaningful social contacts, or whether you are completely on

17   your own.

18        In terms of the condition of the victim, one might

19   consider if there are any mental health conditions, could be

20   phobias, could be hyperactivity, could be a minor, that would

21   all be more vulnerable to the isolation.

22        And in terms of combination of methods, you might

23   consider the cell.  Is it a small, dark cell with no windows,

24   where you are not able to tell the time of the day?  Do you have

25   access to a toilet or are there even unsanitary conditions

1   associated with it?  All of those assessments would clarify if

2   the isolation or solitary confinement would amount to ill

3   treatment or torture.

4   Q.  Let's now focus on threats, which, again, you had briefly

5   mentioned earlier.  Can you provide some examples of threats and

6   how they may amount to violations of international law?

7   A.  A classical threat is so-called mock execution, where you

8   think you are being executed but it turned out that you weren't.

9   This threat is typically considered torture.

10          Here we see a dog.  And normally you would say that the

11  use of dogs by -- trained dogs, of course, by law enforcement is

12  a perfectly legitimate means in terms of, for instance, crowd

13  control or pursuing a suspect that escapes.  But when the victim

14  is in custody, it's a different issue.  And the threat here with

15  the dog would of course be threat to be bitten by the dog.  And

16  I think everybody would be afraid if there's a growling dog, big

17  dog in front of you threatening to bite you.

18          But the individual, the conditions of the victim, might

19  make this even a stronger threat if you, for instance, are not

20  used to having dogs as pets, if dogs are typically stray dogs

21  that you have to be afraid of.  And the combinations here might

22  be that you are restrained, you are unable to move, you may be

23  naked.  And these conditions would all, again, clarify if the

24  threat of a dog would amount to ill treatment or even torture.

25  Q.  Now, all these threats that you had mentioned are directed

1    towards the detainee in your examples.  Does a threat have to be

2    directed towards that specific detainee?

3    A.  No, the threat could be directed towards relatives.  For

4    instance:  We have your family in the room next door and we're

5    going to rape them or kill them unless you comply.

6    Q.  I want to now focus on suspension and stress positions.  How

7    may those amount to torture and/or other cruel, inhuman, or

8    degrading treatment?

9    A.  Here we have suspension or stress positions which are

10   sometimes lumped and sometimes distinguished as two.  But

11   suspension in arms or feet is typically torture.  And the

12   suspension that we see here may be the so-called strappado,

13   where you're suspended in your hands but the hands are tied

14   behind the back.  And this is a particularly painful form of

15   torture because your shoulders dislocate and it's so painful

16   that you typically faint.

17          Another extreme is the standing, which is, of course, a

18   daily activity.

19   Q.  I'm doing that right now.

20   A.  Yes.  But forced standing, of course, might serve a purpose,

21   that you are ordered to stand.  And again, here, the duration is

22   decisive.  Are you standing here for minutes or hours or maybe

23   many hours?  And what about the intensity of the forced

24   standing?  Are you allowed to move a little bit just to help the

25   circulation back, or are you ordered to stand completely still?

1          And the conditions of the victim here would, for

2     instance, involve whether you are in good health, whether you

3     are dehydrated, whether you are exhausted in advance.  And the

4     combinations might be, are you forced to stand naked?  Are you

5     threatened, for instance, with injury?  If you cannot stand

6     anymore or if you move, are you threatened with electrocution or

7     to be shot?

8          So that would be a combination that all in all would

9     decide whether the forced standing might be ill treatment or

10    torture.

11    Q.  Are the methods that you list on this slide, are they

12    exhaustive of what violates international law?

13    A.  No, they are not.  There are no limits to what perpetrators

14    might think of.  But there's a common denominator among all

15    those methods, be they physical, psychological, or even sexual.

16    And the common denominator is the creation of a mental impact

17    where powerlessness and lack of dignity, lack of identity, and

18    sometimes even lack of sense of reality, what is true, what is

19    wrong, is created.

20         And in torture, this mental health condition is created

21    and taken advantage of when pursuing a purpose like obtaining a

22    confession or information.

23    Q.  Thank you, Dr. Modvig.

24         MR. FISHER:  Your Honor, I have no more questions.  I

25    do have copies of the slide deck if Your Honor would like them.

```
 1              THE COURT:  Well, they would not go to the jury --
 2              MR. FISHER:  Right.  But in case --
 3              THE COURT:  -- but for part of the record, we'll
 4      include that as just the record.
 5              All right.  Cross-examination?
 6              MS. BAILEY:  Yes, Your Honor.  We have exhibit binders.
 7              May I proceed, Your Honor?
 8              THE COURT:  You may.
 9                CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT
10      BY MS. BAILEY:
11      Q.  Good afternoon, Dr. Modvig.  My name is Linda Bailey and I
12      represent CACI.
13              I have some clarifying questions.  You never visited
14      Abu Ghraib in 2003 or 2004, right?
15      A.  No, I didn't.
16      Q.  And you don't have any firsthand knowledge of anything that
17      happened there?
18      A.  No.
19      Q.  Okay.  You don't have any firsthand knowledge if anyone ever
20      mistreated these plaintiffs?
21      A.  No.
22      Q.  And you don't have any firsthand knowledge if anyone ever --
23      who was employed by CACI did anything wrong?
24      A.  No.
25      Q.  Okay.
```

1        MS. BAILEY:  Could we bring up the definition?  Thank

2    you.

3    Q.  All right.  You're testifying as an expert on international

4    law today.

5    A.  (No verbal response.)

6    Q.  And you mentioned a lot of your qualifications.  Are you

7    also on the faculty of American University Washington School of

8    Law?

9    A.  I'm not on the faculty, but I have been guest lecturer there

10   for a period of time.

11   Q.  Okay.  And you specialize in human rights law?

12   A.  No, on the aspects of torture.  So what I have taught in

13   there is the use of the Istanbul Protocol in the investigation

14   of alleged cases of torture.

15   Q.  Would you say the Istanbul Protocol is important?

16   A.  Yes, definitely.

17   Q.  Why?

18   A.  It's used as a tool to guide complete and thorough

19   evaluation of potential or alleged cases of torture for court

20   cases or for other purposes of accountability.

21   Q.  Would you have concerns about an assessment that didn't

22   follow the Istanbul Protocol, an assessment into torture

23   allegations?

24   A.  Well, there's a difference between the first and the second

25   version of the Istanbul Protocol.  Because the first one

1    actually follows very much a forensic medical paradigm, whereas

2    the revised version is a little bit broader and also includes

3    the role that other health professionals may play.  And this, in

4    fact, understands that in health care settings, the conditions

5    for doing a thorough examination, including an evaluation of

6    consistency between the findings and the allegations, might not

7    be there.  And that means you would here potentially find

8    examples of reports that do not fully comply with all the

9    requirements of the Istanbul Protocol, but, nevertheless, are

10   useful steps towards it.

11          For instance, the preservation of evidence in terms of

12   photographic evidence, in terms of medical descriptions, might

13   be valuable even for a forensic doctor at a later stage, even if

14   they are not at the time they are preserved, are fully

15   consistent with the protocol.

16   Q.  Earlier we discussed -- or you discussed on direct

17   international norms regarding torture and CIDT.  Is that

18   correct?

19   A.  Yes.

20   Q.  And these are universal norms?

21   A.  Yes.

22   Q.  Meaning they apply to everybody.  Right?

23   A.  Yes.

24   Q.  I think in your report -- you drafted a report for this

25   case.  Is that correct?

1    A.  Yes.

2    Q.  And in that report you reflected your opinions?

3    A.  Yes.

4    Q.  Okay.  And I think in your report you referred to it as a

5    global consensus, so something everybody agrees on?

6    A.  Yes.

7    Q.  And that would include the United States?

8    A.  Yes.

9    Q.  All right.  There are some differences, though, in how

10   different organizations define torture, aren't there?

11   A.  Different organizations?  What do you mean?  Different

12   countries, states?

13   Q.  Amnesty International versus the UN --

14   A.  Oh, yes, that's true.

15   Q.  -- versus the courts?

16   A.  Yes, the one medical association has a definition of torture

17   that is broader than the one in the UN Convention.  And that, of

18   course, has its reasons, because the United Nations is an

19   intergovernmental organization that aims at state responsibility

20   and state obligations, whereas other definitions that may be

21   broader, may include torture perpetrated by private actors.

22   Q.  Okay.  You chose to use the definition of torture from the

23   Convention Against Torture.  Is that correct?

24   A.  Yes.

25   Q.  Okay.  And that's also the definition that you used in your

1    report?

2    A.  Yes.

3    Q.  But you shaved the last sentence off, didn't you?

4    A.  Yes.

5    Q.  Okay.  And the last sentence is an important exception to

6    the definition, isn't it?

7    A.  No.

8    Q.  No?  Okay.  Let's look at your -- in your exhibit binder,

9    and let's look at Defense Exhibit 66 at page 5.

10            MS. BAILEY:  And this is just for the witness.

11   A.  66, page 5.

12   Q.  Yeah, it's towards the back.

13   A.  Yes.

14   Q.  And I have the original here.  This is a book that you wrote

15   on -- or excuse me.  This is a book where you wrote a chapter

16   that dealt with torture.  Is that correct?

17   A.  Yes.

18   Q.  And I've got a segment of that chapter in your binder.

19   A.  Yes.

20   Q.  And it discusses the exception that we just mentioned that

21   you excluded from your definition?

22   A.  Uh-huh.

23            THE COURT:  I'm sorry, we have to have "yes" or "no."

24   It doesn't show up in the transcript.

25            THE WITNESS:  Yes.  I'm sorry.

```
 1              THE COURT:  Is there any objection to 66?  Are you

 2   moving it into evidence?

 3              MS. BAILEY:  I'm not, Your Honor.  I'm just questioning

 4   him.

 5              THE COURT:  All right.  That's fine.

 6   Q.  And if you look, do you or do you not say in the second

 7   paragraph:  "In the UN Convention Against Torture and other

 8   cruel and inhuman or degrading treatment or punishment, an

 9   important exception is given; that is, pain and suffering

10   inherent to lawful sanctions."

11              You say that.  Right?

12   A.  Yes.

13   Q.  And that exception for lawful punishment, according to you,

14   that can include things like amputation, flogging, and stoning.

15   Correct?

16   A.  Yes.

17   Q.  So under your understanding of the definition of torture,

18   the definition that you chose, the things you -- you know, in

19   your report you describe that handcuffing can be torture, but

20   stoning a woman to death for adultery, that's perfectly legal?

21   A.  This chapter was written in 2004.

22   Q.  Sir, do you know when the events of this case took place?

23   A.  Yes, 2004.

24   Q.  2003.

25   A.  Okay.  Yes.
```

1    Q.  So at that time, that would have been your standard, that

2    handcuffing -- you're saying today, handcuffing a detainee could

3    be torture, but it's perfectly legal to stone a woman to death

4    for adultery?

5    A.  After my time in the Committee Against Torture, I have

6    become much wiser in terms of what constitutes torture.  And

7    what I have learned is that already in 2002, a prominent

8    scholar, Sir Nigel Rodley, that was UN special rapporteur on

9    torture, appointed by the Human Rights Council, has clearly

10   stated that lawful sanctions should be interpreted under

11   international law standards.  And flogging, stoning, et cetera

12   would never be considered legal under international law.  They

13   would fall under the *jus cogens*.

14           And for that reason, I would withdraw my statement

15   here.  And I have since then learned that this exception is not

16   so important.  That is why I answered no, I don't think it's

17   very important.

18           In the Committee Against Torture, we have reviewed

19   countries where Sharia law applies, and it has never been an

20   obstacle or a limitation of the recommendations of the Committee

21   Against Torture that there were local Sharia laws that allowed

22   those kinds of activities, and that I wasn't completely aware of

23   when I wrote this chapter, but I am today.

24   Q.  So you changed your mind from 2004 to now.  Is that fair?

25   A.  Yes.  Yes.

1    Q.  But in 2004, which is after the events of this case, that

2    was your opinion?

3    A.  It was.

4    Q.  And your opinion was also that hooding -- you know, hooding

5    a detainee could be torture, but chopping a person's hand off

6    for theft was fine?

7    A.  That was not my opinion, that it was fine.  I think that's

8    putting mouth -- putting words in my mouth.

9    Q.  I'm sorry, you're correct, sir.  But it was legal --

10          MR. FISHER:  Can she let the witness answer.

11          THE COURT:  Yes, I think you need to do that.

12   A.  I have never said that any of these were okay.  I have made

13   the point that they may fall under the exception that lawful

14   sanctions, which is mentioned in the definition.

15          But I have changed my opinion now, and I am in

16   consistency with international law now that clearly says this is

17   not consistent with international standards, and, hence, the

18   exception in the definition, as you mentioned, is not of great

19   practical significance.

20   Q.  And that's the case now?

21   A.  Yes.

22   Q.  Okay.  Understood.

23          You went through a lot of different conduct that could

24   constitute torture, CIDT, and you had a conversation on direct

25   about degrading treatment.  Is that fair?

1    A.  Yes.

2    Q.  In your report, when looking at things like degrading

3    treatment, you relied in part on decisions from the European

4    Court of Human Rights.  Is that accurate?

5    A.  Yes.

6    Q.  Okay.  In your report you say, "The European Court of Human

7    Rights operates with a minimum level of severity when assessing

8    torture or CIDT."

9         What did you mean by that?

10   A.  A minimum level of severity, is, as I have stated

11   previously, a holistic approach that involves both an assessment

12   of the individual conditions and the duration and intensity.

13   Q.  Okay.  The European Court of Human Rights arose out of the

14   European Convention on Human Rights.  Is that right?

15   A.  Yes.

16   Q.  The United States never signed that convention, did it?

17   A.  True.

18   Q.  Okay.  And in fact, sometimes the United States government

19   disagrees with the European Court of Human Rights about what

20   conduct violates CIDT, doesn't it?

21   A.  Likely so.  I believe you.

22   Q.  Okay.  In fact, when the United States ratified the

23   Convention on Torture, the U.S. Senate Foreign Relations

24   Committee said that the European Court of Human Rights

25   interprets CIDT to, quote, "include treatment that would

1    probably not be prohibited by the U.S. Constitution and may not

2    even be illegal in the United States."

3           Is that accurate?

4    A.  It's accurate that it was said.  But I would like to add

5    that when the Committee Against Torture reviewed the

6    United States in 2014, where I had the honor of being one of two

7    rapporteurs, the difference of the definitions of torture, in

8    the reservation that the United States has made when ratifying

9    the convention, did not have any practical significance.  In the

10   debate between the committee and the delegation headed by Tom

11   Malinowski, there were no issues related to whether these fall

12   under the U.S. understanding of torture or the United Nations.

13          So my opinion is that it's true what you say, there is

14   formally this difference, and there's a reservation to the

15   definition by the United States, but in practical terms it

16   doesn't have any great significance.

17   Q.  Okay.  And just to put a finer point on it, the actual

18   reservation itself is that the United States, in joining the

19   Convention Against Torture, only considers CIDT to be within the

20   scope of things that would be cruel and unusual punishment under

21   the U.S. Constitution.  Right?

22   A.  I agree, yes.

23   Q.  Okay.  Are you familiar with the U.S. War Crimes Act?

24   A.  No.

25   Q.  Okay.  I would like to ask you a few questions about it

1    related to your report.  But I have it for you.  Specifically

2    we're going to look at whether this current U.S. law conflicts

3    with some of your testimony today.

4            So let's take a look at Defense Exhibit 41 in your

5    binder.  And if you could please turn to page 34,

6    subparagraph B.

7            MR. FISHER:  Objection, Your Honor.  He only testified

8    as to torture and other cruel, inhuman, and degrading treatment,

9    and not war crimes.  And it seems like this is going into war

10   crimes.

11           THE COURT:  You-all approach the bench.

12           (BENCH CONFERENCE ON THE RECORD.)

13           THE COURT:  From what I've heard so far is, are you

14   arguing there were any war crimes committed at this point?

15           MR. FISHER:  We are, Your Honor.  But he's only

16   testifying to torture and CIDT.

17           THE COURT:  I haven't heard anything yet regarding any

18   evidence of war crimes here, it seems to me.

19           MR. FISHER:  Okay.

20           THE COURT:  Are you going to move ahead?

21           MR. FISHER:  Yes, Your Honor.

22           (END BENCH CONFERENCE.)

23   Q.  Okay, sir.  Were you able to turn to page 34,

24   subparagraph B?  Just let me know when you're there.  Do you see

25   language that says, "Revision to the war crimes offense under

```
 1   federal criminal code"?

 2   A.  The amendment, you mean?

 3   Q.  I'm sorry?

 4   A.  "Revision to war crimes offense under federal criminal

 5   code."

 6   Q.  Yes, sir.  Do you see that?

 7   A.  Yes.

 8   Q.  Let's skip down to new Subsection D.  Do you see that that

 9   discusses common Article 3 violations and prohibited conduct?

10   A.  Yes.

11   Q.  Let's focus in on the definition of cruel, inhuman, or

12   degrading treatment.  Could you please read that definition to

13   the jury?

14          MR. FISHER:  Objection, Your Honor.  It just says cruel

15   and inhuman treatment.  As he described on direct, degrading --

16          THE COURT:  You can do that on cross-examination.

17   Overruled.

18   Q.  Could you please read the definition of cruel or inhuman

19   treatment?

20   A.  "The act of a person who commits or conspires or attempts to

21   commit an act intended to inflict severe or serious physical or

22   mental pain or suffering other than pain or suffering incidental

23   to lawful sanctions, including serious physical abuse upon

24   another within his custody or control."

25   Q.  Thank you.  Now let's turn to page 35 and go to
```

1     Subsection 2(D).  It's towards the bottom.

2     A.  "The term serious physical pain and suffering," that's it?

3     Q.  Yes, sir.  I was going to ask you to tell us what the

4     definition of serious pain or suffering is.

5     A.  There's no fixed definition because it depends on the

6     perception by the individual.

7     Q.  Under this U.S. law, sir, could you please read for us what

8     the definition of serious physical pain or suffering is?

9     A.  Okay.  Certainly.  "The term serious physical pain or

10     suffering shall be applied for purposes of Paragraph 1(B) as

11     meaning bodily injury that involves a substantial risk of death,

12     extreme physical pain, a burn or physical disfigurement of a

13     serious nature other than cuts, abrasions, or bruises, or

14     significant loss or impairment of a bodily member or organ or

15     mental faculty."

16     Q.  Sir, didn't you just testify that under international norms,

17     that that is not a valid description, and that torture does not

18     have to involve pain at the level you would experience with

19     organ failure and impairment of bodily function or death?  Did

20     you say that?

21     A.  Yes.  According to international standards.

22     Q.  Yes.  And international law, as you described it, is a

23     global consensus.  Right?

24     A.  I'm not sure I understand the question.

25     Q.  We talked earlier, you said it's a global consensus.  It's

1    something everyone agrees on?

2    A.  Yes.

3    Q.  This is what the U.S. thinks.  So do you still think that

4    your opinion on that issue is a global consensus?

5    A.  Yes.  I have seen nowhere signs in my career from the

6    Committee Against Torture that there's not consensus about the

7    *jus cogens* prohibition of torture and mistreatment.

8    Q.  Do you see that international law as you describe it

9    conflicts with current U.S. law on this issue?

10   A.  I think this discussion is taken out of a context, where I

11   have had no opportunity to analyze what you are actually

12   presenting to me, the war crimes law that I told you I was not

13   familiar with.  So I do not feel able to answer your question

14   right now.

15   Q.  So you're an expert on CIDT in the world, but not in the

16   United States?

17   A.  Apparently not in this paragraph you mentioned to me.

18   That's true.

19   Q.  Okay.  Fair enough.

20         Let's talk about the Convention Against Torture.  Let's

21   talk about Article 16.  You've opined on CIDT as it's described

22   under Article 16.  Is that correct?

23   A.  Yes.

24   Q.  And as you and I just discussed, the United States ratified

25   the Convention Against Torture with its reservation, saying that

1    the CIDT is only to the extent of the U.S. Constitution.

2    Correct?

3    A.   Uh-huh.

4    Q.   Okay.   And the War Crimes Act actually says the same thing,

5    but --

6              THE COURT:   Counsel, don't testify.

7              MS. BAILEY:   Yeah, withdrawn.

8    Q.   So something is not cruel and unusual treatment -- or if

9    something is not cruel and unusual treatment under the

10   U.S. Constitution, then it's not CIDT.   Correct?

11             MR. FISHER:   Objection, Your Honor.

12             THE COURT:   Sustained.

13   Q.   When the United States ratified the Convention Against

14   Torture, it also made clear that Article 16 is not

15   self-executing, didn't it?

16   A.   I'm not aware of that.

17             MR. FISHER:   Objection, Your Honor.

18             THE COURT:   Again, this witness is not a lawyer, and

19   you're asking him at this point, in my feeling, to get into

20   nuances of international law that are beyond the scope of the

21   expertise for which he has been called.

22             So I'm going to sustain this line of questioning.   Move

23   on.

