```
 1                UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                     Alexandria Division


 3
    SUHAIL NAJIM ABDULLAH          :    Civil Case
 4  AL SHIMARI,  et al.,           :    No. 1:08-CV-827
                                   :
 5                 Plaintiffs      :
                                   :
 6          v.                     :
                                   :
 7  CACI PREMIER TECHNOLOGY,       :
    INC.,                          :    April 19, 2024
 8                                 :
                   Defendant       :    9:30 a.m.
 9  ..........................     :    ........................

10            TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                          DAY 5
11         BEFORE THE HONORABLE LEONIE M. BRINKEMA
                 UNITED STATES DISTRICT JUDGE
12

13  APPEARANCES:

14  FOR THE PLAINTIFFS:      MUHAMMAD USMAN FARIDI
                             ALEXANDRA MAHLER-HAUG
15                           ANDREW HADDAD
                             BONITA ROBINSON
16                           MICHAEL BUCHANAN
                             MICHAEL FISHER
17                           THOMAS KICAK
                             W. SCOTT KIM
18                           PATTERSON BELKNAP WEBB & TYLER, LLP
                             1133 Avenue of the Americas
19                           New York, New York  10036
                             212-336-2000
20
                             BAHER AZMY
21                           THE CENTER FOR CONSTITUTIONAL RIGHTS
                             666 Broadway
22                           7th Floor
                             New York, New York  10012
23                           212-614-6464

24
                             (APPEARANCES CONTINUED ON FOLLOWING
25                           PAGE:)
```

```
 1     FOR THE DEFENDANT:        JOHN O'CONNOR, JR.
                                 LINDA BAILEY
 2                               JOSEPH McCLURE
                                 STEPTOE & JOHNSON LLP
 3                               1330 Connecticut Avenue, NW
                                 7th Floor
 4                               Washington, D.C. 20036
                                 202-429-3000
 5
                                 NINA GINSBERG
 6                               DIMUROGINSBERG PC
                                 1101 King Street
 7                               Suite 610
                                 Alexandria, Virginia 22314
 8                               703-684-4333

 9                               STEPHEN ELLIOTT
                                 JASON LYNCH
10                               UNITED STATES DEPARTMENT OF JUSTICE
                                 CIVIL DIVISION
11                               FEDERAL PROGRAMS BRANCH
                                 1100 L Street, NW
12                               Washington, D.C. 20044
                                 202-598-0905
13
                                 REBECCA LEVENSON
14                               OFFICE OF THE UNITED STATES ATTORNEY
                                 2100 Jamieson Avenue
15                               Alexandria, Virginia 22314
                                 703-299-3700
16

17     OFFICIAL COURT REPORTER:   REBECCA STONESTREET, RPR, CRR
                                  U.S. District Court, 9th Floor
18                                401 Courthouse Square
                                  Alexandria, Virginia  22314
19                                (240) 426-7767

20
                             ( Pages 1 - 175)
21

22
             COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
23

24

25
```

```
 1                       C O N T E N T S

 2
        WITNESS:              DIRECT    CROSS    REDIRECT    RECROSS
 3
        RAYMOND SCOTT NORTHROP
 4      By Ms. Ginsberg        6         --        75         --
        By Mr. Kim            --         42        --         81
 5
        DANIEL JACOB PORVAZNIK
 6      By Mr. O'Connor        83        --        --         --
        By Mr. Buchanan       --         95        --
 7

 8      (DEPOSITION EXCERPTS PLAYED IN COURT:)

 9      ARMY INTERROGATOR E 4
        GEORGE PAPPAS          5
10      ARMY INTERROGATOR A 120
        ARMY INTERROGATOR B 121
11      CAROLYN HOLMES        123

12      (DEPOSITION EXCERPTS READ INTO THE RECORD:)

13      AMY MONAHAN            136
        WILLIAM HARDING BRADY, III
14                            139
        ARMY INTERROGATOR E 140
15

16                       E X H I B I T S

17      PLAINTIFF EXHIBITS                              PAGE

18      Exhibit 42                                      90
        Exhibit 93                                      34
19      Exhibit 99, pg 5                                60
        Exhibit 101                                     39
20      Exhibit 132                                     54
        Exhibit 136                                     32
21      Exhibit 214                                     120

22      DEFENDANT EXHIBITS                              PAGE

23      Exhibit 20, pg 2                                5
        Exhibit 23                                      6
24      Exhibit 37                                      123
        Exhibit 70                                      20
25
```

```
 1                    P R O C E E D I N G S

 2          THE COURT:  All right.  The jury is here on time this

 3     morning so we'll get started.

 4          (Jury in at 9:30 a.m.)

 5          THE COURT:  Good morning, ladies and gentlemen.  Thank

 6     you for being here nice and on time.  And I assume -- any

 7     problems with photographers or anybody out front today?  All

 8     right.  Good.  And last night, no problems getting home?

 9     Excellent.  And you've all been following my instructions.

10          So I know that jurors like to know their schedule.  We

11     are definitely going to complete all of the evidence today, and

12     then Monday you'll be getting closing arguments and the jury

13     instructions.  So my guesstimate is you will probably get this

14     case for deliberation around lunchtime Monday.  That's the

15     schedule we're on.

16          Mr. O'Connor?

17          MR. O'CONNOR:  Good morning, Your Honor.  CACI is

18     presenting deposition testimony from Army Interrogator E.  We

19     started to play him yesterday, Your Honor, and many thought he

20     had been played already.  But it turns out the Army was using

21     two different ground station operators in interrogations, so

22     this one is different.  The good news, we cut it down to

23     11 minutes last night.

24          THE COURT:  Excellent.  All right.

25          (Excerpt of taped testimony of ARMY INTERROGATOR E
```

```
 1    played in open court.)

 2             (End of excerpt.)

 3             MR. O'CONNOR:  Your Honor, at this time CACI presents

 4    Colonel Thomas Pappas by video deposition.  And, Your Honor,

 5    we're moving in the second page of Defense Exhibit 20, which was

 6    admitted during the deposition.

 7             THE COURT:  All right.  Is that going to be Defense

 8    Exhibit 20 in this case as well?

 9             MR. O'CONNOR:  That's exactly what it is.  It's Defense

10    Exhibit 20.

11             THE COURT:  So Defense Exhibit 20, page 2 only, is in

12    evidence.  Any objection?

13             MR. AZMY:  No objection.

14             MR. O'CONNOR:  And I have clips.

15             (DEFENDANT EXHIBIT Number 20, page 2 was admitted into

16    evidence.)

17             (Excerpt of the videotaped deposition of THOMAS PAPPAS

18    played in open court.)

19             (End of excerpt.)

20             MR. O'CONNOR:  Your Honor, we're now going to play the

21    plaintiffs' cross-examination of Colonel Pappas.

22             (Excerpt of cross-examination in videotaped deposition

23    of THOMAS PAPPAS played in open court.)

24             (End of excerpt.)

25             MR. O'CONNOR:  Your Honor, at this time CACI calls
```

1    Scott -- I'm told there's a brief redirect.

2            (Excerpt of redirect examination in videotaped

3    deposition of THOMAS PAPPAS played in open court.)

4            (End of excerpt.)

5            MR. O'CONNOR:  I jumped the gun, Your Honor.  CACI

6    calls Scott Northrop.  He's testifying live.

7            MR. FARIDI:  Your Honor, while the witness approaches,

8    we still have to move into evidence DX 25, which was used during

9    Colonel Pappas's cross-examination.

10           THE COURT:  Any objection?

11           MR. O'CONNOR:  No, Your Honor.

12           THE COURT:  All right.  Defendant Exhibit 25 is in.

13           MR. FARIDI:  Your Honor, I apologize.  It's 23.

14           THE COURT:  Defendant's 23, not 25.

15           (DEFENDANT EXHIBIT Number 23 was admitted into

16    evidence.)

17           (Oath administered by courtroom deputy clerk.)

18           **(RAYMOND SCOTT NORTHROP, having been duly sworn,**

19                   **testified as follows:)**

20               **EXAMINATION BY COUNSEL FOR DEFENDANT**

21    **BY MS. GINSBERG:**

22    Q.  Good morning.

23    A.  Good morning.

24    Q.  Mr. Northrop, will you introduce yourself to the jury and

25    the Court, please?

1    A.  Yeah, good morning.  My name is Scott Northrop.  Full name

2    is Raymond Scott Northrop, but I generally am known by my middle

3    name, which is Scott.

4    Q.  Mr. Northrop, will you briefly describe your educational

5    background?

6    A.  Yes.  I have a bachelor's in business management from the

7    University of Maryland, and a master's of business

8    administration from the City University of Seattle.

9    Q.  And were you ever a member of the military?

10   A.  Yes, I was.  I enlisted in the Army in July of 1983; I was

11   honorably discharged in April -- sorry.  Yeah, April of 1987.

12   Q.  And where were you stationed?

13   A.  I started at Fort Jackson, South Carolina for my basic

14   training, and then continued on for my advanced individual

15   training, AIT, which is where you learn to do the job, also at

16   Fort Jackson.

17          And then, after that, I was permanent party in

18   Heidelberg, Germany at the headquarters, United States Army

19   Europe, Office of the Deputy Chief of Staff Intelligence.

20   Q.  And how long did you serve there?

21   A.  I was there from January 1984 until I left the Army in April

22   of '87.  But then I stayed there as a government civilian

23   employee, as a security specialist.

24   Q.  Okay.  And what was your MOS?

25   A.  I was an administrative specialist.

1    Q.  And just very briefly, what were your responsibilities?

2    A.  Okay.  As an administrative specialist, I supported -- in my

3    case I worked in the intelligence analysis branch, so I

4    supported the chief of the branch and the other employees there

5    in administrative matters, ensuring intelligence reports were

6    created and disseminated, other administrative type duties.

7    Q.  And in that capacity, did you have at least some exposure to

8    the content of these intelligence reports?

9    A.  Yes.

10   Q.  What did you do when you retired from the Army?

11   A.  I didn't actually retire.  I ETS, which is end of term of

12   service, and that's when I became a government civilian

13   employee.

14   Q.  Okay.  And where did you last work before -- I'm just going

15   to make this assumption.  You went to work for CACI at some

16   point.  Correct?

17   A.  Correct.  Yeah, so I left government civilian employment in

18   March of 1992, stayed in Germany to complete my MBA because that

19   was through City University's European division, and in July of

20   '94 I came back to the United States.

21          So I worked in a few different administrative and sales

22   type jobs until 1998, and then I was executive director of the

23   Wellsville Area Chamber of Commerce until I was hired by CACI.

24   Q.  And when were you hired by CACI?

25   A.  In November of 2003.

1    Q.  And how did that come about?

2    A.  I was -- the government had told CACI that they needed a

3    primary point of contact over in Iraq, so when I worked in

4    Germany, one of the guys I worked there in the military was a

5    current CACI manager.  He had recommended my name to Chuck Mudd

6    and Mark Billings, and Mark Billings called me and offered me --

7    you know, we talked about the job and he offered me the job.

8    Q.  All right.  And the job he offered you was in-country

9    manager?

10   A.  In-country manager.

11   Q.  Okay.  And what was your role expected to be as in-country

12   manager?

13   A.  As the in-country manager I was the primary point of contact

14   for administrative and contractual matters for the military,

15   primarily the COR, the contracting officer representative.  And

16   also, I supported our personnel there, our CACI personnel, if

17   they had any type of administrative issues such as payroll

18   problems or...I also ensured that they had proper, you know,

19   living quarters wherever they -- whichever forward operating

20   base they were sent to, as well as working accommodations.

21   Q.  And were you responsible for those functions at Abu Ghraib?

22   A.  Correct.

23   Q.  And were there other bases in Iraq that you were also

24   performing these same responsibilities for?

25   A.  Yes.  We supported the military at numerous bases in Iraq.

1   Some of the bigger ones that come to mind would be obviously

2   Camp Victory; then there was what they called colloquially as

3   the Green Zone, which is where the U.S. embassy was located in

4   Baghdad City.  We had people in Fallujah, Tikrit, Mosul.

5   Another big area where we had people was in Balad.

6   Q.  And you performed these administrative duties for the CACI

7   employees at all of those locations?

8   A.  Correct.

9   Q.  Right.

10  A.  For not only the intelligence contract.  We also had a

11  logistics contract.  So I represented both.

12  Q.  All right.  And we've heard -- are you familiar with the

13  term "operational control" or "operational" --

14  A.  Yeah.

15  Q.  And how do you understand that term?

16  A.  Well, operational control was dictated by the military

17  because that was the day-to-day mission support.

18  Q.  And did you have any responsibility whatsoever for that

19  function?

20  A.  No.

21  Q.  All right.  What if any on-boarding or training did you go

22  through before arriving in Iraq?

23  A.  Okay.  So after I was offered the position by CACI, they

24  then -- Chuck Mudd had my résumé reviewed by the COR to

25  determine whether he felt I was a good fit.  And he agreed I

1    was.

2            So then I went to Fort Bliss, at the CONUS replacement

3    center.  And every contractor had to go through what they called

4    CRC before being deployed, and that CRC, it was roughly a week

5    long.  They would do medical, dental checks to make sure you

6    were physically fit to be able deploy, and you would also

7    receive briefings on -- cultural briefings on the area, threat

8    briefings.  You would get a briefing on the Geneva Convention,

9    and then you would also be provided with some basic military

10   supplies to take, such as a sleeping bag, jacket, things like

11   that.

12   Q.  So did every CACI employee who went to Fort Bliss get a

13   briefing on the Geneva Conventions?

14   A.  Yes, they should have.

15   Q.  Okay.  And you said, if I understood you correctly, that

16   your résumé was reviewed by the COR?

17   A.  Correct.

18   Q.  Now, the COR is -- what is the COR?

19   A.  The COR is the contracting officer's representative.

20   Q.  Before you explain, is that a military position or is that a

21   civilian position?

22   A.  Oh, well, it depends on the contract.

23   Q.  Under the contract that CACI had.

24   A.  Under this contract it was a military position.  When I

25   first arrived in Iraq, it was Lieutenant Colonel Brady, and then

1    in February of '04 -- Colonel Brady was with 5th Corps.  In

2    February '04, 5th Corps left country and 3rd Corps arrived, and

3    the new corps was Major Daniels.

4    Q.  So if I understand correctly, you understood that your

5    résumé had been reviewed by the then --

6    A.  Colonel Brady.

7    Q.  Colonel Brady, okay.

8         And do you recall when you arrived in Iraq?

9    A.  Yeah, it was a couple days before Thanksgiving,

10   November 2003, somewhere around the 23rd, 24th.

11   Q.  And how long did you actually stay in Iraq?

12   A.  I was in Iraq for one year.

13   Q.  And was there a reason for this one-year period?

14   A.  Yes.  I told CACI that if I were to go deploy, I would

15   deploy for one year.  And then, when that year was up, I came

16   back.

17   Q.  Okay.  And how would you -- so you arrived at the end of

18   November of 2003.  How would you at that time describe CACI

19   operations in Iraq?

20   A.  Semi-operational.  I mean, it was that way also for the

21   military.  It was very -- you know, things were still being, you

22   know, more developed.  And our -- both at Camp Victory and at

23   Abu Ghraib, the living conditions were less than satisfactory,

24   so we were able to get Major General Fast, who was the senior

25   intelligence official in Iraq, she agreed to provide some

1   dollars to the contract to have an area within Camp Victory and

2   at Abu Ghraib renovated for living and working conditions.

3   Q.   Okay.  And during the time that the living conditions were

4   not up to par, as far as you know, were interrogations going on?

5   A.   Oh, yes.  Yes.  So interrogations were going on before I

6   arrived in country.  I mean, we had roughly 100 to 120 personnel

7   in Iraq between the two contracts, the intelligence contract and

8   the logistics contract.

9   Q.   The logistics contract was entirely separate from the

10  intelligence?

11  A.   Yeah, two separate distinct contracts.

12          THE COURT:  Just so we're clear, the 110 to 120 CACI

13  employees, are you talking about at Abu Ghraib or Iraq in

14  general?

15          THE WITNESS:  At Iraq in general.

16          THE COURT:  In Iraq in general.  So some were at

17  Camp Victory?

18          THE WITNESS:  Yes.

19  Q.   And where were you stationed?

20  A.   I was at Camp Victory.

21  Q.   So can you describe what your role was when you actually got

22  to Iraq?  What did you do?

23  A.   Yeah.  So, once again, I was the primary administrative

24  contractual point of contact for the military, specifically the

25  COR.  And I also provided administrative support to our

1    personnel that were there.

2    Q.  Okay.  And were you responsible at all for communicating

3    with Army personnel on contract-related issues?

4    A.  Yes.  Yes.  That would be primarily with the COR, but also

5    with onsite military senior leadership, if they had a question

6    about the contract.

7    Q.  Okay.  And what types of issues did that cover?

8    A.  Many times it would be things like, you know, working hours.

9    The COR understood the contract.  Some of the more local senior

10   military didn't always know the -- you know, how many hours per

11   week an employee was allowed to work, because we had --

12   depending on the job within the statement of work, we had some

13   people who worked 60 hours a week, some worked 72, some worked

14   84.

15   Q.  And who determined the number of hours that the different

16   job categories were?

17   A.  The government.  That was part of the contract.

18   Q.  And did CACI also supply analysts and screeners under this

19   contract?

20   A.  Yes.

21   Q.  And did you provide the same administrative functions for

22   the analysts and the screeners who were operating in Iraq?

23   A.  Yes.

24   Q.  Who did you directly report to?

25   A.  So I reported to Chuck Mudd as our division VP, and

1    Mark Billings, who was his director of operations.  And then

2    also indirectly to Amy Jens, who later became Amy Monahan when

3    she got married.  She was the program manager at Chantilly.

4    Q.  She was the program manager in Virginia?

5    A.  Correct.

6    Q.  In Chantilly.

7         So what was the difference between the job

8    responsibilities that Chuck Mudd had and the job

9    responsibilities that Mark Billings had?

10   A.  Chuck was the general manager for the division, as the

11   vice president, and Chuck was -- or, I'm sorry, Mark was Chuck's

12   director of operations.

13   Q.  And who did you have the most contact with?

14   A.  With Chuck.

15   Q.  How often was Chuck Mudd in Iraq?

16   A.  Chuck would come roughly every six weeks, and he would stay

17   for a couple, two to three weeks at a time.

18   Q.  All right.  And how often, if you know, did he actually go

19   to Abu Ghraib?

20   A.  I believe pretty much every time he came we would take a

21   visit there, because it was one of the easier sites to get to.

22   It was roughly 20 minutes away.

23   Q.  20 minutes away from Camp Victory?

24   A.  From Camp Victory, yes.

25   Q.  And how often did you visit Abu Ghraib?

1    A.  Did I go?  I would go roughly every couple of weeks, stay

2    for maybe two, three hours to communicate with the employees,

3    and, as necessary, also with any of the military personnel

4    there.  But I would also do that at the other sites as well, the

5    ones that I could get to.

6    Q.  And did you receive any training from either Mark Billings

7    or Chuck Mudd once you arrived in Iraq?

8    A.  Yes.  When I arrived, Chuck Mudd was there and met me, and

9    the first -- that whole three weeks he was there, at that time,

10   you know, he acquainted me with the statement of work, with the

11   contract, introduced me to the primary military people that I

12   would be engaging with, and -- yeah, so...and also on CACI

13   administrative procedures.

14   Q.  And were you given some sort of general understanding of

15   what the intelligence operations were supposed to look like?

16   A.  Yes.  So --

17   Q.  At least as far as CACI was concerned.

18   A.  Correct.  I mean, that would have been dictated by the

19   statement of work.  Right?  So along with how it's detailed

20   within the statement of work, I was also provided with an

21   understanding of where our people were that were already there

22   when I got in country, so I would know, you know, where we had

23   various people within the country.

24   Q.  All right.  Did you exercise any operational control over

25   CACI or military interrogators?

1    A.  No.

2    Q.  Did you supervise or direct the day-to-day job performance

3    of CACI interrogators?

4    A.  No.

5    Q.  Who had that operational control?

6    A.  The military.

7    Q.  And as far as you understood, who was responsible for the

8    supervision and direction of day-to-day operations of CACI

9    interrogators?

10   A.  Depending on the site, there would be either a

11   noncommissioned officer in charge, NCOIC, or commissioned

12   officer in charge, OIC.

13   Q.  And was that the case at Abu Ghraib prison?

14   A.  Yes.

15   Q.  And were those the -- the noncommissioned officer in charge

16   or the officer in charge, were those the individuals who CACI

17   interrogators were ultimately responsible to report to for their

18   day-to-day -- for the performance of their day-to-day

19   responsibilities?

20   A.  Yeah.

21   Q.  Who -- I guess I'm just going to assume.  Is it correct that

22   the military chain of command were the individuals who gave

23   instructions to CACI interrogators about how they conducted

24   their interrogations?

25          MR. KIM:  Objection, Your Honor.  Foundation.

```
 1              THE COURT:  Well, no, it's been asked and answered.
 2              MS. GINSBERG:  I'll move on.
 3              THE COURT:  Sustained.
 4     Q.  Who determined if CACI screeners got promoted from screener
 5     position to the position of interrogator?
 6     A.  All positions, those included, for any type of operational
 7     promotion was recommended and requested by the military, and
 8     would be approved by the COR before it could happen.
 9     Q.  Okay.  And did CACI have some involvement in that decision?
10     A.  Not in the decision itself.  Our role would have been if a
11     person was promoted, it would mean moving up in the labor
12     category level.  And so then it would become a contractual thing
13     so that we were invoicing properly and billing properly.
14     Q.  All right.  And how was that promotion communicated from
15     Iraq back to Chantilly?
16     A.  After I was in country, it would be through me.  Previous to
17     that, I'm not totally sure.  I think probably via email.
18     Q.  Now, do you know whether the military had to approve all the
19     CACI personnel prior to their deployment to Iraq?
20     A.  Yes.  They would review the résumés of personnel, and
21     sometimes that would occur via direct email to the COR and other
22     times it would be me sitting with the COR going through résumés.
23     Q.  Okay.  So once you arrived in Iraq, did you have direct
24     discussions with the COR about individuals who CACI proposed to
25     be hired under the contract?
```

1    A.  Yes.

2    Q.  And who approved your hiring, do you know?

3    A.  Colonel Brady.

4    Q.  And did the COR have the additional responsibilities of

5    monitoring CACI's compliance with the contract?

6    A.  Yes.

7    Q.  And can you explain how that was done?

8    A.  Yes.  So the COR would receive reports from the onsite

9    military leads as to performance, how we were meeting our

10   performance objectives as laid out in the statement of work.

11   And so then, you know, based on that, the COR would then relay

12   that to the contracting officer, who was in the United States

13   dictating our compliance with the contract.

14   Q.  And before the abuses came to light, had you -- did you

15   receive any complaints from the COR about any of the CACI

16   employees at Abu Ghraib?

17   A.  No.

18   Q.  Were CACI interrogators required to hold security

19   clearances?

20   A.  Yes.

21   Q.  And who imposed that requirement?

22   A.  The government.

23   Q.  And do you know who approved the security clearances for the

24   CACI employees?

25   A.  The government.

```
 1    Q.  And I assume you had a security clearance?

 2    A.  I did.

 3    Q.  And the government approved your security clearance?

 4    A.  Right.

 5    Q.  So was there -- do you know who had established the rules of

 6    engagement?

 7    A.  The military.

 8    Q.  And that would be for the -- for interrogators?

 9    A.  Correct.

10    Q.  And was there a difference in how CACI interrogators were

11    expected to perform their mission from the way the soldiers were

12    expected to perform?

13    A.  No.

14    Q.  If you would look at what's been marked as Defense

15    Exhibit 70 in your notebook.

16             THE COURT:  Any objection to 70?

17             MR. KIM:  I haven't seen it yet, Your Honor.

18             MS. GINSBERG:  My apologies, Your Honor.

19             MR. KIM:  No objection, Your Honor.

20             THE COURT:  It's in.

21             (DEFENDANT EXHIBIT Number 70 was admitted into

22    evidence.)

23    Q.  What is Defense Exhibit 70?

24    A.  Those are our CACI code of conduct in Iraq.

25    Q.  And were all CACI employees required to adhere to the code
```

1     of conduct?

2     A.  Yes.  And when an employee would arrive in Iraq, as part of

3     their in-processing that we would do with them there, they would

4     have to read and acknowledge that they read and understood it.

5     Q.  And what type of conduct does the code of conduct cover?

6     A.  Predominantly it was about how to act as a professional in

7     the setting that they were going to be in, and to show respect

8     to, you know, the colleagues as well as the military.

9     Q.  And if you would look at Paragraph 4, it says:  "If you have

10    a complaint, take it to your CACI leadership.  Do not complain

11    about CACI issues in front of government personnel."

12          What do you understand that to mean?

13    A.  So that meant things like, if you had an issue with your

14    pay, for example, don't complain to the military about it, tell

15    me or your site lead about it so that we could take care of it

16    administratively.

17    Q.  And who would the -- well, did this cover complaints

18    regarding the actual performance of interrogations?

19    A.  No, this was purely administrative.

20    Q.  All right.  And does the code of conduct include a statement

21    about who sets the number of hours that CACI required -- CACI

22    employees are required to work?

23    A.  Yes.  That would be Paragraph 15, where it states, "Number

24    of hours you work is set by the government."

25    Q.  Okay.  If a CACI employee witnessed abuse, who would that

1    person report the abuse to?

2    A.  To the military supervisor and also their team lead, CACI

3    team lead.

4    Q.  And as far as you know, did a CACI employee -- if they

5    observed abuse, did their obligations end at reporting that

6    abuse to the appropriate person?

7            MR. KIM:  Objection, Your Honor.  Calls for

8    speculation.

9            THE COURT:  I think he can testify as to what he

10   understood the policy would be, yes.

11   A.  Could you repeat it, please?

12   Q.  Yes.  As far as you understood the policy, did the -- did

13   the CACI employees have any additional responsibility -- if -- a

14   CACI employee who observed abuse, did he have any additional

15   responsibility other than reporting it either to the appropriate

16   military personnel or -- and to you?

17   A.  I would think that would be -- my understanding is that

18   would be determined by the local military leadership as well as

19   the COR, as to the next steps they would want that person to

20   take.

21   Q.  Okay.  Could the Army fire a CACI employee?

22   A.  The Army could request an employee be removed from the

23   contract.

24   Q.  Okay.  So could the Army impose any discipline on a CACI

25   employee?

1   A.  Discipline in the sense of requesting they be removed from

2   the contract or perhaps removed from the base that they were on.

3   But that kind of discipline.  I guess I'm not sure what

4   parameter of discipline you mean.

5   Q.  Yeah, is that something that the Army could do, request that

6   somebody be removed from the contract?

7   A.  Correct.

8   Q.  And could they request that they be removed from one

9   facility in particular and maybe put at a different facility?

10  A.  Yes.

11  Q.  And could they request that a security clearance be removed?

12  A.  Yes.  Yeah, that was also --

13  Q.  And what would happen if a request like that was made?

14  A.  We would accommodate to the best of our ability.  We were

15  there at the behest of the government.

16  Q.  So how would that request be communicated, generally?

17  A.  It would be communicated to me via the site lead, or it

18  would also be communicated from the military lead on that

19  particular site to the COR, and then the COR would address it

20  with me.

21        THE COURT:  Ms. Ginsberg, it's time for our morning

22  break.  We'll be in recess until 25 of.

23        MS. GINSBERG:  Thank you, Your Honor.

24        (Jury out at 11:18 a.m.)

25        (Recess taken at 11:19 a.m.)

```
 1                 THE COURT:  All right.  Let's bring the jury in.

 2                 (Jury in at 11:35 a.m.)

 3                 THE COURT:  Ms. Ginsberg?

 4      BY MS. GINSBERG:

 5      Q.  Mr. Northrop, were you ever issued a weapon while you were

 6      in Iraq?

 7      A.  No.  Our contract prohibited us having weapons outside of

 8      two positions.

 9      Q.  Okay.  And what were those two positions?

10      A.  The C2X advisor and the special security officer.

11      Q.  Okay.  So did interrogators ever have -- were they permitted

12      to have weapons?

13      A.  No.

14      Q.  And that was a requirement that was in the contract?

15      A.  Correct.

16      Q.  Okay.  How was the invoicing for the work that was performed

17      at -- in Iraq done?

18      A.  Okay.  Our employees would submit their hours electronically

19      into CACI's time-keeping system.  The program manager back in

20      Chantilly would pull the information together, they would then

21      send a draft invoice to me in Iraq.  I would then sit down with

22      the COR and we would go through it line by line.  And once the

23      COR concurred with the information that was on there, it would

24      then go back and we would then be able to submit it for payment.

25      Q.  All right.  Would you look at what's been, I believe
```

```
 1    admitted, as Plaintiff's Exhibit 84?

 2    A.  Yes.

 3    Q.  What is this?

 4    A.  It looks like the contract order for...

 5    Q.  Can you see a date up at the top, on the left-hand side?

 6    A.  Yes.  Yeah, it's -- it's a little blurry, but December 3rd,

 7    2003.

 8    Q.  All right.  Would that have been the first contract order?

 9    A.  I don't believe so.

10    Q.  And you see some numbers down at the bottom, on the bottom

11    right-hand corner?

12    A.  Yeah.

13    Q.  Next to the words "Grand Total," what is the grand total

14    number written there?

15    A.  It says $21,799,921.

16    Q.  All right.  And what does that number represent?

17    A.  That would be the not-to-exceed total contract value for, it

18    looks like this period of performance of December 3rd, 2003, to

19    December 2nd, 2004.

20    Q.  So CACI would not be permitted to bill more than

21    21-million-odd dollars under this contract?

22    A.  Correct.  Not without further permission from the

23    contracting officer.

24    Q.  And would you look at the second page of this exhibit?

25    A.  Yes.
```

1    Q.  And would you explain what the information on the second

2    page of this exhibit is?

3    A.  Okay.  So at the top where it lists the FAR - that's the

4    Federal Acquisition Regulation - it states that it's a time and

5    material and labor hour contract.  So that means that CACI could

6    only bill labor for actual hours worked.

7    Q.  And would that be the equivalent of the hours that were

8    submitted through the invoicing process that you just described?

9    A.  Correct.  Correct.

10   Q.  And does that number represent the actual amount -- well,

11   why don't you go to the next category?  I'll withdraw that

12   question.

13   A.  So the 001, 002, 003, those are called CLINs, contract line

14   item numbers.  And it looks like the CLIN Number 1, where it

15   says "Technical Services Support," that looks like it's for the

16   labor, and it says for HUMINT augmentee contractors.

17          CLIN Number 2 looks like an ODC CLIN, ODC standing for

18   other direct costs.  So those would be any other allowable costs

19   other than labor for travel.

20          And then CLIN Number 3 looks like it was for equipment,

21   vehicles, body armor, so forth.

22   Q.  Okay.  So within each of these three categories, the amounts

23   for the -- the total for technical service support, the

24   16,549 -- $16,549,000, that was a not-to-exceed number?

25   A.  Correct.

1    Q.  And the same for the two other categories?

2    A.  Correct.

3    Q.  And the ODC, the other direct costs, were they costs for

4    which CACI had to submit proof that the expenditures were made?

5    A.  Yes.  Correct.  It would be also part of the invoicing

6    process.

7    Q.  And with respect to the first category, the labor category,

8    might there be a difference in the amount that the government

9    allowed for a particular labor category?  Say interrogator or

10   screener, might there be a difference in the amount that was

11   allowed under the contract and the amount that CACI actually

12   paid those employees?

13          MR. KIM:  Your Honor, leading.  Calls for speculation.

14          THE COURT:  It's not leading and it's not speculative.

15   Overruled.

16          Go ahead.

17   Q.  If you know.  If you know.

18   A.  Yeah.  So in general, the way it works from a labor

19   perspective in this type of contract is when CACI would have bid

20   on this contract, they would have proposed a price per labor

21   category.  Correct?  So labor category represents the particular

22   work position, and within different labor categories you could

23   have, say, a junior person, a mid-level person, or a senior

24   level person, and each of those being represented by a

25   negotiated labor hour price.

```
 1              So in this situation, with a time and material/labor
 2     hour contract, for each hour that an employee worked, CACI was
 3     authorized to bill X dollars, whatever that amount was that was
 4     negotiated and agreed upon.  But that's different than what
 5     would have been paid to employees.
 6              THE COURT:  And the difference was your profit?
 7              THE WITNESS:  Correct.
 8              MS. GINSBERG:  Thank you, Your Honor.  I was going to
 9     ask the question.
10     Q.  And how is it that you would calculate your profit on a
11     contract like this?
12     A.  Yes.  And that would be specific to CLIN Number 1, however.
13     CLINs Number 2 and 3 were cost reimbursable CLINs, and it's just
14     like the same sounds, you were reimbursed for your costs.
15     You're not allowed to put any type of fee-bearing profit margin
16     on cost reimbursable CLINs.
17     Q.  So just to be clear, CACI did not make $21 million profit on
18     this contract?
19              MR. KIM:  Objection, Your Honor.  Leading.
20              THE COURT:  It's a waste of time to lead on a question
21     like that.  It's overruled.  It's obvious to the jury that's how
22     things work.  Okay?
23              MS. GINSBERG:  Thank you.
24     Q.  If you would look at the bottom of the third and the top of
25     the fourth page of this exhibit, there's a page 4 of 21.
```

1    A.  Oh, yes.  Okay.

2    Q.  And in subparagraph 4A at the bottom, the last...if you

3    would read the sentence beginning on the third line from the

4    bottom.

5    A.  Of subparagraph A?

6    Q.  Yes.

7    A.  Third line from the bottom?

8    Q.  First, does this paragraph talk about the requirements for

9    interrogators?

10   A.  No, this paragraph specific looks like it's for the G2X

11   advisor position.

12   Q.  Okay.  So that's a different category.

13       And do you know if the interrogators -- the

14   requirements for interrogators under this contract were always

15   net?  The experience --

16   A.  As far as I know, yes.

17   Q.  And if the interrogators didn't have the equivalent

18   experience to what was called for under the contract, their

19   hiring was nevertheless approved by the Army?

20   A.  Well, it would depend.  Sometimes the COR would allow it and

21   other times they would not.

22   Q.  But if an interrogator or a screener didn't have the minimum

23   requirements and they were allowed to work, it would be because

24   the Army approved their working under the contract?

25   A.  Correct.

1   Q.  Okay.  So did -- were you ever told that -- at some point

2   after beginning of -- the end of December that CACI employees

3   had witnessed detainee abuse?

4   A.  I was informed at that time that it was -- that it had

5   happened, and that General Taguba had begun an investigation.

6   Q.  And did you know that there was also a CID investigation?

7   A.  Yes.

8   Q.  A criminal investigation.  Okay.

9           THE COURT:  How were you informed, do you recall?  How

10  did you learn about the CID investigation?

11          THE WITNESS:  Through the COR, and also the CID

12  investigator spoke with me.

13          THE COURT:  That was before or after you heard it from

14  General Taguba?

15          THE WITNESS:  I never personally heard from

16  General Taguba.

17          THE COURT:  Was it before or after you were contacted

18  by somebody -- were you contacted by somebody from his group,

19  from his investigation team?

20          THE WITNESS:  I don't remember from General Taguba, but

21  I was from General Fay's investigation.

22          THE COURT:  All right.  So you think the first time you

23  heard about this was for CID?

24          THE WITNESS:  I believe it was through the COR.

25          THE COURT:  I'm sorry, through the COR.  All right.

1    Thank you.

2    Q.  Okay.  And what were your instructions from CACI management

3    with respect to these investigations?

4         THE COURT:  Well, I think stop for a second.

5         What did you do when you were contacted by the COR?

6    When you were contacted by the COR about this situation, what

7    did you do?

8         THE WITNESS:  I notified my supervisors at CACI, and I

9    was told to make sure that we cooperated in any way that we were

10   asked to.

11   Q.  Okay.  Was there a time that you became aware that there was

12   a problem between some of the CACI employees who had been

13   interviewed as a part of the CID investigation?

14   A.  You mean a personal conflict between employees?

15   Q.  Yes.

16   A.  Yes.  I was told by Dan Porvaznik that two employees were

17   upset, Dan Johnson and Tim Dugan, because they believed that

18   another employee, Torin Nelson, had said something derogatory

19   about them when they were interviewed by the CID investigator.

20   Q.  And if you would please look at what's been admitted as

21   Plaintiff's Exhibit, I believe 136.

22        MS. GINSBERG:  Your Honor, I believe this is an exhibit

23   that's been admitted.

24        MR. KIM:  Your Honor, I'm not sure if this one is

25   actually admitted.

```
 1              THE COURT:  Well, is there any objection?  It's your
 2    exhibit.
 3              MR. KIM:  Yes.  It's hearsay.
 4              THE COURT:  It's your exhibit.
 5              MR. KIM:  I understand.  It's admissible as a party
 6    opponent admission, but not by CACI's counsel.
 7              THE COURT:  I'm going to let it in.
 8              Go ahead.
 9              (PLAINTIFF EXHIBIT Number 136 was admitted into
10    evidence.)
11    Q.  What is this, Plaintiff's Exhibit 136?
12    A.  It's a summary of my interaction with Torin Nelson before he
13    departed Iraq.
14    Q.  And was he one of the individuals that was involved in the
15    conflict?
16    A.  Correct.
17    Q.  And you wrote this email on May 5th of 2004.  Do you
18    remember why you wrote it around that date?
19    A.  I believe that I was requested -- myself and Dan Porvaznik
20    were requested to relay our recollection of the situation around
21    Torin.
22    Q.  Okay.  And does this Plaintiff's Exhibit 136 accurately
23    reflect your memory about what happened with respect to
24    Torin Nelson?
25    A.  Yes.
```

1    Q.  So what did happen as far as your interactions with him?

2    A.  Right.  So after I learned from Dan that there was, you

3    know, some conflict between Torin and Dan Johnson and Tim Dugan,

4    within a day or two - I can't remember exactly - I made a visit

5    to Abu Ghraib to check on employees.  And while I was there,

6    went into the mess hall for lunch, and that's where I saw Torin.

7           So I sat down with Torin to talk to him to see how he

8    was doing, and at that time, you know, he said he was worried

9    about his safety in general because Abu Ghraib did get mortared

10   a lot.  So he was worried about his safety in general, but also

11   he thought that Dan Johnson and Tim Dugan were, quote, "trying

12   to get even with him."

13   Q.  Okay.  And then what did you do?

14   A.  I asked Torin if he would like to come back to Camp Victory

15   with me.  And so he said yes.  So I had him pack up his

16   belongings, and then, when I left, he came back to Camp Victory

17   with me.

18   Q.  Did you have further conversations with him when you got

19   back to Camp Victory?

20   A.  Yes.  I asked him what he would like to do next.  I asked

21   him if he would like to be relocated to another forward

22   operating base or if he would like to go home.  Originally he

23   said that, yes, he would like to be transferred to another

24   forward operating base, but then he spoke with his wife and

25   together they decided that it would be best if he just came home

 1    because he was fearful of being in Iraq in general.

 2    Q.  And did he go home?

 3    A.  Yes.

 4    Q.  And did he resign?

 5    A.  I believe he resigned from CACI, correct.

 6    Q.  All right.  Would you please look at what's been marked as

 7    Plaintiff's Exhibit 93.

 8            MS. GINSBERG:  I'm not sure if this one has been

 9    admitted.

10    A.  Okay.

11            THE COURT:  Any objection to 93?

12            MR. KIM:  No objection.

13            THE COURT:  It's in.

14            (PLAINTIFF EXHIBIT Number 93 was admitted into

15    evidence.)

16    Q.  Mr. Northrop, what is Plaintiff's Exhibit 93?

17    A.  This looks like from Dan Porvaznik, his recollection of his

18    interaction with Torin around the same subject.

19    Q.  All right.  Was this email sent to you?

20    A.  I believe I was one of the people on the distribution list,

21    but it was directed to Mark Billings.

22    Q.  Okay.  And what did Mr. Porvaznik say in this email about

23    the circumstances leading up to Torin Nelson leaving Abu Ghraib?

24            THE COURT:  Hold on a second.  How many pages do you

25    have in your book?

1            THE WITNESS:  One, two...

2            MS. GINSBERG:  Should be two pages.

3            THE COURT:  I've only got one.

4            THE WITNESS:  I have a two-page statement and then what

5     looks like the forwarding email.

6            MS. GINSBERG:  Your Honor, I can just ask him --

7            THE COURT:  I got one from my clerk.  Thank you.

8     Q.  What did Mr. Porvaznik say about the circumstances as he

9     understood them leading up to Mr. Nelson's departure from the

10    JIDC?

11    A.  Yeah, so it appeared, based on what he had written here,

12    that there were tensions between Torin and Tim Dugan even prior

13    to the CID interview, where it looks like in a -- I wasn't

14    cognizant of this until reading this.  But it looks like the

15    interpreter working with Torin felt that Torin was missing some

16    signs, cues, whatever from the detainee during his

17    interrogation, and the interpreter mentioned it to Tim Dugan,

18    who then mentioned it to the military supervisor.  And that

19    started tensions between them.

20            And then he goes on to talk about the -- with the

21    investigation, and how Tim and Dan Johnson believed that Torin

22    had said something derogatory about them.

23    Q.  And did he say anywhere -- did he have an opinion about how

24    Torin was conducting himself in general, about whether he was a

25    good interrogator?

 1    A.  Yeah, Dan's words here is that, "Although he is indeed a

 2    good interrogator, a self-assessment may be over the top and

 3    definitely makes him susceptible to criticism.  He is

 4    thin-skinned."

 5          That is Dan's opinion.

 6    Q.  And if you would look at what's been marked as

 7    Plaintiff's Exhibit 100.

 8          MR. O'CONNOR:  That's in.

 9          MS. GINSBERG:  This one has been admitted, Your Honor.

10    Q.  Do you recognize this document?

11    A.  I do.

12    Q.  All right.  What is it, please?

13    A.  It's a memorandum for record from Major Daniels, the COR, to

14    me, regarding Dan Johnson, requesting termination and security

15    clearance revocation.

16    Q.  So is this an example of what you were describing before of

17    how the Army could request that somebody be removed from a

18    contract --

19    A.  Correct.

20    Q.  -- or terminated in some way?  And would these categories,

21    requests for termination and pending security clearance

22    revocation for Dan Johnson, those would be the kind of, I'm

23    using the word "discipline," that the Army could request being

24    imposed?

25    A.  Correct.

1    Q.  And what's the date of this -- the typewritten date of this
2    memorandum?
3    A.  13 May, 2004.
4    Q.  And is there a handwritten delineation above that date?
5    A.  Yes.  It states it was delivered on 21 May, 2004.
6    Q.  And can you tell whether there's any significance to the
7    delivered date?
8    A.  Yeah, I believe that would relate to Paragraph 3, where
9    Major Daniels said that if either the company or Dan Johnson
10   would like to appeal or oppose this action that's being taken,
11   they were allowing seven days.  So it was seven days from
12   delivery.
13        So that handwritten note shows that even though the MFR
14   was written on 13 May, it wasn't delivered until the 21st.
15   Q.  Okay.  And there's a second, third, and fourth page behind
16   that memorandum.  Do you recognize or can you tell what they
17   are?
18   A.  Yes.  This looks like correspondence between Major Daniels,
19   the COR, and Jeff Elefante, who was the CACI lead counsel at the
20   time.
21   Q.  Was he also an executive vice president of CACI?
22   A.  Yes.
23   Q.  And if you look on the bottom of the second page, what does
24   Major Daniels tell Mr. Elefante about charges being made against
25   Dan Johnson?  Bottom of the second page of this document, page 2

```
 1    of 4.
 2    A.  Oh, sorry.  It says there are no charges being made against
 3    Dan Johnson, the photograph in question is attached for his
 4    review, and he is stating that taking photographs of and/or with
 5    detainees is prohibited by the Geneva Convention.  "Detainee
 6    also is in what is perceived as an unapproved stress position.
 7    Mr. Johnson has been unable to explain the origin of this
 8    picture and any reason why the detainee is in his current
 9    position."
10    Q.  And you've seen this picture?
11    A.  I have many -- a couple decades ago.
12    Q.  And it's a picture of somebody sitting facing backwards,
13    crouching facing backwards in a chair?
14    A.  Yes.
15    Q.  And Dan Johnson is someone who is pictured in that
16    photograph?
17    A.  Correct.
18    Q.  And "charges" means criminal charges?
19    A.  That's what I believe he meant.
20    Q.  And as far as you know, was Dan Johnson ever charged with a
21    crime?
22    A.  Not that I'm aware of.
23    Q.  And so do you know if CACI prepared a response to this
24    memorandum, as they were invited to do?
25    A.  I believe they did.
```

1    Q.  And if you would look at Exhibit 101,

2    Plaintiff's Exhibit 101.

3              MR. KIM:  No objection, Your Honor.

4              THE COURT:  It's in.

5              (PLAINTIFF EXHIBIT Number 101 was admitted into

6    evidence.)

7    A.  Okay.

8    Q.  Do you recognize that as the response that was submitted to

9    Major Daniels?

10   A.  Yes.

11   Q.  And if you look at the last page of that document, page 5 of

12   5.

13   A.  Okay.

14   Q.  Whose names are at the bottom of this document?

15   A.  Mine and Harry Thornsvard, who is the senior vice president.

16   Q.  And were you the only person who prepared this document?

17   A.  No.  I provided input into it.

18   Q.  And before it was signed and submitted to Major Daniels, did

19   you read this entire document?

20   A.  Yes.

21   Q.  And was everything in it accurate?

22   A.  To the extent I knew, correct.

23   Q.  And there is some discussion in here about Dan Johnson's

24   awareness of the photograph being taken, on page 3 of 5.

25   A.  Okay.

1    Q.  Is this explanation different from an original opinion that
2    you held about the timing of the photograph being taken?
3    A.  Yes.  If I remember correctly, I was a bit skeptical of
4    Dan Johnson's explanation when I initially heard about it and
5    saw the timing of the photos, because it was such a close amount
6    of time that they were taken.  But then I believe there's a few
7    weeks between this being taken and my initial email or
8    memorandum of whatever I had written at the time about it, where
9    I discussed the matter with Dan in detail and also discussed it
10   with Major Daniels in detail, as well as some of the other
11   military interrogation leadership there about that.  And I
12   softened a bit on my skepticism that he may or may not known
13   about these photographs being taken because he would be
14   concentrating on his job.
15   Q.  So is it fair to say that you changed your impression based
16   on discussion and investigation --
17   A.  Right.
18   Q.  -- that you participated in between the time that you
19   expressed your first opinion in an earlier email and this letter
20   being written?
21   A.  Yes.
22   Q.  And did you also include a response to the Army's allegation
23   that this was an impermissible stress position that the person
24   in the chair was --
25   A.  Yeah.  I mean, that was part of this response here, that

```
 1    it's hard to tell if it was indeed a stress position because
 2    it's a photograph.  You can't tell from a photograph how long
 3    the person was in that position or whatever to cause stress.
 4    Q.  All right.  And the amount of time that the person was
 5    actually in that position, would that make a difference, in your
 6    opinion, about whether or not this constituted a stress
 7    position?
 8            MR. KIM:  Objection.
 9            THE COURT:  I'll sustain that objection.  He's not an
10    expert in that area.
11            MS. GINSBERG:  It's only offered for his opinion of
12    what he wrote here.
13            THE COURT:  No.  No.
14    Q.  And so were you aware of whether or not there were military
15    personnel at Abu Ghraib who actually wanted Dan Johnson to stay
16    at Abu Ghraib and continue acting as an interrogator?
17    A.  Yes, there were a number of military personnel in both
18    leadership positions and other military interrogators who came
19    forward, and on behalf of Dan Johnson, stating that he was a
20    very good interrogator and that they would like him to be able
21    to stay.
22    Q.  And do you remember who any of those individuals was?
23    A.  I believe one was Lieutenant Colonel Steve Jordan.  I don't
24    exactly remember who the others were, but there were maybe
25    three, four total.
```

1    Q.  And did Major Daniels change his position about removing

2    Dan Johnson from the contract and revoking his security

3    clearance as a result of what was submitted by CACI?

4    A.  Yeah, I believe he did.

5    Q.  Was Dan Johnson allowed to stay at Abu Ghraib?

6    A.  I believe he was for a period of time, and that eventually

7    he left.

8    Q.  All right.  And was he ultimately terminated by CACI?

9    A.  No, I don't believe he was terminated by CACI.  I think he

10   resigned.

11   Q.  He resigned.

12          MS. GINSBERG:  Your Honor, those are all the questions

13   I have.

14          THE COURT:  All right.  Cross?

15          MR. KIM:  We have witness binders, Your Honor.

16          **CROSS-EXAMINATION BY COUNSEL FOR PLAINTIFFS**

17   **BY MR. KIM:**

18   Q.  Good afternoon.  My name is William Scott Kim, but I go by

19   my middle name as well, Scott.

20   A.  Easy to remember.

21   Q.  Nice to meet you.

22          So you began working at CACI in November 2003.  Right?

23   A.  Correct.

24   Q.  And you were interviewed in the United States?

25   A.  Yes.

1    Q.  And you were hired while you were in the United States?

2    A.  Correct.

3    Q.  And you were CACI's first in-country manager in Iraq.

4    Correct?

5    A.  Correct.

6    Q.  Okay.  And you held CACI's top position in Iraq?

7    A.  From an administrative perspective, correct.

8         THE COURT:  Can you keep your voice up, please?

9         THE WITNESS:  Oh, yeah.  Sorry.

10   Q.  Who was above you operationally, from a CACI point of view,

11   in Iraq?

12   A.  Operationally, the military.

13   Q.  So you were CACI's top position in Iraq.  Correct?

14   A.  For administrative and contractual matters.

15   Q.  Was there anybody above you operationally in CACI in Iraq?

16   A.  No.  I guess you would have to define operationally.  To me,

17   operationally means the day-to-day fulfilling of the mission.

18   Q.  Right.  Mr. Northrop, I'm asking a relatively simple

19   question, whether or not you held CACI's top position in Iraq.

20        MS. GINSBERG:  Your Honor, I think he said why he's not

21   understanding the question.

22        THE COURT:  Look, you were the top CACI person in Iraq,

23   yes or no?

24        THE WITNESS:  Correct.  For administrative and

25   contractual matters.

```
 1              THE COURT:  I understand that.
 2              MR. KIM:  I understand that that's their position.
 3   Q.  You reported to Mark Billings, Chuck Mudd, and Amy Monahan.
 4   Correct?
 5   A.  Correct.
 6   Q.  And all three of them are based in the United States?
 7   A.  Yes.
 8   Q.  And after accepting the job, you immediately moved to Iraq
 9   in late November 2003?
10   A.  Correct.
11   Q.  And how did you travel there?
12   A.  Military transport.
13   Q.  Who paid for your travel there?
14   A.  U.S. government.
15   Q.  And you did not receive any training from CACI prior to
16   moving to Iraq.  Correct?
17   A.  Correct.
18   Q.  And while you were in Iraq, you only wore civilian clothing?
19   A.  Yes.
20   Q.  In fact, CACI employees were contractually required to only
21   wear civilian clothing while in Iraq?
22   A.  Yes.
23   Q.  And you were CACI's top representative in Iraq from a
24   managerial point of view as well.  Correct?
25   A.  Correct.
```

1    Q.  And as the in-country manager, you were responsible for

2    CACI's intelligence contract?

3    A.  From a contractual administrative perspective, yes.

4    Q.  So do you recall being deposed in a related litigation back

5    in 2007, Mr. Northrop?

6    A.  Yes.

7    Q.  And you were under oath at that time?

8    A.  Yes.

9    Q.  And you provided truthful answers at that time?

10   A.  Yes.

11   Q.  So if I could now refer you to your deposition transcript,

12   which should be in the back of your binder.  And I'll refer you

13   to page 52, using the -- not on the bottom, but there's the four

14   boxes, Mr. Northrop, with the pages numbers in the top right.

15   A.  I'm sorry, which page?  52?

16   Q.  I'm not referring to the page numbers at the bottom right.

17   A.  Oh, the ones within the box?

18   Q.  Yes.  So if you look at page 52, lines 4 to 9.

19        THE COURT:  There's nothing inconsistent.  That's not

20   an inconsistent statement.  Move on, please.

21   Q.  And so the intelligence contract that CACI had with the

22   government, that was for supplying interrogators to Iraq, among

23   other positions.  Right?

24   A.  Correct.  Interrogators was part of multiple skill sets.

25   Q.  And CACI had never employed interrogators prior to this

```
 1    contract.  Is that right?
 2    A.  That I don't know.
 3    Q.  Are you aware of CACI ever providing interrogators prior to
 4    this contract?
 5    A.  I don't know.
 6    Q.  So you're not aware?
 7    A.  No, I'm not.  I didn't start working for CACI until then.
 8    Q.  And so you first reviewed CACI's intelligence contract with
 9    the military after arriving in Iraq.  Right?
10    A.  Correct.
11    Q.  And I believe you testified on your direct examination, you
12    reviewed it with Chuck Mudd?
13    A.  Yes.
14    Q.  And the personnel, including the interrogators that CACI
15    employed under this contract with the Army, they were considered
16    CACI employees.  Correct?
17    A.  Correct.  Sorry.  Correct.
18    Q.  And they were paid by CACI?
19    A.  Yes.
20    Q.  And the majority of your time in Iraq -- you also mentioned
21    a logistics contract, but the majority of your time was spent
22    managing the intelligence contract.  Correct?
23    A.  Correct.
24    Q.  And we've looked at the contract a bit, but I'm going to ask
25    you to look at it again, which is Plaintiff's Exhibit 83 in your
```

 1    binder.  And if you would turn to page 6.

 2    A.  I'm sorry, hang on.  Did you say 83?

 3    Q.  Yes, Plaintiff's Exhibit 83.  And if you would turn to

 4    page 6, this is the reference to the statement of work that you

 5    discussed on your direct examination.  Right?

 6    A.  Okay.

 7    Q.  And you mentioned there was a bidding process for these

 8    statements of work like this.  Correct?

 9    A.  Yeah.  Generally speaking, the government goes through an

10    acquisition process.

11    Q.  And so multiple contractors are allowed to bid on that

12    before it's awarded to a contractor?

13    A.  Correct.

14    Q.  And that statement of work is also drafted prior to it being

15    awarded to a contractor.  Correct?

16    A.  Correct.  It would have been created during the acquisition

17    process by the government.

18    Q.  And so are you aware that Tom Howard, a CACI employee,

19    assisted in the drafting of this statement of work?

20    A.  No, I didn't know Tom Howard at that time.

21    Q.  That would be problematic.  Right?

22    A.  It would depend on how it was submitted.  You are allowed to

23    provide what they call white papers to the government with ideas

24    and recommendations, but it's up to the government what

25    ultimately goes into the statement of work.

1    Q.  So if Tom Howard was involved in the actual drafting process

2    of this statement of work prior to CACI being awarded the

3    contract, before that open bidding process was allowed to

4    happen, that is problematic.  Correct?

5            MS. GINSBERG:  Your Honor, objection.  Foundation.

6            THE COURT:  Sustained.

7            MR. KIM:  It's within Major General Fay's report.

8            THE COURT:  Sustained.

9    Q.  So if you look at Paragraph 4 of this document, this section

10   provides a general overview of the employees CACI was to provide

11   in support of the interrogation support program.  Right?

12   A.  Okay.

13   Q.  And CACI management here in Virginia was responsible for

14   locating people to fill these intelligence roles.  Right?

15   A.  Correct.

16   Q.  And if you look at the last sentence, the employees CACI was

17   to provide were to be tasked in accordance with Department of

18   Defense, U.S. Civil Code, and international regulations.  Do you

19   see that?

20   A.  Yes.

21   Q.  And you mentioned on your direct examination FAR.  What is

22   that?

23   A.  Oh, it's Federal Acquisition Regulation.

24   Q.  So you're familiar with government regulations concerning

25   contractors for the government?

```
 1    A.   Some.   I wouldn't say I'm expert on all of them.
 2    Q.   Okay.   But -- so as the in-country manager responsible for
 3    managing the intelligence contract that is directed to task
 4    employees in accordance with Department of Defense regulations,
 5    you certainly reviewed Department of Defense regulations
 6    involving contractors.   Correct?
 7    A.   Yes.
 8    Q.   Okay.   And so you understood what those regulations
 9    provided?
10    A.   Yes.
11    Q.   Okay.   And the Army is a department within the Department of
12    Defense as well.   Right?
13    A.   Correct.
14    Q.   And so you also understood what Army regulations for
15    government contractors required.   Correct?
16         MS. GINSBERG:   Objection, Your Honor.   This is very
17    vague as to what contract --
18         THE COURT:   I'm going to sustain the objection.   It's
19    late in the day in terms of this case.   Get specifically to what
20    it is you're trying to get at.
21         MR. KIM:   Okay.
22    Q.   So why don't we refer --
23         MR. KIM:   One more question, Your Honor, first, before
24    I refer to the document.
25    Q.   Are you aware that Army regulations in effect in 2003 and
```

1    2004 required contractors who provided battlefield support

2    services to perform the necessary supervisory and management

3    function of their employees?

4    A.  For contractual reasons they would, administrative.  But

5    operational was dictated by the military.

6    Q.  Okay.  So why don't we look at what I've marked as

7    Plaintiff's Exhibit 227.  Let me know when you're there,

8    Mr. Northrop.

9    A.  Okay.

10   Q.  And if we look at the top of page 3, this became effective

11   November 29, 1999.

12   A.  Okay.

13        MR. KIM:  Your Honor, I now move to admit this into

14   evidence.

15        MS. GINSBERG:  Your Honor, I don't think he's

16   established that Mr. Northrop is an expert on the FAR or on

17   contract administration.  It's getting pretty far afield here --

18        MR. KIM:  Your Honor, I --

19        THE COURT:  Wait.  You let counsel finish making her

20   objection first.

21        MS. GINSBERG:  I think we're getting pretty far afield

22   from what he knows and what he was involved with with the Army.

23        MR. KIM:  So I just established with Mr. Northrop that

24   he's familiar with government regulations, that he understands

25   them.

```
 1              THE COURT:  You're somewhat beating a dead horse.  It
 2      has been said a million times in this case, the military
 3      controls what they do; CACI controls the administrative elements
 4      of their employment, which means pay, promotions, where they
 5      sleep, vacations.
 6              Let's move on to a new topic.
 7      BY MR. KIM:
 8      Q.  At Abu Ghraib, CACI was also employed as an onsite
 9      manager -- CACI also employed an onsite manager.  Correct?
10      A.  Correct.
11      Q.  And the onsite manager would also be referred to as the team
12      lead.  Correct?
13      A.  Yes.
14      Q.  And when you first arrived in Iraq, Dan Porvaznik was the
15      site lead at Abu Ghraib?
16      A.  Yes.
17      Q.  And after he was promoted to a different position,
18      Mr. Stefanowicz became the site lead at Abu Ghraib?
19      A.  Correct.
20      Q.  And I believe you testified on direct examination that all
21      operational promotions were done by the military alone.  Did I
22      understand you correctly?
23      A.  Yes.  But the site lead was a CACI denoted position, not a
24      contractual operational position.
25      Q.  So it's your testimony that CACI's onsite manager had no
```

1    operational duties?

2    A.  No, I didn't say that.  They were dual headed.  They had

3    their operational job, whatever that may be, and then for us as

4    the site lead, they would provide onsite administrative support

5    for me.  You know, accountability of personnel, coordinating for

6    vacations, if they had any pay issues, that kind of thing, they

7    would address that up to me.  But those were CACI-chosen

8    positions, not contractual positions.

9    Q.  And so who possessed authority to make those promotion

10   decisions regarding the site lead at Abu Ghraib?

11   A.  From a CACI administrative perspective, for our purposes, it

12   was us.  But any operational mission-related promotions would be

13   requested and recommended by the local military lead through the

14   COR, and would require the COR's concurrence.

15   Q.  So it's your testimony CACI could promote somebody for

16   administrative purposes, such as to site lead at Abu Ghraib, but

17   he could not be promoted for operational reasons --

18   A.  That's correct.

19   Q.  -- for separate operational responsibilities?

20   A.  Two different responsibilities.

21   Q.  So a site lead could be promoted for an administrative

22   purpose but not for an operational purpose?

23   A.  Correct.

24   Q.  And so who had the ultimate authority about whether to --

25   withdrawn.

 1              You signed off on Mr. Stefanowicz's promotion.

 2    Correct?

 3    A.  As the site lead, correct.

 4    Q.  And Mr. Porvaznik and Tom Howard both recommended

 5    Mr. Stefanowicz be promoted?

 6    A.  Yes.

 7    Q.  And your superiors in the United States approved

 8    Mr. Stefanowicz's promotion.  Correct?

 9    A.  Yes.

10    Q.  And it's your testimony that you're distinguishing between

11    an administrative promotion and an operational promotion?

12    A.  Yes.

13    Q.  And you at least admit -- withdrawn.

14              Prior to Mr. Porvaznik's promotion, Mr. Stefanowicz was

15    Mr. Provaznik's deputy at Abu Ghraib.  Correct?

16    A.  Correct.

17    Q.  Mr. Porvaznik worked during the day?

18    A.  Yeah, it was my understanding that generally Porvaznik

19    worked during the day and Stefanowicz in the evenings.

20    Q.  And so the interrogators who worked at night, they would

21    report issues to Mr. Stefanowicz, and those interrogators who

22    worked during the day, they would report issues to

23    Mr. Porvaznik?

24    A.  Yes.  CACI-related issues.  If there was operational issues,

25    they would report that through the military supervisor.

1    Q.  And you testified on direct that CACI cooperated in full

2    with the Army's investigations into Abu Ghraib.  Did I

3    understand you correctly?

4    A.  Yes.

5    Q.  And again, you were involved in responding to the Army's

6    request regarding those investigations?

7    A.  Yes.

8    Q.  And so if the Army asked for something, you would give it to

9    them in full.  Correct?

10   A.  Yes.  To the extent possible, correct.

11   Q.  Okay.  So I would like to show you what has been marked as

12   Plaintiff's Exhibit 132.

13           THE COURT:  Any objection to 132?

14           MS. GINSBERG:  No objection, Your Honor.

15           THE COURT:  It's in.

16           (PLAINTIFF EXHIBIT Number 132 was admitted into

17   evidence.)

18   Q.  So this is a May 31st, 2004 email from you to Chuck Mudd,

19   Mark Billings, and David Norton.  Is that right?

20   A.  I don't...oh, yes, yes, I see where you're looking.

21   Q.  And so these emails related to a Criminal Investigation

22   Division investigation into Abu Ghraib.  Right?

23   A.  Yeah.

24   Q.  And you see in the first line here, an Army CID investigator

25   is seeking information regarding CACI employees?

```
 1    A.  Yes.

 2    Q.  And regarding this request in the second paragraph, you

 3    proposed only providing investigators the names of the people

 4    but no other personal information, and to tell him that any

 5    personal information they have, to request it from CACI

 6    corporate.  Right?

 7    A.  Yes.

 8    Q.  And if you look at the final sentence of the second

 9    paragraph, one of your proposed justifications for this was,

10    "Everything our employees have said to the CID so far has ended

11    up in the international media."  Right?

12    A.  Yes.

13    Q.  And so you were concerned about statements that your CACI

14    employees made regarding the investigation, the Criminal

15    Investigation Division's investigation, being reported in the

16    media.  Isn't that correct?

17    A.  It was more concerned about their personal information --

18    Q.  Do you see --

19    A.  -- being released.

20    Q.  Can you point me to where you write that distinction in this

21    email?

22    A.  Well, I say, tell them personal information, they should

23    request it from CACI corporate.  I was more comfortable if they

24    went through our HR executives on the release of this type of

25    personally identifiable information.
```

1    Q.  Can you point me in the document where you write that?

2    A.  Well, right here, where I say, "Give them the names of the

3    people but no other personal information, and have them request

4    it from CACI corporate."

5    Q.  You testified on your direct the Army approved these very

6    people's employment in the first place, did you not?

7    A.  Yes.

8    Q.  And that you provided résumés and CVs to the Army?

9    A.  Yes.

10   Q.  And so that would include the personal information being

11   requested here?

12   A.  Yes.

13   Q.  But now, when the Criminal Investigation Division

14   investigator who is investigating abuses at Abu Ghraib is asking

15   for that very same information, you proposed not sending it all

16   to them.  Correct?

17           MS. GINSBERG:  Judge, I think he can explain what he

18   intended by what he wrote.  It may be different than what

19   counsel --

20           THE COURT:  I'll allow a little bit of this, but I

21   don't think it's going to go very far.  All right?  Have a seat.

22   Q.  Do you need me to repeat my question?

23   A.  No.  Yeah, so I guess if the military already had the

24   information, they wouldn't need to request it.

25   Q.  Well, the CID division certainly needed it.  Correct?

1    A.  They had requested it, and I was not comfortable giving them

2    that type of information without it being reviewed by our

3    corporate headquarters.

4    Q.  Okay.  I can move on now.

5         We referred to the CACI code of conduct earlier.

6    Correct?

7    A.  Yes.

8    Q.  And you have in your binder in front of you

9    Plaintiff's Exhibit 86.  I believe it's the copy of the same

10   document that was just admitted as Defendant's Exhibit 70.  You

11   have it in front of you.  I'll ask you to use that version.

12        You testified on your direct, part of your job was

13   explaining this code of conduct to CACI employees as part of

14   their processing.  Right?

15   A.  Correct.

16   Q.  And you actually required all CACI employees, upon arriving

17   in Iraq, to sign this code of conduct.  Right?

18   A.  Correct.

19   Q.  And as the, you know, senior employee, CACI employee in

20   Iraq, you were responsible for ensuring, in the ordinary course,

21   that all CACI employees in Iraq followed this.  Right?

22   A.  To the best of my ability, yes.

23   Q.  And if they did not, CACI employees did not follow this code

24   of conduct, CACI possessed the ability to fire employees.

25   Correct?

1    A.  Correct.

2    Q.  And if we continue reading on to Paragraph 8 here, CACI team

3    lead and managers were also the ones who conducted annual

4    performance evaluations and pay raise recommendations for CACI

5    employees.  Right?

6    A.  Correct.

7    Q.  And so a CACI team lead at Abu Ghraib was expected to have

8    an understanding of their employees' performance.  Right?

9        THE COURT:  Counsel, because you're reading your

10   questions, they're reading too fast.  I'm sure some of the

11   jurors are having trouble following you.  Questions should be a

12   little bit better paced than that.  All right?

13       MR. KIM:  My apologies, Your Honor.

14   Q.  And so the CACI team lead at Abu Ghraib, he would have been

15   expected to have an understanding of their employees'

16   performance, such as the interrogators.  Correct?

17   A.  Yes.  And he would get that feedback from the NCOIC, OIC.

18   Q.  And so are you making a distinction between the fact that

19   the site lead at Abu Ghraib, without speaking to the COR, would

20   have no idea what his employees' performance was?

21   A.  No.  What I'm saying is, you would do that in any annual

22   performance evaluation, is you elicit feedback from people who

23   either work with or around that particular person.

24   Q.  So he would discuss each of his interrogators' performance

25   with those working in the hard site, and consider that

1    information in addition to his own personal knowledge in

2    evaluating their interrogators' performance?

3    A.   Right.   Right.

4    Q.   And you discussed earlier, again, if we look back to

5    Paragraph 4, there's this provision about CACI employees taking

6    their complaints to CACI leadership and not the Army.

7    A.   Uh-huh.

8    Q.   Do you recall discussing that?

9    A.   Correct.

10   Q.   And you testified that this only related to administrative

11   issues.   Correct?

12   A.   Correct.

13   Q.   Is there any qualifying language in Paragraph 4 to

14   distinguish between administrative issues and operational?

15   A.   Not specifically.

16   Q.   And so moving on to a new topic, Mr. Northrop, a CACI

17   employee threatening another CACI employee would be against CACI

18   policy.   Correct?

19   A.   Yes.

20   Q.   And so, in fact, such conduct is against this CACI code of

21   conduct we were just discussing.   Right?

22   A.   Correct.

23   Q.   And so CACI represented in that same code of conduct it

24   would not tolerate kind of harassment of CACI employees or

25   non-employees.   Right?

     1    A.  Correct.

     2    Q.  And you discussed on your direct examination Torin Nelson's

     3    allegations with CACI's counsel.  Right?

     4    A.  Correct.

     5    Q.  And you discussed the reasons for his leaving CACI?

     6    A.  Yes.

     7    Q.  And you testified that part of his reasons for leaving CACI,

     8    in that email counsel showed you, was that he was considered

     9    *persona non grata* at Abu Ghraib.  Correct?

    10    A.  I believe that was part of Dan Porvaznik's statement.

    11    Q.  Okay.  But you were aware of that?

    12    A.  Yes.

    13    Q.  And I would like to show you what has been marked as

    14    Plaintiff's Exhibit 99, specifically page 5.  It's a large

    15    document, but we're only going to focus on this single page.

    16            THE COURT:  So just page 5 of 99?

    17            MR. KIM:  That's the only one I'll be referring to,

    18    Your Honor.

    19            THE COURT:  Any objection?

    20            MS. GINSBERG:  No objection.

    21            THE COURT:  All right.

    22            (PLAINTIFF EXHIBIT Number 99, page 5, was admitted into

    23    evidence.)

    24    Q.  And this is a February 2004 daily report under the heading

    25    of C2.  Do you see that?

1    A.  Yes.

2    Q.  And the CACI C2 advisor at this time was Tom Howard?

3    A.  Yes.

4    Q.  And Mr. Howard, in his role as the CACI C2 advisor, was

5    responsible for interrogation support to the combined joint task

6    force.  Isn't that right?

7    A.  Define "responsible for."

8    Q.  So from a CACI point of view, he was responsible for

9    fulfilling the contract which required interrogation support to

10   the combined joint task force.  Right?

11   A.  Well, I would say Tom Howard as the C2X advisor, his job was

12   to advise the military on HUMINT, human intelligence related

13   matters.  I would not say that he was responsible for

14   interrogation operations.

15   Q.  Okay.  Can we turn back briefly to Exhibit 83, then, which I

16   actually don't know if you referred to that one, but this is one

17   of the two CACI contracts that CACI was supplying interrogators

18   to Iraq for.  And just let me know when you're at Exhibit 83,

19   specifically page 6.

20   A.  Okay.

21   Q.  And you see this lists the requirements for CACI's C2

22   advisor?

23   A.  I'm sorry, which page were you on?

24   Q.  Page 6, Section 5, this lists the requirements for CACI's C2

25   advisor.

1     A.  Okay.

2     Q.  And do you see the first sentence at the top of the page

3     reads:  "Candidate will be responsible for all locally employed

4     persons, screening, and interrogation support to the CJTF."

5             THE COURT:  Slow down, counsel.  Slow down.

6             MR. KIM:  I'm sorry.

7     A.  Okay.

8     Q.  And so Mr. Howard's role was to provide, in part of his

9     role, was interrogation support to the CJTF?

10    A.  As it states here.

11    Q.  And so if we go back to Plaintiff's Exhibit 99, again, just

12    page 5.

13    A.  Okay.

14    Q.  These reports were in fact -- these daily reports were in

15    fact written up daily.  Correct?

16    A.  Yeah.  For the most part, yes.

17    Q.  And these daily reports were sent to Mark Billings,

18    Chuck Mudd, Harry Thornsvard, and program managers.  Correct?

19    A.  Correct.

20    Q.  And do you see here that Mr. Howard writes:  "There is a

21    portion of this challenge that I need to address with Chuck face

22    to face.  This is due to the sensitivity of a certain ongoing

23    investigation that was instigated/fueled by an employee who, in

24    mine and Scott's opinion, needs to be quietly let go.  Scott

25    will address this with Mark as well."

```
 1                Chuck is Chuck Mudd.  Correct?
 2   A.  Correct.  And, I'm sorry, which paragraph are you reading
 3   from?
 4   Q.  So this is at the top, under "Special Note," the first
 5   sentence.
 6                THE COURT:  If you look at the screen, it may help you,
 7   Mr. Northrop.
 8                THE WITNESS:  Oh, I didn't see that.
 9                THE COURT:  Yeah.
10   Q.  And so you see --
11   A.  Okay.
12   Q.  Sorry.  And Mark is Mark Billings?
13   A.  Correct.
14   Q.  And the referenced employee who needs to be quietly let go
15   is not Mr. Johnson, is it?
16   A.  No, I don't believe so.  I actually don't recollect what
17   this was about.  It may not have had anything to do with
18   interrogation operations.
19   Q.  So I'll just -- the referenced employee who needs to be
20   quietly let go is not Mr. Johnson.  Is that your recollection?
21   A.  Correct.
22   Q.  Nor is it Mr. Dugan.  Correct?
23   A.  Correct.
24   Q.  And those were the two employees who made threats to
25   Mr. Nelson?
```

1    A.  I don't know for a fact that they did.  For me, it was

2    hearsay.

3    Q.  That's what Mr. Nelson reported to you?

4    A.  Correct.

5    Q.  So it is -- in fact, the employee here being referenced that

6    needs to be quietly let go is Mr. Nelson himself, who you

7    testified under direct felt threatened by other CACI employees?

8    A.  I'm sorry, repeat that.

9    Q.  Sure.  So the reference to the employee who needs to be

10   quietly let go, it is Mr. Nelson, correct, the one who was

11   making reports to you and others about feeling threatened by

12   Mr. Dugan and Mr. Johnson?

13   A.  No, I would disagree with that.  Because there was nothing

14   quiet about Torin leaving.

15   Q.  So you disagree that the referenced employee who needs to be

16   quietly let go is Mr. Nelson?

17   A.  I do disagree with that, and I don't know who is being

18   referred to.

19   Q.  Okay.  So why don't we look at your deposition transcript

20   again.

21   A.  Okay.

22   Q.  Specifically page 186.

23   A.  I'm sorry, what tab was that again?

24   Q.  It's at the back.

25   A.  Oh, okay.  186?

1    Q.  Yes.  And I'm reading from lines 20 -- 186, line 20, I'm

2    beginning.  Question:  "And so the reference there that an

3    investigation that was instigated/fueled by an employee who, in

4    mine and Scott's opinion, needs to be quietly let go, is that a

5    reference to Torin Nelson?"

6          Answer:  "If I remember right, it was."

7    A.  Okay.  Now, this deposition was given 17 years ago --

8          MR. KIM:  There's no question pending.

9          THE COURT:  Wait, wait.

10         MS. GINSBERG:  Your Honor, he's trying to answer --

11         THE COURT:  Well, there's no question pending, so you

12    should not be volunteering information.  But we don't want two

13    people talking at the same time.

14    Q.  So you're unaware of any CACI investigation into

15    Mr. Nelson's allegations about Mr. Johnson and Mr. Dugan

16    threatening him.  Correct?  I'm no longer referring to anything

17    in your deposition transcript at this time, Mr. Northrop.

18    A.  Oh, okay.

19    Q.  So you're unaware of CACI taking any investigation into

20    Mr. Nelson's allegations against Mr. Johnson and Mr. Dugan.

21    Correct?

22    A.  Not specifically that I remember.

23    Q.  Okay.  You did not personally investigate Mr. Nelson's

24    allegations.  Correct?

25    A.  I believe I spoke with both Dan and Tim, and they both

 1    denied treating him that way.  And unfortunately, having not

 2    witnessed it, you know, it became kind of a he said/he said

 3    situation.

 4    Q.  So your investigation ended on a conversation with Mr. Dugan

 5    and Mr. Johnson about it?

 6    A.  Correct.

 7    Q.  And you testified Mr. Nelson, his reason for leaving his

 8    position at Abu Ghraib was that he was afraid of being in Iraq

 9    in general.  Is that correct?

10    A.  Partially.  That was part of his reason, yes.

11    Q.  And you understood he went to Afghanistan after he left

12    CACI's employment?

13    A.  I didn't know where he went after he left CACI.

14    Q.  Is it your testimony that an interrogator engaging in

15    detainee abuse is against CACI policy?

16    A.  Yes, it would be.

17    Q.  Okay.  And is it CACI policy to fire interrogators that have

18    engaged in detainee abuse?

19    A.  If it was proven, yes, CACI would fire them.

20    Q.  And you spoke on your direct about a CACI employee called

21    Daniel Johnson?

22    A.  Yes.

23    Q.  And he was one of the interrogators CACI hired to work at

24    Abu Ghraib.  Correct?

25    A.  Correct.

1    Q.  And we also discussed Plaintiff's Exhibit 100, if you want

2    to go back there for a moment.

3    A.  Okay.

4    Q.  And so the first sentence of Paragraph 1 here is that,

5    "CJTF-7 is requesting the immediate termination of

6    Mr. Dan Johnson, and intends to process his security clearance

7    for revocation."

8         Do you see that?

9    A.  Yes.

10   Q.  And that is because the Army could not fire Mr. Johnson

11   itself.  Correct?

12   A.  Correct.

13   Q.  And that's because he was a CACI employee?

14   A.  Correct.  They could request he be removed from the

15   contract.  But they did have control over the revocation of his

16   security clearance.

17   Q.  And if you turn to page 2, you discussed this email from

18   Major Daniels to Mr. Elefante.  And there's another sentence

19   that I would like to focus you on, because I believe on your

20   direct you only talked about a couple parts of it.

21        So if you look towards the top of actually page 3, do

22   you see at the top here Major Daniels, who was the COR of CACI's

23   intelligence contract, wrote:  "Command has no other choice but

24   to have Mr. Johnson removed from the current contract and this

25   reported as a derogatory report with the appropriate personnel

 1    security offices."

 2             Is that correct?

 3    A.  Correct.

 4    Q.  And CACI did not abide by the Army's request to immediately

 5    terminate Mr. Johnson.  Correct?

 6    A.  I'm sorry, repeat that.

 7    Q.  So CACI did not abide by the Army's expressly written

 8    request to immediately terminate Mr. Johnson.  Right?

 9    A.  What they did was they took their seven days, as allowed by

10    Major Daniels, to respond.

11    Q.  I understand that's your testimony.  So let's go back to

12    what's now been admitted as Plaintiff's Exhibit 101, which

13    should be the next tab in your binder.

14    A.  Okay.

15    Q.  And this is the -- again, this is CACI's response to the

16    Army's request for, again, an immediate termination of

17    Daniel Johnson.  Correct?

18    A.  Correct.

19    Q.  And this was sent to Harry Thornsvard, who was the senior

20    vice president of CACI?

21    A.  Correct.

22    Q.  And he was located in the United States?

23    A.  Correct.

24    Q.  And you write in the third paragraph on the first page:

25    "CACI does not condone and will not tolerate illegal activities

1      or wrongdoing of any kind.  Quite apart from any government

2      inquiry, if CACI comes into possession of evidence corroborating

3      wrongdoing by any CACI employee, the company will take swift and

4      appropriate action."

5            Did you believe this to be a truthful statement when

6      you sent this to the Army?

7      A.  Yes.

8      Q.  And so this response, this is again referring to a

9      photograph that you talked a bit about on your direct.  Correct?

10     A.  Correct.

11     Q.  So while keeping this letter in front of you, I'm going to

12     ask that we show on the screen Plaintiff's Exhibit 206,

13     specifically page 10.

14           And so the photo on the screen, this is the photo in

15     question.  Right?

16     A.  Correct.

17     Q.  And turning back to the letter, the response in front of

18     you, beginning with the second sentence, the letter reads:

19     "Nobody in the photograph appears to be tense, angry,

20     threatening, or under any visible stress.  Indeed, the photo

21     depicts what appears to be a relatively relaxed scene."

22           In attempting to explain this as a relaxed scene, you

23     go on to write:  "Squatting is common and unremarkable among

24     Iraqis, and squatting in the direction that the detainee is

25     facing is the only way in which he can do so with stability."

1           You signed this letter.  Correct?

2    A.  I did.

3    Q.  And this is CACI's official response, again, to the Army's

4    request to immediately fire DJ; based upon its letter to you,

5    wrote, and I quote, "was a dangerous stress position and was not

6    in keeping with established interrogation procedures."

7           This is, again, CACI's official response to this

8    request.  Correct?

9    A.  Correct.

10   Q.  And so quickly let's just see what Major General Fay has to

11   say about this.  And again, he was the general who --

12           MS. GINSBERG:  Judge, this isn't in the record.

13           THE COURT:  Sustained.  Sustained.

14   Q.  So if we turn to the next page of CACI's response to the

15   Army, on page 3, the first sentence of the last paragraph of

16   this section reads:  "Finally, we have no information indicating

17   that Mr. Johnson ordered the detainee to assume the position in

18   the photo, or was privy to anyone else directing the detainee to

19   squat in the chair.  Mr. Johnson has no recollection of this

20   particular interrogation.  He has told us that it was not his

21   practice to conduct interrogations with detainees in the

22   position of the detainee in the photo."

23           Now, do you see that?

24   A.  Yes.

25   Q.  So is it CACI's position the detainee voluntarily assumed

1    the position depicted in the photo?

2    A.  I believe it's CACI's position that we weren't there when it

3    happened, so we don't know if the person did it voluntarily or

4    was told.  We can only go by what we were told by Dan Johnson.

5    Q.  And CACI's position that the detainee in this photo might be

6    doing this voluntarily is based upon Mr. Johnson's word?

7    A.  Yes.

8    Q.  And so is it also CACI's position that it was necessary to

9    consider perhaps someone outside this photograph was directing

10   what was happening inside the photograph?

11   A.  I'm sorry, say that one more time.

12   Q.  So is it CACI's position that it was also considering

13   whether somebody outside the photograph, not shown there, was

14   directing what was happening inside the photograph?

15   A.  I don't remember that ever being CACI's position.

16   Q.  Okay.  And you wrote back to the Army Mr. Johnson's lack of

17   recall of the event in question was credible.  Right?

18   A.  I'm sorry, one more time.

19   Q.  So you wrote back to the Army in this letter that

20   Mr. Johnson's lack of recall of the events in question was

21   credible.  Is that correct?

22   A.  Yes.

23   Q.  And this was your response even though you doubted, as you

24   testified on your direct at one point, that Mr. Johnson's

25   version of events was incorrect.  Correct?

1    A.  I'm sorry, I don't understand the question.

2    Q.  And so CACI's response to the Army, where it indicated that

3    it found Mr. Johnson's lack of recall credible in rebuffing the

4    Army's request to fire him, you put that into the letter even

5    though at one time, as you testified on your direct, you doubted

6    Mr. Johnson's version of events.  Is that correct?

7    A.  Yes.  As I stated, my initial reaction, I was skeptical.

8    Q.  And that was based upon there being other photographs of

9    Mr. Johnson within the timeframe in question?

10   A.  Correct.

11   Q.  And you also testified on your direct that there was members

12   of the Army that actually wanted DJ to stay at Abu Ghraib.

13   Correct?

14   A.  Correct.

15   Q.  And so was it CACI's position in part, in fulfilling those

16   Army members' requests to attempt to have DJ stay at Abu Ghraib,

17   that CACI was okay with continuing to employ an interrogator at

18   Abu Ghraib who had been photographed interrogating a detainee

19   that was in an unauthorized stress position?

20   A.  Well, I think at that point, because there were military

21   officers and others who are experts in this field of

22   interrogation who were speaking on behalf of Dan Johnson, we

23   took that into consideration, that it would be worth seeing if

24   he could stay longer.

25   Q.  And so my question was a bit simpler.  It's simply, CACI was

1    okay continuing to employ Daniel Johnson after seeing this

2    photograph.  Correct?

3    A.  Based on the evidence that was provided to us, yes.

4    Q.  And the only evidence you had that Mr. Johnson did not force

5    this detainee into the position shown is Mr. Johnson's own

6    response?

7    A.  Correct.  At that time, yes.

8    Q.  And you also testified the military had control -- or

9    complete control over interrogations.  Is that right?

10   A.  Correct.

11   Q.  And you testified every interrogation at Abu Ghraib was

12   carried out at the direction of the military.  Did I understand

13   you correctly?

14   A.  Correct.

15   Q.  And so is it your testimony, when the jury sees, for

16   example, photos of unmuzzled dogs being used on detainees with a

17   hood over their heads, that was being carried out pursuant to

18   directives from the military?

19   A.  I believe it was being done by the military, not by CACI

20   interrogators.

21   Q.  And so you're aware that there is findings regarding

22   Mr. Johnson engaging in abuse of detainees.  Correct?

23   A.  No.  I'm not sure what you're asking me.

24   Q.  You're aware that Major General Fay, for example, found that

25   Mr. Stefanowicz, a CACI employee, directed the use of dogs on

1    detainees.  Correct?

2    A.  I remember Major General Fay stating that.  But that was

3    also based on hearsay from others, and there was just as many,

4    if not more, people who stated that Steve did not do that.

5    Q.  And so it's your position that Major General Fay's

6    definitive investigation into the intelligence operations at

7    Abu Ghraib was faulty?

8    A.  It's not my place to decide whether his investigation was

9    faulty or not.

10   Q.  But, so, photographs of unmuzzled dogs, and his findings

11   that Mr. Stefanowicz directed the use of unmuzzled dogs, is it

12   your testimony that only the Army was authorized to direct CACI

13   interrogators to engage in such abuse?

14         MS. GINSBERG:  I think this is confusing and asked and

15   answered.

16         THE COURT:  Asked and answered.  Sustained.

17   Q.  You never saw any interrogation plans.  Correct?

18   A.  No.

19   Q.  And you never reviewed any interrogation plans?

20   A.  No.

21   Q.  And you never discussed the development of any interrogation

22   plans with any CACI interrogator?

23   A.  No.  I was only given -- Dan Porvaznik gave me a 30,000-foot

24   view of what would go into one.

25   Q.  And so your testimony regarding the military's operational

1    control over CACI interrogators at Abu Ghraib is based upon a

2    thousand-foot view of a conversation with Dan Porvaznik?

3    A.  No.  I was specifying the interrogation plans.

4    Q.  And so you were involved in the operational decisions

5    regarding interrogations?

6    A.  No.

7    Q.  Okay.  And so you were not at Abu Ghraib every day.

8    Correct?

9    A.  Correct.

10   Q.  And you did not know whether every interrogation at

11   Abu Ghraib was authorized by the Army.  Correct?

12   A.  Well, no, I guess not.

13   Q.  And you also do not know whether every interrogation was

14   actually carried out pursuant to a written plan from the Army.

15   Correct?

16   A.  No, not specifically.

17            MR. KIM:  No more questions, Your Honor.

18            MS. GINSBERG:  Just a few.

19            THE COURT:  All right.

20            **REDIRECT EXAMINATION BY COUNSEL FOR DEFENDANT**

21   **BY MS. GINSBERG:**

22   Q.  First of all, Mr. Northrop, are you familiar with the other

23   pictures that were the subject of Major Daniel's request to

24   terminate Mr. Johnson?

25   A.  Yes.  I believe there were pictures of Dan doing -- in a

1    hallway or something like that at the prison.

2    Q.  Let me just shortcut the question.

3    A.  Okay.

4    Q.  There were no -- none of the other pictures involved --

5        THE COURT:  Well, now, you can't lead either.  He's

6    your witness.

7    Q.  Do you know whether any of the other pictures involved

8    Mr. Johnson and any detainee?

9    A.  Oh, no.

10   Q.  And if you would look at Plaintiff's Exhibit Number 100 that

11   was referred to in cross-examination, on the second page, bottom

12   of the second page.

13   A.  Okay.

14   Q.  And let's go to the first page first.  Major Daniels

15   requested the immediate termination of Mr. Johnson.  Is that

16   right?

17   A.  Correct.

18   Q.  And he -- you were asked about a sentence that says:  "The

19   command has no other choice but to have Mr. Johnson removed from

20   the current contract and this reported as a derogatory report

21   with the appropriate personnel security offices."

22       You're aware of that?

23   A.  Yes.  But I think the part that has been left out both times

24   is, "Without any further explanation."

25   Q.  Yes, I was going to ask you that.  Did counsel leave out

1    part of that sentence?

2    A.  Yes.

3    Q.  And would you read again for the jury the first part of that

4    sentence?

5    A.  Yes.  So if you don't mind, I'll read the whole sentence so

6    it has context.

7    Q.  Please.

8    A.  It says:  "Without any further explanation, based on the

9    photograph itself, this command has no other choice but to have

10   Mr. Johnson removed from the current contract and this reported

11   as a derogatory report with the appropriate personnel security

12   offices."

13   Q.  And did Major Daniels' memorandum, the first page of this

14   exhibit, invite CACI to provide a further explanation?

15   A.  Yes.

16   Q.  And that explanation was provided?

17   A.  Correct.

18   Q.  In the letter that was signed by you?

19   A.  Correct.

20   Q.  And Major Daniels made up his own mind to have Mr. Johnson

21   removed from the contract, and basically rejected your

22   explanation?

23   A.  Yes, I believe that was the case.

24   Q.  All right.  And with respect to Deposition Exhibit 83, if

25   you would go back and look at Plaintiff's Exhibit 83.

1    A.  Okay.

2    Q.  And this is the exhibit where -- I'm sorry, we may be

3    looking at the wrong exhibit.  This is the exhibit where...no.

4         I'm sorry, I don't have the right exhibit written down.

5    But you were asked questions about who was the -- who the

6    employee was that had to be quietly let go that was in the daily

7    report?

8    A.  Yes.

9    Q.  And do you recall what the date of the daily report was?  It

10   was a February date.  Correct?

11   A.  Yes, without seeing it again.

12   Q.  Right.  I'm sorry.  The correct exhibit is

13   Plaintiff's Exhibit 99, and it's page 5 of 60.

14   A.  Page 5?

15   Q.  Page 5 of 60.

16   A.  Okay.

17   Q.  And it says:  "Special note, there's a portion of this

18   challenge that I need to address with Chuck face to face."  And

19   then it goes on to say:  "This is due to the sensitivity of a

20   certain," quote, unquote, "'ongoing investigation' that was

21   instigated/fueled by an employee who, in mine and Scott's

22   opinion, needs to be quietly let go.  Scott will address this

23   with Mark as well."

24         Do you see that?

25   A.  Yes.

1    Q.  And what is the date of this daily report?

2    A.  18 February, 2004.

3    Q.  Right.  And February 18th, 2004, was after the date -- or

4    was it after the date that you took Mr. Nelson to Camp Victory

5    and offered him another position --

6    A.  Yes.

7    Q.  -- at a different facility in Iraq?

8              THE COURT:  Wait.

9              MR. KIM:  Leading, Your Honor.  She is answering the

10   question for him.

11             THE COURT:  Sustained.  You can ask him that without

12   leading.

13   Q.  What is the date that you took Mr. Nelson to Camp Victory?

14   A.  Yeah, it was on or around the 25th of January, I believe.

15   Q.  Okay.  And that was Plaintiff's Exhibit 136?

16             THE COURT:  I don't think that's in this book.

17   Q.  This was a summary of your interaction with Torin Nelson.

18   A.  Oh, okay.  Yeah, so that was, yeah, around the week of

19   25 January.

20   Q.  Right.  And did Mr. Nelson, did he accept your offer to go

21   to another location in Iraq?

22   A.  No.  He decided to go home.

23   Q.  And did he resign?

24   A.  Once he got back to the United States, I believe so.

25   Q.  Okay.  So if the date of the daily report was February 18th,

1    2004, do you think that the person who needed to be quietly let

2    go was referring to Mr. Nelson?

3    A.  No, I don't believe so.

4    Q.  So is it possible that you made a mistake during your

5    deposition when you said you thought it might?

6    A.  I could have.

7    Q.  And you were asked some questions with respect to

8    Plaintiff's Exhibit 132, about concerns you had about releasing

9    personal identifying information about CACI employees who were

10   at Abu Ghraib.

11   A.  Correct.

12   Q.  And what was your reason that -- to be concerned that that

13   type of information might be put out into the public record?

14   A.  Because other information already had been, you know,

15   released to the media in some fashion.

16   Q.  And are you aware whether there was -- whether there was an

17   employee who complained about the media showing up at his home?

18   A.  Yes, I had heard about that.

19   Q.  And do you know what that employee did after the media

20   showed up at his home?

21   A.  I don't remember.

22   Q.  You don't know.  So you don't know whether or not that

23   person --

24           THE COURT:  No leading.

25           MS. GINSBERG:  Your Honor, those are all the questions

1    I have.

2          MR. KIM:  Briefly, Your Honor.

3          THE COURT:  You're going to hold up the lunch.

4          MR. KIM:  Two or three questions.

5          **RECROSS-EXAMINATION BY COUNSEL FOR PLAINTIFFS**

6    **BY MR. KIM:**

7    Q.  So Plaintiff's Exhibit 136, this is your summary of your

8    interaction with Torin Nelson?

9    A.  Yeah.

10   Q.  And you did not write this until May 11, 2004?

11   A.  Correct.

12   Q.  So you did not report the threats that other employees made

13   against Mr. Nelson to Mark Billings, Amy Jensen, and Chuck Mudd

14   until May 11, 2004?

15   A.  No, I'm sure I would have done it sooner, it's just not part

16   of these exhibits.

17   Q.  But you're not aware of any document that summarizes your

18   interactions with Mr. Nelson in a report to these individuals

19   until the one in front of you.  Correct?

20   A.  Well, correct, because that's what's in front of me.  But it

21   would have been communicated in order for Torin to be able to

22   get manifested to go back to the United States.

23   Q.  So it's your testimony you may have written down or reported

24   to them that he manifested out, but not the threats.  Correct?

25   A.  Possible.

1    Q.  And the last sentence here is that Mr. Nelson left Iraq on

2    February 4, 2004?

3    A.  Yes.

4         MR. KIM:  Nothing further, Your Honor.

5         THE COURT:  It's now time for lunch, folks.  Hopefully

6    your lunches are in the jury room, and we'll see you back at

7    2 o'clock.  Thank you.

8         (Jury out at 1:02 p.m.)

9         (Recess taken at 1:02 p.m.)

10        THE COURT:  Is there an issue before we bring the jury

11   in?

12        MR. BUCHANAN:  Yes, Your Honor.  Mike Buchanan on

13   behalf of the plaintiffs.

14        Before the break we were questioning Mr. Northrop about

15   this concept of what the defendants have been calling

16   operational control over its own employees regarding

17   interrogation services.  We dispute the whole notion of

18   operational control, both as a matter of fact and as a matter of

19   law.  Those are terms that are not in the contract.  And we can

20   deal with the legal issues later.

21        But with this next witness, we expect to hear similar

22   testimony about this alleged lack of operational control over

23   CACI interrogators, and we plan to show through our

24   cross-examination -- to challenge that idea.

25        And I know you, Judge, made some comments before,

 1    during Dr. Northrop's cross-examination, about that line of

 2    questioning.  We think it's appropriate with this particular

 3    witness because it's specific to the interrogation --

 4         THE COURT:  I'm not going to prevent you from raising

 5    what I think are appropriate cross-examination.  All right?  The

 6    borrowed servant issue, though, is in this case.  There will be

 7    jury instructions on the borrowed servant for which the

 8    defendant has properly acknowledged that most likely they have

 9    the burden of proof, and that will be how the instruction reads.

10         But, yes, you can go ahead and cross.  What I can't

11    stand is when we get into this sort of stupid fight about

12    nomenclature, because that's problematic, in my view.

13         MR. BUCHANAN:  I understand, Your Honor.

14         THE COURT:  Let's bring the jury in.  And this is the

15    video?

16         MR. O'CONNOR:  It's a live video link, yes, Your Honor.

17         (Jury in at 2:07 p.m.)

18         THE COURT:  Ladies and gentlemen, this witness is going

19    to be a live witness, but brought by video because he's

20    unavailable to be here physically in person.  All right?  It's

21    not going to be one of those depositions that have been sort of

22    prerecorded.

23         MR. O'CONNOR:  Your Honor, CACI calls Daniel Porvaznik.

24         We need to swear the witness in, Your Honor.

25         (Oath administered by courtroom deputy clerk.)

1          **(DANIEL JACOB PORVAZNIK, having been duly sworn,**

2                    **testified as follows:)**

3          **EXAMINATION BY COUNSEL FOR DEFENDANT**

4     **BY MR. O'CONNOR:**

5     Q.  Good afternoon, Mr. Porvaznik.  Could you state your full

6     name for the record?

7     A.  Daniel Jacob Porvaznik.

8     Q.  Mr. Porvaznik, did you work for CACI at Abu Ghraib prison?

9     A.  Yes.

10    Q.  When did you work at Abu Ghraib?

11    A.  I first arrived I believe 5 October 2003, and departed

12    approximately April, I believe, of 2004.

13    Q.  At some time prior to working at Abu Ghraib, were you in the

14    United States military?

15    A.  Yes, I was.

16    Q.  Which branch?

17    A.  United States Marine Corps.

18    Q.  What years were you in the Marine Corps?

19    A.  1978 until 1999.

20    Q.  Were you on active duty for all those years?

21    A.  Yes, I was.

22    Q.  During your time in the Marine Corps, did you have a

23    military occupational specialty?

24    A.  Yes.

25    Q.  What was your MOS?

1    A.  0251, interrogator/translator.

2    Q.  Did you have a security clearance while in the Marine Corps?

3    A.  Yes.

4    Q.  Did you have formal training as an interrogator?

5    A.  Yes.

6    Q.  Please tell the jury about your interrogator training in the

7    Marine Corps.

8    A.  I initially started in the fall, I believe, of 1985.  I went

9    to the -- at that point we all went, to include Marines, went to

10   the Schoolhouse, as we called it, at Fort Huachuca, Arizona.  I

11   don't recall exactly, but I believe it was approximately 14 or

12   16 weeks long.

13   Q.  How many of your 21 years in the Martin Corps were you

14   assigned to interrogator duties?

15   A.  Basically from 1986 on, along with some other duties that

16   occurred such as defense attache' duties and analysis.

17   Q.  Did you ever teach interrogation techniques in the

18   Marine Corps?

19   A.  Yes, I did.

20   Q.  Please explain your experience in training Marine

21   interrogators.

22   A.  I arrived at the Marine schoolhouse for interrogations of

23   prisoners of war in I believe the summer of 1992.  I was

24   stationed there -- we had many training iterations, of which I

25   was the course director for over three and a half years, until

1    leaving the Marine Corps training center, or easily known as

2    Virginia Beach.

3    Q.  When you left the Marine Corps in 1999, was that by

4    retirement?

5    A.  Yes, it was.

6    Q.  What rank did you hold?

7    A.  Gunnery sergeant.

8    Q.  Did you take a job after retirement?

9    A.  Yes, I did.

10   Q.  What did you do?

11   A.  I went to work for a company at that point, Premier

12   Technology Group, as the senior intelligence analyst in Germany.

13   Q.  And did you spend your with PTG in Germany?

14   A.  Yes, I did.

15   Q.  Did there come a time that you left PTG?

16   A.  Well, at one point in time CACI bought PTG, and while it was

17   CACI PTG, I did one month in Romania, also.

18   Q.  How did you come to deploy to Iraq?

19   A.  Early on when I was working for PTG, and later on CACI PTG,

20   I let the home office know, meaning Stacy, that I wanted to get

21   back to the Middle East.  Because that was my background.  So

22   when the opportunity did come up, they asked me, because they

23   were positive that they would probably get a yes, as they did.

24   Q.  Did you fly over to Iraq with any other CACI employees?

25   A.  I did.  From Fort Bliss, Texas, correct.

87

1   Q.  When you flew over to Iraq, did you know you were going to

2   be deployed to Abu Ghraib prison?

3   A.  Initially, no.  There was a question mark as to what the

4   U.S. Army wanted.

5   Q.  Were you assigned as an interrogator at Abu Ghraib prison?

6   A.  Yes.  Along with other duties, correct.

7   Q.  Let's talk about your other duties.  What other duties did

8   you have at Abu Ghraib prison?

9   A.  I was the site lead there, but also primarily my duties were

10  administrative.  As it turned out, I spent 98 percent of my time

11  taking care of administrative duties.

12  Q.  And when you say administrative duties, what kind of things

13  do you mean?

14  A.  They had to have computers, had to have office equipment,

15  logistics of getting personnel back and forth from, say,

16  Camp Victory to Abu Ghraib, and later on from Abu Ghraib to

17  other sites.  Getting ahold of ballistic vests, pay issues,

18  getting insurance papers taken care of, emergency leave if it

19  were to come up, housing, safe and secure housing.  It took up a

20  lot of time.

21  Q.  As a site lead, did you have any supervisory role over the

22  way that CACI interrogators conducted the interrogation mission?

23  A.  No.

24  Q.  Who performed that supervisory role?

25  A.  Well, in general, the U.S. Army; more specifically, that

1    would have been Captain Wood and some of her chief warrant

2    officers.

3    Q.  Did interrogation plans have to be approved before an

4    interrogation could take place at Abu Ghraib?

5    A.  Interrogation plans did have to be approved.

6    Q.  And who had to approve the interrogation plans?

7    A.  Again, that would be the interrogation control element,

8    Captain Wood and her staff.

9    Q.  Was anyone at CACI involved in approving interrogation

10   plans?

11   A.  No.

12   Q.  Did a CACI interrogator ever show you his or her proposed

13   interrogation plan?

14   A.  Yes.

15   Q.  Was that so that you could approve it?

16   A.  Not that I could approve it, no.

17   Q.  And why were you -- why did you sometimes see CACI

18   interrogators propose interrogation plans?

19   A.  Well, because my background and experience, sometimes they

20   wanted to bounce ideas.  But it was like peers, like, for

21   instance, lawyers talking to each other or doctors talking to

22   each other.  But I could not approve the plan as far as to say,

23   go ahead.

24   Q.  In the CACI interrogation plans that you saw, did any of

25   them propose detainee treatment that you considered abusive or

```
 1    illegal?

 2    A.  No.

 3    Q.  Did you ever see a CACI interrogator abuse a detainee?

 4    A.  I did not.

 5    Q.  What would you have done if you had seen a CACI employee

 6    abusing a detainee?

 7    A.  I would have ensured that that activity was ceased

 8    immediately, and then reported it up, well, to the Army.

 9    Q.  Did you ever see an Army interrogator abuse a detainee?

10    A.  I did not.

11    Q.  What would you have done if you had seen an Army

12    interrogator abusing a detainee?

13    A.  Likewise, I would have ceased the activity and reported it

14    to more senior military personnel at Abu Ghraib or the JIDC.

15    Q.  Are you familiar with the term "interrogation rules of

16    engagement"?

17    A.  Yes, I am.

18    Q.  What are IROEs?

19    A.  They're the parameters, the legally authorized limits of

20    which our interrogations can be conducted.

21              MR. O'CONNOR:  Can we pull up Plaintiff's Exhibit 42.

22              Before we do that, Your Honor, we move in

23    Plaintiff's Exhibit 42.

24              THE COURT:  Any objection?

25              MR. BUCHANAN:  No objection.
```

```
 1              (PLAINTIFF EXHIBIT Number 42 was admitted into
 2     evidence.)
 3              MR. O'CONNOR:  Can we put that up on the screen.
 4     Q.  Mr. Porvaznik, have you seen these interrogation rules of
 5     engagement before?
 6     A.  Yes, I have.
 7     Q.  Where did you see them?
 8     A.  They are posted in the ICE, the interrogation control
 9     element, and probably a couple of other places at Abu Ghraib.
10     Q.  Did CACI have any role in establishing the interrogation
11     rules of engagement at Abu Ghraib?
12     A.  Absolutely not.
13     Q.  Who established the interrogation rules of engagement?
14     A.  In general, the U.S. Army.  Yes, the military.
15     Q.  Were CACI employees sometimes promoted from screener to
16     interrogator?
17     A.  That did happen on a couple of occasions, yes.
18     Q.  Whose decision was that?
19     A.  That would be the client, the U.S. Army.
20     Q.  Are you aware that General Taguba conducted an investigation
21     of the MP brigade at Abu Ghraib prison?
22     A.  Yes.
23     Q.  Were you interviewed by Major General Taguba or his staff?
24     A.  No, I was not.
25     Q.  Do you know if CACI was asked to provide any information to
```

1     Major General Taguba and his staff?

2     A.  I don't know of a formal request, but I do know that they

3     requested for Steven Stefanowicz to be interviewed by

4     General Taguba, and said interview did occur.

5     Q.  Are you aware that Major General Fay conducted an

6     investigation of the 205th Military Intelligence Brigade as it

7     relates to Abu Ghraib prison?

8     A.  Yes.

9     Q.  Were you interviewed by Major General Fay and his staff?

10    A.  I was.

11    Q.  Did Major General Fay request any assistance or information

12    from CACI as part of his investigation?

13    A.  He requested that we have -- that we provide any CACI

14    personnel that he wanted to interview; we made sure they got

15    there and were able to be interviewed by General Fay and his

16    staff.  And we may have sent a report, also.

17           But anything that General Fay or his staff requested,

18    CACI did provide.

19    Q.  When did you leave Abu Ghraib prison?

20    A.  I believe it was around April 2004.

21    Q.  Did you leave earlier than that to take on other duties?

22    A.  I did leave at one point to go to the Marine Corps ball in

23    Baghdad on November 10th, 2003.

24    Q.  That was just a one-day departure?

25    A.  Correct.

1    Q.  And so from October to April, during the time that you were

2    at Abu Ghraib prison, did you see naked detainees?

3    A.  I did not see them when I was there, no.

4    Q.  Have you seen pictures of them now?

5    A.  I have seen pictures since, yes.  I do believe it's probably

6    in the summer of 2004 when I actually saw photos.

7    Q.  Have you seen pictures of sexual humiliation that occurred

8    at Abu Ghraib?

9    A.  Yes.

10   Q.  Did you see any of that conduct while you were actually

11   there?

12   A.  I did not.

13   Q.  And you've seen -- I assume you've seen a number of pictures

14   of detainee abuse at Abu Ghraib prison?

15   A.  I would say more than a handful, yes.  I haven't seen

16   hundreds, but I've...

17   Q.  Do you condone the abuses that you've seen pictured?

18   A.  Absolutely not.

19          MR. O'CONNOR:  Can we put up Plaintiff's Exhibit 38,

20   please.  That's already in.  There it is.

21   Q.  Have you seen this picture of Daniel Johnson before,

22   Mr. Porvaznik?

23   A.  Yes, I have.

24   Q.  Other than this picture of Mr. Johnson, have you seen any

25   pictures of CACI personnel with a detainee?

1    A.   No.

2    Q.   During the time that you were at Abu Ghraib prison from

3    October of 2003 to April of 2004, did CACI have any male

4    interrogators there who wore their hair in a ponytail?

5    A.   No.

6    Q.   Did you know a CACI interrogator named Richard Arant?

7    A.   Yes.

8    Q.   What do you remember about Mr. Arant?

9    A.   He wasn't there very long, he was experienced.  And also the

10   fact that -- well, by his own desire, he left the contract

11   early.

12   Q.   Do you remember why he quit?

13   A.   He had -- and he did not go into specifics with me, but he

14   said he had seen some things that he thought were wrong, being

15   by --

16   Q.   I didn't hear the last part.  He saw things that were wrong

17   what?

18   A.   That were being -- interrogations and some treatment by

19   junior Army interrogators that were -- well, he would have

20   stopped it if he had -- if he could.  But he didn't go into

21   specifics.

22        MR. O'CONNOR:  Can we put up Plaintiff's Exhibit 15,

23   please.  115, if I didn't say that.  If we could scroll to the

24   fourth paragraph, the one that starts, "Dan will."

25   Q.   Mr. Porvaznik, do you have a hard copy of Exhibit 115 there

1    with you?

2    A.  Yes, I do.

3    Q.  If it's easier for you, you can look at that or you can look

4    at what's on the screen.

5         Do you see in the fourth paragraph, Mr. Arant makes

6    reference to telling you about his concerns regarding the

7    handling of prisoners and interrogation methods used?

8    A.  Yes.

9    Q.  Do you recall Mr. Arant expressing such concerns to you?

10   A.  Yes, he did.  Again, he didn't go into specifics with

11   myself, but he did express his concerns, again, in particular,

12   with the junior Army personnel.

13   Q.  Moving down the paragraph, do you see the sentence:  "Dan

14   was alert to such possible circumstances even before CACI

15   personnel arrived on station, and was firm from the beginning

16   that CACI personnel not put themselves in compromising positions

17   which might result in any allegations of wrongdoing."

18   A.  Yes, I do.

19   Q.  Is that an accurate description of what you conveyed to the

20   CACI personnel?

21   A.  Yes, it is.

22        MR. O'CONNOR:  Your Honor, I have no further questions.

23        THE COURT:  All right.  Cross-examination?

24        MR. KICAK:  Your Honor, we have witness binders for the

25   Court.

1          **CROSS-EXAMINATION BY COUNSEL FOR PLAINTIFFS**

2     **BY MR. BUCHANAN:**

3     Q.  Good afternoon, Mr. Porvaznik.

4     A.  Good afternoon.

5     Q.  My name is Michael Buchanan.  In your direct testimony you

6     testified that you left Abu Ghraib prison in April of 2004.  Is

7     that right?

8     A.  I believe it was April.  It's been 20 years plus.

9     Q.  Do you recall that in mid to late January of 2004 you took a

10    lengthy R&R and returned to the United States?

11    A.  In January of 2004.  And I actually didn't go to the States,

12    I stayed within Europe.

13    Q.  And so during that period of time, extending well into

14    February, from mid to late January 2004 to at some point in late

15    February 2004, you were not on site at Abu Ghraib prison.  Is

16    that right?

17    A.  For approximately two and a half weeks.  Again, I'm fuzzy on

18    the specific length of time.

19    Q.  And I think you testified that you were engaged to be both

20    an interrogator and also the site lead.  Is that right?

21    A.  Yes.

22    Q.  And as the site lead, you were the highest ranking CACI

23    employee at Abu Ghraib prison.  Is that right?

24    A.  That would be an accurate statement, yes.

25    Q.  You testified about your background as an interrogator with

1   the United States Marine Corps.  And you worked with the

2   Marine Corps for many years before you retired from the

3   military.  Is that right?

4   A.  Yes.

5   Q.  And in order to become an interrogator with the

6   United States Marine Corps, you would agree with me that it's a

7   vigorous process?

8   A.  Most definitely.

9   Q.  And that includes an application process.  Is that right?

10  A.  Yes, it does.

11  Q.  And in order to apply in the Marine Corps, it requires four

12  to five years of military experience.  Is that right?

13  A.  At that point in history, absolutely accurate.  What the

14  current parameters are, I don't know.

15  Q.  We'll talk about during the time of your service.  Okay?

16  A.  Okay.

17  Q.  And after putting in an application, an applicant is subject

18  to a panel of six to 10 interviewees.  Is that right?

19  A.  I don't remember the exact number.  Yes, probably at least

20  six, though.

21  Q.  And if accepted into the program, someone going into the

22  interrogator program was required to do three months to one year

23  of on-the-job training.  Is that right?

24  A.  Yeah.  Normally the training period -- yeah, normally at

25  least three months, correct.

1   Q.  And at that point, after completing on-the-job training, an

2   applicant would be admitted to attend the Schoolhouse.  Is that

3   right?

4   A.  At some point, yes.

5   Q.  And I believe you testified that the training at the

6   Schoolhouse lasted 14 to 16 weeks.  Is that correct?

7   A.  From what I can remember, yes.

8   Q.  And among the things that an applicant would learn at the

9   Schoolhouse were interrogation approaches.  Is that right?

10  A.  Yes.

11  Q.  Report writing?

12  A.  Yes.

13  Q.  And training on various conventions regarding the treatment

14  of detainees?

15  A.  Yes.  The Geneva Conventions, or field manual 27-10, one in

16  the same.

17  Q.  You would agree that interrogations skills require practice?

18  A.  Yes.

19  Q.  And you believe that years of military service were helpful

20  background in order to be an interrogator.  Is that right?

21  A.  Yes.

22  Q.  You were --

23  A.  Yes, vaguely.

24  Q.  Can you complete your answer, please, sir?  I didn't mean to

25  interrupt you.

1    A.  To be able to understand interrogating anybody, or asking or

2    interviewing anybody, it's probably good to have some

3    understanding of terminology, concepts, nomenclature, all sorts

4    of things.

5    Q.  And would you agree with me that Mr. Dugan did not meet the

6    standards from the United States military corps as an

7    interrogator?

8    A.  No, I'm not too sure I would agree with that.

9    Q.  Did he receive the kind of formal training that you had?

10   A.  I do not recollect.  But I do know that the client agreed,

11   or wanted to.

12   Q.  Did he have experience conducting interrogation of detainees

13   before being retained by CACI?

14   A.  I'm not clear on that.  I don't -- I can't give you a yes or

15   no on that because I'm not sure.

16   Q.  Okay.  What about Mr. Johnson?  He was 22 years old at the

17   time he was hired by CACI.  Is that right?

18   A.  He was young.  That's probably about the right age.

19   Q.  Had he attended formal training on interrogation techniques

20   at the Schoolhouse, like you did?

21   A.  That is my understanding, yes.

22   Q.  And what about Mr. Stefanowicz?  Had he attended formal

23   training on interrogation techniques the way that you had?

24   A.  He had gone through various human intelligence training.

25   Q.  At the time he was hired by CACI, had he interrogated a

1    single detainee?

2    A.  Previous to that, I don't know.  I do know -- I can't get

3    too deep into it, but during his tenure at the defense attaché

4    office in Aman, there were situations.  I can't expand.

5    Q.  So Mr. Stefanowicz was hired by CACI to be a screener at

6    Abu Ghraib prison.  Is that right?

7    A.  Initially, yes.  Correct.

8    Q.  And he arrived at the Abu Ghraib facility on October 5th,

9    the same day that you did.  Is that right?

10    A.  Yes.

11    Q.  And initially he started working as a screener for CACI at

12    the Abu Ghraib prison.  Is that right?

13    A.  Yes.

14    Q.  And he became an interrogator with CACI only a few days

15    after his arrival.  Is that right?

16    A.  And that was after -- in consultation with.  That's not the

17    right verb.  Captain Wood and others wanted him to become an

18    interrogator.  It was the client's request.

19    Q.  And a few months later, in January 2004, as you were leaving

20    to go out on your R&R, Mr. Stefanowicz was promoted to take your

21    position as the onsite leader.  Is that right?

22    A.  The actual sequence of events is, ultimately he did take

23    over as site lead.  Hopefully that answers your question.

24    Q.  Okay.  And you recommended him for that position.  Is that

25    right?

1    A.  I did.  But also, the client much preferred that also,

2    meaning the U.S. Army.

3    Q.  When you were originally hired by CACI, you thought that the

4    site lead responsibilities would be a small portion of your

5    time.  Is that right?

6    A.  I knew it would be more challenging than a previous site

7    lead position I had in Germany.  As it turned out, basically

8    swallowed up all my time.

9    Q.  And you expected, when you arrived at Abu Ghraib prison,

10   that you would be conducting detainee interrogations.  Is that

11   right?

12   A.  I did expect to be able to do some, yes.

13   Q.  In fact, you only did about two interrogations.  Is that

14   right?

15   A.  Actual interrogations myself?

16   Q.  Yes.

17   A.  Yeah.  Probably two, yeah.

18   Q.  Would you agree that the Abu Ghraib prison facility was a

19   large site?

20   A.  Very --

21   Q.  And your -- I'm sorry, go ahead.  Complete your answer.

22   A.  I said expansive.  It was, yes, quite large.

23   Q.  And your responsibilities as the site lead required you to

24   travel around that expansive site.  Is that right?

25   A.  As one could.

 1    Q.  And you worked primarily during the day shift.  Is that

 2    correct?

 3    A.  Yes.

 4    Q.  And Mr. Stefanowicz primarily worked on the night shift.  Is

 5    that right?

 6    A.  I would not say primarily.  There was a mix.

 7    Q.  You did attend shift change meetings at the hard site.  Is

 8    that correct?

 9    A.  Not at the hard site.  Shift change normally was done at the

10    ICE.

11    Q.  At the ICE?

12    A.  Correct.

13    Q.  That's a separate facility from the hard site?

14    A.  Yes, indeed.

15    Q.  You did not spend significant amount of time at the hard

16    site, did you?

17    A.  Very little.  Correct.

18    Q.  And I understand your testimony is that while you were

19    working for CACI at the Abu Ghraib prison, the United States

20    Army had command and control over CACI personnel.  Is that your

21    testimony?

22    A.  When it comes to in regards to the actual interrogations,

23    report writing, plans, yes, the Army had control.

24    Q.  And it's your testimony that the United States military

25    approved all CACI personnel prior to their deployment to Iraq.

1    Is that right?

2    A.  That is my understanding, correct.  Yes.

3    Q.  And that the United States military assigned all the tasks

4    to CACI personnel.  Is that right?

5    A.  Correct.

6    Q.  And that you and all CACI interrogators reported to

7    Captain Wood.  Is that right?

8    A.  Yes.  Not necessarily directly.  There were section leaders,

9    and then again, also, she had a couple of chief warrant

10   officers.  But ultimately, yes, Captain Wood.

11   Q.  You would agree that as between CACI interrogators and

12   military interrogators, it was pretty clear to anyone looking

13   that CACI personnel were civilians.  Would you agree with that?

14   A.  Yes.

15   Q.  And that's because CACI personnel wore civilian clothing.

16   Right?

17   A.  Correct.  We did not wear uniforms or carry arms.

18   Q.  Whereas military personnel were required to wear military

19   uniforms.  Right?

20   A.  Yes.

21   Q.  CACI personnel were permitted to have facial hair.  Is that

22   right?

23   A.  Yes.

24   Q.  Members of the military, were they permitted to have facial

25   hair?

1    A.  No, I can't remember anyone there having facial hair.

2    Q.  And military personnel were permitted to carry weapons.  Is

3    that right?

4    A.  Yes.

5    Q.  Whereas CACI personnel were not permitted to carry weapons.

6    Correct?

7    A.  That is accurate.

8    Q.  As to site lead, you attended daily meetings with

9    Captain Wood.  Isn't that right?

10   A.  I would say at least six days a week, pretty much daily,

11   yeah.

12   Q.  And as the CACI site lead, you would share your views with

13   her on the quality of CACI personnel.  Is that right?

14   A.  I would give her what I saw and observed, she would take it

15   in; it was up to her to -- she had the final decision as to if

16   what I had to say was good, bad, or ugly.

17   Q.  When you first arrived at Abu Ghraib, you were meeting the

18   CACI interrogators and screeners for the first time.  Is that

19   right?

20   A.  If they were -- if they arrived after I got there, yes, that

21   would be the time I would have met them.

22   Q.  And when you arrived, you made an effort to speak with the

23   CACI interrogators at great length in order to assess their

24   qualifications.  Correct?

25   A.  Yes.  As much as I could, yes.

1    Q.  And you did that so you could provide Captain Wood with the

2    input she needed in order to decide how to assign CACI

3    personnel.  Is that right?

4    A.  Yes.  She would also talk to incoming CACI interrogators.

5    Q.  As the onsite leader for CACI, you had the ability to sit in

6    on interrogations carried out by CACI employees.  Isn't that

7    right?

8    A.  Yes.

9    Q.  You also would advise CACI interrogators on how to carry out

10   their job responsibilities.  Isn't that right?

11   A.  How to carry it out?

12   Q.  Yes.

13   A.  No.

14   Q.  You would -- you wouldn't share your experience and

15   expertise with CACI interrogators on things like techniques and

16   style?

17   A.  If they came to me and said, Dan, do you think this will

18   work?  Again, as a peer, as a fellow interrogator, I would

19   provide input, but that did not mean I was approving anything.

20   Again, at the end of the day, it was Captain Wood and her staff

21   that made a decision whether or not said plan, interrogation

22   plan, would be completed that way.

23   Q.  And you had an opportunity to provide input and feedback to

24   CACI interrogators on their interrogation plans.  Right?

25   A.  Again, informally.  But I did not have any control over

1    their planning or how it was conducted.

2    Q.  If you saw an interrogation plan involving a CACI

3    interrogator that violated the CACI code of ethics, you had the

4    ability to reject that plan.  Right?

5    A.  If there's anything that would have been detrimental, I

6    would have said, no, don't go there.

7    Q.  You could have rejected the plan?

8    A.  No, not necessarily.

9    Q.  You would have approved the plan --

10   A.  Because if Captain Wood and her staff thought Approaches 1

11   and 2 were best, then that's the way it would go.

12   Q.  And so it's your testimony that you would not have rejected

13   an interrogation plan that violated CACI's code of ethics?

14   A.  If it violated CACI's code of ethics, I would have said --

15   that would fall in line with the Geneva Conventions and anything

16   else, or FM 27-10.

17   Q.  And if you advised a CACI interrogator not to proceed with

18   an interrogation technique that violated the Geneva Convention,

19   and then they went ahead and did so, you had the ability to

20   discipline that employee.  Right?

21   A.  I would have had to bring it to the attention of the Army.

22   If there was a violation of the Conventions, yes -- any

23   violation of the Geneva Conventions or incorrect use of the

24   interrogation rules of engagement, again, I would have to take

25   that to the client.

1    Q.  Let me just break this down.  A CACI interrogator presents

2    you with an interrogation plan that proposes a technique that

3    violates the Geneva Convention.  Okay?  You with me?

4    A.  Yes.

5    Q.  Okay.  You review that plan and you tell the CACI

6    interrogator, "Don't do that, you're not permitted to do that."

7    Okay?  You with me?

8    A.  Yes.

9    Q.  And then the CACI interrogator goes ahead and carries out

10   that interrogation plan.  In that circumstance, would CACI have

11   the ability to discipline that interrogator, yes or no?

12   A.  Probably -- well, first of all, they would have been fired,

13   for one.  And two, it would have been brought to the attention

14   of the Army.

15   Q.  And when you say they would have been fired, they would have

16   been fired by CACI.  Right?

17   A.  Well, actually, from my understanding, it could have been

18   CACI or it could have been by the Army itself.

19   Q.  CACI could fire --

20   A.  The client had the ability to have somebody fired also.

21   Q.  CACI could have fired that employee without consulting the

22   Army.  Isn't that right?

23   A.  Given any employee, CACI could have fired somebody.

24   Q.  Without consulting the Army?

25   A.  Never came up, so I don't fully understand your...

1    Q.  You don't think CACI had the ability to fire an employee for

2    violating its code of ethics and the Geneva Convention without

3    first consulting the Army?

4    A.  They could have fired them for violation of CACI ethics,

5    yes.  In regards to the Geneva Convention, they would have had

6    to have been fired and disciplinary or possibly legal issues in

7    regards to the Army, especially when you're talking about

8    violations of the Geneva Conventions.

9    Q.  And if you saw or heard an interrogation conducted by a CACI

10   interrogator where detainee abuse was occurring, you had the

11   authority to stop that interrogation.  Right?

12   A.  Yes.

13   Q.  Now, CACI employees had a duty to report abuse directly to

14   you.  Isn't that right?

15   A.  Correct.  And to the Army.  Both.

16   Q.  It's your testimony that you had no ability to assign CACI

17   interrogators to conduct particular interrogations.  Is that

18   right?

19   A.  Correct.  That was solely in the -- under the purview of the

20   U.S. Army.  I had no control over whether they --

21   Q.  Did you have any input?

22   A.  No, I did not.

23   Q.  And that's because it's your testimony that CACI had no

24   operational control whatsoever.  Is that right?

25   A.  Correct.

1    Q.  And you testified on direct about General Fay conducting an

2    investigation regarding the abuses at Abu Ghraib.  You're aware

3    that he issued a report?

4    A.  Yes.

5    Q.  And you read that report?

6    A.  A long time ago, yes, I did.

7    Q.  And you're familiar with his findings in that report?

8    A.  It's been a long time since I read it, but yes.

9    Q.  Let's turn your attention to PTX 23 at page 74.  It's in

10   evidence.

11        MR. BUCHANAN:  And if we can bring that up on the

12   screen so the witness can see it.

13   Q.  And Captain Fay -- I'm sorry, General Fay found Captain Wood

14   relied on the CACI site manager, Civilian 18, to interview

15   contractors as they arrived and assign them based on his or her

16   interviews.  Do you see that?

17   A.  I see this highlighted section, yes.

18   Q.  And you were the CACI site manager at that time.  Isn't that

19   right?

20   A.  Yes.

21   Q.  And General Fay found that Captain Wood knew little of their

22   individual backgrounds or experience.  Do you see that?

23   A.  I see that.

24   Q.  Now, we've briefly discussed the CACI code of ethics.  You

25   were required to review the CACI code of ethics each year.  Is

1    that right?

2    A.  State your question again, please.

3    Q.  Sure.  I'm asking you about the CACI code of ethics.

4    A.  Right.

5    Q.  You were required to read them each year?

6    A.  Yeah, I'm pretty sure.

7    Q.  And you would sign a statement or something acknowledging

8    that you had received and read the code of ethics.  Right?

9    A.  It's been a long time ago, but I'm pretty sure that's a yes.

10   Q.  And you reviewed the CACI code of ethics before you deployed

11   to Abu Ghraib prison.  Is that right?

12   A.  I believe that's a yes.

13   Q.  And part of your responsibilities as a site lead was to make

14   sure that employees under your supervision in Iraq also reviewed

15   the code of ethics.  Right?

16   A.  Yes.

17   Q.  And that they abided by it.  Correct?

18   A.  Yes.

19   Q.  And the CACI code of ethics governed your conduct as the

20   onsite leader at Abu Ghraib prison.  Is that correct?

21   A.  The CACI code of ethics, yes.

22        MR. BUCHANAN:  If we can bring up PTX 85, already in

23   evidence, and take a look at the CACI code of ethics.

24   Q.  I'm drawing your attention to the section titled "Management

25   Responsibility."  Do you see that?

1    A.  I see "Management Rights Policy" as the title.

2    Q.  You're right, "Management Rights Policy."  Thank you for

3    that.

4         And you see the highlighted portion that says:  "CACI

5    management retains all rights to operate the business according

6    to its judgment, including but not limited to direct, supervise,

7    control, and, when appropriate, discipline the workforce."

8         Do you see that?

9    A.  Yes, I do.

10   Q.  So under the CACI code of ethics, CACI retained the right to

11   direct, supervise, and control its employees.  Is that right?

12   A.  As regard to the CACI code of ethics, yeah.

13   Q.  And that CACI code of ethics applied to your role at

14   Abu Ghraib prison.  Correct?

15   A.  Yes.

16   Q.  You testified on direct that you didn't hear of any

17   allegation of abuse against CACI employees.  Is that right?

18   A.  Correct.

19   Q.  But if you had heard those allegations of abuse, you would

20   have stopped that abuse and reported it.  Correct?

21   A.  Indeed.

22   Q.  And you would have considered that part of a quality control

23   function as the site manager.  Right?

24   A.  As part of that, and just as a law-abiding human being, yes.

25   Q.  Now, we started to talk about Major General Fay's

 1    investigation.  And you were aware at the time that

 2    Major General Fay was conducting interviews of CACI personnel.

 3    Is that right?

 4    A.  Yes.

 5    Q.  And CACI personnel submitted sworn statements to

 6    General Fay.  Is that right?

 7    A.  As did ICE.  I'm sure they did, also.  I never saw them, but

 8    yes.

 9    Q.  You do recall providing a sworn statement to General Fay.

10    Is that right?

11    A.  Yes, I do.

12    Q.  You're familiar with a CACI employee by the name of

13    Claudius Albury?

14    A.  Yes.

15    Q.  In 2003 and 2004, Mr. Albury was a CACI employee working

16    with you at Abu Ghraib prison.  Is that right?

17    A.  Correct.

18    Q.  And what was his position with CACI?

19    A.  Screener.

20    Q.  You're also familiar with a CACI employee working at

21    Abu Ghraib prison in 2003 and 2004 by the name of Billy Krieger?

22    A.  Yes.

23    Q.  And Mr. Krieger was also a CACI screener working with you at

24    Abu Ghraib prison.  Is that right?

25    A.  Yes.  I believe he was a screener, yes.

 1   Q.  And Mr. Krieger reported to Mr. Albury.  Is that right?

 2   A.  No.

 3   Q.  Was Mr. Albury his supervisor?

 4   A.  No.

 5   Q.  Both Mr. Krieger and Mr. Albury reported to you.  Is that

 6   right?

 7   A.  As I being the site lead there, in that sense, yes.

 8   Q.  And as a result of reporting to you, they were obligated to

 9   report instances of detainee abuse to you.  Is that right?

10   A.  Yes.

11   Q.  And do you recall that Mr. Albury reported to you about

12   Mr. Krieger?

13   A.  I don't recall that specifically, no.

14   Q.  Can you take a look at PTX 223 in your notebook.

15           MR. BUCHANAN:  I'm sorry, I have to put it on the

16   screen just for the witness.

17           MR. O'CONNOR:  That's not admitted.

18           MR. BUCHANAN:  Right.  So we're just going to use it to

19   refresh the witness' recollection.

20           THE COURT:  Hopefully he'll be able to read it.  It's

21   hard on the screen.  It's hard to read it here.

22           MR. BUCHANAN:  Can we show it just to the witness.

23   Q.  I just want to bring your attention towards the middle,

24   where it says, "The abuse" -- I'm sorry.  "I reported" --

25           MR. O'CONNOR:  Your Honor --

 1          THE COURT:  Wait, wait, wait.  You're basically
 2    publishing it.  Just have him read it.
 3          MR. BUCHANAN:  I was going to say, just drawing his
 4    attention to where he said, "I reported" --
 5          THE COURT:  Well, there's yellow lines.  Right?
 6          MR. BUCHANAN:  Yes.
 7          THE COURT:  You want him to read the yellow?
 8          MR. BUCHANAN:  Yes.
 9          THE COURT:  Just read the yellow, please.
10          THE WITNESS:  Um...
11          THE COURT:  No, don't read it out loud, please.
12          THE WITNESS:  Yes, ma'am.  I'm just reading the
13    highlighted area.
14    A.  Okay.  I've read it.
15    Q.  Does this refresh your recollection that Mr. Albury reported
16    to you about Mr. Krieger?
17    A.  Yes, that helps my recollection.
18    Q.  Okay.  And do you recall that Mr. Albury reported to you
19    about abuse he saw or he knew of by -- of detainees by
20    Mr. Krieger?
21    A.  Again, an allegation.  And from what I understand, is that
22    Mr. Albury didn't see it, for all I know.  So, yeah, I don't...
23    Q.  But you recall that he reported abuse to you by Mr. Krieger?
24    A.  Yes, vaguely.  Without seeing that, I wouldn't have had a
25    clue.

```
 1            MR. BUCHANAN:  Your Honor, we would move for the
 2   admission of PTX 223 under 801(d)(2)(D).
 3            THE COURT:  Any objection to this coming in?
 4            MR. O'CONNOR:  It's hearsay, Your Honor.
 5            THE COURT:  Yeah, I'm going to sustain the objection.
 6   Q.  Okay.  Let's move on to -- are you familiar with a -- I
 7   think you testified on direct about a CACI employee by the name
 8   of Rich Arant.  Is that right?
 9   A.  Yes.
10   Q.  And he was working at Abu Ghraib prison when you arrived
11   there in October of 2003.  Is that correct?
12   A.  I don't remember if he was already there or he came
13   afterwards.  Again, it's been a long time.
14   Q.  And you testified on direct that Mr. Arant provided some
15   information to you about detainee abuse carried out by Army
16   interrogators.  Is that right?
17   A.  Yes.  He did not go into specifics, but he did bring it up,
18   correct.
19   Q.  So it's your testimony here today -- and that was --
20   Mr. Arant reported to you at Abu Ghraib prison.  Right?
21   A.  Yes.  As a CACI employee, I being the site lead, yes.
22   Q.  And when he notified you that he was leaving, he met with
23   you.  Right?
24   A.  Yes.  Before he left AG.
25   Q.  And he indicated to you that one of the reasons he was
```

1    leaving was because he was uncomfortable with the detainee

2    treatment he was seeing.  Is that right?

3    A.  Yes.

4    Q.  So it's your testimony here today that the reason Mr. Arant

5    left Abu Ghraib prison was because he was uncomfortable with

6    what he was seeing in terms of how detainees were being treated.

7    Right?

8    A.  More in particular, he focused on, again, junior -- nothing

9    against the Army, but they were Army.  Junior Army interrogators

10   or junior personnel conducting interrogations.

11   Q.  Do you remember having your deposition taken back in 2006 in

12   another case?

13   A.  I do remember -- yes, I did give a deposition, I think, in

14   the summer of 2006.  I don't remember exactly.

15   Q.  And the deposition took place in Columbus, Ohio.  Do you

16   remember that?

17   A.  Yes.

18   Q.  And there was a court reporter who was present for your

19   deposition?

20   A.  Yes, there was.  I believe so.

21   Q.  And the court reporter was taking down the questions that

22   were asked and the answers that you gave?

23   A.  Yes.

24   Q.  And you were placed under oath at that deposition before you

25   began answering questions.  Is that right?

1    A.  I'm pretty sure I was, yes.

2    Q.  And it was similar to the oath that you took here today in

3    this courtroom.  Right?

4    A.  Yes.

5    Q.  And it also required you to tell the truth.  Is that

6    correct?

7    A.  Yes.

8    Q.  And you were asked questions at that deposition and you

9    answered those questions.  Is that right?

10    A.  Yes.

11    Q.  I want to draw your attention -- we're going to bring this

12    up on the screen for you to look at, to page 224 of your

13    deposition.

14         THE COURT:  This should only go to the witness.

15         MR. BUCHANAN:  225, I'm sorry.

16         THE COURT:  225.

17    Q.  Okay.  On the top, were you asked a question about -- were

18    you asked the following question, starting on the bottom of page

19    224, line 22 --

20         MR. O'CONNOR:  Your Honor --

21         THE COURT:  Hold on a second.  What is the point of

22    this?  It doesn't appear to be impeachment.

23         MR. BUCHANAN:  Your Honor, may I approach?  Because on

24    the next page, starting at line 12, there's an answer about why

25    Mr. Arant left.

1              THE COURT:  All right.  Hold on.

2              Well, I'm not sure why you want this in your case, but

3     I'm going to permit it.  It is different from what he has just

4     said.  Go ahead.

5     Q.  And under oath, did you provide testimony about the reasons

6     why Mr. Arant left Iraq?

7     A.  Yes.

8     Q.  Were you asked:  "So he left because it was too dangerous?"

9              And did you answer:  "That, and because he had problems

10    with his eyes.  He told me that once he got there, that he was

11    supposed to have had some operation done on his eyes.  I don't

12    know if it was cataracts or something like that.  But he had

13    postponed it because he wanted to deploy to Iraq.  Once he got

14    there, he realized that it was going to hinder him being there,

15    so he said, you know, I'm outta here.  Sorry, I've got to go."

16             Do you see that?

17    A.  It's not in front of me, no.

18             COURTROOM CLERK:  Counsel, your exhibit only goes to

19    page 128.  There is no page 225 on this flash drive.

20             MR. BUCHANAN:  Okay.  We'll move along.

21             COURTROOM CLERK:  I have it here, counsel.

22             THE COURT:  Did you find it?

23             COURTROOM CLERK:  Yes, Judge.

24             MR. BUCHANAN:  I keep doing that too.  It's PDF page --

25    there's a page number in the upper right hand.  It's four pages

```
 1    per sheet.

 2              THE COURT:  Can you read that?

 3    A.  I can read it now.

 4    Q.  You see at line 2, your testimony is about Mr. Arant.  Do

 5    you see that?

 6    A.  Yes.

 7    Q.  And on line 11, you were asked:  "So he left because it was

 8    too dangerous?"

 9              And your answer:  "That, and because his" -- "he had

10    problems with his eyes."

11              Do you see that?

12    A.  Yes.  And that also is accurate.

13    Q.  And you go on to say:  "He told me that once he got there,

14    he was supposed to have some operation done on his eyes.  I

15    don't know if it was cataracts or something like that.  But he

16    had postponed it because he wanted to deploy to Iraq.  Once he

17    got there, he realized that it was going to hinder him being

18    there, so he said, you know what, I'm out of here.  Sorry, but

19    I've got to go."

20              And you responded:  "I understand.  Not a problem."

21              Did I read that correctly?

22    A.  Yes.  That, again, is also accurate.

23    Q.  And in that answer under oath, nowhere do you say he left in

24    part because he was uncomfortable with the detainee abuse he was

25    witnessing?
```

```
 1    A.  At that point in time I didn't remember it.

 2    Q.  And do you recall that the CID investigation began in

 3    January 2004?

 4    A.  I remember it starting in early 2004, but I can't -- I don't

 5    remember when exactly.

 6    Q.  Do you recall that you provided -- or you completed a

 7    questionnaire as part of the CID investigation?

 8    A.  I don't recall the questionnaire.  I do remember being

 9    questioned by them.

10          MR. BUCHANAN:  Can we bring up, just for the witness to

11    see, what's been marked for identification as PTX 214.

12          THE COURT:  All right.

13    Q.  Take a moment.  Do you see your name at the top?

14    A.  Yes.

15    Q.  Does that appear to be your handwriting?

16    A.  Yes.

17    Q.  And do you recall filling in these questions -- answers to

18    these questions?

19    A.  Vaguely.  But it is my writing, yes.

20          MR. BUCHANAN:  Your Honor, I would move for the

21    admission of PTX 214.

22          THE COURT:  Any objection?

23          MR. O'CONNOR:  No, Your Honor.

24          THE COURT:  All right.  It's in.

25
```

1           (PLAINTIFF EXHIBIT Number 214 was admitted into

2     evidence.)

3     Q.  I want to draw your attention down to a question in the

4     middle of the page.  Right in the top of the page there, or

5     right in the middle of the page there, there's a question that

6     says:  "Do you know of any events where detainees were abused,

7     assaulted, or treated immorally?"

8           Do you see that?

9     A.  Yes.  Yeah, I see this.  Correct.

10    Q.  And your answer to that question was, "No"?

11    A.  That's what I wrote, yeah.

12          MR. BUCHANAN:  No further questions, Your Honor.

13          THE COURT:  Is there any redirect?

14          MR. O'CONNOR:  No, Your Honor.

15          THE COURT:  Thank you for your testimony.  All right?

16    We'll be signing off now.

17          THE WITNESS:  Okay.  Thank you.

18          THE COURT:  Mr. O'Connor, do you have other witnesses?

19          MR. O'CONNOR:  We do, Your Honor.  We have CACI

20    interrogator, which will be a tape recorded 35-minute

21    deposition.  We also have Army Interrogator B, which we

22    substantially reduced over the lunch hour, and we're going to

23    read that in because it will be more efficient than trying to

24    adjust the pitch.  Then we have one short video, and that will

25    be it.

```
 1                (Excerpt of taped interview of INTERROGATOR A played in
 2     open court.)
 3                (End of excerpt.)
 4                MR. O'CONNOR:  Your Honor, CACI calls via read-in
 5     deposition, Army Interrogator B.
 6                THE COURT:  B as in boy?
 7                MR. O'CONNOR:  B as in boy.  We cut this down and
 8     marked it old school.
 9                May I proceed, Your Honor?
10                THE COURT:  Yes.
11                (The following testimony of ARMY INTERROGATOR B was
12     read into the record in open court:)
13     Q.  Army Interrogator B, you were in the United States Army at
14     the time you serve at Abu Ghraib prison?
15     A.  Yes.
16     Q.  What unit were you in when you served at Abu Ghraib prison?
17     A.  302nd MI battalion.
18     Q.  What rank did you hold when you served at Abu Ghraib prison?
19     A.  Specialist.
20     Q.  What was your military occupational specialty when you
21     served at Abu Ghraib prison?
22     A.  Electronic intelligence analyst.
23     Q.  Were you ever disciplined or reprimanded by the Army for
24     anything that occurred at Abu Ghraib prison?
25     A.  No.
```

```
 1     Q.  Have you ever been convicted of a crime?

 2     A.  No.

 3          MR. O'CONNOR:  Page 3.

 4     Q.  During the time that you were serving at Abu Ghraib prison,

 5     were detainees in the permanent structure forced to remain

 6     naked?

 7     A.  No.

 8     Q.  Did you see any detainees wearing women's underwear?

 9     A.  No.

10          MR. O'CONNOR:  Page 8.

11     Q.  You testified that you didn't remember the interrogation of

12     plaintiff Al Shimari.  Is it fair to say that you don't remember

13     who the linguist was for that interrogation?

14     A.  That is fair.

15     Q.  Is it fair to say that if I asked you any questions about

16     what happened during any interrogation of plaintiff Al Shimari,

17     you would be unable to answer that?

18     A.  That's fair to say.

19     Q.  Did you ever give instructions to the MPs regarding how to

20     handle detainees?

21     A.  No.

22     Q.  Do you recall if the interrogators that you were working

23     with ever gave such instructions?

24     A.  No.

25     Q.  During your time at Abu Ghraib, do you recall seeing
```

1    anything that you would consider abuse of a detainee?

2    A.  No.

3              (END OF READ-IN.)

4              MR. O'CONNOR:  So concludes Interrogator B, Your Honor.

5              THE COURT:  All right.

6              MR. O'CONNOR:  Our final witness is Captain

7    Carolyn Wood, who at the time was Major Carolyn Holmes.  We're

8    presenting her by video.  I think it's about 20 minutes.

9              (Excerpt of videotaped deposition of CAROLYN HOLMES

10   played in open court.)

11             (End excerpt.)

12             MR. O'CONNOR:  Your Honor, CACI moves to admit

13   Defendant's Exhibit 37, which is the Secretary Rumsfeld

14   memorandum that the Court said it would take judicial notice of

15   yesterday.

16             THE COURT:  All right.

17             MR. FARIDI:  We object.

18             THE COURT:  Well, I'm putting it in because I put your

19   two in as well.  So if you don't want yours in, I won't put that

20   one in.

21             MR. FARIDI:  I think it's a slightly different issue,

22   Your Honor.  We can approach on it.

23             THE COURT:  No, that's all right.  I've ruled.  It's

24   in.

25             (DEFENDANT Exhibit 37 was admitted into evidence.)

1        MR. O'CONNOR:  May I publish it, Your Honor?

2        THE COURT:  Yes.

3        MR. O'CONNOR:  It's a September 15, 2004 memorandum for

4    the Secretary of Army, "Subject:  Processing of claims by Iraqi

5    detainees based on allegations of personal injury/abuse and

6    mistreatment.

7        The U.S. Army has claims responsibility in Iraq.

8    Because of the sensitivity of allegations of personal

9    injury/abuse and mistreatment of Iraqi detainees, particularly

10   at Abu Ghraib prison, I asked the Secretary of the Army review

11   all claims based on such allegations and act on them in his

12   discretion.  Prior to his review, such claims will be

13   investigated by a foreign claims commission under the

14   Foreign Claims Act, 10 U.S.C. 2734, or investigated under other

15   applicable claims statutes.

16       The report of investigation will include a thorough

17   analysis of whether the claim is cognizable under the

18   Foreign Claims Act or other claims statutes, whether the

19   claimant is a proper claimant under the Foreign Claims Act or

20   other claims statutes, and a recommendation regarding an

21   appropriate amount of compensation, if any.

22       The report of the foreign claims commission, or

23   investigation under other applicable claims statutes, should be

24   forwarded to the Secretary of the Army.  If it is concluded that

25   the claim is not payable under the Foreign Claims Act or other

1    claims statutes, the Secretary of the Army will identify

2    alternative authorities under which compensation can be

3    provided, and either such take such action in inappropriate

4    cases, or forward the claim to the Deputy Secretary of Defense

5    via the general counsel of the Department of Defense with a

6    recommendation whether such payment is appropriate.

7          Signed, Donald Rumsfeld, Secretary of Defense."

8          With that, Your Honor, CACI rests.

9          THE COURT:  All right.  This is the right time to take

10    our afternoon break.  Before we do that, is there going to be a

11    rebuttal case?

12          MR. FARIDI:  Yes.  Very brief, Your Honor.

13          THE COURT:  That's all right.  Then I'll have the jury

14    take their break.  We'll be in recess until 4:30.

15          (Jury out at 4:13 p.m.)

16          (Recess taken at 4:13 p.m.)

17          THE COURT:  Do I understand there's an issue about the

18    rebuttal case?

19          MR. O'CONNOR:  We object to much or most of it,

20    Your Honor.  It's five deposition read-ins.

21          THE COURT:  The plaintiff has a right to rebut.

22          MR. O'CONNOR:  I completely agree with that.  But a lot

23    of it is not rebuttal.  Some of it are counter-designations that

24    were struck and just repurposed as rebuttal, which we don't

25    think is appropriate.

```
 1              For Colonel Brady, every designation they have for
 2     Colonel Brady was struck by the Court except for the one that
 3     they've got in what they want to do today, which asks him what
 4     his name is.  But every substantive question they ask him is a
 5     counter-designation the Court struck.  This is just repurposing
 6     a counter-designation, saying, well, it's rebuttal now.
 7              Army Interrogator E, they want to designate language
 8     where Army Interrogator E says that he -- let's see.  I can hand
 9     this up if it would be helpful.  But he saw a CACI employee pull
10     fingers -- spread fingers on a detainee, and they banged on the
11     walls of an interrogation booth before questioning him.  And
12     that's not rebutting anything that we said.
13              But even more to the point, you have to go -- that
14     really requires six pages of counter-designations to point out
15     that the witness so said, which they do not want to put in the
16     rebuttal case, that it was an imam that -- so the witness said,
17     I'm actually sure it's not one of these plaintiffs.
18              And I just don't know what that rebuts that we put in
19     in our case.
20              THE COURT:  Well, why was that not done during the
21     deposition that was played?
22              MR. O'CONNOR:  Because they didn't serve
23     counter-designations until shortly before trial and the Court
24     struck them.  The counter-designations were due five years ago.
25              THE COURT:  All right.  Let me hear.
```

1          MR. FARIDI:  Your Honor, this is a different context.

2    They've put on a case, for instance, just to use the example for

3    CACI interrogator -- Army Interrogator E, for instance, where

4    all of the witnesses who said they never heard anything, didn't

5    see anything.  We now get an opportunity to rebut that by the

6    testimony of some of the same interrogators or translators who

7    are going to say, yeah, we did see some stuff.  So this is

8    completely appropriate, and in response to the case that they

9    put on.

10          The issue that Mr. O'Connor is raising is that he's

11    claiming that we were required to disclose the designations for

12    our rebuttal case five years ago, in 2018.  That's not the case.

13    Our rebuttal case is responsive to the case that they actually

14    get to put on trial.

15          THE COURT:  All right.  What makes this difficult is

16    that if this were a normal trial where the witnesses had

17    testified live, you would have been required to hold the

18    witness, not release the witness, and then we would have brought

19    the witness back in and asked questions as long as it was

20    appropriate rebuttal.

21          It is true that if in a particular case the witness

22    says, "I never saw any misconduct," and you have evidence that

23    that same witness said, "I saw misconduct," then it would be

24    appropriate rebuttal.

25          But I want to see what you're talking about.  Because

```
1    if, in fact, further on that rebuttal is further clarified, then
2    it's opening up the door to surrebuttal.  And I think it's
3    getting late in the day for this back and forth.
4         MR. FARIDI:  I only have five designations, and we can
5    go through each one of these one by one if you like.
6         THE COURT:  Is it earmarked on the...
7         So what page is it for E?  For Interrogator Edward, E,
8    what page is it?
9         MR. O'CONNOR:  The Excel spreadsheet has the proposed
10   designations.  The redirect that I did at the deposition that
11   clarifies all of this is an imam and not one of the plaintiffs
12   is 179 to 185, which I've handed up to the Court.
13        THE COURT:  Am I correct, the red portions are the
14   rebuttal you want to read in?
15        MR. FARIDI:  Your Honor, which one are you looking at?
16        THE COURT:  I thought I was looking at E.  Don't give
17   me apples and oranges this late in the day.
18        MR. FARIDI:  There's two documents that reflect that.
19   There's a document that at the very top it says "Army E
20   Rebuttal 3."  It's in the manila folders that are being handed
21   to Your Honor.
22        THE COURT:  I have too many things.  Take these back,
23   give me one set that makes some sense.  All right?  I'm not
24   going to look at a million different documents at this point.
25   One set.  I want to know exactly what -- for E and only for E,
```

1      what you plan to introduce as rebuttal.

2              MR. FARIDI:  I have three copies, Your Honor.

3              THE COURT:  That is it?

4              MR. FARIDI:  Yes.

5              THE COURT:  That is for E?

6              MR. FARIDI:  Yes.

7              THE COURT:  Now, would there be surrebuttal on E?

8              MR. O'CONNOR:  I have it in my hand, Your Honor.

9              THE COURT:  Hand it up.  I'm going to look first at the

10     rebuttal.  So everything that I have here, this is the entire

11     rebuttal?

12             MR. FARIDI:  Just for E.

13             THE COURT:  I understand.  But you want all of this?

14             MR. FARIDI:  Yes.

15             THE COURT:  You gave me two copies of the same thing.

16     Now let me take a look at this transcript.

17             All right.  So as I understand it, this rebuttal -- I

18     don't see anything in the rebuttal that's trying to link this

19     testimony to Mr. Al-Zuba'e.

20             MR. FARIDI:  That's not necessary for us, Your Honor.

21             THE COURT:  Right.  What you're doing is you're showing

22     more instances of abuse.

23             MR. FARIDI:  Because they had their pseudonymous

24     witnesses testify that they never saw or heard anything with

25     respect to any detainee.

1          THE COURT:  All right.  And so I'm not sure,

2     Mr. O'Connor, why this surrebuttal is at all relevant, because

3     they're not trying to say that Al Zuba'e was the person who was

4     described in this excerpt.

5          MR. O'CONNOR:  Your Honor, if they're going to present

6     evidence of abuse that they saw, that a witness said he saw, I

7     think we are entitled to have the jury understand that's not one

8     of these plaintiffs.  Because it's a very different situation --

9     I mean, if one of these plaintiffs is -- if there's an

10    eyewitness to abuse, obviously that's a very different posture

11    than some guy was abused.  And I think we're entitled to have

12    them understand --

13         THE COURT:  Are you still going to spend time, your

14    precious 45 minutes, arguing to the jury that the plaintiffs in

15    this case were not subjected to improper treatment?  I'm giving

16    you a rhetorical question.

17         One of the reasons why we don't have a jury charge yet

18    is because this has been an extremely difficult case.  I've not

19    had a problem like this with the theories going all over the

20    place and trying to be as fair as I can to both sides and as

21    accurate as I can on the law.  But it's very difficult.

22         If you are still actually arguing that the three

23    plaintiffs in this case were not subjected -- I'm not saying it

24    was by CACI people or anything like that.  But if that's still

25    part of your case, so be it.  I'll let you put this in.  All

1    right?

2         But I do think that this as to Interrogator E is

3    relevant.  It is appropriate rebuttal because it does rebut what

4    he was saying about not seeing any other instances of abuse.

5         But, again, for both sides, I'm not sure how valuable

6    this really is.  I was particularly impressed - and I'm going to

7    forget which number it was - with one of the ones we heard this

8    afternoon where you have an interrogator who was saying, yeah, I

9    saw somebody wearing women's underwear, I saw some nakedness.  I

10   mean, there are admissions in these.  I don't know how many more

11   you-all need.  But I'm going to permit the rebuttal as to E to

12   go in.  All right?

13        And if CACI wants to sure rebut, I will permit that.

14   So let me get this to whoever else gets this.  We can bring the

15   jury in.

16        MR. FARIDI:  Your Honor, I'm going to limit the

17   rebuttal.  We had five witnesses; I'm going to limit it to four.

18   I was going to do another Army interrogator, but I'll take that

19   out.  But there's three other witnesses.  This will be brief.  I

20   will be done in the next 15 minutes with all of them.

21        THE COURT:  All right.  You've given notice, though, to

22   Mr. O'Connor as to who they are --

23        MR. FARIDI:  Yes.

24        THE COURT:  -- in case they want to have any

25   surrebuttal?  And we'll have to see if it's appropriate.

 1          MR. FARIDI:  We haven't gotten any response from them

 2     as to surrebuttal.  This is the first I'm hearing about it.  But

 3     we've given them notice -- we sent them our notice as to our

 4     rebuttal case last night.

 5          MR. O'CONNOR:  Your Honor, I view that not -- as less

 6     surrebuttal and more a counter-designation.  I mean, if we're

 7     going to leave that witness in -- I mean, if the witness were

 8     here, I would cross the witness with that, and say:  Well, isn't

 9     it true --

10          MR. FARIDI:  I'm happy to read it in, Your Honor.  I'll

11     just read in his copy after I'm done with my --

12          THE COURT:  Would you rather have my law clerk read it

13     in?

14          MR. FARIDI:  Yeah.  I'll ask the questions and then the

15     law clerk can give the answers.  That's the most efficient way.

16          THE COURT:  Let's bring the jury in.

17          (Jury in at 4:43 p.m.)

18          THE COURT:  So ladies and gentlemen, what's happened

19     now is that the defense, CACI, has rested.  We're going to have

20     a brief rebuttal case from the plaintiffs.  All right?  And

21     that's going to be the playing of small snippets and some

22     reading in of some deposition testimony.

23          All right.

24          MR. FARIDI:  Your Honor, at the outset, for our

25     rebuttal case I do want to read in two paragraphs from the

1    request for judicial notice that we submitted yesterday, and

2    Your Honor allowed, as to the CPA.  Those haven't been read to

3    the jury.

4            THE COURT:  Go ahead.

5            MR. FARIDI:  "The Coalition Provisional Authority

6    displaced Iraqi law and governmental institutions, and, pursuant

7    to Coalition Provisional Authority Order 17, immunized coalition

8    personnel and contractors from Iraqi law and Iraqi legal

9    process; instead, subjecting all coalition personnel to the

10   exclusive jurisdiction of their parent states.

11           Coalition Provisional Authority Order 17 further

12   provided that third-party claims for personal injury could not

13   be brought in Iraqi courts, but would be submitted and dealt

14   with by the parent state whose coalition personnel, property,

15   activities, or other assets are alleged to have caused the

16   claimed damage in a manner consistent with the national laws of

17   the parent state."

18           Your Honor, plaintiffs call by video designation

19   Carolyn Holmes.  And the run time for this particular video is

20   approximately 3 minutes and 9 seconds.

21           THE COURT:  All right.

22           (The following testimony of CAROLYN HOLMES was read

23   into the record in open court:)

24   Q.  Good morning, Major Holmes.

25   A.  Good morning.

1    Q.  Major Holmes, during the time you were at Abu Ghraib between

2    August and December of 2003, do you recall any interrogator

3    providing you or the warrant officer, the NCOIC, Pappas or

4    Jordan, a plan that would include a request to have detainees

5    nude?

6    A.  I can't speak for anybody else.

7    Q.  Just from your knowledge.

8    A.  Not from my knowledge.

9    Q.  How about to have detainees cuffed to bars?

10   A.  Again, no, not to my knowledge.

11   Q.  I'm just asking from your knowledge.

12   A.  Not to my knowledge, no.

13   Q.  How about to have their diet manipulated?

14   A.  I really don't know.

15   Q.  Okay.  How about having the environment manipulated, from

16   your knowledge?

17   A.  Not to my knowledge, no.

18   Q.  How about to humiliate them in a way like having them put on

19   women's underwear?

20   A.  Not to my knowledge.

21   Q.  During your tenure in Abu Ghraib between August and

22   December of 2003, did you provide any authorization or approval

23   for interrogations -- for interrogators to physically assault

24   detainees?

25   A.  No.

1   Q.  Major Holmes, did you know who was responsible at Abu Ghraib

2   to make sure you are provided with trained or qualified

3   interrogators?

4   A.  I don't know who that responsibility is.  It was -- a

5   decision to place CACI personnel was echelons above Abu Ghraib.

6   So I don't know who is responsible for placing personnel.

7   Q.  Okay.

8   A.  All I know is that they --

9   Q.  They just arrived?

10  A.  They just arrived.

11  Q.  Okay.  When they just arrived, you didn't have personal

12  knowledge of their background.  Correct?

13  A.  That's correct.

14  Q.  When they arrived, you weren't provided their résumés.

15  Correct?

16  A.  That is correct.

17  Q.  When they arrived, you weren't provided any references about

18  them.  Correct?

19  A.  That's correct.

20  Q.  Did you ever approve of Steve Stefanowicz to treat detainees

21  like shit?

22  A.  No.

23  Q.  Did you ever approve or give authorization to Big -- to

24  Steve Stefanowicz to strip detainees nude?

25  A.  Absolutely not.

  1            (END READ-IN.)

  2            MR. FARIDI:  Your Honor, plaintiffs now call

  3    Amy Monahan, formerly known as Jensen, by deposition transcript.

  4            THE COURT:  Again.  You-all have those transcripts,

  5    right, Mr. O'Connor?

  6            MR. O'CONNOR:  I have something close to it.  Now I

  7    have it.

  8            (The following testimony of AMY MONAHAN was read into

  9    the record in open court:)

 10    Q.  Would you state your full name for the record.

 11    A.  Amy Elizabeth Monahan.

 12    Q.  Did you go by another name previously, Ms. Monahan?

 13    A.  Amy Jensen.

 14    Q.  And did CACI alert the COR that it was sending over --

 15            MR. FARIDI:  And I believe there's an error in the

 16    transcript.  It should be read as "résumés."  And I think

 17    Mr. O'Connor would agree.

 18            MR. O'CONNOR:  I agree with that.

 19    Q.  And did CACI alert the COR that it was sending over résumés

 20    that did not match the statement of work?

 21    A.  Yes.

 22    Q.  And was that an email transmittal from you?

 23    A.  Yes.  For a position that I managed, yes.

 24    Q.  And in those instances, would you send the résumés directly

 25    to the COR or did you send them to the CACI in-country manager?

1   A.  It worked both ways.

2   Q.  Am I correct in understanding that under Colonel Brady's

3   tenure, you sent it to Tom Howard, and then, when Major Daniels

4   came on board, you sent it directly to him?

5   A.  You're correct that when Colonel Brady was the COR, the

6   résumés were forwarded to Tom Howard.  I don't know that it was

7   all directed by Major Daniels that they started going to him,

8   but eventually the résumés did go through him directly.  If we

9   needed follow-up, then we would send them to Dan so they could

10  work directly with Major Daniels.

11  Q.  From your vantage point, would you accept an email back from

12  Tom Howard on a candidate who lacked the statement of work

13  qualifications as authorization to send that person to Iraq?

14  A.  Yes.

15  Q.  But you didn't distinguish in accepting Mr. Howard's

16  authorization on whether or not the person met the statement of

17  work qualifications.  Correct?

18  A.  If Tom Howard had emailed me that he thought this person

19  would -- was qualified to carry out the responsibilities of the

20  position we were looking to hire them for, then, yes, I

21  proceeded with hiring that person.

22  Q.  What I'm really trying to understand is, how did CACI

23  employees in Iraq differ from CACI employees in the U.S.?  Other

24  than the fact that CACI employees in Iraq have to agree not to

25  drink alcohol and not the carry weapons, was there any other way

 1     in which CACI employees in Iraq differed from CACI employees in

 2     the United States?

 3     A.  They were subject to house and welfare inspections.

 4     Q.  And are there any other ways in which CACI employees in Iraq

 5     differ from CACI employees in the U.S.?

 6     A.  I can't recall any other specific differences.

 7     Q.  Ms. Monahan, you have the daily reports from Iraq?

 8     A.  Yes.

 9     Q.  And you received these from whom?

10     A.  Scott Northrop.

11     Q.  And when you pointed, how do we know it's from

12     Scott Northrop?

13     A.  Well, it could have been Dan Porvaznik, but once Scott

14     arrived in country, he took over as the in-country manager, and

15     it was one of the responsibilities of the in-country manager.

16     Q.  Were these sent to you by email?

17     A.  Yes.

18     Q.  And did you read all of them when you received them?

19     A.  Yes.

20     Q.  And who else besides you received the daily reports by

21     email?

22     A.  All the program managers associated with the contract,

23     Mark Billings, Chuck Mudd.  Our executive VP, Harry Thornsvard,

24     held that position initially.  I'm not sure who else was on the

25     distribution list.

 1              MR. FARIDI:  Your Honor, plaintiffs now call

 2     William Harding Brady, III via deposition designation.

 3              (The following testimony of WILLIAM HARDING BRADY, III

 4     was read into the record in open court:)

 5     Can you state your full name for the record?

 6     A.  William Harding Brady, III.

 7     Q.  If CACI decided to move a screener up to a position of

 8     interrogator, did you get involved in that process?

 9     A.  Not that I would recall, no.

10     Q.  Would anybody in the military get involved in the process of

11     CACI promoting somebody from screener to interrogator?

12     A.  I would only be speculating.  I have no -- no knowledge.

13     Q.  So to the best of your knowledge, that's not something that

14     the military got involved in?

15     A.  I'm not saying that.  I'm saying I don't know.

16     Q.  Okay.  But you are the contract officer -- withdrawn.  Let

17     me rephrase.

18              Okay.  But you as the contract officer weren't involved

19     in that.  Correct?

20     A.  I don't recall, no.

21     Q.  Now, you made a reference to a skilled base out there.  Am I

22     correct in understanding that CACI, not the military, was

23     responsible for recruiting their own employees?

24     A.  CACI was required to provide certain standards of employees,

25     yes.  To do that, I would assume they would have to recruit.

1    Q.  But that's not something that you weighed in or got involved

2    in in any way?

3    A.  I certainly had nothing to do with recruiting from Baghdad,

4    Iraq, no.

5    Q.  And I take it you had nothing to do with the interview

6    process that CACI used?

7    A.  I have no knowledge of their interview process.  I assume

8    they had one.

9           (END READ-IN.)

10          MR. FARIDI:  And the last witness, Your Honor,

11   plaintiffs call by -- plaintiffs call Army Interrogator E via

12   deposition designation.

13          Your Honor, I think I gave you all of my copies of this

14   one, if I can just get one back.

15          (The following testimony of ARMY INTERROGATOR E was

16   read into the record in open court:)

17   Q.  Okay.  Good morning, Army Interrogator E.  During the

18   entirety of the time that you were at Abu Ghraib, did you

19   witness any abuse or mistreatment?

20   A.  Yes.

21   Q.  What did you witness?

22   A.  A CACI employee putting pressure on a detainee's fingers.

23   Q.  And how did the CACI employee apply pressure to the fingers?

24   A.  With his own fingers.

25   Q.  And was this CACI employee the interrogator that you were on

1    a Tiger Team with?

2    A.  Yes.

3    Q.  Other than that instance of putting pressure on the fingers,

4    did you witness any other abuse or mistreatment during the

5    entirety of the time at Abu Ghraib?  You can go ahead and

6    answer.

7    A.  There was one other time when a detainee was hooded and

8    there was loud heavy metal music playing.  He was left alone for

9    a while, and there was a lot of loud banging on the walls.

10   Q.  And do you know who turned on the loud heavy metal music?

11   A.  The CACI employee.

12   Q.  The same CACI employee that you were on a Tiger Team with?

13   A.  Yes.

14   Q.  And do you know who did the loud banging on the walls?

15   A.  Him and myself.

16   Q.  Did you do this of your own volition or did someone ask you

17   to do this?

18   A.  The CACI employee asked me to do this.

19   Q.  Did anyone else bang on the walls?  Did this incident of the

20   loud heavy metal music and the loud banging of the walls occur

21   during an interrogation?

22   A.  Yes.

23   Q.  Were you ever questioned by CID in connection with things

24   that occurred at Abu Ghraib?

25   A.  Yes.

1    Q.  And what did you tell them?

2    A.  I explained that I had seen them, that military police had

3    made detainees kneel in gravel for an extended point in time.

4    Q.  And what else did you tell them?

5    A.  I don't recall all their questions.

6    Q.  Do you recall anything else that you told them?

7    A.  That was the main part that sticks out.  That's really all I

8    remember about the conversation.

9    Q.  And how many times did you see military police have

10   detainees kneel in gravel?

11   A.  A couple times.

12   Q.  More than five?

13   A.  No.

14   Q.  More than three?

15   A.  No.

16   Q.  More than one?

17   A.  Yes.

18   Q.  Do you recall when you witnessed MPs having detainee kneel

19   in gravel?

20   A.  I don't recall when.  It was in the soft site, or in the

21   tented area.

22   Q.  All the times that you saw MPs having detainees kneel in

23   gravel was at the soft site.  Is that correct?

24   A.  Yes, that was the only place with gravel.

25   Q.  Do you know whether [sic] the detainees had come from that

```
 1     were required to kneel in gravel?

 2     A.  They were being housed in that tented area.

 3     Q.  And how did you know that?

 4     A.  It was one of the areas we would get people to take them to

 5     the interrogation booths.

 6     Q.  The gravel area was near the interrogation booths.  Is that

 7     what you're saying?

 8     A.  It's one of the areas combined with the hard site that -- or

 9     we would transport detainees from to the interrogation booths.

10          MR. FARIDI:  Turn to the second transcript.

11     Q.  Earlier you testified about an incident you recall in which

12     the fingers of a detainee were squeezed or pressed as part of an

13     interrogation.  Do you recall that testimony?

14     A.  Yes.

15     Q.  And you also testified about an incident in which loud

16     music, perhaps Metallica, was played, and there were banging

17     sounds made during the interrogation of a detainee.  Do you

18     recall that testimony?

19     A.  Correct.

20     Q.  Do you remember if the detainee in those two incidents was

21     the same detainee?

22     A.  That's correct.

23     Q.  Yes, the detainee in those two incidents was the same

24     detainee?

25     A.  Yes.
```

1    Q.  Sitting here today, do you recall the appearance of that

2    detainee?

3    A.  Vaguely I do.

4    Q.  You vaguely recall the appearance of the detainee subject to

5    the two incidents about which you testified, the finger

6    squeezing and the loud music.  Is that right?

7    A.  Yes.

8    Q.  Do you recall earlier that Mr. O'Connor had you look at some

9    pictures of some photographs of individuals?

10   A.  Yes.

11   Q.  I'm going to turn back to one of them here.  It is Exhibit

12   Number 2.

13        MR. FARIDI:  "Mr. O'Connor:  It is not to question."

14   Q.  Do you recall looking at this picture?

15   A.  I recall looking at it.

16   Q.  To the best of your recollection, is it the same detainee

17   that was subject to finger squeezing and loud music?

18   A.  No, it is not.

19   Q.  And do you recall -- let me ask that again.

20        And turn to the fifth page of Exhibit Number 2.  Can

21   you read the Bates number at the bottom of that page?

22   A.  ASUSA 035418.

23   Q.  To the best of your knowledge, is this the same individual

24   who was subject to the finger-squeezing incident and the loud

25   music incident?

1    A.  No.

2    Q.  Mr. O'Connor also showed you several other photos that were

3    not contemporaneous with your time at Abu Ghraib of several

4    older individuals.  Do you recall that?

5    A.  Yes, I do.

6    Q.  When you looked at those photographs, did you recognize any

7    of them as the individual who was subject to the

8    finger-squeezing incident or the loud music incident?

9    A.  No, I did not.

10   Q.  Do you recall looking at what is marked as Army

11   Interrogator E Exhibit Number 2 as a whole?

12   A.  Yes.

13   Q.  And do you recall reading through various pages in that

14   exhibit earlier today?

15   A.  I do.

16   Q.  When you read through that exhibit, did you see any

17   information that would lead you to believe the individual

18   described in that exhibit is different than the individual

19   subject to the loud music and finger-squeezing incident?

20   A.  They -- they're different individuals.

21   Q.  Is there also information absent from Exhibit Number 2 that

22   you think would have been included if it were the same

23   individual?

24   A.  Yes.

25        MR. FARIDI:  "Mr. Soskin:  Those are all the questions

1    that I have.

2         "Mr. O'Connor:  I have a few follow-ups."

3    Q.  "Question by Mr. O'Connor:  What is it within Army

4    Interrogator E Exhibit 2 that shows you that the person

5    subjected to the finger squeezing and loud music was not

6    plaintiff Al-Zuba'e?

7    A.  That individual was not held at the hard site, he was held

8    at the open tent.  And -- yes.  The individual where those

9    instances happened was kept in the open air site, not in the

10   hard site, and he was an imam and didn't look like any of the

11   individuals in the photos I was shown.

12   Q.  And I think you testified that there were things you would

13   expect to be in the detainee file for the person subjected to

14   the finger squeezing and loud music that is not in Exhibit 2.

15   What were -- what would those be?

16   A.  Mostly what I just stated.

17   Q.  Okay.  Is it correct that -- well, strike that.

18        Was any detainee abused or mistreated during any

19   interrogation that you and Army Interrogator D conducted

20   together?

21   A.  No.

22   Q.  Was any -- well, strike that.

23        So if plaintiff Al Zuba'e was interrogated by you and

24   Army Interrogator D, we can conclude that he was not mistreated

25   during that interrogation.  Right?

1    A.  That's correct.

2    Q.  You testified about seeing some detainees who were made to

3    kneel on gravel in the open air tents.  Were -- are you aware of

4    any interrogators or analysts involved in having those detainees

5    kneel in gravel in the open air tents?

6    A.  No.  That was MPs.

7    Q.  Solely MPs?

8    A.  To the best of my knowledge.

9    Q.  Okay.  Ms. Hittson asked you about some act of

10   mistreatment --

11          THE COURT:  Is there anything further here?  Unless

12   I've got it wrong, the rest is just a question.  Is there an

13   answer?  We can stop.

14          (END READ-IN.)

15          MR. FARIDI:  Last but not least, yesterday you asked us

16   to put together a chart that sets forth --

17          THE COURT:  We can take care of that.

18          Any other surrebuttal?

19          MR. O'CONNOR:  No, Your Honor.

20          THE COURT:  All right.  We have now completed all of

21   the evidence, and at this point, ladies and gentlemen, I'm going

22   to send you home.  And I think just because I don't want to have

23   you waiting unnecessarily, I think Monday we'll have you start

24   at 10 o'clock.  All right?

25          Now, again, the case is not over.  There has definitely

1    been some media coverage about the case, so please do not

2    conduct any investigation.  Avoid any media coverage.  Again,

3    you have the whole weekend, the weather is going to be nice.

4    Relax, put this case out of your mind, and Monday, when you come

5    back, you'll get the closing arguments from counsel,

6    instructions from the Court, and then you'll have the case for

7    deliberation.

8          At this point you should not be thinking about the case

9    or trying to make up your mind because you don't yet know the

10   law that applies to this case and you haven't heard the closing

11   arguments of counsel.  All right?

12         We'll see you back here at 10:00 Monday morning.

13         (Jury out at 5:03 p.m.)

14   THE COURT:  The first order of business, I want to make

15   sure there's no issue about exhibits.  So we're going to go

16   through the drill of making sure -- I understand last night you

17   did it informally, so we're going to read in -- I know last

18   night you did a check, but I want to make sure it's formally on

19   the record.  We're going to read in all the exhibits that were

20   introduced yesterday and today.

21   COURTROOM CLERK:  Beginning with yesterday, PTX 104,

22   PTX 72, PTX 98A, PTX 98B, PTX 107A, PTX 107B, PTX 107C,

23   PTX 107D, PTX 107E, PTX 100, PTX 83, PTX 84, PTX 103, PTX 225,

24   PTX 133, PTX 207, PTX 85.  That was all from yesterday.

25         For today I have DX 20, page 2, DX 23, DX 70, PTX 136,

1    PTX 93, PTX 101, PTX 132, PTX -- PTX 99, page 5, PTX 42,

2    PTX 214, and DX 37.

3            MR. FARIDI:  Your Honor, that all sounds accurate.  The

4    only discrepancy that I noticed is that with respect to PTX 133,

5    only pages 1 and 4 through 11 were admitted.

6            COURTROOM CLERK:  What number was that?

7            MR. FARIDI:  133.  This is from yesterday.

8            THE COURT:  Is that consistent with the defendant's

9    view, only pages 1 and 4 through 11 of 133?

10           MR. O'CONNOR:  Let me confer, Your Honor.

11           There's a minor conflict in our notes, but we can sort

12   that out.

13           THE COURT:  Which witness -- through which witness did

14   that come?

15           MS. ROBINSON:  That came in through Mr. Billings,

16   Your Honor.  I have the transcript.

17           THE COURT:  That's the easiest way of doing it.  I've

18   got my notes, too.

19           MS. ROBINSON:  When I sought to introduce it,

20   Your Honor, I said:  "Your Honor, we'll only seek to admit a

21   portion of it once we just establish that he received the

22   document."

23           And Mr. O'Connor asked:  "Which pages do you want?

24   Which are you interested in?"

25           And I responded:  "I'm going to ask him about the cover

1    email and then pages 4 through 11."

2          MR. O'CONNOR:  Problem solved.

3          THE COURT:  All right.  It was 1 and 4 through 11.

4          MS. ROBINSON:  Right.  Page 1 and 4 through 11.

5          THE COURT:  And, Mr. O'Connor, does the defense have

6    any concern about the exhibits that have been entered, and you

7    agreed with what we just read in?

8          MR. O'CONNOR:  It looked right to me, Your Honor.

9          THE COURT:  Very good.  Then I had suggested that you

10   try to work on an index because the jury will certainly be

11   asking for that.  Did you each prepare one for your exhibits, or

12   has that not been done yet?

13         MR. FARIDI:  Your Honor, we prepared one and we sent

14   ours over to them last night, and they told us this morning that

15   ours was fine.  And this relates to the exhibits that were

16   introduced during our case.

17         So ours has been QCed by them and it's ready to go.  I

18   haven't seen theirs yet, but I expect it will come in.

19         MR. O'CONNOR:  I was told that --

20         MR. McCLURE:  Sorry, Your Honor, this is just for

21   deposition exhibits that were --

22         THE COURT:  No.  To the extent that a plaintiffs'

23   exhibit had a different number during the deposition when it was

24   being discussed, then there needs to be a translation so the

25   jury will get it.  Okay?

 1          MR. O'CONNOR:  Theirs doesn't do that either, so I
 2     think we just both need to do it.
 3          THE COURT:  Okay.  Look, it's a complicated case.  I
 4     don't have the jury charge done yet either, so we're all sort of
 5     forgiven on that.  Okay?
 6          All right.  That takes care of that.  We're going to
 7     try to get you some portion of the charge tonight, but I don't
 8     think you're going to see my whole thought about it until
 9     Sunday.  I am giving, however, the borrowed servant instruction,
10     slightly changed, possibly, from what you submitted, but I think
11     it definitely is appropriate in this case, with the admonition
12     that the defendant has the burden of proving that by a
13     preponderance of the evidence.
14          Yes?
15          MR. AZMY:  Your Honor, I have a footnote on the jury
16     charge.  I promise you I'm not up here to try and relitigate the
17     decision on the judicial notice of the Rumsfeld memo, but to the
18     extent that one of our concerns was about --
19          THE COURT:  I may put you at ease.  I'm going to give a
20     cautionary instruction to the jury that nothing in these three
21     matters of which I have taken judicial notice prevents a
22     plaintiff from bringing a suit under the ATS.
23          Does that take care of the problem?
24          MR. AZMY:  In this court.  Thank you, Your Honor.
25          THE COURT:  I saw that as an issue.  I mean, the only

1    reason I've done it is because it came up during the

2    questioning, and I want to put the jury at ease.  There's no

3    issue about failure to exhaust or anything like that.  So it's

4    there.  Okay?

5             MR. AZMY:  Thank you.

6             THE COURT:  We'll take care of that.  I think that's it

7    for tonight.

8             Now, I have no court other than this case Monday.  What

9    I'm going to suggest is, we'll get my proposed charge to you as

10   quickly as possible.  I'm sure you will have comments.  Email

11   them to my clerk - I think you have her email - as quickly as

12   you can.  We will probably get you sort of my final take on your

13   comments hopefully on Sunday.

14            And I think, since I have the jury coming in at 10:00,

15   I don't think we're going to need more than 30 to 40 minutes to

16   fight about it Monday morning, if we do.  Many times I find, by

17   the end of things, everybody is comfortable.

18            So at 10 o'clock we'll start, hopefully on time, the

19   opening statements.  If we're still fussing with the

20   instructions, it may go beyond that.  But I think 9 o'clock

21   start time on Monday will be fine.

22            I'm not sure whether the jury is going to insist on

23   leaving at 4:00.  I told you they could, and, Ms. Ginsberg, you

24   definitely can.  If the jury wants to stay past 4:00, I will let

25   them.  So I only need one attorney per side to cover, okay, if

1    that happens.  And again, we will not be in session on Tuesday,

2    and then Wednesday morning I'm hoping the jury will want to come

3    in nice and early so we can get this case wrapped up before

4    Friday.

5              Anything else we need to address tonight?  No?

6              MR. FARIDI:  Nothing from us, Your Honor.

7              MR. O'CONNOR:  Nothing from the defense.

8              THE COURT:  We'll recess court for the day.

9              (Off the record at 5:12 p.m.)

10

11

12

13

14

15

16

17              **CERTIFICATE OF OFFICIAL COURT REPORTER**

18

19              **I, Rebecca Stonestreet, certify that the foregoing is a**

20    **correct transcript from the record of proceedings in the**

21    **above-entitled matter.**

22

23

24    **____//Rebecca Stonestreet_____              __4/30/24____**

25    **SIGNATURE OF COURT REPORTER                      DATE**

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

## $

**$16,549,000** [1] - 26:24
**$21** [1] - 28:17
**$21,799,921** [1] - 25:15

## '

**'04** [2] - 12:1, 12:2
**'87** [1] - 7:22
**'94** [1] - 8:20
**'ongoing** [1] - 78:20

## /

**//Rebecca** [1] - 153:24

## 0

**001** [1] - 26:13
**002** [1] - 26:13
**003** [1] - 26:13
**0251** [1] - 85:1
**035418** [1] - 144:22

## 1

**1** [9] - 2:20, 26:14, 28:12, 67:4, 105:10, 149:5, 149:9, 150:3, 150:4
**10** [5] - 69:13, 96:18, 124:14, 147:24, 152:18
**100** [5] - 13:6, 36:7, 67:1, 76:10, 148:23
**10012** [1] - 1:22
**10036** [1] - 1:19
**101** [6] - 3:19, 39:1, 39:2, 39:5, 68:12, 149:1
**103** [1] - 148:23
**104** [1] - 148:21
**107A** [1] - 148:22
**107B** [1] - 148:22
**107C** [1] - 148:22
**107D** [1] - 148:23
**107E** [1] - 148:23
**10:00** [2] - 148:12, 152:14
**10th** [1] - 91:23
**11** [9] - 4:23, 81:10, 81:14, 118:7, 149:5, 149:9, 150:1, 150:3, 150:4
**110** [1] - 13:12
**1100** [1] - 2:11
**1101** [1] - 2:6

**1133** [1] - 1:18
**115** [2] - 93:23, 93:25
**11:18** [1] - 23:24
**11:19** [1] - 23:25
**11:35** [1] - 24:2
**12** [1] - 116:24
**120** [4] - 3:10, 3:21, 13:6, 13:12
**121** [1] - 3:10
**123** [2] - 3:11, 3:24
**128** [1] - 117:19
**13** [2] - 37:3, 37:14
**132** [6] - 3:20, 54:12, 54:13, 54:16, 80:8, 149:1
**133** [4] - 148:24, 149:4, 149:7, 149:9
**1330** [1] - 2:3
**136** [9] - 3:13, 3:20, 31:21, 32:9, 32:11, 32:22, 79:15, 81:7, 148:25
**139** [1] - 3:14
**14** [2] - 85:11, 97:6
**140** [1] - 3:14
**15** [4] - 21:23, 93:22, 124:3, 131:20
**16** [2] - 85:12, 97:6
**16,549** [1] - 26:24
**17** [3] - 65:7, 133:7, 133:11
**179** [1] - 128:12
**18** [2] - 79:2, 108:14
**185** [1] - 128:12
**186** [3] - 64:22, 64:25, 65:1
**18th** [2] - 79:3, 79:25
**19** [1] - 1:7
**1978** [1] - 84:19
**1983** [1] - 7:10
**1984** [1] - 7:21
**1985** [1] - 85:8
**1986** [1] - 85:15
**1987** [1] - 7:11
**1992** [2] - 8:18, 85:23
**1998** [1] - 8:22
**1999** [3] - 50:11, 84:19, 86:3
**1:02** [2] - 82:8, 82:9
**1:08-CV-827** [1] - 1:4

## 2

**2** [17] - 3:23, 5:11, 5:15, 26:17, 28:13, 37:25, 67:17, 82:7, 105:11, 118:4, 144:12, 144:20, 145:11, 145:21, 146:4, 146:14,

148:25
**20** [14] - 3:23, 3:24, 5:5, 5:8, 5:10, 5:11, 5:15, 15:22, 15:23, 65:1, 95:8, 123:8, 148:25
**2003** [16] - 8:25, 12:10, 12:18, 25:7, 25:18, 42:22, 44:9, 49:25, 84:11, 91:23, 93:3, 111:15, 111:21, 114:11, 134:2, 134:22
**20036** [1] - 2:4
**2004** [28] - 25:19, 32:17, 37:3, 37:5, 50:1, 54:18, 60:24, 79:2, 79:3, 80:1, 81:10, 81:14, 82:2, 84:12, 91:20, 92:6, 93:3, 95:6, 95:9, 95:11, 95:14, 95:15, 99:19, 111:15, 111:21, 119:3, 119:4, 124:3
**20044** [1] - 2:12
**2006** [2] - 115:11, 115:14
**2007** [1] - 45:5
**2018** [1] - 127:12
**202-429-3000** [1] - 2:4
**202-598-0905** [1] - 2:12
**2024** [1] - 1:7
**205th** [1] - 91:6
**206** [1] - 69:12
**207** [1] - 148:24
**21** [3] - 28:25, 37:5, 85:13
**21-million-odd** [1] - 25:21
**2100** [1] - 2:14
**212-336-2000** [1] - 1:19
**212-614-6464** [1] - 1:23
**214** [5] - 3:21, 119:11, 119:21, 120:1, 149:2
**21st** [1] - 37:14
**22** [2] - 98:16, 116:19
**223** [2] - 112:14, 114:2
**22314** [3] - 2:7, 2:15, 2:18
**224** [2] - 116:12, 116:19
**225** [4] - 116:15, 116:16, 117:19, 148:23
**227** [1] - 50:7
**23** [6] - 3:23, 6:13,

148:25
**23rd** [1] - 12:10
**240** [1] - 2:19
**24th** [1] - 12:10
**25** [5] - 6:8, 6:12, 6:14, 23:22, 79:19
**25th** [1] - 79:14
**27-10** [2] - 97:15, 105:16
**2734** [1] - 124:14
**29** [1] - 50:11
**2:07** [1] - 83:17
**2nd** [1] - 25:19

## 3

**3** [10] - 26:20, 28:13, 37:8, 39:24, 50:10, 67:21, 70:15, 122:3, 128:20, 133:20
**30** [1] - 152:15
**30,000-foot** [1] - 74:23
**302nd** [1] - 121:17
**31st** [1] - 54:18
**32** [1] - 3:20
**34** [1] - 3:18
**35-minute** [1] - 120:20
**37** [4] - 3:24, 123:13, 123:25, 149:2
**38** [1] - 92:19
**39** [1] - 3:19
**3rd** [3] - 12:2, 25:6, 25:18

## 4

**4** [14] - 3:9, 21:9, 28:25, 38:1, 45:18, 48:9, 59:5, 59:13, 82:2, 149:5, 149:9, 150:1, 150:3, 150:4
**4/30/24** [1] - 153:24
**40** [1] - 152:15
**401** [1] - 2:18
**42** [6] - 3:4, 3:18, 89:21, 89:23, 90:1, 149:1
**426-7767** [1] - 2:19
**45** [1] - 130:14
**4:00** [2] - 152:23, 152:24
**4:13** [2] - 125:15, 125:16
**4:30** [1] - 125:14
**4:43** [1] - 132:17
**4A** [1] - 29:2

## 5

**5** [17] - 1:10, 3:9, 3:19, 3:23, 39:11, 39:12, 39:24, 60:14, 60:16, 60:22, 61:24, 62:12, 78:13, 78:14, 78:15, 84:11, 149:1
**52** [3] - 45:13, 45:15, 45:18
**54** [1] - 3:20
**5:03** [1] - 148:13
**5:12** [1] - 153:9
**5th** [4] - 12:1, 12:2, 32:17, 99:8

## 6

**6** [6] - 3:4, 3:23, 47:1, 47:4, 61:19, 61:24
**60** [4] - 3:19, 14:13, 78:13, 78:15
**610** [1] - 2:7
**666** [1] - 1:21

## 7

**70** [7] - 3:24, 20:15, 20:16, 20:21, 20:23, 57:10, 148:25
**703-299-3700** [1] - 2:15
**703-684-4333** [1] - 2:8
**72** [2] - 14:13, 148:22
**74** [1] - 108:9
**75** [1] - 3:4
**7th** [2] - 1:22, 2:3

## 8

**8** [2] - 58:2, 122:10
**801(d)(2)(D)** [1] - 114:2
**81** [1] - 3:4
**83** [9] - 3:6, 46:25, 47:2, 47:3, 61:15, 61:18, 77:24, 77:25, 148:23
**84** [3] - 14:14, 25:1, 148:23
**85** [2] - 109:22, 148:24
**86** [1] - 57:9

## 9

**9** [3] - 45:18, 133:20, 152:20
**90** [1] - 3:18
**93** [6] - 3:18, 34:7, 34:11, 34:14, 34:16,

149:1

**95** [1] - 3:6

**98** [1] - 87:10

**98A** [1] - 148:22

**98B** [1] - 148:22

**99** [7] - 3:19, 60:14, 60:16, 60:22, 62:11, 78:13, 149:1

**9:30** [2] - 1:8, 4:4

**9th** [1] - 2:17

---

# A

**a.m** [5] - 1:8, 4:4, 23:24, 23:25, 24:2

**ABDULLAH** [1] - 1:3

**abide** [2] - 68:4, 68:7

**abided** [1] - 109:17

**abiding** [1] - 110:24

**ability** [10] - 23:14, 57:22, 57:24, 104:5, 105:4, 105:19, 106:11, 106:20, 107:1, 107:16

**able** [9] - 11:6, 12:24, 24:24, 41:20, 81:21, 91:15, 98:1, 100:12, 112:20

**above-entitled** [1] - 153:21

**absent** [1] - 145:21

**absolutely** [4] - 90:12, 92:18, 96:13, 135:25

**Abu** [93] - 9:21, 12:23, 13:2, 13:13, 15:19, 15:25, 17:13, 19:16, 33:5, 33:9, 34:23, 41:15, 41:16, 42:5, 51:8, 51:15, 51:18, 52:10, 52:16, 53:15, 54:2, 54:22, 56:14, 58:7, 58:14, 58:19, 60:9, 66:8, 66:24, 72:12, 72:16, 72:18, 73:11, 74:7, 75:1, 75:7, 75:11, 80:10, 84:8, 84:10, 84:13, 87:2, 87:5, 87:8, 87:16, 88:4, 89:14, 90:9, 90:11, 90:21, 91:7, 91:19, 92:2, 92:8, 92:14, 93:2, 95:6, 95:15, 95:23, 99:6, 99:8, 99:12, 100:9, 100:18, 101:19, 103:17, 108:2, 109:11, 109:20, 110:14, 111:16, 111:21, 111:24, 114:10,

114:20, 115:5, 121:14, 121:16, 121:18, 121:21, 121:24, 122:4, 122:25, 124:10, 134:1, 134:21, 135:1, 135:5, 140:18, 141:5, 141:24, 145:3

**abuse** [31] - 21:25, 22:1, 22:5, 22:6, 22:14, 30:3, 66:15, 66:18, 73:22, 74:13, 89:3, 89:9, 92:14, 107:10, 107:13, 110:17, 110:19, 110:20, 112:9, 112:24, 113:19, 113:23, 114:15, 118:24, 123:1, 129:22, 130:6, 130:10, 131:4, 140:19, 141:4

**abused** [3] - 120:6, 130:11, 146:18

**abuses** [4] - 19:14, 56:14, 92:17, 108:2

**abusing** [2] - 89:6, 89:12

**abusive** [1] - 88:25

**accept** [2] - 79:20, 137:11

**accepted** [1] - 96:21

**accepting** [2] - 44:8, 137:15

**accommodate** [1] - 23:14

**accommodations** [1] - 9:20

**accordance** [2] - 48:17, 49:4

**according** [1] - 110:5

**accountability** [1] - 52:5

**accurate** [9] - 39:21, 94:19, 95:24, 96:13, 103:7, 118:12, 118:22, 130:21, 149:3

**accurately** [1] - 32:22

**acknowledge** [1] - 21:4

**acknowledged** [1] - 83:8

**acknowledging** [1] - 109:7

**acquainted** [1] - 16:10

**acquisition** [2] - 47:10, 47:16

**Acquisition** [2] - 26:4,

48:23

**Act** [4] - 124:14, 124:18, 124:19, 124:25

**act** [3] - 21:6, 124:11, 147:9

**acting** [1] - 41:16

**action** [3] - 37:10, 69:4, 125:3

**active** [1] - 84:20

**activities** [2] - 68:25, 133:15

**activity** [2] - 89:7, 89:13

**actual** [7] - 21:18, 26:6, 26:10, 48:1, 99:22, 100:15, 101:22

**addition** [1] - 59:1

**additional** [3] - 19:4, 22:13, 22:14

**address** [7] - 23:19, 52:7, 62:21, 62:25, 78:18, 78:22, 153:5

**adhere** [1] - 20:25

**adjust** [1] - 120:24

**administered** [2] - 6:17, 83:25

**administration** [2] - 7:8, 50:17

**administrative** [29] - 7:25, 8:2, 8:5, 8:6, 8:21, 9:14, 9:17, 10:6, 13:23, 13:25, 14:21, 16:13, 21:19, 43:7, 43:14, 43:24, 45:3, 50:4, 51:3, 52:4, 52:11, 52:16, 52:21, 53:11, 59:10, 59:14, 87:10, 87:11, 87:12

**administratively** [1] - 21:16

**admissible** [1] - 32:5

**admission** [3] - 32:6, 114:2, 119:21

**admissions** [1] - 131:10

**admit** [4] - 50:13, 53:13, 123:12, 149:20

**admitted** [23] - 5:6, 5:15, 6:15, 20:21, 25:1, 31:20, 31:23, 31:25, 32:9, 34:9, 34:14, 36:9, 39:5, 54:16, 57:10, 60:22, 68:12, 90:1, 97:2, 112:17, 120:1, 123:25, 149:5

**admonition** [1] - 151:11

**advanced** [1] - 7:14

**advise** [2] - 61:12, 104:9

**advised** [1] - 105:17

**advisor** [7] - 24:10, 29:11, 61:2, 61:4, 61:11, 61:22, 61:25

**Afghanistan** [1] - 66:11

**afield** [2] - 50:17, 50:21

**afraid** [1] - 66:8

**afternoon** [6] - 42:18, 84:5, 95:3, 95:4, 125:10, 131:8

**afterwards** [1] - 114:13

**AG** [1] - 114:24

**age** [1] - 98:18

**ago** [6] - 38:11, 65:7, 108:6, 109:9, 126:24, 127:12

**agree** [11] - 96:6, 97:17, 98:5, 98:8, 100:18, 102:11, 102:13, 125:22, 136:17, 136:18, 137:24

**agreed** [5] - 10:25, 12:25, 28:4, 98:10, 150:7

**ahead** [10] - 27:16, 32:8, 83:10, 88:23, 100:21, 105:19, 106:9, 117:4, 133:4, 141:5

**ahold** [1] - 87:17

**air** [3] - 146:9, 147:3, 147:5

**AIT** [1] - 7:15

**AL** [1] - 1:4

**Al** [6] - 122:12, 122:16, 129:19, 130:3, 146:6, 146:23

**al** [1] - 1:4

**Al-Zuba'e** [2] - 129:19, 146:6

**Albury** [9] - 111:13, 111:15, 112:1, 112:3, 112:5, 112:11, 113:15, 113:18, 113:22

**alcohol** [1] - 137:25

**alert** [3] - 94:14, 136:14, 136:19

**ALEXANDRA** [1] - 1:14

**Alexandria** [4] - 1:2,

2:7, 2:15, 2:18

**allegation** [3] - 40:22, 110:17, 113:21

**allegations** [9] - 60:3, 65:15, 65:20, 65:24, 94:17, 110:19, 124:5, 124:8, 124:11

**alleged** [2] - 82:22, 133:15

**allow** [2] - 29:20, 56:20

**allowable** [1] - 26:18

**allowed** [14] - 14:11, 27:9, 27:11, 28:15, 29:23, 42:5, 47:11, 47:22, 48:3, 68:9, 133:2

**allowing** [1] - 37:11

**alone** [2] - 51:21, 141:8

**alternative** [1] - 125:2

**Aman** [1] - 99:4

**Americas** [1] - 1:18

**amount** [9] - 26:10, 27:8, 27:10, 27:11, 28:3, 40:5, 41:4, 101:15, 124:21

**amounts** [1] - 26:22

**AMY** [2] - 3:13, 136:8

**Amy** [7] - 15:2, 44:3, 81:13, 136:3, 136:11, 136:13

**analysis** [3] - 8:3, 85:16, 124:17

**analyst** [2] - 86:12, 121:22

**analysts** [3] - 14:18, 14:22, 147:4

**ANDREW** [1] - 1:15

**angry** [1] - 69:19

**annual** [2] - 58:3, 58:21

**answer** [12] - 65:6, 65:10, 97:24, 100:21, 116:24, 117:9, 118:9, 118:23, 120:10, 122:17, 141:6, 147:13

**answered** [4] - 18:1, 74:15, 74:16, 116:9

**answering** [2] - 79:9, 115:25

**answers** [5] - 45:9, 99:23, 115:22, 119:17, 132:15

**apart** [1] - 69:1

**apologies** [2] - 20:18, 58:13

**apologize** [1] - 6:13

appeal [1] - 37:10
appear [1] - 116:22, 119:15
appearance [2] - 144:1, 144:4
APPEARANCES [2] - 1:13, 1:24
appeared [1] - 35:11
apples [1] - 128:17
applicable [2] - 124:15, 124:23
applicant [3] - 96:17, 97:2, 97:8
application [2] - 96:9, 96:17
applied [1] - 110:13
applies [1] - 148:10
apply [2] - 96:11, 140:23
approach [2] - 116:23, 123:22
Approaches [1] - 105:10
approaches [2] - 6:7, 97:9
appropriate [18] - 22:6, 22:15, 67:25, 69:4, 76:21, 77:11, 83:2, 83:5, 110:7, 124:21, 125:6, 125:25, 127:8, 127:20, 127:24, 131:3, 131:25, 151:11
approval [1] - 134:22
approve [7] - 18:18, 88:6, 88:15, 88:16, 88:22, 135:20, 135:23
approved [12] - 18:8, 19:2, 19:23, 20:3, 29:19, 29:24, 53:7, 56:5, 88:3, 88:5, 101:25, 105:9
approving [2] - 88:9, 104:19
April [10] - 1:7, 7:11, 7:21, 84:12, 91:20, 92:1, 93:3, 95:6, 95:8
Arant [1] - 93:6, 93:8, 94:5, 94:9, 114:8, 114:14, 114:20, 115:4, 116:25, 117:6, 118:4
area [8] - 10:5, 11:7, 13:1, 41:10, 113:13, 142:21, 143:2, 143:6
Area [1] - 8:23
areas [2] - 143:4,
143:8
arguing [2] - 130:14, 130:22
arguments [3] - 4:12, 148:5, 148:11
Arizona [1] - 85:10
armor [1] - 26:21
arms [1] - 102:17
Army [82] - 4:18, 4:20, 7:10, 7:18, 7:21, 8:10, 14:3, 22:21, 22:22, 22:24, 23:5, 29:19, 29:24, 36:17, 36:23, 46:15, 49:11, 49:14, 49:25, 50:22, 54:8, 54:24, 56:5, 56:8, 59:6, 67:10, 69:6, 70:15, 71:16, 71:19, 72:2, 72:12, 72:16, 74:12, 75:11, 75:14, 87:4, 87:25, 89:8, 89:9, 89:11, 90:14, 90:19, 93:19, 94:12, 100:2, 101:20, 101:23, 105:21, 106:14, 106:18, 106:22, 106:24, 107:3, 107:7, 107:15, 107:20, 114:15, 115:9, 120:21, 121:5, 121:13, 121:23, 124:4, 124:7, 124:10, 124:24, 125:1, 126:7, 126:8, 127:3, 128:19, 131:18, 140:11, 140:17, 145:10, 146:3, 146:19, 146:24
ARMY [7] - 3:9, 3:10, 3:10, 3:14, 4:25, 121:11, 140:15
Army's [8] - 40:22, 54:2, 54:5, 68:4, 68:7, 68:16, 70:3, 72:4
arrival [1] - 99:15
arrive [1] - 21:2
arrived [25] - 11:25, 12:2, 12:8, 12:17, 13:6, 16:7, 16:8, 18:23, 51:14, 84:11, 85:22, 94:15, 99:8, 100:9, 103:17, 103:20, 103:22, 108:15, 114:10, 135:9, 135:10, 135:11, 135:14, 135:17, 138:14
arriving [3] - 10:22, 46:9, 57:16
assault [1] - 134:23
assaulted [1] - 120:7
assess [1] - 103:23
assessment [1] - 36:2
assets [1] - 133:15
assign [3] - 104:2, 107:16, 108:15
assigned [3] - 85:14, 87:5, 102:3
assistance [1] - 91:11
assisted [1] - 47:19
associated [1] - 138:22
assume [7] - 4:6, 17:21, 20:1, 70:17, 92:13, 139:25, 140:7
assumed [1] - 70:25
assumption [1] - 8:15
ASUSA [1] - 144:22
ATS [1] - 151:22
attache' [1] - 85:16
attached [1] - 38:3
attaché [1] - 99:3
attempt [1] - 72:16
attempting [1] - 69:22
attend [2] - 97:2, 101:7
attended [3] - 98:19, 98:22, 103:8
attention [8] - 105:21, 106:13, 108:9, 109:24, 112:23, 113:4, 116:11, 120:3
ATTORNEY [1] - 2:14
attorney [1] - 152:25
augmentee [1] - 26:16
August [2] - 134:2, 134:21
authorities [1] - 125:2
Authority [3] - 133:5, 133:7, 133:11
authority [3] - 52:9, 52:24, 107:11
authorization [4] - 134:22, 135:23, 137:13, 137:16
authorized [4] - 28:3, 74:12, 75:11, 89:19
Avenue [3] - 1:18, 2:3, 2:14
avoid [1] - 148:2
awarded [3] - 47:12, 47:15, 48:2
aware [18] - 31:11, 38:22, 41:14, 46:3, 46:6, 47:18, 49:25, 60:11, 73:21, 73:24, 76:22, 80:16, 81:17,
90:20, 91:5, 108:2, 111:1, 147:3
awareness [1] - 39:24
AZMY [5] - 1:20, 5:13, 151:15, 151:24, 152:5

# B

bachelor's [1] - 7:6
background [6] - 7:5, 86:21, 88:19, 95:25, 97:20, 135:12
backgrounds [1] - 108:22
backwards [2] - 38:12, 38:13
bad [1] - 103:16
bag [1] - 11:10
Baghdad [3] - 10:4, 91:23, 140:3
BAHER [1] - 1:20
BAILEY [1] - 2:1
Balad [1] - 10:5
ball [1] - 91:22
ballistic [1] - 87:17
bang [1] - 141:19
banged [1] - 126:10
banging [4] - 141:9, 141:14, 141:20, 143:16
bars [1] - 134:9
base [5] - 9:20, 23:2, 33:22, 33:24, 139:21
based [14] - 19:11, 35:11, 40:15, 44:6, 70:4, 71:6, 72:8, 73:3, 74:3, 75:1, 77:8, 108:15, 124:5, 124:11
bases [2] - 9:23, 9:25
basic [2] - 7:13, 11:9
Bates [1] - 144:21
battalion [1] - 121:17
battlefield [1] - 50:1
Beach [1] - 86:2
bearing [1] - 28:15
beating [1] - 51:1
became [7] - 8:12, 15:2, 31:11, 50:10, 51:18, 66:2, 99:14
become [3] - 18:12, 96:5, 99:17
BEFORE [1] - 1:11
began [3] - 42:22, 115:25, 119:2
beginning [6] - 29:3, 30:2, 65:2, 69:18, 94:15, 148:21
begun [1] - 30:5
behalf [3] - 41:19, 72:22, 82:13
behest [1] - 23:15
behind [1] - 37:15
BELKNAP [1] - 1:18
belongings [1] - 33:16
best [8] - 23:14, 33:25, 57:22, 105:11, 139:13, 144:16, 144:23, 147:8
better [1] - 58:12
between [16] - 13:7, 15:7, 31:12, 31:14, 33:3, 35:12, 35:19, 37:18, 40:7, 40:18, 53:10, 58:18, 59:14, 102:11, 134:1, 134:21
beyond [1] - 152:20
bid [2] - 27:19, 47:11
bidding [1] - 47:7, 48:3
Big [1] - 135:23
big [1] - 10:5
bigger [1] - 10:1
bill [2] - 25:20, 26:6, 28:3
billing [1] - 18:13
Billings [13] - 9:6, 15:1, 15:9, 16:6, 34:21, 44:3, 54:19, 62:17, 63:12, 81:13, 138:23, 149:15
Billy [1] - 111:21
binder [4] - 45:12, 47:1, 57:8, 68:13
binders [2] - 42:15, 94:24
bit [7] - 40:3, 40:12, 46:24, 56:20, 58:12, 69:9, 72:25
Bliss [3] - 11:2, 11:12, 86:25
blurry [1] - 25:6
board [1] - 137:4
boarding [1] - 10:21
body [1] - 26:21
BONITA [1] - 1:15
book [2] - 34:25, 79:16
booth [1] - 126:11
booths [3] - 143:5, 143:6, 143:9
borrowed [2] - 83:6, 83:7, 151:9
bottom [14] - 25:10, 28:24, 29:2, 29:4, 29:7, 37:23, 37:25, 39:14, 45:13, 45:16, 76:11, 116:18,

144:21
**bought** [1] - 86:16
**bounce** [1] - 88:20
**box** [1] - 45:17
**boxes** [1] - 45:14
**boy** [2] - 121:6, 121:7
**Brady** [10] - 11:25, 12:1, 12:6, 12:7, 19:3, 126:1, 126:2, 137:5, 139:2, 139:6
**BRADY** [2] - 3:13, 139:3
**Brady's** [1] - 137:2
**BRANCH** [1] - 2:11
**branch** [3] - 8:3, 8:4, 84:16
**break** [5] - 23:22, 82:14, 106:1, 125:10, 125:14
**brief** [4] - 6:1, 125:12, 131:19, 132:20
**briefing** [2] - 11:8, 11:13
**briefings** [3] - 11:7, 11:8
**briefly** [5] - 7:4, 8:1, 61:15, 81:2, 108:24
**brigade** [1] - 90:21
**Brigade** [1] - 91:6
**bring** [12] - 24:1, 82:10, 83:14, 105:21, 108:11, 109:22, 112:23, 114:17, 116:11, 119:10, 131:14, 132:16
**bringing** [1] - 151:22
**BRINKEMA** [1] - 1:11
**Broadway** [1] - 1:21
**brought** [4] - 83:19, 106:13, 127:18, 133:13
**Buchanan** [3] - 3:6, 82:12, 95:5
**BUCHANAN** [21] - 1:16, 82:12, 83:13, 89:25, 95:2, 108:11, 109:22, 112:15, 112:18, 112:22, 113:3, 113:6, 113:8, 114:1, 116:15, 116:23, 117:20, 117:24, 119:10, 119:20, 120:12
**burden** [2] - 83:9, 151:12
**business** [4] - 7:6, 7:7, 110:5, 148:14
**BY** [14] - 6:20, 6:21, 24:4, 42:16, 42:17,

51:7, 75:20, 75:21, 81:5, 81:6, 84:3, 84:4, 95:1, 95:2

---

# C

**C2** [5] - 60:25, 61:2, 61:4, 61:21, 61:24
**C2X** [2] - 24:10, 61:11
**CACI** [276] - 1:7, 4:17, 5:3, 5:25, 6:5, 8:15, 8:23, 8:24, 9:2, 9:5, 9:16, 10:6, 10:23, 11:12, 11:23, 12:14, 12:18, 13:12, 14:18, 16:12, 16:17, 16:25, 17:3, 17:8, 17:16, 17:23, 18:4, 18:9, 18:19, 18:24, 19:15, 19:18, 19:24, 20:10, 20:24, 20:25, 21:10, 21:11, 21:21, 21:25, 22:2, 22:4, 22:13, 22:14, 22:21, 22:24, 25:20, 26:5, 27:4, 27:11, 27:19, 28:2, 28:17, 30:2, 31:2, 31:8, 31:12, 34:5, 37:19, 37:21, 38:23, 42:3, 42:8, 42:9, 42:22, 43:10, 43:15, 43:22, 44:15, 44:20, 45:21, 45:25, 46:3, 46:7, 46:14, 46:16, 46:18, 47:18, 48:2, 48:10, 48:13, 48:16, 51:3, 51:8, 51:9, 51:23, 52:7, 52:11, 52:15, 53:24, 54:1, 54:25, 55:5, 55:13, 55:23, 56:4, 57:5, 57:13, 57:16, 57:19, 57:21, 57:23, 57:24, 58:2, 58:4, 58:7, 58:14, 59:5, 59:6, 59:16, 59:17, 59:20, 59:23, 59:24, 60:5, 60:7, 61:2, 61:4, 61:8, 61:17, 64:7, 65:14, 65:19, 66:13, 66:15, 66:17, 66:19, 66:20, 66:23, 67:13, 68:4, 68:7, 68:20, 68:25, 69:2, 69:3, 72:17, 72:25, 73:19, 73:25, 74:12, 74:22, 75:1, 77:14, 80:9, 82:23, 83:23, 84:8, 86:16, 86:17, 86:19, 86:24, 87:22, 88:9, 88:12, 88:17, 88:24,

89:3, 89:5, 90:10, 90:15, 90:25, 91:12, 91:13, 91:18, 92:25, 93:3, 93:6, 94:14, 94:16, 94:20, 95:22, 98:13, 98:17, 98:25, 99:5, 99:11, 99:14, 100:3, 101:19, 101:20, 101:25, 102:4, 102:6, 102:11, 102:13, 102:15, 102:21, 103:5, 103:12, 103:13, 103:18, 103:23, 104:2, 104:4, 104:5, 104:6, 104:9, 104:15, 104:24, 105:2, 105:3, 105:17, 106:1, 106:5, 106:9, 106:10, 106:16, 106:18, 106:19, 106:21, 106:23, 107:1, 107:4, 107:9, 107:13, 107:16, 107:23, 108:14, 108:18, 108:24, 108:25, 109:3, 109:10, 109:19, 109:21, 109:23, 110:4, 110:10, 110:12, 110:13, 110:17, 111:2, 111:5, 111:12, 111:15, 111:18, 111:20, 111:23, 114:7, 114:21, 120:19, 121:4, 123:12, 125:8, 126:9, 127:3, 130:24, 131:13, 132:19, 135:5, 136:14, 136:19, 136:25, 137:22, 137:23, 137:24, 138:1, 138:4, 138:5, 139:7, 139:11, 139:22, 139:24, 140:6, 140:22, 140:23, 140:25, 141:11, 141:12, 141:18, 141:20
**CACI's** [30] - 19:5, 24:19, 32:6, 43:3, 43:6, 43:13, 43:19, 44:23, 45:2, 46:8, 51:25, 60:3, 61:21, 61:24, 66:12, 67:22, 68:15, 70:3, 70:7, 70:14, 70:25, 71:2, 71:5, 71:8, 71:12,

71:15, 72:2, 72:15, 105:13, 105:14
**CACI-chosen** [1] - 52:7
**CACI-related** [1] - 53:24
**calculate** [1] - 28:10
**Camp** [13] - 10:2, 12:22, 13:1, 13:17, 13:20, 15:23, 15:24, 33:14, 33:16, 33:19, 79:4, 79:13, 87:16
**candidate** [2] - 62:3, 137:12
**capacity** [1] - 8:7
**Captain** [13] - 88:1, 88:8, 99:17, 102:7, 102:10, 103:9, 104:1, 104:20, 105:10, 108:13, 108:21, 123:6
**care** [7] - 21:15, 87:11, 87:18, 147:17, 151:6, 151:23, 152:6
**Carolina** [1] - 7:13
**CAROLYN** [3] - 3:11, 123:9, 133:22
**Carolyn** [2] - 123:7, 133:19
**carried** [5] - 73:12, 73:17, 75:14, 104:6, 114:15
**carries** [1] - 106:9
**carry** [7] - 102:17, 103:2, 103:5, 104:9, 104:11, 137:19, 137:25
**case** [4] - 4:14, 5:8, 8:3, 17:13, 49:19, 51:2, 77:23, 83:6, 115:12, 117:2, 125:11, 125:18, 126:16, 126:19, 127:2, 127:8, 127:12, 127:13, 127:21, 130:15, 130:18, 130:23, 130:25, 131:24, 132:4, 132:20, 132:25, 147:25, 148:1, 148:4, 148:6, 148:8, 148:10, 150:16, 151:3, 151:11, 152:8, 153:3
**Case** [1] - 1:3
**cases** [1] - 125:4
**cataracts** [2] - 117:12, 118:15
**categories** [5] - 14:16, 26:22, 27:1, 27:22,

36:20
**category** [8] - 18:12, 26:11, 27:7, 27:9, 27:21, 29:12
**caused** [1] - 133:15
**cautionary** [1] - 151:20
**ceased** [2] - 89:7, 89:13
**center** [2] - 11:3, 86:1
**CENTER** [1] - 1:21
**certain** [3] - 62:22, 78:20, 139:24
**certainly** [4] - 49:5, 56:25, 140:3, 150:10
**CERTIFICATE** [1] - 153:17
**certify** [1] - 153:19
**chain** [1] - 17:22
**chair** [3] - 38:13, 40:24, 70:19
**challenge** [3] - 62:21, 78:18, 82:24
**challenging** [1] - 100:6
**Chamber** [1] - 8:23
**change** [3] - 42:1, 101:7, 101:9
**changed** [2] - 40:15, 151:10
**Chantilly** [4] - 15:3, 15:6, 18:15, 24:20
**charge** [9] - 17:11, 17:12, 17:15, 17:16, 130:17, 151:4, 151:7, 151:16, 152:9
**charged** [1] - 38:20
**charges** [4] - 37:24, 38:2, 38:18
**chart** [1] - 147:16
**check** [2] - 33:5, 148:18
**checks** [1] - 11:5
**Chief** [1] - 7:19
**chief** [3] - 8:4, 88:1, 102:9
**choice** [3] - 67:23, 76:19, 77:9
**chosen** [1] - 52:7
**Chuck** [21] - 9:5, 10:24, 14:25, 15:8, 15:10, 15:11, 15:14, 15:15, 15:16, 16:7, 16:8, 44:3, 46:12, 54:18, 62:18, 62:21, 63:1, 78:18, 81:13, 138:23
**Chuck's** [1] - 15:11
**CID** [13] - 30:6, 30:10, 30:11, 30:23, 31:13,

31:19, 35:13, 54:24, 55:10, 56:25, 119:2, 119:7, 141:23
**circumstance** [1] - 106:10
**circumstances** [3] - 34:23, 35:8, 94:14
**City** [3] - 7:8, 8:19, 10:4
**Civil** [2] - 1:3, 48:18
**CIVIL** [1] - 2:10
**civilian** [7] - 7:22, 8:12, 8:17, 11:21, 44:18, 44:21, 102:15
**Civilian** [1] - 108:14
**civilians** [1] - 102:13
**CJTF** [2] - 62:4, 62:9
**CJTF-7** [1] - 67:5
**claim** [3] - 124:17, 124:25, 125:4
**claimant** [2] - 124:19
**claimed** [1] - 133:16
**claiming** [1] - 127:11
**claims** [12] - 124:4, 124:7, 124:11, 124:12, 124:13, 124:15, 124:18, 124:20, 124:22, 124:23, 125:1, 133:12
**Claims** [4] - 124:14, 124:18, 124:19, 124:25
**clarified** [1] - 128:1
**clarifies** [1] - 128:11
**Claudius** [1] - 111:13
**clear** [4] - 13:12, 28:17, 98:14, 102:12
**clearance** [9] - 20:1, 20:3, 23:11, 36:15, 36:21, 42:3, 67:6, 67:16, 85:2
**clearances** [2] - 19:19, 19:23
**CLERK** [5] - 117:18, 117:21, 117:23, 148:21, 149:6
**clerk** [6] - 6:17, 35:7, 83:25, 132:12, 132:15, 152:11
**client** [5] - 90:19, 98:10, 100:1, 105:25, 106:20
**client's** [1] - 99:18
**CLIN** [5] - 26:14, 26:17, 26:20, 28:12
**CLINs** [4] - 26:13, 28:13, 28:16
**clips** [1] - 5:14
**close** [2] - 40:5, 136:6

**closing** [3] - 4:12, 148:5, 148:10
**clothing** [3] - 44:18, 44:21, 102:15
**clue** [1] - 113:25
**Coalition** [3] - 133:5, 133:7, 133:11
**coalition** [3] - 133:7, 133:9, 133:14
**code** [26] - 20:24, 20:25, 21:5, 21:20, 57:5, 57:13, 57:17, 57:23, 59:20, 59:23, 105:3, 105:13, 105:14, 107:2, 108:24, 108:25, 109:3, 109:8, 109:10, 109:15, 109:19, 109:21, 109:23, 110:10, 110:12, 110:13
**Code** [1] - 48:18
**cognizable** [1] - 124:17
**cognizant** [1] - 35:14
**colleagues** [1] - 21:8
**colloquially** [1] - 10:2
**Colonel** [5] - 5:4, 5:21, 6:9, 11:25, 12:1, 12:6, 12:7, 19:3, 41:23, 126:1, 126:2, 137:2, 137:5
**Columbus** [1] - 115:15
**combined** [3] - 61:5, 61:10, 143:8
**comfortable** [3] - 55:23, 57:1, 152:17
**coming** [2] - 114:3, 152:14
**command** [5] - 17:22, 67:23, 76:19, 77:9, 101:20
**comments** [3] - 82:25, 152:10, 152:13
**Commerce** [1] - 8:23
**commission** [2] - 124:13, 124:22
**commissioned** [1] - 17:11
**common** [1] - 69:23
**communicate** [1] - 16:2
**communicated** [5] - 18:14, 23:16, 23:17, 23:18, 81:21
**communicating** [1] - 14:2
**company** [3] - 37:9, 69:3, 86:11

**compensation** [2] - 124:21, 125:2
**complain** [2] - 21:10, 21:14
**complained** [1] - 80:17
**complaint** [1] - 21:10
**complaints** [3] - 19:15, 21:17, 59:6
**complete** [5] - 4:11, 8:18, 73:9, 97:24, 100:21
**completed** [3] - 104:22, 119:6, 147:20
**completely** [2] - 125:22, 127:8
**completing** [1] - 97:1
**compliance** [2] - 19:5, 19:13
**complicated** [1] - 151:3
**compromising** [1] - 94:16
**COMPUTERIZED** [1] - 2:22
**computers** [1] - 87:14
**concentrating** [1] - 40:14
**concept** [1] - 82:15
**concepts** [1] - 98:3
**concern** [1] - 150:6
**concerned** [4] - 16:17, 55:13, 55:17, 80:12
**concerning** [1] - 48:24
**concerns** [5] - 80:8, 94:6, 94:9, 94:11, 151:18
**conclude** [1] - 146:24
**concluded** [1] - 124:24
**concludes** [1] - 123:4
**concurred** [1] - 24:23
**concurrence** [1] - 52:14
**conditions** [3] - 12:23, 13:2, 13:3
**condone** [2] - 68:25, 92:17
**conduct** [17] - 20:24, 21:1, 21:5, 21:20, 57:5, 57:13, 57:17, 57:24, 59:20, 59:21, 59:23, 70:21, 92:10, 107:17, 109:19, 148:2
**conducted** [9] - 17:23, 58:3, 87:22, 89:20, 90:20, 91:5, 105:1, 107:9, 146:19

**conducting** [6] - 35:24, 98:12, 100:10, 108:1, 111:2, 115:10
**confer** [1] - 149:10
**conflict** [4] - 31:14, 32:15, 33:3, 149:11
**confusing** [1] - 74:14
**Connecticut** [1] - 2:3
**connection** [1] - 141:23
**consider** [3] - 58:25, 71:9, 123:1
**consideration** [1] - 72:23
**considered** [4] - 46:15, 60:8, 88:25, 110:22
**considering** [1] - 71:12
**consistent** [2] - 133:16, 149:8
**constituted** [1] - 41:6
**CONSTITUTIONAL** [1] - 1:21
**consultation** [1] - 99:16
**consulting** [3] - 106:21, 106:24, 107:3
**contact** [4] - 9:3, 9:13, 13:24, 15:13
**contacted** [4] - 30:17, 30:18, 31:5, 31:6
**contemporaneous** [1] - 145:3
**content** [1] - 8:8
**context** [2] - 77:6, 127:1
**continue** [2] - 41:16, 58:2
**continued** [1] - 7:14
**CONTINUED** [1] - 1:24
**continuing** [2] - 72:17, 73:1
**contract** [65] - 10:10, 10:11, 11:22, 11:23, 11:24, 13:1, 13:7, 13:8, 13:9, 14:3, 14:6, 14:9, 14:17, 14:19, 16:11, 18:25, 19:5, 19:13, 22:23, 23:2, 23:6, 24:7, 24:14, 25:4, 25:8, 25:17, 25:21, 26:5, 26:13, 27:11, 27:19, 27:20, 28:2, 28:11, 28:18, 29:14, 29:18, 29:24, 36:18, 42:2, 45:2, 45:21, 46:1,

46:4, 46:8, 46:15, 46:21, 46:22, 46:24, 48:3, 49:3, 49:17, 50:17, 61:9, 67:15, 67:23, 67:24, 76:20, 77:10, 77:21, 82:19, 93:10, 138:22, 139:16, 139:18
**contract-related** [1] - 14:3
**contracting** [4] - 9:15, 11:19, 19:12, 25:23
**contractor** [2] - 11:3, 47:12, 47:15
**contractors** [8] - 26:16, 47:11, 48:25, 49:6, 49:15, 50:1, 108:15, 133:8
**contracts** [3] - 13:7, 13:11, 61:17
**contractual** [9] - 9:14, 13:24, 18:12, 43:14, 43:25, 45:3, 50:4, 51:24, 52:8
**contractually** [1] - 44:20
**control** [21] - 10:13, 10:16, 16:24, 17:5, 67:15, 73:8, 73:9, 75:1, 82:16, 82:18, 82:22, 88:7, 90:8, 101:20, 101:23, 104:25, 107:20, 107:24, 110:7, 110:11, 110:22
**controls** [2] - 51:3
**CONUS** [1] - 11:2
**Convention** [6] - 11:8, 38:5, 105:18, 106:3, 107:2, 107:5
**conventions** [1] - 97:13
**Conventions** [6] - 11:13, 97:15, 105:15, 105:22, 105:23, 107:8
**conversation** [3] - 66:4, 75:2, 142:8
**conversations** [1] - 33:18
**conveyed** [1] - 94:19
**convicted** [1] - 122:1
**cooperated** [2] - 31:9, 54:1
**coordinating** [1] - 52:5
**copies** [3] - 129:2, 129:15, 140:13
**copy** [3] - 57:9, 93:25, 132:11

**COR** [37] - 9:15, 10:24, 11:16, 11:18, 11:19, 13:25, 14:4, 14:9, 18:8, 18:21, 18:22, 18:24, 19:4, 19:8, 19:11, 19:15, 22:19, 23:19, 24:22, 24:23, 29:20, 30:11, 30:24, 30:25, 31:5, 31:6, 36:13, 37:19, 52:14, 58:19, 67:22, 136:14, 136:19, 136:25, 137:5
**COR's** [1] - 52:14
**corner** [1] - 25:11
**corporate** [4] - 55:6, 55:23, 56:4, 57:3
**Corps** [17] - 12:1, 12:2, 84:17, 84:18, 84:22, 85:2, 85:7, 85:13, 85:18, 86:1, 86:3, 91:22, 96:1, 96:2, 96:6, 96:11
**corps** [2] - 12:3, 98:6
**correct** [194] - 8:16, 8:17, 9:22, 10:8, 11:17, 15:5, 16:18, 17:21, 20:9, 23:7, 24:15, 25:22, 26:9, 26:25, 27:2, 27:5, 27:21, 28:7, 29:25, 32:16, 34:5, 36:19, 36:25, 38:17, 39:22, 42:23, 43:2, 43:4, 43:5, 43:7, 43:13, 43:24, 44:4, 44:5, 44:10, 44:16, 44:17, 44:24, 44:25, 45:24, 46:10, 46:16, 46:17, 46:22, 46:23, 47:8, 47:13, 47:15, 47:16, 48:4, 48:15, 49:6, 49:13, 49:15, 51:9, 51:10, 51:12, 51:19, 52:18, 52:23, 53:2, 53:3, 53:8, 53:15, 53:16, 54:9, 54:10, 55:16, 56:16, 56:25, 57:6, 57:15, 57:18, 57:25, 58:1, 58:6, 58:16, 59:9, 59:11, 59:12, 59:18, 59:22, 60:1, 60:4, 60:9, 62:15, 62:18, 62:19, 63:1, 63:2, 63:13, 63:21, 63:22, 63:23, 64:4, 64:10, 65:16, 65:21, 65:24, 66:6, 66:9, 66:24, 66:25, 67:11, 67:12, 67:14,
82:1, 68:3, 68:5, 68:17, 68:18, 68:21, 68:23, 69:9, 69:10, 69:16, 70:1, 70:8, 70:9, 71:21, 71:25, 72:6, 72:10, 72:13, 72:14, 73:2, 73:7, 73:10, 73:14, 73:22, 74:1, 74:17, 75:8, 75:9, 75:11, 75:15, 76:17, 77:17, 77:19, 78:10, 78:12, 80:11, 81:11, 81:19, 81:20, 81:24, 86:25, 87:6, 91:25, 96:25, 97:6, 99:7, 101:2, 101:8, 101:12, 101:17, 102:2, 102:5, 102:17, 103:6, 103:24, 107:15, 107:19, 107:25, 109:17, 109:20, 110:14, 110:18, 110:20, 111:17, 114:11, 114:18, 116:6, 120:9, 128:13, 135:12, 135:13, 135:15, 135:16, 135:18, 135:19, 137:2, 137:5, 137:17, 139:19, 139:22, 142:23, 143:19, 143:22, 146:17, 147:1, 153:20
**correctly** [7] - 11:15, 12:4, 40:3, 51:22, 54:3, 73:13, 118:21
**correspondence** [1] - 37:18
**corroborating** [1] - 69:2
**cost** [2] - 28:13, 28:16
**costs** [5] - 26:18, 27:3, 28:14
**Counsel** [1] - 58:9
**counsel** [13] - 32:6, 37:19, 50:19, 56:19, 60:3, 60:8, 62:5, 76:25, 117:18, 117:21, 125:5, 148:5, 148:11
**COUNSEL** [6] - 6:20, 42:16, 75:20, 81:5, 84:3, 95:1
**counter** [7] - 125:23, 126:5, 126:6, 126:14, 126:23, 126:24, 132:6
**counter-designation**
[3] - 126:5, 126:6, 132:6
**counter-designations** [4] - 125:23, 126:14, 126:23, 126:24
**country** [16] - 9:8, 9:10, 9:11, 9:13, 12:2, 13:6, 16:22, 16:23, 18:16, 43:3, 45:1, 49:2, 136:25, 138:14, 138:15
**couple** [2] - 12:9, 15:17, 16:1, 38:11, 67:20, 90:9, 90:17, 102:9, 142:11
**course** [2] - 57:20, 85:25
**court** [16] - 5:1, 5:18, 5:23, 6:3, 115:18, 115:21, 121:2, 121:12, 123:10, 133:23, 136:9, 139:4, 140:16, 151:24, 152:8, 153:8
**Court** [9] - 2:17, 6:25, 94:25, 123:14, 126:2, 126:5, 126:23, 128:12, 148:6
**COURT** [152] - 1:1, 2:17, 3:8, 4:2, 4:5, 4:24, 5:7, 5:11, 6:10, 6:12, 6:14, 13:12, 13:16, 18:1, 18:3, 20:16, 20:20, 22:9, 23:21, 24:1, 24:3, 27:14, 28:6, 28:20, 30:9, 30:13, 30:17, 30:22, 30:25, 31:4, 32:1, 32:4, 32:7, 34:11, 34:13, 34:24, 35:3, 35:7, 39:4, 41:9, 41:13, 42:14, 43:8, 43:22, 44:1, 45:19, 48:6, 48:8, 49:18, 50:19, 51:1, 54:13, 54:15, 56:20, 58:9, 60:16, 60:19, 60:21, 62:5, 63:6, 63:9, 65:9, 65:11, 70:13, 74:16, 75:19, 76:5, 79:8, 79:11, 79:16, 80:24, 81:3, 82:5, 82:10, 83:4, 83:14, 83:18, 89:24, 94:23, 112:20, 113:1, 113:5, 113:7, 113:9, 113:11, 114:3, 114:5,
116:14, 116:16, 116:21, 117:1, 117:22, 118:2, 119:12, 119:22, 119:24, 120:13, 120:15, 120:18, 121:6, 121:10, 123:5, 123:16, 123:18, 123:23, 124:2, 125:9, 125:13, 125:17, 125:21, 126:20, 126:25, 127:15, 128:6, 128:13, 128:16, 128:22, 129:3, 129:5, 129:7, 129:9, 129:13, 129:15, 129:21, 130:1, 130:13, 131:21, 131:24, 132:12, 132:16, 132:18, 133:4, 133:21, 136:4, 147:11, 147:17, 147:20, 148:14, 149:8, 149:13, 149:17, 150:3, 150:5, 150:9, 150:22, 151:3, 151:19, 151:25, 152:6, 153:8, 153:17, 153:25
**Courthouse** [1] - 2:18
**courtroom** [3] - 6:17, 83:25, 116:3
**COURTROOM** [5] - 117:18, 117:21, 117:23, 148:21, 149:6
**courts** [1] - 133:13
**cover** [5] - 14:7, 21:5, 21:17, 149:25, 152:25
**coverage** [2] - 148:1, 148:2
**CPA** [1] - 133:2
**CRC** [2] - 11:4
**created** [2] - 8:6, 47:16
**credible** [3] - 71:17, 71:21, 72:3
**crime** [2] - 38:21, 122:1
**Criminal** [3] - 54:21, 55:14, 56:13
**criminal** [2] - 30:8, 38:18
**criticism** [1] - 36:3
**CROSS** [3] - 3:2, 42:16, 95:1
**cross** [11] - 5:21, 5:22, 6:9, 42:14, 76:11, 82:24, 83:1, 83:5, 83:10, 94:23, 132:8
**CROSS-EXAMINATION** [2] - 42:16, 95:1
**cross-examination** [8] - 5:21, 5:22, 6:9, 76:11, 82:24, 83:1, 83:5, 94:23
**crouching** [1] - 38:13
**CRR** [1] - 2:17
**cues** [1] - 35:16
**cuffed** [1] - 134:9
**cultural** [1] - 11:7
**current** [6] - 9:5, 38:8, 67:24, 76:20, 77:10, 96:14
**cut** [2] - 4:22, 121:7
**CVs** [1] - 56:8

**D**

**D.C** [2] - 2:4, 2:12
**daily** [12] - 60:24, 62:14, 62:15, 62:17, 78:6, 78:9, 79:1, 79:25, 103:8, 103:10, 138:7, 138:20
**damage** [1] - 133:16
**Dan** [36] - 31:16, 31:17, 32:19, 33:2, 33:3, 33:11, 34:17, 35:21, 36:14, 36:22, 37:9, 37:25, 38:3, 38:15, 38:20, 39:23, 40:4, 40:9, 41:15, 41:19, 42:2, 42:5, 51:14, 60:10, 65:25, 67:6, 71:4, 72:22, 74:23, 75:2, 75:25, 93:24, 94:13, 104:17, 137:9, 138:13
**Dan's** [2] - 36:1, 36:5
**dangerous** [3] - 70:5, 117:8, 118:8
**DANIEL** [2] - 3:5, 84:1
**Daniel** [6] - 66:21, 68:17, 73:1, 83:23, 84:7, 92:21
**Daniel's** [1] - 75:23
**Daniels** [17] - 12:3, 36:13, 37:9, 37:18, 37:24, 39:9, 39:18, 40:10, 42:1, 67:18, 67:22, 68:10, 76:14, 77:20, 137:3, 137:7,

137:10

**Daniels'** [1] - 77:13

**date** [13] - 25:5, 32:18, 37:1, 37:4, 37:7, 78:9, 78:10, 79:1, 79:3, 79:4, 79:13, 79:25

**DATE** [1] - 153:25

**David** [1] - 54:19

**DAY** [1] - 1:10

**day-to-day** [6] - 10:17, 17:2, 17:8, 17:18, 43:17

**days** [6] - 12:9, 37:11, 68:9, 99:14, 103:10

**dead** [1] - 51:1

**deal** [1] - 82:20

**dealt** [1] - 133:13

**decades** [1] - 38:11

**December** [6] - 25:6, 25:18, 25:19, 30:2, 134:2, 134:22

**decide** [2] - 74:8, 104:2

**decided** [3] - 33:25, 79:22, 139:7

**decision** [7] - 18:9, 18:10, 90:18, 103:15, 104:21, 135:5, 151:17

**decisions** [2] - 52:10, 75:4

**deep** [1] - 99:3

**Defendant** [2] - 1:8, 6:12

**defendant** [3] - 83:8, 123:25, 151:12

**DEFENDANT** [8] - 2:1, 3:22, 5:15, 6:15, 6:20, 20:21, 75:20, 84:3

**Defendant's** [2] - 57:10, 123:13

**defendant's** [2] - 6:14, 149:8

**defendants** [1] - 82:15

**Defense** [13] - 5:5, 5:7, 5:9, 5:11, 20:14, 20:23, 48:18, 49:4, 49:5, 49:12, 125:4, 125:5, 125:7

**defense** [5] - 85:16, 99:3, 132:19, 150:5, 153:7

**define** [2] - 43:16, 61:7

**definitely** [6] - 4:11, 36:3, 96:8, 147:25, 151:11, 152:24

**definitive** [1] - 74:6

**deliberation** [2] - 4:14, 148:7

**delineation** [1] - 37:4

**delivered** [3] - 37:5, 37:7, 37:14

**delivery** [1] - 37:12

**denied** [1] - 66:1

**denoted** [1] - 51:23

**dental** [1] - 11:5

**departed** [2] - 32:13, 84:11

**DEPARTMENT** [1] - 2:10

**Department** [5] - 48:17, 49:4, 49:5, 49:11, 125:5

**department** [1] - 49:11

**departure** [2] - 35:9, 91:24

**depicted** [1] - 71:1

**depicts** [1] - 69:21

**deploy** [6] - 11:6, 12:14, 12:15, 86:18, 117:13, 118:16

**deployed** [3] - 11:4, 87:2, 109:10

**deployment** [2] - 18:19, 101:25

**deposed** [1] - 45:4

**DEPOSITION** [2] - 3:8, 3:12

**Deposition** [1] - 77:24

**deposition** [30] - 4:18, 5:4, 5:6, 5:17, 5:22, 6:3, 45:11, 64:19, 65:7, 65:17, 80:5, 115:11, 115:13, 115:15, 115:19, 115:24, 116:8, 116:13, 120:21, 121:5, 123:9, 125:20, 126:21, 128:10, 132:22, 136:3, 139:2, 140:12, 150:21, 150:23

**depositions** [1] - 83:21

**Deputy** [2] - 7:19, 125:4

**deputy** [3] - 6:17, 53:15, 83:25

**derogatory** [5] - 31:18, 35:22, 67:25, 76:20, 77:11

**describe** [3] - 7:4, 12:18, 13:21

**described** [3] - 26:8, 130:4, 145:18

**describing** [1] - 36:16

**description** [1] - 94:19

**designate** [1] - 126:7

**designation** [7] - 126:1, 126:5, 126:6, 132:6, 133:18, 139:2, 140:12

**designations** [7] - 125:23, 126:14, 126:23, 126:24, 127:11, 128:4, 128:10

**desire** [1] - 93:10

**detail** [2] - 40:9, 40:10

**detailed** [1] - 16:19

**detainee** [45] - 30:3, 35:16, 38:5, 38:8, 66:15, 66:18, 69:24, 70:17, 70:18, 70:22, 70:25, 71:5, 72:18, 73:5, 76:8, 88:25, 89:3, 89:6, 89:9, 89:12, 92:14, 92:25, 99:1, 100:10, 107:10, 112:9, 114:15, 115:1, 118:24, 123:1, 126:10, 129:25, 141:7, 142:18, 143:12, 143:17, 143:20, 143:21, 143:23, 143:24, 144:2, 144:4, 144:16, 146:13, 146:18

**detainee's** [1] - 140:22

**detainees** [28] - 38:5, 70:21, 73:16, 73:22, 74:1, 92:2, 97:14, 98:12, 113:19, 115:6, 120:6, 122:5, 122:8, 122:20, 124:5, 124:9, 134:4, 134:9, 134:24, 135:20, 135:24, 142:3, 142:10, 142:22, 142:25, 143:9, 147:2, 147:4

**determine** [1] - 10:25

**determined** [3] - 14:15, 18:4, 22:18

**detrimental** [1] - 105:5

**developed** [1] - 12:22

**development** [1] - 74:21

**dictated** [3] - 10:16, 16:18, 50:5

**dictating** [1] - 19:13

**diet** [1] - 134:13

**differ** [2] - 137:23, 138:5

**differed** [1] - 138:1

**difference** [6] - 15:7, 20:10, 27:8, 27:10, 28:6, 41:5

**differences** [1] - 138:6

**different** [22] - 4:21, 4:22, 8:21, 14:15, 23:9, 27:22, 28:4, 29:12, 40:1, 51:17, 52:20, 56:18, 79:7, 117:3, 123:21, 127:1, 128:24, 130:8, 130:10, 145:18, 145:20, 150:23

**difficult** [3] - 127:15, 130:18, 130:21

**DIMUROGINSBERG** [1] - 2:6

**DIRECT** [1] - 3:2

**direct** [28] - 17:2, 18:21, 18:23, 26:18, 27:3, 46:11, 47:5, 48:21, 51:20, 54:1, 56:5, 57:12, 60:2, 64:7, 66:20, 67:20, 69:9, 71:24, 72:5, 72:11, 74:12, 95:5, 108:1, 110:6, 110:11, 110:16, 114:7, 114:14

**directed** [5] - 34:21, 49:3, 73:25, 74:11, 137:7

**directing** [3] - 70:18, 71:9, 71:14

**direction** [3] - 17:8, 69:24, 73:12

**directives** [1] - 73:18

**directly** [7] - 14:24, 102:8, 107:13, 136:24, 137:4, 137:8, 137:10

**director** [4] - 8:22, 15:1, 15:12, 85:25

**disagree** [3] - 64:13, 64:15, 64:17

**discharged** [1] - 7:11

**disciplinary** [1] - 107:6

**discipline** [8] - 22:24, 23:1, 23:3, 23:4, 36:23, 105:20, 106:11, 110:7

**disciplined** [1] - 121:23

**disclose** [1] - 127:11

**discrepancy** [1] - 149:4

**discretion** [1] - 124:12

**discuss** [1] - 58:24

**discussed** [11] - 40:9, 47:5, 59:4, 60:2, 60:5, 67:1, 67:17, 74:21, 108:24, 150:24

**discussing** [2] - 59:8, 59:21

**discussion** [2] - 39:23, 40:16

**discussions** [1] - 18:24

**displaced** [1] - 133:6

**dispute** [1] - 82:17

**disseminated** [1] - 8:6

**distinct** [1] - 13:11

**distinction** [2] - 55:20, 58:18

**distinguish** [2] - 59:14, 137:15

**distinguishing** [1] - 53:10

**distribution** [2] - 34:20, 138:25

**DISTRICT** [3] - 1:1, 1:1, 1:11

**District** [1] - 2:17

**DIVISION** [1] - 2:10

**division** [4] - 8:19, 14:25, 15:10, 56:25

**Division** [3] - 1:2, 54:22, 56:13

**Division's** [1] - 55:15

**DJ** [3] - 70:4, 72:12, 72:16

**doctors** [1] - 88:21

**document** [14] - 36:10, 37:25, 39:11, 39:14, 39:16, 39:19, 48:9, 49:24, 56:1, 57:10, 60:15, 81:17, 128:19, 149:22

**documents** [2] - 128:18, 128:24

**dogs** [4] - 73:16, 73:25, 74:10, 74:11

**dollars** [3] - 13:1, 25:21, 28:3

**don't...** [1] - 113:22

**don't...oh** [1] - 54:20

**Donald** [1] - 125:7

**done** [16] - 19:7, 24:17, 51:21, 73:19, 81:15, 89:5, 89:11, 101:9, 117:11, 118:14, 126:20, 131:20, 132:11, 150:12, 151:4, 152:1

**door** [1] - 128:2

**doubted** [2] - 71:23,

72:5
**down** [13] - 4:22, 24:21, 25:10, 33:7, 62:5, 78:4, 81:23, 94:13, 106:1, 115:21, 120:3, 121:7
**Dr** [1] - 83:1
**draft** [1] - 24:21
**drafted** [1] - 47:14
**drafting** [2] - 47:19, 48:1
**draw** [2] - 116:11, 120:3
**drawing** [2] - 109:24, 113:3
**drill** [1] - 148:16
**drink** [1] - 137:25
**drive** [1] - 117:19
**dual** [1] - 52:2
**due** [3] - 62:22, 78:19, 126:24
**Dugan** [11] - 31:17, 33:3, 33:11, 35:12, 35:17, 63:22, 64:12, 65:15, 65:20, 66:4, 98:5
**duly** [2] - 6:18, 84:1
**during** [32] - 5:6, 6:8, 13:3, 35:16, 47:16, 53:17, 53:19, 53:22, 80:4, 83:1, 84:22, 92:1, 93:2, 95:13, 96:15, 99:3, 101:1, 122:4, 122:16, 122:25, 126:20, 134:1, 134:21, 140:17, 141:4, 141:21, 143:17, 146:18, 146:25, 150:16, 150:23, 152:1
**duties** [13] - 8:6, 10:6, 52:1, 85:14, 85:15, 85:16, 87:6, 87:7, 87:9, 87:11, 87:12, 91:21
**duty** [2] - 84:20, 107:13
**DX** [5] - 6:8, 148:25, 149:2

# E

**early** [4] - 86:19, 93:11, 119:4, 153:3
**earmarked** [1] - 128:6
**ease** [2] - 151:19, 152:2
**easier** [2] - 15:21, 94:3
**easiest** [1] - 149:17

**easily** [1] - 86:1
**East** [1] - 86:21
**EASTERN** [1] - 1:1
**easy** [1] - 42:20
**echelons** [1] - 135:5
**educational** [1] - 7:4
**Edward** [1] - 128:7
**effect** [1] - 49:25
**effective** [1] - 50:10
**efficient** [2] - 120:23, 132:15
**effort** [1] - 103:22
**either** [9] - 16:6, 17:10, 22:15, 37:9, 58:23, 76:5, 125:3, 151:1, 151:4
**electronic** [1] - 121:22
**electronically** [1] - 24:18
**Elefante** [3] - 37:19, 37:24, 67:18
**element** [2] - 88:7, 90:9
**elements** [1] - 51:3
**elicit** [1] - 58:22
**Elizabeth** [1] - 136:11
**ELLIOTT** [1] - 2:9
**email** [19] - 18:17, 18:21, 32:17, 34:19, 34:22, 35:5, 40:7, 40:19, 54:18, 55:21, 60:8, 67:17, 136:22, 137:11, 138:16, 138:21, 150:1, 152:10, 152:11
**emailed** [1] - 137:18
**emails** [1] - 54:21
**embassy** [1] - 10:3
**emergency** [1] - 87:18
**employ** [2] - 72:17, 73:1
**employed** [5] - 45:25, 46:15, 51:8, 51:9, 62:3
**employee** [51] - 7:23, 8:13, 11:12, 14:11, 21:2, 21:25, 22:4, 22:14, 22:21, 22:22, 22:25, 28:2, 31:18, 47:18, 57:19, 59:17, 62:23, 63:14, 63:19, 64:5, 64:9, 64:15, 65:3, 66:20, 67:13, 69:3, 73:25, 78:6, 78:21, 80:17, 80:19, 89:5, 95:23, 105:20, 106:21, 106:23, 107:1, 111:12, 111:15, 111:20, 114:7, 114:21,

126:9, 140:22, 140:23, 140:25, 141:11, 141:12, 141:18
**employees** [56] - 8:4, 10:7, 13:13, 16:2, 19:16, 19:24, 20:25, 21:22, 22:13, 24:18, 27:12, 28:5, 30:2, 31:12, 31:14, 31:16, 33:5, 44:20, 46:16, 48:10, 48:16, 49:4, 50:3, 54:25, 55:10, 55:14, 57:13, 57:16, 57:21, 57:23, 57:24, 58:5, 59:5, 59:24, 59:25, 63:24, 64:7, 80:9, 81:12, 82:16, 86:24, 90:15, 104:6, 107:13, 109:14, 110:11, 110:17, 137:23, 137:24, 138:1, 138:4, 138:5, 139:23, 139:24
**employees'** [3] - 58:8, 58:15, 58:20
**employment** [4] - 8:17, 51:4, 56:6, 66:12
**END** [4] - 123:3, 136:1, 140:9, 147:14
**end** [7] - 8:11, 12:17, 22:5, 30:2, 104:20, 123:11, 152:17
**End** [5] - 5:2, 5:19, 5:24, 6:4, 121:3
**ended** [2] - 55:10, 66:4
**engage** [1] - 74:13
**engaged** [2] - 66:18, 95:19
**engagement** [6] - 20:6, 89:16, 90:5, 90:11, 90:13, 105:24
**engaging** [3] - 16:12, 66:14, 73:22
**enlisted** [1] - 7:10
**ensured** [2] - 9:18, 89:7
**ensuring** [2] - 8:5, 57:20
**entered** [1] - 150:6
**entire** [2] - 39:19, 129:10
**entirely** [1] - 13:9
**entirety** [2] - 140:18, 141:5
**entitled** [3] - 130:7, 130:11, 153:21
**environment** [1] -

134:15
**equipment** [2] - 26:20, 87:14
**equivalent** [2] - 26:7, 29:17
**error** [1] - 136:15
**especially** [1] - 107:7
**establish** [1] - 149:21
**established** [5] - 20:5, 50:16, 50:23, 70:6, 90:13
**establishing** [1] - 90:10
**et** [1] - 1:4
**ethics** [17] - 105:3, 105:13, 105:14, 107:2, 107:4, 108:24, 108:25, 109:3, 109:8, 109:10, 109:15, 109:19, 109:21, 109:23, 110:10, 110:12, 110:13
**ETS** [1] - 8:11
**Europe** [2] - 7:19, 95:12
**European** [1] - 8:19
**evaluating** [1] - 59:2
**evaluation** [1] - 58:22
**evaluations** [1] - 58:4
**evenings** [1] - 53:19
**event** [1] - 71:17
**events** [5] - 71:20, 71:25, 72:6, 99:22, 120:6
**eventually** [2] - 42:6, 137:8
**evidence** [24] - 4:11, 5:12, 5:16, 6:8, 6:16, 20:22, 32:10, 34:15, 39:6, 50:14, 54:17, 60:23, 69:2, 73:3, 73:4, 90:2, 108:10, 109:23, 120:2, 123:25, 127:22, 130:6, 147:21, 151:13
**exact** [1] - 96:19
**exactly** [7] - 5:9, 33:4, 41:24, 85:11, 115:14, 119:5, 128:25
**EXAMINATION** [6] - 6:20, 42:16, 75:20, 81:5, 84:3, 95:1
**examination** [14] - 5:21, 5:22, 6:2, 6:9, 46:11, 47:5, 48:21, 51:20, 60:2, 76:11, 82:24, 83:1, 83:5,

94:23
**example** [5] - 21:14, 36:16, 73:16, 73:24, 127:2
**exceed** [2] - 25:17, 26:24
**Excel** [1] - 128:9
**excellent** [2] - 4:9, 4:24
**except** [1] - 126:2
**Excerpt** [5] - 4:25, 5:17, 5:22, 6:2, 123:9
**excerpt** [8] - 5:2, 5:19, 5:24, 6:4, 121:1, 121:3, 123:11, 130:4
**EXCERPTS** [2] - 3:8, 3:12
**exclusive** [1] - 133:10
**executive** [3] - 8:22, 37:21, 138:23
**executives** [1] - 55:24
**exercise** [1] - 16:24
**exhaust** [1] - 152:3
**EXHIBIT** [10] - 5:15, 6:15, 20:21, 32:9, 34:14, 39:5, 54:16, 60:22, 90:1, 120:1
**exhibit** [17] - 25:24, 26:2, 28:25, 31:22, 32:2, 32:4, 77:14, 78:2, 78:3, 78:4, 78:12, 117:18, 145:14, 145:16, 145:18, 150:23
**Exhibit** [60] - 3:18, 3:18, 3:19, 3:19, 3:20, 3:20, 3:21, 3:23, 3:23, 3:24, 3:24, 5:5, 5:8, 5:10, 5:11, 6:12, 20:15, 20:23, 25:1, 31:21, 32:11, 32:22, 34:7, 34:16, 36:7, 39:1, 39:2, 46:25, 47:3, 50:7, 54:12, 57:9, 57:10, 60:14, 61:15, 61:18, 62:11, 67:1, 68:12, 69:12, 76:10, 77:24, 77:25, 78:13, 79:15, 80:8, 81:7, 89:21, 89:23, 92:19, 93:22, 93:25, 123:13, 123:25, 144:11, 144:20, 145:11, 145:21, 146:4, 146:14
**exhibits** [7] - 81:16, 148:15, 148:19, 150:6, 150:11,

150:15, 150:21
**EXHIBITS** [2] - 3:17, 3:22
**expand** [1] - 99:4
**expansive** [2] - 100:22, 100:24
**expect** [4] - 82:21, 100:12, 146:13, 150:18
**expected** [6] - 9:11, 20:11, 20:12, 58:7, 58:15, 100:9
**expenditures** [1] - 27:4
**experience** [8] - 29:15, 29:18, 85:20, 88:19, 96:12, 98:12, 104:14, 108:22
**experienced** [1] - 93:9
**expert** [3] - 41:10, 49:1, 50:16
**expertise** [1] - 104:15
**experts** [1] - 72:21
**explain** [7] - 11:20, 19:7, 26:1, 38:7, 56:17, 69:22, 85:20
**explained** [1] - 142:2
**explaining** [1] - 57:13
**explanation** [7] - 40:1, 40:4, 76:24, 77:8, 77:14, 77:16, 77:22
**exposure** [1] - 8:7
**express** [1] - 94:11
**expressed** [1] - 40:19
**expressing** [1] - 94:9
**expressly** [1] - 68:7
**extended** [1] - 142:3
**extending** [1] - 95:13
**extent** [4] - 39:22, 54:10, 150:22, 151:18
**extremely** [1] - 130:18
**eyes** [4] - 117:10, 117:11, 118:10, 118:14
**eyewitness** [1] - 130:10

## F

**face** [4] - 62:21, 62:22, 78:18
**facial** [3] - 102:21, 102:24, 103:1
**facility** [6] - 23:9, 79:7, 99:8, 100:18, 101:13
**facing** [3] - 38:12, 38:13, 69:25
**fact** [12] - 44:20, 58:18, 59:20, 62:14,

62:15, 64:1, 64:5, 82:18, 93:10, 100:13, 128:1, 137:24
**failure** [1] - 152:3
**fair** [6] - 40:15, 122:12, 122:14, 122:15, 122:18, 130:20
**fall** [2] - 85:8, 105:15
**Fallujah** [1] - 10:4
**familiar** [9] - 10:12, 48:24, 50:24, 75:22, 89:15, 108:7, 111:12, 111:20, 114:6
**far** [13] - 13:4, 16:17, 17:7, 22:4, 22:12, 29:16, 33:1, 38:20, 50:17, 50:21, 55:10, 56:21, 88:22
**FAR** [3] - 26:3, 48:21, 50:16
**FARIDI** [36] - 1:14, 6:7, 6:13, 123:17, 123:21, 125:12, 127:1, 128:4, 128:15, 128:18, 129:2, 129:4, 129:6, 129:12, 129:14, 129:20, 129:23, 131:16, 131:23, 132:1, 132:10, 132:14, 132:24, 133:5, 136:2, 136:15, 139:1, 140:10, 143:10, 144:13, 145:25, 147:15, 149:3, 149:7, 150:13, 153:6
**fashion** [1] - 80:15
**fast** [1] - 58:10
**Fast** [1] - 12:24
**faulty** [2] - 74:7, 74:9
**Fay** [15] - 70:10, 73:24, 74:2, 91:5, 91:9, 91:11, 91:15, 91:17, 108:1, 108:13, 108:21, 111:2, 111:6, 111:9
**Fay's** [4] - 30:21, 48:7, 74:5, 110:25
**fearful** [1] - 34:1
**February** [10] - 12:1, 12:2, 60:24, 78:10, 79:2, 79:3, 79:25, 82:2, 95:14, 95:15
**Federal** [2] - 26:4, 48:23
**FEDERAL** [1] - 2:11

**fee** [1] - 28:15
**fee-bearing** [1] - 28:15
**feedback** [3] - 58:17, 58:22, 104:23
**fellow** [1] - 104:18
**felt** [3] - 10:25, 35:15, 64:7
**few** [6] - 8:21, 40:6, 75:18, 99:14, 99:19, 146:2
**field** [2] - 72:21, 97:15
**fifth** [1] - 144:20
**fight** [2] - 83:11, 152:16
**file** [1] - 146:13
**fill** [1] - 48:14
**filling** [1] - 119:17
**final** [4] - 55:8, 103:15, 123:6, 152:12
**finally** [1] - 70:16
**findings** [2] - 73:21, 74:10, 108:7
**fine** [2] - 150:15, 152:21
**finger** [7] - 144:5, 144:17, 144:24, 145:8, 145:19, 146:5, 146:14
**finger-squeezing** [3] - 144:24, 145:8, 145:19
**fingers** [7] - 126:10, 140:22, 140:23, 140:24, 141:3, 143:12
**finish** [1] - 50:19
**fire** [9] - 22:21, 57:24, 66:17, 66:19, 67:10, 70:4, 72:4, 106:19, 107:1
**fired** [8] - 106:12, 106:15, 106:16, 106:20, 106:21, 106:23, 107:4, 107:6
**firm** [1] - 94:15
**first** [32] - 11:25, 16:9, 25:8, 27:7, 29:8, 30:22, 40:19, 43:3, 46:8, 49:23, 50:20, 51:14, 54:24, 56:6, 62:2, 63:4, 67:4, 68:24, 70:15, 75:22, 76:14, 77:3, 77:13, 84:11, 103:17, 103:18, 106:12, 107:3, 129:9, 132:2, 148:14
**FISHER** [1] - 1:16
**fit** [2] - 10:25, 11:6
**five** [7] - 96:12,

125:20, 126:24, 127:12, 128:4, 131:17, 142:12
**flash** [1] - 117:19
**flew** [1] - 87:1
**Floor** [3] - 1:22, 2:3, 2:17
**fly** [1] - 86:24
**FM** [1] - 105:16
**focus** [2] - 60:15, 67:19
**focused** [1] - 115:8
**folders** [1] - 128:20
**folks** [1] - 82:5
**follow** [3] - 57:23, 137:9, 146:2
**follow-up** [1] - 137:9
**follow-ups** [1] - 146:2
**followed** [1] - 57:21
**following** [8] - 4:9, 58:11, 116:18, 121:11, 133:22, 136:8, 139:3, 140:15
**FOLLOWING** [1] - 1:24
**follows** [2] - 6:19, 84:2
**foot** [1] - 75:2
**footnote** [1] - 151:15
**FOR** [10] - 1:1, 1:14, 1:21, 2:1, 6:20, 42:16, 75:20, 81:5, 84:3, 95:1
**for..** [1] - 25:4
**force** [3] - 61:6, 61:10, 73:4
**forced** [1] - 122:5
**foregoing** [1] - 153:19
**foreign** [2] - 124:13, 124:22
**Foreign** [4] - 124:14, 124:18, 124:19, 124:25
**forget** [1] - 131:7
**forgiven** [1] - 151:5
**formal** [5] - 85:4, 91:2, 98:9, 98:19, 98:22
**formally** [1] - 148:18
**formerly** [1] - 136:3
**Fort** [6] - 7:13, 7:16, 11:2, 11:12, 85:10, 86:25
**forth** [4] - 26:21, 87:15, 128:3, 147:16
**forward** [5] - 9:19, 33:21, 33:24, 41:19, 125:4
**forwarded** [2] - 124:24, 137:6
**forwarding** [1] - 35:5
**foundation** [2] -

17:25, 48:5
**four** [5] - 41:25, 45:13, 96:11, 117:25, 131:17
**fourth** [4] - 28:25, 37:15, 93:24, 94:5
**Friday** [1] - 153:4
**front** [9] - 4:7, 21:11, 57:8, 57:11, 69:11, 69:17, 81:19, 81:20, 117:17
**fulfilling** [3] - 43:17, 61:9, 72:15
**full** [6] - 7:1, 54:1, 54:9, 84:5, 136:10, 139:5
**fully** [1] - 106:25
**function** [3] - 10:19, 50:3, 110:23
**functions** [2] - 9:21, 14:21
**fussing** [1] - 152:19
**fuzzy** [1] - 95:17

## G

**G2X** [1] - 29:10
**General** [27] - 12:24, 30:5, 30:14, 30:16, 30:20, 30:21, 48:7, 70:10, 73:24, 74:2, 74:5, 90:20, 90:23, 91:1, 91:4, 91:5, 91:9, 91:11, 91:15, 91:17, 108:1, 108:13, 108:21, 110:25, 111:2, 111:6, 111:9
**general** [16] - 13:14, 13:15, 13:16, 15:10, 16:14, 27:18, 33:9, 33:10, 34:1, 35:24, 48:10, 66:9, 70:11, 87:25, 90:14, 125:5
**generally** [4] - 7:2, 23:16, 47:9, 53:18
**Geneva** [11] - 11:8, 11:13, 38:5, 97:15, 105:15, 105:18, 105:23, 106:3, 107:2, 107:5, 107:8
**gentlemen** [4] - 4:5, 83:18, 132:18, 147:21
**GEORGE** [1] - 3:9
**Germany** [6] - 7:18, 8:18, 9:4, 86:12, 86:13, 100:7
**Ghraib** [93] - 9:21, 12:23, 13:2, 13:13,

15:19, 15:25, 17:13,
19:16, 33:5, 33:9,
34:23, 41:15, 41:16,
42:5, 51:8, 51:15,
51:18, 52:10, 52:16,
53:15, 54:2, 54:22,
56:14, 58:7, 58:14,
58:19, 60:9, 66:8,
66:24, 72:12, 72:16,
72:18, 73:11, 74:7,
75:1, 75:7, 75:11,
80:10, 84:8, 84:10,
84:13, 87:2, 87:5,
87:8, 87:16, 88:4,
89:14, 90:9, 90:11,
90:21, 91:7, 91:19,
92:2, 92:8, 92:14,
93:2, 95:6, 95:15,
95:23, 99:6, 99:8,
99:12, 100:9,
100:18, 101:19,
103:17, 108:2,
109:11, 109:20,
110:14, 111:16,
111:21, 111:24,
114:10, 114:20,
115:5, 121:14,
121:16, 121:18,
121:21, 121:24,
122:4, 122:25,
124:10, 134:1,
134:21, 135:1,
135:5, 140:18,
141:5, 141:24, 145:3
**Ginsberg** [4] - 3:4,
23:21, 24:3, 152:23
**GINSBERG** [29] - 2:5,
6:21, 18:2, 20:18,
23:23, 24:4, 28:8,
28:23, 31:22, 34:8,
35:2, 35:6, 36:9,
41:11, 42:12, 43:20,
48:5, 49:16, 50:15,
50:21, 54:14, 56:17,
60:20, 65:10, 70:12,
74:14, 75:18, 75:21,
80:25
**given** [6] - 16:14, 65:7,
74:23, 106:23,
131:21, 132:3
**governed** [1] - 109:19
**government** [23] -
7:22, 8:12, 8:17, 9:2,
14:17, 19:22, 19:25,
20:3, 21:11, 21:24,
23:15, 27:8, 44:14,
45:22, 47:9, 47:17,
47:23, 47:24, 48:24,
48:25, 49:15, 50:24,
69:1

**governmental** [1] -
133:6
**Grand** [1] - 25:13
**grand** [1] - 25:13
**grata** [1] - 60:9
**gravel** [9] - 142:3,
142:10, 142:19,
142:23, 142:24,
143:1, 143:6, 147:3,
147:5
**great** [1] - 103:23
**Green** [1] - 10:3
**ground** [1] - 4:21
**Group** [1] - 86:12
**group** [1] - 30:18
**guess** [5] - 17:21,
23:3, 43:16, 56:23,
75:12
**guesstimate** [1] - 4:13
**gun** [1] - 6:5
**gunnery** [1] - 86:7
**guy** [1] - 130:11
**guys** [1] - 9:4

## H

**HADDAD** [1] - 1:15
**hair** [4] - 93:4, 102:21,
102:25, 103:1
**half** [2] - 85:25, 95:17
**hall** [1] - 33:6
**hallway** [1] - 76:1
**hand** [6] - 25:5, 25:11,
117:25, 126:8,
129:8, 129:9
**handed** [2] - 128:12,
128:20
**handful** [1] - 92:15
**handle** [1] - 122:20
**handling** [1] - 94:7
**handwriting** [1] -
119:15
**handwritten** [2] - 37:4,
37:13
**hang** [1] - 47:2
**happy** [1] - 132:10
**harassment** [1] -
59:24
**hard** [12] - 41:1, 58:25,
93:25, 101:7, 101:9,
101:13, 101:15,
112:21, 143:8,
146:7, 146:10
**HARDING** [2] - 3:13,
139:3
**Harding** [2] - 139:2,
139:6
**Harry** [4] - 39:15,
62:18, 68:19, 138:23
**HAUG** [1] - 1:14

**headed** [1] - 52:2
**heading** [1] - 60:24
**headquarters** [2] -
7:18, 57:3
**heads** [1] - 73:17
**hear** [4] - 82:21,
93:16, 110:16,
126:25
**heard** [12] - 10:12,
30:13, 30:15, 30:23,
40:4, 80:18, 107:9,
110:19, 127:4,
129:24, 131:7,
148:10
**hearing** [1] - 132:2
**hearsay** [4] - 32:3,
64:2, 74:3, 114:4
**heavy** [3] - 141:8,
141:10, 141:20
**Heidelberg** [1] - 7:18
**held** [6] - 40:2, 43:6,
43:19, 138:24, 146:7
**help** [1] - 63:6
**helpful** [2] - 97:19,
126:9
**helps** [1] - 113:17
**highest** [1] - 95:22
**highlighted** [3] -
108:17, 110:4,
113:13
**himself** [2] - 35:24,
64:6
**hinder** [2] - 117:14,
118:17
**hire** [1] - 137:20
**hired** [9] - 8:23, 8:24,
18:25, 43:1, 66:23,
98:17, 98:25, 99:5,
100:3
**hiring** [3] - 19:2,
29:19, 137:21
**history** [1] - 96:13
**Hittson** [1] - 147:9
**hold** [8] - 19:18,
34:24, 81:3, 86:6,
116:21, 117:1,
121:18, 127:17
**Holmes** [5] - 123:7,
133:19, 133:24,
134:1, 135:1
**HOLMES** [3] - 3:11,
123:9, 133:22
**home** [5] - 4:8, 33:22,
33:25, 34:2, 79:22,
80:17, 80:20, 86:20,
147:22
**Honor** [98] - 4:17,
4:19, 5:3, 5:4, 5:20,
5:25, 6:5, 6:7, 6:11,
6:13, 17:25, 20:17,

20:18, 20:19, 22:7,
23:23, 27:13, 28:8,
28:19, 31:22, 31:24,
35:6, 36:9, 39:3,
42:12, 42:15, 43:20,
48:5, 49:16, 49:23,
50:13, 50:15, 50:18,
54:14, 58:13, 60:18,
65:10, 75:17, 79:9,
80:25, 81:2, 82:4,
82:12, 83:13, 83:16,
83:23, 83:24, 89:22,
94:22, 94:24,
112:25, 114:1,
114:4, 116:20,
116:23, 119:20,
119:23, 120:12,
120:14, 120:19,
121:4, 121:9, 123:4,
123:12, 123:22,
124:1, 125:8,
125:12, 125:20,
127:1, 128:15,
128:21, 129:2,
129:8, 129:20,
130:5, 131:16,
132:5, 132:10,
132:24, 133:2,
133:18, 136:2,
139:1, 140:10,
140:13, 147:19,
149:3, 149:10,
149:16, 149:20,
150:8, 150:13,
150:20, 151:15,
151:24, 153:6
**HONORABLE** [1] -
1:11
**honorably** [1] - 7:11
**hood** [1] - 73:17
**hooded** [1] - 141:7
**hopefully** [5] - 82:5,
99:23, 112:20,
152:13, 152:18
**hoping** [1] - 153:2
**horse** [1] - 51:1
**hour** [5] - 26:5, 27:25,
28:2, 120:22
**hours** [10] - 14:8,
14:10, 14:13, 14:15,
16:2, 21:21, 21:24,
24:18, 26:6, 26:7
**house** [1] - 138:3
**housed** [1] - 143:2
**housing** [2] - 87:19
**Howard** [12] - 47:18,
47:20, 48:1, 53:4,
61:2, 61:4, 61:11,
62:20, 137:3, 137:6,
137:12, 137:18

**Howard's** [2] - 62:8,
137:15
**HR** [1] - 55:24
**Huachuca** [1] - 85:10
**human** [3] - 61:12,
98:24, 110:24
**humiliate** [1] - 134:18
**humiliation** [1] - 92:7
**HUMINT** [2] - 26:16,
61:12
**hundreds** [1] - 92:16

## I

**I've..** [1] - 92:16
**ICE** [4] - 90:8, 101:10,
101:11, 111:7
**idea** [2] - 58:20, 82:24
**ideas** [2] - 47:23,
88:20
**identifiable** [1] - 55:25
**identification** [1] -
119:11
**identify** [1] - 125:1
**identifying** [1] - 80:9
**Ill** [4] - 3:13, 139:2,
139:3, 139:6
**illegal** [2] - 68:25, 89:1
**imam** [3] - 126:16,
128:11, 146:10
**immediate** [2] - 67:5,
68:16, 76:15
**immediately** [5] -
44:8, 68:4, 68:8,
70:4, 89:8
**immorally** [1] - 120:7
**immunized** [1] - 133:7
**impeachment** [1] -
116:22
**impermissible** [1] -
40:23
**impose** [1] - 22:24
**imposed** [2] - 19:21,
36:24
**impressed** [1] - 131:6
**impression** [1] - 40:15
**improper** [1] - 130:15
**IN** [5] - 3:8, 123:3,
136:1, 140:9, 147:14
**in-country** [10] - 9:8,
9:10, 9:11, 9:13,
43:3, 45:1, 49:2,
136:25, 138:14,
138:15
**in-processing** [1] -
21:3
**inappropriate** [1] -
125:3
**INC** [1] - 1:7
**incident** [8] - 141:19,

143:11, 143:15, 144:24, 144:25, 145:8, 145:19
**incidents** [3] - 143:20, 143:23, 144:5
**include** [6] - 21:20, 40:22, 56:10, 85:9, 124:16, 134:4
**included** [2] - 18:6, 145:22
**includes** [1] - 96:9
**including** [2] - 46:14, 110:6
**incoming** [1] - 104:4
**inconsistent** [2] - 45:19, 45:20
**incorrect** [2] - 71:25, 105:23
**indeed** [5] - 36:1, 41:1, 69:20, 101:14, 110:21
**index** [1] - 150:10
**indicated** [2] - 72:2, 114:25
**indicating** [1] - 70:16
**indirectly** [1] - 15:2
**individual** [9] - 7:14, 108:22, 144:23, 145:7, 145:17, 145:18, 145:23, 146:7, 146:8
**individuals** [10] - 17:16, 17:22, 18:24, 32:14, 41:22, 81:18, 144:9, 145:4, 145:20, 146:11
**informally** [2] - 104:25, 148:17
**information** [25] - 24:20, 24:23, 26:1, 54:25, 55:4, 55:5, 55:17, 55:22, 55:25, 56:3, 56:10, 56:15, 56:24, 57:2, 59:1, 65:12, 70:16, 80:9, 80:13, 80:14, 90:25, 91:11, 114:15, 145:17, 145:21
**informed** [2] - 30:4, 30:9
**initial** [2] - 40:7, 72:7
**injury** [1] - 133:12
**injury/abuse** [2] - 124:5, 124:9
**input** [5] - 39:17, 104:2, 104:19, 104:23, 107:21
**inquiry** [1] - 69:2
**inside** [2] - 71:10, 71:14

**insist** [1] - 152:22
**inspections** [1] - 138:3
**instance** [4] - 88:21, 127:2, 127:3, 141:3
**instances** [5] - 112:9, 129:22, 131:4, 136:24, 146:9
**instead** [1] - 133:9
**instigated/fueled** [3] - 62:23, 65:3, 78:21
**institutions** [1] - 133:6
**instruction** [3] - 83:9, 151:9, 151:20
**instructions** [9] - 4:9, 4:13, 17:23, 31:2, 83:7, 122:19, 122:23, 148:6, 152:20
**insurance** [1] - 87:18
**Intelligence** [2] - 7:19, 91:6
**intelligence** [20] - 8:3, 8:5, 8:8, 10:10, 12:25, 13:7, 13:10, 16:15, 45:2, 45:21, 46:8, 46:22, 48:14, 49:3, 61:12, 67:23, 74:6, 86:12, 98:24, 121:22
**intended** [1] - 56:18
**intends** [1] - 67:6
**interaction** [4] - 32:12, 34:18, 79:17, 81:8
**interactions** [2] - 33:1, 81:18
**interested** [1] - 149:24
**international** [2] - 48:18, 55:11
**interpreter** [2] - 35:15, 35:17
**interrogated** [2] - 98:25, 146:23
**interrogating** [2] - 72:18, 98:1
**interrogation** [64] - 35:17, 40:11, 48:11, 61:5, 61:9, 61:14, 62:4, 62:9, 63:18, 70:6, 70:20, 72:22, 73:11, 74:17, 74:19, 74:21, 75:3, 75:10, 75:13, 82:17, 83:3, 85:17, 87:22, 88:3, 88:4, 88:5, 88:6, 88:7, 88:9, 88:13, 88:18, 88:24, 89:15, 90:4, 90:8, 90:10, 90:13, 94:7, 97:9, 98:12, 98:19, 98:23,

104:21, 104:24, 105:2, 105:13, 105:18, 105:24, 106:2, 106:10, 107:9, 107:11, 122:11, 122:13, 122:16, 126:11, 141:21, 143:5, 143:6, 143:9, 143:13, 143:17, 146:19, 146:25
**interrogations** [20] - 4:21, 13:4, 13:5, 17:24, 21:18, 70:21, 73:9, 75:5, 85:22, 89:20, 93:18, 97:17, 100:10, 100:13, 100:15, 101:22, 104:6, 107:17, 115:10, 134:23
**INTERROGATOR** [8] - 3:9, 3:10, 3:10, 3:14, 4:25, 121:1, 121:11, 140:15
**interrogator** [44] - 18:5, 27:9, 29:22, 35:25, 36:2, 41:16, 41:20, 66:14, 72:17, 74:22, 85:4, 85:6, 85:14, 87:5, 88:12, 89:3, 89:9, 89:12, 90:16, 93:6, 95:20, 95:25, 96:5, 96:22, 97:20, 98:7, 99:14, 99:18, 104:18, 105:3, 105:17, 106:1, 106:6, 106:9, 106:11, 107:10, 120:20, 127:3, 131:8, 131:18, 134:2, 139:8, 139:11, 140:25
**Interrogator** [16] - 4:18, 120:21, 121:5, 121:13, 123:4, 126:7, 126:8, 127:3, 128:7, 131:2, 140:11, 140:17, 145:11, 146:4, 146:19, 146:24
**interrogator/ translator** [1] - 85:1
**interrogators** [51] - 16:25, 17:3, 17:9, 17:17, 17:23, 19:18, 20:8, 20:10, 24:11, 29:9, 29:13, 29:14, 29:17, 41:18, 45:22, 45:24, 45:25, 46:3, 46:14, 53:20, 53:21,

58:16, 61:17, 66:17, 66:23, 73:20, 74:13, 75:1, 82:23, 85:21, 87:22, 88:18, 93:4, 93:19, 102:6, 102:11, 102:12, 103:18, 103:23, 104:4, 104:9, 104:15, 104:24, 107:17, 114:16, 115:9, 122:22, 127:6, 134:23, 135:3, 147:4
**interrogators'** [2] - 58:24, 59:2
**interrupt** [1] - 97:25
**interview** [7] - 35:13, 91:4, 91:14, 108:14, 121:1, 140:5, 140:7
**interviewed** [7] - 31:13, 31:19, 42:24, 90:23, 91:3, 91:9, 91:15
**interviewees** [1] - 96:18
**interviewing** [1] - 98:2
**interviews** [2] - 108:16, 111:2
**INTO** [1] - 3:12
**introduce** [3] - 6:24, 129:1, 149:19
**introduced** [3] - 16:11, 148:20, 150:16
**investigate** [1] - 65:23
**investigated** [2] - 124:13, 124:14
**investigating** [1] - 56:14
**investigation** [29] - 30:5, 30:6, 30:8, 30:10, 30:19, 30:21, 31:13, 35:21, 40:16, 54:22, 55:14, 55:15, 62:23, 65:3, 65:14, 65:19, 66:4, 74:6, 74:8, 90:20, 91:6, 91:12, 108:2, 111:1, 119:2, 119:7, 124:16, 124:23, 148:2
**Investigation** [3] - 54:21, 55:15, 56:13
**investigation'** [1] - 78:20
**investigations** [3] - 31:3, 54:2, 54:6
**investigator** [4] - 30:12, 31:19, 54:24, 56:14

**investigators** [1] - 55:3
**invite** [1] - 77:14
**invited** [1] - 38:24
**invoice** [1] - 24:21
**invoicing** [4] - 18:13, 24:16, 26:8, 27:5
**involved** [14] - 32:14, 48:1, 50:22, 54:5, 75:4, 76:4, 76:7, 88:9, 139:8, 139:10, 139:14, 139:18, 140:1, 147:4
**involvement** [1] - 18:9
**involving** [2] - 49:6, 105:2
**Iraq** [68] - 9:3, 9:23, 9:25, 10:22, 11:25, 12:8, 12:11, 12:12, 12:19, 12:25, 13:7, 13:13, 13:15, 13:16, 13:22, 14:22, 15:15, 16:7, 18:15, 18:19, 18:23, 20:24, 21:2, 24:6, 24:17, 24:21, 32:13, 34:1, 43:3, 43:6, 43:11, 43:13, 43:15, 43:19, 43:22, 44:8, 44:16, 44:18, 44:21, 44:23, 45:22, 46:9, 46:20, 51:14, 57:17, 57:20, 57:21, 61:18, 66:8, 79:7, 79:21, 82:1, 86:18, 86:24, 87:1, 101:25, 109:14, 117:6, 117:13, 118:16, 124:7, 137:13, 137:23, 137:24, 138:1, 138:4, 138:7, 140:4
**Iraqi** [6] - 124:4, 124:9, 133:6, 133:8, 133:13
**Iraqis** [1] - 69:24
**IROEs** [1] - 89:18
**issue** [9] - 21:13, 82:10, 83:6, 123:21, 125:17, 127:10, 148:15, 151:25, 152:3
**issued** [2] - 24:5, 108:3
**issues** [14] - 9:17, 14:3, 14:7, 21:11, 52:6, 53:21, 53:22, 53:24, 59:11, 59:14, 82:20, 87:17, 107:6
**item** [1] - 26:14
**iterations** [1] - 85:24

**itself** [4] - 18:10, 67:11, 77:9, 106:18

## J

**jacket** [1] - 11:10
**Jackson** [2] - 7:13, 7:16
**Jacob** [1] - 84:7
**JACOB** [2] - 3:5, 84:1
**Jamieson** [1] - 2:14
**January** [8] - 7:21, 79:14, 79:19, 95:9, 95:11, 95:14, 99:19, 119:3
**JASON** [1] - 2:9
**Jeff** [1] - 37:19
**Jens** [1] - 15:2
**Jensen** [3] - 81:13, 136:3, 136:13
**JIDC** [2] - 35:10, 89:14
**job** [18] - 7:15, 9:7, 9:8, 14:12, 14:16, 15:7, 15:8, 17:2, 40:14, 44:8, 52:3, 57:12, 61:11, 86:8, 96:23, 97:1, 104:10
**jobs** [1] - 8:22
**JOHN** [1] - 2:1
**Johnson** [46] - 31:17, 33:3, 33:11, 35:21, 36:14, 36:22, 37:9, 37:25, 38:3, 38:7, 38:15, 38:20, 41:15, 41:19, 42:2, 42:5, 63:15, 63:20, 64:12, 65:15, 65:20, 66:5, 66:21, 67:6, 67:10, 67:24, 68:5, 68:8, 68:17, 70:17, 70:19, 71:4, 72:9, 72:22, 73:1, 73:4, 73:22, 75:24, 76:8, 76:15, 76:19, 77:10, 77:20, 92:21, 92:24, 98:16
**JOHNSON** [1] - 2:2
**Johnson's** [9] - 39:23, 40:4, 71:6, 71:16, 71:20, 71:24, 72:3, 72:6, 73:5
**joint** [2] - 61:5, 61:10
**Jordan** [2] - 41:23, 134:4
**JOSEPH** [1] - 2:2
**JR** [1] - 2:1
**Judge** [3] - 70:12, 82:25, 117:23
**judge** [1] - 56:17
**JUDGE** [1] - 1:11
**judgment** [1] - 110:6

**judicial** [4] - 123:14, 133:1, 151:17, 151:21
**July** [2] - 7:10, 8:19
**jumped** [1] - 6:5
**junior** [6] - 27:23, 93:19, 94:12, 115:8, 115:9, 115:10
**jurisdiction** [1] - 133:10
**jurors** [2] - 4:10, 58:11
**JURY** [1] - 1:10
**jury** [29] - 4:2, 4:12, 6:24, 24:1, 28:21, 73:15, 77:3, 82:6, 82:10, 83:7, 83:14, 85:6, 125:13, 130:7, 130:14, 130:17, 131:15, 132:16, 133:3, 150:10, 150:25, 151:4, 151:15, 151:20, 152:2, 152:14, 152:22, 152:24, 153:2
**Jury** [8] - 4:4, 23:24, 24:2, 82:8, 83:17, 125:15, 132:17, 148:13
**JUSTICE** [1] - 2:10
**justifications** [1] - 55:9

## K

**keep** [2] - 43:8, 117:24
**keeping** [3] - 24:19, 69:11, 70:6
**kept** [1] - 146:9
**KICAK** [2] - 1:17, 94:24
**Kim** [2] - 3:4, 42:18
**KIM** [33] - 17:17, 17:25, 20:17, 20:19, 22:7, 27:13, 28:19, 31:24, 32:3, 32:5, 34:12, 39:3, 41:8, 42:15, 42:17, 44:2, 48:7, 49:21, 49:23, 50:13, 50:18, 50:23, 51:7, 58:13, 60:17, 62:6, 65:8, 75:17, 79:9, 81:2, 81:4, 81:6, 82:4
**kind** [8] - 23:3, 36:22, 52:6, 59:24, 66:2, 69:1, 87:12, 98:9
**King** [1] - 2:6
**kneel** [7] - 142:3, 142:10, 142:18,

142:22, 143:1, 147:3, 147:5
**knowledge** [15] - 59:1, 134:7, 134:8, 134:10, 134:11, 134:12, 134:16, 134:17, 134:20, 135:12, 139:12, 139:13, 140:7, 144:23, 147:8
**known** [4] - 7:2, 40:12, 86:1, 136:3
**knows** [1] - 50:22
**Krieger** [8] - 111:21, 111:23, 112:1, 112:5, 112:12, 113:16, 113:20, 113:23

## L

**labor** [12] - 18:11, 26:5, 26:6, 26:16, 26:19, 27:7, 27:9, 27:18, 27:20, 27:21, 27:22, 27:25
**lack** [4] - 71:16, 71:20, 72:3, 82:22
**lacked** [1] - 137:12
**ladies** [4] - 4:5, 83:18, 132:18, 147:21
**laid** [1] - 19:10
**language** [2] - 59:13, 126:7
**large** [3] - 60:14, 100:19, 100:22
**last** [14] - 4:8, 4:23, 8:14, 39:11, 48:16, 70:15, 82:1, 93:16, 132:4, 140:10, 147:15, 148:16, 148:17, 150:14
**last...if** [1] - 29:2
**lasted** [1] - 97:6
**late** [7] - 44:9, 49:19, 95:9, 95:14, 128:3, 128:17
**law** [8] - 82:19, 110:24, 130:21, 132:12, 132:15, 133:6, 133:8, 148:10
**law-abiding** [1] - 110:24
**laws** [1] - 133:16
**lawyers** [1] - 88:21
**lead** [36] - 21:15, 22:2, 22:3, 23:17, 23:18, 28:20, 37:19, 51:12, 51:15, 51:18, 51:23, 52:4, 52:10, 52:13,

52:16, 52:21, 53:3, 58:3, 58:7, 58:14, 58:19, 76:5, 87:9, 87:21, 95:20, 95:22, 99:23, 100:4, 100:7, 100:23, 103:8, 103:12, 109:13, 112:7, 114:21, 145:17
**leader** [3] - 99:21, 104:5, 109:20
**leaders** [1] - 102:8
**leadership** [6] - 14:5, 21:10, 22:18, 40:11, 41:18, 59:6
**leading** [8] - 27:13, 27:14, 28:19, 34:23, 35:9, 79:9, 79:12, 80:24
**leads** [1] - 19:9
**learn** [3] - 7:15, 30:10, 97:8
**learned** [1] - 33:2
**least** [7] - 8:7, 16:17, 53:13, 96:19, 96:25, 103:10, 147:15
**leave** [6] - 76:25, 87:18, 91:19, 91:21, 91:22, 132:7
**leaving** [10] - 34:23, 60:5, 60:7, 64:14, 66:7, 86:1, 99:19, 114:22, 115:1, 152:23
**left** [22] - 7:21, 8:17, 12:2, 25:5, 33:16, 42:7, 66:11, 66:13, 76:23, 82:1, 86:3, 86:15, 93:10, 95:6, 114:24, 115:5, 116:25, 117:6, 117:8, 118:7, 118:23, 141:8
**left-hand** [1] - 25:5
**legal** [3] - 82:20, 107:6, 133:8
**legally** [1] - 89:19
**length** [2] - 95:18, 103:23
**lengthy** [1] - 95:10
**LEONIE** [1] - 1:11
**less** [2] - 12:23, 132:5
**letter** [9] - 40:19, 69:11, 69:17, 69:18, 70:1, 70:4, 71:19, 72:4, 77:18
**level** [3] - 18:12, 27:23, 27:24
**LEVENSON** [1] - 2:13
**Lieutenant** [2] - 11:25,

41:23
**light** [1] - 19:14
**likely** [1] - 83:8
**likewise** [1] - 89:13
**limit** [2] - 131:16, 131:17
**limited** [1] - 110:6
**limits** [1] - 89:19
**LINDA** [1] - 2:1
**line** [13] - 24:22, 26:13, 29:3, 29:7, 54:24, 65:1, 83:1, 105:15, 116:19, 116:24, 118:4, 118:7
**lines** [3] - 45:18, 65:1, 113:5
**linguist** [1] - 122:13
**link** [2] - 83:16, 129:18
**list** [2] - 34:20, 138:25
**lists** [3] - 26:3, 61:21, 61:24
**litigation** [1] - 45:4
**live** [4] - 6:6, 83:16, 83:19, 127:17
**living** [4] - 9:19, 12:23, 13:2, 13:3
**LLP** [2] - 1:18, 2:2
**local** [3] - 14:9, 22:18, 52:13
**locally** [1] - 62:3
**located** [2] - 10:3, 68:22
**locating** [1] - 48:14
**location** [1] - 79:21
**locations** [1] - 10:7
**logistics** [5] - 10:11, 13:8, 13:9, 46:21, 87:15
**look** [37] - 16:15, 20:14, 21:9, 24:25, 25:24, 28:24, 31:20, 34:6, 36:6, 37:23, 39:1, 39:11, 43:22, 45:18, 46:25, 48:9, 48:16, 50:6, 50:10, 55:8, 59:4, 63:6, 64:19, 67:21, 76:10, 77:25, 94:3, 109:23, 112:14, 116:12, 128:24, 129:9, 129:16, 144:8, 146:10, 151:3
**looked** [3] - 46:24, 145:6, 150:8
**looking** [9] - 54:20, 78:3, 102:12, 128:15, 128:16, 137:20, 144:14, 144:15, 145:10
**looks** [12] - 25:4,

25:18, 26:14, 26:15, 26:17, 26:20, 29:10, 34:17, 35:5, 35:13, 35:14, 37:18
**loud** [15] - 113:11, 141:8, 141:9, 141:10, 141:14, 141:20, 143:15, 144:6, 144:17, 144:24, 145:8, 145:19, 146:5, 146:14
**lunch** [4] - 33:6, 81:3, 82:5, 120:22
**lunches** [1] - 82:6
**lunchtime** [1] - 4:14
**LYNCH** [1] - 2:9

## M

**ma'am** [1] - 113:12
**MAHLER** [1] - 1:14
**MAHLER-HAUG** [1] - 1:14
**main** [1] - 142:7
**Major** [36] - 12:3, 12:24, 36:13, 37:9, 37:18, 37:24, 39:9, 39:18, 40:10, 42:1, 48:7, 67:18, 67:22, 68:10, 70:10, 73:24, 74:2, 74:5, 75:23, 76:14, 77:13, 77:20, 90:23, 91:1, 91:5, 91:9, 91:11, 110:25, 111:2, 123:7, 133:24, 134:1, 135:1, 137:3, 137:7, 137:10
**majority** [2] - 46:20, 46:21
**male** [1] - 93:3
**managed** [1] - 136:23
**Management** [3] - 109:24, 110:1, 110:2
**management** [5] - 7:6, 31:2, 48:13, 50:2, 110:5
**manager** [22] - 9:5, 9:9, 9:10, 9:12, 9:13, 15:3, 15:4, 15:10, 24:19, 43:3, 45:1, 49:2, 51:9, 51:11, 51:25, 108:14, 108:18, 110:23, 136:25, 138:14, 138:15
**managerial** [1] - 44:24
**managers** [3] - 58:3, 62:18, 138:22

**managing** [2] - 46:22, 49:3
**manifested** [2] - 81:22, 81:24
**manila** [1] - 128:20
**manipulated** [2] - 134:13, 134:15
**manner** [1] - 133:16
**manual** [1] - 97:15
**March** [1] - 8:18
**margin** [1] - 28:15
**Marine** [15] - 84:17, 84:18, 84:22, 85:2, 85:7, 85:18, 85:20, 85:22, 86:1, 86:3, 91:22, 96:1, 96:2, 96:6, 96:11
**Marines** [1] - 85:9
**mark** [1] - 87:3
**Mark** [16] - 9:6, 15:1, 15:9, 15:11, 16:6, 34:21, 44:3, 54:19, 62:17, 62:25, 63:12, 78:23, 81:13, 138:23
**marked** [9] - 20:14, 34:6, 36:6, 50:6, 54:11, 60:13, 119:11, 121:8, 145:10
**married** [1] - 15:3
**Martin** [1] - 85:13
**Maryland** [1] - 7:7
**master's** [1] - 7:7
**match** [1] - 136:20
**material** [1] - 26:5
**material/labor** [1] - 28:1
**matter** [4] - 40:9, 82:18, 153:21
**matters** [6] - 8:5, 9:14, 43:14, 43:25, 61:13, 151:21
**MBA** [1] - 8:18
**McCLURE** [2] - 2:2, 150:20
**mean** [16] - 12:20, 13:6, 16:18, 18:11, 21:12, 23:4, 31:14, 40:25, 87:13, 97:24, 104:19, 130:9, 131:10, 132:6, 132:7, 151:25
**meaning** [2] - 86:20, 100:2
**means** [4] - 26:5, 38:18, 43:17, 51:4
**meant** [2] - 21:13, 38:19
**media** [7] - 55:11, 55:16, 80:15, 80:17,

80:19, 148:1, 148:2
**medical** [1] - 11:5
**meet** [2] - 42:21, 98:5
**meeting** [2] - 19:9, 103:17
**meetings** [2] - 101:7, 103:8
**member** [1] - 7:9
**members** [2] - 72:11, 102:24
**members'** [1] - 72:16
**memo** [1] - 151:17
**memorandum** [8] - 36:13, 37:2, 37:16, 38:24, 40:8, 77:13, 123:14, 124:3
**memory** [1] - 32:23
**mentioned** [5] - 35:17, 35:18, 46:20, 47:7, 48:21
**mess** [1] - 33:6
**met** [4] - 16:8, 103:21, 114:22, 137:16
**metal** [3] - 141:8, 141:10, 141:20
**Metallica** [1] - 143:16
**methods** [1] - 94:7
**MFR** [1] - 37:13
**MI** [1] - 121:17
**Michael** [1] - 95:5
**MICHAEL** [2] - 1:16, 1:16
**mid** [3] - 27:23, 95:9, 95:14
**mid-level** [1] - 27:23
**Middle** [1] - 86:21
**middle** [5] - 7:2, 42:19, 112:23, 120:4, 120:5
**might** [6] - 27:8, 27:10, 71:5, 80:5, 80:13, 94:17
**Mike** [1] - 82:12
**Military** [1] - 91:6
**military** [68] - 7:9, 9:4, 9:14, 9:25, 10:16, 11:9, 11:20, 11:24, 12:21, 13:24, 14:5, 14:10, 16:3, 16:11, 16:25, 17:6, 17:22, 18:7, 18:18, 19:9, 20:7, 21:8, 21:14, 22:2, 22:16, 22:18, 23:18, 35:18, 40:11, 41:14, 41:17, 41:18, 43:12, 44:12, 46:9, 50:5, 51:2, 51:21, 52:13, 53:25, 56:23, 61:12, 72:20, 73:8, 73:12, 73:18, 73:19,

84:14, 84:23, 89:14, 90:14, 96:3, 96:12, 97:19, 98:6, 101:24, 102:3, 102:12, 102:18, 102:24, 103:2, 121:20, 139:10, 139:14, 139:22, 142:2, 142:9
**military's** [1] - 74:25
**million** [3] - 28:17, 51:2, 128:24
**mind** [5] - 10:1, 77:5, 77:20, 148:4, 148:9
**mine** [4] - 39:15, 62:24, 65:4, 78:21
**minimum** [1] - 29:22
**minor** [1] - 149:11
**minutes** [8] - 4:23, 15:22, 15:23, 123:8, 130:14, 131:20, 133:20, 152:15
**misconduct** [2] - 127:22, 127:23
**missing** [1] - 35:15
**mission** [5] - 10:17, 20:11, 43:17, 52:12, 87:22
**mission-related** [1] - 52:12
**mistake** [1] - 80:4
**mistreated** [2] - 146:18, 146:24
**mistreatment** [5] - 124:6, 124:9, 140:19, 141:4, 147:10
**mix** [1] - 101:6
**moment** [2] - 67:2, 119:13
**Monahan** [6] - 15:2, 44:3, 136:3, 136:11, 136:12, 138:7
**MONAHAN** [2] - 3:13, 136:8
**Monday** [8] - 4:12, 4:14, 147:23, 148:4, 148:12, 152:8, 152:16, 152:21
**monitoring** [1] - 19:5
**month** [1] - 86:17
**months** [3] - 96:22, 96:25, 99:19
**morning** [14] - 4:3, 4:5, 4:17, 6:22, 6:23, 7:1, 23:21, 133:24, 133:25, 140:17, 148:12, 150:14, 152:16, 153:2
**mortared** [1] - 33:9
**MOS** [2] - 7:24, 84:25

**most** [6] - 15:13, 62:16, 83:8, 96:8, 125:19, 132:15
**mostly** [1] - 146:16
**Mosul** [1] - 10:4
**move** [12] - 6:8, 18:2, 45:20, 50:13, 51:6, 57:4, 89:22, 114:1, 114:6, 117:20, 119:20, 139:7
**moved** [1] - 44:8
**moves** [1] - 123:12
**moving** [5] - 5:5, 18:11, 44:16, 59:16, 94:13
**MP** [1] - 90:21
**MPs** [5] - 122:19, 142:18, 142:22, 147:6, 147:7
**MR** [142] - 4:17, 5:3, 5:9, 5:13, 5:14, 5:20, 5:25, 6:5, 6:7, 6:11, 6:13, 17:25, 20:17, 20:19, 22:7, 27:13, 28:19, 31:24, 32:3, 32:5, 34:12, 36:8, 39:3, 41:8, 42:15, 42:17, 44:2, 48:7, 49:21, 49:23, 50:13, 50:18, 50:23, 51:7, 58:13, 60:17, 62:6, 65:8, 75:17, 79:9, 81:2, 81:4, 81:6, 82:4, 82:12, 83:13, 83:16, 83:23, 84:4, 89:21, 89:25, 90:3, 92:19, 93:22, 94:22, 94:24, 95:2, 108:11, 109:22, 112:15, 112:17, 112:18, 112:22, 112:25, 113:3, 113:6, 113:8, 114:1, 114:4, 116:15, 116:20, 116:23, 117:20, 117:24, 119:10, 119:20, 119:23, 120:12, 120:14, 120:19, 121:4, 121:7, 122:3, 122:10, 123:4, 123:6, 123:12, 123:17, 123:21, 124:1, 124:3, 125:12, 125:19, 125:22, 126:22, 127:1, 128:4, 128:9, 128:15, 128:18, 129:2, 129:4, 129:6, 129:8, 129:12,

129:14, 129:20, 129:23, 130:5, 131:16, 131:23, 132:1, 132:5, 132:10, 132:14, 132:24, 133:5, 136:2, 136:6, 136:15, 136:18, 139:1, 140:10, 143:10, 144:13, 145:25, 147:15, 147:19, 149:3, 149:7, 149:10, 150:2, 150:8, 150:13, 150:19, 150:20, 151:1, 151:15, 151:24, 152:5, 153:6, 153:7
**MS** [31] - 6:21, 18:2, 20:18, 23:23, 24:4, 28:8, 28:23, 31:22, 34:8, 35:2, 35:6, 36:9, 41:11, 42:12, 43:20, 48:5, 49:16, 50:15, 50:21, 54:14, 56:17, 60:20, 65:10, 70:12, 74:14, 75:18, 75:21, 80:25, 149:15, 149:19, 150:4
**Mudd** [14] - 9:5, 10:24, 14:25, 15:8, 15:15, 16:7, 16:8, 44:3, 46:12, 54:18, 62:18, 63:1, 81:13, 138:23
**MUHAMMAD** [1] - 1:14
**multiple** [2] - 45:24, 47:11
**music** [11] - 141:8, 141:10, 141:20, 143:16, 144:6, 144:17, 144:25, 145:8, 145:19, 146:5, 146:14

**N**

**NAJIM** [1] - 1:3
**naked** [2] - 92:2, 122:6
**nakedness** [1] - 131:9
**name** [16] - 7:1, 7:3, 9:5, 42:18, 42:19, 84:6, 95:5, 111:12, 111:21, 114:7, 119:13, 126:4, 136:10, 136:12, 139:5
**named** [1] - 93:6
**names** [3] - 39:14,

55:3, 56:2
**national** [1] - 133:16
**NCOIC** [3] - 17:11, 58:17, 134:3
**near** [1] - 143:6
**necessarily** [2] - 102:8, 105:8
**necessary** [4] - 16:3, 50:2, 71:8, 129:20
**need** [10] - 56:22, 56:24, 62:21, 78:18, 83:24, 131:11, 151:2, 152:15, 152:25, 153:5
**needed** [5] - 9:2, 56:25, 80:1, 104:2, 137:9
**needs** [9] - 62:24, 63:14, 63:19, 64:6, 64:9, 64:15, 65:4, 78:22, 150:24
**negotiated** [2] - 27:25, 28:4
**Nelson** [20] - 31:18, 32:12, 32:24, 34:23, 63:25, 64:3, 64:6, 64:10, 64:16, 65:5, 66:7, 79:4, 79:13, 79:17, 79:20, 80:2, 81:8, 81:13, 81:18, 82:1
**Nelson's** [5] - 35:9, 60:2, 65:15, 65:20, 65:23
**net** [1] - 29:15
**never** [10] - 30:15, 45:25, 74:17, 74:19, 74:21, 106:25, 111:7, 127:4, 127:22, 129:24
**nevertheless** [1] - 29:19
**New** [4] - 1:19, 1:22
**new** [3] - 12:3, 51:6, 59:16
**news** [1] - 4:22
**next** [9] - 22:19, 25:13, 26:11, 33:20, 68:13, 70:14, 82:21, 116:24, 131:20
**nice** [4] - 4:6, 42:21, 148:3, 153:3
**night** [8] - 4:8, 4:23, 53:20, 101:4, 132:4, 148:16, 148:18, 150:14
**NINA** [1] - 2:5
**nobody** [1] - 69:19
**nomenclature** [2] - 83:12, 98:3

**non** - 59:25, 60:9
**non-employees** [1] - 59:25
**noncommissioned** [2] - 17:11, 17:15
**none** [1] - 76:4
**normal** [1] - 127:16
**normally** [3] - 96:24, 101:9
**Northrop** [20] - 6:6, 6:24, 7:1, 7:2, 7:4, 24:5, 34:16, 43:18, 45:5, 45:14, 50:8, 50:16, 50:23, 59:16, 63:7, 65:17, 75:22, 82:14, 138:10, 138:12
**NORTHROP** [2] - 3:3, 6:18
**Northrop's** [1] - 83:1
**Norton** [1] - 54:19
**not-to-exceed** [2] - 25:17, 26:24
**note** [2] - 37:13, 78:17
**Note** [1] - 63:4
**notebook** [2] - 20:15, 112:14
**notes** [2] - 149:11, 149:18
**NOTES** [1] - 2:22
**nothing** [9] - 45:19, 64:13, 82:4, 115:8, 140:3, 140:5, 151:20, 153:6, 153:7
**notice** [7] - 123:14, 131:21, 132:3, 133:1, 151:17, 151:21
**noticed** [1] - 149:4
**notified** [2] - 31:8, 114:22
**notion** [1] - 82:17
**November** [7] - 8:25, 12:10, 12:18, 42:22, 44:9, 50:11, 91:23
**nowhere** [1] - 118:23
**nude** [2] - 134:5, 135:24
**number** [14] - 14:15, 21:21, 25:14, 25:16, 26:10, 26:24, 41:17, 92:13, 96:19, 117:25, 131:7, 144:21, 149:6, 150:23
**Number** [21] - 5:15, 6:15, 20:21, 21:23, 26:14, 26:17, 26:20, 28:12, 28:13, 32:9, 34:14, 39:5, 54:16,

60:22, 76:10, 90:1, 120:1, 144:12, 144:20, 145:11, 145:21
**numbers** [4] - 25:10, 26:14, 45:14, 45:16
**numerous** [1] - 9:25
**NW** [2] - 2:3, 2:11

**O**

**o'clock** [4] - 82:7, 147:24, 152:18, 152:20
**O'Connor** [15] - 3:6, 4:16, 120:18, 127:10, 130:2, 131:22, 136:5, 136:17, 144:8, 144:13, 145:2, 146:2, 146:3, 149:23, 150:5
**O'CONNOR** [50] - 2:1, 4:17, 5:3, 5:9, 5:14, 5:20, 5:25, 6:5, 6:11, 36:8, 83:16, 83:23, 84:4, 89:21, 90:3, 92:19, 93:22, 94:22, 112:17, 112:25, 114:4, 116:20, 119:23, 120:14, 120:19, 121:4, 121:7, 122:3, 122:10, 123:4, 123:6, 123:12, 124:1, 124:3, 125:19, 125:22, 126:22, 128:9, 129:8, 130:5, 132:5, 136:6, 136:18, 147:19, 149:10, 150:2, 150:8, 150:19, 151:1, 153:7
**oath** [5] - 45:7, 115:24, 116:2, 117:5, 118:23
**Oath** [2] - 6:17, 83:25
**object** [2] - 123:17, 125:19
**objection** [27] - 5:12, 5:13, 6:10, 17:25, 20:16, 20:19, 22:7, 28:19, 32:1, 34:11, 34:12, 39:3, 41:8, 41:9, 48:5, 49:16, 49:18, 50:20, 54:13, 54:14, 60:19, 60:20, 89:24, 89:25, 114:3, 114:5, 119:22
**objectives** [1] - 19:10

**obligated** [1] - 112:8
**obligations** [1] - 22:5
**observed** [3] - 22:5, 22:14, 103:14
**obvious** [1] - 28:21
**obviously** [2] - 10:1, 130:10
**occasions** [1] - 90:17
**occupational** [2] - 84:23, 121:20
**occur** [3] - 18:21, 91:4, 141:20
**occurred** [4] - 85:16, 92:7, 121:24, 141:24
**occurring** [1] - 107:10
**October** [5] - 84:11, 92:1, 93:3, 99:8, 114:11
**ODC** [3] - 26:17, 27:3
**OF** [8] - 1:1, 1:10, 2:10, 2:14, 2:22, 123:3, 153:17, 153:25
**offer** [1] - 79:20
**offered** [6] - 9:6, 9:7, 9:8, 10:23, 41:11, 79:5
**OFFICE** [1] - 2:14
**office** [3] - 86:20, 87:14, 99:4
**Office** [1] - 7:19
**officer** [11] - 9:15, 17:11, 17:12, 17:15, 17:16, 19:12, 24:10, 25:23, 134:3, 139:16, 139:18
**officer's** [1] - 11:19
**officers** [3] - 72:21, 88:2, 102:10
**offices** [3] - 68:1, 76:21, 77:12
**OFFICIAL** [2] - 2:17, 153:17
**official** [3] - 12:25, 70:3, 70:7
**often** [3] - 15:15, 15:18, 15:25
**Ohio** [1] - 115:15
**OIC** [2] - 17:12, 58:17
**old** [2] - 98:16, 121:8
**older** [1] - 145:4
**ON** [1] - 1:24
**on-boarding** [1] - 10:21
**on-the-job** [2] - 96:23, 97:1
**once** [11] - 13:23, 16:7, 18:23, 24:22, 79:24, 117:10, 117:13, 118:13,

118:16, 138:13, 149:21

**one** [68] - 4:22, 9:4, 12:12, 12:13, 12:15, 15:21, 23:8, 31:24, 32:14, 34:8, 34:20, 35:1, 35:3, 35:7, 36:9, 41:23, 49:23, 55:9, 60:17, 61:16, 64:10, 66:23, 71:11, 71:18, 71:24, 72:5, 74:24, 81:19, 83:21, 86:16, 86:17, 91:22, 91:24, 93:24, 96:22, 97:15, 100:25, 106:13, 114:25, 120:24, 123:20, 126:2, 126:17, 128:5, 128:11, 128:15, 128:23, 128:25, 130:7, 130:9, 130:17, 131:7, 138:15, 140:8, 140:14, 141:7, 142:16, 143:4, 143:8, 144:11, 150:11, 150:13, 151:18, 152:25

**one-day** [1] - 91:24

**one-year** [1] - 12:13

**ones** [5] - 10:1, 16:5, 45:17, 58:3, 131:7

**ongoing** [1] - 62:22

**onsite** [10] - 14:5, 19:8, 51:8, 51:9, 51:11, 51:25, 52:4, 99:21, 104:5, 109:20

**open** [16] - 5:1, 5:18, 5:23, 6:3, 48:3, 121:2, 121:12, 123:10, 133:23, 136:9, 139:4, 140:16, 146:8, 146:9, 147:3, 147:5

**opening** [2] - 128:2, 152:19

**operate** [1] - 110:5

**operating** [4] - 9:19, 14:22, 33:22, 33:24

**operation** [2] - 117:11, 118:14

**operational** [25] - 10:13, 10:16, 12:20, 16:24, 17:5, 18:6, 50:5, 51:21, 51:24, 52:1, 52:3, 52:12, 52:17, 52:19, 52:22, 53:11, 53:24, 59:14, 74:25, 75:4, 82:16,

82:18, 82:22, 107:24

**operationally** [5] - 43:10, 43:12, 43:15, 43:16, 43:17

**operations** [8] - 12:19, 15:1, 15:12, 16:15, 17:8, 61:14, 63:18, 74:6

**operators** [1] - 4:21

**opinion** [9] - 35:23, 36:5, 40:1, 40:19, 41:6, 41:11, 62:24, 65:4, 78:22

**opponent** [1] - 32:6

**opportunity** [3] - 86:22, 104:23, 127:5

**oppose** [1] - 37:10

**or...l** [1] - 9:18

**oranges** [1] - 128:17

**Order** [2] - 133:7, 133:11

**order** [9] - 25:4, 25:8, 81:21, 96:5, 96:11, 97:20, 103:23, 104:2, 148:14

**ordered** [1] - 70:17

**ordinary** [1] - 57:20

**origin** [1] - 38:7

**original** [1] - 40:1

**originally** [2] - 33:22, 100:3

**outset** [1] - 132:24

**outside** [3] - 24:7, 71:9, 71:13

**outta** [1] - 117:15

**overruled** [2] - 27:15, 28:21

**overview** [1] - 48:10

**own** [6] - 59:1, 73:5, 77:20, 82:16, 93:10, 139:23, 140:24, 141:16

---

# P

**p.m** [8] - 82:8, 82:9, 83:17, 125:15, 125:16, 132:17, 148:13, 153:9

**paced** [1] - 58:12

**pack** [1] - 33:15

**page** [65] - 5:5, 5:11, 5:15, 25:24, 26:2, 28:25, 35:4, 37:15, 37:23, 37:25, 39:11, 39:24, 45:13, 45:15, 45:16, 45:18, 47:1, 47:4, 50:10, 60:14, 60:15, 60:16, 60:22, 61:19, 61:23, 61:24,

62:2, 62:12, 64:22, 67:17, 67:21, 68:24, 69:13, 70:14, 70:15, 76:11, 76:12, 76:14, 77:13, 78:13, 78:14, 78:15, 108:9, 116:12, 116:18, 116:24, 117:19, 117:24, 117:25, 120:4, 120:5, 122:3, 122:10, 128:7, 128:8, 144:20, 144:21, 148:25, 149:1, 150:4

**PAGE** [3] - 1:25, 3:17, 3:22

**pages** [11] - 2:20, 34:24, 35:2, 45:14, 117:25, 126:14, 145:13, 149:5, 149:9, 149:23, 150:1

**paid** [4] - 27:12, 28:5, 44:13, 46:18

**panel** [1] - 96:18

**papers** [2] - 47:23, 87:18

**Pappas** [3] - 5:4, 5:21, 134:3

**PAPPAS** [4] - 3:9, 5:17, 5:23, 6:3

**Pappas's** [1] - 6:9

**par** [1] - 13:4

**paragraph** [10] - 29:8, 29:10, 55:2, 55:9, 63:2, 68:24, 70:15, 93:24, 94:5, 94:13

**Paragraph** [8] - 21:9, 21:23, 37:8, 48:9, 58:2, 59:5, 59:13, 67:4

**paragraphs** [1] - 132:25

**parameter** [1] - 23:4

**parameters** [2] - 89:19, 96:14

**parent** [1] - 133:10, 133:14, 133:17

**part** [28] - 14:17, 21:2, 27:5, 31:13, 40:25, 45:24, 57:12, 57:13, 60:7, 60:10, 62:8, 62:16, 66:10, 72:15, 76:23, 77:1, 77:3, 81:15, 91:12, 93:16, 109:13, 110:22, 110:24, 118:24, 119:7, 130:25, 142:7, 143:12

**partially** [1] - 66:10

**participated** [1] -

40:18

**particular** [12] - 23:9, 23:19, 27:9, 27:21, 58:23, 70:20, 83:2, 94:11, 107:17, 115:8, 127:21, 133:19

**particularly** [2] - 124:9, 131:6

**parts** [1] - 67:20

**party** [3] - 7:17, 32:5, 133:12

**past** [1] - 152:24

**PATTERSON** [1] - 1:18

**pay** [5] - 21:14, 51:4, 52:6, 58:4, 87:17

**payable** [1] - 124:25

**payment** [2] - 24:24, 125:6

**payroll** [1] - 9:17

**PC** [1] - 2:6

**PDF** [1] - 117:24

**peer** [1] - 104:18

**peers** [1] - 88:20

**pending** [3] - 36:21, 65:8, 65:11

**people** [15] - 10:4, 10:5, 14:13, 16:11, 16:21, 16:23, 34:20, 48:14, 55:3, 56:3, 58:22, 65:13, 74:4, 130:24, 143:4

**people's** [1] - 56:6

**per** [4] - 14:10, 27:20, 118:1, 152:25

**perceived** [1] - 38:6

**percent** [1] - 87:10

**perform** [3] - 20:11, 20:12, 50:2

**performance** [13] - 17:2, 17:18, 19:9, 19:10, 21:18, 25:18, 58:4, 58:8, 58:16, 58:20, 58:22, 58:24, 59:2

**performed** [3] - 10:6, 24:16, 87:24

**performing** [1] - 9:24

**perhaps** [3] - 23:2, 71:9, 143:16

**period** [5] - 12:13, 25:18, 42:6, 95:13, 96:24

**permanent** [2] - 7:17, 122:5

**permission** [1] - 25:22

**permit** [3] - 7:13, 131:11, 131:13

**permitted** [7] - 24:11,

25:20, 102:21, 102:24, 103:2, 103:5, 106:6

**person** [24] - 18:11, 22:1, 22:6, 22:19, 27:23, 27:24, 39:16, 40:23, 41:3, 41:4, 43:22, 58:23, 71:3, 80:1, 80:23, 83:20, 130:3, 137:13, 137:16, 137:18, 137:21, 146:4, 146:13

**persona** [1] - 60:9

**personal** [13] - 31:14, 55:4, 55:5, 55:17, 55:22, 56:3, 56:10, 59:1, 80:9, 124:5, 124:8, 133:12, 135:11

**personally** [3] - 30:15, 55:25, 65:23

**personnel** [44] - 9:16, 13:6, 14:1, 14:3, 16:3, 18:19, 18:20, 21:11, 22:16, 41:15, 41:17, 46:14, 52:5, 67:25, 76:21, 77:11, 87:15, 89:14, 91:14, 92:25, 94:12, 94:15, 94:16, 94:20, 101:20, 101:25, 102:4, 102:13, 102:15, 102:18, 102:21, 103:2, 103:5, 103:13, 104:3, 111:2, 111:5, 115:10, 133:8, 133:9, 133:14, 135:5, 135:6

**persons** [1] - 62:4

**perspective** [4] - 27:19, 43:7, 45:3, 52:11

**pg** [2] - 3:19, 3:23

**photo** [7] - 69:14, 69:20, 70:18, 70:22, 71:1, 71:5

**photograph** [14] - 38:3, 38:16, 39:24, 40:2, 41:2, 69:9, 69:19, 71:9, 71:10, 71:13, 71:14, 73:2, 77:9

**photographed** [1] - 72:18

**photographers** [1] - 4:7

**photographs** [6] - 38:4, 40:13, 72:8,

74:10, 144:9, 145:6

**photos** [5] - 40:5, 73:16, 92:6, 145:2, 146:11

**physically** [3] - 11:6, 83:20, 134:23

**picture** [6] - 38:8, 38:10, 38:12, 92:21, 92:24, 144:14

**pictured** [2] - 38:15, 92:17

**pictures** [10] - 75:23, 75:25, 76:4, 76:7, 92:4, 92:5, 92:7, 92:13, 92:25, 144:9

**pitch** [1] - 120:24

**place** [7] - 56:6, 74:8, 88:4, 115:15, 130:20, 135:5, 142:24

**placed** [1] - 115:24

**places** [1] - 90:9

**placing** [1] - 135:6

**PLAINTIFF** [8] - 3:17, 32:9, 34:14, 39:5, 54:16, 60:22, 90:1, 120:1

**plaintiff** [6] - 122:12, 122:16, 125:21, 146:6, 146:23, 151:22

**Plaintiff's** [28] - 25:1, 31:21, 32:11, 32:22, 34:7, 34:16, 36:7, 39:2, 46:25, 47:3, 50:7, 54:12, 57:9, 60:14, 62:11, 67:1, 68:12, 69:12, 76:10, 77:25, 78:13, 79:15, 80:8, 81:7, 89:21, 89:23, 92:19, 93:22

**plaintiffs** [14] - 1:5, 82:13, 126:17, 128:11, 130:8, 130:9, 130:14, 130:23, 132:20, 133:18, 136:2, 139:1, 140:11

**PLAINTIFFS** [4] - 1:14, 42:16, 81:5, 95:1

**plaintiffs'** [2] - 5:21, 150:22

**plan** [16] - 75:14, 82:23, 88:13, 88:22, 104:21, 104:22, 105:2, 105:4, 105:7, 105:9, 105:13, 106:2, 106:5, 106:10, 129:1, 134:4

**planning** [1] - 105:1

**plans** [12] - 74:17, 74:19, 74:22, 75:3, 88:3, 88:5, 88:6, 88:10, 88:18, 88:24, 101:23, 104:24

**play** [2] - 4:19, 5:20

**PLAYED** [1] - 3:8

**played** [9] - 4:20, 5:1, 5:18, 5:23, 6:3, 121:1, 123:10, 126:21, 143:16

**playing** [2] - 132:21, 141:8

**plus** [1] - 95:8

**point** [29] - 8:16, 9:3, 9:13, 13:24, 30:1, 43:10, 44:24, 55:20, 56:1, 61:8, 71:24, 72:20, 85:9, 86:11, 86:16, 91:22, 95:14, 96:13, 97:1, 97:4, 116:21, 119:1, 126:13, 126:14, 128:24, 137:11, 142:3, 147:21, 148:8

**pointed** [1] - 138:11

**police** [2] - 142:2, 142:9

**policy** [5] - 22:10, 22:12, 59:18, 66:15, 66:17

**Policy** [2] - 110:1, 110:2

**ponytail** [1] - 93:4

**portion** [6] - 62:21, 78:17, 100:4, 110:4, 149:21, 151:7

**portions** [1] - 128:13

**Porvaznik** [21] - 31:16, 32:19, 34:17, 34:22, 35:8, 51:14, 53:4, 53:17, 53:18, 53:23, 74:23, 75:2, 83:23, 84:5, 84:7, 84:8, 90:4, 92:22, 93:25, 95:3, 138:13

**PORVAZNIK** [2] - 3:5, 84:1

**Porvaznik's** [2] - 53:14, 60:10

**position** [47] - 10:23, 11:20, 11:21, 11:24, 18:5, 27:22, 29:11, 38:6, 38:9, 40:23, 41:1, 41:3, 41:5, 41:7, 42:1, 43:6, 43:13, 43:19, 44:2, 51:17, 51:23, 51:24, 66:8, 70:5, 70:17,

70:22, 70:25, 71:1, 71:2, 71:5, 71:8, 71:12, 71:15, 72:15, 72:19, 73:5, 74:5, 79:5, 99:21, 99:24, 100:7, 111:18, 136:23, 137:20, 138:24, 139:7

**positions** [8] - 18:6, 24:8, 24:9, 41:18, 45:23, 52:8, 94:16

**positive** [1] - 86:23

**possessed** [2] - 52:9, 57:24

**possession** [1] - 69:2

**possible** [5] - 54:10, 80:4, 81:25, 94:14, 152:10

**possibly** [1] - 107:6, 151:10

**posted** [1] - 90:8

**postponed** [2] - 117:13, 118:16

**posture** [1] - 130:10

**practice** [2] - 70:21, 97:17

**precious** [1] - 130:14

**predominantly** [1] - 21:6

**preferred** [1] - 100:1

**PREMIER** [1] - 1:7

**Premier** [1] - 86:11

**prepare** [1] - 150:11

**prepared** [3] - 38:23, 39:16, 150:13

**preponderance** [1] - 151:13

**prerecorded** [1] - 83:22

**present** [2] - 115:18, 130:5

**presenting** [2] - 4:18, 123:8

**presents** [2] - 5:3, 106:1

**president** [4] - 15:11, 37:21, 39:15, 68:20

**pressed** [1] - 143:12

**pressure** [3] - 140:22, 140:23, 141:3

**pretty** [8] - 15:20, 50:17, 50:21, 102:12, 103:10, 109:6, 109:9, 116:1

**prevent** [1] - 83:4

**prevents** [1] - 151:21

**previous** [3] - 18:16, 99:2, 100:6

**previously** [1] - 136:12

**price** [2] - 27:20, 27:25

**primarily** [6] - 9:15, 14:4, 87:9, 101:1, 101:4, 101:6

**primary** [4] - 9:3, 9:13, 13:23, 16:11

**prison** [36] - 17:13, 76:1, 84:8, 87:2, 87:5, 87:8, 90:21, 91:7, 91:19, 92:2, 92:14, 93:2, 95:6, 95:15, 95:23, 99:6, 99:12, 100:9, 100:18, 101:19, 109:11, 109:20, 110:14, 111:16, 111:21, 111:24, 114:10, 114:20, 115:5, 121:14, 121:16, 121:18, 121:21, 121:24, 122:4, 124:10

**prisoners** [2] - 85:23, 94:7

**privy** [1] - 70:18

**problem** [5] - 31:12, 118:20, 130:19, 150:2, 151:23

**problematic** [3] - 47:21, 48:4, 83:12

**problems** [5] - 4:7, 4:8, 9:18, 117:9, 118:10

**procedures** [2] - 16:13, 70:6

**proceed** [2] - 105:17, 121:9

**proceeded** [1] - 137:21

**proceedings** [1] - 153:20

**PROCEEDINGS** [1] - 1:10

**process** [15] - 26:8, 27:6, 47:7, 47:10, 47:17, 48:1, 48:3, 67:6, 96:7, 96:9, 133:9, 139:8, 139:10, 140:6, 140:7

**processing** [3] - 21:3, 57:14, 124:4

**professional** [1] - 21:6

**profit** [4] - 28:6, 28:10, 28:15, 28:17

**program** [8] - 15:3, 15:4, 24:19, 48:11, 62:18, 96:21, 96:22, 138:22

**PROGRAMS** [1] - 2:11

**prohibited** [2] - 24:7, 38:5

**promise** [1] - 151:16

**promote** [1] - 52:15

**promoted** [8] - 18:4, 18:11, 51:17, 52:17, 52:21, 53:5, 90:15, 99:20

**promoting** [1] - 139:11

**promotion** [8] - 18:7, 18:14, 52:9, 53:1, 53:8, 53:11, 53:14

**promotions** [3] - 51:4, 51:21, 52:12

**proof** [2] - 27:4, 83:9

**proper** [2] - 9:18, 124:19

**properly** [3] - 18:13, 83:8

**property** [1] - 133:14

**propose** [2] - 88:18, 88:25

**proposed** [8] - 18:24, 27:20, 55:3, 55:9, 56:15, 88:12, 128:9, 152:9

**proposes** [1] - 106:2

**Provaznik's** [1] - 53:15

**proven** [1] - 66:19

**provide** [17] - 12:25, 14:21, 47:23, 48:10, 48:17, 52:4, 62:8, 77:14, 90:25, 91:13, 91:18, 104:1, 104:19, 104:23, 117:5, 134:22, 139:24

**provided** [17] - 11:9, 13:25, 16:20, 39:17, 45:9, 49:9, 50:1, 56:8, 73:3, 77:16, 114:14, 119:6, 125:3, 133:12, 135:2, 135:14, 135:17

**provides** [1] - 48:10

**providing** [4] - 46:3, 55:3, 111:9, 134:3

**proving** [1] - 151:12

**provision** [1] - 59:5

**Provisional** [3] - 133:5, 133:7, 133:11

**pseudonymous** [1] - 129:23

**PTG** [6] - 86:13, 86:15, 86:16, 86:17, 86:19

**PTX** [32] - 108:9, 109:22, 112:14,

114:2, 119:11, 119:21, 148:21, 148:22, 148:23, 148:24, 148:25, 149:1, 149:2, 149:4
**public** [1] - 80:13
**publish** [1] - 124:1
**publishing** [1] - 113:2
**pull** [3] - 24:20, 89:21, 126:9
**purely** [1] - 21:19
**purpose** [2] - 52:22
**purposes** [2] - 52:11, 52:16
**pursuant** [3] - 73:17, 75:14, 133:6
**purview** [1] - 107:19
**put** [22] - 23:9, 28:15, 72:4, 80:13, 90:3, 92:19, 93:22, 94:16, 112:15, 123:18, 123:19, 126:15, 126:18, 127:2, 127:9, 127:14, 130:25, 134:18, 147:16, 148:4, 151:19, 152:2
**putting** [4] - 96:17, 123:18, 140:22, 141:3

## Q

**QCed** [1] - 150:17
**qualifications** [3] - 103:24, 137:13, 137:17
**qualified** [2] - 135:2, 137:19
**qualifying** [1] - 59:13
**quality** [2] - 103:13, 110:22
**quarters** [1] - 9:19
**questioned** [2] - 119:9, 141:23
**questioning** [4] - 82:14, 83:2, 126:11, 152:2
**questionnaire** [2] - 119:7, 119:8
**questions** [21] - 42:12, 58:10, 58:11, 75:17, 78:5, 80:7, 80:25, 81:4, 94:22, 115:21, 115:25, 116:8, 116:9, 119:17, 119:18, 120:12, 122:15, 127:19, 132:14, 142:5, 145:25

**quickly** [3] - 70:10, 152:10, 152:11
**quiet** [1] - 64:14
**quietly** [10] - 62:24, 63:14, 63:20, 64:6, 64:10, 64:16, 65:4, 78:6, 78:22, 80:1
**quit** [1] - 93:12
**quite** [2] - 69:1, 100:22
**quote** [3] - 33:11, 70:5, 78:20

## R

**R&R** [2] - 95:10, 99:20
**raise** [1] - 58:4
**raising** [2] - 83:4, 127:10
**rank** [2] - 86:6, 121:18
**ranking** [1] - 95:22
**rather** [1] - 132:12
**RAYMOND** [2] - 3:3, 6:18
**Raymond** [1] - 7:2
**reaction** [1] - 72:7
**READ** [5] - 3:12, 123:3, 136:1, 140:9, 147:14
**read** [41] - 21:4, 29:3, 39:19, 77:3, 77:5, 108:5, 108:8, 109:5, 109:8, 112:20, 112:21, 113:2, 113:7, 113:9, 113:11, 113:14, 118:2, 118:3, 118:21, 120:23, 121:4, 121:12, 125:20, 128:14, 132:10, 132:11, 132:12, 132:25, 133:2, 133:22, 136:8, 136:16, 138:18, 139:4, 140:16, 144:21, 145:16, 148:17, 148:19, 150:7
**read-in** [1] - 121:4
**READ-IN** [4] - 123:3, 136:1, 140:9, 147:14
**read-ins** [1] - 125:20
**reading** [9] - 35:14, 58:2, 58:9, 58:10, 63:2, 65:1, 113:12, 132:22, 145:13
**reads** [4] - 62:3, 69:18, 70:16, 83:9
**ready** [1] - 150:17
**realized** [2] - 117:14,

118:17
**really** [5] - 126:14, 131:6, 134:14, 137:22, 142:7
**reason** [7] - 12:13, 38:8, 66:7, 66:10, 80:12, 115:4, 152:1
**reasons** [7] - 50:4, 52:17, 60:5, 60:7, 114:25, 117:5, 130:17
**Rebecca** [1] - 153:19
**REBECCA** [2] - 2:13, 2:17
**rebuffing** [1] - 72:3
**rebut** [4] - 125:21, 127:5, 131:3, 131:13
**rebuts** [1] - 126:18
**Rebuttal** [1] - 128:20
**rebuttal** [23] - 125:11, 125:18, 125:23, 125:24, 126:6, 126:16, 127:12, 127:13, 127:20, 127:24, 128:1, 128:14, 129:1, 129:10, 129:11, 129:17, 129:18, 131:3, 131:11, 131:17, 132:4, 132:20, 132:25
**rebutting** [1] - 126:12
**receive** [6] - 11:7, 16:6, 19:8, 19:15, 44:15, 98:9
**received** [5] - 109:8, 138:9, 138:18, 138:20, 149:21
**recess** [3] - 23:22, 125:14, 153:8
**Recess** [3] - 23:25, 82:9, 125:16
**recognize** [4] - 36:10, 37:16, 39:8, 145:6
**recollect** [2] - 63:16, 98:10
**recollection** [8] - 32:20, 34:17, 63:20, 70:19, 112:19, 113:15, 113:17, 144:16
**recommendation** [2] - 124:20, 125:6
**recommendations** [2] - 47:24, 58:4
**recommended** [5] - 9:5, 18:7, 52:13, 53:4, 99:24
**record** [14] - 36:13, 70:12, 80:13, 84:6,

121:12, 133:23, 136:9, 136:10, 139:4, 139:5, 140:16, 148:19, 153:9, 153:20
**RECORD** [1] - 3:12
**recorded** [1] - 120:20
**RECROSS** [1] - 3:2
**rECROSS** [1] - 81:5
**rECROSS-EXAMINATION** [1] - 81:5
**recruit** [1] - 139:25
**recruiting** [2] - 139:23, 140:3
**red** [1] - 128:13
**REDIRECT** [2] - 3:2, 75:20
**redirect** [4] - 6:1, 6:2, 120:13, 128:10
**reduced** [1] - 120:22
**refer** [4] - 45:11, 45:12, 49:22, 49:24
**reference** [6] - 47:4, 64:9, 65:2, 65:5, 94:6, 139:21
**referenced** [4] - 63:14, 63:19, 64:5, 64:15
**references** [1] - 135:17
**referred** [5] - 51:11, 57:5, 61:16, 64:18, 76:11
**referring** [5] - 45:16, 60:17, 65:16, 69:8, 80:2
**reflect** [2] - 32:23, 128:18
**refresh** [2] - 112:19, 113:15
**regard** [1] - 110:12
**regarding** [16] - 21:18, 36:14, 52:10, 54:6, 54:25, 55:2, 55:14, 73:21, 74:25, 75:5, 82:16, 94:6, 97:13, 108:2, 122:19, 124:20
**regards** [3] - 101:22, 107:5, 107:7
**Regulation** [2] - 26:4, 48:23
**regulations** [8] - 48:18, 48:24, 49:4, 49:5, 49:8, 49:14, 49:25, 50:24
**reimbursable** [2] - 28:13, 28:16
**reimbursed** [1] - 28:14
**reject** [1] - 105:4

**rejected** [3] - 77:21, 105:7, 105:12
**relate** [1] - 37:8
**related** [7] - 14:3, 45:4, 52:12, 53:24, 54:21, 59:10, 61:12
**relates** [2] - 91:7, 150:15
**relatively** [2] - 43:18, 69:21
**relax** [1] - 148:4
**relaxed** [2] - 69:21, 69:22
**relay** [2] - 19:11, 32:20
**release** [2] - 55:24, 127:18
**released** [2] - 55:19, 80:15
**releasing** [1] - 80:8
**relevant** [2] - 130:2, 131:3
**relied** [1] - 108:14
**relitigate** [1] - 151:16
**relocated** [1] - 33:21
**remain** [1] - 122:5
**remember** [30] - 30:20, 32:18, 33:4, 40:3, 41:22, 41:24, 42:20, 65:6, 65:22, 71:15, 74:2, 80:21, 93:8, 93:12, 96:19, 97:7, 103:1, 114:12, 115:11, 115:13, 115:14, 115:16, 119:1, 119:4, 119:5, 119:8, 122:11, 122:12, 142:8, 143:20
**removed** [12] - 22:22, 23:1, 23:2, 23:6, 23:8, 23:11, 36:17, 67:14, 67:24, 76:19, 77:10, 77:21
**removing** [1] - 42:1
**renovated** [1] - 13:2
**repeat** [4] - 22:11, 56:22, 64:8, 68:6
**rephrase** [1] - 139:17
**replacement** [1] - 11:2
**report** [27] - 14:24, 17:17, 22:1, 48:7, 53:21, 53:22, 53:25, 60:24, 67:25, 76:20, 77:11, 78:7, 78:9, 79:1, 79:25, 81:12, 81:18, 91:16, 97:11, 101:23, 107:13, 108:3, 108:5, 108:7, 112:9, 124:16, 124:22

reported [21] - 14:25, 44:3, 55:15, 64:3, 67:25, 76:20, 77:10, 81:23, 89:8, 89:13, 102:6, 110:20, 112:1, 112:5, 112:11, 112:24, 113:4, 113:15, 113:18, 113:23, 114:20

reporter [2] - 115:18, 115:21

REPORTER [3] - 2:17, 153:17, 153:25

reporting [3] - 22:5, 22:15, 112:8

reports [9] - 8:5, 8:8, 19:8, 62:14, 62:17, 64:11, 138:7, 138:20

represent [2] - 25:16, 26:10

representative [3] - 9:15, 11:19, 44:23

represented [3] - 10:11, 27:24, 59:23

represents [1] - 27:21

reprimanded [1] - 121:23

repurposed [1] - 125:24

repurposing [1] - 126:5

request [27] - 22:22, 23:5, 23:8, 23:11, 23:13, 23:16, 36:17, 36:23, 54:6, 55:2, 55:5, 55:23, 56:3, 56:24, 67:14, 68:4, 68:8, 68:16, 70:4, 70:8, 72:4, 75:23, 91:2, 91:11, 99:18, 133:1, 134:4

requested [10] - 18:7, 32:19, 32:20, 52:13, 56:11, 57:1, 76:15, 91:3, 91:13, 91:17

requesting [3] - 23:1, 36:14, 67:5

requests [2] - 36:21, 72:16

require [2] - 52:14, 97:17

required [19] - 19:18, 20:25, 21:21, 21:22, 44:20, 49:15, 50:1, 57:16, 61:9, 96:22, 100:23, 102:18, 108:25, 109:5, 116:5, 127:11, 127:17, 139:24,

143:1

requirement [2] - 19:21, 24:14

requirements [5] - 29:8, 29:14, 29:23, 61:21, 61:24

requires [2] - 96:11, 126:14

resign [2] - 34:4, 79:23

resigned [3] - 34:5, 42:10, 42:11

respect [8] - 21:7, 27:7, 31:3, 32:23, 77:24, 80:7, 129:25, 149:4

respond [1] - 68:10

responded [2] - 118:20, 149:25

responding [1] - 54:5

response [15] - 38:23, 39:8, 40:22, 40:25, 68:15, 69:8, 69:17, 70:3, 70:7, 70:14, 71:23, 72:2, 73:6, 127:8, 132:1

responsibilities [14] - 8:1, 9:24, 15:8, 15:9, 17:19, 19:4, 52:19, 52:20, 100:4, 100:23, 104:10, 109:13, 137:19, 138:15

responsibility [5] - 10:18, 22:13, 22:15, 124:7, 135:4

Responsibility [1] - 109:25

responsible [16] - 9:21, 14:2, 17:7, 17:17, 45:1, 48:13, 49:2, 57:20, 61:5, 61:7, 61:8, 61:13, 62:3, 135:1, 135:6, 139:23

responsive [1] - 127:13

rest [1] - 147:12

rested [1] - 132:19

rests [1] - 125:8

result [3] - 42:3, 94:17, 112:8

retained [2] - 98:13, 110:10

retains [1] - 110:5

retire [1] - 8:11

retired [2] - 8:10, 96:2

retirement [2] - 86:4, 86:8

returned [1] - 95:10

review [6] - 18:20, 38:4, 106:5, 108:25, 124:10, 124:12

reviewed [10] - 10:24, 11:16, 12:5, 46:8, 46:12, 49:5, 57:2, 74:19, 109:10, 109:14

revocation [4] - 36:15, 36:22, 67:7, 67:15

revoking [1] - 42:2

rhetorical [1] - 130:16

Rich [1] - 114:8

Richard [1] - 93:6

right-hand [1] - 25:11

Rights [2] - 110:1, 110:2

RIGHTS [1] - 1:21

rights [1] - 110:5

ROBINSON [4] - 1:15, 149:15, 149:19, 150:4

role [10] - 9:11, 13:21, 18:10, 61:4, 62:8, 62:9, 87:21, 87:24, 90:10, 110:13

roles [1] - 48:14

Romania [1] - 86:17

room [1] - 82:6

roughly [5] - 11:4, 13:6, 15:16, 15:22, 16:1

RPR [1] - 2:17

ruled [1] - 123:23

rules [6] - 20:5, 89:15, 90:4, 90:11, 90:13, 105:24

Rumsfeld [3] - 123:13, 125:7, 151:17

run [1] - 133:19

résumé [3] - 10:24, 11:16, 12:5

résumés [9] - 18:20, 18:22, 56:8, 135:14, 136:16, 136:19, 136:24, 137:6, 137:8

**S**

safe [1] - 87:19

safety [2] - 33:9, 33:10

said/he [1] - 66:2

sales [1] - 8:21

sat [1] - 33:7

satisfactory [1] - 12:23

saw [21] - 33:6, 40:5, 74:17, 88:24, 92:6, 93:16, 103:14, 105:2, 107:9, 111:7,

113:19, 126:9, 127:22, 127:23, 129:24, 130:6, 131:9, 142:22, 151:25

scene [2] - 69:21, 69:22

schedule [2] - 4:10, 4:15

school [1] - 121:8

Schoolhouse [5] - 85:10, 97:2, 97:6, 97:9, 98:20

schoolhouse [1] - 85:22

Scott [12] - 6:1, 6:6, 7:1, 7:2, 7:3, 42:18, 42:19, 62:24, 78:22, 138:10, 138:12, 138:13

SCOTT [3] - 1:17, 3:3, 6:18

Scott's [3] - 62:24, 65:4, 78:21

screen [9] - 63:6, 69:12, 69:14, 90:3, 94:4, 108:12, 112:16, 112:21, 116:12

screener [11] - 18:4, 27:10, 29:22, 90:15, 99:5, 99:11, 111:19, 111:23, 111:25, 139:7, 139:11

screeners [4] - 14:18, 14:22, 18:4, 103:18

screening [1] - 62:4

scroll [1] - 93:23

seat [1] - 56:21

Seattle [1] - 7:8

second [5] - 5:5, 25:24, 26:1, 31:4, 34:24, 37:15, 37:23, 37:25, 55:2, 55:8, 69:18, 76:11, 76:12, 116:21, 143:10

seconds [1] - 133:20

Secretary [7] - 123:13, 124:4, 124:10, 124:24, 125:1, 125:4, 125:7

Section [1] - 61:24

section [5] - 48:9, 70:16, 102:8, 108:17, 109:24

secure [1] - 87:19

security [16] - 7:23, 19:18, 19:23, 20:1, 20:3, 23:11, 24:10, 36:14, 36:21, 42:2,

67:6, 67:16, 68:1, 76:21, 77:11, 85:2

see [57] - 25:5, 25:10, 33:7, 48:19, 54:20, 54:24, 55:18, 60:25, 61:21, 62:2, 62:20, 63:8, 63:10, 67:8, 67:22, 70:10, 70:23, 78:24, 82:6, 88:17, 89:3, 89:9, 90:7, 92:2, 92:3, 92:10, 94:5, 94:13, 108:12, 108:16, 108:17, 108:22, 108:23, 109:25, 110:1, 110:4, 110:8, 113:22, 117:16, 118:4, 118:5, 118:11, 119:11, 119:13, 120:8, 120:9, 122:8, 126:8, 127:5, 127:7, 127:25, 129:18, 131:25, 142:9, 145:16, 148:12, 151:8

seeing [9] - 72:23, 73:1, 78:11, 113:24, 115:2, 115:6, 122:25, 131:4, 147:2

seek [1] - 149:20

seeking [1] - 54:25

sees [1] - 73:15

self [1] - 36:2

self-assessment [1] - 36:2

semi [1] - 12:20

semi-operational [1] - 12:20

send [6] - 24:21, 136:24, 136:25, 137:9, 137:13, 147:22

sending [3] - 56:15, 136:14, 136:19

senior [9] - 12:24, 14:5, 14:9, 27:23, 39:15, 57:19, 68:19, 86:12, 89:14

sense [3] - 23:1, 112:7, 128:23

sensitivity [3] - 62:22, 78:19, 124:8

sent [11] - 9:20, 34:19, 62:17, 68:19, 69:6, 91:16, 132:3, 137:3, 137:4, 138:16, 150:13

sentence [15] - 29:3, 48:16, 55:8, 62:2,

63:5, 67:4, 67:18, 69:18, 70:15, 76:18, 77:1, 77:4, 77:5, 82:1, 94:13

**separate** [4] - 13:9, 13:11, 52:19, 101:13

**September** [1] - 124:3

**sequence** [1] - 99:22

**sergeant** [1] - 86:7

**servant** [3] - 83:6, 83:7, 151:9

**serve** [3] - 7:20, 121:14, 126:22

**served** [3] - 121:16, 121:18, 121:21

**service** [4] - 8:12, 26:23, 96:15, 97:19

**Services** [1] - 26:15

**services** [2] - 50:2, 82:17

**serving** [1] - 122:4

**session** [1] - 153:1

**set** [3] - 21:24, 128:23, 128:25

**sets** [3] - 21:21, 45:24, 147:16

**setting** [1] - 21:7

**seven** [3] - 37:11, 68:9

**several** [2] - 145:2, 145:3

**sexual** [1] - 92:7

**share** [2] - 103:12, 104:14

**sheet** [1] - 118:1

**shift** [4] - 101:1, 101:4, 101:7, 101:9

**Shimari** [2] - 122:12, 122:16

**SHIMARI** [1] - 1:4

**shit** [1] - 135:21

**short** [1] - 120:24

**shortcut** [1] - 76:2

**shortly** [1] - 126:23

**show** [7] - 21:7, 54:11, 60:13, 69:12, 82:23, 88:12, 112:22

**showed** [3] - 60:8, 80:20, 145:2

**showing** [2] - 80:17, 129:21

**shown** [3] - 71:13, 73:5, 146:11

**shows** [2] - 37:13, 146:4

**sic** [1] - 142:25

**side** [2] - 25:5, 152:25

**sides** [2] - 130:20, 131:5

**sign** [2] - 57:17, 109:7

**sIGNATURE** [1] -

153:25

**signed** [5] - 39:18, 53:1, 70:1, 77:18, 125:7

**significance** [1] - 37:6

**significant** [1] - 101:15

**signing** [1] - 120:16

**signs** [1] - 35:16

**similar** [2] - 82:21, 116:2

**simple** [1] - 43:18

**simpler** [1] - 72:25

**simply** [1] - 72:25

**single** [2] - 60:15, 99:1

**sit** [2] - 24:21, 104:5

**site** [43] - 17:10, 21:15, 23:17, 23:19, 51:15, 51:18, 51:23, 52:4, 52:10, 52:16, 52:21, 53:3, 58:19, 58:25, 87:9, 87:21, 95:15, 95:20, 95:22, 99:23, 100:4, 100:6, 100:19, 100:23, 100:24, 101:7, 101:9, 101:13, 101:16, 103:8, 103:12, 108:14, 108:18, 109:13, 110:23, 112:7, 114:21, 142:20, 142:23, 143:8, 146:7, 146:9, 146:10

**sites** [3] - 15:21, 16:4, 87:17

**sitting** [3] - 18:22, 38:12, 144:1

**situation** [5] - 28:1, 31:6, 32:20, 66:3, 130:8

**situations** [1] - 99:4

**six** [5] - 15:16, 96:18, 96:20, 103:10, 126:14

**skeptical** [2] - 40:3, 72:7

**skepticism** [1] - 40:12

**skill** [1] - 45:24

**skilled** [1] - 139:21

**skills** [1] - 97:17

**skinned** [1] - 36:4

**sleep** [1] - 51:5

**sleeping** [1] - 11:10

**slightly** [2] - 123:21, 151:10

**slow** [2] - 62:5

**small** [2] - 100:4, 132:21

**snippets** [1] - 132:21

**so...and** [1] - 16:12

**soft** [2] - 142:20, 142:23

**softened** [1] - 40:12

**soldiers** [1] - 20:11

**solely** [2] - 107:19, 147:7

**solved** [1] - 150:2

**someone** [4] - 38:15, 71:9, 96:21, 141:16

**sometimes** [1] - 18:21, 29:20, 88:17, 88:19, 90:15

**somewhat** [1] - 51:1

**somewhere** [1] - 12:10

**sooner** [1] - 81:15

**sorry** [29] - 7:11, 15:11, 30:25, 38:2, 43:9, 45:15, 46:17, 47:2, 61:23, 62:6, 63:2, 63:12, 64:8, 64:23, 68:6, 71:11, 71:18, 72:1, 78:2, 78:4, 78:12, 100:21, 108:13, 112:15, 112:24, 116:15, 117:15, 118:18, 150:20

**sort** [6] - 16:14, 83:11, 83:21, 149:11, 151:4, 152:12

**sorts** [1] - 98:3

**Soskin** [1] - 145:25

**sought** [1] - 149:19

**sounds** [3] - 28:14, 143:17, 149:3

**South** [1] - 7:13

**speaking** [3] - 47:9, 58:19, 72:22

**Special** [1] - 63:4

**special** [2] - 24:10, 78:17

**specialist** [4] - 7:23, 7:25, 8:2, 121:19

**specialty** [2] - 84:23, 121:20

**specific** [5] - 28:12, 29:10, 83:3, 95:18, 138:6

**specifically** [11] - 13:24, 49:19, 59:15, 60:14, 61:19, 64:22, 65:22, 69:13, 75:16, 87:25, 112:13

**specifics** [4] - 93:13, 93:21, 94:10, 114:17

**specifying** [1] - 75:3

**speculating** [1] - 139:12

**speculation** [2] - 22:8, 27:13

**speculative** [1] - 27:14

**spend** [3] - 86:13, 101:15, 130:13

**spent** [2] - 46:21, 87:10

**spread** [1] - 126:10

**spreadsheet** [1] - 128:9

**Square** [1] - 2:18

**squat** [1] - 70:19

**squatting** [2] - 69:23, 69:24

**squeezed** [1] - 143:12

**squeezing** [7] - 144:6, 144:17, 144:24, 145:8, 145:19, 146:5, 146:14

**stability** [1] - 69:25

**Stacy** [1] - 86:20

**Staff** [1] - 7:19

**staff** [8] - 88:8, 90:23, 91:1, 91:9, 91:16, 91:17, 104:20, 105:10

**stand** [1] - 83:11

**standards** [2] - 98:6, 139:24

**standing** [1] - 26:17

**start** [4] - 46:7, 147:23, 152:18, 152:21

**started** [8] - 4:3, 4:19, 7:13, 35:19, 85:8, 99:11, 110:25, 137:7

**starting** [3] - 116:18, 116:24, 119:4

**starts** [1] - 93:24

**state** [6] - 84:5, 109:2, 133:14, 133:17, 136:10, 139:5

**statement** [21] - 14:12, 16:10, 16:19, 16:20, 19:10, 21:20, 35:4, 45:20, 47:4, 47:14, 47:19, 47:25, 48:2, 60:10, 69:5, 95:24, 109:7, 111:9, 136:20, 137:12, 137:16

**statements** [4] - 47:8, 55:13, 111:5, 152:19

**STATES** [4] - 1:1, 1:11, 2:10, 2:14

**states** [5] - 21:23, 26:4, 37:5, 62:10, 133:10

**States** [22] - 7:18, 8:20, 19:12, 42:24,

43:1, 44:6, 53:7, 68:22, 79:24, 81:22, 84:14, 84:17, 95:10, 95:11, 96:1, 96:6, 98:6, 101:19, 101:24, 102:3, 121:13, 138:2

**stating** [3] - 38:4, 41:19, 74:2

**station** [2] - 4:21, 94:15

**stationed** [3] - 7:12, 13:19, 85:24

**statutes** [5] - 124:15, 124:18, 124:20, 124:23, 125:1

**stay** [10] - 12:11, 15:16, 16:1, 41:15, 41:21, 42:5, 72:12, 72:16, 72:24, 152:24

**stayed** [3] - 7:22, 8:18, 95:12

**Stefanowicz** [14] - 51:18, 53:5, 53:14, 53:19, 53:21, 73:25, 74:11, 91:3, 98:22, 99:5, 99:20, 101:4, 135:20, 135:24

**Stefanowicz's** [2] - 53:1, 53:8

**STENOGRAPHIC** [1] - 2:22

**STEPHEN** [1] - 2:9

**steps** [1] - 22:19

**STEPTOE** [1] - 2:2

**Steve** [4] - 41:23, 74:4, 135:20, 135:24

**Steven** [1] - 91:3

**sticks** [1] - 142:7

**still** [6] - 6:8, 12:21, 130:13, 130:22, 130:24, 152:19

**STONESTREET** [1] - 2:17

**Stonestreet** [2] - 153:19, 153:24

**stop** [3] - 31:4, 107:11, 147:13

**stopped** [2] - 93:20, 110:20

**Street** [2] - 2:6, 2:11

**stress** [8] - 38:6, 40:23, 41:1, 41:3, 41:6, 69:20, 70:5, 72:19

**strike** [2] - 146:17, 146:22

**strip** [1] - 135:24

**struck** [4] - 125:24, 126:2, 126:5, 126:24

**structure** [1] - 122:5

**stuff** [1] - 127:7

**stupid** [1] - 83:11

**style** [1] - 104:16

**subject** [9] - 34:18, 75:23, 96:17, 138:3, 144:4, 144:17, 144:24, 145:7, 145:19

**Subject** [1] - 124:4

**subjected** [4] - 130:15, 130:23, 146:5, 146:13

**subjecting** [1] - 133:9

**submit** [3] - 24:18, 24:24, 27:4

**submitted** [9] - 26:8, 39:8, 39:18, 42:3, 47:22, 111:5, 133:1, 133:13, 151:10

**subparagraph** [2] - 29:2, 29:5

**substantially** [1] - 120:22

**substantive** [1] - 126:4

**suggest** [1] - 152:9

**suggested** [1] - 150:9

**SUHAIL** [1] - 1:3

**suit** [1] - 151:22

**Suite** [1] - 2:7

**summarizes** [1] - 81:17

**summary** [3] - 32:12, 79:17, 81:7

**summer** [3] - 85:23, 92:6, 115:14

**Sunday** [2] - 151:9, 152:13

**superiors** [1] - 53:7

**supervise** [3] - 17:2, 110:6, 110:11

**supervision** [2] - 17:8, 109:14

**supervisor** [4] - 22:2, 35:18, 53:25, 112:3

**supervisors** [1] - 31:8

**supervisory** [3] - 50:2, 87:21, 87:24

**supplies** [1] - 11:10

**supply** [1] - 14:18

**supplying** [2] - 45:22, 61:17

**Support** [1] - 26:15

**support** [11] - 10:17, 13:25, 26:23, 48:11, 50:1, 52:4, 61:5, 61:9, 62:4, 62:9

**supported** [4] - 8:2, 8:4, 9:16, 9:25

**supposed** [3] - 16:15, 117:11, 118:14

**surrebuttal** [7] - 128:2, 129:7, 130:2, 131:25, 132:2, 132:6, 147:18

**susceptible** [1] - 36:3

**sustain** [3] - 41:9, 49:18, 114:5

**sustained** [7] - 18:3, 48:6, 48:8, 70:13, 74:16, 79:11

**swallowed** [1] - 100:8

**swear** [1] - 83:24

**swift** [1] - 69:3

**sworn** [4] - 6:18, 84:1, 111:5, 111:9

**system** [1] - 24:19

---

# T

**tab** [2] - 64:23, 68:13

**Taguba** [4] - 30:5, 30:14, 30:16, 30:20, 90:20, 90:23, 91:1, 91:4

**tape** [1] - 120:20

**taped** [2] - 4:25, 121:1

**task** [3] - 49:3, 61:5, 61:10

**tasked** [1] - 48:17

**tasks** [1] - 102:3

**teach** [1] - 85:17

**team** [7] - 22:2, 22:3, 30:19, 51:11, 58:2, 58:7, 58:14

**Team** [2] - 141:1, 141:12

**Technical** [1] - 26:15

**technical** [1] - 26:23

**technique** [2] - 105:18, 106:2

**techniques** [4] - 85:17, 98:19, 98:23, 104:15

**Technology** [1] - 86:12

**TECHNOLOGY** [1] - 1:7

**tense** [1] - 69:19

**tensions** [2] - 35:12, 35:19

**tent** [1] - 146:8

**tented** [2] - 142:21, 143:2

**tents** [2] - 147:3, 147:5

**tenure** [3] - 99:3, 134:21, 137:3

**term** [4] - 8:11, 10:13,

10:15, 89:15

**terminate** [3] - 68:5, 68:8, 75:24

**terminated** [3] - 36:20, 42:8, 42:9

**termination** [5] - 36:14, 36:21, 67:5, 68:16, 76:15

**terminology** [1] - 98:3

**terms** [3] - 49:19, 82:19, 115:6

**testified** [31] - 6:19, 46:11, 51:20, 54:1, 56:5, 57:12, 59:10, 60:7, 64:7, 66:7, 71:24, 72:5, 72:11, 73:8, 73:11, 84:2, 95:6, 95:19, 95:25, 97:5, 108:1, 110:16, 114:7, 114:14, 122:11, 127:17, 143:11, 143:15, 144:5, 146:12, 147:2

**testify** [2] - 22:9, 129:24

**testifying** [1] - 6:6

**testimony** [34] - 4:18, 4:25, 51:25, 52:15, 53:10, 66:14, 68:11, 73:15, 74:12, 74:25, 81:23, 82:22, 95:5, 101:18, 101:21, 101:24, 105:12, 107:16, 107:23, 114:19, 115:4, 117:5, 118:4, 120:15, 121:11, 127:6, 129:19, 132:22, 133:22, 136:8, 139:3, 140:15, 143:13, 143:18

**Texas** [1] - 86:25

**Thanksgiving** [1] - 12:9

**THE** [170] - 1:1, 1:11, 1:14, 1:21, 2:1, 2:14, 3:12, 4:2, 4:5, 4:24, 5:7, 5:11, 6:10, 6:12, 6:14, 13:12, 13:15, 13:16, 13:18, 18:1, 18:3, 20:16, 20:20, 22:9, 23:21, 24:1, 24:3, 27:14, 28:6, 28:7, 28:20, 30:9, 30:11, 30:13, 30:15, 30:17, 30:20, 30:22, 30:24, 30:25, 31:4, 31:8, 32:1, 32:4, 32:7, 34:11, 34:13,

34:24, 35:1, 35:3, 35:4, 35:7, 39:4, 41:9, 41:13, 42:14, 43:8, 43:9, 43:22, 43:24, 44:1, 45:19, 48:6, 48:8, 49:18, 50:19, 51:1, 54:13, 54:15, 56:20, 58:9, 60:16, 60:19, 60:21, 62:5, 63:6, 63:8, 63:9, 65:9, 65:11, 70:13, 74:16, 75:19, 76:5, 79:8, 79:11, 79:16, 80:24, 81:3, 82:5, 82:10, 83:4, 83:14, 83:18, 89:24, 94:23, 112:20, 113:1, 113:5, 113:7, 113:9, 113:10, 113:11, 113:12, 114:3, 114:5, 116:14, 116:16, 116:21, 117:1, 117:22, 118:2, 119:12, 119:22, 119:24, 120:13, 120:15, 120:17, 120:18, 121:6, 121:10, 123:5, 123:16, 123:18, 123:23, 124:2, 125:9, 125:13, 125:17, 125:21, 126:20, 126:25, 127:15, 128:6, 128:13, 128:16, 128:22, 129:3, 129:5, 129:7, 129:9, 129:13, 129:15, 129:21, 130:1, 130:13, 131:21, 131:24, 132:12, 132:16, 132:18, 133:4, 133:21, 136:4, 147:11, 147:17, 147:20, 148:14, 149:8, 149:13, 149:17, 150:3, 150:5, 150:9, 150:22, 151:3, 151:19, 151:25, 152:6, 153:8

**the..** [1] - 128:6

**theirs** [2] - 150:18, 151:1

**themselves** [1] - 94:16

**theories** [1] - 130:19

**they've** [2] - 126:3, 127:2

**thin** [1] - 36:4

**thin-skinned** [1] - 36:4

**thinking** [1] - 148:8

**third** [6] - 28:24, 29:3, 29:7, 37:15, 68:24, 133:12

**third-party** [1] - 133:12

**Thomas** [1] - 5:4

**THOMAS** [4] - 1:17, 5:17, 5:23, 6:3

**Thornsvard** [4] - 39:15, 62:18, 68:19, 138:23

**thorough** [1] - 124:16

**thousand** [1] - 75:2

**thousand-foot** [1] - 75:2

**threat** [1] - 11:7

**threatened** [2] - 64:7, 64:11

**threatening** [3] - 59:17, 65:16, 69:20

**threats** [3] - 63:24, 81:12, 81:24

**three** [15] - 15:17, 16:2, 16:9, 26:22, 41:25, 44:6, 81:4, 85:25, 96:22, 96:25, 129:2, 130:22, 131:19, 142:14, 151:20

**Tiger** [2] - 141:1, 141:12

**Tikrit** [1] - 10:4

**Tim** [7] - 31:17, 33:3, 33:11, 35:12, 35:17, 35:21, 65:25

**time-keeping** [1] - 24:19

**timeframe** [1] - 72:9

**timing** [2] - 40:2, 40:5

**title** [1] - 110:1

**titled** [1] - 109:24

**today** [10] - 4:7, 4:11, 114:19, 115:4, 116:2, 126:3, 144:1, 145:14, 148:20, 148:25

**together** [4] - 24:20, 33:25, 146:20, 147:16

**tolerate** [2] - 59:24, 68:25

**Tom** [10] - 47:18, 47:20, 48:1, 53:4, 61:2, 61:11, 137:3, 137:6, 137:12, 137:18

**tonight** [3] - 151:7, 152:7, 153:5

**took** [9] - 68:9, 72:23, 79:4, 79:13, 87:19, 95:9, 115:15, 116:2, 138:14
**top** [19] - 25:5, 26:3, 28:24, 36:2, 43:6, 43:13, 43:19, 43:22, 44:23, 45:14, 50:10, 62:2, 63:4, 67:21, 67:22, 116:17, 119:13, 120:4, 128:19
**topic** [2] - 51:6, 59:16
**Torin** [21] - 31:18, 32:12, 32:21, 32:24, 33:3, 33:6, 33:7, 33:14, 34:18, 34:23, 35:12, 35:15, 35:21, 35:24, 60:2, 64:14, 65:5, 79:17, 81:8, 81:21
**Total** [1] - 25:13
**total** [4] - 25:13, 25:17, 26:23, 41:25
**totally** [1] - 18:17
**towards** [2] - 67:21, 112:23
**trained** [1] - 135:2
**training** [19] - 7:14, 7:15, 10:21, 16:6, 44:15, 85:4, 85:6, 85:20, 85:24, 86:1, 96:23, 96:24, 97:1, 97:5, 97:13, 98:9, 98:19, 98:23, 98:24
**transcript** [9] - 45:11, 64:19, 65:17, 129:16, 136:3, 136:16, 143:10, 149:16, 153:20
**TRANSCRIPT** [1] - 1:10
**TRANSCRIPTION** [1] - 2:22
**transcripts** [1] - 136:4
**transferred** [1] - 33:23
**translation** [1] - 150:24
**translators** [1] - 127:6
**transmittal** [1] - 136:22
**transport** [2] - 44:12, 143:9
**travel** [4] - 26:19, 44:11, 44:13, 100:24
**treat** [1] - 135:20
**treated** [2] - 115:6, 120:7
**treating** [1] - 66:1
**treatment** [5] - 88:25,

93:18, 97:13, 115:2, 130:15
**trial** [3] - 126:23, 127:14, 127:16
**TRIAL** [1] - 1:10
**trouble** [1] - 58:11
**true** [2] - 127:21, 132:9
**truth** [1] - 116:5
**truthful** [2] - 45:9, 69:5
**try** [3] - 150:10, 151:7, 151:16
**trying** [9] - 33:11, 49:20, 65:10, 120:23, 129:18, 130:3, 130:20, 137:22, 148:9
**Tuesday** [1] - 153:1
**turn** [9] - 47:1, 47:3, 61:15, 67:17, 70:14, 108:9, 143:10, 144:11, 144:20
**turned** [3] - 87:10, 100:7, 141:10
**turning** [1] - 69:17
**turns** [1] - 4:20
**two** [28] - 4:21, 13:7, 13:11, 15:17, 16:2, 24:8, 24:9, 27:1, 31:16, 33:4, 35:2, 35:4, 52:20, 61:17, 63:24, 65:12, 81:4, 95:17, 100:13, 100:17, 106:13, 123:19, 128:18, 129:15, 132:25, 143:20, 143:23, 144:5
**two-page** [1] - 35:4
**two..** [1] - 35:1
**TYLER** [1] - 1:18
**type** [10] - 8:6, 8:22, 9:17, 18:6, 21:5, 27:19, 28:15, 55:24, 57:2, 80:13
**types** [1] - 14:7
**typewritten** [1] - 37:1

**U**

**U.S** [13] - 2:17, 10:3, 44:14, 48:18, 87:4, 87:25, 90:14, 90:19, 100:2, 107:20, 124:7, 137:23, 138:5
**U.S.C** [1] - 124:14
**ugly** [1] - 103:16
**ultimate** [1] - 52:24
**ultimately** [5] - 17:17,

42:8, 47:25, 99:22, 102:10
**um..** [1] - 113:10
**unable** [2] - 38:7, 122:17
**unapproved** [1] - 38:6
**unauthorized** [1] - 72:19
**unavailable** [1] - 83:20
**unaware** [2] - 65:14, 65:19
**uncomfortable** [3] - 115:1, 115:5, 118:24
**under** [31] - 11:23, 11:24, 14:18, 18:25, 25:21, 27:11, 29:14, 29:18, 29:24, 45:7, 46:15, 60:24, 63:4, 64:7, 69:20, 107:19, 109:14, 110:10, 114:2, 115:24, 117:5, 118:23, 124:13, 124:14, 124:17, 124:19, 124:23, 124:25, 125:2, 137:2, 151:22
**understood** [11] - 11:15, 12:4, 14:9, 17:7, 21:4, 22:10, 22:12, 35:9, 49:8, 49:14, 66:11
**underwear** [2] - 122:8, 131:9, 134:19
**unfortunately** [1] - 66:1
**uniforms** [2] - 102:17, 102:19
**unit** [1] - 121:16
**United** [21] - 7:18, 8:20, 19:12, 42:24, 43:1, 44:6, 53:7, 68:22, 79:24, 81:22, 84:14, 84:17, 95:10, 96:1, 96:6, 98:6, 101:19, 101:24, 102:3, 121:13, 138:2
**UNITED** [4] - 1:1, 1:11, 2:10, 2:14
**University** [2] - 7:7, 7:8
**University's** [1] - 8:19
**unless** [1] - 147:11
**unmuzzled** [2] - 73:16, 74:10, 74:11
**unnecessarily** [1] - 147:23
**unquote** [1] - 78:20
**unremarkable** [1] - 69:23

**up** [42] - 12:15, 13:4, 18:11, 25:5, 33:15, 34:23, 35:9, 43:8, 47:24, 52:7, 55:11, 62:15, 77:20, 80:17, 80:20, 81:3, 86:22, 87:19, 89:8, 89:21, 90:3, 92:19, 93:22, 100:8, 103:15, 106:25, 108:11, 109:22, 114:17, 116:12, 119:10, 126:9, 128:2, 128:12, 129:9, 137:9, 139:7, 148:9, 151:16, 152:1, 153:3
**upper** [1] - 117:25
**ups** [1] - 146:2
**upset** [1] - 31:17
**USMAN** [1] - 1:14

**V**

**vacations** [2] - 51:5, 52:6
**vague** [1] - 49:17
**vaguely** [5] - 97:23, 113:24, 119:19, 144:3, 144:4
**valuable** [1] - 131:5
**value** [1] - 25:17
**vantage** [1] - 137:11
**various** [4] - 16:23, 97:13, 98:24, 145:13
**vehicles** [1] - 26:21
**verb** [1] - 99:17
**version** [3] - 57:11, 71:25, 72:6
**vests** [1] - 87:17
**via** [7] - 18:17, 18:21, 23:17, 121:4, 125:5, 139:2, 140:11
**vice** [4] - 15:11, 37:21, 39:15, 68:20
**Victory** [13] - 10:2, 12:22, 13:1, 13:17, 13:20, 15:23, 15:24, 33:14, 33:16, 33:19, 79:4, 79:13, 87:16
**video** [8] - 5:4, 83:15, 83:16, 83:19, 120:24, 123:8, 133:18, 133:19
**videotaped** [4] - 5:17, 5:22, 6:2, 123:9
**view** [4] - 43:10, 44:24, 61:8, 74:24, 75:2, 83:12, 132:5, 149:9
**views** [1] - 103:12

**vigorous** [1] - 96:7
**violated** [4] - 105:3, 105:13, 105:14, 105:18
**violates** [1] - 106:3
**violating** [1] - 107:2
**violation** [3] - 105:22, 105:23, 107:4
**violations** [1] - 107:8
**VIRGINIA** [1] - 1:1
**Virginia** [6] - 2:7, 2:15, 2:18, 15:4, 48:13, 86:2
**visible** [1] - 69:20
**visit** [3] - 15:21, 15:25, 33:4
**voice** [1] - 43:8
**volition** [1] - 141:16
**voluntarily** [3] - 70:25, 71:3, 71:6
**volunteering** [1] - 65:12
**VP** [2] - 14:25, 138:23

**W**

**wait** [7] - 50:19, 65:9, 79:8, 113:1
**waiting** [1] - 147:23
**walls** [5] - 126:11, 141:9, 141:14, 141:19, 141:20
**wants** [2] - 131:13, 152:24
**war** [1] - 85:23
**warrant** [3] - 88:1, 102:9, 134:3
**Washington** [2] - 2:4, 2:12
**waste** [1] - 28:20
**ways** [2] - 137:1, 138:4
**weapon** [1] - 24:5
**weapons** [5] - 24:7, 24:12, 103:2, 103:5, 137:25
**wear** [3] - 44:21, 102:17, 102:18
**wearing** [2] - 122:8, 131:9
**weather** [1] - 148:3
**WEBB** [1] - 1:18
**Wednesday** [1] - 153:2
**week** [5] - 11:4, 14:11, 14:13, 79:18, 103:10
**weekend** [1] - 148:3
**weeks** [8] - 15:16, 15:17, 16:1, 16:9, 40:7, 85:12, 95:17,

97:6
**weighed** [1] - 140:1
**welfare** [1] - 138:3
**Wellsville** [1] - 8:23
**whatsoever** [2] - 10:18, 107:24
**where...no** [1] - 78:3
**whereas** [2] - 102:18, 103:5
**whichever** [1] - 9:19
**white** [1] - 47:23
**whole** [6] - 16:9, 77:5, 82:17, 145:11, 148:3, 151:8
**wife** [1] - 33:24
**William** [3] - 42:18, 139:2, 139:6
**WILLIAM** [2] - 3:13, 139:3
**withdraw** [1] - 26:11
**withdrawn** [3] - 52:25, 53:13, 139:16
**witness** [32] - 6:7, 42:15, 76:6, 82:21, 83:3, 83:18, 83:19, 83:24, 94:24, 108:12, 112:16, 112:22, 116:14, 119:10, 123:6, 126:15, 126:16, 127:18, 127:19, 127:21, 127:23, 130:6, 132:7, 132:8, 140:10, 140:19, 140:21, 141:4, 149:13
**WITNESS** [17] - 3:2, 13:15, 13:18, 28:7, 30:11, 30:15, 30:20, 30:24, 31:8, 35:1, 35:4, 43:9, 43:24, 63:8, 113:10, 113:12, 120:17
**witness'** [1] - 112:19
**witnessed** [4] - 21:25, 30:3, 66:2, 142:18
**witnesses** [6] - 120:18, 127:4, 127:16, 129:24, 131:17, 131:19
**witnessing** [1] - 118:25
**women's** [3] - 122:8, 131:9, 134:19
**Wood** [12] - 88:1, 88:8, 99:17, 102:7, 102:10, 103:9, 104:1, 104:20, 105:10, 108:13, 108:21, 123:7

**word** [2] - 36:23, 71:6
**words** [2] - 25:13, 36:1
**wore** [3] - 44:18, 93:4, 102:15
**workforce** [1] - 110:7
**works** [1] - 27:18
**worried** [2] - 33:8, 33:10
**worth** [1] - 72:23
**wrapped** [1] - 153:3
**write** [5] - 55:20, 56:1, 68:24, 69:23, 81:10
**writes** [1] - 62:20
**writing** [3] - 97:11, 101:23, 119:19
**written** [10] - 25:14, 35:11, 37:14, 40:8, 40:20, 62:15, 68:7, 75:14, 78:4, 81:23
**wrongdoing** [3] - 69:1, 69:3, 94:17
**wrote** [9] - 32:17, 32:18, 41:12, 56:18, 67:23, 70:5, 71:16, 71:19, 120:11

# Y

**year** [7] - 12:12, 12:13, 12:15, 96:22, 108:25, 109:5
**years** [12] - 65:7, 84:18, 84:20, 85:13, 85:25, 95:8, 96:2, 96:12, 97:19, 98:16, 126:24, 127:12
**yellow** [3] - 113:5, 113:7, 113:9
**yesterday** [8] - 4:19, 123:15, 133:1, 147:15, 148:20, 148:21, 148:24, 149:7
**York** [4] - 1:19, 1:22
**you-all** [2] - 131:11, 136:4
**young** [1] - 98:18
**your..** [1] - 106:25
**yourself** [1] - 6:24

# Z

**Zone** [1] - 10:3
**Zuba'e** [4] - 129:19, 130:3, 146:6, 146:23