# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

|  |  |  |
|---|---|---|
| SUHAIL NAJIM ABDULLAH AL SHIMARI, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No.    1:08-cv-0827 LMB-JFA |
| CACI PREMIER TECHNOLOGY, INC., | ) ) | |
| Defendant, | ) ) ) | |

## DEFENDANT CACI PREMIER TECHNOLOGY, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR JUDGMENT AS A MATTER OF LAW

John F. O'Connor
Virginia Bar No. 93004
Linda C. Bailey (admitted *pro hac vice*)
Joseph McClure (admitted *pro hac vice*)
STEPTOE LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 429-3000 – telephone
(202) 429-3902 – facsimile
joconnor@steptoe.com
lbailey@steptoe.com
jmcclure@steptoe.com

William D. Dolan, III
Virginia Bar No. 12455
LAW OFFICES OF WILLIAM D.
DOLAN, III, PC
8270 Greensboro Drive, Suite 700
Tysons Corner, VA 22102
(703) 584-8377 – telephone
wdolan@dolanlaw.net

Nina J. Ginsberg
Virginia Bar No. 19472
DiMuroGinsberg, PC
1001 N. Fairfax Street, Suite 510
Alexandria, VA  22314-2956
703-684-4333 – telephone
703-548-3181 – facsimile
nginsberg@dimuro.com

*Counsel for Defendant CACI Premier
Technology, Inc.*

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    LEGAL STANDARD ........................................................................................ 2

III.   ARGUMENT ...................................................................................................... 2

       A.     The Borrowed Servant Doctrine Precludes Liability as a Matter of Law ............... 2

       B.     The Government's Invocation of the State Secrets Privilege Prevented
              CACI from Obtaining a Fair Trial ....................................................... 14

       C.     No Reasonable Jury Could Find CACI Liable Based on the Evidence
              Plaintiffs Adduced at Trial ................................................................... 19

              1.     Plaintiffs' Aiding and Abetting Claims Fail as a Matter of Law ............. 19

              2.     Plaintiffs Failed to Present Sufficient Evidence of Conspiracy ............... 23

       D.     Plaintiffs' Claims Are Barred Under Binding Precedents ..................................... 27

              1.     Plaintiffs' Claims Are Impermissibly Extraterritorial ............................. 27

              2.     Binding Precedent Precludes this Court from Implying a Damages
                     Remedy for Plaintiffs' Claims ................................................................. 28

              3.     Plaintiffs' Claims Are Preempted ............................................................. 29

IV.    CONCLUSION ................................................................................................ 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A Soc'y Without a Name v. Virginia*,
   655 F.3d 342 (4th Cir. 2011) ............................................................23, 24

*Abilt v. CIA*,
   848 F.3d 305 (4th Cir. 2017) ....................................................................15

*Al Shimari v. CACI Premier Tech., Inc.*,
   840 F.3d 147 (4th Cir. 2016) ......................................................................4

*Estate of Alvarez v. Rockefeller Found.*,
   96 F.4th 686 (4th Cir. 2024) ............................................................ *passim*

*Aziz v. Alcolac, Inc.*,
   658 F.3d 388 (4th Cir. 2011) ..................................................20, 23, 27

*Belk, Inc. v. Meyer Corp.*,
   679 F.3d 146 (4th Cir. 2012) ....................................................................19

*Bulger v. Hurwitz*,
   62 F.4th 127 (4th Cir. 2023) ...............................................................28, 29

*Coker v. Gunter*,
   191 Va. 747 (Va. 1951)..............................................................................10

*Denton v. Yazoo & MVR Co.*,
   284 U.S. 305 (1932)....................................................................................3

*U.S. ex rel. DRC, Inc. v. Custer Battles, LLC*,
   562 F.3d 295 (4th Cir. 2009) ......................................................................2

*Dyer v. Smith*,
   56 F.4th 271 (4th Cir. 2022) ...............................................................28, 29

*Egbert v. Boule*,
   596 U.S. 482 (2022)............................................................................28, 29

*El-Masri v. United States*,
   479 F.3d 296 (4th Cir. 2007) ......................................................15, 18, 19

*Gairola v. Va. Dep't of Gen. Servs.*,
   753 F.2d 1281 (4th Cir. 1985) ....................................................................2

*Grenadier v. BWW Law Grp.*,
   No. 1:14-cv-827, 2015 WL 417839 (E.D. Va. Jan. 30, 2015) ......................................... 23-24

*Haig v. Agee*,
   453 U.S. 280 (1981) ........................................................................................................28

*Huff v. Marine Tank Testing Corp.*,
   631 F.2d 1140 (4th Cir. 1980) ...............................................................3, 7, 8, 9, 10

*Jesner v. Arab Bank, PLC*,
   584 U.S. 241 (2018) ........................................................................................................28

*In re KBR, Inc.*,
   893 F.3d 241 (4th Cir. 2018) ...........................................................................................4

*In re KBR, Inc., Burn Pit Litigation*,
   744 F.3d 326 (4th Cir. 2014) .........................................................................................30

*Kiobel v. Royal Dutch Petroleum Co.*,
   569 U.S. 108 (2013) ........................................................................................................27

*Ladd v. Rsch. Triangle Inst.*,
   335 F. App'x 285 (4th Cir. 2009) ...................................................................................12

*Lange v. California*,
   141 S. Ct. 2011 (2021) .....................................................................................................4

*Loren Data Corp. v. GXS, Inc.*,
   501 F. App'x 275 (4th Cir. 2012) ..................................................................................24

*Morgan v. Baker Hughes Inc.*,
   728 F. App'x 850 (10th Cir. 2018) ..................................................................................2

*Nestle USA, Inc. v. Doe*,
   593 U.S. 628 (2021) ........................................................................................................27

*Presbyterian Church of Sudan v. Talisman*,
   582 F.3d 244 (2d Cir. 2009) .....................................................................................20, 23

*RJR Nabisco, Inc. v. European Cmty.*,
   579 U.S. 325 (2016) ........................................................................................................27

*Ross v. Blake*,
   578 U.S. 632 (2016) ..........................................................................................................4

*Saleh v. Titan*,
   580 F.3d 1 (D.C. Cir. 2009) ......................................................................................29, 30

*Singer v. Reali*,
   883 F.3d 425 (4th Cir. 2018) ................................................................4

*Sosa v. Alvarez-Machain*,
   542 U.S. 692 (2004) ........................................................................28

*Standard Oil Co. v. Anderson*,
   212 U.S. 215 (1909) .......................................................................3, 13

*Thomas v. Salvation Army S. Territory*,
   841 F.3d 632 (4th Cir. 2016) ..............................................................23

*United States v. Elbaz*,
   52 F.4th 593 (4th Cir. 2022), *cert. denied*, 144 S. Ct. 278 (2023) ........................27

*United States v. Hunt*,
   99 F.4th 161 (4th Cir. 2024) ..............................................................15

*United States v. Maynard*,
   90 F.4th 706 (4th Cir. 2024) ..............................................................16

*United States v. Scheffer*,
   523 U.S. 303 (1998) ........................................................................15

*Weisgram v. Marley Co.*,
   528 U.S. 440 (2000) ..........................................................................2

*Ziglar v. Abbasi*,
   137 S. Ct. 1843 (2017) .....................................................................29

**Other Authorities**

Fed. R. Civ. P. 50 ....................................................................2, 19, 27

U.S. Const. art. I, § 8, cls. 1, 11-15 .......................................................29

U.S. Const. art. II, § 2, cls. 1, 2 ..........................................................29

## I.    INTRODUCTION

The trial of this action was emotionally charged, with Plaintiffs offering harrowing testimony concerning their alleged treatment at Abu Ghraib prison.  To be sure, what occurred at Abu Ghraib was an inexcusable, indefensible outrage.  Crucially, though, nothing in Plaintiffs' testimony, or in the other trial evidence, connected CACI to Plaintiffs' treatment.  The trial of this action also confirmed that the United States' three successful assertions of the state secrets privilege – which denied CACI, the Court, and the jury access to information regarding the identities and backgrounds of Army and CACI interrogators assigned to interrogate Plaintiffs, and to contemporaneous records of Plaintiffs' treatment – forced CACI to defend with both hands tied behind its back.  The exclusion of live testimony from the interrogators who actually interrogated the Plaintiffs made it impossible for the jury to assess their credibility and resolve any conflicts in the evidence regarding Plaintiffs' treatment.  Despite the unprecedented handicaps on CACI's ability to present its defense at trial, Plaintiffs were unable to secure a verdict in their favor.

