# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| SUHAIL NAJIM ABDULLAH AL SHIMARI, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) )   No.   1:08-cv-0827 LMB-JFA |
| CACI PREMIER TECHNOLOGY, INC., | ) ) ) |
| Defendant, | ) ) ) |

## DEFENDANT CACI PREMIER TECHNOLOGY, INC.'S
## OPPOSITION TO PLAINTIFFS' MOTION FOR A NEW TRIAL

John F. O'Connor
Virginia Bar No. 93004
Linda C. Bailey (admitted *pro hac vice*)
Joseph McClure (admitted *pro hac vice*)
STEPTOE LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 429-3000 – telephone
(202) 429-3902 – facsimile
joconnor@steptoe.com
lbailey@steptoe.com
jmcclure@steptoe.com

Nina J. Ginsberg
Virginia Bar No. 19472
DiMuroGinsberg, PC
1001 N. Fairfax Street, Suite 510
Alexandria, VA  22314-2956
703-684-4333 – telephone
703-548-3181 – facsimile
nginsberg@dimuro.com

*Counsel for Defendant CACI Premier Technology, Inc.*

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................... 1

II.    ARGUMENT ................................................................................................. 2

       A.    CACI's Renewed Rule 50 Motion Should Be Granted ........................... 2

       B.    Plaintiffs Failed to Prove a Prima Facie Case for Conspiracy Involving CACI ..... 3

       C.    Plaintiffs' Aiding and Abetting Claim Is Not "Viable" ........................... 13

             1.    Plaintiffs Failed to Prove CACI Interrogators Provided Practical
                   Assistance to the Military Personnel that had a Substantial Effect on
                   Military Personnel Mistreating a Particular Plaintiff ............................... 13

             2.    Plaintiffs Failed to Prove that CACI Interrogators Provided MPs with
                   Any Assistance with the Purpose of Facilitating a Plaintiff's Abuse ....... 16

       D.    Plaintiffs Failed to Prove Vicarious Liability ....................................... 19

       E.    The Borrowed Servant Doctrine Bars Vicarious Liability as a Matter of Law .... 23

       F.    The Court Should Certify for Interlocutory Appeal any Order Denying CACI's
             Rule 50 Motion ................................................................................. 27

III.   CONCLUSION ............................................................................................. 30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A Soc'y without a Name v. Virginia*,
  655 F.3d 342 (4th Cir. 2011) ...............................................10

*Adhikari v. Kellogg Brown & Root, Inc.*,
  845 F.3d 184 (5th Cir. 2017) ...............................................28

*Al Shimari v. CACI Premier Tech.*,
  657 F. Supp. 2d 700 (E.D. Va. 2009) ...............................................20

*Al-Sabah v. World Bus. Lenders, LLC*,
  No. 18-CV-02958-SAG, 2024 WL 263579 (D. Md. Jan. 24, 2024) ....................18

*Aziz v. Alcolac, Inc.*,
  658 F.3d 388 (4th Cir. 2011) ...............................................18, 19

*Charleston Area Med. Ctr., Inc. v. Blue Cross & Blue Shield Mut. of Ohio, Inc.*,
  6 F.3d 243 (4th Cir. 1993) ...............................................4

*Cooke-Bates v. Bayer Corp.*,
  No. 3:10-CV-261, 2010 WL 4789838 (E.D. Va. Nov. 16, 2010) ...........................28

*Doe I v. Cisco Sys., Inc.*,
  73 F.4th 700 (9th Cir. 2023) ...............................................29

*Du Daobin v. Cisco Sys., Inc.*,
  2 F. Supp. 3d 717 (D. Md. 2014) ...............................................19

*El-Masri v. United States*,
  479 F.3d 296 (4th Cir. 2007) ...............................................29

*Federated Dep't Stores v. Moitie*,
  452 U.S. 394 (1981) ...............................................15

*Fry v. Rand Constr. Corp.*,
  964 F.3d 239 (4th Cir. 2020) ...............................................3

*Gairola v. Com. of Va. Dep't of Gen. Servs.*,
  753 F.2d 1281 (4th Cir. 1985) ...............................................1, 14

*Gunning v. Cooley*,
  281 U.S. 90 (1930) ...............................................4

*Kennedy v. St. Joseph's Ministries, Inc.*,
    657 F.3d 189 (4th Cir. 2011) ........................................................................28

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig.*,
    174 F. Supp. 3d 911 (D.S.C. 2016) ................................................................7

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig. (No II) MDL 2502*,
    892 F.3d 624 (4th Cir. 2018) ........................................................................7

*Lopez-Soto v. Ashcroft*,
    383 F.3d 228 (4th Cir. 2004) ...................................................................7, 16

*Loren Data Corp. v. GXS, Inc.*,
    501 F. App'x 275 (4th Cir. 2012) ................................................................12

*Mastafa v. Chevron Corp.*,
    770 F.3d 170 (2d Cir. 2014)..........................................................................29

*McDaniel v. Mehfoud*,
    708 F. Supp. 754 (E.D. Va. 1989) ...............................................................28

*McKiver v. Murphy-Brown, LLC*,
    980 F.3d 937 965 (4th Cir. 2020) ..................................................................3

*Nestle USA, Inc. v. Doe*,
    593 U.S. 628 (2021)......................................................................................28

*New York Cent. R. Co. v. Ambrose*,
    280 U.S. 486 (1930)...................................................................................6, 8

*Precision Piping & Instruments, Inc. v. E.I. du Pont de Nemours & Co.*,
    951 F.2d 613 (4th Cir. 1991) .....................................................................4, 5

*Ralston Purina Co. v. Edmunds*,
    241 F.2d 164 (4th Cir. 1957) ............................................................4, 11, 14

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000)...................................................................................2, 8

*RJR Nabisco, Inc. v. European Cmty.*,
    579 U.S. 325 (2016)......................................................................................28

*Roe v. Howard*,
    917 F.3d 229 (4th Cir. 2019) ........................................................................28

*Sanyal v. Toyota Motor N. Am., Inc.*,
    No. 1:14CV960 JCC/TCB, 2015 WL 3650725 (E.D. Va. June 11, 2015) ........................7, 16

*Thomas v. Salvation Army S. Territory*,
    841 F.3d 632 (4th Cir. 2016) ................................................................10

*United States v. Elbaz*,
    52 F.4th 593 (4th Cir. 2022), cert. denied, 144 S. Ct. 278 (2023) ...........29

*Verisign, Inc. v. XYZ.COM LLC*,
    848 F.3d 292 (4th Cir. 2017) ..................................................................7

*Watkins v. Prof'l Sec. Bureau, Ltd.*,
    201 F.3d 439 (Table), 1999 WL 1032614 (4th Cir. 1999) ....................23

*Yeager v. United States*,
    557 U.S. 110 (2009) ..............................................................................12

**Statutes**

28 U.S.C. § 1292(b) ....................................................................................29

**Other Authorities**

Fed. R. Civ. P. 50(b) .....................................................................................2

Restatement (Second) of Agency § 228 (1958) ..........................................19

Restatement (Second) of Torts § 876 (1979) ..............................................18

## I.     INTRODUCTION

Plaintiffs' motion is remarkable for what it addresses and what it ignores.  Plaintiffs devote considerable space to arguing the obvious point that plaintiffs generally are allowed a retrial after a hung jury absent an intervening decision ending the case.  But Plaintiffs bury the borrowed servant doctrine at the end of their submission, and do not address at all threshold bases for judgment such as extraterritoriality, state secrets, and the Court's power to create causes of action.

The principal reason Plaintiffs are not entitled to a retrial is that the trial of this action demonstrates CACI's entitlement to judgment as a matter of law.[1]  Plaintiffs contend that the evidence at trial on their conspiracy claims was sufficient to stave off judgment as a matter of law, but the trial produced no evidence of an agreement by CACI personnel to enter into an unlawful agreement that encompassed abuse of these Plaintiffs.  Instead, Plaintiffs argue that they have presented evidence of enough facts (such as interactions with unidentified civilians and CACI personnel being involved in mistreatment of others), from which the jury could make an educated guess that Plaintiffs were abused through a conspiracy in which CACI personnel participated.  But that falls far short of the standard.  A "case should be withdrawn from the jury when any verdict in favor of the nonmoving party necessarily will be premised upon 'speculation and conjecture.'" *Gairola v. Com. of Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985) (quoting *Ford Motor Co. v. McDavid*, 259 F.2d 261, 266 (4th Cir. 1958)).  And with no evidence at all of assistance by CACI personnel in their alleged mistreatment, Plaintiffs' aiding and abetting claims are, if anything, worse.

---

[1] CACI's Rule 50 motion is currently pending before the Court.  In this opposition, CACI responds to the arguments made by Plaintiffs in support of their request for a retrial, and does not repeat every argument made in CACI's Rule 50 motion.

