**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| SUHAIL NAJIM ABDULLAH AL SHIMARI *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| *v.* | ) ) ) Case No. 1:08-cv-827 (LMB/JFA) |
| CACI PREMIER TECHNOLOGY, INC., | ) ) ) |
| Defendant. | ) ) ) |
| | ) |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
CACI'S MOTION FOR JUDGMENT AS A MATTER OF LAW**

15114350

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT .................................................................................... 1

THE PROCEEDINGS AT TRIAL ............................................................................... 2

I.     CACI'S CONTRACTUAL AND REGULATORY REQUIREMENTS TO SUPERVISE AND MANAGE ITS EMPLOYEES ......................................... 2

II.    RECRUITMENT, HIRING AND SUPERVISION OF INTERROGATORS ................. 3

III.   CACI INTERROGATORS' COLLABORATION WITH AND INSTRUCTIONS TO MILITARY PERSONNEL TO ABUSE DETAINEES ............................................. 4

IV.   PLAINTIFFS SUFFERED ABUSES AS A RESULT OF THE CACI-MILITARY PERSONNEL CONSPIRACY ........................................ 6

ARGUMENT .................................................................................................................. 7

V.    PLAINTIFFS ADDUCED SUFFICIENT EVIDENCE TO PERMIT A JURY TO FIND CACI LIABLE ON THEIR CLAIMS ............................................ 7

     A.    CACI Has Not Met Its Burden as to the Conspiracy Claims ................................. 8

     B.    CACI Has Not Met Its Burden as to the Aiding and Abetting Claims ................. 12

VI.   CACI IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW BASED ON THE BORROWED SERVANT DOCTRINE ......................................... 15

     A.    A Reasonable Jury Could Reject CACI's Borrowed Servant Defense, as the Court Has Previously Held ............................................... 15

     B.    CACI Did Not Prove Its Borrowed Servant Defense Beyond Dispute, as Required to Warrant a Directed Verdict ................................. 15

           1.    CACI Was Tasked With and Maintained Responsibility for Its Personnel at Abu Ghraib ............................................... 17

           2.    Alternatively, the Jury Could Conclude that CACI and the Army Shared Control Over CACI Personnel ....................................... 20

           3.    The "Facts on the Ground" Make Even Clearer that the Applicability of the Borrowed Servant Doctrine is Disputed ................... 23

     C.    CACI's Arguments Are Contrary to Public Policy ............................................. 25

i

**TABLE OF CONTENTS**
**(continued)**

**Page**

VII.   CACI IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW DUE TO THE GOVERNMENT'S INVOCATION OF STATE SECRETS .................................. 26

    A.   CACI's Own Cited Authority Undermines Its Arguments....................................27

    B.   CACI's Defense Strategically Exploited the Government's State Secrets Invocation ................................................................................................................28

VIII.   CACI'S REMAINING ARGUMENTS HAVE BEEN REPEATEDLY REJECTED AND SHOULD BE REJECTED AGAIN.................................................... 30

CONCLUSION..................................................................................................................... 30

15114350

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abraham v. United States*,
932 F.2d 900 (11th Cir. 1991) ..................................................................................16

*Al Shimari v. CACI Premier Tech., Inc.*,
324 F. Supp. 3d 668 (E.D. Va. 2018) ...................................................................22, 30

*Al Shimari v. CACI Premier Tech., Inc.*,
368 F. Supp. 3d 935 (E.D. Va. 2019) .....................................................................23

*Al Shimari v. CACI Premier Tech., Inc.*,
840 F.3d 147 (4th Cir. 2016) ...............................................................................23, 25

*Al Shimari v. CACI Premier Tech., Inc.*,
No. 15-1831, Dkt. 21-1 (4th Cir. Sept. 28, 2015) ...............................................3, 30

*Al Shimari v. CACI Premier Tech., Inc.*,
Nos. 09-1335, 10-1891, 10-1921, Dkt. 146 (4th Cir. Jan. 14, 2012) .....................26

*Aziz v. Alcolac Inc.*,
658 F.3d 388 (4th Cir. 2011) ..................................................................................14

*Campbell-Ewald Co. v. Gomez*,
577 U.S. 153 (2016) ..............................................................................................26

*Dellums v. Powell*,
566 F.2d 216 (D.C. Cir. 1977) ................................................................................16

*Duke v. Uniroyal Inc.*,
928 F.2d 1413 (4th Cir. 1991) .................................................................................7

*El-Masri v. United States*,
479 F.3d 296 (4th Cir. 2007) ..................................................................................27

*Est. of Alvarez by & through Galindo v. Rockefeller Found.*,
96 F.4th 686 (4th Cir. 2024) .............................................................................20, 22

*Est. of Alvarez v. Johns Hopkins Univ.*,
275 F. Supp. 3d 670 (D. Md. 2017) .........................................................................16

*Est. of Rodriquez v. Drummond Co.*,
02-cv-665 (N.D. Ala.), Dkt. 460-11........................................................................14

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ............................................................................13

*Huff v. Marine Tank Testing Corp.*,
    631 F.2d 1140 (4th Cir. 1980) .......................................................................19, 20

*Jara, et al. v. Nunez*,
    13-cv-1426 (M.D. Fl.), Dkt. 184 .....................................................................13

*In re KBR, Inc.*,
    893 F.3d 241 (4th Cir. 2018) ............................................................................26

*Keil v. Seth Corp.*,
    2021 WL 5088242 (E.D. Va. Nov. 2, 2021) ....................................................10

*Loren Data Corp. v. GXS, Inc.*,
    501 F. App'x 275 (4th Cir. 2012) ....................................................................10

*Minnkota Power Co-op., Inc. v. Manitowoc Co.*,
    669 F.2d 525 (8th Cir. 1982) ............................................................................21

*N.L.R.B. v. Town & Country Elec., Inc.*,
    516 U.S. 85 (1995) ............................................................................................20

*Presbyterian Church of Sudan v. Talisman*,
    582 F.3d 244 (2d Cir. 2009) .............................................................................14

*Price v. City of Charlotte*,
    93 F.3d 1241 (4th Cir. 1996) ..............................................................................7

*Pridemore v. Hryniewich*,
    2022 WL 4542250 (E.D. Va. Sept. 28, 2022) ..................................................21

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000) ............................................................................................7

*Sharpe v. Bradley Lumber Co.*,
    446 F.2d 152 (4th Cir. 1971) ............................................................................21

*Twitter, Inc. v. Taamneh*,
    598 U.S. 471 (2023) ..........................................................................................13

*Tysons Toyota, Inc. v. Globe Life Ins. Co.*,
    45 F.3d 428 (4th Cir. 1994) ..............................................................................10

*United States v. Banks*,
    10 F.3d 1044 (4th Cir. 1993) ............................................................................11

iv

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*United States v. Burgos*,
    94 F.3d 849 (4th Cir. 1996) ..................................................................................10, 11

*United States v. Rafiekian*,
    68 F.4th 177 (4th Cir. 2023) ........................................................................................10

*Ware v. Cia De Navegacion Andes, S. A.*,
    180 F. Supp. 939 (E.D. Va. 1960) ..............................................................................16

*Watson v. Lambert's Point Docks, Inc.*,
    1985 WL 1087835 (E.D. Va. June 23, 1983) ............................................................16

*Westmoreland v. TWC Admin. LLC*,
    924 F.3d 718 (4th Cir. 2019) ........................................................................................7

*White v. Bethlehem Steel Corp.*,
    222 F.3d 146 (4th Cir. 2000) ................................................................................15, 16

**Statutes**

18 U.S.C. § 2340 ..............................................................................................................26, 27

FTCA § 2671 ..........................................................................................................................26

**Other Authorities**

48 CFR pt. 252 ........................................................................................................................26

73 Fed. Reg. 16,764, 16,755 (Mar. 31, 2008) .......................................................................26

73 Fed. Reg. 16,764, 16755 (Mar. 31, 2008) ........................................................................22

Fed. R. Civ. P. 50(a) ................................................................................................................7

Fed. R. Civ. P. 50(b) ...........................................................................................................7, 15

Restatement (Second) of Agency § 226 ................................................................................21

Restatement (Second) of Agency § 227 ................................................................................16

Restatement (Second) of Torts § 876 ....................................................................................13

Restatement (Third) of Agency § 7.03 ..................................................................................21

## PRELIMINARY STATEMENT

Over sixteen years, this case has presented numerous complex questions of law which the Court, in its designated role, previously decided.  At trial, it was the jury's role to decide the remaining, contested factual issues necessary to resolve the case.  In instructing the jury, this Court repeatedly noted that the factual issues in the case were "complicated" and credited the jury for its thoughtfulness, hard work, and commitment to a proper evaluation of the contested evidence.  Despite its careful consideration, the jury was unable to reach a unanimous verdict.

