# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

|  |  |  |
|---|---|---|
| SUHAIL NAJIM ABDULLAH AL SHIMARI, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No.    1:08-cv-0827 LMB-JFA |
| CACI PREMIER TECHNOLOGY, INC., | ) ) | |
| Defendant, | ) ) ) | |

## DEFENDANT CACI PREMIER TECHNOLOGY, INC.'S CORRECTED REPLY (REPLACING DKT. #1651) IN SUPPORT OF ITS MOTION FOR JUDGMENT AS A MATTER OF LAW

John F. O'Connor
Virginia Bar No. 93004
Linda C. Bailey (admitted *pro hac vice*)
Joseph McClure (admitted *pro hac vice*)
STEPTOE LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 429-3000 – telephone
(202) 429-3902 – facsimile
joconnor@steptoe.com
lbailey@steptoe.com
jmcclure@steptoe.com

Nina J. Ginsberg
Virginia Bar No. 19472
DiMuroGinsberg, PC
1001 N. Fairfax Street, Suite 510
Alexandria, VA  22314-2956
703-684-4333 – telephone
703-548-3181 – facsimile
nginsberg@dimuro.com

*Counsel for Defendant CACI Premier Technology, Inc.*

## <u>TABLE OF CONTENTS</u>

I.      **INTRODUCTION** ........................................................................................... 1

II.     **ARGUMENT** ................................................................................................. 2

     A.      Plaintiffs' Allegations Do Not Match the Evidence at Trial ................................ 2

     B.      Plaintiffs Failed to Prove Their Conspiracy and Aiding and Abetting Claims ....... 4

          1.      Plaintiffs Failed to Prove Their Conspiracy Claims ................................... 4

          2.      Plaintiffs Failed to Prove Their Aiding and Abetting Claims ..................... 8

     C.      The Borrowed Servant Doctrine Precludes Liability ........................................ 10

     D.      CACI Alone Was Denied Due Process by the Government's Invocation of the State Secrets Privilege ................................................................................... 14

     E.      Plaintiffs' Claims Are Barred Under Binding Precedents .................................. 18

III.    **CONCLUSION** ............................................................................................. 18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Estate of Alvarez v. Rockefeller Found.*,
  96 F.4th 686 (4th Cir. 2024) ......................................................................................9, 13, 14

*Aziz v. Alcolac, Inc.*,
  658 F.3d 388 (4th Cir. 2011) ...................................................................................................9

*Chaplick v. Mao*,
  No. CV TDC-13-2070, 2016 WL 4516061 (D. Md. Aug. 25, 2016) ........................................3

*Columbia Gas Transmission, LLC v. Ott*,
  984 F. Supp. 2d 508 (E.D. Va. 2013) ......................................................................................3

*Graves v. Lioi*,
  930 F.3d 307 (4th Cir. 2019) ...............................................................................................2, 3

*Krembel v. United States*,
  837 F. App'x 943 (4th Cir. 2020) ............................................................................................3

*Peralta v. Dillard*,
  744 F.3d 1076 (9th Cir. 2014) .................................................................................................3

*Plotkin v. Lehman*,
  No. 98-1638, 1999 WL 259669 (4th Cir. Apr. 30, 1999).........................................................2

*Westberry v. Gislaved Gummi AB*,
  178 F.3d 257 (4th Cir. 1999) ...................................................................................................8

*Winchester Homes, Inc. v. Osmose Wood Preserving, Inc.*,
  37 F.3d 1053 (4th Cir. 1994) ...................................................................................................3

**Rules**

Fed. R. Civ. P. 50................................................................................................................4, 17

**Other Authorities**

1B James W. Moore *et al.*, Moore's Federal Practice ...................................................................3

## I.      INTRODUCTION

Plaintiffs' opposition is emblematic of the three fatal flaws in Plaintiffs' case that were readily apparent at trial: (1) Plaintiffs' allegations do not match the facts, (2) the evidence does not support either Plaintiffs' conspiracy or aiding and abetting theories of liability, and (3) CACI indisputably had no control over its interrogators' performance of the interrogation mission at Abu Ghraib Prison.  Any one of these flaws is a sufficient basis upon which to grant CACI's motion. Plaintiffs have had their day in Court and they were unable present sufficient evidence from which a reasonable jury could find CACI liable for their alleged abuse.  Plaintiffs' own uncorroborated testimony, ambiguous testimony from the criminals convicted of the abuse at Abu Ghraib, and mudslinging based on accusations made in government reports relying on uncountable levels of hearsay-within-hearsay do not contradict the evidence on which CACI relies and are not enough to survive CACI's motion for judgment as a matter of law.

CACI agrees with the first paragraph of Plaintiffs' opposition: the issues in this case were so difficult that the most thoughtful and diligent jury a party could wish for was unable to decide this case.[1]  That is not inconsistent with CACI's motion for judgment as a matter of law.  By design, Plaintiffs' trial strategy relied on inflamed emotions and misdirection.  Plaintiffs inundated the jury with graphic photographs that did not involve Plaintiffs or anyone from CACI.[2]  Plaintiffs engaged in Orwellian levels of doublespeak, telling the Court and the jury that they were not alleging anyone from CACI abused them, while blaming unidentified "civilians" for their abuse and pointing the finger at CACI interrogators.  *See, e.g.*, Dkt. #1643 at 8 (citing Dkt. #1644-5 at 48:12-50:17 (citing testimony in which Plaintiff Al Ejaili described abuse during interrogations

---

[1] The jury became deadlocked in less than three days, not eight as Plaintiffs state.  Dkt. #1648 at 23 n.15.

