# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| SUHAIL NAJIM ABDULLAH AL SHIMARI, *et al.*, | )<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )   No.   1:08-cv-0827 LMB-JFA |
| CACI PREMIER TECHNOLOGY, INC., | )<br>)<br>) |
| Defendant, | )<br>) |

## DEFENDANT CACI PREMIER TECHNOLOGY, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR RECONSIDERATION OF THE COURT'S DENIAL OF ITS MOTION FOR JUDGMENT AS A MATTER OF LAW

**I.   INTRODUCTION**

In denying CACI's[1] Rule 50 motion for judgment as a matter of law, the Court's sole articulated rationale was that the trial testimony of former CACI employee Daniel Porvaznik "cuts both ways" on the issue of the military's direction and control of CACI interrogators at Abu Ghraib prison. Specifically, the Court called out Mr. Porvaznik's testimony that, if he had witnessed a violation of the Geneva Conventions, he would have stopped it and reported the matter to the Army chain of command. Mr. Porvaznik also testified that if the violation involved a CACI employee, then CACI could terminate their employment. This, the Court suggested, could be viewed as reflecting a lack of plenary control of interrogation operations by the military.

---

[1] "CACI" refers to Defendant CACI Premier Technology, Inc.

That perspective is contradicted by the evidence presented at trial.  Indeed, Mr. Porvaznik's testimony confirms, rather than contradicts, the military's control over interrogation operations.  Mr. Porvaznik's duty to intervene and report observed detainee abuse was imposed by the U.S. Army on Mr. Porvaznik and everyone else at Abu Ghraib prison as part of the ***U.S. Army's*** direction and control over detainee and interrogation operations.

The Interrogation Rules of Engagement ("IROEs") for Abu Ghraib prison, promulgated exclusively by the U.S. Army, incorporated the Geneva Conventions by specifically decreeing that those Conventions applied.  Ex. A.  The Geneva Conventions prohibit abuse of detainees.  Third Geneva Convention Relative to the Treatment of Prisoners of War in 1949, arts. 13, 17 (available at https://treaties.un.org/pages/showdetails.aspx?objid=0800000280158b1a).  The IROEs also expressly provided that ensuring compliance with the IROE's was ***everyone's*** responsibility.  Ex. A.  The only reasonable construction of that directive is that "everyone" had a duty to stop any observed violation of the Geneva Conventions.  Finally, the IROE's explicitly required that "VIOLATIONS MUST BE REPORTED IMMEDIATELY TO THE OIC."  These were the Army's rules regarding interrogation operations and they were mandatory, not advisory.

Putting aside Mr. Porvaznik's ever-present moral duties,[2] the fact that he would have stopped and reported a Geneva Convention violation by a CACI employee, or by a soldier, reflects the U.S. Army's exercise of direction and control *over interrogation operations generally and CACI specifically*.  It shows that, if he had observed a Geneva Convention violation, Mr. Porvaznik would follow the rules established by the U.S. Army by stopping and reporting the conduct, nothing more and nothing less.  It cannot reasonably be construed as a lack of military control

---

[2] As observed in *Northwestern Bands of Shoshone Indians v. United States,* 324 U.S. 335, 355 (1945), with respect to Indian legal rights, "It is most unfortunate to try to measure this moral duty in terms of legal obligations . . . ." (Jackson, J., concurring).

given the evidence adduced at trial. In fact, on this record, viewing the ability to stop and report a Geneva Conventions violation as diminished military control over interrogations is inherently unreasonable.

Indisputably, CACI interrogators were performing the work of the United States in conducting interrogations. It was, after all, the United States that, through the Authorization for Use of Military Force Against Iraq Resolution of 2002, Public Law No. 107-243, determined to use military force against Saddam Hussein's Iraq government. The resolution authorized the President to use the Armed Forces of the United States "as he determines to be necessary and appropriate" to "defend the national security of the United States against the continuing threat posed by Iraq." Consistent with that, it was the U.S. Army that had the power to control and direct the interrogators in the performance of their work.

As the entity in a unilateral position to direct and control interrogation operations, and superior position to monitor and prevent detainee abuse, the United States, as the borrowing employer, is the entity with *respondeat superior* liability for detainee abuse at Abu Ghraib prison. Therefore, reconsideration is appropriate and, upon reconsideration, the Court should grant CACI's motion for judgment as a matter of law.

