UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
                        ALEXANDRIA DIVISION

---------------------------x
SUHAIL NAJIM ABDULLAH AL     :     Civil Action No.:
SHIMARI, et al.,             :     1:08-cv-827
           Plaintiffs,       :
     versus                  :     Wednesday, October 30, 2024
                             :     Alexandria, Virginia
CACI PREMIER TECHNOLOGY,     :     Day 1
INC.,                        :     Pages 1-287
           Defendant.        :
---------------------------x

        The above-entitled jury trial was heard before the Honorable Leonie M. Brinkema, United States District Judge. This proceeding commenced at 10:08 a.m.

                    A P P E A R A N C E S:

FOR THE PLAINTIFFS:   CHARLES MOLSTER, ESQUIRE
                      THE LAW OFFICES OF CHARLES B. MOLSTER,
                      III, PLLC
                      2141 Wisconsin Avenue, NW
                      Suite M
                      Washington, D.C.  20007
                      (703) 346-1505

                      BAHER AZMY, ESQUIRE
                      THE CENTER FOR CONSTITUTIONAL RIGHTS
                      666 Broadway
                      7th Floor
                      New York, New York  10012
                      (212) 614-6464

                      MUHAMMAD FARIDI, ESQUIRE
                      MICHAEL BUCHANAN, ESQUIRE
                      BONITA ROBINSON, ESQUIRE
                      ANDREW HADDAD, ESQUIRE
                      SCOTT KIM, ESQUIRE
                      ALEXANDRA MAHLER-HAUG, ESQUIRE
                      PATTERSON BELKNAP WEBB & TYLER LLP
                      1133 Avenue of the Americas
                      New York, New York  10036
                      (212) 336-2000

                                                              1

A P P E A R A N C E S:

FOR THE DEFENDANT:      JOHN O'CONNOR, JR., ESQUIRE
                        LINDA BAILEY, ESQUIRE
                        JOSEPH MCCLURE, ESQUIRE
                        STEPTOE LLP
                        1330 Connecticut Avenue, NW
                        7th Floor
                        Washington, D.C.  20036
                        (202) 429-3000

                        NINA GINSBERG, ESQUIRE
                        DIMUROGINSBERG PC
                        1101 King Street
                        Suite 610
                        Alexandria, Virginia  22314
                        (703) 684-4333

FOR THE UNITED          STEPHEN ELLIOTT, ESQUIRE
STATES:                 UNITED STATES DEPARTMENT OF JUSTICE
                        CIVIL DIVISION FEDERAL PROGRAMS BRANCH
                        1100 L Street, NW
                        Washington, D.C.  20044
                        (202) 598-0905

COURT REPORTER:         STEPHANIE M. AUSTIN, RPR, CRR
                        Official Court Reporter
                        United States District Court
                        401 Courthouse Square
                        Alexandria, Virginia  22314
                        (571) 298-1649
                        S.AustinReporting@gmail.com


        COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

TABLE OF CONTENTS

WITNESSES

On behalf of the Plaintiffs:

SALAH AL-EJAILI

Direct examination by Mr. Azmy ............195
Cross-examination by Mr. O'connor ........227
Redirect examination by Mr. Azmy ..........251

TORIN NELSON

Direct examination by Mr. Faridi ..........264

EXHIBITS

On behalf of the Plaintiff:
Admitted

Number 13 ..................................202
Number 1 ...................................206
Number 193 .................................209
Number 224 .................................229
Number 224 .................................257
Number 230 .................................271
Number 229 .................................273
Number 85A .................................274
Number 226 .................................286

On behalf of the Defendant:
Admitted

Number 93 ..................................231
Number 2 ...................................258

MISCELLANY

Proceedings October 30, 2024 ..............4
Opening statement by Mr. Azmy .............164
Opening statement by Mr. O'Connor ........177
Certificate of Court Reporter ............287

3

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

P R O C E E D I N G S

THE DEPUTY CLERK:  Civil Action Number 1:08-cv-827, Suhail Najim Abdullah Al Shimari, et al. versus CACI Premier Technology, Inc.  This case comes on for trial by jury.

Would counsel please note their appearance for the record, first for the plaintiffs.

MR. MOLSTER:  Good morning, Your Honor. Charles Molster on behalf of the plaintiffs.  With me at counsel table is Muhammad Faridi, Bonita Robinson, Alex Mahler-Haug, Michael Buchanan back in the back, Scott Kim, also in the back, and Andrew Haddad.  They're all from Patterson Belknap, Your Honor.  Baher Azmy from the Center for Constitutional Rights.  And then I have a couple of paralegals and some other members of our staff.  Would you like me to introduce those as well?

THE COURT:  We'll do that later during the voir dire.

MR. MOLSTER:  Very well, Your Honor.  Thank you.

THE COURT:  Thank you, Mr. Molster.

For the defense.

MR. O'CONNOR:  Good morning, Your Honor. John O'Connor for CACI.  I'm joined by my co-counsel Linda Bailey, Nina Ginsberg and Joseph McClure.

THE COURT:  Good morning.

4

And good morning, ladies and gentlemen.  Thank you for being here today.  You're here to be considered for service on a jury.  This is going to be a civil trial that I anticipate I hope will not last more than two weeks.  We are not going to hold court on next Tuesday, November 5, which is Election Day.  So those of you who have not yet voted and want to vote in person can do so.  But that Tuesday, you will not be -- we will not be in session.  So we will be working the rest of this week, Wednesday, Thursday and Friday, and Monday, Wednesday, Thursday and Friday of next week.

Quite frankly, I am reasonably optimistic, unless we have some logistical problems, that we will finish all of the evidence Wednesday or Thursday of next week.  But then we will have to leave time for the jury to what we call deliberate, to decide the case.  And because the following weekend, Monday the 11th, is a Federal holiday, that could push deliberations into that week into that Tuesday or Wednesday.

So as you think about your ability to serve on this jury, we are going to need to have people whose calendars are sufficiently clear that they could be here for the full two weeks, I think at the outset would be the longest this case would go.

Now, in a minute, we're going to call attendance.

5

When you hear your name called, will you please stand and say here or present, and then you may sit down.

THE DEPUTY CLERK:  Juror Number 1, Gemma Aleman.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 2, Stephen Ambrozik.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 3, Stephanie Bell.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 4, Brian Caney.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 5, Victor Chen.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 6, Chantel Clayborn.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 7, Dillon Clegg.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 9, Barbara Cornwell.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 10, Sergie Daez.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 11, Christopher Damon-Cronmiller.

6

THE PROSPECTIVE JUROR:  Present.

THE DEPUTY CLERK:  Juror Number 12, Than Dang.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 13, Christopher Davidson.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 14, Yahaida Divittorio.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 15, Lisa Dockins.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 16, Robin Du Shole.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 17, Rimaz Eldirdieri.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 18, Carey Erickson.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 19, Patrick Gaston.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 20, Lorraine Gershman.

7

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 21, Gordon Green.

Juror Number 22, Paul Hamp, II.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 23, Walton Hare.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 24, Sandaldeep Jassar.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 25, Dong Jiang.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 26, Misty Keller.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 27, Paige Kelly.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 28, Allison Kennedy.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 29, Eugenia Kim.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 30, Aaron Koch.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 32, Sisi Li.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 33, Carlos Llanos

8

Suarez.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 34, Jennifer Lohse.

THE PROSPECTIVE JUROR:  Present.

THE DEPUTY CLERK:  Juror Number 35, Alan Luckett.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 36, Mary Matusiewicz.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 37, Sharon McGee.

THE PROSPECTIVE JUROR:  Present.

THE DEPUTY CLERK:  Juror Number 38, Tinsae Mengesha.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 39, Monica Moir.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 40, Jeremy Montgomery.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 41, Dan Moore.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 42, Kathryn Morris.

THE PROSPECTIVE JUROR:  Here.

9

THE DEPUTY CLERK:  Juror Number 43, Amanda North.

THE PROSPECTIVE JUROR:  Present.

THE DEPUTY CLERK:  Juror Number 44, Thomas Nowalk.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 45, Steven Pavlecka.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 46, Cynthia Peloquin.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 47, Michelle Phillips.

THE PROSPECTIVE JUROR:  Present.

THE DEPUTY CLERK:  Juror Number 48, Averil Phillips-Bernard.

THE PROSPECTIVE JUROR:  Present.

THE DEPUTY CLERK:  Juror Number 49, Michael Plaugher.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 50, Najam Qureshi.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 51, Scott Rimm.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 53, Maria Rosas Castrillon.

10

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 55, Damon Saunders.

Juror Number 56, Debra Schroeder.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 57, Keily Shay.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 58, Jaryka Sheppard.

Juror Number 59, Meghan Sikes.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 60, John Smith.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 61, Mary Spano.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 62, Christopher Suarez.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 63, Sri Padma Tanniru.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 64, Kelly Tischler.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 65, Christopher

11

Toner.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 66, Elizabeth Vanderputten.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 67, Dick Vansise.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 69, Doreen Washington.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 70, Jeffrey Weber.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 71, Ahmed Weshahy.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 72, Matthew Wiggins.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 73, Stephanie Williams.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 74, Karen Wilson.

THE PROSPECTIVE JUROR:  Here.

THE DEPUTY CLERK:  Juror Number 75, Helen Yohannes.

THE PROSPECTIVE JUROR:  Present.

12

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE DEPUTY CLERK:  Is there anybody here whose name I have not called?

THE COURT:  We had a late arrival.  Were you a juror?  The young lady who just came in.

THE COURT SECURITY OFFICER:  No, ma'am.

THE COURT:  No.  All right.

So is there anyone here who believes you're here for jury duty whose name was not just called?  All right.

The clerk is now going to ask you all to stand and take an affirmation to tell the truth in answering the questions the Court is going to propose to all of you.

THE DEPUTY CLERK:  Please stand and raise your right hand.

(Prospective jurors sworn.)

THE DEPUTY CLERK:  Thank you.  You may be seated.

THE COURT:  All right.  So, ladies and gentlemen, as I said, we're going to choose actually eight of you to actually serve as the jury in this case, and if you are chosen to be a juror, you should actually think about yourself as if you were a judge.

I can't give each of you a black robe to wear while you're sitting over here in the jury box as a juror, but you should consider yourself a judge throughout the trial because your job as a juror will be to judge the facts of the case and then to render a decision based upon the

13

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

facts that you find have been proven using the legal principles that I will give you at the end of the trial in what are called the legal instructions.

Now, you know yourself that what you expect a good judge should do or be is somebody who comes into a trial with absolutely no understanding or knowledge about the case, no predispositions, no biases or prejudices. You would expect that the judge doesn't know any of the parties, any of the witnesses or the lawyers or the people involved in the trial, and that the judge is going to have a completely open mind and listen carefully to all the evidence.

So you also want a judge who has a sufficient command of the English language to be able to fully understand the testimony and the exhibits, and a judge who has the physical ability to sit through the trial.

So, for example, if any of you are suffering from some significant medical issues that require medication that might make you drowsy or have other issues of that sort, obviously there might be an issue about whether you could sit as a fully attentive juror.

So that's the background for what we call the voir dire or the jury selection time of a trial.

Now, I ask all the questions during the voir dire. That's the normal practice in federal court. And I'm going

14

to use the word "you" in the question, but I want you to think about not just whether the question applies to you individually, but also if it applies to any of your immediate family members or very close personal friends, then you do need to answer the question. And the way we will proceed is you would raise your hand.

Now, I don't believe I know any of you, and I certainly can't see most of you, so I have to point. I start on my left in the first row and go across the courtroom, and I can usually pretty much see the second row. After that, I can't, so I'll finish with the left side and the middle and then the far side.

It's going to be very important that you speak in a good loud voice. We will have one of our court security officers with a microphone to assist in that respect.

If during the voir dire any questions are asked for which the answer, in your view, is very personal or private and you do not want to discuss it in open court, ask to approach the bench, in which case I put on that funny white noise machine, which is supposed to block the hearing of everybody in the court from what is being done, and this is called the bench.

So the juror would come right up here, stand in front of me, and then one lawyer for each side will be able to come as well to hear what you have to say, and then I'll

15

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

ask you to go back to your seat.

There is one question that I'm going to begin with that I will probably ask each juror who has an answer to come up to the bench, but we'll get to that in a second.

So I want to begin by, first of all, giving you a very brief overview as to what this case involves, because the first question is going to be whether any of you believe that you may have seen, read, or heard anything whatsoever about this case.

This is a civil action that has been brought by three plaintiffs. And in a civil case, the plaintiff -- and the plaintiff sits over on this side -- is the party who has filed the lawsuit. And the defendant, in this case we have a corporate defendant, CACI Premier Technology, is the party against whom the lawsuit has been filed.

Our three plaintiffs are Iraqi Nationals, Mr. Suhail Al Shimari, Mr. Asa'ad Al-Zuba'e, and Mr. Salah Al-Ejaili.

Two of the plaintiffs will not be able to be physically in the courthouse. They will be testifying from Iraq. We have these television screens, and the jury box has television screens in it as well, and so they will be testifying what we call live, that is right now. I think tomorrow and Friday is when we're going to hear from those two plaintiffs. But that will be by television with the

16

assistance of language interpreters.

The third plaintiff, Mr. Al-Ejaili, is a former Al Jazeera reporter, and he will be in the courtroom.  I assume he's here today?  All right.  That's fine.

These three plaintiffs have filed this lawsuit against CACI Premier Technologies, which you may also hear referred to as CACI or C-A-C-I.  The defendant is a Northern Virginia government contractor, and an issue in this case are events that occurred at the Abu Ghraib detention center, which was located in Iraq near Baghdad in the fall of 2003 into January of 2004.  That is the time period involved in this case.

In 2003, a multinational coalition led by the United States invaded Iraq, and those forces were attacked. To gather intelligence to assist the coalition, many Iraqis who were believed to have information that could help the coalition forces were detained at the Abu Ghraib facility for questioning.  Because the United States military did not have enough interrogators, it hired defense contractor CACI to supply interrogators.

In this case, the plaintiffs allege that while they were held at Abu Ghraib, they were subjected to conduct that constitutes torture and/or cruel, inhuman and degrading treatment.  Now, you may hear the term cruel, inhuman and degrading treatment sometimes referred to as CID or CIDT.

17

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

And I'll give you more specific instructions as to what is involved in those types of conduct later in the trial.

The plaintiffs do not claim that any CACI interrogator directly abused them. Instead, they allege that CACI interrogators conspired with military police to subject these plaintiffs to torture or CID, and aided and abetted the military police to either torture or commit CID against the plaintiffs.

Each plaintiff seeks monetary damages from CACI for the abuse they claim they experienced. On all of these issues, the plaintiffs have the burden of proof, and in a civil case, the burden of proof is called proof beyond a -- I'm sorry, by a preponderance of the evidence.

Now, CACI maintains that none of its interrogators either conspired with or aided and abetted the military police or anyone else to mistreat the plaintiffs.

CACI further contends that the United States Army, and not CACI, had the operational control over the CACI interrogators, and, therefore, that CACI cannot be liable for any mistreatment of any plaintiff. On this issue, CACI has the burden of proof, which, again, is a burden of proof by a preponderance of the evidence.

It will be the jury's job in this case to decide the issues that I've just described for you and to reach a decision based upon the facts that you determine.

18

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Now, having explained to you a little bit about what's involved in this case, do any of you believe you may have seen, heard, read or believe that you might know anything whatsoever about this case?  I'm going to start on the left side first.

Is there anybody in the first row on the left side?  How about in the center section?  All right.  If you'll come forward, please.

(Bench conference.)

THE COURT:  We've got one attorney for each side. Whoever is going to handle the voir dire for the plaintiffs.

What is your name, please?

THE PROSPECTIVE JUROR:  Monica Moir.

THE COURT:  M-O-I-R.  French name, Moir?

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  All right.  This is Juror Number 39.

MR. MOLSTER:  Thank you.

THE COURT:  What do you think you know in referring to this?

THE PROSPECTIVE JUROR:  I have read, like, extensively about it.  I work in politics, and so I've --

THE COURT:  Based on what you've seen or read, do you think you've formed some opinions about this?

THE PROSPECTIVE JUROR:  Yes.  Yeah.

THE COURT:  Thank you.  You can go back to your

19

seat.

To keep this matter going efficiently, I will strike this juror for cause.  Do you have -- or do you want to do it at the bench?  We'll do it at the bench if you want to.

MR. O'CONNOR:  I mean, I'm not --

MR. MOLSTER:  No objection.

THE COURT:  To her being struck for cause?

MR. MOLSTER:  Right.

MR. O'CONNOR:  Just knowing something about the case, I'm not sure that's --

THE COURT:  All right.  Okay.  That's fine.  We'll just do it juror by juror.  You might as well stay up here.

MR. MOLSTER:  Stay up here or no?

THE COURT:  Yes.  Stay up here so they can get by.

MR. MOLSTER:  Got you.

(Open court.)

THE COURT:  Was there anybody else in the front row in the first row?  No?

How about on the far side, on the first row only, please.  No.  All right.

Now, in the second row on the left, is there anybody who feels they might know or have heard anything whatsoever about the issues in this case?  Anybody?  How about in the middle section, second row?  No hands.  On the

20

far side on the right.  Yes.  If you'll please come up.

(Bench conference.)

THE COURT:  Yes, ma'am, what is your name?

THE PROSPECTIVE JUROR:  Elizabeth Vanderputten.

THE COURT:  With a V?

THE PROSPECTIVE JUROR:  Yes.  I think I'm 65.

THE COURT:  Yes, there you are.

Is it a Dutch name?

THE PROSPECTIVE JUROR:  Yes.  My grandfather.

THE COURT:  What do you know about the case?

THE PROSPECTIVE JUROR:  I remember reading about it and discussing the cases of torture in Iraq 20 years ago.

THE COURT:  Okay.  Based upon what you've seen or heard or read about the case, do you feel you've made up your mind about any of the issues?

THE PROSPECTIVE JUROR:  Not the issues.  I mean, I certainly remember the horror of it.

THE COURT:  Of our age group of people.  The young ones will not remember it, I'm sure.

Is there anything about what you may remember that you feel could make it difficult for you to be an impartial juror?

THE PROSPECTIVE JUROR:  I don't think so.

THE COURT:  All right.  Thank you, ma'am.  You can be seated.

21

MR. MOLSTER: Can I have the juror number? I'm sorry.

THE COURT: I'm sorry. Number 66.

THE PROSPECTIVE JUROR: 66. Thank you. Thank you.

(Open court.)

THE COURT: Was there anybody else in the second row on the far right? No. All right.

Now the third row on the left, is there anybody? Yes, sir. If you would come up, please.

(Bench conference.)

THE COURT: Good morning. Can we have your name, please.

THE PROSPECTIVE JUROR: Montgomery, Jeremy.

THE COURT: Yes, Mr. Montgomery.

THE PROSPECTIVE JUROR: So my knowledge of this case isn't so much the specifics as it pertains to this case, it's just I have a very near relationship to General Sanchez. I was an Air Force -- I was deployed to Iraq at the time.

THE COURT: General Sanchez?

THE PROSPECTIVE JUROR: Yes, he was commander of Combined Joint Task Force 7.

THE COURT: His name will come up in the case?

THE PROSPECTIVE JUROR: Yes. Before he was

22

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

commander of the CJTF-7, he was commander of 1st Armored Division.  And when I was in the Air Force, I was part of the staff weather office for 1st Armored Division, so I worked for my Air Force major, and he worked for General Sanchez.  So I have that close proximity.

THE COURT:  Did he ever talk with you about anything to do with Abu Ghraib, any of the issues?

THE PROSPECTIVE JUROR:  No.  By that time, he was the commander of 5th Corps in his non-war-fighting capacity. But CJTF-7 in his war-fighting capacity.

THE COURT:  And I note that you're wearing a mask. Have you been sick recently?

THE PROSPECTIVE JUROR:  No.

THE COURT:  It's perfectly all right.

THE PROSPECTIVE JUROR:  I just have facial disfigurement.  I just wear it for that.

THE COURT:  I'm sorry?

THE PROSPECTIVE JUROR:  Facial disfigurement, so I just wear this for that and keep that covered.

THE COURT:  That's fine.

THE PROSPECTIVE JUROR:  It's I guess a vanity thing.

THE COURT:  Do you feel in any respect because of your relationship with General Sanchez that that could make it difficult for you to be impartial in judging this case?

23

THE PROSPECTIVE JUROR:  No, ma'am.

THE COURT:  Were you, yourself, ever at Iraq?

THE PROSPECTIVE JUROR:  I was at Balad Airbase, and that was from approximately June to November of 2003. And before that, I was at the division main headquarters in Iraq at Baghdad Airbase doing the weather for 1st Armored Division headquarters.

THE COURT:  You've never worked in interrogation?

THE PROSPECTIVE JUROR:  Oh, no, ma'am.  No, ma'am. I was just the weather forecaster.  I was there to support their aviation assets.

THE COURT:  Did you hear things about what was going on at Abu Ghraib when you were there?

THE PROSPECTIVE JUROR:  From the reporting -- so we didn't have like unclassified Internet access there, but on the classified side, they have a news service at the DoD called the Early Bird where they would gather stories and republish them from like major news publishers.  And so, you know, I remember hearing about it then, and then, you know, once I was back in Germany after I redeployed and went back to Garrison, I remember hearing about it on the news, but I never really paid much attention to it.

THE COURT:  All right.  Do you feel you could be completely impartial in judging this case based upon your connection with Sanchez and having him as your commander?

24

THE PROSPECTIVE JUROR:  Yes, ma'am.

THE COURT:  Thank you.  You may return to your seat.

THE PROSPECTIVE JUROR:  Thank you.

(Open court.)

THE COURT:  All right.  Was there anybody else in Mr. Montgomery's row?

All right.  Now in the center section.  Yes, come forward, please.

(Bench conference.)

THE COURT:  May we have your name, please.

THE PROSPECTIVE JUROR:  Good morning, Your Honor. Dick Vansise.

THE COURT:  You're Number 67.  Yes, sir.

THE PROSPECTIVE JUROR:  Yes, ma'am.  I work for a military services organization located on Joint Base Myer-Henderson Hall.

In the early 2000s at one of our annual meetings, our guest speaker was General Peter Pace.  During the course of the meeting, there were senior ex-chiefs in attendance because they're members of our association.  They began to absolutely lambaste General Pace during our annual meeting as an unintended consequence of the meeting.  And I'm just concerned that it could -- I could have a certain bias against the overall history of the incident of Abu Ghraib.

25

THE COURT:  All right.  So you feel it would be difficult given the issues in this case to be objective?

THE PROSPECTIVE JUROR:  Yeah.  Just because of what I witnessed.  The anger and the outrage against General Pace.  That's all.  That's all I have.

THE COURT:  As a result of what was going on?

THE PROSPECTIVE JUROR:  Yes, ma'am.

MR. O'CONNOR:  Your Honor, I just didn't hear who discussed the outrage, and I don't want to ask questions.

THE COURT:  It was the people attending the meeting.  Military people, I assume.

THE PROSPECTIVE JUROR:  Yes, ma'am.

THE COURT:  Who were very upset.

THE PROSPECTIVE JUROR:  Ex-chiefs who were members of our association.  They were very distraught at General Pace.  They completely derailed our annual meeting, and it turned into an episode of, like, Donahue or something.  And they absolutely let loose on General Pace.  We felt so bad for General Pace.  He was the guest speaker that day.

THE COURT:  I understand.

THE PROSPECTIVE JUROR:  So just for consideration.

THE COURT:  Thank you, sir.

THE PROSPECTIVE JUROR:  Yes, ma'am.

THE COURT:  There was somebody else in that row.  Yes, ma'am, your name please.

26

THE PROSPECTIVE JUROR:  Averil Phillips-Bernard.

THE COURT:  What was the last name?

THE PROSPECTIVE JUROR:  Phillips-Bernard.

THE COURT:  Yes.  Ms. Phillips-Bernard, you're Number 48.

MR. O'CONNOR:  Thank you.

THE PROSPECTIVE JUROR:  Yes, 48.

THE COURT:  Yes, ma'am.

THE PROSPECTIVE JUROR:  All right.  So my husband listens to Al Jazeera religiously, and he listens to news religiously, so I hear a lot of news as a sideline.

And in regards to the case, what I've heard is that the U.S. representatives were using different forms of coercion, which were inhumane.  For example, they were waterboarding the detainees and stripping them naked as a form of coercion to get them to say exactly what they needed to say.

THE COURT:  So you heard about that?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Do you feel that would make it difficult for you to judge this case?

THE PROSPECTIVE JUROR:  Well, I also have heard some that have already been tried and convicted of it.

THE COURT:  Okay.  Those are the military people?

THE PROSPECTIVE JUROR:  Yes.

27

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE COURT:  Again, do you feel that might make it difficult for you to remain objective?  It's a hard question to answer, but that's why you're here to answer.

THE PROSPECTIVE JUROR:  It's bias, implicit or explicit, it's bias.

THE COURT:  Thank you, ma'am.  You can go back to your seat.

THE PROSPECTIVE JUROR:  Thank you.

THE COURT:  Is there anybody else in that middle row?  All right.

THE COURT SECURITY OFFICER:  Ma'am, come forward.

THE COURT:  Yes, ma'am.  Your name, please.

THE PROSPECTIVE JUROR:  Mary Spano, S-P-A-N-O.

THE COURT:  Number 61, Mary Elizabeth Spano?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Yes, ma'am.

THE PROSPECTIVE JUROR:  I'm just familiar with what happened at Abu Ghraib and all the contractors that are involved, and I don't know that I can be impartial.  I'm a human rights and political activist, and so I've signed a lot of petitions and done a lot of research into these, so that's where I stand.  I don't know if that affects anything or not.

THE COURT:  That's an honest answer.

THE PROSPECTIVE JUROR:  Okay.

28

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE COURT:  Is there anybody else in that third middle row?  How about now on the third row on the side, anybody over there?

THE DEPUTY CLERK:  I don't know if they can hear you.

(Open court.)

THE COURT:  I'm sorry.  Is there anybody else on the third middle row or on the third row on the right-hand side?  No.  All right.

Now, back on the left side, is there anybody else on the fourth row who believes they may know or have heard anything about this case or the issues at Abu Ghraib?  No. How about in the center section?  All right.  If you'll come forward, please.

(Bench conference.)

MR. O'CONNOR:  We know the white noise works.

THE PROSPECTIVE JUROR:  Good morning, Your Honor.

THE COURT:  What's your name, please.

THE PROSPECTIVE JUROR:  My name is Aaron, Koch, last name, K-O-C-H.  I should be Juror 31 or 32.  I forget exactly.

THE COURT:  I love how you all know your numbers. That's a good sign.

MR. O'CONNOR:  30.

THE PROSPECTIVE JUROR:  30.  Okay.

29

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE COURT:  Yes, sir.

THE PROSPECTIVE JUROR:  Very good.  So I'm going to work off the best of my recollection of a few months ago.  I believe I've seen the previous running of this trial in the press and the outcome.  I believe my understanding of what I read is that it was a hung jury mistrial.  I believe I read that the jurors deliberated for almost ten days or something like that.

The reason I saw this is because my neighbor, who I'm reasonably close with, worked as I think a fairly senior role at CACI.  And then I'd never really known what he did because he couldn't tell me much.

THE COURT:  That's enough of an answer for us.  Thank you, sir.  You can go back to your seat.

THE PROSPECTIVE JUROR:  Okay.  Thank you.

THE COURT:  The next person.

THE COURT SECURITY OFFICER:  Sir, come forward.

THE COURT:  Good morning.

THE PROSPECTIVE JUROR:  Good morning.

THE COURT:  Your name, please.

THE PROSPECTIVE JUROR:  Ambrozik is the last name, Stephen.

THE COURT:  All right.  Ambrozik.

THE PROSPECTIVE JUROR:  Yes, ma'am.

THE COURT:  Yes, sir.

30

THE PROSPECTIVE JUROR:  I really only would have heard is accusations of torture at Abu Ghraib.  I don't know any details about this case specifically or anything like that.

THE COURT:  In any respect from what you've heard, do you think it would be difficult for you to be impartial in this case?

THE PROSPECTIVE JUROR:  No.  I know very little detail.

THE COURT:  Where did you hear about that?  The newspapers or TV?

THE PROSPECTIVE JUROR:  Yeah.  Probably from the TV.  The news.

THE COURT:  Recently or back in the day?

THE PROSPECTIVE JUROR:  A while ago, I'm sure. It's just a distant memory I wanted to let you know about rather than go down the case and then --

THE COURT:  That's great.  Thank you.

THE PROSPECTIVE JUROR:  Thank you.

THE COURT SECURITY OFFICER:  Ma'am, come up.

THE COURT:  Good morning.

THE PROSPECTIVE JUROR:  Hi.

THE COURT:  What is your name, please?

THE PROSPECTIVE JUROR:  Jennifer Lohse.

THE COURT:  Number 34.

31

THE PROSPECTIVE JUROR:  Okay.  Yes.

THE COURT:  Yes, ma'am.

THE PROSPECTIVE JUROR:  You know, I do feel like I've certainly read many, many stories of the treatment of prisoners at Abu Ghraib.  I have heard of CACI before.  I guess nothing totally concrete comes to mind, but certainly --

THE COURT:  From what you have heard, do you feel in any respect it could make it difficult for you to be impartial in judging this case?

THE PROSPECTIVE JUROR:  That's what I'm afraid of.

THE COURT:  You think it might?

THE PROSPECTIVE JUROR:  That it would, yeah.

THE COURT:  Slightly biased?

THE PROSPECTIVE JUROR:  Uh-huh.

THE COURT:  All right.  Thank you, Ms. Lohse.

THE PROSPECTIVE JUROR:  Thanks.

THE COURT SECURITY OFFICER:  Ma'am, come forward.

THE COURT:  Good morning.

THE PROSPECTIVE JUROR:  Hi.  Generally nothing specific.

THE COURT:  What's your name?

THE PROSPECTIVE JUROR:  Erickson, E-R-I-C-K-S-O-N.

THE COURT:  Is it Carey?

THE PROSPECTIVE JUROR:  Yes.

32

THE COURT:  Number 18.  Yes, ma'am.

THE PROSPECTIVE JUROR:  Not the case specifically, but I -- but knowing about Abu Ghraib, yeah.  So I didn't know -- you said the issue generally.  I know about the -- I remember the issue generally.

THE COURT:  From reading about it?

THE PROSPECTIVE JUROR:  Reading about it and NPR, et cetera, and so forth.

THE COURT:  So do you think in any respect it would make it difficult for you to be impartial in judging this case because the issue in this case is whether CACI --

THE PROSPECTIVE JUROR:  Is responsible, yeah.

Probably not.  I am a federal contractor, though.  So we'll get to that.

THE COURT:  We'll get to the contractor question a little later.

THE PROSPECTIVE JUROR:  So as far as that's concerned.  But I wanted to make sure it's if you knew about the issue generally, which I do.

THE COURT:  All right.  But in terms --

THE PROSPECTIVE JUROR:  Of partiality, no.  I could be impartial.

THE COURT:  You could be impartial?

THE PROSPECTIVE JUROR:  Uh-huh.

THE COURT:  How recently did you hear or read

33

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

anything about Abu Ghraib?

THE PROSPECTIVE JUROR:  I mean, more back when it was happening.  So, yeah, it's been --

THE COURT:  Nothing recently?

THE PROSPECTIVE JUROR:  Not recently.  So sorry if that was a waste of your time.

THE COURT:  No.  Thank you.

THE PROSPECTIVE JUROR:  Thank you.

(Open court.)

THE COURT:  Is there anybody else in that row?  Over here.  Wait one second.  All right.

Is there anybody else on the left side?  I think it will be easier to do it that way.  Anyone else on the left side come forward, please.

(Bench conference.)

THE COURT:  Your name, please.

THE PROSPECTIVE JUROR:  Christopher Davidson.

THE COURT:  Yes, Mr. Davidson, Number 13.

MR. MOLSTER:  Thank you.

THE PROSPECTIVE JUROR:  Yes.  Nothing with the actual defendants, but about the stuff going on over in Abu Ghraib, but I've read some of about the interrogators and things that have happened over there.  I don't know if that was exactly what was related to that.

THE COURT:  How recently did you read about that?

34

THE PROSPECTIVE JUROR:  I would probably say within the last few months or so.

THE COURT:  And in the context of just an article about that -- those events or anything about these plaintiffs or anything like that?

THE PROSPECTIVE JUROR:  With the plaintiffs not specifically.  Some stuff with some of the government contractors about, like, them hiring people over there, some stuff I've read about that.

THE COURT:  Was it in The Washington Post or the New York Times or do you remember where?

THE PROSPECTIVE JUROR:  That would have been New York Times, I believe.

THE COURT:  And it was fairly recent?

THE PROSPECTIVE JUROR:  Again, in the last few months, yeah.  I don't know if that's recent.

THE COURT:  All right.  Do you think from anything you've read that you've made up your mind about any issues or anything that would make it difficult to decide that CACI was responsible for any of that contact?  In any respect, does that make it difficult for you?

THE PROSPECTIVE JUROR:  Personally, yes.

THE COURT:  Thank you, sir.

THE PROSPECTIVE JUROR:  Thank you so much.

(Open court.)

35

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE COURT:  Is there anyone else on the left side in any row?

THE COURT SECURITY OFFICER:  Sir, come forward.

(Bench conference.)

THE PROSPECTIVE JUROR:  How are you doing, Your Honor?

THE COURT:  Fine, sir.  What's your name?

THE PROSPECTIVE JUROR:  Patrick Gaston.

THE COURT:  I'm sorry, Gaston?

THE PROSPECTIVE JUROR:  Gaston.  Thank you.

I'm not sure that this counts, but I heard about it in the news when it was occurring, and, you know, the prison system there in Iraq, so I'm not quite sure it's relevant.  I have some general knowledge of it, but not this case.

THE COURT:  Do you think -- the information that you have about Abu Ghraib, is that from recently reading or hearing --

THE PROSPECTIVE JUROR:  Oh, no.  No.  No.  Way back.

THE COURT:  Going into the early 2000s.  Okay.

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  In any respect from what you've heard, do you feel it would be difficult for you to be impartial in judging the issues in this case?

36

THE PROSPECTIVE JUROR:  No.

THE COURT:  Thank you, Mr. Gaston.

THE PROSPECTIVE JUROR:  Thank you very much.

THE COURT SECURITY OFFICER:  Sir, come forward.

THE COURT:  Good morning.

THE PROSPECTIVE JUROR:  Good morning.

THE COURT:  Your name, sir.

THE PROSPECTIVE JUROR:  Michael Plaugher.

THE COURT:  Number 49, Michael Wayne.

THE PROSPECTIVE JUROR:  Michael Wayne, yes.  I don't know about the company, but I do recall the Abu Ghraib prison being in the news a lot with the prisoners on the crates or whatever with the dogs.

THE COURT:  So is there anything recently that you read or heard about the case or is that back --

THE PROSPECTIVE JUROR:  That's back from when the war was going on, yeah.

THE COURT:  Is there anything of what you were exposed to in those reports that you think could make it difficult for you to be impartial in judging this case?

THE PROSPECTIVE JUROR:  I don't think so, but at the time, I didn't really have any issues with the enhanced interrogation stuff because we were at war, so I didn't see an issue with it.

THE COURT:  Okay.

37

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE PROSPECTIVE JUROR:  Now, I mean, so much time has passed, I don't really know.

THE COURT:  Remember, the issue in this case is whether CACI is responsible --

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  -- for any of that.

So do you feel based upon what you know or have heard about what happened, that that could make it difficult for you to be impartial in making that judgment?

THE PROSPECTIVE JUROR:  I don't believe so.  I don't believe so.

