UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

----------------------------x
SUHAIL NAJIM ABDULLAH AL      :    Civil Action No.:
SHIMARI, et al.,              :    1:08-cv-827
            Plaintiffs,       :
    versus                    :    Thursday, October 31, 2024
                              :    Alexandria, Virginia
CACI PREMIER TECHNOLOGY,      :    Day 2 - a.m.
INC.,                         :    Pages 1-122
            Defendant.        :
----------------------------x

        The above-entitled jury trial was heard before the Honorable Leonie M. Brinkema, United States District Judge. This proceeding commenced at 9:30 a.m.

A P P E A R A N C E S:

FOR THE PLAINTIFFS:   CHARLES MOLSTER, ESQUIRE
                      THE LAW OFFICES OF CHARLES B. MOLSTER, III, PLLC
                      2141 Wisconsin Avenue, NW
                      Suite M
                      Washington, D.C.  20007
                      (703) 346-1505

                      BAHER AZMY, ESQUIRE
                      THE CENTER FOR CONSTITUTIONAL RIGHTS
                      666 Broadway
                      7th Floor
                      New York, New York  10012
                      (212) 614-6464

                      MUHAMMAD FARIDI, ESQUIRE
                      MICHAEL BUCHANAN, ESQUIRE
                      BONITA ROBINSON, ESQUIRE
                      ANDREW HADDAD, ESQUIRE
                      SCOTT KIM, ESQUIRE
                      ALEXANDRA MAHLER-HAUG, ESQUIRE
                      PATTERSON BELKNAP WEBB & TYLER LLP
                      1133 Avenue of the Americas
                      New York, New York  10036
                      (212) 336-2000

1

A P P E A R A N C E S:

FOR THE DEFENDANT:      JOHN O'CONNOR, JR., ESQUIRE
                        LINDA BAILEY, ESQUIRE
                        JOSEPH MCCLURE, ESQUIRE
                        STEPTOE LLP
                        1330 Connecticut Avenue, NW
                        7th Floor
                        Washington, D.C.  20036
                        (202) 429-3000

                        NINA GINSBERG, ESQUIRE
                        DIMUROGINSBERG PC
                        1101 King Street
                        Suite 610
                        Alexandria, Virginia  22314
                        (703) 684-4333

FOR THE UNITED          STEPHEN ELLIOTT, ESQUIRE
STATES:                 UNITED STATES DEPARTMENT OF JUSTICE
                        CIVIL DIVISION FEDERAL PROGRAMS BRANCH
                        1100 L Street, NW
                        Washington, D.C.  20044
                        (202) 598-0905

COURT REPORTER:         STEPHANIE M. AUSTIN, RPR, CRR
                        Official Court Reporter
                        United States District Court
                        401 Courthouse Square
                        Alexandria, Virginia  22314
                        (571) 298-1649
                        S.AustinReporting@gmail.com


     COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

TABLE OF CONTENTS

WITNESSES

On behalf of the Plaintiffs:

ASA'AD HAMZA HANFOOSH AL-ZUBA'E

Direct examination by Mr. Kim ..............7
Cross-examination by Ms. Bailey ...........36
Redirect examination by Mr. Kim ...........53
Recross examination by Ms. Bailey .........56

TORIN NELSON

Direct examination by Mr. Faridi ..........58
Cross-examination by Mr. O'Connor .........91

EXHIBITS

On behalf of the Plaintiffs:
Admitted

Number 206C .................................12
Number 161D .................................17
Number 161C .................................18
Number 206E .................................19
Number 206B .................................21
Number 32 ...................................30
Number 161B .................................32
Number 206A .................................33
Number 20 ...................................38
Number 226, paragraphs 16 to 18 ...........44
Number 51, page 4 ..........................81
Number 221 ..................................86
Number 42 ..................................110
Number 216 .................................115

On behalf of the Defendant:
Admitted

Number 30, page 5 ..........................37
Number 11, page 27 .........................43
Number 30, pages 19 through 23 ............46
Number 16 ..................................51
Number 11, paragraphs 5 and 7 .............57

MISCELLANY

Proceedings October 31, 2024 ..............4
Certificate of Court Reporter ............122

3

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

P R O C E E D I N G S

THE DEPUTY CLERK:  Civil Action Number 1:08-cv-827, Al Shimari, et al. versus CACI Premier Technology, Inc.

Would counsel please note their appearance for the record, first for the plaintiffs.

MR. KIM:  Good morning, Your Honor.  Scott Kim for plaintiffs.

THE COURT:  Good morning.

MR. O'CONNOR:  Good morning, Your Honor. John O'Connor, Linda Bailey, Nina Ginsberg, and Joe McClure for CACI.

THE COURT:  All right.  Good morning.

Just for the record, we have to interrupt the testimony of Mr. Nelson because we need to have the timing for the foreign witnesses carefully done.  So we're going to go forward.

And as I said -- or had my staff advise you all, I don't want every morning to have some little nitpicking issue in this case.  Let's get it tried.

All right.  Let's bring the jury in.

THE COURT SECURITY OFFICER:  Yes, Judge.

Rise for the jury.

(Jury present at 9:32 a.m.)

THE COURT:  Good morning, ladies and gentlemen.

4

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

I can never predict what the temperature is going to be in the courtroom.  This morning it's a bit cool.  If any of you start to be uncomfortable -- good, some of you brought sweaters -- but let us know.  All right.  And it does take a little bit of time to change the temperature.  So if you start to feel uncomfortable, or if the jury room is either too warm or too cold, let my court security officer know, and we'll try to do what we can to make you comfortable.

I just want to check in.  Did any of you bump into any problems last night at all in following my instructions?  No.  All right.  Good.

Now, we had to change the order of things a little bit today.  You may recall when we finished yesterday, we were in the middle of the direct examination of Mr. Nelson.  Because of the time difference between the United States and Iraq, we had to reschedule the case today so that we could take the testimony of one of the other plaintiffs who is in Iraq testifying, you know, live now.

What time is it in Iraq, by the way, just so the jury knows?

MR. KIM:  Seven hours ahead, Your Honor.

THE COURT:  So it's well into the afternoon.  All right.  So that's why we are going to have to go in this order.  All right.

5

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

So our next witness is going to be the defendant, Mr. Al-Zuba'e.  And we'll start that.  So he's going to be visible to you on the big screen here or on the small screens.  If any of you want to change your position within the jury box, feel free to do so.  All right.

Are you ready to proceed?

Now we're going to interpret from here?  The interpreters are in this courtroom?

MR. KIM:  Yes, Your Honor.

THE COURT:  Then I think the best thing is to be actually probably in the witness box.

And just for the record, we'll have both interpreters reaffirmed today.

THE DEPUTY CLERK:  Can you raise your right hand.

(Interpreters sworn in open court.)

THE DEPUTY CLERK:  Thank you.

THE COURT:  All right.  Thank you.

MR. KIM:  And we have one more copy of the exhibits for Your Honor.

THE COURT:  All right.

THE COURT SECURITY OFFICER:  Whose copy is this?

MR. KIM:  For the Court.

THE COURT:  Don't I have a set?

THE DEPUTY CLERK:  Is this the same set?

MR. KIM:  Yes.  We just thought the Court might

6

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

want two copies.

And does the witness need to be sworn in remotely as well, Your Honor?

THE COURT:  Yes.

THE DEPUTY CLERK:  Can you raise your right hand.

Thereupon,

ASA'AD HAMZA HANFOOSH AL-ZUBA'E,

having been called as a witness on behalf of the plaintiffs and having been first duly sworn by the Deputy Clerk, was examined and testified as follows:

(Time noted: 9:35 a.m.)

DIRECT EXAMINATION

BY MR. KIM:

Q    Okay.  Good morning, Asa'ad.

Could you please state your full name for the record.

A    Asa'ad Hamza Hanfoosh.

Q    And how old are you?

A    Fifty-one years old.

Q    And where do you currently live, Asa'ad?

A    Baghdad, Abu Ghraib.

Q    Do you have children, Asa'ad?

A    Yes.

Q    And how about grandchildren?  Do you have grandchildren, Asa'ad?

7

Direct examination - A. Al-Zuba'e

A     Yes.  Yes.

Q     What is your religion?

A     Muslim.

Q     What is the highest level of school you've completed, Asa'ad?

A     Third grade.

Q     Are you able to read and write?

A     No.

Q     What do you currently do for a living, Asa'ad?

A     I have a store where I sell fruits and vegetables.

Q     And going back to 2003, what did you do for a living, Asa'ad?

A     I was a taxi driver, and I was also dealing with livestock.

Q     And sticking to November 2003, Asa'ad, were you arrested?

A     Yes.

Q     After you were arrested, where were you taken, Asa'ad?

          THE INTERPRETER:  Sorry.  The interpreter needs a repetition.

          THE WITNESS:  Abu Ghraib jail.

BY MR. KIM:

Q     And when you first arrived to Abu Ghraib prison, what was the first room you were taken to?

A     Computer.

8

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q    And upon arriving to this computer room, who else was in the room?

A    There were people whom I did not know.

Q    And were there any Americans inside of the room, Asa'ad?

A    Yes.

Q    What were they wearing?

A    Civilian.

Q    How long were you held in this computer room, Asa'ad?

A    Three days.

Q    Were you mistreated while inside of this computer room, Asa'ad?

A    Yes.

Q    Can you describe how you were mistreated, Asa'ad?

A    They told me take off my clothes, held my penis.  He held it for me until I came.

Q    And you're saying that they held your penis.

     Who are "they"?

A    Civilian people.

Q    And were you instructed to do anything by these civilian people, Asa'ad?

A    Yes.

Q    What did they instruct you to do?

A    Masturbate.

Q    And when they told you to do this, what happened next,

9

Case 1:08-cv-00827-LMB-JFA   Document 1816   Filed 11/12/24   Page 10 of 122
PageID# 54231
Direct examination of A. Al-Zuba'e

Asa'ad?  What did you do?

A    I didn't do anything.  I was crying, screaming, I was shaking.

MR. KIM:  And I'd like to now show the plaintiff first just a photo marked as Plaintiffs' Exhibit 168.

THE COURT:  Any objection to 168?

MS. BAILEY:  Objection to relevance and prejudice.

THE COURT:  I'll take a look at it.

MS. BAILEY:  Just to be clear, the relevance objection is because it's not Mr. Asa'ad in the photo, nor is the soldier in the photo someone from the computer room.

MR. KIM:  And, your Honor, if I can clarify.

We will not be showing any photos today that we're going to be arguing are Mr. Al-Zuba'e.  We are showing photos that are accurate representations of similar things that happened to him.

THE COURT:  I don't think this one is necessary, so overruled.  I'm sorry, I'm going to sustain the objection.

If it's not a picture of what happens to this individual or the description is such that it's not clear to the jury what was described, we don't need the pictures.

All right.  Let's move on.

MR. KIM:  Understood, Your Honor.

BY MR. KIM:

10

Case 1:08-cv-00827-LMB-JFA   Document 1816   Filed 11/12/24   Page 11 of 122
PageID# 54232
Direct examination A. Al-Zuba'e

Q    So, Mr. Al-Zuba'e, you just described being forced to masturbate and other civilians touching your genitals.

Can you describe to the jury how this all made you feel?

THE INTERPRETER:  The interpreter needs a repetition for the last word.

THE WITNESS:  I was scared, I was -- I was scared, I was screaming, I was crying.  I said too bad, how could this happen to me.

BY MR. KIM:

Q    Okay.  And finally at the conclusion of this incident, Asa'ad, where did you go next?

A    They sent me back to the same room.

Q    And after the computer room, Asa'ad, where did you go next?

A    Then they sent me to the jail -- to the jail cells.

Q    And, Asa'ad, how were you brought from the computer room to the cells?

A    They put a bag on my head, they put handcuffs on my arms, and they got me inside a car.

Q    How were you removed from the car, Asa'ad?

A    They hit me, they tied -- they pulled me from --

THE INTERPRETER:  I'm sorry.  The interpreter needs a repetition.

THE WITNESS:  So they pulled me from the back,

11

Case 1:08-cv-00827-LMB-JFA    Document 1816    Filed 11/12/24    Page 12 of 122
PageID# 54233
Direct examination - A. Al-Zuba'e

from around my neck, they hit me, they were screaming at me, I was scared, and they took me to the jail cell.

BY MR. KIM:

Q    And, Asa'ad, you were doing motions with your hands, you were placing them just below your neck.

Can you describe to the jury in more detail why you were doing that motion with your hands?

A    So as the bag was on top of my head, it was twisted, twisted around my neck.

Q    Was there something around your neck, Asa'ad?

A    It was a plastic bag on my head.

Q    And how long were you dragged for from this car to the cells?

A    I swear, I do not recall exactly.

Q    Okay.  And eventually, Asa'ad, you said you were brought to the cells.

MR. KIM:  And I'd like to now show Plaintiffs' Exhibit 206C, which was previously admitted at General Fay's deposition.

THE COURT:  Any objection to 206C?

MS. BAILEY:  No objection, Your Honor.

THE COURT:  All right.  It's in.

(Plaintiffs' Exhibit Number **206C admitted into evidence.**)

BY MR. KIM:

Q    Is this where you now were, Asa'ad?

12

Case 1:08-cv-00827-LMB-JFA   Document 1816   Filed 11/12/24   Page 13 of 122
PageID# 54234
Direct examination A. Al-Zuba'e

A    Yes.  I was downstairs, not upstairs.

Q    And just to be clear, Asa'ad, do you have a name for this building?

A    Cells.

Q    And so after you were brought into this building, Asa'ad, from the vehicle, what happened next?

A    They were hitting me, screaming at me, I was crying, I was extremely scared.

MR. KIM:  We can bring this photo down now as well.

BY MR. KIM:

Q    And at a certain point, Asa'ad, were you moved from the first floor to a different room?

A    Are you talking about the same time when they got me?

Q    Yes, Asa'ad.

I'm asking after you arrived -- after you first arrived to the cells from the first floor, were you eventually moved to a separate room?

THE INTERPRETER:  The interpreter is not able to hear very well.

THE COURT:  This is the best we've got for the technology.  We'll just have to take it more slowly.

THE INTERPRETER:  Interpreter apologizes.  The interpreter needs a repetition.

THE WITNESS:  They stripped me -- they took me,

13

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA    Document 1816    Filed 11/12/24    Page 14 of 122
Direct examination of A. Al-Zuba'e
PageID# 54235

they stripped me naked, they took me up to the shower.

BY MR. KIM:

Q    And, Asa'ad, after they stripped you naked and took you up to the shower room, what happened inside the shower room?

A    So he -- he choked me, he took the bag from my head, and he pushed me in, and the place was cold, and I was crying inside the shower.

Q    And were you forced to shower yourself inside of the shower room?

A    Yes.  I was scared, I was screaming, I was crying.  The weather inside was very cold, it was freezing.

Q    And how did that water feel on your skin, Asa'ad?

A    It was extremely cold.  Freezing.

Q    What time of year was it, Asa'ad?

A    It was around January 11th when they took me.

Q    And, Asa'ad, did anyone make any threats to you while you were inside of the shower room?

