```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
                        ALEXANDRIA DIVISION


---------------------------x
SUHAIL NAJIM ABDULLAH AL      :    Civil Action No.:
SHIMARI, et al.,              :    1:08-cv-827
           Plaintiffs,        :
    versus                    :    Friday, November 1, 2024
                              :    Alexandria, Virginia
CACI PREMIER TECHNOLOGY,      :    Day 3
INC.,                         :    Pages 1-175
           Defendant.         :
---------------------------x
```

        The above-entitled jury trial was heard before the Honorable Leonie M. Brinkema, United States District Judge. This proceeding commenced at 9:31 a.m.

A P P E A R A N C E S:

```
FOR THE PLAINTIFFS:   CHARLES MOLSTER, ESQUIRE
                      THE LAW OFFICES OF CHARLES B. MOLSTER,
                      III, PLLC
                      2141 Wisconsin Avenue, NW
                      Suite M
                      Washington, D.C.  20007
                      (703) 346-1505

                      BAHER AZMY, ESQUIRE
                      THE CENTER FOR CONSTITUTIONAL RIGHTS
                      666 Broadway
                      7th Floor
                      New York, New York  10012
                      (212) 614-6464

                      MUHAMMAD FARIDI, ESQUIRE
                      MICHAEL BUCHANAN, ESQUIRE
                      BONITA ROBINSON, ESQUIRE
                      ANDREW HADDAD, ESQUIRE
                      SCOTT KIM, ESQUIRE
                      ALEXANDRA MAHLER-HAUG, ESQUIRE
                      PATTERSON BELKNAP WEBB & TYLER LLP
                      1133 Avenue of the Americas
                      New York, New York  10036
                      (212) 336-2000
```

1

A P P E A R A N C E S:

FOR THE DEFENDANT:        JOHN O'CONNOR, JR., ESQUIRE
                          LINDA BAILEY, ESQUIRE
                          JOSEPH MCCLURE, ESQUIRE
                          STEPTOE LLP
                          1330 Connecticut Avenue, NW
                          7th Floor
                          Washington, D.C.  20036
                          (202) 429-3000

                          NINA GINSBERG, ESQUIRE
                          DIMUROGINSBERG PC
                          1101 King Street
                          Suite 610
                          Alexandria, Virginia  22314
                          (703) 684-4333

FOR THE UNITED            STEPHEN ELLIOTT, ESQUIRE
STATES:                   UNITED STATES DEPARTMENT OF JUSTICE
                          CIVIL DIVISION FEDERAL PROGRAMS BRANCH
                          1100 L Street, NW
                          Washington, D.C.  20044
                          (202) 598-0905

COURT REPORTER:           STEPHANIE M. AUSTIN, RPR, CRR
                          Official Court Reporter
                          United States District Court
                          401 Courthouse Square
                          Alexandria, Virginia  22314
                          (571) 298-1649
                          S.AustinReporting@gmail.com


       COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

TABLE OF CONTENTS

WITNESSES

On behalf of the Plaintiffs:

SABRINA HARMAN

Direct examination by Ms. Robinson ........8
Cross-examination by Ms. Ginsberg .........49
Redirect examination by Ms. Robinson ......88
Recross-examination by Ms. Ginsberg .......94

JENS MODVIG

Direct examination by Ms. Mahler-Haug .....99
Cross-examination by Ms. Bailey ...........122

AMY MONAHAN - read-in .....................138

ARNOLD MORSE - video testimony ............150

On behalf of the Defendant:

WILLIAM BRADY, III - read-in ..............157

EXHIBITS

On behalf of the Plaintiffs:
Admitted

Number 161, first page ...................14
Number 232 ...............................17
Number 34 ................................21
Number 233 ...............................26
Number 161, photos 153, 162, 163 and 165 ..34
Number 234 ...............................36
Number 139 ...............................37
Number 10 ................................56
Number 8 .................................65
Number 36 ................................68
Number 115 ...............................137
Numbers 23, 83, 84, 100A, 104, 137 .......149
Numbers 23, 27, 75, 76, 161A, 180A, 196, ..152
       197, 198, 199, 200, 201

3

EXHIBITS

On behalf of the Defendant:
Admitted

Number 14 ................................53
Number 15 ................................53
Number 16 ................................54

MISCELLANY

Proceedings November 1, 2024 ..............5
Certificate of Court Reporter ............175

4

P R O C E E D I N G S

THE DEPUTY CLERK:  Civil Action Number 1:08-cv-827, Al Shimari et al. versus CACI Premier Technology, Inc.

Would counsel please note their appearance for the record, first for the plaintiffs.

MR. FARIDI:  Good morning, Your Honor. Muhammad Faridi from Patterson Belknap, along with my colleagues, Andrew Haddad, Michael Buchanan, and paralegal Sean O'Shea and Kaihan Rahimi, and Bonita Robinson, who will be joining up momentarily.

THE COURT:  Good morning.

MR. O'CONNOR:  Good morning, Your Honor. John O'Connor for CACI, joined by co-counsel Nina Ginsberg, Linda Bailey and Joseph McClure.

THE COURT:  Good morning.  All right.  Now, has the plaintiff appeared yet?

MR. FARIDI:  Not yet, Your Honor.  We're looking at the screen, and as soon as he appears, he will pop up on the screen.  We're hoping that he is able to appear this morning.

THE COURT:  All right.  Well, in any case, we have the video that we were finishing up from last night.  So if he "pops up," is that going to interfere -- will that stop the video?

5

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

MR. FARIDI:  No.  I think we've got about 25 minutes worth of video left, and if he still is not there, we have witnesses lined up.  So there will be no delay, Your Honor.

THE COURT:  All right.  All the jurors are here now; right?

THE COURT SECURITY OFFICER:  Yes, Judge.

THE COURT:  Let's bring them in.

MR. FARIDI:  And we can have the interpreters step down.

THE COURT SECURITY OFFICER:  Rise for the jury.

(Jury present at 9:33 a.m.)

THE COURT:  Good morning, ladies and gentlemen.  Once again, thank you for being here on time.

I can always tell when I have a really good jury when my jurors are here on time.  Again, because we all know Northern Virginia traffic can be so difficult, so I expect some of you got up quite early this morning to make sure you would make the deadline, so we genuinely appreciate that.

Again, I'm going to assume, other than some Trick-Or-Treaters, none of you had any problems at home last night?  Good.

All right.  We're going to continue with the video deposition of Mr. Frederick, and so we should pick up from where we were last night.

6

(Deposition of Ivan Frederick played.)

THE COURT:  All right.  Is the plaintiff available yet?

MR. FARIDI:  Your Honor, I think we'll play down the cross-examination by CACI's counsel.

THE COURT:  All right.

(Deposition of Ivan Frederick played.)

MR. FARIDI:  Your Honor, at this time, plaintiffs call Sabrina Harman.

Your Honor, while they're getting the witness, there is one small matter I think if we can just approach the sidebar for about 30 seconds.

THE COURT:  All right.

(Bench conference.)

MS. ROBINSON:  So my expectation is that this witness is going to have a memory very similar to Mr. Frederick, and, fortunately, while she was at Abu Ghraib, she wrote certain contemporaneous letters back home. We have those letters.  I know CACI submitted a *Touhy* authorization for use of those letters.  So we plan to lay the foundation to introduce them as present sense impressions.  I just didn't want that to come out of nowhere when we try to lay that foundation.

THE COURT:  You said it was a *Touhy*?

MS. ROBINSON:  CACI submitted a *Touhy* request a

7

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Direct examination - S. Harman

few weeks ago that the government gave last week that gave

authorization to speak about these letters.

MS. GINSBERG:  We have those letters.

THE COURT:  I'm sorry?

MS. GINSBERG:  We have those letters.

THE COURT:  So there's no problem?

MS. ROBINSON:  You're fine having those admitted?

THE COURT:  You labeled them as exhibits?

MS. ROBINSON:  Yes.

THE COURT:  That's fine.

MS. ROBINSON:  Yes.

(Open court.)

THE COURT SECURITY OFFICER:  Raise your right hand.  Face the deputy clerk.

Thereupon,

SABRINA HARMAN,

having been called as a witness on behalf of the plaintiffs and having been first duly sworn by the Deputy Clerk, was examined and testified as follows:

(Time noted: 10:07 a.m.)

THE COURT SECURITY OFFICER:  You may be seated.

DIRECT EXAMINATION

BY MS. ROBINSON:

Q    Good morning, Ms. Harman.  Can you please state your full name for the jury?

8

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Direct examination - S. Harman

A      Sabrina Dawn Harman.

THE COURT:  Ms. Harman, we're going to have to be able to hear you clearly.

Are you sick right now?

THE WITNESS:  Yes.

THE COURT:  Do you know what you're sick from?

THE WITNESS:  A respiratory infection.

THE COURT:  I doubt that that's communicable at this point.  I think I would like you to take your mask off so we can hear you clearly.  All right.  Do the best you can.  Do you need some Kleenex or water?

THE WITNESS:  I have some.  Thank you.

THE COURT:  Let's proceed.

BY MS. ROBINSON:

Q      And I'm not sure if the jury heard you.  Can you repeat your full name?

A      Sabrina Dawn Harman.

Q      Did you ever serve in the Army?

A      Yes, ma'am.

Q      When did you join the Army?

A      October 2001.

Q      Do you recall how old you were when you joined the Army?

A      Mid 20s.

Q      And why did you join the Army?

9

A     I just needed college money.

Q     I didn't hear what you said.

A     I needed money for college.

        THE COURT:  Ms. Harman, you have to speak up.

        THE WITNESS:  I lost my voice.

        THE COURT:  You're still going to have to speak up as best you can.

        THE WITNESS:  Yes, ma'am.

BY MS. ROBINSON:

Q     You said you needed money for college?

A     Yes, ma'am.

Q     In the Army, was there a particular company you were assigned to?

A     372nd MP company.

Q     Did you say 72nd?

A     372nd.

Q     372nd?

A     Yes, ma'am.

Q     Were you deployed to Abu Ghraib in the late 2003 to early 2004 time period?

A     Yes, ma'am.

Q     And did you arrive at Abu Ghraib in approximately October 2003?

A     Yes.

Q     What was your role at Abu Ghraib?

10

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A    I guess to look after detainees.

THE COURT:  I'm sorry, what was your answer?

THE WITNESS:  To look after detainees.

THE COURT:  To look after detainees?

THE WITNESS:  Where, at Abu Ghraib or before?

BY MS. ROBINSON:

Q    Yes.  At Abu Ghraib.

A    Yes, ma'am.

Q    Who did you report to on a day-to-day basis?

A    Sergeant Frederick.

Q    Sergeant Frederick?

A    Yes, ma'am.

Q    While you were at Abu Ghraib, did you interact with members of the military police?

A    I did.

Q    And your company was a military police company; is that right?

A    No -- oh, yes.  Yes, we were.  Sorry.

Q    Did you know someone named Charles Graner?

A    Yes.

Q    How do you know Mr. Graner?

A    He was in my unit.

Q    Do you know someone named Megan Ambuhl Graner?

A    Yes, ma'am.

Q    How did you know Ms. Ambuhl Graner?

11

A    She was also in my unit.

Q    Can you describe your relationship with Charles Graner and Megan Ambuhl Graner?

A    I mean, I really didn't know them too much before. They were in a separate platoon.  Like separate unit -- same unit, but just separate.

Q    Did you become friendly with them while you were at Abu Ghraib?

A    Yeah, I think so.

THE COURT SECURITY OFFICER:  Hold the mic a little bit closer.

THE WITNESS:  Yes, sir.

BY MS. ROBINSON:

Q    Did you remain friends with them after you left?

A    Yes.

Q    How did your career in the military end?

A    I was court-martialed.

Q    Ms. Harman, the jury has already heard a lot about the hard site at Abu Ghraib.

Did you work at the hard site?

A    Yes, ma'am.

Q    Similarly, the jury has heard about different tiers of the hard site --

THE COURT:  You don't need to tell the witness what the jury has heard about, just ask the question.

12

BY MS. ROBINSON:

Q    Did you work on Tier 1A?

A    Yes, ma'am.

Q    When you worked on Tier 1A, what were your responsibilities?

A    Just to feed people.  It just depended on who came in.  I didn't really work 1A; I worked 1B, and it was for the kids and the women.

        THE COURT:  I couldn't hear that.  What was that?

        THE WITNESS:  I worked 1B, which was separate from 1A.  So it was for the kids and the women that were there.  So it was to feed them and let them take showers.

BY MS. ROBINSON:

Q    Were you primarily assigned to 1B?

A    If I worked that tier, yes.

Q    Did you do any work in Tier 1A?

A    I was never -- I don't think.  I don't recall.  I don't recall being assigned to 1A.

Q    Did you visit Tier 1A on occasion?

A    It was connected.  It was the same area.  Just, like, 1A was on this side, and 1B was on this side, and they were connected.

Q    So you had occasion to be in Tier 1A at times?

A    Yes.  Yes.

Q    And did you work on the day shift or the night shift?

13

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A     The night shift.

Q     On those occasions where you were on Tier 1A during the night shift, did you see other military police personnel there?

A     Yes.  At 1A and 1B?

Q     1A.

A     Yes.

Q     If you could take a look at your binder at what's been labeled PTX 161.  This is a subset of the photographs that comprise PTX 161, and I just want you to focus on the first photograph on the first page.  It has the label Photo M60; do you see that?

A     I believe so.  Yes.

Q     Is that a photograph of you?

A     Yes.

          MS. ROBINSON:  Your Honor, plaintiffs move to admit just that one page of PTX 161.

          THE COURT:  Any objection?

          MS. GINSBERG:  No objection.

          THE COURT:  All right.  It's in.

   (Plaintiffs' Exhibit Number 161, first page admitted into evidence.)

BY MS. ROBINSON:

Q     Ms. Harman, who else is in that photograph?

A     Megan Ambuhl.

14

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE COURT:  I'm sorry, who?

THE WITNESS:  Megan Ambuhl.

MS. ROBINSON:  Megan Ambuhl Graner.

BY MS. ROBINSON:

Q    When you visited --

MS. ROBINSON:  You can put the photo down, please.

BY MS. ROBINSON:

Q    On the occasions when you visited Tier 1A on the night shift, did you see detainees there?

A    Yes.

Q    While you were at Abu Ghraib on the occasions that you visited Tier 1A, did you ever observe detainees being abused?

A    Yes.

Q    Did you begin to see detainees being abused shortly after you began working at Abu Ghraib?

A    Define abuse.  Because, like, being naked, I saw that before when we did the walk-through.  So is that considered abuse?

Q    I'll back that up.

A    Okay.

Q    You said you went on a walk-through.

What are you referring to?

A    We went on a walk-through before to take over from the unit before.

15

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q    I just want to make sure I heard correctly.

You said you did a walk-through when taking over

from the unit before?

A    Yes.

THE COURT SECURITY OFFICER:  Keep the mic closer.

THE WITNESS:  And there was a naked detainee at

that point.  Is that considered abuse?

BY MS. ROBINSON:

Q    Was that what you had in mind when you had said you had

witnessed abuses?

A    Yes.

Q    Okay.  While you were at Abu Ghraib, did you document

the abuse that you witnessed in any letters?

A    In where?

Q    In letters.

A    Yes.

Q    Who did you write letters to?

A    My spouse.

Q    And when you wrote those letters, you did it shortly

after you witnessed the abuse that you saw?

A    I believe so.

Q    Could you please take a look at what's been marked as

PTX 232 in your binder.

MS. ROBINSON:  And, Your Honor, this is a document

that was produced to us with highlighting and redactions on

16

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

the first page, but it continues onto the second page --

THE COURT:  All right.

MS. ROBINSON:  -- in unredacted form.

THE COURT:  Any objection to 232?

MS. GINSBERG:  There's no objection.

THE COURT:  All right.  It's in.

(Plaintiffs' Exhibit Number **232 admitted into evidence.**)

BY MS. ROBINSON:

Q    Ms. Harman, is this a letter that you wrote?

A    It is.

Q    And does this describe an instance of abuse that you witnessed?

A    I believe so, yes.

Q    All right.  I'm going to walk through certain passages of the letter with you and ask you some questions about it; okay?

A    Yes, ma'am.

Q    Okay.  So on the first page, I just want to walk through the first two highlights.  You wrote:  "Kelly, okay. I don't like that anymore.  At first it was funny, but these people are going too far.  It went too far.  Even I can't handle what's going on.  I can't get it out of my head."

Ms. Harman, when you said that these people are going too far, what did you mean?

A    I don't recall.

17

Q   Okay.  Can you please look at the next page.  And looking at the second line from the top starting with the words "I walk down."

You wrote:  "I walk downstairs after blowing the whistle and beating on the cells with an ASP to find" -- and then there's a redaction.  Redacted -- "handcuffed backward to his window naked with his underwear over his head and face.  He looked like Jesus Christ."

Now, without using the name of any detainee, can you tell us what you were describing there?

A   They had --

MS. GINSBERG:  Your Honor, objection.  I think it speaks for itself.

THE COURT:  I think it speaks for itself as well.  I'll sustain the objection.

The one thing that could be clarified is, what did you mean in the letter when you said he looked like Jesus Christ?

THE WITNESS:  The position he was in.

THE COURT:  And can you demonstrate for the jury clearly what the position was in, as you remember it?

THE WITNESS:  He was handcuffed backwards to a bed with his hands outright.

THE COURT:  With his hands ...

THE WITNESS:  His hands stretched out.

18

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE COURT:  All right.  So the witness demonstrated the hands being spread out.  All right.

MS. ROBINSON:  I'm going to continue reading some passages, but I'm limiting my questions to those that could require further clarification.

BY MS. ROBINSON:

Q    All right.  You then wrote:  "At first I had to laugh, so I went on and grabbed the camera and took a picture.  One of the guys took my ASP and started 'poking' at his dick."

Pausing there.  Just for those who may not know, what is an ASP?

A    I don't know how to explain it.  It's just like a bar that comes out.

Q    So it's just a long bar?

A    Right.

Q    Okay.  And you referred to one of the guys.

Who were the guys who were with you?

A    I don't recall.

Q    And why did you want to take a picture of this detainee?

A    To show that it happened.

Q    Why did you think it was important to show that it happened?

A    Nobody would believe it.

Q    All right.  Continuing on to the next sentence.  You

19

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

wrote: "Again I thought, okay, that's funny. Then it hit me, that's a form of molestation. You can't do that. I took more pictures now to record what is going on."

And when you say you took more pictures to record what is going on, is that what you were describing earlier, taking the pictures because no one would believe it?

A    Yes, ma'am.

Q    Now, looking about four lines further down starting with the language "they turned the lights out," you wrote: "They turned the lights out and slammed the door and left him there while they went down to Cell Number 4. This man had been so fucked that when they grabbed his foot through the cell bars, he began screaming and crying. After praying to Allah, he moans a constant short ah, ah every few seconds for the rest of the night."

Ms. Harman, were you there the whole night to hear him?

A    I don't recall.

Q    And then jumping to the end of the letter, I just want to start about three lines up from the language "Kelly, it's awful." And you wrote: "Kelly, it's awful, and you know how fucked up I am in the head. Both sides of me think it's wrong. I thought I could handle anything. I was wrong."

What did you mean when you said that both sides of me think it's wrong?

20

A    Civilian and the soldier.

Q    I didn't hear you.  I'm sorry.

A    The civilian side and the soldier.

Q    And I'll put that document away.

Ms. Harman, I'd like you to look at your -- in your binder at what's been previously admitted at PTX 34.

MS. ROBINSON:  If you could put that up.

THE COURT:  Any objection to 34?

MS. ROBINSON:  It's already in, Your Honor.

THE COURT:  All right.  No, it's apparently not in.  Well, whether it is or isn't, is there any objection to 34?

MS. GINSBERG:  No.

THE COURT:  All right.  It's in.

(Plaintiffs' Exhibit Number 34 admitted into evidence.)

BY MS. ROBINSON:

Q    Ms. Harman, did you take this photograph?

A    Yes.

Q    Without giving a name, do you recognize the person in this photograph?

A    The people in it?

Q    I'm sorry.  The person depicted in this photograph, without giving a name, do you recognize it?

A    Yes, I know who that is.

Q    Is this the person that you described in the letter

21

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

that we had just read?

A    That's the same detainee.

Q    Now, for state secret concerns, if you could just answer my next question with a yes or a no.

