UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
---------------------------x
SUHAIL NAJIM ABDULLAH AL    :    Civil Action No.:
SHIMARI, et al.,            :    1:08-cv-827
            Plaintiffs,     :
     versus                 :    Monday, November 4, 2024
                            :    Alexandria, Virginia
CACI PREMIER TECHNOLOGY,    :    Day 4
INC.,                       :    Pages 1-310
            Defendant.      :
---------------------------x
```

The above-entitled jury trial was heard before the Honorable Leonie M. Brinkema, United States District Judge. This proceeding commenced at 9:28 a.m.

A P P E A R A N C E S:

FOR THE PLAINTIFFS:    CHARLES MOLSTER, ESQUIRE
                       THE LAW OFFICES OF CHARLES B. MOLSTER, III, PLLC
                       2141 Wisconsin Avenue, NW
                       Suite M
                       Washington, D.C.  20007
                       (703) 346-1505

                       BAHER AZMY, ESQUIRE
                       THE CENTER FOR CONSTITUTIONAL RIGHTS
                       666 Broadway
                       7th Floor
                       New York, New York  10012
                       (212) 614-6464

                       MUHAMMAD FARIDI, ESQUIRE
                       MICHAEL BUCHANAN, ESQUIRE
                       BONITA ROBINSON, ESQUIRE
                       ANDREW HADDAD, ESQUIRE
                       SCOTT KIM, ESQUIRE
                       ALEXANDRA MAHLER-HAUG, ESQUIRE
                       PATTERSON BELKNAP WEBB & TYLER LLP
                       1133 Avenue of the Americas
                       New York, New York  10036
                       (212) 336-2000

1

A P P E A R A N C E S:

FOR THE DEFENDANT:      JOHN O'CONNOR, JR., ESQUIRE
                        LINDA BAILEY, ESQUIRE
                        JOSEPH MCCLURE, ESQUIRE
                        STEPTOE LLP
                        1330 Connecticut Avenue, NW
                        7th Floor
                        Washington, D.C.  20036
                        (202) 429-3000

                        NINA GINSBERG, ESQUIRE
                        DIMUROGINSBERG PC
                        1101 King Street
                        Suite 610
                        Alexandria, Virginia  22314
                        (703) 684-4333

FOR THE UNITED          STEPHEN ELLIOTT, ESQUIRE
STATES:                 UNITED STATES DEPARTMENT OF JUSTICE
                        CIVIL DIVISION FEDERAL PROGRAMS BRANCH
                        1100 L Street, NW
                        Washington, D.C.  20044
                        (202) 598-0905

COURT REPORTER:         STEPHANIE M. AUSTIN, RPR, CRR
                        Official Court Reporter
                        United States District Court
                        401 Courthouse Square
                        Alexandria, Virginia  22314
                        (571) 298-1649
                        S.AustinReporting@gmail.com


     COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

TABLE OF CONTENTS

WITNESSES

On behalf of the Plaintiffs:

SUHAIL NAJIM ABDULLAH AL SHIMARI - read in

Direct examination by Mr. Haddad ..........12
Cross-examination by Ms. Ginsberg .........26
Redirect examination by Mr. Haddad ........59

On behalf of the Defendant:

DANIEL PORVAZNIK

Direct examination by Mr. O'connor ........65
Cross-examination by Mr. Buchanan .........98
Redirect examination by Mr. O'Connor ......149
Recross-examination by Mr. Buchanan .......161

MARK BILLINGS

Direct examination by Mr. O'Connor ........163
Cross-examination by Ms. Robinson .........186
Redirect examination by Mr. O'Connor ......254
Recross-examination by Ms. Robinson .......270

CHARLES MUDD - read-in ...................273

EXHIBITS

On behalf of the Plaintiffs:
Admitted

Number 195 ................................22
Number 206G ...............................23
Number 13 .................................61
Number 133, pages 40 to 42 ...............75
Number 214   .............................147
Number 38 .................................155
Number 85 .................................215
Number 128A ...............................227
Number 95-1 ...............................234
Number 103 ................................237
Number 106A, page 1 ......................239
Number 107B ...............................241
Number 225 ................................243
Number 128B ...............................247

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

EXHIBITS

On behalf of the Defendant:
Admitted

Number 29, pages 3, 202, 39, 48, 49 .......61
Number 20 .................................78
Number 77 ................................168
Number 12 ................................174
Number 13 ................................180
Number 75 ................................220

MISCELLANY

Proceedings November 4, 2024 ..............5
Certificate of Court Reporter ............310

4

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

P R O C E E D I N G S

THE DEPUTY CLERK:  Civil Action Number 1:08-cv-827, Al Shimari et al. versus CACI Premier Technology, Inc.

Will counsel please note their appearance for the record, first for the plaintiffs.

MR. FARIDI:  Good morning, Your Honor. Muhammad Faridi on behalf of the plaintiffs, joined by my colleagues Andrew Haddad, Charles Molster and Sean O'Shea, who's our paralegal.  On later on, Mike Buchanan and Bonita Robinson will be joining us at counsel table.

THE COURT:  All right.

MR. O'CONNOR:  Good morning, Your Honor. John O'Connor, Nina Ginsberg, Linda Bailey and Joseph McClure for CACI.

THE COURT:  All right.  I've been over your papers.  My understanding is Plaintiff Al Shimari is not available.  I'm satisfied that the explanation I've got is sufficient.  I'm overruling defendant's objections, and we'll go ahead and have the testimony read in.

I assume you have copies of the transcript for the Court, as well as my law clerk?

MR. HADDAD:  Yes, Your Honor.  And the parties have agreed on designations.

THE COURT:  Okay.

5

MS. GINSBERG:  Your Honor, my understanding is that Mr. Haddad only provided the direct and redirect examination.  I have copies of the cross-examination.

THE COURT:  All right.  So what's going to happen then is we'll have plaintiffs' counsel read the direct.  When we come to the cross, Ms. Ginsberg are you going to be doing the reading?

MS. GINSBERG:  I'm going to read.

THE COURT:  You're going to read the cross.  I'll explain to the jury what's going to happen, all right, and then any redirect will be done again by plaintiffs' counsel so it mirrors as close as possible the way in which the testimony would have been taken.

MS. GINSBERG:  Your Honor, we have copies here of the full transcripts.

THE COURT:  Yeah.  Let's hand everything up.

MS. GINSBERG:  And these are the ones that contained the agreed designations.

THE COURT:  Right.  I'm assuming both sides have done some redesignations.

MR. HADDAD:  That's right, Your Honor.  The version that I have cuts out all texts that was not designated to make it easier for the law clerk and the Court to follow.  So that's the version that I just handed up.

THE COURT:  All right.  Hold on a second.

6

MS. GINSBERG:  Your Honor --

THE COURT:  Wait.  Wait.  Wait.

All right.  So what I have here, the fatter of the two is the direct examination.  So only the yellow is what's to be read in; correct?

MR. HADDAD:  Your Honor, what I handed up is this paper which has red writing on it.  This is the direct examination.  Everything on this document is going to be read.  I'm not sure what Ms. Ginsberg just handed up.  I think that might have been a longer version with highlighting for only certain parts that we've agreed on, but this one is easier to follow.

MS. GINSBERG:  That's correct, Your Honor.  Ours have --

THE COURT:  No.  I'm completely confused.

What is this larger one?

MS. GINSBERG:  The larger one is the compilation of the direct, the cross, and the redirect that we've all agreed on.

THE COURT:  All right.  But, again, so everything that's in yellow in this larger one is what is going to be read in today; is that correct?

MS. GINSBERG:  Yellow and blue -- on ours, at least, yellow and blue.

MR. HADDAD:  That's right, Your Honor.

7

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE COURT:  Correct.  I see a few blues.  All right.

MS. GINSBERG:  Yes.

THE COURT:  So then the question is --

MS. GINSBERG:  Okay.  So Mr. Haddad did not hand up the cross.

THE COURT:  Hand up all the transcripts now so we don't have a long break in between.

MS. GINSBERG:  That's what the thicker one is. It's the entire examination, the direct, the cross, and the redirect.

MR. HADDAD:  Your Honor, we handed up this version for the direct, and we also handed up an identical version for the redirect, just because it's easier to read.  I submit that the Court should use this copy for our redirect, and then CACI's free to offer whatever copy it wants.

THE COURT:  I'm going to work from the big one that has the yellow and the blue in it; all right?

MR. HADDAD:  Okay.

MS. GINSBERG:  Yes.

THE COURT:  Because this should be in the same order that it would have been done during the trial.  So we'll read the direct examination.  And then, Ms. Ginsberg, when we get to cross, you do the cross.  We'll go back and have the plaintiff read the redirect; all right.

8

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

MS. GINSBERG:  Yes.  Your Honor, and I think there may be just three or four also in orange because we were going back and forth.  But the yellow, the blue, and the orange should be read.

THE COURT:  I'm looking for orange, and I'm not seeing it.

MS. GINSBERG:  There are almost none.  There's orange on page 23.

THE COURT:  All right.  Hold on.

MR. HADDAD:  Everything that is highlighted should be read.

THE COURT:  All right.  Just let me see what you're talking about.  Oh, that was just my thing on the demonstrative.  Okay.  All right.

Now, is there a plan to show exhibits while the testimony is going on?

MR. HADDAD:  Your Honor, during the direct testimony, we have a video that will be showing the transcript and when an exhibit is -- was published to the jury in April, we'll put it on the screen, and then it gets taken down.  Once it gets taken down --

THE COURT:  We're not going to do it that way. Since we're reading it in, they're not going to be watching something on the screen.  That would be highlighting testimony differently than we would otherwise do.  All

9

right.  This is meant to be absolutely the same as if he was here testifying.  All right.

MR. HADDAD:  We can put the exhibits on the screen then.  Just the exhibits, not the transcript.

THE COURT:  Evan, you may need to stop for a second when the exhibit is being shown.

All right.  Anything further before we get started?

MS. GINSBERG:  Your Honor.

THE COURT:  Yes.

MS. GINSBERG:  What do you plan to tell the jury?

THE COURT:  I'm going to tell the jury that for reasons outside of the control of the plaintiff, he's not available to come in to testify, and the law permits a substitution of this sort.  He previously testified in an earlier proceeding, or something along those lines, under oath with an interpreter, and we have a transcript of that, and we're going to read that in.

MS. GINSBERG:  And will the jury also be told what they are -- what they're hearing is the interpreter's --

THE COURT:  Yeah, I will.  Yes.  Okay.  All right.

Let's bring the jury in.

THE COURT SECURITY OFFICER:  Yes, Your Honor.

THE COURT:  I will let you put a still photo of the plaintiff on the screen if you can do that without any

10

text because they would have a chance to have seen him.

MR. HADDAD:  Okay.  I think we should be able to do that.  Thank you, Your Honor.

THE COURT SECURITY OFFICER:  Rise for the jury.

(Jury present at 9:35 a.m.)

THE COURT:  Good morning, ladies and gentlemen. Once again, I want to commend you all for being here on time, and you all look refreshed and smiling.  It was a great weekend for football, those of you who are fans.  The weather was wonderful.  And we're going to move things as quickly as we can for you all.

We're going to start with the last witness on behalf of the plaintiffs' case, and that will be the testimony of Mr. Al Shimari.

Now, through no fault of his own, Mr. Al Shimari is not going to be available for the video presentation of his testimony the way we did the other plaintiff who is in Iraq.

Fortunately, we have a transcript of testimony that he provided previously.  He was under oath, the same oath that all the other witnesses have taken.  And we are going to read into the record the testimony that he provided under oath previously.  My law clerk is going to read the answers of the plaintiff.

Now, remember, those would have been through a

11

Case 1:08-cv-00827-LMB-JFA   Document 1818   Filed 11/12/24   Page 12 of 310
PageID# 54530
Direct examination / video testimony - S. Al Shimari

translator.  So the same way when you heard from the other plaintiff, the answers you're getting are the answers which the interpreter translated, but you are going to be told at the end of the case to evaluate the testimony of witnesses, whether live in court or by deposition, using many of the same principles as you can.

All right.  We'll begin now -- so, for the record, this witness, Mr. Suhail Najam Abdullah Al Shimari, was called as a witness on behalf of the plaintiffs, was fully sworn by a deputy clerk, and now we are going to read his transcript into the record.  All right.  We'll start on line 13, page 1 -- page 11.  Sorry.

DIRECT EXAMINATION

BY MR. HADDAD:

Q    Hello, Suhail.  Can you please say your full name for the jury.

A    Al Shimari.  Abdullah Al Shimari.  Correct.

Q    How are you doing today, Suhail?

A    I am well.

Q    Suhail, how old are you?

A    Sixty-five years old.

Q    Where do you live right now?

A    I live in Mahmoudiyah, an area near to the highway in the Village of Abdullah.  Oh, Abdullah Alisha (phonetic).  In the village of Abdullah Alisha.  So it's near the

12

highway.  Okay.

Q    Okay.  Thank you, Suhail.

Suhail, are you married?

A    Yes, I am married.

Q    How long have you been married?

A    I got married in 1981.

Q    Do you have children?

A    Six.

Q    Where were you born?  Where were you born?

A    In the same village.

Q    Can you describe your educational background?

A    I have a bachelor's in mathematics.

Q    What do you do for a living?

A    I am a school principal.

Q    Okay.  What type of school are you a principal at?

A    I work as a school principal in the same village, Abdullah Alisha.

Q    Are you a principal at a middle school?

A    Yes.  Middle school.  Yes.  Middle school.

Q    Before you were the principal, what did you do?

A    I was a teacher.

Q    Were you a math teacher?

A    Yes.  Mathematics teacher.

Q    Suhail, do you practice a particular religion?

A    I am Muslim.

13

Case 1:08-cv-00827-LMB-JFA   Document 1818   Filed 11/12/24   Page 14 of 310
PageID# 54532
Direct examination/Read testimony - S. Al Shimari

Q    Suhail, I'd like to focus your attention on the fall of 2003.

A    All right.

Q    Did there come a time in late 2003 when you were detained at Abu Ghraib prison?

A    Yes.  Yes.

Q    When exactly were you detained at Abu Ghraib prison?

A    So I was detained in the cellblocks.

Q    When you were first detained at Abu Ghraib, were you held in the cellblocks that you just mentioned?

A    Yes.

        MR. HADDAD:  I'd like to show the witness Plaintiffs' Exhibit 13, which is already in evidence.

        THE WITNESS:  Yes.  This is the place where I was detained.  I was in Jail Cell Number 1.

BY MR. HADDAD:

Q    For how long?

A    Thirty days.  A full month.

Q    Okay.  So you were in the cellblock for the month of December 2003?

A    Yes.

Q    You said that you were in Cell Number 1.

        Can you describe what your cell looked like?

A    The jail had two levels, ground level and a higher level.  It was quite cold, and it was tight.

14

MR. HADDAD:  The photo can be taken down now.

BY MR. HADDAD:

Q    So in the month that you were detained in the cellblock, were you interrogated?

A    Yes.  Yes.  I was interrogated twice or three times in that jail cell.

Q    When you were interrogated at this cellblock, what type of shirt was the person who was asking you questions wearing?

A    Okay.  So the man would be wearing a black T-shirt, camel-color pants.  Camel-color pants.  That's it.

Q    While you were being questioned, was something ever put on your head?

A    Yes.  They would put the bag on my head.  And it shows in the pictures.  They would put the black bag on my head.

Q    What kind of bag was put on your head?

A    A regular bag.  A sandbag.

Q    So I'd like to turn to how you were treated while you were at the cellblock.

During the time you were at the cellblock, were you abused?

A    Yes.  I would like to clarify a few matters.  As soon as I got to that place, they put me in the jail cell.  So the first day, they shaved my mustache, my beard my hair. And, as you know, that's a form of humiliation for a man to

15

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

shave their mustache, their beard and their hair.  It's a form of humiliation.

After that, they took me to the shower.  So a female soldier took me.  A female soldier.  If it's a man, I would be ashamed and embarrassed to be exposed in front of the man.  But, nevertheless, that was a female soldier.  So she gave me a small soap, and she told me to take a shower.  It was quite cold, and she would not let me stop, finish my shower until the bar of soap was consumed.

After that, they gave me a red jumpsuit.  A red jumpsuit.  So she dipped the red jumpsuit in the water, got it wet, and then gave it to me to wear.  After that, they got me to strip naked, and they made me hold my penis.

While I was inside the cell, I was attacked, and they were fingering me from behind.  Yes.

Q    Suhail, I think you just mentioned that you were fingered from behind --

THE COURT:  Counsel, keep your voice up, please.

MR. HADDAD:  Sorry.

BY MR. HADDAD:

Q    Suhail, I think you just mentioned that you were fingered from behind in your cellblock.

Do you mean that someone inserted a finger into your rectum?

A    Yes.

16

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA    Document 1818    Filed 11/12/24    Page 17 of 310
PageID# 54535
Direct examination of trial testimony - S. Al Shimari

Q    And did this happen more than once?

A    Of course.  Whenever I'm taken to the -- whenever I'm taken for interrogation, I get bad treatment.

Q    Suhail, I'm going to ask you more questions about what you just said, but could you describe some of the other ways that you were abused that you haven't mentioned yet first?

A    Yes.  Go ahead and ask me the question.

Q    While you were being questioned, did you ever have to kneel on anything?

A    They had me kneel over some sharp rocks, and those rocks will cause you to get injured.  And the position they had me is where I had to get on my knees and focus on the interrogator.

During the interrogation, the interrogator, what he would do is he would draw a circle on the wall and place a dot inside that circle.  And he had -- he asked me -- he would ask me to put my -- he would ask me to place my nose on that dot.

Q    So I want to ask you more about when you kneeled on sharp stones.

Can you show the jury how big the stones were?

A    Those stones were broken into pieces, and whenever you put your knees on it, it will cause you an injury.

Q    Suhail, can you use your hands to show the jury how big the stones were?

17

A   They were about the size of an egg, and it has the sharp edges.

Also, I have another point that I would like to bring up.  So whenever I was interrogated, what the interrogator would do is he would talk to me directly.  And behind him, they put a glass, and behind that glass, there was a dog.  And I was threatened every time if I do not cooperate during the session of the interrogation.

Can I add some more?

Q   Sure, Suhail, you can add some more.

A   During that session, when the dog was present, so whenever they do the interrogation session, they would bring up the dog close to my face, and that caused me to have a hernia in my stomach.  And, themself, they operate -- they had a surgery, and they operated themself on me.

Q   Suhail, I have a -- I have a question about what you just said, Suhail.

A   Okay.

Q   So a minute ago you talk about how you kneeled on sharp stones during an interrogation.

Did someone tell you to do that?

A   Of course.  I was forced.  I did not have a choice.

Q   Who forced you to do that?

A   The same person who was wearing a black shirt, and that's the one who was giving the commands.

18

Case 1:08-cv-00827-LMB-JFA    Document 1818    Filed 11/12/24    Page 19 of 310
PageID# 54537
Direct examination / Dead testimony - S. Al Shimari

Q    A minute ago, you also spoke about how someone drew a circle on the wall and made you stand against it.

A    Yes.

Q    Did that happen after you were questioned?

A    During the interrogation, it was a form of punishment. When I don't cooperate, he would ask me to do that.  I was getting struck if I do not cooperate, and sometimes they would reload the gun.

Q    You just mentioned a gun.

Did someone have a gun while you were standing against the wall?

A    Yeah, there was a weapon present.

Q    Okay.  Did anyone point a gun at you while you were standing against the wall?

A    Yes.

Q    And for how long did you have to stand against the wall like that?

A    We can say about three hours.

Q    Did you try to move away from the wall?

A    My feet were swollen, and I kept on trying not to fall, but out of fear, I attempted to stand up.

Q    What were you afraid of?

A    I was afraid because a weapon was pointed at me.

Q    Suhail, I'm going to ask you about other things that may have happened to you while you were at the cellblock.

19

A    God willing.

Q    While you were at the cellblock, did anyone ever intentionally touch your genitals?

A    Yes.  They tried, they did, and they had me handcuffed on the bed and then --

Q    Go ahead.

A    And during the night, they will play -- they will play loud music at night, and nobody was able to sleep.

Q    You just mentioned that someone grabbed your genitals while you were at the cellblock.

Did they say anything to you while they were doing this?

A    I was told that I would be raped, and also I was told that my family will be brought here not for you to see, but for you to watch them being raped.  And this is unacceptable.  Once or twice they poured cold water on me.

Q    Where did they pour cold water?

A    It was a form of punishment near the showers.

Q    Okay.  Did they pour cold water on you?

A    No.  There was a tub of cold water, and they picked me up and placed me in that tub of cold water, and they repeated that again.  And they put me in a red jumpsuit. What they would do is they will wet it, and then they asked me to wear it.

Q    Suhail, you mentioned loud music a minute ago.

20

When would loud music be played at the cellblock?

A    From sunset until sunrise.  Throughout the whole night.

Q    Were you able to sleep while the loud music was being played?

A    It's impossible to go to sleep.

Q    While you were at the cellblock, were you ever naked?

A    Completely naked for 30 days.  And the thing with the red jumpsuit, I would prefer to stay naked and not put it on because of how wet it was.

Q    Were your arms ever chained to anything while you were at the cellblock?

A    Yes.  What they did was they handcuffed me to the bed, and while I was handcuffed, they started playing with my penis, and they would bring the dog near me.

Q    Okay.  So you just said that you were handcuffed to a bed.

Were your arms in front of you or behind you?

A    Behind me.

MR. HADDAD:  Let the record show that the witness put his arms behind his back and stood up.

I'd like to show the witness Plaintiffs' Exhibit 195.  It's not in evidence yet, so it should be shown only to the witness at this time.

MS. GINSBERG:  Judge, relevance.

THE COURT:  This was allowed in as demonstrative

21

Case 1:08-cv-00827-LMB-JFA   Document 1818   Filed 11/12/24   Page 22 of 310
Direct examination/Redirect testimony - S. Al Shimari
PageID# 54540

evidence, so let's move this along.

MR. HADDAD:  Okay.  We move to admit Plaintiffs'
Exhibit 195.

THE COURT:  It's in.

(Plaintiffs' Exhibit Number **195 admitted into evidence**.)

MR. HADDAD:  Please publish Exhibit 95 to the
jury.  Plaintiffs' Exhibit 195.

THE WITNESS:  That's exactly how I was handcuffed.
Yes.  Exactly like this photo.

MR. HADDAD:  Thank you, Suhail.  We can take the
photo down.

THE WITNESS:  And as you are aware, I am a
principal of a school.  I am a man.

BY MR. HADDAD:

Q    Can you say that one more time?

A    I am a man, a principal of a school.  Is it possible
for me to add on a little bit more?

Q    Suhail, I'll ask you a different question now.

A    God willing.

Q    While you were at the cellblock, were you ever
electrically shocked?

A    Yes.  Whenever I was taken, they would place my hand
behind my back, and then upon arrival, there was wires that
they would connect to me.

Q    Okay.  And while you were being questioned, were you

22

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

ever electrically shocked?

A    Yes.

Q    While you were at the cellblock, were you ever beaten?

A    I was beaten, and I had -- during that beating, I lost my teeth.  And if you would like me to show you, I don't mind.

Q    I don't think you need to show us.

A    I was struck on my head, my hand, my back.

Q    Okay.  While you were at the cellblock, were you ever choked?

A    Yes.  Yes, I was choked.  And while I was choked, they will bring up the dog, and they will put a blanket on the dog.  And whenever the dog attempt to bite me, they will pull the dog back.

        MR. HADDAD:  I'd like to show the witness Plaintiffs' Exhibit 206G.  It's in evidence through 206 already, but this is just a subpart of just that photograph. I move to admit 206G into evidence.

        THE COURT:  All right.

  (Plaintiffs' Exhibit Number 206G admitted into evidence.)

        MR. HADDAD:  Can you please publish it to the jury and to Suhail.

BY MR. HADDAD:

Q    Suhail, do you recognize the individual on the right in this photograph?

23

A    Yes.  This is one of the people that were -- who were present there, and they were with us.

Q    Suhail, you mentioned earlier that you had a hernia.

Where in your body was the hernia?

A    Right about my belly button.

MR. HADDAD:  You can take down this photo.

THE WITNESS:  And also if you would like me to show you that, I will show you that.

BY MR. HADDAD:

Q    That's okay, Suhail.  You don't need to show us.

Did you ever have a surgery to address the hernia?

A    Yes, I did.

Q    Do you still suffer from stomach pain?

A    No, I'm better now.

Q    Getting better now.  All right.

A    But my whole body is hurting me.

Q    Okay.  Do you suffer from headaches?

A    Yes, I do.  I also hallucinate sometimes to the point where my relationship with my family is deteriorating, and what happened to me is very humiliating.

Q    How often do you have headaches?

A    It depends.  Every week, every five days.  Not any specific time.

Q    Did you have headaches this often before you were detained at Abu Ghraib?

24

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA   Document 1818   Filed 11/12/24   Page 25 of 310
PageID# 54543
Direct examination of trial testimony - S. Al Shimari

A    No, I did not have anything prior to that.

Q    You mentioned earlier that you have pain in other parts of your body.

What other parts of your body do you have pain?

A    Around my wrists from where they placed the handcuffs, and also my shoulder from beatings, and my neck as well. Yes.

Q    Did your memory get worse after Abu Ghraib?

A    Of course.

Q    And I didn't mean to interrupt you.

Do you have pain in any other parts of your body aside from what you just told us?

A    Sometimes my feet get swollen, I have back pain, and it's to the point it causes me not being able to fall asleep.

Q    Did you have this back pain before you were detained at Abu Ghraib?

A    No.

Q    Did your ability to concentrate change after you left Abu Ghraib?

A    Of course.  I started forgetting a lot and not being able to gather everything.

Q    Did you change emotionally after Abu Ghraib?

A    As a principal and someone who is -- had to adhere to assaulting and beatings, what do you think?  I am ashamed to

25

even tell my own family.

Q    You mentioned earlier that this has affected the relationship with your family.

Can you talk about how this has affected your relationship with your family?

A    No.  Before -- before that, I had no problem listening to my family.  But now I have -- I don't have the patience for anything.  As soon as they tell me something, I'll get angry.

Q    Since being at Abu Ghraib, do you sleep differently than you did before?

A    Yes, it is different.  Dealing with my family became different, and my whole life is different.

Q    Do you have nightmares after Abu Ghraib?

A    Yes.  I do have nightmares to the point where I imagine things that is about to happen to me.

MR. HADDAD:  Thank you, Suhail.  No further questions.

THE COURT:  So now we have the cross-examination, just as if the witness were in court.

CROSS-EXAMINATION

BY MS. GINSBERG:

Q    Good afternoon, Mr. Al Shimari.  My name is Nina Ginsberg.  I represent CACI.  That's the company you -- in Virginia -- here in Virginia that you sued.

26

I'm sorry.  But would you pronounce your name for me?  I'm afraid I've been pronouncing it incorrectly.

A     Suhail Najam Abdullah Al Shimari.

Q     Mr. Al Shimari, is that correct?

A     Yes.

Q     Thank you.

Mr. Al Shimari, we've never meant before; is that right?

A     Yes.

Q     Mr. Al Shimari, did you hear at the very beginning the statement that one of your lawyers read aloud about your interrogations at Abu Ghraib?

Mr. Al Shimari, the United States and your lawyers and CACI have agreed that on December 15th, 2003, CACI Interrogator A served as the lead interrogator, and Army Interrogator B served as the assistant interrogator analyst in the intelligence interrogation of Mr. Al Shimari.

According to the interrogator's reports and notes, the interrogation lasted for two hours and 15 minutes; do you agree with that?

A     I don't understand your question.  Can you repeat the question?

Q     Well, Mr. Al Shimari, do you dispute that you were interrogated only one time at Abu Ghraib?

A     Only one time?  No.  More than three times.

27

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q    All right.  Do you agree that the mistreatment that you suffered while you were detained for almost five years at Abu Ghraib was not the first time that you experienced traumatic events that had a significant effect on your life?

A    No.  I was interrogated more than one time.

Q    Okay.  Well, Mr. Al Shimari, I'm going to ask you, you lived through three wars in Iraq; is that correct?

A    Yes.

Q    And the Iran-Iraq war, that lasted from 1980 to 1988?

A    Yes.

Q    And the Gulf War where the multiple -- there were military coalition to liberate that invaded Iraq to liberate Kuwait?

A    Yes.

Q    And that was from August of 1990 to about February of 1991?

A    Yes.

Q    And you actually served in the military during both of those wars; correct?

A    Yes.

Q    And you were a captain in the field artillery regiment?

A    Yes.

Q    And while you were in the Army, you sought action, you were involved in fighting during those wars?

A    Yes.

28

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q    And you watched other people who you commanded, you watched them die; is that right?

A    Yes.

Q    And, in fact, you, yourself, came very close to death at least one time?

A    Correct.

Q    Yeah.  And you received a shrapnel wound to your abdomen that went through your body?

A    Yes.

Q    And that was in 1987?

A    Yes.

Q    And as a result of that, you were actually hospitalized for three or four months?

A    Correct.

Q    And then you recuperated at home for another six or seven months?

A    Yes.

Q    So this had -- this had a big effect on you?

A    Not in the same way where I had to endure injustice, assault and -- while being detained.

Q    Okay.

A    Nobody had shaved my beard, my mustache, and I was not told that they would bring my wife for them to rape.

Q    I understand.

        Mr. Al Shimari, you're not wearing a beard; right?

29

A    No.  I'm talking about my mustache.  My head being shaved, the way they grabbed my penis, the way they fingered me.

Q    Yes.  But you said shaving your beard was a humiliation, and you haven't worn a beard for many, many years; is that correct?

A    I am a Muslim, and I was wearing a beard at the time.

Q    All right.  In March of 2003, the United States invaded Iraq again; is that correct?  They came to capture Saddam Hussein?

A    Yes.

Q    And --

A    I was -- at that time, I was in Abu Ghraib.

Q    Yes.  You were arrested in November, on November 7th, 2003, while the United States was occupying Iraq?

A    Correct.  7 of November 2003.

Q    Okay.  Now I'm going to ask you about some of the things that happened to you before you got to Abu Ghraib.

A    Yes.

Q    Okay.  So you were arrested in your home when three Army vehicles full of soldiers came to your home and took you?

A    Yes.

Q    A large number of soldiers came to your house and arrested you on November 7th; correct?

A    Yes.

Q    Yes.

And they didn't only take you, they took five -- maybe four other members of your family?

A    Yes.

Q    And there were no civilian people who were there when you and your family were arrested; right?

A    Where did -- what do you mean by "civilian"?

Q    Where you were first arrested on November 7th, you didn't see any people wearing civilian clothes, everybody was a soldier?

A    Yes.  When I was arrested at that time, there was no -- it was a military force that came in.

Q    Okay.  And after you were arrested, you were held -- before you got to Abu Ghraib, you were held at three different American military bases; is that also correct?

A    Correct.

Q    And you were held -- you were held at those bases between November 7th and December 1st, which is the date that you were -- we understand you arrived at Abu Ghraib?

A    Yes.

Q    Okay.  And at some -- at least one, and maybe more of those prisons during those three weeks, you were hit on the head by American soldiers; is that correct?

A    No.  All the torture was being done at Abu Ghraib.

31

Q    And you weren't -- you were not put in a pile of cells with animals?

A    Yes.  In Abu Ghraib, I was attacked by a dog.

Q    No.  I'm asking you at one -- at one of the different American military camps before you got to Abu Ghraib.

A    No.  No.  There was nothing.

Q    And you were hit in the stomach by American soldiers before you got to Abu Ghraib?

A    No.  What they would do is they would handcuff me and just transfer me from one location to another until I arrived at -- to Abu Ghraib.

Q    And when they did that, they put a bag over your head that was filled with soil so that you couldn't breathe while -- when you were being transported?

A    Yes.  Don't forget, it's been a while.  I do not remember everything.

Q    I understand that.

A    I only remember the worst place, which is Abu Ghraib.

Q    Well, I'm going to ask you some questions.

You remember that you answered questions under oath at a deposition in 2017, I think, is that right?

A    Answering questions in 2017, yes.

Q    Yes.  And you were under oath at that deposition, you swore to tell the truth at that deposition; is that right?

A    And I'm still telling the truth.

32

Q    Yes.  And at that deposition, you also -- you had one of your lawyers there with you?

A    Where?

Q    At the deposition in 2017.

A    Yes.

Q    And I'm sorry --

A    It has been a while, and whenever somebody asks me a question, I will give them an answer.

Q    Okay.  And just my last question about that.

There was an interpreter at the -- there at the deposition, and you were able to understand the questions and give your answers?

A    Yes.

Q    Okay.  All right.  So I'm going to ask you questions now about three different military camps that you were taken to before Abu Ghraib; okay?

A    Yes.

Q    So the first place you were taken was an American military base called Camp Mursalat; correct?

A    Correct.

Q    And on your way to Camp Mursalat, you were stacked up in a trunk with other prisoners and kept together tight, like head to head to foot, with other soldiers; correct?

A    Yes.  Correct.  Yeah.  There was many of us.  And that's why we were placed in a confined place.

33

Q    Okay.  And the soldiers -- I'm sorry.  Go ahead.

A    Yeah.  It is clear I was transferred from one camp to another in a vehicle.

Q    Okay.  And --

A    What is the issue with me being transferred from one location to another?

Q    I'm going to keep asking some questions; all right?

A    Yes.

Q    When you were transferred, the soldiers put a bag on your head, on everyone's head?

A    Yes.

Q    And you stayed at Camp Mursalat for two days; correct?

A    Correct.

Q    And while you were there at Camp Mursalat, you were put in a very small cage with four or five other people; correct?

A    Correct.

Q    And you were also asked questions, interrogated when you were at Camp Mursalat; correct?

A    Correct.

Q    And the people who interrogated you at Camp Mursalat were soldiers; correct?

A    But they did not mistreat me.

Q    Okay.  Well, did they put a bag on your head when there were -- when they were interrogating you; correct?

34

A    Yes.

Q    And then after -- while you were at Camp Mursalat, the only people you came in contact with were American soldiers; correct?

A    Yes.

Q    Okay.  So you saw nobody wearing civilian clothes?

A    At that place, it was a temporary-held place.  We were held there for two days, and they conducted one interrogation with us and that was it.

Q    Okay.  And while you were there, you had no contact with anyone that you believe was working for CACI while you were at Camp Mursalat?

A    I didn't even know what CACI is.

Q    Okay.  So then the next -- after those two days, you were taken to Camp Luhoom; correct?

A    Correct.  It's Luhoom.

Q    And you were taken by soldiers to Camp Luhoom.  Camp Lahoom is a military base; correct?

A    Yes.  Military.

Q    And, again, you were taken in a military car with other prisoners with a bag over your head when you were taken there?

A    Yes.  Correct.

Q    And you were held at Camp Luhoom in a small tent for about a week; is that right?

35

A    Yes.

Q    And there was also interrogations by U.S. soldiers? That U.S. soldiers interrogated you while you were at Camp Luhoom; right?

A    One time.

Q    Okay.  And the only people that you saw at Camp Lahoom were American soldiers; correct?

A    Correct.

Q    And no one that you saw there was wearing civilian clothes; correct?

A    As I have told you, it was a temporary time.

Q    Okay.  And then the last place you were taken before you got to Abu Ghraib was Camp Mujahideen; correct?

A    Correct.

Q    And you were transported to Camp Mujahideen the same way, in a truck with other prisoners with a bag over your head?

A    Yes.

Q    All right.  But this time, the soldiers, they were pushed very close to each other, the head next to the foot of the other person -- other person?

A    Correct.

Q    And it was painful?

A    Very.

Q    Very painful.

36

And also very difficult to breathe?

A    Yes.  Being transferred with a bag over the head in a car, yes.

Q    Okay.  And you previously said that you think you may have some of the weakness in your side, on your left side, was caused by being stacked head to foot in this truck when you were being taken?

A    What kind of weakness?

Q    Now you have weakness in your side?

A    No, I did not have anything like that.

Q    All right.  I must be mistaken.

Then you were detained at Camp Mujahideen for maybe 15 days?

A    Approximately.

Q    And while you were at --

A    It has been -- don't forget, it has been 20 years.  I don't remember very well.

Q    I understand.

You were interrogated at Camp Mujahideen two times; correct?

A    Approximately.

Q    Okay.

A    Correct.

Q    And the person who interrogated you was an American soldier?

37

A    I don't know whether it was an American or CII, or -- I don't know.  I don't know who they are.

Q    But someone in a military uniform?

