UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
---------------------------x
SUHAIL NAJIM ABDULLAH AL     :     Civil Action No.:
SHIMARI, et al.,             :     1:08-cv-827
           Plaintiffs,       :
    versus                   :     Wednesday, November 6, 2024
                             :     Alexandria, Virginia
CACI PREMIER TECHNOLOGY,     :     Day 5
INC.,                        :     Pages 1-112
           Defendant.        :
---------------------------x
```

        The above-entitled jury trial was heard before the
Honorable Leonie M. Brinkema, United States District Judge.
This proceeding commenced at 9:39 a.m.

A P P E A R A N C E S:

FOR THE PLAINTIFFS:    CHARLES MOLSTER, ESQUIRE
                       THE LAW OFFICES OF CHARLES B. MOLSTER,
                       III, PLLC
                       2141 Wisconsin Avenue, NW
                       Suite M
                       Washington, D.C.  20007
                       (703) 346-1505

                       BAHER AZMY, ESQUIRE
                       THE CENTER FOR CONSTITUTIONAL RIGHTS
                       666 Broadway
                       7th Floor
                       New York, New York  10012
                       (212) 614-6464

                       MUHAMMAD FARIDI, ESQUIRE
                       MICHAEL BUCHANAN, ESQUIRE
                       BONITA ROBINSON, ESQUIRE
                       ANDREW HADDAD, ESQUIRE
                       SCOTT KIM, ESQUIRE
                       ALEXANDRA MAHLER-HAUG, ESQUIRE
                       PATTERSON BELKNAP WEBB & TYLER LLP
                       1133 Avenue of the Americas
                       New York, New York  10036
                       (212) 336-2000

1

```
                        A P P E A R A N C E S:

FOR THE DEFENDANT:      JOHN O'CONNOR, JR., ESQUIRE
                        LINDA BAILEY, ESQUIRE
                        JOSEPH MCCLURE, ESQUIRE
                        STEPTOE LLP
                        1330 Connecticut Avenue, NW
                        7th Floor
                        Washington, D.C.  20036
                        (202) 429-3000

                        NINA GINSBERG, ESQUIRE
                        DIMUROGINSBERG PC
                        1101 King Street
                        Suite 610
                        Alexandria, Virginia  22314
                        (703) 684-4333

FOR THE UNITED          STEPHEN ELLIOTT, ESQUIRE
STATES:                 UNITED STATES DEPARTMENT OF JUSTICE
                        CIVIL DIVISION FEDERAL PROGRAMS BRANCH
                        1100 L Street, NW
                        Washington, D.C.  20044
                        (202) 598-0905

COURT REPORTER:         STEPHANIE M. AUSTIN, RPR, CRR
                        Official Court Reporter
                        United States District Court
                        401 Courthouse Square
                        Alexandria, Virginia  22314
                        (571) 298-1649
                        S.AustinReporting@gmail.com


     COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

2

TABLE OF CONTENTS

WITNESSES

On behalf of the Defendant:

INTERROGATOR A ............................11

INTERROGATOR B ............................11

INTERPRETER K ............................12

JASON PAYNE-JAMES

Direct examination by Ms. Bailey .........12
Cross-examination by Mr. Buchanan .........55
Redirect examination by Ms. Bailey ........90

INTERROGATOR C ............................96

INTERROGATOR E ............................97

INTERROGATOR F ............................97

INTERROGATOR G ............................97

EXHIBITS

On behalf of the Plaintiffs:
Admitted

Number 236, page 69, paragraph 268, .......66
subsection E
Number 236, page 120, paragraph 507 .......81
Number 236, page 81, paragraph 342 ........88
Numbers 98A, 98B, 107A, 107C, 107D, 107E, .102
14, 72

On behalf of the Defendant:
Admitted

Number 37 .................................5
Number 101 ................................17
Number 106 through 109 ....................50
Numbers 32, 33, 34, 35 ...................102

MISCELLANY

Proceedings November 6, 2024 .............4
Certificate of Court Reporter ............112

3

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

P R O C E E D I N G S

THE DEPUTY CLERK:  Civil Action Number 1:08-cv-827, Al Shimari, et at versus CACI Premier Technology, Inc.

Would counsel please note their appearance for the record, first for the plaintiffs.

MR. FARIDI:  Good morning, Your Honor. Muhammad Faridi on behalf of the plaintiffs.  I'm joined by my colleagues Michael Buchanan, Andrew Haddad and Chip Molster, and our paralegal -- Charles Molster.  I'm sorry.

THE COURT:  That's all right.  That's how he's known throughout the district.

MR. FARIDI:  And our paralegal Sean O'Shea and Kaihan Rahimi.

THE COURT:  Good morning.

MR. O'CONNOR:  Good morning, Your Honor. John O'Connor for CACI.  I'm joined by my co-counsel Linda Bailey, Nina Ginsberg and Joseph McClure.

THE COURT:  Good morning.

All right.  Before we get started, I just want everyone to know that if you've got problems with the exhibits, that needs to be put on the record.  There's apparently a paralegal who's going back and forth with my courtroom deputy.  We're not going to have that.  So if there are issues, we'll bring them up in court on the

4

record.  And there are issues.  And any exhibit matters where the exhibits you believe have already been entered into evidence, you first need to discuss with the other side to make sure that there isn't some dispute going on.  All right.

Let's bring the jury in.

THE COURT SECURITY OFFICER:  Yes, Judge.

Rise for the jury.

(Jury present at 9:41 a.m.)

THE COURT:  Good morning, ladies and gentlemen.  Thank you for being back here promptly.  We're going to continue with the defendant, CACI's case.  The case is moving very well.  Counsel have, again, worked on tailoring some of the evidence so that we're going to try to keep this case on schedule.  All right.

All right.  Mr. O'Connor.

MR. O'CONNOR:  Your Honor, CACI moves into evidence Defendant's Exhibit 37, which the Court has previously ruled would be admissible in this case.

THE COURT:  37 is what?

MR. O'CONNOR:  It's the Rumsfeld memorandum, Your Honor.

THE COURT:  Yes.  I've already ruled that that is appropriate, so that is in evidence.

(Defense Exhibit Number 37 admitted into evidence.)

5

MR. O'CONNOR:  And we would like to publish it at this time, Your Honor.

THE COURT:  Go ahead.

MR. O'CONNOR:  Put it up for everyone, please.

This is a September 15, 2004, a memorandum from the Secretary of Defense.  It's a memorandum from the Secretary of the Army.  Subject:  Processing of claims by Iraqi detainees based on allegations of personal injury/abuse and mistreatment.

And the text says:  The U.S. Army has claimed responsibility in Iraq.  Because of the sensitivity of allegations of personal injury/abuse and mistreatment by Iraqi detainees, particularly at Abu Ghraib prison, I ask that the Secretary of the Army review all claims based on such allegations and act on them in his discretion.  Prior to his review, such claims will be investigated by a foreign claims commission under the Foreign Claims Act, 10 U.S.C. 2734, or investigated under other applicable claims statutes.

The report of investigation will include a thorough analysis of whether the claim is cognizable under the Foreign Claims Act or other claims statutes, whether the claimant is a proper claimant under the Foreign Claims Act or other claims statutes, and a recommendation regarding an appropriate amount of compensation, if any.

6

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

The report of the foreign claims commission, or investigation under other applicable claims statutes, should be forwarded to the Secretary of the Army.  If it is concluded that the claim is not payable under the Foreign Claims Act or other claimed statutes, the Secretary of the Army will identify alternative authorities under which compensation could be provided and either take such action in appropriate cases or forward the claim to the deputy Secretary of Defense via the general counsel of the Department of Defense with a recommendation of whether such payment is appropriate.  Signed by Donald Rumsfeld, Secretary of Defense.

Your Honor, we're about to play three pseudonymous tape-recorded depositions of interrogators who were associated with Plaintiff Al Shimari.  In advance of that, I'm going to publish some excerpts from the United States interrogatory response to Defense Exhibit 2.

THE COURT:  All right.  And, ladies and gentlemen, "pseudonymous" means we are not going to know the name of the person whose testimony you're going to hear.  All right.

And I believe there's going to be a demonstrative shown?

MR. O'CONNOR:  There will be a demonstrative shown, Your Honor.

THE COURT:  All right.  And a demonstrative is

7

simply -- it's not going to go in as evidence, but there's going to be a picture of the individual.  Not of the person who is speaking, but of the plaintiff for whom this testimony is directed; correct?

MR. O'CONNOR:  That's correct, Your Honor.

THE COURT:  And for relevance.  Okay.  Thank you.

MR. O'CONNOR:  If we can put up Defense Exhibit 2. And I ask -- these are the United States's responses to Interrogatories Number 1 and Number 2 of Defendant CACI Premier Technology.

THE COURT:  Any objection to Defense Exhibit 2?

MR. FARIDI:  No objection, Your Honor.

THE COURT:  All right.  It's already in, Your Honor, apparently.

MR. O'CONNOR:  I believe it is, Your Honor.

And if we could turn to page 3, please.

CACI's Interrogatory Number 1 to the United States asks:  Identify any interrogator who interrogated any plaintiff at Abu Ghraib prison.

Please turn to page 4.

The United States's response was as follows: Subject to and without waiving its objections, the United States identifies the following information.  On December 15, 2003, Plaintiff Suhail Najam Abdullah Al Shimari, Plaintiff Al Shimari, was interrogated by a CACI

8

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

interrogator assigned Field Reporter Number, FRN.  And that's redacted.  But this person is identified as CACI Interrogator A.  And an Army interrogator assigned FRN.  And redacted.  Identified as Army Interrogator B.

Let's go to page 6.  Interrogatory Number 2.  For each interrogator identified in response to Interrogatory Number 1, describe the facts relating to such interrogator's interactions with plaintiffs, including the specific conduct to which such interrogators subjected any plaintiff and the source of any direction under which the acts took place.

And let's move to page 7.  And the United States responded with respect to Plaintiff Al Shimari.  On December 15, 2003, CACI Interrogator A served as the lead interrogator, and Army Interrogator B served as the assistant interrogator/analyst in the intelligence interrogation of Plaintiff Al Shimari.  According to the interrogator's report and notes, the interrogation lasted 2 hours and 55 minutes.

And then there's some redactions by the United States.

And the next paragraph continues:  The interrogators reported using the -- it's redacted -- approaches in this interrogation.  More redactions by the United States.

Page 8.  In connection with the December 15, 2003

9

interrogation, CACI Interrogator A and Army Interrogator B were subject to the direction of the military chain of command, beginning with their military section leader, an Army non-commissioned officer, who was to be briefed both prior to and following the interrogation to ensure that the interrogators were focused on answering CJTF-7's priority intelligence requirements, human intelligence requirements, and source-directed requirements.

Their military section leader was also responsible for strictly enforcing the Interrogation Rules of Engagement, IROE.  From their military section leader, the interrogator's chain of command flowed through the military non-commissioned officer in charge, NCOIC, and officer in charge, OIC, of the interrogation and control element, ICE, to the military chain of command at the Joint Interrogation and Detention Center, JIDC.

Next paragraph.  No CACI personnel were in this chain of command.  While the CACI site manager at Abu Ghraib, Daniel Porvaznik, managed CACI personnel issues, and the ICE OIC relied on him as one source of information regarding the abilities and qualifications of CACI interrogators, the military chain of command controlled the interrogation facility, set the structure for interrogation operations, and was responsible for how interrogations were to occur during both the planning and execution phases.

10

Case 1:08-cv-00827-LMB-JFA    Document 1819    Filed 11/12/24    Page 11 of 112
Audio recordings - between Interrogator A and Interrogator B
PageID# 54839

Next paragraph.

The reported approaches used in this interrogation were authorized by the IROE.  There's a citation to a document.  The CJTF-7 interrogation and counter-resistance policy memorandum dated October 12, 2003, and Army Field Manual 34-52, September 28, 1992.  A summarized description of the approaches used in this interrogation follows.

Next page.  It's entirely redacted.

On the following page.  And the interrogatory response ends:  Oversight and the use of those approaches is provided by the interrogators, military section, and ICE leaders.

Your Honor, with that, we call by pseudonymous recorded deposition, CACI Interrogator A.

THE COURT:  All right.

(Audio recording played - Interrogator A)

MR. O'CONNOR:  Your Honor, at this time we present the pseudonymous deposition of Army Interrogator B.  The run time is about 14 minutes.

I neglected to provide the Court with clips from A, but I will send those with the clips from B, and the same to opposing counsel.

THE COURT:  All right.

(Audio recording played - Interrogator B)

MR. O'CONNOR:  Your Honor, at this time, CACI

11

presents Interpreter K by pseudonymous deposition.  This run time is just a minute and 16 seconds.

THE COURT:  All right.

MR. O'CONNOR:  We have quick notes for the Court.

(Audio recording played - Interpreter K)

MR. O'CONNOR:  Your Honor, at this time CACI calls Dr. Payne-James to the stand.

THE COURT:  All right.

THE COURT SECURITY OFFICER:  Good morning.  Come forward.  Raise your right hand.

Thereupon,

JASON PAYNE-JAMES,

having been called as a witness on behalf of the defendant and having been first duly sworn by the Deputy Clerk, was examined and testified as follows:

(Time noted: 10:40 a.m.)

THE DEPUTY CLERK:  Thank you.

THE COURT SECURITY OFFICER:  You may be seated.

MS. BAILEY:  May I proceed?

THE COURT:  Yes, ma'am.

DIRECT EXAMINATION

BY MS. BAILEY:

Q   Good morning, sir.  Would you please introduce yourself to the jury.

A   Good morning.  My name is Jason Payne-James.

12

Q    Where are you from?

A    I'm from the United Kingdom.

Q    How did you come to be involved in this case?

A    I was instructed by the law firm Steptoe on behalf of CACI.

Q    Okay.  Is there a demonstrative exhibit that would be useful to the jury in helping to understand your testimony today?

A    Yes, I think so.

        MS. BAILEY:  Okay.  If you would please -- if you could take that down.  Just for the witness.

BY MS. BAILEY:

Q    If you would look at your screen.

        Is this the demonstrative exhibit?

