UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

-----------------------------x
SUHAIL NAJIM ABDULLAH AL      :      Civil Action No.:
SHIMARI, et al.,              :      1:08-cv-827
            Plaintiffs,       :
     versus                   :      Thursday, November 7, 2024
                              :      Alexandria, Virginia
CACI PREMIER TECHNOLOGY,      :      Day 6
INC.,                         :      Pages 1-146
            Defendant.        :
-----------------------------x

        The above-entitled jury trial was heard before the
Honorable Leonie M. Brinkema, United States District Judge.
This proceeding commenced at 9:34 a.m.

A P P E A R A N C E S:

FOR THE PLAINTIFFS:    CHARLES MOLSTER, ESQUIRE
                       THE LAW OFFICES OF CHARLES B. MOLSTER,
                       III, PLLC
                       2141 Wisconsin Avenue, NW
                       Suite M
                       Washington, D.C.  20007
                       (703) 346-1505

                       BAHER AZMY, ESQUIRE
                       THE CENTER FOR CONSTITUTIONAL RIGHTS
                       666 Broadway
                       7th Floor
                       New York, New York  10012
                       (212) 614-6464

                       MUHAMMAD FARIDI, ESQUIRE
                       MICHAEL BUCHANAN, ESQUIRE
                       BONITA ROBINSON, ESQUIRE
                       ANDREW HADDAD, ESQUIRE
                       SCOTT KIM, ESQUIRE
                       ALEXANDRA MAHLER-HAUG, ESQUIRE
                       PATTERSON BELKNAP WEBB & TYLER LLP
                       1133 Avenue of the Americas
                       New York, New York  10036
                       (212) 336-2000

1

A P P E A R A N C E S:

FOR THE DEFENDANT:      JOHN O'CONNOR, JR., ESQUIRE
                        LINDA BAILEY, ESQUIRE
                        JOSEPH MCCLURE, ESQUIRE
                        STEPTOE LLP
                        1330 Connecticut Avenue, NW
                        7th Floor
                        Washington, D.C.  20036
                        (202) 429-3000

                        NINA GINSBERG, ESQUIRE
                        DIMUROGINSBERG PC
                        1101 King Street
                        Suite 610
                        Alexandria, Virginia  22314
                        (703) 684-4333

FOR THE UNITED          STEPHEN ELLIOTT, ESQUIRE
STATES:                 UNITED STATES DEPARTMENT OF JUSTICE
                        CIVIL DIVISION FEDERAL PROGRAMS BRANCH
                        1100 L Street, NW
                        Washington, D.C.  20044
                        (202) 598-0905

COURT REPORTER:         STEPHANIE M. AUSTIN, RPR, CRR
                        Official Court Reporter
                        United States District Court
                        401 Courthouse Square
                        Alexandria, Virginia  22314
                        (571) 298-1649
                        S.AustinReporting@gmail.com


        COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

TABLE OF CONTENTS

WITNESSES

On behalf of the Plaintiffs:

CHARLES MUDD ..............................15

CAROLYN HOLMES ............................20

INTERROGATOR A ...........................20

INTERROGATOR B ...........................20

EXHIBITS

On behalf of the Plaintiffs:
Admitted

Numbers 23A and 23B ......................12
Number 206, pages 1 through 22 ...........14
Number 161, Photographs 153, 162, 163 ....29
and 165
Number 171 ...............................142

MISCELLANY

Proceedings November 7, 2024 .............4
Closing argument by Mr. Faridi ...........46
Closing argument by Mr. O'Connor .........71
Rebuttal closing argument by Mr. Faridi ...100
Jury instructions ........................104
Certificate of Court Reporter ............146

3

P R O C E E D I N G S

THE DEPUTY CLERK:  Civil Action Number 1:08-cv-827, Al Shimari et al. versus CACI Premier Technology, Inc.

Will counsel please note their appearance for the record, first for the plaintiffs.

MR. FARIDI:  Good morning, Your Honor. Muhammad Faridi on behalf of the plaintiffs, joined by my colleagues Alex Mahler-Haug, Andrew Haddad and Charles Molster.

THE COURT:  Good morning.

MR. O'CONNOR:  Good morning, Your Honor. John O'Connor for CACI, joined by my co-counsels Linda Bailey, Nina Ginsberg and Joseph McClure.

THE COURT:  All right.  The jury is all here, and we'll bring them in.

THE COURT SECURITY OFFICER:  Yes, Judge.

THE COURT:  And we're in the midst of Colonel Pappas's deposition.

THE COURT SECURITY OFFICER:  Rise for the jury.

(Jury present at 9:35 a.m.)

THE COURT:  Good morning, ladies and gentlemen. Thank you again for being here on time.  As I say, it's a real good sign that you're a wonderful and conscientious jury.  We're moving things along.  I'm quite sure that

4

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

you're going to get -- I mean I'm positive you're going to get the case to start deliberating on today.  All right.

So we're wrapping up the defendant's case this morning, and I believe we'll have a brief rebuttal case from the plaintiffs, and we'll see then.  There may be some longer breaks today because there are various housekeeping matters that we have to set up before we can give the case to you.  All right.

All right.  Mr. O'Connor.

MR. O'CONNOR:  Good morning, Your Honor.  CACI continues the videotaped deposition of Colonel Thomas Pappas.

THE COURT:  Very good.

(Video deposition played of Thomas Pappas.)

MR. O'CONNOR:  Cross-examination is coming next, Your Honor.

THE COURT:  All right.

(Video deposition played of Thomas Pappas.)

MR. O'CONNOR:  And, Your Honor, we have a brief redirect.

THE COURT:  All right.

(Video deposition played of Thomas Pappas.)

MR. O'CONNOR:  Your Honor, CACI presents the video deposition testimony of Major Carolyn Holmes, formerly known as Captain Carolyn Wood.  I have clips for the Court and for

Video deposition - C. Wood/Holmes

opposing counsel.  The run time is 19 minutes and 4 seconds.

THE COURT:  All right.

(Video deposition played of Carolyn Holmes.)

MR. O'CONNOR:  Your Honor, CACI rests.

THE COURT:  All right.  Now there's a rebuttal case; correct?

MR. HADDAD:  Yes, Your Honor.  We have a short rebuttal case, about 15 minutes.

MR. O'CONNOR:  Your Honor, may we approach on some of the rebuttal issues?

(Bench conference.)

MR. HADDAD:  One thing I just wanted to clarify before John starts is we're going to start by offering in two exhibits.  Those are --

THE COURT:  Wait.  Wait.  Wait.

MR. HADDAD:  So before we read in any witnesses, we're going to offer two exhibits, which are one-page excerpts from the Fay report that were not previously admitted that go directly to CACI's borrowed servant defense.  We disclosed those to CACI several days ago.  So we're going to start by just offering those and quickly reading them into the record.  I have copies here for Your Honor and John.  And then after that we will --

THE COURT:  Let me see.

MR. HADDAD:  So this is 23A.  This is the first

6

one.

THE COURT:  The entire thing you're reading in?

MR. HADDAD:  I'm only going to read in part of it, but we're offering the whole thing.  I'm only going to read in about four sentences.  It starts with -- near the bottom of the first page it says:  Another indication of the apparent inadequacy of on-site contract management.  It's right after 10U.  I'm going to read about half of that paragraph.

THE COURT:  Hang on a second.

What was the second one?

MR. HADDAD:  The second one is right here, Your Honor.  I'm only going to read in one sentence from this.  It's the sentence that begins interrogators with their section leaders' knowledge.

MR. O'CONNOR:  Interrogators with their section leaders' knowledge?

MR. HADDAD:  Yes.  It's the last unredacted sentence.  That's all I'm going to read.

THE COURT:  All right.  Is there going to be any objection to these?

MR. O'CONNOR:  We do object, Your Honor.  The Court went through and painstakingly approved -- and approved or disapproved which parts of the investigation were coming in, and we've been operating on that ruling

7

since April or March.

MR. HADDAD: Your Honor, it's only in CACI's case that they can offer their affirmative defense of borrowed servant. We're entitled to rebut that defense in our rebuttal case, and this goes to that defense.

THE COURT: I'm going to permit this.

May I hold on to these?

MR. HADDAD: Yes.

And after that we're doing four witnesses. We've cut the list from what we sent you last night. Just the first four. It's about 14 minutes in total. The first one is a read-in; the next three are videos.

THE COURT: Okay.

MR. O'CONNOR: Four? I think that's five.

THE COURT: No. They got rid of the last one, Interrogator E.

MR. HADDAD: We cut Interrogator E. I told Linda this morning. I thought she told you. I'm sorry.

MR. O'CONNOR: Right. I thought you had A, B, Mudd, Holmes, Morse.

MR. HADDAD: That's it.

MR. O'CONNOR: Oh, Morse is out?

MR. HADDAD: We cut Morse, yeah.

MR. O'CONNOR: Okay.

THE COURT: Do you want that for surrebuttal?

8

MR. O'CONNOR:  No.  No, Your Honor.  I just want to make sure I understood.

A and B, Your Honor, they're allegations of isolated instances of misconduct by CACI personnel.  These issues -- these incidents have not come up.  So we certainly have not denied or put a case on relating to them or anything.  That's not rebutting anything.  One of them is A testifies that he saw an analyst flick cigarette ashes at a detainee and that he reported it.  That doesn't rebut anything in our case.

And then B testifies that he saw A put a lit cigarette sort of underneath a bag for a few -- a hood for a few seconds so smoke went into the hood.  But, again, we've not denied those.  Those are not issues that have come up.  I'm not sure why that's rebuttal.  I mean, these should have been cross-designations and not rebuttal.

MR. HADDAD:  Your Honor, the Interrogator A testimony rebuts the borrowed servant defense.  John said that he reported it.  He reported it to Dan Porvaznik.  He said this happened to Dan Porvaznik.  Dan Porvaznik testified I never had reports of abuse.  This rebuts evidence they put on in their case.

THE COURT:  All right.  I'm going to let -- it's short.  I'm going to allow it in.

MR. O'CONNOR:  And then on Chuck Mudd, Your Honor,

9

they want to -- most of Mudd we don't think is that useful, but it's not objectionable. But they want to put in his opinion on -- Your Honor has seen the Dan Johnson photograph, the only photograph that -- with the squatting detainee. They want to put in his view of whether that was permissible. We've not taken any position. All we've said is that's the only picture.

And then they also want to put in language about whether site managers have the ability to influence CACI employees. And his answer is, he says probably yeah. He says he would assume he or she can. I don't know of any case where they did. Probably so. I mean, he's --

MR. HADDAD: Just to finish, he says but common sense tells me yeah.

MR. O'CONNOR: That, yeah, probably so. And then --

MR. HADDAD: Yeah. He says yeah.

MR. O'CONNOR: And then there's -- they want to just have him talk about the code of conduct. We haven't put a case on the code of conduct.

MR. HADDAD: Your Honor, the --

THE COURT: I don't need to hear the argument. I think because of the borrowed servant issue, this goes in. I'm allowing that in.

MR. HADDAD: Okay. Thank you, Your Honor.

10

MR. O'CONNOR:  And Holmes, we don't think it's very worthwhile.  It's mostly her saying she doesn't know, but it's not prejudicial, so I'm not going to use any capital on that.

THE COURT:  Okay.

MR. HADDAD:  And then there's two additional facts that we want to read in the record.  It's facts that Your Honor read into the record at the April trial about the coalition provisional authority --

THE COURT:  That's in the jury instructions.

MR. HADDAD:  That's in the jury instructions.

THE COURT:  They don't have to hear it twice.

MR. HADDAD:  Okay.  Fine with us, Your Honor.

THE COURT:  Speaking of jury instructions, I'm still tailoring a few.  We haven't had your argument yet.  Your argument to me, right, you moved --

MR. O'CONNOR:  For -- we'll do that when they rest their rebuttal case, Your Honor.

THE COURT:  What we're going to do, just so you know how the morning is going to work, once we get the evidence in, I'm going to give the jury a fairly long break because I'll hear your argument, and then I'm going to go back to chambers and finish up the instructions.  I'm still tailoring them a little bit.

I just want to make sure that I've got this

11

straight, neither side proposed any changes to the verdict form; is that correct?  You didn't submit a new one, and you just submitted the old one.

MR. O'CONNOR:  We don't propose any changes.

MR. HADDAD:  I think that's right.  I was not the person who did it.

THE COURT:  I want to make sure you're sure of that.

MR. HADDAD:  Okay.

THE COURT:  Okay.  That's fine.

MR. HADDAD:  I'll just quickly let my co-counsel know about that.

THE COURT:  Okay.

(Open court.)

MR. HADDAD:  Your Honor, plaintiffs, as part of their rebuttal case, offer into evidence Plaintiffs' Exhibits 23A and 23B.  Your Honor has a copy already, and so does opposing counsel.

I'm going to start by reading 23A into the record.

THE COURT:  And I'm granting both of those. They're both in.

(Plaintiffs' Exhibit Numbers 23A and 23B admitted into evidence.)

MR. HADDAD:  So starting near the bottom of the page.

12

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Another --

THE COURT:  Wait.  I'm sorry.  Give some context.
These are excerpts from the Fay report?

MR. HADDAD:  Yes.  So these are excerpts of the
Fay report that have previously not been admitted into
evidence or read to the jury.  This is page 51 of the Fay
report.

It reads:  Another indication of the apparent
inadequacy of on-site contract management and lack of
contract training is the apparent lack of understanding of
the appropriate relationship between contractor personnel,
government civilian employees and military personnel.
Several people indicated in their statements that contractor
personnel were supervising government personnel or vice
versa.

Sergeant Adams indicated that CACI employees were
in positions of authority and appeared to be supervising
government personnel.  She indicated a CACI employee named
first name was listed as being in charge of screening.
Civilian 8 (CACI) was in charge of B section with military
personnel listed as subordinates on the organization chart.
Soldier 14 also indicated that Civilian 8 was a supervisor
for a time.  Captain Wood stated that CACI supervised
military personnel in her statement but offered no
specifics.

13

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Finally, a government organization chart showed a Civilian 2 (CACI) as the head of the DAB.  Civilian 2 is a CACI employee.

Next I'm going to read from Plaintiffs' Exhibit 23B, which is another excerpt from the Fay report.  And this is page 63 of the Fay report.

Interrogators, with their section leaders' knowledge, routinely utilized approaches/techniques without obtaining the required authority, indicating confusion at a minimum of two levels of supervision.

Your Honor, one very quick housekeeping matter as well.  Plaintiffs' Exhibit 206, pages 1 through 22, was admitted at General Fay's deposition, but it wasn't formally moved into the record.  We move it into the record at this time.  I understand that CACI has no objection.

MR. O'CONNOR:  That's right, Your Honor.

THE COURT:  Plaintiffs' 206, pages 1 through ...

MR. HADDAD:  22.

THE COURT:  One through 22 is in.  All right.

(Plaintiffs' Exhibit Number 206, pages 1 through 22 admitted into evidence.)

MR. HADDAD:  Your Honor, plaintiffs call Charles Mudd, via read-in.

THE COURT:  All right.  We need to get Evan in here.  Do we have the transcripts?

14

MR. HADDAD:  I think so, yes.

THE COURT:  Okay.

The testimony of Charles Mudd was read in as follows:

Q    Would you please state your name for the record?

A    Charles Leslie Mudd.

Q    Within the CACI structure, who was responsible for the day-to-day management of the contract compliance?

A    I assume I would be as division chief.  That's an assumption.

Q    And when you say it's an assumption, that's the assumption you were working under at the time?

A    Uh-huh.  Yes.

Q    And did you review the cost reports and invoices before they were sent to the government?

A    Oh, yes.

Q    And were you the one who made the decision of whether or not to include a particular charge to the government?

A    I would get involved in that discussion, yes, if something was questionable.

Q    Did you have the final authority -- approval authority on what got sent?

A    No.  CACI corporate was the final approving authority.

Q    Was that your -- just in practical terms, is that your boss that had the final approval authority?

15

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

A   No.  It was a cost accountant who would prepare the invoices.  We would review the invoices, they'd go back to the cost accountant, so I'm assuming their bosses got involved to make sure everything was accurate.

Q   And so that was a finance function within corporate?

A   Yes.

Q   The questions of what interrogators could and could not do, if a CACI employee had a question about whether or not some direction that they had been given to them was permissible, what were they supposed to do?

A   If the CACI employee is told some type of interrogation techniques that he or is she is uncomfortable with, feels is not supposed to be done, they can either take it to the military supervisor there at the site, or they can take it to our site lead, who would then take it to the military supervisor.  It depends upon the relationship between the interrogator or the screener or the analyst with the military versus who do they take it to.

Q   And when you say "depends on the relationship" who they felt most comfortable with, whether it was a military person or a CACI person?

A   More if they're comfortable with the military.  Obviously if the sergeant in charge of the operation or the captain in charge tell them to do something they don't agree with, then they'd take it to our CACI site lead.

16

If it was a young sergeant who just happens to be on that team telling them to do something, they could very well take it to the warrant officer.  So it depends on who they felt uncomfortable with and who was giving them direction where they took it to.

Q    Do you remember forming your own view as to whether or not what you observed in the photograph of that CACI employee was permissible?

A    I'm not an interrogator.  I'm not an intel type.  So I can't say what Rules of Engagement were right and what is wrong.  Having an Iraqi prisoner squat on a chair personally didn't seem too bad to me because that's where they sit all the time; however, it doesn't mean it was right or wrong.  I mean, I just don't know.  The government had a problem with it because they showed us the picture.

Q    Mr. Mudd, if a CACI employee was asked to beat up a prisoner, could he refuse to do that?

A    Yes.  He would have to go to a site lead and the government and say, hey, someone has asked me to do this, and I think it's not correct.

Q    And did you expect your employees to do that if they were asked to beat up a prisoner?

A    If they were told to do something which is illegal, yes, I expect them to come to the leadership.

Q    Did those -- did the site managers have the ability to

17

influence the CACI employees that were in their site in the way they performed their duties?

A    Obvious answer is probably, yeah.  I mean, they were there.  They did not impact our paycheck, per se, but if you got a site lead and you got ten CACI employees and one guy is in charge, you assume he or she can influence the people on that team.  I don't know of any case where they did, but common sense tells me, yeah, probably so.

Q    The code of conduct that we have before us, Number 4, reads:  If you have a complaint, take it to your CACI leadership.  Do not take it to the government leadership.  Do not complain about CACI issues in front of government personnel.

A    Yes.

Q    And you drafted that; right?

A    Yes.

Q    Were the -- were CACI -- if a CACI employee had difficulty with the military person that they were working most directly with, was that something they were supposed to come and complain to CACI about first?

A    Yes.

Q    And why was that?

A    So our site leader could get involved and fix the problem, talk to the government.  Instead of one of our analysts, whatever, going to a lieutenant colonel and

18

complaining about a sergeant, it's better for our site lead

to go to the lieutenant colonel and say, hey, we seem to

have a problem down there at that one team.

Q    So you didn't want -- you didn't want the rank and file

of CACI employees to be able to just willy-nilly go up the

military chain of command?

A    No.

Q    Were the CACI employees briefed on that issue that they

were supposed to be coming to CACI management, not to

military management with work difficulties?

A    This checklist and different versions of this

checklist, CACI code of conduct, was briefed to the

employees in-country.  They got there, the country manager,

or whoever was giving that brief for the incoming personnel,

would go down point by point and explain each one, and so it

took a while to go over this sheet.  And then at the end,

they signed it, said yes, they got it, and we kept the back

sheet on file.  We didn't keep the first two or three pages,

but this thing got modified as we went along as new problems

surfaced.

          MR. HADDAD:  No further questions for

Charles Mudd.

