UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
---------------------------x
SUHAIL NAJIM ABDULLAH AL    :    Civil Action No.:
SHIMARI, et al.,            :    1:08-cv-827
          Plaintiffs,       :
     versus                 :    Friday, November 8, 2024
                            :    Alexandria, Virginia
CACI PREMIER TECHNOLOGY,    :    Day 7
INC.,                       :    Pages 1-26
          Defendant.        :
---------------------------x
```

The above-entitled jury trial was heard before the Honorable Leonie M. Brinkema, United States District Judge. This proceeding commenced at 2:05 p.m.

A P P E A R A N C E S:

FOR THE PLAINTIFFS:    CHARLES MOLSTER, ESQUIRE
                       THE LAW OFFICES OF CHARLES B. MOLSTER,
                       III, PLLC
                       2141 Wisconsin Avenue, NW
                       Suite M
                       Washington, D.C.  20007
                       (703) 346-1505

                       BAHER AZMY, ESQUIRE
                       THE CENTER FOR CONSTITUTIONAL RIGHTS
                       666 Broadway
                       7th Floor
                       New York, New York  10012
                       (212) 614-6464

                       MUHAMMAD FARIDI, ESQUIRE
                       MICHAEL BUCHANAN, ESQUIRE
                       BONITA ROBINSON, ESQUIRE
                       ANDREW HADDAD, ESQUIRE
                       SCOTT KIM, ESQUIRE
                       ALEXANDRA MAHLER-HAUG, ESQUIRE
                       PATTERSON BELKNAP WEBB & TYLER LLP
                       1133 Avenue of the Americas
                       New York, New York  10036
                       (212) 336-2000

1

A P P E A R A N C E S:

FOR THE DEFENDANT:        JOHN O'CONNOR, JR., ESQUIRE
                          LINDA BAILEY, ESQUIRE
                          JOSEPH MCCLURE, ESQUIRE
                          STEPTOE LLP
                          1330 Connecticut Avenue, NW
                          7th Floor
                          Washington, D.C.  20036
                          (202) 429-3000

                          NINA GINSBERG, ESQUIRE
                          DIMUROGINSBERG PC
                          1101 King Street
                          Suite 610
                          Alexandria, Virginia  22314
                          (703) 684-4333

FOR THE UNITED            STEPHEN ELLIOTT, ESQUIRE
STATES:                   UNITED STATES DEPARTMENT OF JUSTICE
                          CIVIL DIVISION FEDERAL PROGRAMS BRANCH
                          1100 L Street, NW
                          Washington, D.C.  20044
                          (202) 598-0905

COURT REPORTER:           STEPHANIE M. AUSTIN, RPR, CRR
                          Official Court Reporter
                          United States District Court
                          401 Courthouse Square
                          Alexandria, Virginia  22314
                          (571) 298-1649
                          S.AustinReporting@gmail.com


     COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

P R O C E E D I N G S

(This transcript does not include under seal portion.)

THE DEPUTY CLERK:  Civil Action Number 1:08-cv-827, Al Shimari et al. versus CACI Premier Technology, Inc.

Will counsel please note their appearance for the record, first for the plaintiffs.

MR. FARIDI:  Good afternoon, Your Honor. Muhammad Faridi from Patterson Belknap on behalf of plaintiffs, joined by my colleagues Alex Mahler-Haug, Baher Azmy from The Center for Constitutional Rights, and Charles Molster.

THE COURT:  Good morning.

MR. O'CONNOR:  Good afternoon, Your Honor.

THE COURT:  Yes.

MR. O'CONNOR:  John O'Connor for CACI joined by co-counsel Linda Bailey, Nina Ginsberg and Joseph McClure.

THE COURT:  All right.  So, as you know, we've gotten two questions from the jury.  Question Number 1: What is the definition of operational control?  And Number 2:  Does control mean full control or some control? All right.

MR. AZMY:  We want to address the second question first, as you know, this is a point we keep coming back to.

Our reading of case law in this circuit is clear

3

that it requires a relinquishment of complete control.  If I could read to your *Methanol v. CDI Corp.*  It's a Fourth Circuit 2022 case.  Under the borrowed servant doctrine, a general employer remains liable for the negligent conduct of its employee unless he has "completely relinquished control of the employee's conduct to a third party."

*Allegheny Energy,* that's Western Virginia.  Under the borrowed servant rule, a general employer remains liable for the negligent act of a servant unless it affirmatively appears he has completely relinquished control.

