1

                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
                        ALEXANDRIA DIVISION

---------------------------x
SUHAIL NAJIM ABDULLAH AL      : Civil Action No.:
SHIMARI, et al.,             : 1:08-cv-827
             Plaintiffs,      :
     versus                   : Thursday, October 31, 2024
                              : Alexandria, Virginia
CACI PREMIER TECHNOLOGY,      : Day 2 - p.m.
INC.,                         : Pages 1-107
             Defendant.       :
---------------------------x

         The above-entitled jury trial was heard before the Honorable Leonie M. Brinkema, United States District Judge.  This proceeding commenced at 2:00 p.m.

                 A P P E A R A N C E S:

FOR THE PLAINTIFFS:    CHARLES MOLSTER, ESQUIRE
                       THE LAW OFFICES OF CHARLES B.
                       MOLSTER, III, PLLC
                       2141 Wisconsin Avenue, NW
                       Suite M
                       Washington, D.C.  20007
                       (703) 346-1505

                       BAHER AZMY, ESQUIRE
                       THE CENTER FOR CONSTITUTIONAL
                       RIGHTS
                       666 Broadway, 7th Floor
                       New York, New York  10012
                       (212) 614-6464

                       MUHAMMAD FARIDI, ESQUIRE
                       MICHAEL BUCHANAN, ESQUIRE
                       BONITA ROBINSON, ESQUIRE
                       ANDREW HADDAD, ESQUIRE
                       SCOTT KIM, ESQUIRE
                       ALEXANDRA MAHLER-HAUG, ESQUIRE
                       PATTERSON BELKNAP WEBB & TYLER
                       1133 Avenue of the Americas
                       New York, New York  10036
                       (212) 336-2000

      COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

A P P E A R A N C E S:

FOR THE DEFENDANT:        JOHN O'CONNOR, JR., ESQUIRE
                          LINDA BAILEY, ESQUIRE
                          JOSEPH MCCLURE, ESQUIRE
                          STEPTOE LLP
                          1330 Connecticut Avenue, NW
                          7th Floor
                          Washington, D.C.   20036
                          (202) 429-3000

                          NINA GINSBERG, ESQUIRE
                          DIMUROGINSBERG PC
                          1101 King Street
                          Suite 610
                          Alexandria, Virginia   22314
                          (703) 684-4333

FOR THE UNITED            STEPHEN ELLIOTT, ESQUIRE
STATES:                   UNITED STATES DEPARTMENT OF
                          JUSTICE
                          CIVIL DIVISION FEDERAL PROGRAMS
                          BRANCH
                          1100 L Street, NW
                          Washington, D.C.   20044
                          (202) 598-0905

COURT REPORTER:           RHONDA F. MONTGOMERY, CCR, RPR
                          Official Court Reporter
                          United States District Court
                          401 Courthouse Square
                          Alexandria, Virginia   22314
                          (703) 299-4599
                          RMontgomery@CourtReport.net

**TABLE OF CONTENTS**

**WITNESSES**

On Behalf of the Plaintiffs:

TORIN NELSON

Cross-Examination by Mr. O'Connor.............4
Redirect Examination by Mr. Faridi............12
Recross-Examination by Mr. O'Connor..........27

CHARLES GRANER (via video)....................29

MEGAN GRANER (via video)......................29

ANTONIO TAGUBA

Direct Examination by Mr. Faridi..............30
Cross-Examination by Mr. O'Connor.............76
Redirect Examination by Mr. Faridi............99
Recross-Examination by Mr. O'Connor..........100

Ivan Frederick (via video)....................104

MISCELLANY

Proceedings October 31, 2024..................4

Certificate of Court Reporter................107

Nelson - Cross-Examination by Mr. O'Connor          4

(The jury is not present.)

THE COURT:  Let's bring the jury in.

THE COURT SECURITY OFFICER:  Yes, Judge.

(The jury enters at 2:02 p.m.)

THE COURT:  Mr. O'Connor.

MR. O'CONNOR:  May I proceed, Your Honor?

THE COURT:  Yes, sir.

CROSS-EXAMINATION CONTINUED

BY MR. O'CONNOR:

Q    Mr. Nelson, during the lunch break, did you talk to anyone about your testimony?

A    No.

Q    Now, before lunch, we were talking about your communications with Tim Dugan after he found out about your statement to CID.  Do you recall that?

A    Okay.

Q    Okay.  You didn't tell anyone from CACI what Tim Dugan had said to you until you told Dan Porvaznik why you were quitting, right?

A    To my recollection, that's correct.

Q    And at that point, you didn't trust either chain of command?

A    I wouldn't say I didn't trust either chain of command.  I definitely didn't trust the CACI chain of command after that interaction.

Q     Okay.  Can you pull out your 2005 testimony to -- that you gave in the Salt Lake City --

THE COURT:  Exhibit 94.

MR. O'CONNOR:  Yes.  Thank you, Your Honor.

BY MR. O'CONNOR:

Q     Defense Exhibit 94?

A     Yes.

Q     And let me ask you to turn to page 59.  Do you see at line 2 where Ms. Burke asked you, "When you say you didn't specify which chain of command, meaning you didn't specify whether you didn't trust the military or didn't trust CACI," what was your answer?

A     Correct.  I didn't specify because I didn't want to -- one, I didn't want to upset too many people right off.  Two, I didn't -- I didn't really trust either chain of command at the time.  Because it seemed the more and more I was finding out, it seemed like the more and more there was really something serious going on.

Q     Okay.  Thank you.

You testified you feared for your life.  Isn't it true that you feared for your life from day one from the outset from all the attacks that you were getting?

A     That was part of it, but that's always present in the war zone.

Nelson - Cross-Examination by Mr. O'Connor                    6

Q     So you feared for your life from day one?

A     Slightly.

Q     Okay.  And -- but by January 2004, you didn't feel comfortable because, in your words, being found out that I'm sort of a stool pigeon?

A     I believe that heightened my danger.

Q     And so as you were giving notice that you were quitting CACI, Scott Northrop happened to be visiting the prison, right?

A     That's correct.

Q     And you liked Scott, didn't you?

A     We got along, yes.

Q     You had a lot of respect for Scott?

A     From what I knew, I did.

Q     Can you turn to Exhibit 94, page 60.

      Are you there?

A     Yes.

Q     On line 17, didn't you say, "I had a lot of respect for him.  He seemed to come to me for some pointers as to what's going on on the intel side to be able to help him do his job"?

A     That's correct.

Q     Thank you.

      And you told Scott you were quitting CACI, right?

A     That's correct.

Rhonda  F.  Montgomery   OCR-USDC/EDVA   (703)  299-4599

Nelson - Cross-Examination by Mr. O'Connor                    7

Q     And he said that he had room in his SUV, so, again, he'd take you to Camp Victory?

A     Correct, that same day.

Q     And so the day you announced you were going to quit, he took you to Camp Victory?

A     I don't know if I said that I was going to quit CACI overall, but I was going to quit that job.  And that's why he took me back to CACIville.

Q     Okay.  And when you got to CACIville, CACI offered you another position on another contract in Iraq, right?

A     They offered me the possibility.  They told me to apply for it.

Q     And they told you that you would be away from Dugan and Johnson if you wanted to continue working for CACI?

A     I don't remember if they said that I would be away from them, but we may have had that conversation.  I can't remember for sure.

Q     Ultimately, you just decided you wanted to quit, right?

A     Yes.  I wanted to get, in fact, out of the country.

Q     On your direct examination, you offered some opinions on the training and experience of CACI

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

interrogators.  You were concerned that you had run into any of them?

A     Beforehand, correct.

Q     Let's talk about the qualifications of some of the CACI interrogators.  You were one, right?

A     Yes.

Q     And you, yourself, are supremely qualified to be an interrogator in Iraq, right?

A     Not supremely.  Adequate.

Q     Certainly qualified?

A     Yes.

Q     What about Sean Duysen?  Was he a school-trained Marine interrogator?

A     I don't recall.

Q     You don't know Mr. Duysen's qualifications?

A     No.

Q     What about Brent Jones?  He was a qualified interrogator.

A     I don't recall him.

Q     You don't recall his qualifications?

A     No.

Q     What about James Matheson?

A     No, I don't recall.

Q     You don't know his qualifications?

A     No.

Nelson - Cross-Examination by Mr. O'Connor                    9

Q     Dan Porvaznik was a school-trained Marine interrogator, right?

A     Yes.  I don't know what years.

Q     Do you know that he ran the Marine Corps interrogation schoolhouse?

A     No, I didn't know that.

Q     What about Joe Ryan?  He was a qualified interrogator, right?

A     I don't remember.

Q     Kevin Bloodworth, his background was in law enforcement and not military interrogations, right?

A     I don't remember Mr. Bloodworth.  Is he a screener?

Q     Well, let's get to that.  Do you remember Mr. Bloodworth at all?

A     No.

Q     Okay.  Do you know if he was hired as a screener or as an interrogator?

        THE COURT:  Well, if he doesn't know him, how would he know that?

        MR. O'CONNOR:  I'll move on, Your Honor.

BY MR. O'CONNOR:

Q     Tim Dugan, you know he wasn't hired by CACI as an interrogator, right?

A     That's what I was confused about.  My

    Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

Nelson - Cross-Examination by Mr. O'Connor                    10

understanding was he was an analyst when I first arrived.

Q    He was a screener?

A    I didn't know if he was a screener or not.

Q    Okay.

A    The first time I remember meeting him was in the JIDC, the interrogation center.

Q    He was promoted in-country to interrogator because the Army needed people to interrogate?

A    Again, I don't remember if he was an interrogator or an analyst when I first met him.

        THE COURT:  All right.  Here's another example, folks, of a lawyer trying to testify.  All lawyers would love to be able to do that, and we don't let them.  So that was a statement.  The witness says he doesn't know.  You have to erase the statement.  All right.

BY MR. O'CONNOR:

Q    Do you know for what position Steve Stefanowicz was hired initially?

A    I don't know for sure.

Q    So you don't know if he was brought in as a screener and then promoted in-country?

A    I don't.

        MR. FARIDI:  Your Honor, objection.

Nelson - Cross-Examination by Mr. O'Connor                11

THE COURT:  Yeah.  I want to move this along.

MR. O'CONNOR:  I only have two questions -- three questions left, Your Honor.

THE COURT:  Well, if they draw an objection, you won't be able to ask it.

BY MR. O'CONNOR:

Q    Did you know while you were in Abu Ghraib prison the Army had radar technicians conducting interrogations?

(Mr. Faridi stands.)

THE COURT:  No, overruled.

A    No, I did not know.

Q    The three plaintiffs in this case -- just answer this yes or no because of state secrets reasons.  Do you remember them at all from Abu Ghraib prison?

A    No.

Q    Do you -- again, answer yes or no.  Do you know if they were interrogated in Abu Ghraib prison?

A    I don't know.

MR. O'CONNOR:  That's it, Your Honor.  No further questions.

THE COURT:  Any redirect?

MR. FARIDI:  Very briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. FARIDI:

Q    Mr. Nelson, you were asked a number of questions by Mr. O'Connor about whether the military had operational control at Abu Ghraib.  Do you recall those questions?

A    Yes.

Q    Can you talk about what role CACI had in managing and supervising its employees at Abu Ghraib as to interrogations?

A    What they did have or what they --

Q    The role that they did have.

        THE COURT:  Well, I think the first question -- to your knowledge, did CACI have any role in the conduct of interrogations?

        THE WITNESS:  To my knowledge, yes, they did have the ability to influence operations.

BY MR. FARIDI:

Q    How so?

A    If any -- standard procedure is if a contracting company has any word, knowledge, or discovery of improprieties by their personnel, they not only have the responsibility but the obligation to immediately pull that person from their position of duties.  It could be a suspension.  It could be a termination.

Rhonda F. Montgomery   OCR-USDC/EDVA  (703) 299-4599

Nelson - Redirect Examination by Mr. Faridi.          13

They can return that person if they find that they're not in any way, shape, or form doing anything wrong.

But it's -- part of the procedure is for what a site manager would actually be doing.  During the conduct with their liaise, should be asking questions about how are personnel performing, are there any issues coming up that we need to be aware of.  And if there's any complaints whatsoever or any suspicion, then they absolutely have the ability to be able to remove that person either from that position or from the company entirely.

Q    Let's talk about the site manager that CACI had at Abu Ghraib, Mr. Porvaznik.  Did CACI personnel meet with Mr. Porvaznik at Abu Ghraib?

A    CACI personnel, yes.

Q    How often?

A    We would see them on pretty much a daily basis coming and going.

Q    Okay.  Did Mr. Porvaznik have any role with respect to the JIDC?