24             MS. BAILEY:   Understood, Your Honor.

25   Q.   You mentioned special, is it rapporteur?

1    A.   Uh-huh.

2    Q.   They're individual experts that are appointed by the

3    UN Human Rights Council?

4    A.   Correct.

5    Q.   They monitor and raise awareness on human rights issues?

6    A.   Yeah.

7    Q.   They're independent from the UN?

8    A.   Yes.

9    Q.   They're independent from any other organization?

10   A.   Yes.

11   Q.   They're independent from any government?

12   A.   Yes.

13   Q.   They're the opinions of one person?

14   A.   No.

15   Q.   Is there more than one special rapporteur that signs their

16   name to it?

17   A.   The thing is, the special rapporteurs elected by the

18   United Nations Human Rights Council are prominent experts, often

19   scholars, that, through a competitive process, are appointed for

20   a period to gather the developments and state of affairs on

21   torture-related issues.  And they do so not by opining on their

22   own and providing, putting forward individual views; rather,

23   they develop reports after having consulted widely among agents,

24   experts, players, civil society organizations, and taking stock

25   of the developments.

1          For instance, I quoted quite a lot the report by

2     Professor Manfred Nowak in 2010, where he issued a report on the

3     concepts of torture and ill treatment and the practical

4     examples.  This was a very, very useful report that was rather a

5     landmark report, not done before, where he took stock of the

6     developments in international law, the jurisprudence of

7     different agents and judicial bodies.  And this report is not

8     just the opinion of a single person, it rather represents the

9     state of affairs of the international law development.

10    Q.  And it was very useful because it reflected the developments

11    of international law?

12    A.  The state of affairs.

13    Q.  And how things had changed in international law regarding

14    torture and CIDT?

15    A.  Developed.

16    Q.  Developed?

17    A.  Yes.

18    Q.  Is that different than changed?

19    A.  Well, development is more incremental, I would say.  Because

20    it's not a success.  It's like a protection within the field of

21    human rights is not going backwards, it is in fact going forward

22    slowly by the different decisions made by judicial bodies.

23          That's what we call the jurisprudence.  That is

24    developing slowly, and that means that stock-taking on regular

25    intervals - for instance, every decade or something like that -

1    might be a relevant issue to see where are we.

2            And he was taking stock of perhaps the last 10,

3    20 years of exactly this field.  So this was a useful state of

4    affairs report.

5    Q.  And so as you just described, the protections under human

6    rights against torture and CIDT, they're expanding, which is

7    positive for everyone.  Correct?

8    A.  Expanding slowly, yes.

9    Q.  Expanding slowly.  And so this year, the rights are better

10   off than they were 10 years ago?

11   A.  Hopefully in some areas, yes.

12   Q.  Okay.  And more so, hopefully, than 20 years ago?

13   A.  Hopefully.

14   Q.  Okay.  Great.  You listed -- you relied on the Committee

15   Against Torture to consider what acts might constitute CIDT.

16   Correct?

17   A.  At least there were contributions from the jurisprudence of

18   the committee, yes.

19   Q.  Yes.  Understood.  And as counsel pointed out, you listed

20   some examples of things the committee says are CIDT in your

21   report.  But that's not an exhaustive list.  There are other

22   things?

23   A.  Yes.

24   Q.  And there are other things that the committee itself has

25   determined is CIDT.  Correct?

1    A.  Yes.  With the proviso that I just testified that the

2    circumstances are decisive.  It's not a method is torture.  A

3    method is ill treatment.  The method is applied and the

4    circumstances, duration, intensity, et cetera, decides whether

5    this amounts to ill treatment or torture.

6    Q.  Okay.  And one of the things that the committee has said is

7    CIDT is corporal punishment for discipline in the home.

8    Correct?

9    A.  Yes.

10   Q.  That's spanking?

11   A.  Spanking, yes.

12   Q.  Okay.  So any parent in here who has spanked their child has

13   committed CIDT, under the committee's standards?

14   A.  No.  What makes the committee in some occasions to deal with

15   corporate punishment of children is that even if the corporal

16   punishment is exercised by parents, the state has the

17   responsibility to protect their children.  And if they know that

18   severe pain or suffering are inflicted, it's essentially the

19   same as if women are being raped.  They're not being raped by

20   the state, but the state has a responsibility to protect its

21   citizens.

22          And if it knows that children are being not spanked but

23   severely corporal punished, and if they know that women are

24   being raped, then the state has the protective responsibility,

25   and that makes it, by the end of the day, responsible if they

1    knew or should have known that these acts were going on and they

2    did nothing to protect it.

3    Q.  So if I understand you correctly, you can't just look at

4    something that the committee has said is conduct that would be

5    CIDT.  It's really individual to every circumstance.  So

6    corporal punishment in one circumstance may or may not be CIDT,

7    just like some of the things that were on your slide.  Is that

8    correct?

9    A.  Corporal punishment is many things, and I testified that if

10   we look at beatings with maybe related to corporal punishment,

11   beatings might amount to ill treatment, but it depends on the

12   duration and the intensity.  A slap on the face is not ill

13   treatment, but if you prolong the duration and if you beat all

14   over and all over again, it may amount to ill treatment.

15            So, yes, of course there are situations where a certain

16   treatment may amount to ill treatment or torture, and others

17   where it will not.  I mentioned the example of the dogs.  The

18   dog threat may be perfectly legal in some circumstances, but,

19   depending on the purpose, depending on the duration, intensity,

20   the condition of the victim, and any combinations, it may

21   develop into the level of ill treatment or even torture.

22   Q.  Okay.  You mentioned that when you were the chair of the

23   Committee Against Torture, that you had an opportunity to work

24   with the United States in that process where ultimately they

25   concluded obligations.  Is that correct?

1    A.   Yes.

2    Q.   And when you did that, did you consider the Army field

3    manual on intelligence interrogations?

4    A.   Yes, I did.

5    Q.   Yes, you did.  Okay.

6    A.   I have to say, it's 10 years ago, but I did.

7    Q.   I will help you remember.

8    A.   Thank you.

9    Q.   So in their concluding obligations, is it true that the

10   committee thought that an interrogation technique called

11   separation was problematic?

12   A.   Yes.

13   Q.   Okay.  And specifically it found the field expedient

14   separation technique permits forms of sensory deprivation?

15   A.   Uh-huh.

16   Q.   That's where sometimes you can use goggles or a blindfold

17   and earmuffs to block out noise and sound and vision?

18   A.   That's one way of undertaking sensory deprivation, yes.

19   Q.   Okay.  And that's what we're talking about when we talk

20   about field expedient separation?

21   A.   I believe there were others, if I remember correctly.  But

22   if your questioning is in terms of goggles and ear, then fine

23   with me.

24   Q.   Okay.  At bottom, it's really just something that blocks

25   sound and sight.  Is that fair?

1    A.  Yes.

2    Q.  Okay.  And that, under the field manual, is normally limited

3    to 12 hours, but that time limit doesn't include when the

4    military is doing it for security purposes.  Right?

5    A.  Right.

6    Q.  Okay.  And those 12 hours can be expanded, by approval.

7    Correct?

8    A.  Yes.

9    Q.  Okay.  And the committee thought that this was contrary to

10   the committee's view of international detainee treatment

11   requirements.  Right?

12   A.  If I remember the example that you bring up now correctly, I

13   remember that the treatment that was justified in the field

14   manual was being held in a room where there was no possibility

15   of having sounds or light sensations.  And that was what we

16   talked about at that point.

17   Q.  Okay.  The way that you defined it, and that's how you

18   understand the field expedient?

19   A.  Yes.

20   Q.  But the United States disagreed with you, didn't they?

21   A.  I believe they did.

22   Q.  In fact, it says right in the manual that that conduct does

23   not constitute CIDT?

24         MR. FISHER:  Objection.

25   A.  Yes.

```
 1              THE COURT:  Look, it's getting late in the day.  The
 2    jury has been at it all day.  How much longer do you have for
 3    cross?
 4              MS. BAILEY:  About three minutes.
 5              THE COURT:  Let's wrap it up.
 6    Q.  And the United States has not changed that part of the
 7    manual, have they?
 8    A.  I am not aware of that.  But I believe you're right.
 9    Q.  Okay.  Thank you.
10              MS. BAILEY:  No further questions.
11              THE COURT:  Two minutes of redirect?
12              MR. FISHER:  Yes, Your Honor, very short.
13              REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFFS
14    BY MR. FISHER:
15    Q.  Dr. Modvig, you were shown the War Crimes Act.  How does
16    this affect the international standard on torture, war crimes,
17    and other cruel, inhuman, or degrading treatment?
18    A.  I'm sorry, I didn't understand the question.  Could you
19    repeat, please?
20    Q.  Yes.  You were shown -- defendant's counsel showed you the
21    War Crimes Act.
22    A.  Yes.
23    Q.  How does that definition affect, if at all, the
24    international standard on war crimes?
25    A.  In my opinion, it does not.
```

72

 1    Q.  Okay.

 2    A.  But I'm not an expert in international humanitarian law.

 3    Q.  So defendant's counsel also talked a little bit about a

 4    chapter in a book about lawful sanctions.  Just to be clear, is

 5    inflicting pain during interrogations equivalent to lawful

 6    sanctions?

 7    A.  No, it's not.

 8    Q.  And were the types of treatment you talked about on your

 9    direct considered torture and/or other cruel, inhuman, or

10    degrading treatment in 2003?

11    A.  I'm sorry, I didn't understand the question.

12    Q.  Sure.  The types of treatment that you discussed on your

13    direct examination with me.

14    A.  Yes.

15    Q.  Were those considered torture and/or other cruel, inhuman,

16    or degrading treatment in 2003?

17    A.  Yes.

18    Q.  So that includes, for example, forced nakedness?

19    A.  Yes.

20    Q.  Stress positions?

21    A.  Yes.

22    Q.  The use of dogs?

23    A.  As well, yes.

24    Q.  And in evaluating torture and cruel, inhuman, or degrading

25    treatment, is it relevant to evaluate and assess if the

1    techniques are used in combination with each other?

2    A.   Indeed so.

3              MS. BAILEY:  Objection.  We're going beyond the scope.

4              THE COURT:  I'm going to sustain the objection.

5              MR. FISHER:  Your Honor, I have nothing further.

6              THE COURT:  I assume there's no further recross?

7              Ladies and gentlemen, your involvement is done for

8    today.  Please remember my cautions about avoiding any kind of

9    coverage of this case over any means.  Do not discuss anything

10   you've seen or heard today with anybody.

11             Again, get a good night's sleep.  Hopefully traffic

12   will be a bit more forgiving tomorrow morning so we can get

13   started right away at 9:30.  Remember, we have some other trials

14   going on in the courthouse, so sometimes there's a bit of lineup

15   coming through security.  So you've got to give yourselves a

16   little extra time.

17             We're going to stay in session with counsel for a few

18   minutes, but the jury is free to go this evening.  We'll see you

19   in the morning.

20             (Jury out at 6:00 p.m.)

21             THE COURT:  Now, the first thing I want to do today, to

22   start to make sure we don't have a long, drawn-out session later

23   in the week, is to get a list of all the exhibits which we

24   believe have been actually entered into evidence at this point

25   through the now nine witnesses who have testified so far.

1          So counsel, especially because it's a little confusing

2    at times because in some of these recorded depositions there are

3    references to exhibits, so I want both sides to be on top of

4    this and let us know if we've missed something.  All right?

5          I'll let my courtroom deputy start reading, so please

6    listen carefully.

7          COURTROOM DEPUTY CLERK:  PTX 13.  Also, I'm going in

8    order from yesterday of how they came in.  I don't know if that

9    helps.

10         THE COURT:  That's how we'll do it, yeah.

11         COURTROOM DEPUTY CLERK:  PTX 13, PTX 01, PTX 193,

12   PTX 224, DX 2, PTX 221, PTX 159, PTX 168, PTX 206C, PTX 206B,

13   PTX 161D, PTX 161C, PTX 206E, PTX 36, PTX 199, DX 30, PTX 20,

14   PTX 19, PTX 23, PTX 137, PTX 5, PTX 11, PTX 16, PTX 17, PTX 76,

15   PTX 161, PTX 206.

16         THE COURT:  First of all, from the plaintiff, do you

17   think any other exhibits were entered so far?

18         MR. FARIDI:  Your Honor, I think there may be one

19   slight issue with PTX 161.  I think we have offered 161 --

20   subparts of 161, but the entirety of the exhibit may not be in

21   evidence.

22         THE COURT:  She said 161D and 161C, if I heard

23   correctly.

24         MR. FARIDI:  And 161 was also mentioned, the second to

25   last one that was mentioned.  And my notes indicate, Your Honor,

1      that we have received into evidence 161A, B, C, and D.

2            COURTROOM DEPUTY CLERK:  D1, D2, D38, and then D1

3      through 36.  Is that what you had said?  During the deposition?

4            MR. FARIDI:  Yes, that is correct.

5            That's it, Your Honor.

6            THE COURT:  That's it from the plaintiff.

7            All right.  Now, Mr. O'Connor?

8            MR. O'CONNOR:  No, Your Honor, our assumption is, for

9      instance, there were some exhibits admitted during the

10     General Fay de bene esse, but that hasn't been played yet.

11           THE COURT:  I'm just talking about what's come in so

12     far.  So this would be General Taguba, Frederick -- the

13     deposition of Frederick had some.  Are those in?  Do you feel

14     those are reflected in our notes?  If not, you-all have to clean

15     that up.  Because it's a little complicated the way it's been

16     done.

17           But the record for the trial itself has to have, in my

18     view, a clear indication that a specific exhibit has been

19     entered.  Okay?

20           MR. O'CONNOR:  Understood.

21           THE COURT:  I'll give you overnight, then, to look at

22     it, or send us an email tomorrow.  If the plaintiff agrees with

23     that, then we'll just make that part of the record.

24           Yes?

25           MR. ELLIOTT:  Your Honor, there's one of the Taguba

1    report --

2              THE COURT:  Well, we corrected that problem.  Correct?

3              MR. ELLIOTT:  Well, there's two versions of the report

4    that are exhibits, plaintiffs' exhibits.  We believe the version

5    of Exhibit 28 should be used, whereas I believe the parties

6    believe Exhibit 137, which has been entered already, is the

7    version that should be in use.

8              Exhibit 28 is the publicly available authorized version

9    of the report, whereas 137 is the unauthorized, unredacted

10   version.

11             MS. ROBINSON:  Your Honor, first, there are actually

12   three versions on the exhibit list.

13             THE COURT:  You-all choose one all three of you can

14   agree with.  There shouldn't be a dispute.

15             MS. ROBINSON:  So one -- the version that was used

16   today, 137, that one unredacts Big Steve's name.  That was the

17   primary reason for using it.  We had received from the

18   government their proposed redactions to a number of exhibits;

19   they had not included that exhibit among the ones they wanted

20   redacted.  We've been using consistently the redacted versions

21   that the government provided.  We were unaware that the

22   government needed additional redactions to that because we

23   didn't receive them.

24             I don't think the government has a problem with the

25   unredacted version.

1          THE COURT:  I don't want to spend time on this.  The

2     three parties look at the exhibit, decide which one you want to

3     come in, we'll make sure that's the one that should come in.

4     You-all will have to work it out tonight.

5          Is there anything else that we need to address?

6          MR. O'CONNOR:  There's a couple, Your Honor.  We and

7     the United States don't agree -- they wanted to redact a couple

8     of our exhibits, and we don't agree to the extent of their

9     redactions.  They called it PII, but it's redacting names, and a

10    lot of names that are in the public record and completely

11    divorce the exhibits from any evidentiary value.  They take

12    everybody's name out.

13          They're taking out the names of people who swore oaths

14    to sworn statements in Springfield, Virginia, which doesn't

15    really seem like a profile in courage here --

16          THE COURT:  My ruling previously has been that if a

17    name is in the public record, we're not taking it out of this

18    case.  And I'm not getting any pushback from the government.

19          MR. ELLIOTT:  No.  If there's been an error --

20          THE COURT:  Tonight you-all work it out.  If there's

21    still a problem, we can address it tomorrow.

22          MR. O'CONNOR:  We have one excerpt from the Stefanowicz

23    de bene esse deposition.  Your Honor might recall, during the

24    deposition, plaintiffs started reading from Ivan Frederick's

25    2004 statement, and we objected.  And the Court said, is he

1    going to testify?  And they said yes.  And the Court said,

2    finish your questions; we might have to take that out later.

3    And he testified, but that statement that they were reading from

4    didn't come in.

5         So our view is that should come out because the

6    statement was hearsay that was never admitted, and the Court had

7    said at the time we're going to revisit this once we see what

8    happens with Frederick.

9         THE COURT:  I have at this point no idea what you're

10   talking about.

11        MR. O'CONNOR:  I have excerpts.  I can hand up the

12   excerpts.

13        MR. HADDAD:  Your Honor, I can respond while -- I have

14   a very quick response.

15        THE COURT:  Is there no problem?

16        MR. HADDAD:  There is a problem.

17        THE COURT:  Let me take a look at it so I have some

18   understanding what we're talking about.

19        All right.  So this is part of Stefanowicz's deposition

20   that we did.  Correct?

21        MR. O'CONNOR:  That's right, Your Honor.

22        THE COURT:  And so your argument is that when

23   Frederick's deposition was played today, so he testified today,

24   that this line of questioning was not included.

25        MR. O'CONNOR:  Right.  They read from his statement

1    that was never admitted in his deposition.  So it's not

2    evidence, so it's completely hearsay.

3            THE COURT:  All right.  Now I'll hear the opposition.

4            MR. HADDAD:  Sure.  Good afternoon, Your Honor.

5    Andrew Haddad for the plaintiffs.

6            First of all, I think CACI is late on this issue.  Last

7    week we brought up on a meet and confer that we planned to play

8    this portion of Big Steve's deposition at trial.  They didn't

9    raise it in their brief to the Court last Wednesday, which the

10   Court indicated they should raise all trial issues.  They didn't

11   raise it, and therefore we believe have waived their opportunity

12   to address this.  Your Honor said de bene esse depositions

13   should be played as-is, that's it.

14           THE COURT:  No, I don't agree.  No, there was a clear

15   objection made at the time, and I don't think that's proper

16   evidence.  So I'll sustain the objection.

17           MR. O'CONNOR:  We'll take it out, Your Honor.

18           THE COURT:  That's fine.  In terms of the schedule that

19   I believe we have, Fay and Monahan are the only two names left

20   on today's list.  I assume the last plaintiff is going to

21   testify tomorrow first.  Is that the plan?

22           MR. FARIDI:  Yes, Muhammad Faridi for the plaintiffs,

23   Your Honor.  The last plaintiff will testify first thing in the

24   morning.  That's Mr. Al-Shimari.  And based on how we have been

25   proceeding, I think we'll be able to rest late tomorrow

1   afternoon, probably late in the afternoon.  We were hoping to

2   rest a little bit earlier, but I think late in the afternoon,

3   depending how the crosses go, late in the evening is what we're

4   planning on.

5           THE COURT:  Excellent.

6           MR. FARIDI:  At some point, Your Honor, it would be

7   helpful to get a good sense of when you plan to have a charge

8   conference.

9           THE COURT:  My plan would be to start putting jury

10  instructions together.  I'll give you my proposed charge and

11  we'll see where we go from there.

12          I still don't see how war crimes is in this case.

13  Torture and CIDT you got.  I don't see where there's any

14  evidence of war crimes, and your proposed verdict have that

15  included category.  I'm strongly recommending you think about

16  simplifying the case so the jury can be focused on what's much

17  clearer for them.  All right?  So that's something I'm throwing

18  out to both sides.

19          But so far, there has been, in my view, absolutely zero

20  testimony on that issue.

21          MR. FARIDI:  Your Honor, we can also deal with this at

22  the charge conference.  One nuance there is that under

23  international standards, torture and CIDT constitute war crimes.

24  So that would be our connection to war crimes.

25          THE COURT:  Do you really need it?  You don't.

1          MR. FARIDI:  We will think about that issue and so

2     advise Your Honor tomorrow morning, so you won't have to think

3     about it in terms of jury instructions.

4          MS. GINSBERG:  Your Honor, I think we still need a

5     ruling on the exclusion of the plaintiffs' exhibit that we --

6          THE COURT:  I'm going to wait to see you start putting

7     them in.  There are several of them that I think should not come

8     in.  I started looking at them this morning.  All right?  It's

9     better to have the full context, all right, and the case is

10    moving fast enough.  It puts both sides at risk of having the

11    jury see objections being made and sustained or overruled.  All

12    right?

13         MS. GINSBERG:  Understood, Your Honor.

14         MR. O'CONNOR:  Your Honor, I'm not going to leave

15    Ms. Ginsberg to last.  Plaintiffs' case is shrinking and our

16    case is a little over two days, we believe.  It's actually

17    fairly predictable because a lot of it is already in the can.  I

18    have at least one witness who cannot be here until Monday, and

19    if they go through the day tomorrow, then that's not a problem

20    because the stuff I have is going to go through Thursday and

21    Friday.

22         THE COURT:  Who is the witness?

23         MR. O'CONNOR:  Daniel Porvaznik.  He's not subject to

24    the subpoena power of the Court.  And we've moved him up to

25    Monday, but I would -- it's possible we could run out of

1    witnesses at 3 o'clock or 4 o'clock on Friday, and I just want

2    to raise that.

3              THE COURT:  How long do you anticipate his testimony

4    taking?