A second trial of this action is inappropriate.  A retrial is unwarranted because the evidence was fully vetted at the first trial, with the exception of evidence that will forever remain unavailable because of the state secrets privilege, and the available evidence amply demonstrated that CACI is entitled to judgment as a matter of law on multiple grounds.  These grounds include (1) application of the borrowed servant doctrine; (2) CACI's inability to receive a fair trial because of the state secrets privilege; and (3) that the evidence presented at this trial, and which would be presented in any retrial, demonstrates that Plaintiffs do not have evidence sufficient to support a jury verdict in their favor on their allegations of aiding and abetting or conspiratorial conduct by CACI employees.  Plaintiffs' claims also are legally deficient on several additional grounds.

Plaintiffs received their day in court, a day in court that shined a light on the Abu Ghraib scandal as brightly as the state secrets privilege will allow.  The evidence presented at trial

demonstrates beyond doubt that a jury, fully instructed on how the law applies to Plaintiffs' claims, could not reasonably return any verdict other than a verdict in CACI's favor. And the trial of this action has confirmed the applicability of the legal defenses CACI has asserted in this case. Accordingly, this Court should grant judgment as a matter of law to CACI on all Plaintiffs' claims.

## II.    LEGAL STANDARD

"Rule 50 is one of the tools necessary to ensure that the law (reason, not emotion) controls." *Morgan v. Baker Hughes Inc.*, 728 F. App'x 850, 869 (10th Cir. 2018) (O'Brien, J., concurring). It "allows the trial court to remove cases or issues from the jury's consideration when the facts are sufficiently clear that the law requires a particular result." *Weisgram v. Marley Co.*, 528 U.S. 440, 448 (2000) (internal citations and quotations omitted). Judgment as a matter of law is appropriate where a party has been fully heard on an issue and "there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue." Fed. R. Civ. P. 50(a); *see also U.S. ex rel. DRC, Inc. v. Custer Battles, LLC*, 562 F.3d 295, 305 (4th Cir. 2009) ("Judgment as a matter of law is proper when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment,"). "[A] mere scintilla of evidence is not enough to defeat a motion for judgment as a matter of law." *Gairola v. Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985).

## III.    ARGUMENT

### A.    The Borrowed Servant Doctrine Precludes Liability as a Matter of Law

The borrowed servant doctrine applies when a general employer "lends" its employee, "with respect to particular work," to another employer (the borrowing employer) who has the power to direct and control the employee's performance of such work. *Estate of Alvarez v. Rockefeller Found.*, 96 F.4th 686, 693-94 (4th Cir. 2024). In such a circumstance, the employee

is treated as the employee of the borrowing employer with respect to such work, "with all the legal consequences of the new relation." *Id.* Where the facts show that the alleged borrowing employer merely provided information to employees as to the work the general employer is supposed to accomplish, the borrowed servant doctrine does not apply. *Denton v. Yazoo & MVR Co.*, 284 U.S. 305, 309-10 (1932). But where the alleged borrowing employer has "the power to supervise," a power that brings with it "the duty, on the part of the [employees] directed, to obey," the borrowed employee doctrine applies. *Id.* In such a case, *respondeat superior* liability, if any, rests with the borrowing employer and not the loaning employer. *Estate of Alvarez*, 96 F.4th at 694 ("When an agent has been lent by one principal to the service of another, the agent, 'in respect of his acts in that service, is to be dealt with as the servant of the latter and not of the former.'") (quoting *Denton*, 284 U.S. at 308); *see also Standard Oil Co. v. Anderson*, 212 U.S. 215, 221 (1909).

"When determining whether such a transfer has occurred, 'we must inquire whose is the work being performed;' this question 'is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work.'" *Estate of Alvarez*, 96 F.4th at 694 (quoting *Standard Oil*, 212 U.S. at 221–22). Determining the power to direct and control employees is a fact-intensive inquiry that depends on the facts as they occurred on the ground. *See Huff v. Marine Tank Testing Corp.*, 631 F.2d 1140, 1142 (4th Cir. 1980) (borrowed servant doctrine applied even though loaning employer had a "supervisor" on site, as the facts on the ground showed that the borrowing employer had the power to assign work to the employees, integrated the employees into teams with the borrowing employer's own employees, and provided identical supervision to its own employees and the employees it borrowed). Indeed, in this very case the Fourth Circuit has held that questions of direction and control should be determined based on the actual facts on the ground, and not by "examining the directives issued by the military for

conducting interrogation sessions." *Al Shimari v. CACI Premier Tech., Inc.*, 840 F.3d 147, 157 (4th Cir. 2016); *see also In re KBR, Inc.*, 893 F.3d 241, 261 (4th Cir. 2018) (holding that contractor's employees were under actual control of U.S. Army for purposes of decision to use burn pits based on facts on the ground and rejecting evidence of control that existed "on paper").[1] There is no reason why the power to direct and control should be addressed differently in the borrowed servant context, with the exception that the key question for the borrowed servant is the *power* to control rather than the actual exercise of control. *Estate of Alvarez*, 96 F.4th at 694.

There is no genuine dispute regarding the allocation of power to direct and control CACI interrogators in their dealings with detainees. Plaintiffs can quibble with labels like "operational control," but the actual facts on the ground as to which entity – as between the U.S. Army and CACI management – had the power to direct and control particular tasks is not at all disputed. The military's control was plenary, absolute, and unqualified. As the Court rightly expressed at trial:

> It has been said a million times in this case, ***the military controls what they do***; CACI controls the administrative elements of their employment, which means pay, promotions, where they sleep, vacations.

4/19/24 Trial Tr. at 51:1-6 (emphasis added). Indeed, the evidence of the U.S. Army's exclusive power to control interrogation and detainee operations – including all work performed by CACI interrogators – is so overwhelming that to meaningfully catalog it in the text of this memorandum would preclude legal argument. *See, e.g.*, Exhibit A (DX 2, U.S. Responses to Interrogatories), Exhibit B (Table of Testimony Proving the Borrowed Servant Doctrine Precludes Liability), Exhibit C (DX 20, JIDC organizational chart), Exhibit D (PTX 42, IROE), Exhibit E (PTX 83,

---

[1] Courts routinely look to the "facts on the ground" in making numerous determinations. *See, e.g.*, *Lange v. California*, 141 S. Ct. 2011, 2018 (2021) (citations omitted) (exigent circumstances); *Ross v. Blake*, 578 U.S. 632, 643 (2016) (availability of administrative remedy); *Singer v. Reali*, 883 F.3d 425, 442 (4th Cir. 2018) (materiality of undisclosed facts).

Delivery Order 35), Exhibit F (PTX 84, Delivery Order 71), Exhibit G (PTX 100, COR Memo

Regarding Mr. Johnson), Exhibit H (DX 23, CJTF-7 Interrogation and Counter-Resistance Policy).

It is not just the sheer magnitude of evidence proving the military's control, however, that

commands a ruling that the borrowed servant doctrine bars liability.   The trial exhibits and

testimony are unequivocal.   The United States' interrogatory responses, by themselves, are

conclusive on the issue of direction and control.   According to the United States, CACI and military

interrogators who interacted with Plaintiffs were:

> ***subject to the direction of the military chain of command***,
> beginning with their military section leader, an Army non-
> commissioned officer, who was briefed both prior to and following
> the interrogation to ensure that the interrogators were focused on
> answering CJTF-7's priority intelligence requirements, human
> intelligence (HUMINT) requirements, and source directed
> requirements.   The military section leader was also responsible for
> strictly enforcing the interrogation rules of engagement (IROE). . . .
>
> ***No CACI personnel were in this chain of command.***   While the
> CACI site manager at Abu Ghraib, Dan Porvaznik, managed CACI
> personnel issues and the ICE OIC relied on him as one source of
> information regarding the abilities and qualifications of CACI
> interrogators, ***the military chain of command controlled the
> interrogation facility, set the structure for interrogation
> operations, and was responsible for how interrogations were to
> occur during both planning and execution phases***.

Exhibit A (DX 2) at 8 (emphasis added); *see also id.* at 14 (with minor differences).   The testimony

adduced at trial confirmed and amplified the United States government's admissions:

- The U.S. Army alone formulated and issued the Interrogation Rules of Engagement
  (IROEs).   Exhibit B at 1-4, 45-46; Exhibit D.

- The U.S. Army alone set intelligence priorities and trained interrogators regarding the rules
  and procedures for interrogations, which applied identically to military and CACI
  interrogators.   *See* Exhibit B at 1-5; *see also* Exhibit C (JIDC organization chart from
  November 29, 2003, showing the MI chain of command with CACI interrogators
  incorporated and subordinate to military personnel); Exhibit H (CJTF-7 Interrogation and
  Counter-Resistance Policy regarding Army-approved interrogation approaches).