The only other issues meaningfully addressed in Plaintiffs' motion – *respondeat superior* and the borrowed servant doctrine – cannot overcome the veritable mountain of evidence presented at trial showing that torture and CIDT are well outside the scope of CACI interrogators' employment and that the U.S. Army directed and controlled CACI interrogators' dealings with detainees.  For all of these reasons, the Court should reject Plaintiffs' request for a retrial and enter judgment in CACI's favor on all counts.

## II.    ARGUMENT

### A.    CACI's Renewed Rule 50 Motion Should Be Granted

Plaintiffs urge that CACI's renewed Rule 50 motion is "futile" because "the Court already denied CACI's Rule 50(a) motion at the close of Plaintiffs' case."  Dkt. #1643 at 3.  This argument is meritless.  Rule 50(b) expressly allows a defendant to renew a Rule 50(a) motion after a mistrial:

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. . . . if the motion addresses a jury issue not decided by a verdict . . .  the movant may file a renewed motion for judgment as a matter of law . . . .

Fed. R. Civ. P. 50(b).  The Court's ruling on April 17, 2024, effectively delayed any determination on the legal merits of CACI's motion and simply permitted the case to go to the jury for deliberation.  In no way does the Court's ruling during trial constitute some form of law of the case that now bars CACI's renewed motion.

The Supreme Court has directed that "in entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record."  *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000).  "In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Id.*   The task of the Court, then, is to determine whether the evidence

presented, combined with all permissible inferences, provides a legally sufficient basis for a reasonable jury to find in favor of the nonmoving party. *Fry v. Rand Constr. Corp.,* 964 F.3d 239, 244 (4th Cir. 2020). There are many grounds on which the Court could grant a Rule 50 motion, Plaintiffs' own evidence demonstrates the merit of CACI's motion. Judgment under Rule 50 is warranted "if the nonmoving party failed to make a showing on an essential element of his case with respect to which he had the burden of proof." *McKiver v. Murphy-Brown, LLC,* 980 F.3d 937 965 (4th Cir. 2020) (citing *Russell v. Absolute Collection Servs., Inc.,* 763 F.3d 385, 392 (4th Cir. 2014). That is precisely the case with respect to Plaintiffs' claims of conspiracy and aiding & abetting.

> **B.     Plaintiffs Failed to Prove a Prima Facie Case for Conspiracy Involving CACI**

Plaintiffs argue that substantial evidence admitted at trial supported their conspiracy claims. Dkt. #1643 at 4. To that end, Plaintiffs assert they put forth evidence to support four premises that – to their minds – meet the Court's enunciated standard for conspiracy. *Id.* at 4-6. Plaintiffs claim the trial record shows (1) government investigations determined "that CACI interrogators instructed military police to abuse detainees as a way to 'set the conditions' for interrogations," (2) there were instances (not related to Plaintiffs) in which CACI interrogators directed detainee abuse, (3) MPs testified that interrogators instructed them to mistreat detainees to "get them to talk," (4) Plaintiffs testified that they were abused and sometimes civilians were present and some of their abuse was similar to the instances described in government reports. *Id.* Leaving aside whether the trial record actually proves these four premises – it does not, *see, e.g.,* Section II.B, n.5, *infra* – and assuming for the moment that each was established, Plaintiffs' conspiracy claim ***still*** fails because Plaintiffs did not present evidence of causation. Only by conjecture, guesswork and speculation could a reasonable jury make the leap of logic to establish the required causative link between the conspiracy that Plaintiffs allege and the treatment to which

they testified.  The law simply does not permit the imposition of liability against a defendant on that basis.

To merit the jury's consideration of their conspiracy claims, Plaintiffs had to prove more than the ***possibility*** that their alleged injuries resulted from a conspiracy in which CACI interrogators participated.  Any inferences drawn from the evidence to establish causation must have risen to the level of "***reasonably probable***."  *Charleston Area Med. Ctr., Inc. v. Blue Cross & Blue Shield Mut. of Ohio, Inc.*, 6 F.3d 243, 248 (4th Cir. 1993) (reversing and remanding for judgment in favor of the defendant) (emphasis added).  It is not enough for the evidence to be merely consistent with Plaintiffs' theory of liability.  *Gunning v. Cooley*, 281 U.S. 90, 94-95 (1930) (quoting *Ewing v. Goode*, 78 F. 442, 444 (C.C.S.D. Ohio 1897)) ("When a plaintiff produces evidence that is consistent with an hypothesis that the defendant is not [liable], and also with one that he is, his proof tends to establish neither.").  This is particularly true when there are multiple plausible explanations for the alleged injuries, only one of which arguably implicates the defendant.  "Alternative possibilities as to the cause of an event are not enough where the defendant is liable under one and not under the others and where no basis for a rational choice and where the alternatives is provided."  *Ralston Purina Co. v. Edmunds*, 241 F.2d 164, 167 (4th Cir. 1957) (reversed and remanded for entry of judgment for defendant).  Under those circumstances, a jury could reach a verdict only based on "sheer conjecture and speculation."  *Id.*

To find for Plaintiffs, it would have been necessary for the jury to conclude that the evidence tended to exclude the possibility that the MPs who allegedly abused them acted independently.  *Precision Piping & Instruments, Inc. v. E.I. du Pont de Nemours & Co.,* 951 F.2d 613, 617 (4th Cir. 1991) (citing *Laurel Sand & Gravel, Inc.*, 924 F.2d 539, 543 (4th Cir. 1991) (citing *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764 (1984))) (affirming the district

court directing a verdict in favor of the defendant on conspiracy claims).  The jury would also have had to conclude that the evidence tended to exclude the possibility that MPs and CACI interrogators conspired to abuse particular detainees, which did not include Plaintiffs (*i.e.*, that whatever "collusive action" may have occurred did not harm Plaintiffs).  *Id.*  Accordingly, Plaintiffs needed to show that the inferences that CACI interrogators joined a conspiracy to abuse detainees at large and that caused their victimization were more "reasonable . . . [than] the competing inferences of independent action or collusive action that could not have harmed [them]." *Id.* (citing *Stephen Jay Photography, Ltd. v. Olan Mills, Inc.*, 903 F.2d 988, 994 (4th Cir. 1990)).  This Plaintiffs did not and could not do.

The evidence at trial, and specifically the premises Plaintiffs rely upon in their motion (Dkt. #1643 at 4-6), does not exclude the possibility that the MPs acted independently when they allegedly abused Plaintiffs.  Indeed, the evidence compels the conclusion of independent action.  All of the most horrific abuse at Abu Ghraib was indisputably conducted by MPs wholly outside the interrogation context.  *See, e.g.*, Dkt. #1588 (Ex. A) (Frederick Test.) at 51-54 (incidents involving a hooded detainee standing on a box with wires connected to his fingers, naked pyramid and simultaneous abuse of detainees, forced masturbation, nonconsensual groping of female detainee all unrelated to interrogations); Dkt. #1585 (Graner Test.) at 7 (instructions from military and civilian interrogators did not relate the crimes for which Graner was charged and convicted); Dkt. #1591 (Ex. A) (Fay Test.) at 66-68 (MI and CACI interrogators not involved in hooded detainee standing on a box or naked pyramid abuse); PTX-23 at 77 (military intelligence not involved in the above-mentioned acts or PFC England standing with a leash around a detainee's neck).  The Jones-Fay Report concluded that "the primary cause of the most egregious violent and sexual assault abuses was the individual criminal propensities of the particular perpetrators."  PTX-

23 at 24. Unsurprisingly then, the Jones-Fay Report contains nothing that would allow a reasonable inference of a broad conspiracy to abuse detainees. Nor does the Taguba Report permit such an inference. That Report neither finds a conspiracy nor contains evidence from which one could be inferred, hypothesized or pieced together in connection with interrogations. In short, military intelligence had nothing to do with these despicable acts.

In addition, the MPs engaged in widespread abusive practices that were completely divorced from any instructions they received from military intelligence. According to the Jones-Fay Report, "most, though not all, of the violent or sexual abuses occurred ***separately from scheduled interrogations and did not focus on persons held for intelligence purposes***." PTX-23 at 4 (emphasis added). No allegations in the Jones-Fay report involved these Plaintiffs. Out of the 25 detainees CID identified as having been abused, 11 were not even military intelligence holds. *Id.* at 104. Even types of mistreatment that could sometimes be attributed to abusive military intelligence practices could just as easily have been MPs undertaking independent action in the course of their prison guard duties. For example, while the Jones-Fay Report concluded that interrogators sometimes used nakedness to "break down" detainees, it also concluded that "MPs would also sometimes discipline detainees by taking away clothing and putting the detainees in cells naked." *See* PTX-23 at 103. Plaintiffs offered the jury no way to determine whether their alleged abuse resulted from direction by military intelligence or from separate and independent action by MPs. "The utmost that can be said is that the [abuse] may have resulted from any one of several causes, for some of which [military intelligence] was responsible, and for some of which it was not. This is not enough." *New York Cent. R. Co. v. Ambrose*, 280 U.S. 486, 490 (1930) (citing *Patton v. Texas & Pacific Railway Co.*, 179 U. S. 658, 663 (1901)).