In its motion for judgment as a matter of law, CACI offers no basis—none—for displacing the jury's role and its conscientious grappling with contested factual issues.  CACI proceeds as if the jury did not hear, and evaluate, a wealth of evidence that supports Plaintiffs' conspiracy and aiding-and-abetting claims—evidence that caused a diligent jury to deliberate for eight days before becoming deadlocked.  That some jurors agreed that Plaintiffs' evidence was sufficient to render a judgment in their favor is reason enough to reject, under the high burden CACI faces, the present motion.  CACI cannot simply displace the contested evidence that led to lengthy jury deliberations with its self-serving, distorted, and highly selective version of facts.  Under the law, a new jury must hear and resolve the contested factual issues in this case.

CACI's motion also admittedly "reassert[s]" arguments that the Court has already resolved in Plaintiffs' favor.  Those arguments include the notion that the Alien Tort Statute cannot be applied "extraterritorially" in this case, that the claims alleged constitute implied causes of action purportedly foreclosed by the law, and that the claims are subject to the preemption doctrine.  These arguments are not only barred by the law of the case, but they are also just wrong—for the very reasons that the Court ruled against CACI on these issues on prior occasions.

15114350

This Court should deny CACI's meritless motion for judgment as a matter of law and schedule a new trial.

## THE PROCEEDINGS AT TRIAL[1]

Plaintiffs presented fourteen witnesses and offered into evidence dozens of exhibits.[2] From that evidence and the evidence CACI introduced, the jury could have found the following.

## I.    CACI'S CONTRACTUAL AND REGULATORY REQUIREMENTS TO SUPERVISE AND MANAGE ITS EMPLOYEES

In August 2003, CACI, a corporation that provides contract services to U.S. government "customers," entered into the first of two contracts to provide the Army with interrogation services, including civilian interrogators, to augment the military's forces in Iraq.  *See* May 30, 2024 Declaration of Muhammad U. Faridi (the "Faridi Decl."), Ex. 1 (PTX 83); *id.* Ex. 2 (PTX 84); *id.* Ex. 3 (4/18/24 Tr.) (Billings) 23:25-24:9.  Pursuant to the contract, CACI promised to supply "resident experts" in interrogation, who would "assist, supervise, coordinate, and monitor all aspects of interrogation activities."  *Id.* Ex. 1 at 6.  Consistent with the Army Field Manual applicable to civilian contractors, which represents binding Army doctrine and policy, CACI agreed that it was "responsible for providing supervision for all contractor personnel."  *Id.* Ex. 1 at 7.  CACI did so because, as the Manual mandates, "[c]ommanders do not have direct control

---

[1]    Plaintiffs do not purport to recite every piece of evidence presented at trial that supported their claims, but instead discuss only the evidence necessary to respond to CACI's arguments on this motion.

[2]    These witnesses were:  Plaintiffs Al-Ejaili, Al-Zuba'e, and Al Shimari; Major Generals Antonio Taguba and George Fay, who investigated abuses at Abu Ghraib and authored reports summarizing their findings; former military police personnel Ivan Frederick, Charles Graner, Meghan Ambuhl Graner, and Sabrina Harman, who were present at Tier 1 of the Hard Site, where the abuses in question occurred, on a daily basis; former CACI interrogator Torin Nelson; Jens Modvig, an expert in international norms regarding torture and cruel, inhuman, or degrading treatment ("CIDT"); CACI corporate representative Arnold Morse; William Brady, the Army's Contracting Officer Representative ("COR") for CACI; and Carolyn Holmes, an Army officer with interrogation operations responsibilities at Abu Ghraib.

15114350

over contractors"; "only contractors manage, supervise, and give directions to their employees"; and "the contractor … must take direct responsibility and action for his employee's conduct," *Id.* Ex. 4 (PTX 207) at 5, 15, 68;[3] *see also* ECF No. 1591, Ex C, Morse Tr. 171:23-172:03, 172:14-24 (corporate representative confirming that CACI bore this responsibility and that CACI site lead Porvaznik served as the company's "operational supervisor"). In return for this provision of contractor personnel and supervision, CACI received millions of dollars. *See* Faridi Decl. Ex. 1 at 24; *id.* Ex. 2 at 1.

## II.   RECRUITMENT, HIRING AND SUPERVISION OF INTERROGATORS

CACI was responsible for recruiting qualified interrogators to send to Abu Ghraib. *Id.* Ex. 5 (4/17/24 (AM) Trial Tr.) (Monahan) 86:23-87:19. The company ultimately hired individuals it knew were unqualified for the interrogator role—several of whom, including Tim Dugan and Steven Stefanowicz ("Big Steve"), CACI sent to Abu Ghraib as "screeners" and quickly promoted to interrogators, *without approval from the military*. *See id.* Ex. 6 (PTX 103); *id.* Ex. 7 (PTX 104); *id.* Ex. 8 (PTX 225). The evidence showed that, contrary to CACI's suggestions, CACI's hires were often approved by Tom Howard, a CACI advisor to the military, not by the military itself. *Id.* Ex. 9 (4/19/24 Trial Tr.) (Monahan) 137:2-21. Once CACI personnel arrived at Abu Ghraib, CACI's "operational supervisor," Dan Porvaznik—and not the military—interviewed them and assigned them to what he deemed the appropriate teams. *See id.* Ex. 10 (PTX 23) at 74; *id.* Ex. 9 (Porvaznik) 108:13-23. Moreover, in connection with his

---

[3]      In multiple amicus briefs filed in this case, retired military officers explained the rationale for the legal framework applicable to civilian contractors accompanying the military, which requires contractor supervision and discipline of their civilian employees who are outside the military chain of command. *See* Br. of Amici Curiae Retired Military Officers at 17-22, *Al Shimari v. CACI Premier Tech., Inc.*, No. 15-1831, Dkt. 21-1 (4th Cir. Sept. 28, 2015); Br. of Amici Curiae Retired Military Officers, No. 19-1328, Dkt. 42-1 (4th Cir. May 21, 2019).

15114350

supervisory responsibilities, Porvaznik reviewed and weighed in on CACI interrogators' proposed interrogation plans and had the authority to instruct CACI interrogators not to follow any plans that violated CACI rules or to stop any abusive interrogations. *Id.* Ex. 9 (Porvaznik) 105:2-16, 106:1-23, 107:9-15; *see also id.* Ex. 1 at 6 (requiring CACI personnel to abide by "Department of Defense, US Civil Code, and International Regulations").

## III. CACI INTERROGATORS' COLLABORATION WITH AND INSTRUCTIONS TO MILITARY PERSONNEL TO ABUSE DETAINEES

At Abu Ghraib, CACI interrogators worked closely with the military police ("MPs")— the organization responsible for detention operations—in Tier 1 of the Hard Site, a confined space consisting of two levels of a hallway of cellblocks. *See* ECF No. 1588, Ex. A, Frederick Tr. 25:24-26:04 (describing "the working relationship between MPs and the interrogators" as "a brotherhood"); Faridi Decl. Ex. 11 (PTX 206A), Ex. 12 (PTX 206B) (images of Tier 1A). The evidence was overwhelming that CACI interrogators instructed military police to "set the conditions" for detainees and "soften [them] up" for interrogation—phrases that communicated the infliction of an array of abuses constituting torture or CIDT, including forced nudity, sexual humiliation, painful and prolonged stress positions, beatings, and threats of attack from military working dogs—and encouraged and complimented them when they carried out these instructions. *See* ECF No. 1588, Ex. A, Frederick Tr. 50:06-08, 54:06-16; 55:23-56:08, 56:19-20; 98:17-22; *id.*, Ex. B, Ambuhl-Graner Tr. 13:16-22, 25:17-19, 46:06-08, 46:13, 46:15-17; *id.*, Ex. C, Harman Tr. 32:05-06, 32:08-11, 32:13-16, 32:18-21, 32:23-33:01, 33:03; ECF No. 1585, Ex. A, Graner Tr. 47:17-19, 58:07-48:11.[4] This coordination between interrogators and military

---

[4] *See also* Faridi Decl. Ex. 13 (4/16/24 (AM) Trial Tr.) (Taguba) 96:22-24 ("[MPs] were getting their instructions from the MI … and specifically from CACI."); *id.* Ex. 14 (4/16/24 (PM) Trial Tr.) (Taguba) 11:24-12:20 (MPs "literally implicated [Big Steve] as providing instructions to them," including instructions to "set[] conditions for a successful interrogation" by harassing, intimidating, or assaulting detainees); *id.* Ex. 15 (PTX 137) at 18 (finding that interrogators,

police—the conspiracy—occurred outside of the military chain of command and thus went unmonitored by the military.  *See* ECF No. 1600-2, Pappas Tr. 63:18-64:17, 64:19-65:06, 65:09-21.