[2] *See, e.g.*, PTX-17, -32, -36, -161A, -161B, -161C, -161D, -168, -193, -195 through -201.

with a tall, white civilian with a goatee and telling the Court to infer it was Steven Stefanowicz); *id.* (saying the Court should infer Plaintiffs Al Zuba'e's and Al Shimari's testimony about civilian interrogators involved CACI interrogators); 4/16/24 AM Trial Tr. at 30:2-31:10 (Plaintiff Al Zuba'e claiming civilian interrogators threatened to rape his wife and hit his head against the wall).[3]  That kind of evidence makes a newsworthy splash and clearly provoked strong feelings from the jury, but simply does not overcome the evidence compelling entry of judgment in CACI's favor.

## II.   ARGUMENT

### A.   Plaintiffs' Allegations Do Not Match the Evidence at Trial

Plaintiffs cannot bank on pretrial rulings to overcome their failure to prove their case at trial.  To that end, Plaintiffs repeatedly argue that the Court's pretrial rulings on motions to dismiss and for summary judgment are "law of the case" that require the Court to rule in their favor now. *See, e.g.*, Dkt. #1649 at 9, 10 n.6, 14, 15, 22 n.10, 23.  That, of course, is not how law of the case doctrine works.

The law of the case doctrine "poses no bar to the assessment of past holdings based on a different procedural posture when . . . later review expands the court's inquiry based on development of actual facts underlying a plaintiff's claims." *Graves v. Lioi*, 930 F.3d 307, 318 (4th Cir. 2019); *see also Plotkin v. Lehman*, No. 98-1638, 1999 WL 259669 at *1 (4th Cir. Apr. 30, 1999) (interlocutory orders, like denials of motions to dismiss and motions for summary judgment, "remain open to trial court reconsideration, and do not constitute the law of the case"

---

[3] Plaintiffs also told the Court that they were not alleging (and thought they did not need to allege) that any of the three CACI interrogators accused of misconduct were assigned to interrogate Plaintiffs, but refused to say as much to the jury (despite the Court requesting a stipulation based on counsel's agreement at the bench).  *See* 4/18/24 Trial Tr. at 5:16-8:17, 141:11-147:23.

(unpublished table and *per curiam* decision) (quoting *Perez-Ruiz v. Crespo-Guillen*, 25 F.3d 40, 42 (1st Cir. 1994) (internal citation and quotation marks omitted)); *Krembel v. United States*, 837 F. App'x 943, 950 (4th Cir. 2020); 1B James W. Moore *et al.*, Moore's Federal Practice ¶ 0.404[4.1], at 124 n.4 ("[U]ntil entry of judgment, [interlocutory orders] remain subject to change at any time. The doctrine of law of the case does not limit the power of the court in this respect.") (2d ed. 1993); *Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014).[4]

This is for good reason as, in the pretrial context, factual development remains ongoing. *Graves*, 930 F.3d at 318; *Peralta*, 744 F.3d at 1088 ("denial of a summary judgment motion is never law of the case because factual development of the case is ongoing"). Pretrial rulings, by their nature, are "based on incomplete information" and, thus, "don't bind district judges for the remainder of the case." *Chaplick*, 2016 WL 4516061, at *3 (quoting *Peralta*, 744 F.3d at 1088).

As in all cases, this Court's pretrial rulings were based on the lowest possible bar, one that considered the plausibility of Plaintiffs' allegations[5] and not the trial record. The differences between the two in this case are vast. As detailed in Sections II.B and C, *infra*, trial exposed the

---

[4] *See also Winchester Homes, Inc. v. Osmose Wood Preserving, Inc.*, 37 F.3d 1053, 1058 n.8 (4th Cir. 1994) (noting that a final judgment is required "to sustain the application of the rule of the law of the case" (quoting *United States v. U.S. Smelting Co.*, 339 U.S. 186, 199 (1950)); *see, e.g.*, *Columbia Gas Transmission, LLC v. Ott*, 984 F. Supp. 2d 508, 523 (E.D. Va. 2013) (denial of a motion to dismiss "does not constitute 'the law of the case' as envisioned by the Fourth Circuit and does not preclude the undersigned from recommending summary judgment be entered . . . even though a motion to dismiss on the same pleading was previously denied"); *Chaplick v. Mao*, No. CV TDC-13-2070, 2016 WL 4516061, at *3 (D. Md. Aug. 25, 2016).

[5] For example, Plaintiffs cite to the prior District Judge's decision, from March 2009, in which he ruled that Plaintiffs' allegations of conspiracy were "plausible" in light of, among other things, their allegations that former Plaintiff Rashid (*i.e.*, the dismissed plaintiff who forgot to mention he had been *shot* until 2013) had purportedly been hidden from the Red Cross. Dkt. #1649 at 10 n.6 (citing Dkt. #94 at 65-68). Leaving aside the Court's express statement that these prior rulings are for all intents and purposes defunct, Dkt. #1648 at 20 n.13, it is difficult to imagine what possible relevance that decision has to the present case or whether Plaintiffs can meet their burden of showing concerted conduct instead of independent, parallel conduct.

utter lack of substance behind Plaintiffs' allegations and the soundness of CACI's borrowed servant defense.