## II. LEGAL STANDARD

The Court's denial of CACI's Rule 50 motion, having come after a mistrial, is an interlocutory order from which there is no right of immediate appeal. Fed. R. Civ. P. 54(b). Accordingly, "Rule 54(b) is the proper mechanism by which to address th[is] motion." *Hughes v. Immediate Response Techs., LLC*, No. 1:14-cv-1699(LMB/IDD), 2015 WL 2157424, at *7 (E.D. Va. May 6, 2015). "The district court's reconsideration of an interlocutory order is not subject to the heightened standards that apply to reconsideration of declaratory judgments." *Touchcom, Inc.*

*v. Bereskin & Parr*, 790 F. Supp. 2d 435, 463 (E.D. Va. 2011) (citing *Am. Canoe Ass'n v. Murphy Farms*, 326 F.3d 505, 514 (4th Cir. 2003); *see also Netscape Commc'ns Corp. v. ValueClick, Inc.*, 704 F. Supp. 2d 544, 546 (E.D. Va. 2010) ("[A] motion for reconsideration filed under Rule 54(b) . . . does not require a showing of extraordinary circumstances."). With respect to interlocutory orders, the Court may reconsider and grant relief "as justice requires." *Fayetteville Investors v. Comm. Builders*, 936 F.2d 1462, 1473 (4th Cir. 1991). With respect to a motion for reconsideration under Rule 54(b), "[t]he ultimate responsibility of the federal courts, at all levels, is to reach the correct judgment under law." *Netscape*, 704 F. Supp. 2d at 546 (quoting *Am. Canoe*, 326 F.3d at 514-15). As this Court has explained:

> A district court may grant a motion for reconsideration under [Fed. R. Civ. P.] 54(b): (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available earlier; or (3) to correct a clear error of law or prevent manifest injustice.

*Integrated Direct Mktg., LLC v. May*, No. 1:14-cv-1183, 2016 WL 7334278, at *1 (E.D. Va. Aug. 12, 2016).

**III.   ARGUMENT**

The borrowed servant doctrine applies in the ATS context and requires entry of judgment in CACI's favor. In *Estate of Alvarez v. Rockefeller Foundation*, 96 F.4th 686, 694 (4th Cir. 2024), the Fourth Circuit applied the borrowed servant doctrine to claims brought under ATS. The court held that the Rockefeller Foundation, which paid and carried on its rolls a doctor who performed unlawful medical experiments on humans in Guatemala, did not have *respondeat superior* liability for the doctor's conduct because the United States, not the Rockefeller Foundation, directed and controlled the doctor's activities. *Id.* As the court explained:

> When determining whether such a transfer [of *respondeat superior* liability] has occurred, "we must inquire whose is the work being

4

> performed;" this question "is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work." When an agent has been lent by one principal to the service of another, the agent "in respect of his acts in that service, is to be dealt with as the servant of the latter and not of the former."

*Id.* (internal citations omitted) (quoting *Standard Oil Co. v. Anderson*, 212 U.S. 215, 221-22 (1909), and *Denton v. Yazoo & M.V.R. Co.*, 284 U.S. 305, 308 (1932)). In establishing the framework for the borrowed servant doctrine in the ATS context, the Fourth Circuit repeatedly relied on the Restatements of Agency and case law cited in those Restatements. *See id.* at 693-94. Two important principles emerge from these authorities.

*First*, "[l]iability should be allocated to the employer **in the better position** to take measures to prevent the injury suffered by the third party. An employer is in that position if the employer has the right to control an employee's conduct." *Restatement (Third) of Agency* § 7.03 cmt. d(2) (Am. Law Inst. 2006) (emphasis added). For that reason, as explained in *Alvarez*, the touchstone of the borrowed servant doctrine is the *power* to control employees in activities relating to the liability in question. *Alvarez*, 96 F.4th at 694.