THE COURT:  You don't believe so?

THE PROSPECTIVE JUROR:  Uh-uh.

THE COURT:  All right.  Thank you, sir.

THE PROSPECTIVE JUROR:  All right.  Thank you.

(Open court.)

THE COURT SECURITY OFFICER:  Sir, come forward.

(Bench conference.)

THE COURT:  Good morning.

THE PROSPECTIVE JUROR:  Good morning.

THE COURT:  Can I get your name, please.

THE PROSPECTIVE JUROR:  Victor Chen, Juror Number 5.

THE COURT:  Yes.  Number 5.  Yes, Mr. Chen.

THE PROSPECTIVE JUROR:  Yes.  I was thinking about

38

your question, and if your question is like anything I know about Abu Ghraib, right, obviously I read about that. I mean, I followed that contemporaneously, but I don't know anything about this case.

THE COURT: So anything that you might have learned about Abu Ghraib was from many years ago?

THE PROSPECTIVE JUROR: Yeah. It was contemporaneous with the time and then following, you know, the things that happened after. But, like I said, I can't recall anything about this case.

THE COURT: All right. And would you say from what you have heard about Abu Ghraib or read about Abu Ghraib, would that, in any respect, make it difficult for you to be an impartial judge in this case?

THE PROSPECTIVE JUROR: I don't think so. I don't think so.

THE COURT: Have you had any recent consideration about this case in the last year or so?

THE PROSPECTIVE JUROR: No. In fact, if I'm aware of this case, I don't remember it. If I read about it in the papers, I don't recall.

THE COURT: All right.

THE PROSPECTIVE JUROR: Okay.

(Open court.)

THE COURT: All right. Now, do we have any people

39

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

in the center section in the last two or three rows who want to answer this question?  All right.

So let's go to the far right side.  Are there any folks on the far right side who have an answer to this question?

All right.  Thank you.  Counsel, you can go back to your seats.

MR. MOLSTER:  Thank you, Your Honor.

THE COURT:  I'm now going to have the parties reintroduce themselves.  I'm going to start with the plaintiffs, have counsel for the plaintiffs, all lawyers and technical people who may be taking a role in this case are going to need to stand up, face the jury pool, state their name clearly, and any law firm with which they are associated.

We want to know, folks, whether any of you might know in any personal or business capacity any of the attorneys or paralegals or technical folks working for the plaintiffs or ever had any business dealings or relationships with these individuals or with the law firms involved.

Mr. Molster.

MR. MOLSTER:  Thank you, Your Honor.  I'm one of the counsel for the plaintiffs, my name is Charles Molster, M-O-L-S-T-E-R.  I have my own law firm called The Law

40

Offices of Charles B. Molster.  Also with me at counsel table we have -- one, two, three, four, five -- six lawyers from a firm called Patterson Belknap.  Muhammad Faridi is lead trial lawyer -- one of our lead trial lawyers.  Bonita Robinson, Alex Mahler-Haug, Michael Buchanan in the back, Scott Kim, Andrew Haddad.  And then additional members of our team are Kaihan Rahimi.  How did I do on that one, Kaihan, okay?  And Sean O'Shea.  And Jocelyn Cinquino.  And shall I introduce our client at this point?  Oh, I'm sorry.  Baher.  I'm sorry.  Baher Azmy.

THE COURT:  And his group.

MR. MOLSTER:  The Center for Constitutional Rights.

THE COURT:  All right.  Do any members of the pool believe you might know any of the attorneys or the technical folks working with them in any business or personal capacity or the various law firms or groups from which they work?  Anybody?

Way in the back, your name, sir.  If you could please stand up.  What is your name?

THE PROSPECTIVE JUROR:  Brian Caney.

THE COURT:  Yes, Mr. Caney.  Juror Number 4.  Yes, sir.

THE PROSPECTIVE JUROR:  One of plaintiffs' counsel was a former law professor of mine.

41

THE COURT:  And who is that just for the record?

THE PROSPECTIVE JUROR:  Professor Azmy.

THE COURT:  Okay.  Now, Mr. Caney, are you a lawyer?

THE PROSPECTIVE JUROR:  I am.

THE COURT:  What is your area of practice?

THE PROSPECTIVE JUROR:  Federal procurement law.

THE COURT:  All right.  And what subject were you taught by counsel?

THE PROSPECTIVE JUROR:  Constitutional law.

THE COURT:  All right.  Do you feel in any respect because you had that relationship with counsel that you might have some inclination to favor his side of the case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Have you had any contact with him recently?

THE PROSPECTIVE JUROR:  Not recently, no.

THE COURT:  Well, in the last three or four years?

THE PROSPECTIVE JUROR:  No.

THE COURT:  No.  All right.  And what kind of work do you actually do?  Do you work for the federal government?

THE PROSPECTIVE JUROR:  I do.

THE COURT:  For a federal agency?

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  And you negotiate contracts, or what

42

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

is your role?

THE PROSPECTIVE JUROR:  More advice to government officials that are entering into contracts.

THE COURT:  Government contracting may be a significant issue in this case.

Do you feel from your knowledge of that process that that might make it difficult for you to be impartial in judging this case?

THE PROSPECTIVE JUROR:  I don't believe so.

THE COURT:  All right.  Thank you, sir.

Is there anybody else?  All right.  Let's introduce the plaintiff at the same time.

MR. MOLSTER:  Yes.  This is the plaintiff.  I would like to introduce our client, the client who is here in the United States, Salah Al-Ejaili.

THE COURT:  And Mr. Al-Ejaili, as I recall, formerly worked for Al Jazeera; correct?  Yes.

So, folks, first of all, do any of you think you might know the plaintiff in any personal or business capacity?

All right.  Thank you, sir.  You may have a seat.

Do any members of the panel, have you ever worked for, read or heard about Al Jazeera or feel that because of the plaintiff's relationship to that publication, that might affect your ability to judge this case fairly?  Anybody?

43

Yes.  In the front row, ma'am.  Your name, please.

THE PROSPECTIVE JUROR:  Sharon McGee.

THE COURT:  Ms. McGee, you're Juror Number 37.
Yes, ma'am.

What do you know about -- do you know something
about the newspaper?

THE PROSPECTIVE JUROR:  I know a lot about the
reports that come from there.

THE COURT:  Is there anything about that that you
feel could make it difficult for you to be impartial in
judging the case?

THE PROSPECTIVE JUROR:  I'd like to say no, but
possibly, yes.

THE COURT:  All right.  Thank you, ma'am.  And,
again, you're Ms. McGee; correct?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  Thank you.

Anybody else?  Yes.  Your name, please, in the
front row.

THE PROSPECTIVE JUROR:  My name is Sergie Daez.

THE COURT:  What's the last name?

THE PROSPECTIVE JUROR:  Daez, D-A-E-Z.

THE COURT:  Yes, sir.

THE PROSPECTIVE JUROR:  Yeah.  I have heard about
Al Jazeera and what they've written about in the past a few

44

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

times.

THE COURT:  Is there anything about the newspaper -- that publication that you feel could affect your impartiality in judging this case?  In other words -- it's a hard question, folks, to answer, you know, whether you think you might have a bias or a prejudice or you might find something that you just -- would affect how you would judge a case, and so that's why we're asking that question.

THE PROSPECTIVE JUROR:  Maybe.

THE COURT:  Maybe?

THE PROSPECTIVE JUROR:  Yeah.  Maybe.

THE COURT:  All right.  Thank you, Mr. Daez.

Is there anybody else?

THE PROSPECTIVE JUROR:  Thomas Nowalk.

THE COURT:  What's the last name?

THE PROSPECTIVE JUROR:  Nowalk, N-O-W-A-L-K.

THE COURT:  Yes, sir.  Number 44.

THE PROSPECTIVE JUROR:  I read the newspaper every other day online, so I do -- it's hard to say no because I do like to read it for another perspective.

THE COURT:  In other words, is there anything about your consuming that media that you feel could affect your ability one way or the other to be impartial?

THE PROSPECTIVE JUROR:  Maybe.

THE COURT:  All right.  Thank you, Mr. Nowalk.

45

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Anybody else?  Way in the back.  Your name, please.

THE PROSPECTIVE JUROR:  Juror name Christopher Damon-Cronmiller, and I have heard of Al Jazeera, but only in a very minutial capacity.

THE COURT:  Is there anything that you've heard about it or seen about it that you think could affect your impartiality in this case?

THE PROSPECTIVE JUROR:  I sincerely doubt it.

THE COURT:  All right.  Thank you and you're Number 11, Mr. Damon-Cronmiller?

THE PROSPECTIVE JUROR:  Cronmiller, yes.

THE COURT:  Thank you.  Anybody on the right side? Your name, please.

THE PROSPECTIVE JUROR:  Stephen Ambrozik, Juror Number 2.

THE COURT:  Yes, sir.

THE PROSPECTIVE JUROR:  I'm aware of the publication.  I've read it in the past a few times.

THE COURT:  Is there anything about what you've read or the publication that you feel could affect your impartiality?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you, sir.

THE PROSPECTIVE JUROR:  Thanks.

46

THE COURT:  That's everybody?  You need to get your hands up good and high so we can see you all.  Thanks.

Yes, your name please.

THE PROSPECTIVE JUROR:  Christopher Toner.  I've read some publications on Al Jazeera.

THE COURT:  All right.  I'm sorry.  How do you spell your last name?

THE PROSPECTIVE JUROR:  T-O-N-E-R.

THE COURT:  Number 65, Mr. Toner.

Is there anything about what you've read that you feel could affect your impartiality?

THE PROSPECTIVE JUROR:  No.

THE COURT:  No.  All right.  Thank you, sir.

Anybody else?  All right.  Then I'll have plaintiffs' [sic] counsel, Mr. O'Connor, introduce yourselves, again, the name of the law firms, et cetera, you know.

MR. O'CONNOR:  Thank you, Your Honor.

Good morning.  My name is John O'Connor.  I'm one of the lawyers for the defendant, CACI, in this case.  I'm at the law firm of Steptoe, LLP, which is in Washington, D.C.  Other lawyers from Steptoe are Linda Bailey and Joseph McClure.  Our paralegal from Steptoe is Riley John. We're also joined at counsel table by our co-counsel Nina Ginsberg.  She is with the law firm of DiMuroGinsberg,

47

which is a law firm in Alexandria.  We have our technical
specialist, Jeffrey Roberts, who is with a company called
Digital Evidence Group.  And then we also have Ms. Jody
Brown, who is a long-time executive at CACI who is joining
us at counsel table.

THE COURT:  So, ladies and gentlemen, do any of
you think you might know in any personal or business
capacity any of the defense counsel or the law firms
involved in representing the defendant?

Yes, ma'am.  Your name, please.

THE PROSPECTIVE JUROR:  Just years ago I had --

THE COURT:  I'm sorry.  I need your name.

THE PROSPECTIVE JUROR:  Elizabeth Vanderputten.

THE COURT:  Yes, ma'am.

THE PROSPECTIVE JUROR:  Just years ago I was a
program officer for a CACI award, but that's like 25 years
ago.

THE COURT:  You were a program officer?

THE PROSPECTIVE JUROR:  I worked for a federal
agency, and we had a contract with CACI.

THE COURT:  But that was you said many, many years
ago?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Was there anything about that
interaction with CACI that you feel could affect your

48

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

impartiality?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you, ma'am.

Now I'm going to ask a question about CACI separately, but let me just focus first on the attorneys and the law firms.

Is there anybody who thinks you might have any relationship with any of the attorneys or have ever had any business dealings with the law firms?

All right.  Now, CACI or C-A-C-I, because you'll hear it referred to as different ways, is a Northern Virginia government contractor.  Have any of you, Number 1, ever worked for or had business dealings with CACI?  Do any of you own any stock?  I don't know if it's publicly traded, but if it is -- or ever had any financial dealings -- is it publicly traded?

MR. O'CONNOR:  It is publicly traded, Your Honor.

THE COURT:  To your knowledge, whether you've ever had any investments in CACI, done any business dealings with the entity, I would like to know that now.

So is there anybody on the left side?  I see someone way in the back.  Yes, your name, sir.

THE PROSPECTIVE JUROR:  Nah Qureshi, with a Q.

THE COURT:  Yes, Mr. Qureshi.  Number 50.

THE PROSPECTIVE JUROR:  I've contracted with CACI

49

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

for the past 20 years selling them flooring and flooring products in various capacities.

THE COURT:  So you have sold products to CACI.

THE PROSPECTIVE JUROR:  I've sold products directly to CACI, and I've sold products to general contractors that are doing business in CACI's locations.

THE COURT:  Are you currently in some business relationship with CACI right now?

THE PROSPECTIVE JUROR:  I really don't know.  I'm the president of the company, we do jobs all over the area so we very well possibly could.  But their headquarters is very close to my office, and I know I've been inside of it dozens of times in the past 20 years.

THE COURT:  Do you feel that that business relationship could make it difficult for you to be impartial in judging this case?

THE PROSPECTIVE JUROR:  Yes.  They give me money.

THE COURT:  That's a perfectly acceptable reason. Thank you, sir.

MR. O'CONNOR:  Your Honor, this juror is accepted.

THE COURT:  Thank you, Mr. Qureshi.

All right.  Is there anybody else?  I'm sure some of you have heard of CACI because, again, it's a Northern Virginia entity.

All right.  Let me get the gentleman back there.

50

Yes, sir.

THE PROSPECTIVE JUROR:  I would prefer to approach the bench to discuss the topic.

THE COURT:  All right.  Come up.

(Bench conference.)

THE DEPUTY CLERK:  He's Number 2.

THE COURT SECURITY OFFICER:  Sir, come forward.

THE COURT:  Mr. Ambrozik?

THE PROSPECTIVE JUROR:  Yes, ma'am.  So I work in government acquisitions, and we may be working with Army in the near future to send money their way, CACI's way.

THE COURT:  Given your position, do you think it difficult to be impartial?

THE PROSPECTIVE JUROR:  No.  It's a completely disconnected area.  We're not really working with CACI; we're working with the other government agency.  But understood that maybe it's -- uncertain, I guess, is probably a better way to put it.

THE COURT:  You also probably have some experience with state secrets?

THE PROSPECTIVE JUROR:  Absolutely.  Yes.

THE COURT:  During the course of this trial, there will be the invocation of the state secret privilege, and there will be redacted information.

Again, would that make it difficult for you to be

51

impartial in judging this case?

THE PROSPECTIVE JUROR:  No.

MR. MOLSTER:  What juror number?  Sorry.

THE COURT:  Two.

MR. MOLSTER:  Thank you.

THE COURT:  How much interaction have you or your group had at CACI?

THE PROSPECTIVE JUROR:  My group has had zero interaction.  They have an existing contract vehicle with an Army group that we work with.

THE COURT:  Uh-huh.  Okay.  Thank you.

THE PROSPECTIVE JUROR:  Thank you.

(Open court.)

THE COURT:  All right.  Is there anybody else who has -- yes.

THE COURT SECURITY OFFICER:  He would like to come forward.

(Bench conference.)

THE COURT:  Yes.  Your name, please.

THE PROSPECTIVE JUROR:  Brian Caney.

THE COURT:  Yeah.  Mr. Caney, yes.

THE PROSPECTIVE JUROR:  So, in full disclosure, I'm sure I have advised on contracts involving CACI in the past.  I mean, I used to work for a private law firm years ago.  And we did a lot of government contracts.

52

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Also with the government, I may have advised on contracts where CACI was involved.  I don't have any specific knowledge or don't have any recollection of anything specific, but I just wanted you to know that.  I mean, in my years, they're a big contractor, I know, and so on.

THE COURT:  And I assume you're very familiar with the FARs?

THE PROSPECTIVE JUROR:  Yes.  Very familiar.

THE COURT:  Thank you.

MR. MOLSTER:  Which number, Your Honor?

THE COURT:  Number 4.  Brian Caney.

(Open court.)

THE COURT:  All right.  So is there anyone else on the left -- wait a minute, on the left side who has had any business dealings with or has heard anything at all about CACI?  No.  All right.

Now in the center section, is there anybody?  We have several hands still up.  All right.

Your name, please.

THE PROSPECTIVE JUROR:  Last name K-O-C-H, first name Aaron.

THE COURT:  Yes, sir.

THE PROSPECTIVE JUROR:  Yes.  So under the topic of having heard about -- my neighbor is, I believe,

53

relatively senior within CACI.

THE COURT:  That's right.  You've already answered that question.

THE PROSPECTIVE JUROR:  Very good.  Thank you.

THE COURT:  Okay.  Anyone else in the back there, first of all.

Yes, sir, your name.

THE PROSPECTIVE JUROR:  Steve Pavlecka.

THE COURT:  Can you spell the last name?

THE PROSPECTIVE JUROR:  P-A-V-L-E-C-K-A.

THE COURT:  Yes.  Number 45.

THE PROSPECTIVE JUROR:  Yes, ma'am.  I have a friend of mine who does work for CACI.

THE COURT:  A close friend?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Is there anything about that relationship that you think could make it difficult for you to be impartial in judging the case?

THE PROSPECTIVE JUROR:  There shouldn't be.

THE COURT:  Has that person ever talked with you about this lawsuit?

THE PROSPECTIVE JUROR:  Not this lawsuit, no.

THE COURT:  All right.

THE PROSPECTIVE JUROR:  No lawsuits.

THE COURT:  No lawsuits.  Your fellow and sister

54

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

jurors are talking like lawyers.  Lawyers pick up on that kind of language.

THE PROSPECTIVE JUROR:  Right.

THE COURT:  Okay.  How recently have you had conversations with this friend about anything that might deal with CACI?

THE PROSPECTIVE JUROR:  Last week.

THE COURT:  Last week.  But nothing to do with this case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  And, again, you think you could be completely impartial in judging it?

THE PROSPECTIVE JUROR:  I do.

THE COURT:  All right.  Thank you, sir.

Your name again, please.

THE PROSPECTIVE JUROR:  Sharon McGee.

THE COURT:  Yes, Ms. McGee.

THE PROSPECTIVE JUROR:  It's been a while, but I worked with CACI on a government contract CCSP a while ago, and I worked directly with at least three employees at that time.

THE COURT:  Were you an employee of CACI or a contractor?

THE PROSPECTIVE JUROR:  No.  I was a -- they joined my company and a project we were doing as a separate

55

entity.  So they were a partner on the project we were doing.

THE COURT:  And you were partnering in such a way that you were supplying employees to somebody else?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  So you were providing personnel to -- I couldn't hear your whole answer.  To a police agency?

THE PROSPECTIVE JUROR:  No.  It was to the Department of Defense.

THE COURT:  Department of Defense.  All right.

Was there anything about that business relationship that you feel could make it difficult for you to be impartial in judging this case?

THE PROSPECTIVE JUROR:  I don't think so.

THE COURT:  Is that relationship still ongoing right now?

THE PROSPECTIVE JUROR:  No.

THE COURT:  And about when did that contract end?

THE PROSPECTIVE JUROR:  2005.

THE COURT:  2005.  It didn't have anything to do with Iraq or Abu Ghraib, or did it?

THE PROSPECTIVE JUROR:  It had to do -- no.  I would say no, but it had to do with the rebuilding of the Pentagon communication infrastructure after the attack.

56

THE COURT:  Of the Pentagon?

THE PROSPECTIVE JUROR:  Uh-huh.

THE COURT:  All right.  Thank you, ma'am.

Anybody else?  Okay.  Yes, ma'am, your name again please.

THE PROSPECTIVE JUROR:  Monica Moir.

THE COURT:  Yes, ma'am.

THE PROSPECTIVE JUROR:  I have heard about CACI in the extent that my past acquaintance had worked there.

THE COURT:  I'm sorry, to the extent of what?

THE PROSPECTIVE JUROR:  One of my past acquaintances has worked there in the past.

THE COURT:  All right.  Is there anything that your classmate may have told you about the work experience that you feel could affect your impartiality in judging the case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you, ma'am.

THE PROSPECTIVE JUROR:  Thanks.

THE COURT:  All right.  Last call.  Anybody else?

Your name, please.

THE PROSPECTIVE JUROR:  Paul Hamp.

THE COURT:  How do you spell the last name?

THE PROSPECTIVE JUROR:  H-A-M-P.

THE COURT:  H-A-M-P-H?

57

THE PROSPECTIVE JUROR:  Just P.  H-A-M-P.

THE COURT:  I got it.  Number 22, yes, sir.

THE PROSPECTIVE JUROR:  I'm familiar with CACI.  I used to work for a small government contractor.  We didn't have any contracts with CACI, but certainly dealt with CACI employees, just more socially.  My wife works for the federal government.  I don't know if they're a contracting situation, but I just wanted to make that known as well.

THE COURT:  I'm sorry.  You said that you did some contracting work with CACI?

THE PROSPECTIVE JUROR:  CACI employees would, like, participate in events that we would put on.  So I didn't have direct dealings with CACI, but certainly rubbed elbows with --

THE COURT:  Was there anything about those business relationships that might make it difficult for you to be impartial in judging this case?

THE PROSPECTIVE JUROR:  Nope.

THE COURT:  Were you ever involved in supervising any of those CACI people?

THE PROSPECTIVE JUROR:  No.

THE COURT:  No?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you, sir.

THE PROSPECTIVE JUROR:  You're welcome.

58

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE COURT:  Anybody else?  Last call on this question.  Okay.

When I say last call, as we're asking these questions, if you do think there is something you want to go back over, please let us know.

All right.  I want now for -- we'll start with the plaintiffs' side -- the plaintiff to slowly read the names of all witnesses either who are going to either testify in the courtroom live or testify through what we call depositions.

You would find, ladies and gentlemen, during the course of getting this case ready for trial, many witnesses were -- their testimony was taken during what we call the discovery process.  So we actually, in some cases, will have testimony that was prerecorded.  Those witnesses were under oath, just like any witness who would be here live in the courtroom, and they were asked questions by both sides, and it was recorded just the way it would be recorded here in the courtroom, but, for various reasons, those witnesses cannot physically appear in the courtroom itself.  And so I want the parties to make sure that they've run all those names by you all.  The question then will be whether any of you recognize or think you might know any of the witnesses who could be called to testify in this case.

I think -- so I don't know who's going to do that

59

on behalf of the plaintiff.  Just read the names slowly and in a good loud voice.

MR. FARIDI:  Good morning.  The witnesses' names are as follows:  Salah Al-Ejaili.  Torin Nelson.  Charles Graner.  Megan Ambuhl Graner.  Ivan Frederick.  Asa'ad Al-Zuba'e.  Antonio Taguba.  William Cathcart.  Jens Modvig.  Suhail Al Shimari.  And Sabrina Harman.  And just two more names, Your Honor.  Amy Monahan.  George Fay.  Arnold Morse.

THE COURT:  Ladies and gentlemen, do any of you think you recognize any of those names?  All right.

Then Mr. O'Connor.

MR. O'CONNOR:  CACI's potential witnesses are as follows:  James Beachner.  Mark Billings.  Colonel William Brady.  Charles Graner.  Carolyn Holmes, who is also known as Carolyn Wood.  Amy Monahan.  Charles Mudd, also known as Chuck Mudd.  R. Scott Northrop.  Colonel Thomas Pappas.  Dr. Jason Payne-James.  Daniel Porvaznik and Steven Stefanowicz.

THE COURT:  Ladies and gentlemen, do any of you recognize any of the witnesses who may testify for the defense?  All right.

Have any members of the pool served in the U.S. Armed Services or are currently serving in any capacity like National Guard, et cetera?

Let me start on the left side.  Anybody in the

60

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

first couple of rows?  Get your hands up so we can really see you all.

All right.  Your name again, please.

THE PROSPECTIVE JUROR:  Montgomery, Your Honor.

THE COURT:  Yes, Mr. Montgomery.  And remind me, what service were you with?

THE PROSPECTIVE JUROR:  I was in the Air Force; however, during the period in question, I was farmed out, so-to-speak, by the Air Force to the Army to do weather support for their aviation assets, and at the time I was assigned in garrison in Germany to 1st Armored Division.

THE COURT:  And, Mr. Montgomery, based upon your military experience, do you feel in any respect that could affect your ability to be impartial in judging this case?

THE PROSPECTIVE JUROR:  No, Judge.

THE COURT:  All right.  Thank you, sir.

I think there was another hand on the left side.  Yeah.

THE PROSPECTIVE JUROR:  Matusiewicz.

THE COURT:  I'm sorry, the last name.

THE PROSPECTIVE JUROR:  Matusiewicz, with an M.

THE COURT:  Mary Elizabeth; correct?

THE PROSPECTIVE JUROR:  Yes, ma'am.

THE COURT:  All right.  Number 36.

Yes, ma'am, your military service?

61

THE PROSPECTIVE JUROR:  I served in the United States Air Force.

THE COURT:  For about -- are you still in the service?

THE PROSPECTIVE JUROR:  I am not.  I'm retired.  I served from 1986 to 2010.

THE COURT:  All right.  Is there anything about that service that you feel could affect your impartiality in judging this case?

THE PROSPECTIVE JUROR:  No, ma'am.

THE COURT:  Were you at this point stationed in Iraq?

THE PROSPECTIVE JUROR:  I was not.

THE COURT:  Any of your close colleagues in Iraq?

THE PROSPECTIVE JUROR:  Numerous acquaintances. No one that I was particularly close to.

THE COURT:  And during the time you were in service, that would cover the time period we're talking about here, which is the latter part of 2003 into early of 2004.

THE PROSPECTIVE JUROR:  Yes, ma'am.

THE COURT:  Did you hear anything about what was going on at Abu Ghraib or any -- the problem over there?

THE PROSPECTIVE JUROR:  At that time, I was the commander of the space force, space command down in Florida,

62

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

and outside of things that were on the national news, I had no other insight.

THE COURT:  All right.  So you don't feel -- and you didn't recognize any of the military persons' names who were read as witnesses?

THE PROSPECTIVE JUROR:  I did not.

THE COURT:  All right.  Thank you, ma'am.

Anybody else on the left side with military service?

All right.  Now in the center.  All right.  We'll start in the first row.  Ms. McGee, am I getting it correct now?

THE PROSPECTIVE JUROR:  Yes, ma'am.  Sorry.

THE COURT:  Ms. McGee, what service were you in?

THE PROSPECTIVE JUROR:  You said you.  So it's my husband.  He's retired Air Force.

THE COURT:  Retired Air Force?

THE PROSPECTIVE JUROR:  And my brother-in-laws were in the Navy and Marines and Army.

THE COURT:  Did any of them see active duty in Iraq?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Was your husband involved in Iraq at all?

THE PROSPECTIVE JUROR:  No.  My brother-in-law.

63

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

He was the Marine.

THE COURT:  Marine.  Was there anything about that experience or about your military connections that you feel could affect your impartiality in judging this case?

THE PROSPECTIVE JUROR:  Maybe.

THE COURT:  Maybe.  All right.  Thank you, Ms. McGee.  Somebody else in that row, any other military people?  Anyone else in the center?  I thought more hands went up.  Yeah.

THE PROSPECTIVE JUROR:  Walt Hare, 23.

THE COURT:  Yes, Mr. Hare.

THE PROSPECTIVE JUROR:  United States Marine Corps.

THE COURT:  All right.  And how long did you serve?

THE PROSPECTIVE JUROR:  Four years active duty; six years inactive reserves starting in '88.

THE COURT:  All right.  So you were not in Iraq?

THE PROSPECTIVE JUROR:  No.  I was stationed in North Carolina during Desert Storm.

THE COURT:  All right.  Is there anything about your military service that you feel could make it difficult for you to be impartial in judging this case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Thank you, Mr. Hare.  Anybody else in

64

the center section with military service?

THE PROSPECTIVE JUROR:  67, Vansise, Your Honor.

THE COURT:  Yes, sir.

THE PROSPECTIVE JUROR:  United States Army, '86 to '90, Herzogenaurach, Germany.

THE COURT:  Was there anything about your experience with the military that you feel could affect your impartiality in judging this case?

THE PROSPECTIVE JUROR:  No, ma'am.

THE COURT:  All right.  Thank you, sir.

Anyone else in the center section?

How about on the right side?  Anybody?  We'll start -- yes, ma'am.

THE PROSPECTIVE JUROR:  I didn't serve, but my --

THE COURT:  I'm sorry, I need your name, please.

THE PROSPECTIVE JUROR:  I'm sorry.  Michelle Phillips.

THE COURT:  Yes, Ms. Phillips.

THE PROSPECTIVE JUROR:  I didn't serve, but my brother served in Desert Storm in the U.S. Army, and my son was in the Air Force, and he did -- and my son-in-law both are in.  I'm sorry.

THE COURT:  All right.  So your brother was in Desert Storm?

THE PROSPECTIVE JUROR:  Yes.

65

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE COURT:  Did he talk at all about his experiences there or in particular anything about Abu Ghraib?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Is there anything about your family members' service that you feel could make it difficult for you to be impartial in judging this case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Is your son still in active duty?

THE PROSPECTIVE JUROR:  No.  And my son-in-law is retired Army.

THE COURT:  In the Army?

THE PROSPECTIVE JUROR:  And he served in Iraq.

THE COURT:  Did he ever talk about his experiences in Iraq?

THE PROSPECTIVE JUROR:  No.

THE COURT:  To your knowledge, were either of them involved in any kind of questioning of people, interrogation in other words?

THE PROSPECTIVE JUROR:  No, not to my knowledge.

THE COURT:  All right.  Thank you, ma'am.

THE PROSPECTIVE JUROR:  You're welcome.

THE COURT:  All right.  Any other folks on the right side?

THE PROSPECTIVE JUROR:  Doreen Washington.

66

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE COURT:  Yes, ma'am.

THE PROSPECTIVE JUROR:  I served in the military U.S. Army from '96 to '05.

THE COURT:  All right.  Again, that would cover the time period we're talking about here.

Where were you stationed?

THE PROSPECTIVE JUROR:  At the time, I was in Germany.

THE COURT:  I'm sorry?

THE PROSPECTIVE JUROR:  Germany.

THE COURT:  At any point were you ever in Iraq during that time?

THE PROSPECTIVE JUROR:  No, I wasn't.

THE COURT:  Did you pick up any scuttlebutt, any gossip about what was happening?

THE PROSPECTIVE JUROR:  No.

THE COURT:  No.  Is there anything about your military service that you feel could make it difficult for you to be impartial in judging this case?

THE PROSPECTIVE JUROR:  No, I don't.

THE COURT:  Okay.  Thank you, Ms. Washington.

Anyone else?  Yes, we have another hand up.

THE PROSPECTIVE JUROR:  Thank you.  Number 26, Misty Keller.

THE COURT:  Yes, ma'am.

67

THE PROSPECTIVE JUROR:  My brother's currently in the U.S. Navy.

THE COURT:  And is there anything about his service, Ms. Keller, that you feel could affect your impartiality in judging this case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you.  Anyone else?

Have any of the jurors other than those who have already answered the question because of their service, military service, have any of you ever been to Iraq? Anybody else?  Yes.  Yes, ma'am.  Your name, please.

THE PROSPECTIVE JUROR:  Kelly Tischler, 64.

THE COURT:  Number 64.  Yes, Ms. Tischler.

THE PROSPECTIVE JUROR:  Actually, my husband, he worked for the U.S. Corps of Engineers, Army Corps of Engineers for about ten years, and he deployed as a civilian to Iraq for a period of time.

THE COURT:  Was it during the time period we're talking about here, late --

THE PROSPECTIVE JUROR:  Slightly after.  It would have been about in 2004.

THE COURT:  2004.

Did he, to your knowledge, do any work at Abu Ghraib?

THE PROSPECTIVE JUROR:  No.

68

THE COURT:  He must have talked with you about his experiences in Iraq.

THE PROSPECTIVE JUROR:  A bit.  He was involved in collecting remote sensing data for the Corps of Engineers.  This was right before we got married.  Actually, when we were still dating.

THE COURT:  Was there anything about what he may have said to you or anything about his service that you feel could affect your impartiality?

THE PROSPECTIVE JUROR:  No, ma'am.

THE COURT:  All right.  Thank you, Ms. Tischler.

Is there anybody else?  There's another hand up.

THE PROSPECTIVE JUROR:  Hare.

THE COURT:  Yes, sir.

THE PROSPECTIVE JUROR:  My wife is an employee of the U.S. State Department and in the Inspector General's Office and has been deployed -- not deployed, but has been TDY'd to Baghdad a number of times to conduct audits.

THE COURT:  Any time close to the time period involved in this case?

THE PROSPECTIVE JUROR:  No, ma'am.

THE COURT:  Is there anything about what she may have told you about her experiences in Iraq that you feel could affect your impartiality in judging this case?

THE PROSPECTIVE JUROR:  No, ma'am.

69

THE COURT:  All right.  Thank you, Mr. Hare.

Anybody else?

THE PROSPECTIVE JUROR:  Chris Toner.

THE COURT:  I'm sorry, the last name?

THE PROSPECTIVE JUROR:  Toner, T-O-N-E-R.  I think 65.

THE COURT:  Yes, sir.

THE PROSPECTIVE JUROR:  My father was in the military around that time.

THE COURT:  Was he in --

THE PROSPECTIVE JUROR:  He was deployed in Iraq at that time.

THE COURT:  He was deployed, all right.

Do you know what his position was when he was over there?

THE PROSPECTIVE JUROR:  He was a budgeting officer from I guess 5th Corps.

THE COURT:  Did he talk at all about what he saw over there?

THE PROSPECTIVE JUROR:  Mostly money.

THE COURT:  All right.

THE PROSPECTIVE JUROR:  No active combat or anything like that.

THE COURT:  Is there anything about his experiences in Iraq and things he's told you about that that

70

you feel could affect your impartiality in judging this case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  No.  All right.  Thank you, Mr. Toner.

And, ladies and gentlemen, we've had a couple of moments when we have laughed, and I always tell jurors because it happens in every trial, there are moments when something funny happens.  That's the nature of the human condition.

The fact that we might have moments of levity does not mean that this is not an extremely serious case.  It's a very important case for the plaintiffs, and it's a very important case for CACI.

I always tell jurors to understand the role of humor in a trial, and that is, you know, it's part of the human experience.  When things are tense, frankly, humor can break up that tension a little bit.  It's very normal human reaction.  It doesn't mean that the trial is not a very serious trial.

Those of you who are theater fans may know, you know, the Shakespearean tragedy Hamlet, which is one of the darkest tragedies out there.  Right in the middle of that play, there is slapstick humor.  And Shakespeare did that to break the tension.  So please understand the role that humor may occasionally play in the course of a trial.

71

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

All right.  There's nobody else who has an answer to that question.  All right.

And then the next question I want to find is whether any of the members of the panel have any experience either in law enforcement or in corrections work.  That would include if you've ever been a military police officer, sheriff, working in any kind of a law enforcement or correctional capacity.

We're going to start on the left side first.  We'll start as close to the front as we can.  No one in the first two rows.  All right.

Yes, sir, your name please.

THE PROSPECTIVE JUROR:  Michael Plaugher, 49, I believe.

THE COURT:  Yes, Mr. Plaugher, 49.

THE PROSPECTIVE JUROR:  I currently work for the U.S. Postal Inspection Service as a program specialist.  Prior to that I was a uniformed law enforcement officer with the Inspection Service.

THE COURT:  All right.  And in your position, have you been involved in interrogating or asking questions of witnesses or potential defendants?

THE PROSPECTIVE JUROR:  Just folks that I would encounter in the normal course of business, we would ask them.

72

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE COURT:  Have you had any specialized training in interrogation techniques?

THE PROSPECTIVE JUROR:  No.

THE COURT:  No.  Is there anything about the issues in this case that you think might make it difficult for you to be impartial because of your background in law enforcement?

THE PROSPECTIVE JUROR:  I don't believe so.