A    He pushed me inside, he started screaming at me, and he said we are going to rape you today.

Q    Did you believe him, Asa'ad?

A    Yes, I believed him.  I was crying, I was screaming.  I was very scared.

Q    Were any females present?

A    Yes.  There were females present, yes.

Q    Asa'ad, during this shower, did you ever try to leave

14

Direct examination - A. Al-Zuba'e

the room?

A   Yes.  I was trying to leave the room, and I was pushed in.  The water was freezing.

Q   How long did this incident in the shower room last?

A   I had to finish two bars of soap on my head.  Until I finished them, then I was able to leave.

Q   And, Asa'ad, when you were finally able to leave, what happened next?

A   They took me to the same place.

Q   And by the same place, do you mean the hallway downstairs?

A   Yes.

Q   And what happened here?

THE INTERPRETER:  Interpreter needs repetition for the first word.

THE WITNESS:  I was crawling in the hallway on my chest, my arms and my stomach.  I was screaming, crying.  I was very scared.

BY MR. KIM:

Q   Why were you crawling on your stomach up and down the hallway, Asa'ad?

A   He's telling me to crawl.  I was scared.

Q   Were you clothed?

A   No, I was naked.

Q   And as you were being forced to crawl up and down your

15

Case 1:08-cv-00827-LMB-JFA   Document 1816   Filed 11/12/24   Page 16 of 122
Direct examination 54237 A. Al-Zuba'e
PageID# 54237

stomach, Asa'ad, can you describe in a bit more detail what else was happening as you were doing that?

A    How do you want me to explain?

Q    What were the other people in the room doing as you were crawling up and down the hallway, Asa'ad?

A    They were screaming at me, yelling at me, hitting at me, and I was crying and screaming.

Q    And so, Asa'ad, what condition was your body in?  Did it cause any injuries to you being forced to crawl up and down the hallway on your stomach as you were being hit?

A    My body, my whole body was bleeding, blood, blood from my arms, from my chest, from my legs.

Q    And, Asa'ad, how long were you made to do this?

A    I swear, I do not recall.

Q    That's okay, Asa'ad.

     Aside from being forced to crawl up and down the hallways, what else happened to you during this incident in the hallway?

A    I had my arms out like that, I had them open and like that for -- while I was standing up.

     MR. KIM:  And let the record show that Mr. Al-Zuba'e spread his arms out on the video.

     And I'd like to show now what's been marked as Plaintiffs' Exhibit 161D to the plaintiff only at this time. And I would just like to ask him if this is similar to what

16

happened to him during this incident in the hallway.

THE COURT:  You said 161 ...

MR. KIM:  D, as in dog.

THE WITNESS:  Yes.

THE COURT:  I'm going to let 161D in.

MS. BAILEY:  I'll just note our objection for the record.

THE COURT:  All right.

(Plaintiffs' Exhibit Number **161D admitted into evidence.**)

BY MR. KIM:

Q    And, Asa'ad, how long were you forced to pose in this manner?

A    I swear, I do not recall how long.

Q    What was going through your mind as you were being made to do this?

A    I was extremely scared, I was screaming, I was crying.

MR. KIM:  And we can bring this down now.

BY MR. KIM:

Q    Asa'ad, did anything else happen to you during this incident in the hallway that we have not discussed?

A    I was standing, and I had to put my hands up like that.

MR. KIM:  And I'd like to now move into evidence Plaintiffs' Exhibit 161C, which was admitted at Sergeant Frederick's deposition.

THE COURT:  All right.  161C is in.

17

(Plaintiffs' Exhibit Number **161C admitted into evidence.**)

MR. KIM:  And can we please bring that up.

BY MR. KIM:

Q   Asa'ad --

THE INTERPRETER:  The interpreter needs a repetition.

THE WITNESS:  Yes.  It was just like this one.

BY MR. KIM:

Q   What were you standing on?  What's being depicted here?

MR. KIM:  And just to be clear, when I say what were you standing on, we're not saying this is Asa'ad in the photo, but this is something similar that happened to him.

BY MR. KIM:

Q   Asa'ad, what were you forced to stand on?

A   They're boxes for food.

Q   And to be forced to stand in a manner similar to this, did that cause you any physical discomfort?

A   Yes.  My body was hurting, I was screaming, I was crying.

Q   And do you recall how long you were made to stand like this, Asa'ad?

A   No.  I swear, I do not recall.

MR. KIM:  And we can bring this photo now down.

BY MR. KIM:

Q   And again, Asa'ad, was there anything else that you

18

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

recall that happened to you during this incident in the hallway that we have not yet discussed?

A    It's been a long time, I do not remember.

Q    Thank you, Asa'ad.

So after this incident in the hallway was finally over, where were you taken next?

A    In a jail cell.

MR. KIM:  And I'd like to now move into evidence Plaintiffs' Exhibit 206E, as in echo, which was admitted at General Fay's deposition.

MS. BAILEY:  No objection.

THE COURT:  All right.  It's in.

(Plaintiffs' Exhibit Number **206E admitted into evidence.**)

MR. KIM:  If we could please bring that photo up.

THE COURT:  206E.

THE WITNESS:  Yes.  It's exactly like this one.

BY MR. KIM:

Q    And so, Asa'ad, this was the cell that you were taken to next?

A    Yes.  Yes.

Q    Can you describe to the jury what happened to you inside of here?

A    I was scared, I had a bag on my head, I was sleeping on my stomach, it was extremely cold, I was screaming.

Q    Were you still naked, Asa'ad?

Case 1:08-cv-00827-LMB-JFA    Document 1816    Filed 11/12/24    Page 20 of 122
Direct examination — A. Al-Zuba'e
PageID# 54241

A    Yes.

Q    And at this point, you also had a bag on your head; did I hear you correctly?

A    Yes.

Q    Were you restrained in any way?

A    Iron handcuffs.

Q    And how long were you held inside of here, Asa'ad?

A    Until morning.

Q    And so can you describe in a bit more detail, Asa'ad, what happened to you as you were handcuffed naked with the hood over your head inside of this cell overnight?

A    I was screaming, crying just like a little child when he cries.

Q    Was there a toilet inside of this room, Asa'ad?

A    No, there was none.  I had to do it on myself.

Q    Okay.  And so, Asa'ad, after you were finally let go from this room, what happened next?

A    They took me to another jail cell.

        MR. KIM:  And if we could now show Plaintiffs' Exhibit 206B, as in beta, which was admitted at General Fay's deposition?

        THE COURT:  All right.

        MS. BAILEY:  No objection, Your Honor.

        THE COURT:  All right.  It's in.

   (Plaintiffs' Exhibit Number 206B admitted into evidence.)

                                                        20

Case 1:08-cv-00827-LMB-JFA   Document 1816   Filed 11/12/24   Page 21 of 122
PageID# 54242
Direct examination A. Al-Zuba'e

BY MR. KIM:

Q    And were you moved to one of the cells shown here, Asa'ad?

A    Yes.  Yes.

Q    And after being moved to one of these cells, Asa'ad, were you brought to an interrogation at some point?

A    They came in the evening to me.

        MR. KIM:  We can bring this photo down now.

BY MR. KIM:

Q    And how were you brought to your first interrogation, Asa'ad?

A    They put a bag on my head, they put -- they handcuffed my hand, and they would twist me down the hallway to the left and to the right.

Q    And who was it?  Can you describe who it was that was doing this to you?

A    The guard.

Q    And this guard brought you to a separate room where the interrogation took place, did I understand you correctly?

A    Yes.

Q    And can you describe who the interrogators were, what they looked like?

A    Three civilians.

Q    How could you tell they were civilians?

A    When they got me inside, they would take the bag off my

21

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA    Document 1816    Filed 11/12/24    Page 22 of 122
Direct examination 54243 A. Al-Zuba'e
PageID# 54243

head.

Q    And what were they wearing?

A    Civilians.

Q    Okay.  And during the interrogation, where was the guard who brought you there?

THE INTERPRETER:  Sorry.  The interpreter needs a repetition.

MR. KIM:  Sure.

BY MR. KIM:

Q    During the interrogation, where was the guard who brought you there?

A    Outside the room.

Q    And at the end of the interrogation, did you see the civilian interrogators interact with anybody else?

A    Yes.  He went outside, talked to the guard, and then he came back in.

Q    Okay.  And after the civilian interrogator spoke to the guard, what happened next?

THE INTERPRETER:  Sorry.  The interpreter needs a repetition.

THE WITNESS:  He brought me back to the same jail cell.

BY MR. KIM:

Q    And what happened upon being brought back to your cell?

A    He told me to turn around -- he told me to turn

22

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

around --

THE INTERPRETER:  Sorry.  The interpreter needs a repetition.

THE WITNESS:  He told me to turn around, slapped me against the wall, he hit me, and I fell to the ground, and then he told me to stand up.

BY MR. KIM:

Q   And, Asa'ad, you said he hit you.

Did that cause you any physical injuries?

A   Yes.  My head.  I had swelling in my head.

Q   And then, Asa'ad, you said he told you to stand up, and I think I saw you motion and put your two hands above your head.

Why were you doing that?

A   Then he handcuffed me to the bed.  You see my wrist right now was swollen from being handcuffed.

MR. KIM:  And let the record reflect he was holding both hands high above his head.

BY MR. KIM:

Q   And what portion of the bed were you handcuffed to, Asa'ad?

A   The very top one up.

Q   And so as you were cuffed to the very top of the bed, where were your feet?

THE INTERPRETER:  The interpreter needs a

23

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

repetition.

THE WITNESS:  My feet were barely touching the floor of the cell.

BY MR. KIM:

Q    Asa'ad, how long were you kept in this position?

A    I stayed the whole night until the next day to 4 p.m., that's when he came and took off the handcuffs.

Q    And while you were cuffed in this position until the next day, did you have to use the restroom, Asa'ad?

A    I was screaming, crying, yelling.  There was no answer. There was nothing, so I had to do it on myself.

Q    And, Asa'ad, after you were finally uncuffed, when were you next interrogated?

THE INTERPRETER:  Sorry.  The interpreter needs a repetition.

BY MR. KIM:

Q    After you were finally uncuffed, when were you next interrogated?

A    They took -- it was the same.  It was my room, the same room.

Q    So they brought you to the same interrogation room, am I understanding you correctly, Asa'ad?

A    No.  I stayed in my room, in my jail cell.

Q    Okay.  And were you interrogated a second time, Asa'ad?

A    Yes.

24

Case 1:08-cv-00827-LMB-JFA    Document 1816    Filed 11/12/24    Page 25 of 122
Direct examination of A. Al-Zuba'e
PageID# 54246

Q    And how were you brought there?

THE INTERPRETER:  I'm sorry?

BY MR. KIM:

Q    How were you brought to the second interrogation?

A    Same thing.  He put a bag on my head, handcuffed me, he turned me to the right, turned me to the left, and then he got me to the room, and then he took the bag off my head.

Q    And when the bag was taken off your head, who was inside the room with you?

A    Three civilians.

Q    And during this second interrogation, Asa'ad, where was the guard who brought you there?

A    Outside the room.

Q    Okay.  And at the end of the second interrogation, Asa'ad, did you see the civilian interrogators interact with anyone at the end?

A    After two days, the same interrogators came to talk to me, and then they started talking to the guard.

Q    Okay.  Asa'ad, so if I'm understanding you correctly, you said that you saw the civilian interrogators talk to the guards at the end of the second interrogation?

A    Yes.

Q    And then I think you said you were brought back to your cell?

A    Yes.  Yes.

25

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA   Document 1816   Filed 11/12/24   Page 26 of 122
Direct examination of A. Al-Zuba'e
PageID# 54247

Q    Okay.  And when you got -- when you were back at your cell, what happened next?

THE INTERPRETER:  Sorry.  The interpreter needs a repetition.

BY MR. KIM:

Q    When you were back inside of your cell, what happened next?

A    After three days, maybe two days, the same interrogators came to my room, and they talked to the guard, and they took all my belongings outside.

Q    And what belongings did they take from your cell?

A    Everything.  Everything.  My clothes, my bed. Everything was taken out.

Q    What were you left with?

A    I had nothing.  Nothing was left with me.

Q    How long were you left without your belongings?

A    Three days.

Q    What did you sleep on during those three days?

A    I did not sleep.  I did not sleep.  I got sick.  I was crying, I was screaming.

Q    Were you able to keep warm at all?

A    No.  I was screaming, I was crying, I got sick, I had to see a doctor.

Q    And, Asa'ad, you said you were provided your things back at the end of those three days; did I hear you

26

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA    Document 1816    Filed 11/12/24    Page 27 of 122
Direct examination A. Al-Zuba'e
PageID# 54248

correctly?

A    Yes.

Q    And what happened after you were given your things back?

A    He threw my belongings, and he left.

Q    Were you interrogated a third time?

A    Yes.

Q    And how were you brought to the third interrogation?

        (Lights went off at Mr. Al-Zuba'e's location.)

        MR. KIM:  We can keep going.  We don't know how long it will be.

        THE WITNESS:  Third interrogation?

BY MR. KIM:

Q    How were you brought to your third interrogation?

A    Same way.  They put a bag on my head, they handcuffed me, they turned me around two or three times, they took me to an open place.  It was cold, and it was raining.

Q    Did the cold temperature and the rain, did that cause you any discomfort?

A    My stomach was hurting me, I was crying, I was screaming.

Q    And at the conclusion of this interrogation, Asa'ad, were you brought back to your cell?

A    Yes.

Q    Sorry, Asa'ad.  To backtrack for a moment, during this

27

third interrogation, what were the interrogators wearing?

A    Civilians.

THE COURT:  Was it the same three civilians who had done the first two interrogations?

THE WITNESS:  No.  No.  Different ones.  Different ones.

BY MR. KIM:

Q    Asa'ad, were you interrogated a fourth time?

A    Yes.  Yes.

Q    And how were you brought to the fourth interrogation?

A    Same way.  They put a bag on my head, handcuffed me, they turned me around two or three times, they took me upstairs to the second floor.

Q    And who was present during this fourth interrogation?

A    Also three civilians.

Q    Were any threats made during this interrogation?

THE INTERPRETER:  I'm sorry.  The interpreter needs a repetition.

BY MR. KIM:

Q    Were any threats made during this interrogation?

A    Yes.  Yes.  Yes.  Yes.

Q    What threats were made to you, Asa'ad?

A    They said we'll bring your family and we'll rape them.

Q    Did you believe them, Asa'ad?

A    Yes.  Yes.  I was crying, I was screaming.

28

Q    Were you otherwise harmed during this interrogation, Asa'ad?

A    Yes.

Q    In what way?

A    He told me to stand up, he threw me against the wall, and I fell down.

Q    Who threw you against the wall, Asa'ad?

A    Civilians.

Q    Was it one of the interrogators?

        THE INTERPRETER:  I'm sorry.  The interpreter needs a repetition.

        THE WITNESS:  One of them slapped me against the wall, and I fell down.

BY MR. KIM:

Q    And what happened at the conclusion of this interrogation, where were you brought next?

A    They brought me back to the same jail cell.