Do you know who the interrogator was for this detainee?

A    I do.

Q    And without giving a name, did that interrogator work for the company CACI?

A    It did.

Q    Now, was that CACI interrogator present for any portion of the abuse that you described in your letter?

A    I just don't recall.

Q    You say you don't recall?

A    I don't recall.

Q    Okay.  Let me see if I can refresh your recollection.

Can you please look at tab 2 in your binder.  Or, excuse me, tab B in your binder.  And if you could look specifically at page 16.

MS. GINSBERG:  Your Honor, this is not a -- she's not allowed to just read from her deposition.

THE COURT:  No, but this is to refresh her memory, I assume.

MS. ROBINSON:  That is correct.  I'm going to ask her to read the lines to herself.

22

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE COURT:  All right.

BY MS. ROBINSON:

Q    Could you please turn to page 16 of tab 2.  And if you could focus on the line beginning 16, 22 and read through to 17, 7 just to yourself.

A    I'm totally lost.

Q    All right.  Are you at tab B in your binder?

THE COURT:  Oh, B.

MS. ROBINSON:  Yes, B as in boy.

THE COURT:  And the page number again for the record.

MS. ROBINSON:  It's tab B, page 16, 22 to 17, 7.  And just read that to yourself.

THE WITNESS:  Page 16?  Page 16?

MS. ROBINSON:  16, yes.

THE WITNESS:  6-0 or 1-6?

MS. ROBINSON:  16.  And then starting at line 22.  Let me know when you're there, and I'll walk you through it.

THE WITNESS:  I'm sorry.  I'm there.

BY MS. ROBINSON:

Q    Okay.  So starting on 16, 22, if you could just read to yourself onto the next page through 17, 7.  Oh, excuse me.  I think I know why we're all confused.  Yeah.  Wrong page.  I'm sorry.

Page 41.

23

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A    Read 16 to 41?

Q    I gave you the wrong page.  I'm sorry.  Page 41, and begin reading at 41, 17, and continue on for a couple of pages to 43, 09.

A    (Complies.)

Q    Okay.  And I gave you that full page range just to make sure you have the context, but I'm looking particularly at the lines 43, 7 to 43, 9.

Does that refresh your recollection that the CACI interrogator for this detainee was present?

MS. GINSBERG:  Your Honor, Your Honor, she's leading.

THE COURT:  Just does that refresh your memory?

MS. GINSBERG:  Yeah, but not the --

MS. ROBINSON:  I just wanted to make sure we had the initial question because it's been a couple of minutes.

THE COURT:  Yeah.  And there was an initial question, so that's all right.

THE WITNESS:  I don't recall him with the detainee.

THE COURT:  I'm sorry?

THE WITNESS:  I don't recall him with the detainee.

MS. GINSBERG:  I'm sorry.  I didn't hear the answer.

24

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE WITNESS:  I don't recall him with the detainee.  I can't remember.

THE COURT:  She does not recall the CACI interrogator with the detainee.

Is that the answer?

THE WITNESS:  Yes, ma'am.

BY MS. ROBINSON:

Q    At the time -- excuse me.

This is your deposition from 2013; is that right?

A    Yes.  Yes, it is.

Q    And at the time that this deposition was taken, you were able to answer this question regarding the presence of this CACI interrogator; is that right?

A    Yes.

Q    All right.

MS. ROBINSON:  Your Honor, there's a slight state secrets concern because this document uses a name, but I plan to read in the lines and replace the name with the words the CACI.

THE COURT:  No, we've not been permitting that.

MS. GINSBERG:  Objection.

THE COURT:  Let's move on.

MS. ROBINSON:  All right.

BY MS. ROBINSON:

Q    Ms. Harman, while you were at Abu Ghraib, did you

25

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

observe the use of unmuzzled dogs on detainees?

A    Yes.

Q    Did you document your observations about the use of

unmuzzled dogs in a letter to your spouse?

A    I believe, I did.

Q    Can you please look in your binder to PTX 233.

        THE COURT:  Is there any objection to 233?

        MS. GINSBERG:  Your Honor, this is hearsay.  She

can ask the questions.  If she remembers any of this

information, she can testify about it, but the letter is

hearsay.

        THE COURT:  Well, I don't think it's any different

from 232.  It's this woman's present impressions taken at

the time.  This is what she's reporting she saw or heard,

and I'm going to permit it over your objection.

        MS. GINSBERG:  She may remember it.  She doesn't

have to rely on the letter itself.

        MS. ROBINSON:  Your Honor, if it's admissible as a

present sense impression, it does not matter that she may

remember it.

        THE COURT:  I'm letting it in.  233 is in.

  (Plaintiffs' Exhibit Number **233 admitted into evidence.**)

        MS. ROBINSON:  Can you please put 233 on the

screen.

        THE COURT:  Just for the record, is Kelly the name

of your husband at that time?

THE WITNESS:  It's my wife.

THE COURT:  I'm sorry?

THE WITNESS:  It's my wife.  My wife.

THE COURT:  Your wife.  Sorry.

THE WITNESS:  My wife.  Yes.

BY MS. ROBINSON:

Q    Ms. Harman, is this document a letter that you wrote to your wife about the use of an unmuzzled dog?

A    It is.

Q    I'd like to again read through portions of this letter and ask you certain questions about it.

MS. GINSBERG:  Your Honor, can I make one further objection.  The letter starts out "the other day."  I don't I think that that amounts to a present sense impression.

THE COURT:  I'm permitting the letter over -- objection is overruled.  But let's get this moving.

All right.  The date of the letter is what?

THE WITNESS:  December 15th, 2003.

THE COURT:  All right.  Go ahead.

BY MS. ROBINSON:

Q    Ms. Harman, you wrote:  "Kelly, okay, what's been going on.  The other day an inmate was in his cell.  They did a cell check and found that he had busted on the board, on the window, and had a rope he made out of a blanket he was

27

given.  The rest of the shredded blanket was an oval ball shape."

Can you describe what you meant there by the oval ball shape?

A    I don't recall.

Q    Continuing on with the letter you wrote:  "He said he didn't knock the window out, that he has a baby, that he was making a baby doll out of the shredded blanket to remind him of his baby.  They didn't buy it, so they brought him out of the cell, stripped him down and called K9."

What is K9, Ms. Harman?

A    They had dogs.

Q    They were people -- were they personnel with dogs?

A    It was MI with dogs.

(Reporter interrupted for clarification.)

THE WITNESS:  MI, military intelligence.

BY MS. ROBINSON:

Q    Continuing with the next sentence.

You wrote:  "This is the first time I have seen military police dogs here.  Two dogs with two owners came in and go to the man against the wall.  The guy is scared out of his mind.  Iraqis are afraid of dogs.  Not sure why.  So the dogs are barking, and he's getting more and more nervous."

Just pausing there.  What made you think that the

28

detainee was scared out of his mind?

A    He just was scared.

Q    Just based on the way he looked?

A    His appearance, yes.

Q    How did you get the understanding that Iraqis are afraid of dogs?

A    Before we came there, there was -- we were with the public, and they didn't seem to like dogs.  They preferred cats.

Q    So you were around Iraqi civilians previously?

A    Yes.

Q    Immediately below that language there is a diagram.

        MS. ROBINSON:  Can you please zoom in on the diagram.

BY MS. ROBINSON:

Q    Ms. Harman, can you explain to us what this diagram is showing?

A    It looks like the position where everybody was.

Q    And am I correct that there are two dog handlers each with a dog on either side of the person labeled as "him"?

        Is "him" the detainee?

A    Yes.

Q    And where are you in this diagram?

A    Off to the side.

Q    And that's on the right-hand side there is a stick

29

figure with the words "me" next to the figure?

A    Yes.

Q    Continuing on beneath the diagram with the letter. I'll wait for that to come down.  You wrote:  "So Graner tells the guy to lay down, and he starts to, but the dogs get closer, so he stands back up.  They start yelling at him.  The Iraqi starts screaming and runs straight to Graner and the interpreter.  It looked like he was going to jump into his arms.  Graner and the interp move, and one of the guys lets his dog loose enough to bite him in the leg for no reason.  So the guy was hysterical, and he started to run towards me."

Pausing there.  Can you explain what you meant when you wrote that one of the guys let his dog loose enough to bite the detainee for no reason?

A    I don't remember.

Q    Continuing on you wrote:  "The guy couldn't control the dog this time.  The dog got in another bite on his other leg.  Blood was everywhere.  He got to me.  My hand went to his face as the guys tackled him from behind."

Do you recall what you meant by "he got me"?

A    No.

Q    Continuing on you wrote:  "He wasn't trying to escape anything but those dogs.  Now the dog is" -- excuse me. "Now the floor is covered with blood.  I run up and get the

30

medic bag and water, and of course they took pictures.  I stopped taking pictures.  I am not getting into this mess any more than I already have."

First, when you wrote "of course they took pictures," who was the "they"?

A    I can't remember.  It was common.  Like, everybody.

Q    I'm sorry, I didn't hear?

A    It was common.  They had cameras.

Q    It was common to have cameras?

A    (Gesturing affirmatively.)

Q    And when you wrote that you're not getting into "this mess" anymore, do you recall what you meant by that?

A    Yes.

Q    What did you mean by that?

A    I just didn't want to be there anymore.  I asked for a transfer, so ...

Q    You asked for a transfer from where?

A    Out of that tier when I got back from leave.

Q    When were you on leave?

A    November 9th, I believe.

Q    Do you remember how long --

A    I had just gotten back.

Q    I cut you off.  I'm sorry.

A    I had gotten back I think right before December.

Q    And once you got back, you asked for a transfer out of

31

Tier 1?

A    Yes.

Q    And why did you ask for a transfer?

A    I didn't want to be there anymore.

Q    And why didn't you want to be there anymore?

A    I just didn't want to be there.

Q    Continuing on with the letter you wrote:  "So I start to clean him up, and the first bite isn't that bad.  Took a few layers off, but not too bad to need anything more than a gauze pad.  It was teeth marks that looked something like" -- and then it appears like there's an image and an arrow -- "but the other one, a tooth had punctured his skin, and that's where all the blood was coming from."

I just want to clarify.  That image with a few lines with the small arrow next to it, is that an image of what the bite mark looked like?

A    Yes.

Q    And then you continued on.  "One of our medics came, and he taught me how to give stitches.  He put one in, I put one in.  It was kind of fun, but I felt horrible for this guy.  The dog should have never been there."

So you and the medic were together stitching up the wound of the detainee?

A    Yes.

Q    And when you wrote at the end of that paragraph that

32

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

the dog should have never been there, what did you mean?

A    I had just never seen dogs there before, so I didn't understand.

Q    Did you think it was necessary for the dog to be present in that situation?

A    No.

MS. ROBINSON:  All right.  We can put this letter down.

BY MS. ROBINSON:

Q    Ms. Harman, we looked at one picture of I think what you described as detainee abuse earlier in your testimony, and you mentioned a moment ago that cameras were common.

Have you seen other pictures of detainee abuse at Abu Ghraib?

A    Yes.

Q    Were you investigated by the military for your role in detainee abuse?

A    Yes.

Q    Are you depicted in any photographs of abuse?

A    Yes.

Q    Did you take any pictures yourself other than the one we discussed earlier today?

A    Yes.

Q    I want to go briefly through just a very small number of photographs that you were involved in.

33

Can you please look back at your binder at PTX 161. And after the first page that we looked at, I'd like you to look at the second, third and fourth pages of this document. And these are specifically photos that are labeled M153, M162, M163, and M165. This is, again, a subset of a larger number of photographs on the exhibit list as PTX 161.

Do you recognize these photographs, Ms. Harman?

A    Yes.

Q    Are these photographs of the person who was bitten by the dog described in the letter we just read?

A    Yes.

MS. ROBINSON: Okay. Your Honor, we move to admit these small number of photos.

THE COURT: 153, 162, 163 and 165.

MS. ROBINSON: That's correct.

MS. GINSBERG: There's no objection.

THE COURT: All right. They're in.

(Plaintiffs' Exhibit Number **161, photos 153, 162, 163 and 165 admitted into evidence.**)

BY MS. ROBINSON:

Q    I don't want to spend too long on them. I'll just run through them very quickly.

The first photo, this is the detainee after he was bitten by the dog you described?

34

A    Yes.

Q    Going to the next photos -- I think we can just go through them very quickly one at a time.

Is that you in the photo?

A    Yes.

Q    And is that you stitching up the detainee's injury?

A    The medic, yes.  No, that's the medic.

Q    So there are two people in the photo.  Are you either of those people?

A    Yes.

Q    Which one are you?

A    The one to the right.

Q    Okay.  The next photo.

Is this showing the same thing from a different angle?

A    Yes.

Q    Do you know who it is who appears to be stepping on the detainee?

A    No.

Q    Okay.  And the last photo.  And that's you again?

A    Yes.

Q    And the medic is the person to your left?

A    Yes.

MS. ROBINSON:  You can take the photos down.

BY MS. ROBINSON:

35

Q    Can you please look in your binder at what's been marked as PTX 234.

Do you recognize this photo, Ms. Harman?

A    Yes.

MS. ROBINSON:  We move to admit 234.

MS. GINSBERG:  No objection.

THE COURT:  It's in.

(Plaintiffs' Exhibit Number **234 admitted into evidence.**)

BY MS. ROBINSON:

Q    Ms. Harman, where are you in this photo?  It may be hard to see.

A    I'm taking a photo from behind.

Q    It looks like you are holding something in your hands. Can you tell us what that is?

A    It was a camera.

Q    Why were you holding a camera in your hands?

A    I was taking a photo.

Q    And can you describe to the jury why you were engaged in the conduct depicted in this photo?

A    I was just present at the time.

Q    Just present?

A    Yes.

Q    I want to look at just one more photograph.  PTX 139 in your binder.

THE COURT:  Any objection to 139?

36

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

MS. GINSBERG:  No objection.

(Plaintiffs' Exhibit Number **139 admitted into evidence.**)

BY MS. ROBINSON:

Q    Ms. Harman, do you recognize this photo?

A    Yes.

Q    Did you take this photograph?

A    I think so.

MS. ROBINSON:  You can put that photo down.

BY MS. ROBINSON:

Q    All right.  Ms. Harman, we've now looked at several pictures showing the abuse of detainees.

Were pictures of detainee abuse swapped among personnel at Abu Ghraib?

A    I didn't know at the time, no.

Q    Do you recall testifying in 2005 to Army CID?

A    Yes.

Q    Can you please turn to tab C in your binder.  And if you could look -- does tab C appear to reflect the testimony that you gave to CID on June 27th, 2005?  That's on the first page.

A    What do you want me to do?

Q    I was just asking you, does this reflect the testimony that you gave to CID on June 27th, 2005 based on the first page?

A    Yes.

37

Q    Can you please turn to page 100 of this document.  And I think you testified a moment ago that you were not aware that photos of abuse were swapped; is that correct?

A    Yeah, I don't remember.

         THE COURT:  I'm sorry, what was the answer?

         THE WITNESS:  Yeah, I don't remember being swapped.

BY MS. ROBINSON:

Q    Just to clarify, is the answer that you don't remember, or they were not swapped?

A    I found out that they are swapped, but that was after.

Q    Okay.  Was it your understanding while you were at Abu Ghraib that photos were swapped?

A    I don't recall.

Q    Okay.  Can you please look at page 100 of this document.  And could you read to yourself lines 13 through 19 of that page.

A    Okay.

Q    Does that refresh your recollection that you understood at the time that photos were swapped at Abu Ghraib?

A    Yes.

Q    Now, do you recall that those who were swapping the photos included military intelligence or MI personnel at Abu Ghraib?

A    I don't recall.

38

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Direct Examination - S. Harman

MS. GINSBERG:  Leading.

THE COURT:  That's leading.  All right.  Objection sustained.

MS. ROBINSON:  Sure.

BY MS. ROBINSON:

Q    Were the people who swapped -- did the people who swapped photographs at Abu Ghraib include MI personnel?

A    I don't recall.

Q    Can you please take a look at tab E in your binder.

THE COURT:  What did you do with the photographs that you took?

THE WITNESS:  I put them on my computer.

THE COURT:  I'm sorry?

THE WITNESS:  I put them on my computer, and then I gave them to my wife when I got home.

THE COURT:  To your knowledge, did you give your pictures to anybody else?

THE WITNESS:  No, ma'am.  Just Kelly.

THE COURT:  Did you see pictures from anybody else while you were there?

THE WITNESS:  There was a laptop in the office, and there was a screen saver.

THE COURT:  And do you recall what the screen saver looked like?

THE WITNESS:  I know there was pictures on it, but

39

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

I don't recall which one.

THE COURT:  Did the pictures depict any of the kinds of misconduct that you described in your letters?

THE WITNESS:  Yes, ma'am.

THE COURT:  All right.  Now, I'm sorry, you were on Exhibit --

MS. ROBINSON:  Sure.  So it's tab E.

BY MS. ROBINSON:

Q    And the question that I had asked was:  Were the people -- or did the people who were swapping pictures include military intelligence or MI personnel?  And I think your answer was that you don't recall; is that correct?

A    Yes.

Q    All right.  So looking at tab E, can you look up ten lines from the bottom of the page.  And let me know when you've read that.

A    Ten lines up.

Yeah, I read it.

Q    Does that refresh your recollection that military intelligence were swapping pictures?

A    It does not.

Q    All right.  Ms. Harman, did military intelligence give instructions on how to treat detainees at Abu Ghraib?

A    Yes.

Q    Were those instructions verbal rather than in writing?

40

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A      They were verbal and written down by the person in charge of 1A.

Q      I didn't hear your last answer.

A      They were verbal and then written down usually by the people in 1A.

Q      Were they always written down?

A      I don't know.

Q      Do you recall a civilian interrogator with the name Steve Stefanowicz referred to as Big Steve?

A      Yes.

Q      How do you know him?

A      He was one of the handlers.

Q      And is handler anonymous with interrogator?

A      Yes.

Q      If you could describe Big Steve in one word, what would that word be?

A      Big.

Q      Big.

       Have you ever used the word overpowering to describe him?

A      I don't recall.

Q      All right.  Can you please take a look at tab C in your binder.  This is your 2005 CID statement.  And if you could look at page 129, and specifically at the lines 2 through 4. Let me know when you've read that.

41

A    You said 129?

Q    Lines 2 through 4 of 129.

A    Okay.

Q    Does that refresh your recollection that you described Big Steve as overpowering?

A    I just don't remember.

Q    Okay.  Do you recall whether there were particular military police personnel that he primarily -- that Big Steve primarily worked with?

A    Yes.

Q    And who were those personnel?

A    Graner.

Q    Excuse me?

A    Graner.

Q    Graner.  Is that Charles Graner or ...

A    Yes.

Q    Okay.  Did you ever see or hear Big Steve give instructions to Graner?

A    I don't recall.

Q    Can you look at tab B in your binder.  This is your 2013 deposition testimony.  And if you could look specifically at page 19.  And I want you to look at just -- well, start at lines 20 through 24 of page 19 for context just to figure out who's referred to there.  You may have to look at the top of the page as well at lines 6 through 7 or

42

5 through 7.

A    Okay.

Q    Does that refresh your recollection that you saw or heard Big Steve give instructions to Graner?

A    No.

Q    That does not refresh your recollection.

When you gave this testimony, you were able to answer this question; is that right?

A    Yes.

Q    All right.  I'm going to read in the record the language starting at 19 -- well, at 19, 20 through 19, 24.

Question:  Did you see or hear him give other MP's instructions?

Answer:  Yes.

Question:  Did he give instructions to Frederick?

Answer:  To Graner.

Ms. Harman, have you heard of the name Daniel Johnson?

A    Yes.  DJ.  Yes.  Yes.  Yes.

Q    DJ, is that what you said?

A    (Gesturing affirmatively.)

Q    Who is DJ?

A    He worked at CACI.

Q    Do you recall any incidents with DJ that you thought were abusive or unusual in any regard?

43

A    I don't recall.

Q    Can you look at page 30 of the same tab that we were just looking at.  Starting at line 24 of page 30, can you read from 30, 24 to 31, 7?

A    (Complies.)

Q    And once you've read that, I don't know if you saw on page 30, 12 to 13, just to confirm who the person being discussed in those lines was.

A    Okay.

Q    Do those lines refresh your recollection about any incident that you observed with DJ that you thought was unusual or abusive?