A    Correct.

Q    All right.  I'm going to --

A    But we did not see the same treatment where we were getting humiliated.

Q    All right.  I'm going to ask you some questions that first -- the first of the two interrogations.

A    What place?

Q    At Camp Mujahideen.

     Okay.  So while you were at Camp Mujahideen, you were abused; correct?

A    Every time I was being interrogated, it was abuse.

Q    Okay.  And they put a bag over your head?

A    Yes.

Q    And that bag again was full of soil?

A    Yes.

Q    And it made it very hard for you to breathe?

A    Same thing.

Q    And also very difficult to talk.  All right.

     And there were some other things that happened to you during that interrogation; correct?

A    Like?

Q    All right.  That they put -- you were in a position

38

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

where your feet were higher than your head?

A    No.  That was only at Abu Ghraib.

Q    Mr. Al Shimari, do you remember being asked at your deposition:  Did anything happen during the first interrogation that you viewed as mistreatment other than having --

A    At what location?

Q    At Camp -- the first -- your first interrogation.

A    What?  At Abu Ghraib or what?  What interrogation?

Q    No.  At Camp Mujahideen.

A    Yes.  At Camp Mujahideen, I was interrogated twice, but it did not affect me like Abu Ghraib.

Q    All right.  Mr. Al Shimari, you agree you were interrogated two times at Camp Mujahideen; correct?

A    Correct.

Q    And the second time you were interrogated, there was a man who you had described as wearing a ponytail; correct?

A    The person with the ponytail was at Abu Ghraib.

Q    All right.  Do you agree that --

A    It has been a long time.  I don't remember all the details.

Q    All right.  And do you agree, though, that the second interrogation that you had took place before you were moved to the cellblock at Abu Ghraib?

A    Yes.

39

Q    All right.  And do you also agree -- and do you also recall at page 50, lines 3 to 6, being asked:  Mr. Al Shimari, you said a bit ago that your second interrogation had an interrogator with a ponytail; is that right?

A    Yes.  One of the interrogators had long hair.

Q    Okay.  And do you recall answering the question about your second interrogation with the man with the ponytail answering yes?

A    And I still do say yes to that question, but I do not remember exactly at what location it was.  It has been over 20 years.

Q    And do you remember that someone in one of those interrogations at Camp Mujahideen was pushing and pulling you and pushed you and -- and pushed you around in the room, in the interrogation room?

A    We were more than ten people in one room, and there was one interrogator, and he was interrogating one at a time.

Q    All right.  And during one of those interrogations, they had your hands tied so hard that you were afraid your hand or your wrist was going to be broken?

A    No.  Not at that location.  That was at Abu Ghraib.

Q    All right.  Do you recall during your deposition being asked:  Are there any other things that happened during the first interrogation that you called mistreatment?  Page 47, lines 19 to 21.

40

And do you recall answering:  He was pulling me all the way.  They almost broke my hands.  They were tied hard.  They were tied so hard, my hands, they almost got broken?  Page 48, lines 6 to 8.  And do you also recall the man with the ponytail ordering you to stand on your toes with your nose on the wall?

A    Yes.  It has been a while.  It has been a long time.  I only remember the torture that I went through at Abu Ghraib.

Q    And do you also remember during the interrogation with the man with the ponytail, that you were losing your balance because you were standing with your nose on the wall?

A    I remember the extreme mistreatment that I went through while I was at Abu Ghraib.

Q    All right.  But I'm asking you about Camp Mujahideen with the man with the ponytail.

A    I don't remember all the camps, but I remember the one location that I went through the most mistreatment.

Q    Well, all right.  Well, you haven't sued anybody --

A    It has been 20 years.

Q    All right.  Well, you haven't sued anybody -- sir, please answer -- please let me ask my question.

You haven't sued anybody -- you haven't sued anybody for any of the mistreatment that you suffered at one of the three camps; correct?

A    I do not know who was committing the mistreatment,

41

whether it was a CII or other people exactly.

Q    Okay.  And after you left Camp Mujahideen, you were taken to Abu Ghraib; is that correct?

A    Correct.

Q    And before you got to Abu Ghraib, you didn't see any person dressed in civilian clothes; is that correct?

A    Yes.  All of them were military.

Q    Okay.  And you were -- you testified on direct examination that when you were first taken to Abu Ghraib, you were taken directly to the cellblock; is that correct?

A    Correct.

Q    Okay.  And you said that you were interrogated two or three times in the jail's cellblock; is that correct?

A    Correct.

Q    Okay.  So you were not taken any place outside the cellblock to be interrogated; is that your testimony?

A    No.  They take me to a different place, and I would be punished.  All the interrogation was done outside of the cell -- of the jail cell.

Q    Mr. Al Shimari, you testified that you were brought to the -- that after you were brought to the cellblock, soldiers took you to the showers.

A    Initially when I -- when they brought me, they shaved my head, mustache, my beard, and then they took me to the shower.

42

Q    Okay.  And that was soldiers that did that to you; right?

A    Of course.  But after a while, I learned that the soldiers, they would not do anything.

Q    All right.  It was the soldiers that made you strip naked in the shower?

A    Yes.  Soldiers did.

Q    Yes.  And the soldiers made you hold your penis?

A    No.  They held my -- they held my penis.

Q    They held your penis, and they attacked you in the shower?

A    Yes.  A female soldier who attacked me in the shower.

Q    Okay.  And was the female -- and it was the female soldier that put her finger in your rectum?

A    No, the soldier.

Q    It was a man, a male soldier?

A    Yes.

Q    Okay.  And then you said you were taken back to the cell with the wet jumpsuit; correct?

A    Correct.

Q    And then at some point you were taken for interrogation; is that correct?

A    Correct.

Q    And the soldiers took you from your cell and brought you to where the interrogation was?

43

A    Yes.

Q    And that was somewhere inside the building where the cellblock was?

A    Close to it.

Q    Okay.  And the room where you were interrogated, it had -- it was a room with concrete walls?

A    Yes.

Q    And a concrete floor?

A    No.  The floor had the broken stones.

Q    But the floor was concrete; was it?  It was close to my -- I'm sorry.

A    It was close to the -- to my jail cell.

Q    Okay.  And it was in that room that you claim -- the concrete room that you claim there were rocks on the ground and rocks on the floor and they made you kneel?

A    Yes.  That's where the interrogation took place.

Q    Okay.  And was it where -- the two people who were interrogators in that room; correct?

A    No.  There was one interrogator and one guard.  There was an interrogator and a military member.

Q    Okay.  And the military member was also telling you what to do; correct?

A    Yes.

Q    Okay.  And you said -- you testified that during every one of your interrogations, they had a dog behind a window;

44

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

is that correct?

A    Yes.  Very close to us during the interrogation.

Q    All right.  But outside the interrogation room?

A    They close to the interrogation room.

Q    All right.  But you're testifying it was behind a window; is that right?  So you could see that there was a dog there?

A    Yeah.  There was a glass window, and at any given moment, the window could be opened, and the dog can attack me.

Q    All right.  But the cell that you -- the room you were in when you were interrogated, it was concrete, had concrete walls and a concrete door and a door that was closed; correct?

A    Yeah.  The room that I was in, it had a window.  It had a door that made up -- like, a safe door.

Q    And you testified at some point they brought the dog close to your face?

A    Yes.

Q    And that's what caused you to have a hernia?

A    Yes.

Q    And you also testified that someone had a gun pointed at you during the interrogation?

A    Yes.

Q    Yes.  And --

45

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A     It was a form of punishment whenever -- what he does, he would reload the weapon.

Q     All right.  And who in the interrogation room was the person that had the gun?

A     The guard who was -- the guard who was taking orders from the interrogator.

Q     The guard was outside the interrogation room; correct?

A     Very close to the interrogator.

Q     All right.  Well, there were three people in the interrogation room; correct?

A     No, it was not three; it was just the interrogator, interpreter and the guard.

Q     Okay.  And after the interrogation, you said that while you were at the cellblock, you testified that you said that they touched your genitals.

      You meant the soldiers; correct?

A     Yes.  Correct.

Q     And it was the soldiers who said that you would be raped and they would bring your family there to be raped; correct?

A     Yes.  No.  That was -- I was told that by the interrogator, not them.  The interrogator told me that he was going to bring my family, not the soldier.

Q     All right.  Do you recall being asked -- when one of your lawyers asked you questions this morning:  While you

46

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

were at the cellblock, were you -- did they threaten to rape you?  And you said yes:  I was told?

A    When?

Q    This morning your lawyer asked you about things that happened to you in the cellblock; do you remember that?

A    A little bit -- a while ago my attorney asked me what happened inside the cell.

Q    No.  Inside the cellblock.

A    Yes.  I was just asked that question during the court session.

Q    And one of the things you told your lawyer that happened to you in the cellblock, not in the interrogation room, in the cellblock is I was --

A    When I was mentioning about how I was handcuffed and then you guys showed me the picture and all that?

Q    Yes.  All right.

And one of the things you said happened to you on the cellblock is I was told I would be raped and my family would be brought here and my wife would be raped?

A    Yes.

Q    Okay.  And it was the soldiers that said that to you?

A    No.  The interrogator told me that he was going to do that to my wife, not the soldiers.

Q    Okay.  And is it your testimony that you were held completely naked for the whole 30 days that you were at Abu

47

Ghraib?

A    Yes.  With a red wet jumpsuit.  And that was the only thing that was available.

Q    Okay.  But you weren't naked during the interrogations that you had on December 15th; were you?

A    Whenever I was brought up for the interrogation, they put -- I would go in the red jumpsuit.

Q    Okay.  You testified that at the cellblock, you were electrically -- electrically shocked; do you remember?

A    Whenever I get back from the cellblock, that's when that happens.

Q    When you --

A    There was a room where it is dark and it does not have any light to it.

Q    Okay.  And you were taken by soldiers to that room where you were shocked?

A    The soldiers brought me to the interrogator, and the interrogator did that.

Q    Okay.  And is it -- it's your testimony that you were shocked on your hands; is that right?  They put wires on your hands?

A    Yes.  Right here and here.

Q    And also -- and on your hands also?

A    Over my arms.

Q    Okay.  After that -- and after -- after the

48

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

interrogation, you were at Abu Ghraib for about 30 days, you were at the hard site, and then you were taken to some tents; correct?

A    Correct.

Q    And at the tents, did you see your family once you were moved to the tents?

A    After more than a month and a half, I was able to see them.

Q    All right.  You were seen -- you were -- after you stayed at the -- well, let me ask you this.

        MS. GINSBERG:  Could we -- could we display Plaintiffs' Exhibit 206G?  The one that previously ...

BY MS. GINSBERG:

Q    All right.  The man on the left wearing the brown shirt, is that one of the men that was a soldier -- one of the soldiers who did these things to you?  I'm sorry.  The right.

A    One of them.  I have seen this person before.

Q    All right.  And was he -- was he the soldier?

A    It's one of them, but he has other -- also, people were there with him.

Q    Okay.

A    But this one I'm very sure of him.

Q    Okay.  But you're not sure about the man on the left wearing the whole camouflage?

49

A    Yes, I'm not sure.

Q    All right.  Do you remember sometime it may be in April of 2004, you were moved to Camp Bucca; correct?

A    Correct.

Q    All right.  And you stayed at Camp Bucca for almost four years?

A    Yes.  Yes.

Q    And while you were at Camp Bucca, is that where you had the hernia operation?

A    Yes.

MS. GINSBERG:  All right.  Exhibit 29, Defendant's Exhibit 29.  Would you display for the witness and the Court page 202.

This is the detainee file that was maintained while Mr. Al Shimari was in U.S. military custody.  It's a government document.

BY MS. GINSBERG:

Q    Mr. Al Shimari, if you would look at the picture that's on the page that's in front of you.

Is that what you looked like when you were arrested?

A    Can you zoom in?

Q    There, is that better?

A    Yes.  That was my number.

Q    But is this -- is that how -- is that what you looked

50

like when you were arrested in November of 2003?

A    Yes.  I also had a wristband on my hand with the number and the picture in it.

MS. GINSBERG:  And then if we could have page 3 of the same exhibit, Defense Exhibit 29 displayed.

BY MS. GINSBERG:

Q    Do you see the picture on that page, Mr. Al Shimari?

A    Yes, I do.

Q    And is that the way you looked when you were taken to Camp Bucca?

A    Yes, that's me, but --

Q    Okay.

A    -- I had a long beard.

Q    I'm sorry, you had?

A    I had a long beard.  Yes, I had a long beard.

Q    All right.  Now, do you remember that when you were at Camp Bucca, you were taken for two days to a medical facility?

A    Yes.  I went there twice.  They operated on the hernia and something else.

Q    All right.  And you were also -- you were there in 2005; right?  And while you were there, you had the opportunity to tell them about any medical or physical complaints that you had; correct?

A    Of course.  I was in extreme pain after the hernia

51

surgery.

Q    No.  At the other -- you saw doctors at the medical facilities at additional different times when you were at Camp Bucca; correct?

A    Yes.

MS. GINSBERG:  And if we could display page 39.

BY MS. GINSBERG:

Q    Did you ever complain to any medical people at Camp Bucca that you had medical problems other than the hernia?

A    I did mention -- I did mention that I was having pain in my hands, my legs, and also my teeth were removed.

Q    Okay.  And do you remember that you had an examination of your eyes because you were having trouble reading?

A    Where?  At Bucca?

Q    Yes, at Camp Bucca.

A    Yes, I did.

Q    Okay.  And do you remember that you were examined for your teeth because you complained that you had a loose tooth that was causing you some pain?

A    Yes.

Q    And at the time, you had all of your teeth; correct?

A    No.  They started falling out one after another.

Q    Are you testifying that they started falling out while you were at Camp Bucca?

A    Initially at Abu Ghraib, and then at Bucca, they

52

started falling out.

Q   So if there was a --

MS. GINSBERG:  Would you display page 48 and 49.

BY MS. GINSBERG:

Q   Do you see -- on page 48, do you see there at the top right -- well, on the top part of the page, there are pictures of teeth; do you see that?

A   Yes, I see.

MS. GINSBERG:  Okay.  And on page 49, if you would -- if the interpreter would read the words next to medical -- medic assessment.  Translate that for Mr. Al Shimari.

BY MS. GINSBERG:

Q   All right.  Mr. Al Shimari, do you remember that you were seen many times by these doctors for minor complaints but never told them that you had been injured and were suffering from things, from pain that you incurred when you were at the cellblock in Abu Ghraib?

A   I was under punishment, and I did not have the chance to talk about it.

MS. GINSBERG:  Okay.  Your Honor, at this point I would move the admission of additional pages, pages 39, 48, 49.

THE COURT:  All right.  Those are all in.

BY MS. GINSBERG:

53

Q   All right.  So just -- all right.

So, Mr. Al Shimari, do you remember that you were also subject to interrogation during the time you spent at the camp, the tent camp at Abu Ghraib?

A   What do you -- I'm not understanding the question.

Q   I'm asking, do you remember that you were also -- after you were removed from the cellblock to the tent camp, that during the time you were at the tent camp, you were also interrogated?

A   Yes.

Q   Yes.  And you were also subject to additional mistreatment at the tent camp; correct?

A   Of course.

Q   And some of that was -- well, when some of the things that was mistreatment was being forced to sleep on the floor; right?

A   Yes.

Q   And you had insufficient toilet facilities; is that right?

A   Very little.

Q   Is that right?

A   Yeah.  There were only a few of them.

Q   The one Porta John for 1,000 men; is that right?

A   Where?

Q   In the tent camps.

54

A    Yeah.  There were only a few.

Q    Okay.  And do you remember being examined by a medical expert who was hired by your lawyers named Mr. Xenakis in January of 2013?

A    Where was this at?

Q    In Erbil.

A    Yes.

Q    Do you also know that Dr. Xenakis examined two other plaintiffs in this case?

A    Yeah.  He -- I was checked by him.  I don't know about the other two.

Q    Okay.  And do you remember telling Dr. Xenakis that you endured repeated harsh treatments during your interrogations at Abu Ghraib, and you suffered from extreme stress for another four years?

A    Yes.

Q    And that was the four years when you were held at Camp Bucca; correct?

A    I was asked that question, and I answered that question.

Q    Okay.  And do you remember telling Dr. Xenakis that you endured very stressful and abusive interrogation sessions that continued during the whole first year of your detention at Abu Ghraib?

A    I was only -- I only spent one month in the cellblock.

55

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q    No.  But what I'm asking you is if you remember telling Dr. Xenakis that you endured very stressful and abusive interrogation sessions during the first year of your detention at Abu Ghraib.

A    Yes.  He asked me the question.  He asked me how long was I -- I was at Abu Ghraib.  I told him one year.  How long was I in the cellblock, and I told him one month.

Q    Okay.  And do you remember telling him you were interrogated three or four times after you were moved to the first tent camp?

A    Yes.

Q    Okay.

A    But I don't know the dates.  It has been a while.

Q    I understand.  So I'm almost finished, Mr. Al Shimari.

Now, you testified about how the abuse you suffered has affected you; is that right?

A    Yes.

Q    Okay.  And during the time since you were released, you were a teacher in a middle school; is that right?

A    Correct.

Q    All right.  And while you were a teacher, you interacted every day with the students, what ages, 8, 9, 10, 11 years old?

A    No.  I'm a teacher who deals with students who are 13 years and over.

56

Q    Okay.  13 years and older.  Okay.

And were you able to interact with those students without losing your temper or screaming at them or any other inappropriate types of behavior; is that right?

A    Correct.  I have no choice.  I have to do what I do in order to support myself.

Q    I understand.

And were you also able to, even though you said you had a headache -- had headaches, frequent headaches, you were still able to teach your classes; correct?

A    And I am still going through the headaches.

Q    And you were actually -- you were so -- you were so successful enough at your job that you were promoted to being a principal of the school; is that right?

A    Of course.

Q    And you've been able to do that job successfully since you were promoted to being a principal?

A    Most of the people that I teach are very close to me. Most of them are my cousins and close family.

Q    Well, you're a principal, correct?

A    Correct.

Q    Okay.  And your memory, your worst memory, that has not interfered with your being able to be a principal of a school; correct?

A    Oh, of course it affected me.  It did affect me.  But

57

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

as a principal, I do have my deputy who helps me with school.

Q    Okay.  And your ability -- your ability -- your decreased ability to concentrate, that has also not interfered with your ability to perform your responsibilities as a principal -- as the principal; correct?

A    I wasn't able to teach anymore, and that's why I was promoted as a principal because I don't have to teach.  Ever since I left, ever since I was released from 2013 until now, I have been a principal.

Q    Well, you -- from 2013 until now, you've been a principal?

A    Yes.

Q    And before that, you were -- after you were released until -- after you were released in 2008 until 2013, you were a teacher?

A    Yes.

Q    Mr. Al Shimari, you haven't seen a doctor to receive treatment for any of your injuries or the pain that you now have told us you've suffered since you were released from Camp Bucca; is that correct?

A    So far I have diabetes, I've been dealing with headaches.

Q    But you haven't been treated by a doctor for the

58

Case 1:08-cv-00827-LMB-JFA    Document 1818    Filed 11/12/24    Page 59 of 310
PageID# 54577
Redirect read testimony - S. Al Shimari

injuries that you claim you suffered while you were either at Abu Ghraib or Camp Bucca?

A    No.  I was treated, and now I have high blood pressure, diabetes.

Q    Earlier did you testify that the interrogator in the interrogation --

THE COURT:  This is redirect.

MS. GINSBERG:  Oh, sorry.

REDIRECT EXAMINATION

BY MR. HADDAD:

Q    Suhail, we're almost done.  I just have a few questions.

Suhail, earlier you spoke about being forced to kneel on sharp stones during an interrogation.

A    Yes.

Q    Earlier, did you testify that the interrogator in the interrogation where you kneeled on sharp stones had a ponytail?

A    Yes.

Q    Did that interrogation happen at the cellblock in Abu Ghraib?

A    In the same location close to the cellblock.

Q    Okay.  I'll show you.

A    The interrogation room outside of the cellblock.

Q    You also -- did you also testify about how you had to

59

Case 1:08-cv-00827-LMB-JFA    Document 1818    Filed 11/12/24    Page 60 of 310
PageID# 54578
Redirect read testimony - S. Al Shimari

stand against a wall while someone pointed a gun at you?

A    Yes.

Q    Did that happen at the cellblock in Abu Ghraib?

A    No.  Inside the cellblock, I was only handcuffed.  The other things were done outside the cellblock inside the interrogation room where the dog was brought and I -- I had to stand up against a wall.

Q    Did all of that happen at Abu Ghraib prison?

A    Yes.

Q    Before you were detained at Abu Ghraib prison, did anyone ever grab your genitals?

A    Not at all.

Q    Before you were held at Abu Ghraib, did anyone insert fingers in your rectum?

A    No, of course not.

Q    Did anybody chain your arms to a bed behind you while you were naked before you were at Abu Ghraib?

A    No.  No.

Q    Before you were detained at Abu Ghraib, were you ever threatened with dogs?

A    No.  Not even a dog.

        MR. HADDAD:  No further questions.

        MS. GINSBERG:  Your Honor, what wasn't read was the Court admitted DX 29, pages 3 and 202, and we move that they be admitted.

60

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA    Document 1818    Filed 11/12/24    Page 61 of 310
PageID# 54579
Redirect read testimony - S. Al Shimari

THE COURT:  Just 3 and 202?  I thought 39 and 48 as well.

MS. GINSBERG:  Those were admitted during the testimony.  But what wasn't read were pages 3 and 202, which were also admitted.

THE COURT:  All right.  Any objection?  So Defense Exhibit 29, pages 3, 202, 39 and 48 are in.

MR. HADDAD:  No objection, Your Honor.

MS. GINSBERG:  And 49.

MR. HADDAD:  No objection.

THE COURT:  And 49.  Okay.

(Defense Exhibit Number 29, pages 3, 202, 39, 48, 49 admitted into evidence.)

MR. HADDAD:  For the record, Plaintiffs' Exhibits 13, 195 and 206G were admitted during plaintiffs' direct.

THE COURT:  All right.

(Plaintiffs' Exhibit Number 13 admitted into evidence.)

MR. HADDAD:  We would also like to read a portion of the parties' stipulation regarding Mr. Al Shimari.

THE COURT:  Go ahead.  And just for the record again, that's Exhibit Number?

MR. HADDAD:  Exhibit Number 226.  I'm sorry.

THE COURT:  Got it.

MR. HADDAD:  Just for the record, this was read

61

Case 1:08-cv-00827-LMB-JFA    Document 1818    Filed 11/12/24    Page 62 of 310
Redirect read of testimony - S. Al Shimari
PageID# 54580

before Mr. Al Shimari's trial testimony.

THE COURT:  If they're stipulations, they're allowed to be read to the jury.  Thank you.

MR. HADDAD:  Thank you, Your Honor.

So I'm reading paragraphs 5 through 8 of the stipulation, which is Plaintiffs' Exhibit 226.

Paragraph 5:  Plaintiff Suhail Najam Abdullah Al Shimari was taken into custody by the U.S. military on or about November 7th, 2003.

Paragraph 6:  Mr. Al Shimari was detained at Abu Ghraib prison starting approximately December 1st, 2003 and was held there until October 11th, 2004.  He was released from U.S. military custody on or about March 27th, 2008.

Paragraph 7:  Mr. Al Shimari was assigned ISN Number 153913.

Paragraph 8:  According to the United States, Mr. Al Shimari was interrogated by a CACI employee, CACI Interrogator A, and Army Interrogator B on December 15th, 2003.

THE COURT:  All right.

MR. FARIDI:  With that, Your Honor, plaintiffs rest their case.

THE COURT:  All right.  Counsel, approach the bench.

(Bench conference.)

62

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA    Document 1818    Filed 11/12/24    Page 63 of 310
PageID# 54581
Redirect read testimony - S. Al Shimari

THE COURT:  All right.  Mr. O'Connor.

MR. O'CONNOR:  We have a motion under Rule 50 for judgment as a matter of law, Your Honor.

THE COURT:  I'm going to deny the motion at this point.  I want to get your case in, and I'll reconsider the motion at the end of the defense case.

MR. O'CONNOR:  All right.  Your Honor, should I state the basis?  We have a written brief.

THE COURT:  Go ahead.

MR. O'CONNOR:  The borrowed servant doctrine. Extraterritoriality.  The Court lacks the power to create a private right of action.  Plaintiffs' claims are preemptive by other federal statutory law.  There's been no evidence to support a judgment on aiding or abetting or on a conspiracy. State secrets.  Derivative sovereign immunity.  Political question doctrine.

THE COURT:  Okay.  At this point, I'll deny without prejudice.  I'm going to reconsider some of them very carefully in your case; all right?

MR. O'CONNOR:  Understood, Your Honor.  We'll file our brief tonight.

THE COURT:  Yes.  Go ahead and do that.  Thank you.

MR. O'CONNOR:  Thank you, Your Honor.

                    (Open court.)

                                              63

THE COURT: All right. Ladies and gentlemen, as I indicated to you on Friday that we are close -- we're moving the case quite quickly.

The plaintiff has how rested. That means the plaintiffs believe they have produced all the evidence that they need to make their case. We're now turning to the defense case. CACI will then start calling its witnesses. And, again, we're reversing the order. So the direct examination will be done by defense counsel; cross-examination, if any, by the plaintiffs' counsel; and if there's redirect, it goes back to defense counsel; if there's recross, it goes back to plaintiffs' counsel.

And are we ready to proceed then, Mr. O'Connor?

MR. O'CONNOR: We are, Your Honor.

CACI calls Daniel Porvaznik.

THE COURT: All right.

MR. O'CONNOR: And we have binders, Your Honor.

THE COURT SECURITY OFFICER: Sir, come forward. Face the deputy clerk and raise your right hand.

Thereupon,

DANIEL PORVAZNIK,

having been called as a witness on behalf of the defendant and having been first duly sworn by the Deputy Clerk, was examined and testified as follows:

(Time noted: 10:38 a.m.)

64

THE DEPUTY CLERK:  Thank you.

THE COURT SECURITY OFFICER:  You may be seated.

DIRECT EXAMINATION

BY MR. O'CONNOR:

Q    Mr. Porvaznik, could you state your full name for the record?

A    Daniel Jacob Porvaznik.

Q    And, Mr. Porvaznik, I know you have some hearing issues.  If you can't hear me or any of the lawyers for the plaintiffs, please ask us to repeat or raise our voice; okay?

A    Absolutely.  Yes.

Q    Did you work for CACI at Abu Ghraib prison?

A    Yes, I did.

Q    When did you work at Abu Ghraib?

A    I arrived October 5th, 2003 and left sometime in March of 2004.  Probably the tail end of it.

Q    From the time you arrived in October until the time you left in March, were you at Abu Ghraib every day?

A    No.  There was -- before the Marine Corps ball on November 10th of 2003, I went to the green zone to attend the ball.  And then I can't remember if it was February or -- in that time frame, I took two and a half weeks of R&R, or leave, if you will.

Q    Other than those two instance, were you at Abu Ghraib

65

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

continuously from when you arrived in October until the time you left in March?

A    Yes.

Q    At some time prior to working at Abu Ghraib, were you in the United States military?

A    Yes.

Q    Which branch?

A    United States Marine Corps.

Q    What years were you in the United States Marine Corps?

A    April '78 to April of 1999.

Q    Were you on active duty for all of those years?

A    Yes.

Q    During the time you were in the Marine Corps, did you have a military occupational specialty?

A    Yes.  I had two, actually.  I started off in the infantry 0351.  And then in 1985, I crossed over to the 0251, interrogator translator.

Q    So you -- what year again did you become an interrogator translator?

A    I went to schoolhouse I want to say in 1985.

Q    And so you held an interrogator military occupational specialty from that time until you retired?

A    Yes.

Q    Did you have a -- did you have a security clearance while you were in the Marine Corps?

66

A     Yes.

Q     What was that security clearance?

A     Top secret, SCI.

Q     And what does top secret SCI mean?

A     Well, SCI is sensitive compartmented information.  It's very specific, and there are a lot of -- there's a lot involved to get that clearance.

Q     Did you have formal training as an interrogator?

A     Yes.

Q     Could you please tell the jury about your interrogator training in the Marine Corps?

A     I started off -- well, when I left the infantry, I ended up -- we had to go through -- there was an interview process, and then there was anywhere from six months to two years that one goes through on-the-job training.  And then after that, I ended up at Fort Huachuca, Arizona for the -- because at that point in time, all Marines went to the Army school of interrogation.

Q     How many interrogations did you conduct while you were in the Marine Corps?

A     Actual interrogations, I'd say about 75.  And if you include debriefings, it goes up to about 100 total.

Q     Can you tell the jury what the difference is between an interrogation and a debriefing?

A     Well, a debriefing you could -- one could debrief a

67

Case 1:08-cv-00827-LMB-JFA    Document 1818    Filed 11/12/24    Page 68 of 310
Direct examination of D. Porvaznik
PageID# 54586

friendly, to use that term --

THE COURT:  I'm sorry, I didn't hear that last answer.  You can debrief ...

THE WITNESS:  Soldiers -- yes, Your Honor.

Soldiers, they go out on patrol, they come back. You ask them questions about who, what, when, where, how, why.  Debriefing.  It's not aggressive or antagonistic; it's just what happened and what did you see.  That would be a debriefing as opposed to an interrogation.

BY MR. O'CONNOR:

Q    Did you conduct -- during your time in the Marine Corps, did you conduct interrogations in war zones?

A    Yes.

Q    Can you tell the jury a little bit about that?

A    The first was -- would have been a -- it was called a non-combatant evacuation operation in Liberia, Operation Sharp Edge.

(Reporter interrupted for clarification.)

THE WITNESS:  Sharp Edge.

THE COURT:  Why don't you move a little closer. That microphone is that black box.  That will help us.

THE WITNESS:  Oh.  Sorry.

Again, Operation Sharp Edge.

We evacuated approximately 2,100 personnel at a two -- well, three sites, the capital, and a Voice of

68

America site, and also, later on, Port Buchanan.

The more interrogations actually were during Operation Shield Storm, and I was basically a -- I got farmed out to 2nd Light Armored Infantry Battalion and conducted numerous interrogations in '91, 1991.

BY MR. O'CONNOR:

Q   Did you ever teach interrogation techniques while you were in the Marine Corps?

A   Yes.

Q   Can you explain what you did in teaching those techniques?

A   Again, all these personnel, Marines, who actually ended up with some Navy personnel.  I believe the course was approximately 16 weeks long.  It's been a long time.  But we would go through anything from FM 27-10, which is basically the Geneva Conventions.  We also talked about -- well, it was more doing as opposed to an academic process.

They actually had to -- we had them write reports, we had them actually learn different approaches.  So, yeah, it was about 16 weeks long, if I remember correctly.

Q   And was this at the United States Marine Corps's interrogation schoolhouse?

A   Yes.  Eventually the Marine Corps established its own schoolhouse for interrogation or just human intelligence collection.  That was at more commonly known as Virginia

69

Case 1:08-cv-00827-LMB-JFA   Document 1818   Filed 11/12/24   Page 70 of 310
Direct examination of D. Porvaznik
PageID# 54588

Beach, but at the Navy Marine Corps Intel Training Center, Dam Neck.

Q    And did you have a particular position at the Marine Corps's schoolhouse?

A    I was the course director for the interrogation of prisoners of war.  Three and a half years.

Q    When you left the Marine Corps in 1999 was that by retirement?

A    Yes.

Q    And what rank did you hold?

A    Gunnery sergeant.

        (Reporter interrupted for clarification.)

        THE WITNESS:  Gunnery sergeant.

BY MR. O'CONNOR:

Q    Did you take a job after your retirement?

A    Yes.

Q    Where did you take a job?

A    It was with a company called Premier Technology Group, and I was brought on as a senior intelligence analyst working in Heidelberg, Germany supporting the U.S. Army.

Q    How did you come to deploy to Iraq?

A    I -- over my career, I spent a lot of time in the Middle East, North Africa, two and a half years at the embassy in Oman supporting the defense attaché office. Basically, I had a long history with working in the Middle

70

East.  So when I was in Germany, I spoke to a Mr. Chuck Mudd, who was my boss's boss, basically, and I let him know that if there ever was a possibility for me to go to Iraq, I would do so, and eventually that came to pass.

Q    By the time you went to Iraq, had Premier Technology Group been acquired by CACI?

A    Restate again, please.

Q    Yeah.

By the time you -- when you went to Iraq, by then, had PT -- Premier Technology Group been purchased by CACI?

A    Yes.

Q    So when you went to Iraq, you were a CACI employee?

A    Correct.  Yes.

Q    How did you get to Iraq when you deployed?

A    It might sound odd, but I had to fly from Germany to Fort Bliss, Texas for in-processing.  I spent roughly a week there, and then U.S. military flight ultimately to Baghdad International Airport.

Q    Did you fly over to Iraq with any other CACI employees?

A    Yes.

Q    Who, if you can remember?

A    If I remember, I want to say Pescatore, Stefanowicz, Jeff McCall, I believe, and the other names escape me.

Q    Okay.  When you flew over to Iraq, did you know that you would be deployed to Abu Ghraib prison?

71

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A    I had an idea, but it wasn't really firmed up.

Q    Did you end up being stationed at Abu Ghraib prison when you got to Iraq?

A    Yes.

Q    Were you assigned as an interrogator at Abu Ghraib prison?

A    Yes.  Also a site lead.

Q    Who was responsible for the operational supervision of CACI interrogators?

A    Operational supervision was the U.S. military, in that case, the Army.

Q    And you mentioned that you were also assigned as the site lead?

A    Yes.

Q    What were the site lead's responsibilities for CACI?

A    Primarily was -- well, it was administrative and logistical support issues.

Q    What sort of administrative and logistical support issues did you have to deal with as the site lead?

A    Anything from pay problems, we had an issue with -- when we deployed, we had Kevlar vests, but we did not have plates in them.  That was a major issue.  Eventually we got that resolved.  Housing, heating, we didn't have running water when we first got there.  Looking out for the health and welfare of the CACI personnel that were at Abu Ghraib or

72

personnel transiting through.

Q    When you say personnel transiting through, what do you mean by that?

A    They would -- they would land at BIAP.  Again, Baghdad International Airport.  Then they would go Camp Victory, and they would meet with the in-country program manager, Scott Northrop, and then they would be transported out to Abu Ghraib.

We also -- the transit part is they had to go -- the overall client -- meaning the Army again -- wanted interrogation support, analytical support, screener support at -- well, for instance, off the top of my head, Fallujah, Tikrit, Mosul.  So they would come through -- they could spend possibly, you know, two days or maybe a week or two at Abu Ghraib, and then they would leave from there.  And getting those personnel from Point A to Point B was, to put it lightly, onerous.  It's not like you're going to go to a grocery store, you jump in your car and you go.

We had to go at the -- well, basically the Army provided all the transportation and/or escort because driving from anywhere -- you know, Camp Victory or Abu Ghraib just to Fallujah, possible ambushes, improvised explosive devices.  So if the Army didn't have a convoy going, we plan on moving on Wednesday, we weren't going because we weren't allowed or authorized to do so.

73

And it wasn't just for the safety of our people, but if something happened and one of the CACI employees was kidnapped, taken hostage, that was -- then that would subsequently endanger more soldiers and/or possibly Marines in trying to recover them.

Q    Now, you mentioned that you had to deal with the logistics of getting people from Abu Ghraib to Fallujah, Mosul, Tikrit.

Did some of the CACI employees who came to Abu Ghraib stay at Abu Ghraib to work?

A    Yes.

Q    Did the site lead position bring with it any role in the operational supervision of how CACI interrogators did the interrogation mission?

A    No.

Q    Who handled that operational supervision?

A    The military.  The Army.

Q    Okay.  I'm going to ask you to take the binder in front of you, and I'm going to ask you to go to Exhibit -- Plaintiffs' Exhibit 133.

THE COURT:  Any objection?

MR. BUCHANAN:  No objection.

THE COURT:  All right.  It's in.

MR. O'CONNOR:  Your Honor, we're only moving in pages 40 to 42.

74

THE COURT:  All right.  40 to 42 only.

(Plaintiffs' Exhibit Number **133, pages 40 to 42 admitted**

**into evidence.)**

MR. O'CONNOR:  And can we publish page 40, please.

BY MR. O'CONNOR:

Q    Mr. Porvaznik, have you seen the document that's at pages 40 to 42 of this exhibit before?

A    Yes.