        THE COURT:  What exhibit number is it in the book?

        MS. BAILEY:  There's no exhibit number.  It's just a demonstrative, Your Honor.

BY MS. BAILEY:

Q    Is this a demonstrative, Doctor?

A    Yes.  This is the demonstrative.

        MS. BAILEY:  Thank you.  I would like to publish to the jury, Your Honor.

        THE COURT:  Any objection?

        MR. BUCHANAN:  No.  No objection.

        THE COURT:  All right.  You may do so.

13

Direct examination J. Payne-James

MS. BAILEY:  Okay.

BY MS. BAILEY:

Q    Professor Payne-James, are you trained in any professions?  I see a variable alphabet under your name.

A    Yes.  I'm a medical doctor primarily.  That was my initial training.  I practice as a doctor.

Q    Okay.  Are you trained in any particular specialties as a doctor?

A    In the course of my career, I've trained as a surgeon and as a gastroenterologist.  I've worked in acute medicine.  But for the last 30 years, my main work has been what's broadly called forensic and legal medicine.

And just for the Court's benefit, I am not a forensic pathologist.  I don't undertake autopsies.  I'm a forensic doctor who works predominately with the living.

Q    What education have you completed?

A    After senior school in the UK, we undertake, if we are wishing to become doctors, a five-year training to become a bachelor of medicine and bachelor of surgery.  That gives you the primary ability to act as a doctor.  And then subsequent to that, there may be many years of further training in particular specialties.

Q    Okay.  And what particular specialties have you had training in?

A    By virtue of my qualifications, I'm a trained surgeon,

14

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

a trained gastroenterologist, and I'm trained in forensic and legal medicine.

Q    Okay.

A    Those are represented by the qualifications listed after my name.

Q    Can you give the jury a brief understanding of your professional background?

A    Yes.  For the first ten years of my career, I worked in public hospitals in the National Health Service in the United Kingdom.  And after about ten years, I moved into the area of forensic and legal medicine, using some of the skills and competencies I had learned in my previous ten years.

So for the last 30 years or more, I've worked in the forensic and legal medicine field, which predominantly relates to, for example, criminal courts, coroners courts, which are the England and Wales means of medical/legal investigation of death.  But other court settings where medical evidence is needed to be interpreted for the legal system.

Q    Have you authored or edited any publications related to forensic medicine?

A    Yes.  I published a number of books.  I've authored and co-edited a number of books, some of which are seen on the screen.

15

Q    Have any of your publications ever been cited by U.S. courts?

A    Yes.

Q    What experience do you have evaluating detainees?

A    Probably the last 30 years or so of my career has predominately been involved in assessing people, perhaps in custodial settings, whether in short-term custody, such as police; sometimes in longer-term custodies such as prison settings; and sometimes in security settings.  And that kind of work will involve simple medical care for people who've got the conditions that many of us might have here like diabetes or asthma.  But then also specifically in relation to the legal system, and, for example, documenting injury in both complainants of and people who have been arrested in connection as possible suspects in a crime.

Q    All right.  Have you done any work related to assessments of patients who claim torture, cruel, inhuman or degrading treatment?

A    Yes, I have.

Q    How many?

A    Probably into the thousand or so.

        The nature of my work within the criminal justice system is that many of the patients that I see within that setting may have, for example, refugee or asylum backgrounds where they may have been subject to some forms of abuse.

16

But then there's a specific group where we may be specifically asked to assess accounts of torture or cruel, inhuman and degrading treatment.

Q Would you please refer to Exhibit -- Defense Exhibit 101 in your binder, and tell me if you recognize that document.

THE COURT: Is there any objection to Defense 101?

MR. BUCHANAN: Yes, Your Honor. Relevance.

THE COURT: Well, it's the curriculum vitae. We always, for expert witnesses, allow that to come in. Overruled. It's in.

(Defense Exhibit Number 101 admitted into evidence.)

MS. BAILEY: Thank you, Your Honor.

BY MS. BAILEY:

Q Have you ever testified in court?

A Yes.

Q Okay. How many times?

A Thousands of times.

Q Have you ever testified in a U.S. court?

A No.

Q Okay. Has any court ever rejected or excluded your evidence?

A Not that I'm aware of.

MS. BAILEY: Your Honor, at this time I would like to offer Professor Payne-James as an expert in forensic

medicine and injury causation.

MR. BUCHANAN:  No objection, Your Honor.

THE COURT:  All right.  He is so qualified.

BY MS. BAILEY:

Q    Sir, what instructions did you receive for your work in this case?

A    I was requested by Steptoe to undertake three elements of an assessment.  To examine Mr. Al-Zuba'e and Mr. Al Shimari, and to the extent possible -- and I'm reading this, as you can see -- to determine whether there are allegations of mistreatment that can either be verified or rebutted.

Q    So let me pause you there.

With respect to that first instruction, were you able to examine Mr. Al-Zuba'e and Mr. Al Shimari?

A    Yes, I was.

Q    When?

A    I examined them on the 13th and the 14th of February of this year.

Q    Where?

A    In Kuala Lumpur in Malaysia.

Q    Were you able to develop any opinions related to their allegations of abuse?

A    Yes, I was.

Q    Were you able to make any determinations -- or I guess did you make any determinations with respect to the

18

credibility of their allegations?

A    No.  That's the function of the Court.  I provide evidence that the Court and the jury can interpret.

Q    What was your second instruction?

A    My second instruction was to determine both Mr. Al-Zuba'e and Mr. Al Shimari's current condition and their prognosis.

Q    Were you able to make that determination?

A    To a degree, yes.

Q    Regarding your last instruction, what was your last instruction?

A    My last instruction was to evaluate the examinations and reports of Dr. Steven Xenakis.

Q    So because Dr. Xenakis has not testified in this case, we'll only discuss his examination and report to the extent you relied on them in rendering your opinions; do you understand that limitation?

A    I understand.

Q    Are you being compensated for your participation in this case?

A    Yes, I am.

Q    What is the compensation for?

A    The compensation is for the worked involved on a daily rate and an hourly rate.

Q    Was there a different rate for going to Kuala Lumpur to

19

do the examinations?

A    Yes.  I can't be precise about the rates, but, for example, about two and a half thousand pounds sterling per day would be my daily rate.

Q    Does the fact that you've been paid to render your opinion in this case affect your opinions in any way?

A    No.

Q    Why not?

A    The duties of an expert, certainly in the United Kingdom, are very well laid out, and those are that your duty is solely to the Court -- to the Court to whom you're presenting the evidence.  So irrespective of who has instructed you or who has paid you, your findings should be independent of that.  And so whether it's a compensated case or a pro bono case, the evidence I give by whom -- irrespective of whom has instructed me will be the same.

Q    What would it mean for your work if you were to allow bias to affect your opinions?

A    Well, that aspect of my expert work would dry up very quickly.

Q    Okay.  Did you use any particular process to evaluate Plaintiffs Al-Zuba'e and Shimari in this case?

A    Yes.  And on the screen, you can see an image of what's called the Manual on the Effective Investigation and Documentation of Torture and Cruel, Inhuman and Degrading

20

Treatment.  The short form name for that is the Istanbul Protocol, which is where the initial edition of this in 1999 was developed.

In the last couple of years in 2022, a second edition has been published and updated over the years.  And the Istanbul Protocol is a means by which torture, cruel, inhuman and degrading treatment can be evaluated to present evidence to a Court that can then make a determination of findings.

Q    Did you contribute at all to the current version of the protocol?

A    Yes, I did.

Q    How?

A    My area of expertise in particular relates to injury, causation and documentation of injury.  Chapter 5 of the Istanbul Protocol addresses those issues, and I was one of the editors and co-authors of that chapter.

Q    Did you do anything with respect to Annex 3?

A    Annex 3 is the anatomical drawings.  These are body diagrams that people may use when trying to annotate or identify, note down findings.  I then created those images for the -- those body diagrams for this version of the Istanbul Protocol.

Q    Did you conduct a full assessment under the protocol in this case?

21

Direct examination - J. Payne-James

A    Under the protocol, I conducted I would say a partial assessment in that I undertook a physical assessment of Mr. Al Shimari and Mr. Al-Zuba'e.

Q    Okay.  What would it be if it were a full assessment?

A    The full Istanbul assessment generally used a psychological or psychiatric assessment as well.

Q    Okay.  Is it common or uncommon for you to complete just the physical examination?

A    It's very common for me just to complete a physical examination, because I'm not a trained psychologist or psychiatrist.

Q    Let's talk through the procedure for an examination under the Istanbul Protocol and how you used it here.

What's the first step?

A    One of the first steps is often if the person that you're examining's first language isn't English is to make sure that you've got an appropriate interpreter who you can rely on to provide unfiltered and appropriate translation of your questions and the responses of that individual back to you.

Q    Was there an interpreter in this case?

A    Yes.  There was an interpreter in this case who provided those functions.

Q    Did you give the interpreter any instructions?

A    Yes.  The interpreter was -- having introduced himself

22

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

to me was asked very clearly to say that when you're translating on my behalf, if I am asking questions, or, for example, Mr. Al Shimari is responding to my questions, to give a direct and unedited, as it were, translation so that I know exactly -- Mr. Al Shimari, for example, will know exactly what I am asking, and that the response to whatever I have asked is an accurate response back from Mr. Al Shimari.

Q    What's involved in getting consent?

A    Consent is a general principle used in all medical care.  But, in essence, it's allowing the person to consent to whatever you want to do.

In this case, it's important that in terms of the information provided and consent, that both Mr. Al Shimari and Mr. Al-Zuba'e understand what the purpose of my examination is, who I am doing it on behalf of, and what the outcome of that examination will be.

So they will be asked -- they will be told who I am, what I am doing the examination for.  And I will then also say that I will produce a report that may include photographs of marks or scars on your body.  That will be created into the report that may be reviewed by non-medical professionals, by legal professionals, by judges, by juries and others as part of the court case.

Q    Was there anything noteworthy of plaintiffs' consent in

23

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA   Document 1819   Filed 11/12/24   Page 24 of 112
Direct examination of J. Payne-James
PageID# 54852

this case?

A    Generally I asked for written consent so that I have a signature.  And at the time that I was asking for consent, it was raised by Mr. Al Shimari and Mr. Al-Zuba'e, they didn't wish to give written consent, but they would give verbal consent.  And they discussed this with their legal team who were present, not within the examination, but nearby.

Q    Do you do anything to make patients comfortable when you're doing an examination of this sort?

A    Yeah.  When undertaking an examination, people are often embarrassed or ashamed or upset about the nature of the examination and the reason for why it's being done.  So it's absolutely essential to ensure that the individual is as comfortable as possible.  And that means if you have the ability to be in a room that's comfortable, with comfortable seats, there's no distractions, and that they're fully aware that if part of the examination or taking the history that's asking the questions, if they become uncomfortable, it's entirely up to them to say I don't wish to go on, or I don't wish to answer that question, or I don't wish to proceed. So it's made very clear that the individuals being examined, that they have control of what is happening to them.

In terms of the physical examination, the essence of undertaking any examination of somebody -- somebody's

24

perhaps intimate regions, or perhaps their arms, legs, is to maintain dignity to avoid embarrassment.  And, again, all the time maintain consent.  So if somebody is being examined, they will have blankets or clothes that are removed part of the time, and not, for example, lying there naked while an examination is being done.  It's crucial to ensure the person being examined, the patient being examined, is comfortable and unembarrassed.

Q    Did you have any sense whether the plaintiffs in this case were comfortable during your examinations?

A    Yes.

Q    How did you get that sense?

A    The -- throughout the examination, they were extremely cooperative and raised no concerns, and had they done so, I think there was a couple of restroom breaks, but apart from that, there were no concerns raised by them, the interpreter, or anyone else.

Q    After the introductions are over, what do you do next?

A    The next thing that we do, having gotten consent and agreed to move on, is to take the history to find out what's happened to them.  And, by that, we take a bit of background about their general information, their circumstances, their religion and first language.  We ask about family setting, about previous work, about any medical health problems. We'll go through past medical events.  And we then go

25

through a systemic history, asking, for example, about whether there are any heart conditions or respiratory conditions or skin conditions.  This is all done in a structured manner.

Q    When you are doing this sort of interview, what is your practice for recording what the person says?

A    It would depend where the assessment is being undertaken.  If it's in a -- for example, in a room where there's electricity and you can use a laptop, then I take an account directly onto my laptop.  Sometimes we're not able to do that, we may be examining somebody in a cell, in a prison where there are prison guards who won't allow you to bring in, for example, cameras.  So you adapt to the local circumstances.

In Mr. Al Shimari and Mr. Al-Zuba'e's case, we were able to have full facilities where I was able to use my laptop.  So I document everything directly onto a laptop.

Q    Was there anything of note in either man's background that might explain any of the marks on their bodies or the symptoms that they mentioned to you?

A    Well, when we're taking a history, there are a number of things, because we're anticipating -- because we haven't examined the individuals at this point -- what might account for anything that we do find in terms of physical injury marks or scars.  So it's important to know people's

26

employment background.  And I think in both Mr. Al-Zuba'e and Mr. Al Shimari's case, both had periods of time when they were either farmers or looked after livestock or were working in agricultural settings.  Sports.  If people are active sports people working particularly in -- or playing in contact sports, people may often have injuries as a result of those.

So we're looking for things within their background that may have caused injuries or visible marks so that we can explain what those are and separate them from other marks or scars or lesions that we find.

Q    You pointed out the background work in livestock -- working with livestock.

Why is that significant?

A    Well, I mean, animal -- it would depend, I suppose, who's from a rural background or not.  But I think if you're working or living in a rural setting with animals or with plants, then people get scratches, they get bitten, they get -- a number of things that may happen.  But these may account for some findings.

Q    Okay.  Was there anything in particular about Mr. Al Shimari's background that could account for physical markings on his body?

A    Mr. Al Shimari didn't have any preexisting illnesses, but he had previously been, I think for 12 years, a

27

Case 1:08-cv-00827-LMB-JFA    Document 1819    Filed 11/12/24    Page 28 of 112
Direct examination of J. Payne-James
PageID# 54856

reservist in the military, and he had been -- he had actually been hit by shrapnel when a bomb went off in 1987 it was. And that resulted in him being hospitalized in a military and then a civilian hospital. So that, again, shrapnel will create marks and injuries.