          THE COURT:  All right.  And that's the last

read-in; correct?

          MR. HADDAD:  Yes.

19

THE COURT:  Thank you, Evan.

MR. HADDAD:  Your Honor, next plaintiffs call Carolyn Holmes as a rebuttal witness via video.  I have a clip report for the Court.

(Video deposition played of Carolyn Holmes.)

(Video played.)

MR. HADDAD:  One moment Your Honor.  Technical difficulties.

(Video deposition played of Carolyn Holmes.)

MR. HADDAD:  Your Honor, plaintiffs call CACI Interrogator A.  This is a six-minute video.  And I have clip reports for Your Honor.

THE COURT:  This is another one of the pseudonymous --

MR. HADDAD:  Yes.

THE COURT:  All right.

(Audio recording played - Interrogator A)

MR. HADDAD:  Your Honor, plaintiffs call as their final rebuttal case Army Interrogator B, which is one of the pseudonymous interrogators who testified in CACI's case.  I have clip reports for the Court.

THE COURT:  All right.

(Audio recording played - Interrogator B)

THE COURT:  Okay.

MR. FARIDI:  Your Honor, at this time plaintiffs

20

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 21 of 146
PageID# 54961
Audio recording of Interrogators A and B

rest their rebuttal case.

THE COURT:  All right.  That's fine.  That means all the evidence is now in; correct?

All right.  So, ladies and gentlemen, I don't want you to just be sitting listening to the white noise, and we have a fair number of logistical issues we have to work on, including making sure all the exhibits are ready to go, so I'm going to give you an extended break, and I'm actually going to give you 45 minutes.  So you're free to go down to the second floor, there's a little cafeteria there, you can get some sodas or snacks if you would like.  I'll just ask you to be back here promptly at noon.  I think by then we should have the case ready for you.

So the next things you're going to have -- and, again, I don't want you to start making up your minds -- we're going to have the closing arguments of counsel, and then most likely we'll be taking the lunch break sometime in that time frame.

You may want to get something to eat because I may have the lunch break start a little bit later.  And then I'll be giving you, after lunch, if things stay on schedule, the closing -- the final jury instructions, and then we'll be sending the case to you all for deliberation later this afternoon.  All right.  That's the plan right now.  Things can shift, but I'm going to try not to waste your time.  So

21

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 22 of 146
PageID# 54962
Audio recording of interrogators A and B

please be back here by noon.  You should leave your notebooks on your chairs or in the jury room.  All right.

THE COURT SECURITY OFFICER:  Rise for the jury.

(Jury not present at 11:06 a.m.)

THE COURT:  All right.  First thing I wanted to ask you is does anyone remember how much time I gave you last time for closing?

MR. O'CONNOR:  45 minutes, Your Honor.  They had to split theirs.

THE COURT:  Their side.  All right.  That's about what I was going to do today as well.  That's why I said we might have lunch start at 1:30 if I can stay on schedule.  All right.

All right.  Mr. O'Connor, you had a question -- or you had an argument you wanted to make?

MR. O'CONNOR:  Yes, Your Honor.  We renew our motion for judgment under Rule 50 that we brought at the close of plaintiffs' case.  We have a total of nine grounds asserted.  We filed our brief last Friday.  I'd like to talk about at least a few of them.

I want to start with aiding and abetting.  When we had our trial in April and the jury hung, the Court expressed some doubt about whether aiding and abetting should be in part of this trial, and I think the evidence that's come in in this trial has justified the Court's

22

concerns about that, the aiding and abetting claims.

Aiding and abetting, as Your Honor noted with the last trial, and presumably will be the same or a similar instruction in this trial, requires direct involvement by a CACI employee in facilitating, assisting the mistreatment of one of these plaintiffs.  This is not conspiracy where you can be pretty far removed at times and still have some liability if the scope of the conspiracy is brought.  There has to be direct connection between assistance provided by a CACI employee and these plaintiffs.

That also has to be for the purpose of committing the unlawful act.  You know, if the purpose is to get intelligence, that's not aiding and abetting.  The purpose has to be I want to torture this person or I want to commit CIDT on this person.

We don't even have -- we don't have a single CACI employee identified as providing any practical assistance to the plaintiffs in this case, and we certainly don't have any evidence from which someone could rationally conclude that any such assistance would have been with the purpose of facilitating the conduct that's outlawed by -- that the Court found subject to the Alien Tort Statute.

THE COURT:  All right.  Have a seat.

Let me hear the plaintiffs' response.

MR. FARIDI:  Your Honor, under your instructions

23

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 24 of 146
PageID# 54964
Audio recording Interrogators A and B

from the last trial, we're required to prove that CACI

provided practical assistance, and I think we have

demonstrated that.  There's been significant testimony that

CACI interrogators were directing military police members to

soften up the detainees to get them ready for

interrogations.

THE COURT:  Yeah.  But you know the last time --

I'm going to grant this motion.  I should have -- I thought,

as you know, because we struggled with it last time, there

is simply insufficient evidence to show that this conduct

was directly -- directed at the three plaintiffs.  And I

think that's what aiding and abetting requires.

The conspiracy claim is different.  You've got

enough to go to the jury on conspiracy.  But I am going to

take the aiding and abetting.  I'm satisfied that there is

insufficient evidence to show that direct connection that

has to be there.  So that part of your motion is granted.

All right.

You may see where I'm going from there,

Mr. O'Connor.

MR. O'CONNOR:  I have a good idea, Your Honor.

I assume the Court may not want further argument

on conspiracy.

THE COURT:  No.  No.  It's there.

MR. O'CONNOR:  Borrowed servant?

24

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 25 of 146
PageID# 54965
Audio recordings of Interrogators A and B

THE COURT: I'm letting the borrowed servant instruction go through. What I'm trying to do is move this a bit because I'm still tinkering with a few of the instructions, and with the aiding and abetting coming out, obviously the instructions are going to be different, and I want to give you all enough time to look at the revisions.

There's enough evidence -- it's a fact-bound issue, and this case is in a different posture than the previous one. I'm not going to tell you the differences that I see because you need to do your own closing arguments, but I think there's a significant difference in how the evidence came in this time than it did last time.

The borrowed servant instruction will go to the jury. I will be adding, however, a sentence or two that makes it clear that an employee can have two masters at the same time. All right. Because the restatement clearly says that. It's a fact-bound evaluation that the jury has to make in looking at all the facts and circumstances.

Anyway, you'll see the instruction, and I'm sure there will be some discussion about it.

MR. O'CONNOR: We'll object to that when it comes, but that's not this current business.

And, Your Honor, we also asserted a number of legal defenses that I assume the Court probably does not want argument on. We do think that there's not been

25

Case 1:08-cv-00827-LMB-JFA   Document 1820   Filed 11/12/24   Page 26 of 146
PageID# 54966
Audio recording of interrogators A and B

evidence of domestic conduct that gets it done here --

THE COURT:  Look --

MR. O'CONNOR:  -- it's ordinary corporate business.

THE COURT:  -- I recognize that this is an area of greatly unsettled law.  I'm comfortable with the pretrial decisions that I've made.  I think the evidence in this case does strongly show much more impact on the United States and involvement from the home base here in Northern Virginia than any of the cases the Supreme Court has yet addressed on this issue.  But it is definitely an open question, and I would not be surprised down the road, depending upon what happens, should the plaintiffs achieve a victory in this case.  The appellate process will be quite interesting. It's a legitimate legal issue, but I'm comfortable on the evidence that I've seen that that argument does not prevail, at least at this level.

MR. O'CONNOR:  And, Your Honor, the Court has issued pretrial rulings on what I think are pretty clearly straight questions of law regarding the Court's power to imply a cause of action preemption, state secrets, derivative sovereign immunity and political question.  I'm happy to argue each and every one of those.

THE COURT:  And you've done it well, and you've made your record, Mr. O'Connor.  As I said, there's some

26

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 27 of 146
PageID# 54967
Audio recording — Interrogators A and B

other very interesting issues in this case.  The state secrets decisions are definitely vulnerable.  Although both sides were impacted by that.  And I'm still going to give the same instructions.  Most of the instructions are the same.  I'm going to give you the changed instructions.

No one at -- I mean, there really were not much requests for additional new instructions.  Most of the instructions -- I mean, the preponderance of the evidence instruction is the same, we're still using clear and convincing evidence for punitive damages.  You know, all of that we hashed out last time, and I didn't see much -- anything new from you all.

MR. O'CONNOR:  I think that's largely right, Your Honor.

THE COURT:  Okay. All right.  So for the record then, I've denied all of the defendant's motions except for the motion for judgment as a matter of law on the aiding and abetting count.  All right.

So I hope to be able to bring you out the proposed instructions in about 15 minutes or so so you'll have time to look at them and discuss them with me before we get the final set written up for the jury.  All right.

Now, the other thing is, have you all got the index of admitted exhibits, including the ones we may have added today?

27

MR. FARIDI:  Yes, we have.  And we also have just one clarification on one of the exhibit numbers that we want to make, and we've discussed the issue with CACI's counsel, and we're in agreement.

THE COURT:  Which is?

MR. FARIDI:  I'll let my colleague, Ms. Mahler-Haug, deal with that.

MS. MAHLER-HAUG:  Very briefly.  With respect to Plaintiffs' Exhibit 161, both sides agree that Photograph M163 was also admitted with the other specific photographs, and so we just wanted to quickly clarify the record that that is admitted into evidence and will be so reflected on our --

THE COURT:  N, as in Nancy, 163?

MS. MAHLER-HAUG:  M, as in Mary.

THE COURT:  M, as in Mary, 163.

MS. MAHLER-HAUG:  Right.  So it's photos M153, M162 --

THE COURT:  I'm sorry.  Wait a minute.  M153?  All right.  M153.  Go ahead.

MS. MAHLER-HAUG:  162.

THE COURT:  Go ahead.

MS. MAHLER-HAUG:  163 and 165.

THE COURT:  So Plaintiffs' Exhibit 161 --

MS. MAHLER-HAUG:  Correct.

28

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 29 of 146
PageID# 54969
Audio recordings Interrogators A and B

THE COURT:  -- consists of only four photographs?

MS. MAHLER-HAUG:  Correct.

THE COURT:  All right.  153, 162, 163 and 165?

MS. MAHLER-HAUG:  That's right, Your Honor.

THE COURT:  All right.  We have to make sure that the book reflects that.  All right.

(Plaintiffs' Exhibit Number **161 Photographs 153, 162, 163 and 165 admitted into evidence.**)

THE COURT:  I believe it's this case that one of the questions that we got from the jury was a question about whether the title of the exhibits in the index was evidence.

MR. O'CONNOR:  That's right, Your Honor.  I think we've worked all those out.  We had some proposed changes to theirs.  I think ours were fairly not -- I don't think we had any objections to ours; they were pretty vanilla.

THE COURT:  All right.  I'm going to add an instruction.  I'm trying to pre think what they had questions about last time so we can have it in this.

I'm going to also put somewhere in the instructions that I've asked the attorneys to provide for you a list of the exhibits that were entered into evidence.  They gave a brief title of the exhibits so it will help you to find it, but the title is not evidence in this case.  All right.

MR. O'CONNOR:  That's great, Your Honor.  And we

29

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 30 of 146
PageID# 54970
Audio recordings of Interrogators A and B

have -- we brought hard copies, but we have to make one change because an exhibit was not admitted. So we'll make that during this break, and then we'll have hard copies of the index of our exhibits, our admitted exhibits.

THE COURT: All right. I'm sorry. Did you say there was an exhibit that has not yet been admitted?

MR. O'CONNOR: On the hard copy that we brought over, there is an exhibit listed that was not admitted. So we just need to delete that from our chart, and so our paralegal will do that during this break and then bring back hard copies.

THE COURT: That's fine. All right.

So is there anything else we need to address?

MS. MAHLER-HAUG: No. Just to add that, like defendant, plaintiffs have hard copies of our exhibit list, and we also need to make one change to reflect the admitted evidence, but we'll have that ready as well. It's good to go otherwise.

THE COURT: All right. The only other thing is on the verdict form now, I've taken the old verdict form, and I've removed the aiding and abetting cause of action. So it's just going to be the conspiracy. All right. And, again, we have a separate set of questions for -- as to each plaintiff just the way we did last time. All right. So that we probably can bring out to you now so we have a

30

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 31 of 146
PageID# 54971
Audio recording of Interrogators A and B

verdict form, so if there's anything that we've missed, you can get that right away.

All right.  Anything further then?

MR. FARIDI:  Nothing from us, Your Honor.

MR. O'CONNOR:  No, Your Honor.  Thank you.

THE COURT:  All right.  We'll recess court until I get back.

(A brief recess was taken.)

THE COURT:  All right.  I'm going to give you each a copy.  There are only four instructions that I think need to be changed.  We're adding the one -- brand-new one that I mentioned to you, and it simply reads -- we'll probably put this one right after where I go through the different types of evidence.

You will have a list of all exhibits that were admitted into evidence during the trial.  The titles of the exhibits are not evidence and are only intended to help you locate the documents you're looking for.  Okay.

The reason it took so much time in there is I realized as I was thinking this through -- so, Mr. O'Connor, you need to respond to this.

My Jury Instruction 26 is the corporate responsibility for employee conduct instruction.  In going through the plaintiffs' objections, they are correct that under Virginia law, if it is established that somebody is an

31

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 32 of 146
PageID# 54972
Audio recording — Interrogators A and B

employee of a corporation, then whether they're acting within the scope of their employment, the burden would be on the defendant to say that they're not within the scope.  But you're not making that argument in this case.  You never have.  The argument has always been the borrowed servant argument.

Now, if you were making an argument that there are not -- that the employees are not acting within the scope of their employment, then I'm going to go ahead and probably give what we now have marked as Instruction 26, which incorporated the example.  Remember, because it did confuse the jury what was within the scope of employment.

Because there's no question, these people are working under employee -- a contract that you all have.  So the real issue, it seems to me from listening to how your defense has always been in this case, is that, yeah, they're working on a CACI contract, but they're under the control of the government, and all the misconduct occurred at the government's control.

So I just want you to think about that.  I don't have a problem giving the corporate responsibility instruction, but as a result of that, I've changed the -- overview of the case, Number 19.  Because originally in the last case, we did, in fact, have it wrong, that is that there were three elements that the plaintiffs have to prove,

32

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 33 of 146
PageID# 54973
Audio recording of Interrogators A and B

the third element being that the conduct occurred within the scope of their employment.

And so if you look at revised Instruction 19, that third element has been removed. So the plaintiffs would have to prove, first that they were subjected to torture or CIDT; and then secondly, that CACI's employees were responsible by being members of the conspiracy. Okay.

It's a matter of -- it's your defense, so you need to tell me what you want there. But it occurred to me -- I'm trying to make these instructions because I think the evidence is so complicated that the cleaner and simpler the instructions, the easier it's going to be for the jury, and I don't really think this issue of respondeat superior is an issue in the case.

You can think -- I'm not going to require you to stand up in a second and give me an answer on that, but, I mean, that's why the instruction's changed.

Okay. So there are two issues. One is if you want that issue left in the case, then take a careful look at Instruction 26. Okay. Because that would address it, I think.

And then the other issue is going to be the borrowed servant. And I have made that -- because the last time it was not part of -- I've made it a standalone instruction. So in going over the overview of the case

33

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 34 of 146
PageID# 54974
Audio recordings - Interrogators A and B

after indicating what the plaintiffs have to prove, I said in the last paragraph:  Even if a plaintiff proves all of these two facts by a preponderance of the evidence, CACI maintains that it is not liable for any misconduct of its interrogators under the borrowed servant doctrine. Defendant has the burden of proving this defense by a preponderance of the evidence.  I'll explain this doctrine in the next instruction.  And then the next instruction is a very simple -- it's as simple as it can be, but I think it still correctly captures the essence of *Alvarez* borrowed servant doctrine.

I looked carefully at the plaintiffs'.  I think the plaintiffs' is too complicated and is not actually 100 percent accurate.

The issue is, in all the cases I've looked at, including the restatement, the ultimate issue is who has the control over the work at the time that the misconduct occurs.  That's the core issue for the borrowed servant doctrine.

So, anyway, those are the only instructions that I changed.  Otherwise, you've got the whole charge because it's the same charge we did last time.  So I'm still giving a punitive damages instruction.  It's still clear and convincing evidence of standard.  I know there was a fight about that last time, but I'm still comfortable with that.

34

So I'll give you a few minutes.  You've got the copies of the changed instructions.  And what we'll do is, you know, if there are any other changes, read them over carefully.  We'll come back -- so maybe 10 -- it's not a lot to read.

MR. O'CONNOR:  We don't need more than 10 minutes, Your Honor.

THE COURT:  All right.  Let me -- is the plaintiff ready to respond already?

MR. AZMY:  We can defer until we all come back.

THE COURT:  Maybe 10 minutes, so my staff knows how much longer to stay around here, by 1:00?

MR. AZMY:  That's more than enough time.

THE COURT:  And if you're sooner, just let Kim know that you're ready for me to come back in.

MR. O'CONNOR:  On the scope of employment, I probably need two minutes, Your Honor, to confer to be able to give you an answer.

THE COURT:  All right.  And if for some reason we get a question from the jury that's somewhat like that, that's the instruction I'm going to give them, so take a look at 26.  Okay.  That would be the one.  All right.

MR. O'CONNOR:  Understood.

THE COURT:  All right.  We'll recess court.

                (A brief recess was taken.)

35

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 36 of 146
PageID# 54976
Audio recording of Interrogators A and B

THE COURT:  All right.  For the plaintiffs.

MR. AZMY:  Thank you, Your Honor.  So --

THE COURT:  Let me ask you this, first of all, on Instruction 19, that's the overview of the case, is there any objection to that instruction?

MR. AZMY:  No.

THE COURT:  Okay.  So -- and I think for CACI, is there any objection to 19?

MR. O'CONNOR:  No, Your Honor.

THE COURT:  Okay.  All right.  That one's all right then.

Now, borrowed servant.

MR. AZMY:  Your Honor, yeah.  I think we have concerns similar to the concerns we had last time, because although the instruction mentions that there could be more than one employer --

THE COURT:  Right.

MR. AZMY:  -- we haven't told them what follows from that, which is that the defense is not available if they find that there's shared control.  Because it does risk leaving the jury to think that there's a binary, when in the next sentence you say that you can have more than one employer at the time the wrongful act is committed, that's in the first paragraph.

THE COURT:  Right.

36

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

MR. AZMY:  And then in determining the liability of a company for acts performed by one of its employees who has also worked for another company, you must consider who -- and I think the jury might read that as one or the other controlled the work.  And -- but I think the idea of having two masters is that both would have controlled the work.

So we would request an additional line that suggests that if there's shared control, the defense is not available.

THE COURT:  All right.

MR. AZMY:  And then I have something on 26 briefly, Your Honor.

THE COURT:  All right.  What's -- let me hear your 26 issue.

MR. AZMY:  So the 26 issue, I know Your Honor was thinking about sort of eliminating the scope of employment, which is fine with us.  We just think what should remain is in the first paragraph, the theory of corporate responsibility, the defendant is a corporation to the end of the second sentence.  And then the rest -- we have no objection to striking, which looks a little bit like your supplemental instruction on scope of employment.

THE COURT:  Yeah.  Because I'm presuming that it's a somewhat confusing instruction in the context of this

37

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 38 of 146
PageID# 54978
Audio recording, Interrogators A and B

case.

MR. AZMY:  Understood.  Yeah.

THE COURT:  The difficulty here is there's no question.  They're working for CACI, they're performing CACI's contract.

MR. AZMY:  Yes.