And as we've argued to you before, the facts in the *Estate of Alvarez* reflect a complete relinquishment of control.  There was no presence of Rockefeller in Guatemala. The people in Guatemala didn't even recognize this person as an employee of the Rockefeller Center, which sort of underscores the idea that there was complete relinquishment. And even then the Court went to a factual analysis of whether, despite the complete relinquishment, there could any circumstance that would render him a dual servant, and then found even under those facts, there could not be shared control.  So we believe the law is clear on that point.

With respect to operational control, I think our intuition is we don't think we should opine on that one way or the other.

THE COURT:  I clearly recall the testimony, they

4

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

asked I believe it was Pappas and several others, what do you mean -- they had trouble themselves --

MR. AZMY:  Yes, that's right.

THE COURT:  -- defining what is operational control.

MR. AZMY:  That's right.

THE COURT:  We may be getting another question, so let's just wait.

MR. AZMY:  I understand.

THE COURT SECURITY OFFICER:  They're all back from lunch now, Judge.

THE COURT:  That's all.

MR. AZMY:  Just one final point, Your Honor, while we're on the subject.

I think this could be cured and aligned with the notion of the two masters dual servant conception that Your Honor is thinking about by adding a line at the end of the first paragraph of Instruction Number 20 to say something like "or whether the control was shared between the two companies."  So we think those two elements are critical to the borrowed servant analysis under Fourth Circuit law.

THE COURT:  All right.  I'll hear from --

MR. O'CONNOR:  Your Honor, I think I'll start with where we agree, and that is that we don't think that defining operational control is appropriate or wise.  I

5

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

mean, the test doesn't use the phrase "operational control"; it uses different words.  And if anything is to be said, it's I think to reiterate what the actual instruction is and what the buzz words are in the actual instruction.

We disagree with Mr. Azmy's notion that a fact-finder could just say, well, I think they both have respondeat superior liability.  If you look at the statement, it says that as between -- I mean, as Your Honor said when we were talking about instructions before the jury began deliberating, the lending employer always has some degree of control because they're paying the loan employees and the like.  And if you look at -- the restatement talks about that the liability should go to the entity that is better situated to control the conduct that resulted in injury.

Here -- and I turn to the Fourth Circuit's discussion in *Huff* where -- it was a loan of lawyers [sic] -- *Huff* is at 631 F.2d 1140.  The loaning -- it was a welding company that loaned some welders to another company when they had a shortfall, and the loaning company actually had a supervisor on site.  And the Court said that was not -- the loaning employee was not the employer for purposes of borrowed servant because what was important is that it was the -- who was concerned with the details of the work, that's pulled straight out of *Huff* at 1143.

6

Also, the *McLamb* case, which we've cited to the Court in our briefing on borrowed servant, there, the -- Du Pont actually had some experts that were loaned to the Army.  And the argument there was, well, they're directing the Army Corps of Engineers personnel in what they're doing, so Du Pont should be viewed as the employer of the underlings who actually caused an explosion through the way they did the work.

And what the Fourth Circuit said was, not only is that wrong, the Army Corps of Engineers is the employer of the Du Pont experts, because they were overall in charge of directing and controlling how the activities went, and they could have, you know, accepted or rejected the advice of the Du Pont engineers.

So we think that the answer for does control mean full control or some control is right out of *Huff*.  And it's which employer was the one that had concern with the details of the work being done, which here would be, you know, interrogation, interaction with detainees.

THE COURT:  All right.  So you're recommending that we tell the jury that we're unable to give them a definition of operational control because that's a factual -- that's not a technical legal term; that's a term in this case about which the lawyers have -- the witnesses have testified, and they have to make that factual

7

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

determination for themselves.

MR. O'CONNOR:  Well, or that operational control is not part of -- that's not one of the -- one of the phrases that is the -- that controls the borrowed servant instruction.

THE COURT:  Well, we don't know, though, necessarily that's where this is coming from.

MR. O'CONNOR:  I suppose that's true, although I think we could infer it probably.

THE COURT:  Probably.

And then the second one, you're recommending the Court for the does control mean full control or some control.  We basically say, you know, I'm not answering that question directly, but what I am telling you is that the law requires that you look at who was concerned with the details of the work being done or when the tort occurred.

MR. O'CONNOR:  Exactly.  That's right.

THE COURT:  All right.

MR. AZMY:  Your Honor, does that reflect the question around control?  Because if the question is about control and not just concern, we think the case law and the --

THE COURT:  Well, I'll look at the language in 631 to see if it uses the word concerned or controlled.  But I'll also look at the *Methane* case that you got.  And,

8

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

again, I'll go back to look at *Alvarez* which is the most recent statement on the borrowed servant doctrine out of the Fourth Circuit.