A    To my knowledge, yes.  I don't know how much he used it.  But he had access, and he was over there.  I remember seeing him from time to time.

Q    What's the basis of your knowledge on that issue?

A    Just visually seeing him interacting with -- I

Nelson - Redirect Examination by Mr. Faridi.          14

can't remember if I actually talked with him in the interrogation center or if it was just coming and going.

Q     Now, you testified on direct and I also believe on cross-examination that you had access to reports with respect to detainees who you were not interrogating. Do you recall that?

A     Yes.  If I -- especially if they are associated with any of my detainees.  I absolutely have the right to be able to go through the operational reports.

Q     Did Mr. Porvaznik have access to detainee reports with respect to those detainees who were interrogated by or assigned to CACI interrogators?

A     I don't see why not.

          THE COURT:  Well, just so the jury can understand this, how would one get access to those reports?  Where were they kept?  What was the procedure?

          THE WITNESS:  Generally -- in those days, it probably would have been kept on an in-house database that is classified.  Generally, it's secret, possibly secret note form, Your Honor.

          THE COURT:  On a computer?

          THE WITNESS:  On a computer database.

          And I'm trying to remember if they had

Nelson - Redirect Examination by Mr. Faridi.            15

servers or not -- but I can't remember offhand -- or if it was on the individual hard drives.  I think we were connected at least through an internet in the JIDC. And -- because I had access to other people's without having to go to their terminals and such like that to be able to access the files.

THE COURT:  Things were not compartmentalized?

THE WITNESS:  Compartmentalized within the JIDC definitely.  I don't know how transport of information -- whether or not it was through SIPRNet, S-I-P-R-N-E-T, which would be the means of communication for being able to transmit classified up to secret note form remotely to, for example, Camp Victory.

THE COURT:  All right.  To get access to that database, would one need a password?

THE WITNESS:  You would need to have your own account and, at minimum, a password.

THE COURT:  When you were there, could you have seen any interrogator's work?

THE WITNESS:  Yes.  Yes, Your Honor.

THE COURT:  Whether they were working on your group or any other group?

THE WITNESS:  That's correct, Your Honor.

Nelson - Redirect Examination by Mr. Faridi.          16

MR. FARIDI:  You read my mind, Your Honor.

THE COURT:  Again, I think it's hard for jurors sometimes.  I hope that helps them a little bit.

Go ahead.

BY MR. FARIDI:

Q    Do you know a gentleman by the name Tom Howard?

A    I do.  We had some interaction mainly towards the end when I was in CACIville before I left.

Q    Who did Mr. Howard work for?

A    My understanding is he worked for CACI.

Q    And can you describe his level of seniority within the CACI enterprise?

A    My understanding is he was either the acting or the actual 2X, which is the senior advisor for human intelligence matters to the intelligence staff.

Q    So CACI had its own person advising the intelligence staff within the Army?

A    Yes.  I remember him distinctly introducing himself as the former TFCICA.  That's T-F-C-I-C-A, which stands for Task Force Counterintelligence Control Authority, I believe, which is a very senior-ranking position in any type of counterintelligence operation.

Q    Did he have advisory or supervisory authority with respect to interrogations at Abu Ghraib?

A    From what he told me, that he had a very

Nelson - Redirect Examination by Mr. Faridi.        17

high-level access to that, as well as hiring and firing decisions, which is why he was the one who approached me with the recommendation for applying for the position for the G2X position at one of the divisions.

MR. FARIDI:  Let me pull up -- I'm going to ask my colleague, Mr. O'Shea, to pull up PTX85A, which is already in evidence.  This is the CACI code of conduct from 2003.  And, Mr. O'Shea, if you can, go to page 11.

BY MR. FARIDI:

Q    I want to just focus on some language that appears in the right column.  It's titled Obligation of Employees to Report Violations and Assist in Investigations.

Do you see that?

A    I do.

Q    And it's a little bit grainy, so I'm going to try to read this into the record.  It says, number one, "It is the responsibility of an employee or consultant having knowledge of any activity that is or may be a violation of the code or affirmative action policy to promptly disclose such activity."

Then number -- and Subsection B states, "CACI also has available a hotline at 1-800-928-3505 or email, gmadison@caci.com, where reports of potentially

Nelson - Redirect Examination by Mr. Faridi.                18

illegal, unauthorized, or inappropriate conduct can be made confidentially at any time."

Do you see that?

A    Yes, I do.

Q    So could CACI folks at Abu Ghraib who were engaged in abuse or saw abuse firsthand with their own eyes report misconduct to CACI in the United States?

A    That's correct.

Q    So let's talk a little bit about the abuse.  You were asked a lot of questions about whether you saw abuse.  Can you remind the jury, sir:  What shift did you work on?

A    I worked the day shift.

Q    So when you visited the hard site at Abu Ghraib, was that in the daytime or nighttime?

A    It was always during the daytime.

Q    And what shift did Mr. Steve Stefanowicz work?

A    He worked the night shift.

Q    You were asked a lot of questions about whether you reported -- what you did report and what you did not report.  Do you recall those questions?

A    Yes.

MR. FARIDI:  Okay.  So let's pull up PTX51, which is the statement that you made to the CID on January 21, 2004, just the last page, which is in

Nelson - Redirect Examination by Mr. Faridi.          19

evidence.  I'll ask my colleague to highlight some language here.

BY MR. FARIDI:

Q    So let's focus on what you did report, okay?  You reported -- you say here, "I, Torin S. Nelson, as far as one of the things we talked about yesterday" -- the first thing you say here is, "The people I suggest you look at is Dan Johnson, Tim DUGAN, these two gentlemen. I have looked at their files.  I sat next to an interrogation that JOHNSON was doing one day, where he was breaking a tables and chairs in the room with the detainee."

     Do you see that?

A    Yes.

Q    You also reported that, "MR. DUGAN has a reputation for breaking the tables in the room."

     Did you report that?

A    Yes.

Q    And you told the CID, "Look into file."

     Do you see that?

A    Yes.

Q    You reported, sir, "He is my detainee now.  One of the first times I interviewed him at the beginning of Jan '04, he showed me a large bruise to his left forearm that was about six to eight inches long, and he

Nelson - Redirect Examination by Mr. Faridi.          20

stated he got it from being grabbed and being thrown around."

Q      Did you report that?

A      Yes.

Q      And it states, "He had a bump on his forehead over his left eye that he related he received that from being thrown into a wall."

Did you report that?

A      Yes.

Q      It states, "He said that the interrogator grabbed him and threw him down."

Did you report that, sir?

A      Yes.

Q      Skip some language here.  It states, "After the first interview, Dan JOHNSON says to put this guy in isolation because he is not being forthright in his information.  DJ is a young interrogator, he is very excited and motivated, and he believes everyone here should be broken."

Did you report that?

A      Yes.

Q      Skip some language here.  "There is another incident SPC LUCIANA SPENCER was involved in where one of her detainees, she wanted to degrade him; she stripped him naked and made him walk back."

Nelson - Redirect Examination by Mr. Faridi.                    21

Did you report that?

A     Yes.

Q     It states, "I would really look at the files for the detainees of DUGAN and JOHNSON."

Did you report that?

A     Yes.

Q     And then I'm going to skip to the last paragraph. There's some redaction here.  That's a blank space. And it states, Someone "was sitting in the vehicle sandbagged, the interrogator who I think might have been DUGAN or JOHNSON, grabbed him and threw him out of the vehicle to the ground, the interrogator then yells at him for falling on the ground, and then started dragging or pulling the detainee by the cuffs."

Did you report that, sir?

A     Yes.

Q     You were asked a lot of questions, sir, about the process that needs to be followed with respect to an interrogation.  Do you recall Mr. O'Connor asking you those questions?

A     Yes.

Q     You talked about the process that you followed in preparing and filing the interrogation plans.

Do you recall that?

A     Yes.

Nelson - Redirect Examination by Mr. Faridi.          22

Q    Do you know if other CACI employees, CACI interrogators followed the same process as you?  Do you know that?

A    Do I know if they did?

Q    Yeah.

A    No, I don't know.

Q    And based on the reports of Daniel Johnson that you reviewed, did you see them following the same process that you followed?

A    No, not to the extent that I did.

Q    When you reviewed the files of Tim Dugan, another CACI employee, did you see him, when you looked at his files, following the same process that you followed?

A    I looked for files, but I didn't find some.

Q    Is it common, sir, based on your experience, for interrogators who abuse detainees to document their abuse in the interrogation logs?

          MR. O'CONNOR:  Objection, Your Honor.

          THE COURT:  That one I'm going to sustain.

BY MR. FARIDI:

Q    You were asked a lot of questions about the IROE, the Interrogation Rules of Engagement, and that's PTX42.

          MR. FARIDI:  And let's put that up on the screen, please.

Nelson - Redirect Examination by Mr. Faridi.          23

BY MR. FARIDI:

Q    Sir, was putting detainees in naked pyramids authorized by the IROEs?

A    To my knowledge, no.

Q    Was the punching of detainees authorized by these rules?

A    To my knowledge, no.

Q    Was keeping detainees naked for hours and days authorized by the IROEs?

A    For days, no.

Q    Was chaining detainees to bars for days authorized by the IROEs?

A    No.

Q    Was the terrorizing of detainees by unmuzzled dogs authorized by the IROEs?

A    To my knowledge, no.

Q    I'll move on, Your Honor.

And Mr. O'Connor asked you about the very last part of the IROEs that states that, "Everyone is responsible for ensuring compliance to the IROE."

Do you see that?

A    Yes.

Q    That applies to CACI employees, correct?

A    That's correct.

Q    You were asked a few questions about not having

Nelson - Redirect Examination by Mr. Faridi.                    24

returned phone calls made to you sometime months after you left Abu Ghraib, phone calls made to you by CACI's counsel.  Do you recall those questions?

A    Yes.

Q    Okay.  Now, can you remind the jury, sir, what CACI's leadership did to you when you reported threats to your life by CACI employees in Iraq?

A    Local leadership seemed to me to side more with the -- either with the individuals who were making the threats or possibly with, CACI more interested in CACI's well-being than with the well-being of myself.

Q    And so why is it that you did not return the phone calls of CACI's outside counsel?

A    At the time, I felt like I had no reason to be able to trust any type of interaction with any representative of CACI whether they were legal or organic to CACI itself.

Q    Mr. O'Connor showed you a document that was attached to the Canvass form that you filled out in 2004 to refresh your recollection.  Do you recall that?

A    Which one?

Q    It's this page.

A    Yes, sir.

          MR. FARIDI:  He didn't mark that as an exhibit.  I want to mark it as an exhibit.

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

Nelson - Redirect Examination by Mr. Faridi.          25

Your Honor, we'll mark it as PTX235 for identification.

THE COURT:  Any objection?

MR. O'CONNOR:  Yes, Your Honor.  The part labeled 2 is hearsay.  It's even labeled as hearsay.

MR. FARIDI:  Your Honor, we offer PTX235 in evidence.

THE COURT:  I'm going to sustain the objection that it's hearsay.

MR. FARIDI:  Thank you, Your Honor.

THE COURT:  It's not in.

BY MR. FARIDI:

Q    Sir, you were asked questions about whether my law firm is paying for your travel expenses.  Do you recall that?

A    Yes.

Q    Have you ever denied that before?

A    No.

Q    Okay.  Are you being paid any money by my firm?

A    No.

Q    Are you being paid any money by the three individual plaintiffs?

A    No.

Q    Are you being paid money by anyone for the loss of time away from work?  By the plaintiffs?  By us?

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

A     No.   I'm having to use my own vacation time.

Q     So why is it, sir, that you came here to Virginia voluntarily from Fort Huachuca, Arizona, without compensation to testify before this jury?

A     I believe it's the right thing to do.

          MR. FARIDI:  Your Honor, no further questions.  I will say that --

          THE COURT:  All right.  There's no further questions.

          All right, Mr. O'Connor.

          MR. FARIDI:  I was going to ask for an instruction from Your Honor as to preparation by him -- of him by counsel.  I think Your Honor gives a standard instruction on preparation.

          THE COURT:  Well, nothing came out about that.  There was simply a question at lunchtime, "Did he speak to anybody," and he said no.

          MR. FARIDI:  There was a question, Your Honor, beforehand during Mr. O'Connor's cross-examination, but that's fine.  We'll move on, Your Honor.

          MR. O'CONNOR:  Can we put up Plaintiffs' Exhibit 42, and can you highlight the first box towards the bottom of the page.  It says everyone is responsible.

Nelson - Recross-Examination by Mr. O'Connor          27

                        RECROSS-EXAMINATION

BY MR. O'CONNOR:

Q    Mr. Nelson, you just testified that, "Everyone is responsible for ensuring compliance to the IROE."  That applies to CACI personnel too, right?