5              MR. O'CONNOR:  I suspect his direct would be an hour,

6    hour and a half.  Probably hour.

7              THE COURT:  I have told the jury that we would not be

8    in session on Tuesday.

9              MR. O'CONNOR:  Correct.

10             THE COURT:  I don't like the idea of charging the jury

11   on Monday and having them sit for a whole day not working on the

12   case.  What I may do is check with them tomorrow and see if they

13   have made such plans that they could not be here on Tuesday.

14             And, Ms. Ginsberg, you don't have to be here on

15   Tuesday.

16             MS. GINSBERG:  Your Honor, Tuesday is not a problem for

17   me at all.

18             THE COURT:  I have a scheduling problem, so what I

19   might do is, if we get the case to the jury Monday night, I

20   might have another judge babysit the jury for a couple of hours

21   when I can't be here.  A conflict came up in my schedule.

22             I'm going to think about that, and whether I would like

23   to keep your case open that long.  But the problem is, I don't

24   know whether the plaintiff is planning any kind of a rebuttal

25   case at this point.

1        MR. FARIDI:  At this point, Your Honor, we're not

2   planning on it.  I think if there are scope objections made by

3   the defendant and Your Honor sustains those objections, we may

4   need to put on a short rebuttal case.  But I don't think it will

5   be longer than a few hours, I think.

6        MR. O'CONNOR:  A scope objection would be exceedingly

7   unlikely from us, Your Honor.  I'm not going to waste anybody's

8   time.

9        THE COURT:  Do you have a deposition from the witness?

10       MR. O'CONNOR:  From Mr. Porvaznik?  It's from 20 years

11   ago, Your Honor.  It's not covering everything we would have him

12   testify to.

13       THE COURT:  You know, it is the rocket docket and I

14   warned everybody.  I am concerned.  I mean, I want to get this

15   case to the jury as quickly as we can, and I don't want to hold

16   it up artificially for Monday.  If the case is over by

17   3:00 o'clock Friday afternoon, it would be my plan to have

18   you-all at least close the case and give them the jury

19   instructions first thing Monday morning.

20       So I am concerned about the fact that a witness would

21   be holding up the schedule.

22       MR. FARIDI:  Your Honor, if I may, we worked long and

23   hard, our team stayed up nights, some of the days, to streamline

24   our case because we took your admonition seriously on this

25   issue.  And I think if they don't have Mr. Porvaznik showing up

1     here on Friday --

2             THE COURT:  Can he appear by video, a live video?  I

3     mean, he's got to be -- I assume he's in the United States.

4             MR. O'CONNOR:  He's in the United States, Your Honor.

5     Possibly.

6             THE COURT:  We can do him that way.  Technology is

7     wonderful.  All right?

8             MR. O'CONNOR:  We will evaluate all of the options,

9     Your Honor, yes.

10            THE COURT:  Have him available if we need to do it that

11    way.  All right?  Maybe we can do it that way.

12            MS. GINSBERG:  Judge, I'm afraid I am going to be the

13    last one.

14            MR. FARIDI:  One thing I will just flag is, you know,

15    I'm sure Your Honor is aware of this, if we see

16    cross-examinations that are protracted and that are designed to

17    getting this case to Monday, I'm sure Your Honor would be on --

18            THE COURT:  I'm not shy about cutting the case.

19            Frankly, right now I don't want to see another picture

20    of the tiers.  The jury has seen it two or three times.  This is

21    a good jury, they've all stayed awake.  There's a lot of

22    cumulative evidence in this case already.  All right?  They

23    don't need to see more pictures of naked piles of bodies and

24    that sort of stuff, or piles of naked bodies.

25            Yes, it applies to the defense as well.  All right?

1          Ms. Ginsberg?

2          MS. GINSBERG:  Yes.  Judge, if the Court admits two of

3     these exhibits, I believe they're Exhibit 97 and 98, they are

4     the HR files for Daniel Johnson and Steve Stefanowicz, they are

5     replete with PII that has not been redacted.  And I think if the

6     plaintiff wants to offer those exhibits, I think it's their

7     obligation to redact the PII.  There are Social Security

8     numbers, telephone numbers --

9          THE COURT:  Of course.  There can't even be an issue on

10    this.  Have you talked to counsel?

11         MS. GINSBERG:  I have.  And they've told me because we

12    originally produced the document, it's our responsibility to

13    delete the PII.  And we are not offering those exhibits, we are

14    opposing them, and it's...

15         THE COURT:  All right.  I don't even want to hear an

16    answer.  It will be taken care of.  No PII or the exhibit

17    doesn't come in.  All right?

18         We'll recess court for the evening.

19         (Off the record at 6:21 p.m.)

20

21

22

23

24

25

1                 **CERTIFICATE OF OFFICIAL COURT REPORTER**

2

3          I, Rebecca Stonestreet, certify that the foregoing is a

4 correct transcript from the record of proceedings in the

5 above-entitled matter.

6

7

8      \_\_\_\_\_//Rebecca Stonestreet_____         \_\_4/23/24\_\_\_\_\_

9 SIGNATURE OF COURT REPORTER            DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**'**

**'21** [1] - 37:4

**/**

**//Rebecca** [1] - 86:8

**0**

**01** [1] - 74:11

**1**

**1** [3] - 2:13, 32:23, 40:21
**1(B** [1] - 61:10
**10** [11] - 3:18, 14:15, 14:17, 15:2, 15:3, 32:17, 33:3, 37:9, 66:2, 66:10, 69:6
**10012** [1] - 1:23
**10036** [1] - 1:19
**11** [8] - 3:14, 8:24, 9:16, 11:23, 32:16, 33:2, 34:7, 74:14
**1101** [1] - 2:6
**1133** [1] - 1:19
**12** [2] - 70:3, 70:6
**13** [5] - 3:18, 32:17, 33:3, 74:7, 74:11
**1330** [1] - 2:3
**137** [9] - 22:13, 22:16, 23:7, 23:8, 23:9, 74:14, 76:6, 76:9, 76:16
**14** [5] - 3:18, 16:11, 16:12, 32:17, 33:3
**15** [5] - 29:23, 32:12, 32:23, 34:24, 45:12
**15-6** [2] - 7:13, 31:7
**150** [1] - 38:22
**152529** [1] - 24:10
**159** [2] - 34:9, 74:12
**16** [8] - 1:7, 3:14, 32:16, 33:2, 62:21, 62:22, 63:14, 74:14
**161** [8] - 3:17, 32:17, 33:3, 74:15, 74:19, 74:20, 74:24
**161A** [1] - 75:1
**161C** [2] - 74:13, 74:22
**161D** [2] - 74:13, 74:22
**168** [1] - 74:12
**17** [4] - 3:15, 32:16, 33:2, 74:14
**174** [1] - 37:19
**18** [3] - 3:4, 22:5,

22:11
**19** [6] - 3:15, 16:11, 16:12, 32:16, 33:2, 74:14
**193** [1] - 74:11
**1988** [1] - 36:9
**199** [1] - 74:13
**1999** [1] - 38:11
**19th** [2] - 18:14, 18:18
**1:08-CV-827** [1] - 1:4

**2**

**2** [5] - 1:10, 3:18, 32:17, 33:3, 74:12
**2(D)** [1] - 61:1
**20** [8] - 13:23, 20:20, 24:23, 33:13, 66:3, 66:12, 74:13, 83:10
**200** [1] - 5:5
**2000** [1] - 36:16
**2002** [1] - 55:7
**2003** [7] - 7:25, 17:16, 19:24, 49:14, 54:24, 72:10, 72:16
**20036** [1] - 2:4
**2004** [9] - 18:14, 18:19, 36:16, 49:14, 54:21, 54:23, 55:24, 56:1, 77:25
**2008** [1] - 35:23
**2010** [1] - 65:2
**2014** [2] - 37:3, 58:6
**2016** [1] - 37:4
**202-429-3000** [1] - 2:4
**2022** [1] - 38:12
**2024** [1] - 1:7
**205th** [4] - 6:4, 9:18, 9:21, 9:23
**206** [4] - 3:18, 32:17, 33:4, 74:15
**206B** [1] - 74:12
**206C** [1] - 74:12
**206E** [1] - 74:13
**212-336-2000** [1] - 1:20
**212-614-6464** [1] - 1:23
**221** [1] - 74:12
**22314** [2] - 2:7, 2:11
**224** [1] - 74:12
**23** [1] - 74:14
**24** [1] - 32:13
**240** [1] - 2:11
**28** [6] - 22:4, 22:5, 22:9, 22:20, 76:5, 76:8
**2:00** [1] - 1:8
**2:04** [1] - 4:2

**3**

**3** [3] - 4:14, 60:9, 82:1
**30** [1] - 74:13
**31** [1] - 18:19
**33** [9] - 3:9, 3:13, 3:14, 3:14, 3:15, 3:15, 3:16, 3:17, 3:18
**34** [3] - 3:9, 59:5, 59:23
**35** [3] - 3:6, 3:10, 60:25
**36** [2] - 74:13, 75:3
**372nd** [2] - 5:5, 5:7
**3:00** [1] - 83:17

**4**

**4** [3] - 3:4, 34:7, 82:1
**4/23/24** [1] - 86:8
**400** [1] - 4:22
**401** [1] - 2:10
**41** [1] - 59:4
**426-7767** [1] - 2:11
**44** [1] - 4:13
**45** [1] - 5:25
**46** [1] - 8:25
**49** [1] - 3:6
**4:05** [1] - 33:15
**4:23** [1] - 33:22

**5**

**5** [8] - 3:13, 14:15, 14:17, 32:16, 33:2, 53:9, 53:11, 74:14

**6**

**6** [1] - 34:24
**610** [1] - 2:7
**66** [3] - 53:9, 53:11, 54:1
**666** [1] - 1:22
**6:00** [1] - 73:20
**6:21** [1] - 85:19

**7**

**7** [1] - 23:14
**703-684-4333** [1] - 2:8
**71** [3] - 3:6, 14:13, 14:17
**75** [1] - 16:10
**76** [3] - 3:12, 32:16, 33:2, 74:14
**7th** [2] - 1:22, 2:3

**8**

**8** [2] - 15:1, 15:3
**800th** [1] - 18:10

**9**

**9** [5] - 22:4, 22:5, 22:10, 22:11, 23:23
**9(i** [1] - 23:24
**97** [1] - 85:3
**98** [1] - 85:3
**9:30** [1] - 73:13
**9th** [1] - 2:10

**A**

**ABDULLAH** [1] - 1:3
**ability** [2] - 5:22, 8:21
**able** [4] - 45:24, 59:23, 62:13, 79:25
**above-entitled** [1] - 86:5
**abrasions** [1] - 61:13
**absence** [1] - 44:20
**absent** [1] - 43:6
**absolutely** [3] - 11:1, 26:1, 80:19
**Abu** [16] - 4:20, 4:24, 5:7, 5:12, 5:23, 6:5, 8:1, 8:5, 8:10, 8:19, 17:15, 18:22, 20:24, 25:22, 26:11, 49:14
**abuse** [17] - 8:18, 11:16, 13:3, 13:5, 13:17, 13:24, 17:9, 17:16, 19:23, 20:3, 20:23, 25:16, 25:21, 25:25, 26:3, 29:21, 60:23
**abuses** [1] - 25:14
**accept** [1] - 40:1
**access** [3] - 45:14, 45:15, 45:25
**accordance** [2] - 11:14, 12:3
**according** [4] - 7:13, 39:5, 54:13, 61:21
**accountability** [1] - 50:20
**accurate** [4] - 23:20, 57:4, 58:3, 58:4
**accurately** [1] - 10:18
**acquiescence** [1] - 41:1
**Act** [4] - 58:23, 63:4, 71:15, 71:21
**act** [3] - 40:22, 60:20, 60:21
**acting** [1] - 41:2

**action** [3] - 30:10, 43:16, 43:19
**activities** [2] - 45:15, 55:22
**activity** [1] - 47:18
**actors** [1] - 52:21
**acts** [4] - 42:3, 42:4, 66:15, 68:1
**actual** [1] - 58:17
**add** [1] - 58:4
**additional** [1] - 76:22
**address** [3] - 77:5, 77:21, 79:12
**administered** [1] - 35:6
**admits** [1] - 85:2
**admitted** [7] - 32:18, 32:20, 33:4, 34:10, 75:9, 78:6, 79:1
**admonition** [1] - 83:24
**adultery** [2] - 54:20, 55:4
**advance** [1] - 48:3
**advantage** [1] - 48:21
**advice** [3] - 6:14, 10:5, 31:2
**advise** [1] - 81:2
**advisory** [1] - 38:7
**advocate** [2] - 19:5, 19:15
**advocates** [1] - 19:10
**affable** [1] - 21:19
**affairs** [4] - 64:20, 65:9, 65:12, 66:4
**affect** [2] - 71:16, 71:23
**afraid** [3] - 46:16, 46:21, 84:12
**afternoon** [8] - 18:3, 33:9, 49:11, 79:4, 80:1, 80:2, 83:17
**age** [1] - 41:17
**agents** [2] - 64:23, 65:7
**ago** [6] - 13:23, 24:23, 66:10, 66:12, 69:6, 83:11
**agree** [6] - 32:19, 58:22, 76:14, 77:7, 77:8, 79:14
**agreed** [1] - 23:1
**agrees** [3] - 52:5, 62:1, 75:22
**ahead** [1] - 59:20
**aims** [1] - 52:19
**AI** [3] - 24:8, 24:12, 79:24
**AL** [1] - 1:4
**al** [1] - 1:4
**Al-Shimari** [1] - 79:24

**Al-Zuba'e** [2] - 24:8, 24:12
**alert** [1] - 33:9
**ALEXANDRA** [1] - 1:14
**Alexandria** [3] - 1:2, 2:7, 2:11
**allegations** [4] - 19:23, 21:13, 50:23, 51:6
**alleged** [4] - 28:10, 38:17, 50:14, 50:19
**allow** [1] - 39:21
**allowed** [4] - 11:11, 26:9, 47:24, 55:21
**allowing** [1] - 40:2
**AMBUHL** [2] - 3:9, 34:13
**Ambuhl** [1] - 34:6
**amendment** [1] - 60:2
**American** [1] - 50:7
**Americas** [1] - 1:19
**Amnesty** [1] - 52:13
**amount** [7] - 46:2, 46:6, 46:24, 47:7, 68:11, 68:14, 68:16
**amounts** [1] - 67:5
**amputation** [1] - 54:14
**analyze** [1] - 39:3, 62:11
**analyzed** [2] - 43:7, 43:10
**ANDREW** [1] - 1:15
**Andrew** [1] - 79:5
**answer** [6] - 10:18, 29:13, 37:23, 56:10, 62:13, 85:16
**answered** [1] - 55:16
**answering** [1] - 5:19
**anticipate** [1] - 82:3
**ANTONIO** [2] - 3:3, 4:8
**anyway** [1] - 9:14
**appear** [1] - 84:2
**APPEARANCES** [2] - 1:13, 1:24
**applicable** [2] - 11:15, 12:3
**applied** [2] - 43:11, 61:10, 67:3
**applies** [2] - 55:19, 84:25
**apply** [2] - 43:15, 51:22
**appointed** [11] - 7:25, 18:10, 18:14, 18:18, 18:21, 18:24, 27:15, 29:1, 55:9, 64:2, 64:19
**appointment** [1] - 19:16

**approach** [3] - 9:14, 57:11, 59:11
**appropriate** [1] - 19:21
**approval** [2] - 31:11, 70:6
**April** [1] - 1:7
**AR** [1] - 7:13
**area** [1] - 39:20
**areas** [1] - 66:11
**argued** [1] - 45:12
**arguing** [1] - 59:14
**argument** [1] - 78:22
**arms** [1] - 47:11
**Army** [5] - 7:13, 20:2, 25:13, 30:10, 69:2
**arose** [1] - 57:13
**Article** [7] - 29:23, 31:7, 40:21, 60:9, 62:21, 62:22, 63:14
**articles** [1] - 83:2
**artificially** [1] - 83:16
**as-is** [1] - 79:13
**Asa'ad** [1] - 23:24
**aside** [1] - 14:24
**aspects** [1] - 50:12
**assaulted** [1] - 12:19
**assess** [1] - 72:25
**assessing** [1] - 57:7
**assessment** [3] - 50:21, 50:22, 57:11
**assessments** [1] - 46:1
**assigned** [8] - 6:13, 28:3, 28:7, 28:18, 28:22, 29:2, 29:5, 29:8
**assignment** [1] - 39:6
**associated** [2] - 16:20, 46:1
**association** [1] - 52:16
**assume** [3] - 73:6, 79:20, 84:3
**assumption** [1] - 75:8
**attacks** [1] - 42:24
**attempts** [2] - 41:21, 60:20
**authorities** [2] - 8:11, 17:2
**authority** [4] - 6:14, 16:22, 16:24, 27:17
**authorized** [3] - 11:14, 12:3, 76:8
**available** [2] - 76:8, 84:10
**Avenue** [2] - 1:19, 2:3
**average** [1] - 39:21
**avoiding** [1] - 73:8

**awake** [1] - 84:21
**aware** [6] - 30:3, 30:4, 55:22, 63:16, 71:8, 84:15
**awareness** [1] - 64:5
**AZMY** [1] - 1:21

**B**

**babysit** [1] - 82:20
**background** [2] - 36:6, 36:14
**backwards** [1] - 65:21
**BAHER** [1] - 1:21
**Bailey** [2] - 3:6, 49:11
**BAILEY** [12] - 2:1, 3:15, 49:6, 49:10, 50:1, 53:10, 54:3, 63:7, 63:24, 71:4, 71:10, 73:3
**Base** [2] - 4:24, 8:1
**based** [6] - 11:24, 13:6, 29:3, 31:2, 40:16, 79:24
**beat** [1] - 68:13
**beatings** [5] - 44:23, 44:25, 68:10, 68:11
**become** [2] - 41:14, 55:6
**BEFORE** [1] - 1:11
**began** [1] - 20:5
**beginning** [1] - 13:7
**behalf** [1] - 13:1
**behind** [1] - 47:14
**beings** [1] - 43:1
**Belgrade** [1] - 36:24
**beliefs** [1] - 44:1
**Belknap** [1] - 35:8
**BELKNAP** [1] - 1:18
**belonged** [1] - 8:15
**below** [1] - 7:11
**bench** [1] - 59:11
**BENCH** [2] - 59:12, 59:22
**bene** [3] - 75:10, 77:23, 79:12
**better** [3] - 4:7, 66:9, 81:9
**between** [10] - 6:20, 6:22, 7:5, 8:16, 8:17, 42:9, 44:18, 50:24, 51:6, 58:10
**beyond** [2] - 63:20, 73:3
**big** [1] - 46:16
**Big** [2] - 76:16, 79:8
**binder** [6] - 14:7, 14:11, 23:6, 53:8, 53:18, 59:5
**binders** [1] - 49:6

**bit** [10] - 37:18, 40:12, 43:22, 44:16, 47:24, 51:2, 72:3, 73:12, 73:14, 80:2
**bite** [1] - 46:17
**bitten** [1] - 46:15
**blindfold** [1] - 69:16
**block** [1] - 69:17
**blocks** [1] - 69:24
**board** [1] - 38:7
**boatload** [1] - 20:2
**bodies** [4] - 65:7, 65:22, 84:23, 84:24
**bodily** [3] - 61:11, 61:14, 61:19
**body** [1] - 44:25
**BONITA** [1] - 1:15
**book** [6] - 17:24, 22:6, 38:6, 53:14, 53:15, 72:4
**books** [2] - 35:10, 38:2
**bottom** [2] - 61:1, 69:24
**break** [3] - 11:17, 33:1, 33:9
**brief** [2] - 38:13, 79:9
**briefly** [4] - 36:6, 42:2, 45:4, 46:4
**brigade** [2] - 5:6
**Brigade** [19] - 4:22, 5:1, 5:2, 5:3, 6:4, 9:19, 9:21, 9:23, 10:8, 18:11, 18:22, 19:1, 20:14, 20:15, 26:14, 26:17, 27:4, 27:15
**Brigadier** [5] - 4:18, 5:10, 6:23, 7:8, 8:8
**bring** [5] - 5:25, 9:1, 33:16, 50:1, 70:12
**BRINKEMA** [1] - 1:11
**broader** [3] - 51:2, 52:17, 52:21
**Broadway** [1] - 1:22
**brought** [1] - 79:7
**bruises** [1] - 61:13
**brute** [1] - 44:24
**BUCHANAN** [1] - 1:16
**bullet** [2] - 11:11, 11:22
**burn** [1] - 61:12
**BY** [12] - 3:8, 4:10, 4:11, 18:1, 18:2, 23:5, 35:16, 35:17, 49:9, 49:10, 71:13, 71:14