- The U.S. Army alone required, reviewed, and approved interrogation plans and interrogation reports, which were contained on classified U.S. Army servers. *See* Exhibit B at 6-10; *see also* Exhibit D (chart of IROEs issued by Gen. Sanchez, delineating approaches that required the Command General's approval).

- The U.S. Army alone determined what should be done with intelligence collected from interrogations. *See* Exhibit B at 11; *see, e.g.*, Exhibit I (DX 30) at 54-62.

- The U.S. Army chain of command supervised and directed all aspects of the interrogation mission and treated Army and CACI interrogators identically. *See* Exhibit B at 12-22; *see also* Exhibit C (JIDC organization chart from November 29, 2003, showing the MI chain of command with CACI interrogators incorporated and subordinate to military personnel), Exhibit E at 6 ("Identified personnel supporting this effort will be integrated into MIL/CIV analyst, screening, and interrogation teams (both static/permanent facilities and mobile locations), in order to accomplish CDR CJTF-7 priorities and tasking IAW Department of Defense, US Civil Code, and International Regulations."), Exhibit F ("As the operational element, HSTs support the overall divisional/separate brigade HUMINT mission, and ***perform under the direction and control of the unit's MI chain of command or Brigade 52, as determined by the supported command***.") (emphasis added).

- The Army approved the hiring, promotion, or transfer of interrogators and could and did require that CACI remove CACI interrogators from the contract. *See* Exhibit B at 23-31.

- CACI personnel had no role in the intelligence chain of command. *See* Exhibit B at 32-35; *see also* Exhibit C (JIDC organization chart from November 29, 2003, showing no CACI personnel supervising interrogators in the chain of command).

- CACI's supervision of its interrogators was limited to administrative matters and it had no duty or ability to supervise interrogation operations. *See* Exhibit B at 36-44; *see also* Exhibit C (JIDC organization chart from November 29, 2003, showing no CACI personnel supervising interrogators in the chain of command).

- CACI management had no role in establishing and were not advised as to intelligence priorities, operational procedures, or detainee conditions of confinement. *See* Exhibit B at 45-46.

- CACI management had no role in investigating detainee abuse at Abu Ghraib; allegations of abuse were reported to the U.S. Army. *See id.* at 47-49.[2]

---

[2] CACI management could not have investigated detainee abuse at Abu Ghraib even if it had received reports that implicated its interrogators (which it did not). To this day, CACI is not permitted even to know to whom its interrogators were assigned or what interrogations approaches the U.S. Army approved for them to use and which they actually used. *See* Section III.B, *infra*.

- CACI management in the United States were not informed about interrogation operations at Abu Ghraib, including the work performed by CACI interrogators.  *See id.* at 50-53.

The above indicia of the power to control more than meet the Fourth Circuit test for the borrowed servant doctrine.  Indeed, the relationship between CACI interrogators and the U.S. Army bears a striking resemblance to contract employees and a borrowing employer discussed in the Fourth Circuit's decision in *Huff v. Marine Tank Testing Corp.*, 631 F.2d 1140 (4th Cir. 1980).  In *Huff*, a contractor provided four contract employees to a borrowing employer with an insufficient workforce.  As the Court explained, the contractor functioned as "a source of supply of manpower to satisfy a temporary need," with the borrowing employer directing the contract employees' work based on its own business priorities.  *Id.* at 1143.

In this case, CACI provided contract interrogators because the U.S. Army did not have sufficient personnel to fulfill its mission.  *See* Dkt. #1600 (Ex. B) (Pappas Test.) at 9 ("We -- we did not have enough interrogators within the -- within the command -- the request for forces that I talked to you about was -- was trying to get more people to help us do this mission."); 4/18/24 Trial Tr. (Brady Test.) at 124:25-125:1 (CACI addressed "a shortage on the ground that we did not see addressed in a reasonable time frame").  And the U.S. Army directed CACI interrogators' work based on its own intelligence priorities.  *See* Dkt. #1600 (Ex. E) (Wood Test.) at 9.  CACI management had no role in establishing and were not advised as to intelligence priorities.  *See* Dkt. #1598 (Ex. A) (Stefanowicz Test.) at 20; Dkt. #1598 (Ex. B) (Army Interrogator C Test.) at 9-10.

In *Huff*, the contract employees remained on the general employer's payroll, and the borrowing employer paid the contractor for the use of its employees.  Because the contract employee's wages were not paid directly by the borrowing employer, rather the borrowing employer paid the contractor on a man-hour basis, the Fourth Circuit concluded that "the relation of [the borrowing employer] to the wages that [contract employee] actually received was much

less indirect than it would have been if [the contractor] had undertaken to accomplish a specific construction objective by its employees and resources." 631 F.2d at 1143. CACI was, likewise, paid on a man-hour basis for the number of hours dictated by the U.S. Army and CACI's invoices billing interrogators' time were reviewed and approved by the U.S. Army. *See* 4/19/24 Trial Tr. (Northrup Test.) at 14:15-17 (hours CACI interrogators were required to work was determined by the government), 21:20-24 (same), 24:16-24 ("Our employees would submit their hours electronically into CACI's time-keeping system. . . . I would then sit down with the COR and we would go through it line by line. And once the COR concurred with the information that was on there, it would then go back and we would then be able to submit it for payment.").

In *Huff*, the contractor had a "supervisor" on site at the general employer's worksite who appeared to have mostly been involved in timekeeping. 631 F.2d at 1142. The presence of a "supervisor" on site did not affect the Fourth Circuit's analysis because he was not present at the time of the injuries in question and was not focused on directing the actual performance of work. As the Fourth Circuit explained, the contractor "fully performed its part of the bargain when it supplied the equipment and qualified [contract employees] who would accept the direction of [the borrowing employer's] supervisors." *Id.* CACI had a site lead who handled administrative matters that arose for CACI interrogators, but had no role supervising or directing interrogation or detainee operations. *See* Exhibit B at 36-44. Moreover, CACI's site lead during the relevant period, Mr. Porvaznik, testified that he spent very little time at the hard site and did not witness any abuse. *See* 4/19/24 Trial Tr. (Porvaznik Test.) at 89:3-10, 101:13-17. Thus, like the supervisor in *Huff*, he was not present at the time of any alleged misconduct. That evidence was uncontradicted.

Of particular importance to the Fourth Circuit, the borrowing employer in *Huff* exercised significant direction over the work performed. 631 F.2d at 1142. The same holds true in this case:

| *Huff* | JIDC/Interrogation Control Element |
|---|---|
| • Contract employees were assigned to one of the borrowing employer's supervisors. | • CACI interrogators were assigned to tiger teams with military section leaders and supervised by the military chain of command.  *See* Exhibit A at 8; Exhibit C (JIDC organization chart).<br><br>• CACI personnel did not manage CACI interrogators.  *See* 4/18/24 Trial Tr. (Mudd Test.) at 95:9-96:1 ("I was not managing or my team leaders were not managing their day-to-day operations."). |
| • Borrowing employer supervisors assigned the contract employees their work. | • The Army determined where CACI personnel would be assigned.  *See* 4/18/24 Trial Tr. (Billings Test.) at 24:17-23.<br><br>• Military intelligence supervisors assigned detainees to interrogators.  *See* Dkt. #1600 (Ex. A) (Army Interrogator E Test.) at 4-5; 4/19/24 Trial Tr. (Porvaznik Test.) at 101:18-102:10.<br><br>• CACI personnel had no ability to assign CACI interrogators to conduct particular interrogations. *See* 4/19/24 Trial Tr. (Porvaznik Test.) at 107:16-25.<br><br>• CACI management in the United States had no role in assigning detainees to interrogators.  *See* Dkt. #1598 (Ex. E) (Army Interrogator F Test.) at 13. |
| • Contract employees did not work together, but were integrated into teams with the borrowing employer's workers. | • CACI interrogators did not work together, but were integrated into tiger teams with military interrogators.  *See* Exhibit C (JIDC organization chart); |
| • The borrowing employer treated the contract employees the same as it treated its own employees for purposes of assignments and supervision. | • CACI interrogators were subject to identical rules and procedures as Army interrogators.  *See* 4/15/24 PM Trial Tr. (Nelson Test.) at 108:14-19; 4/16/24 PM Trial Tr. (Taguba Test.) at 17:8-13; Dkt. #1591 (Morse Test.) at 91-92; Dkt. #1600 (Ex. E) (Wood Test.) at 8-10; Dkt. #1600 (Ex. B) (Pappas Test.) at 19-21.<br><br>• CACI interrogators were incorporated into the Interrogation Control Element and treated the same as Army interrogators, to the point where they were indistinguishable from an operational standpoint. *See* 4/18/24 Trial Tr. (Brady Test.) at 122:2-14; Dkt. #1600 (Ex. E) (Wood Test.) at 7-8 ("Basically, we treated the CACI personnel the same way that |