In an effort to overcome this hurdle, Plaintiffs trumpet their self-serving and often self-contradicted[2] testimony that their abuse occurred "before, during, and after interrogations, sometimes in the presence of civilian interrogators who appeared to be directing the abuse," Dkt. #1643 at 5-6, as if this vague correlation establishes causation in their favor.  But as the Court instructed the jury, "The *mere presence* at the scene of wrongful conduct itself *does not make one a conspirator* or an aider or abettor."  4/22/2024 Trial Tr. (Jury Instructions) at 101:20-22 (emphasis added).  In any event, it is well established that "[c]orrelation does not equal causation." *Sanyal v. Toyota Motor N. Am., Inc.*, No. 1:14CV960 JCC/TCB, 2015 WL 3650725, at *7 (E.D. Va. June 11, 2015) (dismissing action because evidence that the plaintiff's seizures increased after an accident did not allow the court to infer that the accident caused the increased frequency of seizures); *see also Lopez-Soto v. Ashcroft*, 383 F.3d 228, 238 (4th Cir. 2004) (disregarding correlative evidence because a reference to an event does not demonstrate that what follows is "because of" that event).[3]  Plaintiffs' testimony is, therefore, insufficient both as a matter of law and logic to establish the causation required for their conspiracy claims.

---

[2] *See, e.g.*, Dkt. #1640-18 (Plaintiff Al Zuba'e's statement from 2004 in which he makes clear that all of his abuse was at the hands of MPs and none occurred during an interrogation); *see also* Dkt. #1640-19 (Plaintiff Al Shimari's statement from 2004 in which he makes clear that he was never abused by a civilian).

[3] *See also In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig.*, 174 F. Supp. 3d 911, 934 (D.S.C. 2016) (citing *United States v. Valencia*, 600 F.3d 389, 425 (5th Cir. 2010) ("Evidence of mere correlation, even a strong correlation, is often spurious and misleading when masqueraded as causal evidence, because it does not adequately account for other contributory variables."); *Peters v. AstraZeneca LP*, 224 Fed. Appx. 503, 507 (7th Cir.2007) ("[A] correlation alone is not evidence of causation."); *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 885 (10th Cir. 2005) ("A correlation does not equal causation.")); *see also In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 633 (4th Cir. 2018) ("confounding variables . . . 'cause a correlation to exist' between those variables 'without causation being present'"); *Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 300 (4th Cir. 2017) (affirming exclusion of expert testimony that did not distinguish between "correlation" and "causation").

But even if Plaintiffs were able to somehow saddle civilian interrogators with the blame for their mistreatment, the evidence at trial still does not exclude the possibility that OGA civilian interrogators independently subjected detainees, including Plaintiffs, to mistreatment.  The Jones-Fay Report cited the fact that multiple agencies and organizations were involved in interrogations at Abu Ghraib as one of the factors that led to the abuse that occurred.  PTX-23 at 11-12.  Indeed, the report concluded that "[i]nteraction with OGA and other agency interrogators who [MPs perceived] did not follow the same rules as U.S. Forces . . . encouraged Soldiers to deviate from prescribed techniques." *Id.* at 24.  Plaintiffs did not offer the jury any proof that could allow them to determine whether any potentially culpable civilian interrogators who influenced MPs were employed by CACI or other government agencies.  Rather, the unrefuted evidence shows that at least one of the civilian interrogators that Plaintiff Al Shimari asserts questioned him belonged to another agency.  Plaintiff Al Shimari testified that he was interrogated by a civilian with a ponytail. *See* 4/17/2024 AM Trial Tr. (Al Shimari Test.) at 49:8-18.  Assuming for a moment that testimony is truthful, the unrefuted evidence is that there were no CACI interrogators at Abu Ghraib who had long hair with ponytails during the relevant time period.  *See, e.g.*, 4/19/24 Trial Tr. (Porvaznik Test.) at 93:2-5.[4]  Again, proof that Plaintiffs' abuse resulted from one of several causes, only some of which implicate CACI interrogators "is not enough."  *See New York Cent. R. Co.*, 280 U.S. at 490 (citing *Patton*, 179 U. S. at 663).

---

[4] The fact that government records show that two CACI interrogators participated in Messrs. Al Shimari and Al Zuba'e's interrogations is meaningless to this inquiry given the overwhelming disparities between the government's records versus Plaintiffs' testimony about their interrogations.  As an initial matter, the government's evidence of what military records show for Plaintiffs' interrogations is unrefuted and comes from a disinterested party.  It, therefore, must be credited for purposes of this motion.  *Reeves*, 530 U.S. at 151.  Given that, there is no plausible way for a jury to reconcile that evidence with Plaintiffs' testimony, except by accepting the record evidence that Plaintiffs were also interrogated by civilians from other government agencies.

The evidence at trial, and specifically the premises Plaintiffs rely upon in their motion (Dkt. #1643 at 4-6), does not exclude the possibility that, if any conspiracy existed between MPs and CACI interrogators, it was limited to a relatively small number of particular detainees that did not include Plaintiffs.  As the Court rightly observed, there were "only three CACI people who've been identified as having been possibly complicit in the conspiracy," *see* 4/18/24 Trial Tr. at 7:3-6, Timothy Dugan, Daniel Johnson, and Steven Stefanowicz.  Of those three, there is no evidence that Messrs. Dugan or Johnson ever directed MPs to abuse detainees in the manner that Plaintiffs allege.  There is not a single reference in the entire record suggesting that Mr. Dugan ever ordered any MP to treat any detainee (let alone Plaintiffs) in any particular fashion.[5]  Mr. Dugan allegedly once pushed one detainee (not a Plaintiff) down and dragged him to an interrogation booth, *see* Dkt. #1591 (Ex. B) (Fay Test.) at 56-57 (no indication of collusion with MPs, no indication of any other abusive conduct).  The only evidence in the record related to Mr. Johnson related to his treatment of an Iraqi Police Officer – *not a detainee*.  Dkt. #1591 (Ex. B) (Fay Test.) at 53, 70-71

---

[5] Plaintiffs claim, "Former CACI interrogator Torin Nelson told the jury that he personally saw and heard evidence of other CACI interrogators directing detainee abuse."  Dkt. #1643 at 5.  No reasonable juror could draw that conclusion from the evidence Plaintiffs cite.  Nothing in Nelson's testimony suggests CACI interrogators directed anyone else to do anything.  Indeed, he was forced to admit that he did not "know of any circumstances where military police working within the detention facility were used to soften up or prepare the detainees for interrogations by giving them physical fitness or other acts to sway the detainee to cooperate."  4/15/2024 PM Trial Tr. (Nelson Test.) at 111:23-112:3.  Nelson testified that he had been assigned a detainee who had formerly been assigned to Dugan because the detainee had a medical condition and said the detainee had an old bruise on his arm and a bump on his forehead and that he saw no indication it related to an interrogation in the interrogation log.  *Id.* at 89:6-91:8.  Nelson also testified that Johnson "had a good attitude" and "want[ed] to do a good job," but used "the fear of harsh approach, a little bit excessively, in my opinion."  *Id.* at 95:4-8.  The only incident Nelson recalled was Johnson yelling and banging on the walls and furniture during an interrogation.  *Id.* at 95:11-21.  Nelson was concerned because he felt the interrogation was "disruptive" to his own work.  *Id.* at 95:23-96:5.  Nelson considered Johnson's reports "unprofessional" and was concerned about Johnson's admittedly indecorous descriptions of the detainee's emotional disposition.  *Id.* at 97:15-23.  He never, however, testified that Mr. Johnson abused or ordered the abuse of a detainee.  Mr. Nelson described Mr. Stefanowicz as "a very nice, amiable person."  *Id.* at 91:12-21.

9

(no indication of abusive conduct towards a detainee, no indication of instructing MPs related to detainees); Dkt. #1588 (Ex. A) (Frederick Test.) at 57-58.  There is nothing in the record that suggests any connection between this conduct and Plaintiffs' alleged mistreatment and nothing in the record that suggests this conduct was part of any illicit agreement to abuse detainees.  At most, this conduct reflects parallel conduct.