CACI interrogators, including Big Steve, Daniel Johnson ("DJ"), and Dugan, not only requested such abuses, but were sometimes present when they occurred or even engaged in them directly.  *See, e.g.*, ECF No. 1588, Ex. C, Harman Tr. 42:12-15, 42:17-43:09, 43:17-18 (recalling that her very first encounter with Big Steve was witnessing him together with Graner and Frederick as the latter two "had [Big Steve's detainee] against the bed chained up or handcuffed up [wearing] women's underwear, … throughout the night in different positions"); *id.*, Ex. A, Frederick Tr. 126:24-127:01 (recalling Big Steve instructing him to "use the dogs on [a detainee] and to treat him like shit"); *id.* 81:24-82:1 (describing use of "pressure point" techniques and obstruction of detainee's breathing in DJ's presence); Faridi Decl. Ex. 16 (4/15/24 (PM) Trial Tr.) (Nelson) 95:6-21; 97:18-23 (testifying regarding DJ's concerning use of harsh interrogation techniques; regarding an interrogation in which DJ was "yelling, the walls were being beaten, banging was going on, furniture … was most likely being thrown around"; and about DJ's reports that in his interrogations, he made a detainee "cry[] like a little baby in the corner" and "broke[]" a detainee "into a thousand pieces like humpty-dumpty"); *id.* 89:6-90:7 (testifying that detainee reassigned from Dugan to Nelson because of his medical condition came to Nelson with "very intense" bruising across entire forearm and "bump on his forehead"); *see also* Faridi Decl.

---

including CACI interrogators, "actively requested that MP guards set physical and mental conditions for favorable interrogation of witnesses"); *id.* at 48 (finding that Big Steve "instructed MPs … to facilitate interrogations by 'setting conditions'" which were unauthorized and that Big Steve "clearly knew his instructions equated to physical abuse"); ECF No. 1591, Ex. B, Fay Tr. 85:21-24, 86:16-19 (testifying that "Military Police and interrogators were working together inside the hard site to set the conditions for interrogations" and that this was done "to create this overall atmosphere that would support [the interrogators'] ability to interrogate.").

15114350

Ex. 10 at 121 (describing Big Steve's unauthorized use of dogs, physical assault of detainee, and boasts about cultural and sexual humiliation of detainee); *id.* at 166 (describing DJ's encouragement of abuse, illicit use of dogs, and implementation of unauthorized stress position); *id.* at 165 (describing physical abuse of detainee by Dugan); *id.* Ex. 17 (PTX 100) (Army stating that DJ "was photographed with a security detainee in a dangerous stress position").

The abuses often took place openly and notoriously so much so that they are memorialized in hundreds of pictures that the abusers themselves took, some of which were even used as computer screensavers. *See id.* Ex. 13 (Taguba) 85:10-24.[5] As subsequent military investigations confirmed, the abuses were "systemic." *Id.* Ex. 15 at 16.

## IV.   PLAINTIFFS SUFFERED ABUSES AS A RESULT OF THE CACI-MILITARY PERSONNEL CONSPIRACY

Plaintiffs were detained in Tier 1 during the same time period that CACI interrogators were operating there. Each plaintiff was interrogated, formally or informally, by CACI personnel. *Id.* Ex. 36 (PTX 226 (Stipulation)) ¶¶ 8, 18; *id.* Ex. 37 (DX 2) at 4-5; *see also, e.g.,* *id.* Ex. 16 (Al-Ejaili) 48:12-50:17, 72:16-73:2; *id.* Ex. 13 (Al-Zuba'e) 22:9-12, 25:9-20; *id.* Ex. 5 (Al Shimari) 15:5-9 (Plaintiffs each testifying about interrogations by civilian interrogators). And each plaintiff suffered horrific abuses of the same kind that military police were inflicting on detainees throughout Tier 1 at the behest of CACI interrogators. *See* ECF No. 1643 at 6. Indeed, the very purpose of the abuse was to "soften up" detainees for interrogations by interrogators, including those employed by CACI. *See* Faridi Decl. Ex. 16 (Al-Ejaili) 42:24-

---

[5]    *See also* Faridi Decl. Exs. 18-35 (PTX 1, PTX 16, PTX 17, PTX 32, PTX 36, PTX 161A-D, PTX 168, PTX 193, PTX 195, PTX 196, PTX 197, PTX 198, PTX 199, PTX 200, and PTX 201, respectively) (photographs depicting abuse).

45:3, 47:4-8 (testifying about abuse by Frederick and Graner); *id.* Ex. 5 (Al Shimari) 25:10-17, 60:24-61:8 (testifying about abuse by Graner).

## ARGUMENT

A defendant moving pursuant to Fed. R. Civ. P. 50(b) "bears a hefty burden," given the constraints of the Seventh Amendment. *Price v. City of Charlotte*, 93 F.3d 1241, 1249 (4th Cir. 1996). In assessing CACI's motion, the Court must "draw all reasonable inferences in favor of [Plaintiffs], and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). Accordingly, the Court must "assume that the testimony in favor of plaintiffs was credible, unless totally incredible on its face, and ignore evidence to rebut it." *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 722 (4th Cir. 2019) (citation omitted). Likewise, the Court must "disregard all evidence favorable to [CACI] that the jury is not required to believe." *Reeves*, 530 U.S. at 151. "If, with that evidence"—*i.e.*, the evidence viewed most favorably to Plaintiffs—"a reasonable jury *could* return a verdict in favor of plaintiffs," the Court must deny the motion, "even if the [C]ourt's judgment on the evidence differs." *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1417 (4th Cir. 1991) (emphasis added).

## V.     PLAINTIFFS ADDUCED SUFFICIENT EVIDENCE TO PERMIT A JURY TO FIND CACI LIABLE ON THEIR CLAIMS

CACI argues that Plaintiffs did not offer sufficient evidence of their claims for conspiracy and aiding and abetting to permit a jury to find in their favor. Br. at 19-26. The Court has already rejected these arguments. When CACI moved for a directed verdict pursuant to Fed. R. Civ. P. 50(a), maintaining that Plaintiffs had not "put on evidence that CACI personnel aided and abetted or conspired with anyone with respect to their treatment," Faridi Decl. Ex. 5, 11:20-25, the Court held that "there's more than enough evidence that's been

15114350

presented at this point to allow this case to go forward." *Id.* at 13:1-2.  The jury—which, as the

Court repeatedly recognized, was particularly attentive and thoughtful, *see, e.g.*, *id.* at 10-13—

proved the Court right: it deliberated for *eight days* without finding in favor of CACI on any

claim.  The evidence that was "more than enough" at the conclusion of Plaintiffs' case has not

suddenly vanished.  Nor did CACI's defense render Plaintiffs' evidence "totally incredible."

Unable to deal squarely with the evidence, CACI's brief is premised primarily on

misconceptions and misstatements of the trial record.

### A.   CACI Has Not Met Its Burden as to the Conspiracy Claims

As the Court instructed, Plaintiffs' conspiracy claims require proof of the following:  (1)

an agreement to inflict torture or CIDT on detainees at Abu Ghraib; (2) CACI's knowing or

intentional entry into that agreement; (3) commission of an overt act in furtherance of the

conspiracy by one of its members; and (4) infliction of torture or CIDT upon the Plaintiff in

question, resulting from acts in furtherance of the conspiracy.  *Id.* Ex. 38 (4/22/24 Trial Tr.)

100:13-101:4.

A reasonable jury easily could have found (and, based on their notes, apparently did find)

in Plaintiffs' favor with respect to each of the foregoing elements.  As discussed above, Plaintiffs

presented evidence of systemic abuses, including, among other things, the near-constant

implementation of forced nudity and stress positions, the infliction of sexual humiliation and

physical violence, and the threats of attacks by dogs.  *See id.*  That evidence came from a wide

variety of sources, including contemporaneous photographs, the testimony of the military police

who were in Tier 1 on a daily basis, the reports and testimony of the generals who investigated

abuse at Abu Ghraib, and, of course, from the Plaintiffs themselves.  *See supra* at 6-7.  Other

than identifying some minor, immaterial inconsistencies in Plaintiffs' memories twenty years

15114350

after the events, there is almost nothing in the record contradicting the wealth of evidence on this issue.

Additionally, Plaintiffs offered evidence that CACI personnel instructed the MPs to "set conditions" and "soften up" detainees for interrogation, terms that encompassed inflicting the above-described abuses; that CACI personnel told the military police that it was doing good work when they carried out these instructions; that the relationship between CACI personnel and the MPs in Tier 1 was tantamount to a "brotherhood"; and that CACI personnel were present for or themselves directly inflicted the abuses. *Id.* at 4-5.  And Plaintiffs established, of course, that they themselves suffered the same forms of torture and CIDT that CACI requested—often at the hands of the very military police who testified about being instructed by CACI. *Id.* at 6-7.