**B.      Plaintiffs Failed to Prove Their Conspiracy and Aiding and Abetting Claims**

Plaintiffs, understandably, seek to capitalize on the rigorous standard Rule 50 sets forth for granting judgment as a matter of law.  The problem, however, is that Plaintiffs' recitation of the evidence bears little resemblance to what the jury received at trial and Rule 50 does not permit Plaintiffs to reimagine trial as they wish the evidence would have come in.  This problem is exacerbated by the irrational inferences Plaintiffs demand the Court make in their favor – inferences that are not supported by the evidence and to which they are not entitled.[6]

**1.      Plaintiffs Failed to Prove Their Conspiracy Claims**

Plaintiffs' urge that they produced sufficient evidence that the jury could and *did* find CACI liable for conspiracy.  Dkt. #1649 at 8.  According to Plaintiffs, they offered evidence of "systemic abuses," that CACI interrogators instructed and encouraged MPs to abuse detainees,[7] and that they were personally abused in similar ways to recorded instances of abuse.  *Id.* at 8-9.  Plaintiffs complain, "Nowhere in CACI's brief does it acknowledge (1) the evidence that its personnel instructed that the military police set the conditions for interrogation and soften up detainees; (2) the 'systemic' nature of the abuses implemented pursuant to such instructions; or (3) the extent of the evidence directly implicating CACI personnel in the commission of these abuses."  Dkt. #1649

---

[6] Plaintiffs' argument that the Court's ruling on CACI's Rule 50(a) motion precludes granting the instant motion remains meritless.  *See* Dkt. #1648 at 2.

[7] Plaintiffs characterize CACI interrogators' relationships with MPs at the hard site as "a brotherhood," based on Ivan Frederick's describing the relationship between MPs and interrogators *generally* as a brotherhood.  *Compare* Dkt. #1649 at 9 *with* Dkt. #1588 (Ex. A) at 14. What Plaintiffs skip is that Frederick was clear that his relationship with Steve Stefanowicz was nothing more than a working relationship.  *See* Dkt. #1588 (Ex. A) at 22.

at 9.  This evidence, Plaintiffs assert, "lays more than an adequate foundation from which to infer the existence of an agreement into which CACI voluntarily entered."  *Id.*

Of course, as the jury themselves stated (twice) and the Court discussed, the jury did not find *anything* in Plaintiffs' favor.  *See* Dkt. #1648 at 11 n.8; 5/2/24 Trial Tr. at 8:3-4 ("We just don't know what they're doing, or they may have found, you know, definitively in favor of CACI . . . .").  Nor could they have reached a finding for Plaintiffs, as Plaintiffs did not prove *any* of the required elements to make a *prima facie* case for conspiracy.

Plaintiffs claim the evidence supported finding that CACI interrogators instructed MPs to abuse detainees to "set conditions" for interrogations.  Dkt. #1649 at 4.  But the evidence showed that "setting conditions" ranged from perfectly acceptable, Army-sanctioned approaches (*e.g.*, approved sleep plans, Dkt. #1598-1 (Stefanowicz Test.) at 66) to the abusive tactics used by some MPs.  Thus, without more, evidence that CACI interrogators asked MPs to "set conditions" is meaningless.  The only CACI interrogator ever accused of instructing MPs to use *abusive* tactics on a detainee was Steven Stefanowicz, who was accused of directing the abuse of one "special project" detainee, indisputably never gave instructions regarding detainees to whom he was not assigned, and was never assigned to Plaintiffs.  Dkt. #1648 at 9-12.  No other CACI interrogators – including Tim Dugan and Daniel Johnson – were ever even accused of instructing MPs to abuse a detainee.  *Id.* at 9-10; *id.* at 9, n.5.  Moreover, Plaintiffs' own exhibit proved that the MPs independently used the same tactics sometimes attributed to instructions from military intelligence as disciplinary measures.  Dkt. #1648 at 6 (citing PTX-23).  The ubiquity of MP abuse, contrasted with the narrow evidence connecting one CACI interrogator to mistreatment of one unrelated detainee, is devastating to Plaintiffs' conspiracy claim.  *Id.* at 3-13 (demonstrating the absence of

any evidence proving causation between CACI interrogator conduct and the abuse of detainees at large).