*Second*, a borrowing employer's failure to exercise, or failure to exercise effectively, its power to control the borrowed employees' activities does not affect the borrowed servant calculus. *Restatement (Third) of Agency* § 1.01 cmt. c ("A principal's failure to exercise the right of control does not eliminate it . . . ."); *see also Harris v. Miller*, 438 S.E.2d 731, 735 (N.C. 1994) ("A servant is the employe[e] of the person who has the *right* of controlling the manner of his performance of the work, irrespective of whether he actually *exercises* that control or not."), *cited with approval by Restatement (Third) of Agency* § 7.03 reporter's note d(2). Indeed, in *Huff v. Marine Tank Testing Corp.*, 631 F.3d 1140, 1143-44 (4th Cir. 1980), the Fourth Circuit held that it was "of no moment" that the borrowing employer's "supervision of the [borrowed] welders was not close." *Id.* All that mattered was that the borrowing employer "assigned the work to all of the welders,

5

those directly on [the borrowing employer's] payroll and those extra welders borrowed from Perry Welding, and others," and that the borrowing employer provided the same type of supervision to the borrowed employees as it did with respect to its own employees. *Id.* at 1144.

In denying CACI's Rule 50 motion from the bench, the Court stated that the testimony of former CACI employee Daniel Porvaznik "cuts both ways" and that "[t]here are times when he says yes he could have pulled somebody if he knew they were violating the Geneva Convention, and then there are other times when he said, no, the military controlled everything." 6/14/24 Tr. at 4:20-24 (Ex. B). With respect, the Court's perception of Mr. Porvaznik's testimony appears to be guided by the misapprehension that Mr. Porvaznik's stated duty to intervene if he saw detainee abuse (which he never saw) was not a direction he received from the U.S. Army. It was. And the U.S. Army's imposition of an affirmative duty to prevent Geneva Convention violations was just one more way in which it exercised direction and control over all of the Army and CACI personnel at Abu Ghraib prison.

Indeed, Mr. Porvaznik confirmed in his testimony that the military controlled interrogation operations and that, as site lead, he had very little involvement in interrogations and no control over the process. Mr. Porvaznik testified that he spent "98 percent of [his] time taking care of administrative duties." 4/19/24 am Trial Tr. at 87:10-11 (Ex. C); *see also id.* at 100:3-8 (administrative duties "basically swallowed up all my time."). Because of his administrative obligations, Mr. Porvaznik himself conducted only about two interrogations. *Id.* at 100:9-18. He spent "very little" time at the Abu Ghraib hard site. *Id.* at 101:15-17. Mr. Porvaznik testified that he had no "supervisory role over the way that CACI interrogators conducted the interrogation mission," as that role was the responsibility of the U.S. Army. *Id.* at 87:21-88:2. He testified that the U.S. Army required that Army and CACI interrogators prepare interrogation plans, that the

6

Army leadership had to approve an interrogation plan before the interrogation could go forward, and that CACI personnel had no role in approving interrogation plans. *Id.* at 88:3-11; *see also id.* at 101:22-23 ("When it comes to in regards to the actual interrogations, report writing, plans, yes, the Army had control."). Mr. Porvaznik testified that "the United States military assigned all the tasks to CACI personnel," and that "all CACI interrogators reported to Captain Wood." *Id.* at 102:3-10. Mr. Porvaznik testified that the U.S. Army established the IROEs applicable to Army and CACI interrogators, and that CACI had "absolutely" no role in their formulation. *Id.* at 89:15-90:14.

As noted above, Mr. Porvaznik was clear in testifying that he never saw detainee abuse. *Id.* at 89:3-14, 92:1-18. However, the Court's Rule 50 ruling placed significance on Mr. Porvaznik's testimony that, hypothetically, if he had seen an Army or CACI interrogator abusing a detainee he "would have ensured that the activity was ceased immediately, and then reported it up, well, ***to the Army***." *Id.* at 89:3-14 (emphasis added). Similarly, Mr. Porvaznik testified, hypothetically, that he would have advised a CACI employee not to "go there" if he saw an interrogation plan that violated CACI's Code of Ethics, but that the matter would be raised with the Army chain of command for a final decision. *Id.* at 105:2-11. With respect to Geneva Conventions violations, which Mr. Porvaznik never saw, Mr. Porvaznik testified he would have done the following had he seen such a violation:

> I would have had to bring it to the attention of the Army. If there was a violation of the Conventions, yes – any violation of the Geneva Conventions or incorrect use of the interrogation rules of engagement, again, I would have to take that to the client.