THE COURT:  All right.  Thank you, sir.

Other people on the left side?

THE PROSPECTIVE JUROR:  Number 5, Victor Chen.

THE COURT:  Yes, Mr. Chen.

THE PROSPECTIVE JUROR:  I currently work for the FBI.

THE COURT:  In what capacity?

THE PROSPECTIVE JUROR:  I do -- so I'm not a deputized law enforcement officer.  I do program management analytic work.

THE COURT:  Is there anything with that work -- and FBI is not at all involved in this case.

So is there anything about your work that you think might make it difficult for you to be impartial in judging this case?

THE PROSPECTIVE JUROR:  I mean, I don't think so.

THE COURT:  Have you had any training in

73

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

interrogation techniques?

THE PROSPECTIVE JUROR:  No, but I've participated on interviews.

THE COURT:  So you have watched people be interviewed?

THE PROSPECTIVE JUROR:  Yeah.  And conducted a few, yeah.

THE COURT:  And you have conducted some.

Again, is there anything about those experiences -- because interrogation is going to be an issue in this case -- that you think might make it difficult for you to be impartial?

THE PROSPECTIVE JUROR:  I don't think so.

THE COURT:  All right.  Thank you, Mr. Chen.

Anyone else on the left side?  All right.

Now in the center section, anyone with law enforcement background or experience?  Yes.  Yes, your name, please.

THE PROSPECTIVE JUROR:  My name is Sergie Daez, D-A-E-Z.

THE COURT:  Yes, sir.

THE PROSPECTIVE JUROR:  I currently work as a contractor for the Drug Enforcement Administration.

THE COURT:  So you actually are not a DEA employee but you work there as a contractor?

74

THE PROSPECTIVE JUROR:  No, I'm just a contractor.

THE COURT:  All right.  What kind of work are you doing?

THE PROSPECTIVE JUROR:  I'm contracted to the asset forfeiture division.  A lot of clerk work, stuff like that.

THE COURT:  Are you ever involved in doing any kind of questioning?

THE PROSPECTIVE JUROR:  Never.

THE COURT:  Is there anything about your work at the DEA, or frankly your work as a contractor, that you feel could affect your impartiality?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you, sir.

Anyone else in the center section?  All right.

On the right side then.  Is there anybody with law enforcement experience or corrections experience?

Other than that question, is there anybody who believes that during the course of their employment, part of their job has been to act as a formal interrogator, that is somebody who has to ask, you know, extensive questions in order to ferret out information, do any of you feel you have had that kind of experience?

Have any of you ever been the subject of an interrogation where you were required to formally answer

75

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

questions to a law enforcement type of agent?

Yes, sir.  Your name, please.

THE PROSPECTIVE JUROR:  My name is Chris Suarez.

THE COURT:  I'm sorry, the last name.

THE PROSPECTIVE JUROR:  Suarez, S-U-A-R-E-Z.

THE COURT:  Yeah.

THE PROSPECTIVE JUROR:  I've been arrested and interrogated a couple of times, and then I've been sued multiple times, so I've been investigated that way as well.

THE COURT:  Have any of those experiences as someone being interrogated, do you feel that that could affect your impartiality in judging this case?

THE PROSPECTIVE JUROR:  Absolutely.

THE COURT:  I'm sorry?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  Thank you, sir.

Anybody else?

THE PROSPECTIVE JUROR:  May name is Carlos Llanos.

THE COURT:  And how do you spell the last name?

THE PROSPECTIVE JUROR:  L-L-A-N-O-S.

THE COURT:  Yes, sir.  Number 33.

THE PROSPECTIVE JUROR:  Yes.  I was once interrogated by the FBI on a case about mortgage fraud.  I was working as a mortgage loan processor at the time.

THE COURT:  Was there anything about that

76

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

experience being interrogated that you feel could affect your impartiality in judging this case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you, sir.  Anybody else?  Anyone else?  No.  Oh, yes, your name, please.  Wait.  Wait.  We need to get the --

THE PROSPECTIVE JUROR:  Sandaldeep Jassar.

THE COURT:  Can you spell the last name?

THE PROSPECTIVE JUROR:  J-A-S-S-A-R.

THE COURT:  Yes, Ms. Jassar.

THE PROSPECTIVE JUROR:  So there was like one time interrogation regarding one case that was filed on my company.

THE COURT:  I'm sorry, it was one time?

THE PROSPECTIVE JUROR:  Somebody, like, filed a lawsuit.

THE COURT:  Against you?

THE PROSPECTIVE JUROR:  My company.

THE COURT:  Your company?

THE PROSPECTIVE JUROR:  Yeah.  So there was some kind of interrogation at that time.

THE COURT:  So you had to answer questions?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Was there anything about that experience that you think could make it difficult for you to

77

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

be impartial in judging this case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  No.  All right.  Thank you, Ms. Jassar.

And we have another hand back there.

THE PROSPECTIVE JUROR:  Can I approach the bench please, ma'am?

THE COURT:  Mr. Ambrozik, I don't think we need to hear anymore.  The only question I want to know would that experience make it difficult for you to be impartial?

THE PROSPECTIVE JUROR:  No.

THE COURT:  I am getting to know a few of you all by name.

Anybody else who has been -- yes, way in the back.

THE PROSPECTIVE JUROR:  Sisi Lee.

THE COURT:  Yes, ma'am.

THE PROSPECTIVE JUROR:  My mother was a plaintiff once and filed a lawsuit.  So I was a witness and questioned or cross-examined, I forgot the legal jargon, by certain attorneys.

THE COURT:  Was there anything about that experience as one being interrogated that you feel could make it difficult for you to be impartial in judging this case?

THE PROSPECTIVE JUROR:  Potentially.

78

THE COURT:  You think it could be?

THE PROSPECTIVE JUROR:  It wasn't a comfortable experience.

THE COURT:  All right.  I just wanted to make sure.  That's fine.  Thank you, Ms. Lee.

THE PROSPECTIVE JUROR:  Yes, thanks.

THE COURT:  Ms. Lee is Number 32.

Anybody else?

THE PROSPECTIVE JUROR:  Thomas Nowalk.

THE COURT:  Yes, sir.

THE PROSPECTIVE JUROR:  I develop training programs for the State Department.  I was a contractor, and it was the anti-terrorism assistance program, and I worked with law enforcement officers to develop the courses and also supported them with delivering them overseas.

THE COURT:  So I'm assuming you have a sense of what is appropriate interrogation techniques and non-appropriate?

THE PROSPECTIVE JUROR:  Yeah.  One of the courses that I helped develop with some former FBI agents was crisis negotiations.  All right.  So this kind of interrogation processes were part of the content.

THE COURT:  All right.  Thank you, Mr. Nowalk.

Anybody else?

Do any members of the panel believe, because of

79

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

life experiences or things that they've read in the paper or whatever, that they believe that they might have some biases against people of the Muslim faith or who are of Iraqi background?  I mean, obviously that kind of feeling has to be addressed.

Yes, your name please.

THE PROSPECTIVE JUROR:  Dillon Clegg.

THE COURT:  Number 7, Mr. Clegg, yes, sir.

THE PROSPECTIVE JUROR:  So I grew up, I got to witness 911, you know, all that stuff, schools getting locked down.  I've got cousins on my mother's side of the family that have died during their service, so that would partially affect my decision.

THE COURT:  All right.  Thank you, Mr. Clegg.

Is there anybody else?

This is a civil trial, and the plaintiffs are seeking monetary damages for their injuries which they allege they have experienced as a result of the defendant's conduct.

Do any of you have any opinions about the civil justice system that you feel could affect your ability to being an impartial juror?  And that could include such things as have you ever been sued, or have you ever had to bring a civil lawsuit.  I want to know any experience you've had with the civil justice system that you think could

80

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

affect your impartiality.

Yes.

THE PROSPECTIVE JUROR:  Qureshi, with a Q.

THE COURT:  Yes, Mr. Qureshi.

THE PROSPECTIVE JUROR:  I've been involved in several civil lawsuits and ended up negotiating settlements, and it's left a very bad taste in my mouth.

THE COURT:  Thank you, Mr. Qureshi.

Anybody else on the left side?  All right.  In the center.

THE PROSPECTIVE JUROR:  My name is Chris Suarez. I was actually in this building last year for a lawsuit.  We did not win it.  And so, yes, I have some bias towards the civil side.

THE COURT:  All right.  Thank you, sir.

Anybody else?

THE PROSPECTIVE JUROR:  Pavlecka, Steve.

My son was involved in a traffic accident, the plaintiff actually ran into the side of his car and broke his leg.  So there's a little bit of bias there.

THE COURT:  I'm sorry, your last name again.

THE PROSPECTIVE JUROR:  P-A-V-L-E-C-K-A.

THE COURT:  And you think that could affect your impartiality?

THE PROSPECTIVE JUROR:  It might.

81

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE COURT:  All right, sir.  You're Number 45.
All right.  Thank you.

Anybody else?

Have any members of the panel ever had to be a witness during either a civil or a criminal case so that you actually had to sit on the witness stand and be questioned?
All right.  Let's --

THE PROSPECTIVE JUROR:  Montgomery.

THE COURT:  Yes, Mr. Montgomery.

THE PROSPECTIVE JUROR:  I was called as a witness at a criminal trial in 2010 in the State of Oregon.

THE COURT:  And how was the experience as a witness?

THE PROSPECTIVE JUROR:  I was in a college mock trial, so it was nothing new to me.

THE COURT:  All right.  So it wasn't a problem for you?

THE PROSPECTIVE JUROR:  No, ma'am.

THE COURT:  All right.  Thank you, sir.

Anybody else on the left side?  Way in the back.

THE PROSPECTIVE JUROR:  Sisi Lee.

THE COURT:  Yes, ma'am.

THE PROSPECTIVE JUROR:  It was the same lawsuit.
My mom was the plaintiff, I served as one of her witnesses for a dispute over a will/trust.

82

THE COURT:  And you indicated before that was a difficult situation for you.

THE PROSPECTIVE JUROR:  Yes.  It was, like, five years.  We went all the way to the Supreme Court of Virginia.

THE COURT:  All right.  Thank you, Ms. Lee.

THE PROSPECTIVE JUROR:  Thank you.

THE COURT:  Yes, your name, please.

THE PROSPECTIVE JUROR:  Hi.  Lisa Dockins.

THE COURT:  Yes, Ms. Dockins.

THE PROSPECTIVE JUROR:  I was a witness for my best friend's divorce.

THE COURT:  And is there anything about that experience as a witness during a proceeding that you feel could affect your impartiality?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you, ma'am.

Yes, your name please.

THE PROSPECTIVE JUROR:  Chantel Clayborn, C-L-A-Y-B-O-R-N.

THE COURT:  Yes, Ms. Clayborn.

THE PROSPECTIVE JUROR:  I served as a witness in a civil trial for -- I worked for a child care company, and someone had -- basically was seeking justice for her child getting her finger hurt.

83

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE COURT:  And was there anything about your experience as a witness that you feel could affect your impartiality?

THE PROSPECTIVE JUROR:  No, ma'am.

THE COURT:  No.  All right.  Thank you, Ms. Clayborn.

Anyone else in the center section?

THE PROSPECTIVE JUROR:  Stephanie Williams.

THE COURT:  Yes, Ms. Morris.  I'm sorry, what is your last name?

THE PROSPECTIVE JUROR:  Williams.

THE COURT:  I'm sorry.  Ms. Williams.  Yes, ma'am.

THE PROSPECTIVE JUROR:  I've been a witness in a criminal -- for the defense in a criminal trial.  It was a felony trial about a DUI.

THE COURT:  All right.  Was there anything about your experience on the witness stand that you feel could affect your impartiality in judging this case?

THE PROSPECTIVE JUROR:  No, ma'am.

THE COURT:  All right.  Thank you.

I know I saw at least one hand on this side. Yeah.

THE PROSPECTIVE JUROR:  Doreen Washington.

THE COURT:  Yes, Ms. Washington.

THE PROSPECTIVE JUROR:  I was a witness in a rape

84

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

trial.

THE COURT:  For the state or for the defendant?

THE PROSPECTIVE JUROR:  State.

THE COURT:  For the prosecution?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Was there anything about that experience that you feel could affect your impartiality in judging this case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you, ma'am.

Anybody else?  No one else has been a witness in a proceeding?  I don't think I -- I don't need to hear from you again, sir.

Anybody else?  No.  Okay.

Several of the witnesses, including certainly two of our plaintiffs, are going to need the assistance of an interpreter because they do not speak English or English well enough to testify.

Do any of you feel that would create a problem for you in evaluating that testimony if it's coming through a court-certified interpreter?  Anybody?

Many of you have already talked about your experiences having been a contractor in particular.  I want to know, are there are any other jurors who have ever worked as a contractor and/or are in a contracting business, that

85

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

is where your business is to make staff available to other companies, in other words, you provide contractors to other companies.  So we want to now know your experience in sort of the contracting industry.

So are there any people who have not already told us about your contracting background?

Yes, your name, please.

THE PROSPECTIVE JUROR:  Jeffrey Weber, Number 70.

THE COURT:  Yes, sir.

THE PROSPECTIVE JUROR:  I currently work for Booz Allen Hamilton.  I don't have any engagements with contracting related to CACI, but I have been at Booz Allen for 15 years and was at Northrop Grumman prior to that.

THE COURT:  Are you a person who goes out on projects that Booz Allen has contracts for, or what's your actual role in the business?

THE PROSPECTIVE JUROR:  I'm an analyst.  So I'm a lead analyst and will often engage with the government clients.

THE COURT:  And you actually will work for the client then?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  Is there anything about your experiences in that industry that you feel could affect your impartiality in evaluating this case?

86

THE PROSPECTIVE JUROR:  No.

THE COURT:  And I'm going to give you -- give the jury some instructions on the law that applies to contractors.  If you should disagree with the instructions of the Court based upon your experience, can you put aside your disagreement and follow the instructions given by the Court?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  Thank you, sir.

Anybody else on the left side?  Yes, your name, please.

THE PROSPECTIVE JUROR:  Ahmed Weshahy, W-E-S.

THE COURT:  One second, sir.  Can you spell the last name again?

THE PROSPECTIVE JUROR:  W-E-S-H-A-H-Y.

THE COURT:  Yes, Mr. Weshahy.

THE PROSPECTIVE JUROR:  Currently an employee with MCD.  We're a federal contractor.  We have a bunch of sites here in the CONUS and in the CONUS area.

THE COURT:  And what kind of work do you do?

THE PROSPECTIVE JUROR:  It's operations and maintenance.  So we do facility support services for DoD customers.

THE COURT:  All right.  So, in other words, you work for the company, but you actually perform your duties

87

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

at another facility?

THE PROSPECTIVE JUROR:  Yes.  In one of my previous roles with my company, I did work with the business development team.  So I was involved in pricing a contract. I know that -- I believe CACI was the ultimate awardee of that contract, so that's where some familiarity comes in.

THE COURT:  Is there anything about your experience in the contracting world or the contract with CACI that you feel could affect your impartiality in judging this case?

THE PROSPECTIVE JUROR:  No, ma'am.

THE COURT:  All right.  Thank you, sir.

Your name, please.

THE PROSPECTIVE JUROR:  Divittorio.

THE COURT:  Spell the last name.

THE PROSPECTIVE JUROR:  D-I-V-I-T-T-O-R-I-O.

THE COURT:  Try it one more time.

THE PROSPECTIVE JUROR:  D-I-V-I --

THE COURT:  Got it.  Number 14.  Yes, ma'am.

THE PROSPECTIVE JUROR:  I am a contract and security officer for Lumen Technologies.  They are a telecommunication company, and we do federal contracts.

THE COURT:  Right.  You, yourself, do you ever go out and work for the government client?

THE PROSPECTIVE JUROR:  I do visit government

88

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

sites, mainly because I process security clearances for individuals that need to work on classified contracts.

THE COURT: All right. Is there anything about your experience in that line of work that you think could make it difficult for you to be impartial in judging this case?

THE PROSPECTIVE JUROR: No.

THE COURT: And, again, as I said to the previous juror, I'm going to give the juror some instructions about how to approach the issue of contractors working. If you disagree with the definitions and the instructions given by the Court because of your experience, can you put aside your personal experience and decide the case based on the instructions given to you by the Court?

THE PROSPECTIVE JUROR: Yes.

THE COURT: All right. Thank you, ma'am.

Anybody else? Yes.

THE PROSPECTIVE JUROR: Hi. Lorraine Gershman, G-E-R.

THE COURT: I've got you. Number 20.

THE PROSPECTIVE JUROR: Hi. I used to work for Tetra Tech, and one of the projects was we were contracted out by EPA to clean up the anthrax contamination in the Senate.

THE COURT: Was there anything about your

89

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

experience as a contractor that you feel could affect your impartiality in judging this case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  And, again, would you have any problem following the Court's specific instructions about contractors, even if you disagreed with the Court's description of the --

THE PROSPECTIVE JUROR:  I do not believe so.

THE COURT:  All right.  Thank you, Ms. Gershman.

Anybody else on the left side?

THE PROSPECTIVE JUROR:  Mary Matusiewicz.
Following retirement from the Air Force, I worked for three different defense contractors, Sumaria Systems working a single project for the Air Force, then Alion Science and Technology, and Aerospace Corporation, working in the Pentagon as a space systems acquisition analyst.

THE COURT:  Is there anything about your work as a contractor that you feel could make it difficult to be impartial in judging this case?

THE PROSPECTIVE JUROR:  No, ma'am.

THE COURT:  And, again, would you have any difficulty following the Court's specific instructions as to contractors and --

THE PROSPECTIVE JUROR:  No, ma'am.  No, ma'am.

THE COURT:  All right.  Thank you, ma'am.

90

Anyone else on the left side?

THE PROSPECTIVE JUROR:  Number 5, Victor Chen.

THE COURT:  Yes, Mr. Chen.

THE PROSPECTIVE JUROR:  For a brief time, I worked for a contractor that contracted back to the federal government.

THE COURT:  And, again, anything about that experience that you feel could affect your impartiality?

THE PROSPECTIVE JUROR:  I don't think so.

THE COURT:  Would you have any difficulty in following the Court's instructions as to contractor relationships, et cetera, even if you disagreed with it?

THE PROSPECTIVE JUROR:  I don't think so.

THE COURT:  All right.  Thank you, Mr. Chen.

Anybody else on the left side?  Now, in the center section, start in the first row, anybody?  Second row?

THE PROSPECTIVE JUROR:  Debra Schroeder.  I used to work for a company that did antiterrorism design for the government.

THE COURT:  Hold on one second.  The last name is Shutter?

THE PROSPECTIVE JUROR:  Schroeder, S-C-H-R-O-E-D-E-R.

THE COURT:  Yes, Ms. Schroeder.  Number 56.

THE PROSPECTIVE JUROR:  Yes.  So yeah, I used to

91

work for a company that did antiterrorism design for the federal government.

THE COURT: So were you a contractor sent out to do that work?

THE PROSPECTIVE JUROR: On some projects, yes.

THE COURT: All right. Was there anything about that -- those experiences that you feel could affect your impartiality in judging this case?

THE PROSPECTIVE JUROR: No.

THE COURT: And, again, can you follow the specific instructions the Court gives you about contractors, even if you disagree with how it's described?

THE PROSPECTIVE JUROR: Yes.

THE COURT: Yes. All right. Thank you, Ms. Schroeder.

Anyone else on the first or -- yes, sir.

THE PROSPECTIVE JUROR: Nowalk again.

THE COURT: Yes, sir.

THE PROSPECTIVE JUROR: I'm sorry. I currently now work for the Forge Group, LLC for Department of Defense contract, and we work at the facility with the client.

THE COURT: All right. Thank you. Anybody else? Yes, the whole row.

THE PROSPECTIVE JUROR: Last name Hare, Number 23.

THE COURT: Yes, sir.

92

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE PROSPECTIVE JUROR:  From the time frame of about 15 years ago to about 30 years ago, I have worked on a multitude of government contracts as a contractor.

THE COURT:  And you were contracted out to work on --

THE PROSPECTIVE JUROR:  I was contracting out to work on a government site.

THE COURT:  Was there anything about that experience that you feel could affect your impartiality in judging this case?

THE PROSPECTIVE JUROR:  No, ma'am.

THE COURT:  Again, I'll be giving some instructions about how to look at that contractor relationship.  If my description is different from what you might understand it to be, can you put aside your own view and follow the Court's instructions?

THE PROSPECTIVE JUROR:  Yes, ma'am.

THE COURT:  All right.  Thank you, Mr. Hare.

THE PROSPECTIVE JUROR:  Kelly Tischler, 64.

THE COURT:  Yes, Ms. Tischler.

THE PROSPECTIVE JUROR:  I am an acquisition attorney for the Department of Defense Office of General Counsel supporting the secretariat in the Pentagon.  I'm an acquisition law subject matter expert in that office.  I advise senior policymakers on a variety of government

93

contract issues.  I've also, in the past, advised contracting officers directly working for the Defense Logistics Agency, and, for a brief period of time, for Booz Allen Hamilton.

THE COURT:  Was there anything about your work in that respect that you feel could make it difficult for you to be impartial in judging this case?

THE PROSPECTIVE JUROR:  I hope not.  Possibly.

THE COURT:  I mean, again, an issue in this case is going to be the degree to which CACI employees are working for CACI or working for the Army.  I'm going to give some instructions on that issue.

Do you feel that you could follow my instructions, even if you might disagree based upon your legal training or experience?  We can't have a shadow legal advisor in the jury room for the jurors.  That's why I ask you that question.

THE PROSPECTIVE JUROR:  Understood, ma'am.  I will do my best to be as impartial as I can.

THE COURT:  I mean, frankly, I listen and watch jurors as they speak.  It sounds like it may be difficult for you.

THE PROSPECTIVE JUROR:  This is why I'm talking. I think that might -- it might pose a challenge.  I would do my best, but it might be difficult for me to be unbiased.

94

THE COURT:  All right.  Thank you, Ms. Tischler.

THE PROSPECTIVE JUROR:  Robin Du Shole.  I worked as HR director for both SAIC and Booz Allen Hamilton.

THE COURT:  So those are companies that are --

THE PROSPECTIVE JUROR:  Government contractors.

THE COURT:  Yeah.

THE PROSPECTIVE JUROR:  And I've also done recruiting for them, hiring people to work on contracts.

THE COURT:  All right.  Ms. Du Shole, is there anything about that work that you think might make it difficult for you to be impartial in judging this case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  And, again, can you follow the Court's instructions on that area even if you might disagree with the Court's definition of terms or that sort of thing?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Thank you, Ms. Du Shole.

Anyone else in the center section?

All right.  Now on the far right side here.  All right.  We'll start again I guess in the second row.

THE PROSPECTIVE JUROR:  Keily Shay.

THE COURT:  Spell the last name.

THE PROSPECTIVE JUROR:  S-H-A-Y.

THE COURT:  Yes, Ms. Shay.

THE PROSPECTIVE JUROR:  I currently work for an

95

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

FFRDC, and I currently work for a government contractor.

THE COURT:  And how long ago was that?

THE PROSPECTIVE JUROR:  Since 2018.

THE COURT:  All right.  CACI was not the government contractor?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Was there anything about your work as a government contractor that you feel could affect your impartiality in judging this case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  And, again, can you follow the Court's instructions on the issue of contractors and employment?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Even if you disagree based on your experiences?

THE PROSPECTIVE JUROR:  Yep.

THE COURT:  All right.  Thank you, Ms. Shay.

THE PROSPECTIVE JUROR:  Elizabeth Vanderputten.

THE COURT:  Yes, ma'am.

THE PROSPECTIVE JUROR:  I've served as the contracting office of technical representative for several contracts where we've had staff on site doing work.  And I've signed off on numerous grants with different research agencies.

THE COURT:  We will be having testimony, I

96

believe, of at least one contracting officer in this case, and that may be an issue in the case.

Again, do you feel because of your work experience, you might have difficulty in evaluating impartially the testimony in the trial?

THE PROSPECTIVE JUROR:  No.

THE COURT:  No.

And, again, would you have any difficulty in following the instructions of the Court, even if a definition, for example, might be different from what you might feel it should be based on your experience?

THE PROSPECTIVE JUROR:  No.

THE COURT:  No problem.  All right.  Thank you.

THE PROSPECTIVE JUROR:  Doreen Washington.

THE COURT:  Yes, ma'am.

THE PROSPECTIVE JUROR:  I was a contractor from '06 to '17 for the government.

THE COURT:  For the federal government?

THE PROSPECTIVE JUROR:  For the federal government.

THE COURT:  And, again, so you have worked for different government agencies as a contractor?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Is there anything about that experience that you feel could make it difficult for you to

97

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

be impartial in judging this case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  And, again, can you follow the Court's instructions even if you disagree with them?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Thank you, ma'am.

Anyone else?  This is the Washington, D.C. area where I think about half of you have had some experience as contractors.

Have any members of the panel ever served as a juror before either in any civil or criminal trial in either federal or state court?  We'll start on the left side.  So any of you with any prior jury experience, get your hands up nice so we can see you.

THE PROSPECTIVE JUROR:  Hi.  Lorraine Gershman.

THE COURT:  Yes, ma'am.

THE PROSPECTIVE JUROR:  I served as a juror, oh, boy, 20-ish years ago for Fairfax County.

THE COURT:  Was it a civil or a criminal case?

THE PROSPECTIVE JUROR:  It was a criminal case.

THE COURT:  Do you remember what was at issue in the case?

THE PROSPECTIVE JUROR:  Larceny.

THE COURT:  What did the jury do?

THE PROSPECTIVE JUROR:  We found the -- guilty.

98

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE COURT:  Was there anything about your experience in that case that you feel could affect your impartiality in judging this trial?

THE PROSPECTIVE JUROR:  Nope.

THE COURT:  And, again, a different standard of proof.  A criminal case is proof beyond a reasonable doubt; civil cases are proof by a preponderance of the evidence.  It's not as high a standard.

You don't have any problem in following the instructions as to a civil case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you, Ms. Gershman.

Anybody else on the left side?  How about in the center section, anybody who's been a juror?  All right.  We'll start on the aisle.

THE PROSPECTIVE JUROR:  Karen Wilson.

THE COURT:  Yes, ma'am.

THE PROSPECTIVE JUROR:  I served on a Prince William County jury for a child molestation case.  The witness couldn't continue, so the case was dropped.

THE COURT:  The case was dropped?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Was there anything about that experience that you feel could affect your impartiality in serving as a juror in this case?

99

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE PROSPECTIVE JUROR:  Probably.

THE COURT:  You think so?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  All right, Ms. Wilson.  Thank you.

Somebody else in the center section?

THE PROSPECTIVE JUROR:  Mary Spano, Number 61, I think.  This is my fourth time for jury duty.  My first in Prince William County.  The two times I was in Maryland, one was a domestic violence case, and one was a robbery case.

THE COURT:  And do you remember what the juries did in those various cases?

THE PROSPECTIVE JUROR:  I was dismissed on the domestic violence case, and the criminal -- the robbery case the criminals were found guilty.

THE COURT:  Anything about those experiences that you feel could affect your impartiality?

THE PROSPECTIVE JUROR:  No.  Just the criminal one I was just super young and stupid, so ...

THE COURT:  All right.

THE PROSPECTIVE JUROR:  But now I know better.

THE COURT:  Thank you, Ms. Spano.

THE PROSPECTIVE JUROR:  Number 23, Hare.

THE COURT:  Yes, Mr. Hare.

THE PROSPECTIVE JUROR:  While in the military, I was on a military court martial.

100

THE COURT:  You served as a judge, practically?

THE PROSPECTIVE JUROR:  No.  I was --

THE COURT:  Part of the panel?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Was there anything about that experience -- first of all, what happened in that panel, do you remember?

THE PROSPECTIVE JUROR:  It was mostly just stupid little stuff, speeding violations on base, late getting back.  It was just little infractions by some of the junior enlisted.

THE COURT:  Anything about that experience that you feel would make it difficult to be impartial?

THE PROSPECTIVE JUROR:  No.  No, ma'am.

THE COURT:  All right.  Thank you, sir.

THE PROSPECTIVE JUROR:  Alan Luckett, I think 36.

THE COURT:  Yes, Mr. Luckett.  35.

THE PROSPECTIVE JUROR:  In Fairfax County, I served on a jury for attempted murder, abduction and rape.

THE COURT:  What did the jury do in that case?

THE PROSPECTIVE JUROR:  Guilty.  Guilty.  Guilty.

THE COURT:  Anything about that experience that you feel could make it difficult to be impartial?

THE PROSPECTIVE JUROR:  No, ma'am.

THE COURT:  All right.  Thank you, Mr. Luckett.

101

Anyone else in the center section who has served as a juror?  How about on the right side?

THE PROSPECTIVE JUROR:  Elizabeth Vanderputten.

THE COURT:  Yes, ma'am.

THE PROSPECTIVE JUROR:  I was on four juries.  Two criminal -- for the District of Columbia.  Two criminal, one was a rape case; one was a drug case.  One civil case.

THE COURT:  And in the --

THE PROSPECTIVE JUROR:  One case was during the voir dire.  Luckily I was not picked for that because that was a multiple murder case.

THE COURT:  All right.  Well, let's start with the civil case.

Do you remember what was involved in that case?

THE PROSPECTIVE JUROR:  I don't remember the issues, but we found the person -- we found for the plaintiff.

THE COURT:  For the plaintiff.  Did you award damages in that case?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Do you remember what the damages were?

THE PROSPECTIVE JUROR:  I don't really remember. This is many years ago.

THE COURT:  Was there anything about that experience and that process that you feel could affect your

102

impartiality in judging this case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Now, in the two criminals cases, what happened in those cases?

THE PROSPECTIVE JUROR:  One case found guilty, and one not guilty.

THE COURT:  All right.

THE PROSPECTIVE JUROR:  And I was the chairman of the not guilty.

THE COURT:  You were the foreperson of the one they found not guilty.  All right.

Was there anything about those experiences that you feel could affect your impartiality in judging this case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Thank you, ma'am.

Anybody else on this side on the right side?

I want to give the jury an idea about how our trial days run.  After today, I'm going to want the trial to start at 9:30 rather than 10:00.  I run my trials fairly close to 6:00.  We sometimes stop a little bit before that, but that pretty much is the standard trial day.

I give the jurors a one-hour lunch break at 1:00 and a mid-morning and a mid-afternoon break of about 15 to 20 minutes.

103

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

We obviously need jurors who can give us their full time and attention for the possibly two-week time period we're talking about.  Again, with the exceptions of next Tuesday, no court, and Monday, November 11, I believe I have the right date there, yeah, that's a Federal holiday, so there would not be any court on that day.

Are there any of you, either because of pressing personal issues, such as child care, medical appointments, unchangeable business plans, et cetera, for which you feel you could not sit for that time period?  And also with this question is whether any of you have any physical or medical issues that would interfere with your ability to serve.

Now, we can make certain accommodations.  I've had jurors, for example, who are diabetic who need to be able to take breaks to get some sugar.  We can provide either more breaks or the ability to have small snacks while in the course of the trial.

People with back trouble can stand up and move around.  As long as you're paying attention, you're not required to sit constantly in the jury box.  You have to stay there, but, I mean, you can stand up and stretch.  So we do try to make as many accommodations as we can, but we obviously need jurors who can give their full time and attention to the trial.

So if now any of you have any issues with the

104

length of the trial or with your ability to sit, this is the time to let us know.

So let's start on the first row of the left side. Is there anybody in Row 1 who has an issue with that?  No.

How about the second row?  Yes.  Your name, please, sir.

THE COURT SECURITY OFFICER:  He would like to approach, Your Honor.

THE COURT:  Yes.

(Bench conference.)

THE COURT:  Your name again please.

THE PROSPECTIVE JUROR:  Patrick Gaston.

THE COURT:  Yes, Mr. Gaston.

THE PROSPECTIVE JUROR:  So we're involved in a big move from Northern Virginia to Washington, D.C., and it's all occurring in the next couple of weeks, so I really love and appreciate being here and doing my duty, but I think I'll be very distracted, and I'll be available on a very limited basis to be here.

THE COURT:  So is it your company or your --

THE PROSPECTIVE JUROR:  Oh, no.  No.  No.  It's a personal move.  It's a family move.

THE COURT:  You're actually moving in the next two weeks?

THE PROSPECTIVE JUROR:  Yeah.  Yeah.  Yeah.  We're

105

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

packing, we're moving.  It's a big move.  We're moving from an 8,000 square foot place in Virginia to a 2,200 square foot in D.C.  We've got to put things in storage, we've got to pack things.  It's a burden, to say the least.

THE COURT:  And there's not enough other family members around?

THE PROSPECTIVE JUROR:  It's just my wife and I, and she works full time.

THE COURT:  And you're retired at this point?

THE PROSPECTIVE JUROR:  I refuse to be retired.

THE COURT:  All right.  We would like to have you available for the jury.

THE PROSPECTIVE JUROR:  I would love to be available, but I just wanted to be very transparent and honest.

THE COURT:  All right.  Thank you, sir.

THE PROSPECTIVE JUROR:  Thank you, Your Honor.

(Open court.)

THE COURT:  All right.  Are there any other folks on the left side of the courtroom?

THE PROSPECTIVE JUROR:  Michael Plaugher, 49.

With my position in the inspection service, I'm the only one actually in the country that does that, so it would just create a hardship for the agency.  Aside from that, I don't have any personal --

106

THE COURT:  Are you involved at all in some of these issues with mailboxes that are having problems?

THE PROSPECTIVE JUROR:  Tantamount.  I mean, just a very little bit.

THE COURT:  I'm sorry?

THE PROSPECTIVE JUROR:  Just a cursory level. Nothing serious.

THE COURT:  And your agency can't do without you for two weeks?

THE PROSPECTIVE JUROR:  They may have to, but there's no one to backfill my position within the agency, so it would just create the hardship for them.

THE COURT:  If you were called to be a juror, would the fact that you knew your employer might not be happy with that, can that affect in any respect your ability to be impartial and fair in judging this case?

THE PROSPECTIVE JUROR:  I don't believe so.

THE COURT:  All right.  Thank you.

Anybody else on the left side?

THE COURT SECURITY OFFICER:  He would like to approach.

THE COURT:  Yes.

(Bench conference.)

THE PROSPECTIVE JUROR:  If you've got a medical issue, I guess now is the time to tell you.

107

THE COURT:  Yes.  Your name, please.

THE PROSPECTIVE JUROR:  John Smith.  I'm in the 60s somewhere.  Exactly 60.  Crohn's disease.

THE COURT:  I understand.

THE PROSPECTIVE JUROR:  I'm on HUMIRA, so I'm in clinical remission right now, so I can sit here today and have a good time, I can sit here tomorrow and have a good time, but you never know when that good time will end.

THE COURT:  And when you have a bad time, is it constant?

THE PROSPECTIVE JUROR:  No.  It's in clinical remission.  So right now my GI doctor is like enjoy life.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  You know, but beware.

THE COURT:  If it flares up, are you able -- we give you a lot of breaks.

THE PROSPECTIVE JUROR:  I'm able to give you notice and say I need a break whenever you can give me a break.

THE COURT:  Fine.  We can accommodate that.

THE PROSPECTIVE JUROR:  Correct.

THE COURT:  With that accommodation, would you be sufficiently comfortable and be focused on --

THE PROSPECTIVE JUROR:  Yeah.  I used to be at a point where I couldn't do that, but now in clinical

108

remission, you can say, hey, I need a break --

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  -- whenever you get a chance, you know, and I'm good to go.

THE COURT:  Bad timing.  Thank you, Mr. Smith.

THE PROSPECTIVE JUROR:  Okay.  Thank you.

(Open court.)

THE COURT SECURITY OFFICER:  Would like to approach, Your Honor.