Q    Do you recall any other interrogations while you were held inside the cells?

A    How could I remember?

Q    Okay.  While inside the cells, were you ever mistreated with dogs?

A    Yes.

Q    Were you ever bit by a dog?

A    At night.

29

Q    Where were you when the dog bit you?

A    In the hallway.

Q    Were you clothed?

A    No.  No.  I was naked.

MR. KIM:  I'd like to now show the plaintiff, Plaintiffs' Exhibit 32, and this should only be shown to the plaintiff first.

BY MR. KIM:

Q    Is this similar to how a dog was used on you in the hallway, Asa'ad?

THE COURT:  Hold on a second.

Is there any objection to 32?

MS. BAILEY:  Yes.  Object to relevance and prejudice.  It's not this plaintiff, it's not the same individuals.

THE COURT:  Again, to the extent the description needs more clarification, I'm going to permit it.  On this one, I will permit, so Plaintiffs' 32 is in.

(Plaintiffs' Exhibit Number 32 admitted into evidence.)

THE COURT:  Again, this is not a picture of this plaintiff, but it's meant to demonstrate the type of experience that he is describing.

MR. KIM:  Thank you, Your Honor.

THE WITNESS:  Yes.

BY MR. KIM:

30

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA   Document 1816   Filed 11/12/24   Page 31 of 122
Direct examination of A. Al-Zuba'e
PageID# 54252

Q    Asa'ad, can you describe to the jury just what was going through your mind as the dog was used on you in this way?

THE INTERPRETER:  Sorry.  The interpreter needs a repetition.

THE WITNESS:  I was screaming, I was yelling, screaming, I was very scared, I was terrified.

THE COURT:  Did you say that the dog actually bit you?

THE WITNESS:  Yes.

THE COURT:  Where did it bite?

THE WITNESS:  My arms and my legs.  Until now, I have -- it shows on my body.

MR. KIM:  Thank you, Your Honor.

And we can bring the photo down now.

BY MR. KIM:

Q    Was a dog ever used on you other than this incident in the hallway?

A    Yes.  But the dog did not bite me.  I was handcuffed to the jail cell, and the dog would come close to me, and it was pulled back.  It did not bite me.

MR. KIM:  And can we now -- I'd like to move into evidence Plaintiffs' Exhibit 161B, as in boy, which was admitted at Sergeant Frederick's deposition.

THE COURT:  All right.  I assume no objection.

31

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA    Document 1816    Filed 11/12/24    Page 32 of 122
Direct examination 54253 A. Al-Zuba'e
PageID# 54253

MS. BAILEY:  No objection, Your Honor.

THE COURT:  All right.  161D, as in dog --

MR. KIM:  B.

THE COURT:  I'm sorry B, as in boy is in.

(Plaintiffs' Exhibit Number **161B admitted into evidence.**)

BY MR. KIM:

Q    Asa'ad, was this similar to how you were chained to the bars of your cell when a dog was used on you the second time?

A    Yes.  Yes.

MR. KIM:  Okay.  And we can take that down now. Thank you.

BY MR. KIM:

Q    And so, Asa'ad, we've talked about what's happened to you as far as direct abuse.

But did you ever see other detainees being abused?

A    Yes.

Q    What other abuse did you see, Asa'ad?

A    They would pile people on top of each other.

Q    Where were you when you saw this happen?

A    I was in my jail cell.

MR. KIM:  Okay.  And I'd like to now move into evidence Plaintiffs' Exhibit 206A, as in alpha, which I believe has been previously admitted at a deposition.

MS. BAILEY:  No objection, Your Honor.

32

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA    Document 1816    Filed 11/12/24    Page 33 of 122
PageID# 54254
Direct examination A. Al-Zuba'e

THE COURT:  All right.  206A is in.

(Plaintiffs' Exhibit Number **206A admitted into evidence.**)

THE COURT:  Is there a question?

MR. KIM:  I'm just waiting for the photo to come up, Your Honor.

BY MR. KIM:

Q    And so, Asa'ad, is this what you saw, or did you see something similar to this while inside your cell?

A    I saw the same thing.

Q    What was your reaction to seeing this?

A    I was shaking, I was shivering, I was scared.

Q    Were you afraid that something similar might happen to you?

A    Yes.  Yes.  I was scared.  I was extremely scared.

Q    And if -- do you recognize the guard, the male guard in this photo?

A    Yes.  This guard, his shift was the night shift.

Q    What do you recognize him from, and why does he stand out to you?

THE INTERPRETER:  Sorry?

MR. KIM:  Sure.  What stands out to him about this gentleman.

THE WITNESS:  I was scared.  I was scared.  My whole body was shivering.  I was extremely scared.

BY MR. KIM:

Q    Asa'ad, did the male guard in this photo, did he abuse you?

A    Yes.

Q    In what ways?

THE INTERPRETER:  The interpreter needs a repetition.

THE WITNESS:  He took me to the bathroom.  He said I'll rape you.  I will do feeky feeky (phonetic) on you.

BY MR. KIM:

Q    Do you remember him abusing you in any other ways, Asa'ad?

A    He slapped me against the wall.

Q    Okay, Asa'ad.

MR. KIM:  We can take this photo down now.

BY MR. KIM:

Q    Did you ever see any other forms of abuse of other detainees, Asa'ad?

A    I do not recall.

Q    Okay.  Asa'ad, I'd like to now talk a bit about the effect of being inside the cells at Abu Ghraib has had on you.

How have your relationships with friends and family changed, if at all?

A    I have no friends.

Q    And before Abu Ghraib, before your time inside the

34

Case 1:08-cv-00827-LMB-JFA    Document 1816    Filed 11/12/24    Page 35 of 122
Direct examination of A. Al-Zuba'e
PageID# 54256

cells at Abu Ghraib, did you have friends?

A    Yes.

Q    And why is it that you no longer see them?

And so, Asa'ad, I'll just briefly repeat my question.

Why is it that you think you no longer have any relationships with your friends?

A    Emotionally, I'm doing very bad.  I don't want to see anyone, don't want to deal with anyone.  When I left the jail, I was done.

Q    Okay, Asa'ad.  And can you describe in any more detail what effect your time inside the cells has had on you from a mental point of view?

THE INTERPRETER:  The interpreter needs a repetition.

THE WITNESS:  I was -- emotionally I'm doing extremely bad, even with my own family.  I don't have a relationship with them.

BY MR. KIM:

Q    Do you have any lasting physical effects, Asa'ad?

A    Yes.

Q    Can you describe those to the jury?

A    So my wrist right now is still swollen, I still have the marks from the dog bite, I have problems with my arm, lifting up my arm.

35

MR. KIM: Okay, Asa'ad. Thank you very much for your time today. That's the extent of the direct examination.

THE COURT: Do we need to change interpreters, or are you going to do the whole thing?

THE INTERPRETER: Your Honor, I speak Iraqi, so I have to do the whole thing.

THE COURT: Ah, I understand.

THE INTERPRETER: She's my backup. Thank you, Your Honor.

THE COURT: All right. Thank you.

All right. Go ahead.

MS. BAILEY: Thank you, Your Honor. We have binders for the Court.

CROSS-EXAMINATION

BY MS. BAILEY:

Q   Good morning, Mr. Al-Zuba'e.

THE COURT: Wait. Wait. One second.

BY MS. BAILEY:

Q   Good morning, Mr. Al-Zuba'e. Although I understand it's afternoon where you are.

A   Hello.

Q   My name's Linda Bailey, and I have a few more questions for you today.

A   Welcome to you.

36

Case 1:08-cv-00827-LMB-JFA   Document 1816   Filed 11/12/24   Page 37 of 122
PageID# 54258
Cross-examination A. Al-Zuba'e

Q    Thank you.

I want to start by clarifying something.  I believe you testified on your direct examination that you were brought to Abu Ghraib in January.

Is it more accurate to say that you were brought to Abu Ghraib in November?

A    I don't -- I swear, I don't recall.  I think it might have been November.

MS. BAILEY:  Okay.  At this time, Your Honor, I would like to admit page 5 from Defense Exhibit 30, which is the detainee file that the parties have agreed is admissible.

MR. KIM:  No objection, Your Honor.

THE COURT:  All right.  Just page 5 of Defense Exhibit 30 is in.

 (Defense Exhibit Number 30, page 5 admitted into evidence.)

MS. BAILEY:  Thank you, Your Honor.

And if we could put page 5 on the screen and focus at the top two lines.

BY MS. BAILEY:

Q    Mr. Al-Zuba'e, does the date of capture of November 5th, 2003 sound accurate to you?

A    I swear, I do not recall.

MS. BAILEY:  Okay.  We can take that down.  Thank you.

37

Case 1:08-cv-00827-LMB-JFA   Document 1816   Filed 11/12/24   Page 38 of 122
PageID# 54259
Cross-examination A. Al-Zuba'e

Your Honor, at this time I would also like to admit Plaintiffs' Exhibit 20, which the parties have consented as admissible.

THE COURT:  Again, no objection; correct?

MR. KIM:  Correct.

THE COURT:  All right.  20 is in.

MS. BAILEY:  Thank you, Your Honor.

(Plaintiffs' Exhibit Number **20 admitted into evidence.**)

BY MS. BAILEY:

Q    Mr. Al-Zuba'e, do you remember giving a statement about your treatment at Abu Ghraib prison to investigators while you were still imprisoned there?

A    When I left the jail cell is when I was interrogated.

Q    I'm talking about a separate incident, Mr. Al-Zuba'e. I'm talking about when investigators came and talked to you and asked you about whether you had been abused.

A    Yes.

MS. BAILEY:  Okay.  If we could focus in on the paragraph, if that's possible.

BY MS. BAILEY:

Q    Now, these investigators, they were investigating the detainee abuse that was happening at Abu Ghraib prison; is that right?

A    Yes.

Q    The date on this document is January 17th, 2004.

38

Case 1:08-cv-00827-LMB-JFA    Document 1816    Filed 11/12/24    Page 39 of 122
PageID# 54260
Cross-examination A. Al-Zuba'e

Do you have any reason to disagree with that date?

A    I swear, I do not recall.

Q    Okay.  Now, this was the first time that you reported to someone about how you had been mistreated; is that right?

A    When I was inside the tents after I left the jail cell is when the interrogators came and interrogated us.

Q    Okay.  Obviously you knew it was important to be honest?

A    Yes.

Q    And you knew it was important to tell them everything that had happened to you?

A    Yes.

Q    Why didn't you tell those investigators about the horrible assault you suffered in the computer room?

A    I was scared.  I just wanted to leave.  I was afraid that there might have been -- that might cause a problem.

Q    You were examined by Dr. Stephen Xenakis about 11 years ago in Iraq; is that correct?

A    Yes.

Q    He is your paid expert witness?

THE INTERPRETER:  Sorry.  The interpreter --

BY MS. BAILEY:

Q    He is your paid expert witness?

THE INTERPRETER:  The interpreter needs an interpretation.

39

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA    Document 1816    Filed 11/12/24    Page 40 of 122
PageID# 54261
Cross-examination A. Al-Zuba'e

You said paid expert witness?

MS. BAILEY:  Yes.

THE INTERPRETER:  Okay.

BY MS. BAILEY:

Q    Do you understand the question, Mr. Al-Zuba'e?

A    I don't know.

Q    Do you understand that Mr. -- or excuse me, Dr. Xenakis was paid to evaluate you for purposes of this litigation?

MR. KIM:  Objection, Your Honor.  Relevance.

THE COURT:  Well, the medical examination would be relevant.  Whether he's paid or not -- let's move this along, please.

MS. BAILEY:  Okay.

THE COURT:  Do you remember being examined by a doctor named Dr. Xenakis?

THE WITNESS:  No, I do not recall.  I do not recall.

BY MS. BAILEY:

Q    Sir, didn't you just testify a few minutes ago that you did recall being examined by Dr. Xenakis about 11 years ago in Iraq?

THE INTERPRETER:  The interpreter needs a repetition.

THE WITNESS:  Yes.  He came to examine me in Iraq. Yes.

40

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA    Document 1816    Filed 11/12/24    Page 41 of 122
Cross-examination of A. Al-Zuba'e
PageID# 54262

BY MS. BAILEY:

Q    Okay.  You didn't tell Dr. Xenakis about being assaulted in the computer room; did you?

A    I told him.  I told him.  I told him everything.

Q    Okay.  You were examined by Dr. Payne-James in Malaysia in February of this year; right?

A    Yes.

Q    You didn't tell Dr. Payne-James about being assaulted in the computer room; did you?

A    Yes, I told him.  I told him.

Q    In fact, didn't you actually tell him that no one hurt you or any of the detainees who were in that computer room?

A    No, that didn't happen.  I told them.  I told them so many things.

Q    When he specifically asked you if you had been sexually assaulted at Abu Ghraib, you told him you were not; correct?

A    No.  Just as I told you guys, I told him.

Q    You testified today that all of you interrogators were civilian; correct?

A    Yes.

Q    In your statement to investigators that you gave while you were in prison, which is still on the screen, you didn't mention any civilians.

     If civilians hurt you, why didn't you say so?

A    What do you want me to say, how the civilians are?

41

Case 1:08-cv-00827-LMB-JFA   Document 1816   Filed 11/12/24   Page 42 of 122
PageID# 54263
Cross-examination A. Al-Zuba'e

Q    Sir, I'm asking you why you didn't mention any civilians in your statement to investigators?

A    Which investigators?

Q    I'll move on.

You answered interrogatories when you were in Turkey in 2012; is that correct?

A    Yes, I do recall, yes.

MS. BAILEY:  Okay.  At this time I would like to show the witness, and not the jury, Defense Exhibit 11 at page 27.

BY MS. BAILEY:

Q    Do you see this document, sir?

THE COURT:  There's no objection to this; is there?

MR. KIM:  It should not come into evidence, though, Your Honor.

THE COURT:  All right.  Let's see.  Page what, 27?

MS. BAILEY:  Page 27.

THE COURT:  All right.

MS. BAILEY:  I'm going to ask if this is his signature.

MR. KIM:  No objection, Your Honor.  We withdraw.

THE COURT:  So this whole exhibit is going in then?

MS. BAILEY:  No, Your Honor.  I would just like

42

Case 1:08-cv-00827-LMB-JFA    Document 1816    Filed 11/12/24    Page 43 of 122
PageID# 54264
Cross-examination of A. Al-Zuba'e

page 27, and then I have a specific paragraph.

THE COURT:  All right.  All right.

Is that his signature?

THE WITNESS:  Yes.

MS. BAILEY:  Thank you.  And we can publish that to the jury now.

(Defense Exhibit Number 11, page 27 admitted into evidence.)

MS. BAILEY:  All right.  I'd like to go to this same exhibit at page 3, paragraph 5.

BY MS. BAILEY:

Q    Sir, if only civilian interrogators interrogated you, then why did you mention a male interrogator wearing a military uniform as one of the people that you were in contact with at Abu Ghraib prison?

THE INTERPRETER:  The interpreter needs a clarification from the deponent.

THE WITNESS:  So it was outside the jail cell. The interrogator with the military clothes came to the tents.  It was outside the cell.