A    No.

Q    Okay.  One moment.

          Ms. Harman, when you gave this testimony in 2013, you were able to answer questions about conduct that DJ engaged in accurately; is that right?

A    Yes.

Q    Okay.  I'm going to read in the lines beginning 30, 24 through 31, 7.

          And question:  Did you ever see him put a sandbag over a detainee's head?

          Answer:  Yes.

          Question:  Do you remember anything else about that incident without saying the detainee's name?

44

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Answer:  That he had goggles on, and they made him walk around like Frankenstein.

Okay.  Ms. Harman, earlier you discussed seeing detainees, or at least a detainee naked; do you recall that?

A    Yes.

Q    Was keeping detainees naked designed to soften them up for interrogation?

A    Yes.

Q    Earlier we looked at a photograph of a detainee assigned to a CACI interrogator who was chained to part of his cell; do you recall that?

A    Yes.

Q    Was chaining detainees to the bars of their cells --

        MS. GINSBERG:  Leading.

        THE COURT:  Sustained.

BY MS. ROBINSON:

Q    What was the purpose of chaining detainees to the bars of their cells?

A    To keep them awake.

Q    Was there any connection between keeping them awake?

        MS. GINSBERG:  Objection.

        THE COURT:  It's going to be leading.  Sustained.

BY MS. ROBINSON:

Q    Earlier in your testimony you described and we saw a picture of a detainee with female underwear on him.

45

What was the purpose of putting detainees in female underwear?

A    I found out that it was to humiliate them.

Q    Can you say that again?

MS. GINSBERG:  Objection.  It sounds like hearsay.

THE COURT:  Sustained.

Were you ever involved in either putting on or bringing female underwear to any of these sites?

THE WITNESS:  No.  That was the only detainee that I saw that happen to.

THE COURT:  I'm sorry?

THE WITNESS:  That was the only detainee that I saw that happen to.

THE COURT:  To one person?

THE WITNESS:  Yes.

THE COURT:  Did you report any of what you saw to anyone up the chain of command?

THE WITNESS:  Everybody knew.

THE COURT:  I'm sorry?

THE WITNESS:  Everybody knew.  Like, there's nothing to report.  Like, my chain of command was there, so ...

THE COURT:  And when you say your chain of command, who was in your chain of command?

THE WITNESS:  Sergeant Snyder, Sergeant Frederick.

46

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Like, everybody that worked in the office, they knew.

THE COURT:  How about the captain?

THE WITNESS:  Captain Brinson.  I don't know.  I mean, I don't know.  Well, even Brinson -- sorry.  Captain Brinson.  Like, he was there during one of the incidents, so ...

BY MS. ROBINSON:

Q    Ms. Harman, was it your assumption that the abuse --

MS. GINSBERG:  Objection.  Leading.

THE COURT:  I think that's a bad question.  If you want to rephrase it, you can.

BY MS. ROBINSON:

Q    Did you have any understanding whether others at Abu Ghraib who worked on Tier 1A were aware of abuse there?

A    Yes.

Q    And what was that understanding based on?

A    They were there.

Q    In your view, was --

A    I'm sorry?

Q    Withdrawn.  Withdrawn.

A    Okay.

Q    Earlier, Ms. Harman, you testified about an incident involving an unmuzzled dog.

Do you recall the purpose of having unmuzzled dogs interacting with detainees?

47

A    Do I what?  I'm sorry.

Q    Do you recall why unmuzzled dogs were used with detainees?

A    No.

Q    Ms. Harman, you mentioned earlier that you were the subject of a court martial?

A    Yes, ma'am.

Q    What were you court-martialed for?

A    Taking photos, maltreatment, and being in photos.

        THE COURT:  I'm sorry, what was the last part?

        THE WITNESS:  Being in photos.

        THE COURT:  So taking the photos and being in the photos?

        THE WITNESS:  And then maltreatment for not being able to stop it.

BY MS. ROBINSON:

Q    And were you convicted at your court martial?

A    Yes.

Q    What was your sentence?

A    Six months.

Q    Did you testify in court martials of other military personnel involving events at Abu Ghraib?

A    I think so.  Yes.  Yes, I did.

Q    To your knowledge, was anyone from CACI court-martialed?

48

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A     No.

            MS. ROBINSON:  I'll pass the witness.

                       CROSS-EXAMINATION

BY MS. GINSBERG:

Q     Ms. Harman, my name is Nina Ginsberg.  I'm going to ask
you some questions.

            THE COURT:  Ms. Ginsberg, before you get started,
is there an exhibit book for the cross-examination?

            MS. GINSBERG:  Sorry, Your Honor.  We have it.

BY MS. GINSBERG:

Q     Ms. Harman, everybody -- all of the MPs that worked on
Tier 1A were court-martialed; is that correct?

A     All of them?

Q     All of them.

A     No, ma'am.

Q     Sergeant Frederick --

A     Yes.

Q     -- was court-martialed?

A     Yes.

Q     And Corporal Graner was court-martialed?

A     Yes, ma'am.

Q     Megan Ambuhl, was she court-martialed or not?

A     I don't recall.

Q     Okay.  Who else was court-martialed, to your knowledge?

A     Jeremy Sivits, and Davis.

49

Q    Davis.

And they were present for most of these incidents; is that correct?

A    Not most, no.  One was just accidentally there, and he got into a photo, so they court-martialed him, but he wasn't a part of anything.  But, I mean, the others, we were all there.

Q    So there was sort of a team of you, Sergeant Frederick, Corporal Graner, Megan Ambuhl, and you?

A    A team?

Q    Well, you worked with -- you worked 12 hours a day --

A    Yes, ma'am.

Q    -- correct?

And you were partnered with who?

A    Me?

Q    Yes.

A    It depended on the day.

Q    Did you work with Corporal Graner on a regular basis?

A    No.

Q    Who did you work with on a regular basis?

A    I didn't.  I worked the other tiers, or I was a runner.  But when Megan was off, I would work Tier 1B.

Q    All right.  But you were present frequently with the people who worked on the night shift --

A    Yes, ma'am.

50

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q      -- on Tier 1?

A      Yes, ma'am.

Q      Who did those people include?

A      Charles Graner and Megan Ambuhl.

Q      And the pictures that you were shown, Charles Graner was in many of those pictures; correct?  Or took those pictures?

A      I don't know.  Maybe.

            MS. GINSBERG:  Excuse me, Your Honor.  Your Honor, if I could just have a minute.

                              (Pause.)

BY MS. GINSBERG:

Q      All right.  You arrived at Abu Ghraib you said in October of 2023; correct?

A      Yes, ma'am.

Q      And there were --

            THE COURT:  Not 2023.

            MS. GINSBERG:  2003.  Thank you, Your Honor.

BY MS. GINSBERG:

Q      And when you got there, you believed that this -- you believed that this was one of the worst sites you had ever seen; correct?

A      I have never been anywhere --

Q      You had never been anywhere like that before?

A      -- like that.

51

Q    The detainees -- you were there to feed and guard the women and the children detainees?

A    Yes, ma'am.

Q    But you spent a fair amount of time down -- or in the Tier 1A with detainees who were not women and children; correct?

A    Yes.

Q    All right.  And you took your orders from Sergeant Frederick; is that right?

A    Yes.

Q    You never received orders from any interrogator at Abu Ghraib; is that correct?

A    Not that I recall.

Q    Okay.  And do you know who the plaintiffs are in this case?

A    I do not.

Q    Have you ever seen pictures of them?

A    From the site, no.

Q    If you would look in Defendant's -- the notebook of the defendant's exhibits, DX 14.

        THE COURT:  Is there any objection?  I think we've actually got this already in.

        MS. ROBINSON:  If it's not in, no objection.

        THE COURT:  I assume you're moving it in, Ms. Ginsberg.

52

MS. GINSBERG:  Yes.

THE COURT:  All right.  DX 14 is in.

(Defense Exhibit Number 14 admitted into evidence.)

THE COURT:  Is there a question?

BY MS. GINSBERG:

Q    Do you see that picture?

A    I see it.

Q    Have you ever seen that person on Tier 1A?

A    No, not that I remember.

Q    Okay.  And would you look at DX 15.

THE COURT:  Any objection to DX 15?

MS. ROBINSON:  No objection, Your Honor.

THE COURT:  All right.

(Defense Exhibit Number 15 admitted into evidence.)

BY MS. GINSBERG:

Q    Did you see this man on Tier 1A?

A    Not that I recall.

THE COURT:  I'm sorry, what was the answer?

THE WITNESS:  Not that I remember.

BY MS. GINSBERG:

Q    And if you look at DX 16, please.

THE COURT:  Any objection?

MS. ROBINSON:  No objection.

THE COURT:  All right.

(Defense Exhibit Number 16 admitted into evidence.)

53

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

BY MS. GINSBERG:

Q    Now, you were -- you weren't just charged for taking pictures, but you were charged with conspiring with Sergeant Frederick, Sergeant Davis, Corporal Graner, Specialist Jeremy Sivits, and Megan Ambuhl and Private Lindy England; is that correct?

A    Correct.

Q    So this wasn't just something that you did by yourself, this was something that you engaged in with a group of people?

A    Because we were all there, yes.

Q    But you understand a conspiracy is an agreement to do something that's illegal?

        MS. ROBINSON:  Objection, Your Honor.

        THE COURT:  Sustained.

BY MS. GINSBERG:

Q    Well, did you plead guilty or --

A    No.

Q    -- you went to trial?

A    Yes, ma'am.

Q    And you were convicted?

A    Yes, ma'am.

Q    By a military jury?

A    Yes.

Q    And you were also convicted by a military jury of

54

Cross-examination - S. Harman

conspiring to commit maltreatment of subordinates to affect

the object of the conspiracy, which was to force detainees

to crawl on the floor in such a manner to ensure that their

genitals dragged on the floor?

A    I don't recall that.

Q    You don't recall that --

A    If that's -- I don't recall all --

Q    If that's what the charge was, you don't disagree that

that's --

A    Was I charged with that one?  They had a lot of charges

that were dropped.  So I don't know which one --

Q    Well, do you recall that you were convicted of

conspiring with Charles Graner, Adel Nakhla and others to

commit the offense under the Uniform Code of Military

Justice of maltreatment of subordinates?

A    If that's what it says.

Q    Yes.  And the subordinates were the detainees?

A    Yes.

Q    And in order to affect the object of the conspiracy,

Corporal Graner forced naked detainees to crawl on the floor

in such a manner as to ensure that their genitals dragged on

the floor?

A    I don't know.

Q    You saw Corporal Graner force detainees to crawl on the

floor so that their genitals dragged on the floor?

55

A    I don't recall.

Q    You don't recall seeing that?

A    I don't recall, no.

Q    If you would look at what's marked as PTX 10.

THE COURT:  Are you moving that in?  I think we've already got that in.

MS. ROBINSON:  No objection, Your Honor.

THE COURT:  All right.  It's a repeat. Plaintiff's 10 is in.

(Plaintiffs' Exhibit Number **10 admitted into evidence.**)

BY MS. GINSBERG:

Q    All right.  And this is the pyramid that you testified about before; is that correct?

A    Yes.  Yes.

Q    And that's you basically on the top of the pyramid?

A    Behind it, yes.

Q    Yes.

And Corporal Graner behind you?

A    Yes.

Q    And you're smiling --

A    Yes.

Q    -- is that right?

So you were not upset that this happened?

A    I don't know how I was feeling.

Q    Excuse me?

56

Cross-Examination - S. Harman

A    I don't know how I was feeling.

Q    Well, you are smiling there; is that right?

A    I am.

Q    And nobody forced you to get on top of that pyramid?

A    I wasn't on top of it.

Q    Well, behind it leaning over it.

A    Yes.  Right.

Q    Right.  And those are all naked detainees?

A    It is.

Q    And they have hoods on their head?

A    Yes.

Q    And, presumably, you thought it was a good idea to have yourself photographed in that position smiling on top of the pyramid?

A    I just agreed to be in the photo.

Q    Excuse me?

A    I just agreed to be in the photo.

Q    Well, you decided to be in the photo.  Nobody asked you to get in the photo.

A    Well, Frederick said smile, so ...

        THE COURT:  I'm sorry, what?

        THE WITNESS:  Well, Frederick said to smile, so we did so.

BY MS. GINSBERG:

Q    And so you smiled?

57

A     We did.

Q     And no interrogator was present when this pyramid was done?

A     I don't recall.

Q     Well --

THE COURT:  There are a lot of individuals there.

Were there any other MPs around this situation?

THE WITNESS:  On this one?  I really don't remember much of this incident.

THE COURT:  Well, when the detainees were unpiled, so-to-speak --

THE WITNESS:  Yes.

THE COURT:  -- what happened next?

THE WITNESS:  I don't remember.

THE COURT:  You don't have any memory at all?

THE WITNESS:  I don't.

THE COURT:  I see what appears to be a fair amount of clothing behind -- to the right side of the picture.

Was that clothing they had been wearing?

THE WITNESS:  Yes.

THE COURT:  Were you present when the clothing was removed?

THE WITNESS:  I might have been.  I don't know.

THE COURT:  Do you remember how the men became naked?

58

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE WITNESS:  I don't.

BY MS. GINSBERG:

Q    Well, do you remember that it was a standard operating procedure to make detainees take off their clothes and be naked in the cellblock?

A    I thought it was for interrogation purposes, so I don't know.

Q    Well --

A    Not everybody --

Q    What I asked you, was it standard operating procedure for the MPs to make the detainees take off their clothes and be naked?

A    That was depending on who it was.  Not everybody was forced to be naked.

Q    All right.  Well, these -- all these detainees were naked; right?

And, in fact, these detainees were CID detainees; correct?

A    I don't recall.

Q    And the military interrogators had nothing to do with the CID detainees; correct?

A    I don't know if they -- I don't know.

Q    Well, you know that the CID detainees were being investigated by the Criminal Investigation Division?

A    I didn't know at the time, no.  I don't know.

59

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q    You didn't know that there was a difference between the CID detainees and the detainees who were being held for interrogation?

A    Were they handlers?  They all blended together.  Like, I didn't know who was who.

Q    But did you know that there was a difference?

A    Between the handlers?

MS. ROBINSON:  Objection.  Asked and answered.

THE WITNESS:  No.

THE COURT:  No, this is different.

BY MS. GINSBERG:

Q    Between the detainees.

A    Oh.  No.  Unless, like, if CID, I guess -- I have no idea.  I don't know.

THE COURT:  Were all --

THE WITNESS:  I don't know how to answer it.

THE COURT:  Some of these people were wearing red outfits.

Was there a uniform that the detainees were supposed to be wearing?

THE WITNESS:  There were orange jumpsuits.

THE COURT:  Orange jumpsuits?

THE WITNESS:  Yes.

THE COURT:  To your knowledge, were there any other colored jumpsuits that detainees were wearing?

60

THE WITNESS:  I don't recall.

BY MS. GINSBERG:

Q    All right.  So you don't recall that the military interrogators had nothing to do with CID detainees?

A    I wouldn't know, no.

Q    Were you given instructions about how you were supposed to do your job?

A    From MI?

Q    No.  As a military police officer, were you instructed about the detainees at all?

A    I don't recall.

Q    You don't remember?

A    No.

Q    And you don't remember that your second in charge involved three detainees who were stripped of their clothing, handcuffed together nude on the ground and forced to lay on each other and simulate sex while they were in photographs; do you remember that?

A    I was never charged with that.

THE COURT:  All right.  Ms. Ginsberg, it's time for the morning break.  We're going to be in recess until 11:30.  We'll need you back here.  If you want to put your mask back on, that's fine.  11:30.

(A brief recess was taken.)

THE COURT:  All right.  Before we bring the jury

61

in, the jury is having difficulty hearing both counsel and the witness. It's very important that they be able to hear, so everyone has to speak up.

I understand that Mr. Al Shimari is not going to be able to testify at least today; is that correct? Counsel, whoever is --

MR. FARIDI: Yes, that is correct, Your Honor. I was given a note by a member of our team who's been in touch with the folks in Iraq. We have an American lawyer who's filed a notice of appearance in this case, as well as an Iraqi lawyer in Iraq to assist with the testimony. And we were informed by Mr. Al Shimari's son that he believes that Mr. Al Shimari was detained by Iraqi police this morning.

Your Honor may remember that after the medical examination that was done in Malaysia, Mr. Al Shimari was detained at the airport and was questioned by Iraqi police for several days, and he was ultimately released.

We believe that there are some elements within the Iraqi government and the Iraqi police that don't like this particular lawsuit, perhaps, and the fact that he's --

THE COURT: Well, I don't know what the motivations are, but the reality of it is, there's only a finite amount of time to try this case. We've cut off the Zoom connection for today. All right.

Obviously I'm assuming there will be proceedings

62

next week.  If you're able to reconnect -- but you have to give us sufficient notice so that we can get the technology set up.  All right.  But at this point just as an alert, once we finish the evidence in this case, if he has not been available, then I think we'll have to, you know, address that situation; all right?

MR. FARIDI:  We will.

THE COURT:  All right.  That's fine.

MR. FARIDI:  Thank you, Your Honor.

THE COURT:  All right.  Then let's bring the jury in.

THE COURT SECURITY OFFICER:  Yes, Judge.

Rise for the jury.

(Jury present at 11:34 a.m.)

THE COURT:  You all may be seated.

Ladies and gentlemen, we have during the break had the sound system adjusted as much as we can.  I've again advised both counsel and the witness to speak up.

You all should not be shy.  If you're having trouble -- I mean, I'm trying to look at you and listen at the same time.  But if you're having trouble hearing, it's really important just raise your hand, and that will indicate to me, and I'll direct it to be repeated.  All right.

Ms. Ginsberg.

63

MS. GINSBERG:  Thank you.

BY MS. GINSBERG:

Q    Ms. Harman, you testified that you don't remember the standard operating procedure to get the detainees naked when they arrived at Tier 1?

THE COURT:  Ms. Ginsberg, you also need to stay by the microphone.

MS. GINSBERG:  I apologize, Your Honor.

THE WITNESS:  I'm sorry.

BY MS. GINSBERG:

Q    You previously testified that you don't recall that it was standard operating procedures for the MPs to get detainees naked when they arrived at Tier 1A?

A    I don't recall.

Q    You don't recall.

Would you please look at Defense Exhibit -- or actually it's the PTX 8.  It's the plaintiffs' exhibit.  Let me know if you recognize that.  It's in our notebook.

A    Okay.

THE COURT:  008.

MS. GINSBERG:  008.

THE COURT:  Plaintiffs' 008.  You're moving it in?

MS. GINSBERG:  Yes.

THE COURT:  Any objection?  It's the plaintiffs' exhibit, it shouldn't be.

64

MS. ROBINSON:  No objection, Your Honor.

THE COURT:  All right.  Plaintiffs' Exhibit 8 is in.

(Plaintiffs' Exhibit Number **8 admitted into evidence.**)

BY MS. GINSBERG:

Q    All right.  If you would look just below -- well, first of all, what is this?

A    It looks like a statement.

Q    And it's your sworn statement; is that correct?

A    Yes, ma'am.

Q    And it's a sworn statement that you made on January 14th, 2004?

A    Yes, ma'am.

Q    As part of an investigation at Abu Ghraib?

A    Yes.

Q    Okay.  And if you would look at -- just below the middle of the page and --

THE COURT:  This is in evidence if you want to put it on the screen.

MS. GINSBERG:  Would you put it on?

THE COURT:  And you can highlight the evidence.

BY MS. GINSBERG:

Q    Yes.  So do you see a little -- below the middle of the screen it says:  The night of the pyramid -- there's a question.

65

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

During the night of the period that you discussed above, who ordered the five men to strip their clothes off; do you see that?

A    Yes, ma'am.

Q    All right.  And do you see your answer, I don't know?  Or I don't remember.

A    Yes, ma'am.

Q    Excuse me.

And then it's standard procedure here to -- for them to remove their clothes when they enter the cellblock, 1A.  The question, is it standard procedure.  And you see your answer is yes?

A    Right.  If they're going to be interrogated, yes, ma'am.

Q    So it was standard procedure for any of the detainees to be stripped naked?

A    No, ma'am.

Q    Well, did you say it was standard procedure for them to have them remove their clothes when they enter cellblock?

A    Of those -- for interrogation, yes.

Q    For?

A    Interrogation, yes.