Q    Is this a memorandum provided by the Army to CACI personnel when they arrived at Abu Ghraib?

A    Correct.  Memorandum for the record.  MFR for short.

Q    And is there a date on this memorandum?

A    The 1st of October 2003.

Q    Okay.  I'm going to ask you to take a look at paragraph 2 that's right there on the first page where it says:  "Daily scope of duties.  The overall duty of the civilian HUMINT professional will vary depending on the individual's experience and training.  The duties will include interrogators, debriefers, screeners, data entry, databasing, report editing and analysts."

        Did CACI provide employees who filled all those positions?

A    Yes.

Q    And the next sentence says:  "Each individual is expected to perform the same duties and attain the same

75

standards as their military counterparts."

Was that the expectation for CACI employees?

A    Yes.

Q    Okay.  I'm going to ask you to turn to page 41 and take a look at paragraph 6; do you see it?

A    Yes.  I do.

Q    All right.  Where it says:  "Chain of command.  The JIDC is not a standard military organization, and, therefore, does not follow a standard structure.  Two chains of command will be in effect; the operational and the administrative.  The interrogation section leader will be the first person in the operational chain of command proceeding to the NCOIC and OIC.  Administrative actions will be resolved either by the civilian contractor site manager, or the HHSC first sergeant/commander."

Is that consistent with the way operational supervision and control occurred at Abu Ghraib prison?

A    Yes.

Q    And the reference to administrative action being resolved by the civilian contractor site manager, was that also consistent with the way things actually operated at Abu Ghraib prison?

A    Yes.  Correct.

Q    Okay.  Let's go to paragraph 7 where it says: "Civilian administrative issues.  Each civilian agency has a

76

designated site manager or representative."

For CACI, that was you?

A     Correct.

Q     Okay.  Next sentence:  "If the designated representative is not solving problems that arise, such as pay problems, please bring it to the attention of the chain of command.  We will not be able to fix the problem, but we can get it voiced so that the problem is addressed."

Was that the expectation at Abu Ghraib prison?

A     Yes.

Q     Okay.  Let's go to paragraph 15 where it says:  "Point of contact for this memorandum is Sergeant First Class Johnson, interrogation NCOIC"; do you see that?

A     Yes, I do.

Q     Was Sergeant First Class Johnson the NCOIC at the ICE?

A     Yes.

THE COURT:  And, again, that means non-commissioned officer in charge?

MR. O'CONNOR:  Yes.

THE WITNESS:  Yes, ma'am.

MR. O'CONNOR:  Okay.  Can we bring up Defense Exhibit 20.  Not to the jury.  Well, actually, just wait.

BY MR. O'CONNOR:

Q     Take a look at Defense Exhibit 20.

THE COURT:  Is there an objection to 20?

77

MR. BUCHANAN:  No objection, Your Honor.

THE COURT:  No objection.

MR. O'CONNOR:  Please publish Defense Exhibit 20.

THE COURT:  It's in.

(Defense Exhibit Number 20 admitted into evidence.)

BY MR. O'CONNOR:

Q    Mr. Porvaznik, is this an organizational chart for the joint interrogation and debriefing center at Abu Ghraib prison?

A    Yes.

Q    Okay.  I want to focus your attention initially toward the upper left where it says ICE; do you see that?

A    I do.

Q    And do you -- who was the OIC, the officer in charge, of the ICE?

A    That would have been Captain Carolyn Wood.

Q    And you see her name reflected there?

A    Yes, I do.

Q    And underneath that, that's the Sergeant First Class Johnson from the last exhibit?

A    Correct.  Yes.

Q    Was the JIDC an organization that was formed under the 205th Military Intelligence Brigade?

A    Yes.

Q    And was the 205th Military Intelligence Brigade the

78

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

military intelligence unit at Abu Ghraib?

A    Yes.

Q    Do you remember who was the commanding officer of the 205th Military Intelligence Brigade?

A    I believe it was a Colonel Pappas.

Q    Thomas Pappas?

A    Yes, Thomas.  Correct.

Q    Was the JIDC an organization that was set up under his operational command?

A    Yes.

Q    Okay.  Now, this organizational chart in front of you is from November 29, 2003?

A    Yes.

Q    Let's start at the top.

     Do you see the box marked director at the very top?

A    I do.

Q    Who's listed there?

A    Lieutenant Colonel Jordan.

Q    Do you remember Lieutenant Colonel Jordan's first name?

A    I believe it was Steve.  I'm not positive about that.

Q    Do you remember Lieutenant Colonel Jordan?

A    Yes.

Q    And underneath him, there's -- if you go down two boxes, there's an operations officer named Major Price?

79

A    Yes.  Major Price.  Correct.

Q    And do you remember Major Price?

A    I do remember discussions with him.

Q    Okay.  Now, look over -- if you follow the wire down and to the left, you get to the ICE; do you see that?

A    Yes.

Q    What was the ICE?

A    The Interrogation Control Element.

Q    And what was the mission of the ICE while you were there?

A    Oh, the mission of the ICE was to run the actual operations of interrogations, screening of individuals, report writing, ensuring that everything was put into a secure database.

Q    Okay.  And do you see on the organizational chart that Captain Wood was listed as the officer in charge?

A    Yes.

Q    And is that how you recall it, that she ran the show at the ICE?

A    Absolutely.  Yes.

Q    And what were her job responsibilities?

A    Well, to ensure -- well, the interrogations and everything ran as smoothly as possible.  The -- she was also responsible for health and welfare of the soldiers that were stationed at Abu Ghraib.

80

Q    And if you follow the chart down from the ICE --

A    Right.

Q    -- are there interrogation sections below the ICE?

A    Yes.

Q    Do you remember the interrogators being divided into different sections?

A    Well, there were -- there were five sections, but each section had what we call Tiger Teams that were -- and depending on the amount of personnel that were available, it would probably be about ideally five Tiger Teams to a section.

Q    Okay.  So looking -- let's look at the very bottom row on the organizational chart as an example.

A    Okay.

Q    On the left, there's -- it says SSG.

     Is that the --

A    Staff sergeant.

Q    An SSG is what?

A    Staff sergeant.

Q    Okay.  So all of the section leaders, were they all in the Army?

A    Yes.

Q    And what ranks were the section leaders holding?

A    Most of them were staff sergeants, but there was one sergeant also, E6 and E5.

81

Q    Fairly senior enlisted soldiers?

A    Yes.

Q    Okay.  And then if you go to the right of the -- on the bottom row, you see -- one, two, three, four -- five boxes, and the last two just say Tiger Team.

Are those the Tiger Teams?

A    Yes.

Q    What comprised a Tiger Team at Abu Ghraib prison?

A    A Tiger Team would have an interrogator, an analyst and a translator.  Basically pretty much a three-person team.

Q    And in that bottom row --

THE COURT:  Let me stop for a second.

Explain to the jury your understanding of what the role was for the analysts.  We've not heard much about the analyst.

THE WITNESS:  Okay, Your Honor.

The interrogator asks the questions, the analyst will have done research background on the individual and/or associated individuals.  Again, basically it's analysis.  That's what they do.

THE COURT:  Would the analysts sometimes give questions to the interrogator to ask?

THE WITNESS:  They might ahead of time say you might want to address this, or this is not important, this is important.  You know, emphasize.  That was one of the

reasons the analyst was there, because they had the opportunity, they had the time, and they were focused on doing as much research as possible.

THE COURT:  And was there a report -- after the questioning was done, was there some kind of a report that was prepared after that?

THE WITNESS:  Yes.  The old term was a tactical interrogation report, TIR.

THE COURT:  Tactical interrogation report?

THE WITNESS:  Yes, ma'am.

THE COURT:  And who prepared that?

THE WITNESS:  That would be written by the interrogator.

THE COURT:  What, if any, input would the analyst have in that report, if you know?

THE WITNESS:  Not really a whole lot, to be honest, as far as the actual tactical interrogation report. There would be -- that's pretty much up to the interrogator.

THE COURT:  Okay.  Go ahead.

BY MR. O'CONNOR:

Q    And building on the Court's questions, CACI had civilian interrogators at Abu Ghraib?

A    Yes.

Q    Did CACI have civilian analysts at Abu Ghraib?

A    Yes.

83

Case 1:08-cv-00827-LMB-JFA    Document 1818    Filed 11/12/24    Page 84 of 310
PageID# 54602
Direct examination of D. Porvaznik

Q    And were there military analysts at Abu Ghraib?

A    Yes.

Q    And were there military interrogators at Abu Ghraib?

A    Yes, of course.

Q    Okay.  Let's talk about the interpreters for just a minute.

        Were the interpreters military or civilian?

A    Pretty much I think all of them were civilian.

Q    And were any of the interpreters CACI employees?

A    No.

Q    Okay.  And so just looking at the bottom row, immediately to the right of the section leader we have three bubbles that have some redaction, but it looks like there's a sergeant and a specialist in the first bubble?

A    Yes.

Q    Is that a Tiger Team?

A    Yes.

Q    And then next to the right, there's two sergeants?

A    Correct.

Q    And that's also a Tiger Team?

A    Yes.

Q    And next to that, there's a sergeant and Torin Nelson listed?

A    Yes.

Q    And was that also a Tiger Team?

84

A    Yes.

Q    And those Tiger Teams reported, was it to the section leader that's to the left?

A    Yes.  They all would report to the section leader.

Q    And would that be the same if you went up each row that the Tiger Teams would report to the section leader to their left?

A    Yes.  Correct.

Q    And the section leader would report up to the ICE?

A    Yes.

Q    Where was the first place -- well, let me back up.

Prior to an interrogation at Abu Ghraib prison, did an interrogator have to have an interrogation plan approved?

A    Yes.

Q    And was that true for both military interrogators and CACI interrogators?

A    Yes.

Q    And who would draft the interrogation plan?

A    The interrogator would draft the plan.

Q    And would the plan list the interrogation approaches and techniques that were proposed to be used?

A    Yes.

Q    What was the process for an interrogator gaining approval of an interrogation plan?

85

A    They would draft their plan, and then they would bring it up to the -- basically the section leader was the first individual to give approval or disapproval.

Q    And --

A    But they weren't the final word.

Q    You read my mind.

If the section leader approved of the interrogation plan, did it have to go any further?

A    Yes.

Q    Where else did it have to go?

A    It would go up either to the NCOIC -- ultimately it would be approved by Captain Wood, the officer in charge.

Q    The officer in charge of the ICE?

A    Yes.

Q    Was anyone from CACI involved in approving interrogation plans either for civilian or military interrogators?

A    No.  Absolutely not.

Q    Did you ever see a proposed interrogation plan that a CACI interrogator had prepared?

A    Yes.

Q    Often?

A    No, not often.

Q    On the occasions where you saw the proposed plan, was that so that you could approve it?

86

A      Not that I could approve it.  It's like peers bouncing ideas, whether it be lawyers, solicitors, doctors.  For approval?  No.  Again, that was the section leader, NCOIC and OIC.  They were the only ones who could approve a plan.

Q      Could you disapprove a plan?

A      No, actually, I couldn't.

Q      So --

A      I mean, I could say -- if he was -- the interrogator was bouncing an idea, again, just peers talking, I could say you do want to do that or you don't want to do that.  But I'm not approving it.  At the end of the day or any given day, it was the military that said, yes, this is good to go.

Q      Are you familiar with the term Interrogation Rules of Engagement or IROEs?

A      Yes.

Q      At Abu Ghraib prison, what were the Interrogation Rules of Engagement?

A      The IROE established parameters of what was authorized or legal to use or -- yeah, they established lines of what could or could not be done during an interrogation.

          MR. O'CONNOR:  Can we bring up Plaintiffs' Exhibit 42, Your Honor.  This has already been admitted into evidence.

          THE COURT:  All right.

          MR. O'CONNOR:  Do you need water?  Do you have

87

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

water?

THE WITNESS:  Yes, please.

THE COURT SECURITY OFFICER:  You need more?

THE WITNESS:  Yeah.

MR. O'CONNOR:  Are you okay?

THE WITNESS:  Yes.

BY MR. O'CONNOR:

Q    Plaintiffs' Exhibit 42, which is entitled Interrogation Rules of Engagement, were those the IROEs that were posted at Abu Ghraib prison?

A    Yes.  And in probably two or three different places within the ICE and the ops office.  Matter of fact, I think it was even digital.  Yeah, it was digital on the different, you know, classified computers that we had.

Q    Was this the chart of interrogation techniques and approaches that were approved for use at Abu Ghraib prison?

A    Yes.

Q    Who created this chart?

A    Who specifically?  The military.  U.S. Army.

Q    Who decided what interrogation approaches and techniques were approved for use at Abu Ghraib prison?

A    Again, the Army.  The military.

Q    What role did CACI have in those decisions?

A    None.

Q    Did you personally have a responsibility to ensure that

88

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

the IROEs were followed at Abu Ghraib prison?

A   Everybody had that responsibility.  Meaning the interrogators, myself and the military.  Everybody had that.  That's why you have Interrogation Rules of Engagement is to make sure that things go properly.

Q   And if you look at the box -- at the bottom of the page, look at the upper box.  Do you see where it says: "Everyone is responsible for ensuring compliance to the IROE.  Violations must be reported immediately to the OIC"?

A   Yes.

Q   Was that the expectation for everyone working at Abu Ghraib prison?

A   For everyone, correct.

Q   And that obligation was imposed by the Army?

A   Yes.

Q   And what were your obligations if you saw conduct that was in violation of the IROEs?

A   I would stop -- I would cease the activity and report it immediately to the military.

Q   Is the answer the same if -- regardless of whether the person violating the IROEs was a civilian or a soldier?

A   Any violation.  It didn't make -- it would not make a difference if it was civilian or military in uniform.

Q   During the time that you were at Abu Ghraib, did you ever see a soldier or a civilian engage in conduct that was

89

in violation of the IROEs?

A     No.

Q    In the few CACI interrogation plans you saw, did any proposed treatment that you considered abusive or illegal?

A     No.

Q    The fact that you would have stopped a violation of the IROEs, if you had seen it, would that make you a supervisor of the person engaged in that conduct?

A     No, not at all.

If I were to expound on that, I would say if you're walking down the street if you're not a police officer but you see somebody being assaulted, the right thing to do is try to intervene and save what would be a potential victim.  It doesn't mean I'm a police officer, though.

Q    Were there times at CACI -- strike that.

Were there times that employees that CACI sent over to Iraq to fill a position other than interrogator were moved to an interrogator position once they got in-country?

A     Yes.

Q    And whose decision was that?

A     The military again.

Q    How did that occur?

A     In some case -- well, first of all, the Army didn't have enough interrogators, period.  That's why we were

90

there, to support that mission.

So Captain Wood, the OIC, again, officer in charge of the Interrogation Control Element, she would have -- she would feed it up her chain of command.  Ultimately, it would end up with the contracting officer representative on Camp Victory, and recommendations from the client -- again from the military -- said, yes, we want X, Y and Z, these three different individuals to be interrogators as opposed to, say, a screener.

Q    Can you think of any CACI employees who came to Abu Ghraib either as a screener or an analyst and were moved to interrogator at the request of the Army?

A    Steve Stefanowicz.  I believe Steve Pescatore.  Dugan.  I'm not sure.  Those are two or three that -- yeah.

Q    Do you remember a CACI employee named Kevin Bloodworth?

A    Yes.  Bloodworth was also promoted to interrogator by again the Army.

THE COURT:  All right.  Now, it's about time that we normally take the morning break.  And this might give you a chance to clear your throat.  All right.

Ladies and gentlemen, we'll be on recess until 11:35.  All right.  So 15-minute recess.

(Jury not present at 11:21 a.m.)

(A brief recess was taken.)

THE COURT:  All right.  We'll bring the jury in.

91

Case 1:08-cv-00827-LMB-JFA   Document 1818   Filed 11/12/24   Page 92 of 310
Direct examination of D. Porvaznik
PageID# 54610

THE COURT SECURITY OFFICER:  Yes, Judge.

(Jury present at 11:37 a.m.)

THE COURT:  All right.  Let's continue.

BY MR. O'CONNOR:

Q    Mr. Porvaznik, before we broke, we were talking about CACI employees who were not on an interrogator billet being moved over to an interrogator billet in-country.

Do you know if the leadership at Abu Ghraib prison had soldiers who were not school-trained interrogators conducting interrogations?

A    I believe there were.  Probably at least -- I want to say they were radar techs or something like that.  But they weren't school trained or -- they weren't interrogators.

Q    And, again, try to keep your -- keep close to the microphone so that the jury can hear you.

A    Sure.

Q    Are you aware that Major General Taguba conducted an investigation of the MP brigade at Abu Ghraib prison?

A    Yes.

Q    Were you interviewed by Major General Taguba and his staff?

A    No.

Q    Was CACI asked to provide any information to Major General Taguba and his staff?

A    Yes.  And he actually requested -- Major General Taguba

92

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

interviewed Mr. Steve Stefanowicz.

Q    Do you recall any other requests for assistance from Major General Taguba and his staff?

A    Not that I recall, no.

THE COURT:  Were you involved at all in arranging for the interview with Stefanowicz?

THE WITNESS:  I just -- in regards to coordinating with military as far as transportation.

THE COURT:  Was he not at Abu Ghraib at the time he was interviewed?

THE WITNESS:  I don't know where the interview took place.  I don't know if it was at Abu Ghraib or if it was on Camp Victory.

THE COURT:  But you were involved, to some degree, in arranging the logistics for it, or were you not?

THE WITNESS:  Well, the Army actually provided the transportation and the security.

THE COURT:  But you were notified about it; were you?  Were you notified about it?

THE WITNESS:  The fact that -- yes.

THE COURT:  All right.  Go ahead.

BY MR. O'CONNOR:

Q    And are you aware that Major General Fay conducted an investigation of the 205th Military Intelligence Brigade as it relates to Abu Ghraib prison?

93

A     Yes.

Q     Were you interviewed by Major General Fay and his staff?

A     Yes.

Q     Did Major General Fay request any assistance or information from CACI as part of his investigation?

A     Yes.  I don't know exactly what we provided, but we did ensure that any personnel that Major General Fay wanted to speak with, we made sure that they got to Camp Victory.  Not all of them were at Abu Ghraib.  Some of them were -- possibly came from Tikrit or other sites in Iraq.  But anything that CACI was requested, I know we provided to Major General Fay and his staff.

Q     Did CACI have a policy regarding cooperation with Major General Fay's investigation?

A     Yes.  To cooperate.

Q     You were at Abu Ghraib from October 2003 to March of 2004?

A     Yes.

Q     Other than a couple of times that you were absent?

A     Correct.  Yes.

Q     Have you seen pictures of detainee mistreatment at Abu Ghraib prison from that time period?

A     I have seen -- yes, I have seen pictures of ...

Q     How many have you seen?

94

A    Five, ten.  I don't really remember.

Q    Have you seen pictures showing forced nudity?

A    Yes.

Q    Have you seen pictures of naked detainees chained to the bars of their cells?

A    Pictures of?  Yes.

Q    Have you seen pictures of sexual humiliation?

A    Yes.

Q    Have you seen pictures where the detainee is standing on a box with wires attached to his fingers?

A    Yes.

Q    Have you seen pictures of detainees on leashes?

A    Yes.

Q    Did you see any of this detainee abuse with your own eyes during the time you were at Abu Ghraib prison?

A    No, I did not.

Q    Did you see any detainee abuse --

A    No --

Q    -- while you were at Abu Ghraib prison?

A    -- I did not.

Q    Do you condone these detainee abuses?

A    I'm sorry?

Q    Do you condone these detainee abuses?

A    Of course not.

Q    If you had seen these abuses occurring, what would you

95

have done?

A    If I had seen it actually happening, again, I would have done what I could to cease the activity and then report it up the -- well, to the military.

Q    What would you have expected CACI or Army personnel to do if they had seen these abuses?

A    The same thing.

         MR. O'CONNOR:  Can we put up Plaintiffs' Exhibit 38, which is already in evidence, Your Honor.

BY MR. O'CONNOR:

Q    You can look to your left if you want, Mr. Porvaznik. It's on the screen to your left.

A    Oh, got it.

Q    Other than this picture of Daniel Johnson, have you seen any picture of a CACI employee with a detainee?

A    No.

Q    Did CACI have any interrogators at Abu Ghraib prison who were males who had a ponytail?

A    No.

Q    Do you remember a CACI employee named Torin Nelson?

A    Yes.

Q    Did he express concerns for his safety at Abu Ghraib prison?

A    The first day he showed up, he expressed concerns.

Q    Did there come a time in January 2004 when Mr. Nelson

96

Case 1:08-cv-00827-LMB-JFA   Document 1818   Filed 11/12/24   Page 97 of 310
Direct examination of D. Porvaznik
PageID# 54615

came to you with concerns about his relationship with Tim Dugan and Dan Johnson?

A    Yes.

Q    Can you tell the jury what happened in your interaction with Mr. Nelson?

A    Basically he told me that he had concerns in regards to Dugan and Johnson.  There was some bad blood going on there. And basically he told me -- "he," meaning Torin Nelson -- that he thought that Dugan, Tim Dugan, I believe, and Dan Johnson were threatening him.

Q    Did he say why he believed they were threatening him?

A    They were -- he did.  He was under the impression -- again, Nelson was under the impression that -- he thought that Dugan had believed -- Dugan believed that Nelson had allegated -- made allegations of abuse.

Q    Were you unwilling to hear Torin Nelson out?

A    No, I heard him out.  Absolutely.

Q    Did you take sides between Torin Nelson on one hand and Dugan and Johnson on the other?

A    No, it's not my business.  If there was anything going on, it would be an Army investigation.

Q    And at the time, was there an Army investigation underway regarding detainee abuse?

A    On the timeline, I'm not actually too sure.

MR. O'CONNOR:  Those are all my questions for now,

97

Mr. Porvaznik.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  Cross.

CROSS-EXAMINATION

BY MR. BUCHANAN:

Q    Good morning, Mr. Porvaznik.

A    Good morning.

Q    My name is Michael Buchanan, and I'll be asking you some questions this morning.  If at any time you're having difficulty hearing me, please let me know, and I'll try to keep my voice up.

So if I understand correctly, you arrived at the Abu Ghraib prison on October 5th, 2003; is that right?

A    Yes.

Q    And you left in February of 2004 for a multi-week R&R; is that right?

A    I believe it was February.  But yes, for -- I left for approximately two and a half weeks.

Q    And then you left the -- your position as site leader for good in March of 2004; is that right?

A    Yes.

Q    And your title, your position with CACI was site manager at Abu Ghraib prison; is that right?

A    Correct.

Q    Site leader?

98

A    Site lead.

Q    Site lead?

A    Yes.

Q    And in that position, you were the senior-most CACI employee at Abu Ghraib; is that right?

A    Yes.

Q    In addition to -- we're going to spend a little time on your background.

You learned to speak Arabic; is that right?

A    Yes.

Q    And you actually are conversational in the Iraqi dialect of Arabic?

A    Rusty now, but the answer is yes for then, yeah.

Q    And at the time that you retired from the Marine Corps, you had been working in military intelligence for roughly 15 years; is that right?

A    That's about right, yes.

Q    And you mentioned on your direct testimony that you had received training while you were in the Marine Corps; is that right?

A    Yes.

Q    And that's training to be an interrogator; correct?

A    Yes.

Q    And in order for you -- in the Marine Corps, in order to even be admitted into the interrogation program, a

99

soldier needed a minimum of four to five years of service; is that right?

A    At that point in time, that was the policy.  One could not enlist into the Marine Corps to be an interrogator.

Q    And you believe having four to five years of experience was important for someone going into the military core interrogation program; right?

A    Yes.

Q    And you believe that someone who has less than roughly that amount of time would lack the maturity and wherewithal to be able to be an effective interrogator; right?

A    Yes, I do.  I mean, the wherewithal is just nomenclature, understanding rank structure, tactics, techniques.  Yes.

Q    All right.  And you believe that some years of prior military experience are important for someone to be an interrogator in a military operation; is that right?

A    It would be ideal, yes.

Q    And, again, it's important for someone to be able to understand tactics, techniques and procedures relating to interrogation; correct?

A    Yes.

Q    Now, for the Marine Corps program, you were required to submit a written biography as a part of an application process; correct?

100

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Cross-examination D. Porvaznik

A    I believe I did.  Again, a long time ago.

Q    And you would describe the process for being admitted into the program to be extensive; is that fair?

A    Yes.

Q    For you -- in your own personal experience, you had to go through a panel interview that included six to ten interviewers, right?

A    I believe it was six to ten, yeah.  Normally a minimum of six.

Q    And after that interview, you were required to go through on-the-job training before being admitted into more formal training; is that right?

A    Correct.

Q    And that training -- on-the-job training I believe you mentioned lasts six months to two years; is that right?

A    It could vary, but yeah.  Roughly six months to two years.

Q    And during the on-the-job training portion, the person would be evaluated to see if they could proceed to the next step; is that right?

A    Correct.

Q    And that next step would be to attend what is known as a schoolhouse; right?

A    Yes.

Q    And in this case -- in your case, that would be Fort

101

Huachuca; correct?

A    In my case, Fort Huachuca, yes.

Q    And at Fort Huachuca, you learned different interrogation approaches; is that right?

A    Yes.

Q    Questioning techniques?

A    Yes.

Q    Report writing?

A    Yes.

Q    And various conventions -- international conventions regarding the treatment of detainees; is that right?

A    Yes.

Q    And that would include the Geneva Convention?

A    The Geneva Convention, yes.

Q    And that kind of training in your view is important because it teaches you right and wrong; correct?

A    Yes.

Q    And during your time in the Marine Corps, you became the course director at the Marine Corps interrogation schoolhouse; is that right?

A    Yes, I did.

Q    And you had that position for three and a half years; is that right?

A    Approximately three and a half.

Q    And you would agree that based on your training and

102

experience, you were well qualified to be a site leader at Abu Ghraib prison?

A    Understanding -- yes.  The interrogator's job, the analyst's job, the screener's job, databases.  Yes.

Q    And you reviewed the contract requirements for interrogators at Abu Ghraib prison?

A    Say it again, please.

Q    You reviewed the contract requirements for civilian interrogators at Abu Ghraib prison; is that right?

A    I knew what the expectations were.  I really don't know if I actually saw the entire contract.

Q    Did you understand that CACI was required to provide resident experts in interrogation?

A    Yes.

Q    And you would consider yourself at that time in 2003 to have been a resident expert?

A    Yes.

Q    Okay.  Now, you mentioned that when you landed in-country on October 5th, you were traveling with Mr. Stefanowicz; is that right?

A    Yes.  He was one of the ones that came along.

Q    And you had not met him prior to meeting him in Iraq; is that correct?

A    We actually met in Fort Bliss, Texas.

Q    And that was a few days before the flight to Iraq?

103

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A    Correct.  Yes.

Q    But you had not met him prior to Fort Bliss?

A    No.

Q    And you're aware that Mr. Stefanowicz did not attend formal training at Fort Huachuca?

A    To the best of my knowledge, I don't know -- I don't know that he did.  What I do know is that he also was an analyst.  And I can't address it specifically, but some of his duties had at the defense attaché office in Muscat, Oman involved debriefing and talking to people.

Q    Okay.

A    I can't go into more specifics.

Q    But you know that he does not have any formal schooling like you had in terms of how to conduct interrogations?

A    I don't believe he went to the schoolhouse.

Q    And Mr. Dugan was a CACI interrogator at Abu Ghraib prison during the time you were the site leader; is that correct?

A    He was there, and I'm trying to remember -- he might have moved on to another site also.  But, yes, he was at Abu Ghraib when I was there.

Q    And you know that he did not attend Fort Huachuca or any other formal schooling in how to conduct interrogations; is that right?

A    I'm very fuzzy as to what his qualifications were as

104

far as formal training.

Q    Do you recall that he worked in retail and compliance prior to being hired by CACI?

A    I don't recall that.

Q    Do you recall seeing Mr. Dugan's resume in connection with filling the positions at Abu Ghraib prison?

A    I might have seen his resume.  I don't remember.

Q    Do you recall that -- thinking that he was not qualified to be an investigator?

A    No, I don't think I -- because, again, it was actually the client that wanted Dugan to be promoted, so ...

Q    Sure.

        But I'm asking your view at the time in 2003, that you did not think he was qualified to be an interrogator?

A    No, I wouldn't say that I didn't think he was qualified.

Q    Dan Johnson.  He was 22 years old in 2003; is that right?

A    Sounds about right.  Early 20s for sure.

Q    Early 20s?

A    Yeah.

Q    Do you know whether he had four to five years of military experience at that point?

A    Likely not if he was 22 years old.  But --

Q    Now --

105

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A    -- that's the difference between the way the Marine Corps handled the -- anything dealing with human intelligence.  As opposed to the Army, you could -- I don't know if you still can, but back then you could enlist to become an interrogator.

Q    Now, you mentioned that Mr. Stefanowicz was hired by CACI to be a screener at Abu Ghraib prison; is that right?

A    Yes.

Q    And within a few days of arriving at Abu Ghraib, he was promoted to a position of interrogator; is that right?

A    I don't know if it was a matter of a few days, but Captain Wood, Carolyn Wood, the OIC, she wanted Stefanowicz to be promoted.

Q    And that was shortly after his arrival at Abu Ghraib prison; is that fair?

A    I don't remember when it was.

Q    And when you moved on from your position as the site lead, you recommended that Mr. Stefanowicz be promoted to be the site lead at Abu Ghraib prison; is that right?

A    Yes, I did.

Q    Okay.  And that was roughly in January of 2004?

A    I don't remember when I made that call.  Or made that decision, I should say.  Because I didn't leave until March.

Q    Right.

A    So ...

106

Q    Sometime in early 2004?

A    Yes.  Yeah.  Correct.

Q    While working -- conducting interrogations at Abu Ghraib prison, CACI interrogators were required to wear civilian clothing; is that right?

A    They were -- for the most part, everybody wore civilian attire or mufti.  But I do remember that there was a memorandum for the record that put out -- the Army didn't want people mixing it, you know, half DCUs or desert uniforms, or half civilian attire.  It was either one or the other.  But all our folks wore civilian attire.

Q    So the military did not want there to be confusion about who was military on the one hand and who was a civilian on the other hand; is that right?

A    I think for the purposes of the military, yes.

Q    Military personnel were required to wear military uniforms while on duty; is that right?

A    Yes.

Q    CACI interrogators were permitted to have facial hair; is that right?

A    Yes. Facial hair.  Sure.

Q    And, in fact, several CACI interrogators wore facial hair while at Abu Ghraib prison; is that right?

A    There was some that had beards, yes.  Facial hair.

Q    And there were -- and CACI interrogators were permitted

107

to have long hair; right?

A     Yes.

Q     And, in fact, there were -- a good amount actually had long hair or facial hair; is that fair to say?

A     I don't know about a good amount.  Look at my hair cut, and I'm going to compare a lot of people.

Q     But at the time in 2003, there were a good amount of CACI interrogators who had long hair; is that fair to say?

A     Long by my standards, yes.

Q     Military personnel carried weapons; is that right?

A     Yes.

Q     And --

A     Not into the booth, but yes.

Q     While on the facility; is that right?

A     Correct.  Yes.

Q     And CACI personnel were not allowed to carry weapons; is that right?

A     Correct.

Q     Okay.  Would you agree that as between a CACI interrogator and a military interrogator, it was pretty clear to anybody looking that CACI personnel were civilians?

A     I would say that's correct.  Yes.

Q     Okay.  Now I want to talk about your duties and responsibilities as site lead.

        As a site lead, you reviewed the qualification of

108

Cross-examination D. Porvaznik

CACI screeners and interrogators; is that right?

A    As I had them, yes.

Q    And when you first arrived at Abu Ghraib prison, were there CACI interrogators already there?

A    There were two or three personnel there already that were CACI.  I can't really remember what the positions were. I think one was an analyst and a couple were screeners.

Q    And when you were present at Abu Ghraib prison, is it fair to say that you spoke to great length to CACI interrogators as they arrived to learn about their qualifications?

A    I wanted to get a feel for, you know, whether or not they were good to go or what I considered to be good to go.

Q    So you would spend time speaking with them at great length to learn about their qualifications and experience; right?

A    Actually, it was a two-way street.  I was also briefing them on items such as -- well, what to do, you know, mortar attacks or rocket attacks and all that kind of stuff like that.

Q    But you did speak to them about their qualifications and experience as interrogators and for the positions that they were filling; right?

A    To the best of my ability, yes.  Correct.

Q    And that was important for you to understand the

109

qualifications of the people who were working under your supervision; is that right?

A    Define "supervision," because I did not supervise in regards to interrogations.

Q    Okay.

A    That was the Army's rubric.

Q    Okay.  We're going to talk about that.

A    Okay.

Q    You were the liaison -- you acted as a coordinator and advisor to the Joint Interrogation and Debriefing Center; is that right?

A    I wouldn't say advisor.  I mean, I could make a suggestion, but it was totally up to the Army.  More often not, Captain Wood, as the officer in charge of the ICE.

Q    And the suggestions --

A    It was her call.

Q    -- that you would make regarding the issues of interrogation and screening operations; right?

A    No.

Q    You were the liaison between CACI employees and the Joint Interrogation Debriefing Center; is that right?

A    Liaison?

Q    Yes.

A    I was the point of contact for ...

Q    As part of your responsibility, you worked closely with

110

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Captain Wood, the officer in charge; right?

A    I let her know what was going on with our people.

Q    Okay.  In fact, you met with her daily; didn't you?

A    I wouldn't necessarily say daily.  Maybe four times a week as an average.  I really don't recall.

Q    Do you remember having your deposition taken in 2006 in a case called *Ibrahim v. Titan Corp*?

A    Yes.

Q    And you recall that deposition took place in Columbus, Ohio?

A    Yes, I believe so.

Q    And there was a court stenographer there transcribing what you said that day?

A    Okay.

Q    And you recall that you were placed under oath during that deposition?

A    Yes.

Q    And that's the same oath that you took here today?

A    Yes.

Q    An oath that required you to tell the truth; is that right?

A    Correct.

Q    I'd like to draw your attention in the binder to the first tab that's labeled deposition testimony, and specifically to page 137, line 24.

111

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A    Line 24?

Q    And were you asked this:  Question:  Did you -- did you end up meeting and speaking with Captain Wood on a fairly regular basis?

And did you give this answer:  Yes, I would say daily.

A    Yeah.  For the most part it probably was daily.  Again, it's a very long time ago.  I'm sure there's probably, you know, some days where I didn't actually see her.  But for the most part, yeah, close to daily.

Q    As part of your discussions with Captain Wood, you provided her with information about the background qualifications of the CACI interrogators; is that right?

A    What I knew of them either from resume and/or sitting and speaking with them.

Q    Because she had no information about their background; right?

A    I don't know how much information she had, but obviously the contracting officer representative in the military in general had -- they approved whether or not somebody came over as an interrogator or a screener or what have you.

Q    Okay.  And you provided her with information about their qualifications that would enable her to make decisions as to where she wanted to employ them; right?

112

A     Again, to the best of my ability, yes.

Q     Okay.  Using your experience and skill set, you would advise Captain Wood on how to deploy CACI interrogators and screeners; right?

A     Not how to deploy them, no.  That was Captain Wood's decision.

Q     But you would provide her your input; correct?

A     I didn't have any say as to, you know, where they deployed or how they deployed or -- no.

Q     My question was, but you would make suggestions to her as to how to deploy CACI interrogators; right?

A     I didn't even suggest as far as -- no.

          THE COURT:  Would she ask you for your opinion about, you know, this fella, so-and-so, do you think he's ready?  I mean, did you have that interaction with her?

          THE WITNESS:  I gave her the information that I had, or after sitting down and talking with set individuals or interrogators or screeners or analysts, and she would listen to me.  But then it was totally up to her and the NCOIC to determine whether or not -- you know, who was going to be on what Tiger Team or who was going to do what interrogation.  Again, that was all the U.S. Army.

          THE COURT:  But did she ever ask you for your opinion?

          THE WITNESS:  She asked what I thought sometimes.

113

THE COURT:  All right.

THE WITNESS:  If that answers the question, Your Honor.

THE COURT:  And would you tell her?  Would you tell her what you thought?

THE WITNESS:  What I thought.  She could take it or leave it, though.