Q    For the background, did the time period that you inquired about cover just the time period prior to Abu Ghraib, or did it also cover the time period after release until your examination?

A    It's up to the date of your examination. Because what you're trying to do is to identify things that may be relevant to detention and separate those from the things that happen in every day life, like accidents or falls or in a sports-related injury.

Q    What did Mr. Al Shimari tell you about his work after his release from Abu Ghraib?

A    Mr. Al Shimari became a teacher after he was released from detention. He became a mathematics teacher. His basic degree was mathematics.

Q    And then did he ever get promoted?

A    I think two years before I saw him. So this year he had become a school manager.

Q    And so if he was released in 2008, are you saying he became the school manager in 2022?

A    Around about then, I would guess.

28

Q    Why is a complete medical history important?

A    A complete medical history again is similar to the employment in sports history.  What you're trying to do is find out whether somebody has conditions that may have resulted in marks or scars that are separate from the detention or the alleged abuse issues.  So the kind of things that may produce marks or scars include skin diseases.  For example, psoriasis, dermatitis, these may cause marks and scars that people have on their body.

Q    What did Mr. Al-Zuba'e report in terms of seeking medical treatment since his time at Abu Ghraib?

A    I don't think Mr. Al-Zuba'e had any medical treatment.  I think apart from being assessed by Dr. Xenakis, I don't think he had any other medical treatment.

Q    What did Mr. Al Shimari report in terms of seeking medical treatment since his time at Abu Ghraib?

A    Mr. Al Shimari had a diagnosis of diabetes, and so he made reference to seeing his diabetic specialist from time to time.

Q    And then does there come a point where you inquire about the specific allegations?

A    Yes.  You then ask for a sequential as far as that person can do.  And it's very important to say to people that the precise dates and times are not what I'm looking for.  What I'm looking for is to understand what happened to

29

you in your own words from the time of your detention onwards. And you allow people to tell you their story. Occasionally you might prompt them to move on a bit if they retrace their steps. But throughout the course of taking the history, you're allowing them to give you their account of what happened to them.

Q    And did Mr. Al-Zuba'e and Mr. Al Shimari both give you their accounts?

A    Yes.

Q    I'd like to ask you a few questions about what Mr. Al-Zuba'e told you.

Did Mr. Al-Zuba'e tell you about anything that occurred inside a computer building?

A    The computer building was where he was first taken, and he specifically said to me he wasn't hurt or injured there.

Q    Okay. Did Mr. Al-Zuba'e describe anything happening when he arrived at the cellblock generally?

A    Mr. Al-Zuba'e was hooded I think from the point of the cellblock, and then he was threatened, and he was aware of dogs, and things were being thrown into his cell and all that. He was hooded; he couldn't tell what they were.

Q    Did you get a sense of the time frame for how long Mr. Al-Zuba'e was hooded from when he was first taken to the cellblock?

A    Yes. I think it was overnight. And then at sometime

30

Case 1:08-cv-00827-LMB-JFA    Document 1819    Filed 11/12/24    Page 31 of 112
PageID# 54859
Direct examination of J. Payne-James

the following day, his hood was removed, and then later in the afternoon, he was taken I think for questioning.

Q    I'd like to ask you a few questions now about what Mr. Al Shimari told you about his allegations.

Did Mr. Al Shimari describe anything about his detention by coalition forces prior to arriving at Abu Ghraib?

A    He was put into the back of a truck with a number of other people that were laying on top of each other, and he considered he had had some damage to his left side.

Q    What, if anything, did Mr. Al Shimari tell you about being hooded at Abu Ghraib?

A    Mr. Al Shimari said that he was hooded but that stuff was put in -- or he was covered with a sack, and stuff was put into the dirt, and debris was put into that hood when it was placed over his head.

Q    What was the time frame that he said that he experienced this hooding?

A    This was intermittently for the -- I think throughout the year at Abu Ghraib, but predominately in the first four months he said to me.

Q    So he said he was hooded for the first -- periodically for the first four months?

A    Yes.

Q    All right.  Did Mr. Al Shimari ever describe being

31

handcuffed in his cell to you?

A    Yes.  He was handcuffed to the top of his bunk.

Q    Okay.  I'd like to show what's been already admitted into evidence as Plaintiffs' Exhibit 195.

Does this exhibit match what Mr. Al Shimari told you about the position in which he was restrained?

A    Yes.

MS. BAILEY:  Let's take that down.

BY MS. BAILEY:

Q    When conducting an interview of a patient either alleging torture or CIDT, would you ever just show them a picture and say:  Is this what happened to you?

A    I wouldn't, no.

Q    Why not?

A    Well, it could affect their account.  It may alter their accounts.  It may forget concerns of them, and it may not represent what happened to them.

Q    And when you say alter their account, is that a concern for accuracy?

A    Yes.  I mean, the reliance needs to be on what that person records rather than what you suggest to them, and that's what I'm -- we're taking a history and very weary of you don't suggest to people what might have happened to them, how this might have happened.  You rely on what they tell you.

32

Q    And then prior to your physical examination, do you have patients describe to you where their injuries are?

A    Yes.  Once you've established the, as it were, the narrative or the chronology of the detentions and what happened, you ask specifically are there any chronic or enduring in somebody who -- where these things have happened some time ago, are there any symptoms that you have that you relate to your time in detention or any marks or scars, and you ask them to detail those.

Q    Did Mr. Al-Zuba'e complain to you that because of his treatment at Abu Ghraib, he had difficulty raising his arm?

A    No.

Q    We'll get a little bit more into the physical examinations in a minute.

But just on this issue, did you assess the mobility of his arm?

A    Yeah.  It's -- part of the routine assessment of anyone physically is to look at their musculoskeletal system, which, in essence, means the power and the movement of their arms and legs.

Q    Okay.  Did you find any abnormalities, or did Mr. Al-Zuba'e show any difficulties in raising his arm?

A    No.

MS. BAILEY:  All right.  I'd like to show what's been previously admitted as Plaintiffs' Exhibit 161C.

33

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

BY MS. BAILEY:

Q    Did Mr. Al-Zuba'e ever tell you that he was handcuffed in this position?

A    No.

MS. BAILEY:  You can take that down.

BY MS. BAILEY:

Q    Once the interview is complete, what happens next?

A    The physical assessment -- sometimes we just say would you like a break, do you want a coffee or a tea, and then we'll go on to take -- do the -- undertake the physical examination, because that is done in stages.

And you undertake basic medical findings like pulse, blood pressure.  You look at the skin to see whether there's any anemia or jaundice.  These are the kind of examinations that you would do in any setting.  And then you specifically look at areas such as the skin, the face and the head, the eyes, the nose, the throat.  You look at the mouth, look at the teeth, and then you look at the chest and the abdomen.

By looking, I mean, you're looking first to see if you can see any abnormality.  And you palpate, you use your hands to feel if there's any abnormality.  And then you move onto the musculoskeletal aspect of an examination.

I'm shortening my account, but that involves checking the movement, identifying any abnormalities that

34

may be drawn to your attention by, in this case,

Mr. Al Shimari or Mr. Al-Zuba'e.

We look at the -- we do a genital examination,

with consent, particularly if there's been any allegation of

genital damage.  And we then after that, we'll undertake

photography of those areas that have been identified as

being abnormal or sharing marks that need to be recorded.

Q    When you take photographs, is there anything in

particular that you use with the photographs?

A    Yeah.  Undertaking photography or marks or scars on an

individual is really important.  There are three elements to

it.  For each mark or scar that you see, it is appropriate

to take a distance image so that you know what you're

looking at.  Sometimes it may be small so you don't take a

close-up.  You take a distance image so you know, one, where

the particular abnormality is.

Secondarily, you take a more close-up image of the

mark that you're looking at.

And thirdly, and most importantly, you take an

image of that mark, but with a ruler and a color scale so

that when the images are being reviewed, for example, in

court or by other healthcare colleagues, there is a good

understanding of whether or not this is an accurate

reproduction and identification of what you're seeing.

Each mark or scar, there's a written description

35

of what that is.  That may be supplemented -- not always, but sometimes -- by body diagrams.  But if you have access to photography, the photography supplements and corroborates the written description.

THE COURT:  All right.  I think at this point we're ready for the mid-morning break.  We'll be on recess until 11:35.

(Jury not present at 11:14 a.m.)

THE COURT:  All right.  We'll bring the jury in.

THE COURT SECURITY OFFICER:  Yes, Judge.

Rise for the jury.

(Jury present at 11:37 a.m.)

THE COURT:  Folks, how is it in the jury room?  Is it too cold, too warm?

THE JUROR:  It's good.

THE COURT:  You're smiling.  We'll try to get it adjusted.

THE JUROR:  The window blinds with the sun coming in.  It's cooler in here than it is in there.

THE COURT:  All right.  We're going to try to get it a little bit more comfortable in here.  All right.  It takes a while.

Go ahead.

MS. BAILEY:  Thank you, Your Honor.

Can we please bring back where we were on the

36

slide show.  Thank you.

BY MS. BAILEY:

Q    I think we just concluded, Dr. Payne-James, talking about the physical examination.

Now I'd like to ask, are there any other sorts of materials that you would consider in this kind of examination?

A    The kind of materials that you might consider in any particularly non-recent assessment is if there are previous medical records, previous dental records, and then sometimes other information, other evidence which might include family photographs prior to when somebody's been injured.  There's a range of materials and documents that you may be able to have access to.

Q    What would be the purpose of having an old photo?

A    The purpose of an old photo may be -- you may be able to corroborate when somebody didn't have an injury, and then subsequent to that, that they had it.  But those are the kind of things.  It's corroboration often of things that might have happened previously or sharing that something wasn't there at a particular time.

Q    Were there any medical records for either plaintiff that you considered in this case?

A    Mr. Al Shimari, within his detainee record, had a limited amount of medical records which related or just

37

indicated that he had had a dental assessment, that he'd also been subject to the shrapnel injury, and he just noted that, and that he'd had what's called an umbilical hernia, an abdominal hernia.

Q   Did you consider any other expert assessments in your evaluation?

A   I had access to Dr. Steven Xenakis's reports from January 2013.

Q   Did you take them into account or rely upon them at all when you formed your opinions?

A   I didn't rely upon them.  The recording of the physical aspects of the abuse, which is my main area, was, in my view, not detailed enough.  It didn't clarify exactly what he was describing and showing.

Q   Okay.  Did you have any concerns, you know, just based on your knowledge of psychiatric or psychological evaluation about what you saw in that part of the evaluation?

A   Well, to emphasize, I'm not a psychologist or psychiatrist, but I often see psychology and psychiatric reports.  Dr. Xenakis did note himself in, I think both Mr. Al-Zuba'e and Mr. Al Shimari's report, that he hadn't undergone or he had deferred psychological instruments, which are often part of a full psychological assessment, which quantified, to some extent, the degree of problems that somebody may have.  But he noted in both reports that

38

he had deferred that.

Also, in 2013, was the time when what's called the Diagnostic and Statistical Manual of Mental Diseases change from what is briefly known as DSM-IV to a new version, and that happened that year.

So his documentation of the findings that he had made were based on the DSM-IV, the previous iteration, and so it wouldn't be a current assessment because we now use the DSM-5.

Q    Did you conclude you were not able to rely on his assessment?

A    Yes.  I can sometimes use additional assessments, particularly if there are areas where something is documented very clearly.  But I wasn't confident that they assisted me.

Q    Okay.  In this case, were you provided other materials that you did not take into account when you formed your opinions?

A    I was provided with depositions and interrogatories, other accounts from both Mr. Al Shimari and Mr. Al-Zuba'e. But for the purposes of my assessment, I'm really reliant upon my own structured interview, my structured assessment, which, again, uses the principles of the Istanbul Protocol, which work well and then can be interpreted by others.

Q    Did you note any inconsistencies between what

39

Mr. Al-Zuba'e and Mr. Al Shimari told you and what they said in other settings?

A    Yes.  There were different accounts.  I didn't do a specific analysis of all the differences.

Q    Okay.  But does that affect your evaluation?

A    No.  For me, it's important for me to make sure that the history that I'm getting, that I've done it in what I believe is the appropriate way.  That I put Mr. Al Shimari and Mr. Al-Zuba'e in a position that they feel confident that they can relate exactly what happened and raise the relevant issues.

Q    Let's talk a little bit about the opinions and conclusions that come out of your examination.

Medically, what do you do with respect to a patient you've encountered?

A    Medically, you try and relate what somebody has said has happened to them, to marks that they may say have happened as a result of that particular action or actions. And you relate to what you find with your physical findings. So you're relating the history to the physical findings and determining whether or not that was caused in that way or not.  And, for many injuries, many marks and many scars, they're what we call non-specific.  You can't say that was definitely caused in that way, or what was definitely caused in another way.  There's a range of possibilities.

40

Q    What about if you note some sort of condition that needs to be addressed in that particular plaintiff or patient?

A    If there's a medical condition that -- whenever we're seeing patients -- and I use the term "patient," because I think medically that's really important for us just to consider that however we're examining somebody, whatever setting, you consider people are patients, and you're endeavoring to make sure that you can establish a relationship and get a rapport.

But it's important that if people do raise things which are unrelated to the particular instructions, for example, that I've been given to assess physical injury, that I identify that and make recommendations.

Q    Did you make any recommendations with respect to Mr. Al-Zuba'e in this case?

A    Mr. Al-Zuba'e I noted had a consistently elevated blood pressure during the course of the examination.  Now, raised blood pressure is not unusual in settings of stress or anxiety.  I mean, my blood pressure is probably raised now.  But in terms of somebody who you are examining over a period of time, when things have calmed down and settled down, his was persistently higher to a level that would give me concern that it would put him, if prolonged, at increased risk of, say, stroke or heart attack.  So within my report,

41

I recommended that he should be urgently reviewed with regard to his blood pressure.  I was, of course, seeing him in a setting where I don't have access to be able to refer to specific individuals.