THE COURT:  The real question for this specific case, though, is where there is the tort committed on a different location for a borrowing employer.  You know, it's impossible.  I mean, they're always going to be working for CACI.  Always.

MR. AZMY:  Right.  Yes.

THE COURT:  So I think -- again, I'm trying to assume that this jury could have the same confusion that the other one did.  But CACI may not want the instruction at all, which moots the issue.

So let me hear Mr. O'Connor.

MR. AZMY:  Just to be clear, Your Honor, we don't disagree as long as there's an explanation how a corporation can be held liable, which is in the first three sentences of Instruction 26.

THE COURT:  I'm not sure I understood that.

MR. AZMY:  So defendant is a corporation --

THE COURT:  Right.

MR. AZMY:  -- under the law.  A corporation is

38

considered to be a person.

THE COURT:  Right.

MR. AZMY:  When the corporation's named as a defendant in a lawsuit, it can act --

THE COURT:  All that stays in.

MR. AZMY:  Okay.  I'm just making sure.  Thank you.

THE COURT:  26 is the entire instruction I would give.  If I'm going to give any kind of a corporate responsibility instruction, all right, this is the one I'm going to give.

MR. AZMY:  I understand.  I thought potentially you were thinking about maybe striking what was the supplemental instruction around the scope of employment.

THE COURT:  No.

MR. AZMY:  Okay.  I understand, Your Honor.

THE COURT:  Mr. O'Connor.

MR. AZMY:  Then just one small part about this instruction about the hypothetical.  This occurred to us last time, I think the -- well, having an example -- an illustrative example of course can be helpful.  I think the use of the pornographic photos might be a little bit unfortunate given the facts of this case.  We certainly don't -- and I know we're --

THE COURT:  I could say, you know, cocaine.

39

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 40 of 146
PageID# 54980
Audio recording -- Interrogators A and B

MR. AZMY:  Yes.  I think -- we just don't want the jury thinking is the Judge telling us that pornographic images are always outside the scope of employment.

THE COURT:  All right.  Let me see this.  May be moot.  Is it moot or not?

MR. O'CONNOR:  I think it is moot, Your Honor.  We note that the Court's proposed instruction differs from last trial in that the Court last trial placed the burden on plaintiffs and then this one places it on us.  We object to that, but to the extent the Court's adhering to that, then we're not going to request a scope of employment instruction.

THE COURT:  Well, I think it would confuse things given what your main defense is --

MR. O'CONNOR:  I understand that.

THE COURT:  -- under the borrowed servant.

So no scope of employment's going in.  If the jury comes up with some kind of a weird question about it, all right, then the instruction I'm going to give them is 26, and I'm going to change graphic pornography -- pornographic photos to cocaine.  All right.  I mean --

MR. O'CONNOR:  If it comes up.

THE COURT:  Just as an example of something that's outside the scope.

MR. O'CONNOR:  Understood, Your Honor.  The

40

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 41 of 146
PageID# 54981
Audio recording of interrogators A and B

context of what's being sold doesn't really matter for us there.

THE COURT: All right. So then just for recap, the entire package that was given -- we're going to rerun them so they're clean and you can have them.

I've decided to save a piece of paper. At the end of Instruction 3, which is the one that just gives the different categories of evidence, I'm going to put the instruction that I mentioned to you about the index. It makes sense to go there. I try to put the instructions sort of logically together, and that's basically an evidence-related instruction. Okay.

So we will reprint these for you so you have them fresh on your desks, but you know what they are now. And you've got a half an hour to get ready for your closing arguments. All right.

The nice thing now about the schedule is that we won't have a break between closing arguments, which we would have had otherwise. So when we get back at 1:30, you'll go first with your closing. I assume you want 30 and 15 in terms of your time?

MR. FARIDI: I think we'll do 33 -- I'm sorry, we have 45 minutes; right?

THE COURT: 45 total.

MR. FARIDI: So we will do 35 and 10.

41

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 42 of 146
PageID# 54982
Audio recording of interrogators A and B

THE COURT: 35 and 10. All right. And we'll give you a timer again towards the three-minute and the one-minute. All right.

MR. FARIDI: Yes.

MR. O'CONNOR: I'll take 45 and zero, Your Honor.

THE COURT: Okay. And you don't need all the time, by the way. All right.

Anything further before we break?

MR. AZMY: Yes, Your Honor. Simply that if you -- just to preserve our objection in the event that you don't adopt our proposed dual servant instruction.

THE COURT: I read your brief. I don't totally agree with it. I've looked at the cases. I think the instruction is sufficient. I'm trying to keep it as simple and clean as possible. I'm not going to change it. And, you know, we'll see whether the jury has questions that might require some further elucidation.

MR. AZMY: Okay. And just to underscore, our concern is them not knowing what happens if they are working for both, like what follows legally.

THE COURT: Okay. All right. They will always be working for both; the issue is who's controlling it at the time the tort is committed. That's the essence of the borrowed servant.

MR. AZMY: Yes. Our understanding is that if

42

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

you're subject to control --

THE COURT:  Listen, you should argue -- I mean you can argue that to the jury; it's not improper for you to make that argument.  Okay.

MR. AZMY:  Okay.  Thank you, Your Honor.

THE COURT:  All right.  Anything further?  If not, we'll see you back here at 1:30.

(Court recessed for lunch at 12:59 p.m.)

AFTERNOON SESSION 1:35 p.m.

THE COURT:  All right.  Before we bring the jury in, just to make sure, I understand that -- is it correct is that both sides are asking that the judicial notice be taken out of the instructions?

MR. FARIDI:  No.  The only reason we didn't read that in the rebuttal part of the case is because, Your Honor, our understanding was that you were going to put that judicial notice in the instruction.

THE COURT:  It's in the instructions.

MR. FARIDI:  Yes.  We agree it should be there.

MR. O'CONNOR:  They never asked for judicial notice.  And, in fact, in an attempt to keep out one of our exhibits, they told the Court in a pleading they were not requesting that judicial notice in this trial.  We didn't know that that was going to be in the instructions until we saw them a minute ago.

43

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 44 of 146
PageID# 54984
Audio recording of Interrogators A and B

THE COURT:  Yeah, but I've asked you several times.  I think I started asking you last night are there any objections to the instructions.  I mean, these are the instructions that I gave last time.

What is the prejudice to this going in?

MR. O'CONNOR:  Well, one --

THE COURT:  Because you brought in the evidence.  I mean, I would think, if anything, I thought the objection was going to be from the plaintiffs because you put in the Rumsfeld memo over plaintiffs' objection, and it's your case that has the Foreign Claims Act stuff in it.

So why are you objecting?

MR. O'CONNOR:  The first part of that talks about coalition Provisional Order 17 and plaintiffs swore off requesting it at -- you know, judicial notice of that and then didn't request it during the trial of this case.

THE COURT:  If it doesn't hurt you, why are you arguing it?  It seems to me, if anything, it strengthens your case and maybe hurts the plaintiffs a little bit.

I'm going to leave it in because -- I'm leaving it in.

MR. O'CONNOR:  Your Honor, we don't have a copy of the instructions now.  We handed it to Ms. Reno.  We don't have a copy.

THE COURT:  You do now.

44

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 45 of 146
PageID# 54985
Audio recordings interrogators A and B

MR. O'CONNOR:  No, we don't.  We handed it to Ms. Reno to show --

MS. RENO:  It's right here.  Sorry about that.

MR. O'CONNOR:  That's okay.  Thank you.

THE COURT:  All right.  Everybody ready now?  And the demonstratives, if you're using them, you're ready with the demonstratives?  Let's bring them in.

THE DEPUTY CLERK:  Yes, Judge.

Rise for the jury.

(Jury present at 1:38 p.m.)

THE COURT:  All right.  Ladies and gentlemen, so we've reached the final stages of the trial.  I've given each side a total of 45 minutes to argue the case.  The plaintiffs, because the plaintiffs have the burden of going forward first, they'll make the first opening closing argument.  They will take a half an hour for that.  And then the defendant will be able to making its closing argument, and that will be a 45-minute argument, and the plaintiff -- it was 30 and 15; right?  Or was it 35 and 10?

MR. FARIDI:  35 and 10, Your Honor.

THE COURT:  Then there will be a ten-minute rebuttal by the plaintiffs.

So we should finish that around 3:00.  Then I'm going to give you a short break.  And then we'll come right back in, and I will give you the instructions.  It will

45

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

probably take 20 to 30 minutes to give you the instructions, and then we'll be letting you go into the jury room to start your deliberations.  So that's the schedule for this afternoon.  All right.

All right.  Who's going to open for the plaintiff? Counsel.

CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFFS

MR. FARIDI:  Good afternoon, members of the jury. It's my honor to be addressing you for the first time directly in this trial.

At the beginning of this case, we told you that what happened at Abu Ghraib was one of the most shameful periods in American history.  In late 2003/early 2004 the detainees at Abu Ghraib were tortured and humiliated at the direction of military intelligence, including CACI.

And how do we know that?  We know that from the photographs of the abuse that were taken by those who were involved in perpetuating the abuse.  We know that from the military's leadership, which investigated the abuse and made factual findings related to the abuse.

We know that from the members of the military police who were court martialed, and some of them spent time in jail as a result of perpetuation of the abuse at Abu Ghraib.

And we know that from some of the victims of the

46

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 47 of 146
Audio recording of Interrogators A and B
PageID# 54987

abuse, including our clients, Salah, Asa'ad and Suhail.

The whole world acknowledges that abuse took place at Abu Ghraib.  Our country's military leadership acknowledges that abuse took place at Abu Ghraib.  Those who were directly perpetuating the abuse acknowledged that abuse took place at Abu Ghraib and have owned up to it.  They served time in jail.

CACI will tell you that it acknowledges that abuse took place at Abu Ghraib.  But the substance of their defense, once you look at it carefully, and I'll go into it with a little bit more detail later, boils down to demeaning the victims of the abuse, denying the role of CACI employees, the role that they played in the abuse, and then deflecting responsibility entirely to the U.S. military.

I want to echo Judge Brinkema's words from earlier in thanking you for the careful attention and diligence that you have shown throughout this entire trial.

Judge Brinkema said at the very early stage of this case that you will be provided pieces to a puzzle.  The pieces are the facts, and, here, the facts show that there was a conspiracy to abuse detainees at Abu Ghraib.

Who was involved with the conspiracy?  CACI and members of the military police.  The brotherhood.  Those are the words of Sergeant Frederick, a member of the military police who was in the conspiracy with CACI.

47

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA   Document 1820   Filed 11/12/24   Page 48 of 146
PageID# 54988
Audio recording of Interrogators A and B

What was the -- what was the purpose of the conspiracy?  To soften up detainees, to get them ready, to enable the interrogations.

And what were the acts that were in furtherance of the conspiracy?  The members of the military police carried out the instructions given to them by military intelligence and inflicted brutality.

And what were the results of the conspiracy?  The torture, the cruel, inhuman and degrading treatment that was inflicted on our clients.

When you put these pieces together, there's one thing that is clear:  CACI is responsible for the abuse that was perpetuated at Abu Ghraib, including on our three clients.

And I want to remind you very briefly of some of the witnesses that you heard from who connected CACI to the abuse at Abu Ghraib.  The military leadership, the military police, and the victims of the abuse.  You also heard this morning from CACI Interrogator A and Army Interrogator B, the testimony of those witnesses still fresh in your mind.  And I want to take you to the testimony that some of the -- that each of the witnesses provided to you over the last week.

Let's begin with the military's leadership, Major General Antonio Taguba.  And you heard from him last week,

48

Audio recording of interrogators A and B

and he told you he was asked to investigate all aspects of the abuse at Abu Ghraib.  His words.  And he described the torture and the CIDT that was inflicted in many forms at Abu Ghraib.  It's on the screen in front of you.  Punching, slapping, kicking detainees, forcing detainees to remove their clothing and keeping them naked for several days at a time, forcing naked male detainees for wearing women's underwear, and using working military dogs without muzzles to intimidate and frighten the detainees.  Those are exactly the same types of abuses that our clients suffered at Abu Ghraib.  And remember the words of the General, the abuses were systemic, and they were illegal.

And he also found that the abuse was being directed by military intelligence.  Military intelligence, which includes CACI.  The interrogators actively requested that MP guards set physical and mental conditions of favorable interrogation of witnesses.

So what does it mean to set the conditions for interrogation?  General Taguba said that's code for abusing the detainees to get them ready for the interrogations.  And he told you that you don't need a formal agreement, and he said that you can accomplish this, you can have this agreement through a wink.  Those are the words that he used.

And General Taguba also told you who from CACI was behind a lot of the abuse.  Steve Stefanowicz, Big Steve.

49

Big Steve, according to the General, instructed the military police to facilitate interrogations by setting the conditions.  He clearly knew his instructions equated to physical abuse, the General's words.

And General Taguba also told you how is it that the military intelligence, which, again, includes CACI, and the military police were able to work together to inflict the abuse.  Command vacuum.  He found that there was no clear delineation of responsibility between the commands.  Military intelligence on the one hand, and military police on the other.  And there was very little oversight by the commanders of the military.  And that's what allowed the abuse to take place.

And then you also heard from Major General Fay, George Fay, who was appointed by our country's military to investigate military intelligence's role in the abuse.  And he found that the abuses were caused by morally corrupt soldiers and civilians.  That's CACI.

And he also was asked whether he concluded in his investigation whether the contract interrogators from CACI were involved in the abuse that he uncovered.  He said there were.  He was asked:

Question:  And so military police and interrogators were working together inside the hard site to set the conditions for interrogations?

50

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 51 of 146
PageID# 54991
Audio recording of Interrogators A and B

Answer:  Yes.

And he also outlined the different types of abuses that he saw and found at Abu Ghraib.  The same types of abuses that General Taguba found.  Physical abuse, use of dogs, humiliating and degrading treatment, forced nudity, simulated sexual positions, improper use of isolation, and he found also that the abuses were unlawful, and they were not justified.

And General Fay also told you who from CACI was behind the abuses.  Big Steve.  He found in his report that Big Steve used a dog during an interrogation and that the dog was unmuzzled.  Big Steve pushed, kicked a detainee.  Big Steve told other people that he had, himself, shaven the hair and beard of a detainee and put that detainee in red women's underwear, and then he was allegedly bragging about it because he thought it was funny.

General Fay also talked about the abuse that another CACI interrogator, DJ, Daniel Johnson, perpetuated at Abu Ghraib.  He found that DJ abused detainees, DJ used dogs, DJ placed a detainee in unauthorized stress positions.  And then he also made findings with respect to a third CACI interrogator, Tim Dugan, another CACI interrogator.  And he found that Dugan had grabbed a detainee who was handcuffed off of a vehicle, dropped him on the ground, and then he dragged that detainee into the interrogation booth, and then

51

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 52 of 146
PageID# 54992
Audio recordings of interrogators A and B

when the detainee tried to get up, Dugan would yank the detainee very hard to make him fall again. CACI's interrogator, Tim Dugan.

So why is CACI liable for the abuses? Take a look at what General Fay said. He said that their instructions, CACI's instructions, created an environment that resulted in the routine abuse of detainees at Abu Ghraib, including our clients. That, by itself, makes CACI liable.

The military also appointed Lieutenant Anthony R. Jones. You didn't hear from him, but his report is part of the record before you. It's included in PTX 23. Okay.

And General Jones found in his report that the failure to effectively screen, certify and integrate contract interrogators, CACI's interrogators, was one of the factors that contributed to the abuses occurring at Abu Ghraib. And he also found that integration of some of the contractors without training and qualifications, CACI's contractors, created ineffective interrogation teams and a potential for non-compliance with doctrine and applicable laws. That means a violation of the Geneva Conventions.

And then lastly, the military appointed Vice Admiral Church to take a look at the policies governing interrogations in Iraq, in Afghanistan, and also at Guantanamo Bay. And like the generals, Vice Admiral Church also found that the events at Abu Ghraib had become

52

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 53 of 146
PageID# 54993
Audio recording of Interrogators A and B

synonymous with the topic of detainee abuse.  And then he also found that the -- none of the abuse that he saw in the pictures, none of that abuse was authorized by our country's military.

So your job is hard as jurors.  But isn't it remarkable that you have access to the photographs of the abuse?  Isn't it remarkable that you have the benefit of the findings made by four senior leaders of our country's military leadership?

And how is it then that CACI can claim that its employees were not involved with the abuse?  You heard that in the opening statement.  To believe CACI, you have to find that the generals were wrong.  You have to find that the generals were wrong in the reports that they made back in 2004, '5 and '6.  And you have to find also that they were not credible when you heard their deposition testimony or when they testified in front of you at this trial.

So aside from the military generals, you also heard from members of the military police, CACI's co-conspirators, who were court martialed for carrying out the abuses at Abu Ghraib and some of whom served time in jail.

And these are the people who worked at the hard site during the night shift when Big Steve roamed, as he put it.  He was always at the hard site, he was there all the

53

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 54 of 146
PageID# 54994
Audio recordings of Interrogators A and B

time.  These are the people he was interacting with.

You heard from Staff Sergeant Ivan Frederick, okay, and he told you via deposition, he was asked:  Did CACI or did interrogators ask MPs to soften up detainees?

Answer:  Yes, sir.

Question:  What did you understand the purpose of these kinds of treatment to be?

To get them to talk.

Question:  How would you describe the working relationship between the MPs and the interrogators?

Answer:  A brotherhood.

Okay.  And he also pointed out who from CACI was behind the abuses.  He named Big Steve.

Question:  Did Steve ever tell you to abuse the detainees?

Answer:  Steve just basically wanted us to use a dog on him to treat him like shit.

He talked about DJ's role in the abuses, and he told you via deposition that DJ used -- he used pressure points at the instruction of DJ on a detainee, and that at DJ's instruction, he covered a detainee's nose and mouth during an interrogation.

You also heard from Specialist Charles Graner, and this is what he told you via deposition.

Question:  Did civilian interrogators give you

54

instructions about how to treat detainees?

Answer:  Yes.

And then he also testified that he recalled hearing civilian interrogators, CACI's interrogators, give instructions to other military personnel, and that he even received encouragements from civilian interrogators when he followed out the instructions, carried out the instructions telling him that he was doing a good job.

And then you also heard from Specialist Megan Graner, and she told you via deposition that civilian interrogators gave her instructions on how to treat detainees, and she heard instructions from them that she should remove their clothing and that she should put them in stress conditions.

And then you heard from Sabrina Harman.  And you heard her testimony, the riveting testimony, the unvarnished testimony, the unrehearsed testimony that she gave you from the witness box.  And you can hear the remorse in her voice, and you can hear that remorse and you can see that remorse in the letters that she sent back home to her spouse 21 years ago, those letters are part of the record.

And she also described the abuse that she was observing with a tremendous amount of particularity in the letters she wrote back home.  On the left side of the screen is a diagram that she drew telling her spouse what she had

55

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 56 of 146
PageID# 54996
Audio recording of interrogators A and B

witnessed.  And on the right side, you've got the photograph that someone took of the abuse, and they line up perfectly. They match.

Q    And she told you that she didn't report any of the abuse because everybody who was there knew.  Everybody who was there knew, including her chain of command.  Her words.

And then she also talked about CACI's role in the abuse.  She said that she did hear or see Stefanowicz, Big Steve, give instructions to other MPs.  And that -- you see the picture of the detainee who she talked about in her letter, she referred to him as Jesus Christ.  You know who -- and then the interrogator for that particular detainee was a CACI interrogator, and she testified about that as well.