MR. AZMY:  Right.

THE COURT:  Just as a matter of curiosity, to your knowledge, is there any other case pending before the Fourth Circuit right now that addresses the borrowed servant issue? Has anyone looked to see?

MR. AZMY:  No.  We agree as between *Methanol* and *Alvarez*, those are the two most recent pronouncements.

And, again, Your Honor, we would encourage you towards the end to look at the Court's treatment of the dual servant question.  Because after they agreed that there was full relinquishment on the fact, there were zero connections between the two entities.  In fact, Rockefeller paid for a while just because the other entity couldn't pay and then stopped.  There was no recognition that the doctor was in any way affiliated.  There were no communications back and forth between the two entities.  There was a complete severance.  And here, of course, Porvaznik, which is very different than *Huff*, was on the ground.  And you know the testimony as well as we do about his level of control. Everyone recognized that these were civilians and were separate from their own entity.  They were, you know, with CACI.  And so the *Alvarez* really does set the bar -- the

9

factual analysis as the complete relinquishment, and this is very different.

THE COURT:  Well, again, you know, the problem with this case, and I've said it so many times, it's a very difficult case for this jury.  And, I don't mind sharing it, it's always been a difficult case in chambers.  We don't agree.

All right.  And the problem here is, you do have, I think, pretty much uncontestable evidence that the military set the ground rules for how interrogations were supposed to be conducted.  They put the Tiger Teams and these teams together.  There was a military chain of command.  And the work that was being done was interrogation work.  And all of that falls under the military's end of things.  And what CACI was doing was doing classic government contracting, that is they were providing the government with people to perform a function which the government wanted help with.

MR. AZMY:  Well, in that sense, this is sort of like government contracting.  And, you know, I think this rule would arguably be too expansive and make every government contractor a borrowed servant, which, you know, I don't think as a policy or a legal matter is correct.

And then of course, Your Honor, there's plenty of evidence, including the Fay evidence we introduced and

10

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

the -- from Taguba that there was, in fact, command vacuum on the night shift, and CACI employees were in control.

And then ultimately I think the best way to deal with this, if you don't want to -- is to recognize that there can be shared control, and the facts certainly support that in addition to the idea that, as a matter of law, the relinquishment has to be complete per *Methanol*, *Allegheny* and the *Estate of Alvarez*.

THE COURT:  I think to say that complete abandonment of all control absolutely cannot be an accurate statement.  That basically means then that CACI has to fire these people.  They no longer work for CACI.

CACI's got control over them.  If they want to take R&R leave, they arrange that with CACI; they don't arrange that with the military.  If they're unhappy because they don't have adequate -- as I understand it, they needed toilets rather than Porta Johns, they're going to CACI for that; they're not going to the military for that.

MR. AZMY:  But they also have the shared interest in the work of collection interrogation.  I think there's evidence in the record from Porvaznik and others that they shared, even at the formal level, an interest in interrogation, which is why they were paid to provide resident experts for interrogation.  And then of course at some point there was misconduct, and, at that point, the

11

Army was not in control.  If anything, the evidence shows where there was misconduct.  It was MIs, including CACI, ordering the MPs.  That's all over the record.

So I think to leave this question open for the jury and not acknowledge all of the facts to show that CACI actually had some control over, not only their own employees but the MPs during the point of misconduct.  Which is the entire theory of the case.  This is how this scandal was, you know, revealed through the military general reports.

THE COURT:  Okay.  Well, we're going to take a look at it.  I'm not going to send anything in to the jury until I come back and run it by you all, and then probably I'll have the jury come in and give it to them verbally with a written supplemental instruction the way we did last time. All right.

MR. AZMY:  Thank you, Your Honor.

MR. O'CONNOR:  Understood, Your Honor.  Thank you.

(A brief recess was taken.)

THE COURT:  All right.  So we've put together what would be Supplemental Instruction Number 1, and it reads: It is a question of fact that the jury must decide whether CACI had the ability to control the interrogation work being performed by CACI employees at Abu Ghraib when the torture or cruel, inhuman or degrading treatment occurred.  Whether the Army alone or both the Army and CACI had this ability is

12

a factual question that you must decide.

I want your feedback on that.

MR. O'CONNOR:  Your Honor, we think this instruction has -- is not consistent in several ways with Fourth Circuit law, and there's also some wordsmithing issues as well.