A    That's correct.

Q    And prior to your statements to CID in mid to late January, you didn't report suspected misconduct by Dugan to anybody, right?

A    That's correct.

Q    And you didn't report suspected abuse by Johnson to anybody?

A    That's correct.

Q    And are you aware of, prior to the CID investigation, anybody reporting abuse of detainees by CACI personnel to CACI management?

A    No, I'm not familiar.

Q    When you had your 2005 -- the 78-page sworn statement with Susan Burke, the question-and-answer session, she asked you if CACI interrogators report to Tom Howard, and you said they did not, right?

A    Probably not, yes.

Q    You said that CACI interrogators in Abu Ghraib reported to military personnel who were running the JIDC, J-I-D-C?

A     That's correct.

Q     Mr. Faridi asked you about whether naked pyramids were permitted by the IROEs.  You're aware that no intelligence personnel, military or civilian, had anything to do with the naked pyramids, right?

A     I don't know.

Q     And you testified that CACI could fire somebody if they had -- if they were told that the interrogator was involved in detainee abuse?

A     Yes, sir.

Q     But if nobody told CACI management that, CACI had no information to act on, right?

A     That would be correct.

          MR. O'CONNOR:  Thank you.

          All right.  No further questions, Your Honor.

          THE COURT:  Does anybody anticipate calling Mr. Nelson again during the course of the trial?

          MR. FARIDI:  No, Your Honor.

          MR. O'CONNOR:  No, Your Honor.

          THE COURT:  All right.  Then, Mr. Nelson, you're released as a witness.  You can stay and watch the proceedings or you may leave, but you're not to discuss your testimony with any witness who has not yet testified.

          Thank you.

M. Graner - Video                                                        29

THE WITNESS:  Yes, Your Honor.

(The witness stands aside.)

THE COURT:  All right.  Your next witness.

MR. FARIDI:  Your Honor, plaintiffs call Charles Graner via video deposition.

THE COURT:  All right.

MR. FARIDI:  This segment is about seven minutes long.  Mr. Graner was a member of the military police at Abu Ghraib.

CHARLES GRANER, PLAINTIFFS' WITNESS

(Video played.)

THE COURT:  Turn the sound up, please.

(Video played.)

MR. FARIDI:  Your Honor, at this time, plaintiffs call Megan Graner via video deposition.  This testimony is approximately five minutes long.

THE COURT:  All right.

MR. FARIDI:  Your Honor, we also move into evidence at this time PTX159.

THE COURT:  Any objection?

MR. O'CONNOR:  No objection, Your Honor.

THE COURT:  All right.  159 is in.

MEGAN GRANER, PLAINTIFFS' WITNESS

(Video played.)

MR. FARIDI:  Your Honor, at this time,

Taguba - Direct Examination by Mr. Faridi                    30

plaintiffs call Major General Antonio Taguba, retired.

ANTONIO M. TAGUBA, PLAINTIFFS' WITNESS, SWORN

DIRECT EXAMINATION

BY MR. FARIDI:

Q    It's good to see you, sir.  Would you please give your name for the reporter.

A    My name is Antonio M. Taguba, Major General, United States Army, retired.

Q    General Taguba, can you please tell the members of the jury about your educational background?

A    I have a bachelor's degree from --

THE COURT:  I'm sorry.  General, you need to speak up.  There's the microphone right there.

THE WITNESS:  Yes, ma'am.

I have a bachelor's degree from Idaho State University, and I have three master's degrees.

Q    Where did you grow up, General?

A    I grew up -- I was born in Manila, Philippines, and my parents and I emigrated to Hawaii in 1961.  We became American citizens in 1962.

Q    You were eleven when you emigrated from the Philippines to Hawaii?

A    I was ten years old.

Q    You spoke about the degree that you received from Idaho.  Do you also have a MPA from Webster College?

A     Yes.  I have a bachelor's degree from Webster University.  I have a master's degree from Salve Regina University in Rhode Island.  I have a master's degree from the U.S. Naval War College.

Q     And your master's degree from Salve Regina is in international relations, correct?

A     That's correct.

Q     And your master's degree from the College of Naval Command is in national security and strategic studies, correct?

A     That's correct.

Q     General, how long did you serve in our country's military?

A     I served for 34 years on active duty.

Q     And can you provide a brief overview of your military career, sir?

       THE COURT:  We really don't need that.  Let's move right to his testimony.

BY MR. FARIDI:

Q     General, have you received any declarations or honors for your service in the military?

A     Yes, I did.

Q     Okay.  I want to move on to your appointment with respect to Abu Ghraib in Iraq.  Were you appointed in January 2004 to conduct an investigation in Iraq?

A     Yes, I was.

Q     And who appointed you to conduct that investigation, sir?

A     I was appointed by my commander, Lieutenant General David McKiernan.

Q     And upon the completion of your investigation, did you issue a report?

A     Yes, I did.

Q     And have you reviewed that report to prepare for your testimony today?

A     The report was an informal investigation under the Army Regulation 15-6 to investigate allegations of maltreatment and abuse of detainees at Abu Ghraib.

      I was supposed to also consider the competence and leadership of 800th MP Brigade, which I was -- we were told and the team.

      We were also told to examine the training, competency, and professional development and leadership development of the brigade and to provide irrefutable and --

      (Reporter clarification.)

A     To provide information on the competency and leadership competence of the 800th MP Brigade.

      And the fourth one is to provide facts and evidence on my investigation.

Taguba - Direct Examination by Mr. Faridi                    33

Q    So let's take a look at PTX137.  It's in the binder in front of you.  This is --

A    137?

Q    Yes, 137, General.

          THE COURT:  Is there any objection to 137?

          MR. O'CONNOR:  No, Your Honor.

          THE COURT:  All right.  137 is in.

BY MR. FARIDI:

Q    Let's go to page 6 of 76.

A    137?

Q    Yes.  It's also on the screen in front of you.  Yes, 137.

A    All right.

Q    Is this the report, General, that you issued?

A    That's correct.

Q    Okay.  And you began to give an overview of what you were charged to investigate.  I want to focus in on that more.  And at the bottom of page 6, let's focus on paragraph 3.

     Do you see that?

A    I do.

Q    Okay.  Under 3(a) --

          THE COURT:  Hold on one second.  We are going to get the lapel mic for the witness.

          THE COURT SECURITY OFFICER:  Sir, would you

     Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

Taguba - Direct Examination by Mr. Faridi                    34

just speak into it and hold it, please.

THE COURT:  Much better.  Thank you.

THE WITNESS:  Much better?

THE COURT:  Yes.

THE WITNESS:  All right.  Repeat the question, please.

BY MR. FARIDI:

Q    It states that you were directed to conduct an informal investigation and you were tasked to -- and A states, "Inquire into all the facts and circumstances surrounding recent allegations of detainee abuse, specifically allegations of maltreatment at the Abu Ghraib prison."

Do you see that?

A    Correct, I see it.

Q    And does it reference here in paragraph 3 to the CFLCC, the commander -- CFLCC appointing you to undertake this investigation, do you know what that reference is to?

A    You mean the initials?

Q    Yes.

A    It's a Combined Forces Land Component Command.

Q    When did you get this mandate to investigate?

A    Approximately 30th, 31st of January 2004.

Q    General, can you describe the allegations of

Taguba - Direct Examination by Mr. Faridi                    35

detainee abuse that prompted this investigation?

A    There were previous investigations, informal investigations that was conducted by CJTF, seven in Iraq that compiled their -- and, of course, there were some allegations after that that was made in January 2004 previous to that of abuse, escapes, lack of supervision, lack of commander control in the Abu Ghraib facility and possibly the other three detention centers.

Q    Was the CJTF investigation known as the Army Criminal Division investigation?

A    No.  That was the combined task force that was commanded by Lieutenant General Rick Sanchez in Iraq.

Q    Was there a separate investigation by the Army's Criminal Investigation Division?

A    Yes, that preceded my investigation.

Q    So both of these investigations preceded your investigation?

A    Yes.

Q    Okay.  And in your investigation, did you uncover photos and videos that captured the detainee abuse?

A    Yes, I did.

Q    We're not going to show you any of the pictures.

A    Thank you.

Q    Can you just describe at a high level what is it

Taguba - Direct Examination by Mr. Faridi                    36

that you uncovered when you undertook the investigation?

A    Well, I did a preliminary run-through investigation when I was in Baghdad, and the provost marshal and the commander of the Criminal Investigation Division showed me the contents of the CD that was confiscated.

Q    And let's go to the top of page 7.  It will pop up on the screen in front of you.

A    Okay.

Q    And C states, "Investigate the training, standards, employment, command policies, internal procedures, and command climate in the 800th MP Brigade, as appropriate."

     What's the 800th MP Brigade?

A    The 800th MP Brigade was assigned to conduct detention operations throughout the theater, meaning throughout Iraq.

Q    And the military police that was running -- or was supposed to run the Abu Ghraib prison, did that police fall within the 800th MP Brigade?

A    Correct.

Q    Why was it important, sir, to investigate the training of personnel at Abu Ghraib?

A    Well, to ensure that they know exactly what their

Rhonda  F.  Montgomery   OCR-USDC/EDVA   (703)  299-4599

Taguba - Direct Examination by Mr. Faridi                    37

mission was to begin with and that they had competent leadership from colonel all the way down to private, that they know what the mission was supposed to be, the detention operations.  But we also found out that they literally were not trained to conduct detention operations.

Q    The paragraph also references command climate in the brigade.  Why did you investigate that?

A    It's important that you have a positive command climate throughout your whole brigade.  Because without that competent commanding officer and downward in the leadership, that would create chaos in discipline and lack of standards in terms of their mission.

Q    Let's go to Subsection D of your investigation. You were asked to, "Make specific findings of fact concerning all aspects of the investigation, and make any recommendations for corrective action, as appropriate."

     Did you, in fact, make findings of fact?

A    That's absolutely correct.

Q    What did you mean by all aspects of the investigation?

A    For example, we are not just focused on Abu Ghraib because there were other units that were assigned detention operations throughout Iraq.  Camp Bucca was

Taguba - Direct Examination by Mr. Faridi                38

one of them.  Camp Cropper was another one.  And the Mac (phonetic) Detention Center in Baqubah.

Q    My questions today will focus on Abu Ghraib.

A    Okay.

Q    Let's talk about the process that you undertook in connection with your investigation, okay?  Were you assisted in your investigation by anyone, or were you doing it solo?

A    No.  The complex situation regarding this allegation did not just make me the investigator.  We assembled about 25 members of my investigation team, all experts, MDs, psychiatrists for that matter, legal counsel.  And we split in two investigation teams -- one was led by me and the other one by my deputy, Colonel Kin LaFate -- because we were given 30 days to complete the investigation.

Q    General, you said that your team included a psychiatrist?

A    Yes.

Q    Why?

A    We wanted to ensure that the possibility that there was some -- when you say mistreatment, you know, all matters of the investigation, sometimes you know, you have PTSD for that matter and other assorted ailments.  Because they were trying to deploy --

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

Taguba - Direct Examination by Mr. Faridi                    39

redeploy back to the States, and the 800th MP Brigade was picked to stay longer.  And had I do it again, I would have had two psychiatrists and many medical doctors with me, but we didn't have that capability.

Q    Let me show you paragraph 5 from page 7.  It's going to pop up on the screen in front of you.

     You say here that you assembled your team prior to the actual appointment by the commander, and you talk about sending subject matter experts from the provost marshal and staff judge advocate.  Why did you assemble subject matters from the provost marshal and the staff judge advocate?

A    Well, the MP -- the provost marshal has the organizational responsibility for detention EPW matters in the command, and we had -- we needed operational command lawyers to complement our investigation, which most of them were already in theater.  That was the gist of our investigation in concert with my guidance to investigate.

Q    And this paragraph talks about subject matters in areas of detention and internment operations as well.  Why was that important?

A    Because we were conducting EPW operations at the same time, not necessarily detention operations.

Q    What's EPW?

Taguba - Direct Examination by Mr. Faridi                    40

A     Enemy prisoners of war.

Q     Okay.  And where were you when you received the mandate for this investigation?

A     I was at the headquarters of command forces combined in Kuwait.

Q     And did you personally visit Abu Ghraib in connection with your investigation?

A     Yes, I did.

Q     And how many days did you spend, sir, at the Abu Ghraib prison in connection with your investigation?