**C**

**CACI** [21] - 1:7, 9:12, 9:13, 9:17, 10:19, 10:20, 13:13, 21:6, 21:9, 23:16, 23:19, 26:3, 26:7, 26:19, 30:18, 30:21, 30:25, 33:25, 49:12, 49:23, 79:6
**Camp** [1] - 13:21
**cannot** [2] - 48:5, 81:18
**capacity** [1] - 41:2
**Captain** [1] - 26:24
**care** [2] - 51:4, 85:16
**career** [1] - 62:5
**carefully** [1] - 74:6
**Carolyn** [1] - 26:24
**case** [29] - 29:9, 29:14, 38:25, 39:19, 40:5, 49:2, 51:25, 54:22, 56:1, 56:20, 73:9, 77:18, 80:12, 80:16, 81:9, 81:15, 81:16, 82:12, 82:19, 82:23, 82:25, 83:4, 83:15, 83:16, 83:18, 83:24, 84:17, 84:18, 84:22
**Case** [1] - 1:3
**cases** [4] - 38:18, 50:14, 50:19, 50:20
**category** [1] - 80:15
**cautions** [1] - 73:8
**cell** [3] - 16:19, 45:23
**Center** [1] - 10:21
**CENTER** [1] - 1:21
**center** [6] - 6:13, 8:3, 8:14, 9:24, 15:18, 15:19
**certain** [4] - 39:22, 41:14, 43:23, 68:15
**certainly** [2] - 40:19, 61:9
**CERTIFICATE** [1] - 86:1
**certify** [1] - 86:3
**cetera** [3] - 41:18, 55:11, 67:4
**chain** [1] - 31:10
**chair** [1] - 68:22
**chairperson** [3] - 37:4, 37:6, 37:8
**changed** [5] - 55:24, 56:15, 65:13, 65:18, 71:6
**chapter** [6] - 38:23, 53:15, 53:18, 54:21, 55:23, 72:4

**charge** [6] - 8:14, 26:25, 80:7, 80:10, 80:22
**charged** [4] - 29:20, 29:24, 30:1, 30:14
**charging** [1] - 82:10
**check** [1] - 82:12
**chief** [1] - 35:25
**child** [1] - 67:12
**children** [3] - 67:15, 67:17, 67:22
**choose** [1] - 76:13
**chopping** [1] - 56:5
**chose** [2] - 52:22, 54:18
**chronic** [1] - 41:12
**CID** [12] - 20:2, 20:5, 21:2, 21:10, 21:11, 21:24, 24:1, 24:19, 25:3, 25:6, 25:8, 25:13
**CIDT** [23] - 51:17, 56:24, 57:8, 57:20, 57:25, 58:19, 59:16, 62:15, 62:21, 63:1, 63:10, 65:14, 66:6, 66:15, 66:20, 66:25, 67:7, 67:13, 68:5, 68:6, 70:23, 80:13, 80:23
**circulation** [1] - 47:25
**circumstance** [2] - 68:5, 68:6
**circumstances** [8] - 40:13, 43:12, 44:15, 44:16, 44:21, 67:2, 67:4, 68:18
**citizens** [1] - 67:21
**Civil** [1] - 1:3
**civil** [1] - 64:24
**civilian** [8] - 9:17, 9:20, 16:21, 17:1, 17:5, 18:24, 20:15, 26:19
**civilians** [2] - 17:11, 20:8
**CJTF** [1] - 17:12
**CJTF-7** [1] - 13:22
**clarify** [3] - 24:5, 46:1, 46:23
**clarifying** [1] - 49:13
**classical** [1] - 46:7
**clean** [1] - 75:14
**clear** [6] - 6:12, 8:22, 63:14, 72:4, 75:18, 79:14
**clearance** [3] - 13:11, 30:6, 30:11
**clearer** [1] - 80:17
**clearly** [6] - 11:15,

13:2, 13:4, 41:8, 55:9, 56:16
**clerk** [1] - 35:6
**CLERK** [3] - 74:7, 74:11, 75:2
**close** [1] - 83:18
**closer** [1] - 36:20
**clothes** [1] - 16:19
**code** [2] - 60:1, 60:5
**coercion** [1] - 40:25
**cogens** [2] - 55:13, 62:7
**collaborated** [1] - 16:5
**colleague** [1] - 17:21
**collected** [1] - 25:13
**Colonel** [13] - 6:2, 6:3, 6:16, 6:18, 6:24, 7:2, 7:8, 7:25, 8:8, 8:15, 26:13, 26:16, 29:20
**colonel** [1] - 8:13
**combination** [3] - 45:22, 48:8, 73:1
**combinations** [4] - 43:14, 46:21, 48:4, 68:20
**coming** [1] - 73:15
**command** [11] - 4:25, 5:22, 7:24, 8:2, 8:4, 8:9, 8:13, 13:1, 17:13, 19:6, 31:10
**commander** [4] - 4:23, 5:14, 6:3, 26:13
**commanders** [4] - 6:20, 6:22, 6:23, 8:11
**commanding** [3] - 4:22, 17:12, 18:16
**comment** [2] - 16:18, 29:3
**comments** [1] - 12:16
**commissioned** [1] - 18:18
**commit** [1] - 60:21
**commits** [1] - 60:20
**committed** [2] - 59:14, 67:13
**Committee** [11] - 37:3, 37:7, 37:17, 55:5, 55:18, 55:20, 57:24, 58:5, 62:6, 66:14, 68:23
**committee** [19] - 37:8, 37:10, 37:12, 37:20, 37:22, 37:24, 38:10, 38:19, 38:20, 38:24, 58:10, 66:18, 66:20, 66:24, 67:6, 67:14, 68:4, 69:10, 70:9
**committee's** [2] - 67:13, 70:10

**common** [5] - 16:17, 42:9, 48:14, 48:16, 60:9
**community** [2] - 40:18, 41:24
**company** [2] - 5:4
**Company** [2] - 5:5, 5:7
**compensated** [1] - 39:6
**compensation** [1] - 39:8
**competence** [1] - 12:10
**competitive** [1] - 64:19
**complete** [1] - 50:18
**completely** [7] - 39:21, 42:12, 45:16, 47:25, 55:22, 77:10, 79:2
**compliance** [1] - 37:10
**complicated** [1] - 75:15
**comply** [2] - 47:5, 51:8
**comprises** [1] - 37:8
**COMPUTERIZED** [1] - 2:15
**concept** [1] - 41:16
**concepts** [1] - 65:3
**concern** [1] - 10:25
**concerned** [2] - 83:14, 83:20
**concerns** [1] - 50:21
**concluded** [1] - 68:25
**concludes** [1] - 37:24
**concluding** [1] - 69:9
**conclusions** [4] - 7:17, 7:19, 7:22, 39:8
**condition** [4] - 43:14, 45:18, 48:20, 68:20
**conditions** [13] - 11:13, 11:19, 12:5, 12:7, 12:8, 12:14, 45:19, 45:25, 46:18, 46:23, 48:1, 51:4, 57:12
**conduct** [10] - 8:22, 12:18, 28:25, 29:1, 39:3, 56:23, 57:20, 60:9, 68:4, 70:22
**conducted** [5] - 10:11, 25:9, 27:8, 27:22, 31:8
**conducting** [4] - 13:18, 26:2, 27:5, 28:16
**confer** [2] - 17:21,

79:7
**conference** [2] - 80:8, 80:22
**CONFERENCE** [2] - 59:12, 59:22
**confession** [3] - 40:24, 45:10, 48:22
**confinement** [3] - 45:3, 45:4, 46:2
**conflict** [1] - 82:21
**conflicts** [2] - 59:2, 62:9
**confused** [1] - 23:21
**confusing** [1] - 74:1
**Connecticut** [1] - 2:3
**connection** [3] - 10:1, 39:6, 80:24
**consensus** [5] - 52:5, 61:23, 61:25, 62:4, 62:6
**consent** [1] - 41:1
**consider** [5] - 5:13, 45:19, 45:23, 66:15, 69:2
**consideration** [1] - 25:11
**considered** [8] - 24:20, 42:20, 43:23, 44:5, 46:9, 55:12, 72:9, 72:15
**considers** [1] - 58:19
**consistency** [2] - 51:6, 56:16
**consistent** [3] - 41:24, 51:15, 56:17
**consistently** [1] - 76:20
**conspires** [1] - 60:20
**constitute** [8] - 41:20, 44:13, 45:1, 45:13, 56:24, 66:15, 70:23, 80:23
**constitutes** [2] - 39:3, 55:6
**Constitution** [4] - 58:1, 58:21, 63:1, 63:10
**CONSTITUTIONAL** [1] - 1:21
**consulted** [1] - 64:23
**contacts** [1] - 45:16
**context** [4] - 43:8, 62:10, 81:9
**continue** [1] - 4:3
**continued** [1] - 36:25
**CONTINUED** [2] - 1:24, 4:10
**contract** [1] - 9:17
**contractor** [2] - 10:20, 26:19

**Contractor** [1] - 23:11
**contractors** [7] - 17:1, 17:5, 17:13, 18:25, 20:15, 21:3, 31:1
**contrary** [1] - 70:9
**contributions** [1] - 66:17
**control** [10] - 8:4, 8:9, 13:1, 17:2, 17:6, 17:13, 26:25, 42:12, 46:13, 60:24
**convention** [5] - 37:11, 37:19, 37:22, 57:16, 58:9
**Convention** [10] - 40:20, 52:17, 52:23, 54:7, 57:14, 57:23, 58:19, 62:20, 62:25, 63:13
**conversation** [1] - 56:24
**cooperating** [1] - 8:12
**coordination** [1] - 8:17
**Copenhagen** [2] - 36:10, 36:12
**copies** [1] - 48:25
**copy** [1] - 34:7
**corner** [1] - 14:20
**Corp** [1] - 23:12
**corporal** [6] - 67:7, 67:15, 67:23, 68:6, 68:9, 68:10
**corporate** [1] - 67:15
**Corporation** [1] - 26:22
**correct** [59] - 4:18, 4:19, 5:8, 6:7, 6:8, 6:24, 6:25, 7:9, 8:6, 18:11, 18:12, 18:20, 18:23, 19:2, 19:4, 19:20, 20:4, 20:6, 20:9, 20:12, 21:3, 21:24, 22:2, 22:12, 25:12, 25:15, 25:22, 26:8, 26:12, 27:25, 28:4, 28:8, 28:12, 29:6, 31:6, 31:12, 33:11, 51:18, 51:25, 52:23, 53:16, 54:15, 56:9, 62:22, 63:2, 63:10, 64:4, 66:7, 66:16, 66:25, 67:8, 68:8, 68:25, 70:7, 75:4, 76:2, 78:20, 82:9, 86:4
**corrected** [1] - 76:2
**correctly** [4] - 68:3, 69:21, 70:12, 74:23
**Council** [4] - 36:18,

55:9, 64:3, 64:18
**counsel** [10] - 9:13, 33:25, 38:25, 63:6, 66:19, 71:20, 72:3, 73:17, 74:1, 85:10
**COUNSEL** [5] - 4:10, 18:1, 35:16, 49:9, 71:13
**counter** [1] - 34:18
**counter-designations** [1] - 34:18
**countries** [2] - 52:12, 55:19
**country** [1] - 37:24
**country's** [1] - 16:22
**couple** [4] - 36:14, 77:6, 77:7, 82:20
**courage** [1] - 77:15
**course** [10] - 9:4, 9:12, 15:22, 46:11, 46:15, 47:17, 47:20, 52:18, 68:15, 85:9
**court** [8] - 32:5, 32:7, 33:6, 34:2, 34:14, 35:2, 50:19, 85:18
**Court** [14] - 2:10, 22:21, 57:4, 57:6, 57:13, 57:19, 57:24, 77:25, 78:1, 78:6, 79:9, 79:10, 81:24, 85:2
**COURT** [102] - 1:1, 2:9, 3:8, 4:3, 4:7, 12:11, 14:19, 15:8, 15:11, 15:13, 17:18, 17:23, 22:6, 22:10, 22:12, 22:15, 22:19, 22:23, 23:2, 23:18, 24:5, 24:9, 29:12, 31:21, 31:23, 31:25, 32:4, 32:10, 32:21, 32:25, 33:8, 33:13, 33:16, 33:20, 33:23, 34:4, 34:11, 34:16, 34:20, 35:10, 35:12, 35:14, 36:19, 39:16, 49:1, 49:3, 49:8, 53:23, 54:1, 54:5, 56:11, 59:11, 59:13, 59:17, 59:20, 60:16, 63:6, 63:12, 63:18, 71:1, 71:5, 71:11, 73:4, 73:6, 73:21, 74:10, 74:16, 74:22, 75:6, 75:11, 75:21, 76:2, 76:13, 77:1, 77:16, 77:20, 78:9, 78:15, 78:17, 78:22, 79:3, 79:14, 79:18,

80:5, 80:9, 80:25, 81:6, 81:22, 82:3, 82:7, 82:10, 82:18, 83:9, 83:13, 84:2, 84:6, 84:10, 84:18, 85:9, 85:15, 86:1, 86:9
**courthouse** [1] - 73:14
**Courthouse** [1] - 2:10
**courtroom** [2] - 35:6, 74:5
**COURTROOM** [3] - 74:7, 74:11, 75:2
**courts** [1] - 52:15
**coverage** [1] - 73:9
**covering** [1] - 83:11
**coy** [1] - 10:16
**create** [1] - 8:18
**created** [3] - 42:14, 48:19, 48:20
**creation** [2] - 42:11, 48:16
**credible** [13] - 6:15, 10:6, 12:24, 15:24, 15:25, 24:2, 24:20, 25:2, 27:14, 28:5, 28:11, 28:23, 29:4
**crime** [4] - 29:20, 29:24, 30:1, 30:14
**Crimes** [4] - 58:23, 63:4, 71:15, 71:21
**crimes** [13] - 59:9, 59:10, 59:14, 59:18, 59:25, 60:4, 62:12, 71:16, 71:24, 80:12, 80:14, 80:23, 80:24
**criminal** [3] - 17:3, 60:1, 60:4
**criteria** [1] - 45:7
**cross** [11] - 17:23, 32:14, 33:11, 33:24, 34:1, 34:16, 34:17, 49:5, 60:16, 71:3, 84:16
**CROSS** [3] - 3:2, 18:1, 49:9
**cross-examination** [7] - 17:23, 32:14, 33:11, 33:24, 34:1, 49:5, 60:16
**CROSS-EXAMINATION** [2] - 18:1, 49:9
**cross-examinations** [1] - 84:16
**crosses** [1] - 80:3
**crowd** [1] - 46:12
**CRR** [1] - 2:9
**cruel** [29] - 38:3, 39:4,

39:13, 40:6, 40:8, 42:17, 42:18, 42:20, 43:2, 43:8, 43:16, 43:19, 44:6, 44:14, 44:19, 45:5, 47:7, 54:8, 58:20, 59:8, 60:11, 60:14, 60:18, 63:8, 63:9, 71:17, 72:9, 72:15, 72:24
**Cruel** [1] - 40:20
**cumulative** [1] - 84:22
**current** [2] - 59:2, 62:9
**custody** [2] - 46:14, 60:24
**cuts** [1] - 61:13
**cutting** [1] - 84:18

## D

**D.C** [1] - 2:4
**D1** [5] - 3:17, 32:16, 33:3, 75:2
**D2** [4] - 3:17, 32:16, 33:3, 75:2
**D38** [4] - 3:17, 32:17, 33:3, 75:2
**daily** [1] - 47:18
**Daniel** [2] - 81:23, 85:4
**Danish** [1] - 35:21
**dark** [1] - 45:23
**darkness** [1] - 44:9
**DATE** [1] - 86:9
**David** [1] - 18:16
**DAY** [1] - 1:10
**days** [3] - 45:12, 81:16, 83:23
**de** [3] - 75:10, 77:23, 79:12
**deal** [2] - 67:14, 80:21
**dealt** [1] - 53:16
**death** [5] - 41:23, 54:20, 55:3, 61:11, 61:19
**debate** [1] - 58:10
**decade** [1] - 65:25
**decades** [1] - 36:14
**December** [2] - 19:24, 20:1
**decide** [2] - 48:9, 77:2
**decides** [1] - 67:4
**decision** [1] - 18:13
**decisions** [2] - 57:3, 65:22
**decisive** [2] - 47:22, 67:2
**deck** [1] - 48:25
**defendant** [1] - 83:3
**Defendant** [1] - 1:8
**DEFENDANT** [3] - 2:1,

18:1, 49:9
**Defendant's** [1] - 22:5
**defendant's** [3] - 32:14, 71:20, 72:3
**defense** [1] - 84:25
**Defense** [2] - 53:9, 59:4
**define** [2] - 41:21, 52:10
**defined** [2] - 41:19, 70:17
**definitely** [1] - 50:16
**definition** [20] - 40:17, 42:18, 50:1, 52:16, 52:22, 52:25, 53:6, 53:21, 54:17, 54:18, 56:14, 56:18, 58:15, 60:11, 60:12, 60:18, 61:4, 61:5, 61:8, 71:23
**definitions** [2] - 52:20, 58:7
**definitive** [1] - 31:5
**degrading** [30] - 38:4, 39:4, 39:14, 40:7, 40:8, 42:18, 42:19, 42:23, 43:2, 43:8, 43:16, 43:19, 43:22, 43:23, 44:3, 44:6, 44:14, 44:19, 45:6, 47:8, 54:8, 56:25, 57:2, 59:8, 60:12, 60:15, 71:17, 72:10, 72:16, 72:24
**Degrading** [1] - 40:21
**degree** [1] - 36:11
**dehydrated** [1] - 48:3
**delegation** [2] - 37:23, 58:10
**delete** [1] - 85:13
**delineation** [1] - 8:22
**demeanor** [1] - 10:15
**denied** [1] - 15:22
**denominator** [2] - 48:14, 48:16
**Deposition** [1] - 14:10
**deposition** [19] - 14:4, 24:16, 32:12, 32:18, 32:20, 33:5, 34:1, 34:13, 34:23, 35:1, 75:3, 75:13, 77:23, 77:24, 78:19, 78:23, 79:1, 79:8, 83:9
**DEPOSITIONS** [1] - 3:8
**depositions** [2] - 74:2, 79:12
**deprivation** [3] - 44:8, 69:14, 69:18
**deprives** [1] - 42:8

18:1, 49:9
**deputy** [3] - 35:6, 36:22, 74:5
**DEPUTY** [3] - 74:7, 74:11, 75:2
**derogatory** [2] - 5:14, 13:10
**describe** [14] - 4:20, 10:15, 13:16, 13:24, 17:14, 17:15, 35:24, 36:6, 36:15, 37:5, 37:16, 38:13, 54:19, 62:8
**described** [5] - 15:16, 60:15, 61:22, 62:21, 66:5
**description** [1] - 61:17
**descriptions** [1] - 51:12
**designation** [1] - 34:6
**designations** [1] - 34:18
**designed** [1] - 84:16
**detail** [1] - 37:18
**detainee** [16] - 13:17, 19:23, 20:2, 20:23, 24:1, 25:14, 25:16, 25:21, 26:4, 26:7, 29:21, 47:1, 47:2, 55:2, 56:5, 70:10
**detainees** [8] - 17:10, 21:24, 25:25, 28:3, 28:7, 28:18, 28:21, 29:5
**Detention** [1] - 10:21
**detention** [5] - 6:13, 8:3, 8:14, 9:24, 15:18
**determined** [1] - 66:25
**develop** [4] - 36:1, 41:12, 64:23, 68:21
**developed** [5] - 28:20, 31:4, 39:20, 65:15, 65:16
**developing** [1] - 65:24
**development** [2] - 65:9, 65:19
**developments** [4] - 64:20, 64:25, 65:6, 65:10
**dialogue** [1] - 37:25
**difference** [5] - 43:5, 44:18, 50:24, 56:7, 58:14
**differences** [2] - 44:22, 52:9
**different** [14] - 6:6, 8:11, 24:25, 38:22, 42:23, 43:2, 46:14, 52:10, 52:11, 56:23, 65:7, 65:18, 65:22

**DIGNITY** [3] - 35:21, 35:25, 36:25
**dignity** [4] - 42:14, 42:24, 48:17
**diminishing** [1] - 42:25
**DIMUROGINSBERG** [1] - 2:6
**direct** [11] - 4:3, 21:1, 21:8, 22:1, 32:24, 51:16, 56:24, 60:15, 72:9, 72:13, 82:5
**DIRECT** [1] - 3:2
**directed** [4] - 13:25, 46:25, 47:2, 47:3
**director** [1] - 36:23
**disagreed** [1] - 70:20
**disagrees** [1] - 57:19
**discipline** [2] - 16:22, 67:7
**discrimination** [1] - 40:25
**discuss** [2] - 32:6, 73:9
**discussed** [5] - 42:2, 51:16, 62:24, 72:12
**discusses** [2] - 53:20, 60:9
**discussion** [1] - 62:10
**disfigurement** [1] - 61:12
**dislocate** [1] - 47:15
**dispute** [1] - 76:14
**distinguished** [1] - 47:10
**District** [1] - 2:10
**DISTRICT** [3] - 1:1, 1:1, 1:11
**Division** [1] - 1:2
**divorce** [1] - 77:11
**docket** [1] - 83:13
**doctor** [4] - 35:19, 36:9, 36:11, 51:13
**document** [1] - 85:12
**documentation** [1] - 36:2
**documented** [1] - 25:17
**documents** [1] - 27:20
**dog** [8] - 16:5, 46:10, 46:15, 46:16, 46:17, 46:24, 68:18
**dogs** [16] - 15:16, 15:17, 15:21, 16:3, 16:6, 16:8, 28:12, 28:17, 28:20, 46:11, 46:20, 68:17, 72:22
**done** [9] - 20:17, 25:6, 31:20, 33:25, 36:15, 37:21, 65:5, 73:7,