9

| *Huff* | JIDC/Interrogation Control Element |
|---|---|
|  | we did the military intelligence."); *id.* at 9; *id.* at 11 ("I treated them all the same, so it really wouldn't have stood out to me whether they were an intel or - - or a CACI guy."). |
| • The borrowing employer was solely responsible for working conditions and hazards which might be encountered in the course of the work. | • The Army was responsible for base security. *See* Dkt. #1600 (Ex. B) (Pappas Test.) at 4-6.<br><br>• The Army was responsible for detainee operations. *See* 4/16/24 AM Trial Tr. (Taguba Test.) at 82:20-21; *see also* Exhibit J (PTX 23 excerpt) at 16 ("The 800th MP Brigade was designated the responsible unit for the Abu Ghraib detention facility and for securing and safeguarding the detainees."). |

In *Huff*, the Fourth Circuit also held that it was of "no moment" that the supervision provided by the borrowing employer was not close. 631 F.2d at 1143-44.[3]  In particular, the fact that there was "no suggestion that [the borrowing employer's] supervision of the work of [the contract employees] differed in the least from its supervision of [employees] on its own payroll," demonstrated the applicability of the borrowed servant doctrine. *Id.*  Regardless, the *quality* of the control exercised by the borrowing employer is not the right question.  What matters is who had "the *power* to control," not whether they wielded that power effectively.  *Estate of Alvarez*, 96 F.4th at 694 (emphasis added).  Irrespective of whether the Army did a good job controlling CACI interrogators or running detainee operations at Abu Ghraib, the trial evidence left no room for dispute that *only* the Army had the power to direct how CACI interrogators conducted the interrogation mission and interacted with detainees.

Plaintiffs' main "evidence" that CACI maintained control over its interrogators at Abu Ghraib are cherry-picked quotes from the Army Field Manual that provides non-binding guidance

---

[3] *See also Coker v. Gunter*, 191 Va. 747, 754-55 (Va. 1951) (borrowed servant doctrine applied where the borrowing employer told the employee when to work and when to quit, where to go and what to do, and the work being done was planned by borrowing employer, including the time, means and method of doing it).

regarding the use of contractors on the battlefield.  *See* Exhibit C (PTX 207).[4]  The problem with

this evidence is that Mark Billings testified – unrefuted – that the field manual "is just guidance;

it's not policy."  *See* 4/18/24 Trial Tr. at 61:16-17; *see also id.* at 67:6-10 ("The Army publishes

information on all different types of topics.  These are things that could be considered when I was

a soldier as, okay, these are good ideas, but it doesn't mean that it is a dictated policy that you must

do these things.").  His testimony is corroborated by the field manual itself, which states, "Field

Manual 3-100.21 (100-21) addresses the use of contractors *as an added resource for the*

*commander to consider* when planning support for an operation."  Exhibit L (PTX 207) at 4

(emphasis added).  Regardless, as the jury ably pointed out: "There are clear contradictions in the

Field Manual, mainly regarding COR responsibilities . . . ."  Exhibit M (5/1/24 Jury Note).  The

jury rightly questioned what weight and credibility could be given a self-contradictory piece of

evidence that is not even binding.  *Id.*  As explained above, rules on paper, even if they were

supposed to be binding, do not trump the facts on the ground in assessing the power to direct and

control.  By any measure, that power rested exclusively with the U.S. Army.

Plaintiffs also offered the theory that a breakdown in the Army's chain of command should

negate the borrowed servant even if the Army was supposed to be directing and controlling the

loaned employees.  This mischaracterization of the law clearly affected the jury, which queried,

"In regards to the Fay/Jones report (PTX-023, pg 23 of 177) who is responsible for interrogation

operations if there was no chain of command or direction?"  *Id.*  But, as explained above, this is

not a question that the jury needed to resolve as the only question the jury needed to answer was

---

[4] Notably, Col. Pappas had never seen this purportedly authoritative document.  Exhibit K (excerpt from Pappas *de bene esse* deposition).  This testimony was removed as part of an objection from the recording of Col. Pappas's *de bene esse* deposition cross-examination played at trial. CACI would not consent to its removal at a retrial.

whether the Army had the "*power* to control" interrogation operations (not whether it actually did so or did so effectively). *Estate of Alvarez*, 96 F.4th at 694 (emphasis added). And the answer to that question is unequivocally "yes." *See* Exhibit B at 1-31.

Unable to overcome the inundation of evidence proving the Army's exclusive control, Plaintiffs have repeatedly pedaled the false narrative that *Estate of Alvarez* limits the borrowed servant doctrine to situations where the transfer of direction and control to the borrowing employer is complete on all matters. 96 F.4th at 693.[5] But Fourth Circuit precedent is clear: "The authority of the borrowing employer does not have to extend to every incident of an employer-employee relationship; rather, it need only encompass the servant's performance of the particular work in which he is engaged at the time of the accident." *Ladd v. Rsch. Triangle Inst.*, 335 F. App'x 285, 288 (4th Cir. 2009) (citations and quotation omitted) (quoting *White v. Bethlehem Steel Corp.*, 222 F.3d 146, 149 (4th Cir. 2000)). A contrary rule of law would effectively eliminate the borrowed servant doctrine. The very point of the borrowed servant doctrine is that a person can be in the employ of a general employer, but treated as the employee of a borrowing employer (and not of the general employer) for particular matters. *Id.* at 693-94. By definition, a borrowed servant *always* wears two hats – as an employee on the books of a general employer but on loan to another employer with the power to direct and control the employee's work.

This makes good sense. The entire point of *respondeat superior* liability is that the employer was in a position to exercise control and prevent tortious conduct committed by its employee. As the Supreme Court explained in a borrowed servant case cited with approval in

---

[5] The Court has rightly rejected this argument. *See, e.g.*, 4/22/2024 Trial Tr. at 8:8-10 ("I've looked again at the *Alvarez* case. I think that our instruction absolutely models the Fourth Circuit's discussion of the borrowed servant doctrine . . . ."); *id.* at 8:14-18 ("Other than the plaintiffs wanting to add additional gloss, which I don't think is necessary, and it's certainly not within the *Alvarez* decision, I think this is a correct statement of Fourth Circuit law on this issue.").

*Estate of Alvarez*:  "In substance, it is that the master is answerable for the wrongs of his servant, not because he has authorized them nor because the servant, in his negligent conduct, represents the master, but because he is conducting the master's affairs, and the master is bound to see that his affairs are so conducted that others are not injured."  *Standard Oil*, 212 U.S. at 221.  When a general employer has no ability to control or prevent the conduct at issue, the basis for extending liability to that employer evaporates.  This does not mean that no one can be held liable for the alleged misconduct, but rather ensures that the entity that actually bore responsibility for directing the employee's actions and reaped the benefits of the employee's labors be held to task instead.  The jury repeatedly requested further and more detailed instruction over the legal standard for the borrowed servant doctrine.  *See, e.g.*, Exhibit M, Exhibit N (4/24/24 Jury Note, Q2), Exhibit O (4/25/24 Jury Note, Q2), Exhibit P (Supplementary Instruction No. 1).  Ultimately, the jury's inability to agree on an interpretation of the doctrine contributed to its inability to reach a unanimous conclusion.  Exhibit Q (5/2/24 Jury Note) ("We are also not unanimous about our interpretations of the borrowed servant doctrine . . . .").

Differing interpretations of the borrowed servant doctrine by a lay jury, however, raise no barrier to the Court implementing its proper interpretation of the legal standard to the undisputed facts.  What matters is which entity had the actual power to direct and control CACI interrogators, not what Army manuals recommend or what best practices might be.  CACI management basically knew where its interrogators were deployed within Iraq and that's it.  CACI management could not have directed and controlled interrogators' interactions with detainees if it had wanted to do so.  The borrowed servant doctrine clearly applies and requires entry of judgment.