Parallel conduct is insufficient as a matter of law to demonstrate a conspiracy.  *A Soc'y without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011); *Thomas v. Salvation Army S. Territory*, 841 F.3d 632, 637 (4th Cir. 2016).  So, "'[w]ithout more,'" allegations that Mr. Dugan and Mr. Johnson each engaged in a single incident of mistreatment – neither of which involve instructing an MP to abuse a detainee[6] – "'does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.'"  *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).[7]  Therefore, there is insufficient evidence in the trial record to establish that either Mr. Dugan or Mr. Johnson participated in a conspiracy to abuse detainees at the hard site.

That leaves a single CACI employee, Steve Stefanowicz, who purportedly conspired with Military Police to abuse detainees apropos of their interrogations and in a manner for which CACI is liable.  That is a bridge *way* too far.  The trial record demonstrates that the only allegations

---

[6] Notably, the only instance in which Mr. Stefanowicz is alleged to have instructed MPs related to an incident of mistreatment (rather than simply being present) is when MPs had the detainee known as "Al Qaeda" out of his cell and were using a dog with him and Mr. Stefanowicz told them, "Take him home."  PTX-23 at 168.  Thus, the only instruction anyone saw him give was for the MPs to stop and put Al Qaeda back in his cell.  Telling MPs to stop harassing a detainee does not support an inference of a conspiracy to abuse detainees.

[7] To establish a conspiracy, Plaintiffs needed to prove "the persons who agreed to the alleged conspiracy, the specific communications amongst the conspirators, or the manner in which any such communications were made."  *Id.* at 347.  Absent such proof, Plaintiffs' evidence is "insufficient to support a meeting of the minds" and "[a]t most . . . amount to 'parallel conduct and a bare assertion of a conspiracy.'"  *Id.* (quoting *Twombly*, 550 U.S. at 570).

involving Mr. Stefanowicz were that he participated in the mistreatment of *one* "special project" detainee (not a Plaintiff) to whom he was exclusively assigned.  *See* Dkt. #1598 (Ex. A) (Stefanowicz Test.) at 24-25; PTX-23 at 120-21 (Fay Report shows Mr. Stefanowicz was accused of using dogs only with a "special project" detainee nicknamed "Al Qaeda"); Dkt. #1588 (Ex. A) (Frederick Test.) at 61 (use of dogs related to A.Q.); 4/16/2024 PM Trial Tr. (Taguba Test.) at 28:1-29:7 (allegations against Stefanowicz related only to his assigned detainees); Dkt. #1588 (Ex. C) (Harman Test.) at 73 (the only incident Harman recalls involving Stefanowicz related to a detainee to whom he was assigned).  Plaintiffs put on no evidence (because none exists) that Mr. Stefanowicz was marauding around the hard site instigating the torture of detainees housed there.

The *undisputed* evidence at trial proved that interrogators, including Mr. Stefanowicz, only gave instructions to MPs related to detainees to whom they were assigned.  *See, e.g.*, Dkt. #1585 (Ex. A) (Graner Test.) at 7-8 (Graner received instructions from interrogators only for detainees to whom that interrogator was assigned); Dkt. #1588 (Ex. A) (Frederick Test.) at 56-57 (same); PTX-23 (Fay Report) at 120-21.  Thus, for the allegations against Mr. Stefanowicz to amount to more than parallel conduct, Mr. Stefanowicz would have had to have been assigned to Plaintiffs. He was not.  *See, e.g.*, Dkt. #1598 (Ex. A) (Stefanowicz Test.) at 33-34.  Asserting that a tall, white man with a goatee interrogated them is not enough to establish the necessary connection.  "It is not sufficient to show a set of circumstances bringing the theory of appellants within the realm of possibilities, nor can the theory itself furnish the deficiency, the evidence must bring the theory to the level and dignity of a probable cause." *Ralston Purina Co.*, 241 F.2d at 168.[8]  Plaintiffs each

---

[8] Plaintiffs' assertion that the jury's notes "suggest that it found the existence of a conspiracy and CACI's participation in it" is belied by the jury's own words stating they were "not unanimous on <u>anything</u>." Dkt. #1417-7 at 12 (triple underline in original); *see also id.* at 22 (not unanimous on any of the Plaintiffs or their understandings of the evidence or law).  In any event,

had the opportunity during their direct examinations to review pictures of CACI personnel generally and Mr. Stefanowicz in particular to determine whether any were involved in their alleged abuse and did not do so.  Plaintiffs also had the ability to review Mr. Stefanowicz's recorded *de bene esse* deposition to see if they recognized his voice or mannerisms, and did not.

With no evidence that Mr. Stefanowicz ever mistreated or ordered the mistreatment of a detainee to whom he was not assigned, and no evidence that Mr. Stefanowicz was assigned to any Plaintiff, no inference of concerted conduct can be made without "evidence that places the parallel conduct in context that raises a suggestion of a preceding agreement as distinct from identical, independent action." *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 278 (4th Cir. 2012) (internal quotations omitted).  "The evidence must tend to exclude the possibility that the alleged co-conspirators acted independently." *Id.*  Plaintiffs presented no such evidence at trial.

Because Plaintiffs failed to offer evidence excluding the equally or more likely possibilities that (1) the MPs who allegedly abused them acted independently or possibly at the behest of OGA interrogators and/or (2) any conspiracy involving CACI interrogators was limited to a small

---

the Supreme Court's observation in *Yeager v. United States,* 557 U.S. 110 (2009), disposes of Plaintiffs' speculation:

> Unlike the pleadings, the jury charge, or the evidence introduced by the parties, there is no way to decipher what a hung count represents . . . . A host of reasons – sharp disagreement, confusion about the issues, exhaustion after a long trial, to name but a few – could work alone or in tandem to cause a jury to hang.  To ascribe meaning to a hung count would presume an ability to identify which factor was at play in the jury room.  But that is not reasoned analysis; it is guesswork.  Such conjecture about possible reasons for a jury's failure to reach a decision should play no part in assessing the legal consequences of a unanimous verdict that the jurors did not return.

*Id.* at 121-22.

number of detainees that did not include Plaintiffs and, therefore, did not harm Plaintiffs, CACI is entitled to judgment as a matter of law on Plaintiffs' conspiracy claims.

### C.     Plaintiffs' Aiding and Abetting Claim Is Not "Viable"

Plaintiffs offer the milquetoast endorsement that their aiding and abetting claim is "viable." Dkt. #1643 at 6.  It doesn't even clear that low bar.  Plaintiffs' evident lack of confidence in this claim, like the Court's skepticism, is warranted.  5/2/2024 Trial Tr. at 14:18-21 ("[T]he more I think about the evidence that's been presented, and if you look at the jury instruction and the Fourth Circuit case law, I don't think that count can be sustainable.").  There is simply no evidence in the trial record that (1) "CACI interrogators provided practical assistance to the military personnel that had a substantial effect on the military personnel torturing or inflicting cruel, inhuman, or degrading treatment *on that plaintiff*" or (2) if CACI interrogators had provided the assistance, "they acted with the purpose of facilitating torture and/or cruel, inhuman, or degrading treatment *on that plaintiff*."  Dkt. #1617-4 at 33 (emphasis added).

### 1.     Plaintiffs Failed to Prove CACI Interrogators Provided Practical Assistance to the Military Personnel that had a Substantial Effect on Military Personnel Mistreating a Particular Plaintiff

Plaintiffs urge that six pieces of evidence establish that CACI interrogators assisted MPs and had a substantial effect on MPs who tortured them: (1) CACI interrogators interrogated Plaintiffs Al Shimari and Al Zuba'e, (2) CACI interrogators wore civilian clothes, (3) Plaintiff Al Ejaili said he was repeatedly interrogated by a tall, white civilian with a goatee, whom Plaintiffs say the Court has to assume is Mr. Stefanowicz, (4) Plaintiffs Al Shimari and Al Zuba'e said they were repeatedly interrogated by civilians, whom Plaintiffs say the Court has to assume were CACI interrogators, (5) Plaintiffs claim they were "abused before, during, and after interrogations, and sometimes clearly at the civilian interrogator's direction," and (6) Plaintiffs Al Ejaili and Al Shimari say that MP Charles Graner abused them.  Dkt. #1643 at 8.