This evidence lays more than an adequate foundation from which to infer the existence of an agreement into which CACI voluntarily entered, as the Court has already concluded over the course of this case. *See* ECF No. 679 at 39-40.  In its brief, CACI takes a kitchen-sink approach, but its arguments are wrong on the facts and on the law.

As to the facts, CACI baldly claims Plaintiffs have not met their burden, but only by ignoring the most fundamental and prevalent evidence in the case.  Nowhere in CACI's brief does it acknowledge (1) the evidence that its personnel instructed that the military police set the conditions for interrogation and soften up detainees; (2) the "systemic" nature of the abuses implemented pursuant to such instructions; or (3) the extent of the evidence directly implicating CACI personnel in the commission of these abuses.  *See supra* at 4-6; *compare id*. with Br. at 26.

As to the law, CACI moves the bar far higher than this Court has already set it, *see* ECF No. 678 at 38-43, or the law requires, demanding the sort of explicit, direct evidence of conspiracy that this Court and the Fourth Circuit repeatedly has made clear is unnecessary (and,

9

indeed, rarely available), and ignoring the law on the scope of conspiracy liability.  Focusing on

the "agreement" elements of conspiracy, CACI ignores two basic legal principles.

First, "[b]y its very nature, a conspiracy is clandestine and covert, thereby frequently

resulting in little direct evidence of … an agreement."  *United States v. Rafiekian*, 68 F.4th 177,

189 (4th Cir. 2023) (quoting *United States v. Burgos*, 94 F.3d 849, 857 (4th Cir. 1996)).

Accordingly, "[a] plaintiff need not prove an express agreement, because 'proof of a tacit

understanding suffices.'"  *Keil v. Seth Corp*., 2021 WL 5088242, at *16 (E.D. Va. Nov. 2, 2021)

(quoting *Tysons Toyota, Inc. v. Globe Life Ins. Co*., 45 F.3d 428 (4th Cir. 1994) (Table)); *see*

*also* ECF No. 678 at 39-40 (factual allegations supported an inference "that CACI employees

and military personnel entered into an agreement to torture detainees" sufficient to defeat motion

to dismiss).  As recited above, Plaintiffs offered significant evidence from which the requisite

"tacit understanding" could be inferred.[6]  Plaintiffs also offered direct evidence of such an

agreement, wherein MPs admitted to being instructed to "set the conditions" for interrogation,

followed by the MPs obeying those instructions, and then being lauded for doing so.  *See, e.g.*,

---

[6]      In arguing otherwise, CACI remains fixated on the proposition that mere "parallel
conduct and a bare assertion of conspiracy are not enough for a claim to proceed."  Br. at 23.
This proposition—which concerns the standard for *pleading* conspiracy and which arose from
the antitrust realm, where parallel (and otherwise lawful) behavior among independent
businesses is expected and thus does not permit an inference of agreement—has been rejected in
this case repeatedly.  ECF No. 94 at 65-68; ECF No. 679 at 38-40; ECF No. 1143.  And for good
reason:  CACI's contention that the various actors who committed plainly unlawful abuses at
Tier 1A all acted independently of one another—rather than pursuant to a tacit agreement—is
absurd and flies in the face of the evidence.  *See* ECF No. 94 at 68.  That CACI interrogators
*instructed* that MPs commit abuse for a particular purpose shared by both the interrogators and
the MPs is antithetical to the concept of "parallel conduct."  The circumstances of which
Plaintiffs presented evidence more than "raise[] a suggestion of a preceding agreement as distinct
from identical, independent action," which CACI acknowledges is enough to satisfy the
"agreement" elements of conspiracy.  *See* Br. at 24 (quoting *Loren Data Corp. v.  GXS, Inc.*, 501
F. App'x 275, 278 (4th Cir. 2012)); *see also Tysons Toyota*, 45 F.3d at 428 (evidence that "points
to complementary and interlocking actions … which together suggest a conspiratorial scheme"
support inference of conspiracy).

ECF No. 1585, Ex. A, Graner Tr. 47:17-19; 48:6-11; 48:17-49:12; ECF No. 1588, Ex. A, Frederick Tr. 55:23-57:7; 57:19-58:8; Ex. B, Ambuhl-Graner Tr. 13:17-22; 25:17-19; 46:6-8; 46:13; 46:15-17.

Second, a conspiracy need not require great precision, coordination, or order. Nevertheless, CACI maintains that the "chaos" at Abu Ghraib "is antithetical to the notion of a conspiracy." Br. at 25. Keeping aside that this depiction contradicts CACI's insistence, in practically the same breath, that CACI interrogators' actions were governed by an allegedly well-defined Army chain of command, the Fourth Circuit has long recognized that "while many conspiracies are executed with precision, the fact that a conspiracy is loosely-knit, haphazard, or ill-conceived does not render it any less a conspiracy—or any less unlawful." *Burgos*, 94 F.3d at 858; *see also United States v. Banks*, 10 F.3d 1044, 1054 (4th Cir. 1993) (explaining that "[c]ritically, it is not necessary to proof of a conspiracy that it have a discrete, identifiable organizational structure"). Indeed, the jury easily could have concluded that the very "chaos" that CACI now emphasizes created just the sort of environment in which the conspiracy at issue—one that involved obtaining information from detainees in the midst of confusion and "a broken detention operations program," Br. at 25—was likely to develop and flourish. *See, e.g.*, Faridi Decl. Ex. 14 (Taguba) 8:4-23 (explaining that "lack of command and control" made abuse more likely to occur at Abu Ghraib).

Finally, CACI argues that the evidence linking Plaintiffs' injuries to the conspiracy was insufficient. But this argument rests on the same false premise that the evidence at trial was

11

15114350

limited to discrete acts of isolated misconduct rather than the systemic abuses across Tier 1 of the kind Plaintiffs themselves suffered.[7]

### B.    CACI Has Not Met Its Burden as to the Aiding and Abetting Claims

CACI's arguments about Plaintiffs' aiding and abetting claims are doomed by the same flaws that pervade CACI's conspiracy arguments.  To prove aiding and abetting, Plaintiffs had to demonstrate (1) that military personnel subjected Plaintiffs to torture or CIDT; (2) that CACI provided practical assistance to those military personnel that had a substantial effect on the infliction of such torture or CIDT; and (3) that, when CACI provided that practical assistance, it did so with the purpose of facilitating the torture or CIDT.  Faridi Decl. Ex. 38, 102:11-24. CACI argues that a reasonable jury could not find for Plaintiffs as to the latter two elements. CACI focuses on the claimed absence of a causal link between it and the abuse of Plaintiffs. Here, too, CACI distorts both the facts and the law.

On the facts, CACI misstates the record, asserting that "[t]he only possible evidence of an interaction between a CACI employee and any plaintiff is a statement from Sergeant Beachner" about an interaction with Plaintiff Al Ejaili.  *See* Br. at 26.  But CACI has stipulated that its personnel interrogated Plaintiffs Al-Zuba'e and Al Shimari.  *See* Faridi Decl. Ex. 36 ¶¶ 8, 18; *id.* Ex. 39 (4/15/24 (AM) Tr.) 30:6-24; *id.* Ex. 13, 6:4-14; *id.* Ex. 5, 9:10-10:1.  Indeed, CACI itself read evidence of its personnel's interrogation of Plaintiffs to the jury.  *See, e.g.*, *id.* Ex. 3, 74:8-11 (reading from DX 2); *id.* Ex. 37 (stating that Plaintiffs Al-Zuba'e and Al Shimari were interrogated by CACI interrogations).  Moreover, each plaintiff testified that he was interrogated

---

[7]     CACI contends that "most of [Plaintiffs'] alleged abuse occurred outside of interrogations."  Br. at 26.  That is, of course, entirely consistent with Plaintiffs' theory that CACI interrogators sought to soften up detainees in connection with interrogations—logically, this often would occur "outside of interrogations," in order to create conditions where it is more likely the detainee would divulge information during the interrogation itself.

by civilian interrogators, and the evidence showed that CACI was the only company that provided civilian interrogators and such interrogators were easily distinguishable from military interrogators since they wore civilian clothing.  *See supra* at 7.