Plaintiffs urge that the abuses "*implemented pursuant to such instructions*" were "systemic," presumably to try to encompass any of Plaintiffs' alleged abuses within the ambit of abuse conducted pursuant to interrogators' instructions. Dkt. #1649 at 9 (emphasis added). But this is neither an accurate representation of the evidence nor a permissible inference from that evidence. The Taguba report concluded that "systemic and illegal abuse of detainees was intentionally perpetrated by several members of the military police guard force." PTX-137 at 16. It does not mention military intelligence until the end of that paragraph, where it states, "*In addition to the aforementioned crimes*, there were *also* abuses committed by" military intelligence members. *Id.* (emphasis added). The "systemic" abuse by MPs was discussed separately from other abuses committed by military intelligence. *Id.*[8]

Plaintiffs highlight that the abuses "often took place openly and notoriously so much so that they are memorialized in hundreds of pictures that the abusers themselves took." Dkt. #1649 at 6. What Plaintiffs fail to mention is that out of all those hundreds of pictures, there is only *one* instance that shows a CACI interrogator – the picture of Mr. Johnson with an Iraqi police officer squatting in a chair. That's it. Thus, even if the abuse is characterized as "systemic," *id.*, there is no evidence to suggest that anyone from CACI instructed MPs to abuse detainees beyond Mr. Stefanowicz possibly mistreating one, unrelated detainee. There is no support for Plaintiffs'

---

[8] Maj. Gen. Taguba did not have authority to investigate military intelligence in the first place. 4/16/24 PM Trial Tr. at 18:21-19:2. He was only allowed to interview four military intelligence personnel, reviewed no military intelligence documents, and sought only to identify accusations that *might* be credible to hand over to the person authorized to investigate military intelligence. *Id.* at 26:9-27:22, 31:4-6.

statement that the abuses at Abu Ghraib, in general, were committed "at the behest of CACI interrogators."  *Id.*

Plaintiffs next build and attack a straw man, urging that CACI improperly suggests that there must be explicit evidence of an agreement to prove a conspiracy.  Dkt. #1649 at 9-10.  That misstates CACI's argument.  As CACI explained, "when concerted conduct is a matter of inference" – as it would be here – "a plaintiff must include evidence that places the parallel conduct in context that raises a suggestion of a preceding agreement as distinct from identical, independent action."  Dkt. #1639 at 24 (quoting *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 278 (4th Cir. 2012)).  Plaintiffs are unable to show whether any alleged detainee abuse occurred as a result of concerted conduct (necessary for conspiracy liability) or independent, similar conduct (insufficient for conspiracy liability).  Dkt. #1639 at 23-24; Dkt. #1648 at 3-13.[9]  Plaintiffs' insinuate that a conspiracy is inferentially proven by the fact that military intelligence interrogators, including CACI interrogators, followed the U.S. Army-directed procedure for Army and CACI interrogators to work with military police to implement approved interrogation approaches.  That argument is deeply flawed.  Following the Army-dictated process, even if it resulted in mistreatment by the military police, does not prove an independent agreement between the interrogators and military police to abuse detainees.  It merely shows military intelligence complying with Army procedure.  *See, e.g.*, Dkt. #1600 (Ex. B) (Pappas Test.) at 27.

Plaintiffs attempt to link their alleged abuse to a conspiracy involving CACI by insisting that they were abused not during, but before their interrogations, as a means of softening them up.

---

[9] Plaintiffs' retort that the possibility of independent action "is absurd and flies in the face of the evidence" is surprising, given their citation is to a 2009 decision by the Court on the *plausibility* of the *allegations* in Plaintiffs' Amended Complaint (which is *substantially* different from both the current complaint and the actual evidence at trial).  Dkt. #1649 at 10 n.6 (citing Dkt. #94 at 68); *see also* Section II.A, *supra*.

Dkt. #1649 at 12 n.7.  Plaintiffs' conspiracy theory is best characterized by the maxim *post hoc, ergo propter hoc,* meaning "after this, therefore because of this."  This maxim denotes the fallacy of confusing correlation with causation by drawing a conclusion from a temporal relationship.  *See Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 265 (4th Cir. 1999) ("the mere fact that two events correspond in time does not mean that the two necessarily are related in any causative fashion.").  Here, Plaintiffs Al Shimari and Al Zuba'e seek to infer a conspiracy based on the false premise that a temporal relationship proves a causal relationship.  It does not.  The circumstance that abuse allegedly preceded interrogation is not proof of a causal connection between the two.  Put another way, timing does not eliminate the need to show causation.  This Plaintiffs did not do at trial.

### 2.    Plaintiffs Failed to Prove Their Aiding and Abetting Claims

Plaintiffs begin their aiding and abetting argument by misstating the Court's instruction for the same.  The Court instructed that, in addition to showing MPs subjected them to torture and CIDT, Plaintiffs had to show:

> That CACI interrogators provided practical assistance to the military personnel that had a substantial effect on the military personnel torturing or inflicting cruel, inhuman or degrading treatment ***on that plaintiff***.

and

> That when CACI interrogators provided the assistance, they acted with the purpose of facilitating torture and/or cruel, inhuman or degrading treatment ***on that plaintiff***.

4/22/24 Trial Tr. at 102:17-24 (emphasis added).  The Court continued, "In other words, to constitute aiding and abetting, there must be a causal link between actions by CACI interrogators and the commission of the wrongful act ***against that plaintiff***."  *Id.* at 102:25-103:3 (emphasis added).  Perhaps channeling Dr. Modvig's penchant for shaving the end off legal definitions, *see*

4/16/24 PM Trial Tr. at 52:22-54:12, Plaintiffs trimmed "on that plaintiff" off the Court's instructions in an attempt to attenuate the causal connection required to find aiding and abetting. Dkt. #1649 at 12-13.