*Id.* at 105:21-25. While qualifying his answer on the grounds that the issue "never came up," Mr. Porvaznik also testified that CACI would have had to fire an employee who violated the Geneva Conventions. *Id.* at 107:1-8. These obligations, however, are not the exercise of direction and

7

control over CACI employees in their dealings with detainees; they reflect one of the many ways that **the U.S. Army** directed and controlled detainee and interrogation operations at Abu Ghraib prison, as the duties to ensure compliance with the IROEs and to report wrongdoing came directly from the U.S. Army.

The Court's Rule 50 decision equates Mr. Porvaznik's testimony with direction and control *by CACI*, even though the hypotheticals posed never occurred. More to the point, however, the Court ascribed the hypothetical stopping and reporting Geneva Convention violations by Mr. Porvaznik as indicia of direction and control *by CACI* without assessing the **source** of Mr. Porvaznik's duty to stop and report such violations. That duty is directly traceable to the U.S. Army and its exercise of direction and control over both Army and CACI interrogators.

The United States signed the Third Geneva Convention Relative to the Treatment of Prisoners of War in 1949 and Congress ratified the treaty in 1955. *See* https://treaties.un.org/pages/showdetails.aspx?objid=0800000280158b1a. Article 13 of the third Geneva Convention provides that "Prisoners of war must at all times be treated humanely." Article 17 goes on to state in pertinent part:

> No physical or mental torture, nor any other form of coercion, may be inflicted on prisoners of war to secure from them information of any kind whatsoever. Prisoners of war who refuse to answer may not be threatened, insulted, or exposed to any unpleasant or disadvantageous treatment of any kind.

Third Geneva Convention art. 17.

The IROEs adopted **by the U.S. Army**, and admitted into evidence during Mr. Porvaznik's trial testimony, specifically decreed that the Geneva Conventions applied at Abu Ghraib prison. Ex. A (Trial Ex. D-42) ("The Geneva Conventions apply within CJTF-7."). If that were not enough, the U.S. Army-promulgated IROEs at Abu Ghraib prison specifically required "everyone" to not only ensure compliance with the IROEs, but to report any violations to the Army leadership:

8

> EVERYONE IS RESPONSIBLE FOR ENSURING COMPLIANCE TO THE IROE.
>
> VIOLATIONS MUST BE REPORTED IMMEDIATELY TO THE OIC.

*Id.*

By making CACI (and Army) interrogators responsible for "ensuring compliance" with the IROEs, which themselves incorporate the Geneva Conventions, the ***U.S. Army*** imposed an affirmative obligation on Mr. Porvaznik and everyone else at Abu Ghraib to stop any observed Geneva Convention violations and to immediately report the violation to the OIC, Captain Wood. Thus, Mr. Porvaznik's testimony that he would have stopped a CACI employee from committing a Geneva Convention violation and reported it to the U.S. Army leadership is consistent with the U.S. Army's exercise of direction and control, through its power to impose duties on Mr. Porvaznik. As a result, the Court's reliance of Mr. Porvaznik's testimony as suggesting control *by CACI* reflects a misapprehension of the *reason* that Mr. Porvaznik had an affirmative duty to take corrective measures if he had ever observed a Geneva Convention violation.

Indeed, this is not a case in which the lending and borrowing employers are pointing fingers at each other as to who had the power of operational direction and control. The official position of the Untied States is the same as CACI's position – that CACI and military interrogators who interacted with Plaintiffs were:

> ***subject to the direction of the military chain of command***, beginning with their military section leader, an Army non-commissioned officer, who was briefed both prior to and following the interrogation to ensure that the interrogators were focused on answering CJTF-7's priority intelligence requirements, human intelligence (HUMINT) requirements, and source directed requirements. The military section leader was also responsible for strictly enforcing the interrogation rules of engagement (IROE). . . .
>
> ***No CACI personnel were in this chain of command.*** While the CACI site manager at Abu Ghraib, Dan Porvaznik, managed CACI

9

>personnel issues and the ICE OIC relied on him as one source of information regarding the abilities and qualifications of CACI interrogators, ***the military chain of command controlled the interrogation facility, set the structure for interrogation operations, and was responsible for how interrogations were to occur during both planning and execution phases***.