THE COURT:  All right.

(Bench conference.)

THE COURT:  Your name, sir.

THE PROSPECTIVE JUROR:  Qureshi with a Q.

THE COURT:  Yes, Mr. Qureshi.

THE PROSPECTIVE JUROR:  So my daughter has a two-day music festival in Fredericksburg that I have to take her to.  It's been on the scheduled for months.

THE COURT:  When will you be gone?

THE PROSPECTIVE JUROR:  All day next Friday and Saturday.  But then also I own a business, me and my father own a business.  One of us needs to be there Wednesdays and Fridays to sign payroll and vendor's checks, and we would have to make -- go out of our way to make special accommodations if one of us isn't there, and he's going on a cruise this weekend for the next two weeks.

109

THE COURT:  Thank you, Mr. Qureshi.

Counsel, I don't want to wear you out, so why don't you just sort of stay by the bench and we'll see how many ...

MR. O'CONNOR:  Okay.

(Open court.)

THE COURT SECURITY OFFICER:  Ma'am, come up.  Come forward.

(Bench conference.)

THE PROSPECTIVE JUROR:  Juror Number 25, Sandaldeep Jassar.

THE COURT:  Yes, ma'am.

THE PROSPECTIVE JUROR:  So for two weeks my husband is in India.  25, J-A-S-S-A-R.

THE COURT:  24.

THE PROSPECTIVE JUROR:  24.

So my husband, he went to India for two weeks.  My mother-in-law, father-in-law actually went.  Today I asked for my sister to come here, I have two kids, to drop them to the school.  So for the next two weeks, I'm not sure if I can be able to.  It's a one-hour drive also.

THE COURT:  So your children are in elementary school?

THE PROSPECTIVE JUROR:  One in elementary, one in middle.

110

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE COURT:  All right.  And right now, normally who would help you out with child care?

THE PROSPECTIVE JUROR:  Me, myself.  I do take care of the kids, and then I go to work.  I have my own company.  I work for my own company.  I, like, drop my son, and then I go to work.  8:30.

THE COURT:  So it's an hour commute from where -- where do you live?

THE PROSPECTIVE JUROR:  I live in Bristow, Virginia, near to Manassas.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  I was just wondering -- if it's really important, then it's fine, but if like you can do exception.

THE COURT:  You have coverage for today?

THE PROSPECTIVE JUROR:  I have coverage for today.  I asked my sister-in-law for help.

THE COURT:  Could she help you for the next five or six days?

THE PROSPECTIVE JUROR:  I have to ask her.  She might help.

THE COURT:  Does she work?

THE PROSPECTIVE JUROR:  She works.

THE COURT:  Would she take time off from work to be able to --

111

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE PROSPECTIVE JUROR:  She works with me.

THE COURT:  Oh, she works with you?

THE PROSPECTIVE JUROR:  Uh-huh.

THE COURT:  All right.  If you are -- if it winds up that you are called to be a juror for the trial, would you be able to pay full time and attention to the case?

THE PROSPECTIVE JUROR:  I think so.  I just wanted to let you know.

THE COURT:  All right.  Thank you, Ms. Jassar.

THE PROSPECTIVE JUROR:  Okay.

(Open court.)

THE COURT:  Is there anyone else on the left side?  If you can answer from there, that's fine.

Yes, ma'am.

THE PROSPECTIVE JUROR:  Do I have to say my name?  Yahaida Divittorio.  I pick up my son at --

THE COURT:  Sorry.  Ms. Divittorio; correct?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Yes, ma'am.

THE PROSPECTIVE JUROR:  I pick up my son at 3:15 every day from school.

THE COURT:  All right.  Is there anybody who can help you out with child care for a week or two?

THE PROSPECTIVE JUROR:  I can try to make it work.

THE COURT:  Again, if you're chosen to be a juror,

112

you've got to be here.

I mean, how likely is it that you can get someone to help you out?  I assume you have someone lined up for today.

THE PROSPECTIVE JUROR:  I'm sorry?

THE COURT:  I assume you have someone lined up for today.

THE PROSPECTIVE JUROR:  Yes.  Yes.  My husband.  We -- he helps, and -- between the two of us, but sometimes with his work, it's hard.

THE COURT:  If you were chosen to be a juror, would the concern that you have about, you know, your husband covering or getting a neighbor or another family member to cover, would that be a problem for you?  In other words, would you find that it was distracting you from serving as a juror?

THE PROSPECTIVE JUROR:  It could be, yes.

THE COURT:  All right.  Thank you, ma'am.

Fourteen.  Fourteen.

Yes, ma'am -- or sir.

THE PROSPECTIVE JUROR:  Dillon Clegg again.

THE COURT:  Yes, Mr. Clegg.

THE PROSPECTIVE JUROR:  So I work for a contractor called SC Companies out of Manassas.  They already know that I'm here, but I'm one of, like, three certified techs for

113

the IICRC.  It's a water mitigation company, and we have to have a certified tech in the field at all times, and currently we only have three certified techs, and we go on an on-call schedule which is a -- sorry, mandatory 24/7 service.  They can probably do without me for a week, but I don't know about two to three weeks depending on the size of the trial.

THE COURT:  All right.  And Mr. Clegg, if you were called to be a juror for this case, though, would you be able to be fully impartial in judging it other than what you may have already told me?

THE PROSPECTIVE JUROR:  I guess.

THE COURT:  All right.  Thank you, sir.

Anybody else on the left side?

THE COURT SECURITY OFFICER:  Sir, come forward.

THE COURT:  Mr. Chen?

THE PROSPECTIVE JUROR:  Yes.

(Bench conference.)

THE PROSPECTIVE JUROR:  My question is --

THE COURT:  Number 5.

THE PROSPECTIVE JUROR:  So my question is, I was talking to my boss before I came here, and I guess this is just the question about the two weeks.  I mean, I think I'm okay to do this, but we're pretty thin in our office, and it's probably not as bad as that guy back there.  I guess

114

maybe I'm asking your counsel, can I call my boss?

THE COURT:  He has no choice.  You're a federal employee.

THE PROSPECTIVE JUROR:  I know.  I know.

THE COURT:  And it can't interfere with your employment.

THE PROSPECTIVE JUROR:  Got you.

THE COURT:  It's always a sacrifice.  And, frankly, you know, we push cases, we push the lawyers, and they're trained to push a case as fast as we can.

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  I'm hoping it doesn't go the full two weeks.

THE PROSPECTIVE JUROR:  Got ya.  Okay.  Okay.

THE COURT:  But, in any respect, if you were to be called, would the fact that you might be a little concerned about what's going on --

THE PROSPECTIVE JUROR:  I think I would be okay.  Like I said, it's something probably a number of people here are saying, the potential hardship to the office.

THE COURT:  Well --

THE PROSPECTIVE JUROR:  Yeah, I know.  I know.  It may not be a --

THE COURT:  And you can work on Election Day.

THE PROSPECTIVE JUROR:  Oh, that's right.  Well,

115

thanks for that.

(Open court.)

THE COURT:  Ms. Lee.  Yes, ma'am.  Number 32.

(Bench conference.)

THE PROSPECTIVE JUROR:  Hi.  So I've been selected for a final round of interviews with Booz, and I didn't want to say it in public because I know the HR director of Booz is here.  It's embarrassing if I don't get the job.  But also it's the final round of interviews.  It's a once-in-a-lifetime opportunity with their chief information security officer for next week.

I didn't check my email because I don't have my cell phone with me.  I don't know the exact schedule, but I really prefer not to miss it.

THE COURT:  I understand.

THE PROSPECTIVE JUROR:  It's a final round.  I really don't want to miss this stuff.  I have evidence.  I have, like, the email in my phone.

THE COURT:  All right.  Thank you, Ms. Lee.

THE PROSPECTIVE JUROR:  Thank you so much.

And there's another reason.

I work for Capital One, and we have our year-end performance review, like, this upcoming two, three weeks.  I have to create templates for my direct reports to defend them in cross-calibrations.  Only I, as their people leader

116

or manager, can do that.  My director won't know enough about their performance to adequately defend them in cross-cals.  And Capital One is very strict about letting go, like, 8 to 15 percent of their workforce every year.  We do this twice a year, so I have to be there to defend them.  Our cross-calibration templates would be due soon, plus feedback.

THE COURT:  So it would be a conflict?

THE PROSPECTIVE JUROR:  My direct reports would not be well defended by my director because he's not close enough to our work for our year-end process.  Thank you so much.

(Open court.)

THE COURT SECURITY OFFICER:  Sir, come forward.

(Bench conference.)

THE COURT:  Your name, please.

THE PROSPECTIVE JUROR:  Yes.  My name is Than Dang.

THE COURT:  Your last name, please.

THE PROSPECTIVE JUROR:  Dang, D-A-N-G.

THE COURT:  Spell it just one more time.

THE PROSPECTIVE JUROR:  D-A-N-G.

MR. O'CONNOR:  12.

THE COURT:  Yeah.  Yes, sir, Mr. Dang.

THE PROSPECTIVE JUROR:  I'm here because this

117

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

weekend I have family vacation.  I've been unable to do, like, jury duty for three week.

THE COURT:  I'm sorry.  You have a vacation coming up?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Have you paid for --

THE PROSPECTIVE JUROR:  Already.  Already planned for three months ago.

THE COURT:  Where are you going?

THE PROSPECTIVE JUROR:  Jamaica.

THE COURT:  Jamaica?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  It's prepaid tickets?

THE PROSPECTIVE JUROR:  No.  Already paid for, whole family.

THE COURT:  You've already paid?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  So it's nonrefundable?

THE PROSPECTIVE JUROR:  Nonrefundable, yes.

THE COURT:  Thank you.

THE PROSPECTIVE JUROR:  Thank you, Your Honor.

MR. MOLSTER:  Was that 25?

MR. O'CONNOR:  12.

THE COURT:  That was 12.

(Open court.)

118

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE COURT:  Yes, sir.

THE PROSPECTIVE JUROR:  Jeffrey Weber, Number 70.

THE COURT:  Yes, Mr. Weber.

THE PROSPECTIVE JUROR:  I'm currently receiving treatment for a mobility issue in my left knee, which necessitates weekly gel injection shots, as well as twice weekly physical therapy, which has all been scheduled.

THE COURT:  So you have a shot scheduled for this week?

THE PROSPECTIVE JUROR:  I had my shot for this week, but the next two weeks I have a shot scheduled at the orthopedist, and they're only open 9 to 5.

THE COURT:  Would it be possible to get next week's shot on Tuesday?  I mean, it's not a Federal holiday; it's just Election Day.

THE PROSPECTIVE JUROR:  I'm not sure.  It would be dependent on their scheduling.  But I had scheduled this about a month ago.  So my guess is not with such short notice, but I could call.

THE COURT:  And in terms of the physical therapy, what happens if you miss a session or two?

THE PROSPECTIVE JUROR:  The physical therapy isn't a big issue.  It's -- there's at home stuff that can be done.  So I could miss the physical therapy, but the shots are recommended and scheduled as part of the treatment.

119

THE COURT:  Okay.  And you said they're open from 9 to 5?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  How close to this location is the --

THE PROSPECTIVE JUROR:  It's in Reston, so not very.

THE COURT:  All right.  Mr. Weber, we'll see what we can do.

Anybody else on the left side?  All right.  Now in the center section.

THE COURT SECURITY OFFICER:  Ma'am, come up.

(Bench conference.)

THE COURT:  Yes, ma'am.  Your name again, please.

THE PROSPECTIVE JUROR:  Monica Moir.

THE COURT:  Yes.

THE PROSPECTIVE JUROR:  So I work for a super PAC, and we're in the last few days of our election stretch before Election Day, and I do manage a team over there.  So that is my main work issue until Tuesday.  But then I do have a short trip planned starting next Thursday from Thursday to Monday that's already paid for.

THE COURT:  Are you going with anybody else?

THE PROSPECTIVE JUROR:  Yeah.  With my fiancée.

THE COURT:  It's already been paid for?

THE PROSPECTIVE JUROR:  Yeah.  Thank you.

120

THE COURT SECURITY OFFICER:  They're starting to ask about bathroom breaks.  We've held them off.

THE COURT:  We're almost done.  We're almost done.

(Open court.)

THE COURT:  Folks, we should be done in about five minutes, those of you who need to leave for a break.  So let's see if we can move this as quickly as possible.

All right.  First of all, let's do it this way. Those of you who don't need to approach the bench but have an answer to this question, let's do those folks first.  All right.

THE PROSPECTIVE JUROR:  Last name Suarez.  I have a radiology appointment on Friday.  I can look into getting that switched out, but I'm also flying in a technician from Italy.  I've been working on that for three months to get this technician in from Italy.

THE COURT:  That's okay, Mr. Suarez.  Thank you. I don't need to hear anything more.  Okay.

THE PROSPECTIVE JUROR:  Stephanie Bell, B-E-L-L.

THE COURT:  Yes, Ms. Bell.

THE PROSPECTIVE JUROR:  I have a work trip planned for next week that's been on the books since June, November 7th through the 10th.

THE COURT:  What company do you work for?

THE PROSPECTIVE JUROR:  I work for one of the

121

local universities.  I'm a professor.

THE COURT:  And is that a trip that could be postponed?

THE PROSPECTIVE JUROR:  No.  It's for a specific event taking place during that time period.

THE COURT:  Are you going as a spectator or as a participant?

THE PROSPECTIVE JUROR:  Both.

THE COURT:  All right.  Thank you, Ms. Bell.

THE PROSPECTIVE JUROR:  Thank you.

THE COURT:  Yes.

THE PROSPECTIVE JUROR:  So first name Tinsae, last name Mengesha.

THE COURT:  How do you spell the last name?

THE PROSPECTIVE JUROR:  M-E-N-G-E-S-H-A.

THE COURT:  Yes, sir.

THE PROSPECTIVE JUROR:  So I'm a senior software engineer/data analyst, and I'm in the process of changing a job.  So I have two job interviews that I cracked the first round for, and the next one is going to require me to prepare a lot and take crash courses.  So if I'm taking those courses, I'll be up until, like, 3 or 4 a.m., and then the next morning when I come, I'm probably not going to provide, you know, a fair operation in terms of, like, abilities.

122

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE COURT:  When is the exam itself going to be held?

THE PROSPECTIVE JUROR:  So the first round of interviews, one was yesterday, so I passed that.  And another one was before last week, I passed that as well.  The next round, which is more technical stuff, will be held, one is on next Tuesday.  That's -- I know it's a free day, but still I have to be prepared for it.  And then another one is on Thursday.  Still, I need to be prepared for it.  And these are high-paying jobs.

THE COURT:  All right.  Thank you, Mr. Mengesha.

THE PROSPECTIVE JUROR:  Thank you.

Hi.  Kathryn Morris.

THE COURT:  Yes, Ms. Morris.

THE PROSPECTIVE JUROR:  I have kids that need rides from school, rides to practices.  I'm supposed to be traveling on the 14th with my one daughter.

THE COURT:  Is there anyone who can help you out with the child care?

THE PROSPECTIVE JUROR:  Two weeks is a long time.  Like, my husband can pick up today, but, I mean, he's on calls and has different things where he can't leave, so I just don't know how I'm going to work it for two weeks.

THE COURT:  Thank you, Ms. Morris.

THE PROSPECTIVE JUROR:  Stephanie Williams.

123

THE COURT:  Yes, Ms. Williams.

THE PROSPECTIVE JUROR:  In regards to child care, I'm a single mother of a school-aged child.  He's in before and after school care in Prince William County.  It requires me to pick him up by 6 p.m.

Also, there's no school Friday, Monday or Tuesday of next week, so there won't be any before or after-school care.  I have made arrangements with my employer to work from home those days, so I don't have any other arrangements for child care.

THE COURT:  Thank you, Ms. Williams.

THE PROSPECTIVE JUROR:  Chris Damon-Cronmiller, Juror Number 11, I believe.

So I do work for the civil service; however, there's only -- I'm one of only four people in my agency of 200,000 people that can actually do what I do, which is not directly involved in civil justice -- in the civil justice system, but it is reviewing and drafting decisions on civil rights discrimination cases.  And they -- my boss does know that I'm going to be here at least until Friday, but at least for my agency, being absent for two weeks might constitute a work stoppage, but that would not impact my impartiality as a potential juror.

THE COURT:  All right.  Thank you, sir.

THE PROSPECTIVE JUROR:  Paige Kelly, Number 27.  I

124

have a work trip scheduled for tomorrow and Friday.  I will be out of state.

THE COURT:  Who do you work for?

THE PROSPECTIVE JUROR:  I work for a think tank in Crystal City.

THE COURT:  What would happen if you could not make those two out-of-town visits?

THE PROSPECTIVE JUROR:  Somebody else can cover for me, but I'm really the specialist that is going to be covering the event.  And then it's a priority of my CEO, so somebody else would not do as well of a job as me.

THE COURT:  Are you a presenter?

THE PROSPECTIVE JUROR:  No, but I'm working the event.

THE COURT:  When you say "working the event," what does that mean?

THE PROSPECTIVE JUROR:  I work on the communications team, so I'm covering the event online.

THE COURT:  So you're basically communicating it?

THE PROSPECTIVE JUROR:  Yeah.  I work in social media.  And it's a priority of our CEO that we have good social media coverage of the event.

THE COURT:  If you were required to be a juror here, and so they would have to make other arrangements, do you feel in any respect you would be distracted or have

125

difficulties in still being impartial to the parties because of that?

THE PROSPECTIVE JUROR:  I think I would be focused on thinking about how the event would be going, but I would try my best to keep the focus here.

THE COURT:  Thank you, Ms. Kelly.

Anybody else in the center section?

How about on the -- I know some of you want to approach, but those of you who don't need to approach the bench, is there anybody else?  How about on the right side.

THE PROSPECTIVE JUROR:  I have a vacation.

THE COURT:  I'm sorry, I need your name again.

THE PROSPECTIVE JUROR:  Oh.  Keily Shay, S-H-A-Y.

THE COURT:  Yes, Ms. Shay.

THE PROSPECTIVE JUROR:  I have a vacation planned to Spain from November 7th to November 12th.  We're celebrating my husband's 30th birthday.  It's also the first time we're going out of the country since we were married during COVID.  The hotel and the flights are not refundable.

THE COURT:  Thank you, Ms. Shay.

Anybody else?

THE PROSPECTIVE JUROR:  Elizabeth Vanderputten.  I have a vacation planned starting Wednesday to Europe.

THE COURT:  To Europe?

THE PROSPECTIVE JUROR:  Yep.

126

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE COURT:  All right.  So that's also probably not refundable.  All right.  Thank you, ma'am.

THE PROSPECTIVE JUROR:  Maria Rosas.

THE COURT:  Can you spell the last name?

THE PROSPECTIVE JUROR:  R-O-S-A-S.

THE COURT:  Yes, ma'am.

THE PROSPECTIVE JUROR:  I'm working at a preschool, and I can be absent one day, but many days it's going to be crazy.

THE COURT:  I'm sorry, what is your position?

THE PROSPECTIVE JUROR:  Assistant teacher.

THE COURT:  An assistant teacher.

THE PROSPECTIVE JUROR:  Yes.  And also a Spanish teacher.

THE COURT:  All right.  But if you were called to be a juror, is that going to be a problem for you?  For you?

THE PROSPECTIVE JUROR:  It's going to be hard, because, you know, my first language is Spanish.

THE COURT:  You have -- have you had trouble understanding some of what I have said today?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  Thank you, ma'am.

THE PROSPECTIVE JUROR:  Thank you.  My name is Helen Yohannes.

THE COURT:  What's your last name?

127

THE PROSPECTIVE JUROR:  Helen Yohannes.

THE COURT:  I'm sorry, can you spell it, please?

THE PROSPECTIVE JUROR:  H-E-L-E-N.

THE COURT:  Spell your last name again, please.

THE PROSPECTIVE JUROR:  Yohannes, Y-O-H-A-N-N-E-S.

THE COURT:  Yes, Ms. Yohannes.

THE PROSPECTIVE JUROR:  I have barrier language. I don't understand.

THE COURT:  Just a second.  Yes, ma'am.  What?

THE PROSPECTIVE JUROR:  I have barrier language. I don't understand.

THE COURT:  You're having trouble understanding?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  Thank you, ma'am.

All right.  Anybody else?  I think in the first row we had somebody.  Yes, your name, please.

THE PROSPECTIVE JUROR:  Barbara Cornwell.  I think I'm Number 9.

THE COURT:  Yes, Ms. Cornwell.

THE PROSPECTIVE JUROR:  I have a work trip scheduled for the 18th.  So as long as we're under the two weeks.

THE COURT:  Oh, I don't think we're going to still be in session on the 18th.

THE PROSPECTIVE JUROR:  Okay.  Perfect.  Thank

128

you.

THE COURT:  Other than that, you're no problem.

THE PROSPECTIVE JUROR:  Correct.  I just want to make that note.  Thank you.

THE COURT:  Thank you, Ms. Cornwell.

THE PROSPECTIVE JUROR:  Hamp, Paul.  H-A-M-P is the last name.  Child care duties.  Loudoun County Public Schools --

THE COURT:  I'm sorry.  What is your last name?

THE PROSPECTIVE JUROR:  H-A-M-P.

THE COURT:  H-A-M-P.  Yes, Mr. Hamp.

THE PROSPECTIVE JUROR:  Yes, ma'am.

Child care.  Loudoun County Public Schools are closed today through next Tuesday.  So I can be here for that time, but my wife has a work trip, and she will be out the following week in which I do not have coverage for.

THE COURT:  And there are no other family members or friends who could watch the children?

THE PROSPECTIVE JUROR:  Not for that duration, no.

THE COURT:  All right.  Thank you, sir.

THE PROSPECTIVE JUROR:  Eugenia Kim.

THE COURT:  Yes, Ms. Kim.

THE PROSPECTIVE JUROR:  I have a preplanned family trip next Wednesday through Friday.

THE COURT:  Is it out of the area?

THE PROSPECTIVE JUROR:  Yes, out of town.

THE COURT:  I'm sorry?

THE PROSPECTIVE JUROR:  Yes, out of town.
Florida.

THE COURT:  Florida.  So have tickets been paid
for?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  Thank you.  Anybody else?

THE PROSPECTIVE JUROR:  Number 23, Walt Hare.

THE COURT:  Yes, Mr. Hare.

THE PROSPECTIVE JUROR:  I have prepaid
reservations starting Friday through Tuesday.

THE COURT:  So this coming Friday?

THE PROSPECTIVE JUROR:  Yes, ma'am.

THE COURT:  And is it out of town?

THE PROSPECTIVE JUROR:  It's an hour and a half
away.  That's not too far, but it's nonrefundable.

THE COURT:  It's not refundable?

THE PROSPECTIVE JUROR:  Correct.

THE COURT:  All right.  Thank you, Mr. Hare.

All right.  Is there anybody else?  Does anyone
need to approach the bench, or have I -- all right.

THE COURT SECURITY OFFICER:  Sir, come forward.

(Bench conference.)

THE COURT:  What's your name, please?

130

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE PROSPECTIVE JUROR:  Steve Pavlecka, Juror Number 45.

THE COURT:  Let me get to the page.

THE PROSPECTIVE JUROR:  Yes, ma'am.

THE COURT:  Yes, sir.

THE PROSPECTIVE JUROR:  Right now my wife is battling Stage 4 cancer.

THE COURT:  I'm sorry.

THE PROSPECTIVE JUROR:  She's got a battery test tomorrow and is starting a clinical trial on the 13th. Needless to say, I'm not sleeping a lot right now.

THE COURT:  I wish you the best.

THE PROSPECTIVE JUROR:  I just wanted to let you know.  Thank you.

THE COURT:  Is there anyone else who wanted to approach the bench?  Anyone else wanted to --

THE COURT SECURITY OFFICER:  Ma'am, come forward.

THE COURT:  Yes, ma'am.  Your name.

THE PROSPECTIVE JUROR:  Phillips-Bernard, Number 48.

THE COURT:  Yes, ma'am.

THE PROSPECTIVE JUROR:  Post chemotherapy neuropathy.  I'm also always in pain.  The hour plus that it took to drive here left me in a lot of pain, so sitting in a jury box is going to be very distracting.

131

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE COURT:  Thank you, ma'am.

THE PROSPECTIVE JUROR:  Thank you.

(Open court.)

THE COURT:  Yes, sir.  You can start coming forward.

THE COURT SECURITY OFFICER:  Sir, come forward.

(Bench conference.)

THE PROSPECTIVE JUROR:  Dan Moore.  Dan Moore.

THE COURT:  Number 41.  Yes, sir.

THE PROSPECTIVE JUROR:  Sorry.  A few things.  So the commute, it's probably an hour and a half at minimum.

THE COURT:  Where do you live?

THE PROSPECTIVE JUROR:  I live out in Fauquier County, like near the Rappahannock almost.

The lowest thing is that I volunteer on Tuesdays and Thursdays starting at 2:30, which I won't be able to do, and they'll be fine.  Like, she'll be fine with me not there.

I'm self-employed, though, so I will not be able to provide service to my clients or answer questions to contractors.  And I'm not inundated with calls all day, but I do get them, and I have active projects right now.

THE COURT:  What kind of business?

THE PROSPECTIVE JUROR:  Interior design.  So there's active construction happening right now.  So I'm not

132

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

available to do that.  Again, no one's going to die.

And then I'm taking a continuing education class.
Now, it's in the evenings, it doesn't start until 6, but I
have to be online at 6, and I can't be in the car, I can't
be -- I have to be in front of the computer at 6, and that's
on Mondays and Wednesdays.

THE COURT:  And that's related to your work?

THE PROSPECTIVE JUROR:  Correct.  Yeah.  And it's
over the beginning of December.  It's not super long, but
it's a three-and-a-half-hour class Mondays and Wednesdays.

THE COURT:  You've had to pay for that?

THE PROSPECTIVE JUROR:  Uh-huh.  Yeah.  And I'm
already in it.  I'm in the middle of it.  I'm like in seven
classes.

THE COURT:  Thank you, Mr. Moore.

THE PROSPECTIVE JUROR:  Thank you.  And I
understand the importance of this, and I'm happy to do it, I
just ...

THE COURT:  That's life.

THE PROSPECTIVE JUROR:  Yes.  Yes.

THE COURT:  Yes, ma'am.  Your name, please.

THE PROSPECTIVE JUROR:  Rimaz Eldirdieri.

THE COURT:  Spell the last name.

THE PROSPECTIVE JUROR:  E-L-D-I-R --

THE COURT:  Yes.

133

THE PROSPECTIVE JUROR:  So I have two issues.  One issue is I'm not sure if I'm going to be biased coming on their side.

The second issue is, my company is a non-profit, and our tax form and state registration renewal is due by the 15th.  So I'm the only one who's going to be handling that.  The person who can back me up is on vacation right now, and I don't think I can be here for two weeks.

THE COURT:  All right.  And you also said you thought you might have a bias?

THE PROSPECTIVE JUROR:  Yeah.  I don't think I can ...

THE COURT:  All right.  We would love to have you serve.  I appreciate the answer.

THE PROSPECTIVE JUROR:  Thank you so much.

(Open court.)

THE COURT:  Are there any other jurors who need to be heard on this?

All right.  Ladies and gentlemen, I've asked you a range of questions, and I know you've been here quite a while, but I want to know now whether, for any reason other than what you've already told me, you feel you could not sit as a completely fair and attentive juror and follow the instructions of the Court.  Is there anybody?

All right.  Counsel, come back up to the bench.

134

(Bench conference.)

THE COURT:  First of all, Mr. Molster, is there any additional voir dire you want the Court to put to the jury?

MR. MOLSTER:  No, Your Honor.

THE COURT:  You're satisfied with the voir dire?

MR. MOLSTER:  Yes, Your Honor.

MR. O'CONNOR:  Your Honor, one of the jurors, they have an employer listed that is completely -- it's FRS.  We don't have any idea what that is.

THE COURT:  Which juror is it?

MR. O'CONNOR:  28.

THE COURT:  Allison Kennedy.

MR. O'CONNOR:  Right.  We just don't know what the company is.

(Open court.)

THE COURT:  Ms. Kennedy, where are you? Ms. Kennedy, just stand up for a second.  Can you tell us, what company do you work for?

THE PROSPECTIVE JUROR:  The Federal Reserve.

THE COURT:  The Federal Reserve?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Thank you.  We just couldn't quite tell from the abbreviation in the paperwork.

THE PROSPECTIVE JUROR:  Okay.  Sorry.

135

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE COURT:  Thank you.

(Bench conference.)

THE COURT:  Okay.

MR. O'CONNOR:  Okay.

THE COURT:  All right.  Now, so was there any objection to the voir dire?

MR. O'CONNOR:  No objection to the voir dire, Your Honor.

THE COURT:  So here's what I'm going to do based on my notes.  All right.  I'm going to tell you the jurors that I think should be excused for cause.  All right.

Number 3, Stephanie Bell.  She's the professor. So you have to tell me if you object to that person being stricken for cause.  Number 3, Bell.

MR. MOLSTER:  Judge, on the hardship; right?

THE COURT:  Work hardship, yeah.  Any objection?

MR. MOLSTER:  I mean, I like her, but I don't think there's a basis to object.

THE COURT:  There's going to be a lot to strike.

Number 4, Caney.

MR. O'CONNOR:  No objection.

THE COURT:  Caney knows CACI people.  He's a government contracting person.

MR. O'CONNOR:  Azmy was his professor.

THE COURT:  Yes.

136

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

MR. MOLSTER:  I don't have him as somebody who said he wouldn't be impartial.

THE COURT:  No.  No.  No.  The --

MR. MOLSTER:  Was this the guy with the neighbors?

THE COURT:  He's --

MR. O'CONNOR:  Azmy is his law professor.

THE COURT:  Four is out.

Number 6, Dillon Clegg.

MR. O'CONNOR:  He's 7, Your Honor.

THE COURT:  I'm sorry, 7.

MR. MOLSTER:  No objection.

THE COURT:  He expressed bias.

MR. MOLSTER:  No objection.

MR. O'CONNOR:  I tend to agree.

THE COURT:  Number 10, Daez.  Had an issue with Al Jazeera.

MR. MOLSTER:  No objection.

THE COURT:  Any objection?

MR. O'CONNOR:  No objection.

THE COURT:  All right.  Number 12, Dang has a prepaid vacation, nonrefundable.

MR. O'CONNOR:  No objection, Your Honor.

MR. MOLSTER:  No objection.

THE COURT:  Number 13, Christopher Davidson expressed bias.

137

MR. O'CONNOR:  He did.

MR. MOLSTER:  I'm sorry?

THE COURT:  Number 13, Davidson.

MR. MOLSTER:  Did you say bias?

THE COURT:  Bias.

MR. MOLSTER:  Was he the one who heard about the case in the last few months from the New York Times and he's concerned it might be related to the other case?

THE COURT:  All right.  Number 14, Divittorio, has a child care issue.

MR. O'CONNOR:  No objection.

MR. MOLSTER:  No objection.

THE COURT:  No objection.  All right.

Number 17, Ms. Rimaz Eldirdieri.  She has bias towards the plaintiffs.  She's the only person, I guess, who's missing --

MR. O'CONNOR:  There was a few others.

THE COURT:  Well, I can't -- well, she expressed bias towards the plaintiffs.

MR. MOLSTER:  I didn't see any basis.

MR. O'CONNOR:  She's the one who just came up here.

MR. MOLSTER:  Oh, right.  That's okay.

THE COURT:  All right.  Now, Number 19, Mr. Gaston is the one whose family is moving to D.C.

138

MR. O'CONNOR:  I mean, I wouldn't even know if he can be a juror if he's domiciled in D.C. partway through the trial.

THE COURT:  Anyway, any objection to him being struck?

MR. MOLSTER:  I think he can move his move.

THE COURT:  You want him?

MR. MOLSTER:  Yes.

MR. O'CONNOR:  I'm not going to -- if that's their view, I'm not going to --

THE COURT:  That's fine.  So 19 is okay.

THE DEPUTY CLERK:  Okay.

THE COURT:  22, Paul Hamp has child care issues. He also knows CACI folks.  He had child care.

Any objection?

MR. MOLSTER:  Sorry, which one?

THE COURT:  22, child care.

MR. O'CONNOR:  No objection.

MR. MOLSTER:  No objection.

THE COURT:  All right.  He's out.  23, Hare has a prepaid trip.

MR. MOLSTER:  No objection.

MR. O'CONNOR:  No objection.

THE COURT:  All right.  24, Jassar, she's the one whose husband is going to India for two weeks, indicated

139

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

child care.  And I don't want to take a gamble on having somebody start and then telling me they can't continue.

MR. MOLSTER:  I'm sorry, which number?  I apologize.

THE COURT:  24, Jassar.  Her husband's going to India.

MR. MOLSTER:  Right.  Right.  Right.

THE COURT:  She doesn't have any help with the kids.

MR. MOLSTER:  No objection.

THE COURT:  All right.  So 24 is out.

27, Kelly.  She's got work issues.

MR. MOLSTER:  It's just an event; right?

THE COURT:  I know, but she said -- I asked her if it would be a problem, if the CEO was going to be giving her a hard time.  You know, it can be a distraction, that's the problem.  But if neither of you want that person struck, I won't strike them, but I think I would strike that person.

MR. O'CONNOR:  We're ambivalent.

THE COURT:  You don't care.  All right.  Then I'll leave her in.

29, Eugenia Kim.

MR. O'CONNOR:  Florida trip.

THE COURT:  Yeah, that's the Florida trip.

MR. MOLSTER:  No objection.

140

MR. O'CONNOR:  No objection.

THE COURT:  She's out.  Did you get that, Katie?

THE DEPUTY CLERK:  Yeah.

THE COURT:  29 is out.

30, this is Mr. Koch.  He knows --

MR. O'CONNOR:  He knows there was a hung jury.

MR. MOLSTER:  Was he the guy knowing there was a hung jury?

THE COURT:  Yeah.  He's out.  30 is out.

33, Sisi Lee.

MR. O'CONNOR:  She's 32, Your Honor.

THE COURT:  I'm sorry.  32.  Yeah.  She has the Booz Allen interview, and she had also --

MR. MOLSTER:  She's got to support her direct reports.

THE COURT:  Right.  So she's out, 32.

And 34, Jennifer Lohse, L-O-H-S-E.  I can't recall --

MR. O'CONNOR:  She's heard stories about Abu Ghraib.  She's heard about CACI saying bias.  I don't know which way that would --

MR. MOLSTER:  I'm sorry, which number?

MR. O'CONNOR:  34.

THE COURT:  34.  Any objection?

MR. O'CONNOR:  If they don't object, I don't

141

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

object.

THE COURT:  I'm sorry?

MR. O'CONNOR:  We're ambivalent, Your Honor.  If they don't object --

THE COURT:  Are you objecting?

MR. MOLSTER:  No -- yes.  I'm fine.

THE COURT:  You are objecting?

MR. MOLSTER:  I'm fine with it.

THE COURT:  34 is out then.

THE DEPUTY CLERK:  Is out?

MR. O'CONNOR:  I wasn't sure if that was what he meant.  Sorry.

THE COURT:  34.

MR. MOLSTER:  Right.  Yes.

THE COURT:  Out.

MR. O'CONNOR:  Okay.  That's fine.

THE COURT:  37, McGee.  She's worked with contractors.  She's got an issue with Al Jazeera, as I recall.

MR. MOLSTER:  She said she might be prejudiced.

MR. O'CONNOR:  She had a case of the want-offs.

THE COURT:  I know.

MR. MOLSTER:  She had a case of the what?

MR. O'CONNOR:  Of the want-offs.

THE COURT:  38, Mr. Mengesha, who has the exams

142

that he's got to be taken.