MS. BAILEY:  I'd like to show the witness and -- I'm sorry, and the jury what's already been admitted, Plaintiffs' Exhibit 226, paragraphs 16 to 18.

THE COURT:  All right.  226 is in evidence, but again only those admitted portions.

MS. BAILEY:  Yes, Your Honor.

43

Cross-examination A. Al-Zuba'e

(Plaintiffs' Exhibit Number **226, paragraphs 16 to 18**

admitted into evidence.)

BY MS. BAILEY:

Q    Sir, plaintiffs have stipulated in this case that according to the United States government, you were interrogated by five military interrogators and only one civilian interrogator.

How do you explain that?

A    No military -- no military interrogators interrogated me inside the jail cell; they were all civilians.  Only when I left the jail cell.

Q    Were you able to tell the difference between military interrogators and civilian interrogators?

A    Through clothing.

Q    When you were at Abu Ghraib, did you know that off-duty military police guards were allowed to wear civilian clothing?

MR. KIM:  And, Your Honor, before he can respond, just objection.  Assumes facts not in evidence.

THE COURT:  Sustained.

BY MS. BAILEY:

Q    Mr. Al-Zuba'e, you've alleged that soldiers in the United States Army abused you.

Why haven't you filed a lawsuit against any of them?

44

Case 1:08-cv-00827-LMB-JFA    Document 1816    Filed 11/12/24    Page 45 of 122
PageID# 54266
Cross-examination A. Al-Zuba'e

THE COURT:  Let's take the exhibit down from the screen.

THE WITNESS:  The Army did not mistreat us.  The U.S. Army -- the U.S. Army did not mistreat us.

BY MS. BAILEY:

Q    Sir, didn't you testify on direct that a military police officer named Graner abused you horribly?

THE INTERPRETER:  The interpreter needs a clarification.

THE WITNESS:  He's just a guard.  He takes orders from others.  He's just a guard.

BY MS. BAILEY:

Q    Did you ever hear someone give him orders to abuse you?

A    No, because whenever we asked him for help, he says I can't do anything, it's out of my hands.  I have to take orders, then I can do it.

Q    He said that to you personally?

A    Not to me directly.  He said it through an interpreter.  Egyptian.

Q    Okay.  You have filed a claim against the United States government before, though; haven't you?

A    No.  No.

MS. BAILEY:  Okay.  I'd like to admit also from Plaintiffs' -- or, excuse me, Defense Exhibit 30, pages 19 through 23.  And if we could go to page 19 and focus at the

45

Case 1:08-cv-00827-LMB-JFA    Document 1816    Filed 11/12/24    Page 46 of 122
PageID# 54267
Cross-examination A. Al-Zuba'e

top.

THE COURT:  All right.

MR. KIM:  No objection, Your Honor.

THE COURT:  All right.  They're in.

(Defense Exhibit Number 30, pages 19 through 23 admitted into evidence.)

BY MS. BAILEY:

Q    Sir, is that your name in Arabic?  And I realize you don't recognize the English.

But is that your name in Arabic on the top line?

A    Yes.  Yes.

Q    Okay.  This is a claim form that's in your detainee file to the U.S. Army Foreign Claims Commission?

THE INTERPRETER:  The interpreter needs a repetition.

BY MS. BAILEY:

Q    Oh, sorry.

This is a claim form in your detainee file to the U.S. Army Foreign Claims Commission?  I'll follow up with a question when you translate that.

I'd like you to look at -- if we could go to the top of page 23.  You made a claim for things you said the United States Army took from you when you were captured; is that correct?

A    What do you mean when I filed?  Is that when they took

46

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA   Document 1816   Filed 11/12/24   Page 47 of 122
PageID# 54268
Cross-examination A. Al-Zuba'e

me from my house?

Q   When you were captured, sir, did you say that the U.S. Army took $20,000 from you?

A   They --

THE INTERPRETER:  The interpreter needs a repetition.

THE WITNESS:  In the computer, they took my car, my money.

MS. BAILEY:  I'm sorry.  Did you say the computer?

THE INTERPRETER:  Yes.

BY MS. BAILEY:

Q   Okay.  They took your car, and $20,000 is the amount of money that they took?

A   Yes.

Q   Okay.  Did the United States government ever give that $20,000 back to you?

A   No.  Nobody returned it.

Q   That's a lot of money.  Weren't you upset that you didn't get it back?

A   I don't know what to do.  I was scared.  I was not able to say anything.

Q   Okay.  But you haven't filed a lawsuit against the United States to get your $20,000 back?

A   No, I did not.

Q   Okay.  You mentioned that the Army took your car.

47

Case 1:08-cv-00827-LMB-JFA    Document 1816    Filed 11/12/24    Page 48 of 122
PageID# 54269
Cross-examination A. Al-Zuba'e

You're a taxi -- or you were a taxi driver; correct?

A    The way we work, it's not very organized.  Sometimes it's taxi driver, sometimes I buy and sell things.

Q    You couldn't be a taxi driver without your car?

A    Yes.  It's my car.  It's not like a rental.

Q    But you didn't file a lawsuit against the United States government to get your car back or to get money for it; did you?

A    Yes.

Q    Yes, you did; or yes, you did not?

THE INTERPRETER:  The interpreter needs a clarification.  The interpreter asked him is that true that you did not file, and the deponent said yes.

MS. BAILEY:  Okay.  Thank you.  I appreciate it.

If we could go to the bottom of that page and focus in on the text there.

BY MS. BAILEY:

Q    At the same time you made your claim for $20,000, you also claimed that you had been tortured at Abu Ghraib prison; is that correct?

A    I swear, I do not recall.

Q    Okay. The United States hasn't paid you anything for a claim of torture, correct?

A    Yes.

48

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

MS. BAILEY:  Is that also that that is correct?

THE INTERPRETER:  Correct.  Yes.

MS. BAILEY:  Thank you.

BY MS. BAILEY:

Q    But instead of filing a lawsuit against the government, you filed a lawsuit against CACI?

A    Yes.

Q    You didn't know who employed the employee -- or the civilians you saw at Abu Ghraib; did you?

A    No, I don't.

Q    Okay.  When you first sued CACI, you claimed that CACI interrogators directly abused you; didn't you?

THE INTERPRETER:  Sorry.  The interpreter needs a clarification.  When you first what?

BY MS. BAILEY:

Q    When you first sued CACI, you claimed that CACI interrogators directly abused you?

A    I did not know that.  It was civilians that mistreated me.  They were not military.

Q    So you're saying now that it's -- you are claiming still today that CACI interrogators directly abused you?

A    They were civilians, yes.

Q    Do you understand there is no claim in this case before this jury that civilians directly abused you?

MR. KIM:  Objection, Your Honor.

49

Case 1:08-cv-00827-LMB-JFA   Document 1816   Filed 11/12/24   Page 50 of 122
PageID# 54271
Cross-examination A. Al-Zuba'e

THE COURT:  Overruled.

THE INTERPRETER:  The interpreter needs a repetition.

BY MS. BAILEY:

Q    Sure.

Do you understand that in this case before this jury, there is no claim that civilians directly abused you?

THE INTERPRETER:  I'm sorry.  The interpreter needs a repetition.

THE WITNESS:  The treatment was all from the civilians.

BY MS. BAILEY:

Q    Okay.  You never asked the United States government to identify who interrogated you; did you?

A    I'm scared.  I didn't want to ask.  Who would I ask?

Q    Your lawyers didn't ask on your behalf either; did they?

THE COURT:  Sustained.  There's no question.

BY MS. BAILEY:

Q    Have you ever tried to sue Mr. Graner?

A    I don't know.

Q    After you were released from Abu Ghraib, you didn't seek any medical treatment; did you?

A    Yes.

Q    Yes, he did; or no, he did not?

50

Case 1:08-cv-00827-LMB-JFA    Document 1816    Filed 11/12/24    Page 51 of 122
PageID# 54272
Cross-examination A. Al-Zuba'e

A     Yes, meaning I did not seek any.

Q     Okay.  So the only times you've seen a doctor for talking about the treatment you received at Abu Ghraib is when you saw Dr. Xenakis and Dr. Payne-James?

A     Dr. Xenakis said what injuries do you have.  I told him what I had just told you.

        MS. BAILEY:  Okay.  I'd like to show just the witness Defense Exhibit 16.

        THE COURT:  Is there any objection to 16?

        MR. KIM:  No, Your Honor.

        THE COURT:  All right.  It's in.

    (Defense Exhibit Number 16 admitted into evidence.)

        MS. BAILEY:  If we could publish 16, please.

BY MS. BAILEY:

Q     Sir, this is a picture of you that Dr. Xenakis took when he did his examination of you in 2013; is that correct?

A     Yes.  This is my picture, yes.

Q     Who was there when you were examined?

A     I swear, I don't recall.  Maybe somebody was there.  I do not recall.

Q     Was there an interpreter?

A     Maybe there was not an interpreter.  I swear, I do not recall.

Q     Okay.  I'd like to ask you about some of the information Dr. Xenakis considered.

51

Case 1:08-cv-00827-LMB-JFA    Document 1816    Filed 11/12/24    Page 52 of 122
PageID# 54273
Cross-examination A. Al-Zuba'e

Did you tell Dr. Xenakis that on the second day of your confinement, you were given a traditional robe to wear?

A    No, I did not tell him that.

Q    Did you tell him that you were bitten by dogs during your interrogation sessions, not in the hallway?

THE INTERPRETER:  Not in all?

MS. BAILEY:  Not in the hallway.

THE WITNESS:  I do not recall.

BY MS. BAILEY:

Q    Did you tell him that you had been physically abusive to both of your wives and your children since your release?

A    I was not in a good -- I was not feeling good after I left, but I did not tell him such things.

Q    Would you say your wives and children have witnessed the effects that imprisonment had had on you physically and mentally?

A    Yes.

Q    But none of them are testifying in this trial; are they?

A    Repeat.

Q    None of them are testifying in this trial; correct?

A    No, I don't know.

Q    In fact, there are no witnesses in this trial who will verify the things you testified to today?

MR. KIM:  Objection, Your Honor.

52

THE COURT:  I'm going to sustain that objection.

MS. BAILEY:  No further questions, Your Honor.

THE COURT:  Is there any redirect?

MR. KIM:  Yes.  Can we bring up Plaintiffs' Exhibit 20, please, and specifically the second page.

THE DEPUTY CLERK:  There's only one page.

MR. KIM:  Are you able to go to defendant's version of it?

THE DEPUTY CLERK:  Yes.

REDIRECT EXAMINATION

BY MR. KIM:

Q    Asa'ad, are you able to read what is written here?

A    No.  No.

Q    Did anyone ever read to you what is written here?

A    No.

Q    And going to the first page, did anyone ever read to you what is written here either?

A    No.

Q    Do you know if whoever wrote this statement actually wrote down everything you said?

A    I don't know.

Q    Do you recall what you spoke about with the people who wrote this statement?

A    I swear, I do not recall.

Q    Do you recall any of the questions they asked you?

53

A     No, I do not recall.

Q     Do you know if they asked you to identify your interrogators?

A     I do not recall, no.

            MR. KIM:  We can bring this down now.

            And can we please bring up Defense Exhibit 30.

            MS. BAILEY:  What page?

            MR. KIM:  Specifically page 19.

BY MR. KIM:

Q     And you spoke about this briefly with defense counsel. This is a claim in your detainee file submitted to the United States Army Foreign Claims Commission; do you recall that?

            THE INTERPRETER:  The interpreter needs the last three words you said.

            MR. KIM:  Sure.  If he just recalls speaking about that with defense counsel.

            THE WITNESS:  I do not recall.

BY MR. KIM:

Q     Okay.  Let's go to page 23, please.

            And so this asks you to provide a brief statement underlying your claim for damages.  And if we could scroll to the bottom.  And so this reads at the bottom in English: I was tortured at Abu Ghraib prison and had a breakdown and was assigned an attorney by the Pentagon named Captain

54

Norman.

Do you know who Captain Norman is?

A    No.  No.

Q    Do you even recall ever meeting this attorney that was purportedly assigned to you?

A    No, I do not recall.

Q    Did anyone ever contact you about this claims form?

A    No.  No.

Q    And so nobody from the U.S. government -- after you submitted this claims form for torture, nobody ever discussed that with you?

A    No.

MR. KIM:  We can take this down now.

Can we please bring up Defense Exhibit 11, paragraph 7, which is, I believe, on the third page.

BY MR. KIM:

Q    And so defense counsel spoke to you about a couple of the other paragraphs here, but paragraph 7 provides two male interrogators wearing civilian clothes whose specific identities are currently known to Plaintiff Al-Zuba'e, have knowledge relevant to the abuses alleged in paragraphs 46, 49 and 50 of the second amended complaint.

This was also a part of your interrogatory responses; is that correct?

A    I swear, I do not recall.

55

Case 1:08-cv-00827-LMB-JFA   Document 1816   Filed 11/12/24   Page 56 of 122
PageID# 54277
Recross-examination - A. Al-Zuba'e

MR. KIM:  Okay.  We can take this down now.

And last question.  If we could please bring up Plaintiffs' 226 as well, specifically paragraph 18.

THE COURT:  All right.  This is the uncontested facts?

MR. KIM:  And I'm just going to briefly read this into the record, Your Honor.

THE COURT:  Go ahead.

MR. KIM:  And so this is the stipulation of facts between the parties, and paragraph 18 reads:  According to the United States, Mr. Al-Zuba'e was interrogated by a CACI employee, CACI Interrogator G, and Army Interrogator B, on December 23rd, 2003.

No further questions.

THE COURT:  Any recross?

MS. BAILEY:  Very brief, Your Honor.

If we could bring up Plaintiffs' Exhibit 20 on the second page, and if we could focus in on the bottom writing.

RECROSS EXAMINATION

BY MS. BAILEY:

Q   Mr. Al-Zuba'e, that's your signature, isn't it, on the bottom left?

A   I swear, I do not recall.

MS. BAILEY:  Okay.  And this is a housekeeping issue, Your Honor.  I'm not sure that I admitted in Defense

56

Case 1:08-cv-00827-LMB-JFA    Document 1816    Filed 11/12/24    Page 57 of 122
PageID# 54278
Recross-examination - A. Al-Zuba'e

Exhibit 11 on page 3, paragraph 5, which we showed to the jury. And presumably plaintiffs' counsel would like paragraph 7 as well admitted.

MR. KIM: Yes.

MS. BAILEY: So if we could admit both those paragraphs.

THE COURT: One second. Exhibit 11?

MS. BAILEY: Yes, Your Honor. Defense Exhibit 11 at page 3, paragraphs 5 and 7.

THE COURT: All right. Just those portions are in. That's all. Yes.

MS. BAILEY: Yes, Your Honor. And page 27 was previously admitted.

THE COURT: Right. All right.

(Defense Exhibit Number 11, paragraphs 5 and 7 admitted into evidence.)

MS. BAILEY: Thank you, Your Honor. No further questions.

THE COURT: Very good, because it's about time for the break.

Mr. Al-Zuba'e, I want to thank you for your testimony, but your testimony is now complete.