Q    Well, that's not what you were asked; is it?

A    As they came in, like, not everybody was going to get naked.

66

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q    All right.  Everybody who came into this cellblock where that picture was taken of the pyramid, it was standard procedure for the MPs to have them remove their clothes when they enter Cellblock A?

A    Okay.

Q    Your answer was yes; is that ...

A    Yes.

Q    All right.  So that was standard -- that's what you recall standard procedure being back in January of 2004; correct?

A    Okay.  Yes.

Q    And, again, none of the people who were present for that pyramid were people from military intelligence; correct?

A    I'm not sure.

Q    Well, did you see any of them present in any pictures that you took?

A    Not that I recall.

Q    All right.  Would you please look at what's marked PTX 36.

        MS. GINSBERG:  Your Honor, I believe this has been admitted.

        THE COURT:  I think this is already in, some version of it.  The problem is some of these have double labels on it.

67

MS. GINSBERG:  Yes, I think it's been admitted.

THE DEPUTY CLERK:  It's not.

THE COURT:  Let's just do it this way, it's in. We'll move it in now.

  (Plaintiffs' Exhibit Number **36 admitted into evidence.**)

BY MS. GINSBERG:

Q    And what is this photograph?  Do you remember it?

A    I do.

Q    All right.  Did you take that photograph?

A    I might have.

Q    All right.  Is that the same pyramid?

A    Yes.

Q    And is that Corporal Graner?

A    Yes.

Q    And who else is in that photograph?

A    England.

Q    And they both have a thumbs up?

A    Yes.

Q    All right.  So you were present -- the 1B is right adjacent to 1A; is that right?

A    Yes, ma'am.

Q    And so -- and you went -- you did go back and forth between 1B and 1A frequently?

A    They were connected, yes.

Q    So you saw what was going on there on a regular basis?

68

A    If I was there, yes.

Q    And you were there every day?

A    I wouldn't say that.

Q    Did you not work 12-hour shifts?

A    Yes.

Q    Seven days a week?

A    Yes.  I worked other tiers also.

Q    I'm sorry, I can't hear you.

A    I worked other tiers.  There were Tiers 2, 3 and 4 also.

Q    Okay.  Was the majority of your time on 1B?

A    If I worked that location, yes.

Q    All right.  You did not see any interrogations take place in the cellblock; correct?

A    Not that I recall.

Q    Okay.  All right.  Would you look at what's already been admitted as PTX 206.  Do you have it in front of you?

        And there are a number of photographs of the cellblock that -- is that right?

A    Yes.

Q    Okay.  And there were other pictures in there of detainees; do you see those?

        THE COURT:  What's the question?

BY MS. GINSBERG:

Q    Well, did you take -- do you remember taking any of

69

those pictures?

A    I didn't take any of these.

THE COURT:  I didn't hear your answer.

THE WITNESS:  No, ma'am, I didn't take any of these.

BY MS. GINSBERG:

Q    Well, you took a lot of pictures before you wrote those two letters to your wife; is that correct?

A    The first letter, no.

Q    Well, when you took pictures of -- the pictures of the dogs, those -- some of those occurred before you wrote to your wife?

A    I didn't take photos of the dogs, I don't believe.

Q    You didn't take them?

A    I took photos of the prisoner in the underwear in October, and that was the first ones.

Q    Okay.

A    That's when I first saw them.

Q    All right.  Would you look at what's DX 40.  What's marked as DX 40.  I believe it's the same as the government's -- or the Plaintiffs' Exhibit --

THE COURT:  Well, don't worry about that.  DX 40.  All right.

MS. GINSBERG:  DX 40.

THE COURT:  Enter DX 40.

70

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE WITNESS:  DX 40.

MS. GINSBERG:  Yes.  Your Honor, this has been admitted.

THE COURT:  Yeah.  I know.  It's in.

MS. GINSBERG:  All right.

BY MS. GINSBERG:

Q   Now, this was -- this was a detainee that you had interaction with; correct?

A   Yes.

Q   All right.  Did you take that picture?

A   I'm not sure if I took that one, but I took ones similar.

Q   Okay.  You took some that resemble this photograph?

A   Yes.

Q   Okay.  And you actually gave this detainee a nickname?

A   Yes.

Q   All right.

A   Well, I didn't give him -- he had a nickname, yes.

Q   He had a nickname?

A   Yes.

Q   But you all referred to him by a nickname?

A   In the beginning, yes.

Q   And you see the wires that are attached on his hands and under that -- whatever that garment is that's -- that he's wearing?

71

A    Yes.

Q    All right.  You attached those wires?

A    Yes.

Q    And that was your idea?

A    That's what my statement says, so yes.

Q    Well, it was your idea?

A    Frederick said it wasn't, but it was.

Q    All right.  And you told him that if he fell off the box, he was going to be electrocuted?

A    That's what the statement said.

Q    All right.

A    I don't recall saying that to him.

Q    You don't recall saying that?

A    No.

Q    Okay.  Now, you were -- you -- when you put the wires on him and told him he was going to be electrocuted, you were joking; right?

A    There was no electricity, yes.

Q    But you were joking.  You were making this a joke.

A    We were joking with him, yes.

Q    All right.  And you thought it was -- you were just playing around with him?

        THE COURT:  Now, what is the relevance?

        THE WITNESS:  I was just keeping him awake.

        THE COURT:  What is the relevance of this to this

72

case?  This witness is not on the stand; she's already been court-martialed.  You need to start connecting this up to the issues in this case.  All right.

MS. GINSBERG:  Your Honor, but she has said this was all so terrible and she couldn't stand it.

THE COURT:  Nevertheless, you need to move this along.

MS. GINSBERG:  Okay.

BY MS. GINSBERG:

Q    But you did -- you did say that you were joking with him in your statement?

A    Yes.

Q    And you also said that it was okay to be doing this, it wasn't so bad because you weren't hurting him?

A    He was just getting exhausted before interrogation.

Q    And in your mind, that was okay, that's what you said?

A    I didn't see anything bad.  Like, he wasn't physically getting hurt.  He wasn't naked.  Like, they let him keep his clothes or his blanket.

MS. GINSBERG:  Your Honor, I'll try and keep it to what's relevant here.

BY MS. GINSBERG:

Q    All right.  Did you know -- did you ever see Rules of Engagement?

A    I don't recall.

73

Q    You don't recall?

A    I don't.

Q    All right.  So do you recall -- you don't recall reading Rules of Engagement for how prisoners should be treated?

A    (Gesturing negatively.)

Q    All right.  And do you know -- also, did you read or ever hear about Rules of Engagement for interrogations?

A    No.

Q    No.  So you don't know whether or not anything that you saw occur was something that was approved -- was an approved method by someone up the military chain of command?

A    No.

Q    Okay.  And that's true with respect to any of these -- the detainee that you said was Jesus Christ?

A    Right.

Q    And you wouldn't have -- and anything that you overheard or overheard being said to either Graner or Frederick, you don't know whether any instructions that may have been communicated were for behaviors that were approved for military interrogations?

A    I wouldn't know.

Q    Okay.  And when you hear the term "MI," what does that mean to you?

A    Military intelligence.

74

Q    Okay.  And do you know -- well, you don't know whether that includes -- or, in your mind, does that include civilians?

A    At the time or now?

Q    Okay.  Would you look at your deposition at page 20 and look at lines 10 to 17.

A    What -- PX what?

            THE COURT SECURITY OFFICER:  Which tab?

            MS. GINSBERG:  It's marked --

            THE COURT:  It's the very first document.

            MS. GINSBERG:  Yes.  It says deposition.

            THE WITNESS:  What page?

            THE COURT SECURITY OFFICER:  Page 20.

            THE WITNESS:  Okay.

            THE COURT:  Ask the question, Ms. Ginsberg.

BY MS. GINSBERG:

Q    Does that refresh your recollection as to whether you thought of military intelligence as also including civilian interrogators?

A    On page 20?

            THE COURT:  Wait.

            THE WITNESS:  It talks about Steve.

BY MS. GINSBERG:

Q    June 17 --

            THE COURT:  Hold on a second.  What is your answer

75

today?

THE WITNESS:  For what?

THE COURT:  In other words, today, is it your understanding that military intelligence included civilian interrogators.

THE WITNESS:  Well, today I know that there's different branches.

THE COURT:  I'm sorry.  Back then did you know that?

THE WITNESS:  I did not know.  I thought they were just linked together.  They were all the same.

THE COURT:  You thought they were all the same?

THE WITNESS:  Yes.

THE COURT:  Now set it up.  Come on.

BY MS. GINSBERG:

Q    Now, have you read lines 12 -- or 10 through 17?

A    This is about Steve on page 20?

Q    No.  This is page 20 of your deposition.  You see -- do you see where at line 10 it says:  "What does the term MI mean to you?"  Do you see that?

A    On page -- or on line 12 it says --

THE COURT:  Are you on the right thing?  It's the very first exhibit in your book.  It says deposition.  You look at page 20, you go to line 10.

THE WITNESS:  Oh, I'm sorry.  Okay.

76

Okay.  What line?

THE COURT:  Line 10.  There's a question.  Do you see the question?

THE WITNESS:  Yes, ma'am.

THE COURT:  Reading down, do you see the answer to that question?

THE WITNESS:  Yes.

THE COURT:  What was your answer?

THE WITNESS:  It was the term -- would the term MI include civilian interrogators.  And it says you can answer.  And it says I'm not sure.

THE COURT:  All right.  That's it.

BY MS. GINSBERG:

Q    Okay.  All right.  You testified about seeing someone named Steve at the cellblock?

A    Yes.

Q    Okay.  Did anybody -- did you ever hear anybody call him Mr. Steve?

A    No, not that I recall.

Q    Okay.  And you only recall seeing him in the cellblock one time; is that correct?

A    I only remember him once, yes.

Q    Excuse me?

A    I only remember him one time, yes.

Q    Okay.  And you saw him there.  That was the one time

77

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

that you testified about?

A    I don't know.  What do you mean testified?  Just now?

Q    Just now.

A    Yes.

Q    Yes.  Okay.

And you only saw him -- this incident happened in October of 2003; right?

A    Yes, ma'am.

Q    And you only saw him there at the beginning; is that right?

A    That I recall, yes.

Q    And you have -- you don't know anything about what Steve may have said to Corporal Graner or Sergeant Frederick; correct?

A    No.

Q    And so you -- you don't know if Steve ever saw any one of the MPs mistreating a detainee?

A    I don't know.

Q    You don't know.

And you -- he never -- Steve never gave any instructions to you; correct?

A    Not that I recall.

Q    Okay.  And you didn't hear him give instructions to Corporal Graner or any of the other MPs; correct?

A    Not that I recall.

78

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q    And Corporal Graner never told you that he received instructions from Steve?

A    Not that I recall.

Q    And the same is true for the other -- well, for Sergeant Frederick?

A    Not that I recall, no.

Q    You don't recall him -- anyone telling you -- any of the other MPs telling you that they received instructions?

A    From Steve?

Q    From Steve.

A    No.

Q    Okay.  I just want to be clear, you never saw Steve present at this cellblock where he was mistreating a detainee?

A    I don't recall seeing him.

Q    You don't recall?

A    Only that one time.

Q    You don't recall him ever mistreating a detainee?

A    Not that I recall, no.

Q    Okay.  And you don't recall Steve or any of the other civilian interrogators being present when dogs were being used?

A    Not that I recall.

Q    Okay.  And you never heard any -- you never heard anyone say that MI had instructed -- you never heard any MPs

79

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

say that MI had instructed them to bring in the dogs?

A    I don't remember.

Q    Okay.  And there was really no way for you to distinguish who the military interrogators were from any of the civilian interrogators; correct?

A    Never paid attention, no.

Q    All right.  And unless you knew them, you had no idea who the military intelligence interrogators were?

A    Correct.

Q    So you don't know.  All right.

All right.  And in any of the pictures of the detainees that we were shown, those were done by -- the people who put them in those positions, handcuffed them or had the detainee who stood on a box bending over, those incidents were things that the MPs decided to do to the detainees; correct?

A    The pictures in here?

Q    Well, you recall the picture of the detainee standing on the box bending over?

A    Yes.

Q    That was something that one of the MPs decided --

A    Yes.

Q    -- to tell the detainee to do?

A    Yes.

Q    Yes.  And the picture of the detainees with the hands

80

on the cell bars, that also was something that the MPs told --

A    I don't know.

Q    -- that they did?

A    I don't know about that one.

Q    All right.  Well, you didn't -- did you -- when you saw that, you didn't see any interrogator present on the cellblock?

A    I barely remember, so I don't know.

Q    So you have no idea who decided to handcuff detainees to their -- the bars on their cells?

A    No, ma'am.

Q    And I think you testified about seeing one detainee wearing women's underwear?

A    That's the same detainee.

Q    Yes.  And isn't it true that there just wasn't enough -- the supplies were short, and they didn't have enough men's underwear, and that you were given women's underwear to give to the detainees when they were asking for clothing?

A    I don't know about that.

Q    All right.  You brought clothing to one of the detainees; correct?

A    I've brought clothing to many.

Q    Okay.  And you've brought women's underwear to these

81

detainees?

A    I don't recall that.

THE COURT:  I'm sorry.  What was the answer?

THE WITNESS:  I don't recall that.

BY MS. GINSBERG:

Q    You don't recall that you didn't?

A    I don't recall bringing underwear to somebody like ...

Q    All right.  At the beginning of your testimony, you testified about the letters that you wrote home?

A    Yes.

Q    And all of the abuse that you described in those letters was abuse that you witnessed being committed by members of the military police; correct?

A    I can't remember who was in -- like, I don't know.  I don't know who was there that first night, so -- with the guy with the underwear.  There was other people there, I just can't remember who they were.

Q    All right.  Well --

A    So I can't say yes.

Q    All right.  You said -- if you would look at PTX 233.

A    232?

Q    PTX 233.

THE COURT:  Right at the back of the book.  They should be the CACI cross-examination book.

MS. GINSBERG:  No.  This is the plaintiffs' book

82

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

PTX --

THE COURT:  233 is in the book.

MS. GINSBERG:  -- 233.

THE COURT:  Do you have it?

THE WITNESS:  Yes, ma'am.  Yes, ma'am.

THE COURT:  Okay.

BY MS. GINSBERG:

Q    All right.  Now, this was a letter that you wrote on December 15th of 2003?

A    Yes.

Q    All right.  And you had already been there since October?

A    Yes.  Well -- yes.

Q    Okay.

THE COURT:  But did you say there was a gap?

THE WITNESS:  Yeah, there was a gap.  I left November 9th.

THE COURT:  All right.  Slow down.

When did you leave?

THE WITNESS:  November 9th.

THE COURT:  November 9th?

THE WITNESS:  Yes, ma'am.

THE COURT:  And how long were you gone?

THE WITNESS:  Two weeks, plus travel.

THE COURT:  So two and a half weeks?

83

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE WITNESS:  About that.

THE COURT:  All right.  And then you came back?

THE WITNESS:  Yes.

THE COURT:  So how far before December 3rd did you come back?

THE WITNESS:  I can't recall.  I know it was after Thanksgiving.

THE COURT:  All right.  Go ahead.

BY MS. GINSBERG:

Q    All right.  So you were there at least a month?

A    Yes.

Q    And you were witnessing what was going on?

A    Yes.

Q    Okay.  And if you look at the first paragraph, you were writing about the man who shredded a blanket?

A    Okay.

Q    Do you see that?

A    Yes.  Yes.

Q    And this happened in Tier 1A; correct?

A    I believe so, yes.

Q    So you would have been in that tier when this happened?

A    Yes.

Q    Okay.  And he said that he didn't knock out a window, and he was -- he has a baby, and he was making -- shredding the blanket to maybe it look like his baby or remind him of

84

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

his baby; correct?

A    Okay.  Yes.

Q    And then you say "they didn't buy it."

        "They" were the military police who were there guarding this detainee; correct?

A    I don't even remember this whole thing.

Q    You don't remember this incident at all?

A    I remember the dog biting him, but that's it.  I don't remember before or who was with him.

Q    Well, you wrote this letter; correct?

A    I did 20 years ago.

Q    And this does not refresh your recollection that you were present for this incident?

A    It does not, no.

Q    Okay.  So when you wrote they didn't buy it, so they brought him out of the cell, stripped him down and called K9.

        Who else would "they" be in the cellblock at night?

A    I don't know if MI was -- like, I have no idea who it was.

Q    Well, you say "this is the first time I've seen military police dogs here."

A    Yes.

Q    And so you don't know that it was the military police

85

who were present that night that called the military police dogs?

A    I don't know.  The dogs were MP's.  I mean MI's.

Q    Well, you say here they called the military police dogs here.

A    Okay.

Q    Okay.

A    I got it confused.

Q    Okay.  And if you look at PTX 161.  It's not in that binder.  It should be in the other -- the plaintiffs' binder.

THE COURT:  If it's already in, you can put it on the screen so it moves faster.

MS. GINSBERG:  Yes.  Would you put that up, the first picture.

BY MS. GINSBERG:

Q    Okay.  Do you recognize that -- you identified that as you and Megan Ambuhl?

A    Yes.

Q    Okay.  And the date of this picture is 11/2/2003?

A    Yes.

THE COURT:  Wait.  Can we get it on the screen?

BY MS. GINSBERG:

Q    Do you see that?

A    Yes.

86

Q    Camera date 2003:11:01?

A    Yes.

Q    And something above it it says last written, November of 2003, 02.  Right.  So something happened with the picture.

This is your camera?

A    I don't think so.

Q    All right.  It's a picture of you.

And you're smiling here; right?

A    Yes.

Q    So in November, you were not distressed about being on the --

A    We had pictures of detainees that are smiling, but I'm sure they weren't happy to be there.

Q    All right.  Would you look at the picture on the next page of the detainee who was bitten by the dog.

There were no military intelligence personnel there for this -- when this happened; correct?

A    I have no idea who was there.

Q    Well, you don't remember seeing any military intelligence people there?

A    I don't remember who was there.

Q    All right.  And the person who was called was a military medic?

A    Yes.

87

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q    Not somebody that the -- that would be somebody that the MPs called; correct?

A    Yes.

Q    Not military intelligence?

A    Not that I'm aware of.

Q    And the last photograph, that's you smiling?

A    Yes.

Q    Okay.  And that's while you're stitching up someone who was bitten by a dog and bleeding all over the floor?

A    Yes.

MS. GINSBERG:  I have no other questions, Your Honor.

THE COURT:  All right.  Any redirect?

MS. ROBINSON:  Briefly, Your honor.

REDIRECT EXAMINATION

BY MS. ROBINSON:

Q    Ms. Harman, on your cross-examination, Ms. Ginsberg asked you questions about Big Steve; do you recall that?

A    Yes.

THE COURT:  About what?

MS. ROBINSON:  Big Steve.

THE COURT:  Big Steve.

BY MS. ROBINSON:

Q    And she asked you about occasions on which you saw Big Steve; do you recall that?

88

A    Yes.

Q    Did you see Big Steve standing on the top tier of 1A?

        MS. GINSBERG:  Objection.  Leading.

        THE COURT:  Yes, I agree.  Sustained.

BY MS. ROBINSON:

Q    Do you recall circumstances in which you saw Big Steve in Tier 1A?

A    I do.

Q    In what circumstances did you see him in Tier 1A?

A    He was standing on the tier.

Q    And can you describe what tier you mean?

A    So there's an office, and then there's a landing, and that's where I saw him.

Q    And do you recall -- withdrawn.

        Was Big Steve standing with anyone when you saw him?

A    He was.

Q    Who was he standing with?

A    Graner.

        THE COURT:  I'm sorry, who?

        THE WITNESS:  Graner.

        THE COURT:  Graner?

        THE WITNESS:  Yes, ma'am.

BY MS. ROBINSON:

Q    Ms. Ginsberg asked you, I believe, if you had seen or

89

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

heard Big Steve give instructions to anyone; do you recall that?

A    Her question?  Yes.

Q    Did you see or hear Big Steve give instructions to anyone?

A    I did not.  Not that I recall.

Q    Not that you recall?

A    Yes, ma'am.

Q    Can we please look back at tab B of the first binder I gave you.  It's the -- it's your 2013 deposition.

A    Which page?

Q    Tab B, and page 19.

    And can you please review lines 5 -- excuse me. Lines 6 to 7, and then lines 18 through 24.