THE COURT:  I understand that.  But my question is -- I think what counsel is trying to find out is exactly the kind of interaction you would have with her.

So, I mean, when you say you gave her your thoughts, was she sometimes -- or maybe she wasn't -- ever asking for your opinion or your evaluation?  In other words, what do you think, is this guy better as an analyst or better as an interrogator?  Did you ever have that type of question from her?

THE WITNESS:  Yeah, probably once or twice.  And, again, that's when Captain Wood came up with -- they were really short of interrogators, the Army was in general.  And she brought up to me whether or not so-and-so should be promoted from screener to interrogator or from analyst to interrogator.  But that was initiated and prompted by her.  What do I think as a -- I would agree if I agreed.

THE COURT:  And, I mean, if you didn't agree, would you tell her I don't think he's quite ready for it

114

yet? Do you ever remember doing that?

THE WITNESS: No, I don't remember doing that. And the reason being is because I don't think that situation ever came up. Whoever she came up with or had formed the opinion that Mr. Zed needs to become an investigator, that was, again, from her, if that helps.

THE COURT: And if somebody were changed from a screener to an interrogator, did their salary go up? Was there an economic impact?

THE WITNESS: I believe there was, yes.

THE COURT: Did you --

THE WITNESS: What the salary difference was, for the life of me I couldn't tell you. I don't know. But there was a difference, yes.

THE COURT: Did you have to report that back to CACI?

THE WITNESS: In regards to somebody being promoted from screener to interrogator?

THE COURT: Yeah.

THE WITNESS: Well, yes. But, again, it also went to the contracting officer representative who spoke with CACI, period. Yeah.

THE COURT: And who was that?

THE WITNESS: The COR would have talked to Scott Northrop as the in-country program manager. And I don't

115

know -- above and beyond that, I couldn't -- I would have to guess whether or not the COR spoke with people back in the United States.

THE COURT:  All right.  I'm sorry.  Go ahead.

THE WITNESS:  That would be speculation on my part.

MR. BUCHANAN:  Thank you, Your Honor.

BY MR. BUCHANAN:

Q    As site leader, you were responsible for how CACI interrogators performed their jobs; is that right?

A    On how they performed their jobs?

Q    Yes.

A    I was not responsible for that.  I was responsible for making sure they were fed, taken care of, had housing, safety.  But as far as on how well they did their job, that really would have, again, fallen under the rubric of the U.S. military.

Q    So you had no role on how CACI interrogators conducted interrogations?

A    Correct, I did not.

Q    Based on your years as an interrogator with the Marine Corps, you know there are a number of ways that someone can supervise an interrogation; is that right?

A    Yes.  There are probably two or three off the top of my head.

116

Cross-examination D. Porvaznik

Q    So you can sit in and actively participate in an investigation; right?

A    Correct.

Q    You can sit in and passively observe an interrogation; right?

A    Right.

Q    You can watch from a closed-circuit television if that technology is available; right?

A    Yes.

Q    You can listen in remotely if audio monitoring is available; right?

A    One could do that if available, yes.

Q    And you could also review the written work product prepared by the interrogator; right?

A    One could, yes.

Q    So you can review interrogation plans, and you can review interrogation reports; correct?

A    One could, but not in my role at Abu Ghraib.

Q    We're going to get there.

A    Okay.

Q    And those are all parts of ways someone could supervise an interrogator; right?

A    Yes.

Q    Okay.  The purpose of supervision is to ensure that interrogators are performing their jobs properly; would you

117

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

agree with that?

A    State it again, please.

Q    I'm sorry?

A    State it again, please.

Q    Sure.

        The purpose of supervision is to ensure that interrogators are performing their jobs properly; you would agree with that?

A    Yes.  And the military supervised.

Q    For example, you could make sure that interrogators that are being supervised are not employing techniques that cross the line; right?

A    That would be part of the -- yes.  The supervision part.

Q    And to recommend different approaches to the interrogator; right?

A    The section leader would, yeah.

Q    I'm asking about you.  I'm asking about your experience in the Marine Corps.

A    Oh, in the Marine Corps.

Q    Right.

        A supervisor -- one of the purposes for supervising an interrogator is to suggest different approaches to them; right?

A    Yeah.  Sure.

118

Case 1:08-cv-00827-LMB-JFA   Document 1818   Filed 11/12/24   Page 119 of 310
Cross-examination of D. Porvaznik
PageID# 54637

Q    And one purpose of supervision would be to stop abuses if the supervisor learned that they were happening; right?

A    Correct.

Q    Okay.  Now, let's discuss the tools available to you as the CACI site lead to supervise CACI interrogators at Abu Ghraib.

        You had full access to the Joint Interrogation and Debriefing Center; right?

A    Yes.

Q    You had full access to the Interrogation Control Element; right?

A    Yes.  I could go into the ICE, yes.

Q    Now, the hard site is a separate facility from the Joint Interrogation and Debriefing Center; right?

A    Correct.

Q    And it's separate from the Interrogation Control Element?

A    Yes.

Q    Okay.

A    It's actually quite -- it was quite a walk.

Q    It was quite a walk?

A    Yeah.

Q    It was a far distance; right?

A    Yeah.

Q    And during your time at Abu Ghraib prison, you very

119

Cross-examination D. Porvaznik

rarely went to the hard site; is that right?

A     Correct.

Q     Okay.  You had the ability to attend shift change meetings; is that right?

A     Yes.

Q     And those are -- there were two shifts at the prison, there was a night shift, and there was a day shift; right?

A     I believe so, yeah.  That sounds about right.

Q     So there were two meetings each day; correct?  Two shift change meetings?

A     Sounds right, yeah.

Q     And you attended about 95 percent of the shift change meetings; right?

A     I don't remember the percentage I attended.

Q     Okay.  So if you look back on that first tab of your deposition, I'd just ask you to take a quick look -- look quickly at page 158, line 1 and see if that refreshes your recollection.  Just read that to yourself.

A     158?

Q     Yes.  Line 1.  And you could read the question before that.

A     Okay.  Okay.  I'm looking at -- I found it.

Q     Does that refresh your recollection that you attended 95 percent of the shift change meetings?

A     Probably did.  Again, it's a long time ago.

120

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q    Understood.

And the shift change meetings, where were they held?

A    I think they were held in the ICE.

Q    In the ICE?

A    Yeah.

Q    Okay.  You also had access to the interrogation facilities; right?

A    Yes.

Q    And you had the ability to sit in on interrogations being conducted by CACI interrogators; correct?

A    Yes.

Q    And, in fact, you did sit in on quite a few interrogations conducted by CACI interrogators; isn't that true?

A    I wouldn't say quite a few.

Q    Okay.  Let's go to page 160 of your deposition.  I'm sorry.  Yeah, 160 of your deposition, lines 21 through 24.

And do you see where you were asked the question on line 18:  How much -- you said that beginning in November you began to actually interrogate as well?

And the answer was:  I probably only did a total of -- quite honestly probably only did one or two complete interrogations.  And I assisted with others.  I observed quite a few.

121

MR. O'CONNOR:  Your Honor, he left out "a few others."

THE COURT:  Yes, I know.

BY MR. BUCHANAN:

Q    A few others.  I'm sorry.  I assisted with a few others.  I observed quite a few; do you see that?

A    Yes, I do.  And I probably saw a lot more than what I remember.  Again, we're talking over 21 years ago now.

Q    Sure.  And when you observed CACI interrogators conducting interrogations, that's not because the Army ordered you to do that; right?

A    Well, actually at some points, Captain Wood did want me to go ahead and see how so-and-so was doing.

Q    And there were other times you did this on your own; right?

A    I might have.  I really don't remember.

Q    And you sat in on those interrogations because you had quality control responsibilities over CACI's interrogators; isn't that right?

A    I would not say that's correct.

Q    Okay.  Let's go back to your deposition, page 144.

A    Okay.  I'm there.

Q    Okay.  And if we go up a little bit, you were asked a question, you said:  Absolutely, that was part of your job responsibilities; do you see that?  Are you with me?

122

Cross-examination D. Porvaznik

THE COURT:  Why don't you read the question at 13.
Let's get some context.

MR. BUCHANAN:  Okay.

BY MR. BUCHANAN:

Q    Okay.  Starting up at line 13:  Now when you are --
when you are observing the CACI personnel conducting the
interrogations, I take it you would have stopped
interrogations in which you saw any type of physical abuse?
And your answer was:  Absolutely; do you see that?

A    Again, where -- I'm sorry.  Which page and which line?

Q    I'm sorry.  Starting at page 143.

THE COURT:  It's right above 144.

BY MR. BUCHANAN:

Q    Line 13.

A    Okay.  143, line 13.  Okay.

Q    Okay.  Did I read that correctly, that question and
answer?

A    I'm reading it.

Q    Okay.  The next question -- are you done with that
part?

A    Yes.

Q    The next question is:  You say absolutely.  That was
part of your job responsibility.  Do you see that question?
And you said:  To ensure -- well, one is military, and one
is professional.  As a very experienced interrogator

123

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

having -- the one thing we didn't cover during my career business was -- is that I was the course director for the interrogation of prisoners of war for the Marine Corps and Navy for three and a half years.  I -- I do know interrogations and what is right and what is wrong, so, in that sense, and as the site manager, sure.  As part of quality control, yes.

A    I would say I overstated or misspoke on that.

Q    In 2006 when you gave testimony on that?

A    Yeah.  That would be 2006.

Q    You also had the ability to watch CACI personnel planning and preparing to conduct interrogations; is that right?

A    I had the opportunity, yes.

Q    And you had access to the Army's databases; correct?

A    Yes, I had access to the -- yes.

Q    So you had access, and you could review interrogation plans that CACI interrogators created; right?

A    I could, but I didn't necessarily do so.

Q    Sometimes you went into the Army database and you reviewed interrogation plans that CACI interrogators created; isn't that right?

A    Sometimes I'd look at the plans, and sometimes I would look at the tactical interrogation report after the fact.

Q    Okay.  And you undertook that exercise to make sure

124

that CACI interrogators were performing properly; isn't that right?

A    I wouldn't state it that strongly.

Q    Okay.  If we go to your deposition on page 167, line 23, and we'll probably have to read a little bit above it from the earlier part of that page.

Let's start on line 3.

A    Okay.  167 and --

Q    Let's start on line 3.

A    Line 3.  Okay.

Q    All right.  Now, were there occasions when you didn't see a CACI interrogator plan, you said you saw most of them, but there were occasions you might not have seen one; do you see that?

A    Yes, I do.

Q    And you gave an answer:  I didn't even see most of them; I say a goodly amount of time.  There were a lot, and there was a lot of interrogations going on.  And, again, since the military had, you know, the complete control and approval of those interrogation plans, I would periodically just go in, and for my own knowledge, I would take a look at them just to see how the guys were doing; right?  You saw that?  I read that correctly?

A    Yes, I'm with you.

Q    Okay.  And you continue your answer:  Or I would have

125

discussions with some of the other military interrogators or section leader or watch officers or OIC just to get a -- and that would be, you know, sometime -- sometimes those, it's like doctors or lawyers getting together and talking just, you know, comparing notes and seeing.

Question:  Right.

Answer:  You know.

Question:  And you did it because you wanted to make sure your guys were performing right?

Answer:  That was one of the reasons.  That was the main reason actually.

That was the testimony you gave in 2006; right?

A    Okay.  Yeah.  I'm tracking with you on that.

Q    Okay.  You also had access through the Army database to CACI interrogators' reports that they wrote; correct?

A    Yes, I had access to those.

Q    And their interrogator notes, too; right?

A    Their notes?

Q    Yeah, their notes.

A    Yeah, I could have.

Q    And you could speak to CACI interrogators about their interrogation plans; right?

A    If they came up to me and asked.

Q    And you have --

A    I didn't prompt it myself, though.

126

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q    But you would have those discussions with CACI interrogators; right?

A    Again, peers talking to each other.

Q    And they would bounce ideas off of you; right?

A    Bounce an idea?  Yes.  On occasion, sure.

Q    What techniques and approaches they were using; right?

A    Again, bouncing ideas.  That could include approaches.

Q    Fair to say there were no restrictions placed on your access to information regarding CACI interrogators and their performance?

A    There was -- for the most part, I believe I could get to what I -- if I wanted to look at something.  But there were some -- if you go into SCI or even to more possibly say for a high-value target, I might not have been able to look at that.

Q    So if something was classified above a level that you had clearance, you couldn't access that information; right?

A    Correct.

Q    But, otherwise, you could access information within the Army database?

A    In general, yes.

Q    And Captain Wood, meeting with you daily, would share with you reports about how CACI interrogators were performing; right?

A    She would give me feedback.

127

Q    You also had access to the Army database that included reports of detainee abuse; correct?

A    I never actually saw that.

Q    Now, in talking to CACI interrogators and they were bouncing ideas off of you, you would offer them your advice as to what's a good idea and what's a bad idea; right?

A    If they asked for my advice, I would give them, you know, good, bad or ugly.  But, again, I couldn't approve or disapprove any plan that they had.

Q    You -- if you saw a plan -- hold on.  Withdraw that question.

In your entire career, you've never used dogs in connection with an interrogation; is that right?

A    No.  Never.

Q    And, in your view, the use of dogs is way above and beyond; fair to say?

A    I would think so.  Interrogations -- the expression catch more flies with honey than you do with vinegar, so ...

Q    So you would agree that use of dogs is way above and beyond?

A    Yes.

Q    And if you saw a CACI interrogation plan that involved the use of dogs, you would have stopped that plan from going forward; fair to say?

A    I would have brought it to the attention of probably

128

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Captain Wood or NCOIC.

Q    Okay.

A    And, again, because they're the ones who could approve or disapprove.

Q    We'll get there.

MR. BUCHANAN:  Now, you have -- let's bring up PTX 42 already in evidence.

BY MR. BUCHANAN:

Q    And just focusing on that middle block that we looked at earlier, it says:  Everyone is responsible for ensuring compliance to the IROE; right?

A    142?

Q    You can look on the screen.  It might be a little bit easier.

A    Yes.  Okay.

Q    Yeah.  I'm sorry.

A    Yes.

Q    Right.  And violations must be reported immediately to the OIC; correct?

A    Correct.

Q    And that obligation applied to you and to all CACI employees; is that right?

A    It applied to all CACI employees, and it applied to all military.

Q    Okay.  You're familiar with the CACI code of ethics;

129

right?

A    It's been a long time, but yes.  Yeah.

Q    Do you recall that it was part of your employment agreement when you joined CACI in 2003?

A    Yeah, I believe so.  If I remember.

Q    And do you recall that each year, year after year, you were required to review that code of ethics and then sign an acknowledgment that you had reviewed it?

A    I don't remember if we had to do it every year.  It's quite possible.

Q    Okay.

A    Again, it's a long time ago.

Q    You reviewed the CACI code of ethics before you deployed to Abu Ghraib; right?

A    I believe I did.

Q    Okay.  And as the site -- CACI site leader, you made sure that other CACI employees under your supervision reviewed and signed off on the code of ethics; right?

A    Either I did or it was done at Camp Victory.

Q    And it was your responsibility to make sure that CACI employees abided by that code of ethics; right?

A    In regards to CACI, yes.  Sure.

        MR. BUCHANAN:  So let's take a look at PTX 85A, please.

        THE COURT:  Any objection to 85A?

130

MR. BUCHANAN:  Sorry.  It's in evidence.

THE COURT:  All right.  It's in evidence.

THE WITNESS:  All right.  I'm there.

BY MR. BUCHANAN:

Q    Okay.  Do you recognize that as the CACI code of ethics and business conduct for the year 2003?

A    Yes.

Q    And that's the year of which you were sent to Abu Ghraib prison as the CACI site leader?

A    Correct.  Yes.

Q    Okay.  If you turn to page 7 -- it will come up on the screen.  It might be a little bit easier for you to review it.

A    Okay.

Q    And drawing your attention to the section called management rights policy.

Do you see where it says:  CACI management retains all rights to operate the business according to its judgment, including, but not limited to -- and then if we go down to the bottom -- direct, supervise and control, and when it seems appropriate -- when it deems appropriate, discipline the workforce; do you see that?

A    Yes, I do.

Q    So CACI retained the right to direct, supervise and control its employees; is that right?

131

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A    To supervise whether or not they were taking care of business for the client.

Q    Okay.  And this is the code of ethics that applied to you and CACI employees at Abu Ghraib; is that right?

A    Say it again, please.

Q    This is the code of ethics that applied to you and to CACI employees at Abu Ghraib?

A    Yes.

Q    Now, if you saw an interrogation plan involving a CACI interrogator that violated the CACI code of ethics, you had the ability to reject that plan; isn't it right?

A    It could be overwritten by the military.

THE COURT:  That wasn't responsive to the question.

Repeat your question.

MR. BUCHANAN:  Yeah.

BY MR. BUCHANAN:

Q    You, as the CACI site leader --

A    Sure.

Q    -- you had the ability to reject that plan?

A    I couldn't control that.  I could suggest, no, that's not good.

Q    Let's go to your deposition, page 184, starting at line 8.  Let me know when you're there.

A    Deposition; correct?

132

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q    Yeah.  The first tab in your binder.  We're at page 184, line 8.

A    I'm sorry 84 or 94?

Q    184.

A    184?

Q    184.

A    Okay.  I'm there.

Q    Okay.  You were asked:  And -- and so when I -- when I asked you about whether or not you would have approved a plan, you said no, you would have disapproved the plan that would have crossed the line?

        Question:  Right.

        Line 15.  Answer:  Again, I am not part of the approval process for interrogation plan.

        Question:  I --

        Answer:  But if somebody brought one up to me of their own volition, yes.  I would have -- I would have sat there and said no, you can't do that and don't do that.  And -- well, again, that's all hypothetical because it never happened, but --

        Do you see that?

A    Yes, I do.

Q    Okay.  So your testimony in 2006 was if you saw a CACI interrogation plan that included something that crossed the line, you would have stopped that plan from going forward?

133

A    I would have suggested that they do something else or not do that.

Q    Okay.

A    But, again, they're submitting it to the Army.

Q    And if you disapproved of a plan, a CACI employee was not permitted to go -- to disregard your instructions and then to go to the Army for approval; is that right?

A    No, they could.

Q    I'm sorry?

A    They could go to the Army.

Q    That would be an act of insubordination; wouldn't it?

A    A very strong word.

Q    Okay.  Let's take a look at your deposition testimony starting at the top of page 185, line 1.

         Are you there?

A    I'm on 185 and line 1.

Q    Question:  Is your direction to an employee "No, don't do that.  You cannot do that"; is that a direction that has to be followed by the CACI employee?

         Answer:  It's a -- it's violating our -- the CACI PT code of ethics for Iraq or anything like that. Disciplinary action would be taken depending on what -- depending on what the issue was that could result in -- yes, terminating or being asked to leave the contract or something; do you see that?

134

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A    Yes.

Q    So if you gave -- if you told a CACI interrogator I do not approve of this plan, if they then went to the military to seek approval, that would be a violation of CACI code of ethics; right?

A    Conceivably, but that stated code of ethics is a code. It's not hard and fast.

Q    And that --

A    It is, but it --

Q    And that interrogation would be subject to disciplinary action, including termination; right?

A    I believe that contract -- what I do remember of it was at will, meaning the employee could say I'm leaving.  We couldn't keep them there.  And the military could also say this person is not up to snuff, they're not performing, and they could -- or if there's, you know, some violation that they did, the military could also, at will, fire said employee.

Q    That employee's an at-will employee of CACI; right?

A    Of CACI, yes.

Q    And means CACI can terminate that employee at will; right?

A    Technically, yeah, they could.

Q    Is there something other than technical?

A    No.  Thinking about it, no.

135

Q    If you saw an interrogation being conducted by a CACI interrogator where detainee abuse was occurring, you absolutely would have stopped it?

A    Again, if I saw a -- please restate.  I'm sorry.

Q    Sure.

If you saw or heard an interrogation being conducted by a CACI interrogator where detainee abuse was occurring, you absolutely would have stopped it?

A    Yes.

Q    Because you had the authority to stop it?

A    We all had that responsibility per the IROE.

Q    You didn't have to go and seek Captain Wood's approval to stop that interrogation; did you?

A    Again, if we were violating human rights or something like that, or if the individual is, yeah, I stopped it, and then I would tell Captain Wood.

Q    And you also would have told the CACI chain of command; right?

A    Yes.

Q    Because you have obligations to report both to the military and to CACI; right?

A    Yeah.  Yes.

Q    Now, the Army can't fire, on its own, a CACI employee; right?

A    I believe they could.

136

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q    They could unilaterally fire a CACI employee, come up and say you're fired?

A    At the end of the day, yes.

Q    Okay.  You were asked some questions about General Fay's investigation; right?

A    Right.

Q    And --

A    Yes.

Q    You've reviewed General Fay's report?

A    I never saw his whole report.

Q    You saw parts of it?

A    The only thing I saw of his report was basically a summation of my interview with General Fay and his --

Q    So you're familiar with the section of General Fay's report that talks about you; is that right?

A    Probably should be.

MR. BUCHANAN:  Let's bring up PTX 23 already in evidence.  And we're going to look at page 74 of 177.

BY MR. BUCHANAN:

Q    And, Mr. Porvaznik, it will come up on the screen, which might be a little bit easier for you.

A    Okay.

Q    And do you recognize this as the excerpt from Captain -- I'm sorry, Major General Fay's report discussing you?

137

Case 1:08-cv-00827-LMB-JFA   Document 1818   Filed 11/12/24   Page 138 of 310
PageID# 54656
Cross-examination of D. Porvaznik

A    Okay.

Q    All right.  There's a reference there to Civilian 18, who is described as the CACI site manager; do you see that?

A    Yes, I do.

Q    And that would be a reference to you; right?

A    I believe so, yes.  Yeah.

Q    And Major General Fay writes:  Captain Wood relied on the CACI site manager, Civilian 18, to interview contractors as they arrived and to assign them based on his interviews; do you see that?

A    I see that.

Q    And he also wrote:  She knew little of their individual background or experience; right?

A    Well, that's what they wrote.

        MR. BUCHANAN:  Okay.  Now, you can take that down.

        THE WITNESS:  Not necessarily my words.

        MR. BUCHANAN:  I understand.  We can take that down.

BY MR. BUCHANAN:

Q    And, again, in your nearly daily conversations with Captain Wood, you would receive feedback on the performance of CACI interrogators; right?

A    She would give me input on occasion, sure.

Q    And after everything we just reviewed, it is still your testimony that you had no control, no responsibility, no

138

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

oversight over CACI interrogators in performing their duties as interrogators?

A    I couldn't control their interrogations.

Q    Okay.  Now, you testified that you didn't see any -- you didn't see any instances of abuse; right?

A    Correct.

Q    But as a site leader, people would report up to you about instances of abuse they saw or heard; right?

A    It would have, yeah.  If they saw it.

Q    Okay.  And you were aware that in or around January 2004, the Army Criminal Investigation Division began conducting an investigation into allegations of detainee abuse at Abu Ghraib; right?

A    That time frame sounds about right.

Q    There was a lot of buzz on Abu Ghraib about the presence of the Criminal Investigation Division; right?

A    There was.  But I also -- it was somewhere -- again, I'm not -- I'm fuzzy on when I took my two and a half weeks R&R.  I do know when I came back, we had -- folks let me know that I would have to sit down with the CID or Criminal Investigative Division, and talk to them.

Q    And you would tell CACI employees, you know, the Criminal Investigation Division here, you should go over and talk to them; right?

A    If they were requested to be spoken to, yeah, we would

139

have cooperated, sure.

Q    And you know that individuals submitted sworn statements to the Army as part of that CID investigation; right?

A    I believe so, yeah.  Sounds about right.

Q    Including you; right?

A    Yeah.  Yes.

Q    And you understood that you had an obligation to report abuse that you became aware of to the military; right?

A    If it actually happened, yes.

Q    And it's not just what you saw; it's what other people brought to your attention; correct?

A    There probably were a couple of times that somebody allegated, but it was -- there was no evidence.  Nothing to back it up.

Q    You're familiar with a CACI employee named Claudius Albury?

A    Albury, yes.

Q    He was a CACI screener working at Abu Ghraib; is that right?

A    Yes.  I believe -- yeah, he was a screener.

Q    And you're also familiar with someone named Billy Krieger?

A    Krieger, yes.

Q    Krieger was also a CACI screener working at Abu Ghraib;

140

Cross-examination D. Porvaznik

right?

A    Yes.  Sounds right.

Q    And both of those guys reported to you; is that right?

A    Within the CACI food chain, yeah.

Q    Okay.  And Mr. Albury was obligated to report instances of detainee abuse to you; right?

A    Well, to the military and to me.

Q    And to you.  Okay.

     Do you recall that Mr. Albury reported to you that Mr. Krieger had engaged in detainee abuse?

A    Again, it was a case of allegation.

Q    But that's a yes, you remember that he reported that Mr. Krieger engaged in detainee abuse?

A    No, actually, I didn't.  I didn't remember that.

Q    Okay.  Just for your own -- to refresh your own recollection, take a look at PTX 23 in your book.  I'm sorry, 223.  I misspoke.

          THE COURT:  I'm sorry, 223?

          MR. BUCHANAN:  223.  I'm sorry, Your Honor.

          THE WITNESS:  That's PTX 23; correct?

          MR. BUCHANAN:  I'm sorry, 223.

          THE COURT:  Way in the back of the book.

          Is there any objection to this coming in?  Were you moving it in?

          MR. BUCHANAN:  I wasn't planning to, but --

141

THE COURT:  I'll leave it up to you.

MR. BUCHANAN:  I'll offer it into evidence.

THE COURT:  Any objection?

MR. O'CONNOR:  Hearsay, Your Honor.

MR. BUCHANAN:  It goes to his notice, Your Honor.

THE COURT:  Okay.  I'll allow --

MR. O'CONNOR:  Well, this is not to him, Your Honor, so it doesn't go to his notice.  It's his out-of-court statement.

THE COURT:  Wait a second.

See if you can lay a foundation.

MR. BUCHANAN:  Okay.  I can use it just to refresh, Your Honor.

THE COURT:  Okay.

BY MR. BUCHANAN:

Q    Mr. Porvaznik, does this refresh your recollection that Mr. Albury reported to you that Mr. Krieger engaged in detainee abuse?

A    I think he did.  I don't remember to be honest.

Q    Okay.

A    Again, a real long time ago.

Q    Are you familiar with a CACI employee named Rich Arant?

A    Yes.

Q    He was a CACI -- he was a CACI employee who worked with you at Abu Ghraib?

142

A     Yes.

Q     He was an interrogator?

A     He was an interrogator, yes.

Q     And he was present at Abu Ghraib when you arrived in 2003?

A     I don't remember if he was there first or -- I -- I know he and I were there at the same time, I just can't remember who got there first, whether it was Rich Arant or myself.

Q     And he had an obligation to report detainee abuse to you; is that right?

A     Yes.

Q     And shortly after you arrived, Mr. Arant decided to leave Abu Ghraib prison; is that right?

A     Yeah.  He wasn't there very long, if I remember correctly.

Q     And you conducted an exit interview of him as he was leaving?

A     I guess you could call it an exit interview.

Q     And he told you that he was leaving because he had witnessed detainee abuse; isn't that right?

A     He told me he saw things that made him uncomfortable, but he didn't go into the specifics.

          MR. BUCHANAN:  Okay.  Can we bring up what's in evidence as PTX 115.

143

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

BY MR. BUCHANAN:

Q     Just drawing your attention to the first line under Amy, it says --

MR. BUCHANAN:  Blow that up, please.

BY MR. BUCHANAN:

Q     -- I assume Dan Porvaznik has been in touch with you regarding my separation from employment; do you see that?

A     I do.

Q     And if we go down to the fourth paragraph, it starts: Dan, will, I'm sure, be advising you as to what reasons were given to the client to explain my departure; right?

A     I see it, yes.

Q     Okay.  And you could see the next sentence:  I had suggested to Dan that my concerns regarding the handling of prisoners and interrogation methods should be kept in-house for now; do you see that?

A     I see that.

Q     And he writes:  You're probably aware now of an ongoing investigation regarding allegations that male interrogators conducted an unauthorized interrogation of a female inmate held in an isolation facility at Abu Ghraib prison; right?

A     I see that.

Q     This does not involve anything which I or any other CACI employee witnessed or reported, but it does confirm my assessment that the situation I observed may not be an

144

isolated incident; right?

A    Okay.

Q    So the reason that Mr. Arant told you he was leaving was because he was aware of detainee abuse, and it made him uncomfortable; right?

A    He just said he saw things that made him uncomfortable. He did not actually specifically say detainee abuse or any specific incident.

Q    But he was providing you information about the treatment of detainees that made him uncomfortable; right?

A    What he considered.

Q    Okay.  And it says in the first sentence again:  Will be advising what reasons were given to the client to explain my departure; do you see that?

A    Yes.

Q    And the reasons for departure that were given to the client was that Mr. Arant was having trouble with his eyes?

A    Yes.

Q    Okay.  So you did not --

A    Which is what Arant told me.

Q    So the client, the Army, was not told that Mr. Arant was uncomfortable about the way detainees were being treated, and that's the reason he was leaving?

A    Say it again, please.

Q    The client, the Army, was not told that the reason that

145

Case 1:08-cv-00827-LMB-JFA    Document 1818    Filed 11/12/24    Page 146 of 310
PageID# 54664
Cross-examination of D. Porvaznik

Mr. Arant was leaving Abu Ghraib prison was because he was uncomfortable with how detainees were being treated; right?

A    He was uncomfortable.  Now, the -- I really don't remember whether or not -- my discussions with Captain Wood.

Q    Okay.

A    I mean, there were other cases where people came and they were uncomfortable and they left of their own volition.

Q    Now, you had information from Captain Wood and other sources about whether there would be any personality conflicts between Army personnel and CACI interrogators; right?

A    Say it again, please.

Q    You had access to information through Captain Wood and other means to determine whether there were any personality conflicts between Army personnel and CACI interrogators; right?

A    It was brought to my attention, yeah.

Q    And you would know if Army personnel refused to work with a CACI interrogator; right?

A    I don't remember that happening.  I don't remember it, I should say.

Q    And that would have been brought to your attention if it happened?

A    I would think so.

Q    So you're not aware that Army interrogator Adams

146

refused to work with DJ, Mr. Johnson?

A    I don't remember that.

Q    Okay.

A    I remember Johnson, but I don't remember Adams or whoever.

Q    Okay.  So in January of 2004, you were the site lead at Abu Ghraib prison, and the CID investigation is undergoing; do you remember that?

A    Yes.  Vaguely.  Yeah.

Q    And do you recall that you were asked to complete a questionnaire as part of that CID investigation?

A    Yes.

Q    Okay.  Just -- I want you to turn for the moment to Exhibit 214 in your binder.

        MR. BUCHANAN:  And then I will move this into evidence, Your Honor.

        THE COURT:  Any objection to 214?

        MR. O'CONNOR:  No, Your Honor.

        THE COURT:  All right.  It's in.

   (Plaintiffs' Exhibit Number **214 admitted into evidence.**)

        MR. BUCHANAN:  Bring 214 up on the screen.

BY MR. BUCHANAN:

Q    Do you recognize the handwriting on this document?

A    Yes.

Q    Is that your handwriting?

147

A    It is.

Q    And that's your name that appears on the top?

A    That is my name.

Q    And this is a handwritten statement that you provided to the CID as part of you investigation?

A    Yeah.

Q    Can we go to the second question and just blow that up, please.  And the question is:  What is your job description at the prison, and what are your daily duties?  Do you see that?

A    Yes.

Q    Can you read your answer to the jury, please.

A    JIDC -- J-I-D-C -- CACI (ops site lead) managing all CACI contractors supporting JIDC-AG operations.

Q    So in 2004, you described yourself to the Army as the operations site lead for CACI; right?

A    For CACI, but not for interrogations.

Q    Supporting all JIDC-AG operations; correct?

A    Supporting.  That's a keyword there.

Q    Okay.  Let's go down a little bit further, and there's a question that says:  Do you know of any events where detainees were abused, assaulted or treated immorally; do you see that?

A    I see that.

Q    And you answered no to that question; right?

148

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A    Correct, I did.

Q    You didn't provide any information that you had received from Mr. Albury; right?

A    I didn't know it to be true.  And, again, it was an allegation.

Q    And you didn't report anything to the CID about your conversation with Mr. Arant; did you?

A    I don't recall that I did.

Q    Okay.  The answer is right there; right?

A    Yeah.

Q    If we go a little bit further down, there's a question that says:  Do you have any information you feel this office needs in order to complete this investigation into detainee abuse and maltreatment and/or the unauthorized photography and videoing of detainees; do you see that?

A    Yes, I do.

Q    And what was your answer?

A    No.

        MR. BUCHANAN:  Nothing further, Your Honor.

        THE COURT:  All right.  Any redirect?

        MR. O'CONNOR:  Can we put Plaintiffs' Exhibit 115 back up.

                REDIRECT EXAMINATION

BY MR. O'CONNOR:

Q    So, Mr. Porvaznik, you at least briefly knew a CACI

149

interrogator named Richard Arant; right?

A   Yes.

Q   And what do you remember about Mr. Arant?

A   Good guy.  Qualified.  Good interrogator.

Q   How long was Mr. Arant at the prison?

A   I really don't remember.  Maybe a couple weeks.  I am definitely fuzzy on that one.

Q   Okay.  Let's look again at the fourth paragraph. Mr. Buchanan went over part of it with you.

And you see Mr. Arant's reference to telling you about his "concerns regarding the handling of prisoners and interrogation methods used"; do you see that?

A   Yes.

Q   Do you remember what he said to you?

A   I remember that he said he -- again, he saw things that made him uncomfortable; he did not go into specifics.  He did at some point say something to the effect of -- he had an issue with really young interrogators.

Q   Army interrogators?

A   Army interrogators.

Again, the U.S. Army, you can enlist and join the Army to become an interrogator, but not have I would say wherewithal and maturity to truly function.  That's my personal opinion, though.

Q   And if you look a little further down the paragraph, it

150

says:  This does not involve anything which I or any other CACI employee witnessed or reported, but it does confirm my assessment that the situation I observed may not be an isolated instance; do you see that?

A    Yes, I do.

Q    Did -- during your conversation with Mr. Arant, did he make any allegations of wrongdoing by CACI personnel?

A    No, he did not.

Q    Okay.  The very next sentence says:  Dan was alert to such possible circumstances even before CACI personnel arrived on station and was firm from the beginning that CACI personnel not put themselves in compromising positions which might result in any allegations of wrongdoing.

A    Right.

Q    Is that an accurate characterization of what you told the CACI personnel?

A    Yes.

Q    And were you, in fact, firm that CACI personnel should avoid putting themselves in compromising situations?

A    Yes.

Q    There's a reference further down in the paragraph to acts conducted by junior active-duty military personnel.

Did Mr. Arant go into any detail on what the acts conducted by junior active-duty military personnel were?

A    No.  Again, he didn't go into specifics.

151

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q    Now, at the end of the paragraph, Mr. Arant states: Junior enlisted personnel are not competent to conduct interrogation operations in an unsupervised mode.

A    Okay.

Q    Do you agree with that?

A    That was Arant's opinion.  And, again, like I just stated earlier, that's my opinion also, but that's -- but it was the Army's show.

Q    And the Army was using junior enlisted --

A    Yes.

Q    -- interrogators to conduct interrogations?

A    Absolutely.  They were.

Q    And Mr. Buchanan asked you about the extensive training that's required for someone to be a school-trained interrogator in the Marine Corps.

A    Yes.

Q    Did the military leadership, the ICE have enough school-trained interrogators in order to complete the interrogation mission while you were there?

A    No, they didn't have enough.  That's one of the reasons why they hired CACI.

Q    And did -- and did the ICE ask -- well, did the ICE state that they -- at times, that it wanted CACI employees who were not even sent over as interrogators, analysts, screeners and the like, promoted them to interrogators

152

because they needed them for the mission?

A    Did the client -- did the Army or ICE?

Q    Yes.

A    Yes.

Q    Mr. Buchanan asked you a number of questions about ways that you had the ability to supervise.

You had the ability to see interrogation plans?

A    I could see them, yes.

Q    Couldn't any interrogator see interrogation plans?

A    Absolutely.  They've been put into the secure database.