Q    Did you relate his high blood pressure in any way to his treatment at Abu Ghraib?

A    No.  Blood pressure is very, very common.  He's a 51-year-old male, moderately obese.  Blood pressure -- high blood pressure is not unusual.  Stress and anxiety acutely can raise blood pressure, but I felt that this was -- throughout the course of my examination I repeated it.  It was constantly elevated.

He had other symptoms to do with his eyes and feeling dizzy, which, again, might have related to that.  So I take that all into account.

Q    So you said the dizziness and the eyes you related to the blood pressure --

A    I --

Q    -- potentially?

A    I can't exclude that it wasn't part of the blood pressure or Mr. Al-Zuba'e related it to his time in detention.

Q    Did you assess any symptoms for which you made recommendations with respect to Mr. Al Shimari?

A    Mr. Al Shimari had a number of issues.  The two most

42

significant ones I think for him were very much that he had lost most of his teeth.  He had two remaining teeth.  Now, he attributed that to his time within Abu Ghraib, within his time of detention.  But I note that when Dr. Xenakis saw him in 2013, most of those teeth were present.  So his concern was that -- and the point that he made to me was that his teeth and the fact that he had ill-fitting dentures meant that he couldn't enjoy meat, which was a sadness for him which he commented upon.

The other thing that he made reference to, and he was very aware that this would be discussed and reflected upon, was that a loss of libido and erectile dysfunction, which he attributed to his time in detention.

And I also recommended -- because he had, more recently, developed urinary symptoms, and I recommended that he needed, with regard to his urinary and erectile dysfunction issues, to see a urologist, somebody who specializes in that field.  And for his teeth, I felt that it would be appropriate for him to see a dentist or odontologist.

Q    Did you relate either of those concerns to his treatment at Abu Ghraib?

A    He related them to his treatment at Abu Ghraib.  For me, erectile dysfunction, urinary symptoms in men of his age, my age, is not uncommon at all.  And there are many

43

factors for that, which is why it requires a specialist assessment. Psychological issues can cause erectile dysfunction, but tend not to cause urinary dysfunction.

Q   Okay. Does the Istanbul Protocol provide a system for evaluating the physical findings that you made?

A   Yes. And the reason the Istanbul Protocol, or the approach that the Istanbul Protocol uses has largely been adopted widely in criminal courts, is that it gives, as I think I alluded to just now, a degree -- how you can assign not a likelihood, but a consistency of how consistent something is with the account that you've been given. And there are five levels of consistency listed within the Istanbul Protocol. And, for example, I used those commonly in my day-to-day work in the criminal setting.

Q   Okay. Let's walk through those consistency levels a bit.

What does it mean if something is not consistent?

A   If it's not consistent, it simply means that it couldn't have been caused in the way that the person says.

Q   Okay. What is diagnostic of?

A   Diagnostic means that that is the only way it could have been caused, and there's no ambiguity about its cause. If the person says such-and-such was caused in this way, the examination confirms that that's the only way it can be caused.

44

Q    Could you give an example?

A    I suppose the best or simplest example if somebody's been slashed across the face with a knife -- with a razor blade, there is a linear mark, a clean linear mark, and you have the blade -- the blade with the DNA on it.  You have a healed or a fresh incise wounds.  Those are pretty diagnostic, those kind of injuries.

Q    Okay.  So those are the two bookends of the consistency level.

Let's talk about what consistent with means. That's Level 2.

A    Yes.  Consistent with means that the physical findings -- in terms of the physical findings, what I see the mark or the lesion I see, could have been caused in the way that, in Mr. Al Shimari or Mr. Al-Zuba'e's case, say that it was caused.  But there are many other causes.  There are many other ways in which that could have been caused. And that's often when the injury, when you look at it, is non-specific.  So you can't say there's a particular shape or a pattern that has caused this.

Q    Okay.  Is it fair to say that that's the lowest level of correlation possible between a physical finding and an allegation?

A    It's the fourth level on the five levels, yes.

Q    And when you say something is consistent with an

45

allegation, does that mean you're saying it happened that way?

A    No.

Q    Okay.

A    I'm saying that it's consistent with it, so it could have happened in that way.

Q    Did you complete this evaluation for each of the physical markings that either you or Mr. Al-Zuba'e identified that possibly related to his treatment at Abu Ghraib?

A    Yes.

Q    Okay.  What were your conclusions with respect to those physical findings individually?

A    Individually, the findings that I found following taking the history from both Mr. Al Shimari and Mr. Al-Zuba'e, were that they were consistent with the accounts that they gave.

Q    And so they could have been caused by -- if I understand right, that means they could have been caused the way that he said, but there are also many other explanations?

A    Yes.

Q    Okay.  Could considering multiple physical findings that are consistent with allegations all together raise the consistency level for your overall evaluation?

46

A     Potentially they could, yes.

Q     Okay.  Did it in this case with Mr. Al-Zuba'e?

A     No.

Q     Why not?

A     Because there was a relatively few number, and they want a large number.  And they were most likely different in the way in which the accounts were given of how they were produced.

Q     Did you do the same sort of evaluation for each of the physical markings that either you or Mr. Al Shimari identified as potentially related to his time at Abu Ghraib?

A     Yes.  In both cases.

Q     Okay.  And what were your conclusions with respect to the physical findings individually for Mr. Al Shimari?

A     For Mr. Al Shimari, again, I felt that the findings individually were consistent with the account he gave, but there were other possible causes.

Q     How many other possible causes?

A     Well, the term in the Istanbul Protocol uses the term "many," and I think we use that in the term of however each of us in the court would use the term "many."

Q     So sort of your normal understanding?

A     I think a normal understanding is not assigned a particular number.

Q     Okay.  When you put all of Mr. Al Shimari's physical

47

findings together, did that raise the consistency level at all?

A    No.

Q    Okay.  Why not?

A    Because, again, it didn't -- there weren't any significant enough findings that I was able to say that I felt that this was highly consistent.  And perhaps it's important to say that the next level is highly consistent, meaning there are few other explanations.

When you have non-specific findings, it's often -- there is so many different possibilities of how injuries were caused and how they might leave persistent or residual marks or scars, that the possibilities are endless.

Q    For either plaintiff, did you have any additional information that was available to you that, in your judgment, raised the consistency level?

A    No.

Q    Why not?

A    Why not?

Q    What sorts of additional information could have done that?

A    Well, a psychological assessment could have done, medical records could have done, visual evidence, such as video of abuses happening.  Those kind of things are all things that may influence the outcome of what you see.

48

Case 1:08-cv-00827-LMB-JFA    Document 1819    Filed 11/12/24    Page 49 of 112
Direct examination of J. Payne-James
PageID# 54877

But then again, the determination become --
reverts back to that of the Court.

Q    To be clear, does the fact that neither plaintiff's markings could be -- excuse me.

To be clear, does the fact that neither plaintiff's markings got a consistency rating higher than consistent with mean that you are concluding their allegations are false?

A    No.

Q    Okay.  Why doesn't it mean that?

A    It's not for me to conclude what the allegations are; that is the function of the Court.  I put the evidence to the best of my ability for the Court, and the Court uses that with other evidence that's been presented to make that determination.

Q    Okay.  And even if they had no markings whatsoever, would that, under the protocol, disprove what they say?

A    No.  Many abuses, in the same as any injuries anyway if I -- I sometimes use the example if I come up and punch each member of the jury with different force --

Q    Please don't.

A    -- some people may have a fractured cheekbone, but others may have no visible marks.  So there's a range of particular injuries, so people can be abused and assaulted and leave no visible marks.

49

Q    Okay.  If you saw the markings you saw on Mr. Al-Zuba'e and Al Shimari outside the context of a forensic examination, just in a clinical setting, would you be concerned that patient had been the victim of abuse?

MR. BUCHANAN:  Objection.

THE COURT:  I'm going to sustain that objection.

BY MS. BAILEY:

Q    Okay.  Given the consistency level, I don't know that we need to go through every physical finding, but I'd like to take a look at a few to give the jury an idea of your process.

Would you please look at your binder at Defense Exhibits 106 to 109.

THE COURT:  Are you going to move all those in?

MS. BAILEY:  Yes, Your Honor.

THE COURT:  Any objection?

MR. BUCHANAN:  No objection.

THE COURT:  All right.  They're all in.

(Defense Exhibit Numbers 106 through 109 admitted into evidence.)

THE WITNESS:  Sorry.  Which exhibit is this?

MS. BAILEY:  106, 107, 108 and 109.

THE WITNESS:  Have I got -- have I got these in this bundle?

THE COURT:  They should be at the very back of the

50

very large volume.

THE WITNESS:  Thank you.

THE COURT:  We could also have you put them on the --

THE WITNESS:  Thank you, Your Honor.  I think the tabs were hidden.

THE COURT:  Also, it should be on the screen.

MS. BAILEY:  Yes, I will put it on the screen.

THE WITNESS:  Thank you, Your Honor.  It is also on the screen as well.  I'm drowning in data.

Yes.

BY MS. BAILEY:

Q    So on the screen, do you recognize those pictures?

A    Yes.

Q    Thank you.

So could you explain to the jury what the picture on the left shows?  And I believe that's Mr. Al-Zuba'e.

A    Yes.  So that's Mr. Al-Zuba'e's right wrist, this side of the wrist.  And I'm pointing at where it is on my hand.

And lighting is very important when taking photographs.  And specifically with this image, I've lit it so that you can see that there is a lump, and there is a mass just -- that's about 3 by 2 centimeters in diameter. And it's associated with where -- with the wrist.  And Mr. Al-Zuba'e said that he had been handcuffed or tied

51

around the wrist on a number of occasions.

Could that be caused by trauma to the wrist?  The answer is yes.  Because that lump, when the arm was elevated, would drain, which means it would go flat, it would mean that it was a vascular, and, in particular, a venous problem.  It's a collection of blood caused by damage to the veins around the wrist.  And that's almost certainly been caused by damage to the valves in the veins, which is why when the arm is lifted it drains when it goes above the level of the heart.

That is a finding that I've not seen before in handcuffs, but it could be caused by trauma to that region, including by handcuffs, because the valves of the vein underlying that lump have been damaged in some way, probably by trauma.  That's the only ...

But that trauma could be an impact of a fall, falling onto an outstretched hand.  There are many ways -- an impact from something else.  No account was given such as that.  But in terms of how a lump like that appears, that is consistent with Mr. Al-Zuba'e's account, but there are many other causes.

And in terms of handcuffing and restraint or zip tying, which I have seen thousands, I've not seen an injury like this before.

Q    Okay.  Could you please explain to the jury what the

52

picture on the right shows?

A    Yes.  The picture on the right is Mr. Al Shimari's outer right ankle just over the lumpy bit of his ankle joint.  And that's a round -- it's about a centimeter in diameter, but it's a thickened area of the skin that breaks down from time to time and bleeds and -- maybe if he's wearing shoes or boots that rub against his -- the bone of his ankle.

The nature -- the appearance of that is that it's what we call a granuloma.  It's something that has become chronically inflamed, and it fibroses and then heals up and the breaks down again if there is trauma to it.

He -- so that first appeared after he had been shackled around his ankles, which is the account that he gave to me and that it had remained there ever since, and certainly that is a possibility.

But any injury to the ankle, a kick from somebody else, a fall could result in that kind of granulomatis repeat and recurrent breakdown and then healing up for a bit, appearance.  So again, there is a consistency there, but there are many other possible causes.

Q    Let's look at this next slide.

What does this slide generally reflect?

A    Okay.  Well, the slides here reflect things that haven't been caused by the accounts given by either

53

Mr. Al Shimari or Mr. Al-Zuba'e.  And there are other explanations from them that they are very clearly evident marks or scars.

What we're looking at on the left-hand image, if you look at the Numbers 6 and 8 -- and these, by the way, are centimeters, not inches.  If you go up, you'll see a slightly pale scar about 2 centimeters across.  And that's the entry wound to one of the shrapnel injuries that Mr. Al Shimari sustained in 1987 when he was working with the military when a bomb exploded.  So that is the scar of an entry wound from that shrapnel.

If we look at the right-hand image, that is, in fact, Mr. Al-Zuba'e's left arm.  It's slightly cut off.  And having said, you should always have an image that shows the whole part of the -- of where the injury is.  And this is where we're looking in this region here.  And you'll see a bluish mark and then a fainted cross on the back of the hand here and here.  And these are tattoo marks which Mr. Al-Zuba'e reported to me were done when he was a younger man.  They were just playing, they're just tattoos.  He also had two others on his right hand.  But these are not caused by any of the abuses that he alleged.

Q    Okay.  And for the scar on the left, could a mark like that ever be caused by an electrical shock?

A    This would not be caused by an electrical shock because

54

Case 1:08-cv-00827-LMB-JFA    Document 1819    Filed 11/12/24    Page 55 of 112
Cross-examination of J. Payne-James
PageID# 54883

you can see that it is -- well, I can see that it is a linear healed scar.  It is not a diffuse area of scarring.

Q    Okay.  And perhaps a silly question, but could the tattoo on the right side be caused by shackling?

A    No.

Q    Okay.  With respect to the symptoms that Mr. Al Shimari and Mr. Al-Zuba'e reported to you, was there anything about them that was different in a significant way from what you would expect from a patient of their background?

A    In terms of their broad symptomatology?

Q    Correct.

A    Mr. Al-Zuba'e's a 51-year-old male, and I think Mr. Al Shimari is now 65.  The general symptoms are of those that often present to clinics, to hospitals.  Even in the absence of torture or previous torture or allegations of torture.  So they're not uncommon symptoms.

            MS. BAILEY:  Thank you.

            No further questions, Your Honor.

            THE COURT:  All right.  Cross-examination.

                    CROSS-EXAMINATION

BY MR. BUCHANAN:

Q    Good afternoon, Dr. Payne-James.

A    Good afternoon.

Q    My name is Michael Buchanan, and I'll be asking you some questions today.

55

A    I understand.  Thank you.

Q    You conducted your examinations in February of 2024; is that right?

A    Yes, that's correct.

Q    So that would be roughly 20 years after the abuses alleged by Mr. Al-Zuba'e and Mr. Al Shimari took place; right?