And then came CACI's cross-examination when CACI tried to establish that all of the abuse that the MPs were perpetuating, they were doing it on their own without any involvement or direction from CACI.  Ms. Ginsberg was the one who was asking her these questions.  And this is what she said, she said this was a standard operating procedure to humiliate the detainees, to keep them awake to get them ready for their interrogations.  That was a standard operating procedure at Abu Ghraib.

And then you heard from the victims of the abuse, our clients.  All three men were at the hard site in

56

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 57 of 146
PageID# 54997
Audio recordings of Interrogators A and B

December 2003 -- in late 2003/early 2004.  And that issue is undisputed.  You heard us read the stipulations of facts into the record.  They established that these individuals were there at the hard site in Tier 1A.  And that's where Big Steve roamed.  Right.

And here you see on this slide the abuses that they perpetuated against Salah.  He described for you how painful and shameful it was for him to be naked in front of other detainees, and how these grown men were avoiding making eye contact with each other to avoid exacerbating each other's shame.  And what happened to him at Abu Ghraib was according to the plan.  He got to Abu Ghraib, he was stripped and humiliated overnight, he was broken, and then he was interrogated.

And take a look at what they did to Asa'ad.  All right.  And you heard him try to convey how he cried out for help, that one night that they threw him in the hole naked, handcuffed and hooded.  And no one came to help him, and that was by design because they wanted to break him down for the interrogations.

And then you heard from Suhail.  Okay.  And this is what they did to him.  And he talked about how he was raped, his genitals were grabbed.  And remember the words that he said, I'm a principal of a school, I'm a man, when he was talking about the indignity that he had to suffer

57

Case 1:08-cv-00827-LMB-JFA   Document 1820   Filed 11/12/24   Page 58 of 146
PageID# 54998
Audio recording of Interrogators A and B

when he was forced to be naked.

And when you heard these three men testify, you heard their vulnerability and you heard their pain.  You saw their bravery, and then you saw the truth come out in its most unvarnished and its most raw form.  And you saw Salah and Asa'ad try to keep their struggle -- try to keep their composure as they tried to regain their dignity and tell you about the physical pain and the psychological trauma that they are suffering from and will continue to suffer for the rest of their lives.

I'm going to show you just one picture that is a powerful example of the abuse that our clients experienced at Abu Ghraib.  And this is a picture of Salah from the first night that he was there, hooded, naked, tied up with vomit at his feet.  And he told you who abused him.  He told you it was Graner.  And you know where Graner got his instructions from; right?

And remember this picture, keep this picture in mind when CACI questions whether our clients were actually abused.  And remember Sabrina's testimony that if the pictures didn't exist, no one would believe that this took place.

We also called to the witness stand Dr. Jens Modvig, one of the foremost experts on torture and CIDT, and he gave you the framework on how to evaluate whether someone

58

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 59 of 146
PageID# 54999
Audio recording of Interrogators A and B

has experienced torture and CIDT, and he talked about the techniques that are used that can -- to produce severe physical pain and psychological pain.  Each one of these techniques used against our clients, sometimes in combination with one another.

And CACI's own expert, Dr. Payne-James, told you that what he saw on our clients' bodies was consistent with what you heard from them.  Right.  And he also told you about the lasting psychological trauma that torture survivors, like our clients, will endure.

So how did CACI, an IT services company, end up in all of these abuses?  Mr. O'Connor loves reminding you that the military had radar technicians conducting interrogations at Abu Ghraib before CACI showed up, but that's the reason the military turned to CACI.  They contracted with CACI for resident experts -- they contracted with CACI for resident experts, people who are experienced in interrogation so that the military didn't need to supervise them.

And you saw that CACI stood to gain around $32 million for interrogation services in Iraq, excluding the travel and the other costs that are outlined in the contract.  So with all that money that CACI stood to gain, did CACI hire resident experts?

Take a look at what Tom Howard said about some of the folks they were sending to Abu Ghraib.  None of these

59

Case 1:08-cv-00827-LMB-JFA   Document 1820   Filed 11/12/24   Page 60 of 146
PageID# 55000
Audio recording - Interrogators A and B

candidates have the basic qualifications that the customer requires for the interrogator position.

And take a look at what he wrote about Big Steve. He said he's got a crafty resume, he's a no-go.  Dugan, he said, I'm sorry to give my no-go for this guy.  And, remember, DJ was just 22 years old.  And you heard from Dan Porvaznik, the site lead that CACI had at Abu Ghraib, about how many years of training and experience that it took him to become an interrogator.  Did any of these people that CACI sent over -- except for Torin Nelson, did any of these people that CACI sent over have the training and experience? Absolutely not.

And Mr. Billings, who hired a lot of these people, he testified before you also.  And he claimed that the military reviewed and approved the resumes of every single person that CACI hired.  But then we showed you evidence that the folks that CACI was hiring and promoting, that was being done by CACI without the military's approval.  That's in PTX 128A and PTX 225.

And General Fay found that CACI's failures -- CACI's failure to send qualified and trained people to Abu Ghraib was detrimental to the intelligence operations of our country.  General Fay's finding right in front of you.  So CACI sent these people to Abu Ghraib, these unqualified people to Abu Ghraib even though CACI knew as early as

60

October 2003 that detainee abuse was rampant at Abu Ghraib.

And right in front of you is a letter that a CACI interrogator, Richard Arant, sent to CACI's leadership in October of 2003.  And he's saying here in this letter that he's quitting because he can't put up with the abuse that he's seeing at Abu Ghraib.  And he says here, and he tells Dan Porvaznik, CACI's site lead, about that as well.  And you know what Mr. Porvaznik told the Army as to why Mr. Arant was leaving?  Mr. Porvaznik said that Arant was leaving because he's got issues with his eyes, he's having trouble with his eyes.

But that's not the only time that CACI employees told Dan Porvaznik about the abuse that they were seeing on the ground.  And you heard testimony -- actually, you heard Dan Porvaznik admit on the witness stand during his cross-examination that he recalled that Mr. Albury, a CACI employee, had reported to him that another CACI employee, Billy Krieger, had engaged in detainee abuse.

And you heard this morning from CACI Interrogator A that he had informed Dan Porvaznik about an incident when he saw a naked detainee with women's underwear on his head. So did Dan Porvaznik do anything?  You know the answer.  He did nothing.  In fact, he covered it up.  The military asked Dan Porvaznik whether he had any information about detainee abuse.  This is the questionnaire that Dan Porvaznik filled

61

out.  He said he wasn't aware of anything.

And you also heard, remember, from Torin Nelson, the first day of trial.  The seasoned CACI interrogator. The one who left in January 2004.  And here's what he told you that he heard and saw at Abu Ghraib.  He said that he heard Big Steve brag about how he had gotten one of the detainees to admit that the detainee was Osama Bin Laden in disguise.  How do you think Big Steve got that?  You think there was torture involved?  And Big Steve thought it was funny, and he was joking around about it.  Right.

And then he told you that DJ was conducting an interrogation next door to Torin Nelson, and there was so much commotion in that room, furniture being thrown around, that Torin had to cancel his own interrogation.

And then when Torin went to the detainee files for another interrogator who DJ was handling, Torin found that DJ was writing in those detainee files that the detainee's crying like a baby.  Crying in the corner like a little girl.  Detainee is broken into 1,000 pieces like Humpty Dumpty.  These are the people that CACI sent to Abu Ghraib.

And he also told you about Tim Dugan.  Right.  And he said Dugan was bragging about kicking a table onto a detainee when he was handcuffed onto an eye bolt on the floor.  And Torin also saw signs of abuse, physical abuse, on a detainee who had been assigned to Dugan.

62

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 63 of 146
PageID# 55003
Audio recording of interrogators A and B

And you saw CACI's code of conduct, the top ten business values.  The first one is placing integrity and honesty above all else.  Number 8 is being accountable and taking responsibility for what we do.

Did CACI place integrity and honesty above all else?  Are they -- have they held themselves accountable, and have they taken responsibility?  I think you know the answers to those questions.

You got a flavor in CACI's opening statement of the lens that CACI would go to avoid accountability.  Okay. And remember the three hurdles that Mr. O'Connor put up here on the screen in front of you, whether plaintiffs were subjected to torture or CIDT, whether CACI's employees were involved with the abuse, and is CACI responsible for its employee's conduct?  You know what these three hurdles boil down to?  Demeaning our clients, denying the reality of the abuse and CACI's involvement in the abuse at Abu Ghraib, and deflecting responsibility entirely to the U.S. Army.

Let's talk about the first hurdle.

You saw the regret and remorse from so many of the witnesses who testified before you about the abuse that they saw when they investigated the abuse or when they perpetuated the abuse at Abu Ghraib.  That's the military leadership and the MPs.  The only entity that has no regrets, no remorse for what happened is CACI.

63

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 64 of 146
PageID# 55004
Audio recording interrogators A and B

You'll recall the testimony of Mark Billings. When my colleague Bonnie Robinson asked him do you regret hiring Big Steve? And you know what his answer was? No regrets. And he smirked when he gave that answer.

The second hurdle. Who did CACI call to the witness stand to defend what happened at Abu Ghraib? Big Steve. Would you find him to be credible? Ask yourselves. Certainly the generals didn't. General Taguba found Steve to be a liar. Big Steve had made a false statement to General Taguba about his activities during the investigations and his knowledge of the abuses.

General Fay, another military general, found Big Steve to be a liar. He said that Big Steve lied to him when he was being questioned about Big Steve's use of dogs during interrogations.

So who do you believe? The generals? Or Big Steve? Ask yourselves.

The reality is, Big Steve's lies that started in 2004, and that were brought to this courtroom courtesy of CACI. And look at the things that he lied about during his testimony. He lied about forced nudity. He lied about the use of dogs. And he lied about making detainees wear women's underwear and then bragging about it.

CACI also put up other witnesses. You'll remember Dan Porvaznik, and you'll remember the anonymous

64

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 65 of 146
Audio recordings of Interrogators A and B
PageID# 55005

interrogators and the anonymous interpreters. They claimed they didn't see any abuse. They heard no evil, they saw no evil at Abu Ghraib. Did you find any of their testimony to be rehearsed? Why would -- just ask yourselves, why would they admit to having been engaged in abuse and exposing themselves to criminal liability?

So how do you reconcile the testimony of these individuals against the pictures? You can't. How do you reconcile the testimony against the general's findings? You can't.

And then came the deflection from CACI, the third hurdle that they put up. And you heard CACI claim that even if the interrogators are -- participated in the abuse, it's not them who's liable; the responsibility lies with the U.S. government.

What they're basically saying is that the Army was responsible for everything. And of course there was some coordination and collaboration with the Army, but that doesn't relieve CACI of their responsibility that it had to supervise its own employees.

The judge is going to give you an instruction on CACI's affirmative defense, known as the borrowed servant doctrine. And this is the defense that CACI has to prove by a preponderance of the evidence; it's not our -- it's not something that we have to prove.

65

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 66 of 146
PageID# 55006
Audio recording of interrogators A and B

And the judge is going to instruct you that to determine the -- the judge is going to -- the judge's instruction is going to ask you to determine who controlled the work of the CACI interrogators at the time of the misconduct.  The most important thing that you've got to keep in your mind is that both CACI and the military can share control.  If you find that CACI shared any control over its employees, then CACI has not met its burden, and it is liable.

So let me quickly take you through some of the evidence bearing on CACI's ability to supervise its own employees.

Take a look at the contract, CACI's contract with the government.  The contractor is responsible for providing supervision for all contractor personnel.  Mr. O'Connor is going to stand up here soon, and he's going to say, well, no, no, that's just administrative control, not operational control.  The contract doesn't say that.  The contract says that the work of the interrogators will be managed by the senior CI agent.  The senior CI agent is the CACI employee.

Take a look at the CACI code of conduct and the employment agreement that it asks all of its employees to enter into.  Both of these documents say that CACI is responsible for directing, supervising and controlling its employees.

66

Case 1:08-cv-00827-LMB-JFA   Document 1820   Filed 11/12/24   Page 67 of 146
PageID# 55007
Audio recording Interrogators A and B

Take a look at -- go to the next slide.

Take a look at the Army Field Manual, and General Taguba told you about it.  Remember, this is Army doctrine and Army policy.  This document says the commanders, the military, they don't have direct control over contractors or their employees; only contractors manage, supervise and give directions to their employees.  Only the contractor can directly supervise its employees; the military chain of command exercises management control through the contract.

And then take a look at Army Regulation 715-9.  This is key.  This is the regulation that is referenced in CACI's contract with the government.  This regulation says that the commercial firms providing the battlefield support services -- that's CACI -- will perform the necessary supervisory and management functions on their employees.  Contractor employees are not under the direct supervision of military personnel in the chain of command.

Lastly, let me show you very quickly what General Fay found as to the reality on the ground.  What I showed you before is what the contract and the policy said; let's talk about what happened on the ground.

And General Fay found that several people indicated in their statements that contractor, CACI personnel, was supervising government personnel or vice versa.  Sergeant Adams indicated that CACI employees were in

67

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 68 of 146
PageID# 55008
Audio recording of Interrogators A and B

position of authority and appeared to be supervising government personnel. She indicated a CACI employee named -- I don't have the name -- was listed as being in charge of screening. Civilian 8, the CACI employee, was in charge of B section with military personnel listed as subordinates on the organization chart. Soldier 14 also indicated Civilian 8, that's CACI, was a supervisor for a time. And Captain Wood stated that CACI supervised military personnel in her statement.

So how could it be that CACI was supervising military personnel but not its own employees? It can't be.

And CACI -- let me just say one more thing on this deflection issue. And you're going to hear about this from Mr. O'Connor very soon. You're going to hear him talk about some complicated Federal Acquisition Regulations about inherently governmental functions that prohibit contractors from supervising their own employees.

But keep in mind that unlike Army Regulation 715-9, the one that I showed you before, the one that's referenced in CACI's contract, the Federal Acquisition Regulations are going to talk about, they're not referenced in CACI's contracts.

And keep in mind that Admiral Church also debunked their argument as we demonstrated through the cross-examination of Mark Billings.

68

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 69 of 146
PageID# 55009
Audio recording of Interrogators A and B

And, by the way, on Mark Billings, he's a self-proclaimed expert on Federal Acquisition Regulations and defense contracting, and you heard him admit during cross-examination that the argument that they're making about the Federal Acquisition Regulations was never something that he ever mentioned in the last 20 years in the declarations and testimonies that he has been submitting in court on behalf of CACI.

You know what this argument looks like?  A lawyer-invented argument to avoid accountability and to deflect responsibility.

And so once you set aside the demeaning --

Your Honor, I'll take a couple minutes over, and you can take it from my rebuttal time.

THE COURT:  All right.

MR. FARIDI:  Once you set aside the demeaning denials and deflection, your job as jurors gets a lot simpler.  Okay.  And the question you have to ask yourself is, did military intelligence -- and that includes CACI -- did they conspire with the military police to abuse the detainees?

And the judge, Judge Brinkema, is going to instruct you on the law on conspiracy.  And one of the things that she's going to tell you, if you take a look at her instruction carefully, once a conspiracy is formed, each

69

member of the conspiracy is liable for the actions of the other co-conspirators performed during the course and in furtherance of the conspiracy.

So let me give you an example to illustrate this point. My colleague, Bonnie Robinson, and I, we agree to sell illegal drugs. Okay. I instruct Bonnie to sell the drugs. Bonnie goes out there, and she sells the drugs. I am liable, even if I did not personally sell the drugs or I don't even need to know who she is selling the drugs to in order for me to be liable under the Judge's instruction.

So in the context of this case, what does that mean? Even though there is evidence that you've seen linking civilian interrogators, right, physically abusing our clients, instructing military police to abuse our clients, under the law, it is enough that CACI and the MPs agree to inflict brutality on the detainees, and our clients were abused as a result of that.

The last thing I'm going to talk about very briefly is what you should do after you see the puzzle pieces come together. You have to hold CACI accountable. Just as co-conspirators were held accountable in the court martials.

So how does a jury -- how does this jury measure the harm that CACI's actions have caused our clients and in our legal system? The only mechanism that this jury has to

70

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 71 of 146
PageID# 55011
Audio recording of Interrogators A and B

recompense our clients is a monetary award.  That's the measure of justice that you can provide to Salah, to Suhail and to Asa'ad.

The damages award is for you to determine, but we submit that under these circumstances, an award of $3 million for each plaintiff is sufficient.

You'll also have to determine the issue of punitive damages, whether or not to punish CACI for the harm that it has caused.  In our view, the appropriate measure of punitive damages is $32 million, which is the amount that CACI stood to gain from the contracts that it had for interrogation services, not including the cost and the expenses.

And remember what you heard from CACI's corporate representative.  The Iraq contracts were just a small piece of business for them, but the effects of the misconduct that CACI has engaged in has been having life-changing and devastating impact on our clients.

The law authorizes you, the members of this jury, to send a message that the cruelty and the dehumanization of human beings that took place at Abu Ghraib will not be tolerated in our country.  Thank you.

THE COURT:  All right.  Mr. O'Connor.

CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

MR. O'CONNOR:  Good afternoon.

71

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 72 of 146
PageID# 55012
Audio recording of Interrogators A and B

During the last week, Judge Brinkema has said it, and she's right; Mr. Faridi said it, and he's right. You've been a very good jury. You've been paying attention, you've been sitting through God awful pseudonymous depositions where you're just looking at a screen and listening to people who don't come in very clearly. No one other than me is probably sicker of hearing my voice on all those depositions than you are. But you've been paying attention, you've been taking notes. That's a good thing. Because I think when you go and you look at your notes, you're going to find a lot of what Mr. Faridi said is not backed up by what actually happened in the trial, is a contortion, a twisting of the evidence, is not a fair representation of the evidence.

You're going to get some instructions from the judge after arguments, and one of them is that, you know, you consider the evidence in a trial as a reasonable and careful person would deal with any very important question that must be resolved by examining facts, opinions and evidence. And that's -- your job is to give a sober, fair, analytical assessment of the evidence.

Why do you think the plaintiffs are putting up pictures of abuse -- of horrific abuse that are not of their clients and are not of our clients? It's to provoke an emotional response as opposed to the reasonable, careful

72

Audio recording of Interrogators A and B

response that you're supposed to engage in.

You can, with that careful analysis -- there's a few things that are fair and that you can conclude. Another thing I agree with Mr. Faridi on, we're not here defending the abuses at Abu Ghraib prison. You can believe that the abuses at Abu Ghraib prison are a stain on this country. You can believe that because we believe that, and they believe that, and probably everybody here believes that. You can believe that it's a humiliation of our country and that it's inconsistent with our values as Americans. You can believe all of that. But the analytical part of your brain can also realize the obvious fact that you can believe all those things, as we do, as pretty much everyone here does, and still say these plaintiffs have not made the case against this defendant, because they haven't.

The interesting thing to me about Mr. Faridi's closing argument is you spent about 20 minutes talking about testimony and talking about abuses at Abu Ghraib, and you know who he never mentioned in the first 20 minutes? His clients. And then he talked about his clients. And you know who he never mentioned during the time that he was talking about his clients' claims? My client.

Now, why is that? Because there's no connection between the abuse that his plaintiffs claim and my client. They've not made any effort to bridge that gap and show how

73

Case 1:08-cv-00827-LMB-JFA   Document 1820   Filed 11/12/24   Page 74 of 146
PageID# 55014
Audio recordings interrogators A and B

my clients had anything to do with the treatment that these plaintiffs claim to have suffered.

When you come right down to it, this is a case of injury.  We have plaintiffs claiming that they were injured. And I want you to think about what would you -- what do you expect in a case where plaintiffs come in and say I want you to award me money because I've been injured.  If somebody walks out of a bar in Old Town Alexandria and gets assaulted, what do you expect from that plaintiff?  Well, you'd expect to hear from them, to hear their testimony. You would expect some consistency in their version of exactly what happened.  You'd expect that they would sue the entities that actually injured them, that they know injured them.  Is that what happened here?