*Alvarez* talks about -- it's who has the power to control and direct the servants and the performance of --

THE COURT:  I can put power rather than ability if that's the case.

MR. O'CONNOR:  We certainly want that in all the places where the word "ability" appears.

But then it also goes on to say:  The important question is not whether the agent remains the servant of the general employer as to matters generally, but whether or not, as to the act in question, he is acting in the business of and under the direction of one or the other.

And the restatement talks about the employer being the one in the better position to control, not -- the final sentence we think is clearly contrary to the restatement, I think it's contrary to Rockefeller or to the *Estate of Alvarez*.  Certainly *McLamb* where there is no question that the Du Pont experts had the power to exercise some control over the Army Corps of Engineers people underneath them, because they were directing them exactly what to do, and the

13

Court said no, the Army was ultimately in charge, so the Army is ultimately in charge.

The -- also the -- I think the word allege probably should come before the word torture or cruel. I think we're assuming facts --

THE COURT: Well, remember, they don't get -- the jury does not get to the affirmative defense unless they have already found that there was the torture.

MR. O'CONNOR: But I don't think they're required to do these in any order, so I do think it assumes a fact that's not there.

THE COURT: All right. So reading your objection, you would change it to read: It is a question of fact that the jury must decide whether CACI had the power to control the interrogation work being performed by CACI employees at Abu Ghraib when the alleged torture or cruel, inhuman or degrading treatment occurred. Whether the Army alone, or both the Army and CACI, had this power to control is a factual question that you must decide.

MR. O'CONNOR: No, Your Honor. We certainly object to the final question, because that suggests that the jury can decide, well, CACI had some ability or power here, and so therefore we're going to find that both the Army and CACI are subject to respondeat superior.

I think the question is which of the -- taking it

14

right out of the *Estate of Alvarez*, the important question is not whether general servant, et cetera, but whether or not, as to the act in question, he is acting in the business of and under the direction of one or the other.  Which, again, restatement frames it in terms of who had the better ability or power to control the conduct in question.

THE COURT:  But, you know, your problem for you is they're in the business of serving CACI's contract.  So, I mean, I think we looked last time or I thought last time about in the business of, and that's confusing to the jury, I think.

MR. O'CONNOR:  I'm sorry, Your Honor, I just didn't follow that.

THE COURT:  Yeah.  Is this not working?

I'm saying I think when you put phrases in like who's working in the business of, the only business here is CACI.  That's the business.  I mean, the work or the -- you don't talk about the Army -- well, I guess some people talk about the Army being the business, but you wouldn't normally say the business of interrogation, but you would say the business of fulfilling a contract.  So I don't like that particular language for this case.

MR. O'CONNOR:  Well, I have others.

The *Estate of Alvarez* also talks -- it cites *Standard Oil*, a Supreme Court case, and it says that -- the

15

question is:  Which employer's work is being done, and which employer exercised the power of control.  That's at 694 from *Estate of Alvarez.*

I mean, we're giving this instruction -- the last sentence gives the jury the erroneous instruction that if they conclude that it's the Army's work, the Army is in charge of the interrogation mission, but CACI could exercise some influence at the margins, that, oh, we could just find that they're both the respondeat superior entity, and I think that's not consistent with the law.  The law is who's in a better position to control the work and control the conduct of the employees.

THE COURT:  Let me hear from the plaintiff.

MR. AZMY:  Thank you, Your Honor.

In sort of order of importance, we think the last line is critical, as you know, because the law accommodates the possibility, and implicit in the question about power to control is that there may be shared power to control.

The facts in this case suggest that strongly via Porvaznik.  He had the -- he had the authority to stop interrogations that were improper.  People, in fact, went to him when there are improper interrogations.  He said he had the obligation to stop interrogations as part of QC.  Morse said -- the 30(b)(6) witness -- he was in control.  Captain Wood worked with him to assign interrogators.  He sat in on

16

interrogations.  So there is shared control, which is completely consistent with *Estate of Alvarez*.  The notion that you have two masters, including under the restatement and with *Standard Oil* which talks -- the term they use is whether control had been suspended, creating an entirely new relationship.

So we think the last sentence is appropriate, as you know.  And for the record, Your Honor, we think that we should add what follows from a conclusion that there's shared control, which is that the defense doesn't apply.  That's been our consistent position.  And then so that's most important I think given the law and the facts and *Estate of Alvarez* and the dual servant instruction.