A     At the initial stage, I spent three days without my team.  I just wanted to ensure that we were doing the right thing.  I got through doctor to commanding general, Commander Richard Sanchez -- Ricardo Sanchez. And upon that -- those findings, I went back to advice or update General McKiernan, who appointed me to investigate, and to ask him did I need -- I needed to organize my investigation team with all the necessary experts and resources that we can find.

Q     Let's turn to page 12 of your report, General.  I want to focus on paragraph 1 on page 12.  And it states here that, "My investigation team immediately began an in-depth review of all available documents regarding the 800th MP Brigade.  We reviewed in detail the

Taguba - Direct Examination by Mr. Faridi                41

voluminous CID investigation regarding alleged detainee abuses at detention facilities in Iraq, particularly the Abu Ghraib Detention Facility."

Why was it important for you, sir, to review all of the voluminous CID materials?

A    Well, we needed to understand that there were previous investigations and previous reports, inquiries that preceded my investigation.  So my team and I collected all of that, to include General Miller's report and General Ryder's report, to include other reports of investigations to ensure that, you know, we had relevance, that I was not the only investigation that was conducting.

Q    And you go on to state here that you analyzed approximately 50 witness statements from military police and military intelligence personnel, potential suspects, and detainees.

Did these statements include statements from CACI employees?

A    No, there were no statements from CACI at that time because my focus was on the 800th MP Brigade, and CACI belonged to another brigade, a Military Intelligence Brigade.

Q    Did there come a time, sir, that you did, in fact, review statements from CACI personnel?

Taguba - Direct Examination by Mr. Faridi                    42

A     Not specifically from CACI, but we interviewed a member -- or two members of CACI that was implicated by the soldiers in terms of mistreatment and abuses of detainees.

Q     When you say that you interviewed CACI personnel who were implicated in abuse by the soldiers, can you describe that?

A     Yes.   When we were interviewing the soldiers, the guards -- let's put it that way.   When we were interviewing them, through the course of the interviews, about half a dozen of them, they were talking about Mr. Steve from CACI.   And I quote, Mr. Steve from CACI.

      So we were kind of curious who -- what CACI was. We thought it was K-H-A-K-I.   Well, when we found out it was a contracting organization called CACI, we were really interested in why were they talking about Mr. Steve.

Q     Well, we'll focus on that in a moment.

      Approximately how many photographs and videos of the abuse did you look at yourself?

A     Okay.  I'll make an approximate.   I saw about five or six videos of sodomy abuse, sexual abuse you might say.   And I lost count about -- after about 500 on one CD.

Q    Of pictures?

A    Pictures, photos, videos, you name it.

Q    Can you describe whether and how the photographs of the abuse were being displayed at Abu Ghraib?

A    Well, when we asked CID how the discovery of that CD, the CD was obtained by Sergeant Joseph Darby.  And they were being used as screen savers on laptops by the guards.

Q    Did you say screen savers on laptops?

A    Screen savers that were on the laptops, and I saw some of the photos on their laptops.

Q    Let's turn to page 15 of your report.  There's a section here titled "Regarding part one of the investigation, I make the following specific findings of fact."

You did, in fact, make findings of fact, correct?

A    Correct, collectively.

Q    I want to focus on a handful of your findings. Let's turn to page 16, paragraph 5, please.  I want to focus on the first three sentences here.

Now, you write here, "That between October and December 2003, at the Abu Ghraib Confinement Facility, numerous incidents of sadistic, blatant, and wanton criminal abuses were inflicted on several detainees."

Why did you use these words, sadistic, blatant,

Taguba - Direct Examination by Mr. Faridi                    44

and wanton?

A     The photographs in and of itself was unbelievably a tragedy.  I've never seen anything like that, not in my career, not in even movies for that matter.  It was very sad that that happened.  The photographs and the videos were -- were unbelievably graphic.  And the photographs of dogs being used were just a violation of the Interrogation Rules of Engagement and even the Detention Rules of Engagement -- were used incessantly inside the facility.

Q     The next sentence you state, sir, "This systemic and illegal abuse of detainees was intentionally perpetrated by several members of the military police guard force (372nd Military Police Company, 320th Military Police Battalion, 800th MP Brigade), in Tier (section) 1-A of the Abu Ghraib Prison."

      First, for those who are not familiar with the military vernacular, what's the difference between a brigade, a battalion, and a company?

A     Bear with me here.  The brigade is the higher headquarters of a battalion.  It consists of about 1,200 to approximately 3,000 soldiers.  A battalion is a subset of that brigade, and a battalion has about 500 to 700 personnel.  A company is then a subset of a battalion.  It has approximately 150 to 200 personnel.

Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599

Taguba - Direct Examination by Mr. Faridi                    45

Q     Why did you use the word "systemic" in this sentence?

A     It seemed to matter that -- for my team and I, there was increasingly -- it was basically a standard operating procedure for them to conduct this type of brutality.

Q     Why did you use the word "illegal"?

A     Because they were illegal in concert with the tenets of the Geneva convention, which was an international law and what we practice in war.

Q     The third sentence states, "The allegations of abuse were substantiated by detailed witness statements (ANNEX 26) and the discovery of extremely graphic photographic evidence."

      Let's focus on witness statements.  How did the witness statements substantiate the abuse?

A     We collected all of the data from previous investigations as a matter of reference and for our investigation, that this has happened before, and in concert with what the allegations were that was founded by abuse at Abu Ghraib.  We provide evidence by the provost marshal that was assigned to General Sanchez' unit.  So we collected all of that.

      We also collected evidence on statements from Iraqis who were interviewed and also previous

Taguba - Direct Examination by Mr. Faridi                    46

statements from the Criminal Investigation Division.

Q    We'll focus on the statements in a moment.

     Let's go to paragraph 6 at the bottom of page 16 and at the top of page 17.  It's got a long list of abuse.  Do you see that?

A    Yes.

Q    Can you just describe, sir -- I'm not going to ask you to read through A through M here, but can you just describe for the jury at a high level what is it you were seeking to convey in this paragraph of your report?

A    Given to the practicality with collection of evidence with photographs and videos and also statements from interviews that we conducted, then we came to a conclusion in listing all of those in paragraph 6.

Q    Let's go to paragraph 7 on page 17.

A    Okay.

Q    It's pulling up on the screen.  Just bear with us.

     And you write here that, "These findings are amply supported by written confessions provided by several of the suspects, written statements provided by detainees, and witness statements.  In reaching my findings, I have carefully considered the pre-existing statements of the following witnesses and suspects:"

Taguba - Direct Examination by Mr. Faridi                47

Do you see that?

A     That's correct.

Q     And you list here Sabrina Harman as a suspect?

A     Right.

Q     A suspect of what?

A     Suspects of mistreatment and taking photographs, which is prohibited by the Geneva convention.

Q     You list here Torin S. Nelson, Titan Corp., assigned to the 205th MI Brigade.  Who is Torin Nelson?

A     He's a contractor, interpreter, and also assisting in interrogation.

Q     You say here that he was working for Titan.  Did you mean CACI?

A     No -- well, he was -- he's a contractor from Titan Corporation unrelated to CACI and being supervised by the 205 Military Intelligence Brigade.

Q     And let's go to paragraph 8.  Here you say, "In addition, several detainees also described the following acts of abuse, which under the circumstances, I find credible based on the clarity of their statements and supporting evidence provided by other witnesses."

Do you see that?

A     Yes.

Q     Okay.  And again, just at a high level -- I'm not

Taguba - Direct Examination by Mr. Faridi                    48

going to ask you to read A through H here.  At a high level, could you describe what you're trying to convey here?

A    These are illegal activities and not following in concert with the Interrogation Rules of Engagement or even the Detention Rules of Engagement outlawed by the Geneva convention.

Q    Let's skip down to H.  It actually goes onto the next page.

And H states -- while it's being pulled up on the screen -- "Using military working dogs to frighten and intimidate detainees with threats of attack, and in one instance actually biting a detainee."

Why was that problematic, the use of military working dogs to frighten and intimidate detainees?

A    There were two dog teams.  One was a bomb -- they are trained to access and sniff out bombs, and the other one was not necessarily something that they would use in interrogation.  He was also a drug sniffing dog.

And I interviewed both the noncommissioned officers in charge, one Army and one Navy.  And the Navy was being ordered to use the dogs inside the cell inasmuch as the Army military dogs.  But before they can use that, they needed the explicit authority -- authorization from Lieutenant General Rick Sanchez, a

Taguba - Direct Examination by Mr. Faridi                      49

three-star general.  And he needed -- they needed his permission to use the dogs, but they disobeyed that. The interrogators and the MPs disregarded that.

Q    Let's focus, sir, on paragraph 9.  And you say here that you've carefully considered the statements provided by the following detainees, which you find to be -- which you find credible based on the clarity of their statements and supporting evidence provided by other witnesses.

     And you list here Asad Hamza Hanfosh, Detainee No. 152529.  Why did you find this particular detainee's statement to be credible?

A    Well, there were detainees.  I just -- I didn't select or pick or choose him.  We collaborated their statements with CID at the time, which was a criminal investigation.

Q    General, do you know that Mr. Asad Hanfosh is a plaintiff in this lawsuit?

A    No, I don't.

Q    Let's go to paragraph 10 on page 18.  I want to focus now on the role of military intelligence and command vac, something you spoke about earlier.  You write here that, "Military Intelligence interrogators and other US Government Agency's interrogators actively requested that MP guards set physical and mental

Taguba - Direct Examination by Mr. Faridi                    50

conditions for favorable interrogation of witnesses."

Why did you use the words "actively requested"?

A    It's just that.  The word actively present and without any equivocation that they were being ordered primarily or supervised to conduct illegal activities incidental to interrogation, which is not their mission.

Q    What did your investigation show, sir, with respect to MPs receiving instructions on setting physical and mental conditions from CACI employees?

A    Those were the words from the MPs we interrogated in person, that they mentioned Mr. Steve from CACI.  He was giving them instructions on setting the conditions, which in our turn would be negative conditions to make their interrogation successful the following day or the following night.

Q    How often did these MP folks invoke Steve's name?

A    Several times.

Q    Let's go to paragraph 12 on pages 19 and 20.  You say here, sir, that, "I find that prior to its deployment to Iraq or Operation Iraqi Freedom, the 320th MP Battalion and the 372nd MP Company had received no training in detention/internee operations. I also find that very little instruction or training was provided to MP personnel on the applicable rules of

the Geneva Convention Relative to the Treatment of Prisoners of War."

You go on to say, "Moreover, I find that few, if any, copies of the Geneva Conventions were ever made available to MP personnel or detainees."

Let me ask you first:  What are the Geneva conventions?

A     What are the Geneva conventions?

Q     Yes.

A     Well, it's outlawed.  It's illegal for mistreating them through abuse, to beings -- to slapping and things of that nature.  It's also illegal if they're not providing them with health and welfare, meaning food. It's illegal to just isolate them without due cause. They're supposed to be under the Geneva convention in 1949.  They're supposed to treat any prisoners of war equal to what we, if we were captured, to be treated as well, humanely.

Q     And how did the lack of instruction and training conditions contribute, if at all, to detainee abuse at Abu Ghraib?

A     It was based on the 800th MP Brigade, who were not organized to conduct detention operations.  They were traffic circulation, meaning roots, bomb protection, protection on convoys, and things of that nature.

Taguba - Direct Examination by Mr. Faridi                    52

And they had multiple battalions you might say. But they were rotating in and out of country because somebody declared that war was over at that point in time. And so they redeployed, I think, maybe four or five of their battalions and retained the 325th and two other brigades -- two other battalions, I'm sorry. And they were not trained -- they were not trained for detention operations.

Q    Let's go to paragraph 30 on page 26. You write here, sir, that, "In general, US civilian contract personnel" -- and you include CACI in the parenthetical -- "third country nationals, and local contractors do not appear to be properly supervised within the detention facility at Abu Ghraib. During our on-site inspection, they wandered about with too much unsupervised free access in the detainee area."

Can you speak to how CACI personnel had this free access in the detainee area and why you found that to be problematic?

A    We could not understand their command relationship as contractors to the two MI Brigades, let alone in Iraq. It should have been identified on the contract of their commander relationship as contractors on the battlefield.

They were just roaming around undetected and --

Taguba - Direct Examination by Mr. Faridi                    53

this is a secret confinement facility, all of them, all four of them.  And they were just roaming around, some in civilian clothes.  We didn't know if they were military or if they were contractors.

Q    Let's go to paragraph 8 on page 38.  You write here, sir, that, "With respect to the 800th MP Brigade mission at Abu Ghraib, I find that there was clear friction and lack of effective communication between the Commander, 205th MI Brigade, who controlled FOB Abu Ghraib after 19 November 2003, and the Commander, 800th MP Brigade, who controlled detainee operations inside the FOB.  There was no clear delineation of responsibility between commands, little coordination at the command level, and no integration of the two functions.  Coordination occurred at the lowest possible levels with little oversight by commanders."