75:16
**door** [1] - 47:4
**down** [3] - 10:17, 10:22, 60:8
**dozens** [2] - 20:7
**Dr** [4] - 39:12, 48:23, 49:11, 71:15
**draft** [1] - 19:14
**drafted** [6] - 19:3, 19:5, 19:10, 19:15, 19:19, 51:24
**drafters** [1] - 38:22
**draw** [3] - 7:17, 7:19, 7:22
**drawn** [1] - 73:22
**drawn-out** [1] - 73:22
**drink** [1] - 44:8
**duly** [2] - 4:8, 35:15
**duration** [9] - 43:13, 44:22, 45:11, 47:21, 57:12, 67:4, 68:12, 68:13, 68:19
**during** [8] - 21:1, 31:13, 32:20, 45:15, 72:5, 75:3, 75:9, 77:23
**DX** [2] - 74:12, 74:13

## E

**ear** [1] - 69:22
**early** [1] - 20:1
**earmuffs** [1] - 69:17
**EASTERN** [1] - 1:1
**easy** [1] - 23:10
**edited** [3] - 19:4, 19:11, 19:21
**editorial** [4] - 38:10, 38:19, 38:20, 38:23
**editors** [1] - 38:23
**education** [1] - 39:20
**educational** [1] - 36:6
**effective** [1] - 5:13
**eight** [1] - 15:3
**either** [4] - 15:17, 23:22, 39:19, 43:19
**elaborate** [2] - 40:12, 44:16
**elected** [4] - 37:2, 37:9, 37:12, 64:17
**electrocution** [1] - 48:6
**element** [2] - 26:25, 41:6
**elements** [1] - 42:9
**ELLIOTT** [4] - 29:11, 75:25, 76:3, 77:19
**email** [1] - 75:22
**emergency** [1] - 40:14
**employed** [1] - 49:23

**employee** [7] - 23:16, 23:19, 26:3, 26:7, 30:19, 30:22, 30:25
**employer** [1] - 9:10
**employment** [2] - 13:8, 13:9
**encouraged** [1] - 28:25
**end** [7] - 4:5, 14:11, 33:7, 33:21, 34:3, 35:3, 67:25
**END** [1] - 59:22
**End** [1] - 34:15
**endorsed** [1] - 38:15
**enforce** [1] - 37:16
**enforcement** [1] - 46:11
**engaged** [1] - 28:25
**entail** [1] - 44:21
**entailed** [1] - 38:22
**entails** [1] - 40:22
**entered** [4] - 73:24, 74:17, 75:19, 76:6
**entirety** [1] - 74:20
**entitled** [1] - 86:5
**environment** [1] - 8:18
**equal** [1] - 41:22
**equated** [3] - 11:16, 13:3, 13:5
**equivalent** [2] - 33:10, 72:5
**erroneously** [1] - 30:21
**error** [1] - 77:19
**escapes** [1] - 46:13
**especially** [2] - 4:5, 74:1
**esse** [3] - 75:10, 77:23, 79:12
**essentially** [5] - 16:19, 40:22, 41:3, 41:16, 67:18
**establish** [2] - 10:5, 10:7
**establishing** [1] - 11:4
**et** [4] - 1:4, 41:18, 55:11, 67:4
**ethnic** [1] - 44:1
**euphemism** [1] - 12:8
**European** [6] - 57:3, 57:6, 57:13, 57:14, 57:19, 57:24
**evaluate** [2] - 72:25, 84:8
**evaluating** [1] - 72:24
**evaluation** [3] - 38:16, 50:19, 51:5
**evasive** [2] - 5:19, 7:3
**evening** [3] - 73:18, 80:3, 85:18

**events** [3] - 17:16, 54:22, 56:1
**everywhere** [1] - 17:1
**evidence** [22] - 13:18, 28:2, 28:11, 28:15, 28:23, 29:4, 32:15, 33:4, 33:18, 34:10, 38:17, 51:11, 51:12, 54:2, 59:18, 73:24, 74:21, 75:1, 79:2, 79:16, 80:14, 84:22
**evidentiary** [1] - 77:11
**exactly** [4] - 5:13, 24:17, 43:21, 66:3
**examination** [12] - 4:3, 17:23, 21:1, 32:13, 32:14, 33:11, 33:24, 34:1, 49:5, 51:5, 60:16, 72:13
**EXAMINATION** [5] - 4:10, 18:1, 35:16, 49:9, 71:13
**examinations** [1] - 84:16
**examine** [1] - 37:10
**examines** [1] - 37:22
**example** [6] - 12:17, 16:15, 44:23, 68:17, 70:12, 72:18
**examples** [10] - 12:17, 44:5, 44:9, 44:10, 45:2, 46:5, 47:1, 51:8, 65:4, 66:20
**exceedingly** [1] - 83:6
**excellent** [1] - 80:5
**exception** [7] - 53:5, 53:20, 54:9, 54:13, 55:15, 56:13, 56:18
**Excerpt** [3] - 33:5, 34:1, 34:13
**excerpt** [6] - 33:7, 34:3, 34:15, 35:1, 35:3, 77:22
**EXCERPTED** [1] - 3:8
**excerpts** [2] - 78:11, 78:12
**excluded** [1] - 53:21
**exclusion** [1] - 81:5
**excuse** [1] - 53:15
**excuses** [2] - 5:14, 5:21
**executed** [1] - 46:8
**executing** [1] - 63:15
**execution** [1] - 46:7
**executive** [1] - 26:16
**exercised** [1] - 67:16
**exhausted** [1] - 48:3
**exhaustive** [2] - 48:12, 66:21
**exhibit** [11] - 22:22,

35:10, 49:6, 53:8, 74:20, 75:18, 76:12, 76:19, 77:2, 81:5, 85:16
**Exhibit** [19] - 3:13, 3:14, 3:14, 3:15, 3:15, 3:16, 3:17, 3:18, 22:4, 22:5, 22:9, 23:7, 23:9, 53:9, 59:4, 76:5, 76:6, 76:8, 85:3
**Exhibits** [1] - 33:2
**EXHIBITS** [1] - 3:12
**exhibits** [14] - 35:11, 35:12, 73:23, 74:3, 74:17, 75:9, 76:4, 76:18, 77:8, 77:11, 85:3, 85:6, 85:13
**exonerated** [1] - 30:16
**expanded** [1] - 70:6
**expanding** [3] - 66:6, 66:8, 66:9
**expedient** [3] - 69:13, 69:20, 70:18
**experience** [3] - 37:1, 39:19, 61:18
**expert** [6] - 36:1, 39:12, 39:25, 50:3, 62:15, 72:2
**expertise** [3] - 37:13, 39:20, 63:21
**experts** [5] - 37:9, 37:13, 64:2, 64:18, 64:24
**explain** [1] - 5:20
**extend** [1] - 41:12
**extent** [2] - 63:1, 77:8
**extra** [1] - 73:16
**extreme** [3] - 41:21, 47:17, 61:12
**eye** [2] - 7:24

## F

**face** [1] - 68:12
**facilitate** [1] - 11:13
**facility** [1] - 9:24
**fact** [9] - 11:7, 13:13, 39:24, 51:4, 57:18, 57:22, 65:21, 70:22, 83:20
**facts** [1] - 39:18
**faculty** [3] - 50:7, 50:9, 61:15
**failure** [2] - 41:22, 61:19
**faint** [1] - 47:16
**fair** [6] - 20:20, 55:24, 56:25, 62:19, 69:25
**fairly** [1] - 81:17

fall [3] - 55:13, 56:13, 58:11
familiar [2] - 58:23, 62:13
family [1] - 47:4
far [7] - 20:13, 29:22, 59:13, 73:25, 74:17, 75:12, 80:19
FARIDI [27] - 1:14, 4:11, 4:15, 9:1, 12:13, 14:22, 17:20, 22:17, 22:25, 31:19, 31:24, 32:2, 32:11, 32:22, 34:5, 34:22, 35:4, 74:18, 74:24, 75:4, 79:22, 80:6, 80:21, 81:1, 83:1, 83:22, 84:14
Faridi [2] - 3:4, 79:22
fast [1] - 81:10
favorable [2] - 11:20, 12:14
Fay [5] - 27:23, 30:16, 31:4, 75:10, 79:19
feature [1] - 44:12
federal [2] - 60:1, 60:4
feet [1] - 47:11
female [1] - 5:20
few [7] - 7:3, 9:4, 9:11, 45:2, 58:25, 73:17, 83:5
field [11] - 37:13, 38:3, 39:12, 65:20, 66:3, 69:2, 69:13, 69:20, 70:2, 70:13, 70:18
file [1] - 13:9
files [1] - 85:4
finders [1] - 39:24
findings [8] - 5:9, 8:7, 8:9, 12:21, 29:17, 30:13, 30:24, 51:6
fine [8] - 32:21, 34:11, 34:20, 54:5, 56:6, 56:7, 69:22, 79:18
finer [1] - 58:17
finish [1] - 78:2
finished [1] - 31:7
first [15] - 9:13, 11:11, 28:10, 41:6, 45:3, 50:24, 50:25, 73:21, 74:16, 76:11, 79:6, 79:21, 79:23, 83:19
firsthand [3] - 49:16, 49:19, 49:22
FISHER [21] - 1:16, 35:7, 35:11, 35:13, 35:17, 39:11, 40:4, 48:24, 49:2, 56:10, 59:7, 59:15, 59:19, 59:21, 60:14, 63:11,

63:17, 70:24, 71:12, 71:14, 73:5
Fisher [2] - 3:6, 35:8
fixed [1] - 61:5
flag [1] - 84:14
flogging [2] - 54:14, 55:11
Floor [3] - 1:22, 2:3, 2:10
focus [10] - 11:10, 36:13, 40:5, 41:6, 42:1, 43:22, 45:2, 46:4, 47:6, 60:11
focused [2] - 19:24, 80:16
follow [2] - 16:1, 50:22
followed [1] - 12:22
following [2] - 5:17, 16:2
FOLLOWING [1] - 1:25
follows [3] - 4:9, 35:15, 51:1
food [1] - 44:8
FOR [9] - 1:1, 1:14, 1:21, 2:1, 4:10, 18:1, 35:16, 49:9, 71:13
forced [8] - 28:12, 28:17, 28:20, 47:20, 47:23, 48:4, 48:9, 72:18
foregoing [2] - 44:11, 86:3
Foreign [1] - 57:23
forensic [2] - 51:1, 51:13
forgiving [1] - 73:12
form [1] - 47:14
formality [1] - 10:8
formally [1] - 58:14
format [1] - 10:8
forms [1] - 69:14
forward [2] - 64:22, 65:21
Forward [2] - 4:24, 8:1
forwarded [1] - 31:10
foundation [1] - 12:11
four [6] - 14:19, 26:9, 27:6, 29:16, 29:17, 37:20
frankly [1] - 84:19
Frederick [5] - 32:11, 33:24, 75:12, 75:13, 78:8
FREDERICK [3] - 3:9, 33:5, 34:2
Frederick's [2] - 77:24, 78:23
free [1] - 73:18
friction [2] - 8:16, 8:20

Friday [4] - 81:21, 82:1, 83:17, 84:1
front [2] - 14:7, 46:17
full [1] - 81:9
fully [2] - 51:8, 51:14
function [1] - 61:19

## G

gather [1] - 64:20
gears [1] - 42:17
gender [1] - 41:17
General [32] - 4:4, 4:12, 4:18, 5:10, 6:21, 6:23, 7:8, 7:16, 7:23, 8:8, 11:7, 13:7, 14:13, 14:20, 15:1, 15:4, 16:10, 18:3, 18:13, 18:15, 18:16, 18:17, 24:21, 27:23, 31:4, 31:25, 32:4, 75:10, 75:12
general [13] - 4:22, 7:11, 11:9, 15:6, 16:22, 17:12, 17:13, 17:14, 18:14, 18:16, 32:1, 36:16, 36:22
generally [1] - 5:9
generation [1] - 13:10
generic [1] - 7:4
Geneva [1] - 37:24
gentlemen [3] - 33:23, 39:17, 73:7
Ghraib [16] - 4:20, 4:24, 5:7, 5:12, 5:23, 6:5, 8:1, 8:5, 8:10, 8:19, 17:15, 18:22, 20:24, 25:22, 26:11, 49:14
Ginsberg [3] - 81:15, 82:14, 85:1
GINSBERG [7] - 2:5, 81:4, 81:13, 82:16, 84:12, 85:2, 85:11
given [6] - 16:7, 23:6, 24:1, 28:2, 29:22, 54:9
global [4] - 52:5, 61:23, 61:25, 62:4
goggles [2] - 69:16, 69:22
governing [1] - 39:13
government [9] - 17:9, 23:1, 57:18, 64:11, 76:18, 76:21, 76:22, 76:24, 77:18
graduated [1] - 36:9
GRANER [2] - 3:9, 34:14
Graner [1] - 34:6

great [3] - 56:18, 58:16, 66:14
group [1] - 38:23
growling [1] - 46:16
guest [1] - 50:9
guide [2] - 38:21, 50:18
guides [1] - 38:16
guy [1] - 21:19

## H

HADDAD [4] - 1:15, 78:13, 78:16, 79:4
Haddad [1] - 79:5
half [2] - 10:14, 82:6
halfway [1] - 20:17
Hamza [1] - 23:24
hand [4] - 14:20, 27:14, 56:5, 78:11
handbook [1] - 38:6
handcuffing [3] - 54:19, 55:2
handed [2] - 20:10, 25:11
handlers [1] - 16:5
hands [2] - 47:13
Hanfoosh [4] - 22:2, 23:24, 24:19, 24:25
Hanfoosh's [1] - 25:2
harassed [1] - 12:19
hard [2] - 12:18, 83:23
harm [1] - 42:2
Harman [1] - 34:23
HARMAN [2] - 3:10, 35:1
harmonious [2] - 6:20, 6:22
hate [1] - 15:6
HAUG [1] - 1:14
head [1] - 36:22
headed [1] - 58:10
headquarters [2] - 13:21, 13:22
health [6] - 41:17, 45:19, 48:2, 48:20, 51:3, 51:4
hear [4] - 21:18, 32:7, 79:3, 85:15
heard [6] - 24:15, 33:20, 59:13, 59:17, 73:10, 74:22
hearsay [2] - 78:6, 79:2
held [2] - 35:22, 70:14
help [4] - 14:2, 22:17, 47:24, 69:7
helpful [1] - 80:7
helps [1] - 74:9
hence [1] - 56:17

herself [1] - 5:20
higher [1] - 7:7
hired [1] - 30:20
hold [1] - 83:15
holding [1] - 83:21
holistic [1] - 57:11
home [1] - 67:7
Honor [78] - 4:6, 14:22, 15:10, 17:19, 17:20, 17:22, 22:11, 22:17, 23:4, 24:8, 24:17, 29:11, 31:20, 31:24, 32:2, 32:3, 32:9, 32:11, 32:15, 32:18, 32:20, 32:22, 33:12, 33:17, 34:8, 34:9, 34:19, 34:22, 34:25, 35:4, 35:7, 35:11, 39:11, 40:4, 48:24, 48:25, 49:6, 49:7, 54:3, 59:7, 59:15, 59:21, 60:14, 63:11, 63:17, 63:24, 71:12, 73:5, 74:18, 74:25, 75:5, 75:8, 75:25, 76:11, 77:6, 77:23, 78:13, 78:21, 79:4, 79:12, 79:17, 79:23, 80:6, 80:21, 81:2, 81:4, 81:13, 81:14, 82:16, 83:1, 83:3, 83:7, 83:11, 83:22, 84:4, 84:9, 84:15, 84:17
honor [1] - 58:6
HONORABLE [1] - 1:11
hooding [2] - 56:4
hopefully [4] - 66:11, 66:12, 66:13, 73:11
hoping [1] - 80:1
horrific [2] - 20:2, 20:22
hour [7] - 10:14, 32:12, 32:23, 82:5, 82:6
hours [6] - 47:22, 47:23, 70:3, 70:6, 82:20, 83:5
house [1] - 26:10
HR [1] - 85:4
Human [9] - 55:9, 57:4, 57:6, 57:13, 57:14, 57:19, 57:24, 64:3, 64:18
human [6] - 42:24, 43:1, 50:11, 64:5, 65:21, 66:5
humanitarian [1] - 72:2

**humiliating** [1] - 42:25
**humiliation** [1] - 44:8
**humiliations** [1] - 42:7
**hundreds** [1] - 25:21
**hyperactivity** [1] -
45:20

## I

**idea** [3] - 17:7, 78:9,
82:10
**identification** [1] -
25:18
**identify** [1] - 27:13
**identity** [2] - 42:14,
48:17
**ill** [15] - 44:13, 44:18,
44:21, 44:24, 46:2,
46:24, 48:9, 65:3,
67:3, 67:5, 68:11,
68:12, 68:14, 68:16,
68:21
**illegal** [1] - 58:2
**illegally** [1] - 31:14
**imagined** [1] - 41:22
**impact** [1] - 48:16
**impairment** [2] -
61:14, 61:19
**implement** [2] - 36:1,
37:21
**implementation** [1] -
38:1
**implicated** [2] - 11:25,
28:6
**important** [6] - 10:3,
50:15, 53:5, 54:9,
55:16, 55:17
**impressions** [1] - 42:8
**improperly** [1] - 8:21
**improve** [1] - 38:1
**IN** [1] - 3:8
**in-person** [1] - 6:10
**inasmuch** [1] - 6:20
**INC** [1] - 1:7
**incidental** [1] - 60:22
**include** [6] - 49:4,
52:7, 52:21, 54:14,
57:25, 70:3
**included** [6] - 26:7,
34:17, 41:9, 76:19,
78:24, 80:15
**includes** [2] - 51:2,
72:18
**including** [5] - 18:8,
19:9, 44:3, 51:5,
60:23
**incompatible** [1] -
42:25
**incremental** [1] -
65:19

**indeed** [1] - 73:2
**independent** [3] -
64:7, 64:9, 64:11
**independently** [1] -
42:15
**indicate** [1] - 74:25
**indicated** [1] - 79:10
**indication** [1] - 75:18
**individual** [11] - 37:9,
41:17, 42:12, 42:13,
43:25, 46:18, 57:12,
61:6, 64:2, 64:22,
68:5
**individuals** [4] - 6:18,
8:7, 8:16, 8:17
**inferior** [1] - 7:11
**inflict** [2] - 42:5, 60:21
**inflicted** [5] - 40:23,
40:25, 41:4, 43:4,
67:18
**inflicting** [3] - 25:24,
26:3, 72:5
**infliction** [1] - 17:9
**information** [10] -
6:10, 6:15, 6:17,
10:6, 11:4, 28:5,
28:20, 40:24, 45:10,
48:22
**inherent** [1] - 54:10
**Inhuman** [1] - 40:21
**inhuman** [26] - 38:4,
39:4, 39:13, 40:7,
40:8, 42:17, 42:19,
42:20, 43:2, 43:8,
43:16, 43:19, 44:6,
44:14, 44:19, 45:5,
47:7, 54:8, 59:8,
60:11, 60:15, 60:18,
71:17, 72:9, 72:15,
72:24
**initial** [1] - 20:16
**injury** [3] - 44:8, 48:5,
61:11
**inside** [2] - 15:17, 16:6
**instance** [11] - 44:2,
45:14, 46:12, 46:19,
47:4, 48:2, 48:5,
51:11, 65:1, 65:25,
75:9
**instigation** [1] - 41:1
**Institute** [1] - 35:21
**instructed** [1] - 11:12
**instructing** [2] - 12:6,
29:3
**instruction** [2] -
16:15, 33:17
**instructions** [14] -
11:15, 12:1, 12:2,
12:22, 12:24, 12:25,
13:2, 13:5, 16:2,

27:18, 28:2, 80:10,
81:3, 83:19
**integrity** [1] - 42:13
**Intelligence** [7] - 6:4,
9:18, 9:21, 9:23,
18:22, 18:25, 20:14
**intelligence** [7] - 6:6,
7:5, 11:18, 26:10,
27:13, 27:21, 69:3
**intended** [1] - 60:21
**intensely** [1] - 44:3
**intensity** [8] - 43:13,
44:22, 45:13, 47:23,
57:12, 67:4, 68:12,
68:19
**intent** [1] - 42:21
**intentionally** [2] -
40:23, 41:4
**interactions** [1] - 7:12
**interest** [1] - 36:13
**intergovernmental**
- 52:19
**international** [33] -
36:17, 38:15, 39:5,
39:12, 40:6, 40:9,
40:16, 40:18, 41:23,
43:17, 43:20, 46:6,
48:12, 50:3, 51:17,
55:11, 55:12, 56:16,
56:17, 61:16, 61:21,
61:22, 62:8, 63:20,
65:6, 65:9, 65:11,
65:13, 70:10, 71:16,
71:24, 72:2, 80:23
**International** [2] -
36:17, 52:13
**interpreted** [1] - 55:10
**interpreter** [1] - 30:20
**interprets** [1] - 57:25
**interrogate** [5] - 28:8,
28:22, 29:2, 29:5,
29:8
**interrogated** [1] -
29:14
**Interrogation** [1] -
10:21
**interrogation** [14] -
8:15, 11:12, 12:6,
12:7, 12:9, 12:15,
12:18, 13:20, 15:19,
26:25, 27:4, 27:10,
31:2, 69:10
**interrogations** [4] -
11:13, 11:20, 69:3,
72:5
**interrogator** [4] - 9:17,
9:20, 21:6, 21:9
**interrogators** [2] - 7:6,
13:17
**intervals** [1] - 65:25