## B.     The Government's Invocation of the State Secrets Privilege Prevented CACI from Obtaining a Fair Trial

The Court upheld three assertions of the state secrets privilege by the United States, all of which denied CACI access to, and the ability to present to the jury, crucial evidence regarding Plaintiffs' assigned interrogators and Plaintiffs' interrogations.  This included prohibiting CACI from discovering and presenting at trial evidence regarding the identities and backgrounds of the Army *and CACI* interrogators who were assigned to interrogate these Plaintiffs.[6]  The state secrets privilege also barred CACI from discovery and presenting at trial virtually every important fact regarding the conduct of Plaintiffs' interrogations, such as: (1) counterintelligence reports related to Plaintiffs, (2) summary interrogation reports for Plaintiffs' interrogations containing analyst and interrogator intelligence focus comments, (3) interrogation collector comments regarding Plaintiffs, (4) Plaintiffs' interrogation plans, (5) approaches used during Plaintiffs' interrogations; (6) observations related to Plaintiffs' mood/attitude, (7) interrogator recommendations and/or suggested future approaches that may work with the Plaintiff, and (8) suggestions for when future interrogations of a Plaintiff should occur.  Dkt. #1042 at 6 (quoting Sec. Mattis' declaration asserting state secrets privilege).  Among these withheld documents was the "tailored interrogation plan actually used for a lengthy interrogation of Plaintiff Al Shimari," the only interrogation of Al Shimari that the United States identified.  *Id.* at 7.

Prior to trial, CACI raised due process concerns about its inability to present evidence in its defense because the government asserted state secrets privilege over extensive swaths of material information.  *See, e.g.*, Dkt. #1042.  In a sense, CACI's pretrial concerns were

---

[6] CACI has not found another case where a company defending itself was denied the opportunity to learn the identities of ***its own employees*** who were eyewitnesses regarding a plaintiff's allegations, or to call those employees to testify in person at trial.

hypothetical, as only a trial would show how these concerns played out.  Trial demonstrated that CACI's concerns were, if anything, understated.  Denying the jury evidence regarding the identities and backgrounds of Plaintiffs' interrogators, live testimony from interrogators so that the jury could make a credibility assessment, and contemporaneous records regarding Plaintiffs' treatment, denied CACI due process in the trial of this action.  The same would occur in a retrial.

"[S]ome matters are so pervaded by state secrets as to be incapable of judicial resolution once the privilege has been invoked." *El-Masri v. United States*, 479 F.3d 296, 306 (4th Cir. 2007) (citing *Totten v. United States*, 92 U.S. 105, 107 (1875), and *United States v. Reynolds*, 345 U.S. 1, 11 n. 26 (1953)).  When protection of state secrets deprives the parties of information central to the litigation of the case, dismissal is required because the plaintiff's "personal interest in pursuing his civil claim is subordinated to the collective interest in national security." *Abilt v. CIA*, 848 F.3d 305, 318 (4th Cir. 2017); *see also El-Masri*, 479 F.3d at 306, 312.  The Fourth Circuit has recognized that dismissal is required when privileged information is so central to the litigation that if "the defendants could not properly defend themselves without resort to privileged evidence." *El-Masri*, 479 F.3d at 309.  As the trial has confirmed, CACI could not properly defend itself without using information withheld on state secrets grounds.

The central function of a jury is assessing the credibility of witnesses. *United States v. Scheffer*, 523 U.S. 303, 312-13 (1998).  "[I]t is the jury's province to weigh the credibility of the witnesses, and to resolve any conflicts in the evidence." *United States v. Hunt*, 99 F.4th 161, 185 (4th Cir. 2024) (citations omitted).  Here, the looming presence of the state secrets privilege made a fair assessment of credibility impossible.  The Plaintiffs and their assigned interrogators provided conflicting testimony about whether abuses occurred during Plaintiffs' interrogations.  Plaintiffs testified to severe mistreatment during their interrogations and the interrogators and interpreters

15

denied that any treatment similar to what Plaintiffs alleged occurred in any interrogation in which they participated.  While the jury had to decide who was telling the truth, CACI was prevented from discovering, and advising the jury of, the interrogators' and interpreters' identities and backgrounds.  Because of the state secrets privilege, Army and CACI interrogators, and civilian interpreters, could not appear live at trial, but were presented through tape-recorded and pitch-adjusted depositions.  These recordings were choppy, pseudonymous audio files that were rendered tedious by the government's incessant privilege objections and irritating to listen to as a result of the government's demand that CACI alter the recordings' pitch.  No one present in the courtroom could contest that listening to the pseudonymous depositions was a painful experience[7] – one CACI had no choice but to inflict on the jury.

By excluding from live testimony the only eyewitnesses to Plaintiffs' interrogations, it was impossible for the jury to make reasonable credibility determinations regarding their testimony – testimony that directly contradicted the Plaintiffs' claims.  *See United States v. Maynard*, 90 F.4th 706, 712 (4th Cir. 2024) ("jurors assess credibility not only by facial expressions, but also by "the words the witnesses said . . . how they said them . . . their body language, their pauses, their mannerisms[,] and all the other intangible factors that are present in a trial." (citation omitted)).

Apart from presentation issues, the state secrets privilege severely undermined the *substance* of the interrogators' testimony.  For both Army *and CACI* interrogators interacting with Plaintiffs, CACI was prevented from asking or presenting to the jury:

- When they arrived or how long they served at Abu Ghraib;

- Anything about their professional backgrounds, including whether they served anywhere in Iraq outside of Abu Ghraib, whether they had prior military experience (including military interrogation experience), and, if so, what type of discharge they received, and

---

[7] 4/18/24 Trial Tr. at 116:13-16 ("I have to tell you, the way these are going in – I'm watching the jury.  Up until now, they're taking notes.  They're not taking notes anymore.").

what if any prior military training in interrogations or interrogation approaches they had undergone;

- Whether they had ever been accused of misconduct related to detainee abuse at Abu Ghraib or were identified in the government reports Plaintiffs were able to put into evidence as someone suspected of misconduct at Abu Ghraib;

- Whether they were Steve Stefanowicz, Daniel Johnson, or Tim Dugan, whom Plaintiffs vilified as their main "proof" of CACI's purported conspiracy liability;

- If they worked for CACI, how they were recruited and hired; and

- Whether they were ever reprimanded by either the U.S. military or CACI.

*See generally, e.g.*, Dkt. #1598 (Ex. C).  Meanwhile, Plaintiffs were permitted to compound CACI's prejudice by offering evidence suggesting that *some* CACI interrogators were not sufficiently credentialed or trained, as well as government reports based entirely on hearsay that three CACI interrogators likely engaged in misconduct.  CACI's presentation of interrogator testimony by pitch-adjusted audio recordings, subject to myriad state secrets objections, prevented CACI from presenting evidence as to the training and experience of the CACI interrogators who actually interrogated Plaintiffs, from showing whether the CACI interrogators who interacted with Plaintiffs were accused of misconduct in government reports, and denied the jury the opportunity to view the pseudonymous interrogators to assess their demeanor and credibility.  CACI also was prevented by the state secrets privilege from discovering and presenting contemporaneous records of Plaintiffs' treatment during interrogations, such as approved interrogation plans and reports, that could have corroborated the interrogators' testimony.

Plaintiffs, on the other hand, were permitted to present live testimony, either in person or via video conference, that had no government objections and no alterations to their appearances or voices.  Plaintiffs also were allowed to "humanize" their clients by presenting them as family men – a "journalist, a taxi driver and a farmer [who were] swept up and taken to a prison outside of

17

Baghdad" (4/22/24 Trial Tr. at 18:4-5), while CACI was prohibited from presenting any evidence bearing on Plaintiffs' character and motive to lie (such as Al Shimari's membership in the Ba'ath Party, the cache of explosives and weapons in his possession when he was apprehended, or why the U.S. Army detained him for nearly five years). Someone actively involved in an insurgency against American troops might have a strong incentive to lie about his treatment, and the evidence CACI was prevented from presenting went straight to his credibility. CACI was not even permitted to advise the jury that Al Shimari and Al Zuba'e appeared by video because they are not permitted to enter the United States. By contrast, the state secrets privilege barred CACI from providing any useful background information to "humanize" Plaintiffs' interrogators, who directly contravened Plaintiffs' testimony. All of this put CACI at an incalculable disadvantage at trial.

*El-Masri* is directly on point. El-Masri asserted a *Bivens* claim and two Alien Tort Statute claims against CIA personnel and government contractors, alleging that he had been subjected to the United States' extraordinary rendition program and "was detained and interrogated in violation of his rights under the Constitution and international law." 479 F.3d at 299. The United States invoked the state secrets privilege regarding its extraordinary rendition program and El-Masri's treatment pursuant to that program. *Id.* at 301. The United States' invocation of privilege included the "means and methods" of El-Masri's rendition and treatment. *Id.* at 311.

The court affirmed dismissal because the defendants could not fairly defend themselves without use of privileged state secrets. As the court explained:

> The main avenues of defense available in this matter are to show that El–Masri was not subject to the treatment that he alleges; that, if he was subject to such treatment, the defendants were not involved in it; or that, if they were involved, the nature of their involvement does not give rise to liability. Any of those three showings would require disclosure of information regarding the means and methods by which the CIA gathers intelligence. If, for example, the truth is that El-Masri was detained by the CIA but his description of his

18

> treatment is inaccurate, that fact could be established only by disclosure of the actual circumstances of his detention, and its proof would require testimony by the personnel involved.