13

Beginning with the low-hanging fruit, Plaintiffs cannot rely on the standard requiring the Court to make *reasonable* inferences in their favor to demand that the Court engage in abject speculation and conjecture. *Gairola*, 753 F.2d at 1285; *Ralston Purina Co.*, 241 F.2d at 167. The Court is not required to assume that Plaintiff Al Ejaili was interrogated by Mr. Stefanowicz simply because he remembers a tall, white man with a goatee. Plaintiffs had ample opportunity to show Mr. Al Ejaili a picture of Mr. Stefanowicz to identify him and never did. There is no evidence in the record that Mr. Stefanowicz was the *only* tall, white man with a goatee at Abu Ghraib. In addition, the undisputed evidence from the government shows that Plaintiff Al Ejaili was never formally interrogated and that the only interaction he *may* have had with Mr. Stefanowicz was during the IP round-up when Mr. Stefanowicz did nothing that violated the interrogation rules of engagement. Dkt. #1640-1 at 16. The Court, likewise, does not have to assume (and should not assume) that just because CACI interrogators wore civilian clothing all civilian interrogators were CACI employees. The record is replete with undisputed evidence that there were other civilian interrogators on site, some of whom *interrogated a detainee who died during the interrogation*. *See, e.g.*, PTX-23 at 105 (noting death of detainee in OGA custody). Assuming that all civilian interrogators Plaintiffs now recall as being culpable in their abuse were CACI employees would be nothing more than rank speculation, particularly since Plaintiffs themselves have admitted that they lack facts tying CACI personnel to their alleged mistreatment[9] and Plaintiff Al Shimari identified a civilian interrogator who questioned him that was indisputably *not* a CACI

---

[9] *See, e.g.*, 4/15/24 Trial Tr. (Al Ejaili Test.) at 55:11-16, 61:20-23, 62:7-10, 71:6-20 (Q. And so the answer is no, you can't point to a CACI employee giving anyone instructions about your treatment. Correct? A. No.); 5/16/24 Trial Tr. (Al Zuba'e Test.) at 51:12-15, 56:10-22; 5/17/24 Trial Tr. (Al Shimari Test.) at 39:20-40:6, 51:1-7, 51:24-52:4, 54:13-25, 55:24-56:5.

interrogator, *see* 4/17/2024 AM Trial Tr. (Al Shimari Test.) at 49:8-18; 4/19/24 Trial Tr. (Porvaznik Test.) at 93:2-5.

Plaintiffs cannot rely on the fact that two CACI interrogators interrogated Plaintiffs Al Shimari and Al Zuba'e to prove aiding and abetting. As this Court correctly instructed at trial, "[t]he mere presence at the scene of wrongful conduct does not make one . . . an aider and abettor." 4/22/2024 Trial Tr. at 101:20-22. The unrebutted evidence at trial is that no abuse occurred during the one interrogation each of Al Shimari and Al-Zuba'e in which a pseudonymous CACI interrogator participated.[10]

Next Plaintiffs' assert that they were abused in temporal proximity to interrogations, and add that the abuse was "sometimes clearly at the civilian interrogator's direction." Dkt. #1643 at 8.[11] But there was no actual evidence to support this proposition, with Plaintiffs (who could not speak English) merely testifying that sometimes their interrogator would speak unknown words to the MPs who would bring the detainee back to the hard site. As the Court instructed the jury, argument of counsel is not evidence. True at trial, the point is equally valid in a Rule 50 context. That a juror could guess that an interrogator could have told an MP to abuse a detainee is not evidence that such a thing occurred. As explained above, neither temporal correlation nor the

---

[10] Dkt. #1600 (Ex. C) (CACI Interrogator A Test.) at 25:07-09, 25:15, 93:05-10, 93:16-17, 93:19-95:05, 98:06-18, 99:07-100:08, 101:01-09, 102:02-21, 103:10-13, 103:18-104:08, 104:13-18, 105:01-08, 105:14-15, 105:22-106:02, 106:06-22, 108:03-05, 108:11, 111:08-21; Dkt. #1600 (Ex. D) (Army Interrogator B Test.) at 27:13-16, 84:01-06, 84:08, 85:08-10, 85:13; Dkt. #1598 (Ex. C) (CACI Interrogator G Test.) at 30:21-31:18, 33:09-34:10, 44:07-54:06, 54:21-55:20, 56:05-61:03, 62:10-18, 62:20-63:03, 106:13-107:13, 108:11-21.

[11] To the extent Plaintiffs argue that they were abused during interrogations by CACI interrogators, they are offering a new theory that they have previously and expressly disavowed. *See* 4/22/24 Trial Tr. at 90:13-15 (Jury Instructions) ("The plaintiffs do not allege that any CACI personnel, including Steve Stefanowicz, Daniel Johnson and Timothy Dugan, directly mistreated them."). The Court's "dismissal WITH PREJUDICE" (Dkt. #680) of Plaintiffs' claim of direct abuse "for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is a 'judgment on the merits.'" *Federated Dep't Stores v. Moitie*, 452 U.S. 394, 399 n.3 (1981).

presence of unidentified civilians is sufficient to prove causation showing that CACI interrogators intentionally assisted MPs to abuse any Plaintiff.  In addition, Plaintiffs did not offer evidence from which a jury could conclude that any conversations between civilian interrogators and MPs resulted in Plaintiffs' abuse.  That abuse allegedly occurred after those conversations at most establishes speculative correlation – not causation.  *Sanyal*, 2015 WL 3650725, at *7; *Lopez-Soto*, 383 F.3d at 238.

Last, Plaintiffs say that Plaintiffs Al Ejaili and Al Shimari's testimony that MP Charles Graner abused them, combined with the fact that Graner testified that he took instructions from military intelligence on how to treat detainees and was told by civilian interrogators that he was doing a good job, somehow shows CACI provided MPs abusing them with practical assistance. That is quite a leap.  Graner was implicated in a massive amount of abuse at Abu Ghraib and *none* of the conduct for which he was prosecuted had *anything* to do with military intelligence, let alone CACI interrogators.  Dkt. #1585 (Ex. A) (Graner Test.) at 7.  Moreover, nothing in Graner's testimony suggests that the instructions he received from military intelligence were abusive.  *See id. generally*.  In any event, Graner affirmed the unrefuted evidence that interrogators only instructed MPs with respect to detainees to whom they were assigned.  *Id.* at 7-8 (Graner recalls receiving instructions from interrogators only for detainees to whom that interrogator was assigned).  Thus, the fact that Graner may have mistreated Plaintiffs does nothing to connect their mistreatment to CACI interrogators.

## 2.  Plaintiffs Failed to Prove that CACI Interrogators Provided MPs with Any Assistance with the Purpose of Facilitating a Plaintiff's Abuse

Plaintiffs claim – with no explanation – that the same evidence they believe demonstrates a conspiracy also "shows that the reason why CACI interrogators directed the abuse of detainees – and by inference, Plaintiffs – was to 'soften them up' for interrogations so that CACI could show

results to its U.S.-military customer." Dkt. #1643 at 8.  The problem with this theoretical motive for directing that detainees be abused is that there is absolutely no evidence in the trial record to support it.  Nothing in the delivery orders and statements of work governing the contract insinuates any penalties or rewards tied to intelligence collection.  *See generally* Dkt. #1640-5, 1640-6. Moreover, the facts on the ground do not support Plaintiffs' made-up motive either.  Plaintiffs had every opportunity to ask CACI interrogators (Stefanowicz, Porvaznik, and CACI Interrogators A and G) at trial whether they were under pressure to produce intelligence results at all costs, including through abuse, and Plaintiffs elected not to develop that theory of motive.[12]  Plaintiffs showed no communications with CACI management discussing its interrogators' successes or failures related to intelligence collection.   Plaintiffs admitted no communications from the government discussing the substance of CACI interrogators' work.  Indeed, the only evidence in the record about communications between the government and CACI management regarding CACI interrogator performance shows those communications did not touch on the amount or quality of intelligence they collected, but *did* address their treatment of detainees:

> Q When you were -- when you were making your visits to Abu Ghraib and talking to the customer about the performance of the interrogators, what were the topics of the discussion?
>
> A How their interrogation or screening analysts work, are they performing what they're supposed to be doing, do they have the right attitude.  Okay.  Are they showing up to work on time, are they goofing off too much, are they treating the -- you know, ***are they dealing with the prisoners like they're supposed to be dealing with them***.  Just the normal day-by-day type operations.

---

[12] Indeed, Johnson was removed from the contract *because* he was suspected of detainee abuse.  *See* 4/18/24 Trial Tr. (Billings Test.) at 28:1-29:14.  The other evidence in the record showed a CACI employee being removed for sending uncomplimentary information regarding the military back to a local newspaper, not his success rate for interrogations.  *Id.* at 29:18-30:7.

4/18/24 Trial Tr. (Mudd Test.) at 107:9-19 (emphasis added).  The notion that CACI plotted to abuse detainees to show off to the military is nothing but a figment of Plaintiffs' imaginations.  It is entirely lacking in proof or even facts that could support such an inference.  In reality, *nothing* could have been more detrimental to CACI's relationship with its military customer than for its interrogators to engage in criminal or abusive conduct.  At trial, Plaintiffs offered no reasonable basis for a jury to conclude either that CACI interrogators instructed anyone to abuse Plaintiffs or that, if they had, their purpose in any way related to CACI's interests.