As to the law, CACI continues to rely on the premise already rejected by this Court that Plaintiffs cannot satisfy the practical assistance requirement unless they show that CACI directly instructed military personnel to abuse *these particular Plaintiffs*, rather than other detainees.  But this is not the "causal link" that aiding and abetting requires.[8]  To the contrary, as the Supreme Court—citing the "leading case on civil aiding-and-abetting" liability—explained, "those who aid and abet 'a tortious act may be liable not only for the act itself but also 'for other reasonably foreseeable acts done in connection with it.'"  *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 485, 486–87 (2023) (quoting *Halberstam v. Welch*, 705 F.2d 472, 484 (D.C. Cir. 1983)); *see also* Restatement (Second) of Torts § 876, cmt. d (recognizing that "a person who encourages another to commit a tortious act may be responsible for other acts by the other" when those acts are foreseeable).  In other words, when CACI interrogators instructed that military police set conditions for interrogations of certain detainees by abusing them or by treating them "like shit," CACI became liable not only for the abuse of those specific detainees, but also for the foreseeable injuries to Plaintiffs and other detainees who were subjected to the same forms abuse.  *See, e.g.*, *Jara, et al. v. Nunez*, 13-cv-1426 (M.D. Fl.), Dkt. 184 at 18-19 (instructing, in ATS case, that "[u]nder an aiding and abetting theory of liability, it is not necessary that

---

[8]    That link concerns how significant or substantial the practical assistance is in ***causing*** the tort at issue.  *See* Faridi Decl. Ex. 38, 102:25-103:5 (instructing jury that "to constitute aiding and abetting, there must be a causal link between actions by CACI interrogators and the commission of the wrongful act against that Plaintiff.  ***If CACI interrogators' assistance was insignificant or insubstantial, then their acts and conduct cannot have had a substantial effect***" (emphasis added)).

15114350

Defendant knew specifically which wrongful acts were being committed by the perpetrators, so long as they were a natural and foreseeable result of the activity that Defendant helped to undertake"); *see also Est. of Rodriquez v. Drummond Co.,* 02-cv-665 (N.D. Ala.), Dkt. 460-11, Trial Tr. 2140:23-2141:7 (instructing jury that assistance required for aiding and abetting "need not have caused the acts of the killers" but would be "sufficient if the act or acts of assistance made a significant difference to the perpetration of the killings").

The two cases that CACI has unsuccessfully invoked for over a decade, *Aziz v. Alcolac Inc.*, 658 F.3d 388 (4th Cir. 2011), and *Presbyterian Church of Sudan v. Talisman*, 582 F.3d 244 (2d Cir. 2009), lend no support for CACI's assertion that Plaintiffs must prove that its employees specifically requested or facilitated *Plaintiffs'* abuse.  CACI's misreading of these cases was directly rejected by the Court.  *See* ECF No. 627 at 34-35 (CACI brief in support of motion to dismiss); ECF No. 679 at 44-45 (Opinion & Order denying motion to dismiss).  *Aziz* said nothing about a direct causal link between a defendant's actions and a particular plaintiff, only concluding that the complaint's allegations were too conclusory to support any inference of intentionality between the defendant and the *harms* at issue.  As this Court previously noted, however, Plaintiffs' allegations, now supported by a wealth of trial evidence, represent "exactly the supporting facts for which the *Aziz* court was searching."  ECF No. 678 at 45.  CACI mischaracterizes *Talisman* in the same manner.  *See* Br. at 20 (emphasis in original).  And the plaintiff in *Talisman* failed for not adducing sufficient evidence that the defendant's conduct was connected to an ATS violation or "was done for an improper purpose."  *See Talisman*, 582 F.3d at 262-64.  There can be no credible dispute that Plaintiffs offered overwhelming evidence on both issues.  In any event, there was sufficient evidence under the unduly high bar CACI seeks to

14

set for the jury to infer that CACI interrogators specifically requested abuse of Plaintiffs.  *See supra* at 6-7; *see also* ECF No. 1643 at 6-10.

## VI.   CACI IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW BASED ON THE BORROWED SERVANT DOCTRINE

### A.   A Reasonable Jury Could Reject CACI's Borrowed Servant Defense, as the Court Has Previously Held

The Court has repeatedly rejected CACI's prior attempts to invoke the borrowed servant doctrine as grounds for wholesale dismissal.  CACI invoked borrowed servant in arguing for summary judgment (ECF No. 1033), but the Court denied the motion on that basis.  ECF No. 1143.  On the eve of trial, CACI again invoked borrowed servant in arguing for reconsideration of the Court's ruling on derivative sovereign immunity.  ECF No. 1487.  This too was rejected by the Court.  Faridi Decl. Ex. 40 (4/5/2024 Hearing Tr.) 4:1-6.  At trial, the record produced numerous, serious factual disputes as to this affirmative defense, such that CACI cannot possibly meet the burden required on its Rule 50(b) motion.  That the jury was clearly unable to unanimously resolve this very issue in CACI's favor—in light of evidence demonstrating that CACI retained control over the hiring, firing, supervision and discipline of employees and that military regulations preclude such civilian employees from the military "chain of command"— plainly demonstrates that a reasonable juror could reject the defense.  Ultimately, a jury must resolve these factual questions in a new trial.

### B.   CACI Did Not Prove Its Borrowed Servant Defense Beyond Dispute, as Required to Warrant a Directed Verdict

For the borrowed servant doctrine to preclude the general employer from incurring liability, the borrowing employer must have "authoritative direction and control over a worker … encompass[ing] the servant's performance of the particular work in which he is engaged *at the time of the* [tort]."  *White v. Bethlehem Steel Corp.*, 222 F.3d 146, 149 (4th Cir. 2000) (emphasis

15114350

added).  Factors relevant to the borrowed-servant analysis include "the supervision of the employee, the ability to unilaterally reject the services of an employee, the payment of wages and benefits either directly or by pass-through, or the duration of employment."  *Id.*

As a baseline, where, as here, a general employer-employee relationship has been established, the court must *presume* "that the [employee] remains in his general employment so long as, by the service rendered to another, he is performing the business entrusted to him by the general employer."  *Est. of Alvarez v. Johns Hopkins Univ.*, 275 F. Supp. 3d 670, 694 (D. Md. 2017) (quoting cmt. b to Res. (Second) of Agency § 227)); *see also Watson v. Lambert's Point Docks, Inc.*, 1985 WL 1087835, at *3 (E.D. Va. June 23, 1983) (same), *aff'd*, 732 F.2d 152 (4th Cir. 1984).  "[T]he burden is on such general employer to show that in fact allegiance has been transferred."  *Ware v. Cia De Navegacion Andes, S. A.*, 180 F. Supp. 939, 943 (E.D. Va. 1960).

Importantly, "[t]here is no inference that because the general employer has permitted a division of control, he has surrendered it."  *Abraham v. United States*, 932 F.2d 900, 902–03 (11th Cir. 1991) (quoting cmt. B to Section 227 of the Restatement (Second) of Agency); *Dellums v. Powell*, 566 F.2d 216, 220-21 (D.C. Cir. 1977) (same).  Rather, for the general employer to be released from all liability for its employee, the employee must cease to be the employer's servant as to the work giving rise to the conduct in question.   In other words, the general employer must relinquish *all control* over the lent employee to be absolved of liability, and dual control over the employee does not meet that high bar.  This is a requirement CACI cannot meet when it is CACI's contractual responsibility, supervision, and control over its civilian contractors placed with the military at Abu Ghraib is taken into account.

### 1.   CACI Was Tasked With and Maintained Responsibility for Its Personnel at Abu Ghraib

The legal instruments governing CACI's contract with the Army all make explicit that CACI—and not the Army—bore ultimate responsibility for the conduct and supervision of CACI's employees.  This evidence alone creates a sufficient dispute regarding the borrowed servant defense.  The many jury notes on the borrowed servant doctrine illustrate the impossibility of resolving the question as a matter of law in CACI's favor.

The then-applicable Army Field Manual governing use of contractors—which reflects "Army doctrine and policy" on the subject, *see* Faridi Decl. Ex. 4 at 5; *id.* Ex. 3 (Billings) 70:15-22—repeatedly and expressly states that "[Army] [c]ommanders do not have direct control over contractors or their employees … [and] only contractors manage, supervise, and give directions to their employees."  *Id.* Ex. 4 at 15 (§ 1-22); *see id.* at 68 (§4-45) ("It is the contractor who must take direct responsibility and action for his employee's conduct.").  Indeed, the military personnel primarily responsible for interfacing with contractors were "prohibited from … [i]nterfering with the *contractor's management prerogative* by 'supervising' contractor employees or otherwise directing their work efforts."  *Id.* at 90-91 (Appendix A) (emphasis added).  The military thus seeks to avoid, as a matter of law, the substantial risk of liability that would accrue from routine government contracts such as CACI's, where a government contractor necessarily performs work at the direction of the military.