Plaintiffs argue that it is CACI that got the law wrong.[10]  Plaintiffs claim "CACI continues to rely on the premise . . . that Plaintiffs cannot satisfy the practical assistance requirement unless they show that CACI directly instructed military personnel to abuse *these particular Plaintiffs*, rather than other detainees" and urge "this is not the 'causal link' that aiding and abetting requires." *Id.* at 13.  Plaintiffs go on to cite a Supreme Court case quoting D.C. Circuit precedent and the Restatement (Second) of Torts to contend that they only needed to establish that it was "reasonably foreseeable" that instructions from CACI interrogators about other detainees might lead to abuse of detainees generally, which would include Plaintiffs.  *Id.*

Plaintiffs are dead wrong.   Plaintiffs' argument directly conflicts with the Court's instructions, which are patterned precisely after *Aziz v. Alcolac, Inc.*, 658 F.3d 388 (4th Cir. 2011) and *Estate of Alvarez v. Rockefeller Found.*, 96 F.4th 686, 694 (4th Cir. 2024).   Both the D.C. Circuit and the Restatement adopted a different standard for aiding and abetting that is inapplicable here.   *See* Dkt. #1648 at 18-19.   As the Court recognized, Fourth Circuit precedent requires that "to be liable for aiding and abetting, there must be evidence that CACI interrogators **intended** that any assistance they provided military personnel would result in military personnel committing

---

[10] Plaintiffs also accuse CACI of distorting the facts over an obvious scrivener's error.  *Id.* at 12.  CACI cited the Court's instruction that "plaintiffs do not allege that any CACI personnel, including Steve Stefanowicz, Daniel Johnson and Timothy Dugan, directly mistreated them," *see* Dkt. #1639 at 21 (quoting 4/22/24 Trial Tr. at 90:13-15 (Jury Instructions), and then stated, "The only possible evidence of an interaction between a CACI employee and any plaintiff is a statement from Sergeant Beachner, but Sergeant Beachner is clear that the single interaction he described between an Al Jazeera reporter (possibly Plaintiff Al Ejaili) and Mr. Stefanowicz fully complied with the IROE."  *Id.*  The sentence should read, "The only possible evidence of an interaction between *any of these three CACI employees* and any plaintiff is . . . ."

wrongful acts ***against these plaintiffs***."  4/22/24 Trial Tr. at 103-11:15 (emphasis added).  Directly contrary to Plaintiffs' argument, the Court instructed, "The purpose standard ***cannot be satisfied by a finding that CACI interrogators assisted military personnel with the purpose of its facilitating wrongful acts against other detainees***."  *Id.* at 103:16-19 (emphasis added).

Plaintiffs toss out a throwaway comment at the end of their aiding and abetting argument that a jury could infer, based on the evidence at trial, that CACI interrogators specifically requested abuse of Plaintiffs.  Dkt. #1649 at 14-15.  As the Court has recognized (5/2/24 Trial Tr. at 14:18-21) and CACI has set forth in detail (Dkt. #1639 at 19-23; Dkt. #1648 at 16-19), that is simply untrue.

### C.     The Borrowed Servant Doctrine Precludes Liability

The uncontroverted evidence demonstrating the military's absolute control over interrogation operations and proving CACI's borrowed servant doctrine defense was repeated "a million times" at trial (*see* 4/19/24 Trial Tr. at 51:1-6; *see also* Dkt. #1640-2) and has now been catalogued and briefed extensively as well (*see* Dkt. #1639 at 2-13; *see also* Dkt. #1648 at 23-27).  Plaintiffs' opposition raises no legal[11] or factual issues that meaningfully challenge the applicability of this doctrine.  *See generally* Dkt. #1649 at 15-26.

Plaintiffs conjure a purported "regulatory requirement" in addition to a contractual requirement that CACI "supervise" its employees.  Dkt. #1649 at 2-3.  But – as Plaintiffs admit – no such regulation exists.  *See id.* at 18 (quoting the Jones-Fay Report) ("[n]o doctrine exists to

---

[11] At trial, the Court rejected Plaintiffs' attempts to inject their "dual servant" theory of shared liability into this case multiple times.  *See* 5/2/24 Trial Tr. at 12:1-6 ("We've been through this a couple of times . . . that's, in my view, the law of the case at this point."); *see also* Dkt. #1649 at 20-22 (re-raising the same issue).  Accordingly, rather than reargue this decided issue, CACI will incorporate by reference its Response to Plaintiffs' Supplemental Submission Regarding the Court's Jury Instructions (Dkt. #1612).

guide interrogators and their intelligence leaders" in the "command and control of contractors"). Moreover, the undisputed evidence is that Plaintiffs' *only* source for this fictional regulatory requirement, Army Field Manual 3-100.21 (PTX-207), "is just guidance; it's not policy." *See* 4/18/24 Trial Tr. (Billings) at 61:16-17; *see also* Dkt. #1648 at 24. Moreover, even if this guidance equated to a regulation, it would govern the Army – not CACI. Dkt. #1640-12 at 4 (The AFM is merely "an added resource ***for the commander*** to consider when planning support for an operation.") (emphasis added).