Exhibit D (DX 2) at 8 (emphasis added); *see also id.* at 14 (with minor differences).

In its bench ruling denying CACI's Rule 50 motion, the Court also made a passing reference to the jury's question about the significance to the borrowed servant doctrine if "there had been a complete loss of command by the military." 6/14/24 Tr. at 4:11-19. The Court did not appear to ground its denial of CACI's motion on this theory that an Army failure to exercise direction and control would cause *respondeat superior* liability to revert back to CACI. If the Court has grounded its denial of CACI's motion in such a theory, it would have been error. As *Alvarez* commands, the borrowed servant doctrine depends on who had the "power" to direct and control the borrowed employees, not whether the power is wielded adequately. *Alvarez*, 96 F.4th at 694. A borrowing employer's failure to exercise adequate supervision, when it had the power to do so, does not undermine application of the borrowed servant doctrine. *Huff*, 631 F.2d at 1143-44. Indeed, the Fourth Circuit's decision in *Huff*, the *Restatement (Third) of Agency*, and cases cited by the Restatement all make clear that *respondeat superior* liability rests with the principal that better had the power to direct and control the borrowed employees, and is not determined based on whether the borrowing employer properly exercised its power to direct and control. *Huff*, 631 F.2d at 1143-44; *Restatement (Third) of Agency* § 1.01 cmt. c; *Harris*, 438 S.E.2d at 735.[3]

---

[3] In the event the Court denies this motion and requires a retrial, CACI will propose additional jury instructions relating to the borrowed servant doctrine to address areas where the Court appears to ascribe confusion to the jury.

10

Indeed, a contrary rule would be absurd, as it would absolve from liability a borrowing employer who had the superior power to control the borrowed employees but negligently or intentionally failed to provide that supervision. Such a rule also would be unfair to lending employers such as CACI, which do not exercise operational supervision because that power is assumed by the borrowing employer. A fundamental premise of the borrowed servant doctrine is that "[l]iability should be allocated to the employer in the better position to take measures to prevent the injury suffered by the third party." *Restatement (Third) of Agency* § 7.03 cmt. d(2). That is the U.S. Army, which assigned interrogators to detainees, set the IROEs, and reviewed and approved interrogation plans, and not to CACI, whose site lead performed administrative duties that almost never brought him in the vicinity of detainees or interrogations.

## IV. CONCLUSION

The Court should reconsider its denial of CACI's Rule 50 motion and should grant that motion.

Respectfully submitted,

*/s/   John F. O'Connor*
John F. O'Connor
Virginia Bar No. 93004
Linda C. Bailey (admitted *pro hac vice*)
Joseph McClure (admitted *pro hac vice*)
STEPTOE LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 429-3000 – telephone
(202) 429-3902 – facsimile
joconnor@steptoe.com
lbailey@steptoe.com
jmcclure@steptoe.com

Nina J. Ginsberg
Virginia Bar No. 19472
DiMuroGinsberg, PC
1001 N. Fairfax Street, Suite 510
Alexandria, VA  22314-2956
703-684-4333 – telephone
703-548-3181 – facsimile
nginsberg@dimuro.com

*Counsel for Defendant CACI Premier Technology, Inc.*

## CERTIFICATE OF SERVICE

      I hereby certify that on the 8th day of July, 2024, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the below-listed counsel.

                                    Cary Citronberg, Esq.
                                    Zwerling/Citronberg, PLLC
                                    114 North Alfred Street
                                    Alexandria, VA 22314
                                    cary@zwerling.com

                                    */s/*   John F. O'Connor
                                    John F. O'Connor
                                    Virginia Bar No. 93004
                                    Attorney for Defendant CACI Premier Technology,
                                        Inc.
                                    STEPTOE LLP
                                    1330 Connecticut Avenue, N.W.
                                    Washington, D.C. 20036
                                    (202) 429-3000 – telephone
                                    (202) 429-3902 – facsimile
                                    joconnor@steptoe.com