MR. O'CONNOR:  He would stay up until 4 in the morning.  I don't want a juror like that.

THE COURT:  Neither side wants a juror like that.

Any objection?  So 38 is also out.

39, Moir has a prepaid vacation and also knows a lot about -- any objection to 49 [sic]?

MR. MOLSTER:  One second.  No.  49?

THE COURT:  39.

Number 40, Montgomery knows Sanchez.

MR. MOLSTER:  I'm sorry, Judge.  Let me just get to 39.  Oh, I got him.  No objection.

THE COURT:  All right.  39 is out.

40 is out.  That's the Montgomery, knows Sanchez, among other things.

MR. MOLSTER:  All right.

THE COURT:  No objection there.

41, Dan Moore.  He just was here.  He's the long commute, the online issues.

MR. O'CONNOR:  We don't object.

MR. MOLSTER:  Yeah.  The marshal.

THE COURT:  So 41 is out.

42, Morris is child care.

MR. O'CONNOR:  And travel.

THE COURT:  Yeah.

143

MR. MOLSTER:  No objection.

MR. O'CONNOR:  No objection.

THE COURT:  All right.  44, Nowalk, he's developed interrogation protocols.  He's got Al Jazeera knowledge.

MR. MOLSTER:  No objection.

MR. O'CONNOR:  No objection.

THE COURT:  So 44 is out.

45, his wife had Stage 4 cancer.

MR. O'CONNOR:  No objection.

MR. MOLSTER:  No objection.

THE COURT:  All right.  48, Phillips-Bernard has a medical issue.  That's the woman who says she was in a great deal of pain.  Remember when she --

MR. MOLSTER:  I'm sorry?

THE COURT:  48.

MR. MOLSTER:  48?

THE COURT:  Yeah.

MR. O'CONNOR:  No objection.

THE COURT:  All right.  50, Qureshi, he sells to CACI.

MR. MOLSTER:  That's the --

MR. O'CONNOR:  We would be happy with that.

THE COURT:  50, Mr. Qureshi he sells --

MR. O'CONNOR:  I'm not going to object.

MR. MOLSTER:  No objection.

144

THE COURT:  53, Rosas has a Spanish -- has a language problem.  That's the one with the thick Spanish accent.  Any objection?

MR. O'CONNOR:  No.

MR. MOLSTER:  No objection.

THE COURT:  57, Shay, has foreign travel scheduled.

MR. O'CONNOR:  No objection.

THE COURT:  57?

MR. MOLSTER:  I'm sorry, Judge.  No objection.

THE COURT:  All right. 61, Spano.

MR. O'CONNOR:  Spano.

THE COURT:  Spano.  She's working on the campaign right now.  I have no idea which side she's on, but --

MR. MOLSTER:  I know what side.

THE COURT:  Okay.  So 61 is out.

62, Suarez, he's been prosecuted.  You don't want him.

MR. O'CONNOR:  We're not going to object.

THE COURT:  62.  If you say you want him.

MR. MOLSTER:  You're going to have my head examined.  No objection.

THE COURT:  Okay.  62 is out.

66, Vanderputten.  She was looking really good until she had the -- 66, she has to be excused.  66 is out.

145

MR. O'CONNOR:  Your Honor, if you're going to pass someone, do I say it now or wait until the end?

THE COURT:  Was it 64?

MR. O'CONNOR:  64.

THE COURT:  I have a question mark.  She's an attorney.  She does exactly the kind of work that's involved in this case.

MR. O'CONNOR:  She was asked if she could be impartial -- if she could be partial, and she said I hope not.

THE COURT:  I saw that.  I'm going to strike that 64.

MR. MOLSTER:  No objection.

THE COURT:  No objection.  Okay.

67.  This is the fellow that was at joint military base, and they were lambasting General Pace.

MR. O'CONNOR:  Who is the nicest guy.

THE COURT:  I know.

Any objection to 67 being out?

MR. MOLSTER:  No, Judge.

MR. O'CONNOR:  No objection.

MR. MCCLURE:  You all felt sorry for Pace?

MR. O'CONNOR:  He's a swell guy.

THE COURT:  Number 70 is the fellow who needs the shot for his leg.  So that's a medical excuse.

146

MR. O'CONNOR:  I don't think I could live with myself if I object.

MR. MOLSTER:  This is Weber?

THE COURT:  This is Weber.  Any objection?

MR. MOLSTER:  No objection.

THE COURT:  70 is out.

73, Williams is child care.

MR. O'CONNOR:  No objection.

MR. MOLSTER:  No objection.

THE COURT:  Karen Wilson I indicated out, but I can't read my own notes.

MR. O'CONNOR:  She said she would be biased if she was to serve as a juror.

THE COURT:  That's right.

MR. MOLSTER:  Which number?

THE COURT:  74.

MR. O'CONNOR:  74.

MR. MOLSTER:  She said from a criminal case.

THE COURT:  Yeah.  That's right.

MR. MOLSTER:  That was kind of weird, but she said it.

THE COURT:  So 74 is out.

The last one, 75, is the language problem.  That's Yohannes.

MR. O'CONNOR:  No objection to that.

147

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE COURT:  Do you want to run through them?

THE DEPUTY CLERK:  Yeah.  I can read them back.

THE COURT:  So here's the list.  Listen carefully.

THE DEPUTY CLERK:  Okay.  Struck is 3, 4, 7, 10, 12, 13, 14, 17, 22, 23, 24, 29 --

MR. MOLSTER:  I'm sorry, you got 27?

THE DEPUTY CLERK:  No.  We decided to keep --

THE COURT:  You guys didn't agree on that.

MR. O'CONNOR:  If you want to take her out, I'm happy to go along, but you said keep her.

THE COURT:  Right.

THE DEPUTY CLERK:  Okay.

MR. MOLSTER:  Sorry.

THE DEPUTY CLERK:  You said 29 and --

THE COURT:  29 is out, but not 27.

THE DEPUTY CLERK:  Not 27.

30, 32, 34, 37, 38, 39, 40, 41, 42, 44, 45, 48, 50, 53, 57, 61, 62, 64, 66.

MR. MOLSTER:  62, 64, 66.

THE COURT:  Okay.

THE DEPUTY CLERK:  67, 70, 73, 74, 75.

MR. O'CONNOR:  That's what I have.

THE COURT:  All right.

MR. MOLSTER:  So I may have a couple that I would like to consider.  Let's see here.  49.

148

THE COURT:  The postal inspector?

MR. MOLSTER:  He's the one who said when he first heard about it, he thought it was fine, he thought that what happened was okay.  Didn't see a problem with it is what he said.

THE COURT:  I'm sorry.  I didn't see an issue with him.

MR. O'CONNOR:  I didn't either.  He said he wasn't biased.

THE COURT:  Maybe use a peremptory if you want, but I don't see any reason to striking him.

MR. MOLSTER:  He said he heard it was in the news, it was hard to be impartial, didn't see a problem with it.

THE COURT:  Anything else?

MR. MOLSTER:  Just give me one second.  I'm sorry. 49, that's the one I just raised.

THE COURT:  49 is the postal inspector.

MR. MOLSTER:  I've got two.

THE COURT:  Number 2?  I didn't see any indication from him that he couldn't be impartial.

MR. O'CONNOR:  Neither did I.

THE COURT:  We've got to move this along, Mr. Molster.

MR. MOLSTER:  Very well.

THE COURT:  Okay.  Each side gets three

149

peremptories.  Right.  And no backstriking.  You know the drill.  So we'll go back, and we'll get this jury selected.  I'm going to give them the preliminary instructions, and opening statements will be after lunch because it's almost 1:00.

MR. MOLSTER:  Are you going to give them a break now?

THE COURT:  No.  I want to get this jury in place.

MR. O'CONNOR:  I'm fine.  The court security officer said that --

THE COURT:  If we have to take a break now, we're never going to get this jury back.

MR. O'CONNOR:  I'm fine with that.

THE COURT:  Let's just get this.

MR. MOLSTER:  Cruel and unusual.

THE COURT:  I'm sorry?

MR. MOLSTER:  I'm just kidding.

                    (Open court.)

THE DEPUTY CLERK:  Ladies and gentlemen of the jury, as I call your name, please come forward and have a seat in the jury box as directed by the court security officer.

Juror Number 27, Paige Kelly.  Juror Number 15, Lisa Dockins.  Juror Number 11, Christopher Damon-Cronmiller.  Juror Number 35, Alan Luckett.  Juror

150

Number 9, Barbara Cornwell.  Juror Number 63, Sri Padma Tanniru.  Juror Number 43, Amanda North.  Juror Number 28, Allison Kennedy.

(Pause.)

THE DEPUTY CLERK:  The following jurors may -- are excused, Juror Number 9, Barbara Cornwell.  Juror Number 35, Alan Luckett.  Juror Number 11, Christopher Damon-Cronmiller.  Juror Number 15, Lisa Dockins.  Juror Number 28, Allison Kennedy.

Will the following jurors please come to the jury box as directed by the court security officer.  Juror Number 56, Debra Schroeder.  Juror Number 19, Patrick Gaston.  Juror Number 18, Carey Erickson.  Juror Number 33, Carlos Llanos Suarez.  Juror Number 46, Cynthia Peloquin.

(Pause.)

THE DEPUTY CLERK:  The following juror can leave the courtroom.  Juror Number 46, Cynthia Peloquin.

Will the following juror please come in the jury box.  Juror Number 69, Doreen Washington.

THE COURT:  Ladies and gentlemen of the jury, will you please stand, raise your right hand and respond after the affirmation.

(Jury panel sworn.)

THE DEPUTY CLERK:  Thank you.  You may be seated.

THE COURT:  All right.  I know it's been a long

151

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

morning, folks.  I want to thank the rest of the pool, but we have now chosen the eight people who will serve as the jury.  The rest of you may leave.  Thank you for your attendance.  I'm going to ask you to be as quiet as you can because I want to give you all two minutes of instructions and then the morning break.  All right.

I have longer instructions to give to you.  I will do those after the lunch break.  So we're almost on our normal schedule.  We'll start again at five after 2.

The main thing is at this point, don't start thinking about this case at all.  You've got an hour to have lunch.  Relax a little bit.  If you eat together, get to know each other.  There's several places around here.  If you want to go out, the weather is supposed to be quite nice today.  There is a small cafeteria on the second floor where there are vending-machine-type things.  But we want you back here promptly at five after 2 so we can begin the trial.  I will give you some instructions at that point.  We're going to give you some notebooks for taking notes.  I'll instruct you about how to handle the note-taking, and then we're going to have the opening statements of counsel.

So I'm going to let our jury go now.  And obviously make sure you don't overhear anything in the courthouse about this case.  I don't think you'll bump into any of the lawyers, but if you should be in like an elevator

152

and you see a lawyer, if he or she does not make friendly eye contact with you, they're not trying to be rude; they're trying to to avoid any appearance of an out-of-court contact with a juror, because, at this point, they want to make sure that there is no problem in that respect.

All right. You're not to conduct any investigation about this case. So during the lunch break, please do not get on your phones and try to look anything up. You have to decide this case solely on what you see and hear inside of this courtroom. That's how our system works.

We will make this case go as quickly as possible. I know it's been a long morning. I will never make you sit this long again. But if you go with my court security officer, he'll show you where the jury room is. And if you'll just be back here by five after 2, we'll be in good shape. Thank you.

Counsel, you're staying for a minute.

THE COURT SECURITY OFFICER: Rise for the jury.

(Jury not present at 1:09 p.m.)

THE COURT: All right. So there was some issue, Mr. Molster, that you had wanted to raise before we got the jury in place?

MR. MOLSTER: Briefly, Your Honor.

I have a hearing on Friday. It was originally last Friday and Judge Porter moved it to this Friday at

153

10:00.  It's in a cybersquatting case where I'm counsel for Discover Financial.

THE COURT:  That's fine.  There's so many lawyers in this case --

MR. MOLSTER:  You don't think we need more?

THE COURT:  That applies to you as well, Ms. Ginsberg.  You're both local counsel.  So if any lawyer has to be away, as long as there's one attorney per side and it doesn't slow the case down, you don't have to ask me for leave.

MR. MOLSTER:  I may be a few minutes late on Friday.

THE COURT:  That's fine.

Is there anything else?

Now, when we get back, as I said, I'll have my standard opening instructions I'll give the jury, and then each side has 20 minutes for opening statements.  And then I assume we'll be ready to start with testimony; right?  Anything else we need to address right now?  No?

MR. MOLSTER:  Not for us, Your Honor.

THE COURT:  Then we're on recess until five after 2.

(Court recessed for lunch at 1:10 p.m.)

AFTERNOON SESSION 2:07 p.m.

THE COURT:  All right.  Any issues before we bring

154

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

the jury in?

MR. O'CONNOR:  No, Your Honor.

THE COURT:  All right.  Let's bring the jury in.

THE COURT SECURITY OFFICER:  Yes, Judge.

(Jury present at 2:08 p.m.)

THE COURT:  I'm going to ask you all to just move down a little bit.  I like to be able to see my jurors' faces.  If you're all hunkered down at that end, I can't watch you, just to make sure you're not going to sleep.

Very good.  I mean, you can sit anywhere in the box, really.  But, again, I do -- and I think sometimes you like to be able to make eye contact with me as well.

All right.  Folks, now that you've had your lunch break, we're going to start the trial itself, and the first thing I want to caution you on is note-taking.  So I think you all have your notebooks now.

There's no requirement that jurors take notes.  In fact, many judges don't let jurors take notes.  I think, especially for a multi-day trial, it can be helpful.  If you like to take notes, if it helps you concentrate, feel free to do so, but you don't have to take notes.

If you do take notes, remember that they're only your own individual memory aid.  They will not be evidence, and you're not to share them with each other.  After each day's session, you have to leave the notebooks here, and

155

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

we'll get them back to you the next day.

You are eight co-equal judges, and each of your own individual memories about the evidence and opinions about the evidence is worthy of consideration and respect by all the other jurors.  The fact that some of you may have taken a lot of notes and others of you may have taken very few or no notes doesn't mean that the person who took lots of notes that his or her memory is any better or opinion is any better than a juror who took no notes or very few.  And as long as you don't let your note-taking skew your approach to the case, then you're welcome to take notes.

Now, in terms of the trial structure, after I stop talking, we're going to have the opening statements of counsel.  The plaintiff has the burden of proof on most of the issues in this case, and so the plaintiffs will go first at each stage of the trial.  So the plaintiffs will make the first opening statement.  Now, we've limited the time for that to 20 minutes per side.

And an opening statement is basically a preview of what that side believes the case is going to show.  If any of you do jigsaw puzzles, you would know that the cover of the jigsaw puzzle box has the picture of all the pieces put together.  And many times in a trial, what you're getting is two different box covers, two different pictures.  At the end of the day, you all have to decide how you put the

156

pieces together and what the final picture will look like.

After the plaintiff has made -- they have made their opening statement, then defense makes an opening statement on behalf of the CACI defendant. After that, we'll begin the evidence portion of the trial.

Now, in this case -- and I can't recall, are there stipulations?

MR. O'CONNOR: There are stipulations, Your Honor.

THE COURT: All right. Fine.

So there are basically three categories of evidence that you're going to have in this case. The first would be stipulations. Now, when the parties stipulate to a fact, that means that there's not going to be any actual evidence presented as to that fact. The parties have agreed that that fact is the case.

You, as the jurors, are the fact-finders. You don't have to accept a stipulation. Most jurors do, but you don't have to. But it does mean that there will not be any evidence presented to support that particular fact.

Then we have the testimony of witnesses. Now, again, because the plaintiff has the burden of proof, the plaintiffs will call their witnesses first. So after the opening statements are done, counsel for the plaintiffs will call a witness, and they will ask that witness all the questions that they have. That's called the direct

157

examination.  When they have finished with that, then on behalf of the defendant, Mr. O'Connor or one of his colleagues will ask questions of the witness.  That's called cross-examination.

If issues came up during the cross-examination which the plaintiffs want to clarify, they can't repeat, but if there's additional information that they feel is needed to clarify what came out on cross, they are allowed what is called redirect examination.  And if something comes out in redirect examination that the defense wants to clarify, they are allowed to have a recross.

There often isn't cross-examination.  There's no requirement for cross, there's no requirement for redirect or for recross, but that is the most that that witness would be exposed to.  I call it two rounds of questioning.  Then that witness sits down and plaintiffs' counsel will call the next witness and it goes on like that until all the witnesses from the plaintiffs' side of the case have been called.

Now, I mentioned to you earlier, most of the witnesses will be here in this courtroom testifying from the box over here, that's the witness box.  We call them live witnesses.  Then our two -- two of our three plaintiffs will be testifying live, but remote by -- over cable or satellite transmissions.

We will also have testimony that's been prerecorded of other witnesses.  So those witnesses will not be in the courtroom, and their testimony was taken at some previous time during the course of the proceedings, and you will have that testimony.

Some of the witnesses in this case are going to have -- you will not get their names, and you will not be able to see them; you will only be able to hear them, and that's because there are some state secrets involved with some of the witnesses, so we'll get to that.  But your job will be to evaluate the testimony of the witnesses.

Then the other type of evidence we have is physical evidence.  Now, there's going to be a fair number of exhibits.  I know there are going to be some contracts, there are going to be some manuals, there are going to be photographs, there may be some videotapes.  That's what we call physical evidence.

Once the plaintiff has presented all of the testimonial and exhibits, you will hear the plaintiff say that they are resting.  At that point, we would then turn to the defense, and we now reverse the order of things.  So the defense counsel will then call their witnesses, and they will conduct the direct examination.  Counsel for the plaintiffs will conduct any recross -- I'm sorry, any cross.  If counsel for the defense feels that something came up in

159

cross with that witness that needs to be clarified, there will be a redirect, and then again counsel for the plaintiffs can do recross if something came up in the redirect. And we'll go that way until all the witnesses and all the physical evidence which the defense wants to enter into evidence has been entered.

At that point, there may or may not be a rebuttal case by the plaintiffs, which is permitted. It's very seldom in the case that we have a surrebuttal case. I can't tell whether that will happen or not in this case. But, at that point, the evidence portion of the trial is over.

The next phase of the trial will be the closing arguments of counsel, and this is the time when the lawyers for each side will try to sum up the evidence which they feel has been presented during the trial, and they'll argue to you the ultimate conclusion they want you to reach.

Plaintiff, again, because they have the burden, they'll go first with their closing argument. Then on behalf of CACI, counsel will make the closing argument for the defense. And, again, because the party with the burden has that extra burden, the plaintiffs are allowed a brief rebuttal closing argument. And then it's my job to give you the actual legal instructions. And I will read them to you. So you'll get them orally like this, but you will have physical copies of the instructions to take back with you to

160

the jury room.

When you go to deliberate, you will have with you your collective memories, your notebooks, all the physical evidence that's been entered into the record and my instructions.

We cannot give you transcripts of the trial testimony, so that's why we always warn jurors at the beginning, make sure that you're paying careful attention. It's not possible to turn a case around that quickly, and it also creates some other legal problems to start giving snippets of transcripts to jurors. So we do rely on a juror's memory in a case like this that's going to take a little bit of time. So that's why getting a good night sleep every time is the best thing you can do to be a good, well-prepared juror.

Now, during the course of a trial, a lawyer may object if the lawyer believes that something is going on that violates some rule of evidence or procedure or some earlier ruling in the case. It's my job to rule on an objection. If I think the objection is well made that there is, in fact, a problem, you will hear me either say sustained or granted, and those words mean the exact same thing. On the other hand, if I don't think there's a problem, I'll say denied or overruled. And, again, those two words mean the same thing.

161

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Now, you should not draw any inference against a side because that side has filed an objection, and you should not try to make -- draw any inference from how I rule as to whether I think that side should win or lose the case.

Think about how an umpire or referee in a sporting events calls, like if it's baseball, balls and strikes. That's done to keep the operation going by the rules; it's not done to help one side or to hurt the other.

So the last thing is a little bit of a repeat what I told you earlier, but I just want to caution once again how important it is for juniors to very carefully follow the instruction about proper juror behavior. And that is, you must decide this case solely on what you see and hear in this courtroom. So you have to avoid any outside influence.

Now, I don't think there will be any media coverage about the case, but if there were to be, you have to immediately get away from it. So, you know, if it's in the newspaper or if it's on TV, turn it off or close the paper.

And you're not being sequestered, you go home tonight. You can tell your family members or your business colleagues that you're going to be in court for the next few days in a federal court. You're not to talk at all about the case, because I guarantee that if you start talking about what you're hearing in court, whoever you're talking

162

with will start giving your their 2 cents worth about the issues. And they're not sitting here. They're not going to see everything, they're not going to have all the information that is part of the case.

It's also extremely important these days with social media, do not -- if you have, you know, a Facebook page or whatever, you should not be on the Facebook page telling folks, oh, I'm sitting on this trial at the courthouse. Just stay away from any social media.

And as I said earlier, if you should feel that you bumped into somebody who might be chatting about the case in the hall or you see one of the lawyers, you know, you get away from any kind of a situation where it might appear as though there's been an improper contact with a juror.

My court security officer, Mr. Hendrick, is here. He works with jurors all the time. If you have any concerns or questions, let him know, and he'll bring that to my attention.

Counsel, any objection to the preliminary instructions?

MR. O'CONNOR: No, Your Honor.

THE COURT: All right.

MR. FARIDI: None, Your Honor.

THE COURT: All right. Then we're ready for opening statements.

163

Who is going to represent the plaintiffs for that?

MR. AZMY:  I am, Your Honor.

THE COURT:  All right.  We'll give you a three-minute warning and a one-minute warning.

MR. AZMY:  Three and one?

THE COURT:  Yes.  Three and one.

OPENING STATEMENT ON BEHALF OF THE PLAINTIFFS

MR. AZMY:  Good afternoon, Your Honor.  May it please the Court.

Ladies and gentlemen of the jury, this case is about securing justice for victims of one of the most disturbing and shameful episodes in recent American history.

Twenty years ago, the world learned of shocking, brutal and unlawful abuses perpetrated on Iraqi men held by the United States military in a notorious prison facility called Abu Ghraib.  Men there were beaten, sexually assaulted, religiously humiliated, degraded and, yes, even tortured by U.S. soldiers working in the Abu Ghraib prison.

But these U.S. soldiers were not working alone. They worked hand-in-hand with employees of a large government contractor, CACI or C-A-C-I, the defendant in this case, who had a lucrative contract with the United States government to provide interrogators.

Now, everyone, including then President George W. Bush, and military leadership condemned the abuses at Abu

164

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Ghraib and demanded accountability.  Abu Ghraib betrayed American values, it violated military law and policy and U.S. and international law, and it left a lasting stain on America's reputation in the world.  Our clients are three individuals who endured and survived the torture and mistreatment at Abu Ghraib.

My name is Baher Azmy, and along with my legal team, I'm very proud to represent these courageous men.  Let me introduce them to you now.

Sitting here at counsel table is Salah Al-Ejaili. He is a journalist who lives in Sweden with his wife and three teenaged children.  He will be testifying today live.

Next, if you look at the screen in the middle, is Asa'ad Al-Zuba'e.  He runs a fruit and vegetable grocery in Iraq.

And next, Suhail Al Shimari, he's an educator and middle school principal in Iraq.

I need to stress that it is very painful for them to talk about what happened to them.  It's very difficult. It brings back feelings of pain and shame.  But they are also very grateful that they have the opportunity to tell you their story directly and the opportunity to seek justice from an American court of law.

You'll recall what I said about President Bush condemning the abuses and military leaders, so after the Abu

165

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Ghraib scandal hit, they launched a number of investigations, and through a separate military process, unlike a civil process called a court-martial process, they found many military personnel, military police, responsible, and they were held accountable through this court-martial process. Some of them spent time in military prison.

Now, these military police were the ones working hand-in-hand with the CACI employees to abuse detainees, and some of these military police will testify for plaintiff to say that it was CACI interrogators that told them to abuse detainees.

So now despite the military -- other military investigative reports implicating CACI's employees in the scandal, did CACI ever punish or discipline their employees? No. And despite weeks into being sent to Abu Ghraib, CACI -- despite CACI management hearing about warnings of mistreatment there, did they investigate? No. They turned a blind eye and collected ultimately on a $31 million contract.

So we are here, to determine whether CACI also bears legal responsibility for what happened to our clients at Abu Ghraib, and we submit the evidence will show that it does, that CACI not only knew of the abuses at Abu Ghraib, but they were willing and active participants in it.

So let me tell the story from a starting point.

166

You may recall in 2003, the U.S.-led coalition and invaded Iraq and toppled the military dictator there, Saddam Hussein.  In the ensuing months, some chaos came about, and thousands of Iraqi men were swept up and detained by U.S. forces.  Some of them were detained in what was a notorious prison under Saddam Hussein, Abu Ghraib, which the United States repurposed for a military prison.  Our three clients were held at Abu Ghraib.

Now, the United States lacked sufficient personnel in light of these developments to conduct interrogations, so they entered into a lucrative contact with CACI to provide interrogation service.  And let's look at the contract. It's an important document in this case.

Among other things, the contract was very specific about who was to do what.  CACI was to provide resident experts to the military, and it was CACI, the contractor in this case, that was responsible to provide all supervision of their own employees.

Why did the military insist on that?  A couple of reasons.  First, the military didn't have time or capacity to train or supervise employees.  And as we'll see later, military law required strict separation of military command from civilian command.  They were mandated to be kept separate.

So CACI, even though it was a large military

167

contractor, had not been in the interrogation business in 2003, so they sort of scrambled to find the "resident experts" to fulfill their contracts within weeks, and the evidence will show that CACI management knew they were not sending over real experts.

Let me talk to you about three of the employees that are at the heart of this case, CACI employees. There is Steve Stefanowicz, who's commonly known throughout Abu Ghraib as Big Steve. He had a commanding presence in interrogations at Abu Ghraib, but he had no prior experience interrogating detainees. His job before being sent to Abu Ghraib was selling jet skis in Florida. CACI management thought him "crafty." And two military investigative generals found his testimony dishonest.

There's Dan Johnson, commonly known as DJ. He was 22 when he was sent there, and he's shown in a picture that shows the abuse of detainees. Tim Dugan is another employee similarly unqualified. So they were all sent as resident experts to Abu Ghraib.

Now, let me tell you a little bit about the facility there. Abu Ghraib is a sprawling facility. The black square is a part of Abu Ghraib called the hard site, but we're talking about a much smaller place where the atrocities happened in Tier 1, the red box. And let's go inside the prison.

168

These are pictures from inside Tier 1.  You can basically see it's two floors with cellblocks on either side, and the second picture gives you a good scale, which, to us, suggests that no one -- that no abuse could happen there without people knowing about it.

So CACI employees and interrogators were sent to Abu Ghraib in about late September 2003 and then started working hand in hand with military police there in "a joint mission" to carry out interrogations.

A little word about terminology.  We're going to talk about military intelligence, sometimes called MI.  That includes CACI, largely interrogators.  And MPs, sometimes called military police.  These were largely low-level U.S. soldiers who were operating mostly as prison guards in the facility, and they had what they called a brotherhood.

Our clients arrived to Abu Ghraib soon after and were soon subject to the system of abuse that the brotherhood was implementing.  So -- and even from the first night you will see, they endured torment that lasted throughout their time there.

Now, how did this brotherhood work?  Well, testimony will show from the military generals and from the military police who were part of the brotherhood, that it was CACI who took control and ordered the MPs, these low-level prison guards, to treat detainees "like shit."  To

169

"soften them up" for interrogations.  To set the conditions for interrogations.  Basically to break these human beings psychologically and morally so they become susceptible to interrogations that CACI and the MIs would want to undertake.  That's what the evidence will show.

Now, there's a particular kind of evidence in this case, which is kind of remarkable.  One bizarre piece -- part of the Abu Ghraib scandal is that pictures were taken.  Hundreds of pictures were taken, almost casually reflecting a casual attitude to the abuses there.  They wound up on screen savers of employees in Abu Ghraib.  And I'm going to show you some pictures of the kind of abuses that the brotherhood was engaged in.

Now, these pictures themselves don't -- in these pictures don't show our clients, but they are representative of all the sorts of things our clients suffered.  And it brings me no pleasure to show you these photographs; they're very disturbing.  They're hard to look at, let alone understand, but we have to.

This is one very common technique, forced nudity.  You can see the fear on the detainees.  All our clients were subject to this.  Salah says he was kept naked at the hard site 75 to 80 percent of the nearly two months he was there.

This is use of unmuzzled dogs to scare detainees, another common practice.  And this is very important, and

170

you have to look a little bit carefully.  This depicts what we call a stress position.  Notice the detainee's arms are stretched across his body vertically in a contorted and very painful position while he's hooded.

We will have an expert, a human rights expert, Dr. Jens Modvig, talk to you about what constitutes torture and cruel, inhuman and degrading treatment, which is a question you have to answer.

So when the military found out about the Abu Ghraib scandal, they acted very quickly and conducted two comprehensive military investigations.  The first was undertaken by Major General Antonio Taguba, who will testify for us this week.  He traveled to Iraq and found incontrovertible evidence of abuses and the kind of abuses our clients suffered.  Let's look at what he found. Punching, slapping, kicking detainees.  Forcing detainees to remove their clothing and keeping them naked for days at a time.  Forcing naked male detainees to wear women's underwear.  Using military working dogs to intimidate and frighten detainees.

He interviewed CACI employee Big Steve, Steve Stefanowicz.  He made a recommendation for a reprimand, and here's what he found.  Big Steve allowed and/or instructed MPs to facilitate interrogations by "setting conditions, which were unauthorized.  He clearly knew his instructions

171

equated to physical abuse." He's talking about CACI employee Big Steve. And he found that Big Steve lied, made a false statement about -- to the interrogator about what he was doing.

After that, another investigation was ordered by Major General George Fay, who will testify through a video recording. He was sent there to look specifically at the role of MI, military intelligence. He interviewed 170 personnel, who reviewed 9,000 pages of documents, and this is what he found, similar to Major General Taguba. These are the kinds of abuses he found. Physical abuse, slapping, kicking, twisting the hands of a detainee. Use of dogs prevalent to threaten and terrify detainees, which is a violation of law. Nakedness comes up over and over. Common practice of keeping detainees in the state of undress. Male detainees were naked in the presence of female soldiers. The nakedness was clearly degrading and humiliating. Other forms of humiliating and degrading treatments that were intended to degrade. That was the point, to soften them up, to set the conditions that were prohibited by the Geneva Conventions, Army policies and the Uniform Code of Military Justice.

Major General also made findings specifically about CACI employees. This is what his investigation revealed. This is anonymous in the report, but we all agree

172

that Civilian Number 5 is Tim Dugan.  So he finds that Tim Dugan grabbed a detainee, handcuffed the detainee and dropped him on the ground and dragged him into an investigation room.

What about DJ?  He encouraged Staff Sergeant Frederick, who will testify in this case, to abuse an Iraqi police detainee.  He threatened the use of dogs saying to a detainee, if you see that dog there, if you do not tell me what I want to know, I'm going to get that dog on you, and he placed the detainee in an unauthorized stress position.

What about Big Steve?  Lots of findings about Big Steve from multiple sources.  Inappropriate use of dogs during an interrogation, pushed or kicked a detainee into the cell with his foot.  He lied to Major General Fay's staff as well and he bragged that he had shaved the hair and beard of a detainee and put him in red women's underwear.  These are what the reports will reveal.

And CACI will testify, of course, and they will likely say a few things in their defense.  First, I expect they'll say, well, you'll never see a CACI interrogator who actually laid a hand on a detainee, and you won't see a CACI interrogator in a lot of these pictures.  That is a distraction, what we call in the law a red herring, made to make you look the other way.

What is important here, and all we need to show is

173

an agreement, a conspiracy, and we will show that through the evidence because CACI MPs -- sorry, CACI interrogators told MPs to abuse detainees, soften them up, and then the MPs agreed and carried it out.  That's what we need to show.

And the Court will instruct you on our two theories of liability.  One, that CACI conspired with MPs to abuse detainees; and, two, that CACI aided and abetted MPs in abusing detainees.

CACI might rely on the defense that deflects responsibility to the Army and basically says we were just following orders of the Army.  I expect you might hear CACI say something like we knew nothing, we saw nothing, we heard nothing, and that we lost all power to control any of our employees and gave up all responsibility to control our employees to the Army.  The evidence shows just the opposite.

Now, remember, we looked at the contract before. The contract makes that legally insufficient or impossible. CACI supposedly -- CACI is supposed to supervise them.  Why is that in the contract I mentioned?  Because the military authorities require it.  Let's look at two authorities in this case.  One is what's called a field manual that's basic Army policy.  AR refers to an Army regulation.  We'll talk a lot about that in this case, and you will have an opportunity to review these in deliberations.

174

This is what the Army requires.  It must be clearly understood that commanders, military commanders, do not have direct control over contractor employees.  Bolded in the original text:  Contractor employees are not government employees.  Only contractors directly manage and supervise employees.  It is the contractor who must take direct responsibility and action for his employees' conduct.  And then affirmed by the contract, provided support services must provide necessary supervision and management functions.

So, what that reality reflects is that the Army -- there are two sets of rules.  The Army supervises its own soldiers through a chain of command.  Civilians are not in the chain of command and supervised through the contract through their own supervisors, and never the two shall meet.

And, in fact, CACI operationalized this, as you will see.  They operationalized the contract by sending, for example, a site lead in Abu Ghraib named Dan Porvaznik, and he was a supervisor there.  He had the power to review interrogations, the power to hire and fire and discipline employees, to conduct performance reviews.

Now, you'll also hear something that also shows that CACI has something backwards.  You'll hear this term command vacuum from the generals.  Abu Ghraib and Iraq were, in some ways, disorganized, in some ways chaotic.  And what the military generals observed is there was a command vacuum

175

in Abu Ghraib.  Leadership wasn't there allowing people to sort of do whatever they want.  And in that command vacuum, particularly on the night shift where commanders were absent, it's CACI interrogators that took control, and not the other way around, and ordered MPs to abuse detainees.

And of course you're going to hear from our plaintiffs, our clients, and they will describe in detail all the MP -- all the torment the MPs subjected them to.  In very palpable ways, they are depicted in the pictures that you will see.

The evidence is going to show that Salah, Asa'ad and Suhail were victims of cruel, inhuman and degrading treatment and torture.  It's going to show that CACI interrogators directed and encouraged these abuses.

Now, for Salah, Asa'ad and Suhail, the emotional pain of what they went through is lasting.  They suffer from depression, anxiety, nightmares, irritability, particularly with family members, and social isolation.  Everything we all know to expect from people who go through trauma.

So Salah, Asa'ad and Suhail are courageous individuals who have been waiting a long time to share what they endured in an American court of law.  We ask you to listen to their story, and we will ask you to return a large monetary verdict against CACI for what our clients endured. And in so doing, we know that you all cannot cure the stain

176

of Abu Ghraib, but in so doing, you would have the power to provide a small measure of justice to individuals that have come to this court to seek it.

Thank you.

THE COURT:  All right, Mr. O'Connor.

OPENING STATEMENT ON BEHALF OF THE DEFENDANT

MR. O'CONNOR:  Good afternoon.  We met this morning.  My name is John O'Connor, and along with the rest of our team, it's my privilege to represent CACI in this case.

I want to start with a couple of things that we wholeheartedly agree with the plaintiffs about.  Abu Ghraib was a stain on this country.  Those of you of a certain age remember, probably, when those news reports came out and the horrific pictures came out.  We think they're horrific, too. But that's -- you know, you're going to see a lot of those pictures.  They showed you some during their opening statement.  We're going to show you a couple during our opening and they're going to show you a lot during the trial.