Thank you to the interpreter.

THE WITNESS: Thank you.

(Witness excused at 11:20 a.m.)

57

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE COURT:  So, ladies and gentlemen, we're going to have our morning break now.  I'm going to give you 15 minutes, and then we will start with the completion of the direct examination of Mr. Torin Nelson that began yesterday.  All right.  15-minute recess.

(Jury not present at 11:20 a.m.)

(A recess was taken.)

THE DEPUTY CLERK:  Rise for the jury.

(Jury present at 11:36 a.m.)

THE COURT:  All right.  Mr. Nelson, you're still under your affirmation to tell the truth from yesterday's testimony.

DIRECT EXAMINATION

BY MR. FARIDI:

Q    Mr. Nelson, when we left off yesterday, we were talking about the relationship between military intelligence and military police; do you recall that, sir?

A    Yes, I do.

Q    At Abu Ghraib, did you notice something about how the military police folks were behaving and what they were doing that you found to be unusual?

A    There was one particular incident towards the end of my tenure there.  This would have been sometime, I believe, in the beginning of January.  I was in the process of escorting my detainee at that time through the hard site.  We couldn't

58

go to the normal interrogation booth, so I was walking him along the catwalk on the upper floor towards the showers as an alternate interrogation booth.

I noticed that down on the floor, the first floor, there was one of the cell doors of the hard site open, allowing me to actually see into the cell of another non-associated detainee with me.

The MP, I noticed, had opened up the door in order to be able to change a CD on a stereo box that had been playing extremely loud music, like a heavy metal/grudge type of music just at full volume.

This box was sitting in front of a detainee who was forced to sit cross-legged on the floor facing the outer door.  There are two doors.  There's an outer door that's solid, inner doors that are bars.  The detainee appeared to have been possibly handcuffed or tied, I'm not sure, to the bars sitting in the squatting position.  Not squatting, maybe Indian style, I guess.  Cross-legged.  Directly facing the box, and the MP was changing the CD to put on another music CD.  Extremely loud music.

Q    Why did you find that unusual?

A    Well, this would not be anything that an MP would normally be doing.  This is not -- this is total breach from standard protocol for what a guard force is actually supposed to do with detainees that they're safeguarding.

59

But it is something that has been brought up for military intelligence applications before.

Q    In your experience, do military police folks defer to the interrogator's authority?

A    Yes.

MR. O'CONNOR:  Objection.  Competence.

THE COURT:  Oh, I think given this man's experience in the field, he can certainly answer that question.  Overruled.

BY MR. O'CONNOR:

Q    What's the answer?

A    Yes.

Throughout my experience with working with guard forces around the world, I've never had an incident where guard forces actually balked at any type of request order that I've give them in the conduct of handling detainees that are assigned to me.

Q    And what role do interrogators have in setting conditions for detainees for interrogations?

A    Ultimately they have an extreme high level of control. They can put in requests on a regular basis for isolation, separation, change of scenery.  They can put in requests, which are usually adhered to, for extra things.  Extra rations, extra blankets, pillows, comfort items, a change of location within a detention facility.  This would all be

60

used to facilitate the interrogation process.  So they have a lot of leeway with guard force to be able to put in requests.

Q    Now, at Abu Ghraib, sir, did you personally direct any of the military police folks to abuse any of your detainees?

A    I have never done so in my entire career.

Q    Why not?

A    I find it counterproductive, ineffective, a waste of time.

Q    Why is it counterproductive?  Why is it a waste of time?

A    One, I am able to get a very high amount of information that is truthful and accurate from detainees by treating them humanely and engaging them in conversation, eliciting information or just getting their willing cooperation.

I have noticed that people who have other detainees who go into a more confrontational method with their investigations tend to get lower amounts of information.  You know, less cooperation.  And the quality of the information is usually substandard.  Very poor, vague, lacking of detail or accuracy.

As well as my studies throughout other theaters of war going back to World War II, I was an instructor, I studied previous engagements, and studies have shown that the most effective information that we have gleaned has been

61

through the use of humane treatment by qualified, skilled people.

Q    Well, let's talk about the personnel, the interrogators at Abu Ghraib.

Did you interact with other CACI interrogators, employees at Abu Ghraib?

A    I did.  Pretty much from the first day that I arrived.

Q    Let's talk about Tim Dugan for a moment.

Who is Tim Dugan?

A    Tim Dugan was another CACI employee that was assigned to work with me in the same facility in the intelligence center there, the JIDC.  My first understanding was that he was actually working as an analyst.

Q    All right.  Well, did you ever live with him at Abu Ghraib, with Mr. Dugan?

A    So after about a week or two of living in general quarters, which was a much open bay area, we were transferred into more private prison cells in one area of the compound.  Tim Dugan was sharing a cell with me, so we spent quite a bit of time together.

Q    When you were spending time with Mr. Dugan when you were sharing a cell with him, did you ever hear him talk about treatment of detainees at Abu Ghraib?

A    Yes.  There was one incident late December or early January -- I think it might have been late December -- where

62

Tim had been drinking a little bit.  He had another fellow in the cell, and I was in the cell laying on my cot.  He was sharing what I would consider war stories, and he was complaining about how the interrogator that was partnered with him, a military interrogator, was inadequate, in his opinion.  He was too soft on his -- on the detainee that he and Tim were working.  And so Tim felt the need, the obligation to take over and -- because he believed that that was the effective way to do it.

So there was a particular incident that he described where the detainee was handcuffed to an eye bolt in the floor of the interrogation booth.  The eye bolt is supposed to be used for the leg irons so that --

Q    For the what?

A    For leg irons, the shackles that are put around the ankles of a detainee so that they cannot run away.

MPs can be ordered to cuff a detainee to the eye bolt that is mounted into the floor to avoid the detainee being able to escape.  I don't feel the need to ever use it. I usually unhandcuff my detainees.  But it is an option for safeguarding prisoners, as well as the personnel that are in the room.

Tim described how he had the detainee handcuffed to the eye bolt so that the detainee was not able to sit in a chair, was forced to squat on the floor so that the

63

plastic -- white plastic lawn type of furniture that we had in the interrogation booths was eye level to -- well, it was right about even with his nose, I would say, and then he was just looking over the table as Tim leaned back in his chair and asked him questions.

Tim described how he asked a question he didn't like, and he kicked the table, and he said that they said that I hit the detainee.  I don't think I did, but I don't even care if I did, I know what I did works, and I'll save lives.

Q   Were you -- what was your reaction when you heard Mr. Dugan describe this incident?

MR. O'CONNOR:  Objection, Your Honor.  Relevance.

THE COURT:  His reaction, I think, is not relevant.  I'll sustain that objection.

MR. FARIDI:  Sure.

THE COURT:  But the question is, did you report that discussion to anybody at CACI?

THE WITNESS:  At CACI, no, I did not.  I needed to gather more information on the incident.  It was already reported through the military channels, and I wanted to look at it because it was -- I did not know at the time if it was a detainee that was associated with any of my detainees and if it would affect my work or my ability to work with any of my detainees at the time, Your Honor.

64

THE COURT:  And, wait, just to clarify one thing further.

You had indicated before when you were describing the high level of control that interrogators had, you said you could put in a request for extra blankets, change of location, et cetera.

What was the request process, and to whom would such requests go?

THE WITNESS:  The normal process for putting in a request is the same pretty much what we do with interrogation plans before we actually go in and do an interrogation plan.

THE COURT:  All right.  Now, this is as to Abu Ghraib, not any other place.

So at Abu Ghraib, what was that chain?

THE WITNESS:  Yes, Your Honor.

It was the same process at Abu Ghraib with our interrogation plans, which they normally will go through our team chief as the sections that we're divided into.  It would go through our chain of command, generally on the military side.

THE COURT:  Excuse me.

Who would the team chiefs be?

THE WITNESS:  Well, it would be usually senior NCOs or a chief warrant officer on the military side.  And

65

the request -- because there is -- this is operational matters on a day-to-day basis within the JIDC for intelligence-gathering purposes.  So the military is the client and will need to sign off, according to FM 2-22.3, on any particular requests that are asked for during the course of an interrogation, Your Honor.

THE COURT:  All right.  Go ahead.

BY MR. FARIDI:

Q    And I'll follow up on a few of the issues that Your Honor has raised.

Let's focus first on whether or not you reported this incident.  Okay.

Did you report this incident that -- as to Mr. Dugan?

A    Yes, I did report it once to General Taguba's CID investigators who came through to ask their questions.  They were the proper authorities that were sent, and so I gave all information that I could about things that I had known that I believed were relevant and pertinent to the questions that they asked.

Q    And we'll get into the details of it later.

But did you have discussions with Mr. Porvaznik, who worked for CACI, as to some of the issues at Abu Ghraib?

A    Yes.  Right from the very beginning, as I stated, the first week I mentioned some of my difficulties of being able

66

to work there given the conditions that hadn't been explained to me beforehand. And Mr. Porvaznik, one of his main points was asking me to stay there longer because they were so shorthanded with experienced interrogators, to which I agreed, and was the main impetus for me to stay as long as I actually did.

Q    We're going to dive into that a little bit more later.

Did you interrogate anyone who had previously been interrogated by Mr. Dugan?

A    Yes.

Q    Okay. So let's focus on the first meeting you had with this detainee. Please don't disclose the name of the detainee; okay?

A    Correct.

Q    Can you describe the physical condition that you found the detainee in when you took over that detainee's interrogation?

A    So I was in the interrogation booth with both my translator and my analyst side saddling with me. The three of us were sitting there. And I began the interrogation by just introducing myself and mentioning that I was here to be able to take care of any issues that he might have, and we were just going to have a conversation.

After the introductions, he started talking --

MR. O'CONNOR: Your Honor, to the extent he's

67

going to start saying what a third party told him for the truth of that matter, that's hearsay, and we object.

MR. FARIDI: We're not going to focus on that.

BY MR. FARIDI:

Q   Can you just describe the detainee's physical appearance?

A   He started talking, and while he talked, he pulled up his sleeve and showed his arm, which is -- his forearm was bruised from about his elbow down to his wrist, possibly about 7, 8 inches long or so. It was an older bruise because it was yellowing a little bit, brown, there was still some purple. But it was very deep and very strong and it went around the entire forearm. It was extremely noticeable. And he also pointed to his forehead and showed a large knot or a bump on his forehead over his left eye and he said that he had --

MR. O'CONNOR: Don't --

MR. FARIDI: I got it.

BY MR. FARIDI:

Q   Please don't tell the jury what the detainee told you. You've described the detainee's physical condition. That's enough.

Did you report this incident to the Army's Criminal Investigation Division?

A   I did.

68

Q    Why?

A    Because it was very concerning to me that there was definite proof in my eye at that time that there was physical abuse going on.  The Army CID investigators, in my opinion, were the proper authorities at that time sent in order to be able to conduct a more thorough investigation than I ever could.

Q    Okay.  I'm going to ask for a yes-or-no answer on this.

Did you investigate how the detainee sustained those injuries?

A    Yes.

Q    Okay.  How did you investigate that?  What did you do?

A    After discussing with a couple of other people -- I won't mention any hearsay from them -- I started looking into operational reports.

Operational reports are in-house reports that are written by reporting officers, generally the interrogator after an interrogation.  They're used to log all activities that go on during an interrogation that are outside of intelligence operations.  Intelligence information is submitted through publications, but generally an IAR, an intelligence information report, they are published into the intelligence community.

An MFR, memorandum for record at the time, now called an ISR, interrogation summary report, is an in-house

69

operational report in order to be able to, in detail, log every bit of activity that does not go into the intelligence publications, but is used to make sure that we are accountable for everything that we do in the interrogation booths.

Q    Did you review the investigation log for this particular detainee?

A    I did.

Q    And was the incident that you described logged in the document?

A    It was not.

Q    At Abu Ghraib, sir, did you observe conduct that was not documented in these formal interrogation logs?

A    Yes.

Q    Can you describe that for the jury.

A    Well, again, going on into the particular detainee that I was working with that showed me the bruise and the bump, I was specifically looking for any mention of any incident of an accident, of reporting of a -- of these injuries being sustained by any other means.

        The problem was was that the reports that I was reading were confusing me to the extent that it didn't even comport with what I was hearing about who was directly involved.  It was extremely confusing to me.  This is why it was very difficult for me to actually report to anybody on

70

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

the ground at the time about what I was seeing.

It was already known this is why the detainee was given to me.  The detainee was given to me specifically. Staff Sergeant Ashton (phonetic), my team lead at the time --

THE COURT:  This is not necessarily being offered for the truth; it's explaining how this person gets to this man's attention.  That, to me, is not hearsay.

Go ahead.

THE WITNESS:  -- stated I was being given the detainee because I had a reputation for being good with soft approaches, and the detainee was borderline medical, heart attack or stroke; therefore, they couldn't risk continuing on with previous interrogations.

BY MR. FARIDI:

Q    Let's talk about Steve Stefanowicz.

Do you know him?

A    I do.  I know him as Big Steve.

Q    Okay.  Well, why did you know him as Big Steve?  Can you describe him for the jury?

A    Most people refer to him as Big Steve.  There, most people were on a first-name basis with everybody else.

But Steve was a big guy.  He was tall, very imposing figure, goatee, I think he had at the time.

Q    Can you describe whether he had any supervisory

71

authority at Abu Ghraib?

A    It seemed that he had a de facto supervisory authority. He was not originally hired as an assistant site manager or site lead, but he was operating as one.  He introduced himself as such, and I believe on the first or second day that I was there, he showed me around the compound a little bit and helped me get set up in my original quarters.

Q    And which shift did you work?

A    I worked the day shift.  I generally do.

Q    And which shift did he work?

A    He worked the night shift almost the entire time, as far as I know.

Q    And did you have any conversations with him about interrogations?

A    A little bit.  We would see each other in passing.  We don't usually talk about interrogation operations outside of the interrogation center, but when we would see each other during shift changes, I like to talk to other interrogators about -- especially if they're working on associated detainees.

He was on another team, didn't have an associated detainee at the time, but I was just shooting the breeze with him one day early on, getting to know him.  And he bragged about how he had gotten one of his detainees to admit that he was Osama bin Laden in disguise.

72

Q    Did that stand out to you?

A    Yes.  For a couple of reasons.

        MR. O'CONNOR:  Objection.  Relevance.

        THE COURT:  Overruled.

BY MR. FARIDI:

Q    Why?

A    One, it was obvious that we did not have anybody fitting that description, and, therefore, this was useless information, it was not pertinent to the intelligence community.

        Two, what was more concerning was what you would have to do to a person in order to get them to admit to something so preposterous.

Q    Let's talk about Daniel Johnson.

        Who did he work for?

A    DJ, as we knew him, was an employee of CACI hired as an interrogator.

Q    And, by the way, was Mr. Stefanowicz -- who did he work for?

A    Mr. Stefanowicz worked for CACI as well.

Q    Okay.  And focusing on DJ, Mr. Johnson, did you have any interactions with him?

A    I did.  Probably more than with Steve.

        He may have worked the night shift from time to time, but he worked quite a bit on the day shift with me.