A    Okay.

Q    Does that refresh your recollection about whether Big Steve gave instructions to anyone?

A    It does not.

Q    At the time of this deposition, you were able to answer that question; is that correct?

A    That's correct.

Q    All right.  I'm going to read the questions and answers into the record.

    Question:  Did he -- meaning Steve -- ever give you instructions?

90

Answer:  No.

Question:  Did you see or hear him give other MPs instructions?

Answer:  Yes.

Question:  Did he give instructions to Frederick?

Answer:  To Graner.

All right.  Ms. Ginsberg asked you some questions about whether stripping detainees was a standard operating procedure; do you recall that?

A    Yes.

MS. ROBINSON:  Can we please put back up PTX 34.

BY MS. ROBINSON:

Q    Was the detainee who was nude in this picture, was the nudity there part of any standard operating procedure?

A    Yes.

Q    And what was that procedure?

A    It was just to keep them awake, humiliate them before interrogation.

Q    Why were the detainees being kept awake?

A    Before interrogation.

MS. GINSBERG:  Objection.  Unless she has --

THE COURT:  It's already been asked and answered. It's repetitive.  So let's move this along.

BY MS. ROBINSON:

Q    Can you please look at PTX 8.  It's an exhibit that

91

Ms. Ginsberg showed you before.

Are you there?

A    Yes, ma'am.

Q    So this is a January 14th statement that you gave to CID?

A    (Gesturing affirmatively.)

Q    All right.  Can you please look at the second page.  I just want to discuss a couple of the passages that you did not talk about with Ms. Ginsberg.

Starting about 12 lines up from the bottom of the second page, do you see the question:  How long did the human pyramid last?  Let me know when you're there.

A    Okay.

Q    Okay.  So the question was:  How long did the human pyramid last?

And the answer is:  From the time I got to Cellblock 1A until the time I left with SPC -- redacted -- was about 35 minutes.  The pyramid lasted about 15 to 20 minutes.

During that time period, was the pyramid visible to others who may have been in Tier 1A?

A    Yes.

Q    Looking at the next page, page 3, and I'm looking about ten lines from the top of the page at the lines beginning question after you took the pictures.  Let me know when

92

you're there.

A    Okay.

Q    So this question was after you took the pictures of the pyramid, what happened?

And the answer was:  I went back upstairs to get SPC Ambuhl, and when we walked back downstairs the second time, I saw one male prisoner naked on his knees with another prisoner naked standing in front of him.  I was standing by the doorway, and the two prisoners were in the middle of the cellblock.  They appeared to be about inches from each other.  I do not think that was right for the prisoners to have to do.

What did you understand the prisoners to be simulating there?

A    I didn't remember that.

Q    I'm sorry?

A    I didn't remember that.  I don't know.

Q    You don't know.

Were there MPs around then?

A    I'm sorry?

Q    Were there MPs around at the time?

A    Yes.

Q    And you said that I do not think this was right.

Why was it not right?

A    I don't remember that incident.  I don't know.

93

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q    Can you please look at the next page.

At the top of the page there's a question:  Other than what you have told me, had you ever witnessed or heard about any prisoners being physically or sexually abused?

And your answer was:  Sergeant -- redacted -- entered the room talking about one prisoner on his knees and the other standing above masturbating in front.

Were there -- withdrawn.

How common was it to force detainees to masturbate?

A    I don't know.  That was the first time I heard that.

Q    Did you hear about that on any other occasions?

A    No.

MS. ROBINSON:  No further questions.

THE COURT:  All right.  Any recross?

MS. GINSBERG:  Brief, Your Honor.

RECROSS-EXAMINATION

BY MS. GINSBERG:

Q    If you look back again on PTX 008, that's your sworn statement, and if you look at -- it's the -- toward the top of page 3 where you were asked about a naked prisoner standing in front of another naked prisoner.

All right.  Do you see above that you're actually talking about Corporal Graner -- well, if you look -- look back at the bottom of page 2 first, and if you read.

94

Do you remember seeing Corporal Graner taking his hand back, his right or his left arm back, and cocking it and looking like he was going to hit one of the detainees?

A    I don't recall.

Q    All right.  Would you look at the bottom of 10, just below where you are asking -- you're being asked how long did the human pyramid last, and you said about 15 or 20 minutes.

Can you see below that, would you read the bottom of that and over onto the top -- about ten lines on the top of page 3.

A    Yes.

Q    All right.  Does that refresh your recollection about seeing Corporal Graner sort of making a fist and ...

A    I don't remember that.

MS. GINSBERG:  Your Honor, I'd like to read what's written here.

THE COURT:  We should move this along.  The document is in evidence.  The jury's going to be able to read the document for itself.  The entire document is in evidence.  All right.

MS. GINSBERG:  All right.  Well, I would just like to point out a few other things.

THE COURT:  Let's move on.

BY MS. GINSBERG:

95

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q    You didn't think there was anything wrong with the pyramid; did you?

A    I don't know what I thought.

Q    I didn't hear you.

A    I don't know what I thought at the time.

Q    Well, do you remember being asked in the same statement, do you think any of this was wrong, and giving the answer, I don't think the human pyramid was wrong?

A    No.

Q    Nor posing like he was going to hit the prisoner.  He never hit him?

A    Okay.  I don't know.

Q    So at the time, you didn't think that this pyramid where you're standing behind them and laughing or appearing to have a big smile on your face, you didn't think that was wrong?

A    At the time, I was pretty numb of everything I was seeing, so ...

Q    Okay. All right.  And you were just asked some questions about Steve being up on -- on the upper tier?

A    Yes.

Q    Okay.  And you said that he was -- you thought he was giving instructions?

A    I don't know what he was doing.

Q    Instructed he give instructions to Graner, you said --

96

A    I don't know what he was doing.  I just remember him and Graner on the tier.

Q    All right.  So your answer that he was giving Graner instructions was not correct?

A    I said I didn't remember.

Q    Well, you were not standing next to them; correct?

A    No.

Q    So you basically saw Steve and Corporal Graner standing next to each other?

A    It's about as far as you and I are.

Q    Okay.  As far as you and I are.

      And you couldn't hear what they were saying?

A    I don't recall.

Q    All right.  So you have no idea whether Steve was giving Sergeant Graner instructions or talking about breakfast he had that morning?

A    Right now, I don't recall.

Q    And you didn't know then?

A    I don't know.

Q    Well, you couldn't hear what they were saying?

A    I don't know if I did or not.  I don't recall.

      THE COURT:  Well --

      THE WITNESS:  I don't remember.  It was 20 years ago.

      THE COURT:  Did you tell anybody -- as best you

97

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

can remember, did you tell anybody what they were talking about?

THE WITNESS:  Not that I remember, no.

BY MS. GINSBERG:

Q    You have no idea what they were talking about?

A    Right now, no.

THE COURT:  That's been answered a million times.

BY MS. GINSBERG:

Q    And, again, you only -- you only recall Steve being present for one incident?

A    That I remember, yes.  That incident.

MS. GINSBERG:  All right.  Nothing further.

THE COURT:  All right.  Does anybody anticipate calling this witness again?

MS. ROBINSON:  No, Your Honor.

THE COURT:  How about from the defense?

MS. GINSBERG:  No, Your Honor.

THE COURT:  Your testimony is complete.  You're free to go.  You may also stay in court and watch the proceedings, but you're not to discuss your testimony with any witness who has not yet testified; all right?

THE WITNESS:  Yes, ma'am.

(Witness excused at 12:23 p.m.)

THE COURT:  Call your next witness.

MR. FARIDI:  Your Honor, plaintiffs call Dr. Jens

Modvig.

THE COURT:  All right.

THE COURT SECURITY OFFICER:  Sir, come forward. Face the deputy clerk.  Raise your right hand.

Thereupon,

JENS MODVIG,

having been called as a witness on behalf of the plaintiffs and having been first duly sworn by the Deputy Clerk, was examined and testified as follows:

(Time noted: 12:23 p.m.)

THE COURT SECURITY OFFICER:  Sir, you may be seated.

MS. MAHLER-HAUG:  Alex Mahler-Haug for plaintiffs. May I proceed, Your Honor?

THE COURT:  Yes.  In a good loud voice.  And are there exhibits?

MS. MAHLER-HAUG:  We'll be using a demonstrative that will be shown electronically.

THE COURT:  All right.

DIRECT EXAMINATION

BY MS. MAHLER-HAUG:

Q    Good afternoon.  Would you introduce yourself to the jury, please.

A    My name is Jens Modvig.  I'm a medical doctor from Denmark.

99

Q     And where do you work?

A     I work in DIGNITY, Danish Institute Against Torture.

Q     And how long have you worked at DIGNITY?

A     Since 2008.

Q     And before we continue, let me ask, did you prepare a presentation to aid in your testimony today?

A     Yes.  I did a slide deck.

        MS. MAHLER-HAUG:  Let's pull that up, please.

        THE COURT:  Now, is there any objection to this witness's expert qualifications?

        MS. BAILEY:  No, Your Honor.

        THE COURT:  Then explain for the jury what qualifications for this witness.  In other words, for what field are you actually having him testify?

        MS. MAHLER-HAUG:  Sure.  So plaintiffs offer as an expert in torture and cruel, inhuman or degrading treatment under international standards.

        THE COURT:  All right.  And there's no objection to that; correct?

        MS. BAILEY:  No objection.

        THE COURT:  All right.  So, ladies and gentlemen, I want to, at this point, explain to you that most of the time we don't let witnesses testify as to their opinion about some issue in the case; however, we make an exception for folks who we designate to be experts.  And somebody

100

becomes an expert either through specialized training or through experience.  And so if we find that somebody has appropriate qualifications to allow that person to make an opinion about a matter that is relevant to the case, we will allow that person to testify.

You should understand, however, as the triers of fact, it is totally up to the jury to decide how much, if any, of any expert's testimony you want to accept.  Just because someone is an expert witness doesn't mean that his or her testimony is more worthy of acceptance by the jury than anybody else.

So is there a curriculum vitae that you want to introduce as an exhibit?

MS. MAHLER-HAUG:  Just very briefly we would like to go through a few of his relevant qualifications just to situate him.

THE COURT:  Very quickly.

BY MS. MAHLER-HAUG:

Q    So, Dr. Modvig, very briefly, could you go through your educational background for the jury?

A    Yes.  I'm a social worker from the University of Roskilde.  I'm a medical doctor from the University of Copenhagen.  And I have my research degree, Ph.D., also from the University of Copenhagen.

Q    And as we are discussing these topics today, just make

101

sure to slow down for the court reporter so we can capture everything we're saying.

A     Okay.

Q     And briefly just to cover a few of your professional experiences and focus on the last few decades, could you explain to the jury some of the positions you've held that are listed here on the slide?

A     Yes.  I have been secretariat of the International Rehabilitation Council for Victims of Torture, the IRCT. And I have been deputy head of mission for the OSCE, the Organization for Security and Collaboration in Europe in Kosovo.  A director of the United Nations office in Belgrade.  And I have been elected to the United Nations Committee against Torture from 2014 to '21, the last five years as chairperson of the committee.

Q     And briefly could you explain what the Committee against Torture is?

A     The committee is the body that monitors the compliance with the Convention against Torture.  So the state parties to the convention, 174 in total, including the United States, report every four years to the committee how they have been implementing the provisions of the convention. And then the committee, headed by the chairperson, evaluates in a dialogue with the delegation from the state, evaluates to which degree more can be done to implement the

102

convention.

Q    And we'll come back to the Convention against Torture in a moment.

Did you hold any leadership roles in the committee?

A    I had chairships for several large states, including the United States, Russia and China.

Q    And, very briefly, have you published books or articles on the subject of torture and other cruel, inhuman or degrading treatment?

A    Yes.  I have published a number of research articles, and I have also been on the editorial committee of the Istanbul protocol.

Q    And briefly could you describe what the Istanbul protocol is?

A    The protocol is the United Nations endorsed standard for how to examine and investigate alleged cases of torture primarily for forensic medical examinations.

Q    Now, who retained you as an expert in this case?

A    It was the lawyers of the plaintiffs.

Q    And were you compensated in connection with sharing your expert views?

A    Yes, I was.

Q    And was your compensation tied in any way to the opinions that you formed?

103

A    No, it wasn't.

Q    Is it tied in any way to the outcome of this case?

A    No.  Neither.

Q    Let's discuss your assignment.

Could you explain to the jury what you were asked to do?

A    Yes.  I was asked to analyze the conduct that comprises torture -- or that constitutes, sorry, torture or other cruel, inhuman or degrading treatment under international standards.

Q    And when you say "international standards," could you explain in a bit more detail what you mean?

A    There's a lot of sources for international standards. It starts with the Universal Declaration for Human -- on Human Rights from 1948.  But there's a number of other sources, such as the International Covenant on Civil and Political Rights, and the Convention against Torture, and also the jurisprudence of many judicial bodies, such as the ad hoc courts tribunals in Rwanda and Yugoslavia.  And also the regional courts, the Inter-American Court of Human Rights and European Court of Human Rights, et cetera.

Q    And are there organizations that participate in the process of forming these international standards?

A    There's a lot of organizations, including the United Nations and the European -- Council of Europe contributed,

104

yes.

Q    And the international standards you'll be discussing, are those accepted and recognized by the international community of states?

A    In general, yes, they are.  They represent an international consensus.  For instance, the prohibition of torture is internationally agreed.

Q    And, in your view, why would countries ratify a treaty that limits how they might treat people?

A    Well, basically I think states want to contribute to public good to a world where we don't torture each other.  But I also think there is a direct benefit that if we agree not to torture U.S. citizens if we arrest them on our territory, you will have to agree that you don't torture our citizens if you arrest them.  So there's a reciprocity agreement here, I believe.

Q    Focusing for another moment on this international prohibition.

        Could you explain what you were conveying here on this slide to the jury?

A    Yes.  It's perhaps the most important feature of torture in international law, that is that it is prohibited.  Torture violates international law, and there are no justification for the use of torture.  Exactly the same applies for other cruel, inhuman or degrading treatment.

105

Q    So are there any permissible circumstances for torture to be committed under international law, such as war?

A    No.  No.  Neither war, nor suspicion of terrorism or state of emergency justifies torture.  There are never any excuse for use of torture or treatment.

Q    Let's focus on torture first.

Could you explain what you're conveying on this slide to the jury?

A    Yes.  This is the most agreed-upon international definition of torture.  It's Article 1 of the United Nations Convention against Torture, which is supported by 174 states.  And as you will see, there are some elements in this definition.  Torture comprises any act by which severe pain or suffering, physical or mental, are inflicted intentionally on a person for a specific purpose such as information or confession or any reason of discrimination. And this is inflicted by a person acting in a public capacity or at the instigation of a person acting in a public capacity or with the consent or acquiescence of a person acting in a public capacity.

There's a formal exception which does not have a lot of practical implication that the definition does not include a law for sanctions or pain and suffering arising from lawful sanctions.

Q    And you mentioned the exception that's set forth on

106

this slide.

How does that generally figure in your expert opinions about what is considered torture under international standards, if at all?

A    It doesn't really mean a lot because if lawful sanctions are sanctions that are prohibited in international law, it doesn't mean any real exceptions from the overall definition of torture.

Q    Let me pull up the next slide.

So when you're presented with certain information about allegations of possible torture, how does one go about determining whether torture has been committed under the international standards that we've been discussing?

A    Well, according to the international standards, there are certain methods or techniques that may amount to torture and that, in specific examples, have been deemed to be torture.  But the fact is that no technique in and by itself constitutes torture.  For instance, beatings could be a slap of a hand, and that's, of course, not torture.

So you have to evaluate the circumstances, go behind the technique and see what was actually the circumstances when the technique was used.  And, for instance, you have to look at what was the purpose of doing it.  What was the intent behind it.  How long was it applied.  Were you beaten for three seconds or for

107

20 minutes.  What was the intensity of the beating.  Did you use a tool or a hammer, or was it with a flat hand.

You have to look into the condition of the victim. Is it a five-year-old girl, or is it a-25-year-old man.  Is it a person with a physical or mental health disorder.  Is it an exhausted person.  Is it a person that have just been kept in a dark cell.

And, finally, you have to look into the combination methods.  Would you also threaten the person. Would you also keep the person in a dark cell at the same time.

So all these circumstances can lead to a conclusion of whether it was torture, whether it was cruel or inhuman or degrading treatment, or whether it was actually a legitimate act.

Q    And the factors you just discussed, is that what's depicted on this slide?

A    Yes.  Exactly.

Q    So fair to say that you need to take an overall or holistic assessment of the circumstances in considering whether there's torture?

A    Yes.  Including these dimensions.

Q    And focusing just for a moment on one of the factors you discussed, the condition of the victim, could you explain a bit more on how that might play a role in

108

Direct Examination - J. Modvig

determining whether someone has suffered torture?

A      Sure.

A person may have mental health or physical health conditions that makes the person more susceptible.  There might also be cultural or religious phobias behind the way the person perceives the treatment.  So if, for instance, you have claustrophobia, it may be worse for you to be locked in a small dark room than if you don't.  And if you have religious preference of something or a religious limitation of something, that might make you more susceptible to this act.

Q    Now, under international standards, is severe pain or suffering limited to physical pain?

A      No, it's not.  Suffering or psychological harm or pain would be included just as much, perhaps even more.

Q    And do you consider only the immediate pain that's experienced by a victim in the moment?

A      No.  For all we know, torture leaves lasting suffering. Very often we see chronic pain.  And for the methods of torture that aims to humiliate and debase the person, we see mental health consequences for many years.

Obviously the traumatization in itself can lead to a permanent condition of anxiety, but also the lack of self-confidence that may arise from severe humiliation is frequently the case.

109

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q    And is there a well-defined point at which pain becomes severe pain or suffering under international standards?

A    No.  Generally pain must be considered according to the circumstances and as a subjective phenomenon.

Obviously there are methods that say electricity applied to the genitals that would give excruciating pain to all of us, but, nevertheless, the perception is depending on the circumstances.  For instance, if you have been held in a cold room for a long time, your threshold for pain lowers. We know that medically.  And that means you're more susceptible to infliction of pain.  So always it's necessary to consider the circumstances and the subjective dimensions of pain and suffering.

Q    And the subjectivity of pain, does that apply to mental pain or suffering in addition to physical pain?

A    It does.

Q    And, by the way, is that conception of pain consistent with your own medical training and experience?

A    It is.

MS. BAILEY:  Objection.  That was an area the Court limited.

THE COURT:  Well, this is a trial where everything here gets done in this case.

MS. BAILEY:  Yes, Your Honor, but --

THE COURT:  What is the basis for the --

110

MS. BAILEY:  -- the description of pain from a medical perspective because of the subjectivity, as long as we're not getting into details of pain.

MS. MAHLER-HAUG:  No.

MS. BAILEY:  Okay.  All right.  Withdrawn.

BY MS. MAHLER-HAUG:

Q    Just a few more questions about mental pain under international standards.

Does it have to result from infliction of physical harm or abuse?

A    No, it doesn't.  You can inflict mental pain without at all inflicting physical pain.  For instance, if you force a person to witness torture of others, for instance, his or her relatives, that would be infliction of severe mental pain and suffering without inflicting physical pain.

Q    And we've been discussing torture.  I'd like to turn now and focus on cruel, inhuman or degrading treatment.

Could you please walk the jury through what you're conveying in this slide?

A    Yes.

There's a distinction between cruel and inhuman treatment on the one hand, and degrading treatment on the other.  Because cruel and inhuman treatment is mainly the infliction of severe pain, whereas degrading treatment aims to comprise humiliation and diminishing and stripping a

111

person of his or her dignity.  But, in all of the cases, it's prohibited according to international law.

Q    And is cruel, inhuman or degrading treatment different from torture in terms of the level of severity of the pain that's inflicted?

A    It might be, but that's not the most important distinction.

The most important distinction between torture and other cruel, inhuman or degrading treatment is that, in torture, you have a specific purpose where the perpetrator renders you helpless and powerless and brutally exploits this situation to pursue his purpose.  For instance, obtaining information, humiliation or getting a confession. And this purpose and intent is not so marked, if at all, in other cruel, inhuman or degrading treatment.

Q    And does conduct have to be cruel and inhuman and degrading in order to contravene international standards?

A    No.  Each of them separately are violating international law.