Q    And you had the ability to see interrogation reports?

A    Yes.

Q    But isn't that true of any military or civilian interrogator at Abu Ghraib prison?

A    The database -- I'm pretty sure the plans are in there, the tactical interrogation reports, the Spot reports, anything that -- anybody who had a clearance to get into that classified system could look at it.

Q    And you had the ability to observe interrogations that were going on?

A    Yes.

Q    Were there interrogation booths at Abu Ghraib prison?

A    Yes, there were.

Q    Did they have one-way glass where you could look in and they couldn't see out?

153

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A    I don't remember one-way glass.  No, I don't remember.
I don't think so.

Q    Okay.

A    I don't think we had that much.  We were lucky to have
a booth, honestly.

Q    Could other interrogators see interrogations that were
going on?

A    Sure.

Q    So you have the ability to see interrogations by CACI
interrogators.

Do you have the same ability to see and review
reports and paperwork from interrogations conducted by
soldiers?

A    Yes.

Q    The question is, was it your responsibility to review
and supervise the work done by CACI employees?

A    My responsibility, no.

Q    Was it your responsibility to see and supervise and
review the work of military interrogators at Abu Ghraib
prison?

A    No.

MR. O'CONNOR:  Could we bring up --

THE COURT:  It's actually time for lunch.  We're
going to take the break and continue with this at 2:00.
Thank you.

154

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

(Jury not present at 1:02 p.m.)

(Court recessed for lunch at 1:02 p.m.)

AFTERNOON SESSION 2:02 p.m.

THE COURT:  All right.  Let's bring the jury in.

THE COURT SECURITY OFFICER:  Yes, Judge.

Rise for the jury.

(Jury present at 2:02 p.m.)

THE COURT:  All right.  Mr. O'Connor.

MR. O'CONNOR:  Your Honor, one quick housekeeping matter.  On direct, I had shown the witness Plaintiffs' Exhibit 38, the picture of Daniel Johnson with a detainee, and I had said it had been admitted.  It has not been admitted.  We move its admission.

MR. BUCHANAN:  No objection.

THE COURT:  We've seen it so many times, it really hasn't been moved in yet?

MR. O'CONNOR:  That's what the brains of the outfit are telling me, Your Honor.

THE COURT:  So it's 138?

MR. O'CONNOR:  38.  PTX 38.

THE COURT:  Oh, 38.  All right.  It's in.

MR. O'CONNOR:  Thank you, Your Honor.

(Plaintiffs' Exhibit Number **38 admitted into evidence.**)

MR. O'CONNOR:  And can we put up Plaintiffs' Exhibit 115, please.

155

BY MR. O'CONNOR:

Q    Just a few more questions, Mr. Porvaznik, about the Rich Arant email.

     If we go to the last paragraph on the first page.

A    Yes.

Q    The first couple of sentences say:  In summary, the CACI personnel with whom I had contact, especially Dan Porvaznik and Steve Stefanowicz, have my highest admiration and respect.  I am making no charges regarding the troubling acts I witnessed, acts conducted by junior active-duty military personnel.

     Is it consistent with your recollection of your conversation with Mr. Arant that he was not making charges about whatever it was that he saw?

A    Correct.

Q    And then finally the last paragraph on the second page.

A    I see it.

Q    Mr. Arant, counsel -- in the second sentence.

A    Yes.  Do you want me to read that?

Q    No, it's okay.

     Did you try to be totally honest and straightforward and competent?

A    Yes.

Q    Okay.  Moving to the first tab in plaintiffs' book, which was your deposition.  If you could turn to page 143 of

156

your deposition.  And tell me when you're there.  Page 143.

A    I'm there.

Q    Okay.  And at line 13, you were asked by the plaintiffs' counsel:  Now, when you are -- when you were observing the CACI personnel conducting the interrogations, I take it you would have stopped any interrogation in which you saw any type of physical abuse?

And your answer was:  Absolutely.

And then the lawyer responds with:  And you say absolutely.  That was part of your job responsibilities?

And your response was:  To ensure -- well, one is military and professional.  As a very experienced interrogator having -- the one thing we didn't cover during my career business was that I was the course director for the interrogation of prisoners of war for the Marine Corps and Navy for three and a half years.  I -- I do know interrogation and what is right and what is wrong.  So in -- in that sense and also as a site manager, sure.  As a part of quality control, yes.

Do you see that?

A    Yes, I do.

Q    And so the question you were responding to was if you had saw abuse going on, would you have stopped it?

A    Yes.

Q    And that remains your answer today?

157

Case 1:08-cv-00827-LMB-JFA   Document 1818   Filed 11/12/24   Page 158 of 310
Redirect examination - D. Porvaznik
PageID# 54676

A    Yes.

Q    Now, you were asked by Mr. Buchanan some hypothetical questions of if you saw abuse, would you have stopped it, or if you saw abuse of approaches proposed in an interrogation plan, would you have taken action.

Did any of those circumstances actually occur?

A    No.

Q    So this is your estimation of what you would have done had you seen abuse or seen a CACI interrogator proposing to conduct an abusive interrogation?

A    Yes.

Q    You were asked by Mr. Buchanan about hiring and firing.

Do you have an understanding as to whether the United States Army could direct that a CACI employee be removed from the contract?

A    That was my understanding, yes.

Q    Your understanding was that ...

A    They could -- if they wanted to take somebody off the contract, they could.

Q    And in plaintiffs' binder, I'd ask you to turn to PTX 223.  This is the statement Mr. Buchanan asked you to read to yourself about -- by Claudius Albury.

A    Right.

Q    Dealing with allegations about Billy Krieger.

A    Yes.  Okay.

158

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q    Was Mr. Krieger even around and working on the contract by the time those allegations had worked their way up?

A    No.  I'm pretty sure he wasn't because he left -- he left in a hurry on his own.

Q    And do you know if the Taguba report or the Fay report made any allegations of detainee abuse by Billy Krieger?

A    To the best of my knowledge, no.

Q    Okay.  Let's go to Plaintiffs' Exhibit 133, page 42. And you can look in the binder, or you can look on the screen, whichever --

A    Okay.  The screen will be quicker.

Q    -- is more convenient to you.

        MR. O'CONNOR:  And can we blow up paragraph 14, please.

BY MR. O'CONNOR:

Q    And so the Army's memorandum talks about environment, and it says:  The working and living environment here at Abu Ghraib is nothing less than austere.

        Is that a true statement, in your view?

A    Very much so, yes.

Q    And then the next sentence says:  We ask for your patience in enduring the changes and improvements in our operation and living quarters.

        After that it says:  We are slowly improving on what has already drastically improved.  Any suggestions you

159

may have in improving either site, please bring forward to the OIC and NCOIC; do you see that?

A    Yes, I do.

Q    Was it your understanding that the military leadership was very much open to suggestions to try to improve the overall experience at Abu Ghraib prison?

A    As best they could, yes.

Q    Under difficult circumstances?

A    Yes.  Very.

MR. O'CONNOR:  Now let's go to paragraph -- now go back one page to paragraph 6.

BY MR. O'CONNOR:

Q    And, again, this talks about the chain of command, and the second sentence talks about two chains of command will be in effect, the operational and the administrative.

As site lead, were you the operational chain of command, or were you the administrative chain of command?

A    The administrative chain of command.

MR. O'CONNOR:  No further questions, Your Honor.

THE COURT:  Any recross?

MR. BUCHANAN:  Very, very briefly, Your Honor.

THE COURT:  All right.

MR. BUCHANAN:  If we can just go back to Exhibit 115.  Plaintiffs' Exhibit 115 for a minute.

RECROSS-EXAMINATION

160

BY MR. BUCHANAN:

Q    I want to focus on the date of that email, please.  And you'll see that it's October 14th, 2003; do you see that?

A    Yes, I do.

Q    And at this point, Mr. Arant is already back in the United States; is that right?

A    The way I -- the way I read this, yes.

Q    Okay.  And you and Mr. Stefanowicz arrived in Iraq on October 5th, 2003; right?

A    Yes.

Q    So this email he wrote about Mr. Stefanowicz, this was within meeting him within less than ten days; right?

A    Yeah.  That would make sense.  Yes.

Q    The duty that you had to report allegations of abuse didn't apply just to CACI -- or just to military personnel; right?

A    It applied to everybody.

Q    If you heard of allegations of abuse by a CACI employee, you had an obligation to report that to the Army; right?

A    If indeed it happened, yes.

Q    And if you heard of allegations of abuse by a military personnel, you also had an obligation to report that to the Army; right?

A    Yes.

161

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

MR. BUCHANAN:  I have nothing further, Your Honor.

THE COURT:  All right.  Does anybody anticipate calling this witness again?

MR. O'CONNOR:  No, Your Honor.

MR. BUCHANAN:  No, Your Honor.

THE COURT:  All right.  Then, sir, at this point, you're excused as a witness.  You may stay and watch the proceedings or may leave, but do not discuss your testimony with any witness who has not yet testified.

THE WITNESS:  Understood, Your Honor.

(Witness excused at 2:12 p.m.)

THE COURT:  All right.  Mr. O'Connor, your next witness.

MR. O'CONNOR:  Thank you, Your Honor.  CACI calls Mark Billings to the stand.

THE COURT:  All right.

THE COURT SECURITY OFFICER:  Sir, come forward.  Face the deputy clerk.  Raise your right hand.

Thereupon,

MARK BILLINGS,

having been called as a witness on behalf of the defendant and having been first duly sworn by the Deputy Clerk, was examined and testified as follows:

(Time noted: 2:13 p.m.)

THE COURT SECURITY OFFICER:  You may be seated.

162

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE WITNESS:  Thank you.

DIRECT EXAMINATION

BY MR. O'CONNOR:

Q   Could you please state your name for the record.

A   Mark Wilson Billings.

Q   Mr. Billings, are you currently employed?

A   No.  I'm retired.

Q   Congratulations.

Who was your last employer?

A   CACI.

Q   What years did you work for CACI?

A   2003 to 2020.

Q   I'm going to quickly go through your career prior to CACI.

Did you go to college?

A   I did.  University of New Hampshire.

Q   Were you in the U.S. Army immediately after college?

A   I was.

Q   Were you an officer?

A   I was.

Q   What years were you in the Army?

A   2000- -- I'm sorry.  1973 to 1995.

Q   Did you have a military occupational specialty?

A   I was a transportation core officer and an automation data processing officer.

163

Q    Did you retire from the Army?

A    I did.  1995.

Q    And what rank did you hold upon retiring?

A    Lieutenant colonel.

Q    Were you involved in procurement of contractor services while in the Army?

A    Yes.

Q    Have you been involved in procurements of contractor services after you retired from the Army?

A    Yes.

Q    During your time in the Army, did you ever serve as a contracting Army's representative?

A    Yes.

Q    Can you explain to the jury what a contracting officer's representative does?

A    Well, basically he is the go-between in the case of my working the United States Army and the defense contractor. So basically he ensured that all of the requirements that were spelled out in the contract were being performed correctly.

Q    Can you describe the types of contracts for which you served as a COR when you were in the Army?

A    The ones that I did were associated with automated data processing.  I was involved with a modification to the Army's database, and so that's what I was overseeing were

164

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

data processers.  Basically we were developing an improved system for doing the Army's, what they call the program.  In those days, it was called the FYDP.  It was a five-year defense plan.

Q    Did you take employment after retiring from the Army?

A    I did.

Q    With what company?

A    FC Business Systems.

Q    Were you involved in the U.S. government's procurement of services from contractors while at FC Business?

A    I was a data analyst initially, and then I moved on to being a project manager.  So for a while, yes.

Q    And for the while part, would that be while you were a project manager?

A    Yes.

Q    Can you tell the jury what a project manager does?

A    Well, basically they receive a statement of work that they're asked to perform, and it's their responsibility to do the hiring and to maintain the staff to accomplish the task that we've been hired to perform.

Q    How long were you with FC Business Systems?

A    Until December of '97.

Q    Where did you go after FC Business Systems?

A    I was hired by Premier Technology Group, PTG.

Q    What was PTG's business?

165

A    They were a small 8A, which means a minority-owned business, and they were a defense contractor primarily. They were working for a variety of governmental offices.

Q    When you joined PTG, what were your job responsibilities?

A    When I joined PTG, initially I was a project manager, and then moved up to being a director where I oversaw several project managers.

Q    Did you work on particular contracts while you were at PTG?

A    We started with supporting work at Fort Belvoir, Virginia.  Again, we were doing automation type of support when I started.

Q    When you became a director at PTG, what were your job responsibilities?

A    Well, basically I had a group of project managers that I oversaw.  Basically I was ensuring that work was being done, that the statements of work were being accomplished.

Q    When did PTG get its first intelligence contract?

A    PTG got their first intelligence work in June of 1999.

Q    And what sorts of services -- strike that.

    What sort of services did PTG provide in connection with this first intelligence contract?

A    They were in support of the G2, which is the intelligence staff organization within the United States

166

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Army Europe.  And so we were providing intel analysts, a variety of types.  It was all based on how you gathered the information.  There was human intelligence, there was electronic intelligence, there was -- oh, what else.  Oh, we did satellite signals, communication intelligence.  Those types of things.  So there were about six different types of intel analysts that we were providing to the G2.

Q    Did this initial G2 contract involve the provision of interrogators?

A    No.

Q    Did this G2 intelligence contract call for PTG to provide operational supervision for the intelligence analysts that it was delivering to the Army?

A    No.  We can't do that kind of work that -- the FAR, the Federal Acquisition Regulations specifically calls out intelligence work, and it says that you cannot do operational control of that type of work.  So what we did was provided what I call staff augmentation bodies.

The organization, the G2 had more requirements that they could handle.  So much information was flowing into their headquarters, they needed additional people to help analyze that, and that's what we provided.

MR. O'CONNOR:  Your Honor, we move the admission of Defendant's Exhibit 77, which the Court has previously addressed.

167

THE COURT:  Any objection to 77?

MS. ROBINSON:  We reserve our prior objections, but other than that, no objection.

THE COURT:  All right.  It's in.

(Defense Exhibit Number 77 admitted into evidence.)

MR. O'CONNOR:  Can you put up Defense Exhibit 77.

BY MR. O'CONNOR:

Q    You mentioned the Federal Acquisition Regulations.

What are the -- for those of us who are not in the government contracts world, what are the Federal Acquisition Regulations?

A    Well, they're, again, a group of rules that you are required to follow when you're performing work under a contract.  Most contracts have references to the FAR stipulating you must comply with this regulation, this regulation.

Now, the FAR is the -- what I would call the top of the umbrella.  We have also a DFARs, which is defense Federal Acquisition Regulations, and then we go down to the actual organization.  The United States Army, they have their group of regulations.

So this is kind of the umbrella regulation that governs all regulations.

Q    And the Federal Acquisition Regulations are issued by the United States government?

168

A    Yes.

Q    Are you familiar with the term inherently governmental function?

A    Yes.

Q    Is that a term -- is that a concept you had to deal with during your time at PTG and CACI?

A    Absolutely.  That's what I was referring to earlier when I was talking about regulations that precluded us from doing operational control of intelligence work.

Q    Okay.  And can you give a layman's explanation of what is an inherently governmental function?

A    Well, as I said, you can't do intelligence collection. You can't oversee other soldiers.  As a contractor, I could not give an order to someone that was in the military.  You know, that was not my responsibility.  That was not my authority or ability.  You know, it was not allowed.

Q    Okay.  Let's go to page -- the second page of -- do you have in front of you Defense Exhibit 77?  It's in the binder, or you can look at the screen to your left, whichever is easier for you.

A    Okay.

Q    And let's go to the second page.

        And do you see a 7.503 policy?

A    Yes.

Q    Where it says:  Contracts shall not be used for the

169

performance of inherently governmental functions?

A    Right.

Q    Is that your understanding of what you -- you could not do things that were designated as --

A    That is correct.

Q    That were designated as things as an inherently governmental function?

A    Exactly.

        MR. O'CONNOR:  Okay.  Let's go down to C on the same page.  It's just a little below where you already highlighted.

BY MR. O'CONNOR:

Q    It says:  The following is a list of examples of functions considered to be inherently governmental functions or which shall be treated as such.  This list is not all inclusive; do you see that?

A    Yes.

Q    And let's go to Section 3 right under that.  And is one of those categories the command of military forces, especially the leadership of military personnel, who are members of the combat, combat support or combat service support role?

A    That's correct.

Q    And let's go to 8.  And so the direction and control of intelligence and counterintelligence operations are also an

170

inherently governmental function?

A    Yes.

MR. O'CONNOR:  And I should have gone back.  Can we go back on the same page to 7.502.  Right at the bottom of the first column.

BY MR. O'CONNOR:

Q    And these requirements regarding inherently governmental functions applied to call contracts for services?

A    Correct.

Q    Okay.  So with the G2 contract for PTG, you didn't have supervisor billets working on that contract?

A    There were none.  It was -- the positions that we were asked to fill were all what I call worker bees.  They were basically analysts performing work called out by their various job titles, whether it be interrogators or screeners or just intelligence analysts.

Q    Well, if you weren't providing operational supervision for these analysts, who was providing that operational supervision?

A    The United States Army.

Q    Did PTG provide administrative support?

A    Yes, we did.

Q    What sort of administrative support did PTG provide to its analysts?

171

A    I refer to that as care and feeding.  We made sure that the employee was paid, that he got to go on vacation, that -- basically all of his administrative type of things were handled.  Performance appraisals is another one.

Q    You used the term earlier a staff augmentation contract.

What do you mean by that?

A    It's simply, as I mentioned, you're providing additional staffing to -- to fill an existing requirement that, in this case, the United States Army had.  We were taking people that had the expertise to perform the job similar to those people that were in the United States Army.

Q    And while PTG is providing analysts to U.S. Army Europe, are they working side by side analysts who were actually members of the uniformed Army?

A    Yes, they were.  Basically analysts normally worked on shifts.  It's a 24-hour operation.  So you would have a green suiter and a civilian in blue jeans working side by side.

Q    Did there come a time when CACI acquired PTG?

A    Yes.

Q    About when was that?

A    That was May of 2003.

Q    When you joined CACI, did your job responsibilities change at all?

172

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A    No.

Q    Now let's turn to the contracts that are at issue here.

Did there come a time when the United States contracted with CACI to provide intelligence personnel in Iraq?

A    Yes.

Q    What types of intelligence personnel did CACI provide in Iraq?

A    Well, we, again, started off with intelligence analysts.  We then got into interrogators, screeners, people in that type of labor category.

Q    At the time the United States awarded the first interrogation contract to CACI, how much experience did you have in administering government contracts?

A    I had quite a bit of experience by that time.  As I said, I had done work when I was in the uniform associated with that.  And then after getting out fairly quickly with FC Business Systems, again, I started working and contracting.  And basically, you know, that continued to be one of my primary functions.

Q    Now, I've been referring to the contracts issue here as interrogation contracts.

To be clear, there were other positions that were filled under those contracts?

A    Absolutely.  Yeah.  We would have a contract in this

173

case to support the C2, which was -- it was a combined staff. So, in those days, it meant that you had people from the Air Force and the Navy and all that part of the staff.

We had what they called an organization called JTF-7, which was a joint task force that basically went into Iraq and initially started operations and that type of thing.

So we would get a delivery order, and then under that delivery order, one of the labor categories associated with that delivery order might be interrogators. But we were also providing screeners and analysts and other labor categories. So there was never a contract or a task order that was strictly interrogation.

Q   Okay. Can we -- could you take a look at Defense Exhibit 12 in your binder.

MR. O'CONNOR:  And, Your Honor, we're going to move this into evidence.

THE COURT:  Any objection?

MS. ROBINSON:  No objection.

THE COURT:  All right. It's in.

(Defense Exhibit Number 12 admitted into evidence.)

MR. O'CONNOR:  Okay. Can you put it up on the screen.

BY MR. O'CONNOR:

Q   Mr. Billings, is this the first delivery order under

174

which CACI provided interrogators in support of the United States' operations in Iraq?

A    Yes.  This is Delivery Order 35.  And it was -- it's called out labor category of interrogation, yes.

Q    Did this contract call for CACI to provide personnel to fill supervisory roles over interrogators?

A    No.

Q    And why is that?

A    Again, we go back to it's the inherent responsibility of the government to provide supervision over contractors doing intelligence work.  We're not allowed to do that.  You won't find any labor categories identified as people performing operational supervision here.

Q    Well, who provided the operational supervision of the CACI employees provided under Delivery Order 35?

A    Again, the United States Army.

Q    Is there the requirement that the Army control intelligence operations reflected in the delivery order?

A    Yes, I'm sure it is.  I can't point specifically where.

Q    We'll go through a few.

        Let's go to -- if we can go to page 6, please.

A    Okay.

Q    Again, you can look on the screen, or you can flip in the hard copy, whichever is easier for you.

A    Okay.

175

Q    Take a look at paragraph 3.

You see where it says:  The contractor will provide interrogation support cells as directed by military authority throughout the CJTF-7 AOR?

A    Right.

Q    Now, later in the sentence it says:  To assist, supervise, coordinate and monitor all aspects of interrogation activities.

Do you see the word "supervise" there?

A    Yes.

Q    Was there an expectation that CACI was going to provide operational supervision?

A    No.

Q    Is that because this is an inherently governmental function?

A    Prohibited.

Q    Okay.  Let's go to paragraph 4 on the same page.  And it -- and this is a general category of statement of work. An interrogation support program is designed with mutually-supported efforts to increase the effectiveness of dealing with detainees, persons of interest and enemies prisoners of war that are in the custody of U.S. coalition forces.

It goes on to say:  It's a multifaceted interrogation support cell, and it lists a number of

176

positions; do you see that?

A    Yes.

Q    And were the various labor categories provided by CACI all subject to the operational control of the U.S. Army?

A    Yes.

        MS. ROBINSON:  Objection.  Leading.

        THE COURT:  Sustained.

BY MR. O'CONNOR:

Q    Who provided the operational control for --

A    The United States Army did.

Q    Let me finish the question.

        Who provided the operational control for all the various labor categories of personnel provided under this contract?

A    The United States Army.

Q    And at the bottom of that paragraph, it talks about all this is to be done in accordance with the Department of Defense, U.S. civil code and international regulations?

A    Yes.

Q    And that was your understanding of what was required?

A    Yes.

Q    Let's go to paragraph 9, which is on page -- well, that's not right.

A    Page 11.

        MR. O'CONNOR:  That's not where I want to go, Your

177

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Honor.

THE COURT:  All right.

MR. O'CONNOR:  I want to go to page 9.  Page 9, not paragraph 9.

BY MR. O'CONNOR:

Q    And can you look at Category C, tactical/strategic interrogator.

A    Yes.

Q    Do you see that at the top?

A    Yes.

Q    Okay.  Is this the description of the work to be performed by interrogators under this delivery order?

A    Yes.

Q    Okay.  The first little -- I guess little "i" talks about the interrogator will conduct tactical, operational and strategic interrogations with the use of organizational reference documents in accordance with local SOP and higher authority regulations.

Was that your understanding that CACI's interrogators were going to have to comply with government regulations?

A    Yes, it was.

Q    And paragraph 2 says that the interrogator will coordinate and work in conjunction with the MP unit and MI interrogation units.

178

Was that your understanding at the time?

A    Yes.

Q    And in paragraph 3, it talks about interrogation of persons in accordance with interrogation SOPs and plan; do you see that?

A    Yes.

Q    Was that something that CACI interrogators were supposed to be doing?

A    Yes, it was.

Q    And Number 4:  The interrogator will conduct with usage of a supporting linguist and interrogation plan. Interrogations of identified persons of interest, detainees and POWs in accordance with local and higher-authority regulations?

A    Yes.

Q    That was an expectation?

A    Yes, it was.

Q    Let's go to 5:  The interrogator will conduct other intelligence supporting activities related to interrogation operations as directed; do you see that?

A    Yes.

Q    As directed by whom?

A    The United States Army.

Q    Was there a second delivery order under which CACI provided interrogation personnel to the Army?

179

A     Yes, there was.

Q     Could you take a look in your binder at Defense Exhibit 13.

            THE COURT:  Any objection?

            MR. O'CONNOR:  We're going to move that in, Your Honor.

            MS. ROBINSON:  Is this the same as our PTX 84 which is already in evidence?

            MR. O'CONNOR:  This is Delivery Order 71.

            MS. ROBINSON:  No objection.

            THE COURT:  All right.  It's in.

      (Defense Exhibit Number 13 admitted into evidence.)

            MR. O'CONNOR:  Can we put that one up on the screen.

BY MR. O'CONNOR:

Q     Again, what was Delivery Order 71?

A     It was an increase in the number of requested analysts and screeners.  Those types of things.  So basically it was what I call a follow-on delivery order.  It was work that we had been doing under 35, and it expanded to additional staffing.

Q     Okay.  You mentioned additional screeners and analysts.
            Was it additional interrogators as well?

A     Yes, I believe so.

Q     Did this delivery order provide for any positions for

180

CACI personnel to provide operational supervision over CACI interrogators?

A    No, it did not.

Q    And why is that?

A    Again, we cannot do that work.

Q    Okay.  Let's go to page 4 of the exhibit.  And I want you to focus about the fifth line down there's a sentence that starts with "as the operational element."

HSTs.  What was an HST?

A    That was a HUMINT support team.

Q    Okay.  So, as the operational element, HST support the overall divisional separate brigade HUMINT mission and perform under the direction and control of the unit's MI chain of command or brigade S2 as determined by the supported command; do you see that?

A    Yes.

Q    Is that consistent with how you understood CACI's personnel would be operationally controlled?

A    Yes, it was.

Q    Now, we've talked about the parties' understanding as to operational direction and control.  I want to switch to how it actually worked on the ground.

Where were you working while these delivery orders were in effect?

A    I was in Chantilly, Virginia.

181

Q    Okay.  And what role did you have with respect to these delivery orders?

A    Basically I was the person that was responsible to ensure that the task orders and the delivery orders were submitted for bid and were processed.  And once the award was made, that I ensured, through the use of my project managers, that they were staffed and the employees were hired properly and then deployed to Iraq.

Q    You mentioned a project manager.

Was there a project manager who had responsibility for these contracts?

A    There was.  A lady by the name of Amy Jenson that -- she was one of the project leaders.

We had at the time probably 10 or 11 task orders supporting Iraq, both intelligence and logistics.  So I had a handful of project managers that worked on, you know, various areas and such.

Q    Okay.  What was Ms. Jenson's role with respect to Delivery Orders 35 and 71?

A    She, again, was my worker bee.  She went out working with -- we had recruiters both within the company, and we even had to go out and hire our own independent recruiter trying to identify employees that would go to Iraq for us.  Recruiting was an extreme challenge at the time.  Most people don't want to go work in a war zone.

182

Q     Did Ms. Jenson have any role with respect to the operational supervision of --

A     Absolutely not.  She --

Q     Let me finish the question.

      Did Ms. Jenson have any operational role with respect to the performance of duties by interrogators?

A     No.

Q     Did she have administrative responsibilities?

A     She did.

Q     What sort of administrative things did Ms. Jenson do?

A     As I mentioned, she was responsible to identify qualified candidates, then to offer them letters of employment.  She then was required to ensure that they were prepared, deployed to the CRC, which was the Central Reception Center before they deployed to Iraq.  They received two weeks of training out there by the Army, and then they were sent overseas.

      She also had the requirements to ensure that once the employee had spent a certain amount of time, he was allowed to take what they call an R&R, a rest and recuperation break.  So she would have arranged travel for them to come out of the country.  She was responsible for performance appraisals after they had been in-country for certain amounts of time.  Their performance was reviewed based on what the government had provided for input based on

183

the individual's performance, and then she ensured that, you know, reviews were done on them.

Q    Ms. Jenson's not available to testify in this case; right?

A    No, she is not.  She, unfortunately, died of breast cancer at a very young age.

Q    Who decided where in Iraq CACI personnel would be deployed?

A    Well, it was up to the United States Army to decide exactly where they were deployed.  We had people at numerous sites.  As you heard, we had HSTs.  Those were organizations that had interrogators and screeners embedded in them, but they were up what we call forward locations.  So they were not at the prison; they were out in the forward areas.

Q    Was an HST an Army organization?

A    It was an organization that was developed -- my limited understanding was basically it was made up of contractors primarily.  But I'm assuming that they had military that was working alongside them.

Q    And these are at locations other than Abu Ghraib?

A    Absolutely.

Q    With respect to the interrogation mission in Iraq, who set the intelligence priorities?

A    The United States Army.

Q    Was CACI's management even apprised of the intelligence

184

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

priorities that the Army had established?

A    No.  And the reason I hesitate, you know, we may have learned something through one of our employees, but we were not part of the -- establishing priorities for them.

Q    Okay.  Who assigned interrogators to specific detainees?

A    The United States Army.

Q    Did CACI management even know what detainees were assigned to CACI --

A    Absolutely not.

Q    -- interrogators?  You have to let me finish my question.  I know it's late.

Now, you retired from CACI in 2020?

A    '20.

Q    At least through the time you retired, at least through 2020 when you were at CACI, did CACI management know who its interrogators had been assigned to interrogate?

A    No.

Q    Did CACI management in Virginia have any role in directing or supervising intelligence operations in Iraq?

A    None.  No.

Q    Did CACI management in Virginia receive operational reports on the intelligence collection efforts in Iraq?

A    No, absolutely not.

Q    Did CACI management ever know what substantive

185

intelligence was being gathered in these interrogations?

A    That information was classified.  We had no need.

Q    What sort of supervision did CACI management in Virginia provide to CACI interrogators, analysts, screeners in Iraq?

A    They received administrative support only from CACI employees.

Q    And when you say "administrative support," what do you mean?

A    Again, I'm talking about time cards, pay raises, performance appraisals, travel arrangements, those types of things.

Q    Did you enter into an agreement with anyone to abuse any detainees?

A    No.

Q    And did you do anything to provide practical assistance to anyone for the purpose of helping them abuse detainees?

A    No.

        MR. O'CONNOR:  No further questions, Your Honor.

        THE COURT:  All right.  Cross?

        Do you have a separate book?

        MS. ROBINSON:  Yes.

                CROSS-EXAMINATION

BY MS. ROBINSON:

Q    Good afternoon, Mr. Billings.

A    Good afternoon.

Q    My name is Bonita Robinson.

        Mr. O'Connor has been using the term C-A-C-I.  If I use the term CACI, you'll understand that I'm referring to the same company?

A    I will.  It won't make Dr. London very happy, but ...

Q    So you were employed by CACI or by its predecessor company, PTG, for more than 25 years; correct?

A    It was about 22.

Q    22?

A    22 years I got credit for.

Q    And you had served in the military prior to that?

A    That's correct.

Q    But you never worked in intelligence in your career; right?

A    I did not.  Not in the Army.

Q    On your direct examination, you testified at some length about the role of CACI interrogators at Abu Ghraib and the nature of their relationship to the military; is that right?

A    Yes.

Q    But you don't actually know the specific details of what went on at Abu Ghraib with respect to interrogations; right?

A    No, I don't.

187

Q    You don't actually know who supervised whom on the ground at Abu Ghraib; is that correct?

A    No, I do not.

Q    So I want to focus a bit on your role at CACI in the 2003 to 2004 time period.

Your responsibilities at that time period included managing the day-to-day operations for personnel, for finance, recruiting, those kinds of things?

A    Yes, ma'am.

Q    And you spoke about Amy Jenson's role with respect to two particular delivery orders; is that right?

A    Yes.

Q    But it was you who had management responsibility for those delivery orders; is that correct?

A    I would consider that I was overall responsible using my managers to assist me, yes.

Q    Now I want to talk in a little bit more detail about those delivery orders.

But first, in the sort of management role that you just described, your general management responsibility, you had overall responsibility for ensuring that CACI met the requirements of those contracts; right?

A    Yes.

Q    Let's look at the first delivery order.  And this is going to be a different exhibit than the one Mr. O'Connor

188

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

showed you, but it's the same document, it's just also in evidence.

A    Okay.

Q    That's PTX 83.

THE COURT:  So are you moving that in as well?

MS. ROBINSON:  It was moved in yesterday, Your Honor.

THE COURT:  Okay.

MS. ROBINSON:  Or excuse me, Friday.  The last day we were here.

BY MS. ROBINSON:

Q    Now, I just want to briefly go over the value of these delivery orders.

If you could look at the bottom right-hand corner --

A    Okay.

Q    -- of the document.  You see the number 13,765,733?

A    Yes, I do.

Q    And that was the total amount that CACI was entitled to receive under that contract?

A    That was the total amount that could be billed to that task order.

Q    Right.

A    But that included all labor categories.

Q    And are you distinguishing between categories for

189

interrogators and categories for other services?

A    For screeners and such.

So what I'm saying is that that amount covered all the labor categories that were contained in that delivery order.

Q    And the purpose of this delivery order was support for intelligence services at Abu Ghraib; right?

A    No.  It was intelligence services throughout the C2, which was basically all over the country.  As I mentioned earlier, we had forward deployed people that were with the brigade size, which is basically larger than a division, which was -- in this situation, the JTF-7 task force was considered the division headquarters.  They had forward brigades.  We had people out there with those forward elements.

Q    So it included Abu Ghraib and other portions of other places in Iraq?

A    Yes.  The JTF-7 headquarters was a Camp Victory base, which was, you know, close to Baghdad.  Abu Ghraib was many miles away from where the headquarters was located.

Q    Understood.

So 13.765 million, roughly, was the amount that covered the entire support services in Iraq?

A    Yes.  This was all Iraq work.

Q    And if you could jump to, or you can look at the

190

screen, but page 23 of this exhibit.

The amount that CACI was entitled to receive under this delivery order was modified and increased; is that right?

A    It was increased by -- yes, 6 million.  So it went up to 19 million.

Q    Correct.  So 19.9 million, approximately?

A    Right.  Yeah.  Again, that covers all labor categories.

Q    Understood.

And let's jump to PTX 84, which is Delivery Order 71.  It's the equivalent of the second delivery order that Mr. O'Connor showed you on your direct examination.

A    Yes.

Q    And if you look in the bottom right-hand corner of that document, the value of this delivery order was approximately $21.8 million; is that right?

A    I think so.  It's hard to read.  It's a little bit out of focus, but that's okay.  It's been magnified.

Yeah.  21.799.  Got it.

Q    All right.  Let's jump back to the first Delivery Order 35.  I would like to go over some of the language in it.  I know you discussed a bit of it with Mr. O'Connor on your direct examination.

Now, can we just look at page 2 of the document. Do you see the heading technical support services?

191

A    Okay.

Q    And so that heading specifies that the contractor shall perform in accordance with the statement of work, entitled statement of work CJTF-7C2; right?

A    Yes.

Q    And, Mr. Billings, as the person with administrative responsibility with this contract, it was important to CACI to perform its contracts in accordance with the statement of work; right?

A    Yes.

Q    Now we're going to come back to this in a second, but I do want to jump to what's in your binder as PTX 23. And this is just a one-page excerpt from PTX 23.

Now, this is -- PTX 23 is in evidence. It's the report of Major General Fay. This is one page from this report. And I'd like you to look at the third paragraph.

Do you see the language: There is another problem with the CACI contract. A CACI employee, Thomas Howard, participated with the COR, LTC Brady, in writing the statement of work prior to the award of the contract.

A    Okay.

Q    So a COR is a contracting officer representative like you discussed on your direct?

A    Correct.

Q    And Thomas Howard is a CACI employee who went by Tom

192

Cross-examination M. Billings

Howard; right?

A    He was.

Q    And both Mr. Howard, himself, and Chuck Mudd, a CACI vice president, told you what's reflected here, that Mr. Howard helped develop the statement of work; do you recall that?

A    Vaguely.  Meaning I can't honestly say that I recall Chuck telling me that Tom did this.

Q    Okay.  Let's see if I can help refresh your recollection if you don't remember now.

A    Okay.

Q    Can you please look at Tab 1 in your binder.  And this is a -- let me know when you're there, and I'll confirm that you recognize what this is.

A    Okay.

Q    This is a deposition that you gave under oath in a related litigation in 2007; is that right?

A    Okay.  I'm having trouble with your tabs.  What's the --

Q    Sorry.  Tab A.  I may have said 1.  Tab A.

A    Tab A.  Okay.  Okay.  I've got tab A.

Q    Okay.  And do you recognize tab A as the transcript of a deposition that you gave in a related litigation in 2007?