A    Correct.

Q    The purpose of your examination was determined to what extent the history of their accounts matched the visible physical symptoms that they identified; right?

A    Correct.

Q    You note that the absence of physical findings does not exclude the possibility that torture or cruel, inhuman or degrading treatment was actually inflicted on them?

A    That is correct.

Q    Okay.  And you're not offering any opinions as to whether either of these gentlemen were subject to torture or ill treatment; is that right?

A    No.  I believe that's the function of the Court.

Q    And just at the outset, your reports are limited to Mr. Al-Zuba'e and Mr. Al Shimari; is that right?

A    Yes.

Q    You did not conduct an examination of Mr. Al-Ejaili; is that right?

56

A     I did not.

Q     And there's no report of your findings with regard to Mr. Al-Ejaili; is that right?

A     That's correct.

Q     In your direct testimony, you referenced the Istanbul Protocol.

Is it fair to say that's the gold standard for how examinations should be undertaken when there are complaints of torture or ill treatment?

A     Yes, I think that would be fair.

Q     And you, yourself, were a contributor to the Istanbul Protocol, the 2022 version; is that right?

A     I was.

Q     Okay.  And this is a tool that's commonly used when assessing victims of torture; is that right?

A     It is.

Q     And I believe you testified that you've used it hundreds or perhaps thousands of times in making those assessments; right?

A     I believe I testified and said that I've used the principles in terms of both torture assessments, and also in the criminal setting, these are the principles that are applied.

Q     And that would be thousands of times in your experience?

57

A    Yes.

Q    All right.  You testified on direct about the consent that you received for Mr. Al-Zuba'e and Mr. Al Shimari; do you remember that testimony?

A    I do.

Q    Are you aware that Mr. Al-Zuba'e does not read or write?

A    Yes.  And I believe that was why there was no written consent.

Q    And during the course of your assessment of both of those individuals, at no point in time did they refuse to answer any question; right?

A    I don't believe so, no.

Q    And they did not refuse to cooperate in any way with your physical examination of them; did they?

A    No, they were cooperative.

Q    And you're aware that they flew voluntarily from Iraq to Malaysia to participate in your assessment?

MS. BAILEY:  Objection.

THE COURT:  Sustained.

BY MR. BUCHANAN:

Q    And with regard to the last slide that we looked at with the shrapnel wound in Mr. Al Shimari's back, at no point did he ever suggest that that wound or that scar was the result of abuse at Abu Ghraib prison; did he?

58

A    No.  And I hoped I had made that clear, but I apologize if I didn't.

Q    And the same is true with the tattoo on the left hand of Mr. Al-Zuba'e; right?

A    Mr. Al-Zuba'e didn't say that, yes.

Q    He volunteered to you that that was the result of tattooing he did when he was a teenager; right?

A    That's correct.

Q    Now, the Istanbul Protocol has multiple components to it; is that fair to say?

A    It does.

Q    And one is the physical assessment; right?

A    That's correct.

Q    And another is a psychological assessment?

A    That's correct.

Q    Okay.  And you were hired by CACI to do only the physical assessment of Mr. Al Shimari and Mr. Al-Zuba'e; right?

A    Yes.

Q    And undertaking your physical assessment, after you take the oral account from these gentlemen about the abuses they suffered at Abu Ghraib, you asked each of them to identify the visible physical injuries they suffered as a result of that abuse; right?

A    Yes, if they are aware of them.

59

Case 1:08-cv-00827-LMB-JFA    Document 1819    Filed 11/12/24    Page 60 of 112
PageID# 54888
Cross-examination of J. Payne-James

Q    Okay.  Can you describe what a visible physical injury would be?

A    It can be any marks.  So if you -- if anybody looks at their own skin or what, it's different marks that may have been attributed to an injury that you may recall; sometimes you may not recall.  But marks that are not part of the normal skin.  They may appear different in very general terms.

Q    And you took pictures of those physical injuries that they identified and others that you found; right?

A    Yes.

Q    And then you provided the assessment using the Istanbul Protocol; is that right?

A    Yes.

Q    But to be clear, your assessment is limited to visible physical injuries; is that right?

A    That's correct.

Q    Okay.  And you're aware that torture methods can include abuse -- physical abuse that leaves no physical lesions; is that right?

A    That's correct.

Q    Okay.  And so physical scars and visible physical injuries tell only the part of the story of a torture victim; is that right?

A    That's true.

60

Case 1:08-cv-00827-LMB-JFA    Document 1819    Filed 11/12/24    Page 61 of 112
Cross-examination of J. Payne-James
PageID# 54889

Q    And you agree that documentation of torture frequently takes place when the physical lesions already have disappeared; is that right?

A    If there were visible lesions that leave scarring, then the scarring may endure.  But if they are shorter-term injuries, so, for example, bruising as an acute -- they may disappear, but sometimes they may leave enduring marks.

Q    And the physical injuries, such as bruising, you would fully expect they would have dissipated 20 years after the fact; right?

A    Not necessarily.  Generally bruises disappear.  So bruises, just for the jury's benefit, are caused by blood leaking out of damaged blood vessels following some form of impact.  But in some people, marks from bruising may endure. We call it post-inflammatory hyperpigmentation.  And it's not unusual sometimes to see that in people in any setting.

Q    But it would be unusual to see bruises 20 years after?

A    Yes.  It won't be a bruise; it will be what's termed post-inflammatory hyperpigmentation.

Q    And you didn't ask either gentleman whether they suffered from frequent headaches; did you?

A    They were asked whether they had any -- within the neurological history and systemic history, have you got any symptoms such as headaches, visual disturbance, ear disturbance, sensory disturbance, and I don't recall any

61

Case 1:08-cv-00827-LMB-JFA    Document 1819    Filed 11/12/24    Page 62 of 112
Cross-examination of J. Payne-James
PageID# 54890

responses saying headaches.

Q    So you specifically asked them whether they suffered from frequent headaches?

A    I wouldn't have said frequent headaches, but do you have any symptoms such as headaches.

Q    Did you ask them if they had difficulty sleeping?

A    No, I don't believe I did.

Q    Did you ask them whether they had recurring nightmares?

A    I did, and the response was for -- I think it was Mr. Al Shimari, yes, but I can't be sure.

Q    You did not undertake to evaluate whether either gentleman suffered from post-traumatic stress disorder; right?

A    No.

Q    Or whether they suffered from depression?

A    No.

Q    Anxiety?

A    No.

Q    Or post-concussive syndrome?

A    No.

Q    Those were not outside the scope of your assessments; is that right?

            MS. BAILEY:  Objection.  You said not outside the scope of --

            MR. BUCHANAN:  No.  Outside the scope of your

62

assessment.

MS. BAILEY:  Thank you.

THE WITNESS:  No.  Those are determinations that I would request a psychologist or psychiatrist to make.

BY MR. BUCHANAN:

Q    Okay.  And you understand that to assess the full impact of torture or ill treatment on an individual, it would be important to consider the psychological impact in addition to the physical assessment of that person?

A    Yes.

Q    Okay.  And that's because torture or ill treatment are not limited to physical abuse; right?

A    That's correct.

Q    It includes psychological torture; right?

A    Yes.

Q    Torture that does not include physical contact; right?

A    Yes.

Q    Such as threats of violence or death?

A    Yes.

Q    Threats of rape or sexual assault to the victim or a loved one?

A    Yes.

Q    Prolonged forced nudity?

A    Yes.

Q    Forced shaving?

63

A    Yes.

Q    Humiliating and degrading treatment?

A    Yes.

Q    And psychological torture will not cause physical injury or leave a visible physical scar; right?

A    Correct.

Q    And you're aware that physical trauma can have lasting psychological trauma; right?  So in addition to physical injuries, a victim of torture will suffer lasting psychological trauma; is that right?

A    Can do.

Q    And you're aware that clinical experience shows that the psychological aftereffects of torture are often more persistent and protracted than the physical ones?

A    They may be.

Q    Indeed, the emotional impact or the psychological impact of torture can be profound; is that right?

A    It can be.

Q    And resulting in psychological symptoms that are prevalent, actually, among torture survivors; right?

A    They can be.

Q    And you're aware that Dr. Xenakis conducted his physical examinations and psychological examinations in 2013?

A    I am aware.

64

Q    And you would agree that psychological evaluations can provide critical evidence of abuse among torture victims?

A    Yes.

Q    We've spoken about the Istanbul Protocol.

MR. BUCHANAN:  I'd like to actually move it into evidence and mark it as Plaintiffs' Exhibit 236.

MS. BAILEY:  Objection, Your Honor.  This is hundreds of pages of document.  It's well beyond what the jury needs.

THE COURT:  If there are specific aspects of it, I'll allow it.  But I agree with counsel, we're not going to burden the jury with the whole document.

What pages do you want moved in?

MR. BUCHANAN:  We're going to be looking at page 124 of it.  And that's the page numbering of the document itself; not the .pdf pages.

THE COURT:  All right.

MS. BAILEY:  Your Honor, I will object to the extent it goes to a psychological evaluation, and that is not what Mr. Payne-James is here to testify about.

THE COURT:  I think you've covered the issue sufficiently.

MR. BUCHANAN:  There are a few other passages that we would like to review with him as well.  For example, page 69, paragraph 268.

65

MS. BAILEY:  I'm sorry.  Could you repeat?

MR. BUCHANAN:  Sure.  Paragraph 69, paragraph 268.

THE COURT:  Well, 268 starts on page 68.

MR. BUCHANAN:  It's subparagraph E, specifically.

THE COURT:  I'm sorry?

MR. BUCHANAN:  Subparagraph E.

MS. BAILEY:  No objection to subparagraph E.

THE COURT:  All right.  So just so we're clear, Plaintiffs' Exhibit 236 is in only as to subsection E of paragraph 268, which is on page 69.  So page 69 needs to be redacted so just that part of it's in; all right?

(Plaintiffs' Exhibit Number **236, page 69, paragraph 268, subsection E admitted into evidence.**)

MR. BUCHANAN:  And then I have a few more sections, Your Honor, if you want to do that now or when they come up later.

THE COURT:  Do it when it comes up.

MR. BUCHANAN:  Okay.

THE COURT:  Can you read that small print, Doctor?

THE WITNESS:  I've got my glasses, Your Honor.  Thank you for asking.  But I'm just about in a position that I can read it.

MR. BUCHANAN:  If you put that up on the screen, it might be easier to read.

THE COURT:  All right.  What is your question?

66

MR. BUCHANAN:  Okay.

MS. BAILEY:  Objection, Your Honor.  That's not -- oh, I see it's not for the jury.

BY MR. BUCHANAN:

Q   In February of 2024, you traveled from England to Malaysia to conduct a physical assessment of the plaintiffs?

A   Yes, that's correct.

Q   And you traveled there with a psychologist named Dr. Dee Anand?

MS. BAILEY:  Objection.

THE COURT:  Wait.  Let him finish the question, and you can object.

MS. BAILEY:  This relates to a consulting expert; it's inappropriate to bring it up in the first place.

THE COURT:  No.  I'm going to permit it. Overruled.

BY MR. BUCHANAN:

Q   You traveled to Malaysia with a psychologist named Dr. Dee Anand?

A   Yes, that's right.

Q   And he was hired by CACI to conduct a psychological examination of Mr. Al-Zuba'e and Mr. Al Shimari for this case?

A   Well, I'm not aware of his instructions, but he accompanied me, yes.

67

Cross-examination J. Payne-James

Q     And he actually met with both men in Malaysia?

A     I understand he did.

Q     And Dr. Anand did not issue a report; did he?

A     I'm not aware.

Q     You did review the reports that Dr. Xenakis prepared in connection with your preparation of a report in your testimony?

A     I did.

Q     Just a few more things, basic points, and then we'll get into the reports themselves.

        As a -- conducting your physical assessment, you were not there to determine which account or other from the victim is the one that's appropriate; right?

A     That's correct.

Q     You accept what they tell you, and you perform your assessment based on that account; right?

A     Yes.

Q     Okay.  Conducting a physical assessment under the Istanbul Protocol is not a complex process; is it?

A     I think I would slightly disagree with you.  It's a very structured and very precise process, but your opinion is your opinion.

Q     Well, the process itself is precise and structured, but the substance of it is not particularly complex; is it?

A     I think it is quite complex.

68

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA   Document 1819   Filed 11/12/24   Page 69 of 112
PageID# 54897
Cross-examination of J. Payne-James

THE COURT:  Well, Doctor, to give us some context, how long do you estimate it took for you to conduct each individual examination?

THE WITNESS:  Three to four hours, I would say, Your Honor.

THE COURT:  Per plaintiff?

THE WITNESS:  Yeah.  That's the examination.  Or the assessment.  The history and the examination.

THE COURT:  Right.  The whole -- from the initial interview or introduction to the final end of the physical examination, that was three to four hours?

THE WITNESS:  I would say so, yes.

THE COURT:  All right.

MR. BUCHANAN:  Thank you, Your Honor.

BY MR. BUCHANAN:

Q    And part of that is to actually conduct an interview of the victim; is that right?

A    Yes.

Q    And in these cases, that was done through an interpreter; right?

A    That's correct.

Q    After the interview is conducted, the first part of the interview is to give the account of the abuse; right?

A    That's correct.

Q    And then there's a process whereby you ask the victim

69

to identify the visible physical injuries that he suffered; right?

A    That's correct.

Q    And then you undertake a physical examination overall of the person?

A    That's correct.

Q    And you then specifically focus on the visible physical injuries that you saw?

A    That's correct.

Q    And then you document those injuries by taking pictures and taking notes; right?

A    That's correct.

Q    And ultimately you assess whether those physical injuries are consistent with the allegations of abuse; right?

A    That's correct.

Q    Okay.  Now, visible scars can be patterned or non-specific; right?

A    Yes.

Q    Can you describe for the jury what a patterned physical injury would be?

A    Yeah.  So -- I'm sorry, I'm looking around the courtroom for an example.

        If we took the gavel there and I came and struck somebody on the head with it, the circular part of that

70

gavel may create an imprint on the head which is the same size as that.  That would be an example of a patterned injury.