The plaintiffs know.  They testified.  I recognize Charles Graner, MP Charles Graner, as somebody who abused me.  Charles Graner, soldier, the United States Army.  Did they sue the Army?  Did they sue Charles Graner?  Did they sue the United States government?  They didn't sue any of them.

You'd expect the plaintiff probably to have some interest in knowing actually who injured them.  The plaintiffs claim that they were abused during interrogations.  Have they had any interest in discovering who the interrogators are that actually mistreated them.

74

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 75 of 146
PageID# 55015
Audio recording of interrogators A and B

No, not at all.

You'd also expect in that injury case, you'd expect witnesses and corroboration.  Did you hear from any witness other than plaintiffs that corroborates what plaintiffs say happened to them?  You heard our expert, Dr. Payne-James, and what he said is the injuries that they have on their bodies are consistent with their claims, which is the lowest form of correlation.  What that means is could be, but there's lots of other possible explanations.

He also testified that if nobody told him anything, there were no allegations made to him and he examined the plaintiffs, he wouldn't see it as any more -- anything surprising for people in their 50s or their 60s. People in their 50s and 60s, they have scars, they have marks, whatever.  But you would expect to see some witnesses, some corroboration.  You didn't have a single witness who has a single memory of these plaintiffs that testified in this trial.

All the interrogations and interpreters, the pseudonymous ones, the ones that the United States Army says participated in interrogations of at least two of the plaintiffs, they strongly deny what the plaintiffs say happened to them.  These plaintiffs are alleging abuse during interrogations.  The interrogators say nothing like, I don't remember them, but the things they're saying, that

75

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 76 of 146
PageID# 55016
Audio recording Interrogators A and B

didn't happen in any interrogation that I was at.

You also didn't have any friends, family or others corroborating plaintiffs' allegations of psychological injury.  You just heard them self-describe, and that was it.  And that's maybe the most shocking thing here.

Medical evidence.  If you have a case that involves a fender-bender where someone says their neck hurts a little bit, you'd have a doctor come in and get on the stand for them and give you a diagnosis.  You've got no diagnosis.  These plaintiffs, you know from their own testimony they went to Erbil, Iraq, and they were seen by plaintiffs' expert doctor and psychiatrist, and they didn't put him on to have him be subjected to cross-examination from CACI's witnesses.

So they want you -- they want you to award them, I think a total of $41 million, without a diagnosis at all.  Without medical diagnosis, without psychological diagnosis, without any medical evidence at all.

And by contrast, what do we give you?  Dr. Payne-James.  Played it straight down the middle.  Was he someone who came in to try and trump at our company line?  Absolutely not.  He's devoted his life to torture victims, to refugees, to other people in need.  And he told you, I'm not going to say what they're -- I can't tell looking at their bodies that what they say happened didn't happen, but

76

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 77 of 146
Audio recording, Interrogators A and B
PageID# 55017

I can't tell you it did either. Lots of possible explanations. But they gave you nothing in that regard.

And what do we know? No suit against the United States, no claims against the United States. No suit against Charles Graner, Ivan Frederick or any of the other criminals that plaintiffs claim abused them. But we know the United States pledged that they would pay bona fide claims of detainee abuse. This is Secretary Rumsfeld's memorandum, which I read into the record earlier in the trial, and he made that clear.

But instead what they did is they sued a contractor who doesn't have access to all the information about plaintiffs' treatment because it's classified state secrets. CACI can't know who interrogated them, can't see interrogation plans, doesn't know what interrogation approaches were approved, can't see interrogation reports, doesn't have any of that information. But that's who the plaintiffs decided to sue.

And when you look back -- and we're going to go through this in a bit. If you look back at the plaintiffs, look back in 2003, 2004 when Al-Zuba'e and Al-Ejaili are being released from detention. Read their statements. Do they have any beef with civilian contractors? They don't.

And then five years later, do they go to lawyers and say I want to sue a civilian contractor? No. Lawyers

77

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 78 of 146
PageID# 55018
Audio recording of interrogators A and B

find them because lawyers want to sue government contractors. And the plaintiffs say, sure, I'll join that suit, and then the stories make their way to now we're going to say things about civilians.

The plaintiffs here are really, you know -- and they're props in a sense. They're a vessel for lawyers to bring a lawyer-driven case.

And what do you know, Mr. Al-Ejaili, the one plaintiff who came here to testify, he was here on the first day of trial and testified. Have you seen him? We've got a dozen lawyers here. But the plaintiff, he came and gave his testimony, and he's gone.

This is a political case where they're trying to get a civilian contractor when all the allegations that were made in real time were of abuses by United States soldiers and the United States Army; not CACI.

Okay. For CACI to be liable, you're going to receive a verdict form at the end of this, and there's three pages, one for each plaintiff. There's six pages, two for each plaintiff. And the main question is going to be: Have the plaintiffs proven that CACI is liable to them. That's going to be the main question for each of these plaintiffs, and there's three components to that.

First: Have the plaintiffs proven that they were subjected to torture or CIDT. You're going to have to

78

decide that.

Second:  Have the plaintiffs proven that CACI employees conspired with the soldiers who tortured or committed CIDT on these plaintiffs.

And then third, if you find both of those, the question is:  Has CACI shown that the borrowed servant doctrine applies, and that is that its employees were under the direction of -- the direction and control of the U.S. Army as it related to the interrogation mission.  You have to decide all three of those in favor of plaintiffs and against us in order for CACI to be liable.

Okay.  Let's start with the hurdles.  Hurdle one: Were the plaintiffs subjected to torture or CIDT at Abu Ghraib prison?  We're going to talk a bit about that.  And I want to take one thing head-on that Mr. Faridi said.  He calls it demeaning.  We are not demeaning these plaintiffs. Not one bit.  It's not demeaning to point out inconsistencies in their statements.  It's not demeaning to point out the lack of connection between what they say happened and my client.  That's not demeaning to ask questions and to take the evidence where it goes.

But what do you know.  Were they abused?  It's unknowable at this point.  They say they were abused. That's the only evidence you have that they were abused is that they say they were abused.  Might that be true?

79

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 80 of 146
Audio recordings of Interrogators A and B
PageID# 55020

Absolutely. We don't have any way to disprove that. We don't have access to records. But the thing you do know is if they were abused -- and, again, we're not saying they weren't, because it's not really knowable. Because we know that pseudonymous interrogators denied what they -- what the plaintiffs say happened in interrogations. But if they were abused, the one thing you do know is it didn't go down the way they said it did during this trial. And we can show you that. It was not only denied by the interrogators, there's -- it's inconsistent with what the plaintiffs said before they were suing a civilian contractor. There's no medical evidence. There's no records documenting the abuse.

So let's start with Plaintiff Al-Ejaili. It's not demeaning to point out that when Mr. Al-Ejaili was released from Abu Ghraib prison, he was asked by his employer to write a full, complete report of what happened to him while he was in U.S. custody. And that was three pages in Arabic, and I believe it's six pages in the English translation. And that's Plaintiffs' Exhibit 224, and I urge you to look at that when you're deliberating today and -- because it tells you what Mr. Al-Ejaili was saying when he was released when he wasn't suing a government contractor.

There are a grand total of two references to civilians. He distinguished between soldiers and civilians in the memorandum. So it wasn't that he was

80

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 81 of 146
PageID# 55021
Audio recording of Interrogators A and B

indistinguishing.  He made the distinction, but the only two references to American civilians were at intake where, in the computer room, an American civilian came up and was told this is an Al Jazeera reporter, and he said, no, it can't be, and they said, look at his records, and they said look at that.  Didn't abuse him.  Took him to the next room where he was questioned, where a soldier questioned him in a non-abusive way, and there was a civilian who sat there and never said a word.

But, again, by Mr. Al-Ejaili's own account, he was not abused in that -- up in reception when he was in the first room and then when he was in the -- when he was in the computer room or when he was in the room where the civilian never said a word to him.  Those were the only references to civilians in Mr. Al-Ejaili's contemporaneous statement, putting aside what he testified to now.

What's the government say?  Well, let's start with Mr. Al-Ejaili.  Mr. Al-Ejaili says he was interrogated once he got to the hard site 20 times.  What's the United States say?  No record to formally document any intelligence interrogation of Plaintiff Al-Ejaili.  None at all.

What did you hear from witness after witness?  Interrogations have paper trails.  Torin Nelson, who if you looked up disgruntled former employee in the dictionary, there would be a picture of Torin Nelson.  Every chance he

81

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 82 of 146
PageID# 55022
Audio recordings of interrogators A and B

got to try to stick it to CACI, he did on that stand.  But what did he have to admit?  I took 30 to 50 interrogations, and I expect there to be 30 to 50 interrogation plans and 30 to 50 interrogation reports.  Because all of that stuff was required for an interrogation.  But for Plaintiff Al-Ejaili, there's none.  The Department of Defense has absolutely nothing on him.  It's not demeaning to point that out.

We also know that the logbook entry, which is Plaintiffs' Exhibit 19, but it's also reproduced in Defense Exhibit 2, where the United States acknowledges the logbook said that guy, they realized that Al-Ejaili was a reporter and said take him over, put him away from everyone else, he is not to be talked to by anyone except for some soldiers that are listed in the logbook.  So the idea that he was interrogated 20 times and a bunch of those times by civilians is just completely refuted by contemporaneous records and by what Mr. Al-Ejaili said at the time.

The one thing -- and this is the only contact between one of the plaintiffs and any of the CACI employees, you know, Mr. Stefanowicz, Mr. Johnson, Mr. Dugan, who plaintiffs have been casting mud at.  Mr. Stefanowicz had a brief encounter.  There was nothing violating the IROE in that particular interrogation.  Mr. Stefanowicz testified he had happened on the hard site when the sergeant got shot.  It was commotion, they had everybody out of their cells, he

82

Case 1:08-cv-00827-LMB-JFA   Document 1820   Filed 11/12/24   Page 83 of 146
PageID# 55023
Audio recordings of Interrogators A and B

spoke briefly to a guy which he assumes is the Al Jazeera reporter. Sergeant Beachner said, hey, that's my guy, don't ask him questions, and he said, right, oh, and he said there's enough people here, I don't need to stay for this. Nobody's refuted that. Mr. Al-Ejaili could have refuted that; he didn't refute that.

Let's turn to Mr. Al-Zuba'e. He says now that he was repeatedly interrogated and they were civilians every single time. What did he say back in the day? Well, one thing he said was that he and a taxi driver in Iraq was captured by U.S. forces and had 20,000 U.S. dollars in cash in his cab that was seized by the United States Army.

He does say later on the same page, he does allege that he was tortured. But he also made a statement around the same time where he documented what his claims of abuse were, and there's no reference to civilians.

There's also -- you remember Mr. Al-Zuba'e told a very harrowing story of intake up at reception up in the computer room. He gave a statement. There's no reference to any abuse in the computer room. It's all after he got to the hard site, and it's all by soldiers. Not a single reference to a civilian, not a single reference to the computer room or anything up at intake. And when he went and met with Dr. Payne-James this past February, he told him that he was not mistreated in any way up in the computer

83

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 84 of 146
Audio recordings of Interrogators A and B
PageID# 55024

room.  But now he says he was, and now he says he was abused there by civilians and then repeatedly interrogated just by civilians.

But what else do we know?  The stipulation of uncontested facts in this case, according to the Army, he was interrogated by five different soldiers.  Not only that, you heard from four of them.  You heard from Army Interrogator C, E -- B, C, E and F.  And they all said, yes, I interrogated -- I participated in an interrogation of plaintiff Al-Zuba'e.

So unless they all have some sort of group psychosis and are claiming to be in interrogations that they weren't, Mr. Al-Zuba'e's testimony that he was interrogated only by civilians is not only inconsistent with what he said in 2003, but it's flatly refuted by people who admit they were at interrogations with Mr. Al-Zuba'e.

Mr. Al Shimari.  His testimony was read in by the Court's clerk.  You're going to have to -- the pseudonymous interrogators deny that there was any abuse during his one interrogation that the Army says happened.  You're going to have to decide who you believe between testimony that was read in and testimony that you can't even see the speaker.  But there's no reconciling Mr. Al Shimari's testimony and the testimony of CACI Interrogator A, Army Interrogator B or Interpreter K.

84

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 85 of 146
Audio recordings of Interrogators A and B
PageID# 55025

But we do know that Mr. Al Shimari said that he was interrogated multiple times, I think he talked about four, when the Army says he was only interrogated once, and that was by A, B, and we know that Interpreter K was the interpreter.  And we also know that the reported approaches from this interrogation were authorized by the IROEs.

So, you know, we're not here to say plaintiffs weren't abused.  It's not knowable.  There's a lot of inconsistencies.  But what we do know is what they testified to now is not the way it occurred.  The testimony about civilian involvement in their abuse is not supported by anything that's happened historically from 2003 all the way to today.

But even if you ignore the inconsistencies in the plaintiffs' recounting of the events, the lack of corroboration, the interrogator testimony that refutes what the plaintiffs are saying, the U.S. records that refute what the plaintiffs are saying, if you ignore all of that and you conclude that you believe plaintiffs were abused, and abused in the way they say they were, the question is, have they tied their claims of abuse to CACI employees?  And that's where they talked 20 minutes about every misdeed they could find.  If a CACI employee spit on the sidewalk, that made it into evidence here.  And then they talk about plaintiffs.  But the discussion of CACI is never about their dealings

85

Case 1:08-cv-00827-LMB-JFA   Document 1820   Filed 11/12/24   Page 86 of 146
Audio recording of Interrogators A and B
PageID# 55026

with plaintiffs, and the discussion about plaintiffs is never about any of their interactions with CACI.

They threw a bonnet at my client for a week now with no connections developed.  They talked about training.  What do you know about training?  They show you, oh, Tom Howard said none of these people are a go.  What do they all have in common, the employees listed in that email?  None of them were sent over as an interrogator.  The Army, which was using radar techs, they went around and said you're an interrogator today, you're an interrogator today, because we have 16,000 people, and they need to be interrogated, and we don't have nearly the number of interrogators that we need.  That was not CACI sending over, as interrogators, people who weren't school-trained; that was the Army saying we're in a war, people are dying every day, we're going to do what we need to do and do the best we can with what we've got.  All right.  Never laid a hand on them.  There's no allegation of CACI personnel ever laying a hand on any of the plaintiffs.

One of the things that Mr. Faridi said is, we're saying you should disregard the generals and the admirals and everything they reported.  We're not saying that.  We're not saying that at all.  You can accept every allegation by the generals and the admirals that touches on a specific CACI employee, and none of them connect those discrete acts -- now, remember, CACI's got dozens of employees, but

86

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA   Document 1820   Filed 11/12/24   Page 87 of 146
PageID# 55027
Audio recording interrogators A and B

they have, you know, a handful that are alleged to have engaged in discrete acts of misconduct. None of those are connected in any way to these plaintiffs.

But plaintiffs, they're proceeding on a single theory here, conspiracy. Again, this is not a performance evaluation, though as we'll get to Admiral Church's report, CACI actually performed a vital service at Abu Ghraib prison and elsewhere in Iraq for the United States Army. It's a conspiracy case. Was there a criminal conspiracy here between a CACI employee and soldiers that resulted in abuse of these plaintiffs. What's a conspiracy require? It requires an agreement.

Now, Mr. Faridi was right when he said the agreement doesn't have to be explicit. You don't have to have a contract. You can have a wink, but have they proven that wink that related to abuse of these plaintiffs? They haven't. There's no evidence of that at all. Because that's what it's got to be. It's got to be an agreement that results in injury to these plaintiffs. Parallel conduct is not enough.

What's parallel conduct? If I go out to the garage after court today and there's two thieves in there stealing cars, they're not in a conspiracy unless they agree that they were both going to go in there and steal cars. I mean, you know, parallel incidents of misconduct, criminal

87

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 88 of 146
PageID# 55028
Audio recordings - Interrogators A and B

activity, whatever, that's not a conspiracy; there has to be an agreement.  And presence and knowledge are not enough.

You know, Mr. Faridi wants you to believe that everyone who was at Abu Ghraib knew there was abuse going on.  That's belied by what you heard here this week.  What did Mr. Nelson, who would kick us in the pants any chance he got, what did he say?  I was there.  I was there November, December, January.  I never saw any detainee abuse.

You heard that from multiple witnesses, that they did not see -- remember the pseudonymous interrogators said they didn't see any abuse.  So it's not true that by being there you knew what the MPs were doing in the hard site.  But even if it were true, that's not enough, because knowledge is not a conspiracy.  You have to agree with the people who are doing the abuse, and it's got to be a conspiracy that's broad enough to get at these plaintiffs.

And what evidence do you have of that?  Well, let's start with General Fay.  So you find a grand conspiracy to abuse all detainees that includes all interrogators and MPs?  No.  He only found -- and I say "only," that's probably not right.  He found 44 incidents of abuse.  That's 44 too many.  He found 16 of those occasions, and it's 16 times too many that those involved some involvement of MI personnel, which CACI would be included within, at least for that statement.  So he found 16

88

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA   Document 1820   Filed 11/12/24   Page 89 of 146
Audio recordings of Interrogators A and B
PageID# 55029

instances where a detainee was abused, but there was some connection to military intelligence.

You heard plaintiffs are running with sergeant -- I guess Private Frederick and his testimony about a brotherhood, and they asked about what his relationship with MI was, and he said we're a brotherhood. Do you remember what he said when they asked him what was your relationship with Steve Stefanowicz? He said a working relationship. What's your relationship with Dan Johnson? Just a working relationship. They weren't brothers; they were working. You know, he was guarding, they were interrogating, but there's no allegation that anybody told Sergeant Frederick, Sergeant Corporal Graner or anyone else, no one from CACI told them that they should abuse any of these plaintiffs at all. But that's General Fay. Individual basis. The abuse was directed on an individual basis, not a broad conspiracy. Individual criminality.

What's General Church say? Contractor compliance is generally good. You know, not -- contractors weren't in on a global conspiracy to abuse any and all detainees. He also found that while there were some highly-publicized document of some contractors and abuse at Abu Ghraib, very few instances of abuse involving contractors. That's Vice Admiral Church in his report to the Department of Defense.

So when you're thinking about a conspiracy, I

89

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 90 of 146
PageID# 55030
Audio recording of interrogators A and B

guess the first question I would pose is, who with CACI entered the conspiracy that relates to the abuse of these plaintiffs?  I suppose it's the three boogeymen that plaintiffs have been casting most of their allegations about in the last week.  It'd be Tim Dugan, Dan Johnson, Steve Stefanowicz.  But let's go through them.

Dugan.  There's no connection between Dugan and plaintiffs' claims.  None at all.  They put up the allegation about Dugan.  It was dragging somebody off the back of a Humvee.  Not anything where he instructed anybody to do anything.  So this is not a case of Dugan out there telling MPs do this, do that.  They said he did one bad thing.  That's the only claim that General Fay found substantiated with respect to Dugan.  General Taguba didn't find anything with respect to Dugan.  What's that got to do with plaintiffs or instructed MPs to abuse these plaintiffs?  Nothing.

Johnson.  Where's the connection between Johnson and plaintiffs?  He's not alleged to have done anything in the Taguba report.  The Fay report found a few instances of alleged bad conduct.  It all occurred during IP roundup, which you'll remember is when the sergeant got shot and they were trying to find the source of the gun that got to the detainee and didn't find other weapons.  And it was all with an Iraqi cop.  Because they were suspecting the Iraqi cops,

90

Case 1:08-cv-00827-LMB-JFA   Document 1820   Filed 11/12/24   Page 91 of 146
Audio recordings Interrogators A and B
PageID# 55031

who were guarding prisoners at the hard site, of smuggling in that gun.