We have no problem with adding alleged torture, cruel, inhuman or degrading treatment.  We think the term "power" is a little bit confusing, it's a little bit abstracted.  I think we would prefer authority rather than ability.

THE COURT:  Maybe just change it to who controlled.

MR. AZMY:  No.  I think it's -- I think authority or capacity or ability I think for us more accurately captures the conception in our view, Your Honor.

MR. O'CONNOR:  And, Your Honor, we continue to believe that the restatement view which formulates the

17

question is who's in the better position to control -- to direct and control the employees in their exercise of the conduct that is alleged to have given rise to liability, that's the right formulation.

I think the final sentence is confusing and wrong because it suggests some ability at the margins.  *Huff*, the loaning employee -- the loaning employer had a supervisor on site, but the Court said the details -- you know, the loaning employee was not concerned with the details of the work; that was the borrowing employer.  And the supervisor wasn't present at the exact time that the injury occurred. But there was no question that they had a supervisor who the Court assumed he supervised.

THE COURT:  Well, I'll tell you, at some point Courts have to make decisions.  I'm making a decision in this case because I think this is actually a statement that adequately addresses their question, and if they have further questions, they can come back and ask.  I am going to give the instruction as I've amended it in court.

So I'm changing the word "ability" to "power" because I think that is a good, strong, clear word that they're going to understand.  And I think that absolutely should solve the problem, if they're an intelligent jury, and I think they are, that power to control would I think automatically mean small instances of some control would not

18

be enough.  So I'm going to leave it as is.  All right.

If both sides are unhappy, that probably suggests it's a good decision.

MR. O'CONNOR:  We would also ask the Court add what the Court just said.  I understand the Court's ruled, but --

THE COURT:  I'm going to give just this instruction.  So we have to clean it up, and that's what the jury will get.  I'm going to bring them in in a minute just to give it to them verbally.  Okay.

(A brief recess was taken.)

THE COURT:  All right.  So you've got the instruction, and I'm going to bring the jury in now.  I'm going to give it to them orally, and we have four copies for them that they can add to their set.

THE COURT SECURITY OFFICER:  Yes, Judge.

Rise for the jury.

(Jury present at 2:58 p.m.)

THE COURT:  Good morning -- or afternoon, ladies and gentlemen.  The day is half over.

I always am impressed by the questions which juries ask us.  It shows again how careful you all are thinking about the case.  And so we try as much as we can to answer your questions, but you need to understand there are times when we cannot actually answer the question.

19

So you've given us two questions. The first is what is the definition of operational control. I cannot give you that definition. I mean, that's a factual issue in the case for you to determine. All right. So we can't help you with that.

As to the second question, does control mean full control or some control? I'm going to give you a supplemental instruction, which you should consider. And that is: It is a question of fact that the jury must decide whether CACI had the power to control the interrogation work being performed by CACI employees -- I'm sorry, CACI employees at Abu Ghraib when the alleged torture or cruel, inhuman or degrading treatment occurred. Whether the Army alone, or both the Army and CACI had this power to control, is a factual question that you must decide. All right.

So you'll have four copies of that instruction and your collective memories and opinions, and we'll let you all continue to deliberate.

All right. We'll recess court and await the decision of the jury.

(Jury not present at 3:01 p.m.)

THE COURT: I tell my law clerks more than once, how this is the greatest job in the world, because there's never a week when there isn't some issue that comes up I've never seen before, and that has happened in this case. So

20

I'm going to try to get this as accurately reported to you as possible.

My court security officer heard a knock.  I think you all heard the knock.  The juror -- was it the foreperson?

THE COURT SECURITY OFFICER:  It was.

THE COURT:  -- asks Kim that they want to send a note to me that they do not want me to share with counsel. Yeah, see.  I've never had that happen before.

I told Kim you go back and tell the jury that they have to communicate in writing, that I will look at a written note, but I can't guarantee them that I'm not going to share it with counsel.  He took that message back to them.  Again, not in writing, they told him, well, if we send the Judge a note and she decides she's going to share it with counsel, can we withdraw the note?

So I'm revealing this to you because I have no idea, nor does Kim, what is bothering them.

What I am suggesting we should do to have a complete record, but I want to hear your input on this, is that I bring them in with all of you out of the courtroom, that we get whatever it is that's bothering them on the sealed record.  They may not like this because the reality of it is, if I find what they're telling me is something that I have to reveal, I'm going to reveal it to you all.

21

If it's something that I really feel is unnecessary -- I mean it could be that some juror is having some issue that's embarrassing to the juror and it's not going to affect the jury, I have no idea.  I've never had this issue come up before.