     Can you describe how this lack of clarity and responsibility contributed to detainee abuse?

A    We pride ourselves in the military to be organized.  And the commanding officer of the forward-operating base Abu Ghraib, which is a whole facility, was to be commanded by Brigadier General Janis Karpinski by order.  And the supported command will be the 205th MI Brigade commanded by Colonel Pappas.  And the indication and the supported outcome

Taguba - Direct Examination by Mr. Faridi                    54

was for them to support each other.  But they knew what the chain of command was.  A general is senior.

But later on, with all of the instances of allegations of abuse and things of that nature, the deputy commanding general of CJTF-6 changed the command structure and appointed the colonel to be the commanding officer of that forward-operating base -- it's basically like a fort -- and subrogated the general to be subordinated to that command.

That would create friction.  You know, it's already tenuous in terms of operating a detention center or interrogation operations in war, let alone that now you confuse the chain of command.  It presented a friction in there.

And I interviewed both of them, General Karpinski and Colonel Pappas.  They were very open about hating each other openly, to which I was a bit -- you know, incensed by that.

Q    Let's talk about what that friction created. Let's skip to the bottom of page 38.  And here you write, sir, that, "Although not supported by Brigadier General Karpinski, FRAGO 1108" --

Let's pause here.  What's FRAGO 1108?

A    Fragmentation order.

Q    That's an order from the military?

Taguba - Direct Examination by Mr. Faridi                 55

A     Yes, correct, issued by the commanding general in Iraq.

Q     And Brigadier General Karpinski, she was the head of the 800th Brigade, correct?

A     Yes.  Now she's subordinating to a colonel.

Q     And that's Colonel Pappas?

A     Correct.

Q     Okay.  Now, this goes on to say that, "FRAGO 1108 made all of the MP units at Abu Ghraib TACON" --

      What does that mean?

A     Tactical control.

Q     -- "to the Commander, 205th MI Brigade."

      That's the Military Intelligence Brigade?

A     Correct.

Q     Okay.  "This effectively made an MI Officer, rather than an MP officer, responsible for the MP units conducting detainee operations at that facility.  This is not doctrinally sound due to the different missions and agendas assigned to each of these respective specialties."

      Why was it not appropriate for MI, military intelligence, personnel to be responsible for overseeing the MPs, the military police, at Abu Ghraib?

A     They essentially broke Army doctrine, established doctrine that MPs do not conduct interrogation.  They

conduct passive interrogation by detention, meaning accounting for all the prisoners, but not interrogation.

The implication that was cited here when Pappas was given command of forward-operating base implied that now he controls MPs.  That's confusing.  And if it's confusing at the top, it's confusing to the soldiers at the bottom, meaning who do we obey now type of thing.

Q    I want to talk more about Colonel Pappas, and then I want to turn you to page 44 of your report, sir. It's a section titled Recommendations as to Part Three of the Investigation.

Let's skip ahead actually to page 45 and focus on paragraph 2, okay?

A    Yes.

Q    Did you interview Colonel Pappas?

A    I interviewed him three times.

Q    And where did you interview him, sir?

A    I interviewed him at his headquarters.  I interviewed him at Camp Liberty the second time, as I recall, and I interviewed him off site.

Q    Can you describe the interviews for the jury?

A    Colonel Pappas was very nervous, fidgety.  He answered my questions.  He was essentially trying to

Taguba - Direct Examination by Mr. Faridi                          57

dissuade an answer from me about his command posture. And I believe he was basically being coached by someone. And I asked him if he would tell the truth, and he did not answer that question because I think that perhaps he was trying to save his career.

Q      And, sir, you go on to write here that, "Colonel Thomas M. Pappas, Commander, 205th MI Brigade, be given a General Officer Memorandum of Reprimand and Investigated UP Procedure 15, AR 381-10, US Army Intelligence Activities for the following acts which have been previously referred to in the aforementioned finings:"

The first thing you say here is, "Failing to ensure that Soldiers under his direct command were properly trained in and followed the IROE."

Why did you make that finding?

A      Colonel Pappas was physically stressed with his mission to find what we call actionable intelligence from the detainees. He wasn't pumping enough intelligence out of the detainees.

Plus, he was basically -- was told to continue, and of course, he was stressed about the new command structure that he was placed under.

And I asked him personally. And it's not in the report, but why was he hiding something. There's a

little bit of fear in his face when he looked at me.

Q     The second bullet states, "Failing to ensure that Soldiers under his direct command knew, understood, and followed the protections afforded to detainees in the Geneva Convention."

And the last bullet states, "Failing to properly supervise his soldiers working and 'visiting' Tier 1 of the Hard-Site at Abu Ghraib."

Do you see that?

A     Yes.

Q     Was he, in fact, reprimanded?

A     He was not reprimanded at that time.  I recommended he be reprimanded.

Q     Was he ultimately reprimanded?

A     I don't -- I don't know.

Q     Okay.  Let's focus on Mr. Steve.  You've talked about him a couple of times already.  Was there any interrogator name from the military or CACI that came up more often than Steve's name?

A     According to the soldiers, he was visiting them at Tier 1 day and night or other locations in Abu Ghraib.

He was also visiting staff officers at the headquarters at Camp Victory.

Q     Did you find that he exercised some influence at Abu Ghraib?

Taguba - Direct Examination by Mr. Faridi                    59

A       Not until I was told by the soldiers I interviewed -- we asked them who is Mr. Steve because they refer to him as Mr. Steve.  But they didn't know his last name.

So I was interested.  I was given authority by my general counsel, Dick Gordon, that if I could get into inquiring about military intelligence, his culpability under provision 15 -- I forgot the Army regulation -- he said he would allow it but under strict guidance that we were not going to investigate, just inquire.

Q       You said you interviewed him?

A       Yes, I did.

Q       Why was it important for you to interview him?

A       I wanted to make sure that he was the right Mr. Steve because I found him at the joint interrogation detention center wearing a sweater that said Steve on it.  They described him as a huge man, which he was tall, about six-five.  And I said that must be Mr. Steve.

And I asked him if I could interview him, and reluctantly, he said, yeah, he would comply.

Q       I want to make sure that we're talking about the right Steve.  Was his last name Stefanowicz?

A       That's correct.

Q       Okay.  Let me show you paragraph 11 on page 48 of

Rhonda  F.  Montgomery   OCR-USDC/EDVA   (703)  299-4599

Taguba - Direct Examination by Mr. Faridi                    60

your report, sir.  Here I want to go over this paragraph with some level of particularity.  You refer to Mr. Stefanowicz as contract, U.S. civilian interrogator, CACI, but then you go on to list 205th Military Intelligence Brigade.  Why?

A    He was contracted through the MP Brigade -- I'm sorry, MI Brigade.

Q    And let's talk about the interview.  How long was the interview?

A    I would say about 45 minutes.  I was trying to get him to tell us the truth about his background.

Q    General, when you walked into that interview, did you have an expectation as to how a civilian contractor should behave before a decorated military general?

A    No.  My -- I did not expect that until we started talking.

Q    So what happened?  Can you describe his demeanor during the interview?

A    As I said in first testimony, he tries to intimidate me in front -- there were 15 of us around the table, and I was the only one to ask him questions. So when I asked him based on his resume, supposedly a false resume, had he ever served in the U.S. Navy, he said, yes, he was in the Naval reserve.

     But when I asked him did he have any experience

Taguba - Direct Examination by Mr. Faridi                    61

about interrogating, he said he did.

And when I asked him to give an example of what is limited on the Geneva convention, he could not say anything about that.  He could not declare any statement whatsoever.  He said -- he just basically shut up.

And then he started leaning on the table and tried to intimidate me by staring me in the face.  So I returned the compliment.  I stared him in the face because I knew what he was trying to do.  He was trying to intimidate my members, myself to try and dissuade him that he was not -- he was not giving instructions to the detainees, which he denied.

Q    Did you, in fact, sir, feel intimidated?

MR. O'CONNOR:  Objection, relevance.

THE COURT:  Sustained.

A    Because I would not allow him --

Q    There's no question, sir.

A    I'm sorry.  Okay.

Q    You write here that Mr. Stefanowicz, "be given an Official Reprimand to be placed in his employment file, termination of employment, and generation of a derogatory report to revoke his security clearance for the following acts which have been previously referred to in the aforementioned findings:"

Taguba - Direct Examination by Mr. Faridi                    62

     There's two bullet points here.  The first one is, "Made a false statement to the investigation team regarding the locations of his interrogations, the activities during his interrogations, and his knowledge of abuses."

     Can you elaborate?

A    His own translator implicated him.  He was with him during the course of the interrogation and also instructions.  We believe as a team, my investigating team, that he was lying and he was trying to avoid answering the question.  He was very evasive in terms of just answering a question either yes or no.

     So as a contractor, we don't have the ability to address him for punishment because he's controlled by the contracting -- the COR as they call it.  But then since he was assigned to the MP Brigade -- I'm sorry, the MI Brigade, he has to follow strict regulations regarding the Interrogation Rules of Engagement, which we believe he did not comply with.

Q    The second bullet point states, "Allowed and/or instructed MPs, who were not trained in interrogation techniques, to facilitate interrogations by 'setting conditions' which were neither authorized and in accordance with applicable regulations/policy.  He clearly knew his instructions equated to physical

Taguba - Direct Examination by Mr. Faridi                63

abuse."

Let's break that up.  Earlier, sir, you stated that the MIs actively requested MPs set physical conditions for interrogations.  Do you recall that?

A    Yes.

Q    Is this what you're talking about?

A    Yes.  When you say set the conditions, you have to define what you mean by setting the conditions.  Keep them healthy, make them alert, that type of thing.  But the photographs did not indicate that.  It seems like they were held to a different set of conditions, like slapping, the dogs, scaring, the whole idea.  That's not setting the conditions.  You're setting the conditions for a fearful amount of punishment if they don't answer the question by the interrogator.  That's a different kind of setting the conditions.  It's almost tantamount to setting the conditions wink-wink, you know what I mean.  And I think the guys followed that in a negative sense.

Q    Why did you find that the conditions that he was asking the MPs to set were not in accordance with applicable regulations/policy?

A    By distinction, he was assigned at Abu Ghraib.  My team and I went to the other three detention centers, and there were no such thing as a Steve Stefanowicz

Taguba - Direct Examination by Mr. Faridi                    64

conducting -- setting the conditions.  Their mild abuse, like slapping, of that nature of the other three, but Abu Ghraib was more insidious than anything else.

Q    I want to follow up on the statement that you made that you didn't have the authority to discipline him.  Why is it?  Why didn't you -- as a military general who has been charged to investigate this, why didn't you have the authority to discipline him?

A    Because I was not in command of that unit.  So I had to relay that to the commander that appointed me to investigate.

Q    Mr. Stefanowicz was a civilian, correct?

A    Right.

Q    Did that play any role as to whether or not the military can reprimand him?

A    It can, recommendation for a general memorandum of reprimand for that matter, to be fired, if that.  I've done that as the unit that contracted out.  There's regulations associated with that.  If they misbehave and misbehave contrary to the discipline and order of a unit, as a contractor, they could be fired.

Q    Okay.  You use the word "recommend" in your answer.  Why do you use the word "recommend"?

A    I recommended that because that was a proper

Rhonda  F.  Montgomery   OCR-USDC/EDVA   (703)  299-4599

Taguba - Direct Examination by Mr. Faridi                    65

statement to my commanding officer, Lieutenant General David McKiernan.

Q     General, are you familiar with the Army Field Manual?

A     Yes.

Q     Can you describe what the Army Field Manual is?

A     The Army Field Manual is used for instructional purposes or education to ensure that they comply with the terms of their training, how they conduct out in the field.  That's different than Army regulation.  An Army regulation is regulatory, and it's -- you can basically be court-martialed on violation of that.

Q     Okay.  So I want to, first of all, show you the Army Field Manual.  Let me show you PTX207.

        THE COURT:  Any objection to 207?

        MR. O'CONNOR:  Relevance, Your Honor.

        THE COURT:  Overruled.

BY MR. FARIDI:

Q     And this is FM 3-100.21 (100-21).  Did you review this in preparation of your testimony, General?

A     I'm familiar with it.

Q     This is an Army Field Manual, correct?

A     Right.

Q     And it's titled Contractors on the Battlefield, and it's dated January 2003.  Do you see that?

Taguba - Direct Examination by Mr. Faridi                          66

A      Right.

Q      Because it's dated January 2003, can you describe its relevance to the role of contractors, such as CACI, at Abu Ghraib?