**interview** [12] - 4:23,
5:17, 6:11, 9:4, 10:1,
10:4, 10:10, 10:11,
10:13, 10:23, 26:9,
26:24
**interviewed** [6] - 9:11,
9:15, 10:12, 11:25,
28:24, 29:16
**interviewing** [2] -
6:15, 31:1
**interviews** [3] - 6:17,
25:5, 25:8
**intimidate** [1] - 11:3
**intimidated** [2] - 11:7,
12:19
**intimidating** [1] -
10:24
**introduce** [1] - 35:18
**investigate** [6] - 7:15,
18:10, 18:21, 18:24,
27:15, 31:16
**investigated** [2] -
10:9, 31:3
**investigating** [1] -
27:18
**investigation** [26] -
7:13, 10:1, 18:9,
18:17, 19:7, 19:19,
20:5, 20:11, 20:13,
20:17, 21:23, 24:2,
24:20, 24:21, 25:6,
26:3, 26:6, 27:5,
27:8, 27:20, 27:22,
27:24, 28:1, 31:5,
38:17, 50:13
**Investigation** [1] -
4:14
**involve** [3] - 45:14,
48:2, 61:18
**involved** [1] - 10:6
**involvement** [2] -
13:16, 73:7
**involves** [2] - 57:11,
61:11
**Iraq** [1] - 4:21
**IRTC** [1] - 36:22
**is..** [1] - 22:14
**isolating** [1] - 45:8
**isolation** [8] - 42:8,
44:8, 45:3, 45:12,
45:13, 45:15, 45:21,
46:2
**Israel** [3] - 26:21,
30:13, 30:18
**issue** [15] - 5:16, 6:18,
15:14, 16:10, 22:22,
46:14, 62:4, 62:9,
66:1, 74:19, 79:6,
80:20, 81:1, 83:25,
85:9

**issued** [1] - 65:2
**issues** [7] - 38:8,
39:23, 41:3, 58:11,
64:5, 64:21, 79:10
**Istanbul** [7] - 38:10,
38:14, 50:13, 50:15,
50:22, 50:25, 51:9
**it's..** [1] - 85:14
**itself** [5] - 8:20, 43:11,
58:18, 66:24, 75:17
**IVAN** [3] - 3:9, 33:5,
34:2
**Ivan** [2] - 32:11, 77:24

## J

**Janis** [3] - 4:18, 6:23
**January** [3] - 18:14,
18:19, 20:1
**JENS** [2] - 3:5, 35:15
**Jens** [2] - 35:5, 35:19
**job** [1] - 16:7
**John** [2] - 26:21,
30:13
**JOHN** [1] - 2:1
**Johnson** [1] - 85:4
**JOHNSON** [1] - 2:2
**joining** [1] - 58:18
**Joint** [1] - 10:21
**joint** [1] - 9:24
**Jones** [1] - 27:23
**Jordan** [1] - 26:16
**JOSEPH** [1] - 2:2
**Journal** [1] - 38:7
**journal** [1] - 38:7
**JR** [1] - 2:1
**JUDGE** [1] - 1:11
**judge** [5] - 19:5,
19:10, 19:15, 82:20,
84:12
**Judge** [1] - 85:2
**judicial** [2] - 65:7,
65:22
**junior** [1] - 16:1
**jurisprudence** [3] -
65:6, 65:23, 66:17
**juror** [1] - 39:21
**JURY** [1] - 1:10
**jury** [34] - 6:2, 10:15,
16:15, 17:8, 23:20,
24:6, 24:9, 24:14,
33:9, 33:16, 33:19,
35:18, 35:24, 36:7,
37:5, 38:13, 40:12,
40:17, 49:1, 60:13,
71:2, 73:18, 80:9,
80:16, 81:3, 81:11,
82:7, 82:10, 82:19,
82:20, 83:15, 83:18,
84:20, 84:21

**Jury** [3] - 4:2, 33:22, 73:20
**jus** [2] - 55:13, 62:7
**justification** [1] - 40:10
**justified** [2] - 40:11, 70:13
**justify** [1] - 40:14

## K

**Karpinski** [10] - 4:18, 5:10, 6:21, 6:23, 7:8, 7:16, 7:23, 8:8, 8:13
**keep** [3] - 4:4, 36:19, 82:23
**Kern's** [1] - 27:23
**KICAK** [1] - 1:17
**kill** [1] - 47:5
**killing** [1] - 44:7
**KIM** [1] - 1:17
**kind** [4] - 10:6, 40:25, 73:8, 82:24
**kinds** [1] - 55:22
**King** [1] - 2:6
**knowledge** [6] - 13:13, 36:2, 40:16, 49:16, 49:19, 49:22
**known** [1] - 68:1
**knows** [2] - 22:21, 67:22
**Kosovo** [1] - 36:23

## L

**lack** [6] - 8:4, 8:9, 8:17, 48:17, 48:18
**ladies** [3] - 33:23, 39:17, 73:7
**landmark** [1] - 65:5
**language** [1] - 59:25
**last** [10] - 53:3, 53:5, 66:2, 74:25, 79:6, 79:9, 79:20, 79:23, 81:15, 84:13
**late** [7] - 20:1, 71:1, 79:6, 79:25, 80:1, 80:2, 80:3
**law** [25] - 40:6, 40:9, 43:17, 43:20, 46:6, 46:11, 48:12, 50:4, 50:11, 55:11, 55:12, 55:19, 56:16, 59:2, 61:7, 61:22, 62:8, 62:9, 62:12, 63:20, 65:6, 65:9, 65:11, 65:13, 72:2
**Law** [1] - 50:8
**lawful** [7] - 54:10, 54:13, 55:10, 56:13,

60:23, 72:4, 72:5
**laws** [1] - 55:21
**lawyer** [1] - 63:18
**lawyers** [2] - 33:18, 37:14
**lay** [1] - 12:11
**layers** [1] - 7:11
**lead** [1] - 37:8
**leads** [1] - 8:24
**leaked** [1] - 31:14
**lean** [1] - 10:16
**learn** [1] - 6:17
**learned** [2] - 55:7, 55:15
**least** [5] - 6:15, 10:7, 66:17, 81:18, 83:18
**leave** [2] - 32:6, 81:14
**lecturer** [1] - 50:9
**led** [1] - 8:21
**left** [3] - 17:11, 23:10, 79:19
**legal** [12] - 6:14, 9:13, 10:5, 12:7, 27:16, 31:2, 54:20, 55:3, 55:12, 56:9, 68:18
**legitimate** [1] - 46:12
**lengthy** [1] - 40:19
**LEONIE** [1] - 1:11
**letter** [1] - 24:15
**level** [8] - 7:12, 7:19, 41:21, 43:3, 57:7, 57:10, 61:18, 68:21
**Liberty** [1] - 13:21
**Lieutenant** [3] - 18:13, 18:16, 26:16
**life** [1] - 11:8
**light** [2] - 44:9, 70:15
**likely** [2] - 8:18, 57:21
**limit** [1] - 70:3
**limitation** [1] - 55:20
**limited** [4] - 27:6, 41:7, 41:10, 70:2
**limits** [1] - 48:13
**LINDA** [1] - 2:1
**Linda** [1] - 49:11
**line** [3] - 15:3, 63:22, 78:24
**lines** [5] - 14:15, 14:17, 15:1, 15:2, 16:11
**lineup** [1] - 73:14
**list** [6] - 30:18, 48:11, 66:21, 73:23, 76:12, 79:20
**listed** [4] - 22:6, 44:10, 66:14, 66:19
**listen** [1] - 74:6
**literally** [1] - 11:25
**live** [1] - 84:2

**LLP** [2] - 1:18, 2:2
**local** [1] - 55:21
**logical** [1] - 33:8
**look** [19] - 11:9, 14:4, 14:7, 22:23, 23:6, 23:9, 45:8, 45:11, 53:8, 53:9, 54:6, 59:2, 59:4, 68:3, 68:10, 71:1, 75:21, 77:2, 78:17
**looking** [5] - 14:18, 23:3, 45:7, 57:2, 81:8
**loss** [1] - 61:14
**lumped** [1] - 47:10

## M

**MAHLER** [1] - 1:14
**MAHLER-HAUG** [1] - 1:14
**main** [1] - 43:5
**major** [2] - 7:11, 18:14
**Malinowski** [1] - 58:11
**managed** [1] - 5:6
**mandate** [2] - 37:10, 37:17
**Manfred** [1] - 65:2
**manner** [1] - 10:24
**manual** [5] - 69:3, 70:2, 70:14, 70:22, 71:7
**matter** [2] - 17:4, 86:5
**McCLURE** [1] - 2:2
**McKiernan** [1] - 18:16
**mean** [6] - 12:14, 52:11, 57:9, 60:2, 83:14, 84:3
**meaning** [3] - 10:18, 51:22, 61:11
**meaningful** [2] - 45:14, 45:16
**means** [7] - 12:6, 39:17, 40:13, 46:12, 51:7, 65:24, 73:9
**meant** [1] - 9:13
**media** [1] - 31:14
**medical** [6] - 35:19, 36:9, 36:11, 51:1, 51:12, 52:16
**meet** [1] - 79:7
**MEGAN** [2] - 3:9, 34:13
**Megan** [1] - 34:6
**member** [2] - 9:12, 61:14
**memory** [2] - 15:9, 15:13
**mental** [10] - 11:19, 40:23, 41:8, 42:1,

42:2, 45:19, 48:16, 48:20, 60:22, 61:15
**mention** [1] - 38:9
**mentioned** [25] - 9:3, 21:5, 21:23, 27:7, 29:10, 32:22, 37:12, 38:19, 44:15, 44:17, 44:18, 45:4, 45:7, 46:5, 46:25, 50:6, 53:20, 56:14, 56:18, 62:17, 63:25, 68:17, 68:22, 74:24, 74:25
**method** [4] - 43:10, 67:2, 67:3
**methods** [8] - 42:7, 42:10, 42:15, 43:15, 44:13, 45:22, 48:11, 48:15
**MI** [8] - 10:8, 16:2, 26:14, 26:17, 27:4, 27:15, 29:16, 31:1
**MICHAEL** [2] - 1:16, 1:16
**Michael** [1] - 35:8
**microphone** [1] - 36:20
**might** [26] - 10:6, 16:3, 17:2, 27:14, 39:21, 40:14, 41:22, 43:15, 44:21, 45:18, 45:22, 46:18, 46:21, 47:20, 48:4, 48:9, 48:14, 51:6, 51:12, 66:1, 66:15, 68:11, 77:23, 78:2, 82:19, 82:20
**military** [20] - 5:24, 6:6, 7:4, 7:6, 7:10, 9:4, 11:5, 11:18, 11:19, 16:16, 16:22, 17:2, 17:6, 17:13, 17:17, 26:10, 27:13, 27:21, 70:4
**Military** [11] - 5:1, 5:2, 5:3, 6:4, 9:18, 9:21, 9:23, 18:10, 18:22, 18:25, 20:14
**mind** [1] - 55:24
**minimum** [2] - 57:7, 57:10
**minor** [1] - 45:20
**minutes** [9] - 32:13, 32:23, 34:7, 34:24, 47:22, 71:4, 71:11, 73:18
**MIs** [1] - 11:18
**misconduct** [1] - 28:10
**misled** [1] - 24:6
**missed** [1] - 74:4
**mission** [3] - 8:15,

8:22, 36:23
**mistake** [5] - 22:24, 22:25, 23:2, 23:19
**mistreated** [1] - 49:20
**mistreatment** [1] - 62:7
**misunderstand** [1] - 24:14
**mock** [1] - 46:7
**MODVIG** [2] - 3:5, 35:15
**Modvig** [6] - 35:5, 35:19, 39:12, 48:23, 49:11, 71:15
**moment** [3] - 17:20, 41:10, 42:17
**Monahan** [1] - 79:19
**Monday** [7] - 81:18, 81:25, 82:11, 82:19, 83:16, 83:19, 84:17
**monitor** [1] - 64:5
**morning** [7] - 24:16, 73:12, 73:19, 79:24, 81:2, 81:8, 83:19
**most** [1] - 25:16
**mostly** [1] - 37:14
**mouth** [2] - 56:8
**move** [7] - 14:23, 39:11, 46:22, 47:24, 48:6, 59:20, 63:22
**moved** [1] - 81:24
**moving** [3] - 32:15, 54:2, 81:10
**MP** [7] - 4:22, 5:2, 11:24, 13:1, 13:6, 20:14, 28:24
**MPs** [10] - 6:12, 10:7, 11:12, 11:18, 12:6, 12:21, 25:17, 27:19, 28:2, 29:3
**MR** [92] - 4:11, 4:15, 9:1, 12:10, 12:13, 14:22, 17:19, 17:20, 17:25, 18:2, 22:4, 22:8, 22:11, 22:13, 22:16, 22:17, 22:21, 22:25, 23:3, 23:5, 23:22, 24:4, 24:8, 24:17, 29:11, 31:19, 31:20, 31:22, 31:24, 32:2, 32:3, 32:11, 32:19, 32:22, 33:12, 33:17, 34:5, 34:17, 34:22, 35:4, 35:7, 35:11, 35:13, 35:17, 39:11, 40:4, 48:24, 49:2, 56:10, 59:7, 59:15, 59:19, 59:21, 60:14, 63:11, 63:17, 70:24, 71:12, 71:14,

73:5, 74:18, 74:24, 75:4, 75:8, 75:20, 75:25, 76:3, 77:6, 77:19, 77:22, 78:11, 78:13, 78:16, 78:21, 78:25, 79:4, 79:17, 79:22, 80:6, 80:21, 81:1, 81:14, 81:23, 82:5, 82:9, 83:1, 83:6, 83:10, 83:22, 84:4, 84:8, 84:14

**MS** [19] - 39:15, 49:6, 49:10, 50:1, 53:10, 54:3, 63:7, 63:24, 71:4, 71:10, 73:3, 76:11, 76:15, 81:4, 81:13, 82:16, 84:12, 85:2, 85:11

**MUHAMMAD** [1] - 1:14

**Muhammad** [1] - 79:22

**must** [2] - 7:13, 43:16

## N

**NAJIM** [1] - 1:3
**naked** [4] - 46:23, 48:4, 84:23, 84:24
**nakedness** [1] - 72:18
**name** [12] - 9:3, 22:3, 24:6, 24:11, 29:4, 35:7, 35:19, 49:11, 64:16, 76:16, 77:12, 77:17
**named** [1] - 9:12
**names** [5] - 24:13, 77:9, 77:10, 77:13, 79:19
**Nations** [10] - 36:24, 37:2, 37:6, 37:17, 38:12, 38:15, 40:20, 52:18, 58:12, 64:18
**nature** [4] - 12:20, 17:4, 20:22, 61:13
**necessarily** [2] - 42:22, 43:5
**need** [9] - 22:13, 36:19, 56:11, 77:5, 80:25, 81:4, 83:4, 84:10, 84:23
**needed** [1] - 76:22
**Nelson** [4] - 21:5, 21:9, 21:13, 23:11
**never** [1] - 29:20, 30:1, 40:11, 49:13, 55:12, 55:19, 56:12, 57:16, 78:6, 79:1
**nevertheless** [1] - 51:9

**new** [1] - 60:8
**New** [4] - 1:19, 1:23
**next** [6] - 5:25, 23:23, 32:10, 34:4, 34:21, 47:4
**Nigel** [1] - 55:8
**night** [1] - 82:19
**night's** [1] - 73:11
**nights** [1] - 83:23
**NINA** [1] - 2:5
**nine** [1] - 73:25
**noise** [1] - 69:17
**none** [1] - 31:24
**nonjudicial** [1] - 29:24
**normally** [3] - 39:17, 46:10, 70:2
**norms** [5] - 39:13, 40:16, 51:17, 51:20, 61:16
**notes** [2] - 74:25, 75:14
**NOTES** [1] - 2:15
**nothing** [2] - 68:2, 73:5
**November** [1] - 7:25
**Nowak** [1] - 65:2
**nowhere** [1] - 62:5
**nuance** [1] - 80:22
**nuances** [1] - 63:20
**nudity** [4] - 16:17, 28:12, 28:17, 28:21
**number** [1] - 21:2, 24:10, 24:11, 38:5, 76:18
**numbers** [3] - 14:21, 85:8
**NW** [1] - 2:3

## O

**o'clock** [3] - 82:1, 83:17
**O'Connor** [3] - 3:4, 17:23, 75:7
**O'CONNOR** [40] - 2:1, 12:10, 17:19, 17:25, 18:2, 22:4, 22:8, 22:11, 22:13, 22:16, 22:21, 23:3, 23:5, 23:22, 24:4, 24:8, 24:17, 31:20, 31:22, 32:3, 32:19, 33:12, 33:17, 34:17, 75:8, 75:20, 77:6, 77:22, 78:11, 78:21, 78:25, 79:17, 81:14, 81:23, 82:5, 82:9, 83:6, 83:10, 84:4, 84:8
**Oath** [1] - 35:6
**oaths** [1] - 77:13

**objected** [1] - 77:25
**objection** [16] - 12:10, 12:12, 31:19, 31:21, 39:15, 54:1, 59:7, 60:14, 63:11, 63:17, 70:24, 73:3, 73:4, 79:15, 79:16, 83:6
**objections** [3] - 81:11, 83:2, 83:3
**obligation** [2] - 37:20, 85:7
**obligations** [5] - 37:11, 37:21, 52:20, 68:25, 69:9
**observations** [1] - 12:21
**observe** [1] - 20:23
**obstacle** [1] - 55:20
**obtain** [1] - 45:9
**obtaining** [2] - 40:24, 48:21
**obvious** [1] - 44:23
**occasions** [1] - 67:14
**occur** [2] - 8:18, 20:23
**October** [1] - 19:24
**OF** [5] - 1:1, 1:10, 2:15, 86:1, 86:9
**offense** [2] - 59:25, 60:4
**offer** [1] - 85:6
**offered** [1] - 74:19
**offering** [1] - 85:13
**office** [1] - 36:24
**officer** [2] - 7:14, 26:17
**officers** [2] - 7:10, 7:11
**OFFICIAL** [2] - 2:9, 86:1
**official** [4] - 13:8, 41:2, 41:5
**officiated** [1] - 7:14
**often** [1] - 64:18
**ON** [2] - 1:24, 59:12
**once** [1] - 78:7
**one** [37] - 12:23, 15:15, 17:20, 21:5, 21:8, 22:1, 22:25, 24:1, 34:16, 36:24, 43:18, 44:25, 45:7, 45:18, 50:25, 52:16, 52:17, 58:6, 64:13, 64:15, 67:6, 68:6, 69:18, 74:18, 74:25, 75:25, 76:13, 76:15, 76:16, 77:2, 77:3, 77:22, 80:22, 81:18, 84:13, 84:14
**ones** [1] - 76:19
**open** [5] - 33:6, 34:2,

34:14, 35:2, 82:23
**operates** [1] - 57:7
**operating** [1] - 5:7
**Operating** [2] - 4:24, 8:1
**operation** [1] - 27:21
**opined** [1] - 62:21
**opining** [1] - 64:21
**opinion** [12] - 21:16, 21:20, 39:18, 40:3, 56:2, 56:4, 56:7, 56:15, 58:13, 62:4, 65:8, 71:25
**opinions** [5] - 21:21, 39:22, 40:5, 52:2, 64:13
**opportunity** [3] - 62:11, 68:23, 79:11
**opposing** [1] - 85:14
**opposition** [1] - 79:3
**option** [1] - 40:2
**options** [1] - 84:8
**order** [7] - 19:14, 19:16, 27:9, 37:21, 43:17, 45:9, 74:8
**ordered** [3] - 18:15, 47:21, 47:25
**orders** [5] - 15:6, 15:7, 16:1, 16:8, 18:23
**organ** [3] - 41:22, 61:14, 61:19
**organization** [3] - 36:17, 52:19, 64:9
**organizations** [3] - 52:10, 52:11, 64:24
**origin** [1] - 44:1
**original** [1] - 53:14
**originally** [4] - 19:3, 36:8, 38:11, 85:12
**OSCE** [1] - 36:23
**ourselves** [1] - 27:6
**outcome** [1] - 39:9
**outrank** [1] - 7:15
**outside** [3] - 15:18, 27:8, 27:18
**overall** [1] - 38:24
**overnight** [1] - 75:21
**overruled** [2] - 60:17, 81:11
**oversaw** [1] - 38:24
**own** [5] - 12:24, 18:15, 27:22, 45:17, 64:22