*Id.*  Here, the government's assertions of state secrets – which the Court ultimately concluded were haphazard and, at times, indefensible[8] – prevented CACI from fairly developing its case that CACI interrogators were not involved in Plaintiffs' alleged mistreatment and, to the extent CACI interrogators were implicated in any wrongdoing at Abu Ghraib, such conduct did not relate to Plaintiffs' mistreatment or give rise to liability.  This is no longer a hypothetical inquiry as to whether a trial can fairly be held without this information.  The trial record, and the imbalance of evidence Plaintiffs were permitted to admit for the jury's consideration versus the evidence CACI was prohibited even from learning, proves it cannot.

### C.      No Reasonable Jury Could Find CACI Liable Based on the Evidence Plaintiffs Adduced at Trial

#### 1.      Plaintiffs' Aiding and Abetting Claims Fail as a Matter of Law

A motion under Rule 50 "assesses whether the claim should succeed or fail because the evidence developed at trial was insufficient as a matter of law to sustain the claim."  *Belk, Inc. v. Meyer Corp.*, 679 F.3d 146, 155 (4th Cir. 2012).  As the Court rightly observed, Plaintiffs failed to introduce sufficient evidence to meet the operative standard for aiding and abetting.  5/2/24 Trial Tr. at 14:18-21 ("[T]he more I think about the evidence that's been presented, and if you look at the jury instruction and the Fourth Circuit case law, I don't think that count can be sustainable.").  Specifically, Plaintiffs lack any evidence that CACI personnel provided practical assistance to the

---

[8] *See* 4/18/24 Trial Tr. at 116:22-117:6 ("[Y]ou've made the point, I think, quite graphically, that there were all kinds of what I think now as you look at the context of this case were completely unreasonable invocations of any kind of state secret or privilege. . . . [B]etween two of the interrogators, in one it was okay to talk about the Geneva Convention, and the other it wasn't.  Absolutely ridiculous.").

soldiers who allegedly mistreated them, or that CACI personnel did so for the purpose of facilitating a crime.  Accordingly, CACI is entitled to judgment as a matter of law.

In *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 398 (4th Cir. 2011), the Fourth Circuit held that international law determines the standard for imposing accessorial liability under ATS.  Using international law, the court specified the requirements for aiding and abetting liability under ATS:

> [A] defendant may be held liable under international law for aiding and abetting the violation of that law by another when the defendant (1) provides practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) does so with the purpose of facilitating the commission of that crime.

*Id.* (quoting *Presbyterian Church of Sudan v. Talisman*, 582 F.3d 244, 258 (2d Cir. 2009)).  Thus, Plaintiffs must show that CACI interrogators (1) assisted in the perpetration of a crime against *these Plaintiffs*, and (2) acted with the purpose of causing abuse allegedly suffered by *these Plaintiffs*.  Plaintiffs produced no evidence whatsoever of either element at trial.

In *Aziz*, the Fourth Circuit relied on the Second Circuit's decision in *Talisman* in affirming dismissal of the plaintiffs' aiding and abetting claim because they failed to allege substantial actual assistance in the commission of an international law violation that resulted in injury to the plaintiff.  *Id.* at 401.  In *Talisman*, the Second Circuit held that aiding and abetting claims were available under ATS, but affirmed the entry of summary judgment because the record did not show actions by the defendant that assisted in causing injury *to the plaintiffs in that case*.  582 F.3d at 262–63.  In so doing, the Second Circuit found that while a Talisman Energy subsidiary may have refueled military aircraft bombing civilians, there was no evidence that Talisman was involved in refueling the military bombers *that attacked the plaintiffs*.  *Id.*

The record in this case requires entry of judgment for CACI on aiding and abetting, as there is no evidence that CACI personnel assisted anyone in abusing these Plaintiffs, nor that CACI personnel did so for the purpose of facilitating a crime.  Plaintiffs provided no facts at trial

regarding involvement by CACI employees in any mistreatment they allegedly suffered. Plaintiffs do not allege that any CACI employee ever laid a hand on them. *See* 4/22/24 Trial Tr. at 90:13-15 (Jury Instructions) ("The plaintiffs do not allege that any CACI personnel, including Steve Stefanowicz, Daniel Johnson and Timothy Dugan, directly mistreated them."). The only possible evidence of an interaction between a CACI employee and any plaintiff is a statement from Sergeant Beachner, but Sergeant Beachner is clear that the single interaction he described between an Al Jazeera reporter (possibly Plaintiff Al Ejaili) and Mr. Stefanowicz fully complied with the IROE. *See* Exhibit A at 16. Plaintiffs Al Shimari and Al Zuba'e were similarly unable to connect any of their alleged abuse to CACI personnel.

Even accepting Plaintiffs' testimony of mistreatment, Plaintiffs have not developed evidence that CACI employees did anything that substantially aided or encouraged the tortfeasors.[9] In addition to the government records that contradict Plaintiffs' testimony, every single military or contractor participant in the interrogations of Plaintiffs Al Shimari and Al Zuba'e deny that they engaged in any of the conduct the men allege or that they instructed or even witnessed anyone else engage in such conduct.[10] Thus, *if* Plaintiffs' allegations are true, there is substantial evidence that

---

[9] Even if Plaintiffs would have been able to present such evidence, the Court observed that such actions likely would have been outside the scope of employment for CACI interrogators. *See* 4/15/24 PM Trial Tr. at 93:23-25 (commenting in relation to whether statements related to abuse occurred within the scope of employment, "That's part of the problem, too, is they're acting outside the scope of the contract and they're not protected within the scope of employment.").

[10] Dkt. #1600 (Ex. C) (CACI Interrogator A Test.) at 25:07-09, 25:15, 93:05-10, 93:16-17, 93:19-95:05, 98:06-18, 99:07-100:08, 101:01-09, 102:02-21, 103:10-13, 103:18-104:08, 104:13-18, 105:01-08, 105:14-15, 105:22-106:02, 106:06-22, 108:03-05, 108:11, 111:08-21; Dkt. #1600 (Ex. D) (Army Interrogator B Test.) at 27:13-16, 84:01-06, 84:08, 85:08-10, 85:13; Dkt. #1598-3; Dkt. #1598 (Ex. B) (Army Interrogator C Test.) at 57:05-61:03, 61:08-61:21, 64:05-65:10, 66:11-67:02; Dkt. #1600 (Ex. A) (Army Interrogator E Test.) at 62:19-65:05, 68:04-09, 69:13-70:01, 120:15-17, 120:20, 120:22-121:06, 186:15-18, 186:20; Dkt. #1598 (Ex. E) (Army Interrogator F Test.) at 30:17-31:05, 44:11-45:06, 54:16-59:03, 62:03-15, 63:08-14, 64:02-13, 64:22-65:06, 65:09; Dkt. #1598 (Ex. C) (CACI Interrogator G Test.) at 30:21-31:18, 33:09-34:10, 44:07-54:06, 54:21-55:20, 56:05-61:03, 62:10-18, 62:20-63:03, 106:13-107:13, 108:11-21; Dkt. #1598 (Ex. G)

none of the mistreatment they suffered occurred in the context of an identified interrogation (let alone an interrogation involving a CACI interrogator).

Plaintiffs presented no evidence that the few CACI interrogators *accused* of misconduct at Abu Ghraib – Messrs. Stefanowicz, Johnson, and Dugan – were assigned to them. The only evidence is to the contrary. *See, e.g.*, Dkt. #1598 (Ex. A) (Stefanowicz Test.) at 33-34. This is critical because the undisputed trial evidence was that interrogators never "set conditions" nor directed the treatment of detainees to whom they were not assigned. *See, e.g.*, Dkt. #1585 (Ex. A) (Graner Test.) at 7-8 (Graner recalls receiving instructions from interrogators only for detainees to whom that interrogator was assigned); Dkt. #1588 (Ex. A) (Frederick Test.) at 56-57 (Frederick recalls receiving instructions from interrogators only for detainees to whom that interrogator was assigned); Dkt. #1588 (Ex. C) (Harman Test.) at 73 (the only incident Harman recalls involving a CACI interrogator related to a detainee to whom he was assigned); Dkt. #1598 (Ex. A) (Stefanowicz Test.) at 23, 31. The pseudonymous Army and CACI interrogators also testified that other CACI personnel had no role in dictating how their assigned detainees (*i.e.*, Plaintiffs) were treated. *See, e.g.*, Dkt. #1598 (Ex. B) (Army Interrogator C Test.); Dkt. #1598 (Ex. C) (CACI Interrogator G Test.) at 25-26; Dkt. #1598 (Ex. E) (Army Interrogator F Test.) at 13.