Plaintiffs' next argument rests entirely on a false premise that the Court's 2018 pretrial decision on a motion to dismiss – in which Plaintiffs' *allegations* were accepted as true – has any bearing on CACI's present Rule 50 motion which is determined based on the evidence at trial.  Dkt. #1643 at 9.  Plaintiffs try to bolster their misguided argument by relying on the Restatement (Second) of Torts § 876 (1979) (*see id.* (urging the Court's 2018 ruling "comports well" with the Restatement)), but fail to recognize that the Restatement requires that an aider and abettor only had to act *knowingly* – not purposefully as required in this Circuit for an ATS claim.  *See* Restatement (Second) of Torts § 876 (1979) (case citations) (citing *Nestle USA, Inc. v. Doe*, 593 U.S. 628, 658 (2021) (Alito, J., dissenting) (contrasting *mens rea* standard under *Aziz*, among others, with the Restatement).  The Restatement is irrelevant to this claim.  Plaintiffs' cites to the D.C. Circuit's standard and the District Court of Maryland (in a non-ATS case) fare no better.  *See Aziz v. Alcolac, Inc.*, 658 F.3d 388, 398 (4th Cir. 2011) ("The D.C. Circuit concluded that prosecutions before those tribunals have declared that "the knowledge standard suffices under customary international law."); *compare Al-Sabah v. World Bus. Lenders, LLC*, No. 18-CV-02958-SAG, 2024 WL 263579, at *16 (D. Md. Jan. 24, 2024) (requiring only that the defendant

had knowledge of the tortious act in a non-ATS case) *with Du Daobin v. Cisco Sys., Inc.*, 2 F. Supp. 3d 717, 728 (D. Md. 2014) (applying the *Aziz* purposefulness standard in an ATS case).

Regardless, the gist of what Plaintiffs seem to be arguing is that encouragement, by itself, is enough to establish the requirement that a defendant gave practical assistance that had a substantial effect on the commission of the tort.  Dkt. #1643 at 9-10.  The problem with this argument is that Plaintiffs have no evidence that CACI interrogators encouraged MPs to abuse them.  The only evidence they have on the subject is Graner's testimony that at some point he was told by civilian interrogators that he was doing a good job, Dkt. #1585 (Ex. A) (Graner Test.) at 7, and Frederick's testimony that at some point Mr. Stefanowicz told him he was doing a great job and to keep up the good work, Dkt. #1588 (Ex. A) (Frederick Test.) at 46-47.  Neither witness connected that encouragement to abuse generally, let alone to abuse of these Plaintiffs.

At trial, Plaintiffs failed to connect any CACI employee with their abuse and failed to show that any CACI employee took any actions with the purpose of abusing any Plaintiff.  Accordingly, CACI is entitled to judgment as a matter of law on Plaintiffs' aiding and abetting claims.

### D.    Plaintiffs Failed to Prove Vicarious Liability

Plaintiffs each failed to prove that CACI interrogators, "acting within the scope of their employment," either "conspired with, or aided and abetted, the Army military personnel in torturing or inflicting cruel, inhuman, or degrading treatment on the plaintiff."  Dkt. #1617-4 at 23.[13]  "Whether conduct is within the scope of employment depends upon whether the conduct is

---

[13] Plaintiffs argue that CACI bears the burden of proof that CACI interrogators were *not* acting within the scope of their employment because *Virginia law* places the burden on the defense. Dkt. #1643 at 10, n.6.  Plaintiffs' reliance on Virginia law is misguided.  As demonstrated by *Aziz*, the burdens and standards for determining liability for conduct under the ATS are determined by international law – not state law.  *Aziz*, 658 F.3d at 398-400 (relying on the Second Circuit's interpretation of the Rome Statute to determine *mens rea* for aiding and abetting under the ATS). As the Court noted, the predominant view is that Plaintiffs do not meet their burden of proof for scope of employment simply by showing an employer-employee relationship.  *See* Restatement

of the same general nature as that authorized or incidental to the conduct authorized by the corporation." Dkt. #1617-6. As the Court concluded, if CACI interrogators had directed the abuse of Plaintiffs, such conduct would have been outside the scope of their employment. *See* 4/15/24 PM Trial Tr. at 93:23-25 (commenting in relation to whether statements related to abuse occurred within the scope of employment, "That's part of the problem, too, is they're acting outside the scope of the contract and they're not protected within the scope of employment."). CACI interrogators were required to comport with the terms of CACI's contract with the government, which expressly provided that interrogations be conducted "IAW ['in accordance with'] with local and higher-authority regulations." Dkt. #1640-5 at 9. There is no evidence that CACI authorized any conduct by its interrogators that conflicted with the requirements of the contract or government rules and regulations.

Plaintiffs again try to rely on the Court's 2018 decision for a motion to dismiss, in which the Court was obligated to credit Plaintiffs' allegations, to say that, under "law of the case," the Court must find that "scope of employment" has been established. Dkt. #1643 at 11. This argument is a nonstarter. Plaintiffs alleged a lot of things in their pretrial pleadings that may have,

---

(Second) of Agency § 228 (1958) cmt. b ("Proof that the actor was in the general employment of the master does not of itself create an inference that a given act done by him was within the scope of employment.").

In the same footnote, Plaintiffs also re-raise their objection that the Court should have included an instruction allowing the jury to find liability for even unauthorized conduct if it was foreseeable. According to Plaintiffs, this standard is "law of the case." Plaintiffs are wrong. Plaintiffs cite to *Al Shimari v. CACI Premier Tech.*, 657 F. Supp. 2d 700, 729 (E.D. Va. 2009), which was decided by Judge Lee. After the case was reassigned to this Court, the Court made quite clear that prior decisions – for example, ordering Plaintiffs to appear in the United States for depositions – no longer governed. *See* 4/28/2017 H'ring Tr. at 9:24-10:5 ("The other thing I would ask you-all to do, ***you're with a new judge now***, and with all due respect to my colleague, I mean, ***I'm treating this case pretty much as it's starting with me***, all right? I mean, I'm certainly going to follow what the Fourth Circuit has done, but ***just because certain things were done or not done previously, don't assume that will be the case with me***, all right?") (emphasis added).

under the Court's decisions, permitted a finding of vicarious liability.  But none of them have proven true.

For example, Plaintiffs cite the Court's statement that "CACI had an ability to monitor the interrogators to ensure that they did not enter into the conspiracies."  *Id.*  But all of the evidence at trial showed that CACI had no ability to substantively monitor the conduct of its interrogators.  *See* Dkt. #1640-2 ("Exhibit B") at 32-44, 47-53.  Plaintiffs distort the evidence to support CACI's purported ability to supervise its employees' interrogation operations by altering the testimony that actually came in a trial.  For example, Dan Porvaznik (CACI's site lead at Abu Ghraib) testified that he had the "***ability*** to sit in on interrogations carried out by CACI employees," not the "***authority***" as Plaintiffs state.  *Compare* 4/19/24 Trial Tr. at 104:5-8 *with* Dkt. #1643 at 12 (emphasis added).  What Plaintiffs fail to mention is that the booths were designed so that *anyone* could observe an interrogation.  Dkt. #1600-5 (Ex. E) (Holmes Test.) at 10-11.  Plaintiffs say Mr. Porvaznik had authority to "stop CACI interrogators from giving directions to abuse detainees if he saw it occurring."  Dkt. #1643 at 12.  Mr. Porvaznik did not say anything about CACI interrogators hypothetically giving directions to abuse detainees.  He actually testified that if a CACI interrogator informally discussed an interrogation plan with him (as he had no role in formally reviewing the plans), that he might provide informal input but would have deferred to the ICE and Captain Wood regarding whether the plan would move forward as proposed.  4/19/24 Trial Tr. at 104:14-105:1 ("[I]nformally.  But ***I did not have any control over their planning or how it was conducted***.") (emphasis added).  If the plan contained something "detrimental," he would counsel against that strategy, but – despite counsel attempting to put the words "rejected" and "approved" in his mouth – expressly stated that "if Captain Wood and her staff thought [the proposed approaches were best, then that's the way it would go."  *Id.* at 105:5-11.

If Mr. Porvaznik saw something that was abusive, that violated the Geneva Conventions, he testified that he would report it to the Army. *Id.* at 105:21-25. He did also say that if he saw such conduct that the employee would have been fired. *Id.* at 106:5-107:8. The fact that CACI had the ability to fire its own at-will employees if they were caught participating in unlawful conduct is, to start, unremarkable and also not at all inconsistent with the U.S. Army's plenary authority over CACI interrogator conduct.