CACI's agreement with the Army unsurprisingly complied with this required feature of contracting.  The relevant contract stipulated that CACI was "responsible for providing supervision for all contractor personnel."  *Id.* Ex. 1 at 7; *see id.* at 6 (CACI's "resident experts" would "assist, supervise, coordinate, and monitor all aspects of interrogation activities").  And CACI's own corporate policies reflect the same responsibilities.  *See id.* Ex. 41 (PTX 85) (CACI

Code of Ethics and Business Conduct Standards) at 7-8 ("CACI management retains all rights …

to direct, supervise, control, and when it deems appropriate, discipline the work force."); *see also*

*id.* Ex. 9 (Porvaznik) 110:10-15 (confirming that CACI retained these rights and that this Code

"applied to [his] role at Abu Ghraib prison"); *id.* Ex. 5 (Monahan) 84:14-24 (Monahan)

(testifying that Iraq-based personnel were not exempt from Code).

> The foregoing instruments are not mere paper policies untethered to the realities at Abu

Ghraib.  Indeed, the descriptions they offer of CACI's control over its interrogators and the

absence of the military's power to control are fully consistent with ultimate findings of Major

Generals Antonio Taguba and George Fay who documented (and lamented) the military's lack of

supervisory control over the conduct of contractors.  *See id.* Ex. 10 at 19 (noting that "[n]o

doctrine exists to guide interrogators and their intelligence leaders" in the "command and control

of contractors"); *id.* Ex. 14 (Taguba) 17:1-4 ("Civilian contractors were everywhere, and they

*were not … under the control of the military authorities*") (emphasis added).

> Plaintiffs presented significant and largely uncontroverted evidence reflecting many

aspects of CACI's supervision and control of its personnel at Abu Ghraib, consistent with Army

doctrine, the relevant contracts, and CACI's own policies—including, for example, CACI's

responsibility for recruiting and hiring the interrogators that it sent to Abu Ghraib, paying them,

promoting them, supervising and disciplining them, and, if necessary, firing them.  *See, e.g.*, *id.*

Ex. 5 (Monahan) 86:23-87:19; *id.* Ex. 9 (Northrup) 22:21-23:4; ECF No. 1600, Ex. B, Pappas Tr.

57:12-19; 63:1-9.  Other aspects of CACI's authority, such as the extent of CACI's involvement

in the substantive work of intelligence-gathering at Abu Ghraib, were more hotly contested—but

Plaintiffs adduced evidence of CACI's role in that work, as well.  CACI employee Tom Howard,

for example, served as the "C2X," the "[c]orps level intelligence director" who "report[ed] to the

senior intelligence officer for the entire corps which was running the operation in Iraq." Faridi Decl. Ex. 16 (Nelson) 117:15-118:5. CACI site lead Porvaznik was the "operational supervisor" "charged with *supervising all aspects of interrogation activity at Abu Ghraib.*" ECF No. 1591, Ex. C., Morse Tr. 172:14-20 (emphasis added). Porvaznik—who had more than two decades of experience in military intelligence and interrogations (experience much more extensive than that of many Army personnel at Abu Ghraib) based on his service in the Marine Corps, *see* Faridi Decl. Ex. 9 (Porvaznik) 84:13-86:2; 96:5-98:4—was instrumental in supervising CACI personnel in intelligence and interrogation matters. For example, he assigned personnel to interrogation teams, reviewed and offered feedback on interrogation plans, and had the power (indeed, the obligation) to instruct CACI interrogators not to follow plans that violated CACI rules or to stop abusive interrogations. *See id.* at 105:2-16, 106:1-23, 107:9-15, 108:13-23. Porvaznik's extensive background as an interrogator and in leading interrogation operations is precisely why he was put in the site lead role, and belies the notion that he was a mere administrator with no involvement whatsoever in intelligence operations. Additionally, CACI retained ultimately authority over and above the Army regarding their interrogator's conduct: as occurred on occasion, "[i]f [CACI employees] did get direction from someone else and they thought it was bad direction, they would take it to the [CACI] Site Lead." ECF No. 1598, Ex. D, Mudd Tr. 90:11-21. This evidence all creates, at the least, a jury question about applicability of the borrowed servant doctrine.

To CACI, *Huff v. Marine Tank Testing Corp.*, 631 F.2d 1140 (4th Cir. 1980), a run-of-the-mill case of private businesses subcontracting with other small businesses to meet fluctuating workloads, is some silver bullet that leaves no factual dispute left for the jury. Not so. First, obviously concerned about the important role that Porvaznik played in supervising CACI

personnel at Abu Ghraib, CACI says *Huff* proves that an original employer-supervisor's mere presence at the site of the borrowing employer is irrelevant to the borrowed servant doctrine. *See* Br. at 8.  But the trial evidence, viewed in the light most favorable to Plaintiffs, showed that Porvaznik undertook far more supervisory "operational" engagement in a variety of on-the-ground responsibilities than the *Huff* "supervisor"—who was "mostly involved in timekeeping." *Compare id. with supra* at 19.  Second, CACI's table comparing *Huff* to this case only proves Plaintiffs' point:  the column in CACI's table characterizing CACI's role simply states as undisputed fact matters that were hotly contested at trial.  For example, Plaintiffs presented evidence that CACI managed its interrogators, *see id.*; that Porvaznik, and not the Army, determined where CACI personnel would be assigned, *see* Faridi Decl. Ex. 10 at 74; and that CACI personnel were treated differently than Army personnel, *see, e.g.*, ECF No. 1600-2, Pappas Tr. 57:14-57:22, 63:1-17; ECF No. 1598, Ex. D, Mudd Tr. 90:11-21; Faridi Decl. Ex. 5 (Monahan) 84:14-24.  Especially because the Court must resolve these evidentiary disputes in Plaintiffs' favor on this motion, CACI cannot obtain judgment as a matter of law on questions only a jury must itself resolve.

## 2.  Alternatively, the Jury Could Conclude that CACI and the Army Shared Control Over CACI Personnel

Where a borrowed employee simultaneously acts in the course and scope of his employment for both his original employer and the borrowing employer, the employee is a "dual servant" and the original employer is not absolved from liability.  As the Fourth Circuit's most recent pronouncement emphasized, "a person may be the servant of *two masters ... at one time as to one act*, if the service to one does not involve abandonment of the service to the other").  *Est. of Alvarez by & through Galindo v. Rockefeller Found.*, 96 F.4th 686, 693 (4th Cir. 2024) (emphasis added) (quoting *N.L.R.B. v. Town & Country Elec., Inc.*, 516 U.S. 85, 94–95 (1995)).

Specifically, when the employee's tasks serve the interests of both employers, courts applying the dual servant doctrine usually hold both employers liable for the torts of that single employee. "An employee may cause both employers to be responsible for an act which is a breach of duty to one or both of them.  He may be the servant of two masters, not joint employers as to the same act, if the act is within the scope of his employment for both."  Res. (Second) of Agency § 226 cmt. a (1958) (March 2024 Update) (emphasis added).[9]

If the Army had power to direct certain aspects of CACI's performance of its work in connection with interrogations (in a manner that it would with any government contractor hired to perform services), such an arrangement shows only that CACI consented to *shared direction* over its employees with the Army as to that specific work, not that CACI acceded to relinquish all control over their employee.  *See* ECF No. 1598, Ex. D, Mudd Tr. 142:14-143:4 (confirming that CACI employees were instructed to "report to the military and to CACI"); Faridi Decl. Ex. 42 (PTX 86) (similar).  And the work in connection with interrogations performed by CACI employees even for the Army plainly fell within their scope of employment with CACI and their

---

[9]     *See also Minnkota Power Co-op., Inc. v. Manitowoc Co*., 669 F.2d 525, 532 (8th Cir. 1982) (recognizing that "[a] total shift in liability does not occur … when the servant simultaneously performs an act which falls within the scope of employment for both the general employer and the borrowing employer."); *Sharpe v. Bradley Lumber Co*., 446 F.2d 152, 155 (4th Cir. 1971) (liability existed for lending employer because "an agent can be in the service of two principals simultaneously, provided *both have a right to exercise some measure of control*, and there is a common or *joint participation in the work and benefit to each from its rendition*.") (emphasis added); *Pridemore v. Hryniewich*, 2022 WL 4542250, at *6 (E.D. Va. Sept. 28, 2022) (recognizing that "[e]ven if a party is deemed to be a borrowed servant of one employer, this does not automatically indicate that he is no longer the servant of the initial employer," and that "Officer Hryniewich's possible status as a borrowed employee of Willard Marine, by itself, may not release the City from all liability"; Res. (Third) of Agency § 7.03 cmt. d (stating that "[s]ome cases allocate liability to both general and special employer on the basis that both exercised control over the employee and both benefited to some degree from the employee's work."); ECF No. 1604 at 3-4 (collecting cases).

mandate as CACI interrogators.[10]   Indeed, this is how government contracting works, writ large: to fulfill its contract with a government client, a private employer will by necessity cede some authority over its employees to the government entity to do work the government entity so directs.  The United States government might be quite surprised to learn that, under CACI's borrowed servant theory, the work it directs private employers to do for a government agency—reflected in thousands of extant government contracts worth billions of dollars that are currently in force—would subject the United States to exclusive liability for the misconduct of those employees, even where the contractor maintains supervisory authority over its employees.  *C.f., e.g.*, 73 Fed. Reg. 16,764, 16755 (Mar. 31, 2008).  For all these reasons, CACI interrogators are better characterized, at best, as dual servants, not borrowed servants, and CACI thus remains liable for its employees' acts under *respondeat superior*.