The only reference to "supervision" offered by Plaintiffs that was binding on CACI is from the delivery orders. Dkt. #1649 at 2-3. But Plaintiffs do not point to any evidence that suggests that supervision extended to CACI interrogators' performance of the interrogation mission. That is because the only evidence Plaintiffs cite on this question, the delivery orders, say the opposite. *See* Dkt. #1640-5 at 6 ("Identified personnel supporting this effort will be integrated into MIL/CIV analyst, screening, and interrogation teams (both static/permanent facilities and mobile locations), in order to accomplish CDR CJTF-7 priorities and tasking IAW Department of Defense, US Civil Code, and International Regulations."), Dkt. #1640-6 ("As the operational element, HSTs support the overall divisional/separate brigade HUMINT mission, and perform under the direction and control of the unit's MI chain of command or Brigade 52, as determined by the supported command.").[12] Plaintiffs also reference CACI's code of conduct, which does not contradict the contract requirements that CACI interrogators "perform under the direction and control of the unit's MI chain of command." *See* Dkt. #1648 at 25.

Plaintiffs themselves highlight the purely administrative and non-substantive role CACI had with respect to its interrogators. They claim to have "presented significant and largely

---

[12] Plaintiffs' references to amicus briefs are misplaced as they were not evidence at trial.

uncontroverted evidence reflecting many aspects of CACI's supervision and control of its personnel at Abu Ghraib" and list "recruiting and hiring the interrogators that it sent to Abu Ghraib,[13] paying them, promoting them, supervising and disciplining them, and, if necessary, firing them." Dkt. #1649 at 18.  What do these things have in common?  Not one of them has anything whatsoever to do with interrogation operations at Abu Ghraib.  Recognizing this wrinkle, Plaintiffs concede "[o]ther aspects of CACI's authority, such as the extent of CACI's involvement in the substantive work of intelligence-gathering at Abu Ghraib, were more hotly contested" but insist they "adduced evidence of CACI's role in that work, as well." *Id.*  To that end, Plaintiffs reference Tom Howard, a CACI employee who reported to senior military intelligence personnel in Iraq. *Id.* at 18-19.  Plaintiffs do not mention that Mr. Howard was not stationed at Abu Ghraib.  Plaintiffs claim Dan Porvaznik, not the Army, supervised CACI interrogators. Dkt. #1649 at 3-4, 19, 20.  That is just not true.  *See* Dkt. #1648 at 21-22, 25-27.  While Mr. Porvaznik did provide Captain Wood (now Major Holmes) feedback to assist her in assigning CACI interrogators, he had zero authority or control over CACI interrogators' performance of the interrogation mission. *Id.*  The Army, not CACI, maintained exclusive authority over military and CACI interrogators alike.  *See* Dkt. #1640-2 at 1-10, 12-22, 32-44, 50-53.  No trial evidence contradicts this fact.[14]

---

[13] Plaintiffs assert that CACI hired and promoted unqualified interrogators without Army approval.  Dkt. #1649 at 3-4.  None of the evidence Plaintiffs cite and no evidence in the trial record supports that statement.  CACI never hired or promoted any interrogators without Army approval.  *See* Dkt. #1640-2 at 23-31.  Plaintiffs' suggestion that Amy Monahan's testimony supports a different inference is untrue.  *See* Dkt. #1648 at 25-26.

[14] Plaintiffs say the evidence shows "CACI personnel were treated differently than Army personnel," but the only differences Plaintiffs cite were human resources related.  Dkt. #1649 at 20.  As far as operations were concerned, the military intelligence chain of command "treated the CACI personnel the same way [they] did military intelligence."  Dkt. #1600-5 (Ex. E) (Holmes Test.) at 7; *id.* at 11 ("I treated them all the same, so it really wouldn't have stood out to me whether they were an intel or – or a CACI guy."); *id.* at 12 ("I treated them all the same, so when I talked to the soldiers, I also talked to the CACI.  I didn't differentiate between the civilian and the soldiers because I treated them all exactly the same.").

Plaintiffs maintain that "CACI retained ultimately authority over and above the Army regarding their interrogator's [sic] conduct" because "as occurred on occasion, '[i]f [CACI employees] did get direction from someone else and they thought it was bad direction, they would take it to the [CACI] Site Lead.'"  Dkt. #1649 at 19 (citing Dkt. #1598 (Ex. D) (Mudd Test.) at 90:11-21).  This is a remarkable overstatement of the evidence.  The fact that a government contractor would have its employees work with on-site leaders to help mediate disagreements with military personnel does not translate to having "ultimate authority" over contract employees' performance of the military's mission.  No matter, there is not a scintilla of evidence of such a hypothetical mediation occurring with respect to activities at Abu Ghraib.

Plaintiffs argue that "the 'facts on the ground' inquiry is fatal to CACI's motion."  Dkt. #1649 at 23-25 (citing the Army's failure to exercise adequate supervision).  But Plaintiffs misunderstand which facts matter to the inquiry in the first place.  What matters is who had "the power to control," not whether they wielded that power effectively.  *See Estate of Alvarez*, 96 F.4th at 694; *see also* Dkt. #1639 at 2-5.