The object of the plaintiffs is to make this an emotional decision by you and not to look at the fact of what's actually the case, because most of what the plaintiffs said about the way things actually were run at Abu Ghraib prison is not going to be supported by the

177

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

evidence.  They're pulling things out of context, and when you hear from the witnesses and when you look at the documents, you will see that the fact is, there is no connection between my clients and any abuse that any of these plaintiffs might have suffered.  And I say "might have" because their stories are basically uncorroborated.

We do have a whole bunch of interrogators who -- they're going to be pseudonymous, you're not going to know their names, I'm not going to know their names, the judge isn't going to show their names.  And they're going to testify by tape recording, and they're going to say, hey, what they say happened never happened in any interrogation that I participated in.  That's what you're going to hear from the interrogators.

And I also hope that when you evaluate the plaintiffs, you will look at -- two of the three made statements back in 2003 and 2004.  Compare those and what they say about civilians -- hint, basically nothing -- with what they say now that they're suing a civilian contractor.

Mr. Azmy talked about securing justice.  Justice is not secured by holding an entity that was not responsible for anything that might have happened to these plaintiffs liable to these plaintiffs.

So here's my client, CACI.  It's a large government contractor.  It's been around for about 60 years.

178

Its headquarters was in the Ballston area of Arlington forever, and then a few years ago, they moved out to Reston. It mostly does IT work and things like that for the government. A lot of work for the Defense Department, a lot of work for the intelligence agencies and other agencies mostly in the IT area.

Now, let's go back to 2003 then. Judge Brinkema took you back to the beginning of the case when she explained what this case is about.

The United States invaded Iraq. The soldiers who invaded Iraq were under attack, and the United States Army detained thousands and thousands of Iraqis that it believes may have intelligence value and should be questioned. The big problem they had is they had thousands and thousands of Iraqis, and they didn't have enough soldiers to interrogate them.

You're going to hear that before CACI came on the scene, the Army was using -- they were using non-interrogators to conduct interrogations. Two of the people -- two of the soldiers who interrogated the plaintiffs in this case, they were radar technicians. Because in a war, the Army's got to fight with the Army it has, not with the one it wants. So they were grabbing anybody who they thought was smart enough and able enough to conduct interrogations and having them conduct those

179

interrogations.

Mr. Azmy talked about two government reports.  He didn't talk about Vice Admiral Church's report.  This came after all the events and summarized the findings of Taguba, Fay and about ten other investigations.  And you're going to see an exhibit that has significant excerpts from the Church report.  And it talks about that the Army didn't have enough interrogators, so it had to go out and get interrogators.

So how did that happen?  So 2003, Army invades Iraq.  CACI has a couple of intel analysts, their desk job.  They're in Germany with the Army units they're supporting, and their contracts don't even call for them to deploy.  But one team one flight what happened when the unit deployed?  They got on the plane and deployed to Iraq.  So all of a sudden, CACI had a couple of intel analysts, not interrogators, intel analysts in Iraq.

So a CACI executive named Chuck Mudd, he flew out to Iraq because he wanted to check in on the welfare to make sure that the employees knew that we cared about them and the company was going to look after their needs, and when he was there, he went to the contracting office, made sure everything was set and the analysts made sure they were doing what they were supposed to do.  And being there, he said, is there anything else the Army needs to fight this war.  And they told him they need two things, Porta Johns

and interrogators.  This case is not about the Porta Johns; it's about the interrogators.  And Chuck Mudd said we don't have -- they're not in the interrogation business, but if you need interrogators, let's get a contract, we will get you interrogators.

Now, Mr. Azmy showed you a couple of snippets from the contract.  If you look at the whole contract, the whole contract says you're going to get interrogators over here at CACI, and they're going to get integrated into the military chain of command.  That's how it's going to work, and that's exactly what happened.  CACI was basically a hiring agency.  It went out and it found interrogators.  And the Army approved those interrogators.  Looked at the resumes and approved them when they came in.

Mr. Azmy said, oh, they're sending unqualified people.  What he didn't tell you is he said, oh, Tim Dugan, Steve Stefanowicz, they weren't qualified.  Steve Stefanowicz was a jet ski salesman, which is a misleading characterization.  You'll hear from him by videotaped deposition.

But those people didn't even go over as interrogators; they were sent over as screeners, not interrogators.  And what did the Army do when they got there and they've got tens of thousands of people they need to interrogate?  They came up to Steve Stefanowicz, and they

181

came up to Tim Dugan and said, guess what, you're now going to work over there, you're now going to be an interrogator, and that's how it worked. And if the Army wants to have them interrogate, we're going to have them interrogate.

But the important thing -- and we'll get to why it's important, and the Judge has hinted at it a little bit -- the Army controlled all aspects of CACI interrogators' work. Everything. They were completely in control. They had all the information. I mean, the control was so complete that CACI's management, they knew basically where in Iraq their interrogators were, and that was kind of a list. They didn't know what intelligence the Army was trying to obtain. They didn't even know who their interrogators were being assigned to interrogate. They didn't know what interrogation approaches or plans the interrogators sought to use in interrogations.

The CACI interrogators, just like the military interrogators, they had to take their interrogation plan. And who did they take it to? Did they take it to CACI? No. They took it to the United States Army, and they had an Army section chief who looked at it, said, yeah, this is good; or no, we need to change this, and then it went up another level to Captain Wood, who was in the interrogation control element, and she approved it. CACI didn't even know what was authorized. There's a chart of lists of the approaches

182

and interrogation techniques that are approved.  It was classified.  CACI was not permitted to know that.  20 years later, today, CACI is not allowed to know who its employees were interrogating.

So you're going to hear later from a bunch of pseudonymous interrogators, two of whom are CACI employees. CACI's not allowed to know who they are.  Its own employees. The people who the plaintiffs say should be the source of liability for CACI.

So you're going to hear from all of the interrogators that the Army could find who interrogated any of these plaintiffs.  And, to be clear, the United States says only two of the three were subjected to an intelligence interrogation.  They have no record of Mr. Al-Ejaili being subjected to an interrogation.

But for the two that they could find, they rounded up every interrogator that the records showed that participated in interrogations of these two plaintiffs, and they all say, well, the things they're saying happened, that did not happen.  And you don't have to decide who you believe about that.  But the interrogators have no reason to lie.  They're entities that are protected.  They have no benefit from lying about that.

Contractor compliance.  And the level of contractor experience was generally good.  As I said, the

183

folks that plaintiffs are complaining about that they thought were unqualified to be interrogators, they weren't hired as interrogators.  CACI sent them over as screeners, and they were promoted by the Army because they needed more interrogators.

Let's look at the chain of command.  This is how it worked.  This is the Abu Ghraib interrogation chain of command as it existed before CACI had a contract.  If you look at the top, it's the intelligence brigade.  It's headed by Colonel Thomas Pappas.  You're going to hear from him by videotaped testimony.  He was the head honcho, and he had an executive officer named Lieutenant Colonel Steve Jordan.  And then underneath them was the ICE, the Interrogation Control Element.  That was Captain Carolyn Wood, who was Major Carolyn Holmes by the time she was deposed.  You're also going to hear from her by videotaped deposition.

Underneath Captain Wood, there were a series of about five sections, and each one of them had a section leader.  What do they all have in common?  They were soldiers, too.  They were either sergeants or staff sergeants, and each of those section leaders had a series of Tiger Teams underneath them, which was basically an interrogator, a translator, and if they had one, an analyst, but not always.

So the chart here, I've just put them underneath

184

the middle section, but every one of those sections would have all the different interrogators underneath them. And so when an interrogation was going to go on -- oh, the interrogators. They were junior soldiers, or -- well, they were junior soldiers who were either school-trained interrogators, you know, corporal, specialists; or they were people like radar technicians that the Army said we need interrogators, you're now going to interrogate.

So they would make an interrogation plan. They'd send it up to their section leader. It would go from there to Captain Wood, and Captain Wood had to approve it 100 percent before the interrogation could go forward.

What happened when CACI starts providing people? What did they do? They just slotted right into the various sections. The section leaders just had more sections now, so those CACI interrogators, they had to send their interrogation plans to the sergeant or staff sergeant who would approve it or not. If it approved it, it would go up to Captain Wood who would approve it or not, and if it was approved, they would conduct the interrogation.

The Army also required that for every interrogation, a report be prepared by the interrogator, and that was put into a classified database that the Army maintained of all the interrogations that were conducted at Abu Ghraib prison.

185

Now, you heard from Mr. Azmy, oh, CACI had an employee who was the site lead, his name was Dan Porvaznik. His job was administrative. He was over there as an interrogator, but he actually didn't interrogate much because he had so many administrative duties, which involved, like, getting housing for the interrogators, dealing with getting people in and out of country when they were coming on the contract or going off the contract. Dealing with vacation, leave, family issues, pay issues. He had -- it was all administrative, and everyone you're going to hear from is going to say that.

Mr. Azmy said Mr. Porvaznik, and he had access to the interrogation reports and interrogation plans. Why? Were they sent through him? No. Because he was an interrogator. Every interrogator had access to those. Because as an interrogator, you needed to know what other people are telling other interrogators, that's how you develop intelligence.

So Mr. Azmy will stand there and say, oh Mr. Porvaznik, he had access to that. It's not because he was in a supervisory position; it is because he was an interrogator just like everybody else over there.

And what else did Admiral Church find? Very few instances of abuse involving the contract. This is after -- you know, he's taking into account the Taguba report and the

186

Fay report.  And that's the truth.  If you go through the Taguba report and the Fay report, there is a lot of misconduct at the Abu Ghraib prison, and we are not here to defend that.  They found very few instance that military intelligence was involved in at all.  Most of it was MPs behaving criminally, and they were rightly punished for that.  But they found some that involved military intelligence personnel and a few that involved CACI personnel.

So let's start with the investigations.  General Taguba.  You're going to hear from him, I'm going to guess tomorrow.  He was sent to investigate the MP brigade, not military intelligence.  He was actually denied access to military intelligence personnel, he was denied access to the military intelligence records.  He didn't have any of that.  He was there to investigate the MP brigade, which had a lot of problems.

Major General Taguba was allowed to interview four people from the military intelligence side.  Colonel Pappas, Colonel Jordan, Steve Stefanowicz, a CACI employee, and a guy named John Israel, who was a civilian translator who worked for a company named Titan.

In his report, General Taguba finds he has reasons to suspect that all four of those individuals had some involvement in some of the detainee abuse that occurred at

187

Abu Ghraib prison.  But his purpose -- and he'll testify to this tomorrow or whenever he's called.  His purpose was not to make definitive findings; it was he knew he had a limited insight into military intelligence.  It was to flag things so they could be investigated by somebody who was appointed for that purpose, and that was Major General Fay.

And, in fact, of the four people that General Taguba said he suspected on the MI side, none was ever convicted of a crime relating to detainee abuse.  Lieutenant Colonel Jordan was actually charged with detainee abuse.  He was found not guilty.  The other three were never charged with any detainee abuse.

General Fay, he found a whole bunch of instances. He tried to catalog every instance of detainee abuse that he could substantiate at Abu Ghraib prison, and he found a whole bunch.  He found 44 instances, but only 16 were tied in any way to military intelligence.

Most, though not all of the violent or sexual abuses, were separate from scheduled interrogations and did not focus on people being held for intelligence purposes. It was just -- it was MPs being abusive and criminal and rightly punished for that.

To give you a few examples, I'm going to go through these are unpleasant pictures, but they're some of the famous ones for those of you of a certain age might

188

remember.  Guy on the box.  No military intelligence involvement at all.  That was just MPs being abusive with a CID, not a military intelligence person.

The naked pyramid.  No involvement of a military intelligence or CACI.  Lindy England, MP right there with a leash, no involvement of military intelligence.  This is the only picture.  Thousands of pictures.  There's the picture of a CACI employee.  That's Dan Johnson.  That's an Iraqi policeman who's being asked because he was believed to have smuggled a pistol into a detainee.  That's it.

Tim Dugan.  Found one instance in General Fay's report that had to do with dragging someone off the back of a Jeep.  Not these plaintiffs.  No indication he had any interaction with these plaintiffs.

Dan Johnson.  Everything relates to that Iraqi police officer who was questioned after the shooting in the Abu Ghraib prison.

Steve Stefanowicz.  All the evidence is that anything that he allegedly did wrong was done with detainees he was assigned to interrogate.  He was only assigned to interrogate about five detainees.  None of them were these plaintiffs.

Plaintiffs have three hurdles, and I'm going to go through them quickly because I have three minutes left.

One, were plaintiffs subjected to torture or CIDT

189

at Abu Ghraib prison?  They're going to tell you compelling stories.  They're going to testify, and it's going to be compelling, and it's probably going to be emotional.  It conflicts with some of what they said 20 years ago.  It also certainly conflicts with what the interrogators say happened, and some of it conflicts with Army records. You'll have to make your own decision.  We have no way to definitively show what did or did not happen to those plaintiffs.

The second hurdle.  If they were subjected to torture or CIDT, were individual CACI employees involved? We've got conspiracy claims and aiding and abetting.  Where is the agreement?  Ask yourself that throughout the trial. Where did CACI people agree that they were going to be -- you know, to do anything with MPs that was going to extend to mistreating these plaintiffs?  There's no evidence of that at all.  They just want you to say that three people did discrete bad acts as found by General Fay, so let's just make it up that they probably agreed to abuse these other people who they didn't even interrogate.  Aiding and abetting.  There's no evidence of that either.

All right.  The third hurdle.  Even if CACI employees had engaged in conspiratorial or aiding and abetting contact with these plaintiffs, is CACI liable?  And that's where the Judge mentioned there's a thing called the

190

borrowed servant doctrine.  Employers are often liable for things their employees do, but they're not if you loan them to someone else who controls and directs their activities. And, remember, the interrogators, they went up through the Army chain of command.  CACI didn't have any information about what they're doing, what they're allowed to do, anything like that.

And, you know, the funny thing is, a lot of times in these borrowed servant cases, you have people pointing at each other.  You have a loaning employer saying I didn't direct and control these guys, so the borrowing employer should be liable.  And the borrowing employer says, oh, no, it's not me, it should be you.

No.  To its credit, the United States agrees. This is Colonel Pappas who had operational control.  The United States Army had operational control over the CACI interrogators.  Captain Wood says the same thing.  Same chain of command as the military.

The official position of the United States in connection with -- this is about Interrogator A's interrogation.  The Army's in charge.  Now, they're subject to the direction of the military chain of command from the section leader to the NCOIC all the way up.

Next page.  No CACI personnel were in this chain of command.  That's what -- that's the evidence you're going

191

to hear.  And the evidence is the United States and CACI agree that the Army, as you could expect in a war, they're pretty jealous about controlling activities in the theater of war, and that's what happened here.

And so at the end of the case, we ask you to use reason, analysis and listen to the evidence and not be swayed by emotion, and you should return a verdict for my client.

Thank you.

THE COURT:  All right.  If you could call your first witness.

MR. AZMY:  Actually, Your Honor, could we have a sidebar briefly?

THE COURT:  Yes.

(Bench conference.)

MR. AZMY:  Your Honor, I'm not sure if I heard things correctly, but what I heard from Mr. O'Connor is this:  The judge hinted at it a little bit, but the Army controlled all aspects of interrogation at Abu Ghraib.  And that seems to suggest that you were sort of hinting at their ultimate defense, and so --

THE COURT:  I don't think I did that.  But anyways, it's opening statements.  We're not going to get into it on a sidebar.

MR. AZMY:  No.  Understood, Your Honor.  Just

192

maybe --

THE COURT:  No.

MR. AZMY:  Okay.  Thank you.

(Open court.)

THE COURT:  Counsel, from our previous discussions about getting ready for this trial, there is a rule on witnesses; right?  Everybody's going to be following that.

So no witness who is scheduled to testify may be in court while any other witness is testifying other than the plaintiff and the representative from CACI; right?

MR. FARIDI:  That's correct, Your Honor.

MR. O'CONNOR:  Yes, Your Honor.

THE COURT:  And once a witness is excused, he or she may stay in the courtroom, but then you cannot re-call that witness.  All right.

Who's your first witness?

MR. FARIDI:  Your Honor, before we call our first witness, I want to read a few paragraphs from the parties' stipulation of facts.

THE COURT:  All right.  Do you have an exhibit number or a document number for that?

MR. FARIDI:  Yes.  This is coming from PTX 226. That is the stipulation of uncontested facts.  And I will read, Your Honor, paragraphs 1 through 3 and then paragraphs 19 and 20.

193

THE COURT:  All right.

MR. FARIDI:  Paragraph 1:  Abu Ghraib prison is a prison facility located in Abu Ghraib, Iraq.

Paragraph 2:  Between mid 2003 and August 2006, the United States used the Abu Ghraib facility to hold detainees.

Paragraph 3:  The United States housed thousands of detainees in different parts of the Abu Ghraib facility, including within the prison building.  The prison building was often referred to as the hard site.

Paragraph 19:  Plaintiff Salah Hasan Nusaif Jasim Al-Ejaili was detained at Abu Ghraib from approximately November 9, 2003, until on or about December 20 or 21, 2003.  Mr. Al-Ejaili was assigned ISN 152735.

At this time, Your Honor, plaintiffs called Salah Al-Ejaili.

THE COURT:  All right.

THE COURT SECURITY OFFICER:  Sir, come over.  Face the deputy clerk.  Raise your right hand.

Thereupon,

SALAH AL-EJAILI,

having been called as a witness on behalf of the plaintiffs and having been first duly sworn by the Deputy Clerk, was examined and testified as follows:

(Time noted: 3:03 p.m.)

194

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE DEPUTY CLERK:  Thank you.

THE COURT:  And we'll have the interpreter affirmed as well.

(Interpreter sworn in open court.)

THE COURT SECURITY OFFICER:  Sir, you may be seated.

MS. MAHLER-HAUG:  Your Honor, may I hand up copies of binders?

THE COURT SECURITY OFFICER:  I'll take them.

DIRECT EXAMINATION

BY MR. AZMY:

Q    Good afternoon, Salah.

A    Good afternoon.

Q    Can you please state your full name for the record.

A    My name is Salah Hasan Nusaif Jasim Al-Ejaili.

Q    How old are you?

A    I am 53 years old.

Q    Where do you currently live?

A    I currently live in Sweden.

Q    And with whom do you live?

A    I live with my family, my wife and three children.

Q    How old are your children, and where are they in school?

A    My oldest daughter is 22 years old.  She's about to finish university.  My middle son, Mustafa, just enrolled in

195

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

university, he's 18 years old.  And my son, Ghaith, is 16 years old.  He's in high school.

Q    Do you have any other children?

A    Yes.  I have a son whose name is Saif from a previous wife, and he lives in Iraq, and he works in a communication company.

Q    Where were you born and raised?

A    I was born in Iraq in the Governorate of Diyala, and I grew up in Diyala.

Q    Do you practice a religion?

A    I am Muslim.

Q    What level of schooling did you achieve, and in what areas?

A    I finished my university studies in Iraq.  History.

Q    And did you have a professional career in Iraq?  What was it?

A    Yes.  I worked for a few years in an electrical company.  After that, I worked for Al Jazeera channel.

Q    Okay.  Can you tell the jury what Al Jazeera is?

A    It's a satellite media channel that mainly broadcasts news, and it's well known in the Arab world.

Q    And what was your role at Al Jazeera?

A    So I got up the ladder in my work at Al Jazeera.  In the beginning, I was a journalist and a photographer.  After that, I became a reporter.  After that, I became a news

196

producer at the Al Jazeera channel in Qatar.

Q    And about how long did you work for Al Jazeera?

A    About 11 years, or a bit more.  Perhaps 14 years. 14 years.

Q    Okay.  And what year did you leave Iraq?

A    I left Iraq in 2005.

Q    And you mentioned that your family now resides in Sweden.

Can you briefly explain how that came to be?

A    After 2003, after the collapse of the security in Iraq, I was pondering a safe place for me and my family.  And this idea lasted on my mind for quite some time.

In 2005, I went to work in Jordan, and I remained there for two years.  After that, I went to Qatar.  And then in 2017, me and my family, we settled in Sweden.

Q    Okay.  Do you have legal status there?

A    Yes, we have legal status.  We got nationalized, me and my family.

Q    Are you currently employed in Sweden?

A    I still work in journalism on a freelance basis.

Q    Salah, I'd like to focus your attention on the fall of 2003.

Where were you living in fall 2003?

THE INTERPRETER:  Where were you living?

MR. AZMY:  Living.  Yeah.  In fall.

197

THE WITNESS: I was living in the Governorate of Diyala. It is north of Baghdad.

BY MR. AZMY:

Q    In Iraq; yes?

A    Yes, in Iraq, correct.

Q    And what were you doing for a living at that time?

A    I was working for Al Jazeera channel as a journalist and photographer.

Q    Did there ever come a time in the fall of 2003 when you were detained at the Abu Ghraib prison?

A    Yes. That was in the month of November on the 8th or the 9th of November.

Q    And how was it that you remember that date?

A    It was a significant day in my life. My life prior to that date was completely different from my life after that date. It affected tremendously my social relationships and my psychological status.

Q    And were you familiar with the Abu Ghraib prison before you arrived there?

A    Yes.

Q    Okay. What was its reputation?

A    So prior to 2003, Abu Ghraib was a detention center used by the prior -- by the former Iraqi government. It was a detention center of a bad reputation.

And then after 2003, what we got to know is that

198

Abu Ghraib became a major detention center for the united forces in Iraq.  The United States forces in Iraq.  And we also got to know that people received bad treatment at Abu Ghraib, and it's a bad prison.

Q   So eventually I want to focus on the first night you arrived at Abu Ghraib.

But tell us where you were first taken when you arrived at Abu Ghraib.

A   At the beginning, I remember they put us in tents known by the temporary tents.

Q   And where were you taken after the temporary tents?

A   They took us to a big hall called the computer hall.

Q   And can you describe what that looked like and who was there?

A   So it was quite the big hall.  It had many computers there on which Americans worked.  And then they would let us in two or three at a time, and then they would take our personal information.

Q   And then where were you taken after this computer room?

A   After that, an American soldier came, and he took me to a small room that was adjacent to the computer hall.

Q   Okay.  And what happened in that small room?

A   In that room, there were three individuals, two of which were military uniforms.  The third one wore civilian clothing.

199

Case 1:08-cv-00827-LMB-JFA    Document 1815    Filed 11/12/24    Page 200 of 287
Direct examination of S. Al-Ejaili
PageID# 54134

Q    Can you describe the civilian clothing as best as you remember?

A    So the civilian clothing are what we call safari or khaki.

Q    And what happened after that?

A    One of the military people started to interrogate me. The other person wearing the military uniform was interpreting. The third person who was wearing the civilian clothing was silent during the whole interrogation.

Q    Okay. And then did there ever come a time where you were taken out of this place and transferred someplace else?

A    After about half an hour or more came another individual, an American one. He had the bag on my head, and he handcuffed my hands. And then he got me to get in a car. The car drove about five minutes or a bit more. We arrived to a different location, I believe another building. He got me out of the vehicle, and I remained in that location. He handed me to two other individuals who were also American.

Q    Okay. And did those individuals do or say anything to you?

A    Straightaway, as soon as they got ahold of me, something that resembles an interrogation, but it was more of screaming. One of them was screaming in my right ear; the other one interpreting in my left ear. He was screaming confess, confess. And I was asking him what he wanted me to

200

confess to. He said, you know. Speak up. This lasted for a few minutes, the screaming. And I remember I was right by a wall. And they were very near to my face with the screaming in my face. They told me we will let you be for a few minutes and then we'll come back to you. By then, think well about what you're going to tell us. And then they came back a second time, but the second time was not as long as the first time.

Q   And then what happened when they came back?

A   After that, another individual came and took me from them.

Q   A different one than the first -- the two we're talking about?

A   Yes. Yes. A different individual.

Q   Okay. And what did he -- what did he do to you, and where did he take you?

A   So the bag was on my head. He led me walking about five to seven minutes. And then we got to a place. I felt that place was full of people. And in that place, he started to give me military commands.

Q   Okay. I want to ask you, did you ever have a chance to see that place maybe when your hood was off?

A   Yes. Yes, I did.

Q   Okay. Okay. Can you in your binder turn to the second tab labeled PTX 13.

201

THE COURT:  Is there any objection to this exhibit?  There shouldn't be.

MR. O'CONNOR:  No, there shouldn't be, Your Honor. No objection.

THE COURT:  It's in.

(Plaintiffs' Exhibit Number **13 admitted into evidence.**)

BY MR. AZMY:

Q    Can you describe what you see here?

A    So this is the hall that has the individual cellblocks in Abu Ghraib.  It has a lower level and a higher level. The cells are distributed on the lower level as well as on the higher level.  As far as I recall, I was in one of the corners in this place.

Q    Okay.  So you believe that's where you were taken that night?

A    Yes.  Yes.

Q    And you mentioned the person who brought you there started giving you commands.

Can you tell the jury what he told you to do?

A    So the command was by screaming, and it was take off your clothes.

Q    What did you do?

A    So I thought that they would give me a jumpsuit or something, so I took off the pants and the shirt.  And then after that, he continued with the military command.  He

202

commanded me to take off all my clothes.  I refused at the beginning, and then he started to command me again, if you don't take off your undershirt and underwear, I will take them off with my own hands.  And, therefore, I had to take them off.

Q    Okay.  Did he do anything to you after commanding you to take your clothes off?

A    After I took off my clothes, he got a piece of fabric, as far as I remember at that time, and he tied my hands up behind my neck.

Q    Okay.  Can you show the jury again what that looked like?

A    It was in this manner.

        MR. AZMY:  Let the record reflect that Mr. Al-Ejaili has his hands poised behind his head.

        THE COURT:  All right.

BY MR. AZMY:

Q    And you -- do you still have the hood on at that time?

A    Yes.  The bag was still on my head, but during the moment that I was taking off my undergarments, my underwear, he took off the bag, and then the bag came off my head, and then it came back on.

Q    Okay.  And when you were tied with your hands behind your head and naked, how long were you in that position?

A    I was shackled from the nighttime until the day after

203

Case 1:08-cv-00827-LMB-JFA   Document 1815   Filed 11/12/24   Page 204 of 287
Direct examination of S. Al-Ejaili
PageID# 54138

in the morning.

Q    Were you able to move or sit?

A    Not at all.  All movement was forbidden.  At times, I would get tired, and I would try to sit down.  He would scream at me get up.

Q    So you were forced to stand in this manner overnight?

A    Yes.

Q    Were you able to sleep?

A    Not at all.

Q    Were you given food or water?

A    No, not at all.

Q    What was the temperature like?

A    It was very cold.  And the fans in the hall were turned on at the high speed.

Q    Can you describe to us how it felt physically for you to be tied with your hands behind your back overnight and forced to stand?

A    I felt like my body was falling apart all together.  I felt pain in all my bones and my joints in my shoulders.  My legs were shivering.  A few times I would fall to the ground, but the same individual would come and force me to get up.  One of the times he tried to get the fabric that was tying my hand to have it anchored to something behind.

Q    Can you describe how it felt emotionally or psychologically to be naked for so long in front of others?

204

A    It was very difficult.  I would have hoped to die and not go through this.  It is very difficult to have all your social values and all your values all together be broken.

Q    Were there any particular cultural or religious reasons this was all so difficult?

A    I am Muslim, and according to my religion, it is forbidden by God for us to be naked in front of men or women.  We have been taught this since we were children.  Also, socially and morally it is considered shameful for a man to get naked in front of people.

Q    Did anyone approach you that night when you were tied and naked?

A    Yes.  I felt two American females get near me from behind in a very close distance.  I remember one of them tried to pull a hair from my back, and I was able to hear their breath near my body.

Q    And what was that experience like at that time?  How did that feel?

A    I felt like all my will has been taken away, and I had no way to defend myself in any shape, way or form.

Q    And that night, did you ever hear anything from that area, from that cellblock that was concerning?

A    That night around midnight I started to hear Americans, men and women, singing in English, happy birthday, Al Jazeera.

205

Case 1:08-cv-00827-LMB-JFA   Document 1815   Filed 11/12/24   Page 206 of 287
Direct examination of S. Al-Ejaili
PageID# 54140

Q    Was it your birthday?

A    No.

Q    Did you have any health problems that night?

A    After that, my health deteriorated majorly.  I felt my whole stomach boiling.  After that, a black liquid started to coming out of my -- after that, a black liquid started to come out of my mouth, despite my will, and it started to fall on my body and on the ground.

Q    Can you say a little bit more about the sensation, how that felt physically?

A    It was very painful.  I felt something burning me inside.  In addition, my body was in a collapsing state and my bones were hurting.

Q    Okay.  Salah, if you can look at tab 1 -- turn to tab 1 of your notebook.  Look at PTX 1, marked for identification.

        THE COURT:  Is there any objection to one?

        MR. O'CONNOR:  No, Your Honor.

        THE COURT:  All right.  It's in.

    (Plaintiffs' Exhibit Number 1 admitted into evidence.)

BY MR. AZMY:

Q    Okay.  What do you believe is depicted in this photo?

A    I believe that person is I.

Q    Why do you believe that?

A    All the context present in this picture applies to me in that night.  The red jumpsuit, the fabric that they used

206

to tie my hand behind my neck, the black bag on top of my head, the black liquid that I vomited out of my stomach and it was on the floor, and I was by a wall.

Q   Did you receive any medical attention that night?

A   No, not at all.

Q   Did anyone come to clean the bile up?

A   No, not at all.

Q   Salah, sitting here now, how does it make you feel to see yourself in this picture and know that it's public?

A   It is difficult to describe my feelings.  It reminds me of all the pains that I went through during these moments.  At times, I wish that none of this happened and that I never witnessed it.  But the problem is it's engraved in my memory, and I could never forget it.

Q   So in the morning, did anyone come to you?

A   In the morning, the same individual who brought me there came.  He opened my hands from the fabric and from the jumpsuit.  He pulled the bag from my head.  And another time he started to give me military commands.

Q   One question, why do you believe it was the same man from the night before?

A   Because he had got me to this place in the beginning, and then I was able to see him, and I was able to hear his voice.  The day after in the morning also when he took the bag off my head, I was able to see him, and I also heard his

207

voice.

Q   Okay.  And you said he gave you another command.

What did he tell you to do?

A   He commanded me to clean the floor with the red jumpsuit from that black bile.

Q   Did you?

A   Yes.

Q   Okay.  Can you describe what this person looked like?

A   He was white.  He was American.  He had a mustache.  He wore glasses.  His eyes were protruding.

Q   And what was he wearing, if you remember?

A   He was wearing military pants and a military T-shirt.

Q   Did there ever come a time when you learned the name of this person?

A   After I was released from the jail of Abu Ghraib, and after the pictures of the scandal of Abu Ghraib came onto the media, I saw the picture of that man, and I recognized him.  Later on after he was put to trial, I found out his name.

Q   And what was his name?

A   Graner.

Q   Graner.

Okay.  Salah, I'm showing you -- please open tab 3.  I'm showing you what's been marked PTX 193.

THE COURT:  Any objection to 193?

208

MR. O'CONNOR:  No, Your Honor.

THE COURT:  All right.  It's in.

(Plaintiffs' Exhibit Number **193 admitted into evidence.**)

BY MR. AZMY:

Q    Do you recognize anyone in this picture?

A    Yes.  The one who's present on the right side of the picture.

Q    Who is that?

A    Graner.

Q    Graner.  Okay.

A    Also the man who is on the left, but I don't know his name.

Q    You had interactions with the man on the left also?

A    Correct.

Q    Okay.  Okay.  So after you complied with the order and cleaned up this bile with your uniform, what happened next?

A    Once again, they came, and they put the black bag on top of my head.  And then he led me to the higher floor where the cellblocks are.  He opened one of the cells, got me inside and then locked me in.

Q    Okay.  When you were being transported to the upstairs cellblock, did you have any clothes on?

A    No, not at all.

Q    And the person who took you to the cellblock was who?

A    Graner.

209

Q    Okay.  Just to be clear, Graner was the person who brought you overnight to the cellblock; yes?

A    Correct.

Q    And Graner was the one who told you to take off your clothes?

A    Yes.

Q    And who forced you to clean up your own vomit?

A    Yes.

Q    Okay.  When you arrived to the upstairs cellblock, were you given any fresh clothes?

A    No, not at all.

Q    Okay.  Did you try to put it on -- sorry.

Did you have any clothes with you?  Sorry.

A    I only had the jumpsuit, but it was dirty, it was soiled with the black bile, so it was difficult for me to wear.

Q    Okay.  Did you try to put it on right away?

A    No.  I tried to clean it.  There was a water source inside the cell.  After I cleaned it, it was damp, it was wet.  So I put it aside in the cell thinking that it would eventually dry and then I could wear it.

Q    And in the meantime you were naked?

A    Yes.

Q    Okay.  What was the temperature like in the room?

A    So it was very cold.  The fans were working on the high

210

speed in that hall.

Q    Okay.

A    And inside the cells, it was even colder outside the cells.  I was trying to wrap myself up around myself in order to get a little bit warmer.  There was a source of light of sunrays that was coming through the cell, a small amount of it, and I was trying to stand in a location where that light would hit in order to get warmer.  My body was very cold, and I was shivering.

Q    Did you ever ask anyone that morning to bring you fresh clothing?

A    An American woman, I believe she worked in the jail, I asked her to give me clothes because it was very cold, and I felt like I could get sick and die.  She said, yes, I'll get you clothes.

Q    Did she bring you any clothes?

A    Yes.

Q    What did she bring you?

A    She brought me two pieces of female underwear.

Q    Did she tell you to do anything with it?

A    No.  She just handed them to me in that manner.

Q    Just dropped it in front of you?

A    Yes.

Q    Did she tell you to wear them?

A    Yes.  She said here, put those on.

211

Q    Did you wear them?

A    No.

Q    From where you were in your cellblock, could you see any other men detained there?

A    Yes.

Q    What did you notice about them?

A    I was able to see three or four other prisoners in the cells facing mine that were also naked.  And if I get near the door a little bit more, I was able to see two or three others in the lower level.  Some of them were naked as well.

Q    Were you eventually able to wear the uniform that day?

A    So I remained from the morning all the way to a late time during the night, and then at that time, I felt the dampness of the jumpsuit was becoming less, just enough for me to be able to wear it.

Q    Okay.  Did there come a time when you were taken out of the cell?

A    Yes, in the day that followed.

Q    Okay.  Can you describe anything about the person who came to get you, how was he dressed?

A    He was wearing military pants and a T-shirt.  And I believe he's also present in the picture that had Graner in it.

Q    Where do you believe he's pictured?

A    All the way on the left.  He's the person on the left.

212

Case 1:08-cv-00827-LMB-JFA    Document 1815    Filed 11/12/24    Page 213 of 287
Direct examination of S. Al-Ejaili
PageID# 54147

Q    Okay.  And before he took you out of the cell, what, if anything, did he do to you?

A    So before he got me out of the jail cell, he opened the cell door, and he commanded me to take off all my clothes. After that, he kept the black bag on top of my head.  He handcuffed my hands, and he led me walking to a different place on the same higher level.

Q    Okay.  And can you describe a little bit what you perceived about that place?

A    So it's as if he handed me to a different group.

Q    Okay.

A    So those people, two or three of them, started an interrogation session with me.

Q    Okay.  Were you restrained at this time?

A    My hands were handcuffed.  The black bag was on top of my head.  But when he handed me to those two or three individuals, they took off the cuffs from my hands, and then they tied my hands, each one on one side.  So there was a pipe in the hallway that's on the higher level.  They tied a hand to this side and the other hand to the other side.

Q    Can you please show the jury how you were restrained?

A    In this manner.

Q    Were you sitting or standing?

A    My legs were dangling to the ground.