73

Q    Did you ever have any interactions with him regarding treatment of detainees?

A    A little bit.  There was an associated detainee.  There was a large group of detainees that was brought.  This would have been later on, late December or early January.  He was given one or two of the detainees that were in this associated group, I was given one of the detainees, and there was a third military interrogator who was given another associated detainees.  So we were all working the same associated group at that time.

Q    Okay.  And did you have any interactions with respect to the treatment of detainees that were associated with each other with Mr. Johnson?

A    Very limited interaction, unfortunately.

        Typically when you have a group of detainees that are associated with each other, whether they're soldiers all from the same unit, tribe members from the same tribe or family, whatever it might be, insurgents from the same cell groups, if they're divvied up amongst different interrogators or interrogation teams, it's standard procedure for the various interrogators to work very closely with each other to compare notes, to make sure that they're not overlapping in information, that there is stuff they're corroborating or stuff that is conflicting and be able to resolve those conflicts.  This is something that we train

74

for all the time.  I was doing that with the military interrogator, and we were cooperating quite a bit, and it was very productive for both of us.

When we invited DJ to come and work with us, he consistently failed to show up at any of our meets during shift change to be able to collaborate on this team effort.

Q    And did that affect how you were doing interrogations?

A    Yes, it did.  It forced me then to go through his interrogation reports, both the operational in-house reports, as well as any type of IIRs, intelligence information reports, that he might have published based upon any information he might have been getting.

Q    And what did you find?

A    Well, first off, I was really concerned as to why he immediately, upon the first meeting in his operational report, listed that he put in the detainee for isolation or separation, as we refer to it in intelligence.

It's a very extreme measure.  It generally requires -- at least today it requires the approval of an O-6 or higher, that's a full bird colonel in order to be able to even be approved.  Very isolated cases does it get approved, and it's only good for 30 days.

It also didn't seem necessary in any way, shape or form because our detainees, who were all associated with this one, were extremely cooperative with us, the other

75

military interrogator and I, and talkative with us from the very beginning.  That was the first thing that kind of bothered me.

The second thing was the substandard condition of the reporting, using terms such as "detainee is crying in the corner like a little girl."  "Detainee is broken into 1,000 pieces like Humpty Dumpty."  These are not acceptable in professional publications, and it was, again, very concerning that he was actually typing up such reports.

Q    Did you ever interrogate a detainee in a room that was adjacent to a room where DJ, Mr. Johnson, was conducting an interrogation?

A    Yes.

Q    What did you -- what did you observe?  What did you hear?

A    So this -- I didn't visually observe the interrogation. There were no one-way mirrors between.

We had two interrogation booths in the shack that was behind the hard site that were adjoining each other. Separate entrances to them.  I had my detainee, along with my interpreter and my analyst at the time, in the interrogation booth.  We began our interrogation.  DJ was doing a simultaneous interrogation next door.

Unfortunately, the ruckus that he was creating at that time by throwing furniture, screaming so loud that I

76

could tell immediately that it was DJ's voice, and hearing the profanity that was coming out of him, led me to believe he was doing what we called at the time of a fear up harsh approach.

(Reporter interrupted for clarification.)

THE WITNESS:  Fear up harsh.

There's two types of fear up.  We have a fear up mild and a fear up harsh.  Now we only refer to it as fear up, and it generally refers to only doing it as a fear up mild.  Fear up harsh is something that has been pretty much disavowed by the military intelligence community, at least on the Army side now.

He was making such a ruckus that it caused not only visible concern amongst my detainee, but also amongst my interpreter and my analyst so that we actually had to cancel our interrogation and I had to have my detainee escorted out of the room.

I heard fear up harsh approaches done before.  It's something that I get used to.  You know, I usually will allay the fears or suspicions of whoever I'm working with if they can hear it.

This one was so over the top, in my opinion, that it caused me to actually surreptitiously end my interrogation and reschedule for another time.

THE COURT:  Did you report that in your reports?

77

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE WITNESS:  To the investigators.  I can't remember if it was to the CID investigators or --

THE COURT:  Not to the investigators, no.  In your operational reports, the ones that you said you were filing each day when you had a detainee, was that recorded?

THE WITNESS:  Most likely.  After every interrogation, whether or not it actually comes to fruition where we actually can properly conclude with intelligence information, or if it's ended shortly for outside reasons, I will always put in an operational report.  Standard procedure.

THE COURT:  Again, was any of this -- to your knowledge, did you report any of this to CACI?

THE WITNESS:  At the time, no, I did not.

THE COURT:  How about to Mr. Porvaznik?

THE WITNESS:  No.  At the time, I did not.

THE COURT:  At some point you did?

THE WITNESS:  When I went to -- the first time that I really began to talk with Mr. Porvaznik, my understanding was was that he was in no condition to actually hear anything that I had to say that was of concern.

THE COURT:  What time frame are we talking about?

THE WITNESS:  This would have been early January of 2004.

78

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE COURT:  And when you say he was in no condition, what do you mean by that?

THE WITNESS:  He did not want to hear anything that I had to say at that time about the suspicions of wrongdoing by any other CACI employees in the operational center.

BY MR. FARIDI:

Q    I want to follow up on that.  So let's step back for a moment.

You did report something to the Army's Criminal Investigation Division; correct?

A    Yes.  One of the main reasons -- one of the main reasons why I have to always hold on reporting things is that there are a lot of different factors that can go into a potential or possible abuse.  My gut instinct at the time was to find information that could discount it or corroborate that, usually through operational or intelligence report production, before I can actually start the process.  Because in the intelligence community, it is a very big deal to start saying things against your fellow co-workers, especially in hostile fire areas.  So if you're going to say something against them, you better have some good information to be able to back that up.

Q    Okay.  And you testified earlier -- I just want to reorient the jury on this -- that you reported something

79

about Mr. Dugan to the Army's Criminal Investigation Division; correct?

A    Correct.

Q    Okay.  Turn with me to tab PTX 051 from the binder in front of you.

THE COURT:  Any objection to Plaintiffs' 51?

MR. O'CONNOR:  Yes, Your Honor.  It's hearsay.

MR. FARIDI:  Your Honor, at the time he wrote it, he was a CACI employee, so it's a party-opponent admission.

MR. O'CONNOR:  This would not be in the scope of his employment, Your Honor.

THE COURT:  No.  I'm going to permit it.  It's in.

MR. FARIDI:  It's PTX 51.

MR. O'CONNOR:  Your Honor, he is not a CACI employee.  This is dated June 4th, 2004.

MR. FARIDI:  Well --

MR. O'CONNOR:  That is -- he's not a CACI employee at the time of this statement, which is what matters for admission.

MR. FARIDI:  Your Honor, may I respond?

THE COURT:  Go ahead.

MR. FARIDI:  The last page is a statement dated January 21, 2004.  Okay.  And then -- so there's two statements.

THE COURT:  Wait a minute.

80

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

We're only looking at the last page then, which is page 4 --

MR. FARIDI:  Yes.

THE COURT:  -- of 4.

MR. FARIDI:  Yes.

THE COURT:  That is dated January 21, 2004.

MR. FARIDI:  Yes.  Thank you, Your Honor.  It's the last page.

THE COURT:  And he lists his grade status there as a contractor.  That would come in.  Only that part.  Only page 4.

MR. FARIDI:  Of course, Your Honor.

(Plaintiffs' Exhibit Number **51, page 4 admitted into evidence.**)

BY MR. FARIDI:

Q    And we're not going to go over this long statement.  Okay.

Is this the statement that you made to CID?

A    To the CID investigators at the Abu Ghraib prison, yes.

Q    So after you told the CID what you had observed with respect to Mr. Dugan or what you had heard from him, did you have any interactions with Mr. Dugan?

A    I did.  It would have been a day or two later.

Q    Can you describe those interactions for the members of the jury?

81

A    After talking with the CID investigators and being assured that the information I gave would be kept in strict confidentiality, I continued to operate as I normally would, which means interacting with the people, even though I had discussed my suspicions about their activities with CID investigators.

It was the morning.  I passed Mr. Dugan.  I don't believe I was actually living with him anymore in the same cell.  We had been divided up into one-man cells at that time, but I saw him in passing because we were still in the same housing complex.

At first, he ignored me.  I thought he just didn't hear me.  So I spoke up a little louder and went back towards him.  He stopped, turned around, approached me, came within a few inches of my face, looked me dead in the eye, and said "I'm done with you; you're dead to me."  And then he turned around and walked away.  So at that time I was a little bit suspicious as to what was going on.

Q    All right.  Did you have any interactions with Mr. Johnson, DJ, after you made the statement to CID?

A    No.  I was on my way to the JIDC to find out what was going on because I was concerned that --

Q    And let me just pause you here for a second.

MR. FARIDI:  Your Honor, this is going to be for a non-hearsay purpose.  It's not coming in for the truth.

82

Direct Examination - T. Nelson

He's going to talk about a statement that was made to him by someone else, which ultimately led him to report something to Mr. Porvaznik.  So it's coming in for a non-hearsay purpose.  I just want to flag it for yourself.

THE COURT:  All right.  So the jury understands, you used a terminology, JIDC.

MR. FARIDI:  JIDC.

THE COURT:  What is the JIDC again?

THE WITNESS:  The interrogation center.  Joint Internment and Debriefing Center.

THE COURT:  Okay.  Thank you.

BY MR. FARIDI:

Q    What is it that you heard about Mr. Johnson's reaction to the statement that you made to the Army Criminal Investigation Division?

A    On my way to go to --

MR. O'CONNOR:  Objection, Your Honor.  I'm not sure -- if he went to see the Army Criminal Investigation, I'm not sure of the reason he went there is relevant, and this seems like --

THE COURT:  Well, it's very relevant if he's complaining about conduct by CACI employees there.  So I'm going to overrule that objection.

But why don't you, first of all, explain.  You were already on your way to that office; is that correct?

83

THE WITNESS:  To find Mr. Porvaznik.  Correct, Your Honor.

THE COURT:  All right.  And is that normally where he worked in that facility?

THE WITNESS:  Not normally.  He -- as a site lead or site manager, the site lead or site manager will normally work both in their own administrative areas, as well as in the operational center.

Part of duties for a site lead or site manager, if they're not an operator actually within the place of work, is to liaise on almost a daily basis with the client to make sure that their personnel are performing well to expectations, that there's no issues that arise that the contracting company needs to be made aware of.  So Dan Porvaznik was, from time to time, in the JIDC, the interrogation center.  That's why I was on my way to look for him.

THE COURT:  All right.  So you're on your way to meet with him.

Go ahead.

BY MR. FARIDI:

Q    And what did you experience?

A    On my way to actually look for Dan, I ran into my analyst.  He asked me what did you do because DJ is looking for you and he's screaming for blood.  Those were his words

84

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

to me.

Q   So you had a direct interaction with Mr. Dugan, you heard this about Mr. Johnson.

Did you end up speaking with Mr. Porvaznik about these issues?

A   Yes.  I spoke to him outside in between where the interrogation center is and the housing area.  The -- I believe he was coming from the chow hall, which is in the center of the overall Abu Ghraib compound.  And I was talking to him on the mud path between -- between the two offices.

Q   And what did Mr. Porvaznik say to you?  Let me step back.

What did you tell Mr. Porvaznik?

A   Well, I wasn't sure what Mr. Porvaznik's position was, so because I had spoken to CID investigators in confidentiality, I did not want to just say, look, this is all the stuff that I've been saying about other CACI employees, what do I do?  I wanted to make sure -- I wanted to see if Mr. Porvaznik was in any position or condition or state of mind to be able to be of assistance to me as a CACI employee.  So I asked him just outright, what's going on here?  Why am I getting threats against me from Tim Dugan or DJ?

Q   What was his reaction?

85

A    His reaction was very cold, very suspicious.  He stepped back and looked at me and he said, well, what are you doing?  It seems like you're -- you've got something that you're hiding or that you're talking about them or something like that.  My overall thinking at that moment was I was being sized up as the enemy, that I was not on board with the team.

Q    Let me show you PTX 221.  It's in the binder in front of you.

Are you familiar with this document?

A    I am.  This is an email that I sent shortly afterwards to Amy Jenson, the program manager for CACI.

THE COURT:  Any objection?

MR. O'CONNOR:  No, Your Honor.

THE COURT:  All right.  It's in.

(Plaintiffs' Exhibit Number **221 admitted into evidence.**)

BY MR. FARIDI:

Q    Okay.  And by the way, at the time you sent this email, you were working for CACI; right?

A    By that time, I had been working for CACI for about two months, yes.

Q    Okay.

A    On the ground.

MR. FARIDI:  Let's blow up just the first paragraph here.

86

BY MR. FARIDI:

Q   And you write here:  "Dear Amy" -- by the way, Amy Jenson is the one who interviewed you; right?

A   Originally, yes.  She was the program manager.

Q   And you're writing to Amy and the United States, and you say:  "Dear Amy, I unfortunately have to inform you that I no longer wish to work for CACI, as I feel that, one, there is too great a danger to my life at this time; and, two, I cannot trust the local level of CACI leadership here."

Let's just focus on Number 2.  Why did you feel the need to tell Ms. Jenson that you could not trust the local level of CACI leadership in Iraq?

A   After my interaction with Dan Porvaznik, who was the most senior CACI person there on the site, and seeing that I was not going to receive any type of support from the CACI leadership there, that my only option then was to try and get out of the area as immediately as possible.

Q   After you sent this request, did CACI terminate either Mr. Dugan or Mr. Johnson?

A   No.

Q   Okay.  And did you end up leaving CACI's employ at Abu Ghraib?

A   I did.  It was kind of a fluke, actually.

Q   Where did you go next?

87

A    Well, I didn't -- I don't remember receiving a response from --

THE COURT:  No.  No.  The question is where did you go next.

THE WITNESS:  Correct.

THE COURT:  All right.  So where did you go?

THE WITNESS:  I went to Afghanistan.

BY MR. FARIDI:

Q    What type of work did you do in Afghanistan, sir?

A    I was an assistant site manager for special operations forces in Bagram doing management of linguist assets for special forces.

THE COURT:  Were you hired by the U.S. Army?

THE WITNESS:  I was working for another contracting company.

THE COURT:  You got another contracting company?

THE WITNESS:  Yes.

THE COURT:  Okay.  All right.

BY MR. FARIDI:

Q    Did you perform interrogations in Afghanistan?

A    No, not on that contract.  Subsequent contracts I did.

Q    Okay.  Let's go back to PTX 85A, the CACI code of conduct from 2003 that I showed you yesterday.

This is the code of conduct that you said that you had acknowledged you received; do you recall that?

88

Direct Examination - T. Nelson

A    Yes.

Q    And I want to focus on paragraph 3 on the third page of the document that's already up on the screen.  It's a little bit grainy, so let me read this into the record.

Section 3 is titled "Our People ... The Best."

And then it goes on to say:  "At CACI, people are the most important asset.  Our people bring distinction to all we do.  They are the best."

Can you describe the quality of interrogators that CACI supplied at Abu Ghraib?

A    The interrogators I interacted with that were CACI employees were, in my opinion, substandard.  Nowhere near being high quality, and, in my opinion, should never have been there.