Q    And is it similar to torture in terms of needing to consider the overall circumstances when going about figuring whether cruel, inhuman or degrading treatment has been inflicted?

A    Yes.  Obviously what may degrade or humiliate a person is, to some degree, individual.  All of us would be severely

112

humiliated by being treated as animals or kept -- spoken to as animals.  But, again, here, your individual priorities, origins, ethnic backgrounds might influence what makes you severely humiliated.

Q    So staying on degrading treatment for just another moment, thinking through the factors you discussed earlier, could you walk us through how one might consider the conditions of the victim with respect to degrading treatment?

A    Yeah.  That would be the individual background for perceiving how you are actually treated.

For instance, if you are -- if you are forced naked, to some people in some cultures, that would be bad; for other people in other cultures, it would be devastating.  So, in that sense, where you're coming from means a lot to how you interpret the degrading treatment you are subjected to.

Q    Now, taking a step back, is there an agreed-upon list about what techniques or methods are torture or cruel, inhuman or degrading treatment, per se?

A    No.  In fact, the same method could both constitute torture and constitute cruel -- other cruel, inhuman or degrading treatment or even be a legitimate act or legal act.  The method would depend on the factors I just mentioned to decide whether it's one or the other.

113

Q    Is there a common dynamic between the perpetrator and the victim when there is torture or cruel, inhuman or degrading treatment?

A    In torture, there will always be an extreme degree of powerlessness.  You will always have the victim being completely submitted to the person and be subjected to the willful acts of the perpetrator.

Let's assume an example of sanitary conditions in a place of detention.  These may be humiliating to all of the detainees if they are too few and they are open and people have to use the toilets in front of other people.  That's humiliating.  And if you don't have enough clothes to keep yourself clean and dignified.

But if you, on purpose, are denied access to a toilet and you have to soil yourself, and you are not given means to keep yourself clean and dignified, then it may amount to torture, because then it's suddenly more than just poor conditions.  Then it's a willful, purposeful, intentional act with the purpose of humiliating the person and debasing and degrading the person.  That's the difference.

Q    And, based on your experience in the field, does this sense of powerlessness experienced by a victim end when the mistreatment ceases?

A    No.  The feelings of having been completely submitted

114

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

and in the power of another person is often something that is so shameful that it stays with the person the rest of his life.

Q    I'd like to go through a few more examples and have you explain to the jury how someone might go about assessing whether a person has experienced torture or cruel, inhuman or degrading treatment under international standards.

I've put this slide up.  Could you walk the jury through what you are showing here?

A    Yes.  Here we have a number of methods that have all been deemed to constitute either torture or ill treatment that is either cruel, inhuman or degrading treatment in lawful decisions.  So -- in judicial decisions.  I'm sorry.

And what applies here is that all these methods may amount to torture, or they may amount to cruel or inhuman or degrading treatment.  And some of them might even be legal.

For instance, if we look at the threats, you may be threatened by a dog, and all of us would probably be some -- a little scared or a lot scared of a growling big dog in front of us, but we are not normally in custody, and we can go away.

But if you are in detention and you are -- and you are threatened with a dog's bite, you are not able to go away.  And if you are even tied up or restrained, you may

115

even be naked, you may even be hooded, blindfolded with a sack, you may -- this may amount to torture.

But as normal crowd control in a demonstration, the police are allowed to use dogs.  It's perfectly legitimate.  And they may even threaten you and say, if you don't go over there or here, I will put the dog on you.  That might be a legitimate act.

So these methods may be a legitimate use of force by the law enforcement.  They may, depending on the circumstances and their use and purpose, rise to other cruel, inhuman or degrading treatment.  Or they might even, if there's this purposeful intent of total powerlessness, constitute torture.

Q    And looking at another example that's depicted here, sexual violence.

Could you walk us through how you might go about assessing whether sexual violence amounts to torture or CIDT?

A    Yes.  Sexual violence is an invasion by the perpetrator in our most intimate and private space, both physically and mentally.  And for that reason, it sits -- it marks so seriously on the personality, depending on the nature of the sexual violence.

So sexual violence will always be prohibited, and if it's undertaken in detention, it will, at the very least,

116

constitute other cruel, inhuman or degrading treatment.  But it might certainly amount to torture, specifically if it, for example, rises to rape, which means penetration.

Q    Looking at another example.  Forced shaving.

Could you explain to the jury how you might assess that method in the context of considering whether there's torture or CIDT?

A    Again, here it's a method that, for many people, including myself, is perfectly normal and a daily activity. But when it's forced upon, it may be a problem.  And if it's forced upon a person whose hair or beard or both has a huge significance, it may be so invasive that it may, in certain aspects, amount to cruel, inhuman or degrading treatment or even torture.  If you, by forced shaving, strip a person of his manlihood in front of other people, you may be humiliating him seriously depending on where this person is coming from.

Q    You mentioned threats just a few moments ago and talked about threats from animals, dogs.

For threats of physical harm to a person, could you walk us through how you might assess other types of threats of physical harm?

A    Threats could be simply we're going to kill you.  Or it could be we are going to do something really bad to you.  It could also be a more indirect threat like we are going to

117

rape your wife, and she is in the room next to us, and you can hear her right now.  That would be serious threats that would easily amount to torture if the purpose and the condition of the victim and the combinations are fully in line.  Threats could also be threats of amputation or threats of putting you behind bars for the rest of your life.

And, of course, again, the condition of the person would mean something here.  How serious is this threat.  Is it a threat I believe in.  Is it realistic.  Will it happen.  If they say they will kill me, will they actually do it.

I read yesterday an example of a Ukrainian that was in this Russian custody.  He was forced to see the castration of a Ukraine prisoner of war, and this was a threat to him that he would also be castrated.  So threats can be of many natures, and it depends on how realistic you see and what is the condition of the victim.

Q    And if I understood you correctly, a threat of physical harm could be directed to the victim itself or to someone else; is that right?

A    Yes.

Q    Looking at another example, are you familiar with the term stress position?

A    Yes.

Q    Is that a term that you typically use in your work?

118

A     No, I don't.  I prefer forced positions because forced positions may develop into being stressful, but they might not necessarily be it from the very beginning.

And one example of forced position is forced standing.  And, again, we all stand.  There's no problem in standing except maybe when you are forced to stand and you are not allowed to move at all and you are forced to stand for a long time.  And if you are forced to stand and you are perhaps threatened that something bad will happen if you don't stand still, it may develop into a very stressful situation.  If you then look into the intensity of it that you are not allowed any movements at all but you stand completely still, then the duration and the intensity means a lot.

In terms of the condition of the victim, you may be exhausted, you may be dehydrated, or you may have certain conditions such as varicose veins or a not perfectly functioning heart, which means that there will be accumulation of fluid in the legs, which will add to the pain and suffering that this forced position will have.

Finally, you may have a combination of methods such as being naked, being in a cold room, and being threatened that we will kill you if you move at all.

Q     Are there other examples of forced positions or stress positions that you could share?

119

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A    There are many examples of forced positions.  One is being tied to a chair, another one is being restrained with handcuffs with your hands in the air.  A third one is being forced to stand with your arms out.  And we all know that that becomes painful after a while because there would be insufficient blood flow to the muscles.

Q    And so with each of those examples that you just gave of forced positions, you would still need to go through an assessment of the factors like intensity, duration, conditions of the victim and a combination of techniques; right?

A    Exactly.

Q    Let's just do one more example looking at your slide.

Could you talk about isolation and how you would go about considering whether isolation amounts to torture or cruel, inhuman or degrading treatment?

A    Certainly.

Isolation, again, in and by itself, it's not necessarily harmful.  It might even be something we seek voluntarily.  But if you're forced to isolation, obviously the purpose means a lot.  Why are you locked in a cell or room?  What's the -- it's intentional, of course, but why do you do it.  Is it to soften you up before an interrogation, or is it to punish you for something you've said or done.  How long are you then, what's the duration of it.  Is it

120

hours, days, weeks you are isolated.  And what's the intensity of the isolation.  That is, do you have access to social contacts.  Do you have access to meaningful social activities.  Do you have access to use a bathroom, or are you deprived at the same time of a bathroom.  What are your conditions for your -- the condition of the victim for being isolated.  Do you have claustrophobia.  Do you have another mental health condition, or do you -- do you have previous experiences of being locked into small rooms.

And if we look at the combination of methods, what is in the room you're locked into.  Is it a dark cell without windows.  Is it a cold cell.  Is it a cell without furniture.

So all of these aspects would finally contribute to the determination of whether it's torture or it's other cruel, inhuman or degrading treatment or whether it's actually nothing of those.

Q    Perhaps just one more example briefly.

Could you talk about sleep deprivation and how you might assess that method?

A    Sleep deprivation is -- again, it's often a standard operating procedure in many police stations as a method to soften up the person.  If you have sufficient sleep deprivation, either partial that it deprives sleep -- too little sleep every night or complete total sleep

121

deprivation, you will react mentally to it by being -- by the end of the day in doubt of what is true and what is false, and you will be softer in the interrogation and more abiding to what the people tell you.

THE COURT: All right. It's now 1:00. We're going to take our lunch break, and I'll ask the jury to be back here at 2:00. And, Doctor, we'll need you back here at two as well.

(Jury not present at 1:02 p.m.)

THE COURT: All right. We'll bring the jury in.

THE COURT SECURITY OFFICER: Yes, Judge.

Rise for the jury.

(Jury present at 2:02 p.m.)

THE COURT: All right. Folks, we'll continue with the testimony.

MS. MAHLER-HAUG: Your Honor, we're going to pass the witness at this point.

THE COURT: All right. Any cross?

MS. BAILEY: Yes, Your Honor.

CROSS-EXAMINATION

BY MS. BAILEY:

Q    Good afternoon, Dr. Modvig.

A    Good afternoon.

Q    I just want to clarify a few things.

You didn't visit Abu Ghraib in 2003 or 2004; is

122

that right?

A    That's right.

Q    Okay.  And you don't have any firsthand knowledge of any of the things that happened there during that time?

A    No.

Q    Okay.  You don't have any firsthand knowledge if anyone ever mistreated these plaintiffs?

A    No.

Q    You haven't reviewed any approved interrogation plans for these plaintiffs?

A    No.

Q    Okay.  And you haven't reviewed any of the interrogation reports from their questioning?

A    Yes.

Q    You reviewed interrogation reports?

A    No.  Sorry.  No.  Not interrogation reports.  No. You're right.

Q    And you haven't conducted any medical examinations of these plaintiffs?

A    No.

Q    Okay.  You don't have any firsthand knowledge if anyone at CACI did anything wrong; correct?

A    Correct.

Q    You've never interviewed a CACI interrogator?

A    Excuse me.  Please repeat.

123

Q    Sure.  You've never interviewed a CACI interrogator?

A    No.  No.

Q    And you haven't interviewed anybody in the military intelligence chain of command at Abu Ghraib?

A    No.

Q    Okay.  And you've never seen a picture of a CACI interrogator touching a detainee?

A    No.

Q    I want to talk a little bit about the standard for torture.

The prohibition against torture is universal; right?

A    Yes.

Q    Pretty much everybody knows that torture is wrong; don't they?

A    I guess so, yes.

Q    Okay.  And so know there's no excuse, there's no reason you would be able to torture someone and that would be okay?

A    No.

Q    Being free from torture is one of a human being's most basic rights?

A    Yes.

Q    And almost any person should be able to recognize the kind of treatment that would amount to torture; wouldn't they?

124

A    Perhaps.  I don't know.

Q    You don't know?

A    I haven't seen studies of what people know about torture methods or not.

Q    Don't you think that your average person has a pretty decent understanding of what would be torture?

A    I don't think that the average person knows the exact definition as I stated previously, no.

Q    So they don't know the legal definition?

A    No.

Q    But do you think that their understanding requires that?

A    In some instances it might.

Q    Okay.  The CAT gives the legal definition for torture; right?

A    Yes.

Q    Okay.  But it doesn't list different acts that constitute torture; does it?

A    No.

Q    It gives criteria that you can use so that you can decide if something is torture?

A    Yes.

Q    Right.  Severe pain and suffering is one of those requirements?

A    Yes.

125

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q    But pain is subjective; right?

A    To some degree, yes.

Q    Okay.  And what that basically means is that what's severely painful to you might not be to me and vice versa?

A    As I stated previously, not entirely because there are certainly methods that would be painful to all of us, but there's a moment of subjectivity, and there's a moment of circumstantial factors that affect the way pain is perceived.

Q    So if I remember your testimony correctly, electrocuting someone's genitalia, we can all agree that that would be severely painful?

A    That would be my assumption, yes.

Q    But when you start moving away from there, the different acts can become more of a subjective determination?

A    Subjective and circumstantial, yes.

Q    Okay.  And there's no universal standard that pins that down that describes the exact level of pain; is there?

A    As I testified, pain is not objectively measurable, so, in that sense, you're right.

         On the other hand, there are instances and combinations of methods and circumstances that have been deemed to amount to torture or amount to cruel, inhuman or degrading treatment.

126

Q    But, generally speaking, people have different views and different experiences when it comes to how they feel pain?

A    Yes.

Q    Let's talk a little bit about the Geneva Conventions.

They prohibit torture; correct?

A    Correct.

Q    Okay.  And the United States signed and ratified the Conventions?

A    I would say at this point both that I'm not a lawyer, and I'm not an expert in international humanitarian law. And the Geneva Conventions is not human rights law; they are humanitarian law.

Q    I'm sorry.  I didn't catch -- they are human what law?

A    Humanitarian law.  International humanitarian law. That's the Geneva Conventions.

Q    Understood.  And I don't plan to get into the details.

But do you know if the United States signed and ratified the Geneva Conventions?

A    I definitely assume so.

Q    Okay.  When forming your opinions in this case, were you aware that the Interrogation Rules of Engagement at Abu Ghraib said the Geneva Conventions applied?

A    No.

Q    The United States also signed the UN Convention against

127

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Torture; didn't it?

A    Yes.

Q    Okay.  And under the convention, the Committee against Torture periodically reviews reports that have been submitted by state parties discussing how they're implementing the convention?

A    Correct.

Q    Okay.  You were one of two -- I'm going to say it wrong -- rapporteurs?

A    Yes.

Q    That when the Committee against Torture reviewed the United States' submission in 2014; is that right?

A    That's right.

Q    Okay.  So then you're aware, just generally, that the United States has criminal laws to prosecute people for torture?

A    Yes.

Q    Okay.  And you also would have been aware through that reporting process that there were people in the military who were prosecuted for torture associated with detainee abuse?

A    Associated with?

Q    You learned in the 2014 review that there were military people who were prosecuted for detainee abuse?

A    At least I'm aware of it, yes.

Q    Yes.

And you would have also learned that no one from CACI was ever charged with a crime related to Abu Ghraib?

A     That, I'm not aware of, but I believe you.

THE COURT:  Again, the lawyers cannot testify, so even if a witness said I believe you, we're going to have to hear that testimony from another source than counsel.  All right.  So disregard that.

BY MS. BAILEY:

Q     But you certainly didn't see anything in the United States' report that indicated that?

A     That indicated what?  I'm sorry.

Q     That anyone from CACI was ever charged with a crime.

A     Not to my remembrance, no.

Q     Okay.  If I call the Convention against Torture the CAT, will you understand what I'm talking about?

A     Yes.

Q     The CAT applies to state parties; right?

A     Uh-huh.

Q     Okay.  And when I say state party, is it fair to say I'm talking about the government?

A     Yes.

Q     All right.  So under Article 2 of the CAT, the government has to take steps to prevent torture; right?

A     Yes.

Q     Okay.  And under Article 10 of the CAT, the government

129

has to train the military and anybody who might be working

with detainees on the prohibition against torture; right?

A    Right.

Q    Okay.  Under Article 11, the government sets the rules

and practices for interrogations; don't they?

A    Article 11 is an obligation to review all the measures

and procedures that a government applies when taking persons

into custody.  So it is broader than what you say.

Q    And would that include interrogations?

A    Yes, it would.

Q    Okay.  And it's the government who has responsibility

for that?

A    Yes.

Q    Okay.  And under Article 16, the government is required

to prevent cruel, inhuman and degrading treatment; correct?

A    Correct.

Q    Okay.  If I call cruel, inhuman and degrading treatment

CIDT, will you know what I'm saying?

A    Yes.

Q    Okay.  Thank you.

      Let's talk did CIDT for a moment.  There's no set

definition for it; is there?

A    No.  Only through jurisprudence.

Q    Okay.  So it's not defined in the CAT or any other

international treaty?

130

Cross-Examination - J. Modvig

A     No.

Q     Okay.  In particular, there's no standard for determining if something is degrading treatment; is there?

A     I am not sure I agree here because we actually have a lot of international jurisprudence that establishes, for instance, the lower limit for what is degrading treatment.  So while I agree with you there's no definition, it's not clear that it's not at all described anywhere what it actually entails.

Q     Understood.  But at bottom, doesn't it basically depend on the individual?

A     No.  As I testified before, an assessment of whether an act qualifies as cruel, inhuman or degrading treatment will depend on the purpose and the intent, the duration and intensity of the act, the condition of the victim and any combination or methods.

       For instance, that means that conditions in a prison might amount to cruel, inhuman or degrading treatment.

Q     So I'm talking specifically about degrading treatment now.

       Doesn't whether something -- doesn't whether someone experiences something as being degraded largely depend on that individual?

A     No, I don't think so.  Then anybody could come and say

131

I feel degraded, and that's not the case.

Q    Okay.

A    There's a clear jurisprudence about this.  And, for instance, when you're treated as animals, you are forced to crawl on the table or eat from the floor, that's definitely, in all international contexts, considered as degrading treatment.

Q    Okay.  Can you turn -- the first tab in your binder is marked testimony.

You gave testimony at an earlier proceeding in this case; is that correct?

A    Yes.

Q    Could you please turn to page 43, line 22.

When you testified in this case -- just let me know when you're there.

A    I'm there.

Q    When you testified in this case, weren't you asked:  I want to focus a little bit on degrading treatment.  Is there a certain standard for what may be considered degrading treatment?

And you said:  No.  Basically this depends on the individual.  And then you gave some factors that might affect that individual; is that correct?

A    As I can read here, I said:  Basically this depends on the individual and this person's ethnic origin, religious

132

beliefs and other preconditions for the treatment.  For instance, violation of taboos, including sexual taboos, may be intensely degrading to some people.  That's what I said.

Q    And so you said basically this depends on the individual?

A    And the circumstances that I just read out.

Q    Right.  The factors that I just mentioned earlier.

A    Which goes beyond the individual.

Q    Okay.  CIDT differs from torture in that it doesn't have a specific purpose; right?

A    Right.

Q    So the difference isn't based so much on the intensity of the pain, it's whether or not the person perpetrating that act is doing it for a certain reason?

A    That's just your version, but I agree with you.

Q    Okay.  So is it accurate to say CIDT involves severe pain or suffering without any purpose or intention?

A    It might not.  It's not required that there is a purpose, but there could be a purpose.  If you, for instance, consider a body search, which is humiliating because you have remarks on top of it, then you could say the purpose is to bother or degrade that person, but it will still not qualify as torture; it would qualify as degrading treatment.

Q    So the sort of purpose that you're talking about when

133

you're talking about torture is like an interrogation, trying to question somebody, not the purpose just sort of inherent in the treatment itself?

A     In the definition, it says that the purpose could be obtaining information or confession or any other discrimination.  So discrimination could also be a purpose.

Q     And that's for torture?

A     Yes.

Q     Okay.  And for CIDT, those purposes are not required?

A     They're not required, but they might be there to some degree.

Q     But they might be there to some degree.

So then how is it different from torture?

A     Because the purpose is not clear in the degrading treatment that I just gave this example of because the purpose may be to degrade the person, but the abuse of the powerlessness of this person for a specific purpose is not so clear.  So it may be a borderline, but it would not qualify as torture, in my humble opinion.

Q     Okay.  So if you've got a person who is in custody and is being abused for purposes of interrogation, that would fall in the torture category, not the CIDT category?

A     Most probably, yes.

Q     Okay.  And so because with that sort of purpose, it couldn't be CIDT; it would have to be torture?

134

A      I assume so, yes.

Q      Okay.

A      Again, depending on circumstances.

                MS. BAILEY:  No further questions.

                THE COURT:  Any redirect?

                MS. MAHLER-HAUG:  No, Your Honor.