A    Okay.

Q    And 2007 was much closer in time to the events at issue

193

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

than we are today?

A     Yes.

Q     Okay.  Can you just look at pages -- page 38, lines 13 through 21, and just read that to yourself.  And let me know when you're done.

A     Okay.  I'm on page 38.

Q     Sure.  And just read lines 13 through 21 to yourself.

A     Okay.  Can you tell me which block you're referring to?  Page 146?

Q     So do you see that there are four different pages on each sort of -- within this document?

A     Correct.

Q     So on the top right-hand corner of each page, there's a page number, and I'm on page 38.  Do you see that?

THE COURT:  It's page 11, if that helps you.  The lower bottom corner.  Page 11 of the entire deposition.

THE WITNESS:  Okay.  Because I'm on page 38, I thought.  You're talking about page 38 of the document?

MS. ROBINSON:  Correct.

THE WITNESS:  Okay.  Hold on.

THE COURT:  You want page 11 of the transcript or of the exhibit?

THE WITNESS:  Okay.  I've got page 38, which is on page 11.

THE COURT:  Perfect.

194

THE WITNESS:  Now we're ready.  Thank you.

BY MS. ROBINSON:

Q    And if you could just review to yourself the lines 13 through 21 on that page.

A    Okay.

Q    Now, does that refresh your recollection, Mr. Billings, that both Mr. Mudd and Mr. Howard told you that Mr. Howard helped develop the statement of work for this contract?

A    It does, but, again, as I answered, were you led to believe that -- did Mr. -- tell you.  And I said yes, I was.  I was led to believe, meaning I don't know for sure because I wasn't there.

Q    All right.  That's fine.  We can put Exhibit 23 down and go back to the statement of work on PTX 83, page 6.

So it was your understanding, based on what you were told by Mr. Howard and Mr. Mudd, that Mr. Howard played some role in the development of the contract?

A    What you need to understand is, Tom was an expert in intelligence.  So for someone in the military asking him to comment on something, you know, that's not unusual.

Q    Okay.  So it made sense to you that -- or it made sense today --

A    It made sense that they would ask the experts.  In the area of intelligence and what I consider actual hands-on intelligence, the pool of people to choose from is very

195

limited.

Q    So, Mr. Howard, given his expertise in intelligence matters, weighed in on the statement of work?

A    That was my understanding of it, yes.

Q    Okay.

A    If he was involved, that was what his portion of the involvement was.

Q    And that means that the statement of work, it didn't just contain boilerplate contract language; it was -- it contained provisions that Mr. Howard helped develop?

A    That he would help develop.  But, again, it was the Army that had to accept that.  The statement of work didn't come from Tom Howard is what I'm trying to say.

When I received it, it was sent to the contracting office, and they submitted it to me to develop a rough order of magnitude, a ROM, as to what it would cost.

Q    Let's look -- you can see it maybe on your screen already at paragraph 3 of the statement of work, which is on page 6 of PTX 83.  This is a paragraph that Mr. O'Connor went over with you on your direct examination.

A    Okay.

Q    And the paragraph states that CACI personnel would provide the best value, interrogation support, cell management support, functioning as resident experts for the implementation of an interrogation support cell in

196

Case 1:08-cv-00827-LMB-JFA   Document 1818   Filed 11/12/24   Page 197 of 310
PageID# 54715
Cross-examination of M. Billings

accordance with regulations and standard operating

procedures within the C2 and CJTF.

I want to focus on the words "functioning as

resident experts."  Can you tell the jury what the phrase

"resident experts" means to you?

A    Well, again, it's an individual that's had a certain

amount of training, experiences that would make them

knowledgeable in that particular function.

Q    And, Mr. Billings, you did not personally interview

every single interrogator or other person sent to Abu

Ghraib; did you?

A    No, I did not.

Q    Okay.  Now I want to look a few lines down in that

paragraph.

The paragraph also says that CACI would assist,

supervise, coordinate and monitor all aspects of

interrogation activities; right?

A    Yes.

Q    Can you please give the jury your definition of the

word "supervise"?

A    Well, in this case, we're talking about the

administrative functions that we were asked to perform --

Q    Mr. Billings --

A    -- and so we had to make sure that the employee, you

know, was hired, that they deployed, that we got them to

197

Iraq where the Army could then take control of that individual.  In those days, we would get people from the airport, and we would bring them to Camp Victory base.  After we got them there, they basically were at the discretion of the Army to decide how they got transported, where they got sent to and all of that.  Because we weren't even allowed to go off base in those days by ourselves.  You had to be in a controlled military operation before you could leave the Camp Victory base, and that's how the Army decided where the people went and how they got there.

Q    Now, I just want to read the complete phrase again, the complete clause.

So it says:  Assist, supervise, coordinate --

THE COURT:  That's becoming repetitive.  We don't need --

MS. ROBINSON:  I have a question to follow up with.

THE COURT:  Just ask the question.

MS. ROBINSON:  Sure.

BY MS. ROBINSON:

Q    The definition you provided was administrative functions only, essentially; right?

A    Yes.

Q    So is it your understanding that the term -- the phrase "all aspects of interrogation activities" means only

198

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

administrative aspects?

A    As you -- I brought up the fact that there were functions that were inherently government, meaning we couldn't do them.  So the only thing that we could do in this situation is the administrative type of functions from a supervisory responsibility.

Q    Okay.  Mr. Billings, I referred to a deposition that you gave under oath in 2007; do you recall that?

A    Well, I recall doing the deposition, yes.

Q    And you gave testimony in this case previously as well; correct?

A    Yes.

Q    And do you recall submitting a declaration in connection with the related litigation about 20 years ago? I can refer you to it if you would --

A    I would have to ask you which declaration.  I made several.

Q    Sure.

        You recall making several declarations in connection with this litigation and related litigation?

A    Absolutely.

Q    And in all of those -- in all of that testimony and in all of those declarations, you discussed the extent to which CACI had operational or administrative control over its personnel; right?

199

A    Yes.

Q    You never mentioned the term "inherently governmental functions" in any of those materials; did you?

A    I honestly can't remember.  I was aware of the function.

Q    And you never mentioned the FAR, the F-A-R, before; have you?

A    Again, I can't tell you whether I did or not.  That was a long time ago that I made these declarations.

Q    Okay.  Maybe we'll look at some of them later, but I want to go back to the statement of work.

Can you look at the next paragraph, maybe it's paragraph 5.  Paragraph 5 with the heading technical considerations, C2X screening, and interrogation operations coordinator/special advisor; do you see that on the screen?

A    Okay.

Q    Is -- the C2X is a high-level intelligence director who reports to the senior intelligence officer running operations in Iraq; is that right?

A    Yes.

Q    And is it a -- is it correct that the person that CACI provided for this position was required to have a full knowledge of all intelligence-gathering efforts within its responsibility?

A    Were you saying that that person needs to be trained in

200

Cross-examination M. Billings

all of those areas?

Q    I'm asking whether it was required for this position that CACI provided that the person -- the CACI employee who was filling this position have all -- a full knowledge of all intelligence-gathering efforts within its responsibility?

A    Yes.

Q    Now, the C2X coordinator/special advisor, the person who filled this position under the contract was Tom Howard who helped write this statement of work; right?

A    Yes.

Q    And later in 2004, Dan Porvaznik took over that position?

A    I believe so, yes.

Q    And it was CACI that promoted him to this position; right?

A    The position, again, required government approval. These positions -- you know, we provided resumes.  Tom got selected to be the C2X.  You say Dan took over, I believe he probably did.  And, yes, the government again would have to approve it.

Q    So you said we provided resumes.

        Did the government approve all hires that CACI suggested?

A    The government approved all hiring.  They reviewed all

201

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA    Document 1818    Filed 11/12/24    Page 202 of 310
Cross-examination of M. Billings
PageID# 54720

the resumes, and they agreed to accept people.

Q    And is that the same true for promotions?

A    Yes.  We sent -- as I mentioned earlier, recruiting was extremely difficult.  So we would send people in some cases that were in a lower labor category to see how they performed -- so that the Army could see how they performed.  And, in many cases, the Army came to us and said we would like to move this person from being a screener of detainees to being an interrogator.

Q    And, in your view, the Army approved all of those promotions; is that what you're saying?

A    I mean, the ones that they approved, those are the ones that got moved to the higher labor category.

Q    All right.  Well, I think we'll come back to that subject.

But let's look down at subsection A2 of the paragraph that we were looking at.

Do you see the language part of the role that Mr. Howard had, this C2X coordinator special advisor role was to provide oversight and other directed intelligence support to CJTF screening and intelligence operations; correct?

A    Yes.

Q    And what was your understanding of the term "oversight"?

202

A    I guess it would be that he was observing possibly and had -- have knowledge of what was going on.

Q    All right.  Now let's look just a couple of lines above that.

Do you see the language -- once it pops up on your screen -- the contractor is responsible for providing supervision for all contractor personnel?

A    Uh-huh.

Q    And your understanding is that that is purely administrative supervision; correct?

A    Correct.

Q    Mr. Billings, can you point me to any language in this contract that limits supervision to administrative supervision?

A    I'd have to review them to be able to give you a specific reference.  In most cases -- and we need to go back to the basic ordering agreement, the BPA -- there are references, whether they pull out -- whether it was the FAR, for example, or a particular Army regulation, they can be listed in the basic document.  They apply to all delivery orders that are issued under that.

So the fact that you look at Delivery Order 35 and you don't see any references doesn't mean there aren't any; it means we need to go back to the basic document and see what regulations were called out that we had to comply with.

203

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q    And I'm talking specifically about this delivery order.

You reviewed this delivery order prior to your testimony today; didn't you?

A    Yes.  I --

Q    And you didn't see any reference to the term "administrative" in connection with supervision; did you?

A    I guess I don't recall any at this time, no.

Q    All right.  Let's look very quickly at PTX 84, the second delivery order.  And I just want to look at page 5.

You see the position there specified for junior interrogator?

A    Okay.

Q    And the highlighted language says that:  Junior interrogator conducts interrogations of detainees.  And the second highlight says:  All actions will be managed by the senior CI agent; do you see that?

A    Yes.

Q    And the senior CI agent was a CACI employee?

A    Not necessarily.

Q    Well, let's look up further on the exhibit.

The senior counterintelligence agent is the CI agent, is the same thing as the senior CI agent; right?

A    Right.

Q    And that's a position specified in the contract that CACI was filling?

204

A    Yes.  We would provide people of that labor category. As I mentioned earlier, we were providing qualified individuals to augment their staff.  There was no stipulation that that was a CACI employee that was acting as the senior person in that particular team.

Q    But if the senior CI agent was a CACI employee, that employee would be responsible for managing the junior interrogators as specified in this order; right?

A    As specified in the task order, yes, statement of work.

MS. ROBINSON:  All right.  We can put that document down.

BY MS. ROBINSON:

Q    You testified on your direct about the FAR; correct?

A    Yes.

Q    And you referred to it I think as the regulation that governs all regulations?

A    Correct.

Q    There's no reference in the FAR to -- excuse me.

There's no reference in the task orders that we looked at, 31?

A    As I said earlier, you need to go back to the basic document, the blanket purchase agreement that covers all of the issuing of the task orders and see what the references are in there.

Q    And you don't have that document here; do you?

205

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A    No, I don't have it.  No, ma'am.

Q    But -- well, let's --

A    It was a blanket purchase agreement that was issued by the Department of Interior, the Fort Huachuca office.  It was issued to CACI -- I'm sorry.  It was issued to PTG.

Q    And that was not a contract for provision of interrogators at Abu Ghraib; right?

A    That was an agreement to provide analysts.

Q    Right.

A    It wasn't a specification for interrogators in that document, no.

Q    And, at that time, there were no -- there was no Abu Ghraib setup for this CACI was providing interrogators when that agreement was issued; right?

A    Correct.

Q    Now, the delivery orders that actually covered CACI's provision of interrogators to Abu Ghraib were the ones we just looked at, 35 and 71; correct?

A    Correct.

Q    And there's no mention of the FAR provision that you discussed in either of those?

A    To my knowledge, no.  But, again, it's not surprising. You just have to go back and look at the basic document to see whether that is referenced there.

Q    I want to look at what's previously been admitted as

206

PTX 227.

Are you familiar with this document?

A    Yes.

Q    All right.  So this is an Army regulation governing contractors accompanying the force; is that right?

A    Correct.

Q    And the number of the Army regulation is 715-9?

A    Yes.

Q    Now, this document -- this regulation actually is referenced in the delivery orders that we just looked at; right?

A    I couldn't say.  You'd have to look and see.

Q    Okay.  I can point to you.

MS. ROBINSON:  Why don't you put back up PTX 83, and if you go to page 20 of that document -- excuse me, page 13, excuse me, section 20.  Can you please just highlight the language "AR 715-9."

THE WITNESS:  Okay.  It talks about the DFARs and the AR.

BY MS. ROBINSON:

Q    Right.  And so AR 715-9 is referenced there; right?

A    AR 715-9, and the DFARs is also referenced there.

Q    But that is not the provision you were discussing earlier about inherently governmental functions; is it?

A    This is the Defense Federal Acquisition Agency.  It

207

would not be surprising if you went to that regulation and see the same language, but I can't say that.

Q   But you don't know that it's there; right?

A   Say it again.

Q   You don't know that that's there?

A   I don't know that that's there, no.

        MS. ROBINSON:   Let's go to PTX 227.

BY MS. ROBINSON:

Q   Now, Army regulations are binding; right, Mr. Billings?

A   Army regulations are guidance; they're not law.

Q   Are they binding on military personnel?

A   Army regulations are binding on military personnel, yes.

Q   Thank you.

        Let's go to page --

A   What you need to understand is a regulation is only guidance, and it's a battle -- it's at the commander's discretion whether he agrees to accept it or not.

Q   It's your position -- it's your testimony that a commander can disregard an Army regulation?

A   It is true, yes.

Q   All right.  Let's look at page 16 of this exhibit. Looking at subsection F, do you see the language:  The commercial firms providing battlefield support services will perform the necessary supervisory and management function of

208

their employees; right?

A    Yes.

Q    And CACI is a commercial firm; correct?

A    Yes.

Q    And the next sentence says:  Contractor employees are not under the direct supervision of military personnel in the chain of command; correct?

A    That's what it says.

Q    And that's consistent with the language we saw in the delivery orders that gave CACI the responsibility for supervision of its contractor personnel; right?

A    This doesn't go further to explain the exceptions to this particular guidance.

Q    And this provision doesn't say anything about administrative versus operational supervision; right?

A    This particular one does not.

Q    All right.  We can put that document aside.  I'd like to bring up what's been previously admitted as PTX 207.

        This is an Army Field Manual; correct?

A    It is.

Q    And it's titled contractors on the battlefield and dated January 2003, the same year that CACI was providing interrogation services at Abu Ghraib?

A    Yes.

Q    All right.  And an Army Field Manual is an official

209

publication of the Army that instructs personnel about the appropriate way to do things; right?

A    That is correct.

Q    All right.  And if we look at page 5 of this document, this field manual reflects relevant doctrine, incorporates lessons learned from recent operations and conforms to Army doctrine and policy; right?

A    Yes.

Q    All right.  Now, if we look at page 15 of this document, there's a provision here that says:  Management of contractor activities is accomplished through the responsible contracting organization, not the chain of command.

Here, Mr. Billings, the contracting organization would be CACI; right?

A    Yes.

Q    And where this paragraph says not the chain of command, you understand that to be a reference to the military chain of command; right?

A    Correct.

Q    And the paragraph continues:  Commanders do not have direct control over contractors or their employees (contractor employees are not the same as government employees), only contractors manage, supervise and give directions to their employees; correct?

210

A    That's what it says.

Q    That's what it says.

A    But that's not what was required for this particular task order.

Q    Let me just ask you first, Mr. Billings, this language is consistent with what we saw just in the Army Regulation 715-9; right?

A    Yes.

Q    Now, Mr. Billings, you, yourself, recognize that contractors are not soldiers; right?

A    Correct.

Q    And CACI actually counseled its employees working in military facilities that they do not represent the government or speak for the government; right?

A    That is correct.

Q    All right.  Now I want to look at page 90 of this document.  Can we look at the language in A-1.  It says that the COR -- the COR, excuse me, the contracting officer's designated representative who assists in the technical monitoring and administration of a contract.

You talked about a COR earlier.  That's consistent with your understanding?

A    Yes, it is.

Q    Now I want to look at paragraph A-3.  And this language says:  Although the COR provides a vital link between the

211

military and the contractor, there are certain limits to his authority. A COR is prohibited from, among other things, interfering with the contractor's management prerogative by supervising contractor employees or otherwise directing their work efforts; do you see that?

A    I do see that.

Q    All right. And so under this provision, the prerogative to supervise contractor employees and direct their work efforts resides with the contractor; right?

A    Under this particular regulation, that's what's said.

Q    And that's consistent with Army Regulation 715-9 that we just looked at; right?

A    Yes.

Q    And that's consistent with the language in the statement of work that says --

A    No, it's not.

Q    Can I finish my question, please.

The language in that contract in the statement of work says that the contractor is responsible for supervising its employees; right?

A    Yes.

Q    And it's your understanding that that language is not consistent with this language?

A    Again, we go back to the stipulation that this is a general statement, and you -- you have 100 different

212

Cross-examination - M. Billings

contracts, one of them may be in intelligence, and that's where this doesn't apply.

Q    We'll get to that in a moment, Mr. Billings.

I want to look at just one now more provision of this Army Field Manual.  Let's turn to page 68, and looking at paragraph 4-45.

Do you see the language:  Maintaining discipline of contractor employees is the responsibility of the contractor's management structure, not the military chain of command; right?

A    Yes.

Q    And you're aware that CACI did, in fact, discipline certain CACI employees for their conduct at Abu Ghraib; right?

A    For their contact at Abu Ghraib?

Q    For their conduct.

A    Conduct?

Q    Misconduct at Abu Ghraib.

A    We had issues that were associated with misconduct.  We had people that were drinking alcohol when you're not authorized to have alcohol.  Things like that.  We dealt with those kinds of things.

Q    CACI was responsible for disciplining in those circumstances; right?

A    We took action on things like that, yes.

213

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Cross-examination M. Billings

THE COURT:  Just give the jury an example of what you mean by "took action."

THE WITNESS:  Well, we basically would put them on a probation, for example.  If they were found consuming alcohol that was prohibited, or they left the base camp when I told you earlier that you couldn't leave the camp without proper convoys and things like that, they were basically giving a counseling statement, and they were -- said, you know, for the next 60 days, you're expected to, you know, basically perform your jobs to the letter of the law and not to violate any regulations.  If there was a repeated offense, you know, then you would be dismissed or let go.

BY MS. ROBINSON:

Q    If CACI personnel abused detainees at Abu Ghraib, would you leave -- would you have disciplined them?  Would CACI have disciplined them?

A    If someone was -- say that again, please.

Q    If CACI personnel at Abu Ghraib abused detainees, would CACI have disciplined those personnel?

A    If they had, we would discipline them, yes.

Q    Now, going back to this paragraph 4-45, it continues: The contractor, through company policies, has the most immediate influence in dealing with infractions involving its employees.  It is the contractor who must take direct responsibility for his employee's conduct; do you see that?

214

A     Yes.

Q     And this paragraph references company policies; right?

A     Yes.

Q     And CACI did, in fact, have company policies that governed its employees at Abu Ghraib; right?

A     Yes.

Q     So CACI had a code of ethics in business conduct; right?

A     Correct.

Q     And in order to accept employment with CACI to provide interrogation services at Abu Ghraib, each person you hired had to sign that code of conduct; right?

A     That is correct.

Q     I'd like you to turn in your binder to Plaintiffs' Exhibit 85, which is not yet in evidence.

THE COURT:  Any objection to 85?

MR. O'CONNOR:  Just a second, Your Honor.

No objection.

THE COURT:  It's in.

(Plaintiffs' Exhibit Number 85 admitted into evidence.)

BY MS. ROBINSON:

Q     All right.  So this is the code of conduct that you required the employees you hired to serve at Abu Ghraib to sign compliance with; right?

A     Yes.

215

Q    Now, can you please look at page 7 of the document. And in the bottom right-hand corner, the code of conduct that each employee had to sign said that CACI management retained all rights to direct, supervise, control, and when it deems appropriate, discipline the workforce; right?

A    Yes.

Q    And you agree that nothing in this code of conduct that you provided to employees who were going to serve at Abu Ghraib says that the military is responsible for supervising and managing CACI personnel?

A    Again, this is a corporate policy.  It was not tailored to a specific Army contract.

Q    But when you -- when CACI hired personnel to go to Abu Ghraib specifically --

A    Yes.

Q    -- they made them sign this particular contract; right?

A    Yes, we did.

Q    And you, yourself, sent those offer letters; right?

A    Yes.

Q    Now, I want to -- I want to take a look -- I want to take a look just very quickly at PTX 230, which was in evidence.  This is an employment agreement with a CACI interrogator named Torin Nelson.

            MS. ROBINSON:  If you can show that, Sean.

BY MS. ROBINSON:

216

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q    Do you see that?

A    Yes.

Q    And you understand Torin Nelson was an interrogator who provided services at Abu Ghraib?

A    I'm not sure what labor category he had specifically, but I know that he did interrogations at some point.

Q    He was at Abu Ghraib; is that fair?  Do you recall that, Mr. Billings?

A    Yes.

        MS. ROBINSON:  And if you would go to page 2 of this document.

BY MS. ROBINSON:

Q    The actual employment agreement bakes in that same language from the code of conduct; correct?  It says that --

A    It does.

Q    -- CACI management will direct, supervise, control, and when it deems appropriate, discipline the workforce in management's discretion?

A    Yes.  Yes.

Q    So there's nothing in this employment agreement that says they're subject to the direction and control of the Army; right?

A    It does not.

Q    All right.

A    Yes.

217

Q    I want to talk a little bit now about the FAR that you were discussing earlier and the notion of inherently governmental functions.

MS. ROBINSON:  Can we go back to PTX Number 23, please.  And can you please highlight the language in paragraph -- it's the second paragraph up from the bottom.  Maybe call that out so everyone can read it.

BY MS. ROBINSON:

Q    So this is from the report of General Fay.  And Major General Fay wrote:  Although intelligence activities and related services which encompass interrogation services should be performed by the military or government civilian personnel whenever feasible, it is recognized that contracts for such services may be required in urgent or emergency situations; do you see that?

A    Yes.

Q    And is it your understanding that CACI's provision of interrogation support services at Abu Ghraib constituted this kind of emergency situation when the government was desperate for interrogators?

A    They were desperate, yes.

Q    All right.  Now, I want to look at the language that immediately follows.

The general policy of not contracting for intelligence functions and services was designed in part to

218

avoid many of the problems that eventually developed at Abu Ghraib.  I.e., lack of oversight to ensure that intelligence operations continued to fall within the law and the authorized chain of command, as well as the government's ability to oversee contract operations; do you see that?

A    I do.

Q    So you understand General Fay is saying here that one of the problems with using contractors like CACI was the difficulty for the military to oversee those operations; right?

A    That's what he claims, yes.

MS. ROBINSON:  We can put that document down.

THE WITNESS:  You know, you mentioned earlier --

THE COURT:  Wait.  There's no question pending, Mr. Billings.

BY MS. ROBINSON:

Q    Can you please look in your binder at what's been marked as DTX 75.  Let me know when you're there.

Do you see that, Mr. Billings?

A    75?

Q    75.

A    This is a review of the Department of Defense detention operations?

Q    Correct.

A    Okay.

219

Cross-examination - M. Billings

Q    Have you seen this document before?

A    No, I have not.

MS. ROBINSON:  All right.  Well, plaintiffs offer DTX 75.  It's a defendant exhibit.

MR. O'CONNOR:  We don't object to that, Your Honor.

THE COURT:  All right.  It's in.

(Defense Exhibit Number 75 admitted into evidence.)

BY MS. ROBINSON:

Q    I just want to point you to some language in this document.

Do you know who the author of this document is? Do you see the first page, VADM AT Church?

A    Yeah.  Vice Admiral Church.

Q    And do you understand that he authored a review of, among other things, detention operations and detainee interrogation techniques?

A    I assume he did.  I had no knowledge of this.

Q    You're not familiar with this; right?

A    I'm not familiar with this.

Q    I just want to ask you about a couple of portions that bear upon what you were discussing with respect to the FAR and inherently governmental functions.

A    Okay.

Q    Can you please turn to page 33 of 53 of this document.

220

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

It's the number at the very bottom center.

A    Yes.

Q    All right.  And do you see the heading on this page is the role of contractors and Department of Defense interrogation operations?

A    Yes.

Q    Okay.  Now, please look at the next page.  And I want to draw your attention to the language at the bottom of the page that says:  The fact that military intelligence interrogation services have been acquired via contract, implies that DoD does not consider interrogation to be an inherently governmental function; do you see that?

A    Okay.

Q    All right.  And you see just a couple of lines above the redaction at the bottom of the page, you see that this report's discussion precedes from the assumption that interrogation does not constitute such direction and control as set forth in the FAR; right?

A    Yes.

Q    And --

A    Can you tell me when this document was written?  It says June.

Q    Sure.  If you go to the second page of the document, the date on that is March 7th, 2005.

A    2005?

221

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q     Uh-huh.

A     Okay.

Q     And can you please look at page 37 of this document. And I just want to focus on the end of the last paragraph on the right-hand column.

A     This is -- well --

Q     Do you see that?

A     I do.

Q     And you see a reference to, again, Army Regulation 715-9 above about six lines up from the bottom?

A     Yes.

Q     And then the language that follows is:  However, the fact remains that commander's freedom of action in directing the actions of contract interrogators short of wholesale removal is limited by the term and scope of the contract and by the administrative nature of the governmental contract relationship; do you see that?

A     I do.

Q     Do you disagree with that?

A     The employees received a package of information before they went overseas.  And, as I vaguely recall, it was very clearly stated in that that they were subject to the operational control of the Army.

Q     That was not quite my question.

      My question was --

222

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A    What I'm saying is, this is -- this document is prepared two years after the fact, basically.  So we had no knowledge of what this admiral was thinking.  This is an after-the-fact document where -- and I believe, if I recall correctly, the military did realize that they couldn't contract interrogation, you know, after the fact.

Q    Let's look at the next page of the document, page 38.

Do you see at the top half of page 38 --

MS. ROBINSON:  If you can go to the top.

BY MS. ROBINSON:

Q    -- this report excerpts the Army regulation we looked at, 715-9; right?

A    Yes.

Q    And in the second bullet point is the language we focused on earlier, that says that commercial firms providing battlefield support services will perform the necessary supervisory and management functions of their employees; right?

A    Yes.

Q    And that contractor employees are not under the direct supervision of military personnel?

A    Yes.

Q    All right.  And I just want to look at the bottom half of the paragraph on the left-hand side of the document.

Do you see the language:  Together with the

223

restrictions on contractor control and discipline described above, this point illustrates that contractors may parallel but not be a part of the military chain of the command that they support; right?

A    Yes.

MS. ROBINSON:  Okay.  We can put that document away.

BY MS. ROBINSON:

Q    I want to talk very briefly about performance reviews.

Do you recall testifying on your direct examination that CACI performed performance reviews?

A    Yes, we did.

Q    And so CACI was actually evaluating the work that its personnel performed at Abu Ghraib; right?

A    Basically the staff -- the CACI staff -- we made a conscious decision to have the people that were forward deployed in Iraq not be required for the administrative responsibilities.

We provided -- or we received input from the government as far as performance of employees in the nature of how they did their work.  This information was provided back to our project managers, in this case maybe Amy Jenson, and she actually did the performance appraisal.  It was submitted electronically, and the individual was asked to review it.  If they had any concerns or objections, they

could voice those.  And that's how performance appraisals were actually accomplished during this.

Q   So it's your testimony today that the performance appraisals were based on information provided by the government, not by CACI personnel at Abu Ghraib?

A   It would be both.  I mean, if -- we talked about earlier a violation of alcohol, for example.  That would -- might have been something that was handled strictly by CACI employees.  And so, you know, we were not going to overlook that violation just because it didn't come from the Army if they didn't, you know, report it to us.  So if we were aware of something that needed to be reflected in their appraisal, you know, we would consider that.

Q   But it's your testimony today that the substance of the information about CACI personnel's performance was provided by the government and not by the site managers at Abu Ghraib?

A   The operational performance was provided.  It may have gone from the government to the site manager and then back to Amy, but as far as the operational performance, the government would provide input or the lack thereof if they didn't make any reference to the individual performance.

Q   I want to talk a little bit more, Mr. Billings, about CACI's obligation to provide resident experts at Abu Ghraib.

It was CACI's responsibility to recruit personnel;

225

right?

A    Yes, it was.

Q    And CACI had previously not been in the business of providing interrogators to the military?

A    No, they had not.

Q    And you testified earlier, CACI had difficulty finding qualified people to send to Iraq; right?

A    Yes, they did.

Q    If CACI did not provide enough personnel, they would be in default of their contract; right?

A    That is correct.

Q    And that was a constant concern to you, this prospect of default?

A    Yes, it was.

Q    Now, you testified earlier that the Army reviewed all the resumes of everyone who was sent to Abu Ghraib; right?

A    That is correct.

Q    And signed off on all hiring decisions?

A    They were required to approve all hires.

Q    All right.  I want to show you what's been marked as PTX 128.  This is pages 111 to 112 only.

        THE COURT:  Any objection?

        MR. O'CONNOR:  Which one is this?

        MS. ROBINSON:  Sorry.  It's --

        MR. O'CONNOR:  You have two.

226

MS. ROBINSON:  It's the second 128.  I apologize.

THE COURT:  So 128(2).

MS. ROBINSON:  It's 2, yes.  128(2).

MR. O'CONNOR:  No objection, Your Honor.

THE COURT:  128(2) is in.

MS. ROBINSON:  We'll call it, just for clarity, 128A.

(Plaintiffs' Exhibit Number **128A admitted into evidence.**)

BY MS. ROBINSON:

Q    This is a daily report dated May 12th, 2004; correct?

A    Correct.

Q    And you received daily reports from Iraq; correct?

A    I did.

Q    And it's part of your regular practice to read those daily reports?

A    Yes.

MS. ROBINSON:  All right.  I want to look at the third paragraph in this daily report.  And let's blow that up so the jury can read it.

BY MS. ROBINSON:

Q    I want to read aloud the language.  In the beginning, LTC Brady -- and just pausing there, that's the COR; right?

A    Yes, it was at that time.

Q    In the beginning, LTC Brady, Tom Howard and Dan Porvaznik reviewed all the interrogator resumes.

227

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

And Tom Howard again is a CACI employee?

A    Yes.

Q    And Dan Porvaznik is a CACI employee and the site lead at Abu Ghraib?

A    Yes.

Q    All right.  With time, that responsibility passed to primarily Tom and Dan with LTC Brady only doing occasional QC checks; do you see that?

A    I do.

Q    So LTC Brady was not reviewing all resumes that were sent by CACI to Abu Ghraib; correct?

A    That's what this says.

Q    And this is the daily report sent by CACI?

A    It was.

Q    All right.  We can take that document down.

THE WITNESS:  But it goes on to say that Daniels, who was the --

THE COURT:  I'm sorry, Mr. Billings, there's no pending question.  Mr. O'Connor can ask you follow-up questions if he thinks it's necessary.

BY MS. ROBINSON:

Q    You know, we can put the document back up.  I'll ask you about that last sentence.

So the last sentence says:  Until the current situation blows over, Major Daniels wants to review all new

228

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

interrogator resumes, both JIDC and HST before hire, as well as all JIDC screeners.

Major Daniels was the COR who replaced LTC Brady; correct?

A    That is correct.

Q    And that happened in approximately February of 2004?

A    I couldn't remember exactly when it did, but that seems appropriate.

Q    And based on the date of this daily report in May 2004, you understand that the current situation was the investigations into the abuse at Abu Ghraib?

A    Yes, because this was a 12 May report, and this would have been ongoing.

Q    And at that time, CACI was getting numerous inquiries about the quality of the personnel it had sent to Abu Ghraib?

A    Absolutely.  Yes.

        MS. ROBINSON:  All right.  We can put the document down.

BY MS. ROBINSON:

Q    Now, multiple people whom CACI hired to work at Abu Ghraib were hired originally as screeners because they didn't have the qualifications to be interrogators; is that right?

A    Yes.

229

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q    I want to show you what's already in evidence as

PTX 104.  And if we look at the bottom half of this page,

this is an email from Tom Howard to Amy Jenson copying

several other people; right?

A    Yes.

Q    And one of those people was you, you are the email

address, mbillings@caci.com?

A    Correct.

Q    All right.  And the other recipients of this email

included Dan Porvaznik and Chuck Mudd, who was the CACI vice

president?

A    Yes.

Q    And the subject of the email is:  Re:

Yes/Iraq/Billings-interrogator.

Is your name in the subject because you had to

sign off on those whom CACI would approve?

A    I don't recall being responsible to sign off on it.  I

probably -- you know, at that time, Amy Jenson would be the

one that would collect the resumes.  She was working with

Tom, and she would forward them to him to review them to get

his, I guess feel about them.

Q    Okay.  So you don't know why your name is in the

emails?

A    I do not.

Q    All right.  Looking at the body of the email,

230

Cross-examination - M. Billings

Mr. Howard wrote -- and I'll point you to some language that we can highlight for the jury -- I have carefully reviewed each resume, and though some have potential to be either a database/intel research clerk, LEP screener or a screener for interrogation ops.  NONE -- in all caps -- of these candidates have the basic qualifications that the customer requires for the interrogator position; do you see that?

A    Yes.

Q    And if we look at the next page, there's a list of personnel on this page, the candidates that Mr. Howard was reviewing.  And Number 3, if you can blow that up, is Steven Stefanowicz?

A    Yes.

Q    And Mr. Howard wrote about him:  Though he has a crafty resume, he is neither trained nor qualified for the interrogator position.  It says:  In a nutshell, his job in Muscat, Oman was DIA -- for DIA, excuse me, was that of an admin assistant.  Again, crafty usage of words in his resume.  And then lower down Mr. Howard wrote:  If you sift through his resume, he has no supporting credentials, et cetera.

Now, Mr. Stefanowicz was hired as a screener because he wasn't deemed to be qualified as an interrogator; right?

A    Yes.

231

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q    And you were aware that Mr. Stefanowicz began interrogating detainees almost from the beginning of his time at Abu Ghraib?

A    I don't know when he started.  Again, it was the government that decided to take him from a screener to an interrogator; it wasn't Tom Howard.

Q    We'll get to that.

You're aware, Mr. Billings, that both Major General Taguba and Major General Fay found, after their investigations, that Mr. Stefanowicz was involved in abuse of detainees at Abu Ghraib; right?

A    They were allegations.  But earlier we had gotten an indication that there was no issue back in March.

Q    I'm just asking you about General Taguba and General Fay's findings.

That's what they found; right?

A    Well, but remember that Taguba was in February in his report, and Fay was after that in the August time frame.  So, on one hand, we're told by the government that he's okay, and then there's allegations that are now coming out in the May time frame.

Q    And their findings, these two generals, were that Mr. Stefanowicz was involved in abuse of detainees at Abu Ghraib?

A    That was their finding.

232

Q    Correct.  That's what I'm asking.  That was their findings.

        And they also found that Mr. Stefanowicz lied about his involvement in detainee abuse; do you recall that?

A    I don't.

Q    You don't recall it.  All right.

        But I take it you don't have any regrets about CACI's hiring him; right?

A    I have nothing.  No.  I mean, again, we hired him based on the government's approval.

Q    Well --

A    So I've got no issue the fact that they agreed to accept him.

Q    We just saw a document that said that Lieutenant Colonel Brady was not involved in reviewing resumes other than as a QC check; right?

A    That was -- again, it was my understanding that he was doing that and that you saw in May that -- and that's what I'm trying to say to you is.  It was my understanding that the COR was looking at them.  Along comes Major Daniels, the new COR, and he reinforces the fact that he wants to look at them all.

Q    You had very little communication with either COR; right?

A    Yes, that's probably a true statement.  It was limited.

233

Q    All right.  I want to talk about another person that CACI sent to Abu Ghraib, Tim Dugan.

You hired Tim Dugan; correct?

A    CACI hired him, yes.

Q    Your name is on the offer letter to Mr. Dugan; right?