Another one might be, for example, the microphone here, which has got a mesh.  If that's impacted on the skin, that may provide a patterned imprint, a pattern reflected on the skin.

If you're looking at scars, for example, if somebody has been beaten or whipped, then there may be an enduring imprint of that scar or that mark.

Q    So the physical injury has a pattern that is consistent with the instrument that was used to inflict it?

A    It may be matched directly, yes.

Q    But torture that's imposed, for example, by kicking, by punching, that will not leave a patterned mark; will it?

A    That's correct.

And apologies to interrupt, but you talked about kicking, but you may get, for example, with a kick, a stamp or an imprint of a shoe sole.  So not inevitably will it be a non-specific injury.

Q    And in that example, you could match up the pattern of the shoe with the pattern of the physical injury that you have?

A    Yes.

Q    Okay.  The other types of visible physical injury would

71

be called non-specific; right?

A     Yes.

Q     And that means that you're not able to specifically link that kind of physical injury with how the treatment or torture had been carried out?

A     Yes.  I think it's best to consider it if you look at it, whether it's in an abuse setting or an assault setting or any other accidental setting, by looking at the pattern of either the injury or the scar or the mark.  You can't look at it and say, oh, that was caused by that.

Q     Can you define or explain what blunt force trauma is?

A     Blunt force trauma is -- that is trauma that's injury caused by anything really that doesn't have a sharp edge to it.  So you would have -- the big area of injury generally is divided into blunt force.  So, for example, being struck by a fist or a foot or a gavel or a microphone, whereas sharp force injury -- and the reason I introduced sharp force injury is to show the differential.  But sharp will be anything such as a knife or a broken piece of glass.  But blunt force injury is that injury that is caused by something that doesn't have generally a cutting edge.

Q     And you would agree that the majority of blunt force trauma results in non-specific injuries, scars and bruises?

A     Yes, I think that's fair.

Q     Okay.  Meaning you can't look at those scars and

72

bruises and say, based on their shape, what caused them?

A    That's fair.

Q    Okay.  In concluding that injuries are non-specific -- visible injuries are non-specific, 20 years after the fact is not unusual; fair to say?

A    That's correct.

Q    Now, at the end of the day, you concluded that both Mr. Al Shimari and Mr. Al-Zuba'e had physical -- visible physical injuries that were consistent with the allegations that they reported to you; is that right?

A    That's correct.

Q    Now let's talk specifically about Mr. Al-Zuba'e.

Mr. Al-Zuba'e told you that while in Abu Ghraib, he had been subject to allegations of choking, beating on his body and beating on his genitals; is that right?

A    That's correct.

Q    And because of the passage of time, 20 years, you would not expect to see any visible physical injuries from that kind of treatment?

A    You would not necessarily expect, but you can.

Q    And the absence of any visible physical findings, does not mean that Mr. Al-Zuba'e was not the victim of that kind of treatment at Abu Ghraib?

A    That's correct.

Q    Okay.  And even in your report, you concluded that

73

Mr. Al-Zuba'e's allegations of being choked, for example, you would not expect to see signs of that kind of treatment at this stage; right?

A    That's correct.

Q    And at this stage, you meant 20 years later?

A    That's correct.

Q    Okay.  And with regard to the physical findings that you -- that you looked at and you did assess, let's go through them one by one.

Mr. Al-Zuba'e told you that while he was at Abu Ghraib prison, he was forced to crawl on a walkway on his hands and knees; right?

A    Yes.

Q    And as a result of crawling, he was bleeding on his chest and his hands; right?

A    I'm not sure that Mr. Al-Zuba'e said that he was bleeding to me.  Could you take me to that?

Q    Okay.  But he suffered injuries on his hands and his chest as a result of crawling?

A    He suffered injuries, but I would need to just review what he told me to confirm what he said.

Q    Okay.  You can look at paragraph 123 of your report.

A    I don't have that.  You'll have to bring it up on the screen.  Can it be on the screen?

Q    It's in your binder.

Case 1:08-cv-00827-LMB-JFA    Document 1819    Filed 11/12/24    Page 75 of 112
PageID# 54903
Cross-examination of J. Payne-James

A    It's a different bundle.

MR. BUCHANAN:  There are multiple binders.  Okay.
Tab 1.

THE WITNESS:  Yes, I've got that.

BY MR. BUCHANAN:

Q    And he indicated to you that he had visible physical
injuries on his chest as a result of that incident; right?

A    I think paragraph 3 that you referred me to says they
made him crawl on the walkway on his hands and chest.

Q    Okay.  If we turn to paragraph 217 of your report.

A    Yes.

Q    And it says:  The next three images show two areas of
non-specific irregular pigmented mature scars on the lateral
aspects of the right knee.  These represent two separate
areas of damage, skin surface, and would be consistent
either with crawling along a floor or contact with a dog paw
or claws or impact with a blunt object; right?

A    Yes.

Q    Okay.  So, in other words, you found visible physical
injuries that were consistent with Mr. Al-Zuba'e being
forced to crawl on his hands and knees?

A    Indeed.

Q    And Mr. Al-Zuba'e told you that his wrists were
handcuffed on the top bunk bed so that he could not stand
for a period of time; right?

75

A     That's correct.

Q     All right.  And you -- and he identified a particular area on his body where he had a visible physical injury as a result of that incident; right?

A     Yes.

Q     Okay.  And you examined his right wrist?

A     Yes.

Q     With the area that he indicated?

A     Yes.

Q     And you found that the injuries he suffered there, the physical, physical injury was consistent with being handcuffed and suspended from like --

A     That's correct.

Q     Okay.  You would agree that under the Istanbul Protocol, an examiner should review and access all relevant clinical evidence?

A     Yes.

Q     And you testified on direct that it would be inappropriate to show pictures to the victim; right?

A     Yes.

Q     Right.  But there would be nothing inappropriate about you reviewing pictures; right?

A     I don't -- review what pictures?  Apologies.

Q     So there were pictures, I think you mentioned in your direct testimony, there were videos of the abuse happening.

76

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA   Document 1819   Filed 11/12/24   Page 77 of 112
Cross-examination of J. Payne-James
PageID# 54905

That would be something that would be appropriate for you to review?

A    Yes.

Q    And you did not review any photographs of incidents of abuse taking place at Abu Ghraib as part of your physical assessment of either Mr. Al-Zuba'e or Mr. Al Shimari?

MS. BAILEY:  Objection.  There are no pictures of Mr. Al-Zuba'e or Mr. Al Shimari.

THE COURT:  The answer -- again, I've told the jury many times that the lawyer's question is not any evidence whatsoever; it's only a witness's answer.  So if the witness says I never saw them, that's it.

MR. BUCHANAN:  I can rephrase the question.

BY MR. BUCHANAN:

Q    You did not review any pictures of men being abused at Abu Ghraib prison; did you?

A    No.

Q    And you're aware that those images could depict the kinds of abuse and torture that were actually happening at the prison; right?

A    Sorry, which pictures?

MR. BUCHANAN:  Okay.  Let's bring up PTX 34 in evidence.

BY MR. BUCHANAN:

Q    Are you aware that this photograph was taken at Abu

77

Cross-examination of J. Payne-James

Ghraib prison?

A    If you are confirming that to me, yes.

Q    And that would depict abuse taking place at Abu Ghraib prison where men are shackled to beds with metal handcuffs; right?

A    I understand.

Q    And as part of an analysis under the Istanbul Protocol, it would be appropriate to look at the kinds of abuse that were taking place at this place where the victim claims it was taking place?

A    I have to take into account that the account I was given was somebody who was handcuffed to a bed.  So I've already accepted that that would be consistent with that.  So I'm not quite sure where that takes me.

Q    Okay.  In any event, you did not review any of these photographs?

A    I've not reviewed any additional pictures of either Mr. Al-Zuba'e, Mr. Al Shimari or anyone else.

        MR. BUCHANAN:  You can take that down.

BY MR. BUCHANAN:

Q    Now, Mr. Al-Zuba'e told you that he was bitten by a dog; right?

A    Yes.

Q    And he indicated a spot on his right arm and both legs where he told you he had been bitten?

78

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA    Document 1819    Filed 11/12/24    Page 79 of 112
Cross-examination of J. Payne-James
PageID# 54907

A     Yes.

Q     And he told you that the dog bites did not fully break or penetrate the skin?

A     That's correct.

Q     But he did say the dog bites damaged his skin in some places?

A     Yes.

Q     And he showed you those places on his body?

A     Yes.

Q     And you, in fact, found observable scars in those places that he indicated; right?

A     Yes.

Q     And your conclusion was that those visible scars that he identified was consistent with him being bitten by a dog; is that right?

A     Yes.

Q     Now, Mr. Al-Zuba'e told you during the interview that while he was being held at Abu Ghraib prison, he would be made to face the wall and have his head banged on the wall; right?

A     Yes.

Q     And during your physical examination, you actually found a scar, a visible injury, on Mr. Al-Zuba'e's head; is that right?

A     I found a depression of a scar in the middle of his

79

forehead, yes.

Q    But Mr. Al-Zuba'e told you that the impression you found was not as a result of any treatment or abuse that he suffered at Abu Ghraib prison?

A    That's correct.  He said it happened when he was a child.

Q    In other words, he didn't try to claim that the mark you found on his head was as a result of abuse at Abu Ghraib prison; did he?

A    No, that's correct.

Q    He told you that it was as a result of an injury from when he fell as a child; right?

A    Yes.

Q    And that wasn't the only visible physical injury on Mr. Al-Zuba'e that he told you was not the result of abuse at Abu Ghraib prison; right?

A    Yes.

Q    Mr. Al-Zuba'e did tell you that he had physical pains elsewhere on his body, that he feels stiff and he's achy; right?

A    Yes.

        MR. BUCHANAN:  Your Honor, I would like to take a look at PTX 236, page 120, paragraph 507.

        MR. O'CONNOR:  That should not be up.

        MS. BAILEY:  Your Honor, objection.  This goes

80

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA    Document 1819    Filed 11/12/24    Page 81 of 112
PageID# 54909
Cross-examination of J. Payne-James

again to the psychological evaluation that Professor Payne-James did not conduct.

MR. BUCHANAN:  No, Your Honor.  It goes to physical complaints.

MS. BAILEY:  Under the psychological evaluation, Chapter 4.

THE COURT:  I'm going to permit it in.  Overruled. So it's just paragraph 507; correct?

MR. BUCHANAN:  Correct, Your Honor.

THE COURT:  All right.  That's also in as part of that exhibit.

(Plaintiffs' Exhibit Number **236, page 120, paragraph 507**

**admitted into evidence.**)

BY MR. BUCHANAN:

Q   Now, Mr. Payne-James, looking at paragraph 507 -- and you can look at the screen if that's easier for you.

A    It's easier to actually read it.  Thank you.

Q   Okay.  And it reads there:  Pain, headache or other physical complaints with or without objective physical findings or common problems among torture survivors; do you see that?

A    Yes.

Q   And you agree with that statement?

A    Yes.

Q   Somatic symptoms can be directly due to the physical

81

consequences of torture or psychological in origin.  For example, pain of all kinds may be a direct physical consequence of torture or of psychological origin; do you see that?

A    Yes.

Q    And you agree with that?

A    Yes.

Q    Typical somatic complaints include back pain, musculoskeletal pain and headaches; do you see that?

A    Yes.

Q    And you agree with that?

A    Yes.

Q    Headaches are very common among torture survivors and may be due to torture-inflicted injury; is that right?

A    They may be indeed.

Q    And you agree with that?

A    Yes.

Q    Okay.  And so Mr. Al-Zuba'e's complaints of back pain and musculoskeletal pain and headaches is consistent with his allegations of torture; is that right?

A    Yes.

Q    Let's speak about Mr. Al Shimari.

     Mr. Al Shimari -- I'm sorry, do you --

A    You're preempting me having ...

Q    Okay.  And Mr. Al Shimari also told you that he was

82

Case 1:08-cv-00827-LMB-JFA   Document 1819   Filed 11/12/24   Page 83 of 112
PageID# 54911
Cross-examination of J. Payne-James

threatened by dogs at Abu Ghraib prison; right?

A    He did.

Q    And he specifically told you that he did not sustain any marks as a result of being threatened by dogs?

A    He said that he didn't think he had sustained any marks.

Q    And he mentioned to you that while at Abu Ghraib prison, people grabbed his penis and squeezed hard without his consent; right?

A    They did.

Q    That someone placed fingers in his rectum; right?

A    In his anus, I think he said.

Q    You would agree that that kind of treatment would amount to sexual assault?

A    Yes.

Q    And such treatment, you would not expect to have an enduring visible physical injury or scarring; is that right?

A    Not necessarily.

Q    And you wouldn't expect to find any visible physical injury 20 years after the fact from that kind of abuse; would you?

A    No.

Q    Sexual assault does have a psychological impact; right?

A    It does.

Q    And you would agree that victims of sexual assault

83

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Cross-examination J. Payne-James

often experience mental and emotional problems; is that right?

A    Yes.

Q    And that would include difficulty trusting people or difficulty in other relationships?

A    Yes.

Q    And you would agree that sexual dysfunction is common among survivors of torture or ill treatment; wouldn't you?

A    Yes.

Q    And particularly among those who have experienced sexual torture or rape; is that right?

A    Yes.

Q    And that would include things like a reduced libido?

A    It could.

Q    And erectile dysfunction?

A    It would.

Q    And you would agree that torture can profoundly damage intimate relationships with spouses and family?

A    It could.

Q    And you would agree that Mr. Al Shimari's complaints about sexual dysfunction would be consistent with his allegations of torture?

A    Yes.

Q    And Mr. Al Shimari told you that he was subject to electrical shocks while he was detained at Abu Ghraib

84

prison?

A   He did.

Q   And he said that when the shock was applied, it burned his skin; right?

A   Yes.  Yeah.  I think he -- I think he referred to redness and blisters.

Q   And he identified marks -- visible marks on his body where he told you the electrical shocks occurred?

A   He did.

Q   Okay.  And you examined those scars?

A   Yes.