And am I condoning those allegations against Johnson?  No.  No.  No.  No.  But what I'm saying is, is there evidence that Mr. Johnson, being engaged in these discrete acts with an Iraqi police officer, somehow shows that he entered into an agreement with somebody that resulted in mistreatment of these plaintiffs, and there's not.

Stefanowicz.  Big Steve.  No connection between him and these plaintiffs other than the one harmless interaction that he had with Al-Ejaili during IP roundup that nobody's refuted his account, including Mr. Al-Ejaili, who was here and testified.

What are the allegations about Stefanowicz?  Well, let's start with he's only alleged to have given instructions regarding detainees assigned to him.  Nobody has suggested that he was giving general instructions relating to the treatment of all detainees or any detainees that he was not assigned to.  We asked him that in his testimony, and he said absolutely not.  You know, I gave instructions -- which isn't necessarily bad, of course it can be bad.  But I gave instructions to MPs relating to the treatment of my assigned detainees, which was about five, and I didn't interrogate any of these plaintiffs.

91

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 92 of 146
PageID# 55032
Audio recording of Interrogators A and B

Unrefuted.

But what did General Taguba and Fay and then Frederick and Graner say about the instructions that Mr. Stefanowicz gave to MPs?  General Taguba on the stand when I asked him about it, you -- what are the allegations you found about Stefanowicz?  It was nudity and unauthorized use of dogs.  He said, yeah, that's what he found.  And then I asked him, well, were those for people he was assigned to, and he said they were.  When they put up quotes from General Taguba, they left that one off, but your notes likely reflect it.

General Fay, he was the video deposition.  We went through all of the allegations in the Fay report about Mr. Stefanowicz.  And, again, those were all related to detainees who were assigned to Mr. Stefanowicz for interrogations.

What did General Fay find?  He found improper use of dogs.  He didn't find clothing removal, as I recall it. He found Mr. Stefanowicz put his foot on someone and kicked or shoved him into a cell.  He found that Mr. Stefanowicz had bragged about shaving someone and putting red underwear on his head.  I'm not condoning any of that.  You can conclude all that's true, and it doesn't connect Mr. Stefanowicz to any of these plaintiffs because the unrebutted evidence is when he gave instructions to MPs

92

relating to detainee treatment, it was just for the specific detainees that he was assigned to, which is not any of these plaintiffs.

All right. Let's talk about the third hurdle. This is borrowed servant doctrine, and it's an important defense here.

Plaintiffs' counsel misled you on the test. You're going to receive instructions from Judge Brinkema as to what the test is for the borrowed servant doctrine. They wanted you to conclude that if you find that CACI had any direction or control over CACI personnel, that there's shared liability, and so they are liable for the conduct of the employees, and the U.S. government is also liable for the conduct of the employees.

Read the instruction. That's not what it says. What it says is what's important is for the acts out of which liability arose. Whose work was being performed? Who had the power to direct and control that work? It doesn't have to be all work. Who had the power to direct and control the work that is at issue with respect to the plaintiffs' claims?

This is not some technicality. This isn't a technical defense. You should want this to be the rule. And the reason is, who do you want to be liable for conduct by employees? You want the people who can control their

93

Case 1:08-cv-00827-LMB-JFA   Document 1820   Filed 11/12/24   Page 94 of 146
PageID# 55034
Audio recordings interrogators A and B

activities and who are right there and are supervising them and are deciding what they can do and are making the rules and monitoring and reviewing and approving plans and reviewing and approving reports.  That's who you want responsible for the conduct of an employee, because they're the ones who can make sure the employee's acting in an appropriate way.  That's why the law is like that, and that's what you should want.  It doesn't do anybody a wit of good to make the liability flow to someone who has no practical ability to direct or control the employee, because they can't make anything better or worse.

Could Captain Wood?  Sure.  Could Colonel Pappas? Sure.  Could the section leaders?  Sure.  Could Mark Billings, who's sitting in Chantilly and is not allowed to know what the intelligence priorities are, not allowed to know which detainees are being interrogated by what CACI employee?  Is not allowed to see, review, approve or disapprove interrogation plans?  Is not allowed to see review or see interrogation reports?

The direction and control here is with the United States Army, and under the borrowed servant doctrine, when that's the case, that's where liability for the conduct of the employees should go, and that makes perfect sense.

And what evidence do you have on that direction and control?  It's abundant.  This is -- you saw this slide

94

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 95 of 146
PageID# 55035
Audio recording of Interrogators A and B

in our opening.  This is basically a reproduction of the chain of command as it existed for interrogation matters.

When they didn't have CACI, the yellow box, which is gone, and each section leader, staff sergeant or sergeant, they had Tiger Teams, and they were the first rung in the chain of the command, and then it went up to the NCOIC, and then it went up to Captain Wood, and then it went up to Colonel Jordan and Colonel Pappas.  That's the way it worked with CACI.  Did it change any?  No.  You just plugged in a few more teams that reported to the same staff sergeants or sergeants, went up to the NCOIC, went up to Captain Wood, went to Colonel Jordan, went to Colonel Pappas.  Everyone agrees that that's the way the chain of command worked.

Colonel Pappas.  Were CACI interrogators in all respects subject to the operational control of the military?  He asked a little to make sure he understands, and Ms. Bailey asked him, in terms of their interrogation duties.  Yes.

Captain Wood.

(Video played.)

MR. O'CONNOR:  I'm going to play one more.

(Video played.)

MR. O'CONNOR:  They tried to create -- well, let's go to Colonel Brady.

95

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 96 of 146
PageID# 55036
Audio recording of Interrogators A and B

I would consider the military as the overseer of the civilian contractor. When there's a contractor embedded in a unit, that contractor has clearly worked for the supervisor of that particular section or unit.

What's the U.S.'s position? They talk about the interrogation of Mr. Al Shimari, the interrogators, which was a CACI interrogator and an Army interrogator. They're subject to the direction of the military chain of command, beginning with their military section leader, an Army non-commissioned officer, it goes up to the Army non-commissioned officer in charge, it goes up to the officer in charge, all the way up to the colonels in the JIDC.

No CACI personnel were in this chain of command. They mention Mr. Porvaznik, and the United States says he managed personnel issues, and the ICE OIC relied on him for information regarding CACI interrogators. But the military chain of command controlled the interrogation facility, set the structure for interrogation operations, and was responsible for how interrogations were to occur during both the planning and execution phases.

They tried to make Mr. Porvaznik into some mini operational guy, and that's not right. Everyone -- you don't even have to believe CACI people on that. That's what you heard from the United States government, from the United

96

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 97 of 146
PageID# 55037
Audio recording - Interrogators A and B

States Army, from former soldiers, that Mr. Porvaznik was an admin guy who handled administrative issues.

Oh, if there was a problem, it was good for Mr. Porvaznik to know about it, but what they're mistaking is customer service with control. Because, for instance, CACI Interrogator A, they said, oh, he saw some misconduct, he told Mr. Porvaznik about it. What else did he do? He told the Army chain of command about it, because that's where he needed to report operational things. But does it make good sense to make sure that the company knows that there's an issue going on? Sure. Torin Nelson admitted that.

And what do plaintiffs say? They tried to distract you. They say, oh, let's not look at how it was on the ground, let's look at what manuals say. But they didn't even get the law right. I mean, the test is who had the power to direct and control, and they want it to be who you think could have, should have, would have, was supposed to have control. But they got the law wrong. They say, oh, they want to look at this magical, you know, mysterious FAR, the Federal Acquisition Regulation, which, by its own terms, and you can see it at Defense Exhibit 77, says this applies to all government contracts. And what's it say? It says: Contractors cannot direct and control intelligence and counterintelligence operations. Period.

97

They talk about the Army Field Manual.  What did Colonel Pappas say about the Army Field Manual?  He had never even seen it because that didn't guide how he ran things at Abu Ghraib prison.  It was exactly as he said.  We embedded civilians right in with the military, and they did the exact same things.

They talk about the Army regulation.  Well, General Taguba talked about the Army Reg 715-9, I believe it is.  But what about that regulation?  There's two references to contracting has to be consistent with the Federal Acquisition Regulation.  We pointed those out during Mr. Billings' testimony.  And there's a whole page devoted to inherently governmental functions, which General Taguba -- he's not a contracting officer, he wasn't familiar with the concept, but that's where the concept of this exhibit comes in, Exhibit 77, that the contractors cannot control intelligence or counterintelligence operations.

And you'll notice in the contracts, there aren't any provisions.  There's no billets in there to fill supervisor positions, you know, directly overseeing because they are not allowed to be -- there's no section leaders in the contract.

And, in fact, as General -- as Admiral Church put it, a contract can be written to give the military supervisors significant direct control.  And we showed

98

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 99 of 146
PageID# 55039
Audio recording of Interrogators A and B

you -- this is Deliver Order 13:  Performed under the direction and control of the unit's MI chain of command or Brigade S2.

But most importantly, we can all talk about how everyone remembers things being 20 years ago.  How were they 20 years ago?  This is Plaintiffs' Exhibit 133.  This is what was being told to people when they came to Abu Ghraib prison:  The JIDC is not a standard military organization and therefore does not follow a standard structure.  Two chains of command will be in effect, the operational and the administrative.

The interrogation section leader will be the first person in the operational chain of command proceeding to the NCOIC and the OIC.  It goes on to talk about the administrative chain of command, which deals with pay issues, leave issues, things like that.

In closing, this is going to be my last chance to talk to you.  I appreciate your time, I appreciate your attention.  The important thing here -- you're going to hear and you've heard from plaintiffs about is CACI being accountable?  When you've been denied access to all the information about, you know, interrogation activities, are you shirking responsibility to say that the people who are actually in charge of that are the ones who ought to be responsible for the way that turned out?  That's not

99

Case 1:08-cv-00827-LMB-JFA   Document 1820   Filed 11/12/24   Page 100 of 146
PageID# 55040
Audio recording of Interrogators A and B

shirking responsibility; that's reality.  Being accountable

isn't taking accountability for things that you're not

really accountable for.

Thank you.

THE COURT:  A little over five minutes left.

MR. FARIDI:  You said a little over five minutes,

Your Honor?

THE COURT:  Yes.  Just a smidge.

MR. FARIDI:  Thank you.

REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFFS

MR. FARIDI:  Look, I'm not going to deal with all

of the dehumanization, the demeaning and the denials.  I'm

going to touch on a couple of issues, but I'll focus most of

my time on the deflection.  Okay.

Mr. O'Connor said that the plaintiffs haven't sued

the U.S. government.  That doesn't mean that CACI's not

liable.  And you heard from Asa'ad that he actually filled

out a claim under that Rumsfeld memo for compensation

because he was tortured.  He never heard anything back.

That's all I need to say about that.

Mr. O'Connor said we didn't call a medical expert.

Did we need to call a medical expert to tell you about the

psychological trauma that these people experienced?

Remember Dr. Payne-James, he told you that CACI

had its own psychologist actually meet with the plaintiffs.

100

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 101 of 146
PageID# 55041
Audio recordings of Interrogators A and B

Did you see him testify?  They didn't call him to testify. You should ask yourself why.  Why didn't they call their own psychologist who interviewed our clients to testify about our clients' mental condition.  They know why they didn't call him.

Mr. O'Connor talked about, oh, you've got to go back and read Mr. Al-Ejaili's letter.  We implore you to go back and read his letter.  That letter corroborates -- it's a contemporaneous record that corroborates the suffering that he endured at Abu Ghraib at CACI's behest.

Mr. O'Connor talked about how there's no paper trail documenting the abuse.  The abuse is not documented in the interrogation logs.  Use your common sense.  If you abused, you tortured someone, are you going to go document that in the interrogation logs and the interrogation reports?

And then he talked about how we can't link the CACI employees to our clients.  Again, go back to the Judge's instruction on conspiracy.  There is evidence linking every single one of our clients to a CACI person. That's in the stipulations.  But we're not required to prove that.  It is enough for us that the abuse was standard operating procedure at Abu Ghraib.  That's what their interrogators ordered the military police to do, and our clients were abused as a result of that.

101

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 102 of 146
PageID# 55042
Audio recordings of Interrogators A and B

Okay.  Let me just turn now to the deflection. I've got three minutes left.  And I want to take you through very quickly a few of the documents that Mr. O'Connor completely ignored in his 45 minutes.  Okay.

He ignored the contract.  Did you hear him talk about the contract?  The contract says CACI is responsible for supervision of its employees.  He ignored Army Regulation 715-9.  This is the only regulation that is referenced in CACI's contract.  Right in front of you is CACI's contract.  That contract references Army Regulation 715-9, and that regulation says that CACI is responsible for managing and supervising its own employees.

General Taguba, he spoke about the issue.  He also ignored completely the code of conduct under the employment agreements that they have.  Both of those documents say that CACI retains the right to direct, supervise and control their employees.  They're hiding now from their own documents, because their documents from 2003 and '4 don't support their defense.  You didn't hear him touch these documents at all.  And this is what Dan Porvaznik wrote. This is how he described his job at Abu Ghraib.  He is the ops site lead.  Operations site lead managing all CACI contractors.  We had to pull that out of him during the cross-examination, but this is what he wrote in 2004. Completely undermines their defense.

102

Let me play for you one last thing.  Okay.  This is the testimony of CACI's corporate representative who, you remember from the Judge's instruction, binds the company. This is what he said at his deposition in 2013 before CACI's lawyers invented this new borrowed servant defense that you heard from Mr. O'Connor today.  Let's play that testimony and see what he says.

(Video played.)

MR. FARIDI:  Dan Porvaznik was the operational supervisor.  Today they're telling you, no, he had no operational control; he only had administrative control.

So the last thing I'll say to you, members of the jury, we told you at the beginning of this trial that there's nothing that you can do that can remove this stain that Abu Ghraib left on our country's history, but our system of justice, it does give you the power.  It gives you the ability to provide our clients with some measure of justice, and we leave that responsibility to you.

Thank you for your time.

THE COURT:  Thank you, Counsel.

So, ladies and gentlemen, I'm going to give you a short break, 15 minutes.  And then when you come back in, I'll be giving you the jury instructions.

People may not leave the courtroom while the instructions are being given, so during the break, those who

103

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 104 of 146
PageID# 55044
Audio recording - Interrogators A and B

do not want to sit through the instructions must leave, and we'll keep the courtroom closed at that point. All right. We'll recess court for 15 minutes.

(Jury not present at 3:10 p.m.)

THE COURT: All right. We'll bring the jury in.

THE COURT SECURITY OFFICER: Yes, Judge.

Rise for the jury.

(Jury present at 3:28 p.m.)

JURY INSTRUCTIONS

THE COURT: All right. Folks, this is the last phase before we give the case to you for deliberation. It's the final jury instructions. I'm going to give them to you orally, so I hope you'll pay careful attention in court. But we will give you -- I'm going to give you four copies of the written -- of the instructions. I'm not going to give each of you a copy because I want to save a few trees, and that way it forces you to work together a little bit. But, frankly, if you need more copies, we'll get them to you.

Now that you have heard all of the evidence that is to be received in this trial and each of the arguments of counsel, it becomes my duty to give you the final instructions of the Court as to the law that is applicable to this case. You should use these instructions to guide you in your decisions.

All of the instructions of law given to you by the

104

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA   Document 1820   Filed 11/12/24   Page 105 of 146
PageID# 55045
Audio recordings interrogators A and B

Court, that is those given to you at the beginning of the trial, those given to you during the trial, and these final instructions, must guide and govern your deliberations.

It is your duty as jurors to follow the law as stated in all of the instructions of the Court and to apply these rules of law to the facts as you find them to be from the evidence received during the trial.

Counsel have quite properly referred to some of the applicable rules of law in their closing arguments to you.  If, however, any difference appears to you between the law as stated by counsel and that as stated by the Court in these instructions, you of course are to be governed by the instructions given to you by the Court.  You are not to single out any one instruction alone as stating the law, but must consider the instructions as a whole in reaching your decisions.

Neither are you to be concerned about the wisdom of any rule of law stated by the Court.  Regardless of any opinion you may have as to what the law ought to be, it would be a violation of your sworn duty to base any part of your verdict upon any other view or opinion of the law than that given in these instructions, just as it would be a violation of your sworn duty as judges of the facts to base your verdict upon anything but the evidence received in the case.

105

Audio recording of Interrogators A and B

Now, you were chosen as jurors for this trial in order to evaluate all of the evidence received and to decide each of the factual questions presented by the allegations in plaintiffs' complaint and the defendant's denial of those allegations in its answer.

In resolving the issues presented to you for decision in this trial, you must not be persuaded by bias, prejudice, or sympathy for or against any of the parties to this case or by any public opinion.  Justice through trial by jury depends upon the willingness of each individual juror to seek the truth from the same evidence presented to all the jurors here in the courtroom and to arrive at a verdict by applying the same rules of law as are now being given to each of you in these instructions.

During the trial I permitted you to take notes. Many courts do not permit note-taking by jurors, and so a word of caution is in order.  There's always a tendency to place undue importance on matters which one has written down.  Some testimony, which is considered unimportant at the time presented, and thus not written down, may take on greater importance later in the trial in light of all the evidence presented.

Therefore, you are instructed that your notes are only a tool to aid in your own individual memory, and you should not compare your notes with other jurors in

106

determining the content of any testimony or in evaluating the importance of any evidence.  Your notes are not evidence and are by no means a complete outline of the proceedings or a list of the highlights of the trial.  Above all, your memory should be your greatest asset when it comes time to deliberate and render a decision in this case.

Moreover, you are co-equal judges of the facts, and each juror's memory of and opinion about the evidence is worthy of consideration by all the other jurors.  That a juror may have taken extensive notes does not mean that his or her memory or opinion is worthy of more consideration than the memory or opinion of a juror who took few or no notes.

All parties are equal before the law and are entitled to be treated as equals.  In this case, the plaintiffs are citizens of another country.  Citizens of another country are entitled to the same fair and conscientious consideration by you as any other party.  In this case, the defendant is a corporation.  Corporations are entitled to the same fair and conscientious consideration by you as any party.

A juror should consider the evidence in a trial just as a reasonable and careful person would deal with any very important question that must be resolved by examining facts, opinions and evidence.  You are expected to use your

107

Audio recording of Interrogators A and B

good sense in considering and evaluating the evidence in the case.  Use the evidence only for those purposes for which it has been received, and give the evidence a reasonable and fair construction in the light of your common knowledge of the natural tendencies and inclinations of human beings. Keep constantly in mind that it would be a violation of your sworn duty to base a verdict upon anything other than the evidence received in the case and the instructions of the Court.

Now, the evidence in this case consists of the sworn testimony of the witnesses, regardless of who may have called them; all exhibits received in evidence, regardless of who may have produced them; all facts which have been agreed or stipulated; and all facts and events which may have been judicially noticed.

When the attorneys on both sides stipulate or agree as to the existence of a fact, you may accept the stipulation as evidence and regard that fact as proved; however, you are not required to do so because you are the sole judges of the facts.  The stipulations are reflected in Plaintiffs' Exhibit -- and I believe it's 226; is that correct, Counsel?

MR. O'CONNOR:  That's right, Your Honor.

THE COURT:  Yeah.  All right.