I'm looking for guidance from counsel.  And I should also add that we just got a slip of paper, which we'll give copies to you, of their Tuesday schedule, so I don't think we're getting a decision tonight.  And we'll give you a copy of this.  It's basically the same schedule, 9:30 Tuesday, leaving at 6, the same type of break and lunch structure.  So we'll give you a copy of that.

How do you want me to proceed?

MR. O'CONNOR:  Your Honor, I guess first I would just ask a question to understand.  They would come out and they would talk to the Court on the sealed record.  If the Court concludes it's something that we shouldn't see -- or don't need to know because it's not really germane to the deliberations, what happens to the sealed record?  Does it just stay sealed and we never see it?

THE COURT:  It's sealed.

MR. O'CONNOR:  Or is it disregarded?

THE COURT:  No.  No.  No.  It's part of the record of this case.  I used to be a librarian before I was a lawyer, I keep everything so that down the road the Court of

22

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Appeals could get to see it and possibly counsel.

MR. O'CONNOR:  Understood.  Okay.

THE COURT:  It's hard to know what it is.

MR. O'CONNOR:  I understand.

We're perfectly fine with the Court's proposed approach.  I just wanted to understand the mechanics of --

THE COURT:  And they may not want it.  Because I must, in fairness to them, tell them that after they've made whatever disclosure they have made to me, I may be required -- but at least I could explain that to them in person and you have a record of what they say and what I say.

MR. O'CONNOR:  That's fine with CACI.  I just wanted to make sure I understood what would happen with the sealed record if they don't want us to see it and you don't think we need to.  So that's fine with us.  Thank you.

THE COURT:  What's the plaintiffs' position?

MR. FARIDI:  It's fine with us as well.

THE COURT:  Then I'm going to ask all of you, and you have to be out in the hallway, you can't be in the vestibule.

THE COURT SECURITY OFFICER:  I'll seal the courtroom, and I'll come back in, Judge.

THE COURT:  Right.

(Sealed proceeding produced under a separate cover.)

23

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

THE COURT:  All right.  As I indicated to you, I have had a discussion with the jury on the record that is sealed.  The jury has given me the note at issue, so I will have this note made also under seal part of the record.

I am not going to reveal the contents of the question at this time; it is not necessary to do so.  I have told the jury the answer to their question is no.  It's a very simple answer to a question.  A very interesting question.  And the jury has advised that they are tired and would like to go home.  And I've told them that we all appreciate how hard they've been working, they've asked good questions.  They're working very diligently.  But we're going to let them go home, which means you all can go home as well and start the long weekend.  And we'll see you back here at 9:30 tomorrow morning -- Tuesday morning, folks.  All right.  And I want to thank you for your service.

You all may leave at this time.  Remember my cautions.  You're getting a three-day break.  Just, you know, get relaxed.  You know, get some fresh air, enjoy the weekend, and come back Tuesday morning.  All right.

We'll stay in session for just a second.

THE COURT SECURITY OFFICER:  Rise for the jury.

(Jury not present at 4:45 p.m.)

THE COURT:  And the only thing, just to put you somewhat at ease, is I will be able to show you the

24

question, and you can get the transcript once the trial is over.  This is not going to stay in limbo forever.  All right.  But it's not necessary for you to see it, and that's what's happened.

Again, as I said, in this business, there's never a dull moment, and you never know what you're going to have with a jury trial, which is why I always recommend to lawyers to think about settling, because with jury trials, you just never know what is going to happen.  All right.

So we'll give you a copy of the schedule for Tuesday.  It's the same schedule you've been seeing, but I'd like to make sure you get copies of everything.  And if there's nothing further -- I do have a criminal docket starting at 9:00 Tuesday morning, so I think you've cleared out most of your stuff at this point anyway.  All right.

MR. FARIDI:  Your Honor.

THE COURT:  Yes.

MR. FARIDI:  I expect that the answer is going to be no, but are you at liberty to disclose, at least at a high level, perhaps, the general category of the type of issue this is and whether it's interpersonal among members of the jury, whether it relates to any of the lawyers?

THE COURT:  I will not say a word other than no.

All right.  You all have a good weekend.  We'll be recessing court.

25

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

(Proceedings adjourned at 4:47 p.m.)

-----------------------------------

I certify that the foregoing is a true and accurate transcription of my stenographic notes.

*Stephanie Austin*
_____

Stephanie M. Austin, RPR, CRR

26