A      That's correct.  That was developed when we were doing the campaign at the first Iraqi war and also when we deployed to Afghanistan.

Q      Let's focus on page 4 of the manual.  We've highlighted some language here that's on the screen.

A      Okay.

Q      And it states here, "Field manual 3-100.21 address the use of contractors as an added resource for the commander to consider when planning support for an operation.  Its purpose is to define the role of contractors, describe their relationship to the combatant commanders and the Army service component commanders, and present their mission of augmenting operations and weapon systems support."

       Do you see that?

A      Yes.

Q      Why is it important for the Army, sir, to define the role of contractors and describe their relationship with commanders?

A      First of all, when you do -- when you compete for a contracting company, let's say CACI, they must comply

       Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

Taguba - Direct Examination by Mr. Faridi                    67

with all the regulations international, especially on the battlefield, with the terms of their contract. Because they're literally supplementing or supporting the mission of the armed forces that's operating in that theater. So they are mandated to obey that. It's in their contract.

Q    And let's go to page 5. I've highlighted a sentence here. It states that, "This manual reflects relevant doctrine, incorporates lessons learned from recent operations, and conforms to Army doctrine policy."

You said earlier, sir, that the manual is different from a regulation?

A    Right.

Q    But is the manual something that can be ignored and set aside?

A    Well, you use that as evidence that they were to comply with the field manual.

Q    I'm sorry. I missed that.

A    It's used as evidence should they contravene the terms of their contract.

Q    And I want to go to page 15, and there's just a couple of sentences here that I want to focus on. I highlighted one paragraph here, and we'll go through some of the sentences here one by one. It states,

"Management of contractor activities is accomplished through the responsible contracting organization, not the chain of command."

Can you describe what that means in lay terms?

A    You know, as far as do not have direct control over the contractors because by law they go through the COR.  But the COR is not always there.  They're possibly in another building or another part of the world.  But they are still expected to conform to the terms of their contract designed by the Army or any of the armed forces, to comply with all the terms of that contract and also to obey established law and statutes while under their subordinates.

Q    So did the Army, without going through the COR, have control over the CACI interrogators?

A    They can predicated on the incident.

Q    Okay.  Let's go --

(Reporter clarification.)

A    I've done that.

MR. FARIDI:  Your Honor, you had a question?

THE COURT:  No.

BY MR. FARIDI:

Q    Okay.  It goes on to state, "Commanders do not have direct control over contractors or their employees (contractor employees are not the same as government

employees); only contractors manage, supervise, and give directions to their employees."

Q    Is that consistent with your recollection about how things operated in the 2003-'04 time period?

A    Yes.

Q    And it goes on to say that, "Commanders must manage contractors through the contracting officer or ACO."

What's the ACO?

A    I don't know.

Q    Okay.  What is this you're trying to convey here, this sentence?

A    When a contractor is operating in someone's battle space, the commanding officer must ensure that they're also protected whether they carry weapons or not.  The contractors are not independent of that force, especially when they're in the same battle space.

Q    Does ACO stand for Administrative Contracting Officer?

A    Probably.  Sorry.

Q    Okay.  Let's focus on the bottom of that page.  It states, "It is important to understand that the terms and conditions of the contract establish the relationship between the military (US Government) and the contractor; this relationship does not extend

Taguba - Direct Examination by Mr. Faridi                    70

through the contractor supervisor to his employees.

Only the contractor can directly supervise its

employees.  The military chain of command exercises

management control through the contract."

     Is that consistent with your recollection?

A    Yes.

Q    Let's just skip ahead to page 57, and it states

here --

          THE COURT:  57?

          MR. FARIDI:  Yes.

BY MR. FARIDI:

Q    It states here that, "As stated earlier,

contractor management does not flow through the

standard Army chain of command."

     True statement?

A    Yes.

Q    It goes on to state, "Management of contractor

activities is accomplished through the responsible

requiring unit or activity COR through the supporting

contracting organization in coordination with selected

ARFOR commands and staff."

     Do you see that?

A    Yes.

Q    Then it states that, "It must be clearly

understood that commanders do not have direct control

Taguba - Direct Examination by Mr. Faridi                71

over contractor employees."

And in bold, it states, "Contractor employees are not government employees."

And it goes on to state, "Only contractors directly manage and supervise their employees. Commanders manage contractors through the contracting officer and their appointed CORs in accordance with the terms and conditions of the contract."

Can you speak, sir, whether under the Army doctrine and policy --

MR. FARIDI:  I'll move on, Your Honor.

BY MR. FARIDI:

Q    Let's just skip ahead actually to page 68. There's one last quote here that I want to show you. It's titled Discipline and the Commander's Authority.

Do you see that?

A    Yes.

Q    And it states here that, "Contractor employees are not subject to military law under the UCMJ when accompanying US forces, except during a declared war."

Let's just pause here.  By the way, would you agree that there was no congressional declaration for the war in Iraq?

A    Yes.

Q    Okay.  Because there was no congressional

Taguba - Direct Examination by Mr. Faridi                72

declaration for the Iraq war, were the contractor employees -- were the CACI employees subject to military involvement in the Uniform Code of Military Justice?

A    That's true.  They're not military personnel.  The court-martial manual, it's exclusive for military personnel.

Q    Are you aware, sir, whether military policemen and women, people who were in the uniform, whether any of them were court-martialed as a result of the events at Abu Ghraib?

A    I believe several of them.  The Army supposedly punished over 225 soldiers that were implicated to accomplices to mistreatment of detainees.

Q    Are you aware whether there was a single CACI employee who was court-martialed?

A    No.

Q    A single CACI employee who served time in jail?

A    No.

Q    The field manual goes on to state that, "Maintaining discipline of contractor employees is the responsibility of the contractor's management structure, not the miliary chain of command.  The contractor, through company policies, has the most immediate influence in dealing with infractions

Taguba - Direct Examination by Mr. Faridi                73

involving its employees.  It is the contractor who must take direct responsibility and action for his employee's conduct."

Sir, do you know whether Mr. Steve, Steve Stefanowicz, whether he was terminated by CACI?

A     No.

Q     Did CACI follow your recommendation?

A     I don't think so.

Q     Let's go to pages 90 and 91.  We can skip this.

MR. FARIDI:  I'm trying to streamline, Your Honor.

BY MR. FARIDI:

Q     And let me ask you to skip to an Army regulation, okay, AR 715-9.  Are you familiar with that regulation?

A     Yes.

Q     Okay.  How are you familiar with it?  We'll pull it up on the screen.

MR. FARIDI:  Okay.  Your Honor, it's PTX227, and we offer it into evidence.

THE COURT:  Any objection?

MR. O'CONNOR:  No objection, Your Honor.

THE COURT:  All right.  It's in.

MR. FARIDI:  Thank you.

BY MR. FARIDI:

Q     How are you familiar, sir, with AR 715-9?

Taguba - Direct Examination by Mr. Faridi                74

A     We use that in theater.

Q     This document, you'll see it's in front of you. It's titled Contractors Accompanying the Force, and at the bottom of the screen --

MR. FARIDI:   We can blow that up.

BY MR. FARIDI:

Q     -- it states that it's dated October 1999.

A     Right.

Q     Do you see that?

A     Yes.

Q     In fact, you relied on this document in connection with your report, correct?

A     Yes.

Q     And what was the relevance of this document with respect to CACI and contractors at Abu Ghraib?

A     It is regulatory in nature.  You can use that for the purpose of military court-martial or punishment under Article 15.

Q     And I just want to show you just one from this particular document.  Let's go to Section 3-2(f) on page 16.  I just want to focus on the first two sentences here.  The document states that, "The commercial firm(s)" --

Let me pause here.  Was CACI a commercial firm?

A     Yes.

Q    Okay.  It's states, "The commercial firm(s) providing the battlefield support services will perform the necessary supervisory and management functions of their employees.  Contractor employees are not under the direct supervision of military personnel in the chain of command."

A    Correct.

Q    And that applied with respect to CACI in Abu Ghraib, correct?

A    Correct.

        THE COURT:  Is an area considered a battlefield if a formal declaration of war has not been declared?

        THE WITNESS:  Yes, ma'am.  Yes, Your Honor.

        THE COURT:  So was the area in Iraq at this time properly called a battlefield?

        THE WITNESS:  A battlefield, a war actually.

        THE COURT:  But there had been no formal declaration of war?

        THE WITNESS:  That's correct.

        THE COURT:  All right.

BY MR. FARIDI:

Q    And because Abu Ghraib was in the battlefield and CACI was providing battlefield support, to quote the document here, the necessary supervisory and management

Taguba - Cross-Examination by Mr. O'Connor          76

functions of CACI employees was supposed to be provided under Army regulation by CACI, correct?

A    Right.

Q    Okay.  Just a couple of more questions, General. You can close the binder.

How are individuals who are detained by American military forces during conflict supposed to be treated?

A    For the most part, on average, they were treated humanely.

Q    Did that happen at Abu Ghraib?

A    No.

MR. FARIDI:  No further questions, Your Honor.

THE COURT:  All right.  Mr. O'Connor.

Do you have separate books?

MR. O'CONNOR:  Oh, we do, Your Honor.

THE COURT:  All right.  Mr. O'Connor, resume your questions.

MR. O'CONNOR:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. O'CONNOR:

Q    Good afternoon.  I want to start by thanking you for your service, including the service associated with preparing your report.

You -- do you have a background in military

intelligence?

A     Some.

Q     Okay.  Did you ever serve as an intelligence officer?

A     No.

Q     You testified that you couldn't discipline CACI employees because they were not under your command, right?

A     Yes, and under advisement of counsel.

Q     And you also couldn't discipline any of the soldiers that you were investigating either, right?

A     Well, a recommendation for discipline, yes.

Q     Sure.  But you could recommend discipline for soldiers, and you could recommend discipline for civilian contractors?

A     Right.

Q     And you were appointed to investigate the 800th Military Police Brigade, right?

A     Say that again, please.

Q     You were appointed to investigate the 800th Military Police Brigade?

A     Correct, yes.

Q     And that was the brigade that was commanded by Brigadier General Karpinski?

A     Correct.

Taguba - Cross-Examination by Mr. O'Connor                    78

Q     And you formed the opinion that she was
incompetent; didn't you?

A     Correct.

Q     And that she certainly didn't get along or work
well with Colonel Pappas?

A     Both of them.

Q     Right.  And you found both of them at fault for
that?

A     Right.

Q     But you were not appointed to investigate the
Military Intelligence Brigade or the civilian
contractors assigned to the Military Intelligence
Brigade?

A     Yes.  I recommended that they be investigated.

Q     Sure, and that was your purpose.  Your purpose was
to find things that appeared -- that might be credible
that you could recommend another officer appointed to
investigate the military intelligence operations to
conduct its own investigation, right?

A     Correct.

Q     And that person was Major General Fay?

A     Right.  He was appointed by -- I think he was
appointed not by General Sanchez but someone else.

Q     Okay.  And that ended up resulting in a report
that was authored by Major General Fay, Lieutenant

Taguba - Cross-Examination by Mr. O'Connor                79

General Jones and, I guess, General Kern?

A     General Kern, yes.

Q     And that was the definitive investigation of
military intelligence operations at Abu Ghraib prison?

A     Correct.

Q     And subsequent to your investigation and the
Jones-Fay-Kern investigation, you know that the
Department of Defense commissioned an investigation
that was conducted by Vice Admiral Church?

A     Yes.

Q     Do you know Vice Admiral Church?

A     Never met him.

Q     He at the time had been -- he was the inspector
general of the Navy, right, for the entire Navy?

A     Right.

Q     Now, your report was drafted by other members of
your team, and you edited it; is that fair?

A     We all edited it, not just me.

Q     Did you do any original drafting of your report?

A     No.

Q     And so it was drafted by others, and then you and
others edited it?

A     Yes, we all did.

Q     And you were appointed to conduct your
investigation in January of 2004?

Taguba - Cross-Examination by Mr. O'Connor          80

A     Yes.

Q     With respect to detainee abuse, your report focused on the time period from October to December of 2003, correct?

A     That was my guidance, yes.

Q     And in conducting your investigation, you were in Iraq for about three weeks?

A     No.  I was deployed to Kuwait and Iraq June of 2004.

Q     But did you go into Iraq from Kuwait in order to conduct your investigation?

A     Yes.

Q     And how long were you in Iraq?

A     With that investigation, about 45 days.

Q     And how much of that time did you spend at Abu Ghraib prison?

A     About half of it.

Q     And you saw hundreds of pictures of horrific abuse of detainees?

A     Correct.

Q     And those pictures depicted not only the detainees but many times the persons who were inflicting those horrific abuses?