## P

**P.M** [2] - 1:8, 1:10
**p.m** [6] - 1:8, 4:2, 33:15, 33:22, 73:20, 85:19
**page** [22] - 4:13, 5:25,

8:25, 14:13, 14:16, 14:17, 14:18, 14:20, 16:9, 16:10, 22:5, 22:10, 22:11, 23:8, 23:23, 45:2, 53:9, 53:11, 59:5, 59:23, 60:25
**PAGE** [2] - 1:25, 3:12
**pages** [5] - 2:13, 3:18, 14:19, 32:17, 33:3
**pain** [31] - 40:22, 41:3, 41:6, 41:7, 41:9, 41:10, 41:13, 41:14, 41:16, 41:18, 41:20, 41:21, 41:22, 41:25, 42:1, 42:5, 42:20, 43:3, 43:7, 54:9, 60:22, 61:2, 61:4, 61:8, 61:9, 61:12, 61:18, 67:18, 72:5
**painful** [2] - 47:14, 47:15
**paper** [1] - 14:19
**papers** [1] - 38:5
**Pappas** [12] - 6:2, 6:3, 6:16, 6:18, 6:24, 7:2, 7:8, 7:25, 8:8, 8:15, 26:13, 29:20
**paraded** [1] - 16:18
**paradigm** [1] - 51:1
**paragraph** [4] - 6:1, 13:7, 54:7, 62:17
**Paragraph** [9] - 8:24, 9:16, 11:23, 22:4, 22:5, 22:11, 23:14, 23:23, 61:10
**parameters** [2] - 27:9, 27:18
**parent** [1] - 67:12
**parents** [1] - 67:16
**Part** [1] - 4:14
**part** [8] - 19:7, 24:13, 38:9, 49:3, 57:3, 71:6, 75:23, 78:19
**participate** [2] - 25:5, 25:8
**particular** [2] - 6:1, 8:24
**particularly** [1] - 47:14
**parties** [3] - 37:9, 76:5, 77:2
**party** [1] - 37:19
**passed** [1] - 31:4
**past** [1] - 36:14
**Patterson** [1] - 35:8
**PATTERSON** [1] - 1:18
**PC** [1] - 2:6
**people** [8] - 21:21, 24:13, 25:24, 26:10,

29:1, 37:13, 44:4,
77:13
**per** [1] - 14:19
**perception** [3] - 41:18,
41:24, 61:6
**perfectly** [4] - 46:12,
54:20, 55:3, 68:18
**performance** [1] - 7:4
**perhaps** [3] - 15:24,
42:13, 66:2
**period** [5] - 4:21,
19:24, 19:25, 50:10,
64:20
**permits** [1] - 69:14
**perpetrated** [1] -
52:21
**perpetrator** [1] - 42:12
**perpetrators** [1] -
48:13
**person** [13] - 4:25,
6:10, 7:15, 9:12,
13:19, 39:22, 41:2,
42:24, 45:8, 45:9,
60:20, 64:13, 65:8
**person's** [2] - 44:1,
56:5
**personality** [1] - 10:16
**personally** [5] - 10:10,
10:12, 20:23, 20:25,
28:16
**personnel** [1] - 29:16
**perspective** [1] - 6:19
**pets** [1] - 46:20
**Ph.D** [1] - 36:10
**phobias** [1] - 45:20
**photograph** [2] -
15:17, 16:20
**photographic** [1] -
51:12
**photographs** [3] -
25:17, 25:18, 25:21
**photos** [4] - 25:13,
25:24, 26:2, 26:6
**physical** [22] - 11:16,
11:19, 13:3, 13:5,
13:18, 13:24, 38:17,
40:23, 41:7, 42:3,
42:4, 42:9, 42:15,
44:12, 48:15, 60:21,
60:23, 61:2, 61:8,
61:9, 61:12
**physician** [1] - 35:25
**picked** [3] - 5:21, 8:2,
8:13
**picture** [1] - 84:19
**pictures** [7] - 3:17,
20:2, 20:21, 25:19,
32:16, 33:2, 84:23
**PII** [5] - 77:9, 85:5,
85:7, 85:13, 85:16

**piles** [2] - 84:23, 84:24
**place** [2] - 44:25,
54:22
**placed** [1] - 13:8
**plaintiff** [8] - 24:15,
74:16, 75:6, 75:22,
79:20, 79:23, 82:24,
85:6
**PLAINTIFF** [2] - 3:12,
33:2
**Plaintiff's** [2] - 22:8,
23:9
**plaintiffs** [15] - 1:5,
23:7, 29:9, 29:14,
32:11, 34:5, 34:22,
35:4, 35:9, 38:25,
39:11, 49:20, 77:24,
79:5, 79:22
**predictable** [1] - 81:17
**PREMIER** [1] - 1:7
**prepare** [1] - 36:3
**prepared** [1] - 19:3
**present** [5] - 6:4,
10:10, 10:20, 13:19,
42:22
**presentation** [1] -
36:3
**presenting** [1] - 62:12
**presents** [1] - 37:25
**preservation** [1] -
51:11
**preserved** [1] - 51:14
**pressure** [1] - 45:9
**pretty** [1] - 5:20
**prevention** [1] - 36:2
**previous** [1] - 32:20
**previously** [3] - 4:8,
57:11, 77:16
**primary** [1] - 76:17
**prison** [6] - 9:25,
15:18, 16:6, 20:15,
25:22, 26:11
**prisoner** [1] - 24:10
**private** [1] - 52:21
**problem** [9] - 76:2,
76:24, 77:21, 78:15,
78:16, 81:19, 82:16,
82:18, 82:23
**problematic** [1] -
69:11
**proceed** [2] - 35:13,
49:7
**proceeding** [1] - 79:25
**PROCEEDINGS** [1] -
1:10
**proceedings** [2] -
32:6, 86:4
**process** [3] - 31:13,
64:19, 68:24
**produced** [1] - 85:12
**professional** [1] -
36:14
**professionally** [1] -

47:9, 72:20
**positive** [1] - 66:7
**possibility** [1] - 70:14
**possible** [1] - 81:25
**possibly** [1] - 84:5
**potential** [1] - 50:19
**potentially** [1] - 51:7
**power** [1] - 81:24
**powerlessness** [2] -
42:11, 48:17
**PowerPoint** [1] - 36:3
**practical** [4] - 56:19,
58:9, 58:15, 65:3
**preconditions** [1] -
44:2

**PLAINTIFFS** [4] -
1:14, 4:10, 35:16,
71:13
**plaintiffs'** [7] - 22:7,
22:22, 32:13, 32:23,
76:4, 81:5, 81:15
**Plaintiffs'** [1] - 22:20
**plan** [4] - 79:21, 80:7,
80:9, 83:17
**planned** [1] - 79:7
**planning** [3] - 80:4,
82:24, 83:2
**plans** [3] - 27:4, 27:10,
82:13
**play** [2] - 51:3, 79:7
**PLAYED** [1] - 3:8
**played** [8] - 33:5, 34:2,
34:14, 34:18, 35:2,
75:10, 78:23, 79:13
**players** [1] - 64:24
**playing** [1] - 34:18
**point** [15] - 11:11,
11:23, 16:4, 20:18,
31:13, 56:13, 58:17,
59:14, 63:19, 70:16,
73:24, 78:9, 80:6,
82:25, 83:1
**pointed** [1] - 66:19
**police** [7] - 5:24, 6:7,
7:6, 9:4, 11:6, 11:19,
16:16
**Police** [4] - 5:1, 5:2,
5:3, 5:8, 18:11
**policy** [4] - 7:10, 17:8,
17:12, 17:13
**political** [1] - 37:14
**portion** [2] - 40:1, 79:8
**Porvaznik** [3] - 81:23,
83:10, 83:25
**position** [2] - 15:6,
35:22
**positions** [3] - 47:6,

36:15
**professionals** [1] -
51:3
**Professor** [1] - 65:2
**profile** [1] - 77:15
**prohibited** [2] - 40:9,
58:1, 60:9
**prohibition** [2] - 45:5,
62:7
**prolong** [1] - 68:13
**prominent** [2] - 55:7,
64:18
**proper** [1] - 79:15
**proposals** [1] - 41:19
**proposed** [3] - 76:18,
80:10, 80:14
**protect** [3] - 67:17,
67:20, 68:2
**protection** [1] - 65:20
**protections** [1] - 66:5
**protective** [1] - 67:24
**Protocol** [7] - 38:10,
38:14, 50:13, 50:15,
50:22, 50:25, 51:9
**protocol** [4] - 38:16,
38:21, 38:24, 51:15
**protracted** [1] - 84:16
**provide** [4] - 5:22,
17:12, 40:17, 46:5
**provided** [4] - 6:10,
6:11, 16:16, 76:21
**providing** [4] - 7:20,
11:25, 12:25, 64:22
**proviso** [1] - 67:1
**psychological** [7] -
38:16, 41:9, 42:7,
42:10, 42:16, 44:12,
48:15
**PTX** [34] - 14:9, 32:16,
32:17, 33:3, 33:4,
34:9, 74:7, 74:11,
74:12, 74:13, 74:14,
74:15, 74:19
**public** [4] - 41:1, 41:4,
77:10, 77:17
**publications** [1] - 38:3
**publicly** [1] - 76:8
**published** [4] - 38:2,
38:5, 38:11, 38:12
**pull** [2] - 4:15, 22:16
**punished** [1] - 67:23
**punishment** [11] -
29:24, 40:24, 54:8,
54:13, 58:20, 67:7,
67:15, 67:16, 68:6,
68:9, 68:10
**purpose** [11] - 27:12,
40:24, 41:4, 42:21,
43:6, 43:13, 44:20,
45:8, 47:20, 48:21,

68:19
**purposes** [5] - 22:19,
24:20, 50:20, 61:10,
70:4
**pursue** [1] - 27:17
**pursuing** [2] - 46:13,
48:21
**pushback** [1] - 77:18
**put** [4] - 24:4, 45:9,
58:17, 83:4
**puts** [1] - 81:10
**putting** [6] - 18:8,
56:8, 64:22, 80:9,
81:6

**Q**

**qualifications** [1] -
50:6
**qualified** [1] - 39:16
**qualify** [1] - 39:12
**question-and-
answer** [1] - 37:23
**questionable** [1] -
17:3
**questioning** [4] - 54:3,
63:22, 69:22, 78:24
**questions** [12] - 5:19,
7:3, 7:4, 11:4, 17:22,
31:22, 33:18, 48:24,
49:13, 58:25, 71:10,
78:2
**quick** [1] - 78:14
**quickly** [1] - 83:15
**quite** [2] - 38:5, 65:1
**quote** [1] - 57:25
**quoted** [1] - 65:1

**R**

**raise** [5] - 64:5, 79:9,
79:10, 79:11, 82:2
**rank** [2] - 7:7, 7:14
**rape** [1] - 47:5
**raped** [3] - 67:19,
67:24
**rapporteur** [3] - 55:8,
63:25, 64:15
**rapporteurs** [2] - 58:7,
64:17
**rather** [4] - 40:19,
64:22, 65:4, 65:8
**ratified** [2] - 57:22,
62:24, 63:13
**ratifying** [1] - 58:8
**reached** [1] - 39:9
**read** [9] - 14:15, 15:1,
15:4, 16:10, 25:19,
60:12, 60:18, 61:7,
78:25

**reading** [5] - 15:8, 24:22, 74:5, 77:24, 78:3
**ready** [1] - 16:11
**reality** [1] - 48:18
**realized** [1] - 20:14
**really** [4] - 68:5, 69:24, 77:15, 80:25
**reason** [2] - 55:14, 76:17
**reasons** [1] - 52:18
**Rebecca** [1] - 86:3
**REBECCA** [1] - 2:9
**rebuttal** [2] - 82:24, 83:4
**receive** [3] - 27:20, 36:11, 76:23
**received** [4] - 11:24, 20:2, 75:1, 76:17
**recess** [2] - 33:13, 85:18
**Recess** [1] - 33:15
**recollection** [2] - 14:2, 16:9
**recommend** [3] - 5:16, 5:18, 30:8
**recommendation** [4] - 4:17, 7:1, 27:7, 27:16
**recommendations** [2] - 37:25, 55:20
**Recommendations** [1] - 4:14
**recommended** [1] - 30:5
**recommending** [1] - 80:15
**record** [12] - 22:19, 23:18, 34:11, 35:7, 49:3, 49:4, 75:17, 75:23, 77:10, 77:17, 85:19, 86:4
**RECORD** [1] - 59:12
**recorded** [1] - 74:2
**RECROSS** [1] - 3:2
**recross** [1] - 73:6
**redact** [2] - 77:7, 85:7
**redacted** [3] - 76:20, 85:5
**redacting** [1] - 77:9
**redaction** [1] - 22:22
**redactions** [3] - 76:18, 76:22, 77:9
**redirect** [1] - 31:23, 71:11
**REDIRECT** [2] - 3:2, 71:13
**reference** [1] - 23:11
**references** [2] - 24:15, 74:3

**referred** [2] - 9:5, 52:4
**reflected** [3] - 52:2, 65:10, 75:14
**refresh** [3] - 14:2, 15:9, 16:9
**regarded** [1] - 12:25
**regarding** [4] - 11:5, 51:17, 59:17, 65:13
**regular** [1] - 65:24
**Regulation** [1] - 7:13
**regulations/policy** [2] - 11:15, 12:4
**Rehabilitation** [1] - 36:17
**reject** [1] - 39:25
**rejected** [1] - 41:23
**relate** [1] - 8:9
**related** [8] - 6:18, 15:16, 19:14, 38:3, 58:11, 59:1, 64:21, 68:10
**relating** [2] - 28:2, 29:21
**Relations** [1] - 57:23
**relationship** [6] - 6:20, 6:22, 7:5, 9:20, 9:22, 11:5
**relative** [3] - 7:7, 13:17, 17:16
**relatives** [1] - 47:3
**released** [1] - 32:5
**relevance** [1] - 12:10
**relevant** [3] - 37:1, 66:1, 72:25
**relied** [7] - 21:2, 21:23, 24:2, 25:2, 25:19, 57:3, 66:14
**religious** [1] - 44:1
**rely** [1] - 22:22
**remarks** [1] - 5:14
**remember** [8] - 12:17, 15:15, 69:7, 69:21, 70:12, 70:13, 73:8, 73:13
**remind** [1] - 33:19
**removed** [1] - 4:23
**repeat** [2] - 21:7, 71:19
**replete** [1] - 85:5
**report** [38] - 4:13, 9:16, 11:10, 13:10, 19:3, 19:10, 19:17, 19:19, 19:24, 29:18, 30:16, 30:18, 30:21, 30:25, 31:7, 31:13, 37:20, 37:22, 51:24, 52:2, 52:4, 53:1, 54:19, 57:2, 57:6, 59:1, 65:1, 65:2, 65:4, 65:5, 65:7,

66:4, 66:21, 76:1, 76:3, 76:9
**reported** [2] - 25:16, 28:10
**REPORTER** [3] - 2:9, 86:1, 86:9
**reporting** [1] - 8:11
**reports** [2] - 51:8, 64:23
**represent** [1] - 49:12
**represents** [1] - 65:8
**reprimand** [4] - 5:16, 5:18, 7:1, 13:8
**request** [1] - 33:17
**requested** [3] - 11:18, 18:15, 19:11
**require** [1] - 7:10
**requirement** [2] - 10:7, 42:21
**requirements** [2] - 51:9, 70:11
**research** [2] - 38:5, 38:6
**reservation** [4] - 58:8, 58:14, 58:18, 62:25
**respect** [13] - 5:10, 5:24, 8:7, 11:10, 15:20, 17:9, 19:23, 27:12, 28:1, 28:7, 28:21, 29:17, 43:1
**respond** [1] - 78:13
**response** [4] - 15:8, 21:22, 50:5, 78:14
**responses** [1] - 11:24
**responsibilities** [3] - 35:25, 36:1, 37:6
**responsibility** [6] - 8:23, 52:19, 67:17, 67:20, 67:24, 85:12
**responsible** [1] - 67:25
**rest** [3] - 44:9, 79:25, 80:2
**restrained** [1] - 46:22
**result** [1] - 42:3
**retain** [1] - 42:13
**retained** [3] - 38:25, 39:2, 39:3
**review** [3] - 27:4, 31:11, 38:21
**reviewed** [5] - 19:11, 19:21, 26:2, 55:18, 58:5
**revised** [2] - 38:11, 51:2
**Revision** [1] - 59:25
**revision** [3] - 38:21, 38:24, 60:4
**revisit** [1] - 78:7
**revoke** [2] - 13:10,

30:10
**revoked** [2] - 30:6, 30:8
**right-hand** [1] - 14:20
**RIGHTS** [1] - 1:21
**Rights** [8] - 55:9, 57:4, 57:7, 57:13, 57:14, 57:19, 57:24, 64:3, 64:18
**rights** [5] - 50:11, 64:5, 65:21, 66:6, 66:9
**risk** [2] - 61:11, 81:10
**ROBINSON** [3] - 1:15, 76:11, 76:15
**rocket** [1] - 83:13
**Rodley** [1] - 55:8
**role** [4] - 4:20, 11:5, 15:20, 51:3
**roles** [1] - 38:20
**room** [2] - 47:4, 70:14
**RPR** [1] - 2:9
**rules** [1] - 39:13
**ruling** [2] - 77:16, 81:5
**run** [5] - 32:12, 32:22, 34:6, 34:23, 81:25

# S

**SABRINA** [2] - 3:10, 35:1
**Sabrina** [1] - 34:23
**sake** [1] - 23:18
**Sanchez** [3] - 18:13, 18:15, 18:17
**sanctions** [6] - 54:10, 55:10, 56:14, 60:23, 72:4, 72:6
**saw** [4] - 15:17, 16:20, 25:19, 25:21
**schedule** [3] - 79:18, 82:21, 83:21
**scheduling** [1] - 82:18
**scholar** [1] - 55:8
**scholars** [1] - 64:19
**School** [1] - 50:7
**scientific** [1] - 38:7
**scientists** [1] - 37:15
**scope** [5] - 58:20, 63:20, 73:3, 83:2, 83:6
**SCOTT** [1] - 1:17
**screen** [3] - 4:15, 23:10, 24:4
**second** [6] - 5:25, 11:11, 11:22, 50:24, 54:6, 74:24
**seconds** [2] - 34:7, 34:24
**secretary** [2] - 36:16,

36:22
**section** [3] - 4:13, 6:1, 8:25
**security** [5] - 13:10, 30:5, 30:11, 70:4, 73:15
**Security** [1] - 85:7
**see** [28] - 7:24, 13:11, 14:2, 14:20, 18:6, 23:11, 26:5, 26:6, 27:10, 32:7, 46:10, 47:12, 59:24, 60:6, 60:8, 62:8, 66:1, 73:18, 78:7, 80:11, 80:12, 80:13, 81:6, 81:11, 82:12, 84:15, 84:19, 84:23
**seeing** [1] - 20:21
**seeking** [1] - 6:14
**seem** [1] - 77:15
**segment** [1] - 53:18
**self** [1] - 63:15
**self-executing** [1] - 63:15
**Senate** [1] - 57:23
**send** [1] - 75:22
**senior** [3] - 5:22, 7:14
**sensations** [1] - 70:15
**sense** [2] - 48:18, 80:7
**sensory** [2] - 69:14, 69:18
**sentence** [3] - 4:5, 53:3, 53:5
**separate** [4] - 9:24, 27:7, 31:3, 43:18
**separation** [2] - 69:11, 69:14, 69:20
**Serbia** [1] - 36:24
**serious** [7] - 60:21, 60:23, 61:2, 61:4, 61:8, 61:9, 61:13
**seriously** [1] - 83:24
**serve** [1] - 47:20
**service** [1] - 18:8
**serving** [2] - 18:22, 37:3
**SESSION** [2] - 1:8, 1:10
**session** [4] - 37:23, 73:17, 73:22, 82:8
**set** [7] - 11:19, 12:7, 12:24, 12:25, 14:24, 15:7, 41:19
**setting** [4] - 11:13, 12:5, 12:8, 12:14
**settings** [1] - 51:4
**several** [1] - 81:7
**severe** [13] - 40:22, 41:3, 41:6, 41:15, 41:20, 41:24, 42:1,

42:2, 42:5, 42:20, 43:7, 60:21, 67:18
**severely** [1] - 67:23
**severity** [3] - 43:3, 57:7, 57:10
**sexual** [3] - 44:3, 44:13, 48:15
**shall** [1] - 61:10
**Sharia** [2] - 55:19, 55:21
**shaved** [1] - 53:3
**sheet** [1] - 14:19
**shift** [1] - 42:17
**Shimari** [1] - 79:24
**SHIMARI** [1] - 1:4
**short** [2] - 71:12, 83:4
**shot** [1] - 48:7
**shoulders** [1] - 47:15
**show** [3] - 25:24, 26:3, 53:24
**showed** [1] - 71:20
**showing** [1] - 83:25
**shown** [3] - 34:9, 71:15, 71:20
**shrinking** [1] - 81:15
**shy** [1] - 84:18
**side** [3] - 15:18, 26:10, 27:13
**sides** [3] - 74:3, 80:18, 81:10
**sight** [1] - 69:25
**sIGNATURE** [1] - 86:9
**signed** [1] - 57:16
**significance** [3] - 56:19, 58:9, 58:16
**significant** [1] - 61:14
**signs** [2] - 62:5, 64:15
**simple** [1] - 5:20
**simplifying** [1] - 80:16
**single** [1] - 65:8
**sit** [1] - 82:11
**site** [3] - 9:25, 13:20, 16:6
**situations** [1] - 68:15
**skip** [1] - 60:8
**slap** [1] - 68:12
**sleep** [2] - 44:9, 73:11
**slide** [5] - 44:10, 44:11, 48:11, 48:25, 68:7
**slight** [2] - 44:23, 74:19
**slightly** [1] - 42:23
**slowly** [4] - 65:22, 65:24, 66:8, 66:9
**small** [1] - 45:23
**so-called** [2] - 46:7, 47:12
**social** [2] - 36:8, 45:16