Plaintiffs themselves have admitted that they lack facts tying CACI personnel to their alleged mistreatment. *See, e.g.*, 4/15/24 Trial Tr. (Al Ejaili Test.) at 55:11-16, 61:20-23, 62:7-10, 71:6-20 (Q. And so the answer is no, you can't point to a CACI employee giving anyone instructions about your treatment. Correct? A. No.); 5/16/24 Trial Tr. (Al Zuba'e Test.) at 51:12-15, 56:10-22; 5/17/24 Trial Tr. (Al Shimari Test.) at 39:20-40:6, 51:1-7, 51:24-52:4, 54:13-25,

---

(Interpreter M Test.) at 34:10-14, 35:10-14, 35:21-36:01, 50:07-16, 66:12-16, 68:07-69:04, 69:14-18, 70:09-71:18, 72:01-12, 102:18-103:16; Dkt. #1598 (Ex. H) (Interpreter N Test.) at 39:01-07, 55:05-58:01, 58:06-17, 60:07-09, 63:09-64:08, 118:12-16.

55:24-56:5.  Repeating their mantra – contradicted by all of the government evidence in this case and their own prior statements[11] – that unidentified civilians caused all their woes is insufficient. As in *Aziz* and *Talisman*, this wholesale absence of facts is fatal to Plaintiffs' aiding and abetting claims and requires entry of judgment as a matter of law.

### 2.    Plaintiffs Failed to Present Sufficient Evidence of Conspiracy

Plaintiffs failed to demonstrate any CACI interrogators or other personnel participated in a conspiracy that resulted in Plaintiffs being tortured or subjected to cruel, inhuman, or degrading treatment ("CIDT").  To prove a conspiracy, Plaintiffs needed to show:

> That there was an agreement between two or more persons to inflict torture or cruel, inhuman or degrading treatment on detainees at the Abu Ghraib hard site.
>
> That the defendant knowingly and intentionally joined the conspiracy.
>
> That either the defendant or a co-conspirator committed an act in furtherance of the conspiracy.
>
> The torture and/or cruel, inhuman or degrading treatment to which plaintiffs were subjected resulted from acts in furtherance of the conspiracy.

4/22/24 Trial Tr. (Jury Instructions) at 100:12-101:4.

"[P]arallel conduct and a bare assertion of a conspiracy are not enough for a claim to proceed."  *Thomas v. Salvation Army S. Territory*, 841 F.3d 632, 637 (4th Cir. 2016).  "Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."  *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011); *see also Grenadier v. BWW Law Grp.*, No.

---

[11] *See, e.g.*, Exhibit A at 4-15 (identifying multiple Army interrogators); Exhibit R (PTX 20, Al Zuba'e's statement to CID regarding his treatment in January 2004 alleging mistreatment only by soldiers); Exhibit S (PTX 224, Al Ejaili's report to Al Jazeera within the months after his release indicating zero mistreatment at the hands of civilians).

1:14-cv-827, 2015 WL 417839, at *11 (E.D. Va. Jan. 30, 2015). "[W]hen concerted conduct is a matter of inference, a plaintiff must include evidence that places the parallel conduct in context that raises a suggestion of a preceding agreement as distinct from identical, independent action." *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 278 (4th Cir. 2012) (internal quotations omitted). "The evidence must tend to exclude the possibility that the alleged co-conspirators acted independently." *Id.*; *see also A Society Without a Name*, 655 F.3d at 346.

Plaintiffs offered no evidence of any agreement between anyone from CACI and anyone else "to inflict torture or cruel, inhuman or degrading treatment on detainees at the Abu Ghraib hard site." 4/22/24 Trial Tr. (Jury Instructions) at 100:18-21. At most, Plaintiffs offered evidence of discrete incidents involving three CACI interrogators that did not involve Plaintiffs. The Fay Report chronicled forty-four incidents of abuse of detainees, but does not characterize these as the product of an overarching conspiracy. Rather, for the sixteen incidents of abuse for which MG Fay found interrogator involvement, he concluded that mistreatment "was directed on an individual basis." Exhibit J at 41. Indeed, the abuses detailed in the Fay report reflect random, uncoordinated and spontaneous acts of abuse, most of which had no connection with interrogations whatsoever. *Id.* at 41-42. The Plaintiffs' claim of conspiracy amounts to nothing more than speculation and conjecture, as the evidence presented at trial did not provide sufficient facts giving rise to an inference of a meeting of the minds to support a claim for conspiracy. There is simply no evidence that suggests a commitment to a common purpose.

The Fay Report paints a picture of Abu Ghraib as involving unmitigated *chaos* – failures of leadership supervision, systemic problems – inadequate interrogation doctrine and training, an acute shortage of soldiers, lack of clear lines of responsibility between the military chains of command, lack of clear interrogation policy, intense pressure to produce actionable intelligence,

use of Abu Ghraib by the CIA, significant confusion with respect to interrogation techniques, an outdated military training manual for interrogations, severe overcrowding at Abu Ghraib – a totally inadequate physical plant, scarcity of resources, frequent mortar attacks on Abu Ghraib killing and wounding detainees, a broken detention operations program. *Id.* at 3-5, 11-12, 23-24. These facts all contradict the notion that there was any sort of coordination and planning one would expect to find in a conspiracy.

There is no evidence suggesting that the discrete acts of misconduct for which CACI interrogators are accused – none of which involved these Plaintiffs – were part of a broader, preceding agreement. The trial evidence showed that it was U.S. Army-directed procedure for Army and CACI interrogators to work with military police to implement approved interrogation approaches. *See, e.g.*, Dkt. #1600 (Ex. B) (Pappas Test.) at 27. Following that process, even if it resulted in mistreatment by the military police, does not prove an independent agreement between the interrogators and military police to torture or commit CIDT. Both the Taguba Report and the Fay Report depict chaos at the Abu Ghraib hard site. Chaos is antithetical to the notion of a conspiracy, which requires an agreement to act in concert pursuant to a common plan for the purpose of achieving a particular objective. Moreover, the trial evidence demonstrated that the notorious sexual assaults and physical assaults inflicted by MPs were not the product of instructions from interrogators, but were the actions of sadistic and sick MPs acting on their own. Dkt. #1588 (Ex. A) (Frederick Test.) at 108:22-109:22.

With respect to the second and third elements, whether anyone from CACI "knowingly and intentionally" joined the purported conspiracy and committed acts in furtherance thereof, the Court rightly observed at nearly the close of evidence, that "Dugan, Johnson and Stefanowicz . . . are the three and the only three CACI people who've been identified as having been possibly

complicit in the conspiracy." *See* 4/18/24 Trial Tr. at 7:3-6. But, of course, complicity is not enough. "[T]here must be evidence that a defendant knowingly and intentionally did something that enabled the wrongful conduct to occur." 4/22/24 Trial Tr. (Jury Instructions) at 101:24-102:1. The "wrongful conduct" at issue here was a purported conspiracy to inflict torture and CIDT on detainees generally at Abu Ghraib prison. *Id.* at 100:18-21. At most, the hearsay evidence at trial could allow a jury to conclude that (1) Mr. Dugan once pushed one detainee down and dragged him to an interrogation booth, *see* Dkt. #1591 (Ex. B) (Fay Test.) at 56-57, (2) Mr. Johnson participated in the mistreatment of an Iraqi police officer (*i.e.*, not a detainee), *id.* at 53, 70-71, and (3) Mr. Stefanowicz participated in the mistreatment of *one* detainee to whom he was exclusively assigned, *see* Dkt. #1598 (Ex. A) (Stefanowicz Test.) at 24-25.

Even assuming all the other elements for conspiracy were met with respect to Messrs. Dugan, Johnson, or Stefanowicz (which they were not), Plaintiffs offered no evidence at trial that the discrete acts of misconduct of which these employees were accused resulted in *Plaintiffs'* alleged mistreatment pursuant to a conspiracy. Indeed, as described above, the evidence shows that none of those alleged acts had anything to do with Plaintiffs nor any agreement to mistreat the detainee population at large. These were, as they are described in the trial record, specific acts with specific detainees – not prison-wide patterns of abuse. Moreover, Plaintiffs offered no evidence at trial that any acts committed in furtherance of any agreement with CACI personnel to torture or inflict CIDT on detainees caused their alleged mistreatment. From what Plaintiffs themselves describe, most of their alleged abuse occurred outside of interrogations and related to MP management of detainees and not military intelligence priorities. Without proof of an agreement or acts in furtherance of an agreement to torture or inflict CIDT, and without proof that such acts caused Plaintiffs' alleged mistreatment, CACI is entitled to judgment as a matter of law.