Mr. Porvaznik further testified that if he saw or heard an interrogation where detainee abuse was occurring, he would stop it. *Id.* at 107:9-12. He explained that he would do so both as a CACI employee and also as "a law-abiding human being." *Id.* at 110:19-24 (discussing his response if he had heard allegations of abuse). A hypothetical discussion about Mr. Porvaznik intervening if he happened to see or hear about abuse hardly demonstrates that CACI had the ability to monitor its interrogators' interrogation practices. This is particularly true because Mr. Porvaznik testified that he never saw detainee abuse. *See* 4/19/24 Trial Tr. (Porvaznik Test.) at 89:3-10, 101:13-17.

Plaintiffs again trot out the argument that detainee abuse must have been within the scope of employment for CACI interrogators because CACI had a financial motive for "facilitat[ing] successful interrogations and stay[ing] silent about abuse." Dkt. #1643 at 12.[14] As previously explained, this argument is naught but a misnomer. *See* Section II.C.2, *supra*. The fact that the Court accepted it for purposes of ruling on a pretrial motion to dismiss does not magically transform it into truth.

As the Court explained in Supplementary Instruction No. 2, unauthorized and aberrant conduct (*e.g.*, a realtor showing a potential buyer pornographic materials) is outside the scope of

---

[14] In addition, even if proof existed that CACI knew about abuse and "stay[ed] silent" about it, that would be insufficient to support either conspiracy or aiding and abetting liability.

employment.  Dkt. #1617-6.  There is no question that torturing and inflicting cruel, inhuman, or degrading treatment on another person (or telling someone to do it) is unauthorized and aberrant conduct.

### E.  The Borrowed Servant Doctrine Bars Vicarious Liability as a Matter of Law

It is telling that Plaintiffs omit any discussion of the borrowed servant doctrine until the final two paragraphs of their argument.  Dkt. #1643 at 13-14.[15]  Perhaps that is because the borrowed servant doctrine was so clearly established in this case, that a reasonable jury could not find to the contrary.  *See Watkins v. Prof'l Sec. Bureau, Ltd.*, 201 F.3d 439 (Table), 1999 WL 1032614, at *2 (4th Cir. 1999).  As the Court correctly observed:

> It has been said a million times in this case, ***the military controls what they do***; CACI controls the administrative elements of their employment, which means pay, promotions, where they sleep, vacations.

4/19/24 Trial Tr. at 51:1-6 (emphasis added); *see also* Dkt. #1639 at 2-13.  Plaintiffs would have the Court reject "the assertions of CACI's witnesses" that CACI did not have operational control over its interrogators, because that evidence was, purportedly, contradicted.  But Plaintiffs' witnesses also testified that CACI did not have control over how its employees performed the interrogation mission at Abu Ghraib.  *See, e.g.*, 4/15/24 PM Trial Tr. (Nelson Test.) at 106:1-4 (any issues related to interrogations had to go through the Army chain of command), 107:1-7 ("Not

---

[15] Plaintiffs include a single paragraph after the borrowed servant discussion that can only be described as an inaccurate *non sequitur*.  Plaintiffs note for the Court that "a jury of eight deliberated about this case for eight days before announcing they were deadlocked."  Dkt. #1643 at 14.  False: the jury received the case on the afternoon of April 22, 2024, court was not in session on April 23, 2024, the jury deliberated for two full days on April 24-25, 2024, and at 12:25 p.m. on April 26, 2024, sent the Court a note indicating, "We are in a deadlock/impasse that seems to be impossible to get over."  4/26/2024 Trial Tr. at 7:2-10.  It took the jury less than three days to announce they were deadlocked as to all issues.  Dkt. #1417-7 at 12 ("not unanimous on <u>anything</u>").  In any event, as Plaintiffs point out, "[t]here is no way to decipher what a hung jury represents."  Dkt. #1643 at 3 (quoting *Jordan v. Large*, 27 F.4th 308, 312 (4th Cir. 2022)).

that CACI – we knew that CACI couldn't do anything, really, about operational affairs, intelligence matters, anything like that, but at least that they should be aware of the fact that some of the CACI personnel were dealing, through the military chain of command, with intelligence matters or operational matters."), 107:23-108:1 (domestic CACI management did not have any concern with the operational matters at Abu Ghraib prison), 108:14-19 (the Army chain of command also established the interrogation rules of engagement for interrogations at Abu Ghraib prison), 108:11-13 (interrogations could not go forward without an Army-approved interrogation plan), 116:22-117:9 (Army had to approve promotions of CACI employees to interrogators).

Plaintiffs rely on snippets from Army Field Manual 3-100.21 regarding contractors on the battlefield, but the uncontested evidence regarding this manual is that it "is just guidance; it's not policy." *See* 4/18/24 Trial Tr. (Billings) at 61:16-17; *see also id.* at 67:6-10 ("The Army publishes information on all different types of topics. These are things that could be considered when I was a soldier as, okay, these are good ideas, but it doesn't mean that it is a dictated policy that you must do these things."). Mr. Billings's testimony is corroborated by the field manual itself, which states that it is "an added resource for the commander to consider when planning support for an operation." Dkt. #1640-12 at 4 (emphasis added). His testimony is further corroborated by the Jones-Fay Report, which in evaluating contractor management at Abu Ghraib stated, "No doctrine exists to guide interrogators and their intelligence leaders (NCO, Warrant Officer, and Officer) in the contract management or command and control of contractors in a wartime environment." PTX-23 (Jones-Fay Report) at 53. Thus, FM 3-100.21 does not naysay testimony from witnesses with personal knowledge describing how things actually worked on the ground. That evidence established that the U.S. Army directed and controlled CACI and Army interrogators in their interrogation mission. Plaintiffs presented no evidence to contradict any of this.

Plaintiffs urge that the CACI Code of Conduct reserves CACI's right to manage and control its employees. Again, this general corporate guidance does not contradict testimony from witnesses with personal knowledge describing how things actually worked at Abu Ghraib. Moreover, a reservation of rights is simply a declaration stating that one's silence or inaction should not be interpreted as a waiver of rights. It does not necessarily reflect the actual practices or realities on the ground, nor does it mean that such rights will be exercised. Plaintiffs have produced no evidence that CACI in any way attempted to "direct, supervise, or control" its interrogators related to the interrogation mission at Abu Ghraib.

Plaintiffs next cite a smattering of testimony that does not quite say what they want it to say. For example, Plaintiffs say, "General Fay found that the Army relied on Porvaznik, the site lead, to interview CACI interrogators when they arrived at Abu Ghraib and to assign them to detainees, and Porvaznik admitted that on cross-examination." Dkt. #1643 at 13 (citing Ex. 4 at 74; Ex. 8 at 108:13-20, 103:17-104:4.). In reality, the Fay Report states Captain Wood relied on the CACI site lead "to interview contractors as they arrived and to assign them based on his interviews." PTX-23 at 74. It does not mention assigning interrogators "to detainees," and, in fact, Captain Wood (now Major Holmes) clarified that when they arrived CACI interrogators "were assigned to different sections, based on their skill sets." Dkt. #1600-5 (Ex. E) (Holmes Test.) at 7. Also, Mr. Porvaznik only admitted on cross-examination to what was written in the Fay Report – not that the statement was accurate. *See* 4/19/24 Trial Tr. at 108:17 ("I see this highlighted section, yes."); *id.* at 23 ("I see that.").

Plaintiffs say "CACI's Amy Monahan admitted that CACI sent interrogators to Abu Ghraib who did not meet the Army's requirements (as set forth in its contracts with CACI) without getting approval from the Army." Dkt. #1643 at 13-14. But that entire discussion centered around the

administrative question of how the resumes were funneled to the COR, whether she emailed the COR directly or sent them to the COR through CACI's in-country manager.  Dkt. #1601-2 (Ex. B) at 2-3.  At no point does Ms. Monahan say that any interrogators who did not meet the Army's requirements were sent without Army approval.  In fact, she expressly states CACI alerted the COR when it sent resumes whenever they did not match the statement of work.  *Id.*

Plaintiffs say, "CACI's Scott Northrop admitted that CACI refused to fire its interrogator Dan Johnson . . . even after the Army asked CACI to terminate him."  Dkt. #1643 at 14 (citing Ex. 8 at 63:19-69:24).  To start, the Army never asked CACI to "fire" Mr. Johnson.  The Army told CACI to terminate him *from the contract* (because it had the authority and control over CACI and Mr. Johnson to require that CACI do so).  The email in the same exhibit invites CACI to explain the photo in which Mr. Johnson appeared with a detainee in "what is perceived as a[n] unapproved stress position," and states that "[w]ithout any further explanation, based on the photograph itself, this command has no other choice but to have Mr. Johnson removed from the current contract . . . ."  Dkt. #1640-7 (Exhibit G) at 2-3.  And that is exactly what Mr. Northrup reflected in his testimony.  4/19/24 Trial Tr. (Northrup Test.) at 67:4-68:3.  He also testified that a number of Army personnel specifically requested that Mr. Johnson stay on the contract.  *Id.* at 41:14-25.  Moreover, the undisputed evidence is that CACI did, in fact, remove Mr. Johnson from the contract.  4/18/24 Trial Tr. (Billings Test.) at 29:6-14.