Thus, contrary to CACI's contentions, even if CACI demonstrated as a matter of law that the Army in fact had power to control CACI personnel's work at Abu Ghraib, the jury must be able to consider whether an employee is a dual servant.  *See Est. of Alvarez*, 96 F.4th at 695 (after concluding that doctor was borrowed servant of borrowing employer, going on to consider whether doctor nevertheless was a dual servant, but rejecting the argument on the particular facts presented regarding the general employer's authority).

---

[10]     CACI fleetingly suggests in its brief that the unlawful conduct in which Plaintiffs allege CACI interrogators engaged would not fall within the scope of their employment with CACI. Br. at 21 n.9.  This argument has been foreclosed be the law of the case.  The Court has already held, "CACI interrogators' actions were undeniably related to and within the scope of their employment," and "[t]he entire purpose of their employment was to direct the interrogation of detainees at the Hard Site—and the goal of the conspirac[y] was to design and implement a program of abuse to facilitate successful interrogations."  *Al Shimari v. CACI Premier Tech., Inc.*, 324 F. Supp. 3d 668, 696 (E.D. Va. 2018).

22

> **3.     The "Facts on the Ground" Make Even Clearer that the Applicability of the Borrowed Servant Doctrine is Disputed**

Finally recognizing the force of Army regulations and policies which foreclose CACI's ability to argue that its interrogators were controlled by the Army, CACI shifts to a defense relating to "facts on the ground." Br. at 3-4. But the contested evidence in the case precludes judgment as a matter of law on the defense. And viewed either way, the principles reflected in the Army Field Manual are dispositive, or at least highly probative evidence, that CACI is not entitled to the defense.

This "facts on the ground" inquiry is fatal to CACI's motion. First, as conceded by CACI elsewhere in its brief, *see* Br. at 24-25, and as General Taguba's testimony confirms, the reality "on the ground" was "chaos," a command vacuum in which military authority was largely absent and in which the central conduct at issue—CACI interrogators' work with the military police to "soften up" detainees and "set the conditions for interrogation"—fell entirely outside any chain of command. Put another way, whatever direction from the military that was contemplated at the start of CACI's work became ineffective during the chaos that ensued at Abu Ghraib. Any reasonable juror could so conclude.

Second, and relatedly, the Fourth Circuit has made clear (in the context of the political question doctrine) and this Court has similarly determined (in the context of derivative sovereign immunity) that, as a matter of law, the military did not (and could not) have authority over CACI's conduct that is violative of international law—even if CACI personnel were operating under the military's general direction when committing those violations (which they were not). *See Al Shimari*, 840 F.3d at 157 (military cannot "direct[] a contractor to engage in unlawful activity); *see also Al Shimari v. CACI Premier Tech., Inc*., 368 F. Supp. 3d 935, 970–71 (E.D. Va. 2019) (same regarding derivative sovereign immunity).

15114350

Third, CACI's theory is internally inconsistent.  CACI claims on the one hand, that what matters is the reality on the ground, and not what is "on paper," while on the other hand, CACI largely relies on the paper, not the reality, for its borrowed servant defense.  Specifically, CACI emphasizes organizational charts, formal rules of engagement and interrogation policies; government interrogatory responses that reflected formal policies (not actual practice); and testimony concerning how things were supposed to work at Abu Ghraib.  *See* Br. at 4-6, 9-10.  But the trial evidence made obvious that the reality on the ground departed dramatically from the aspirations of these written policies.  *See, e.g*., Faridi Decl. Ex. 10 at 23 (noting that "interrogation operations were plagued by a lack of an organizational chain of command presence"); ECF No. 1600, Ex. B, Pappas Tr. 29:1-15 (observing that organizational chart did "not necessarily indicate how we might do business on a day-to-day basis" and warning against "the impression that this dictated how we did operations"); Faridi Decl. Ex. 5 (Monahan)86:23-87:19 (discussing concerns that, inconsistent with formal policy, "interrogations [we]re being done without any supervision").

Indeed, the on-the-ground reality was that there was "no clear command and control" for the military at Abu Ghraib.  *Id.* Ex. 13 (Taguba) 99:9-19; *see also id.* Ex. 10 at 83 (noting "lack of oversight [at Abu Ghraib] to ensure that intelligence operations … f[e]ll within the law"); ECF No. 1591, Ex. B, Fay Tr. 28:20-29:06 (describing failures and lack of leadership as well as issues affecting command and control).  As Colonel Pappas explained, the conspiratorial conduct to "set conditions" took place entirely "outside of formal chains of command," and the military never had any "formal system in place to monitor" this conduct.  ECF No. 1600, Ex. B, Pappas Tr. 65:9-21.  The existence of this military command vacuum undercuts CACI's assertions of "plenary, absolute, and unqualified" Army control over CACI interrogators.  ECF No. 1639 at 9.

15114350

Indeed, as an inversion of CACI's claimed defense, the command vacuum is what allowed CACI interrogators to take control over and direct military personnel (not the other way around).

Finally, as described above, even if there were some general military operational control over CACI (albeit insufficient to grant CACI's defense as a matter of law), the misconduct CACI undertook even under such putative control did not come at the direction of the Army.  The evidence at trial overwhelmingly established that the military did not authorize such violations of international law.  *See, e.g.*, ECF No. 1591, Ex. B, Fay Tr. 30:20-31:03 (testifying that none of abuses Major General Fay investigated were sanctioned or otherwise approved by the military); ECF No. 1600, Ex. B, Pappas Tr. 86:11-25 (testifying that humiliation of detainees was always prohibited; Faridi Decl. Ex. 43 (PTX 42) (Interrogation Rules of Engagement); *see also id.* Ex. 14 (Taguba) (interrogators' "instructing the MPs to set conditions for a successful interrogation" was "not legal"); *id.* Ex. 9 (Holmes) 135:20-25 (Holmes never authorized or approved the abuses at issue).

### C.    CACI's Arguments Are Contrary to Public Policy

CACI's arguments are also premised upon an overbroad conception of the borrowed servant doctrine that would potentially make the government liable for the misconduct of *any* third-party employees operating under a government contract.  This cannot be the law, and indeed, stands in stark contrast to the myriad regulations and laws that make clear that government contractors working with the military must retain supervisory and disciplinary control over its civilian employees—as CACI did here—and accept the liability that flows from their misconduct.[11]  *See, e.g.*, Contractor Personnel Authorized to Accompany U.S. Amed Forces

---

[11]    CACI effectively concedes that its borrowed servant defense is little more than a repackaging of its failed political question and government contract defense arguments.  Br. at 4 ("There is no reason why the power to direct and control should be addressed differently in the borrowed servant context" than in the political question or government contractor defense

15114350

Deployed Outside the United States, 73 Fed. Reg. 16,764, 16,755 (Mar. 31, 2008) (codified at 48 CFR pt. 252 (the "inappropriate use of force by contractor personnel authorized to accompany the U.S. forces can subject such personnel to United States […] prosecution and civil liability"); *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016) (government contractors enjoy no immunity from liability when they exceed their contract and act unlawfully); FTCA § 2671 ("employees of the government … *does not include any contractor* with the United States") (emphasis added).

## VII.   CACI IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW DUE TO THE GOVERNMENT'S INVOCATION OF STATE SECRETS

As an initial matter, CACI is under the false premise that it is the only party affected by the government's decision to invoke state secrets.  As the Court has recognized, Plaintiffs, too, were affected—perhaps in ways more profound than CACI.  *See id.* Ex. 38 at 6:13-22; 85:4-11; *see also id.* Ex. 39 at 133:14-23.  The only difference is that Plaintiffs have not been as vocal in their complaints because the reality is that—as baseless as it has been—the government's invocation of state secrets did not fundamentally deprive either side of due process of law.