Plaintiffs urge that the borrowed servant doctrine is inapplicable because "the military did not (and could not) have authority over CACI's conduct that is violative of international law."  Dkt. #1649 at 23; *see also id.* at 25 (the Army did not authorize violations of international law).  There are two problems with this line of reasoning.  First, Plaintiffs cannot have their cake and eat it too.  If CACI interrogators' conduct when performing the military intelligence mission was so aberrant that the military "could not" have authority over it, then it likewise could not have been within the scope of employment and *respondeat superior* liability would not be triggered in the first place.  *See* Dkt. #1639 at 21 n.9; Dkt. #1648 at 19-22.  Second, even assuming the military did not have authority over CACI interrogators' conduct if that conduct violated international law,

13

there is no evidence CACI had any control over any aspect of their employees' performance of the military's interrogation mission let alone any international law violations.

Plaintiffs next challenge the long-standing borrowed servant doctrine, recently applied in the ATS context in *Estate of Alvarez*, on public policy grounds, saying that the way CACI (and the Fourth Circuit) define the doctrine "would potentially make the government liable for the misconduct of any third-party employees operating under a government contract." Dkt. #1649 at 25-26. This argument showcases Plaintiffs' misunderstanding of government contracts. There are multiple kinds of contracts. Under most contracts, the government hires a contractor to perform a task for the government. In that scenario, the contractor's employees remain under the contractor's control and supervision in performing the task for the government and the borrowed servant doctrine would not apply. In some contracts, like the ones at issue here, the government, rather than asking the contractor to accomplish a task, hires the contractor to provide employees to the government to supplement the government's own personnel and act under the government's direct supervision and control. This, depending on the facts, may trigger the borrowed servant doctrine. Here, the Army had complete control over CACI interrogators' performance of the Army's interrogation mission and CACI had none. This represents an archetypal example of circumstances that give rise to the borrowed servant doctrine.

### D.    CACI Alone Was Denied Due Process by the Government's Invocation of the State Secrets Privilege

Plaintiffs try to wave away CACI's state secrets argument as having been decided years ago by the Court. That misses the point. The Court has now seen in an actual trial how the state secrets privilege precludes CACI from receiving a fair trial that is consistent with due process standards. At its most basic level, there was an unresolvable conflict in the testimony of Plaintiffs and their interrogators. Plaintiffs allege they were abused during or in connection with their

interrogations.  The soldiers and CACI employees who interrogated Plaintiffs deny that any such thing occurred in connection with the interrogations in which they participated.  Plaintiffs were allowed to present their evidence in full view of the jury.  They were humanized, with the Court preventing CACI from presenting evidence that would contradict Plaintiffs' self-characterizations as peaceful family men "swept up" by undiscerning U.S. Army roundups.  4/22/24 Trial Tr. at 18:4-5.  CACI had to try to rebut that through tape recorded depositions that were filled with holes caused by the state secrets privilege and where the jury could not view the witnesses and their demeanors in making an exceedingly important credibility determination.  None of this is conjecture, and the Court's decision now can be informed by what an actual trial looked like.

Plaintiffs, apparently with a straight face, argue that they were equally if not more affected by the government's invocation of the state secrets privilege and that CACI just whines about it more.  Dkt. #1649 at 26-27.  The notion that Plaintiffs were equally (or more) affected by the government's state secrets assertion lacks seriousness.  Plaintiffs repeatedly told the Court they did not need the information covered by the government's privilege assertion.  *See, e.g.*, 5/4/18 H'ring Tr. (Anderson) at 27:24-25 ("we can get a judgment ultimately based on the agreement, based on testimony of some coconspirators"); *id.* at 29:4-5 ("I don't think this is ultimately a case where credibility is essential, particularly credibility of the interrogators."); 7/6/18 H'ring Tr. at 15:13-20 (agreeing with the Court that identifying CACI interrogators is not necessary for Plaintiffs); Dkt. #819 at 1-2 (neither opposing nor seeking disclosure of their own interrogators' identities and calling the use of pseudonymous depositions "acceptable"); *id.* at 2, 5-9 (interrogators' identities not essential to litigate indirect liability claims); *id.* at 3-4 (laying out the arguments *CACI* purportedly should have made against the state secrets invocation that Plaintiffs themselves never raised); Dkt. #1082 at 3 ("nor is this information necessary to adjudicate the

theories of liability pursued by Plaintiffs"); Dkt. #1649 at 27 ("Plaintiffs' theories of aiding and abetting and conspiracy liability do not require proof that any particular CACI interrogator directly inflicted the abuse in question.").

Plaintiffs, tellingly, never sought to depose *their own interrogators*, but merely tagged along for CACI's depositions (Dkt. #819 at 2), and did not call any of their own interrogators in their case in chief nor did they timely designate deposition testimony for inclusion in CACI's defense case. Plaintiffs did not seek declassification of the redacted portions of their own detainee files and did not use any portions of their files in their case in chief. Plaintiffs did not seek access to the "tailored interrogation plan actually used for a lengthy interrogation of Plaintiff Al Shimari," which was shielded by the privilege. Dkt. #1042 at 6 (quoting Sec. Mattis' declaration asserting state secrets privilege). In short, Plaintiffs suffered no prejudice from the government's expansive state secrets invocation.