MR. AZMY:  Let the record reflect that he

213

described having his arms outstretched and handcuffed to a pole.

BY MR. AZMY:

Q    Was this painful?

A    It caused me dislocation in my two shoulders in the bones.

Q    Okay.  How were you treated during this interrogation session?

A    To start with that day and every day it was terror amid the cellblocks.  We would hear the screams of the detainees everywhere.  So they were getting us mentally accustomed that we're also going to be exposed to the same screaming. After a minute or two, I felt that I'm being striked, different strikes on the head, on the back, on the abdomen.

Q    This was during this interrogation session when you felt being hit?

A    Right before their interrogation started.

Q    I see.  Okay.

     And then during the interrogation, how did you feel?

A    So during the interrogation, they asked me many questions, some of which were personal.  And much of the interrogation was related to Al Jazeera channel.

Q    And how were you feeling at that moment?  Were you -- you know, describe your feelings during the interrogation.

214

A    So the morning of that day, like every day, it was terror.  You hear the screaming everywhere.  People screaming from pain.  So the fear was instilled inside me. I would expect something would happen to me, perhaps I would die, because the screams we would hear were illogical.

Q    Were you ever able to get a look at the person who was mostly asking you the questions during this interrogation?

A    Right before the interrogation was finished, he pulled the black bag off my head so I was able to see that man.

Q    What did he look like?

A    He was of big stature, white.  I believe he had a goatee or a beard.  I don't particularly recall if he was bald or not bald, but his general characteristic, he was a man of a big stature.

Q    Okay.  Do you believe you were ever interrogated by him again after this first time?

A    At least two or three times after.

Q    Is there anything about his appearance or his attitude that you remember in particular?

A    So I remember this one time I was standing on something that was a bit high, perhaps it was a step, one or two steps high.  And he was on the ground, and he still felt like he was bigger than I.  So the way he would talk to me was humiliating.  He would laugh at me and say, yes, as soon as you're released, you're going to go back and work for Al

215

Case 1:08-cv-00827-LMB-JFA    Document 1815    Filed 11/12/24    Page 216 of 287
Direct examination of S. Al-Ejaili
PageID# 54150

Jazeera.  Of course they pay you, you have to work for them.

Q    Okay.  What was he wearing when you saw him?

A    He was wearing civilian clothing, safari.

        MR. AZMY:  Okay.  Let's zoom out a little bit.

BY MR. AZMY:

Q    About how long do you think you were held at Abu Ghraib?

A    About two months.

Q    And during that time, about how many times do you think you were interrogated?

A    So I don't remember exactly how many times, but not two or three days would pass without one interrogation.  At times, I wouldn't even call it an interrogation, I would call it a torture party.

Q    Where would the interrogations occur generally?

A    Mostly on the higher floor.  There were a few rooms.  The -- at other times, it would be on the lower level in the middle hallway.

Q    You already explained your -- the terror you felt on your way to interrogations.

        Can you tell us how you were treated during interrogations?

A    Physically, it was very painful, of course.  All of a sudden, they would pour hot water, hot tea on you.  Or they would throw cold water on you.  Or at times they would strip

216

Case 1:08-cv-00827-LMB-JFA    Document 1815    Filed 11/12/24    Page 217 of 287
Direct examination of S. Al-Ejaili
PageID# 54151

us completely naked, keep the black bag on top of our head, and they would get dogs very near our bodies. That was terrifying, and it was scary. Especially when you're defenseless, you cannot defend yourself in any way. You have no freedom, you have no will.

Q   And when you were not in interrogations, where were you held?

A   In the cellblocks.

Q   And what were the conditions like in the cellblocks?

A   Not much different from outside the cells. The cells were small. Most of the time we were naked inside these cells. We would get exposed to punishment for the slightest simplest reasons, and the simplest punishment is they forcefully strip you naked. And then they tie your hands to the door of the cell for hours, perhaps a full day.

Q   Can you estimate how often you were kept naked?

A   I would say 75 to 80 percent of the whole time I was there.

Q   Were you able to sleep?

A   It was difficult to sleep. First, it was very cold. Lights, high-beam lights were on at all times. Fans turned on at high speed all the time. In addition, they would play loud music all night.

Q   And when you were in the cellblocks or otherwise, were you able to see other detainees?

217

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA   Document 1815   Filed 11/12/24   Page 218 of 287
Direct examination of S. Al-Ejaili
PageID# 54152

A    Yes, I was able to see them, yes.

Q    What do you remember most about seeing them?

A    It was very painful.  It's difficult for you to look at a person in front of you who's completely naked.  We would avoid looking at each other.

Q    During your time in Abu Ghraib, did you have any contact with your family?

A    No, not at all.

Q    How did that feel?

A    It was saddening, and it was painful.  My family knew nothing about me, and I knew nothing about them.  I would think they were really worried for me, and I would wonder do they know that I'm in this place.  It was quite a difficult and painful situation.

Q    So after being held at Abu Ghraib, did you eventually leave the prison?

A    Yes.  After that, I was released.

Q    And did you eventually reunite with your family?

A    Yes.

Q    What was their immediate reaction when they saw you?

A    It was a mix of happiness, joy, pain and sadness.  They were happy that I was released from jail.  They had lost hope regarding that.  But they were sad and in pain regarding how I was and what I looked like.

Q    What did you look like to them?

218

Case 1:08-cv-00827-LMB-JFA    Document 1815    Filed 11/12/24    Page 219 of 287
Direct examination of S. Al-Ejaili
PageID# 54153

A    Emaciated.  Thin.

Q    And after your first few weeks or months after being released from Abu Ghraib, how did you feel psychologically?

A    I went through a period of isolation.  I was refusing to meet with anyone.  Even there were people who would come to congratulate and bless that I was released from jail, but I would refuse to meet with them.  I would make excuses, and I would ask them to tell them he's sleeping, he's tired, or anything of the sort.

Even my family in the household, my mother, my siblings, my wife, I was not speaking with them.  At times, they would try to ask me what is it, and I would close the subject all together.  My thoughts were if I don't talk about that subject, it would be better for me not to reopen the wounds yet again.  I also majorly lacked self-confidence.

Q    It's been 20 years, Salah.  How does the experience at Abu Ghraib affect you?

A    As for the pain and the sadness regarding what happened, any time that I see any picture of Abu Ghraib, it flashbacks my memory.  Perhaps people can see me as a strong person who works as a media -- as a news producer and a journalist, but one picture destroys everything.

Q    So why did you bring this case, Salah?  What do you hope to get out of this?

219

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A    A form of remediation.  Justice.  And that is something that's very important.  Perhaps if justice is achieved in this case -- and I do have hope that justice will be achieved -- perhaps that will ease and end all the pains that I suffer from.  Perhaps if we could reach a resolution that's convincing and fair to me, perhaps I can fold this chapter all together and say it was something from the past.

Q    And how does it feel being here testifying?

A    It's very difficult for me to be here and testifying to this testimony.  But it's a big deal.  I am someone who comes all the way from Iraq to America for them to present a case and have it be accepted by a federal court.  And all these people being present here to witness justice be achieved.  I think that's a big deal, and it cannot even be valued.

        MR. AZMY:  Thank you, Salah.

        No further questions for now, Your Honor.

        THE COURT:  All right.  I think this is a good time to take the afternoon break, and then we'll start with the cross-examination.

        Who's going to do that, Mr. O'Connor?

        MR. O'CONNOR:  I'm going to do it, Your Honor.

        THE COURT:  All right.  We'll be in recess until 20 after 4.  Okay.

            (Jury not present at 4:01 p.m.)

220

(A brief recess was taken.)

THE COURT:  All right.  My understanding is we have to do a matter at the bench; yes?

MR. ELLIOTT:  Please.

(Bench conference.)

MR. ELLIOTT:  Thank you for your indulgence.

Plaintiffs elicited testimony from the plaintiff about the physical description of one of his interrogators. I don't want to speculate about where that line of questioning could be going, but the description could be viewed as similar to someone who's played a prominent role in this case.  And I just want to remind both sides that we cannot identify a specific interrogator with a specific detainee.

MR. AZMY:  Since I'm the guilty party, this is exactly the set of questions we asked last time.  This is almost verbatim from the prior transcript.  It's on the public record.

MR. ELLIOTT:  I'm not asking it to be stricken; I apologize.  I just don't want them to attempt to identify that interrogator by name.

MR. AZMY:  Could I ask sort of my own ignorance question?  If it's our own plaintiffs and not a government witness, what is the problem?  I mean, if our own clients overheard this person being called something, why can't our

221

Case 1:08-cv-00827-LMB-JFA   Document 1815   Filed 11/12/24   Page 222 of 287
Direct examination of S. Al-Ejaili
PageID# 54156

client testify to that?  Why do we cede to the government's interest there with their own former employees?  Just to help me understand.

MR. ELLIOTT:  Sure.  The state secrets privilege assertion was upheld for linking a specific interrogator with any of the plaintiffs or the specific interrogator with any detainee.  That was upheld by Your Honor.

THE COURT:  Well, I mean, as I recall, the government has agreed to some of this; right?  Did they not?

MR. O'CONNOR:  I don't know what you mean by "this," Your Honor.

THE COURT:  In some of the representations that were made by the government, they did indicate that none of the three named people that are at issue in this case, the three CACI people, interrogated any of these plaintiffs.  I think you said that in your --

MR. AZMY:  There's no record of it.

MR. O'CONNOR:  They're pseudonymous interrogators, but ...

THE COURT:  Yeah.  Yeah.  Look, there's been no name, and a vague description of a big tall guy that is not specific is not a problem.

MR. ELLIOTT:  Perfectly fine.

THE COURT:  Okay.  I don't see any problem at all of the testimony that came in.

222

Case 1:08-cv-00827-LMB-JFA    Document 1815    Filed 11/12/24    Page 223 of 287
Direct examination of S. Al-Ejaili
PageID# 54157

So I'm not requiring that any -- you said it was in the last transcript that was stricken from the government?

MR. ELLIOTT:  No.  No.

MR. AZMY:  No.  No.  It's been -- so we have no --

MR. ELLIOTT:  We're just asking that we don't -- if there's any --

THE COURT:  Anything further.

MR. ELLIOTT:  Anything further.

THE COURT:  Okay.  Well, look, if, in fact, a question is asked, you should raise the objection immediately, and then we'll approach the bench and take care of it.

MR. ELLIOTT:  Absolutely.  Or any other evidence that they're attempting to link to that description, if that makes sense.  A description of the individual.

THE COURT:  I would be surprised if something more comes up with this case than in the previous case.  All right.

MR. O'CONNOR:  Your Honor, we're going to -- we have a brief issue with the next live witness they're going to call.

THE COURT:  Well, aren't you going to cross-examine?

MR. O'CONNOR:  I am, but this might be the only

223

break.

THE COURT:  Go ahead.

MR. O'CONNOR:  Well, I don't need to do it quiet. I don't need to do it at the bench; I can do it back there. I just wanted to alert the Court.

THE COURT:  Okay.  That's fine.  All right.

(Open court.)

THE COURT:  All right.  Mr. O'Connor, you said there was one other issue before we continue?

MR. O'CONNOR:  It is, Your Honor.  The plaintiffs noticed two -- of the eight witnesses they listed for today, two of them are live witnesses, Mr. Al-Ejaili and then Torin Nelson.

Last night, plaintiffs, for the first time, identified exhibits what I assume are for Mr. Nelson's direct.  They said in their filing last night that they relate to the borrowed servant defense, which is not exactly a new defense in this case.  And the justification was, well, it was in CACI's production, as if I should be ready to handle any document pulled from our tens of thousands of pages that was never listed on plaintiffs' exhibit list until 6:00 last night.

So we object.  We object to the new exhibits that they want to use.  These are not rebuttal; these are for their own witness' direct exam.

224

Case 1:08-cv-00827-LMB-JFA    Document 1815    Filed 11/12/24    Page 225 of 287
Direct examination of S. Al-Ejaili
PageID# 54159

THE COURT:  What's good for the goose is good for the gander.  All right.  And that is, unless the exhibits were properly listed ahead of time the way the rules require, they can't come in now.

So, you know, if those exhibits were not listed by the plaintiffs in the original exhibit lists or reasonably refined, you know, like a couple of weeks ago so you would have time to prepare a response, and the same thing is going to happen to you all.  If you have exhibits that you didn't give sufficient notice to the plaintiffs about, you can't use it either.

MR. O'CONNOR:  In principle, I agree with that, Your Honor.  I hope that we're not making an illusion to the one regulation that we want to use because the Court ruled on that --

THE COURT:  We'll worry about that --

MR. O'CONNOR:  -- in a different context.

THE COURT:  Very quickly.

MR. FARIDI:  Could I just be heard on this, Your Honor?

THE COURT:  This is your witness.

MR. FARIDI:  Yes.

If they are going to be allowed to put in a new regulation that they had never disclosed in the 16-year history of this case, that one regulation, then we should

225

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA   Document 1815   Filed 11/12/24   Page 226 of 287
Direct examination of S. Al-Ejaili
PageID# 54160

also be allowed to put in -- put before a witness documents from their own file.  That document, Your Honor -- there's two documents there.  One is this gentleman's employment agreement with CACI, a document from their file, and the other one is a 2003 code of conduct.

The 2004 code of conduct was already on the exhibit list.  The 2003 code of conduct is effectively -- it's basically the same exact thing as the 2004 code of conduct, but the 2003 code of conduct was not on the exhibit list.  So we're asking to put these two documents before this witness who's going to testify.

If Your Honor is not going to allow that --

THE COURT:  Hold on a second.

In terms of Mr. Torin's employment contract, you're saying, with CACI?

MR. FARIDI:  Yes.

THE COURT:  You asked him some of that.  Maybe you didn't use the exhibit, but you did ask a bit about his relationship and his position with CACI last time.

MR. FARIDI:  We did, Your Honor.  And that contract actually undermines the borrowed servant defense.

THE COURT:  We'll see whether that is the case or not.  But, in any case, all right, then you can use the FAR, and they can use these two exhibits.  I don't think that's going to be all that devastating.  All right.

226

MR. O'CONNOR:  Deal.

THE COURT:  All right.  There you go.

MR. O'CONNOR:  Thank you, Your Honor.

THE COURT:  Let's bring the jury in.

THE COURT SECURITY OFFICER:  Yes, Judge.

(Jury present at 4:22 p.m.)

THE COURT:  Again, folks, you can sit anywhere in the box.  All right.

We're going to start the cross-examination of Mr. Al-Ejaili at this point.

Mr. O'Connor, we may be having a problem with the screen in the witness box, so I don't know how many exhibits the witness is going to have to look at.  All right.

MR. O'CONNOR:  I think it will be few, and if they are, I think using the binder that we've handed up to him is going to work just fine for the witness.

THE COURT:  Fine.  All right.

MR. O'CONNOR:  Could we put up Exhibit 193, please.

CROSS-EXAMINATION

BY MR. O'CONNOR:

Q   Mr. Al-Ejaili, you were asked about this picture during your direct examination.

The soldier on the left, that's Ivan Frederick; isn't it?

227

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE INTERPRETER:  Can you repeat the name?

MR. O'CONNOR:  Ivan Frederick.

THE WITNESS:  I do not know his name.

BY MR. O'CONNOR:

Q    Do you remember Ivan Frederick is one of the MPs that you interacted with at Abu Ghraib prison?

A    No.

Q    Okay.  So you were arrested by U.S. soldiers on November 3, 2003 in Diyala, Iraq; correct?

A    Correct.

Q    And you were released by the Army from Abu Ghraib prison on December 20 or 21 of 2003; right?

A    As far as I remember, yes.

Q    And so the events you're testifying about today all occurred more than 20 years ago?

A    Correct.

Q    But shortly after you were released, your employer, Al Jazeera, they asked you to write a report of your experience in U.S. custody?

A    Correct.

Q    And you wrote that report within a few weeks of being released from Abu Ghraib prison?

A    Correct.

Q    I'm going to ask you to take the binder that you've been provided and turn to Exhibit PTX 224.

228

THE COURT:  And there's no objection to that; correct?

MR. AZMY:  Correct.

THE COURT:  All right.  Then it's in evidence.

MR. O'CONNOR:  Thank you, Your Honor.

(Plaintiffs' Exhibit Number **224 admitted into evidence.**)

THE COURT:  And this, for the record, folks, is an English translation of an Arabic script.

MR. O'CONNOR:  Well, the exhibit is both, Your Honor.  We have the Arabic script with the English translation behind.

THE COURT:  Right.

BY MR. O'CONNOR:

Q   And this is the report that you wrote for Al Jazeera; right?

A   Correct.

Q   And the first three pages are your drafting of your report in Arabic?

A   Correct.

Q   And after that is a translation of your report into English; correct?

A   Yes.  Correct.

Q   And this report was intended to be a complete report of your time in U.S. custody; right?

A   No.

229

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q    No.

In 2014, did you appear on a podcast called Democracy Now?

A    Yes.

Q    Do you remember stating on that podcast that the report you drafted after you were released was a complete report?

A    No, I don't recall that.

MR. O'CONNOR:  Okay.  Your Honor, we would like to play about a two-minute clip from the Democracy Now interview.

THE COURT:  Is there an exhibit number for that for the record?

MR. O'CONNOR:  The exhibit -- well, it's a video, Your Honor.

THE COURT:  Well, we still put a number on it so it makes sense in the record.

MR. O'CONNOR:  What's next in line?

MR. AZMY:  Your Honor, we have not seen anything about this.

THE COURT:  Was this listed on the exhibit list ahead of time?

MR. O'CONNOR:  No, Your Honor.  This is an impeachment exhibit that I actually pulled off Mr. Azmy's website.

THE COURT:  All right.  But we still need a number

230

on it for the record.

MR. O'CONNOR:  75, Your Honor.

THE COURT:  All right.  Defense 75.  It's in.

MR. O'CONNOR:  Can you play the clip that runs from -- I'm sorry, Your Honor, 93.  Defense Exhibit 93.

THE COURT:  Exhibit 93.  All right.

(Defense Exhibit Number 93 admitted into evidence.)

MR. O'CONNOR:  Can you play the clip that runs from 3020 to 3240.

(Video played.)

BY MR. O'CONNOR:

Q    Do you remember having your deposition taken in this case in 2013?

A    Who deposed me?

Q    You came to my office in Washington and we sat for a question-and-answer session in 2013.

A    Yes, I remember.  Yes.  Correct.

Q    And in that deposition, you referred to the report you wrote for Al Jazeera as a full report; didn't you?

A    Sir, you tell me it's a complete report.  If I want to write a complete report, I could perhaps write 200 pages. The report that I wrote was what I observed and what I experienced regarding the topic, and it was brief, but it's not every single thing.

Q    Well, it was you that referred to it as a complete

231

report; right?

A    Perhaps I was not aware of all the details and I was not recalling them.

Q    Okay.  You're a professional reporter by trade; aren't you?

A    The two or three months following my release from Abu Ghraib, I was not in my full power, I was not psychologically, or my consciousness was not all there.  My abilities were not all there.  So I was going through a very difficult time psychologically, so I cannot say for sure all my abilities were all there at that time.

Q    And you're college educated?

A    Correct.

Q    And you know it's important when you write a report to cover all the important facts; right?

A    The report was not for the sake of the media or journalism.  It was solely a report handed to my supervisor in order for them to be aware of what happened to me in jail.

Q    And you drafted this report about five years before you met up with lawyers who wanted to have you sue a defense contractor; right?

A    I believe so.

Q    So let's go through your report.

        Your report first addresses your arrest by

232

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

American soldiers near Ba'Quba Stadium in Iraq; correct?

A    What was the town called?

Q    Ba'Quba.

A    Correct.

Q    And there were no civilians involved in your arrest; right?

A    No.

Q    And according to your report, you were next taken to a joint station for the Iraqi police and American forces; right?

A    Correct.

Q    And while you were there, you were interrogated once by a U.S. soldier; right?

A    Correct.

Q    And during your time at the police station, you had no interaction at all with American civilians; right?

A    Correct.

Q    And then your statement goes on to say you were transferred to Al Faris Airport in Ba'Quba; is that right?

A    Yes.

Q    And according to your statement, the treatment of the American soldiers was very bad?

A    Correct.

Q    And you were put into a room with dirty bedding for days?

233

A    One day, as far as I recall.

Q    Okay.

A    Yes.

Q    And then --

A    Yes, a day or two.

Q    I'm sorry?

A    Yes, a day or two.

Q    Then according to your statement, you were flown by the U.S. Army to Tikrit; right?

A    Yes.

Q    And CACI didn't have anything to do with your transportation to Tikrit; did it?

A    I do not know CACI.

Q    So you have no reason to believe that CACI was involved in -- to move you by helicopter to Tikrit?

A    I do not know.

Q    Okay.  And all the people that were involved in actually transporting you by helicopter, they were U.S. soldiers?

A    I believe they were U.S. soldiers, but I cannot tell 100 percent because I had a bag on top of my head and my hands were handcuffed.

Q    And during the helicopter trip with the U.S. soldiers, there was no soundproofing, so you suffered headaches for several days after the flight?

234

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A    Yes.

Q    And you describe the helicopter flight as terrifying; right?

A    Correct.

Q    You were afraid that the soldiers were going to throw you out of the helicopter?

A    Correct.

Q    And the helicopter was tilting from side to side during your flight?

A    This is what I felt because I had that black bag on top of my head.

Q    Thank you.

According to your statement, your treatment in Tikrit was worse than at Al Faris airport; right?

A    Yes.

Q    You were kept in solitary confinement for two days?

A    It was not solitary confinement; it was a room, and it was open.

Q    And you -- during the time that you were held in Tikrit, you had -- you were held for two days with handcuffs on your hands?

A    Yes, but I was able to move.  So there was space between the handcuffs and enough space on the hands and also on the feet, so I was able to move, even though I was handcuffed.

235

Q    And you were not interrogated at Tikrit; were you?

A    Not an interrogation.  They took personal information.

Q    And there was no civilian involvement with you and your time at Tikrit; was there?

A    I don't particularly recall.

Q    And after Tikrit, you were brought to Abu Ghraib prison on about November 8, 2003?

A    Correct.

Q    And you were first brought to a temporary tent called the reception; right?

A    Correct.

Q    And on the second day, you were brought to a computer room where there was a group of American soldiers; correct?

A    Correct.

Q    And they were friendly and joked around with you; didn't they?

A    Correct.

Q    And then an American in civilian clothes came up to you and the soldiers, and that civilian didn't believe you were an Al Jazeera reporter until he saw your file; right?

A    Correct.

Q    And you weren't mistreated in the computer room; were you?

A    No.

Q    And then your statement says that the American civilian

236

Cross-examination S. Al-Ejaili

took you to another room where an American interrogator asked you questions; right?

A    The room had more than one individual and not just one individual, but yes, correct.

Q    But the person asking you questions was an American soldier; right?

A    He wore military clothing.

Q    And there was an American civilian present while you were being questioned, but he never spoke; right?

A    Correct.

Q    And you weren't mistreated during that questioning session; were you?

A    Correct.

Q    And after the soldier questioned you in the interrogation room, he said you would be investigated by other interrogators; right?

A    They did not tell me anything.  They said they would transport me to a different location.

Q    And then soldiers handcuffed you and put a bag on your head?

A    Correct.

Q    And they took you by car to another building?

A    Yes.

Q    And you were met at the building by an American soldier and an interpreter; right?

237

A    Okay.  I do not know if they were soldiers or not.

Q    Do you remember testifying about your interaction with these two people at your 2013 deposition?

A    I remember there was a deposition; I just don't recall all the details.

Q    Okay.  Do you recall testifying that when you were brought to the two people, they pulled the bag off my head, there were --

MR. AZMY:  Where are you?

MR. O'CONNOR:  52, one.

BY MR. O'CONNOR:

Q    They pulled the bag off my head.  There were two persons, one of them in a military person, and the other his interpreter.  They asked me to get strip naked.  I asked, I refused to obey.  They said you, yourself, will get naked, or we will get you naked by ourselves.  So I had no choice but to take off all my clothing.  I gave -- they put the bag -- again, they put the bag on my head, they handcuffed me, and it was something like also interrogation with me.

MR. AZMY:  Your Honor, I'm not sure how this is a prior inconsistent statement.  It appears to be improper impeachment.

THE COURT:  It appears to be fairly consistent with what he said before.

MR. O'CONNOR:  Well, he said he didn't know if it

238

was a soldier or civilian, and he did say it was an American in military uniform and an interpreter, Your Honor.  That's the only inconsistency I'm talking about here is the soldier.  It's also an admission.

THE COURT:  All right.  Ask the question again.  See if this refreshes his memory.

THE INTERPRETER:  Before you ask, can you please say which page this is on?

MR. O'CONNOR:  Sure.  It's on page 52, line 1 of his deposition, which is --

THE COURT:  The first exhibit.  It's the first one in the book.

THE WITNESS:  It is possible I could read what I wrote in Arabic and perhaps the interpreter could interpret it now?

MR. O'CONNOR:  Okay.  Please.

THE WITNESS:  Maybe the interpretation and translation is not accurate.

MR. O'CONNOR:  Please read 52, line 1, to 52, line 4.

THE COURT:  Are you in the deposition?  It's the first exhibit.  It's the first exhibit in the book.

MR. O'CONNOR:  If he can't do English, it doesn't do any good being at the page.

THE COURT:  All right.  This is taking too long.

239

It's a subtle point.  I don't think it's that important.
Let's move.

MR. O'CONNOR:  Very well, Your Honor.

BY MR. O'CONNOR:

Q    Do you know if you testified in 2013 that it was an American soldier and an interpreter who greeted you at the building?

A    Yes.  But I was not aware that they were soldiers.  I had a bag on top of my head.  But we referred to everybody present in the jail as Americans.

Q    After they finished questioning you, two soldiers tied your hands over your head to a pole; isn't that right?

A    That was later on.  In the report that's written in Arabic, I mention that there's another soldier who took me from those two soldiers.

Q    Okay.  So you had a soldier take you from the first two to two more soldiers; right?

A    One that's different from the other two.  And when I found out later, it was Graner.

Q    Right.  And one of those two soldiers was Charles Graner, a U.S. Army MP; right?

A    No.  There was a person who was on his own.  He's not -- he's not one of the two who worked together.

Q    But it was a soldier?

A    He wore a military uniform.

240

Q    When's the first time you interacted with the person that you now know to be Charles Graner?

A    What do you mean by the question?

Q    The first time that you had any interaction with Charles Graner.

A    He got ahold of me from those other two, and then he took me to the cellblock, and he commanded me to take off my clothes.

Q    That was Graner who did that?

A    Later on I found out it was Graner.

Q    And what did Graner do after you were completely unclothed?

A    He's the one who pulled my arms behind my head, had the bag on my head and then kept me all the way to the morning. He's the one who commanded me to clean the black vomit that I vomited on the ground.

Q    So the next morning, again, Soldier Charles Graner commanded you to clean up the vomit with your jumpsuit?

A    Yes.

Q    And then Graner took you to a cell that was about one and a half meters by 3 meters; correct?

A    Correct.

Q    And according to your statement, you asked a female MP for clothes and a blanket; right?

A    I do not know if she was an MP.  She was present in the

241

building.

Q    You asked a female in the building to bring you a blanket and clothes?

A    Correct.

Q    Do you know if CACI had any female interrogators at Abu Ghraib prison?

A    I do not know anything regarding that.

Q    And your statement goes on to say that the female soldier -- or the female came back to your cell and brought you women's underwear; correct?

A    Correct.

Q    And your statement goes on to say after that, you were interrogated every two to three days?

A    Correct.

Q    You're aware that the Department of Defense has not located any record that would formally document any intelligence interrogation of you; right?

        MR. AZMY:  Objection, Your Honor.

        THE COURT:  Wait.  Wait.  Wait.

        What's the basis for the objection?  What's the basis for the objection?

        MR. AZMY:  Lacks foundation, Your Honor.

        MR. O'CONNOR:  I'm asking if he's aware.

        THE COURT:  Now, what I want the jury to understand is when a lawyer asks the question, unless the

242

witness says yes, that's what happened or acknowledges it, if the witness says I don't know, you must disregard the question of the lawyer.  The lawyers can't testify.  All right.

So you're asking a question.  You've asked it. And what's the answer?

THE INTERPRETER:  Can you please repeat it?

MR. O'CONNOR:  Should I ask it again?

THE COURT:  Go ahead.

BY MR. O'CONNOR:

Q    You're aware that the Department of Defense has not located any record that would formally document any intelligence interrogation of you; right?

A    I'm not aware of that.

THE COURT:  All right.  You have to erase that question.  There's no evidence at this point in this record that such a statement was ever made.  Okay.

BY MR. O'CONNOR:

Q    You were also mistreated by Ivan Frederick; correct?

A    I do not know that person.

Q    Did you testify in your 2013 deposition that you were abused by Army MP Ivan Frederick?

A    No, I am not aware of that.  What I know is there was a man that he would lead me from inside the jail to outside the jail, and later on I found out that it was that person.

243

Q    You later on found out it was Ivan Frederick?

A    Through you, the attorneys.

Q    Sure.  But later on you learned that that person was Ivan Frederick?

A    At that time, and even a few years after, I was completely unaware of who that person was.

Q    No, I understand that.

Sitting here today, you know that person was Ivan Frederick; right?

A    Only two days ago.

Q    Okay.  And you didn't see the faces of your interrogators because you had a bag on your head; right?

A    At times the bag was on my head, and other times they would remove the bag from my head.

Q    In fact, in your statement to Al Jazeera, you said that I did not see their faces in most cases because of the bag placed on my head; right?

A    That is the big picture; however, there are details. Not all of them are mentioned in that report.

Q    In your 2014 appearance on the Democracy Now podcast, did you say, but of course all the interrogations were conducted while you were kept naked and hooded, and they would ask you questions to which you would answer?

A    Yes.

Q    And in the same interview when you were asked who

244

interrogated you, didn't you answer:  As for the interrogators, I did not know who they were.  I was hooded throughout the interrogations, so I could not tell who they were.  Were they American Army personnel?  Were they from outside the Army?  Were they affiliated with security companies?

A    I was subjected to many interrogations.  I was subjected to more than 20.  Some of which the bag was on my head all together and I was not able to see anyone.  And other times I was able to see, but though there were seldom times.  Therefore, what I'm mentioning is the big picture, I did not see them.

Now, if I'm trying to remember all the details, I'm trying to recall my memory and push to remember, yes, perhaps some of those pictures can come back to my memory.

Q    And so now it's more than 20 times that you were interrogated while you were at Abu Ghraib prison?

A    Yes.  On the premise that every two to three days I was subjected to these interrogations, and I spent 50 days about in the cell, if you do simple math, it's about 20 or such.

Q    And in this exhibit, Plaintiffs' Exhibit 224, which you wrote a three-page Arabic summary for Al Jazeera; right?

A    Correct.

Q    And in that summary, you made exactly two references to civilians; right?

245

A    I don't recall exactly.

Q    Well, you mentioned the civilian in reception who didn't believe you were a reporter until he saw your file; right?

A    I don't remember exactly.

Q    Okay.  And your report also mentioned the civilian in the interrogation room who didn't speak; right?

A    Yes.  That, I remember.

Q    And that civilian didn't mistreat you in any way; did he?

A    No, he didn't.

Q    But you do believe that U.S. Army soldiers wrongfully arrested you; don't you?

MR. AZMY:  Objection, Your Honor.  Relevance.

THE COURT:  I think the reason for arrest is not relevant to this case.  Sustained.

MR. O'CONNOR:  Your Honor, I was not asking about the reason, just that he thinks it was wrongful.  It goes to why he's suing a civilian contractor and not the --

THE COURT:  No.  No.  No.  No.  Sustained.

BY MR. O'CONNOR:

Q    You believe U.S. Army soldiers treated you very bad at Al Faris airport; don't you?

A    It was the first interaction with the American forces at the Al Faris airport, and it was odd.

246

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q    You called it very bad in your report; didn't you?

A    Yes.

Q    And you believe U.S. Army soldiers mistreated you on the helicopter ride to Tikrit; right?

A    Inside the helicopter, they did not mistreat me.

Q    Well, the ride was veering from side to side, and you had a bag on your head; right?

THE COURT:  That's cumulative.  That's cumulative. We don't need to hear it twice.

BY MR. O'CONNOR:

Q    And you identified U.S. Army Soldier Charles Graner as mistreating you at Abu Ghraib prison?

A    Yes.

Q    Since you were released by the U.S. Army in 2003, what have you done to pursue a claim against the United States?

MR. AZMY:  Objection, Your Honor.  Relevance.

THE COURT:  Excuse me?

MR. AZMY:  Objection.  Relevance.

THE COURT:  No.  I'm going to overrule that objection.

THE WITNESS:  During the early years, I didn't do anything at all.

BY MR. O'CONNOR:

Q    Have you done anything since then to pursue a claim against the United States?

247

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A   No.  The situation in Iraq was unstable, the legal and political atmosphere in Iraq in general were unstable.  I did not know what was the right path to pursue.

Q   But in the 20 years since you were released from Abu Ghraib prison, you've never brought a claim against the United States for your treatment; have you?

A   No.

Q   You never sued Charles Graner for abusing you?

A   No.

Q   Did you ever make any effort to find the identities of the interrogators that you say interrogated you at Abu Ghraib prison?

MR. AZMY:  Objection, Your Honor.  Relevance.

THE COURT:  No.  I'm going to overrule the objection.

THE WITNESS:  I believe these are legal matters that require attorneys.  I'm not able to get to all of these details.

BY MR. O'CONNOR:

Q   But in 2008, you met up with attorneys who wanted to file a suit against CACI; right?

MR. AZMY:  Your Honor, I don't know where this is going.  This is getting close to privilege.

MR. O'CONNOR:  I'm not going beyond the solicitation, Your Honor.

248

THE COURT:  All right.  Go ahead.

THE WITNESS:  I did not meet directly with them at the beginning; however, friends in Iraq mentioned there is a possibility that lawsuits can be brought against those who harmed you in Abu Ghraib.  And based on that, I communicated with the attorneys.  And we started to talk about the matter all the way that I got to understand details regarding that story, and this is how this lawsuit started.

BY MR. O'CONNOR:

Q   And when we took your deposition in 2013 and I asked you what CACI did in causing the injuries you suffered, didn't you say if they were at Abu Ghraib prison, yes, they have a role?

A   If they were the interrogators, of course they had a big role.

Q   Well, you also said:  As long as they were at Abu Ghraib prison, yes, they have fault; right?

A   The interrogators that used to interrogate us, and they were civilians, of course they are responsible for everything that happened.

Q   But you don't have any information as to the identity of exactly who you say interrogated you; do you?

A   Of course I don't have information; however, when you sit down with the attorneys and you get to delve into details, the story becomes clearer.  We just had simple

249

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA    Document 1815    Filed 11/12/24    Page 250 of 287
Cross-examination of S. Al-Ejaili
PageID# 54184

information.  There were contractors present in Abu Ghraib jail.

Q    Okay.  And in ten years -- and when you filed this lawsuit, you allege that CACI personnel directly tortured you; didn't you?

A    I don't remember that.

Q    Okay.  After you were released from Abu Ghraib prison, you didn't go see a doctor for any injuries; did you?

A    No.

Q    And the first time that you saw a psychiatrist or psychologist was in January of 2013; right?

A    I think so.

Q    And that was when you went to Erbil, Iraq to meet with Dr. Steven Xenakis?

A    Correct.

Q    And he was the doctor that the plaintiffs hired as a medical expert in this case; right?

A    Yes.

Q    And he spent about a half a day with you?

A    I don't remember the time.

Q    Dr. Xenakis didn't identify any physical injuries to you; did he?