Q    Let's look at Section 4.  Again, it's a little bit grainy, so let me just read a portion of it into the record.

"Our responsibilities ... Fully Accountable."

And then it goes on to say:  "At CACI, we insist on taking full responsibility for ourselves as individuals. We are fully accountable for what we do.  Our published code of ethics delineates our uncompromising policies on compliance with the laws and regulations of the jurisdictions where we conduct business.  We reward legitimate success and forgive understandable failure (no one is perfect!), but we always learn from our mistakes."

89

Did CACI hold its employees who talked openly about engaging in abuse at Abu Ghraib accountable?

A    Not to my knowledge.  None whatsoever.

Q    Did CACI hold its employees who threatened you with your life for reporting the abuse to the Army Criminal Investigation Division accountable?

A    Not to my knowledge, no.

Q    And based on the employment agreement that we've reviewed earlier yesterday, the code of conduct that we're looking at now, did CACI's management have the ability to stop CACI employees from abusing detainees at Abu Ghraib?

A    Yes.  Standard procedure.

Q    How so?

A    As a contracting authority, according to FM 3-100.21, the contractor has ultimate say on how they conduct the operations.  They can refuse to cooperate with the military client if the military client is not performing according to the dictates of the agreement.

They can pull out, transfer, or fire any of their own employees at will if that employee is found by that company to be not complying with what the agreed-upon contract was with the client at any point.

This is done not on the sole purview of the client, but on the decision of the contracting company. This is why the on-ground and even higher level management

90

personnel will work in tandem, cooperation, with the military client.  This is one of the main purposes of having a site lead or a site manager.  I've worked as one myself. Liaison with the client is for that purpose.

Q   Just a couple of more questions.

You spoke today and yesterday about events that took place 20 years ago -- more than 20 years ago.

How do you remember these events, these conversations, with so much detail?

A   Well, I have a pretty good memory in general, which helps me in my job.  But there are certain events in my life which have left a really lasting impression.  I can remember things going back to my childhood.  I can remember my father dying on Mother's Day 1988 almost 40 years ago.  I can recall all the events of that day.

What I experienced at Abu Ghraib was one of the worst experiences in my life.  I'm going to live with that for the rest of my life.

MR. FARIDI:  We pass the witness.

THE COURT:  All right.  Mr. O'Connor.

MR. O'CONNOR:  Your Honor.  We have some binders.

THE COURT:  All right.

CROSS-EXAMINATION

BY MR. O'CONNOR:

Q   Mr. Nelson, was drinking alcohol allowed at Abu Ghraib

91

prison?

A    To my knowledge, no.

Q    Okay.  So when you saw -- when you were laying in your bunk and you saw Tim Dugan drinking alcohol, I assume you went right out and reported that to somebody; right?

A    No, because I knew that it would be useless.

Q    Okay.  So you did not?  The answer is no?

A    No.

Q    Okay.  And when Tim Dugan told you that -- about the detainee that he -- that you say he said he chained to the eye bolt during the interrogation, you went right out and reported that to the Army; right?

A    No.  As I explained, I needed to gather more information about it.

Q    Because what he told you wasn't enough for you to think that you had any credible grounds for making an accusation against Mr. Dugan; right?

A    For serious accusations, you would generally need more information to corroborate or validate what you had learned, yes.

Q    And when Mr. Dugan told you the story while he's improperly drinking alcohol in your room, you didn't go and tell CACI Tim Dugan told me a story about dealings with a detainee that are completely inappropriate; did you?

A    No, not at that time.

92

Q    And, in fact, you didn't tell anybody until after the Abu Ghraib scandal had been disclosed and the CID was investigating detainee abuse in January; right?

A    Correct.  Once the proper authorities were on the ground, that's when I felt what I've got is what I need to report because they are the proper authorities.

Q    But prior to that time, you didn't think it was appropriate to go tell Captain Wood, the officer in charge of the interrogation control element?

A    It was.  But if you're going to, again, make any serious accusations against your fellow co-workers in a war zone, you need to make sure that you have good information and good evidence.  There's always rumors going around.  And if you just go and say, oh, well, I heard this and I heard that, chances are the leadership is just going to dismiss it.

Q    And so in your estimation, you didn't have good evidence, good information because you didn't report it?

A    Oh, I had good enough information, in my opinion, that it warranted further investigation.

Q    By you, not reporting it to the proper authorities?

A    No.  No.  Actually, that's why I reported it to the CID, and I kept telling in my sworn statement, if you'll read it, that I suggest you look into.  I used that term repeatedly.  Because I knew that they had not only the

93

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

authority, but the capability to be able to do a much more thorough investigation than I could while I was running operations.

Q    And that wasn't at the time that Tim Dugan made the statements to you, this was late January of 2004 when CID's already investigating all the detainee abuse; right?

A    I think it was probably about a week or two afterwards. I had spent that time not only doing my interrogations, but also trying to get information usually through the operational reports.  I had very limited means to be able to do that.

Q    Right.  But to be clear, your first reporting of anything relating to Mr. Dugan to anybody was in late January when CID was already investigating detainee abuse and you made your statement?

A    I think it probably would have been around the 18th or 19th of January.  So maybe closer to the middle.  Because I believe the statement was around the 21st of January.  That was when it was written up, and that was the following day after I actually had the one-on-one with the investigators. I was called back to, once they had typed it up, to verify it and sign off on it.

          And that interview was done one or two days after we were called in to the CID office to fill out a piece of paper, which is why they actually called me back in to

94

actually do a full statement with them.  So this would have all been somewhere around maybe the 17th, 18th or 19th.

Q    But not when Mr. Dugan made the statements to you; it was after?

A    Of course.

Q    Steve Stefanowicz, in your view, he was a very nice individual; right?

A    Nice to the Americans.

Q    A very nice individual period, wasn't he, in your view?

A    No.  Nice to Americans.

Q    You didn't think he was a very nice amiable person?

A    A nice and amiable.  Very gregarious.  Very outgoing to Americans.  He was, in my opinion, a showman.

Q    Do you remember testifying in another proceeding in April of this year?

A    Yes.

Q    Did you testify that Steve Stefanowicz was a very nice individual?

A    Yes.

        MR. FARIDI:  Page, line number, maybe.

        MR. O'CONNOR:  Well, I'm asking him what he recalls.

        THE COURT:  He remembered, so that's all right.

BY MR. O'CONNOR:

Q    And did you testify that he was a very nice amiable

95

person?

A   Yes.

Q   And you didn't qualify that as to Americans; did you?

A   I didn't realize that it was necessary at the time, so that's why I'm doing it now.

Q   So you did not; right?

A   No, I did not.

Q   Thank you.

Daniel Johnson, you saw it in a -- when you started looking at his interrogation plans that he sought approval for isolation for a detainee; right?

A   I don't remember if it was in an interrogation plan or in an MFR, memorandum for record, after the fact.  I think it was in an MFR.

Q   Either way, he had asked the Army chain of command to approve that; right?  That's what you saw?

A   No, not necessarily, because if I'm not looking at the interrogation plan, which would go through his section chief, and I'm only looking at the MFR, I'm only looking at the after-the-fact.  So it may have just been done without going through the proper channels.  I can't make that call.

Q   But you don't have any idea; do you?

A   Whether or not he put in the request?  No.

Q   Thank you.

And fear up harsh was an interrogation approach

96

that was approved under the Interrogation Rules of

Engagement that the Army set at Abu Ghraib prison; right?

A    According to FM 34-52, correct.  It is the name of one

of the more difficult approaches.  It is very

confrontational, and it is very out of the norm because it

can be abused easily.

THE COURT:  Well, that's not an answer to the

question.  As I understand the question from Mr. O'Connor is

simply:  Fear up harsh was one of the techniques that did

have Army approval at Abu Ghraib.  The answer would be yes

or no.

THE WITNESS:  Yes, Your Honor.

MR. O'CONNOR:  Thank you, Your Honor.

BY MR. O'CONNOR:

Q    And you live in Arizona?

A    I do.

Q    And you're not here under a trial subpoena; are you?

A    No, I am not.

Q    You came here voluntarily?

A    I did.

Q    And you took time off from work to travel across the

country to testify?

A    I did.

Q    Who paid for your travel?

A    The law firm.

97

Q    The law firm representing the detainees?

A    Yes.

Q    Okay.  And did you meet with the law firm's lawyers to prepare your testimony?

A    Yes.

Q    And back in April, you voluntarily traveled across the country to testify in another proceeding in this case; right?

A    Yes.

Q    And did you take time off from work?

A    Yes.

Q    Who paid for your travel and lodging?

A    The same law firm.

Q    Now, you recall that the Taguba report leaked into the media in about May of 2004?

A    To my knowledge, yes.

Q    Okay.  So let's look at your communications with CACI.

        Shortly after that, you received a series of calls from a lawyer named Bill Cable; right?

A    I don't remember his name offhand, but I do remember a number of calls from an individual saying -- stating that they were a lawyer representing CACI, correct.

Q    And he wanted to interview you to try and get a better picture of things that were going on at Abu Ghraib prison; right?

98

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A    Correct.

Q    And you were hesitant to talk to him?

A    I was.

Q    And you put him off for a few days?

A    Yes.

Q    And he called you several more times trying to set up an interview with you?

A    Once or twice.  A couple times possibly.

Q    And you remained hesitant to cooperate with CACI?

A    Yes.  I was still debating on whether or not I wanted to speak with their law firm.

Q    And eventually the lawyer for CACI gave up and said if you want -- we're here if you're willing to talk to us, let us know?

A    That's correct.

Q    Let's take a step forward a year to 2005.

       You were contacted by a lawyer for detainees who were suing CACI; right?

A    I'm sorry.  Could you repeat the question?

Q    You were contacted by a lawyer named Susan Burke who was representing detainees suing CACI?

A    Correct.

Q    And she wanted to talk to you to get a better picture of things at Abu Ghraib prison; right?

A    Yes.

99

Q    And you voluntarily appeared at a hotel in Salt Lake City for an interview that was recorded by a court reporter?

A    Yes, I believe so.

Q    And it was a 78-page transcribed interview?

A    That sounds correct.

Q    CACI wasn't notified that you were going to sit down and have an interview with the plaintiffs' counsel; right?

A    I don't know.

Q    Well, you didn't notify CACI.

A    Correct.

Q    You were at Abu Ghraib prison from late November 2003 to mid to late January 2004?

A    At the present, yes.

Q    How many interrogations did you participate during that time?

A    I don't remember offhand.  I mean, there's settling in --

Q    Well, you have a really good memory.  Can you give me an estimate?

A    At Abu Ghraib, I'd say 30 to 50 possibly.

Q    Okay.  And there's paperwork associated with those interrogations; right?

A    Yes.

Q    Tell the jury the paperwork that is associated with each interrogation that you did at Abu Ghraib prison.

100

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A    Well, generally there is an interrogation plan that's done beforehand, intelligence reports from production, and an operational report, or an MFR, that is done following the interrogations.

Q    So if you did 30 to 50 interrogations, you would expect that there are 30 to 50 interrogation plans and 30 to 50 interrogation reports from your interrogations; right?

A    Possibly, yes.

Q    All right.  So you flew over to Iraq in November of 2003?

A    That sounds about right, yes.

Q    And you were on the same flight as Scott Northrop; correct?

A    Correct.  We flew in together into BIAP.

Q    And Scott Northrup was CACI's country manager in Iraq?

A    He was the new incoming country manager, yes.  We met at CRC in the CONUS redeployment center at Fort Bliss, Texas.

Q    And he was normally at Camp Victory?

A    Yes.

Q    And he wasn't an interrogator?

A    No.  To my knowledge, no.

Q    He just had an administrative job to administer the contract for CACI?

A    As country manager, my understanding was with that he

101

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

would administrate a number of contracts throughout the country, correct.

Q    And you arrived at Abu Ghraib prison on November 26th or 27th of 2003?

A    Might have been just a couple of days earlier than that.  I think maybe around the 23rd.

Q    Okay.

A    Or 24th.

Q    All right.  Do you agree that CACI interrogators at Abu Ghraib reported through the military chain of command to the military personnel who were running the JIDC at Abu Ghraib as far as operational matters go?

A    Could you repeat the question, please?

Q    Yeah.

        Do you agree with the statement that CACI interrogators at Abu Ghraib reported through your chain of command to the military personnel who were running the JIDC at Abu Ghraib, you would report to the military personnel as far as operational matters go?

A    That's correct.

Q    If you had operational issues, you were supposed to take those through the military chain of command; right?

A    Yes.  If there's any operational issues, first go-to is the military.

Q    And while you were serving at Abu Ghraib prison, you

102

knew that CACI couldn't do anything about operational affairs, intelligence matters, anything like that; right?

A   That CACI could not do anything?

Q   While you were serving at Abu Ghraib, you knew that CACI could not do anything about operational affairs, intelligence matters, anything like that?

A   They couldn't give orders.

Q   They couldn't do anything about operational affairs, intelligence matters, anything like that; right?

A   Well, they could pull someone out, one of their employees.

Q   Can you turn to the binder that you've been provided and take out your statement under oath.

MR. O'CONNOR:  This is marked as Defendant's Exhibit 94 for identification only.

THE COURT:  All right.  Is it trial testimony? Sworn testimony?  What kind of testimony?

MR. O'CONNOR:  It's his sworn testimony from the 2005 court reported interview with Susan Burke in Salt Lake City.

THE COURT:  Exhibit 94.  I got it.  Okay.

THE WITNESS:  Was there an exhibit number?

MR. O'CONNOR:  It's Exhibit 94.

THE WITNESS:  Oh, 94.  Okay.

BY MR. O'CONNOR:

103

Q    And I'm going to ask you to turn to page 24.  Let me know when you're there.

A    Page 24.  Okay.

Q    I'm sorry.  Let's go back to page 22.  I'm at the wrong page.

Didn't you testify -- well, when you had your interview with Susan Burke, you took that under oath; right?

A    Correct.

Q    And if you look at line 21 of page 22, don't you say: "Not that CACI -- we knew that CACI couldn't do anything really about operational affairs, intelligence matters, anything like that, but at least that they should be aware of the fact that some of the CACI personnel were dealing through the military chain of command with intelligence matters or operational matters"?

A    That's correct.

Q    Thank you.

In fact, the Army ran operations at Abu Ghraib prison; right?

A    Day-to-day operations.  They are the senior personnel.

Q    Then you testified on direct examination that Dan Porvaznik was the site lead for CACI at Abu Ghraib prison; right?

A    That's correct.

Q    Isn't it true that he handled mainly administrative

104

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

affairs as a site manager?

A    Mainly, yes.  The majority of his time, absolutely.

Q    And you testified, I think, that Dan Porvaznik would have had access to interrogation reports?

A    Yes.

Q    But that's because he had a security clearance to be able to look at those and was there filling an interrogator role; right?

A    That's correct.

        MR. FARIDI:  Objection.  Foundation.

        MR. O'CONNOR:  He just said yes.

        THE COURT:  I'm overruling that objection.