                THE COURT:  All right.  Does anyone anticipate calling the doctor again?

                MS. BAILEY:  No, Your Honor.

                MS. MAHLER-HAUG:  No, Your Honor.

                THE COURT:  Sir, you're welcome to stay and watch the proceedings or leave, but you're not to discuss your testimony with any witness who has not yet testified.

                THE WITNESS:  Thank you very much.

                        (Witness excused at 2:17 p.m.)

                THE COURT:  All right.  Your next witness.  Is it Ms. Monahan?

                MR. FARIDI:  That is correct, Your Honor.  But before --

                THE COURT:  Wait a second then.  We need -- Katie, give Evan a call.  We're going to need Evan.

                Yes.

                MR. FARIDI:  Before we play Ms. Monahan's testimony, I do want to read paragraphs from the parties' stipulation, which is PTX 226.

                                                          135

THE COURT:  All right.

MR. FARIDI:  Paragraph 21 of the stipulation provides CACI PT is an indirect wholly-own subsidiary of CACI International, Inc.

Paragraph 22:  CACI PT is a Delaware corporation with its principal place of business at 1100 North Glebe Road, Arlington, Virginia 22201.

Paragraph 23:  CACI International, Inc. incorporated CACI PT in March 2003 in order to acquire most of the assets of Premier Technology Group, PTG.

Paragraph 24:  In September 1998, the Army directorate of contracting awarded a blanket purchase agreement, BPA, for information technology to PTG.  In January 2001, the Army directorate of contracting transferred the BPA to the Department of Interior's national business center, NBC.  NBC modified the BPA in July 2003 to reflect the acquisition of PTG's assets.

Paragraph 25:  CACI PT provided interrogation services under two delivery orders, Delivery Order 35, DO35, and Delivery Order 71, DO71.  Delivery orders are sometimes also referred to as work orders or task orders.

Paragraph 26:  These delivery orders were issued and administered by the Department of the Interior, DOI, under a General Services Administration, GSA, schedule contract for information technology services.

136

Paragraph 27:  Pursuant to these delivery orders, CACI interrogators and screeners began arriving in Iraq on or about September 28th, 2003.

Your Honor, in connection with Ms. Monahan's testimony, we will also be moving into evidence PTX 115.

THE COURT:  Is there any objection to 115?

MS. BAILEY:  I haven't seen it.

No objection, Your Honor.

THE COURT:  All right.  Plaintiffs' 115 is in evidence.

(Plaintiffs' Exhibit Number **115 admitted into evidence.**)

MR. FARIDI:  And, Your Honor, this testimony is approximately nine minutes long.

THE COURT:  Depends how quickly my law clerk reads the answers.  So it could be faster or slower.

So what we're doing in this case, ladies and gentlemen, here we don't have a video recording of that testimony.  This would have been testimony taken under oath just as if the witness were here in court.  There's a transcript of that testimony.  Counsel will read the questions, and my law clerk -- one of my law clerks will read the answers.  All right.  So even though it's Amy Monahan, we have Evan reading the answers.  All right.

Go ahead.

The testimony of Amy Monahan was read in as

137

Case 1:08-cv-00827-LMB-JFA    Document 1817    Filed 11/12/24    Page 138 of 175
PageID# 54481
Read-in testimony - A. Monahan

follows:

Q    Could you please state your full name for the record?

A    Amy Elizabeth Monahan.

Q    Did you go by another name previously, Ms. Monahan?

A    Amy Jenson.

Q    When CACI bought PTG, you then became a CACI employee?

A    Correct.

Q    And that was in 2002?

A    '3.

Q    2003.

     And, I'm sorry, what month was that?

A    May.

Q    At that time when the -- when you were turning into a CACI employee, what contracts were you managing?

A    The C2 contract biometrics contract.  Let me think.  I can't honestly remember.  I've managed four contracts back and forth, and I can't remember which ones actually were under my responsibility when the acquisition occurred.

Q    Which are the contracts that provided people to interrogate prisoners in Iraq?

A    The Iraq C2 contract.

Q    Is that how you refer to it as the Iraq C2 contract?

A    The C2 contract, yes.

Q    Now, as part of staff augmentation contracts, did CACI provide a structure to supervise the CACI people?

138

Case 1:08-cv-00827-LMB-JFA    Document 1817    Filed 11/12/24    Page 139 of 175
PageID# 54482
Read-in testimony - A. Monahan

A    Yes.

Q    And what was that structure?

A    We had a site lead at the various locations where our personnel would be located, and an overarching in-country manager, and then project managers located back in the States.

Q    And you were such a project manager; right?

A    Correct.

Q    And what -- did the in-country manager actually report to you?

A    He -- technically, yes.

Q    What type of communication did you have with the in-country manager on the C2 Iraq contract?

A    Almost daily communication.  If we weren't communicating daily, it might have been because communication initially was extremely difficult.

Q    And was this predominately telephonic?

A    No.  Predominately email.

Q    Now, when -- when the -- when the C2 contract in Iraq started, who was the in-country manager?

A    Dan Porvaznik.

Q    Now, who supervises the CACI employees in Iraq?

A    The military.

Q    Does CACI supervise its employees at all in any way, shape or form?

139

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA    Document 1817    Filed 11/12/24    Page 140 of 175
PageID# 54483
Read-in testimony - A. Monahan

A    CACI site leads would make sure that the employees were adhering to the military standards of the unit they were supporting.

Q    So is CACI -- the CACI site leads were supposed to make sure that the CACI employees were doing what the military wanted them to do?

A    Correct.

Q    So they were supervising them in that regard?

A    Yes.

Q    And were you personally also aware of what it was the military wanted the CACI employees to be doing?

A    No.  Not anything other than the statement of work.

Q    So, for example, you did not see the memorandums of understanding that were -- that were disseminated by the military in Iraq?

A    That's correct.

Q    Now, you said you had almost daily communications with the in-country manager.

        Did you also have similarly frequent communications with your site leads?

A    Yes.

Q    Did most of the -- did most of the discussion about personnel focus on people that were having difficulties performing?

A    Most of the discussion regarding personnel at that

140

point in time focused on pay and benefits and leave.

Q    Getting people paid and making sure they had time off?

A    Correct.

Q    Was your purpose to try and get people to join CACI, though?

A    The purpose was to hire people in support of that contract.

Q    And you and your colleagues had some significant concern that you might be able to perform -- you might not be able to get enough people?

A    There was concern about the number of personnel that we were able to get to go over to Iraq, yes.

Q    And what about the CACI code of conduct, do the CACI employees in Iraq have to abide by the CACI code of conduct?

A    Yes.

Q    Are they given any exceptions to that code of conduct because they are serving in Iraq?

A    No.

Q    In an instance when a CACI employee is asked to do something by the military that is inconsistent with the CACI code of conduct, what is the employee supposed to do?

A    They're supposed to bring it up to management within CACI.

Q    Now, did -- when -- I take it when somebody resigned, they were -- CACI then made arrangements for them to travel

141

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

out of Iraq?

A    Correct.

Q    And they didn't require that employees continue to serve after they resigned?  They didn't --

A    We don't require that, no.

Q    So a CACI -- so, for example, a CACI interrogator can -- you can quit on a Friday and then leave the country immediately?

A    Not necessarily.  They can resign, have their resignation be effective immediately, but when they are able to leave country is dependent upon flight availability.

Q    But CACI does not prevent people from quitting immediately?

A    That's true.  It's an at-will employment.

Q    And either -- and CACI can fire them or they can quit with no notice on either side; correct?

A    Correct.

(Thereafter Exhibit 6 was marked for identification.)

Q    If you would just let me know when you're finished reading it.

A    Okay.

Q    Ms. Monahan, this is an email that you received from Mr. Arrant in the regular course of business?

A    Yes.

142

Read-in testimony - A. Monahan

THE COURT:  Let me stop.  That's our 115 for this case?

MR. HADDAD:  That's correct.

THE COURT:  Just so it's not confusing.

MR. HADDAD:  Plaintiffs' Exhibit 115.

THE COURT:  Okay.

BY MR. HADDAD:

Q    And when you received this email from Mr. Arrant and learned that he, in fact, had not reported this and had not consulted a military officer, did you consider, yourself, reporting the violations?

A    No.

Q    And why not?

A    Because at the time I read this email, I did not interpret the email to be telling me unequivocally that there were abuses going on at the prison that he witnessed.

Q    Well, you know he was quitting over what he had seen; right?

A    Yes.

Q    And you knew this was a man who was experienced with a military background; correct?

A    Yes.

Q    Well, I'm trying to to understand, Mr. Arrant has raised a concern about what's going on in the prison; correct?

143

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A     Yes.

Q     And one of his concerns is about the fact that interrogations are being done without any supervision; correct?

A     Yes.

Q     And I take it that you actually didn't do anything to find out whether or not his concerns were well-founded?

A     Personally, no.

Q     And to the best of your knowledge, none of your colleagues did anything to find out whether his concerns were well-founded?

A     I do not know.

Q     From your point of view, you kept sending people to work over in that prison without knowing whether or not there were violations of the law?

A     I did continue to hire personnel.

Q     And you did continue to send them over without trying to inform yourself as to whether there were any ongoing violations of the law?

A     Yes.

Q     Well, when the abuse photographs were made public, did you at that point make any inquiry as to whether CACI had done anything back in October of 2003 to prevent its employees from participating in the abuse?

A     No, I personally did not.

144

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA   Document 1817   Filed 11/12/24   Page 145 of 175
PageID# 54488
Read-in testimony - A. Monahan

Q    And as you sit here today, you just don't know whether or not CACI ever took any steps to prevent its employees from participating in the abuse?

A    That's correct.

Q    Are CACI employees given any training as to what they're supposed to do when they observe violations of the law at the prison?

A    Not that I'm aware of.

Q    Well, what am I to understand from your testimony?

A    You're to understand that I did receive this email, that I did relay this email and the contents thereof to Mark Billings, and I do not remember the courses of action that transpired after that regarding this matter.

Q    And yet, although you had managerial level responsibility for those persons in Iraq, you took absolutely no steps to make sure that they weren't participating in violations?

A    They had signed codes of ethic -- they had signed code of ethics paperwork when joining CACI.  I had no reason to think that there was anything other than professional legal methods that they used to carry out the responsibility of their jobs.

Q    And when you say you had no reason to think there was anything other than professional legal methods being used, you don't think Mr. Arrant had told you that anything other

145

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

than professional methods had been used?

A    Not by CACI employees.

Q    And so if -- so in a sense then, you thought it didn't matter whether or not the military was using professional legal methods or not; it only mattered to you whether CACI employees were using professional legal methods?

A    My primary concern was CACI personnel, as I have no authority over military personnel.

MR. HADDAD:  No further questions.

THE COURT:  All right.  And that took care of any cross as well; is that correct?

MS. BAILEY:  Yes, Your Honor.

THE COURT:  All right.  Thank you, Evan.

So no more read-ins today; is that correct?

MR. FARIDI:  No more read-ins, Your Honor.

THE COURT:  All right.  Thank you.

All right.  Your next witness.

MR. FARIDI:  Your Honor, before we call the next witness, who is going to be Arnold Morse, and that's going to be via video deposition, I want to read in CACI's responses to some requests for admission, and I think Your Honor usually gives a standard instruction.

THE COURT:  All right.  So, ladies and gentlemen, again, another -- we've been learning about civil discovery procedures.  We've talked about interrogatories.  Another

146

Read-in testimony - A. Monahan

method in which lawyers conduct an investigation before a case comes to trial is by filing requests for admissions. And so what happens is, a side will say admit or deny the following facts. All right. And if a party admits a fact, then that is considered to be an established fact, which, again, you're still free to disregard, but that's a piece of evidence that's going to come into the case. If a party denies a fact, then they've denied it, and there would have to be proof presented during a trial to establish that fact. All right.

All right. So there are certain admissions that you're going to read into the record at this time?

MR. FARIDI:  Yes, Your Honor.

THE COURT:  All right.

MR. FARIDI:  I will begin with Request for Admission Number 23. Civilian -- we'll put it up on the screen as well, Your Honor.

Civilian Number 5 in the report entitled AR-15-6, investigation of the Abu Ghraib detention facility and the 205th Military Intelligence Brigade by MG George R. Fay, the Fay report, is Tim Dugan.

Response:  CACI incorporates its general objections. Subject to and without waiving the foregoing objections, CACI believes this request to be accurate and therefore admits it.

147

Case 1:08-cv-00827-LMB-JFA    Document 1817    Filed 11/12/24    Page 148 of 175
PageID# 54491
Read-in testimony - A. Monahan

Request for Admission Number 24:  Civilian-11 in the Fay report is Daniel Johnson.

Response:  CACI incorporates its general objections.  Subject to and without waiving the foregoing objections, CACI believes this request to be accurate and therefore admits it.

Request for Admission Number 25:  Civilian-21 in the Fay report is Steve Stefanowicz.

Response:  CACI incorporates its general objections.  Subject to and without waiving the foregoing objections, CACI believes this request to be accurate and therefore admits it.

And, Your Honor, Mr. Morse was CACI's 30(b)(6) deponent, and I'll ask Your Honor to give an instruction on 30(b)(6) testimony.

THE COURT:  So, again, in that pretrial discovery period when there's a corporate party -- and CACI is a corporate party -- the lawyers can ask for the corporation to speak.  And of course a corporation can't speak.  So what happens is the corporation designates one of its employees, it can be an officer or just an employee, but the corporation makes the decision whom they're going to designate as what's called a 30(b)(6) witness.  The 30(b)(6) is one of the Civil Rules of Procedure.  And then that person's testimony is considered to be the testimony of the

148

Read-in testimony - A. Monahan

corporation, and it binds the corporation.  All right.

So this is CACI speaking through this witness.

MR. FARIDI:  Yes.  And, Your Honor, through this witness, we will be seeking to admit the following exhibits: PTX 23, PTX 83, PTX 84, PTX 100A, PTX 104, PTX 137.

And, Your Honor, some of these exhibits were marked with different numbers at the deposition, and we'll provide Your Honor with a document that links the PTX numbers to the exhibit numbers that were used at the deposition.

THE COURT:  All right.  But these exhibits that we've -- is there any objection to any of these coming in?

MS. BAILEY:  Assuming all of that is the same as in the deposition, no objection.

(Plaintiffs' Exhibit Numbers 23, 83, 84, 100A, 104, 137 admitted into evidence.)

THE COURT:  All right.  I would like the translation as it comes in.  In other words, if you're showing them in a deposition, Exhibit 7, and 7 is 23 for purposes of this record, you've got -- you should tell us then and there.

MR. FARIDI:  If I could just confirm that, You Honor.  I think the exhibits, when they pop up on the screen, will likely have the PTX numbers that will be used for this trial.

149

THE COURT:  That will be much easier.  All right.

MR. FARIDI:  Your Honor, for this deposition, they do not.

THE COURT:  Then hopefully somebody -- you've got enough lawyers out there.  Somebody on your team should know what is what.

MR. FARIDI:  Yes.  We'll do that right now, Your Honor.

THE COURT:  All right.

MR. FARIDI:  Your Honor, I have a copy of the exhibits for the Court.

And one qualification, Your Honor.  PTX 83 was not shown to the witness during the deposition, but we have reached an agreement with CACI that it is deemed admitted.

THE COURT:  All right.  I'm assuming that's okay.

MS. BAILEY:  That's fine, Your Honor.

MR. FARIDI:  And we'll play that, Your Honor.  At some point we'll pause, and I'll make a reference.

THE COURT:  That's fine.

(Video deposition played of Arnold Morse.)

MS. ROBINSON:  This is PTX 23 in this case.

THE COURT:  Thank you.

MS. ROBINSON:  This is the first page of PTX 100.

THE COURT:  Thank you.

MS. ROBINSON:  This is PTX 104.

150

THE COURT:  Thank you.

MR. FARIDI:  There's a technical difficulty, Your Honor.  Bear with us a moment.  The computer froze.

(Video played.)

MR. FARIDI:  Your Honor, at this time, I would like to read in CACI's response to a request for admission from the plaintiffs.

THE COURT:  All right.

MR. FARIDI:  This is Request for Admission Number 10.

During the relevant date range, the CACI vice president referenced in Request Number 8 visited Abu Ghraib.  And since this references Request Number 8, Request Number 8 provided -- referred to the vice president as the vice president responsible for the services in Iraq.  And the relevant date range -- I'll skip that, Your Honor.

The response from CACI was:  CACI incorporates its general objections subject to and without waiving the foregoing objections.  CACI responds as follows.  To the extent CACI is defined to refer to CACI International, Inc., this request is denied.

To the extent CACI is defined to refer to include CACI PT, this request is admitted.

Your Honor, at this point, plaintiffs call Major General George Fay via video deposition.

151

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE COURT:  All right.

MR. FARIDI:  And in connection with this deposition, we will be seeking to admit the following exhibits, which were already admitted by the Court at the deposition, and I'll read out those numbers.  They are PTX 23, PTX 27, PTX 75, PTX 76, PTX 161A, PTX 180A, PTX 196, PTX 197, PTX 198, PTX 199, PTX 200 and PTX 201.

MS. BAILEY:  No objection.

THE COURT:  They're all in.

(Plaintiff Exhibit Numbers **23, 27, 75, 76, 161A, 180A, 196, 197, 198, 199, 200, 201 admitted into evidence.**)

MR. FARIDI:  And the run time of the video is approximately 105 minutes.

THE COURT:  Okay.  We'll probably take the afternoon break possibly in the middle of it.  We'll see.

(Video deposition played of George Fay.)

THE COURT:  This is the normal time to take our afternoon break.  And, again, the testimony goes in a little bit slowly this way, so I want the jury to stay alert, and so we'll be in recess until 4:30.

(Jury not present at 4:12 p.m.

(A recess was taken.)

THE COURT:  How much more time is this going to run?

MR. FARIDI:  Between the rest of the direct, Your

152

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Honor, and cross-examination and the redirect, it's about 45 minutes total.

THE COURT:  All right.  Have you any other witnesses?

MR. FARIDI:  After this witness, the only other remaining witness is Mr. Al Shimari.

THE COURT:  He's not -- all right.  Now assuming he's available Monday, we'll start with him on Monday.  If he's not, how many witnesses -- let me hear from CACI.

Mr. O'Connor.

MR. O'CONNOR:  Yes, Your Honor.

THE COURT:  Yeah.  How long do you think your case is going to take?

MR. O'CONNOR:  I've got it I think about 15 hours of actual time.  I've got --

THE COURT:  Is that including what you anticipate the cross-examinations will be?

MR. O'CONNOR:  That's the one assumption that's going into it.  It includes what I assume would be cross-examination.  We have four live witnesses; the rest of it is either video or read-ins.  So the rest of it's in the can.

THE COURT:  All right.  Now, you're not going to show as many of the depositions where almost nothing is said other than state secret?

153

Video Deposition - G. Fay

MR. O'CONNOR:  The pseudonymous depositions are cut all the way down to a grand total of two and a half hours for all eight or nine of them.  If Mr. Al Shimari is not in the case, that cuts about almost an hour off of that.  But that remains to be seen what's going to happen there.

THE COURT:  All right.  That's fine.  Just trying to get a sense of it.

So it looks as though, with any luck, we'll be getting this case to the jury on Thursday?

MR. O'CONNOR:  I think so.  If Mr. Al Shimari does not testify on Monday, I believe -- my case is just over two days.  So I think whether he testifies or not, we will be done with our case on Thursday.

THE COURT:  All right.  Well, we'll see.  We may have a few minutes to start your case this afternoon.

MR. O'CONNOR:  Your Honor --

THE COURT:  Without prejudice.

MR. O'CONNOR:  But with respect, Your Honor, I don't think I should have to start my case until they've rested.  I mean, I think -- I don't -- I mean, when their case is over, I have a motion to bring, and right now, I don't believe that Mr. Al Shimari can survive a Rule 50 motion.  And much of my case does depend on what the story is with Mr. Al Shimari if he's in the case or not.  I have tactical decisions on witnesses.  Some of the depositions

154

would have to be either cut or disregarded if he's not in the case.

I mean, I am not asking the Court to say at 5:15 you don't have your witness, you're done. I understand if he's here Monday morning, that's great, but I respectfully -- I think it's fairest to us if we get to start our case when they've rested their case.

THE COURT: Well, let's get the jury in and finish this up, and we'll see where we are. I'm not going to waste 45 minutes if that's all we've got left.