A    It may well be.  I signed a lot of offer letters.  I can't say specifically that I signed his.  I don't remember.

Q    Okay.  Let's take a look at what is in your binder as PTX 95, and it's the first 95.  PTX 95-1.

THE COURT:  95-1?

MS. ROBINSON:  95-1.  Correct.

THE COURT:  Any objection to 95-1?

MR. O'CONNOR:  No, Your Honor.

THE COURT:  It's in.

(Plaintiffs' Exhibit Number 95-1 admitted into evidence.)

BY MS. ROBINSON:

Q    This is the employment application that Mr. Dugan sent to CACI; correct?

A    Yes.

Q    I want to look at just the -- I think it might be the second page of the document.  Right.

MS. ROBINSON:  And can you please call out that section.  All right.

BY MS. ROBINSON:

Q    So this section of the application highlights

234

Mr. Dugan's prior work experience; correct?

A    Yes, it does.

Q    So he had worked at an electronics store, CompUSA, as an operations auditor?

A    Uh-huh.  Yes.

Q    And prior to that, he had been a general manager at Sears?

A    That's what's written here, yes.

Q    Let's look at the next page.

MS. ROBINSON:  Now can you blow up his educational background.

BY MS. ROBINSON:

Q    You see that Mr. Dugan identified job-related specialized training, internship and extracurricular activities?

A    Okay.

Q    And under those, Mr. Dugan identified wrestling/football/track.  And then wrestling/football/VP Sigma Tau Nu fraternity, VP residence hall counsel, two years.

Do you agree, Mr. Billings, that VP of the Sigma Tau Nu fraternity is related to interrogation work at Abu Ghraib?

A    No.

MS. ROBINSON:  You can put that document down.

235

Case 1:08-cv-00827-LMB-JFA    Document 1818    Filed 11/12/24    Page 236 of 310
Cross-examination of M. Billings
PageID# 54754

THE WITNESS:  But there's other education that had to have been reflected for him to be considered for employment.

BY MS. ROBINSON:

Q    Now we just put the exhibit down, but I think you have it in your binder.

Can you identify for me what other education was relevant to his application for employment for interrogation services at Abu Ghraib?  There's nothing under that heading interrogation; correct?

A    Well, if you look on the first page, it shows that he has a top secret SCI clearance that was approved in August of '89.  So he had to have been doing something in the military to get that kind of clearance because it wasn't at Sears.

Q    But he wasn't working for the military at the time that CACI hired him; right?

A    At the time he was hired, yes.  But what that shows is he has done something in his past life.

Q    Well, let's look at what's in your binder.

MS. ROBINSON:  You can put the document down, Sean.

BY MS. ROBINSON:

Q    What's in your binder at PTX 103?  This is not yet in evidence.

236

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A     If you want to finish what we're talking about, if you had looked at page 3 of his --

THE COURT:  I'm sorry.  Mr. Billings, please, there's no question pending.

BY MS. ROBINSON:

Q     Can you please look in your binder at PTX 103.

A     (Complies.)

Q     This is an email that originated in August 2003; correct?  If you go through that email chain.

A     103.  May 19th?

Q     I'm looking at it earlier in the email chain.

A     Oh.  What section did you want to ...

Q     The earliest email is from August 2003; correct?  It may help to just look at page 2 of 6.  I think that's the earlier email in the chain.

A     I see August 24th.

Q     Right.  And at the top of this chain, the May 2004 email, this was forwarded to you; correct?

A     It was forwarded to me in May of 2004.  Yes, it was.

Q     Correct.

MS. ROBINSON:  Your Honor, plaintiffs offer PTX 103.

THE COURT:  Any objection?

MR. O'CONNOR:  No objection, Your Honor.

THE COURT:  All right.  It's in.

237

(Plaintiffs' Exhibit Number **103 admitted into evidence.**)

BY MS. ROBINSON:

Q    All right.  Can you please turn back to page 2, that August 24, 2003 email you referenced.

And you see in that bottom email, Tim Dugan sent his cover letter and resume to CACI; right?

A    Yes.

Q    And on the bottom of the first page of the document going onto the second page, Tom Howard weighed in on Mr. Dugan's application; right?

A    Yes.

Q    And he wrote:  I am sorry to give my no-go for this guy.  Though he seems to have some experience back when, it is not prevalent today; do you see that?

A    Yes.

Q    And so CACI hired him as a screener; right?

A    I'm assuming so, yes.

Q    Now, you understand that General Fay found in his report that Mr. Dugan was involved in detainee abuse at Abu Ghraib; right?

A    I don't recall that, no.

Q    You don't recall that.  All right.

We've talked about hiring of personnel.  I want to talk about a subject that you discussed on your direct which is promotion of personnel.

238

Do you recall that the -- you recall that Mr. Stefanowicz was promoted to an interrogator; right?

A    Yes.

Q    Are you aware that Mr. Dugan was also promoted to an interrogator?

A    Yes.

Q    All right.  Now, you testified that the military signed off on all promotions; right?

A    Correct.

Q    CACI has records showing its own decisions to promote personnel to interrogators; right?

A    In some cases, yes.

Q    All right.  Well, let's take a look in your binder at what's been marked as PTX 106.  This is just the first page of 106.

            THE COURT:  Any objection to 106?

            MR. O'CONNOR:  It's just --

            MS. ROBINSON:  It's just the first page.  So 106 is a large file with many sort of disparate documents, so this is just one email of 106.

            MR. O'CONNOR:  No objection, Your Honor.

            THE COURT:  All right.  It's in.

      (Plaintiffs' Exhibit Number **106A, page 1 admitted into**

                        **evidence.)**

            (Exhibit 106 later clarified to be 106A.)

239

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

MS. ROBINSON:  Can we put that up on the screen.

BY MS. ROBINSON:

Q    All right.  So this is a May 20th, 2004 email from Amy Jenson to you and one other CACI employee; right?

A    Yes, it is.

Q    All right.  And I want to focus on the language in the second paragraph.  Ms. Jenson wrote:  I told Tim -- you understand that's a reference to Mr. Dugan?

A    Yes.

Q    I told Tim that he was only approved for a screener position, but that he could prove himself and his skills once in country.  And then further down Ms. Jenson writes: Dan -- do you understand this Dan to be a reference to Dan Porvaznik?

A    Yes.

Q    Dan did give Tim the opportunity to prove his interrogation capabilities and agreed that he should be moved officially to an interrogator position.  Based on Dan Porvaznik's determination that Tim was qualified to be an interrogator, I promoted Tim on January 1st, 2004; do you see that?

A    I do.

Q    So Ms. Jenson doesn't say anything about the military approving his promotion; right?

A    Not in this statement.

240

Cross-examination M. Billings

Q    All right.  Can you look in your binder at what's been marked as PTX 107B.

        THE COURT:  Any objection to 107B?

        MR. O'CONNOR:  I'm getting there, Your Honor.

        MS. ROBINSON:  I'll say this was an exhibit that was admitted at the de bene esse deposition of Mr. Stefanowicz, so I believe it's coming in one way or the other.  We would like to move it in now.

        MR. O'CONNOR:  No objection, Your Honor.

        THE COURT:  All right.  It's in.

    (Plaintiffs' Exhibit Number 107B admitted into evidence.)

BY MS. ROBINSON:

Q    All right.  Now, this is an email dated February 2nd, 2004 from Mr. Stefanowicz to Amy Jenson; correct?

A    I couldn't tell that from this.

Q    I blew it up for you.  Does that help?

A    Oh, there it is.

Q    It's an email from February 2004 from Mr. Stefanowicz to Amy Jenson?

A    Why did you redact the email?

Q    We redacted personal identifying information.  We don't want to throw around people's personal emails.

A    Okay.  So it's my assumption that somebody labeled that email address as being from Steve.

Q    Correct.

241

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A    Okay.

Q    Yeah.  And now let's take a look at the first paragraph of the email.

MS. ROBINSON:  If you could call that out, Sean.

BY MS. ROBINSON:

Q    Mr. Stefanowicz wrote to Ms. Jenson:  A couple of other issues to talk about.  My position as the Number 2 person here and the salary increase I proposed and supported from Dan.  No reply to date to Dan, Scott or I.

And do you understand those references to be Dan Porvaznik and Scott Northrop?

A    Yes.

Q    All right.  And he wrote:  I will stop performing the numerous duties here if that is what's desired.  I am not going to do the massive amount of the interrogations and operational issues plus the additional ones for free.  The silence over the past six weeks indicates to me CACI does not plan on making the role perm.  Please advise.

All right.  So Mr. Stefanowicz says that he would stop performing interrogations and stop performing operational issues if CACI wanted him to; right?

A    That's what he says.

Q    And he doesn't say anything about the military here; right?

A    He does not.  This is a pay issue.

242

Q    Now, you're aware that there's no record of military approval of Mr. Stefanowicz or Mr. Dugan's promotions; right?

A    I could not tell you.  I don't have access to the documents.

Q    All right.  Let's look at what is marked in your binder as PTX 225.

THE COURT:  Any objection to 225?

MR. O'CONNOR:  No, Your Honor.

THE COURT:  All right.  It's in.

(Plaintiffs' Exhibit Number **225 admitted into evidence.**)

MS. ROBINSON:  All right.  If you could blow up the second line, Sean.  Or, sorry, the header.

BY MS. ROBINSON:

Q    So this is an email from Amy Jenson to you again in May 2004; right?

A    Yes.

MS. ROBINSON:  And if you could blow up the first full paragraph, Sean.

BY MS. ROBINSON:

Q    And the email concerns approvals for various personnel that CACI sent to Iraq; right?

A    Yes.

Q    Now I want to look at the second paragraph.  It's the one that begins "additionally you won't find."

243

Ms. Jenson wrote to you:  You won't find interrogator approvals for, among other people, Mr. Dugan and Mr. Stefanowicz due to the fact that they were only hired as screeners and then were promoted in-country; do you see that?

A    I do.

Q    Now, you don't actually know whether the military approved either of those promotions; do you?

A    They wouldn't be in that position if they hadn't been approved by the government.  The government was doing the operational control.  They were well aware that those people were performing interrogator duties.  Our failure to document that change does not mean that the government did not have knowledge of that change.

Q    Is it your testimony, Mr. Billings, that there's no possibility that the military did not approve certain CACI personnel who were promoted to interrogators?

A    To the best of my knowledge, the government was always, you know, making the decisions for interrogators to be performing work as interrogators.

Q    You have no personal knowledge of whether or not there was an approval for Mr. Stefanowicz or Mr. Dugan; right?

A    I was not there, so I have no idea.

Q    Correct.

Now, we've seen, Mr. Billings, a number of emails

244

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

sent to you by Amy Jenson in around May 2004; right?

A   Correct.

Q   And I think you mentioned earlier this was in the context of the investigations into abuse at Abu Ghraib; correct?

A   Correct.

Q   Now, I mentioned the name Torin Nelson earlier.

You recall that he worked at Abu Ghraib; right?

A   Yes.

Q   And you're aware that he resigned?

A   I am aware that he resigned.

Q   Several months after his resignation, you helped pull together information about personnel that CACI hired and CACI personnel who left the country for Major Daniels; do you recall that?

A   No, I don't.

Q   All right.  Why don't you take a look in your binder at what's been marked as tab E.  This is just to refresh the witness's recollection.

A   What tab?

Q   Tab E.  Letter E.

A   E.  Echo.

THE COURT:  E, as in Edward?

MS. ROBINSON:  Yes.  E, as in Edward, Your Honor.

THE WITNESS:  Email from Scott Northrop?

245

BY MS. ROBINSON:

Q    Yes.  And please just read it to yourself; don't read it aloud.  It's not in evidence.

A    (Complies.)

Q    And let me know when you're done reviewing.

A    Okay.

Q    Now, does that refresh your recollection that you were involved in putting together materials for Major Daniels on personnel -- CACI personnel who had left Abu Ghraib?

A    Yes.

Q    Now, the information that CACI put together included that Torin Nelson resigned due to fear of mortar attacks at Abu Ghraib; do you remember that?

A    I recall that as being -- yes.  It was contained in an email that he was concerned.

Q    And you recall that that was the reason that was provided to Major Daniels for his resignation?

A    To the best of my knowledge, yes, it was.

Q    You're aware, Mr. Billings, that was not the reason Mr. Nelson resigned?

A    I am aware that there were other concerns on his part.

Q    I want to look at what's been marked as -- this is the other PTX 128 we looked at earlier.  PTX 128-1 in your binder.

          THE COURT:  Any objection to 128-1?

246

MR. O'CONNOR:  No, Your Honor.

THE COURT:  All right.  It's in.

MS. ROBINSON:  And just I believe we called the first document we looked at PTX 128A; we'll call this one PTX 128B.

(Plaintiffs' Exhibit Number **128B admitted into evidence.**)

BY MS. ROBINSON:

Q    This is another daily report, Mr. Billings?

A    Correct.

Q    And this one is dated February 2nd, 2004?

A    Yes.

MS. ROBINSON:  And I want to look at the second page of this document.  And can you please highlight this sort of large chunk of text beneath the heading personnel.

BY MS. ROBINSON:

Q    Now, in this internal CACI correspondence, CACI wrote: Torin Nelson and Sean Duysen are both resigning their positions at Abu Ghraib to return to the States.  At first, Nelson was going to resign outright due to the situation between him, Tim Dugan and Dan Johnson referencing the ongoing CID investigation at the prison.  And it goes on to say:  Nelson felt endangered if he stayed at the prison, so I brought him back to Camp Victory.

The reason that Mr. Nelson resigned was because of the situation between him, Mr. Dugan and Mr. Johnson in

247

connection with the CID investigation; right?

A    Well, that was one of the concerns that was brought up, but if I recall correctly, Nelson was offered to be moved to another location, and he was given several days to think about it, and he contacted his spouse, and they agreed to it, and then they backed up and said, no, you know, he wanted to come home.

Q    But when CACI provided the government about information about why Mr. Nelson resigned, CACI did not tell the government that Mr. Nelson resigned, at least in part, due to this conflict at --

A    That particular statement did not include anything about the allegation.

Q    All right.  Now I want to talk about one other interrogator who served at Abu Ghraib for CACI.

        You recall Mr. Arant?

A    Vaguely, yes.

Q    Do you recall that he was someone whom Tom Howard believed was extremely qualified?

A    Again, I'd have to see some documentation.  I don't recall that.

Q    Sure.  Why don't you take a look at tab G in your binder.

        MS. ROBINSON:  And we're not offering this, Your Honor; we're just using it to refresh his recollection.

248

THE WITNESS:  Okay.

BY MS. ROBINSON:

Q    Does this refresh your recollection that Mr. Howard thought that Mr. Arant was --

A    He was qualified.

Q    Okay.

A    Told Amy to go ahead and hire him.

Q    All right.  Now, you're aware that he resigned from CACI in October 2003?

A    I don't recall the specifics of his resigning, no.

Q    Sure.

MS. ROBINSON:  Why don't we put up PTX 115, which is already in evidence.

BY MS. ROBINSON:

Q    In this email, Mr. Arant refers to his concerns regarding the handling of prisoners and interrogation methods; right?

A    I don't know.  You have to -- okay.

Q    You can also look at the document in your binder, Mr. Billings, to get the full context.

THE COURT:  Well, it's getting close to our afternoon break time, so why don't we break until 4:30, and that should give the witness a chance to look at that as well.

(Jury not present at 4:13 p.m.)

249

(A brief recess was taken.)

THE COURT:  Let's bring the jury in.

THE COURT SECURITY OFFICER:  Yes, Judge.

(Jury present at 4:32 p.m.)

MS. ROBINSON:  May I proceed, Your Honor?

THE COURT:  Yes, ma'am.

BY MS. ROBINSON:

Q    Mr. Billings, you may be happy to know, and perhaps everybody else will, too, just a few more minutes of questioning.

A    Okay.

MS. ROBINSON:  Can we pull back up PTX 115.  I just want to ask you about a couple of sentences in this document.  Can you please highlight -- there we go.  The language up there.

BY MS. ROBINSON:

Q    I just want to ask you about the highlighted language.

Do you see the sentence:  Until interrogations are conducted in an environment monitored by officer personnel, violations of well-written Rules of Engagement will likely continue to occur.

Do you understand, Mr. Billings, that the military was not monitoring interrogations?

A    That's the claim here, I could say that.

Q    That's what Mr. Arant said; right?

250

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A    That's what he's saying.

And the difference here is, he's saying that commissioned officers, which are lieutenants, captains and things like that, needed to be there supervising this because the lower enlisted personnel weren't capable of doing that.  That's the claim here.

Q    Right.  And he's saying those officers were not monitoring --

A    Right.  That's the difference.  If you have someone with a possibly higher education, that type of thing.

Q    Okay.  And let's just jump to one more section of that email.

Mr. Arant wrote:  Junior enlisted personnel are not competent to conduct interrogation operations in an unsupervised mode, and signed paperwork by interrogators acknowledging those rules is not sufficient to protect the chain of command from its legal responsibilities.

So you understand Mr. Arant was saying here that interrogations were being conducted without supervision; right?

A    Well, that's the claim.  But, again, he's referring to military people here.

Q    Correct.  He's saying military personnel are not supervised in their investigations.

A    And their chain of command.

251

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Cross-examination M. Billings

Q   Right.  All right.

MS. ROBINSON:  We can put that document down.

BY MS. ROBINSON:

Q   Now, just as a final document.  I just want to return to DX 75, which we looked at quite a while ago at this point.

Do you recall this document?

A   Okay.  That's the one, yes, that I hadn't seen.

Q   And I believe you said something along the lines that it was not relevant to events at Abu Ghraib; is that what you said?

A   Well, it was written after the fact.

Q   All right.  And I just want to look at two short excerpts of this.

Can you please look at page 3.  And you see that can you actually back up and look at the whole page for a second.

So this is the executive summary of the document; right?

A   Yes.

Q   All right.  And can you go back to that part.

So the investigation that this report discusses included over -- one moment.

A   Okay.  So this is something being done by the inspector general.

252

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

MS. ROBINSON:  Let's just highlight the document.
Hold on.  That first paragraph.  Okay.

BY MS. ROBINSON:

Q    Now, looking towards the bottom of the paragraph, do you see the language:  Throughout the investigation, which included over 800 interviews with personnel serving or having served in Iraq, Afghanistan, Guantanamo Bay, Cuba; do you see that language?

A    Yes.

Q    Do you understand this is an investigation that involved hundreds of interviews with personnel serving in --

A    That's what it claims.

Q    And can you look at page 4.  There's a paragraph here that discusses Abu Ghraib specifically; do you see that?

A    Yes.

Q    And it says:  The events at Abu Ghraib have become pseudonymous with the topic of detainee abuse.  We did not directly investigate those events, which have been comprehensively examined by other officials and are the subject of ongoing investigations to determine criminal culpability, but the report -- consider the findings and conclusions of those prior investigations specific to Abu Ghraib?

A    Yes.

Q    All right.  You can put the document away.

253

MS. ROBINSON:  No further questions, Your Honor.

THE COURT:  All right.  Any redirect?

MR. O'CONNOR:  Yes, Your Honor.  Can we bring up Defense Exhibit 12, please.

REDIRECT EXAMINATION

BY MR. O'CONNOR:

Q    Mr. Billings, you can look in our binder either there, Defense Exhibit 12, or you can look on the screen, whatever is easier for you.

A    Okay.  I'll look at the screen.  Delivery Order 35.

Q    Which is the first of the two delivery orders at issue here; right?

A    Yes.

Q    And Ms. Robinson asked you some questions about the pricing of the services to be provided under the contract?

A    Correct.

Q    Okay.  Those -- the prices are divided into certain categories; aren't they?

A    Yes, they are.

Q    Can we go to the next page.

So, for instance, the original contract price is a little over $13 million.  There's technical support services that's a little over 10 million?

A    Correct.  That's the cost associated with the labor categories.

254

Q     So these are the human beings?

A     Those are the human beings.

Q     Paying for those people to go over and provide analyst services, screening services, interrogator services?

A     Exactly.

Q     The next category down, there's about 327,000.

A     That's what we call other direct charges, ODCs.

Now, these include things like housing, cost-of-living allowance that they refer to as COLA.  So these are additional expenses to the government based on authorizations that we had.  Working in a war zone, for example, there's a certain allowance that the government will allow you to charge for that type of work.

Q     And the next category down is travel?

A     Travel.  Basically our expense to -- at that time -- sometimes there were military transportation; other times we were told we need these people right away so put them on a commercial aircraft and fly them, and that's the pot of money that we would use to pay for those expenses.

Q     And in order to perform these contracts, did CACI have to purchase equipment, computers, things like that?

A     Initially when we went over there, there was a lack of body armor.  When we went to our central receiving center at Fort Bliss, Texas, there was nothing to give the soldier -- the soldier.  There was nothing to give the employee an

255

opportunity to pick up the body armor that was necessary. The Army was out of stock. So I had to go out and contract with local vendors to purchase this body armor.

We gave the soldiers as they got on the plane the body armor, so when they arrived there, they at least had a helmet and body protection. Because there were active combat going on at this time. We had mortar strikes on our compound, we'd have rocket attacks and things like that. So these were basic things that the military couldn't provide at the time, but we stepped up and made sure they had them.

Now, the government made right by it, and they reimbursed us for these things. The body armor, once it was in Iraq, became government body armor. They went ahead and paid for us under the ODC category and such, and then we had it available to give to our follow-on or our new employees.

Q    And the -- looking at those three categories, the top category, technical support services, you have to pay -- CACI had to pay all the people that were filling all these positions?

A    Yes, of course we did. They had salaries.

Q    And so the amount there is designed to cover the salaries, benefits, other costs with people, and, in a perfect world, provide a profit to the company?

A    We had several categories. We would have the salary of the employee, then we would have overhead expenses, and then

256

we had a small amount what they call G&A, which included, you know, some profit margin associated with it.

MR. O'CONNOR:  Okay.  And if we can pull up DX 13.

BY MR. O'CONNOR:

Q    This contract on its face was about $21.8 million; do you see that?

A    Yes.

Q    And is that a not-to-exceed figure?

A    It is.

Q    And what does that mean?

A    That means you can spend up to that amount, but you can't spend any more than that.  So don't submit what we called invoices, which are requests for payment, that would exceed that amount.

Q    So, for instance, if CACI didn't fill all of the positions on the contract, the amount payable to CACI might be less?

A    Much less.

MS. ROBINSON:  Objection.  Leading.

THE WITNESS:  When we were in the process of hiring, you know, we were looking for 100 people, we might have had only 40, so we had the fund to pay 100, but we didn't have the people, so we --

MR. O'CONNOR:  If you could turn to the second page.

257

BY MR. O'CONNOR:

Q   And like Delivery Order 35, there are categories for each of the --

A   Yes.

Q   That adds up to the total not-to-exceed amount for the contract?

A   Correct.

Q   And the first one is --

A   Technical services.

Q   What was that again?

A   Technical services.

Q   And that's paying for the people?

A   That's paying for the people.

Q   And the next one down is travel?

A   Travel, right.

Q   Travel had gotten cheaper?

A   Well, probably at that time there was more military transportation, so we didn't have to provide the transportation.

Q   And the third category is?

A   This is the ODCs, and those were -- our allowances were kicking in.  What was being allowed by the government regulations for being in a hostile work area for accommodating, you know, cost of living and things.

Q   Do you know if CACI made a profit on these contracts?

258

A    I don't know for sure.  I'm assuming that they did because there was a profit, you know, built into the contract.

Q    But CACI has to incur -- does CACI have to incur all the costs associated with the cost of the people, the cost of the equipment, the cost of the travel?

A    Yes.

Q    And sticking with Defense Exhibit 13, I want to --

MR. O'CONNOR:  If you can go to page 5, please, and focus on the junior interrogator.

BY MR. O'CONNOR:

Q    Ms. Robinson had focused you on the sentence that says: All actions we managed by the senior CI agent; do you see that?

A    Yes.

Q    Okay.  Let's go back to page 4, paragraph 3.

Does this provision explain exactly how that HUMINT support teams are going to be supervised?

A    You've highlighted the operational -- basically it calls out that it is under the direction and control of the unit's military intelligence chain of command or the brigade S2.  The S2 is the staff element within a battalion or brigade for intelligence.  So basically right there, it's saying that we will be under the control of the military intelligence chain of command.

259

Q     Okay.  I'm going to ask you to take the plaintiffs' binder and go to PTX 128, Number 2.  It's page 111 in our version.

A     Okay.

Q     It's 128, page 111.

A     Got it.

Q     There it is.

A     The whole thing.

Q     Okay.  And Ms. Robinson asked you about the third paragraph where Major Daniels asked Scott to pass on the following, and you see the paragraph there; right?

A     Yes.

        MR. O'CONNOR:  Can we highlight that and blow it up.

BY MR. O'CONNOR:

Q     It does indicate that in the beginning, Lieutenant Colonel Brady reviewed all the interrogator resumes; do you see that?

A     Yes.

Q     And when's this dated?

A     This is done the 12th of May.

Q     Okay.  So this is seven months after the early people from CACI arrived?

A     Probably in October, right.

        MR. O'CONNOR:  Okay.  You can take that down.

260

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Let's go to PTX 95-1.  And that's going to be -- for us it's going to be PTX 95, page 1.

BY MR. O'CONNOR:

Q   This is Tim Dugan's application?

A   Yes.

Q   And you were about to give an answer relating to page 3 of the document as to Mr. Dugan's relevant intelligence experience; right?  What do you see on page 3 about Mr. Dugan's relevant intelligence experience?

A   Well, what I was looking at was the fact that he -- interviewing and integrating, dishonored association, intral (phonetic) for 17 years.  LP, local police investigations and training for 17 years.  Knowledge of the Middle East history.  Knowledge of the terror groups operating in the Middle East.  NCOIC, which is non-commissioned officer in charge, of the Battalion S2, which is the staff organization at the battalion level for the 224th military intelligence Europe, AE, Army Europe.

So I don't understand, except I do understand because I was an employee filling out an application, too. They didn't give him enough places to put all this good information, which is what we focused on when we hired the gentleman.

I mean, it says right here he was an interrogator at the 21st PYSOPS company from '86 to '89.  So that's three

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

years.  If you go back to look at it, he had the security clearances for working in that type of position, and he was given an honorable discharge.  So, you know ...

Q    Okay.

A    When I was trying to find people, these were exactly what we were looking for.  It's just the information is in the wrong block to fit the application.

Q    And Mr. Dugan wasn't hired -- was he hired originally as an interrogator?

A    I don't know.

Q    All right.  Let's go to --

A    But he certainly had the -- you know, he had experience.

Q    Ms. Robinson asked you questions about how if you don't have a written approval from the government to move somebody from screener or analyst to interrogator, how you know that the Army knows that they've been promoted.

        MR. O'CONNOR:  Can we bring up DX 20.

        I think she specifically asked you about Stefanowicz and Dugan.  Can we highlight -- can we focus in on the Tiger Teams.

BY MR. O'CONNOR:

Q    And you see Mr. Dugan listed there on a Tiger Team and Mr. Stefanowicz?

A    Okay.

262

Q    Can you think of a way that they end up on the Army's organizational chart as interrogators and a Tiger Team if the Army doesn't know they've been promoted to interrogator?

A    Yeah.  There's no way that they weren't aware of it. And, as I recall, we used to send Excel spreadsheets that listed every position because the COR wanted to know what was going on and how were we filling these vacancies.  So I would have to send -- or Amy did -- weekly Excel spreadsheets that showed all the vacancies, you know, who we tried to hire, you know, how many resumes we had received and all this kind of stuff.

So again, as the plaintiff pointed out, that was one of my main concerns was hiring people and filling these vacancies, and had a fear that, you know, the government would throw up their hands and say, you know, you're not getting it done fast enough.  So they were well aware of where people were being slotted.

Q    And in the latter half of 2003, say October, November, December, how good was the communication between Virginia and U.S. forces in Iraq?

A    It was very poor.  We had no priority as far as getting any of the government communication systems.  We hired -- or we hired.  We purchased what we call land sats, were basically satellite communication to allow our people -- we had a small section of Camp Victory that became CACIville.

263

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

And basically that was our means of communication was using

satellite communication because we couldn't rely on the

government's existing systems.

MR. O'CONNOR:  Could we pull up Defense Exhibit 7,

please.  And go to -- scroll down to page 3, I believe it

is.  Nope, up to page 2.  Okay.

BY MR. O'CONNOR:

Q    We talked earlier on direct examination about

inherently governmental functions, Mr. Billings.

A    Yes.

Q    Okay.  And one of those is the direction and control of

intelligence and counterintelligence operations?

A    Correct.

MR. O'CONNOR:  Okay.  We can put that down.

Let's go to PTX 227, please.

BY MR. O'CONNOR:

Q    Ms. Robinson asked you about a number of provisions in

this Army regulation, contractors accompanying the force,

but I'm going to go over a few that she didn't.

MR. O'CONNOR:  Can we start on page 14, please.

And can you highlight 3-1C, please.

BY MR. O'CONNOR:

Q    Do you see where it says:  Given such, contracted

battlefield support services will be acquired under the

authority of the Federal Acquisition Regulations?

264

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A    Yes.

Q    Are the Federal Acquisition Regulations the document we just showed you about governmental function?

A    Yes, it is.

MR. O'CONNOR:  Okay.  And let's go to the next page, page 17.  And can you highlight -- or can you blow up 3-3B, as in bravo.

BY MR. O'CONNOR:

Q    And do you see starting with the -- starting with the second sentence that begins "instead."  Instead, as prescribed by the applicable Federal Acquisition Regulations, it was required by force protection to ensure the health and welfare.  The contracting officer's representative shall communicate the Army's requirements and prioritize the contractor's activities within the terms and conditions of the contract?

A    I do.

Q    Is it your understanding that the FAR controls the power to contract out services?

A    Yes, I did.

MS. ROBINSON:  Objection.  Leading.

THE COURT:  Sustained.

MR. O'CONNOR:  Okay.  Let's go to DX 75, please. This is the Church report.  Can we go to page 34.  And can you highlight the sentence at the bottom on the left-hand

265

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

column that says:  The fact the military intelligence -- no.

Down.  No.  Down.  Just highlight that.  And then the next

column.  Thank you.

BY MR. O'CONNOR:

Q    Ms. Robinson asked you about this section that says:

The fact that military intelligence interrogation services

had about acquired via contract implies that DoD does not

consider interrogation to be an inherently governmental

function; do you see that?

A    Yes.

Q    Does this say anything about control of interrogations?

A    No.

          MR. O'CONNOR:  But let's go to page 38, and let's

blow up the entire paragraph that starts "finally."  Above

it.  Right there.

BY MR. O'CONNOR:

Q    Ms. Robinson asked you about the bottom half of the

paragraph but not about the top half.

          MR. O'CONNOR:  Can we just highlight the first two

sentences in this paragraph, please.

BY MR. O'CONNOR:

Q    And so the Church report indicates:  Finally, it is

worth reiterating that the Federal Acquisition Regulation

specifically designates "leadership of military personnel"

and "direction and control of intelligence and

266

counterintelligence operations" as inherently governmental

functions.  Therefore, contract interrogators cannot be

assigned in supervisory positions over DoD, military or

civilian personnel; do you see that?

A    I do.

Q    Is that consistent with your understanding of control

of intelligence operations?

A    It is consistent with what I understand.

Q    And --

A    That's how we operated.

        MR. O'CONNOR:  Let's go back briefly to PTX 227.

That's the Army regulation.  And go to page 23.

BY MR. O'CONNOR:

Q    The government regulation has a whole section on

inherent governmental functions; right?

A    Yes.

        MR. O'CONNOR:  And if we can blow up on the first

paragraph the sentence that starts about six lines down,

begins with "functions inherent to."

BY MR. O'CONNOR:

Q    It says:  Functions inherent to are necessary for the

sustainment of combat operations that are performed under

combat conditions or in otherwise uncontrolled situations

and that require direct control by the military command

structure, and military training for their proper execution

267

are considered inherently governmental.

Is that consistent with your understanding of the concept of --

A    Yes, it is.

Q    -- inherently governmental functions?

A    That is correct.

MR. O'CONNOR:  Let's go to the next paragraph down and highlight the first sentence.

BY MR. O'CONNOR:

Q    So B says:  Functions that require knowledge and skills acquired primarily through military training and current military experience for the successful performance of the prescribed duties are considered inherently governmental.

MR. O'CONNOR:  Let's go on to the next sentence.

BY MR. O'CONNOR:

Q    In all cases, such functions must require the kind of expertise that can only be delivered from firsthand military experience through the command of military forces or by participating in or conducting military operations, tactics or systems operations.

So does the Army regulation here, which is entitled contractors accompanying the force, recognize that inherently governmental functions have to be abided by?

MS. ROBINSON:  Objection.  Leading.

THE COURT:  You have to be on your feet when you

268

object.  That's the practice here.

Sustained.

MR. O'CONNOR:  All right.  Last exhibit, PTX 133, page 41.

BY MR. O'CONNOR:

Q    Mr. Billings, you testified that intelligence operations are in some ways different from the normal rules that generic regulations and field manuals applied to?

A    Yes.

MR. O'CONNOR:  Let's blow up chain of command in paragraph 6 here.

BY MR. O'CONNOR:

Q    This is a document from the JIDC at Abu Ghraib.  It says:  The JIDC it not a standard military organization, and, therefore, does not follow a standard structure.  Two chains of command will be in effect, the operational and the administrative.

The interrogation section leader will be the first person in the operational chain of command proceeding to the NCOIC and OIC.  Administrative actions will be resolved either by the civilian contractor site manager or the HHSS, first sergeant/commander.

The dual chain of command that's set out here, is that consistent with how you understand interrogation operations have to be controlled?

269

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A    That's correct.

MS. ROBINSON:  Objection.  Leading.

THE COURT:  Again, that is leading.  Sustained.

MR. O'CONNOR:  No further questions.  Thank you, Your Honor.

THE COURT:  All right.  Any recross?

MS. ROBINSON:  Very briefly.

Can we please pull back up DX 75.  It's the Church report.  And can you go to page 38, it's the page that Mr. O'Connor showed Mr. Billings a moment ago.  And can you please blow up that paragraph.

RECROSS-EXAMINATION

BY MS. ROBINSON:

Q    You see the sentence that Mr. O'Connor read to you, Mr. Billings:  Therefore, contract interrogator cannot be assigned in supervisory positions over DoD, military or civilian personnel.

Those last five words, DoD, military or civilian personnel, the reference to civilian personnel is to DoD civilian personnel; right?

A    I have to think about that because it could refer to all civilian personnel.

Q    Well, it says DoD, military or civilian personnel.

A    Yeah.  Military or civilian, but it --

THE COURT:  We're not going to get into semantics.

270

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

All right.  It says what it says.  Let's move on, please.

MS. ROBINSON:  Can we please put up once more PTX 103.

BY MS. ROBINSON:

Q    And while we're waiting for it to come up, Mr. Billings, you testified on Mr. O'Connor's redirect that Mr. Dugan had the qualifications and experience to be an interrogator; right?

A    Yes.  Based on the application.

Q    Right.

MS. ROBINSON:  And if we look at page 2 of this document.  Highlight the language in that first paragraph.

BY MS. ROBINSON:

Q    Mr. Howard thought that he did not; correct?

A    That's his opinion.

Q    All right.

A    Yes.

MS. ROBINSON:  No further questions.

THE COURT:  All right.  Does anybody anticipate calling Mr. Billings again in the course of the trial?

MR. O'CONNOR:  No, Your Honor.  Thank you.

MS. ROBINSON:  No, Your Honor.

THE COURT:  Mr. Billings, you're excused as a witness.  You may stay and watch the proceedings or leave, but do not discuss your testimony with any witness who has

271

not yet testified.

THE WITNESS:  Thank you.

(Witness excused at 5:05 p.m.)

THE COURT:  All right.  Your next witness.

MR. O'CONNOR:  Your Honor, CACI will be presenting the testimony of Charles Mudd via read-in deposition.

THE COURT:  Katie, get Evan in.  Get Evan to come in.

Mr. O'Connor, how long do you anticipate this read-in to take?

MR. O'CONNOR:  I'm a novice.  I'm going to guess a half hour, Your Honor, but that's a wild guess.

THE COURT:  All right.  All right.  Now, I see two different colors here.  I see red and I see green.

MR. O'CONNOR:  One were our designations; the others were theirs, Your Honor.  We're going to read all of the highlighted material.