Q   And you concluded that those scars were consistent with a healed local burn; didn't you?

A   They were.

Q   And Mr. Al Shimari told you that while at Abu Ghraib prison, he was handcuffed to the top bunk of a bed; right?

A   He did.

Q   And he told you that he was not able to lay down or sit down; right?

A   Yes.  For up to an hour at a time.

Q   And you examined places where he identified visible physical injuries as a result of that treatment?

A   Yes.

Q   And you found that the -- you found a fine linear scar on his skin; right?

85

A    Yes.  On his wrist.

Q    And you determined that that scar was consistent with damage caused by the application of some form of wrist restraint; is that right?

A    It could be, yes.

Q    Now, you mentioned that there was some discrepancies in the versions of what was told to you and to Dr. Xenakis; is that right?

A    Yes.  Reading Dr. Xenakis's report, there were differences, but I didn't make a direct comparison.

Q    And victims of torture sometimes have difficulty locating precisely -- precise times and dates in recalling their abuse; right?

A    Yes.

Q    And you know from your experience that there can be a discrepancy in a victim's account over an extensive period of time since the mistreatment; right?

A    Yes.  And that's the purpose of the way in which the interview was undertaken is to try and minimize those risks of discrepancy.

Q    So one possible -- one -- you would agree that the telling of a -- recounting of abuse over time, particularly over a long period of time, it's not uncommon for minor details to change; would you agree with that?

A    I'm sorry.  Can you repeat your question?

86

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Q    Sure.

You would agree that with the passage of time, for example, 20 years, you would expect that there would be variations in how that abuse is recounted?

A    You wouldn't expect it, but it's certainly possible.

Q    Okay.  And you would agree that discrepancies in a victim's account have to take into consideration the skills of the person who's actually taking that account; right?

A    It may be consistent.  It may be dependent on that, yes.

Q    And when the account is being relayed through a translator, it could be as a result of using different translators?

A    It's possible.

Q    Now, the Istanbul Protocol talks about how torture survivors may have difficulty recounting specific details.

A    Yes.

Q    Okay.

MR. BUCHANAN:  Your Honor, I would like to look at paragraph 342 on page 81 of Exhibit 236.

THE WITNESS:  Sorry.  Can you repeat that?

MR. BUCHANAN:  Sure.  We're just waiting on the Judge.

THE WITNESS:  Sure.  Apologies.

THE COURT:  Any objection to page 81, paragraph

87

342?  Any objection?

MS. BAILEY:  No, Your Honor.

THE COURT:  All right.  That's in as well.

(Plaintiffs' Exhibit Number 236, page 81, paragraph 342

admitted into evidence.)

MR. BUCHANAN:  Thank you, Your Honor.  We'll bring that up on the screen, and you have the option of either using the screen or the book.

BY MR. BUCHANAN:

Q    Okay.  This is a section about difficulty recalling and recounting; is that right?

A    Yes.

Q    And it says:  Torture survivors may have difficulty recounting the specific details of the torture or ill treatment for several important reasons; do you see that?

A    Yes.

Q    And if we look at number -- letter C, a lack of trust in the examining clinician or interpreter; right?

A    Yes.

Q    That could be one reason why they may have some difficulty recounting that?

A    Yes.

Q    And if we look at D right below that, the psychological impact of torture and trauma in and of itself can create difficulties in recounting that trauma; right?

88

A    Yes, it can.

Q    And that would include related mental illnesses such as depression or PTSD; is that right?

A    Indeed.

Q    And if we look down at letter F, there may be protective coping mechanisms such as denial, avoidance or dissociation; right?

A    Yes.

Q    And those are all reasons why victims of torture sometimes have difficulty recounting specific details of torture?

A    And they may do, yes.

Q    Now, you've reviewed Dr. Xenakis's reports, and you've provided some commentary about his conclusions; is that right?

A    Yes.  Yes.

Q    And you're aware that Dr. Xenakis diagnosed both men --

     MS. BAILEY:  Objection.  Your Honor, plaintiffs chose not to call this doctor, and he did not rely on the reports, so there is no basis to get over the hearsay objection here.

     MR. BUCHANAN:  Judge, he specifically commented and testified about Dr. Xenakis's use of the DSM to examine and assess these people.

     THE COURT:  I'm going to sustain the objection.

89

MR. BUCHANAN:  One moment, Your Honor.

Nothing further, Your Honor.  Thank you.

THE COURT:  All right.  Any redirect?

MS. BAILEY:  Briefly, Your Honor.

REDIRECT EXAMINATION

BY MS. BAILEY:

Q    I just want to clarify a few things with you, Professor Payne-James; is that all right?

A    Yes.

Q    All right.  Initially in the cross-examination, Mr. Buchanan asked you about whether you just focused on visible findings in your physical examination.

I just wanted to clarify.  You mentioned in your direct you palpate, look at mobility and symptoms.

Are there things you consider beyond just what you see with your eyes?

A    You take into account the symptoms that people describe and try to relate those, say, for example, back pain to any physical abnormality in terms of movement which may not be visible -- necessarily visible until movement is elicited.

Q    Okay.  And so it's fair so say there's more to it than just taking pictures of an interviewee?

A    I'd like to think so.

Q    Okay.  I'd like you to look at paragraph 217 of Mr. Al-Zuba'e's report.  I believe this referred to markings

90

on Mr. Al-Zuba'e's knee, one of the findings that
Mr. Buchanan took you through.

A    It was -- I'm sorry, which paragraph was it?

Q    217.

A    Okay.  Got it here.  Yep.

Q    Okay.  Are you there?

A    Yes.

Q    All right.  What was your finding with respect to that?

A    If I may read it.

Q    Absolutely.

A    The next three images show two areas of non-specific irregular pigmented material scars on the lateral aspect of the right knee.  These represent two separate areas of damaged skin surfaces and would be consistent either with crawling along the floor or contact with a dog paw or claws or impact from a blunt object, such as a shod foot. Mr. Al-Zuba'e could not be sure which of these was the cause but said they occurred in detention.

Q    Okay.  So you determined consistent with was your analysis?

A    Yes.

Q    Okay.  What other things could be consistent with that kind of a marking?

A    Tripping and falling, running into something.  Many -- I mean, many different things.

91

Redirect examination J. Payne-James

Q    Okay.  Mr. Buchanan brought up the possibility of looking at pictures of other detainees who were abused at Abu Ghraib prison.

A    Yes.

Q    Were you trying to judge Mr. Al-Zuba'e's credibility?

A    No.  That's the purpose for -- that's the role of the Court.

Q    Okay.  What purpose would it serve for you to look at pictures of other detainees in the same location?

A    I'm not sure that it serves any purpose.

Q    Mr. Buchanan referred you to page 81 of the Istanbul Protocol, and it was a portion talking about why torture survivors might have difficulty recounting details; do you recall that?

A    Yes.

Q    Okay.  And he pointed out under C that lack of trust in the examining clinician or interpreter could be one of the reasons?

A    Yes.

Q    Did you have any reason to believe that either Mr. Al-Zuba'e or Mr. Al Shimari were uncomfortable or untrusting of you during the examination?

A    Well, I can't speak for Mr. Al-Zuba'e or Mr. Al Shimari, but no indications were given to me that they were uncomfortable or dissatisfied or reluctant to

92

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

proceed, and appeared very happy to give their accounts to the best of their ability.

Q    Okay.  Mr. Buchanan also referred you to paragraph 507 of the Istanbul Protocol about somatic pains; do you recall that?

A    Yes.

Q    And one of those somatic pains was headaches?

A    Yes.

Q    Did either man tell you that they suffered from headaches?

A    No.

Q    Okay.  Mr. Buchanan also asked you about electrical shocks alleged by Mr. Al Shimari?

A    Yes.

Q    Okay.  And you did identify some healed local burns on his body?

A    Yes.

Q    What else could that have been caused by?

A    Well, they were scars that could be caused by local burns.  But they could be grazes, could be marks, insect bites, infected insect bites.  There are lots of different causes.

Q    So it's fair to say there are a whole lot of other things that could have caused those marks?

A    Yes.  They're non-specific.

93

Q    Were either the presentation or the number of marks on either Mr. Al-Zuba'e or Mr. Al Shimari sufficient to allow you to conclude that there was a higher level of consistency between their allegations and their physical findings?

A    No.

Q    Were either their symptoms or their visible markings anything that you would not expect to see in men of their age from their region?

A    And that's often part of the difficulty and the need to undertake a detailed physical examination.  Unfortunately, as we all get older, we develop symptoms, aches, pains, stiffness, urinary symptoms, loss of libido, erectile dysfunction.  It's a part of life, certainly for males, and that's why I recommended further assessments for the two men.

MS. BAILEY:  No further questions.

THE COURT:  Any recross?

MR. BUCHANAN:  Nothing, Your Honor.

THE COURT:  I assume at this point no one's going to call the doctor again?

MS. BAILEY:  No, Your Honor.

THE COURT:  Thank you, sir, for your testimony. You may now stay in court and watch the proceedings, or you may leave, but you're not to discuss your testimony with any witness who has not yet testified.

94

THE WITNESS:  Thank you, Your Honor.

(Witness excused at 12:52 p.m.)

THE COURT:  All right.  Your next witness.

MR. O'CONNOR:  Your Honor, we're going to begin presenting pseudonymous depositions relating to Mr. Al-Zuba'e.  I would like to publish from the parties a stipulation of uncontested facts paragraphs 13 to 18.  And then we're going to be doing Interrogator C, Army Interrogator C.

Can you put up PTX 226 and go to page 2.

The parties have stipulated as follows starting at paragraph 13:  Plaintiff Asa'ad Hamza Hanfoosh Al-Zuba'e was taken into custody by U.S. military in early November 2003.  Mr. Al-Zuba'e was detained at Abu Ghraib prison until mid 2004.  Mr. Al-Zuba'e was assigned ISN 152529.

According to the United States, on November 7, 2003, Mr. Al-Zuba'e was interrogated by two soldiers, Army Interrogator C, and Army interrogator F.

According to the United States, on November 18, 2003, Mr. Al-Zuba'e was interrogated by two soldiers, Army Interrogator D and Army Interrogator E.

Paragraph 18 on the next page:  According to the United States, Mr. Al-Zuba'e was interrogated by a CACI employee, CACI Interrogator G, and Army Interrogator B on December 23rd, 2003.

95

And, Your Honor, we'll present Interrogator C. The run time is 9 minutes and 40 seconds, and I have clips.

THE COURT:  This is the clip of Army Interrogator C?

MR. O'CONNOR:  Yes, Your Honor.  Army Interrogator C.

(Audio clip played of Army Interrogator C.)

THE COURT:  This is a good time for our lunch. Folks, again, we'll have a one-hour lunch break.  Please be back here by 2:00, and we'll see you all back then.  All right.

(Jury not present at 1:01 p.m.)

(Court recessed for lunch at 1:01 p.m.)

AFTERNOON SESSION 2:00 p.m.

THE COURT:  All right.  We'll bring the jury in.

THE COURT SECURITY OFFICER:  Yes, Judge.

Rise for the jury.

(Jury present at 2:01 p.m.)

THE COURT:  All right.  So we'll go back on the tape.

MR. O'CONNOR:  Yes, Your Honor.  We'll be playing the remainder of Army Interrogator C's pseudonymous deposition.

(Audio clip played of Army Interrogator C.)

MR. O'CONNOR:  Your Honor, CACI calls Army

96

Interrogator E via pseudonymous recorded deposition.

THE COURT:  All right.

MR. O'CONNOR:  I have reports for the Court and for counsel.

(Audio clip played of Army Interrogator E.)

MR. O'CONNOR:  Your Honor, CACI calls via pseudonymous recorded deposition Army Interrogator F.  And I have clip reports.  The run time is 14 minutes and 53 seconds.

THE COURT:  All right.

(Audio clip played of Army Interrogator F.)

MR. O'CONNOR:  Your Honor, CACI calls CACI Interrogator G via pseudonymous tape-recorded deposition.  I have clips for the Court and opposing counsel.  The run time is 39 minutes, 7 seconds.

(Audio clip played of Army Interrogator G.)

THE COURT:  And, ladies and gentlemen, I do want you to appreciate that these interrogatories were taken when?  Or these depositions were taken when?  Mr. O'Connor, when were these depositions taken?

MR. O'CONNOR:  These depositions were taken in 2018, Your Honor.  2017.

THE COURT:  Over the course of some passage of time, some of those objections have changed.  That's why, you know, the name Dan Porvaznik now is well known as being

97

Case 1:08-cv-00827-LMB-JFA    Document 1819    Filed 11/12/24    Page 98 of 112
Video deposition of S. Stefanowicz
PageID# 54926

the CACI site person at Abu Ghraib.  When these depositions were taken, that was apparently still an issue the government wanted to keep secret.  All right.

MR. O'CONNOR:  Your Honor, at this time, CACI calls Steven Stefanowicz by video deposition.

THE COURT:  All right.

MR. O'CONNOR:  I have binders.

(Video deposition played of Steven Stefanowicz.)

THE COURT:  This is now in evidence as well; correct?

MR. O'CONNOR:  It is, Your Honor.

(Video deposition resumed of Steven Stefanowicz.)

THE COURT:  Actually, this is a good time to take the afternoon break.  It's 4:15.  We'll reconvene at 4:35.

(Jury not present at 4:13 p.m.)

(A recess was taken.)

THE COURT:  All right.  Mr. O'Connor, how much more time do you estimate your case taking today?

MR. O'CONNOR:  We're going to end up going through the day, Your Honor.  We have about a half hour-ish.  It's all recorded, so it's just a matter of ...

THE COURT:  All right.  And if there is a rebuttal case, my understanding is approximately an hour; is that right?

MR. FARIDI:  Yes, Your Honor.  I think we have

98

Case 1:08-cv-00827-LMB-JFA   Document 1819   Filed 11/12/24   Page 99 of 112
Video deposition of S. Stefanowicz
PageID# 54927

some videos and some depositions which will probably take about an hour.

THE COURT:  Do we have any read-ins tomorrow morning?

MR. FARIDI:  Yes.  I think one.

THE COURT:  All right.  We'll just plan for that.