The Court has taken judicial notice of certain

108

Case 1:08-cv-00827-LMB-JFA   Document 1820   Filed 11/12/24   Page 109 of 146
Audio recording of Interrogators A and B
PageID# 55049

facts or events.  When the Court declares that it has taken judicial notice of some fact or event, you may accept the Court's declaration as evidence and regard as proved the fact or event which has been judicially noticed.  You are not required to do so, however, since, again, you are the sole judges of the facts.  The facts for which I have taken judicial notice are the following:

One:  The coalition provisional authority displaced Iraqi law and governmental institutions, and pursuant to Coalition Provisional Authority Order 17, immunized coalition personnel and contractors from Iraqi laws and Iraqi legal process.  Instead, subjecting all could coalition personnel to the exclusive jurisdiction of their parent states.

Two:  Coalition Provisional Authority Order 17 further provided that third-party claims for personal injury could not be brought in Iraqi courts, but would be "submitted and dealt with by the parent state whose coalition personnel, property, activities or other assets, are alleged to have caused the claimed damage in a manner consistent with the national laws of the parent state."

Three:  The United States Army has claims responsibility in Iraq with respect to the personal injury, abuse and mistreatment of Iraqi detainees, particularly at Abu Ghraib prison.

109

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA   Document 1820   Filed 11/12/24   Page 110 of 146
PageID# 55050
Audio recording of Interrogators A and B

Accordingly, the Department of Defense established a formal claims process on September 15, 2004 pursuant to the Foreign Claims Act Title 10 of the United States Code, Section 2734, through which the United States committed to investigate claims and provide a recommendation regarding an appropriate amount of compensation, if any.

If a cognizable claim is not payable under the Foreign Claims Act or other claimed statutes, the Secretary of the Army will identify alternative authorities under which compensation could be provided, and, in appropriate cases, take such action.

The Court took judicial notice of these three facts because the issue of claim recovery through the Foreign Claims Act was raised during the trial. Nothing in the Foreign Claims Act, however, prevents a plaintiff from bringing a civil action in a domestic court under the Alien Tort Statute. Which is the statute at issue in this case, and I'll explain more about that statute to you in a few minutes.

Now, any proposed testimony or proposed exhibit to which an objection was sustained by the Court and any testimony or exhibit ordered stricken by the Court must be entirely disregarded by the jury. Anything you may have seen or heard outside the courtroom is not evidence and must be entirely disregarded.

110

Case 1:08-cv-00827-LMB-JFA   Document 1820   Filed 11/12/24   Page 111 of 146
PageID# 55051
Audio recording of Interrogators A and B

Questions asked by a lawyer for either party are not evidence.  And you've heard me say that many times during the trial.  If a lawyer asks a question of a witness which contains a statement of fact, you may not consider the lawyer's statement as any evidence of that fact.  Only a witness's answer to a question may be considered as evidence.

And objections, statements and arguments of counsel also are not evidence in the case unless made as an admission or stipulation of fact.

You are to base your verdict only on the evidence received in the case; however, in your consideration of the evidence received, you are not limited to the bald statements of the witnesses or to the bald assertions in the exhibits.

In other words, you're not limited solely to what you see and hear as the witnesses testify or as the exhibits are admitted.  Instead, you are permitted to draw from the facts which you find have been proved such reasonable inferences as you feel are justified in the light of your experience and common sense.  Inferences are simply deductions or conclusions which reason and common sense lead the jury to draw from the evidence received in the case.

You will have a list of all the exhibits that were admitted into evidence during the trial.  And actually I

111

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 112 of 146
PageID# 55052
Audio recording of Interrogators A and B

think it's two lists; right?  A list from the plaintiffs' side, and a list of the defendant's side?

MR. O'CONNOR:  That's right, Your Honor.

THE COURT:  All right.  And so they will have the exhibit number and a very brief description of the exhibit, like photographs or the CACI contract, something like that.

The titles of the exhibits are not evidence and are only intended to help you locate the documents you are looking for.

Now, testimony or an exhibit can be admitted into evidence during a trial only if they meet certain criteria or standards.  It is the sworn duty of the attorney on either side of the case to object when the other side offers testimony or an exhibit which that attorney believes is not properly admissible under the rules of law.  Only by raising an objection can a lawyer request and then obtain a ruling from the Court on the admissibility of the evidence being offered by the other side.

You should not be influenced against an attorney or the attorney's client because the attorney has made an objection.  Moreover, do not attempt to interpret my rulings on objections as somehow indicating how I think you should decide this case.  I simply am making a ruling on a legal question regarding that particular piece of testimony or exhibit.

112

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

It is the duty of the Court to admonish an attorney who, out of zeal for his or her cause, does something which I feel is not in keeping with the rules of evidence or procedure.  You are to draw absolutely no inference against the side to whom an admonition of the Court may have been addressed during the trial.

And during the course of the trial, I occasionally asked questions of a witness.  Do not assume that I hold any opinion on the matters to which my question may relate.  The Court may ask a question simply to clarify a matter; not to help one side of the case or to hurt the other side.

Now, there are two types of evidence which are generally presented during a trial, and they're called direct evidence and circumstantial evidence.

Direct evidence is the testimony of a person, such as an eyewitness, who asserts or claims to have actual knowledge of a fact.  Circumstantial evidence is proof of a chain of facts and circumstances indicating the existence of a fact.

I'll give you an example of circumstantial evidence.  You leave your house at noon on a cold February day.  At that time your front yard is bare.  It starts to snow, and you return at 5 p.m., and you see a footprint in the snow that now covers your front yard.  From the facts that you left your home at noon, returned at 5 p.m., you see

113

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 114 of 146
PageID# 55054
Audio recording of Interrogators A and B

the footprint, and you know from common experience that human beings are normally associated with a footprint, you can infer that there was a person in your yard sometime between noon and 5 p.m. that day.

If you actually had seen a person, you would have direct evidence of that fact.  When you didn't see the person, those other facts I gave you, that's an example of circumstantial evidence.

Now, the law makes no distinction between the weight or value to be given to either direct or circumstantial evidence, nor is a greater degree of certainty required of circumstantial evidence than of direct evidence.  You should weigh all the evidence in the case in making your decisions.

Your decisions as to the facts of this case should not be determined by the number of witnesses testifying for or against a party or by the number of exhibits introduced by one side or the other.

You should consider all of the facts and circumstances in evidence to determine which of the witnesses you choose to believe or not believe and which of the exhibits have more or less value.

You may find that the testimony of a smaller number of witnesses on one side is more credible than the testimony of a greater number of witnesses on the other

114

side, or that one or two exhibits may have more significance in your evaluation of the case as against numerous exhibits that you find have less significance.  To sum up this instruction, always consider the quality of the evidence, not the quantity of the evidence.

Now, you, as jurors, are the sole and exclusive judges of the credibility of each of the witnesses called to testify, and only you determine the importance, which we sometimes call the weight, if any, that the testimony deserves.  After making your assessment concerning the credibility of a witness, you may decide to believe all of that witness's testimony, only a portion of the testimony, or none of it at all.

In making your assessment of that witness, you should carefully scrutinize all of the testimony given by that witness, the circumstances under which each witness has testified, and all of the other evidence which tends to show whether a witness, in your opinion, is worthy of belief.

Consider each witness's intelligence, motive to falsify, state of mind and appearance and manner while on the witness stand.

Consider the witness's ability to observe the matters as to which he or she has testified, and consider whether the witness impresses you as having an accurate memory or recollection of these matters.

115

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 116 of 146
Audio recordings, Interrogators A and B
PageID# 55056

Also consider any relation a witness may bear to either side of the case, the manner in which each witness might be affected by your verdict, and the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case.

Inconsistencies or discrepancies in the testimony of a witness or between the testimony of different witnesses may or may not cause you to disbelieve or discredit such testimony.  Two or more persons witnessing an incident or a transaction may simply see or hear it differently.  Innocent misrecollection, like failure of recollection, is not an uncommon human experience.

In weighing the effect of a discrepancy, however, always consider whether it relates to a matter of importance or to an insignificant detail, and consider whether the discrepancy resulted from innocent error or from intentional falsehood.

Now, the ability of both the plaintiffs and the defendant to produce all the exhibits and witness testimony they would have wanted to produce has been limited by the United States having invoked the state secret privilege to ensure that military or other secrets are not revealed.

As a result, certain exhibits have been redacted, and certain witnesses were unable to testify in this case as to matters to which the government invoked the state secrets

116

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 117 of 146
PageID# 55057
Audio recording - Interrogators A and B

privilege.

As I instructed you at the outset of the trial, for interrogation personnel whose identities were withheld by the government, do not base any of your credibility, determinations on the format in which their testimony was admitted into evidence.  The parties in this case bear no responsibility for that decision, and the lack of identity and background information should not adversely influence your judgment of these witnesses' credibility.

In this case, we've heard the testimony of some witnesses by deposition, as well as one of the plaintiffs. When a person is unavailable to testify in trial, the deposition of that person may be used at trial.  A deposition is simply a pretrial procedure in which the attorneys for both sides may question a witness or an adverse party under oath before a court stenographer.  Each side is entitled to take depositions, and each side is entitled to ask questions at each deposition.

You may consider the testimony of a witness given at a deposition according to the same standards you would use to evaluate the testimony of a witness given at trial. These instructions apply to witnesses who testify -- also apply to witnesses who testify pseudonymously, that is the various interrogators who, you know, you could only hear their voices and we had a black screen and we didn't get

117

Case 1:08-cv-00827-LMB-JFA   Document 1820   Filed 11/12/24   Page 118 of 146
PageID# 55058
Audio recording of Interrogators A and B

their names.

In those cases where depositions were read to you, do not place any significance on the behavior or tone of voice of any person reading the questions and answers. Otherwise, you should treat the deposition testimony the same way as any other testimony presented in court.

Evidence has been presented to you in the form of admissions to the truth of certain facts.  These admissions were given in writing before the trial in response to requests that were submitted under established court procedures.  You must treat these facts as having been proved.

And do we have an exhibit number for the admissions?  Anybody remember offhand what it is?  I thought you would have that one memorized.

MR. FARIDI:  Your Honor, it's PTX 171.

THE COURT:  Plaintiffs' Exhibit 171 in case you all wanted to take a look at that.

Now, a witness may be discredited or impeached by contradictory evidence or by evidence that at some other time the witness has said or done something or has failed to say or do something that is inconsistent with the witness's present testimony.

If you believe any witness has been impeached and thus discredited, you may give the testimony of that witness

118

Case 1:08-cv-00827-LMB-JFA   Document 1820   Filed 11/12/24   Page 119 of 146
Audio recordings of Interrogators A and B
PageID# 55059

such credibility, if any, you think it deserves.

If a witness is shown knowingly to have testified falsely about any material matter, you have a right to distrust such witness's other testimony, and you may reject all the testimony of that witness or give it such credibility as you think it deserves.  An act or omission is knowingly done if the act is done voluntarily and intentionally and not because of a mistake or accident or other innocent reason.

If you believe from the evidence that a party previously made a statement inconsistent with his testimony at this trial, you may consider that previous statement as evidence that what the party previously said was true.

The rules of evidence ordinarily do not permit witnesses to testify as to their own opinions or their own conclusions about important questions in a trial.  An exception to this rule exists as to those witnesses who are described as expert witnesses.

An expert witness is someone who, by education or by experience, may have become knowledgeable in some technical, scientific or very specialized area.  If such knowledge or experience may be of assistance to you in understanding some of the evidence or in determining a fact, an expert witness in that area may state an opinion as to a matter in which he or she claims to be an expert.  You

119

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA   Document 1820   Filed 11/12/24   Page 120 of 146
PageID# 55060
Audio recording of Interrogators A and B

should consider each expert opinion received in evidence in this case and give it such weight, if any, as you think it deserves.  You should consider the testimony of expert witnesses just as you consider other evidence in this case.

If you should decide that the opinion of an expert witness is not based upon sufficient education or experience, or if you should conclude that the reasons given in support of the opinion are not sound, or if you conclude that the opinion is outweighed by other evidence, you may disregard the opinion in part or in its entirety.  As I've said to you several times before, you are the sole judges of the facts of the case.

And if any reference by the Court or by counsel to matters of testimony or exhibits does not coincide with your own memory of that evidence, it is your memory which should control during your deliberations and not the statements of the Court or of counsel.

There are three plaintiffs in this case, and each plaintiff has separate individual rights.  You should decide the case as to each plaintiff and the defendant separately. Unless otherwise stated, the instruction will apply to all of the parties.

Now, in this lawsuit, the plaintiffs claim that they were the victims of torture and cruel, inhuman or degrading treatment while housed in the hard site at Abu

120

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 121 of 146
PageID# 55061
Audio recording of Interrogators A and B

Ghraib.  They are suing under the Alien Tort Statute, which is a United States law which gives people the right to sue and their cases to be decided in an American court for certain violations of international law.  International law prohibits torture and cruel, inhuman or degrading treatment.

There are no exceptions to these prohibitions. Neither war, nor national security, nor any other exceptional circumstance can ever justify torture or cruel, inhuman or degrading treatment.  All persons have the right to be free from these violations.

A person who is injured by any of these international law violations may sue in a United States court under the Alien Tort Statute.  This is true even if the international law violations occur in another country, such as Iraq.

Now I'm going to give you an overview of the case.

Each plaintiff, that is Suhail Najam Abdullah Al Shimari, Mr. Salah Hasan Nusaif Al-Ejaili, and Asa'ad Hamza Hanfoosh Al-Zuba'e alleges that in violation of the Alien Tort Statute, he was the victim of torture and cruel, inhuman and degrading treatment while he was detained at the Abu Ghraib hard site.

Plaintiffs do not allege that any CACI personnel, including Steve Stefanowicz, Daniel Johnson and Timothy Dugan, directly mistreated them.  Instead, they claim that

121

these CACI interrogators conspired with Army military personnel to torture or inflict cruel, inhuman or degrading treatment on detainees in the hard site, which resulted in the plaintiffs being tortured or subjected to cruel, inhuman or degrading treatment.

Each plaintiff seeks monetary damages from CACI Premier Technology, Inc. to compensate for the injuries sustained from being subjected to torture or cruel, inhuman and degrading treatment, as well as to punish CACI for the conduct of its employees.

For any plaintiff to prevail on his claim that his right to be free from torture or cruel, inhuman and degrading treatment under the Alien Tort Statute to prove that that has been violated by the defendant, the plaintiff must prove two facts by a preponderance of the evidence.  If a plaintiff fails to prove both facts by a preponderance of the evidence, he is not entitled to any judgment.

The two facts that must be proved are that, Number 1, the plaintiff was either tortured or subjected to cruel, inhuman or degrading treatment.  The plaintiff does not have to prove that he was both -- that he was both tortured and subjected to cruel, inhuman or degrading treatment.  Proof by a preponderance of the evidence as to either type of wrongful treatment satisfies this element.

And two, the second element, is that CACI's

122

employees were responsible for the plaintiff being tortured or subjected to cruel, inhuman or degrading treatment by conspiring with Army military personnel to have the hard site detainees tortured or to inflict cruel, inhuman or degrading treatment on them.

If a plaintiff has proved these two facts, then he must also prove, again by the preponderance of the evidence, his compensatory damages.  And to be awarded any punitive damages, he must prove entitlement to them by a higher standard of proof, which is called clear and convincing evidence.  And I'll give you definitions of those in a second.

Because each plaintiff's case must be evaluated individually, that one plaintiff may prevail against the defendant does not mean that any other plaintiff automatically prevails.  Likewise, should defendant be found not liable as to one plaintiff does not mean that the defendant is automatically not liable to any other plaintiff.

Even if a plaintiff proves all of these -- these two facts by a preponderance of the evidence, CACI maintains that it is not liable for any misconduct of its interrogators under the borrowed servant doctrine. Defendant has the burden of proving this defense by a preponderance of the evidence.  And I'll explain that

123

defense to you.

A person can be in the general employ of one company while, at the same time, being the employee of another company.  In other words, an employee who commits a wrongful act may have more than one employer at the time the wrongful act is committed.

In determining the liability of a company for acts performed by one of its employees who was also working for another company, you must consider who controlled the work of the employee when the alleged misconduct occurred.

In this case, CACI employees were performing work on a government contract with the United States military at Abu Ghraib.  Therefore, the issue you must determine is under whose direction and control were the employees when they engaged in the alleged misconduct.  In other words, when an employee has been lent by one employer to perform the services of another employer, you have to consider who was controlling the employee's work at the time of the alleged misconduct.  In making this decision, you should consider all the facts in evidence.

CACI, that is the defendant, has the burden to prove the borrowed servant defense by a preponderance of the evidence.  If it fails to do so, then it can be held liable for the conduct of its interrogators.

Now, to prove a claim by a preponderance of the

124

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

evidence means to prove that something is more likely true than not true.  In other words, a preponderance of the evidence means such evidence as, when considered and compared with the evidence opposed to it, has more convincing force and produces in your minds belief that what is sought to be proved is more likely true than not true.

A preponderance of the evidence means the greater weight of the evidence.  It refers to the quality and persuasiveness of the evidence, not to the number of witnesses or documents.  This standard does not require proof to an absolute certainty.

If you find the credible evidence on a given issue is evenly divided between the parties, that it is equally probable that one side is right, as it is that the other side is right, then you must decide the issue against the party who has the burden of proof.  This is because the party bearing the burden must prove more than simply equality of evidence; it must prove the element at issue by a preponderance of the evidence.

On the other hand, the party with this burden of proof need prove no more than preponderance.  So as long as you find that the scales tip however slightly in favor of the party with this burden of proof, then that element will have been proved by a preponderance of the evidence.

And I don't know if you see it or not.  Behind

125

you'll see a balance scale.  All right.  I always tell juries, just think about this instruction.  You put all the evidence that favors one side on the one scale, on the one platform; all the evidence that favors the other side on the other platform, and you look how the scales weigh.  If they're equal, 50/50, the party that has the burden of proof on that issue loses because they have not produced enough evidence by the greater weight.

At the same time, if the scales tip -- and it only has to be a feather's weight difference -- but if the scales tip at all in favor of the party that has that burden, they've met the burden because they have a greater weight of the evidence.  So that's how you think about that instruction.

Some of you may have heard the term proof beyond a reasonable doubt.  That's the standard used in a criminal case.  It is absolutely not the standard that applies in this case.  So this is preponderance of the evidence, with one exception which I'll get to in a minute.

Now, plaintiffs each contend that they were subjected to torture in violation of customary international law.  This claim must be proved separately as to each individual plaintiff.  To establish this claim, each plaintiff must prove by a preponderance of the evidence, one:  That military personnel subjected him to severe pain

126

or suffering, whether physical or mental.

Two:  That military personnel inflicted this pain or suffering on him intentionally for the purpose of obtaining information or a confession or for punishment, intimidation or coercion.

And three:  That military personnel inflicted this pain or suffering on him by or with the consent of a public official or other person acting in an official capacity and while the plaintiff was in the official custody -- official's custody or under the official's control.  In other words, that military personnel were acting under color of law.

Acting under color of law means that a person is acting or purporting to act in the performance of his official duties.  It means that the action is clothed with the authority of the government.  A person can act under the color of law even when his actions overstep or constitute an abuse of his legal authority.

Torture may include mental pain and suffering.  To constitute torture, the mental pain or suffering must be prolonged mental harm and caused by or resulting from the intentional infliction or threatened infliction of severe physical pain or suffering or the threat of imminent death.

In evaluating the severity of the pain and suffering a plaintiff endured, you should consider the

127

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 128 of 146
Audio recordings of Interrogators A and B
PageID# 55068

duration, frequency and intensity of the methods he endured, the permanence or lasting effects of the methods used, and individual factors such as age, gender and religion.

The severity of physical or mental pain or suffering by an individual is not evaluated by the effect of any acts or methods taken in isolation.  Rather, torture should be measured by considering the cumulative effects of the acts and methods on the individual.