A     Absolutely, yes.

Q     And you said it was -- did you say about 500 that

Taguba - Cross-Examination by Mr. O'Connor                    81

you saw?

A     More than 500.  I just stopped looking at them.

Q     How many of those pictures had -- was a CACI employee depicted in?

A     There were none.

Q     Zero?

A     Right.

Q     Did you see any detainee abuse occur during the time that you were at Abu Ghraib prison?

A     No.

Q     And by the time you were appointed, Army CID had already conducted an investigation of the detainee abuse?

A     Yes.

Q     And the way this happened is CID -- Army CID is the Criminal Investigation Division?

A     Yes.

Q     And so it's an arm of the Army that investigates crimes within the Army?

A     Crimes, yes.

Q     And the Army CID had received photographs depicting horrific detainee abuse?

A     Photographs and videos, yes.

Q     And so that Army CID conducted an investigation in which it collected the pictures and videos and

Taguba - Cross-Examination by Mr. O'Connor                    82

interviewed a whole number of civilians and military personnel?

A    Yes, the same set I saw.

Q    And then they passed all of those pictures and statements on to you?

A    Right.

Q    And the statements that were passed on to you included written statements by MPs?

A    Correct.

Q    And written statements by Army interrogators?

A    Correct.

Q    Including statements by civilian interrogators employed by CACI?

A    We did not collect any statements from CACI.  All we did was to find evidence that would implicate CACI, and we handed that to General Fay.

Q    Right.  Sir, my question is just a little different.  In the large volume of CID statements you received, some of those were statements by CACI personnel, right?

A    That I don't recall.

Q    Okay.  Do you recall there being written statements from interpreters who were employed by Titan Corporation?

A    Yes.

Taguba - Cross-Examination by Mr. O'Connor                    83

Q     And you and your investigative team did not participate in a development of the written statements that were in the CID investigation?

A     No.

Q     But your team did rely on those statements that had been previously given to CID?

A     Right.

Q     Was most of the detainee abuse that you reported on documented by photographs and videos taken by MPs?

A     For the most part, there were.

Q     Was that, yes, for the most part they were?

A     Yes.

Q     Thank you.

A     Those were the ones presented to me by Lieutenant Colonel Joel Mocello -- Jerry Mocello.

Q     And these were the photos that an Army soldier turned over to Army CID?

A     Sergeant Darby, yes.

Q     Now, isn't it the case that you were only allowed to interview four people working on the military intelligence side of the house at Abu Ghraib prison?

A     If I count Pappas -- I forgot the other two others -- three others.

Q     You were allowed to interview Colonel Pappas?

A     Yes, my general counsel allowed me to do that.

Taguba - Cross-Examination by Mr. O'Connor                    84

Q    And you were allowed to interview Lieutenant Colonel Jordan?

A    Yes.

Q    And you were allowed to interview Steve Stefanowicz?

A    Yes.

Q    And you were allowed to interview an interpreter by the name of John Israel?

A    Yes.

Q    And was there anyone else on the military intelligence side that you were allowed to interview?

A    No, not that I recall.

Q    And you didn't interview Captain Carolyn Wood, who was the officer in charge of the interrogation --

A    No, she was not available.

Q    Where was she?

A    I have no idea.

Q    Did you ask to interview her?

A    Yeah, I believe so.  I mean, this is 20 years ago.

Q    Sure, I understand.  That's a fair point.

     Was the request denied?

A    We wanted to include anyone and anybody that had anything to do with Abu Ghraib detention facility.

          MR. O'CONNOR:  Can we pull up Plaintiffs' Exhibit 137 and go to page 12.

Taguba - Cross-Examination by Mr. O'Connor                    85

          THE COURT:  That's already in, I believe.

          MR. O'CONNOR:  It's already in evidence, Your

Honor.

BY MR. O'CONNOR:

Q     And so in your report, you indicate that your

investigative team began in-depth review of all

available documents regarding the 800th MP Brigade?

A     Yes.

Q     You were not allowed to access any documents from

the Military Intelligence Brigade; were you?

A     Not that I recall.

Q     In fact, you wanted to see interrogation plans

from the Military Intelligence Brigade, but they

weren't provided to you, right?

A     Yes, they were not provided because I was not

investigating them.

Q     Right.  Now, in addition to the pictures and the

CID statements, your investigation team actually

interviewed a number of other soldiers and civilians,

right?

A     Correct.

Q     Did anyone that you interviewed as part of your

investigation testify that they personally saw abuse of

detainees at Abu Ghraib prison?

A     Well, the testimonies from the MP guards told me,

yes, they saw them.

Q    So you personally interviewed MPs who told you they saw abuse at Abu Ghraib prison?

A    They implicated Stefanowicz.

Q    Okay.  Do you remember having your deposition taken in this case in 2018?

A    You were the one that deposed me; weren't you?

Q    I believe it was at the U.S. Attorney's Office here --

A    Yes.

Q    -- in 2018.

Can you look in your binders that I have given you?

THE COURT:  Volume 1.

BY MR. O'CONNOR:

Q    It's in Volume 1.  It says deposition.

A    Okay.  Deposition, okay.

THE COURT:  Right at the front of Volume 1.

What page, Mr. O'Connor?

BY MR. O'CONNOR:

Q    General, I'm going to ask you to turn to page 81.

A    What page?

Q    81.

A    81.

Q    And at line 6, you were asked if you interviewed

Taguba - Cross-Examination by Mr. O'Connor                    87

anyone who testified with a person who saw abuse at Abu Ghraib, and your answer was, "None that I remember," right?

Are you there?  I'm sorry.  I thought you were there.  Page 81, lines 6 to --

A     Okay.  Again, it's 2024.  And I do remember that three or four MPs had basically collaborated that they were given instructions by Steven Stefanowicz.

Q     And these were MPs that you personally interviewed?

A     These are the ones I interviewed.

Q     Do you remember their names?

A     No.  Twenty years ago, right?

Q     It was 20 years ago.

With respect to military intelligence operations, wasn't it your purpose to provide some references so another investigating officer could be appointed to investigate military intelligence operations?

A     Could you phrase that again, please?

Q     Sure.  With respect to MI operations, wasn't it your purpose to provide some references so another officer appointed to investigate the military intelligence operations could proceed from that?

A     If you -- if you refer to General Fay --

Q     Yes.

A     I don't remember because we were still conducting our investigation when he showed up.  So we -- actually, I conferred with him on the course of my investigation, on what I was trying to do, what I was doing, and what his mission was, to investigate it too.

Q     During your investigation, you wanted to gain more information about the persons working with the MI Brigade so that you could recommend they be investigated by the MI investigator, right?

A     Right.  Now George Fay, just to clarify, Mr. O'Connor, was subsequently appointed based on our recommendation to General Sanchez and General McKiernan to hold an investigation team --

       (Reporter clarification.)

A     The investigation of 205 MI Brigade based on the findings that we uncovered.

Q     All right.  And that's exactly the way it's supposed to work, right?

A     Correct.

Q     You investigated the MP Brigade.  You saw some things of concern with respect to military intelligence, right?

A     Yes.

Q     And you -- with the limited access you had, you put in your report what you had learned so that the MI

Taguba - Cross-Examination by Mr. O'Connor                89

Brigade could be investigated?

A    Detention operations include just about everybody. The two primary organizations are MP and MI.  Those are the two major ones.  Then you have engineers associated with that because you are establishing your detention operations in theater, not just because you're just capturing enemy people and putting them there. Interrogation is going to be associated with that. That's the reason why -- that was the two units that was picked by General Sanchez, and their supervisor was a two-star general.

Q    And didn't you testify in 2018 that your purpose with respect to military intelligence was to merely pass on the information that could be credible, that they should look into the interrogation site regarding Abu Ghraib in totality?

        MR. FARIDI:  Objection, Your Honor.  Improper use of prior statement.

        THE COURT:  Well, more than that.  I think this is not getting very far.  So let's move this along, Mr. O'Connor.

        And I think it's about time for our afternoon break anyway.  So, folks, we'll be in recess until 4:30.

        (Recess from 4:12 p.m. until 4:30 p.m.)

Taguba - Cross-Examination by Mr. O'Connor                    90

        (The jury is not present.)

                THE COURT:  We need to move this along.  Just
ask questions that need to be asked.

                Let's bring the jury in.

                THE COURT SECURITY OFFICER:  Yes, Judge.

        (The jury enters at 4:31 p.m.)

                THE COURT:  Go ahead.

                MR. O'CONNOR:  Thank you, Your Honor.

BY MR. O'CONNOR:

Q    General Taguba, in your report, you found reason
to suspect four people on the military intelligence
side of the house of involvement in detainee abuse,
correct?

A    Yes.

Q    And those were the exact same four military
intelligence personnel that you were allowed to
interview?

A    Yes.

Q    And that was Colonel Pappas, Lieutenant Colonel
Jordan, Steve Stefanowicz, and John Israel?

A    Correct.

Q    And you weren't asserting that they were
responsible for every single act of detainee abuse that
occurred at Abu Ghraib prison?

A    They didn't admit to anything under oath, no.  I

    Rhonda  F.  Montgomery   OCR-USDC/EDVA  (703)  299-4599

Taguba - Cross-Examination by Mr. O'Connor                91

asked them -- Colonel Pappas, for example, if he had made any type of provisions -- different provisions in the interrogation operations.

Q    Let's talk about Mr. Stefanowicz.  Your investigation did not turn up any evidence that he had given MPs instructions about the treatment of detainees who were not assigned to him, right?

A    Because he denied everything.

Q    I'm just trying -- your investigation didn't turn up any contrary evidence --

A    We got the impression that he was complicit based on the testimony and on the interviews of the few soldiers that implicated him.

Q    But the information you received all related to the treatment of detainees who were assigned to Mr. Stefanowicz for interrogations, correct?

A    Regardless, they mentioned his name as the one that was giving them orders to set the conditions for interrogation.

Q    Sir, respectfully, could you answer my question.  Your investigation only turned up, with respect to Mr. Stefanowicz, allegations that he gave directions to MPs --

A    Yes.

Q    -- about detainees that were assigned to him?

Taguba - Cross-Examination by Mr. O'Connor                    92

A     Yes.

Q     Thank you.

      And the instances where you did turn up allegations of Mr. Stefanowicz giving instructions to MPs, those were cases of him being involved with either forced nudity or use of dogs, right?

A     They did not elaborate on that.

Q     But the allegations that you received from any source about Mr. Stefanowicz, they were limited to improper nudity and use of dogs, right?

A     That was the limitation that was given by general counsel because I could not continue with interviewing them.

Q     Sure, I understand.  I'm only asking about what you were able to uncover --

A     Yes.

Q     -- on the limitation that you had.

A     Right.

Q     And it was forced nudity and abuse of dogs --

A     All of the above, yes.

Q     -- for detainees assigned to Mr. Stefanowicz?

A     Yes.

Q     Do you know -- please answer this yes or no because of state secrets concerns.  Do you know what detainees were assigned to Mr. Stefanowicz?

Taguba - Cross-Examination by Mr. O'Connor                93

A     No.  No.

Q     Would it surprise you that he was assigned to only five detainees to interrogate?

A     I don't know.

Q     Please answer this yes or no because of state secrets issues.

A     Okay.

Q     Do you know who was assigned to interrogate any of the plaintiffs in this case?

A     No.

Q     Do you know if they were ever interrogated?

A     No.

          MR. O'CONNOR:  Can we pull up Plaintiffs' Exhibit 137 and go to page 18, please.

BY MR. O'CONNOR:

Q     Plaintiff asked you about this page of your report where you found a statement by Asad Hamza Hanfosh, who is one of the plaintiffs here, credible.

A     Right.

          MR. O'CONNOR:  Now, can we please bring up Plaintiffs' Exhibit 20.

BY MR. O'CONNOR:

Q     And this is the statement that he gave in January of 2004?

          THE COURT:  Is there any objection to 20

Taguba - Cross-Examination by Mr. O'Connor                    94

going in?

MR. O'CONNOR:  It's already in, Your Honor.

THE COURT:  20 is already in?

MR. O'CONNOR:  Yes, ma'am.

THE COURT:  Okay.

THE WITNESS:  I might have read it, but I don't recall all of it.

BY MR. O'CONNOR:

Q    Sure.  That's fair.  It's been 20 years.  All I'm getting at is the statement he gave in connection with the CID investigation is the one that you found credible?

A    Yes.

Q    Thank you.

And going back to the four military intelligence personnel that you made findings relating to, Colonel Pappas, he was never court-martialed or charged with a crime relating to detainee abuse, correct?

A    That I don't know.

Q    You're not aware of it?

A    No.