**Social** [1] - 85:7
**society** [1] - 64:24
**soldier** [3] - 5:20, 12:23, 28:24
**soldiers** [16] - 5:15, 7:5, 8:21, 9:5, 9:11, 11:6, 11:24, 12:16, 13:6, 15:15, 15:25, 16:1, 20:7, 21:3, 28:5, 28:24
**solitary** [2] - 45:3, 45:4, 46:2
**someone** [1] - 7:12
**sometimes** [6] - 47:10, 48:18, 57:18, 69:16, 73:14
**sorry** [12] - 9:7, 15:5, 15:11, 19:18, 22:8, 36:19, 53:23, 53:25, 56:9, 60:3, 71:18, 72:11
**sort** [1] - 84:24
**sought** [1] - 9:13
**sound** [2] - 69:17, 69:25
**sounds** [1] - 70:15
**spanked** [2] - 67:12, 67:22
**spanking** [2] - 67:10, 67:11
**speaking** [1] - 5:9
**special** [4] - 55:8, 63:25, 64:15, 64:17
**specialize** [1] - 50:11
**specific** [6] - 5:4, 13:24, 40:23, 41:4, 47:2, 75:18
**specifically** [2] - 59:1, 69:13
**spend** [1] - 77:1
**Springfield** [1] - 77:14
**Square** [1] - 2:10
**staff** [9] - 10:11, 19:4, 19:5, 19:9, 19:10, 19:14, 19:15, 19:19, 21:1
**stage** [1] - 51:13
**stand** [4] - 47:21, 47:25, 48:4, 48:5
**standard** [5] - 38:15, 42:23, 55:1, 71:16, 71:24
**standards** [6] - 39:5, 55:11, 56:17, 61:21, 67:13, 80:23
**standing** [5] - 47:17, 47:20, 47:22, 47:24, 48:9
**staring** [2] - 10:17, 10:22

**start** [4] - 73:22, 74:5, 80:9, 81:6
**started** [4] - 32:25, 73:13, 77:24, 81:8
**state** [14] - 9:18, 37:9, 37:19, 40:13, 52:19, 52:20, 64:20, 65:9, 65:12, 66:3, 67:16, 67:20, 67:24
**statement** [13] - 6:11, 21:9, 21:11, 22:2, 24:19, 24:24, 24:25, 25:3, 55:14, 77:25, 78:3, 78:6, 78:25
**statements** [8] - 13:6, 20:7, 21:2, 21:8, 21:24, 24:1, 25:20, 77:14
**STATES** [2] - 1:1, 1:11
**States** [20] - 17:6, 17:9, 52:7, 57:16, 57:18, 57:22, 58:2, 58:6, 58:8, 58:15, 58:18, 62:16, 62:24, 63:13, 68:24, 70:20, 71:6, 77:7, 84:3, 84:4
**states** [2] - 37:19, 52:12
**states'** [1] - 37:10
**stay** [2] - 32:5, 73:17
**stayed** [2] - 83:23, 84:21
**stays** [1] - 33:9
**Stefanowicz** [26] - 9:2, 9:3, 9:5, 9:14, 9:17, 11:10, 11:11, 12:22, 12:25, 13:14, 13:25, 16:16, 16:21, 21:14, 21:16, 21:18, 26:19, 28:1, 28:11, 28:18, 28:21, 30:1, 30:5, 30:24, 77:22, 85:4
**Stefanowicz's** [4] - 13:16, 15:20, 30:11, 78:19
**STENOGRAPHIC** [1] - 2:15
**steps** [2] - 31:16, 51:10
**STEPTOE** [1] - 2:2
**Steve** [7] - 9:2, 12:22, 21:14, 21:16, 21:18, 26:16, 85:4
**Steve's** [2] - 76:16, 79:8
**still** [7] - 22:15, 24:21, 47:25, 62:3, 77:21, 80:12, 81:4
**stock** [2] - 64:24, 65:5,

65:24, 66:2
**stock-taking** [1] - 65:24
**stone** [1] - 55:3
**Stonestreet** [2] - 86:3, 86:8
**STONESTREET** [1] - 2:9
**stoning** [3] - 54:14, 54:20, 55:11
**stopped** [1] - 31:1
**strappado** [1] - 47:12
**stray** [1] - 46:20
**streamline** [2] - 14:22, 83:23
**Street** [1] - 2:6
**stress** [3] - 47:6, 47:9, 72:20
**stronger** [1] - 46:19
**strongly** [1] - 80:15
**stuff** [2] - 81:20, 84:24
**subject** [1] - 81:23
**subjective** [2] - 41:16, 41:18
**subordinate** [1] - 8:2
**subparagraph** [2] - 59:6, 59:24
**subparts** [1] - 74:20
**subpoena** [1] - 81:24
**Subsection** [2] - 60:8, 61:1
**substantial** [1] - 61:11
**subsume** [1] - 5:6
**success** [1] - 65:20
**successful** [3] - 12:6, 12:7, 12:9
**suffered** [1] - 41:10
**suffering** [19] - 40:22, 41:3, 41:7, 41:9, 41:20, 41:25, 42:1, 42:6, 42:21, 43:3, 43:7, 54:9, 60:22, 61:2, 61:4, 61:8, 61:10, 67:18
**SUHAIL** [1] - 1:3
**Suite** [1] - 2:7
**summarized** [1] - 43:12
**superior** [2] - 7:12, 12:24
**supervision** [3] - 5:12, 5:22, 7:20
**supervisory** [1] - 7:18
**supposed** [1] - 8:12
**surprise** [1] - 21:18
**suspect** [2] - 46:13, 82:5
**suspected** [1] - 28:15
**suspended** [1] - 47:13
**suspension** [1] - 47:6,

47:9, 47:11, 47:12
**suspicion** [1] - 40:14
**sustain** [2] - 12:11, 17:18, 31:21, 63:22, 73:4, 79:16
**sustained** [2] - 63:12, 81:11
**sustains** [1] - 83:3
**swore** [1] - 77:13
**sworn** [3] - 4:8, 35:15, 77:14
**systematic** [1] - 44:24
**systematically** [1] - 44:25

**T**

**tab** [1] - 14:10
**table** [1] - 10:17
**taboos** [1] - 44:3
**TAGUBA** [2] - 3:3, 4:8
**Taguba** [5] - 4:4, 4:12, 18:3, 75:12, 75:25
**taught** [1] - 50:12
**team** [10] - 6:14, 9:14, 10:5, 19:7, 25:5, 25:8, 27:16, 31:2, 31:3, 83:23
**technique** [2] - 69:10, 69:14
**techniques** [2] - 11:13, 73:1
**technology** [1] - 84:6
**TECHNOLOGY** [1] - 1:7
**telephone** [1] - 85:8
**term** [3] - 12:5, 61:2, 61:9
**terminate** [1] - 13:13
**terminated** [1] - 13:9
**terms** [12] - 5:11, 41:17, 45:18, 45:22, 46:12, 51:11, 51:12, 55:6, 58:15, 69:22, 79:18, 81:3
**terrorism** [1] - 40:14
**testified** [10] - 4:9, 21:1, 32:8, 35:15, 59:7, 67:1, 68:9, 73:25, 78:3, 78:23
**testify** [9] - 24:10, 39:18, 39:22, 61:16, 63:6, 78:1, 79:21, 79:23, 83:12
**testifying** [2] - 50:3, 59:16
**testimony** [9] - 14:5, 15:24, 32:4, 32:7, 36:4, 39:25, 59:3, 80:20, 82:3

**THE** [109] - 1:1, 1:11, 1:14, 2:1, 4:3, 4:6, 4:7, 12:11, 14:19, 15:8, 15:10, 15:11, 15:12, 15:13, 15:15, 17:18, 17:23, 22:6, 22:10, 22:12, 22:15, 22:19, 22:23, 23:2, 23:18, 24:5, 24:9, 29:12, 31:21, 31:23, 31:25, 32:4, 32:9, 32:10, 32:21, 32:25, 33:8, 33:13, 33:16, 33:20, 33:23, 34:4, 34:11, 34:16, 34:20, 35:10, 35:12, 35:14, 36:19, 36:21, 39:16, 49:1, 49:3, 49:8, 53:23, 53:25, 54:1, 54:5, 56:11, 59:11, 59:12, 59:13, 59:17, 59:20, 60:16, 63:6, 63:12, 63:18, 71:1, 71:5, 71:11, 73:4, 73:6, 73:21, 74:10, 74:16, 74:22, 75:6, 75:11, 75:21, 76:2, 76:13, 77:1, 77:16, 77:20, 78:9, 78:15, 78:17, 78:22, 79:3, 79:14, 79:18, 80:5, 80:9, 80:25, 81:6, 81:22, 82:3, 82:7, 82:10, 82:18, 83:9, 83:13, 84:2, 84:6, 84:10, 84:18, 85:9, 85:15
**theft** [1] - 56:6
**therefore** [1] - 79:11
**they've** [3] - 33:20, 84:21, 85:11
**thinks** [2] - 21:18, 62:3
**Thomas** [2] - 6:2, 6:3
**THOMAS** [1] - 1:17
**thorough** [2] - 50:18, 51:5
**threat** [9] - 46:7, 46:9, 46:14, 46:15, 46:19, 46:24, 47:1, 47:3, 68:18
**threatened** [3] - 42:3, 48:5, 48:6
**threatening** [1] - 46:17
**threats** [7] - 42:7, 44:7, 46:4, 46:5, 46:25
**three** [9] - 15:2, 29:8, 36:9, 36:23, 71:4,

76:12, 76:13, 77:2, 84:20
**threshold** [1] - 41:14
**thresholds** [1] - 41:19
**throwing** [1] - 80:17
**Thursday** [1] - 81:20
**tied** [2] - 39:8, 47:13
**tiers** [1] - 84:20
**Titan** [5] - 23:12, 23:19, 26:22, 30:13, 30:20
**titled** [2] - 4:13, 14:10
**to..** [1] - 22:18
**today** [13] - 15:9, 15:13, 36:4, 50:4, 55:2, 55:23, 59:3, 73:8, 73:10, 73:21, 76:16, 78:23
**today's** [1] - 79:20
**together** [2] - 18:8, 80:10
**toilet** [1] - 45:25
**Tom** [1] - 58:10
**tomorrow** [8] - 73:12, 75:22, 77:21, 79:21, 79:25, 81:2, 81:19, 82:12
**tonight** [2] - 77:4, 77:20
**took** [8] - 20:7, 28:5, 28:23, 29:4, 30:10, 54:22, 65:5, 83:24
**tool** [1] - 50:18
**top** [1] - 74:3
**Torin** [4] - 21:5, 21:9, 21:13, 23:11
**Torture** [21] - 35:21, 36:18, 37:3, 37:7, 37:17, 38:7, 40:20, 52:23, 54:7, 55:5, 55:18, 55:21, 57:23, 58:5, 58:19, 62:6, 62:20, 62:25, 63:14, 66:15, 68:23
**torture** [71] - 36:2, 38:3, 38:6, 38:8, 38:17, 38:18, 39:4, 39:13, 40:6, 40:8, 40:15, 40:17, 41:11, 42:3, 42:4, 42:10, 43:3, 43:10, 43:11, 44:5, 44:13, 44:18, 45:1, 45:5, 45:13, 46:3, 46:9, 46:24, 47:7, 47:11, 47:15, 48:10, 48:20, 50:12, 50:14, 50:19, 50:22, 51:17, 52:10, 52:16, 52:21, 52:22, 53:16, 54:17, 54:19, 55:3,

55:6, 55:9, 56:5, 56:24, 57:8, 58:7, 58:12, 59:8, 59:16, 61:17, 62:7, 64:21, 65:3, 65:14, 66:6, 67:2, 67:5, 68:16, 68:21, 71:16, 72:9, 72:15, 72:24, 80:13, 80:23
**torture-related** [1] - 64:21
**touching** [1] - 42:6
**towards** [6] - 47:1, 47:2, 47:3, 51:10, 53:12, 61:1
**traffic** [1] - 73:11
**trained** [3] - 11:12, 36:8, 46:11
**training** [1] - 39:20
**TRANSCRIPT** [1] - 1:10
**transcript** [2] - 53:24, 86:4
**Transcript** [1] - 14:10
**TRANSCRIPTION** [1] - 2:15
**transcripts** [2] - 34:7, 34:24
**translator** [1] - 26:21, 30:13
**treatment** [56] - 38:4, 39:4, 39:14, 40:7, 40:9, 42:18, 42:19, 42:20, 42:23, 42:25, 43:2, 43:9, 43:11, 43:14, 43:22, 43:24, 44:2, 44:6, 44:14, 44:19, 44:20, 44:21, 44:24, 45:6, 46:3, 46:24, 47:8, 48:9, 54:8, 56:25, 57:3, 57:25, 59:8, 60:12, 60:15, 60:19, 63:8, 63:9, 65:3, 67:3, 67:5, 68:11, 68:13, 68:14, 68:16, 68:21, 70:10, 70:13, 71:17, 72:8, 72:10, 72:12, 72:16, 72:25
**Treatment** [1] - 40:21
**trial** [4] - 39:9, 75:17, 79:8, 79:10
**TRIAL** [1] - 1:10
**trials** [1] - 73:13
**tried** [1] - 5:20
**true** [7] - 26:9, 48:18, 52:14, 57:17, 58:13, 62:18, 69:9
**trying** [1] - 11:3
**Tuesday** [4] - 82:8,

82:13, 82:15, 82:16
**turn** [7] - 4:12, 5:24, 14:13, 28:2, 59:5, 59:23, 60:25
**turned** [1] - 46:8
**two** [18] - 6:12, 6:20, 6:22, 6:23, 8:7, 8:11, 8:16, 8:17, 20:16, 37:23, 47:10, 58:6, 71:11, 76:3, 79:19, 81:16, 84:20, 85:2
**two-day** [1] - 37:23
**TYLER** [1] - 1:18
**Tyler** [1] - 35:8
**type** [2] - 10:16, 13:24
**types** [2] - 72:8, 72:12
**typically** [5] - 44:20, 46:9, 46:20, 47:11, 47:16

## U

**U.S** [14] - 2:10, 9:17, 17:16, 57:23, 58:1, 58:12, 58:21, 58:23, 59:2, 61:7, 62:3, 62:9, 63:1, 63:10
**ultimately** [3] - 9:10, 39:24, 68:24
**UN** [6] - 52:13, 52:17, 54:7, 55:8, 64:3, 64:7
**unable** [1] - 46:22
**unauthorized** [3] - 28:12, 28:17, 76:9
**unaware** [1] - 76:21
**uncooperative** [1] - 7:23
**under** [19] - 17:2, 42:12, 54:17, 55:10, 55:12, 55:13, 56:13, 58:12, 58:20, 59:25, 60:4, 61:7, 61:16, 62:22, 63:9, 66:5, 67:13, 70:2, 80:22
**understate** [1] - 20:22
**understood** [6] - 40:18, 56:22, 63:24, 66:19, 75:20, 81:13
**undertaking** [1] - 69:18
**unfortunately** [1] - 31:15
**unit** [1] - 7:5
**United** [30] - 17:6, 17:9, 36:24, 37:2, 37:6, 37:17, 38:12, 38:15, 40:20, 52:7, 52:18, 57:16, 57:18, 57:22, 58:2, 58:6,

58:8, 58:12, 58:15, 58:18, 62:16, 62:24, 63:13, 64:18, 68:24, 70:20, 71:6, 77:7, 84:3, 84:4
**UNITED** [2] - 1:1, 1:11
**United-Nations-endorsed** [1] - 38:15
**units** [2] - 6:13, 7:20
**universal** [1] - 51:20
**University** [3] - 36:10, 36:12, 50:7
**unless** [2] - 17:3, 47:5
**unlikely** [1] - 83:7
**unredact** [1] - 23:1
**unredacted** [2] - 76:9, 76:25
**unredacts** [1] - 76:16
**unrestrained** [1] - 44:25
**unsanitary** [1] - 45:25
**unusual** [3] - 58:20, 63:8, 63:9
**up** [24] - 4:4, 4:5, 4:15, 5:25, 9:1, 11:17, 22:16, 24:4, 28:2, 31:10, 36:19, 50:1, 53:24, 70:12, 71:5, 75:15, 78:11, 79:7, 81:24, 82:21, 83:16, 83:21, 83:23, 83:25
**upper** [1] - 14:20
**useful** [4] - 51:10, 65:4, 65:10, 66:3
**USMAN** [1] - 1:14

## V

**valid** [1] - 61:17
**valuable** [1] - 51:13
**value** [1] - 77:11
**verbal** [2] - 21:22, 50:5
**verdict** [1] - 80:14
**version** [11] - 22:12, 22:14, 22:15, 50:25, 51:2, 76:4, 76:7, 76:8, 76:10, 76:15, 76:25
**versions** [3] - 76:3, 76:12, 76:20
**versus** [2] - 52:13, 52:15
**via** [1] - 32:12
**victim** [7] - 42:6, 43:14, 45:18, 46:13, 46:18, 48:1, 68:20
**Victims** [1] - 36:18
**video** [8] - 32:12, 33:5, 34:5, 34:6, 34:23,

34:24, 84:2
**videos** [2] - 20:21, 25:17
**videotaped** [3] - 34:1, 34:13, 35:1
**VIDEOTAPED** [1] - 3:8
**view** [4] - 70:10, 75:18, 78:5, 80:19
**views** [1] - 64:22
**violate** [2] - 43:17, 45:4
**violates** [4] - 40:9, 43:20, 48:12, 57:20
**violation** [1] - 44:2
**violations** [2] - 46:6, 60:9
**Virginia** [3] - 2:7, 2:11, 77:14
**VIRGINIA** [1] - 1:1
**vision** [1] - 69:17
**visited** [1] - 49:13
**voice** [2] - 4:4, 36:19
**vulnerable** [1] - 45:21

## W

**wait** [1] - 81:6
**waived** [1] - 79:11
**wants** [1] - 85:6
**War** [4] - 58:23, 63:4, 71:15, 71:21
**war** [13] - 59:9, 59:14, 59:18, 59:25, 60:4, 62:12, 71:16, 71:24, 80:12, 80:14, 80:23, 80:24
**warned** [1] - 83:14
**wartime** [1] - 17:16
**Washington** [2] - 2:4, 50:7
**waste** [1] - 83:7
**watch** [1] - 32:6
**WEBB** [1] - 1:18
**Webb** [1] - 35:8
**Wednesday** [1] - 79:9
**week** [2] - 73:23, 79:7
**weeks** [1] - 20:16
**whereas** [4] - 51:1, 52:20, 76:5, 76:9
**whole** [1] - 82:11
**widely** [1] - 64:23
**willing** [1] - 9:15
**windows** [1] - 45:23
**wiser** [1] - 55:6
**withdraw** [1] - 55:14
**withdrawn** [5] - 5:5, 7:18, 10:3, 17:14, 63:7
**witness** [16] - 32:5, 32:7, 32:10, 33:24,

34:4, 34:9, 34:21, 39:25, 40:2, 53:10, 56:10, 63:18, 81:18, 81:22, 83:9, 83:20
**WITNESS** [8] - 3:2, 4:6, 15:10, 15:12, 15:15, 32:9, 36:21, 53:25
**witnessed** [1] - 13:20
**witnesses** [3] - 39:18, 73:25, 82:1
**woman** [2] - 54:20, 55:3
**women** [2] - 67:19, 67:23
**wonderful** [1] - 84:7
**Wood** [1] - 26:24
**words** [3] - 7:15, 8:2, 56:8
**worker** [1] - 36:8
**world** [2] - 24:13, 62:15
**wrap** [1] - 71:5
**write** [1] - 12:4
**written** [2] - 24:12, 54:21
**wrote** [7] - 11:9, 11:11, 13:2, 13:8, 53:14, 53:15, 55:23

## Y

**year** [2] - 36:24, 66:9
**years** [11] - 13:23, 20:20, 24:23, 36:9, 36:23, 37:20, 66:3, 66:10, 66:12, 69:6, 83:10
**yesterday** [1] - 74:8
**York** [4] - 1:19, 1:23
**you-all** [6] - 59:11, 75:14, 76:13, 77:4, 77:20, 83:18
**yourself** [5] - 14:15, 15:1, 15:4, 16:11, 35:18
**yourselves** [1] - 73:15

## Z

**Z1** [2] - 32:16, 33:2
**Z1-Z6** [1] - 3:17
**Z6** [2] - 32:16, 33:3
**zero** [1] - 80:19
**Zuba'e** [2] - 24:8, 24:12