### D.      Plaintiffs' Claims Are Barred Under Binding Precedents

The Rule 50 motion CACI filed at the close of Plaintiffs' case raised legal issues that the Court previously has decided against CACI as a matter of law.  CACI continues to believe these legal defenses are meritorious and concludes that they should be reasserted in this motion.

### 1.      Plaintiffs' Claims Are Impermissibly Extraterritorial

The ATS does not apply extraterritorially.  *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 124 (2013).  In *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325 (2016), the Court held that the extraterritoriality test for ATS is the "focus" test that applies to every other statute.  *Id.* at 337.  Under this test, Plaintiffs may maintain a claim under the ATS only if "the conduct relevant to the statute's focus occurred in the United States."  *Id.*  General corporate activity such as decision-making is irrelevant to an extraterritoriality analysis.  *Nestle USA, Inc. v. Doe*, 593 U.S. 628, 634 (2021) ("Because making 'operational decisions' is an activity common to most corporations, generic allegations of this sort do not draw a sufficient connection between the cause of action respondents seek – aiding and abetting forced labor overseas – and domestic conduct.").

The "focus" test forecloses Plaintiffs' claims.  The object of a secondary liability claim is the primary unlawful conduct itself, so extraterritoriality for a secondary liability claim is determined by where the primary violation occurred.  *United States v. Elbaz*, 52 F.4th 593, 604 (4th Cir. 2022), *cert. denied*, 144 S. Ct. 278 (2023).  Indeed, in *Aziz*, 658 F.3d at 398, the Fourth Circuit recognized that the object of secondary liability under ATS is the primary violation of international law, holding that aiding and abetting liability requires proof of practical assistance with the purpose of assisting *in the international law violation*.

In this case, the alleged primary violations are abuses Plaintiffs allegedly suffered at the hands of U.S. soldiers in Iraq.  And even if the actual aiding and abetting or the entry into a conspiracy were the "focus" of the ATS, none of that even arguably occurred in the United States.

27

The only trial evidence regarding CACI personnel in the United States being aware of detainee abuse was a report to Amy Monahan of unspecified misconduct by junior enlisted soldiers, a report that stressed that CACI personnel were not involved in any wrongdoing.  Exhibit T (PTX 115). As this Court correctly instructed the jury, knowledge of misconduct, or failing to report observed misconduct, does not qualify as conspiratorial conduct or aiding and abetting.  4/22/24 Trial Tr. at 101:20-102:1, 103:16-21.   Accordingly, Plaintiffs' case is an impermissible extraterritorial application of the ATS and CACI is entitled to judgment at as a matter of law.

### 2.   Binding Precedent Precludes this Court from Implying a Damages Remedy for Plaintiffs' Claims

Judicial creation of substantive causes of action raise serious separation-of-powers concerns, *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 256 (2018), and its power to do so "is, at best, uncertain," *Egbert v. Boule*, 596 U.S. 482, 491 (2022); *Bulger v. Hurwitz*, 62 F.4th 127, 136 (4th Cir. 2023).  "[T]he ATS is a jurisdictional statute creating no new causes of action," *Sosa v. Alvarez-Machain*, 542 U.S. 692, 694 (2004), leaving as the only possible avenue this Court's judicial creation of a cause of action encompassing Plaintiffs' claims.

"[E]ven a single sound reason to defer to Congress" will be enough to require a court to refrain from creating an implied cause of action.  Courts have found it improper to imply causes of action in cases implicating national security.  *See Haig v. Agee*, 453 U.S. 280, 292 (1981); *see, e.g.*, *Egbert*, 596 U.S. at 483 (declining to permit a judge-made cause of action for a border patrol agent roughing up an American smuggling suspect); *Dyer v. Smith*, 56 F.4th 271, 280-81 (4th Cir. 2022) (photography of a TSA pat-down was sufficiently connected to national security to preclude a judge-made cause of action).  The national security implications here – involving interrogations of detainees for battlefield intelligence at a facility in a war zone – are much more pronounced than the national security nexus that precluded a judge-made cause of action in *Egbert* and *Dyer*.

In *Egbert*, *Dyer*, and *Bulger*, the Supreme Court and Fourth Circuit held that the mere existence of an alternative remedial structure, even if ineffective or unavailable to the plaintiff, categorically precludes a judge-created cause of action.  *See Egbert*, 596 U.S. at 484 (grievance procedure of uncertain utility); *Dyer*, 56 F.4th at 280 (remedial claim process inapplicable to the plaintiff); *Bulger*, 62 F.4th at 140–41 (process for challenging prison transfer that decedent could not use).  Here, an administrative claim process was created to address bona fide claims of detainee abuse (*see* Exhibit U (DX 37); *Saleh v. Titan*, 580 F.3d 1, 2 (D.C. Cir. 2009)), but Plaintiffs elected not to utilize it.  Under *Egbert*, *Dyer*, and *Bulger*, that is fatal to Plaintiffs' ATS claims.

This case falls squarely within the zone of claims involving national security interests (certainly more so than *Egbert* and *Dyer*), and involves a request for judge-made causes of action where Plaintiffs have eschewed alternative remedial structures.  This is not the extraordinary case where the judiciary is better equipped than Congress to authorize and define a private right of action.  Accordingly, this Court should grant judgment for CACI as a matter of law.

### 3.    Plaintiffs' Claims Are Preempted

The Constitution and federal law vest exclusive responsibility for waging war and for determining national security policy in the federal government.  U.S. Const. art. I, § 8, cls. 1, 11-15; art. II, § 2, cls. 1, 2; *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1861 (2017).  Thus, states are preempted from legislating in this context.  Using the "law of nations" – a body of rules gleaned from the law of foreign sovereigns – is even more inimical to the federal interests.

In *Saleh*, the D.C. Circuit held that the Constitutional commitment of foreign affairs powers to Congress and the President displaces ATS claims arising from war.  *Saleh*, 580 F.3d at 16 ("[R]eliance on supposed international law would impinge on the foreign policy prerogatives of our legislative and executive branches").  Accordingly, the court applied the same "ultimate military control" test for ATS claims that barred the plaintiffs' state-law claims.  *Id.* at 16.  Thus:

29

> During wartime, where a private service contractor is integrated into combatant activities over which the military retains command authority, a tort claim arising out of the contractor's engagement in such activities shall be preempted.

*Id.* at 9; *see also In re KBR, Inc., Burn Pit Litigation*, 744 F.3d 326, 349 (4th Cir. 2014) (applying same test for state-law claims). Plaintiffs' claims are subject to the "ultimate military authority" preemption test. The facts of this case are identical to *Saleh*. It is, thus, no surprise that Plaintiffs' claims are, likewise, preempted. The evidence at trial showed that the conduct at issue occurred during wartime and that CACI employees were integrated into combatant activities. 4/15/24 PM Trial Tr. at 102 (Nelson Test.); Dkt. #1600 (Ex. B) (Pappas Test.) at 24-33; Dkt. #1588 (Ex. A) (Frederick Test.) at 72, 78, 94, 115-16:07, 121-122; Exhibit E (PTX 83); Exhibit F (PTX 84).

## IV.    CONCLUSION

The Court should grant judgment as a matter of law on all claims in favor of CACI.

Respectfully submitted,

/s/   John F. O'Connor
John F. O'Connor
Virginia Bar No. 93004
Linda C. Bailey (admitted *pro hac vice*)
Joseph McClure (admitted *pro hac vice*)
STEPTOE LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 429-3000 – telephone
(202) 429-3902 – facsimile
joconnor@steptoe.com
lbailey@steptoe.com
jmcclure@steptoe.com

William D. Dolan, III
Virginia Bar No. 12455
LAW OFFICES OF WILLIAM D.
DOLAN, III, PC
8270 Greensboro Drive, Suite 700
Tysons Corner, VA 22102
(703) 584-8377 – telephone
wdolan@dolanlaw.net

Nina J. Ginsberg
Virginia Bar No. 19472
DiMuroGinsberg, PC
1001 N. Fairfax Street, Suite 510
Alexandria, VA  22314-2956
703-684-4333 – telephone
703-548-3181 – facsimile
nginsberg@dimuro.com

*Counsel for Defendant CACI Premier Technology, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 16th day of May, 2024, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the below-listed counsel.

Cary Citronberg, Esq.
Zwerling/Citronberg, PLLC
114 North Alfred Street
Alexandria, VA 22314
cary@zwerling.com

/s/   John F. O'Connor
John F. O'Connor
Virginia Bar No. 93004
Attorney for Defendant CACI Premier Technology, Inc.
STEPTOE LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000 – telephone
(202) 429-3902 – facsimile
joconnor@steptoe.com