Last, Plaintiffs say, "Arnold Morse admitted that Dan Porvaznik was CACI's 'operational supervisor' at Abu Ghraib and was 'charged with supervising all aspects of interrogation activities.'"  Dkt. #1643 at 14.  That is not quite right.  Mr. Morse was asked by Plaintiffs' counsel, "Who were the CACI employees who were charged with supervising all aspects of interrogation activities at Abu Ghraib?"  Dkt. #1591 (Ex. C) at 93.  Mr. Morse did *not* agree with counsel's

premise that *anyone* from CACI was "charged with supervising all aspects of interrogation activities at Abu Ghraib." Instead, he responded, "There were two CACI supervisors who had responsibility for in-country supervision. One was Dan Porvaznik. And he was sort of the operational supervisor. He was the point of contact to the government counterpart, the COR. And the other supervisor who played an administrative role was Scott Northrop. And his duties had to do with the administration of the work." *Id.* From CACI's perspective, Mr. Porvaznik *was* the operational supervisor – for *business* operations. As was "said a million times" at trial, and *never* contradicted, Mr. Porvaznik supervised "the administrative elements of [CACI interrogators'] employment, which means pay, promotions, where they sleep, vacations." 4/19/24 Trial Tr. at 51:1-6. The understanding that this was CACI's business operations was confirmed by the site lead who replaced Mr. Porvaznik when he left Iraq, Steve Stefanowicz:

> Q. What were the site lead's responsibilities?
>
> A. **CACI business operation support**. So for all the staff that were coming to Abu Ghraib, their administrative pay, making sure the staff could reach out to family, their – the ones who they had left at home, whether as – whatever their support networks were that they wanted to communicate to, payroll issues, eventually planning for travel, vacations, scheduling, administrative support.

Dkt. #1598-1 (Ex. A) (Stefanowicz Test.) at 18 (emphasis added).

There is no genuine dispute regarding the allocation of power to direct and control CACI interrogators in their dealings with detainees. Plaintiffs can quibble with labels like "operational supervisor," but the actual facts on the ground as to which entity – as between the U.S. Army and CACI management – had the power to direct and control particular tasks is not at all disputed.

## F.   The Court Should Certify for Interlocutory Appeal any Order Denying CACI's Rule 50 Motion

The Court should grant judgment to CACI for the reasons stated in CACI's Rule 50 motion and in this opposition. But Plaintiffs are wrong that a denial of CACI's Rule 50 motion is an

obligatory ticket to a retrial.  If the Court for any reason is disinclined to grant CACI's renewed Rule 50 motion – and that motion should be granted – the Court should certify its decision for interlocutory appeal.  The Court may certify an order for interlocutory appeal when it "'involves a controlling question of law as to which there is substantial ground for difference of opinion' and immediate appeal . . . may materially advance the ultimate termination of the litigation.'"  *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 195 (4th Cir. 2011) (quoting 28 U.S.C. § 1292(b)).

An order involves a "controlling question of law" if the order contains a question of law and the court of appeals' "resolution of it could 'terminate[] the case.'"  *Id.* at 195.  "An issue presents a substantial ground for difference of opinion if courts, as opposed to parties, disagree on a controlling question of law."  *Cooke-Bates v. Bayer Corp.*, No. 3:10-CV-261, 2010 WL 4789838, at *2 (E.D. Va. Nov. 16, 2010); *McDaniel v. Mehfoud*, 708 F. Supp. 754, 756 (E.D. Va. 1989).

If the Court were to deny CACI's renewed Rule 50 motion, that order necessarily would involve controlling questions of law for which are is a substantial ground for difference of opinion.  Just taking extraterritoriality, a dispositive issue curiously omitted from Plaintiffs' motion, Plaintiffs allege abuse in Iraq and there was no trial evidence of CACI personnel in the United States conspiring to abuse detainees or aiding and abetting abuse of these Plaintiffs.  Therefore, the Court could deny CACI's motion only by concluding either that ATS's focus is something other than the primary tort or the accessorial conduct *or* that the focus test does not apply at all.

A number of courts, including the Supreme Court, have held that the focus test for extraterritoriality applies to ATS.[16]  And multiple courts have held that the focus test for accessorial conduct (such as conspiracy or aiding and abetting) is determined by either the place

---

[16] *See, e.g.*, *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325 (2016); *Nestle USA, Inc. v. Doe*, 593 U.S. 628, 634 (2021); *Roe v. Howard*, 917 F.3d 229, 240 (4th Cir. 2019); *Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 196-97 (5th Cir. 2017).

of the primary prohibited conduct (here, torture and CIDT) or the place where the accessorial

conduct occurred.[17] Any denial of CACI's renewed Rule 50 motion, which would require rejection

of CACI's extraterritorial argument, necessarily would involve a legal ruling with which multiple

courts have disagreed.   The same would be true if the Court were to refuse to dismiss on state

secrets grounds, as the Fourth Circuit affirmed dismissal on similar facts in *El-Masri v. United

States*, 479 F.3d 296, 306 (4th Cir. 2007) (affirming dismissal in detainee abuse case where state

secrets privilege precluded disclosure of records regarding plaintiff's treatment).   And as CACI

has explained in its renewed Rule 50 motion, the Supreme Court has repeatedly warned against

judge-made causes of action, and the undisputed facts show that the borrowed servant doctrine

applies.

As for the remaining requirement for § 1292(b) certification – that an interlocutory appeal

to resolve these threshold legal issues "may materially advance the ultimate termination of the

litigation" the wisdom of certification is self-evident.   The trial of this case demonstrated that the

trial of this action is difficult.   It involves two Plaintiffs who are prohibited from entering this

country.   It involves the looming presence of the state secrets privilege and the dilemma that

interrogator testimony is basically impossible to present in an effective way.   And for all of those

difficulties, there is no guarantee that a trial of this action will result in a verdict.   After less than

three full days of deliberations in the just-concluded trial, the jury advised that they could not agree

on *anything*.   After four more days of deliberations, the story did not change.   There is no telling

how many trials would be required to reach a verdict in this case.   But the factual record is fully

---

[17] *See, e.g.*, *United States v. Elbaz*, 52 F.4th 593, 604 (4th Cir. 2022) (focus of claim for conspiracy is place where primary violation occurred), cert. denied, 144 S. Ct. 278 (2023); *Doe I v. Cisco Sys., Inc.*, 73 F.4th 700, 737 (9th Cir. 2023) (place of alleged aiding and abetting controls extraterritoriality analysis for aiding and abetting claim under ATS); *Mastafa v. Chevron Corp.*, 770 F.3d 170, 184–85 (2d Cir. 2014) (same).

developed *now*, and there are threshold legal issues – extraterritoriality, state secrets, the Court's power to create causes of action under ATS, and borrowed servant doctrine – that are now perfectly susceptible to appellate review based on facts that were developed at trial and not controverted.

Appellate review now would either end this case or at least ensure that the correct principles of law are applied at any retrial. Thus, even if the Court were disinclined to grant CACI's Rule 50 motion – and, respectfully, the Court should not be disinclined – the more efficient course would be to certify any denial order for interlocutory appeal rather than setting a retrial that would proceed on an unsettled legal framework without any particular reason to believe a verdict would result.

## III.   CONCLUSION

The Court should not set a retrial. Rather, it should grant CACI's renewed Rule 50 motion. Respectfully submitted,

/s/   John F. O'Connor
John F. O'Connor
Virginia Bar No. 93004
Linda C. Bailey (admitted *pro hac vice*)
Joseph McClure (admitted *pro hac vice*)
STEPTOE LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 429-3000 – telephone
(202) 429-3902 – facsimile
joconnor@steptoe.com
lbailey@steptoe.com
jmcclure@steptoe.com

Nina J. Ginsberg
Virginia Bar No. 19472
DiMuroGinsberg, PC
1001 N. Fairfax Street, Suite 510
Alexandria, VA  22314-2956
703-684-4333 – telephone
703-548-3181 – facsimile
nginsberg@dimuro.com

*Counsel for Defendant CACI Premier
Technology, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of May, 2024, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the below-listed counsel.

Cary Citronberg, Esq.
Zwerling/Citronberg, PLLC
114 North Alfred Street
Alexandria, VA 22314
cary@zwerling.com

*/s/   John F. O'Connor*
John F. O'Connor
Virginia Bar No. 93004
Attorney for Defendant CACI Premier Technology, Inc.
STEPTOE LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000 – telephone
(202) 429-3902 – facsimile
joconnor@steptoe.com