In the instant motion, CACI seeks to relitigate issues resolved conclusively against it long ago.  *See* ECF No. 1143 (denying CACI's motion to dismiss based on state secrets privilege);

---

context (citing *In re KBR, Inc.,* 893 F.3d 241, 261 (4th Cir. 2018)).  In so doing, CACI fails to identify the key distinction between this case and other contractor defense cases and why it was previously denied those defenses.  In essence, this case does not allege state law tort claims, but international torts brought under the ATS that could not be lawfully ordered or authorized by the military.  *See, e.g., Al Shimari v. CACI Premier Tech., Inc.,* 840 F.3d 147, 158 (4th Cir. 2016) ("commission of unlawful acts [such as torture and CIDT] is not based on 'military expertise and judgment,' and is not a function committed to a coordinate branch of government."); *see also* Br. of the United States as Amicus Curiae at 22-23, *Al Shimari v. CACI Premier Tech., Inc.*, Nos. 09-1335, 10-1891, 10-1921, Dkt. 146 (4th Cir. Jan. 14, 2012) (courts must take into account "the federal interests in ensuring that a contractor's involvement in detention operations is conducted" in accordance with federal law, including the Anti-Torture Statute, 18 U.S.C. § 2340).

15114350

Faridi Decl. Ex. 44 (2/27/2019 Hearing Transcript) 6:12-7:10 (same).  The trial record shows

that the government's invocation did not prevent CACI from obtaining a fair trial.  Indeed, even

as CACI insists that it was deprived of information necessary to defend itself, it simultaneously

contends the record evidence also entitles it to judgment as a matter of law—an untenable

contradiction that illuminates the incoherence of CACI's argument.[12]

### A.    CACI's Own Cited Authority Undermines Its Arguments

As it has before, CACI invokes *El-Masri v. United States*, 479 F.3d 296 (4th Cir. 2007)

in support of its motion on state secrets grounds.  Br. at 23-24.  *El-Masri* holds that state secrets

may warrant dismissal "if the circumstances make clear that privileged information will be so

central to the litigation that any attempt to proceed will threaten that information's disclosure."

479 F.3d at 308.  Here, the central limitation that the government's invocation of state secrets

imposed—on both CACI and Plaintiffs—was that the parties could not discover or reveal the

identities of the particular interrogators who interrogated Plaintiffs.  But that information was not

"central" to CACI's defense, because Plaintiffs' theories of aiding and abetting and conspiracy

liability do not require proof that any particular CACI interrogator directly inflicted the abuse in

question.  Indeed, the Court informed the jury (and CACI repeatedly emphasized) that "plaintiffs

are not alleging that CACI personnel ever laid a hand on them."  Faridi Decl. Ex. 38 at 44:10-

44:11.

---

[12]    The contradiction is not new, though: the Court recognized this same "irony" five years ago, when it denied CACI's motion for summary judgment on state secrets grounds. *See id.* ("[T]here's sort of an irony here because on the one hand, CACI is arguing we couldn't get enough information to defend ourselves, and yet they're moving for summary judgment on an argument that we have enough evidence in this record that judgment should be granted to us as a matter of law.").

15114350

CACI's chief complaint is that the government's invocation implicated the jury's ability to assess witness credibility and on the manner in which CACI presented its evidence. Yet, nothing in *El Masri* suggests that issues regarding credibility assessment and the format of testimony warrant dismissal. In any event, the Court—which carefully considered these issues in denying CACI's motion to dismiss on state secrets grounds and concluded that "proper instructions given to the jury" would effectively address the concern, *see id.* Ex. 44 at 6:12-7:10; ECF No. 1143—instructed the jury multiple times about the state secrets privilege and why certain witnesses testified pseudonymously. *Id.* Ex. 39 at 133:14-23; *Id.* Ex. 38 at 12-19. It cautioned that "the lack of identity and background information should not adversely influence your judgment as to these witnesses' credibility." *Id.* at 12-19. Those instructions adequately addressed CACI's concerns.

### B.    CACI's Defense Strategically Exploited the Government's State Secrets Invocation

CACI complains that the state secrets privilege "made a fair assessment of credibility impossible" because CACI could not "discover[] and advis[e] the jury of" interrogators' "identities and backgrounds" and because CACI had to present the testimony of Army and CACI interrogators through "choppy, pseudonymous audio files that were rendered tedious" by, among other things, "the government's incessant privilege objections." Br. at 16. But CACI dramatically overstates the impact of the invocation on credibility assessment, while even more severely understating the extent to which the "painful" aspects of its witness presentation, *see id.*, were self-inflicted and even strategically chosen.

As to the contention that CACI could not discover interrogators' identities or elicit information about their backgrounds, CACI was (of course) the employer of all the CACI interrogators at Abu Ghraib. CACI knows perfectly well the identities of those interrogators and

has had two decades to investigate their conduct—indeed, CACI has written and published a 700+ page book detailing such efforts.  CACI sought and obtained a last minute *de bene esse* deposition to preserve the trial testimony of one of those interrogators, Big Steve, and elicited substantial information about his "identit[y] and background[]."  Nothing (but, perhaps, concern about what they might reveal) prevented CACI from calling (or deposing) Dugan, DJ, or any of the other CACI personnel who served at Abu Ghraib, or from inquiring about those witnesses' backgrounds, training, CACI recruitment process, and what they did and saw at Abu Ghraib.

CACI chose not to call these personnel, but instead to rely primarily on the testimony of Big Steve and the pseudonymous witnesses.  If their testimony was "painful" and "tedious," Br. at 21, and subject to "incessant privilege objections"—which CACI could have chosen to simply cut from its presentation, rather than relying upon it now to manufacture an otherwise avoidable prejudice, that is a result of CACI's strategic decisions.  Moreover, CACI mischaracterizes the extent to which the state secrets privilege affected "the substance of the interrogators' testimony."  Br. at 16.  For example, CACI presented substantial pseudonymous interrogator testimony regarding any discipline or reprimand resulting from the interrogators' conduct at Abu Ghraib.[13]

---

[13]     *See, e.g.*, ECF No. 1600-3 at 3 (eliciting whether CACI Interrogator A was "charged with a crime as a result of … your services as an interrogator in Iraq"); ECF No. 1600-4 at 3 (eliciting whether Army Interrogator B was "ever disciplined or reprimanded by the Army for anything that occurred at Abu Ghraib Prison" or otherwise convicted of a crime); ECF No. 1598-2 at 3 (eliciting same with respect to Army Interrogator C); ECF 1598-3 at 6 (eliciting whether CACI Interrogator G had "ever been tried by court-martial or subjected to nonjudicial punishment by the U.S. military at any time in your life" or "charged with a crime as a result of your service as an interrogator in Iraq").

## VIII.   CACI'S REMAINING ARGUMENTS HAVE BEEN REPEATEDLY REJECTED AND SHOULD BE REJECTED AGAIN

CACI acknowledges that its remaining arguments—regarding extraterritoriality, implied causes of action under the ATS, and preemption—concern "legal issues that the Court previously has decided against CACI as a matter of law."  Br. at 27.  The Court's prior rulings are the law of the case, and CACI does not even attempt to offer new grounds revisiting them now.

As to extraterritoriality, the Court has repeatedly held that "[t]he record … shows substantial domestic conduct that is relevant to the alleged law of nations violations," and that CACI's arguments to the contrary are "unpersuasive."  Following Plaintiffs' trial presentation, the Court was "even more satisfied" of this conclusion.  Faridi Decl. Ex. 45 (4/17/24 (PM) Trial Tr.) 13:7-10.  The Court has likewise rejected CACI's claim that implying a cause of action under the ATS violates separation of powers (Br. at 33).  *See Al Shimari*, 684 F. Supp. 3d at 505 ("it is the law of the case that adjudication of plaintiffs' claims does not impermissibly infringe on the political branches").  CACI's suggestion that the ATS—a congressional enactment—is somehow preempted, has likewise been rejected.  *Al Shimari*, 324 F. Supp. 3d at 699.  Because there has been no intervening change in controlling law, these arguments should be rejected again.

## CONCLUSION

For the foregoing reasons, the Court should deny CACI's motion for judgment as a matter of law on all claims and schedule a new jury trial on Plaintiffs' claims.

Dated: May 30, 2024

Respectfully submitted,

*/s/ Cary Citronberg*

Cary Citronberg (VA Bar #81363)
JOHNSON/CITRONBERG, PLLC

15114350

421 King Street, Suite 505
Alexandria, VA 22314
Tel. 703-684-8000 | cary@jc-attorney.com

Muhammad U. Faridi, *Admitted pro hac vice*
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036

Baher Azmy, *Admitted pro hac vice*
Katherine Gallagher, *Admitted pro hac vice*
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor New
York, NY 10012

Shereef Hadi Akeel, *Admitted pro hac vice*
AKEEL & VALENTINE, P.C.
888 West Big Beaver Road
Troy, MI 48084-4736

*Attorneys for Plaintiffs*

31

## CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2024, I electronically filed the foregoing, which sends notification to counsel for Defendants.

*/s/ Cary Citronberg*
Cary Citronberg

15114350