Plaintiffs claim that the identity of CACI's own employees who interrogated Plaintiffs Al Shimari and Al Zuba'e (as Plaintiff Al Ejaili was never interrogated, *see* DX-2), "was not 'central' to CACI's defense, and CACI did not need to know the identities of such employees "because Plaintiffs' theories of aiding and abetting and conspiracy liability do not require proof that any particular CACI interrogator directly inflicted the abuse in question." Dkt. #1649 at 27. Plaintiffs make this argument without any apparent sense of irony, despite having told the Court two weeks earlier that it could infer a conspiracy from the fact that "Plaintiffs testified that they were horrifically abused before, during, and after interrogations, sometimes in the presence of civilian interrogators who appeared to be directing the abuse." Dkt. #1643 at 5-6. That is, Plaintiffs ask the Court to keep their conspiracy claims on life support because a reasonable jury could infer that Plaintiffs were abused before, during, and after interrogations by civilian interrogators (who a jury

could guess were CACI employees) but neither CACI nor the jury needs to know the identities of, view testimony from, or assess the credibility of CACI interrogators who interacted with Plaintiffs because it's really just not that important.

Plaintiffs complain that CACI was permitted to depose Mr. Stefanowicz[15] for trial and suggest CACI should have deposed Messrs. Dugan and Johnson.  Dkt. #1649 at 29.  This is ironic given that Plaintiffs' case predominantly relies on allegations against these men and Plaintiffs never sought to depose *any* of them.  Moreover, calling Messrs. Dugan and Johnson proved unnecessary as Plaintiffs offered the jury no evidence whatsoever that either of these men instructed MPs to abuse detainees.  Dkt. #1648 at 9.  Plaintiffs further suggest that CACI could have called random CACI interrogators at trial to discuss their backgrounds and experiences at Abu Ghraib.  *Id.*  The suggestion is ridiculous.  There would be no purpose in dragging interrogators who served their country well and had no allegations made against them and no relationship to Plaintiffs into Court so that they could be associated with Plaintiffs' false allegations.  Moreover, the state secrets privilege would have prevented any of those interrogators from commenting about any specific detainees – including Plaintiffs.

Plaintiffs chide that it is "incoheren[t]" for CACI to argue both that it is entitled to judgment as a matter of law under Rule 50 and that it was denied due process by the exclusion of critical evidence covered by the state secrets privilege.  Dkt. #1649 at 27 n.12.  This argument misses the point.  As counsel explained when the same issue was raised at summary judgment, there is no conflict between these two arguments because CACI's motion is based predominantly on Plaintiffs' inability to prove their case.  *See* 2/27/19 H'ring Tr. at 10:8-13.  Plaintiffs' abject failure

---

[15] Plaintiffs gratuitously refer to Mr. Stefanowicz as "Big Steve" throughout their opposition.

to adduce sufficient evidence to support any of their claims does not render CACI's inability to offer critical evidence to defend itself any less problematic.  The fact that Plaintiffs were unable to obtain a jury verdict against a defendant with both hands tied behind its back merely emphasizes the weakness of Plaintiffs' case.

Plaintiffs suggest that CACI should have cut the state secrets objections from their presentations of the pseudonymous interrogators in order to make presentation of their testimony more palatable.  Dkt. #1649 at 29.  The problem with that suggestion is that it contravenes the Court's stated preference that instead of providing an instruction describing the evidence CACI was prevented from learning and offering, CACI should leave the objections in the depositions so the jury would know exactly what the government chose to keep secret.

There is no legitimate argument that CACI was not severely prejudiced by its inability to identify and thoroughly question the only people with any potential motive for abusing Plaintiffs or to have full access to Plaintiffs' detainee files and interrogation records.

### E.    Plaintiffs' Claims Are Barred Under Binding Precedents

CACI incorporates by reference and reiterates its arguments regarding extraterritoriality, damages, and preemption from its original motion.  Dkt. #1639 at 27-30.

## III.    CONCLUSION

The Court should not set a retrial.  Rather, it should grant CACI's renewed Rule 50 motion.

Respectfully submitted,

/s/   John F. O'Connor
John F. O'Connor                                    Nina J. Ginsberg
Virginia Bar No. 93004                              Virginia Bar No. 19472
Linda C. Bailey (admitted *pro hac vice*)           DiMuroGinsberg, PC
Joseph McClure (admitted *pro hac vice*)            1001 N. Fairfax Street, Suite 510
STEPTOE LLP                                         Alexandria, VA  22314-2956
1330 Connecticut Avenue, N.W.                       703-684-4333 – telephone
Washington, DC 20036                                703-548-3181 – facsimile
(202) 429-3000 – telephone                          nginsberg@dimuro.com
(202) 429-3902 – facsimile
joconnor@steptoe.com
lbailey@steptoe.com
jmcclure@steptoe.com

*Counsel for Defendant CACI Premier*
*Technology, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 6th day of June, 2024, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the below-listed counsel.

Cary Citronberg, Esq.
Zwerling/Citronberg, PLLC
114 North Alfred Street
Alexandria, VA 22314
cary@zwerling.com

/s/   John F. O'Connor
John F. O'Connor
Virginia Bar No. 93004
Attorney for Defendant CACI Premier Technology,
    Inc.
STEPTOE LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000 – telephone
(202) 429-3902 – facsimile
joconnor@steptoe.com