A    To start with, I never had apparent physical injuries. Specifically because that meeting was many years after the incident.

250

Q    So your first meeting with a doctor to testify on your behalf was 11 years after the -- your time at Abu Ghraib prison?

A    I think so, yes.

Q    Have you had any follow-up examinations with Dr. Xenakis?

A    What do you mean by that?

Q    Has he seen you again other than January of 2013?

A    I don't recall.

Q    Do you recall how much Dr. Xenakis was paid to conduct examinations of you and the other plaintiffs?

A    No, I do not know that.

        MR. O'CONNOR:  No further questions, Your Honor.

        THE COURT:  All right.  Redirect?

        MR. AZMY:  Yes, please.

                    REDIRECT EXAMINATION

BY MR. AZMY:

Q    You were asked by Mr. O'Connor about a report that you wrote, PX 224, I believe; yes?  Is that right?

A    Yes.

Q    Okay.  When did you write the report?  When?  Yeah. Around what date?

A    I believe it was two or three weeks after I was released from jail.  I don't recall exactly.

Q    Sure.

251

And what was the purpose of the report?

A   Briefly I was supposed to say where I was and what happened in a brief and clear way.

Q   To whom was the report written?  Who was it written for?

A   The office manager in Iraq in Baghdad.

Q   Of your employer?

A   Yes.

Q   Okay.  Did you -- were you asked to, or did you feel the need to include every detail of your time at Abu Ghraib in this report?

A   No.

Q   Okay.  And is there anything in the report that's inaccurate?

A   Nothing inaccurate; however, this report is a general picture.

Q   Okay.

A   Again, I said if I wanted to include all the details, it would take tens of pages.

Q   Okay.  Mr. O'Connor asked you in your deposition whether the report you prepared was full or complete; do you remember being asked that?

A   I don't remember that.

Q   Okay.  Let's look at your deposition testimony, page 186, line 12 to 187.  I'm going to read from those

252

lines in English, and I would ask the interpreter to translate.

THE INTERPRETER:  What is it, 186?

THE COURT:  It's the first exhibit in that big volume.  All right.

MR. AZMY:  Page 186 starting at line 12.  Do you see?  Yes.  Uh-huh.

I'm going to read this, and please translate.  I'll go piece by piece.

BY MR. AZMY:

Q    When you were released by the United States military and returned to Al Jazeera, you testified that they had you write a report about your experiences in U.S. custody.

Answer:  Yes.

Okay.  And then on line 21, you were asked:  That report describes your arrest and detention by the military.

And you answered:  Yes, in a brief way.

A    Uh-huh.

THE COURT:  I'm sorry, do you recall testifying that way?

THE WITNESS:  My memory does not recall all these details, but if you go back to history, it is probably true.

BY MR. AZMY:

Q    Okay.  When you wrote the report, did you know that CACI had interrogators at Abu Ghraib?

253

A    I knew there were security contractors, but I wasn't sure if it was CACI or anything else.

Q    Okay.  And when you wrote the report, did you note Graner's identification at that time?  Did you know the identity of Graner at the time you wrote the report?

A    At the time, I was able to see his picture, and I recognized him.

Q    Okay.  When you wrote the report in January?

A    Which report are you referring to?

Q    Sorry.  The report, 224, the Al Jazeera report.

A    No.  No.  I was not aware at that time.

Q    Okay.  So you wouldn't have included that in the report; correct?

A    No.  No.

Q    Okay.

A    At that time, the pictures of the jail did not come on the media, and there were no names known.

Q    Okay.  When you were in interrogations, about how often was a bag placed over your head?

A    Most of the interrogations, the bag was on my head; however, there were many times, seldom times, where the bag would be removed from my head.

Q    Okay.  And it's in those moments when the bag was removed that you could see who was interrogating you?

        MR. O'CONNOR:  Objection.  Leading.

254

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE COURT:  Sustained.

BY MR. AZMY:

Q    Okay.  After you were released from Abu Ghraib, were you made aware of any process to make a financial claim against the United States?  Did anyone give you any information about that?

A    No.

Q    Okay.  After your release, was there any reason why you didn't see a psychologist in Iraq?

A    Okay.  So first, it is cultural.  In Iraq, it is something that's not necessarily common that you go to a psychiatrist or psychologist, and then you would be labeled crazy.  And at the time, I did not even think that something was wrong with me.  And it was that fear to go seek a psychiatrist or psychologist, at least I would be called crazy.  I don't even think there's any psychologists or psychiatrists in the governorate where I reside or in Baghdad.  Meaning, there's a specific thing that someone can reach to.

Q    Okay.  You testified to your physical examination by a Dr. Xenakis in Erbil; yes?

A    Yes.

Q    And you testified that at the time you were examined, you didn't have any sort of lasting physical symptoms from the time at Abu Ghraib; is that right?

255

A     That is correct.  Time has elapsed, and there was no present physical injuries on my body.

Q     What about mental harm, then and now, do you have any mental or psychological harm from what happened at Abu Ghraib?

A     Of course the psychological harm is here and persistent.

Q     Can you say a little bit more about that?

A     Until this very moment, I lack confidence in people.  I could never trust anyone.  Perhaps some would say this is normal, but what I have is not normal; it's more than normal.  I fear any other, any agreement, any actions.

         The other thing is the mention of the Abu Ghraib jail, the mention of that causes me fear and anxiety even though many years have passed.

         MR. AZMY:  Thank you, Salah.

         No further questions, Your Honor.

         THE COURT:  Is there any recross?

         MR. O'CONNOR:  Nothing at all, Your Honor.  Thank you.

         THE COURT:  All right.  Thank you for your testimony.  The witness may step down.

                   (Witness excused at 5:17 p.m.)

         THE COURT:  Mr. O'Connor, I'm not sure if you formally moved 224 in.  It's a plaintiffs' exhibit as I see

256

it labeled; is that correct?

MR. O'CONNOR:  It is a plaintiffs' exhibit, Your Honor.

THE COURT:  You're moving it in?

MR. O'CONNOR:  You asked any objection, and they said no objection, so it's in.

THE COURT:  So it's in.  I just want to make sure.

MR. O'CONNOR:  If we didn't move, we so move.

THE COURT:  Yes, it is in.

(Plaintiffs' Exhibit Number **224 admitted into evidence.**)

THE COURT:  It's Plaintiffs' 224.

All right.  Your next witness.

MR. FARIDI:  Your Honor, before we call the next witness, I want to read the United States government's response to an interrogatory by CACI.  The parties have agreed to the admission of this particular response from the United States government, and this is in Defense Exhibit 2.

THE COURT:  All right.  And there's no objection to that; correct?

MR. O'CONNOR:  No, Your Honor, no objection.

THE COURT:  Now, for purposes of the record, are you putting a number on this?  Defense Exhibit 2, is that what it is?

MR. FARIDI:  That is it, Your Honor.

THE COURT:  So each side's moving the other

257

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

exhibits in.  That's all right.

MR. O'CONNOR:  I just want to make clear, this is now in, Your Honor?

THE COURT:  I'm sorry?

MR. O'CONNOR:  The exhibit is now in?

THE COURT:  It is now in, yes.  Defense Exhibit 2 is in.

(Defense Exhibit Number 2 admitted into evidence.)

MR. FARIDI:  As redacted, Your Honor.  With the redactions.

THE COURT:  Yes.

MR. FARIDI:  The interrogatory asks the United States government to identify any interrogator who interrogated any plaintiff at Abu Ghraib prison.  And I want to read the third paragraph, the United States' response as it relates to Mr. Al-Ejaili.

The response of the United States government was that the Department of Defense has not located any record that would formally document any intelligence interrogation of Plaintiff Salah Hasan Nusaif Jasim Al-Ejaili, Plaintiff Al-Ejaili, such as an interrogation plan, an interrogation report or investigator notes; however, as described below in response to Interrogatory Number 2, the Department of Defense has located and produced other information suggesting that Plaintiff Al-Ejaili may have been

258

interrogated by an Army interrogator and a CACI interrogator during his detention at Abu Ghraib.

Your Honor, plaintiffs call Torin Nelson.

MR. O'CONNOR:  Your Honor, before we do that, I assumed we were going to go on and read in Interrogatory Number 2, which is cross-referenced in Interrogatory Number 1.  I think for completeness, I don't think it's appropriate to not read 2.

THE COURT:  I think so the jury doesn't get confused, let's read Number 2.

MR. FARIDI:  We're happy to do so, Your Honor.

Interrogatory Number 2 asked for each interrogator identified in response to Interrogatory Number 1, describe the facts relating to such interrogators' interaction with plaintiffs, including the specific conduct to which such interrogators subjected any plaintiff and the source of any direction under which the acts took place.  And going to Section C of the United States government's response, which appears on page --

THE COURT:  All right.  Let me stop for just one second.

So, folks, in civil litigation in the federal system, before the case ever comes to trial, the lawyers can engage in what is called discovery, and discovery are techniques that are used by the lawyers to obtain

259

information about the case.

One of those forms is by asking questions, they're called interrogatories.  You're hearing that word a lot in this case.  So the lawyer for a particular side will write specific questions, and then the lawyer for the other side is responsible for providing a full answer that have to be truthful.  All right.

In this case, because of the involvement of the United States at Abu Ghraib, they were -- interrogatories were put to the United States, and that's why we have interrogatory answers from the United States in this case.

As I mentioned to you also earlier, there are still areas surrounding the events at Abu Ghraib which the United States government feels require that they not be public.

And so you will see on many of the documents -- and this is an example of that -- sections of the document blacked out.  That blacking out was not by -- was not done by the parties in this case.  In fact, both sides would like to have that unblocked.  But the United States has taken the position that it must be redacted.  That's the technical term.

So I want to make sure you understand why you're seeing things that way.  But all of the redactions you're seeing are as a result of the United States government, not

260

of the parties.

All right.  Go ahead.

MR. FARIDI:  I'll now read the United States' response to Interrogatory Number 2 as it relates to Mr. Al-Ejaili, and it begins on page 15 of Defense Exhibit 2.

The United States wrote:  Although as noted in response to Interrogatory Number 1, the Department of Defense has found no formal record of an intelligence interrogation of Plaintiff Al-Ejaili.  Other records in its possession reference military intelligence activity during Plaintiff Al-Ejaili's detention at Abu Ghraib, including suggestions that Plaintiff Al-Ejaili may have been interrogated by a CACI interrogator and a military interrogator.

In the military police log for the Abu Ghraib hard site, there is a reference on November 9, 2003.  "2015, 8:15 p.m., new civilian internee Number 152735 worked for Al Jazeera.  CIC says he is a reporter moved to 1A-28."

On the following day, November 10, 2003, after the opening of the log at 1600, 4 p.m., there is this entry: "Note:  Per the chief not further identified but presumably a military chief warrant officer, Number 152735 is to have contact with no one except his team."  There is a parenthetical that includes the first names of two

261

individuals who are not further identified and the last names of two known Army interrogators.

"If anyone attempts to speak with this person and gives a problem, notify the chief at" -- provides apparent phone number -- "log everyone who tries to or speaks with this person, Military Policeman Graner."

In this same time period, emails were exchanged between intelligence officials at CJTF-7 and the Abu Ghraib ICE. The CJTF-7 official forwarded draft intelligence information report, DIIR, regarding another Al Jazeera employee who had been detained by the coalition and remarked that the DIIR was "something of interest/possible assistance in dealing with Al Jazeera TV guide."

The ICE military official responded: "Will put this in Al Jazeera dude's file. My last marching orders for this guy was not to talk to him. He's currently in ISO."

The CJTF-7 official replied: "Be advised the subject in the DIIR is not, again, not the same as the guy at Abu Ghraib. The material may still be helpful for background, but please do not confuse the two."

In addition, in 2013, the Department of Army approved the deposition of Army Interrogator James Lee Joseph Beachner. During the April 25, 2013 deposition of Sergeant Beachner, the United States permitted Beachner to affirm that statements he made to military investigators in

262

a June 4, 2004 sworn statement were true.  According to Beachner's 2004 statement, Beachner had been assigned to interrogate the Al Jazeera reporter, and that on one occasion, he found out that CACI interrogator Steve Stefanowicz "was questioning him."

According to Beachner's statement, "when I found this out, I told him to stop because this was my detainee.  He stopped.  There was nothing violating the IROE in that particular interrogation."

The United States is continuing to exercise its due diligence to determine if there is any additional information it can provide.  Should it come across additional responsive information, the United States will supplement its responses consistent with Rule 26(e) of the Federal Rules of Civil Procedure.

THE COURT:  All right.

MR. FARIDI:  Your Honor, at this time, plaintiffs call Torin Nelson.

THE COURT SECURITY OFFICER:  Sir, come forward.  Face the deputy clerk.  Raise your right hand.

Thereupon,

TORIN NELSON,

having been called as a witness on behalf of the plaintiffs and having been first duly sworn by the Deputy Clerk, was examined and testified as follows:

263

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

(Time noted: 5:26 p.m.)

THE DEPUTY CLERK:  Thank you.

THE COURT SECURITY OFFICER:  You may be seated.

DIRECT EXAMINATION

BY MR. FARIDI:

Q    Could you please introduce yourself to the Court and the members of the jury.

A    My name is Torin Nelson.

Q    Mr. Nelson, have you heard of CACI?

A    Yes, I have.

Q    And how is it that you've heard of CACI, sir?

A    Well, I worked for them from late 2003 to early 2004.

Q    And, Mr. Nelson, what type of work did you do with CACI?

A    I was hired by them to work as an interrogator.

Q    An interrogator where?

A    In Iraq at a place called Abu Ghraib prison.

THE COURT:  Mr. Nelson, can you move a little closer to the microphone?  It's that little black box in front of you there.  Thank you.

THE WITNESS:  This one?

THE COURT:  Yeah.

THE WITNESS:  Yes, Your Honor.

BY MR. FARIDI:

Q    Mr. Nelson, prior to joining CACI, did you serve in our

264

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

country's military?

A    Yes.  I joined the U.S. military, the United States Army in 1992 as a 97 echo interrogator was the title.  And I had 11 years experience, going on 12 by the time that I was actually hired by CACI.  Eleven, 12 years of experience as a soldier working as an interrogator.

Q    And when you were in our country's military, what particular branch did you work in?

A    I worked for U.S. Army intelligence.  Six years as regular Army, and then another six years as Utah National Guard, the 300th Military Intelligence Brigade is who I was assigned to in the Utah National Guard, the whole time as an interrogator in 97 echo.  And most of the time that I was with the Utah National Guard was not part time; it was full time.

Q    For those of us who are not familiar with the military vernacular, what is 97 echo?

A    97 echo is the military occupational specialty or MOS.  Each job for the United States Army is given a particular designator.  So 97 echo is specifically as an interrogator.  It is now considered a -- they changed it in the 2000s to a 35 mike.

Q    And prior to going to work for CACI in November of 2003, approximately how much experience had you gained with respect to interrogations through your work with the United

265

States military in the Utah National Guard?

A    I was considered to be a very experienced interrogator given the time.  When I joined in 1992, the first couple of years were spent in training.  First basic, then I was sent to language school to learn Russian, and then to Fort Huachuca to the interrogator school.

In 2004 I was there for about four months before I graduated, and then I was sent off to my first duty station. But at my duty station, my training continued basically as what we would consider OJT, on-the-job training, because I was doing real-world in-language debriefings of live sources for the 66 Military Intelligence Brigade in Augsburg, Germany.  I did that for a few years.

Then I was also working as a strategic debriefer for weapons inspection teams in Europe overseeing the conventional forces of Europe treaty.  And then I was sent down to Bosnia to work for counterintelligence force protection missions working both as a translator in Bosnia, but also as a human intelligence collector interviewing local nationals and such like that.

And then after that, probably the most relevant experience was my deployment with the Utah National Guard down to Guantanamo Bay, Cuba, GTMO, from mid 2002 to 2003 where I interrogated enemy combatants that were housed at Guantanamo Bay.  And then following that directly instead of

266

being redeployed back home, I was actually mobilized with the rest of my battalion to participate in the invasion of Iraq in the spring of 2003. So I was considered to be one of the more experienced people.

Q    And between formal and informal training, prior to joining CACI in November of 2003, can you approximate the number of years of training you had in interrogation? Just give us a number.

A    I would probably say 10 to 11 years of training.

Q    Mr. Nelson, are you currently employed?

A    Yes, I am.

Q    And can you describe for the jury who you work for?

A    I work for a defense contracting company. I am currently employed at Fort Huachuca. I've been at Fort Huachuca, Arizona for about the last three and a half years now. I was working initially as an instructor at the 35 mike course, which is human intelligence collector, which succeeded the 97 echo interrogator course. I worked there for a few years, and recently I was just promoted to the 2XMC course, which is -- the 2X is the assistant to the two shop, which is in charge of intelligence for all staff command positions throughout the military to advise specifically on human intelligence aspects. So that includes counterintelligence, strategic debriefing, interrogations and military source operations. So I am an

267

instructor there as the subject matter expert, the SME, for interrogation operations.

Q    For those who don't follow the military vernacular, 2X, et cetera, can you describe the level of importance associated with your position?

A    A 2X is specifically designated to advise the two who is in charge of all intelligence operations for each command going anywhere from a company level all the way up to core or above.

So you can have somebody who's a battalion commander or lieutenant colonel who has an assistant who's their 2X, all the way up to a three- or four-star general who will have a 2X shop usually staffed by a number of people.

The students that we normally get in now are midfield grade officers.  They're talking captains, majors, senior warrant officers and senior NCOs, non-commissioned officers.  Occasionally the -- a civilian, usually a GS-13 or such pay grade will come through as well that works for the intelligence community.

Q    I want to talk about how you began to work for CACI.

Okay.  And at the time you were hired by CACI, did you know having been in the interrogation community for 11 years at that time, whether CACI provided interrogation services?

268

A     No.  The first time I heard about CACI was when a friend called me up in about September of 2003 telling me that there was a company that was looking to hire interrogators.  He wasn't going to go, but he recommended me.

Q     And were you interviewed by CACI?

A     It was two telephone interviews, one by a recruiter. This would have been around September, also maybe late September.  And the second interview also by telephone was Amy Jenson, I believe, the program manager.

Q     And who did Amy Jenson work for as a program manager?

A     She worked for CACI.

Q     And can you describe the interview that you had with Amy Jenson, the program manager at CACI?

A     Overall I would say it was one of the more odd interviews that I've ever had.  It only lasted for about 30 minutes over the phone.  The first five minutes of it was me talking about my experience and my skills, and then the rest of the phone call, about 25 minutes, was her mainly talking about how good it was to work for CACI, all the benefits and things that I would expect and such like that.

Q     Why did you find that interaction to be odd?

A     Well, even if we're working doing interviews, discussions and such like that in an unclassified manner, like over a public phone and such like that, there are

269

certain terms and such that you just get used to hearing people ask you about to describe your experience so that they can get a better understanding of, you know, beyond just your resume and such.  Like, how much do you actually bring to the table as an employee.

We have a very specific skill set, and people in our community kind of know some of the terminology that they need to use around each other to kind of ascertain does this person actually have the experience and the knowledge that they purport to do, and she didn't use any of that.

Q    Did you meet with anyone from CACI's management before you were hired?

A    Before I was hired, no.  The only interaction I had was telephonically, those two phone calls, and then emails back and forth, maybe a couple follow-up calls just to make sure things had gotten through.  But it was -- the first time I ever met anybody was after I had been hired.  And, you know, it would have been at the CRC, the CONUS reemployment center down at Fort Bliss, Texas where I was getting ready to actually go through my medical exams and get equipment issued and those kinds of things before I actually got deployed to Iraq.  And that fellow who I met was another new hire.

Q    So let me ask you to turn to PTX 230.  It's in the binder in front of you.

270

THE COURT:  Is there any objection to 230?  It's a CACI document.

MR. O'CONNOR:  Your Honor's already ruled on this, Your Honor.

THE COURT:  Well, just tell me.  I mean --

MR. O'CONNOR:  No objection.

THE COURT:  All right.  230 is in.

(Plaintiffs' Exhibit Number 230 admitted into evidence.)

BY MR. FARIDI:

Q    And let's focus on the first page that's titled employment agreement; do you see that?

A    Yes.

Q    And let's just skip to the last page, page 4, of the document.

Is that your signature there?

A    Yes.  That's -- I printed my name, signed it and dated it on the right side.

Q    And it's countersigned by Amy Jenson; correct?

A    Yes.

Q    And let's take a look at the section titled management rights on page 2 of the document.  Okay.

We've highlighted some language, and I want to read some of the language to you and ask you a question.

A    Okay.

Q    It says:  CACI's management retains all rights to

271

operate the business according to its judgment, including

without limitation, the right to determine the size and

nature of the work -- I'll skip some language here -- to be

the sole judge of the competence and performance of

employees, to determine the means and manner in which the

business is to be conducted, including services to be

provided.  And then skipping some language again.  In the

very last line it states:  To direct, supervise, control,

and when it deems appropriate, discipline the workforce in

management's discretion; do you see that?

A    Yes, I do.

Q    Okay.  What was your understanding as to CACI's ability

to supervise your work as an interrogator at Abu Ghraib?

A    It was pretty standard.  As far as for my hiring, there

were expectations of my being able to do the job, to do the

job correctly according to the rules, and to be held

accountable for that.  And that would be overseen by the

resident CACI personnel who were tasked with making sure

that I was doing my job.  It's pretty standard.

Q    Did CACI have the ability to fire you?

A    Yes.

Q    Did it have the ability to discipline you?

A    Yes.

Q    And let me show you PTX 229.

     Is that your signature on this document?

272

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A    Yes.  I printed and signed my name there.

Q    And is this a CACI document?

A    Yes, it is.

        MR. FARIDI:  Your Honor, we offer PTX 229.

        THE COURT:  Any objection?

        MR. O'CONNOR:  Let me look at it, Your Honor.

        THE COURT:  It's in.

        MR. O'CONNOR:  No objection.

        THE COURT:  It's in.

    (Plaintiffs' Exhibit Number **229 admitted into evidence.**)

BY MR. FARIDI:

Q    Okay.  And the document's titled certification of understanding and compliance code of ethics and business conduct standards, electronic communications policy, the year 2003.

        And the first sentence states:  I have read, understand and agree to comply about CACI's code of ethics and business conduct, standards and the electronic communications policy; do you see that?

A    Yes.

Q    Did you review the CACI code of ethics?

A    I did.  It was sent to me, and I looked it over.

Q    Let me show you PTX 85A.

        THE COURT:  Any objection to 85A?

        MR. O'CONNOR:  No, Your Honor.

273

THE COURT:  It's in.

(Plaintiffs' Exhibit Number 85A admitted into evidence.)

BY MR. FARIDI:

Q    And the document is titled year 2003 code of ethics and business conduct standards, revised February 2003; do you see that?

A    Yes.

Q    Okay.  Is this a document that you reviewed?

A    Yes.

Q    Okay.  Set that aside, we'll come back to it later.

Mr. Nelson, when did you arrive in Iraq?

A    In Iraq, it would have been I believe early morning on the 21st of November 2003.

Q    And when you got to Iraq, where did you go first?

A    We flew into BIAP, which is Baghdad International Airport.  Phoned into the Camp Victory to be picked up.  I flew in with another new hire from CACI, Mr. Scott Northrup. And he and I were transported over to the area we refer to as CACIville on Camp Victory, and I was there for about two days, I think, before the morning of the 23rd.  I was transported --

THE COURT:  Hold on a second.

What is Camp Victory?

THE WITNESS:  Camp Victory was one of the main bases that U.S. forces had set up near Baghdad International

274

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Airport.  I believe that the core commander, the three-star was actually headquartered there.  So a lot of activity at Camp Victory.  CACIville was a small portion of that.

So we flew in, drove over to there.  We were there for about two days.  Then I was driven out to Abu Ghraib on the morning I believe of the 23rd of November 2003.

BY MR. FARIDI:

Q    Can you describe what CACIville is or was?

A    It was just an old one-story building, basically maybe a couple of other outbuildings as well.  Kind of on the edge of the Camp Victory compound area where most of the in-house senior personnel for CACI were primary located, they would kind of base their operations out of.

Q    And when you got to Abu Ghraib in November of 2003 from CACIville, did you meet with any folks who worked for CACI?

A    When I got to AbuG?

Q    Yes.

(Reporter interrupted for clarification.)

THE WITNESS:  AbuG.  Abu Ghraib.

See, that morning when we got through the front gates and dropped off at the housing compound, some of the first people that I remember meeting were Dan Porvaznik, I think someone named Hank, and I think I met Steve a little bit later.

BY MR. FARIDI:

275

Q     Let's focus on Dan for a second.

          Who's Dan Porvaznik?

A     Dan Porvaznik was my on-site manager.

Q     Who did he work for?

A     He was also a CACI employee.

Q     Who did Mr. Porvaznik report to?

A     To my understanding, Mr. Porvaznik was reporting primarily to Amy Jenson.  It might have been a couple of other people as well depending on the situation, but most of the traffic that I saw either through email or, you know, conversations and such, you know, home office reported back sounded like it was mostly dialogue between Mr. Porvaznik and Ms. Jenson.

Q     And Ms. Jenson was in the United States?

A     Yes, at home office.

Q     Okay.  And can you describe, from your standpoint, what you viewed to be Mr. Porvaznik's responsibilities on the ground at Abu Ghraib in Iraq?

A     So as overall site manager, he was in charge of making sure that all the CACI personnel were provided for, accounted for, present.  There were no issues.  Payroll, personnel, medical, vacation, leave issues at all.

          But also to ensure that as a site manager, we were all -- how would I put it -- providing the services that had been agreed upon to the client, which in this case was the

276

military.

Q   You had agreed to a CACI code of conduct before you went to Abu Ghraib?

A   Yes.

Q   Who was responsible on the ground at Abu Ghraib in ensuring that you complied with the CACI code of conduct?

A   The site manager ran -- I suppose also his assistant site manager, which later on turned out to be Steve.  But the main point of contact was Dan Porvaznik to ensure that.

And that's pretty typical, actually, for site managers to work in conjunction with the military client to make sure that all their personnel are actually doing the job that they agreed upon.

Q   And you referenced a Steve as an assistant manager.

What's Steve's last name?

A   I always mess it up.

Q   Would it refresh your recollection if I said Steve Stefanowicz?

A   Stefanowicz, yeah.

Q   Okay.  And who did he work for?

A   Steve Stefanowicz also worked for CACI.

Q   And when you were at Abu Ghraib, aside from interacting with Mr. Porvaznik, did you get to interact with other interrogators there?

A   Yeah.  Military and CACI interrogators.  I pretty much

277

interacted with almost all of them.  Some more than others.
The ones that worked on my shift I got to interact with on a
much more regular basis.

Q    Did you recognize anyone that you knew from the
interrogation world from which you came from?

A    No.  None on the CACI side.  There were maybe one, two
on the military side that I recognized from previous
deployments, but those were military personnel.

There was one female interrogator who was coming
in on the day that I left in 2004.  That was the only person
that I recognized from any of the previous work that I had
ever done.

Q    And did that surprise you?  Did that concern you?

A    Well, that was one of my initial concerns.  There were
a lot of initial concerns, but that was one of them was the
fact, not just that I didn't know anybody there, but it was
unusual because I was actually used to actually running into
a lot of the same faces on my deployments.

Q    And why is it that not running into interrogators at
Abu Ghraib from your prior life, why was that a surprise to
you?

A    Well, first off, it was one of the first times that I
had done a deployment where that didn't happen.  Whether I
was going to the desert in Kuwait for the invasion, whether
it was GTMO, whether it was my tours in Bosnia, I was

278

constantly running into people that I had worked with previously because we were such a small group, and, you get to know each other.  Interrogators are a very small-knit group in the United States military.

Q    And from your interactions with these CACI employees, these interrogators, what, if anything, did you learn about their backgrounds?

A    Almost immediately I began to realize that a lot of them didn't seem to have the experience necessary to be even qualified to be doing interrogations, and certainly not to do them well.

I remember there was a meeting within the first week that I arrived there where I believe it was headed up by Chuck Mudd who came out on a visit to Abu Ghraib.

Q    Who did Mr. Mudd work for?

A    Mr. Mudd was working for CACI.  I think he was a VP, but I'm not sure.

Anyways, he was -- he held kind of like a mini town hall for all the CACI personnel.  This would have been right around Thanksgiving, I believe.  And I noticed that a lot of the personnel -- the CACI personnel that were at that meeting were addressing a lot of their concerns and such, safety, provisions, you know, communications, those sorts of things.  But it just seemed like at that meeting -- I remember after the meeting going up to Dan and saying I'm

279

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

not really sure I want to work here and I might want to actually consider either working for CACI somewhere else or going to work for another company.

Because he specifically told me you're one of the most experienced guys, we really need you and asked me to stick it out for a couple of weeks or a few weeks to see if maybe things got better.

I agreed to that, and then as I continued to work there longer, I realized I really was one of the more experienced people. They were sorely needing experienced interrogators to be able to do the mission correctly. So that's why I stayed around as long as I did.

Q    All right. I want to switch subjects a little bit. Related subject. I want to talk about the treatment of detainees at Abu Ghraib.

A    Yes.

Q    Okay. And before we get started on that subject, I want to clarify one thing.

Did the United States military ever authorize you, as a CACI interrogator, to direct the military police to abuse detainees?

A    No.

Q    And based on your training and experience, what understanding, if any, did you have as to how detainees needed to be treated?

280

A      Well, based upon not only my training, but also my personal experience plus all the work that I had done in research prior to that, studying good interrogation cases over the 20th century, my understanding was was that the best results came from treating your captured personnel, whether they're unlawful enemy combatants or whether or not they're enemy prisoners of war, humanely.  Treat them, some people would say with kid gloves, but I preferred to use the term with a bare minimum of humanity in the sense that you need to think of them as human beings first and foremost, not the enemy.

Once you do that, then you build up your relationship from that baseline through conversation, understand who they are as a person, what's motivating them, what their strengths, what their weaknesses are.  Once you have kind of a better understanding of who they are, then you can kind of present the predicament that they find themselves in at that moment so that you can leverage that in order to be able to give them a good option for being able to be cooperative with you.

Ultimately in military intelligence interrogation, you're not looking for a confession from anybody.  What you're looking for is information that is truthful and accurate so that you can paint a better picture of the unknown areas of the battlefield.  Because the intelligence

281

that we provide gives more information to the commanders so that they can make better decisions.

Q   Can you describe the relationship between interrogators and military police at Abu Ghraib?

A   Minimalism is usually best.  Military police are there serving a purpose to be able to safeguard, protect, and, if need be, restrict detainees.  Whether it's in their movement or in their actions or their interactions with each other and such like that, these are for a multitude of purposes. That is a separate mission generally, almost always, from military intelligence, which is primarily there to actually interact with the detainees.

So there's very little collaboration.  There is cooperation, but very little collaboration ever between military intelligence personnel and military police, especially when it comes to military intelligence personnel using military police for their purposes.

Q   What actually happened on the ground at Abu Ghraib in terms of the relationship between military intelligence and military police?

A   Well, I found out that there were numerous violations.

MR. O'CONNOR:  Objection.  Hearsay.  He found out?

MR. FARIDI:  Well, we can lay the foundation.

THE COURT:  Well, I'll tell you what.  It's getting late, and the jury has been here longer than the

282

normal day.  You all came in around 8:30, I suspect.  So I'm going to let the jury go home tonight, and we'll have Mr. Nelson back on the stand at 9:30 tomorrow morning.  All right.

Ladies and gentlemen, please remember my cautions about avoiding any media coverage.  I actually did see a couple of reporters at certain times during the trial.  So don't be looking for anything, and if you see anything, immediately, you know, get away from it.

As I said before, the best thing we can do as a juror is to get a good night's sleep.  If there's still enough daylight out there, until this weekend you'll have a little bit of daylight, even some fresh air and some exercise.

But we appreciate -- we definitely appreciate the sacrifice that you're all making in being here.  And, again, I will continue to push the lawyers.  We always do a little housekeeping each night to see what we can do to keep the case moving.

Leave your notebooks here, and we cannot start until you're all here in the morning.  So I know traffic in Northern Virginia can be a real issue, so try to leave a little bit early so you're here on time.

We'll let the jury go.  Mr. Nelson, you can leave for the evening.  We'll see you at 9:30 tomorrow morning.

283

And I have a couple of matters to take up with counsel.

THE COURT SECURITY OFFICER:  Rise for the jury.

(Jury not present at 5:55 p.m.)

THE COURT:  All right.  Now what I want for tomorrow is I want a clear list of the witnesses and the order in which you plan to call them.  All right.

It sounds like we're behind schedule.  I think the voir dire took longer than it normally does, so I want to start, you know, moving the case.  All right.

Are there any issues that may be coming up tomorrow that we need to address?

MR. O'CONNOR:  I don't foresee any other than what I think Your Honor was getting at.  We got a list of eight witnesses last night, including four hours of de bene esse depositions.  I'm hoping that this isn't a guess within this list of who we're going to call tomorrow.

THE COURT:  In any case, let's think about whether we need as much of the de bene esse depositions as everybody originally thought we might need.

The main thing is, though, I want the list of witnesses who are anticipated.  And every night before you all leave, that list should be prepared for the next day so that counsel knows what's coming.  And when we go into the defense case, the same obligation will apply to the defense; all right?

284

MR. FARIDI:  And that's fine, Your Honor.

I think one thing just to flag for you, just depending on how the examinations go, we may need to switch the order, particularly towards the tail end of the day.  If we're running out of time and let's say we have two hours of de bene esse testimony that we may not be able to play in its entirety, we may move up someone who's got 30 minutes of testimony to avoid a break in the middle of the testimony.

THE COURT:  Well, I understand that, but we're having a break now with Mr. Nelson's testimony.  I don't think that's that critical.  Maybe if you get close to the weekend or some of the gaps that we have, that's a different situation.  Let's keep it moving, and that avoids problems.  All right.

So tomorrow we shouldn't have a problem.  I think we may have to get our tech people in.  I'm not sure yet that the screen is working for the witness box, so I want to try to get that working.  But if there's nothing further then we'll recess court.

Oh, no.  I do want to follow my practice of reading into the record those exhibits that were entered into evidence.  We're going to do that at the end of each night just to make sure, and it avoids having to do it all at the end of the trial.  All right.

THE DEPUTY CLERK:  PTX 13.  PTX 1.  PTX 193.

285

PTX 224.  DTX 93.  DTX 2.  PTX 230.  PTX 229.  PTX 85A.

THE COURT:  All right.  And we also have Plaintiffs' 226.  That's the stipulation.  I'm assuming the entire stipulation at some point will go in.  We were just reading portions of it; correct?

MR. O'CONNOR:  I think that's right, Your Honor.

MR. FARIDI:  Yeah.

THE COURT:  So Plaintiffs' 226.  It was Stipulations 1 through 3, 19 and 20.  Those were actually read.  But that whole exhibit will be in.  Okay.

(Plaintiffs' Exhibit Number **226 admitted into evidence.**)

THE COURT:  And every stipulation that's in it at some point is going to be published to the jury, or if they get the whole exhibit that they can read in the jury room; correct?

MR. O'CONNOR:  Exactly.  One way or the other, Your Honor.

THE COURT:  All right.  That's fine.

Anything further then?  All the exhibits that everybody thought were introduced today are in?

MR. FARIDI:  Nothing from us, Your Honor.

MR. O'CONNOR:  Nothing further, Your Honor.  Thank you.

THE COURT:  All right.  Good.

We'll recess court then until 9:30.

286

(Proceedings adjourned at 5:59 p.m.)

----------------------------------

I certify that the foregoing is a true and accurate transcription of my stenographic notes.

_Stephanie Austin_

_____

Stephanie M. Austin, RPR, CRR

287