BY MR. O'CONNOR:

Q    But Dan Porvaznik was more concerned with administrative matters and so forth; right?

A    To my knowledge, that's correct.

Q    So during normal parts of work, he was not expected to really be checking up on your work; right?

A    Correct.

Q    You testified yesterday that Dan Porvaznik mostly communicated with Amy Jenson outside of Abu Ghraib; do you remember that?

A    Most of his time, yes, I believe.

Q    Do you have visibility into who Dan Porvaznik mostly talked to?

105

A    No, because most of the time I'm working in the JIDC. But most of the time that I did have interaction with him, it seemed that most of his communication was done with Amy Jenson.

Q    And those would be things like pay issues, vacation issues, things like that; right?

A    Well, that's normal.  There was a long list of grievances that Dan shared with me that were more than just normal administrative things.

Q    All right.  Are you aware of a single communication, even one, between Dan Porvaznik and Amy Jenson relating to the conduct of an interrogation at Abu Ghraib prison?

A    A particular interrogation, no.

Q    Because that was not in her bailiwick at all; right?

A    She didn't have a need to know, nor was that appropriate to be able to give information like that that could potentially be classified over open lines, which is why we need a site lead on site with a security clearance, like you said.

Q    And, in fact, it would have been classified, the identities of detainees that particular interrogators were interrogating; right?

A    Yeah.  That would absolutely be crossing the line for sure.

Q    So Dan Porvaznik certainly would not be permitted to

106

broadcast that to the people in Virginia at CACI?

A   No, he would not.

Q   And CACI personnel back in the United States, they didn't have any role with respect to operational matters; did they?

A   Any role?

Q   Yeah, that's the question.

A   I would disagree with that.

Q   Okay.  You have your statement out from 2005 with Susan Burke?

THE COURT:  That's that exhibit again.

MR. O'CONNOR:  That's Exhibit 94, Your Honor.

THE COURT:  Yes.  What page?

MR. O'CONNOR:  27.

THE WITNESS:  Which page?

MR. O'CONNOR:  27.

THE WITNESS:  27.

BY MR. O'CONNOR:

Q   At line 7, Ms. Burke asked you:  "What about back in the United States, did you know who was operational in the line of command at CACI back in the United States?"

Can you read to the jury what your answer was?

A   "The operations side, to my knowledge, there was nobody at home office or stateside" --

THE COURT:  Slow down just a bit, please.  Start

107

over and read slowly so the court reporter can get it.

BY MR. O'CONNOR:

Q    Nice and slow and loud for the jury.

A    "The operations side, to my knowledge, there was nobody at home office or stateside that was CACI that was even concerned with operational matters, and that their concern was administrative matters solely."

Q    Thank you.

Before you could conduct an interrogation, you were required to submit an interrogation plan for approval; right?

A    That's correct.

Q    And those interrogation plans were submitted to the Army chain of command?

A    That's correct.

Q    And so the first person that you would submit it to, would that be your Army section chief?

A    Yes.

Q    And the Army section chief would then move it on to Captain Wood?

A    Either the NCOIC or the OIC, the non-commissioned officer in charge, or the officer in charge of the interrogation cell.  If it needed to go higher, it would.

Q    But these are all Army people we're talking about?

A    Correct.

108

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q    And your interrogation plan had to be approved by the Army chain of command before the interrogation could move forward?

A    Correct.

Q    And that was an absolute requirement?

A    That's correct.

Q    If the Army chain of command hadn't approved your interrogation plan, you had to revise it before the interrogation could go forward?

A    That's correct.

Q    Who at CACI was an approval point for your interrogation plans?

A    Nobody.

Q    Who at CACI's headquarters in Virginia reviewed and approved your interrogation plans?

A    Nobody.

Q    As far as you know, has anyone who worked in CACI's Virginia office ever seen an interrogation plan from Abu Ghraib prison?

A    From Abu Ghraib prison, no.  To my knowledge, no.

Q    The Army chain of command also established the Interrogation Rules of Engagement for interrogations at Abu Ghraib prison; right?

A    The IROE, the Interrogation Rules of Engagement, correct.

109

Q     And the IROEs, the Interrogation Rules of Engagement, they applied equally to the Army and CACI's interrogators?

A     That is correct.

MR. O'CONNOR:  Can we put up Defense Exhibit 42.

Your Honor, we would move that into evidence.

THE COURT:  I assume there's no objection?

MR. O'CONNOR:  It's the IRO.

MR. FARIDI:  No objection, Your Honor.

THE COURT:  All right.  It's in.  Again, this is Plaintiffs' Exhibit 42.

MR. O'CONNOR:  Oh, I'm sorry.  Plaintiffs' Exhibit 42.  My apologies.

THE COURT:  It's in.

(Plaintiffs' Exhibit Number 42 admitted into evidence.)

BY MR. O'CONNOR:

Q     Mr. Nelson, this was the Interrogation Rules of Engagement that was posted at Abu Ghraib prison; isn't it?

A     To my understanding, yes.

Q     And who promulgated the IROs?

A     I'm not sure of your question.

Q     These are promulgated by the Army; right?

A     Are you looking for a particular individual?

Q     Well, if you have one.

A     No, I don't.

Q     But by the Army; right?

110

A    That's my understanding, correct.

Q    And do you see at the bottom in the middle where it says:  "Everyone is responsible for ensuring compliance with the IRO"?

A    Yes.

Q    And it says:  "Violations must be reported immediately to the OIC"?

A    Yes.

Q    And so the Army, through the IROs, dictated that anyone seeing a violation of the IROs needed to report those immediately to the OIC?

A    Correct.

Q    The OIC was Captain Wood?

A    I believe so.

Q    And after you finished your investigation, you had to complete an interrogation report?

A    Yes.

Q    And they were --

        MR. O'CONNOR:  You can take that down.

BY MR. O'CONNOR:

Q    They were submitted into a classified Army database?

A    Yes.

Q    And the reports you wrote went in the same database that reports that Army interrogators wrote?

A    They should.

111

Q     And the requirement to post these interrogation reports into the Army database, that was imposed by the U.S. Army?

A     Yes.

Q     Can you think of a single time that you had a communication with CACI personnel in Virginia about a detainee you were interrogating?

A     No.

Q     Are you aware of a single communication between any CACI interrogator at Abu Ghraib prison and any CACI employee in Virginia about the interrogation of a detainee?

A     No.

Q     You testified earlier that CACI interrogators were subject to the Army chain of command for operational matters; right?

A     Yes.

Q     And that was also true of military interrogators? Military interrogators, they were also subject to the military chain of command?

A     Yes.

Q     Were you in the chain of command over any military interrogators?

A     No, I was not.

Q     Let me ask you this:  If you had seen a military interrogator violating the IROs in his treatment of a detainee, you would have stopped him; wouldn't you?

112

A    Anything that departed from the Interrogation Rules of Engagement that I was able to ascertain was going on directly in front of me, yes, I would have.

Q    Sometimes you might see treatment, you don't know if it's been approved or not?

A    Exactly.

Q    But if you see something that is never able to be approved, you would have stepped in and stopped that soldier?

A    Yes.

Q    But you weren't supervising that soldier or controlling that soldier; right?

A    No.

Q    This is just an obligation that everyone at Abu Ghraib had to ensure compliance with the IROs?

A    That's correct.

Q    When Army CID began investigating detainee abuse in January of 2004, you filled out a canvass form asking what you knew about detainee abuse?

A    That's correct.

Q    And you were asked whether you had ever seen any photographs of detainees other than those authorized for official use?

A    That's correct.

Q    And you answered no?

113

A    That's correct.

Q    And you were asked if you had ever seen photographs of detainees being abused or humiliated; right?

A    That's correct.

Q    And you answered no?

A    That's correct.

Q    And you were asked if you knew of any circumstances where military police working within the detention facility were used to soften up or prepare detainees for interrogations by giving them physical fitness or other acts to sway the detainee to cooperate; right?

A    That's correct.

Q    And you answered no?

A    That's correct.

Q    And you were asked if you had ever witnessed any acts of abuse of maltreatment while working at the detention facility; right?

A    That's correct.

Q    And you answered yes to that; right?

A    I believe so.

Q    Okay.  Well, let's take it up.  It's Plaintiffs' Exhibit 216.

THE COURT:  All right.  Any objection to Plaintiffs' 216?

MR. FARIDI:  No objection, Your Honor.

114

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE COURT:  All right.  It's in.

(Plaintiffs' Exhibit Number **216 admitted into evidence.**)

MR. O'CONNOR:  Could we publish it?

BY MR. O'CONNOR:

Q    Is this the canvass form that you filled out?

A    I believe so, yes.  It looks like.  It looks like my handwriting.

MR. O'CONNOR:  Take that down.  Take that down. Take that down.  It has your Social Security number on the first page.

THE COURT:  All right.  We'll make it part of the record, but you have to redact it.

MR. O'CONNOR:  We'll redact it for the record, Your Honor.

BY MR. O'CONNOR:

Q    But as far as when you answered that you had witnessed acts of abuse or mistreatment and you answered yes, you gave additional information on the back of the page; right?

A    That's correct.

Q    And said see -- it says Number 1 on back.

MR. O'CONNOR:  Okay.  We can put it back up. We've redacted it, but we're going to go to page 2 now.

BY MR. O'CONNOR:

Q    And Number 1 where you talked about the -- what you had witnessed, you talk about in November of 2003, you were

115

observing activity in the screening room -- screening area, and you observed a black male MP, approximately 20 to 25 years of age, leading detainees through the in-processing area; right?

A   Correct.

Q   And the MP -- you went on to say:  "The MP would lead the detainees by grabbing one and shoving him into the room or in the direction he wanted the detainees to go"; right?

A   Correct.

Q   And then you added:  "The MP seemed to be angry at the detainees who were silent and compliant."

A   Correct.

Q   That was the -- as of January of 2004, that was the only positive response you gave to whether you had witnessed any acts of abuse or maltreatment while working at the detention facility?

A   I'm not sure if -- what exactly I put on Block Number 2.

Q   Okay.

A   Because I put a yes on it and referred to Block Number 2 on the front page.

Q   Okay.  I'm going to give you a document to refresh your recollection.

        MR. FARIDI:  Your Honor, we have no objection to the admission of this document.

116

MR. O'CONNOR:  I'm not asking to admit it.

THE COURT:  I'm sorry, you have no objection?

MR. FARIDI:  No objection.

MR. O'CONNOR:  I'm not asking to admit it; I'm asking to refresh the witness's recollection, Your Honor.

THE COURT:  Well, it's difficult to read anyway, but go ahead.  So take a look at that.

BY MR. O'CONNOR:

Q    And your response discusses an event that somebody who you can't even remember told you that that person had seen; right?

A    Yes.

Q    And your first word was hearsay?

A    Yes.

Q    Okay.  So, Number 1, the event with -- in the screening room with the MP pushing some detainees, that was the only act of abuse or maltreatment that you had seen that you reported when you did your CID canvass report?

A    Correct.

Q    Thank you.

You came back to Virginia in May of 2004 to meet with Major General Fay's investigation team; right?

A    End of May, beginning of June of 2004, I believe.

Q    And you told -- well, let's start with, you first met with General Fay, and you were reluctant to speak with him

117

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

unless they gave you immunity from prosecution; right?

A    That's correct.

Q    Do you have any reason to believe that you were at risk of prosecution?

A    I didn't, but a friend of mine who was a lawyer recommended that I ask for that.

Q    And they ended up refusing to give you immunity; right?

A    Correct.

Q    And you did end up talking to General Fay?

A    Yeah, the next day.

Q    And you told him that the only incidence of detainee abuse that you were aware of were the ones in your statement and in your prior statements to CID?

A    That's correct.

Q    You also told Major General Fay's investigation team that you never saw dogs being used in interrogations at Abu Ghraib?

A    Not in interrogations, no.

Q    You also told Major General Fay that you never saw any naked detainees?

A    That's correct.

Q    And so in the entire time that you were at Abu Ghraib prison and you were conducting 30 to 50 interrogations of --
are those all hard site detainees?

A    No.  Some of them were the regular MI hold.  We had

118

about 10,000 people in the overall compound.  About 1,000

were in MI hold, they were out in what would be called a

tent city, and then there was the hard site for particular

individuals.

Q    About what percentage of your interrogations were

individuals who were in the hard site?

A    Maybe 30 percent --

Q    Okay.

A    -- offhand.

Q    And so all the -- and you would go to the hard site to

get the detainee and take them somewhere to be interrogated?

A    Generally, yes.

Q    And so all the times that you went into the hard site

for interrogations, you never saw a naked detainee?

A    No.  Semi naked one once.

Q    You never saw dogs being used for an interrogation?

A    Not for an interrogation.  I saw dogs, but not for

interrogations.

Q    You never saw any detainee being abused in the hard

site when you were in there?

A    Physically abused, no.

Q    Because when you did the canvass report, you said you

had never seen any abuse of detainees other than what

happened in the screening room with an MP?

A    Yes.

119

Q    And back -- let's go to January of 2004.

You made -- you went and met with CID because they were now investigating detainee abuse; right?

A    Correct.

Q    And you made a statement on January 21, 2004?

A    I signed the statement that was written up for me.  I believe I actually made the statement a day or two before that, correct.

Q    And in the statement, you said that the people you suggest that CID look at are Dan Johnson and Tim Dugan?

A    Correct.

Q    Now, at the time, you didn't really have anything on Dugan and Johnson as it related to detainee abuse; did you?

A    Anything?  No, I disagree with that.

Q    Okay.  In fact, you've testified that you told -- what you told CID was:  "I don't have anything really damning, but go ahead and take this, and maybe if it helps your investigation, it does."

A    Yeah.  That's not solid enough.  That's why I didn't report it beforehand, like you asked.

Q    But you hadn't substantiated it?

A    I hadn't substantiated it, no.  I was waiting.  I was trying to.

Q    And you believed that CID was going to keep your identity confidential?

120

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A    Correct.

Q    And the next day you walked past Dugan, and he ignored you?

A    Yes.

Q    And he ended up saying, you better watch your back, you're dead to me, I'm through with you; right?

A    Correct.

Q    And, at that point, you acted innocent of the whole affair and went looking for Dan Porvaznik to find out what was going on; right?

A    Correct.

Q    And Porvaznik told you that he thought Dugan believed you had said something about him to CID?

A    Yes.

Q    And, in fact, that was true; right?

A    Yes.

Q    But you looked Dan Porvaznik in the eye and said that wasn't true?

A    Absolutely.

Q    And you didn't think Dan believed you?

A    No.

Q    And it bothered you?

A    Yes.

Q    It bothered you that Dan Porvaznik thought you were lying when you were, in fact, lying; right?

121

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A    Yes.

THE COURT:  All right.  I think at this point it's lunchtime.  We're going to take our -- try to stay on schedule.

So we're on break until 2:00, folks.  You're free to go outside and enjoy the fresh air.  Just please be back here by 2 so we can continue with the testimony.

Thank you.

(Jury not present at 1:01 p.m.)

----------------------------------

I certify that the foregoing is a true and accurate transcription of my stenographic notes.

_____

Stephanie M. Austin, RPR, CRR

122