THE COURT SECURITY OFFICER: Rise for the jury.

(Jury present at 4:37 p.m.)

THE COURT: All right.

(Video played.)

MR. FARIDI: There's a brief redirect, Your Honor I think it's about three minutes.

THE COURT: All right.

(Video played.)

THE COURT: All right. That concludes the deposition?

MR. FARIDI: It does, Your Honor.

THE COURT: All right.

MR. O'CONNOR: Your Honor.

THE COURT: Yes.

MR. O'CONNOR: If the Court would like, I can --

155

we could do a short read-in out of turn on a no-prejudice basis.

THE COURT:  All right.  I just want the jury to know what's going on.  All right.

MR. O'CONNOR:  Sure.

THE COURT:  At this point, the plaintiff has only one witness left.  It's the last of the Iraqi plaintiffs who is unable to -- we're having problems getting him connected to the case.

If we're unable to get his testimony by Monday, then he will no longer be participating in this case, and the plaintiff will rest.  And that means we're going to be starting -- I'm going to let the defense start with their case right now, all right, with a very short piece of evidence.  But that's ahead of schedule.  I think jurors are always happy to hear that.  The lawyers have worked well in trying to get this case as concise as possible.  On Monday, I'll be able to give you a much better schedule, but I just wanted you to know that things are moving quickly.

With no prejudice with any procedural issues, Mr. O'Connor, you may start your evidence.

MR. O'CONNOR:  This would be a deposition read-in, Your Honor.  Does the Court have a clerk?

THE COURT:  You can get Evan back in here.

MR. O'CONNOR:  I can supply someone.

156

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA   Document 1817   Filed 11/12/24   Page 157 of 175
PageID# 54500
Read-in deposition - W. Brady

THE COURT:  No.  No.  No.  We have to do it. Let's get Evan.

MR. O'CONNOR:  And, Your Honor, we're going to be presenting the deposition experts from Colonel William Brady, who was the contracting officer's representative.

THE COURT:  All right.  All right.  This is Colonel William Brady, III?

MR. O'CONNOR:  That's correct, Your Honor.  May I proceed?

THE COURT:  Yes, sir.

The testimony of William Brady, III, was read as follows:

Q    Please state your full name for the record?

A    William Harding Brady, III.

Q    When did you become -- are you a full colonel?

MR. BLANCHARD-WU:  I might be on a different page.

MR. O'CONNOR:  Oh.

THE COURT:  Page 8.

MR. O'CONNOR:  Oh, I skipped page 4.  Do you not have page 8 after page 4?

MR. BLANCHARD-WU:  I do have page 8.

THE COURT:  All right.  Just go to page 8.

MR. BLANCHARD-WU:  Oh, just the green parts.  Got it.

MR. O'CONNOR:  Just the green parts.

157

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Read-in Testimony - W. Brady

MR. BLANCHARD-WU:  Got it.

Q    When did you become -- are you a full colonel?

A    Yes.

Q    When did you become a full colonel?

A    December of 2005.

Q    When you work with the contractual services that are supporting the military operations, do you consider the contract employees to be the equivalent of soldiers?

A    Can you be a little more specific on what you're asking?

Q    Well, really, I'm trying to get at how you think of contractors.  Like, when you're working day to day --

A    Okay.

Q    -- within a military environment with soldiers and with contractors, in your mind, what are the -- what are the similarities, and what are the differences?

A    They are a member of our team.

Q    And what do you mean by saying a member of the team? They have the same responsibilities as a military person?

A    What I'm saying is that they are a part of our mission. They're a part of how we execute our mission.

Q    Are there any differences between a soldier and a contract employee?

A    In my opinion, there are some differences.  Primarily administrative and logistical.  But from a missions

158

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

standpoint, no.

Q    When you say logistical, administrative, who is actually employing the contractor?

A    What contractor are you referring to?

Q    I'm really talking any time you've been working with contract employees.

The military itself is not the employer; correct?

A    I would consider the military as the overseer of the civilian contractor.

Q    Okay.  Thinking back over time and on the instances when you've worked with the outside with contractors rather than soldiers, could anybody give a contractor an order the same way that anybody could give a soldier an order?

A    I've never been in a situation where you're saying give them an order.  In my experience, the contract workers that I have been associated with have performed the duties they've been asked to do by the supervisor.

Q    And that's kind of what I'm going at, sir.

Because they're contract employees, is it more clearly delineated who their supervisor is so that they essentially take contract direction from one designated person in the military?

A    In my experience, when there is a contractor embedded in a unit, whether it is a staff or whatever the function is -- and I'm being generic here in my experience -- that

159

that contractor has clearly worked for the supervisor of that particular section or unit.

Q    Okay.  What were your responsibilities vis-a-vis the CACI contract?

A    I oversaw the requirements, and I worked directly with the CACI site manager within the country.

Q    And who was there?

A    There were a couple during my time frame there.  The last one that I recall, the first time is Scott.  I forget his last name.

Q    Scott Northrup?

A    Scott Northrup, correct.

Q    And you say you oversaw the requirements.

    What do you mean by that?

A    When the Army established a requirement for contractual services from the military standpoint, I provided oversight to what was being -- what was being filled by the contractor, made sure they understood what the requirement was.

Q    How did it come about that the 5th Corps in Iraq decided to use CACI to augment its ranks?

A    I think the simplest way to explain that was that we had an existing relationship with CACI.  They were established on the ground, and we had thus far been very satisfied with their performance.

160

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Read-in Deposition - W. Brady

Q    But was it a shortage of the ability to get more personnel from the military?

A    Largely, yes.  Actually, let me restate that.  As opposed to unable to get people from the military, it was simply at the time a shortage on the ground that we did not see addressed in a reasonable time frame.

Q    Did you express any view as to whether or not the contract should be bid out generally?

A    No.

Q    Do you know -- do you have any knowledge as to why it was given to CACI?

A    Only what I said earlier.  We had an existing relationship with CACI.  They were on the ground.  We had thus far been satisfied with their services.  We were in the middle of a war.

Q    Did you play any role in deciding who it was that CACI was going to hire?

A    CACI, as a rule, would have the resumes on site in Baghdad when the Internet decided to work on a good day when we had a 25th hour and the eighth day of the week to look at paper.

        But, yes, they brought their resumes, and to the extent possible, I would screen resumes as a quality control function.

Q    And when you say "quality control function," am I

161

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Read-in Designees - W. Brady

correct in understanding that you viewed yourself basically as just kind of checking up to make sure that CACI was doing what it was supposed to do?

A    I reviewed resumes just to have a reasonable belief that we were getting quality employees.  I can't say I reviewed all of them by any stretch of the imagination.  I reviewed a significant percentage.

Q    Now, my understanding is that, for the most part, you reviewed the CACI employees as performing well; correct?

A    Yes.

Q    But just speaking to your own actions, did you ever brief anybody out at Abu Ghraib or any group of people out at Abu Ghraib about the fact that they could reject CACI employees as unsatisfactory?

A    A group of people?

Q    Or a person.

A    Is it an audience?  The leadership of the MI brigade knew that they had the ability to reject unsatisfactory soldiers, unsatisfactory contractors, any unsatisfactory condition on the ground, because that's the scope of a commander on the ground.

Q    And so did you have some pattern or practice where you talked to your leadership point of contact how are the CACI employees doing?

A    I can't say that I had set a rhythm or such to do that.

162

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

I guess what I will express is that I was very confident in the military chain of command.  It does really well for the Army.  The contract employees were embedded with the military chain of command.  Any problem, regardless of the nature of the problem, the Army's pretty good at reporting the problem.

Q    So it's your confidence in the military's chain of command ferreting out and reporting of problems that leads you to be confident that any problems with CACI employees would have been similarly ferreted out and reported?

A    I was confident that there were leaders on the ground present in and around the interrogation operations or the analytical operations or the staff operations that they were performing.  That I had a point of contact.  That it is well known that if there was a problem, you report the problem.

Q    Did you ever go and observe CACI interrogators interrogating prisoners?

A    I did observe interrogation operations several times, yes.

Q    Did you observe CACI employees, though not --

A    There were times that CACI employees were part of the interrogation team, yes.

Q    Did you ever observe interrogations out at Abu Ghraib where there weren't CACI interrogators in the team?

A    I can't say for sure if I did or not.

163

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q    Do you remember people complaining to you about Steve Stefanowicz?

A    No, I don't at the time.  I think after the fact I've seen his name come up in things.  But at the time, no, I don't.

MR. O'CONNOR:  That concludes the testimony of Colonel Brady, Your Honor.

THE COURT:  All right.  And there was no cross-examination?

MR. O'CONNOR:  This is the entirety of the testimony to be presented.

THE COURT:  All right.  That's fine.

All right.  I think, at this point, the jury's been very patient, and rather than trying to start another witness, I'm going to let you all go home a little bit early so you can get a start on the weekend, all right, folks.

Now, remember my cautions.  I'm pushing the lawyers to do their job, so you have to continue doing your job, which is, again, to avoid any coverage about the case, to, you know, not get on -- you can have your social media, but just don't discuss the case in any respect.  All right.

There's a lot going on this weekend, the weather is going to be lovely, there's an interesting football game, so I hope you all have a good weekend.  And, remember, Election Day, you will not be coming to court.  Hopefully

164

you will all be voting if you haven't already voted.  All right.  You all have a good weekend.

We're going to stay in session.  Thank you.

THE COURT SECURITY OFFICER:  Rise for the jury.

(Jury not present at 5:41 p.m.)

THE COURT:  All right.  So we're going to have to take care of some logistical matters right now.

I am going to require that the plaintiffs alert defense counsel, as well as my staff -- so I'll give you a contact number so that you can email us.  By 6 p.m. Sunday night, we have to know for certain whether or not Mr. Al Shimari is going to be able to testify.  All right.

And the reason for that -- there are multiple reasons.  First of all, what Mr. O'Connor said is, he may need to change his evidence based upon whether that plaintiff is still in the case, and so I don't want to have gaps in the trial because that hasn't happened or take up unnecessary time hearing evidence that's now irrelevant.

But, Number 2, we have to have other staff up here because of the logistics in getting that done, so it would not be appropriate.

So I'm giving you until 6 p.m. Sunday.  If you know for certain he'll be available Monday morning, then we will have him go first.  All right.  Then, at that point, the plaintiff would be officially resting.  All right.

165

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Number 2, Mr. O'Connor -- I'm speaking to you because you're sort of the lead counsel for the defense team -- I want to make sure that you have put together a list of witnesses that you communicate to the plaintiffs. You may want to have two lists, one depending upon, you know, whether Mr. Al Shimari is going to be able to testify or not; and the other if he doesn't. And also, you know, as long as I have it on my desk Monday morning, that's fine as far as we're concerned.

MR. O'CONNOR: We exchange at 8 p.m. the night before, so I should know by then what the story is with Mr. Al Shimari.

THE COURT: That's fine. Okay.

MR. O'CONNOR: We will do that, Your Honor.

THE COURT: Okay. I want you both -- because we did this last time -- to be preparing the list of exhibits for the jurors so we don't have a gap.

I'm really hoping we can get this case to the jury early enough so that we don't have a three-day weekend gap in the middle of their deliberations. All right. The ideal thing would be to get this case to the jury by lunchtime Thursday if we can do it. That would give all day Monday, all day Wednesday, Thursday morning for closing arguments and instructions. They get the case. Whether they'll do it in a day and a half or whether -- if it goes beyond that,

166

sobeit.  But I worry about a long gap in the midst of jury deliberations.  So keep that in mind as both sides put their case together.  Okay.  But that's why having the list of exhibits as close to being prepared as possible will shorten that gap.

All right.  At one point I think plaintiffs' counsel said there was something you needed to discuss.  Has that been taken care of now, or is there still some issue out there?

MR. FARIDI:  There's I think three things, Your Honor, at this point.  I'll flag them for you.

THE COURT:  All right.

MR. FARIDI:  One is, I just want to address Your Honor's comment about Mr. Al Shimari.

We're obviously going to work all weekend to try and locate him and try to get him to testify on Monday.  If he's not able to testify on Monday, I think the Civil Procedures Rules address what happens in that circumstance.  He will become an unavailable witness, and we will demonstrate and establish his unavailability, and then, Your Honor, we will offer his prior testimony into evidence.

I'm not sure whether his inability to testify results in his dismissal from the case.  We're happy to research the issue further over the weekend and put in a submission on Sunday evening in the event that he's not able

167

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

to testify, but that's an issue, Your Honor, that I think needs further evaluation before Your Honor makes up your mind on that.

THE COURT:  All right.  Now, we have transcripts of that.  Again, that would have a law clerk reading his answers and you all doing the questions.

MR. FARIDI:  And it will be much more streamlined because we won't have a translator.

THE COURT:  Yeah.

MR. FARIDI:  The second issue, Your Honor, is Mr. O'Connor stated just now that he's got four live witnesses.  I think one of the live witnesses is going to be Dr. Payne-James.

As Your Honor knows, we did not call our psychiatrist, Mr. Xenakis, to testify.  We don't think there's any need for him.  Dr. Payne-James submitted a rebuttal report in response to Dr. Xenakis.  I don't think Dr. Payne-James should be allowed to testify.

We went through this last time around.  We didn't call Dr. Xenakis, and, as a result of that, they dropped Dr. Payne-James because there was nothing to rebut.  There was no expert from the plaintiff that Dr. Payne-James was rebutting at trial.

So I'm not sure whether they are calling Dr. Payne-James.  But, you know, they know exactly who we're

168

calling.  We're not calling Dr. Xenakis.  And I'm just wondering if they are calling Dr. Payne-James, and if they are, we need to address that issue at some point.

THE COURT:  All right.

MR. O'CONNOR:  Your Honor, Dr. Payne-James is not a rebuttal expert; he's our expert.  We fought for years to get authorization to take medical exams that we first tried to take in 2013.

THE COURT:  This was the examination in Malaysia?

MR. O'CONNOR:  That's right, Your Honor.

THE COURT:  Uh-huh.

MR. O'CONNOR:  And so if they chose not to put on expert evidence, that's their decision, but that doesn't preclude us from putting on expert evidence from the medical examination that we -- it took us ten years to get and we finally got.

THE COURT:  I'm going to permit it.  All right.

And what's the third issue?

MR. FARIDI:  And the third issue is something that Mr. Molster is going to address, Your Honor.

THE COURT:  All right.

MR. MOLSTER:  Good afternoon, Your Honor.

7:30 last night we got an email, I'd be happy to hand it up, about some materials that CACI wants to play to show to the jury on the screen, as I understand it, while

169

they're playing these depositions that happened six years ago.  And these are not documents that were used at the deposition; these were documents that they sent to us last night.  They apparently have taken photos of our clients, enhanced them, and put -- we believe it's affirmative evidence and they want to pass it off to the jury as if these were documents that were used at the deposition.  They absolutely were not used at the deposition.  We never saw them before 7:30 last night.  We don't think --

THE COURT:  Wait.  There are two different issues.

Issue Number 1 is, were these exhibits that you had seen but not in the context of the depositions, or are these brand-new exhibits that you had never seen before?

MR. MOLSTER:  My understanding is they're brand-new exhibits.  I'd be happy to pass it up if you would like.

MR. O'CONNOR:  Your Honor, can I be heard on that?

THE COURT:  Yes.

MR. O'CONNOR:  These aren't exhibits.  As Your Honor will recall from the last trial, the pseudonymous interrogations were, in the Court's words, deathly boring.

THE COURT:  Oh, they were awful.

MR. O'CONNOR:  And when they went, we had a black screen that had the pseudonymous interrogator's name and that had text of the deposition.

170

What we wanted to do was have a demonstrative on the screen that reminds the jury of what the parties have stipulated to as to the connection of that nameless, faceless person to the plaintiffs in this case.

And it's just because it's hard enough to have somebody who's nameless and faceless.  If they were there, the jury would say that red-headed guy interrogating Al Shimari.  The brunette guy interrogated Al-Zuba'e.

And so instead of just having a black with CACI Interrogator A, what we propose to do is we took the picture -- we didn't enhance it or alter it; we pulled it from their detainee file.  If they want a different picture from the plaintiff, that's great.  All we want to do is, as the jury's hearing the testimony of these people that are going to be hard to distinguish, that they can look down and say, oh, this is about Al Shimari, this is a person that everyone stipulated interrogated Al Shimari.  And same for Al-Zuba'e.  That's all we want to do with it.  It's not an exhibit.

THE COURT:  All right.

MR. MOLSTER:  I disagree that it's not --

THE COURT:  Well, I think it will be -- you didn't sit through that last trial, which was just horrendous.  It was about the worst testimony I've had to put up with.

This is simply a demonstrative.  It's not going to

171

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

go back to the jury when they go to deliberate.  It simply clarifies for them what they're going to be hearing, because most jurors have never heard anything quite like this when you don't get the name of the witness, you don't see the witness.

And, as I recall, the voices were even changed; weren't they?

MR. O'CONNOR:  They will not be this time, Your Honor, but they were last time.

THE COURT:  Okay.  Well, that's a big improvement there.

Now, if you all don't want it on the whole time, you know, I don't think it's that important, but at least it gives the jury context when they start to hear it.  Because I suspect -- those depositions were not that long, and I'm not going to let them be long.  I mean, the number of times we heard state secret or don't answer the question, it just went on and on, and they only need to get a sample of that to get the picture.

MR. MOLSTER:  Your Honor, I don't want to belabor the point.  I don't think it's fair to us because they weren't actually used at the deposition.  The jury is going to think they were.

THE COURT:  I will tell the jury, folks, this is a demonstrative exhibit simply to help you understand about

172

which plaintiff is this testimony relevant and which of the CACI people were involved.  That's it.

MR. MOLSTER:  We also believe that the jury is going to conclude that these are the only people that interrogated them and the rest --

THE COURT:  You can make an argument on that.  No.  No.  No.  This is not helpful.  No.  You can do it.

MR. O'CONNOR:  Thank you, Your Honor.

MR. MOLSTER:  Thank you, Your Honor.

THE COURT:  All right.  Was there anything else?

MR. FARIDI:  No.  That's it, Your Honor.

THE COURT:  Mr. O'Connor?

MR. O'CONNOR:  Not from us, Your Honor.

THE COURT:  All right.  Very good.

Then the last thing from us is we're going to have Katie read into the record those exhibits that went in today.  And, again, you all just listen carefully, please.

THE DEPUTY CLERK:  DX 40.  PTX 161, photo M60.  PTX 232.  PTX 34.  PTX 233.  PTX 161, photo M153, M162, M163, M165.  PTX 234.  PTX 139.  DX 14.  DX 15.  DX 16.  PTX 10.  PTX 8.  PTX 36.  PTX 115.  PTX 23.  PTX 83.  PTX 84.  PTX 100A.  PTX 104.  PTX 27.  PTX 75.  PTX 180A.  PTX 196.  PTX 197.  PTX 198.  PTX 199.  PTX 200.  PTX 201.

THE COURT:  All right.

MR. MCCLURE:  What was the first one you had on

173

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

the list?

THE DEPUTY CLERK:  DX 40.

THE COURT:  All right.  Does anyone think we missed any or included some that you didn't think were in?

MR. FARIDI:  Did you also say PTX 206, pages 2, 10, 13 and 14?

THE DEPUTY CLERK:  That was yesterday.

THE COURT:  That was yesterday.

MR. FARIDI:  Otherwise -- I think we may have one issue with respect to 206 and if the first 21 pages. Pages 1 through 22 of 206.  If you said that 206A came in, then I think we're good.  I'm checking my list.

Your Honor, I'm told it may have come in yesterday.

THE DEPUTY CLERK:  206 came in yesterday with Al-Zuba'e.

MR. FARIDI:  Then we're good.

THE COURT:  206A is in, yes.

Any issue with the exhibits from the defense?

MR. O'CONNOR:  No, Your Honor.  We're good.

THE COURT:  All right.  Very good.  Then we're all set.

Again, you can leave your tables as they are if you're comfortable doing it because we don't have anything in here Monday.  We'll see you all back here at 9:30.  All

174

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

right.

(Proceedings adjourned at 5:54 p.m.)

-----------------------------------

I certify that the foregoing is a true and accurate
transcription of my stenographic notes.

*Stephanie Austin*
_____

Stephanie M. Austin, RPR, CRR

175

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894