THE COURT:  So we're not going to distinguish between direct and cross?

MR. O'CONNOR:  That's right, Your Honor.

THE COURT:  That's fine.

MR. O'CONNOR:  This was a deposition, so there was only questions by plaintiffs' counsel --

THE COURT:  That's fine.

MR. O'CONNOR:  -- in that case.

272

THE COURT:  All right.

MR. O'CONNOR:  May we proceed, Your Honor?

THE COURT:  Yes, sir.

The testimony of Charles Mudd was read in as follows:

Q    Would you please state your name for the record?

A    Charles Leslie Mudd.

Q    When did you retire from CACI?

A    I did not retire from CACI.  I quit CACI January 13th, 2005 -- 2006.  One year ago.

Q    Why did you quit?

A    I was ready to retire.  I sat in retire -- CACI didn't have a retirement plan like the government, so I just gave my resignation, decided I worked long enough, and I wanted to enjoy life while I can still enjoy it.

Q    Did you take any employment after you resigned from CACI?

A    I formed up an LLC to trade stock.  I'm on a couple companies as a consultant if needed.  I think I've worked six hours for one company in the last over a year basically looking over proposals.  So basically I'm not working for any company.

Q    Let's start just with your educational background.

A    Undergrad degree in mathematics from Western Kentucky University in 1970; a master's of public administration from

273

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Western Kentucky University, I don't know, 1970 something, '74/'75, I'm not too sure when.

Q    That's okay.

A    Master of science in computers, engineering department out of George Washington University, probably about '82/'83. I've done graduate work at Marymount University in education.

Q    And what about your employment history, sir?  Where did you first begin after college?

A    Went right into the Army.  Twenty-six years in the military.  Retired from military in 1996.

Q    What branch of the -- Army?

A    Army.  I was in the computer field acquisition field for the Army.

Q    Were you infantry?  Artillery?

A    The branch itself was adjutant general corps.  After I retired in '96, I went to work for a company called FC Business Systems here in the local area.  I am not too sure of their address now; they moved.  Worked for them for about one year.  Then I went to work for a company called PTG, Premier Technology Group, from '97 to 2004 when PTG got bought out by CACI.  Left CACI -- stayed with PTG/CACI. Left CACI 13 January 2006.

Q    What rank did you retire with?

A    Colonel O6.

274

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q    Full colonel?

A    Uh-huh.

Q    When you first started with PTG Group, what were your job responsibilities?

A    Management VP.  Management of business development. Building business.  Once I built it, to manage what I was building.

Q    And what kind of business was PTG in?

A    Basically it was all work for the government.

Q    Was it all working for the military?

A    Everything I dealt with was mostly working for the military.  A couple small little projects non-military, but basically working for the military.

Q    During your time at PTG, did PTG contract with military -- with the military to provide interrogators?

A    No.

Q    When did you -- when did you first contract with the military to provide interrogators?

A    Exact time frame, sometime in the fall of 2003.

Q    Was that business that you had developed?

A    Yes.

Q    And tell me how you went about getting that business?

A    We had a contract.  "We," being PTG.  PTG was bought out by CACI, I want to say in May of 2003.  I could be wrong about the exact date.

275

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

When PTG was bought out, we'd already had a contract in Germany supporting V Corps G2 and V Corps G3 and V Corps G4.

When the Iraq kicked off -- the war kicked off in Iraq, we had three or four of our employees from V Corps 2 and two or three employees from V Corps 4 deployed to Iraq with the soldiers supporting the V Corps.

Q    When you say that you had a contract supporting the V Corps, what does that mean?  What does support mean?

A    We had a contract where we would provide intel analysts for the G2, logistics analysts for G4.

Q    And when you say -- just because this may be read by a jury or may be read by the people, when you say an intel analyst, that's an intelligence analyst?

A    Uh-huh.  I'm sorry.  Intelligence analyst.  Right.

Q    And logistics analyst?

A    Logistics analyst.

Q    And in that setting, were you, PTG, as this contractor to support V Corps, do the PTG employees report to the military?

A    Yes.

Q    Now, the development -- I'm sorry.

Now, the deployment of the employees to Iraq, how did that come about?

And then there's a comment by counsel.

276

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA    Document 1818    Filed 11/12/24    Page 277 of 310
PageID# 54795
Read-a-thon-y - C. Mudd

The three to four employees that were on the intel analyst's side, and the two to three -- I'm sorry, I got that wrong.  The three to four employees that were V Corps 3, and the two to three employees that were V Corps 4 support?

A    When they deployed to Iraq, they, being the V Corps military side, the contracting office modified our contract so that we would deploy with them.  There was already a clause.  It's a boilerplate clause in the contract that we had to go wherever the government told us to go, but they had to modify the contract, put some different cost estimates in there.  So when the military deployed, they told us they were going to take our employees.  We went to our employees, told them they were going to be deployed to Iraq, and they said fine, and so they went to Iraq.

Q    I'm sorry.  The COR, who was the contracting officer?

A    I want to say at that time frame most likely is Lieutenant Colonel Brady, but I could be wrong.

Q    The employees that deployed to Iraq at that time frame, what were they supposed to be doing in Iraq?

A    The same thing they were doing for the V Corps in Germany in Heidelberg, Germany.  The intelligence analysts would do intel work, intelligence work, study issues, write papers, take directions from the military.  You know, it kind of depends on what the government needed at that time.

277

Same way with logistics people.  They did whatever I call staff-type work.

Q    In Iraq -- so at this time, now CACI owns PTG, and you have several employees supporting V Corps?

A    Uh-huh.

Q    What happened to make you get the Iraq contract?

A    Okay.  Part of my job was multifold.  One was to build business; two, manage the business that we've got; and three, take care of employees.

Q    Take care of employees.  Okay.

A    Make sure they're housed properly and they don't have any problems, or if they've got an issue, they can talk to us.  Talk to CACI or PTG management.

About in July of 2003, because I had four or five or six, seven employees in Iraq, I decided to go to Iraq and see how our employees were doing because it was a war zone, so I got permission from the government to go to Iraq.  I had to have a letter of -- LOI.  LOI stands for letter of, maybe invitation, but I don't know what the "I" stands for.

So I got a letter from them to go to Iraq, permission, got a badge before I got into Iraq, a CAC card, and then flew into Kuwait commercial.  I was not billable to the government.

Once I got to Kuwait, there was a V Corps liaison there in Kuwait.  I was asked to stop by and see her -- from

278

the managers in Germany to stop by and see the V Corps liaison to make sure we weren't having any problem that she knew about.

Q    And what was her name?

A    Female major.  I don't remember.  Okay.  It's just been too long ago.

I stopped by and saw her.  She didn't have a problem with us, what we were doing downrange.  She recommended I might want to go see the contracting office and make sure we weren't having any problems there in Kuwait, so I went by and saw some contracting officer, a civilian.  Again, I don't remember his name.  Introduced myself.  He was friendly.  Told him what kind of stuff we did and asked him if I found business in Iraq, because, again, I have multiple purposes in life.  Do I bring it back to him as the contracting office?  He said no.  Grant [sic], you had just started up.  Again, this is in July.

Q    I'm sorry, what just started up?

A    Iraq just really is into a turmoil, wild west.  He said I'm more concerned right now -- his exact words "I'm more concerned about getting water trucks and port-a-potties in Iraq than I am about doing any other type of contracting work."  He said deal with the contracting officer in Iraq, there's one down there.  If you find something you think might help them out with or they need help.  I said fine.

279

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q    And what type of services were you describing to him?

A    I didn't know what he was looking for.

Q    So you were open-ended?  What do you need?

A    We do intel-type, we do logistics-type, we do IT-type. We do all kinds of things.  He said fine.  He wanted to know if we had any type of BPAs or IDIQ-type contracts.  Any type of contract where you could add more work to it.  I said, yeah, we had those, all companies do.  Not all companies, most companies do.  He wanted to know which one we had.  I told him we had one out of Fort Huachuca.  He said fine, who is my contracting officer, and I told him, and he said, yeah, I know her.

Q    Who was the contracting officer?

A    I want to say -- I could be wrong.  Betty Sebastian, but I could be wrong about that.

Q    Could it be Blankingship?

A    Blankenship name rings a bell to me, but she's not the one I dealt with.

Q    Okay.

A    Anyway, he said he knew whatever contracting officer's name I gave him from the government.  Said she was a good lady, she would keep us out of trouble, keep him out of trouble.

        So then I went on, got a -- hitched a ride by a C130 into Iraq.  Met up with my employees and started -- see

280

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

how they're doing, started worrying about where they're going to sleep at and what they're going to eat every day and about the water, the normal care and feeding of our employees.

Q    And there were seven there at the time?

A    Had some over the logistics side and over intel side. Anywhere from five to seven.  We had people coming back and forth, too.  Temporary duty from Germany into Iraq, so it kind of changed back and forth.

One of the things I would always do is go in and talk to our customers.  If I've got two employees supporting this major or this captain or this whoever, I go see how our employees are doing to make sure, one, that the customer understood from a corporate standpoint we were concerned to make sure we were doing a good job.

And, two, if there was a problem, I could snip it in the bud and fix the problem, if there was a personality conflict or if an employee was not doing -- living up to what the contract -- what he's supposed to be doing.  So I would go around and visit.

At that time frame, all our people were located in a place called Camp Victory close to Bagdad.  One location, not living together, but separated out.  Not working together, but in that general area, so it's easy to get around to them.

281

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Talked to the different customers about different things our company could do.  Logistics said they need a whole bunch of help, the G4 types doing property accountability, different areas.  They wanted to know if we could do that type work.  We said, yeah, we do that type work in other contracts.  We could do that.  We could get the people for you, so on and so forth.

They wanted to know about what it would cost.  Not the exact cost, what we call an estimate.  We always go a little bit higher so we can always drop it down to make sure everybody is happy.  But they need to know about what they have to worry about from a cost standpoint.

Q    Do you remember who you dealt with on the intel side?

A    Colonel Brady was one of them.  He was there at that time frame.  If I remember correctly, he was not the COR at the time.  There was a female major, if I'm not mistaken, there for a very, very short time frame.  She still stayed there, but I think she gave it up to Colonel Brady or passed it off to somebody else.

Colonel Brady, at his level, he was a lieutenant colonel.  He was more involved in the big picture, trying to see what things was needed, and so I did a rough order of magnitude.

I was told they would have to go through some type of requirements board.  They didn't know if it was approved

282

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

or not, obviously.  They wanted to know what kind of contract vehicle we had.  Again, I passed the information about Fort Huachuca, gave them names and phone numbers and email addresses.  So they started dialoguing government to government.

Q    So you told Colonel Brady about the Fort Huachuca contracting vehicle?

A    Not only Colonel Brady, I also talked -- gave the same information to the logistics side.  Also the same information to the IT side, people who did the IT work.

Q    On the intel side at this point, are you talking only about intel analysts, or had you started talking about interrogators?

A    To tell you the truth, I don't remember.  He was talking about a whole lot of things.  Some things I said I would not do.

Q    What did you say you would not do?

A    Any time it was a job where it required one spending a lot of time outside the compound, like security of a convoy, we wouldn't touch that.

They talked about -- they were having problems at the different sites about needing more guards, and I said we don't touch that because it requires us to carry a gun and shoot somebody, and we don't -- our company does not do that type of work.  Those type of things we said no to.

283

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

We also turned down things I didn't think I could do.  For example, they wanted to know if I could -- I remember I said no.  They wanted me to get two or three buses into Iraq for about 90 days at a time.  I said no, I don't.

Q    When you were first asked by Colonel Brady about interrogators, did that strike you as something the company could do?

A    Yes.  Again, it's interrogators intel-type, logistics-type.  You hire persons qualified to do the job.  As a company, we did not manage interrogators.  I'm not an intel-type.

Q    So you have no intelligence-gathering background?

A    Prior to this -- prior to getting this contract, no.  So if they asked me to manage intel-types, I couldn't do that.  I had military experience, but not intel-type.  It was not my background.

Q    But that wasn't reason to tell Colonel Brady that the company as a whole couldn't do it?

A    Oh, yeah.  An issue comes up -- we were giving them qualified individuals, and they were managing those qualified individuals.  I was not managing -- or my team leaders or not managing their day-to-day operations.

Q    Now, you had talked before about the corporate decision to make sure that CACI employees stayed, I believe the

284

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Read-Direct Mudd - C. Mudd

phrase you used was inside the wire?

A    It wasn't so much a corporate decision.  It was my decision, and it was also the COR's position, the different CORs we used.  Our contracts were not for us to go out to tactical units on patrols and all that.  We didn't go out and gather intel firsthand from a building under fire.

Q    When CACI was being asked Colonel Brady's wish list, did you talk at all about where the screeners were going to be located in deciding how many screeners you were interested in contracting for?

A    No.  The fact where they're going to be physically located at, he had his mind up.  It drove his numbers of how many he needed -- he thought he needed, but didn't really impact me one way or another of me putting a person in Balad or Fallujah or Camp Victory or at the prison, whatever.  It made no difference to the cost standpoint or what kind of person -- you know, the body I needed.  So as long as it was not on a tactical deployment going out with combat control, it was back in, they call it rear, semi-safe zone.  I wasn't concerned.  So it had no play one way or another, as far as I was concerned.

Q    Now, when you got word -- well, who actually told you that CACI had gotten the contract?  Excuse me, the intel piece of the contract.

A    A contracting officer out at Fort Huachuca sent us the

285

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

contract.

Q    Now, when you -- you said that when you went on your 17 trips to Iraq, one of the things that you did was go and talk to the customer to make sure that CACI employees were performing properly; right?

A    True.  Yes.

Q    And did you do that -- first focusing on the triage screeners.

         Did you do that as to the triage screeners?  Did you talk to their customer?

A    Yes.

Q    And who was the military customer for the triage screeners?

A    It changed.  I remember the guy -- person.  One person I used to talk to, some warrant officer.  I do not remember his name.  On the operations side, there used to be a captain.  I cannot remember her name.

Q    Was it Captain Wood?

A    Yeah, she was there.  Yes.

Q    And when you -- did you -- when you conducted these checks on CACI employees, did you learn the military's view of their performance?

A    Yes.

Q    Now, I've seen reference in the documents that some of the triage screeners were promoted to interrogators; do you

286

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

recall that?

A    Yes.

Q    Do you recall who was promoted to interrogator?

A    I know of one.  We had a few.  I can't remember their names.  Steve -- I can't pronounce the last name.  Big Steve.  He started out as a screener, I call it triage screener.  Triage is my name.

Q    Yes, I understand.

A    It's not the government's.

Q    No, but it's helpful.  Thank you.

A    For non-intel-type, I understand what it means.

We had a few who, based upon how good a job they did as a screener and the government's recommendation, we would promote them up to being an interrogator.  And we had other ones who were not promoted based upon the government's recommendation.

Q    And you say government's recommendation.

How did that come about?  Did they simply come to you?  Did Captain Wood or somebody else come to you and say that they want Big Steve to be promoted to an interrogator?

A    Uh-huh.

Q    You need to say --

A    Yes.

Q    And then what -- on the CACI end, what did you do when you got that government recommendation?

287

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A    We would go to the employee and ask them if they wanted to be promoted to another position.

Q    Do you recognize the name DJ Johnson?

A    Yes, I do.

Q    And do you recall that there was a picture of DJ Johnson in which he was interrogating an Iraqi?

A    Yes, I am aware of that picture.

Q    And my understanding from the documents is that the military initially asked CACI to fire Mr. Johnson; is that correct?

A    I do not remember that.

Q    What do you remember about what the military asked CACI to do vis-a-vis Mr. Johnson?

A    Look at the picture.  As a matter of fact, just the opposite.  I remember the military asking us not to fire him, if my recollection is correct, because certain interrogations he was doing were too critical to the mission for us to fire him.

Q    Had CACI been going to fire him?

A    If -- at that time frame, no, because when the government gave us the picture, they also told us not to fire him at the same time.  So it wasn't a decision making on our process one way or the other.

Q    And did you review the picture?

A    I've seen the picture, yes.

288

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q    You said in your declaration that you became familiar with the Interrogation Rules of Engagement?

A    Uh-huh.  Yes.

Q    And why is it that you were reviewing the Interrogation Rules of Engagement?

A    When all the problems with the pictures of Iraq coming up into the press, I started getting a whole lot more involved in the interrogation, paying a whole lot more attention to it.  Up to that time frame, interrogation was only one very small part of our contract.

Q    Prior to photographs of the abuse being published, had you read the Interrogation Rules of Engagement?

A    I do not remember reading them before then, no.

Q    Now, you talked about making 17 trips to Iraq.

A    Uh-huh.  Yes.

Q    What prompted that number of trips?  For example, did you have a schedule where you went to Iraq every quarter?

A    No, there was no particular schedule.  I'd go all over as often as I thought was necessary to take care of employees.

Q    Was it -- were the trips prompted by concern for the employees, or were they prompted by desire to expand the business or both?

A    More concerned about the employees, especially once we got our task orders -- started getting task orders.

289

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q    When you -- when you went over on the trips, did you have staff meetings?  Did you have group meetings with the CACI employees at a given location?

A    Uh-huh.  I would pull them all together, sometimes as much as I could pull together.  If a person is working on a site, I couldn't pull him away from his job.  So if I couldn't get him into the meeting, a lot of times I'd walk around and see them one on one to see how things were going.

Q    So you did a lot of direct conversation with the employees?

A    Direct conversation.

Q    And what was the purpose of that?

A    To make sure they're taken good care of.  Did they have any complaints that maybe we could help them with, living conditions, food, danger.  A lot of it was just showing them that CACI corporate was concerned about their welfare.

Q    Did you meet with the customers when you were on the site visits as well?

A    Any time I went in-country, I'd meet with the COR to make sure the COR was happy, or if there was problems I could work with.  Then when I'd go down to an individual site, I would meet with the customers.

Q    And what did you tell the customers was the reason that you wanted to meet with them?

A    I'm truthfully here to find out how our employees are

290

doing.  If there's anything we should be doing that we're not doing.

Q   And what were the types of things that you learned from the customer?

A   I would find out about personality conflicts, certain employees weren't working out properly, coming late to work, taking lunch breaks too long, were not writing good reports. Normal things that, you know, we would hear about.

Q   And then when you got -- and then when you got that information from the customer, what did you do with it?

A   Counsel employee if there was need to be counseled.

Q   Did all -- on all 17 of your trips, did you include a visit to Abu Ghraib prison?

A   No, I did not.

Q   Do you remember on how many of the trips you went to Abu Ghraib?

A   A bunch.  You know, out of 17, I don't know 10, 11, 12, but not every time.

Q   What were the -- what were the range of actions that you had available to you with a problem employee?

A   Counseling, transferring to another location within Iraq, calling rehab transfer.

Q   Rehab transfer?

A   And firing.

Q   Did you have to fire some of the CACI employees in

291

Read-Directly - C. Mudd

Iraq?

A    Yes.

Q    Do you have a sense of the magnitude of how many people you had to fire?

A    Not very many.  Very few compared to the number of employees we had over there.

Q    Now, when you -- when CACI wanted to make a rehab transfer, what did it have to do?

A    We would go to our COR and say we've got A, B, C. We've got Mr. So and So or Ms. So and So at this location, he or she is not doing this properly.  We think by moving them over to this other location, we think there's a personality conflict, or we think if we move this individual, they'll still do a good job.  Then the COR would have to bless it, approve it.

Q    Did the training that CACI gave its deploying employees, did that come before or after the Fort Bliss training?

A    No.  Before.  Because when you went to Fort Bliss, in most cases you were deployed right from Fort Bliss to Kuwait, Kuwait right into Iraq.  And then once they got into Iraq, we brought them down to our CACI -- where we stayed on Camp Victory.  And we gave them briefings to what to expect, what they should and should not do before the government decides where they're going to go to.

292

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q    I've heard that called CACIville.  Is that what it was called?

A    That's what we -- we called it CACIville, right.

Q    Did the CACI employees have to take directions from any soldier, from any military personnel?

A    No.  They took direction from their person that they're working for.  If they did get direction from someone else and they thought it was bad direction, they would take it to the site lead, and the site lead would work with the customer, get it worked out.

Q    Did that happen on occasion?

A    Occasionally, yes.

Q    Now, when the CACI employees got to Iraq and you had the training in CACIville, what was the -- what were the topics that were covered in the CACIville training?

A    What we did, the country manager at CACIville would pull the new people together, one person, eight people, it depends on how many people arrived that day.  Give them a briefing what to expect, where they might be going to, what's going to be -- what's going to happen in the next week, week and a half, because it might take a week before we get them shipped out to the site.  So the government would remind them where they're going to go to, on what they could and could not do, i.e., couldn't drink alcohol, you know, couldn't carry weapons.

293

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA    Document 1818    Filed 11/12/24    Page 294 of 310
PageID# 54812
Read-back of 54812 - C. Mudd

Just kind of went over the whole checklist of sayings and tried to answer their questions, make sure they were comfortable, make sure they knew where -- you know, how to get to chow, whether they're at CACIville and get them rested up.

Q     And then when they were sent to their different sites, did their -- was there then additional on-site training?

A     It depends on what their job was going to be.  But, yes.  If they went to the prison, they got briefed by the people at the prison.  If they went to an LEP screening sale, they got briefed on what their job was going to be.  So they would get briefings once they went to a location what their function is going to be.

Q     And were those briefings done by military or done by CACI personnel or both?

A     In most cases, done by military.

Q     Did the CACI site leads do any briefings?

A     Yes.  They did the briefings on the admin stuff.  Okay.  Here is how we do time sheets.  This says you have to keep a daily time sheet.  So they did the CACI admin-type stuff, made sure they understood their chain of command.

If they had a problem with the site lead, they could jump up to the country manager.  Make sure that they had -- make sure they had the project manager's name and phone number, email address so they could always go back to

294

CACI corporate if they had an issue.

Q    When you were -- when you were making your visits to Abu Ghraib and talking to the customer about the performance of the interrogators, what were the topics of the discussion?

A    How their interrogation or screening or analysts work. Are they performing what they're supposed to be doing.  Do they have the right attitude okay.  Are they showing up to work on time.  Are they goofing off too much.  Are they treating the -- you know, are they dealing with the prisoners like they're supposed to be dealing with them. Just normal day-to-day-type operations.

Q    On that latter topic, are they dealing with the prisoners the way they're supposed to be dealing with them.

Did you ever have any conversation with the customer in which the customer expressed some concern about, you know, one of your guys is too rough with the prisoners?

A    No.

Q    What were the conversations about dealing with the prisoners the way they were supposed to be dealing with them?  I mean, how did that topic come up?

A    At that time frame, more not being physically abusive. It was more of their attitude toward your prisoners.  Were they doing interrogation with the right attitude.

Q    And what was the right attitude?  What does that mean?

295

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

How were they supposed to be treating the prisoners?

A    That is classified.  That's Rules of Engagement of interrogation.

Q    And at the time, pre-scandal, when you're having these conversations, what -- and the customer is telling you whether or not they're happy with their attitude or not happy with the attitude, what are your reference points?

A    My reference point is what the government thinks is right or wrong since I'm not an interrogator, so I can't tell you what the proper attitude is.  I can only tell you if the government thought he or she had a bad -- wrong attitude or correct attitude.

Q    So really a question of is the customer happy with the CACI employee's attitude?

A    Yes.

Q    Do you recall an interrogator named Richard Arant quitting?

A    I recall the name, but I don't recall him quitting, no.

Q    Do you recall a CACI interrogator observing abuse by the military and getting so concerned about it that he left the country?

A    No.

Q    Were you ever aware of that?

A    I heard about it after the fact.

Q    And when you say "after the fact," meaning you heard

296

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

about it after the scandal?

A    Yes.

Q    Prior to the lunch break, I had asked you about the Rules of Engagement, and you said that you had seen them after the Abu Ghraib scandal broke; right?

A    Uh-huh.

Q    You can't say, uh-huh.

A    Yes, I did.  Okay.  Yes.  I saw them after the scandal broke.

Q    And I take it CACI continued to provide employees to the military to conduct interrogations in accord with those Rules of Engagement?

A    We continued to provide employees to the government under a task order, and, in turn, the government would drive -- dictated what Rules of Engagement should be followed.

Q    Did you learn that there was a change in the Rules of Engagement after the scandal?

A    I saw -- I know I've seen two versions of the Rules of Engagement.  At least two versions after the scandal broke. I don't know if they were changed due to the scandal being -- breaking or not; I just know I saw a couple different versions.

Q    Did you or anyone else at CACI undertake an analysis as to whether CACI was comfortable letting its employees

297

operate according to the Rules of Engagement that you saw?

A    No, I did not.  We did not.

Q    Why not?

A    It was a -- we were working under a government task order under management of the government.  They set the Rules of Engagement; we did not.

Q    Did you interview the CACI employees that were interrogators at Abu Ghraib?

A    No.  The main -- why we did not, there was investigations going on.  We did not want to do anything that would cause a problem to the investigations.

Q    And when you say "cause a problem to the investigations," you're referring to the military investigating the abuse?

A    Yes.

Q    And did the military ask you not to conduct any type of internal investigation?

A    No, they did not.  Did not ask us not to do -- yeah. The military gave us no direction there, except we were told when the military talked to our employees in some of the cases, our employees were told not to share this information, what kind of questions we asked you, with anybody else.

Q    And some of your employees shared with you that they had been told not to share the information --

298

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A    Yeah.

Q    -- with you?

A    Yes.

Q    Did you ever ask the military whether it was permissible for you to conduct an internal investigation of your own employees' conduct?

A    No and yes.  We would go to the COR and say are any of our employees in trouble?  Is there anything we should be doing?  Up until the actual reports came out naming certain employees, we were told by the COR that, no, your CACI employees are not in any type of trouble.

Q    Oh.  So prior to the Taguba report coming out, you had been assured by Colonel Brady that none of the CACI employees were in any trouble?

A    Uh-huh.  Yes.

Q    More so than for your employees that are assigned to contracts performed for the military outside of Iraq?

A    Truthfully, for people outside Iraq, it was one of the forms they fill out, and I never pay any attention to it because it's just a normal piece of paper like insurance documents.  But the next of kin for Iraq was a critical process for us because a lot of the companies were having problems over there when someone got killed.  So we had that.

We had, for example, when we gave them an

299

interview -- not interview.  When they first got in country at our CACIville, our repo depot, whatever you want to call it before we sent them out to whatever site, we gave them a briefing.  We had them sign that briefing.  We made sure we had those to make sure one got the briefing.  Wasn't too concerned.  We just wanted to make sure everyone got a detailed briefing when we got in-country.  So we had certain little forms that we ensured for our people in Iraq but not very much.

Q    Of the paper that you had them sign about the in-country briefing, is that one of the parts of what you have as Exhibit 5?

A    Yeah.  Probably the --

Q    If you could just identify it by the numbers, the Bates numbers.

A    No, this is not it.

Q    Okay.

A    The briefings back in the back are the briefings taking place out at the prison by the government.

Q    But not the CACIville briefing?

A    Not the CACIville briefing.  Not the CACI briefing.

Q    Now, our site -- at the prison --

THE COURT:  Wait.  Wait.  Wait.

MR. O'CONNOR:  Oh, that's you.  I'm sorry.

THE WITNESS:  Now, our site at the prison, our

300

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

site manager would be there when new employees got briefed. But this is not the CACI briefing I was talking about.

BY MR. O'CONNOR:

Q    Did the in-country CACI briefing cover the law of war at all?

A    No, it did not.  It covered if you see something you don't agree with, tell somebody, but it didn't go over what you could and could not do.

Q    It went more over your reporting obligations?

A    Right.  And it was not just for -- it was everybody's guide.  So your LEP screener got the same in-country briefing as an interrogator got, or the logi supply clerk got the same briefing as the interrogator got.

Q    And was briefing given that they were to report both to the military and to CACI?

A    Yes.

Q    And you say you remember talking on the phone on a recurring basis.

Did you have regular calls with Dr. London before the Abu Ghraib scandal?

A    Yes.

Q    And what was the substance of those calls?

A    How are people doing?  Anybody get killed?  Any problems I should be aware of?  He was concerned about the safety of our employees, and also concerned about how is our

301

fill rate coming along.  I mean, are we getting enough people to keep the customer happy.

Q    And by "fill rate," you mean the number of human beings that you can place over in Iraq?

A    Yes.

Q    To do the job?

A    Yes.

Q    And it was a constant struggle to keep that fill rate up?

A    Yes.  It was hard to find enough qualified people and to get them through the pipeline, security clearances.  Security clearance could take anywhere from a month to seven months.  And so that -- all contractors have that problem.  It's not just CACI on security clearances.  So yes.

THE COURT:  All right.  Counsel, approach the bench.

(Bench conference.)

THE COURT:  All right.  Looking at your email, we finished Porvaznik, Billings and Mudd.  And then you wrote then one or more depending upon how much time is left in the day.

So how much more is left for today?

MR. O'CONNOR:  Well, what I was getting at is if we had two hours, I would have played Stefanowicz; if we had one hour, I would have played Pappas.  If we had -- I can

302

do -- I have -- we have three pseudonymous interrogators that interacted with Al Shimari.  The two non-CACI people, B and K, they would be done by 6:00 if you want me to do those, or we could do all three of them together.

THE COURT:  Let me ask you this, how much more do you have for your case?  I'm trying to think how long Wednesday is going to be.

MR. O'CONNOR:  So the pseudonymous interrogators right now are running at 2 hours and 14 minutes.  That's going to --

THE COURT:  Okay.

MR. O'CONNOR:  Total.  That's going to get a little shorter because we're taking some objections out of one of them that has too many.

We have Colonel Pappas, which is just over an hour.  We have Steve Stefanowicz, which is just over two hours.  We have live witnesses Scott Northrop, which is probably a couple hours.  And we have Dr. Payne-James, which is -- I don't think he'll be that long.  And then we have a 30-minute from Captain Wood.  So I think -- I mean, we have enough that we'll certainly go through tomorrow and into --

THE COURT:  Not tomorrow.

MR. O'CONNOR:  Or Wednesday.  You're right, Your Honor.

And into Thursday, but I don't -- I'd have to add

303

that up, but I don't think --

THE COURT:  I want you to try to finish up on Wednesday.  Northrup, I'm sure, it's going to be highly repetitive, so just think about that.  This jury is paying attention, but you're going to put them to sleep.  A lot of it's unnecessary.  Okay.  So just be thinking about that.

MR. O'CONNOR:  Understood.  The cross has been very long.

THE COURT:  I'm sorry?

MR. O'CONNOR:  I was just going to -- the crosses have been very long in our case.

THE COURT:  Well, just think about that.  You're not making a lot of points if it's a long cross.  If there are three or four gems you want to get out, just get the gems out.

And then are you thinking about a rebuttal case?

MR. FARIDI:  I think it will be very short, Your Honor.  I think we'll probably play some depositions.  I don't think the depositions will be longer than an hour and a half, two hours max.  We may have a -- one or two live witnesses.  General Taguba, I think we'll make an executive decision probably tomorrow as to whether we're going to call him or not.  I think it's highly unlikely, but I just want to confirm it with my team.

And then we were contacted by Charles Graner, who

304

may be interested in testifying.  I want to see what they do with respect to Steve Stefanowicz, what they end up playing. We may be able to call him as a rebuttal witness.

MR. O'CONNOR:  Your Honor, I was not allowed to call Chief Rivas.  They've played Mr. Graner as an unavailable witness by video.  The idea that they would bring a live Charles Graner is highly inappropriate.

MR. FARIDI:  He's disclosed.  There's a difference.

THE COURT:  Whether he's disclosed or not -- we'll see.  That's fine.  All right.  I'm going to let the jury go home for tonight.  Okay.

                    (Open court.)

THE COURT:  All right.  Ladies and gentlemen, I think it's best for us to let you go home a few minutes early.  All right.  I know it's going to be dark out there, too.  It's a basic shock this time of year.

Again, as I indicated, tomorrow, because it's Election Day, we're giving you the day off.  But, please, it's very important to continue remembering my cautions.  We are moving this case.

I am cautiously optimistic that you may get this case for deliberations sometime on Thursday.  All right. That's the push.  I'm asking the lawyers to look carefully -- that's what we had our little conference

305

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

about -- about seeing if they can start to tailor things, because I think you're very -- all of you are wide awake and you're taking notes.  I think you'll agree with me some of the testimony is becoming cumulative, and you don't need to hear it four or five times.  So I really want them to start focusing.

All right.  So we'll let you go for this evening.  And, again, please be careful driving home, and remember to follow my cautions.

All right.  We'll stay in session.

THE COURT SECURITY OFFICER:  Rise for the jury.

(Jury not present at 5:48 p.m.)

THE COURT:  All right.  So we're now going to read into the record just to make sure that we have all of the exhibits.  The two or three exhibits that the -- like 107, we're going to go with A and B and not 1 and 2.  All right.

MS. ROBINSON:  That's fine.

THE COURT:  That's how you have them labeled, so I'm not making that change.

THE DEPUTY CLERK:  Okay.  PTX 495.  PTX 206G.  DX 29, pages 3, 39, 48, 49, and 202.  PTX 133, pages 40 to 42.  DX 20.  PTX 38.  PTX 214.  DX 77.  DX 12.  DX 13.  PTX 85.  DX 75.  PTX 128A.  PTX 95-1.  PTX 103.  PTX 106.  PTX 107B.  PTX 225.  PTX 128-1/B.  First you guys said -1, and then you said B, so I'm not sure.  And that was it.

306

THE COURT:  All right.

MR. O'CONNOR:  We think that's right, Your Honor.

MS. ROBINSON:  A couple.  I believe PTX 106 was just the first page of 106.

THE COURT:  I think that's correct.

MS. ROBINSON:  And we can call that 106A if it's easier to differentiate on the exhibit list.

THE DEPUTY CLERK:  Okay.

MS. ROBINSON:  And --

MR. O'CONNOR:  We agree with that.

THE COURT:  Yeah.  Just page 1.  Yeah.

MS. ROBINSON:  And I think 128-1, we should just call that 128B since we have 128A.

THE DEPUTY CLERK:  Okay.

THE COURT:  All right.  So the plaintiffs are satisfied with the exhibits now?

MR. FARIDI:  We think that that is correct, Your Honor.  And if there's any discrepancies, we will let the Court know --

THE COURT:  Okay.

MR. FARIDI:  -- as soon as we can.

THE COURT:  So remember to be consistent with what we've just done in terms of the index as you're putting it together.

And, Mr. O'Connor, you need to make sure that

307

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

you've provided plaintiffs' counsel with your list of witnesses in the order in which you're going to call them. And the only thing, when you give us our emailed version of that, I need to know which, if any, of those witnesses are going to require a read-in.  Because, again, I need to alert my clerk if he's coming in to read.  Obviously it sounds like a lot of them are the depositions that we took before the trial started.

So you can do that overnight, just make sure we have it by morning, and plaintiffs' counsel will get it by whatever time you all have agreed.

MR. O'CONNOR:  Good news, Your Honor.  I don't believe we're going to have any more read-ins.  I think everything is either video or live.

THE COURT:  All right.  That's fine.  Very good.

Yes.

MR. FARIDI:  We will probably have some read-in during our rebuttal case, but we'll notify the Court as soon as we can.

THE COURT:  Okay.  All right.  That's fine.

If there's nothing further, we'll recess court for the evening.

MR. FARIDI:  Your Honor, there is --

THE COURT:  I'm sorry.

MR. FARIDI:  -- just one item.

308

For our planning purposes, do you intend on having a charge conference?

THE COURT:  We're not going to need a long one since, you know, this is déjà vu all over again.  I'm working on a couple of instructions.  Some of the ones that you added I already had.  There's a preponderance of the evidence.  I don't know why the defense -- or one of you resubmitted one.  That's -- anyway.

So I don't think there are many changes that are going to be necessary.  I'm going to take a look at it.  I know there are one or two issues that you're somewhat contesting, and we'll probably get those to you possibly tomorrow night.

All right.  And I need to look at the verdict forms as well.

MR. O'CONNOR:  Your Honor, do we need to clean our spaces?

THE COURT:  No.  As I said, I've cleared my entire docket this week so there are no -- oh.  Oh.  Oh.  I forgot. I've got one criminal matter tomorrow afternoon.  I forgot about that.  So you are going to have to clean.  That was the only time this week.

MR. O'CONNOR:  I'm glad I asked.

THE COURT:  I'm glad you did.  Yes.  Okay.  We'll recess court for the evening.

309

(Proceedings adjourned at 5:53 p.m.)

-----------------------------------

I certify that the foregoing is a true and accurate

transcription of my stenographic notes.

*Stephanie Austin*

_____

Stephanie M. Austin, RPR, CRR

310