MR. FARIDI:  And, Your Honor, we may have one live witness which we previously disclosed to Mr. O'Connor.

THE COURT:  Well, we'll get to that when we get to that.

MR. O'CONNOR:  Yes.  Thank you.

THE COURT:  Let's get the jury.

THE COURT SECURITY OFFICER:  Yes, Judge.

Rise for the jury.

(Jury present at 4:35 p.m.)

THE COURT:  Folks, we'll continue.

MR. O'CONNOR:  Yes, Your Honor.  We will continue with the direct of Mr. Stefanowicz, which has 12 minutes left, but then there's a 51-minute cross and a 2-minute redirect.

(Video deposition resumed of Steven Stefanowicz.)

THE COURT:  It's in.  It's in.

Ladies and gentlemen, something did come up during this testimony I just want you to make sure you understand. The initial question during the cross-examination addressed

99

issues about Mr. Stefanowicz being prepared for his deposition.

It's perfectly appropriate -- in fact, if a lawyer does not speak with a witness ahead of time and find out what the witness is going to say and show them exhibits, then it completely destroys the trial process because it becomes uncontrollable.

So as long as a lawyer is not telling a witness what to say, it is a lawyer's job to prepare that witness before that witness is deposed or testifies in trial.  So you should draw no inferences from that whatsoever.

All right.  Do we have time to start something else?

MR. HADDAD:  Your Honor, I just want to move in exhibits that were offered.

THE COURT:  Every one of them I've got in.  Don't worry about that.

MR. O'CONNOR:  We can start Colonel Pappas, Your Honor.  It's about 40 minutes.  We can do the first 15 minutes.

THE COURT:  Let's get it started.  I don't want to waste any time.

MR. O'CONNOR:  We have binders, Your Honor.

(Video deposition played of Colonel Pappas.)

THE COURT:  All right.  I think this is a good

100

time to stop for the evening since we always have mop-up work to do.

Folks, we are getting very close to the end of the defendant's case.  Although I've been told there will be a brief rebuttal.  But I anticipate you will be getting the closing arguments of counsel and the instructions of the Court tomorrow.  Whether that will leave much time tomorrow to start deliberations, I don't know yet.

Please remember to continue following my instructions to not conduct any investigation, not discuss this case with anybody.  You've not reported any problems to me, so I'm assuming everyone's been behaving by the rules.  And we'll see you back here tomorrow morning promptly at 9:30.  Thank you.

Have a good evening and drive safely.

(Jury not present at 5:57 p.m.)

THE COURT:  All right.  And so we'll begin by reading in the exhibits that were entered into evidence today.

THE DEPUTY CLERK:  DX 37.  DX 101.  DX 106.  DX 107.  DX 108.  DX 109.  PTX 236, page 69, paragraph 268E.  Page 120, paragraph 507.  And page 81, paragraph 342.  DX 32.  DX 33.  DX 34.  DX 35.  PTX 98A.  PTX 98B.  PTX 107A.  PTX 107C.  PTX 107D.  PTX 107E.  PTX 14.  PTX 72.  PTX 156.

101

(Defense Exhibit Numbers 32, 33, 34, 35 admitted into evidence.)

(Plaintiffs' Exhibit Numbers 98A, 98B, 107A, 107C, 107D, 107E, 14, 72 admitted into evidence.)

THE COURT:  I think 107C was also entered; correct?

THE DEPUTY CLERK:  Yes.

MR. HADDAD:  Yes, Your Honor.  107C is also entered.  PTX 156 was not entered into evidence.

THE DEPUTY CLERK:  Well then it got confused because when you asked about admitting exhibits and then she said they're already in.

THE COURT:  Taguba is already in.

THE DEPUTY CLERK:  156 is the transcript.

THE COURT:  Yeah, no.

MR. HADDAD:  156 is the transcript of Mr. Stefanowicz's interview with General Taguba.

THE COURT:  Right.  And that is not in evidence.  That is not in evidence, no.

MR. HADDAD:  So 107C should be added to the list.

THE DEPUTY CLERK:  Yeah, I have that.

MR. O'CONNOR:  We agree with that, Your Honor.

THE COURT:  All right.  So just the 107C.  All right.  That's fine.

Again, I don't have anything in court tomorrow, so

102

you can leave everything here.  All right.

And so you anticipate again, Mr. O'Connor, how much more on your case?

MR. O'CONNOR:  About an -- a little less than an hour, Your Honor.  We have the rest of Pappas, and Major Holmes is 20 minutes.

THE COURT:  All right.  And then we'll be taking care of the plaintiffs' case.

To not waste time tomorrow, what is the issue about the live witness?

MR. O'CONNOR:  Thank you, Your Honor.

This is -- they want to call Charles Graner.  Your Honor might remember that Charles Graner testified in their case in chief by video because he was an unavailable witness.  He was never disclosed as a live witness.  He was not on their 2018 Rule 26 disclosures, he was listed as a video presentation only.  Same thing with the April trial.  Same thing in the revised witness list as we came up to this trial.  So his testimony came in as a video.

And, you know, Mr. Faridi said today he's been disclosed to Mr. O'Connor.  As Your Honor's aware, that was at the end of the day yesterday at the same time Your Honor found out about him.

I need to add that Mr. Graner was deposed in this case in 2013.  He repeatedly invoked his Fifth Amendment

103

right to avoid providing any testimony.  He took the Fifth on whether he had knowledge of detainees standing on boxes to keep them awake, whether he was aware of physical training of detainees, the process for signing out detainees by interrogators, the treatment of the Al Jazeera guy, the manner in which MI and OGA interrogators gave instructions to MPs regarding treatment of detainees, treatment of a detainee named Taxi Driver, who is not one of these plaintiffs, whether civilian interrogators ever asked him to soften up detainees, whether civilian interrogators ever asked him to --

THE COURT:  All right.  You've made your point.

MR. O'CONNOR:  Fourth Circuit law is quite clear that what you can't do is it take the Fifth to thwart discovery and then walk in and say, you know, I think actually I'd like to testify.

THE COURT:  All right.

MR. O'CONNOR:  Can I say one more thing, Your Honor?

THE COURT:  Sure.

MR. O'CONNOR:  There's a particularly nasty element to that, I regret to say, from today.

Plaintiffs' counsel apparently got a 20-page, single-spaced document from Charles Graner.  And what they did with it is, at 1:30 today, they disclosed it to us.  And

104

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Your Honor should know how.  They emailed it to us.

I've been sitting 10 feet from Mr. Faridi all day today.  He can send me notes by hand saying are you calling this -- are you calling your interpreters or are you not calling?  Can you kindly let me know.  And what they decided to do was with that document, knowing that we were likely to talk about Mr. Graner tonight, they say, you know, at 1:30, let's email it to those guys so they'll see it tonight when it's a little late to deal with it today.

I mean, trying to call a completely undisclosed witness, who was already presented as an unavailable witness under these circumstances where he's completely invoked, is brutally unfair to my client, Your Honor.

THE COURT:  All right.

MR. FARIDI:  Your Honor, I'll begin with the last first.

We got the document from Mr. Graner late last night, and we had difficult -- it's 37 megabytes.  That's the file size.  We had a lot of difficulty downloading it, and we had to have folks in New York in the IT department try to download the document.  And we sent it to Mr. O'Connor as soon as we were able to access the document.  So there's no surprise.

I wasn't able -- we went out for lunch for a half hour from the courthouse.  I should have printed a copy and

105

brought it to him. I emailed it to him. And he saw it in the afternoon. So there's no surprise about the document. We received the document from Mr. Graner last night.

I want to address the other issues.

Mr. Graner was on the witness list. He is unavailable. I don't think he's within the subpoena power of the Court. But he reached out to us after our case went in, and he said that he's got information that he wants to bring to the light publicly.

And I'll tell Your Honor what we expect him to testify. You heard from Mr. Stefanowicz today that he never gave any instructions to any of the MPs on how to -- whether to abuse the detainees. We expect Mr. Graner to come in and say that he did receive instructions from Mr. Stefanowicz to carry out abuses against the detainees.

The second thing is, you heard Mr. Stefanowicz say that he was very careful to log every time he entered the hard site and Tier 1A, that there's a log for everything. Mr. Graner's going to testify, if Your Honor will allow him, and he'll say that Mr. Stefanowicz refused to sign into the logbooks, and he then began to maintain his own separate logbook to log every time Mr. Stefanowicz entered the hard site. And ultimately he refused to carry out the abuses that Mr. Stefanowicz was directing him to carry out, and as a result of that, he was either demoted, or he was -- or he

106

was -- I think ultimately -- at one point he -- they refused to not let him go, but ultimately he was demoted from his position.

THE COURT:  All right.  But wait.  Graner was, at some point, deposed, or discovery was obtained from him at one point?

MR. FARIDI:  Yes.  In 2013.

THE COURT:  That's when it should have come out.

I'm going to grant the motion of the defense to prohibit him from testifying.  That's absolutely unfair to do it this way.

MR. FARIDI:  Can I add one -- I heard Your Honor's ruling.

THE COURT:  All right.

MR. FARIDI:  We have no control over the witness. We have no control over whether or not he pleads the Fifth or not.  He is not within our control, Your Honor, so we should not be -- and I heard Your Honor's ruling.  I just want to make sure I make Your Honor aware of this.

We are as equally prejudiced by that as them.  I wish that it came out in 2013, and, if it did, we would have played that before the jury.  But that's not within our control, Your Honor.  He is not our witness; he is a co-conspirator of CACI.

THE COURT:  Well, I understand that, but I'm still

107

not letting it go forward.  All right.

Is that the only other sort of what I'll call housekeeping matter we have to resolve so we can get the evidence in tomorrow?  Are there any other issues that might be coming up?

MR. O'CONNOR:  Your Honor, a number of -- the rest of plaintiffs' rebuttal case are deposition designations. Many of those are not rebutting anything that came out in our case; it's a second case in chief.

Your Honor might remember, plaintiffs didn't make counter-designations to the depositions, and so what they've done for a lot of them is just put them at the back end and say, well, they're now rebuttal evidence.  They involve, like, relatively minor transgressions by CACI personnel, things we've never denied.  So they're not rebutting anything.

For CACI Interrogator A, this is a different category, they want to tell the jury that I know who CACI Interrogator A is.  And Your Honor might remember how that happened.  The government subpoenaed that person, that person knew I represented CACI, called me.  I can't -- so I know who CACI Interrogator A is, but I can't do anything with it.  I haven't told any of my co-counsel.  I can't tell my client.  It's a complete distraction to tell the jury, oh, Mr. O'Connor knows this person's identity when I can't

108

even use it.  I can't tell anybody it.

So that was another piece of -- but there's -- there are issues with the -- and those weren't disclosed to us until 1:30 this morning, we got emailed some clips.  So we've looked at them as fast as we can being that we're here.  But many -- many of the things in there are things that are not rebutting anything that came in our case.

We can submit tonight a -- you know, a short filing that attaches them all and lists where we object to things that are just not rebutting what we did.  We shortened and narrowed our case.  One of the benefits of that is there's less things to rebut, and it would be unfair to us to just let them put in a mini case in chief on the back end.

Thank you.

THE COURT:  All right.

MR. HADDAD:  Your Honor, I can address that.

The reason why we disclosed it last night is because last night was the first time that we heard that CACI might be resting their case today.  They told us that at I think 7:30 p.m. last night.  So, you know, we quickly put together this rebuttal case and sent it to them as fast as we could.  We put together the video clips last night, we stayed up very late just to make sure we disclosed it to CACI in time.  That's why they're --

109

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE COURT:  Wait a minute.  Stop.

I mean, again, we had a very short deposition from Amy Monahan, didn't we already in this case?  Yeah.

MR. O'CONNOR:  They read her in, Your Honor.

THE COURT:  And the proper procedure is -- when we're doing depositions is the side that wants to use the testimony puts in the portion of the deposition they want; the other side gets to put in the cross that they want; and if there's rebuttal or redirect, it goes in.

In other words, it all goes in at one time.  We don't normally -- even if the witnesses are live, I don't normally let lawyers re-call the same witnesses.  I mean, usually if I'm told we might want this witness in rebuttal, we'll often make you do it all at one time.  It's inconvenient to the witness, and it's confusing for the jury, and it does create this kind of problem.  You know, both the jury and the Court heard this testimony a couple of days ago, and the ability to really evaluate whether it's truly appropriate cross or rebuttal, you lose that.  And so I -- at this point, I mean, I don't know why you didn't designate or cross-designate these additional portions of these depositions.

MR. HADDAD:  Your Honor, we did cross-designate it before --

THE COURT:  Then why didn't you ask my law clerk

110

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

to read them in?

MR. HADDAD:  We did before the April trial, and Your Honor struck some of these counter-designations.

THE COURT:  Well if I struck them then, why would I not strike them now?

MR. HADDAD:  I'm sorry, Your Honor.

THE COURT:  Go ahead.

MR. HADDAD:  Every single designation we identified rebuts a point that they made in their case.  I mean, I can go through one by one and explain now.  I mean, they just put on all these pseudonymous interrogators and had them say I never saw these, I never heard anything.  Well, we have designations where they say I did hear about abuse, I did see abuse, I did report abuse to Dan Porvaznik.

THE COURT:  But it would have made much more sense to do that at that time.

I'm telling you right now, this jury -- and I've heard this case now twice, they're not going to be able to connect it.  I will guarantee you that.  Because I would have trouble connecting it at this point.  All right.  There's been so much testimony.  I mean, Monahan, I've got my notes and I can review them, but the jury isn't going to have the same ability.

So I think you need to think very carefully about how much rebuttal -- and it needs to be true rebuttal.  But

111

to the extent that you're trying to do what should have been done, as I said, because of the way this case has gone in with the depositions as so much of the testimony, it should all have been done in the context of that witness testifying.  So that's how I'll leave it for tonight.

All right.  We'll see you back here at 9:30 tomorrow morning.

(Proceedings adjourned at 6:10 p.m.)

-----------------------------------

I certify that the foregoing is a true and accurate transcription of my stenographic notes.

_____
Stephanie M. Austin, RPR, CRR

112