Each plaintiff also contends that he suffered cruel, inhuman or degrading treatment in violation of international law.  For a plaintiff to prevail on this claim, he must prove by a preponderance of the evidence, one:  That Army military personnel intentionally inflicted acts of cruel, inhuman or degrading treatment on him.

And two:  The person who intentionally inflicted severe or serious pain or suffering, whether physical or mental on that plaintiff, did so while he was within the custody or control of that person.

Cruel, inhuman or degrading treatment causes feelings of fear, anguish or inferiority capable of humiliating or debasing the victim and possibly breaking his physical or moral resistance.

Treatment is cruel if it causes serious mental or physical suffering or injury or constitutes a serious attack on human dignity.

128

Audio recording - Interrogators A and B

Treatment is inhuman if it deliberately causes severe suffering, mental or physical, which in the particular situation is unjustified.

Treatment is considered degrading if its effect is such as to arouse feelings of fear, anguish or inferiority capable of humiliating or debasing any one of the plaintiffs.

You must consider the totality of the circumstances in determining whether any individual plaintiff was subjected to cruel, inhuman or degrading treatment which caused severe psychological or physical harm.

Whether treatment is cruel, inhuman or degrading depends upon an assessment of all the particularities of the evidence before you, including the specific conditions at issue, the duration of the measures imposed, the objectives pursued by the perpetrators, and the physical or mental effects on the persons involved.

Acts of torture constitute cruel, inhuman or degrading treatment.  The difference between torture and cruel, inhuman or degrading treatment is the intensity or degree of the physical or mental suffering inflicted.  The two violations are understood to be on a continuum of misconduct.

Even if you find that a plaintiff did not suffer

129

Case 1:08-cv-00827-LMB-JFA   Document 1820   Filed 11/12/24   Page 130 of 146
Audio recording, Interrogators A and B
PageID# 55070

from harm severe enough to constitute torture, you may still find that the plaintiff endured cruel, inhuman or degrading treatment.

Now, the plaintiffs' theory in this case of course is one involving conspiracy. So a conspiracy is an agreement between two or more persons to commit a wrongful act.

To hold defendant liable under a theory of conspiracy to commit torture or cruel, inhuman or degrading treatment as to any of the plaintiffs, that plaintiff must prove by a preponderance of the evidence the following four facts:

One: That there was an agreement between two or more persons to inflict torture or cruel, inhuman or degrading treatment on detainees at the Abu Ghraib hard site.

Two: That the defendant knowingly and intentionally joined the conspiracy.

Three: Either the defendant or a co-conspirator committed an overt act in furtherance of the conspiracy.

And four: The torture and/or cruel, inhuman or degrading treatment to which plaintiffs were subjected resulted from acts taken in furtherance of the conspiracy.

Now, knowledge and participation in a conspiracy may be shown by circumstantial evidence. Once the

130

Case 1:08-cv-00827-LMB-JFA   Document 1820   Filed 11/12/24   Page 131 of 146
PageID# 55071
Audio recordings by interrogators A and B

conspiracy is formed, each member of the conspiracy is liable for the actions of the other co-conspirators performed during the course and in furtherance of the conspiracy.

To prevail on his conspiracy theory, a plaintiff does not have to show that the conspirators met with all the alleged co-conspirators, or that there was a formal written -- or that there was a formal or written agreement or that all conspirators agreed on every detail of the conspiracy.

An agreement to commit torture or cruel, inhuman or degrading treatment may be inferred from circumstances including the nature of the acts done, the relationships between the parties, and the interests of the alleged co-conspirators.

The mere presence at the scene of wrongful conduct by itself does not make one a conspirator. Even knowing that wrongful conduct is occurring does not make one a conspirator. Rather, there must be evidence that a defendant knowingly and intentionally did something that enabled the wrongful conduct to occur.

Now, the fact that I have instructed you as to the proper measure of damages -- and I'm going to do that in a second -- should not be considered as indicating any view of mine as to which party is entitled to your verdict in this

131

Audio recording of interrogators A and B

case.  Instructions as to the measure of damages are given for your guidance only in the event you should find in favor of a plaintiff from a preponderance of the evidence in the case in accordance with the other instructions.

If you find in favor of a plaintiff and against the defendant, then you must determine an amount that is fair compensation for the damages suffered by that plaintiff.  Compensatory damages seek to make the party whole, that is to compensate a plaintiff for the damage suffered because of a defendant's wrongful conduct.  The damages, if any, that you award should be full and fair compensation; no more and no less.

If you decide to award compensatory damages, you should be guided by dispassionate common sense.  Computing damages may be difficult, but you must not let that difficulty lead you to engage in arbitrary guesswork.

On the other hand, the law does not require a plaintiff to prove his losses with mathematical precision, but only with as much definiteness and accuracy as the circumstances permit.

Compensatory damages are the measure of the loss or injuries sustained by the injured plaintiff, and they embrace shame, mortification, humiliation, indignity to the feelings and the like.  You should consider the following elements in determining the amount of compensatory damages

132

to the extent you find them proved by a preponderance of the evidence:  Emotional pain and suffering, mental anguish, physical disfigurement and/or physical pain.  In making an award for such damages, you must use your best judgment and establish an amount of damages that is fair and reasonable in light of the evidence before you.  No evidence of a monetary value of such intangible things as pain and suffering has been or need be introduced into evidence.

There is no exact standard for fixing the compensation to be awarded for these elements of damages. Any award you make must be fair in light of the evidence presented at trial.

Now, if you should find that the defendant is liable for a plaintiffs' injuries, then you have the discretion to also award compensatory -- I'm sorry, to award, in addition to compensatory damages, punitive damages.  You may award punitive damages if a plaintiff proves by clear and convincing evidence that the defendant's conduct was malicious and reckless, not merely unreasonable.

An act is malicious and reckless if it is done in such a manner and under such circumstances as to reflect utter disregard for the potential consequences of the act on the safety and rights of others.

The purpose of punitive damages is to punish a defendant for shocking conduct and to set an example in

133

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 134 of 146
PageID# 55074
Audio recordings of Interrogators A and B

order to deter the defendant or others from committing similar acts in the future.  Whether to award punitive damages is within your discretion.  You're not required to award them.

Punitive damages are appropriate only for especially shocking and offensive misconduct.  If you decide to award punitive damages, you must use sound reason in setting the amount.  It must not reflect bias, prejudice or sympathy toward any party.  But the amount may be as large as you believe necessary to fulfill the purpose of punitive damages.  In this regard, you may consider the financial resources of the defendant in fixing the amount of punitive damages.

Each plaintiff's punitive damage claim must be proven by clear and convincing evidence.  And this is a higher standard of proof than preponderance of the evidence. Clear and convincing evidence means that the thing to be proved is highly probable or reasonably certain.

You probably have heard the phrase proof beyond a reasonable doubt.  That's even stricter.  So what we're talking about here is we have three standards of proof in the law.  We have proof by preponderance of the evidence, that's the basic standard I just gave you.  Clear and convincing evidence is somewhere above that.  Proof beyond a reasonable doubt is the highest.

134

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 135 of 146
PageID# 55075
Audio recording Interrogators A and B

So I can't give you a mathematical precision explanation of what clear and convincing evidence is; it's just much higher than simply preponderance of the evidence.

This is the last instruction.

Upon retiring to your jury room to begin your deliberations, you must elect one of your members to act as your foreperson.  The foreperson will preside over your deliberations and will be your spokesperson here in court. But as I've told you many times before, you're eight co-equal judges, so the fact that one of you will be the foreperson does not mean that that person's opinion or memory of the evidence is worthy of any more consideration. You're eight co-equal judges.  But we need one person who can sort of keep things organized and will also be the person who will sign the verdict form.  So the foreperson will preside over the deliberations and will be your spokesperson here in court and will ultimately sign the verdict form.

Now, your verdict, that is your decision, must represent the collective judgment of the jury.  To return a verdict, it is necessary that each juror agree to it.  In other words, it must be unanimous.

It is your duty as jurors to consult with one another and to deliberate with one another with a view towards reaching an agreement, if you can do so without

135

violation to your individual judgment.

Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence in the case with your fellow and sister jurors.

In the course of your deliberations, do not hesitate to re-examine your own views and to change your opinion if convinced it is erroneous; however, do not surrender your honest conviction solely because of the opinion of the other jurors or for the mere purpose of thereby being able to return a unanimous verdict.

Remember at all times you're not partisans, you don't represent the plaintiffs, and you don't represent the defendant.  Instead, you are judges, specifically judges of the facts of this case, and your sole interest is to seek the truth from the evidence received during the trial.

Now, your verdict must be based solely upon the evidence received in the case.  Nothing you've seen or read or heard outside of court may be considered.  Nothing that I have said or done during the course of this trial is intended in any way to suggest to you what I think your verdict should be.  Nothing said in these instructions, and nothing in any form of verdict is to suggest or convey to you in any way what the verdict should be.

Verdict forms have been prepared for you, and I'm going to go over just one of them because there are three

136

Case 1:08-cv-00827-LMB-JFA   Document 1820   Filed 11/12/24   Page 137 of 146
PageID# 55077
Audio recording of Interrogators A and B

identical forms, but we have one for each individual plaintiff to reiterate the fact that you have to consider each plaintiff's case individually.

So the verdict form, first of all, has the caption of the case and the case number, and then it says:  To answer any question in this verdict form, the jury must be unanimous.  So we're reminding you about that obligation.

As to the first plaintiff we're listing here, Mr. Al-Ejaili.  Number 1:  Has plaintiff proven by a preponderance of the evidence that defendant, CACI Premier Technology, Inc., is liable to plaintiff for conspiring with military personnel to inflict torture or cruel, inhuman or degrading treatment on detainees in the Abu Ghraib hard site that resulted in plaintiff being tortured or subjected to cruel, inhuman or degrading treatment?  That's Question Number 1.  And the jury answers either yes or no.  And we have yes first because most people just say yes or no.  It doesn't -- that's not meant to suggest any kind of an answer.

If your answer is yes, then please answer Questions 2 and 3.  On the other hand, if your answer is no, you do not need to further answer any other questions, and the foreperson should just go to the second page, and he or she should write their signature, please then print it, because we can't always read your signature, and the date

137

Case 1:08-cv-00827-LMB-JFA   Document 1820   Filed 11/12/24   Page 138 of 146
PageID# 55078
Audio recording—Interrogators A and B

that the decision is made.  All right.

On the other hand, if you find that the plaintiff has proven by a preponderance of the evidence the conspiracy, then the next Question Number 2 is:  What amount, if any, of compensatory damages has plaintiff proved by a preponderance of the evidence.  And there you would write the damage amount.

And Number 3:  What amount, if any, of punitive damages has plaintiff proven by clear and convincing evidence.  And there you would write whatever number you give.  And we have a similar -- exactly the same form for the other two plaintiffs as well.

Now, when you go into the jury room, you will immediately have your notes, your notebooks, you'll have four sets of the jury instructions, and you'll have the verdict form.  You will very quickly be getting the exhibits, but you can start your deliberations before the exhibits come in.

Some courts don't actually send exhibits into the jury, they wait until the jurors start to ask for exhibits.  We just send them all to you.  And you will have these two indexes which should help you in finding things.

Now, it's very important that during your deliberations you do not, in any respect, let anybody know what you're thinking about the case in terms of any votes

138

Audio recording of Interrogators A and B

you might be taking or whatever.

If it becomes necessary during your deliberations to communicate with the Court, that is if you have a question or if there's a problem, it's too cold, it's too hot, you need a white board, whatever, the procedure is for you to send that to me in writing with the foreperson or one of the other jurors having signed the note and the date, and you give it to my court security officer, Mr. Hendrick.

No member of the jury should ever attempt to communicate with the Court or anyone else by means other than a signed writing.  And I will only communicate back with you either by bringing you back into court and just giving you further instructions or trying to answer your question this way, or in some cases I may send back a note to you.  All right.  But that is how we will be communicating.

It will be important for us for you to -- whoever is chosen as the foreperson to do a couple of things right away.  And that is, Number 1, to send us a schedule that you want to follow.  Once a jury gets a case, you control the schedule.  If you want to stay until midnight tonight, you can stay until midnight, but we've probably got to get word to the building people so we can keep the heating or air conditioning.  If you want to come in at 7:30 tomorrow morning, as long as you're all here, I'm always here before

139

Case 1:08-cv-00827-LMB-JFA   Document 1820   Filed 11/12/24   Page 140 of 146
PageID# 55080
Audio recording of Interrogators A and B

7:30, you know, we'll accommodate you.  You set the schedule.

I have found from past experience, a lot of my jurors get used to the schedule, and I wind up seeing you like the one-hour lunch break at 1:00, we like the mid-morning break, mid-afternoon, but that's all up to you.

But the reason why we like to know what your schedule is because I require one lawyer per side to remain in the courtroom while you're deliberating, because if you have a question, I can't answer your question without checking it with counsel for both sides.  So if I've let all of them go, you know, having to re-herd everybody, you know, you might be waiting unnecessarily, and I really do work hard not to waste your time.  But, at the same time, if we know that you're not deliberating, you're taking your break, then they can also leave the courtroom.

The other thing that's really, really important is, as I've said many times now, you're eight co-equal judges, and so when you go to deliberate, you want to hear what each other is saying about the evidence and what your opinions are.  So even if just one of you is in the restroom, you should stop deliberating because, you know, the seven of you would be talking, and that one juror is not hearing what you've got to say.  And that's part of the job of the foreperson is to make sure you don't start

140

Case 1:08-cv-00827-LMB-JFA   Document 1820   Filed 11/12/24   Page 141 of 146
PageID# 55081
Audio recording, Interrogators A and B

deliberating until all eight of you are together.  The same thing in the morning when you come back, and I'm sure you'll come back tomorrow morning because it's late today, until everybody is there, you know, you can chat about the weather, baseball, the football game, whatever you want to talk about.  Don't talk about the case.  All right.  And that's very important that jurors remember that.

When you have finally reached a verdict, then the procedure would be for the foreperson, as I said, to fill out the verdict form, fold it over, you let my court security officer know that you have a verdict, we'll bring you back in and return the verdict in open court.  All right.

Counsel, approach the bench.

(Bench conference.)

THE COURT:  Good on this one?

MR. O'CONNOR:  You correctly read 25.  The paper said aiding and abetting.

THE COURT:  We're going to have to fix that.  We've got it.

MR. FARIDI:  With the exception of the borrowed servant instruction that we spoke about earlier, everything else is fine.

MR. O'CONNOR:  We have no objection, Your Honor.

THE DEPUTY CLERK:  I just want to say for the

141

admissions, PTX 171, that's actually not in evidence.

MR. FARIDI:  PTX 171, which were the request for admissions, we didn't put them into evidence because we just read that.

MR. O'CONNOR:  We have no issue with that being in evidence.

MR. FARIDI:  That's fine.

THE COURT:  I think it should be in evidence.

(Plaintiffs' Exhibit Number **171 admitted into evidence.**)

MR. O'CONNOR:  Just those three -- I think just three admissions; right?

MR. FARIDI:  I think the three CACI --

THE COURT:  I'll tell the jurors just three of the admissions in 171.

MR. FARIDI:  Yes.

THE COURT:  Is that how the exhibit's prepared right now?

MR. FARIDI:  We'll have the exhibits prepared right now, Judge.  We'll bring them to your staff in the next 15 minutes or so.

MR. O'CONNOR:  That's fine.

THE COURT:  Okay.  I'll tell them that.

(Open court.)

THE COURT:  The lawyers have reminded me that with Exhibit 17 -- Plaintiffs' 171, which is the admissions, to

142

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 143 of 146
PageID# 55083
Audio recording of Interrogators A and B

save you time and trouble, there are only three admissions

that were relevant to the case, so don't be alarmed if you

see -- I don't know if you're going to black it out or what

you're going to do, but that's how that exhibit is going in.

All right, folks.

Then what we're going to do now is -- it's, what,

4:30-ish.  What we want you to do as we're getting the

paperwork ready for you is decide who wants to become the

foreperson, and then decide how you want to spend the rest

of the day.  If you do want to stay past 6:00, you may; you

don't have to.  All right.  It would also be nice if you

could decide sort of how you think you want to do tomorrow.

Now, just looking down the road, this Monday is

Veteran's Day, and so it is a federal holiday, we are

closed.  So if you have not reached a verdict by the end of

tomorrow, whatever time you decide to stop tomorrow, we

would be coming back into session on Tuesday.  So I just

want you to just keep that in mind.  All right.

We'll recess court to await the decision of the

jury.

(Jury not present at 4:27 p.m.)

(A recess was taken.)

THE COURT:  All right.  So the jury has indicated

to my court security officer they want to go home tonight.

They're tired.  That's always better, I think, to have a

143

Case 1:08-cv-00827-LMB-JFA   Document 1820   Filed 11/12/24   Page 144 of 146
PageID# 55084
Audio recording of Interrogators A and B

fresh jury.  Plus, it's going to take a bit longer to get all the exhibits together, so I'm going to send them home.

You've got -- I think we've given you a copy of their note.  They want to start tomorrow morning, the standard 9:30 time.  So we need one lawyer.  I don't need all of you, just one lawyer per side is enough.  If you all want to be here, that's fine, but you should be here at 9:30 tomorrow morning.  Okay.  You can leave your stuff alone if you want to.

All right.  I'm just told I have a sentencing at 9 tomorrow morning, so, guess what, you will have to clean your tables.  All right.

Let me see.  I think that should be it.  Is there anything that we need to raise with the jury?

MR. O'CONNOR:  Your Honor, we object to the request for more water.  I'm just kidding.

THE COURT:  You know, that was the Judge Bryan approach for lawyers, not to have water on counsel table.  Things went a lot faster in those days.

All right.  We'll bring the jury in.

THE COURT SECURITY OFFICER:  Yes, Judge.

Rise for the jury.

(Jury present at 4:53 p.m.)

THE COURT:  All right.  Folks, I know you're tired and you want to go home and that's perfectly fine; I

144

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 145 of 146
PageID# 55085
Audio recording Interrogators A and B

understand that.

We've gotten your note, so you want to be back at 9:30.  So remember, out of courtesy for each other, if one of you is late, nobody can start work.  All right.

Now, it's very important, it's even more important now than it was before, that you continue to follow my instructions.  No private emails to each other, no investigation about the case whatsoever.  You know, keep following the instructions about not talking about the case.

Our student juror, I think you're okay now with your professor?

THE JUROR:  Yes.

THE COURT:  Are you cleared through next Wednesday should the jury be here next week?

THE JUROR:  Excuse me?

THE COURT:  Will you be all right about next week?  I told him that you might be here through Wednesday.  Because when we did the voir dire, remember, I said it could go until next Wednesday.  I don't know how long it will take you all to deliberate.  There is no rush.  All right.  You just take your time.

We will have for you -- when you come in tomorrow morning, we'll have more water, we will have the white board or whatever.  Yeah, we have a white board we can get for you and some markers.  And I think that's all you're requesting.

145

Case 1:08-cv-00827-LMB-JFA    Document 1820    Filed 11/12/24    Page 146 of 146
Audio recordings of interrogators A and B
PageID# 55086

And so, again, get I good night sleep.  I think you're going to get extra tonight.  It may be raining tomorrow.  You know rain in Northern Virginia on a Friday morning, so be careful about traffic.  All right.  We'll let you go this evening, folks, and we'll see you back tomorrow morning.  All right.

(Jury not present at 4:56 p.m.)

(Proceedings adjourned at 4:56 p.m.)

-----------------------------------

I certify that the foregoing is a true and accurate transcription of my stenographic notes.

*Stephanie Austin*
_____

Stephanie M. Austin, RPR, CRR

146