Q    And Lieutenant Colonel Jordan, he was tried by a court-martial, but he was found not guilty of all the charges relating to detainee abuse?

A    Unbelievably, yes.

Taguba - Cross-Examination by Mr. O'Connor                    95

Q     Mr. Stefanowicz was never charged with a crime?

A     That I don't know.

Q     You're not aware of any?

A     No.

Q     You had recommended that he have his security clearance revoked?

A     I don't recall.

Q     Okay.  Do you know if he ever had his security clearance revoked?

A     No.

Q     John Israel, the Titan interpreter, he was never charged with a crime; was he?

A     No.

Q     And he was, in fact, exonerated in his favor, right?

A     That I don't know.

Q     Did you -- well, do you view yourself as an expert in federal procurement law?

A     I'm not an expert.  I'm aware of it.

Q     Okay.  And you're aware of the Federal Acquisition Regulations?

A     Not entirely.

Q     Well, none of us are entirely.  That's a fair point.

      You do have an understanding that inherent

Taguba - Cross-Examination by Mr. O'Connor                96

governmental functions cannot be delegated by the government to a contractor?

A    That I don't know.

Q    Okay.  Do you know if in 2003 control of interrogation operations was by regulation an inherent governmental function?

A    That's a surprise to me.  I don't know.

Q    Okay.  At an earlier stage of this case, did you sign on to a friend-of-the-court brief in favor of the plaintiffs and against CACI?

A    No.

Q    Okay.  I'm going to ask you to take a look in your binder.

        THE COURT:  Which volume?

        MR. O'CONNOR:  It should be Binder 2.  It's the *amicus* brief.

        THE COURT:  All right.

        MR. O'CONNOR:  I'm sorry, Binder 1, and it says *amicus* brief.

        THE WITNESS:  What page?

BY MR. O'CONNOR:

Q    You can turn to page 6.

        THE COURT:  I'm sorry.  What docket number?  What number?

        MR. O'CONNOR:  It's not a docket number in

Taguba - Cross-Examination by Mr. O'Connor                        97

this court, Your Honor.

THE COURT:  What exhibit number?

MR. O'CONNOR:  It's marked as *amicus* brief in Binder 1.

THE COURT:  It's the very first item.  Okay.

MR. O'CONNOR:  That's right.

THE COURT:  Got it.

BY MR. O'CONNOR:

Q     If you go to page 6, you signed on to a friend-of-the-court brief in favor of the plaintiffs and against CACI?

A     Page 6 you said?

Q     Page 6, yes.

A     Yep.

Q     Okay.  Let's pull up Plaintiffs' Exhibit 227, which has already been admitted, and let's go to page 21.

A     21.

Q     You testified about this Army regulation on Contractors Accompanying the Force.  Am I right to understand that you're not familiar with the concept of inherent government function?

A     No, I've never seen it.

Q     Okay.  Are you familiar with Vice Admiral Church's findings with respect to whether the military was

Taguba - Cross-Examination by Mr. O'Connor                98

allowed to control CACI interrogators?

A    I have no knowledge, nor have I read his report.

Q    Okay.  And the -- well, you've never read his report?

A    No.

Q    He in some ways commented on your report, but you never read it?

A    There were 20 other reports that commented on my report that I did not read.

Q    Okay, fair enough.  And you testified earlier about a contracting officer and the duties of a contracting officer.  You understand the contracting officer representative in this case was a Lieutenant Colonel Brady, who was an Army colonel serving in Iraq?

A    I've never met him.

Q    You're aware that the COR was an Army colonel, right?

A    No.

Q    You're just not aware of who the COR was?

A    It could be -- it could be an officer.  I did not inquire.

            MR. O'CONNOR:  Okay.  Thank you.

            THE COURT:  Is that it?

            MR. O'CONNOR:  Yes.  Yes, Your Honor.

            THE COURT:  Any redirect?

Taguba - Redirect Examination by Mr. Faridi                99

           MR. FARIDI:  Very brief, Your Honor.

                  REDIRECT EXAMINATION

BY MR. FARIDI:

Q    General Taguba, you were asked questions by
Mr. O'Connor about whether any CACI employees were
depicted in the 500 or so pictures of detainee abuse
that you saw.  Do you recall that question?

A    Yes.

Q    I think your answer was you didn't see any CACI
employees in there.  But, General, can you just remind
the jury as to the role that CACI played in the
detainee abuse at Abu Ghraib?

           THE COURT:  I think that's not appropriate
redirect.

BY MR. FARIDI:

Q    Okay.  You were asked a couple of questions about
whether the instructions that Mr. Stefanowicz may have
given with respect to abuse were limited to the
detainees that he interrogated.  Do you recall that
question?

A    He did not specify the detainees that he was
assigned to.  He just specified generally to set the
conditions for me -- for him to have a successful
interrogation.  I did not inquire about who they were.

Q    Okay.  And, General, you were asked a question

Taguba - Recross-Examination by Mr. O'Connor          100

about whether you filed an *amicus* brief in this case.
Do you recall that question?

A     Yes.

Q     Why did you file an *amicus* brief?

A     I don't recall.  Depositions were depositions.  I
thought I was doing something right, and it's done.

          MR. FARIDI:  Thank you.

          No further questions.

          MR. O'CONNOR:  Very brief recross, Your
Honor.

          THE COURT:  There were three questions asked.
So it better be very brief.

          MR. O'CONNOR:  It's going to be very brief,
Your Honor.

                    RECROSS-EXAMINATION

BY MR. O'CONNOR:

Q     If you could, turn to your deposition from 2018.

          MR. FARIDI:  Your Honor, for what purpose?
Hearsay.

          THE COURT:  Well, wait a minute.  What of the
three questions that were asked is this relevant to?

          MR. O'CONNOR:  This relates to the question
he was asked about whether Mr. Stefanowicz had --
whether evidence had been turned up that
Mr. Stefanowicz had given instructions relating to

Taguba - Recross-Examination by Mr. O'Connor          101

detainees he was not assigned to.

THE COURT:  I don't think -- I don't think you wanted to open that door.  I thought it was quite clear.

BY MR. O'CONNOR:

Q    You testified about that issue back in 2018, right?

A    I don't recall.

Q    Okay.  Can you turn to page 93?

A    Okay.

Q    Just let me know when you're there.

THE COURT:  Is this question set at line 17?

MR. O'CONNOR:  Yes, Your Honor.

THE COURT:  It absolutely doesn't add anything to what was already said.  I'm sustaining the objection.

MR. O'CONNOR:  Thank you, Your Honor.  No questions.

THE COURT:  All right.  Does anyone anticipate calling the general again during the course of the trial?

MR. FARIDI:  We may call him as a rebuttal witness, Your Honor, and we've informed the government.

THE COURT:  All right.  General, I can't release you.  You can go home today.  I don't recall

Taguba - Recross-Examination by Mr. O'Connor          102

where you live.  I doubt we would be getting to a rebuttal case this week.

THE WITNESS:  Okay.

THE COURT:  But you will need to stay in contact so that if you are needed, that you're back here in time.

While you're awaiting the recall, you are not to discuss your testimony with any witness who has not yet testified.

All right.  Thank you for your service and for your testimony.

THE WITNESS:  Thank you.

(The witness stands aside.)

THE COURT:  All right.  Call your next witness.

MR. FARIDI:  All right.  Plaintiffs call Ivan Frederick, the deposition.  Mr. Frederick was a staff sergeant and part of the military police at Abu Ghraib.

THE COURT:  You're out of order.  I thought we had another live witness.

MR. FARIDI:  Yes.  We have released him, Your Honor.

THE COURT:  You've released him?

MR. FARIDI:  Yes.

THE COURT:  I'm looking at Mr. O'Connor's

103

face.  I think that's a surprise.

MR. O'CONNOR:  No.  They released him, as I understand it, for today.

MR. FARIDI:  And I don't think we're going to call him again tomorrow, but I just need to confer with one of my colleagues who is not here right now.

THE COURT:  All right.  Let's keep this moving then.  So we're going to be playing the video of Ivan Frederick.

MR. FARIDI:  And the video, Your Honor, is 105 minutes long.  With the video, we're going to be introducing into evidence a number of exhibits.  I'll give you the --

THE COURT:  Do you have a book?

MR. FARIDI:  Yeah, there is a book.

It's PTX5; PTX11; PTX16; PTX17; PTX19; PTX76; PTX161 but only Z1, Z2, Z3, Z4, Z5, Z6, D1, D2, and D38; and lastly, PTX 206 but only pages 2, 10, 13, and 14.

THE COURT:  Are there any objections to any of those exhibits?

MR. O'CONNOR:  None that we didn't make at the deposition, Your Honor.

THE COURT:  All right.  All of those exhibits -- just for the record, Plaintiffs'

Frederick - Video                                                    104

Exhibits 5; 11; 16; 17; 19; 76; 161 but just pages 21 through 26, correct, Counsel?

MR. FARIDI:  It's actually, Your Honor, photographs Z1 through Z6.

THE COURT:  I'm sorry, Z1 through Z6.

Then there's also D1, 2, 3, and 8; is that right?  I'll do this very quickly.

MR. FARIDI:  D1, 2, and 38.

THE COURT:  D1, D2, and D38.

Then there's Exhibit 206, only 2, 10, 13, and 14.

MR. FARIDI:  Yes, Your Honor.

THE COURT:  All right.  Let's go.

IVAN FREDERICK, PLAINTIFFS' WITNESS

(Video played.)

THE COURT:  Let's stop it here tonight.

I think the jury has had a long day.

How much longer is this going to run?  It should be almost over.

MR. FARIDI:  I think there's about ten minutes of direct examination left and some cross-examination by Mr. O'Connor.

THE COURT:  Is the remaining plaintiff going to be tomorrow morning?

MR. FARIDI:  Yes.

105

THE COURT:  All right.  So, again, we're going to have a little bit of a break in the flow of things.  We'll start tomorrow morning at 9:30 with the last of our plaintiffs.  He will also be testifying from Iraq; is that correct?

MR. MOLSTER:  Tomorrow is Friday?

THE COURT:  Tomorrow is Friday.

MR. MOLSTER:  Yes.  We'll start at 9:30 or 10:00?

THE COURT:  9:30.  I finished my docket, so this case can go forward.

So, ladies and gentlemen, it is Halloween evening.  So be very careful driving home because the children will be out.  It's a nice warm day.

Thank you again for your attention.  Please continue to follow my instructions about not discussing anything about this case at home.  Don't discuss it with anyone.

Get a good night's sleep.  Don't eat too much candy.  If you want to bring some so that you get some sugar in the jury room, that's okay.

We'll see you back here promptly at 9:30.

We're going to stay in session.  We have a few housekeeping matters to take care of.

THE COURT SECURITY OFFICER:  Rise for the

106

jury.

        (The jury exits at 5:59 p.m.)

                THE COURT:  As is our practice, we are going to read into the record those exhibits that we believe were admitted into evidence today.  If there's anything that you think we've left out, this is the time to correct the record.  And anything that you think should not be in, this is the time to correct the record.

                THE COURTROOM DEPUTY:  PTX206C; PTX161D; PTX161C; PTX206E; PTX206B; PTX32; PTX161B; PTX206A; DX30, page 5 and pages 19 to 23; PTX20; DX11, page 3, paragraphs 5 and 7 and page 27; DX16; PTX51, page 4; PTX221; PTX42; PTX216 -- that one needs to be redacted -- PTX159; PTX137; PTX207; PTX227; PTX5; PTX11; PTX16; PTX17; PTX19; PTX76; PTX161, Z1 through Z6, D1, D2, D38; PTX206; 210; 213; and 214.

                THE COURT:  That's everything, correct?

                THE COURTROOM DEPUTY:  Were those last three PTXs because I didn't -- the 210, 213 and 214?

                THE COURT:  Is it 210, 13, and 14?  There were four pages in 206, right, 210, 213, and 214?

                MR. FARIDI:  Otherwise it's accurate, Your Honor.

                THE COURT:  I'm sorry?

                MR. FARIDI:  It's accurate.

107

THE COURT:  CACI agrees?

MR. O'CONNOR:  Yes, Your Honor.  We think that's right.

THE COURT:  Then we're all set.

All right.  So tomorrow morning at 9:30.

And just so you know, I have no court tomorrow, no court Monday.  So you can leave everything as is.  We're not in session Tuesday, but I may have some criminal matters that afternoon.  So you may have to clean them Monday night, but we'll take care of it then.

All right.  Recess for the evening.

-----------------------------------
Time:  6:03 p.m.

I certify that the foregoing is a true and accurate transcription of my stenographic notes.

_____
/s/
Rhonda F. Montgomery, CCR, RPR